IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of ORLY GENGER to Remove Dalia Genger as Trustee of the Orly Genger 1993 Trust Established on Dec. 13, 1993 by Arie Genger, grantor. | S.D.N.Y. Case No. 19-cv-9319 |
| Orly Genger, beneficiary of The Orly Genger 1993 Trust, <br><br> Petitioner, <br><br> v. <br><br> Dalia Genger, as trustee of The Orly Genger 1993 Trust, and The Sagi Genger 1993 Trust, <br><br> Respondents. | N.Y. Cnty. Surrogate's Court File No.:  2008-0017 |

## NOTICE OF REMOVAL

TO THE HONORABLE COURT:

Ron Satija, the Chapter 7 Trustee ("Bankruptcy Trustee") for the bankruptcy estate of petitioner Orly Genger ("Orly"), by and through his undersigned counsel, on behalf of the petitioner, hereby files this Notice of Removal pursuant to 28 U.S.C. § 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure in order to remove to this Court the action pending in the New York County Surrogate's Court, and respectfully states as follows:

1.     On July 12, 2019, Orly filed a voluntary petition for bankruptcy pursuant to Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Western District of Texas, Austin Division, under Case No. 19-10926-TMD (the "Bankruptcy Case").  The Bankruptcy Case is currently pending, and Ron Satija is the court-appointed Bankruptcy Trustee.

2.      Orly commenced the underlying action against Dalia Genger ("Dalia") in the New

York County Surrogate's Court more than ten years ago.  The operative pleadings in the case

include (i) the Third Amended Verified Petition for Removal of Dalia Genger as Trustee, dated

October 15, 2012 (the "Removal Petition"), and (ii) the Petition for a Compulsory Accounting

and Related Relief Pursuant to Surrogate's Court Procedure Act 2205, dated October 10, 2012 as

well as Dalia's Accounting and Petition for Judicial Settlement of Accounting, dated May 9,

2013 (the "Accounting").  Through these matters, Orly seeks, *inter alia*, the removal of Dalia

Genger as trustee of the Orly Genger 1993 Trust, the appointment of a successor trustee who is

not conflicted with Orly, as well as damages from Dalia as a result of Dalia's breaches of

fiduciary duty during her tenure as trustee.[1]

3.      Dalia moved to dismiss the case against her on or about November 19, 2012, and

her motion to dismiss was denied by the New York Surrogate's Court on or about June 21,

2017.[2]  Thereafter, Dalia filed an answer and purported cross-claims against Orly.  Orly filed a

motion to dismiss these purported cross-claims on or about September 8, 2017, and this motion

has been *sub judice* before the Surrogate's Court since that time.

4.      Now that Orly has filed for bankruptcy protection, Orly's claims against Dalia

belong to Orly's bankruptcy estate.  On this basis the Bankruptcy Trustee seeks to remove the

claims in the Surrogate's Court action to the bankruptcy court by way of the instant removal

proceeding.  Once the action is removed, the Bankruptcy Trustee intends to promptly file a

---

[1]  As of June 2019, Dalia claims to have appointed Michael Oldner, an individual unknown to Orly who is apparently located in Arkansas, to serve as the "successor trustee" of the Orly Genger 1993 Trust.  This appointment was made during the pendency of the removal proceedings against Dalia and is accordingly invalid.  Therefore, the relief Orly seeks in the Surrogate's Court against Dalia applies with equal force to the purported successor trustee.

[2]  At the same time, the court also denied the motion to dismiss filed by the Sagi Genger 1993 Trust.

motion to transfer the case to the Western District of Texas, where the Bankruptcy Case is
pending.

5.    The Surrogate's Court action is a civil action (other than a proceeding before the
United States Tax Court or a civil action by a governmental unit to enforce its police or
regulatory power) of which this Court has jurisdiction under the provisions of 28 U.S.C.
§ 1334(b).

6.    Upon removal, the action is a core proceeding under 28 U.S.C. § 157(b)(2),
including without limitation subsections (A), (B), (C), (E) and (O).  Alternatively, the matter is
related to the Bankruptcy Case, and the Federal Court should retain jurisdiction because the
matter cannot be timely adjudicated in the New York Surrogate's Court.  The Surrogate's Court
case has been pending for *more than a decade* without the adjudication of Orly's claims.

7.    This notice of removal is timely because the underlying Surrogate's Court action
against Dalia was initiated well before the commencement of the Bankruptcy Case, and this
notice is being filed within ninety days after the order of relief in the Bankruptcy Case.  Fed. R.
Bankr. P. 9027(a)(2).

8.    Pursuant to Rule 9027 of the Federal Rules of Bankruptcy Procedure, the
Bankruptcy Trustee is causing a copy of this Notice to be filed with the Clerk in the Surrogate's
Court action and serving copies of this Notice upon Dalia Genger's attorney as well as all other
counsel of record in the Surrogate's Court proceeding, including the Guardian Ad Litem
appointed by the Surrogate's Court.  The service list appended hereto contains a list of all
counsel to the removed proceeding.

9.    Additionally, a complete copy of contents of the Surrogate's Court's file for this
proceeding is attached hereto, as Exhibits 1 through 113.

WHEREFORE, the Bankruptcy Trustee prays that the Court and parties take notice that the New York Surrogate's Court action has been removed to this Court, and that the Court grant the moving parties such other and further relief to which they may be justly entitled.

Dated: New York, New York
      October 8, 2019

                      KASOWITZ BENSON TORRES LLP

                      /s/ Michael Paul Bowen
                      By:  Michael Paul Bowen (mbowen@kasowitz.com)
                      Andrew R. Kurland (akurland@kasowitz.com)
                      1633 Broadway
                      New York, NY 10019
                      Tel. (212) 506-1700
                      Fax (212) 506-1800

                      *Attorneys for Ron Satija, Bankruptcy Trustee*

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 8, 2019, the foregoing document was served via FedEx (without exhibits) on the parties to the New York Surrogate's Court action, as indicated below. They have been informed that exhibits are available by contacting the undersigned counsel.

Judith Bachman, Esq.
The Bachman Law Firm
365 S. Main Street, 2nd Floor
New City, NY 10956

*Counsel for Dalia Genger*

Spencer I. Schneider, Esq.
39 Broadway, 32nd Floor
New York, NY 10006

*Counsel for Michael Oldner*

John Dellaportas, Esq.
EMMET, MARVIN & MARTIN LLP
120 Broadway, 32nd Floor
New York, NY 10271

*Counsel for the Sagi Genger 1993 Trust*

Steven Riker, Esq.
Law Office of Steven Riker
One Grand Central Place, 46th Floor
New York, NY 10165

*Guardian Ad Litem*

KASOWITZ BENSON TORRES LLP

Andrew R. Kurland, Esq.

At the Surrogate's Court held in and for the County
of New York, at the Courthouse, 31 Chambers
Street, New York, New York on the 23rd day of
June 2009

HON. KRISTIN BOOTH GLEN
PRESENT: HON. SURROGATE

Surrogate

| In the Matter of the Application of | File No.: 0017/2008 |
| --- | --- |
| ORLY GENGER, as a person interested, for the removal of DALIA GENGER as Trustee of the Orly Genger 1993 Trust pursuant to SCPA §711 (11) | **ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINTS** |

On reading and filing the annexed Verified Petition of Petitioner, ORLY GENGER, and

the exhibits, verified on the 22nd day of June, 2009, and the memorandum of law in support of

Petitioner's Verified Petition dated June 22, 2009,

LET the Respondent, DALIA GENGER, the sole fiduciary of the Orly Genger 1993

Trust, show cause before Surrogate **TROY K. WEBBER** at the Surrogate's Court, 31 Chambers

Street, New York, New York, on the 1st day of July 2009 at 10:00 o'clock in the forenoon of that

Room 509

day or as soon thereafter as counsel may be heard why an order should not be entered:

(a)     Enjoining and restraining Respondent, her agents and all other persons

acting on her behalf from withdrawing, selling disposing, transferring, assigning, removing,

pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly

Trust's 19.43% interest in Trans-Resources, Inc., ("TRI"), a closely held corporation, founded by

Arie Genger, Petitioner's father and Respondent's former husband of Respondent and any other

assets which may be remaining in the Orly Trust;

NYO_XFER\137033\\1

(b)    Removing Respondent as Trustee of the Orly Trust for breaching her

fiduciary duties, wasting and dissipating the assets of the Orly Trust and imprudently managing

and injuring the property committed to her charge;

(c)    Surcharging Respondent in the amount of the loss of the value of Orly's

interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)    Appointing Michael D. Grohman, Esq. as successor trustee;

(e)    Waiving any requirement that Petitioner post an undertaking; and

(f)    Granting Petitioner such further relief deemed necessary or proper.

ORDERED that, during the pendency of this proceeding, Respondent, her agents and all

other persons acting on her behalf are temporarily restrained from withdrawing, selling,

disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering,

liening, hypothecating or secreting the Orly Trust's 19.43% interest in TRI and other assets

remaining in the Orly Trust; and it is further

ORDERED that service of a copy of this Order and the papers upon which it is based

shall be served on Respondent by personal service at either her residence, located at 200 East

65th Street, Apt. 32W, New York, New York 10021, or any other address at which she can be

located, on or before June 24, 2009.

ENTER:

_____

Surrogate    Surrogate

At the Surrogate's Court held in and for the County
of New York, at the Courthouse, 31 Chambers
Street, New York, New York on the _1_ day of
~~June~~ 2009
July

New York County Surrogate's Court
DATA ENTRY DEPT.
Date: July 1, 2009

PRESENT: HON. _Troy K. Webber_
Surrogate

---

In the Matter of the Application of

ORLY GENGER, as a person interested,
for the removal of DALIA GENGER
as Trustee of the Orly Genger 1993 Trust
pursuant to SCPA §711 (11)

---

File No.: 0017/2008

**ORDER TO SHOW CAUSE
WITH TEMPORARY
RESTRAINTS**

On reading and filing the annexed Verified Petition of Petitioner, ORLY GENGER, and

the exhibits, verified on the 22nd day of June, 2009, and the memorandum of law in support of

Petitioner's Verified Petition dated June 22, 2009,

LET the Respondent, DALIA GENGER, the sole fiduciary of the Orly Genger 1993

Trust, show cause before Surrogate _Troy K. Webber_ at the Surrogate's Court, ~~31 Chambers~~ sitting at 60 Central

~~Street,~~ room 300 New York, New York, on the 5th day of ~~June~~ August 2009 at 10:00 o'clock in the forenoon of that

day or as soon thereafter as counsel may be heard why an order should not be entered:

    (a)    Enjoining and restraining Respondent, her agents and all other persons

acting on her behalf from withdrawing, selling disposing, transferring, assigning, removing,

pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly

Trust's 19.43% interest in Trans-Resources, Inc., ("TRI"), a closely held corporation, founded by

Arie Genger, Petitioner's father and Respondent's former husband of Respondent and any other

assets which may be remaining in the Orly Trust;

(b)    Removing Respondent as Trustee of the Orly Trust for breaching her

fiduciary duties, wasting and dissipating the assets of the Orly Trust and imprudently managing

and injuring the property committed to her charge;

(c)    Surcharging Respondent in the amount of the loss of the value of Orly's

interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)    Appointing Michael D. Grohman, Esq. as successor trustee;

(e)    Waiving any requirement that Petitioner post an undertaking; and

(f)    Granting Petitioner such further relief deemed necessary or proper.

ORDERED that, during the pendency of this proceeding, Respondent, ~~her agents and all~~ *and/or her counsel* *are required to give notice by overnight mail to petitioners counsel of any 1) offer* ~~other persons acting on her behalf are temporarily restrained from withdrawing, selling,~~ *to purchase the Orly Trust's 19.3% interest in TRI within 10 days of receiving* ~~disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering,~~ *such offer and 2) act by Respondent, her agents and all other persons* ~~liening, hypothecating or secreting the Orly Trust's 19.43% interest in TRI and other assets~~ *acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell or* ~~remaining in the Orly Trust; and it is further~~ *otherwise after the Orly Trust's interest in TRI at least 10 days prior to such act* *and it is further* ORDERED that service of a copy of this Order and the papers upon which it is based

shall be served on Respondent by personal service at either her residence, located at 200 East

65th Street, Apt. 32W, New York, New York 10021, or any other address at which she can be

located, on or before ~~June~~ *July 7*, 2009; and it is further

   *ORDERED, that any responsive papers shall be filed by* *July 29, 2009.*

~~ENTER:~~

Surrogate

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
ORLY GENGER 1993 Trust Pursuant to
SCPA § 711 (11)

**AFFIDAVIT IN OPPOSITION TO
RESPONDENT'S MOTION TO
DISMISS**

**FILE NO.:  0017/2008**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

STATE OF NEW YORK      )
                                 ) ss.:
COUNTY OF                )

ORLY GENGER, being duly sworn deposes and says:

1.    I am Petitioner in the above-captioned matter and familiar with all the facts recited herein.  I submit this affidavit in opposition to Respondent's Cross-Motion to Dismiss my Verified Petition dated June 22, 2009 (the "Petition") (i) seeking removal of Respondent as Trustee of the Orly Genger 1993 Trust (the "Orly Trust"); (ii) surcharging Respondent in the amount of the loss of the value of my interest in TPR Investment Associates Inc. ("TPR"), a closely held family-owned operation and (iii) awarding me costs and attorneys' fees. A copy of the Petition is annexed as Exhibit A.  Respondent, prior to filing a Verified Answer, is seeking dismissal of the Petition claiming I allegedly failed to join the Sagi Genger 1993 Trust (the "Sagi Trust") as an interested party and because I allegedly failed to state a cause of action upon which relief can be granted.  My lawyers have advised me that Respondent's papers are insufficient for the Court to grant dismissal.

2.    Respondent's motion is nothing more than a transparent attempt to delay discovery and ultimately the trial of this matter.  If my mother was truly concerned about my

well-being she would not be refusing to submit to the jurisdiction of the Court or deliberately delaying my ability to obtain the discovery required to try this case. My mother's lack of response to the Petition is further evidence of how desperately I need to have her removed as my Trustee. My attorneys have advised me that discovery will likely be stayed until the Surrogate rules on Respondent's motion. On July 1, 2009, a hearing was held before Surrogate Troy K. Webber. My counsel, Respondent's counsel, Robert A. Meister, Esq., and I were present, but my mother, the Respondent, did not appear—another example of Respondent spurning her responsibility as my Trustee. The Court recognized that factual issues were in dispute between the parties, that there was an immediate need for discovery and ultimately a trial of the issues presented in my Verified Petition. (A certified copy of the court transcript is annexed as Exhibit B. See, page 20, lines 19-21; page 28, lines 21-23; page 29, lines 3-7).

3.      During oral argument, Mr. Meister asserted that (a) the Orly Trust has no interest in TPR and as a result Respondent could not have breached her fiduciary duty, (b) Respondent, as Trustee, could not have prevented the diminution of the Orly Trust's interest in TPR and (c) Respondent, as Trustee had no standing to prevent the sale of the Sagi Trust's 19.43% interest in TRI to the Trump Group. Neither Mr. Meister nor Respondent (since she was not present) offered any sworn testimony or documentary evidence in response to my Petition. Because Respondent's position was in direct conflict with mine, Judge Webber set dates for responsive pleadings to be filed and a discovery schedule which required all notices to be served by August 20, 2009. (See Exhibit B page 30, lines 14-16).

4.      Respondent, in the dismissal motion, has taken the same exact position that Mr. Meister raised at the July 1st court appearance despite the fact that the Court has already opined on these issues and confirmed that discovery is necessary before any rulings and determinations

2

can be made.    Moreover, Respondent's application is supported solely by Mr. Meister's affirmation which contains facts of which he has no personal knowledge.   Only Respondent or another party with first hand knowledge of pertinent events can provide support for this motion. Because Respondent's motion fails to provide one scintilla of evidence refuting  the allegations set forth in my Verified Petition, Respondent's motion, as will be demonstrated in my Affidavit, the Affidavit of Judith E. Siegel-Baum, Esq. and the Memorandum of Law must be denied.

## DISPUTED FACTS BETWEEN THE PARTIES COMPEL
## THE DISMISSAL OF RESPONDENT'S MOTION[1]

### A.    Respondent's Claim That The Orly Trust Did Not Have An Interest In TPR Is False

5.    D & K, a family-owned limited partnership in which the Orly Trust has a 48% interest, purchased 240 shares of common stock (constituting 49% of the outstanding shares) in TPR for $10,200,000.  The purchase price of the TPR shares was satisfied as follows:  (a) the Orly Trust and the Sagi Trust each paid $600,000; (b) Respondent paid $50,000; and (c) Respondent, as general partner of D & K, executed a recourse $8,950,000 Promissory Note dated December 21, 1993 (the "Note") to satisfy the balance.  (A copy of the Note is attached to the Petition which is annexed as Exhibit A).   Therefore, as a result of D & K's purchase of TPR stock, each trust acquired a 23.52% indirect interest in TPR and Respondent acquired a 1.96% indirect interest in TPR.   Accordingly, Respondent's position is wrong and a deliberate attempt to mislead the Court.   The Orly Trust had, and still has, an indirect interest in TPR and thus Respondent, as my Trustee, has a fiduciary duty to manage the asset.

---

[1] In order to avoid repetitive submissions, the Court is respectfully referred to the pertinent procedural history and facts outlined in the Petition attached as Exhibit A.

3

NYO_XFER\1373918\2 252931.000

**B.    Respondent's Claim That The Factual Basis For The Petition Was Premised Upon Events That Occurred Prior To Respondent's Appointment As Trustee Is False**

6.      Contrary to the position taken by Respondent, the factual basis for the Petition is predicated upon documentary proof provided to my current counsel by Mr. Meister in June 2009 not upon facts set forth in my February 2008 application seeking to have my mother removed as Trustee (the "February 2008 Removal Application"). In January 2008, my mother was appointed successor Trustee of the Orly Trust and in February 2008 I filed the February 2008 Removal Application. I was, and still am, fearful that my mother will not protect my interests while serving as Trustee because of my mother's ongoing deference to my brother, Sagi, and his interests. In response to the February 2008 Removal Application, Surrogate Roth held that my motion was premature, in that my mother should be given an opportunity to act as Trustee. Instead Surrogate Roth suggested that I commence an SCPA §2201 proceeding to obtain evidence necessary to support a future application to have my mother removed.

7.      Pursuant to Surrogate Roth's suggestion, my attorneys sent Respondent a letter dated May 14, 2009 seeking production of documents related to the Orly Trust's direct and indirect interest in various assets including D & K, D & K GP, TPR and TRI. On June 1, 2009, Mr. Meister responded by informing my attorneys that the Orly Trust no longer owned any interest in TPR. I was advised that TPR purportedly foreclosed on the Note and sold the pledged shares back to TPR for $2,200,000. Mr. Meister provided my counsel with the following documents, all of which are clearly dated after the appointment of my mother as Trustee and the February 2008 Removal Application:   (a) a memo dated August 31, 2008, from Sagi, the CEO of TPR, to Sagi, the general manager of D & K, demanding repayment of the Note and threatening the sale of 240 TPR shares pledged as collateral (a copy of the memo is attached to the Petition which is annexed as Exhibit A); (b) a memo from TPR to D & K announcing the

4

time and date for the public auction of the TPR shares (a copy of the memo is attached to the Petition which is annexed as Exhibit A); and (c) a certificate of sale dated February 27, 2009 evidencing the foreclosure on the Note and the sale of the pledged shares back to TPR for $2,200,000 (a copy of the certificate of sale is attached to the Petition which is annexed as Exhibit A).

8.      The basis for my underlying Petition is that as Trustee of the Orly Trust Respondent owes me, as beneficiary of the Orly Trust, an undiluted fiduciary duty to monitor, manage, maintain and protect the Orly Trust's assets, including the Orly Trust's ownership interest in TPR from challenge or diminution in value. The lack of action by Respondent in the face of the auction is evidence that Respondent breached her fiduciary duty. In fact, to date, with the sale documents in hand, Respondent has failed to take any action. Thus, Respondent breached her fiduciary duties to me by: (a) failing to inform me of TPR's foreclosure on the Note and the sale of the pledged shares, which completely divested the Orly Trust of its 23.52% interest in TPR; (b) failing to take any action to protect or defend the Orly Trust's interest in TPR; (c) failing to apprise me of all activity concerning the Orly Trust and to ensure that I received proper notification of the default and auction; and (d) failing to take any actions to protect the Orly Trust's interest in TRI.

9.      Documentary evidence, provided to me by my mother's counsel Mr. Meister proves that a diminution of the Orly Trust's assets occurred in February 2009 while my mother was serving as Trustee.

10.     My mother, for reasons that appear to be self-dealing, will not voluntarily remove herself as Trustee, and has brought this motion to further delay discovery and trial. My mother, following her divorce from my father, ceded control the following assets which she received as

NYO_XFER\1373918\2 252931.000

part of the divorce to Sagi: her 4% interest in D & K and her 51% interest in TPR. Sagi's dual control over both TPR and D & K directly conflicts with Sagi's fiduciary duties to D & K's limited partners, which include the Orly Trust. Sagi used his dual position at D & K and TPR to engage in self-dealing in connection with the Note. This self –dealing, which was orchestrated by my mother, has damaged my trust and caused Respondent to breach her fiduciary duties. It is clear that Respondent and Sagi engaged in a scheme, using TPR and D & K to fraudulently divest D & K of its ownership interest in TPR, thereby depriving the Orly Trust of its ownership interest in TPR, to my detriment. In order to further her scheme with Sagi, it is clear to me that my mother will never voluntarily remove herself as my Trustee.

**C.**      **Respondent's Counsel, Who Has No Personal Knowledge Of Fact, Incorrectly Concluded That Respondent Had No Control Over The Sale of The Orly Trust's Interest in TPR**

11.      Despite the erroneous conclusions drawn by Mr. Meister, evidence exists which demonstrates that Respondent had knowledge, as early as August 31, 2008, during her tenure as Trustee of the Orly Trust, of Sagi's plan to foreclose on the Note. Upon learning of the actions to be taken by Sagi, Respondent should have immediately objected and taken action to prevent the declaration of default or subsequent sale. Respondent knew that the Orly Trust had a financial interest in the Note. At all relevant times, Respondent knew my address and other contact information but never notified me of the impending foreclosure and auction. As part of my parents' divorce, Respondent received a controlling block of TPR shares. On October 30, 2004, Respondent entered into a shareholder agreement with TPR concerning the future management of the company. Respondent named herself as one of two TPR board members. Sagi, using managerial control afforded to him by the TPR shareholder agreement, awarded himself the other board seat. Although Respondent has intimated that she has divested herself of her controlling interest in TPR, (although no documentary proof has been supplied) she has

6

never offered any sworn testimony or documentary proof indicating that she relinquished her seat on TPR's board of directors. Clearly, this is an issue that needs to be explored through discovery.

12.     Moreover, Respondent, like the entire Genger family, knew the Note was never intended to be enforced. In keeping with my parents' estate planning goals every member of the Genger family understood and agreed before the time of their execution that the Note would never be enforced by any of them. Consistent with this knowledge, on February 14, 2007, Respondent admitted in a sworn statement to the Court that no one was ever supposed to foreclose on the Note. (Respondent's sworn statement is attached to the Petition which is annexed as Exhibit A). Additionally, the unpaid Note was the subject of a post-judgment arbitration proceeding between Respondent and my father which took place in September 2007. Respondent, who was present at the proceedings, heard Sagi and Mr. Parnes testify that the Note should not be enforced and that Sagi, as CEO of TPR, had no intention of collecting the unpaid portion of the Note. Upon receiving notice of Sagi's motives, Respondent should have immediately taken action to preserve the sanctity of her and my father's estate planning goals or sought court guidance.

**D.      Respondent's Counsel, Who Has No Personal Knowledge of The Underlying Fact, Incorrectly Concluded That Respondent Was Not A Party To the Sagi Trusts' Sale Of TRI Stock**

13.     In paragraph 7 of Mr. Mesiter's Affirmation (which is undated), he states that because Respondent was never appointed Trustee of the Sagi Trust and the Orly Trust was not a party to the Sagi Trust's sale of TRI shares there is no basis in law for removing or surcharging Respondent. In essence, Mr. Meister is alleging that there would have been no way for Respondent to have knowledge of the Sagi Trust's sale of the TRI shares. This statement is completely disingenuous. Mr. Meister has drawn a conclusion without any factual support from

7

Respondent or any other party with first hand knowledge. Respondent must submit herself to the inquiry of this Court.

14.    What Mr. Meister fails to recognize is that my mother breached her fiduciary duties by failing to take any action to protect my interest in TRI. Immediately upon learning that the Sagi Trust sold its interest in TRI, my mother should have taken action to preserve the Orly Trust's interest in a majority block of TRI shares. My mother could have moved to reverse the sale or asserted a  position in the Delaware proceeding. By doing nothing my mother caused the diminution in value of the Orly Trust's interest in TRI because the trust now owns a minority block of TRI shares rather than a controlling block of TRI shares. My mother has taken no action because she does not want to muddy the waters with Sagi—her son, with whom she is conspiring, to strip the Orly Trust of its assets.

## CONCLUSION

15.    Respondent's motion to dismiss must be denied in its entirety because (a) the factual allegations set forth in the Petitioner establish a cause of action for Respondent's removal as my Trustee; (b) there are questions of fact which need to be clarified through discovery and answered at trial and (c) the sole basis for Respondent's application is statements made by Respondent's counsel of which he has no personal knowledge. Accordingly, Respondent has failed to properly defend her application.

WHEREFORE, based upon the allegations contained herein, Petitioner requests that Respondent's motion to dismiss be denied and this Court provide the following relief:

(a)    permanently enjoining and restraining Respondent, her agents, and all other persons acting on her behalf from withdrawing, selling, disposing, transferring, assigning,

removing, pledging, redeeming, mortgaging, encumbering, liening, hypothecating, or secreting the Orly Trust's 19.43% interest in TRI and other assets remaining in the Orly Trust;

(b)    removing Respondent as Trustee of the Orly Trust for breaching her fiduciary duties, wasting and dissipating the assets of the Orly Trust, and improvidently managing and injuring the property committed to her charge;

(c)    surcharging Respondent in the amount of the loss of the value of the Orly Trust's interest in TPR as determined by the Court and awarding Petitioner her costs and attorneys' fees;

(d)    appointing Michael D. Grohman, Esq., as successor trustee;

(e)    waiving any requirement that I post an undertaking; and

(f)    granting me any other relief it deems necessary and proper.


Dated:    New York, New York
          August 4, 2009

_____
ORLY GENGER
Petitioner



COZEN O'CONNOR

By:    _____
       Judith E. Siegel-Baum, Esq.
       Attorney for Petitioner
       250 Park Avenue
       New York, New York 10017
       212-986-1116

9

## VERIFICATION

STATE OF NEW YORK )    )
           )ss.:
COUNTY OF NEW YORK )   )

   The undersigned, the Petitioner named in the foregoing petition, being duly sworn, says: I have read the foregoing petition subscribed by me and know the contents thereof, and the same is true of my own knowledge, except as to the matters therein stated to be alleged upon information and believe, and as to those matters I believe it to be true.



_____
Signature of Petitioner

ORLY GENGER
_____
Print Name

Sworn to before me this
4th day of August, 2009.

Notary Public
Commission Expires:
(Affix Notary Stamp or Seal)

STEPHANIE LEHMAN
Notary Public, State of New York
No. 02LE6003129
Commission Expires 2-23-20 (0)

10

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| In the Matter of the Application of ORLY GENGER, as a person interested, for the removal of DALIA GENGER as Trustee of the ORLY GENGER 1993 Trust Pursuant to SCPA § 711 (11) | **ATTORNEY AFFIDAVIT IN OPPOSITION TO RESPONDENT'S MOTION TO DISMISS**<br><br>**FILE NO.:  0017/2008** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

STATE OF NEW YORK   )
                    )ss:
COUNTY OF NEW YORK  )


JUDITH E. SIEGEL-BAUM, deposes and says:

1.    I am a member of the law firm Cozen O'Connor, attorneys for Petitioner, Orly

Genger, and am admitted to practice in the state of New York.  I am familiar with the facts

recited herein and submit this Affidavit in opposition to Respondent's, Dalia Genger, motion to

dismiss the Verified Petition sworn to on June 22, 1999.  (A copy of the Petition is annexed as

Exhibit A).  Significantly, Respondent's motion is based on nothing more than a six (6) page

Notice of Motion and hearsay Affirmation of Robert A. Meister, Esq. in which conclusions are

drawn with no supporting Affidavit by Respondent or Memorandum of Law.  Orly Genger's

Affidavit, sworn to on August 4, 2009, and this Affidavit will demonstrate that Respondent's

application is fatally flawed and should be denied in its entirety.

**Procedural History**

2.      This action was commenced by Petitioner, the beneficiary of the Orly Genger 1993 Trust (the "Orly Trust"), for removal of Respondent as Trustee of the Orly Trust  because Respondent breached her fiduciary duties, wasted and dissipated assets of the Orly Trust and imprudently managed and injured property committed to her charge.

3.      On July 1, 2009, a hearing was held before Surrogate Troy K. Webber at which Petitioner, Respondent's counsel, Robert A. Meister, Esq., and I were present.  Respondent did not appear.  During oral argument, Mr. Meister inaccurately asserted, in direct contravention to the allegations set forth in the Petition, that (a) the Orly Trust has no interest in TPR and as a result Respondent could not have breached her fiduciary duty, (b) Respondent, as Trustee, could not have prevented the dimunition of the Orly Trust's interest in TPR and (c) Respondent, as Trustee, had no standing to prevent the sale of the Sagi Genger 1993 Trust's (the "Sagi Trust") 19.43% interest in TRI to the Trump Group.   Neither Mr. Meister nor Respondent (since she was not present) offered any sworn testimony or documentary evidence either supporting their allegations or in response to the Petition.

4.      The Court recognized that there were factual issues in dispute between the parties with regard to the Orly Trust's ownership interest in TPR and stated "it's something that has to be litigated...[h]owever, we're not going to litigate it now, because I don't know.  And there's nothing before me that tells me whether it is or is not."  (A certified copy of the court transcript is attached as Exhibit B.  See, page 28, lines 21-23 and page 29, lines 5-7).  The Court recognized the need for discovery:

> "Ms. Siegel-Baum:  I think we have to get my removal proceeding; I think I need some discovery done.

The Court:  Most definitely.  Most definitely.  You move for that in the order to

show cause."  (See <u>Exhibit B</u>,  page 20, lines 18-21).

Moreover, the Court recognized the need for a hearing:

"Ms. Siegel-Baum:  But the thing is I don't know if she wants a hearing; I have to

go through a hearing.

The Court:  Yes."  (See <u>Exhibit B</u>, page 21, lines 14-17).

5.     Because Petitioner's and Respondent's positions were in direct conflict, Judge

Webber set dates for responsive pleadings to be filed and a discovery schedule requiring

discovery notices to be served by August 20, 2009.  (See <u>Exhibit B</u>, page 30, lines 14-16).

However, instead of filing a Verified Answer to the Petition, Respondent filed a motion to

dismiss, but without a supporting affidavit from Respondent or anyone else with knowledge of

the facts.  The Petition seeks dismissal of the action for failure to name the Sagi Trust as a

necessary party and for failure to state a cause of action upon which relief can be granted.

However, because Respondent fails to specifically state under which sub-section of CPLR §3211

he is seeking dismissal, it is difficult to truly ascertain the exact nature of the relief set forth in

the motion.  Notwithstanding,  Respondent's claims are completely without merit because issues

exist between the parties and because Respondent has failed to support her application with first

hand knowledge of pertinent and relevant events.

## RESPONDENT'S MOTION TO DISMISS MUST BE DENIED

### A.     Under SCPA Section 711 and Section 712 the Only Indispensable Party to a Removal Proceeding is the Fiduciary

6.     Respondent is seeking dismissal of the Petition because Petitioner failed to name

the Sagi Trust, which has a contingent remainder interest in the Orly Trust, as an interested party.

Respondent cites SCPA §344, a non-existent statute, in support of his position.  In any event

there is no basis under the SCPA for dismissal on this ground. Under SCPA §711, when a Petition to revoke letters of trusteeship is made, the Order to Show Cause or Citation shall issue to the fiduciary. The Court has discretion and may or may not direct process to issue to other interested parties. SCPA §712 specifically states "…process must be issued…to the fiduciary against whom relief is sought and to such other persons as the court may direct."

7.    Petitioner, upon filing, required immediate relief and the Court scheduled a special hearing to address the urgent issues and expedite discovery. The Court in exercising discretion provided by statute, heard the matter without notice to the Trustee (David Parnes, who lives in Israel) of the Sagi Trust. Because there has already been an appearance on this matter, the Court demonstrably exercised its discretion and determined that the fiduciary is the only person interested in defending herself and notice to all persons interested in the estate is not required. The Court was correct.

8.    Furthermore, even if the Court determined that the trustee of the Sagi Trust should receive service, pursuant to CPLR 3024(c) and in accordance with CPLR §3025(a), Petitioner has an automatic right to amend a pleading once without leave of court within twenty (20) days after responsive pleading is served. The purpose of CPLR §3204(c) is to enable the moving party to remedy pleadings which have been called into question by the non-moving party. As a result, even if the Court determined service on the Trustee of the Sagi Trust is mandated, Petitioner still has time to cure without leave of Court. Because there has already been an appearance on this matter, the Court has exercised its discretion and determined that the fiduciary is the only person interested in defending herself and notice to all persons interested in the estate is not required.

**B.    The Motion Is Patently Defective And
Therefore Must Be Dismissed**

9.      The only "support" for the relief set forth in Respondent's motion to dismiss are

conclusory statements made by Respondent's attorney, Mr. Meister.  For example, Mr. Meister

draws the following factual conclusions based upon absolutely no evidence:

(i)      Respondent had no control over the Sagi Trust's sale of common stock of

TRI.  (See ¶6 of Mr. Meister's Affirmation).

(ii)     Respondent had no control over TPR's declaring a default and foreclosing

on the Note.  (See ¶6 of Mr. Meister's Affirmation).

(iii)    Respondent was not a party to the Sagi Trust's sale of TRI stock.  (See ¶6

of Mr. Meister's Affirmation).

(iv)    The Orly Trust is not a shareholder of TPR.  (See ¶8 of Mr. Meister's

Affirmation).

Mr. Meister's conclusory, third party statements cannot serve as a factual basis for the motion.

Only Respondent, or another fact witness, can testify as to what she knew, had control over or

acts she took or did not take in her capacity as fiduciary of the Orly Trust— but she didn't.  Mr.

Meister's Affirmation is nothing more than unsubstantiated and inadmissible hearsay.  Mr.

Meister's conclusory statements --which are not based on personal knowledge and information--

do not permit this Court to evaluate the merits of the case and therefore her motion must fail

because she has not filed any other pleadings in support of her application.

**C.    Because Questions of Fact Exist Respondent's
Motion to Dismiss Must Be Denied**

10.     The Petition set forth numerous facts supported by sworn testimony and

documentary proof, in favor of  Respondent's removal as Trustee.  The Petition sufficiently sets

forth a *prima facie* case for removal because Respondent's breach of duty of loyalty as a Trustee have compromised the assets of the Orly Trust. Where, as here, a cause of action has been established, Respondent's motion to dismiss must be denied.

11.    Further, this Court recognized the existence of numerous questions of law and fact which must be explored through pre-trial discovery. For this very reason Respondent's pre-answer motion must be denied so that each side is given an opportunity to do the necessary discovery. For example, in addition to the Orly Trust's ownership interest in TPR and Respondent and Sagi's conspiracy to diminish the value of the Orly Trust, this Court, as discussed in the Memorandum of Law, must determine whether (i) prior oral statements made by Respondent disavow the Note and/or (ii) writings exist which modify the Note. The only evidence before the Court at this time shows that Respondent and all Genger family members understood and agreed before signing the Note that the Note would never be enforced by her or by any other family member or trustees of the Orly Trust and Sagi Trust and that TPR would never seek to foreclose on the Note or repossess the pledged shares. In that regard, Sagi, acting through TPR, assigned the Note to his longtime friend David Parnes to carry out his charge of ensuring that the Note would not be enforced. It is Petitioner's position, which is supported by case law, that these prior statements act as evidence that the Note was never intended to be enforced. In addition, after the Note was signed, Respondent made sworn statements further confirming that all interested parties to the Note, including Arie, Sagi, Orly, TPR and D & K, had agreed that TPR would never seek to enforce the Note. Discovery from TPR, D & K, Respondent and Sagi must be obtained in order to determine whether other evidence exists which specifically disavow the Note.

12.     Unless this Court permits Petitioner to conduct discovery on these issues she will
be prejudiced and denied the right to prove a legal theory which is adequately alleged by the
facts presented in the Petition.  The Court of Appeals has opined on this issue: "[w]e accept the
facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable
inference, and determine only whether the facts as alleged fit…"  Leon v. Martinez, 84 N.Y.2d
83, 638 N.E.2d 511, 614 N.Y.S.2d 972 (1994).

WHEREFORE, based upon the allegations contained herein, Petitioner requests that
Respondent's motion to dismiss be denied and that this Court provide the following relief to
Petitioner:

(a) permanently enjoining and restraining Respondent, her agents, and all other
persons acting on her behalf from withdrawing, selling, disposing, transferring, assigning,
removing, pledging, redeeming, mortgaging, encumbering, liening, hypothecating, or secreting
the Orly Trust's 19.43% interest in TRI and other assets remaining in the Orly Trust;

(b) removing Respondent as Trustee of the Orly Trust for breaching her fiduciary
duties, wasting and dissipating the assets of the Orly Trust, and improvidently managing and
injuring the property committed to her charge;

(c)     surcharging Respondent in the amount of the loss of the value of the Orly
Trust's interest in TPR as determined by the Court and awarding Petitioner her costs and
attorneys' fees;

(d)     appointing Michael D. Grohman, Esq., as successor trustee;

(e)     waiving any requirement that I post an undertaking; and

(f)     granting me any other relief it deems necessary and proper.

Dated: New York, New York
      August 4, 2009

                                                        JUDITH E. SIEGEL-BAUM
                                                        Attorney for the Petitioner

Sworn to before me this
4th day of August, 2009.



Notary Public
Commission Expires:
(Affix Notary Stamp or Seal)

STEPHANIE LEHMAN
Notary Public, State of New York
No. 02LE6003129
Commission Expires 2-23-20⎯⎯

At the Surrogate's Court held in and for the County
of New York, at the Courthouse, 31 Chambers
Street, New York, New York on the **1** day of
~~June~~ 2009
*July*

New York County Surrogate's Court
DATA ENTRY DEPT.
Date: *July 1, 2009*

PRESENT: HON. **Troy K. Webber**
_____
Surrogate

In the Matter of the Application of

ORLY GENGER, as a person interested,
for the removal of DALIA GENGER
as Trustee of the Orly Genger 1993 Trust
pursuant to SCPA §711 (11)

File No.: 0017/2008

**ORDER TO SHOW CAUSE
WITH TEMPORARY
RESTRAINTS**

On reading and filing the annexed Verified Petition of Petitioner, ORLY GENGER, and

the exhibits, verified on the 22nd day of June, 2009, and the memorandum of law in support of

Petitioner's Verified Petition dated June 22, 2009,

LET the Respondent, DALIA GENGER, the sole fiduciary of the Orly Genger 1993

Trust, show cause before Surrogate **Troy K. Webber** at the Surrogate's Court, ~~31 Chambers~~ *Sitting at 60 Central*

~~Street~~ *Room 300*, New York, New York, on the **5** day of ~~June~~ *August* 2009 at 10:00 o'clock in the forenoon of that

day or as soon thereafter as counsel may be heard why an order should not be entered:

(a)    Enjoining and restraining Respondent, her agents and all other persons

acting on her behalf from withdrawing, selling disposing, transferring, assigning, removing,

pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly

Trust's 19.43% interest in Trans-Resources, Inc., ("TRI"), a closely held corporation, founded by

Arie Genger, Petitioner's father and Respondent's former husband of Respondent and any other

assets which may be remaining in the Orly Trust;

NYO_XFER\137033I\I

(b)   Removing Respondent as Trustee of the Orly Trust for breaching her

fiduciary duties, wasting and dissipating the assets of the Orly Trust and imprudently managing

and injuring the property committed to her charge;

(c)   Surcharging Respondent in the amount of the loss of the value of Orly's

interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)   Appointing Michael D. Grohman, Esq. as successor trustee;

(e)   Waiving any requirement that Petitioner post an undertaking; and

(f)   Granting Petitioner such further relief deemed necessary or proper.

ORDERED that, during the pendency of this proceeding, Respondent, *and/or her counsel* ~~her agents and all~~ *are required to give notice by overnight mail to petitioners counsel of any 1) offer* ~~other persons acting on her behalf are temporarily restrained from withdrawing, selling,~~ *to purchase the Orly Trust's 19.3% interest in TRI within 10 days of receiving* ~~disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering,~~ *such offer and 2) act by Respondent, her agents and all other persons* ~~liening, hypothecating or secreting the Orly Trust's 19.43% interest in TRI and other assets~~ *acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell or* ~~remaining in the Orly Trust; and it is further~~ *otherwise alter the Orly Trust's interest in TRI at least 10 days prior to such act* *and it is further* ORDERED that service of a copy of this Order and the papers upon which it is based

shall be served on Respondent by personal service at either her residence, located at 200 East

65th Street, Apt. 32W, New York, New York 10021, or any other address at which she can be

located, on or before ~~June 7~~, *July 7,* 2009; *and it is further*

*ORDERED, that any responsive papers shall be filed by*
*July 29, 2009.*

~~ENTER:~~

Surrogate

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| In the Matter of the Application of ORLY GENGER, as a person interested, for the removal of DALIA GENGER as Trustee of the ORLY GENGER 1993 Trust Pursuant to SCPA § 711 (11) | **VERIFIED PETITION FOR REMOVAL OF DALIA GENGER AS TRUSTEE AND REQUEST FOR TEMPORARY RESTRAINING ORDER** |
| | **FILE NO.: 0017/2008** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

TO THE SURROGATE'S COURT, STATE OF NEW YORK
COUNTY OF NEW YORK

Petitioner, Orly Genger ("Petitioner" or "Orly"), by her attorneys Cozen O'Connor,

respectfully alleges as her Verified Petition for Removal of Dalia Genger as Trustee:

1.      Orly, domiciled at 1965 Broadway, Apt. 22G, New York, New York 10024, is the

current beneficiary of the Orly Genger 1993 Trust dated December 13, 1993 (the "Orly Trust")

(annexed hereto as Exhibit A). Dalia Genger, residing at 200 East 65th Street, Apt. 32W, New

York, New York 10021 ("Respondent" or "Dalia"), Orly's mother, is the current sole Trustee of

the Orly Trust, and was appointed successor Trustee in January 2008.

2.      Based upon the allegations contained herein, Petitioner requests that this Court

provide the following relief:

(a)      Enjoining and restraining Respondent, her agents, and all other persons

acting on her behalf from withdrawing, selling, disposing, transferring, assigning, removing,

pledging, redeeming, mortgaging, encumbering, liening, hypothecating, or secreting the Orly

Trust's 19.43% interest in Trans-Resources, Inc. ("TRI"),[1] a closely held corporation, founded

---

[1] TRI is the parent company of several subsidiaries that provide growers with specialty fertilizer and industrial chemicals, including Haifa Chemicals Ltd., Na-Churs Alpine Solutions, Plant Products Co. Ltd., and Elgo Irrigation Co.

by Arie Genger ("Arie"), Petitioner's father and Respondent's former husband, and any other assets which may be remaining in the Orly Trust. The Orly Trust's TRI shares are in imminent danger of being sold by Respondent and her son, Orly's brother, Sagi Genger ("Sagi"), for the purpose of benefiting Sagi Genger and presumably Respondent, and depleting and denuding the value of Orly's Trust;

(b)    removing Respondent as Trustee of the Orly Trust for breaching her fiduciary duties, wasting and dissipating the assets of the Orly Trust, and imprudently managing and injuring the property committed to her charge. As will be demonstrated herein, Respondent has conspired with, and participated in the diversion of trust assets to, Sagi, who underhandedly sold without any objection from Respondent, the Orly Trust's indirect interest in TPR Investment Associates Inc. ("TPR"), a closely held family-owned corporation.

(c)    surcharging Respondent in the amount of the loss of the value of Orly's interest in TPR as determined by the Court and awarding the Petitioner costs and attorneys' fees;

(d)    appointing Michael D. Grohman, Esq., as successor trustee;

(e)    waiving any requirement that Petitioner post an undertaking; and

(f)    granting Petitioner such further relief deemed necessary or proper.

3.    To assist the Court in perceiving the severity of Respondent's conduct and the urgency of the provision of extraordinary relief, the following is an overview of the facts supporting this Petition.

## I.    **OVERVIEW**

4.    Arie and Dalia were married on July 23, 1967, in a ceremony held in Israel. In 2004, however, their marriage ended in divorce. Prior to 1993, at which time Dalia and Arie were married, Dalia and Arie formed D & K LP ("D & K"), a family-owned limited partnership

whose name was shorthand for "Dalia and Kids." At the time of its formation, Dalia, the general partner, held a 4% interest, and Orly and Sagi, the limited partners, each held a 48% interest.

5.    In December 1993, Dalia and Arie also established identical irrevocable *inter vivos* trusts for the benefit of each of their children: the Orly Trust and the Sagi Genger 1993 Trust (the "Sagi Trust"). For estate-planning purposes, Dalia and Arie funded each trust with a $600,000 gift. The intent behind the trusts was to ensure that both children received property of equal value. Sash A. Spencer and Lawrence M. Small were named Co-Trustees of both trusts and remained Co-Trustees until the Genger's divorce. After the Trusts were funded, Orly and Sagi each assigned their 48% interests in D & K to their Trusts.

6.    At the same time in December 1993, D & K purchased 240 shares of common stock (constituting 49% of the outstanding shares) in TPR for $10,200,000. The shares were purchased with $600,000 from each of the Orly Trust and the Sagi Trust and $50,000 from Dalia, totaling $1,250,000, and the balance was satisfied with a recourse $8,950,000 promissory note (the "Note") (a copy of which is annexed hereto as Exhibit B). Pursuant to the Note, principal, together with accrued interest, was to be repaid by D & K in annual installments over ten years. The Note was secured by a pledge of the 240 TPR shares owned by D & K. Each of the Trusts and Dalia assumed liability on the Note in proportion to its/her direct interest in D & K. Accordingly, each of the Orly and Sagi Trusts assumed a 48% liability on the Note and acquired a 23.52% indirect interest in TPR and Dalia assumed a 4% liability on the Note and a 1.96% indirect interest in TPR. Payments were made on the Note until 1999, at which time D & K stopped making payments with the implied consent of the interested parties.

7.    At the time of the above-described transaction, Arie owned the remaining 51% of TPR, which held investments in various securities, including TRI common stock, as well as its

interest in the Note. As of March 30, 2001, TPR held a 52.85% interest in TRI. The remaining

minority interest in TRI (47.15%) was owned by various entities controlled directly and

indirectly by Jules and Eddie Trump (the "Trump Group").

8.      On October 26, 2004, Dalia and Arie entered into a Stipulation and Agreement of

Settlement as a final settlement of their divorce (the "Settlement Agreement") (annexed hereto as

Exhibit C). Pursuant to the Settlement Agreement, Dalia received, *inter alia*, Arie's 51% interest

in TPR and retained her 4% interest in D & K. TPR's 52.85% interest in TRI was transferred to

Arie and the Trusts as follows: (i) 13.99% to Arie, (ii) 19.43% to the Orly Trust, and (iii) 19.43%

to the Sagi Trust. The Orly Trust and the Sagi Trust each granted Arie an irrevocable lifetime

voting proxy over their TRI shares (annexed hereto as Exhibit D). Therefore, after October 29,

2004, Arie and the two Trusts held a controlling interest in TRI, and TPR no longer owned any

TRI common stock.

9.      In connection with the divorce settlement, Dalia took measures to cede

management of D & K and TPR to her son Sagi. On October 21, 2004, days before signing the

Settlement Agreement, Dalia and Sagi formed D & K GP LLC ("D & K GP"), whose sole

purpose was to act as the general partner of D & K. Dalia exchanged her 4% interest in D & K

and $1.00 for a 99% membership interest in D & K GP. Sagi purchased a 1% membership

interest in D & K GP for $1.00. Pursuant to the Limited Liability Agreement of D & K GP

(annexed hereto as Exhibit E), Sagi was given the power to select a manager of D & K GP whose

function would be to control D & K's assets. Sagi selected himself to act as manager; thus, Dalia

effectively handed Sagi the authority to control D & K and its assets. Also, by forming D & K

GP, Dalia and Sagi shielded themselves from any personal liability stemming from D & K,

including any personal liability related to the Note. This left the Trusts solely liable on the Note.

10.   On October 30, 2004, Dalia entered into a shareholder agreement with TPR that provided for the management of TPR. Specifically, pursuant to the shareholder agreement (annexed hereto as Exhibit F), D & K, which owned 49% of TPR, was given authority to appoint one board member to the TPR board. Sagi, as the managing partner of D & K, appointed himself as a board member of TPR. As the majority owner of TPR, Dalia was named as the other board member. In addition, the shareholder agreement appointed Sagi as Chief Executive Officer ("CEO") of TPR. Accordingly, Dalia essentially ceded control of TPR to Sagi, just as she had done with D & K.

11.   Below, for the Court's convenience, is a side-by-side summary of Arie's, Dalia's, the Orly Trust's, and the Sagi Trust's interests in TPR before and after Arie's and Dalia's divorce.[2]

### TPR OWNERSHIP
### BEFORE AND AFTER DIVORCE

#### PERCENTAGE

| Person | TPR Before | TPR After |
|---|---|---|
| Arie Genger | 51.00% | 0% |
| Dalia Genger | 1.96% | 52.96% |
| Orly Trust | 23.52% | 23.52% |
| Sagi Trust | 23.52% | 23.52% |
| **TOTAL** | **100%** | **100%** |

---

[2] For the Court's convenience, the chart annexed hereto as Exhibit G provides a summary of Arie's, Dalia's, the Orly Trust's, and the Sagi Trust's ownership interests in TPR, TRI, and D & K as of October 26, 2004 – i.e., the date that Arie and Dalia executed the Settlement Agreement.

12. In connection with the Settlement Agreement, Dalia required that the Trustees of the Orly Trust and the Sagi Trust (Messrs. Sash and Small) resign and be replaced with friends of Sagi. Numerous successor trustees were appointed to the Orly Trust and the Sagi Trust, all of whom were affiliated with Sagi in one way or another. David Parnes and Eric Gribetz (Sagi's longtime friends) and Leah Fang (Sagi's sister-in-law) were appointed as successor trustees to the Orly Trust, and Messrs. Parnes and Gribetz, Rochelle Fang (Sagi's mother-in-law), and Mr. Parnes again, were appointed successor trustees of the Sagi Trust. In January 2008, Dalia was appointed successor trustee of the Orly Trust, despite Orly's objection. By that time, as a result of Dalia's granting him control of TPR and D & K, and through the appointment of his friends and relatives as successor trustees of the Trusts, Sagi effectively had obtained control over the assets held by all of D & K, TPR, the Sagi Trust, and the Orly Trust.

13. On August 2, 2006, Sagi, as part of his managerial role in D & K GP, D & K, and TPR, assigned the Note – which then had an approximate value of $11,000,000 as a result of accrued interest – to Mr. Parnes for only $12,000. (A copy of the Memorandum dated August 2, 2006, assigning the Note is annexed hereto as Exhibit H.) The assignment stated that D & K "denied enforceability of the Note" (see Exhibit H annexed hereto), which presumably is why it was "sold" for $12,000. Sagi signed the assignment on behalf of both TPR, as the maker, and D & K, as the holder. Dalia was copied on the memorandum assigning the note, but neither Orly, the Orly Trust, nor the then-Trustee of the Orly Trust received copies of the memorandum. At the time of this assignment, Mr. Parnes was acting as trustee of both the Orly Trust and the Sagi Trust. Shortly after the assignment, Mr. Parnes resigned as Trustee of the Orly Trust in recognition of the inherent conflict he faced in that role.

14.     Sometime in 2007, Sagi sold a 2% interest in TPR to Rochelle Fang.  The cost of

the 2% interest was based upon a bogus valuation of TPR at $50,000,000.  At the time of the

sale, TPR's assets were worth between approximately $11,000,000 and $12,000,000, plus the

value of the Note.  This sale effectively stripped Dalia of her majority interest in TPR giving

Sagi unfettered control of TPR, in addition to his control of D & K and D & K GP.  In January

2008, when Dalia was appointed successor trustee of the Orly Trust, she completely divested

herself of the balance of her TPR shares. Dalia has not informed either the Court or Orly as to

when she transferred her TPR interest.

15.     On August 22, 2008, unbeknownst to Orly, Rochelle Fang, who had been

appointed Trustee of the Sagi Trust, attempted to sell the Sagi Trust's 19.43% interest in TRI to

the Trump Group, who already owned 47.15% of TRI's outstanding shares, for $26,715,416.

This sale purportedly transferred control of TRI from Arie to the Trump Group who thereafter

purported to hold 66.58% of TRI's outstanding common stock.[3]  In connection with the supposed

sale, Sagi and David Parnes were given seats on TRI's board of directors.  If given effect, this

purported sale, which was consummated after Dalia was appointed successor trustee of the Orly

Trust, would dilute and diminish the value of the Orly Trust's interest in TRI.

16.     Dalia, who had notice of the supposed sale, made no effort to prevent the sale or

to protect the value of the Orly Trust's interest in TRI.  Fearing that Dalia would continue to

neglect her duty to protect the Orly Trust's assets, on January 10, 2009, Petitioner wrote a letter

(annexed hereto as <u>Exhibit I</u>) to her mother stating that "for now, and until further notice, it is my

---

[3] The validity of the sale is at issue in litigation currently pending in Delaware Chancery Court.  The
parties to the action are Arie Genger, TRI, and various entities affiliated with the Trump Group.  The Orly Trust has
not appeared in the action.  In that action, the Trump Group claims to have bought the shares either from the Sagi
Trust or from TPR – thus, the approximately $27 million purportedly paid by the Trump Group either belongs to the
Sagi Trust or to TPR, depending on the outcome of the litigation in Delaware.

strong desire to retain all of the shares of TRI that are currently in the Orly Trust, and I direct

you not to sell them." Dalia refused to agree not to dispose of the TRI shares.

## II.   THE EVIDENCE DISCOVERED BY PETITIONER ON JUNE 1, 2009, REQUIRES INJUNCTIVE RELIEF AND THE IMMEDIATE REMOVAL OF DALIA AS TRUSTEE

17.   In February 2008, Orly applied to this Court to designate a Trustee, or in the

alternative to appoint a special trustee, claiming that Dalia and all of the preceding successor

trustees of the Orly Trust were improperly appointed and had no authority to act on behalf of the

Orly Trust. Orly also alleged wrongful dealings by Dalia as Trustee of the Orly Trust. In

denying the application without prejudice, this Court stated that Orly had made allegations

without sufficient supporting evidence and suggested that Orly commence an SCPA § 2201

proceeding to obtain the necessary evidence and then renew her application. (A copy of the

Court's decision is annexed hereto as Exhibit J.)

18.   On May 14, 2009, as a prerequisite to the SCPA § 2201 application, Orly's

counsel sent Dalia Genger a letter (annexed hereto as Exhibit K) requesting documents related to

the Orly Trust's assets. Soon thereafter, Orly's counsel was notified that Dalia had retained

Robert A. Meister, Esq., of Pedowitz & Meister, LLP, and Orly's counsel therefore forwarded a

copy of the May 14th letter to Mr. Meister.

19.   On June 1, 2009, Mr. Meister responded to Orly's document demand by advising

Orly's counsel that the Orly Trust no longer owned any interest in TPR. According to the letter,

Sagi, acting as CEO of TPR, had foreclosed on the Note and had sold D & K's 240 shares of

TPR for $2,220,000. (A copy of the Letter dated June 1, 2009, is annexed hereto as Exhibit L.)

Before that time, Dalia had neither advised nor notified Orly that Sagi had foreclosed on the

Note,[4] nor advised Orly that Sagi had sold the TPR shares at auction. Thus, upon receipt of Mr. Meister's letter, Orly learned for the first time that:

(a)    On August 31, 2008, Sagi, acting as CEO of TPR, notified himself as the general manager of D & K, that D & K was in default of the Note and declared that unless the entire unpaid principal amount of the Note was paid immediately, TPR would sell, at auction, the 240 shares pledged as collateral. (A copy of the Notification dated August 31, 2008, is annexed hereto as Exhibit M.)

(b)    Thereafter, Sagi, again acting as CEO of TPR, purported to notify D & K (of which he remained the managing partner) that D & K's 240 shares of TPR stock would be publicly auctioned to the highest bidder on February 27, 2009, and that the money received from the sale would be used to reduce the outstanding debt. (A copy of the Notification is annexed hereto as Exhibit N.) Sagi purported to notify the interested parties of the sale by publishing notice of the sale in the New York Post in October 2008 and February 2009. Although at all relevant times Sagi had Orly's contact information, he never informed her of the impending sale.

(c)    On February 27, 2009, TPR (still controlled by Sagi) foreclosed on the 240 shares of TPR and "auctioned" the shares. Not coincidentally, the Sagi-controlled TPR purchased the shares at auction for $2,200,000. (See Exhibit O). The proceeds of the sale – i.e., $2,220,000 – were used to decrease D & K's obligations under the Note, leaving a balance of approximately $8,800,000.

20.    On June 11, 2009, Orly's counsel sent Mr. Meister a letter asking that Dalia, in accordance with Orly's January 2009 request and in light of the secretive diminution of the Orly

---

[4] While the Note had not been serviced since 1999, TPR had not foreclosed on the Note between 1999 and 2008 because it previously had agreed not to foreclose on the Note in order not to upset the estate-planning goals underlying the Note.

Trust's interest in TPR, stipulate in writing that she would not, under any circumstances and until all issues were resolved, sell, transfer, or remove the TRI shares from the Orly Trust. (A copy of the Letter dated June 11, 2009, is annexed hereto as Exhibit P.) That same day, Mr. Meister responded to the June 11th letter, but he failed to address the terms of the proposed stipulation. (A copy of Mr. Meister's Letter dated June 11, 2009, is annexed hereto as Exhibit Q.)

### A.   A Temporary Restraining Order ("TRO") Is Necessary To Protect The Remaining Assets Held By the Orly Trust

21.   It is clear from Dalia's deliberate inaction and complete deferral to Sagi in all matters related to D & K, TPR, and TRI, that without Court intervention Orly's TRI shares will be: a) sold at a significantly discounted rate so that the proceeds can be used to pay her unpaid portion of the Note, b) used as collateral to secure the Orly Trust's unpaid portion of the Note, or c) used to satisfy a Judgment against the Orly Trust. Since Orly's address was known to her brother and her mother at all relevant times, publishing notice of the sale of the TPR shares alone was a clear and deliberate attempt to prohibit Orly from intervening in the foreclosure and the sale. Dalia, who had knowledge of the events as they were transpiring, easily could have given notice of the auction to Orly, but she intentionally chose not to. There is now reason to believe that Dalia will again remain passive if and when Sagi seeks to hijack, sell, or otherwise meddle with the Orly Trust's TRI shares, even though Orly has specifically advised her mother, in writing, to protect the Trust's ownership of the TRI shares.

22.   There is no reason to trust that Dalia will honor her daughter's wishes and instructions since, from the time of her divorce, she has done nothing but ensure that Sagi has complete control over TPR, D & K, and D & K GP, and has allowed Sagi to do as he pleases. At this time, approximately $8,800,000 of the Note remains unsatisfied, and Sagi, as CEO of TPR, has not voided the notice of default. Based upon Dalia's deliberate inaction and failure to protect

the Orly Trust's assets to date, there is strong evidence to reasonably conclude that Dalia will not

protect the Orly Trust's interest in the TRI shares, but rather, will act to benefit herself and Sagi,

including by allowing Sagi to obtain the TRI shares to satisfy the Orly Trust's unpaid portion of

the Note. Without immediate injunctive relief, Orly will have no recourse and the Orly Trust

will be vulnerable to complete depletion. The harm caused to the Orly Trust under these

circumstances would be irreparable.

23.      Based on the facts and documentary evidence presented herein it is likely that the

Orly Trust will succeed on the merits of her Petition. Accordingly, she meets the criteria

necessary to obtain a TRO and a preliminary injunction. Petitioner therefore respectfully

requests that the Court grant her Petition for a TRO and a preliminary injunction in order to

protect the assets held by the Orly Trust, including the TRI shares.

**B.      Dalia Must Be Removed As Trustee Immediately**

24.      Based on the information provided to Orly's counsel on June 1, 2009, which

confirms Respondent's lack of diligence and disloyal service as Trustee, there now exists

sufficient evidence to have Respondent removed as Trustee of the Orly Trust. While serving as

Trustee, Dalia intentionally failed to notify Orly that TPR was taking measures to foreclose on

the Orly Trust's 23.52% indirect interest in TPR. It was Dalia's duty as a fiduciary of the Orly

Trust to be apprised of all activity concerning the Orly Trust and to ensure that Orly received

proper notification of the default and auction. Moreover, Dalia actually knew of the foreclosure

and the auction, but took no steps to protect the Orly Trust's interest in TPR. Dalia knew of

Sagi's plan to foreclose on the Note and sell the TPR shares as early as August 2008; thus, she

withheld information concerning the auction from Orly for almost ten months. Dalia did not

disclose the foreclosure and share sale until she received the demand letter from Orly's counsel

and realized that legal action was imminent. Instead of protecting the Orly Trust's and its

beneficiary's interests, Dalia sat back and silently watched her son strip the Orly Trust of its indirect interest in TPR.

25.     The corporate structure which has intertwined TPR, D & K GP, and D & K's assets, all of which are in some manner controlled by Sagi as a result of Dalia's actions, permits Dalia and Sagi to engage in self-dealing and does not provide for any accountability on either Sagi's or Dalia's part. Unfortunately, the Orly Trust is caught in the middle of Dalia's and Sagi's conspiracy to engage in self-dealing intended to benefit their own interests, while Sagi has been permitted to diminish and dissipate the value of the Orly Trust's assets, including its interests in TPR and, potentially, TRI. By enriching herself and her son at the expense of her daughter, Dalia is in breach of her fiduciary duties as Trustee of the Orly Trust. It is imperative that Orly have a successor trustee appointed who will unbiasedly and loyally protect the Orly Trust's remaining assets.

<strong>(1)     <u>In Direct Conflict With Her Obligations as Fiduciary of The Orly Trust, Dalia Did Nothing To Stop Sagi From Attempting to Sell His Trust's TRI Shares, Which, If Valid, Would Dilute the Value of the Orly Trust's Assets</u></strong>

26.     The Sagi Trust's attempted sale of its interest in TRI to the Trump Group for $26,715,416, which occurred after Dalia was appointed successor trustee of the Orly Trust, purportedly transferred control of TRI from Arie to the Trump Group. As mentioned above, supra paragraph 15, if this purported sale were given effect, then the value of the Orly Trust's assets would be significantly diminished. If the purported sale were valid and effective, then Arie would no longer own a controlling interest in TRI, and thus the Orly Trust would no longer own a portion of the controlling block of TRI shares.

27.     Dalia, as a fiduciary of the Orly Trust, was obligated to apprise herself of any transactions that could affect the value of the Orly Trust's shares, and, in fact, Dalia was contemporaneously aware of the Sagi Trust sale. But Dalia made no effort to protect the value of

the Orly Trust's TRI shares by challenging the proposed sale. Moreover, she has taken no position with regard to the current value of the TRI shares and has taken no measures to protect the Orly Trust's interest in TRI since the purported sale, despite Orly's urgings. By remaining passive with respect to the Orly Trust's TRI shares, Dalia is completely ignoring the intent behind the establishment of the Orly Trust – to transfer an equal amount of assets to each of the children. Dalia, through her actions and her inaction alike, may have permitted Sagi to secure substantially more value from the Trusts' assets than Orly.

(2) **In Direct Conflict With Her Obligations as Fiduciary of The Orly Trust, Dalia Took No Action To Protect the Orly Trust's Interest in TPR**

28.     Pursuant to the August 2006 memorandum assigning the Note to David Parnes – on which Dalia was copied – Sagi, acting as the managing partner of D & K, took the position that the Note was unenforceable. (See Paragraph 4 of Exhibit H annexed hereto.) In the exact same memorandum, however, Sagi, acting as the CEO of TPR, took the directly contrary position that TPR reserved its right to enforce the Note. (See Paragraph 8 of Exhibit H annexed hereto.)

29.     On February 14, 2007, Dalia, who participated in the "sham" transaction between Sagi and Mr. Parnes, and in a clear attempt to clean her hands of any impropriety, admitted in a sworn statement to the Court that no one was ever supposed to foreclose on the Note. (See Paragraph 3 of Exhibit R annexed hereto). Additionally, the unpaid Note was the subject of a post-judgment arbitration proceeding between Dalia and Arie, which took place in September 2007. Dalia, who was present at the proceedings, heard Sagi and Mr. Parnes testify that the Note should not be enforced and that Sagi, as CEO of TPR, had no intention of collecting the unpaid portion of the Note. Thus, Dalia knew long before August 2008 that TPR had effectively disclaimed its right to foreclose on the Note.

30.     As described above, however, in August 2008 (eleven months later), Sagi sought

to enforce the Note. Contrary to the position he had taken under oath at the arbitration, and

contrary to the position he had taken as the managing partner of D & K (see Paragraph 4 of

Exhibit H attached hereto), Sagi issued a default notice to D & K on behalf of TPR. Dalia, who

knew the Note was never intended to be enforced and who previously had sworn to as much,

should have immediately sought to block Sagi from foreclosing on the Note and selling the TPR

shares. Notwithstanding her knowledge and her previous statements, however, Dalia failed to

make any effort to stop Sagi when he engaged in this clear act of self-dealing, even though the

Orly Trust had a clear interest in the TPR shares at issue. As a fiduciary of the Orly Trust with

prior, as well as continued knowledge, of the TPR foreclosure, TPR's supposed claims against D

& K, and D & K's ability to challenge those claims based on prior representations, Dalia had a

duty to protect the Orly Trust's indirect ownership of the TPR shares. But instead of taking the

proactive measures required of a fiduciary, Dalia did nothing and allowed Sagi to obtain the TPR

shares for himself to the detriment of the Orly Trust.[5]

31.     Additionally, Dalia's failure to act in the face of the foreclosure and sale of TPR

stock is especially egregious because she has known since August 2008 that the purported sale of

TRI stock to the Trump Group is being challenged in Delaware state court. She also has known

that in that action the Trump Group is asserting that it bought the TRI stock from *either* the Sagi

Trust *or* TPR. Thus, she has known that, depending on the outcome of the litigation in

Delaware, the Orly Trust could have an interest in the $27 million paid by the Trumps in August

---

[5] Moreover, in connection with her appointment as successor trustee of the Orly Trust in January 2008, Dalia divested herself of her TPR shares (without informing either the Court or Orly as to when she transferred her interest) in a further attempt to distance herself from any attributable wrongdoing. Dalia has contended to this Court that she sold her TPR shares in order to avoid any appearance of impropriety in connection with her appointment as Trustee. Interestingly, however, Dalia has never informed Orly or this Court whether she continues to maintain a 99% interest in D & K GP, the company that controls D & K and, thus, was obligated to service the Note.

2008 if its interest in TPR were preserved. Accordingly, as trustee of the Orly Trust, she should

have been especially vigilant in protecting the Orly Trust's interest in TPR through D & K. But

instead, she allowed Sagi to essentially steal the Orly Trust's interest in TPR so that Sagi can

attempt to retain the entire $27 million regardless of the outcome in Delaware Chancery Court.

Her inaction in this regard is a blatant violation of her fiduciary duties as trustee.

### III.  DALIA SHOULD BE SUR-CHARGED IN THE AMOUNT OF THE LOSS OF THE VALUE OF ORLY'S INTEREST IN TPR AS DETERMINED BY THE COURT AND ORLY SHOULD BE AWARDED ATTORNEYS' FEES

32.    By failing to take action on behalf of the Orly Trust to prevent Sagi from

foreclosing on the Note and selling D & K's TPR shares, Dalia caused the Orly Trust to lose its

interest in TPR. Accordingly, Dalia should be surcharged in an amount of the loss of the value

of Orly's interest in TPR as determined by the Court and should be required to reimburse the

Orly Trust for its attorneys' fees incurred in connection with bringing this action.

### IV.  MICHAEL D. GROHMAN, ESQ. SHOULD BE APPOINTED AS SUCCESSOR TRUSTEE

33.    Based on Dalia's deliberate breach of her fiduciary duties to the Orly Trust, and in

light of Dalia's prior nefarious conduct as the Orly Trust's Trustee, this Court should remove

Dalia as Trustee and replace her with Michael D, Grohman, Esq. Mr. Grohman is a member of

the New York Bar and the head of the Trust and Estates practice group at Duane Morris LLP.

Mr Grohman is not acquainted with any members of the Genger family, does not have any

interest in TRI, TPR, or D & K, and is willing and prepared to succeed Dalia immediately.

34.    No prior application has been made for the relief requested herein.

### PRAYER FOR RELIEF

WHEREFORE, based upon the allegations contained herein, Petitioner requests that this

Court provide the following relief:

(a)     Enjoining and restraining Respondent, her agents, and all other persons acting on her behalf from withdrawing, selling, disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering, liening, hypothecating, or secreting the Orly Trust's 19.43% interest in TRI and other assets remaining in the Orly Trust;

(b)     removing Respondent as Trustee of the Orly Trust for breaching her fiduciary duties, wasting and dissipating the assets of the Orly Trust, and improvidently managing and injuring the property committed to her charge;

(c)     surcharging Respondent in the amount of the loss of the value of Orly's interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)     appointing Michael D. Grohman, Esq., as successor trustee;

(e)     waiving any requirement that Petitioner post an undertaking; and

(f)     granting Petitioner any other relief it deems necessary and proper.

Dated:   New York, New York
         June 22, 2009

_____
ORLY GENGER
Petitioner

COZEN O'CONNOR

By: _____
Judith E. Siegel-Baum, Esq.
Attorney for Petitioner
250 Park Avenue
New York, New York 10017
212-986-1116

# VERIFICATION

STATE OF NEW YORK )
                                )ss.:

COUNTY OF NEW YORK )

     The undersigned, the Petitioner named in the foregoing petition, being duly sworn, says: I have read the foregoing petition subscribed by me and know the contents thereof, and the same is true of my own knowledge, except as to the matters therein stated to be alleged upon information and believe, and as to those matters I believe it to be true.

_____
Signature of Petitioner

ORLY GENGER
_____
Print Name

Sworn to before me this
22nd day of June, 2009.

_____
Notary Public
Commission Expires:
(Affix Notary Stamp or Seal)

ANN MEADE
Notary Public, State of New York
No. 01ME4783921
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires Sept. 30, 2009

# Exhibit A

TRUST AGREEMENT

BETWEEN

ARIE GENGER

AS GRANTOR

AND

LAWRENCE M. SMALL AND SASH A. SPENCER

AS TRUSTEES

CREATING

THE ORLY GENGER 1993 TRUST

*Accounting — og. Leah.* (handwritten)

Dated:  December  _13_ , 1993

Copy 3 of 4

RUBIN BAUM LEVIN CONSTANT & FRIEDMAN

30 ROCKEFELLER PLAZA  ·  NEW YORK, N Y 10112

Index to the Orly Genger 1993 Trust Agreement

| Article | Contents | Page |
|---|---|---|
| FIRST: | Disposition of Principal and Income During the Life of the Grantor's Daughter, ORLY GENGER . . . . . . . . . . . . . . | 1 |
| SECOND: | Continuing Trust for Descendants of the Grantor's Daughter, ORLY GENGER . . . . . . | 5 |
| THIRD: | Disposition of Property if No Descendant of the Grantor is Living . . . . . . . . | 9 |
| FOURTH: | Additions to the Trusts . . . . . . . . . . | 13 |
| FIFTH: | Irrevocability . . . . . . . . . . . . . | 13 |
| SIXTH: | Governing Law . . . . . . . . . . . . . | 13 |
| SEVENTH: | Trustees . . . . . . . . . . . . . | 13 |
| EIGHTH: | Compensation of Trustees . . . . . . . | 18 |
| NINTH: | Settlement of Trustees' Accounts; Exoneration of Trustees . . . . . . . . | 18 |
| TENTH: | Definitions . . . . . . . . . . . . . | 21 |
| ELEVENTH: | Administrative Powers . . . . . . . . . | 22 |
| TWELFTH: | Provisions Relating to the GST . . . . . . | 32 |
| THIRTEENTH: | Release of Powers . . . . . . . . . . | 37 |
| FOURTEENTH: | Provision with Respect to Closely Held Businesses . . . . . . . . . | 38 |
| FIFTEENTH: | Headings . . . . . . . . . . . . . | 39 |
| SIXTEENTH: | Severability . . . . . . . . . . . . . | 39 |

TRUST AGREEMENT dated December _13_ , 1993, between ARIE GENGER (now residing at 1067 Fifth Avenue, New York, New York), as Grantor, and LAWRENCE M. SMALL (now residing at 2804 Woodland Drive, Washington, D.C. 20008) and SASH A. SPENCER (now residing at 251 Crandon Boulevard, Townhouse 164, Key Biscayne, Florida 33149), as Trustees.

The Grantor hereby transfers to the Trustees, and the Trustees hereby acknowledge receipt of, the sum of Six Hundred Thousand Dollars ($600,000.00), to be held, administered and disposed of in accordance with the provisions of Article FIRST hereof. Said sum and any other property that may be received by the Trustees pursuant to the provisions of Article FOURTH hereof, and all investments and reinvestments thereof, and all proceeds thereof which constitute principal, are hereinafter collectively called "principal."

This Trust Agreement shall be known as the "Orly Genger 1993 Trust Agreement" and the trust created by Article FIRST hereof shall be known as the "Orly Genger 1993 Trust."

FIRST:   Disposition of Principal and Income During the Life of the Grantor's Daughter, ORLY GENGER.

A.   The Trustees shall hold, manage, invest and reinvest the principal of the trust created by this Article, IN TRUST, and, so long as the Grantor's daughter, ORLY GENGER, shall live, the Trustees are authorized and empowered to pay such part, parts or all, if any, of the net income of the trust

created by this Article (hereinafter referred to in this Article as "Orly's Trust") to, or apply such part, parts or all, if any, of such net income for the use or benefit of, such one or more of the following individuals living from time to time in such equal or unequal amounts or proportions, and at such time or times, as the Trustees, in their discretion, shall determine:

    1.   The Grantor's daughter, ORLY GENGER.

    2.   Each descendant of ORLY GENGER.

The Trustees shall accumulate all income of Orly's Trust not so paid to or applied and, at least annually, add such net income to the principal of Orly's Trust.

In making such distributions, the Trustees are requested (but they are not directed) to limit the total amount of the distributions made to any descendant of ORLY GENGER with respect to any calendar year to the amount necessary to increase such descendant's taxable income for United States income tax purposes for such year to the greatest amount that shall still result in such descendant not being subject to United States income taxes at the highest marginal rate in effect for such year, after taking into account all of such descendant's other income and deductions for such year.

B.   The Trustees are authorized and empowered to pay to, or apply for the use or benefit of, the Grantor's said daughter such part, parts or all, if any, of the principal of Orly's Trust, and at such time or times, as said Trustees, in

-2-

their discretion, shall determine, without regard to the interest in the trust of any other person and without regard to the fact that any such payment or application may result in the termination of Orly's Trust.

C.   Upon the death of the Grantor's said daughter, the Trustees shall pay the then principal of Orly's Trust, together with all net income thereof then accrued but not yet collected, and collected but not yet disposed of, as follows:

1.   The Trustees shall pay one-half (1/2) of such income and principal, in such equal or unequal amounts or proportions, to or for the use or benefit of such one or more of the descendants of the Grantor's said daughter, and upon such terms, conditions and trusts, if any, as the Grantor's said daughter, by a provision in her Will expressly referring to this Article of this Trust Agreement, shall validly direct and appoint. If, or to the extent that, the Grantor's said daughter shall fail so validly to direct and appoint such principal and income, the Trustees, at the death of the Grantor's said daughter, shall pay the same, per stirpes, to such of the descendants of the Grantor's said daughter as shall survive her, subject, however, to the provisions of Article SECOND hereof, or, if no descendant of the Grantor's said daughter shall survive her, per stirpes, to such of the Grantor's descendants as shall so survive, or, if no descendant of the Grantor shall so survive, in accordance with the provisions of Article THIRD hereof.

-3-

2.    The Trustees shall pay one-half (1/2) of such income and principal, per stirpes, to such of the descendants of the Grantor's said daughter as shall survive her, subject, however, to the provisions of Article SECOND hereof, or, if no descendant of the Grantor's said daughter shall survive her, per stirpes, to such of the Grantor's descendants as shall so survive, or, if no descendant of the Grantor shall so survive, in accordance with the provisions of Article THIRD hereof

3.    If, pursuant to the provisions of paragraph 1 or paragraph 2 of this Section C, the Trustees are directed to pay a per stirpital share of such income and principal to a descendant of the Grantor, and if at the time the Trustees are so directed there shall be in existence a trust for such descendant under a trust agreement between Arie Genger, as grantor, and Lawrence M. Small and Sash A. Spencer, as trustees, executed on the date hereof and known as the "Sagi Genger 1993 Trust Agreement," the Trustees shall not pay such per stirpital share to such descendant but shall instead pay such per stirpital share to the trustees then acting under said trust agreement, to be disposed of by them pursuant to the provisions of the trust for such descendant under said trust agreement.

D.    Notwithstanding anything herein to the contrary, if any Trustee hereunder shall be one of the potential income beneficiaries of Orly's Trust, such Trustee shall not, in his or her capacity as such a Trustee, have any voice or vote or other-

-4-

wise participate in any decision pertaining to the payment or application of the income or principal of Orly's Trust to or for the use or benefit of him or her in his or her capacity as a beneficiary of such trust or to or for the use or benefit of any person whom he or she has an obligation to support, and, in each such event, the other Trustee or Trustees shall make all decisions relating to such trust that pertain to such matters.

SECOND:    Continuing Trusts for
Descendants of the Grantor's Daughter,
ORLY GENGER.

A.    If, under any provision of this Trust Agreement, any property is directed to be paid to a descendant of the Grantor's daughter, ORLY GENGER, subject to the provisions of this Article, such property shall not be distributed or paid to such descendant. Instead, the Trustees shall continue to hold such property, IN TRUST (in a separate trust for each such descendant which is referred to in this Article as "such descendant's trust"; provided, however, that if there shall be property so directed to be paid on more than one occasion to any such descendant, all such property shall be held in a single trust for such descendant), and, so long as such descendant shall live before attaining the age of twenty-one (21) years, the Trustees, other than such descendant if he or she shall be a Trustee hereunder, are authorized and empowered to pay to, or apply for the use or benefit of, such descendant, such part, parts or all, if any, of the net income of such descendant's

-5-

trust, and at such time or times, as said Trustees, in their discretion, shall determine, and the Trustees shall accumulate the balance of such net income, if any, and, at least annually, add it to the principal of such descendant's trust; and, so long as such descendant shall live after attaining the age of twenty-one (21) years, the Trustees shall pay to such descendant all of the net income of such descendant's trust in at least quarterly installments.

B.   The Trustees, other than such descendant if he or she shall be a Trustee hereunder, are authorized and empowered to pay to, or apply for the use or benefit of, such descendant, such part, parts or all, if any, of the principal of such descendant's trust, and at such time or times, as said Trustees, in their discretion, shall determine, without regard to the interest in the trust of any other person and without regard to the fact that any such payment or application may result in the termination of the trust.

C.   Upon the death of such descendant (hereinafter referred to in this Article as "such deceased descendant"), the Trustees shall pay the then principal of such deceased descendant's trust, together with all net income thereof accrued but not yet collected, and collected but not yet disposed of, as follows:

-6-

1.    The Trustees shall pay one-half (1/2) of such income and principal, in such equal or unequal amounts or proportions, to or for the use or benefit of such one or more of the descendants of such deceased descendant, and upon such terms, conditions and trusts, if any, as such deceased descendant, by a provision in his or her Will expressly referring to this Article of this Trust Agreement, shall validly direct and appoint.  If, or to the extent that, such deceased descendant shall fail so expressly and so validly to direct and appoint such principal and income, the Trustees shall, at the death of such deceased descendant, pay the same, per stirpes, to such of the descendants of such deceased descendant as shall survive such deceased descendant, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, per stirpes, to such of the descendants as shall so survive of the ancestor of such deceased descendant closest in degree of relationship to such deceased descendant who (i) shall have descendants who shall so survive and (ii) shall have been a descendant of the Grantor or shall have been the Grantor, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, in accordance with the provisions of Article THIRD hereof.

2.    The Trustees shall pay one-half (1/2) of such income and principal, per stirpes, to such of the descendants of such deceased descendant as shall survive such deceased

-7-

descendant, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, per stirpes, to such of the descendants as shall so survive of the ancestor of such deceased descendant closest in degree of relationship to such deceased descendant who (i) shall have descendants who shall so survive and (ii) shall have been a descendant of the Grantor or shall have been the Grantor, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, in accordance with the provisions of Article THIRD hereof.

3.   If, pursuant to the provisions of paragraph 1 or paragraph 2 of this Section C, the Trustees are directed to pay a per stirpital share of such income and principal to a descendant of the Grantor subject to the provisions of this Article, and if at the time the Trustees are so directed there shall be in existence a trust for such descendant under a trust agreement between Arie Genger, as grantor, and Lawrence M. Small and Sash A. Spencer, as trustees, executed on the date hereof and known as the "Sagi Genger 1993 Trust Agreement," the Trustees shall not pay such per stirpital share to such descendant subject to the provisions of this Article but shall instead pay such per stirpital share to the trustees then acting under said trust agreement, to be disposed of by them pursuant to the provisions of the trust for such descendant under said trust agreement.

- 8 -

D.    Notwithstanding anything herein to the contrary,
each trust created by the terms of this Article shall terminate,
if not sooner terminated, upon the expiration of twenty-one (21)
years after the death of the last surviving descendant of the
Grantor's parents, SHARGA GENGER and DORA GENGER, who shall have
been in being on the date hereof; and the Trustees shall there-
upon pay the then principal of any trust terminated in accor-
dance with the provisions of this Section, together with all net
income thereof accrued but not yet collected and collected but
not yet disposed of, to the descendant of the Grantor with
respect to whom such trust is being held.

THIRD:    Disposition of Property if No Descendant
of the Grantor is Living.

A.    As used in this Article:

1.    The words "such time" shall mean the time as
of which any property is directed to be paid in accordance with
the provisions of this Article.

2.    The term "Qualified Charitable Organization"
shall mean an organization that shall be qualified as an organi-
zation to which contributions and bequests are deductible for
both United States income tax, gift tax and estate tax purposes
under the provisions of Section 170, Section 2522 and Section
2055 of the Internal Revenue Code.

-9-

B.    If, under any provision of this Trust Agreement, any property is directed to be paid in accordance with the provisions of this Article, the Trustees shall pay such property as follows:

1.    If the Grantor, the Grantor's spouse and/or any one or more descendants of the Grantor shall have caused there to be created a foundation known as The Genger Foundation, and if at such time said Foundation shall be in existence and shall be a Qualified Charitable Organization, then, in such event, the Trustees shall pay such property to said Foundation.

2.    If at such time either The Genger Foundation created as aforesaid shall not be in existence or said Foundation shall be in existence but shall not be a Qualified Charitable Organization, and if at such time the Trustees are authorized under applicable law to cause to be organized a corporation under and in accordance with the laws of any state of the United States which the Trustees, in their discretion, shall select, which corporation (i) shall be known by the name of The Genger Foundation (or by such other name as the Trustees, in their discretion, shall select if the name of The Genger Foundation shall not be available to be utilized as the name of said corporation), (ii) shall have as its purposes the encouragement, promotion, support and enhancement of non-orthodox study and education for children in the State of Israel pertaining to the customs, practices and ancient and modern history of the Jewish

-10-

people and shall maintain all of the property held by it, and use all of the net income thereof received from time to time, for the encouragement, promotion, support and enhancement of such study and education for children, (iii) shall be required to maintain all of the property held by it, and use all of the net income thereof received from time to time, for such purposes, with such property and income to be expended for such purposes in such amounts, at such time or times and to or for the use or benefit of such recipient or recipients as the directors, trustees and/or the officers of such corporation shall, in their discretion, determine from time to time, subject, however, to the other provisions of this paragraph 2, (iv) shall have as its initial directors or trustees the Trustees hereunder, the Grantor's cousin, JEREMIAH WOHLBERG (now residing at 2325 Lindenmere Drive, Merrick, New York), if he shall not then be a Trustee hereunder, and also such other individual or individuals, if any, as may be designated by the Trustees, and thereafter to have as directors or trustees such individuals as shall from time to time be determined as provided for in the certificate of incorporation and/or by-laws of said corporation, and (v) shall be organized and maintained in such manner as to be and continue to be a Qualified Charitable Organization, then, in such event, the Trustees shall organize such a corporation, and the Trustees shall pay such property to such corporation.

-11-

3.    If at such time (i) either The Genger Foundation created as aforesaid shall not be in existence or said Foundation shall be in existence but shall not be a Qualified Charitable Organization, and (ii) the Trustees are not authorized under applicable law to cause to be organized a corporation of the nature referred to in paragraph 2 of this Section B, then, in such event, the Trustees shall pay such property to the JEWISH COMMUNAL FUND OF NEW YORK, New York, New York, to be held, administered and disposed of pursuant to the rules and regulations thereof as an Undesignated Philanthropic Fund to be known as the Genger Philanthropic Fund and with the privilege of making advisory recommendations with respect thereto to be held in the first instance by the Trustees, said JEREMIAH WOHLBERG, if he shall not then be a Trustee hereunder, and also by such other individual or individuals, if any, as the Trustees may designate, and thereafter by such other individual or individuals as such designees and their successors acting in such capacity may from time to time designate, and it is requested (but not directed) that the principal and income of such Fund shall be utilized to encourage, promote, support and enhance non-orthodox study and education for children in the State of Israel pertaining to the customs, practices and ancient and modern history of the Jewish people.

-12-

FOURTH:    Additions to the Trusts.

Any person, including the Grantor, by a transfer to take effect during the life of such person or upon the death of such person, may, at any time or times, add to the principal of any trust hereunder any property of any kind or nature acceptable to the Trustees, and any such additional property so received by the Trustees pursuant to the provisions of this Article shall thereafter be deemed to be part of the principal of such trust subject to all of the terms, provisions and conditions of this Trust Agreement.

FIFTH:    Irrevocability.

This Trust Agreement and the trusts hereby created are irrevocable and not subject to amendment or change.

SIXTH:    Governing Law.

This Trust Agreement and the trusts hereby created shall be governed by the laws of the State of New York.

SEVENTH:    Trustees.

A.    The initial Trustees acting hereunder shall be LAWRENCE M. SMALL and SASH A. SPENCER.

B.    Each individual acting as a Trustee hereunder (whether such Trustee is initially a party to this Trust Agreement or a successor Trustee named in Section C of this Article

-13-

or appointed pursuant to the provisions of this Section B) is authorized and empowered to appoint another individual (other than the Grantor) to act in his or her place and stead as a Trustee hereunder. Each appointment of a successor Trustee hereunder shall be made by the execution of an instrument of appointment signed and acknowledged by the individual who shall have made such appointment and by delivering such instrument in accordance with the provisions of Section G of this Article; and any such appointment may be revoked in the same manner by the individual Trustee who shall have made it at any time before the occurrence of the event or events as of which such appointment shall, by its provisions, become effective. Any appointment made in accordance with the provisions of this Section B shall be valid only if the individual so appointed shall, within thirty (30) days after the later of (i) the date on which a copy of such instrument of appointment is so delivered to him or her, and (ii) the occurrence of the event or events as of which such appointment shall, by its provisions, become effective, qualify as a successor Trustee under this Trust Agreement in accordance with the provisions of Section D of this Article. Each successor Trustee named in Section C of this Article or appointed in accordance with the provisions of this Section B shall be vested with the same powers and authority as the initial Trustees who are parties to this Trust Agreement; provided, however, that no such Trustee shall be permitted to exercise any authority or

-14-

power which such Trustee shall be prohibited from exercising by an express provision of this Trust Agreement.

C.  1.  If either LAWRENCE M. SMALL or SASH A. SPENCER shall cease to act as a Trustee hereunder, and no successor Trustee appointed by him pursuant to the provisions of Section B of this Article shall quality and act as a Trustee hereunder, MARTIN A. COLEMAN (now residing at 51 Cambridge Road, Great Neck, New York 11023) shall act as Trustee hereunder.

2.  If MARTIN A. COLEMAN shall fail or cease cease to act as a Trustee hereunder, and no successor Trustee appointed by him pursuant to the provisions of Section B of this Article shall quality and act as a Trustee hereunder, THOMAS G. HARDY (now residing at 935 Park Avenue, New York, New York 10028) shall act as a Trustee hereunder.

D.  Each successor Trustee hereunder shall qualify as such by accepting the trusteeship by the execution of a signed and acknowledged instrument of acceptance and by delivering such instrument in accordance with the provisions of Section G of this Article.

E.  Any individual Trustee hereunder may resign as such a Trustee by the execution of a signed and acknowledged instrument of resignation and by delivering such instrument in accordance with the provisions of Section G of this Article.

-15-

Any such resignation shall become effective upon the receipt of such instrument of resignation by each individual to whom it is delivered or mailed as aforesaid or at such later date as may be specified therein.

F.    If any individual while acting as a Trustee hereunder shall become incapable of discharging his or her responsibilities and duties as such a Trustee by reason of a physical, emotional or intellectual incapacity and such incapacity shall be confirmed by each of two medical doctors in written statements, copies of which shall be delivered or mailed as hereinafter provided, the individual who is so incapacitated shall be deemed for the purposes of construing and applying all of the provisions of this Trust Agreement to have effectively resigned as such Trustee in compliance with the provisions of Section E of this Article, such resignation to be deemed to be effective upon the delivery or mailing of the aforesaid statements as hereinafter provided. Each of the aforesaid statements shall be signed and acknowledged by the medical doctor making the same and copies of the same shall be delivered or mailed by registered or certified mail to the individual, if any, who will become the successor Trustee hereunder in the place and stead of the incapacitated Trustee to whom such statement pertains, to each Trustee, if any, then acting hereunder (other than the incapacitated Trustee to whom such statement pertains), and also to either (i) the Grantor (or, if the Grantor shall not then be

-16-

living, to the executors, administrators or personal representatives of the Grantor's estate), or (ii) any one or more of the adult individuals to whom or for whose use or benefit the income of any trust hereunder may then be paid or applied.

G.    Each instrument directed to be delivered in accordance with the provisions of this Section G shall be delivered in person or by mailing a copy of the same by registered or certified mail to each Trustee, if any, then acting hereunder (other than the Trustee, if any, who shall have executed such instrument), and to either (i) the Grantor (or, if the Grantor is not then living, to the executors, personal representatives or administrators of the Grantor's estate), or (ii) any one or more of the adult individuals to whom or for whose use or benefit the income of any trust hereunder may then be paid or applied.

H.    No bond or other security shall be given by or required in any jurisdiction (whether in the State of New York or elsewhere) of any Trustee at any time acting hereunder (whether such Trustee is named herein or appointed pursuant to the provisions hereof) for the faithful performance of such Trustee's fiduciary duties in any capacity hereunder regardless of whether such Trustee is or may become a non-resident of the State of New York or elsewhere.

-17-

EIGHTH:   <u>Compensation of Trustees.</u>

No Trustee hereunder, whether such Trustee is hereinabove named or appointed pursuant to the provisions hereof, shall be entitled to any compensation (other than reimbursement for out-of-pocket expenses) for services rendered as a Trustee hereunder; and each Trustee who is a party to this Trust Agreement or who qualifies as a successor Trustee hereunder as provided herein shall be deemed to have agreed to serve as such Trustee without receiving any such compensation.

NINTH:   <u>Settlement of Trustees' Accounts;
Exoneration of Trustees.</u>

A.   To the fullest extent permitted by law, the Trustees shall not be required to file with or render to, and the Grantor waives and excuses the filing with or rendering to, any Court an account of their transactions or inventories, accounts, statements or reports of principal and/or income with respect to any trust created hereunder. Nevertheless, the Trustees may at any time have their accounts judicially settled with respect to any trust created hereunder, and in any such proceeding it shall not be necessary to serve any person who is under a disability if there is another party to the proceeding who is not under any disability and who has the same interest as the person who is under a disability, and, in such event, it shall not be necessary to appoint a guardian ad litem for any such party who is under a disability. The expenses of any such

-18-

account shall be a proper administration expense of the trust to which such account relates.

B.   If any Trustee shall resign as a Trustee hereunder, the continuing Trustee, if any, or, if there is no continuing Trustee, any successor Trustee who shall have qualified to act in accordance with the provisions of Section D of Article SEVENTH hereof, may deliver to the Trustee so resigning an instrument whereby such resigning Trustee shall be released and discharged, to the extent stated therein, ~~of and from any and all accountability, liability and responsibility for the acts and omissions as Trustee.~~ Any such release and discharge shall be binding upon all persons, whether or not then in being, then or thereafter interested in either the income or the principal of any trust hereunder and shall have the force and effect of a final decree, judgment or order of a court of competent jurisdiction rendered in an appropriate action or proceeding for the judicial settlement of the account of such Trustee in which jurisdiction was obtained of all necessary and proper parties. The foregoing provision, however, shall not preclude any Trustee so resigning from having his or her account judicially settled, and in any such proceeding it shall not be necessary to serve any person who is under a disability if there is another party to the proceeding who is not under any disability and who has the same interest as the person who is under a disability, and, in such event, it shall not be necessary to appoint a guardian

-19-

ad litem for any such party who is under a disability. The expenses of any judicial account rendered by a Trustee who shall resign shall be a proper administration expense of the trust to which such account relates.

C.   In addition to the foregoing, the Trustees are hereby authorized, at any time and from time to time, with respect to any trust hereunder, to settle the account of the Trustees by agreement between the Trustees and the then adult individual or individuals to whom or for whose use or benefit the income of such trust may then be paid or applied and the adult or adults who would be entitled to the principal in case such trust were to terminate at the time of such agreement, excluding any such individual who is under a disability if there is a party to the agreement who is not under any disability and who has the same interest as the individual who is under a disability, which agreement shall bind all persons, whether or not then in being, then or thereafter interested in either the income or the principal of such trust. Any such settlement shall have the same force and effect as a final decree, judgment or order of a court of competent jurisdiction rendered in an appropriate action or proceeding for the judicial settlement of such account in which jurisdiction was obtained of all necessary and proper parties. The expenses of any such account shall be a proper administration expense of such trust.

-20-

D.   To the extent permitted by law, no Trustee shall be accountable, liable or responsible for any act, default, negligence, or omission of any other Trustee.

TENTH:   Definitions.

Wherever used in this Trust Agreement:

1.   The word "Trustees" and all references to the Trustees shall mean and refer to the Trustees and successor Trustees hereinabove named, any successor Trustee appointed pursuant to the provisions hereof, any substitute Trustee appointed by a court of competent jurisdiction, the survivors or survivor of them, and their and each of their successors or successor, as may be acting hereunder from time to time.

2.   The words "IN TRUST" shall mean "in trust, nevertheless, to hold, manage, invest and reinvest, and, until payment thereof as hereinafter directed, to receive the income thereof."

3.   The word "pay" shall, where applicable, mean "convey, transfer and pay" and the word "payment" shall, where applicable, mean "conveyance, transfer and payment."

4.   The words "descendant" and "descendants," when used with respect to any person, shall be deemed to include (i) every individual who is born to such person, (ii) every individual who is lawfully adopted by such person, and (iii)

-21-

every individual who is otherwise descended from such person, whether by birth, or by lawful adoption, or by a combination thereof.

5. The words "Internal Revenue Code" shall mean and refer to "the United States Internal Revenue Code of 1986 (as amended from time to time)," and any reference to a specific section, chapter or other provision of the Internal Revenue Code shall mean and refer to said section, chapter or other provision and any successor statute thereto pertaining to the same subject matter as said section, chapter or other provision.

ELEVENTH: <u>Administrative Powers</u>.

A. In addition to and in amplification of the powers given by law to trustees, the Trustees, but solely in their fiduciary capacities, are hereby authorized and empowered, in their discretion:

1. To sell, exchange, make contracts with respect to, grant options on or otherwise dispose of, at public or private sale, at such prices, on such terms (including sales on credit with or without security) and at such time or times as the Trustees shall determine, any property, real or personal, which may at any time form part of any trust hereunder.

2. To lease, for such periods (whether or not any such period shall extend beyond the period prescribed by law

-22-

or the probable term of any trust hereunder), on such terms and conditions and at such time or times as the Trustees shall determine, the whole or any portion or portions of any property, real or personal, which may at any time form part of any trust hereunder, whether the same be held in severalty or as tenant-in-common with others or in a partnership, syndicate or joint venture or otherwise, and release and convey any undivided interest in any such property for the purpose of effecting partition of the whole or any part thereof; and make, place, extend or renew mortgages, pledges, building loan agreements or building loan mortgages upon or affecting any and all such property; and make, execute and deliver such mortgages, pledges and agreements, together with proper bonds, notes or other instruments of indebtedness to accompany the same, and such extension or renewal agreements, as to the Trustees shall seem necessary, advisable or proper; and also to repair, alter, reconstruct, build upon or improve any such property and on such terms and at such time or times as the Trustees shall determine, give and grant to others the right so to do, or agree in, or so modify any lease affecting any such property that the lessee may alter, repair, reconstruct, build upon, improve, mortgage and pledge any such property; and generally to make, alter and modify all agreements, leases, mortgages, pledges, building loans, sales, exchanges, transfers and conveyances of or affecting any such property which the Trustees shall determine to be necessary, advisable or proper for the preservation, improvement, enhance-

-23-

ment in value of, or betterment of or addition to, such property.

3.    To hold any part or all of the assets of any trust hereunder invested in the same form of property in which the same shall be invested when received by the Trustees, and invest and reinvest the assets of any such trust, or any portion thereof, in any form of investment which the Trustees may determine (including, without limitation, mutual funds, common trust funds, investment trusts, general partnerships and limited partnerships), whether or not such investment is of the nature prescribed by law as a legal investment for fiduciaries or is speculative in nature, and without regard to the percentage of the assets of such trust which such investment or similar investments may constitute.

4.    To vote in person or by proxy all stocks and other securities held by any trust hereunder; grant, exercise, sell or otherwise turn to account rights to subscribe for stock and securities and options of any nature; amortize or refrain from amortizing premiums on bonds or other securities which the Trustees may purchase or receive; participate in reorganizations, mergers, liquidations or dissolutions, and contribute to the expenses of, and deposit securities with, protective committees in connection therewith; participate in voting trusts; and generally exercise, in respect of said stock and securities, all

-24-

rights, powers or privileges which may be lawfully exercised by any person owning similar property in his or her own right.

5.    To employ any investment counsel, corporate custodians, agents, accountants, brokers and attorneys which the Trustees may select and pay the charges thereof (including charges for preparation of trust tax returns, the Trustees' accounts and any other necessary trust records); and the Trustees, or a partnership, corporation or other entity in which any Trustee shall be interested, or by which any Trustee may be employed, may be retained in any such capacity, and, in such event, the charges which shall be payable to such Trustee, or to any such partnership, corporation or other entity, shall be in addition to compensation otherwise allowable to such Trustee and may be paid without prior judicial approval.

6.    In any case in which the Trustees are authorized or required to pay or distribute any share of any trust hereunder, to make such payment or distribution in kind, or partly in kind and partly in money and, in connection therewith, to allocate equal or unequal interests in, or amounts of, specific property in satisfaction of such payment or distribution; provided, however, that any property distributed in kind shall be valued, for purposes of such distribution, at its fair market value on the date of distribution.

-25-

7.    To settle, adjust, compromise or submit to arbitration any dispute, claim or controversy in which any trust hereunder may be in any way interested.

8.    To borrow money from any person, partnership, corporation or other entity, who may be any Trustee or a partnership, corporation or other entity in which any Trustee may be interested, or by which any Trustee may be employed, for the purpose of meeting any and all charges against any trust hereunder or for any other purpose connected with the administration, preservation, improvement or enhancement in value of any such trust, and, in connection with any such borrowing, to pledge, hypothecate or mortgage any part or all of the assets of any such trust.

9.    To keep any or all of the securities at any time forming a part of any trust hereunder in the name of one or more nominees.

10.    In any case where doubt or uncertainty exists under applicable law or this Trust Agreement, to credit receipts and charge expenses to principal or income, or partly to each.

11.    By instrument or instruments signed by all of the Trustees qualified and acting as such at any time with respect to any trust hereunder, to delegate, in whole or in part, to any person or persons (including any one or more of the

-26-

Trustees) the authority and power to (i) sign checks, drafts or orders for the payment or withdrawal of funds from any bank account or other depository in which funds of such trust shall be held, (ii) endorse for sale, transfer or delivery, or sell, transfer or deliver, or purchase or otherwise acquire, any and all stocks, stock warrants, stock rights, bonds or other securities whatsoever with respect to such trust, and (iii) gain access to any safe deposit box which may be in the names of the Trustees and remove part or all of the contents of any such safe deposit box and release and surrender the same.

12. To pay or deliver to either parent or to the guardian of the property of any minor or to an adult with whom such minor resides, and, with respect to any person for whom it is permissible to do so under applicable law, to a custodian for such person under a Uniform Gifts to Minors Act or Uniform Transfers to Minors Act of any state until the age of eighteen (18) years (or until such age in excess of eighteen (18) years as shall be permissible under applicable law and which the Trustees, in their discretion, shall select) any sum or property, including income, which such minor or such person shall either be entitled to receive or to have applied for his or her use or benefit under any of the provisions hereof, without requiring that such parent, adult or custodian obtain letters of guardianship or that such parent, guardian, adult or custodian give any bond or other security for any such payment or delivery

-27-

so made; and the receipt of such parent, guardian, adult or custodian for the amount of such payment, or for the property so delivered, shall be an absolute protection to the Trustees and a complete release and discharge from all further accountability in respect of any such payment or delivery.

13. If any beneficiary of any trust hereunder shall, in the opinion of the Trustees, be or become incapacitated (whether by reason of illness, age or other causes) the Trustees may, in their discretion, wholly or partly in lieu of paying net income or principal of such trust to such beneficiary as authorized or directed by this Trust Agreement, dispose of the same in one or more of the following ways:

(a) by making payment of such net income or principal to a legally appointed guardian or other fiduciary of such beneficiary;

(b) by making payment of such net income or principal, on behalf of such beneficiary, to any person with whom such beneficiary resides or who has charge of his or her care; and/or

(c) by applying such net income or principal directly for the use or benefit of such beneficiary.

-28-

14.   To remove the assets of, hold and administer any such assets in, and/or move the situs of the administration of any trust hereunder to, such location or locations (which may be in a state or other jurisdiction other than the State of New York) as the Trustees, in their discretion, shall select.   If the Trustees, in their discretion, shall determine it advisable to move the situs of the administration of any trust hereunder to a location where the judicial administration of trusts is required or permitted, the Trustees are authorized to select and request a court in such location having jurisdiction over the administration of trusts to accept jurisdiction over the administration of such trust, and it is requested that such court accept, and that it be permitted to accept, jurisdiction over the administration of such trust; and it is directed that the administration of such trust shall be governed from time to time by the laws of the jurisdiction in which the administration of such trust is then located.

15.   To make, or refrain from making, elections or allocations permitted under any applicable tax law without regard to the effect of any such election or allocation on the interest of any beneficiary of any trust hereunder and, if any such election or allocation shall be made, to apportion, or refrain from apportioning, any benefits thereof among the respective interests of the beneficiaries of such trust, all in such manner as the Trustees shall deem appropriate.

-29-

16.   To retain or invest in solido the property held in any trust hereunder with the property held in one or more of the other trusts hereunder or with the property held in any other trust created by the Grantor or by any other person for purposes of convenience or for the better investment thereof.

17.   To exercise all authority, powers, privileges and discretion conferred in this Article after the termination of any trust created hereunder and until all of the assets of such trust are fully distributed.

B.   No person or party dealing with the Trustees shall be bound to see to the application of any money or other consideration paid by him or her to the Trustees.

C.   Neither the principal nor the income of any trust hereunder, or any part thereof, shall or may at any time be liable or subject in any manner whatsoever to the debts or liabilities of any beneficiary entitled to receive any principal or income therefrom; nor shall the principal or income of any trust hereunder be liable to attachment by garnishment proceedings or other legal process issued by any creditor of any beneficiary of such trust for debts heretofore or hereafter contracted by such beneficiary; nor shall any assignment, conveyance, charge, encumbrance or order, either of principal or income, given by any such beneficiary be valid.

-30-

D.   Wherever in this Trust Agreement it is provided that an instrument is to be "acknowledged," such instrument shall be acknowledged in such manner as would be required if the same were a conveyance of real property entitled to be recorded in the State of New York.

E.   1.   To the fullest extent permitted by law, no transaction or decision involving any trust hereunder shall be deemed invalidated in any way by reason of any personal, beneficial or other interest which any Trustee may have with respect to such transaction or decision, including, without limitation, any transaction or decision with respect to any corporation, company, partnership, association, estate, trust or other entity in which any Trustee may have an interest in a capacity other than as a Trustee hereunder, regardless of any conflict of interest as to any such transaction or decision, and any such transaction or decision shall be lawful and proper and shall not be questioned unless such Trustee is guilty of fraud with respect thereto.  Without limiting the foregoing, no Trustee shall be disqualified or barred from acting as such or have any liability hereunder in exercising any power, authority or discretion conferred upon the Trustees by reason of the fact that such Trustee may be a stockholder, officer, director, partner, executor, administrator, personal representative, trustee, beneficiary, or in any other way interested in the corporation, company, partnership, association, estate, trust or other entity

-31-

whose securities or property are the subject matter of the exercise of such power, authority or discretion.

2.    The Trustees hereunder shall be entitled to compensation as officers, directors, fiduciaries or other participants in any such entity notwithstanding the fact that they are Trustees hereunder and are also entitled to receive reimbursement for their out-of-pocket expenses as such Trustees.

F.    The Trustees shall be under no duty or obligation and shall not be liable to any trust hereunder or to any person or persons interested in any trust hereunder or be surcharged for failure to buy, sell or engage in any transaction directly or indirectly involving securities issued or to be issued by any corporation or other business organization concerning which any of the Trustees, in a capacity other than as a Trustee hereunder, may have acquired any information which has not been disclosed to the public.

TWELFTH:    Provisions Relating to the GST.

A.    As used in this Article:

1.    "GST" shall mean and refer to "the United States generation-skipping transfer tax imposed by Chapter 13 of the Internal Revenue Code."

-32-

2.   The words "inclusion ratio" shall have the same meaning as those words are given in Section 2642 of the Internal Revenue Code.

3.   The words "Net Death Taxes" shall mean and refer to "the aggregate death taxes (including, without limitation, United States, state, local and other estate taxes and inheritance taxes but not including any interest and penalties thereon), after taking into account all applicable credits, payable with respect to the estate of such beneficiary."

B.   1.   Notwithstanding any other provision in this Trust Agreement to the contrary, and in addition to any other power of appointment hereinabove given by the previous provisions of this Trust Agreement to any individual at whose death the inclusion ratio with respect to any trust under this Trust Agreement would, but for the provisions of this Section B, be more than zero (such individual being referred to in this Article as "such beneficiary"), the Trustees of such trust are authorized and empowered, by an acknowledged instrument in writing (with such instrument to be filed with the court, if any, then having jurisdiction over such trust, if such court shall accept such instrument for filing), (i) to create in such beneficiary a power (hereinafter referred to in this Section B as "such power"), to be exercised by a provision in his or her Will expressly referring to this Article of this Trust Agreement, to appoint to the creditors of his or her estate any portion of the

-33-

property held in such trust at the death of such beneficiary, and (ii) to limit such power, by formula or otherwise, to less than all of the property held in such trust at the death of such beneficiary; provided, however, that with respect to each such trust, the maximum amount of property over which such power may be created shall not, after taking into account the property, if any, over which any other such power is created in such beneficiary, exceed the amount, if any, above which any further addition to the amount subject to such power would increase the Net Death Taxes determined with respect to such beneficiary's estate by an amount equal to or greater than the net decrease in the aggregate of (x) the GST and (y) any state and/or local tax on generation-skipping transfers imposed as a result of the death of such beneficiary that would result from such further addition. Unless such beneficiary's Will otherwise provides by express reference to this Trust Agreement and such power, the increase in the Net Death Taxes on such beneficiary's estate resulting from such power shall be paid from that part of the principal of such trust over which such power is exercisable. If, or to the extent that, such beneficiary shall fail so expressly and so validly to exercise any power created in such beneficiary by the Trustees pursuant to the provisions of this paragraph, the unappointed portion (or, as the case may be, all) of the property subject to such power shall pass pursuant to the provisions of this Trust Agreement otherwise applicable to such property.

-34-

2.    The Trustees are further authorized and empowered, by an acknowledged instrument in writing (with such instrument to be filed with the court, if any, then having jurisdiction over the trust to which such power relates, if such court shall accept such instrument for filing), to revoke any power created by the Trustees pursuant to the provisions of paragraph 1 of this Section B at any time prior to the death of the beneficiary in whom such power was created, and to release, in the manner set forth in Article THIRTEENTH hereof, the right to create such a power.  The Trustees shall not be liable for any exercise, release or failure to exercise the authority and power granted to them by the provisions of said paragraph 1 or for the revocation of any power created by them pursuant to the provisions of said paragraph 1, provided they utilize good faith in considering whether or not to exercise or release such power or to cause such revocation, whether such consideration be at their own instance or at the request of an individual who is a beneficiary of a trust hereunder, the guardian or other fiduciary of such an individual, or a member of his or her family.

C.    1.    Notwithstanding any other provision in this Trust Agreement to the contrary, if at any time any property is to be placed in a trust under the provisions of any Article of this Trust Agreement, the Trustees shall, if need be, and if it is possible to do so, divide such property and place the same in separate trusts to the end that one such trust shall have an

-35-

inclusion ratio of zero, and if any property which is directed to be added to a trust hereunder shall have an inclusion ratio which is different than the inclusion ratio of such trust, the Trustees shall not make such addition but shall instead administer such property in a separate trust under this Trust Agreement; and, in each such instance, the property to be placed or held in such a separate trust shall be held, administered and disposed of by the Trustees pursuant to provisions identical to the provisions of the trust to which, but for the provisions of this paragraph 1, such property would have been placed or added.

2.   If, pursuant to the provisions of paragraph 1 of this Section C, any property that would otherwise be held in a single trust hereunder is instead held in separate trusts hereunder, the Trustees of such trusts may, at any time or from time to time, (i) make different tax elections and allocations with respect to each such trust, (ii) expend principal and income and exercise any discretionary power differently with respect to each such trust, (iii) invest each such trust differently, and/or (iv) take all other actions consistent with such trusts being separate entities.  Furthermore, the donee of any power of appointment with respect to such trusts may exercise such power differently with respect to each such trust.

D.   Notwithstanding the provisions of the foregoing Sections of this Article to the contrary, if any Trustee hereunder is a current beneficiary of the income of any trust here-

-36-

under, or may, in the discretion of the Trustees, be a current income beneficiary of any such trust, then, in such event, such Trustee shall not, in his or her capacity as a Trustee of such trust, have any voice or vote or otherwise participate in any decision pertaining to the matters relating to such trust that are addressed in the foregoing Sections of this Article, and, in each such event, the other Trustee or Trustees of such trust shall make all decisions relating to such trust that pertain to such matters.

THIRTEENTH:    Release of Powers.

Any beneficiary and any Trustee hereunder may at any time or times release any discretionary power of appointment or discretionary power to distribute principal or income or any other discretionary power hereby given to such beneficiary or Trustee, either with or without consideration, with respect to the whole or any part of the property subject to such power and also in such manner as to reduce or limit the persons or objects or classes of persons or objects in whose favor such power would otherwise be exercisable, by an instrument signed and acknowledged by the beneficiary or Trustee releasing such power and delivered to (i) each Trustee then acting hereunder (other than the Trustee, if any, who shall have executed such instrument), (ii) the Grantor (or, if the Grantor is not then living, to the executors, administrators or personal representatives of the

-37-

Grantor's estate), or (iii) any one or more of the adult indi-
viduals to whom or for whose use or benefit the income of any
trust hereunder may then be paid or applied.   In the event of
the release of any such power by any Trustee, the remaining
Trustee or Trustees hereunder, if any, may thereafter exercise
such power, other than any discretionary power which was not
initially vested in such remaining Trustee or Trustees.   The
release of any power by any Trustee hereunder pursuant to the
provisions of this Article shall not be binding upon any Trustee
who may thereafter act as a Trustee hereunder unless such power
shall have been released by all of the Trustees then in office
who are vested with such power by their execution of a signed
and acknowledged instrument specifically providing that such
release is to be binding upon all successor Trustees hereunder.

FOURTEENTH:      Provision With Respect To
                 Closely Held Businesses.

Without limiting the powers and authority conferred
upon the Trustees by Article ELEVENTH hereof but in extension
thereof, the Trustees are specifically authorized and empowered,
in their discretion, to retain for as long as they, in their
discretion, shall deem advisable, any or all shares of stock in
any closely held corporation, or any indebtedness owing by any
such corporation, or any or all interests in any proprietorship,
unincorporated business, partnership, joint venture, realty or

-38-

any other asset, whether owned individually, as tenant-in-common, partner or otherwise, regardless of whether such asset or assets shall be producing profits or losses through ownership or operation thereof, and regardless of the percentage of the trusts hereunder which such assets or similar assets may constitute; and their decision to retain and hold any such asset or liability shall be binding and conclusive upon and shall not be subject to question by any person interested, or who may become interested, in any of the trusts hereunder, and the Trustees shall not incur any liability by reason thereof.

FIFTEENTH:    Headings.

The Article headings contained herein are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope hereof or the intent of any provision hereof.

SIXTEENTH:    Severability.

Should any part, clause, provision or condition hereof be held to be void or invalid, then such invalidity shall not affect any other part, clause, provision or condition hereof, but the remainder hereof shall be effective as though such void

-39-

part, clause, provision or condition had not been contained herein.

WITNESS the due execution hereof by the Grantor and Trustees on the day and year first above written.

_____
ARIE GENGER,
as Grantor

_____
LAWRENCE M. SMALL,
as Trustee

_____
SASH A. SPENCER,
as Trustee

-40-

# Exhibit B

<u>PROMISSORY NOTE</u>



$8,950,000

December 2l, 1993
New York, New York

    FOR VALUE RECEIVED, the undersigned, D&K LIMITED PARTNERSHIP, a Delaware limited partnership (the "Company"), promises to pay to the order of TPR INVESTMENT ASSOCIATES, INC., a Delaware corporation (the "Holder") the principal sum of EIGHT MILLION NINE HUNDRED FIFTY THOUSAND ($8,950,000) DOLLARS, together with interest on the unpaid principal balance at 6.06% per annum, as follows.

1.   Interest shall be payable annually in arrears on the anniversary date of this Note.

2.   Installments of principal in the amount of $447,500 each shall be payable annually beginning on the fourth anniversary of this Note, and the entire unpaid principal balance, together with all accrued and unpaid interest, shall be payable on the tenth (10th) anniversary of this Note.

    Payments hereunder shall be made in lawful money of the United States of America in same day or immediately available funds to the account designated by the Holder in writing to the Company from time to time.

    This Note is the promissory note referred to in the Agreement, dated as of September 30, 1992, as amended as of the date hereof, between the Company and the Holder.

    If the Company shall fail to make any payment on this Note within 10 business days after the same shall become due and payable, or in the event of a Bankruptcy Event (defined below), then the Holder may, while such act or occurrence shall be continuing, upon notice to the Company to such effect, declare the entire unpaid principal amount of this Note to be forthwith due and payable, whereupon this Note shall become immediately due and payable without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Company. No remedy herein conferred upon or reserved to the Holder or the Company is intended to be exclusive of any other remedy, and such remedy shall be in addition to every other remedy given hereunder or at law or in equity.

The term "Bankruptcy Event" shall mean any of the following events or occurrences: (i) the Company admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of creditors; or (ii) any proceeding is instituted by or against the Company, seeking to adjudicate it a bankrupt or insolvent, or seeking any arrangement, adjustment composition of the Company, or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking to dissolve, wind-up or liquidate the Company, or any substantial part of its assets, or seeking appointment of a receiver, trustee or other similar official for the Company, or for any substantial part of its property.

In the event of a declaration of acceleration of the principal amount of this Note as set forth above, the Company agrees to pay the cost of collection, including, without limitation, reasonable attorneys' fees and disbursements.

The Company consents to the jurisdiction of the Federal and State Courts sitting in New York City. With respect to any action or proceeding or enforce or collect this Note, the Company agrees that venue will be proper in such courts and hereby waives any objection based upon Forum Non Conveniens. The choice of forum as aforesaid shall not be deemed to preclude the enforcement of any judgment obtained in such forum or the taking of any action to enforce this Note in any other jurisdiction.

THIS NOTE HAS BEEN DELIVERED IN, AND SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE LAWS OF, THE STATE OF NEW YORK.

D&K LIMITED PARTNERSHIP

By: _____
     Dalia Genger, General Partner

Each of the undersigned hereby assumes and becomes liable for the percentage of this Note set forth opposite its respective name, and agrees that the Holder may enforce this Note, to the extent of such liability, as if the undersigned were the Maker thereof.

Trust u/a 12/13/93 f/b/o        48%
Sagi Genger

By: _____
    Lawrence M. Small, Trustee

    _____
    Sash A. Spencer, Trustee

Trust u/a 12/13/93 f/b/o        48%
Orly Genger

By: _____
    Lawrence M. Small, Trustee

    _____
    Sash A. Spencer, Trustee

# Exhibit C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – X

DALIA GENGER,

                            Index No. 302436/02

                      Plaintiff,

             -against-              **STIPULATION**

ARIE GENGER,

                      Defendant.

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – X

        Stipulation of Settlement ("Stipulation" or Agreement") made as of

October 26, 2004, by and between Dalia Genger (the "Wife"), residing at 210 East 65th

Street, Apt. 11J, New York, NY 10021, (Soc. Sec. No. 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), and Arie Genger

(the "Husband"), residing at 2600 Island Blvd., Penthouse One, Williams Island,

Aventura, FL 33160, (Soc. Sec. No. 114-42-294).

                          W I T N E S S E T H:

        WHEREAS, the parties were duly married to each other on July 23, 1967

in a religious ceremony held in Israel; and

        WHEREAS, the children of the marriage, Sagi Genger and Orly Genger,

are all emancipated and there are no expected additional children of the marriage; and

        WHEREAS, the Wife has commenced the above-captioned action against

the Husband seeking a divorce (the "Divorce Action") and the parties desire to resolve

and settle all issues in that action except the entitlement of either party to a divorce; and

        WHEREAS, except as otherwise provided or reflected herein, it is the

intention of the parties that upon completion of implementation of this Agreement, each

party will have received distributions equal to approximately 50% of the aggregate value of the Husband and the Wife's net marital assets.

NOW THEREFORE, it is agreed as follows:

## ARTICLE I

## ARTICLE HEADINGS, RECITALS AND DRAFTING

1.    The headings at the beginning of each Article of this Agreement are for reference purposes only and shall not in any manner, constitute terms or conditions of this Agreement; nor shall they be applicable to any interpretation of the intention or meaning of the parties or of any part of this Agreement.

2.    The "Whereas" clauses at the beginning of this Agreement are an integral part of this Agreement and shall be considered in any interpretation of the intention or meaning of the parties or of any part of this Agreement.

3.    This Agreement is entered into after negotiation and comments by each party and by counsel for both parties. The fact that the following have participated in the drafting shall not be a consideration in the interpretation of this Agreement: Blank Rome LLP, David Parnes, Esq., Sonnenschein Nath & Rosenthal LLP, Carter Ledyard & Milburn LLP, Goldman & Greenbaum, P.C., and Philip Greenhaus, Esq.

1270083.3
1745188RV-2

ARTICLE II

DISTRIBUTION OF ASSETS

1. The parties' marital property shall be divided and disposed of as is set forth in this Article and Articles III and IV, with the exception of the parties' debts and other obligations to third parties (provisions for which are set forth in Article V). Schedule II(1), annexed hereto and made part hereof, sets forth an itemized list of all of the marital property of the Husband and the Wife, as of January 31, 2002 and as of the date of this Agreement with the values as of the dates indicated on such Schedule. The Husband and the Wife (to her knowledge) each represent to the other that such Schedule completely and correctly sets forth all such marital property as of such dates and to the best of each of his/her knowledge with the values of such property as of the dates indicated in such Schedule; the Husband and the Wife represent to the other party that he/she has no knowledge of any marital property not set forth on such Schedule.

2. Distributions Upon Execution of this Agreement.

(a)    *Cash and Other Distributions.* The Husband and the Wife shall each receive concurrently with the execution of this Agreement certain distributions (for each party, the "Immediate Payment(s)"). The Immediate Payments will be made from cash accounts maintained in the Husband and Wife's joint or individual names, investments made jointly or individually, as well as from an escrow account maintained by Blank Rome LLP for the parties' benefit, with approximately $2,504,537.00 dollars ("BR Escrow"), as of the date of this Agreement, all as more fully detailed, and the sources of which specifically identified, in Schedule II(2)(a) annexed hereto and made

3

1270083.3
1745188RV-2

part hereof. The Husband's and the Wife's Immediate Payments, upon execution of this Agreement, shall be as follows:

(i) <u>Husband</u>: The Husband shall receive (A) the sole ownership of all life insurance policies (set forth on Schedule II(2)(a)(i), annexed hereto and made part hereof) which as of January 15, 2004 had an aggregate cash surrender value of $2,447,782; provided, however, that (w) the life insurance policy (Equitable Single Life Split Dollar #150224782) in the face amount of $1,950,000 and with a cash surrender value to the Husband of $147,833 and with a total death benefit of $2,097,833 shall provide from the date hereof that the net death benefit payable to the Wife shall be at least $2,000,000, (x) if for any reason the total net death benefit payable to the Wife shall be less than $2,000,000 during the first year of this Agreement, the Husband shall immediately notify the Wife and deposit $50,000 in escrow with David A. Parnes, Esq. to be paid to the Wife upon the Husband's death prior to the first anniversary of this Agreement, (y) the amount of the net death benefit payable to the Wife may be reduced at every anniversary hereof by $200,000, and (z) the Husband has directly authorized the insurance broker to provide the Wife all information regarding such policy and hereby agrees not to revoke such authorization prior to the tenth anniversary hereof; (B) all of the Husband and Wife's investment in Conservation Securities, which has an estimated value

4

of $2,128,000; (C) a cash distribution from several cash accounts,
including the BR Escrow, of $1,345,000; and (D) 79,045 shares of
common stock of Lumenis Ltd. ("Lumenis") held in certain
retirement accounts.

(ii)    Wife: The Wife shall receive (A) sole ownership of the
Husband's two hundred and fifty (250) shares of common stock of
TPR Investment Associates Inc. ("TPR"), free and clear of any liens
or other encumbrances initially valued as set forth on Schedule II(1),
annexed hereto and made part hereof, which represents fifty one
percent (51%) of the issued and outstanding shares of common stock
of TPR (exclusive of the 1.96% ownership of TPR which the Wife
owns indirectly through her general partnership interest in D&K
defined below), together with a duly executed stock power
transferring said shares to the Wife and all documents in the
Husband's possession, custody or control relating to TPR, including
the adjusted tax basis thereof, (accordingly, the marital asset consists
of 52.96% of the outstanding shares of common stock of TPR (the
"Marital TPR Percentage") and (B) a cash distribution from several
cash accounts, including the BR Escrow, of $1,345,000.


(b) *Marketable Securities.* All securities in the Smith Barney account
referenced as Item F. 1 on Schedule II(1) will, to the extent possible, be divided between

5

the Husband and the Wife in kind, so that the Husband and the Wife shall each have sole ownership of fifty percent (50%) of such securities.

(c) *Retirement Accounts.* With the exception of 79,045 shares of common stock of Lumenis allocated to the Husband from various IRA accounts per paragraph (a) above, all IRA accounts, pension plans, retirement accounts and the like (the "Pension Accounts"), whether in the name of the Husband or in the name of the Wife, shall be divided equally as follows: each party shall cause fifty percent (50%) of the amount accrued and existing in each Pension Account of such party, to be transferred to the other party and shall use his reasonable best efforts to cause such transfer to be made to a Pension Account of the other party, as more fully described in Article IV of this Agreement.

(d) *Disposition of TRI Stock.* See Article II(9)(b) below.

3.    Residual Cash.  To the extent not distributed pursuant to Section 2 of this Article II, any cash available at the time of execution of this Agreement, and at any time thereafter until distribution thereof ("Residual Cash"), shall be placed in escrow ("RC Escrow Account") with David A. Parnes, Esq., ("RC Escrow Agent") or with any other individual or entity designated for such purpose by Sagi Genger (and if Sagi Genger does not promptly make such designation, Orly Genger) pursuant to an Escrow Agreement substantially in the form of Exhibit II(3), annexed hereto.

4.    Non-Liquid Assets.

(a)    All of the parties' other marital assets which are not distributed pursuant to Section 2 of this Article II, including, but not limited to, personal and real property, and securities and investment accounts that cannot be divided in kind (the "Non

Liquid Assets"), shall be sold as promptly as practicable on terms determined by

agreement of the parties; provided, however, that if the parties cannot agree on such

terms within six (6) months of the date of execution of this Agreement (the "Initial

Period"), the Husband and the Wife agree that thereafter authority and control over any

then unsold Non Liquid Assets as to which the terms of sale have not been agreed on by

the parties shall be vested in Sagi Genger pursuant to a power of attorney substantially in

the form of Exhibit II(4)(a) (the "P/A"). Sagi Genger shall have full and complete

authority to sell any and all Non-Liquid Assets at such prices and upon such terms and to

distribute the proceeds of such sales as he, in his sole discretion, sees fit, subject however

to paragraph (b) of this Section 4 of this Article II below, the terms of the P/A and his

fiduciary duties to effectuate the intent of the parties in entering into this Agreement.

Concurrently with the execution of this Agreement, each of the parties will execute the

P/A and deliver it to Sagi Genger. After the Initial Period and during such time as there

exist any unsold Non-Liquid Assets as to which the parties have not agreed on sale terms

during the Initial Period, each of the parties will promptly execute and deliver to Sagi

Genger any and all additional documents requested by Sagi Genger to effectuate the

provisions of this paragraph (a) of this Section 4. At any time, the Husband and the Wife

may mutually revoke the authority and control vested in Sagi Genger over such Non-

Liquid Assets by providing him with written notice signed by the Husband and the Wife

to that effect ("Revocation Notice"), in which case Sagi Genger will immediately

surrender the P/A, the other documents and the Non Liquid Assets, to a party designated

in the written notice by the Husband and the Wife in his stead (the "Successor Attorney

in Fact"). If no Successor Attorney in Fact is designated in the Revocation Notice, David

7.

A. Parnes, Esq. is designated as Successor Attorney in Fact. If Mr. Parnes is unwilling to

act in such capacity or the parties revoke the authority and control vested in him by

providing him with written notice signed by both of them to that effect and fail to

designate a Successor Attorney in Fact in such notice, Eric Gribetz is designated as

Successor Attorney in Fact. If Mr. Gribetz is unwilling to act in such capacity or the

parties revoke the authority and control vested in him by providing him with written

notice signed by both of them to that effect and fail to designate a Successor Attorney in

Fact in such notice, Orly Genger is designated as Successor Attorney in Fact. If Sagi

Genger is unable to act and the Husband and Wife do not promptly send the Revocation

Notice, then Elana Genger (the spouse of Sagi Genger) together with either the Husband

or the Wife may send the Revocation Notice to Sagi Genger, and in such event David A.

Parnes, Esq. shall be designated as Successor Attorney-in-Fact.

(b)    The net proceeds of the sales of the Non-Liquid Assets, whether

effectuated within the Initial Period or thereafter, shall be distributed as follows: (i) such

amount as would be required to cause the balance in the RC Escrow Amount to equal

Twenty Five Thousand dollars ($25,000) ("Basic Escrow Amount") to the RC Escrow

Account; and (ii) all amounts in excess of the Basic Escrow Amount to TPR in

satisfaction of the parties' indebtedness to TPR as set forth in Article V hereof. Upon

payment in full of such indebtedness to TPR, subject to the provisions of this Article II,

Sagi Genger (or a Successor Attorney in Fact) shall, subject to his fiduciary duties to

effectuate the intent of the parties in entering into this Agreement, have the complete

authority, in his sole discretion, to determine the equitable distribution of the remaining

net proceeds of the sales of the Non-Liquid Assets, whether to the Husband, the Wife or

8

to the RC Escrow Account. The Husband and the Wife shall each be obligated to pay any Federal, state or local taxes due by them upon the sale of the Non-Liquid Assets.

5.    First Anniversary Distributions. Within twenty (20) days of the first anniversary of this Agreement ("First Anniversary"), Sagi Genger (or a Successor Attorney in Fact) will provide the Husband and the Wife with a reasonably detailed written summary of the proceeds of the sale of the assets, and the distributions received by each party or deposited into the RC Escrow Account and any related expenses from and including the date of execution of this Agreement through the First Anniversary. The parties agree that, should there be an imbalance in the distributions received by either party ("Imbalance") in favor of either the Husband or the Wife (the "Overpaid Party") Sagi Genger will cause the RC Escrow Agent to pay to the other party ("Underpaid Party") promptly a sum in cash equal to the Imbalance. In determining any Imbalance with regard to the assets of TPR, the parties will adjust the value attributed to the assets of TPR, as set forth on Schedule III(1) annexed hereto and made a part hereof, based on the net proceeds from the sales of such assets from the execution of this Agreement through the First Anniversary.

6.    Second Anniversary Distributions.

(a)    Within twenty (20) days of the second anniversary of this Agreement ("Second Anniversary"), Sagi Genger (or a Successor Attorney in Fact) will provide the Husband and the Wife with a reasonably detailed written cumulative summary of the proceeds of sale or the Assets, and the distributions received by each party from and including the date of this Agreement through the Second Anniversary or deposited in the RC Escrow Account and any related expenses. Should an Imbalance

9

1270083.3
J745188RV-2

exist, at the election of Sagi Genger (or a Successor Attorney in Fact), either (i) the Overpaid Party shall promptly pay the Underpaid Party a portion of such Imbalance in cash, as instructed by Sagi Genger and/or (ii) Sagi Genger shall instruct the RC Escrow Agent to distribute the balance of the RC Escrow Account, in each case, to redress the Imbalance as of the Second Anniversary. With regard to TPR, the parties will adjust the value attributed to the assets of TPR, as set forth on Schedule II(1) annexed hereto and made a part hereof, based on the net proceeds from the sales of such assets from the execution of this Agreement through the Second Anniversary.

(b)    Any Non-Liquid Asset that has not been sold by the Second Anniversary shall be valued and distributed as the Husband and the Wife mutually agree. If there are any assets as to which such agreement has not been reached (the "Remaining Assets") by the 45th day after the Second Anniversary, the Husband and the Wife agree to purchase from, or to sell to, the other party the Remaining Assets, in accordance with the following procedure:

(i) a coin will be tossed in the air, by Orly Genger or in her absence by a person mutually acceptable to the Husband and the Wife;

(ii) the Husband will be designated as "Head" (i.e. – the side of the coin where the profile of a person is impressed) and the Wife will be designated as "Tail" (i.e. – the other side of the coin);

(iii) if the Head side of the coin shall lay face up, the Husband will become the Evaluating Party for the first Remaining Asset selected by the person tossing the coin, and if the Tail side of the coin shall lay face up, the Wife shall become the

10

Evaluating Party for the first Remaining Asset selected by the person tossing the

coin;

(iv) the Evaluating Party shall value and indicate in writing by five business days

following the coin toss to the other party, the sum at which he or she values such

Remaining Asset ("Evaluated RA Value");

(v) by the fifth business day following receipt of the Evaluated RA Value from

the Evaluating Party ("Determination Date"), the other party shall notify the

Evaluating Party in writing whether he or she intends to acquire from, or to sell

to, the Evaluating Party his or her fifty percent (50%) interest in such Remaining

Asset, in which case the other party shall either remit to the Evaluating Party fifty

percent (50%) of the Evaluated RA Value or receive from the Evaluating Party

fifty percent (50%) of the Evaluated RA Value in cash, within thirty (30) business

days following the Determination Date, against receipt of such Remaining Asset.

If the Evaluating Party does not deliver to the other party the Evaluated RA Value

within 30 days of the Determination Date, the other party shall be entitled to take

the Remaining Asset in question free of any payment or obligation.

In the event that there is more than one Remaining Asset, the party who was not the

Evaluating Party for the prior Remaining Asset, shall be entitled to select the next

Remaining Asset to be evaluated and shall be the Evaluating Party for such Remaining

Asset and the procedures in paragraphs (iv) and (v) above shall be followed. The parties

shall thereafter alternate selection of the Remaining Asset for evaluation and acting as

Evaluating Party as provided above, until all Remaining Assets have been evaluated and

disposed of, as provided above.

11

1270083.3
I74518SNV-2

7.    Notwithstanding anything to the contrary contained herein, with a view to avoid the need for direct payments between the Husband and the Wife, when distributing proceeds from the sales of Non-Liquid Assets from time to time, Sagi Genger (or a Successor Attorney in Fact) will take into consideration anticipated changes caused by the sales of assets of TPR.

8.    (a)    Sagi Genger shall be entitled, in his sole discretion and subject to his fiduciary duty to implement the intent of the parties, to incur reasonable expenses necessary for the maintenance of the marital property (with the exception of the apartment (the "Apartment") at 2600 Island Boulevard, Penthouse One, Williams Island, Aventura, Florida 33160), where all maintenance and other ordinary monthly expenses (including, without limitation, taxes and insurance) shall be borne solely by the Husband, in accordance with paragraph (b) below), the expenses of selling the Non-Liquid Assets and other related activities, and to pay such expenses from the RC Escrow Account.

(b)    Concurrently with the execution of this Agreement, the Wife hereby acknowledges the Husband's sole occupation and use of the Apartment until such time as the apartment is sold. The Husband will assume and promptly pay all maintenance and other ordinary monthly expenses incurred in connection with the Apartment until the time of sale of Apartment. The Husband and the Wife agree to cooperate in the sale of the Apartment during the Initial Period and to cooperate and not to interfere in any way with the sale of the Apartment by Sagi Genger (or a Successor Attorney in Fact) as part of the sale of the Non-Liquid Assets, after the Initial Period.

9.    (a) TPR owns three thousand (3,000) shares of common stock in Trans - Resources, Inc. ("TRI Stock"). The Husband represents and warrants to the Wife that the

12

TRI Stock represents 52.85% of the issued and outstanding shares of common stock of TRI, and that the balance of 47.15% of the common stock of TRI is owned beneficially and of record, pursuant to an arm's length transaction with TRI, by (i) Glencova Investment Co., and (ii) TR Investors LLC, subject to a Shareholders Agreement, dated as of March 30, 2001, a complete and correct copy of which has been delivered to the Wife (the "TRI Shareholders Agreement"). The Husband further represents and warrants to Wife that he has no interest in Glencova Investment Co. or in TR Investors LLC and except for the options provided to Bank Hapoalim B.M. (a copy of the agreement granting an option to Bank Hapoalim has been delivered to the Wife), there exist no other direct or indirect ownership interests in TRI, whether by way of issuance of additional shares of any other class of stock, share options, warrants, convertible debt or the like and there is no agreement or understanding among the parties to the TRI Shareholders Agreement except as provided therein. Except for the Consent of TPR, the Husband further represents and warrants that no consent, approval or similar action of any person is required in connection with the transfer of TRI Stock as contemplated hereby and that such transfer will not conflict with any agreement to which the Husband is party or by which he is bound. The Husband further represents and warrants to the Wife that TRI equity may reasonably be considered to be a distressed private security. Concurrently with the execution of this Agreement, the TRI Stock shall be distributed as follows:

(i)     The Husband will receive 794.40 shares of the TRI Stock representing 13.99468% of the common stock of TRI;

(ii)    Each of Sagi Genger and Orly Genger, will receive in trust 1,102.80 shares of the TRI Stock representing 19.42766% of the common stock of

·13

TRI for each of Sagi and Orly and such trusts will simultaneously therewith execute

and deliver irrevocable proxies to Husband for all of the TRI stock owned by the

trusts; and

(c)     Concurrently with the execution of this Agreement, each of the

Husband and Wife will execute and deliver or cause TPR to execute and deliver (i) all

documents reasonably necessary to effect the transfers required by subparagraph (a) of

this Section 9, and (ii) duly executed stock powers to transfer the shares as required by

subparagraph (a) of this Section 9.

(d)     The parties will cause TRI to provide the Husband, Sagi Genger

and Orly Genger with all documents in TRI's possession, custody and control relating to

the adjusted tax basis of the TRI Stock.

(e)     Following the foregoing transfers of the TRI Stock, the Wife will

have no ownership interest in TRI.

10.     <u>Lumenis Stock Options</u>.  The Husband is the owner of 1,400,000 stock

options to purchase shares of Lumenis common stock ("Options") as set forth on

Schedule II(10) annexed hereto and made part hereof, of which (i) 100,000 Options were

granted to the Husband after the  Commencement Date, (ii) prior to the Commencement

Date the Husband transferred the economic interest in 250,000 Options to a third party

(the options specified in (i) and (ii) are not marital property, and (iii) 1,050,000 options

which are marital property (hereinafter referred to "Marital Options"); such Schedule

II(10) will include the exercise prices of the Options.

(a)     The parties agree that the Wife shall be the beneficial owner of and

receive the economic benefits of 525,000 Options as set forth on Schedule 11(10),

14 .

representing 50% of Marital Options hereinafter referred to as the "Wife's Options"); the

remaining 525,000 Marital Options are referred to herein as the "Husband's Options."

Pursuant to the Options' governing documents, the Husband is not allowed to transfer

any of the Options. Accordingly, the Wife can not receive an actual transfer or

assignment of the Wife's Options and the Wife has no claim directly or indirectly against

Lumenis with respect to the Wife's Options.

(b)    The Husband agrees to notify Lumenis of the exercise of Wife's Options,

at her written direction, as promptly as practicable and no later then the fifth (5th)

business day following the date on which the Husband shall receive "actual notice" (as

defined below) in writing from the Wife requesting the exercise, provided that the Wife

simultaneously with such notice remits payment of the appropriate exercise price by wire

transfer to the Husband or, if directed by the Husband, directly to Lumenis, with respect

to those of the Wife's Options that she wishes to exercise, and, further provided that there

are no legal impediments to such exercise, including, without limitation, any restrictions

as set forth in the applicable agreements covering such Options, any "blackout periods"

imposed by Lumenis on its officers and directors,  or restrictions under the Federal

Securities Laws or the rules and regulations of any applicable stock exchange. "Actual

notice" shall mean the Husband's actual receipt of the written notice, which shall include

the number of Wife's Options of each Class of Options she directs him to exercise, and, if

required, appropriate payment from the Wife. In addition, the Wife also agrees to give

written notice of any exercise of the Wife's Options to the person then designated to

receive copies of notices to the Husband (see Article XX) concurrently with any notice to

the Husband. The Husband shall not be liable with regard to any diminution in value or

15

divestiture of option rights between the Wife's sending of notice and either (x) the

Husband's receipt of the same and (y) the Husband's exercise of the Wife's Options on

the Wife's behalf, provided that the Husband provides actual notice to Lumenis as

promptly as practicable and no later than the 3rd business day following his receipt of

notice from the Wife  Upon any exercise of the Wife's Options, the Husband will deliver

or cause to be delivered to the Wife the shares of Lumenis stock received upon such

exercise as promptly as practicable.

(c)    The parties recognize the possibility that the Husband's interest in the

Options may terminate for reasons specified in applicable agreements or otherwise, and

the Husband may thereby lose his rights to the Options.  As long as the Wife's Options

are outstanding, the Husband will use his best efforts to maintain his rights to such

Options.  If there is nonetheless a forfeiture or loss of all or any portion of the Options

while Wife's Options remain outstanding, the Husband shall give the Wife notice of such

forfeiture or loss and the Husband and the Wife shall each sustain a fifty percent (50%)

share in the loss of his and her outstanding share in the Marital Options.

11.    (a)    It is the intention and agreement of the parties that, pursuant to the

provisions of Section 1041 of the Internal Revenue Code, the transfers and payments

between them pursuant to this Article are not taxable transactions to either party.

Moreover it is the intention and agreement of the parties that such transfers and payments

between them are not includible in the income of either the Wife or Husband pursuant to

Sections 61 or 71(a) of the Code, and shall not be deductible by either the Wife or

Husband pursuant to Section 215 of the Code.  Both parties further agree that they shall

not henceforth assert a position (in filing future tax returns) inconsistent with this

1270083.3
1745188RV-2

Agreement or with this undertaking, and each will be liable to the other for damages, including taxes, penalties and interest, as well as reasonable attorneys' and accountants' and other professional fees, expenses and court costs, occasioned by breach of this covenant.

(b)    In the event that the tax assumptions set forth in paragraph (a) of this paragraph should ever prove to be incorrect, the relevant provisions of this Agreement will be modified by the parties so as to approximate as closely as possible the after-tax effects to the parties anticipated by paragraph (a). If the parties have not so agreed within 30 days, one or both parties shall give notice of the failure to agree to Sagi Genger (or in his absence David A. Parnes, Esq.) who shall promptly appoint tax counsel in his discretion, subject to his fiduciary obligations to the parties, and such tax counsel shall have full authority to resolve the matter.

## ARTICLE III

## VALUATION OF TPR ASSETS FOLLOWING EXECUTION OF THIS AGREEMENT

1. TPR has agreed, by resolutions of its Board of Directors (substantially in the form attached hereto as Exhibit III(1)), to be bound by the provisions of this Article III and the other provisions that contemplate action by it, and will cooperate with the Husband and the Wife in order to fulfill the provisions hereof.

A FUNDAMENTAL PART OF THIS AGREEMENT IS THE HUSBAND'S RELINQUISHMENT OF HIS OWNERSHIP OF SHARES OF COMMON STOCK IN TPR, AND THE TRANSFER OF SUCH OWNERSHIP TO THE WIFE. THE PARTIES ARE UNABLE TO DETERMINE THE PRECISE VALUE OF TPR UPON EXECUTION OF THIS AGREEMENT AND ARE RELYING AT THE TIME OF EXECUTION OF THIS AGREEMENT ON TPR'S BOOK VALUE, AS SET FORTH ON SCHEDULE III(1).

17

1270083.3
J745188RV-2

2. The parties agree that the assets of TPR as listed on Schedule III(1-) are divided into three (3) categories;

(i) Cash and marketable securities, designated as (Category A) on Schedule III(1).

(ii) Assets valued designated as (Category B) on Schedule III(1).

(iii) Assets as to which neither party accepts the valuation, designated as (Category C) on Schedule III(1).

The parties accept the value of the assets in Category A as binding upon them (subject to updating due to the passage of time).

(a)    The Husband represents to the Wife that TPR's total liabilities are no more than $10,000.

(b)    TPR, by its Chief Executive Officer or Vice President, within one hundred twenty (120) days of the date of execution of this Agreement must notify the Husband, in writing, whether it accepts the value of the assets in Category B. Should TPR either (x) fail to notify its acceptance in writing or (y) express disagreement with the valuations of the assets in Category B, TPR will be obligated to sell the assets in its discretion, but subject to its duties to its shareholders, and the sales price will be definitive and binding upon the parties as the value of the assets in Category B.

(c)    All of the assets in Category C will either be (x) sold or (y) appraised, by an appraiser selected by Sagi Genger or David A. Parnes, Esq., as determined by TPR in its discretion, but subject to its duties to its shareholders. The sale or appraised value of each asset will be definitive and binding upon the parties as the value of the assets in Category C.

18

(d)     In the event that by the Second Anniversary there remains disagreement as to the valuation of assets in Category B, or if any assets in Category B or Category C have not been sold (the "Non Sold Assets"), the Husband and TPR agree to purchase or to sell, from or to, the other party such Non Sold Assets, in accordance with the following procedure:

(i) a coin will be tossed in the air, by Orly Genger or in her absence by a person mutually acceptable to the Husband and TPR;

(ii) the Husband will be designated as "Head" (i.e. – the side of the coin where the profile of a person is impressed) and TPR will be designated as "Tail" (i.e. – the other side of the coin);

(iii) if the Head side of the coin shall lay face up, the Husband will become the Evaluating Party for the first Non Sold Asset selected by the person tossing the coin, and if the Tail side of the coin shall lay face up, TPR shall become the Evaluating Party for the first Non Sold Asset selected by the person tossing the coin;

(iv) the Evaluating Party shall value and indicate in writing by the fifth business day following the coin toss to the other party,  the sum at which it values such Non Sold Asset ("Evaluated NSA Value");

(v) by the fifth business day, following receipt of the Evaluated NSA Value from the Evaluating Party ("TPR Determination Date"), the other party shall notify the Evaluating Party in writing whether it intends to acquire from, or to sell to, the Evaluating Party its part of such Non Sold Asset, in which case the other party shall either remit to the Evaluating Party its Obligated

19

Share (as defined below) of the Evaluated NSA Value or receive from the

Evaluating Party its Obligated Share of the Evaluated NSA Value, within 30

business days following the TPR Determination Date against receipt of such

Non Sold Asset. If the Evaluating Party does not deliver to the other party

the Evaluated NSA Value, within 30 days of the TPR Determination Date,

the other party shall be entitled to take the Non Sold Asset in question free

of any payment or obligation.

In the event that there is more than one Non Sold Asset, the party who was not the

Evaluation Party for the prior Non Sold Asset shall be entitled to select the next Non Sold

Asset to be evaluated and shall be the Evaluating Party for such Non Sold Asset; and the

procedures in paragraphs (iv) and (v) above shall be followed. The parties shall

thereafter alternate selection of the Non Sold Asset for evaluation and acting as

Evaluating Party as provided above, until all Non Sold Assets have been evaluated.

"Obligated Share" shall mean (a) for TPR, 26.48% and (b) for the Husband, 73.52%.


## ARTICLE IV

## PENSION RIGHTS

1.     The parties shall divide all of their IRA's and other retirement

vehicles as provided in this Article and Article II. All such IRA's and retirement vehicles

are included in Schedule II(1).

2. The Husband's IRA's and retirement vehicles included in Schedule

II(1) contain 79,045 shares of Lumenis which were purchased after the commencement

of the parties' divorce action; such shares shall be the Husband's separate property. The

1270083.3
I745188RV-2

remainder of the assets contained in such IRA's, as of the date of execution of this

Agreement shall be divided into two equal portions and one of those portions will be

transferred by direct transfer into an IRA owned by the Wife as promptly as practicable

after the entry of the Judgment of Divorce.

3.    One half (1/2) of any other IRA's owned by either party, as of the

date of execution of this Agreement will be transferred to the other party by direct

transfer to an IRA owned by the other party as promptly as practicable after the entry of

the Judgment of Divorce.

4.    One-half (1/2) of the assets (other than Lumenis shares referred to

in paragraph IV(2) above) in each of the parties' other pension plans and retirement plans

(including but not limited to any plan qualified under § 401 of the Internal Revenue Code

to which Section 401(a)(11)(B) of the Code or Section 205(b) (1) of ERISA shall apply)

(hereafter a "Qualified Plan") shall be transferred to the other party pursuant to a

Qualified Domestic Relations Order ("QDRO") as promptly as practicable and in any

event within ninety (90) days after service by one party or the other of notice of entry of a

judgment of divorce between the parties.  With respect to the portion of the electing

party's Qualified Plans as described in this paragraph 4 which the electing party is to

retain, the other party consents to the electing party's current and future designation of

beneficiaries under any of such Qualified Plans other than the consenting party (and to

any and all revocations and/or modifications of such designations), including any of such

plans referred to in Section 401(a)(11)(B)(iii) of the Code or Section 205(b)(1)(C) of

ERISA.

21

5.    Except as is specifically provided to the contrary in the prior

provisions of this Article and Article II, each party forever waives any interest that he or

she may have to any IRA, Keogh plan, pension plan, profit sharing plan, 401(k) plan,

individual retirement plan, employee stock ownership plan or stock bonuses or other

employee benefit or other retirement plan of any description whatsoever (including,

without limitation, any life insurance benefits contained therein), in the future held in the

other's name or associated with any employer of the other or with any entity owned, now

or previously, by the other.

6.    Each party has simultaneously executed and delivered to the other

(and in the future will, without further consideration or remuneration, promptly execute

and deliver to the other) all documents that are presented to him or her and that are

reasonably required in order to effectuate the intentions and provisions of this Article.

## ARTICLE V

## RESPONSIBILITY FOR DEBTS

1.    Except for certain obligations (provisions for which are set forth in

paragraph 3 of this Article), the Wife represents that she has not heretofore incurred or

contracted, or caused to be incurred or contracted, for herself, any debt, charge,

obligations or liability whatsoever (contingent or otherwise) for which the Husband or his

estate is or may become liable. The Wife shall not hereafter incur or contract or cause to

be incurred or contracted any debt, charge, obligation or liability whatsoever, for

necessaries or otherwise, upon the credit of the Husband for which the Husband or his

estate may become liable. Except as provided otherwise in paragraph 3 of this Article,

the Wife shall satisfy and shall indemnify the Husband against all debts, charges,

22

1270083.3
1745188RV-2

obligations or liabilities of every kind and nature whatsoever (including reasonable fees of attorneys and other professionals and costs of litigation) which were heretofore or may hereafter be incurred or contracted solely by her.

2.    Except for certain obligations (provisions for which are set forth in paragraph 3 of this Article), the Husband represents that he has not heretofore incurred or contracted, or caused to be incurred or contracted, for himself, any debt, charge, obligations or liability whatsoever (contingent or otherwise) for which the Wife or her estate is or may become liable.  The Husband shall not hereafter incur or contract or cause to be incurred or contracted any debt, charge, obligation or liability whatsoever, for necessaries or otherwise, upon the credit of the Wife for which the Wife or her estate may become liable.  Except as provided otherwise in paragraph 3 of this Article, the Husband shall satisfy and shall indemnify the Wife against all debts, charges, obligations or liabilities of every kind and nature whatsoever (including reasonable fees of attorneys and other professionals and costs of litigation) which were heretofore or may hereafter be incurred or contracted solely by him.

3.    (a) The Husband shall indemnify, defend, and hold harmless the Wife, from and against 100% of any and all liabilities, damages, claims, actions, losses, settlements, penalties, judgments or obligations, (each a "Claim") including her reasonable counsel and other professional fees, expenses and costs, including but not limited to or arising from, existing, threatened and/or future actions, or proceedings naming the Wife (either solely or jointly with other parties) as a party, arising out of, or due to, events that occurred on or before the date of this Agreement.  In addition, the Husband shall indemnify, defend and hold harmless the Wife from and against 100% of

23

any and all Claims which arise by reason of any transaction made hereunder between the Wife or any affiliate of the Wife and any third party without sufficient consideration.

(b) (i)   The Husband shall indemnify, defend, and hold harmless the Wife, from and against 100% of the Marital TPR Percentage of any and all Claims, including her reasonable counsel and other professional fees, expenses and costs (except as otherwise specified in sub-paragraph (ii) below), naming TPR as a party arising out of, or due to, events that occurred on or before the date of this Agreement.

(ii)     The Husband shall indemnify, defend, and hold harmless the Wife, from and against 50% of the Marital TPR Percentage of any and all existing or threatened Claims, including her reasonable counsel and other professional fees, expenses and costs arising from the action against TRI pending in Louisiana and Mississippi referred to as the Bogalusa Litigation. Schedule V(3)(ii) attached to this Agreement contains an update of the status of the Bogalusa litigation. Husband represents and warrants to Wife that to the best of his knowledge there is no other Claim naming TPR as a party, arising out of, or due to, events that occurred on or before the date of this Agreement.

(c) Husband further represents and warrants to Wife she has no liability with respect to the promissory note, dated December 31, 2001 made by the Husband in favor of Sash A. Spencer in the principal amount of one hundred twenty thousand dollars ($120,274.20), a copy of which is annexed hereto as Exhibit V(3)(c) . In any event, the Husband shall indemnify, defend, and hold harmless the Wife from and against 100% of any and all liabilities, damages, claims, actions, losses, settlements, penalties, judgments

24

or obligations, including her reasonable counsel and other professional fees, expenses and costs in connection with such note.

4.    The Husband or the Wife may each, prior to the Second Anniversary, submit a request to an Arbitrator (as such term is defined Article XIII, and upon the terms detailed therein), with notice to the other party, to prevent distribution to the indemnifying party, by Sagi Genger (or his successor Attorney in Fact) of Non Liquid Assets, and Arbitrator shall be entitled to prevent the distribution of Non Liquid Assets to the indemnifying party provided Arbitrator has reasonable grounds to believe that on the preponderance of evidence submitted to him by the parties (i) an actual liability exists, and (ii) the indemnifying party has not provided reasonably satisfactory assurances that assets are available to cover such liability pursuant to indemnities made hereunder. The Arbitrator may order the non-distribution of Non Liquid Assets to the indemnifying party only in the amount and to the extent necessary to cover the Arbitrator's expected value of such liability; a notice to that effect will be promptly delivered to Sagi Genger (or to his successor Attorney in Fact).

5.    Concurrently with the execution of this Agreement, the Husband and the Wife shall each assume two percent (2%) of the amount due (as of the date hereof, approximately $9,880,000, inclusive of interest) under the promissory note to TPR, dated December 21, 1993, in the original principal amount of $8,950,000 made by D&K Limited Partnership ("D&K") of which the Wife is general partner (the "D&K Note"). A copy of the D&K Note, together with the form of the Instrument of Assumption by Husband and Wife and the Acknowledgment and Consent by TPR is annexed hereto as

Exhibit V(5). The Husband's and the Wife's aggregate liability of four percent (4%) represents the entire marital obligation and indebtedness under the D&K Note.

6. Concurrently with the execution of this Agreement, each of the parties will assume one half (1/2) of the liability under certain promissory notes (the "TPR Notes") made by the Husband in favor of TPR in the aggregate amount including outstanding principal and interest of $920,143.36 as of the date of this Agreement. Husband represents and warrants that as of the date of this Agreement the TPR Notes are legal, valid and binding obligations of Husband. Copies of the TPR Notes, together with the form of the Instrument of Assumption by Husband and Wife and the Acknowledgment and Consent by TPR are annexed hereto as Exhibit V(6).

7. Concurrently with the execution of this Agreement, the Husband will forgive all obligations owed to him by D&K in the aggregate amount including outstanding principal and interest of $772,880.16 as of the date of this Agreement ("D&K Obligations to Husband"). A copy of a schedule of the D&K Obligations is annexed hereto as Exhibit V(7). Husband hereby forgives the D&K Obligations to Husband and hereby acknowledges that they are cancelled.

8. The Husband represents and warrants that to the best of his actual knowledge, the obligations set forth in Schedule II(1) and as specifically described above in this Article represent a complete and accurate list of all marital obligations and liabilities in excess of $10,000 that he has entered into, or has caused the Wife to enter into or become responsible for, prior to the date of this Agreement and to the best of his knowledge all material contingent liabilities to which he or she or D&K may be subject arising from any events, actions or omissions prior to the date of this Agreement. The

26

Wife represents and warrants, to the best of her actual knowledge, that the obligations set forth in Schedule II(1) and as specifically described above in this Article represent a complete and accurate list of all marital obligations and liabilities in excess of $10,000 that she has entered into, or has caused D&K to enter into, prior to the date of this Agreement and all material contingent liabilities to which she or D&K may be subject as a result of her actions or omissions prior to the date of this Agreement.

9. Except as specifically stated to the contrary in this Agreement, each party will be solely responsible for the payment of all debts in his or her own name, whether incurred previously or in the future.

1270083.3
17451888\V-2

## ARTICLE VI

### INCOME TAX RETURNS

1.      The parties have previously filed joint, federal, state and local income tax returns for all tax years through the year ended December 31, 2003 for the following jurisdictions:

> US Federal Income Tax
>
> New York State
>
> New York City

(the "Joint Tax Returns"). The Husband represents and warrants that there are not any pending or threatened investigations or audits of any of the Joint Tax Returns.

2.      With respect to any tax return either party filed separately for any tax year, any refunds received or liabilities incurred in connection with such return shall be for the account of the party filing such return. With respect to the parties' joint tax returns for the years 2002 and 2003, any refunds received or liabilities incurred in connection with such returns shall be for the benefit of the Husband.

3.      Promptly after either party receives notice of any investigations or audit after the date hereof, he or she shall give prompt written notice to the other party. The parties shall endeavor in good faith to agree on the handling of the investigation or audit. If the parties have not so agreed within 30 days of notice to the other party, one or both parties shall give notice of the failure to agree to Sagi Genger (or in his absence David Parnes), who shall promptly appoint tax counsel in his discretion, subject to his fiduciary obligations to the parties, and such tax counsel shall have full authority to determine handling of the investigation or audit, including without limitation settling with

28

the investigatory or auditing authority and apportioning liability for any deficiency (including penalties and interest), entitlement to any refund and costs of the investigation or audit including reasonable attorneys', accountants' and other professional fees in accordance with relative responsibility therefor. Husband and Wife may at any time by joint written notice to Sagi Genger (or David A. Parnes, Esq.) and tax counsel appointed as described above revoke the authority of tax counsel and proceed according to mutual agreement. In any such case, liability for any deficiency (including penalty and interest), entitlement to any refund and costs of the investigation or audit including reasonable attorneys', accountants' and other professional fees shall be apportioned in accordance with relative responsibility therefor. In the event that either the Husband or the Wife pays more than his or her share (as determined by this Article) of any deficiency, tax, penalty, or interest relating to a previously filed Joint Tax Return, the Husband or Wife, as the case may be, shall reimburse the other for 50% of the same, together with any reasonable expenses the other party may incur in connection with payment of the excess, including without limitation the other's reasonable attorneys', accountants' and other professional fees and costs of litigation.

4. Husband and Wife shall cooperate in the handling of the investigation or audit, including without limitation execution of such powers of attorney as may be required to enable Sagi Genger (or David A. Parnes, Esq.) and tax counsel to act as contemplated by this Article, execution of amended tax returns or other documents as may be reasonably appropriate in connection with such investigation or audit (provided that the execution of any such other document would not adversely affect the party's financial interest) and promptly and without any charge or other consideration making

29

available such papers, records, documents and information as may be reasonably

appropriate in connection with such investigation or audit.

## ARTICLE VII

## MEDICAL INSURANCE AND RELATED
## EXPENSES FOR THE PARTIES

1. The Husband will maintain his own medical insurance for his own

benefit without contribution by the Wife to the cost thereof. He shall be responsible for

all of his own unreimbursed medical expenses (whether incurred before or after the date

of execution of this Agreement), including, but not limited to, doctors, dentists,

orthodontists, pharmacists, psychiatrists, psychologists or other mental health

professionals. Such unreimbursed medical expenses include, but are not limited to,

insurance deductibles, co-payments and uninsured medical expenses.

2. If the Wife may lawfully choose to do so, she may elect at her expense

to obtain coverage through the Husband's plan of medical insurance under the

Consolidated Omnibus Budget Reconciliation Act of 1985 (commonly referred to as

"COBRA") or other similar laws (or if such coverage is not available for any reason she

may obtain other substantially equivalent coverage reasonably satisfactory to her) for a

period of 36 months. The Wife shall be responsible for all of her own medical expenses

(whether incurred before or after the date of execution of this Agreement) unreimbursed

by such COBRA or other coverage, including, but not limited to, doctors, dentists,

orthodontists, pharmacists, psychiatrists, psychologists or other mental health

professionals. Such unreimbursed medical expenses include, but are not limited to,

insurance deductibles, co-payments and uninsured medical expenses.

30

## ARTICLE VIII

### EQUITABLE DISTRIBUTION

1.      The parties acknowledge and agree that the resources of the parties and the provisions of this Agreement, including the transactions contemplated hereby, are intended, except as otherwise provided or reflected herein, , to effect approximately a 50-50 distribution of their net marital assets and represent and set forth a fair, reasonable and equitable distribution of each of their maintenance, necessaries, property and other rights arising from their marital relationship or otherwise and that the payments, property transfers and releases, whether past, present or due in the future ("Distribution") represent an agreeable and equitable division of such rights. Henceforth all such rights shall be governed solely by this Agreement.

2.      Without limiting paragraph 1 of this Article, but subject to paragraph 5 of this Article, Wife's audit rights as provided in Article XII, the Wife further acknowledges and agrees that:

(a) she is accepting any and all Distributions and other rights under or contemplated by this Agreement in full satisfaction of any claim for equitable distribution or maintenance or spousal support from the Husband, all payments due pursuant to the *pendente lite* order of Judge Judith Gische made on December 3, 2002 and of any claim to any property of the Husband whether owned directly or beneficially by him individually or jointly with the Wife or any third party or parties, that she may have, or may have asserted, including any claim under Section 236(B)(5) of the Domestic Relations Law of New York commonly known as the Equitable Distribution Law, or any applicable law of the United States, the State of New York, or any other state, nation,

31

territory or province now or hereafter having jurisdiction over the parties, or over any of their marital assets; and

(b) in accepting the said Distributions and rights, she is waiving any and all rights, either under the Equitable Distribution Law or any other provision of law to any property of the Husband which she has heretofore claimed or may hereafter claim, constitutes "marital property" as defined by Section 236 Part B(1)(c) of the Domestic Relations Law, as well as to all Husband's separate property disclosed to her.

3. Without limiting paragraph 1 of this Article, but subject to paragraph 5 of this Article, the Husband further acknowledges and agrees that:

(a) he is accepting any and all Distributions and other rights under or contemplated by this Agreement in full satisfaction of any claim for equitable distribution or maintenance or spousal support from the Wife, and of any claim to any property of the Wife whether owned directly or beneficially by her individually or jointly with the Husband or any third party or parties, that he may have, or may have asserted, including any claim under Section 236(B)(5) of the Domestic Relations Law of New York commonly known as the Equitable Distribution Law, or any applicable law of the United States, the State of New York, or any other state, nation, territory or province now or hereafter having jurisdiction over the parties, or over any of their marital assets; and

(b) in accepting the said Distributions and rights, he is waiving any and all rights, either under the Equitable Distribution Law or any other provision of law to any property of the Wife which he has heretofore claimed or may hereafter claim, constitutes "marital property" as defined by Section 236 Part B(1)(c) of the Domestic Relations Law, as well as to all Wife's separate property.

32

4. Subject to paragraph 5 of this Article, each of the parties forever waives, releases, renounces and relinquishes any and all rights or claims to the other's licenses and certificates, degrees, professional practices, business, anticipated income, career, goodwill, earned but as yet undistributed income, enhanced earning capacity, bank accounts, retirement vehicles (including, without limitation, IRAs, 401(k) plans and insurance policies), constructive trusts, equitable liens, pensions, automobiles, claims to intangible assets of the other party, any and all rights or claims based upon the active or passive role of either party in the management of a particular asset, as well as any other rights or claims against the past, present or future property of the other, whether such rights or claims arise at law, in equity or by virtue of the marital relationship.

5. Notwithstanding any other provision of this Agreement, the parties agree that neither party is waiving any rights, claims, liabilities, causes of action or other obligations that may arise from a breach of any representation or any other term of this Agreement, including, without limitation, the representation contained in Article II(9)(a).

## ARTICLE IX

## MUTUAL RELEASE AND DISCHARGE OF CLAIMS AND CLAIMS TO ESTATES

Subject to paragraph 5 of Article VIII:

1. The Husband hereby remises, releases and forever discharges the Wife, the Wife's heirs, executors, administrators, successors and assigns from all actions, causes of action, suits, debts including without limitation the D&K Obligations to Husband, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages,

.33

judgments, expenses, executions, claims, and demands whatsoever, in law, admiralty or

equity, known or unknown, which the Husband, the Husband's heirs, executors,

administrators, successors and assigns ever had or now has against the Wife, for, upon, or

by reason of any matter, cause or thing whatsoever from the beginning of the world to the

day of the date of this Agreement, including (without limitation) claims with respect to

all "separate property" and all "marital property" as those terms are defined in Section

236(B) of the Domestic Relations Law or arising out of the marital relationship, except

for any cause of action for Divorce, Annulment or Separation and any defenses thereto.

2.    The Wife hereby remises, releases and forever discharges the

Husband, the Husband's heirs, executors, administrators, successors and assigns from all

actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds,

bills, specialties, covenants, contracts, controversies, agreements, promises, variances,

trespasses, damages, judgments, expenses, executions, claims, and demands whatsoever,

in law, admiralty or equity, known or unknown, which the Husband, the Husband's heirs,

executors, administrators, successors and assigns ever had or now has against the Wife,

for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of

the world to the day of the date of this Agreement, including (without limitation) claims

with respect to all "separate property" and all "marital property" as those terms are

defined in Section 236(B) of the Domestic Relations Law or arising out of the marital

relationship, except for (a) any amounts that may be due pursuant to the audits referred to

in Article XII and (b) any cause of action for Divorce, Annulment or Separation and any

defenses thereto.

34

3. Each of the parties recognizes the existence of certain imbalances, resulting from (a) inequality of distribution of marital assets prior to the date of this Agreement; (b) the unequal bearing of marital expenses prior to the date of this Agreement; and (c) the misuse by the Husband of marital IRA or other retirement funds for the purchase of Lumenis stock. Each party agrees to disregard such past imbalances, and to release the other, forever and for all purposes whatsoever from, any and all rights and claims arising from such past imbalances.

4. Each party waives, renounces, grants, remises and releases to the other, forever and for all purposes whatsoever any and all rights and claims against the other's estate including dower, curtesy and community property rights and interests, any right of election under the relevant provisions of the Estates, Powers and Trusts Law of the State of New York ("EPTL") or similar laws of other States or jurisdictions, domestic or foreign, including, without limitation, EPTL Sections 5-1.1-A and 5-3.1 or under the laws of testacy or intestacy (including, without limitation, EPTL Sections 4-1.1) in any jurisdiction whatsoever, which he or she ever had, now has or may hereafter acquire in the real or personal property or estate of the other, wherever situated and whether acquired before or subsequent to the date of this Agreement, by reason of inheritance or descent or by virtue of any decedent estate law or any other statute or custom, or arising of the marital relationship, or for any other reason whatsoever.

5. (a) Each of the parties expressly revokes his or her Last Will and Testament ("Will") insofar as the same makes any disposition (whether outright or in trust) to or for the benefit of the other party and further expressly revokes any nomination

35

of the other party as an estate representative or in any other representative or fiduciary capacity thereunder.

(b) It is furthermore the intent of the parties that all Wills made and executed by either of them prior to the execution of this Agreement shall be read and administered as if the other party had predeceased him or her for purposes of distribution of his or her respective estate and of the property interests otherwise passing thereunder.

6. Where a party may be designated a beneficiary or survivor in a testamentary substitute (as defined in Section 5-1.1-A of the EPTL) or any other interest in property passing outside of the Will by operation of law (including but not limited to life insurance but excluding any life insurance specifically required to be maintained by one party for the benefit of the other pursuant to the terms of this Agreement) pursuant to which any interest in property does not pass under a Will, each of the parties will be irrevocably and permanently deemed to have renounced any such designation.

7.     Each of the parties irrevocably and irrebuttably renounces any right of administration upon the estate of the other or nomination by the other as estate representative, contained in the other party's Will.

8.     Neither party shall object to the probate of the other's Will, and in the event that either party dies intestate, the surviving party shall allow administration upon the estate and personal effects of the deceased party to be taken and received by any person who would have been entitled thereto had the surviving party predeceased the deceased party unmarried.

9.     Each party shall, upon request by the executors, administrators or other legal representatives of the other party and receipt of the relevant instruments,

1270083.3
J745188RV-2

promptly execute, acknowledge and deliver (without charge or other consideration) any instrument which in the opinion of said executors, administrators or other legal representatives is reasonably necessary to effectuate the waivers and other provisions of this Article.

10.    Notwithstanding the foregoing, nothing contained in this Agreement shall bar a claim on the part of either party for any cause arising out of a breach of any representation or other term of this Agreement arising or accruing during the lifetime of the deceased party against whose estate such a claim may be made, and such claim shall be in addition to any other remedies which may be available.

## ARTICLE X

## SEPARATE OWNERSHIP

Except as specifically provided to the contrary in this Agreement, each party shall own, as his or her separate property, free of any claim or right of the other, all of the items of property, real, personal and mixed, of any kind, nature or description and wherever situate, which are now or hereafter in his or her name, control or possession, with full power to dispose of the same as fully and effectually in all respects and for all purposes as if unmarried, provided that this provision shall not in any way limit the ability of the Husband or the Wife to enforce his or her rights with respect to breach of any representation or any other breach of the terms of this Agreement by the other party.

37

## ARTICLE XI

### RESIDENCE AND NONINTERFERENCE

1. It is, and shall be, lawful for the Husband and Wife at all times to reside from time at such places as each may see fit and to contract, carry on and engage in any employment, profession, business or trade, which either may deem fit, free from control, restraint or interference, direct or indirect, by the other in all respects as if and she were single and unmarried.

2. Neither the Husband nor the Wife shall in any way molest, disturb, trouble, or interfere with the peace and comfort of the other or compel or seek to compel the other to associate, cohabit or dwell with him or her by any action or proceeding for restoration of conjugal rights or by any means whatsoever.

3. The foregoing provisions of this Article shall not in any way limit the ability of the Husband or the Wife to enforce his or her rights with respect to breach of any representation or any other breach of the terms of this Agreement by the other party, as provided in Article XIII.

## ARTICLE XII

### THE WIFE'S RIGHT TO CERTAIN AUDITS OF THE HUSBAND'S ASSETS

1. On the Wife's request, upon not less than ten (10) business days' written notice, the Husband shall allow the Wife to audit his assets and liabilities as of the date of commencement of the parties' matrimonial action, *i.e.* January 31, 2002, as set forth on Schedule II(1) annexed hereto and made part hereof and as of the date of this Agreement in order to test the correctness and completeness of the items included on such Schedules

38

1270083.3
ITQ/06RV.2

(including contingent liabilities) and the values assigned to each such item based on all information available at the time of audit.

(a)    The Wife shall be entitled to conduct a total of five (5) such audits during the Husband's lifetime.

(b)    Each such audit is to be conducted by a reputable accounting firm.

(i)    Within two (2) weeks of the date of execution of this Agreement, the Husband will provide the Wife with the names of two accounting firms and the principals thereof who will be acceptable to the Husband to perform all of the audits. If the Wife chooses one of those accounting firms and principals, that firm and principal will conduct the audits when requested by the Wife in accordance with the guidelines set forth herein.

(ii)    If the Wife does not choose one of those two firms and principals, the Husband shall have the right on one occasion and only one occasion prior to the commencement of an audit to reject the Wife's selection of any other accounting firm to conduct the audits. Provided that the Husband has not previously exercised that right, he may do so on any of the remaining audits. If the Husband elects to exercise that right, the Wife may not utilize the rejected firm in that or any other audit.

(c)    The Husband will cooperate, and will cause persons under his control to cooperate, with the auditors and will promptly furnish such documents as the auditors may request from time to time. It is expressly understood that the auditors' document requests may relate to matters up to and including the date of the audit.

1270083.3
1745188RV-2

(d)    Such audits shall be at the Wife's sole expense, except that if the

audits find assets not previously disclosed by the Husband on Schedule II(1) with a

cumulative value greater than two hundred fifty thousand dollars ($250,000), the

Husband will be responsible for the entire reasonable cost of all audits which may have

been performed.

2.    (a)    If the audits, individually or cumulatively, find that the Husband

owned any property on January 31, 2002, which is not listed on Schedule II(1), the

Husband will pay to the Wife one-half (1/2) of the value of that property.

(b)    In addition, if the audits, individually or cumulatively, find assets

not listed on Schedule II(1) with a cumulative value greater than two hundred fifty

thousand dollars ($250,000), then (i) such error will be presumed willful on the

Husband's part, and (ii) the Husband will pay to the Wife one-half (1/2) of three (3) times

of that value (in addition to paying audit expenses as provided above). However, the

Husband will have the opportunity to rebut the presumption of willful error at an

arbitration conducted in accordance with Article XIII and at his expense by a

"preponderance of evidence" test. If the Husband has previously made payments

pursuant to subparagraph 2 (a) of this Article, in respect of those assets, he shall receive a

credit therefor against the amounts owed pursuant to this subparagraph (b).

(c)    If the Wife conducts a third audit, (i) after two consecutive audits

have failed to find assets not listed on Schedule II(1) or have failed to find a difference in

assets between the first and second of such consecutive audits of more than twenty five

thousand dollars ($25,000), and (ii) the third audit fails to find assets not listed on such

Schedule or finds a difference of less than twenty five thousand dollars ($25,000) from

the previous two audits, then the Wife will be liable to the Husband for his reasonable expenses incurred as a consequence of cooperating with the third consecutive audit.

(d)     If the Husband disputes the results of any audits or asserts that the cumulative errors (if greater than two hundred fifty thousand dollars ($250,000)) were not willful, the dispute will be determined by arbitration as is provided in Article XIII of this Agreement.

(e)     Any payments due under paragraphs 2 (a) and (b) above shall be made in cash within 60 days of the later of the completion of the audit or the receipt of the arbitration decision.

## ARTICLE XIII

## GOVERNING LAW AND ARBITRATION

1.     This Agreement will be governed and interpreted in accordance with laws of the State of New York, without application of its conflicts of law provisions. This provision for arbitration shall be specifically enforceable by the parties. Any controversy, claim or dispute between the parties directly or indirectly arising out of this Agreement shall be finally settled by arbitration as provided herein. Either party may give written notification to the other party requesting arbitration to resolve any controversy, claim or dispute arising out of this Agreement between the parties.

2.     Subject to the provisions of paragraph 5 of this Article, any award rendered by the Arbitrator (as defined below) may be confirmed in any court having jurisdiction thereof. Notwithstanding the foregoing paragraphs of this Article, either party may file a claim for temporary emergency relief or other temporary remedies not otherwise available through arbitration, in a court of competent jurisdiction, without first

41

having to arbitrate the dispute, provided that such claim for injunctive relief arises from an alleged breach of a specific term of this Agreement.

3.    In the event that a dispute is submitted to arbitration, there shall be one (1) arbitrator (the "Arbitrator") selected (x) by the parties or (y) if the parties fail to select an Arbitrator within twenty (20) days following receipt of a list of potential arbitrators from the American Arbitration Association ("AAA"), the Arbitrator shall be selected by the AAA. The Arbitration shall be conducted as promptly as practicable after the selection of the Arbitrator in accordance with the Commercial Arbitration Rules and Mediation Procedures. The Arbitrator shall be someone who has at least fifteen (15) years of commercial law experience or who was a judge of a court of general jurisdiction.

(a)    The arbitration hearing shall be held in Manhattan, New York, pursuant to the Commercial Arbitration Rules and Mediation Procedures, except where those rules conflict with the provisions of this Article, in which case the provisions of this Article shall control.

(b)    The Arbitrator shall arrange a hearing at a mutually agreeable time and location in Manhattan, New York, which hearing shall be not less than thirty (30) calendar days, and not more than sixty (60) calendar days, after the date on which the Arbitrator was appointed.

(c)    The parties shall each have the right to submit documents, testimony, information, data and memoranda to the Arbitrator in support of their respective positions.

(d)    Within sixty (60) calendar days after such hearing, the Arbitrator shall render a decision with respect to the dispute.

42

(e)    The party against whom the Arbitrator found shall bear the total

costs, Arbitrator's fees and other expenses of the arbitration between the parties,

including the legal fees borne by the other party in bringing or defending the action.

4.    The Arbitrator shall have the authority to require the submission

(at hearing or otherwise) of such documents, information, testimony, and other items as

the Arbitrator may deem necessary to make a fair and reasonable decision, including the

authority to issue subpoenas and similar process to compel production of such

documents, information, testimony and other items.

5.    Subject to the remaining provisions of this paragraph 5, any award

rendered by the Arbitrator shall be conclusive and binding upon the parties hereto;

provided, however, that any such award shall be accompanied by a written opinion of the

Arbitrator giving the reasons for the award.

(a)    The findings of the Arbitrator may not change the express terms of

this Agreement and shall be consistent with the Arbitrator's belief as to what findings a

court of proper jurisdiction would have made in applying the applicable law to the facts

underlying the dispute.

(b)    There shall be no right of appeal from the Arbitrator's

determination unless the Arbitrator shall not have complied with the provisions of this

Article.

(c)    The Arbitrator shall have no authority to award relief in excess of

what this Agreement provides.  Moreover, the Arbitrator shall have no authority to award

non-monetary or equitable relief.

## ARTICLE XIV

43

## LEGAL AND EXPERT FEES

1.      (a) The Wife has previously been represented in the parties'

matrimonial litigation and/or in the negotiation, preparation and execution of this

Agreement by Dominic Barbara and Marilyn B. Chinitz, of the Law Offices of Dominic

Barbara, 1100 Stewart Avenue, Garden City, NY 11530; Sheldon M. Greenbaum of

Goldman & Greenbaum, P.C., 60 East 42nd Street, New York, NY 10165; Philip

Greenhaus, 50 East 42nd Street, New York, NY 10017; and, as to certain commercial

aspects of this Agreement, Carol Robinson Schepp of Carter Ledyard & Milburn LLP, 2

Wall Street, New York, New York 10005.

(b) The Husband has been represented in the parties' matrimonial

litigation and in the negotiation, preparation and execution of this Agreement by Stanford

G. Lotwin and Jay D. Silverstein of Blank Rome LLP, 405 Lexington Avenue, New

York, New York 10174, and Edward Klimerman of Sonnenschein Nath & Rosenthal

LLP, 1221 Avenue of the Americas, New York, NY 10020.

2.      (a) Except as otherwise provided in sub-paragraph (b) of this

Section 2, each party will be solely responsible for the payment of all legal fees, expert

fees and expenses incurred by him or her for services in connection with their

matrimonial litigation and with the negotiation, preparation and execution of this

Agreement (or in connection with any subsequent divorce) and each shall indemnify the

other from all loss and/or expense arising from any claims for counsel fees and

disbursements made by any attorney (or claims for fees and disbursements by any other

professional or expert) in reference to the negotiation and preparation of this Agreement,

and in reference to any other matters related to the matrimonial difficulties existing

44

between the Husband and the Wife including the procurement of an undefended

judgment of divorce.

(b) The following legal fees (i) approximately $200,000 prepaid by

the Wife to the Law Offices of Dominic Barbara, prior to May 24, 2004, for which legal

services are in dispute, and (ii) all legal fees, owed to the lawyers enumerated in Section

3 of Article I and in Section 1(b) of this Article XIV and their respective firms, and

incurred by the Husband and the Wife in connection with the negotiations of this

Agreement from May 24, 2004 until the date of execution of this Agreement, shall be

paid by Sagi Genger (or David A. Parnes, Esq.), or reimbursed to the parties, from the

assets made available to him pursuant to Article II, as soon as practicable.

(c) In consideration for sharing the expense of legal fees, and their

payment from assets made available pursuant to Article II, the Wife will pursue in good

faith (personally, or – at her election – appoint Sagi Genger to pursue in her stead) the

Law Offices of Dominic Barbara, to reclaim the approximately $200,000 prepaid by the

Wife which shall be equally shared by the parties.

## ARTICLE XV

## FULL DISCLOSURE

1.      Each party acknowledges that:

(a)      he or she understands, and has been advised of, his or her right: (i)

to obtain full and complete financial disclosure from the other with respect to all assets

and income owned by the other party whether titularly or beneficially, and (ii) to obtain

appraisals from independent appraisers of his or her own choosing of any property owned

45

by the parties' collectively, or either party individually, including, without limitation, appraisals of tangible and intangible assets;

    (b)    he or she has utilized the rights specified in paragraph 1(a) of this Article to the fullest extent that he or she wishes to do so both in the parties' litigation, including depositions and appraisals, and in earlier extensive voluntary document discovery;

    (c) that he or she is satisfied with the disclosure that he or she has received from the other; and

    (d) that he or she has knowingly and intentionally directed his or her counsel not to seek further disclosure from the other party or to cause appraisals to be made.

    2. (a)   The Wife acknowledges that she has made inquiry into the financial circumstances of the Husband to the extent that she wishes to do so at this time;

    (b)    The Wife has had a full opportunity to consult with, and has consulted at length with, her attorneys identified or referenced in Article XIV regarding all of the circumstances hereof to the extent that she wishes to do so at this time;

    (c)    The Wife acknowledges that this Agreement has not knowingly been the result of any fraud, duress or undue influence exercised upon her by the Husband or by any other person or persons; and

    (d) The Wife acknowledges that she is fully satisfied with the services rendered on her behalf by her attorneys identified or referenced in Article XIV.

1270083.3
I7451888\V-2

3.      The Wife's acknowledgments in paragraphs (1) and (2) above are based on her ability to seek remedies in the event of a breach of any representation in this Agreement and to exercise her audit rights as provided in Article XII.

4.      The Husband acknowledges that (x) he has made inquiry into the financial circumstances of the Wife to the extent that he wishes to do so, and (y) that he cannot appropriately make a claim against the Wife by reason of her non-willful failure to disclose or his failure of knowledge of the financial circumstances of the Wife;

(a)  The Husband has had a full opportunity to consult with, and has consulted at length with, his attorneys, to wit: Blank Rome LLP and Sonnenschein Nath & Rosenthal LLP regarding all of the circumstances hereof;

(b)  The Husband acknowledges that this Agreement has not knowingly been the result of any fraud, duress or undue influence exercised upon him by the Wife or by any other person or persons; and

(c)  The Husband acknowledges that he is fully satisfied with the services rendered on his behalf by Blank Rome LLP and by Stanford G. Lotwin and Jay D. Silverstein in particular.

## ARTICLE XVI

## POSSIBLE INVALIDITY

If any provision of this Agreement, for any reason whatsoever, be declared invalid or unenforceable by any Court of competent jurisdiction, by statute or governmental regulation, the remainder of this Agreement and the application of such provision to any person or situations, other than those as to which such provision may have been held invalid or unenforceable shall not be affected thereby and shall continue

47

to be enforced to the fullest extent that such severance of the invalid portions is possible

without vitiating the original intent and purposes and economic intentions of the parties

(the "Original Intent"), as herein set forth. If it shall appear impossible or impracticable to

continue this Agreement in force after such severance, then and in such event, the parties

hereto each undertake and agree that they will, upon request of the other party, make,

execute, acknowledge and deliver any and all instruments which may be lawfully

effective to again reflect the parties Original Intent, without diminishing the rights of the

parties or increasing their obligations, financial or otherwise, herein. In the event a

provision is superseded under this Article XVI, either party may seek reformation of the

affected provision in any court of competent jurisdiction, which shall be empowered to

revise the provision to reflect the parties' Original Intent to the greatest extent possible,

consistent with New York law. It is the intention of the parties hereto that this provision

may be enforced in equity in addition to, and not to the exclusion of, any other remedies

which may be available to the parties. The parties do not intend by this paragraph to

imply the illegality, invalidity and/or unenforceability of any term, provision, article or

paragraph of this Agreement.

## ARTICLE XVII

### RECONCILIATION AND MATRIMONIAL DECREES

1.    Simultaneously with the execution of this Agreement, each of the

parties will execute and deliver to the other, and in the future will promptly execute and

deliver (without further consideration) to the other:

(a)(i)    All documents reasonably necessary to vacate any and all

restraining orders and injunctions that have been issued in any action between the parties

48

including, but not limited to, their Divorce Action. A listing of the said restraining orders and injunctions is annexed as Schedule XVII(1)(a).

(ii)    Notwithstanding the provisions of paragraph 1(a)(i), the Husband will pay the Wife maintenance of thirty thousand dollars ($30,000) for the month during which this Agreement is executed and for one month thereafter, and his obligation to pay maintenance under prior orders in the Divorce Action will cease upon the thirtieth (30th) day of the month following the month during which this Agreement is executed, provided all maintenance for prior months has been paid in full.

(b)    All documents reasonably necessary to effect the immediate withdrawal of any and all motions now pending in any Court in any litigation between the parties. A listing of the said motions is annexed as Schedule XVII(1)(b) hereto and made part hereof.

(c)    All documents appropriate to immediately notify the Court before whom the parties' Divorce Action is being prosecuted of the parties' having reached a settlement of all of their rights and claims excepting the right to a divorce.

(d)    All documents reasonably necessary to facilitate the immediate grant to the Wife, on papers, of an undefended divorce on the grounds of the Husband's constructive abandonment of the Wife.

2.    This Agreement shall not be invalidated or otherwise affected by a reconciliation or a resumption of marital relations between the parties unless they have executed and acknowledged (with the same formality as this Agreement) a written statement expressly setting forth that they are canceling this Agreement. Accordingly, this Agreement will not be terminated, annulled or modified by (a) the parties'

49

1270083.3
1745188NV-2

resumption of cohabitation and/or sexual relationships even if on a permanent basis or (b)

the parties' actual remarriage (irrespective of whether or not that marriage ever ends).

3.      This Agreement shall not be invalidated or otherwise affected by

any decree or judgment made in any Court in any pending or future action or proceeding

between the parties.

4.      Each party agrees that the provisions of this Agreement shall be

submitted to any court in which either party may seek a judgment, order or decree in a

matrimonial action or any other action or proceeding affecting the marital status of the

parties and that the provisions of this Agreement shall be incorporated in said judgment,

order or decree with such specificity as the Court shall deem permissible and by reference

as may be appropriate under law and under the rules of the Court. However,

notwithstanding said incorporation, the provisions of this Agreement shall survive any

decree, order or judgment and shall not merge therein, and this Agreement may be

independently enforced.

5.      Both parties will fully cooperate with each other in obtaining a

religious divorce or annulment and each will promptly execute and deliver (without

further consideration) all documents reasonably required therefor by the religious court,

tribunal or body. In addition, each party will, if requested, appear (at any reasonable time

and location) before any religious court, tribunal or body in order to effectuate the

purposes of this paragraph. All the costs of such religious divorce or annulment shall be

borne equally by the parties.

50

## ARTICLE XVIII

### IMPLEMENTATION

The Husband and Wife shall, at any and all times, upon request by the other party or his or her legal representatives, promptly make, execute and deliver (without charge or other consideration) any and all other and further instruments as may be reasonably required for the purpose of giving full force and effect to the provisions of this Agreement.

## ARTICLE XIX

### GENERAL PROVISIONS

1.      No failure by either party to exercise any right hereunder or to insist upon strict compliance by the other party with any obligation hereunder and no custom or practice of the parties at variance with the terms hereof shall constitute a waiver of either party's right to demand exact compliance with the terms hereof. Any waiver by either party (whether formal or informal) nonetheless found to exist by an Arbitrator with respect to any particular default by the other party shall not affect or impair the waiving party's rights in respect of any subsequent default of the same or of a different nature, nor shall any delay or omission of either party to exercise any right arising from such a default affect or impair his or her rights as to such default or any subsequent default.

2.      This Agreement shall inure to the benefit of and shall be binding and obligatory upon the heirs, personal representatives, administrators, executors and assignees of the parties herein.

51

1270083.3
I7451888\V-2

3.    Neither this Agreement nor any provision hereof shall be terminated, amended or modified in any respect except by an agreement in writing duly subscribed and acknowledged by both parties with the same formality as this Agreement. Any asserted termination, annulment or modification not so subscribed and acknowledged shall be without effect even if it was substantially and detrimentally relied upon.

4.    The parties may at any time amend, modify or annul this Agreement (in the manner set forth in paragraph 3 of this Article) without the consent of any third person and no third person shall be deemed to have been given any interest or right hereunder.

5.    This Agreement may be executed in counterpart copies and shall become effective when copies executed by both parties have been exchanged. The parties intend to execute in all eight (8) counterpart copies hereof.

## ARTICLE XX

### NOTICES

Any notice required by this Agreement shall be in writing and shall be made to the addresses first listed above (or to any address changed by like notice) or to the facsimile numbers listed below:

Arie Genger
2600 Island Boulevard
Penthouse One
Williams Island
Aventura, Florida   33160

With a copy to:

52

12700833
1745188WV-2

Edward Klimerman, Esq.
Sonnenschein Nath & Rosenthal LLP
1221 Ave. of the Americas,
New York, NY 10010-1089
Fax: (212) 768 6800

Dalia Genger
210 East 65th Street
New York, NY   10021
Fax  (212) 735-9021

With a copy to

Carol Robinson Schepp, Esq.
Carter Ledyard & Milburn LLP
2 Wall Street
New York, NY 10005
Fax  (212) 732-3200

Any such notice shall be delivered by certified mail, return receipt requested or by personal (receipted) delivery or by confirmed facsimile.  Unless otherwise provided, such notice shall be effective one (1) day after actual receipt of personal or faxed delivery or ten (10) days after mailing, whichever is applicable.

## ARTICLE XXI

### ENTIRE UNDERSTANDING

This Agreement contains the entire understanding of the parties who hereby acknowledge that between them there have been and are no representations, warranties, covenants or undertakings (whether written or oral, express or implied) with respect to the subject matter hereof including, without limitation, all rights or claims arising at law, in equity or pursuant to the parties' marital relationship other than those expressly set forth herein or in the transactions contemplated hereby or entered into concurrently herewith.

53

## ARTICLE XXII

## REPRESENTATIONS AS TO UNDERSTANDING OF THE TERMS
## OF THIS AGREEMENT

1.    Each party represents that:

(a)    He or she has had independent legal counsel of his or her own selection;

(b)    His or her legal counsel has advised him or her fully (i) with respect to his or her rights in and to the property and income and estate of the other party if they were divorced in the absence of an agreement such as this one and (ii) with respect to the effect of this Agreement on those rights and (iii) with respect to the rights and obligations set forth in this Agreement. Each party additionally acknowledges that he or she understands such advice from counsel and the terms of this Agreement;

(c)    He or she has given due consideration to all the facts and circumstances likely to influence his or her judgment with respect to matters embodied in this Agreement;

(d)    He or she has no educational, medical (including the use of medications, whether prescription or otherwise), psychological, addictive, sociological, language or cultural disability which would prevent him or her from understanding each and every aspect of this Agreement and the legal and economic and personal consequences of executing this Agreement; and

(e)    He or she believes that the provisions of this Agreement are fair and reasonable as of the date of execution of this Agreement, and that he or she believes

54.

that the provisions of this Agreement are not unconscionable now will not be
unconscionable in the future.

2.    After time to reflect upon the significance and terms of this
Agreement, he or she makes this Agreement freely and voluntarily by him or her and
acknowledges that this Agreement has not knowingly been the result of any fraud, duress,
coercion or undue influence exercised by either party upon the other or by any other
person or persons upon such party.

1270083.3
17451888IV-2

EACH OF THE PARTIES ACKNOWLEDGES:

THAT HE OR SHE HAS CAREFULLY READ THIS AGREEMENT ;

THAT HE OR SHE UNDERSTANDS THE TERMS OF THIS AGREEMENT;

INCLUDING ARTICLE XXII OF THIS AGREEMENT;

THAT HE OR SHE UNDERSTANDS THAT THIS AGREEMENT WILL BE

BINDING ON HIM OR HER IN ALL CIRCUMSTANCES; AND

THAT HE OR SHE HAS HAD A FULL OPPORTUNITY TO CONSULT WITH

(AND HAS CONSULTED WITH) COUNSEL OF HIS OR HER OWN

SELECTION WITH RESPECT THERETO.

IN WITNESS WHEREOF, the parties have hereunto set their respective

hands and seals as of the day and year first above written to eight (8) counterparts hereof,

each of which shall constitute an original.

_____          _____
Witness for the Wife                DALIA GENGER
Carol Robinson Schepp, Esq.

_____          _____
Witness for the Husband             ARIE GENGER
Edward Klimerman, Esq.

1268492.3
I7451888\V-2