STATE OF NEW YORK     )
                      ) ss.:
COUNTY OF NEW YORK   )

On this 30 day of Oct 2004, before me, the undersigned, a Notary Public in and for the State, personally appeared DALIA GENGER, personally known to me known or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual executed the instrument.

_Deborah Kempf_
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-OIKE 4999904
Qualified in New York County
Commission Expires August 3, 200__

STATE OF NEW YORK     )
                      ) ss.:
COUNTY OF NEW YORK   )

On this 28th day of OCT 2004, before me, the undersigned, a Notary Public in and for said State, personally appeared ARIE GENGER, personally known to me known or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that his executed the same in his capacity, and that by his signature on the instrument, the individual executed the instrument.

_Deborah Kempf_
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-OIKE 4999904
Qualified in New York County
Commission Expires August 3, 2005

57

1268492.3
17451688IV-2

CERTIFICATE OF SUBSCRIBING WITNESS

State of New York )
                ) ss.
County of New York )

On the _30_ day of _Oct_____ in the year 2004 before me, the undersigned, a Notary
Public in and for said State, personally appeared CAROL ROBINSON SCHEPP, the
subscribing witness to the foregoing instrument, with whom I am personally acquainted,
who, being by me duly sworn, did depose and say that she resides at _____
_165 Circle Drive, Manhasset, NY 11030_ ; that she
knows DALIA GENGER to be the individual described in and who executed the
foregoing instrument; that said subscribing witness was present and saw said DALIA
GENGER execute the same; and that said witness at the same time subscribed her name
as a witness thereto.

_Deborah Kempf_
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-OIKE 4999904
Qualified in New York County
Commission Expires August 3, 2006

CERTIFICATE OF SUBSCRIBING WITNESS

State of New York )
                ) ss.:
County of New York )
On the _28th_ day of _OCT._ in the year 2004 before me, the undersigned, a Notary Public
in and for said State, personally appeared EDWARD KLIMERMAN, the subscribing
witness to the foregoing instrument, with whom I am personally acquainted, who, being
by me duly sworn, did depose and say that he resides at _14 EAST
75th STREET NEW YORK, NY 10021_ ; that he
knows ARIE GENGER to be the individual described in and who executed the foregoing
instrument; that said subscribing witness was present and saw said ARIE GENGER
execute the same; and that said witness at the same time subscribed his name as a witness
thereto.

_Deborah Kempf_
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-OIKE 4999904
Qualified in New York County
Commission Expires August 3, 2006

58

1268492.3
1745188RV-2

# Exhibit D

**ARIE GENGER**
2600 Island Blvd.
Williams Island Aventura, FL

October 29, 2004

Mr. Eric Gribetz
920 Park Avenue, Apt. 16A
New York, NY 10028

Mr. David Parnes
38 West 69th Street
New York, NY 10023

RE: Orly Genger 1993 Trust (the "Trust")

Gentlemen:

In connection with the transfer to the Trust of 1,102.80 shares of common stock (the "Shares") of Trans-Resources Inc. ("TRI"), pursuant to the terms and conditions of the Stipulation of Settlement of even date herewith, the Trust is granting to Arie Genger an irrevocable proxy (the "Proxy") for the shares, a copy of which is annexed hereto. In the event that for any reason the Proxy is declared invalid and is no longer in effect, the Trust agrees, as promptly as practicable, to enter into a voting trust agreement (the "Voting Agreement") with Arie Genger as the voting trustee, which shall be in substantially the form annexed hereto. During the time that the Proxy is not in effect and prior to the time the Voting Agreement is entered into, the Trust agrees to vote the Shares as directed in writing by Arie Genger.

Any dispute hereunder shall be resolved, as promptly as practicable, by arbitration (by one arbitrator), in accordance with the rules and regulations of the American Arbitration Association.

This letter agreement is entered into under seal as of the date first written above.

Very truly yours,

_ARIE GENGER_

AGREED AND ACCEPTED AS OF
THIS 29TH DAY OF OCTOBER, 2004

ORLY GENGER 1993 TRUST

By: _____
Eric Gribetz, Trustee

By: _____
David Parnes, Trustee

17452177/V-1

# Exhibit E

LIMITED LIABILITY COMPANY AGREEMENT

OF

D&K GP LLC

This Limited Liability Company Agreement (as amended, modified or supplemented from time to time, the "Agreement") of D&K GP LLC (the "Company") is entered into by Dalia Genger ("Dalia") and Sagi Genger ("Sagi"), as members of the Company (each a "Member"; jointly "Members"; and to the extent the context requires the new Member includes additional members as permitted herein).

Whereas, concurrently herewith, Dalia has caused the Company to be formed in Delaware and has transferred to the Company her general partnership interest in D&K LP, a Delaware limited partnership (the "LP") and $1.00 in exchange for a 99% membership interest in the Company; and

Whereas, concurrently herewith Sagi has acquired the remaining 1% membership interest in the Company for $1.00;

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound, the parties hereto hereby agree as follows:

1.  Formation. The Members hereby acknowledges that Dalia, as organizer, filed the Articles of Organization of the Company in the Office of the Secretary of State of Delaware on October 21, 2004 solely for the purpose of forming a limited liability company pursuant to and in accordance with the provisions of the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq. (the "Delaware Act"), and hereby agrees to the terms and conditions of the Limited Liability Company Agreement of the Company, as follows:

2.  Name. The name of the Company is D&K GP LLC.

3.  Purpose. The Company is formed to engage in any lawful act or activity for which limited liability companies may be formed under the Delaware Act.

4.  Offices. The principal business office of the Company shall be located at 200 West 57 Street, Suite 1208, New York, NY 10019. The Company may have such additional

1268503.2

offices located at such place or places inside or outside the State of Delaware as the Members may designate from time to time.

The registered office of the Company in the State of Delaware is located at 2711 Centerville Road, Suite 400, Wilmington, DE 19808. The registered agent of the Company for service of process at such address is Corporation Service Company.

5.  **Management and Powers.** The business and affairs of the Company shall be managed by the Members through a manager to have with the power to do any and all acts necessary or convenient to or in furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by a manager under the Delaware Act ("Manager"). The Manager shall be selected solely by Sagi Genger or by Sagi Genger's assignee or successor in interest, as the case may be. It is the current intent of the parties hereto that the Company will act as general partner of D&K Limited Partnership, a Delaware limited partnership, and it will not engage in any activities unrelated to its acting as such general partner.

6.  **Admission of Additional Members.** After the date hereto, one or more additional Members may be admitted to the Company with the consent of the Members. After the first such additional Member or Members have been admitted to the Company, subsequent additional Members may be admitted to the Company with the consent of a majority in interest of the Members.

7.  **Assignments.** The Members may assign their interest in the Company in whole or in part. However, no Member may assign his interest in the Company in whole or in part without the consent of all other Members.

8.  **Withdrawal of a Member.** No Member may withdraw from the Company prior to its dissolution, or without the consent of all other Members.

9.  **Capital Contributions.** The Members have, each, made a capital contribution to the Company as specified in Schedule A, thereby acquiring the specified percentage interest in the Company. After and each time any additional Member has been admitted to the Company, a Schedule A, setting forth the name and address of each of the Members and his or her respective capital contribution and percentage interest, shall be prepared, dated and annexed to this Limited Liability Company Agreement.

10. **Additional Contributions.** No Member is required to make any additional capital contribution to the Company.

11. **Allocation of Profits and Losses.** The Company's profits and losses shall be allocated to the Members in proportion to the interests of the Members.

12. **Distributions.** Distributions shall be made to the Members at the times and in the aggregate amounts determined by Manager.

13. **Liability of Members.** The Members shall not have any liability for the obligations or liabilities of the Company.

- 2 -

1268503.2

14.   **Exculpation and Indemnification of Managers.** The Company shall indemnify and hold harmless the Members, any and each additional Member admitted to the Company and any Manager against any and all claims and demands whatsoever, to the fullest extent permitted by the Delaware Act, as amended, modified or supplemented from time to time.

16.   **Governing Law.** This Agreement shall be governed by, and construed under, the laws of the State of Delaware, all rights and remedies being governed by said laws.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Limited Liability Company Agreement as of the 26th October, 2004.

Members

_____
Dalia Genger

_____
Sagi Genger

Formed 10/21/04
Transfer D&S
10/26/04

1268503.2

- 3 -

# Exhibit F

## TPR INVESTMETN ASSOCIATES, INC.

## SHAREHOLDERS AGREEMENT

SHAREHOLDERS AGREEMENT, dated as of October 30, 2004, among D&K Limited Partnership, a Delaware limited partnership ("D&K"), and Dalia Genger, an individual residing at 210 East 65th Street, Apt 11J, New York, NY 10021("Dalia Genger") (collectively the "Shareholders" and individually, a "Shareholder") and TPR Investment Associates, Inc., a Delaware corporation (the "Corporation").

## W I T N E S S E T H:

WHEREAS, D&K owns a direct interest in the Corporation of 49% of the outstanding capital stock of the Corporation; and

WHEREAS, Dalia Genger owns a direct interest in the Corporation of the remaining 51% of the outstanding capital stock of the Corporation, and 4% of D&K, which constitutes a 1.47% indirect interest in the Corporation; and

WHEREAS, the parties desire to enter into this Agreement in order to provide for the management of the Corporation and to impose certain restrictions with respect to the sale, transfer or other disposition of the shares of the capital stock of the Corporation ("Shares") upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter set forth, the parties hereto agree as follows:

## SECTION 1

## LEGENDS

All certificates representing shares of Common Stock issued by the Corporation, after the date hereof, to either of the Shareholders shall be subject to this Agreement and shall bear the following legends:

"The shares evidenced by this certificate or any certificate issued

in exchange or transfer therefor are and will be subject to, and may not be transferred except in accordance with, the terms of a certain Shareholders Agreement, dated as of October 30, 2004, by and among the Shareholders of the Corporation and the Corporation, which agreement provides, among other things, for restrictions on the sale, transfer and disposition of the shares of the Corporation, an executed copy of which agreement is on file at the principal office of the Corporation."

## SECTION 2

## MANAGEMENT OF THE CORPORATION

2.1    Board of Directors.  The Board of Directors of the Corporation ("Board") shall initially consist of two (2) directors, as follows:

(i) Dalia Genger shall be a director, and shall have the right to appoint a director in her stead; and

(ii) D&K shall have the right to appoint a director; the first director appointed by D&K shall be Mr. Sagi Genger ("Sagi").

2.2    Management.  Sagi will be appointed by the Board, to serve as Chief Executive Officer of the Corporation, and David Parnes will be appointed by the Board to serve as Vice President.  Compensation of the Corporation's officers will be set by the Board.

## SECTION 3

## RESTRICTIONS ON SALES OR OTHER DISPOSITION OF COMMON STOCK

3.1    Sale of Shares of Common Stock.  During the term of this Agreement, the

parties to this Agreement shall not, either directly or indirectly, sell, assign, pledge, transfer, mortgage, grant any lien or security interest in, convey or otherwise dispose of, encumber or grant any other interest in ("Transfer"), all or any Shares now owned or hereafter acquired by each party, except as hereinafter provided. The term "Shares" as used in this Agreement shall include all shares of Common Stock, whether presently issued or hereafter acquired, scrip representing fractional shares of Common Stock, options, rights and warrants for shares of Common Stock, securities convertible into or exchangeable for shares of Common Stock, or shares of Common Stock received by way of dividend or upon an increase, reduction, substitution or reclassification of the Common Stock, or upon any reorganization of the Corporation or any other interest or right in and to shares of Common Stock of the Corporation.

3.2    Board Approval. No Shareholder shall Transfer any Shares or any interest in any Shares owned by such Shareholder, in whole or in part, and no such attempted Transfer shall be treated as effective for any purpose without obtaining the prior written consent of the Board.

3.3    Sale of Shares and Determination of Buy-Out Price. If a Shareholder desires to Transfer all of the Shares owned by such Shareholder (the "Initiating Shareholder"), such Initiating Shareholder shall notify the other Shareholder in writing (the "Sale Notice"), stating the total number of Shares, owned directly and indirectly by the Initiating Shareholder, which are to be Transferred. The Initiating Shareholder and the other Shareholder will meet, no later than two calendar months following receipt of the Sale Notice by the other Shareholder (the "Sale Meeting") at which time the Shareholders will determine the Buy-Out Price. Prior to a Sale Meeting, the books of the Corporation will be open to the Shareholders and they will cooperate with each other in connection with the impending sale. In addition, up to date audited financials for the Corporation will be provided to the Shareholders. The Corporation will reasonably cooperate with any outside expert hired by any Shareholder to assist in the sale process.

(a)    *The Sale Meeting.* At the Sale Meeting the Shareholders will adhere to the following process:

(i) a coin will be tossed in the air by a person mutually acceptable to the Shareholders;

(ii) the Initiating Shareholder will be designated as "Head" (i.e. - the side of the coin where the profile of a person is impressed) and the other Shareholder will be designated as "Tail" (i.e. - the other side of the coin);

(iii) if the Head side of the coin shall lay face up - the Initiating Shareholder will become the Evaluating Shareholder, and if the Tail side of the coin shall lay face up - the other Shareholder shall become the Evaluating Shareholder;

(iv) the Evaluating Shareholder shall value and indicate in writing within seven (7) business days following the coin toss to the other Shareholder (the "Notified Shareholder"), the sum at which he or she values one Share ("Evaluated Share Value");

(v) within seven (7) business days following receipt of the Evaluated Share Value from the Evaluating Shareholder ("Determination Date"), the Notified Shareholder shall notify the Evaluating Shareholder in writing whether he intends to acquire from, or to sell to, the Evaluating Shareholder his Shares (based on the Evaluated Share Value and the number of Shares in question) in which case the Notified Shareholder shall agree to either (a) remit to the Evaluating Shareholder the appropriate amount based on the Evaluated Share Value, or (b) receive from the Evaluating Shareholder the appropriate amount based on the Evaluated Share Value.

"Transferring Shareholder" shall mean the Shareholder that ultimately pays to the

other Shareholder, by way of advancement and a Note, the Buy Out Price, and "Purchasing Shareholder" shall me the Shareholder that ultimately receives, by way of advancement and a Note, the Buy Out Price.

(b)    *Closing and Payment of Buyout Price*  The consummation of the sale of the Shares (the "Closing") shall be held in the offices of the Corporation, or at such other location as agreed by the Shareholders, at 10:00 a.m. on the twentieth (20th) business day following the Sale Meeting (the "Closing Date").

(i) On or before the Closing Date, the Transferring Shareholder shall deliver duly executed certificates in valid form evidencing the Shares to be sold and purchased, duly endorsed for transfer, free and clear of any liens or encumbrances;

(ii)    on or before sixty (60) days from the Closing Date ("Initial Payment"), the Purchasing Shareholder shall deliver to the Transferring Shareholder immediately available funds by wire transmit to an account designated by the Transferring Shareholder, or a certified or bank check, in an amount equal to no less ten percent (10%) of the applicable Buyout Price;

(iii)    any remaining balance of the applicable Buyout Price shall be paid by the Purchasing Shareholder on or before the seventh monthly anniversary of the Initial Payment (the "Ending Date") .

(c)    *Participation of Corporation.* In order to facilitate the Transfer of Shares, from the Transferring Shareholder to the Purchasing Shareholder, the Corporation will provide the necessary funds, in lieu of the Purchasing Shareholder, to pay the Buyout Price to the Transferring Shareholder. The Shareholders agree to cause the Corporation to provide such funds, and will

execute and deliver all of the documents reasonably necessary for the Corporation to effectuate the foregoing payment, including, without limitation, necessary resolutions and consents.

    (d)    *Board and Management Participation*. From the Determination Date through the Ending Date, the Transferring Shareholder will not actively engage in the management of the Corporation, and will abstain from voting - or cause his/her appointed member on the Board to vote, in any way inconsistent with the vote of the Purchasing Shareholder.

## SECTION 4

## TERM

This Agreement shall terminate either by (i) the consent of the parties hereto, or (ii) upon the consummation of the transfer of Shares, and the receipt of the full Buyout Price by the Transferring Shareholder on the Ending Date.

## SECTION 5

## MISCELLANEOUS

5.1    Complete Agreement.  This Agreement constitutes the complete understanding among the parties hereto with respect to the subject matter hereof, and, no amendment or modification or waiver hereof shall be valid unless made pursuant to an instrument in writing signed by the party against whom such amendment, modification or waiver is sought to be enforced.

5.2    Successors and Assigns.  All of the terms and provisions of this Agreement shall inure to the benefit of and be binding upon the heirs, successors, personal representatives, successors and permitted assigns of the respective parties hereto.

5.3    Waivers. The failure of any party hereto to give notice of the breach or non-fulfillment of any term or condition of this Agreement shall not constitute a waiver thereof, nor shall the waiver of any breach or non-fulfillment of any term or condition of this Agreement constitute a waiver of any other breach or non-fulfillment of that or any other term or condition of this Agreement.

5.4    Amendments. This Agreement may be amended at any time by a writing setting forth such amendment, signed by the Corporation and by both of the Shareholders and/or their permitted designees, it being understood that any such amendment shall not affect any rights or obligations which may have arisen prior thereto by virtue of the operation of the provisions of this Agreement.

5.5    Future Instruments. Each of the parties hereto agrees to execute and deliver all such future instruments and take such other and further action as may be reasonably necessary or appropriate to carry out the provisions of the Agreement and the intention of the parties as expressed herein.

5.6    Governing Law. This Agreement will be governed and interpreted in accordance with laws of the State of Delaware, without application of its conflicts of law provisions.

5.7    Arbitration. Any controversy, claim or dispute between the parties directly or indirectly arising out of this Agreement shall be settled by arbitration, held in Manhattan, New York. Either party may give written notification to the other party requesting arbitration to resolve any controversy, claim or dispute arising out of this Agreement between the parties.

In the event that a dispute is submitted to arbitration, there shall be one (1) arbitrator (the "Arbitrator") selected (x) by the parties or (y) if the parties fail to select an Arbitrator within twenty (20) days following receipt of a list of potential arbitrators from the American Arbitration Association ("AAA"), the Arbitrator shall be selected by the AAA. The Arbitration shall be conducted as promptly as practicable after the selection of the Arbitrator in accordance with the Commercial Arbitration Rules and Mediation

Procedures. The Arbitrator shall be someone who has at least fifteen (15) years of commercial law experience or who was a judge of a court of general jurisdiction.

5.8     Notices. All notices, offers, acceptances and other communications to be made, served or given hereunder (each, a "Notice") shall be in writing and shall be sent by overnight courier service, certified mail, return receipt requested, postage prepaid, or personally delivered, to the recipient party's address set forth on the signature page hereof or shall be sent by electronically confirmed facsimile transmission to the recipient party's facsimile transmission number if such a facsimile transmission number is set forth on the signature page hereof. Such Notices shall also be sent to the recipient Shareholder's attorney at the address or facsimile transmission number of such attorney set forth beneath such Shareholder's signature hereto. Either Shareholder may, by Notice to the other Shareholder given in the manner prescribed above in this Paragraph, designate another address or transmission number to which Notices to him and/or his attorney shall be sent. All Notices made or given in accordance herewith shall be effective on the date of facsimile transmission or personal delivery, the day on which delivery by overnight courier service is guaranteed, or three (3) days after mailing, provided such Notice is in fact received.

5.9     Miscellaneous. Each of the Shareholders agrees that he will consent to and approve any amendment of the Certificate of Incorporation or By-laws of the Corporation which may be necessary or advisable in order to conform any of the provisions of this Agreement or any amendments hereto to the applicable laws of the State of Delaware as now in effect or hereafter enacted.

5.10    Separability of Provisions. Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid or contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

5.11    Section Headings. The Section headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation hereto.

5.12  <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, and by different parties on separate counterparts.  All such counterparts together shall constitute one and the same instrument.

5.13  <u>Number and Gender</u>.  Each definition or pronoun herein shall be deemed to refer to the singular, plural, masculine, feminine or neuter as the context requires. Words such as "herein, "hereinafter," "hereof," "hereto" and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

*******************

IN WITNESS WHEREOF, the parties hereto have duly executed this Shareholders Agreement as of the day and year first above written.

TPR Investment Associates, Inc.
By:Sagi Genger, its Chief Executive Officer

D&K  Limited Partnership
By: D&K GP LLC, its general partners
By:  Sagi Genger, its manager

Dalia Genger

# Exhibit G

# TPR / TRI / D&K Ownership
## October 26, 2004



# Exhibit H

# Memorandum

**To:**   David Parnes

**CC:**   Dalia Genger

**From:** Sagi Genger

**Date:** August 2, 2006

**Re:**   Assignment by TPR of D&K LP's 1993 Promissory Note

---

Dear David,

This will set in writing what I recently proposed to you:

1. I fully acknowledge the commitment to you to sponsor your MBA studies;

2. Instead of making the next payment due, in connection with the MBA fees (approximately $12,000), TPR Investment Associates Inc. ("TPR") will assign to you a promissory note made in its favor by D&K LP ("Note").

3. This promissory Note will be assigned to you on an 'as is' basis.

4. D&K LP and its partners have a variety of claims against TPR, and deny the enforceability of the Note.

5. Collections by you on the Note will be deposited into a separate account, preferably with a mutually acceptable escrow agent. Such amounts collected will be released to you on the earlier of (a) December 31, 2013, or (b) your declaration that you will make no further claims in connection with the Note.

6. D&K will refrain from making claims against TPR, so long as the Note is not enforced by you against it. However, should your collection efforts result in, D&K making a counter-claim against TPR — the funds in the escrow account will be applied towards TPR's defense and any other related outlays, before making any distributions therefrom.

7. You will not assign the Note to any third party without the consent of D&K and TPR.

*August 2, 2006*

8. TPR will retain the right to 7.5% of your net collections and the right to enforce the note.

9. Additional terms in connection with the assignment of the Note will follow.

Be advised that we hereby waive all past, present or future existing conflict of interest we may have.

_____
TPR Investment Associates, Inc.
By: Sagi Genger, President

_____
D&K LP
By: D&K GP LLC
By: Sagi Genger, Managing Member

Read this 2 day of August 2006

_____

2

# Exhibit I

January 10, 2009

Dear Mom,

I understand that my petition to appoint Martin Coleman as Trustee of the Orly Genger 1993 Trust ("Trust") has been denied. My attorneys are reviewing the decision and considering all of my options, including whether to appeal.

For now, and until further notice, it is my strong desire to retain all of the shares of Trans-Resources, Inc. ("TRI") that are currently in the Trust, and I direct you not to sell them. If you are approached, or have been approached, with an offer to purchase any of the TRI shares in the Trust, please notify me immediately. If, despite my wishes, you consider accepting an offer, do not sell any shares until I have a reasonable period of time to maximize the benefit to the Trust, including possible alternative transactions.

As you know, the Trust's TRI shares are subject to an Irrevocable Proxy, dated as of October 29, 2004, in favor of my father, Arie Genger, as well as a voting trust letter agreement with a back-up form of voting trust agreement and voting trust certificate delivered in connection with the Proxy. Copies of those documents are attached. If anyone approaches you about the TRI shares, I insist that you inform them of these facts, and provide them with a copy of this letter and attached documents.

*Olenger* 1/10/2009

Orly Genger

# Exhibit J

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------X

In the Matter of

ORLY GENGER,

                Petitioner,

      -against-

LEAH FANG, DAVID A. PARNES, THE SAGI
GENGER TRUST, DALIA GENGER, JOEL
ISAACSON and MARTIN COLEMAN,

                Respondents.

-----------------------------------------------------------------X

Index No. 2008/0017

**NOTICE OF ENTRY OF
ORDER**

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK  )

        PLEASE TAKE NOTICE that the within is a true copy of a Decision and Order

of the Surrogate's Court of the State of New York, County of New York, dated December 31,

2008, and duly entered by the Clerk of the Surrogate's Court on December 31, 2008.

Dated: New York, New York
       January 16, 2007

SULLIVAN & WORCESTER LLP

By: _____
    Jonathan G. Kortmansky
    Kimberley R. Chapman
    1290 Avenue of the Americas, 29th Flr.
    New York, New York 10104
    (212) 660-3000
    *Attorneys for Respondent Dalia Genger*

To:    Eve Rachel Markewich, Esq. (by e-mail and regular mail)
Markewich & Rosenstock LLP
8 East 41st Street, Fifth Floor
New York, NY 10017

Mark Waldstein, Esq. (by e-mail and regular mail)
McLaughlin & Stern
260 Madison Avenue
New York, NY 10016

Matthew Hoffman, Esq. (by e-mail and regular mail)
Barton, Barton & Plotkin, LLP
Graybar Building
420 Lexington Avenue, 18th Floor
New York, NY 10170

Seth Rubenstein, Esq. (by e-mail and regular mail)
26 Court Street
Room 1501
Brooklyn, NY 11242

SURROGATE'S COURT : NEW YORK COUNTY

JAN 0 2 2009

------------------------------------------ X

In the Matter of the Trust Established
on December 13, 1993, by ARIE GENGER      File No. 0017/2008
for the Benefit of ORLY GENGER.

------------------------------------------ X

R O T H , S .

   This is a contested application by the primary beneficiary

(Orly Genger) of an irrevocable inter vivos trust established by

her father, Arie Genger, seeking the appointment of a successor

trustee or, alternatively, the appointment of a "special trustee"

to investigate alleged wrongdoing concerning the trust.

Petitioner's mother, Dalia Genger (grantor's former wife),

contends that she is the duly appointed successor trustee and

that there is no basis to appoint another fiduciary for any

purpose.

   The trust agreement, dated December 13, 1993, provides for

discretionary income and principal distributions to Orly for life

with remainder to her descendants or, if none, to the grantor's

descendants in trust.

   Article SEVENTH (B), (D), (E), and (G) of the trust

instrument sets forth the following procedure for the resignation

of trustees and the appointment of their successors.

   A trustee may resign by delivering a signed and acknowledged

instrument of resignation in person or by certified or registered

mail to the other trustee and to either the grantor or the income

beneficiary.  Such resignation is effective upon the receipt of

the acknowledged instrument by the other trustee (if there is

one) and the grantor or the income beneficiary or at such later date as may be specified in the instrument.

A trustee may appoint his or her successor by delivering a signed and acknowledged instrument in the same manner as described above for resignation. Any such appointment, however, is valid only if the appointee qualifies by delivering a signed and acknowledged instrument of acceptance in person or by certified or registered mail to each trustee and the grantor or the income beneficiary within 30 days after the later of 1) the date on which a copy of the appointment instrument is delivered to him or her, and 2) the effective date of the appointment as set forth in the appointment instrument. It is observed that there is no provision that requires a resigning trustee to appoint a successor or that there always be two trustees in office.

The original two trustees served until October 2004, when they resigned and appointed David Parnes and Eric Gribitz as their successors. On February 12, 2007, Mr. Gribitz resigned without appointing a successor. On April 26, 2007, Mr. Parnes resigned and appointed as his successor Leah Fang in a signed and acknowledged instrument. Although Ms. Fang noted her acceptance at the bottom of such instrument, her signature was not acknowledged. However, in another document entitled "Release" executed and acknowledged by Ms. Fang the same day, she, as

2

trustee, purported to discharge Mr. Parnes from liability.   It is
undisputed that thereafter Ms. Fang acted as trustee.   Indeed,
Ms. Fang's contention that she received a number of requests for
information from petitioner and that petitioner referred to her
in writing and orally as trustee is not disputed by petitioner.

On December 12, 2007, Ms. Fang, without resigning in
accordance with the trust agreement, attempted to appoint
Patricia Enriquez, as successor trustee.   Her designation of Ms.
Enriquez, however, was by an unacknowledged letter in which she
referred to her own resignation as taking effect upon Ms.
Enriquez's acceptance of the appointment.   Ms. Enriquez accepted
by signing the letter, but such acceptance was not acknowledged
and, in any event, there is nothing in the record to suggest that
such "acceptance" was delivered in accordance with the trust
instrument.   Two weeks later, an attorney for Ms. Enriquez
notified petitioner's counsel by email that her client had
advised that she had no intention to overcome the procedural
omissions.

On January 3, 2008, Ms. Fang and Dalia Genger signed before
a notary a memorandum in which Ms. Fang stated that "to the
extent that I am still vested with any powers to appoint trustees
of the [trust], I confirm your appointment."   The next day, Ms.
Fang executed an acknowledged instrument of resignation and
appointment of successor trustee naming Dalia as her successor

3

and Dalia, on the same day, executed an acknowledged instrument of acceptance. It is undisputed that such documents were delivered in accordance with the trust requirements.

We address first that portion of the instant application which seeks the appointment of a successor trustee on the ground that Dalia was not validly appointed. In such connection, petitioner argues first that, because Ms. Fang's signature on the bottom of Mr. Parnes's appointment instrument was not acknowledged, she never accepted the position in accordance with the trust agreement (and thus could not appoint Dalia her successor). However, such argument ignores the "Release" mentioned above that Ms. Fang executed the same day. Such instrument, which was signed and duly acknowledged, unequivocally establishes Ms. Fang's acceptance of the position. Since petitioner does not challenge the authenticity of such instrument or Mr. Parnes' contention, supported by the record, that it was delivered in accordance with the trust instrument and, as noted above, petitioner thereafter communicated with Ms. Fang as trustee, Ms. Fang properly qualified as successor trustee.

Petitioner's second argument that, in any event, Ms. Fang's appointment of Dalia was ineffective because Ms. Fang had previously resigned as trustee is also without merit. Simply put, Ms. Fang had not previously resigned because her letter to Ms. Enriquez did not contain the formalities (i.e., an

4

acknowledgment) required by the trust agreement. Moreover, although not a model of clarity, the letter makes clear that Ms. Fang did not intend to leave the trust without a trustee in the event that Ms. Enriquez failed to qualify, which is exactly what happened. Thus, Ms. Fang had authority to appoint Dalia as her successor.

Since there is no dispute that the instrument of resignation and appointment executed by Ms. Fang on January 4, 2008, and Dalia's instrument of acceptance of the same date were executed and delivered in accordance with the trust agreement, Dalia is the duly appointed successor trustee of the trust. To find otherwise would be to ignore the chronology of events and the purpose of the provisions at issue, namely to ensure that the trust always has a fiduciary ready, willing and able to act. The fact that petitioner does not wish her mother to be the fiduciary because she considers her an adversary in a broader intra-family dispute does not provide a basis to ignore the grantor's intent, as reflected in the trust instrument, that an acting trustee, and not the beneficiary, decides who shall become a successor trustee. Accordingly, petitioner's application to appoint a successor trustee is denied.

We next turn to petitioner's alternate request for relief, namely that a "special trustee" be appointed for the "purpose of investigation and taking discovery with respect to the wrongful

5.

dealings concerning the assets and income of the trust."

It is noted initially that petitioner's only allegations of "wrongful dealings" concern a close corporation, TPR Investment Associates, Inc.   She contends that her brother Sagi, who is an officer of TPR, and Dalia, who was a shareholder at the time this proceeding was commenced, are engaged in a "wrongful scheme" to divert assets to themselves and, as a result, Dalia "could not possibly" investigate wrongdoing at TPR, which the petition describes as the "greatest" asset of the trust.

However, the premise of the application, namely that the trust's interest in TPR would enable the trustee to investigate or seek relief from TPR, does not appear to be correct. Petitioner does not dispute Dalia's assertion, supported in the record, that the trust is not a shareholder of TPR at all. Rather, D&K LP, an entity in which the trust owns a 48 percent interest, in turn owns approximately 50 percent of TPR. Petitioner does not explain what appears to be a material misstatement concerning TPR's relationship to the trust.   Nor does she identify how a trustee under such circumstances might be in a position to "investigate and address the TPR issues".

In any event, assuming arguendo that a trustee would somehow be able to investigate alleged misconduct at TPR, petitioner's vague and speculative allegations of "wrongful conduct" at TPR from which Dalia purportedly benefitted do not warrant the

6

appointment of a "special trustee".  Similarly, petitioner's
allegations (made upon information and belief) that Dalia had
knowledge of alleged improper acts by former trustee, David
Parnes, in relation to TPR are patently insufficient to warrant
the remedy of a "special trustee".  In such connection, it is
noted that Mr. Parnes and Ms. Fang have been directed to account
for their proceedings as trustees (<u>Matter of Genger</u>, NYLJ, Feb.
25, 2008, at 29, col 3), giving petitioner a forum to seek relief
for most of the conduct about which she complains.

Finally, it is observed that petitioner has not alleged that
Dalia has refused a request for information, which would warrant
relief (SCPA 2102), or has failed as trustee to protect trust
assets.  Indeed, it appears that Dalia (who states that she is
ready and able to act as fiduciary) has yet to assume the duties
of trustee in deference to her daughter's position in this
litigation.  As a validly appointed trustee, she should be given
the opportunity to do what she deems necessary to manage and
protect the trust's assets.

Based upon the foregoing, the appointment of a "special
trustee" is unwarranted at this time and, accordingly, the
application is denied, without prejudice to renewal if future

circumstances warrant such relief.

This decision constitutes the order of the court.

_____
S U R R O G A T E

Dated: December 31, 2008

# Exhibit K



COZEN
O'CONNOR

A PROFESSIONAL CORPORATION

250 PARK AVENUE   NEW YORK, NY 10177   212.509.9400   800.437.7040   212.986.0604 FAX   www.cozen.com

May 14, 2009

Judith E. Siegel-Baum
Direct Phone 212.883.4902
Direct Fax   215.701.2261
jsiegel-baum@cozen.com

**VIA CERTIFIED MAIL/RETURN**
**RECEIPT REQUESTED**
**7003226000561425069**
**AND REGULAR MAIL**

Dalia Genger
200 East 65th Street
Apt. 32W
New York, NY  10021

Re:   Orly Genger 1993 Trust

Ms. Genger:

Please be advised that we represent Orly Genger in her capacity as beneficiary of the Orly Genger 1993 Trust (the "Trust"). You are presently serving as her sole trustee.

Orly has received no information about the assets, income and investments of the Trust and is very concerned that the assets of the Trust have been, or could be, affected by the following lawsuits: <u>Glenclova Investment Co. v. Trans-Resources, Inc., and TPR Investment Associates, Inc.</u> (pending in the Southern District of the State of New York); <u>Robert Smith, TR Investors, LLC and Glenclova Investment Co. v. Trans-Resources, Inc.</u> (pending in Delaware Chancery Court); <u>TR Investors, LLC, Glenclova Investment Co., New TR Equity 1, LLC and New TR Equity II, LLC v. Arie Genger and Trans-Resources, Inc.</u> (pending in Delaware Chancery Court); and <u>New TR Equity, LLC v. Trans-Resources, Inc.</u> (pending in Delaware Chancery Court). Moreover, Orly is concerned that the value of TRI shares owned by the Trust have been impacted by the sale of TRI shares owned by the Sagi Genger 1993 Trust (the "Sagi Trust") to TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC.

Please provide us with the following documents by May 26, 2009:

1.   All documents relating to the assets of the Trust from 2004 through the present.

Dalia Genger
May 14, 2009
Page 2

2.     All documents relating to any and all investments and trades made directly by, or indirectly by, the Trust for the period 2004 through the present including, without limitation, all statements of transactions.

3.     All documents relating to all purchases, sales, transfers and assignments of real or personal property directly by, or indirectly by, the Trust from 2004 through the present including, without limitation, closing statements, deeds, title reports, canceled checks, transfer tax documents, appraisals, catalogues and insurance policy riders.

4.     All documents relating to any and all distributions or payments of money or securities directly by, or indirectly by, the Trust for the period 2004 through the present.

5.     All documents relating to any and all dividends or other payments of money received directly by, or indirectly by, the Trust for the period 2004 through the present.

6.     All documents relating to any and all fees, commissions, reimbursement for expenses and other charges or compensation paid directly by, or indirectly by, the Trust for the period 2004 through the present including, without limitation, canceled checks and wire transfer reports.

7.     All documents relating to any promissory notes, accounts payable and debts and loans owed directly by, or indirectly by, the Trust for the period 1993 through the present.

8.     All U.S. and N.Y. Fiduciary Tax Returns including all back-up documents filed since the Trust's inception.

## D & K GP LLC ("D & K GP")

9.     The Trust has an interest in D & K LP ("D & K"). D & K GP is the general partner of D & K. Accordingly, we request the following documents related to D & K GP for the period 2004 through the present including, without limitation, amendments to the Limited Liability Company Agreement of D & K GP LLC, Schedule A (and amendments) to the Limited Liability Company Agreement of D & K GP LLC (i.e., a list of capital contributions made by the Members), a list of Members from 2004 through the present, subscription documents, tax returns, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes, statements of income distribution to you, the Trust, the Sagi Trust, Sagi Genger ("Sagi") and/or to any other party, records of contributions or investments by you, the Orly Trust, the Sagi Trust, Sagi and/or by any other party, cash receipts, cash disbursements journals, general ledgers, a list of employees from 2004 through the present, a list of appointed management and their compensation schedules from 2004 through the present, W-2s issued and 1099s issued.

Dalia Genger
May 14, 2009
Page 3

## D & K LP ("D & K")

10.     All documents relating to D & K for the period 2004  through the present including, without limitation, all partnership agreements and amendments, a list of capital contributions by each partner from 2004 through the present, a list of all partners from 2004 through the present, subscription documents, tax returns, K-1 statements, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes, statements of income distribution to you, the Trust, the Sagi Trust, Sagi and/or to other parties, records of contributions or investments by you, the Trust, the Sagi Trust, Sagi and/or by other parties, cash receipts, cash disbursements journals, general ledgers, a list of employees, W-2s and 1099s.

11.     All documents relating to the sale or assignment of your interest in D & K to Sagi, D & K GP, the Sagi Trust or any other party including, without limitation, the date on which the sale or assignment was made, the purchase and sale agreement (if by sale and not by assignment), transfer documents, closing documents, canceled checks and appraisals.

12.     All documents relating to the assignment of D & K's promissory note in favor of TPR (dated December 21, 1993) to David Parnes (the "Promissory Note").

## TPR Investment Assocs., Inc. ("TPR")

13.     All documents relating to TPR from 2003 though the present including, without limitation, amendments to TPR Investment Associates, Inc. Shareholders Agreement dated October 30, 2004 ("TPR Shareholder Agreement"), shareholder agreements preceding the present TPR Shareholder Agreement, tax returns, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes from all board meetings and Sale Meetings (as that term is defined in §3.3 of the TPR Shareholder Agreement), records of contributions or investments by you, the Trust, the Sagi Trust and/or Sagi, cash receipts, cash disbursements journals, balance sheets, general ledgers, a list of employees, W-2s, 1099s,  statements of income distribution to you, the Trust, the Sagi Trust, Sagi and/or to any other party, a list of the board of directors from 2003 through the present and a list of appointed management from 2003 through the present and each of their compensation schedules.

14.     All verification of loan and interest repayments to and from TPR from 2004 to the present.

15.     All documents relating to the sale, assignment and collections received from David Parnes in connection with the Promissory Note.

16.     All documents relating to your sale of each tranche of TPR shares either back to TPR, to Sagi or to any other party including without limitation,  a copy of the "Sale Notice" (as that term is defined in §3.3 of the TPR Shareholder Agreement), the "Evaluated Share Value" (as that term is defined in §3.3(a)(v) of the TPR Shareholder Agreement), closing documents, canceled checks and appraisals.

Dalia Genger
May 14, 2009
Page 4

## Trans-Resources, Inc. ("TRI")

17.    All documents relating to TRI from 2003 though the present including, without limitation, shareholder agreements and amendments, tax returns, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes from all board meetings, records of contributions or investments by you, the Trust, the Sagi Trust, Sagi and/or any other party, cash receipts, cash disbursements journals, balance sheets, general ledgers, a list of employees, W-2s, 1099s, and statements of income distribution to you, the Trust, the Sagi Trust, Sagi and/or any other party, a list of all board of director members since 2003 and a list of all appointed management since 2003 and each of their compensation schedules.

18.    The Trust owns TRI shares and as a fiduciary you should have had knowledge that the Sagi Trust sold its TRI shares on August 22, 2008 to TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC. Provide us with all documents relating to the sale of TRI shares by the Sagi Trust.

19.    The assets of the Trust may be affected by the following lawsuits:

(i)    Glenclova Investment Co. v. Trans-Resources, Inc., and TPR Investment Associates, Inc. pending in the United States District Court, Southern District of New York;

(ii)    Robert Smith, TR Investors, LLC and Glenclova Investment Co. v. Trans-Resources, Inc. pending in the Delaware Chancery Court;

(iii)    TR Investors, LLC, Glenclova Investment Co., New TR Equity 1, LLC and New TR Equity II, LLC v. Arie Genger and Trans-Resources, Inc. pending in the Delaware Chancery Court; and

(iv)    New TR Equity, LLC v. Trans-Resources, Inc., pending in the Delaware Chancery Court.

Accordingly, as trustee provide us with copies of documents relating to the above-set-forth proceedings including, without limitation, the pleadings (i.e., the summons, complaint and all motion papers) and correspondence.

20.    All documents related to TRI shares that were issued to the Trust and are being held by Robert Lack, Esq., Friedman Kaplan Seiler & Adleman LLP, 1633 Broadway, New York, New York 10019.

The term "documents" as used above shall mean the original or duplicate copy or draft(s) of any writing or recording of whatever nature, whether written, typed, printed, photocopied, filmed, videotaped or mechanically or electronically sorted or recorded, which is in your possession, custody or control. Moreover, the term "documents" shall include, without limitation, correspondence, e-mails, memoranda, reports, notes, minutes, or records, or telephone conversations, meetings, or conferences, diaries, logs, calendar notes, accounting records, financial statements, books of account, vouchers, invoices, bills, computer tapes, print-outs,

Dalia Genger
May 14, 2009
Page 5

---

writings, drawings, graphs, charts, photographs, videotape recordings, data compilations from which information can be obtained or translated.

If we do not receive a reply with the information requested on or before May 28, 2009, we will be forced to seek court intervention.


Sincerely,

COZEN O'CONNOR

By:    Judith E. Siegel-Baum

JES:pw
cc:    Orly Genger
       Jonathan G. Kortmansky, Esq.

# Exhibit L

# PEDOWITZ & MEISTER, LLP

1501 BROADWAY, SUITE 800
NEW YORK, NEW YORK 10036-5501
www.pedowitzmeister.com

212.403.7330 voice
212.354.6614 facsimile
robert.meister@pedowitzmeister.com

ARNOLD H. PEDOWITZ
ROBERT A. MEISTER

DAVID HARRISON
RANDI MELNICK

NEW JERSEY OFFICE

285 OLD SHORT HILLS ROAD
SHORT HILLS, N.J. 07078
(973) 912-0005

June 1, 2009

EMAIL AND UPS

Judith E. Siegel-Baum, Esq.
Cozen & Worcester
250 Park Avenue
New York, NY 10177

Re:   Orly Genger 1993 Trust

Dear Ms. Siegel-Baum:

I write to respond to your May 14th letter to my client, Dalia Genger in her capacity as Trustee of The 1993 Orly Genger Trust (the Trust).

May I start by expressing Mrs. Genger's understanding about the concern that your client, Orly Genger, has about the effect her interests of the various lawsuits your letter mentions. Mrs. Genger has the same concern, particularly since, as we understand it, the *Glenclova* action raises the issue of whether the transfer to the Trust of shares of Trans-Resources, Inc. (TRI) was invalid under the TRI shareholders' agreement.

Having shared that concern, I would like to respond to your letter in narrative form, rather that in the form a response to a litigation demand for production.

All TRI shares are, I am informed, held for the benefit of the shareholders by TRI. Thus Mrs. Genger does not physically possess a share certificate. I am informed that the absence of such a certificate did not prevent The Sagi Genger Trust from selling the shares it was given.

As your client knows, Mrs. Genger became Trustee January 4, 2008, as successor trustee to Leah Fang. Ms. Fang has an accounting pending in Surrogate's Court, New York County, File No. 0017/2008.

Mrs. Genger has not taken any action as Trustee and has not received any dividends or other property or assets in respect of the TRI shares.

As your client knows, D & K LP pledged its 240 shares of the stock of TPR Investment Associates, Inc. (TPR) to secure its December 21, 1993 Note to TPR in the principal amount of

$8,950,000. I believe that your client has the D&K organization papers; if not I'll be glad to copy them for you at your expense, as they're about an inch think. By notice dated 8/31/2008, TPR declared that Note to be in default and subsequently sold the TPR shares for $2,200,000 on February 27, 2009. I attach papers concerning this transaction.

As a result of the foreclosure, the TRI shares are the Trust's only asset.

To date, Mrs. Genger has not filed and fiduciary tax returns, nor submitted any of her expenses for reimbursement by the Trust nor taken any commissions.

Sincerely,

Robert A. Meister

# Exhibit M

# NOTICE OF DEFAULT & ENFORCEMENT of PLEDGE

To:     Sagi Genger, D&K LP General Manager

From:   Yonit Sternberg, TPR Investment Associates, Secretary

Date:   8/31/2008

Re:     Notice of Default and Liquidation of Collateral

---

Please be advised that you are in default in the payment of amounts due under that certain Promissory Note dated December 21, 1993 in the original amount of $8,950,000(the "Note") due to the failure to pay any principal or interest due since 2005 and failing to make regular payments since 2000. Such default has continued for more than ten (10) business days. Please be advised that pursuant to the Note we hereby declare that the entire unpaid principal amount of the Note immediately due and payable.

The shares of TPR Investment Associates pledged to TPR as collateral will be liquidated at a public auction if the full Note is not satisfied.

Sagi Genger / TPR Investment Associates, Inc.

CONFIDENTIAL

1

# Exhibit N

TO:        D&K LIMITED PARTNERSHIP

FROM:    TPR INVESTMENT ASSOCIATES, INC.

           New York, New York
           Tel: 212-729-5076

-------------------------------------------------------------------------------------------

    We will sell all of your 240 shares of common Stock of TPR Investment Associates, Inc. to the highest qualified bidder in public as follows:

Date:      Friday, February 27, 2009

Time:      2:00 p.m.

Place:     Offices of McLaughlin & Stern, LLP, 260 Madison Avenue, 20th Floor, New York, NY 10016

    You are entitled to an accounting of the unpaid indebtedness secured by the property we intend to sell. You may request an accounting by calling us at 212-729-5076.

    The money that we get from the sale (after paying our costs) will reduce the amount you owe. If we get less money than you owe, you will still owe us the difference. If we get more money than you owe, you will get the extra money, unless we must pay it to someone else.

    You can get the property back at any time before we sell it by paying us the full amount you owe (not just the past due payments), including our expenses. To learn the exact amount you must pay, call us at 212-729-5076.

    If you want us to explain in writing how we have figured the amount that you owe us, you may call us at 212-729-5076 or write us at _____ and request a written explanation.

    If you need more information about the sale, call us at 212-729-5076 or write us at

_____.

# Exhibit O

# CERTIFICATE of SALE and FACT

**Know all men by these presents:** That by virtue of a default in the payment of certain

monies due, and pursuant to the terms of a certain Security Agreement dated 12 / 21 / 93

placed in my hands for execution and foreclosure made by:

_____ O & K Limited Partnership _____ (Borrower)

to ___ TPR Investment Associates, Inc. _____ (Secured Party)

The Secured Party did on the 27 day of Feb. , 2009 in the manner provided by

statute, sell at Public Auction by WILLIAM MANNION, Auctioneer, all the borrower(s) right, title

and interest, in and to the collateral consisting of 240 shares of Capital Stock ~~and the~~

~~appurtenant Proprietary Lease allocated to Apartment No._____ in the building known as~~

~~and located at:~~

__ of TPR Investment Associates, Inc _____

And sold unto TPR Investment Associates, Inc. ____.

of _____

for the sum of $ 2,200,000, ___, they being the highest bidder in accordance with the Terms

of Sale which were available to all bidders.

That public notice of sale was given prior to its taking place and was duly advertised. This

Auction Sale was held at:

McLaughlin + Stern, 2600 Madison Ave., NY, NY .

✓   Sold to the Secured Party, no money exchanged hands except for the

auctioneer's fees and expenses of the sale.

—   The sum of $ ___ of the bid price ~~was paid to the Attorney's for the~~

~~Secured Party as a down payment.~~

IN WITNESS WHEREOF, I have hereunto set my hand on the 27th day of

February , 2009.

_____

William Mannion, Auctioneer

# Exhibit P



## COZEN
## O'CONNOR

A PROFESSIONAL CORPORATION

250 PARK AVENUE   NEW YORK, NY 10177   212.509.9400   800.437.7040   212.986.0604 FAX   www.cozen.com

June 11, 2009

**VIA FACSIMILE, E-MAIL AND US MAIL**

**Judith E. Siegel-Baum**
Direct Phone 212.883.4902
Direct Fax   215.701.2261
jsiegel-baum@cozen.com

Robert A. Meister, Esq.
Pedowitz and Meister
1501 Braodway
New York, New York  10036

Re:   Orly Genger 1993 Trust

Dear Robert:

In response to your email dated June 10, 2009, we are prepared to meet with you and Dalia, at our offices, if you agree to the following:

1.      You agree that Orly will not be present at the meeting.  Based upon prior meetings Orly has advised us that her involvement in this meeting will be too emotionally difficult.

2.      Dalia stipulates, in writing, that she will not, under any circumstances and until we resolve our differences, sell, transfer or remove the TRI shares from the Orly Trust.  In January 2009 Orly advised Dalia of her strong desire to retain all of the TRI shares currently held by the Orly Trust and specifically directed Dalia not to sell them.

If you agree to the above, we are prepared to schedule a meeting for early next week and are available after 4 p.m. on June 16th and after 2 p.m. on June 17th.  If we do not hear back from you by the close of business on Friday, June 12, 2009 we will assume that you and Dalia are

Robert A. Meister, Esq.
June 11, 2009
Page 2

unable to agree to our requests.   I look forward to hearing from you.


Sincerely,



COZEN O'CONNOR

By:  Judith E. Siegel-Baum

JES\pw
cc:   Orly Genger

# Exhibit Q

**From:** Robert Meister [mailto:robert.meister@pedowitzmeister.com]
**Sent:** Thursday, June 11, 2009 4:01 PM
**To:** Siegel-Baum, Judith E.
**Cc:** Langan, Suzann; Lehman, Stephanie
**Subject:** RE: Orly Genger 1993 Trust

Dear Judy:  I just received your letter at 3:50 today.  While I have forwarded it to Dalia Genger, other professional commitments make it impossible for me to respond before early next week.  So if we are to have a meeting, we'll have to find different times.

Bob Meister

# Exhibit R

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------X

In the Matter of:

Dalia Genger,

                 **Plaintiff,**

      -against-

Arie Genger,

             **Defendant.**

------------------------------------------------------------X

Index No. 302436/02

AFFIDAVIT OF DALIA GENGER
IN SUPPORT OF PLAINTIFF'S
APPLICATION FOR AN ORDER
OF CONTEMPT AND OTHER
RELIEF AND IN OPPOSITION TO
DEFENDANT'S CROSS MOTION

STATE OF NEW YORK    )
                       ) ss.:
COUNTY OF NEW YORK  )

**DALIA GENGER, being duly sworn, deposes and says:**

1.    I am the Plaintiff in this action, and submit this affidavit in support of my application that this Court hold my ex-husband, Arie Genger ("Arie"), in contempt for his willful failure to comply with the instructions issued by our son, Sagi Genger ("Sagi"), the attorney-in-fact. The facts stated herein are based upon my personal knowledge unless otherwise stated.

2.    Concurrent with the execution of the Stipulation of Settlement (the "Stipulation") dated October 30, 2004 between Arie and me, it was understood that Sagi would act as Chief Executive Officer of TPR in order to execute various documents required under the Stipulation. It was also understood that the note (the "D&K Note") issued by D&K Limited Partnership dated December 21, 1993, in the principal sum of $8,950,000 and payable to TPR, which was attached as an Exhibit to the Stipulation, would be saleable by Sagi Genger for as little as $10,000. Simultaneous with the execution of the Stipulation, the Board of TPR executed a Board Resolution which gave effect to these understandings. Arie's counsel reviewed the Board

Resolution prior to its execution. He did not state any objection to the Board Resolution, and was satisfied that the Board Resolution reflected the parties' understanding and agreement. A true and correct copy of the Board Resolution is attached hereto. Although the Board Resolution is dated October 31, 2004, it was executed on October 30, 2004.

3.     The purpose of the D&K Note Board Resolution was to carry out our understanding that I not be in the position to foreclose on the D&K Note, and to take for myself an interest that Arie and I intended for the children.

4.     In August 2006, TPR sold the D&K Note (but retained a nominal contingent interest) for $12,000.

Sworn to before me this 14ᵗʰ day of
February, 2007

Notary Public

KATARZYNA SCHWARTZ
Notary Public, State of New York
No. 01SC6158649
Qualified in Queens County
COMMISSION EXPIRES 01/02/2011

DALIA GENGER

Index No. 0017                          Year    2008

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of the Application of ORLY
GENGER, as a person interested, for the removal
of DALIA GENGER as Trustee of the ORLY
GENGER 1993 Trust Pursuant to SCPA §711 (11).

## ORDER TO SHOW CAUSE AND VERIFIED PETITION
## PURSUANT TO SCPA §711(11) WITH TEMPORARY RESTRAINTS

### COZEN O'CONNOR
*Attorneys for Petitioner-Landlord*

*Office and Post Office Address, Telephone*
**250 PARK AVENUE, 10th FLOOR**
**NEW YORK, N.Y. 10177**
**(212) 986-1116**

Signature (Rule 130-1.1-a)

Service of a copy of the within                                      is hereby admitted,

Dated,

Attorney(s) for

Please take notice
☐ **Notice of Entry**
that the within is a *(certified)* true copy of a
duly entered in the office of the clerk of the within named court on
☐ **Notice of Settlement**
that an order                                        of which the within is a true copy will be presented for
settlement to the **HON.**                                 one of the judges
of the within named court, at
on                                      at

Dated,

Yours, etc.
**COZEN O'CONNOR**
*Attorneys for*

*Office and Post Office Address*
**250 PARK AVENUE, 10th FLOOR**
**NEW YORK, N.Y. 10177**

To

SURROGATE'S COURT OF THE STATE OF N.Y.
COUNTY OF NEW YORK
------------------------------------x
In the Matter of the                    File No.
                                        0017/2008
        ESTATE OF ARIE GENDER,
                                        FTR Media
                          Deceased.
------------------------------------x

                                        July 1, 2009

                                        31 Chambers Street
                                        New York, New York 10007


        BEFORE:    HON. TROY K. WEBBER
                   Judge

APPEARANCES:       JUDITH ELLEN SIEGEL-BAUM, ESQ.
                   STEPHANIE LEHMAN, ESQ.
                   Attorney for the Petitioner,
                   Cozen O'Connor
                   250 Park Avenue
                   New York, New York 10177-0001
                   (212) 883-4902

                   ROBERT ALLEN MEISTER, ESQ.
                   Attorney for Dahlia Genger
                   Pedowitz & Meister LLP
                   1501 Broadway
                   New York, New York 10036-5601
                   (212) 403-7330

# AAA ELECTRONIC SOUND REPORTERS
1133 Broadway, Suite 706, New York, New York 10010
(888) 866-5135 ◆ (800) 860-5722 fax

Estate of Arie Genger - 7/1/09                              2

```
 1            THE COURT:  On the record.

 2            MS. SIEGEL-BAUM:  Good morning, Your Honor.  My

 3    name is Judith Siegel-Baum from Cozen O'Connor.  And I

 4    represent the Petitioner, Orly Genger.

 5            MS. LEHMAN:  I'm Stephanie Lehman.  I also

 6    represent the Petitioner, Orly Genger.

 7            MR. MEISTER:  Good morning.  Robert A. Meister,

 8    from Pedowitz & Meister, LLP, representing Dahlia Genger,

 9    as Trustee of the Orly Genger Trust.

10            THE COURT:  Good morning.  So, I apologize you

11    were a little delayed.  We had to set up the recording

12    device, and that took us a little while.  So, just so the

13    record is clear, this is the matter of -- the application

14    of Orly Genger to remove the fiduciary order to show cause

15    with TRO Calendar Number 1 on today's calendar, 0017 of

16    '08.

17            So, the order to show cause was brought.  I did

18    not sign it, because I wanted to hear from the parties

19    first in terms of whether or not obviously it should be

20    signed, and whether or not there should be the temporary

21    restraints, as well as the relief sought by the parties.

22    So, we'll begin there.

23            My question, is what's the urgency?  I mean I'm

24    not really clear what exactly is the urgency in this

25    matter.
```

**AAA ELECTRONIC SOUND REPORTERS**
(888) 866-5135 ◆ (800) 860-5722 fax

Estate of Arie Genger - 7/1/09                                    3

1        MS. SIEGEL-BAUM:  Your Honor, what happened here

2    is that we represented Orly Genger.  Now, as the Court

3    probably is aware, there was a prior proceeding that was

4    brought, and we were retained after that decision came

5    down.  And in the prior decision, Judge Roth had said that

6    there wasn't evidence for -- enough evidence, documentary

7    evidence, for removal.  However, if we were going to

8    proceed again, and if we wanted to bring a 2102 proceeding,

9    that we could bring this application again.  So, our firm

10   was prepared to bring a 2102 proceeding.

11       We sent a demand letter to Mrs. Genger and what

12   happened is, is we received a letter from her counsel, Mr.

13   Meister, which enclosed in the letter was an indication

14   that an asset of the trust, okay, had been -- and I'm not

15   going to get into all the details because they're in the

16   papers.  But it had been sold at a very -- or an indirect

17   asset had been sold at a discounted value, and the trust it

18   had an interest, an indirect interest in shares in TPR

19   stock.

20       And there was also a note, which was a liability

21   of the trust, but it had been sold deeply discounted.  And

22   as a result the note, which ultimately would have become an

23   asset of the trust was now a debt.  And the interest in TPR

24   had totally been depleted from the trust, which had a value

25   at that time.

**AAA ELECTRONIC SOUND REPORTERS**
(888) 866-5135 ◆ (800) 860-5722 fax

Estate of Arie Genger - 7/1/09                    4

1         Now, it turned out that Mrs. Genger had -- or

2    should have had knowledge of this impending sale.  It

3    happened four months ago and she had already come before

4    this Court.  She knew she had an asset in this trust; she

5    knew she had to protect it; but it turned out that her son

6    had actually bought the 240 shares.  He got them back as

7    collateral, and he depleted the value of the note in the

8    trust.  And what happened is we got nothing for it; he

9    bought the stock back at a very low, low rate.  This caused

10   alarm to us.

11        So, I had sent a letter and we had met -- Mr.

12   Meister and I had met, and I had sent a letter to him

13   saying, "Look, we won't do anything about this.  We'll try

14   to work things out.  But I need to have some type of an

15   assurance from your client that she will not do anything

16   with what I can see is now the only asset left in the

17   trust, the TRI stock, because I need to protect this asset

18   because everything else has been depleted and I'll have to

19   bring a removal proceeding.  But in the meantime, this is

20   what we need to do.

21        Although he agreed to meet with me, he would not

22   stipulate to agree not to sell the stock or do anything

23   with the stock.  He was silent on it.  At which point I had

24   no other alternative than to come here because I knew no

25   other relief I could get to protect the asset while we find

Estate of Arie Genger - 7/1/09                              5

1    out what is going on and what has happened to everything.

2         Now, in 2008, in the beginning of 2008, Mrs.

3    Genger was appointed the trustee of the Orly Trust.  The

4    removal proceeding was brought and she said she would act -

5    - she filed an affidavit in this Court in January saying

6    she was acting on Orly's behalf and everything was going to

7    be done to protect her assets, and that she was going to be

8    an independent trustee, and she was going to be a good

9    trustee.

10        Well, what happened is, is a few months later --

11   and my feeling is, as a trustee, when you're protecting

12   someone else's property, if you think something is

13   happening that may not be in the beneficiary's interest,

14   the least you do, is bring an application for advice and

15   direction to this Court.  Because by doing nothing as

16   trustee, it's as bad as if you were acting in your own

17   interest.

18        And what happened is, is at the beginning of

19   these trusts, before this litigation started, both the Orly

20   Trust and the Segie Trust, and the children's father, had a

21   majority interest in a company called TRI.  Unbeknownst to

22   Orly, the Segie Trust, which at that time his sister-in-law

23   was trustee at that time, sold his interest in TRI for

24   almost $27 million to the Trump Group, which gave them a

25   majority interest.  Now, what happened is, is that depleted

**AAA ELECTRONIC SOUND REPORTERS**
(888) 866-5135 ◆ (800) 860-5722 fax

Estate of Arie Genger - 7/1/09                                                6

1   the value of Orly's shares in her trust because it was now

2   a minority interest.  And at the time their father had had

3   the voting power.  Now, it's gone.  It's disappeared.

4            And one of the issues, which I think is very

5   important here, is once either, I would assume, and I

6   cannot prove it, that Mrs. Genger knew about this before.

7   But once she knew about it, she was obligated to do

8   something to protect this asset.

9            Then we had the default on the note, and that the

10  trust lost it's indirect shares of TPR stock.  And now

11  what's happened is it's really owned by an entity that's

12  controlled by their son, Segie; Dahlia's son, Segie.  And

13  what happened is, is that Orly has nothing in her trust.

14  So, the fact is, is the first thing that a fiduciary has to

15  do is protect the asset.

16           Now, Mrs. Genger has come in as the fourth

17  substitute trustee of the Orly Trust.  The first two -- and

18  at the time of the Genger's divorce, Mrs. Genger insisted

19  that the originally appointed trustees of these trusts

20  resign.

21           The first two trustees who came in were friends

22  of their son, Segie; they were school friends.  And one of

23  them sold -- assumed this DNK-note for $12,000, which was

24  worth $10 million.  And then there was something that

25  happened that I don't understand.  An accounting has been

Estate of Arie Genger - 7/1/09                                    7

1    compelled; the person hasn't accounted yet.  But he somehow

2    gave the note back in order to -- and have his MBA degree

3    paid for.  And then he resigned as trustee.  Now, this is

4    before I was in the proceeding, and it seems to me we're

5    going to have to go after him too.

6            Then the next person who comes in is a woman

7    named Leah Fang, who is --

8            THE COURT:  But wasn't all of this addressed

9    before Judge Roth?  I mean I'm trying to get to the

10   present.

11           MS. SIEGEL-BAUM:  Okay, after --

12           THE COURT:  So, everything you're mentioning and

13   you're alluding to, this was already addressed before Judge

14   Roth --

15           MS. SIEGEL-BAUM:  Well, it --

16           THE COURT:  -- and she rendered a decision in

17   terms of all of these matters.

18           MS. SIEGEL-BAUM:  But now we have found out that

19   there were two other -- there's another incident that

20   occurred with this note that Judge Roth didn't know

21   anything about because it happened after that hearing.

22           THE COURT:  No, I recognize that.

23           MS. SIEGEL-BAUM:  The TRI did too.  But now our

24   concern is, this is -- to impose the restraint during the

25   pendency of this action or in the event that we could work

**AAA ELECTRONIC SOUND REPORTERS**
(888) 866-5135 ◆ (800) 860-5722 fax

Estate of Arie Genger - 7/1/09                          8

1    it out in some way.  What is the big deal to Mrs. Genger?

2    It's nothing.  It means she won't sell the stock.

3              THE COURT:  Everything you've referred to, other

4    than the note since Judge Roth's decision has nothing to do

5    with Mrs. Genger.

6              MS. SIEGEL-BAUM:  Well, the note has a lot to do

7    with her.

8              THE COURT:  Yeah, I said other than the note.

9              MS. SIEGEL-BAUM:  Yes.

10             THE COURT:  Right.

11             MS. SIEGEL-BAUM:  But I also think that once she

12   found out about what happened with the TRI stock, she had

13   to do something to notify her daughter of what was going on

14   in addition to the fact -- I mean I think her actions have

15   been somewhat hostile to her daughter because they haven't

16   protected anything that she's had.

17             THE COURT:  So, you're saying she should have

18   called her daughter and said this just happened with this

19   TRI stock?

20             MS. SIEGEL-BAUM:  Yeah, I think she should have

21   tried to protect her interest in TRI.  Now, it's worth

22   less.  Why has she not gone or come to this Court and said

23   you know this is what the asset was.  An action was done by

24   a third-party that's made it --

25             THE COURT:  Aren't you placing greater

Estate of Arie Genger - 7/1/09                    9

1   responsibility on her as a fiduciary then what her duties

2   are; what the statute provides?

3           MS. SIEGEL-BAUM:  I think she has that

4   responsibility.

5           THE COURT:  Based on what?

6           MS. SIEGEL-BAUM:  Based upon the fact that she is

7   holding an asset -- remember, this started as a family to

8   start with.

9           THE COURT:  No, I know.  Based upon what case

10  law; based upon what statute?

11          MS. SIEGEL-BAUM:  Well, I think this is so

12  typical of the Rothco case.  I think it was decided --

13          THE COURT:  It's so typical of?

14          MS. SIEGEL-BAUM:  Of the Rothco case that was

15  decided in this Court 35 years ago.  You know one trustee

16  was supposedly an alleged disinterested trustee.  And what

17  happened was the two others were clearly self-dealing.  But

18  this Court said we need a restraint; we need to stop the

19  sale of these paintings; and we need to remove all of them,

20  because --

21          THE COURT:  I don't think it rises to that level.

22  But, counsel, what is your position in terms of the asset?

23  What I'm concerned with is, is this the only asset right

24  now in the trust is the TRI stock?

25          MS. MEISTER:  That's correct, Your Honor, the TRI

**AAA ELECTRONIC SOUND REPORTERS**
(888) 866-5135 ◆ (800) 860-5722 fax

Estate of Arie Genger - 7/1/09                              10

1    stock.

2              THE COURT:  And what's the approximate value, do

3    you know?

4              MR. MEISTER:  Well, whatever value it has, it's

5    approximately 19½ percent interest in this company called

6    TRI; it's a minority interest.  It's not a publicly traded

7    company.  In fact there are two other litigations pending,

8    one of which challenges whether the sale to the trust in

9    the first place and the sale to the other trust as well was

10   a violation of the shareholder action -- of the

11   shareholder's agreement.

12             And there's another action or perhaps it's a

13   counterclaim pending to enforce an irrevocable life-time

14   proxy that each of the two trusts signed in favor of the

15   father.  So, we're sitting with an illiquid chunk of stock,

16   which is a minority chunk, in a corporation governed by a

17   shareholder agreement, where there are two pending actions,

18   one which is to enforce the irrevocable trust giving

19   someone else voting power over this block of stock.  And

20   the other challenges whether the sale to the trust was in

21   itself a violation of the shareholder agreement.

22             THE COURT:  Right.  So, the question becomes, you

23   couldn't sell it any how?

24             MR. MEISTER:  Well, you certainly couldn't sell

25   it on the market.

Estate of Arie Genger - 7/1/09                                      11

 1            THE COURT:  Right.

 2            MR. MEISTER:  You might be able to sell it to one

 3     of the parties --

 4            THE COURT:  Internally.

 5            MR. MEISTER:  -- who already owns the stock.

 6            THE COURT:  Exactly.

 7            MR. MEISTER:  And presumably nobody else would be

 8     interested in it anyway.  It doesn't pay dividends.

 9            THE COURT:  So, when counsel notified you asking

10     you know that you stipulate or agree not to sell it, what

11     was the problem?

12            MR. MEISTER:  Well, first, with much respect to

13     my colleague, that's not my recollection of the meeting.

14     What my recollection of the meeting was that she demanded,

15     without any legal basis, that somehow Mrs. Genger as

16     trustee of this trust do something to equalize the value of

17     this trust with the other trust, which Mrs. Genger was

18     never trustee of, who sold a comparable block of stock for

19     some twenty plus million dollars.  Which I didn't

20     understand how a trustee of Trust-A, could somehow get

21     money from the other Trust that it had sold stock from,

22     which it didn't participate in.

23            In terms of the immediacy, Your Honor's first

24     question, there is no offer by anyone to purchase this

25     stock.  We're perfectly willing if we receive an offer, to

Estate of Arie Genger - 7/1/09                    12

1    notify counsel for Orly Genger.  I'll use the first names,

2    if I may, except when it's the same name.  In fact if we

3    get such an offer, if we should be so lucky.

4            THE COURT:  Well, has there been any -- have you

5    made any inquiries in terms of attempts to sell the stock?

6            MR. MEISTER:  My understanding, Your Honor, is

7    that there's an injunction from the Delaware Chancery

8    Court, which precludes anyone from making an offer -- any

9    of the other parties who are before that Court, which

10   precludes anyone from signing a contract without giving

11   everyone else five days written notice.

12           THE COURT:  And again, these are the only

13   individuals who would be able to purchase the stock, is

14   that correct?

15           MR. MEISTER:  Under the shareholder's agreement,

16   which we're not a party to., I believe that's correct.  In

17   other words, if Your Honor or I wish to buy this stock,

18   presumably someone would say it's a violation of the

19   shareholder's agreement.

20           THE COURT:  And you would not --

21           MR. MEISTER:  Indeed someone said this very trust

22   purchase of the stock was a violation of the shareholder's

23   agreement.  The trust is not a party to that action, and

24   I've seen no need to rush into the Lion's Den on that one.

25           THE COURT:  Well, I don't see the problem then.

Estate of Arie Genger - 7/1/09                    13

1    I mean it seems clear that the stock is not going to be

2    sold.

3              MS. SIEGEL-BAUM:  Your Honor, this stock -- this

4    is a very important thing that just kind of breezed over.

5    And I'll use first names too.  Segie sold his stock to the

6    Trump Group for $27 million.  He has money in his trust.

7    Orly has no money in her trust, but she does have the debt

8    that's owed on a note.  What is to stop Orly from being

9    once again subject to her brother, with her mother's

10   knowledge, pledging this stock to pay off a debt?  It could

11   be done.

12             And one of the things that I think is very

13   important here is whatever that double-wear we're certainly

14   not a party to it.

15             THE COURT:  I don't understand.  Pledging?

16             MS. SIEGEL-BAUM:  There is a note that is owed;

17   that is about an 8.9 million dollar note.  And I am

18   concerned that the trust owes to TPR it's owed -- indirect

19   it's owed DNK --

20             THE COURT:  I would think that the injunction not

21   only states sale, but also would talk about any type of --

22   of using it as a mortgage or collateral -- excuse me; using

23   it as collateral or transfer.  I'm sure that 's broader

24   than simply sale.

25             MS. SIEGEL-BAUM:  Your Honor, I've never seen

Estate of Arie Genger - 7/1/09                    14

1   this injunction.  I have not seen what it is in Delaware.

2   I don't know what it is.  But I also know that these people

3   have been litigating in this Court in one form or another

4   and I am terrified as a lawyer.  I don't come and bring

5   TRO's; I don't do that, because I think you can usually

6   work it out.  But I know no other alternative here, and I

7   don't think that we are going to have a return date right

8   away because we're on the summer calendar.  And I can't

9   come back here and say, "Oh, it's disappeared; what am I

10  going to do?"

11          He got 27 million dollars -- Segie got 27 million

12  dollars for the same identical shares.  And I have nothing

13  here, and I'm afraid because Dahlia has control and --

14          THE COURT:  No, you have the stock.

15          MS. SIEGEL-BAUM:  I don't have the stock.  Dahlia

16  has the stock.

17          THE COURT:  The stock is in the trust.

18          MS. SIEGEL-BAUM:  Okay, but wait a minute.  But

19  he will not agree with me; he will not voluntarily agree --

20  that's why we're here -- that he will not sell, pledge,

21  hypothecate; he won't agree to it on behalf of his client.

22  So, what do I have?  What's my other alternative?

23          THE COURT:  Is that correct, counsel?

24          MR. MEISTER:  Your Honor, respectfully --

25          MR. SIEGEL-BAUM:  I sent him a letter.  It's

Estate of Arie Genger - 7/1/09                                    15

1    attached to the pleadings.

2              THE COURT:  Let me hear his response.

3              MS. SIEGEL-BAUM:  Okay.

4              MR. MEISTER:  I see no need to bind the trustee

5    in a hypothetical situation.  We're perfectly prepared if

6    an offer is made to give notice to everyone.  And we can

7    battle it out at that time if maybe someone offers to buy

8    it for ten cents, which is pretty easy to say no.  If

9    someone offers to buy it for skidillion (phonetic) dollars,

10   whatever skidillion means in this context, it will be a

11   different thing.

12             THE COURT:  Counsel, what if there's an offer for

13   28 million dollars, they should turn it down?  I know you

14   keep referring to the fact that 27 million was obtained on

15   the other purchase of the stock.

16             MS. SIEGEL-BAUM:  Your Honor, if there would be

17   an offer for 28 million dollars, and there was a

18   restraining order and the trustee came and it was okay that

19   there was something.  That's not what's going to happen.

20             I sent Mr. Meister a letter on June 11.  It's

21   annexed as Exhibit P.  And it specifically says that I'm

22   very willing to have a meeting.  That Dahlia must stipulate

23   in writing that she will not under any circumstances, and

24   to resolve our differences, sell, transfer or remove the

25   TRI shares from the Orly stock.  Didn't do that.

Estate of Arie Genger – 7/1/09                          16

1          In January 2009, Orly sent her mother a letter

2     telling her it was her strong desire to leave that stock in

3     her trust and leave it as it is.  He won't agree.  Why

4     won't he agree?  Doesn't that set off an alarm?  It sure

5     does with me.

6               THE COURT:  He doesn't have to agree.

7               MS. SIEGEL-BAUM:  Well, I think --

8               THE COURT:  I mean as a trustee, they don't have

9     to agree.  If there's any issue later on, then you know it

10    will be dealt with accordingly.  But just for purposes of

11    ceasing these endless arguments and these TRO's, counsel,

12    can we just simply state that you will give notice if there

13    is any inclination to sell, transfer or dispose of the

14    stock; that you'll give notice to the Court, as well as

15    give notice to her?

16              MR. MEISTER:  We can, Your Honor.  In fact,

17    predecessor counsel, after Judge Roth's decision wrote a

18    demand letter on January 26 of this year asking if there

19    were any -- promptly in the event, within two days -- I

20    presume they mean two business days -- notify Orly any

21    offer that we receive.  And whereas, I didn't represent Ms.

22    Genger then, I don't know that there was a response to

23    that.  It certainly seems reasonable.  And indeed, if we

24    receive an offer from anyone, it would seem to me the

25    prudent thing for the trustee to do to give notice to

Estate of Arie Genger - 7/1/09                          17

1   everyone who could conceivably be interested in the hopes

2   of seeing what's the highest and best offer, and assuming

3   it's acceptable to begin with.  So, yes, we certainly would

4   give notice to Orly Genger's counsel and if the Court

5   likes, to the Court too.

6           THE COURT:  Notice of any -- notice --

7           MR. MEISTER:  Of any offer.

8           THE COURT:  -- of any office.

9           MS. SIEGEL-BAUM:  Your Honor?

10          THE COURT:  Yes.

11          MS. SIEGEL-BAUM:  The trust is not a party to the

12  Delaware litigation at all.  It has nothing to do with it.

13  And we have no knowledge of it, but there's also a fear,

14  once again as Segie sold his stock with trust -- the stock

15  in his trust was sold.  He'll try to buy his stock if

16  something happens.  And the other thing is --

17          THE COURT:  But if he buys his stock for $28

18  million what's the problem?

19          MS. SIEGEL-BAUM:  He's not going to buy it for

20  $28 million.

21          THE COURT:  But I'm just saying, what is the

22  problem?  It has to be a reasonable offer.  So, I don't see

23  what the issue is.  I mean if they agree to give notice of

24  any offer or if they intend to sell, transfer or otherwise

25  dispose of the stock --

Estate of Arie Genger - 7/1/09                              18

1        MS. SIEGEL-BAUM:  Five days' notice, and I have

2   to come back and get a restraining order?

3        THE COURT:  No, you don't have to come back to

4   get a retraining order.  Use the telephone.  Call the

5   court; call him.  I mean you don't have to continually make

6   a motion.  It's really not necessary.  I was going to say

7   ten days' notice.

8        MS. SIEGEL-BAUM:  Well, he said five days'

9   notice.

10       THE COURT:  I know, but I was going to say --

11       MS. SIEGEL-BAUM:  But the other thing is --

12       MR. MEISTER:  Actually, the other predecessor's

13  counsel requested two days' notice, but --

14       THE COURT:  Right.  Which is --

15       MS. SIEGEL-BAUM:  Well, I wouldn't -- well, I'm

16  not predecessor's counsel, and I wouldn't ask for two days'

17  notice.  I would say if you want me to be able to do my

18  job, I would like to have the ability with the time to do

19  my job.

20       THE COURT:  So, do you want five days' notice or

21  ten days' notice?

22       MS. SIEGEL-BAUM:  No, I want ten.  I don't want

23  five.  The other thing is, can I have the right to renew

24  this application?

25       THE COURT:  Renew what application?

**AAA ELECTRONIC SOUND REPORTERS**
(888) 866-5135 ♦ (800) 860-5722 fax

Estate of Arie Genger - 7/1/09                                    19

1          MS. SIEGEL-BAUM:  The application for the TRO?

2   Can I renew this --

3          THE COURT:  Why do we need that now?

4          MS. SIEGEL-BAUM:  Well, let's put it this way,

5   I'm making a hypothetical; I don't know what's going to

6   happen, but let's just say that there's this litigation in

7   Delaware, whatever happens, and someone decides that Segie

8   is going to buy this asset, he's made an offer for $2.2

9   million.  Or is going to say, "Look, I get this asset and

10  you're free on the note that your trust owes to DNK and

11  TPR, because I'm going to use this as collateral; I'm going

12  to buy it up for nothing.  Okay.  So --

13         MR. MEISTER:  Respectfully, that would be an

14  offer of which we would have to give notice.

15         THE COURT:  Right.

16         MR. MEISTER:  I think it's pretty hypothetical.

17         MS. SIEGEL-BAUM:  I don't think it's hypothetical

18  because of what's happened in the past.

19         THE COURT:  But it's still an offer.  It's still

20  an offer and you would be given notice on the offer.

21         MS. SIEGEL-BAUM:  I'm given notice as a

22  beneficiary, but I am going to have to come in and stop

23  Dahlia from taking that unfair offer because I'm not the

24  trustee; I don't represent the trustee.  So, I'm going to

25  have make another application.

Estate of Arie Genger - 7/1/09                                    20

1          What I am suggesting -- and this is just because

2     I think it's prudent -- I think that the onus on Dahlia to

3     say I'll hold onto the stock for now, and to agree to the

4     restraints.  Like I was very surprised that Mr. Meister did

5     not stipulate to this while we tried to resolve our

6     differences in a way that we could take care of things;

7     totally ignored my June 11 letter; and even in this Court,

8     he's saying that he never got that.  He's not acknowledging

9     the letter, which I sent him after the meeting.

10          THE COURT:  Counsel, go back to your point.  What

11     is the point?

12          MS. SIEGEL-BAUM:  My point is, is I don't think

13     that my client is protected since she has a trust, which is

14     set up for her benefit and her children's benefit without a

15     restraining order on this stock until this is resolved

16     before a court as to what is happening.

17          THE COURT:  What is resolved?

18          MS. SIEGEL-BAUM:  I think we have to get my

19     removal proceeding; I think I need some discovery done.

20          THE COURT:  Most definitely.  Most definitely.

21     You move for that in the order to show cause.

22          MS. SIEGEL-BAUM:  She's wasted this asset --

23          THE COURT:  Counselor, I wasn't -- I was just

24     making a comment.

25          MS. SIEGEL-BAUM:  Oh, okay.

Estate of Arie Genger - 7/1/09                    21

1           THE COURT:  I was just making a comment --

2           MS. SIEGEL-BAUM:  I'm sorry.

3           THE COURT:  -- that you move for it in the order

4    to show cause.  Now, you'd have to file separate papers

5    moving for the removal.

6           MS. SIEGEL-BAUM:  Well, yeah.

7           THE COURT:  Or we can convert it.

8           MS. SIEGEL-BAUM:  Well, I have it in the

9    petition.

10          THE COURT:  Or we can convert it.

11          MS. SIEGEL-BAUM:  It's in my petition.

12          THE COURT:  Right.

13          MS. SIEGEL-BAUM:  It is in my petition.

14          THE COURT:  Okay.

15          MS. SIEGEL-BAUM:  But the thing is I don't know

16   if she wants a hearing; I have to go through the hearing.

17          THE COURT:  Yes.

18          MS. SIEGEL-BAUM:  We have to have some discovery.

19   In the meantime, this asset is all that I think is there

20   now.

21          THE COURT:  Yes.

22          MS. SIEGEL-BAUM:  And I think that I need to

23   preserve that asset because I think her conduct has been

24   whether or not it's self-dealing, the fact that she has

25   ignored certain responsibilities that I believe the

Estate of Arie Genger - 7/1/09                    22

1    fiduciary has --

2                 THE COURT:  I understand your position, counsel.

3    And what we're going to do is as stated, that counsel has

4    to notify you within ten days where there's an offer, okay?

5    Or where there's an offer made or a request for an offer of

6    the stock, or to sell, transfer, or otherwise dispose of

7    the stock.  And otherwise dispose of would include what you

8    referred to as a pledge.

9                 MS. SIEGEL-BAUM:  Which I'm afraid of.

10                THE COURT:  I know your fears, okay?  So, that's

11   why I'm going to say otherwise dispose of -- settle,

12   transfer, otherwise dispose of.  They have to notify you

13   within ten days.

14                MS. SIEGEL-BAUM:  And notify by hand.  Okay, by

15   hand.

16                THE COURT:  What do you mean by hand?

17                MS. SIEGEL-BAUM:  Deliver it to my office by hand

18   on the day.  That's when the ten days start, when we

19   receive it.  Do not put it in the mail.  I don't want it in

20   the mail.

21                THE COURT:  Okay.

22                MR. MEISTER:  Respectfully, could we do it by

23   overnight courier?

24                THE COURT:  You can do it by -- yeah, I think you

25   should do it by next day delivery.  You could do it by next

Estate of Arie Genger - 7/1/09                              23

1   day delivery; you could do it by --

2              MS. SIEGEL-BAUM:  Okay, but we need --

3              THE COURT:  I mean you need notice.  You know,

4   you could even email; you can fax it; whatever.  You want

5   to do it by overnight, that's fine.  Okay?  That should

6   protect your rights, counsel.

7              The other thing is again, if for some reason --

8   withdrawn.  A lot of this will be dealt with in the

9   accounting proceeding.  There's still a trustee, so there

10  still would be certain ramifications and consequences if in

11  fact there was any wrong doing in terms of that.

12             MS. SIEGEL-BAUM:  Well, I understand.  We do have

13  surcharge; I do understand that.

14             THE COURT:  Right.

15             MS. SIEGEL-BAUM:  Accept the only thing is what

16  I'm concerned about is rather than surcharge you, I'd

17  rather be able to be sure of the assets.

18             THE COURT:  No, I recognize that.  But they're on

19  notice as to all of your fears.  So, for them now to do

20  something which would be obviously against their duties and

21  responsibilities would be somewhat glaring in terms of what

22  the surcharge actually would be.  So, we can deal with

23  that.  So, that's what you'll do; within ten days you'll

24  notify them.

25             MR. MEISTER:  All right, Your Honor.

Estate of Arie Genger - 7/1/09                           24

1        THE COURT:  Okay, now in terms of your other

2    issues, counsel, in terms of the removal and what is it?

3    It's just the removal, is that the only other issue?

4        MS. SIEGEL-BAUM:  I have removal, I have

5    surcharge enforce, I have replacement trust; the usual in a

6    removal proceeding.

7        THE COURT:  Well, the appointment of Michael

8    Groman, that goes along with the removal?

9        MS. SIEGEL-BAUM:  Yes.

10       THE COURT:  Okay.  So, then you'd have to -- this

11   is converted, and then you'd have to go through discovery

12   on these issues.

13       MS. SIEGEL-BAUM:  Well, can we set up a discovery

14   schedule today?

15       THE COURT:  That's what we're doing now.

16       MS. SIEGEL-BAUM:  Okay, good.

17       THE COURT:  That's what we're going to do now.

18       MS. SIEGEL-BAUM:  Okay.

19       MR. MEISTER:  May I hopefully request that we not

20   go over the same grounds that Judge Roth went over?

21       THE COURT:  Yeah.

22       MR. MEISTER:  Because many of the arguments that

23   we've heard here this morning were dealt with in Judge

24   Roth's opinion.

25       MS. SIEGEL-BAUM:  I disagree.  They were not

Estate of Arie Genger - 7/1/09                                    25

1     dealt with.  What Judge Roth said is we need more discovery

2     here.  Because she said that there --

3                THE COURT:  Right.  We need --

4                MS. SIEGEL-BAUM:  -- was no document evidence.

5                THE COURT:  Right.

6                MS. SIEGEL-BAUM:  That's what she said.

7                THE COURT:  We need more, which I'm assuming that

8     we had some.  So, we need more.

9                MS. SIEGEL-BAUM:  I don't think we had --

10               THE COURT:  Not that we're going to re-live the

11    entire litigation.

12               MS. SIEGEL-BAUM:  Right.  And also --

13               THE COURT:  Okay?

14               MS. SIEGEL-BAUM:  -- hopefully through this

15    litigation I don't have to bring a 2102 proceeding, I can

16    get it through discovery here.

17               THE COURT:  You do what you have to do.

18               MS. SIEGEL-BAUM:  Yeah.

19               THE COURT:  Okay.  So, what is it that you

20    believe that you'll be able to --

21               (Off the record.)

22               MR. MEISTER:  I would point out if you're talking

23    about --

24               THE COURT:  Logistically we're trying to figure

25    out how to get it on the calendar and how to do the

Estate of Arie Genger - 7/1/09                                        26

1       removal.

2                MR. MEISTER:  If this is to be vivified somehow,

3       I would point out there's a jurisdictional defect and that

4       they haven't named the remainderman.

5                MS. SIEGEL-BAUM:  The remaindermen are unborn.

6       And the trust can be distributed completely.  I mean I --

7                (Cross-talk.)

8                MS. SIEGEL-BAUM:  Your Honor, can I just point

9       out one thing to you and I don't mean to belabor a point,

10      but when the TPR shares were sold, no notice -- even though

11      you know Mrs. Genger had notice -- no notice was given to

12      Orly.  There was publication, I understand that's what

13      could be done.  But no one -- even though Dahlia had

14      knowledge of this -- nobody gave Orly any notice that she

15      was loosing an asset of her trust.

16               And they knew where she lived.  I mean it's her

17      daughter.  She knew where she lived, and she could have

18      done it.  And once again, I don't want to get in the same -

19      - the secretiveness has been a problem.  And I just hope

20      that you know what we're doing here is that I'm not going

21      to end up with ten days with something that's a done deal.

22      And it seems to me that this is very problematic.

23               And I know I'm belaboring a point, and I know I'm

24      being the kind of lawyer that every Judge hates.  But I do

25      feel that this is a really urgent problem because of what

Estate of Arie Genger - 7/1/09                    27

1     has happened in the past.  And I think that the discovery

2     is going to show that because remember this wasn't

3     discovery that was done in the prior proceeding.

4             MR. MEISTER:  Your Honor, I don't under stand

5     this because in Judge Roth's opinion at Page 6, and it's

6     buried in the order to show cause, is Exhibit J; she

7     expressly says that it does not appear to be correct that

8     the TPR shares were an asset of the trust.  The TPR shares

9     were pledge to a note to secure a note.

10            At one point it was an attempt to get rid of the

11    note that was rescinded and it was rescinded in part

12    because Ms. Orly Genger took the position that the note

13    shouldn't have been transferred.  So, she knew about the

14    note.  In fact the moving papers say that there was a ten

15    year note -- I think it's $8 million.  And it was supposed

16    to be paid annually, and it wasn't paid annually.

17            Now, Mrs. Genger was not the holder of the note.

18    The brother is controlling an entity to which held the

19    note, and to which the TPR shares were pledged.  He

20    exercised his right as a security party.  I don't know

21    somewhere in the papers here it's saying Mrs. Genger as

22    trustee should have done something.  But I know what she

23    could have done.

24            Orly Genger had previously acknowledged the

25    existence of this note.  The note hadn't been paid.  So, I

Estate of Arie Genger - 7/1/09                                              28

1    don't know why this gives counsel concern in any event. It

2    doesn't relate to the TRI shares which are the significant

3    assets -- which always were the significant assets of the

4    trust and now the sole issue of the trust. And Your Honor

5    has already indicated you're going to give directions, then

6    we notify them if there's any offer to do in effect

7    anything with those shares.

8              MS. SIEGEL-BAUM: Your Honor, there's one

9    misrepresentation that's been made here. It is true, the

10   trust each owned 48 percent of DNK, and they had an

11   indirect interest of 23.5 percent in TPR. And so they did

12   have an ownership interest in those 240 shares. So, even

13   though counsel feels there was no interests, there was an

14   interest. And that was it. And it's now gone. It's gone.

15             MR. MEISTER: It's not counsel feels, it's what

16   Judge Roth wrote, quote from Page 6, namely that the trust

17   interest in TPR -- she says the premise of the application,

18   namely that the trust interest in TPR would enable the

19   trustee to investigate or seek relief from TPR, does not

20   appear to be correct. And then she goes --

21             THE COURT: Does not appear to be correct. I

22   mean obviously it's something that has to be litigated;

23   it's something that has to be determined.

24             MS. SIEGEL-BAUM: And it was based upon prior

25   papers that the judge had before her.

Estate of Arie Genger - 7/1/09                    29

1        MR. MEISTER:  I thought Judge Roth determined it,

2    but --

3        THE COURT:  I don't know, reading the decision,

4    I'm not really sure that there was that determination.

5    However, we're not going to litigate it now, because I

6    don't know.  And there's nothing before me that tells me

7    whether it is or is not.

8        MS. SIEGEL-BAUM:  Well, I just would like to

9    point out it was based on prior papers that were filed with

10   the Court that (inaudible) exactly explained the ownership

11   quite accurately.

12       THE COURT:  I don't know.

13       MS. SIEGEL-BAUM:  Yeah.

14       THE COURT:  Okay.  So, then we have to calendar

15   this for August 5; for responsive papers by August 5.  It

16   will be on the calendar on that date.  And then we'll do

17   the discovery.

18       MR. MEISTER:  Do the discovery at that date?

19       THE COURT:  No.  We can set the discovery

20   schedule now.

21       MS. SIEGEL-BAUM:  Let's set it now, please.

22       THE COURT:  So, when is it that -- now, you filed

23   a demand for discovery, counsel?  Did you send a letter?

24       MS. SIEGEL-BAUM:  I sent the letter.  That's what

25   I did at the start, because I was going to bring a 2102

**AAA ELECTRONIC SOUND REPORTERS**
(888) 866-5135 ◆ (800) 860-5722 fax

Estate of Arie Genger - 7/1/09                    30

1    proceeding.

2                    THE COURT:  Okay.

3                    MS. SIEGEL-BAUM:  So, that's what I did.

4                    MR. MEISTER:  And I answered the letter.  Most of

5    the things she asked about are non-existents.  She wants to

6    know about the dividends that were paid.  There were

7    dividends.  I stated that.

8                    THE COURT:  Okay.

9                    MR. MEISTER:  But she can serve a document

10   demand; she can serve whatever she wants.

11                   MS. SIEGEL-BAUM:  You know what, I'll make it a

12   demand for discovery and inspection.  I can turn my letter

13   into that in a week.  That's not a problem.

14                   THE COURT:  Well, that's what I was asking.  You

15   don't have to do that.  That's fine.  So, can you then --

16   let's see; file a discovery demand by the 20th of August?

17                   MS. SIEGEL-BAUM:  Okay.  And that's the

18   deposition notices too, right?

19                   THE COURT:  Yes.  And then you think that you'd

20   be able to conclude discovery by September?  Or would you

21   need more time?

22                   MR. MEISTER:  By the end of September, Your

23   Honor?

24                   THE COURT:  By the end?

25                   MS. SIEGEL-BAUM:  I think we need more time

AAA ELECTRONIC SOUND REPORTERS
(888) 866-5135 ♦ (800) 860-5722 fax

Estate of Arie Genger - 7/1/09                              31

1     because we have to take depositions.

2                  THE COURT:  October?

3                  MS. SIEGEL-BAUM:  Can we do November 15?

4                  THE COURT:  Excuse me?

5                  MS. SIEGEL-BAUM:  Can we do November 15 because

6     I'm a little concerned I might need some third-party

7     discovery.

8                  THE COURT:  Okay.  So, now you recognize then

9     that nothing would occur most probably until January?  I

10    thought there was this urgency.

11                 MS. SIEGEL-BAUM:  Okay.  Well, there is an

12    urgency, but s long as you have given me -- you're going to

13    give an order today saying that counsel is -- are you going

14    to write an order saying that counsel will sign a

15    stipulation saying that we'll get ten days notice?

16                 THE COURT:  Not a stipulation.  I don't think --

17    well, I don't know, do you want to do it by stipulation?  I

18    was just going to do an order.

19                 MS. SIEGEL-BAUM:  I'd like an order if we can

20    have an order.

21                 THE COURT:  Yeah, I was just going to do an

22    order.

23                 MR. MEISTER:  An order is satisfactory.

24                 MS. SIEGEL-BAUM:  Yes.  And then at least I have

25    the order to protect me that I can run back here if I need

Estate of Arie Genger - 7/1/09                    32

1        to --

2                    THE COURT:  Right.

3                    MS. SIEGEL-BAUM:  -- based upon the notice.

4                    THE COURT:  Right.  Don't run back.  I don't want

5        to see you back.  Okay, so -- you know, then August 20

6        you're going to file your discovery demand.  Do you believe

7        you'd be able to complete discovery by November 16 is the

8        Monday?

9                    MS. SIEGEL-BAUM:  16th.

10                   THE COURT:  Okay.  And then we can do a

11       conference -- I guess we'd have to do a conference then.

12       It looks like December 1 or December 4.

13                   MS. SIEGEL-BAUM:  Let's make it December 1.

14                   THE COURT:  That's a Tuesday, okay?  So, we'll do

15       a conference --

16                   MR. MEISTER:  10:00 A.M.?

17                   THE COURT:  Well, actually that's a calendar day.

18                   MS. SIEGEL-BAUM:  Oh, that's bad, right?

19                   (Cross-talk.)

20                   THE COURT:  December 2, then?  We'll just do a

21       conference?

22                   MS. SIEGEL-BAUM:  That's a Wednesday?

23                   THE COURT:  Yes.

24                   MS. SIEGEL-BAUM:  That's fine.

25                   THE COURT:  Is that okay?

Estate of Arie Genger - 7/1/09                                33

1       MS. SIEGEL-BAUM:  Yes.

2       THE COURT:  And then on that date we will set a

3  date for the hearing and the trial, okay?

4       MR. MEISTER:  Is that ten o'clock, Your Honor?

5       THE COURT:  Yes.  Okay, so you'll file your

6  discovery demands or whatever if you want to convert your

7  letter to such.  I would probably -- I think you should

8  probably do a more in depth discovery demand by August 20?

9       MS. SIEGEL-BAUM:  Yes.

10       THE COURT:  And then we'll complete the

11  discovery, including depositions by November 16.  And then

12  our conference date is December 2 at 10:00 A.M.

13       August 5, this motion will be calendared and we

14  need the responsive papers by that date, okay?

15       MR. MEISTER:  Is that an appearance?

16       THE COURT:  I was going to say an appearance is

17  not necessary as long as you file your papers before that

18  date.  I really don't need you here.  Okay.

19       And then if there are any issues that crop up in

20  the interim, then you can just notify Ms. Santamarina and

21  she'll deal with them accordingly.  And then we'll issue

22  the order today and get it out to you.

23       MS. SIEGEL-BAUM:  Thank you very much, Your

24  Honor/

25       THE COURT:  Okay.  Anything else?

Estate of Arie Genger - 7/1/09                                        34

1          MR. MEISTER:  Thank you, Your Honor.

2          THE COURT:  Is that it?

3          (No response.)

4          THE COURT:  Okay.  Thank you.

5          MR. MEISTER:  Thank you.

6          MS. SIEGEL-BAUM:  Your Honor, thank you for

7     giving us this hearing today.  I know it's not your normal

8     calendar.

9          THE COURT:  It's okay.

10         MS. SIEGEL-BAUM:  We appreciate it.

11         THE COURT:  You're welcome.

12         (Whereupon, the proceeding was concluded at this

13    time.)

14                        - oOo -

15

16

17

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T E</u>

I, Rochelle Grant, certify that the foregoing transcript of the proceedings in the Surrogate's Court of the State of New York, County of New York, in the Matter of the Estate of Arie Genger, File Number 0017/08, was prepared using four-track electronic transcription equipment and is a true and accurate record of the proceedings.

Rochelle V. Grant

Date audio was transcribed:

July 12, 2009

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------------

In the Matter of the Application of ORLY GENGER, as          File No. 0017/2008
a person interested, for the removal of DALIA
GENGER as Trustee of the ORLY GENGER 1993
Trust Pursuant to SCPA § 711 (11)

---------------------------------------------------------------------

## AFFIDAVIT OF SERVICE BY FEDERAL EXPRESS

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF NEW YORK  )

SUZANN P. LANGAN, being duly sworn, deposes and says:

I am over 18 years old, am not a party to this action and reside in Queens, New York.

On the 4th day of August, 2009, I served a copy of the within AFFIDAVIT OF PETITIONER, AFFIDAVIT OF JUDITH E. SIEGEL-BAUM AND EXHIBIT THERETO IN OPPOSITION TO RESPONDENT'S MOTION TO DISMISS AND MEMORANDUM OF LAW upon:

Robert A. Meister, Esq.
Pedowitz & Meister LLP
1501 Broadway
New York, New York  10036

by Federal Express, an overnight delivery service regularly employed by this firm and with which this firm maintains an account.

SUZANN P. LANGAN

Sworn to before me this
4th day of August, 2009

Notary Public

STEPHANIE LEHMAN
Notary Public, State of New York
No. 02LE6003129
Commission Expires 2-23-20 10

At the Surrogate's Court held in and for the County
of New York, at the Courthouse, 31 Chambers
Street, New York, New York on the *18* day of
August 2009

PRESENT:  HON. Troy K. Webber

                                        Surrogate

| | |
|---|---|
| In the Matter of the Application of<br><br>ORLY GENGER, as a person interested,<br>for the removal of DALIA GENGER<br>as Trustee of the Orly Genger 1993 Trust<br>pursuant to SCPA §711 (11) | File No.: 0017/2008<br><br>**SUPPLEMENTAL ORDER TO<br>SHOW CAUSE WITH<br>TEMPORARY RESTRAINTS** |

On reading and filing the annexed Verified Petition of Petitioner, ORLY GENGER, and

the exhibits, verified on the 22nd day of June, 2009, and the memorandum of law in support of

Petitioner's Verified Petition dated June 22, 2009,

LET the Respondent, DALIA GENGER, the sole fiduciary of the Orly Genger 1993

Trust, show cause before Surrogate Troy K. Webber at the Surrogate's Court, ~~sitting at 60 Centre~~ *31 Chambers*

*Street,*   *509*

~~Street~~, Room ~~300~~, New York, New York, on the *8* day of *September* 2009 at 10:00 o'clock

in the forenoon of that day or as soon thereafter as counsel may be heard why an order should

not be entered:

(a)      Enjoining and restraining Respondent, her agents and all other persons

acting on her behalf from withdrawing, selling disposing, transferring, assigning, removing,

pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly

Trust's 19.43% interest in Trans-Resources, Inc., ("TRI"), a closely held corporation, founded by

Arie Genger, Petitioner's father and Respondent's former husband of Respondent and any other assets which may be remaining in the Orly Trust;

(b)    Removing Respondent as Trustee of the Orly Trust for breaching her fiduciary duties, wasting and dissipating the assets of the Orly Trust and imprudently managing and injuring the property committed to her charge;

(c)    Surcharging Respondent in the amount of the loss of the value of Orly's interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)    Appointing Michael D. Grohman, Esq. as successor trustee;

(e)    Waiving any requirement that Petitioner post an undertaking; and

(f)    Granting Petitioner such further relief deemed necessary or proper *and/or her counsel*

ORDERED that, during the pendency of this proceeding, Respondent, ~~her agents and all~~ *are required to give notice by overnight mail to Petitioners Counsel of any 1) offer* ~~other persons acting on her behalf are temporarily restrained from withdrawing, selling,~~ *to purchase the Orly Trust's 19.3% interest in TPR w/in 10 days of receiving* ~~disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering,~~ *such offer and 2) act by Respondent, her agents and all other persons* ~~liening, hypothecating or secreting the Orly Trust's 19.43% interest in TRI and other assets~~ *acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell* ~~remaining in the Orly Trust and it is further~~ *or otherwise transfer the Orly Trust's in TRI at least 10 days prior to such act;* *and it is further* ORDERED that service of a copy of this Order and the papers upon which it is based

shall be served on David Parnes, in his capacity as Trustee of the Sagi Genger 1993 Trust, by overnight mail service at his residence, located at 29 Elkachi Street, Tel Aviv, Israel 69497, ~~or~~ *on or before* *August 21, 2009   and   on* ~~Dalia~~ *Pedowitz & Meister, LLP, attorneys* ~~any other address at which she can be located, on or before August __, 2009.~~ *for Dalia Genger, as trustee of the Orly Genger 1993 Trust by personal delivery or overnight m* ~~ENTER~~ *on or before August 21, 2009.*

*TKV*

~~Surrogate~~

At the Surrogate's Court held in and for the County
of New York, at the Courthouse, 31 Chambers
Street, New York, New York on the __1__ day of
~~June~~ 2009
July

New York County Surrogate's Court
DATA ENTRY DEPT.
Date: July 1, 2009

PRESENT: HON. **Troy K. Webber**
Surrogate

In the Matter of the Application of

ORLY GENGER, as a person interested,
for the removal of DALIA GENGER
as Trustee of the Orly Genger 1993 Trust
pursuant to SCPA §711 (11)

File No.: 0017/2008

**ORDER TO SHOW CAUSE
WITH TEMPORARY
RESTRAINTS**

On reading and filing the annexed Verified Petition of Petitioner, ORLY GENGER, and

the exhibits, verified on the 22nd day of June, 2009, and the memorandum of law in support of

Petitioner's Verified Petition dated June 22, 2009,

LET the Respondent, DALIA GENGER, the sole fiduciary of the Orly Genger 1993

Trust, show cause before Surrogate _Troy K. Webber_ at the Surrogate's Court, ~~31 Chambers~~ Sitting at 60 Centre!

~~Street,~~ Room 300 New York, New York, on the 5th day of ~~June~~ August 2009 at 10:00 o'clock in the forenoon of that

day or as soon thereafter as counsel may be heard why an order should not be entered:

        (a)     Enjoining and restraining Respondent, her agents and all other persons

acting on her behalf from withdrawing, selling disposing, transferring, assigning, removing,

pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly

Trust's 19.43% interest in Trans-Resources, Inc., ("TRI"), a closely held corporation, founded by

Arie Genger, Petitioner's father and Respondent's former husband of Respondent and any other

assets which may be remaining in the Orly Trust;

(b)     Removing Respondent as Trustee of the Orly Trust for breaching her fiduciary duties, wasting and dissipating the assets of the Orly Trust and imprudently managing and injuring the property committed to her charge;

(c)     Surcharging Respondent in the amount of the loss of the value of Orly's interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)     Appointing Michael D. Grohman, Esq. as successor trustee;

(e)     Waiving any requirement that Petitioner post an undertaking; and

(f)     Granting Petitioner such further relief deemed necessary or proper.

ORDERED that, during the pendency of this proceeding, Respondent, ~~her agents and all~~ [and/or her counsel] are required to give notice by overnight mail to ~~petitioners~~ counsel of any 1) offer ~~other persons acting on her behalf are temporarily restrained from withdrawing, selling,~~ to purchase the Orly Trust's 19.3% interest in TRI within 10 days of receiving ~~disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering,~~ such offer and 2) act by Respondent, her agents and all other persons ~~liening, hypothecating or secreting the Orly Trust's 19.43% interest in TRI and other assets~~ acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell or ~~remaining in the Orly Trust; and it is further~~ otherwise alter the Orly Trust's interest in TRI at least 10 days prior to such act and it is further ORDERED that service of a copy of this Order and the papers upon which it is based shall be served on Respondent by personal service at either her residence, located at 200 East 65th Street, Apt. 32W, New York, New York 10021, or any other address at which she can be located, on or before ~~June~~ July 7, 2009; and it is further

ORDERED, that any responsive papers shall be filed by July 29, 2009.

~~ENTER:~~

_(signature)_

Surrogate

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
ORLY GENGER 1993 Trust Pursuant to
SCPA § 711 (11)

**ATTORNEY AFFIRMATION
AMENDING PETITION FOR
REMOVAL OF DALIA
GENGER AS TRUSTEE**

**FILE NO.:  0017/2008**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JUDITH E. SIEGEL-BAUM, an attorney duly admitted to practice law in the State of

New York, affirms the following under penalty of perjury:

1.      I am a member of the law firm Cozen O'Connor, attorneys for the Petitioner

herein.

2.      I make this affirmation in order to amend paragraph 1. of the Verified Petition for

Removal of Dalia Genger as Trustee and Request for Temporary Restraining Order, dated and

verified June 22, 2009, to read as follows:

Orly, domiciled at 1965 Broadway, Apt. 22G, New York, New York

10024, is the current beneficiary of the Orly Genger 1993 Trust dated December

13, 1993 (the "Orly Trust") (annexed hereto as Exhibit A). Dalia Genger,

Residing at 200 East 65th Street, Apt. 32W, New York, New York  10021

("Respondent" or "Dalia"), Orly's mother, is the current sole Trustee of the Orly

Trust, and was appointed successor Trustee in January 2008.  The Orly Trust

provides for discretionary payments of income and principal to Orly during her

lifetime with the remainder to be distributed to her descendants, per stirpes.  If

Orly dies leaving no descendants, the remainder of the trust property is to be distributed to the Sagi Trust.  David Parnes, residing at 29 Elkachi Street, Tel Aviv, ISRAEL  69497, is the current Trustee of the Sagi Trust.

Dated: New York, New York
      August _14_, 2009

Judith E. Siegel-Baum

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
ORLY GENGER 1993 Trust Pursuant to
SCPA § 711 (11)

**VERIFIED PETITION FOR
REMOVAL OF DALIA GENGER
AS TRUSTEE AND REQUEST
FOR TEMPORARY
RESTRAINING ORDER**

**FILE NO.:  0017/2008**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

TO THE SURROGATE'S COURT, STATE OF NEW YORK
COUNTY OF NEW YORK

Petitioner, Orly Genger ("Petitioner" or "Orly"), by her attorneys Cozen O'Connor,

respectfully alleges as her Verified Petition for Removal of Dalia Genger as Trustee:

1.       Orly, domiciled at 1965 Broadway, Apt. 22G, New York, New York 10024, is the

current beneficiary of the Orly Genger 1993 Trust dated December 13, 1993 (the "Orly Trust")

(annexed hereto as Exhibit A).  Dalia Genger, residing at 200 East 65th Street, Apt. 32W, New

York, New York 10021 ("Respondent" or "Dalia"), Orly's mother, is the current sole Trustee of

the Orly Trust, and was appointed successor Trustee in January 2008.

2.       Based upon the allegations contained herein, Petitioner requests that this Court

provide the following relief:

(a)       Enjoining and restraining Respondent, her agents, and all other persons

acting on her behalf from withdrawing, selling, disposing, transferring, assigning, removing,

pledging, redeeming, mortgaging, encumbering, liening, hypothecating, or secreting the Orly

Trust's 19.43% interest in Trans-Resources, Inc. ("TRI"),[1] a closely held corporation, founded

---

[1] TRI is the parent company of several subsidiaries that provide growers with specialty fertilizer and industrial chemicals, including Haifa Chemicals Ltd., Na-Churs Alpine Solutions, Plant Products Co. Ltd., and Elgo Irrigation Co.

by Arie Genger ("Arie"), Petitioner's father and Respondent's former husband, and any other assets which may be remaining in the Orly Trust. The Orly Trust's TRI shares are in imminent danger of being sold by Respondent and her son, Orly's brother, Sagi Genger ("Sagi"), for the purpose of benefiting Sagi Genger and presumably Respondent, and depleting and denuding the value of Orly's Trust;

(b)     removing Respondent as Trustee of the Orly Trust for breaching her fiduciary duties, wasting and dissipating the assets of the Orly Trust, and imprudently managing and injuring the property committed to her charge. As will be demonstrated herein, Respondent has conspired with, and participated in the diversion of trust assets to, Sagi, who underhandedly sold without any objection from Respondent, the Orly Trust's indirect interest in TPR Investment Associates Inc. ("TPR"), a closely held family-owned corporation.

(c)     surcharging Respondent in the amount of the loss of the value of Orly's interest in TPR as determined by the Court and awarding the Petitioner costs and attorneys' fees;

(d)     appointing Michael D. Grohman, Esq., as successor trustee;

(e)     waiving any requirement that Petitioner post an undertaking; and

(f)     granting Petitioner such further relief deemed necessary or proper.

3.     To assist the Court in perceiving the severity of Respondent's conduct and the urgency of the provision of extraordinary relief, the following is an overview of the facts supporting this Petition.

## I.     OVERVIEW

4.     Arie and Dalia were married on July 23, 1967, in a ceremony held in Israel. In 2004, however, their marriage ended in divorce. Prior to 1993, at which time Dalia and Arie were married, Dalia and Arie formed D & K LP ("D & K"), a family-owned limited partnership

whose name was shorthand for "Dalia and Kids." At the time of its formation, Dalia, the general partner, held a 4% interest, and Orly and Sagi, the limited partners, each held a 48% interest.

5.      In December 1993, Dalia and Arie also established identical irrevocable *inter vivos* trusts for the benefit of each of their children: the Orly Trust and the Sagi Genger 1993 Trust (the "Sagi Trust"). For estate-planning purposes, Dalia and Arie funded each trust with a $600,000 gift. The intent behind the trusts was to ensure that both children received property of equal value. Sash A. Spencer and Lawrence M. Small were named Co-Trustees of both trusts and remained Co-Trustees until the Genger's divorce. After the Trusts were funded, Orly and Sagi each assigned their 48% interests in D & K to their Trusts.

6.      At the same time in December 1993, D & K purchased 240 shares of common stock (constituting 49% of the outstanding shares) in TPR for $10,200,000. The shares were purchased with $600,000 from each of the Orly Trust and the Sagi Trust and $50,000 from Dalia, totaling $1,250,000, and the balance was satisfied with a recourse $8,950,000 promissory note (the "Note") (a copy of which is annexed hereto as Exhibit B). Pursuant to the Note, principal, together with accrued interest, was to be repaid by D & K in annual installments over ten years. The Note was secured by a pledge of the 240 TPR shares owned by D & K. Each of the Trusts and Dalia assumed liability on the Note in proportion to its/her direct interest in D & K. Accordingly, each of the Orly and Sagi Trusts assumed a 48% liability on the Note and acquired a 23.52% indirect interest in TPR and Dalia assumed a 4% liability on the Note and a 1.96% indirect interest in TPR. Payments were made on the Note until 1999, at which time D & K stopped making payments with the implied consent of the interested parties.

7.      At the time of the above-described transaction, Arie owned the remaining 51% of TPR, which held investments in various securities, including TRI common stock, as well as its

interest in the Note. As of March 30, 2001, TPR held a 52.85% interest in TRI. The remaining minority interest in TRI (47.15%) was owned by various entities controlled directly and indirectly by Jules and Eddie Trump (the "Trump Group").

8.    On October 26, 2004, Dalia and Arie entered into a Stipulation and Agreement of Settlement as a final settlement of their divorce (the "Settlement Agreement") (annexed hereto as Exhibit C). Pursuant to the Settlement Agreement, Dalia received, *inter alia*, Arie's 51% interest in TPR and retained her 4% interest in D & K. TPR's 52.85% interest in TRI was transferred to Arie and the Trusts as follows: (i) 13.99% to Arie, (ii) 19.43% to the Orly Trust, and (iii) 19.43% to the Sagi Trust. The Orly Trust and the Sagi Trust each granted Arie an irrevocable lifetime voting proxy over their TRI shares (annexed hereto as Exhibit D). Therefore, after October 29, 2004, Arie and the two Trusts held a controlling interest in TRI, and TPR no longer owned any TRI common stock.

9.    In connection with the divorce settlement, Dalia took measures to cede management of D & K and TPR to her son Sagi. On October 21, 2004, days before signing the Settlement Agreement, Dalia and Sagi formed D & K GP LLC ("D & K GP"), whose sole purpose was to act as the general partner of D & K. Dalia exchanged her 4% interest in D & K and $1.00 for a 99% membership interest in D & K GP. Sagi purchased a 1% membership interest in D & K GP for $1.00. Pursuant to the Limited Liability Agreement of D & K GP (annexed hereto as Exhibit E), Sagi was given the power to select a manager of D & K GP whose function would be to control D & K's assets. Sagi selected himself to act as manager; thus, Dalia effectively handed Sagi the authority to control D & K and its assets. Also, by forming D & K GP, Dalia and Sagi shielded themselves from any personal liability stemming from D & K, including any personal liability related to the Note. This left the Trusts solely liable on the Note.

10.     On October 30, 2004, Dalia entered into a shareholder agreement with TPR that provided for the management of TPR. Specifically, pursuant to the shareholder agreement (annexed hereto as <u>Exhibit F</u>), D & K, which owned 49% of TPR, was given authority to appoint one board member to the TPR board. Sagi, as the managing partner of D & K, appointed himself as a board member of TPR. As the majority owner of TPR, Dalia was named as the other board member. In addition, the shareholder agreement appointed Sagi as Chief Executive Officer ("CEO") of TPR. Accordingly, Dalia essentially ceded control of TPR to Sagi, just as she had done with D & K.

11.     Below, for the Court's convenience, is a side-by-side summary of Arie's, Dalia's, the Orly Trust's, and the Sagi Trust's interests in TPR before and after Arie's and Dalia's divorce.[2]

## TPR OWNERSHIP
## BEFORE AND AFTER DIVORCE

### PERCENTAGE

| <u>Person</u> | <u>TPR Before</u> | <u>TPR After</u> |
|---|---|---|
| Arie Genger | 51.00% | 0% |
| Dalia Genger | 1.96% | 52.96% |
| Orly Trust | 23.52% | 23.52% |
| Sagi Trust | 23.52% | 23.52% |
| **TOTAL** | **100%** | **100%** |

---

[2] For the Court's convenience, the chart annexed hereto as <u>Exhibit G</u> provides a summary of Arie's, Dalia's, the Orly Trust's, and the Sagi Trust's ownership interests in TPR, TRI, and D & K as of October 26, 2004 – i.e., the date that Arie and Dalia executed the Settlement Agreement.

12.     In connection with the Settlement Agreement, Dalia required that the Trustees of the Orly Trust and the Sagi Trust (Messrs. Sash and Small) resign and be replaced with friends of Sagi.  Numerous successor trustees were appointed to the Orly Trust and the Sagi Trust, all of whom were affiliated with Sagi in one way or another.  David Parnes and Eric Gribetz (Sagi's longtime friends) and Leah Fang (Sagi's sister-in-law) were appointed as successor trustees to the Orly Trust, and Messrs. Parnes and Gribetz, Rochelle Fang (Sagi's mother-in-law), and Mr. Parnes again, were appointed successor trustees of the Sagi Trust.  In January 2008, Dalia was appointed successor trustee of the Orly Trust, despite Orly's objection.  By that time, as a result of Dalia's granting him control of TPR and D & K, and through the appointment of his friends and relatives as successor trustees of the Trusts, Sagi effectively had obtained control over the assets held by all of D & K, TPR, the Sagi Trust, and the Orly Trust.

13.     On August 2, 2006, Sagi, as part of his managerial role in D & K GP, D & K, and TPR, assigned the Note – which then had an approximate value of $11,000,000 as a result of accrued interest – to Mr. Parnes for only $12,000.  (A copy of the Memorandum dated August 2, 2006, assigning the Note is annexed hereto as Exhibit H.)  The assignment stated that D & K "denied enforceability of the Note" (see Exhibit H annexed hereto), which presumably is why it was "sold" for $12,000.  Sagi signed the assignment on behalf of both TPR, as the maker, and D & K, as the holder.  Dalia was copied on the memorandum assigning the note, but neither Orly, the Orly Trust, nor the then-Trustee of the Orly Trust received copies of the memorandum.  At the time of this assignment, Mr. Parnes was acting as trustee of both the Orly Trust and the Sagi Trust.  Shortly after the assignment, Mr. Parnes resigned as Trustee of the Orly Trust in recognition of the inherent conflict he faced in that role.

14.     Sometime in 2007, Sagi sold a 2% interest in TPR to Rochelle Fang. The cost of the 2% interest was based upon a bogus valuation of TPR at $50,000,000. At the time of the sale, TPR's assets were worth between approximately $11,000,000 and $12,000,000, plus the value of the Note. This sale effectively stripped Dalia of her majority interest in TPR giving Sagi unfettered control of TPR, in addition to his control of D & K and D & K GP. In January 2008, when Dalia was appointed successor trustee of the Orly Trust, she completely divested herself of the balance of her TPR shares. Dalia has not informed either the Court or Orly as to when she transferred her TPR interest.

15.     On August 22, 2008, unbeknownst to Orly, Rochelle Fang, who had been appointed Trustee of the Sagi Trust, attempted to sell the Sagi Trust's 19.43% interest in TRI to the Trump Group, who already owned 47.15% of TRI's outstanding shares, for $26,715,416. This sale purportedly transferred control of TRI from Arie to the Trump Group who thereafter purported to hold 66.58% of TRI's outstanding common stock.[3] In connection with the supposed sale, Sagi and David Parnes were given seats on TRI's board of directors. If given effect, this purported sale, which was consummated after Dalia was appointed successor trustee of the Orly Trust, would dilute and diminish the value of the Orly Trust's interest in TRI.

16.     Dalia, who had notice of the supposed sale, made no effort to prevent the sale or to protect the value of the Orly Trust's interest in TRI. Fearing that Dalia would continue to neglect her duty to protect the Orly Trust's assets, on January 10, 2009, Petitioner wrote a letter (annexed hereto as Exhibit I) to her mother stating that "for now, and until further notice, it is my

---

[3] The validity of the sale is at issue in litigation currently pending in Delaware Chancery Court. The parties to the action are Arie Genger, TRI, and various entities affiliated with the Trump Group. The Orly Trust has not appeared in the action. In that action, the Trump Group claims to have bought the shares either from the Sagi Trust or from TPR – thus, the approximately $27 million purportedly paid by the Trump Group either belongs to the Sagi Trust or to TPR, depending on the outcome of the litigation in Delaware.

strong desire to retain all of the shares of TRI that are currently in the Orly Trust, and I direct

you not to sell them." Dalia refused to agree not to dispose of the TRI shares.

## II.    THE EVIDENCE DISCOVERED BY PETITIONER ON JUNE 1, 2009, REQUIRES INJUNCTIVE RELIEF AND THE IMMEDIATE REMOVAL OF DALIA AS TRUSTEE

17.    In February 2008, Orly applied to this Court to designate a Trustee, or in the

alternative to appoint a special trustee, claiming that Dalia and all of the preceding successor

trustees of the Orly Trust were improperly appointed and had no authority to act on behalf of the

Orly Trust. Orly also alleged wrongful dealings by Dalia as Trustee of the Orly Trust. In

denying the application without prejudice, this Court stated that Orly had made allegations

without sufficient supporting evidence and suggested that Orly commence an SCPA § 2201

proceeding to obtain the necessary evidence and then renew her application. (A copy of the

Court's decision is annexed hereto as Exhibit J.)

18.    On May 14, 2009, as a prerequisite to the SCPA § 2201 application, Orly's

counsel sent Dalia Genger a letter (annexed hereto as Exhibit K) requesting documents related to

the Orly Trust's assets. Soon thereafter, Orly's counsel was notified that Dalia had retained

Robert A. Meister, Esq., of Pedowitz & Meister, LLP, and Orly's counsel therefore forwarded a

copy of the May 14th letter to Mr. Meister.

19.    On June 1, 2009, Mr. Meister responded to Orly's document demand by advising

Orly's counsel that the Orly Trust no longer owned any interest in TPR. According to the letter,

Sagi, acting as CEO of TPR, had foreclosed on the Note and had sold D & K's 240 shares of

TPR for $2,220,000. (A copy of the Letter dated June 1, 2009, is annexed hereto as Exhibit L.)

Before that time, Dalia had neither advised nor notified Orly that Sagi had foreclosed on the

Note,[4] nor advised Orly that Sagi had sold the TPR shares at auction. Thus, upon receipt of Mr.

Meister's letter, Orly learned for the first time that:

(a)    On August 31, 2008, Sagi, acting as CEO of TPR, notified himself as the

general manager of D & K, that D & K was in default of the Note and declared that unless the

entire unpaid principal amount of the Note was paid immediately, TPR would sell, at auction, the

240 shares pledged as collateral. (A copy of the Notification dated August 31, 2008, is annexed

hereto as Exhibit M.)

(b)    Thereafter, Sagi, again acting as CEO of TPR, purported to notify D & K

(of which he remained the managing partner) that D & K's 240 shares of TPR stock would be

publicly auctioned to the highest bidder on February 27, 2009, and that the money received from

the sale would be used to reduce the outstanding debt. (A copy of the Notification is annexed

hereto as Exhibit N.) Sagi purported to notify the interested parties of the sale by publishing

notice of the sale in the New York Post in October 2008 and February 2009. Although at all

relevant times Sagi had Orly's contact information, he never informed her of the impending sale.

(c)    On February 27, 2009, TPR (still controlled by Sagi) foreclosed on the

240 shares of TPR and "auctioned" the shares. Not coincidentally, the Sagi-controlled TPR

purchased the shares at auction for $2,200,000. (See Exhibit O). The proceeds of the sale – i.e.,

$2,220,000 – were used to decrease D & K's obligations under the Note, leaving a balance of

approximately $8,800,000.

20.    On June 11, 2009, Orly's counsel sent Mr. Meister a letter asking that Dalia, in

accordance with Orly's January 2009 request and in light of the secretive diminution of the Orly

---

[4] While the Note had not been serviced since 1999, TPR had not foreclosed on the Note between 1999 and
2008 because it previously had agreed not to foreclose on the Note in order not to upset the estate-planning goals
underlying the Note.

Trust's interest in TPR, stipulate in writing that she would not, under any circumstances and until all issues were resolved, sell, transfer, or remove the TRI shares from the Orly Trust. (A copy of the Letter dated June 11, 2009, is annexed hereto as <u>Exhibit P</u>.) That same day, Mr. Meister responded to the June 11th letter, but he failed to address the terms of the proposed stipulation. (A copy of Mr. Meister's Letter dated June 11, 2009, is annexed hereto as <u>Exhibit Q</u>.)

A.   **<u>A Temporary Restraining Order ("TRO") Is Necessary To Protect The Remaining Assets Held By the Orly Trust</u>**

21.    It is clear from Dalia's deliberate inaction and complete deferral to Sagi in all matters related to D & K, TPR, and TRI, that without Court intervention Orly's TRI shares will be: a) sold at a significantly discounted rate so that the proceeds can be used to pay her unpaid portion of the Note, b) used as collateral to secure the Orly Trust's unpaid portion of the Note, or c) used to satisfy a Judgment against the Orly Trust. Since Orly's address was known to her brother and her mother at all relevant times, publishing notice of the sale of the TPR shares alone was a clear and deliberate attempt to prohibit Orly from intervening in the foreclosure and the sale. Dalia, who had knowledge of the events as they were transpiring, easily could have given notice of the auction to Orly, but she intentionally chose not to. There is now reason to believe that Dalia will again remain passive if and when Sagi seeks to hijack, sell, or otherwise meddle with the Orly Trust's TRI shares, even though Orly has specifically advised her mother, in writing, to protect the Trust's ownership of the TRI shares.

22.    There is no reason to trust that Dalia will honor her daughter's wishes and instructions since, from the time of her divorce, she has done nothing but ensure that Sagi has complete control over TPR, D & K, and D & K GP, and has allowed Sagi to do as he pleases. At this time, approximately $8,800,000 of the Note remains unsatisfied, and Sagi, as CEO of TPR, has not voided the notice of default. Based upon Dalia's deliberate inaction and failure to protect

the Orly Trust's assets to date, there is strong evidence to reasonably conclude that Dalia will not protect the Orly Trust's interest in the TRI shares, but rather, will act to benefit herself and Sagi, including by allowing Sagi to obtain the TRI shares to satisfy the Orly Trust's unpaid portion of the Note. Without immediate injunctive relief, Orly will have no recourse and the Orly Trust will be vulnerable to complete depletion. The harm caused to the Orly Trust under these circumstances would be irreparable.

23.    Based on the facts and documentary evidence presented herein it is likely that the Orly Trust will succeed on the merits of her Petition. Accordingly, she meets the criteria necessary to obtain a TRO and a preliminary injunction. Petitioner therefore respectfully requests that the Court grant her Petition for a TRO and a preliminary injunction in order to protect the assets held by the Orly Trust, including the TRI shares.

## B.    Dalia Must Be Removed As Trustee Immediately

24.    Based on the information provided to Orly's counsel on June 1, 2009, which confirms Respondent's lack of diligence and disloyal service as Trustee, there now exists sufficient evidence to have Respondent removed as Trustee of the Orly Trust. While serving as Trustee, Dalia intentionally failed to notify Orly that TPR was taking measures to foreclose on the Orly Trust's 23.52% indirect interest in TPR. It was Dalia's duty as a fiduciary of the Orly Trust to be apprised of all activity concerning the Orly Trust and to ensure that Orly received proper notification of the default and auction. Moreover, Dalia actually knew of the foreclosure and the auction, but took no steps to protect the Orly Trust's interest in TPR. Dalia knew of Sagi's plan to foreclose on the Note and sell the TPR shares as early as August 2008; thus, she withheld information concerning the auction from Orly for almost ten months. Dalia did not disclose the foreclosure and share sale until she received the demand letter from Orly's counsel and realized that legal action was imminent. Instead of protecting the Orly Trust's and its

beneficiary's interests, Dalia sat back and silently watched her son strip the Orly Trust of its indirect interest in TPR.

25.     The corporate structure which has intertwined TPR, D & K GP, and D & K's assets, all of which are in some manner controlled by Sagi as a result of Dalia's actions, permits Dalia and Sagi to engage in self-dealing and does not provide for any accountability on either Sagi's or Dalia's part.  Unfortunately, the Orly Trust is caught in the middle of Dalia's and Sagi's conspiracy to engage in self-dealing intended to benefit their own interests, while Sagi has been permitted to diminish and dissipate the value of the Orly Trust's assets, including its interests in TPR and, potentially, TRI.  By enriching herself and her son at the expense of her daughter, Dalia is in breach of her fiduciary duties as Trustee of the Orly Trust.  It is imperative that Orly have a successor trustee appointed who will unbiasedly and loyally protect the Orly Trust's remaining assets.

**(1)     In Direct Conflict With Her Obligations as Fiduciary of The Orly Trust, Dalia Did Nothing To Stop Sagi From Attempting to Sell His Trust's TRI Shares, Which, If Valid, Would Dilute the Value of the Orly Trust's Assets**

26.     The Sagi Trust's attempted sale of its interest in TRI to the Trump Group for $26,715,416, which occurred after Dalia was appointed successor trustee of the Orly Trust, purportedly transferred control of TRI from Arie to the Trump Group.  As mentioned above, supra paragraph 15, if this purported sale were given effect, then the value of the Orly Trust's assets would be significantly diminished.  If the purported sale were valid and effective, then Arie would no longer own a controlling interest in TRI, and thus the Orly Trust would no longer own a portion of the controlling block of TRI shares.

27.     Dalia, as a fiduciary of the Orly Trust, was obligated to apprise herself of any transactions that could affect the value of the Orly Trust's shares, and, in fact, Dalia was contemporaneously aware of the Sagi Trust sale.  But Dalia made no effort to protect the value of

the Orly Trust's TRI shares by challenging the proposed sale. Moreover, she has taken no position with regard to the current value of the TRI shares and has taken no measures to protect the Orly Trust's interest in TRI since the purported sale, despite Orly's urgings. By remaining passive with respect to the Orly Trust's TRI shares, Dalia is completely ignoring the intent behind the establishment of the Orly Trust – to transfer an equal amount of assets to each of the children. Dalia, through her actions and her inaction alike, may have permitted Sagi to secure substantially more value from the Trusts' assets than Orly.

### (2) In Direct Conflict With Her Obligations as Fiduciary of The Orly Trust, Dalia Took No Action To Protect the Orly Trust's Interest in TPR

28.     Pursuant to the August 2006 memorandum assigning the Note to David Parnes – on which Dalia was copied – Sagi, acting as the managing partner of D & K, took the position that the Note was unenforceable. (See Paragraph 4 of Exhibit H annexed hereto.) In the exact same memorandum, however, Sagi, acting as the CEO of TPR, took the directly contrary position that TPR reserved its right to enforce the Note. (See Paragraph 8 of Exhibit H annexed hereto.)

29.     On February 14, 2007, Dalia, who participated in the "sham" transaction between Sagi and Mr. Parnes, and in a clear attempt to clean her hands of any impropriety, admitted in a sworn statement to the Court that no one was ever supposed to foreclose on the Note. (See Paragraph 3 of Exhibit R annexed hereto). Additionally, the unpaid Note was the subject of a post-judgment arbitration proceeding between Dalia and Arie, which took place in September 2007. Dalia, who was present at the proceedings, heard Sagi and Mr. Parnes testify that the Note should not be enforced and that Sagi, as CEO of TPR, had no intention of collecting the unpaid portion of the Note. Thus, Dalia knew long before August 2008 that TPR had effectively disclaimed its right to foreclose on the Note.

30.     As described above, however, in August 2008 (eleven months later), Sagi sought

to enforce the Note. Contrary to the position he had taken under oath at the arbitration, and

contrary to the position he had taken as the managing partner of D & K (see Paragraph 4 of

Exhibit H attached hereto), Sagi issued a default notice to D & K on behalf of TPR. Dalia, who

knew the Note was never intended to be enforced and who previously had sworn to as much,

should have immediately sought to block Sagi from foreclosing on the Note and selling the TPR

shares. Notwithstanding her knowledge and her previous statements, however, Dalia failed to

make any effort to stop Sagi when he engaged in this clear act of self-dealing, even though the

Orly Trust had a clear interest in the TPR shares at issue. As a fiduciary of the Orly Trust with

prior, as well as continued knowledge, of the TPR foreclosure, TPR's supposed claims against D

& K, and D & K's ability to challenge those claims based on prior representations, Dalia had a

duty to protect the Orly Trust's indirect ownership of the TPR shares. But instead of taking the

proactive measures required of a fiduciary, Dalia did nothing and allowed Sagi to obtain the TPR

shares for himself to the detriment of the Orly Trust.[5]

31.     Additionally, Dalia's failure to act in the face of the foreclosure and sale of TPR

stock is especially egregious because she has known since August 2008 that the purported sale of

TRI stock to the Trump Group is being challenged in Delaware state court. She also has known

that in that action the Trump Group is asserting that it bought the TRI stock from *either* the Sagi

Trust *or* TPR. Thus, she has known that, depending on the outcome of the litigation in

Delaware, the Orly Trust could have an interest in the $27 million paid by the Trumps in August

---

[5] Moreover, in connection with her appointment as successor trustee of the Orly Trust in January 2008, Dalia divested herself of her TPR shares (without informing either the Court or Orly as to when she transferred her interest) in a further attempt to distance herself from any attributable wrongdoing. Dalia has contended to this Court that she sold her TPR shares in order to avoid any appearance of impropriety in connection with her appointment as Trustee. Interestingly, however, Dalia has never informed Orly or this Court whether she continues to maintain a 99% interest in D & K GP, the company that controls D & K and, thus, was obligated to service the Note.

2008 if its interest in TPR were preserved. Accordingly, as trustee of the Orly Trust, she should

have been especially vigilant in protecting the Orly Trust's interest in TPR through D & K. But

instead, she allowed Sagi to essentially steal the Orly Trust's interest in TPR so that Sagi can

attempt to retain the entire $27 million regardless of the outcome in Delaware Chancery Court.

Her inaction in this regard is a blatant violation of her fiduciary duties as trustee.

## III.   DALIA SHOULD BE SUR-CHARGED IN THE AMOUNT OF THE LOSS OF THE VALUE OF ORLY'S INTEREST IN TPR AS DETERMINED BY THE COURT AND ORLY SHOULD BE AWARDED ATTORNEYS' FEES

32.     By failing to take action on behalf of the Orly Trust to prevent Sagi from

foreclosing on the Note and selling D & K's TPR shares, Dalia caused the Orly Trust to lose its

interest in TPR. Accordingly, Dalia should be surcharged in an amount of the loss of the value

of Orly's interest in TPR as determined by the Court and should be required to reimburse the

Orly Trust for its attorneys' fees incurred in connection with bringing this action.

## IV.   MICHAEL D. GROHMAN, ESQ. SHOULD BE APPOINTED AS SUCCESSOR TRUSTEE

33.     Based on Dalia's deliberate breach of her fiduciary duties to the Orly Trust, and in

light of Dalia's prior nefarious conduct as the Orly Trust's Trustee, this Court should remove

Dalia as Trustee and replace her with Michael D, Grohman, Esq. Mr. Grohman is a member of

the New York Bar and the head of the Trust and Estates practice group at Duane Morris LLP.

Mr Grohman is not acquainted with any members of the Genger family, does not have any

interest in TRI, TPR, or D & K, and is willing and prepared to succeed Dalia immediately.

34.     No prior application has been made for the relief requested herein.

### PRAYER FOR RELIEF

WHEREFORE, based upon the allegations contained herein, Petitioner requests that this

Court provide the following relief:

(a)      Enjoining and restraining Respondent, her agents, and all other persons acting on her behalf from withdrawing, selling, disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering, liening, hypothecating, or secreting the Orly Trust's 19.43% interest in TRI and other assets remaining in the Orly Trust;

(b)      removing Respondent as Trustee of the Orly Trust for breaching her fiduciary duties, wasting and dissipating the assets of the Orly Trust, and improvidently managing and injuring the property committed to her charge;

(c)      surcharging Respondent in the amount of the loss cf the value cf Orly's interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)      appointing Michael D. Grohman, Esq., as successor trustee;

(e)      waiving any requirement that Petitioner post an undertaking; and

(f)      granting Petitioner any other relief it deems necessary and proper.

Dated:   New York, New York
         June 22, 2009

_____
ORLY GENGER
Petitioner


COZEN O'CONNOR

By: _____
    Judith E. Siegel-Baum, Esq.
    Attorney for Petitioner
    250 Park Avenue
    New York, New York 10017
    212-986-1116

# VERIFICATION

STATE OF NEW YORK )
                         )
                         )ss.:
COUNTY OF NEW YORK )
                         )

The undersigned, the Petitioner named in the foregoing petition, being duly sworn, says: I have read the foregoing petition subscribed by me and know the contents thereof, and the same is true of my own knowledge, except as to the matters therein stated to be alleged upon information and believe, and as to those matters I believe it to be true.

_____
Signature of Petitioner

ORLY GENGER
_____
Print Name

Sworn to before me this
22nd day of June, 2009.

_____
Notary Public
Commission Expires:
(Affix Notary Stamp or Seal)

ANN MEADE
Notary Public, State of New York
No. 01ME4783921
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires Sept. 30, 2009

At the Surrogate's Court held in and for the County
of New York, at the Courthouse, 31 Chambers
Street, New York, New York on the _16_ day of July
2010

PRESENT:  SURROGATE NORA S. ANDERSON
Surrogate



New York County Surrogate's Court
DATA ENTRY DEPT
Date: JUL 16 2010

---

In the Matter of the Application of

ORLY GENGER, as a person interested,
for the removal of DALIA GENGER
as Trustee of the Orly Genger 1993 Trust
pursuant to SCPA §711 (11)

---

File No.: 0017/2008

**ORDER TO SHOW CAUSE TO
SUPPLEMENT THE COURT'S
JULY 1, 2009 CONFIRMED
AUGUST 18, 2009 ORDER**

Upon filing the annexed Affidavit of Judith E. Siegel-Baum, sworn to on the 15th day of

July 2010, with exhibits annexed thereto and all prior pleadings filed in this matter:

LET the Respondent, DALIA GENGER, the sole trustee of the Orly Genger 1993 Trust,

show cause before Surrogate Nora S. Anderson at the Surrogate's Court, 31 Chambers Street,

New York, New York, on the _18_ day of July 2010 at 10:00 o'clock in the forenoon of that day or

as soon thereafter as counsel may be heard why an order should not be entered:

(a)    Supplementing the Court's Order dated July 1, 2009, confirmed on August

18, 2009, which states:

> "ORDERED that, during the pendency of this proceeding,
> Respondent and/or her counsel are required to give notice
> by overnight mail to Petitioner's Counsel of any 1) offer to
> purchase the Orly Trust's 19.3% interest in TRI within 10
> days of receiving such offer and 2) act by Respondent, her
> agents and all other persons acting on her behalf to assign,
> mortgage, pledge, redeem, encumber, sell or otherwise alter

"ORDERED, that during the pendency of this proceeding, Respondent and/or her counsel are required to give notice by overnight mail to Petitioner's Counsel of any attempt to vote or take any action under the TRI shares held by the Orly Trust for any purpose, including, without limitation, in any election of TRI's directors, with such notice being given at least ten (10) days prior to such attempt being made."

3.     A determination was made in this Surrogate's Court proceeding that no action would be taken until Supreme Court Justice Paul G. Feinman rendered a decision in New York County Supreme Court on various motions pending in ORLY GENGER, in her individual capacity and on behalf of the Orly Genger 1993 Trust (both in its individual capacity and on behalf of D&K Limited Partnership), Plaintiff, against DALIA GENGER, SAGI GENGER, D&K GP LLC, AND TPR INVESTMENT ASSOCIATES, INC., Defendants, Index No.: 109749/2009, Mot. Seq. Nos. 001 through 006.

4.     The motions were decided and a Decision and Order were issued by Justice Feinman on June 28, 2010 (a copy is annexed as <u>Exhibit B</u>).  On pages 16 and 17 of this decision, Justice Feinman determined that the claim of breach of fiduciary duty is currently pending before the Surrogate's Court and "in the interest of judicial economy" will be heard in Surrogate's Court and not in Supreme Court.

5.     Considering (1) the difficult family history of this matter; (2) Respondent's refusal to advise Petitioner of the status of the property in her trust; (3) collateralizing the trust's assets without notice to the beneficiary; and (4) changing the power structure of control of the assets, which are comprised of the unique shares of TRI that cannot be replaced, an additional restriction of the 10 day notice of any ability to vote or take any action under the TRI shares held

2

## ATTORNEY CERTIFICATION

I, Judith E. Siegel-Baum, certify that to the best of my knowledge, information and belief, formed after an inquiry reasonable under the circumstances, certify that the presentation of the foregoing paper or the contentions therein are not frivolous as defined in subsection a of section 130-1.1 of the Rules of the Chief Administrator of the Courts.

Dated: July 15, 2009

_____
Judith E. Siegel-Baum

At the Surrogate's Court held in and for the County of New York, at the Courthouse, 31 Chambers Street, New York, New York on the _18_ day of August 2009

PRESENT: HON. Troy K. Webber
                         Surrogate

In the Matter of the Application of

ORLY GENGER, as a person interested,
for the removal of DALIA GENGER
as Trustee of the Orly Genger 1993 Trust
pursuant to SCPA §711 (11)

File No.: 0017/2008

**SUPPLEMENTAL ORDER TO
SHOW CAUSE WITH
TEMPORARY RESTRAINTS**

On reading and filing the annexed Verified Petition of Petitioner, ORLY GENGER, and the exhibits, verified on the 22nd day of June, 2009, and the memorandum of law in support of Petitioner's Verified Petition dated June 22, 2009,

LET the Respondent, DALIA GENGER, the sole fiduciary of the Orly Genger 1993 Trust, show cause before Surrogate Troy K. Webber at the Surrogate's Court, ~~sitting at 60 Centre~~ _31 Chambers Street,_ Room ~~300~~ _509_, New York, New York, on the _8th_ day of _September_ 2009 at 10:00 o'clock in the forenoon of that day or as soon thereafter as counsel may be heard why an order should not be entered:

      (a)    Enjoining and restraining Respondent, her agents and all other persons acting on her behalf from withdrawing, selling disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly Trust's 19.43% interest in Trans-Resources, Inc., ("TRI"), a closely held corporation, founded by

Arie Genger, Petitioner's father and Respondent's former husband of Respondent and any other assets which may be remaining in the Orly Trust;

(b)    Removing Respondent as Trustee of the Orly Trust for breaching her fiduciary duties, wasting and dissipating the assets of the Orly Trust and imprudently managing and injuring the property committed to her charge;

(c)    Surcharging Respondent in the amount of the loss of the value of Orly's interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)    Appointing Michael D. Grohman, Esq. as successor trustee;

(e)    Waiving any requirement that Petitioner post an undertaking; and

(f)    Granting Petitioner such further relief deemed necessary or proper. *and/or her counsel*

ORDERED that, during the pendency of this proceeding, Respondent, ~~her agents and all~~ *are required to give notice by overnight mail to Petitioners Counsel of any 1) offer* ~~other persons acting on her behalf are temporarily restrained from withdrawing, selling,~~ *to purchase the Orly Trusts 19.3% interest in TPI w/in 10 days of receiving* ~~disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering,~~ *such offer and 2) act by Respondent, her agents and all other persons* ~~liening, hypothecating or secreting the Orly Trust's 19.43% interest in TRI and other assets~~ *acting on her behalf to assign, mortgage, pledge, redeem encumber,* ~~remaining in the Orly Trust and it is further~~ *or otherwise dispose of the Orly Trusts in at least 10 days prior to such act* *and it is further*

ORDERED that service of a copy of this Order and the papers upon which it is based shall be served on David Parnes, in his capacity as Trustee of the Sagi Genger 1993 Trust, by overnight mail service at his residence, located at 29 Elkachi Street, Tel Aviv, Israel 69497, *on or before* *August 21, 2009   and on* ~~Bobe~~ *Pedowitz & Meister, LLP, Attorneys* ~~any other address at which she can be located, on or before August __, 2009.~~ *for Dalia Genger, as trustee of the Orly Genger 1993 Trust by personal delivery or overnight m* ~~out~~ *on or before August 21, 2009.*

ENTER

_TKN_

_Surrogate_

FILED: NEW YORK COUNTY CLERK 07/02/2010
NYSCEF DOC. NO. 71

INDEX NO. 109749/2009

RECEIVED NYSCEF: 07/02/2010

## SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

### HON. PAUL G. FEINMAN

PRESENT: _____

_____ *Justice*

PART _12_

INDEX NO. _109749/09E_

MOTION DATE _____

MOTION SEQ. NO. _001_

MOTION CAL. NO. _____

- v -

The following papers, numbered 1 to _____ were read on this motion to/for _____

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____ | _____ |
| Replying Affidavits _____ | _____ |

**Cross-Motion:** ☐ Yes   ☐ No

Upon the foregoing papers, it is ordered that this motion

MOTION AND CROSS MOTIONS ARE DECIDED
IN ACCORDANCE WITH ANNEXED DECISION AND ORDER.

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

Dated: _6/28/10_  6:05 pm   _____ J.S.C.

Check one: ☐ FINAL DISPOSITION   ☑ NON-FINAL DISPOSITION

Check if appropriate: ☐ DO NOT POST

FILED: NEW YORK COUNTY CLERK 07/02/2010

INDEX NO. 109749/2009

NYSCEF DOC. NO. 74

RECEIVED NYSCEF: 07/02/2010

## SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: _Feinman_ PAUL G. FEINMAN

PART _12_

_Justice_

| | |
|---|---|
| Index Number : 109749/2009 | INDEX NO. 109749/09 |
| **GENGER, ORLY** | MOTION DATE |
| VS. | |
| **GENGER, DALIA** | MOTION SEQ. NO. 003 |
| SEQUENCE NUMBER : 003 | MOTION CAL. NO. |
| DISMISS | |

this motion to/for _____

PAPERS NUMBERED

Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ...  _____

Answering Affidavits — Exhibits _____  _____

Replying Affidavits _____  _____

**Cross-Motion:**  ☐ Yes  ☐ No

Upon the foregoing papers, it is ordered that this motion

MOTION IS ~~DECIDED~~ ~~ORDER~~
IN ACCORDANCE WITH ~~DECISION AND ORDER~~ _connexed to_
_motion seq. no. 001_

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

Dated: _6/28/10_

_____
J.S.C.

Check one:  ☐ FINAL DISPOSITION  ☑ NON-FINAL DISPOSITION

Check if appropriate  ☐ DO NOT POST  ☐ REFERENCE

INDEX NO. 109749/2009

FILED: NEW YORK COUNTY CLERK 07/02/2010
NYSCEF DOC. NO. 75                                          RECEIVED NYSCEF: 07/02/2010

# SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:   FEINMAN                                    PART 12

*Justice Paul G. FEINMAN, Justice*

| Index Number : 109749/2009 | INDEX NO.       109749/09 E |
| GENGER, ORLY | MOTION DATE |
| vs. | MOTION SEQ. NO.   004 |
| GENGER, DALIA | MOTION CAL. NO. |
| SEQUENCE NUMBER : 004 | |
| DISMISS | |

this motion to/for _____

PAPERS NUMBERED

Answering Affidavits — Exhibits _____

Replying Affidavits _____

Cross-Motion:   ☐ Yes   ☑ No

Upon the foregoing papers, it is ordered that this motion

MOTION IS DECIDED IN ACCORDANCE WITH
THE ANNEXED DECISION AND ORDER *annexed to*
*Mot. seq. no. 001.*

*(MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):)*

Dated:   6/28/10                                    _____
                                                              J.S.C.

Check one:   ☐ FINAL DISPOSITION   ☑ NON-FINAL DISPOSITION

Check if appropriate   ☐ DO NOT POST   ☐ REFERENCE

FILED: NEW YORK COUNTY CLERK 07/02/2010

NYSCEF DOC. NO. 76

INDEX NO. 109749/2009

RECEIVED NYSCEF: 07/02/2010

**SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY**

**HON. PAUL G. FEINMAN**

PRESENT: _____     PART 12

_Justice_

| Index Number : 109749/2009 | | INDEX NO. 109749/09 E |
| GENGER, ORLY | | MOTION DATE |
| VS. | | MOTION SEQ. NO. 005 |
| GENGER, DALIA | | MOTION CAL. NO. |
| SEQUENCE NUMBER : 005 | | |
| DISMISS | | |

is motion to/for _____

| PAPERS NUMBERED |
| --- |
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____ | _____ |
| Replying Affidavits _____ | _____ |

Cross-Motion:  ☐ Yes  ☐ No

Upon the foregoing papers, it is ordered that this motion

MOTION IS DECIDED IN ACCORDANCE WITH
THE ANNEXED DECISION AND ORDER annexed to
mot. seq. 001

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

Dated: 6/28/10     _____ J.S.C.

Check one:  ☐ FINAL DISPOSITION   ☐ NON-FINAL DISPOSITION

Check if appropriate  ☐ DO NOT POST   ☐ REFERENCE

FILED: NEW YORK COUNTY CLERK 07/02/2010
INDEX NO. 109749/2009
NYSCEF DOC. NO. 73                                                    RECEIVED NYSCEF: 07/02/2010

## SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: **HON. PAUL G. FEINMAN**                           PART _12_

_____ *Justice*

Genger, Orly

       :v.:

Genger, Dalia

INDEX NO. _109749/09E_

MOTION DATE _____

MOTION SEQ. NO. _006_

MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____ | _____ |
| Replying Affidavits _____ | _____ |

**Cross-Motion:**   ☐ Yes   ☑ No

Upon the foregoing papers, it is ordered that this motion

MOTION IS DECIDED IN ACCORDANCE WITH THE ANNEXED DECISION AND ORDER annexed to

mot. seq. 001

**MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):**

Dated: __6/18/10__                    _____ J.S.C.

Check one:   ☐ FINAL DISPOSITION   ☑ NON-FINAL DISPOSITION

Check if appropriate:   ☐ DO NOT POST

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: CIVIL TERM: PART 12
------------------------------------------------------------X

ORLY GENGER, in her individual capacity and on
behalf of the Orly Genger 1993 Trust (both in its

individual capacity and on behalf of D & K
Limited Partnership),

                    Plaintiff,

      against

DALIA GENGER, SAGI GENGER, D & K GP
LLC, and TPR INVESTMENT ASSOCIATES,
INC.,

                    Defendants.
------------------------------------------------------------X

Index No.    109749/2009
Mot. Seq. Nos.  001 through
             006

**DECISION AND ORDER**

**For the Plaintiff:**
Zeichner Ellman & Krause LLP
575 Lexington Avenue
New York, NY 10022
(212) 223-0400

**For Dalia Genger:**
Pedowitz & Meister LLP
1501 Broadway
New York, NY 10036
(212) 403-7330

**For Sagi Genger:**
McLaughlin & Stern, LLP
260 Madison Avenue
New York, NY 10016
(212) 448-1100

**For D&K GP, LLC:**
Finkelstein Newman Ferrara LLP
225 Broadway
New York, NY 10007

**For TPR:**
Lyons McGovern, LLP
The Hennessy House
16 New Broadway
Sleepy Hollow, NY 10591
(914) 631-1336

      E-filed papers considered in review of this motion brought by order to show cause for a preliminary injunction, motions for summary judgment, and motion to amend:

|  | Papers: | E-File Number: |
|---|---|---|
| Seq. No. 001 | Order to Show Cause & TRO, Exhibits, Memo of Law in Support | 6 , 7, 7-1, 9 |
|  | Affidavit & Affirmation in Opposition, Exhibits, Memo of Law | 35, 35-1 - 35-8, 36, 37 |
|  | Affidavit & Affirmation in Opposition, Memo of Law, Exhibit | 38, 39, 40, 40-1 |
| Seq. No. 002 | Notice of Motion, Affirmations, Exhibits | 12, 13, 13-1 - 13-6, 18, 18-1 - 18-9 |
|  | Pl.'s Omnibus Memo. of Law in Opp. | 52 |
|  | Reply Memo of Law (Dalia Genger) | 61 |
|  | Reply Memo of Law | 65 |
| Seq. No. 003 | Notice of Motion, Affirmation, Exhibits, Memo of Law | 15, 16, 16-1 - 16-9, 19 |
|  | Pl.'s Omnibus Memo. of Law in Opp. | 52, 53 |
|  | Memo of Law in Reply, Affirmation, Exhibit | 59, 60, 60-1 |
|  | Reply Affirmation, Exhibits, Memo of Law | 62, 62-1, 64 |
| Seq. No. 004 | Notice of Motion, Affirmation, Memo of Law, Exhibits | 20, 21, 22, 22-1 - 22-8 |
|  | Pl.'s Omnibus Memo. of Law in Opp. | 52, 54 |
| Seq. No. 005 | Notice of Motion, Affirmation, Memo of Law, Exhibits | 27, 28, 29, 29-1 |
|  | Pl.'s Omnibus Memo. of Law in Opp. | 52, 55 |
| Seq. No. 006 | Notice of Motion, Affirmation, Exhibits | 45, 46, 46-1 - 46-7 |
|  | Affirmation in Opp., Memo of Law, Exhibits | 47, 48, 48-1 - 48-2 |

1

| Affirmation in Reply & Opp | 49 |
| Affirmation in Opposition | 50 |
| Memo of Law in Reply | 51 |
| Affirmation in Opposition, Memo of Law, Exhibits | 56, 57, 57-1 - 57-2 |
| Memo of Law in Reply | 58 |
| Transcript of Oral Argument | 69 |

**PAUL G. FEINMAN, J.:**

The motions bearing sequence numbers 001 through 006 are consolidated for the purpose

of decision.

In motion sequence number 001, plaintiff moves by order to show cause for a

preliminary injunction and a temporary order restraining defendants from removing from the

State or otherwise disturbing shares of D&K Limited Partnership's 48 percent ownership interest

in the common stock of TPR Investment Associates, until there is a judicial determination as to

who owns these closely held family shares.[1] At oral argument, the court continued the TRO

pending determination of these motions.

In motion sequence numbers 002 through 005, each of the defendants originally moved

to dismiss the complaint on various grounds. By interim order dated October 21, 2009, these

motions were converted pursuant to CPLR 3211 ( c) to motions for summary judgment (Doc. 41,

42, 43, 44).[2]

In motion sequence number 006, plaintiff moves for leave to amend the complaint and

submits a proposed amended verified complaint containing additional allegations and naming an

additional defendant.

---

[1] Under the terms of the original TRO signed at the time of the signing of the Order to Show
Cause, defendants and their agents are stayed from removing or disposing in any manner the
shares at issue. Plaintiff was directed to provide an undertaking in the amount of $150,000.

[2] Documents and exhibits are referred herein by their designated e-filing document number in the
New York State Court's E-Filing System.

All the motions are opposed.

For the reasons set forth below, the motion for a preliminary injunction is granted ; the motions by defendants for summary judgment are each granted in part and otherwise denied, and the motion to amend the complaint is granted to the extent indicated.

## Background

The litigants are members of a nuclear family and certain of their family-owned corporations and companies. The central issue concerns the intent behind the signing of a promissory note and pledge agreement in December 1993, executed as part of estate planning tools of the parents of plaintiff Orly Genger and her brother, Sagi Genger, one of the defendants. Plaintiff contends that the note and pledge agreement were part of an entire estate planning scheme by which plaintiff's father, Arie Genger, and plaintiff's mother Dalia Genger, planned to provide for their two children, plaintiff and defendant Sagi Genger, with the greatest amount of funding possible and with minimum tax consequences. Arie and Dalia Genger were divorced in 2004 and the gravamen of this complaint is that in the years following the divorce, plaintiff's mother and brother have deliberately not adhered to the intent behind the promissory note and pledge, and have schemed to seize control of some of the family's closely held companies. Their schemes have been to the detriment of one of the entities, the D&K Limited Partnership, an entity partially owned by the Orly Genger 1993 Trust, and for the benefit of Sagi Genger and for defendant TPR Investment Associates, on which Sagi and Dalia Genger serve as the directors, and of which Sagi Genger is chief executive officer. Among the other relief sought by plaintiff is an injunction restraining further actions that would irreparably harm D&K Ltd. Partnership's ability to recover its interest in the shares originally held by it, that defendants be denied any ability to further erode the holdings of the Orly Genger 1993 Trust, and that shares

3

already sold be returned to the ownership of the Ltd. Partnership.

Plaintiff argues, and none of the defendants dispute her, that as beneficiary of the Orly Genger 1993 Trust, she has a right to assert causes of action on behalf of the trust, citing *Velez v Feinstein*, 87 AD2d 309 (1st Dept. 1982) (where trustee has failed to enforce a claim on behalf of the trust, the beneficiary may do so). She further argues that as the Orly Genger 1993 Trust is a limited partner of D&K Ltd. Partnership, she has the right to assert causes of action on behalf of the Partnership as against TPR Investment and the other defendants, citing among other cases, *CCG Assoc. I v Riverside Assoc.*, 157 AD2d 435, 442 (1st Dept. 1990) ("[t]he right of a limited partner to bring an action on behalf of the partnership to enforce a right belonging to the partnership is beyond dispute") (Pl Memo of Law [Doc. 9:4] p. 1 n. 1).[3] Defendants' arguments in opposition are not persuasive.

According to the verified complaint (Doc. 7-1), plaintiff and her brother Sagi are individually beneficiaries of irrevocable trusts established in 1993 by their parents. Each trust was funded with a $600,000 gift. As established, the Orly Genger Trust and the Sagi Genger Trust together owned 96 percent in defendant D&K Ltd. Partnership, a family-owned limited partnership. Dalia Genger held the remaining four percent interest, and acted as the general manager. Defendant TPR Investment Associates, Inc. is a corporation founded by plaintiff's father, Arie Genger who originally was the sole shareholder, and serves as a holding company for the family's interests. Sagi Genger is presently Chief Executive Officer and a member of the board. Prior to 1993, TPR Investment held a majority interest in non-party Trans-Resources,

---

[3] Unless otherwise noted, all factual allegations are taken from plaintiff's verified complaint (Doc. 7-1).

4

Inc., a closely held private corporation.[4]

Around the time the two trusts were funded in1993, D&K Ltd. Partnership purchased 240 shares of common stock, comprising 49 percent of all shares, in TPR Investment for $10,200,000.  The Orly and Sagi Trusts  each paid $600,000, Dalia Genger paid $50,000, and D&K Ltd. Partnership executed a promissory note dated December 21, 1993 for $8,950,000, in satisfaction of the balance (Ver. Compl. [Doc. 7-1] ¶ 16, citing attached Ex. 1 [eFile Doc. 7-1:49 *et seq.*]).  The note was signed by Dalia Genger as General Partner of D&K Ltd. Partnership. The note required that D&K Ltd. Partnership repay principal and accrued interest in annual installments over a ten-year period.  Both trusts, and Dalia Genger, assumed proportional liability for repayment.  The note was secured with a Pledge Agreement dated December 21, 1993, signed by Dalia Genger, in which D&K Ltd. Partnership pledged its 240 TPR Investment shares as collateral for repayment of the note (Ver. Compl. [Doc. 7-1] ¶ 18)  According to the September 6, 2007, testimony of Sagi Genger in the arbitration proceeding concerning his parents' divorce, the purpose of the note was "[e]ssentially an estate planning tool, to transfer wealth," with the intent to minimize taxes owed by the family members (Doc. 46-5:150-152 [S. Genger EBT, pp. 366, 368]).  As a result of the purchase by D&K Ltd. Partnership of TPR Investment stock, the Orly and Sagi trusts each acquired 23.52 percent indirect interest in TPR Investment, and Dalia acquired a 1.96 percent indirect interest.  Arie Genger retained 51 percent ownership.

As alleged in the complaint, each member of the family understood and agreed, in the

---

[4]Trans-Resources is the parent company of several subsidiaries that provide growers with specialty fertilizer and industrial chemicals, and is one of the two largest produces of potassium nitrate in the world (Ver. Compl. [Doc. 7-1] ¶ 12).

"desire to ensure equal wealth transfer to Sagi and Orly and with the estate-planning purposes underlying the creation of the Trusts and D&K [Ltd. Partnership]'s purchase of the TPR shares," that the note and Pledge Agreement "would never be enforced by any of them" (Ver. Compl. [Doc. 7-1] ¶ 20).   Sagi in particular was charged with ensuring that the promissory note and Pledge Agreement would not be enforced and, in the first years, took "specific steps to fulfill that charge," an example of which follows here (Ver. Compl. [Doc. 7-1] ¶ 20).

D&K Ltd. Partnership made payments on the note until 1999 and then ceased.  In November 2002, TPR Investment sent a letter to D&K Ltd. Partnership seeking payment of the past due principal and interest (Doc. 29-1:77-78]).  Sagi Genger, TPR's CEO, explained during his testimony in the above-mentioned arbitration proceeding that this November 2002 letter was merely "pro forma," and that there was no intent to collect on the note  (Doc. 46-5:153 [S. Genger EBT, p. 370]).

In October 2004, Dalia and Arie Genger were divorced, resulting in certain changes to the ownership of certain family entities, memorialized in the Stipulation and Agreement of Settlement, dated October 26, 2004 (Ver. Compl. [Doc. 7-1] ¶ 22, citing Ex. 2 [Doc. 7-1:66 et seq.]).  In particular, Dalia received sole ownership of Arie Genger's 250 shares of TPR Investment, the Trans-Resources shares were redistributed such that Dalia Genger owned no shares in that company, and Arie Genger was granted a lifetime voting proxy over the family Trans-Resources shares (Stipulation pp. 5, 8-14 [Doc. 7-1:71, 73-80]). The Stipulation and Agreement of Settlement gave Sagi Genger "full and complete authority" to sell non-liquid assets and distribute them as he saw fit, subject to his fiduciary duties to effectuate the intent of the parties entering the Agreement (Stipulation p. 7 [Doc. 7-1:73]).   However, the net proceeds were to be distributed so as to minimally fund a "basic escrow account" after which monies were

6

to go to TPR Investment "in satisfaction of the parties' indebtedness" (Stipulation p. 8 [Doc. 7-1:74]).

Despite the changes, both the Orly and Sagi trusts continued to have equal ownership interests in Trans-Resources shares as well as in the TPR Investment shares owned by D&K Ltd. Partnership (Ver. Compl. [Doc. 7-1] ¶ 23).

Also on October 26, 2004, TPR Investment, Arie Genger, and Dalia Genger signed an Assumption Agreement which acknowledged the promissory note's existence and noted that at that juncture, approximately $9,980,000, inclusive of interest, was owed by D&K Ltd. Partnership to TPR Investment (Doc. 22-4).

In addition, also on the same date, Sagi and Dalia Genger formed D&K GP LLC to serve as the general partner for D&K Ltd. Partnership (Pl. Mot. 001, Ex. 5 ¶ 5 [Doc. 7-1:151]). Under the agreement, Dalia Genger transferred her general partnership interest in D&K Ltd. Partnership, in exchange for a 99 percent interest in D&K GP; Sagi Genger was granted power to select the manager. Accordingly, D&K GP LLC now held a four percent interest in D&K Ltd. Partnership.

Plaintiff alleges that in the years subsequent to the divorce, Dalia Genger has sought, in collusion with her son Sagi Genger, to "destroy" her former husband financially, and their actions have threatened to destroy plaintiff financially as well (Ver. Compl.[Doc. 7-1] ¶ 25). Thus, when Dalia in effect ceded her control over D&K Ltd. Partnership to Sagi, the restructuring left only the two trusts liable to TPR Investment for repayment of the promissory note (Ver. Compl.[Doc. 7-1] ¶ 27). In August 2006, Sagi Genger on behalf of TPR Investment,

7

assigned the promissory note to David Parnes,[5] but stated in writing to Parnes that "D&K LP and

its partners have a variety of claims against TPR, and deny the enforceability of the Note." (Ver.

Compl. [Doc. 7-1] ¶ 47, citing Ex. 8 [Doc. 7-1:179-*et seq.*]). In 2007, Sagi Genger allegedly

stripped Dalia Genger of her majority interest in TPR Investment by selling an interest to his

mother-in-law, Rochelle Fang (Ver. Compl. [Doc. 7-1] ¶ 32). In late 2007 or early 2008, Dalia

Genger divested herself of the balance of her TPR Investment shares, leaving Sagi Genger in

direct control of TPR Investment and its interest in the promissory note (Ver. Compl. [Doc. 7-1]

¶ 33). As a result, Sagi Genger in essence now wore two hats, as CEO of TPR Investment, the

creditor of the note, and as manager of D&K Ltd. Partnership, the debtor on the note (Ver.

Compl. [Doc. 7-1] ¶ 34).

In November 2007, Sagi Genger and Leah Fang executed an "Amended and Restated

Limited Partnership Agreement of D&K Limited Partnership," permitting D&K GP to

"mortgage, hypothecate, pledge, create a security interest in or lien upon, or otherwise encumber

the L[imited] P[artner] TRI Interests, for the benefit of the Partnership (Doc. 46-5:218). The

document was signed by Sagi Genger, managing member of D&K GP LLC, the General Partner,

and Leah Fang, as sole trustee for both the Sagi Genger 1993 Trust and the Orly Genger 1993

Trust, the Limited Partners (Doc. 46-5:223). Plaintiff only learned of this document's existence

in 2009.

In January 2008, Dalia Genger was appointed successor trustee to the Orly Genger 1993

Trust (Ver. Compl. [Doc. 7-1] ¶ 39). She succeeded several other individuals, including two

_____

[5] Parnes is a former trustee of the Orly Genger 1993 Trust, the present trustee of the Sagi Genger
1993 Trust, an officer of TPR Investment and director of Trans-Resources (Ver. Compl. [Doc. 7-
1] ¶ 46). Parnes testified during the arbitration proceeding that the purpose of the transfer of the
note to him was to prevent collection by any others (*Id.*).

8

long-term friends of her son's and her son's sister-in-law. As trustee, Dalia has "complete

control over the assets of the Orly Trust, including its ownership interests in TPR (through

D&K) and TRI" (Ver. Compl. [Doc. 7-1] ¶ 41).

In 2008, TPR Investment, through CEO Sagi Genger, reclaimed the promissory note

from Parnes, and in August 2008, notified D&K Ltd. Partnership's general manager (Sagi

Genger), that it was in default under the note and that if it failed to satisfy the full terms of the

note, its shares would be sold at public auction (Ver. Compl. [Doc. 7-1] ¶ 52, citing Ex. 10 [Doc.

7-1:185-186]). As the payment was not made, D&K Ltd. Partnership was informed by TPR

Investment that the latter would sell the former's 240 shares of common stock in TPR

Investment to the highest qualified bidder on February 27, 2009 (Ver. Compl., Ex. 11 [Doc. 7-

1:187-188]). Notice was not provided to either of the trusts, but was published in THE NEW

YORK POST in October 2008 and again in February 2009 (Ver. Compl. [Doc. 7-1] ¶¶ 52-53,

citing Ex. 12 [Doc. 7-1:189-191]).

On January 31, 2009, the general partner of D&K Ltd. Partnership, that is to say D&K

GP, and the limited partners, the Sagi and Orly trusts, and TPR Investment, memorialized a

document called "Meeting of Partners of D&K LP - Jan. 31, 2009 & Agreement," in which it

was agreed that D&K GP could sign for the Limited Partnership and for each individual partner

when making the limited partners' assets subject to a pledge (Doc. 22-4:17-18).[6] This same

agreement included the promise of TPR Investment that it would "refrain from enforcing the

---

[6]Plaintiff alleges she first learned of this agreement only when the documents were provided as part of defendants' papers submitted in their motions to dismiss (Am. Ver. Compl.[Doc. 46-4] ¶ 94).

note against each limited partner for thirty days." (*Id.* [Doc. 22-4:18]  ¶ 8).[7]

.The note was foreclosed upon on February 27, 2009, less than the 30 days indicated in

the Agreement date, and D&K Ltd. Partnership's 240 shares of TPR Investment were purchased

back by TPR, decreasing the obligations of D&K Ltd. Partnership under the promissory note,

and leaving a balance of approximately $8.8 million that continues to be guaranteed by the Orly

and Sagi trusts (Ver. Compl. [Doc. 7-1] ¶ 57, citing Ex. 13 [Doc. 7-1:192-194]).   Plaintiff and

her attorney only learned in early June 2009 that the note had been foreclosed and that the

pledged shares had been sold back to the company (Ver. Compl. [Doc. 7-1] ¶ 65).  Plaintiff has

made a written demand that TPR Investment return the pledged shares to D&K Ltd. Partnership,

but TPR has declined to comply (Ver. Compl. [Doc. 7-1] ¶ 69, citing Ex. 20 [Doc. 7-1:225-

227]).

Also in August 2008, Rochelle Fang, as trustee of the Sagi Genger 1993 Trust, and Sagi

~~Genger, sold that trust's interest in Trans-Resources to another group (named "Trump"), which~~

sale divested Arie Genger from control and put the company in the control of the Trump group

(Ver. Compl. [Doc. 7-1] ¶ 60, citing Ex.14 [Doc. 7-1:195-207]).  The validity of this sale is

under challenge in Delaware Chancery Court, although plaintiff Orly Genger has not joined in

that action (Ver. Compl. [Doc. 7-1] ¶ 61).

After this purported sale of the Sagi Genger Trust's shares of Trans-Resources, plaintiff

feared her trust's shares would not be protected from sale. She requested in writing from her

mother as trustee in January 2009 and again in June 2009 that the Orly Genger 1993 Trust retain

all of its shares of Trans-Resources and that they not be sold, but Dalia Genger has refused to

---

[7]The copy of the document e-filed with the court is not clear enough to discern who signed on
behalf of the trusts, although presumably it was Dalia Genger, or on behalf of TPR Investment.

agree, or even to respond (Ver. Compl. [Doc. 7-1] ¶¶ 63, 66, citing Ex. 15, 16 [Doc. 7-1:208-215]). Plaintiff, who had brought a proceeding in Surrogate's Court to remove her mother as trustee at the time of her appointment in January 2008, an application which was denied as being premature (Ver. Compl. [Doc. 7-1] ¶¶ 39-40), brought a second application on June 22, 2009, seeking to enjoin Dalia Genger or her agents from doing anything to affect the Orly Genger 1993 Trust's Trans-Resources shares, to remove Dalia as trustee and appoint another in her stead based on breach of fiduciary duties, and for a surcharge for damages (Ver. Compl.[Doc. 7-1] ¶ 67). At this juncture, the Surrogate's Court has ordered that Dalia Genger provide at least 10 days notice before disposing of any of the trust's Trans-Resources shares (Ver. Compl.[Doc. 7-1] ¶ 68, citing Ex.19 [Doc. 7-1:222- 224]).

Plaintiff contends that Dalia Genger has failed to act in the best interests of the Orly Genger 1993 Trust, that Sagi Genger has acted in a self-dealing manner and together with Dalia Genger has undermined the estate plans that intended for both children to benefit equally from the family's wealth (Ver. Compl. [Doc. 7-1] ¶ 58). Plaintiff fears that through defendants' continued scheming, the Orly Genger 1993 Trust's one remaining asset, its ownership of the Trans-Resources shares, will also be wrongly divested (Ver. Compl. [Doc. 7-1] ¶ 59).

The verified complaint alleged 16 causes of action against the various defendants, including replevin of the shares from TPR Investment back to D&K Ltd. Partnership, and a request for a preliminary injunction.

As stated above, defendants each submitted pre-answer motions to dismiss which, after notice by the Court, have been converted to motions for summary judgment pursuant to CPLR 3211 ( c). Subsequent to the filing by defendants of their motions, plaintiff moved to amend her complaint "to address, among other things," the defendants' "scheme regarding the Orly Trust's

11

TRI Shares," and the involvement in the scheme of Leah Fang, the proposed additional

defendant (Pl. Mot. 006, Ex. D, Part 1, Proposed First Am. Ver. Compl., [Doc. 46-4] ¶ 95).   The

proposed first amended verified complaint contains an additional four causes of action, two

against Leah Fang, and two seeking additional declaratory relief, and amends certain of the

original causes of action to include the new allegations and those against Leah Fang.

### *Legal Analysis*

For convenience, the motion to amend will be addressed first, and then the preliminary

injunction, followed by the motions to dismiss.  Because the motion to amend the complaint is

granted, the remainder of this decision addresses the claims as alleged in the amended complaint.

A.     Motion to Amend the Verified Complaint (Sequence Number 006)

Leave to amend pleadings is to be freely given upon terms that may be just (CPLR 3025

[b]).  In addition, CPLR 3025 (a) permits any party to amend a pleading once, without court

permission provided it is done under one of the following circumstances: within 20 days of the

service of the original pleading; at any time before the period for responding to it has expired, or

within 20 days after the service of a responsive pleading.  Plaintiff proffers a proposed amended

complaint to add a new defendant and new causes of action (Doc 46-4).

Contrary to defendants' arguments, case law holds that where a defendant has not

answered the complaint but instead interposed a motion to dismiss, as was done here, the

plaintiff may amend her complaint once as of right, because defendants, by making pre-answer

motions, have extended their time to answer (*see, Johnson v Spence*, 286 AD2d 481 [2d Dept.

2001]; *STS Mgt. Dev., Inc. v New York State Dept. of Taxation & Fin.*, 254 AD2d 409 [2d Dept.

2001]; *Miller v General Motors Corp.*, 99 AD2d 454 [1ˢᵗ Dept. 1984], *aff'd* 64 NY2d 1081

[1985]).  Although defendants oppose, plaintiff is entitled to serve and file her amended

12

complaint without review by the court, although the rulings below on defendants' motions shall refine the scope of the proposed amended complaint and require her to file and serve a second amended complaint. Defendants' arguments in opposition, including that there is another action pending, can be pled as affirmative defenses. Plaintiff's motion to amend her complaint is thus granted to the extent indicated.

B.    Motion for Preliminary Injunction (Sequence Number 001)

Among the purposes of a preliminary injunction are maintaining the status quo and preventing irreparable injury to a party (*see, e.g., Ma v Lien*, 198 AD2d 186 [1st Dept. 1993], *lv dismissed* 83 NY2d 847 [1994]). To prevail, the party seeking injunctive relief must demonstrate a likelihood of success on the merits; that it will suffer irreparable injury if the relief is not granted; and that the equities balance in its favor (*Aetna Ins. Co. v Capasso*, 75 NY2d 860, 862 [1990]). A preliminary injunction should generally not be granted where there are issues of fact (*Lincoln Plaza Tenants Corp. v MDS Properties Dev. Corp.*, 169 AD2d 509 [1st Dept. 1991]; *but see Ma v Lien, supra* at 187 ["even where the facts are in dispute, the nisi prius court can find that a plaintiff has a likelihood of success on the merits from the evidence presented"]). If money damages are an adequate remedy, irreparable harm does not exist and injunctive relief should be denied (*Sterling Fifth Assoc. v Carpentille Corp., Inc.*, 5 AD3d 328, 330 [1st Dept. 2004]).

Plaintiff argues that the shares of Ltd. Partnership are unique chattel as contemplated by CPLR 7109, and that accordingly the court should grant a preliminary injunction restraining defendants from disposing of the shares until order of the court. She argues that the D&K Ltd. Partnership shares are unique because they are shares of a closely held family company which represents an ownership in another closely held family company, TPR Investment, and that their

13

value is dependent, at least in part, on the outcome of the family litigation currently before the Delaware Chancery Court concerning Trans-Resources (Pl. Memo of Law, 5-6 [Doc. 9:8-9]).

Under CPLR 7109, where the chattel is unique, the court may grant a preliminary injunction or temporary restraining order that it may not be transferred, sold, pledged, assigned or otherwise disposed of until the court orders (CPLR 7109 [a]). Defendants argue that the shares are in essence fungible, and that if appropriate, money damages would fully compensate plaintiff (TPR [S. Genger] Aff. in Opp. [Doc. 39] ¶ 6). Sagi Genger avers that the "TPR shares are currently not for sale and there is no intention to sell them at this time or in the near future." (S. Genger Aff. in Opp. [Doc. 35] ¶ 5]). He makes no statements concerning the TRI shares. Plaintiff's argument, however, is that her parents never meant for the promissory note to be enforced, but rather that the trust funds remain intact for the two children. The recent actions taken by defendants concerning the promissory note which have negatively impacted the Orly Genger 1993 Trust, and the sale of the Trans-Resources shares belonging to the Sagi Genger 1993 Trust, possibly foretell defendants' plans to sell her trust's shares of Trans-Resources and thus she seeks court intervention to prevent further dissipation of the trust.

The granting of a preliminary injunction is a discretionary remedy (*Ross v Schenectady*, 259 App. Div. 774, 774 [3d Dept. 1940]; *Dabrinsky v Seagate Assn.*, 239 NY 321 [1925]). Here, where the family shares at issue are intertwined among various family entities, defendants have not offered sufficient evidence to show that the shares of either TPR Investment or Trans-Resources owned by the Orly Genger 1993 Trust are not "unique" and should not be protected from transfer, sale, or assignment until this litigation is ultimately decided. In addition, given that defendant Sagi Genger states there is no immediate plan to sell or otherwise dispose of the TPR Investment shares, an injunction is not likely to cause much harm to defendants. The

14

balance of equities therefore lies in favor of plaintiff. Accordingly, the motion for a preliminary

injunction is granted.

<u>*Motions for Summary Judgment*</u>

The proponent of a summary judgment motion must make a prima facie showing of

entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any

material issues of fact from the case (*Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [

]).  Evidentiary proof must be submitted in admissible form (*Zuckerman v City of N.Y.*, 49

NY2d 557, 562 [1980]).  Parties in opposition must submit "evidentiary facts or materials, by

affidavit or otherwise ... demonstrating the existence of a triable issue of ultimate fact."

(*Tortorello v Carlin*, 260 AD2d 201, 204 [1ˢᵗ Dept. 1999]).  "Issue finding and not issue

resolving" is the proper role of the court in deciding such motions (*Winegrad, supra*, at 853).

Regardless of the sufficiency of the opposing papers,  in the absence of admissible evidence

sufficient to preclude any material issue of fact, summary judgment is unavailable (*Alvarez v*

*Prospect Hosp.*, 68 NY2d 320, 324 [1986]).

None of the converted motions for summary judgment contains first-person affidavits,

and all rely upon documentary evidence and the pleadings for the bases of their motions.

Although plaintiff objects to the lack of first-person affidavits, the converted motions are

nonetheless considered by the court and decided on their merits.

Plaintiff argues that all of the motions should be preemptively denied based on the

doctrines of issue preclusion and judicial estoppel, pointing to the testimony and evidence

presented at the arbitration which resulted in the May 6, 2008, award entitled *Dalia Genger v*

*Arie Genger*, Case No. 13 170 Y 00996 07 (American Arbitration Assn., Commercial

Arbitration Tribunal, NYC).  (Doc. 46-5:131 *et seq.*]).  The doctrine of issue preclusion serves

15

to bar a party from "relitigating in a subsequent action or proceeding an issue that was raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same" (*Ryan v New York Tel. Co.*, 62 NY2d 494, 500 [1984]; *see also, Parker v Blauvelt Volunteer Fire Co.*, 93 NY2d 343, 349 [1999]). The doctrine of judicial estoppel prohibits a party that has assumed a certain position in a prior legal proceeding and secured a judgment in its favor, from assuming a contrary position in another action simply because the party's interests have changed (*City of N.Y. v College Point Sports Assn., Inc.*, 61 AD3d 33, 44 n. 1 [2d Dept. 2009], citations omitted). Notably, of course, the arbitration concerned issues arising from the divorce of plaintiff's parents, and determined, among other questions, that the promissory note could not be enforced by either parent as against each other. This is not the issue raised by plaintiff in her litigation. Additionally, because the testimony by Sagi Genger, Dalia Genger, and others in that arbitration was offered to answer the questions of whether the note was enforceable, and its value, *as between the former husband and wife*, the witnesses and parties did not address the value or enforceability of the note *as between the children* of Arie and Dalia Genger, *or the family owned companies*. Thus, the testimony adduced in the arbitration may well be admissible in this action, but there is no collateral estoppel effect.

C.  <u>Dalia Genger's Motion for Summary Judgment (Sequence Number. 002)</u>

The first amended verified complaint alleges three causes of action against Dalia Genger: breach of fiduciary duty (1st cause of action), fraud (5th cause of action), and conspiracy to commit fraud (8th cause of action).

As argued by defendant, the claim of breach of fiduciary duty is also at issue in a proceeding currently before the Surrogate's Court entitled *In the Matter of the Application of*

16

*Orly Genger, as a person interested, for the removal of Dalia Genger as Trustee of the Orly Genger 1993 Trust pursuant to SCPA § 711 (1)*, File No. 17/2008 (Surrogate's Court NY County). Plaintiff does not address this argument. Accordingly, in the interest of judicial economy, the branch of defendant's motion seeking summary judgment and dismissal as to the complaint's 1st cause of action, is granted, on the ground that the same claim is pending in another court proceeding (CPLR 3211 [a] [4]).

The 5th Cause of Action sounds in fraud, while the 8th Cause of Action alleges conspiracy to commit fraud among the four defendants. As an initial matter, it is well established that "a mere conspiracy to commit a fraud is never of itself a cause of action," although allegations of conspiracy are permitted to connect the actions of separate defendants with an otherwise actionable tort (*Alexander & Alexander of N.Y. Inc. v Fritzen*, 68 NY2d 968, 969 [1986] [citation omitted]). As explained in *Brackett v Griswold*, "[t]he allegation that there was a conspiracy to commit the fraud does not effect the substantial ground of action," and "[t]he *gravamen* is fraud and damage, and not the conspiracy." (112 NY 454, 466-467 [1889]). "The allegation and proof of a conspiracy in an action of this character is only important to connect a defendant with the transaction and to charge him [*sic*] with the acts and declarations of his [*sic*] co-conspirators, where otherwise he [*sic*] could not have been implicated." (*Id.*). Accordingly, the 8th cause of action is dismissed as against this defendant, and the others.

To state a claim for fraud, plaintiff must allege "a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance . . . and damages" (*Eurycleia Partners, LP v Seward & Kissel, LLP*, 12 NY3d 553, 559 [2009]). In addition, under CPLR 3016 (b), the circumstances constituting the wrong must be stated in detail.

Defendant Dalia Genger argues that plaintiff's claims are unspecific and general in

17

nature. In particular, she argues that there is no allegation of the manner in which plaintiff relied

on any of her statements, or in what manner she, defendant, could have prevented the

enforcement of the promissory note and the foreclosure sale. Although plaintiff argues in

opposition that Dalia Genger made many statements over the years, including sworn statements,

affirming that all interested parties to the note had agreed that TPR Investment would never seek

to enforce the promissory note (Am. Ver. Compl. [Doc. 46-4] ¶¶ 62, 145-147), none of

defendant's statements *explicitly* make this assertion other than in the context of the divorce

proceedings. However, plaintiff also argues that even after she requested that her mother, as

trustee, not encumber the remaining assets of the trust, her mother signed the January 2009

Meeting Agreement which gave power to D&K GP - the company controlled by Dalia and Sagi

Genger - to pledge the Orly Genger 1993 Trust's shares of Trans-Resources as security for the

promissory note, and which indemnified Sagi Genger, among others. There are also the

transactions over the years that apparently have given Sagi Genger, and Dalia Genger, potential

control over family assets in a way that has harmed plaintiff's share.

When claiming that the defendants together acted to commit a fraud, the plaintiff need

not allege and prove that each defendant committed every element of fraud but only facts which

support an inference that the defendants knowingly agreed to cooperate in a fraudulent scheme

(*Snyder v Puente De Brooklyn Realty Corp*, 297 AD2d 432, 435 [3d Dept.2002], *lv denied*, 99

NY2d 506 [2003]; *LeFebre v New York Life Ins. & Ann. Corp.*, 214 AD2d 911, 912 [3d Dept.

1995]). Plaintiff alleges that the various defendants together committed fraud by, for example,

creating the conditions that resulted in the "sham sale" of the TPR Investment assets owed by

D&K Ltd. Partnership, and agreeing in the January 2009 Meeting Agreement to give power to

D&K GP, the company controlled by Dalia and Sagi, to pledge the Orly Trust's shares of Trans-

18

Resources as security for the promissory note (Am. Ver. Compl. [Doc. 46-4] ¶¶ 76-68, 151).
Plaintiff asked repeatedly for information about her trust, but because defendant has not been
forthcoming nor kept her informed, she did not know that there was any need to attempt to
protect the assets of her trust.

The evidence and arguments provided by both parties show that there is a question of fact
as to whether Dalia Genger acted with intent to commit fraud against plaintiff's trust, and to lull
plaintiff into a false sense of security as to the status of her trust. Accordingly, the branch of
defendant's motion to dismiss the 5th cause of action is denied.

D.   Sagi Genger's Motion for Partial Summary Judgment (Sequence Number 003)

Defendant Sagi Genger seeks summary judgment and dismissal of the 6th, 7th, 8th, and 16th
causes of action.[8]

The 6th cause of action sounds in fraud. The elements of fraud are set out above in the
discussion of Dalia Genger's motion. The complaint focuses on the statements made by
defendant in particular during the 2007 - 2008 arbitration proceeding, which helped form the
basis for the arbitrator's decision that the parties never intended for the note to be collected and
that it was not an asset to be valued, statements of which the plaintiff was aware and which
caused her to believe that her trust fund was secure and that no one would enforce the note.

The 7th cause of action alleges aiding and abetting fraud. The elements of aiding and
abetting fraud are that there exists a fraud, the defendant knew of the fraud, and the defendant
provided substantial assistance to advance the fraud's commission (*M&T Bank Corp. v
Gemstone CDO VII, Ltd.*, 23 Misc. 3d 1105A; 881 NYS2d 364, 2009 NY Slip Op 50590(U)

---

[8]He does not seek summary judgment as to the 2nd, 3rd, or 4th causes of action, in which he is also
named.

{Sup. Ct., Erie County 2009], *aff'd in part, mod in part*, 68 AD3d 1747 [4th Dept. 2009],

quotation and citation omitted). The complaint contends that defendant and D&K GP knowingly

assisted in the "sham sale" of the D&K Ltd. Partnership shares, failed to notify the Partnership

members of the foreclosure and sale, the sale of which harmed the Orly Trust, and entered into

the Meeting Agreement which now allows defendant and D&K GP to pledge or encumber the

Trans-Resources shares owned by the Orly Genger 1993 Trust.

Defendant argues that summary judgment is appropriate based on the documentary

evidence. He contends that prior to this litigation, plaintiff never claimed that the note or pledge

agreement were invalid. Among the evidence he points to in arguing the note's enforceability, is

testimony of Arie Genger acknowledging that payments were made by D&K Ltd. Partnership on

the promissory note (Doc. 16-4:3-4]) , the Assumption Agreement signed by Dalia, Arie, and

Sagi Genger on October 25, 2004, acknowledging the nearly $10,000,000 due under the note

(Doc. 16-6]), the November 19, 2008 letter from plaintiff's counsel to the Surrogate, stating in

part that "D&K [Ltd. Partnership]  is indebted on a multi-million dollar note to TPR, which is

secured by D&K's 49% stock interest, and which has not been serviced for years" (Doc. 16-8]),

and a document signed by plaintiff dated December 27, 2007, in which she states that the trust

"is indebted in the amount of approximately $4.5 million" (Doc. 16-9]).

Defendant also argues that the statute of frauds bars plaintiff's 6th and 7th causes of action

because plaintiff claims that the promissory note has been orally modified.  General Obligations

Law § 5-701 requires that agreements which by their terms are not to be performed within one

year, or which are promises to answer for the debt or default of another person, must be in

writing and subscribed by the party to be charged therewith (GOL § 5-7-1 [a] [1]-[2]).  The parol

evidence rule of the General Obligations Law provides that where a written agreement  contains

20

a provision stating that it cannot be changed orally, then such a document cannot be changed by executory agreement unless it is in writing, signed by the party against whom enforcement of the change is sought (GOL § 15-301 [1]). Thus, defendant argues that plaintiff cannot claim that the parties legally agreed, orally, that the note would not be enforceable.

Defendant's arguments are unpersuasive. Courts have also found, specifically in regard to promissory notes, that when parties contest whether a notice is enforceable, there is an issue of fact that survives summary judgment and the statute of frauds will not prevent the court's examination of parol evidence on the issue. For example, in *Greenleaf v Lachman*, the Court examined a promissory note allegedly executed so as to avoid negative income tax treatment, and found an exception to the parol evidence rule in order to allow admission of parol evidence, not to vary the terms of the writing, but to show that a "writing, although purporting to be a contract, is, in fact, no contract at all." (216 AD2d 65, 66 [1st Dept.1995], *lv denied* 88 NY2d 802 [1996]). Similarly, in *Dayan v Yurkowski*, the Court denied summary judgment and held that the defendant's parol evidence should be considered to show that the note, while valid on its face, was not intended to take effect (238 AD2d 541 [2d Dep't 1997]; *see also, Paolangeli v Cowles*, 208 AD2d 1174, 1175 [3d Dep't 1994]).

Here, where plaintiff and all the defendants copiously cite to factual support, a material issue of fact exists regarding the intention of the note's enforceability. While the documents speak for themselves, plaintiff raises material questions of fact concerning the actual intent behind the promissory note. She argues that the promissory note's purpose was to facilitate the estate planning of Arie Genger and the transfer of funds between the family members with lessened tax consequences. Indeed, it is curious that interest payments were made by the Partnership for several years and then ceased, and that Sagi Genger testified that TPR

21