to be enforced to the fullest extent that such severance of the invalid portions is possible without vitiating the original intent and purposes and economic intentions of the parties (the "Original Intent"), as herein set forth. If it shall appear impossible or impracticable to continue this Agreement in force after such severance, then and in such event, the parties hereto each undertake and agree that they will, upon request of the other party, make, execute, acknowledge and deliver any and all instruments which may be lawfully effective to again reflect the parties Original Intent, without diminishing the rights of the parties or increasing their obligations, financial or otherwise, herein. In the event a provision is superseded under this Article XVI, either party may seek reformation of the affected provision in any court of competent jurisdiction, which shall be empowered to revise the provision to reflect the parties' Original Intent to the greatest extent possible, consistent with New York law. It is the intention of the parties hereto that this provision may be enforced in equity in addition to, and not to the exclusion of, any other remedies which may be available to the parties. The parties do not intend by this paragraph to imply the illegality, invalidity and/or unenforceability of any term, provision, article or paragraph of this Agreement.

## ARTICLE XVII

### RECONCILIATION AND MATRIMONIAL DECREES

1.    Simultaneously with the execution of this Agreement, each of the parties will execute and deliver to the other, and in the future will promptly execute and deliver (without further consideration) to the other:

(a)(i)   All documents reasonably necessary to vacate any and all restraining orders and injunctions that have been issued in any action between the parties

1270083.3
1745183\BV.2

including, but not limited to, their Divorce Action. A listing of the said restraining orders and injunctions is annexed as Schedule XVII(1)(a).

(ii)    Notwithstanding the provisions of paragraph 1(a)(i), the Husband will pay the Wife maintenance of thirty thousand dollars ($30,000) for the month during which this Agreement is executed and for one month thereafter, and his obligation to pay maintenance under prior orders in the Divorce Action will cease upon the thirtieth (30th) day of the month following the month during which this Agreement is executed, provided all maintenance for prior months has been paid in full.

(b)    All documents reasonably necessary to effect the immediate withdrawal of any and all motions now pending in any Court in any litigation between the parties. A listing of the said motions is annexed as Schedule XVII(1)(b) hereto and made part hereof.

(c)    All documents appropriate to immediately notify the Court before whom the parties' Divorce Action is being prosecuted of the parties' having reached a settlement of all of their rights and claims excepting the right to a divorce.

(d)    All documents reasonably necessary to facilitate the immediate grant to the Wife, on papers, of an undefended divorce on the grounds of the Husband's constructive abandonment of the Wife.

2.    This Agreement shall not be invalidated or otherwise affected by a reconciliation or a resumption of marital relations between the parties unless they have executed and acknowledged (with the same formality as this Agreement) a written statement expressly setting forth that they are canceling this Agreement. Accordingly, this Agreement will not be terminated, annulled or modified by (a) the parties'

1270083_3
1745188RV-2

resumption of cohabitation and/or sexual relationships even if on a permanent basis or (b) the parties' actual remarriage (irrespective of whether or not that marriage ever ends).

3.    This Agreement shall not be invalidated or otherwise affected by any decree or judgment made in any Court in any pending or future action or proceeding between the parties.

4.    Each party agrees that the provisions of this Agreement shall be submitted to any court in which either party may seek a judgment, order or decree in a matrimonial action or any other action or proceeding affecting the marital status of the parties and that the provisions of this Agreement shall be incorporated in said judgment, order or decree with such specificity as the Court shall deem permissible and by reference as may be appropriate under law and under the rules of the Court. However, notwithstanding said incorporation, the provisions of this Agreement shall survive any decree, order or judgment and shall not merge therein, and this Agreement may be independently enforced.

5.    Both parties will fully cooperate with each other in obtaining a religious divorce or annulment and each will promptly execute and deliver (without further consideration) all documents reasonably required therefor by the religious court, tribunal or body. In addition, each party will, if requested, appear (at any reasonable time and location) before any religious court, tribunal or body in order to effectuate the purposes of this paragraph. All the costs of such religious divorce or annulment shall be borne equally by the parties.

1270083.3
17451885\V-2

## ARTICLE XVIII

### IMPLEMENTATION

The Husband and Wife shall, at any and all times, upon request by the other party or his or her legal representatives, promptly make, execute and deliver (without charge or other consideration) any and all other and further instruments as may be reasonably required for the purpose of giving full force and effect to the provisions of this Agreement.

## ARTICLE XIX

### GENERAL PROVISIONS

1.      No failure by either party to exercise any right hereunder or to insist upon strict compliance by the other party with any obligation hereunder and no custom or practice of the parties at variance with the terms hereof shall constitute a waiver of either party's right to demand exact compliance with the terms hereof.  Any waiver by either party (whether formal or informal) nonetheless found to exist by an Arbitrator with respect to any particular default by the other party shall not affect or impair the waiving party's rights in respect of any subsequent default of the same or of a different nature, nor shall any delay or omission of either party to exercise any right arising from such a default affect or impair his or her rights as to such default or any subsequent default.

2.      This Agreement shall inure to the benefit of and shall be binding and obligatory upon the heirs, personal representatives, administrators, executors and assignees of the parties herein.

3.      Neither this Agreement nor any provision hereof shall be terminated, amended or modified in any respect except by an agreement in writing duly subscribed and acknowledged by both parties with the same formality as this Agreement. Any asserted termination, annulment or modification not so subscribed and acknowledged shall be without effect even if it was substantially and detrimentally relied upon.

4.      The parties may at any time amend, modify or annul this Agreement (in the manner set forth in paragraph 3 of this Article) without the consent of any third person and no third person shall be deemed to have been given any interest or right hereunder.

5.      This Agreement may be executed in counterpart copies and shall become effective when copies executed by both parties have been exchanged. The parties intend to execute in all eight (8) counterpart copies hereof.

## ARTICLE XX

## NOTICES

Any notice required by this Agreement shall be in writing and shall be made to the addresses first listed above (or to any address changed by like notice) or to the facsimile numbers listed below:

> Arie Genger
> 2600 Island Boulevard
> Penthouse One
> Williams Island
> Aventura, Florida  33160

With a copy to:

Edward Klimerman, Esq.
Sonnenschein Nath & Rosenthal LLP
1221 Ave. of the Americas,
New York, NY 10010-1089
Fax: (212) 768 6800

Dalia Genger
210 East 65th Street
New York, NY 10021
Fax (212) 735-9021

With a copy to

Carol Robinson Schepp, Esq.
Carter Ledyard & Milburn LLP
2 Wall Street
New York, NY 10005
Fax (212) 732-3200

Any such notice shall be delivered by certified mail, return receipt requested or by personal (receipted) delivery or by confirmed facsimile. Unless otherwise provided, such notice shall be effective one (1) day after actual receipt of personal or faxed delivery or ten (10) days after mailing, whichever is applicable.

## ARTICLE XXI

## ENTIRE UNDERSTANDING

This Agreement contains the entire understanding of the parties who hereby acknowledge that between them there have been and are no representations, warranties, covenants or undertakings (whether written or oral, express or implied) with respect to the subject matter hereof including, without limitation, all rights or claims arising at law, in equity or pursuant to the parties' marital relationship other than those expressly set forth herein or in the transactions contemplated hereby or entered into concurrently herewith.

53

1270083.3
1745188NV-2

## ARTICLE XXII

## REPRESENTATIONS AS TO UNDERSTANDING OF THE TERMS OF THIS AGREEMENT

1.      Each party represents that:

(a)      He or she has had independent legal counsel of his or her own selection;

(b)      His or her legal counsel has advised him or her fully (i) with respect to his or her rights in and to the property and income and estate of the other party if they were divorced in the absence of an agreement such as this one and (ii) with respect to the effect of this Agreement on those rights and (iii) with respect to the rights and obligations set forth in this Agreement. Each party additionally acknowledges that he or she understands such advice from counsel and the terms of this Agreement;

(c)      He or she has given due consideration to all the facts and circumstances likely to influence his or her judgment with respect to matters embodied in this Agreement;

(d)      He or she has no educational, medical (including the use of medications, whether prescription or otherwise), psychological, addictive, sociological, language or cultural disability which would prevent him or her from understanding each and every aspect of this Agreement and the legal and economic and personal consequences of executing this Agreement; and

(e)      He or she believes that the provisions of this Agreement are fair and reasonable as of the date of execution of this Agreement, and that he or she believes

54.

that the provisions of this Agreement are not unconscionable now will not be unconscionable in the future.

2.    After time to reflect upon the significance and terms of this Agreement, he or she makes this Agreement freely and voluntarily by him or her and acknowledges that this Agreement has not knowingly been the result of any fraud, duress, coercion or undue influence exercised by either party upon the other or by any other person or persons upon such party.

EACH OF THE PARTIES ACKNOWLEDGES:

THAT HE OR SHE HAS CAREFULLY READ THIS AGREEMENT ;

THAT HE OR SHE UNDERSTANDS THE TERMS OF THIS AGREEMENT;

INCLUDING ARTICLE XXII OF THIS AGREEMENT;

THAT HE OR SHE UNDERSTANDS THAT THIS AGREEMENT WILL BE

BINDING ON HIM OR HER IN ALL CIRCUMSTANCES; AND

THAT HE OR SHE HAS HAD A FULL OPPORTUNITY TO CONSULT WITH

(AND HAS CONSULTED WITH) COUNSEL OF HIS OR HER OWN

SELECTION WITH RESPECT THERETO.

IN WITNESS WHEREOF, the parties have hereunto set their respective

hands and seals as of the day and year first above written to eight (8) counterparts hereof,

each of which shall constitute an original.

_____
Witness for the Wife
Carol Robinson Schepp, Esq.

_____
DALIA GENGER

_____
Witness for the Husband
Edward Klimerman, Esq.

_____
ARIE GENGER

1268492.3
I745188SW-2

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK  )

On this 30 day of Oct 2004, before me, the undersigned, a Notary Public in and for the State, personally appeared DALIA GENGER, personally known to me known or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual executed the instrument.

Deborah Kempf
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-OIKE 4999904
Qualified in New York County
Commission Expires August 3, 200

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK  )

On this 30 day of OCT 2004, before me, the undersigned, a Notary Public in and for said State, personally appeared ARIE GENGER, personally known to me known or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that his executed the same in his capacity, and that by his signature on the instrument, the individual executed the instrument.

Deborah Kempf
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-OIKE 4999904
Qualified in New York County
Commission Expires August 3, 2005

1268492.3
17451888RV-2

CERTIFICATE OF SUBSCRIBING WITNESS

State of New York      )
                       ) ss.
County of New York  )

On the _30_ day of _Oct_ in the year 2004 before me, the undersigned, a Notary Public in and for said State, personally appeared CAROL ROBINSON SCHEPP, the subscribing witness to the foregoing instrument, with whom I am personally acquainted, who, being by me duly sworn, did depose and say that she resides at _____ _165 Circle Drive, Manhasset NY 11030_ ; that she knows DALIA GENGER to be the individual described in and who executed the foregoing instrument; that said subscribing witness was present and saw said DALIA GENGER execute the same; and that said witness at the same time subscribed her name as a witness thereto.

_Deborah Kempf_
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-OIKE 4999904
Qualified in New York County
Commission Expires August 3, 2006

CERTIFICATE OF SUBSCRIBING WITNESS

State of New York      )
                       ) ss.:
County of New York  )

On the _28_ day of _OCT_ in the year 2004 before me, the undersigned, a Notary Public in and for said State, personally appeared EDWARD KLIMERMAN, the subscribing witness to the foregoing instrument, with whom I am personally acquainted, who, being by me duly sworn, did depose and say that he resides at _14 EAST 75~ STREET NEW YORK, NY 10021_ ; that he knows ARIE GENGER to be the individual described in and who executed the foregoing instrument; that said subscribing witness was present and saw said ARIE GENGER execute the same; and that said witness at the same time subscribed his name as a witness thereto.

_Deborah Kempf_
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-OIKE 4999904
Qualified in New York County
Commission Expires August 3, 2006

1268492.3
1745181RV-2

**ARIE GENGER**
2600 Island Blvd.
Williams Island Aventura, FL

October 29, 2004

Mr. Eric Gribetz
920 Park Avenue, Apt. 16A
New York, NY 10028

Mr. David Parnes
38 West 69th Street
New York, NY 10023

RE: Orly Genger 1993 Trust (the "Trust")

Gentlemen:

In connection with the transfer to the Trust of 1,102.80 shares of common stock (the "Shares") of Trans-Resources Inc. ("TRI"), pursuant to the terms and conditions of the Stipulation of Settlement of even date herewith, the Trust is granting to Arie Genger an irrevocable proxy (the "Proxy") for the shares, a copy of which is annexed hereto. In the event that for any reason the Proxy is declared invalid and is no longer in effect, the Trust agrees, as promptly as practicable, to enter into a voting trust agreement (the "Voting Agreement") with Arie Genger as the voting trustee, which shall be in substantially the form annexed hereto. During the time that the Proxy is not in effect and prior to the time the Voting Agreement is entered into, the Trust agrees to vote the Shares as directed in writing by Arie Genger.

Any dispute hereunder shall be resolved, as promptly as practicable, by arbitration (by one arbitrator), in accordance with the rules and regulations of the American Arbitration Association.

This letter agreement is entered into under seal as of the date first written above.

Very truly yours,

ARIE GENGER

AGREED AND ACCEPTED AS OF
THIS 29TH DAY OF OCTOBER, 2004

ORLY GENGER 1993 TRUST

By: _____
Eric Gribetz, Trustee

By: _____
David Parnes, Trustee

17442170IV-1

# LIMITED LIABILITY COMPANY AGREEMENT

### OF

### D&K GP LLC

This Limited Liability Company Agreement (as amended, modified or supplemented from time to time, the "Agreement") of D&K GP LLC (the "Company") is entered into by Dalia Genger ("Dalia") and Sagi Genger ("Sagi"), as members of the Company (each a "Member"; jointly "Members"; and to the extent the context requires the new Member includes additional members as permitted herein).

Whereas, concurrently herewith, Dalia has caused the Company to be formed in Delaware and has transferred to the Company her general partnership interest in D&K LP, a Delaware limited partnership (the "LP") and $1.00 in exchange for a 99% membership interest in the Company; and

Whereas, concurrently herewith Sagi has acquired the remaining 1% membership interest in the Company for $1.00;

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound, the parties hereto hereby agree as follows:

1.    Formation. The Members hereby acknowledges that Dalia, as organizer, filed the Articles of Organization of the Company in the Office of the Secretary of State of Delaware on October 21, 2004 solely for the purpose of forming a limited liability company pursuant to and in accordance with the provisions of the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq. (the "Delaware Act"), and hereby agrees to the terms and conditions of the Limited Liability Company Agreement of the Company, as follows:

2.    Name. The name of the Company is D&K GP LLC.

3.    Purpose. The Company is formed to engage in any lawful act or activity for which limited liability companies may be formed under the Delaware Act.

4.    Offices. The principal business office of the Company shall be located at 200 West 57 Street, Suite 1208, New York, NY 10019. The Company may have such additional

offices located at such place or places inside or outside the State of Delaware as the Members may designate from time to time.

The registered office of the Company in the State of Delaware is located at 2711 Centerville Road, Suite 400, Wilmington, DE 19808. The registered agent of the Company for service of process at such address is Corporation Service Company.

5. Management and Powers. The business and affairs of the Company shall be managed by the Members through a manager to have with the power to do any and all acts necessary or convenient to or in furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by a manager under the Delaware Act ("Manager"). The Manager shall be selected solely by Sagi Genger or by Sagi Genger's assignee or successor in interest, as the case may be. It is the current intent of the parties hereto that the Company will act as general partner of D&K Limited Partnership, a Delaware limited partnership, and it will not engage in any activities unrelated to its acting as such general partner.

6. Admission of Additional Members. After the date hereto, one or more additional Members may be admitted to the Company with the consent of the Members. After the first such additional Member or Members have been admitted to the Company, subsequent additional Members may be admitted to the Company with the consent of a majority in interest of the Members.

7. Assignments. The Members may assign their interest in the Company in whole or in part. However, no Member may assign his interest in the Company in whole or in part without the consent of all other Members.

8. Withdrawal of a Member. No Member may withdraw from the Company prior to its dissolution, or without the consent of all other Members.

9. Capital Contributions. The Members have, each, made a capital contribution to the Company as specified in Schedule A, thereby acquiring the specified percentage interest in the Company. After and each time any additional Member has been admitted to the Company, a Schedule A, setting forth the name and address of each of the Members and his or her respective capital contribution and percentage interest, shall be prepared, dated and annexed to this Limited Liability Company Agreement.

10. Additional Contributions. No Member is required to make any additional capital contribution to the Company.

11. Allocation of Profits and Losses. The Company's profits and losses shall be allocated to the Members in proportion to the interests of the Members.

12. Distributions. Distributions shall be made to the Members at the times and in the aggregate amounts determined by Manager.

13. Liability of Members. The Members shall not have any liability for the obligations or liabilities of the Company.

1268503.2

- 2 -

14.   Exculpation and Indemnification of Managers. The Company shall indemnify and hold harmless the Members, any and each additional Member admitted to the Company and any Manager against any and all claims and demands whatsoever, to the fullest extent permitted by the Delaware Act, as amended, modified or supplemented from time to time.

16.   Governing Law. This Agreement shall be governed by, and construed under, the laws of the State of Delaware, all rights and remedies being governed by said laws.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Limited Liability Company Agreement as of the 26th October, 2004.

Members

_____
Dalia Genger

_____
Sagi Genger

Formed 10/21/04.
Transfer D to S
10/26/04

1268503.2                                  - 3 -

# TPR INVESTMETN ASSOCIATES, INC.

## SHAREHOLDERS AGREEMENT

SHAREHOLDERS AGREEMENT, dated as of October 30, 2004, among D&K Limited Partnership, a Delaware limited partnership ("D&K"), and Dalia Genger, an individual residing at 210 East 65th Street, Apt 11J, New York, NY 10021("Dalia Genger") (collectively the "Shareholders" and individually, a "Shareholder") and TPR Investment Associates, Inc., a Delaware corporation (the "Corporation").

## W I T N E S S E T H:

WHEREAS, D&K owns a direct interest in the Corporation of 49% of the outstanding capital stock of the Corporation; and

WHEREAS, Dalia Genger owns a direct interest in the Corporation of the remanining 51% of the outstanding capital stock of the Corporation, and 4% of D&K, which constitutes a 1.47% indirect interest in the Corporation; and

WHEREAS, the parties desire to enter into this Agreement in order to provide for the management of the Corporation and to impose certain restrictions with respect to the sale, transfer or other disposition of the shares of the capital stock of the Corporation ("Shares") upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter set forth, the parties hereto agree as follows:

## SECTION 1

## LEGENDS

All certificates representing shares of Common Stock issued by the Corporation, after the date hereof, to either of the Shareholders shall be subject to this Agreement and shall bear the following legends:

"The shares evidenced by this certificate or any certificate issued

in exchange or transfer therefor are and will be subject to, and may not be transferred except in accordance with, the terms of a certain Shareholders Agreement, dated as of October 30, 2004, by and among the Shareholders of the Corporation and the Corporation, which agreement provides, among other things, for restrictions on the sale, transfer and disposition of the shares of the Corporation, an executed copy of which agreement is on file at the principal office of the Corporation."

## SECTION 2

## MANAGEMENT OF THE CORPORATION

2.1    Board of Directors.  The Board of Directors of the Corporation ("Board") shall initially consist of two (2) directors, as follows:

(i) Dalia Genger shall be a director, and shall have the right to appoint a director in her stead; and

(ii) D&K shall have the right to appoint a director; the first director appointed by D&K shall be Mr. Sagi Genger ("Sagi").

2.2    Management.  Sagi will be appointed by the Board, to serve as Chief Executive Officer of the Corporation, and David Parnes will be appointed by the Board to serve as Vice President.  Compensation of the Corporation's officers will be set by the Board.

## SECTION 3

## RESTRICTIONS ON SALES OR OTHER
## DISPOSITION OF COMMON STOCK

3.1    Sale of Shares of Common Stock.  During the term of this Agreement, the

parties to this Agreement shall not, either directly or indirectly, sell, assign, pledge, transfer, mortgage, grant any lien or security interest in, convey or otherwise dispose of, encumber or grant any other interest in ("Transfer"), all or any Shares now owned or hereafter acquired by each party, except as hereinafter provided. The term "Shares" as used in this Agreement shall include all shares of Common Stock, whether presently issued or hereafter acquired, scrip representing fractional shares of Common Stock, options, rights and warrants for shares of Common Stock, securities convertible into or exchangeable for shares of Common Stock, or shares of Common Stock received by way of dividend or upon an increase, reduction, substitution or reclassification of the Common Stock, or upon any reorganization of the Corporation or any other interest or right in and to shares of Common Stock of the Corporation.

3.2  _Board Approval_. No Shareholder shall Transfer any Shares or any interest in any Shares owned by such Shareholder, in whole or in part, and no such attempted Transfer shall be treated as effective for any purpose without obtaining the prior written consent of the Board.

3.3  _Sale of Shares and Determination of Buy-Out Price_. If a Shareholder desires to Transfer all of the Shares owned by such Shareholder (the "Initiating Shareholder"), such Initiating Shareholder shall notify the other Shareholder in writing (the "Sale Notice"), stating the total number of Shares, owned directly and indirectly by the Initiating Shareholder, which are to be Transferred. The Initiating Shareholder and the other Shareholder will meet, no later than two calendar months following receipt of the Sale Notice by the other Shareholder (the "Sale Meeting") at which time the Shareholders will determine the Buy-Out Price. Prior to a Sale Meeting, the books of the Corporation will be open to the Shareholders and they will cooperate with each other in connection with the impending sale. In addition, up to date audited financials for the Corporation will be provided to the Shareholders. The Corporation will reasonably cooperate with any outside expert hired by any Shareholder to assist in the sale process.

(a)      *The Sale Meeting.* At the Sale Meeting the Shareholders will adhere to the following process:

(i) a coin will be tossed in the air by a person mutually acceptable to the Shareholders;

(ii) the Initiating Shareholder will be designated as "Head" (i.e. - the side of the coin where the profile of a person is impressed) and the other Shareholder will be designated as "Tail" (i.e. - the other side of the coin);

(iii) if the Head side of the coin shall lay face up - the Initiating Shareholder will become the Evaluating Shareholder, and if the Tail side of the coin shall lay face up - the other Shareholder shall become the Evaluating Shareholder;

(iv) the Evaluating Shareholder shall value and indicate in writing within seven (7) business days following the coin toss to the other Shareholder (the "Notified Shareholder"),  the sum at which he or she values one Share ("Evaluated Share Value");

(v) within seven (7) business days following receipt of the Evaluated Share Value from the Evaluating Shareholder ("Determination Date"), the  Notified Shareholder shall notify the Evaluating Shareholder in writing whether he intends to acquire from, or to sell to, the Evaluating Shareholder his Shares (based on the Evaluated Share Value and the number of Shares in question) in which case the Notified Shareholder shall agree to  either (a) remit to the Evaluating Shareholder the appropriate amount based on the Evaluated Share Value, or (b) receive from the Evaluating Shareholder the appropriate amount based on the Evaluated Share Value.

"Transferring Shareholder" shall mean the Shareholder that ultimately pays to the

other Shareholder, by way of advancement and a Note, the Buy Out Price, and "Purchasing Shareholder" shall me the Shareholder that ultimately receives, by way of advancement and a Note, the Buy Out Price.

(b)    *Closing and Payment of Buyout Price*  The consummation of the sale of the Shares (the "Closing") shall be held in the offices of the Corporation, or at such other location as agreed by the Shareholders, at 10:00 a.m. on the twentieth (20th) business day following the Sale Meeting (the "Closing Date").

(i) On or before the Closing Date, the Transferring Shareholder shall deliver duly executed certificates in valid form evidencing the Shares to be sold and purchased, duly endorsed for transfer, free and clear of any liens or encumbrances;

(ii)    on or before sixty (60) days from the Closing Date ("Initial Payment"), the Purchasing Shareholder shall deliver to the Transferring Shareholder immediately available funds by wire transmit to an account designated by the Transferring Shareholder, or a certified or bank check, in an amount equal to no less ten percent (10%) of the applicable Buyout Price;

(iii)    any remaining balance of the applicable Buyout Price shall be paid by the Purchasing Shareholder on or before the seventh monthly anniversary of the Initial Payment (the "Ending Date") .

(c)    *Participation of Corporation.* In order to facilitate the Transfer of Shares, from the Transferring Shareholder to the Purchasing Shareholder, the Corporation will provide the necessary funds, in lieu of the Purchasing Shareholder, to pay the Buyout Price to the Transferring Shareholder. The Shareholders agree to cause the Corporation to provide such funds, and will

execute and deliver all of the documents reasonably necessary for the Corporation to effectuate the foregoing payment, including, without limitation, necessary resolutions and consents.

    (d)   *Board and Management Participation.* From the Determination Date through the Ending Date, the Transferring Shareholder will not actively engage in the management of the Corporation, and will abstain from voting - or cause his/her appointed member on the Board to vote, in any way inconsistent with the vote of the Purchasing Shareholder.

## SECTION 4

## TERM

This Agreement shall terminate either by (i) the consent of the parties hereto, or (ii) upon the consummation of the transfer of Shares, and the receipt of the full Buyout Price by the Transferring Shareholder on the Ending Date.

## SECTION 5

## MISCELLANEOUS

5.1   Complete Agreement. This Agreement constitutes the complete understanding among the parties hereto with respect to the subject matter hereof, and, no amendment or modification or waiver hereof shall be valid unless made pursuant to an instrument in writing signed by the party against whom such amendment, modification or waiver is sought to be enforced.

5.2   Successors and Assigns. All of the terms and provisions of this Agreement shall inure to the benefit of and be binding upon the heirs, successors, personal representatives, successors and permitted assigns of the respective parties hereto.

5.3    Waivers. The failure of any party hereto to give notice of the breach or non-fulfillment of any term or condition of this Agreement shall not constitute a waiver thereof, nor shall the waiver of any breach or non-fulfillment of any term or condition of this Agreement constitute a waiver of any other breach or non-fulfillment of that or any other term or condition of this Agreement.

5.4    Amendments. This Agreement may be amended at any time by a writing setting forth such amendment, signed by the Corporation and by both of the Shareholders and/or their permitted designees, it being understood that any such amendment shall not affect any rights or obligations which may have arisen prior thereto by virtue of the operation of the provisions of this Agreement.

5.5    Future Instruments. Each of the parties hereto agrees to execute and deliver all such future instruments and take such other and further action as may be reasonably necessary or appropriate to carry out the provisions of the Agreement and the intention of the parties as expressed herein.

5.6    Governing Law. This Agreement will be governed and interpreted in accordance with laws of the State of Delaware, without application of its conflicts of law provisions.

5.7    Arbitration. Any controversy, claim or dispute between the parties directly or indirectly arising out of this Agreement shall be settled by arbitration, held in Manhattan, New York. Either party may give written notification to the other party requesting arbitration to resolve any controversy, claim or dispute arising out of this Agreement between the parties.

In the event that a dispute is submitted to arbitration, there shall be one (1) arbitrator (the "Arbitrator") selected (x) by the parties or (y) if the parties fail to select an Arbitrator within twenty (20) days following receipt of a list of potential arbitrators from the American Arbitration Association ("AAA"), the Arbitrator shall be selected by the AAA. The Arbitration shall be conducted as promptly as practicable after the selection of the Arbitrator in accordance with the Commercial Arbitration Rules and Mediation

Procedures. The Arbitrator shall be someone who has at least fifteen (15) years of commercial law experience or who was a judge of a court of general jurisdiction.

5.8    Notices. All notices, offers, acceptances and other communications to be made, served or given hereunder (each, a "Notice") shall be in writing and shall be sent by overnight courier service, certified mail, return receipt requested, postage prepaid, or personally delivered, to the recipient party's address set forth on the signature page hereof or shall be sent by electronically confirmed facsimile transmission to the recipient party's facsimile transmission number if such a facsimile transmission number is set forth on the signature page hereof. Such Notices shall also be sent to the recipient Shareholder's attorney at the address or facsimile transmission number of such attorney set forth beneath such Shareholder's signature hereto. Either Shareholder may, by Notice to the other Shareholder given in the manner prescribed above in this Paragraph, designate another address or transmission number to which Notices to him and/or his attorney shall be sent. All Notices made or given in accordance herewith shall be effective on the date of facsimile transmission or personal delivery, the day on which delivery by overnight courier service is guaranteed, or three (3) days after mailing, provided such Notice is in fact received.

5.9    Miscellaneous. Each of the Shareholders agrees that he will consent to and approve any amendment of the Certificate of Incorporation or By-laws of the Corporation which may be necessary or advisable in order to conform any of the provisions of this Agreement or any amendments hereto to the applicable laws of the State of Delaware as now in effect or hereafter enacted.

5.10    Separability of Provisions. Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid or contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

5.11    Section Headings. The Section headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation hereto.

5.12   <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, and by different parties on separate counterparts. All such counterparts together shall constitute one and the same instrument.

5.13   <u>Number and Gender</u>. Each definition or pronoun herein shall be deemed to refer to the singular, plural, masculine, feminine or neuter as the context requires. Words such as "herein, "hereinafter," "hereof," "hereto" and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

*******************

IN WITNESS WHEREOF, the parties hereto have duly executed this Shareholders Agreement as of the day and year first above written.

TPR Investment Associates, Inc.
By: Sagi Genger, its Chief Executive Officer

D&K Limited Partnership
By: D&K GP LLC, its general partners
By:  Sagi Genger, its manager

Dalia Genger



# Memorandum

**To:**   David Parnes

**CC:**   Dalia Genger

**From:** Sagi Genger

**Date:** August 2, 2006

**Re:**   Assignment by TPR of D&K LP's 1993 Promissory Note

Dear David,

This will set in writing what I recently proposed to you:

1. I fully acknowledge the commitment to you to sponsor your MBA studies;

2. Instead of making the next payment due, in connection with the MBA fees (approximately $12,000), TPR Investment Associates Inc. ("TPR") will assign to you a promissory note made in its favor by D&K LP ("Note").

3. This promissory Note will be assigned to you on an 'as is' basis.

4. D&K LP and its partners have a variety of claims against TPR, and deny the enforceability of the Note.

5. Collections by you on the Note will be deposited into a separate account, preferably with a mutually acceptable escrow agent. Such amounts collected will be released to you on the earlier of (a) December 31, 2013, or (b) your declaration that you will make no further claims in connection with the Note.

6. D&K will refrain from making claims against TPR, so long as the Note is not enforced by you against it. However, should your collection efforts result in D&K making a counter-claim against TPR — the funds in the escrow account will be applied towards TPR's defense and any other related outlays, before making any distributions therefrom.

7. You will not assign the Note to any third party without the consent of D&K and TPR.

1

*August 2, 2006*

8. TPR will retain the right to 7.5% of your net collections and the right to enforce the note.

9. Additional terms in connection with the assignment of the Note will follow.

Be advised that we hereby waive all past, present or future existing conflict of interest we may have.

_____
TPR Investment Associates, Inc.
By: Sagi Genger, President

_____
D&K LP
By: D&K GP LLC
By: Sagi Genger, Managing Member

Read this ⟍ day of August 2006

_____

2

## AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT

### OF

### D & K LIMITED PARTNERSHIP

This AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT (this "Agreement") of D&K Limited Partnership (the "Partnership") is made as of the 30th day of October , 2004, by and among the 1993 Orly Genger Trust (the "OG Trust"), the 1993 Sagi Genger Trust (the "SG Trust"), each a limited partner of the partnership, and D&K GP LLC, the general partner of the Partnership.

WHEREAS, the Partnership was formed as a limited partnership pursuant to the provisions of the Delaware Limited Partnership Act, by the filing of a Certificate of Limited Partnership with the Office of the Secretary of State of the State of Delaware and the execution of the Limited Partnership Agreement of the Partnership dated as of December 31, 1988 (the "Original Agreement"); and

WHEREAS, the Original Agreement was subsequently amended several times to reflect, among others, the replacement of the limited partners, the replacement of the general partner, as well as amendments to specific provisions of the Original Agreement and amendments thereto; and

WHEREAS, the parties hereto desire to restate all previous amendments and to enter into this Amended and Restated Limited Partnership Agreement of the Partnership to serve as the governing document of the Partnership;

NOW, THEREFORE, in consideration of the mutual promises and agreements herein made and intending to be legally bound hereby, the parties hereby restate the Original Agreement, and amendments thereto, in its entirety to read as follows:

1

1   Formation of Partnership.   (a) The Partnership was formed, under the name D & K Limited Partnership (the "Partnership"), as a limited partnership under the provisions of the Delaware Limited Partnership Act, as indicated in the preamble of this Agreement, and the execution of the Original Agreement. If requested by the General Partner, the Limited Partners shall promptly execute all certificates and other documents consistent with the terms of this Agreement necessary for the General Partner to accomplish all filing, recording, publishing and other acts as may be appropriate to comply with all requirements for (a) the formation and operation of a limited partnership under the laws of the State of Delaware, (b) if the General Partner deems it advisable, the operation of the Partnership as a limited partnership, or partnership in which the Limited Partners have limited liability, in all jurisdictions where the Partnership proposes to operate and (c) all other filings required to be made by the Partnership.

(b) The general partner of the Partnership is D&K GP LLC, a Delaware limited liability company, and any successor individual or corporation admitted to the Partnership as general partner (the "General Partner"). The limited partners of the Partnership shall be the SG Trust and the OG Trust, and any other persons who are admitted to the Partnership as additional or substituted limited partners in Paragraph 17 (the "Limited Partners") (the Limited Partners and the General Partner, shall be referred to herein as "Partners", and each – a "Partner").

2.   Purpose.   The purpose of the Partnership is to acquire and hold an equity interest (initially, represented by 240 common shares) in TPR Investment Associates, Inc., a Delaware corporation ("TPR") and other legal business activities as determined by the General Partner.

3.   Place of Business.   The principal place of business of the Partnership shall be located at 1211 Park Avenue, New York, N.Y. 10128, or at such other location(s) as may hereafter be determined by the General Partner on notice to the Limited Partners.

4.   Term.   The term of the Partnership shall continue until December 31, 2038; provided, however, that the Partnership shall be dissolved prior to such date upon the happening of any of the following events:

2

(a) upon the written election to terminate made by the General Partner at any time, which election shall be sent to the other Partners;

(b) upon the death, bankruptcy, incapacity, or other withdrawal of the General Partner, unless within ninety (90) days after such event, all of the Limited Partners elect to reconstitute the Partnership, continue its business and elect a new general partner.

(c) in the event the Partnership has distributed all of its assets.

5. **Capital Contributions**.

(a) The Capital Contributions of the Partners consists of the following: :

| | |
|---|---|
| D&K GP LLC | $50,000 |
| 1993 Sagi Genger Trust | $600,000 |
| 1993 Orly Genger Trust | $600,000 |

(b) Each of the Partners shall assume personal liability under any and all indebtedness incurred by the Partnership to finance (and refinance) the purchase by the Partnership of the equity interest in TPR referred to in Paragraph 2 hereof. The Partners shall share such liability among themselves in accordance with their interests in the Partnership, and any payment by a Partner of its share of such liability shall be deemed to be a contribution to the capital of the Partnership as to which such Partner has no rights of contribution or subrogation.

6. **Interest in Partnership**.   Each Partner's interest in the Partnership shall be equal to the proportion that the then balance in his or her capital account bears to the aggregate balance of all of the Partners' capital accounts; where applicable this computation shall be governed by the specific stipulations in Paragraphs 7 and 8 hereof.

3

7    **Capital Account**    A capital account has been established as shown per "5(a)".
Accounts shall be maintained in accordance with the applicable regulations under the Internal
Revenue Service as amended ("the "Code"), and Income Tax Regulations (the "Regulations")
promulgated under the Code. Interest shall not be paid on any capital account and no Partner
shall have the right to withdraw any part of his capital account until dissolution of the
Partnership, and then such distribution or withdrawal shall be governed by paragraph 14 hereof.
No Partner shall have the right to bring an action for partition. Each Partner's capital account
shall be credited by capital contributions. The parties agree that as of the date hereunder the
capital accounts are as per "5(a)" without regard to previous payments made by any of the
Partners. In consideration for such, the Partners recognize the note originally issued in the
amount of $8,950,000 referred to in paragraph 5 the "Note" as a liability of each Limited Partner
to the Partnership as denoted. Partnership rights as per "22" may also be used to enforce
collection of the Note by the Partnership. Any attempted interference by a Partner or a person
beneficially owning an in interest in the Partnership automatically and irrevocably vests the
General Partner with the right to revert the capital account of any Partner to a percentage based
upon his actual pro rata contributions, expel, or otherwise suspend the membership and all rights
accumulated in connection therewith without notice and hold his share of partnership assets as
collateral for payments due. Upon thirty days notice the Partnership may demand full payment
of the Limited Partner's pro rata share of the Note.

8.    **Profits and Losses.**    The net profits and net losses of the Partnership shall be
shared by the Partners in proportion to the then balances in their respective capital accounts. The
terms "net profits" and "net losses" shall mean the net profits and net losses of the Partnership as
determined for federal income tax purposes.

9.    **Management.**

(a) Except as expressly provided herein, the management and control of the day-to-
day operations of the Partnership and the maintenance of the Partnership property shall rest
exclusively with the General Partner. (b) To the fullest extent permitted by law, the General
Partner shall have complete authority over and exclusive control and management of the
business and affairs of the Partnership and all of the Partnership property and all rights, powers

4

and authority appropriate therefore. The powers and discretion of the General Partner on behalf of the Partnership shall include, but shall not be limited to, making investments, selling assets, lending money for any lawful purpose whatsoever, borrowing money for any lawful purpose whatsoever, borrowing money for any lawful purpose whatsoever (and posting assets of the Partnership as collateral therefore), making tax elections under the Code, making distributions to the Partners (subject to Paragraph 10 hereof), executing guarantees for any lawful purpose whatsoever (and posting assets of the Partnership as collateral therefore) and doing all other acts or things necessary to carry out and implement the purposes of the Partnership, provided that each such action is taken upon reasonable terms to the Partnership. The General Partner may delegate, in writing, any of her powers under this Agreement.

(c) Any document, instrument or agreement to be executed and delivered by and on behalf of the Partnership shall be effective is signed and delivered by the General Partner or a delegee of the General Partner.

(d) Each of the other Partners hereby gives its approval to any action taken or to be taken on behalf of the Partnership by the General Partner, and agrees that it shall have no cause of action against the Partnership or the General Partner except for any claim based upon:

(i) the fraud, bad faith or willful misconduct of a Partner; or

(ii) the breach by a Partner of any provision of this Agreement or of any other written agreement to which the Partnership and such person are parties.

(e) No Limited Partner shall take part in the control or management of the Partnership or of the business of the Partnership, nor shall it have any authority to act for or to bind the Partnership in any way.

(f) The Partners acknowledge that the General Partner, its managing member(s), officers, employees and representatives, as the case may be, are hereby released from all liability and are hereby held harmless for any acts or omission they might have taken in their various capacities, whether as officers, employees, representatives, or the like, of TPR or of the Partnership. The Partners further acknowledge that certain actions between TPR and the Partnership, conducted

5

under the direction, instructions or supervision of said employees, officers, managing members, representatives and the like, would be considered 'self dealing'. The Partners hereby indemnify the General Partner, its managing members, officers, employees, representatives and the like, to the fullest extent permitted by law, from any such actions or omissions including, but not limited to, actions considered 'self dealing'.

10.    **Drawings of Income and Principal.**

(a) After making provisions for current debts and other obligations of the Partnership and establishing reasonable reserves for the reasonable needs of the Partnership's business, the General Partner shall distribute, not less frequently than annually, all of the remaining cash of the Partnership.

(b) During the Partnership year of 2038 all of the then remaining principal and accumulated income of the Partnership shall be distributed to the Partners and, upon the final distribution, the Partnership shall terminate.

(c) All distributions of principal, accumulated income and current income made to the Partners shall be made in proportion to each of the Partner's interest as set forth in Paragraph 6 hereof, and the available amount shall be computed after taking into account debts and reserves such as are permitted under Paragraph 14 hereof.

11.    **Transfer of Partnership Interest.** A Partner may not sell, assign, or encumber his or its interest in the Partnership or otherwise withdraw or retire from the Partnership without the prior written consent of the other Partners. No sale or exchange of any interest in the Partnership may be made if the transfer of the interest sought to be sold or exchanged may result, in the opinion of legal counsel to the Partnership, in (i) the termination of the Partnership under Section 708 of the Code, or (ii) the violation of any applicable federal or state securities law.

12.    **Title to Property and Bank Accounts.** The property of the Partnership shall be held in the name of the Partnership or the General Partner as nominee for the Partnership. All Partnership funds shall be deposited in its name in such bank account or accounts as shall be designated by the General Partner and all withdrawals therefrom shall be made upon the

6

signature of the General Partner or such person or persons as shall be so designated by the
General Partner.

13.    Books.    The General Partner shall cause the Partnership to keep accounts
and complete books and records of the business of the Partnership at the principal place of
business of the Partnership, and each Partner shall at all reasonable times have access thereto.

14.    Termination.

(a)  Upon the termination and dissolution of the Partnership, if the Partnership is
not continued pursuant to the terms of this Agreement, the General Partner or, if there is no
General Partner, any person elected by a majority of the Limited Partners to perform such
liquidation of the assets of the Partnership, shall proceed with the orderly liquidation of the assets
of the Partnership, and the net proceeds of such liquidation shall be applied and distributed in the
following order of priority:

( i )  to the payment of any debts and liabilities of the Partnership and the
expenses of liquidation;

( ii )   to the establishment of any reserves which the General Partner may deem
reasonably necessary to meet any contingent or unforeseen liabilities or obligations of the
Partnership or of the Partners arising out of or in connection with the Partnership;

( iii )   the balance, if any, shall be distributed among the Partners in proportion to
and to the extent of the then positive balances in their respective capital accounts (as determined
after giving effect to all capital account adjustments for the Partnership's  taxable year during
which the liquidation occurs); and

( iv )  if any Partner has a deficit balance in his or her capital account (as
determined after giving effect to all capital account adjustments for the Partnership's taxable
year during which the liquidation occurs), such Partner shall be unconditionally obligated to pay
the amount of such deficit balance to the Partnership by the end of such taxable year (or, if later,
within ninety (90) days after the date of such liquidation), which amounts shall be applied and
distributed in accordance with the provisions of this  Paragraph. The General Partner may accept
in lieu thereof, collateral, assurance of availability of collateral, or other secured  guarantees

which the General Partner reasonably deems to be adequate substitutes for such Partner's payment.

(b) In the event it becomes necessary to make distribution of Partnership property in kind, such property shall be transferred and conveyed to the Partners so as to vest in each of them as a tenant in common as undivided interest in the whole of said property in proportion to and to the extent of the then balances in their respective capital accounts.

15.    **Death of Partner.**   The death, bankruptcy, dissolution or withdrawal of a limited partner shall not dissolve the Partnership.

16.    **Notice.**   All notices and other communications required or permitted under this Agreement shall be in writing and may be personally delivered, sent by first class mail, postage prepaid, or electronically delivered, to an address regularly used by the addressee, with acknowledgement receipt, to the Partners at their addresses as shown from time to time on the records of the Partnership, or as may reasonably be known to the General Partner. Any Partner may specify a different address by notifying the General Partner in writing of such different address. All notices and other communications required or permitted under this Agreement shall be deemed to have been received on the day when personally delivered, on the day the electronic acknowledgement has been received by sender, or three days after being mailed in the manner provided in this Section 16, as the case may be.

17.    **Admission of New Partners.**   The Partnership may admit a new Partner upon the majority consent of all of the then existing Partners; consent of the General Partner shall be necessary; such consent to be granted or withheld at the General Partner's sole and unfettered discretion.

18.    **Governing Law.**   The Partnership is formed under the laws of the State of Delaware and the Delaware Uniform Limited Partnership Act.

19.    Liability of the Partners.

(a)    General.    The Partnership hereby indemnifies and agrees to hold each Partner harmless with respect to any claim, liability, damage, cost or expense (including reasonable attorney's fees and disbursements) incurred by reason of any act performed or omitted to be performed as a Partner or in connection with the assets or business of the Partnership, except that no Partner shall be indemnified where he or she is found in a final non-appealable judgment to have committed fraud, bad faith or willful misconduct

(b) Indemnification of General Partner

(i)    To the maximum extent permitted by law, the Partnership, its receiver, or its trustee shall indemnify, save harmless, and pay all judgments and claims against the General Partner, and its members and managers, their respective officers, directors, agents, stockholders, members, managers, partners and other Affiliates, and any other person who serves at the request of the General Partner on behalf of the Partnership as an officer, director, member, partner, employee or agent of the Partnership or any other present or future entity (in each case, an "Indemnitee") and all loss, damage or expense incurred by any Indemnitee or by the Partnership by reason of any act performed or omitted to be performed by any Indemnitee in connection with the Partnership (including, but not limited to, attorneys' fees and other costs and expenses incurred by any Indemnitee in connection with the investigation and defense of any action based on any such act or omission, which attorneys' fees and any other costs and expenses shall be paid as incurred, and any amounts expended in the settlement of any claim of liability, loss or damage).

(ii)    Without limiting the generality of the foregoing, in the event of any action by a Limited Partner (other than an Affiliate of the General Partner) against any Indemnitee, including a Partnership derivative suit or any class action, the Partnership shall indemnify, save harmless, and pay all costs and expenses of such Indemnitee, including attorneys' fees incurred in the defense of such action, which shall be paid as incurred.

(iii)    No Indemnitee shall have any liability to the Partnership or the Limited Partners except liabilities of any Indemnitee for any loss, damage or expense which, by a final

9

judgment or other final adjudication, has been determined to have arisen from such Indemnitee's fraud, willful misconduct or bad faith, which fraud, willful misconduct or bad faith in each case has been determined to have been material to the cause of action adjudicated. Notwithstanding the provisions of Sections 8.4(a) and 8.4(b), no Indemnitee shall be indemnified for any loss, damage or expense if a final judgment or other final adjudication adverse to such Indemnitee establishes that such Indemnitee's loss, damage or expense arose from such Indemnitee's fraud, willful misconduct or bad faith which, in each case, was material to the cause of action so adjudicated and in the event of any such adverse final judgment or other final determination establishing such Indemnitee's fraud, willful misconduct or bad faith material to the cause of action so adjudicated, such Indemnitee shall reimburse to the Partnership any costs and expenses, including attorneys fees, previously advanced to such Indemnitee. Limited Partners shall not be individually obligated with respect to such indemnification beyond their respective Commitments.

20.   **Self-Dealing.** The fact that any Partner is directly or indirectly interested in or connected with any person, firm or corporation employed by the Partnership to render or perform a service or from which or to whom the Partnership may buy or sell merchandise or other property shall not prohibit the General Partner from employing such person, firm or corporation or from dealing with him or her or it, and neither the Partnership nor the other Partners thereof shall have any rights in or to any income or profits derived therefrom by such person, firm or corporation.

21.   **Power of Attorney.** Each Limited Partner hereby constitutes and appoints the General Partner the true and lawful attorney-in-fact for each Limited Partner and in the name, place and stead of each Limited Partner from time to time to execute and file:

   (i)          any certificates and other instruments which may be required to be filed by the Partnership under the laws of the State of Delaware or any other governmental authority having jurisdiction thereover, or which be General Partner shall deem it advisable, in its sole discretion, to file;

10

(ii) any certificates or other instruments amending or modifying the Certificate of Limited Partnership of the Partnership as provided therein;

(iii) any certificates or other instruments which may be required to effectuate the dissolution and termination of the partnership and/or the cancellation of the Certificate of Limited Partnership; and

(iv) any amendment of this Agreement which the General Partner is authorized to make in accordance with the provisions of this Agreement.

it being expressly understood and intended by each of the Partners that such powers of attorney are coupled with an interest. The foregoing powers of attorney shall be irrevocable and shall survive any assignment of the whole or any part of the interest in the Partnership of a Limited Partner and shall be binding upon the assignee thereof.

22. **Authority of General Partner with respect to holdings in TRI**

(a) The Partners acknowledge that each one of the Limited Partners holds 102.80 shares of TRI, representing 19.42766% of the common stock of TRI (each, a "LP TRI Interest(s)").

(b) The General Partner is hereby conferred the authority, in its sole and unfettered discretion to mortgage, hypothecate, pledge, create a security interest in or lien upon, or otherwise encumber the LP TRI Interests, for the benefit of the Partnership or that of third parties, in connection with the Note.

(c) Should the General Partner encumber the LP TRI Interests, as permitted under section (b) above - each Limited Partner shall have the right to redeem its LP TRI Interest to the full extent of such LP's pro-rated participation, responsibility or liability for the unpaid amount of the Note.

11

(d) Each Limited Partner hereby constitutes and appoints the General Partner the true and lawful attorney in fact for each Limited Partner and in the name, place and stead of each Limited Partner from time to time in connection with (i) placing a mortgage, hypothecate, pledge, creating a security interest in or lien upon, or otherwise encumbering the LP TRI Interests in connection with the Note, (ii) removing such mortgage, hypothecation, pledge, security interest, lien or other encumber, placed on the LP TRI Interests, and (iii) negotiating, settling or otherwise handling or managing any rights attached to, or emanating from, the LP TRI Interest and dealing with the LP TRI Interests until payment of the Note has been resolved.

(e) Each Limited Partner agrees that it shall not during the term of this Agreement either directly or indirectly, transfer, sell, assign, mortgage, hypothecate, pledge, create a security interest in or lien upon, encumber, donate, contribute, place in trust (including a voting trust), or otherwise voluntarily or involuntarily dispose of (each, a "Transfer") said Limited Partner's LP TRI Interest.

23.    **Authority of General Partner to Vary Tax Allocations; Tax Matters Partner.**

(a) It is the intent of the Partners that each Partner's distributive share of taxable income or tax loss, and of each item of income, gain, loss, preference, deduction, or credit entering into the computation thereof, shall be determined and allocated in accordance with this Agreement to the fullest extent permitted by Section 704(b) of the Code. In order to preserve and protect the determinations and allocations provided for in this Agreement, the General Partner is authorized and directed to allocate tax income, gain, loss, preference, deduction, or credit (or any item thereof) arising in any year differently than as may otherwise be provided for in this Agreement to the extent that allocating tax income, gain, loss, preference, deduction, or credit (or any item thereof) in the manner provided for in this Agreement would cause the determinations and allocations of each Partner's distributive share of tax income, gain, loss, preference, deduction, or credit (or item thereof) not to be permitted by Section 704 (b) of the Code and applicable Regulations.

In making any such new allocations the General Partner is authorized to act only after having been advised by counsel to the Partnership and the accountants for the Partnership

that in their opinion, under Section 704 (b) of the Code and applicable Regulations, ( i ) the new allocation is necessary, and ( ii ) the new allocations is the minimum modification of the allocations otherwise provided for in this Agreement necessary in order to assure that, either in the current year or in any preceding year, each Partner's distributive share of tax income, gain, loss, preference, deduction, or credit (or item thereof) is determined and allocated in accordance with this Agreement to the fullest extent permitted by Section 704 (b) of the Code and applicable Regulations.

If the General Partner is required to make any new allocation in a manner less favorable to the Limited Partners than is otherwise provided for in the Agreement, the General Partner is authorized and directed, insofar as she is advised by counsel and the accountants for the Partnership that it is permitted by Section 704 (b) of the Code and applicable Regulations, to allocate tax income, gain, loss, preference, deduction, or credit (or item thereof) arising in later years in a manner so as to bring the allocations of tax income, gain, loss, preference, deduction, or credit (or item thereof) to the Limited Partners as near as possible to the allocations otherwise contemplated by this Agreement.

(b)    The General Partner is hereby designated as Tax Matters Partner of the Partnership, as provided in the Regulations pursuant to Section 6231 of the Code. Each Partner, by the execution of this Agreement, consents to such designation of the Tax Matters Partner and agrees to execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such consent. The Tax Matters Partner is hereby authorized, but not required:

(i)    to enter into any settlement with the Internal Revenue Service or the Secretary of the Treasury (the "Secretary") with respect to any tax audit or judicial review, in which agreement the Tax Matters Partner may expressly state that such agreement shall bind the other partners, except that such settlement agreement shall not bind any Partner who (within the time prescribed pursuant to the Code and applicable Regulations) files a statement with the Secretary provided that the Tax Matters Partner shall not have the authority to enter into a settlement agreement on the behalf of such Partner;

13

(ii)    in the event that a notice of final administrative judgment at the Partnership level of any item required to be taken into account by a Partner for tax purposes a "final judgment") is mailed to the Tax Matters Partner, to seek judicial review of such final adjustment, including the filing of a petition for readjustment with the Tax Court, the District Court of the United States for the district in which the Partnership's principal place of business is located, or the United States Claims Court;

(iii)    to intervene in any action brought by any other Partner for judicial review of a final adjustment;

(iv)    to file a request for an administrative adjustment with the Secretary at any time and, if any part of such request is not allowed by the Secretary, to file a petition for judicial review with respect to such request;

(v)    to enter into an agreement with the Internal Revenue Service to extend the period for assessing any tax which is attributable to any item required to be taken into account by a Partner for tax purposes, or an item affected by such item; and

(vi)    to take any other action on behalf of the Partners or the Partnership in connection with any administrative or judicial tax proceeding to the extent permitted by applicable law or regulations.

24.    **Agreement in Counterparts**.  This Agreement may be executed in any number of counterparts which together shall constitute one and the same instrument.

25.    **Rules of Construction**.  Each paragraph of this Agreement shall be considered severable, and if for any reason any paragraph or paragraphs herein are determined to be invalid and contrary to any existing or future laws, such invalidity shall not impair the operation or

affect the portions of this Agreement which are valid.

26.   **Headings.** Headings contained in this Agreement are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provisions hereof.

27.   **Creditors.** None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Partnership, as creditor, or for the benefit of any other individual, corporation or entity.

28.   **Entire Agreement.** This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith. No covenant, representation or condition not expressed in this Agreement shall affect or be effective to interpret, change or restrict the express provisions of this Agreement.

29.   **Pronouns.** All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular and plural as the identity of the person or persons may require.

30.   **Binding Effect.** This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective heirs, successors, executors, administrators, legal representatives and permitted assigns.

31.   **Further Assurances.** Each Partner agrees to do such further acts and to execute such documents as may be reasonably requested in furtherance of, and to carry out and implement the purposes of, t his Agreement and the transactions contemplated herein.

32.   **Amendment.** This Agreement may not be modified except by a writing signed by Partners holding a majority in interest of the Partnership; in the event such majority in interest included only the Limited Partners – the consent of the General Partner shall be required as well.

15

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement, effective on the day and year first written above.

GENERAL PARTNER:

_____

D&K GP LLC

by: Sagi Genger, its managing member

LIMITED PARTNERS:

_____

1993 Sagi Genger Trust

by: Leah Fang, sole trustee

_____

1993 Orly Genger Trust

by: Leah Fang, sole trustee

Restated this ____ day of November, 2007

Meeting of Partners of D&K LP -- Jan. 31, 2009 & Agreement

The undersigned partners having reviewed the status of D&K LP ("D&K") and each of its partners vote as allows to

1. Indemnify and provide a general release from any claim or right at equity, law, or contract or otherwise the current and former general partner, its officers, the partnership's holdings (including TPR Investment Associates, Inc.) and the officers of its holdings to fullest extent permitted in connection with any claim by the partnership and/or its partners. Irrespective of the above, nothing herein shall serve to release or indemnify Arie Genger, William Dowd, Lawrence Small or Edward Klimerman.

2. Authorize the General Partner on behalf of D&K and each limited partner individually to enter and execute such binding compromise as may be possible and deemed prudent by the GP in connection with the outstanding note from D&K guaranteed 50% by each limited partner. Such note having a balance of about $11,204,685 is presently subject to acceleration. Nothing herein shall derogate from authority already granted the General Partner in the Partnership Agreement.

3. The partners wish to clarify that the authority vested in the General Partner to make limited partners' assets subject to a pledge shall be done in substantially the same manner in which TPR Investment Associates, Inc shares were pledged in conjunction with the aforementioned note. However, the General Partner shall be authorized to sign for the partnership and/or each individual partner.

4. Provide such consideration as the GP may deem fit in entering into any compromise.

5. Waive any objection to the dealings of the GP or its officers based on conflict of interest or otherwise.

6. Request that the General Partner make this resolution part of the Partnership Agreement.

7. Attached is a worksheet calculating the amount owed, $11,204,685.

8. TPR Investment Associate, Inc. has agreed to refrain from enforcing the note against each limited partner for thirty days..

_____
Orly Genger 1993 Trust -- LP

_____
Sagi Genger 1993 Trust -- LP

_____
Sagi Genger on behalf of General Partner

_____
TPR Investment Associates, Inc.

Minutes to Partners of D&K LP   Jan. 31, 2009 & Agreement

The undersigned partners, after having reviewed the affairs of D&K LP ("D&K") and each of its partners vote as follows:

1. Indemnify and provide a general release from any claim or right at equity, law, or contract of whatsoever the General and former general partner, its officers, the partnership's holdings, including TPR Investment Associates, Inc., and the officers of its holdings to fullest extent permitted in connection with any claim by the partnership and/or its partners. Irrespective of the above, nothing herein shall serve to release or indemnify Arie Genger, William Dowd, Lawrence Small or Edward Klimmerman.

2. Authorize the General Partner on behalf of D&K and each limited partner individually to enter and execute such binding compromise as may be possible and deemed prudent by the GP in connection with the outstanding note from D&K guaranteed 50% by each limited partner. Such note having a balance of about $11,204,685 is presently subject to acceleration. Nothing herein shall derogate from authority already granted the General Partner in the Partnership Agreement.

3. The partners wish to clarify that the authority vested in the General Partner to make limited partner' assets subject to a pledge shall be done in substantially the same manner in which TPR Investment Associates, Inc shares were pledged in conjunction with the aforementioned note. However, the General Partner shall be authorized to sign for the partnership and/or each individual partner.

4. Provide such consideration as the GP may deem fit in entering into any compromise.

5. Waive any objection to the dealings of the GP or its officers based on conflict of interest or otherwise.

6. Request that the General Partner make this resolution part of the Partnership Agreement.

7. Attached is a worksheet calculating the amount owed, $11,204,685.

8. TPR Investment Associates, Inc. has agreed to refrain from enforcing the note against each limited partner for thirty days..

_____
Orly Genger 1993 Trust – LP

_____
Sagi Genger 1993 Trust – LP

_____
Sagi Genger on behalf of General Partner

_____
TPR Investment Associates, Inc

| Rate | 6.1% |
|---|---|
| | Owing |
| Tuesday, October 26, 2004 | 9,880,000 |
| Portion Not Assumed by Parents | 9,484,800 |
| | |
| Friday, October 31, 2008 | 1466 |
| Days in Year | 365 |
| | 4.02 |
| Interest rate for Period | 26.7% |
| | |
| Dollars of Interest | 2,528,289.02 |
| | |
| Amount Due | 12,013,089.02 |
| Payment | (960,000.00) |
| | |
| Net of Payment | 11,053,089.02 |
| | |
| Saturday, January 31, 2009 | 92 |
| Days in Year | 365 |
| | 0.25 |
| Interest rate for Period | 1.4% |
| Dollars of Interest | 151,595.73 |
| | |
| Current Amount Owed | 11,204,685 |
| | |
| | 5,602,342.38 |

January 10, 2009

Dear Mom,

I understand that my petition to appoint Martin Coleman as Trustee of the Orly Genger 1993 Trust ("Trust") has been denied. My attorneys are reviewing the decision and considering all of my options, including whether to appeal.

For now, and until further notice, it is my strong desire to retain all of the shares of Trans-Resources, Inc. ("TRI") that are currently in the Trust, and I direct you not to sell them. If you are approached, or have been approached, with an offer to purchase any of the TRI shares in the Trust, please notify me immediately. If, despite my wishes, you consider accepting an offer, do not sell any shares until I have a reasonable period of time to maximize the benefit to the Trust, including possible alternative transactions.

As you know, the Trust's TRI shares are subject to an Irrevocable Proxy, dated as of October 29, 2004, in favor of my father, Arie Genger, as well as a voting trust letter agreement with a back-up form of voting trust agreement and voting trust certificate delivered in connection with the Proxy. Copies of those documents are attached. If anyone approaches you about the TRI shares, I insist that you inform them of these facts, and provide them with a copy of this letter and attached documents.

*Olenger*   1/10/2009

Orly Genger

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------X

In the Matter of

ORLY GENGER,

               Petitioner,

     -against-

LEAH FANG, DAVID A. PARNES, THE SAGI
GENGER TRUST, DALIA GENGER, JOEL
ISAACSON and MARTIN COLEMAN,

               Respondents.

-----------------------------------------------------------------X

Index No. 2008/0017

**NOTICE OF ENTRY OF
ORDER**

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK  )

        PLEASE TAKE NOTICE that the within is a true copy of a Decision and Order

of the Surrogate's Court of the State of New York, County of New York, dated December 31,

2008, and duly entered by the Clerk of the Surrogate's Court on December 31, 2008.

Dated: New York, New York
       January 16, 2007

                   SULLIVAN & WORCESTER LLP

                   By:
                     Jonathan G. Kortmansky
                    ~~Kimberley R.~~ Chapman
                     1290 Avenue of the Americas, 29th Flr.
                     New York, New York  10104
                     (212) 660-3000
                     *Attorneys for Respondent Dalia Genger*

{N0137696; 1}

To:   Eve Rachel Markewich, Esq. (by e-mail and regular mail)
      Markewich & Rosenstock LLP
      8 East 41st Street, Fifth Floor
      New York, NY  10017

      Mark Waldstein, Esq. (by e-mail and regular mail)
      McLaughlin & Stern
      260 Madison Avenue
      New York, NY  10016

      Matthew Hoffman, Esq.  (by e-mail and regular mail)
      Barton, Barton & Plotkin, LLP
      Graybar Building
      420 Lexington Avenue, 18th Floor
      New York, NY  10170

      Seth Rubenstein, Esq.  (by e-mail and regular mail)
      26 Court Street
      Room 1501
      Brooklyn, NY  11242

SURROGATE'S COURT : NEW YORK COUNTY      JAN 0 2 2009
----------------------------------------- X
In the Matter of the Trust Established
on December 13, 1993, by ARIE GENGER      File No. 0017/2008
for the Benefit of ORLY GENGER.
----------------------------------------- X

R O T H , S .

This is a contested application by the primary beneficiary

(Orly Genger) of an irrevocable inter vivos trust established by

her father, Arie Genger, seeking the appointment of a successor

trustee or, alternatively, the appointment of a "special trustee"

to investigate alleged wrongdoing concerning the trust.

Petitioner's mother, Dalia Genger (grantor's former wife),

contends that she is the duly appointed successor trustee and

that there is no basis to appoint another fiduciary for any

purpose.

The trust agreement, dated December 13, 1993, provides for

discretionary income and principal distributions to Orly for life

with remainder to her descendants or, if none, to the grantor's

descendants in trust.

Article SEVENTH (B), (D), (E), and (G) of the trust

instrument sets forth the following procedure for the resignation

of trustees and the appointment of their successors.

A trustee may resign by delivering a signed and acknowledged

instrument of resignation in person or by certified or registered

mail to the other trustee and to either the grantor or the income

beneficiary.  Such resignation is effective upon the receipt of

the acknowledged instrument by the other trustee (if there is

one) and the grantor or the income beneficiary or at such later date as may be specified in the instrument.

A trustee may appoint his or her successor by delivering a signed and acknowledged instrument in the same manner as described above for resignation. Any such appointment, however, is valid only if the appointee qualifies by delivering a signed and acknowledged instrument of acceptance in person or by certified or registered mail to each trustee and the grantor or the income beneficiary within 30 days after the later of 1) the date on which a copy of the appointment instrument is delivered to him or her, and 2) the effective date of the appointment as set forth in the appointment instrument. It is observed that there is no provision that requires a resigning trustee to appoint a successor or that there always be two trustees in office.

The original two trustees served until October 2004, when they resigned and appointed David Parnes and Eric Gribitz as their successors. On February 12, 2007, Mr. Gribitz resigned without appointing a successor. On April 26, 2007, Mr. Parnes resigned and appointed as his successor Leah Fang in a signed and acknowledged instrument. Although Ms. Fang noted her acceptance at the bottom of such instrument, her signature was not acknowledged. However, in another document entitled "Release" executed and acknowledged by Ms. Fang the same day, she, as

2

trustee, purported to discharge Mr. Parnes from liability.  It is undisputed that thereafter Ms. Fang acted as trustee.  Indeed, Ms. Fang's contention that she received a number of requests for information from petitioner and that petitioner referred to her in writing and orally as trustee is not disputed by petitioner.

On December 12, 2007, Ms. Fang, without resigning in accordance with the trust agreement, attempted to appoint Patricia Enriquez, as successor trustee.  Her designation of Ms. Enriquez, however, was by an unacknowledged letter in which she referred to her own resignation as taking effect upon Ms. Enriquez's acceptance of the appointment.  Ms. Enriquez accepted by signing the letter, but such acceptance was not acknowledged and, in any event, there is nothing in the record to suggest that such "acceptance" was delivered in accordance with the trust instrument.  Two weeks later, an attorney for Ms. Enriquez notified petitioner's counsel by email that her client had advised that she had no intention to overcome the procedural omissions.

On January 3, 2008, Ms. Fang and Dalia Genger signed before a notary a memorandum in which Ms. Fang stated that "to the extent that I am still vested with any powers to appoint trustees of the [trust], I confirm your appointment."  The next day, Ms. Fang executed an acknowledged instrument of resignation and appointment of successor trustee naming Dalia as her successor

3

and Dalia, on the same day, executed an acknowledged instrument of acceptance. It is undisputed that such documents were delivered in accordance with the trust requirements.

We address first that portion of the instant application which seeks the appointment of a successor trustee on the ground that Dalia was not validly appointed. In such connection, petitioner argues first that, because Ms. Fang's signature on the bottom of Mr. Parnes's appointment instrument was not acknowledged, she never accepted the position in accordance with the trust agreement (and thus could not appoint Dalia her successor). However, such argument ignores the "Release" mentioned above that Ms. Fang executed the same day. Such instrument, which was signed and duly acknowledged, unequivocally establishes Ms. Fang's acceptance of the position. Since petitioner does not challenge the authenticity of such instrument or Mr. Parnes' contention, supported by the record, that it was delivered in accordance with the trust instrument and, as noted above, petitioner thereafter communicated with Ms. Fang as trustee, Ms. Fang properly qualified as successor trustee.

Petitioner's second argument that, in any event, Ms. Fang's appointment of Dalia was ineffective because Ms. Fang had previously resigned as trustee is also without merit. Simply put, Ms. Fang had not previously resigned because her letter to Ms. Enriquez did not contain the formalities (i.e., an

4

acknowledgment) required by the trust agreement. Moreover, although not a model of clarity, the letter makes clear that Ms. Fang did not intend to leave the trust without a trustee in the event that Ms. Enriquez failed to qualify, which is exactly what happened. Thus, Ms. Fang had authority to appoint Dalia as her successor.

Since there is no dispute that the instrument of resignation and appointment executed by Ms. Fang on January 4, 2008, and Dalia's instrument of acceptance of the same date were executed and delivered in accordance with the trust agreement, Dalia is the duly appointed successor trustee of the trust. To find otherwise would be to ignore the chronology of events and the purpose of the provisions at issue, namely to ensure that the trust always has a fiduciary ready, willing and able to act. The fact that petitioner does not wish her mother to be the fiduciary because she considers her an adversary in a broader intra-family dispute does not provide a basis to ignore the grantor's intent, as reflected in the trust instrument, that an acting trustee, and not the beneficiary, decides who shall become a successor trustee. Accordingly, petitioner's application to appoint a successor trustee is denied.

We next turn to petitioner's alternate request for relief, namely that a "special trustee" be appointed for the "purpose of investigation and taking discovery with respect to the wrongful

5.

dealings concerning the assets and income of the trust."

It is noted initially that petitioner's only allegations of "wrongful dealings" concern a close corporation, TPR Investment Associates, Inc.   She contends that her brother Sagi, who is an officer of TPR, and Dalia, who was a shareholder at the time this proceeding was commenced, are engaged in a "wrongful scheme" to divert assets to themselves and, as a result, Dalia "could not possibly" investigate wrongdoing at TPR, which the petition describes as the "greatest" asset of the trust.

However, the premise of the application, namely that the trust's interest in TPR would enable the trustee to investigate or seek relief from TPR, does not appear to be correct. Petitioner does not dispute Dalia's assertion, supported in the record, that the trust is not a shareholder of TPR at all. Rather, D&K LP, an entity in which the trust owns a 48 percent interest, in turn owns approximately 50 percent of TPR. Petitioner does not explain what appears to be a material misstatement concerning TPR's relationship to the trust.   Nor does she identify how a trustee under such circumstances might be in a position to "investigate and address the TPR issues".

In any event, assuming arguendo that a trustee would somehow be able to investigate alleged misconduct at TPR, petitioner's vague and speculative allegations of "wrongful conduct" at TPR from which Dalia purportedly benefitted do not warrant the

6

appointment of a "special trustee". Similarly, petitioner's allegations (made upon information and belief) that Dalia had knowledge of alleged improper acts by former trustee, David Parnes, in relation to TPR are patently insufficient to warrant the remedy of a "special trustee". In such connection, it is noted that Mr. Parnes and Ms. Fang have been directed to account for their proceedings as trustees (Matter of Genger, NYLJ, Feb. 25, 2008, at 29, col 3), giving petitioner a forum to seek relief for most of the conduct about which she complains.

Finally, it is observed that petitioner has not alleged that Dalia has refused a request for information, which would warrant relief (SCPA 2102), or has failed as trustee to protect trust assets. Indeed, it appears that Dalia (who states that she is ready and able to act as fiduciary) has yet to assume the duties of trustee in deference to her daughter's position in this litigation. As a validly appointed trustee, she should be given the opportunity to do what she deems necessary to manage and protect the trust's assets.

Based upon the foregoing, the appointment of a "special trustee" is unwarranted at this time and, accordingly, the application is denied, without prejudice to renewal if future

7

circumstances warrant such relief.

This decision constitutes the order of the court.

_____
S U R R O G A T E

Dated: December 31, 2008

8



## COZEN
## O'CONNOR

A PROFESSIONAL CORPORATION

250 PARK AVENUE    NEW YORK, NY 10177    212.509.9400    800.437.7040    212.986.0604 FAX    www.cozen.com

May 14, 2009

Judith E. Siegel-Baum
Direct Phone 212.883.4902
Direct Fax    215.701.2261
jsiegel-baum@cozen.com

**VIA CERTIFIED MAIL/RETURN
RECEIPT REQUESTED
70032260000561425069
AND REGULAR MAIL**

Dalia Genger
200 East 65th Street
Apt. 32W
New York, NY  10021

Re:    Orly Genger 1993 Trust

Ms. Genger:

Please be advised that we represent Orly Genger in her capacity as beneficiary of the Orly Genger 1993 Trust (the "Trust"). You are presently serving as her sole trustee.

Orly has received no information about the assets, income and investments of the Trust and is very concerned that the assets of the Trust have been, or could be, affected by the following lawsuits: <u>Glenclova Investment Co. v. Trans-Resources, Inc., and TPR Investment Associates, Inc.</u> (pending in the Southern District of the State of New York); <u>Robert Smith, TR Investors, LLC and Glenclova Investment Co. v. Trans-Resources, Inc.</u> (pending in Delaware Chancery Court); <u>TR Investors, LLC, Glenclova Investment Co., New TR Equity 1, LLC and New TR Equity II, LLC v. Arie Genger and Trans-Resources, Inc.</u> (pending in Delaware Chancery Court); and <u>New TR Equity, LLC v. Trans-Resources, Inc.</u> (pending in Delaware Chancery Court). Moreover, Orly is concerned that the value of TRI shares owned by the Trust have been impacted by the sale of TRI shares owned by the Sagi Genger 1993 Trust (the "Sagi Trust") to TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC.

Please provide us with the following documents by May 26, 2009:

1.    All documents relating to the assets of the Trust from 2004 through the present.

Dalia Genger
May 14, 2009
Page 2

2.      All documents relating to any and all investments and trades made directly by, or indirectly by, the Trust for the period 2004 through the present including, without limitation, all statements of transactions.

3.      All documents relating to all purchases, sales, transfers and assignments of real or personal property directly by, or indirectly by, the Trust from 2004 through the present including, without limitation, closing statements, deeds, title reports, canceled checks, transfer tax documents, appraisals, catalogues and insurance policy riders.

4.      All documents relating to any and all distributions or payments of money or securities directly by, or indirectly by, the Trust for the period 2004 through the present.

5.      All documents relating to any and all dividends or other payments of money received directly by, or indirectly by, the Trust for the period 2004 through the present.

6.      All documents relating to any and all fees, commissions, reimbursement for expenses and other charges or compensation paid directly by, or indirectly by, the Trust for the period 2004 through the present including, without limitation, canceled checks and wire transfer reports.

7.      All documents relating to any promissory notes, accounts payable and debts and loans owed directly by, or indirectly by, the Trust for the period 1993 through the present.

8.      All U.S. and N.Y. Fiduciary Tax Returns including all back-up documents filed since the Trust's inception.

## D & K GP LLC ("D & K GP")

9.      The Trust has an interest in D & K LP ("D & K"). D & K GP is the general partner of D & K. Accordingly, we request the following documents related to D & K GP for the period 2004 through the present including, without limitation, amendments to the Limited Liability Company Agreement of D & K GP LLC, Schedule A (and amendments) to the Limited Liability Company Agreement of D & K GP LLC (i.e., a list of capital contributions made by the Members), a list of Members from 2004 through the present, subscription documents, tax returns, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes, statements of income distribution to you, the Trust, the Sagi Trust, Sagi Genger ("Sagi") and/or to any other party, records of contributions or investments by you, the Orly Trust, the Sagi Trust, Sagi and/or by any other party, cash receipts, cash disbursements journals, general ledgers, a list of employees from 2004 through the present, a list of appointed management and their compensation schedules from 2004 through the present, W-2s issued and 1099s issued.

Dalia Genger
May 14, 2009
Page 3

---

### D & K LP ("D & K")

10.    All documents relating to D & K for the period 2004 through the present including, without limitation, all partnership agreements and amendments, a list of capital contributions by each partner from 2004 through the present, a list of all partners from 2004 through the present, subscription documents, tax returns, K-1 statements, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes, statements of income distribution to you, the Trust, the Sagi Trust, Sagi and/or to other parties, records of contributions or investments by you, the Trust, the Sagi Trust, Sagi and/or by other parties, cash receipts, cash disbursements journals, general ledgers, a list of employees, W-2s and 1099s.

11.    All documents relating to the sale or assignment of your interest in D & K to Sagi, D & K GP, the Sagi Trust or any other party including, without limitation, the date on which the sale or assignment was made, the purchase and sale agreement (if by sale and not by assignment), transfer documents, closing documents, canceled checks and appraisals.

12.    All documents relating to the assignment of D & K's promissory note in favor of TPR (dated December 21, 1993) to David Parnes (the "Promissory Note").

### TPR Investment Assocs., Inc. ("TPR")

13.    All documents relating to TPR from 2003 though the present including, without limitation, amendments to TPR Investment Associates, Inc. Shareholders Agreement dated October 30, 2004 ("TPR Shareholder Agreement"), shareholder agreements preceding the present TPR Shareholder Agreement, tax returns, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes from all board meetings and Sale Meetings (as that term is defined in §3.3 of the TPR Shareholder Agreement), records of contributions or investments by you, the Trust, the Sagi Trust and/or Sagi, cash receipts, cash disbursements journals, balance sheets, general ledgers, a list of employees, W-2s, 1099s, statements of income distribution to you, the Trust, the Sagi Trust, Sagi and/or to any other party, a list of the board of directors from 2003 through the present and a list of appointed management from 2003 through the present and each of their compensation schedules.

14.    All verification of loan and interest repayments to and from TPR from 2004 to the present.

15.    All documents relating to the sale, assignment and collections received from David Parnes in connection with the Promissory Note.

16.    All documents relating to your sale of each tranche of TPR shares either back to TPR, to Sagi or to any other party including without limitation, a copy of the "Sale Notice" (as that term is defined in §3.3 of the TPR Shareholder Agreement), the "Evaluated Share Value" (as that term is defined in §3.3(a)(v) of the TPR Shareholder Agreement), closing documents, canceled checks and appraisals.

Dalia Genger
May 14, 2009
Page 4

---

### Trans-Resources, Inc. ("TRI")

17.    All documents relating to TRI from 2003 though the present including, without limitation, shareholder agreements and amendments, tax returns, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes from all board meetings, records of contributions or investments by you, the Trust, the Sagi Trust, Sagi and/or any other party, cash receipts, cash disbursements journals, balance sheets, general ledgers, a list of employees, W-2s, 1099s, and statements of income distribution to you, the Trust, the Sagi Trust, Sagi and/or any other party, a list of all board of director members since 2003 and a list of all appointed management since 2003 and each of their compensation schedules.

18.    The Trust owns TRI shares and as a fiduciary you should have had knowledge that the Sagi Trust sold its TRI shares on August 22, 2008 to TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC.  Provide us with all documents relating to the sale of TRI shares by the Sagi Trust.

19.    The assets of the Trust may be affected by the following lawsuits:

(i)    Glenclova Investment Co. v. Trans-Resources, Inc., and TPR Investment Associates, Inc. pending in the United States District Court, Southern District of New York;

(ii)    Robert Smith, TR Investors, LLC and Glenclova Investment Co. v. Trans-Resources, Inc. pending in the Delaware Chancery Court;

(iii)    TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC v. Arie Genger and Trans-Resources, Inc. pending in the Delaware Chancery Court; and

(iv)    New TR Equity, LLC v. Trans-Resources, Inc., pending in the Delaware Chancery Court.

Accordingly, as trustee provide us with copies of documents relating to the above-set-forth proceedings including, without limitation, the pleadings (i.e., the summons, complaint and all motion papers) and correspondence.

20.    All documents related to TRI shares that were issued to the Trust and are being held by Robert Lack, Esq., Friedman Kaplan Seiler & Adleman LLP, 1633 Broadway, New York, New York 10019.

The term "documents" as used above shall mean the original or duplicate copy or draft(s) of any writing or recording of whatever nature, whether written, typed, printed, photocopied, filmed, videotaped or mechanically or electronically sorted or recorded, which is in your possession, custody or control.  Moreover, the term "documents" shall include, without limitation, correspondence, e-mails, memoranda, reports, notes, minutes, or records, or telephone conversations, meetings, or conferences, diaries, logs, calendar notes, accounting records, financial statements, books of account, vouchers, invoices, bills, computer tapes, print-outs,

NYO_XFER\1316809\1 252931.000

Dalia Genger
May 14, 2009
Page 5

writings, drawings, graphs, charts, photographs, videotape recordings, data compilations from which information can be obtained or translated.

If we do not receive a reply with the information requested on or before May 28, 2009, we will be forced to seek court intervention.

Sincerely,

COZEN O'CONNOR

By:      Judith E. Siegel-Baum

JES:pw

cc:      Orly Genger
         Jonathan G. Kortmansky, Esq.

# PEDOWITZ & MEISTER, LLP

1501 BROADWAY, SUITE 800
NEW YORK, NEW YORK 10036-5501
www.pedowitzmeister.com

212.403.7330 voice
212.354.6614 facsimile
robert.meister@pedowitzmeister.com

ARNOLD H. PEDOWITZ
ROBERT A. MEISTER

DAVID HARRISON
RANDI MELNICK

June 1, 2009

NEW JERSEY OFFICE

285 OLD SHORT HILLS ROAD
SHORT HILLS, N.J. 07078
(973) 912-0005

EMAIL AND UPS

Judith E. Siegel-Baum, Esq.
Cozen & Worcester
250 Park Avenue
New York, NY 10177

Re:    Orly Genger 1993 Trust

Dear Ms. Siegel-Baum:

I write to respond to your May 14th letter to my client, Dalia Genger in her capacity as Trustee of The 1993 Orly Genger Trust (the Trust).

May I start by expressing Mrs. Genger's understanding about the concern that your client, Orly Genger, has about the effect her interests of the various lawsuits your letter mentions. Mrs. Genger has the same concern, particularly since, as we understand it, the *Glenclova* action raises the issue of whether the transfer to the Trust of shares of Trans-Resources, Inc. (TRI) was invalid under the TRI shareholders' agreement.

Having shared that concern, I would like to respond to your letter in narrative form, rather that in the form a response to a litigation demand for production.

All TRI shares are, I am informed, held for the benefit of the shareholders by TRI. Thus Mrs. Genger does not physically possess a share certificate. I am informed that the absence of such a certificate did not prevent The Sagi Genger Trust from selling the shares it was given.

As your client knows, Mrs. Genger became Trustee January 4, 2008, as successor trustee to Leah Fang. Ms. Fang has an accounting pending in Surrogate's Court, New York County, File No. 0017/2008.

Mrs. Genger has not taken any action as Trustee and has not received any dividends or other property or assets in respect of the TRI shares.

As your client knows, D & K LP pledged its 240 shares of the stock of TPR Investment Associates, Inc. (TPR) to secure its December 21, 1993 Note to TPR in the principal amount of

$8,950,000. I believe that your client has the D&K organization papers; if not I'll be glad to copy them for you at your expense, as they're about an inch think. By notice dated 8/31/2008, TPR declared that Note to be in default and subsequently sold the TPR shares for $2,200,000 on February 27, 2009. I attach papers concerning this transaction.

As a result of the foreclosure, the TRI shares are the Trust's only asset.

To date, Mrs. Genger has not filed and fiduciary tax returns, nor submitted any of her expenses for reimbursement by the Trust nor taken any commissions.

Sincerely,

Robert A. Meister

2

# NOTICE OF DEFAULT & ENFORCEMENT of PLEDGE

**To:**    Sagi Genger, D&K LP General Manager

**From:**   Yonit Sternberg, TPR Investment Associates, Secretary

**Date:**   8/31/2008

**Re:**    Notice of Default and Liquidation of Collateral

---

Please be advised that you are in default in the payment of amounts due under that certain Promissory Note dated December 21, 1993 in the original amount of $8,950,000(the "Note") due to the failure to pay any principal or interest due since 2005 and failing to make regular payments since 2000. Such default has continued for more than ten (10) business days. Please be advised that pursuant to the Note we hereby declare that the entire unpaid principal amount of the Note immediately due and payable.

The shares of TPR Investment Associates pledged to TPR as collateral will be liquidated at a public auction if the full Note is not satisfied.

Sagi Genger – TPR Investment Associates, Inc.

CONFIDENTIAL

1

TO:        D&K LIMITED PARTNERSHIP

FROM:    TPR INVESTMENT ASSOCIATES, INC.

          New York, New York
          Tel: 212-729-5076

--------------------------------------------------------------------------------------------------------------

     We will sell all of your 240 shares of common Stock of TPR Investment Associates, Inc. to the highest qualified bidder in public as follows:

Date:       Friday, February 27, 2009

Time:       2:00 p.m.

Place:      Offices of McLaughlin & Stern, LLP, 260 Madison Avenue, 20th Floor, New York, NY 10016

     You are entitled to an accounting of the unpaid indebtedness secured by the property we intend to sell.  You may request an accounting by calling us at 212-729-5076.

     The money that we get from the sale (after paying our costs) will reduce the amount you owe.  If we get less money than you owe, you will still owe us the difference.  If we get more money than you owe, you will get the extra money, unless we must pay it to someone else.

     You can get the property back at any time before we sell it by paying us the full amount you owe (not just the past due payments), including our expenses.  To learn the exact amount you must pay, call us at 212-729-5076.

     If you want us to explain in writing how we have figured the amount that you owe us, you may call us at 212-729-5076 or write us at _____ and request a written explanation.

     If you need more information about the sale, call us at 212-729-5076 or write us at _____.

# CERTIFICATE of SALE and FACT

**Know all men by these presents:** That by virtue of a default in the payment of certain monies due, and pursuant to the terms of a certain Security Agreement dated 12 / 21 / 93 placed in my hands for execution and foreclosure made by:

D + K Limited Partnership _____ (Borrower)

to TPR Investment Associates, Inc. _____ (Secured Party)

The Secured Party did on the 27 day of Feb. , 2009 in the manner provided by statute, sell at Public Auction by WILLIAM MANNION, Auctioneer, all the borrower(s) right, title and interest, in and to the collateral consisting of 240 shares of Capital Stock ~~and the appurtenant Proprietary Lease allocated to Apartment No. _____ in the building known as and located at:~~ of TPR Investment Associates, Inc

And sold unto TPR Investment Associates, Inc.
of _____ .

for the sum of $ 2,200,000. — , they being the highest bidder in accordance with the Terms of Sale which were available to all bidders.

That public notice of sale was given prior to its taking place and was duly advertised. This Auction Sale was held at:

McLaughlin + Stern, 260 Madison Ave., NY, W .

✓  Sold to the Secured Party, no money exchanged hands except for the auctioneer's fees and expenses of the sale.

—  The sum of $ _____ of the bid price was paid to the Attorney's for the Secured Party as a down payment.

IN WITNESS WHEREOF, I have hereunto set my hand on the 27th day of February , 2009.

_____
William Mannion, Auctioneer



## COZEN
## O'CONNOR

A PROFESSIONAL CORPORATION

250 PARK AVENUE   NEW YORK, NY 10177   212.509.9400   800.437.7040   212.986.0604 FAX   www.cozen.com

June 11, 2009

**Judith E. Siegel-Baum**
Direct Phone 212.883.4902
Direct Fax   215.701.2261
jsiegel-baum@cozen.com

**VIA FACSIMILE, E-MAIL AND US MAIL**

Robert A. Meister, Esq.
Pedowitz and Meister
1501 Braodway
New York, New York 10036

Re:   Orly Genger 1993 Trust

Dear Robert:

In response to your email dated June 10, 2009, we are prepared to meet with you and Dalia, at our offices, if you agree to the following:

1.   You agree that Orly will not be present at the meeting. Based upon prior meetings Orly has advised us that her involvement in this meeting will be too emotionally difficult.

2.   Dalia stipulates, in writing, that she will not, under any circumstances and until we resolve our differences, sell, transfer or remove the TRI shares from the Orly Trust. In January 2009 Orly advised Dalia of her strong desire to retain all of the TRI shares currently held by the Orly Trust and specifically directed Dalia not to sell them.

If you agree to the above, we are prepared to schedule a meeting for early next week and are available after 4 p.m. on June 16th and after 2 p.m. on June 17th. If we do not hear back from you by the close of business on Friday, June 12, 2009 we will assume that you and Dalia are

Robert A. Meister, Esq.
June 11, 2009
Page 2

---

unable to agree to our requests.   I look forward to hearing from you.

Sincerely,

COZEN O'CONNOR

By:  Judith E. Siegel-Baum

JES\pw
cc:    Orly Genger

**From:** Robert Meister [mailto:robert.meister@pedowitzmeister.com]
**Sent:** Thursday, June 11, 2009 4:01 PM
**To:** Siegel-Baum, Judith E.
**Cc:** Langan, Suzann; Lehman, Stephanie
**Subject:** RE: Orly Genger 1993 Trust

Dear Judy: I just received your letter at 3:50 today. While I have forwarded it to Dalia Genger, other professional commitments make it impossible for me to respond before early next week. So if we are to have a meeting, we'll have to find different times.

Bob Meister

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------X

In the Matter of:                                    Index No. 302436/02

Dalia Genger,

              Plaintiff,          AFFIDAVIT OF DALIA GENGER
                                                     IN SUPPORT OF PLAINTIFF'S
       -against-                        APPLICATION FOR AN ORDER
                                                     OF CONTEMPT AND OTHER
                                                     RELIEF AND IN OPPOSITION TO
Arie Genger,                                         DEFENDANT'S CROSS MOTION

              Defendant.
------------------------------------------------------------X

STATE OF NEW YORK   )
                      ) ss.:
COUNTY OF NEW YORK  )

**DALIA GENGER**, being duly sworn, deposes and says:

1.     I am the Plaintiff in this action, and submit this affidavit in support of my application that this Court hold my ex-husband, Arie Genger ("Arie"), in contempt for his willful failure to comply with the instructions issued by our son, Sagi Genger ("Sagi"), the attorney-in-fact. The facts stated herein are based upon my personal knowledge unless otherwise stated.

2.     Concurrent with the execution of the Stipulation of Settlement (the "Stipulation") dated October 30, 2004 between Arie and me, it was understood that Sagi would act as Chief Executive Officer of TPR in order to execute various documents required under the Stipulation. It was also understood that the note (the "D&K Note") issued by D&K Limited Partnership dated December 21, 1993, in the principal sum of $8,950,000 and payable to TPR, which was attached as an Exhibit to the Stipulation, would be saleable by Sagi Genger for as little as $10,000. Simultaneous with the execution of the Stipulation, the Board of TPR executed a Board Resolution which gave effect to these understandings. Arie's counsel reviewed the Board

Resolution prior to its execution. He did not state any objection to the Board Resolution, and was satisfied that the Board Resolution reflected the parties' understanding and agreement. A true and correct copy of the Board Resolution is attached hereto. Although the Board Resolution is dated October 31, 2004, it was executed on October 30, 2004.

3.    The purpose of the D&K Note Board Resolution was to carry out our understanding that I not be in the position to foreclose on the D&K Note, and to take for myself an interest that Arie and I intended for the children.

4.    In August 2006, TPR sold the D&K Note (but retained a nominal contingent interest) for $12,000.

Sworn to before me this 14th day of
February, 2007

_____
Notary Public

DALIA GENGER

KATARZYNA SCHWARTZ
Notary Public, State of New York
No. 01SC6156649
Qualified in Queens County
COMMISSION EXPIRES 01/02/2011

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
ORLY GENGER 1993 Trust Pursuant to
SCPA § 711 (11)

**VERIFIED PETITION FOR
REMOVAL OF DALIA GENGER
AS TRUSTEE AND REQUEST
FOR TEMPORARY
RESTRAINING ORDER**

**FILE NO.: 0017/2008**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

TO THE SURROGATE'S COURT, STATE OF NEW YORK
COUNTY OF NEW YORK

Petitioner, Orly Genger ("Petitioner" or "Orly"), by her attorneys Cozen O'Connor,

respectfully alleges as her Verified Petition for Removal of Dalia Genger as Trustee:

1. Orly, domiciled at 1965 Broadway, Apt. 22G, New York, New York 10024, is the

current beneficiary of the Orly Genger 1993 Trust dated December 13, 1993 (the "Orly Trust")

(annexed hereto as Exhibit A). Dalia Genger, residing at 200 East 65th Street, Apt. 32W, New

York, New York 10021 ("Respondent" or "Dalia"), Orly's mother, is the current sole Trustee of

the Orly Trust, and was appointed successor Trustee in January 2008.

2. Based upon the allegations contained herein, Petitioner requests that this Court

provide the following relief:

(a)    Enjoining and restraining Respondent, her agents, and all other persons

acting on her behalf from withdrawing, selling, disposing, transferring, assigning, removing,

pledging, redeeming, mortgaging, encumbering, liening, hypothecating, or secreting the Orly

Trust's 19.43% interest in Trans-Resources, Inc. ("TRI"),[1] a closely held corporation, founded

---

[1] TRI is the parent company of several subsidiaries that provide growers with specialty fertilizer and
industrial chemicals, including Haifa Chemicals Ltd., Na-Churs Alpine Solutions, Plant Products Co. Ltd., and Elgo
Irrigation Co.

by Arie Genger ("Arie"), Petitioner's father and Respondent's former husband, and any other assets which may be remaining in the Orly Trust. The Orly Trust's TRI shares are in imminent danger of being sold by Respondent and her son, Orly's brother, Sagi Genger ("Sagi"), for the purpose of benefiting Sagi Genger and presumably Respondent, and depleting and denuding the value of Orly's Trust;

(b)    removing Respondent as Trustee of the Orly Trust for breaching her fiduciary duties, wasting and dissipating the assets of the Orly Trust, and imprudently managing and injuring the property committed to her charge. As will be demonstrated herein, Respondent has conspired with, and participated in the diversion of trust assets to, Sagi, who underhandedly sold without any objection from Respondent, the Orly Trust's indirect interest in TPR Investment Associates Inc. ("TPR"), a closely held family-owned corporation.

(c)    surcharging Respondent in the amount of the loss of the value of Orly's interest in TPR as determined by the Court and awarding the Petitioner costs and attorneys' fees;

(d)    appointing Michael D. Grohman, Esq., as successor trustee;

(e)    waiving any requirement that Petitioner post an undertaking; and

(f)    granting Petitioner such further relief deemed necessary or proper.

3.    To assist the Court in perceiving the severity of Respondent's conduct and the urgency of the provision of extraordinary relief, the following is an overview of the facts supporting this Petition.

I.    **OVERVIEW**

4.    Arie and Dalia were married on July 23, 1967, in a ceremony held in Israel. In 2004, however, their marriage ended in divorce. Prior to 1993, at which time Dalia and Arie were married, Dalia and Arie formed D & K LP ("D & K"), a family-owned limited partnership

whose name was shorthand for "Dalia and Kids." At the time of its formation, Dalia, the general partner, held a 4% interest, and Orly and Sagi, the limited partners, each held a 48% interest.

5.      In December 1993, Dalia and Arie also established identical irrevocable *inter vivos* trusts for the benefit of each of their children: the Orly Trust and the Sagi Genger 1993 Trust (the "Sagi Trust"). For estate-planning purposes, Dalia and Arie funded each trust with a $600,000 gift. The intent behind the trusts was to ensure that both children received property of equal value. Sash A. Spencer and Lawrence M. Small were named Co-Trustees of both trusts and remained Co-Trustees until the Genger's divorce. After the Trusts were funded, Orly and Sagi each assigned their 48% interests in D & K to their Trusts.

6.      At the same time in December 1993, D & K purchased 240 shares of common stock (constituting 49% of the outstanding shares) in TPR for $10,200,000. The shares were purchased with $600,000 from each of the Orly Trust and the Sagi Trust and $50,000 from Dalia, totaling $1,250,000, and the balance was satisfied with a recourse $8,950,000 promissory note (the "Note") (a copy of which is annexed hereto as Exhibit B). Pursuant to the Note, principal, together with accrued interest, was to be repaid by D & K in annual installments over ten years. The Note was secured by a pledge of the 240 TPR shares owned by D & K. Each of the Trusts and Dalia assumed liability on the Note in proportion to its/her direct interest in D & K. Accordingly, each of the Orly and Sagi Trusts assumed a 48% liability on the Note and acquired a 23.52% indirect interest in TPR and Dalia assumed a 4% liability on the Note and a 1.96% indirect interest in TPR. Payments were made on the Note until 1999, at which time D & K stopped making payments with the implied consent of the interested parties.

7.      At the time of the above-described transaction, Arie owned the remaining 51% of TPR, which held investments in various securities, including TRI common stock, as well as its

interest in the Note. As of March 30, 2001, TPR held a 52.85% interest in TRI. The remaining

minority interest in TRI (47.15%) was owned by various entities controlled directly and

indirectly by Jules and Eddie Trump (the "Trump Group").

8.      On October 26, 2004, Dalia and Arie entered into a Stipulation and Agreement of

Settlement as a final settlement of their divorce (the "Settlement Agreement") (annexed hereto as

Exhibit C). Pursuant to the Settlement Agreement, Dalia received, *inter alia*, Arie's 51% interest

in TPR and retained her 4% interest in D & K. TPR's 52.85% interest in TRI was transferred to

Arie and the Trusts as follows: (i) 13.99% to Arie, (ii) 19.43% to the Orly Trust, and (iii) 19.43%

to the Sagi Trust. The Orly Trust and the Sagi Trust each granted Arie an irrevocable lifetime

voting proxy over their TRI shares (annexed hereto as Exhibit D). Therefore, after October 29,

2004, Arie and the two Trusts held a controlling interest in TRI, and TPR no longer owned any

TRI common stock.

9.      In connection with the divorce settlement, Dalia took measures to cede

management of D & K and TPR to her son Sagi. On October 21, 2004, days before signing the

Settlement Agreement, Dalia and Sagi formed D & K GP LLC ("D & K GP"), whose sole

purpose was to act as the general partner of D & K. Dalia exchanged her 4% interest in D & K

and $1.00 for a 99% membership interest in D & K GP. Sagi purchased a 1% membership

interest in D & K GP for $1.00. Pursuant to the Limited Liability Agreement of D & K GP

(annexed hereto as Exhibit E), Sagi was given the power to select a manager of D & K GP whose

function would be to control D & K's assets. Sagi selected himself to act as manager; thus, Dalia

effectively handed Sagi the authority to control D & K and its assets. Also, by forming D & K

GP, Dalia and Sagi shielded themselves from any personal liability stemming from D & K,

including any personal liability related to the Note. This left the Trusts solely liable on the Note.

10.     On October 30, 2004, Dalia entered into a shareholder agreement with TPR that provided for the management of TPR.  Specifically, pursuant to the shareholder agreement (annexed hereto as Exhibit F), D & K, which owned 49% of TPR, was given authority to appoint one board member to the TPR board.  Sagi, as the managing partner of D & K, appointed himself as a board member of TPR.  As the majority owner of TPR, Dalia was named as the other board member.  In addition, the shareholder agreement appointed Sagi as Chief Executive Officer ("CEO") of TPR.  Accordingly, Dalia essentially ceded control of TPR to Sagi, just as she had done with D & K.

11.     Below, for the Court's convenience, is a side-by-side summary of Arie's, Dalia's, the Orly Trust's, and the Sagi Trust's interests in TPR before and after Arie's and Dalia's divorce.[2]

### TPR OWNERSHIP
### BEFORE AND AFTER DIVORCE

#### PERCENTAGE

| Person | TPR Before | TPR After |
|---|---|---|
| Arie Genger | 51.00% | 0% |
| Dalia Genger | 1.96% | 52.96% |
| Orly Trust | 23.52% | 23.52% |
| Sagi Trust | 23.52% | 23.52% |
| **TOTAL** | **100%** | **100%** |

---

[2] For the Court's convenience, the chart annexed hereto as Exhibit G provides a summary of Arie's, Dalia's, the Orly Trust's, and the Sagi Trust's ownership interests in TPR, TRI, and D & K as of October 26, 2004 – i.e., the date that Arie and Dalia executed the Settlement Agreement.

12.     In connection with the Settlement Agreement, Dalia required that the Trustees of the Orly Trust and the Sagi Trust (Messrs. Sash and Small) resign and be replaced with friends of Sagi. Numerous successor trustees were appointed to the Orly Trust and the Sagi Trust, all of whom were affiliated with Sagi in one way or another. David Parnes and Eric Gribetz (Sagi's longtime friends) and Leah Fang (Sagi's sister-in-law) were appointed as successor trustees to the Orly Trust, and Messrs. Parnes and Gribetz, Rochelle Fang (Sagi's mother-in-law), and Mr. Parnes again, were appointed successor trustees of the Sagi Trust. In January 2008, Dalia was appointed successor trustee of the Orly Trust, despite Orly's objection. By that time, as a result of Dalia's granting him control of TPR and D & K, and through the appointment of his friends and relatives as successor trustees of the Trusts, Sagi effectively had obtained control over the assets held by all of D & K, TPR, the Sagi Trust, and the Orly Trust.

13.     On August 2, 2006, Sagi, as part of his managerial role in D & K GP, D & K, and TPR, assigned the Note – which then had an approximate value of $11,000,000 as a result of accrued interest – to Mr. Parnes for only $12,000. (A copy of the Memorandum dated August 2, 2006, assigning the Note is annexed hereto as Exhibit H.) The assignment stated that D & K "denied enforceability of the Note" (see Exhibit H annexed hereto), which presumably is why it was "sold" for $12,000. Sagi signed the assignment on behalf of both TPR, as the maker, and D & K, as the holder. Dalia was copied on the memorandum assigning the note, but neither Orly, the Orly Trust, nor the then-Trustee of the Orly Trust received copies of the memorandum. At the time of this assignment, Mr. Parnes was acting as trustee of both the Orly Trust and the Sagi Trust. Shortly after the assignment, Mr. Parnes resigned as Trustee of the Orly Trust in recognition of the inherent conflict he faced in that role.

14.     Sometime in 2007, Sagi sold a 2% interest in TPR to Rochelle Fang. The cost of
the 2% interest was based upon a bogus valuation of TPR at $50,000,000. At the time of the
sale, TPR's assets were worth between approximately $11,000,000 and $12,000,000, plus the
value of the Note. This sale effectively stripped Dalia of her majority interest in TPR giving
Sagi unfettered control of TPR, in addition to his control of D & K and D & K GP. In January
2008, when Dalia was appointed successor trustee of the Orly Trust, she completely divested
herself of the balance of her TPR shares. Dalia has not informed either the Court or Orly as to
when she transferred her TPR interest.

15.     On August 22, 2008, unbeknownst to Orly, Rochelle Fang, who had been
appointed Trustee of the Sagi Trust, attempted to sell the Sagi Trust's 19.43% interest in TRI to
the Trump Group, who already owned 47.15% of TRI's outstanding shares, for $26,715,416.
This sale purportedly transferred control of TRI from Arie to the Trump Group who thereafter
purported to hold 66.58% of TRI's outstanding common stock.[3] In connection with the supposed
sale, Sagi and David Parnes were given seats on TRI's board of directors. If given effect, this
purported sale, which was consummated after Dalia was appointed successor trustee of the Orly
Trust, would dilute and diminish the value of the Orly Trust's interest in TRI.

16.     Dalia, who had notice of the supposed sale, made no effort to prevent the sale or
to protect the value of the Orly Trust's interest in TRI. Fearing that Dalia would continue to
neglect her duty to protect the Orly Trust's assets, on January 10, 2009, Petitioner wrote a letter
(annexed hereto as Exhibit I) to her mother stating that "for now, and until further notice, it is my

---

[1]  The validity of the sale is at issue in litigation currently pending in Delaware Chancery Court. The
parties to the action are Arie Genger, TRI, and various entities affiliated with the Trump Group. The Orly Trust has
not appeared in the action. In that action, the Trump Group claims to have bought the shares either from the Sagi
Trust or from TPR – thus, the approximately $27 million purportedly paid by the Trump Group either belongs to the
Sagi Trust or to TPR, depending on the outcome of the litigation in Delaware.

strong desire to retain all of the shares of TRI that are currently in the Orly Trust, and I direct

you not to sell them." Dalia refused to agree not to dispose of the TRI shares.

## II.    THE EVIDENCE DISCOVERED BY PETITIONER ON JUNE 1, 2009, REQUIRES INJUNCTIVE RELIEF AND THE IMMEDIATE REMOVAL OF DALIA AS TRUSTEE

17.    In February 2008, Orly applied to this Court to designate a Trustee, or in the

alternative to appoint a special trustee, claiming that Dalia and all of the preceding successor

trustees of the Orly Trust were improperly appointed and had no authority to act on behalf of the

Orly Trust. Orly also alleged wrongful dealings by Dalia as Trustee of the Orly Trust. In

denying the application without prejudice, this Court stated that Orly had made allegations

without sufficient supporting evidence and suggested that Orly commence an SCPA § 2201

proceeding to obtain the necessary evidence and then renew her application. (A copy of the

Court's decision is annexed hereto as Exhibit J.)

18.    On May 14, 2009, as a prerequisite to the SCPA § 2201 application, Orly's

counsel sent Dalia Genger a letter (annexed hereto as Exhibit K) requesting documents related to

the Orly Trust's assets. Soon thereafter, Orly's counsel was notified that Dalia had retained

Robert A. Meister, Esq., of Pedowitz & Meister, LLP, and Orly's counsel therefore forwarded a

copy of the May 14th letter to Mr. Meister.

19.    On June 1, 2009, Mr. Meister responded to Orly's document demand by advising

Orly's counsel that the Orly Trust no longer owned any interest in TPR. According to the letter,

Sagi, acting as CEO of TPR, had foreclosed on the Note and had sold D & K's 240 shares of

TPR for $2,220,000. (A copy of the Letter dated June 1, 2009, is annexed hereto as Exhibit L.)

Before that time, Dalia had neither advised nor notified Orly that Sagi had foreclosed on the

Note,[4] nor advised Orly that Sagi had sold the TPR shares at auction. Thus, upon receipt of Mr. Meister's letter, Orly learned for the first time that:

        (a)     On August 31, 2008, Sagi, acting as CEO of TPR, notified himself as the general manager of D & K, that D & K was in default of the Note and declared that unless the entire unpaid principal amount of the Note was paid immediately, TPR would sell, at auction, the 240 shares pledged as collateral. (A copy of the Notification dated August 31, 2008, is annexed hereto as Exhibit M.)

        (b)     Thereafter, Sagi, again acting as CEO of TPR, purported to notify D & K (of which he remained the managing partner) that D & K's 240 shares of TPR stock would be publicly auctioned to the highest bidder on February 27, 2009, and that the money received from the sale would be used to reduce the outstanding debt. (A copy of the Notification is annexed hereto as Exhibit N.) Sagi purported to notify the interested parties of the sale by publishing notice of the sale in the New York Post in October 2008 and February 2009. Although at all relevant times Sagi had Orly's contact information, he never informed her of the impending sale.

        (c)     On February 27, 2009, TPR (still controlled by Sagi) foreclosed on the 240 shares of TPR and "auctioned" the shares. Not coincidentally, the Sagi-controlled TPR purchased the shares at auction for $2,200,000. (See Exhibit O). The proceeds of the sale – i.e., $2,220,000 – were used to decrease D & K's obligations under the Note, leaving a balance of approximately $8,800,000.

20.     On June 11, 2009, Orly's counsel sent Mr. Meister a letter asking that Dalia, in accordance with Orly's January 2009 request and in light of the secretive diminution of the Orly

---

[4] While the Note had not been serviced since 1999, TPR had not foreclosed on the Note between 1999 and 2008 because it previously had agreed not to foreclose on the Note in order not to upset the estate-planning goals underlying the Note.

Trust's interest in TPR, stipulate in writing that she would not, under any circumstances and until all issues were resolved, sell, transfer, or remove the TRI shares from the Orly Trust. (A copy of the Letter dated June 11, 2009, is annexed hereto as Exhibit P.) That same day, Mr. Meister responded to the June 11th letter, but he failed to address the terms of the proposed stipulation. (A copy of Mr. Meister's Letter dated June 11, 2009, is annexed hereto as Exhibit Q.)

## A.    A Temporary Restraining Order ("TRO") Is Necessary To Protect The Remaining Assets Held By the Orly Trust

21.    It is clear from Dalia's deliberate inaction and complete deferral to Sagi in all matters related to D & K, TPR, and TRI, that without Court intervention Orly's TRI shares will be: a) sold at a significantly discounted rate so that the proceeds can be used to pay her unpaid portion of the Note, b) used as collateral to secure the Orly Trust's unpaid portion of the Note, or c) used to satisfy a Judgment against the Orly Trust. Since Orly's address was known to her brother and her mother at all relevant times, publishing notice of the sale of the TPR shares alone was a clear and deliberate attempt to prohibit Orly from intervening in the foreclosure and the sale. Dalia, who had knowledge of the events as they were transpiring, easily could have given notice of the auction to Orly, but she intentionally chose not to. There is now reason to believe that Dalia will again remain passive if and when Sagi seeks to hijack, sell, or otherwise meddle with the Orly Trust's TRI shares, even though Orly has specifically advised her mother, in writing, to protect the Trust's ownership of the TRI shares.

22.    There is no reason to trust that Dalia will honor her daughter's wishes and instructions since, from the time of her divorce, she has done nothing but ensure that Sagi has complete control over TPR, D & K, and D & K GP, and has allowed Sagi to do as he pleases. At this time, approximately $8,800,000 of the Note remains unsatisfied, and Sagi, as CEO of TPR, has not voided the notice of default. Based upon Dalia's deliberate inaction and failure to protect

the Orly Trust's assets to date, there is strong evidence to reasonably conclude that Dalia will not protect the Orly Trust's interest in the TRI shares, but rather, will act to benefit herself and Sagi, including by allowing Sagi to obtain the TRI shares to satisfy the Orly Trust's unpaid portion of the Note. Without immediate injunctive relief, Orly will have no recourse and the Orly Trust will be vulnerable to complete depletion. The harm caused to the Orly Trust under these circumstances would be irreparable.

23.    Based on the facts and documentary evidence presented herein it is likely that the Orly Trust will succeed on the merits of her Petition. Accordingly, she meets the criteria necessary to obtain a TRO and a preliminary injunction. Petitioner therefore respectfully requests that the Court grant her Petition for a TRO and a preliminary injunction in order to protect the assets held by the Orly Trust, including the TRI shares.

**B.    Dalia Must Be Removed As Trustee Immediately**

24.    Based on the information provided to Orly's counsel on June 1, 2009, which confirms Respondent's lack of diligence and disloyal service as Trustee, there now exists sufficient evidence to have Respondent removed as Trustee of the Orly Trust. While serving as Trustee, Dalia intentionally failed to notify Orly that TPR was taking measures to foreclose on the Orly Trust's 23.52% indirect interest in TPR. It was Dalia's duty as a fiduciary of the Orly Trust to be apprised of all activity concerning the Orly Trust and to ensure that Orly received proper notification of the default and auction. Moreover, Dalia actually knew of the foreclosure and the auction, but took no steps to protect the Orly Trust's interest in TPR. Dalia knew of Sagi's plan to foreclose on the Note and sell the TPR shares as early as August 2008; thus, she withheld information concerning the auction from Orly for almost ten months. Dalia did not disclose the foreclosure and share sale until she received the demand letter from Orly's counsel and realized that legal action was imminent. Instead of protecting the Orly Trust's and its

beneficiary's interests, Dalia sat back and silently watched her son strip the Orly Trust of its indirect interest in TPR.

25.     The corporate structure which has intertwined TPR, D & K GP, and D & K's assets, all of which are in some manner controlled by Sagi as a result of Dalia's actions, permits Dalia and Sagi to engage in self-dealing and does not provide for any accountability on either Sagi's or Dalia's part. Unfortunately, the Orly Trust is caught in the middle of Dalia's and Sagi's conspiracy to engage in self-dealing intended to benefit their own interests, while Sagi has been permitted to diminish and dissipate the value of the Orly Trust's assets, including its interests in TPR and, potentially, TRI. By enriching herself and her son at the expense of her daughter, Dalia is in breach of her fiduciary duties as Trustee of the Orly Trust. It is imperative that Orly have a successor trustee appointed who will unbiasedly and loyally protect the Orly Trust's remaining assets.

**(1)     In Direct Conflict With Her Obligations as Fiduciary of The Orly Trust, Dalia Did Nothing To Stop Sagi From Attempting to Sell His Trust's TRI Shares, Which, If Valid, Would Dilute the Value of the Orly Trust's Assets**

26.     The Sagi Trust's attempted sale of its interest in TRI to the Trump Group for $26,715,416, which occurred after Dalia was appointed successor trustee of the Orly Trust, purportedly transferred control of TRI from Arie to the Trump Group. As mentioned above, supra paragraph 15, if this purported sale were given effect, then the value of the Orly Trust's assets would be significantly diminished. If the purported sale were valid and effective, then Arie would no longer own a controlling interest in TRI, and thus the Orly Trust would no longer own a portion of the controlling block of TRI shares.

27.     Dalia, as a fiduciary of the Orly Trust, was obligated to apprise herself of any transactions that could affect the value of the Orly Trust's shares, and, in fact, Dalia was contemporaneously aware of the Sagi Trust sale. But Dalia made no effort to protect the value of

the Orly Trust's TRI shares by challenging the proposed sale. Moreover, she has taken no position with regard to the current value of the TRI shares and has taken no measures to protect the Orly Trust's interest in TRI since the purported sale, despite Orly's urgings. By remaining passive with respect to the Orly Trust's TRI shares, Dalia is completely ignoring the intent behind the establishment of the Orly Trust – to transfer an equal amount of assets to each of the children. Dalia, through her actions and her inaction alike, may have permitted Sagi to secure substantially more value from the Trusts' assets than Orly.

(2)   **In Direct Conflict With Her Obligations as Fiduciary of The Orly Trust, Dalia Took No Action To Protect the Orly Trust's Interest in TPR**

28.    Pursuant to the August 2006 memorandum assigning the Note to David Parnes – on which Dalia was copied – Sagi, acting as the managing partner of D & K, took the position that the Note was unenforceable. (See Paragraph 4 of Exhibit H annexed hereto.) In the exact same memorandum, however, Sagi, acting as the CEO of TPR, took the directly contrary position that TPR reserved its right to enforce the Note. (See Paragraph 8 of Exhibit H annexed hereto.)

29.    On February 14, 2007, Dalia, who participated in the "sham" transaction between Sagi and Mr. Parnes, and in a clear attempt to clean her hands of any impropriety, admitted in a sworn statement to the Court that no one was ever supposed to foreclose on the Note. (See Paragraph 3 of Exhibit R annexed hereto). Additionally, the unpaid Note was the subject of a post-judgment arbitration proceeding between Dalia and Arie, which took place in September 2007. Dalia, who was present at the proceedings, heard Sagi and Mr. Parnes testify that the Note should not be enforced and that Sagi, as CEO of TPR, had no intention of collecting the unpaid portion of the Note. Thus, Dalia knew long before August 2008 that TPR had effectively disclaimed its right to foreclose on the Note.

30.     As described above, however, in August 2008 (eleven months later), Sagi sought

to enforce the Note. Contrary to the position he had taken under oath at the arbitration, and

contrary to the position he had taken as the managing partner of D & K (see Paragraph 4 of

Exhibit H attached hereto), Sagi issued a default notice to D & K on behalf of TPR. Dalia, who

knew the Note was never intended to be enforced and who previously had sworn to as much,

should have immediately sought to block Sagi from foreclosing on the Note and selling the TPR

shares. Notwithstanding her knowledge and her previous statements, however, Dalia failed to

make any effort to stop Sagi when he engaged in this clear act of self-dealing, even though the

Orly Trust had a clear interest in the TPR shares at issue. As a fiduciary of the Orly Trust with

prior, as well as continued knowledge, of the TPR foreclosure, TPR's supposed claims against D

& K, and D & K's ability to challenge those claims based on prior representations, Dalia had a

duty to protect the Orly Trust's indirect ownership of the TPR shares. But instead of taking the

proactive measures required of a fiduciary, Dalia did nothing and allowed Sagi to obtain the TPR

shares for himself to the detriment of the Orly Trust.[5]

31.     Additionally, Dalia's failure to act in the face of the foreclosure and sale of TPR

stock is especially egregious because she has known since August 2008 that the purported sale of

TRI stock to the Trump Group is being challenged in Delaware state court. She also has known

that in that action the Trump Group is asserting that it bought the TRI stock from *either* the Sagi

Trust *or* TPR. Thus, she has known that, depending on the outcome of the litigation in

Delaware, the Orly Trust could have an interest in the $27 million paid by the Trumps in August

---

[5] Moreover, in connection with her appointment as successor trustee of the Orly Trust in January 2008, Dalia divested herself of her TPR shares (without informing either the Court or Orly as to when she transferred her interest) in a further attempt to distance herself from any attributable wrongdoing. Dalia has contended to this Court that she sold her TPR shares in order to avoid any appearance of impropriety in connection with her appointment as Trustee. Interestingly, however, Dalia has never informed Orly or this Court whether she continues to maintain a 99% interest in D & K GP, the company that controls D & K and, thus, was obligated to service the Note.

2008 if its interest in TPR were preserved. Accordingly, as trustee of the Orly Trust, she should have been especially vigilant in protecting the Orly Trust's interest in TPR through D & K. But instead, she allowed Sagi to essentially steal the Orly Trust's interest in TPR so that Sagi can attempt to retain the entire $27 million regardless of the outcome in Delaware Chancery Court. Her inaction in this regard is a blatant violation of her fiduciary duties as trustee.

## III.   DALIA SHOULD BE SUR-CHARGED IN THE AMOUNT OF THE LOSS OF THE VALUE OF ORLY'S INTEREST IN TPR AS DETERMINED BY THE COURT AND ORLY SHOULD BE AWARDED ATTORNEYS' FEES

32.     By failing to take action on behalf of the Orly Trust to prevent Sagi from foreclosing on the Note and selling D & K's TPR shares, Dalia caused the Orly Trust to lose its interest in TPR. Accordingly, Dalia should be surcharged in an amount of the loss of the value of Orly's interest in TPR as determined by the Court and should be required to reimburse the Orly Trust for its attorneys' fees incurred in connection with bringing this action.

## IV.   MICHAEL D. GROHMAN, ESQ. SHOULD BE APPOINTED AS SUCCESSOR TRUSTEE

33.     Based on Dalia's deliberate breach of her fiduciary duties to the Orly Trust, and in light of Dalia's prior nefarious conduct as the Orly Trust's Trustee, this Court should remove Dalia as Trustee and replace her with Michael D, Grohman, Esq. Mr. Grohman is a member of the New York Bar and the head of the Trust and Estates practice group at Duane Morris LLP. Mr Grohman is not acquainted with any members of the Genger family, does not have any interest in TRI, TPR, or D & K, and is willing and prepared to succeed Dalia immediately.

34.     No prior application has been made for the relief requested herein.

### PRAYER FOR RELIEF

WHEREFORE, based upon the allegations contained herein, Petitioner requests that this Court provide the following relief:

    (a)    Enjoining and restraining Respondent, her agents, and all other persons acting on her behalf from withdrawing, selling, disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering, liening, hypothecating, or secreting the Orly Trust's 19.43% interest in TRI and other assets remaining in the Orly Trust;

    (b)    removing Respondent as Trustee of the Orly Trust for breaching her fiduciary duties, wasting and dissipating the assets of the Orly Trust, and improvidently managing and injuring the property committed to her charge;

    (c)    surcharging Respondent in the amount of the loss of the value of Orly's interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

    (d)    appointing Michael D. Grohman, Esq., as successor trustee;

    (e)    waiving any requirement that Petitioner post an undertaking; and

    (f)    granting Petitioner any other relief it deems necessary and proper.

Dated:   New York, New York
        June 22, 2009

                              ORLY GENGER
                              Petitioner


COZEN O'CONNOR

By:                                
    Judith E. Siegel-Baum, Esq.
    Attorney for Petitioner
    250 Park Avenue
    New York, New York 10017
    212-986-1116

## VERIFICATION

STATE OF NEW YORK )      )
              )ss.:
COUNTY OF NEW YORK )    )

    The undersigned, the Petitioner named in the foregoing petition, being duly sworn, says: I have read the foregoing petition subscribed by me and know the contents thereof, and the same is true of my own knowledge, except as to the matters therein stated to be alleged upon information and believe, and as to those matters I believe it to be true.

           _____
           Signature of Petitioner

           ORLY GENGER
           Print Name

Sworn to before me this
22nd day of June, 2009.

_____
Notary Public
Commission Expires:
(Affix Notary Stamp or Seal)

                ANN MEADE
            Notary Public, State of New York
              No. 01ME4783921
            Qualified in Nassau County
          Certificate Filed in New York County
          Commission Expires Sept. 30, 2009

At the Surrogate's Court held in and for the County
of New York, at the Courthouse, 31 Chambers
Street, New York, New York on the __1__ day of
~~June~~ July 2009

New York County Surrogate's Court
DATA ENTRY DEPT.
Date: July 1, 2009

PRESENT: HON. __Troy K. Webber__
                               Surrogate

In the Matter of the Application of

ORLY GENGER, as a person interested,
for the removal of DALIA GENGER
as Trustee of the Orly Genger 1993 Trust
pursuant to SCPA §711 (11)

File No.: 0017/2008

**ORDER TO SHOW CAUSE
WITH TEMPORARY
RESTRAINTS**

On reading and filing the annexed Verified Petition of Petitioner, ORLY GENGER, and

the exhibits, verified on the 22nd day of June, 2009, and the memorandum of law in support of

Petitioner's Verified Petition dated June 22, 2009,

LET the Respondent, DALIA GENGER, the sole fiduciary of the Orly Genger 1993

Trust, show cause before Surrogate __Troy K. Webber__ at the Surrogate's Court, ~~31 Chambers~~ Sitting at 60 Centre

~~Street~~ Room 300 New York, New York, on the 5th day of ~~June~~ August 2009 at 10:00 o'clock in the forenoon of that

day or as soon thereafter as counsel may be heard why an order should not be entered:

      (a)     Enjoining and restraining Respondent, her agents and all other persons

acting on her behalf from withdrawing, selling disposing, transferring, assigning, removing,

pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly

Trust's 19.43% interest in Trans-Resources, Inc., ("TRI"), a closely held corporation, founded by

Arie Genger, Petitioner's father and Respondent's former husband of Respondent and any other

assets which may be remaining in the Orly Trust;

(b)    Removing Respondent as Trustee of the Orly Trust for breaching her fiduciary duties, wasting and dissipating the assets of the Orly Trust and imprudently managing and injuring the property committed to her charge;

(c)    Surcharging Respondent in the amount of the loss of the value of Orly's interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)    Appointing Michael D. Grohman, Esq. as successor trustee;

(e)    Waiving any requirement that Petitioner post an undertaking; and

(f)    Granting Petitioner such further relief deemed necessary or proper.

ORDERED that, during the pendency of this proceeding, Respondent ~~her agents and all other persons acting on her behalf are temporarily restrained from withdrawing, selling, disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering, liening, hypothecating or securing the Orly Trust's 19.43% interest in TRI and other assets remaining in the Orly Trust; and it is further~~ [and/or her counsel are required to give notice by overnight mail to petitioner's counsel of any 1) offer to purchase the Orly Trust's 19.3% interest in TRI within 10 days of receiving such offer and 2) act by Respondent, her agents and all other persons acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell or otherwise alter the Orly Trust's interest in TRI at least 10 days prior to such act and it is further]

ORDERED that service of a copy of this Order and the papers upon which it is based shall be served on Respondent by personal service at either her residence, located at 200 East 65th Street, Apt. 32W, New York, New York 10021, or any other address at which she can be located, on or before ~~June~~ July 7, 2009; and it is further

ORDERED, that any responsive papers shall be filed by July 29, 2009.

~~ENTER:~~

Surrogate

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| In the Matter of the Application of ORLY GENGER, as a person interested, for the removal of DALIA GENGER as Trustee of the ORLY GENGER 1993 Trust Pursuant to SCPA § 711 (11) | **ATTORNEY AFFIRMATION AMENDING PETITION FOR REMOVAL OF DALIA GENGER AS TRUSTEE**<br><br>**FILE NO.: 0017/2008** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JUDITH E. SIEGEL-BAUM, an attorney duly admitted to practice law in the State of New York, affirms the following under penalty of perjury:

1.      I am a member of the law firm Cozen O'Connor, attorneys for the Petitioner herein.

2.      I make this affirmation in order to amend paragraph 1. of the Verified Petition for Removal of Dalia Genger as Trustee and Request for Temporary Restraining Order, dated and verified June 22, 2009, to read as follows:

Orly, domiciled at 1965 Broadway, Apt. 22G, New York, New York

10024, is the current beneficiary of the Orly Genger 1993 Trust dated December

13, 1993 (the "Orly Trust") (annexed hereto as Exhibit A). Dalia Genger,

Residing at 200 East 65th Street, Apt. 32W, New York, New York  10021

("Respondent" or "Dalia"), Orly's mother, is the current sole Trustee of the Orly

Trust, and was appointed successor Trustee in January 2008. The Orly Trust

provides for discretionary payments of income and principal to Orly during her

lifetime with the remainder to be distributed to her descendants, per stirpes.  If

Orly dies leaving no descendants, the remainder of the trust property is to be

distributed to the Sagi Trust.  David Parnes, residing at 29 Elkachi Street, Tel

Aviv, ISRAEL  69497, is the current Trustee of the Sagi Trust.

Dated: New York, New York
       August __14__, 2009

_____
Judith E. Siegel-Baum

2

At the Surrogate's Court held in and for the County
of New York, at the Courthouse, 31 Chambers
Street, New York, New York on the *18* day of
August 2009

PRESENT: HON. Troy K. Webber

Surrogate

| | |
|---|---|
| In the Matter of the Application of<br><br>ORLY GENGER, as a person interested,<br>for the removal of DALIA GENGER<br>as Trustee of the Orly Genger 1993 Trust<br>pursuant to SCPA §711 (11) | File No.: 0017/2008<br><br>**SUPPLEMENTAL ORDER TO<br>SHOW CAUSE WITH<br>TEMPORARY RESTRAINTS** |

On reading and filing the annexed Verified Petition of Petitioner, ORLY GENGER, and

the exhibits, verified on the 22nd day of June, 2009, and the memorandum of law in support of

Petitioner's Verified Petition dated June 22, 2009,

LET the Respondent, DALIA GENGER, the sole fiduciary of the Orly Genger 1993

Trust, show cause before Surrogate Troy K. Webber at the Surrogate's Court, ~~sitting at 60 Centre~~ *31 Chambers*

*Street,* ~~Street~~, Room ~~300~~ *509*, New York, New York, on the *8* day of *September* 2009 at 10:00 o'clock

in the forenoon of that day or as soon thereafter as counsel may be heard why an order should

not be entered:

(a)  Enjoining and restraining Respondent, her agents and all other persons

acting on her behalf from withdrawing, selling disposing, transferring, assigning, removing,

pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly

Trust's 19.43% interest in Trans-Resources, Inc., ("TRI"), a closely held corporation, founded by

Arie Genger, Petitioner's father and Respondent's former husband of Respondent and any other assets which may be remaining in the Orly Trust;

(b) Removing Respondent as Trustee of the Orly Trust for breaching her fiduciary duties, wasting and dissipating the assets of the Orly Trust and imprudently managing and injuring the property committed to her charge;

(c) Surcharging Respondent in the amount of the loss of the value of Orly's interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d) Appointing Michael D. Grohman, Esq. as successor trustee;

(e) Waiving any requirement that Petitioner post an undertaking; and

(f) Granting Petitioner such further relief deemed necessary or proper.

ORDERED that, during the pendency of this proceeding, Respondent ~~her agents and all~~ *her counsel* ~~other persons acting on her behalf are temporarily restrained from withdrawing, selling,~~ *re required to give notice by overnight mail to Petitioners Counsel of any 1) offer purchase the Orly Trust's 19.3% interest in TPR w/in 10 days of receiving* ~~disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering,~~ *idr of rev and 2) act by respondent, her agents and all other persons* ~~liening, hypothecating or secreting the Orly Trust's 19.43% interest in TPR and other assets~~ *seeking other behalf to assign, mortgage, pledge, redeem encumber &* ~~remaining in the Orly Trust and it is further~~ *otherwise deal the Orly Trust's* in TPR at least 10 days prior to such act *id it is further*

ORDERED that service of a copy of this Order and the papers upon which it is based shall be served on David Parnes, in his capacity as Trustee of the Sagi Genger 1993 Trust, by overnight mail service at his residence, located at 29 Elkachi Street, Tel Aviv, Israel 69497 ~~or~~ *on or before* *ugust 21, 2009* and on ~~Pedo~~ Pedowitz & Meister, LLP, attorneys ~~any other address at which she can be located, on or before August ___, 2009.~~ *or Dalia Genger, as trustee of the Orly Genger 1993 Trust by rsonal delivery or overnight m ~~atter~~ on or before August 21, 009.*

TK
Surrogate

NYO_XFER\1373998\1 252931.000

- 2 -

At the Surrogate's Court held in and for the County
of New York, at the Courthouse, 31 Chambers
Street, New York, New York on the _ℓ_ day of July
2010

PRESENT: SURROGATE NORA S. ANDERSON
                            Surrogate



New York County Surrogate's Court
DATA ENTRY DEPT
Date: JUL 16 2010

---

In the Matter of the Application of

ORLY GENGER, as a person interested,
for the removal of DALIA GENGER
as Trustee of the Orly Genger 1993 Trust
pursuant to SCPA §711 (11)   -

File No.: 0017/2008

**ORDER TO SHOW CAUSE TO
SUPPLEMENT THE COURT'S
JULY 1, 2009 CONFIRMED
AUGUST 18, 2009 ORDER**

---

Upon filing the annexed Affidavit of Judith E. Siegel-Baum, sworn to on the 15th day of

July 2010, with exhibits annexed thereto and all prior pleadings filed in this matter:

LET the Respondent, DALIA GENGER, the sole trustee of the Orly Genger 1993 Trust,

show cause before Surrogate Nora S. Anderson at the Surrogate's Court, 31 Chambers Street,

New York, New York, on the _26_ day of July 2010 at 10:00 o'clock in the forenoon of that day or

as soon thereafter as counsel may be heard why an order should not be entered:

        (a)      Supplementing the Court's Order dated July 1, 2009, confirmed on August

18, 2009, which states:

> "ORDERED that, during the pendency of this proceeding,
> Respondent and/or her counsel are required to give notice
> by overnight mail to Petitioner's Counsel of any 1) offer to
> purchase the Orly Trust's 19.3% interest in TRI within 10
> days of receiving such offer and 2) act by Respondent, her
> agents and all other persons acting on her behalf to assign,
> mortgage, pledge, redeem, encumber, sell or otherwise alter

1

the Orly Trust's in TRI at least 10 days prior to such act; and it is further"

With the following additional notice provision:

"ORDERED that, during the pendency of this proceeding, Respondent and/or her counsel are required to give notice by overnight mail to Petitioner's Counsel of any attempt to vote or take any action under the TRI shares held by the Orly Trust for any purpose, including, without limitation, in any election of TRI's directors, with such notice being given at least ten (10) days prior to such attempt being made," and

(b)     Granting Petitioner such further relief deemed necessary or proper.

ORDERED that, during the pendency of this proceeding, Respondent and/or her counsel, in addition to the restraints of the Court's Order dated July 1, 2009, confirmed on August 18, 2009, a copy of which is attached hereto and made a part hereof, are required to give notice by overnight mail to Petitioner's counsel of any attempt to vote or take any action under the TRI shares held by the Orly Trust for any purpose, including, without limitation, in any election of TRI's directors, with such notice being given at least ten (10) days prior to such attempt being made; and it is further

ORDERED that service of a copy of this Order and the papers upon which it is based shall be served on Pedowitz & Meister, LLP, 1501 Broadway, New York, New York 10036, attorneys for Dalia Genger, as trustee of the Orly Genger 1993 Trust by personal delivery or overnight mail on or before July 22, 2010.

ENTER:

_Nora S. Anderson_
SURROGATE

NYC_MIDTOWN\158749441 252931.000

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of<br>ORLY GENGER, as a person interested,<br>for the removal of DALIA GENGER<br>as Trustee of the Orly Genger 1993 Trust<br>pursuant to SCPA §711 (11) | **STIPULATION WITHDRAWING<br>ORDER TO SHOW CAUSE<br>SIGNED JULY 16, 2010**<br><br>File No.: 0017/2008 |

**IT IS HEREBY STIPULATED AND AGREED,** by and between Petitioner,

ORLY GENGER, and Respondent, DALIA GENGER, by their respective counsel:

       1.     On July 16, 2010, Surrogate Nora S. Anderson signed an Order to Show

Cause, Respondent Dahlia Genger filed an Answer and Petitioner Orly Genger filed a Reply

Affidavit on July 28, 2010.

       2.     On the return date Counsel appeared and the case was conferenced before

Senior Court Attorney Mary Santamarina.

       3.     A Stipulation was signed by Petitioner and Respondent on ~~August~~ *Septbe 8*,

2010 which is annexed as <u>Exhibit A</u> (and not so-ordered by this Court).

       4.     Petitioner's Order to Show Cause signed July 16, 2010 by Surrogate Nora

S. Anderson, Respondent's Answer, and Petitioner's Reply Affidavit are hereby withdrawn.

       5.     The Parties' counsel further stipulate and agree that Petitioner will move

this Court for permission to amend the Amended Petition in a motion returnable before Surrogate

Anderson on October 1, 2010 and Respondent will not object to Petitioner's request to amend.

By:_____   By:_____
    Judith E. Siegel-Baum                Robert A. Meister
Cozen O'Connor                   Pedowitz & Meister LLP
Attorneys for Orly Genger          Attorneys for Dalia Genger
277 Park Avenue                    1501 Broadway
New York, New York 10172        New York, New York 10036
(212) 883-4900                   (212) 403-7330

Dated:                           Dated: *Sept 8, 2010*

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of the Application of
ORLY GENGER, as a person interested,
for the removal of DALIA GENGER
as Trustee of the Orly Genger 1993 Trust
pursuant to SCPA §711 (11)

**STIPULATION**

File No.: 0017/2008

Stipulation made and entered into on August ___, 2010 between ORLY

GENGER, Petitioner, and DALIA GENGER, Respondent, collectively referred to as (the

"Parties") and their respective Counsel:

WHEREAS, ORLY GENGER commenced the above-captioned proceeding by

filing an Order to Show Cause in New York County Surrogate's Court on June 22, 2009; and

WHEREAS, by Stipulation of the Parties and their respective counsel, Surrogate

Troy K. Webber signed an Order to Show Cause dated July 1, 2009 confirmed on August 18,

2009 with certain restraints contained therein (a copy of which is annexed as <u>Exhibit A</u>); and

WHEREAS, on July 16, 2010, Orly Genger filed an Order to Show Cause to

Supplement Surrogate Webber's prior Order; and

WHEREAS, on July 28, 2010, Dahlia filed an Answer and Orly filed a Reply

Affidavit.

IT IS HEREBY STIPULATED AND AGREED by and between Parties and their

counsel:

NYC_MIDTOWN\1589779\1 252931.000

1.      Upon signing this Stipulation, the Parties will sign and file a Stipulation withdrawing the Order to Show Cause filed July 16, 2010 and the Answer and Reply Affidavit in New York County Surrogate's Court.

2.      In addition to the stipulated restraints in <u>Exhibit A</u>, Orly and Dalia and their respective Counsel agree during the pendency of this proceeding, Dalia and/or her Counsel are required to give notice by overnight mail to Petitioner's Counsel of any attempt to vote any TRI shares held by the Orly Trust for any purpose, including, without limitation, in any election of TRI's directors, with such notice being given at least ten (10) days prior to such attempt being made.

IN WITNESS WHEREOF, the Parties have signed and acknowledged this Stipulation on the day and year written above.

Orly Genger                                Dalia Genger

By: Judith E. Siegel-Baum           By: Robert A. Meister
Cozen O'Connor                          Pedowitz & Meister LLP
Attorneys for Orly Genger             Attorneys for Dalia Genger
277 Park Avenue                          1501 Broadway
New York, New York 10172            New York, New York 10036
(212) 883-4900                           (212) 403-7330

- 2 -

At the Surrogate's Court held in and for the County
of New York, at the Courthouse, 31 Chambers
Street, New York, New York on the _18_ day of
August 2009

PRESENT:  HON. Troy K. Webber

Surrogate

In the Matter of the Application of

ORLY GENGER, as a person interested,
for the removal of DALIA GENGER
as Trustee of the Orly Genger 1993 Trust
pursuant to SCPA §711 (11)

File No.: 0017/2008

**SUPPLEMENTAL ORDER TO
SHOW CAUSE WITH
TEMPORARY RESTRAINTS**

On reading and filing the annexed Verified Petition of Petitioner, ORLY GENGER, and

the exhibits, verified on the 22nd day of June, 2009, and the memorandum of law in support of

Petitioner's Verified Petition dated June 22, 2009,

LET the Respondent, DALIA GENGER, the sole fiduciary of the Orly Genger 1993

Trust, show cause before Surrogate Troy K. Webber at the Surrogate's Court, ~~sitting at 60 Centre~~
_31 i Chambers_
~~Street,~~ Street, Room ~~300~~ _509_, New York, New York, on the _8th_ day of _September_ 2009 at 10:00 o'clock

in the forenoon of that day or as soon thereafter as counsel may be heard why an order should

not be entered:

(a)    Enjoining and restraining Respondent, her agents and all other persons

acting on her behalf from withdrawing, selling disposing, transferring, assigning, removing,

pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly

Trust's 19.43% interest in Trans-Resources, Inc., ("TRI"), a closely held corporation, founded by

Arie Genger, Petitioner's father and Respondent's former husband of Respondent and any other

assets which may be remaining in the Orly Trust;

(b)    Removing Respondent as Trustee of the Orly Trust for breaching her

fiduciary duties, wasting and dissipating the assets of the Orly Trust and imprudently managing

and injuring the property committed to her charge;

(c)    Surcharging Respondent in the amount of the loss of the value of Orly's

interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)    Appointing Michael D. Grohman, Esq. as successor trustee;

(e)    Waiving any requirement that Petitioner post an undertaking; and

(f)    Granting Petitioner such further relief deemed necessary or proper *and for her counsel*

ORDERED that, during the pendency of this proceeding, Respondent, ~~her agents and all~~ *are required to give notice by overnight mail to Petitioners Counsel of any 1) offer to purchase the Orly Trusts 19.3% interest in TPI within 10 days of receiving such offer and 2) act by Respondent, her agents and all other persons acting on her behalf to assign, mortgage, pledge, redeem encumber, or otherwise affect the Orly Trusts in TPI at least 10 days prior to such act and it is further* ~~other persons acting on her behalf are temporarily restrained from withdrawing, selling disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly Trust's 19.43% interest in TPI and other assets remaining in the Orly Trust and it is further~~

ORDERED that service of a copy of this Order and the papers upon which it is based

shall be served on David Parnes, in his capacity as Trustee of the Sagi Genger 1993 Trust, by

overnight mail service at his residence, located at 29 Elkachi Street, Tel Aviv, Israel 69497, ~~or~~ *on or before August 21, 2009 and on* ~~Pedowitz~~ *Pedowitz & Meister, LLP, attorneys* ~~any other address at which she can be located, on or before August ___, 2009.~~ *for Dalia Genger, as trustee of the Orly Genger 1993 Trust by personal delivery or overnight mail on or before August 21, 2009.*

ENTER

*[signature]*
Surrogate

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
ORLY GENGER 1993 Trust Pursuant to
SCPA § 711 (11)

**AFFIDAVIT OF SERVICE**

**FILE NO.:  0017/2008**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## AFFIDAVIT OF SERVICE BY FEDERAL EXPRESS

STATE OF NEW YORK    )
                                          ) ss.:
COUNTY OF NEW YORK  )

JOY GONZALES, being duly sworn, deposes and says:

I am over 18 years old, am not a party to this action and reside in Bergen County, New Jersey.

On the 22nd day of September, 2010, I served a copy of the within **NOTICE OF MOTION FOR LEAVE TO AMEND PETITION** upon:

> Robert A. Meister, Esq.
> Pedowitz & Meister LLP
> *Attorneys for Dalia Genger, Trustee*
> 1501 Broadway
> New York, NY 10036
>
> -and-
>
> David Parnes, Esq.
> *as Trustee of The Sagi Genger Trust*
> 29 El Kachi Street
> Tel Aviv, ISRAEL 69497

by Federal Express, an overnight delivery service regularly employed by this firm and with which this firm maintains an account.

JOY GONZALES

Sworn to before me this
23 day of September, 2010

Notary Public

ANN MEADE
Notary Public, State of New York
No. 01ME4783921
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires Sept. 30, 2008 13

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
ORLY GENGER 1993 Trust Pursuant to
SCPA § 711 (11)

**AFFIDAVIT IN SUPPORT OF
MOTION FOR LEAVE TO
AMEND PETITION**

**FILE NO.: 0017/2008**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

STATE OF NEW YORK     )
                        ) SS:

COUNTY OF NEW YORK   )

      JUDITH E. SIEGEL-BAUM, being duly sworn, deposes and says:

    1.     I am a member of the law firm of Cozen O'Connor, attorneys for Petitioner, Orly

Genger ("Orly") in the above-captioned matter and am fully familiar with all the facts recited

herein. I submit this affidavit in support of Orly's motion for leave to amend and serve a Second

Amended Petition in this proceeding, in the form attached as Exhibit 1.

    2.     The Second Amended Petition is mandatory because (a) additional facts have

transpired which affect The Orly Genger 1993 Trust (the "Orly Trust") while the above

captioned matter was stayed awaiting Judge Feinman's Supreme Court decision dated June 28,

2010, Index Number 109749/2009, and (b) the Orly Trust's TRI Shares have become the subject

matter of a Final Judgment Order of Delaware Chancery Court Civil Action Number 3994-VCS,

a proceeding where neither Orly, the Orly Trust, nor Dalia Genger as Trustee of the Orly Trust

appeared.

3.     Respondent, Petitioner and their respective counsel have signed a Stipulation dated September 8, 2010 withdrawing the July 16, 2010 Order to Show Cause and consenting among other issues to Petitioner serving a Second Amended Petition.  I have been advised by Respondent's Counsel that David Parnes, Esquire, Trustee of the Sagi Genger 1993 Trust (the "Sagi Trust") will not object to Petitioner serving a Second Amended Petition but will not sign a Stipulation agreeing to the Second Amended Petition.

## **PROCEDURAL HISTORY**

4.     On June 22, 2009, Orly filed the initial petition ("Orly's Petition") seeking a temporary restraining order and removal of her mother, Dalia Genger, as the trustee of the Orly Genger 1993 Trust (the "Orly Trust") pursuant to SCPA 711(11) for breaching her fiduciary duties, wasting and dissipating the assets of the Orly Trust, and improvidently managing and injuring the property committed to her charge as a result of her failure to act to preserve trust assets consisting of various family controlled enterprises, and collusion in the systematic looting of those assets by Orly's brother, Sagi Genger ("Sagi").  A copy of the original Petition is attached as Exhibit 2.

5.     On July 1, 2009, Acting Surrogate Troy K. Webber held a special hearing to determine whether the Order to Show Cause should be entertained and the temporary restraining order granted ("July 1 Order").  During oral argument the parties and their respective counsel agreed that certain notice requirements and restrictions pending a final determination were appropriate which Acting Surrogate Webber wrote in the Order which is attached as Exhibit 3.

2

6.     Respondent made a motion returnable on August 5, 2009, to dismiss Orly's

Petition, on the grounds that Orly failed to join the Sagi Trust as an interested party and failed to

state a cause of action upon which relief could be granted.  Petitioner's counsel filed papers in

opposition and appeared before Acting Surrogate Webber on August 5, 2009.

7.     On August 14, 2009, prior to any decision by this Court, Orly filed a

Supplemental Order to Show Cause requesting the same relief as granted in the July 1 Order and

an attorney affirmation amending the Petition to include the Sagi Trust as an interested party,

which was signed by Acting Surrogate Webber on August 18, 2009 and served upon David

Parnes, Esquire, as Trustee of the Sagi Trust and Respondent's counsel on August 19, 2009.  The

Court confirmed the July 1 Order upon signing the August 18, 2009 Order with a return date of

September 8, 2009.  A copy of the confirmed Order and the Attorney's Affirmation is annexed as

Exhibit 4.

8.     A determination was made by the Surrogate's Court in the interest of judicial

economy that no action would be taken on Orly's Petition until Justice Paul G. Feinman rendered

a decision in a New York County, Supreme Court decision, Index Number 109749/2009, in

another matter involving the same parties. The decision was rendered on June 28, 2010.

9.     On July 16, 2010, Petitioner filed an Order to Show Cause to modify the July 1

Order confirmed on August 18, 2009, requesting additional restraints for the TRI Shares held by

the Orly Trust.  Surrogate Anderson signed the Order on July 28, 2010.  A copy of the Order is

attached as Exhibit 5.  Counsel for both parties appeared before Surrogate Anderson on the

return date, and conferenced the matter and (a) agreed to withdraw the July 16, 2010 Order to

3

Show Cause and responsive pleadings, (b) agreed to Petitioner serving a Second Amended

Petition and (3) agreed to have the parties stipulate to the notice requirement and restrictions in

the orders signed by Acting Surrogate Webber and Surrogate Anderson, pending final

determination of this proceeding.  Copies of the Stipulations are attached as Exhibit 6.

## CIRCUMSTANCES THAT HAVE CHANGED
## SINCE THE FILING OF THE PETITION

10.    On August 18, 2010, Vice Chancellor Leo E. Strine, Jr. of Delaware Chancery

Court Civil Action Number 3994-VCS issued a Final Judgment Order in TRI Investors, et. al. vs.

Arie Genger, in which neither Orly, the Orly Trust nor Dalia as trustee was a party or appeared.

The Order ruled that the Orly Genger Trust is not the record or beneficial owner of any TRI

Shares.  Dalia as Trustee of the Orly Trust never appeared in the Delaware proceeding and has

failed to file a Notice of Appeal on behalf of the Orly Trust to protect the assets of the trust.  Orly

has been forced to retain her own Delaware counsel to advise and protect her and the Orly Trust.

This failure to act has demonstrated an even more severe breach of fiduciary duty which may

have depleted a major asset of the Orly Trust.

11.    Since the First Amended Petition was filed, additional documents and facts

evidencing Dalia Genger's breaches of fiduciary duty as Trustee of the Orly Trust have been

obtained which demonstrate a deliberate scheme between Dalia and Sagi to deplete the Orly

Trust's assets.  After the action was commenced, an Amended and Restated Limiting Partnership

Agreement of D&K  Limited Partnership (the "D&K Agreement") executed on November 23,

2007, which purported to grant D&K GP (an entity formed by Dalia and Sagi and which was the

general partner of D&K) the authority to, among other things, encumber the Orly Trust's interest

4

in TRI without giving Orly or the Orly Trust notice. Dalia never disclosed the existence of this

document to Orly after she became her trustee. Another document entitled Meeting of Partners

of D&K LP – January 31, 2009 and Agreement (the "Meeting Agreement") which also purported

to grant D&K GP authority to encumber the Orly Trust's shares of TRI, was signed by Dalia,

while serving as Orly's Trustee. Both of these documents endanger, or were intended to

endanger, the Orly Trust's assets and are further indicia of Dalia's breaches of fiduciary duty.

## ARGUMENT

12.     It is axiomatic that leave "shall be freely given" for a party to amend its pleadings

if there is no prejudice or surprise to Respondent. *See* CPLR 3025(b); *Mandel, Resnik & Kaiser,*

*P.C. v. E.I. Electronics, Inc.,* 41 A.D. 3d 386, 839 N.Y.S. 2d 68, 71 (1st Dep't 2007) ([L]eave to

amend the pleadings is freely granted, absent prejudice."). In order to show prejudice, the other

side must demonstrate they have been hindered in preparation of their case. *Fogal v. Steinfeld,*

163 Misc. 2d 497, 620 N.Y.S.2d 875 (Sup. Ct., N.Y. Co. 1994).

13.     Mere lateness in seeking to amend a pleading is generally not sufficient alone to

warrant a denial of a motion for leave to amend, it must be lateness coupled with significant

prejudice to the other side. *Norwood v. City of New York,* 203 A.D. 2d 147, 610 N.Y.S. 2d 249,

250 (1st Dep't 1994); *Fogal v. Steinfeld,* 163 Misc. 2d 497, 620 N.Y.S.2d 875 (Sup. Ct., N.Y. Co.

1994) ("A court may grant leave to amend pleadings at any time.")

14.     Of the utmost importance, Dalia and her counsel have stipulated not to object to

this Second Amended Petition (See <u>Exhibit 6</u>), and the Trustee of the Sagi Trust, while not

stipulating, has stated to Dalia's counsel that he has no objection to Petitioner's application.

5

15.    In this case, there is no valid basis to deny leave to amend Orly's Petition. Respondent cannot claim prejudice. Respondent's motion to dismiss has not been decided and discovery has not commenced.

## CONCLUSION

16.    Respondent's counsel has no objection to this amendment. Many of the circumstances surrounding the Orly Trust's interest in TPR and TRI have changed. Other lawsuits involving issues that affect Orly's Petition and Amended Petition have been decided and are currently on appeal. Respondent will not be prejudiced by the relief requested herein. Orly must be able to amend and serve a Second Amended Petition to conform to the facts as they presently exist, more than one year after the initial pleadings were filed.

WHEREFORE, Petitioner respectfully requests that the Court grant (a) leave to file and serve the Second Amended Verified Petition; (b) order that the Second Amended Verified Petition be deemed to have been served upon all of the named parties; and (c) grant such other relief as the Court deems proper.

Dated:  September 22, 2010

Judith E. Siegel-Baum

Sworn to before me this
22nd day of September, 2010

Notary Public

GAIL GOLDFARB
NOTARY PUBLIC OF
NO. 02GO6106213
QUALIFIED STATE OF NEW YORK COUNTY
COMMISSION EXPIRES 03/01/20_12_

6

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

|  |  |
|---|---|
| In the Matter of the Application of ORLY GENGER, as a person interested, for the removal of DALIA GENGER as Trustee of the ORLY GENGER 1993 Trust Pursuant to SCPA § 711 (11) | **SECOND AMENDED VERIFIED PETITION FOR REMOVAL OF DALIA GENGER AS TRUSTEE AND REQUEST FOR TEMPORARY RESTRAINING ORDER** _____ **FILE NO.: 0017/2008** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

TO THE SURROGATE'S COURT, STATE OF NEW YORK
COUNTY OF NEW YORK

Petitioner, Orly Genger ("Petitioner" or "Orly"), by her attorneys Cozen O'Connor, respectfully alleges as her Second Amended Verified Petition for Removal of Dalia Genger as Trustee:

1.    Orly, domiciled at 1965 Broadway, Apt. 22G, New York, New York 10024, is the current beneficiary of the Orly Genger 1993 Trust dated December 13, 1993 (the "Orly Trust") (annexed hereto as Exhibit A).

2.    Dalia Genger, residing at 200 East 65th Street, Apt. 32W, New York, New York 10021 ("Respondent" or "Dalia"), Orly's mother, is the current sole Trustee of the Orly Trust, and was appointed successor Trustee in January 2008.

3.    David Parnes residing at 29 Elkachi Street, Tel Aviv, Israel 69497, is the current Trustee of the Sagi Genger 1993 Trust dated December 13, 1993 ("Sagi Trust").

4.    The Orly Trust provides for discretionary payments of income and principal to Orly during her lifetime with the remainder to be distributed to her descendants, per stirpes. If Orly dies leaving no descendants, the remainder of the trust property is to be distributed to the Sagi Trust.

5.    Based upon the allegations contained herein, Petitioner requests that this Court provide the following relief:

(a)    Respondent and/or her counsel during the pendency of this proceeding are required to give notice by overnight mail to Petitioner's Counsel of any (1) offer to purchase the Orly Trust's 19.3% interest in TRI within ten (10) days of receiving such offer; and (2) act by Respondent, her agents, and all other persons acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell, or otherwise alter the Orly Trust's interest at least 10 days prior to such act in accordance with Judge Troy K. Webber's Order dated July 1, 2009 affirmed on August 18, 2009, and stipulated to by the parties' respective counsel. (Annexed hereto as Exhibit B);

(b)    Respondent and/or her counsel during the pendency of this proceeding are required to give notice by overnight mail to Petitioner's Counsel of any attempt to vote any TRI shares held by the Orly Trust for any purpose, including, without limitation, in any election of TRI's directors, with such notice being given at least ten (10) days prior to such attempt being made in accordance with the Stipulation signed by the Parties and the Stipulation withdrawing the Order to Show Cause signed July 16, 2010 by their respective counsel both dated September 8, 2010 (both Stipulations are annexed hereto as Exhibit C);

(c)    remove Respondent as Trustee of the Orly Trust for breaching her fiduciary duties, wasting, dissipating and looting the assets of the Orly Trust, imprudently managing and injuring the property committed to her charge; for concocting a scheme with Sagi Genger to strip the Orly Trust of its two most valuable assets: (a) an indirect interest in 49% of defendant TPR Investment Associates, Inc. ("TPR"), a closely held family corporation; and (b) 1,102.80 shares of common stock of Trans-Resources, Inc. ("TRI") (the "TRI Shares")[1], another

---

[1]    The Orly Trust's TRI Shares have become the subject matter of a Final Judgment Order in Delaware Chancery Court Civil Action Number 3994-VCS although neither Orly nor the Orly Trust nor Dalia as Orly's Trustee was a party to the proceeding. A copy of the decision is annexed hereto as Exhibit D (see paragraph 8 in which Judge Strine included in his ruling that the Orly Trust is not the record or beneficial owner of any TRI Shares although this issue was not in the Complaint and Orly and/or the Orly Trust were not parties to the proceeding). The decision is being appealed on behalf of Orly and her Trust. Dalia as her trustee has failed to file a Notice of Appeal and protect the Orly Trust assets.

closely held corporation; for allowing a foreclosure upon the Orly Trust's indirect 49% interest in TPR pursuant to a promissory note which, by mutual understanding and agreement between the Genger family members and TPR was never to be collected and did nothing to preserve Orly's rights or interest at the foreclosure sale; for colluding with defendants Sagi Genger and D&K GP LLC ("D&K GP") to enter into various agreements that would allow D&K GP to "mortgage, hypothecate, pledge, create a security interest in or lien upon, or otherwise encumber [the Orly Trust's TRI Shares]" in connection with the above-mentioned promissory note without giving any notice to Orly, the Orly Trust's beneficiary; and for failing to protect the Orly Trust by not appearing or appealing the final Judgment Order of V.C. Leo E. Strine, Jr., Delaware Chancery Court Civil Action Number 3994-VCS;

        (d)     surcharge Respondent in the amount of the loss of the value of Orly's interest in TPR and TRI, as determined by the Court and awarding the Petitioner costs and attorneys' fees;

        (e)     appoint Michael D. Grohman, Esq., as successor trustee;

        (f)     waive any requirement that Petitioner post an undertaking; and

        (g)     grant Petitioner such further relief deemed necessary or proper.

6.     To assist the Court in perceiving the severity of Respondent's conduct, the following is an overview of the facts supporting this Petition.

## I.   OVERVIEW

7.     Arie and Dalia were married on July 23, 1967, in a ceremony held in Israel.  In 2004, however, their marriage ended in divorce.  Prior to 1993, while Dalia and Arie were married, Dalia and Arie formed D & K LP ("D & K"), a family-owned limited partnership whose name was shorthand for "Dalia and Kids."  At the time of its formation, Dalia, the general partner, held a 4% interest, and Orly and Sagi, the limited partners, each held a 48% interest.

8.     In December 1993, Dalia and Arie also established identical irrevocable *inter vivos* trusts for the benefit of each of their children:  the Orly Trust and the Sagi Trust.  For estate-planning purposes, Dalia and Arie funded each trust with a $600,000 gift.  The intent behind the trusts was to ensure that both children received property of equal value.  Sash A. Spencer and Lawrence M. Small were named Co-Trustees of both trusts and remained Co-Trustees until the Genger's divorce.  After the Trusts were funded, Orly and Sagi each assigned their 48% interests in D & K to their Trusts.

9.     At the same time in December 1993, D & K purchased 240 shares of common stock (constituting 49% of the outstanding shares) in TPR for $10,200,000.  The shares were purchased with $600,000 from each of the Orly Trust and the Sagi Trust and $50,000 from Dalia, totaling $1,250,000, and the balance was satisfied with a recourse $8,950,000 promissory note (the "Note") (a copy of which is annexed hereto as Exhibit E).  Pursuant to the Note, principal, together with accrued interest, was to be repaid by D & K in annual installments over ten years.  The Note was secured by a pledge of the 240 TPR shares owned by D & K.  Each of the Trusts and Dalia assumed liability on the Note in proportion to its/her direct interest in D & K.  Accordingly, each of the Orly and Sagi Trusts assumed a 48% liability on the Note and acquired a 23.52% indirect interest in TPR and Dalia assumed a 4% liability on the Note and a 1.96% indirect interest in TPR.  Payments were made on the Note until 1999, at which time D & K stopped making payments with the implied consent of the interested parties.

10.     At the time of the above-described transaction, Arie owned the remaining 51% of
TPR, which held investments in various securities, including TRI common stock, as well as its
interest in the Note. As of March 30, 2001, TPR held a 52.85% interest in TRI. The remaining
minority interest in TRI (47.15%) was owned by various entities controlled directly and
indirectly by Jules and Eddie Trump (the "Trump Group").

11.     On October 26, 2004, Dalia and Arie entered into a Stipulation and Agreement of
Settlement as a final settlement of their divorce (the "Settlement Agreement") (annexed hereto as
Exhibit F). Pursuant to the Settlement Agreement, Dalia received, *inter alia*, Arie's 51% interest
in TPR and retained her 4% interest in D & K. TPR's 52.85% interest in TRI was transferred to
Arie and the Trusts as follows: (i) 13.99% to Arie, (ii) 19.43% to the Orly Trust, and (iii) 19.43%
to the Sagi Trust. The Orly Trust and the Sagi Trust each granted Arie an irrevocable lifetime
voting proxy over their TRI shares (annexed hereto as Exhibit G). Therefore, after October 29,
2004, Arie and the two Trusts held a controlling interest in TRI, and TPR no longer owned any
TRI common stock.

12.     In connection with the divorce settlement, Dalia took measures to cede
management of D & K and TPR to her son Sagi. On October 21, 2004, days before signing the
Settlement Agreement, Dalia and Sagi formed D & K GP LLC ("D & K GP"), whose sole
purpose was to act as the general partner of D & K. Dalia exchanged her 4% interest in D & K
and $1.00 for a 99% membership interest in D & K GP. Sagi purchased a 1% membership
interest in D & K GP for $1.00. Pursuant to D & K GP's Limited Liability Agreement (annexed
hereto as Exhibit H), Sagi was given the power to select a manager of D & K GP whose function
would be to control D & K's assets. Sagi selected himself to act as manager; thus, Dalia
effectively handed Sagi the authority to control D & K and its assets. Also, by forming D & K
GP, Dalia and Sagi shielded themselves from any personal liability stemming from D & K,
including any personal liability related to the Note. This left the Trusts solely liable on the Note.

13.    On October 30, 2004, Dalia entered into a shareholder agreement with TPR that provided for the management of TPR. Specifically, pursuant to the shareholder agreement (annexed hereto as Exhibit I), D & K, which owned 49% of TPR, was given authority to appoint one board member to the TPR board. Sagi, as the managing partner of D & K, appointed himself as a board member of TPR. As the majority owner of TPR, Dalia was named as the other board member. In addition, the shareholder agreement appointed Sagi as Chief Executive Officer ("CEO") of TPR. Accordingly, Dalia essentially ceded control of TPR to Sagi, just as she had done with D & K.

14.    Below, for the Court's convenience, is a side-by-side summary of Arie's, Dalia's, the Orly Trust's, and the Sagi Trust's interests in TPR before and after Arie's and Dalia's divorce.[2]

### TPR OWNERSHIP
### BEFORE AND AFTER DIVORCE

**PERCENTAGE**

| Person | TPR Before | TPR After |
|--------|------------|-----------|
| Arie Genger | 51.00% | 0% |
| Dalia Genger | 1.96% | 52.96% |
| Orly Trust | 23.52% | 23.52% |
| Sagi Trust | 23.52% | 23.52% |
| **TOTAL** | **100%** | **100%** |

---

[2] For the Court's convenience, the chart annexed hereto as Exhibit J provides a summary of Arie's, Dalia's, the Orly Trust's, and the Sagi Trust's ownership interests in TPR, TRI, and D & K as of October 26, 2004 – i.e., the date that Arie and Dalia executed the Settlement Agreement.

15.    In connection with the Settlement Agreement, Dalia required that the Trustees of the Orly Trust and the Sagi Trust (Messrs. Sash and Small) resign and be replaced with friends of Sagi. Numerous successor trustees were appointed to the Orly Trust and the Sagi Trust, all of whom were affiliated with Sagi in one way or another. David Parnes and Eric Gribetz (Sagi's longtime friends) and Leah Fang (Sagi's sister-in-law) were appointed as successor trustees to the Orly Trust, and Messrs. Parnes and Gribetz, Rochelle Fang (Sagi's mother-in-law), and Mr. Parnes again, were appointed successor trustees of the Sagi Trust.

16.    On August 2, 2006, Sagi, as part of his managerial role in D & K GP, D & K, and TPR, assigned the Note – which then had an approximate value of $11,000,000 as a result of accrued interest – to Mr. Parnes for only $12,000. (A copy of the Memorandum dated August 2, 2006, assigning the Note is annexed hereto as Exhibit K) The assignment stated that D & K "denied enforceability of the Note" (see Exhibit K annexed hereto). Sagi signed the assignment on behalf of both TPR, as the maker, and D & K, as the holder. Dalia was copied on the memorandum assigning the note, but neither Orly, the Orly Trust, nor the then-Trustee of the Orly Trust received copies of the memorandum. At the time of this assignment, Mr. Parnes was acting as trustee of both the Orly Trust and the Sagi Trust. Shortly after the assignment, Mr. Parnes resigned as Trustee of the Orly Trust in recognition of the inherent conflict he faced in that role.

17.    On November 23, 2007, Leah Fang, Sagi Genger's sister-in-law, then sole Trustee of both the Orly and Sagi Trusts, and Sagi Genger, acting in his capacity as manager of D&K GP, executed an "Amended and Restated Limited Partnership Agreement of D&K Limited Partnership (the "D&K Agreement"). Among other things, the D&K Agreement purported to grant D&K GP authority to "mortgage, hypothecate, pledge, create a security interest in or lien upon, or otherwise encumber [the Orly Trust's TRI Shares] for the benefit of [D&K] or that of third parties, in connection with the Note." See D&K Agreement attached hereto as Exhibit L, p.11.

18.    By its terms, the D&K Agreement does not require D&K GP (i.e., Sagi) to give notice to anyone, including Orly or the Orly Trust, if it decided to encumber the Orly Trust's TRI Shares in any way.

19.    Upon information and belief, the Orly Trust received no consideration and no direct or indirect benefit in exchange for the substantial concession it gave to D&K GP under the D&K Agreement.  Indeed, the D&K Agreement was merely an instrument created for the specific purpose of encumbering the Orly Trust and its beneficiary, Orly with debt.

20.    Leah Fang never informed Orly of the existence of the D & K Agreement.  In January 2008, Dalia was appointed successor trustee of the Orly Trust, despite Orly's objection. At that time she did nothing to attempt to amend Exhibit L nor did she do anything to advise Orly as beneficiary that the prior trustee had granted D&K GP authority to encumber the Orly Trust's TRI Shares.  By that time, as a result of Dalia's granting Sagi control of TPR and D & K, and through the appointment of his friends and relatives as successor trustees of the Trusts, Sagi effectively had obtained control over the assets held by all of D & K, TPR, the Sagi Trust, and the Orly Trust.

21.    On or about January 31, 2009, only weeks after making sworn statements to the Surrogate Court that she intended to protect the Orly Trust and its assets, Dalia executed a document entitled "Meeting of Partners of D&K LP – Jan. 31, 2009 & Agreement (the "Meeting Agreement")."  Like the D&K Agreement, the Meeting Agreement purported to grant D&K GP (i.e., Sagi) authority to encumber the Orly Trust's TRI Shares:

> The partners wish to clarify that the authority vested in the
> General Partner to make limited partners' assets subject to
> a pledge shall be done in substantially the same manner in
> which TPR Investment Associates, Inc. shares were
> pledged in conjunction with the aforementioned note.
> However, the General Partner shall be authorized to sign
> for the partnership and/or each individual partner.

See Meeting Agreement ¶3 (attached hereto as Exhibit M)

22.     In another naked act of self-dealing in violation of Dalia's fiduciary duties as
Trustee, the Meeting Agreement also purports to:

> Indemnify and provide a general release from any claim or
> right at equity, law, or contract or otherwise the current and
> former general partner, its officers, the partnership's
> holdings (including TPR Investment Associates, Inc.) and
> the officers of its holdings to fullest extent permitted in
> connection with any claim by the partnership and/or its
> partners.  Irrespective of the above, nothing herein shall
> serve to release or indemnify Arie Genger, William Dowd,
> Lawrence Small or Edward Klimerman.

See Meeting Agreement, Exhibit M, ¶1.

23.     Upon information and belief, the Orly Trust received no consideration and no
direct or indirect benefit in exchange for the substantial concessions Dalia, acting as trustee, gave
to D&K GP under the Meeting Agreement.  Indeed, the Meeting Agreement, like the D&K
Agreement, was merely another instrument created for the specific purpose of depleting the Orly
Trust and its beneficiary, Orly of its assets.

24.     Both the D&K Agreement and the Meeting Agreement were negotiated and
executed without ever informing the Orly Trust's beneficiary, Orly.  Moreover, Dalia never
subsequently informed Orly of the existence of either agreement, even though Orly made
repeated requests for information about the Orly Trust and its assets during Dalia's tenure as sole
Trustee.  Likewise, although Dalia has given sworn statements to the Surrogate Court regarding
the Orly Trust, she never disclosed the existence of either the D&K Agreement or the Meeting
Agreement to either Surrogate Roth or her successor Surrogate Webber.  Basically, Dalia, as
Orly's mother and trustee gave Sagi total control to pilfer the Orly Trust assets for his own use
and benefits.  Dalia's breach of fiduciary duty resulted in Sagi having the purported power and
ability with Dalia's consent and knowledge to sell the Orly Trust's TRI's Share for one-third
(1/3) of the price that he had sold the Sagi Trust TRI Shares.

25.     Sometime in 2007, Sagi sold a 2% interest in TPR to Rochelle Fang. This sale effectively stripped Dalia of her majority interest in TPR giving Sagi unfettered control of TPR, in addition to his control of D & K and D & K GP. In January 2008, when Dalia was appointed successor trustee of the Orly Trust, she completely divested herself of the balance of her TPR shares. Dalia has not informed either the Court or Orly as to when she transferred her TPR interest.

26.     On August 22, 2008, unbeknownst to Orly, Rochelle Fang, who had been appointed Trustee of the Sagi Trust, attempted to sell the Sagi Trust's 19.43% interest in TRI to the Trump Group, who already owned 47.15% of TRI's outstanding shares, for $26,715,416. This sale purportedly transferred control of TRI from Arie to the Trump Group who thereafter purported to hold 66.58% of TRI's outstanding common stock.[3] In connection with the supposed sale, Sagi and David Parnes were given seats on TRI's board of directors. This sale, which was consummated after Dalia was appointed successor trustee of the Orly Trust, has diluted and diminished the value of the Orly Trust's interest in TRI.

27.     Dalia, while serving as Trustee of the Orly Trust, made no effort to prevent the sale or to protect the value of the Orly Trust's interest in TRI. Fearing that Dalia would continue to neglect her duty to protect the Orly Trust's assets, on January 10, 2009, Petitioner wrote a letter (annexed hereto as Exhibit N) to her mother stating that "for now, and until further notice, it is my strong desire to retain all of the shares of TRI that are currently in the Orly Trust, and I direct you not to sell them." Dalia refused to agree not to dispose of the TRI shares.

---

[3] The validity of the sale was at issue in litigation in Delaware Chancery Court Civil Action Number 3994-VCS, in which the Court's decision is currently pending appeal. The parties to the action are Arie Genger, TRI, and various entities affiliated with the Trump Group. The Orly Trust had not appeared in the action. Although, neither Orly Genger nor the Orly Trust were ever a party to this proceeding, the court ruling applies to her trust's interest in TRI and TPR. In that action, the Trump Group claimed to have bought the shares either from the Sagi Trust or from TPR – thus, the approximately $27 million purportedly paid by the Trump Group somehow belongs to the Sagi Trust or to TPR, and not the Sagi or Orly Trust.

**II.    THE EVIDENCE DISCOVERED BY PETITIONER ON JUNE 1, 2009,  AND
RESPONDENT'S EXECUTION OF THE MEETING AGREEMENT AND
REFUSAL TO PROTECT THE ORLY TRUST'S ASSETS IN THE DELAWARE
CHANCERY COURT PROCEEDING, REQUIRES THE IMMEDIATE
REMOVAL OF DALIA AS TRUSTEE**

28.    In February 2008, Orly applied to this Court to designate a Trustee, or in the

alternative to appoint a special trustee, claiming that Dalia and all of the preceding successor

trustees of the Orly Trust were improperly appointed and had no authority to act on behalf of the

Orly Trust.  Orly also alleged wrongful dealings by Dalia as Trustee of the Orly Trust.  In

denying the application without prejudice, this Court stated that Orly had made allegations

without sufficient supporting evidence and suggested that Orly commence an SCPA § 2201

proceeding to obtain the necessary evidence and then renew her application.  (A copy of the

Court's decision is annexed hereto as Exhibit O.)

29.    On May 14, 2009, as a prerequisite to the SCPA § 2201 application, Orly's

counsel sent Dalia Genger a letter (annexed hereto as Exhibit P) requesting documents related to

the Orly Trust's assets.  Soon thereafter, Orly's counsel was notified that Dalia had retained

Robert A. Meister, Esq., of Pedowitz & Meister, LLP, and Orly's counsel therefore forwarded a

copy of the May 14th letter to Mr. Meister.

30.    On June 1, 2009, Mr. Meister responded to Orly's document demand by advising

Orly's counsel that the Orly Trust no longer owned any interest in TPR.  According to the letter,

Sagi, acting as CEO of TPR, had foreclosed on the Note and had sold D & K's 240 shares of

TPR for $2,220,000.  (A copy of the Letter dated June 1, 2009, is annexed hereto as Exhibit Q.)

Before that time, Dalia had neither advised nor notified Orly that Sagi had foreclosed on the

Note,[4] nor advised Orly that Sagi had sold the TPR shares at auction.  Thus, upon receipt of Mr.

Meister's letter, Orly learned for the first time that:

---

[4] While the Note had not been serviced since 1999, TPR had not foreclosed on the Note between 1999 and
2008 based upon the Genger Family's agreement at the Note's inception that foreclosure on the Note would upset
the estate-planning goals underlying the Note.

(a)     On August 31, 2008, Sagi, acting as CEO of TPR, notified himself as the general manager of D & K, that D & K was in default of the Note and declared that unless the entire unpaid principal amount of the Note was paid immediately, TPR would sell, at auction, the 240 shares pledged as collateral. (A copy of the Notification dated August 31, 2008, is annexed hereto as Exhibit R.)

(b)     Thereafter, Sagi, again acting as CEO of TPR, purported to notify D & K (of which he remained the managing partner) that D & K's 240 shares of TPR stock would be publicly auctioned to the highest bidder on February 27, 2009, and that the money received from the sale would be used to reduce the outstanding debt. (A copy of the Notification is annexed hereto as Exhibit S.) Sagi purported to notify the interested parties of the sale by publishing notice of the sale in the New York Post in October 2008 and February 2009. At all relevant times Sagi had Orly's and Dalia's contact information. Despite this, Orly was never informed of the impending sale.

(c)     On February 27, 2009, TPR (still controlled by Sagi) foreclosed on the 240 shares of TPR and "auctioned" the shares. Not coincidentally, the Sagi-controlled TPR purchased the shares at auction for $2,200,000, making no effort to collect on the Note from the Sagi Trust. (See Exhibit T). The proceeds of the sale – i.e., $2,220,000 – were used to decrease D & K's obligations under the Note, leaving a balance of approximately $8,800,000.

31.     On June 11, 2009, Orly's counsel sent Mr. Meister a letter asking that Dalia, in accordance with Orly's January 2009 request and in light of the secretive diminution of the Orly Trust's interest in TPR, stipulate in writing that she would not, under any circumstances and until all issues were resolved, sell, transfer, or remove the TRI shares from the Orly Trust. (A copy of the Letter dated June 11, 2009, is annexed hereto as Exhibit U) That same day, Mr. Meister responded to the June 11th letter, but he failed to address the terms of the proposed stipulation. (A copy of Mr. Meister's Letter dated June 11, 2009, is annexed hereto as Exhibit V.)

32.     Only many months after this proceeding was commenced, it was discovered that Dalia while serving as Trustee of the Orly Trust had entered into the Meeting Agreement while serving as Orly's trustee (Exhibit M) which authorized D & K GP (Sagi) to encumber the Orly Trust's TRI Shares.

33.     Finally and most importantly, the Orly Trust has been adversely effected by the Delaware Chancery Court's opinion which Orly and the Orly Trust were not parties. Dalia, as her Trustee never appeared in the proceeding to protect the assets of the Trust nor has she filed a Notice of Appeal to protect her beneficiary's interest. As a result, Orly has been forced to retain her own Delaware counsel to advise and protect her and the Orly Trust.

## A.     Dalia Must Be Removed As Trustee Immediately

34.     As a result of Dalia's deliberate inaction and collusion with Sagi, Orly's TRI shares (a) may not be an asset of her trust, and if an asset could be sold at a significantly discounted rate and the proceeds may be used to pay her unpaid portion of the Note, (b) may be used as collateral to secure the Orly Trust's unpaid portion of the Note, or (c) may be used to satisfy a Judgment against the Orly Trust. Since Orly's address was known to her brother and her mother at all relevant times, publishing notice of the sale of the TPR shares alone was a clear and deliberate attempt to prohibit Orly from intervening in the foreclosure and the sale. Dalia, who upon information and belief had knowledge of the events as they were transpiring, easily could have given notice of the auction to Orly, but she intentionally chose not to. There is now reason to believe Dalia deliberately remained passive so as to allow Sagi to hijack, sell, or otherwise meddle with the Orly Trust's TPR and TRI shares, even though Orly has specifically advised her mother, in writing, to protect the Trust's ownership interest in the TPR and TRI shares and will not stop harming her daughter's economic interests in the Orly Trust.

35.    There is no reason to trust that Dalia will honor her daughter's wishes and instructions since, from the time of her divorce, she has done nothing but ensure that Sagi has complete control over TPR, D & K, and D & K GP, and has allowed Sagi to do as he pleases. At this time, approximately $8,800,000 of the Note remains unsatisfied, and Sagi, as CEO of TPR, has not voided the notice of default. Based upon Dalia's deliberate inaction and failure to protect the Orly Trust's assets to date, there is strong evidence to reasonably conclude that Dalia will not protect the Orly Trust's interest in any assets in the Trust, but rather, will act to benefit herself and Sagi, including by allowing Sagi to obtain any asset in the Orly Trust to satisfy the Orly Trust's unpaid portion of the Note.

36.    The fact that Dalia has never appeared or intervened or filed a notice of appeal in the Delaware Action alone is cause for her removal. When added to the information provided to Orly's counsel on June 1, 2009, which confirms Respondent's lack of diligence and disloyal service as Trustee, there are more than sufficient evidence to have Respondent removed as Trustee of the Orly Trust. While serving as Trustee, Dalia intentionally failed to notify Orly that TPR was taking measures to foreclose on the Orly Trust's 23.52% indirect interest in TPR. It was Dalia's duty as a fiduciary of the Orly Trust to be apprised of all activity concerning the Orly Trust and to ensure that Orly received proper notification of the default and auction. Moreover, Dalia actually knew of the foreclosure and the auction, but took no steps to protect the Orly Trust's interest in TPR. Dalia knew of Sagi's plan to foreclose on the Note and sell the TPR shares as early as August 2008; thus, she withheld information concerning the auction from Orly for almost ten months. Dalia did not disclose the foreclosure and share sale until she received the demand letter from Orly's counsel and realized that legal action was imminent and now she has done nothing to protect the Orly Trust assets from the Delaware litigation and in fact may have by her inaction depleted most of the assets of the Orly Trust. Instead of protecting the Orly Trust's and its beneficiary's interests, Dalia sat back and silently watched and supported her son as he stripped the Orly Trust of its indirect interest in TPR.

37.    The corporate structure which has intertwined TPR, D & K GP, and D & K's assets, all of which are in some manner controlled by Sagi as a result of Dalia's actions, permits Dalia and Sagi to engage in self-dealing and does not provide for any accountability on either Sagi's or Dalia's part. Unfortunately, the Orly Trust is caught in the middle of Dalia's and Sagi's conspiracy to engage in self-dealing intended to benefit their own interests, while Sagi has been permitted to diminish and dissipate the value of the Orly Trust's assets, including its interests in TPR and TRI. By enriching herself and her son at the expense of her daughter, Dalia is in breach of her fiduciary duties as Trustee of the Orly Trust. It is imperative that Orly have an independent successor trustee appointed who will unbiasedly and loyally protect the Orly Trust's remaining assets, and make every attempt possible to retain the assets that have been reduced in value.

     (1)    **In Direct Conflict With Her Obligations as Fiduciary of The Orly Trust, Dalia Did Nothing To Stop Sagi From Attempting to Sell His Trust's TRI Shares, Which Have Diluted the Value of the Orly Trust's Assets**

38.    The Sagi Trust's sale of its interest in TRI to the Trump Group for $26,715,416, which occurred after Dalia was appointed successor trustee of the Orly Trust, purportedly transferred control of TRI from Arie to the Trump Group. Assuming if this purported sale has been given effect, then the value of the Orly Trust's assets have significantly diminished since Arie will no longer own a controlling interest in TRI, and thus the Orly Trust would no longer own a portion of the controlling block of TRI shares.

39.    Dalia, as a fiduciary of the Orly Trust, was obligated to apprise herself of any transactions that could affect the value of the Orly Trust's shares, and, in fact, Dalia was, upon information and belief, contemporaneously aware of the Sagi Trust sale. But Dalia made no effort to protect the value of the Orly Trust's TRI shares by challenging the proposed sale. Moreover, she has taken no position with regard to the current value of the TRI shares and has taken no measures to protect the Orly Trust's interest in TRI. By remaining passive with respect to the Orly Trust's TRI shares, and indeed colluding with Sagi, Dalia completely ignored the

intent behind the establishment of the Orly Trust – to transfer an equal amount of assets to each of the children.  Dalia, through her actions and her inaction alike, may have permitted Sagi to secure substantially more value from the Trusts' assets than Orly.

### (2)  **In Direct Conflict With Her Obligations as Fiduciary of The Orly Trust, Dalia Took No Action To Protect the Orly Trust's Interest in TPR**

40.     Pursuant to the August 2006 memorandum assigning the Note to David Parnes – on which Dalia was copied – Sagi, acting as the managing partner of D & K, took the position that the Note was unenforceable.  (See Paragraph 4 of Exhibit K annexed hereto.)  In the exact same memorandum, however, Sagi, acting as the CEO of TPR, took the directly contrary position that TPR reserved its right to enforce the Note.  (See Paragraph 8 of Exhibit K annexed hereto.)

41.     On February 14, 2007, Dalia, who participated in the transaction between Sagi and Mr. Parnes, and in a clear attempt to clean her hands of any impropriety, admitted in a sworn statement to the Court that no one was ever supposed to foreclose on the Note.  (See Paragraph 3 of Exhibit W annexed hereto).  Additionally, the unpaid Note was the subject of a post-judgment arbitration proceeding between Dalia and Arie, which took place in September 2007.  Dalia, who was present at the proceedings, heard Sagi and Mr. Parnes testify that the Note should not be enforced and that Sagi, as CEO of TPR, had no intention of collecting the unpaid portion of the Note.  Thus, Dalia knew long before August 2008 that TPR had effectively disclaimed its right to foreclose on the Note.

42.     As described above, however, in August 2008 (eleven months later), Sagi sought to enforce the Note.  Contrary to the position he had taken under oath at the arbitration, and contrary to the position he had taken as the managing partner of D & K (see Paragraph 4 of Exhibit K attached hereto), Sagi issued a default notice to D & K on behalf of TPR.  Dalia, who knew the Note was never intended to be enforced and who previously had sworn to as much, should have immediately sought to block Sagi from foreclosing on the Note and selling the TPR

shares. Notwithstanding her knowledge and her previous statements, however, Dalia failed to

make any effort to stop Sagi when he engaged in this clear act of self-dealing, even though the

Orly Trust had a clear interest in the TPR shares at issue. As a fiduciary of the Orly Trust with

prior, as well as continued knowledge, of the TPR foreclosure, TPR's supposed claims against D

& K, and D & K's ability to challenge those claims based on prior representations, Dalia had a

duty to protect the Orly Trust's indirect ownership of the TPR shares. But instead of taking the

proactive measures required of a fiduciary, Dalia did nothing and allowed Sagi to obtain the TPR

shares for himself to the detriment of the Orly Trust. Moreover, in connection with her

appointment as successor trustee of the Orly Trust in January 2008, Dalia divested herself of her

TPR shares (without informing either the Court or Orly as to when she transferred her interest) in

a further attempt to distance herself from any attributable wrongdoing. Dalia has contended to

this Court that she sold her TPR shares in order to avoid any appearance of impropriety in

connection with her appointment as Trustee. Interestingly, however, Dalia has never informed

Orly or this Court whether she continues to maintain a 99% interest in D & K GP, the company

that controls D & K and, thus, was obligated to service the Note.

  43. Additionally, Dalia's failure to act in the face of the foreclosure and sale of TPR

stock is especially egregious because she has known since August 2008 that the purported sale of

TRI stock to the Trump Group was being challenged in Delaware Chancery Court. She also has

known that in that action the Trump Group is asserting that it bought the TRI stock from *either*

the Sagi Trust *or* TPR. Thus, she has known that, depending on the outcome of the appeal of

litigation in Delaware, the Orly Trust could have an interest in the $27 million paid by the

Trumps in August 2008 if its interest in TPR were preserved. Accordingly, as trustee of the Orly

Trust, she should have been especially vigilant in protecting the Orly Trust's interest in TPR

through D & K. But instead, she allowed Sagi to essentially steal the Orly Trust's interest in

TPR so that Sagi can attempt to retain the entire $27 million regardless of the outcome of the

appeal in Delaware Chancery Court. Indeed, Dalia has done nothing to ensure that the

$27,000,000 is preserved, so that it will not be depleted by Sagi pending the outcome of the

Delaware appeal. Her inaction in this regard is a blatant violation of her fiduciary duties as trustee.

## III.   DALIA SHOULD BE SUR-CHARGED IN THE AMOUNT OF THE LOSS OF THE VALUE OF ORLY'S INTEREST IN TPR AS DETERMINED BY THE COURT AND ORLY SHOULD BE AWARDED ATTORNEYS' FEES

44.     By failing to take action on behalf of the Orly Trust to prevent Sagi from foreclosing on the Note and selling D & K's TPR shares and through her other actions and inactions described herein, Dalia caused the Orly Trust to lose its interest in TPR and possibly TRI. Accordingly, Dalia should be surcharged in an amount of the loss of the value of Orly's interest in TPR and TRI as determined by the Court and should be required to reimburse the Orly Trust for its attorneys' fees incurred in connection with bringing this action.

## IV.   MICHAEL D. GROHMAN, ESQ. SHOULD BE APPOINTED AS SUCCESSOR TRUSTEE

45.     Based on Dalia's deliberate breach of her fiduciary duties to the Orly Trust, and in light of Dalia's prior nefarious conduct as the Orly Trust's Trustee, this Court should remove Dalia as Trustee and replace her with Michael D, Grohman, Esq. Mr. Grohman is a member of the New York Bar and the head of the Trust and Estates practice group at Duane Morris LLP. Mr Grohman is not acquainted with any members of the Genger family, does not have any interest in TRI, TPR, or D & K, and is willing and prepared to succeed Dalia immediately.

46.     No prior application has been made for the relief requested herein.

### PRAYER FOR RELIEF

WHEREFORE, based upon the allegations contained herein, Petitioner requests that this Court provide the following relief:

(a)     Respondent and/or her counsel during the pendency of this proceeding are required to give notice by overnight mail to Petitioner's Counsel of any (1) offer to purchase the Orly Trust's 19.3% interest in TRI within ten (10) days of receiving such offer; and (2) act by

Respondent, her agents, and all other persons acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell, or otherwise alter the Orly Trust's interest at least 10 days prior to such act in accordance with Judge Troy K. Webber's Order dated July 1, 2009 affirmed on August 18, 2009, and stipulated to by the parties' respective counsel. (Annexed hereto as Exhibit B);

      (b)    Respondent and/or her counsel during the pendency of this proceeding are required to give notice by overnight mail to Petitioner's Counsel of any attempt to vote any TRI shares held by the Orly Trust for any purpose, including, without limitation, in any election of TRI's directors, with such notice being given at least ten (10) days prior to such attempt being made in accordance with the Stipulation signed by the Parties and their counsel dated September 8, 2010 (which is annexed hereto as Exhibit C);

      (c)    remove Respondent as Trustee of the Orly Trust for breaching her fiduciary duties, wasting, dissipating and looting the assets of the Orly Trust, imprudently managing and injuring the property committed to her charge; for concocting a scheme with Sagi Genger to strip the Orly Trust of its two most valuable assets: (a) an indirect interest in 49% of defendant TPR Investment Associates, Inc. ("TPR"), a closely held family corporation; and (b) 1,102.80 shares of common stock of Trans-Resources, Inc. ("TRI") (the "TRI Shares"), another closely held corporation; for allowing a foreclosure upon the Orly Trust's indirect 49% interest in TPR pursuant to a promissory note which, by mutual understanding and agreement between the Genger family members and TPR was never to be collected and did nothing to preserve Orly's rights or interest at the foreclosure sale; for colluding with defendants Sagi Genger and D&K GP LLC ("D&K GP") to enter into various agreements that would allow D&K GP to "mortgage, hypothecate, pledge, create a security interest in or lien upon, or otherwise encumber [the Orly Trust's TRI Shares]" in connection with the above-mentioned promissory note without giving any notice to Orly, the Orly Trust's beneficiary; and for failing to protect the Orly Trust

by appearing or appealing the Final Judgment Order of v.c. Leo E. Strine, Jr., Delaware

Chancery Court Civil Action Number 3997-VCS ;

 

      (d)     surcharging Respondent by an amount of the loss of the value of Orly's

interest in TPR and TRI, as determined by the Court and awarding Petitioner her costs and

attorneys' fees;

      (e)     appointing Michael D. Grohman, Esq., as successor trustee;

      (f)     waiving any requirement that Petitioner post an undertaking; and

      (g)     granting Petitioner any other relief it deems necessary and proper.

Dated:  New York, New York
        September 21, 2010

                                  ORLY GENGER
                                  Petitioner

COZEN O'CONNOR

By:                               
      Judith E. Siegel-Baum, Esq.
      Attorney for Petitioner
      277 Park Avenue
      New York, New York 10172
      212-883-4902

## VERIFICATION

STATE OF NEW YORK )                          )
                                             )ss.:
COUNTY OF NEW YORK )                         )

The undersigned, the Petitioner named in the foregoing Second Amended petition, being duly sworn, says: I have read the foregoing petition subscribed by me and know the contents thereof, and the same is true of my own knowledge, except as to the matters therein stated to be alleged upon information and believe, and as to those matters I believe it to be true.

_____
Signature of Petitioner

ORLY GENGER
_____
Print Name

Sworn to before me this
21 day of September, 2010.

_____
Notary Public
Commission Expires:
(Affix Notary Stamp or Seal)

GAIL GOLDFARB
NOTARY PUBLIC OF
NO. 02GO6106213
QUALIFIED STATE OF NEW YORK COUNTY
COMMISSION EXPIRES 03/01/20 12

## ATTORNEY CERTIFICATION

I, Judith E. Siegel-Baum, certify that to the best of my knowledge, information and belief, formed after an inquiry reasonable under the circumstances, certify that the presentation of the foregoing paper or the contentions therein are not frivolous as defined in subsection a of section 130-1.1 of the Rules of the Chief Administrator of the Courts.

Dated: September 22, 2010

Judith E. Siegel-Baum

TRUST AGREEMENT

BETWEEN

ARIE GENGER

AS GRANTOR

AND

LAWRENCE M. SMALL AND SASH A. SPENCER

AS TRUSTEES

CREATING

THE ORLY GENGER 1993 TRUST

*Accounting —*
*og . Leah.*

Dated:  December  *13*  , 1993

Copy 3 of 4

RUBIN BAUM LEVIN CONSTANT & FRIEDMAN
30 ROCKEFELLER PLAZA  ·  NEW YORK, N Y 10112

Index to the Orly Genger 1993 Trust Agreement

| Article | Contents | Page |
|---|---|---|
| FIRST: | Disposition of Principal and Income During the Life of the Grantor's Daughter, ORLY GENGER . . . . . . . . . | 1 |
| SECOND: | Continuing Trust for Descendants of the Grantor's Daughter, ORLY GENGER . . . . . . | 5 |
| THIRD: | Disposition of Property if No Descendant of the Grantor is Living . . . . . . . | 9 |
| FOURTH: | Additions to the Trusts . . . . . | 13 |
| FIFTH: | Irrevocability . . . . . . . | 13 |
| SIXTH: | Governing Law . . . . . . . | 13 |
| SEVENTH: | Trustees . . . . . . | 13 |
| EIGHTH: | Compensation of Trustees . . . . | 18 |
| NINTH: | Settlement of Trustees' Accounts; Exoneration of Trustees . . . . . | 18 |
| TENTH: | Definitions . . . . . . | 21 |
| ELEVENTH: | Administrative Powers . . . . . | 22 |
| TWELFTH: | Provisions Relating to the GST . . . . | 32 |
| THIRTEENTH: | Release of Powers . . . . . | 37 |
| FOURTEENTH: | Provision with Respect to Closely Held Businesses . . . . . | 38 |
| FIFTEENTH: | Headings . . . . . . | 39 |
| SIXTEENTH: | Severability . . . . . . | 39 |

TRUST AGREEMENT dated December *13*, 1993, between ARIE GENGER (now residing at 1067 Fifth Avenue, New York, New York), as Grantor, and LAWRENCE M. SMALL (now residing at 2804 Woodland Drive, Washington, D.C. 20008) and SASH A. SPENCER (now residing at 251 Crandon Boulevard, Townhouse 164, Key Biscayne, Florida 33149), as Trustees.

The Grantor hereby transfers to the Trustees, and the Trustees hereby acknowledge receipt of, the sum of Six Hundred Thousand Dollars ($600,000.00), to be held, administered and disposed of in accordance with the provisions of Article FIRST hereof. Said sum and any other property that may be received by the Trustees pursuant to the provisions of Article FOURTH hereof, and all investments and reinvestments thereof, and all proceeds thereof which constitute principal, are hereinafter collectively called "principal."

This Trust Agreement shall be known as the "Orly Genger 1993 Trust Agreement" and the trust created by Article FIRST hereof shall be known as the "Orly Genger 1993 Trust."

FIRST:    Disposition of Principal and Income
During the Life of the Grantor's Daughter,
ORLY GENGER.

A.    The Trustees shall hold, manage, invest and rein-vest the principal of the trust created by this Article, IN TRUST, and, so long as the Grantor's daughter, ORLY GENGER, shall live, the Trustees are authorized and empowered to pay such part, parts or all, if any, of the net income of the trust

created by this Article (hereinafter referred to in this Article as "Orly's Trust") to, or apply such part, parts or all, if any, of such net income for the use or benefit of, such one or more of the following individuals living from time to time in such equal or unequal amounts or proportions, and at such time or times, as the Trustees, in their discretion, shall determine:

1.   The Grantor's daughter, ORLY GENGER.

2.   Each descendant of ORLY GENGER.

The Trustees shall accumulate all income of Orly's Trust not so paid to or applied and, at least annually, add such net income to the principal of Orly's Trust.

In making such distributions, the Trustees are requested (but they are not directed) to limit the total amount of the distributions made to any descendant of ORLY GENGER with respect to any calendar year to the amount necessary to increase such descendant's taxable income for United States income tax purposes for such year to the greatest amount that shall still result in such descendant not being subject to United States income taxes at the highest marginal rate in effect for such year, after taking into account all of such descendant's other income and deductions for such year.

B.   The Trustees are authorized and empowered to pay to, or apply for the use or benefit of, the Grantor's said daughter such part, parts or all, if any, of the principal of Orly's Trust, and at such time or times, as said Trustees, in

-2-

their discretion, shall determine, without regard to the interest in the trust of any other person and without regard to the fact that any such payment or application may result in the termination of Orly's Trust.

C.   Upon the death of the Grantor's said daughter, the Trustees shall pay the then principal of Orly's Trust, together with all net income thereof then accrued but not yet collected, and collected but not yet disposed of, as follows:

1.   The Trustees shall pay one-half (1/2) of such income and principal, in such equal or unequal amounts or proportions, to or for the use or benefit of such one or more of the descendants of the Grantor's said daughter, and upon such terms, conditions and trusts, if any, as the Grantor's said daughter, by a provision in her Will expressly referring to this Article of this Trust Agreement, shall validly direct and appoint. If, or to the extent that, the Grantor's said daughter shall fail so validly to direct and appoint such principal and income, the Trustees, at the death of the Grantor's said daughter, shall pay the same, per stirpes, to such of the descendants of the Grantor's said daughter as shall survive her, subject, however, to the provisions of Article SECOND hereof, or, if no descendant of the Grantor's said daughter shall survive her, per stirpes, to such of the Grantor's descendants as shall so survive, or, if no descendant of the Grantor shall so survive, in accordance with the provisions of Article THIRD hereof.

-3-

2.   The Trustees shall pay one-half (1/2) of such income and principal, per stirpes, to such of the descendants of the Grantor's said daughter as shall survive her, subject, however, to the provisions of Article SECOND hereof, or, if no descendant of the Grantor's said daughter shall survive her, per stirpes, to such of the Grantor's descendants as shall so survive, or, if no descendant of the Grantor shall so survive, in accordance with the provisions of Article THIRD hereof

3.   If, pursuant to the provisions of paragraph 1 or paragraph 2 of this Section C, the Trustees are directed to pay a per stirpital share of such income and principal to a descendant of the Grantor, and if at the time the Trustees are so directed there shall be in existence a trust for such descendant under a trust agreement between Arie Genger, as grantor, and Lawrence M. Small and Sash A. Spencer, as trustees, executed on the date hereof and known as the "Sagi Genger 1993 Trust Agreement," the Trustees shall not pay such per stirpital share to such descendant but shall instead pay such per stirpital share to the trustees then acting under said trust agreement, to be disposed of by them pursuant to the provisions of the trust for such descendant under said trust agreement.

D.   Notwithstanding anything herein to the contrary, if any Trustee hereunder shall be one of the potential income beneficiaries of Orly's Trust, such Trustee shall not, in his or her capacity as such a Trustee, have any voice or vote or other-

-4-

wise participate in any decision pertaining to the payment or application of the income or principal of Orly's Trust to or for the use or benefit of him or her in his or her capacity as a beneficiary of such trust or to or for the use or benefit of any person whom he or she has an obligation to support, and, in each such event, the other Trustee or Trustees shall make all decisions relating to such trust that pertain to such matters.

SECOND:   Continuing Trusts for Descendants of the Grantor's Daughter, ORLY GENGER.

A.   If, under any provision of this Trust Agreement, any property is directed to be paid to a descendant of the Grantor's daughter, ORLY GENGER, subject to the provisions of this Article, such property shall not be distributed or paid to such descendant. Instead, the Trustees shall continue to hold such property, IN TRUST (in a separate trust for each such descendant which is referred to in this Article as "such descendant's trust"; provided, however, that if there shall be property so directed to be paid on more than one occasion to any such descendant, all such property shall be held in a single trust for such descendant), and, so long as such descendant shall live before attaining the age of twenty-one (21) years, the Trustees, other than such descendant if he or she shall be a Trustee hereunder, are authorized and empowered to pay to, or apply for the use or benefit of, such descendant, such part, parts or all, if any, of the net income of such descendant's

trust, and at such time or times, as said Trustees, in their discretion, shall determine, and the Trustees shall accumulate the balance of such net income, if any, and, at least annually, add it to the principal of such descendant's trust; and, so long as such descendant shall live after attaining the age of twenty-one (21) years, the Trustees shall pay to such descendant all of the net income of such descendant's trust in at least quarterly installments.

B.   The Trustees, other than such descendant if he or she shall be a Trustee hereunder, are authorized and empowered to pay to, or apply for the use or benefit of, such descendant, such part, parts or all, if any, of the principal of such descendant's trust, and at such time or times, as said Trustees, in their discretion, shall determine, without regard to the interest in the trust of any other person and without regard to the fact that any such payment or application may result in the termination of the trust.

C.   Upon the death of such descendant (hereinafter referred to in this Article as "such deceased descendant"), the Trustees shall pay the then principal of such deceased descen-dant's trust, together with all net income thereof accrued but not yet collected, and collected but not yet disposed of, as follows:

-6-

1.    The Trustees shall pay one-half (1/2) of such income and principal, in such equal or unequal amounts or proportions, to or for the use or benefit of such one or more of the descendants of such deceased descendant, and upon such terms, conditions and trusts, if any, as such deceased descendant, by a provision in his or her Will expressly referring to this Article of this Trust Agreement, shall validly direct and appoint. If, or to the extent that, such deceased descendant shall fail so expressly and so validly to direct and appoint such principal and income, the Trustees shall, at the death of such deceased descendant, pay the same, per stirpes, to such of the descendants of such deceased descendant as shall survive such deceased descendant, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, per stirpes, to such of the descendants as shall so survive of the ancestor of such deceased descendant closest in degree of relationship to such deceased descendant who (i) shall have descendants who shall so survive and (ii) shall have been a descendant of the Grantor or shall have been the Grantor, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, in accordance with the provisions of Article THIRD hereof.

2.    The Trustees shall pay one-half (1/2) of such income and principal, per stirpes, to such of the descendants of such deceased descendant as shall survive such deceased

-7-

descendant, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, per stirpes, to such of the descendants as shall so survive of the ancestor of such deceased descendant closest in degree of relationship to such deceased descendant who (i) shall have descendants who shall so survive and (ii) shall have been a descendant of the Grantor or shall have been the Grantor, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, in accordance with the provisions of Article THIRD hereof.

3.    If, pursuant to the provisions of paragraph 1 or paragraph 2 of this Section C, the Trustees are directed to pay a per stirpital share of such income and principal to a descendant of the Grantor subject to the provisions of this Article, and if at the time the Trustees are so directed there shall be in existence a trust for such descendant under a trust agreement between Arie Genger, as grantor, and Lawrence M. Small and Sash A. Spencer, as trustees, executed on the date hereof and known as the "Sagi Genger 1993 Trust Agreement," the Trustees shall not pay such per stirpital share to such descendant subject to the provisions of this Article but shall instead pay such per stirpital share to the trustees then acting under said trust agreement, to be disposed of by them pursuant to the provisions of the trust for such descendant under said trust agreement.

-8-

D.   Notwithstanding anything herein to the contrary, each trust created by the terms of this Article shall terminate, if not sooner terminated, upon the expiration of twenty-one (21) years after the death of the last surviving descendant of the Grantor's parents, SHARGA GENGER and DORA GENGER, who shall have been in being on the date hereof; and the Trustees shall thereupon pay the then principal of any trust terminated in accordance with the provisions of this Section, together with all net income thereof accrued but not yet collected and collected but not yet disposed of, to the descendant of the Grantor with respect to whom such trust is being held.

THIRD:   Disposition of Property if No Descendant of the Grantor is Living.

A.   As used in this Article:

1.   The words "such time" shall mean the time as of which any property is directed to be paid in accordance with the provisions of this Article.

2.   The term "Qualified Charitable Organization" shall mean an organization that shall be qualified as an organization to which contributions and bequests are deductible for both United States income tax, gift tax and estate tax purposes under the provisions of Section 170, Section 2522 and Section 2055 of the Internal Revenue Code.

-9-

B.   If, under any provision of this Trust Agreement, any property is directed to be paid in accordance with the provisions of this Article, the Trustees shall pay such property as follows:

1.   If the Grantor, the Grantor's spouse and/or any one or more descendants of the Grantor shall have caused there to be created a foundation known as The Genger Foundation, and if at such time said Foundation shall be in existence and shall be a Qualified Charitable Organization, then, in such event, the Trustees shall pay such property to said Foundation.

2.   If at such time either The Genger Foundation created as aforesaid shall not be in existence or said Foundation shall be in existence but shall not be a Qualified Charitable Organization, and if at such time the Trustees are authorized under applicable law to cause to be organized a corporation under and in accordance with the laws of any state of the United States which the Trustees, in their discretion, shall select, which corporation (i) shall be known by the name of The Genger Foundation (or by such other name as the Trustees, in their discretion, shall select if the name of The Genger Foundation shall not be available to be utilized as the name of said corporation), (ii) shall have as its purposes the encouragement, promotion, support and enhancement of non-orthodox study and education for children in the State of Israel pertaining to the customs, practices and ancient and modern history of the Jewish

-10-

people and shall maintain all of the property held by it, and
use all of the net income thereof received from time to time,
for the encouragement, promotion, support and enhancement of
such study and education for children, (iii) shall be required
to maintain all of the property held by it, and use all of the
net income thereof received from time to time, for such pur-
poses, with such property and income to be expended for such
purposes in such amounts, at such time or times and to or for
the use or benefit of such recipient or recipients as the direc-
tors, trustees and/or the officers of such corporation shall, in
their discretion, determine from time to time, subject, however,
to the other provisions of this paragraph 2, (iv) shall have as
its initial directors or trustees the Trustees hereunder, the
Grantor's cousin, JEREMIAH WOHLBERG (now residing at 2325
Lindenmere Drive, Merrick, New York), if he shall not then be a
Trustee hereunder, and also such other individual or individ-
uals, if any, as may be designated by the Trustees, and there-
after to have as directors or trustees such individuals as shall
from time to time be determined as provided for in the certi-
ficate of incorporation and/or by-laws of said corporation, and
(v) shall be organized and maintained in such manner as to be
and continue to be a Qualified Charitable Organization, then, in
such event, the Trustees shall organize such a corporation, and
the Trustees shall pay such property to such corporation.

-11-

3.  If at such time (i) either The Genger Foundation created as aforesaid shall not be in existence or said Foundation shall be in existence but shall not be a Qualified Charitable Organization, and (ii) the Trustees are not authorized under applicable law to cause to be organized a corporation of the nature referred to in paragraph 2 of this Section B, then, in such event, the Trustees shall pay such property to the JEWISH COMMUNAL FUND OF NEW YORK, New York, New York, to be held, administered and disposed of pursuant to the rules and regulations thereof as an Undesignated Philanthropic Fund to be known as the Genger Philanthropic Fund and with the privilege of making advisory recommendations with respect thereto to be held in the first instance by the Trustees, said JEREMIAH WOHLBERG, if he shall not then be a Trustee hereunder, and also by such other individual or individuals, if any, as the Trustees may designate, and thereafter by such other individual or individuals as such designees and their successors acting in such capacity may from time to time designate, and it is requested (but not directed) that the principal and income of such Fund shall be utilized to encourage, promote, support and enhance non-orthodox study and education for children in the State of Israel pertaining to the customs, practices and ancient and modern history of the Jewish people.

-12-

FOURTH: <u>Additions to the Trusts.</u>

Any person, including the Grantor, by a transfer to take effect during the life of such person or upon the death of such person, may, at any time or times, add to the principal of any trust hereunder any property of any kind or nature acceptable to the Trustees, and any such additional property so received by the Trustees pursuant to the provisions of this Article shall thereafter be deemed to be part of the principal of such trust subject to all of the terms, provisions and conditions of this Trust Agreement.

FIFTH: <u>Irrevocability.</u>

This Trust Agreement and the trusts hereby created are irrevocable and not subject to amendment or change.

SIXTH: <u>Governing Law.</u>

This Trust Agreement and the trusts hereby created shall be governed by the laws of the State of New York.

SEVENTH: <u>Trustees.</u>

A. The initial Trustees acting hereunder shall be LAWRENCE M. SMALL and SASH A. SPENCER.

B. Each individual acting as a Trustee hereunder (whether such Trustee is initially a party to this Trust Agreement or a successor Trustee named in Section C of this Article

-13-

or appointed pursuant to the provisions of this Section B) is authorized and empowered to appoint another individual (other than the Grantor) to act in his or her place and stead as a Trustee hereunder. Each appointment of a successor Trustee hereunder shall be made by the execution of an instrument of appointment signed and acknowledged by the individual who shall have made such appointment and by delivering such instrument in accordance with the provisions of Section G of this Article; and any such appointment may be revoked in the same manner by the individual Trustee who shall have made it at any time before the occurrence of the event or events as of which such appointment shall, by its provisions, become effective. Any appointment made in accordance with the provisions of this Section B shall be valid only if the individual so appointed shall, within thirty (30) days after the later of (i) the date on which a copy of such instrument of appointment is so delivered to him or her, and (ii) the occurrence of the event or events as of which such appointment shall, by its provisions, become effective, qualify as a successor Trustee under this Trust Agreement in accordance with the provisions of Section D of this Article. Each successor Trustee named in Section C of this Article or appointed in accordance with the provisions of this Section B shall be vested with the same powers and authority as the initial Trustees who are parties to this Trust Agreement; provided, however, that no such Trustee shall be permitted to exercise any authority or

-14-

power which such Trustee shall be prohibited from exercising by an express provision of this Trust Agreement.

C.  1.  If either LAWRENCE M. SMALL or SASH A. SPENCER shall cease to act as a Trustee hereunder, and no successor Trustee appointed by him pursuant to the provisions of Section B of this Article shall quality and act as a Trustee hereunder, MARTIN A. COLEMAN (now residing at 51 Cambridge Road, Great Neck, New York 11023) shall act as Trustee hereunder.

2.  If MARTIN A. COLEMAN shall fail or cease cease to act as a Trustee hereunder, and no successor Trustee appointed by him pursuant to the provisions of Section B of this Article shall quality and act as a Trustee hereunder, THOMAS G. HARDY (now residing at 935 Park Avenue, New York, New York 10028) shall act as a Trustee hereunder.

D.  Each successor Trustee hereunder shall qualify as such by accepting the trusteeship by the execution of a signed and acknowledged instrument of acceptance and by delivering such instrument in accordance with the provisions of Section G of this Article.

E.  Any individual Trustee hereunder may resign as such a Trustee by the execution of a signed and acknowledged instrument of resignation and by delivering such instrument in accordance with the provisions of Section G of this Article.

-15-