IN WITNESS WHEREOF, the parties have executed and delivered this Agreement, effective on the day and year first written above.

GENERAL PARTNER:

_____

D&K GP LLC

by: Sagi Genger, its managing member

LIMITED PARTNERS:

_____

1993 Sagi Genger Trust

by: Leah Fang, sole trustee

_____

1993 Orly Genger Trust

by: Leah Fang, sole trustee

Restated this ___ day of November, 2007

16

## Meeting of Partners of D&K LP – Jan. 31, 2009 & Agreement

The undersigned partners having reviewed the status of D&K LP ("D&K") and each of its partners vote as follows to:

1. Indemnify and provide a general release from any claim or right at equity, law, or contract or otherwise the current and former general partner, its officers, the partnership's holdings (including TPR Investment Associates, Inc.) and the officers of its holdings to fullest extent permitted in connection with any claim by the partnership and/or its partners. Irrespective of the above, nothing herein shall serve to release or indemnify Arie Genger, William Dowd, Lawrence Small or Edward Klimerman.

2. Authorize the General Partner on behalf of D&K and each limited partner individually to enter and execute such binding compromise as may be possible and deemed prudent by the GP in connection with the outstanding note from D&K guaranteed 50% by each limited partner. Such note having a balance of about $11,204,685 is presently subject to acceleration. Nothing herein shall derogate from authority already granted the General Partner in the Partnership Agreement.

3. The partners wish to clarify that the authority vested in the General Partner to make limited partners' assets subject to a pledge shall be done in substantially the same manner in which TPR Investment Associates, Inc shares were pledged in conjunction with the aforementioned note. However, the General Partner shall be authorized to sign for the partnership and/or each individual partner.

4. Provide such consideration as the GP may deem fit in entering into any compromise.

5. Waive any objection to the dealings of the GP or its officers based on conflict of interest or otherwise.

6. Request that the General Partner make this resolution part of the Partnership Agreement.

7. Attached is a worksheet calculating the amount owed, $11,204,685.

8. TPR Investment Associate, Inc. has agreed to refrain from enforcing the note against each limited partner for thirty days.

_____
Orly Genger 1993 Trust – LP

_____
Sagi Genger 1993 Trust – LP

_____
Sagi Genger on behalf of General Partner

_____
TPR Investment Associates, Inc.

Minutes of Partners of D&K LP - Jan. 31, 2009 & Agreement

... partners ... having reviewed the status of D&K LP ("D&K") and each of its partners vote in favor to:

1. Indemnify and provide a general release from any claim or right at equity, law, or contract or otherwise the current and former general partners, its officers, the partnership's holdings including TPR Investment Associates, Inc.; and the officers of its holdings to fullest extent permitted in connection with any claim by the partnership and/or its partners. Irrespective of the above, nothing herein shall serve to indemnify Arie Genger, William Dowd, Lawrence Small or Edward Klimerman.

2. Authorize the General Partner on behalf of D&K and each limited partner individually to enter and execute such binding compromise as may be possible and deemed prudent by the GP in connection with the outstanding note from D&K guaranteed 50% by each limited partner. Such note having a balance of about $11,204,685 is presently subject to acceleration. Nothing herein shall derogate from authority already granted the General Partner in the Partnership Agreement.

3. The partners wish to clarify that the authority vested in the General Partner to make limited partners assets subject to a pledge shall be done in substantially the same manner in which TPR Investment Associates, Inc shares were pledged in conjunction with the aforementioned note. However, the General Partner shall be authorized to sign for the partnership and/or each individual partner.

4. Provide such consideration as the GP may deem fit in entering into any compromise.

5. Waive any objection to the dealings of the GP or its officers based on conflict of interest or otherwise.

6. Request that the General Partner make this resolution part of the Partnership Agreement.

7. Attached is a worksheet calculating the amount owed, $11,204,685.

8. TPR Investment Associates, Inc. has agreed to refrain from enforcing the note against each limited partner for thirty days.

_____
Orly Genger 1993 Trust – LP

_____
Sagi Genger 1993 Trust – LP

_____
Sagi Genger on behalf of General Partner

_____
TPR Investment Associates, Inc

Rate                                    6.1%

                                        Owing
        Tuesday, October 26, 2004       9,880,000
Portion Not Assumed by Parents          9,484,800


        Friday, October 31, 2008        1466
Days in Year                            365
                                        4.02
Interest rate for Period                26.7%

Dollars of Interest                     2,528,289.02

Amount Due                              12,013,089.02
Payment                                 (960,000.00)

Net of Payment                         11,053,089.02


        Saturday, January 31, 2009      92
Days in Year                            365
                                        0.25
Interest rate for Period                1.4%
Dollars of Interest                     151,595.73

Current Amount Owed                     11,204,685

                                        5,602,342.38

January 10, 2009

Dear Mom,

I understand that my petition to appoint Martin Coleman as Trustee of the Orly Genger 1993 Trust ("Trust") has been denied. My attorneys are reviewing the decision and considering all of my options, including whether to appeal.

For now, and until further notice, it is my strong desire to retain all of the shares of Trans-Resources, Inc. ("TRI") that are currently in the Trust, and I direct you not to sell them. If you are approached, or have been approached, with an offer to purchase any of the TRI shares in the Trust, please notify me immediately. If, despite my wishes, you consider accepting an offer, do not sell any shares until I have a reasonable period of time to maximize the benefit to the Trust, including possible alternative transactions.

As you know, the Trust's TRI shares are subject to an Irrevocable Proxy, dated as of October 29, 2004, in favor of my father, Arie Genger, as well as a voting trust letter agreement with a back-up form of voting trust agreement and voting trust certificate delivered in connection with the Proxy. Copies of those documents are attached. If anyone approaches you about the TRI shares, I insist that you inform them of these facts, and provide them with a copy of this letter and attached documents.

*Orly Genger*   1/10/2009

Orly Genger

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X

In the Matter of

ORLY GENGER,

               Petitioner,

      -against-

LEAH FANG, DAVID A. PARNES, THE SAGI
GENGER TRUST, DALIA GENGER, JOEL
ISAACSON and MARTIN COLEMAN,

               Respondents.

------------------------------------------------------------------X

Index No. 2008/0017

**NOTICE OF ENTRY OF
ORDER**

STATE OF NEW YORK    )
                      ) ss.:
COUNTY OF NEW YORK  )

        PLEASE TAKE NOTICE that the within is a true copy of a Decision and Order

of the Surrogate's Court of the State of New York, County of New York, dated December 31,

2008, and duly entered by the Clerk of the Surrogate's Court on December 31, 2008.

Dated: New York, New York
       January 16, 2007

SULLIVAN & WORCESTER LLP

By: _____

Jonathan G. Kortmansky
Kimberley R. Chapman
1290 Avenue of the Americas, 29th Flr.
New York, New York 10104
(212) 660-3000
*Attorneys for Respondent Dalia Genger*

To:   Eve Rachel Markewich, Esq. (by e-mail and regular mail)
      Markewich & Rosenstock LLP
      8 East 41st Street, Fifth Floor
      New York, NY 10017

      Mark Waldstein, Esq. (by e-mail and regular mail)
      McLaughlin & Stern
      260 Madison Avenue
      New York, NY 10016

      Matthew Hoffman, Esq. (by e-mail and regular mail)
      Barton, Barton & Plotkin, LLP
      Graybar Building
      420 Lexington Avenue, 18th Floor
      New York, NY 10170

      Seth Rubenstein, Esq. (by e-mail and regular mail)
      26 Court Street
      Room 1501
      Brooklyn, NY 11242

SURROGATE'S COURT : NEW YORK COUNTY

JAN 0 2 2009

------------------------------------- X
In the Matter of the Trust Established
on December 13, 1993, by ARIE GENGER         File No. 0017/2008
for the Benefit of ORLY GENGER.
------------------------------------- X

R O T H , S .

    This is a contested application by the primary beneficiary
(Orly Genger) of an irrevocable inter vivos trust established by
her father, Arie Genger, seeking the appointment of a successor
trustee or, alternatively, the appointment of a "special trustee"
to investigate alleged wrongdoing concerning the trust.
Petitioner's mother, Dalia Genger (grantor's former wife),
contends that she is the duly appointed successor trustee and
that there is no basis to appoint another fiduciary for any
purpose.

    The trust agreement, dated December 13, 1993, provides for
discretionary income and principal distributions to Orly for life
with remainder to her descendants or, if none, to the grantor's
descendants in trust.

    Article SEVENTH (B), (D), (E), and (G) of the trust
instrument sets forth the following procedure for the resignation
of trustees and the appointment of their successors.

    A trustee may resign by delivering a signed and acknowledged
instrument of resignation in person or by certified or registered
mail to the other trustee and to either the grantor or the income
beneficiary.  Such resignation is effective upon the receipt of
the acknowledged instrument by the other trustee (if there is

one) and the grantor or the income beneficiary or at such later date as may be specified in the instrument.

A trustee may appoint his or her successor by delivering a signed and acknowledged instrument in the same manner as described above for resignation. Any such appointment, however, is valid only if the appointee qualifies by delivering a signed and acknowledged instrument of acceptance in person or by certified or registered mail to each trustee and the grantor or the income beneficiary within 30 days after the later of 1) the date on which a copy of the appointment instrument is delivered to him or her, and 2) the effective date of the appointment as set forth in the appointment instrument. It is observed that there is no provision that requires a resigning trustee to appoint a successor or that there always be two trustees in office.

The original two trustees served until October 2004, when they resigned and appointed David Parnes and Eric Gribitz as their successors. On February 12, 2007, Mr. Gribitz resigned without appointing a successor. On April 26, 2007, Mr. Parnes resigned and appointed as his successor Leah Fang in a signed and acknowledged instrument. Although Ms. Fang noted her acceptance at the bottom of such instrument, her signature was not acknowledged. However, in another document entitled "Release" executed and acknowledged by Ms. Fang the same day, she, as

2

trustee, purported to discharge Mr. Parnes from liability. It is
undisputed that thereafter Ms. Fang acted as trustee. Indeed,
Ms. Fang's contention that she received a number of requests for
information from petitioner and that petitioner referred to her
in writing and orally as trustee is not disputed by petitioner.

On December 12, 2007, Ms. Fang, without resigning in
accordance with the trust agreement, attempted to appoint
Patricia Enriquez, as successor trustee. Her designation of Ms.
Enriquez, however, was by an unacknowledged letter in which she
referred to her own resignation as taking effect upon Ms.
Enriquez's acceptance of the appointment. Ms. Enriquez accepted
by signing the letter, but such acceptance was not acknowledged
and, in any event, there is nothing in the record to suggest that
such "acceptance" was delivered in accordance with the trust
instrument. Two weeks later, an attorney for Ms. Enriquez
notified petitioner's counsel by email that her client had
advised that she had no intention to overcome the procedural
omissions.

On January 3, 2008, Ms. Fang and Dalia Genger signed before
a notary a memorandum in which Ms. Fang stated that "to the
extent that I am still vested with any powers to appoint trustees
of the [trust], I confirm your appointment." The next day, Ms.
Fang executed an acknowledged instrument of resignation and
appointment of successor trustee naming Dalia as her successor

3

and Dalia, on the same day, executed an acknowledged instrument
of acceptance. It is undisputed that such documents were
delivered in accordance with the trust requirements.

We address first that portion of the instant application
which seeks the appointment of a successor trustee on the ground
that Dalia was not validly appointed. In such connection,
petitioner argues first that, because Ms. Fang's signature on the
bottom of Mr. Parnes's appointment instrument was not
acknowledged, she never accepted the position in accordance with
the trust agreement (and thus could not appoint Dalia her
successor). However, such argument ignores the "Release"
mentioned above that Ms. Fang executed the same day. Such
instrument, which was signed and duly acknowledged, unequivocally
establishes Ms. Fang's acceptance of the position. Since
petitioner does not challenge the authenticity of such instrument
or Mr. Parnes' contention, supported by the record, that it was
delivered in accordance with the trust instrument and, as noted
above, petitioner thereafter communicated with Ms. Fang as
trustee, Ms. Fang properly qualified as successor trustee.

Petitioner's second argument that, in any event, Ms. Fang's
appointment of Dalia was ineffective because Ms. Fang had
previously resigned as trustee is also without merit. Simply
put, Ms. Fang had not previously resigned because her letter to
Ms. Enriquez did not contain the formalities (i.e., an

4

acknowledgment) required by the trust agreement. Moreover, although not a model of clarity, the letter makes clear that Ms. Fang did not intend to leave the trust without a trustee in the event that Ms. Enriquez failed to qualify, which is exactly what happened. Thus, Ms. Fang had authority to appoint Dalia as her successor.

Since there is no dispute that the instrument of resignation and appointment executed by Ms. Fang on January 4, 2008, and Dalia's instrument of acceptance of the same date were executed and delivered in accordance with the trust agreement, Dalia is the duly appointed successor trustee of the trust. To find otherwise would be to ignore the chronology of events and the purpose of the provisions at issue, namely to ensure that the trust always has a fiduciary ready, willing and able to act. The fact that petitioner does not wish her mother to be the fiduciary because she considers her an adversary in a broader intra-family dispute does not provide a basis to ignore the grantor's intent, as reflected in the trust instrument, that an acting trustee, and not the beneficiary, decides who shall become a successor trustee. Accordingly, petitioner's application to appoint a successor trustee is denied.

We next turn to petitioner's alternate request for relief, namely that a "special trustee" be appointed for the "purpose of investigation and taking discovery with respect to the wrongful

5.

dealings concerning the assets and income of the trust."

It is noted initially that petitioner's only allegations of
"wrongful dealings" concern a close corporation, TPR Investment
Associates, Inc.   She contends that her brother Sagi, who is an
officer of TPR, and Dalia, who was a shareholder at the time this
proceeding was commenced, are engaged in a "wrongful scheme" to
divert assets to themselves and, as a result, Dalia "could not
possibly" investigate wrongdoing at TPR, which the petition
describes as the "greatest" asset of the trust.

However, the premise of the application, namely that the
trust's interest in TPR would enable the trustee to investigate
or seek relief from TPR, does not appear to be correct.
Petitioner does not dispute Dalia's assertion, supported in the
record, that the trust is not a shareholder of TPR at all.
Rather, D&K LP, an entity in which the trust owns a 48 percent
interest, in turn owns approximately 50 percent of TPR.
Petitioner does not explain what appears to be a material
misstatement concerning TPR's relationship to the trust.   Nor
does she identify how a trustee under such circumstances might be
in a position to "investigate and address the TPR issues".

In any event, assuming arguendo that a trustee would somehow
be able to investigate alleged misconduct at TPR, petitioner's
vague and speculative allegations of "wrongful conduct" at TPR
from which Dalia purportedly benefitted do not warrant the

6

appointment of a "special trustee". Similarly, petitioner's
allegations (made upon information and belief) that Dalia had
knowledge of alleged improper acts by former trustee, David
Parnes, in relation to TPR are patently insufficient to warrant
the remedy of a "special trustee". In such connection, it is
noted that Mr. Parnes and Ms. Fang have been directed to account
for their proceedings as trustees (Matter of Genger, NYLJ, Feb.
25, 2008, at 29, col 3), giving petitioner a forum to seek relief
for most of the conduct about which she complains.

Finally, it is observed that petitioner has not alleged that
Dalia has refused a request for information, which would warrant
relief (SCPA 2102), or has failed as trustee to protect trust
assets. Indeed, it appears that Dalia (who states that she is
ready and able to act as fiduciary) has yet to assume the duties
of trustee in deference to her daughter's position in this
litigation. As a validly appointed trustee, she should be given
the opportunity to do what she deems necessary to manage and
protect the trust's assets.

Based upon the foregoing, the appointment of a "special
trustee" is unwarranted at this time and, accordingly, the
application is denied, without prejudice to renewal if future

circumstances warrant such relief.

This decision constitutes the order of the court.

_____
S U R R O G A T E

Dated: December 31, 2008

8



# COZEN
# O'CONNOR

A PROFESSIONAL CORPORATION

250 PARK AVENUE    NEW YORK, NY 10177    212.509.9400    800.437.7040    212.986.0604 FAX    www.cozen.com

May 14, 2009

**Judith E. Siegel-Baum**
Direct Phone 212.883.4902
Direct Fax    215.701.2261
jsiegel-baum@cozen.com

**VIA CERTIFIED MAIL/RETURN
RECEIPT REQUESTED
70032260000561425069
AND REGULAR MAIL**

Dalia Genger
200 East 65th Street
Apt. 32W
New York, NY  10021

Re:    Orly Genger 1993 Trust

Ms. Genger:

Please be advised that we represent Orly Genger in her capacity as beneficiary of the Orly Genger 1993 Trust (the "Trust"). You are presently serving as her sole trustee.

Orly has received no information about the assets, income and investments of the Trust and is very concerned that the assets of the Trust have been, or could be, affected by the following lawsuits: <u>Glenclova Investment Co. v. Trans-Resources, Inc., and TPR Investment Associates, Inc.</u> (pending in the Southern District of the State of New York); <u>Robert Smith, TR Investors, LLC and Glenclova Investment Co. v. Trans-Resources, Inc.</u> (pending in Delaware Chancery Court); <u>TR Investors, LLC, Glenclova Investment Co., New TR Equity 1, LLC and New TR Equity II, LLC v. Arie Genger and Trans-Resources, Inc.</u> (pending in Delaware Chancery Court); and <u>New TR Equity, LLC v. Trans-Resources, Inc.</u> (pending in Delaware Chancery Court). Moreover, Orly is concerned that the value of TRI shares owned by the Trust have been impacted by the sale of TRI shares owned by the Sagi Genger 1993 Trust (the "Sagi Trust") to TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC.

Please provide us with the following documents by May 26, 2009:

1.    All documents relating to the assets of the Trust from 2004 through the present.

Dalia Genger
May 14, 2009
Page 2

2.      All documents relating to any and all investments and trades made directly by, or indirectly by, the Trust for the period 2004 through the present including, without limitation, all statements of transactions.

3.      All documents relating to all purchases, sales, transfers and assignments of real or personal property  directly by, or indirectly by, the Trust from 2004 through the present including, without limitation, closing statements, deeds, title reports, canceled checks, transfer tax documents, appraisals, catalogues and insurance policy riders.

4.      All documents relating to any and all distributions or payments of money or securities directly by, or indirectly by, the Trust for the period 2004 through the present.

5.      All documents relating to any and all dividends or other payments of money received directly by, or indirectly by, the Trust for the period 2004 through the present.

6.      All documents relating to any and all fees, commissions, reimbursement for expenses and other charges or compensation paid directly by, or indirectly by, the Trust for the period 2004 through the present including, without limitation, canceled checks and wire transfer reports.

7.      All documents relating to any promissory notes, accounts payable and debts and loans owed directly by, or indirectly by, the Trust for the period 1993 through the present.

8.      All U.S. and N.Y. Fiduciary Tax Returns including all back-up documents filed since the Trust's inception.

## D & K GP LLC ("D & K GP")

9.      The Trust has an interest in D & K LP ("D & K"). D & K GP is the general partner of D & K. Accordingly, we request the following documents related to D & K GP for the period 2004 through the present including, without limitation, amendments to the Limited Liability Company Agreement of D & K GP LLC, Schedule A (and amendments) to the Limited Liability Company Agreement of D & K GP LLC (i.e., a list of capital contributions made by the Members), a list of Members from 2004 through the present, subscription documents, tax returns, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes, statements of income distribution to you, the Trust, the Sagi Trust, Sagi Genger ("Sagi") and/or to any other party, records of contributions or investments by you, the Orly Trust, the Sagi Trust, Sagi and/or by any other party, cash receipts, cash disbursements journals, general ledgers, a list of employees from 2004 through the present, a list of appointed management and their compensation schedules from 2004 through the present, W-2s issued and 1099s issued.

Dalia Genger
May 14, 2009
Page 3

---

### D & K LP ("D & K")

10.     All documents relating to D & K for the period 2004 through the present including, without limitation, all partnership agreements and amendments, a list of capital contributions by each partner from 2004 through the present, a list of all partners from 2004 through the present, subscription documents, tax returns, K-1 statements, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes, statements of income distribution to you, the Trust, the Sagi Trust, Sagi and/or to other parties, records of contributions or investments by you, the Trust, the Sagi Trust, Sagi and/or by other parties, cash receipts, cash disbursements journals, general ledgers, a list of employees, W-2s and 1099s.

11.     All documents relating to the sale or assignment of your interest in D & K to Sagi, D & K GP, the Sagi Trust or any other party including, without limitation, the date on which the sale or assignment was made, the purchase and sale agreement (if by sale and not by assignment), transfer documents, closing documents, canceled checks and appraisals.

12.     All documents relating to the assignment of D & K's promissory note in favor of TPR (dated December 21, 1993) to David Parnes (the "Promissory Note").

### TPR Investment Assocs., Inc. ("TPR")

13.     All documents relating to TPR from 2003 though the present including, without limitation, amendments to TPR Investment Associates, Inc. Shareholders Agreement dated October 30, 2004 ("TPR Shareholder Agreement"), shareholder agreements preceding the present TPR Shareholder Agreement, tax returns, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes from all board meetings and Sale Meetings (as that term is defined in §3.3 of the TPR Shareholder Agreement), records of contributions or investments by you, the Trust, the Sagi Trust and/or Sagi, cash receipts, cash disbursements journals, balance sheets, general ledgers, a list of employees, W-2s, 1099s, statements of income distribution to you, the Trust, the Sagi Trust, Sagi and/or to any other party, a list of the board of directors from 2003 through the present and a list of appointed management from 2003 through the present and each of their compensation schedules.

14.     All verification of loan and interest repayments to and from TPR from 2004 to the present.

15.     All documents relating to the sale, assignment and collections received from David Parnes in connection with the Promissory Note.

16.     All documents relating to your sale of each tranche of TPR shares either back to TPR, to Sagi or to any other party including without limitation, a copy of the "Sale Notice" (as that term is defined in §3.3 of the TPR Shareholder Agreement), the "Evaluated Share Value" (as that term is defined in §3.3(a)(v) of the TPR Shareholder Agreement), closing documents, canceled checks and appraisals.

Dalia Genger
May 14, 2009
Page 4

---

## Trans-Resources, Inc. ("TRI")

17.    All documents relating to TRI from 2003 though the present including, without limitation, shareholder agreements and amendments, tax returns, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes from all board meetings, records of contributions or investments by you, the Trust, the Sagi Trust, Sagi and/or any other party, cash receipts, cash disbursements journals, balance sheets, general ledgers, a list of employees, W-2s, 1099s, and statements of income distribution to you, the Trust, the Sagi Trust, Sagi and/or any other party, a list of all board of director members since 2003 and a list of all appointed management since 2003 and each of their compensation schedules.

18.    The Trust owns TRI shares and as a fiduciary you should have had knowledge that the Sagi Trust sold its TRI shares on August 22, 2008 to TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC. Provide us with all documents relating to the sale of TRI shares by the Sagi Trust.

19.    The assets of the Trust may be affected by the following lawsuits:

(i)    Glenclova Investment Co. v. Trans-Resources, Inc., and TPR Investment Associates, Inc. pending in the United States District Court, Southern District of New York;

(ii)    Robert Smith, TR Investors, LLC and Glenclova Investment Co. v. Trans-Resources, Inc. pending in the Delaware Chancery Court;

(iii)    TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC v. Arie Genger and Trans-Resources, Inc. pending in the Delaware Chancery Court; and

(iv)    New TR Equity, LLC v. Trans-Resources, Inc., pending in the Delaware Chancery Court.

Accordingly, as trustee provide us with copies of documents relating to the above-set-forth proceedings including, without limitation, the pleadings (i.e., the summons, complaint and all motion papers) and correspondence.

20.    All documents related to TRI shares that were issued to the Trust and are being held by Robert Lack, Esq., Friedman Kaplan Seiler & Adleman LLP, 1633 Broadway, New York, New York 10019.

The term "documents" as used above shall mean the original or duplicate copy or draft(s) of any writing or recording of whatever nature, whether written, typed, printed, photocopied, filmed, videotaped or mechanically or electronically sorted or recorded, which is in your possession, custody or control. Moreover, the term "documents" shall include, without limitation, correspondence, e-mails, memoranda, reports, notes, minutes, or records, or telephone conversations, meetings, or conferences, diaries, logs, calendar notes, accounting records, financial statements, books of account, vouchers, invoices, bills, computer tapes, print-outs,

Dalia Genger
May 14, 2009
Page 5

writings, drawings, graphs, charts, photographs, videotape recordings, data compilations from which information can be obtained or translated.

If we do not receive a reply with the information requested on or before May 28, 2009, we will be forced to seek court intervention.

Sincerely,

COZEN O'CONNOR

By:    Judith E. Siegel-Baum

JES:pw

cc:    Orly Genger
       Jonathan G. Kortmansky, Esq.

# PEDOWITZ & MEISTER, LLP

1501 BROADWAY, SUITE 800
NEW YORK, NEW YORK 10036-5501
www.pedowitzmeister.com

212.403.7330 voice
212.354.6614 facsimile
robert.meister@pedowitzmeister.com

ARNOLD H. PEDOWITZ
ROBERT A. MEISTER

DAVID HARRISON
RANDI MELNICK

June 1, 2009

NEW JERSEY OFFICE

285 OLD SHORT HILLS ROAD
SHORT HILLS, N.J. 07078
(973) 912-0005

EMAIL AND UPS

Judith E. Siegel-Baum, Esq.
Cozen & Worcester
250 Park Avenue
New York, NY 10177

Re:   <u>Orly Genger 1993 Trust</u>

Dear Ms. Siegel-Baum:

I write to respond to your May 14th letter to my client, Dalia Genger in her capacity as Trustee of The 1993 Orly Genger Trust (the Trust).

May I start by expressing Mrs. Genger's understanding about the concern that your client, Orly Genger, has about the effect her interests of the various lawsuits your letter mentions. Mrs. Genger has the same concern, particularly since, as we understand it, the *Glenclova* action raises the issue of whether the transfer to the Trust of shares of Trans-Resources, Inc. (TRI) was invalid under the TRI shareholders' agreement.

Having shared that concern, I would like to respond to your letter in narrative form, rather that in the form a response to a litigation demand for production.

All TRI shares are, I am informed, held for the benefit of the shareholders by TRI. Thus Mrs. Genger does not physically possess a share certificate. I am informed that the absence of such a certificate did not prevent The Sagi Genger Trust from selling the shares it was given.

As your client knows, Mrs. Genger became Trustee January 4, 2008, as successor trustee to Leah Fang. Ms. Fang has an accounting pending in Surrogate's Court, New York County, File No. 0017/2008.

Mrs. Genger has not taken any action as Trustee and has not received any dividends or other property or assets in respect of the TRI shares.

As your client knows, D & K I.P pledged its 240 shares of the stock of TPR Investment Associates, Inc. (TPR) to secure its December 21, 1993 Note to TPR in the principal amount of

$8,950,000. I believe that your client has the D&K organization papers; if not I'll be glad to copy them for you at your expense, as they're about an inch think. By notice dated 8/31/2008, TPR declared that Note to be in default and subsequently sold the TPR shares for $2,200,000 on February 27, 2009. I attach papers concerning this transaction.

As a result of the foreclosure, the TRI shares are the Trust's only asset.

To date, Mrs. Genger has not filed and fiduciary tax returns, nor submitted any of her expenses for reimbursement by the Trust nor taken any commissions.

Sincerely,

Robert A. Meister

2

# NOTICE OF DEFAULT & ENFORCEMENT of PLEDGE

**To:**     Sagi Genger, D&K LP General Manager

**From:**   Yonit Sternberg, TPR Investment Associates, Secretary

**Date:**   8/31/2008

**Re:**     Notice of Default and Liquidation of Collateral

---

Please be advised that you are in default in the payment of amounts due under that certain Promissory Note dated December 21, 1993 in the original amount of $8,950,000(the "Note") due to the failure to pay any principal or interest due since 2005 and failing to make regular payments since 2000. Such default has continued for more than ten (10) business days. Please be advised that pursuant to the Note we hereby declare that the entire unpaid principal amount of the Note immediately due and payable.

The shares of TPR Investment Associates pledged to TPR as collateral will be liquidated at a public auction if the full Note is not satisfied.

Sagi Genger – TPR Investment Associates, Inc.

CONFIDENTIAL

1

TO:        D&K LIMITED PARTNERSHIP

FROM:      TPR INVESTMENT ASSOCIATES, INC.

           New York, New York
           Tel: 212-729-5076

------------------------------------------------------------------------------------------------------------

    We will sell all of your 240 shares of common Stock of TPR Investment Associates, Inc.
to the highest qualified bidder in public as follows:

Date:      Friday, February 27, 2009

Time:      2:00 p.m.

Place:     Offices of McLaughlin & Stern, LLP, 260 Madison Avenue, 20th Floor,
           New York, NY 10016

    You are entitled to an accounting of the unpaid indebtedness secured by the property we
intend to sell.  You may request an accounting by calling us at 212-729-5076.

    The money that we get from the sale (after paying our costs) will reduce the amount you
owe.  If we get less money than you owe, you will still owe us the difference.  If we get more
money than you owe, you will get the extra money, unless we must pay it to someone else.

    You can get the property back at any time before we sell it by paying us the full amount
you owe (not just the past due payments), including our expenses.  To learn the exact amount you
must pay, call us at 212-729-5076.

    If you want us to explain in writing how we have figured the amount that you owe us, you
may call us at 212-729-5076 or write us at _____ and request a written explanation.

    If you need more information about the sale, call us at 212-729-5076 or write us at
_____.

# CERTIFICATE of SALE and FACT

**Know all men by these presents:** That by virtue of a default in the payment of certain

monies due, and pursuant to the terms of a certain Security Agreement dated _12 / 21 / 93_

placed in my hands for execution and foreclosure made by:

_D & K Limited Partnership_

to _TPR Investment Associates, Inc._ _____(Borrower)

_____(Secured Party)

The Secured Party did on the _27_ day of _Feb._ , 2009 in the manner provided by

statute, sell at Public Auction by WILLIAM MANNION, Auctioneer, all the borrower(s) right, title

and interest, in and to the collateral consisting of _240_ shares of Capital Stock ~~and the~~

~~appurtenant Proprietary Lease allocated to Apartment No.~~ _____ ~~in the building known as~~

~~and located at:~~

_of TPR Investment Associates, Inc._

And sold unto _TPR Investment Associates, Inc._

~~of~~ _____

for the sum of $ _2,200,000.—_ , they being the highest bidder in accordance with the Terms

of Sale which were available to all bidders.

That public notice of sale was given prior to its taking place and was duly advertised. This

Auction Sale was held at:

_McLaughlin & Stern, 260 Madison Ave, NY, NY_ .

✓_____ Sold to the Secured Party, no money exchanged hands except for the

auctioneer's fees and expenses of the sale.

—_____ The sum of $ _____ of the bid price ~~was paid to the Attorney's for the~~

~~Secured Party as a down payment.~~

IN WITNESS WHEREOF, I have hereunto set my hand on the _27th_ day of

_February_ , 2009.

_____
William Mannion, Auctioneer



## COZEN
## O'CONNOR

A PROFESSIONAL CORPORATION

250 PARK AVENUE    NEW YORK, NY 10177    212.509.9400    800.437.7040    212.986.0604 FAX    www.cozen.com

June 11, 2009

**Judith E. Siegel-Baum**
Direct Phone 212.883.4902
Direct Fax    215.701.2261
jsiegel-baum@cozen.com

**VIA FACSIMILE, E-MAIL AND US MAIL**

Robert A. Meister, Esq.
Pedowitz and Meister
1501 Braodway
New York, New York  10036

Re:    Orly Genger 1993 Trust

Dear Robert:

In response to your email dated June 10, 2009, we are prepared to meet with you and Dalia, at our offices, if you agree to the following:

1.    You agree that Orly will not be present at the meeting. Based upon prior meetings Orly has advised us that her involvement in this meeting will be too emotionally difficult.

2.    Dalia stipulates, in writing, that she will not, under any circumstances and until we resolve our differences, sell, transfer or remove the TRI shares from the Orly Trust. In January 2009 Orly advised Dalia of her strong desire to retain all of the TRI shares currently held by the Orly Trust and specifically directed Dalia not to sell them.

If you agree to the above, we are prepared to schedule a meeting for early next week and are available after 4 p.m. on June 16th and after 2 p.m. on June 17th.  If we do not hear back from you by the close of business on Friday, June 12, 2009 we will assume that you and Dalia are

Robert A. Meister, Esq.
June 11, 2009
Page 2

---

unable to agree to our requests.   I look forward to hearing from you.


Sincerely,



COZEN O'CONNOR

By: _____
       Judith E. Siegel-Baum

JES\pw
cc:    Orly Genger

**From:** Robert Meister [mailto:robert.meister@pedowitzmeister.com]
**Sent:** Thursday, June 11, 2009 4:01 PM
**To:** Siegel-Baum, Judith E.
**Cc:** Langan, Suzann; Lehman, Stephanie
**Subject:** RE: Orly Genger 1993 Trust

Dear Judy:  I just received your letter at 3:50 today.  While I have forwarded it to Dalia Genger, other professional commitments make it impossible for me to respond before early next week.  So if we are to have a meeting, we'll have to find different times.

Bob Meister

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------X

In the Matter of:

Dalia Genger,

      Plaintiff,

    -against-

Arie Genger,

      Defendant.

--------------------------------------------------------X

Index No. 302436/02

AFFIDAVIT OF DALIA GENGER
IN SUPPORT OF PLAINTIFF'S
APPLICATION FOR AN ORDER
OF CONTEMPT AND OTHER
RELIEF AND IN OPPOSITION TO
DEFENDANT'S CROSS MOTION

STATE OF NEW YORK  )
         ) ss.:
COUNTY OF NEW YORK )

**DALIA GENGER, being duly sworn, deposes and says:**

1. I am the Plaintiff in this action, and submit this affidavit in support of my application that this Court hold my ex-husband, Arie Genger ("Arie"), in contempt for his willful failure to comply with the instructions issued by our son, Sagi Genger ("Sagi"), the attorney-in-fact. The facts stated herein are based upon my personal knowledge unless otherwise stated.

2. Concurrent with the execution of the Stipulation of Settlement (the "Stipulation") dated October 30, 2004 between Arie and me, it was understood that Sagi would act as Chief Executive Officer of TPR in order to execute various documents required under the Stipulation. It was also understood that the note (the "D&K Note") issued by D&K Limited Partnership dated December 21, 1993, in the principal sum of $8,950,000 and payable to TPR, which was attached as an Exhibit to the Stipulation, would be saleable by Sagi Genger for as little as $10,000. Simultaneous with the execution of the Stipulation, the Board of TPR executed a Board Resolution which gave effect to these understandings. Arie's counsel reviewed the Board

{N0078423: 1}

P 1/2

Resolution prior to its execution. He did not state any objection to the Board Resolution, and was satisfied that the Board Resolution reflected the parties' understanding and agreement. A true and correct copy of the Board Resolution is attached hereto. Although the Board Resolution is dated October 31, 2004, it was executed on October 30, 2004.

3.    The purpose of the D&K Note Board Resolution was to carry out our understanding that I not be in the position to foreclose on the D&K Note, and to take for myself an interest that Arie and I intended for the children.

4.    In August 2006, TPR sold the D&K Note (but retained a nominal contingent interest) for $12,000.

Sworn to before me this 14th day of
February, 2007

_____
Notary Public

DALIA GENGER

KATARZYNA SCHWARTZ
Notary Public, State of New York
No. 01SC6156649
Qualified in Queens County
COMMISSION EXPIRES 01/02/2011

```
SURROGATE'S COURT OF THE STATE OF N.Y.
COUNTY OF NEW YORK
------------------------------------x
In the Matter of the                     File No.
                                         0017/2008
        ESTATE OF ARIE GENDER,
                                         FTR Media
                          Deceased.
------------------------------------x
```

July 1, 2009

31 Chambers Street
New York, New York 10007


        BEFORE:    HON. TROY K. WEBBER
                   Judge

APPEARANCES:       JUDITH ELLEN SIEGEL-BAUM, ESQ.
                   STEPHANIE LEHMAN, ESQ.
                   Attorney for the Petitioner,
                   Cozen O'Connor
                   250 Park Avenue
                   New York, New York 10177-0001
                   (212) 883-4902

                   ROBERT ALLEN MEISTER, ESQ.
                   Attorney for Dahlia Genger
                   Pedowitz & Meister LLP
                   1501 Broadway
                   New York, New York 10036-5601
                   (212) 403-7330

**AAA ELECTRONIC SOUND REPORTERS**
1133 Broadway, Suite 706, New York, New York 10010
(888) 866-5135 ◆ (800) 860-5722 fax

New York County Surrogate's Court
MISCELLANEOUS DEPT.

NOV 2 2 2010

**FILED**
Clerk

STATE OF NEW YORK
SURROGATE'S COURT: COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - x
In the Matter of the Application of

ORLY GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA §711(11)
- - - - - - - - - - - - - - - - - - - - - - - - - x

REPLY AFFIRMATION IN
SUPPORT OF MOTION TO
DISMISS

File No. 0017/2008

ROBERT A. MEISTER, a member of the New York Bar, hereby affirms under

the penalties of perjury:

1      I make this affirmation to reply briefly to Petitioner Orly Genger's

Affidavit in Opposition to Dalia Genger's Motion to Dismiss the Second Amended

Petition of beneficiary Orly Genger ("Orly Aff."). I will not repeat all the arguments in

my original papers, but merely respond to points in the opposition affidavit.

2      Like her Second Amended Petition, the Orly Aff. is rich with conclusions

without factual or legal support.

3      As a preliminary matter, there is no legal requirement that a motion to

dismiss be verified, and of course most are not verified. As counsel, I signed the motion

and the affirmation in compliance with 22 N.Y.C.R.R. § 130-1.1a(a), and thus the fact

that Dalia Genger did not sign the motion is an irrelevant red herring. Nor is there any

other legal basis to argue that this Motion to Dismiss is somehow "procedurally

incorrect" (Orly Aff. ¶ 2).[1]

---

[1] Surrogate Webber's statements during the July, 2009, argument were musings, not rulings, as
she stated, "I wasn't - - I was just making a comment." Orly Aff., Ex. B, p. 20, ll. 23 – 24.

4       The Decision of the Delaware Chancery Court in <u>TRI Investors, et. al. v.</u>
<u>Arie Genger</u>, Civil Action Number 3994-VCS (August 18, 2010) is not "newly

discovered evidence" (Orly Aff. ¶4), but a controlling judicial decision which this Court

can and indeed must take judicial notice, and it shows that there is no merit to the Second

Amended Petition nor any harm from tale it attempts to tell.

5       Dalia Genger had under no fiduciary duty to, and legally could not,

manage the Orly Trust's indirect interest in TPR as alleged in Orly Aff. ¶¶ 8 and 11, and

therefore this is not a proper grounds for her removal as trustee of the Orly Genger Trust.

The Orly Trust is not an owner of TPR. Rather, as Surrogate Roth held in dismissing

Orly Genger's original petition to remove, it is <u>D & K LP</u>, an entity in which the trust

owns only a 48 percent *limited* partnership interest that was the owner of TPR stock. D

& K LP is a limited partnership created under the Delaware Limited Partnership Act,

which explicitly states that limited partners are subject to the standards and restrictions

set forth in the partnership agreement. See <u>Del. Code</u> § 17- 106. And the Amended and

Restated Limited Partnership Agreement, Exhibit E hereto, signed by the Orly on

November 22, 2007, well before Dalia Genger became Trustee, states in Article 9(e) that:

> No Limited Partner shall take part in the control or management of the
> Partnership or of the business of the Partnership, nor shall it have any authority to
> act for or to bind the partnership in any way.

Thus as a limited partner, Dalia Genger, as Trustee, was legally prohibited from

managing the D & K LP's interest in TPR.

2

6      The Orly Affidavit again substantially mischaracterized Surrogate Roth's prior decision that denied Orly's action to remove Dalia as trustee of the Orly Genger Trust. Surrogate Roth's Opinion, attached as Exhibit A to this Motion, made no such "suggestion" that Orly commence a proceeding under the SCPA to support further claims to remove Dalia. In fact, Surrogate Roth's opinion stated that Orly's allegations of "wrongful conduct" were both "vague and speculative," and as a result, Surrogate Roth found that Orly's attempt to remove Dalia as trustee to be "unwarranted."

7      The Orly Affidavit disingenuously argues (¶14) that there is no proof that Dalia divested herself of her controlling interest in TPR. Did Orly Genger forget that in paragraph 39 of her own *verified* Second Amended <u>Verified</u> Complaint in her Supreme Court action, <u>Orly Genger v. Dalia Genger et. al.</u>, Index No. 109749/09, the relevant parts of which are attached as Exhibit F hereto, Orly Genger herself swore that:

> "Around the time of her appointment as successor trustee to the Orly Trust in January 2008, Dalia divested herself of the balance of her TPR shares."

Thus Orly's own verification is the proof her affidavit here wrongly asserts is absent.

8      Dalia Genger is not and never was trustee of the Sagi Trust, and neither the Orly Trust nor Dalia Genger, as Trustee of the Orly Trust, was a party to the Sagi Trust sale of TRI stock. See Exhibit C to the Motion. Thus the Orly Affidavit's baseless assertion (Orly Aff. ¶ 16) that Dalia Genger "could have moved to reverse the sale or sought to force the Sagi Trust to give proceeds of the sale of TRI stock to TPR" is a fantasy and not a legitimate legal theory.

9      Moreover, Orly's tenuous claim of injury – her contention that Orly Trust owns shares of TRI stock, which supposedly lost value as a result of the Sagi Trust shares – is completely undercut by the Final Judgment Order of the Delaware Chancery Court determining that the transfer of TRI shares to the Orly Trust was void under the TRI Shareholders' Agreement and thus [Arie Genger and] "the Orly Trust have been found to not be the record or beneficial owners of the [TRI] shares transferred to them". TRI Investors, et. al. v. Arie Genger, Civil Action Number 3994-VCS (August 18, 2010); Exhibit D, at ¶ 9.

10     And there is no basis for the assertion (Orly Aff. ¶ 21) that Dalia Genger should have caused the Orly Trust to intervene in the Delaware action. As the Opinion makes clear, the issue was the effect of a contract signed by Orly's father, Arie Genger, and not her mother, Dalia Genger, and whether Arie Genger gave notice to or got the consent of other TRI shareholders, issues as to which Dalia had no knowledge or other input.

11     While there is an appeal pending, if the Delaware Supreme Court affirms the decision that the Orly Trust's ownership of TRI shares was void *ab initio*, any allegations that they lost value based on the Sagi Trust's sale would be totally baseless and no basis to remove Dalia Genger as Trustee. Even if the Delaware Supreme Court reverses that decision, there was nothing that Dalia, as trustee of the Orly Genger Trust, could have done to prevent the Sagi Trust from selling its TRI shares and thus there is no basis to remove or surcharge Dalia Genger.

4

12      As the Second Amended Petition – Orly Genger's <u>fourth</u> bite at the apple

does not allege any action by Dalia Genger took or any inaction she could have taken

during the time she was Trustee and free from judicial restraint or any action that she

could have taken, there is no basis for this proceeding and the Petition should be

dismissed.

November 19, 2010

Robert A. Meister

# Exhibit E

AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT

OF

D & K LIMITED PARTNERSHIP

This AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT (this "Agreement") of D&K Limited Partnership (the "Partnership") is made as of the 30th day of October , 2004, by and among the 1993 Orly Genger Trust (the "OG Trust"), the 1993 Sagi Genger Trust (the "SG Trust"), each a limited partner of the partnership, and D&K GP LLC, the general partner of the Partnership.

WHEREAS, the Partnership was formed as a limited partnership pursuant to the provisions of the Delaware Limited Partnership Act, by the filing of a Certificate of Limited Partnership with the Office of the Secretary of State of the State of Delaware and the execution of the Limited Partnership Agreement of the Partnership dated as of December 31, 1988 (the "Original Agreement"); and

WHEREAS, the Original Agreement was subsequently amended several times to reflect, among others, the replacement of the limited partners, the replacement of the general partner, as well as amendments to specific provisions of the Original Agreement and amendments thereto; and

WHEREAS, the parties hereto desire to restate all previous amendments and to enter into this Amended and Restated Limited Partnership Agreement of the Partnership to serve as the governing document of the Partnership;

NOW, THEREFORE, in consideration of the mutual promises and agreements herein made and intending to be legally bound hereby, the parties hereby restate the Original Agreement, and amendments thereto, in its entirety to read as follows:

1

1.  **Formation of Partnership.**  (a) The Partnership was formed, under the name D & K Limited Partnership (the "Partnership"), as a limited partnership under the provisions of the Delaware Limited Partnership Act, as indicated in the preamble of this Agreement, and the execution of the Original Agreement. If requested by the General Partner, the Limited Partners shall promptly execute all certificates and other documents consistent with the terms of this Agreement necessary for the General Partner to accomplish all filing, recording, publishing and other acts as may be appropriate to comply with all requirements for (a) the formation and operation of a limited partnership under the laws of the State of Delaware, (b) if the General Partner deems it advisable, the operation of the Partnership as a limited partnership, or partnership in which the Limited Partners have limited liability, in all jurisdictions where the Partnership proposes to operate and (c) all other filings required to be made by the Partnership.

(b) The general partner of the Partnership is D&K GP LLC, a Delaware limited liability company, and any successor individual or corporation admitted to the Partnership as general partner (the "General Partner"). The limited partners of the Partnership shall be the SG Trust and the OG Trust, and any other persons who are admitted to the Partnership as additional or substituted limited partners in Paragraph 17 (the "Limited Partners") (the Limited Partners and the General Partner, shall be referred to herein as "Partners", and each – a "Partner").

2.  **Purpose.**  The purpose of the Partnership is to acquire and hold an equity interest (initially, represented by 240 common shares) in TPR Investment Associates, Inc., a Delaware corporation ("TPR") and other legal business activities as determined by the General Partner.

3.  **Place of Business.**  The principal place of business of the Partnership shall be located at 1211 Park Avenue, New York, N.Y. 10128, or at such other location(s) as may hereafter be determined by the General Partner on notice to the Limited Partners.

4.  **Term.**  The term of the Partnership shall continue until December 31, 2038; provided, however, that the Partnership shall be dissolved prior to such date upon the happening of any of the following events:

2

(a)  upon the written election to terminate made by the General Partner at any time, which election shall be sent to the other Partners;

(b)  upon the death, bankruptcy, incapacity, or other withdrawal of the General Partner, unless within ninety (90) days after such event, all of the Limited Partners elect to reconstitute the Partnership, continue its business and elect a new general partner.

(c)  in the event the Partnership has distributed all of its assets.

5.  **Capital Contributions**.

(a)  The Capital Contributions of the Partners consists of the following: :

| | |
|---|---|
| D&K GP LLC | $50,000 |
| 1993 Sagi Genger Trust | $600,000 |
| 1993 Orly Genger Trust | $600,000 |

(b)  Each of the Partners shall assume personal liability under any and all indebtedness incurred by the Partnership to finance (and refinance) the purchase by the Partnership of the equity interest in TPR referred to in Paragraph 2 hereof. The Partners shall share such liability among themselves in accordance with their interests in the Partnership, and any payment by a Partner of its share of such liability shall be deemed to be a contribution to the capital of the Partnership as to which such Partner has no rights of contribution or subrogation.

6.  **Interest in Partnership**.    Each Partner's interest in the Partnership shall be equal to the proportion that the then balance in his or her capital account bears to the aggregate balance of all of the Partners' capital accounts; where applicable this computation shall be governed by the specific stipulations in Paragraphs 7 and 8 hereof.

3

7. **Capital Account**     A capital account has been established as shown per "5(a)". Accounts shall be maintained in accordance with the applicable regulations under the Internal Revenue Service as amended ("the "Code"), and Income Tax Regulations (the "Regulations") promulgated under the Code. Interest shall not be paid on any capital account and no Partner shall have the right to withdraw any part of his capital account until dissolution of the Partnership, and then such distribution or withdrawal shall be governed by paragraph 14 hereof. No Partner shall have the right to bring an action for partition. Each Partner's capital account shall be credited by capital contributions. The parties agree that as of the date hereunder the capital accounts are as per "5(a)" without regard to previous payments made by any of the Partners. In consideration for such, the Partners recognize the note originally issued in the amount of $8,950,000 referred to in paragraph 5 the "Note" as a liability of each Limited Partner to the Partnership as denoted. Partnership rights as per "22" may also be used to enforce collection of the Note by the Partnership. Any attempted interference by a Partner or a person beneficially owning an in interest in the Partnership automatically and irrevocably vests the General Partner with the right to revert the capital account of any Partner to a percentage based upon his actual pro rata contributions, expel, or otherwise suspend the membership and all rights accumulated in connection therewith without notice and hold his share of partnership assets as collateral for payments due. Upon thirty days notice the Partnership may demand full payment of the Limited Partner's pro rata share of the Note.

8. **Profits and Losses.**   The net profits and net losses of the Partnership shall be shared by the Partners in proportion to the then balances in their respective capital accounts. The terms "net profits" and "net losses" shall mean the net profits and net losses of the Partnership as determined for federal income tax purposes.

9. **Management.**

(a) Except as expressly provided herein, the management and control of the day-to-day operations of the Partnership and the maintenance of the Partnership property shall rest exclusively with the General Partner. (b) To the fullest extent permitted by law, the General Partner shall have complete authority over and exclusive control and management of the business and affairs of the Partnership and all of the Partnership property and all rights, powers

4

and authority appropriate therefore. The powers and discretion of the General Partner on behalf of the Partnership shall include, but shall not be limited to, making investments, selling assets, lending money for any lawful purpose whatsoever, borrowing money for any lawful purpose whatsoever, borrowing money for any lawful purpose whatsoever (and posting assets of the Partnership as collateral therefore), making tax elections under the Code, making distributions to the Partners (subject to Paragraph 10 hereof), executing guarantees for any lawful purpose whatsoever (and posting assets of the Partnership as collateral therefore) and doing all other acts or things necessary to carry out and implement the purposes of the Partnership, provided that each such action is taken upon reasonable terms to the Partnership. The General Partner may delegate, in writing, any of her powers under this Agreement.

(c) Any document, instrument or agreement to be executed and delivered by and on behalf of the Partnership shall be effective is signed and delivered by the General Partner or a delegee of the General Partner.

(d) Each of the other Partners hereby gives its approval to any action taken or to be taken on behalf of the Partnership by the General Partner, and agrees that it shall have no cause of action against the Partnership or the General Partner except for any claim based upon:

(i) the fraud, bad faith or willful misconduct of a Partner, or

(ii) the breach by a Partner of any provision of this Agreement or of any other written agreement to which the Partnership and such person are parties.

(e) No Limited Partner shall take part in the control or management of the Partnership or of the business of the Partnership, nor shall it have any authority to act for or to bind the Partnership in any way.

(f) The Partners acknowledge that the General Partner, its managing member(s), officers, employees and representatives, as the case may be, are hereby released from all liability and are hereby held harmless for any acts or omission they might have taken in their various capacities, whether as officers, employees, representatives, or the like, of TPR or of the Partnership. The Partners further acknowledge that certain actions between TPR and the Partnership, conducted

5

under the direction, instructions or supervision of said employees, officers, managing members, representatives and the like, could be considered "self dealing". The Partners hereby indemnify the General Partner, its managing members, offices, employees, representatives and the like, to the fullest extent permitted by law, from any such actions or omissions including, but not limited to, actions considered "self dealing".

### 10. Drawings of Income and Principal.

(a) After making provisions for current debts and other obligations of the Partnership and establishing reasonable reserves for the reasonable needs of the Partnership's business, the General Partner shall distribute, not less frequently than annually, all of the remaining cash of the Partnership.

(b) During the Partnership year of 2038 all of the then remaining principal and accumulated income of the Partnership shall be distributed to the Partners and, upon the final distribution, the Partnership shall terminate.

(c) All distributions of principal, accumulated income and current income made to the Partners shall be made in proportion to each of the Partner's interest as set forth in Paragraph 6 hereof, and the available amount shall be computed after taking into account debts and reserves such as are permitted under Paragraph 14 hereof.

### 11. Transfer of Partnership Interest.

A Partner may not sell, assign, or encumber his or its interest in the Partnership or otherwise withdraw or retire from the Partnership without the prior written consent of the other Partners. No sale or exchange of any interest in the Partnership may be made if the transfer of the interest sought to be sold or exchanged may result, in the opinion of legal counsel to the Partnership, in (i) the termination of the Partnership under Section 708 of the Code, or (ii) the violation of any applicable federal or state securities law.

### 12. Title to Property and Bank Accounts.

The property of the Partnership shall be held in the name of the Partnership or the General Partner as nominee for the Partnership. All Partnership funds shall be deposited in its name in such bank account or accounts as shall be designated by the General Partner and all withdrawals therefrom shall be made upon the

6

signature of the General Partner or such person or persons as shall be so designated by the General Partner.

13.   **Books.**   The General Partner shall cause the Partnership to keep accounts and complete books and records of the business of the Partnership at the principal place of business of the Partnership, and each Partner shall at all reasonable times have access thereto.

14.   **Termination.**

(a) Upon the termination and dissolution of the Partnership, if the Partnership is not continued pursuant to the terms of this Agreement, the General Partner or, if there is no General Partner, any person elected by a majority of the Limited Partners to perform such liquidation of the assets of the Partnership, shall proceed with the orderly liquidation of the assets of the Partnership, and the net proceeds of such liquidation shall be applied and distributed in the following order of priority:

( i ) to the payment of any debts and liabilities of the Partnership and the expenses of liquidation;

( ii )   to the establishment of any reserves which the General Partner may deem reasonably necessary to meet any contingent or unforeseen liabilities or obligations of the Partnership or of the Partners arising out of or in connection with the Partnership;

( iii )   the balance, if any, shall be distributed among the Partners in proportion to and to the extent of the then positive balances in their respective capital accounts (as determined after giving effect to all capital account adjustments for the Partnership's taxable year during which the liquidation occurs); and

( iv )   if any Partner has a deficit balance in his or her capital account (as determined after giving effect to all capital account adjustments for the Partnership's taxable year during which the liquidation occurs), such Partner shall be unconditionally obligated to pay the amount of such deficit balance to the Partnership by the end of such taxable year (or, if later, within ninety (90) days after the date of such liquidation), which amounts shall be applied and distributed in accordance with the provisions of this Paragraph. The General Partner may accept in lieu thereof, collateral, assurance of availability of collateral, or other secured guarantees

7

which the General Partner reasonably deems to be adequate substitutes for such Partner's payment.

(b) In the event it becomes necessary to make distribution of Partnership property in kind, such property shall be transferred and conveyed to the Partners so as to vest in each of them as a tenant in common as undivided interest in the whole of said property in proportion to and to the extent of the then balances in their respective capital accounts.

15.   **Death of Partner.**   The death, bankruptcy, dissolution or withdrawal of a limited partner shall not dissolve the Partnership.

16.   **Notice.**   All notices and other communications required or permitted under this Agreement shall be in writing and may be personally delivered, sent by first class mail, postage prepaid, or electronically delivered, to an address regularly used by the addressee, with acknowledgement receipt, to the Partners at their addresses as shown from time to time on the records of the Partnership, or as may reasonably be known to the General Partner. Any Partner may specify a different address by notifying the General Partner in writing of such different address. All notices and other communications required or permitted under this Agreement shall be deemed to have been received on the day when personally delivered, on the day the electronic acknowledgement has been received by sender, or three days after being mailed in the manner provided in this Section 16, as the case may be.

17.   **Admission of New Partners.**   The Partnership may admit a new Partner upon the majority consent of all of the then existing Partners; consent of the General Partner shall be necessary; such consent to be granted or withheld at the General Partner's sole and unfettered discretion.

18.   **Governing Law.**   The Partnership is formed under the laws of the State of Delaware and the Delaware Uniform Limited Partnership Act.

8

19.   **Liability of the Partners**

(a)   General.   The Partnership hereby indemnifies and agrees to hold each Partner harmless with respect to any claim, liability, damage, cost or expense (including reasonable attorney's fees and disbursements) incurred by reason of any act performed or omitted to be performed as a Partner or in connection with the assets or business of the Partnership, except that no Partner shall be indemnified where he or she is found in a final non-appealable judgment to have committed fraud, bad faith or willful misconduct.

(b) Indemnification of General Partner

(i)   To the maximum extent permitted by law, the Partnership, its receiver, or its trustee shall indemnify, save harmless, and pay all judgments and claims against the General Partner, and its members and managers, their respective officers, directors, agents, stockholders, members, managers, partners and other Affiliates, and any other person who serves at the request of the General Partner on behalf of the Partnership as an officer, director, member, partner, employee or agent of the Partnership or any other present or future entity (in each case, an "Indemnitee") and all loss, damage or expense incurred by any Indemnitee or by the Partnership by reason of any act performed or omitted to be performed by any Indemnitee in connection with the Partnership (including, but not limited to, attorneys' fees and other costs and expenses incurred by any Indemnitee in connection with the investigation and defense of any action based on any such act or omission, which attorneys' fees and any other costs and expenses shall be paid as incurred, and any amounts expended in the settlement of any claim of liability, loss or damage).

(ii)   Without limiting the generality of the foregoing, in the event of any action by a Limited Partner (other than an Affiliate of the General Partner) against any Indemnitee, including a Partnership derivative suit or any class action, the Partnership shall indemnify, save harmless, and pay all costs and expenses of such Indemnitee, including attorneys' fees incurred in the defense of such action, which shall be paid as incurred.

(iii)   No Indemnitee shall have any liability to the Partnership or the Limited Partners except liabilities of any Indemnitee for any loss, damage or expense which, by a final

9

judgment or other final adjudication, has been determined to have arisen from such Indemnitee's fraud, willful misconduct or bad faith, which fraud, willful misconduct or bad faith in each case has been determined to have been material to the cause of action adjudicated. Notwithstanding the provisions of Sections 8.4(a) and 8.4(b), no Indemnitee shall be indemnified for any loss, damage or expense if a final judgment or other final adjudication adverse to such Indemnitee establishes that such Indemnitee's loss, damage or expense arose from such Indemnitee's fraud, willful misconduct or bad faith which, in each case, was material to the cause of action so adjudicated and in the event of any such adverse final judgment or other final determination establishing such Indemnitee's fraud, willful misconduct or bad faith material to the cause of action so adjudicated, such Indemnitee shall reimburse to the Partnership any costs and expenses, including attorneys fees, previously advanced to such Indemnitee. Limited Partners shall not be individually obligated with respect to such indemnification beyond their respective Commitments.

20. **Self-Dealing**. The fact that any Partner is directly or indirectly interested in or connected with any person, firm or corporation employed by the Partnership to render or perform a service or from which or to whom the Partnership may buy or sell merchandise or other property shall not prohibit the General Partner from employing such person, firm or corporation or from dealing with him or her or it, and neither the Partnership nor the other Partners thereof shall have any rights in or to any income or profits derived therefrom by such person, firm or corporation.

21. **Power of Attorney**. Each Limited Partner hereby constitutes and appoints the General Partner the true and lawful attorney-in-fact for each Limited Partner and in the name, place and stead of each Limited Partner from time to time to execute and file:

(i) any certificates and other instruments which may be required to be filed by the Partnership under the laws of the State of Delaware or any other governmental authority having jurisdiction thereover, or which the General Partner shall deem it advisable, in its sole discretion, to file;

10

(ii)    any certificates or other instruments amending or modifying the
Certificate of Limited Partnership of the Partnership as provided therein;

(iii)   any certificates or other instruments which may be required to effectuate
the dissolution and termination of the partnership and/or the cancellation
of the Certificate of Limited Partnership; and

(iv)    any amendment of this Agreement which the General Partner is authorized
to make in accordance with the provisions of this Agreement.

it being expressly understood and intended by each of the Partners that such powers of attorney
are coupled with an interest. The foregoing powers of attorney shall be irrevocable and shall
survive any assignment of the whole or any part of the interest in the Partnership of a Limited
Partner and shall be binding upon the assignee thereof.

22.     **Authority of General Partner with respect to holdings in TRI**

(a) The Partners acknowledge that each one of the Limited Partners holds 102.80
shares of TRI, representing 19.42766% of the common stock of TRI (each, a "LP TRI
Interest(s)").

(b) The General Partner is hereby conferred the authority, in its sole and
unfettered discretion to mortgage, hypothecate, pledge, create a security interest in or lien upon,
or otherwise encumber the LP TRI Interests, for the benefit of the Partnership or that of third
parties, in connection with the Note.

(c) Should the General Partner encumber the LP TRI Interests, as permitted under
section (b) above - each Limited Partner shall have the right to redeem its LP TRI Interest to the
full extent of such LP's pro-rated participation, responsibility or liability for the unpaid amount
of the Note.

11

(d) Each Limited Partner hereby constitutes and appoints the General Partner the true and lawful attorney in fact for each Limited Partner and in the name, place and stead of each Limited Partner from time to time in connection with (i) placing a mortgage, hypothecate, pledge, creating a security interest in or lien upon, or otherwise encumbering the LP TRI Interests in connection with the Note, (ii) removing such mortgage, hypothecation, pledge, security interest, lien or other encumber, placed on the LP TRI Interests, and (iii) negotiating, settling or otherwise handling or managing any rights attached to, or emanating from, the LP TRI Interest and dealing with the LP TRI Interests until payment of the Note has been resolved.

(e) Each Limited Partner agrees that it shall not during the term of this Agreement either directly or indirectly, transfer, sell, assign, mortgage, hypothecate, pledge, create a security interest in or lien upon, encumber, donate, contribute, place in trust (including a voting trust), or otherwise voluntarily or involuntarily dispose of (each, a "Transfer") said Limited Partner's LP TRI Interest

## 23.   **Authority of General Partner to Vary Tax Allocations; Tax Matters Partner.**

(a) It is the intent of the Partners that each Partner's distributive share of taxable income or tax loss, and of each item of income, gain, loss, preference, deduction, or credit entering into the computation thereof, shall be determined and allocated in accordance with this Agreement to the fullest extent permitted by Section 704(b) of the Code. In order to preserve and protect the determinations and allocations provided for in this Agreement, the General Partner is authorized and directed to allocate tax income, gain, loss, preference, deduction, or credit (or any item thereof) arising in any year differently than as may otherwise be provided for in this Agreement to the extent that allocating tax income, gain, loss, preference, deduction, or credit (or any item thereof) in the manner provided for in this Agreement would cause the determinations and allocations of each Partner's distributive share of tax income, gain, loss, preference, deduction, or credit (or item thereof) not to be permitted by Section 704 (b) of the Code and applicable Regulations.

In making any such new allocations the General Partner is authorized to act only after having been advised by counsel to the Partnership and the accountants for the Partnership

12

that in their opinion, under Section 704 (b) of the Code and applicable Regulations, ( i ) the new allocation is necessary, and ( ii ) the new allocations is the minimum modification of the allocations otherwise provided for in this Agreement necessary in order to assure that, either in the current year or in any preceding year, each Partner's distributive share of tax income, gain, loss, preference, deduction, or credit (or item thereof) is determined and allocated in accordance with this Agreement to the fullest extent permitted by Section 704 (b) of the Code and applicable Regulations.

If the General Partner is required to make any new allocation in a manner less favorable to the Limited Partners than is otherwise provided for in the Agreement, the General Partner is authorized and directed, insofar as she is advised by counsel and the accountants for the Partnership that it is permitted by Section 704 (b) of the Code and applicable Regulations, to allocate tax income, gain, loss, preference, deduction, or credit (or item thereof) arising in later years in a manner so as to bring the allocations of tax income, gain, loss, preference, deduction, or credit (or item thereof) to the Limited Partners as near as possible to the allocations otherwise contemplated by this Agreement.

(b)     The General Partner is hereby designated as Tax Matters Partner of the Partnership, as provided in the Regulations pursuant to Section 6231 of the Code. Each Partner, by the execution of this Agreement, consents to such designation of the Tax Matters Partner and agrees to execute , certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such consent. The Tax Matters Partner is hereby authorized, but not required:

> (i)     to enter into any settlement with the Internal Revenue Service or the Secretary of the Treasury (the "Secretary") with respect to any tax audit or judicial review, in which agreement the Tax Matters Partner may expressly state that such agreement shall bind the other partners, except that such settlement agreement shall not bind any Partner who (within the time prescribed pursuant to the Code and applicable Regulations) files a statement with the Secretary provided that the Tax Matters Partner shall not have the authority to enter into a settlement agreement on the behalf of such Partner;

13

(ii)    in the event that a notice of final administrative judgment at the Partnership level of any item required to be taken into account by a Partner for tax purposes a "final judgment") is mailed to the Tax Matters Partner, to seek judicial review of such final adjustment, including the filing of a petition for readjustment with the Tax Court, the District Court of the United States for the district in which the Partnership's principal place of business is located, or the United States Claims Court;

(iii)    to intervene in any action brought by any other Partner for judicial review of a final adjustment;

(iv)    to file a request for an administrative adjustment with the Secretary at any time and, if any part of such request is not allowed by the Secretary, to file a petition for judicial review with respect to such request;

(v)    to enter into an agreement with the Internal Revenue Service to extend the period for assessing any tax which is attributable to any item required to be taken into account by a Partner for tax purposes, or an item affected by such item; and

(vi)    to take any other action on behalf of the Partners or the Partnership in connection with any administrative or judicial tax proceeding to the extent permitted by applicable law or regulations.

24.    **Agreement in Counterparts.**  This Agreement may be executed in any number of counterparts which together shall constitute one and the same instrument.

25.    **Rules of Construction.**  Each paragraph of this Agreement shall be considered severable, and if for any reason any paragraph or paragraphs herein are determined to be invalid and contrary to any existing or future laws, such invalidity shall not impair the operation or

14

affect the portions of this Agreement which are valid.

26.    **Headings.** Headings contained in this Agreement are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provisions hereof.

27.    **Creditors.** None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Partnership, as creditor, or for the benefit of any other individual, corporation or entity.

28.    **Entire Agreement.** This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith. No covenant, representation or condition not expresses in this Agreement shall affect or be effective to interpret, change or restrict the express provisions of this Agreement.

29. **Pronouns.** All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular and plural as the identity of the person or persons may require.

30. **Binding Effect.** This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective heirs, successors, executors, administrators, legal representatives and permitted assigns.

31. **Further Assurances.** Each Partner agrees to do such further acts and to execute such documents as may be reasonably requested in furtherance of, and to carry out and implement the purposes of, t his Agreement and the transactions contemplated herein.

32. **Amendment.** This Agreement may not be modified except by a writing signed by Partners holding a majority in interest of the Partnership; in the event such majority in interest included only the Limited Partners – the consent of the General Partner shall be required as well.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement, effective on the day and year first written above.

GENERAL PARTNER:

D&K GP LLC

by: Sagi Genger, its managing member

LIMITED PARTNERS:

1993 Sagi Genger Trust

by: Leah Fang, sole trustee

1993 Orly Genger Trust

by: Leah Fang, sole trustee

Restated this _____ day of November, 2007

16

# Exhibit F

SUPREME COURT: NEW YORK COUNTY

| | |
|---|---|
| ORLY GENGER in her individual capacity and on behalf of the Orly Genger 1993 Trust (both in its individual capacity and on behalf of D & K Limited Partnership),<br><br>               Plaintiff,<br><br>        - against -<br><br>DALIA GENGER, SAGI GENGER, LEAH FANG, D & K GP LLC, and TPR INVESTMENT ASSOCIATES, INC.,<br><br>            Defendants. | Index No.:  109749/09<br><br><br>**SECOND AMENDED VERIFIED COMPLAINT** |

Plaintiff Orly Genger in her individual capacity and on behalf of the Orly Genger 1993 Trust (both in its individual capacity and on behalf of D & K Limited Partnership), by her attorneys, Zeichner Ellman & Krause LLP, alleges, upon information and belief, for her Second Amended Verified Complaint against the defendants in this action as follows:

## NATURE OF THE ACTION

1.      As described below, Dalia and Sagi Genger, together with various business entities controlled by them and Leah Fang, engaged in a fraud and conspiracy designed to completely loot the Orly Genger 1993 Trust (the "Orly Trust") of its value. The defendants' various acts of self-dealing, material misrepresentations, and material omissions, in breach of their respective fiduciary duties and in violation of New York law, injured Orly Genger, the Orly Trust, and D & K Limited Partnership.

in TPR, from challenge or diminution in value.

36.     In addition, Sagi owes fiduciary duties to Orly arising from the close relationship of trust and confidence between him and his sister.  Orly reposed complete trust, confidence and reliance upon her brother Sagi to protect both her interests and her Trust's interests, including her Trust's ownership interests in TPR and the TRI Shares, and to alert her to anything that may adversely affect her or her Trust's assets.

E.     **Dalia Gives Sagi Complete Control of TPR**

37.     On October 30, 2004, Dalia, as 52.96% owner of TPR, entered into a shareholder agreement with TPR, concerning the future management of the company. Pursuant to this shareholder agreement (attached hereto as **Exhibit 6**), Dalia gave D&K, which owned 49% of TPR, the authority to appoint one board member to TPR's two-member board of directors.  Sagi used his managerial control over D&K to appoint himself as D&K's representative on TPR's board.  In addition, the shareholder agreement appointed Sagi as CEO of TPR.  As TPR's majority shareholder, Dalia named herself as TPR's remaining board member.

38.     Sometime in 2007, Sagi stripped Dalia of her majority interest in TPR by selling a 2% interest in TPR to Rochelle Fang, his mother-in-law.  At the time of the sale, TPR's assets were worth between approximately $11,000,000 and $12,000,000, plus the value of the Note.

39.     Around the time of her appointment as successor trustee to the Orly

Trust in January 2008, Dalia divested herself of the balance of her TPR shares.

40.     Through the above-mentioned transactions, Sagi obtained direct control over TPR and its interest in the Note.  Notably, Sagi's role as CEO of TPR (the creditor on the Note) is in direct conflict with his role as manager of D&K (the debtor on the Note), whose role was to repay the Note or to contest the Note's enforceability.

41.     Moreover, Sagi's dual control over both TPR and D&K directly conflicts with Sagi's and D&K GP's undiluted fiduciary duties to D&K's limited partners, including the Orly Trust, to manage, maintain and protect D&K's assets from challenge or diminution in value.  Sagi would later use his dual positions at TPR and D&K to engage in self-dealing in connection with the Note and to damage the Orly Trust and Orly, in violation of his fiduciary duties.

42.     Notably, other New York courts have recognized Sagi's willingness to engage in self-dealing, ignore clear conflicts of interest, and collude with his mother, Dalia, to the detriment of the other Genger family members.  See Orders and Transcripts attached hereto as **Exhibit 7**.

F.     **Fang and then Dalia Gain Control over the Orly Trust**

43.     In connection with the Settlement Agreement, Dalia required that the Trustees of the Orly Trust and the Sagi Trust (Sash A. Spencer and Lawrence M. Small) resign and be replaced with Sagi's longtime friends, David Parnes and Eric Gribetz.  Mr. Gribetz, subsequently retired as trustee without appointing a successor in

## **VERIFICATION**

STATE OF NEW YORK,
COUNTY OF NEW YORK.

      ORLY GENGER, being duly sworn, says that she is the plaintiff named in

the foregoing second amended verified complaint; that she has read the foregoing second

amended verified complaint, and that the complaint is true to her own knowledge except

as to those matters therein stated to be alleged upon information and belief, and that as to

those matters she believes them to be true.

                                    _____
                                      ORLY GENGER

Sworn to before me this
4th day of August, 2010

_____
        Notary Public

      ANTHONY ROSARIO
Notary Public, State of New York
     No. 01RO6212071
    Qualified in Bronx County
Commission Expires 10/05/20*3*

STATE OF NEW YORK
SURROGATE'S COURT: COUNTY OF NEW YORK
-------------------------------------------------------------------X
In the Matter of the Application of

**AFFIDAVIT OF SERVICE**

ORLY GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the

File No. 0017/2008

Orly Genger 1993 Trust pursuant to SCPA §711(11)
-------------------------------------------------------------------X

STATE OF NEW YORK          )
                          : ss.:
COUNTY OF NEW YORK         )

Marisa Warren, being duly sworn, deposes and says: I am over the age of 18 years

and not a party to this action.  On the 19th day of November, 2010, I served the annexed

REPLY AFFIRMATION IN SUPPORT OF MOTION TO DISMISS on Petitioner by

sending same via UPS overnight mail to:

> Judith E. Siegel-Baum, Esq.
> Stephanie Lehman, Esq.
> Cozen O'Connor PC
> 250 Park Avenue
> New York, NY 10017,

her counsel of record.

Marisa Warren

Sworn to before me this
22nd day of November, 2010.

Notary Public

Karen Kranson
Notary Public
New York County
State of New York
No. 02KR6208929
Expires 07-13-20*13*

STATE OF NEW YORK
SURROGATE'S COURT: COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - x
In the Matter of the Application of

ORLY GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA §711(11)
- - - - - - - - - - - - - - - - - - - - - - - - x

STIPULATION
ADJOURNING MOTION
TO DISMISS

File No. 0017/2008

IT IS HEREBY STIPULATED, by and between the undersigned cousel for all

partied who have appeared in this proceeding, that Respondent Dalia Genger's Motion to

Dismiss the Second Amended Petition of beneficiary Orly Genger, now returnable

November 23, 2010, be and the same hereby is adjourned to 10:00 a.m. on December 21,

2010. ("Orly Aff.").

Cozen O'Connor
By _____
Judith E. Siegel-Baum, Esq.
Attorneys for Petitioner
277 Park Avenue
New York, New York 10172
212.883.4902

Pedowitz & Meister LLP
By _____
Robert N. Meister, Esq.
Attorneys for respondent Dalia Genger
1501 Broadway
New York, NY 10036
212.403.7330

1

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
ORLY GENGER 1993 Trust Pursuant to
SCPA § 711 (11)

**NOTICE OF ENTRY**

**FILE NO.: 0017/2008**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

STATE OF NEW YORK      )
                       )ss.:
COUNTY OF NEW YORK     )

New York County Surrogate's Court
MISCELLANEOUS DEPT.
JAN 10 2011
**FILED**
Clerk

   **PLEASE TAKE NOTICE** that the within is a true copy of the decision constituting the

order of the court signed and dated by Surrogate Nora S. Anderson on October 12, 2010, which

was duly entered in the Surrogate's Court of New York County on October 12, 2010.

Dated: New York, New York
       October 21, 2010

*Judith E. Siegel-Baum*

Cozen O'Connor
Attorney for Petitioner
By: Judith E. Siegel-Baum
277 Park Avenue
New York, New York 10172
(212) 883-4900

TO:    Robert A. Meister, Esq.
       Pedowitz & Meister LLP
       *Attorneys for Dalia Genger, Trustee*
       1501 Broadway
       New York, NY 10036

       David Parnes, Esq.
       *as Trustee of The Sagi Genger Trust*
       29 El Kachi Street
       Tel Aviv, ISRAEL 69497

NYC_MIDTOWN\1601387\1 252931.000

SURROGATE'S COURT : NEW YORK COUNTY

------------------------------------------ X

In the Matter of the Application of
ORLY GENGER, as a Person Interested,
for the Removal of DALIA GENGER        File No. 17/2008
as Trustee of the ORLY GENGER 1993
Trust pursuant to SCPA § 711(11)

------------------------------------------ X

A N D E R S O N,  S.

     At the call of the calendar, the uncontested motion of Orly

Genger to amend her petition seeking the removal of the trustee

of the Orly Genger 1993 Trust was granted.  The petition is

amended in accordance with the proposed amended petition annexed

to the motion papers.

     This decision constitutes the order of the court.

S U R R O G A T E

Dated: October *12*, 2010

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
ORLY GENGER 1993 Trust Pursuant to
SCPA § 711 (11)

**AFFIDAVIT OF SERVICE**

**FILE NO.: 0017/2008**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

<u>AFFIDAVIT OF SERVICE BY FEDERAL EXPRESS</u>

STATE OF NEW YORK    )
                        ) ss.:
COUNTY OF NEW YORK  )

        JOY GONZALES, being duly sworn, deposes and says:

        I am over 18 years old, am not a party to this action and reside in Bergen County, New Jersey.

        On the 21st day of October, 2010, I served a copy of the within **NOTICE OF ENTRY** upon:

                      Robert A. Meister, Esq.
                      Pedowitz & Meister LLP
                      *Attorneys for Dalia Genger, Trustee*
                      1501 Broadway
                      New York, NY 10036

                      David Parnes, Esq.
                      *as Trustee of The Sagi Genger Trust*
                      29 El Kachi Street
                      Tel Aviv, ISRAEL 69497

by Federal Express, an overnight delivery service regularly employed by this firm and with which this firm maintains an account.

                                           _____
                                           JOY GONZALES

Sworn to before me this
21st day of October, 2010

_____
    Notary Public

SUZANN P. LANGAN
Notary Public, State of New York
No. 01LA5051937
Qualified in Queens County
Commission Expires November 13, 20__

NYC_MIDTOWN\1601387\1 252931.000

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
ORLY GENGER 1993 Trust Pursuant to
SCPA § 711 (11)

**SECOND AMENDED VERIFIED
PETITION FOR REMOVAL OF
DALIA GENGER AS TRUSTEE
AND REQUEST FOR
TEMPORARY RESTRAINING
ORDER**

**FILE NO.: 0017/2008**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X



New York County Surrogate's Court
MISCELLANEOUS DEPT.

JAN 1 0 2011

FILED

Clerk

TO THE SURROGATE'S COURT, STATE OF NEW YORK
COUNTY OF NEW YORK

     Petitioner, Orly Genger ("Petitioner" or "Orly"), by her attorneys Cozen O'Connor,

respectfully alleges as her Second Amended Verified Petition for Removal of Dalia Genger as

Trustee:

     1.     Orly, domiciled at 1965 Broadway, Apt. 22G, New York, New York 10024, is the

current beneficiary of the Orly Genger 1993 Trust dated December 13, 1993 (the "Orly Trust")

(annexed hereto as Exhibit A).

     2.     Dalia Genger, residing at 200 East 65th Street, Apt. 32W, New York, New York

10021 ("Respondent" or "Dalia"), Orly's mother, is the current sole Trustee of the Orly Trust,

and was appointed successor Trustee in January 2008.

     3.     David Parnes residing at 29 Elkachi Street, Tel Aviv, Israel 69497, is the current

Trustee of the Sagi Genger 1993 Trust dated December 13, 1993 ("Sagi Trust").

     4.     The Orly Trust provides for discretionary payments of income and principal to

Orly during her lifetime with the remainder to be distributed to her descendants, per stirpes. If

Orly dies leaving no descendants, the remainder of the trust property is to be distributed to the

Sagi Trust.

5.      Based upon the allegations contained herein, Petitioner requests that this Court provide the following relief:

(a)      Respondent and/or her counsel during the pendency of this proceeding are required to give notice by overnight mail to Petitioner's Counsel of any (1) offer to purchase the Orly Trust's 19.3% interest in TRI within ten (10) days of receiving such offer; and (2) act by Respondent, her agents, and all other persons acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell, or otherwise alter the Orly Trust's interest at least 10 days prior to such act in accordance with Judge Troy K. Webber's Order dated July 1, 2009 affirmed on August 18, 2009, and stipulated to by the parties' respective counsel. (Annexed hereto as Exhibit B);

(b)      Respondent and/or her counsel during the pendency of this proceeding are required to give notice by overnight mail to Petitioner's Counsel of any attempt to vote any TRI shares held by the Orly Trust for any purpose, including, without limitation, in any election of TRI's directors, with such notice being given at least ten (10) days prior to such attempt being made in accordance with the Stipulation signed by the Parties and the Stipulation withdrawing the Order to Show Cause signed July 16, 2010 by their respective counsel both dated September 8, 2010 (both Stipulations are annexed hereto as Exhibit C);

(c)      remove Respondent as Trustee of the Orly Trust for breaching her fiduciary duties, wasting, dissipating and looting the assets of the Orly Trust, imprudently managing and injuring the property committed to her charge; for concocting a scheme with Sagi Genger to strip the Orly Trust of its two most valuable assets: (a) an indirect interest in 49% of defendant TPR Investment Associates, Inc. ("TPR"), a closely held family corporation; and (b) 1,102.80 shares of common stock of Trans-Resources, Inc. ("TRI") (the "TRI Shares")[1], another

---

[1]      The Orly Trust's TRI Shares have become the subject matter of a Final Judgment Order in Delaware Chancery Court Civil Action Number 3994-VCS although neither Orly nor the Orly Trust nor Dalia as Orly's Trustee was a party to the proceeding. A copy of the decision is annexed hereto as Exhibit D (see paragraph 8 in which Judge Strine included in his ruling that the Orly Trust is not the record or beneficial owner of any TRI Shares although this issue was not in the Complaint and Orly and/or the Orly Trust were not parties to the proceeding). The decision is being appealed on behalf of Orly and her Trust. Dalia as her trustee has failed to file a Notice of Appeal and protect the Orly Trust assets.

closely held corporation; for allowing a foreclosure upon the Orly Trust's indirect 49% interest in TPR pursuant to a promissory note which, by mutual understanding and agreement between the Genger family members and TPR was never to be collected and did nothing to preserve Orly's rights or interest at the foreclosure sale; for colluding with defendants Sagi Genger and D&K GP LLC ("D&K GP") to enter into various agreements that would allow D&K GP to "mortgage, hypothecate, pledge, create a security interest in or lien upon, or otherwise encumber [the Orly Trust's TRI Shares]" in connection with the above-mentioned promissory note without giving any notice to Orly, the Orly Trust's beneficiary; and for failing to protect the Orly Trust by not appearing or appealing the final Judgment Order of V.C. Leo E. Strine, Jr., Delaware Chancery Court Civil Action Number 3994-VCS;

      (d)    surcharge Respondent in the amount of the loss of the value of Orly's interest in TPR and TRI, as determined by the Court and awarding the Petitioner costs and attorneys' fees;

      (e)    appoint Michael D. Grohman, Esq., as successor trustee;

      (f)    waive any requirement that Petitioner post an undertaking; and

      (g)    grant Petitioner such further relief deemed necessary or proper.

6.    To assist the Court in perceiving the severity of Respondent's conduct, the following is an overview of the facts supporting this Petition.

## I.    OVERVIEW

7.    Arie and Dalia were married on July 23, 1967, in a ceremony held in Israel. In
2004, however, their marriage ended in divorce. Prior to 1993, while Dalia and Arie were
married, Dalia and Arie formed D & K LP ("D & K"), a family-owned limited partnership whose
name was shorthand for "Dalia and Kids." At the time of its formation, Dalia, the general
partner, held a 4% interest, and Orly and Sagi, the limited partners, each held a 48% interest.

8.    In December 1993, Dalia and Arie also established identical irrevocable *inter
vivos* trusts for the benefit of each of their children: the Orly Trust and the Sagi Trust. For
estate-planning purposes, Dalia and Arie funded each trust with a $600,000 gift. The intent
behind the trusts was to ensure that both children received property of equal value. Sash A.
Spencer and Lawrence M. Small were named Co-Trustees of both trusts and remained Co-
Trustees until the Genger's divorce. After the Trusts were funded, Orly and Sagi each assigned
their 48% interests in D & K to their Trusts.

9.    At the same time in December 1993, D & K purchased 240 shares of common
stock (constituting 49% of the outstanding shares) in TPR for $10,200,000. The shares were
purchased with $600,000 from each of the Orly Trust and the Sagi Trust and $50,000 from Dalia,
totaling $1,250,000, and the balance was satisfied with a recourse $8,950,000 promissory note
(the "Note") (a copy of which is annexed hereto as Exhibit E). Pursuant to the Note, principal,
together with accrued interest, was to be repaid by D & K in annual installments over ten years.
The Note was secured by a pledge of the 240 TPR shares owned by D & K. Each of the Trusts
and Dalia assumed liability on the Note in proportion to its/her direct interest in D & K.
Accordingly, each of the Orly and Sagi Trusts assumed a 48% liability on the Note and acquired
a 23.52% indirect interest in TPR and Dalia assumed a 4% liability on the Note and a 1.96%
indirect interest in TPR. Payments were made on the Note until 1999, at which time D & K
stopped making payments with the implied consent of the interested parties.

10.     At the time of the above-described transaction, Arie owned the remaining 51% of
TPR, which held investments in various securities, including TRI common stock, as well as its
interest in the Note. As of March 30, 2001, TPR held a 52.85% interest in TRI. The remaining
minority interest in TRI (47.15%) was owned by various entities controlled directly and
indirectly by Jules and Eddie Trump (the "Trump Group").

11.     On October 26, 2004, Dalia and Arie entered into a Stipulation and Agreement of
Settlement as a final settlement of their divorce (the "Settlement Agreement") (annexed hereto as
Exhibit F). Pursuant to the Settlement Agreement, Dalia received, *inter alia*, Arie's 51% interest
in TPR and retained her 4% interest in D & K. TPR's 52.85% interest in TRI was transferred to
Arie and the Trusts as follows: (i) 13.99% to Arie, (ii) 19.43% to the Orly Trust, and (iii) 19.43%
to the Sagi Trust. The Orly Trust and the Sagi Trust each granted Arie an irrevocable lifetime
voting proxy over their TRI shares (annexed hereto as Exhibit G). Therefore, after October 29,
2004, Arie and the two Trusts held a controlling interest in TRI, and TPR no longer owned any
TRI common stock.

12.     In connection with the divorce settlement, Dalia took measures to cede
management of D & K and TPR to her son Sagi. On October 21, 2004, days before signing the
Settlement Agreement, Dalia and Sagi formed D & K GP LLC ("D & K GP"), whose sole
purpose was to act as the general partner of D & K. Dalia exchanged her 4% interest in D & K
and $1.00 for a 99% membership interest in D & K GP. Sagi purchased a 1% membership
interest in D & K GP for $1.00. Pursuant to D & K GP's Limited Liability Agreement (annexed
hereto as Exhibit H), Sagi was given the power to select a manager of D & K GP whose function
would be to control D & K's assets. Sagi selected himself to act as manager; thus, Dalia
effectively handed Sagi the authority to control D & K and its assets. Also, by forming D & K
GP, Dalia and Sagi shielded themselves from any personal liability stemming from D & K,
including any personal liability related to the Note. This left the Trusts solely liable on the Note.

13.     On October 30, 2004, Dalia entered into a shareholder agreement with TPR that provided for the management of TPR. Specifically, pursuant to the shareholder agreement (annexed hereto as Exhibit I), D & K, which owned 49% of TPR, was given authority to appoint one board member to the TPR board. Sagi, as the managing partner of D & K, appointed himself as a board member of TPR. As the majority owner of TPR, Dalia was named as the other board member. In addition, the shareholder agreement appointed Sagi as Chief Executive Officer ("CEO") of TPR. Accordingly, Dalia essentially ceded control of TPR to Sagi, just as she had done with D & K.

14.     Below, for the Court's convenience, is a side-by-side summary of Arie's, Dalia's, the Orly Trust's, and the Sagi Trust's interests in TPR before and after Arie's and Dalia's divorce.[2]

### TPR OWNERSHIP
### BEFORE AND AFTER DIVORCE

### PERCENTAGE

| Person | TPR Before | TPR After |
|---|---|---|
| Arie Genger | 51.00% | 0% |
| Dalia Genger | 1.96% | 52.96% |
| Orly Trust | 23.52% | 23.52% |
| Sagi Trust | 23.52% | 23.52% |
| **TOTAL** | **100%** | **100%** |

---

[2] For the Court's convenience, the chart annexed hereto as Exhibit J provides a summary of Arie's, Dalia's, the Orly Trust's, and the Sagi Trust's ownership interests in TPR, TRI, and D & K as of October 26, 2004 – i.e., the date that Arie and Dalia executed the Settlement Agreement.

15.     In connection with the Settlement Agreement, Dalia required that the Trustees of the Orly Trust and the Sagi Trust (Messrs. Sash and Small) resign and be replaced with friends of Sagi. Numerous successor trustees were appointed to the Orly Trust and the Sagi Trust, all of whom were affiliated with Sagi in one way or another. David Parnes and Eric Gribetz (Sagi's longtime friends) and Leah Fang (Sagi's sister-in-law) were appointed as successor trustees to the Orly Trust, and Messrs. Parnes and Gribetz, Rochelle Fang (Sagi's mother-in-law), and Mr. Parnes again, were appointed successor trustees of the Sagi Trust.

16.     On August 2, 2006, Sagi, as part of his managerial role in D & K GP, D & K, and TPR, assigned the Note – which then had an approximate value of $11,000,000 as a result of accrued interest – to Mr. Parnes for only $12,000. (A copy of the Memorandum dated August 2, 2006, assigning the Note is annexed hereto as Exhibit K) The assignment stated that D & K "denied enforceability of the Note" (see Exhibit K annexed hereto). Sagi signed the assignment on behalf of both TPR, as the maker, and D & K, as the holder. Dalia was copied on the memorandum assigning the note, but neither Orly, the Orly Trust, nor the then-Trustee of the Orly Trust received copies of the memorandum. At the time of this assignment, Mr. Parnes was acting as trustee of both the Orly Trust and the Sagi Trust. Shortly after the assignment, Mr. Parnes resigned as Trustee of the Orly Trust in recognition of the inherent conflict he faced in that role.

17.     On November 23, 2007, Leah Fang, Sagi Genger's sister-in-law, then sole Trustee of both the Orly and Sagi Trusts, and Sagi Genger, acting in his capacity as manager of D&K GP, executed an "Amended and Restated Limited Partnership Agreement of D&K Limited Partnership (the "D&K Agreement"). Among other things, the D&K Agreement purported to grant D&K GP authority to "mortgage, hypothecate, pledge, create a security interest in or lien upon, or otherwise encumber [the Orly Trust's TRI Shares] for the benefit of [D&K] or that of third parties, in connection with the Note." See D&K Agreement attached hereto as Exhibit L, p.11.

18.     By its terms, the D&K Agreement does not require D&K GP (i.e., Sagi) to give

notice to anyone, including Orly or the Orly Trust, if it decided to encumber the Orly Trust's TRI

Shares in any way.

19.     Upon information and belief, the Orly Trust received no consideration and no

direct or indirect benefit in exchange for the substantial concession it gave to D&K GP under the

D&K Agreement.  Indeed, the D&K Agreement was merely an instrument created for the

specific purpose of encumbering the Orly Trust and its beneficiary, Orly with debt.

20.     Leah Fang never informed Orly of the existence of the D & K Agreement.  In

January 2008, Dalia was appointed successor trustee of the Orly Trust, despite Orly's objection.

At that time she did nothing to attempt to amend Exhibit L nor did she do anything to advise

Orly as beneficiary that the prior trustee had granted D&K GP authority to encumber the Orly

Trust's TRI Shares.  By that time, as a result of Dalia's granting Sagi control of TPR and D & K,

and through the appointment of his friends and relatives as successor trustees of the Trusts, Sagi

effectively had obtained control over the assets held by all of D & K, TPR, the Sagi Trust, and

the Orly Trust.

21.     On or about January 31, 2009, only weeks after making sworn statements to the

Surrogate Court that she intended to protect the Orly Trust and its assets, Dalia executed a

document entitled "Meeting of Partners of D&K LP – Jan. 31, 2009 & Agreement (the "Meeting

Agreement")."  Like the D&K Agreement, the Meeting Agreement purported to grant D&K GP

(i.e., Sagi) authority to encumber the Orly Trust's TRI Shares:

> The partners wish to clarify that the authority vested in the
> General Partner to make limited partners' assets subject to
> a pledge shall be done in substantially the same manner in
> which TPR Investment Associates, Inc. shares were
> pledged in conjunction with the aforementioned note.
> However, the General Partner shall be authorized to sign
> for the partnership and/or each individual partner.

See Meeting Agreement ¶3 (attached hereto as Exhibit M)

22.     In another naked act of self-dealing in violation of Dalia's fiduciary duties as

Trustee, the Meeting Agreement also purports to:

> Indemnify and provide a general release from any claim or
> right at equity, law, or contract or otherwise the current and
> former general partner, its officers, the partnership's
> holdings (including TPR Investment Associates, Inc.) and
> the officers of its holdings to fullest extent permitted in
> connection with any claim by the partnership and/or its
> partners. Irrespective of the above, nothing herein shall
> serve to release or indemnify Arie Genger, William Dowd,
> Lawrence Small or Edward Klimerman.

See Meeting Agreement, Exhibit M, ¶1.

23.     Upon information and belief, the Orly Trust received no consideration and no

direct or indirect benefit in exchange for the substantial concessions Dalia, acting as trustee, gave

to D&K GP under the Meeting Agreement. Indeed, the Meeting Agreement, like the D&K

Agreement, was merely another instrument created for the specific purpose of depleting the Orly

Trust and its beneficiary, Orly of its assets.

24.     Both the D&K Agreement and the Meeting Agreement were negotiated and

executed without ever informing the Orly Trust's beneficiary, Orly. Moreover, Dalia never

subsequently informed Orly of the existence of either agreement, even though Orly made

repeated requests for information about the Orly Trust and its assets during Dalia's tenure as sole

Trustee. Likewise, although Dalia has given sworn statements to the Surrogate Court regarding

the Orly Trust, she never disclosed the existence of either the D&K Agreement or the Meeting

Agreement to either Surrogate Roth or her successor Surrogate Webber. Basically, Dalia, as

Orly's mother and trustee gave Sagi total control to pilfer the Orly Trust assets for his own use

and benefits. Dalia's breach of fiduciary duty resulted in Sagi having the purported power and

ability with Dalia's consent and knowledge to sell the Orly Trust's TRI's Share for one-third

(1/3) of the price that he had sold the Sagi Trust TRI Shares.

25.     Sometime in 2007, Sagi sold a 2% interest in TPR to Rochelle Fang. This sale effectively stripped Dalia of her majority interest in TPR giving Sagi unfettered control of TPR, in addition to his control of D & K and D & K GP. In January 2008, when Dalia was appointed successor trustee of the Orly Trust, she completely divested herself of the balance of her TPR shares. Dalia has not informed either the Court or Orly as to when she transferred her TPR interest.

26.     On August 22, 2008, unbeknownst to Orly, Rochelle Fang, who had been appointed Trustee of the Sagi Trust, attempted to sell the Sagi Trust's 19.43% interest in TRI to the Trump Group, who already owned 47.15% of TRI's outstanding shares, for $26,715,416. This sale purportedly transferred control of TRI from Arie to the Trump Group who thereafter purported to hold 66.58% of TRI's outstanding common stock.[3] In connection with the supposed sale, Sagi and David Parnes were given seats on TRI's board of directors. This sale, which was consummated after Dalia was appointed successor trustee of the Orly Trust, has diluted and diminished the value of the Orly Trust's interest in TRI.

27.     Dalia, while serving as Trustee of the Orly Trust, made no effort to prevent the sale or to protect the value of the Orly Trust's interest in TRI. Fearing that Dalia would continue to neglect her duty to protect the Orly Trust's assets, on January 10, 2009, Petitioner wrote a letter (annexed hereto as Exhibit N) to her mother stating that "for now, and until further notice, it is my strong desire to retain all of the shares of TRI that are currently in the Orly Trust, and I direct you not to sell them." Dalia refused to agree not to dispose of the TRI shares.

---

[3] The validity of the sale was at issue in litigation in Delaware Chancery Court Civil Action Number 3994-VCS, in which the Court's decision is currently pending appeal. The parties to the action are Arie Genger, TRI, and various entities affiliated with the Trump Group. The Orly Trust had not appeared in the action. Although, neither Orly Genger nor the Orly Trust were ever a party to this proceeding, the court ruling applies to her trust's interest in TRI and TPR. In that action, the Trump Group claimed to have bought the shares either from the Sagi Trust or from TPR – thus, the approximately $27 million purportedly paid by the Trump Group somehow belongs to the Sagi Trust or to TPR, and not the Sagi or Orly Trust.

## II.   THE EVIDENCE DISCOVERED BY PETITIONER ON JUNE 1, 2009, AND RESPONDENT'S EXECUTION OF THE MEETING AGREEMENT AND REFUSAL TO PROTECT THE ORLY TRUST'S ASSETS IN THE DELAWARE CHANCERY COURT PROCEEDING, REQUIRES THE IMMEDIATE REMOVAL OF DALIA AS TRUSTEE

28.   In February 2008, Orly applied to this Court to designate a Trustee, or in the alternative to appoint a special trustee, claiming that Dalia and all of the preceding successor trustees of the Orly Trust were improperly appointed and had no authority to act on behalf of the Orly Trust. Orly also alleged wrongful dealings by Dalia as Trustee of the Orly Trust. In denying the application without prejudice, this Court stated that Orly had made allegations without sufficient supporting evidence and suggested that Orly commence an SCPA § 2201 proceeding to obtain the necessary evidence and then renew her application. (A copy of the Court's decision is annexed hereto as Exhibit O.)

29.   On May 14, 2009, as a prerequisite to the SCPA § 2201 application, Orly's counsel sent Dalia Genger a letter (annexed hereto as Exhibit P) requesting documents related to the Orly Trust's assets. Soon thereafter, Orly's counsel was notified that Dalia had retained Robert A. Meister, Esq., of Pedowitz & Meister, LLP, and Orly's counsel therefore forwarded a copy of the May 14th letter to Mr. Meister.

30.   On June 1, 2009, Mr. Meister responded to Orly's document demand by advising Orly's counsel that the Orly Trust no longer owned any interest in TPR. According to the letter, Sagi, acting as CEO of TPR, had foreclosed on the Note and had sold D & K's 240 shares of TPR for $2,220,000. (A copy of the Letter dated June 1, 2009, is annexed hereto as Exhibit Q.) Before that time, Dalia had neither advised nor notified Orly that Sagi had foreclosed on the Note,[4] nor advised Orly that Sagi had sold the TPR shares at auction. Thus, upon receipt of Mr. Meister's letter, Orly learned for the first time that:

---

[4] While the Note had not been serviced since 1999, TPR had not foreclosed on the Note between 1999 and 2008 based upon the Genger Family's agreement at the Note's inception that foreclosure on the Note would upset the estate-planning goals underlying the Note.

(a)     On August 31, 2008, Sagi, acting as CEO of TPR, notified himself as the general manager of D & K, that D & K was in default of the Note and declared that unless the entire unpaid principal amount of the Note was paid immediately, TPR would sell, at auction, the 240 shares pledged as collateral. (A copy of the Notification dated August 31, 2008, is annexed hereto as Exhibit R.)

(b)     Thereafter, Sagi, again acting as CEO of TPR, purported to notify D & K (of which he remained the managing partner) that D & K's 240 shares of TPR stock would be publicly auctioned to the highest bidder on February 27, 2009, and that the money received from the sale would be used to reduce the outstanding debt. (A copy of the Notification is annexed hereto as Exhibit S.) Sagi purported to notify the interested parties of the sale by publishing notice of the sale in the New York Post in October 2008 and February 2009. At all relevant times Sagi had Orly's and Dalia's contact information. Despite this, Orly was never informed of the impending sale.

(c)     On February 27, 2009, TPR (still controlled by Sagi) foreclosed on the 240 shares of TPR and "auctioned" the shares. Not coincidentally, the Sagi-controlled TPR purchased the shares at auction for $2,200,000, making no effort to collect on the Note from the Sagi Trust. (See Exhibit T). The proceeds of the sale – i.e., $2,220,000 – were used to decrease D & K's obligations under the Note, leaving a balance of approximately $8,800,000.

31.     On June 11, 2009, Orly's counsel sent Mr. Meister a letter asking that Dalia, in accordance with Orly's January 2009 request and in light of the secretive diminution of the Orly Trust's interest in TPR, stipulate in writing that she would not, under any circumstances and until all issues were resolved, sell, transfer, or remove the TRI shares from the Orly Trust. (A copy of the Letter dated June 11, 2009, is annexed hereto as Exhibit U) That same day, Mr. Meister responded to the June 11th letter, but he failed to address the terms of the proposed stipulation. (A copy of Mr. Meister's Letter dated June 11, 2009, is annexed hereto as Exhibit V.)

32.    Only many months after this proceeding was commenced, it was discovered that Dalia while serving as Trustee of the Orly Trust had entered into the Meeting Agreement while serving as Orly's trustee (Exhibit M) which authorized D & K GP (Sagi) to encumber the Orly Trust's TRI Shares.

33.    Finally and most importantly, the Orly Trust has been adversely effected by the Delaware Chancery Court's opinion which Orly and the Orly Trust were not parties. Dalia, as her Trustee never appeared in the proceeding to protect the assets of the Trust nor has she filed a Notice of Appeal to protect her beneficiary's interest. As a result, Orly has been forced to retain her own Delaware counsel to advise and protect her and the Orly Trust.

A.    **Dalia Must Be Removed As Trustee Immediately**

34.    As a result of Dalia's deliberate inaction and collusion with Sagi, Orly's TRI shares (a) may not be an asset of her trust, and if an asset could be sold at a significantly discounted rate and the proceeds may be used to pay her unpaid portion of the Note, (b) may be used as collateral to secure the Orly Trust's unpaid portion of the Note, or (c) may be used to satisfy a Judgment against the Orly Trust. Since Orly's address was known to her brother and her mother at all relevant times, publishing notice of the sale of the TPR shares alone was a clear and deliberate attempt to prohibit Orly from intervening in the foreclosure and the sale. Dalia, who upon information and belief had knowledge of the events as they were transpiring, easily could have given notice of the auction to Orly, but she intentionally chose not to. There is now reason to believe Dalia deliberately remained passive so as to allow Sagi to hijack, sell, or otherwise meddle with the Orly Trust's TPR and TRI shares, even though Orly has specifically advised her mother, in writing, to protect the Trust's ownership interest in the TPR and TRI shares and will not stop harming her daughter's economic interests in the Orly Trust.

35.     There is no reason to trust that Dalia will honor her daughter's wishes and instructions since, from the time of her divorce, she has done nothing but ensure that Sagi has complete control over TPR, D & K, and D & K GP, and has allowed Sagi to do as he pleases. At this time, approximately $8,800,000 of the Note remains unsatisfied, and Sagi, as CEO of TPR, has not voided the notice of default. Based upon Dalia's deliberate inaction and failure to protect the Orly Trust's assets to date, there is strong evidence to reasonably conclude that Dalia will not protect the Orly Trust's interest in any assets in the Trust, but rather, will act to benefit herself and Sagi, including by allowing Sagi to obtain any asset in the Orly Trust to satisfy the Orly Trust's unpaid portion of the Note.

36.     The fact that Dalia has never appeared or intervened or filed a notice of appeal in the Delaware Action alone is cause for her removal. When added to the information provided to Orly's counsel on June 1, 2009, which confirms Respondent's lack of diligence and disloyal service as Trustee, there are more than sufficient evidence to have Respondent removed as Trustee of the Orly Trust. While serving as Trustee, Dalia intentionally failed to notify Orly that TPR was taking measures to foreclose on the Orly Trust's 23.52% indirect interest in TPR. It was Dalia's duty as a fiduciary of the Orly Trust to be apprised of all activity concerning the Orly Trust and to ensure that Orly received proper notification of the default and auction. Moreover, Dalia actually knew of the foreclosure and the auction, but took no steps to protect the Orly Trust's interest in TPR. Dalia knew of Sagi's plan to foreclose on the Note and sell the TPR shares as early as August 2008; thus, she withheld information concerning the auction from Orly for almost ten months. Dalia did not disclose the foreclosure and share sale until she received the demand letter from Orly's counsel and realized that legal action was imminent and now she has done nothing to protect the Orly Trust assets from the Delaware litigation and in fact may have by her inaction depleted most of the assets of the Orly Trust. Instead of protecting the Orly Trust's and its beneficiary's interests, Dalia sat back and silently watched and supported her son as he stripped the Orly Trust of its indirect interest in TPR.

37.    The corporate structure which has intertwined TPR, D & K GP, and D & K's

assets, all of which are in some manner controlled by Sagi as a result of Dalia's actions, permits

Dalia and Sagi to engage in self-dealing and does not provide for any accountability on either

Sagi's or Dalia's part. Unfortunately, the Orly Trust is caught in the middle of Dalia's and

Sagi's conspiracy to engage in self-dealing intended to benefit their own interests, while Sagi has

been permitted to diminish and dissipate the value of the Orly Trust's assets, including its

interests in TPR and TRI. By enriching herself and her son at the expense of her daughter, Dalia

is in breach of her fiduciary duties as Trustee of the Orly Trust. It is imperative that Orly have

an independent successor trustee appointed who will unbiasedly and loyally protect the Orly

Trust's remaining assets, and make every attempt possible to retain the assets that have been

reduced in value.

**(1)    In Direct Conflict With Her Obligations as Fiduciary of The Orly Trust, Dalia Did Nothing To Stop Sagi From Attempting to Sell His Trust's TRI Shares, Which Have Diluted the Value of the Orly Trust's Assets**

38.    The Sagi Trust's sale of its interest in TRI to the Trump Group for $26,715,416,

which occurred after Dalia was appointed successor trustee of the Orly Trust, purportedly

transferred control of TRI from Arie to the Trump Group. Assuming if this purported sale has

been given effect, then the value of the Orly Trust's assets have significantly diminished since

Arie will no longer own a controlling interest in TRI, and thus the Orly Trust would no longer

own a portion of the controlling block of TRI shares.

39.    Dalia, as a fiduciary of the Orly Trust, was obligated to apprise herself of any

transactions that could affect the value of the Orly Trust's shares, and, in fact, Dalia was, upon

information and belief, contemporaneously aware of the Sagi Trust sale. But Dalia made no

effort to protect the value of the Orly Trust's TRI shares by challenging the proposed sale.

Moreover, she has taken no position with regard to the current value of the TRI shares and has

taken no measures to protect the Orly Trust's interest in TRI. By remaining passive with respect

to the Orly Trust's TRI shares, and indeed colluding with Sagi, Dalia completely ignored the

intent behind the establishment of the Orly Trust – to transfer an equal amount of assets to each of the children. Dalia, through her actions and her inaction alike, may have permitted Sagi to secure substantially more value from the Trusts' assets than Orly.

**(2)    In Direct Conflict With Her Obligations as Fiduciary of The Orly Trust, Dalia Took No Action To Protect the Orly Trust's Interest in TPR**

40.    Pursuant to the August 2006 memorandum assigning the Note to David Parnes – on which Dalia was copied – Sagi, acting as the managing partner of D & K, took the position that the Note was unenforceable. (See Paragraph 4 of Exhibit K annexed hereto.) In the exact same memorandum, however, Sagi, acting as the CEO of TPR, took the directly contrary position that TPR reserved its right to enforce the Note. (See Paragraph 8 of Exhibit K annexed hereto.)

41.    On February 14, 2007, Dalia, who participated in the transaction between Sagi and Mr. Parnes, and in a clear attempt to clean her hands of any impropriety, admitted in a sworn statement to the Court that no one was ever supposed to foreclose on the Note. (See Paragraph 3 of Exhibit W annexed hereto). Additionally, the unpaid Note was the subject of a post-judgment arbitration proceeding between Dalia and Arie, which took place in September 2007. Dalia, who was present at the proceedings, heard Sagi and Mr. Parnes testify that the Note should not be enforced and that Sagi, as CEO of TPR, had no intention of collecting the unpaid portion of the Note. Thus, Dalia knew long before August 2008 that TPR had effectively disclaimed its right to foreclose on the Note.

42.    As described above, however, in August 2008 (eleven months later), Sagi sought to enforce the Note. Contrary to the position he had taken under oath at the arbitration, and contrary to the position he had taken as the managing partner of D & K (see Paragraph 4 of Exhibit K attached hereto), Sagi issued a default notice to D & K on behalf of TPR. Dalia, who knew the Note was never intended to be enforced and who previously had sworn to as much, should have immediately sought to block Sagi from foreclosing on the Note and selling the TPR

shares. Notwithstanding her knowledge and her previous statements, however, Dalia failed to make any effort to stop Sagi when he engaged in this clear act of self-dealing, even though the Orly Trust had a clear interest in the TPR shares at issue. As a fiduciary of the Orly Trust with prior, as well as continued knowledge, of the TPR foreclosure, TPR's supposed claims against D & K, and D & K's ability to challenge those claims based on prior representations, Dalia had a duty to protect the Orly Trust's indirect ownership of the TPR shares. But instead of taking the proactive measures required of a fiduciary, Dalia did nothing and allowed Sagi to obtain the TPR shares for himself to the detriment of the Orly Trust. Moreover, in connection with her appointment as successor trustee of the Orly Trust in January 2008, Dalia divested herself of her TPR shares (without informing either the Court or Orly as to when she transferred her interest) in a further attempt to distance herself from any attributable wrongdoing. Dalia has contended to this Court that she sold her TPR shares in order to avoid any appearance of impropriety in connection with her appointment as Trustee. Interestingly, however, Dalia has never informed Orly or this Court whether she continues to maintain a 99% interest in D & K GP, the company that controls D & K and, thus, was obligated to service the Note.

43.    Additionally, Dalia's failure to act in the face of the foreclosure and sale of TPR stock is especially egregious because she has known since August 2008 that the purported sale of TRI stock to the Trump Group was being challenged in Delaware Chancery Court. She also has known that in that action the Trump Group is asserting that it bought the TRI stock from *either* the Sagi Trust *or* TPR. Thus, she has known that, depending on the outcome of the appeal of litigation in Delaware, the Orly Trust could have an interest in the $27 million paid by the Trumps in August 2008 if its interest in TPR were preserved. Accordingly, as trustee of the Orly Trust, she should have been especially vigilant in protecting the Orly Trust's interest in TPR through D & K. But instead, she allowed Sagi to essentially steal the Orly Trust's interest in TPR so that Sagi can attempt to retain the entire $27 million regardless of the outcome of the appeal in Delaware Chancery Court. Indeed, Dalia has done nothing to ensure that the $27,000,000 is preserved, so that it will not be depleted by Sagi pending the outcome of the

Delaware appeal. Her inaction in this regard is a blatant violation of her fiduciary duties as
trustee.

## III.   DALIA SHOULD BE SUR-CHARGED IN THE AMOUNT OF THE LOSS OF THE VALUE OF ORLY'S INTEREST IN TPR AS DETERMINED BY THE COURT AND ORLY SHOULD BE AWARDED ATTORNEYS' FEES

44.   By failing to take action on behalf of the Orly Trust to prevent Sagi from
foreclosing on the Note and selling D & K's TPR shares and through her other actions and
inactions described herein, Dalia caused the Orly Trust to lose its interest in TPR and possibly
TRI. Accordingly, Dalia should be surcharged in an amount of the loss of the value of Orly's
interest in TPR and TRI as determined by the Court and should be required to reimburse the Orly
Trust for its attorneys' fees incurred in connection with bringing this action.

## IV.   MICHAEL D. GROHMAN, ESQ. SHOULD BE APPOINTED AS SUCCESSOR TRUSTEE

45.   Based on Dalia's deliberate breach of her fiduciary duties to the Orly Trust, and in
light of Dalia's prior nefarious conduct as the Orly Trust's Trustee, this Court should remove
Dalia as Trustee and replace her with Michael D, Grohman, Esq. Mr. Grohman is a member of
the New York Bar and the head of the Trust and Estates practice group at Duane Morris LLP.
Mr Grohman is not acquainted with any members of the Genger family, does not have any
interest in TRI, TPR, or D & K, and is willing and prepared to succeed Dalia immediately.

46.   No prior application has been made for the relief requested herein.

### PRAYER FOR RELIEF

WHEREFORE, based upon the allegations contained herein, Petitioner requests that this
Court provide the following relief:

(a)   Respondent and/or her counsel during the pendency of this proceeding are
required to give notice by overnight mail to Petitioner's Counsel of any (1) offer to purchase the
Orly Trust's 19.3% interest in TRI within ten (10) days of receiving such offer; and (2) act by

Respondent, her agents, and all other persons acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell, or otherwise alter the Orly Trust's interest at least 10 days prior to such act in accordance with Judge Troy K. Webber's Order dated July 1, 2009 affirmed on August 18, 2009, and stipulated to by the parties' respective counsel. (Annexed hereto as Exhibit B);

(b)      Respondent and/or her counsel during the pendency of this proceeding are required to give notice by overnight mail to Petitioner's Counsel of any attempt to vote any TRI shares held by the Orly Trust for any purpose, including, without limitation, in any election of TRI's directors, with such notice being given at least ten (10) days prior to such attempt being made in accordance with the Stipulation signed by the Parties and their counsel dated September 8, 2010 (which is annexed hereto as Exhibit C);

(c)      remove Respondent as Trustee of the Orly Trust for breaching her fiduciary duties, wasting, dissipating and looting the assets of the Orly Trust, imprudently managing and injuring the property committed to her charge; for concocting a scheme with Sagi Genger to strip the Orly Trust of its two most valuable assets: (a) an indirect interest in 49% of defendant TPR Investment Associates, Inc. ("TPR"), a closely held family corporation; and (b) 1,102.80 shares of common stock of Trans-Resources, Inc. ("TRI") (the "TRI Shares"), another closely held corporation; for allowing a foreclosure upon the Orly Trust's indirect 49% interest in TPR pursuant to a promissory note which, by mutual understanding and agreement between the Genger family members and TPR was never to be collected and did nothing to preserve Orly's rights or interest at the foreclosure sale; for colluding with defendants Sagi Genger and D&K GP LLC ("D&K GP") to enter into various agreements that would allow D&K GP to "mortgage, hypothecate, pledge, create a security interest in or lien upon, or otherwise encumber [the Orly Trust's TRI Shares]" in connection with the above-mentioned promissory note without giving any notice to Orly, the Orly Trust's beneficiary; and for failing to protect the Orly Trust

by appearing or appealing the Final Judgment Order of v.c. Leo E. Strine, Jr., Delaware

Chancery Court Civil Action Number 3997-VCS ;

 

 

(d)     surcharging Respondent by an amount of the loss of the value of Orly's

interest in TPR and TRI, as determined by the Court and awarding Petitioner her costs and

attorneys' fees;

(e)     appointing Michael D. Grohman, Esq., as successor trustee;

(f)     waiving any requirement that Petitioner post an undertaking; and

(g)     granting Petitioner any other relief it deems necessary and proper.

Dated:  New York, New York
        September 21, 2010

_____
ORLY GENGER
Petitioner

COZEN O'CONNOR

By: _____
    Judith E. Siegel-Baum, Esq.
    Attorney for Petitioner
    277 Park Avenue
    New York, New York 10172
    212-883-4902

## VERIFICATION

STATE OF NEW YORK )
                            )ss.:

COUNTY OF NEW YORK )

     The undersigned, the Petitioner named in the foregoing Second Amended petition, being duly sworn, says: I have read the foregoing petition subscribed by me and know the contents thereof, and the same is true of my own knowledge, except as to the matters therein stated to be alleged upon information and believe, and as to those matters I believe it to be true.

_____
Signature of Petitioner

ORLY GENGER
Print Name

Sworn to before me this
21 day of September, 2010.

_____
Notary Public
Commission Expires:
(Affix Notary Stamp or Seal)

GAIL GOLDFARB
NOTARY PUBLIC OF
NO. 02GO6106213
QUALIFIED STATE OF NEW YORK COUNTY
COMMISSION EXPIRES 03/01/20 12

# ATTORNEY CERTIFICATION

I, Judith E. Siegel-Baum, certify that to the best of my knowledge, information and belief, formed after an inquiry reasonable under the circumstances, certify that the presentation of the foregoing paper or the contentions therein are not frivolous as defined in subsection a of section 130-1.1 of the Rules of the Chief Administrator of the Courts.

Dated: September 22, 2010

Judith E. Siegel-Baum

TRUST AGREEMENT

BETWEEN

ARIE GENGER

AS GRANTOR

AND

LAWRENCE M. SMALL AND SASH A. SPENCER

AS TRUSTEES

CREATING

THE ORLY GENGER 1993 TRUST

*Account org —*
*org · leah.*

Dated: December  13  , 1993

Copy 3 of 4

RUBIN BAUM LEVIN CONSTANT & FRIEDMAN

30 ROCKEFELLER PLAZA · NEW YORK, N Y 10112

## Index to the Orly Genger 1993 Trust Agreement

| Article | Contents | Page |
|---|---|---|
| FIRST: | Disposition of Principal and Income During the Life of the Grantor's Daughter, ORLY GENGER | 1 |
| SECOND: | Continuing Trust for Descendants of the Grantor's Daughter, ORLY GENGER | 5 |
| THIRD: | Disposition of Property if No Descendant of the Grantor is Living | 9 |
| FOURTH: | Additions to the Trusts | 13 |
| FIFTH: | Irrevocability | 13 |
| SIXTH: | Governing Law | 13 |
| SEVENTH: | Trustees | 13 |
| EIGHTH: | Compensation of Trustees | 18 |
| NINTH: | Settlement of Trustees' Accounts; Exoneration of Trustees | 18 |
| TENTH: | Definitions | 21 |
| ELEVENTH: | Administrative Powers | 22 |
| TWELFTH: | Provisions Relating to the GST | 32 |
| THIRTEENTH: | Release of Powers | 37 |
| FOURTEENTH: | Provision with Respect to Closely Held Businesses | 38 |
| FIFTEENTH: | Headings | 39 |
| SIXTEENTH: | Severability | 39 |

TRUST AGREEMENT dated December _13_ , 1993, between ARIE GENGER (now residing at 1067 Fifth Avenue, New York, New York), as Grantor, and LAWRENCE M. SMALL (now residing at 2804 Woodland Drive, Washington, D.C. 20008) and SASH A. SPENCER (now residing at 251 Crandon Boulevard, Townhouse 164, Key Biscayne, Florida 33149), as Trustees.

The Grantor hereby transfers to the Trustees, and the Trustees hereby acknowledge receipt of, the sum of Six Hundred Thousand Dollars ($600,000.00), to be held, administered and disposed of in accordance with the provisions of Article FIRST hereof. Said sum and any other property that may be received by the Trustees pursuant to the provisions of Article FOURTH hereof, and all investments and reinvestments thereof, and all proceeds thereof which constitute principal, are hereinafter collectively called "principal."

This Trust Agreement shall be known as the "Orly Genger 1993 Trust Agreement" and the trust created by Article FIRST hereof shall be known as the "Orly Genger 1993 Trust."

FIRST:      Disposition of Principal and Income
            During the Life of the Grantor's Daughter,
            ORLY GENGER.

A.    The Trustees shall hold, manage, invest and rein-vest the principal of the trust created by this Article, IN TRUST, and, so long as the Grantor's daughter, ORLY GENGER, shall live, the Trustees are authorized and empowered to pay such part, parts or all, if any, of the net income of the trust

created by this Article (hereinafter referred to in this Article
as "Orly's Trust") to, or apply such part, parts or all, if any,
of such net income for the use or benefit of, such one or more
of the following individuals living from time to time in such
equal or unequal amounts or proportions, and at such time or
times, as the Trustees, in their discretion, shall determine:

    1.   The Grantor's daughter, ORLY GENGER.

    2.   Each descendant of ORLY GENGER.

The Trustees shall accumulate all income of Orly's Trust not so
paid to or applied and, at least annually, add such net income
to the principal of Orly's Trust.

    In making such distributions, the Trustees are
requested (but they are not directed) to limit the total amount
of the distributions made to any descendant of ORLY GENGER with
respect to any calendar year to the amount necessary to increase
such descendant's taxable income for United States income tax
purposes for such year to the greatest amount that shall still
result in such descendant not being subject to United States
income taxes at the highest marginal rate in effect for such
year, after taking into account all of such descendant's other
income and deductions for such year.

    B.   The Trustees are authorized and empowered to pay
to, or apply for the use or benefit of, the Grantor's said
daughter such part, parts or all, if any, of the principal of
Orly's Trust, and at such time or times, as said Trustees, in

-2-

their discretion, shall determine, without regard to the interest in the trust of any other person and without regard to the fact that any such payment or application may result in the termination of Orly's Trust.

C.   Upon the death of the Grantor's said daughter, the Trustees shall pay the then principal of Orly's Trust, together with all net income thereof then accrued but not yet collected, and collected but not yet disposed of, as follows:

1.   The Trustees shall pay one-half (1/2) of such income and principal, in such equal or unequal amounts or proportions, to or for the use or benefit of such one or more of the descendants of the Grantor's said daughter, and upon such terms, conditions and trusts, if any, as the Grantor's said daughter, by a provision in her Will expressly referring to this Article of this Trust Agreement, shall validly direct and appoint.  If, or to the extent that, the Grantor's said daughter shall fail so validly to direct and appoint such principal and income, the Trustees, at the death of the Grantor's said daughter, shall pay the same, per stirpes, to such of the descendants of the Grantor's said daughter as shall survive her, subject, however, to the provisions of Article SECOND hereof, or, if no descendant of the Grantor's said daughter shall survive her, per stirpes, to such of the Grantor's descendants as shall so survive, or, if no descendant of the Grantor shall so survive, in accordance with the provisions of Article THIRD hereof.

-3-

2.   The Trustees shall pay one-half (1/2) of such income and principal, per stirpes, to such of the descendants of the Grantor's said daughter as shall survive her, subject, however, to the provisions of Article SECOND hereof, or, if no descendant of the Grantor's said daughter shall survive her, per stirpes, to such of the Grantor's descendants as shall so survive, or, if no descendant of the Grantor shall so survive, in accordance with the provisions of Article THIRD hereof

3.   If, pursuant to the provisions of paragraph 1 or paragraph 2 of this Section C, the Trustees are directed to pay a per stirpital share of such income and principal to a descendant of the Grantor, and if at the time the Trustees are so directed there shall be in existence a trust for such descendant under a trust agreement between Arie Genger, as grantor, and Lawrence M. Small and Sash A. Spencer, as trustees, executed on the date hereof and known as the "Sagi Genger 1993 Trust Agreement," the Trustees shall not pay such per stirpital share to such descendant but shall instead pay such per stirpital share to the trustees then acting under said trust agreement, to be disposed of by them pursuant to the provisions of the trust for such descendant under said trust agreement.

D.   Notwithstanding anything herein to the contrary, if any Trustee hereunder shall be one of the potential income beneficiaries of Orly's Trust, such Trustee shall not, in his or her capacity as such a Trustee, have any voice or vote or other-

-4-

wise participate in any decision pertaining to the payment or application of the income or principal of Orly's Trust to or for the use or benefit of him or her in his or her capacity as a beneficiary of such trust or to or for the use or benefit of any person whom he or she has an obligation to support, and, in each such event, the other Trustee or Trustees shall make all decisions relating to such trust that pertain to such matters.

SECOND:   Continuing Trusts for Descendants of the Grantor's Daughter, ORLY GENGER.

A.   If, under any provision of this Trust Agreement, any property is directed to be paid to a descendant of the Grantor's daughter, ORLY GENGER, subject to the provisions of this Article, such property shall not be distributed or paid to such descendant. Instead, the Trustees shall continue to hold such property, IN TRUST (in a separate trust for each such descendant which is referred to in this Article as "such descendant's trust"; provided, however, that if there shall be property so directed to be paid on more than one occasion to any such descendant, all such property shall be held in a single trust for such descendant), and, so long as such descendant shall live before attaining the age of twenty-one (21) years, the Trustees, other than such descendant if he or she shall be a Trustee hereunder, are authorized and empowered to pay to, or apply for the use or benefit of, such descendant, such part, parts or all, if any, of the net income of such descendant's

trust, and at such time or times, as said Trustees, in their discretion, shall determine, and the Trustees shall accumulate the balance of such net income, if any, and, at least annually, add it to the principal of such descendant's trust; and, so long as such descendant shall live after attaining the age of twenty-one (21) years, the Trustees shall pay to such descendant all of the net income of such descendant's trust in at least quarterly installments.

B.   The Trustees, other than such descendant if he or she shall be a Trustee hereunder, are authorized and empowered to pay to, or apply for the use or benefit of, such descendant, such part, parts or all, if any, of the principal of such descendant's trust, and at such time or times, as said Trustees, in their discretion, shall determine, without regard to the interest in the trust of any other person and without regard to the fact that any such payment or application may result in the termination of the trust.

C.   Upon the death of such descendant (hereinafter referred to in this Article as "such deceased descendant"), the Trustees shall pay the then principal of such deceased descendant's trust, together with all net income thereof accrued but not yet collected, and collected but not yet disposed of, as follows:

-6-

1.    The Trustees shall pay one-half (1/2) of such income and principal, in such equal or unequal amounts or proportions, to or for the use or benefit of such one or more of the descendants of such deceased descendant, and upon such terms, conditions and trusts, if any, as such deceased descendant, by a provision in his or her Will expressly referring to this Article of this Trust Agreement, shall validly direct and appoint.  If, or to the extent that, such deceased descendant shall fail so expressly and so validly to direct and appoint such principal and income, the Trustees shall, at the death of such deceased descendant, pay the same, per stirpes, to such of the descendants of such deceased descendant as shall survive such deceased descendant, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, per stirpes, to such of the descendants as shall so survive of the ancestor of such deceased descendant closest in degree of relationship to such deceased descendant who (i) shall have descendants who shall so survive and (ii) shall have been a descendant of the Grantor or shall have been the Grantor, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, in accordance with the provisions of Article THIRD hereof.

2.    The Trustees shall pay one-half (1/2) of such income and principal, per stirpes, to such of the descendants of such deceased descendant as shall survive such deceased

-7-

descendant, subject, however, to the provisions of this Article,
or, if no such descendant shall so survive, per stirpes, to such
of the descendants as shall so survive of the ancestor of such
deceased descendant closest in degree of relationship to such
deceased descendant who (i) shall have descendants who shall so
survive and (ii) shall have been a descendant of the Grantor or
shall have been the Grantor, subject, however, to the provisions
of this Article, or, if no such descendant shall so survive, in
accordance with the provisions of Article THIRD hereof.

3.    If, pursuant to the provisions of paragraph
1 or paragraph 2 of this Section C, the Trustees are directed to
pay a per stirpital share of such income and principal to a
descendant of the Grantor subject to the provisions of this
Article, and if at the time the Trustees are so directed there
shall be in existence a trust for such descendant under a trust
agreement between Arie Genger, as grantor, and Lawrence M. Small
and Sash A. Spencer, as trustees, executed on the date hereof
and known as the "Sagi Genger 1993 Trust Agreement," the
Trustees shall not pay such per stirpital share to such descen-
dant subject to the provisions of this Article but shall instead
pay such per stirpital share to the trustees then acting under
said trust agreement, to be disposed of by them pursuant to the
provisions of the trust for such descendant under said trust
agreement.

-8-

D.    Notwithstanding anything herein to the contrary,
each trust created by the terms of this Article shall terminate,
if not sooner terminated, upon the expiration of twenty-one (21)
years after the death of the last surviving descendant of the
Grantor's parents, SHARGA GENGER and DORA GENGER, who shall have
been in being on the date hereof; and the Trustees shall there-
upon pay the then principal of any trust terminated in accor-
dance with the provisions of this Section, together with all net
income thereof accrued but not yet collected and collected but
not yet disposed of, to the descendant of the Grantor with
respect to whom such trust is being held.

THIRD:    Disposition of Property if No Descendant
of the Grantor is Living.

A.    As used in this Article:

1.    The words "such time" shall mean the time as
of which any property is directed to be paid in accordance with
the provisions of this Article.

2.    The term "Qualified Charitable Organization"
shall mean an organization that shall be qualified as an organi-
zation to which contributions and bequests are deductible for
both United States income tax, gift tax and estate tax purposes
under the provisions of Section 170, Section 2522 and Section
2055 of the Internal Revenue Code.

-9-

B.   If, under any provision of this Trust Agreement, any property is directed to be paid in accordance with the provisions of this Article, the Trustees shall pay such property as follows:

1.   If the Grantor, the Grantor's spouse and/or any one or more descendants of the Grantor shall have caused there to be created a foundation known as The Genger Foundation, and if at such time said Foundation shall be in existence and shall be a Qualified Charitable Organization, then, in such event, the Trustees shall pay such property to said Foundation.

2.   If at such time either The Genger Foundation created as aforesaid shall not be in existence or said Foundation shall be in existence but shall not be a Qualified Charitable Organization, and if at such time the Trustees are authorized under applicable law to cause to be organized a corporation under and in accordance with the laws of any state of the United States which the Trustees, in their discretion, shall select, which corporation (i) shall be known by the name of The Genger Foundation (or by such other name as the Trustees, in their discretion, shall select if the name of The Genger Foundation shall not be available to be utilized as the name of said corporation), (ii) shall have as its purposes the encouragement, promotion, support and enhancement of non-orthodox study and education for children in the State of Israel pertaining to the customs, practices and ancient and modern history of the Jewish

-10-

people and shall maintain all of the property held by it, and use all of the net income thereof received from time to time, for the encouragement, promotion, support and enhancement of such study and education for children, (iii) shall be required to maintain all of the property held by it, and use all of the net income thereof received from time to time, for such purposes, with such property and income to be expended for such purposes in such amounts, at such time or times and to or for the use or benefit of such recipient or recipients as the directors, trustees and/or the officers of such corporation shall, in their discretion, determine from time to time, subject, however, to the other provisions of this paragraph 2, (iv) shall have as its initial directors or trustees the Trustees hereunder, the Grantor's cousin, JEREMIAH WOHLBERG (now residing at 2325 Lindenmere Drive, Merrick, New York), if he shall not then be a Trustee hereunder, and also such other individual or individuals, if any, as may be designated by the Trustees, and thereafter to have as directors or trustees such individuals as shall from time to time be determined as provided for in the certificate of incorporation and/or by-laws of said corporation, and (v) shall be organized and maintained in such manner as to be and continue to be a Qualified Charitable Organization, then, in such event, the Trustees shall organize such a corporation, and the Trustees shall pay such property to such corporation.

-11-

3.   If at such time (i) either The Genger Foundation created as aforesaid shall not be in existence or said Foundation shall be in existence but shall not be a Qualified Charitable Organization, and (ii) the Trustees are not authorized under applicable law to cause to be organized a corporation of the nature referred to in paragraph 2 of this Section B, then, in such event, the Trustees shall pay such property to the JEWISH COMMUNAL FUND OF NEW YORK, New York, New York, to be held, administered and disposed of pursuant to the rules and regulations thereof as an Undesignated Philanthropic Fund to be known as the Genger Philanthropic Fund and with the privilege of making advisory recommendations with respect thereto to be held in the first instance by the Trustees, said JEREMIAH WOHLBERG, if he shall not then be a Trustee hereunder, and also by such other individual or individuals, if any, as the Trustees may designate, and thereafter by such other individual or individuals as such designees and their successors acting in such capacity may from time to time designate, and it is requested (but not directed) that the principal and income of such Fund shall be utilized to encourage, promote, support and enhance non-orthodox study and education for children in the State of Israel pertaining to the customs, practices and ancient and modern history of the Jewish people.

-12-

FOURTH:   _Additions to the Trusts._

Any person, including the Grantor, by a transfer to take effect during the life of such person or upon the death of such person, may, at any time or times, add to the principal of any trust hereunder any property of any kind or nature acceptable to the Trustees, and any such additional property so received by the Trustees pursuant to the provisions of this Article shall thereafter be deemed to be part of the principal of such trust subject to all of the terms, provisions and conditions of this Trust Agreement.

FIFTH:   _Irrevocability._

This Trust Agreement and the trusts hereby created are irrevocable and not subject to amendment or change.

SIXTH:   _Governing Law._

This Trust Agreement and the trusts hereby created shall be governed by the laws of the State of New York.

SEVENTH:   _Trustees._

A.   The initial Trustees acting hereunder shall be LAWRENCE M. SMALL and SASH A. SPENCER.

B.   Each individual acting as a Trustee hereunder (whether such Trustee is initially a party to this Trust Agreement or a successor Trustee named in Section C of this Article

-13-

or appointed pursuant to the provisions of this Section B) is authorized and empowered to appoint another individual (other than the Grantor) to act in his or her place and stead as a Trustee hereunder. Each appointment of a successor Trustee hereunder shall be made by the execution of an instrument of appointment signed and acknowledged by the individual who shall have made such appointment and by delivering such instrument in accordance with the provisions of Section G of this Article; and any such appointment may be revoked in the same manner by the individual Trustee who shall have made it at any time before the occurrence of the event or events as of which such appointment shall, by its provisions, become effective. Any appointment made in accordance with the provisions of this Section B shall be valid only if the individual so appointed shall, within thirty (30) days after the later of (i) the date on which a copy of such instrument of appointment is so delivered to him or her, and (ii) the occurrence of the event or events as of which such appointment shall, by its provisions, become effective, qualify as a successor Trustee under this Trust Agreement in accordance with the provisions of Section D of this Article. Each successor Trustee named in Section C of this Article or appointed in accordance with the provisions of this Section B shall be vested with the same powers and authority as the initial Trustees who are parties to this Trust Agreement; provided, however, that no such Trustee shall be permitted to exercise any authority or

-14-

power which such Trustee shall be prohibited from exercising by an express provision of this Trust Agreement.

C.   1.   If either LAWRENCE M. SMALL or SASH A. SPENCER shall cease to act as a Trustee hereunder, and no successor Trustee appointed by him pursuant to the provisions of Section B of this Article shall qualify and act as a Trustee hereunder, MARTIN A. COLEMAN (now residing at 51 Cambridge Road, Great Neck, New York 11023) shall act as Trustee hereunder.

2.   If MARTIN A. COLEMAN shall fail or cease to act as a Trustee hereunder, and no successor Trustee appointed by him pursuant to the provisions of Section B of this Article shall qualify and act as a Trustee hereunder, THOMAS G. HARDY (now residing at 935 Park Avenue, New York, New York 10028) shall act as a Trustee hereunder.

D.   Each successor Trustee hereunder shall qualify as such by accepting the trusteeship by the execution of a signed and acknowledged instrument of acceptance and by delivering such instrument in accordance with the provisions of Section G of this Article.

E.   Any individual Trustee hereunder may resign as such a Trustee by the execution of a signed and acknowledged instrument of resignation and by delivering such instrument in accordance with the provisions of Section G of this Article.

-15-

Any such resignation shall become effective upon the receipt of such instrument of resignation by each individual to whom it is delivered or mailed as aforesaid or at such later date as may be specified therein.

F. If any individual while acting as a Trustee hereunder shall become incapable of discharging his or her responsibilities and duties as such a Trustee by reason of a physical, emotional or intellectual incapacity and such incapacity shall be confirmed by each of two medical doctors in written statements, copies of which shall be delivered or mailed as hereinafter provided, the individual who is so incapacitated shall be deemed for the purposes of construing and applying all of the provisions of this Trust Agreement to have effectively resigned as such Trustee in compliance with the provisions of Section E of this Article, such resignation to be deemed to be effective upon the delivery or mailing of the aforesaid statements as hereinafter provided. Each of the aforesaid statements shall be signed and acknowledged by the medical doctor making the same and copies of the same shall be delivered or mailed by registered or certified mail to the individual, if any, who will become the successor Trustee hereunder in the place and stead of the incapacitated Trustee to whom such statement pertains, to each Trustee, if any, then acting hereunder (other than the incapacitated Trustee to whom such statement pertains), and also to either (i) the Grantor (or, if the Grantor shall not then be

-16-

living, to the executors, administrators or personal representa-
tives of the Grantor's estate), or (ii) any one or more of the
adult individuals to whom or for whose use or benefit the income
of any trust hereunder may then be paid or applied.

G.    Each instrument directed to be delivered in
accordance with the provisions of this Section G shall be deliv-
ered in person or by mailing a copy of the same by registered or
certified mail to each Trustee, if any, then acting hereunder
(other than the Trustee, if any, who shall have executed such
instrument), and to either (i) the Grantor (or, if the Grantor
is not then living, to the executors, personal representatives
or administrators of the Grantor's estate), or (ii) any one or
more of the adult individuals to whom or for whose use or bene-
fit the income of any trust hereunder may then be paid or
applied.

H.    No bond or other security shall be given by or
required in any jurisdiction (whether in the State of New York
or elsewhere) of any Trustee at any time acting hereunder
(whether such Trustee is named herein or appointed pursuant to
the provisions hereof) for the faithful performance of such
Trustee's fiduciary duties in any capacity hereunder regardless
of whether such Trustee is or may become a non-resident of the
State of New York or elsewhere.

-17-

EIGHTH:    Compensation of Trustees.

No Trustee hereunder, whether such Trustee is herein-above named or appointed pursuant to the provisions hereof, shall be entitled to any compensation (other than reimbursement for out-of-pocket expenses) for services rendered as a Trustee hereunder; and each Trustee who is a party to this Trust Agreement or who qualifies as a successor Trustee hereunder as provided herein shall be deemed to have agreed to serve as such Trustee without receiving any such compensation.

NINTH:    Settlement of Trustees' Accounts;
          Exoneration of Trustees.

A.   To the fullest extent permitted by law, the Trustees shall not be required to file with or render to, and the Grantor waives and excuses the filing with or rendering to, any Court an account of their transactions or inventories, accounts, statements or reports of principal and/or income with respect to any trust created hereunder.   Nevertheless, the Trustees may at any time have their accounts judicially settled with respect to any trust created hereunder, and in any such proceeding it shall not be necessary to serve any person who is under a disability if there is another party to the proceeding who is not under any disability and who has the same interest as the person who is under a disability, and, in such event, it shall not be necessary to appoint a guardian ad litem for any such party who is under a disability.   The expenses of any such

-18-

account shall be a proper administration expense of the trust to which such account relates.

B.    If any Trustee shall resign as a Trustee here-under, the continuing Trustee, if any, or, if there is no con-tinuing Trustee, any successor Trustee who shall have qualified to act in accordance with the provisions of Section D of Article SEVENTH hereof, may deliver to the Trustee so resigning an instrument whereby such resigning Trustee shall be released and discharged, to the extent stated therein, ~~of and from~~ ~~~~ ~~~~ ~~~~ ~~~~ ~~~~. Any such release and discharge shall be binding upon all persons, whether or not then in being, then or thereafter interested in either the income or the principal of any trust hereunder and shall have the force and effect of a final decree, judgment or order of a court of competent juris-diction rendered in an appropriate action or proceeding for the judicial settlement of the account of such Trustee in which jurisdiction was obtained of all necessary and proper parties. The foregoing provision, however, shall not preclude any Trustee so resigning from having his or her account judicially settled, and in any such proceeding it shall not be necessary to serve any person who is under a disability if there is another party to the proceeding who is not under any disability and who has the same interest as the person who is under a disability, and, in such event, it shall not be necessary to appoint a guardian

-19-

ad litem for any such party who is under a disability. The expenses of any judicial account rendered by a Trustee who shall resign shall be a proper administration expense of the trust to which such account relates.

C.   In addition to the foregoing, the Trustees are hereby authorized, at any time and from time to time, with respect to any trust hereunder, to settle the account of the Trustees by agreement between the Trustees and the then adult individual or individuals to whom or for whose use or benefit the income of such trust may then be paid or applied and the adult or adults who would be entitled to the principal in case such trust were to terminate at the time of such agreement, excluding any such individual who is under a disability if there is a party to the agreement who is not under any disability and who has the same interest as the individual who is under a disability, which agreement shall bind all persons, whether or not then in being, then or thereafter interested in either the income or the principal of such trust. Any such settlement shall have the same force and effect as a final decree, judgment or order of a court of competent jurisdiction rendered in an appropriate action or proceeding for the judicial settlement of such account in which jurisdiction was obtained of all necessary and proper parties. The expenses of any such account shall be a proper administration expense of such trust.

-20-

D.   To the extent permitted by law, no Trustee shall be accountable, liable or responsible for any act, default, negligence, or omission of any other Trustee.

TENTH:   Definitions.

Wherever used in this Trust Agreement:

1.   The word "Trustees" and all references to the Trustees shall mean and refer to the Trustees and successor Trustees hereinabove named, any successor Trustee appointed pursuant to the provisions hereof, any substitute Trustee appointed by a court of competent jurisdiction, the survivors or survivor of them, and their and each of their successors or successor, as may be acting hereunder from time to time.

2.   The words "IN TRUST" shall mean "in trust, nevertheless, to hold, manage, invest and reinvest, and, until payment thereof as hereinafter directed, to receive the income thereof."

3.   The word "pay" shall, where applicable, mean "convey, transfer and pay" and the word "payment" shall, where applicable, mean "conveyance, transfer and payment."

4.   The words "descendant" and "descendants," when used with respect to any person, shall be deemed to include (i) every individual who is born to such person, (ii) every individual who is lawfully adopted by such person, and (iii)

-21-

every individual who is otherwise descended from such person, whether by birth, or by lawful adoption, or by a combination thereof.

5.   The words "Internal Revenue Code" shall mean and refer to "the United States Internal Revenue Code of 1986 (as amended from time to time)," and any reference to a specific section, chapter or other provision of the Internal Revenue Code shall mean and refer to said section, chapter or other provision and any successor statute thereto pertaining to the same subject matter as said section, chapter or other provision.

ELEVENTH: <u>Administrative Powers</u>.

A.   In addition to and in amplification of the powers given by law to trustees, the Trustees, but solely in their fiduciary capacities, are hereby authorized and empowered, in their discretion:

1.   To sell, exchange, make contracts with respect to, grant options on or otherwise dispose of, at public or private sale, at such prices, on such terms (including sales on credit with or without security) and at such time or times as the Trustees shall determine, any property, real or personal, which may at any time form part of any trust hereunder.

2.   To lease, for such periods (whether or not any such period shall extend beyond the period prescribed by law

-22-

or the probable term of any trust hereunder), on such terms and conditions and at such time or times as the Trustees shall determine, the whole or any portion or portions of any property, real or personal, which may at any time form part of any trust hereunder, whether the same be held in severalty or as tenant-in-common with others or in a partnership, syndicate or joint venture or otherwise, and release and convey any undivided interest in any such property for the purpose of effecting partition of the whole or any part thereof; and make, place, extend or renew mortgages, pledges, building loan agreements or building loan mortgages upon or affecting any and all such property; and make, execute and deliver such mortgages, pledges and agreements, together with proper bonds, notes or other instruments of indebtedness to accompany the same, and such extension or renewal agreements, as to the Trustees shall seem necessary, advisable or proper; and also to repair, alter, reconstruct, build upon or improve any such property and on such terms and at such time or times as the Trustees shall determine, give and grant to others the right so to do, or agree in, or so modify any lease affecting any such property that the lessee may alter, repair, reconstruct, build upon, improve, mortgage and pledge any such property; and generally to make, alter and modify all agreements, leases, mortgages, pledges, building loans, sales, exchanges, transfers and conveyances of or affecting any such property which the Trustees shall determine to be necessary, advisable or proper for the preservation, improvement, enhance-

-23-

ment in value of, or betterment of or addition to, such prop-
erty.

3.    To hold any part or all of the assets of any
trust hereunder invested in the same form of property in which
the same shall be invested when received by the Trustees, and
invest and reinvest the assets of any such trust, or any portion
thereof, in any form of investment which the Trustees may deter-
mine (including, without limitation, mutual funds, common trust
funds, investment trusts, general partnerships and limited part-
nerships), whether or not such investment is of the nature pre-
scribed by law as a legal investment for fiduciaries or is spec-
ulative in nature, and without regard to the percentage of the
assets of such trust which such investment or similar invest-
ments may constitute.

4.    To vote in person or by proxy all stocks and
other securities held by any trust hereunder; grant, exercise,
sell or otherwise turn to account rights to subscribe for stock
and securities and options of any nature; amortize or refrain
from amortizing premiums on bonds or other securities which the
Trustees may purchase or receive; participate in reorganiza-
tions, mergers, liquidations or dissolutions, and contribute to
the expenses of, and deposit securities with, protective commit-
tees in connection therewith; participate in voting trusts; and
generally exercise, in respect of said stock and securities, all

-24-

rights, powers or privileges which may be lawfully exercised by any person owning similar property in his or her own right.

5.    To employ any investment counsel, corporate custodians, agents, accountants, brokers and attorneys which the Trustees may select and pay the charges thereof (including charges for preparation of trust tax returns, the Trustees' accounts and any other necessary trust records); and the Trustees, or a partnership, corporation or other entity in which any Trustee shall be interested, or by which any Trustee may be employed, may be retained in any such capacity, and, in such event, the charges which shall be payable to such Trustee, or to any such partnership, corporation or other entity, shall be in addition to compensation otherwise allowable to such Trustee and may be paid without prior judicial approval.

6.    In any case in which the Trustees are authorized or required to pay or distribute any share of any trust hereunder, to make such payment or distribution in kind, or partly in kind and partly in money and, in connection therewith, to allocate equal or unequal interests in, or amounts of, specific property in satisfaction of such payment or distribution; provided, however, that any property distributed in kind shall be valued, for purposes of such distribution, at its fair market value on the date of distribution.

-25-

7.    To settle, adjust, compromise or submit to arbitration any dispute, claim or controversy in which any trust hereunder may be in any way interested.

8.    To borrow money from any person, partnership, corporation or other entity, who may be any Trustee or a partnership, corporation or other entity in which any Trustee may be interested, or by which any Trustee may be employed, for the purpose of meeting any and all charges against any trust hereunder or for any other purpose connected with the administration, preservation, improvement or enhancement in value of any such trust, and, in connection with any such borrowing, to pledge, hypothecate or mortgage any part or all of the assets of any such trust.

9.    To keep any or all of the securities at any time forming a part of any trust hereunder in the name of one or more nominees.

10.    In any case where doubt or uncertainty exists under applicable law or this Trust Agreement, to credit receipts and charge expenses to principal or income, or partly to each.

11.    By instrument or instruments signed by all of the Trustees qualified and acting as such at any time with respect to any trust hereunder, to delegate, in whole or in part, to any person or persons (including any one or more of the

-26-

Trustees) the authority and power to (i) sign checks, drafts or orders for the payment or withdrawal of funds from any bank account or other depository in which funds of such trust shall be held, (ii) endorse for sale, transfer or delivery, or sell, transfer or deliver, or purchase or otherwise acquire, any and all stocks, stock warrants, stock rights, bonds or other securities whatsoever with respect to such trust, and (iii) gain access to any safe deposit box which may be in the names of the Trustees and remove part or all of the contents of any such safe deposit box and release and surrender the same.

12.   To pay or deliver to either parent or to the guardian of the property of any minor or to an adult with whom such minor resides, and, with respect to any person for whom it is permissible to do so under applicable law, to a custodian for such person under a Uniform Gifts to Minors Act or Uniform Transfers to Minors Act of any state until the age of eighteen (18) years (or until such age in excess of eighteen (18) years as shall be permissible under applicable law and which the Trustees, in their discretion, shall select) any sum or property, including income, which such minor or such person shall either be entitled to receive or to have applied for his or her use or benefit under any of the provisions hereof, without requiring that such parent, adult or custodian obtain letters of guardianship or that such parent, guardian, adult or custodian give any bond or other security for any such payment or delivery

so made; and the receipt of such parent, guardian, adult or custodian for the amount of such payment, or for the property so delivered, shall be an absolute protection to the Trustees and a complete release and discharge from all further accountability in respect of any such payment or delivery.

13.   If any beneficiary of any trust hereunder shall, in the opinion of the Trustees, be or become incapacitated (whether by reason of illness, age or other causes) the Trustees may, in their discretion, wholly or partly in lieu of paying net income or principal of such trust to such beneficiary as authorized or directed by this Trust Agreement, dispose of the same in one or more of the following ways:

> (a)   by making payment of such net income or principal to a legally appointed guardian or other fiduciary of such beneficiary;

> (b)   by making payment of such net income or principal, on behalf of such beneficiary, to any person with whom such beneficiary resides or who has charge of his or her care; and/or

> (c)   by applying such net income or principal directly for the use or benefit of such beneficiary.

-28-

14.   To remove the assets of, hold and administer any such assets in, and/or move the situs of the administration of any trust hereunder to, such location or locations (which may be in a state or other jurisdiction other than the State of New York) as the Trustees, in their discretion, shall select.   If the Trustees, in their discretion, shall determine it advisable to move the situs of the administration of any trust hereunder to a location where the judicial administration of trusts is required or permitted, the Trustees are authorized to select and request a court in such location having jurisdiction over the administration of trusts to accept jurisdiction over the administration of such trust, and it is requested that such court accept, and that it be permitted to accept, jurisdiction over the administration of such trust; and it is directed that the administration of such trust shall be governed from time to time by the laws of the jurisdiction in which the administration of such trust is then located.

15.   To make, or refrain from making, elections or allocations permitted under any applicable tax law without regard to the effect of any such election or allocation on the interest of any beneficiary of any trust hereunder and, if any such election or allocation shall be made, to apportion, or refrain from apportioning, any benefits thereof among the respective interests of the beneficiaries of such trust, all in such manner as the Trustees shall deem appropriate.

-29-

16.   To retain or invest in solido the property held in any trust hereunder with the property held in one or more of the other trusts hereunder or with the property held in any other trust created by the Grantor or by any other person for purposes of convenience or for the better investment thereof.

17.   To exercise all authority, powers, privileges and discretion conferred in this Article after the termination of any trust created hereunder and until all of the assets of such trust are fully distributed.

B.   No person or party dealing with the Trustees shall be bound to see to the application of any money or other consideration paid by him or her to the Trustees.

C.   Neither the principal nor the income of any trust hereunder, or any part thereof, shall or may at any time be liable or subject in any manner whatsoever to the debts or liabilities of any beneficiary entitled to receive any principal or income therefrom; nor shall the principal or income of any trust hereunder be liable to attachment by garnishment proceedings or other legal process issued by any creditor of any beneficiary of such trust for debts heretofore or hereafter contracted by such beneficiary; nor shall any assignment, conveyance, charge, encumbrance or order, either of principal or income, given by any such beneficiary be valid.

-30-

D.    Wherever in this Trust Agreement it is provided that an instrument is to be "acknowledged," such instrument shall be acknowledged in such manner as would be required if the same were a conveyance of real property entitled to be recorded in the State of New York.

E.    1.    To the fullest extent permitted by law, no transaction or decision involving any trust hereunder shall be deemed invalidated in any way by reason of any personal, beneficial or other interest which any Trustee may have with respect to such transaction or decision, including, without limitation, any transaction or decision with respect to any corporation, company, partnership, association, estate, trust or other entity in which any Trustee may have an interest in a capacity other than as a Trustee hereunder, regardless of any conflict of interest as to any such transaction or decision, and any such transaction or decision shall be lawful and proper and shall not be questioned unless such Trustee is guilty of fraud with respect thereto.    Without limiting the foregoing, no Trustee shall be disqualified or barred from acting as such or have any liability hereunder in exercising any power, authority or discretion conferred upon the Trustees by reason of the fact that such Trustee may be a stockholder, officer, director, partner, executor, administrator, personal representative, trustee, beneficiary, or in any other way interested in the corporation, company, partnership, association, estate, trust or other entity

-31-

whose securities or property are the subject matter of the exercise of such power, authority or discretion.

2.   The Trustees hereunder shall be entitled to compensation as officers, directors, fiduciaries or other participants in any such entity notwithstanding the fact that they are Trustees hereunder and are also entitled to receive reimbursement for their out-of-pocket expenses as such Trustees.

F.   The Trustees shall be under no duty or obligation and shall not be liable to any trust hereunder or to any person or persons interested in any trust hereunder or be surcharged for failure to buy, sell or engage in any transaction directly or indirectly involving securities issued or to be issued by any corporation or other business organization concerning which any of the Trustees, in a capacity other than as a Trustee hereunder, may have acquired any information which has not been disclosed to the public.

TWELFTH:  Provisions Relating to the GST.

A.   As used in this Article:

1.   "GST" shall mean and refer to "the United States generation-skipping transfer tax imposed by Chapter 13 of the Internal Revenue Code."

-32-

2.   The words "inclusion ratio" shall have the same meaning as those words are given in Section 2642 of the Internal Revenue Code.

3.   The words "Net Death Taxes" shall mean and refer to "the aggregate death taxes (including, without limitation, United States, state, local and other estate taxes and inheritance taxes but not including any interest and penalties thereon), after taking into account all applicable credits, payable with respect to the estate of such beneficiary."

B.   1.   Notwithstanding any other provision in this Trust Agreement to the contrary, and in addition to any other power of appointment hereinabove given by the previous provisions of this Trust Agreement to any individual at whose death the inclusion ratio with respect to any trust under this Trust Agreement would, but for the provisions of this Section B, be more than zero (such individual being referred to in this Article as "such beneficiary"), the Trustees of such trust are authorized and empowered, by an acknowledged instrument in writing (with such instrument to be filed with the court, if any, then having jurisdiction over such trust, if such court shall accept such instrument for filing), (i) to create in such beneficiary a power (hereinafter referred to in this Section B as "such power"), to be exercised by a provision in his or her Will expressly referring to this Article of this Trust Agreement, to appoint to the creditors of his or her estate any portion of the

-33-

property held in such trust at the death of such beneficiary, and (ii) to limit such power, by formula or otherwise, to less than all of the property held in such trust at the death of such beneficiary; provided, however, that with respect to each such trust, the maximum amount of property over which such power may be created shall not, after taking into account the property, if any, over which any other such power is created in such beneficiary, exceed the amount, if any, above which any further addition to the amount subject to such power would increase the Net Death Taxes determined with respect to such beneficiary's estate by an amount equal to or greater than the net decrease in the aggregate of (x) the GST and (y) any state and/or local tax on generation-skipping transfers imposed as a result of the death of such beneficiary that would result from such further addition.  Unless such beneficiary's Will otherwise provides by express reference to this Trust Agreement and such power, the increase in the Net Death Taxes on such beneficiary's estate resulting from such power shall be paid from that part of the principal of such trust over which such power is exercisable. If, or to the extent that, such beneficiary shall fail so expressly and so validly to exercise any power created in such beneficiary by the Trustees pursuant to the provisions of this paragraph, the unappointed portion (or, as the case may be, all) of the property subject to such power shall pass pursuant to the provisions of this Trust Agreement otherwise applicable to such property.

-34-

2.   The Trustees are further authorized and empowered, by an acknowledged instrument in writing (with such instrument to be filed with the court, if any, then having jurisdiction over the trust to which such power relates, if such court shall accept such instrument for filing), to revoke any power created by the Trustees pursuant to the provisions of paragraph 1 of this Section B at any time prior to the death of the beneficiary in whom such power was created, and to release, in the manner set forth in Article THIRTEENTH hereof, the right to create such a power.   The Trustees shall not be liable for any exercise, release or failure to exercise the authority and power granted to them by the provisions of said paragraph 1 or for the revocation of any power created by them pursuant to the provisions of said paragraph 1, provided they utilize good faith in considering whether or not to exercise or release such power or to cause such revocation, whether such consideration be at their own instance or at the request of an individual who is a beneficiary of a trust hereunder, the guardian or other fiduciary of such an individual, or a member of his or her family.

C.   1.   Notwithstanding any other provision in this Trust Agreement to the contrary, if at any time any property is to be placed in a trust under the provisions of any Article of this Trust Agreement, the Trustees shall, if need be, and if it is possible to do so, divide such property and place the same in separate trusts to the end that one such trust shall have an

-35-

inclusion ratio of zero, and if any property which is directed to be added to a trust hereunder shall have an inclusion ratio which is different than the inclusion ratio of such trust, the Trustees shall not make such addition but shall instead administer such property in a separate trust under this Trust Agreement; and, in each such instance, the property to be placed or held in such a separate trust shall be held, administered and disposed of by the Trustees pursuant to provisions identical to the provisions of the trust to which, but for the provisions of this paragraph 1, such property would have been placed or added.

2.   If, pursuant to the provisions of paragraph 1 of this Section C, any property that would otherwise be held in a single trust hereunder is instead held in separate trusts hereunder, the Trustees of such trusts may, at any time or from time to time, (i) make different tax elections and allocations with respect to each such trust, (ii) expend principal and income and exercise any discretionary power differently with respect to each such trust, (iii) invest each such trust differently, and/or (iv) take all other actions consistent with such trusts being separate entities.  Furthermore, the donee of any power of appointment with respect to such trusts may exercise such power differently with respect to each such trust.

D.   Notwithstanding the provisions of the foregoing Sections of this Article to the contrary, if any Trustee hereunder is a current beneficiary of the income of any trust here-

-36-

under, or may, in the discretion of the Trustees, be a current income beneficiary of any such trust, then, in such event, such Trustee shall not, in his or her capacity as a Trustee of such trust, have any voice or vote or otherwise participate in any decision pertaining to the matters relating to such trust that are addressed in the foregoing Sections of this Article, and, in each such event, the other Trustee or Trustees of such trust shall make all decisions relating to such trust that pertain to such matters.

THIRTEENTH:     Release of Powers.

Any beneficiary and any Trustee hereunder may at any time or times release any discretionary power of appointment or discretionary power to distribute principal or income or any other discretionary power hereby given to such beneficiary or Trustee, either with or without consideration, with respect to the whole or any part of the property subject to such power and also in such manner as to reduce or limit the persons or objects or classes of persons or objects in whose favor such power would otherwise be exercisable, by an instrument signed and acknowledged by the beneficiary or Trustee releasing such power and delivered to (i) each Trustee then acting hereunder (other than the Trustee, if any, who shall have executed such instrument), (ii) the Grantor (or, if the Grantor is not then living, to the executors, administrators or personal representatives of the

-37-

Grantor's estate), or (iii) any one or more of the adult indi-
viduals to whom or for whose use or benefit the income of any
trust hereunder may then be paid or applied.  In the event of
the release of any such power by any Trustee, the remaining
Trustee or Trustees hereunder, if any, may thereafter exercise
such power, other than any discretionary power which was not
initially vested in such remaining Trustee or Trustees.  The
release of any power by any Trustee hereunder pursuant to the
provisions of this Article shall not be binding upon any Trustee
who may thereafter act as a Trustee hereunder unless such power
shall have been released by all of the Trustees then in office
who are vested with such power by their execution of a signed
and acknowledged instrument specifically providing that such
release is to be binding upon all successor Trustees hereunder.

      FOURTEENTH:     Provision With Respect To
                        Closely Held Businesses.

Without limiting the powers and authority conferred
upon the Trustees by Article ELEVENTH hereof but in extension
thereof, the Trustees are specifically authorized and empowered,
in their discretion, to retain for as long as they, in their
discretion, shall deem advisable, any or all shares of stock in
any closely held corporation, or any indebtedness owing by any
such corporation, or any or all interests in any proprietorship,
unincorporated business, partnership, joint venture, realty or

-38-

any other asset, whether owned individually, as tenant-in-common, partner or otherwise, regardless of whether such asset or assets shall be producing profits or losses through ownership or operation thereof, and regardless of the percentage of the trusts hereunder which such assets or similar assets may constitute; and their decision to retain and hold any such asset or liability shall be binding and conclusive upon and shall not be subject to question by any person interested, or who may become interested, in any of the trusts hereunder, and the Trustees shall not incur any liability by reason thereof.

FIFTEENTH:      Headings.

The Article headings contained herein are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope hereof or the intent of any provision hereof.

SIXTEENTH:      Severability.

Should any part, clause, provision or condition hereof be held to be void or invalid, then such invalidity shall not affect any other part, clause, provision or condition hereof, but the remainder hereof shall be effective as though such void

-39-

part, clause, provision or condition had not been contained herein.

WITNESS the due execution hereof by the Grantor and Trustees on the day and year first above written.

ARIE GENGER,
as Grantor

LAWRENCE M. SMALL,
as Trustee

SASH A. SPENCER,
as Trustee

-40-

At the Surrogate's Court held in and for the County of New York, at the Courthouse, 31 Chambers Street, New York, New York on the __1__ day of ~~June~~ 2009  
*July*

New York County Surrogate's Court  
CATA ENTRY DEPT.  
Date: *July 1, 2009*

PRESENT: HON. **Troy K. Webber**  
_____  
Surrogate

In the Matter of the Application of

ORLY GENGER, as a person interested, for the removal of DALIA GENGER as Trustee of the Orly Genger 1993 Trust pursuant to SCPA §711 (11)

File No.: 0017/2008

**ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINTS**

On reading and filing the annexed Verified Petition of Petitioner, ORLY GENGER, and

the exhibits, verified on the 22nd day of June, 2009, and the memorandum of law in support of

Petitioner's Verified Petition dated June 22, 2009,

LET the Respondent, DALIA GENGER, the sole fiduciary of the Orly Genger 1993

Trust, show cause before Surrogate *Troy K. Webber* at the Surrogate's Court, ~~31 Chambers~~ *Sitting at 60 Centre*

~~Street,~~ *Room 309* New York, New York, on the 5th day of ~~June~~ *August* 2009 at 10:00 o'clock in the forenoon of that

day or as soon thereafter as counsel may be heard why an order should not be entered:

(a)    Enjoining and restraining Respondent, her agents and all other persons

acting on her behalf from withdrawing, selling disposing, transferring, assigning, removing,

pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly

Trust's 19.43% interest in Trans-Resources, Inc., ("TRI"), a closely held corporation, founded by

Arie Genger, Petitioner's father and Respondent's former husband of Respondent and any other

assets which may be remaining in the Orly Trust;

(b)    Removing Respondent as Trustee of the Orly Trust for breaching her

fiduciary duties, wasting and dissipating the assets of the Orly Trust and imprudently managing

and injuring the property committed to her charge;

(c)    Surcharging Respondent in the amount of the loss of the value of Orly's

interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)    Appointing Michael D. Grohman, Esq. as successor trustee;

(e)    Waiving any requirement that Petitioner post an undertaking; and

(f)    Granting Petitioner such further relief deemed necessary or proper.

ORDERED that, during the pendency of this proceeding, Respondent ~~her agents and all~~ [and/or her counsel
are required to give notice by overnight mail to petitioners counsel of any 1) offer
~~other persons acting on her behalf are temporarily restrained from withdrawing, selling,~~
to purchase the Orly Trust's 19.3% interest in TRI within 10 days of receiving
~~disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering,~~
such offer and 2) act by Respondent, her agents and all other persons
~~liening, hypothecating or secreting the Orly Trust's 19.43% interest in TRI and other assets~~
acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell or
~~remaining in the Orly Trust; and it is further~~
otherwise alter the Orly Trust's interest in TRI at least 10 days prior to such act
and it is further ORDERED that service of a copy of this Order and the papers upon which it is based

shall be served on Respondent by personal service at either her residence, located at 200 East

65th Street, Apt. 32W, New York, New York 10021, or any other address at which she can be

located, on or before ~~June 7~~ July 7, 2009; and it is further

ORDERED, that any responsive papers shall be filed by
July 29, 2009.

~~ENTER:~~

Surrogate

At the Surrogate's Court held in and for the County
of New York, at the Courthouse, 31 Chambers
Street, New York, New York on the _18_ day of
August 2009

PRESENT: HON. Troy K. Webber
                              Surrogate

---

In the Matter of the Application of

ORLY GENGER, as a person interested,
for the removal of DALIA GENGER
as Trustee of the Orly Genger 1993 Trust
pursuant to SCPA §711 (11)

File No.: 0017/2008

**SUPPLEMENTAL ORDER TO
SHOW CAUSE WITH
TEMPORARY RESTRAINTS**

---

On reading and filing the annexed Verified Petition of Petitioner, ORLY GENGER, and

the exhibits, verified on the 22nd day of June, 2009, and the memorandum of law in support of

Petitioner's Verified Petition dated June 22, 2009,

LET the Respondent, DALIA GENGER, the sole fiduciary of the Orly Genger 1993

Trust, show cause before Surrogate Troy K. Webber at the Surrogate's Court, ~~sitting at 60 Centre~~ _31 Chambers_

~~Street,~~ _Street, 509_ ~~Street, Room 300,~~ New York, New York, on the _8th_ day of _September_ 2009 at 10:00 o'clock

in the forenoon of that day or as soon thereafter as counsel may be heard why an order should

not be entered:

> (a)    Enjoining and restraining Respondent, her agents and all other persons

acting on her behalf from withdrawing, selling disposing, transferring, assigning, removing,

pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly

Trust's 19.43% interest in Trans-Resources, Inc., ("TRI"), a closely held corporation, founded by

Arie Genger, Petitioner's father and Respondent's former husband of Respondent and any other

assets which may be remaining in the Orly Trust;

(b)     Removing Respondent as Trustee of the Orly Trust for breaching her

fiduciary duties, wasting and dissipating the assets of the Orly Trust and imprudently managing

and injuring the property committed to her charge;

(c)     Surcharging Respondent in the amount of the loss of the value of Orly's

interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)     Appointing Michael D. Grohman, Esq. as successor trustee;

(e)     Waiving any requirement that Petitioner post an undertaking; and

(f)     Granting Petitioner such further relief deemed necessary or proper. *and for her counsel*

ORDERED that, during the pendency of this proceeding, Respondent, ~~her agents and all~~ *are required to give notice by overnight mail to Petitioners Counsel of any 1) offer to purchase the Orly Trust's 19.3% interest in TPR w/in 10 days of receiving such offer and 2) act by Respondent, her agents and all other persons acting on her behalf to assign, mortgage, pledge, redeem encumber & otherwise deal with the Orly Trust assets in TR at least 10 days prior to such act* ~~other persons acting on her behalf are temporarily restrained from withdrawing, selling disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly Trust's 19.43% interest in TRI and other assets remaining in the Orly Trust and it is further~~ *and it is further*

ORDERED that service of a copy of this Order and the papers upon which it is based

shall be served on David Parnes, in his capacity as Trustee of the Sagi Genger 1993 Trust, by

overnight mail service at his residence, located at 29 Elkachi Street, Tel Aviv, Israel 69497, ~~or~~ *on or before* *August 21, 2009* and on ~~Pedowtz & Meister, LLP, attorneys~~ *Pedowitz & Meister, LLP, attorneys* ~~any other address at which she can be located, on or before August __, 2009.~~ *for Dalia Genger, as trustee of the Orly Genger 1993 Trust by personal delivery or overnight mail on or before August 21, 2009.*

ENTER

*TK/*

~~Surrogate~~ *Surrogate*

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of ORLY GENGER, as a person interested, for the removal of DALIA GENGER as Trustee of the Orly Genger 1993 Trust pursuant to SCPA §711 (11) | **STIPULATION WITHDRAWING ORDER TO SHOW CAUSE SIGNED JULY 16, 2010**<br><br>File No.: 0017/2008 |

**IT IS HEREBY STIPULATED AND AGREED**, by and between Petitioner,

ORLY GENGER, and Respondent, DALIA GENGER, by their respective counsel:

1.      On July 16, 2010, Surrogate Nora S. Anderson signed an Order to Show

Cause, Respondent Dahlia Genger filed an Answer and Petitioner Orly Genger filed a Reply

Affidavit on July 28, 2010.

2.      On the return date Counsel appeared and the case was conferenced before

Senior Court Attorney Mary Santamarina.

3.      A Stipulation was signed by Petitioner and Respondent on ~~August~~ _Sept to 8_,

2010 which is annexed as Exhibit A (and not so-ordered by this Court).

4.      Petitioner's Order to Show Cause signed July 16, 2010 by Surrogate Nora

S. Anderson, Respondent's Answer, and Petitioner's Reply Affidavit are hereby withdrawn.

5.      The Parties' counsel further stipulate and agree that Petitioner will move

this Court for permission to amend the Amended Petition in a motion returnable before Surrogate

Anderson on October 1, 2010 and Respondent will not object to Petitioner's request to amend.

By: _Judith E. Siegel-Baum_                         By: _____
        Judith E. Siegel-Baum                                   Robert A. Meister
Cozen O'Connor                                           Pedowitz & Meister LLP
Attorneys for Orly Genger                               Attorneys for Dalia Genger
277 Park Avenue                                          1501 Broadway
New York, New York 10172                                 New York, New York 10036
(212) 883-4900                                           (212) 403-7330

Dated:                                                   Dated: _Sept 8, 2010_

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

In the Matter of the Application of
ORLY GENGER, as a person interested,
for the removal of DALIA GENGER
as Trustee of the Orly Genger 1993 Trust
pursuant to SCPA §711 (11)

**STIPULATION**

File No.: 0017/2008

---

Stipulation made and entered into on August ___, 2010 between ORLY

GENGER, Petitioner, and DALIA GENGER, Respondent, collectively referred to as (the

"Parties") and their respective Counsel:

WHEREAS, ORLY GENGER commenced the above-captioned proceeding by

filing an Order to Show Cause in New York County Surrogate's Court on June 22, 2009; and

WHEREAS, by Stipulation of the Parties and their respective counsel, Surrogate

Troy K. Webber signed an Order to Show Cause dated July 1, 2009 confirmed on August 18,

2009 with certain restraints contained therein (a copy of which is annexed as Exhibit A); and

WHEREAS, on July 16, 2010, Orly Genger filed an Order to Show Cause to

Supplement Surrogate Webber's prior Order; and

WHEREAS, on July 28, 2010, Dahlia filed an Answer and Orly filed a Reply

Affidavit.

IT IS HEREBY STIPULATED AND AGREED by and between Parties and their

counsel:

NYC_MIDTOWN\1589779\1 252931.000

1.      Upon signing this Stipulation, the Parties will sign and file a Stipulation withdrawing the Order to Show Cause filed July 16, 2010 and the Answer and Reply Affidavit in New York County Surrogate's Court.

2.      In addition to the stipulated restraints in <u>Exhibit A</u>, Orly and Dalia and their respective Counsel agree during the pendency of this proceeding, Dalia and/or her Counsel are required to give notice by overnight mail to Petitioner's Counsel of any attempt to vote any TRI shares held by the Orly Trust for any purpose, including, without limitation, in any election of TRI's directors, with such notice being given at least ten (10) days prior to such attempt being made.

IN WITNESS WHEREOF, the Parties have signed and acknowledged this Stipulation on the day and year written above.

Orly Genger

Dalia Genger

By: Judith E. Siegel-Baum
Cozen O'Connor
Attorneys for Orly Genger
277 Park Avenue
New York, New York 10172
(212) 883-4900

By: Robert A. Meister
Pedowitz & Meister LLP
Attorneys for Dalia Genger
1501 Broadway
New York, New York 10036
(212) 403-7330

- 2 -

At the Surrogate's Court held in and for the County
of New York, at the Courthouse, 31 Chambers
Street, New York, New York on the _18_ day of
August 2009

PRESENT:  HON. Troy K. Webber

              Surrogate

---

In the Matter of the Application of

ORLY GENGER, as a person interested,
for the removal of DALIA GENGER
as Trustee of the Orly Genger 1993 Trust
pursuant to SCPA §711 (11)

File No.: 0017/2008

**SUPPLEMENTAL ORDER TO
SHOW CAUSE WITH
TEMPORARY RESTRAINTS**

---

On reading and filing the annexed Verified Petition of Petitioner, ORLY GENGER, and

the exhibits, verified on the 22nd day of June, 2009, and the memorandum of law in support of

Petitioner's Verified Petition dated June 22, 2009,

LET the Respondent, DALIA GENGER, the sole fiduciary of the Orly Genger 1993

Trust, show cause before Surrogate Troy K. Webber at the Surrogate's Court, ~~sitting at 60 Centre~~ _at Chambers_

~~Street,~~ _Street,_ Room ~~300~~ _509_, New York, New York, on the _8_ day of _September_ 2009 at 10:00 o'clock

in the forenoon of that day or as soon thereafter as counsel may be heard why an order should

not be entered:

        (a)      Enjoining and restraining Respondent, her agents and all other persons

acting on her behalf from withdrawing, selling disposing, transferring, assigning, removing,

pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly

Trust's 19.43% interest in Trans-Resources, Inc., ("TRI"), a closely held corporation, founded by

Arie Genger, Petitioner's father and Respondent's former husband of Respondent and any other

assets which may be remaining in the Orly Trust;

(b)    Removing Respondent as Trustee of the Orly Trust for breaching her

fiduciary duties, wasting and dissipating the assets of the Orly Trust and imprudently managing

and injuring the property committed to her charge;

(c)    Surcharging Respondent in the amount of the loss of the value of Orly's

interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)    Appointing Michael D. Grohman, Esq. as successor trustee;

(e)    Waiving any requirement that Petitioner post an undertaking; and

(f)    Granting Petitioner such further relief deemed necessary or proper. *and/or her counsel*

ORDERED that, during the pendency of this proceeding, Respondent, *her agents and all* ~~to Petitioners counsel at any~~ *1) offer*
*are required to give notice by overnight mail* ~~other persons acting on her behalf are temporarily restrained from withdrawing, selling,~~ *to purchase the Orly trust's 19.3% interest in TPR w/in 10 days of receiving*
*such offer and 2) act by Respondent, her assets and all other persons* ~~disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering,~~
*acting on her behalf to assign, mortgage, pledge, redeem, encumber* ~~liening, hypothecating or secreting the Orly Trust's 19.43% interest in TRI and other assets~~
*or otherwise* ~~remaining in the Orly Trust and it is further~~ *interests in TRI at least 10 days prior to such act*
*and it is further* ORDERED that service of a copy of this Order and the papers upon which it is based

shall be served on David Parnes, in his capacity as Trustee of the Sagi Genger 1993 Trust, by
*or or before.*
overnight mail service at his residence, located at 29 Elkachi Street, Tel Aviv, Israel 69497, ~~or~~
*August 21, 2009    and on* ~~Pedowitz~~ *Pedowitz & Meister, LLP, attorneys*
~~any other address at which she can be located, on or before August __, 2009.~~
*for Dalia Genger, as trustee of the Orly Genger 1993 Trust by*
*personal delivery or overnight m  ~~ENTER~~ on or before August 21,*
*2009.*

*TK/*

*Surrogate* ~~Surrogate~~

Exhibit D



**GRANTED**

EFiled: Aug 18 2010 9:51AM EDT
Transaction ID 32725607
~~Case No. 3994-VCS~~



## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

TR INVESTORS, LLC, GLENCLOVA
INVESTMENT CO., NEW TR EQUITY I,
LLC, and NEW TR EQUITY II, LLC, and
TRANS-RESOURCES, INC.,

          Plaintiffs,

    v.

ARIE GENGER,

          Defendant.

ARIE GENGER,

          Counterclaim Plaintiff,

    v.

TR INVESTORS, LLC, GLENCLOVA
INVESTMENT CO., NEW TR EQUITY I,
LLC, and NEW TR EQUITY II, LLC, and
TRANS-RESOURCES, INC.,

          Counterclaim Defendants.

Civil Action No. 3994-VCS

### FINAL JUDGMENT ORDER

For the reasons set forth in this Court's Opinions of December 9, 2009, February

3, 2010, July 23, 2010, and August 9, 2010 (the "Opinions"), this _____ day of August, 2010, IT

IS HEREBY ORDERED that:

      1.     Unless otherwise provided herein, all defined terms in this Final Judgment

Order shall have the same meanings ascribed to them under the Court's Opinions.

      2.     TR Investors, LLC ("Investors") is the owner of 1,740.7641 shares of the

authorized and issued stock of Trans-Resources, Inc. ("Trans-Resources").

      3.     Glenclova Investment Co. ("Glenclova") is the owner of 1,553.4931

shares of the authorized and issued stock of Trans-Resources.

4.      New TR Equity I, LLC ("Equity I") is the owner of 275.7 shares of the authorized and issued stock of Trans-Resources.

5.      New TR Equity II, LLC ("Equity II") is the owner of 275.7 shares of the authorized and issued stock of Trans-Resources.

6.      The foregoing ownership holdings of Investors and Glenclova include 64% of the Balance Shares, as that term is defined in the Stockholders Agreement, representing 66.4144 shares of the authorized and issued stock of Trans-Resources.

7.      As a result of the foregoing, Investors, Glenclova, Equity I and Equity II are presently the owners of a total of 3,845.6572 shares, or 67.7477%, of the authorized and issued stock of Trans-Resources.

8.      TPR is the record and beneficial owner of all Trans-Resources shares not presently owned by the Plaintiffs.

9.      Arie Genger and the Orly Genger Trust are not (and have not been since at least the date of execution of the Stockholders Agreement) the record or beneficial owners of any Trans-Resources shares.

10.     No Trans-Resources shares presently owned by Plaintiffs are subject to any proxy of any kind in favor of Arie Genger.

11.     All of the transfers of shares of the authorized and issued stock of Trans-Resources that Arie Genger purported to cause TPR to make in 2004 (to himself, the Sagi Genger 1993 Trust, and the Orly Genger 1993 Trust) were in violation of the Stockholders Agreement.

2

12.     As a result, the transfers were void, the purportedly transferred shares continued to be owned by TPR, and Investors and Glenclova had the right under Section 3.2 of the Stockholders Agreement to buy all of the shares purportedly transferred by TPR.

13.     In exchange for, among other consideration, such right under Section 3.2 of the Stockholders Agreement to purchase the Trans-Resources shares purportedly transferred in 2004 from TPR to Arie Genger and the Orly Genger 1993 Trust, Investors, Glenclova, Equity I and Equity II obtained the contractual right to purchase those shares pursuant to a Letter Agreement dated August 22, 2008, between TPR and those entities.

14.     If Investors, Glenclova, Equity I and Equity II exercise their rights under the Letter Agreement, they may purchase the shares improperly transferred in 2004 to Arie Genger and the Orly Genger 1993 Trust per the terms of the Letter Agreement, will own such shares, and may vote those shares (which are not subject to any proxy of any kind in favor of Arie Genger).

15.     Trans-Resources need not recognize Arie Genger or the Orly Genger 1993 Trust as stockholders.

16.     Defendant Arie Genger is ordered to pay reasonable attorneys' fees and expenses to Plaintiffs, in accordance with this Court's December 9, 2009 and February 3, 2010 Opinions, in the amount of $3,200,000, based on Mr. Genger's agreement that he will not challenge the reasonableness of the amount of such fee award (whether on appeal or otherwise), except on the ground that it was improper to award any sanction, including attorneys' fees or expenses, for this Court's contempt finding against Mr. Genger.

17.     This Order constitutes a final judgment as to all counts of Plaintiffs' Amended and Verified Complaint Under 8 *Del. C.* § 225, dated March 11, 2009.

3

18.     This Order constitutes a final judgment as to Arie Genger's Counterclaim

dated March 30, 2009.

19.     Unless and until otherwise ordered by the Delaware Court of Chancery or

the Supreme Court of the State of Delaware, or agreed to in writing by the parties to the above

action, Arie Genger and his agents, servants, employees, attorneys, advisors and all persons

acting in concert or participation with any of them (including but not limited to Orly Genger and

the Orly Genger 1993 Trust to the extent they are so acting), and each of their successors and

assigns, shall not, during the pendency of any appeal from this Court's Opinions and Orders in

this action, commence or prosecute any legal proceeding (other than this action and any appeal

arising therefrom) in any state court constituting a collateral attack on, attempt to prevent

implementation of, or relitigation of, any of the Court's holdings set out in paragraphs 2 through

16 (inclusive) of this Final Judgment Order; provided, however, that (x) the foregoing shall not

limit the ability of any of the individuals or entities named herein to: (1) commence litigation or

to assert added claims or counterclaims in existing litigation so as to comply with any statute of

limitations or other doctrine that would subsequently bar such claim, so long as the person

making such filing shall contemporaneously apply for a stay of such litigation or claim for the

duration of the pendency of this appeal, or (2) make any necessary filings in litigation already

filed or commenced against them, so long as they contemporaneously apply for a stay of that

proceeding for the duration of the pendency of this appeal; and (y) Arie Genger shall have the

right to seek an order from a court of competent jurisdiction requiring TPR Investment

Associates, Inc. and its officers and directors to place in escrow the proceeds of sale of the shares

of TRI referenced in paragraph 14 of this Order.  For the avoidance of doubt, nothing in this

Order shall prohibit the commencement or prosecution of claims against TPR Investment

Associates, Inc. and its officers and directors and other relevant parties for fiduciary or other misconduct, so long as, during the pendency of this appeal, the persons commencing that action do not seek therein to collaterally attack, prevent the implementation of, or relitigate this Court's holdings described in paragraphs 2 through 16 above.

20.    The Second Amended Status Quo Order entered by the Court on December 30, 2008 is hereby terminated and dissolved.

_____

The Honorable Leo E. Strine, Jr.

This document constitutes a ruling of the court and should be treated as such.

|  |  |
|---:|:---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Leo E Strine |
| **File & Serve Transaction ID:** | 32722444 |
| **Current Date:** | Aug 18, 2010 |
| **Case Number:** | 3994-VCS |
| **Case Name:** | CLOSED 8/17/2010 CONF ORDER T R Investors LLC vs Arie Genger |
| **Court Authorizer:** | Leo E Strine |

/s/ Judge Leo E Strine

<u>PROMISSORY NOTE</u>



$8,950,000

December 21, 1993
New York, New York

FOR VALUE RECEIVED, the undersigned, D&K LIMITED PARTNERSHIP, a Delaware limited partnership (the "Company"), promises to pay to the order of TPR INVESTMENT ASSOCIATES, INC., a Delaware corporation (the "Holder") the principal sum of EIGHT MILLION NINE HUNDRED FIFTY THOUSAND ($8,950,000) DOLLARS, together with interest on the unpaid principal balance at 6.06% per annum, as follows.

1.   Interest shall be payable annually in arrears on the anniversary date of this Note.

2.   Installments of principal in the amount of $447,500 each shall be payable annually beginning on the fourth anniversary of this Note, and the entire unpaid principal balance, together with all accrued and unpaid interest, shall be payable on the tenth (10th) anniversary of this Note.

Payments hereunder shall be made in lawful money of the United States of America in same day or immediately available funds to the account designated by the Holder in writing to the Company from time to time.

This Note is the promissory note referred to in the Agreement, dated as of September 30, 1992, as amended as of the date hereof, between the Company and the Holder.

If the Company shall fail to make any payment on this Note within 10 business days after the same shall become due and payable, or in the event of a Bankruptcy Event (defined below), then the Holder may, while such act or occurrence shall be continuing, upon notice to the Company to such effect, declare the entire unpaid principal amount of this Note to be forthwith due and payable, whereupon this Note shall become immediately due and payable without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Company. No remedy herein conferred upon or reserved to the Holder or the Company is intended to be exclusive of any other remedy, and such remedy shall be in addition to every other remedy given hereunder or at law or in equity.

The term "Bankruptcy Event" shall mean any of the following events or occurrences: (i) the Company admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of creditors; or (ii) any proceeding is instituted by or against the Company, seeking to adjudicate it a bankrupt or insolvent, or seeking any arrangement, adjustment composition of the Company, or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking to dissolve, wind-up or liquidate the Company, or any substantial part of its assets, or seeking appointment of a receiver, trustee or other similar official for the Company, or for any substantial part of its property.

In the event of a declaration of acceleration of the principal amount of this Note as set forth above, the Company agrees to pay the cost of collection, including, without limitation, reasonable attorneys' fees and disbursements.

The Company consents to the jurisdiction of the Federal and State Courts sitting in New York City. With respect to any action or proceeding or enforce or collect this Note, the Company agrees that venue will be proper in such courts and hereby waives any objection based upon Forum Non Conveniens. The choice of forum as aforesaid shall not be deemed to preclude the enforcement of any judgment obtained in such forum or the taking of any action to enforce this Note in any other jurisdiction.

THIS NOTE HAS BEEN DELIVERED IN, AND SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE LAWS OF, THE STATE OF NEW YORK.

D&K LIMITED PARTNERSHIP

By: _____
    Dalia Genger, General Partner

Each of the undersigned hereby assumes and becomes liable for the percentage of this Note set forth opposite its respective name, and agrees that the Holder may enforce this Note, to the extent of such liability, as if the undersigned were the Maker thereof.

Trust u/a 12/13/93 f/b/o        48%
Sagi Genger

By: _____
    Lawrence M. Small, Trustee


    _____
    Sash A. Spencer, Trustee


Trust u/a 12/13/93 f/b/o        48%
Orly Genger

By: _____
    Lawrence M. Small, Trustee


    _____
    Sash A. Spencer, Trustee

G:\ZRF\WP\TRI\TRR21001.NOT                    —3—

                                                        12/13/93 7:47pm

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –X

DALIA GENGER,

                        Plaintiff,

             -against-

ARIE GENGER,

                        Defendant.

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –X

Index No. 302436/02

**STIPULATION**

       Stipulation of Settlement ("Stipulation" or Agreement") made as of October 26, 2004, by and between Dalia Genger (the "Wife"), residing at 210 East 65[th] Street, Apt. 11J, New York, NY 10021, (Soc. Sec. No. 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), and Arie Genger (the "Husband"), residing at 2600 Island Blvd., Penthouse One, Williams Island, Aventura, FL 33160, (Soc. Sec. No. 114-42-294).

W I T N E S S E T H:

       WHEREAS, the parties were duly married to each other on July 23, 1967 in a religious ceremony held in Israel; and

       WHEREAS, the children of the marriage, Sagi Genger and Orly Genger, are all emancipated and there are no expected additional children of the marriage; and

       WHEREAS, the Wife has commenced the above-captioned action against the Husband seeking a divorce (the "Divorce Action") and the parties desire to resolve and settle all issues in that action except the entitlement of either party to a divorce; and

       WHEREAS, except as otherwise provided or reflected herein, it is the intention of the parties that upon completion of implementation of this Agreement, each

party will have received distributions equal to approximately 50% of the aggregate value of the Husband and the Wife's net marital assets.

NOW THEREFORE, it is agreed as follows:

## ARTICLE I

## ARTICLE HEADINGS, RECITALS AND DRAFTING

1.    The headings at the beginning of each Article of this Agreement are for reference purposes only and shall not in any manner, constitute terms or conditions of this Agreement; nor shall they be applicable to any interpretation of the intention or meaning of the parties or of any part of this Agreement.

2.    The "Whereas" clauses at the beginning of this Agreement are an integral part of this Agreement and shall be considered in any interpretation of the intention or meaning of the parties or of any part of this Agreement.

3.    This Agreement is entered into after negotiation and comments by each party and by counsel for both parties. The fact that the following have participated in the drafting shall not be a consideration in the interpretation of this Agreement: Blank Rome LLP, David Parnes, Esq., Sonnenschein Nath & Rosenthal LLP, Carter Ledyard & Milburn LLP, Goldman & Greenbaum, P.C., and Philip Greenhaus, Esq.

1270083_3
17451888\V-2

## ARTICLE II

## DISTRIBUTION OF ASSETS

1. The parties' marital property shall be divided and disposed of as is set forth in this Article and Articles III and IV, with the exception of the parties' debts and other obligations to third parties (provisions for which are set forth in Article V). Schedule II(1), annexed hereto and made part hereof, sets forth an itemized list of all of the marital property of the Husband and the Wife, as of January 31, 2002 and as of the date of this Agreement with the values as of the dates indicated on such Schedule. The Husband and the Wife (to her knowledge) each represent to the other that such Schedule completely and correctly sets forth all such marital property as of such dates and to the best of each of his/her knowledge with the values of such property as of the dates indicated in such Schedule; the Husband and the Wife represent to the other party that he/she has no knowledge of any marital property not set forth on such Schedule.

2. <u>Distributions Upon Execution of this Agreement.</u>

(a) *Cash and Other Distributions.* The Husband and the Wife shall each receive concurrently with the execution of this Agreement certain distributions (for each party, the "Immediate Payment(s)"). The Immediate Payments will be made from cash accounts maintained in the Husband and Wife's joint or individual names, investments made jointly or individually, as well as from an escrow account maintained by Blank Rome LLP for the parties' benefit, with approximately $2,504,537.00 dollars ("BR Escrow"), as of the date of this Agreement, all as more fully detailed, and the sources of which specifically identified, in Schedule II(2)(a) annexed hereto and made

3

part hereof. The Husband's and the Wife's Immediate Payments, upon execution of this Agreement, shall be as follows:

    (i)    <u>Husband</u>: The Husband shall receive (A) the sole ownership of all life insurance policies (set forth on Schedule II(2)(a)(i), annexed hereto and made part hereof) which as of January 15, 2004 had an aggregate cash surrender value of $2,447,782; provided, however, that (w) the life insurance policy (Equitable Single Life Split Dollar #150224782) in the face amount of $1,950,000 and with a cash surrender value to the Husband of $147,833 and with a total death benefit of $2,097,833 shall provide from the date hereof that the net death benefit payable to the Wife shall be at least $2,000,000, (x) if for any reason the total net death benefit payable to the Wife shall be less than $2,000,000 during the first year of this Agreement, the Husband shall immediately notify the Wife and deposit $50,000 in escrow with David A. Parnes, Esq. to be paid to the Wife upon the Husband's death prior to the first anniversary of this Agreement, (y) the amount of the net death benefit payable to the Wife may be reduced at every anniversary hereof by $200,000, and (z) the Husband has directly authorized the insurance broker to provide the Wife all information regarding such policy and hereby agrees not to revoke such authorization prior to the tenth anniversary hereof; (B) all of the Husband and Wife's investment in Conservation Securities, which has an estimated value

4