of $2,128,000; (C) a cash distribution from several cash accounts, including the BR Escrow, of $1,345,000; and (D) 79,045 shares of common stock of Lumenis Ltd. ("Lumenis") held in certain retirement accounts.

(ii)     Wife: The Wife shall receive (A) sole ownership of the Husband's two hundred and fifty (250) shares of common stock of TPR Investment Associates Inc. ("TPR"), free and clear of any liens or other encumbrances initially valued as set forth on Schedule II(1), annexed hereto and made part hereof, which represents fifty one percent (51%) of the issued and outstanding shares of common stock of TPR (exclusive of the 1.96% ownership of TPR which the Wife owns indirectly through her general partnership interest in D&K defined below), together with a duly executed stock power transferring said shares to the Wife and all documents in the Husband's possession, custody or control relating to TPR, including the adjusted tax basis thereof, (accordingly, the marital asset consists of 52.96% of the outstanding shares of common stock of TPR (the "Marital TPR Percentage") and (B) a cash distribution from several cash accounts, including the BR Escrow, of $1,345,000.

(b) *Marketable Securities.* All securities in the Smith Barney account referenced as Item F. 1 on Schedule II(1) will, to the extent possible, be divided between

5

the Husband and the Wife in kind, so that the Husband and the Wife shall each have sole ownership of fifty percent (50%) of such securities.

(c) *Retirement Accounts.* With the exception of 79,045 shares of common stock of Lumenis allocated to the Husband from various IRA accounts per paragraph (a) above, all IRA accounts, pension plans, retirement accounts and the like (the "Pension Accounts"), whether in the name of the Husband or in the name of the Wife, shall be divided equally as follows: each party shall cause fifty percent (50%) of the amount accrued and existing in each Pension Account of such party, to be transferred to the other party and shall use his reasonable best efforts to cause such transfer to be made to a Pension Account of the other party, as more fully described in Article IV of this Agreement.

(d) *Disposition of TRI Stock.* See Article II(9)(b) below.

3.      Residual Cash. To the extent not distributed pursuant to Section 2 of this Article II, any cash available at the time of execution of this Agreement, and at any time thereafter until distribution thereof ("Residual Cash"), shall be placed in escrow ("RC Escrow Account") with David A. Parnes, Esq., ("RC Escrow Agent") or with any other individual or entity designated for such purpose by Sagi Genger (and if Sagi Genger does not promptly make such designation, Orly Genger) pursuant to an Escrow Agreement substantially in the form of Exhibit II(3), annexed hereto.

4.      Non-Liquid Assets.

(a)      All of the parties' other marital assets which are not distributed pursuant to Section 2 of this Article II, including, but not limited to, personal and real property, and securities and investment accounts that cannot be divided in kind (the "Non

1270083.3
17451RRRV-2

Liquid Assets"), shall be sold as promptly as practicable on terms determined by agreement of the parties; provided, however, that if the parties cannot agree on such terms within six (6) months of the date of execution of this Agreement (the "Initial Period"), the Husband and the Wife agree that thereafter authority and control over any then unsold Non Liquid Assets as to which the terms of sale have not been agreed on by the parties shall be vested in Sagi Genger pursuant to a power of attorney substantially in the form of Exhibit II(4)(a) (the "P/A"). Sagi Genger shall have full and complete authority to sell any and all Non-Liquid Assets at such prices and upon such terms and to distribute the proceeds of such sales as he, in his sole discretion, sees fit, subject however to paragraph (b) of this Section 4 of this Article II below, the terms of the P/A and his fiduciary duties to effectuate the intent of the parties in entering into this Agreement. Concurrently with the execution of this Agreement, each of the parties will execute the P/A and deliver it to Sagi Genger. After the Initial Period and during such time as there exist any unsold Non-Liquid Assets as to which the parties have not agreed on sale terms during the Initial Period, each of the parties will promptly execute and deliver to Sagi Genger any and all additional documents requested by Sagi Genger to effectuate the provisions of this paragraph (a) of this Section 4. At any time, the Husband and the Wife may mutually revoke the authority and control vested in Sagi Genger over such Non-Liquid Assets by providing him with written notice signed by the Husband and the Wife to that effect ("Revocation Notice"), in which case Sagi Genger will immediately surrender the P/A, the other documents and the Non Liquid Assets, to a party designated in the written notice by the Husband and the Wife in his stead (the "Successor Attorney in Fact"). If no Successor Attorney in Fact is designated in the Revocation Notice, David

A. Parnes, Esq. is designated as Successor Attorney in Fact. If Mr. Parnes is unwilling to act in such capacity or the parties revoke the authority and control vested in him by providing him with written notice signed by both of them to that effect and fail to designate a Successor Attorney in Fact in such notice, Eric Gribetz is designated as Successor Attorney in Fact. If Mr. Gribetz is unwilling to act in such capacity or the parties revoke the authority and control vested in him by providing him with written notice signed by both of them to that effect and fail to designate a Successor Attorney in Fact in such notice, Orly Genger is designated as Successor Attorney in Fact. If Sagi Genger is unable to act and the Husband and Wife do not promptly send the Revocation Notice, then Elana Genger (the spouse of Sagi Genger) together with either the Husband or the Wife may send the Revocation Notice to Sagi Genger, and in such event David A. Parnes, Esq. shall be designated as Successor Attorney-in-Fact.

(b)     The net proceeds of the sales of the Non-Liquid Assets, whether effectuated within the Initial Period or thereafter, shall be distributed as follows: (i) such amount as would be required to cause the balance in the RC Escrow Amount to equal Twenty Five Thousand dollars ($25,000) ("Basic Escrow Amount") to the RC Escrow Account; and (ii) all amounts in excess of the Basic Escrow Amount to TPR in satisfaction of the parties' indebtedness to TPR as set forth in Article V hereof. Upon payment in full of such indebtedness to TPR, subject to the provisions of this Article II, Sagi Genger (or a Successor Attorney in Fact) shall, subject to his fiduciary duties to effectuate the intent of the parties in entering into this Agreement, have the complete authority, in his sole discretion, to determine the equitable distribution of the remaining net proceeds of the sales of the Non-Liquid Assets, whether to the Husband, the Wife or

1270083.3
17451888RV-2

to the RC Escrow Account. The Husband and the Wife shall each be obligated to pay
any Federal, state or local taxes due by them upon the sale of the Non-Liquid Assets.

5.    First Anniversary Distributions. Within twenty (20) days of the first
anniversary of this Agreement ("First Anniversary"), Sagi Genger (or a Successor
Attorney in Fact) will provide the Husband and the Wife with a reasonably detailed
written summary of the proceeds of the sale of the assets, and the distributions received
by each party or deposited into the RC Escrow Account and any related expenses from
and including the date of execution of this Agreement through the First Anniversary. The
parties agree that, should there be an imbalance in the distributions received by either
party ("Imbalance") in favor of either the Husband or the Wife (the "Overpaid Party")
Sagi Genger will cause the RC Escrow Agent to pay to the other party ("Underpaid
Party") promptly a sum in cash equal to the Imbalance. In determining any Imbalance
with regard to the assets of TPR, the parties will adjust the value attributed to the assets
of TPR, as set forth on Schedule III(1) annexed hereto and made a part hereof, based on
the net proceeds from the sales of such assets from the execution of this Agreement
through the First Anniversary.

6.    Second Anniversary Distributions.

(a)    Within twenty (20) days of the second anniversary of this
Agreement ("Second Anniversary"), Sagi Genger (or a Successor Attorney in Fact) will
provide the Husband and the Wife with a reasonably detailed written cumulative
summary of the proceeds of sale or the Assets, and the distributions received by each
party from and including the date of this Agreement through the Second Anniversary or
deposited in the RC Escrow Account and any related expenses. Should an Imbalance

1270083.3
J745188RV-2

exist, at the election of Sagi Genger (or a Successor Attorney in Fact), either (i) the Overpaid Party shall promptly pay the Underpaid Party a portion of such Imbalance in cash, as instructed by Sagi Genger and/or (ii) Sagi Genger shall instruct the RC Escrow Agent to distribute the balance of the RC Escrow Account, in each case, to redress the Imbalance as of the Second Anniversary. With regard to TPR, the parties will adjust the value attributed to the assets of TPR, as set forth on Schedule II(1) annexed hereto and made a part hereof, based on the net proceeds from the sales of such assets from the execution of this Agreement through the Second Anniversary.

(b)     Any Non-Liquid Asset that has not been sold by the Second Anniversary shall be valued and distributed as the Husband and the Wife mutually agree. If there are any assets as to which such agreement has not been reached (the "Remaining Assets") by the 45th day after the Second Anniversary, the Husband and the Wife agree to purchase from, or to sell to, the other party the Remaining Assets, in accordance with the following procedure:

(i) a coin will be tossed in the air, by Orly Genger or in her absence by a person mutually acceptable to the Husband and the Wife;

(ii) the Husband will be designated as "Head" (i.e. – the side of the coin where the profile of a person is impressed) and the Wife will be designated as "Tail" (i.e. – the other side of the coin);

(iii) if the Head side of the coin shall lay face up, the Husband will become the Evaluating Party for the first Remaining Asset selected by the person tossing the coin, and if the Tail side of the coin shall lay face up, the Wife shall become the

Evaluating Party for the first Remaining Asset selected by the person tossing the coin;

(iv) the Evaluating Party shall value and indicate in writing by five business days following the coin toss to the other party, the sum at which he or she values such Remaining Asset ("Evaluated RA Value");

(v) by the fifth business day following receipt of the Evaluated RA Value from the Evaluating Party ("Determination Date"), the other party shall notify the Evaluating Party in writing whether he or she intends to acquire from, or to sell to, the Evaluating Party his or her fifty percent (50%) interest in such Remaining Asset, in which case the other party shall either remit to the Evaluating Party fifty percent (50%) of the Evaluated RA Value or receive from the Evaluating Party fifty percent (50%) of the Evaluated RA Value in cash, within thirty (30) business days following the Determination Date, against receipt of such Remaining Asset. If the Evaluating Party does not deliver to the other party the Evaluated RA Value within 30 days of the Determination Date, the other party shall be entitled to take the Remaining Asset in question free of any payment or obligation.

In the event that there is more than one Remaining Asset, the party who was not the Evaluating Party for the prior Remaining Asset, shall be entitled to select the next Remaining Asset to be evaluated and shall be the Evaluating Party for such Remaining Asset and the procedures in paragraphs (iv) and (v) above shall be followed. The parties shall thereafter alternate selection of the Remaining Asset for evaluation and acting as Evaluating Party as provided above, until all Remaining Assets have been evaluated and disposed of, as provided above.

1270083.3
I7451888V-2

7.     Notwithstanding anything to the contrary contained herein, with a view to avoid the need for direct payments between the Husband and the Wife, when distributing proceeds from the sales of Non-Liquid Assets from time to time, Sagi Genger (or a Successor Attorney in Fact) will take into consideration anticipated changes caused by the sales of assets of TPR.

8.     (a)     Sagi Genger shall be entitled, in his sole discretion and subject to his fiduciary duty to implement the intent of the parties, to incur reasonable expenses necessary for the maintenance of the marital property (with the exception of the apartment (the "Apartment") at 2600 Island Boulevard, Penthouse One, Williams Island, Aventura, Florida 33160), where all maintenance and other ordinary monthly expenses (including, without limitation, taxes and insurance) shall be borne solely by the Husband, in accordance with paragraph (b) below), the expenses of selling the Non-Liquid Assets and other related activities, and to pay such expenses from the RC Escrow Account.

(b)     Concurrently with the execution of this Agreement, the Wife hereby acknowledges the Husband's sole occupation and use of the Apartment until such time as the apartment is sold. The Husband will assume and promptly pay all maintenance and other ordinary monthly expenses incurred in connection with the Apartment until the time of sale of Apartment. The Husband and the Wife agree to cooperate in the sale of the Apartment during the Initial Period and to cooperate and not to interfere in any way with the sale of the Apartment by Sagi Genger (or a Successor Attorney in Fact) as part of the sale of the Non-Liquid Assets, after the Initial Period.

9.     (a) TPR owns three thousand (3,000) shares of common stock in Trans-Resources, Inc. ("TRI Stock"). The Husband represents and warrants to the Wife that the

TRI Stock represents 52.85% of the issued and outstanding shares of common stock of TRI, and that the balance of 47.15% of the common stock of TRI is owned beneficially and of record, pursuant to an arm's length transaction with TRI, by (i) Glencova Investment Co., and (ii) TR Investors LLC, subject to a Shareholders Agreement, dated as of March 30, 2001, a complete and correct copy of which has been delivered to the Wife (the "TRI Shareholders Agreement"). The Husband further represents and warrants to Wife that he has no interest in Glencova Investment Co. or in TR Investors LLC and except for the options provided to Bank Hapoalim B.M. (a copy of the agreement granting an option to Bank Hapoalim has been delivered to the Wife), there exist no other direct or indirect ownership interests in TRI, whether by way of issuance of additional shares of any other class of stock, share options, warrants, convertible debt or the like and there is no agreement or understanding among the parties to the TRI Shareholders Agreement except as provided therein. Except for the Consent of TPR, the Husband further represents and warrants that no consent, approval or similar action of any person is required in connection with the transfer of TRI Stock as contemplated hereby and that such transfer will not conflict with any agreement to which the Husband is party or by which he is bound. The Husband further represents and warrants to the Wife that TRI equity may reasonably be considered to be a distressed private security. Concurrently with the execution of this Agreement, the TRI Stock shall be distributed as follows:

(i)     The Husband will receive 794.40 shares of the TRI Stock representing 13.99468% of the common stock of TRI;

(ii)    Each of Sagi Genger and Orly Genger, will receive in trust 1,102.80 shares of the TRI Stock representing 19.42766% of the common stock of

13

1270083.3
17451888V-2

TRI for each of Sagi and Orly and such trusts will simultaneously therewith execute and deliver irrevocable proxies to Husband for all of the TRI stock owned by the trusts; and

(c)     Concurrently with the execution of this Agreement, each of the Husband and Wife will execute and deliver or cause TPR to execute and deliver (i) all documents reasonably necessary to effect the transfers required by subparagraph (a) of this Section 9, and (ii) duly executed stock powers to transfer the shares as required by subparagraph (a) of this Section 9.

(d)     The parties will cause TRI to provide the Husband, Sagi Genger and Orly Genger with all documents in TRI's possession, custody and control relating to the adjusted tax basis of the TRI Stock.

(e)     Following the foregoing transfers of the TRI Stock, the Wife will have no ownership interest in TRI.

10.    Lumenis Stock Options.  The Husband is the owner of 1,400,000 stock options to purchase shares of Lumenis common stock ("Options") as set forth on Schedule II(10) annexed hereto and made part hereof, of which (i) 100,000 Options were granted to the Husband after the Commencement Date, (ii) prior to the Commencement Date the Husband transferred the economic interest in 250,000 Options to a third party (the options specified in (i) and (ii) are not marital property, and (iii) 1,050,000 options which are marital property (hereinafter referred to "Marital Options"); such Schedule II(10) will include the exercise prices of the Options.

(a)     The parties agree that the Wife shall be the beneficial owner of and receive the economic benefits of 525,000 Options as set forth on Schedule 11(10),

representing 50% of Marital Options hereinafter referred to as the "Wife's Options"); the remaining 525,000 Marital Options are referred to herein as the "Husband's Options." Pursuant to the Options' governing documents, the Husband is not allowed to transfer any of the Options. Accordingly, the Wife can not receive an actual transfer or assignment of the Wife's Options and the Wife has no claim directly or indirectly against Lumenis with respect to the Wife's Options.

(b)    The Husband agrees to notify Lumenis of the exercise of Wife's Options, at her written direction, as promptly as practicable and no later then the fifth (5th) business day following the date on which the Husband shall receive "actual notice" (as defined below) in writing from the Wife requesting the exercise, provided that the Wife simultaneously with such notice remits payment of the appropriate exercise price by wire transfer to the Husband or, if directed by the Husband, directly to Lumenis, with respect to those of the Wife's Options that she wishes to exercise, and, further provided that there are no legal impediments to such exercise, including, without limitation, any restrictions as set forth in the applicable agreements covering such Options, any "blackout periods" imposed by Lumenis on its officers and directors,  or restrictions under the Federal Securities Laws or the rules and regulations of any applicable stock exchange. "Actual notice" shall mean the Husband's actual receipt of the written notice, which shall include the number of Wife's Options of each Class of Options she directs him to exercise, and, if required, appropriate payment from the Wife. In addition, the Wife also agrees to give written notice of any exercise of the Wife's Options to the person then designated to receive copies of notices to the Husband (see Article XX) concurrently with any notice to the Husband. The Husband shall not be liable with regard to any diminution in value or

divestiture of option rights between the Wife's sending of notice and either (x) the

Husband's receipt of the same and (y) the Husband's exercise of the Wife's Options on

the Wife's behalf, provided that the Husband provides actual notice to Lumenis as

promptly as practicable and no later than the 3rd business day following his receipt of

notice from the Wife  Upon any exercise of the Wife's Options, the Husband will deliver

or cause to be delivered to the Wife the shares of Lumenis stock received upon such

exercise as promptly as practicable.

(c)    The parties recognize the possibility that the Husband's interest in the

Options may terminate for reasons specified in applicable agreements or otherwise, and

the Husband may thereby lose his rights to the Options.  As long as the Wife's Options

are outstanding, the Husband will use his best efforts to maintain his rights to such

Options.  If there is nonetheless a forfeiture or loss of all or any portion of the Options

while Wife's Options remain outstanding, the Husband shall give the Wife notice of such

forfeiture or loss and the Husband and the Wife shall each sustain a fifty percent (50%)

share in the loss of his and her outstanding share in the Marital Options.

11.    (a)    It is the intention and agreement of the parties that, pursuant to the

provisions of Section 1041 of the Internal Revenue Code, the transfers and payments

between them pursuant to this Article are not taxable transactions to either party.

Moreover it is the intention and agreement of the parties that such transfers and payments

between them are not includible in the income of either the Wife or Husband pursuant to

Sections 61 or 71(a) of the Code, and shall not be deductible by either the Wife or

Husband pursuant to Section 215 of the Code.  Both parties further agree that they shall

not henceforth assert a position (in filing future tax returns) inconsistent with this

1270083.3
17451888V-2

Agreement or with this undertaking, and each will be liable to the other for damages, including taxes, penalties and interest, as well as reasonable attorneys' and accountants' and other professional fees, expenses and court costs, occasioned by breach of this covenant.

(b)    In the event that the tax assumptions set forth in paragraph (a) of this paragraph should ever prove to be incorrect, the relevant provisions of this Agreement will be modified by the parties so as to approximate as closely as possible the after-tax effects to the parties anticipated by paragraph (a).  If the parties have not so agreed within 30 days, one or both parties shall give notice of the failure to agree to Sagi Genger (or in his absence David A. Parnes, Esq.) who shall promptly appoint tax counsel in his discretion, subject to his fiduciary obligations to the parties, and such tax counsel shall have full authority to resolve the matter.

## ARTICLE III

## VALUATION OF TPR ASSETS FOLLOWING EXECUTION OF THIS AGREEMENT

1. TPR has agreed, by resolutions of its Board of Directors (substantially in the form attached hereto as Exhibit III(1)), to be bound by the provisions of this Article III and the other provisions that contemplate action by it, and will cooperate with the Husband and the Wife in order to fulfill the provisions hereof.

A FUNDAMENTAL PART OF THIS AGREEMENT IS THE HUSBAND'S RELINQUISHMENT OF HIS OWNERSHIP OF SHARES OF COMMON STOCK IN TPR, AND THE TRANSFER OF SUCH OWNERSHIP TO THE WIFE.  THE PARTIES ARE UNABLE TO DETERMINE THE PRECISE VALUE OF TPR UPON EXECUTION OF THIS AGREEMENT AND ARE RELYING AT THE TIME OF EXECUTION OF THIS AGREEMENT ON TPR'S BOOK VALUE, AS SET FORTH ON SCHEDULE III(1).

1270083.3
1745188NV-2

2. The parties agree that the assets of TPR as listed on Schedule III(1.) are divided into three (3) categories;

    (i) Cash and marketable securities, designated as (Category A) on Schedule III(1).

    (ii) Assets valued designated as (Category B) on Schedule III(1).

    (iii) Assets as to which neither party accepts the valuation, designated as (Category C) on Schedule III(1).

The parties accept the value of the assets in Category A as binding upon them (subject to updating due to the passage of time).

    (a)    The Husband represents to the Wife that TPR's total liabilities are no more than $10,000.

    (b)    TPR, by its Chief Executive Officer or Vice President, within one hundred twenty (120) days of the date of execution of this Agreement must notify the Husband, in writing, whether it accepts the value of the assets in Category B. Should TPR either (x) fail to notify its acceptance in writing or (y) express disagreement with the valuations of the assets in Category B, TPR will be obligated to sell the assets in its discretion, but subject to its duties to its shareholders, and the sales price will be definitive and binding upon the parties as the value of the assets in Category B.

    (c)    All of the assets in Category C will either be (x) sold or (y) appraised, by an appraiser selected by Sagi Genger or David A. Parnes, Esq., as determined by TPR in its discretion, but subject to its duties to its shareholders. The sale or appraised value of each asset will be definitive and binding upon the parties as the value of the assets in Category C.

18

(d)    In the event that by the Second Anniversary there remains disagreement as to the valuation of assets in Category B, or if any assets in Category B or Category C have not been sold (the "Non Sold Assets"), the Husband and TPR agree to purchase or to sell, from or to, the other party such Non Sold Assets, in accordance with the following procedure:

(i) a coin will be tossed in the air, by Orly Genger or in her absence by a person mutually acceptable to the Husband and TPR;

(ii) the Husband will be designated as "Head" (i.e. – the side of the coin where the profile of a person is impressed) and TPR will be designated as "Tail" (i.e. – the other side of the coin);

(iii) if the Head side of the coin shall lay face up, the Husband will become the Evaluating Party for the first Non Sold Asset selected by the person tossing the coin, and if the Tail side of the coin shall lay face up, TPR shall become the Evaluating Party for the first Non Sold Asset selected by the person tossing the coin;

(iv) the Evaluating Party shall value and indicate in writing by the fifth business day following the coin toss to the other party, the sum at which it values such Non Sold Asset ("Evaluated NSA Value");

(v) by the fifth business day, following receipt of the Evaluated NSA Value from the Evaluating Party ("TPR Determination Date"), the other party shall notify the Evaluating Party in writing whether it intends to acquire from, or to sell to, the Evaluating Party its part of such Non Sold Asset, in which case the other party shall either remit to the Evaluating Party its Obligated

19

Share (as defined below) of the Evaluated NSA Value or receive from the Evaluating Party its Obligated Share of the Evaluated NSA Value, within 30 business days following the TPR Determination Date against receipt of such Non Sold Asset. If the Evaluating Party does not deliver to the other party the Evaluated NSA Value, within 30 days of the TPR Determination Date, the other party shall be entitled to take the Non Sold Asset in question free of any payment or obligation.

In the event that there is more than one Non Sold Asset, the party who was not the Evaluation Party for the prior Non Sold Asset shall be entitled to select the next Non Sold Asset to be evaluated and shall be the Evaluating Party for such Non Sold Asset; and the procedures in paragraphs (iv) and (v) above shall be followed. The parties shall thereafter alternate selection of the Non Sold Asset for evaluation and acting as Evaluating Party as provided above, until all Non Sold Assets have been evaluated.

"Obligated Share" shall mean (a) for TPR, 26.48% and (b) for the Husband, 73.52%.


## ARTICLE IV

## PENSION RIGHTS

1.      The parties shall divide all of their IRA's and other retirement vehicles as provided in this Article and Article II. All such IRA's and retirement vehicles are included in Schedule II(1).

2. The Husband's IRA's and retirement vehicles included in Schedule II(1) contain 79,045 shares of Lumenis which were purchased after the commencement of the parties' divorce action; such shares shall be the Husband's separate property. The

1270083.3
1745188RV-2

remainder of the assets contained in such IRA's, as of the date of execution of this .

Agreement shall be divided into two equal portions and one of those portions will be

transferred by direct transfer into an IRA owned by the Wife as promptly as practicable

after the entry of the Judgment of Divorce.

3.      One half (1/2) of any other IRA's owned by either party, as of the

date of execution of this Agreement will be transferred to the other party by direct

transfer to an IRA owned by the other party as promptly as practicable after the entry of

the Judgment of Divorce.

4.      One-half (1/2) of the assets (other than Lumenis shares referred to

in paragraph IV(2) above) in each of the parties' other pension plans and retirement plans

(including but not limited to any plan qualified under § 401 of the Internal Revenue Code

to which Section 401(a)(11)(B) of the Code or Section 205(b) (1) of ERISA shall apply)

(hereafter a "Qualified Plan") shall be transferred to the other party pursuant to a

Qualified Domestic Relations Order ("QDRO") as promptly as practicable and in any

event within ninety (90) days after service by one party or the other of notice of entry of a

judgment of divorce between the parties. With respect to the portion of the electing

party's Qualified Plans as described in this paragraph 4 which the electing party is to

retain, the other party consents to the electing party's current and future designation of

beneficiaries under any of such Qualified Plans other than the consenting party (and to

any and all revocations and/or modifications of such designations), including any of such

plans referred to in Section 401(a)(11)(B)(iii) of the Code or Section 205(b)(1)(C) of

ERISA.

1270083.3
1745148RV-2

5.      Except as is specifically provided to the contrary in the prior provisions of this Article and Article II, each party forever waives any interest that he or she may have to any IRA, Keogh plan, pension plan, profit sharing plan, 401(k) plan, individual retirement plan, employee stock ownership plan or stock bonuses or other employee benefit or other retirement plan of any description whatsoever (including, without limitation, any life insurance benefits contained therein), in the future held in the other's name or associated with any employer of the other or with any entity owned, now or previously, by the other.

6.      Each party has simultaneously executed and delivered to the other (and in the future will, without further consideration or remuneration, promptly execute and deliver to the other) all documents that are presented to him or her and that are reasonably required in order to effectuate the intentions and provisions of this Article.

## ARTICLE V
## RESPONSIBILITY FOR DEBTS

1.      Except for certain obligations (provisions for which are set forth in paragraph 3 of this Article), the Wife represents that she has not heretofore incurred or contracted, or caused to be incurred or contracted, for herself, any debt, charge, obligations or liability whatsoever (contingent or otherwise) for which the Husband or his estate is or may become liable. The Wife shall not hereafter incur or contract or cause to be incurred or contracted any debt, charge, obligation or liability whatsoever, for necessaries or otherwise, upon the credit of the Husband for which the Husband or his estate may become liable. Except as provided otherwise in paragraph 3 of this Article, the Wife shall satisfy and shall indemnify the Husband against all debts, charges,

22

obligations or liabilities of every kind and nature whatsoever (including reasonable fees of attorneys and other professionals and costs of litigation) which were heretofore or may hereafter be incurred or contracted solely by her.

2.       Except for certain obligations (provisions for which are set forth in paragraph 3 of this Article), the Husband represents that he has not heretofore incurred or contracted, or caused to be incurred or contracted, for himself, any debt, charge, obligations or liability whatsoever (contingent or otherwise) for which the Wife or her estate is or may become liable.  The Husband shall not hereafter incur or contract or cause to be incurred or contracted any debt, charge, obligation or liability whatsoever, for necessaries or otherwise, upon the credit of the Wife for which the Wife or her estate may become liable.  Except as provided otherwise in paragraph 3 of this Article, the Husband shall satisfy and shall indemnify the Wife against all debts, charges, obligations or liabilities of every kind and nature whatsoever (including reasonable fees of attorneys and other professionals and costs of litigation) which were heretofore or may hereafter be incurred or contracted solely by him.

3.       (a) The Husband shall indemnify, defend, and hold harmless the Wife, from and against 100% of any and all liabilities, damages, claims, actions, losses, settlements, penalties, judgments or obligations, (each a "Claim") including her reasonable counsel and other professional fees, expenses and costs, including but not limited to or arising from, existing, threatened and/or future actions, or proceedings naming the Wife (either solely or jointly with other parties) as a party, arising out of, or due to, events that occurred on or before the date of this Agreement.  In addition, the Husband shall indemnify, defend and hold harmless the Wife from and against 100% of

any and all Claims which arise by reason of any transaction made hereunder between the Wife or any affiliate of the Wife and any third party without sufficient consideration.

(b) (i)   The Husband shall indemnify, defend, and hold harmless the Wife, from and against 100% of the Marital TPR Percentage of any and all Claims, including her reasonable counsel and other professional fees, expenses and costs (except as otherwise specified in sub-paragraph (ii) below), naming TPR as a party arising out of, or due to, events that occurred on or before the date of this Agreement.

(ii)   The Husband shall indemnify, defend, and hold harmless the Wife, from and against 50% of the Marital TPR Percentage of any and all existing or threatened Claims, including her reasonable counsel and other professional fees, expenses and costs arising from the action against TRI pending in Louisiana and Mississippi referred to as the Bogalusa Litigation. Schedule V(3)(ii) attached to this Agreement contains an update of the status of the Bogalusa litigation. Husband represents and warrants to Wife that to the best of his knowledge there is no other Claim naming TPR as a party, arising out of, or due to, events that occurred on or before the date of this Agreement.

(c) Husband further represents and warrants to Wife she has no liability with respect to the promissory note, dated December 31, 2001 made by the Husband in favor of Sash A. Spencer in the principal amount of one hundred twenty thousand dollars ($120,274.20), a copy of which is annexed hereto as Exhibit V(3)(c) . In any event, the Husband shall indemnify, defend, and hold harmless the Wife from and against 100% of any and all liabilities, damages, claims, actions, losses, settlements, penalties, judgments

1270083.3
1745188RV-2

or obligations, including her reasonable counsel and other professional fees, expenses and costs in connection with such note.

4.     The Husband or the Wife may each, prior to the Second Anniversary, submit a request to an Arbitrator (as such term is defined Article XIII, and upon the terms detailed therein), with notice to the other party, to prevent distribution to the indemnifying party, by Sagi Genger (or his successor Attorney in Fact) of Non Liquid Assets, and Arbitrator shall be entitled to prevent the distribution of Non Liquid Assets to the indemnifying party provided Arbitrator has reasonable grounds to believe that on the preponderance of evidence submitted to him by the parties (i) an actual liability exists, and (ii) the indemnifying party has not provided reasonably satisfactory assurances that assets are available to cover such liability pursuant to indemnities made hereunder. The Arbitrator may order the non-distribution of Non Liquid Assets to the indemnifying party only in the amount and to the extent necessary to cover the Arbitrator's expected value of such liability; a notice to that effect will be promptly delivered to Sagi Genger (or to his successor Attorney in Fact).

5. Concurrently with the execution of this Agreement, the Husband and the Wife shall each assume two percent (2%) of the amount due (as of the date hereof, approximately $9,880,000, inclusive of interest) under the promissory note to TPR, dated December 21, 1993, in the original principal amount of $8,950,000 made by D&K Limited Partnership ("D&K") of which the Wife is general partner (the "D&K Note"). A copy of the D&K Note, together with the form of the Instrument of Assumption by Husband and Wife and the Acknowledgment and Consent by TPR is annexed hereto as

Exhibit V(5). The Husband's and the Wife's aggregate liability of four percent (4%) represents the entire marital obligation and indebtedness under the D&K Note.

6. Concurrently with the execution of this Agreement, each of the parties will assume one half (1/2) of the liability under certain promissory notes (the "TPR Notes") made by the Husband in favor of TPR in the aggregate amount including outstanding principal and interest of $920,143.36 as of the date of this Agreement. Husband represents and warrants that as of the date of this Agreement the TPR Notes are legal, valid and binding obligations of Husband. Copies of the TPR Notes, together with the form of the Instrument of Assumption by Husband and Wife and the Acknowledgment and Consent by TPR are annexed hereto as Exhibit V(6).

7. Concurrently with the execution of this Agreement, the Husband will forgive all obligations owed to him by D&K in the aggregate amount including outstanding principal and interest of $772,880.16 as of the date of this Agreement ("D&K Obligations to Husband"). A copy of a schedule of the D&K Obligations is annexed hereto as Exhibit V(7). Husband hereby forgives the D&K Obligations to Husband and hereby acknowledges that they are cancelled.

8. The Husband represents and warrants that to the best of his actual knowledge, the obligations set forth in Schedule II(1) and as specifically described above in this Article represent a complete and accurate list of all marital obligations and liabilities in excess of $10,000 that he has entered into, or has caused the Wife to enter into or become responsible for, prior to the date of this Agreement and to the best of his knowledge all material contingent liabilities to which he or she or D&K may be subject arising from any events, actions or omissions prior to the date of this Agreement. The

Wife represents and warrants, to the best of her actual knowledge, that the obligations set forth in Schedule II(1) and as specifically described above in this Article represent a complete and accurate list of all marital obligations and liabilities in excess of $10,000 that she has entered into, or has caused D&K to enter into, prior to the date of this Agreement and all material contingent liabilities to which she or D&K may be subject as a result of her actions or omissions prior to the date of this Agreement.

9. Except as specifically stated to the contrary in this Agreement, each party will be solely responsible for the payment of all debts in his or her own name, whether incurred previously or in the future.

## ARTICLE VI

## INCOME TAX RETURNS

1.    The parties have previously filed joint, federal, state and local income tax returns for all tax years through the year ended December 31, 2003 for the following jurisdictions:

US Federal Income Tax

New York State

New York City

(the "Joint Tax Returns"). The Husband represents and warrants that there are not any pending or threatened investigations or audits of any of the Joint Tax Returns.

2.    With respect to any tax return either party filed separately for any tax year, any refunds received or liabilities incurred in connection with such return shall be for the account of the party filing such return. With respect to the parties' joint tax returns for the years 2002 and 2003, any refunds received or liabilities incurred in connection with such returns shall be for the benefit of the Husband.

3.    Promptly after either party receives notice of any investigations or audit after the date hereof, he or she shall give prompt written notice to the other party. The parties shall endeavor in good faith to agree on the handling of the investigation or audit. If the parties have not so agreed within 30 days of notice to the other party, one or both parties shall give notice of the failure to agree to Sagi Genger (or in his absence David Parnes), who shall promptly appoint tax counsel in his discretion, subject to his fiduciary obligations to the parties, and such tax counsel shall have full authority to determine handling of the investigation or audit, including without limitation settling with

1270083.3
1745188RV-2

the investigatory or auditing authority and apportioning liability for any deficiency (including penalties and interest), entitlement to any refund and costs of the investigation or audit including reasonable attorneys', accountants' and other professional fees in accordance with relative responsibility therefor. Husband and Wife may at any time by joint written notice to Sagi Genger (or David A. Parnes, Esq.) and tax counsel appointed as described above revoke the authority of tax counsel and proceed according to mutual agreement. In any such case, liability for any deficiency (including penalty and interest), entitlement to any refund and costs of the investigation or audit including reasonable attorneys', accountants' and other professional fees shall be apportioned in accordance with relative responsibility therefor. In the event that either the Husband or the Wife pays more than his or her share (as determined by this Article) of any deficiency, tax, penalty, or interest relating to a previously filed Joint Tax Return, the Husband or Wife, as the case may be, shall reimburse the other for 50% of the same, together with any reasonable expenses the other party may incur in connection with payment of the excess, including without limitation the other's reasonable attorneys', accountants' and other professional fees and costs of litigation.

4. Husband and Wife shall cooperate in the handling of the investigation or audit, including without limitation execution of such powers of attorney as may be required to enable Sagi Genger (or David A. Parnes, Esq.) and tax counsel to act as contemplated by this Article, execution of amended tax returns or other documents as may be reasonably appropriate in connection with such investigation or audit (provided that the execution of any such other document would not adversely affect the party's financial interest) and promptly and without any charge or other consideration making

available such papers, records, documents and information as may be reasonably appropriate in connection with such investigation or audit.

## ARTICLE VII

## MEDICAL INSURANCE AND RELATED
## EXPENSES FOR THE PARTIES

1. The Husband will maintain his own medical insurance for his own benefit without contribution by the Wife to the cost thereof. He shall be responsible for all of his own unreimbursed medical expenses (whether incurred before or after the date of execution of this Agreement), including, but not limited to, doctors, dentists, orthodontists, pharmacists, psychiatrists, psychologists or other mental health professionals. Such unreimbursed medical expenses include, but are not limited to, insurance deductibles, co-payments and uninsured medical expenses.

2. If the Wife may lawfully choose to do so, she may elect at her expense to obtain coverage through the Husband's plan of medical insurance under the Consolidated Omnibus Budget Reconciliation Act of 1985 (commonly referred to as "COBRA") or other similar laws (or if such coverage is not available for any reason she may obtain other substantially equivalent coverage reasonably satisfactory to her) for a period of 36 months. The Wife shall be responsible for all of her own medical expenses (whether incurred before or after the date of execution of this Agreement) unreimbursed by such COBRA or other coverage, including, but not limited to, doctors, dentists, orthodontists, pharmacists, psychiatrists, psychologists or other mental health professionals. Such unreimbursed medical expenses include, but are not limited to, insurance deductibles, co-payments and uninsured medical expenses.

1270083.3
1745188RV-2

ARTICLE VIII

EQUITABLE DISTRIBUTION

1.     The parties acknowledge and agree that the resources of the parties
and the provisions of this Agreement, including the transactions contemplated hereby, are
intended, except as otherwise provided or reflected herein, , to effect approximately a 50-
50 distribution of their net marital assets and represent and set forth a fair, reasonable and
equitable distribution of each of their maintenance, necessaries, property and other rights
arising from their marital relationship or otherwise and that the payments, property
transfers and releases, whether past, present or due in the future ("Distribution") represent
an agreeable and equitable division of such rights. Henceforth all such rights shall be
governed solely by this Agreement.

2.     Without limiting paragraph 1 of this Article, but subject to
paragraph 5 of this Article, Wife's audit rights as provided in Article XII, the Wife
further acknowledges and agrees that:

(a) she is accepting any and all Distributions and other rights under or
contemplated by this Agreement in full satisfaction of any claim for equitable distribution
or maintenance or spousal support from the Husband, all payments due pursuant to the
*pendente lite* order of Judge Judith Gische made on December 3, 2002 and of any claim
to any property of the Husband whether owned directly or beneficially by him
individually or jointly with the Wife or any third party or parties, that she may have, or
may have asserted, including any claim under Section 236(B)(5) of the Domestic
Relations Law of New York commonly known as the Equitable Distribution Law, or any
applicable law of the United States, the State of New York, or any other state, nation,

territory or province now or hereafter having jurisdiction over the parties, or over any of their marital assets; and

(b) in accepting the said Distributions and rights, she is waiving any and all rights, either under the Equitable Distribution Law or any other provision of law to any property of the Husband which she has heretofore claimed or may hereafter claim, constitutes "marital property" as defined by Section 236 Part B(1)(c) of the Domestic Relations Law, as well as to all Husband's separate property disclosed to her.

3. Without limiting paragraph 1 of this Article, but subject to paragraph 5 of this Article, the Husband further acknowledges and agrees that:

(a) he is accepting any and all Distributions and other rights under or contemplated by this Agreement in full satisfaction of any claim for equitable distribution or maintenance or spousal support from the Wife, and of any claim to any property of the Wife whether owned directly or beneficially by her individually or jointly with the Husband or any third party or parties, that he may have, or may have asserted, including any claim under Section 236(B)(5) of the Domestic Relations Law of New York commonly known as the Equitable Distribution Law, or any applicable law of the United States, the State of New York, or any other state, nation, territory or province now or hereafter having jurisdiction over the parties, or over any of their marital assets; and

(b) in accepting the said Distributions and rights, he is waiving any and all rights, either under the Equitable Distribution Law or any other provision of law to any property of the Wife which he has heretofore claimed or may hereafter claim, constitutes "marital property" as defined by Section 236 Part B(1)(c) of the Domestic Relations Law, as well as to all Wife's separate property.

1270083.3
17451888V-2

4. Subject to paragraph 5 of this Article, each of the parties forever waives, releases, renounces and relinquishes any and all rights or claims to the other's licenses and certificates, degrees, professional practices, business, anticipated income, career, goodwill, earned but as yet undistributed income, enhanced earning capacity, bank accounts, retirement vehicles (including, without limitation, IRAs, 401(k) plans and insurance policies), constructive trusts, equitable liens, pensions, automobiles, claims to intangible assets of the other party, any and all rights or claims based upon the active or passive role of either party in the management of a particular asset, as well as any other rights or claims against the past, present or future property of the other, whether such rights or claims arise at law, in equity or by virtue of the marital relationship.

5.    Notwithstanding any other provision of this Agreement, the parties agree that neither party is waiving any rights, claims, liabilities, causes of action or other obligations that may arise from a breach of any representation or any other term of this Agreement, including, without limitation, the representation contained in Article II(9)(a).

## ARTICLE IX

## MUTUAL RELEASE AND DISCHARGE OF CLAIMS
## AND CLAIMS TO ESTATES

Subject to paragraph 5 of Article VIII:

1. The Husband hereby remises, releases and forever discharges the Wife, the Wife's heirs, executors, administrators, successors and assigns from all actions, causes of action, suits, debts including without limitation the D&K Obligations to Husband, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages,

1270083.3
I74518ERV-2

.33

judgments, expenses, executions, claims, and demands whatsoever, in law, admiralty or

equity, known or unknown, which the Husband, the Husband's heirs, executors,

administrators, successors and assigns ever had or now has against the Wife, for, upon, or

by reason of any matter, cause or thing whatsoever from the beginning of the world to the

day of the date of this Agreement, including (without limitation) claims with respect to

all "separate property" and all "marital property" as those terms are defined in Section

236(B) of the Domestic Relations Law or arising out of the marital relationship, except

for any cause of action for Divorce, Annulment or Separation and any defenses thereto.

      2.    The Wife hereby remises, releases and forever discharges the

Husband, the Husband's heirs, executors, administrators, successors and assigns from all

actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds,

bills, specialties, covenants, contracts, controversies, agreements, promises, variances,

trespasses, damages, judgments, expenses, executions, claims, and demands whatsoever,

in law, admiralty or equity, known or unknown, which the Husband, the Husband's heirs,

executors, administrators, successors and assigns ever had or now has against the Wife,

for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of

the world to the day of the date of this Agreement, including (without limitation) claims

with respect to all "separate property" and all "marital property" as those terms are

defined in Section 236(B) of the Domestic Relations Law or arising out of the marital

relationship, except for (a) any amounts that may be due pursuant to the audits referred to

in Article XII and (b) any cause of action for Divorce, Annulment or Separation and any

defenses thereto.

1270083.3
1745188AV-2

3. Each of the parties recognizes the existence of certain imbalances, resulting from (a) inequality of distribution of marital assets prior to the date of this Agreement; (b) the unequal bearing of marital expenses prior to the date of this Agreement; and (c) the misuse by the Husband of marital IRA or other retirement funds for the purchase of Lumenis stock. Each party agrees to disregard such past imbalances, and to release the other, forever and for all purposes whatsoever from, any and all rights and claims arising from such past imbalances.

4. Each party waives, renounces, grants, remises and releases to the other, forever and for all purposes whatsoever any and all rights and claims against the other's estate including dower, curtesy and community property rights and interests, any right of election under the relevant provisions of the Estates, Powers and Trusts Law of the State of New York ("EPTL") or similar laws of other States or jurisdictions, domestic or foreign, including, without limitation, EPTL Sections 5-1.1-A and 5-3.1 or under the laws of testacy or intestacy (including, without limitation, EPTL Sections 4-1.1) in any jurisdiction whatsoever, which he or she ever had, now has or may hereafter acquire in the real or personal property or estate of the other, wherever situated and whether acquired before or subsequent to the date of this Agreement, by reason of inheritance or descent or by virtue of any decedent estate law or any other statute or custom, or arising of the marital relationship, or for any other reason whatsoever.

5. (a) Each of the parties expressly revokes his or her Last Will and Testament ("Will") insofar as the same makes any disposition (whether outright or in trust) to or for the benefit of the other party and further expressly revokes any nomination

35

of the other party as an estate representative or in any other representative or fiduciary capacity thereunder.

(b) It is furthermore the intent of the parties that all Wills made and executed by either of them prior to the execution of this Agreement shall be read and administered as if the other party had predeceased him or her for purposes of distribution of his or her respective estate and of the property interests otherwise passing thereunder.

6. Where a party may be designated a beneficiary or survivor in a testamentary substitute (as defined in Section 5-1.1-A of the EPTL) or any other interest in property passing outside of the Will by operation of law (including but not limited to life insurance but excluding any life insurance specifically required to be maintained by one party for the benefit of the other pursuant to the terms of this Agreement) pursuant to which any interest in property does not pass under a Will, each of the parties will be irrevocably and permanently deemed to have renounced any such designation.

7. Each of the parties irrevocably and irrebuttably renounces any right of administration upon the estate of the other or nomination by the other as estate representative, contained in the other party's Will.

8. Neither party shall object to the probate of the other's Will, and in the event that either party dies intestate, the surviving party shall allow administration upon the estate and personal effects of the deceased party to be taken and received by any person who would have been entitled thereto had the surviving party predeceased the deceased party unmarried.

9. Each party shall, upon request by the executors, administrators or other legal representatives of the other party and receipt of the relevant instruments,

1270083.3
1745188MV-2

promptly execute, acknowledge and deliver (without charge or other consideration) any instrument which in the opinion of said executors, administrators or other legal representatives is reasonably necessary to effectuate the waivers and other provisions of this Article.

10.    Notwithstanding the foregoing, nothing contained in this Agreement shall bar a claim on the part of either party for any cause arising out of a breach of any representation or other term of this Agreement arising or accruing during the lifetime of the deceased party against whose estate such a claim may be made, and such claim shall be in addition to any other remedies which may be available.

## ARTICLE X

## SEPARATE OWNERSHIP

Except as specifically provided to the contrary in this Agreement, each party shall own, as his or her separate property, free of any claim or right of the other, all of the items of property, real, personal and mixed, of any kind, nature or description and wherever situate, which are now or hereafter in his or her name, control or possession, with full power to dispose of the same as fully and effectually in all respects and for all purposes as if unmarried, provided that this provision shall not in any way limit the ability of the Husband or the Wife to enforce his or her rights with respect to breach of any representation or any other breach of the terms of this Agreement by the other party.

## ARTICLE XI

### RESIDENCE AND NONINTERFERENCE

1. It is, and shall be, lawful for the Husband and Wife at all times to reside from time at such places as each may see fit and to contract, carry on and engage in any employment, profession, business or trade, which either may deem fit, free from control, restraint or interference, direct or indirect, by the other in all respects as if and she were single and unmarried.

2.    Neither the Husband nor the Wife shall in any way molest, disturb, trouble, or interfere with the peace and comfort of the other or compel or seek to compel the other to associate, cohabit or dwell with him or her by any action or proceeding for restoration of conjugal rights or by any means whatsoever.

3.    The foregoing provisions of this Article shall not in any way limit the ability of the Husband or the Wife to enforce his or her rights with respect to breach of any representation or any other breach of the terms of this Agreement by the other party, as provided in Article XIII.

## ARTICLE XII

### THE WIFE'S RIGHT TO CERTAIN AUDITS OF THE HUSBAND'S ASSETS

1. On the Wife's request, upon not less than ten (10) business days' written notice, the Husband shall allow the Wife to audit his assets and liabilities as of the date of commencement of the parties' matrimonial action, i.e. January 31, 2002, as set forth on Schedule II(1) annexed hereto and made part hereof and as of the date of this Agreement in order to test the correctness and completeness of the items included on such Schedules

38

1770083.3
171019681.2

(including contingent liabilities) and the values assigned to each such item based on all information available at the time of audit.

       (a)     The Wife shall be entitled to conduct a total of five (5) such audits during the Husband's lifetime.

       (b)     Each such audit is to be conducted by a reputable accounting firm.

          (i)     Within two (2) weeks of the date of execution of this Agreement, the Husband will provide the Wife with the names of two accounting firms and the principals thereof who will be acceptable to the Husband to perform all of the audits. If the Wife chooses one of those accounting firms and principals, that firm and principal will conduct the audits when requested by the Wife in accordance with the guidelines set forth herein.

          (ii)     If the Wife does not choose one of those two firms and principals, the Husband shall have the right on one occasion and only one occasion prior to the commencement of an audit to reject the Wife's selection of any other accounting firm to conduct the audits. Provided that the Husband has not previously exercised that right, he may do so on any of the remaining audits. If the Husband elects to exercise that right, the Wife may not utilize the rejected firm in that or any other audit.

       (c)     The Husband will cooperate, and will cause persons under his control to cooperate, with the auditors and will promptly furnish such documents as the auditors may request from time to time. It is expressly understood that the auditors' document requests may relate to matters up to and including the date of the audit.

1270083.3
17451RNV-2

(d)     Such audits shall be at the Wife's sole expense, except that if the

audits find assets not previously disclosed by the Husband on Schedule II(1) with a

cumulative value greater than two hundred fifty thousand dollars ($250,000), the

Husband will be responsible for the entire reasonable cost of all audits which may have

been performed.

2.     (a)     If the audits, individually or cumulatively, find that the Husband

owned any property on January 31, 2002, which is not listed on Schedule II(1), the

Husband will pay to the Wife one-half (1/2) of the value of that property.

(b)     In addition, if the audits, individually or cumulatively, find assets

not listed on Schedule II(1) with a cumulative value greater than two hundred fifty

thousand dollars ($250,000), then (i) such error will be presumed willful on the

Husband's part, and (ii) the Husband will pay to the Wife one-half (1/2) of three (3) times

of that value (in addition to paying audit expenses as provided above). However, the

Husband will have the opportunity to rebut the presumption of willful error at an

arbitration conducted in accordance with Article XIII and at his expense by a

"preponderance of evidence" test. If the Husband has previously made payments

pursuant to subparagraph 2 (a) of this Article, in respect of those assets, he shall receive a

credit therefor against the amounts owed pursuant to this subparagraph (b).

(c)     If the Wife conducts a third audit, (i) after two consecutive audits

have failed to find assets not listed on Schedule II(1) or have failed to find a difference in

assets between the first and second of such consecutive audits of more than twenty five

thousand dollars ($25,000), and (ii) the third audit fails to find assets not listed on such

Schedule or finds a difference of less than twenty five thousand dollars ($25,000) from

40

the previous two audits, then the Wife will be liable to the Husband for his reasonable expenses incurred as a consequence of cooperating with the third consecutive audit.

(d)     If the Husband disputes the results of any audits or asserts that the cumulative errors (if greater than two hundred fifty thousand dollars ($250,000)) were not willful, the dispute will be determined by arbitration as is provided in Article XIII of this Agreement.

(e)     Any payments due under paragraphs 2 (a) and (b) above shall be made in cash within 60 days of the later of the completion of the audit or the receipt of the arbitration decision.

## ARTICLE XIII

## GOVERNING LAW AND ARBITRATION

1.     This Agreement will be governed and interpreted in accordance with laws of the State of New York, without application of its conflicts of law provisions. This provision for arbitration shall be specifically enforceable by the parties. Any controversy, claim or dispute between the parties directly or indirectly arising out of this Agreement shall be finally settled by arbitration as provided herein. Either party may give written notification to the other party requesting arbitration to resolve any controversy, claim or dispute arising out of this Agreement between the parties.

2.     Subject to the provisions of paragraph 5 of this Article, any award rendered by the Arbitrator (as defined below) may be confirmed in any court having jurisdiction thereof. Notwithstanding the foregoing paragraphs of this Article, either party may file a claim for temporary emergency relief or other temporary remedies not otherwise available through arbitration, in a court of competent jurisdiction, without first

41

having to arbitrate the dispute, provided that such claim for injunctive relief arises from an alleged breach of a specific term of this Agreement.

      3.    In the event that a dispute is submitted to arbitration, there shall be one (1) arbitrator (the "Arbitrator") selected (x) by the parties or (y) if the parties fail to select an Arbitrator within twenty (20) days following receipt of a list of potential arbitrators from the American Arbitration Association ("AAA"), the Arbitrator shall be selected by the AAA. The Arbitration shall be conducted as promptly as practicable after the selection of the Arbitrator in accordance with the Commercial Arbitration Rules and Mediation Procedures. The Arbitrator shall be someone who has at least fifteen (15) years of commercial law experience or who was a judge of a court of general jurisdiction.

      (a)    The arbitration hearing shall be held in Manhattan, New York, pursuant to the Commercial Arbitration Rules and Mediation Procedures, except where those rules conflict with the provisions of this Article, in which case the provisions of this Article shall control.

      (b)    The Arbitrator shall arrange a hearing at a mutually agreeable time and location in Manhattan, New York, which hearing shall be not less than thirty (30) calendar days, and not more than sixty (60) calendar days, after the date on which the Arbitrator was appointed.

      (c)    The parties shall each have the right to submit documents, testimony, information, data and memoranda to the Arbitrator in support of their respective positions.

      (d)    Within sixty (60) calendar days after such hearing, the Arbitrator shall render a decision with respect to the dispute.

1270083.3
1745188RV-2

(e)     The party against whom the Arbitrator found shall bear the total costs, Arbitrator's fees and other expenses of the arbitration between the parties, including the legal fees borne by the other party in bringing or defending the action.

4.     The Arbitrator shall have the authority to require the submission (at hearing or otherwise) of such documents, information, testimony, and other items as the Arbitrator may deem necessary to make a fair and reasonable decision, including the authority to issue subpoenas and similar process to compel production of such documents, information, testimony and other items.

5.     Subject to the remaining provisions of this paragraph 5, any award rendered by the Arbitrator shall be conclusive and binding upon the parties hereto; provided, however, that any such award shall be accompanied by a written opinion of the Arbitrator giving the reasons for the award.

(a)     The findings of the Arbitrator may not change the express terms of this Agreement and shall be consistent with the Arbitrator's belief as to what findings a court of proper jurisdiction would have made in applying the applicable law to the facts underlying the dispute.

(b)     There shall be no right of appeal from the Arbitrator's determination unless the Arbitrator shall not have complied with the provisions of this Article.

(c)     The Arbitrator shall have no authority to award relief in excess of what this Agreement provides.  Moreover, the Arbitrator shall have no authority to award non-monetary or equitable relief.

### ARTICLE XIV

43

## LEGAL AND EXPERT FEES

1.      (a)  The Wife has previously been represented in the parties' matrimonial litigation and/or in the negotiation, preparation and execution of this Agreement by Dominic Barbara and Marilyn B. Chinitz, of the Law Offices of Dominic Barbara, 1100 Stewart Avenue, Garden City, NY 11530; Sheldon M. Greenbaum of Goldman & Greenbaum, P.C., 60 East 42nd Street, New York, NY 10165; Philip Greenhaus, 50 East 42nd Street, New York, NY 10017; and, as to certain commercial aspects of this Agreement, Carol Robinson Schepp of Carter Ledyard & Milburn LLP, 2 Wall Street, New York, New York 10005.

(b)  The Husband has been represented in the parties' matrimonial litigation and in the negotiation, preparation and execution of this Agreement by Stanford G. Lotwin and Jay D. Silverstein of Blank Rome LLP, 405 Lexington Avenue, New York, New York 10174, and Edward Klimerman of Sonnenschein Nath & Rosenthal LLP, 1221 Avenue of the Americas, New York, NY 10020.

2.      (a)  Except as otherwise provided in sub-paragraph (b) of this Section 2, each party will be solely responsible for the payment of all legal fees, expert fees and expenses incurred by him or her for services in connection with their matrimonial litigation and with the negotiation, preparation and execution of this Agreement (or in connection with any subsequent divorce) and each shall indemnify the other from all loss and/or expense arising from any claims for counsel fees and disbursements made by any attorney (or claims for fees and disbursements by any other professional or expert) in reference to the negotiation and preparation of this Agreement, and in reference to any other matters related to the matrimonial difficulties existing

1270083.3
1745188NV-2

between the Husband and the Wife including the procurement of an undefended judgment of divorce.

(b) The following legal fees (i) approximately $200,000 prepaid by the Wife to the Law Offices of Dominic Barbara, prior to May 24, 2004, for which legal services are in dispute, and (ii) all legal fees, owed to the lawyers enumerated in Section 3 of Article I and in Section 1(b) of this Article XIV and their respective firms, and incurred by the Husband and the Wife in connection with the negotiations of this Agreement from May 24, 2004 until the date of execution of this Agreement, shall be paid by Sagi Genger (or David A. Parnes, Esq.), or reimbursed to the parties, from the assets made available to him pursuant to Article II, as soon as practicable.

(c) In consideration for sharing the expense of legal fees, and their payment from assets made available pursuant to Article II, the Wife will pursue in good faith (personally, or – at her election – appoint Sagi Genger to pursue in her stead) the Law Offices of Dominic Barbara, to reclaim the approximately $200,000 prepaid by the Wife which shall be equally shared by the parties.

## ARTICLE XV

## FULL DISCLOSURE

1.    Each party acknowledges that:

(a)    he or she understands, and has been advised of, his or her right: (i) to obtain full and complete financial disclosure from the other with respect to all assets and income owned by the other party whether titularly or beneficially, and (ii) to obtain appraisals from independent appraisers of his or her own choosing of any property owned

by the parties' collectively, or either party individually, including, without limitation, appraisals of tangible and intangible assets;

(b)    he or she has utilized the rights specified in paragraph 1(a) of this Article to the fullest extent that he or she wishes to do so both in the parties' litigation, including depositions and appraisals, and in earlier extensive voluntary document discovery;

(c) that he or she is satisfied with the disclosure that he or she has received from the other; and

(d) that he or she has knowingly and intentionally directed his or her counsel not to seek further disclosure from the other party or to cause appraisals to be made.

2. (a)    The Wife acknowledges that she has made inquiry into the financial circumstances of the Husband to the extent that she wishes to do so at this time;

(b)    The Wife has had a full opportunity to consult with, and has consulted at length with, her attorneys identified or referenced in Article XIV regarding all of the circumstances hereof to the extent that she wishes to do so at this time;

(c)    The Wife acknowledges that this Agreement has not knowingly been the result of any fraud, duress or undue influence exercised upon her by the Husband or by any other person or persons; and

(d) The Wife acknowledges that she is fully satisfied with the services rendered on her behalf by her attorneys identified or referenced in Article XIV.

46

3.    The Wife's acknowledgments in paragraphs (1) and (2) above are based on her ability to seek remedies in the event of a breach of any representation in this Agreement and to exercise her audit rights as provided in Article XII.

4.    The Husband acknowledges that (x) he has made inquiry into the financial circumstances of the Wife to the extent that he wishes to do so, and (y) that he cannot appropriately make a claim against the Wife by reason of her non-willful failure to disclose or his failure of knowledge of the financial circumstances of the Wife;

(a) The Husband has had a full opportunity to consult with, and has consulted at length with, his attorneys, to wit: Blank Rome LLP and Sonnenschein Nath & Rosenthal LLP regarding all of the circumstances hereof;

(b) The Husband acknowledges that this Agreement has not knowingly been the result of any fraud, duress or undue influence exercised upon him by the Wife or by any other person or persons; and

(c) The Husband acknowledges that he is fully satisfied with the services rendered on his behalf by Blank Rome LLP and by Stanford G. Lotwin and Jay D. Silverstein in particular.

## ARTICLE XVI

## POSSIBLE INVALIDITY

If any provision of this Agreement, for any reason whatsoever, be declared invalid or unenforceable by any Court of competent jurisdiction, by statute or governmental regulation, the remainder of this Agreement and the application of such provision to any person or situations, other than those as to which such provision may have been held invalid or unenforceable shall not be affected thereby and shall continue

47

to be enforced to the fullest extent that such severance of the invalid portions is possible without vitiating the original intent and purposes and economic intentions of the parties (the "Original Intent"), as herein set forth. If it shall appear impossible or impracticable to continue this Agreement in force after such severance, then and in such event, the parties hereto each undertake and agree that they will, upon request of the other party, make, execute, acknowledge and deliver any and all instruments which may be lawfully effective to again reflect the parties Original Intent, without diminishing the rights of the parties or increasing their obligations, financial or otherwise, herein. In the event a provision is superseded under this Article XVI, either party may seek reformation of the affected provision in any court of competent jurisdiction, which shall be empowered to revise the provision to reflect the parties' Original Intent to the greatest extent possible, consistent with New York law. It is the intention of the parties hereto that this provision may be enforced in equity in addition to, and not to the exclusion of, any other remedies which may be available to the parties. The parties do not intend by this paragraph to imply the illegality, invalidity and/or unenforceability of any term, provision, article or paragraph of this Agreement.

## ARTICLE XVII

## RECONCILIATION AND MATRIMONIAL DECREES

1.      Simultaneously with the execution of this Agreement, each of the parties will execute and deliver to the other, and in the future will promptly execute and deliver (without further consideration) to the other:

(a)(i)    All documents reasonably necessary to vacate any and all restraining orders and injunctions that have been issued in any action between the parties

including, but not limited to, their Divorce Action. A listing of the said restraining orders and injunctions is annexed as Schedule XVII(1)(a).

      (ii)    Notwithstanding the provisions of paragraph 1(a)(i), the Husband will pay the Wife maintenance of thirty thousand dollars ($30,000) for the month during which this Agreement is executed and for one month thereafter, and his obligation to pay maintenance under prior orders in the Divorce Action will cease upon the thirtieth (30th) day of the month following the month during which this Agreement is executed, provided all maintenance for prior months has been paid in full.

      (b)    All documents reasonably necessary to effect the immediate withdrawal of any and all motions now pending in any Court in any litigation between the parties. A listing of the said motions is annexed as Schedule XVII(1)(b) hereto and made part hereof.

      (c)    All documents appropriate to immediately notify the Court before whom the parties' Divorce Action is being prosecuted of the parties' having reached a settlement of all of their rights and claims excepting the right to a divorce.

      (d)    All documents reasonably necessary to facilitate the immediate grant to the Wife, on papers, of an undefended divorce on the grounds of the Husband's constructive abandonment of the Wife.

      2.    This Agreement shall not be invalidated or otherwise affected by a reconciliation or a resumption of marital relations between the parties unless they have executed and acknowledged (with the same formality as this Agreement) a written statement expressly setting forth that they are canceling this Agreement. Accordingly, this Agreement will not be terminated, annulled or modified by (a) the parties'

49

resumption of cohabitation and/or sexual relationships even if on a permanent basis or (b)

the parties' actual remarriage (irrespective of whether or not that marriage ever ends).

3.      This Agreement shall not be invalidated or otherwise affected by

any decree or judgment made in any Court in any pending or future action or proceeding

between the parties.

4.      Each party agrees that the provisions of this Agreement shall be

submitted to any court in which either party may seek a judgment, order or decree in a

matrimonial action or any other action or proceeding affecting the marital status of the

parties and that the provisions of this Agreement shall be incorporated in said judgment,

order or decree with such specificity as the Court shall deem permissible and by reference

as may be appropriate under law and under the rules of the Court. However,

notwithstanding said incorporation, the provisions of this Agreement shall survive any

decree, order or judgment and shall not merge therein, and this Agreement may be

independently enforced.

5.      Both parties will fully cooperate with each other in obtaining a

religious divorce or annulment and each will promptly execute and deliver (without

further consideration) all documents reasonably required therefor by the religious court,

tribunal or body. In addition, each party will, if requested, appear (at any reasonable time

and location) before any religious court, tribunal or body in order to effectuate the

purposes of this paragraph. All the costs of such religious divorce or annulment shall be

borne equally by the parties.

## ARTICLE XVIII

## IMPLEMENTATION

The Husband and Wife shall, at any and all times, upon request by the other party or his or her legal representatives, promptly make, execute and deliver (without charge or other consideration) any and all other and further instruments as may be reasonably required for the purpose of giving full force and effect to the provisions of this Agreement.

## ARTICLE XIX

## GENERAL PROVISIONS

1.    No failure by either party to exercise any right hereunder or to insist upon strict compliance by the other party with any obligation hereunder and no custom or practice of the parties at variance with the terms hereof shall constitute a waiver of either party's right to demand exact compliance with the terms hereof. Any waiver by either party (whether formal or informal) nonetheless found to exist by an Arbitrator with respect to any particular default by the other party shall not affect or impair the waiving party's rights in respect of any subsequent default of the same or of a different nature, nor shall any delay or omission of either party to exercise any right arising from such a default affect or impair his or her rights as to such default or any subsequent default.

2.    This Agreement shall inure to the benefit of and shall be binding and obligatory upon the heirs, personal representatives, administrators, executors and assignees of the parties herein.

3.     Neither this Agreement nor any provision hereof shall be terminated, amended or modified in any respect except by an agreement in writing duly subscribed and acknowledged by both parties with the same formality as this Agreement. Any asserted termination, annulment or modification not so subscribed and acknowledged shall be without effect even if it was substantially and detrimentally relied upon.

4.     The parties may at any time amend, modify or annul this Agreement (in the manner set forth in paragraph 3 of this Article) without the consent of any third person and no third person shall be deemed to have been given any interest or right hereunder.

5.     This Agreement may be executed in counterpart copies and shall become effective when copies executed by both parties have been exchanged. The parties intend to execute in all eight (8) counterpart copies hereof.

## ARTICLE XX

## NOTICES

Any notice required by this Agreement shall be in writing and shall be made to the addresses first listed above (or to any address changed by like notice) or to the facsimile numbers listed below:

> Arie Genger
> 2600 Island Boulevard
> Penthouse One
> Williams Island
> Aventura, Florida  33160

With a copy to:

Edward Klimerman, Esq.
Sonnenschein Nath & Rosenthal LLP
1221 Ave. of the Americas,
New York, NY 10010-1089
Fax: (212) 768 6800

Dalia Genger
210 East 65th Street
New York, NY   10021
Fax (212) 735-9021

With a copy to

Carol Robinson Schepp, Esq.
Carter Ledyard & Milburn LLP
2 Wall Street
New York, NY 10005
Fax (212) 732-3200

Any such notice shall be delivered by certified mail, return receipt requested or by personal (receipted) delivery or by confirmed facsimile.  Unless otherwise provided, such notice shall be effective one (1) day after actual receipt of personal or faxed delivery or ten (10) days after mailing, whichever is applicable.

## ARTICLE XXI

### ENTIRE UNDERSTANDING

This Agreement contains the entire understanding of the parties who hereby acknowledge that between them there have been and are no representations, warranties, covenants or undertakings (whether written or oral, express or implied) with respect to the subject matter hereof including, without limitation, all rights or claims arising at law, in equity or pursuant to the parties' marital relationship other than those expressly set forth herein or in the transactions contemplated hereby or entered into concurrently herewith.

1270083.3
1745188RV-2

## ARTICLE XXII

## REPRESENTATIONS AS TO UNDERSTANDING OF THE TERMS OF THIS AGREEMENT

1.      Each party represents that:

(a)     He or she has had independent legal counsel of his or her own selection;

(b)     His or her legal counsel has advised him or her fully (i) with respect to his or her rights in and to the property and income and estate of the other party if they were divorced in the absence of an agreement such as this one and (ii) with respect to the effect of this Agreement on those rights and (iii) with respect to the rights and obligations set forth in this Agreement. Each party additionally acknowledges that he or she understands such advice from counsel and the terms of this Agreement;

(c)     He or she has given due consideration to all the facts and circumstances likely to influence his or her judgment with respect to matters embodied in this Agreement;

(d)     He or she has no educational, medical (including the use of medications, whether prescription or otherwise), psychological, addictive, sociological, language or cultural disability which would prevent him or her from understanding each and every aspect of this Agreement and the legal and economic and personal consequences of executing this Agreement; and

(e)     He or she believes that the provisions of this Agreement are fair and reasonable as of the date of execution of this Agreement, and that he or she believes

54.

that the provisions of this Agreement are not unconscionable now will not be unconscionable in the future.

2.     After time to reflect upon the significance and terms of this Agreement, he or she makes this Agreement freely and voluntarily by him or her and acknowledges that this Agreement has not knowingly been the result of any fraud, duress, coercion or undue influence exercised by either party upon the other or by any other person or persons upon such party.

1270083.3
1745188RV-2

EACH OF THE PARTIES ACKNOWLEDGES:

THAT HE OR SHE HAS CAREFULLY READ THIS AGREEMENT ;

THAT HE OR SHE UNDERSTANDS THE TERMS OF THIS AGREEMENT;

INCLUDING ARTICLE XXII OF THIS AGREEMENT;

THAT HE OR SHE UNDERSTANDS THAT THIS AGREEMENT WILL BE

BINDING ON HIM OR HER IN ALL CIRCUMSTANCES; AND

THAT HE OR SHE HAS HAD A FULL OPPORTUNITY TO CONSULT WITH

(AND HAS CONSULTED WITH) COUNSEL OF HIS OR HER OWN

SELECTION WITH RESPECT THERETO.

IN WITNESS WHEREOF, the parties have hereunto set their respective

hands and seals as of the day and year first above written to eight (8) counterparts hereof,

each of which shall constitute an original.

Witness for the Wife
Carol Robinson Schepp, Esq.

DALIA GENGER

Witness for the Husband
Edward Klimerman, Esq.

ARIE GENGER

1268492.3
1745188RV-2

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

On this 30 day of Oct 2004, before me, the undersigned, a Notary Public in and for the State, personally appeared DALIA GENGER, personally known to me known or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual executed the instrument.

_Deborah Kempf_
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-OIKE 4999904
Qualified in New York County
Commission Expires August 3, 200_

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

On this 28 day of OCT 2004, before me, the undersigned, a Notary Public in and for said State, personally appeared ARIE GENGER, personally known to me known or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that his executed the same in his capacity, and that by his signature on the instrument, the individual executed the instrument.

_Deborah Kempf_
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-OIKE 4999904
Qualified in New York County
Commission Expires August 3, 200_

57

1268492.3
I745188RV-2

CERTIFICATE OF SUBSCRIBING WITNESS

State of New York     )
                      ) ss.
County of New York   )

On the _30_ day of _Oct_ in the year 2004 before me, the undersigned, a Notary Public in and for said State, personally appeared CAROL ROBINSON SCHEPP, the subscribing witness to the foregoing instrument, with whom I am personally acquainted, who, being by me duly sworn, did depose and say that she resides at _____ _165 Circle Drive, Manhasset NY 11030_ ; that she knows DALIA GENGER to be the individual described in and who executed the foregoing instrument; that said subscribing witness was present and saw said DALIA GENGER execute the same; and that said witness at the same time subscribed her name as a witness thereto.

_Deborah Kempf_
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-OIKE 4999904
Qualified in New York County
Commission Expires August 3, 2006

CERTIFICATE OF SUBSCRIBING WITNESS

State of New York     )
                      ) ss.:
County of New York   )

On the _28__ day of _OCT_ in the year 2004 before me, the undersigned, a Notary Public in and for said State, personally appeared EDWARD KLIMERMAN, the subscribing witness to the foregoing instrument, with whom I am personally acquainted, who, being by me duly sworn, did depose and say that he resides at _14 EAST 75 STREET   NEW YORK, NY 10021_ ; that he knows ARIE GENGER to be the individual described in and who executed the foregoing instrument; that said subscribing witness was present and saw said ARIE GENGER execute the same; and that said witness at the same time subscribed his name as a witness thereto.

_Deborah Kempf_
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-OIKE 4999904
Qualified in New York County
Commission Expires August 3, 2006

1268492.3
I745188BV-2

**ARIE GENGER**
2600 Island Blvd.
Williams Island Aventura, FL

October 29, 2004

Mr. Eric Gribetz
920 Park Avenue, Apt. 16A
New York, NY 10028

Mr. David Parnes
38 West 69th Street
New York, NY 10023

RE: Orly Genger 1993 Trust (the "Trust")

Gentlemen:

In connection with the transfer to the Trust of 1,102.80 shares of common stock (the "Shares") of Trans-Resources Inc. ("TRI"), pursuant to the terms and conditions of the Stipulation of Settlement of even date herewith, the Trust is granting to Arie Genger an irrevocable proxy (the "Proxy") for the shares, a copy of which is annexed hereto. In the event that for any reason the Proxy is declared invalid and is no longer in effect, the Trust agrees, as promptly as practicable, to enter into a voting trust agreement (the "Voting Agreement") with Arie Genger as the voting trustee, which shall be in substantially the form annexed hereto. During the time that the Proxy is not in effect and prior to the time the Voting Agreement is entered into, the Trust agrees to vote the Shares as directed in writing by Arie Genger.

Any dispute hereunder shall be resolved, as promptly as practicable, by arbitration (by one arbitrator), in accordance with the rules and regulations of the American Arbitration Association.

This letter agreement is entered into under seal as of the date first written above.

Very truly yours,

ARIE GENGER

AGREED AND ACCEPTED AS OF
THIS 29TH DAY OF OCTOBER, 2004

ORLY GENGER 1993 TRUST

By: _____
Eric Gribetz, Trustee

By: _____
David Parnes, Trustee

17452170V.1

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## D&K GP LLC

This Limited Liability Company Agreement (as amended, modified or supplemented from time to time, the "Agreement") of D&K GP LLC (the "Company") is entered into by Dalia Genger ("Dalia") and Sagi Genger ("Sagi"), as members of the Company (each a "Member"; jointly "Members"; and to the extent the context requires the new Member includes additional members as permitted herein).

Whereas, concurrently herewith, Dalia has caused the Company to be formed in Delaware and has transferred to the Company her general partnership interest in D&K LP, a Delaware limited partnership (the "LP") and $1.00 in exchange for a 99% membership interest in the Company; and

Whereas, concurrently herewith Sagi has acquired the remaining 1% membership interest in the Company for $1.00;

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound, the parties hereto hereby agree as follows:

1.   Formation.  The Members hereby acknowledges that Dalia, as organizer, filed the Articles of Organization of the Company in the Office of the Secretary of State of Delaware on October 21, 2004 solely for the purpose of forming a limited liability company pursuant to and in accordance with the provisions of the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq. (the "Delaware Act"), and hereby agrees to the terms and conditions of the Limited Liability Company Agreement of the Company, as follows:

2.   Name.  The name of the Company is D&K GP LLC.

3.   Purpose.  The Company is formed to engage in any lawful act or activity for which limited liability companies may be formed under the Delaware Act.

4.   Offices.  The principal business office of the Company shall be located at 200 West 57 Street, Suite 1208, New York, NY 10019.  The Company may have such additional

1268503.2

offices located at such place or places inside or outside the State of Delaware as the Members may designate from time to time.

The registered office of the Company in the State of Delaware is located at 2711 Centerville Road, Suite 400, Wilmington, DE 19808. The registered agent of the Company for service of process at such address is Corporation Service Company.

5. **Management and Powers.** The business and affairs of the Company shall be managed by the Members through a manager to have with the power to do any and all acts necessary or convenient to or in furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by a manager under the Delaware Act ("Manager"). The Manager shall be selected solely by Sagi Genger or by Sagi Genger's assignee or successor in interest, as the case may be. It is the current intent of the parties hereto that the Company will act as general partner of D&K Limited Partnership, a Delaware limited partnership, and it will not engage in any activities unrelated to its acting as such general partner.

6. **Admission of Additional Members.** After the date hereto, one or more additional Members may be admitted to the Company with the consent of the Members. After the first such additional Member or Members have been admitted to the Company, subsequent additional Members may be admitted to the Company with the consent of a majority in interest of the Members.

7. **Assignments.** The Members may assign their interest in the Company in whole or in part. However, no Member may assign his interest in the Company in whole or in part without the consent of all other Members.

8. **Withdrawal of a Member.** No Member may withdraw from the Company prior to its dissolution, or without the consent of all other Members.

9. **Capital Contributions.** The Members have, each, made a capital contribution to the Company as specified in Schedule A, thereby acquiring the specified percentage interest in the Company. After and each time any additional Member has been admitted to the Company, a Schedule A, setting forth the name and address of each of the Members and his or her respective capital contribution and percentage interest, shall be prepared, dated and annexed to this Limited Liability Company Agreement.

10. **Additional Contributions.** No Member is required to make any additional capital contribution to the Company.

11. **Allocation of Profits and Losses.** The Company's profits and losses shall be allocated to the Members in proportion to the interests of the Members.

12. **Distributions.** Distributions shall be made to the Members at the times and in the aggregate amounts determined by Manager.

13. **Liability of Members.** The Members shall not have any liability for the obligations or liabilities of the Company.

14.  Exculpation and Indemnification of Managers. The Company shall indemnify and hold harmless the Members, any and each additional Member admitted to the Company and any Manager against any and all claims and demands whatsoever, to the fullest extent permitted by the Delaware Act, as amended, modified or supplemented from time to time.

16.  Governing Law. This Agreement shall be governed by, and construed under, the laws of the State of Delaware, all rights and remedies being governed by said laws.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Limited Liability Company Agreement as of the 26th October, 2004.

Members

_____
Dalia Genger

_____
Sagi Genger

Formed 10/21/04
Transfer D⊕S
10/26/04

1268503.2                                   - 3 -

# TPR INVESTMETN ASSOCIATES, INC.

## SHAREHOLDERS AGREEMENT

SHAREHOLDERS AGREEMENT, dated as of October 30, 2004, among D&K Limited Partnership, a Delaware limited partnership ("D&K"), and Dalia Genger, an individual residing at 210 East 65th Street, Apt 11J, New York, NY 10021("Dalia Genger") (collectively the "Shareholders" and individually, a "Shareholder") and TPR Investment Associates, Inc., a Delaware corporation (the "Corporation").

## WITNESSETH:

WHEREAS, D&K owns a direct interest in the Corporation of 49% of the outstanding capital stock of the Corporation; and

WHEREAS, Dalia Genger owns a direct interest in the Corporation of the remanining 51% of the outstanding capital stock of the Corporation, and 4% of D&K, which constitutes a 1.47% indirect interest in the Corporation; and

WHEREAS, the parties desire to enter into this Agreement in order to provide for the management of the Corporation and to impose certain restrictions with respect to the sale, transfer or other disposition of the shares of the capital stock of the Corporation ("Shares") upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter set forth, the parties hereto agree as follows:

## SECTION 1

## LEGENDS

All certificates representing shares of Common Stock issued by the Corporation, after the date hereof, to either of the Shareholders shall be subject to this Agreement and shall bear the following legends:

"The shares evidenced by this certificate or any certificate issued

in exchange or transfer therefor are and will be subject to, and may not be transferred except in accordance with, the terms of a certain Shareholders Agreement, dated as of October 30, 2004, by and among the Shareholders of the Corporation and the Corporation, which agreement provides, among other things, for restrictions on the sale, transfer and disposition of the shares of the Corporation, an executed copy of which agreement is on file at the principal office of the Corporation."

## SECTION 2

## MANAGEMENT OF THE CORPORATION

2.1   <u>Board of Directors</u>.  The Board of Directors of the Corporation ("Board") shall initially consist of two (2) directors, as follows:

(i) Dalia Genger shall be a director, and shall have the right to appoint a director in her stead; and

(ii) D&K shall have the right to appoint a director; the first director appointed by D&K shall be Mr. Sagi Genger ("Sagi").

2.2   <u>Management</u>.  Sagi will be appointed by the Board, to serve as Chief Executive Officer of the Corporation, and David Parnes will be appointed by the Board to serve as Vice President.  Compensation of the Corporation's officers will be set by the Board.

## SECTION 3

## RESTRICTIONS ON SALES OR OTHER
## DISPOSITION OF COMMON STOCK

3.1   <u>Sale of Shares of Common Stock</u>.  During the term of this Agreement, the

parties to this Agreement shall not, either directly or indirectly, sell, assign, pledge, transfer, mortgage, grant any lien or security interest in, convey or otherwise dispose of, encumber or grant any other interest in ("Transfer"), all or any Shares now owned or hereafter acquired by each party, except as hereinafter provided. The term "Shares" as used in this Agreement shall include all shares of Common Stock, whether presently issued or hereafter acquired, scrip representing fractional shares of Common Stock, options, rights and warrants for shares of Common Stock, securities convertible into or exchangeable for shares of Common Stock, or shares of Common Stock received by way of dividend or upon an increase, reduction, substitution or reclassification of the Common Stock, or upon any reorganization of the Corporation or any other interest or right in and to shares of Common Stock of the Corporation.

3.2    <u>Board Approval</u>. No Shareholder shall Transfer any Shares or any interest in any Shares owned by such Shareholder, in whole or in part, and no such attempted Transfer shall be treated as effective for any purpose without obtaining the prior written consent of the Board.

3.3    <u>Sale of Shares and Determination of Buy-Out Price</u>. If a Shareholder desires to Transfer all of the Shares owned by such Shareholder (the "<u>Initiating Shareholder</u>"), such Initiating Shareholder shall notify the other Shareholder in writing (the "<u>Sale Notice</u>"), stating the total number of Shares, owned directly and indirectly by the Initiating Shareholder, which are to be Transferred. The Initiating Shareholder and the other Shareholder will meet, no later than two calendar months following receipt of the Sale Notice by the other Shareholder (the "<u>Sale Meeting</u>") at which time the Shareholders will determine the Buy-Out Price. Prior to a Sale Meeting, the books of the Corporation will be open to the Shareholders and they will cooperate with each other in connection with the impending sale. In addition, up to date audited financials for the Corporation will be provided to the Shareholders. The Corporation will reasonably cooperate with any outside expert hired by any Shareholder to assist in the sale process.

(a)    *The Sale Meeting.* At the Sale Meeting the Shareholders will adhere to the following process:

(i) a coin will be tossed in the air by a person mutually acceptable to the Shareholders;

(ii) the Initiating Shareholder will be designated as "Head" (i.e. - the side of the coin where the profile of a person is impressed) and the other Shareholder will be designated as "Tail" (i.e. - the other side of the coin);

(iii) if the Head side of the coin shall lay face up - the Initiating Shareholder will become the Evaluating Shareholder, and if the Tail side of the coin shall lay face up - the other Shareholder shall become the Evaluating Shareholder;

(iv) the Evaluating Shareholder shall value and indicate in writing within seven (7) business days following the coin toss to the other Shareholder (the "Notified Shareholder"), the sum at which he or she values one Share ("Evaluated Share Value");

(v) within seven (7) business days following receipt of the Evaluated Share Value from the Evaluating Shareholder ("Determination Date"), the Notified Shareholder shall notify the Evaluating Shareholder in writing whether he intends to acquire from, or to sell to, the Evaluating Shareholder his Shares (based on the Evaluated Share Value and the number of Shares in question) in which case the Notified Shareholder shall agree to either (a) remit to the Evaluating Shareholder the appropriate amount based on the Evaluated Share Value, or (b) receive from the Evaluating Shareholder the appropriate amount based on the Evaluated Share Value.

"Transferring Shareholder" shall mean the Shareholder that ultimately pays to the

other Shareholder, by way of advancement and a Note, the Buy Out Price, and "Purchasing Shareholder" shall me the Shareholder that ultimately receives, by way of advancement and a Note, the Buy Out Price.

(b)   *Closing and Payment of Buyout Price*  The consummation of the sale of the Shares (the "Closing") shall be held in the offices of the Corporation, or at such other location as agreed by the Shareholders, at 10:00 a.m. on the twentieth (20th) business day following the Sale Meeting (the "Closing Date").

(i) On or before the Closing Date, the Transferring Shareholder shall deliver duly executed certificates in valid form evidencing the Shares to be sold and purchased, duly endorsed for transfer, free and clear of any liens or encumbrances;

(ii)   on or before sixty (60) days from the Closing Date ("Initial Payment"), the Purchasing Shareholder shall deliver to the Transferring Shareholder immediately available funds by wire transmit to an account designated by the Transferring Shareholder, or a certified or bank check, in an amount equal to no less ten percent (10%) of the applicable Buyout Price;

(iii)   any remaining balance of the applicable Buyout Price shall be paid by the Purchasing Shareholder on or before the seventh monthly anniversary of the Initial Payment (the "Ending Date") .

(c)   *Participation of Corporation.* In order to facilitate the Transfer of Shares, from the Transferring Shareholder to the Purchasing Shareholder, the Corporation will provide the necessary funds, in lieu of the Purchasing Shareholder, to pay the Buyout Price to the Transferring Shareholder. The Shareholders agree to cause the Corporation to provide such funds, and will

execute and deliver all of the documents reasonably necessary for the Corporation to effectuate the foregoing payment, including, without limitation, necessary resolutions and consents.

(d)    *Board and Management Participation*. From the Determination Date through the Ending Date, the Transferring Shareholder will not actively engage in the management of the Corporation, and will abstain from voting - or cause his/her appointed member on the Board to vote, in any way inconsistent with the vote of the Purchasing Shareholder.

## SECTION 4

## TERM

This Agreement shall terminate either by (i) the consent of the parties hereto, or (ii) upon the consummation of the transfer of Shares, and the receipt of the full Buyout Price by the Transferring Shareholder on the Ending Date.

## SECTION 5

## MISCELLANEOUS

5.1    Complete Agreement.  This Agreement constitutes the complete understanding among the parties hereto with respect to the subject matter hereof, and, no amendment or modification or waiver hereof shall be valid unless made pursuant to an instrument in writing signed by the party against whom such amendment, modification or waiver is sought to be enforced.

5.2    Successors and Assigns.  All of the terms and provisions of this Agreement shall inure to the benefit of and be binding upon the heirs, successors, personal representatives, successors and permitted assigns of the respective parties hereto.

5.3   Waivers. The failure of any party hereto to give notice of the breach or non-fulfillment of any term or condition of this Agreement shall not constitute a waiver thereof, nor shall the waiver of any breach or non-fulfillment of any term or condition of this Agreement constitute a waiver of any other breach or non-fulfillment of that or any other term or condition of this Agreement.

5.4   Amendments. This Agreement may be amended at any time by a writing setting forth such amendment, signed by the Corporation and by both of the Shareholders and/or their permitted designees, it being understood that any such amendment shall not affect any rights or obligations which may have arisen prior thereto by virtue of the operation of the provisions of this Agreement.

5.5   Future Instruments. Each of the parties hereto agrees to execute and deliver all such future instruments and take such other and further action as may be reasonably necessary or appropriate to carry out the provisions of the Agreement and the intention of the parties as expressed herein.

5.6   Governing Law. This Agreement will be governed and interpreted in accordance with laws of the State of Delaware, without application of its conflicts of law provisions.

5.7   Arbitration. Any controversy, claim or dispute between the parties directly or indirectly arising out of this Agreement shall be settled by arbitration, held in Manhattan, New York. Either party may give written notification to the other party requesting arbitration to resolve any controversy, claim or dispute arising out of this Agreement between the parties.

In the event that a dispute is submitted to arbitration, there shall be one (1) arbitrator (the "Arbitrator") selected (x) by the parties or (y) if the parties fail to select an Arbitrator within twenty (20) days following receipt of a list of potential arbitrators from the American Arbitration Association ("AAA"), the Arbitrator shall be selected by the AAA. The Arbitration shall be conducted as promptly as practicable after the selection of the Arbitrator in accordance with the Commercial Arbitration Rules and Mediation

Procedures. The Arbitrator shall be someone who has at least fifteen (15) years of commercial law experience or who was a judge of a court of general jurisdiction.

5.8 <u>Notices</u>. All notices, offers, acceptances and other communications to be made, served or given hereunder (each, a "Notice") shall be in writing and shall be sent by overnight courier service, certified mail, return receipt requested, postage prepaid, or personally delivered, to the recipient party's address set forth on the signature page hereof or shall be sent by electronically confirmed facsimile transmission to the recipient party's facsimile transmission number if such a facsimile transmission number is set forth on the signature page hereof. Such Notices shall also be sent to the recipient Shareholder's attorney at the address or facsimile transmission number of such attorney set forth beneath such Shareholder's signature hereto. Either Shareholder may, by Notice to the other Shareholder given in the manner prescribed above in this Paragraph, designate another address or transmission number to which Notices to him and/or his attorney shall be sent. All Notices made or given in accordance herewith shall be effective on the date of facsimile transmission or personal delivery, the day on which delivery by overnight courier service is guaranteed, or three (3) days after mailing, provided such Notice is in fact received.

5.9 <u>Miscellaneous</u>. Each of the Shareholders agrees that he will consent to and approve any amendment of the Certificate of Incorporation or By-laws of the Corporation which may be necessary or advisable in order to conform any of the provisions of this Agreement or any amendments hereto to the applicable laws of the State of Delaware as now in effect or hereafter enacted.

5.10 <u>Separability of Provisions</u>. Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid or contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

5.11 <u>Section Headings</u>. The Section headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation hereto.

5.12   Counterparts. This Agreement may be executed in any number of counterparts, and by different parties on separate counterparts. All such counterparts together shall constitute one and the same instrument.

5.13   Number and Gender. Each definition or pronoun herein shall be deemed to refer to the singular, plural, masculine, feminine or neuter as the context requires. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

\*\* \*\* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IN WITNESS WHEREOF, the parties hereto have duly executed this Shareholders Agreement as of the day and year first above written.

TPR Investment Associates, Inc.
By: Sagi Genger, its Chief Executive Officer

D&K Limited Partnership
By: D&K GP LLC, its general partners
By: Sagi Genger, its manager

Dalia Genger



# TPR / TRI / D&K Ownership
October 26, 2004

# Memorandum

**To:**    David Parnes

**CC:**    Dalia Genger

**From:**  Sagi Genger

**Date:**  August 2, 2006

**Re:**    Assignment by TPR of D&K LP's 1993 Promissory Note

Dear David,

This will set in writing what I recently proposed to you:



1. I fully acknowledge the commitment to you to sponsor your MBA studies;

2. Instead of making the next payment due, in connection with the MBA fees (approximately $12,000), TPR Investment Associates Inc. ("TPR") will assign to you a promissory note made in its favor by D&K LP ("Note").

3. This promissory Note will be assigned to you on an 'as is' basis.

4. D&K LP and its partners have a variety of claims against TPR, and deny the enforceability of the Note.

5. Collections by you on the Note will be deposited into a separate account, preferably with a mutually acceptable escrow agent. Such amounts collected will be released to you on the earlier of (a) December 31, 2013, or (b) your declaration that you will make no further claims in connection with the Note.

6. D&K will refrain from making claims against TPR, so long as the Note is not enforced by you against it. However, should your collection efforts result in, D&K making a counter-claim against TPR – the funds in the escrow account will be applied towards TPR's defense and any other related outlays, before making any distributions therefrom.

7. You will not assign the Note to any third party without the consent of D&K and TPR.

*August 2, 2006*

8.  TPR will retain the right to 7.5% of your net collections and the right to enforce the note.

9.  Additional terms in connection with the assignment of the Note will follow.


Be advised that we hereby waive all past, present or future existing conflict of interest we may have.


_____
TPR Investment Associates, Inc.
By: Sagi Genger, President


_____
D&K LP
By: D&K GP LLC
By: Sagi Genger, Managing Member


Read this ___ day of August 2006

_____

2

AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT

OF

D & K LIMITED PARTNERSHIP

This AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT (this "Agreement") of D&K Limited Partnership (the "Partnership") is made as of the 30th day of October , 2004, by and among the 1993 Orly Genger Trust (the "OG Trust"), the 1993 Sagi Genger Trust (the "SG Trust"), each a limited partner of the partnership, and D&K GP LLC, the general partner of the Partnership.

WHEREAS, the Partnership was formed as a limited partnership pursuant to the provisions of the Delaware Limited Partnership Act, by the filing of a Certificate of Limited Partnership with the Office of the Secretary of State of the State of Delaware and the execution of the Limited Partnership Agreement of the Partnership dated as of December 31, 1988 (the "Original Agreement"); and

WHEREAS, the Original Agreement was subsequently amended several times to reflect, among others, the replacement of the limited partners, the replacement of the general partner, as well as amendments to specific provisions of the Original Agreement and amendments thereto; and

WHEREAS, the parties hereto desire to restate all previous amendments and to enter into this Amended and Restated Limited Partnership Agreement of the Partnership to serve as the governing document of the Partnership;

NOW, THEREFORE, in consideration of the mutual promises and agreements herein made and intending to be legally bound hereby, the parties hereby restate the Original Agreement, and amendments thereto, in its entirety to read as follows:

1.  **Formation of Partnership.**   (a) The Partnership was formed, under the name D & K Limited Partnership (the "Partnership"), as a limited partnership under the provisions of the Delaware Limited Partnership Act, as indicated in the preamble of this Agreement, and the execution of the Original Agreement. If requested by the General Partner, the Limited Partners shall promptly execute all certificates and other documents consistent with the terms of this Agreement necessary for the General Partner to accomplish all filing, recording, publishing and other acts as may be appropriate to comply with all requirements for (a) the formation and operation of a limited partnership under the laws of the State of Delaware, (b) if the General Partner deems it advisable, the operation of the Partnership as a limited partnership, or partnership in which the Limited Partners have limited liability, in all jurisdictions where the Partnership proposes to operate and (c) all other filings required to be made by the Partnership.

(b) The general partner of the Partnership is D&K GP LLC, a Delaware limited liability company, and any successor individual or corporation admitted to the Partnership as general partner (the "General Partner"). The limited partners of the Partnership shall be the SG Trust and the OG Trust, and any other persons who are admitted to the Partnership as additional or substituted limited partners in Paragraph 17 (the "Limited Partners") (the Limited Partners and the General Partner, shall be referred to herein as "Partners", and each – a "Partner").

2.  **Purpose.**  The purpose of the Partnership is to acquire and hold an equity interest (initially, represented by 240 common shares) in TPR Investment Associates, Inc., a Delaware corporation ("TPR") and other legal business activities as determined by the General Partner.

3.  **Place of Business.**  The principal place of business of the Partnership shall be located at 1211 Park Avenue, New York, N.Y. 10128, or at such other location(s) as may hereafter be determined by the General Partner on notice to the Limited Partners.

4.  **Term.**  The term of the Partnership shall continue until December 31, 2038; provided, however, that the Partnership shall be dissolved prior to such date upon the happening of any of the following events:

(a) upon the written election to terminate made by the General Partner at any time, which election shall be sent to the other Partners;

(b) upon the death, bankruptcy, incapacity, or other withdrawal of the General Partner, unless within ninety (90) days after such event, all of the Limited Partners elect to reconstitute the Partnership, continue its business and elect a new general partner.

(c) in the event the Partnership has distributed all of its assets.

5. **Capital Contributions**.

(a) The Capital Contributions of the Partners consists of the following: :

| | |
|---|---|
| D&K GP LLC | $50,000 |
| 1993 Sagi Genger Trust | $600,000 |
| 1993 Orly Genger Trust | $600,000 |

(b) Each of the Partners shall assume personal liability under any and all indebtedness incurred by the Partnership to finance (and refinance) the purchase by the Partnership of the equity interest in TPR referred to in Paragraph 2 hereof. The Partners shall share such liability among themselves in accordance with their interests in the Partnership, and any payment by a Partner of its share of such liability shall be deemed to be a contribution to the capital of the Partnership as to which such Partner has no rights of contribution or subrogation.

6. **Interest in Partnership**.   Each Partner's interest in the Partnership shall be equal to the proportion that the then balance in his or her capital account bears to the aggregate balance of all of the Partners' capital accounts; where applicable this computation shall be governed by the specific stipulations in Paragraphs 7 and 8 hereof.

3

7   **Capital Account.**      A capital account has been established as shown per "5(a)". Accounts shall be maintained in accordance with the applicable regulations under the Internal Revenue Service as amended ("the "Code"), and Income Tax Regulations (the "Regulations") promulgated under the Code. Interest shall not be paid on any capital account and no Partner shall have the right to withdraw any part of his capital account until dissolution of the Partnership, and then such distribution or withdrawal shall be governed by paragraph 14 hereof. No Partner shall have the right to bring an action for partition. Each Partner's capital account shall be credited by capital contributions. The parties agree that as of the date hereunder the capital accounts are as per "5(a)" without regard to previous payments made by any of the Partners. In consideration for such, the Partners recognize the note originally issued in the amount of $8,950,000 referred to in paragraph 5 the "Note" as a liability of each Limited Partner to the Partnership as denoted. Partnership rights as per "22" may also be used to enforce collection of the Note by the Partnership. Any attempted interference by a Partner or a person beneficially owning an in interest in the Partnership automatically and irrevocably vests the General Partner with the right to revert the capital account of any Partner to a percentage based upon his actual pro rata contributions, expel, or otherwise suspend the membership and all rights accumulated in connection therewith without notice and hold his share of partnership assets as collateral for payments due. Upon thirty days notice the Partnership may demand full payment of the Limited Partner's pro rata share of the Note.

8.   **Profits and Losses.**   The net profits and net losses of the Partnership shall be shared by the Partners in proportion to the then balances in their respective capital accounts. The terms "net profits" and "net losses" shall mean the net profits and net losses of the Partnership as determined for federal income tax purposes.

9.   **Management.**

(a) Except as expressly provided herein, the management and control of the day-to-day operations of the Partnership and the maintenance of the Partnership property shall rest exclusively with the General Partner. (b) To the fullest extent permitted by law, the General Partner shall have complete authority over and exclusive control and management of the business and affairs of the Partnership and all of the Partnership property and all rights, powers

4

and authority appropriate therefore. The powers and discretion of the General Partner on behalf of the Partnership shall include, but shall not be limited to, making investments, selling assets, lending money for any lawful purpose whatsoever, borrowing money for any lawful purpose whatsoever, borrowing money for any lawful purpose whatsoever (and posting assets of the Partnership as collateral therefore), making tax elections under the Code, making distributions to the Partners (subject to Paragraph 10 hereof), executing guarantees for any lawful purpose whatsoever (and posting assets of the Partnership as collateral therefore) and doing all other acts or things necessary to carry out and implement the purposes of the Partnership, provided that each such action is taken upon reasonable terms to the Partnership. The General Partner may delegate, in writing, any of her powers under this Agreement.

(c) Any document, instrument or agreement to be executed and delivered by and on behalf of the Partnership shall be effective is signed and delivered by the General Partner or a delegee of the General Partner.

(d) Each of the other Partners hereby gives its approval to any action taken or to be taken on behalf of the Partnership by the General Partner, and agrees that it shall have no cause of action against the Partnership or the General Partner except for any claim based upon:

(i) the fraud, bad faith or willful misconduct of a Partner, or

(ii) the breach by a Partner of any provision of this Agreement or of any other written agreement to which the Partnership and such person are parties.

(e) No Limited Partner shall take part in the control or management of the Partnership or of the business of the Partnership, nor shall it have any authority to act for or to bind the Partnership in any way.

(f) The Partners acknowledge that the General Partner, its managing member(s), officers, employees and representatives, as the case may be, are hereby released from all liability and are hereby held harmless for any acts or omission they might have taken in their various capacities, whether as officers, employees, representatives, or the like, of TPR or of the Partnership. The Partners further acknowledge that certain actions between TPR and the Partnership, conducted

5

under the direction, instructions or supervision of said employees, officers, managing members, representatives and the like, would be considered 'self dealing'. The Partners hereby indemnify the General Partner, its managing members, officers, employees, representatives and the like, to the fullest extent permitted by law, from any such actions or omissions including, but not limited to, actions considered 'self dealing'.

10.   **Drawings of Income and Principal.**

(a) After making provisions for current debts and other obligations of the Partnership and establishing reasonable reserves for the reasonable needs of the Partnership's business, the General Partner shall distribute, not less frequently than annually, all of the remaining cash of the Partnership.

(b) During the Partnership year of 2038 all of the then remaining principal and accumulated income of the Partnership shall be distributed to the Partners and, upon the final distribution, the Partnership shall terminate.

(c) All distributions of principal, accumulated income and current income made to the Partners shall be made in proportion to each of the Partner's interest as set forth in Paragraph 6 hereof, and the available amount shall be computed after taking into account debts and reserves such as are permitted under Paragraph 14 hereof.

11.   **Transfer of Partnership Interest.**   A Partner may not sell, assign, or encumber his or its interest in the Partnership or otherwise withdraw or retire from the Partnership without the prior written consent of the other Partners. No sale or exchange of any interest in the Partnership may be made if the transfer of the interest sought to be sold or exchanged may result, in the opinion of legal counsel to the Partnership, in (i) the termination of the Partnership under Section 708 of the Code, or (ii) the violation of any applicable federal or state securities law.

12.   **Title to Property and Bank Accounts.**   The property of the Partnership shall be held in the name of the Partnership or the General Partner as nominee for the Partnership. All Partnership funds shall be deposited in its name in such bank account or accounts as shall be designated by the General Partner and all withdrawals therefrom shall be made upon the

signature of the General Partner or such person or persons as shall be so designated by the General Partner.

13.   **Books.**   The General Partner shall cause the Partnership to keep accounts and complete books and records of the business of the Partnership at the principal place of business of the Partnership, and each Partner shall at all reasonable times have access thereto.

14.   **Termination.**

(a)  Upon the termination and dissolution of the Partnership, if the Partnership is not continued pursuant to the terms of this Agreement, the General Partner or, if there is no General Partner, any person elected by a majority of the Limited Partners to perform such liquidation of the assets of the Partnership, shall proceed with the orderly liquidation of the assets of the Partnership, and the net proceeds of such liquidation shall be applied and distributed in the following order of priority:

( i )  to the payment of any debts and liabilities of the Partnership and the expenses of liquidation;

( ii )   to the establishment of any reserves which the General Partner may deem reasonably necessary to meet any contingent or unforeseen liabilities or obligations of the Partnership or of the Partners arising out of or in connection with the Partnership;

( iii )   the balance, if any, shall be distributed among the Partners in proportion to and to the extent of the then positive balances in their respective capital accounts (as determined after giving effect to all capital account adjustments for the Partnership's taxable year during which the liquidation occurs); and

( iv )  if any Partner has a deficit balance in his or her capital account (as determined after giving effect to all capital account adjustments for the Partnership's taxable year during which the liquidation occurs), such Partner shall be unconditionally obligated to pay the amount of such deficit balance to the Partnership by the end of such taxable year (or, if later, within ninety (90) days after the date of such liquidation), which amounts shall be applied and distributed in accordance with the provisions of this Paragraph. The General Partner may accept in lieu thereof, collateral, assurance of availability of collateral, or other secured guarantees

7

which the General Partner reasonably deems to be adequate substitutes for such Partner's payment.

(b) In the event it becomes necessary to make distribution of Partnership property in kind, such property shall be transferred and conveyed to the Partners so as to vest in each of them as a tenant in common as undivided interest in the whole of said property in proportion to and to the extent of the then balances in their respective capital accounts.

15. **Death of Partner**. The death, bankruptcy, dissolution or withdrawal of a limited partner shall not dissolve the Partnership.

16. **Notice.** All notices and other communications required or permitted under this Agreement shall be in writing and may be personally delivered, sent by first class mail, postage prepaid, or electronically delivered, to an address regularly used by the addressee, with acknowledgement receipt, to the Partners at their addresses as shown from time to time on the records of the Partnership, or as may reasonably be known to the General Partner. Any Partner may specify a different address by notifying the General Partner in writing of such different address. All notices and other communications required or permitted under this Agreement shall be deemed to have been received on the day when personally delivered, on the day the electronic acknowledgement has been received by sender, or three days after being mailed in the manner provided in this Section 16, as the case may be.

17. **Admission of New Partners**. The Partnership may admit a new Partner upon the majority consent of all of the then existing Partners; consent of the General Partner shall be necessary; such consent to be granted or withheld at the General Partner's sole and unfettered discretion.

18. **Governing Law**. The Partnership is formed under the laws of the State of Delaware and the Delaware Uniform Limited Partnership Act.

19.    **Liability of the Partners.**

(a)    Gneral.    The Partnership hereby indemnifies and agrees to hold each Partner harmless with respect to any claim, liability, damage, cost or expense (including reasonable attorney's fees and disbursements) incurred by reason of any act performed or omitted to be performed as a Partner or in connection with the assets or business of the Partnership, except that no Partner shall be indemnified where he or she is found in a final non-appealable judgment to have committed fraud, bad faith or willful misconduct

(b) Indemnification of General Partner

(i)    To the maximum extent permitted by law, the Partnership, its receiver, or its trustee shall indemnify, save harmless, and pay all judgments and claims against the General Partner, and its members and managers, their respective officers, directors, agents, stockholders, members, managers, partners and other Affiliates, and any other person who serves at the request of the General Partner on behalf of the Partnership as an officer, director, member, partner, employee or agent of the Partnership or any other present or future entity (in each case, an "Indemnitee") and all loss, damage or expense incurred by any Indemnitee or by the Partnership by reason of any act performed or omitted to be performed by any Indemnitee in connection with the Partnership (including, but not limited to, attorneys' fees and other costs and expenses incurred by any Indemnitee in connection with the investigation and defense of any action based on any such act or omission, which attorneys' fees and any other costs and expenses shall be paid as incurred, and any amounts expended in the settlement of any claim of liability, loss or damage).

(ii)    Without limiting the generality of the foregoing, in the event of any action by a Limited Partner (other than an Affiliate of the General Partner) against any Indemnitee, including a Partnership derivative suit or any class action, the Partnership shall indemnify, save harmless, and pay all costs and expenses of such Indemnitee, including attorneys' fees incurred in the defense of such action, which shall be paid as incurred.

(iii)    No Indemnitee shall have any liability to the Partnership or the Limited Partners except liabilities of any Indemnitee for any loss, damage or expense which, by a final

judgment or other final adjudication, has been determined to have arisen from such Indemnitee's fraud, willful misconduct or bad faith, which fraud, willful misconduct or bad faith in each case has been determined to have been material to the cause of action adjudicated. Notwithstanding the provisions of Sections 8.4(a) and 8.4(b), no Indemnitee shall be indemnified for any loss, damage or expense if a final judgment or other final adjudication adverse to such Indemnitee establishes that such Indemnitee's loss, damage or expense arose from such Indemnitee's fraud, willful misconduct or bad faith which, in each case, was material to the cause of action so adjudicated and in the event of any such adverse final judgment or other final determination establishing such Indemnitee's fraud, willful misconduct or bad faith material to the cause of action so adjudicated, such Indemnitee shall reimburse to the Partnership any costs and expenses, including attorneys fees, previously advanced to such Indemnitee. Limited Partners shall not be individually obligated with respect to such indemnification beyond their respective Commitments.

20.   **Self-Dealing**. The fact that any Partner is directly or indirectly interested in or connected with any person, firm or corporation employed by the Partnership to render or perform a service or from which or to whom the Partnership may buy or sell merchandise or other property shall not prohibit the General Partner from employing such person, firm or corporation or from dealing with him or her or it, and neither the Partnership nor the other Partners thereof shall have any rights in or to any income or profits derived therefrom by such person, firm or corporation.

21.   **Power of Attorney**. Each Limited Partner hereby constitutes and appoints the General Partner the true and lawful attorney-in-fact for each Limited Partner and in the name, place and stead of each Limited Partner from time to time to execute and file:

(i)   any certificates and other instruments which may be required to be filed by the Partnership under the laws of the State of Delaware or any other governmental authority having jurisdiction thereover, or which he General Partner shall deem it advisable, in its sole discretion, to file;

(ii)      any certificates or other instruments amending or modifying the
          Certificate of Limited Partnership of the Partnership as provided therein;

(iii)     any certificates or other instruments which may be required to effectuate
          the dissolution and termination of the partnership and/or the cancellation
          of the Certificate of Limited Partnership; and

(iv)      any amendment of this Agreement which the General Partner is authorized
          to make in accordance with the provisions of this Agreement.

it being expressly understood and intended by each of the Partners that such powers of attorney
are coupled with an interest. The foregoing powers of attorney shall be irrevocable and shall
survive any assignment of the whole or any part of the interest in the Partnership of a Limited
Partner and shall be binding upon the assignee thereof.

22.    **Authority of General Partner with respect to holdings in TRI**

(a) The Partners acknowledge that each one of the Limited Partners holds 102.80
shares of TRI, representing 19.42766% of the common stock of TRI (each, a "LP TRI
Interest(s)").

(b) The General Partner is hereby conferred the authority, in its sole and
unfettered discretion to mortgage, hypothecate, pledge, create a security interest in or lien upon,
or otherwise encumber the LP TRI Interests, for the benefit of the Partnership or that of third
parties, in connection with the Note.

(c) Should the General Partner encumber the LP TRI Interests, as permitted under
section (b) above - each Limited Partner shall have the right to redeem its LP TRI Interest to the
full extent of such LP's pro-rated participation, responsibility or liability for the unpaid amount
of the Note.

11

(d) Each Limited Partner hereby constitutes and appoints the General Partner the true and lawful attorney in fact for each Limited Partner and in the name, place and stead of each Limited Partner from time to time in connection with (i) placing a mortgage, hypothecate, pledge, creating a security interest in or lien upon, or otherwise encumbering the LP TRI Interests in connection with the Note, (ii) removing such mortgage, hypothecation, pledge, security interest, lien or other encumber, placed on the LP TRI Interests, and (iii) negotiating, settling or otherwise handling or managing any rights attached to, or emanating from, the LP TRI Interest and dealing with the LP TRI Interests until payment of the Note has been resolved.

(e) Each Limited Partner agrees that it shall not during the term of this Agreement either directly or indirectly, transfer, sell, assign, mortgage, hypothecate, pledge, create a security interest in or lien upon, encumber, donate, contribute, place in trust (including a voting trust), or otherwise voluntarily or involuntarily dispose of (each, a "Transfer") said Limited Partner's LP TRI Interest

23. **Authority of General Partner to Vary Tax Allocations; Tax Matters Partner.**

(a) It is the intent of the Partners that each Partner's distributive share of taxable income or tax loss, and of each item of income, gain, loss, preference, deduction, or credit entering into the computation thereof, shall be determined and allocated in accordance with this Agreement to the fullest extent permitted by Section 704(b) of the Code. In order to preserve and protect the determinations and allocations provided for in this Agreement, the General Partner is authorized and directed to allocate tax income, gain, loss, preference, deduction, or credit (or any item thereof) arising in any year differently than as may otherwise be provided for in this Agreement to the extent that allocating tax income, gain, loss, preference, deduction, or credit (or any item thereof) in the manner provided for in this Agreement would cause the determinations and allocations of each Partner's distributive share of tax income, gain, loss, preference, deduction, or credit (or item thereof) not to be permitted by Section 704 (b) of the Code and applicable Regulations.

In making any such new allocations the General Partner is authorized to act only after having been advised by counsel to the Partnership and the accountants for the Partnership

that in their opinion, under Section 704 (b) of the Code and applicable Regulations, ( i ) the new allocation is necessary, and ( ii ) the new allocations is the minimum modification of the allocations otherwise provided for in this Agreement necessary in order to assure that, either in the current year or in any preceding year, each Partner's distributive share of tax income, gain, loss, preference, deduction, or credit (or item thereof) is determined and allocated in accordance with this Agreement to the fullest extent permitted by Section 704 (b) of the Code and applicable Regulations.

If the General Partner is required to make any new allocation in a manner less favorable to the Limited Partners than is otherwise provided for in the Agreement, the General Partner is authorized and directed, insofar as she is advised by counsel and the accountants for the Partnership that it is permitted by Section 704 (b) of the Code and applicable Regulations, to allocate tax income, gain, loss, preference, deduction, or credit (or item thereof) arising in later years in a manner so as to bring the allocations of tax income, gain, loss, preference, deduction, or credit (or item thereof) to the Limited Partners as near as possible to the allocations otherwise contemplated by this Agreement.

(b)    The General Partner is hereby designated as Tax Matters Partner of the Partnership, as provided in the Regulations pursuant to Section 6231 of the Code. Each Partner, by the execution of this Agreement, consents to such designation of the Tax Matters Partner and agrees to execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such consent. The Tax Matters Partner is hereby authorized, but not required:

(i)    to enter into any settlement with the Internal Revenue Service or the Secretary of the Treasury (the "Secretary") with respect to any tax audit or judicial review, in which agreement the Tax Matters Partner may expressly state that such agreement shall bind the other partners, except that such settlement agreement shall not bind any Partner who (within the time prescribed pursuant to the Code and applicable Regulations) files a statement with the Secretary provided that the Tax Matters Partner shall not have the authority to enter into a settlement agreement on the behalf of such Partner;

13

(ii)    in the event that a notice of final administrative judgment at the Partnership level of any item required to be taken into account by a Partner for tax purposes a "final judgment") is mailed to the Tax Matters Partner, to seek judicial review of such final adjustment, including the filing of a petition for readjustment with the Tax Court, the District Court of the United States for the district in which the Partnership's principal place of business is located, or the United States Claims Court;

(iii)    to intervene in any action brought by any other Partner for judicial review of a final adjustment;

(iv)    to file a request for an administrative adjustment with the Secretary at any time and, if any part of such request is not allowed by the Secretary, to file a petition for judicial review with respect to such request;

(v)    to enter into an agreement with the Internal Revenue Service to extend the period for assessing any tax which is attributable to any item required to be taken into account by a Partner for tax purposes, or an item affected by such item; and

(vi)    to take any other action on behalf of the Partners or the Partnership in connection with any administrative or judicial tax proceeding to the extent permitted by applicable law or regulations.

24.    **Agreement in Counterparts**.  This Agreement may be executed in any number of counterparts which together shall constitute one and the same instrument.

25.    **Rules of Construction**.  Each paragraph of this Agreement shall be considered severable, and if for any reason any paragraph or paragraphs herein are determined to be invalid and contrary to any existing or future laws, such invalidity shall not impair the operation or

affect the portions of this Agreement which are valid.

26.   **Headings.**   Headings contained in this Agreement are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope of this Agreement or  the intent of any provisions hereof.

27.   **Creditors.**   None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Partnership, as creditor, or for the benefit of any other individual, corporation or entity.

28.   **Entire Agreement.**   This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith.  No covenant, representation or condition not expresses in this Agreement shall affect or be effective to interpret, change or restrict the express provisions of this Agreement.

29.   **Pronouns.**   All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular and plural as the identity of the person or persons may require.

30.   **Binding Effect**.   This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective heirs, successors, executors, administrators, legal representatives and permitted assigns.

31.   **Further Assurances.**   Each Partner agrees to do such further acts and to execute such documents as may be reasonably requested in furtherance of, and to carry out and implement the purposes of, t his Agreement and the transactions contemplated herein.

32.   **Amendment**.   This Agreement may not be modified except by a writing signed by Partners holding a majority in interest of the Partnership; in the event such majority in interest included only the Limited Partners – the consent of the General Partner shall be required as well.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement, effective on the day and year first written above.

GENERAL PARTNER:

D&K GP LLC
by: Sagi Genger, its managing member

LIMITED PARTNERS:

1993 Sagi Genger Trust
by: Leah Fang, sole trustee

1993 Orly Genger Trust
by: Leah Fang, sole trustee

Restated this ____ day of November, 2007

16

## Meeting of Partners of D&K LP -- Jan. 31, 2009 & Agreement

The undersigned partners having reviewed the status of D&K LP ("D&K") and each of its partners vote as follows to:

1. Indemnify and provide a general release from any claim or right at equity, law, or contract or otherwise the current and former general partner, its officers, the partnership's holdings (including TPR Investment Associates, Inc.) and the officers of its holdings to fullest extent permitted in connection with any claim by the partnership and/or its partners. Irrespective of the above, nothing herein shall serve to release or indemnify Arie Genger, William Dowd, Lawrence Small or Edward Klimerman.

2. Authorize the General Partner on behalf of D&K and each limited partner individually to enter and execute such binding compromise as may be possible and deemed prudent by the GP in connection with the outstanding note from D&K guaranteed 50% by each limited partner. Such note having a balance of about $11,204,685 is presently subject to acceleration. Nothing herein shall derogate from authority already granted the General Partner in the Partnership Agreement.

3. The partners wish to clarify that the authority vested in the General Partner to make limited partners' assets subject to a pledge shall be done in substantially the same manner in which TPR Investment Associates, Inc shares were pledged in conjunction with the aforementioned note. However, the General Partner shall be authorized to sign for the partnership and/or each individual partner.

4. Provide such consideration as the GP may deem fit in entering into any compromise.

5. Waive any objection to the dealings of the GP or its officers based on conflict of interest or otherwise.

6. Request that the General Partner make this resolution part of the Partnership Agreement.

7. Attached is a worksheet calculating the amount owed, $11,204,685.

8. TPR Investment Associate, Inc. has agreed to refrain from enforcing the note against each limited partner for thirty days..

_____
Orly Genger 1993 Trust -- LP

_____
Sagi Genger 1993 Trust — LP

_____
Sagi Genger on behalf of General Partner

_____
TPR Investment Associates, Inc.

Meeting of Partners of D&K LP - Jan. 31, 2008 & Agreement

Partnership having reviewed the affairs of D&K LP ("D&K") and each of its partners vote as follows:

1. Indemnify and provide a general release from any claim or right at equity, law, or contract or otherwise the current and former general partner, its officers, the partnership's holdings including TPR Investment Associates, Inc., and the officers of its holdings to fullest extent permitted in connection with any claim by the partnership and/or its partners. Irrespective of the above, nothing herein shall serve to release or indemnify Arie Genger, William Dowd, Lawrence Small or Edward Klimerman.

2. Authorize the General Partner on behalf of D&K and each limited partner individually to enter and execute such binding compromise as may be possible and deemed prudent by the GP in connection with the outstanding note from D&K guaranteed 50% by each limited partner. Such note having a balance of about $11,204,685 is presently subject to acceleration. Nothing herein shall derogate from authority already granted the General Partner in the Partnership Agreement.

3. The partners wish to clarify that the authority vested in the General Partner to make limited partners' assets subject to a pledge shall be done in substantially the same manner in which TPR Investment Associates, Inc shares were pledged in conjunction with the aforementioned note. However, the General Partner shall be authorized to sign for the partnership and/or each individual partner.

4. Provide such consideration as the GP may deem fit in entering into any compromise.

5. Waive any objection to the dealings of the GP or its officers based on conflict of interest or otherwise.

6. Request that the General Partner make this resolution part of the Partnership Agreement.

7. Attached is a worksheet calculating the amount owed, $11,204,685.

8. TPR Investment Associate, Inc. has agreed to refrain from enforcing the note against each limited partner for thirty days.

_____
Orly Genger 1993 Trust – LP

_____
Sagi Genger 1993 Trust – LP

_____
Sagi Genger on behalf of General Partner

_____
TPR Investment Associates, Inc

| | |
|---|---|
| Rate | 6.1% |
| | Owing |
| Tuesday, October 26, 2004 | 9,880,000 |
| Portion Not Assumed by Parents | 9,484,800 |
| | |
| Friday, October 31, 2008 | 1466 |
| Days in Year | 365 |
| | 4.02 |
| Interest rate for Period | 26.7% |
| | |
| Dollars of Interest | 2,528,289.02 |
| | |
| Amount Due | 12,013,089.02 |
| Payment | (960,000.00) |
| | |
| Net of Payment | 11,053,089.02 |
| | |
| | |
| Saturday, January 31, 2009 | 92 |
| Days in Year | 365 |
| | 0.25 |
| Interest rate for Period | 1.4% |
| Dollars of Interest | 151,595.73 |
| | |
| Current Amount Owed | 11,204,685 |
| | |
| | 5,602,342.38 |

January 10, 2009

Dear Mom,

I understand that my petition to appoint Martin Coleman as Trustee of the Orly Genger 1993 Trust ("Trust") has been denied. My attorneys are reviewing the decision and considering all of my options, including whether to appeal.

For now, and until further notice, it is my strong desire to retain all of the shares of Trans-Resources, Inc. ("TRI") that are currently in the Trust, and I direct you not to sell them. If you are approached, or have been approached, with an offer to purchase any of the TRI shares in the Trust, please notify me immediately. If, despite my wishes, you consider accepting an offer, do not sell any shares until I have a reasonable period of time to maximize the benefit to the Trust, including possible alternative transactions.

As you know, the Trust's TRI shares are subject to an Irrevocable Proxy, dated as of October 29, 2004, in favor of my father, Arie Genger, as well as a voting trust letter agreement with a back-up form of voting trust agreement and voting trust certificate delivered in connection with the Proxy. Copies of those documents are attached. If anyone approaches you about the TRI shares, I insist that you inform them of these facts, and provide them with a copy of this letter and attached documents.

*Orly Genger*   1/10/2009
Orly Genger

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------X

In the Matter of

ORLY GENGER,

                 Petitioner,

        -against-

LEAH FANG, DAVID A. PARNES, THE SAGI
GENGER TRUST, DALIA GENGER, JOEL
ISAACSON and MARTIN COLEMAN,

                 Respondents.

------------------------------------------------------------X

            Index No. 2008/0017

        **NOTICE OF ENTRY OF
           ORDER**

STATE OF NEW YORK   )
                  ) ss.:
COUNTY OF NEW YORK  )

        PLEASE TAKE NOTICE that the within is a true copy of a Decision and Order

of the Surrogate's Court of the State of New York, County of New York, dated December 31,

2008, and duly entered by the Clerk of the Surrogate's Court on December 31, 2008.

Dated: New York, New York
       January 16, 2007

                  SULLIVAN & WORCESTER LLP

                  By: _____
                  Jonathan G. Klortmansky
                  Kimberley R. Chapman
                  1290 Avenue of the Americas, 29th Flr.
                  New York, New York  10104
                  (212) 660-3000
                  *Attorneys for Respondent Dalia Genger*

To:   Eve Rachel Markewich, Esq. (by e-mail and regular mail)
Markewich & Rosenstock LLP
8 East 41st Street, Fifth Floor
New York, NY 10017

Mark Waldstein, Esq. (by e-mail and regular mail)
McLaughlin & Stern
260 Madison Avenue
New York, NY 10016

Matthew Hoffman, Esq. (by e-mail and regular mail)
Barton, Barton & Plotkin, LLP
Graybar Building
420 Lexington Avenue, 18th Floor
New York, NY 10170

Seth Rubenstein, Esq. (by e-mail and regular mail)
26 Court Street
Room 1501
Brooklyn, NY 11242

SURROGATE'S COURT : NEW YORK COUNTY

JAN 0 2 2009

-------------------------------------- X

In the Matter of the Trust Established
on December 13, 1993, by ARIE GENGER
for the Benefit of ORLY GENGER.

File No. 0017/2008

-------------------------------------- X

R O T H , S .

This is a contested application by the primary beneficiary
(Orly Genger) of an irrevocable inter vivos trust established by
her father, Arie Genger, seeking the appointment of a successor
trustee or, alternatively, the appointment of a "special trustee"
to investigate alleged wrongdoing concerning the trust.
Petitioner's mother, Dalia Genger (grantor's former wife),
contends that she is the duly appointed successor trustee and
that there is no basis to appoint another fiduciary for any
purpose.

The trust agreement, dated December 13, 1993, provides for
discretionary income and principal distributions to Orly for life
with remainder to her descendants or, if none, to the grantor's
descendants in trust.

Article SEVENTH (B), (D), (E), and (G) of the trust
instrument sets forth the following procedure for the resignation
of trustees and the appointment of their successors.

A trustee may resign by delivering a signed and acknowledged
instrument of resignation in person or by certified or registered
mail to the other trustee and to either the grantor or the income
beneficiary.  Such resignation is effective upon the receipt of
the acknowledged instrument by the other trustee (if there is

one) and the grantor or the income beneficiary or at such later date as may be specified in the instrument.

A trustee may appoint his or her successor by delivering a signed and acknowledged instrument in the same manner as described above for resignation. Any such appointment, however, is valid only if the appointee qualifies by delivering a signed and acknowledged instrument of acceptance in person or by certified or registered mail to each trustee and the grantor or the income beneficiary within 30 days after the later of 1) the date on which a copy of the appointment instrument is delivered to him or her, and 2) the effective date of the appointment as set forth in the appointment instrument. It is observed that there is no provision that requires a resigning trustee to appoint a successor or that there always be two trustees in office.

The original two trustees served until October 2004, when they resigned and appointed David Parnes and Eric Gribitz as their successors. On February 12, 2007, Mr. Gribitz resigned without appointing a successor. On April 26, 2007, Mr. Parnes resigned and appointed as his successor Leah Fang in a signed and acknowledged instrument. Although Ms. Fang noted her acceptance at the bottom of such instrument, her signature was not acknowledged. However, in another document entitled "Release" executed and acknowledged by Ms. Fang the same day, she, as

2

trustee, purported to discharge Mr. Parnes from liability.  It is undisputed that thereafter Ms. Fang acted as trustee.  Indeed, Ms. Fang's contention that she received a number of requests for information from petitioner and that petitioner referred to her in writing and orally as trustee is not disputed by petitioner.

On December 12, 2007, Ms. Fang, without resigning in accordance with the trust agreement, attempted to appoint Patricia Enriquez, as successor trustee.  Her designation of Ms. Enriquez, however, was by an unacknowledged letter in which she referred to her own resignation as taking effect upon Ms. Enriquez's acceptance of the appointment.  Ms. Enriquez accepted by signing the letter, but such acceptance was not acknowledged and, in any event, there is nothing in the record to suggest that such "acceptance" was delivered in accordance with the trust instrument.  Two weeks later, an attorney for Ms. Enriquez notified petitioner's counsel by email that her client had advised that she had no intention to overcome the procedural omissions.

On January 3, 2008, Ms. Fang and Dalia Genger signed before a notary a memorandum in which Ms. Fang stated that "to the extent that I am still vested with any powers to appoint trustees of the [trust], I confirm your appointment."  The next day, Ms. Fang executed an acknowledged instrument of resignation and appointment of successor trustee naming Dalia as her successor

3

and Dalia, on the same day, executed an acknowledged instrument of acceptance. It is undisputed that such documents were delivered in accordance with the trust requirements.

We address first that portion of the instant application which seeks the appointment of a successor trustee on the ground that Dalia was not validly appointed. In such connection, petitioner argues first that, because Ms. Fang's signature on the bottom of Mr. Parnes's appointment instrument was not acknowledged, she never accepted the position in accordance with the trust agreement (and thus could not appoint Dalia her successor). However, such argument ignores the "Release" mentioned above that Ms. Fang executed the same day. Such instrument, which was signed and duly acknowledged, unequivocally establishes Ms. Fang's acceptance of the position. Since petitioner does not challenge the authenticity of such instrument or Mr. Parnes' contention, supported by the record, that it was delivered in accordance with the trust instrument and, as noted above, petitioner thereafter communicated with Ms. Fang as trustee, Ms. Fang properly qualified as successor trustee.

Petitioner's second argument that, in any event, Ms. Fang's appointment of Dalia was ineffective because Ms. Fang had previously resigned as trustee is also without merit. Simply put, Ms. Fang had not previously resigned because her letter to Ms. Enriquez did not contain the formalities (i.e., an

4

acknowledgment) required by the trust agreement. Moreover, although not a model of clarity, the letter makes clear that Ms. Fang did not intend to leave the trust without a trustee in the event that Ms. Enriquez failed to qualify, which is exactly what happened. Thus, Ms. Fang had authority to appoint Dalia as her successor.

Since there is no dispute that the instrument of resignation and appointment executed by Ms. Fang on January 4, 2008, and Dalia's instrument of acceptance of the same date were executed and delivered in accordance with the trust agreement, Dalia is the duly appointed successor trustee of the trust. To find otherwise would be to ignore the chronology of events and the purpose of the provisions at issue, namely to ensure that the trust always has a fiduciary ready, willing and able to act. The fact that petitioner does not wish her mother to be the fiduciary because she considers her an adversary in a broader intra-family dispute does not provide a basis to ignore the grantor's intent, as reflected in the trust instrument, that an acting trustee, and not the beneficiary, decides who shall become a successor trustee. Accordingly, petitioner's application to appoint a successor trustee is denied.

We next turn to petitioner's alternate request for relief, namely that a "special trustee" be appointed for the "purpose of investigation and taking discovery with respect to the wrongful

5.

dealings concerning the assets and income of the trust."

It is noted initially that petitioner's only allegations of "wrongful dealings" concern a close corporation, TPR Investment Associates, Inc.   She contends that her brother Sagi, who is an officer of TPR, and Dalia, who was a shareholder at the time this proceeding was commenced, are engaged in a "wrongful scheme" to divert assets to themselves and, as a result, Dalia "could not possibly" investigate wrongdoing at TPR, which the petition describes as the "greatest" asset of the trust.

However, the premise of the application, namely that the trust's interest in TPR would enable the trustee to investigate or seek relief from TPR, does not appear to be correct. Petitioner does not dispute Dalia's assertion, supported in the record, that the trust is not a shareholder of TPR at all. Rather, D&K LP, an entity in which the trust owns a 48 percent interest, in turn owns approximately 50 percent of TPR. Petitioner does not explain what appears to be a material misstatement concerning TPR's relationship to the trust.   Nor does she identify how a trustee under such circumstances might be in a position to "investigate and address the TPR issues".

In any event, assuming arguendo that a trustee would somehow be able to investigate alleged misconduct at TPR, petitioner's vague and speculative allegations of "wrongful conduct" at TPR from which Dalia purportedly benefitted do not warrant the

6

appointment of a "special trustee". Similarly, petitioner's allegations (made upon information and belief) that Dalia had knowledge of alleged improper acts by former trustee, David Parnes, in relation to TPR are patently insufficient to warrant the remedy of a "special trustee". In such connection, it is noted that Mr. Parnes and Ms. Fang have been directed to account for their proceedings as trustees (Matter of Genger, NYLJ, Feb. 25, 2008, at 29, col 3), giving petitioner a forum to seek relief for most of the conduct about which she complains.

Finally, it is observed that petitioner has not alleged that Dalia has refused a request for information, which would warrant relief (SCPA 2102), or has failed as trustee to protect trust assets. Indeed, it appears that Dalia (who states that she is ready and able to act as fiduciary) has yet to assume the duties of trustee in deference to her daughter's position in this litigation. As a validly appointed trustee, she should be given the opportunity to do what she deems necessary to manage and protect the trust's assets.

Based upon the foregoing, the appointment of a "special trustee" is unwarranted at this time and, accordingly, the application is denied, without prejudice to renewal if future

circumstances warrant such relief.

This decision constitutes the order of the court.

_____
S U R R O G A T E

Dated: December 31, 2008



## COZEN
## O'CONNOR

A PROFESSIONAL CORPORATION

250 PARK AVENUE   NEW YORK, NY 10177   212.509.9400   800.437.7040   212.986.0604 FAX   www.cozen.com

May 14, 2009

**Judith E. Siegel-Baum**
Direct Phone 212.883.4902
Direct Fax   215.701.2261
jsiegel-baum@cozen.com

**VIA CERTIFIED MAIL/RETURN
RECEIPT REQUESTED
70032260000561425069
AND REGULAR MAIL**

Dalia Genger
200 East 65th Street
Apt. 32W
New York, NY  10021

Re:   Orly Genger 1993 Trust

Ms. Genger:

Please be advised that we represent Orly Genger in her capacity as beneficiary of the Orly Genger 1993 Trust (the "Trust"). You are presently serving as her sole trustee.

Orly has received no information about the assets, income and investments of the Trust and is very concerned that the assets of the Trust have been, or could be, affected by the following lawsuits: Glenclova Investment Co. v. Trans-Resources, Inc., and TPR Investment Associates, Inc. (pending in the Southern District of the State of New York); Robert Smith, TR Investors, LLC and Glenclova Investment Co. v. Trans-Resources, Inc. (pending in Delaware Chancery Court); TR Investors, LLC, Glenclova Investment Co., New TR Equity 1, LLC and New TR Equity II, LLC v. Arie Genger and Trans-Resources, Inc. (pending in Delaware Chancery Court); and New TR Equity, LLC v. Trans-Resources, Inc. (pending in Delaware Chancery Court). Moreover, Orly is concerned that the value of TRI shares owned by the Trust have been impacted by the sale of TRI shares owned by the Sagi Genger 1993 Trust (the "Sagi Trust") to TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC.

Please provide us with the following documents by May 26, 2009:

1.   All documents relating to the assets of the Trust from 2004 through the present.

Dalia Genger
May 14, 2009
Page 2

---

2.      All documents relating to any and all investments and trades made directly by, or indirectly by, the Trust for the period 2004 through the present including, without limitation, all statements of transactions.

3.      All documents relating to all purchases, sales, transfers and assignments of real or personal property directly by, or indirectly by, the Trust from 2004 through the present including, without limitation, closing statements, deeds, title reports, canceled checks, transfer tax documents, appraisals, catalogues and insurance policy riders.

4.      All documents relating to any and all distributions or payments of money or securities directly by, or indirectly by, the Trust for the period 2004 through the present.

5.      All documents relating to any and all dividends or other payments of money received directly by, or indirectly by, the Trust for the period 2004 through the present.

6.      All documents relating to any and all fees, commissions, reimbursement for expenses and other charges or compensation paid directly by, or indirectly by, the Trust for the period 2004 through the present including, without limitation, canceled checks and wire transfer reports.

7.      All documents relating to any promissory notes, accounts payable and debts and loans owed directly by, or indirectly by, the Trust for the period 1993 through the present.

8.      All U.S. and N.Y. Fiduciary Tax Returns including all back-up documents filed since the Trust's inception.

## D & K GP LLC ("D & K GP")

9.      The Trust has an interest in D & K LP ("D & K"). D & K GP is the general partner of D & K. Accordingly, we request the following documents related to D & K GP for the period 2004 through the present including, without limitation, amendments to the Limited Liability Company Agreement of D & K GP LLC, Schedule A (and amendments) to the Limited Liability Company Agreement of D & K GP LLC (i.e., a list of capital contributions made by the Members), a list of Members from 2004 through the present, subscription documents, tax returns, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes, statements of income distribution to you, the Trust, the Sagi Trust, Sagi Genger ("Sagi") and/or to any other party, records of contributions or investments by you, the Orly Trust, the Sagi Trust, Sagi and/or by any other party, cash receipts, cash disbursements journals, general ledgers, a list of employees from 2004 through the present, a list of appointed management and their compensation schedules from 2004 through the present, W-2s issued and 1099s issued.

Dalia Genger
May 14, 2009
Page 3

## D & K LP ("D & K")

10.    All documents relating to D & K for the period 2004 through the present including, without limitation, all partnership agreements and amendments, a list of capital contributions by each partner from 2004 through the present, a list of all partners from 2004 through the present, subscription documents, tax returns, K-1 statements, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes, statements of income distribution to you, the Trust, the Sagi Trust, Sagi and/or to other parties, records of contributions or investments by you, the Trust, the Sagi Trust, Sagi and/or by other parties, cash receipts, cash disbursements journals, general ledgers, a list of employees, W-2s and 1099s.

11.    All documents relating to the sale or assignment of your interest in D & K to Sagi, D & K GP, the Sagi Trust or any other party including, without limitation, the date on which the sale or assignment was made, the purchase and sale agreement (if by sale and not by assignment), transfer documents, closing documents, canceled checks and appraisals.

12.    All documents relating to the assignment of D & K's promissory note in favor of TPR (dated December 21, 1993) to David Parnes (the "Promissory Note").

## TPR Investment Assocs., Inc. ("TPR")

13.    All documents relating to TPR from 2003 though the present including, without limitation, amendments to TPR Investment Associates, Inc. Shareholders Agreement dated October 30, 2004 ("TPR Shareholder Agreement"), shareholder agreements preceding the present TPR Shareholder Agreement, tax returns, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes from all board meetings and Sale Meetings (as that term is defined in §3.3 of the TPR Shareholder Agreement), records of contributions or investments by you, the Trust, the Sagi Trust and/or Sagi, cash receipts, cash disbursements journals, balance sheets, general ledgers, a list of employees, W-2s, 1099s, statements of income distribution to you, the Trust, the Sagi Trust, Sagi and/or to any other party, a list of the board of directors from 2003 through the present and a list of appointed management from 2003 through the present and each of their compensation schedules.

14.    All verification of loan and interest repayments to and from TPR from 2004 to the present.

15.    All documents relating to the sale, assignment and collections received from David Parnes in connection with the Promissory Note.

16.    All documents relating to your sale of each tranche of TPR shares either back to TPR, to Sagi or to any other party including without limitation, a copy of the "Sale Notice" (as that term is defined in §3.3 of the TPR Shareholder Agreement), the "Evaluated Share Value" (as that term is defined in §3.3(a)(v) of the TPR Shareholder Agreement), closing documents, canceled checks and appraisals.

Dalia Genger
May 14, 2009
Page 4

### Trans-Resources, Inc. ("TRI")

17.     All documents relating to TRI from 2003 though the present including, without limitation, shareholder agreements and amendments, tax returns, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes from all board meetings, records of contributions or investments by you, the Trust, the Sagi Trust, Sagi and/or any other party, cash receipts, cash disbursements journals, balance sheets, general ledgers, a list of employees, W-2s, 1099s, and statements of income distribution to you, the Trust, the Sagi Trust, Sagi and/or any other party, a list of all board of director members since 2003 and a list of all appointed management since 2003 and each of their compensation schedules.

18.     The Trust owns TRI shares and as a fiduciary you should have had knowledge that the Sagi Trust sold its TRI shares on August 22, 2008 to TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC. Provide us with all documents relating to the sale of TRI shares by the Sagi Trust.

19.     The assets of the Trust may be affected by the following lawsuits:

(i)     Glenclova Investment Co. v. Trans-Resources, Inc., and TPR Investment Associates, Inc. pending in the United States District Court, Southern District of New York;

(ii)     Robert Smith, TR Investors, LLC and Glenclova Investment Co. v. Trans-Resources, Inc. pending in the Delaware Chancery Court;

(iii)     TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC v. Arie Genger and Trans-Resources, Inc. pending in the Delaware Chancery Court; and

(iv)     New TR Equity, LLC v. Trans-Resources, Inc., pending in the Delaware Chancery Court.

Accordingly, as trustee provide us with copies of documents relating to the above-set-forth proceedings including, without limitation, the pleadings (i.e., the summons, complaint and all motion papers) and correspondence.

20.     All documents related to TRI shares that were issued to the Trust and are being held by Robert Lack, Esq., Friedman Kaplan Seiler & Adleman LLP, 1633 Broadway, New York, New York 10019.

The term "documents" as used above shall mean the original or duplicate copy or draft(s) of any writing or recording of whatever nature, whether written, typed, printed, photocopied, filmed, videotaped or mechanically or electronically sorted or recorded, which is in your possession, custody or control. Moreover, the term "documents" shall include, without limitation, correspondence, e-mails, memoranda, reports, notes, minutes, or records, or telephone conversations, meetings, or conferences, diaries, logs, calendar notes, accounting records, financial statements, books of account, vouchers, invoices, bills, computer tapes, print-outs,

Dalia Genger
May 14, 2009
Page 5

_____

writings, drawings, graphs, charts, photographs, videotape recordings, data compilations from which information can be obtained or translated.

If we do not receive a reply with the information requested on or before May 28, 2009, we will be forced to seek court intervention.


Sincerely,

COZEN O'CONNOR

By:    Judith E. Siegel-Baum

JES:pw
cc:    Orly Genger
       Jonathan G. Kortmansky, Esq.

# PEDOWITZ & MEISTER, LLP

1501 BROADWAY, SUITE 800
NEW YORK, NEW YORK 10036-5501
www.pedowitzmeister.com

212.403.7330 voice
212.354.6614 facsimile
robert.meister@pedowitzmeister.com

June 1, 2009

ARNOLD H. PEDOWITZ
ROBERT A. MEISTER

DAVID HARRISON
RANDI MELNICK

NEW JERSEY OFFICE

285 OLD SHORT HILLS ROAD
SHORT HILLS, N.J. 07078
(973) 912-0005

EMAIL AND UPS

Judith E. Siegel-Baum, Esq.
Cozen & Worcester
250 Park Avenue
New York, NY 10177

Re:   Orly Genger 1993 Trust

Dear Ms. Siegel-Baum:

I write to respond to your May 14th letter to my client, Dalia Genger in her capacity as Trustee of The 1993 Orly Genger Trust (the Trust).

May I start by expressing Mrs. Genger's understanding about the concern that your client, Orly Genger, has about the effect her interests of the various lawsuits your letter mentions. Mrs. Genger has the same concern, particularly since, as we understand it, the *Glenclova* action raises the issue of whether the transfer to the Trust of shares of Trans-Resources, Inc. (TRI) was invalid under the TRI shareholders' agreement.

Having shared that concern, I would like to respond to your letter in narrative form, rather that in the form a response to a litigation demand for production.

All TRI shares are, I am informed, held for the benefit of the shareholders by TRI. Thus Mrs. Genger does not physically possess a share certificate. I am informed that the absence of such a certificate did not prevent The Sagi Genger Trust from selling the shares it was given.

As your client knows, Mrs. Genger became Trustee January 4, 2008, as successor trustee to Leah Fang. Ms. Fang has an accounting pending in Surrogate's Court, New York County, File No. 0017/2008.

Mrs. Genger has not taken any action as Trustee and has not received any dividends or other property or assets in respect of the TRI shares.

As your client knows, D & K LP pledged its 240 shares of the stock of TPR Investment Associates, Inc. (TPR) to secure its December 21, 1993 Note to TPR in the principal amount of

$8,950,000. I believe that your client has the D&K organization papers; if not I'll be glad to copy them for you at your expense, as they're about an inch think. By notice dated 8/31/2008, TPR declared that Note to be in default and subsequently sold the TPR shares for $2,200,000 on February 27, 2009. I attach papers concerning this transaction.

As a result of the foreclosure, the TRI shares are the Trust's only asset.

To date, Mrs. Genger has not filed and fiduciary tax returns, nor submitted any of her expenses for reimbursement by the Trust nor taken any commissions.

Sincerely,

Robert A. Meister

2

# NOTICE OF DEFAULT & ENFORCEMENT of PLEDGE

| To: | Sagi Genger, D&K LP General Manager |
|---|---|
| From: | Yonit Sternberg, TPR Investment Associates, Secretary |
| Date: | 8/31/2008 |
| Re: | Notice of Default and Liquidation of Collateral |

Please be advised that you are in default in the payment of amounts due under that certain Promissory Note dated December 21, 1993 in the original amount of $8,950,000(the "Note") due to the failure to pay any principal or interest due since 2005 and failing to make regular payments since 2000. Such default has continued for more than ten (10) business days. Please be advised that pursuant to the Note we hereby declare that the entire unpaid principal amount of the Note immediately due and payable.

The shares of TPR Investment Associates pledged to TPR as collateral will be liquidated at a public auction if the full Note is not satisfied.

Sagi Genger – TPR Investment Associates, Inc.

CONFIDENTIAL

1

TO:        D&K LIMITED PARTNERSHIP

FROM:      TPR INVESTMENT ASSOCIATES, INC.

           New York, New York
           Tel: 212-729-5076

---------------------------------------------------------------------------------------------------------------

    We will sell all of your 240 shares of common Stock of TPR Investment Associates, Inc.
to the highest qualified bidder in public as follows:

Date:      Friday, February 27, 2009

Time:      2:00 p.m.

Place:     Offices of McLaughlin & Stern, LLP, 260 Madison Avenue, 20th Floor,
           New York, NY 10016

    You are entitled to an accounting of the unpaid indebtedness secured by the property we
intend to sell. You may request an accounting by calling us at 212-729-5076.

    The money that we get from the sale (after paying our costs) will reduce the amount you
owe. If we get less money than you owe, you will still owe us the difference. If we get more
money than you owe, you will get the extra money, unless we must pay it to someone else.

    You can get the property back at any time before we sell it by paying us the full amount
you owe (not just the past due payments), including our expenses. To learn the exact amount you
must pay, call us at 212-729-5076.

    If you want us to explain in writing how we have figured the amount that you owe us, you
may call us at 212-729-5076 or write us at _____ and request a written explanation.

    If you need more information about the sale, call us at 212-729-5076 or write us at
_____.

# CERTIFICATE of SALE and FACT

**Know all men by these presents:** That by virtue of a default in the payment of certain monies due, and pursuant to the terms of a certain Security Agreement dated 12 / 21 / 93 placed in my hands for execution and foreclosure made by:

_D & K Limited Partnership_ _____ (Borrower)

to _TPR Investment Associates, Inc._ _____ (Secured Party)

The Secured Party did on the 27 day of Feb. , 2009 in the manner provided by statute, sell at Public Auction by WILLIAM MANNION, Auctioneer, all the borrower(s) right, title and interest, in and to the collateral consisting of 240 shares of Capital Stock ~~and the appurtenant Proprietary Lease allocated to Apartment No.~~ _____ ~~in the building known as and located at:~~

_of TPR Investment Associates, Inc_ _____

And sold unto _TPR Investment Associates, Inc._ _____

~~of~~ _____

for the sum of $ 2,200,000.— , they being the highest bidder in accordance with the Terms of Sale which were available to all bidders.

That public notice of sale was given prior to its taking place and was duly advertised. This Auction Sale was held at:

_McLaughlin & Stern, 260 Madison Ave., NY, NY_ _____

✓  Sold to the Secured Party, no money exchanged hands except for the auctioneer's fees and expenses of the sale.

—  (The sum of $ _____ of the bid price ~~was paid to the Attorney's for the Secured Party~~ as a down payment.

IN WITNESS WHEREOF, I have hereunto set my hand on the 27th day of February , 2009.

_[signature]_
_____
William Mannion, Auctioneer



## COZEN
## O'CONNOR

A PROFESSIONAL CORPORATION

250 PARK AVENUE    NEW YORK, NY 10177    212.509.9400    800.437.7040    212.986.0604 FAX    www.cozen.com

June 11, 2009

Judith E. Siegel-Baum
Direct Phone 212.883.4902
Direct Fax    215.701.2261
jsiegel-baum@cozen.com

**VIA FACSIMILE, E-MAIL AND US MAIL**

Robert A. Meister, Esq.
Pedowitz and Meister
1501 Braodway
New York, New York  10036

Re:    Orly Genger 1993 Trust

Dear Robert:

In response to your email dated June 10, 2009, we are prepared to meet with you and Dalia, at our offices, if you agree to the following:

1.    You agree that Orly will not be present at the meeting.  Based upon prior meetings Orly has advised us that her involvement in this meeting will be too emotionally difficult.

2.    Dalia stipulates, in writing, that she will not, under any circumstances and until we resolve our differences, sell, transfer or remove the TRI shares from the Orly Trust.  In January 2009 Orly advised Dalia of her strong desire to retain all of the TRI shares currently held by the Orly Trust and specifically directed Dalia not to sell them.

If you agree to the above, we are prepared to schedule a meeting for early next week and are available after 4 p.m. on June 16th and after 2 p.m. on June 17th.  If we do not hear back from you by the close of business on Friday, June 12, 2009 we will assume that you and Dalia are

Robert A. Meister, Esq.
June 11, 2009
Page 2

---

unable to agree to our requests.    I look forward to hearing from you.


Sincerely,



COZEN O'CONNOR

By: Judith E. Siegel-Baum

JES\pw
cc:    Orly Genger

**From:** Robert Meister [mailto:robert.meister@pedowitzmeister.com]
**Sent:** Thursday, June 11, 2009 4:01 PM
**To:** Siegel-Baum, Judith E.
**Cc:** Langan, Suzann; Lehman, Stephanie
**Subject:** RE: Orly Genger 1993 Trust

Dear Judy:  I just received your letter at 3:50 today.  While I have forwarded it to Dalia Genger, other professional commitments make it impossible for me to respond before early next week.  So if we are to have a meeting, we'll have to find different times.

Bob Meister

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------X

In the Matter of:                                          :       Index No. 302436/02

Dalia Genger,                                             :

                          Plaintiff,                      :       AFFIDAVIT OF DALIA GENGER
                                                          :       IN SUPPORT OF PLAINTIFF'S
              -against-                                   :       APPLICATION FOR AN ORDER
                                                          :       OF CONTEMPT AND OTHER
                                                          :       RELIEF AND IN OPPOSITION TO
Arie Genger,                                             :       DEFENDANT'S CROSS MOTION
                                                          :
                          Defendant.                      :
------------------------------------------------------------X

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF NEW YORK       )

**DALIA GENGER, being duly sworn, deposes and says:**

1.    I am the Plaintiff in this action, and submit this affidavit in support of my application that this Court hold my ex-husband, Arie Genger ("Arie"), in contempt for his willful failure to comply with the instructions issued by our son, Sagi Genger ("Sagi"), the attorney-in-fact. The facts stated herein are based upon my personal knowledge unless otherwise stated.

2.    Concurrent with the execution of the Stipulation of Settlement (the "Stipulation") dated October 30, 2004 between Arie and me, it was understood that Sagi would act as Chief Executive Officer of TPR in order to execute various documents required under the Stipulation. It was also understood that the note (the "D&K Note") issued by D&K Limited Partnership dated December 21, 1993, in the principal sum of $8,950,000 and payable to TPR, which was attached as an Exhibit to the Stipulation, would be saleable by Sagi Genger for as little as $10,000. Simultaneous with the execution of the Stipulation, the Board of TPR executed a Board Resolution which gave effect to these understandings. Arie's counsel reviewed the Board

Resolution prior to its execution. He did not state any objection to the Board Resolution, and was satisfied that the Board Resolution reflected the parties' understanding and agreement. A true and correct copy of the Board Resolution is attached hereto. Although the Board Resolution is dated October 31, 2004, it was executed on October 30, 2004.

3. The purpose of the D&K Note Board Resolution was to carry out our understanding that I not be in the position to foreclose on the D&K Note, and to take for myself an interest that Arie and I intended for the children.

4. In August 2006, TPR sold the D&K Note (but retained a nominal contingent interest) for $12,000.

Sworn to before me this 14th day of
February, 2007

_____
Notary Public

DALIA GENGER

KATARZYNA SCHWARTZ
Notary Public, State of New York
No. 01SC6158649
Qualified in Queens County
COMMISSION EXPIRES 01/02/2011

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
ORLY GENGER 1993 Trust Pursuant to
SCPA § 711 (11)

**AFFIDAVIT OF SERVICE**

**FILE NO.:  0017/2008**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

<u>AFFIDAVIT OF SERVICE BY FEDERAL EXPRESS</u>

STATE OF NEW YORK    )
                       ) ss.:
COUNTY OF NEW YORK  )

       JOY GONZALES, being duly sworn, deposes and says:

       I am over 18 years old, am not a party to this action and reside in Bergen County, New Jersey.

       On the 21st day of October, 2010, I served a copy of the within **SECOND AMENDED VERIFIED PETITION FOR REMOVAL OF DALIA GENGER AS TRUSTEE AND REQUEST FOR TEMPORARY RESTRAINING ORDER** upon:

> Robert A. Meister, Esq.
> Pedowitz & Meister LLP
> *Attorneys for Dalia Genger, Trustee*
> 1501 Broadway
> New York, NY 10036

> David Parnes, Esq.
> *as Trustee of The Sagi Genger Trust*
> 29 El Kachi Street
> Tel Aviv, ISRAEL 69497

by Federal Express, an overnight delivery service regularly employed by this firm and with which this firm maintains an account.

                                              _____
                                                JOY GONZALES

Sworn to before me this
21st day of October, 2010

*Suzann P Langan*
Notary Public

SUZANN P. LANGAN
Notary Public, State of New York
No. 01LA5051337
Qualified in Queens County
Commission Expires November 13, 20__



STATE OF NEW YORK
SURROGATE'S COURT: COUNTY OF NEW YORK
-----------------------------------------------------------------X

In the Matter of the Application of ORLY GENGER,       :      File No: 0017/2008
as a person interested, for the removal of       :
DALIA GENGER as Trustee of the Orly Genger 1993       :      **NOTICE OF CHANGE**
Trust pursuant to SCPA § 711(11)       :      **OF ADDRESS**
     :

----------------------------------------------------------- X


To:       Cozen O'Connor
     250 Park Avenue
     New York, NY 10017
     Attn: Gail Goldfarb

     Platzer, Swergold, Karlin, Levine, Goldberg & Jaslow, LLP
     1065 Avenue of the Americas
     New York, NY 10018
     Attn: Ralph Hochberg

     Clerk of Court
     Surrogate's Court, Miscellaneous Department
     31 Chambers Street
     New York, NY 10007

New York County Surrogate's Court
MISCELLANEOUS DEPT.
AUG 28 2012
**FILED**
Clerk

PLEASE TAKE NOTICE that PEDOWITZ & MEISTER LLP, Counsel to Respondent, Dalia

Genger, in the above-captioned matter is relocating. Effective as of August 16, 2012, all future

correspondence, service of pleadings, and other documents submitted in hard copy should be

directed to the following address and telephone number:

             Pedowitz & Meister LLP
             570 Lexington Avenue, 18th Floor
             New York, NY 10022
             (212) 403-7333

Counsels' direct telephone numbers, fax number and email addresses remain unchanged.

DATED: August 23, 2012                              Respectfully submitted,


                                                    PEDOWITZ & MEISTER LLP

                                                    By: _____
                                                         Robert A. Meister, Esq.
                                                         Pedowitz & Meister LLP
                                                         570 Lexington Avenue, 18th Floor
                                                         New York, NY 10022
                                                         (212) 403-7330
                                                         robert.meister@pedowitzmeister.com

SURROGATE'S COURT OF THE STATE OF NEW YORK          File No. 0017/2008
COUNTY OF NEW YORK
-------------------------------------------------------------------------X
In the Matter of the Application of ORLY GENGER, as a
person interested, for the removal of DALIA GENGER as          NOTICE OF
Trustee of the ORLY GENGER 1993 Trust Pursuant to             SUBSTITUTION OF
SCPA § 711 (11)                                                ATTORNEYS
-------------------------------------------------------------------------X

S I R S:

      PLEASE TAKE NOTICE that effective as of the date hereof Platzer, Swergold, Karlin,

Levine, Goldberg & Jaslow, LLP is substituted in the place and stead of Cozen O'Connor as

attorneys for Petitioner Orly Genger in the above captioned proceeding.

      Effective as of the date hereof, demand is made that copies of all papers in the above

captioned action be served upon the undersigned.

Dated: New York, New York
      August 22, 2012

New York County Surrogate's Court
MISCELLANEOUS DEPT.

SEP 1 0 2012

RECEIVED

PLATZER, SWERGOLD, KARLIN, LEVINE,
GOLDBERG & JASLOW, LLP.
Attorneys for Pettioner Orly Genger

By: _____
      Ralph R. Hochberg
1065 Avenue of the Americas
New York, NY 10018

To:    Pedowitz & Meister, LLP.
      Attorneys for Respondent Dalia Genger
      570 Lexington Avenue
      New York, NY 10022

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK    )
                           )ss:.
COUNTY OF NEW YORK)

      **MICHELLE BROWN**, being duly sworn, deposes and says; that deponent is not a party to the action, is over 18 years of age and resides at Bronx, New York.

      That on August 22, 2012, deponent served a copy of the within **NOTICE OF SUBSTITUTION OF ATTORNEYS** upon:

Pedowitz & Meister, LLP.
Attorneys for Respondent Dalia Genger
570 Lexington Avenue
New York, NY 10022

the addresses designated by said individuals or entities for that purpose by depositing a true copy of same enclosed in a post-paid properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service within the State of New York.

**MICHELLE BROWN**

Sworn to before me this
22nd day of August, 2012

**NOTARY PUBLIC**

ANDREW S. MULLER
Notary Public, State of New York
No. 02-MU024147
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires February 28, 2014

PLATZER, SWERGOLD, KARLIN, LEVINE,

ALL-STATE LEGAL®
07181-BF • 07182-BL • 07183-GY • 07184-WH
800.222.0510 www.aslegal.com

Index No. 0017                     Year 20 2008

# SURROGATE'S COURT OF THE STATE OF NEW YORK
# COUNTY OF NEW YORK

In the Matter of the Application of ORLY GENGER, as a person interested, for the removal of
DALIA GENGER as Trustee of the ORLY GENGER 1993 Trust Pursuant to SCPA § 711 (11)

## NOTICE OF SUBSTITUTION OF ATTORNEYS

### PLATZER, SWERGOLD, KARLIN, LEVINE, GOLDBERG & JASLOW, LLP

*Attorneys for*

1065 AVENUE OF THE AMERICAS, 18TH FLOOR
NEW YORK, NEW YORK 10018
TEL: (212) 593-3000
FAX: (212) 593-0353

*Pursuant to 22 NYCRR 130-1.1-a, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, (1) the contentions contained in the annexed document are not frivolous and that (2) if the annexed document is an initiating pleading, (i) the matter was not obtained through illegal conduct, or that if it was, the attorney or other persons responsible for the illegal conduct are not participating in the matter or sharing in any fee earned therefrom and that (ii) if the matter involves potential claims for personal injury or wrongful death, the matter was not obtained in violation of 22 NYCRR 1200.41-a.*

*Dated:* ..............................................   Signature ...............................................................................

Print Signer's Name.................................................................................

*Service of a copy of the within*                                          *is hereby admitted.*

*Dated:*

......................................................................................
*Attorney(s) for*

*PLEASE TAKE NOTICE*

☐ that the within is a (certified) true copy of a
NOTICE OF    entered in the office of the clerk of the within-named Court on                    20
ENTRY

☐ that an Order of which the within is a true copy will be presented for settlement to the
NOTICE OF    Hon.                                        , one of the judges of the within-named Court,
SETTLEMENT   at
             on                 20     , at            M.

*Dated:*

### PLATZER, SWERGOLD, KARLIN, LEVINE, GOLDBERG & JASLOW, LLP

*Attorneys for*

*To:*                                          1065 AVENUE OF THE AMERICAS, 18TH FLOOR
                                               NEW YORK, NEW YORK 10018

*Attorney(s) for*

Filing Fee Paid  $_____
Receipt No.:      _____

STATE OF NEW YORK
SURROGATE'S COURT: COUNTY OF NEW YORK
-------------------------------------------------------------------------------X
In the Matter of the Application for a Compulsory Accounting and
Related Relief by ORLY GENGER, as a person
interested in the ORLY GENGER 1993 TRUST,

                      Petitioner,

      **-against-**

DALIA GENGER,

                    Respondent.

**PETITION FOR A
COMPULSORY ACCOUNTING
AND RELATED RELIEF
SCPA 2205**

File No. 0017/2008 /1A

-------------------------------------------------------------------------------X

To the Surrogate's Court of the County of New York:

It is respectfully alleged:

1. The name, citizenship, and domicile (or, in the case of a corporation, its principal office) of the petitioner(s) are as follows:

Name: ORLY GENGER

Domicile: 780 Greenwich Street, Apartment #4P, New York, NY 10014

Citizen of: United States of America

2. That Respondent, Dalia Genger, is successor Trustee of the Orly Genger 1993 Trust having duly qualified therefor on or about January, 2008.

3. That the fiduciary has not filed an account of her proceedings as fiduciary.

4. The petitioner is [  ] distributee  [  ] legatee  [  ] creditor  [X] other (specify) Orly Genger 1993 Trust's sole beneficiary

and the reason why petitioner(s) wish(es) the fiduciary to account is:

       The Trustee, Dalia Genger, has breached her fiduciary duties to Petitioner by egregiously, willfully, maliciously, deliberately and surreptitiously scheming to pledge, encumber, transfer and dissipate all of the assets of the Orly Trust in violation of her fiduciary duties as Trustee and in violation of the prior Order of this Court dated July 1, 2009 as set forth in detail in the Petitioner's Third Amended Verified Petition seeking, *inter alia,* the removal of Dalia Genger as Trustee of the Orly Trust, which is being filed contemporaneously with this Petition. Further, Dalia Genger refuses to inform Orly Genger of any matters involving the Trust, its assets, income, liabilities and any other matters or actions which affect same.

5.   The persons entitled to notice on an application to suspend, modify or revoke a fiduciary's letters, to appoint a successor fiduciary  or to settle a fiduciary's account (See SCPA Section 2206(2)) are:

| <u>Name</u> | <u>Address</u> | <u>Nature of Interest</u> |
|---|---|---|
| Orly Genger | 780 Greenwich Street, Apartment #4P<br>New York, NY 10014 | Petitioner and<br>Sole Beneficiary |
| Dalia Genger | 200 East 65th Street, Apartment #32W<br>New York, New York 10021 | Sole Trustee |

**[For additional relief pursuant to SCPA §2205 and §2206, check the appropriate box]:**

[X] upon failure to appear on the return date of process without satisfactory excuse therefore, or upon failure to file an account in the time and manner directed by the court, let **DALIA GENGER** show cause why she should not be suspended and why the court should not appoint Joel Isaacson, an eligible person, as temporary fiduciary and to fix a trial date for a hearing on the removal of **DALIA GENGER** whose letters have been suspended and for the appointment of Joel Isaacson, as Successor Fiduciary.

[  ] if the fiduciary is suspended or the fiduciary fails to account in the time and manner directed by the court, why the court should not fix a date for a hearing to take and state the fiduciary's account, in accordance with the proposed accounting attached to the petition, the summary statement of such account has been served herewith.

## [State any further relief requested]

Petitioner respectfully requests that the Court schedule a hearing to determine the amount that DALIA GENGER should be surcharged as a result of her breach of her fiduciary duties to the Orly Genger 1993 Trust and to Petitioner as its sole beneficiary including, but not limited to, a surcharge in the amount of any loss of value of the Orly Genger 1993 Trust's assets and all of the Petitioner's reasonable attorneys' fees, costs and expenses.

Dated: October 10, 2012

1. _Genger_____
(Signature of Petitioner)

_ORLY GENGER_____
(Print Name)

2. _____
(Signature of Petitioner)

_____
(Print Name)

3. _____
(Name of Corporate Petitioner)

_____
(Signature of Officer)

_____
(Print Name and Title of Officer)

STATE OF NEW YORK            )
COUNTY OF NEW YORK           ) ss.:

ORLY GENGER,  being duly sworn deposes and says that I am/we are the petitioner(s)  above named.  I/we have read the foregoing petition and the same is true of my/our own knowledge except as to matters therein stated to be alleged upon information and belief and as to those matters I/we believe them to be true.

_____          _____
(Signature of Petitioner)                              (Signature of Petitioner)

*ORLY GENGER*
_____          _____
(Print Name)                                          (Print Name)

On October 15, 2012, before me personally came ORLY GENGER to me known to be the person described in and who executed the foregoing instrument.  Such person duly swore to such instrument before me and duly acknowledged that she executed the same.

_____                    **Daniel B Fix**
Notary Public                                        Notary Public State of New York
Commission Expires:                                  New York County, LIC# 02FI6239452
(Affix Notary Stamp or Seal)                         Comm Exp 04/18/2015

STATE OF NEW YORK            )
COUNTY OF _____    ) ss.:

The undersigned, a _____ of _____
                              (Title)                                        (Name of Bank or Trust Company)
a corporation duly qualified to act in a fiduciary capacity without further security, being duly sworn, say:

1. VERIFICATION: I have read the foregoing petition subscribed by me and know the contents thereof, and the same is true of my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe it to be true.

_____
(Name of Corporate Petitioner)

_____
(Signature of Officer)

_____
(Print Name and Title of Officer)

On _____, before me personally came _____,
to me known, who duly swore to the foregoing instrument and which did say that he/she resides at _____ and
that he/she is a _____ of _____ the
corporation described in and which executed such instrument, and that he/she signed his/her name thereto by the order of the Board of Directors of the corporation.

_____
Notary Public
Commission Expires:
(Affix Notary Stamp or Seal)

Signature of Attorney: _____

Print Name: _____

Firm Name: _____ Tel. No. ( 212) 593-3000

Address of Attorney: _____

PLATZER, SWERGOLD, KARLIN, LEVINE,

ALL-STATE LEGAL®
07181-BF · 07182-BL · 07183-GY · 07184-WH
800.222.0510 www.aslegal.com

*Index No.* **0017**               *Year* 20 **08**

STATE OF NEW YORK
SURROGATE'S COURT: COUNTY OF NEW YORK

In the Matter of the Application for a Compulsory Accounting and Related Relief by ORLY GENGER,
as a person interested in the ORLY GENGER 1993 TRUST,

                                   Petitioner,

                    -against-

DALIA GENGER,

                                   Respondent.

## PETITION FOR A COMPULSORY ACCOUNTING AND RELATED RELIEF

### PLATZER, SWERGOLD, KARLIN, LEVINE,
### GOLDBERG & JASLOW, LLP

*Attorneys for*        **PLAINTIFF**

1065 AVENUE OF THE AMERICAS, 18th FLOOR
NEW YORK, NEW YORK 10018
TEL: (212) 593-3000
FAX: (212) 593-0353

*Pursuant to 22 NYCRR 130-1.1-a, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, (1) the contentions contained in the annexed document are not frivolous and that (2) if the annexed document is an initiating pleading, (i) the matter was not obtained through illegal conduct, or that if it was, the attorney or other persons responsible for the illegal conduct are not participating in the matter or sharing in any fee earned therefrom and that (ii) if the matter involves potential claims for personal injury or wrongful death, the matter was not obtained in violation of 22 NYCRR 1200.41-a.*

*Dated:* ......................................        Signature ...........................................

                                         Print Signer's Name...........................................

*Service of a copy of the within*                              *is hereby admitted.*

*Dated:*

                    ............................................
                         *Attorney(s) for*

### PLEASE TAKE NOTICE

☐       *that the within is a (certified) true copy of a*
NOTICE OF       *entered in the office of the clerk of the within-named Court on*                    20
ENTRY

☐       *that an Order of which the within is a true copy will be presented for settlement to the*
NOTICE OF       *Hon.                    , one of the judges of the within-named Court,*
SETTLEMENT       *at*
            *on                    20        , at                    M.*

*Dated:*

                         **PLATZER, SWERGOLD, KARLIN, LEVINE,**
                         **GOLDBERG & JASLOW, LLP**
            *Attorneys for*

*To:*                              1065 AVENUE OF THE AMERICAS, 18th FLOOR
                              NEW YORK, NEW YORK 10018

*Attorney(s) for*

TRUST AGREEMENT

BETWEEN

ARIE GENGER

AS GRANTOR

AND

LAWRENCE M. SMALL AND SASH A. SPENCER

AS TRUSTEES

CREATING

THE ORLY GENGER 1993 TRUST

*Account ng —*
*og. Leah.*

Dated: December  *13*  , 1993

Copy 3 of 4

RUBIN BAUM LEVIN CONSTANT & FRIEDMAN
30 ROCKEFELLER PLAZA  •  NEW YORK, N Y 10112

Index to the Orly Genger 1993 Trust Agreement

| Article | Contents | Page |
|---|---|---|
| FIRST: | Disposition of Principal and Income During the Life of the Grantor's Daughter, ORLY GENGER | 1 |
| SECOND: | Continuing Trust for Descendants of the Grantor's Daughter, ORLY GENGER | 5 |
| THIRD: | Disposition of Property if No Descendant of the Grantor is Living | 9 |
| FOURTH: | Additions to the Trusts | 13 |
| FIFTH: | Irrevocability | 13 |
| SIXTH: | Governing Law | 13 |
| SEVENTH: | Trustees | 13 |
| EIGHTH: | Compensation of Trustees | 18 |
| NINTH: | Settlement of Trustees' Accounts; Exoneration of Trustees | 18 |
| TENTH: | Definitions | 21 |
| ELEVENTH: | Administrative Powers | 22 |
| TWELFTH: | Provisions Relating to the GST | 32 |
| THIRTEENTH: | Release of Powers | 37 |
| FOURTEENTH: | Provision with Respect to Closely Held Businesses | 38 |
| FIFTEENTH: | Headings | 39 |
| SIXTEENTH: | Severability | 39 |

TRUST AGREEMENT dated December *13*, 1993, between
ARIE GENGER (now residing at 1067 Fifth Avenue, New York, New
York), as Grantor, and LAWRENCE M. SMALL (now residing at 2804
Woodland Drive, Washington, D.C. 20008) and SASH A. SPENCER (now
residing at 251 Crandon Boulevard, Townhouse 164, Key Biscayne,
Florida 33149), as Trustees.

The Grantor hereby transfers to the Trustees, and the
Trustees hereby acknowledge receipt of, the sum of Six Hundred
Thousand Dollars ($600,000.00), to be held, administered and
disposed of in accordance with the provisions of Article FIRST
hereof. Said sum and any other property that may be received by
the Trustees pursuant to the provisions of Article FOURTH
hereof, and all investments and reinvestments thereof, and all
proceeds thereof which constitute principal, are hereinafter
collectively called "principal."

This Trust Agreement shall be known as the "Orly
Genger 1993 Trust Agreement" and the trust created by Article
FIRST hereof shall be known as the "Orly Genger 1993 Trust."

FIRST:    Disposition of Principal and Income
During the Life of the Grantor's Daughter,
ORLY GENGER.

A.    The Trustees shall hold, manage, invest and rein-
vest the principal of the trust created by this Article, IN
TRUST, and, so long as the Grantor's daughter, ORLY GENGER,
shall live, the Trustees are authorized and empowered to pay
such part, parts or all, if any, of the net income of the trust

created by this Article (hereinafter referred to in this Article as "Orly's Trust") to, or apply such part, parts or all, if any, of such net income for the use or benefit of, such one or more of the following individuals living from time to time in such equal or unequal amounts or proportions, and at such time or times, as the Trustees, in their discretion, shall determine:

    1.   The Grantor's daughter, ORLY GENGER.

    2.   Each descendant of ORLY GENGER.

The Trustees shall accumulate all income of Orly's Trust not so paid to or applied and, at least annually, add such net income to the principal of Orly's Trust.

In making such distributions, the Trustees are requested (but they are not directed) to limit the total amount of the distributions made to any descendant of ORLY GENGER with respect to any calendar year to the amount necessary to increase such descendant's taxable income for United States income tax purposes for such year to the greatest amount that shall still result in such descendant not being subject to United States income taxes at the highest marginal rate in effect for such year, after taking into account all of such descendant's other income and deductions for such year.

B.   The Trustees are authorized and empowered to pay to, or apply for the use or benefit of, the Grantor's said daughter such part, parts or all, if any, of the principal of Orly's Trust, and at such time or times, as said Trustees, in

-2-

their discretion, shall determine, without regard to the interest in the trust of any other person and without regard to the fact that any such payment or application may result in the termination of Orly's Trust.

C.  Upon the death of the Grantor's said daughter, the Trustees shall pay the then principal of Orly's Trust, together with all net income thereof then accrued but not yet collected, and collected but not yet disposed of, as follows:

1.  The Trustees shall pay one-half (1/2) of such income and principal, in such equal or unequal amounts or proportions, to or for the use or benefit of such one or more of the descendants of the Grantor's said daughter, and upon such terms, conditions and trusts, if any, as the Grantor's said daughter, by a provision in her Will expressly referring to this Article of this Trust Agreement, shall validly direct and appoint. If, or to the extent that, the Grantor's said daughter shall fail so validly to direct and appoint such principal and income, the Trustees, at the death of the Grantor's said daughter, shall pay the same, per stirpes, to such of the descendants of the Grantor's said daughter as shall survive her, subject, however, to the provisions of Article SECOND hereof, or, if no descendant of the Grantor's said daughter shall survive her, per stirpes, to such of the Grantor's descendants as shall so survive, or, if no descendant of the Grantor shall so survive, in accordance with the provisions of Article THIRD hereof.

-3-

2.    The Trustees shall pay one-half (1/2) of such income and principal, per stirpes, to such of the descendants of the Grantor's said daughter as shall survive her, subject, however, to the provisions of Article SECOND hereof, or, if no descendant of the Grantor's said daughter shall survive her, per stirpes, to such of the Grantor's descendants as shall so survive, or, if no descendant of the Grantor shall so survive, in accordance with the provisions of Article THIRD hereof

3.    If, pursuant to the provisions of paragraph 1 or paragraph 2 of this Section C, the Trustees are directed to pay a per stirpital share of such income and principal to a descendant of the Grantor, and if at the time the Trustees are so directed there shall be in existence a trust for such descendant under a trust agreement between Arie Genger, as grantor, and Lawrence M. Small and Sash A. Spencer, as trustees, executed on the date hereof and known as the "Sagi Genger 1993 Trust Agreement," the Trustees shall not pay such per stirpital share to such descendant but shall instead pay such per stirpital share to the trustees then acting under said trust agreement, to be disposed of by them pursuant to the provisions of the trust for such descendant under said trust agreement.

D.    Notwithstanding anything herein to the contrary, if any Trustee hereunder shall be one of the potential income beneficiaries of Orly's Trust, such Trustee shall not, in his or her capacity as such a Trustee, have any voice or vote or other-

-4-

wise participate in any decision pertaining to the payment or application of the income or principal of Orly's Trust to or for the use or benefit of him or her in his or her capacity as a beneficiary of such trust or to or for the use or benefit of any person whom he or she has an obligation to support, and, in each such event, the other Trustee or Trustees shall make all decisions relating to such trust that pertain to such matters.

SECOND:    Continuing Trusts for Descendants of the Grantor's Daughter, ORLY GENGER.

A.    If, under any provision of this Trust Agreement, any property is directed to be paid to a descendant of the Grantor's daughter, ORLY GENGER, subject to the provisions of this Article, such property shall not be distributed or paid to such descendant. Instead, the Trustees shall continue to hold such property, IN TRUST (in a separate trust for each such descendant which is referred to in this Article as "such descendant's trust"; provided, however, that if there shall be property so directed to be paid on more than one occasion to any such descendant, all such property shall be held in a single trust for such descendant), and, so long as such descendant shall live before attaining the age of twenty-one (21) years, the Trustees, other than such descendant if he or she shall be a Trustee hereunder, are authorized and empowered to pay to, or apply for the use or benefit of, such descendant, such part, parts or all, if any, of the net income of such descendant's

-5-

trust, and at such time or times, as said Trustees, in their discretion, shall determine, and the Trustees shall accumulate the balance of such net income, if any, and, at least annually, add it to the principal of such descendant's trust; and, so long as such descendant shall live after attaining the age of twenty-one (21) years, the Trustees shall pay to such descendant all of the net income of such descendant's trust in at least quarterly installments.

B.   The Trustees, other than such descendant if he or she shall be a Trustee hereunder, are authorized and empowered to pay to, or apply for the use or benefit of, such descendant, such part, parts or all, if any, of the principal of such descendant's trust, and at such time or times, as said Trustees, in their discretion, shall determine, without regard to the interest in the trust of any other person and without regard to the fact that any such payment or application may result in the termination of the trust.

C.   Upon the death of such descendant (hereinafter referred to in this Article as "such deceased descendant"), the Trustees shall pay the then principal of such deceased descendant's trust, together with all net income thereof accrued but not yet collected, and collected but not yet disposed of, as follows:

-6-

1.   The Trustees shall pay one-half (1/2) of such income and principal, in such equal or unequal amounts or proportions, to or for the use or benefit of such one or more of the descendants of such deceased descendant, and upon such terms, conditions and trusts, if any, as such deceased descendant, by a provision in his or her Will expressly referring to this Article of this Trust Agreement, shall validly direct and appoint.  If, or to the extent that, such deceased descendant shall fail so expressly and so validly to direct and appoint such principal and income, the Trustees shall, at the death of such deceased descendant, pay the same, per stirpes, to such of the descendants of such deceased descendant as shall survive such deceased descendant, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, per stirpes, to such of the descendants as shall so survive of the ancestor of such deceased descendant closest in degree of relationship to such deceased descendant who (i) shall have descendants who shall so survive and (ii) shall have been a descendant of the Grantor or shall have been the Grantor, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, in accordance with the provisions of Article THIRD hereof.

2.   The Trustees shall pay one-half (1/2) of such income and principal, per stirpes, to such of the descendants of such deceased descendant as shall survive such deceased

-7-

descendant, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, per stirpes, to such of the descendants as shall so survive of the ancestor of such deceased descendant closest in degree of relationship to such deceased descendant who (i) shall have descendants who shall so survive and (ii) shall have been a descendant of the Grantor or shall have been the Grantor, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, in accordance with the provisions of Article THIRD hereof.

3.   If, pursuant to the provisions of paragraph 1 or paragraph 2 of this Section C, the Trustees are directed to pay a per stirpital share of such income and principal to a descendant of the Grantor subject to the provisions of this Article, and if at the time the Trustees are so directed there shall be in existence a trust for such descendant under a trust agreement between Arie Genger, as grantor, and Lawrence M. Small and Sash A. Spencer, as trustees, executed on the date hereof and known as the "Sagi Genger 1993 Trust Agreement," the Trustees shall not pay such per stirpital share to such descen- dant subject to the provisions of this Article but shall instead pay such per stirpital share to the trustees then acting under said trust agreement, to be disposed of by them pursuant to the provisions of the trust for such descendant under said trust agreement.

-8-

D.    Notwithstanding anything herein to the contrary, each trust created by the terms of this Article shall terminate, if not sooner terminated, upon the expiration of twenty-one (21) years after the death of the last surviving descendant of the Grantor's parents, SHARGA GENGER and DORA GENGER, who shall have been in being on the date hereof; and the Trustees shall thereupon pay the then principal of any trust terminated in accordance with the provisions of this Section, together with all net income thereof accrued but not yet collected and collected but not yet disposed of, to the descendant of the Grantor with respect to whom such trust is being held.

THIRD:    Disposition of Property if No Descendant of the Grantor is Living.

A.    As used in this Article:

1.    The words "such time" shall mean the time as of which any property is directed to be paid in accordance with the provisions of this Article.

2.    The term "Qualified Charitable Organization" shall mean an organization that shall be qualified as an organization to which contributions and bequests are deductible for both United States income tax, gift tax and estate tax purposes under the provisions of Section 170, Section 2522 and Section 2055 of the Internal Revenue Code.

-9-

B.    If, under any provision of this Trust Agreement, any property is directed to be paid in accordance with the provisions of this Article, the Trustees shall pay such property as follows:

1.    If the Grantor, the Grantor's spouse and/or any one or more descendants of the Grantor shall have caused there to be created a foundation known as The Genger Foundation, and if at such time said Foundation shall be in existence and shall be a Qualified Charitable Organization, then, in such event, the Trustees shall pay such property to said Foundation.

2.    If at such time either The Genger Foundation created as aforesaid shall not be in existence or said Foundation shall be in existence but shall not be a Qualified Charitable Organization, and if at such time the Trustees are authorized under applicable law to cause to be organized a corporation under and in accordance with the laws of any state of the United States which the Trustees, in their discretion, shall select, which corporation (i) shall be known by the name of The Genger Foundation (or by such other name as the Trustees, in their discretion, shall select if the name of The Genger Foundation shall not be available to be utilized as the name of said corporation), (ii) shall have as its purposes the encouragement, promotion, support and enhancement of non-orthodox study and education for children in the State of Israel pertaining to the customs, practices and ancient and modern history of the Jewish

-10-

people and shall maintain all of the property held by it, and use all of the net income thereof received from time to time, for the encouragement, promotion, support and enhancement of such study and education for children, (iii) shall be required to maintain all of the property held by it, and use all of the net income thereof received from time to time, for such purposes, with such property and income to be expended for such purposes in such amounts, at such time or times and to or for the use or benefit of such recipient or recipients as the directors, trustees and/or the officers of such corporation shall, in their discretion, determine from time to time, subject, however, to the other provisions of this paragraph 2, (iv) shall have as its initial directors or trustees the Trustees hereunder, the Grantor's cousin, JEREMIAH WOHLBERG (now residing at 2325 Lindenmere Drive, Merrick, New York), if he shall not then be a Trustee hereunder, and also such other individual or individuals, if any, as may be designated by the Trustees, and thereafter to have as directors or trustees such individuals as shall from time to time be determined as provided for in the certificate of incorporation and/or by-laws of said corporation, and (v) shall be organized and maintained in such manner as to be and continue to be a Qualified Charitable Organization, then, in such event, the Trustees shall organize such a corporation, and the Trustees shall pay such property to such corporation.

-11-

3. If at such time (i) either The Genger Foundation created as aforesaid shall not be in existence or said Foundation shall be in existence but shall not be a Qualified Charitable Organization, and (ii) the Trustees are not authorized under applicable law to cause to be organized a corporation of the nature referred to in paragraph 2 of this Section B, then, in such event, the Trustees shall pay such property to the JEWISH COMMUNAL FUND OF NEW YORK, New York, New York, to be held, administered and disposed of pursuant to the rules and regulations thereof as an Undesignated Philanthropic Fund to be known as the Genger Philanthropic Fund and with the privilege of making advisory recommendations with respect thereto to be held in the first instance by the Trustees, said JEREMIAH WOHLBERG, if he shall not then be a Trustee hereunder, and also by such other individual or individuals, if any, as the Trustees may designate, and thereafter by such other individual or individuals as such designees and their successors acting in such capacity may from time to time designate, and it is requested (but not directed) that the principal and income of such Fund shall be utilized to encourage, promote, support and enhance non-orthodox study and education for children in the State of Israel pertaining to the customs, practices and ancient and modern history of the Jewish people.

-12-

FOURTH:    Additions to the Trusts.

Any person, including the Grantor, by a transfer to take effect during the life of such person or upon the death of such person, may, at any time or times, add to the principal of any trust hereunder any property of any kind or nature acceptable to the Trustees, and any such additional property so received by the Trustees pursuant to the provisions of this Article shall thereafter be deemed to be part of the principal of such trust subject to all of the terms, provisions and conditions of this Trust Agreement.

FIFTH:    Irrevocability.

This Trust Agreement and the trusts hereby created are irrevocable and not subject to amendment or change.

SIXTH:    Governing Law.

This Trust Agreement and the trusts hereby created shall be governed by the laws of the State of New York.

SEVENTH:    Trustees.

A.    The initial Trustees acting hereunder shall be LAWRENCE M. SMALL and SASH A. SPENCER.

B.    Each individual acting as a Trustee hereunder (whether such Trustee is initially a party to this Trust Agreement or a successor Trustee named in Section C of this Article

-13-

or appointed pursuant to the provisions of this Section B) is authorized and empowered to appoint another individual (other than the Grantor) to act in his or her place and stead as a Trustee hereunder.   Each appointment of a successor Trustee hereunder shall be made by the execution of an instrument of appointment signed and acknowledged by the individual who shall have made such appointment and by delivering such instrument in accordance with the provisions of Section G of this Article; and any such appointment may be revoked in the same manner by the individual Trustee who shall have made it at any time before the occurrence of the event or events as of which such appointment shall, by its provisions, become effective.   Any appointment made in accordance with the provisions of this Section B shall be valid only if the individual so appointed shall, within thirty (30) days after the later of (i) the date on which a copy of such instrument of appointment is so delivered to him or her, and (ii) the occurrence of the event or events as of which such appointment shall, by its provisions, become effective, qualify as a successor Trustee under this Trust Agreement in accordance with the provisions of Section D of this Article.   Each successor Trustee named in Section C of this Article or appointed in accordance with the provisions of this Section B shall be vested with the same powers and authority as the initial Trustees who are parties to this Trust Agreement; provided, however, that no such Trustee shall be permitted to exercise any authority or

-14-

power which such Trustee shall be prohibited from exercising by an express provision of this Trust Agreement.

C.   1.   If either LAWRENCE M. SMALL or SASH A. SPENCER shall cease to act as a Trustee hereunder, and no successor Trustee appointed by him pursuant to the provisions of Section B of this Article shall quality and act as a Trustee hereunder, MARTIN A. COLEMAN (now residing at 51 Cambridge Road, Great Neck, New York 11023) shall act as Trustee hereunder.

2.   If MARTIN A. COLEMAN shall fail or cease cease to act as a Trustee hereunder, and no successor Trustee appointed by him pursuant to the provisions of Section B of this Article shall quality and act as a Trustee hereunder, THOMAS G. HARDY (now residing at 935 Park Avenue, New York, New York 10028) shall act as a Trustee hereunder.

D.   Each successor Trustee hereunder shall qualify as such by accepting the trusteeship by the execution of a signed and acknowledged instrument of acceptance and by delivering such instrument in accordance with the provisions of Section G of this Article.

E.   Any individual Trustee hereunder may resign as such a Trustee by the execution of a signed and acknowledged instrument of resignation and by delivering such instrument in accordance with the provisions of Section G of this Article.

-15-

Any such resignation shall become effective upon the receipt of such instrument of resignation by each individual to whom it is delivered or mailed as aforesaid or at such later date as may be specified therein.

F.   If any individual while acting as a Trustee hereunder shall become incapable of discharging his or her responsibilities and duties as such a Trustee by reason of a physical, emotional or intellectual incapacity and such incapacity shall be confirmed by each of two medical doctors in written statements, copies of which shall be delivered or mailed as hereinafter provided. the individual who is so incapacitated shall be deemed for the purposes of construing and applying all of the provisions of this Trust Agreement to have effectively resigned as such Trustee in compliance with the provisions of Section E of this Article, such resignation to be deemed to be effective upon the delivery or mailing of the aforesaid statements as hereinafter provided. Each of the aforesaid statements shall be signed and acknowledged by the medical doctor making the same and copies of the same shall be delivered or mailed by registered or certified mail to the individual, if any, who will become the successor Trustee hereunder in the place and stead of the incapacitated Trustee to whom such statement pertains, to each Trustee, if any, then acting hereunder (other than the incapacitated Trustee to whom such statement pertains), and also to either (i) the Grantor (or, if the Grantor shall not then be

-16-

living, to the executors, administrators or personal representatives of the Grantor's estate), or (ii) any one or more of the adult individuals to whom or for whose use or benefit the income of any trust hereunder may then be paid or applied.

G.   Each instrument directed to be delivered in accordance with the provisions of this Section G shall be delivered in person or by mailing a copy of the same by registered or certified mail to each Trustee, if any, then acting hereunder (other than the Trustee, if any, who shall have executed such instrument), and to either (i) the Grantor (or, if the Grantor is not then living, to the executors, personal representatives or administrators of the Grantor's estate), or (ii) any one or more of the adult individuals to whom or for whose use or benefit the income of any trust hereunder may then be paid or applied.

H.   No bond or other security shall be given by or required in any jurisdiction (whether in the State of New York or elsewhere) of any Trustee at any time acting hereunder (whether such Trustee is named herein or appointed pursuant to the provisions hereof) for the faithful performance of such Trustee's fiduciary duties in any capacity hereunder regardless of whether such Trustee is or may become a non-resident of the State of New York or elsewhere.

-17-

EIGHTH:    Compensation of Trustees.

No Trustee hereunder, whether such Trustee is herein-above named or appointed pursuant to the provisions hereof, shall be entitled to any compensation (other than reimbursement for out-of-pocket expenses) for services rendered as a Trustee hereunder; and each Trustee who is a party to this Trust Agreement or who qualifies as a successor Trustee hereunder as provided herein shall be deemed to have agreed to serve as such Trustee without receiving any such compensation.

NINTH:    Settlement of Trustees' Accounts; Exoneration of Trustees.

A.    To the fullest extent permitted by law, the Trustees shall not be required to file with or render to, and the Grantor waives and excuses the filing with or rendering to, any Court an account of their transactions or inventories, accounts, statements or reports of principal and/or income with respect to any trust created hereunder. Nevertheless, the Trustees may at any time have their accounts judicially settled with respect to any trust created hereunder, and in any such proceeding it shall not be necessary to serve any person who is under a disability if there is another party to the proceeding who is not under any disability and who has the same interest as the person who is under a disability, and, in such event, it shall not be necessary to appoint a guardian ad litem for any such party who is under a disability. The expenses of any such

-18-

account shall be a proper administration expense of the trust to
which such account relates.

B.   If any Trustee shall resign as a Trustee here-
under, the continuing Trustee, if any, or, if there is no con-
tinuing Trustee, any successor Trustee who shall have qualified
to act in accordance with the provisions of Section D of Article
SEVENTH hereof, may deliver to the Trustee so resigning an
instrument whereby such resigning Trustee shall be released and
discharged, to the extent stated therein, ~~or and~~ ~~~~
~~~~ Any such release and discharge shall be
binding upon all persons, whether or not then in being, then or
thereafter interested in either the income or the principal of
any trust hereunder and shall have the force and effect of a
final decree, judgment or order of a court of competent juris-
diction rendered in an appropriate action or proceeding for the
judicial settlement of the account of such Trustee in which
jurisdiction was obtained of all necessary and proper parties.
The foregoing provision, however, shall not preclude any Trustee
so resigning from having his or her account judicially settled,
and in any such proceeding it shall not be necessary to serve
any person who is under a disability if there is another party
to the proceeding who is not under any disability and who has
the same interest as the person who is under a disability, and,
in such event, it shall not be necessary to appoint a guardian

-19-

ad litem for any such party who is under a disability. The expenses of any judicial account rendered by a Trustee who shall resign shall be a proper administration expense of the trust to which such account relates.

C.   In addition to the foregoing, the Trustees are hereby authorized, at any time and from time to time, with respect to any trust hereunder, to settle the account of the Trustees by agreement between the Trustees and the then adult individual or individuals to whom or for whose use or benefit the income of such trust may then be paid or applied and the adult or adults who would be entitled to the principal in case such trust were to terminate at the time of such agreement, excluding any such individual who is under a disability if there is a party to the agreement who is not under any disability and who has the same interest as the individual who is under a disability, which agreement shall bind all persons, whether or not then in being, then or thereafter interested in either the income or the principal of such trust. Any such settlement shall have the same force and effect as a final decree, judgment or order of a court of competent jurisdiction rendered in an appropriate action or proceeding for the judicial settlement of such account in which jurisdiction was obtained of all necessary and proper parties. The expenses of any such account shall be a proper administration expense of such trust.

-20-

D.   To the extent permitted by law, no Trustee shall be accountable, liable or responsible for any act, default, negligence, or omission of any other Trustee.

TENTH:   Definitions.

Wherever used in this Trust Agreement:

1.   The word "Trustees" and all references to the Trustees shall mean and refer to the Trustees and successor Trustees hereinabove named, any successor Trustee appointed pursuant to the provisions hereof, any substitute Trustee appointed by a court of competent jurisdiction, the survivors or survivor of them, and their and each of their successors or successor, as may be acting hereunder from time to time.

2.   The words "IN TRUST" shall mean "in trust, nevertheless, to hold, manage, invest and reinvest, and, until payment thereof as hereinafter directed, to receive the income thereof."

3.   The word "pay" shall, where applicable, mean "convey, transfer and pay" and the word "payment" shall, where applicable, mean "conveyance, transfer and payment."

4.   The words "descendant" and "descendants," when used with respect to any person, shall be deemed to include (i) every individual who is born to such person, (ii) every individual who is lawfully adopted by such person, and (iii)

-21-

every individual who is otherwise descended from such person, whether by birth, or by lawful adoption, or by a combination thereof.

5.   The words "Internal Revenue Code" shall mean and refer to "the United States Internal Revenue Code of 1986 (as amended from time to time)," and any reference to a specific section, chapter or other provision of the Internal Revenue Code shall mean and refer to said section, chapter or other provision and any successor statute thereto pertaining to the same subject matter as said section, chapter or other provision.

ELEVENTH: Administrative Powers.

A.   In addition to and in amplification of the powers given by law to trustees, the Trustees, but solely in their fiduciary capacities, are hereby authorized and empowered, in their discretion:

1.   To sell, exchange, make contracts with respect to, grant options on or otherwise dispose of, at public or private sale, at such prices, on such terms (including sales on credit with or without security) and at such time or times as the Trustees shall determine, any property, real or personal, which may at any time form part of any trust hereunder.

2.   To lease, for such periods (whether or not any such period shall extend beyond the period prescribed by law

-22-