or the probable term of any trust hereunder), on such terms and
conditions and at such time or times as the Trustees shall
determine, the whole or any portion or portions of any property,
real or personal, which may at any time form part of any trust
hereunder, whether the same be held in severalty or as
tenant-in-common with others or in a partnership, syndicate or
joint venture or otherwise, and release and convey any undivided
interest in any such property for the purpose of effecting par-
tition of the whole or any part thereof; and make, place, extend
or renew mortgages, pledges, building loan agreements or build-
ing loan mortgages upon or affecting any and all such property;
and make, execute and deliver such mortgages, pledges and agree-
ments, together with proper bonds, notes or other instruments of
indebtedness to accompany the same, and such extension or
renewal agreements, as to the Trustees shall seem necessary,
advisable or proper; and also to repair, alter, reconstruct,
build upon or improve any such property and on such terms and at
such time or times as the Trustees shall determine, give and
grant to others the right so to do, or agree in, or so modify
any lease affecting any such property that the lessee may alter,
repair, reconstruct, build upon, improve, mortgage and pledge
any such property; and generally to make, alter and modify all
agreements, leases, mortgages, pledges, building loans, sales,
exchanges, transfers and conveyances of or affecting any such
property which the Trustees shall determine to be necessary,
advisable or proper for the preservation, improvement, enhance-

-23-

ment in value of, or betterment of or addition to, such property.

3.  To hold any part or all of the assets of any trust hereunder invested in the same form of property in which the same shall be invested when received by the Trustees, and invest and reinvest the assets of any such trust, or any portion thereof, in any form of investment which the Trustees may determine (including, without limitation, mutual funds, common trust funds, investment trusts, general partnerships and limited partnerships), whether or not such investment is of the nature prescribed by law as a legal investment for fiduciaries or is speculative in nature, and without regard to the percentage of the assets of such trust which such investment or similar investments may constitute.

4.  To vote in person or by proxy all stocks and other securities held by any trust hereunder; grant, exercise, sell or otherwise turn to account rights to subscribe for stock and securities and options of any nature; amortize or refrain from amortizing premiums on bonds or other securities which the Trustees may purchase or receive; participate in reorganizations, mergers, liquidations or dissolutions, and contribute to the expenses of, and deposit securities with, protective committees in connection therewith; participate in voting trusts; and generally exercise, in respect of said stock and securities, all

-24-

rights, powers or privileges which may be lawfully exercised by any person owning similar property in his or her own right.

5.   To employ any investment counsel, corporate custodians, agents, accountants, brokers and attorneys which the Trustees may select and pay the charges thereof (including charges for preparation of trust tax returns, the Trustees' accounts and any other necessary trust records); and the Trustees, or a partnership, corporation or other entity in which any Trustee shall be interested, or by which any Trustee may be employed, may be retained in any such capacity, and, in such event, the charges which shall be payable to such Trustee, or to any such partnership, corporation or other entity, shall be in addition to compensation otherwise allowable to such Trustee and may be paid without prior judicial approval.

6.   In any case in which the Trustees are authorized or required to pay or distribute any share of any trust hereunder, to make such payment or distribution in kind, or partly in kind and partly in money and, in connection therewith, to allocate equal or unequal interests in, or amounts of, specific property in satisfaction of such payment or distribution; provided, however, that any property distributed in kind shall be valued, for purposes of such distribution, at its fair market value on the date of distribution.

-25-

7.   To settle, adjust, compromise or submit to arbitration any dispute, claim or controversy in which any trust hereunder may be in any way interested.

8.   To borrow money from any person, partnership, corporation or other entity, who may be any Trustee or a partnership, corporation or other entity in which any Trustee may be interested, or by which any Trustee may be employed, for the purpose of meeting any and all charges against any trust hereunder or for any other purpose connected with the administration, preservation, improvement or enhancement in value of any such trust, and, in connection with any such borrowing, to pledge, hypothecate or mortgage any part or all of the assets of any such trust.

9.   To keep any or all of the securities at any time forming a part of any trust hereunder in the name of one or more nominees.

10.   In any case where doubt or uncertainty exists under applicable law or this Trust Agreement, to credit receipts and charge expenses to principal or income, or partly to each.

11.   By instrument or instruments signed by all of the Trustees qualified and acting as such at any time with respect to any trust hereunder, to delegate, in whole or in part, to any person or persons (including any one or more of the

-26-

Trustees) the authority and power to (i) sign checks, drafts or orders for the payment or withdrawal of funds from any bank account or other depository in which funds of such trust shall be held, (ii) endorse for sale, transfer or delivery, or sell, transfer or deliver, or purchase or otherwise acquire, any and all stocks, stock warrants, stock rights, bonds or other securities whatsoever with respect to such trust, and (iii) gain access to any safe deposit box which may be in the names of the Trustees and remove part or all of the contents of any such safe deposit box and release and surrender the same.

12.  To pay or deliver to either parent or to the guardian of the property of any minor or to an adult with whom such minor resides, and, with respect to any person for whom it is permissible to do so under applicable law, to a custodian for such person under a Uniform Gifts to Minors Act or Uniform Transfers to Minors Act of any state until the age of eighteen (18) years (or until such age in excess of eighteen (18) years as shall be permissible under applicable law and which the Trustees, in their discretion, shall select) any sum or property, including income, which such minor or such person shall either be entitled to receive or to have applied for his or her use or benefit under any of the provisions hereof, without requiring that such parent, adult or custodian obtain letters of guardianship or that such parent, guardian, adult or custodian give any bond or other security for any such payment or delivery

-27-

so made; and the receipt of such parent, guardian, adult or custodian for the amount of such payment, or for the property so delivered, shall be an absolute protection to the Trustees and a complete release and discharge from all further accountability in respect of any such payment or delivery.

13.   If any beneficiary of any trust hereunder shall, in the opinion of the Trustees, be or become incapacitated (whether by reason of illness, age or other causes) the Trustees may, in their discretion, wholly or partly in lieu of paying net income or principal of such trust to such beneficiary as authorized or directed by this Trust Agreement, dispose of the same in one or more of the following ways:

(a)  by making payment of such net income or principal to a legally appointed guardian or other fiduciary of such beneficiary;

(b)  by making payment of such net income or principal, on behalf of such beneficiary, to any person with whom such beneficiary resides or who has charge of his or her care; and/or

(c)  by applying such net income or principal directly for the use or benefit of such beneficiary.

14.  To remove the assets of, hold and administer any such assets in, and/or move the situs of the administration of any trust hereunder to, such location or locations (which may be in a state or other jurisdiction other than the State of New York) as the Trustees, in their discretion, shall select.  If the Trustees, in their discretion, shall determine it advisable to move the situs of the administration of any trust hereunder to a location where the judicial administration of trusts is required or permitted, the Trustees are authorized to select and request a court in such location having jurisdiction over the administration of trusts to accept jurisdiction over the administration of such trust, and it is requested that such court accept, and that it be permitted to accept, jurisdiction over the administration of such trust; and it is directed that the administration of such trust shall be governed from time to time by the laws of the jurisdiction in which the administration of such trust is then located.

15.  To make, or refrain from making, elections or allocations permitted under any applicable tax law without regard to the effect of any such election or allocation on the interest of any beneficiary of any trust hereunder and, if any such election or allocation shall be made, to apportion, or refrain from apportioning, any benefits thereof among the respective interests of the beneficiaries of such trust, all in such manner as the Trustees shall deem appropriate.

-29-

16. To retain or invest in solido the property held in any trust hereunder with the property held in one or more of the other trusts hereunder or with the property held in any other trust created by the Grantor or by any other person for purposes of convenience or for the better investment thereof.

17. To exercise all authority, powers, privileges and discretion conferred in this Article after the termination of any trust created hereunder and until all of the assets of such trust are fully distributed.

B. No person or party dealing with the Trustees shall be bound to see to the application of any money or other consideration paid by him or her to the Trustees.

C. Neither the principal nor the income of any trust hereunder, or any part thereof, shall or may at any time be liable or subject in any manner whatsoever to the debts or liabilities of any beneficiary entitled to receive any principal or income therefrom; nor shall the principal or income of any trust hereunder be liable to attachment by garnishment proceedings or other legal process issued by any creditor of any beneficiary of such trust for debts heretofore or hereafter contracted by such beneficiary; nor shall any assignment, conveyance, charge, encumbrance or order, either of principal or income, given by any such beneficiary be valid.

-30-

D.    Wherever in this Trust Agreement it is provided that an instrument is to be "acknowledged," such instrument shall be acknowledged in such manner as would be required if the same were a conveyance of real property entitled to be recorded in the State of New York.

E.    1.    To the fullest extent permitted by law, no transaction or decision involving any trust hereunder shall be deemed invalidated in any way by reason of any personal, beneficial or other interest which any Trustee may have with respect to such transaction or decision, including, without limitation, any transaction or decision with respect to any corporation, company, partnership, association, estate, trust or other entity in which any Trustee may have an interest in a capacity other than as a Trustee hereunder, regardless of any conflict of interest as to any such transaction or decision, and any such transaction or decision shall be lawful and proper and shall not be questioned unless such Trustee is guilty of fraud with respect thereto.  Without limiting the foregoing, no Trustee shall be disqualified or barred from acting as such or have any liability hereunder in exercising any power, authority or discretion conferred upon the Trustees by reason of the fact that such Trustee may be a stockholder, officer, director, partner, executor, administrator, personal representative, trustee, beneficiary, or in any other way interested in the corporation, company, partnership, association, estate, trust or other entity

-31-

whose securities or property are the subject matter of the exercise of such power, authority or discretion.

2.    The Trustees hereunder shall be entitled to compensation as officers, directors, fiduciaries or other participants in any such entity notwithstanding the fact that they are Trustees hereunder and are also entitled to receive reimbursement for their out-of-pocket expenses as such Trustees.

F.    The Trustees shall be under no duty or obligation and shall not be liable to any trust hereunder or to any person or persons interested in any trust hereunder or be surcharged for failure to buy, sell or engage in any transaction directly or indirectly involving securities issued or to be issued by any corporation or other business organization concerning which any of the Trustees, in a capacity other than as a Trustee hereunder, may have acquired any information which has not been disclosed to the public.

TWELFTH:  Provisions Relating to the GST.

A.    As used in this Article:

1.    "GST" shall mean and refer to "the United States generation-skipping transfer tax imposed by Chapter 13 of the Internal Revenue Code."

-32-

2. The words "inclusion ratio" shall have the same meaning as those words are given in Section 2642 of the Internal Revenue Code.

3. The words "Net Death Taxes" shall mean and refer to "the aggregate death taxes (including, without limitation, United States, state, local and other estate taxes and inheritance taxes but not including any interest and penalties thereon), after taking into account all applicable credits, payable with respect to the estate of such beneficiary."

B. 1. Notwithstanding any other provision in this Trust Agreement to the contrary, and in addition to any other power of appointment hereinabove given by the previous provisions of this Trust Agreement to any individual at whose death the inclusion ratio with respect to any trust under this Trust Agreement would, but for the provisions of this Section B, be more than zero (such individual being referred to in this Article as "such beneficiary"), the Trustees of such trust are authorized and empowered, by an acknowledged instrument in writing (with such instrument to be filed with the court, if any, then having jurisdiction over such trust, if such court shall accept such instrument for filing), (i) to create in such beneficiary a power (hereinafter referred to in this Section B as "such power"), to be exercised by a provision in his or her Will expressly referring to this Article of this Trust Agreement, to appoint to the creditors of his or her estate any portion of the

-33-

property held in such trust at the death of such beneficiary, and (ii) to limit such power, by formula or otherwise, to less than all of the property held in such trust at the death of such beneficiary; provided, however, that with respect to each such trust, the maximum amount of property over which such power may be created shall not, after taking into account the property, if any, over which any other such power is created in such beneficiary, exceed the amount, if any, above which any further addition to the amount subject to such power would increase the Net Death Taxes determined with respect to such beneficiary's estate by an amount equal to or greater than the net decrease in the aggregate of (x) the GST and (y) any state and/or local tax on generation-skipping transfers imposed as a result of the death of such beneficiary that would result from such further addition. Unless such beneficiary's Will otherwise provides by express reference to this Trust Agreement and such power, the increase in the Net Death Taxes on such beneficiary's estate resulting from such power shall be paid from that part of the principal of such trust over which such power is exercisable. If, or to the extent that, such beneficiary shall fail so expressly and so validly to exercise any power created in such beneficiary by the Trustees pursuant to the provisions of this paragraph, the unappointed portion (or, as the case may be, all) of the property subject to such power shall pass pursuant to the provisions of this Trust Agreement otherwise applicable to such property.

-34-

2.   The Trustees are further authorized and empowered, by an acknowledged instrument in writing (with such instrument to be filed with the court, if any, then having jurisdiction over the trust to which such power relates, if such court shall accept such instrument for filing), to revoke any power created by the Trustees pursuant to the provisions of paragraph 1 of this Section B at any time prior to the death of the beneficiary in whom such power was created, and to release, in the manner set forth in Article THIRTEENTH hereof, the right to create such a power.  The Trustees shall not be liable for any exercise, release or failure to exercise the authority and power granted to them by the provisions of said paragraph 1 or for the revocation of any power created by them pursuant to the provisions of said paragraph 1, provided they utilize good faith in considering whether or not to exercise or release such power or to cause such revocation, whether such consideration be at their own instance or at the request of an individual who is a beneficiary of a trust hereunder, the guardian or other fiduciary of such an individual, or a member of his or her family.

C.   1.   Notwithstanding any other provision in this Trust Agreement to the contrary, if at any time any property is to be placed in a trust under the provisions of any Article of this Trust Agreement, the Trustees shall, if need be, and if it is possible to do so, divide such property and place the same in separate trusts to the end that one such trust shall have an

-35-

inclusion ratio of zero, and if any property which is directed to be added to a trust hereunder shall have an inclusion ratio which is different than the inclusion ratio of such trust, the Trustees shall not make such addition but shall instead administer such property in a separate trust under this Trust Agreement; and, in each such instance, the property to be placed or held in such a separate trust shall be held, administered and disposed of by the Trustees pursuant to provisions identical to the provisions of the trust to which, but for the provisions of this paragraph 1, such property would have been placed or added.

2.   If, pursuant to the provisions of paragraph 1 of this Section C, any property that would otherwise be held in a single trust hereunder is instead held in separate trusts hereunder, the Trustees of such trusts may, at any time or from time to time, (i) make different tax elections and allocations with respect to each such trust, (ii) expend principal and income and exercise any discretionary power differently with respect to each such trust, (iii) invest each such trust differently, and/or (iv) take all other actions consistent with such trusts being separate entities. Furthermore, the donee of any power of appointment with respect to such trusts may exercise such power differently with respect to each such trust.

D.   Notwithstanding the provisions of the foregoing Sections of this Article to the contrary, if any Trustee hereunder is a current beneficiary of the income of any trust here-

-36-

under, or may, in the discretion of the Trustees, be a current income beneficiary of any such trust, then, in such event, such Trustee shall not, in his or her capacity as a Trustee of such trust, have any voice or vote or otherwise participate in any decision pertaining to the matters relating to such trust that are addressed in the foregoing Sections of this Article, and, in each such event, the other Trustee or Trustees of such trust shall make all decisions relating to such trust that pertain to such matters.

THIRTEENTH:   Release of Powers.

Any beneficiary and any Trustee hereunder may at any time or times release any discretionary power of appointment or discretionary power to distribute principal or income or any other discretionary power hereby given to such beneficiary or Trustee, either with or without consideration, with respect to the whole or any part of the property subject to such power and also in such manner as to reduce or limit the persons or objects or classes of persons or objects in whose favor such power would otherwise be exercisable, by an instrument signed and acknowledged by the beneficiary or Trustee releasing such power and delivered to (i) each Trustee then acting hereunder (other than the Trustee, if any, who shall have executed such instrument), (ii) the Grantor (or, if the Grantor is not then living, to the executors, administrators or personal representatives of the

-37-

Grantor's estate), or (iii) any one or more of the adult individuals to whom or for whose use or benefit the income of any trust hereunder may then be paid or applied.  In the event of the release of any such power by any Trustee, the remaining Trustee or Trustees hereunder, if any, may thereafter exercise such power, other than any discretionary power which was not initially vested in such remaining Trustee or Trustees.  The release of any power by any Trustee hereunder pursuant to the provisions of this Article shall not be binding upon any Trustee who may thereafter act as a Trustee hereunder unless such power shall have been released by all of the Trustees then in office who are vested with such power by their execution of a signed and acknowledged instrument specifically providing that such release is to be binding upon all successor Trustees hereunder.

FOURTEENTH:    Provision With Respect To
               Closely Held Businesses.

Without limiting the powers and authority conferred upon the Trustees by Article ELEVENTH hereof but in extension thereof, the Trustees are specifically authorized and empowered, in their discretion, to retain for as long as they, in their discretion, shall deem advisable, any or all shares of stock in any closely held corporation, or any indebtedness owing by any such corporation, or any or all interests in any proprietorship, unincorporated business, partnership, joint venture, realty or

-38-

any other asset, whether owned individually, as tenant-in-common, partner or otherwise, regardless of whether such asset or assets shall be producing profits or losses through ownership or operation thereof, and regardless of the percentage of the trusts hereunder which such assets or similar assets may constitute; and their decision to retain and hold any such asset or liability shall be binding and conclusive upon and shall not be subject to question by any person interested, or who may become interested, in any of the trusts hereunder, and the Trustees shall not incur any liability by reason thereof.

FIFTEENTH:    _Headings_.

The Article headings contained herein are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope hereof or the intent of any provision hereof.

SIXTEENTH:    _Severability_.

Should any part, clause, provision or condition hereof be held to be void or invalid, then such invalidity shall not affect any other part, clause, provision or condition hereof, but the remainder hereof shall be effective as though such void

part, clause, provision or condition had not been contained herein.

WITNESS the due execution hereof by the Grantor and Trustees on the day and year first above written.

ARIE GENGER,
as Grantor

LAWRENCE M. SMALL,
as Trustee

SASH A. SPENCER,
as Trustee

**PLATZER, SWERGOLD, KARLIN, LEVINE,**
**GOLDBERG & JASLOW, LLP**
Attorneys for Petitioner, Orly Genger
1065 Avenue of the Americas, 18th Floor
New York, New York 10018
Telephone: 212-593-3000

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

File No. 0017/2008

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER, as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA § 711(11)

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK   )
                    )ss.:
COUNTY OF NEW YORK  )

     Wendi Leon, being duly sworn, deposes and says:

     1.    I am not a party to the action, am over 18 years of age and reside in Queens County, New York.

     On October 16, 2012 I served a copy of the **THIRD AMENDED PETITION OF ORLY GENGER FOR REMOVAL OF DALIA GENGER AS TRUSTEE WITH EXHIBITS "A" THROUGH "II"** in a properly addressed envelope, via *Federal Express* Standard Next Day Delivery, and deposited same at an official depository under the exclusive care and custody of Federal Express within the State of New York upon the following:

     Robert Meister, Esq.
     Pedowitz & Meister LLP
     570 Lexington Avenue, 18th Floor
     New York, NY  10022

                    Wendi Leon

Sworn to before me this
16th day of October, 2012

Evan J. Salan
Notary Public, State of New York
No. 02SA6067728
Qualified in New York County
My Commission Expires 2/22/14

g:\skolnick & hochberg\wordproc\genger\aos third amended verified petition.docx

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

File No. 0017/2008

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER, as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA § 711(11)



New York County Surrogate's Court
MISCELLANEOUS DEPT.

OCT 1 7 2012

**FILED**

Clerk

## THIRD AMENDED VERIFIED PETITION FOR REMOVAL
## OF DALIA GENGER AS TRUSTEE

TO THE SURROGATE'S COURT, STATE OF NEW YORK
COUNTY OF NEW YORK

Petitioner, Orly Genger ("Petitioner" or "Orly"), by her attorneys, Platzer, Swergold,

Karlin, Levine, Goldberg & Jaslow, LLP, respectfully alleges as her Third Amended Verified

Petition (the "Third Amended Petition") for Removal of Dalia Genger as Trustee as follows:

1. Orly, domiciled at 780 Greenwich Street, Apartment #4P, New York, New

York 10014, is the current and sole beneficiary of the Orly Genger 1993 Trust dated December

13, 1993 (the "Orly Trust"). Annexed hereto as **Exhibit "A"** is a copy of the Orly Trust.

2. Dalia Genger ("Dalia" or "Respondent"), residing at 200 East 65th Street,

Apartment #32W, New York, New York 10021 is Orly's mother and is the current sole Trustee

of the Orly Trust. Dalia was appointed successor Trustee in January, 2008.

3. The Orly Trust provides for discretionary payments of income and principal

to Petitioner during her lifetime with the remainder to be distributed to her descendants, per

stirpes. If Petitioner dies leaving no descendants, the remainder of the trust property is to be

distributed to the Sagi Genger 1993 Trust (the "Sagi Trust"). Sagi Genger ("Sagi") is Orly's

brother.

4.     For the reasons set forth herein, Petitioner respectfully requests that this Court enter an order:

(a)     Pursuant to Surrogate Court's Procedure Act ("SCPA") § 711(2)(3)(7) and/or (8) providing for the immediate removal of Dalia as Trustee of the Orly Trust as a result of her: (i) numerous and continuous breaches of her fiduciary duties to the Orly Trust and Petitioner as its sole beneficiary; (ii) waste and dissipation of the Orly Trust's assets; (iii) repeated and willful engagement in an ongoing fraudulent scheme with Sagi to loot, encumber, pledge and transfer the assets of the Orly Trust; (iv) deliberate and willful violation and contempt of the prior Order of this Court dated July 1, 2009 (the "July 2009 Order") (as well as her deliberate and willful violation and contempt of prior restraining Orders imposed upon her by other New York Courts in related proceedings) as set forth herein; and, (v) imprudent management and injury to the assets of the Orly Trust committed to her charge, all as set forth in this Third Amended Petition;

(b)     Suspending the Letters of Appointment heretofore issued to Dalia;

(c)     Appointing Joel Isaacson as successor trustee; and,

(d)     Granting such other and further relief as this Court deems to be just equitable and proper.

## PRELIMINARY STATEMENT

5.     Petitioner is the sole beneficiary of the Orly Trust. Dalia is Petitioner's mother and is the sole Trustee of the Orly Trust. Petitioner is filing this Third Amended Petition as a result of Dalia's egregious, willful, malicious, deliberate and surreptitious scheme to pledge, encumber, transfer and dissipate all of the assets of the Orly Trust in violation of her fiduciary duties as Trustee and in violation of the July 2009 Order.

6.     As will be set forth further below in this Third Amended Petition, Dalia

and Sagi have continuously engaged in a secretive and machiavellian scheme to loot, encumber, pledge, waste, dissipate and transfer the assets of the Orly Trust for personal gain and/or as punishment of Orly for her maintaining her relationship with her father, Arie Genger ("Arie"), during and after acrimonious divorce proceedings between Arie and Dalia.

7.     In addition to this scheme being an egregious breach of Dalia's fiduciary duties to the Orly Trust, Dalia's actions in this regard also constitute a blatant and willful disobedience of the July 2009 Order by pledging and encumbering the assets of the Orly Trust and completely dissipating their value without any prior notice to Petitioner as required under the July 2009 Order, all in breach of Dalia's fiduciary obligations.

8.     Most recently, the Petitioner discovered that Dalia and Sagi entered into various secretive agreements (as will be set forth in this Third Amended Petition) to loot, dissipate, pledge, encumber and transfer the assets of the Orly Trust by agreeing to allow the potential foreclosure against valuable assets of the Orly Trust by Manhattan Safety Company ("MSCo"), a recently created entity in St. Kitts, which upon information and belief is controlled by a professional gambler. All of these recent secret agreements were entered into by Dalia and Sagi without prior notice to Petitioner as required under the July 2009 Order.

9.     As further set forth below, Dalia and Sagi's secretive scheme to loot, pledge, encumber and transfer the assets of the Orly Trust is so brazen in its nature, constitutes such an egregious breach of Dalia's fiduciary duties as Trustee and Dalia's contempt of the July 2009 Order is so clear, that her immediate removal as Trustee of the Orly Trust is both warranted and necessary in order to prevent any further irreparable harm from occurring to the assets of the Orly Trust and Petitioner, as its sole beneficiary.

10.     Dalia's immediate removal as Trustee is necessary because it is clear that

-3-

the prior Orders and warnings of this Court (and as will be shown in this Third Amended Petition, the prior Orders of other courts as well) mean absolutely nothing to her and Sagi. Thus, as long as Dalia is Trustee, any assets of the Orly Trust will remain vulnerable and subject to immediate irreparable harm as a result of her ongoing scheme with Sagi.

11.    Dalia's ongoing conspiracy and scheme with Sagi in this regard is akin to Dalia "thumbing her nose" at this Court and Petitioner, as sole beneficiary of the Orly Trust.

12.    A summary of the timeline of critical factual and procedural events surrounding this matter as well as the events which precipitated the filing of this Third Amended Petition appears immediately below and will provide the Court with the proper context in which to appreciate the severity of Dalia's misconduct. As set forth below, the lengthy summarization of the factual history is necessary in order to show that Dalia's actions cannot be viewed in a "vacuum" and constitute a pattern of ongoing conduct for approximately the past four (4) years which is specifically intended to harm Petitioner and the Orly Trust.

## THE FORMATION OF D & K LP AND THE FORMATION AND INITIAL FUNDING OF THE ORLY TRUST FOR PETITIONER'S BENEFIT, AS SOLE BENEFICIARY

13.    Dalia and Arie were married in 1967 and their marriage subsequently ended in divorce in 2004.

14.    Prior to 1993, Dalia and Arie formed D & K LP ("D & K") a family owned limited partnership, whose name was shorthand for "Dalia and Kids". At the time of its formation, Dalia was the general partner and held a 4% interest. Petitioner and her brother, Sagi, were the limited partners who each held a 48% interest.

15.    In December, 1993, Dalia and Arie established identical irrevocable inter vivos trusts for the benefit of Petitioner and Sagi, the Orly Trust and the Sagi Trust (jointly, the Orly Trust and the Sagi Trust shall be referred to hereinafter as the "Trusts"). For estate-

-4-

planning purposes, Dalia and Arie funded each trust with a $600,000 gift. <u>The intent behind the
Trusts was to ensure that both Petitioner and her brother received property of equal value.</u> Sash
A. Spencer and Lawrence M. Small were named Co-Trustees of both Trusts and remained Co-
Trustees until Petitioner's parents' divorce in 2004. After the Trusts were funded, Sagi and
Petitioner each assigned their 48% interests in D & K to their respective Trusts.

## THE CREATION OF THE D & K NOTE

16.    At the same time in December 1993, D & K purchased 240 shares of
common stock (constituting 49% of the outstanding shares) of TPR Investment Associates, Inc.
("TPR"), a closely held family corporation for the sum of $10,200,000. The shares were
purchased with $600,000 from each of the Orly Trust and the Sagi Trust and $50,000 from Dalia,
totaling $1,250,000. The balance was satisfied with a recourse $8,950,000 Promissory Note (the
"D & K Note"). Annexed hereto as **Exhibit "B"** is a copy of the D & K Note.

17.    As set forth further below in this Third Amended Petition, there was never
any intention by Arie, Dalia, Sagi and Orly for TPR to collect upon the D & K Note.

18.    Pursuant to the D & K Note, principal, together with accrued interest, was
to be repaid by D & K in annual installments over ten years. The D & K Note was secured by a
pledge of the 240 TPR shares owned by D & K. (See **Exhibit "B"- Pledge Agreement**) Each
of the Trusts and Dalia assumed liability on the D & K Note in proportion to its/her direct
interest in D & K. Accordingly, each of the Trusts, assumed a 48% liability on the D & K Note
and acquired a 23.52% indirect interest in TPR. Dalia assumed a 4% liability on the D & K Note
and acquired a 1.96% indirect interest in TPR.

19.    At the time of the above-described transaction, Arie owned the remaining
51% of TPR, which held investments in various securities including common stock in Trans-
Resources, Inc ("TRI"), as well as its interest in the D & K Note. TRI was a successful and

valuable company which was engaged in the business of manufacturing specialty chemical products for agricultural and industrial end uses.

20.    Payments were made on the D & K Note out of dividends paid by TRI until 1999. Thereafter, when TRI stopped paying dividends, D & K stopped making payments under the D & K Note with the consent of the interested parties.

21.    As of March 20, 2001, TPR held a 52.85% interest in TRI. The remaining minority interest in TRI (47.15%) was owned by various entities controlled directly and indirectly by Jules and Eddie Trump (the "Trump Group").

## ARIE AND DALIA'S DIVORCE IN 2004 AND ITS EFFECT ON THE TRUSTS' ASSETS

22.    On October 26, 2004, Dalia and Arie entered into a Stipulation and Agreement of Settlement as a final settlement of their divorce (the "Settlement Agreement"). Pursuant to the Settlement Agreement, Dalia received, *inter alia,* Arie's 51% interest in TPR and retained her 4% interest in D & K. TPR's 52.85% interest in TRI was transferred to Arie and the Trusts as follows: (i) 13.99% to Arie, (ii) 19.43% to the Orly Trust (the "Orly Trust TRI Shares") and (iii) 19.43% to the Sagi Trust. The Orly Trust and the Sagi Trust each granted Arie an irrevocable lifetime voting proxy over their TRI shares (annexed hereto as **Exhibit "C"**). Therefore, after October 29, 2004, Arie and the Trusts held a controlling interest in TRI and TPR no longer owned any TRI common stock.

## DALIA CEDES CONTROL OF D & K AND TPR TO SAGI AND THE FORMATION OF D & K GP LLC

23.    In connection with the divorce settlement, Dalia took measures to cede management of D & K to Sagi. On October 21, 2004, days before signing the Settlement Agreement, Dalia and Sagi formed D & K GP LLC ("D & K GP"). Dalia exchanged her 4% interest in D & K and $1.00 for a 99% membership interest in D & K GP. Sagi purchased a 1%

membership interest in D & K GP for $1.00.  Pursuant to D & K GP's Limited Liability Agreement (annexed hereto as **Exhibit "D"**), Sagi was given the power to select a manager of D & K GP whose function would be to control D & K's assets.  Sagi selected himself to act as manager; thus, Dalia effectively handed Sagi the authority to control D & K and its assets.  Also, by forming D & K GP, Dalia and Sagi shielded themselves from any personal liability stemming from D & K, including any personal liability related to the D & K Note.  This left the Trusts solely liable for any obligations due under the D & K Note.

24.    On October 30, 2004, Dalia entered into a shareholder's agreement with TPR that provided for the management of TPR. Specifically, pursuant to the TPR shareholder's agreement (annexed hereto as **Exhibit "E"**), D & K, which owned 49% of TPR, was given authority to appoint one board member to the TPR board. Sagi, as the managing partner of D & K appointed himself as a board member of TPR. As the majority owner of TPR, Dalia was named as the other board member. In addition, the shareholder agreement appointed Sagi as Chief Executive Officer ("CEO") of TPR.  Accordingly, Dalia essentially ceded control of TPR to Sagi, just as she had done with D & K.

25.    For the Court's convenience, below is a summary of Arie, Dalia, and the Trusts' interests in TPR both before and after the divorce and Settlement Agreement:

| Person | TPR Interest Before | TPR Interest After |
|---|---|---|
| Arie Genger | 51.00% | 0% |
| Dalia Genger | 1.96% | 52.96%[1] |
| Orly Trust (indirectly through D & K) | 23.52% | 23.52% |
| Sagi Trust (indirectly through D & K) | 23.52% | 23.52% |
| **Total** | **100%** | **100%** |

26.     In connection with the Settlement Agreement, Dalia required that the Trustees of the Orly Trust and the Sagi Trust (Messrs. Sash and Small) resign and be replaced with friends of Sagi. Numerous successor trustees were appointed to the Orly Trust and the Sagi Trust, all of whom were affiliated with Sagi in one way or another and were controlled by him. David Parnes and Eric Gribetz (Sagi's longtime friends) and Leah Fang (Sagi's sister-in-law) were appointed as successor trustees to the Orly Trust, and Messrs. Parnes and Gribetz, Rochelle Fang (Sagi's mother-in-law), and Mr. Parnes again, were appointed successor trustees of the Sagi Trust.

## THE SHAM ASSIGNMENT AND SALE OF THE D & K NOTE

27.     On or about October 31, 2004, the TPR Board (consisting of Dalia and Sagi) passed a resolution to sell the D & K Note. Sagi was charged with the responsibility of selling the D & K Note to a "third party".

28.     In December, 2005, Sagi filed amended 2002 and 2003 tax returns for

---

[1] Dalia held a 1.96% indirect interest in TPR prior to the divorce as a result of her 4% interest in D & K. Pursuant to the Settlement Agreement, Dalia received an additional 51% direct interest in TPR from Arie. Just prior to the Settlement Agreement, as stated above, Dalia transferred her 4% interest in D & K (and thus, her 1.96% indirect interest in TPR) to D & K GP.

TPR, writing off the entire D & K Note and declaring it as a loss in the approximate amount of $8,700,000.

29.    On August 2, 2006, Sagi, as part of his managerial role in D & K GP, D & K and TPR, assigned and sold the D & K Note, which then had an approximate value of $11,000,000 as a result of the accrued interest, to Mr. Parnes in his individual capacity for the sum of only $12,000 (a copy of the Memorandum dated August 2, 2006 (the "D & K Note Memorandum"), assigning and selling the D & K Note is annexed hereto as **Exhibit "F"**). The D & K Note Memorandum asserts unspecified claims by D & K against TPR and Sagi expressly memorialized that D & K "denies enforceability of the [D & K Note]". **(See Exhibit "F")**

30.    Sagi signed the D & K Note Memorandum on behalf of both TPR as the holder and D & K as the maker. Dalia was copied on the D & K Note Memorandum but Petitioner did not receive a copy of same. At the time of the D & K Note Memorandum, Mr. Parnes was acting as trustee of both Trusts. Shortly after the D & K Note Memorandum, Mr. Parnes summarily resigned as Trustee of the Orly Trust without explanation.

## THE D & K NOTE WAS NEVER INTENDED TO BE ENFORCED

31.    Mr. Parnes testified in Arie and Dalia's matrimonial arbitration (See **Exhibit "G"**, which contains the relevant portions of the transcript of Mr. Parnes' testimony from the arbitration) that:

(i)    As the Trustee of both Trusts, he was a "trusted" person to keep the D & K Note to make sure it would never be collected. (See Pages 460-461);

(ii)    D & K does not have to make payments to TPR; (Page 452)

(iii)    The D & K Note is uncollectible (Page 453); and,

(iv)    Sagi's job was to "bury the D & K Note in the woods" (Page 461)

32.    Sagi testified in the same arbitration (See **Exhibit "H"**, which contains the relevant portions of the transcript of Sagi's testimony from the arbitration) that:

      (i)      The purpose of the D & K Note was for estate planning (Pages 367-380);

      (ii)     The D & K Note was never declared in default (Page 370);

      (iii)    There was no intention of collecting the D & K Note (Page 370); and,

      (iv)    The D & K Note is worth nothing (Pages 375-377)

33.     In addition, Dalia, who was copied on the D & K Note Memorandum,

previously admitted in her Pre-Hearing Memorandum submitted to the Court in connection with

the matrimonial arbitration that the D & K Note was never intended to be collected upon because

the:

> "…collection by TPR of the D & K Note would simply transfer
> wealth from the children, Sagi and Orly, to their parents,
> Arie and Dalia, thus undoing the estate planning scheme which
> had transferred that wealth to the children.
> (See **Exhibit "I"**, excerpt from Dalia's Pre-Trial Memorandum
> Page "26")

34.     Ultimately, the Gengers' matrimonial arbitrator, Judge I. Leo Milonas,

specifically determined that the D & K Note was never intended to be collected from its

inception.

> "The arbitrator finds for Dalia on this issue. The D & K [N]ote
> was part of the estate planning scheme to transfer wealth to the
> children. The parties never intended for this note to be collected
> and to do so would re-transfer wealth back to the parents and
> defeat their estate plan.
> (See **Exhibit "J"**, Final Arbitration Award in Genger divorce
> proceeding, Page "15")

35.     Petitioner was well aware of, and relied upon, the agreement that the D &

K Note would never be enforced. Petitioner was also aware of, and relied upon, Judge Milonas'

award declaring the D & K Note worthless and uncollectible, and Dalia, Sagi and Mr. Parnes'

sworn statements and/or written submissions to that effect.

**THE D & K AGREEMENT IS ENTERED INTO WITHOUT PETITIONER'S
KNOWLEDGE AND PURPORTEDLY AUTHORIZES D & K TO PLEDGE
AND ENCUMBER THE ORLY TRUST TRI SHARES**

36.    On or about November 23, 2007, Leah Fang (Sagi's sister-in-law), the

then sole Trustee of both Trusts[2], and Sagi, acting in his capacity as manager of D & K GP,

executed an "Amended and Restated Limited Partnership Agreement of D & K Limited

Partnership (the "D & K Agreement"). Among other things, the D & K Agreement purported to

grant D & K GP authority to "mortgage, hypothecate, pledge, create, a security interest in or lien

upon, or otherwise encumber [the Orly Trust TRI Shares] for the benefit of [D & K] or that of

third parties, in connection with the [D & K Note]". (See a copy of the D & K Agreement

attached hereto as **Exhibit "K"**, Page "11"). There was no legitimate need or purpose for the

amendment. It was a preliminary step in Sagi and Dalia's scheme to punish Petitioner and

attempt to loot the Orly Trust of this valuable asset.

37.    By its terms, the D & K Agreement, does not require D & K GP (i.e.

Sagi) to give notice to anyone, including Petitioner or the Orly Trust, if a decision is made to

encumber the Orly Trust TRI Shares in any way.

38.    Upon information and belief, the Orly Trust received no consideration and

no direct or indirect benefit in exchange for the substantial concession it gave to D & K GP

under the D & K Agreement. Indeed, the D & K Agreement was merely an instrument created

for the specific purpose of encumbering the Orly Trust and Petitioner as its beneficiary, with

debt.

39.    Leah Fang never informed Petitioner of the existence of the D & K

---

[2] In 2007, Mr. Gribetz resigned as the trustee of both Trusts, without appointing a successor, thereby
leaving Mr. Parnes as the sole remaining trustee. Thereafter, as set forth above, Mr. Parnes resigned as trustee of the
Orly Trust appointing Leah Fang as successor Trustee.

Agreement. In January, 2008, Dalia was appointed successor trustee of the Orly Trust, despite

Petitioner's objections. At that time, Dalia, notwithstanding her knowledge that the D & K Note

was not intended to be collected, did nothing to attempt to rescind or nullify the D & K

Agreement, nor did she do anything to advise Petitioner as beneficiary that the prior trustee had

granted D & K GP authority to encumber the Orly Trust TRI shares. By that time, as a result of

Dalia's granting Sagi control of TPR and D & K through the appointment of his friends and

relatives as successor trustee of the Trusts, Sagi had effectively obtained control over all of the

assets held by D & K, TPR, the Sagi Trust and the Orly Trust.[3]

      40.    Through the above-mentioned transactions, Dalia allowed Sagi to obtain

direct control over TPR and its interest in the D & K Note to the detriment of Petitioner and the

Orly Trust. Notably, Sagi's role as CEO of TPR, (the creditor on the D & K Note) is in direct

conflict with his role as manager of D & K (the debtor on the D & K Note), whose role was to

repay the D & K Note or contest its enforceability.

## ORLY'S INITIAL APPLICATION TO REMOVE DALIA AS TRUSTEE

      41.    In February, 2008, Petitioner filed an initial application with this Court

(the "Initial Application") to remove Dalia as Trustee of the Orly Trust on the grounds that she

feared Dalia would not protect her interests while serving as Trustee because of Dalia's

animosity towards Arie, and her collusion with Sagi.

      42.    Surrogate Roth denied the Initial Application as premature, believing

---

[3] In addition, by stock purchase agreement dated January 18, 2007, Sagi as CEO of TPR sold 2% of TPR's shares to his mother-in-law, Rochelle Fang, thereby eliminating Dalia's majority ownership interest of TPR by diluting it to 49%. Around the time that she became sole Trustee to the Orly Trust in January 2008, Dalia purportedly divested herself of the balance of her TPR shares. Thus, in addition to being CEO, Sagi effectively controlled TPR through the 49% owned by D & K, which Sagi controlled and the 2% owned by Rochelle Fang, also controlled by Sagi. (See **Exhibit "L"**, Transcript of Hearing before the Honorable Jane S. Solomon dated August 22, 2011 in the action entitled Orly Genger v. Sagi Genger, Supreme Court of the State of New York, County of New York, Index No. 100697/2008) (Pages "53" to "55" for example)

Dalia should be given the chance to demonstrate whether she intended to act in Orly's interests or against Orly's interests. Surrogate Roth gave Dalia the benefit of the doubt based, in part, on sworn statements by Dalia to the Surrogate Court that she intended to protect the Orly Trust and its assets.

> "[I]t appears that Dalia (who states that she is ready and able to act as fiduciary) has yet to assume the duties of trustee in deference to her daughter's position in this litigation. As a validly appointed trustee, she should be given the opportunity to do what she deems necessary to manage and protect the trust's assets.
>
> Based upon the foregoing, the appointment of a "special trustee" is unwarranted at this time and, accordingly, the application is denied, without prejudice to renewal if future circumstances warrant such relief.
> (See copy of Surrogate Court Decision dated December 31, 2008 annexed hereto as **Exhibit "M"**, Pages 7-8) (emphasis added).

43.     At the time of the Surrogate's decision, the extent of Dalia's complicity in the conspiracy with Sagi was not fully understood.

### WITHIN WEEKS OF SURROGATE ROTH'S DECISION, RATHER THAN PROTECT THE ORLY TRUST, DALIA HELPED SAGI STRIP THE ORLY TRUST OF ITS ONLY ASSETS

44.     Sadly, Dalia's every action since Surrogate Roth's decision has proven Petitioner's fears were well grounded and the benefit of the doubt given to Dalia by Surrogate Roth was unjustified. As described below, rather than protecting the Orly Trust, Dalia has used her position as Trustee to help Sagi Genger strip the Orly Trust of its two assets: (1) 1,102.80 shares of common stock in TRI; and (2) a 23.52% indirect interest in TPR.

45.     As set forth below, Dalia was an active and willing participant in Sagi's scheme to strip the Orly Trust of its assets, thereby causing harm to Petitioner as the Orly Trust's sole beneficiary.

## DALIA HELPS SAGI TRY TO STRIP THE ORLY TRUST OF THE ORLY TRUST TRI SHARES

46.    Dalia has always understood the true value and importance of the Orly Trust TRI Shares to Petitioner and to the Orly Trust. Indeed, during the Initial Application to remove Dalia as Trustee, Dalia's attorney sent Surrogate Roth a letter stating that "the most valuable asset in the Orly Genger Trust is the shares of TRI'" and "the TRI Shares held by the Orly Trust are potentially worth tens of millions of dollars." See November 11, 2008 Letter to Hon. Renee R. Roth from J.G. Kortmansky, Esq. annexed hereto as **Exhibit "N"**. (emphasis supplied)

47.    On August 22, 2008, unbeknownst to Petitioner, Rochelle Fang, (Sagi's mother-in-law) who had been appointed Trustee of the Sagi Trust, attempted to sell the Sagi Trust's 19.43% in TRI to the Trump Group who thereafter purported to hold 66.58% of TRI's outstanding common stock.[4]   In connection with the supposed sale, Sagi and David Parnes were given seats on TRI's board of directors.  This sale, which was consummated after Dalia was appointed successor trustee of the Orly Trust, has diluted and diminished the value of the Orly Trust's interest in TRI since Arie will no longer have a controlling interest in TRI (which he previously had by virtue of his voting proxy over the Trust's shares, see **Exhibit "C"**) and thus, the Orly Trust would no longer own a portion of the controlling block of TRI shares.[5]

---

[4] In response to Dalia and Sagi's collusive efforts to sell the TRI shares to the Trump Group, Petitioner, on behalf of herself, individually and the Orly Trust, commenced an action in the Supreme Court for New York County seeking to determine, among other things, the ownership of the Orly Trust TRI Shares.  See Arie Genger and Orly Genger, in her individual capacity and on behalf of The Orly Genger 1993 Trust v. Sagi Genger, TPR Investment Associates, Inc., Dalia Genger, The Sagi Genger 1993 Trust, Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, Jules Trump, Eddie Trump and Mark Hirsch, Index No. 651089/2010 (the "New York TRI Action"). The New York TRI Action is still pending before Justice Feinman.

[5] In 2011, without prior notice to Petitioner as required under the July 2009 Order, Dalia, as Trustee of the Orly Trust and in a transparent forum shopping move, commenced an action in the Delaware Chancery Court seeking a declaration that the Orly Trust is the beneficial owner of the Orly Trust TRI Shares.  Dalia has been restrained from pursuing this action pursuant to a prior Order of the Court issued in the New York TRI Action.

48. On or about January 31, 2009, only weeks after making sworn statements to the Surrogate Court that she intended to protect the Orly Trust and its assets, Dalia executed a document entitled "Meeting of Partners of D & K LP- Jan. 31, 2009 & Agreement (the "Meeting Agreement"). Annexed hereto as **Exhibit "O"** is a copy of the Meeting Agreement. Like the D & K Agreement, the Meeting Agreement purported to grant D & K GP (i.e., Sagi) unfettered authority to encumber the Orly Trust TRI Shares:

> "The partners wish to clarify that the authority vested in the General Partner to make limited partners' assets subject to a pledge shall be done in substantially the same manner in which TPR Investment Associates, Inc. shares were pledged in conjunction with the aforementioned note [the D & K Note]. However, the General Partner shall be authorized to sign for the partnership and/or each individual partner."
> (See **Exhibit "O"**, Paragraph "3")

49. In another naked act of self-dealing in violation of Dalia's fiduciary duties as Trustee, the Meeting Agreement also purports to:

> "Indemnify and provide a general release from any claim or right at equity, law, or contract or otherwise the current and former general partner, its officers, the partnership's holdings (including TPR Investment Associates, inc.) and the officers of its holdings to fullest extent permitted in connection with any claim by the partnership and/or its partners. Irrespective of the above, nothing herein shall serve to release or indemnify Arie Genger, William Dowd, Lawrence Small or Edward Klimerman." (See **Exhibit "O"**, Paragraph "1")

50. Upon information and belief, the Orly Trust received no consideration and no direct or indirect benefit in exchange for the substantial concession, Dalia, acting as trustee, gave to D & K GP under the Meeting Agreement. Indeed, the Meeting Agreement, like the D & K Agreement, was merely another instrument created for the specific purpose of depleting the Orly Trust of its assets.

51. Both the D & K Agreement and the Meeting Agreement were negotiated

and executed without ever informing Petitioner. Moreover, Dalia never subsequently informed

Petitioner of the existence of either agreement, even though Petitioner made repeated requests to

Dalia for information about the Orly Trust and its assets during her tenure as Trustee. The

Meeting Agreement was only disclosed on or about October 2009 in connection with the New

York TPR Action (defined and discussed below) which was commenced by Petitioner in the

Supreme Court for New York County.

52.    Notably on January 10, 2009, just days before Dalia signed the Meeting

Agreement granting Sagi unfettered authority to dispose of the Orly Trust TRI Shares (and

purporting to indemnify Sagi regardless of any actions he took in connection with same),

Petitioner sent Dalia a letter reminding her (once again) that the Orly Trust TRI Shares needed to

be protected and retained.

> "For now, and until further notice, <u>it is my strong desire to retain all
> of the shares of Trans-Resources., Inc. ("TRI") that are currently in
> the Trust</u>, and I direct you not to sell them. If you are approached,
> or have been approached, with an offer to purchase any of the TRI
> shares in the Trust, please notify me immediately. If, despite my
> wishes, you consider accepting an offer, do not sell any shares until
> I have a reasonable period of time to maximize the benefit to the
> Trust, including possible alternative transactions."
> (See January 10, 2009 letter from Petitioner to Dalia (emphasis
> added), a copy of which is annexed hereto as **Exhibit "P"**)

53.    Dalia, in violation of her fiduciary obligations refused to agree not to

dispose of the Orly Trust TRI Shares. To do so would be contrary to the fraudulent scheme

in which Dalia was a willing participant.

54.    Likewise, although Dalia has given sworn statements to the Surrogate

Court regarding the Orly Trust, she never disclosed the existence of the D & K Agreement or the

Meeting Agreement to either Surrogate Roth or her successor Surrogate Webb. Basically,

through the D & K Agreement, the Meeting Agreement and by ceding management of D & K

and TPR to Sagi, Dalia gave Sagi total control to pilfer the Orly Trust assets for his own use and benefit.

## DALIA HELPS SAGI TRY TO STRIP THE ORLY TRUST OF ITS INDIRECT INTEREST IN TPR

55.    In Surrogate Roth's decision, she noted that in the Initial Application, "...petitioner has not alleged that Dalia has refused a request for information, which would warrant relief (SCPA 2102), or has failed as trustee to protect trust assets" (see **Exhibit "M"**, Page "7").

56.    On May 14, 2009, Petitioner's then counsel, Judith Siegel-Baum, sent Dalia's attorney, Robert Meister, a document demand relating to the Orly Trust's assets. (annexed hereto as **Exhibit "Q"**).

57.    On June 1, 2009, Mr. Meister responded to Ms. Sigel-Baum's document demand by advising her that the Orly Trust no longer owned any interest in TPR. According to the letter, Sagi, acting as CEO for TPR, had foreclosed on the D & K Note and sold D & K's 240 shares of TPR for $2,200,000. A copy of the letter is annexed hereto as **Exhibit "R"**. Before that time, Dalia had neither advised nor notified Petitioner that Sagi had foreclosed on the D & K Note, nor advised Petitioner that Sagi had sold the TPR shares at auction. This news came as a complete and utter shock to Petitioner.

58.    Despite the clear and consistent agreement among the Genger family members that the D & K Note was never to be collected upon or enforced, the sworn testimony and/or Court submissions of Dalia, Sagi and Mr. Parnes, the assignee and purchaser of the D & K Note, and Judge Milonas' award and specific determination to this effect, upon receipt of Mr. Meister's letter, Petitioner learned for the first time that:

(a)     Sagi caused TPR to reclaim the D & K Note from Mr. Parnes.[6]  Then, on August 31, 2008, Sagi, acting as CEO of TPR, notified himself as the general manager of D & K, that D & K was in default under the D & K Note and declared that unless the entire unpaid principal amount of the D & K Note was paid immediately, TPR would sell, at auction, the 240 shares pledged as collateral.  A copy of this purported Notification dated August 31, 2008 is annexed hereto as **Exhibit "S"**.  Dalia, who knew that the D & K Note was never intended to be enforced and who previously had sworn to as such, in violation of her fiduciary duties as Trustee, never sought to block Sagi from foreclosing on the D & K Note and selling the TPR shares. Notwithstanding her knowledge and her previous sworn statement, Dalia failed to make any effort to stop Sagi when he engaged in this clear act of self-dealing, even though the Orly Trust had a clear interest in the TPR shares at issue.

(b)     Thereafter, Sagi, again acting as CEO of TPR, purported to notify D & K (of which he remained managing partner) that D & K's 240 shares of TPR stock would be auctioned to the highest bidder on February 27, 2009, and that the money received from the sale would be used to reduce the outstanding debt under the D & K Note.  A copy of this purported Notification is annexed hereto as **Exhibit "T"**.  Sagi purported to notify the interested parties of the sale by publishing notice of the sale in the New York Post in October 2008 and February 2009.  At all relevant times, Sagi had Petitioner and Dalia's contact information.  Despite this, Petitioner was never informed of the impending sale.  At the time that Sagi secretly schemed with the connivance of Dalia to structure the bogus sale, it was clear that the value of the TPR shares was significantly higher than any purported value of the D & K Note (although as previously stated the D & K Note had no value).

---

[6] On or about May 25, 2008, Mr. Parnes rescinded, *ab initio*, the assignment of the D & K Note. Petitioner was also not notified of that action.

(c)    On February 27, 2009, TPR (still controlled by Sagi) foreclosed on the 240 shares of TPR and "auctioned" the shares (the "TPR Sale"). Not coincidentally, TPR purchased the shares at auction for $2,200,000, which was substantially less than their estimated value, making no effort to collect on the D & K Note from the Sagi Trust. (See **Exhibit "U"**). The $2,200,000 proceeds of the TPR Sale were purportedly used to decrease D & K's obligations under the D & K Note. The deficiency under the D & K Note was deliberately manufactured by this sham auction in order to provide Sagi and TPR with a future basis to foreclose upon the Orly Trust's only remaining principal asset, the Orly Trust TRI Shares.

59.    TPR and Sagi, with the connivance of Dalia in breach of her fiduciary duty, effectively stripped the Orly Trust of its indirect interest in the TPR shares by improperly foreclosing on the D & K Note and conducting the TPR Sale notwithstanding the fact that the Genger family never intended the D & K Note to be enforced. Notably, this alleged and purported notification process and sham TPR Sale took place without Dalia objecting in any way, taking preventive action of any kind, or notifying Petitioner in any way.    In short, Dalia, allowed the sham TPR Sale to transpire, did not notify Petitioner of same and clearly violated her duties as a fiduciary to the Orly Trust and Petitioner, as sole beneficiary by failing to protect the valuable trust asset.

60.    The forgoing scheme injured Petitioner and the Orly Trust in a number of ways. The Orly Trust's interest in D & K is now worthless, as it purportedly no longer owns any interest in TPR, while Sagi now has control over the foreclosed TPR shares. The scheme also destroyed Arie and Dalia's tax and estate planning intent that both children have equal shares in the family wealth.

61.    Dalia, who knew that the D & K Note was never intended to be enforced, should have immediately sought to block Sagi from foreclosing on the D & K Note and selling

-19-

the TPR shares. Certainly, she should have informed Petitioner so Petitioner could make her own efforts to block the sham TPR sale or, at the least, arrange for other bidders to be at the sale. Notwithstanding her knowledge and her previous sworn statement, Dalia failed to make any effort to stop Sagi when he engaged in this clear act of self-dealing, even though the Orly Trust has a clear interest in the TPR shares at issue.

62.     As if this was not an egregious enough breach of Dalia's fiduciary duties to the Orly Trust, Dalia has made no effort whatsoever to date to seek any contribution from the Sagi Trust for its share of purported amounts due under the D & K Note (although as previously stated at length herein, no such purported sums are due under the D & K Note because it was never intended to be enforced). In other words, if the D & K Note was truly a "liability" of both Trusts, in theory, TPR should have foreclosed on the Sagi Trust's interests as well. Of course, this will never happen as long as Sagi is still the CEO of TPR (the holder of the D & K Note) and the manager of D & K, (the maker of the D & K Note). By ceding management authority of TPR and D & K to Sagi, Dalia deliberately created Sagi's clear and unequivocal conflict of interest and "paved the road" for his self-dealing. This has resulted in Sagi looting the Orly Trust for his own benefit with the tacit or express approval of Dalia.

63.     As a fiduciary of the Orly Trust with prior, as well as continued knowledge, of the TPR foreclosure, Dalia had a duty to protect the Orly Trust's indirect ownership of the TPR shares. Instead of taking proactive measures required of a fiduciary, Dalia did nothing and allowed Sagi to obtain the TPR shares for himself to the detriment of the Orly Trust. Moreover, in connection with her appointment as successor trustee of the Orly Trust in January, 2008, as previously stated above, Dalia purportedly divested herself of her TPR shares for the sum of $5,000,000 (without informing the Court or Petitioner as to when she transferred her interest) in a further attempt to distance herself from any attributable wrongdoing.

64.    Dalia knew of Sagi's plan to foreclose on the D & K Note as early as August, 2008, thus she withheld information from Petitioner concerning the TPR Sale for almost 10 months. Even then, she only provided the information until she received a demand letter from Petitioner's counsel and realized that legal action was imminent.

65.    In fact, the notice of the TPR Sale in the New York Post was specifically designed by Dalia and Sagi not to provide Petitioner with notice and an opportunity to object to same. Dalia and Sagi were both aware of Petitioner's address at this time but instead of notifying Petitioner, they chose to deceive her by publishing notice in the newspaper.

66.    As a result of the sham TPR Sale, on or about June 9, 2009, Petitioner commenced an action which is pending before the Supreme Court for New York County entitled, Orly Genger et al v. Dalia Genger, Sagi Genger, D & K GP LLC, TPR Investment Associates, Inc. and Leah Fang, Index No. 109749/2009 (the "New York TPR Action"). In the New York TPR Action, Petitioner is seeking, *inter alia*, monetary damages and the return of the TPR shares.[7]

## THE JULY 2009 ORDER AND INJUNCTION AND PETITIONER'S RENEWED APPLICATION WITH THIS COURT TO REMOVE DALIA AS TRUSTEE

67.    Upon learning of the sham TPR Sale, which stripped the Orly Trust of its indirect interest in its shares of TPR, Petitioner renewed her petition with this Court to remove Dalia as Trustee of the Orly Trust by filing same on or about June 22, 2009. Petitioner also filed a Motion with this Court and sought a temporary restraining order which enjoined and prohibited

---

[7] By Decision and Order of the Honorable Paul G. Feinman dated June 28, 2010 in the New York TPR Action, Justice Feinman determined that the Petitioner's claim with respect to Dalia's breach of her fiduciary duty as sole Trustee of the Orly Trust should be decided by the Surrogate's Court. Further, in the same Decision and Order, Justice Feinman denied Dalia's Motion for Summary Judgment and determined that there is a "...question of fact as to whether Dalia Genger acted with intent to commit fraud against plaintiff's trust [the Orly Trust], and to lull plaintiff [Orly] into a false sense of security as to the status of her trust." (See **Exhibit "V"**, Decision and Order of Justice Feinman dated June 28, 2010, Pages "17" and 19")

Dalia, *inter alia,* and anyone acting on her behalf from attempting to sell, transfer, pledge and encumber or take any act with respect to the Orly Trust TRI Shares without providing Petitioner with at least 10 days prior notice. A copy of the June 22, 2009 Petition (without the exhibits attached to it which are duplicative) is annexed hereto as **Exhibit "W"**.

68.    As a result of the Petitioner's forgoing motion for a restraining order, the July 1, 2009 Order was entered pending the outcome of this proceeding and which imposed certain protective restraints (the "Restraints") upon Dalia as previously set forth above. Dalia declined to attend the hearing.

69.    During counsel's oral argument of Petitioner's motion for a restraining order, Surrogate Webber noted to Dalia's counsel that:

> "They [Dalia and Sagi] are on notice of all of your fears
> [with respect to the dissipation of the Orly Trust's assets].
> So for them now to do something which would obviously
> be against their duties and responsibilities would be
> somewhat glaring in terms of what the surcharge [to be
> imposed against Dalia] would be." (emphasis supplied)
> (See excerpt from transcript from July 1, 2009
> hearing annexed hereto as **Exhibit "X"**, Page "23")

70.    The Restraints were later confirmed by this Court on August 18, 2009, reconfirmed and supplemented with additional restraints by this Court on July 16, 2010 and made a part of a stipulation between Petitioner and Dalia which was entered on September 8, 2010 (see **Exhibit "Y"**).

71.    On or about September 21, 2010, Petitioner filed the Second Amended Verified Petition (the "Second Amended Petition") to remove Dalia as Trustee. Dalia has filed a Motion to Dismiss the Second Amended Petition and the decision on the Motion to Dismiss still remains *sub judice.*

## THE ADDITIONAL RESTRAINTS PLACED UPON DALIA AND SAGI BY THE NEW YORK COURTS IN THE NEW YORK TRI ACTION AND THE NEW YORK TPR ACTION

72.     In addition to the Restraints imposed upon Dalia by the July 2009 Order, on or about July 28, 2010, the Court in the New York TPR Action also restrained Dalia, Sagi and the co-defendants to that action from transferring, selling, pledging, assigning, or otherwise disposing of D & K's 48% ownership interest in TPR. (the "TPR Action Restraints") (See **Exhibit "Z"** at page "32")

73.     The Court in the New York TRI Action also entered certain restraints against Dalia, Sagi and the other co-defendants to that action with respect to the Orly Trust TRI Shares.[8] (the "TRI Action Restraints") (See **Exhibit "AA"**, December 28, 2011 Order in New York TRI Action, Pages "14" through "15").

## DALIA HAS WILLFULLY AND REPEATEDLY DISOBEYED THE JULY 2009 ORDER BY ENTERING INTO A FURTHER SCHEME TO ENCUMBER AND DISSIPATE THE ORLY TRUST'S ASSETS

74.     Petitioner submits that it could not be any more clear to Dalia, her counsel, Sagi and the other co-defendants to the New York TPR Action and the New York TRI Action that Dalia was forbidden from transferring, pledging, encumbering, assigning, selling and/or dissipating any assets of the Orly Trust without prior notice to Petitioner as a result of: (i) the Restraints set forth in the July 1, 2009 Order; (ii) Surrogate Webb's statement to Dalia's counsel on the return date that Dalia and Sagi are on notice of Petitioner's fears that the Orly Trust's assets will be dissipated (and therefore, any actions taken by Dalia against her duties and responsibilities would obviously be "glaring") (See **Exhibit "X"**, Page "23"); (iii) the Stipulation entered into between Petitioner and Orly further confirming the Restraints (See **Exhibit "Y"**;

---

[8] Both the New York TRI Action and the New York TPR Action are before Justice Paul Feinman.

and, (iv) the restraints imposed by Justice Feinman in the New York TRI Action and New York TPR Action (collectively, the "Supreme NY Restraints"). All these restraints were specifically and expressly intended to preserve the "status quo" until the Courts rendered a final decision.

75.    Notwithstanding the forgoing, rather than honor any of these restraints, subsequent to the Petitioner's filing of the Second Amended Petition, Dalia, Sagi and their cohorts, have continued to conspire together and in secret to render all of these restraints a nullity.

76.    Instead of treating this Court's July 2009 Order and the Supreme NY Restraints as Orders to be obeyed and boundaries to be honored, Dalia, Sagi and their cohorts saw them as obstacles to be hurdled. To that end, Dalia, D & K (through D & K GP), and/or TPR (in other words, Dalia and Sagi) secretly executed eight (8) agreements[9] encumbering the Orly Trust with $4.44 million in new debt, which the Orly Trust has no hope of paying off.

77.    In breach of Dalia's fiduciary duties as Trustee, the Secret Agreements were specifically designed and intended as part of Dalia and Sagi's scheme to encumber the Orly Trust with debt but not to similarly encumber the Sagi Trust with any debt whatsoever.

78.    Petitioner discovered the existence of the Secret Agreements on or about July 6, 2012 solely in response to discovery requests made by Petitioner's counsel in the New York TPR Action. These documents were only first produced on or about July 6, 2012 notwithstanding the fact that: (i) the initial Secret Agreements, namely, the $4,000,000

---

[9] These eight secret agreements (collectively, the "Secret Agreements") will be further described immediately below and are: (i) the $4,000,000 Promissory Note dated October 3, 2011 (See Exhibit "BB"); (ii) the Credit and Forbearance Agreement and Second Amendment and Restatement of Promissory Note executed on May 15, 2012 (See Exhibit "CC"); (iii) the $4,240,000 Amended and Restated Promissory Note dated May 15, 2012 (See Exhibit "DD"); (iv) the $200,000 Promissory Note dated May 15, 2012 (See Exhibit "EE"); (v) the Agreement Amending Terms of Promissory Note dated March, 2012 (See Exhibit "FF"); (vi) the purported TPR Settlement Agreement dated October 3, 2011 (See Exhibit "GG"); (vii) the purported Amended and Restated TPR Settlement Agreement dated March 16, 2012 (See Exhibit "HH"); and, (viii) the Bill of Sale and Note Assignment dated May 15, 2012 (See Exhibit "II").

Promissory Note and the TPR Settlement Agreement were both executed approximately nine (9) months earlier on October 3, 2011; (ii) the July 2009 Order expressly required that Dalia provide Petitioner with prior notice of any and all acts which would affect the Orly Trust TRI Shares; and, (iii) the Supreme NY Restraining Orders expressly required that Dalia provide prior notice of any and all acts which would affect the Orly Trust's respective interests in the Orly Trust TRI Shares and TPR.

### THE 2011 PROMISSORY NOTE

79.    Unbeknownst to Petitioner, on October 3, 2011, Dalia and TPR purported to cancel the $4,500,000 deficiency remaining on the D & K Note after the disputed TPR Sale and replace it with a $4,000,000 promissory note that directly obligated the Orly Trust to pay TPR (the "2011 Promissory Note"). (See **Exhibit "BB"**, copy of 2011 Promissory Note and the TPR Settlement Agreement (defined below), **Exhibit "GG"**).

80.    By so doing, Dalia wrongly attempted to: (i) transfer $4 million dollars of liability from D & K to the Orly Trust (See **Exhibit "GG"**, TPR Settlement Agreement at 5); (ii) replace the unenforceable D & K Note with a putatively enforceable one (id); (iii) acknowledge the legality of the sham TPR Sale and the resulting deficiency (id. at 2-3); and, (iv) ensure that this $4 million dollar liability would not fall within the release that was part of the purported TPR Settlement Agreement reached that same day between Dalia, Sagi and the other defendants to the New York TPR Action, but would continue to burden the Orly Trust (id. at 5).

81.    The 2011 Promissory Note was payable to TPR the earlier of: (a) November 1, 2012; or, (b) the receipt of any proceeds from the sale of the Orly Trust TRI Shares, "notwithstanding anything to the contrary herein or in the parties' accompanying [TPR] Settlement Agreement". See **Exhibit "BB"** at 1.

82.     By executing the 2011 Promissory Note on behalf of the Orly Trust, Dalia (i) obligated the Orly Trust to pay all of TPR's legal fees (See **Exhibit "BB"** at 2); (ii) **made her removal as Trustee an "Event of Default" making the 2011 Promissory Note immediately due and payable** (id. at 1, emphasis added); and, (iii) agreed to the law and jurisdiction of the State of Delaware (id at 2)[10]

## THE 200K PROMISSORY NOTE AND THE CREDIT AGREEMENT

83.     In May, 2012, TPR assigned the 2011 Promissory Note to MSCo, a St. Kitts entity. In exchange for an alleged $400,000 received from MSCo, Dalia had the Orly Trust sign another promissory note for $200,000 (the "200K Note") (See **Exhibit "EE"**) and increased the 2011 Promissory Note to $4,240,000.[11] (See **Exhibit "CC"**, Credit and Forbearance Agreement and Second Amendment and Restatement of Promissory Note (the "Credit Agreement" and **Exhibit "EE"**, (the 200K Note).

84.     Further, Dalia, purporting to act as Trustee wrongfully attempted to: (i) waive any defenses the Orly Trust would have to payment, including any defenses with respect to MSCo., TPR, or any prior holder of the 2011 Promissory Note (See **Exhibit "CC"**, Credit Agreement, §6.1(c)); (ii) have the Orly Trust broadly indemnify MSCo., should Orly or any future Trustee legally attack the 2011 Promissory Note, the Amended Promissory Note, or the Credit Agreement (id., §7); (iii) make the Orly Trust liable for all costs of collection, including attorneys' fees (See **Exhibit "DD"**, Amended and Restated Promissory Note (the "Amended 2011 Note") § 6); (iv) **make Dalia's replacement as the Orly Trust Trustee an "Event of**

---

[10] In March, 2012, unbeknownst to Petitioner, TPR, D & K and the Orly Trust (i.e. Dalia and Sagi) purported to enter into an "Agreement Amending Terms of Promissory Note" to provide for New York law and jurisdiction in any competent court (See **Exhibit "FF"**). This Agreement also gave Dalia and Sagi the power to amend the 2011 Promissory Note at will.

[11] In other words, Dalia pledged $440,000 of Orly Trust assets in exchange for a purported $400,000.

**Default" making the Amended 2011 Note and the 200K Note (jointly, the "Notes")**

**immediately due and payable** (See **Exhibit "CC"**, Credit Agreement, § 6.2, emphasis added);

(v) agree to pay the 200K Note from the sale of the Orly Trust TRI Shares "notwithstanding

anything to the contrary" (**Exhibit "EE"**, 200K Note, §1.3); and, (vi) make the Credit

Agreement and Notes fully assignable without the consent of, or notice to, the Orly Trust (See

**Exhibit "CC"**, Credit Agreement, § 10).

## THE PURPORTED SETTLEMENT AND AMENDED SETTLEMENT

85.    On October 3, 2011, Dalia (supposedly on behalf of the Orly Trust), TPR

and D & K (by Sagi Genger) purported to settle the New York TPR Action.

86.    Petitioner and her counsel in the New York TPR Action were not

informed of this purported settlement nor was Petitioner consulted in any way regarding its

terms.

87.    In violation of the July 2009 Order, the Supreme NY Restraints, Surrogate

Webb's admonishment to Dalia concerning the dissipation of the Orly Trust's Assets, and the

Stipulation entered into between Petitioner and Dalia, the purported settlement agreement (the

"TPR Settlement Agreement", which incorporates the 2011 Promissory Note by reference)

purports to have the Orly Trust transfer all its interests in D & K and disclaim all interest in TPR.

The settlement agreement also has TPR relinquish its claims to the Orly Trust TRI Shares:

> (a) TPR hereby relinquishes in favor of the OG Trust [the Orly Trust] any
> economic interest in the TRI Shares [the Orly Trust TRI Shares] and assigns
> to the OG Trust its right to any economic benefits of the TRI Shares
> including any proceeds from the sale thereof, including but not limited to
> the $10.3 million in proceeds otherwise owing to TPR in the future pursuant
> to the terms of the August 22, 2008 letter agreement; (b) the OG Trust -
> irrespective of any claim made or asserted on its behalf by Orly Genger –
> hereby transfers to TPR its limited partnership interest in DK (the "DK
> Interest"), and disclaims any interest in, any shares of or TPR, either directly

or indirectly through DK (the "TPR Interest");... and (c) TPR agrees to pay $100,000 for the legal fees of the OG Trust.[12]
(See **Exhibit "GG"**, TPR Settlement Agreement, Paragraph "1")

88.    On March 16, 2012, Dalia (supposedly on behalf of the Orly Trust), TPR, and D & K GP (by Sagi Genger) entered into a purported Amended and Restated Settlement Agreement (the "Amended TPR Settlement Agreement"). Once again, Petitioner was not informed or consulted in any way. The purported "settlement" was restated, and then amended to purportedly cancel and void "the (i) the Amended and Restated Limited Partnership Agreement of D&K Limited Partnership dated as of October 30, 2004 and signed November 22, 2007, and/or (ii) the Meeting of Partners of D&K L.P. January 31, 2009 and Agreement." See **Exhibit "HH"**, March 16, 2012 Amended TPR Settlement Agreement, Paragraph "1").

89.    Importantly, though the Amended TPR Settlement Agreement purported to void these two agreements *ab* initio, the purported settlement did nothing to reverse or unwind the sham TPR Sale that these two agreements purported to enable, or to cancel the supposed deficiency resulting from the TPR Sale.[13]

90.    Demonstrably, these various actions and agreements (agreed to in secret and never revealed to the Court or Petitioner despite numerous Court appearances, filings and outstanding documents requests) in the New York TPR Action and New York TRI Action violated the protective restraints imposed by this Court and the other New York Courts in a

---

[12] Dalia, Sagi, TPR, and D & K also purported to require the Orly Trust to pay D & K and TPR's attorneys' fees, should Petitioner continue to advance claims on the Orly Trust's behalf (see **Exhibit "GG"**, Paragraph "8") and purported to release one another from all claims, causes of action, lawsuits, demands, liability of any kind, asserted or unasserted, known or unknown, suspected or unsuspected, direct or derivative, in connection with the 1993 Note [D & K Note], the [Orly Trust] TRI Shares, the Share Transfer, the DK Interest, the TPR Interest, the 2008 Letter Agreement, or any other matters, through the date of the Agreement Id. at Paragraph "4")

[13] The parties also made sure that the Release in the TPR Settlement Agreement did not cover anyone on Sagi and Dalia's "enemies list" (See **Exhibit "HH"**, Amended TPR Settlement Agreement, Paragraph "3"), changed the governing law to New York law (id. at Paragraph "6"), and made their agreement to Delaware jurisdiction non-exclusive (id.).

number of independent ways. As to the TPR Settlement Agreement and the Amended TPR

Settlement Agreement:

(a)    Pursuant to the July 2009 Order, Dalia and her counsel were required to give Petitioner 10 days advance notice of any transaction that impacted the Orly Trust TRI Shares, but failed to provide notice of either the TPR Settlement Agreement or the Amended TPR Settlement Agreement;

(b)    By agreeing in the TPR Settlement Agreement and the Amended TPR Settlement Agreement to have the Orly Trust relinquish its interest in TPR and transfer its interest in D & K to TPR, Dalia, Sagi, D & K GP, and TPR jointly and severally violated the TPR Action Restraints which forbade each of them from "transferring, pledging, assigning or otherwise disposing of the [Orly Trust TPR] Shares." (See **Exhibit "Z"** at 31-32)

91.    As to the Notes and the Credit Agreement, TPR's assignment of the 2011

Promissory Note to MSCo was an "…act by Respondent, her agents and all other persons acting

on her behalf to assign, mortgage, pledge, redeem, encumber, sell or otherwise alter the Orly

Trust's interest in TRI…"  Accordingly, pursuant to the July 2009 Order, Dalia was required to

give Petitioner at least 10 days notice of the transaction but completely failed to do so.  This

failure to notify Petitioner also violated various provisions of the Supreme NY Restraining

Orders.

## THE EVENT OF DEFAULT UNDER THE NOTES HAS BEEN TRIGGERED AS A RESULT OF THE DISMISSAL OF DALIA'S COUNSEL'S FEDERAL INTERPLEADER ACTION

92.    As a result of Dalia, TPR, D & K (through D & K GP) (i.e, Dalia and

Sagi's) actions, the $4.44 million dollars in new debt to MSCo is immediately due and payable

because of one of the poison pills that litter the Secret Agreements (in addition to the one that

provides an event of default if Dalia is removed as Trustee of the Orly Trust) has already been

triggered[14], and thus, MSCo is able to immediately proceed against the Orly Trust's assets in any

---

[14]The resolution of an interpleader action commenced by Dalia's counsel, Pedowitz & Meister LLP ("Pedowitz & Meister") is a triggering Event of Default under the Secret Agreements. Pedowitz & Meister was the

jurisdiction in the world (Delaware, St. Kitts, etc.) without notice or warning to the Orly Trust or to anyone.

93.     Thus, by her actions Dalia has created a situation where the assets of the Orly Trust could be in immediate peril of dissipation.

## DALIA NEEDS TO BE REMOVED AS TRUSTEE IMMEDIATELY

94.     As a result of all of Dalia's forgoing actions and inactions described in this Third Amended Verified Petition, her breach of her fiduciary duties to Petitioner as beneficiary of the Orly Trust, her violation of the terms and conditions of this Court's July 2009 Order and the Supreme NY Restraints, her ongoing conspiracy and scheme with Sagi to loot, transfer, pledge, encumber and dissipate the Orly Trust's assets and the immediate peril to those assets, Petitioner submits that Dalia's should be immediately removed as Trustee of the Orly Trust.

## JOEL ISAACSON SHOULD BE APPOINTED AS SUCCESSOR TRUSTEE

95.     As a result of Dalia's forgoing actions and inactions described in this Third Amended Verified Petition, her breach of her fiduciary duties to Petitioner as beneficiary

---

Escrow Agent with respect to the proceeds of the disputed sale of the Orly Trust TRI Shares and commenced an interpleader action against Petitioner, Dalia as Trustee of the Orly Trust and other parties in the United States District Court for the Southern District of New York, Pedowitz & Meister LLP v. TPR Investment Associates, Inc. Orly Genger, et al (Case No. 11 Civ. 5602) (the "Pedowitz & Meister Interpleader Action) whereby it sought, *inter alia,* a judgment from the Court determining who was entitled to the proceeds of the disputed sale of the Orly Trust TRI Shares. Petitioner's counsel moved to dismiss the Pedowitz & Meister Interpleader Action on the grounds, *inter alia,* that the District Court lacked subject matter jurisdiction and in any event, all the parties and claims involved in the Pedowitz & Meister Interpleader Action were already pending before Justice Feinman in the New York TRI Action. The Pedowitz & Meister Interpleader Action was recently dismissed by Judge John F. Keenan in the United States District for the Southern District of New York by Opinion and Order dated June 14, 2012, due to lack of subject matter jurisdiction and described by him as a "sham". See Case No.'s 08 Civ. 7140 (JFK), 11 Civ. 5602 (JFK), et al), Docket No. 64). Thus, the resolution of this sham action has triggered an Event of Default under the Secret Agreements. It is worth noting that Pedowitz & Meister represents both Dalia in her individual capacity and as Trustee of the Orly Trust.

of the Orly Trust and her violation of the terms and conditions of this Court's July 2009 Order, Dalia should be immediately removed as Trustee and replaced with Joel Isaacson.

96.    Mr. Isaacson is the founder and CEO of Joel Isaacson & Co. LLC, which has been a leading independent wealth management firm in New York City for almost 20 years, and which is located at 546 Fifth Avenue, 20th Floor, New York, NY 10036. Mr. Isaacson specializes in financial services and tax planning and has acted as trustee for more than 100 trusts. He holds a Bachelors of Science Degree in accounting and a Masters of Business Administration degree in financial planning. Mr. Isaacson is not acquainted with any members of the Genger family, does not have any interest in TRI, TPR or D & K, is willing and prepared to succeed Dalia as Trustee immediately and has an understanding of the current status of the Orly Trust.

**WHEREFORE,** respectfully requests that an Order be entered: (i) immediately removing Dalia Genger as Trustee of the Orly Trust; (ii) suspending the Letters of Appointment heretofore issued to Dalia; (iii) appointing Joel Isaacson as successor trustee; and, (iv) granting such other and further relief as this Court deems to be just equitable and proper.

Dated: New York, New York
        October 15, 2012

                                        _____
                                        ORLY GENGER

## VERIFICATION

STATE OF NEW YORK          )
                                           ) ss.:

COUNTY OF NEW YORK      )

ORLY GENGER, the petitioner named in the foregoing Third Amended Verified

Petition, being duly sworn, deposes and says:

1.     I am the Petitioner in this matter.

2.     I have read the annexed Third Amended Verified Petition, know the contents thereof and the same are true to my knowledge, except those matters thereon which are stated to be alleged upon information and belief, and as to those matters I believe them to be true.

_____
ORLY GENGER

Sworn to before me this
15th day of October, 2012

_____
Notary Public

**Daniel B Fix**
Notary Public State of New York
New York County, LIC# 02F16239452
Comm Exp 04/18/2015

TRUST AGREEMENT

BETWEEN

ARIE GENGER

AS GRANTOR

AND

LAWRENCE M. SMALL AND SASH A. SPENCER

AS TRUSTEES

CREATING

THE ORLY GENGER 1993 TRUST

Dated: December *13*, 1993

Copy 3 of 4

RUBIN BAUM LEVIN CONSTANT & FRIEDMAN
30 ROCKEFELLER PLAZA · NEW YORK, N.Y. 10112

DG 00313

## Index to the Orly Genger 1993 Trust Agreement

| Article | Contents | Page |
|---|---|---|
| FIRST: | Disposition of Principal and Income During the Life of the Grantor's Daughter, ORLY GENGER | 1 |
| SECOND: | Continuing Trust for Descendants of the Grantor's Daughter, ORLY GENGER | 5 |
| THIRD: | Disposition of Property if No Descendant of the Grantor is Living | 9 |
| FOURTH: | Additions to the Trusts | 13 |
| FIFTH: | Irrevocability | 13 |
| SIXTH: | Governing Law | 13 |
| SEVENTH: | Trustees | 13 |
| EIGHTH: | Compensation of Trustees | 18 |
| NINTH: | Settlement of Trustees' Accounts; Exoneration of Trustees | 18 |
| TENTH: | Definitions | 21 |
| ELEVENTH: | Administrative Powers | 22 |
| TWELFTH: | Provisions Relating to the GST | 32 |
| THIRTEENTH: | Release of Powers | 37 |
| FOURTEENTH: | Provision with Respect to Closely Held Businesses | 38 |
| FIFTEENTH: | Headings | 39 |
| SIXTEENTH: | Severability | 39 |

DG 00314

TRUST AGREEMENT dated December *13*, 1993, between ARIE GENGER (now residing at 1067 Fifth Avenue, New York, New York), as Grantor, and LAWRENCE M. SMALL (now residing at 2804 Woodland Drive, Washington, D.C. 20008) and SASH A. SPENCER (now residing at 251 Crandon Boulevard, Townhouse 164, Key Biscayne, Florida 33149), as Trustees.

The Grantor hereby transfers to the Trustees, and the Trustees hereby acknowledge receipt of, the sum of Six Hundred Thousand Dollars ($600,000.00), to be held, administered and disposed of in accordance with the provisions of Article FIRST hereof. Said sum and any other property that may be received by the Trustees pursuant to the provisions of Article FOURTH hereof, and all investments and reinvestments thereof, and all proceeds thereof which constitute principal, are hereinafter collectively called "principal."

This Trust Agreement shall be known as the "Orly Genger 1993 Trust Agreement" and the trust created by Article FIRST hereof shall be known as the "Orly Genger 1993 Trust."

FIRST:    Disposition of Principal and Income
During the Life of the Grantor's Daughter,
ORLY GENGER.

A. The Trustees shall hold, manage, invest and reinvest the principal of the trust created by this Article, IN TRUST, and, so long as the Grantor's daughter, ORLY GENGER, shall live, the Trustees are authorized and empowered to pay such part, parts or all, if any, of the net income of the trust

DG 00315

created by this Article (hereinafter referred to in this Article as "Orly's Trust") to, or apply such part, parts or all, if any, of such net income for the use or benefit of, such one or more of the following individuals living from time to time in such equal or unequal amounts or proportions, and at such time or times, as the Trustees, in their discretion, shall determine:

1.    The Grantor's daughter, ORLY GENGER.

2.    Each descendant of ORLY GENGER.

The Trustees shall accumulate all income of Orly's Trust not so paid to or applied and, at least annually, add such net income to the principal of Orly's Trust.

In making such distributions, the Trustees are requested (but they are not directed) to limit the total amount of the distributions made to any descendant of ORLY GENGER with respect to any calendar year to the amount necessary to increase such descendant's taxable income for United States income tax purposes for such year to the greatest amount that shall still result in such descendant not being subject to United States income taxes at the highest marginal rate in effect for such year, after taking into account all of such descendant's other income and deductions for such year.

B.    The Trustees are authorized and empowered to pay to, or apply for the use or benefit of, the Grantor's said daughter such part, parts or all, if any, of the principal of Orly's Trust, and at such time or times, as said Trustees, in

-2-

DG 00316

their discretion, shall determine, without regard to the interest in the trust of any other person and without regard to the fact that any such payment or application may result in the termination of Orly's Trust.

C.   Upon the death of the Grantor's said daughter, the Trustees shall pay the then principal of Orly's Trust, together with all net income thereof then accrued but not yet collected, and collected but not yet disposed of, as follows:

1.   The Trustees shall pay one-half (1/2) of such income and principal, in such equal or unequal amounts or proportions, to or for the use or benefit of such one or more of the descendants of the Grantor's said daughter, and upon such terms, conditions and trusts, if any, as the Grantor's said daughter, by a provision in her Will expressly referring to this Article of this Trust Agreement, shall validly direct and appoint. If, or to the extent that, the Grantor's said daughter shall fail so validly to direct and appoint such principal and income, the Trustees, at the death of the Grantor's said daughter, shall pay the same, per stirpes, to such of the descendants of the Grantor's said daughter as shall survive her, subject, however, to the provisions of Article SECOND hereof, or, if no descendant of the Grantor's said daughter shall survive her, per stirpes, to such of the Grantor's descendants as shall so survive, or, if no descendant of the Grantor shall so survive, in accordance with the provisions of Article THIRD hereof.

-3-

DG 00317

2.   The Trustees shall pay one-half (1/2) of such income and principal, per stirpes, to such of the descendants of the Grantor's said daughter as shall survive her, subject, however, to the provisions of Article SECOND hereof, or, if no descendant of the Grantor's said daughter shall survive her, per stirpes, to such of the Grantor's descendants as shall so survive, or, if no descendant of the Grantor shall so survive, in accordance with the provisions of Article THIRD hereof

3.   If, pursuant to the provisions of paragraph 1 or paragraph 2 of this Section C, the Trustees are directed to pay a per stirpital share of such income and principal to a descendant of the Grantor, and if at the time the Trustees are so directed there shall be in existence a trust for such descendant under a trust agreement between Arie Genger, as grantor, and Lawrence M. Small and Sash A. Spencer, as trustees, executed on the date hereof and known as the "Sagi Genger 1993 Trust Agreement," the Trustees shall not pay such per stirpital share to such descendant but shall instead pay such per stirpital share to the trustees then acting under said trust agreement, to be disposed of by them pursuant to the provisions of the trust for such descendant under said trust agreement.

D.   Notwithstanding anything herein to the contrary, if any Trustee hereunder shall be one of the potential income beneficiaries of Orly's Trust, such Trustee shall not, in his or her capacity as such a Trustee, have any voice or vote or other-

-4-

wise participate in any decision pertaining to the payment or application of the income or principal of Orly's Trust to or for the use or benefit of him or her in his or her capacity as a beneficiary of such trust or to or for the use or benefit of any person whom he or she has an obligation to support, and, in each such event, the other Trustee or Trustees shall make all decisions relating to such trust that pertain to such matters.

SECOND:    Continuing Trusts for
Descendants of the Grantor's Daughter,
ORLY GENGER.

A.    If, under any provision of this Trust Agreement, any property is directed to be paid to a descendant of the Grantor's daughter, ORLY GENGER, subject to the provisions of this Article, such property shall not be distributed or paid to such descendant. Instead, the Trustees shall continue to hold such property, IN TRUST (in a separate trust for each such descendant which is referred to in this Article as "such descendant's trust"; provided, however, that if there shall be property so directed to be paid on more than one occasion to any such descendant, all such property shall be held in a single trust for such descendant), and, so long as such descendant shall live before attaining the age of twenty·one (21) years, the Trustees, other than such descendant if he or she shall be a Trustee hereunder, are authorized and empowered to pay to, or apply for the use or benefit of, such descendant, such part, parts or all, if any, of the net income of such descendant's

-5-

DG 00319

trust, and at such time or times, as said Trustees, in their discretion, shall determine, and the Trustees shall accumulate the balance of such net income, if any, and, at least annually, add it to the principal of such descendant's trust, and, so long as such descendant shall live after attaining the age of twenty-one (21) years, the Trustees shall pay to such descendant all of the net income of such descendant's trust in at least quarterly installments.

B.    The Trustees, other than such descendant if he or she shall be a Trustee hereunder, are authorized and empowered to pay to, or apply for the use or benefit of, such descendant, such part, parts or all, if any, of the principal of such descendant's trust, and at such time or times, as said Trustees, in their discretion, shall determine, without regard to the interest in the trust of any other person and without regard to the fact that any such payment or application may result in the termination of the trust.

C.    Upon the death of such descendant (hereinafter referred to in this Article as "such deceased descendant"), the Trustees shall pay the then principal of such deceased descen-dant's trust, together with all net income thereof accrued but not yet collected, and collected but not yet disposed of, as follows:

-6-

DG 00320

1.   The Trustees shall pay one-half (1/2) of
such income and principal, in such equal or unequal amounts or
proportions, to or for the use or benefit of such one or more of
the descendants of such deceased descendant, and upon such
terms, conditions and trusts, if any, as such deceased descen-
dant, by a provision in his or her Will expressly referring to
this Article of this Trust Agreement, shall validly direct and
appoint.   If, or to the extent that, such deceased descendant
shall fail so expressly and so validly to direct and appoint
such principal and income, the Trustees shall, at the death of
such deceased descendant, pay the same, per stirpes, to such of
the descendants of such deceased descendant as shall survive
such deceased descendant, subject, however, to the provisions of
this Article, or, if no such descendant shall so survive, per
stirpes, to such of the descendants as shall so survive of the
ancestor of such deceased descendant closest in degree of rela-
tionship to such deceased descendant who (i) shall have descen-
dants who shall so survive and (ii) shall have been a descendant
of the Grantor or shall have been the Grantor, subject, however,
to the provisions of this Article, or, if no such descendant
shall so survive, in accordance with the provisions of Article
THIRD hereof.

2.   The Trustees shall pay one-half (1/2) of
such income and principal, per stirpes, to such of the descen-
dants of such deceased descendant as shall survive such deceased

-7-

DG 00321

descendant, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, per stirpes, to such of the descendants as shall so survive of the ancestor of such deceased descendant closest in degree of relationship to such deceased descendant who (i) shall have descendants who shall so survive and (ii) shall have been a descendant of the Grantor or shall have been the Grantor, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, in accordance with the provisions of Article THIRD hereof.

3.    If, pursuant to the provisions of paragraph 1 or paragraph 2 of this Section C, the Trustees are directed to pay a per stirpital share of such income and principal to a descendant of the Grantor subject to the provisions of this Article, and if at the time the Trustees are so directed there shall be in existence a trust for such descendant under a trust agreement between Arie Genger, as grantor, and Lawrence M. Small and Sash A. Spencer, as trustees, executed on the date hereof and known as the "Sagi Genger 1993 Trust Agreement," the Trustees shall not pay such per stirpital share to such descendant subject to the provisions of this Article but shall instead pay such per stirpital share to the trustees then acting under said trust agreement, to be disposed of by them pursuant to the provisions of the trust for such descendant under said trust agreement.

- 8 -

DG 00322

D.    Notwithstanding anything herein to the contrary, each trust created by the terms of this Article shall terminate, if not sooner terminated, upon the expiration of twenty-one (21) years after the death of the last surviving descendant of the Grantor's parents, SHARGA GENGER and DORA GENGER, who shall have been in being on the date hereof; and the Trustees shall thereupon pay the then principal of any trust terminated in accordance with the provisions of this Section, together with all net income thereof accrued but not yet collected and collected but not yet disposed of, to the descendant of the Grantor with respect to whom such trust is being held.

THIRD:    Disposition of Property if No Descendant of the Grantor is Living.

A.   As used in this Article:

1.    The words "such time" shall mean the time as of which any property is directed to be paid in accordance with the provisions of this Article.

2.    The term "Qualified Charitable Organization" shall mean an organization that shall be qualified as an organization to which contributions and bequests are deductible for both United States income tax, gift tax and estate tax purposes under the provisions of Section 170, Section 2522 and Section 2055 of the Internal Revenue Code.

-9-

B.    If, under any provision of this Trust Agreement, any property is directed to be paid in accordance with the provisions of this Article, the Trustees shall pay such property as follows:

1.    If the Grantor, the Grantor's spouse and/or any one or more descendants of the Grantor shall have caused there to be created a foundation known as The Genger Foundation, and if at such time said Foundation shall be in existence and shall be a Qualified Charitable Organization, then, in such event, the Trustees shall pay such property to said Foundation.

2.    If at such time either The Genger Foundation created as aforesaid shall not be in existence or said Foundation shall be in existence but shall not be a Qualified Charitable Organization, and if at such time the Trustees are authorized under applicable law to cause to be organized a corporation under and in accordance with the laws of any state of the United States which the Trustees, in their discretion, shall select, which corporation (i) shall be known by the name of The Genger Foundation (or by such other name as the Trustees, in their discretion, shall select if the name of The Genger Foundation shall not be available to be utilized as the name of said corporation), (ii) shall have as its purposes the encouragement, promotion, support and enhancement of non-orthodox study and education for children in the State of Israel pertaining to the customs, practices and ancient and modern history of the Jewish

-10-

DG 00324

people and shall maintain all of the property held by it, and
use all of the net income thereof received from time to time,
for the encouragement, promotion, support and enhancement of
such study and education for children, (iii) shall be required
to maintain all of the property held by it, and use all of the
net income thereof received from time to time, for such pur-
poses, with such property and income to be expended for such
purposes in such amounts, at such time or times and to or for
the use or benefit of such recipient or recipients as the direc-
tors, trustees and/or the officers of such corporation shall, in
their discretion, determine from time to time, subject, however,
to the other provisions of this paragraph 2, (iv) shall have as
its initial directors or trustees the Trustees hereunder, the
Grantor's cousin, JEREMIAH WOHLBERG (now residing at 2325
Lindenmere Drive, Merrick, New York), if he shall not then be a
Trustee hereunder, and also such other individual or individ-
uals, if any, as may be designated by the Trustees, and there-
after to have as directors or trustees such individuals as shall
from time to time be determined as provided for in the certi-
ficate of incorporation and/or by-laws of said corporation, and
(v) shall be organized and maintained in such manner as to be
and continue to be a Qualified Charitable Organization, then, in
such event, the Trustees shall organize such a corporation, and
the Trustees shall pay such property to such corporation.

-11-

3.    If at such time (i) either The Genger Foundation created as aforesaid shall not be in existence or said Foundation shall be in existence but shall not be a Qualified Charitable Organization, and (ii) the Trustees are not authorized under applicable law to cause to be organized a corporation of the nature referred to in paragraph 2 of this Section B, then, in such event, the Trustees shall pay such property to the JEWISH COMMUNAL FUND OF NEW YORK, New York, New York, to be held, administered and disposed of pursuant to the rules and regulations thereof as an Undesignated Philanthropic Fund to be known as the Genger Philanthropic Fund and with the privilege of making advisory recommendations with respect thereto to be held in the first instance by the Trustees, said JEREMIAH WOHLBERG, if he shall not then be a Trustee hereunder, and also by such other individual or individuals, if any, as the Trustees may designate, and thereafter by such other individual or individuals as such designees and their successors acting in such capacity may from time to time designate, and it is requested (but not directed) that the principal and income of such Fund shall be utilized to encourage, promote, support and enhance non-orthodox study and education for children in the State of Israel pertaining to the customs, practices and ancient and modern history of the Jewish people.

-12-

DG 00326

FOURTH:   <u>Additions to the Trusts.</u>

Any person, including the Grantor, by a transfer to take effect during the life of such person or upon the death of such person, may, at any time or times, add to the principal of any trust hereunder any property of any kind or nature acceptable to the Trustees, and any such additional property so received by the Trustees pursuant to the provisions of this Article shall thereafter be deemed to be part of the principal of such trust subject to all of the terms, provisions and conditions of this Trust Agreement.

FIFTH:   <u>Irrevocability.</u>

This Trust Agreement and the trusts hereby created are irrevocable and not subject to amendment or change.

SIXTH:   <u>Governing Law.</u>

This Trust Agreement and the trusts hereby created shall be governed by the laws of the State of New York.

SEVENTH:   <u>Trustees.</u>

A.   The initial Trustees acting hereunder shall be LAWRENCE M. SMALL and SASH A. SPENCER.

B.   Each individual acting as a Trustee hereunder (whether such Trustee is initially a party to this Trust Agreement or a successor Trustee named in Section C of this Article

-13-

DG 00327

or appointed pursuant to the provisions of this Section B) is authorized and empowered to appoint another individual (other than the Grantor) to act in his or her place and stead as a Trustee hereunder. Each appointment of a successor Trustee hereunder shall be made by the execution of an instrument of appointment signed and acknowledged by the individual who shall have made such appointment and by delivering such instrument in accordance with the provisions of Section G of this Article; and any such appointment may be revoked in the same manner by the individual Trustee who shall have made it at any time before the occurrence of the event or events as of which such appointment shall, by its provisions, become effective. Any appointment made in accordance with the provisions of this Section B shall be valid only if the individual so appointed shall, within thirty (30) days after the later of (i) the date on which a copy of such instrument of appointment is so delivered to him or her, and (ii) the occurrence of the event or events as of which such appointment shall, by its provisions, become effective, qualify as a successor Trustee under this Trust Agreement in accordance with the provisions of Section D of this Article. Each successor Trustee named in Section C of this Article or appointed in accordance with the provisions of this Section B shall be vested with the same powers and authority as the initial Trustees who are parties to this Trust Agreement; provided, however, that no such Trustee shall be permitted to exercise any authority or

-14-

DG 00328

power which such Trustee shall be prohibited from exercising by an express provision of this Trust Agreement.

C.    1.    If either LAWRENCE M. SMALL or SASH A. SPENCER shall cease to act as a Trustee hereunder, and no successor Trustee appointed by him pursuant to the provisions of Section B of this Article shall quality and act as a Trustee hereunder, MARTIN A. COLEMAN (now residing at 51 Cambridge Road, Great Neck, New York 11023) shall act as Trustee hereunder.

2.    If MARTIN A. COLEMAN shall fail or cease cease to act as a Trustee hereunder, and no successor Trustee appointed by him pursuant to the provisions of Section B of this Article shall quality and act as a Trustee hereunder, THOMAS G. HARDY (now residing at 935 Park Avenue, New York, New York 10028) shall act as a Trustee hereunder.

D.    Each successor Trustee hereunder shall qualify as such by accepting the trusteeship by the execution of a signed and acknowledged instrument of acceptance and by delivering such instrument in accordance with the provisions of Section G of this Article.

E.    Any individual Trustee hereunder may resign as such a Trustee by the execution of a signed and acknowledged instrument of resignation and by delivering such instrument in accordance with the provisions of Section G of this Article.

-15-

DG 00329

Any such resignation shall become effective upon the receipt of such instrument of resignation by each individual to whom it is delivered or mailed as aforesaid or at such later date as may be specified therein.

F.    If any individual while acting as a Trustee hereunder shall become incapable of discharging his or her responsibilities and duties as such a Trustee by reason of a physical, emotional or intellectual incapacity and such incapacity shall be confirmed by each of two medical doctors in written statements, copies of which shall be delivered or mailed as hereinafter provided, the individual who is so incapacitated shall be deemed for the purposes of construing and applying all of the provisions of this Trust Agreement to have effectively resigned as such Trustee in compliance with the provisions of Section E of this Article, such resignation to be deemed to be effective upon the delivery or mailing of the aforesaid statements as hereinafter provided.  Each of the aforesaid statements shall be signed and acknowledged by the medical doctor making the same and copies of the same shall be delivered or mailed by registered or certified mail to the individual, if any, who will become the successor Trustee hereunder in the place and stead of the incapacitated Trustee to whom such statement pertains, to each Trustee, if any, then acting hereunder (other than the incapacitated Trustee to whom such statement pertains), and also to either (i) the Grantor (or, if the Grantor shall not then be

-16-

DG 00330

living, to the executors, administrators or personal representa-
tives of the Grantor's estate), or (ii) any one or more of the
adult individuals to whom or for whose use or benefit the income
of any trust hereunder may then be paid or applied.

G.   Each instrument directed to be delivered in
accordance with the provisions of this Section G shall be deliv-
ered in person or by mailing a copy of the same by registered or
certified mail to each Trustee, if any, then acting hereunder
(other than the Trustee, if any, who shall have executed such
instrument), and to either (i) the Grantor (or, if the Grantor
is not then living, to the executors, personal representatives
or administrators of the Grantor's estate), or (ii) any one or
more of the adult individuals to whom or for whose use or bene-
fit the income of any trust hereunder may then be paid or
applied.

H.   No bond or other security shall be given by or
required in any jurisdiction (whether in the State of New York
or elsewhere) of any Trustee at any time acting hereunder
(whether such Trustee is named herein or appointed pursuant to
the provisions hereof) for the faithful performance of such
Trustee's fiduciary duties in any capacity hereunder regardless
of whether such Trustee is or may become a non-resident of the
State of New York or elsewhere.

-17-

DG 00331

EIGHTH:   Compensation of Trustees.

No Trustee hereunder, whether such Trustee is herein-
above named or appointed pursuant to the provisions hereof,
shall be entitled to any compensation (other than reimbursement
for out-of-pocket expenses) for services rendered as a Trustee
hereunder; and each Trustee who is a party to this Trust Agree-
ment or who qualifies as a successor Trustee hereunder as pro-
vided herein shall be deemed to have agreed to serve as such
Trustee without receiving any such compensation.

NINTH:   Settlement of Trustees' Accounts;
Exoneration of Trustees.

A.   To the fullest extent permitted by law, the
Trustees shall not be required to file with or render to, and
the Grantor waives and excuses the filing with or rendering to,
any Court an account of their transactions or inventories, ac-
counts, statements or reports of principal and/or income with
respect to any trust created hereunder.   Nevertheless, the
Trustees may at any time have their accounts judicially settled
with respect to any trust created hereunder, and in any such
proceeding it shall not be necessary to serve any person who is
under a disability if there is another party to the proceeding
who is not under any disability and who has the same interest as
the person who is under a disability, and, in such event, it
shall not be necessary to appoint a guardian ad litem for any
such party who is under a disability.   The expenses of any such

-18-

DG 00332

account shall be a proper administration expense of the trust to which such account relates.

B.   If any Trustee shall resign as a Trustee hereunder, the continuing Trustee, if any, or, if there is no continuing Trustee, any successor Trustee who shall have qualified to act in accordance with the provisions of Section D of Article SEVENTH hereof, may deliver to the Trustee so resigning an instrument whereby such resigning Trustee shall be released and discharged, to the extent stated therein, of and from any and all accountability, liability and responsibility for acts or omissions as Trustee. Any such release and discharge shall be binding upon all persons, whether or not then in being, then or thereafter interested in either the income or the principal of any trust hereunder and shall have the force and effect of a final decree, judgment or order of a court of competent jurisdiction rendered in an appropriate action or proceeding for the judicial settlement of the account of such Trustee in which jurisdiction was obtained of all necessary and proper parties. The foregoing provision, however, shall not preclude any Trustee so resigning from having his or her account judicially settled, and in any such proceeding it shall not be necessary to serve any person who is under a disability if there is another party to the proceeding who is not under any disability and who has the same interest as the person who is under a disability, and, in such event, it shall not be necessary to appoint a guardian

-19-

DG 00333

ad litem for any such party who is under a disability.  The expenses of any judicial account rendered by a Trustee who shall resign shall be a proper administration expense of the trust to which such account relates.

C.    In addition to the foregoing, the Trustees are hereby authorized, at any time and from time to time, with respect to any trust hereunder, to settle the account of the Trustees by agreement between the Trustees and the then adult individual or individuals to whom or for whose use or benefit the income of such trust may then be paid or applied and the adult or adults who would be entitled to the principal in case such trust were to terminate at the time of such agreement, excluding any such individual who is under a disability if there is a party to the agreement who is not under any disability and who has the same interest as the individual who is under a disability, which agreement shall bind all persons, whether or not then in being, then or thereafter interested in either the income or the principal of such trust.  Any such settlement shall have the same force and effect as a final decree, judgment or order of a court of competent jurisdiction rendered in an appropriate action or proceeding for the judicial settlement of such account in which jurisdiction was obtained of all necessary and proper parties.  The expenses of any such account shall be a proper administration expense of such trust.

DG 00334

D.    To the extent permitted by law, no Trustee shall be accountable, liable or responsible for any act, default, negligence, or omission of any other Trustee.

TENTH:    <u>Definitions</u>.

Wherever used in this Trust Agreement:

1.    The word "Trustees" and all references to the Trustees shall mean and refer to the Trustees and successor Trustees hereinabove named, any successor Trustee appointed pursuant to the provisions hereof, any substitute Trustee appointed by a court of competent jurisdiction, the survivors or survivor of them, and their and each of their successors or successor, as may be acting hereunder from time to time.

2.    The words "IN TRUST" shall mean "in trust, nevertheless, to hold, manage, invest and reinvest, and, until payment thereof as hereinafter directed, to receive the income thereof."

3.    The word "pay" shall, where applicable, mean "convey, transfer and pay" and the word "payment" shall, where applicable, mean "conveyance, transfer and payment."

4.    The words "descendant" and "descendants," when used with respect to any person, shall be deemed to include (i) every individual who is born to such person, (ii) every individual who is lawfully adopted by such person, and (iii)

-21-

DG 00335

every individual who is otherwise descended from such person, whether by birth, or by lawful adoption, or by a combination thereof.

5.    The words "Internal Revenue Code" shall mean and refer to "the United States Internal Revenue Code of 1986 (as amended from time to time)," and any reference to a specific section, chapter or other provision of the Internal Revenue Code shall mean and refer to said section, chapter or other provision and any successor statute thereto pertaining to the same subject matter as said section, chapter or other provision.

ELEVENTH: <u>Administrative Powers</u>.

A.    In addition to and in amplification of the powers given by law to trustees, the Trustees, but solely in their fiduciary capacities, are hereby authorized and empowered, in their discretion:

1.    To sell, exchange, make contracts with respect to, grant options on or otherwise dispose of, at public or private sale, at such prices, on such terms (including sales on credit with or without security) and at such time or times as the Trustees shall determine, any property, real or personal, which may at any time form part of any trust hereunder.

2.    To lease, for such periods (whether or not any such period shall extend beyond the period prescribed by law

-22-

DG 00336

or the probable term of any trust hereunder), on such terms and conditions and at such time or times as the Trustees shall determine, the whole or any portion or portions of any property, real or personal, which may at any time form part of any trust hereunder, whether the same be held in severalty or as tenant-in-common with others or in a partnership, syndicate or joint venture or otherwise, and release and convey any undivided interest in any such property for the purpose of effecting par-tition of the whole or any part thereof; and make, place, extend or renew mortgages, pledges, building loan agreements or build-ing loan mortgages upon or affecting any and all such property; and make, execute and deliver such mortgages, pledges and agree-ments, together with proper bonds, notes or other instruments of indebtedness to accompany the same, and such extension or renewal agreements, as to the Trustees shall seem necessary, advisable or proper; and also to repair, alter, reconstruct, build upon or improve any such property and on such terms and at such time or times as the Trustees shall determine, give and grant to others the right so to do, or agree in, or so modify any lease affecting any such property that the lessee may alter, repair, reconstruct, build upon, improve, mortgage and pledge any such property; and generally to make, alter and modify all agreements, leases, mortgages, pledges, building loans, sales, exchanges, transfers and conveyances of or affecting any such property which the Trustees shall determine to be necessary, advisable or proper for the preservation, improvement, enhance-

-23-

ment in value of, or betterment of or addition to, such prop-
erty.

3.    To hold any part or all of the assets of any
trust hereunder invested in the same form of property in which
the same shall be invested when received by the Trustees, and
invest and reinvest the assets of any such trust, or any portion
thereof, in any form of investment which the Trustees may deter-
mine (including, without limitation, mutual funds, common trust
funds, investment trusts, general partnerships and limited part-
nerships), whether or not such investment is of the nature pre-
scribed by law as a legal investment for fiduciaries or is spec-
ulative in nature, and without regard to the percentage of the
assets of such trust which such investment or similar invest-
ments may constitute.

4.    To vote in person or by proxy all stocks and
other securities held by any trust hereunder; grant, exercise,
sell or otherwise turn to account rights to subscribe for stock
and securities and options of any nature; amortize or refrain
from amortizing premiums on bonds or other securities which the
Trustees may purchase or receive; participate in reorganiza-
tions, mergers, liquidations or dissolutions, and contribute to
the expenses of, and deposit securities with, protective commit-
tees in connection therewith; participate in voting trusts; and
generally exercise, in respect of said stock and securities, all

-24-

DG 00338

rights, powers or privileges which may be lawfully exercised by any person owning similar property in his or her own right.

5.    To employ any investment counsel, corporate custodians, agents, accountants, brokers and attorneys which the Trustees may select and pay the charges thereof (including charges for preparation of trust tax returns, the Trustees' accounts and any other necessary trust records); and the Trustees, or a partnership, corporation or other entity in which any Trustee shall be interested, or by which any Trustee may be employed, may be retained in any such capacity, and, in such event, the charges which shall be payable to such Trustee, or to any such partnership, corporation or other entity, shall be in addition to compensation otherwise allowable to such Trustee and may be paid without prior judicial approval.

6.    In any case in which the Trustees are authorized or required to pay or distribute any share of any trust hereunder, to make such payment or distribution in kind, or partly in kind and partly in money and, in connection therewith, to allocate equal or unequal interests in, or amounts of, specific property in satisfaction of such payment or distribution; provided, however, that any property distributed in kind shall be valued, for purposes of such distribution, at its fair market value on the date of distribution.

-25-

DG 00339

7.   To settle, adjust, compromise or submit to arbitration any dispute, claim or controversy in which any trust hereunder may be in any way interested.

8.   To borrow money from any person, partnership, corporation or other entity, who may be any Trustee or a partnership, corporation or other entity in which any Trustee may be interested, or by which any Trustee may be employed, for the purpose of meeting any and all charges against any trust hereunder or for any other purpose connected with the administration, preservation, improvement or enhancement in value of any such trust, and, in connection with any such borrowing, to pledge, hypothecate or mortgage any part or all of the assets of any such trust.

9.   To keep any or all of the securities at any time forming a part of any trust hereunder in the name of one or more nominees.

10.   In any case where doubt or uncertainty exists under applicable law or this Trust Agreement, to credit receipts and charge expenses to principal or income, or partly to each.

11.   By instrument or instruments signed by all of the Trustees qualified and acting as such at any time with respect to any trust hereunder, to delegate, in whole or in part, to any person or persons (including any one or more of the

-26-

DG 00340

Trustees) the authority and power to (i) sign checks, drafts or
orders for the payment or withdrawal of funds from any bank
account or other depository in which funds of such trust shall
be held, (ii) endorse for sale, transfer or delivery, or sell,
transfer or deliver, or purchase or otherwise acquire, any and
all stocks, stock warrants, stock rights, bonds or other securi-
ties whatsoever with respect to such trust, and (iii) gain
access to any safe deposit box which may be in the names of the
Trustees and remove part or all of the contents of any such safe
deposit box and release and surrender the same.

12.   To pay or deliver to either parent or to the
guardian of the property of any minor or to an adult with whom
such minor resides, and, with respect to any person for whom it
is permissible to do so under applicable law, to a custodian for
such person under a Uniform Gifts to Minors Act or Uniform
Transfers to Minors Act of any state until the age of eighteen
(18) years (or until such age in excess of eighteen (18) years
as shall be permissible under applicable law and which the
Trustees, in their discretion, shall select) any sum or prop-
erty, including income, which such minor or such person shall
either be entitled to receive or to have applied for his or her
use or benefit under any of the provisions hereof, without
requiring that such parent, adult or custodian obtain letters of
guardianship or that such parent, guardian, adult or custodian
give any bond or other security for any such payment or delivery

-27-

so made; and the receipt of such parent, guardian, adult or custodian for the amount of such payment, or for the property so delivered, shall be an absolute protection to the Trustees and a complete release and discharge from all further accountability in respect of any such payment or delivery.

13.   If any beneficiary of any trust hereunder shall, in the opinion of the Trustees, be or become incapacitated (whether by reason of illness, age or other causes) the Trustees may, in their discretion, wholly or partly in lieu of paying net income or principal of such trust to such beneficiary as authorized or directed by this Trust Agreement, dispose of the same in one or more of the following ways:

(a)   by making payment of such net income or principal to a legally appointed guardian or other fiduciary of such beneficiary;

(b)   by making payment of such net income or principal, on behalf of such beneficiary, to any person with whom such beneficiary resides or who has charge of his or her care; and/or

(c)   by applying such net income or principal directly for the use or benefit of such beneficiary.

-28-

DG 00342

14.    To remove the assets of, hold and administer any such assets in, and/or move the situs of the administration of any trust hereunder to, such location or locations (which may be in a state or other jurisdiction other than the State of New York) as the Trustees, in their discretion, shall select.    If the Trustees, in their discretion, shall determine it advisable to move the situs of the administration of any trust hereunder to a location where the judicial administration of trusts is required or permitted, the Trustees are authorized to select and request a court in such location having jurisdiction over the administration of trusts to accept jurisdiction over the administration of such trust, and it is requested that such court accept, and that it be permitted to accept, jurisdiction over the administration of such trust; and it is directed that the administration of such trust shall be governed from time to time by the laws of the jurisdiction in which the administration of such trust is then located.

15.    To make, or refrain from making, elections or allocations permitted under any applicable tax law without regard to the effect of any such election or allocation on the interest of any beneficiary of any trust hereunder and, if any such election or allocation shall be made, to apportion, or refrain from apportioning, any benefits thereof among the respective interests of the beneficiaries of such trust, all in such manner as the Trustees shall deem appropriate.

-29-

DG 00343

16.   To retain or invest _in_ _solido_ the property held in any trust hereunder with the property held in one or more of the other trusts hereunder or with the property held in any other trust created by the Grantor or by any other person for purposes of convenience or for the better investment thereof.

17.   To exercise all authority, powers, privileges and discretion conferred in this Article after the termination of any trust created hereunder and until all of the assets of such trust are fully distributed.

B.   No person or party dealing with the Trustees shall be bound to see to the application of any money or other consideration paid by him or her to the Trustees.

C.   Neither the principal nor the income of any trust hereunder, or any part thereof, shall or may at any time be liable or subject in any manner whatsoever to the debts or liabilities of any beneficiary entitled to receive any principal or income therefrom; nor shall the principal or income of any trust hereunder be liable to attachment by garnishment proceedings or other legal process issued by any creditor of any beneficiary of such trust for debts heretofore or hereafter contracted by such beneficiary; nor shall any assignment, conveyance, charge, encumbrance or order, either of principal or income, given by any such beneficiary be valid.

-30-

DG 00344

D.   Wherever in this Trust Agreement it is provided
that an instrument is to be "acknowledged," such instrument
shall be acknowledged in such manner as would be required if the
same were a conveyance of real property entitled to be recorded
in the State of New York.

E.   1.   To the fullest extent permitted by law, no
transaction or decision involving any trust hereunder shall be
deemed invalidated in any way by reason of any personal, benefi-
cial or other interest which any Trustee may have with respect
to such transaction or decision, including, without limitation,
any transaction or decision with respect to any corporation,
company, partnership, association, estate, trust or other entity
in which any Trustee may have an interest in a capacity other
than as a Trustee hereunder, regardless of any conflict of
interest as to any such transaction or decision, and any such
transaction or decision shall be lawful and proper and shall not
be questioned unless such Trustee is guilty of fraud with
respect thereto.   Without limiting the foregoing, no Trustee
shall be disqualified or barred from acting as such or have any
liability hereunder in exercising any power, authority or dis-
cretion conferred upon the Trustees by reason of the fact that
such Trustee may be a stockholder, officer, director, partner,
executor, administrator, personal representative, trustee, bene-
ficiary, or in any other way interested in the corporation, com-
pany, partnership, association, estate, trust or other entity

-31-

whose securities or property are the subject matter of the exercise of such power, authority or discretion.

2.    The Trustees hereunder shall be entitled to compensation as officers, directors, fiduciaries or other participants in any such entity notwithstanding the fact that they are Trustees hereunder and are also entitled to receive reimbursement for their out-of-pocket expenses as such Trustees.

F.    The Trustees shall be under no duty or obligation and shall not be liable to any trust hereunder or to any person or persons interested in any trust hereunder or be surcharged for failure to buy, sell or engage in any transaction directly or indirectly involving securities issued or to be issued by any corporation or other business organization concerning which any of the Trustees, in a capacity other than as a Trustee hereunder, may have acquired any information which has not been disclosed to the public.

TWELFTH:    <u>Provisions Relating to the GST</u>.

A.    As used in this Article:

1.    "GST" shall mean and refer to "the United States generation-skipping transfer tax imposed by Chapter 13 of the Internal Revenue Code."

-32-

DG 00346

2.   The words "inclusion ratio" shall have the same meaning as those words are given in Section 2642 of the Internal Revenue Code.

3.   The words "Net Death Taxes" shall mean and refer to "the aggregate death taxes (including, without limitation, United States, state, local and other estate taxes and inheritance taxes but not including any interest and penalties thereon), after taking into account all applicable credits, payable with respect to the estate of such beneficiary."

B.   1.   Notwithstanding any other provision in this Trust Agreement to the contrary, and in addition to any other power of appointment hereinabove given by the previous provisions of this Trust Agreement to any individual at whose death the inclusion ratio with respect to any trust under this Trust Agreement would, but for the provisions of this Section B, be more than zero (such individual being referred to in this Article as "such beneficiary"), the Trustees of such trust are authorized and empowered, by an acknowledged instrument in writing (with such instrument to be filed with the court, if any, then having jurisdiction over such trust, if such court shall accept such instrument for filing), (i) to create in such beneficiary a power (hereinafter referred to in this Section B as "such power"), to be exercised by a provision in his or her Will expressly referring to this Article of this Trust Agreement, to appoint to the creditors of his or her estate any portion of the

-33-

property held in such trust at the death of such beneficiary,
and (ii) to limit such power, by formula or otherwise, to less
than all of the property held in such trust at the death of such
beneficiary; provided, however, that with respect to each such
trust, the maximum amount of property over which such power may
be created shall not, after taking into account the property, if
any, over which any other such power is created in such benefi-
ciary, exceed the amount, if any, above which any further addi-
tion to the amount subject to such power would increase the Net
Death Taxes determined with respect to such beneficiary's estate
by an amount equal to or greater than the net decrease in the
aggregate of (x) the GST and (y) any state and/or local tax on
generation-skipping transfers imposed as a result of the death
of such beneficiary that would result from such further addi-
tion.   Unless such beneficiary's Will otherwise provides by
express reference to this Trust Agreement and such power, the
increase in the Net Death Taxes on such beneficiary's estate
resulting from such power shall be paid from that part of the
principal of such trust over which such power is exercisable.
If, or to the extent that, such beneficiary shall fail so
expressly and so validly to exercise any power created in such
beneficiary by the Trustees pursuant to the provisions of this
paragraph, the unappointed portion (or, as the case may be, all)
of the property subject to such power shall pass pursuant to the
provisions of this Trust Agreement otherwise applicable to such
property.

-34-

DG 00348

2.   The Trustees are further authorized and empowered, by an acknowledged instrument in writing (with such instrument to be filed with the court, if any, then having jurisdiction over the trust to which such power relates, if such court shall accept such instrument for filing), to revoke any power created by the Trustees pursuant to the provisions of paragraph 1 of this Section B at any time prior to the death of the beneficiary in whom such power was created, and to release, in the manner set forth in Article THIRTEENTH hereof, the right to create such a power.  The Trustees shall not be liable for any exercise, release or failure to exercise the authority and power granted to them by the provisions of said paragraph 1 or for the revocation of any power created by them pursuant to the provisions of said paragraph 1, provided they utilize good faith in considering whether or not to exercise or release such power or to cause such revocation, whether such consideration be at their own instance or at the request of an individual who is a beneficiary of a trust hereunder, the guardian or other fiduciary of such an individual, or a member of his or her family.

C.   1.   Notwithstanding any other provision in this Trust Agreement to the contrary, if at any time any property is to be placed in a trust under the provisions of any Article of this Trust Agreement, the Trustees shall, if need be, and if it is possible to do so, divide such property and place the same in separate trusts to the end that one such trust shall have an

-35-

DG 00349

inclusion ratio of zero, and if any property which is directed
to be added to a trust hereunder shall have an inclusion ratio
which is different than the inclusion ratio of such trust, the
Trustees shall not make such addition but shall instead admin-
ister such property in a separate trust under this Trust Agree-
ment; and, in each such instance, the property to be placed or
held in such a separate trust shall be held, administered and
disposed of by the Trustees pursuant to provisions identical to
the provisions of the trust to which, but for the provisions of
this paragraph 1, such property would have been placed or added.

2.    If, pursuant to the provisions of paragraph
1 of this Section C, any property that would otherwise be held
in a single trust hereunder is instead held in separate trusts
hereunder, the Trustees of such trusts may, at any time or from
time to time, (i) make different tax elections and allocations
with respect to each such trust, (ii) expend principal and
income and exercise any discretionary power differently with
respect to each such trust, (iii) invest each such trust differ-
ently, and/or (iv) take all other actions consistent with such
trusts being separate entities.  Furthermore, the donee of any
power of appointment with respect to such trusts may exercise
such power differently with respect to each such trust.

D.    Notwithstanding the provisions of the foregoing
Sections of this Article to the contrary, if any Trustee here-
under is a current beneficiary of the income of any trust here-

-36-

DG 00350

under, or may, in the discretion of the Trustees, be a current income beneficiary of any such trust, then, in such event, such Trustee shall not, in his or her capacity as a Trustee of such trust, have any voice or vote or otherwise participate in any decision pertaining to the matters relating to such trust that are addressed in the foregoing Sections of this Article, and, in each such event, the other Trustee or Trustees of such trust shall make all decisions relating to such trust that pertain to such matters.

THIRTEENTH:   <u>Release of Powers</u>.

Any beneficiary and any Trustee hereunder may at any time or times release any discretionary power of appointment or discretionary power to distribute principal or income or any other discretionary power hereby given to such beneficiary or Trustee, either with or without consideration, with respect to the whole or any part of the property subject to such power and also in such manner as to reduce or limit the persons or objects or classes of persons or objects in whose favor such power would otherwise be exercisable, by an instrument signed and acknowledged by the beneficiary or Trustee releasing such power and delivered to (i) each Trustee then acting hereunder (other than the Trustee, if any, who shall have executed such instrument), (ii) the Grantor (or, if the Grantor is not then living, to the executors, administrators or personal representatives of the

-37-

DG 00351

Grantor's estate), or (iii) any one or more of the adult indi-
viduals to whom or for whose use or benefit the income of any
trust hereunder may then be paid or applied.  In the event of
the release of any such power by any Trustee, the remaining
Trustee or Trustees hereunder, if any, may thereafter exercise
such power, other than any discretionary power which was not
initially vested in such remaining Trustee or Trustees.  The
release of any power by any Trustee hereunder pursuant to the
provisions of this Article shall not be binding upon any Trustee
who may thereafter act as a Trustee hereunder unless such power
shall have been released by all of the Trustees then in office
who are vested with such power by their execution of a signed
and acknowledged instrument specifically providing that such
release is to be binding upon all successor Trustees hereunder.

FOURTEENTH:     Provision With Respect To
                Closely Held Businesses.

Without limiting the powers and authority conferred
upon the Trustees by Article ELEVENTH hereof but in extension
thereof, the Trustees are specifically authorized and empowered,
in their discretion, to retain for as long as they, in their
discretion, shall deem advisable, any or all shares of stock in
any closely held corporation, or any indebtedness owing by any
such corporation, or any or all interests in any proprietorship,
unincorporated business, partnership, joint venture, realty or

-38-

DG 00352

any other asset, whether owned individually, as tenant-in-common, partner or otherwise, regardless of whether such asset or assets shall be producing profits or losses through ownership or operation thereof, and regardless of the percentage of the trusts hereunder which such assets or similar assets may constitute; and their decision to retain and hold any such asset or liability shall be binding and conclusive upon and shall not be subject to question by any person interested, or who may become interested, in any of the trusts hereunder, and the Trustees shall not incur any liability by reason thereof.

FIFTEENTH:    Headings.

The Article headings contained herein are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope hereof or the intent of any provision hereof.

SIXTEENTH:    Severability.

Should any part, clause, provision or condition hereof be held to be void or invalid, then such invalidity shall not affect any other part, clause, provision or condition hereof, but the remainder hereof shall be effective as though such void

-39-

DG 00353

part, clause, provision or condition had not been contained
herein.

WITNESS the due execution hereof by the Grantor and
Trustees on the day and year first above written.

ARIE GENGER,
as Grantor

LAWRENCE M. SMALL,
as Trustee

SASH A. SPENCER,
as Trustee

-40-

DG 00354

STATE OF NEW YORK      )
                       )   ss.:
COUNTY OF NEW YORK     )

On this 13 day of December, 1993, before me personally appeared ARIE GENGER, to me known and known to me to be a person described in and who executed the foregoing instrument, and he duly acknowledged to me that he executed the same.

_____
Notary Public

BRIT GEIGER
Notary Public, State of New York
No. 24-4502318 Qual. in Kings Co.
Certificate Filed in New York County
Commission Expires June 30, 1995

District of Columbia :ss
~~STATE OF~~                )
                           )   ss.:
~~COUNTY OF~~               )

On this 15th day of December, 1993, before me personally appeared LAWRENCE M. SMALL, to me known and known to me to be a person described in and who executed the foregoing instrument, and he duly acknowledged to me that he executed the same.

_____
Jeanne M. Meister
Notary Public

My Commission Expires July 31, 1997

STATE OF New York   )
                    )   ss.:
COUNTY OF New York  )

On this 16th day of December, 1993, before me personally appeared SASH A. SPENCER, to me known and known to me to be a person described in and who executed the foregoing instrument, and he duly acknowledged to me that he executed the same.

_____
Stella M. Orso
Notary Public

STELLA M. ORSO
Notary Public, State of New York
No. 24-4524037
Qualified in Kings County
Certificate Filed in New York County
Commission Expires March 30, 1994

-41-

DG 00355

## PROMISSORY NOTE



**$8,950,000**

December 21, 1993
New York, New York

FOR VALUE RECEIVED, the undersigned, D&K LIMITED PARTNERSHIP, a Delaware limited partnership (the "Company"), promises to pay to the order of TPR INVESTMENT ASSOCIATES, INC., a Delaware corporation (the "Holder") the principal sum of EIGHT MILLION NINE HUNDRED FIFTY THOUSAND ($8,950,000) DOLLARS, together with interest on the unpaid principal balance at 6.06% per annum, as follows.

1. Interest shall be payable annually in arrears on the anniversary date of this Note.

2. Installments of principal in the amount of $447,500 each shall be payable annually beginning on the fourth anniversary of this Note, and the entire unpaid principal balance, together with all accrued and unpaid interest, shall be payable on the tenth (10th) anniversary of this Note.

Payments hereunder shall be made in lawful money of the United States of America in same day or immediately available funds to the account designated by the Holder in writing to the Company from time to time.

This Note is the promissory note referred to in the Agreement, dated as of September 30, 1992, as amended as of the date hereof, between the Company and the Holder.

If the Company shall fail to make any payment on this Note within 10 business days after the same shall become due and payable, or in the event of a Bankruptcy Event (defined below), then the Holder may, while such act or occurrence shall be continuing, upon notice to the Company to such effect, declare the entire unpaid principal amount of this Note to be forthwith due and payable, whereupon this Note shall become immediately due and payable without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Company. No remedy herein conferred upon or reserved to the Holder or the Company is intended to be exclusive of any other remedy, and such remedy shall be in addition to every other remedy given hereunder or at law or in equity.

G:\ERF\RF\DKI\TPR21001.NOT

12/13/93 7:47pm

The term "Bankruptcy Event" shall mean any of the following events or occurrences: (i) the Company admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of creditors; or (ii) any proceeding is instituted by or against the Company, seeking to adjudicate it a bankrupt or insolvent, or seeking any arrangement, adjustment, composition of the Company, or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking to dissolve, wind-up or liquidate the Company, or any substantial part of its assets, or seeking appointment of a receiver, trustee or other similar official for the Company, or for any substantial part of its property.

In the event of a declaration of acceleration of the principal amount of this Note as set forth above, the Company agrees to pay the cost of collection, including, without limitation, reasonable attorneys' fees and disbursements.

The Company consents to the jurisdiction of the Federal and State Courts sitting in New York City. With respect to any action or proceeding or enforce or collect this Note, the Company agrees that venue will be proper in such courts and hereby waives any objection based upon <u>Forum Non Conveniens</u>. The choice of forum as aforesaid shall not be deemed to preclude the enforcement of any judgment obtained in such forum or the taking of any action to enforce this Note in any other jurisdiction.

THIS NOTE HAS BEEN DELIVERED IN, AND SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE LAWS OF, THE STATE OF NEW YORK.

D&K LIMITED PARTNERSHIP

By: _____
     Dalia Genger, General Partner

Each of the undersigned hereby assumes and becomes liable for the percentage of this Note set forth opposite its respective name, and agrees that the Holder may enforce this Note, to the extent of such liability, as if the undersigned were the Maker thereof.

Trust u/a 12/13/93 f/b/o                 48%
Sagi Genger

By: _____
    Lawrence M. Small, Trustee

    _____
    Sash A. Spencer, Trustee


Trust u/a 12/13/93 f/b/o             48%
Orly Genger

By: _____
    Lawrence M. Small, Trustee

    _____
    Sash A. Spencer, Trustee


G:\ERP\WP\TRT\TPR21001.NOT                    -3-

12/13/93 7:47pm

PLEDGE AGREEMENT, dated December 21, 1993, made by D&K LIMITED PARTNERSHIP, a Delaware limited partnership (the "Pledgor"), to TPR INVESTMENT ASSOCIATES, INC., a Delaware corporation ("TPR").

### PRELIMINARY STATEMENTS:

(1)  The Pledgor is the owner of 240 shares of Common Stock of TPR (the "Pledged Shares") evidenced by Certificate No. 5 issued in the name of Pledgor.

(2)  Pledgor purchased the pledged shares from TPR and paid a portion of the purchase price therefor with a promissory note (the "Note") of even date herewith in the principal amount of $8,950,000

NOW THEREFORE, in consideration of the premises and in order to induce TPR to accept the Note in part payment of the purchase price of the Pledged Shares, the Pledgor hereby agrees as follows:

SECTION 1.  <u>Pledge.</u>  The Pledgor hereby pledges to TPR, and grants to TPR a security interest in, the following (the "Pledged Collateral"):

(i)  the Pledged Shares and the certificate representing the Pledged Shares, and all dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Pledge Shares; and

(ii) all additional shares of stock of the issuer of the Pledged Shares from time to time acquired by the Pledgor in any manner, and the certificates representing such

additional shares, and all dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares.

SECTION 2.  <u>Security for Obligations.</u>  This Agreement secures the payment of all obligations of the Pledgor now or hereafter existing under the Note and all obligations of the Pledgor now or hereafter existing under this Agreement (all such obligations of the Pledgor being the "Obligations").

SECTION 3.  <u>Delivery of Pledged Collateral.</u>  All certificates of instruments representing or evidencing the Pledged Collateral shall be delivered to and held by or on behalf of TPR pursuant hereto and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to TPR.  TPR shall have the right, at any time in its discretion and without notice to the Pledgor, to transfer to or to register in name or any of its nominees any or all of the Pledged Collateral, subject only to the revocable rights specified in Section 6(a).  In addition, TPR shall have the right at any time to exchange certificates or instruments representing or evidencing Pledged Collateral for certificates or instruments of smaller of larger denominations.

SECTION 4.  <u>Representations and Warranties.</u>  The Pledgor hereby represents and warrants to TPR as follows:

-2-

(a) The Pledgor is the legal and beneficial owner of the Pledged Collateral free and clear of any lien, security interest, option or other charge or encumbrance except for the security interest created by this Agreement.

(b) The pledge of the Pledged Shares pursuant to this Agreement creates a valid and perfected first priority security interest in the Pledged Collateral, securing the payment of the Obligations.

(c) This Agreement is the legal, valid and binding obligation of the Pledgor enforceable against the Pledgor in accordance with its terms.

(d) No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required either (i) for the pledge by the Pledgor of the Pledged Collateral pursuant to this Agreement or for the execution, delivery or performance of the Agreement by the Pledgor or (ii) for the exercise by TPR of the voting or other rights provided for in this Agreement or the remedies in respect of the Pledged Collateral pursuant to this Agreement (except as may be required in connection with such disposition by laws affecting the offering and sale of securities generally).

SECTION 5. _Further Assurances._ The Pledgor agrees that at any time and from time to time, at the expense of the Pledgor, the Pledgor will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that TPR may request, in

-3-

order to perfect and protect any security interest granted or purported to be granted hereby or to enable TPR to exercise and enforce its rights and remedies hereunder with respect to the Pledged Collateral.

SECTION 6. <u>Voting Rights; Dividends; Etc.</u>  (a) So long as no Event of Default (as hereinafter defined) shall have occurred and be continuing:

(i) The Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Pledged Collateral or any part thereof for any purpose not inconsistent with the terms of this Agreement.

(ii) The Pledgor shall be entitled to receive and retain any and all dividends and interest paid in respect of the Pledged Collateral, <u>provided, however,</u> that any and all

(A) dividends and interest paid or payable other than in cash in respect of, and instruments and other property received, receivable or otherwise distributed in respect of, or in exchange for, any Pledged Collateral,

(B) dividends and other distributions paid or payable in cash in respect of any Pledged Collateral in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in-surplus, and

(C) cash paid, payable or otherwise distributed in respect of principal of, or in redemption of, or in exchange for, any Pledged Collateral, shall be, and shall be

-4-

forthwith delivered to TPR to hold as, Pledged Collateral and shall, if received by the Pledgor, be received in trust for the benefit of TPR, be segregated from the other property or funds of the Pledgor, and be forthwith delivered to TPR as Pledged Collateral in the same form as so received (with any necessary endorsement).

(iii) TPR shall execute and deliver (or cause to be executed and delivered) to the Pledgor all such proxies and other instruments as the Pledgor may reasonably request for the purpose of enabling the Pledgor to exercise the voting and other rights which it is entitled to exercise pursuant to paragraph (i) above and to receive the dividends or interest payments which it is authorized to receive and retain pursuant to paragraph (ii) above.

(b) Upon the occurrence and during the continuance of an Event of Default:

(i)   All rights of the Pledgor to exercise the voting and other consensual rights which it would otherwise be entitled to exercise pursuant to Section 6(a)(i) and to receive the dividends and interest payments which it would otherwise be authorized to receive and retain pursuant to Section 6(a)(ii) shall cease, and all such rights shall thereupon become vested in TPR who shall thereupon have the sole right to exercise such voting and other consensual rights and to exercise such voting and other consensual

-5-

rights and to receive and hold as Pledged Collateral such dividends and interest payments.

(ii) All dividends and interest payments which are received by the Pledgor contrary to the provisions of paragraph (i) of this Section 6(b) shall be received in trust for the benefit of TPR, shall be segregated from other funds of the Pledgor and shall be forthwith paid over to TPR as Pledged Collateral in the same form as so received (with any necessary endorsement).

SECTION 7. <u>Transfer and Other Liens; Additional Shares.</u> The Pledgor agrees that it will not create or permit to exist any lien, security interest, or other charge or encumbrance upon or with respect to any of the Pledged Collateral, except for the security interest under this Agreement.

SECTION 8. <u>TPR Appointed Attorney-in-Fact.</u> Effective upon the occurrence of an Event of Default the Pledgor hereby appoints TPR the Pledgor's attorney-in-fact, with full authority in the place and stead of the Pledgor and in the name of the Pledgor or otherwise, from time to time in TPR's discretion to take any action and to execute any instrument which TPR may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation, to receive, endorse and collect all instruments made payable to the Pledgor representing any dividend, interest payment or other distribution in respect of the Pledged Collateral or any part thereof and to give full discharge for the same.

SECTION 9. <u>TPR May Perform.</u> If the Pledgor fails to perform any agreement contained herein, TPR may itself perform, or cause performance of, such agreement, and the expenses of TPR incurred in connection therewith shall be payable to the Pledgor under Section 12.

SECTION 10. <u>Reasonable Care.</u> TPR shall be deemed to have exercised reasonable care in the custody and preservation of the Pledged Collateral in its possession if the Pledged Collateral is accorded treatment substantially equal to that which TPR accords its own property, it being understood that TPR shall not have any responsibility for (i) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Pledged Collateral, whether or not TPR has or is deemed to have knowledge of such matters, or (ii) taking any necessary steps to preserve rights against any parties with respect to any Pledged Collateral.

SECTION 11. <u>Remedies upon Default.</u> If any Event of Default shall have occurred and be continuing:

(a) TPR may exercise in respect of the Pledged Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party on default under the Uniform Commercial Code (the "Code") in effect in the State of New York at that time, and TPR may also, without notice except as specified below, sell the Pledged Collateral or any part thereof in one or more parcels at public or private

-7-

sale, at any exchange, broker's board or at TPR's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as TPR may deem commercially reasonable. The Pledgor agrees that, to the extent notice of sale shall be required by law, at least ten days' notice to the Pledgor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. TPR shall not be obligated to make any sale of Pledged Collateral regardless of notice of sale having been given. TPR may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it is so adjourned.

(b)    Any cash held by TPR as Pledged Collateral and all cash proceeds received by TPR in respect of any sale of, collection from, or other realization upon all or any part of the Pledged Collateral may, in the discretion of TPR, be held by TPR as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to TPR pursuant to Section 12) in whole or in part by TPR against, all or any part of the Obligations in such by order as TPR shall elect. Any surplus of such cash or cash proceeds held by and remaining after payment in full of all the Obligations shall be paid over to the Pledgor or to whomsoever may be lawfully entitled to receive such surplus.

-8-

(c)  As used in this Agreement, the term "Event of Default" means the failure of the Pledgor to make any payment required under the Note or the failure to perform any covenant, condition or agreement contained herein or the occurrence of any Bankruptcy Event (as defined in the Note)

SECTION 12.  Expenses.  The Pledgor will upon demand pay to TPR the amount of any and all reasonable expenses, including the reasonable fees and expenses of its counsel and of any experts and agents, which TPR may incur in connection with (i) the administration of this Agreement, (ii) the custody or preservation of, or the sale of, collection from, or other realization upon, any of the Pledged Collateral, (iii) the exercise of enforcement of any of the rights of TPR hereunder or (iv) the failure by the Pledgor to perform or observe any of the provisions hereof.

SECTION 13.  Amendments, Etc.  No amendment or waiver of any provision of this Agreement nor consent to any departure by the Pledgor herefrom, shall in any event be effective unless the same shall be in writing and signed by TPR, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

SECTION 14.  Addresses for Notices.  All notices and other communications provided for hereunder shall be in writing (including telegraphic or facsimile communication) and, if to the Pledgor, mailed or delivered or transmitted to it, addressed to

-9-

it at 1067 Fifth Avenue, New York, New York, or if to TPR, mailed or delivered or transmitted to it, addressed to it at 9 West 57th Street, New York, New York, or as to either party at such other address as shall be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section.  All such notices and other communications shall, when mailed, or transmitted, respectively, be effective when deposited in the mails, or received, respectively, addressed as aforesaid.

SECTION 15.  <u>Continuing Security Interest; Transfer of Note.</u>  This Agreement shall create a continuing security interest in the Pledged Collateral and shall (i) remain in full force and effect until payment in full of the Obligations, (ii) be binding upon the Pledgor, its successors and assigns, and (iii) inure to the benefit of TPR and its successors, transferees and assigns.  Upon the payment in full of the Obligations, the Pledgor shall be entitled to the return, upon its request and at its expense, of such of the Pledged Collateral as shall not have been sold or otherwise applied pursuant to the terms hereof.

SECTION 16.  <u>Governing Law; Terms.</u>  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, except as required by mandatory provisions of law and except to the extent that the validity or perfection of the security interest hereunder, or remedies hereunder, in respect of any particular Pledged Collateral are governed by the laws of a jurisdiction other than the State of New York.  Unless

-10-

otherwise defined herein, terms defined in Article 9 of the Uniform Commercial Code in the State of New York are used herein as therein defined.

SECTION 17. **Waiver of Jury Trial.** The Pledgor hereby irrevocably waives all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement or the transactions contemplated thereby.

IN WITNESS WHEREOF, the Pledgor has caused this Agreement to be duly executed and delivered by its general partner as of the date first above written.

D&K Limited Partnership

By: _____
   Dalia Genger, general partner

-11-

**TPR INVESTMENT ASSOCIATES, INC.**
200 West 57th Street
New York, NY 10019

October 29, 2004

Mr. Arie Genger
2600 Island Blvd., Penthouse One
Williams Island, Aventura, FL 33160

Sagi Genger 1993 Trust
200 West 57th Street
New York, NY 10019

Orly Genger 1993 Trust
200 West 57th Street
New York, NY 10019

Ladies and Gentlemen:

This letter will set forth our agreement pursuant to which you will purchase the 3,000 shares of common stock ("the Shares") of Trans-Resources, Inc. ("TRI") owned by TPR Investment Associates, Inc. ("TPR"). TPR hereby sells, transfers and conveys the Shares to you as follows:

(i)    794.40 Shares to Arie Genger ;

(ii)   1,102.80 Shares to the Sagi Genger 1993 Trust , and

(iii)  1,102.80 Shares to the Orly Genger 1993 Trust.

The purchase price is $1.00 per share, receipt of which is hereby acknowledged.

The Shares represent 52.85% of the issued and outstanding shares of TRI. The Shares are being transferred hereunder free and clear of any liens, claims or encumbrances and such transfer does not violate the Certificate of Incorporation of TPR or any agreement to which TPR is subject.

The trustees of the Sagi Genger 1993 Trust and of the Orly Genger 1993 Trust ("Trusts") have agreed to execute on behalf of the Trusts (i) an Irrevocable Proxy to appoint Arie Genger to vote the Shares owned by the Trusts and (ii) a voting trust letter agreement, copies of which are annexed hereto.

In case, at any time hereinafter, any further action is necessary or desirable to carry out the purposes of this Letter Agreement, each of the parties hereto shall take or cause to be taken all necessary action, including, without limitation, the execution and delivery of such

Page 2
Mr. Arie Genger
Sagi Genger 1993 Trust
Orly Genger 1993 Trust

further instruments and documents as may be reasonably requested by any party for such purpose or otherwise to complete or perfect the transactions contemplated hereby.

This Letter Agreement shall be governed by the laws of the State of New York without regard to conflicts of law principles.

Very truly yours,

TPR INVESTMENT ASSOCIATES, INC.

By: _____
Sagi Genger, President

AGREED TO AND ACCEPTED
THIS __21 DAY OF OCTOBER, 2004

_____
ARIE GENGER

SAGI GENGER 1993 TRUST

By: _____
David A. Parnes, Trustee

_____
Eric Gribetz, Trustee

ORLY GENGER 1993 TRUST

By: _____
David A. Parnes, Trustee

_____
Eric Gribetz, Trustee

## Irrevocable Proxy

The Sagi Genger 1993 Trust (the "Trust"), being the current record and beneficial owner of 1,102.80 shares of common stock of Trans-Resource, Inc., a corporation organized and existing under the laws of the State of Delaware ("TRI"), with its principal place of business at 200 West 57th Street, New York, New York, 10019, does hereby constitute and appoint Arie Genger, Chairman of the Board, Chief Executive Officer, and the owner of approximately fourteen percent (14%) of the shares of common stock of TRI, to vote as its proxy, all shares of common stock of TRI which are now or hereafter owned by the Trust, at any and all meetings of the stockholders of TRI, regular or special (or by consent in lieu of a meeting) or any adjournments thereof, in the same manner and to the same extent that the Trust might, were the Trust present at said meeting (or executing such consent), upon any issue or proposal which may be brought before such meeting or by such consent.

This Irrevocable Proxy shall be deemed coupled with an interest and be irrevocable from the date hereof, and shall continue for the duration of Arie Genger's life.

Dated: October 2?, 2004

The Sagi Genger 1993 Trust

By _____
Eric Gribetz, Trustee

By _____
David A. Parnes, Trustee

STATE OF NEW YORK        )
                         )ss.:
COUNTY OF NEW YORK       )

On the 21 day of _October_ in the year 2004 before me, the undersigned, a Notary Public in and for the State of New York, personally appeared ERIC GRIBBTZ, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of whom the individual acted, executed the instrument.

_____
Notary Public

STEPHEN M. BALDINI
Notary Public, State of New York
No. 4898868
Qualified in New York County
Commission Expires July 13, 1994 _2001_

STATE OF NEW YORK        )
                         )ss.:
COUNTY OF NEW YORK       )

On the 30 day of _October_ in the year 2004 before me, the undersigned, a Notary Public in and for the State of New York, personally appeared DAVID A. PARNES, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of whom the individual acted, executed the instrument.

_Deborah Kempf_
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-OIKE 4999904
Qualified in New York County
Commission Expires August 5, 200-6

<u>Irrevocable Proxy</u>

The Orly Genger 1993 Trust (the "Trust"), being the current record and beneficial owner of 1,102.80 shares of common stock of Trans-Resource, Inc., a corporation organized and existing under the laws of the State of Delaware ("TRI"), with its principal place of business at 200 West 57th Street, New York, New York, 10019, does hereby constitute and appoint Arie Genger, Chairman of the Board, Chief Executive Officer, and the owner of approximately fourteen percent (14%) of the shares of common stock of TRI, to vote as its proxy, all shares of common stock of TRI which are now or hereafter owned by the Trust, at any and all meetings of the stockholders of TRI, regular or special (or by consent in lieu of a meeting) or any adjournments thereof, in the same manner and to the same extent that the Trust might, were the Trust present at said meeting (or executing such consent), upon any issue or proposal which may be brought before such meeting or by such consent.

This Irrevocable Proxy shall be deemed coupled with an interest and be irrevocable from the date hereof, and shall continue for the duration of Arie Genger's life.

Dated: October 29, 2004

The Orly Genger 1993 Trust

By_____
Eric Gribetz, Trustee

By_____
David A. Parnes, Trustee

STATE OF NEW YORK    )
                     )ss.:
COUNTY OF NEW YORK   )

On the 29 day of October in the year 2004 before me, the undersigned, a Notary Public in and for the State of New York, personally appeared ERIC GRIBETZ, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of whom the individual acted, executed the instrument.

Notary Public
STEPHEN M. BALDINI
Notary Public, State of New York
No. 4998888
Qualified in New York County
Commission Expires July 13, 1994 2006

STATE OF NEW YORK    )
                     )ss.:
COUNTY OF NEW YORK   )

On the 30 day of October in the year 2004 before me, the undersigned, a Notary Public in and for the State of New York, personally appeared DAVID A. PARNES, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of whom the individual acted, executed the instrument.

Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-OIKE 4998904
Qualified in New York County
Commission Expires August 3, 2006

- 2 -

**ARIE GENGER**
2600 Island Blvd.
Williams Island Aventura, FL

October 7, 2004

Mr. Eric Gribetz
920 Park Avenue, Apt. 16A
New York, NY 10028

Mr. David Parnes
38 West 69ᵗʰ Street
New York, NY 10023

RE:  Sagi Genger 1993 Trust (the "Trust")

Gentlemen:

In connection with the transfer to the Trust of 1,102.80 shares of common stock (the "Shares") of Trans-Resources Inc. ("TRI"), pursuant to the terms and conditions of the Stipulation of Settlement of even date herewith, the Trust is granting to Arie Genger an irrevocable proxy (the "Proxy") for the shares, a copy of which is annexed hereto. In the event that for any reason the Proxy is declared invalid and is no longer in effect, the Trust agrees, as promptly as practicable, to enter into a voting trust agreement (the "Voting Agreement") with Arie Genger as the voting trustee, which shall be in substantially the form annexed hereto. During the time that the Proxy is not in effect and prior to the time the Voting Agreement is entered into, the Trust agrees to vote the Shares as directed in writing by Arie Genger.

Any dispute hereunder shall be resolved, as promptly as practicable, by arbitration (by one arbitrator), in accordance with the rules and regulations of the American Arbitration Association.

This letter agreement is entered into under seal as of the date first written above.

Very truly yours,

ARIE GENGER

AGREED AND ACCEPTED AS OF
THIS 14ᵗʰ DAY OF OCTOBER, 2004

SAGI GENGER 1993 TRUST

By: _____
Eric Gribetz, Trustee

By: _____
David Parnes, Trustee

FORM OF

## VOTING TRUST AGREEMENT

AGREEMENT, dated as of _____ __, 200, among _____ _____

NOW, THEREFORE, in consideration of the mutual undertakings of the parties hereinafter set forth, a voting trust in respect of the Securities is hereby created and established, subject to the following terms and conditions, to all and every one of which the parties hereto expressly assent and agree:

1.    **Deposit of Shares**.    Each of the Depositors hereby transfers and assigns to the Trustee all of the Securities owned by such Depositor of record or beneficially.

2.    **Issuance of Voting Trust Certificates**.    Concurrently with the deposit hereunder by Depositor of the Securities, the Trustee will issue to each Depositor, and will from time to time issue with respect to all Securities hereafter deposited hereunder, a Voting Trust Certificate or Voting Trust Certificates, in the form attached hereto as Exhibit __, representing the Securities or other securities of the Company transferred and delivered to them (the "Trust Securities"), which certificate will be registered in the name of Depositor or in such name as may be specified in writing by the Depositor.

3.    **Holding of Trust Securities**.    The instruments or certificates for the Trust Securities deposited with the Trustee may, at the election of the Trustee, if not registered in the name of the Trustee, as Trustee, be surrendered and canceled and new certificates therefor issued to the Trustee, as Trustee.  In all instruments or certificates issued in the name of the Trustee, as Trustee, it shall appear on the face thereof that they are issued pursuant to this Agreement and, in the entry of such ownership in the books of the Company, that fact shall also be noted. The Trust Securities shall be held by the Trustee for the purposes of and in accordance with this Agreement, and none of the Trust Securities, or any interest therein, shall be sold or otherwise disposed of by the Trustee except as herein expressly provided or in accordance with a final order of any court or administrative agency with jurisdiction thereover.

4.    **Distributions on or Exchanges of Trust Securities**.    (a) Until the termination of this Agreement and the delivery of the instruments or certificates for the Trust Securities in exchange for Voting Trust Certificates, the Trustee shall, promptly following the receipt of any dividends or other distributions (including, without limitation, any rights to purchase or subscribe for securities) of any kind paid or made upon such Trust Securities, pay and transfer the property so distributed to, or as directed by, the registered holder or holders of the Voting Trust Certificates in proportion to its respective interests in the distribution; provided, however, that, in case the Trustee, as Trustee, shall receive any such rights, the Trustee shall hold such rights

NY03115W.1

subject to this Agreement and shall immediately issue Voting Trust Certificates in respect of such rights to the registered holder of each Voting Trust Certificate relating to such securities. Any such rights so received by the Trustee, as Trustee, shall be Trust Securities hereunder.

(b)    Upon any increase, reduction or reclassification of the securities of the Company, or upon any merger, consolidation, reorganization or dissolution of the Company, the Trustee is authorized to make such surrender of the Trust Securities as may be proper or expedient and either to hold any security or other property issued in exchange for such surrendered Trust Securities or to distribute such securities or property if such securities or property would have been distributed if the receipt of such securities or property were governed by paragraph (a) of this Section 4. Unless the then outstanding Voting Trust Certificates are exchanged for new Voting Trust Certificates, the then outstanding Voting Trust Certificates shall, without any further action, be deemed to be adjusted as may be appropriate to reflect such increase, reduction, reclassification, merger, consolidation, reorganization or dissolution referred to in the first sentence of this paragraph (b).

5.    Voting of Trust Securities. The Trustee shall vote, in person or by proxy, all Trust Securities of each class entitled to vote, on all matters submitted to the Company's stockholders in accordance with Section 5(b).

6.    Release of Trust Securities. This Agreement shall continue in effect for the duration of Arie Genger's life.

7.    Interest of Trustee. The Trustee assumes no liability as a stockholder of the Company, his interest hereunder being that of Trustee only. The Trustee will vote the Trust Securities on all matters in accordance with the provisions of this Agreement, but he shall have no implied obligations, and assume no responsibility in respect of any action taken by the Company or taken as a result of its vote so cast, and the Trustee shall incur no responsibility as Trustee or otherwise by reason of any error in law, mistake of judgment, or of anything done or suffered or omitted to be done under this Agreement, except for its own individual gross negligence or willful misconduct. The Trustee shall be entitled to rely and to act upon the advice of legal counsel. The Trustee assumes no responsibility with respect to the validity or genuineness of any of the instruments or certificates to be deposited hereunder, or any notice, request, assignment, power of attorney, acknowledgment or other paper or document, and the Trustee shall be entitled to assume that any such instruments or certificates or other papers or documents are genuine and valid and what they purport to be, and are signed by the proper parties, and the endorsements and assignments thereof are genuine and legal.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

-2-

STATE OF NEW YORK      )
                       )ss.:
COUNTY OF NEW YORK )

On the 29 day of _October_ in the year 2004 before me, the undersigned, a Notary Public in and for the State of New York, personally appeared ERIC GRIBETZ, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of whom the individual acted, executed the instrument.

Notary Public
STEPHEN M. BALDINI
Notary Public, State of New York
No. 4999888
Qualified in New York County
Commission Expires July 13, 1994 *1606*

STATE OF NEW YORK      )
                       )ss.:
COUNTY OF NEW YORK )

On the 30 day of _October_ in the year 2004 before me, the undersigned, a Notary Public in and for the State of New York, personally appeared DAVID A. PARNES, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of whom the individual acted, executed the instrument.

Deborah Kempf
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-OIKE 4999904
Qualified in New York County
Commission Expires August 3, 200*6*

- 2 -

**ARIE GENGER**
2600 Island Blvd.
Williams Island Aventura, FL

October 7, 2004

Mr. Eric Gribetz
920 Park Avenue, Apt. 16A
New York, NY 10028

Mr. David Parnes
38 West 69ᵗʰ Street
New York, NY 10023

RE: Sagi Genger 1993 Trust (the "Trust")

Gentlemen:

In connection with the transfer to the Trust of 1,102.80 shares of common stock (the "Shares") of Trans-Resources Inc. ("TRI"), pursuant to the terms and conditions of the Stipulation of Settlement of even date herewith, the Trust is granting to Arie Genger an irrevocable proxy (the "Proxy") for the shares, a copy of which is annexed hereto. In the event that for any reason the Proxy is declared invalid and is no longer in effect, the Trust agrees, as promptly as practicable, to enter into a voting trust agreement (the "Voting Agreement") with Arie Genger as the voting trustee, which shall be in substantially the form annexed hereto. During the time that the Proxy is not in effect and prior to the time the Voting Agreement is entered into, the Trust agrees to vote the Shares as directed in writing by Arie Genger.

Any dispute hereunder shall be resolved, as promptly as practicable, by arbitration (by one arbitrator), in accordance with the rules and regulations of the American Arbitration Association.

This letter agreement is entered into under seal as of the date first written above.

Very truly yours,

ARIE GENGER

AGREED AND ACCEPTED AS OF
THIS 14 ᵀᴴ DAY OF OCTOBER, 2004

SAGI GENGER 1993 TRUST

By: _____
     Eric Gribetz, Trustee

By: _____
     David Parnes, Trustee

## EXHIBIT 1

**THIS CERTIFICATE IS ISSUED PURSUANT TO, AND THE RIGHTS OF THE HOLDER HEREOF ARE SUBJECT TO AND LIMITED BY, THE TERMS OF THE VOTING TRUST AGREEMENT REFERRED TO IN THE TEXT HEREOF**

## VOTING TRUST CERTIFICATE

THIS IS TO CERTIFY THAT _____ is entitled, on the surrender of this Certificate, to receive [insert description of Trust Securities]. This Certificate is issued pursuant to, and the rights of the holders hereof are subject to and limited by, the terms of a Voting Trust Agreement, dated as of _____, _____ by and among _____ , as Trustee, and _____as Depositors, and of every agreement adhering to, amending or supplementing the same, a copy of which Voting Trust Agreement and any such other agreement is on file in the principal office of _____.

The holder of this Certificate shall be entitled to the benefits of said Voting Trust Agreement, including the right to receive the cash distributions paid by the Company with respect to the Trust Securities.

This Certificate shall be transferable only on the books of the undersigned Trustee or any successor or successors, to be kept by them or their agent, on surrender hereof by the registered holder in person or by attorney duly authorized in accordance with the provisions of the Voting Trust Agreement, and, until so transferred, the Trustee may treat the registered holder as the owner of this Certificate for all purposes whatsoever, unaffected by any notice to the contrary.

By accepting this Certificate, the holder hereof consents to and becomes a party to the Voting Trust Agreement with the same force and effect as if the Voting Trust Agreement had been signed under seal by the owner hereof, whether or not it is so signed.

This Certificate is not valid until duly signed by the Trustee.

IN WITNESS WHEREOF, the Trustee have signed this Certificate this____ day of _____, 20__.

**ARIE GENGER**
2600 Island Blvd.
Williams Island Aventura, FL

October 29, 2004

Mr. Eric Gribetz
920 Park Avenue, Apt. 16A
New York, NY 10028

Mr. David Parnes
38 West 69th Street
New York, NY 10023

RE:  <u>Orly Genger 1993 Trust (the "Trust")</u>

Gentlemen:

In connection with the transfer to the Trust of 1,102.80 shares of common stock (the "Shares") of Trans-Resources Inc. ("TRI"), pursuant to the terms and conditions of the Stipulation of Settlement of even date herewith, the Trust is granting to Arie Genger an irrevocable proxy (the "Proxy") for the shares, a copy of which is annexed hereto. In the event that for any reason the Proxy is declared invalid and is no longer in effect, the Trust agrees, as promptly as practicable, to enter into a voting trust agreement (the "Voting Agreement") with Arie Genger as the voting trustee, which shall be in substantially the form annexed hereto. During the time that the Proxy is not in effect and prior to the time the Voting Agreement is entered into, the Trust agrees to vote the Shares as directed in writing by Arie Genger.

Any dispute hereunder shall be resolved, as promptly as practicable, by arbitration (by one arbitrator), in accordance with the rules and regulations of the American Arbitration Association.

This letter agreement is entered into under seal as of the date first written above.

Very truly yours,

ARIE GENGER

AGREED AND ACCEPTED AS OF
THIS 41TH DAY OF OCTOBER, 2004

ORLY GENGER 1993 TRUST

By: _____
Eric Gribetz, Trustee

By: _____
David Parnes, Trustee

**FORM OF**

**VOTING TRUST AGREEMENT**

AGREEMENT, dated as of _____ ___, 200_, among _____.

NOW, THEREFORE, in consideration of the mutual undertakings of the parties hereinafter set forth, a voting trust in respect of the Securities is hereby created and established, subject to the following terms and conditions, to all and every one of which the parties hereto expressly assent and agree:

1.    Deposit of Shares.  Each of the Depositors hereby transfers and assigns to the Trustee all of the Securities owned by such Depositor of record or beneficially.

2.    Issuance of Voting Trust Certificates.  Concurrently with the deposit hereunder by Depositor of the Securities, the Trustee will issue to each Depositor, and will from time to time issue with respect to all Securities hereafter deposited hereunder, a Voting Trust Certificate or Voting Trust Certificates, in the form attached hereto as Exhibit __, representing the Securities or other securities of the Company transferred and delivered to them (the "Trust Securities"), which certificate will be registered in the name of Depositor or in such name as may be specified in writing by the Depositor.

3.    Holding of Trust Securities.  The instruments or certificates for the Trust Securities deposited with the Trustee may, at the election of the Trustee, if not registered in the name of the Trustee, as Trustee, be surrendered and canceled and new certificates therefor issued to the Trustee, as Trustee.  In all instruments or certificates issued in the name of the Trustee, as Trustee, it shall appear on the face thereof that they are issued pursuant to this Agreement and, in the entry of such ownership in the books of the Company, that fact shall also be noted. The Trust Securities shall be held by the Trustee for the purposes of and in accordance with this Agreement, and none of the Trust Securities, or any interest therein, shall be sold or otherwise disposed of by the Trustee except as herein expressly provided or in accordance with a final order of any court or administrative agency with jurisdiction thereover.

4.    Distributions on or Exchanges of Trust Securities.  (a)  Until the termination of this Agreement and the delivery of the instruments or certificates for the Trust Securities in exchange for Voting Trust Certificates, the Trustee shall, promptly following the receipt of any dividends or other distributions (including, without limitation, any rights to purchase or subscribe for securities) of any kind paid or made upon such Trust Securities, pay and transfer the property so distributed to, or as directed by, the registered holder or holders of the Voting Trust Certificates in proportion to its respective interests in the distribution; provided, however, that, in case the Trustee, as Trustee, shall receive any such rights, the Trustee shall hold such rights

subject to this Agreement and shall immediately issue Voting Trust Certificates in respect of such rights to the registered holder of each Voting Trust Certificate relating to such securities. Any such rights so received by the Trustee, as Trustee, shall be Trust Securities hereunder.

(b)      Upon any increase, reduction or reclassification of the securities of the Company, or upon any merger, consolidation, reorganization or dissolution of the Company, the Trustee is authorized to make such surrender of the Trust Securities as may be proper or expedient and either to hold any security or other property issued in exchange for such surrendered Trust Securities or to distribute such securities or property if such securities or property would have been distributed if the receipt of such securities or property were governed by paragraph (a) of this Section 4. Unless the then outstanding Voting Trust Certificates are exchanged for new Voting Trust Certificates, the then outstanding Voting Trust Certificates shall, without any further action, be deemed to be adjusted as may be appropriate to reflect such increase, reduction, reclassification, merger, consolidation, reorganization or dissolution referred to in the first sentence of this paragraph (b).

5.      _Voting of Trust Securities_. The Trustee shall vote, in person or by proxy, all Trust Securities of each class entitled to vote, on all matters submitted to the Company's stockholders in accordance with Section 5(b).

6.      _Release of Trust Securities_. This Agreement shall continue in effect for the duration of Arie Genger's life.

7.      _Interest of Trustee_. The Trustee assumes no liability as a stockholder of the Company, his interest hereunder being that of Trustee only. The Trustee will vote the Trust Securities on all matters in accordance with the provisions of this Agreement, but he shall have no implied obligations, and assume no responsibility in respect of any action taken by the Company or taken as a result of its vote so cast, and the Trustee shall incur no responsibility as Trustee or otherwise by reason of any error in law, mistake of judgment, or of anything done or suffered or omitted to be done under this Agreement, except for its own individual gross negligence or willful misconduct. The Trustee shall be entitled to rely and to act upon the advice of legal counsel. The Trustee assumes no responsibility with respect to the validity or genuineness of any of the instruments or certificates to be deposited hereunder, or any notice, request, assignment, power of attorney, acknowledgment or other paper or document, and the Trustee shall be entitled to assume that any such instruments or certificates or other papers or documents are genuine and valid and what they purport to be, and are signed by the proper parties; and the endorsements and assignments thereof are genuine and legal.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

- 2 -

## EXHIBIT 1

**THIS CERTIFICATE IS ISSUED PURSUANT TO, AND THE RIGHTS OF THE HOLDER HEREOF ARE SUBJECT TO AND LIMITED BY, THE TERMS OF THE VOTING TRUST AGREEMENT REFERRED TO IN THE TEXT HEREOF**

## VOTING TRUST CERTIFICATE

THIS IS TO CERTIFY THAT _____ is entitled, on the surrender of this Certificate, to receive [insert description of Trust Securities]. This Certificate is issued pursuant to, and the rights of the holders hereof are subject to and limited by, the terms of a Voting Trust Agreement, dated as of _____ ___, _____, by and among _____, as Trustee, and _____ as Depositors, and of every agreement adhering to, amending or supplementing the same, a copy of which Voting Trust Agreement and any such other agreement is on file in the principal office of _____.

The holder of this Certificate shall be entitled to the benefits of said Voting Trust Agreement, including the right to receive the cash distributions paid by the Company with respect to the Trust Securities.

This Certificate shall be transferable only on the books of the undersigned Trustee or any successor or successors, to be kept by them or their agent, on surrender hereof by the registered holder in person or by attorney duly authorized in accordance with the provisions of the Voting Trust Agreement, and, until so transferred, the Trustee may treat the registered holder as the owner of this Certificate for all purposes whatsoever, unaffected by any notice to the contrary.

By accepting this Certificate, the holder hereof consents to and becomes a party to the Voting Trust Agreement with the same force and effect as if the Voting Trust Agreement had been signed under seal by the owner hereof, whether or not it is so signed.

This Certificate is not valid until duly signed by the Trustee.

IN WITNESS WHEREOF, the Trustee have signed this Certificate this___ day of _____, 20__.

_____



INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE

# TRANS-RESOURCES, INC.

50,000 SHARES COMMON STOCK
PAR VALUE $.01 EACH

100,000 SHARES PREFERRED STOCK
PAR VALUE $1.00 EACH

THE CORPORATION WILL FURNISH WITHOUT CHARGE TO ANY SHAREHOLDER WHO SO REQUESTS THE POWERS, DESIGNATIONS,
PREFERENCES AND RELATIVE, PARTICIPATING, OPTIONAL OR OTHER SPECIAL RIGHTS OF EACH CLASS OF STOCK OR SERIES
THEREOF, AND THE QUALIFICATIONS, LIMITATIONS OR RESTRICTIONS OF SUCH PREFERENCES AND/OR RIGHTS

**This is to Certify that** _____ ARIE GENGER———— _____ is the owner of

SEVEN HUNDRED NINETY-FOUR and FOUR TENTHS —

FULLY PAID AND NON-ASSESSABLE SHARES OF THE COMMON STOCK OF

**TRANS-RESOURCES, INC.**

*transferable on the books of the Corporation by the holder hereof in person or by duly
authorized Attorney, upon surrender of this Certificate, properly endorsed.*

*Witness, the seal of the Corporation and the signatures of its duly authorized officers.*

Dated / October 30, 2004

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM — as tenants in common
TEN ENT — as tenants by the entireties
JT TEN — as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT — .......... Custodian ..........
                                (Cust)          (Minor)
                        under Uniform Gifts to Minors
                        Act ..........................
                                    (State)

Additional abbreviations may also be used though not in the above list.

*For value received,* ____ *hereby sell, assign and transfer unto*

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

_____

(PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE)

_____ *Shares*
*represented by the within Certificate, and do hereby*
*irrevocably constitute and appoint*
_____ *Attorney*
*to transfer the said Shares on the books of the within named*
*Corporation with full power of substitution in the premises.*
     *Dated* _____

          *In presence of*

NOTICE: THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR, WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER.



INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE

# TRANS-RESOURCES, INC.

50,000 SHARES COMMON STOCK
PAR VALUE $.01 EACH

100,000 SHARES PREFERRED STOCK
PAR VALUE $1.00 EACH

THE CORPORATION WILL FURNISH WITHOUT CHARGE TO ANY SHAREHOLDER WHO SO REQUESTS THE POWERS, DESIGNATIONS, PREFERENCES AND RELATIVE, PARTICIPATING, OPTIONAL OR OTHER SPECIAL RIGHTS OF EACH CLASS OF STOCK OR SERIES THEREOF AND THE QUALIFICATIONS, LIMITATIONS OR RESTRICTIONS OF SUCH PREFERENCES AND/OR RIGHTS

This is to Certify that    — ORLY GENGER 1993 TRUST —

_____ One Thousand, One Hundred Two and Eight Tenths _____

FULLY PAID AND NON-ASSESSABLE SHARES OF THE COMMON STOCK OF

is the owner of

## TRANS-RESOURCES, INC.

transferable on the books of the Corporation by the holder hereof in person or by duly authorized Attorney, upon surrender of this Certificate, properly endorsed.

Witness, the seal of the Corporation and the signatures of its duly authorized officers.

Dated October 30, 2004

SEE REVERSE SIDE FOR CERTAIN DEFINITIONS

PRESIDE CORPORATE PRINTING, N.Y.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM — as tenants in common
TEN ENT — as tenants by the entireties
JT TEN — as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT — .........Custodian...........
                              (Cust)              (Minor)
                    under Uniform Gifts to Minors
                    Act ...........
                                  (State)

Additional abbreviations may also be used though not in the above list.

**For value received,** ____ **hereby sell, assign and transfer unto**

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

(PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE)

_____ **Shares** **represented by the within Certificate, and do hereby irrevocably constitute and appoint**

_____ **Attorney** **to transfer the said Shares on the books of the within named Corporation with full power of substitution in the premises.**

Dated _____

In presence of

_____          _____

NOTICE. THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR, WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER.



INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE

# TRANS-RESOURCES, INC.

50,000 SHARES COMMON STOCK
PAR VALUE $.01 EACH

100,000 SHARES PREFERRED STOCK
PAR VALUE $1.00 EACH

THE CORPORATION WILL FURNISH WITHOUT CHARGE TO ANY SHAREHOLDER WHO SO REQUESTS THE POWERS, DESIGNATIONS, PREFERENCES AND RELATIVE, PARTICIPATING, OPTIONAL OR OTHER SPECIAL RIGHTS OF EACH CLASS OF STOCK OR SERIES THEREOF AND THE QUALIFICATIONS, LIMITATIONS OR RESTRICTIONS OF SUCH PREFERENCES AND/OR RIGHTS

This is to Certify that  — SAGI GENGER 1993 TRUST —

—— ONE THOUSAND ONE HUNDRED TWO and EIGHT TENTHS ——

FULLY PAID AND NONASSESSABLE SHARES OF THE COMMON STOCK OF

TRANS-RESOURCES, INC.

—————————————— is the owner of

transferable on the books of the Corporation by the holder hereof in person or by duly authorized Attorney, upon surrender of this Certificate properly endorsed.

Witness, the seal of the Corporation and the signatures of its duly authorized officers.

Dated October 30, 2004.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

| | | |
|---|---|---|
| TEN COM | —as tenants in common | UNIF GIFT MIN ACT — ........Custodian ............. |
| TEN ENT | —as tenants by the entireties | (Cust)              (Minor) |
| JT TEN | —as joint tenants with right of survivorship and not as tenants in common | under Uniform Gifts to Minors Act ................ ............. (State) |

Additional abbreviations may also be used though not in the above list.

*For value received, ____ hereby sell, assign and transfer unto*

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

(PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE)

_____ *Shares*

*represented by the within Certificate, and do hereby irrevocably constitute and appoint*

_____ *Attorney*

*to transfer the said Shares on the books of the within named Corporation with full power of substitution in the premises.*

    *Dated* _____

        *In presence of*

NOTICE: THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR, WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER.



# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## D&K GP LLC

This Limited Liability Company Agreement (as amended, modified or supplemented from time to time, the "Agreement") of D&K GP LLC (the "Company") is entered into by Dalia Genger ("Dalia") and Sagi Genger ("Sagi"), as members of the Company (each a "Member"; jointly "Members"; and to the extent the context requires the new Member includes additional members as permitted herein).

Whereas, concurrently herewith, Dalia has caused the Company to be formed in Delaware and has transferred to the Company her general partnership interest in D&K LP, a Delaware limited partnership (the "LP") and $1.00 in exchange for a 99% membership interest in the Company; and

Whereas, concurrently herewith Sagi has acquired the remaining 1% membership interest in the Company for $1.00;

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound, the parties hereto hereby agree as follows:

1.  Formation. The Members hereby acknowledges that Dalia, as organizer, filed the Articles of Organization of the Company in the Office of the Secretary of State of Delaware on October 21, 2004 solely for the purpose of forming a limited liability company pursuant to and in accordance with the provisions of the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq. (the "Delaware Act"), and hereby agrees to the terms and conditions of the Limited Liability Company Agreement of the Company, as follows:

2.  Name. The name of the Company is D&K GP LLC.

3.  Purpose. The Company is formed to engage in any lawful act or activity for which limited liability companies may be formed under the Delaware Act.

4.  Offices. The principal business office of the Company shall be located at 200 West 57 Street, Suite 1208, New York, NY 10019. The Company may have such additional

1268503.2

offices located at such place or places inside or outside the State of Delaware as the Members may designate from time to time.

The registered office of the Company in the State of Delaware is located at 2711 Centerville Road, Suite 400, Wilmington, DE 19808. The registered agent of the Company for service of process at such address is Corporation Service Company.

5.     **Management and Powers.** The business and affairs of the Company shall be managed by the Members through a manager to have with the power to do any and all acts necessary or convenient to or in furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by a manager under the Delaware Act ("Manager"). The Manager shall be selected solely by Sagi Genger or by Sagi Genger's assignee or successor in interest, as the case may be. It is the current intent of the parties hereto that the Company will act as general partner of D&K Limited Partnership, a Delaware limited partnership, and it will not engage in any activities unrelated to its acting as such general partner.

6.     **Admission of Additional Members.** After the date hereto, one or more additional Members may be admitted to the Company with the consent of the Members. After the first such additional Member or Members have been admitted to the Company, subsequent additional Members may be admitted to the Company with the consent of a majority in interest of the Members.

7.     **Assignments.** The Members may assign their interest in the Company in whole or in part. However, no Member may assign his interest in the Company in whole or in part without the consent of all other Members.

8.     **Withdrawal of a Member.** No Member may withdraw from the Company prior to its dissolution, or without the consent of all other Members.

9.     **Capital Contributions.** The Members have, each, made a capital contribution to the Company as specified in Schedule A, thereby acquiring the specified percentage interest in the Company. After and each time any additional Member has been admitted to the Company, a Schedule A, setting forth the name and address of each of the Members and his or her respective capital contribution and percentage interest, shall be prepared, dated and annexed to this Limited Liability Company Agreement.

10.    **Additional Contributions.** No Member is required to make any additional capital contribution to the Company.

11.    **Allocation of Profits and Losses.** The Company's profits and losses shall be allocated to the Members in proportion to the interests of the Members.

12.    **Distributions.** Distributions shall be made to the Members at the times and in the aggregate amounts determined by Manager.

13.    **Liability of Members.** The Members shall not have any liability for the obligations or liabilities of the Company.

1268503.2

- 2 -

14.    Exculpation and Indemnification of Managers. The Company shall indemnify and hold harmless the Members, any and each additional Member admitted to the Company and any Manager against any and all claims and demands whatsoever, to the fullest extent permitted by the Delaware Act, as amended, modified or supplemented from time to time.

16.    Governing Law. This Agreement shall be governed by, and construed under, the laws of the State of Delaware, all rights and remedies being governed by said laws.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Limited Liability Company Agreement as of the 26th October, 2004.

Members

_____
Dalia Genger

_____
Sagi Genger

Formed 10/21/04.
Transfer D⟶S
10/26/04

# TPR INVESTMETN ASSOCIATES, INC.

## SHAREHOLDERS AGREEMENT

SHAREHOLDERS AGREEMENT, dated as of October 30, 2004, among D&K Limited Partnership, a Delaware limited partnership ("D&K"), and Dalia Genger, an individual residing at 210 East 65th Street, Apt 11J, New York, NY 10021("Dalia Genger") (collectively the "Shareholders" and individually, a "Shareholder") and TPR Investment Associates, Inc., a Delaware corporation (the "Corporation").

## WITNESSETH:

WHEREAS, D&K owns a direct interest in the Corporation of 49% of the outstanding capital stock of the Corporation; and

WHEREAS, Dalia Genger owns a direct interest in the Corporation of the remanining 51% of the outstanding capital stock of the Corporation, and 4% of D&K, which constitutes a 1.47% indirect interest in the Corporation; and

WHEREAS, the parties desire to enter into this Agreement in order to provide for the management of the Corporation and to impose certain restrictions with respect to the sale, transfer or other disposition of the shares of the capital stock of the Corporation ("Shares") upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter set forth, the parties hereto agree as follows:

## SECTION 1

## LEGENDS

All certificates representing shares of Common Stock issued by the Corporation, after the date hereof, to either of the Shareholders shall be subject to this Agreement and shall bear the following legends:

"The shares evidenced by this certificate or any certificate issued

in exchange or transfer therefor are and will be subject to, and may not be transferred except in accordance with, the terms of a certain Shareholders Agreement, dated as of October 30, 2004, by and among the Shareholders of the Corporation and the Corporation, which agreement provides, among other things, for restrictions on the sale, transfer and disposition of the shares of the Corporation, an executed copy of which agreement is on file at the principal office of the Corporation."

## SECTION 2

## MANAGEMENT OF THE CORPORATION

2.1   Board of Directors.  The Board of Directors of the Corporation ("Board") shall initially consist of two (2) directors, as follows:

(i) Dalia Genger shall be a director, and shall have the right to appoint a director in her stead; and

(ii) D&K shall have the right to appoint a director; the first director appointed by D&K shall be Mr. Sagi Genger ("Sagi").

2.2   Management. Sagi will be appointed by the Board, to serve as Chief Executive Officer of the Corporation, and David Parnes will be appointed by the Board to serve as Vice President.  Compensation of the Corporation's officers will be set by the Board.

## SECTION 3

## RESTRICTIONS ON SALES OR OTHER DISPOSITION OF COMMON STOCK

3.1   Sale of Shares of Common Stock.  During the term of this Agreement, the

parties to this Agreement shall not, either directly or indirectly, sell, assign, pledge, transfer, mortgage, grant any lien or security interest in, convey or otherwise dispose of, encumber or grant any other interest in ("Transfer"), all or any Shares now owned or hereafter acquired by each party, except as hereinafter provided. The term "Shares" as used in this Agreement shall include all shares of Common Stock, whether presently issued or hereafter acquired, scrip representing fractional shares of Common Stock, options, rights and warrants for shares of Common Stock, securities convertible into or exchangeable for shares of Common Stock, or shares of Common Stock received by way of dividend or upon an increase, reduction, substitution or reclassification of the Common Stock, or upon any reorganization of the Corporation or any other interest or right in and to shares of Common Stock of the Corporation.

3.2   _Board Approval_. No Shareholder shall Transfer any Shares or any interest in any Shares owned by such Shareholder, in whole or in part, and no such attempted Transfer shall be treated as effective for any purpose without obtaining the prior written consent of the Board.

3.3   _Sale of Shares and Determination of Buy-Out Price_. If a Shareholder desires to Transfer all of the Shares owned by such Shareholder (the "_Initiating Shareholder_"), such Initiating Shareholder shall notify the other Shareholder in writing (the "_Sale Notice_"), stating the total number of Shares, owned directly and indirectly by the Initiating Shareholder, which are to be Transferred. The Initiating Shareholder and the other Shareholder will meet, no later than two calendar months following receipt of the Sale Notice by the other Shareholder (the "_Sale Meeting_") at which time the Shareholders will determine the Buy-Out Price. Prior to a Sale Meeting, the books of the Corporation will be open to the Shareholders and they will cooperate with each other in connection with the impending sale. In addition, up to date audited financials for the Corporation will be provided to the Shareholders. The Corporation will reasonably cooperate with any outside expert hired by any Shareholder to assist in the sale process.

(a)   *The Sale Meeting*. At the Sale Meeting the Shareholders will adhere to the following process:

(i) a coin will be tossed in the air by a person mutually acceptable to the Shareholders;

(ii) the Initiating Shareholder will be designated as "Head" (i.e. - the side of the coin where the profile of a person is impressed) and the other Shareholder will be designated as "Tail" (i.e. - the other side of the coin);

(iii) if the Head side of the coin shall lay face up - the Initiating Shareholder will become the Evaluating Shareholder, and if the Tail side of the coin shall lay face up - the other Shareholder shall become the Evaluating Shareholder;

(iv) the Evaluating Shareholder shall value and indicate in writing within seven (7) business days following the coin toss to the other Shareholder (the "Notified Shareholder"), the sum at which he or she values one Share ("Evaluated Share Value");

(v) within seven (7) business days following receipt of the Evaluated Share Value from the Evaluating Shareholder ("Determination Date"), the Notified Shareholder shall notify the Evaluating Shareholder in writing whether he intends to acquire from, or to sell to, the Evaluating Shareholder his Shares (based on the Evaluated Share Value and the number of Shares in question) in which case the Notified Shareholder shall agree to either (a) remit to the Evaluating Shareholder the appropriate amount based on the Evaluated Share Value, or (b) receive from the Evaluating Shareholder the appropriate amount based on the Evaluated Share Value.

"Transferring Shareholder" shall mean the Shareholder that ultimately pays to the

other Shareholder, by way of advancement and a Note, the Buy Out Price, and "*Purchasing Shareholder*" shall me the Shareholder that ultimately receives, by way of advancement and a Note, the Buy Out Price.

(b)    *Closing and Payment of Buyout Price*  The consummation of the sale of the Shares (the "*Closing*") shall be held in the offices of the Corporation, or at such other location as agreed by the Shareholders, at 10:00 a.m. on the twentieth (20th) business day following the Sale Meeting (the "*Closing Date*").

(i) On or before the Closing Date, the Transferring Shareholder shall deliver duly executed certificates in valid form evidencing the Shares to be sold and purchased, duly endorsed for transfer, free and clear of any liens or encumbrances;

(ii)    on or before sixty (60) days from the Closing Date ("*Initial Payment*"), the Purchasing Shareholder shall deliver to the Transferring Shareholder immediately available funds by wire transmit to an account designated by the Transferring Shareholder, or a certified or bank check, in an amount equal to no less ten percent (10%) of the applicable Buyout Price;

(iii)    any remaining balance of the applicable Buyout Price shall be paid by the Purchasing Shareholder on or before the seventh monthly anniversary of the Initial Payment (the "*Ending Date*") .

(c)    *Participation of Corporation.* In order to facilitate the Transfer of Shares, from the Transferring Shareholder to the Purchasing Shareholder, the Corporation will provide the necessary funds, in lieu of the Purchasing Shareholder, to pay the Buyout Price to the Transferring Shareholder. The Shareholders agree to cause the Corporation to provide such funds, and will

execute and deliver all of the documents reasonably necessary for the Corporation to effectuate the foregoing payment, including, without limitation, necessary resolutions and consents.

(d)    *Board and Management Participation.* From the Determination Date through the Ending Date, the Transferring Shareholder will not actively engage in the management of the Corporation, and will abstain from voting - or cause his/her appointed member on the Board to vote, in any way inconsistent with the vote of the Purchasing Shareholder.

## SECTION 4

## TERM

This Agreement shall terminate either by (i) the consent of the parties hereto, or (ii) upon the consummation of the transfer of Shares, and the receipt of the full Buyout Price by the Transferring Shareholder on the Ending Date.

## SECTION 5

## MISCELLANEOUS

5.1    Complete Agreement.  This Agreement constitutes the complete understanding among the parties hereto with respect to the subject matter hereof, and, no amendment or modification or waiver hereof shall be valid unless made pursuant to an instrument in writing signed by the party against whom such amendment, modification or waiver is sought to be enforced.

5.2    Successors and Assigns.  All of the terms and provisions of this Agreement shall inure to the benefit of and be binding upon the heirs, successors, personal representatives, successors and permitted assigns of the respective parties hereto.

5.3     Waivers.  The failure of any party hereto to give notice of the breach or non-fulfillment of any term or condition of this Agreement shall not constitute a waiver thereof, nor shall the waiver of any breach or non-fulfillment of any term or condition of this Agreement constitute a waiver of any other breach or non-fulfillment of that or any other term or condition of this Agreement.

5.4     Amendments.  This Agreement may be amended at any time by a writing setting forth such amendment, signed by the Corporation and by both of the Shareholders and/or their permitted designees, it being understood that any such amendment shall not affect any rights or obligations which may have arisen prior thereto by virtue of the operation of the provisions of this Agreement.

5.5     Future Instruments.  Each of the parties hereto agrees to execute and deliver all such future instruments and take such other and further action as may be reasonably necessary or appropriate to carry out the provisions of the Agreement and the intention of the parties as expressed herein.

5.6     Governing Law.  This Agreement will be governed and interpreted in accordance with laws of the State of Delaware, without application of its conflicts of law provisions.

5.7     Arbitration.  Any controversy, claim or dispute between the parties directly or indirectly arising out of this Agreement shall be settled by arbitration, held in Manhattan, New York. Either party may give written notification to the other party requesting arbitration to resolve any controversy, claim or dispute arising out of this Agreement between the parties.

In the event that a dispute is submitted to arbitration, there shall be one (1) arbitrator (the "Arbitrator") selected (x) by the parties or (y) if the parties fail to select an Arbitrator within twenty (20) days following receipt of a list of potential arbitrators from the American Arbitration Association ("AAA"), the Arbitrator shall be selected by the AAA. The Arbitration shall be conducted as promptly as practicable after the selection of the Arbitrator in accordance with the Commercial Arbitration Rules and Mediation

Procedures. The Arbitrator shall be someone who has at least fifteen (15) years of commercial law experience or who was a judge of a court of general jurisdiction.

5.8    Notices. All notices, offers, acceptances and other communications to be made, served or given hereunder (each, a "Notice") shall be in writing and shall be sent by overnight courier service, certified mail, return receipt requested, postage prepaid, or personally delivered, to the recipient party's address set forth on the signature page hereof or shall be sent by electronically confirmed facsimile transmission to the recipient party's facsimile transmission number if such a facsimile transmission number is set forth on the signature page hereof. Such Notices shall also be sent to the recipient Shareholder's attorney at the address or facsimile transmission number of such attorney set forth beneath such Shareholder's signature hereto. Either Shareholder may, by Notice to the other Shareholder given in the manner prescribed above in this Paragraph, designate another address or transmission number to which Notices to him and/or his attorney shall be sent. All Notices made or given in accordance herewith shall be effective on the date of facsimile transmission or personal delivery, the day on which delivery by overnight courier service is guaranteed, or three (3) days after mailing, provided such Notice is in fact received.

5.9    Miscellaneous. Each of the Shareholders agrees that he will consent to and approve any amendment of the Certificate of Incorporation or By-laws of the Corporation which may be necessary or advisable in order to conform any of the provisions of this Agreement or any amendments hereto to the applicable laws of the State of Delaware as now in effect or hereafter enacted.

5.10    Separability of Provisions. Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid or contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

5.11    Section Headings. The Section headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation hereto.

5.12   Counterparts.  This Agreement may be executed in any number of counterparts, and by different parties on separate counterparts.  All such counterparts together shall constitute one and the same instrument.

5.13   Number and Gender.  Each definition or pronoun herein shall be deemed to refer to the singular, plural, masculine, feminine or neuter as the context requires. Words such as "herein, "hereinafter," "hereof," "hereto" and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

IN WITNESS WHEREOF, the parties hereto have duly executed this Shareholders Agreement as of the day and year first above written.

TPR Investment Associates, Inc.
By:Sagi Genger, its Chief Executive Officer

D&K  Limited Partnership
By: D&K GP LLC, its general partners
By:  Sagi Genger, its manager

Dalia Genger

# Memorandum

**To:**     David Parnes

**CC:**     Dalia Genger

**From:** Sagi Genger

**Date:** August 2, 2006

**Re:**     Assignment by TPR of D&K LP's 1993 Promissory Note

Dear David,

This will set in writing what I recently proposed to you:

I fully acknowledge the commitment to you to sponsor your MBA studies;

Instead of making the next payment due, in connection with the MBA fees (approximately $12,000), TPR Investment Associates Inc. ("TPR") will assign to you a promissory note made in its favor by D&K LP ("Note").

This promissory Note will be assigned to you on an 'as is' basis.

D&K LP and its partners have a variety of claims against TPR, and deny the enforceability of the Note.

5. Collections by you on the Note will be deposited into a separate account, preferably with a mutually acceptable escrow agent. Such amounts collected will be released to you on the earlier of (a) December 31, 2013, or (b) your declaration that you will make no further claims in connection with the Note.

6. D&K will refrain from making claims against TPR, so long as the Note is not enforced by you against it. However, should your collection efforts result in, D&K making a counter-claim against TPR – the funds in the escrow account will be applied towards TPR's defense and any other related outlays, before making any distributions therefrom.

7. You will not assign the Note to any third party without the consent of D&K and TPR.

1

August 2, 2006

8. TPR will retain the right to 7.5% of your net collections and the right to enforce the note.

9. Additional terms in connection with the assignment of the Note will follow.

Be advised that we hereby waive all past, present or future existing conflict of interest we may have.

*(signature)*
_____
TPR Investment Associates, Inc.
By: Sagi Genger, President

*(signature)*
_____
D&K LP
By: D&K GP LLC
By: Sagi Genger, Managing Member

Read this ___ day of August 2006

*(signature)*
_____

2

GENGER VS. GENGER

PROCEEDINGS - 9/7/07

*Reviewed*

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



*Ellen Grauer*
**COURT REPORTING** Co. LLC
worldwide!

TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434    FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

GENGER

BSA XMAX(15/15)
PROCEEDINGS - 9/7/07

VS. GENGER

## Page 446

PARNES - CROSS

(2) Q. If you take a look at that. This is
(3) a summary –
(4) THE ARBITRATOR: Do you have a copy
(5) for counsel?
(6) MR. GENGARO: Yes.
(7) Q. – of all the checks to you – the
(8) checks are behind there -- either to you or on
(9) your behalf?
(10) A. Right.
(11) Q. Totaling about $240,000 over the
(12) past two and a half years or so; does that
(13) sound about right?
(14) A. Over the past three years, yes.
(15) Q. That you received from TPR, right?
(16) A. Correct.
(17) Q. In October of 2004, just before the
(18) stipulation was entered into, Dalia Genger
(19) required and Sagi Genger that the trustees of
(20) the children's trusts be changed, right?
(21) A. I don't remember it being Dalia
(22) required that or Sagi. I mean, Sagi was
(23) involved, but Dalia required that.
(24) Actually, I think Arie required
(25) that, because they were indirectly to hold

## Page 447

PARNES - CROSS

(2) stock of TRI, and both Sagi and Arie were
(3) concerned to let TRI function as it is without
(4) disturbing them, and they were looking for
(5) people, trustees who would be acceptable, and
(6) the names that were suggested were two
(7) long-time friends of Sagi, Eric Gribetz and
(8) myself.
(9) Q. Well the trust already had two
(10) trustees for years, right?
(11) A. Yes, they were Sash Spencer and
(12) Larry Small.
(13) Q. It wasn't Arie Genger's idea to
(14) change those?
(15) A. It was Dalia. It had to be mutually
(16) acceptable on both of them.
(17) Q. It wasn't Arie's demand that the
(18) trustees be changed? That was from Dalia and
(19) Sagi, right?
(20) A. That was – I don't think it was
(21) from Sagi. It was probably from Dalia, yes.
(22) Q. And the trustees were, in fact,
(23) replaced, and you were substituted as a trustee
(24) along with Eric Gribetz of both Orly and Sagi's
(25) trust, correct?

## Page 448

PARNES - CROSS

(2) A. Correct.
(3) Q. As a result of being a trust, you
(4) know as a lawyer you owed Orly and Sagi a
(5) fiduciary duty, right?
(6) A. Correct.
(7) Q. And you, therefore, cannot take any
(8) position or engage or approve a transaction in
(9) which you're involved that is contrary to Orly
(10) or Sagi's interest, right?
(11) MR. VELIE: Objection.
(12) THE ARBITRATOR: Sustained that –
(13) any position?
(14) Q. You can't engage in a transaction
(15) that is contrary to Orly and Sagi's interests,
(16) correct?
(17) MR. VELIE: Same objection.
(18) THE ARBITRATOR: Sustained.
(19) Q. Are you familiar with the D&K note?
(20) A. Yes.
(21) Q. You know that that Dalia Genger and
(22) Sagi Genger have taken a position in this
(23) arbitration that the D&K notes have no value?
(24) A. I did not realize that this was in
(25) this arbitration. I knew at the stipulation

## Page 449

PARNES - CROSS

(2) that was the case.
(3) Q. Do you know that is the case now?
(4) A. Now that you tell me, yes.
(5) Q. Are you aware that Dalia Genger
(6) signed – take a look at Exhibit 71. That is
(7) our exhibit. This is an affidavit that Dalia
(8) Genger signed in the matrimonial case dated
(9) February 14th of '07. Do you see that?
(10) A. Yes, I see it.
(11) Q. Dalia Genger swears in here in
(12) paragraph 4 that in August 2006, TPR sold the
(13) D&K note but retained a nominal contingent
(14) interest for $12,000, right?
(15) A. Right.
(16) Q. Now, the D&K note was a secured
(17) promissory note, right?
(18) A. I do not remember, but –
(19) Q. You don't know that it was a secured
(20) note?
(21) A. I don't remember. I didn't see the
(22) note for a while.
(23) Q. Now, the third party that Dalia
(24) Genger who is referring to who bought the note
(25) is you, right?

GENGER

BSA XMAX[16/16]

PROCEEDINGS - 9/7/07

VS. GENGER

## Page 450

(1)      PARNES - CROSS
(2)      A.   Right.
(3)      Q.   Now there is a — if you look in —
(4)   if you turn the page, there is a TPR — it's
(5)   AG1925 at the bottom.
(6)          THE ARBITRATOR:  I'm sorry.  What
(7)      exhibit?
(8)      Q.   Right behind the affidavit there is
(9)   a TPR resolution that authorizes the sale of
(10)  the D&K note, correct?
(11)     A.   Yes.
(12)     Q.   And it requires that the sale be to
(13)  an unrelated third party, right?
(14)     A.   Right.
(15)     Q.   Now, you agree that you are not an
(16)  unrelated third party, right?
(17)         MR. VELIE:  Objection.
(18)         THE ARBITRATOR:  I'll allow it.
(19)     A.   Not entirely.  I'm not related.  I
(20)  don't have a stake in the company.
(21)     Q.   You're an officer of TPR, right?
(22)     A.   Yes, officially I am an officer of
(23)  TPR.
(24)     Q.   You were paid only $250,000 from the
(25)  company, right?

## Page 451

(1)      PARNES - CROSS
(2)      A.   Over three years, right.
(3)      Q.   You're a lawyer for the company,
(4)   right?
(5)      A.   Right.
(6)      Q.   And you're the trustees of the two
(7)   children's trust, right?
(8)      A.   Right.
(9)      Q.   Are you aware — maybe you're not
(10)  aware — that Dalia was ordered in this
(11)  arbitration to produce the sale of documents
(12)  for the sale of the D&K note?
(13)     A.   Okay.
(14)         THE ARBITRATOR:  "Okay" being what?
(15)         THE WITNESS:  Fine.  If she ordered
(16)  it, she ordered it.  What can I do?
(17)     Q.   Look at Exhibit 67.
(18)         MR. VELIE:  You're talking about
(19)  your number?
(20)         MR. GENGARO:  Yes, our number 67.
(21)         MR. OPPENHEIM:  If you can specify
(22)  for the record to make it clear.
(23)         MR. GENGARO:  Yes, it's our exhibit.
(24)     Q.   It's at the back, at the bottom with
(25)  Bates number — I'm looking at AG1914.  You see

## Page 452

(1)      PARNES - CROSS
(2)   they are all Bates numbered in order?
(3)      A.   I have it.
(4)      Q.   This is the document that Dalia
(5)   produced in this arbitration as being the sale
(6)   document of the D&K note?
(7)      A.   Right.
(8)      Q.   You signed this memo and agreed to
(9)   the terms on the second page, correct?
(10)     A.   Correct.
(11)     Q.   And under the terms of this memo you
(12)  are to become the holder of the D&K note,
(13)  right?
(14)     A.   Right.
(15)     Q.   So that D&K is now no longer
(16)  required to make payment to TPR, right?
(17)     A.   Right.
(18)     Q.   It's going to pay you, right?
(19)         MR. VELIE:  Objection.  This
(20)  document speaks for itself and has a
(21)  number of conditions in it.
(22)         THE ARBITRATOR:  I'll allow the
(23)  question.
(24)         Can you answer the question?
(25)     A.   Correct.  It says what it says.

## Page 453

(1)      PARNES - CROSS
(2)      Q.   This is over an $8 million note?
(3)      A.   Face value of 8 million.
(4)      Q.   Are you in possession of the note?
(5)      A.   I believe I have the note, yes.
(6)      Q.   Are you also in possession of the
(7)   security for the note?
(8)      A.   That I do not remember.  If it is
(9)   part of a bundle, I probably have the bundle,
(10)  yes.
(11)     Q.   You bought a note with a face value
(12)  over $8 million, right?
(13)     A.   Right.
(14)     Q.   You know it had security, right?
(15)     A.   No.
(16)     Q.   You don't know it was secured?
(17)     A.   No.
(18)     Q.   So nobody told you that it was
(19)  secured by 49 percent of TPR's stock?
(20)     A.   To be honest, what I know about the
(21)  note was that it had basically was
(22)  uncollectable.  It had no value.
(23)     Q.   But you paid $12,000 for it?
(24)     A.   Yes.
(25)     Q.   So you paid $12,000 for what you

GENGER                                                  VS. GENGER

BSA XMAX(17/17)
PROCEEDINGS - 9/7/07

---

### Page 454

PARNES - CROSS

(1)
(2)  believe to be a worthless note?
(3)      A.  Yes.
(4)      Q.  You have not made any effort to
(5)  collect on this note, correct?
(6)      A.  Correct.
(7)      Q.  Let me look at some of the terms of
(8)  this note, of this assignment, this memo.
(9)          According to this memo, you're
(10)  buying the note in paragraph 3 on an as-is
(11)  basis?
(12)      A.  Right.
(13)      Q.  What does that mean?
(14)      A.  No changes, no amendments are being
(15)  made to it.
(16)      Q.  And you also were assigned the
(17)  collateral for the note, right?
(18)      A.  Right.
(19)      Q.  So you now have the security?
(20)      A.  Right.
(21)      Q.  So if the note is not paid, you can
(22)  foreclose on that security and take ownership
(23)  of 49 percent of TPR stock?
(24)      A.  Theoretically, yes.
(25)      Q.  Correct?

---

### Page 455

PARNES - CROSS

(1)
(2)      A.  Theoretically it is correct.
(3)      Q.  And that stock, according to the --
(4)  let's pull out the stipulation.  The pages
(5)  aren't numbered.
(6)          If you go to the scheduled TPR
(7)  assets, it's Schedule III (1).  So on that
(8)  schedule of TPR assets that was attached to the
(9)  stipulation, it shows that the book value of
(10)  TPR at that time was $11.6 million, right?
(11)      A.  If that's what it says, that's what
(12)  it says.
(13)      Q.  So the minimum value, approximately,
(14)  of the 49 percent security that you hold for
(15)  this D&K note is over $5 million, right?
(16)          MR. VELIE:  Objection.  If we are
(17)  doing arithmetic, that's the arithmetic,
(18)  but are you asking him to value the
(19)  company.
(20)          MR. GENGARO:  He holds the note.  He
(21)  holds the collateral.  It's multimillion
(22)  dollars.  I assume he knows how valuable
(23)  this is to him.
(24)          MR. VELIE:  He testified --
(25)          THE ARBITRATOR:  We are wasting

---

### Page 456

PARNES - CROSS

(1)
(2)  time.
(3)          The answer is?
(4)      Q.  That's approximately right, right?
(5)      A.  If I valued the note at what it was,
(6)  yes.  49 percent of 11 million is about
(7)  5 million, yes.
(8)      Q.  Now, the memo also says that -- if
(9)  we look at the memo, this is Exhibit 67?
(10)          MR. VELIE:  Whose Exhibit 67?
(11)          MR. LENTZ:  Our Exhibit 67.
(12)          THE ARBITRATOR:  Respondent's
(13)  Exhibit 67.
(14)      Q.  The memo says that D&K has claims
(15)  against TPR and denies that the note is
(16)  enforceable.  Do you see that?
(17)      A.  Give me one moment and I'll see it.
(18)          THE ARBITRATOR:  This is
(19)  Respondent's 67?
(20)          MR. LENTZ:  Yes, page 1914.
(21)      Q.  Paragraph 6, it says here in
(22)  number 5 that collections by you on the note
(23)  will be deposited into a separate account
(24)  preferably with a mutually acceptable escrow
(25)  agent.  Do you see that?

---

### Page 457

PARNES - CROSS

(1)
(2)      A.  Yes.
(3)      Q.  So you cannot even collect on this
(4)  note, right?
(5)      A.  I can collect -- that is not true.
(6)  If I wanted to collect, I can collect.  There
(7)  is a mechanism where the funds go into.
(8)      Q.  An escrow account?
(9)      A.  An escrow account, and then they are
(10)  divvied up and then goes to what you showed me
(11)  earlier, that TPR retained a nominal stake in
(12)  the note.
(13)      Q.  The memo says that D&K agrees to not
(14)  make any claims against TPR as long as you
(15)  don't collect on the note, right?
(16)      A.  Right.
(17)      Q.  If you do collect, the money you
(18)  collect has to be used to pay TPR's legal fees,
(19)  right?
(20)      A.  Right.
(21)      Q.  You're not allowed to assign this
(22)  note, right?
(23)      A.  Right.
(24)      Q.  And TPR actually is entitled to
(25)  receive seven and a half percent of your net

---