GENGER                           BSA XMAX(18/18)                           VS. GENGER
                              PROCEEDINGS - 9/7/07

Page 458

PARNES - CROSS

(2) collections, right?

(3) A. That is correct.

(4) Q. Who signed this memo for TPR?

(5) A. For TPR, Sagi Genger.

(6) Q. Who signed it for D&K?

(7) A. Sagi, as the GP.

(8) Q. So Sagi wearing both of his hats,

(9) two different hats, signed this memo purporting

(10) to sell you an over $8 million note secured by

(11) 49 percent of TPR for $12,000 pursuant to these

(12) terms?

(13) A. Correct.

(14) Q. Did you give Sagi legal advice

(15) regarding this memo?

(16) A. No.

(17) THE ARBITRATOR: The memo says that,

(18) "This will set in writing what I recently

(19) proposed to you." How is that proposed to

(20) you?

(21) THE WITNESS: Orally.

(22) THE ARBITRATOR: Did you agree to

(23) this arrangement?

(24) THE WITNESS: Yes.

(25) THE ARBITRATOR: How?

Page 459

PARNES - CROSS

(2) THE WITNESS: Orally, and then he

(3) said he wanted to reduce it to writing,

(4) and he reduced it to writing.

(5) THE ARBITRATOR: Did you sign

(6) anything to memorialize it?

(7) THE WITNESS: This is what I signed,

(8) the second page on the bottom. That's my

(9) signature.

(10) Q. That's your signature, right?

(11) A. That's my signature.

(12) THE ARBITRATOR: That is your

(13) signature?

(14) THE WITNESS: Yes.

(15) Q. Looking at the note itself. This is

(16) the first part of Exhibit 67, AG1890. The

(17) trusts each signed this note, the children's

(18) trusts, and are obligated on 48 percent of the

(19) note each, correct?

(20) A. Correct.

(21) Q. And so as a result of this note — I

(22) beg your pardon — as a result of your purchase

(23) of the note, the D&K note, the trusts are now

(24) obligated to pay you, right?

(25) A. Right.

Page 460

PARNES - CROSS

(2) Q. So the trusts that you are the

(3) trustee of, so now you are wearing your hat as

(4) trustee for Orly and Sagi's trust, are required

(5) to pay yourself a note worth over — with a

(6) face value of over $8 million, correct?

(7) A. Correct. That is precisely why I

(8) got the note.

(9) Q. You are now in conflict for the

(10) beneficiaries for why you got the trust?

(11) You're now their creditor?

(12) A. No.

(13) Q. You're not their creditor?

(14) A. That is precisely the reason for

(15) which I agreed to buy the note, because I was

(16) trustee, and you're taking this out of context.

(17) This was a problematic note that was

(18) part of a tax planning mechanism that was put

(19) back in 1993, and throughout the agreement, the

(20) negotiating separation agreement, the note

(21) presented a problem, and there are two issues

(22) that I remember with this, one being that it

(23) should go away — the word that everybody used

(24) around was to bury them in the woods. The

(25) second problem was that if TPR had control of

Page 461

PARNES - CROSS

(2) it, Dalia could collect and go to her children

(3) and collect.

(4) With Dalia it was very easy to deal,

(5) because there was an arrangement that was

(6) reached whereby the ownership of TPR, the

(7) control of TPR, the management of TPR would be

(8) changed and it would not be put in Dalia's

(9) hands.

(10) As to how to bury the note in the

(11) woods, that was left to Sagi to deal with after

(12) everything was signed.

(13) Before the stipulation was signed —

(14) after the stipulation was signed, he made

(15) efforts to try and get rid of the note and was

(16) not able to. He met with lawyers, with tax

(17) counsels, et cetera, and the only way was to

(18) sign was with somebody else.

(19) I — because, as you said, I was the

(20) trustee of both the children, Sagi and Orly, I

(21) felt I had — that would be the honorable and

(22) moral thing to do was to buy the note precisely

(23) since I was a trustee, so it couldn't fall in

(24) someone else's hand, and then they could go and

(25) collect against them.

GENGER                          BSA XMAX(19/19)                          VS. GENGER
                            PROCEEDINGS - 9/7/07

## Page 462

**PARNES - REDIRECT**

(1)
(2)    Q.    Did you make disclosure to Arie
(3)  Genger at the time you bought this note?
(4)    A.    No, I don't remember doing so.
(5)    Q.    Did you get consent from both of the
(6)  beneficiaries for this transaction of the
(7)  trust?
(8)    A.    No.
(9)    Q.    You did not?
(10)    A.    No.
(11)    Q.    There is nothing in the stipulation
(12)  that says this note is going to be buried, is
(13)  there?
(14)    A.    No, there was no -- I'm telling you
(15)  I was there, so I can tell you that that was
(16)  the concern.
(17)    MR. GENGARO:  That's all I have.
(18)
(19)  REDIRECT EXAMINATION
(20)  BY MR. VELIE:
(21)    Q.    We are going to start with our
(22)  Exhibit 11. It is the flow chart.
(23)    When Mr. Gengaro asked you about
(24)  this flow chart and shows you what was proposed
(25)  to be done with the real estate venture, did he

## Page 463

**PARNES - REDIRECT**

(1)
(2)  point out to you that the purchase price by
(3)  Omniway which is to Gilad Sharon was supposed
(4)  to be $1.25 million?
(5)    A.    No.
(6)    Q.    That appears on the chart under
(7)  Omniway; is that correct?
(8)    A.    Correct.
(9)    Q.    Let's go to Exhibit 44. That's our
(10)  exhibit. If you recall, this is your
(11)  memorandum to Ed Klimerman, February 24, 2003;
(12)  is that correct?
(13)    A.    Yes.
(14)    Q.    It says, "In the beginning of
(15)  March 2002 I sent a revised set of documents to
(16)  Gilad, if you -- and they were returned
(17)  unsigned."
(18)    If you recall, did they reflect the
(19)  contemplated purchase price of $1.25 million?
(20)    A.    Yes.
(21)    Q.    Those documents were never signed;
(22)  is that correct?
(23)    A.    They were never signed.
(24)    Q.    And, in fact, if you look deeper
(25)  into this exhibit, there is a subscription

## Page 464

**PARNES - REDIRECT**

(1)
(2)  agreement dated 2/6/2002. It's about three or
(3)  four pages in.
(4)    A.    Yes, I have it.
(5)    Q.    It's five pages in. It is a
(6)  subscription agreement. It's unsigned by
(7)  Omniway; is that correct?
(8)    A.    That's correct, yes.
(9)    Q.    That indicates that Omniway was to
(10)  pay $1.25 million for the interest in the
(11)  Canadian venture; is that correct?
(12)    A.    That is correct.
(13)    Q.    This was returned to you unsigned?
(14)    A.    Unsigned by Omniway, yes.
(15)    Q.    Behind that is a promissory note
(16)  dated February 6, 2002.
(17)    Take a look at the end on page 4.
(18)  Was that returned to you unsigned?
(19)    A.    Yes.
(20)    Q.    So this was returned to you
(21)  unsigned, and the amount that is contemplated
(22)  in the secured promissory note is
(23)  $1.25 million; is that correct?
(24)    A.    That is correct, yes.
(25)    Q.    So the deal, as you understood it

## Page 465

**PARNES - REDIRECT**

(1)
(2)  and as reflected in Exhibit 44, when you --
(3)    MR. LENTZ:  I ask it not be a
(4)  leading question, please.
(5)    THE ARBITRATOR:  Let's get through
(6)  with this. It's okay.
(7)    Q.    In your memorandum of February 24,
(8)  2003, the deal you're describing is a deal for
(9)  Gilad to buy this for $1.25 million; isn't that
(10)  correct?
(11)    MR. LENTZ:  Objection. Leading.
(12)  It's his own witness.
(13)    THE ARBITRATOR:  Overruled.
(14)    A.    $1,250,000 was the price that was
(15)  discussed, yes.
(16)    Q.    As far as you know, that price was
(17)  never paid, and Gilad never became shareholder
(18)  on that basis; is that correct?
(19)    A.    Not at that time, no.
(20)    Q.    He became a shareholder in the
(21)  documents I showed you; is that correct?
(22)    A.    Yes, that is correct.
(23)    Q.    The ones that your notes indicate
(24)  are in March of '04 -- March of '03?
(25)    A.    Following that, yes.

*Reviewed*

# GENGER VS. GENGER

## PROCEEDINGS - 9/6/07

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:



*Ellen Grauer*
COURT REPORTING Co. LLC

TOWER 56, 126 EAST 56TH STREET, FIFTH FLOOR, NEW YORK, NEW YORK 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
WWW.ELLENGRAUER.COM

GENGER                                           VS. GENGER

BSA XMAX(33/33)

PROCEEDINGS - 9/6/07

---

Page 366

(1)
(2)        Q.   Tell us briefly what the note is and
(3)    why it was prepared in the first place.
(4)        A.   The documents reflect that in 1993
(5)    there was a partnership that was previously set
(6)    up in 1998 that was owned originally by my
(7)    sister and me directly and then contributed
(8)    into trusts with my mother being the general
(9)    partner with a four percent interest.
(10)       That partnership acquired 49 percent
(11)   of TPR in 1993 with $1.2 million in cash, and
(12)   if memory serves, a note for $8,950,000, which
(13)   is commonly referred to as the D&K note.
(14)       Q.   Do you have an understanding of what
(15)   that transaction was for? Did you participate
(16)   in it in any way?
(17)       A.   Yes.
(18)       Q.   Tell us what you understood the
(19)   purpose of the transaction.
(20)       A.   Essentially an estate planning tool,
(21)   to transfer wealth.
(22)       Q.   From the parents to the children?
(23)       A.   Yes.
(24)       Q.   That's the basic background of the
(25)   D&K note?

Page 367

(1)
(2)        A.   Yes.
(3)        Q.   Are you aware that your father
(4)    contends that you should have valued the D&K
(5)    note as an offset to the imbalance that you
(6)    determined when you gave your January
(7)    instructions?
(8)        A.   I'm aware that he recently
(9)    researched that, yes.
(10)       Q.   When you say, "Recently," when is
(11)   the first time you're aware that he raised this
(12)   as an issue?
(13)       A.   Sometime in 2007. I'm sorry. That
(14)   was wrong. I think the issue was first raised
(15)   in December 2006.
(16)       Q.   That was in court proceedings?
(17)       A.   That was, not in court proceedings,
(18)   but in lawyerly proceedings.
(19)       Q.   A contention was made by counsel in
(20)   the opening, and I'll call your attention to
(21)   it, that the DDK or one of the DDK reports
(22)   shows payment by Dalia and Arie of part of the
(23)   D&K note.
(24)       Would you explain that transaction?
(25)       A.   Well, my mother as the general

Page 368

(1)
(2)    partner — you have to remember this was set up
(3)    before there were LLC's, so she was personally
(4)    the general partner, was on the hook for four
(5)    percent of the note and, therefore,
(6)    matrimonially they were on the hook for four
(7)    percent of the note.
(8)        So there were only two alternatives.
(9)    Either have the note, that four percent
(10)   forgiven and incur a tax liability, or put the
(11)   money back into TPR, which essentially means
(12)   that approximately the amount that went —
(13)   would have gone to the IRS, went to the
(14)   children, and it became part of the TPR basket.
(15)       Q.   Let's now go to the issue of did you
(16)   make a determination whether or not to value
(17)   the D&K note with respect to whether or not
(18)   there was an imbalance.
(19)       A.   With respect to the residual,
(20)   96 percent?
(21)       Q.   Yes.
(22)       A.   Yes, I made a determination.
(23)       Q.   What was the determination you made,
(24)   and how did you reach it?
(25)       A.   It was to be excluded.

Page 369

(1)
(2)        Q.   You excluded it from the valuation?
(3)        A.   Excluded. It is not in the
(4)    valuation.
(5)        Q.   Can you tell us your reasoning
(6)    process? And we will show you the documents,
(7)    if any, that you need to do this.
(8)        A.   Sure.
(9)        Q.   Let's first take a look at Article
(10)   III of the stipulation, Exhibit 161 at
(11)   Article III.
(12)       MR. VELIE: While everybody sort of
(13)   finds the place, I am going to ask another
(14)   question, if I may.
(15)       THE ARBITRATOR: Please.
(16)       Q.   What was the status of the D&K note?
(17)   Was it being paid?
(18)       A.   At what point in time?
(19)       Q.   At any point you want to tell us
(20)   about. Was it originally paid? What happened?
(21)       A.   Well, there were payments. My
(22)   understanding is that there were payments
(23)   through the year 2000, and then essentially it
(24)   was — there were no payments. I shouldn't say
(25)   it was in default because I believe it was

Page 370

(1)
(2) never declared a default, but there were no
(3) payments made except until the payments were
(4) made in connection with a stipulation.
(5)    Q.   The payment that you just described
(6) a moment ago?
(7)    A.   The four percent.
(8)    Q.   Was there any effort made on
(9) anybody's part to collect the note when
(10) payments were not being made?
(11)    A.   Well, there is a pro forma letter
(12) sent by Mr. Klimerman to my mother during the
(13) divorce which said, you know, you should be
(14) paying this note, but it didn't even declare it
(15) in default. There was no intention of
(16) collecting the money.
(17)    Q.   Let's go to Article III, and tell us
(18) why you determined that Article III excludes a
(19) valuation of the D&K note.
(20)    A.   If you go to the second page of
(21) Article III --
(22)    Q.   Page 18?
(23)    A.   Yes -- you'll see that the assets of
(24) TPR are defined to be in three categories; A, B
(25) and C. And those categories are supposed to be

Page 371

(1)
(2) annotated on Schedule III, which is the TPR
(3) balance sheet, and that is just clear from the
(4) language. There is a drafting error.
(5)        If you go to Schedule III --
(6)    Q.   Let's look at that together.
(7) Schedule III (1), I believe it is. Sagi, take
(8) a look at Schedule III (1.)?
(9)    A.   If you look at Schedule III (1),
(10) you'll see there is no designation at all, and
(11) that is just a drafting of that. That is it.
(12)    Q.   Are there documents that indicate
(13) what was intended by the parties?
(14)    A.   Yes, there are a lot of documents,
(15) but let's turn to a few of them.
(16)    Q.   Let's take a look at Exhibit 71.
(17)    A.   I'm at the memorandum from Ed
(18) Klimerman to me.
(19)    MR. LENTZ: Just the very first
(20) page?
(21)    MR. VELIE: We are going to look at
(22) a couple of pages.
(23)    MR. LENTZ: Just as a general rule,
(24) I'll try to remember to do this, too.
(25)    When you're on a multi-page exhibit, give

Page 372

(1)
(2) me a chance to catch up with you before
(3) you start questioning.
(4)    MR. VELIE: You have been asking me,
(5) and I hope I have been accommodating you.
(6)    MR. LENTZ: You have been. Very
(7) much so.
(8)    Q.   Let's take a look together at the
(9) first page. This is a memo by hand to you from
(10) Edward Klimerman?
(11)    A.   Well, it's a -- this is a typed memo
(12) to me from Ed Klimerman which is signed by hand
(13) which reads, "As discussed yesterday, enclosed
(14) are two copies of exhibits to the agreement.
(15) Please note that I'm still missing exhibits. I
(16) included" --
(17)    THE ARBITRATOR: Some exhibits.
(18)    THE WITNESS: Excuse me, your Honor.
(19) (Reading) I included the cover sheets for
(20) all of the exhibits and for Exhibit H,
(21) book value of TPR, which is what we are
(22) about to discuss. I have made handwritten
(23) changes which will be typed in for the
(24) final version.
(25)    Q.   Let's take a look now --

Page 373

(1)
(2) unfortunately, these pages aren't numbered.
(3)    Can you tell us, is this the
(4) handwritten notations you received from
(5) Mr. Klimerman enclosed with the memorandum you
(6) just read?
(7)    A.   Yes.
(8)    Q.   If it needs any explanation, can
(9) you -- what is category A?
(10)    A.   Category A refers to cash and
(11) investments.
(12)    Q.   Category B?
(13)    A.   Category B in this format says,
(14) "Loan receivables."
(15)    Category C says, "Art at costs," but
(16) most importantly, the stock subscription due
(17) from D&K, which is the D&K note, is not in any
(18) category.
(19)    Q.   It's not circled by Mr. Klimerman?
(20)    A.   No. It says, "See attached schedule
(21) investments."
(22)    Q.   It's about two pages later?
(23)    A.   Well, it's the next page, and it
(24) continues. It doesn't appear anywhere. That's
(25) the most direct evidence.

## Page 374

(1)
(2)        MR. VELIE:  Judge, I just want to
(3)    make sure you have seen a page that looks
(4)    like this which says on it C and A.
(5)        THE ARBITRATOR:  Yes, I have it all.
(6)        THE WITNESS:  There is another set
(7)    of documents which perhaps -- is this our
(8)    last subject?  Because our subject has a
(9)    time.
(10)       Q.    No, we are briefly going to deal
(11)   with furniture and a few other things.
(12)       A.    Allow me to describe it.  There
(13)   are --
(14)       MR. GENGARO:  What is the question?
(15)       THE ARBITRATOR:  Are there any other
(16)   documents?
(17)       Q.    Are there any other documents that
(18)   bear on this issue?
(19)       A.    There are e-mails in July.  If you
(20)   want, we can have them produced here,
(21)   essentially saying --
(22)       MR. VELIE:  They are at Exhibit 68
(23)   and 205.  205 is the July e-mail.
(24)       THE ARBITRATOR:  Which one do you
(25)   need?  205 or 68?

## Page 375

(1)
(2)        Q.    Do you want the July one, Sagi?
(3)        A.    No, I want to start with -- no, 68.
(4)    This is e-mail that is basically to all the
(5)    lawyers forwarded to my father, and the
(6)    relevant part is, "Please note that in my
(7)    analysis I'm adjusting downwards the value of
(8)    the personal assets to reflect the
(9)    worthlessness of the D&K note which is stated
(10)   at nominal value on the auditor's balance
(11)   sheet," and then it continues on to other
(12)   things.
(13)       Q.    Do you want to refer to it?
(14)       A.    Yes.  The next important e-mail --
(15)   this has some sort of an Excel attachment to
(16)   it.  This Excel attachment then morphs into
(17)   having additional things in it on July 5th.
(18)       MR. LENTZ:  Please let me catch up.
(19)   I'm sorry.  Is this part of the same
(20)   exhibit?
(21)       MR. VELIE:  Yes, he's on the same
(22)   exhibit.  When it morphs, you want
(23)   Exhibit 205.
(24)       A.    I'm not in 205.
(25)       Q.    You're in 68?

## Page 376

(1)
(2)        A.    So I need 205.
(3)        Q.    Yes, coming up.
(4)        MR. LENTZ:  So we are done with 68?
(5)        THE WITNESS:  Yes.
(6)        A.    This e-mail of it is worthless
(7)    appears multiple times.  Then if you go to the
(8)    July 5th, 2004 e-mail, it says -- this is an
(9)    e-mail -- really, excuse me.  I'm not used to
(10)   doing this.
(11)       MR. LENTZ:  Just talk a little bit
(12)   slower.
(13)       MR. VELIE:  Judge, are you with us?
(14)       THE ARBITRATOR:  I am.
(15)       THE WITNESS:  This is a note from me
(16)   to my father that basically says, take a
(17)   look at the tab labeled disbursements
(18)   which is a new addition to the spreadsheet
(19)   that he received earlier, meaning
(20)   everything I received in the previous tab
(21)   from the previous e-mail plus this one,
(22)   and this is a draft of Schedule 22A.
(23)       The difference between this and
(24)   Schedule 22A is that this is keyed off of
(25)   the April balance sheet, which is what I

## Page 377

(1)
(2)    had available at the time, and
(3)    Schedule 22A is keyed off of the
(4)    October 1st balance sheet.
(5)        If one looks here, okay, or at
(6)    Schedule 22A, you'll find that if you take
(7)    the book value of TPR without the D&K note
(8)    included and multiply it by 53 percent,
(9)    because 52.85 percent is too precise for
(10)   me, you get to precisely the value here.
(11)   So the schedule --
(12)       Q.    What is the significance of that
(13)   piece of arithmetic?
(14)       A.    The point is what it shows is that
(15)   reflected in that schedule is a zero valuation
(16)   for the D&K note.  That's actually scheduled in
(17)   the agreement, and just do the arithmetic;
(18)   you'll see that it is there.  So Schedule 22A
(19)   essentially started with an e-mail of the D&K
(20)   note is worthless.  That is that.
(21)       Then I think that the final matter
(22)   on this is the October 30th -- I mean, I bring
(23)   in a lot of information, but I want to save
(24)   time.
(25)       If we skip to the October 30, 2006

GENGER

BSA XMAX(36/36)

PROCEEDINGS - 9/6/07

VS. GENGER

## Page 378

(1)
(2) note from Edward Klimerman --
(3)   MR. KORTMANSKY: It is Exhibit 127.
(4)   THE WITNESS: -- this is a
(5) memorandum to me from my father's
(6) attorney, Edward Klimerman, raising a
(7) variety of issues.
(8)   No, this is the wrong memorandum.
(9) This is the October 23rd memorandum. I
(10) want the October 30th memorandum.
(11)   THE ARBITRATOR: 127 is
(12) October 30th.
(13)   Q.   The scheme of arrangement is
(14) chronological?
(15)   A.   I'm sorry, excuse me. Forgive me.
(16)   So this is a memorandum,
(17) October 30th. The importance of October 30th
(18) is that it was a date set in writing between my
(19) parents for sort of no more issues after this
(20) date, and the D&K note is not on here despite
(21) the fact that it's been -- there have been
(22) multiple times in which it would have come up,
(23) and the memorandum ends, "Unless I hear from
(24) you by the end of the day tomorrow, these are
(25) the only open issues you have undertaken to

## Page 379

(1)
(2) resolve. Once all of these open points are
(3) finally resolved, it is expected that, as
(4) contemplated by the stipulation of settlement,
(5) you will render a final accounting. As we
(6) discussed this morning, we will set up a
(7) meeting for tomorrow afternoon," blah, blah,
(8) blah.
(9)   As far as I'm concerned, that --
(10)   Q.   Is that the reason that you did not
(11) value the D&K note?
(12)   A.   Yes.
(13)   Q.   Thank you.
(14)   Did you want to raise other reasons?
(15)   A.   I just want to point out that the
(16) D&K note itself is not only mentioned in the
(17) agreement; it's actually attached to the
(18) agreement.
(19)   There is no secret to the fact that
(20) the D&K note exists. It was known. It's
(21) discussed in both D&K reports, and in every
(22) draft of the D&K report there is a section
(23) titled, "Notes Outstanding to TPR," and it
(24) discussed the D&K note and then doesn't include
(25) it in the tally.

## Page 380

(1)
(2)   So I think -- if that doesn't kill
(3) the issue, I don't know what does. That's it.
(4)   Q.   What would have been the impact of a
(5) collection of the D&K note had TPR collected
(6) it?
(7)   A.   Against D&K?
(8)   Q.   Yes.
(9)   A.   It would have been essentially to,
(10) you know, enforce the pledge, which I guess
(11) means going and selling a minority interest in
(12) a private company to somebody and, frankly,
(13) reversing the estate planning that was
(14) contemplated to begin with.
(15)   Q.   Did you understand that to be
(16) anybody's idea during the stipulation, to
(17) reverse the estate planning?
(18)   MR. GENGARO: He's not competent to
(19) testify what is in other people's head.
(20) Objection.
(21)   THE ARBITRATOR: Sustained.
(22)   Q.   What is your understanding of that
(23) issue?
(24)   A.   There was like 14 percent of TRI
(25) given to the kids under estate planning. No

## Page 381

(1)
(2) one was reversing the estate planning.
(3)   Q.   Thank you.
(4)   MR. VELIE: We are going to shift
(5) gears here.
(6)   THE ARBITRATOR: This is the last
(7) two questions.
(8)   MR. VELIE: I'm down to my last two
(9) pages.
(10)   I believe what I got here are --
(11) what these have to do with are various
(12) counterclaims by Arie, I believe.
(13)   Q.   Let's take a look quickly at -- do
(14) you understand that your father has made sort
(15) of a counterclaim against your mother relating
(16) to a company called OBB?
(17)   A.   Yes.
(18)   Q.   Tell us what you understand it is.
(19)   A.   First you have to understand what
(20) was in the September memo. This was an unusual
(21) situation where OBB -- and I don't remember
(22) what the other property is.
(23)   Q.   That's Exhibit 113.
(24)   A.   OBB and some other property that --
(25)   Q.   The September memo is 113.

## AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT

### OF

### D & K LIMITED PARTNERSHIP

This AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT (this "Agreement") of D&K Limited Partnership (the "Partnership") is made as of the 30th day of October , 2004, by and among the 1993 Orly Genger Trust (the "OG Trust"), the 1993 Sagi Genger Trust (the "SG Trust"), each a limited partner of the partnership, and D&K GP LLC, the general partner of the Partnership.

WHEREAS, the Partnership was formed as a limited partnership pursuant to the provisions of the Delaware Limited Partnership Act, by the filing of a Certificate of Limited Partnership with the Office of the Secretary of State of the State of Delaware and the execution of the Limited Partnership Agreement of the Partnership dated as of December 31, 1988 (the "Original Agreement"); and

WHEREAS, the Original Agreement was subsequently amended several times to reflect, among others, the replacement of the limited partners, the replacement of the general partner, as well as amendments to specific provisions of the Original Agreement and amendments thereto; and

WHEREAS, the parties hereto desire to restate all previous amendments and to enter into this Amended and Restated Limited Partnership Agreement of the Partnership to serve as the governing document of the Partnership;

NOW, THEREFORE, in consideration of the mutual promises and agreements herein made and intending to be legally bound hereby, the parties hereby restate the Original Agreement, and amendments thereto, in its entirety to read as follows:

1

1. **Formation of Partnership.**  (a) The Partnership was formed, under the name D & K Limited Partnership (the "Partnership"), as a limited partnership under the provisions of the Delaware Limited Partnership Act, as indicated in the preamble of this Agreement, and the execution of the Original Agreement. If requested by the General Partner, the Limited Partners shall promptly execute all certificates and other documents consistent with the terms of this Agreement necessary for the General Partner to accomplish all filing, recording, publishing and other acts as may be appropriate to comply with all requirements for (a) the formation and operation of a limited partnership under the laws of the State of Delaware, (b) if the General Partner deems it advisable, the operation of the Partnership as a limited partnership, or partnership in which the Limited Partners have limited liability, in all jurisdictions where the Partnership proposes to operate and (c) all other filings required to be made by the Partnership.

(b) The general partner of the Partnership is D&K GP LLC, a Delaware limited liability company, and any successor individual or corporation admitted to the Partnership as general partner (the "General Partner"). The limited partners of the Partnership shall be the SG Trust and the OG Trust, and any other persons who are admitted to the Partnership as additional or substituted limited partners in Paragraph 17 (the "Limited Partners") (the Limited Partners and the General Partner, shall be referred to herein as "Partners", and each – a "Partner").

2. **Purpose.**  The purpose of the Partnership is to acquire and hold an equity interest (initially, represented by 240 common shares) in TPR Investment Associates, Inc., a Delaware corporation ("TPR") and other legal business activities as determined by the General Partner.

3. **Place of Business.**  The principal place of business of the Partnership shall be located at 1211 Park Avenue, New York, N.Y. 10128, or at such other location(s) as may hereafter be determined by the General Partner on notice to the Limited Partners.

4. **Term.**  The term of the Partnership shall continue until December 31, 2038; provided, however, that the Partnership shall be dissolved prior to such date upon the happening of any of the following events:

2

(a) upon the written election to terminate made by the General Partner at any time, which election shall be sent to the other Partners;

(b) upon the death, bankruptcy, incapacity, or other withdrawal of the General Partner, unless within ninety (90) days after such event, all of the Limited Partners elect to reconstitute the Partnership, continue its business and elect a new general partner.

(c) in the event the Partnership has distributed all of its assets.

5. **Capital Contributions.**

(a) The Capital Contributions of the Partners consists of the following: :

| | |
|---|---|
| D&K GP LLC | $50,000 |
| 1993 Sagi Genger Trust | $600,000 |
| 1993 Orly Genger Trust | $600,000 |

(b) Each of the Partners shall assume personal liability under any and all indebtedness incurred by the Partnership to finance (and refinance) the purchase by the Partnership of the equity interest in TPR referred to in Paragraph 2 hereof. The Partners shall share such liability among themselves in accordance with their interests in the Partnership, and any payment by a Partner of its share of such liability shall be deemed to be a contribution to the capital of the Partnership as to which such Partner has no rights of contribution or subrogation.

6. **Interest in Partnership.**    Each Partner's interest in the Partnership shall be equal to the proportion that the then balance in his or her capital account bears to the aggregate balance of all of the Partners' capital accounts; where applicable this computation shall be governed by the specific stipulations in Paragraphs 7 and 8 hereof.

3

7. **Capital Account.**    A capital account has been established as shown per "5(a)". Accounts shall be maintained in accordance with the applicable regulations under the Internal Revenue Service as amended ("the "Code"), and Income Tax Regulations (the "Regulations") promulgated under the Code. Interest shall not be paid on any capital account and no Partner shall have the right to withdraw any part of his capital account until dissolution of the Partnership, and then such distribution or withdrawal shall be governed by paragraph 14 hereof. No Partner shall have the right to bring an action for partition. Each Partner's capital account shall be credited by capital contributions. The parties agree that as of the date hereunder the capital accounts are as per "5(a)" without regard to previous payments made by any of the Partners. In consideration for such, the Partners recognize the note originally issued in the amount of $8,950,000 referred to in paragraph 5 the "Note" as a liability of each Limited Partner to the Partnership as denoted. Partnership rights as per "22" may also be used to enforce collection of the Note by the Partnership. Any attempted interference by a Partner or a person beneficially owning an in interest in the Partnership automatically and irrevocably vests the General Partner with the right to revert the capital account of any Partner to a percentage based upon his actual pro rata contributions, expel, or otherwise suspend the membership and all rights accumulated in connection therewith without notice and hold his share of partnership assets as collateral for payments due. Upon thirty days notice the Partnership may demand full payment of the Limited Partner's pro rata share of the Note.

8. **Profits and Losses.**    The net profits and net losses of the Partnership shall be shared by the Partners in proportion to the then balances in their respective capital accounts. The terms "net profits" and "net losses" shall mean the net profits and net losses of the Partnership as determined for federal income tax purposes.

9. **Management.**

(a) Except as expressly provided herein, the management and control of the day-to-day operations of the Partnership and the maintenance of the Partnership property shall rest exclusively with the General Partner. (b) To the fullest extent permitted by law, the General Partner shall have complete authority over and exclusive control and management of the business and affairs of the Partnership and all of the Partnership property and all rights, powers

4

and authority appropriate therefore. The powers and discretion of the General Partner on behalf of the Partnership shall include, but shall not be limited to, making investments, selling assets, lending money for any lawful purpose whatsoever, borrowing money for any lawful purpose whatsoever, borrowing money for any lawful purpose whatsoever (and posting assets of the Partnership as collateral therefore), making tax elections under the Code, making distributions to the Partners (subject to Paragraph 10 hereof), executing guarantees for any lawful purpose whatsoever (and posting assets of the Partnership as collateral therefore) and doing all other acts or things necessary to carry out and implement the purposes of the Partnership, provided that each such action is taken upon reasonable terms to the Partnership. The General Partner may delegate, in writing, any of her powers under this Agreement.

(c) Any document, instrument or agreement to be executed and delivered by and on behalf of the Partnership shall be effective is signed and delivered by the General Partner or a delegee of the General Partner.

(d) Each of the other Partners hereby gives its approval to any action taken or to be taken on behalf of the Partnership by the General Partner, and agrees that it shall have no cause of action against the Partnership or the General Partner except for any claim based upon:

(i) the fraud, bad faith or willful misconduct of a Partner, or

(ii) the breach by a Partner of any provision of this Agreement or of any other written agreement to which the Partnership and such person are parties.

(e) No Limited Partner shall take part in the control or management of the Partnership or of the business of the Partnership, nor shall it have any authority to act for or to bind the Partnership in any way.

(f) The Partners acknowledge that the General Partner, its managing member(s), officers, employees and representatives, as the case may be, are hereby released from all liability and are hereby held harmless for any acts or omission they might have taken in their various capacities, whether as officers, employees, representatives, or the like, of TPR or of the Partnership. The Partners further acknowledge that certain actions between TPR and the Partnership, conducted

5

under the direction, instructions or supervision of said employees, officers, managing members, representatives and the like, would be considered 'self dealing'. The Partners hereby indemnify the General Partner, its managing members, officers, employees, representatives and the like, to the fullest extent permitted by law, from any such actions or omissions including, but not limited to, actions considered 'self dealing'.

10.  **Drawings of Income and Principal.**

(a) After making provisions for current debts and other obligations of the Partnership and establishing reasonable reserves for the reasonable needs of the Partnership's business, the General Partner shall distribute, not less frequently than annually, all of the remaining cash of the Partnership.

(b) During the Partnership year of 2038 all of the then remaining principal and accumulated income of the Partnership shall be distributed to the Partners and, upon the final distribution, the Partnership shall terminate.

(c) All distributions of principal, accumulated income and current income made to the Partners shall be made in proportion to each of the Partner's interest as set forth in Paragraph 6 hereof, and the available amount shall be computed after taking into account debts and reserves such as are permitted under Paragraph 14 hereof.

11.  **Transfer of Partnership Interest.**  A Partner may not sell, assign, or encumber his or its interest in the Partnership or otherwise withdraw or retire from the Partnership without the prior written consent of the other Partners. No sale or exchange of any interest in the Partnership may be made if the transfer of the interest sought to be sold or exchanged may result, in the opinion of legal counsel to the Partnership, in (i) the termination of the Partnership under Section 708 of the Code, or (ii) the violation of any applicable federal or state securities law.

12.  **Title to Property and Bank Accounts.**  The property of the Partnership shall be held in the name of the Partnership or the General Partner as nominee for the Partnership. All Partnership funds shall be deposited in its name in such bank account or accounts as shall be designated by the General Partner and all withdrawals therefrom shall be made upon the

6

signature of the General Partner or such person or persons as shall be so designated by the General Partner.

13.    **Books.**    The General Partner shall cause the Partnership to keep accounts and complete books and records of the business of the Partnership at the principal place of business of the Partnership, and each Partner shall at all reasonable times have access thereto.

14.    **Termination.**

(a)  Upon the termination and dissolution of the Partnership, if the Partnership is not continued pursuant to the terms of this Agreement, the General Partner or, if there is no General Partner, any person elected by a majority of the Limited Partners to perform such liquidation of the assets of the Partnership, shall proceed with the orderly liquidation of the assets of the Partnership, and the net proceeds of such liquidation shall be applied and distributed in the following order of priority:

( i ) to the payment of any debts and liabilities of the Partnership and the expenses of liquidation;

( ii )    to the establishment of any reserves which the General Partner may deem reasonably necessary to meet any contingent or unforeseen liabilities or obligations of the Partnership or of the Partners arising out of or in connection with the Partnership;

( iii )    the balance, if any, shall be distributed among the Partners in proportion to and to the extent of the then positive balances in their respective capital accounts (as determined after giving effect to all capital account adjustments for the Partnership's taxable year during which the liquidation occurs); and

( iv )  if any Partner has a deficit balance in his or her capital account (as determined after giving effect to all capital account adjustments for the Partnership's taxable year during which the liquidation occurs), such Partner shall be unconditionally obligated to pay the amount of such deficit balance to the Partnership by the end of such taxable year (or, if later, within ninety (90) days after the date of such liquidation), which amounts shall be applied and distributed in accordance with the provisions of this Paragraph. The General Partner may accept in lieu thereof, collateral, assurance of availability of collateral, or other secured guarantees

7

which the General Partner reasonably deems to be adequate substitutes for such Partner's payment.

(b) In the event it becomes necessary to make distribution of Partnership property in kind, such property shall be transferred and conveyed to the Partners so as to vest in each of them as a tenant in common as undivided interest in the whole of said property in proportion to and to the extent of the then balances in their respective capital accounts.

15.    **Death of Partner.**    The death, bankruptcy, dissolution or withdrawal of a limited partner shall not dissolve the Partnership.

16.    **Notice.**    All notices and other communications required or permitted under this Agreement shall be in writing and may be personally delivered, sent by first class mail, postage prepaid, or electronically delivered, to an address regularly used by the addressee, with acknowledgement receipt, to the Partners at their addresses as shown from time to time on the records of the Partnership, or as may reasonably be known to the General Partner. Any Partner may specify a different address by notifying the General Partner in writing of such different address. All notices and other communications required or permitted under this Agreement shall be deemed to have been received on the day when personally delivered, on the day the electronic acknowledgement has been received by sender, or three days after being mailed in the manner provided in this Section 16, as the case may be.

17.    **Admission of New Partners.**    The Partnership may admit a new Partner upon the majority consent of all of the then existing Partners; consent of the General Partner shall be necessary; such consent to be granted or withheld at the General Partner's sole and unfettered discretion.

18.    **Governing Law.**    The Partnership is formed under the laws of the State of Delaware and the Delaware Uniform Limited Partnership Act.

19.   **Liability of the Partners**.

(a)    General.    The Partnership hereby indemnifies and agrees to hold each Partner harmless with respect to any claim, liability, damage, cost or expense (including reasonable attorney's fees and disbursements) incurred by reason of any act performed or omitted to be performed as a Partner or in connection with the assets or business of the Partnership, except that no Partner shall be indemnified where he or she is found in a final non-appealable judgment to have committed fraud, bad faith or willful misconduct.

(b) Indemnification of General Partner

(i)    To the maximum extent permitted by law, the Partnership, its receiver, or its trustee shall indemnify, save harmless, and pay all judgments and claims against the General Partner, and its members and managers, their respective officers, directors, agents, stockholders, members, managers, partners and other Affiliates, and any other person who serves at the request of the General Partner on behalf of the Partnership as an officer, director, member, partner, employee or agent of the Partnership or any other present or future entity (in each case, an "Indemnitee") and all loss, damage or expense incurred by any Indemnitee or by the Partnership by reason of any act performed or omitted to be performed by any Indemnitee in connection with the Partnership (including, but not limited to, attorneys' fees and other costs and expenses incurred by any Indemnitee in connection with the investigation and defense of any action based on any such act or omission, which attorneys' fees and any other costs and expenses shall be paid as incurred, and any amounts expended in the settlement of any claim of liability, loss or damage).

(ii)    Without limiting the generality of the foregoing, in the event of any action by a Limited Partner (other than an Affiliate of the General Partner) against any Indemnitee, including a Partnership derivative suit or any class action, the Partnership shall indemnify, save harmless, and pay all costs and expenses of such Indemnitee, including attorneys' fees incurred in the defense of such action, which shall be paid as incurred.

(iii)    No Indemnitee shall have any liability to the Partnership or the Limited Partners except liabilities of any Indemnitee for any loss, damage or expense which, by a final

9.

judgment or other final adjudication, has been determined to have arisen from such Indemnitee's fraud, willful misconduct or bad faith, which fraud, willful misconduct or bad faith in each case has been determined to have been material to the cause of action adjudicated. Notwithstanding the provisions of Sections 8.4(a) and 8.4(b), no Indemnitee shall be indemnified for any loss, damage or expense if a final judgment or other final adjudication adverse to such Indemnitee establishes that such Indemnitee's loss, damage or expense arose from such Indemnitee's fraud, willful misconduct or bad faith which, in each case, was material to the cause of action so adjudicated and in the event of any such adverse final judgment or other final determination establishing such Indemnitee's fraud, willful misconduct or bad faith material to the cause of action so adjudicated, such Indemnitee shall reimburse to the Partnership any costs and expenses, including attorneys fees, previously advanced to such Indemnitee. Limited Partners shall not be individually obligated with respect to such indemnification beyond their respective Commitments.

20.    **Self-Dealing**. The fact that any Partner is directly or indirectly interested in or connected with any person, firm or corporation employed by the Partnership to render or perform a service or from which or to whom the Partnership may buy or sell merchandise or other property shall not prohibit the General Partner from employing such person, firm or corporation or from dealing with him or her or it, and neither the Partnership nor the other Partners thereof shall have any rights in or to any income or profits derived therefrom by such person, firm or corporation.

21.    **Power of Attorney**. Each Limited Partner hereby constitutes and appoints the General Partner the true and lawful attorney-in-fact for each Limited Partner and in the name, place and stead of each Limited Partner from time to time to execute and file:

(i)          any certificates and other instruments which may be required to be filed by the Partnership under the laws of the State of Delaware or any other governmental authority having jurisdiction thereover, or which he General Partner shall deem it advisable, in its sole discretion, to file;

10

(ii)        any certificates or other instruments amending or modifying the Certificate of Limited Partnership of the Partnership as provided therein;

(iii)        any certificates or other instruments which may be required to effectuate the dissolution and termination of the partnership and/or the cancellation of the Certificate of Limited Partnership; and

(iv)        any amendment of this Agreement which the General Partner is authorized to make in accordance with the provisions of this Agreement.

it being expressly understood and intended by each of the Partners that such powers of attorney are coupled with an interest. The foregoing powers of attorney shall be irrevocable and shall survive any assignment of the whole or any part of the interest in the Partnership of a Limited Partner and shall be binding upon the assignee thereof.

22.      **Authority of General Partner with respect to holdings in TRI**

(a) The Partners acknowledge that each one of the Limited Partners holds 102.80 shares of TRI, representing 19.42766% of the common stock of TRI (each, a "LP TRI Interest(s)").

(b) The General Partner is hereby conferred the authority, in its sole and unfettered discretion to mortgage, hypothecate, pledge, create a security interest in or lien upon, or otherwise encumber the LP TRI Interests, for the benefit of the Partnership or that of third parties, in connection with the Note.

(c) Should the General Partner encumber the LP TRI Interests, as permitted under section (b) above - each Limited Partner shall have the right to redeem its LP TRI Interest to the full extent of such LP's pro-rated participation, responsibility or liability for the unpaid amount of the Note.

11

(d) Each Limited Partner hereby constitutes and appoints the General Partner the true and lawful attorney-in-fact for each Limited Partner and in the name, place and stead of each Limited Partner from time to time in connection with (i) placing a mortgage, hypothecate, pledge, creating a security interest in or lien upon, or otherwise encumbering the LP TRI Interests in connection with the Note, (ii) removing such mortgage, hypothecation, pledge, security interest, lien or other encumber, placed on the LP TRI Interests, and (iii) negotiating, settling or otherwise handling or managing any rights attached to, or emanating from, the LP TRI Interest and dealing with the LP TRI Interests until payment of the Note has been resolved.

(e) Each Limited Partner agrees that it shall not during the term of this Agreement either directly or indirectly, transfer, sell, assign, mortgage, hypothecate, pledge, create a security interest in or lien upon, encumber, donate, contribute, place in trust (including a voting trust), or otherwise voluntarily or involuntarily dispose of (each, a "Transfer") said Limited Partner's LP TRI Interest

23.    **Authority of General Partner to Vary Tax Allocations; Tax Matters Partner.**

(a) It is the intent of the Partners that each Partner's distributive share of taxable income or tax loss, and of each item of income, gain, loss, preference, deduction, or credit entering into the computation thereof, shall be determined and allocated in accordance with this Agreement to the fullest extent permitted by Section 704(b) of the Code. In order to preserve and protect the determinations and allocations provided for in this Agreement, the General Partner is authorized and directed to allocate tax income, gain, loss, preference, deduction, or credit (or any item thereof) arising in any year differently than as may otherwise be provided for in this Agreement to the extent that allocating tax income, gain, loss, preference, deduction, or credit (or any item thereof) in the manner provided for in this Agreement would cause the determinations and allocations of each Partner's distributive share of tax income, gain, loss, preference, deduction, or credit (or item thereof) not to be permitted by Section 704 (b) of the Code and applicable Regulations.

In making any such new allocations the General Partner is authorized to act only after having been advised by counsel to the Partnership and the accountants for the Partnership

12

that in their opinion, under Section 704 (b) of the Code and applicable Regulations, ( i ) the new allocation is necessary, and ( ii ) the new allocations is the minimum modification of the allocations otherwise provided for in this Agreement necessary in order to assure that, either in the current year or in any preceding year, each Partner's distributive share of tax income, gain, loss, preference, deduction, or credit (or item thereof) is determined and allocated in accordance with this Agreement to the fullest extent permitted by Section 704 (b) of the Code and applicable Regulations.

If the General Partner is required to make any new allocation in a manner less favorable to the Limited Partners than is otherwise provided for in the Agreement, the General Partner is authorized and directed, insofar as she is advised by counsel and the accountants for the Partnership that it is permitted by Section 704 (b) of the Code and applicable Regulations, to allocate tax income, gain, loss, preference, deduction, or credit (or item thereof) arising in later years in a manner so as to bring the allocations of tax income, gain, loss, preference, deduction, or credit (or item thereof) to the Limited Partners as near as possible to the allocations otherwise contemplated by this Agreement.

(b)     The General Partner is hereby designated as Tax Matters Partner of the Partnership, as provided in the Regulations pursuant to Section 6231 of the Code. Each Partner, by the execution of this Agreement, consents to such designation of the Tax Matters Partner and agrees to execute , certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such consent. The Tax Matters Partner is hereby authorized, but not required:

(i)     to enter into any settlement with the Internal Revenue Service or the Secretary of the Treasury (the "Secretary") with respect to any tax audit or judicial review, in which agreement the Tax Matters Partner may expressly state that such agreement shall bind the other partners, except that such settlement agreement shall not bind any Partner who (within the time prescribed pursuant to the Code and applicable Regulations) files a statement with the Secretary provided that the Tax Matters Partner shall not have the authority to enter into a settlement agreement on the behalf of such Partner;

13

(ii)   in the event that a notice of final administrative judgment at the Partnership level of any item required to be taken into account by a Partner for tax purposes a "final judgment") is mailed to the Tax Matters Partner, to seek judicial review of such final adjustment, including the filing of a petition for readjustment with the Tax Court, the District Court of the United States for the district in which the Partnership's principal place of business is located, or the United States Claims Court;

(iii)   to intervene in any action brought by any other Partner for judicial review of a final adjustment;

(iv)   to file a request for an administrative adjustment with the Secretary at any time and, if any part of such request is not allowed by the Secretary, to file a petition for judicial review with respect to such request;

(v)   to enter into an agreement with the Internal Revenue Service to extend the period for assessing any tax which is attributable to any item required to be taken into account by a Partner for tax purposes, or an item affected by such item; and

(vi)   to take any other action on behalf of the Partners or the Partnership in connection with any administrative or judicial tax proceeding to the extent permitted by applicable law or regulations.

24.   **Agreement in Counterparts**. This Agreement may be executed in any number of counterparts which together shall constitute one and the same instrument.

25.   **Rules of Construction**. Each paragraph of this Agreement shall be considered severable, and if for any reason any paragraph or paragraphs herein are determined to be invalid and contrary to any existing or future laws, such invalidity shall not impair the operation or

14

affect the portions of this Agreement which are valid.

26.    **Headings.** Headings contained in this Agreement are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provisions hereof.

27.    **Creditors.** None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Partnership, as creditor, or for the benefit of any other individual, corporation or entity.

28.    **Entire Agreement.** This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith. No covenant, representation or condition not expresses in this Agreement shall affect or be effective to interpret, change or restrict the express provisions of this Agreement.

29.    **Pronouns.** All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular and plural as the identity of the person or persons may require.

30. **Binding Effect.** This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective heirs, successors, executors, administrators, legal representatives and permitted assigns.

31. **Further Assurances.** Each Partner agrees to do such further acts and to execute such documents as may be reasonably requested in furtherance of, and to carry out and implement the purposes of, t his Agreement and the transactions contemplated herein.

32. **Amendment.** This Agreement may not be modified except by a writing signed by Partners holding a majority in interest of the Partnership; in the event such majority in interest included only the Limited Partners – the consent of the General Partner shall be required as well.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement, effective on the day and year first written above.

GENERAL PARTNER:

D&K GP LLC

by: Sagi Genger, its managing member

LIMITED PARTNERS:

1993 Sagi Genger Trust

by: Leah Fang, sole trustee

1993 Orly Genger Trust

by: Leah Fang, sole trustee

Restated this _____ day of November, 2007

16

# ORIGINAL

1

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

------------------------------------------------- x

ORLY GENGER,

                Plaintiff,      Index No.

                                   100697/08

      -against-

SAGI GENGER,

                Defendant.

------------------------------------------------- x

        DEPOSITION of the Non-Party Witness, ROCHELLE
FANG, taken by the Plaintiff, pursuant to Subpoena,
held at Supreme Court of New York 60 Centre Street,
New York, New York, on August 22nd, 2011, at 2:30
p.m., before a Notary Public of the State of New
York.

**********************************************

BARRISTER REPORTING SERVICE, INC.

120 Broadway

New York, N.Y. 10271

212-732-8066

2

```
1
2    A P P E A R A N C E S :
3
4        ZEICHNER ELLMAN & KRAUSE, LLP
                Attorneys for Plaintiff
5               575 Lexington Avenue
                New York, New York 10022
6
        BY:   BRYAN D. LEINBACH, ESQ.
7
8
9        DUANE MORRIS, LLP
                Attorneys for Defendant
10              1540 Broadway
                New York, New York 10006
11
        BY:   EVANGELOS MICHAILIDIS, ESQ.
12
13
14       LYONS McGOVERN, LLP
                Attorneys for Non-Party Witness
15              399 Knollwood Road
                White Plains, New York 10603
16
        BY:   DESMOND C.B. LYONS, ESQ.
17
18
19
                        xxxxx
20
21
22
23
24
25
```

3

```
 1

 2                    S T I P U L A T I O N S

 3    IT IS HEREBY STIPULATED AND AGREED by and between the

 4    attorneys for the respective parties hereto, that:

 5    All rights provided by the C.P.L.R., and Part 221 of

 6    the Uniform Rules for the Conduct of Depositions,

 7    including the right to object to any question, except

 8    as to form, or to move to strike any testimony at this

 9    examination is reserved; and in addition, the failure

10    to object to any question or to move to strike any

11    testimony at this examination shall not be a bar or

12    waiver to make such motion at, and is reserved for,

13    the trial of this action.

14    This deposition may be sworn to by the witness being

15    examined before a Notary Public other than the Notary

16    Public before whom this examination was begun, but the

17    failure to do so or return the original of this

18    examination to counsel, shall not be deemed a waiver

19    of the rights provided by Rule 3116 of the C.P.L.R.,

20    and shall be controlled thereby.

21    The filing of the original of this deposition is

22    waived.

23    IT IS FURTHER STIPULATED, that a copy of this

24    examination shall be furnished to the attorney for the

25    witness being examined without charge.
```

4

```
 1                      R. Fang

 2    R O C H E L L E     F A N G ,

 3                  Having been first duly sworn before a

 4                  Notary Public of the State of New York,

 5                  was Examined and testified as follows:

 6    EXAMINATION

 7    BY MR. LEINBACH:

 8    Q.      Please state your name for the record.

 9    A.      Rochelle Fang.

10    Q.      What is your address?

11    A.      253 West 73rd Street, apartment 14A,

12    New York, New York 10023.

13                  MR. LEINBACH:  I am noticing

14              here I don't see any bank statements.

15              You have not collected it yet?

16                  MR. LYONS:  We will not.  They

17              are not responsive to the subpoena.

18                  MR. LEINBACH:  Why?

19                  MR. LYONS:  They are not

20              responsive.  They don't relate to the

21              companies at issue to the subpoena.

22              That's what the Order calls for.

23                  MR. LEINBACH:  The Order also

24              calls for evidence of income or

25              transfers made to or from Ms. Fang.
```

5

1                    R. Fang

2    Are those evidences of bank

3    statements?

4            MR. LYONS:  It doesn't say that

5    in the Order.

6            MR. LEINBACH:  Judge Solomon

7    said that at the last hearing on

8    several occasions.

9            MR. LYONS:  Arguably

10   responsive.

11           MR. LEINBACH:  I recall on

12   several occasions documents that are

13   arguably responsive that would relate

14   to those things.  You are saying there

15   are no statements that reflect

16   transfers of income that go to or from

17   Ms. Fang?  Is that what you are

18   saying?

19           MR. LYONS:  From what

20   companies?  From the companies you are

21   referring to in the subpoena?

22           MR. LEINBACH:  It would be all

23   of the companies that are referred to.

24           MR. LYONS:  To Ms. Fang.

25           MR. LEINBACH:  To Ms. Fang or

6

1                    R. Fang

2      from Ms. Fang?

3           MR. LYONS:  You can ask.  I

4      don't think so.

5           MR. LEINBACH:  That was one of

6      the things that Judge Solomon

7      specifically stated you should bring

8      today.

9           MR. LYONS:  Ask her the

10     question in her background.

11          THE WITNESS:  I don't know.

12          MR. LYONS:  Do the bank records

13     show transfers?

14          THE WITNESS:  What kind of

15     transfers?

16          MR. LEINBACH:  We will go on

17     the record.  I want to understand, for

18     starters, are you saying essentially

19     those records, you don't have them

20     here today?

21          MR. LYONS:  We don't have

22     those.

23          MR. LEINBACH:  Did you bring

24     any records with you today?

25          MR. LYONS:  What you have is

7

1                    R. Fang

2         what I have produced.

3              MR. LEINBACH:  Judge Solomon

4         was fairly clear that you should bring

5         all records here today which reflect

6         transfers and what it sounds like --

7         it sounds like, to me -- I want to

8         make sure I understand that you didn't

9         bring those records.

10             You don't know whether or not

11        there were transfers?

12             MR. LYONS:  I was advised that

13        there are no transfers or no bank

14        records that show transfers.  That's

15        why I don't have them.

16             MR. LEINBACH:  I have no idea

17        how long Judge Solomon is going to be

18        on the bench.  My suggestion is that

19        we will double check in an hour to see

20        whether she is available.

21             MR. LYONS:  See what other

22        documents you need.  We will get you

23        whatever documents you requested,

24        provided they are responsive.

25   Q.    Good afternoon.  My name is Bryan

8

```
 1                    R. Fang
 2   Leinbach.  I will ask you some questions.
 3           I first ask:  Have you been deposed
 4   before?  Have you ever been deposed?
 5   A.      In my divorce.
 6   Q.      Have you ever been deposed on any
 7   other occasion?
 8   A.      Not that I can recall.
 9   Q.      I am going to explain briefly to you
10   the deposition process.  This might be
11   familiar to you, but I would like to get the
12   rules out so we understand what is going on.
13           You understand that you were just
14   sworn, given an oath to tell the truth?  Do
15   you understand?
16           Is that a yes or no?
17   A.      That's a yes.
18   Q.      With regards to answering questions,
19   if the answer to the question is yes or no, I
20   ask that you state yes or no so that the
21   reporter can actually take that down.  That's
22   because the court reporter cannot translate
23   nods.
24   A.      Okay.
25   Q.      In order for you to tell the truth I
```

1                         R. Fang

2    would ask that you listen carefully to each

3    of the questions that I ask and only respond

4    to a question if you understand that

5    question.

6             Do you understand my instructions?

7    A.      Yes, I do.

8    Q.      If you do not understand a question

9    that I ask, I would ask that you please tell

10   me that you don't understand it and I will

11   make an attempt to ask it in a different way

12   so it is easy to understand.

13            Do you understand that instruction?

14   A.      Yes.

15   Q.      If you have a need to take a break,

16   please tell me and I will make sure that I do

17   everything I can to accommodate you.  My only

18   caveat to that is if there is a question

19   currently pending I ask you to respond to

20   that question before we take a break.

21            Do you understand that instruction?

22   A.      Yes.

23   Q.      Are you currently taking any

24   medications that would impair your ability to

25   give truthful testimony today?

10

1                          R. Fang

2      A.      No.

3      Q.      Can you please state your name for the

4      record?

5      A.      Rochelle A. Fang.

6      Q.      Can you give us your current address?

7      A.      253 West 73rd Street.

8      Q.      How long have you been living at that

9      address?  A ballpark is fine.

10     A.      Ballpark it at nine years.

11     Q.      You have been living there for nine

12     years continuously at that address?

13     A.      Yes.

14     Q.      Are you currently employed?

15     A.      No.

16     Q.      Have you been employed in the last 10

17     years?

18     A.      No.

19     Q.      Can you give me or can you tell me the

20     source of your income at this moment?

21     A.      Yes, it is money and things I have

22     inherited from my father.

23     Q.      You have an inheritance and monies,

24     but can you tell me what "monies" means?

25     A.      It is all inherited from my father.

11

1                      R. Fang

2    Q.      Your income comes in the form of an

3    inheritance payment?

4    A.      Investments that are made for me.

5    Q.      Who makes those investments for you?

6    A.      One is my very bright and very loving

7    son-in-law, Sagi Genger.  The other is my

8    very bright and very lovely nephew, Gary Ran,

9    R-A-N.

10   Q.      Is Mr. Ran a financial advisor?

11   A.      Yes, he is.

12   Q.      Can you give me Mr. Ran's address, if

13   you know it?

14   A.      No.  I know the name of his company,

15   it is Telemus, T-E-L-E-M-U-S, Capital.

16   Q.      You said Mr. Ran is your nephew?

17   A.      Yes.

18   Q.      Did you say Mr. Genger provides you

19   with investment advice?

20   A.      Not advice.  He invests for me.

21   Q.      Could you tell me what investments you

22   currently have?

23   A.      I don't know.

24   Q.      Could you tell me who would know?

25   A.      My son-in-law, as would Gary.

12

1                                   R. Fang

2     Q.      Do you know which investments Mr. Ran

3     is investing for you?

4     A.      No.

5     Q.      Do you know whether any of the

6     investments -- any of the things that you are

7     currently invested in are companies that are

8     owned or controlled by any member of the

9     Genger family?

10    A.      I don't know for sure.  Honestly, I

11    don't.

12    Q.      Would Sagi know?

13    A.      I would think so.

14    Q.      Could you tell me about how much you

15    made from investments in the last year?

16    A.      You would know by looking at my tax

17    returns.  I don't know.

18    Q.      Do you currently have an accountant?

19    A.      Yes.

20    Q.      Who is your current accountant?

21    A.      Gayer, G-A-Y-E-R, Jonas.

22    Q.      Mr. Gayer prepares your taxes?

23    A.      I am sorry?

24    Q.      Does Mr. Gayer prepare your taxes?

25    A.      Yes, like an accountant.

13

1                         R. Fang

2    Q.    Are there any other services that

3    Mr. Gayer provides to you besides taxes?

4    A.    Not that I can recall.

5    Q.    Besides Mr. Gayer do you have any

6    other accountants that work for you or do you

7    employ any other accountants?

8    A.    No.

9    Q.    Besides Mr. Ran and Mr. Genger, I mean

10   Sagi Genger, do you have any other financial

11   advisors?

12   A.    No.

13                  MR. LEINBACH:  I would like to

14            mark this as Exhibit 1.

15                  (Whereupon a subpoena duces

16            tecum ad testificandum was marked

17            Plaintiff's Exhibit 1 for

18            identification as of this date.)

19   Q.    I am looking at what was marked as

20   Plaintiff's Exhibit 1.  It is a subpoena

21   duces tecum ad testificandum addressed to

22   Rochelle Fang, address 253 West 73rd Street,

23   New York, New York.  The subpoena is dated

24   April 27, 2011.

25                  I would like you to take a look at

14

```
 1                          R. Fang
 2   this document.  Take your time to look it
 3   over.
 4            Have you seen this document before?
 5   A.       This one?
 6   Q.       Yes.
 7   A.       I don't remember.  I don't know.
 8   Q.       You don't recall if you have seen this
 9   document before?
10   A.       No, I don't.
11   Q.       Is there anything I could show you
12   that would refresh your memory?
13   A.       I got stuff from Orly.  To tell you
14   the truth I see those things, but my eyes
15   glaze over and I call an attorney.
16   Q.       When you say "stuff" what do you mean?
17   A.       Whatever papers I got.  I mean, to
18   tell you the truth, there were papers.
19   Q.       What kinds of papers?
20   A.       Legal papers.
21   Q.       Where do those papers come?
22   A.       Well, the last time they came they
23   were served to my doorman, my concierge to be
24   more specific, and then I think some came in
25   the mail.
```

15

1                         R. Fang

2    Q.      Do you remember what those documents

3    looked like, the documents that came to your

4    doorman?

5    A.      I didn't read them all.  They

6    mentioned, as best I recall, Riverside, which

7    I know something, and I sort of looked at

8    that and said, "Why do I have this?"

9    Q.      When you say "this" are you referring

10   to the document you got from your doorman?

11   A.      Yes.

12   Q.      What did you do when you received the

13   document from your doorman?

14   A.      What did I do?  I am trying to

15   remember.  I think I called my lawyer.

16   Q.      Who is your lawyer?

17   A.      Now he is my lawyer.  I don't remember

18   who my lawyer was before.  Interesting, I

19   have gone totally blank.

20   Q.      Is there anyone who would know who

21   your lawyer was when you say before?

22                   THE WITNESS:  Would you?

23                   MR. LYONS:  I can't testify.

24   Q.      To make sure that we understand, you

25   can't ask Mr. Lyons to testify for you.  You

1                          R. Fang

2    can say if you don't understand the question.

3    Or if you don't know, you can say that.

4    A.      I don't really remember.

5    Q.      Is there anyone that would know?

6    A.      Maybe my son-in-law, I guess.

7    Q.      By your son-in-law do you mean Sagi

8    Genger?

9    A.      That's the person we are discussing

10   here.   Yes.

11   Q.      Is there anyone else that you spoke

12   with besides your lawyer at the time about

13   the documents that you received from the

14   doorman?

15   A.      You know, it's been a while.   I don't

16   remember who I called or what I did.   Of

17   course it is upsetting, especially when I am

18   asked something I don't have the vaguest idea

19   about.

20   Q.      Do you know if you talked to your

21   son-in-law?

22   A.      I probably did.

23   Q.      Do you remember what you talked about?

24   A.      I probably asked him what Riverside

25   was, because I really didn't know.

17

1                           R. Fang

2    Q.      Do you remember what Sagi told you?

3    A.      No, I don't remember.

4    Q.      Did you speak with Mr. Ran?

5    A.      No.  He has nothing to do with this.

6    Absolutely he has nothing to do with this.

7    Q.      When you say "with this" what does

8    that mean?

9    A.      With River -- he doesn't have anything

10   to do with Riverside.  He has nothing to

11   do -- this is not mine.  This has nothing to

12   do with me.

13   Q.      When you say "this has nothing to do

14   with me" what is it that you are talking

15   about?

16   A.      Riverside.

17   Q.      Do you know what Riverside is?

18   A.      Well, I found out that Riverside is a

19   property in Canada, but up until then I

20   didn't have the vaguest idea what it was.

21   Q.      Who told you that?

22   A.      You know, I don't remember who finally

23   told me.

24   Q.      Do you know when you first learned?

25   A.      No, I don't, but it was post the

18

```
 1                         R. Fang
 2    papers.
 3    Q.       When you say post papers, what does
 4    that mean?
 5    A.       Post the subpoena.
 6    Q.       Post receiving the subpoena?
 7    A.       Yes.
 8    Q.       Do you recall if you spoke with your
 9    lawyer about receiving the subpoena or do you
10    recall whether you did any sort of search for
11    documents?
12    A.       I don't remember.
13    Q.       You don't remember?
14    A.       No, I don't.
15    Q.       Do you ever recall making any search
16    for documents with regards to the subpoena?
17    A.       I know very well -- I have a
18    one-bedroom apartment.  I don't have an
19    office.  There is no searching for documents
20    that I know nothing about.
21    Q.       To be clear, the answer is no?
22    A.       It wasn't necessary to search for
23    documents.  Where would they be; in my oven?
24    Q.       Did you speak with your financial
25    advisors, either Mr. Genger or Mr. Ran, about
```

19

1                          R. Fang

2    this subpoena?

3    A.       I certainly didn't speak to Mr. Ran,

4    that's not the kind of investments -- it

5    would be different.  Did I speak to Sagi?  I

6    don't remember.  To be honest with you, I

7    don't remember.  So much has gone on in my

8    life since then.  I am almost 68 years old.

9    I don't remember.  I don't remember what I

10   had for breakfast yesterday.

11   Q.       Do you remember whether you asked

12   Mr. Genger to collect documents for you with

13   regard to the subpoena?

14   A.       I doubt that I did.  I don't remember.

15   Q.       When you say that you doubt that you

16   did, can you tell me why?

17   A.       Because I don't have anything to do

18   with this.  I said I have no idea what

19   Riverside was until I got your subpoena.  I

20   don't know.  I didn't know.  I haven't the

21   vaguest idea of what this is, so I wouldn't

22   ask him because why would I.

23   Q.       Just to be clear, and I am asking for

24   a yes or no answer, did you or did you not

25   speak with your son-in-law?

20

```
 1                        R. Fang

 2              Do you recall speaking with your

 3     son-in-law?

 4     A.       I don't recall.

 5     Q.       Do you recall whether or not you spoke

 6     to Mr. Gayer about collecting documents?

 7     A.       No.

 8     Q.       You don't remember or you did not

 9     speak with him?

10     A.       I did not speak to Mr. Gayer.  I speak

11     to him about my tax returns.

12     Q.       You didn't ask him or did not contact

13     him with regard to the subpoena at all?

14     A.       No.

15     Q.       Did you ask your lawyer at the time to

16     collect documents with regard to the

17     subpoena?

18     A.       I don't remember.

19     Q.       In speaking about this now has that

20     jarred your recollection as to who your

21     attorney was?

22     A.       No, not at all.  I have no memory.

23     Q.       You mentioned there was a time that

24     someone told you about Riverside and that

25     this was --
```

21

```
 1                       R. Fang
 2   A.      Post subpoena.
 3   Q.      Once you learned what Riverside was
 4   did you do any sort of search for documents?
 5   A.      I knew very well I had nothing to do
 6   with it.
 7   Q.      Once you knew what Riverside was did
 8   you ask anyone to collect documents for you?
 9   A.      I don't think so.  I don't remember.
10   Q.      You don't remember?
11   A.      No.
12   Q.      Ms. Genger --
13   A.      I am not Ms. Genger.
14   Q.      I am sorry, that was a slip.
15           Ms. Fang --
16   A.      Yes.
17   Q.      -- have you spoken with anyone about
18   this litigation?  When I say "this
19   litigation" I mean the caption which is on
20   the subpoena.
21               MR. LYONS:  I will object to
22           the question to the extent it calls
23           for disclosure of any attorney-client
24           communication.
25               Other than your attorney.
```

22

1                           R. Fang

2    A.    Other than my attorney, I don't know.

3    Q.    You don't recall?

4    A.    No.

5    Q.    Did you speak with your son-in-law

6    about this litigation?

7    A.    I certainly mentioned it because it

8    concerns him.

9    Q.    Do you recall what your son-in-law

10   told you about this?

11   A.    No, I don't.

12   Q.    Did you speak with anyone from Duane

13   Morris?

14   A.    Who is that?

15   Q.    The law firm of Duane Morris.

16   A.    Who is Duane Morris?

17   Q.    It is a law firm.

18         Did you speak to anyone from the law

19   office?

20   A.    Absolutely not.

21   Q.    Have you ever spoken to a man named

22   Alan Sash?

23   A.    Yes.

24   Q.    Can you please tell me about your

25   conversations with Mr. Sash?

23

1                              R. Fang

2    A.      That was to a lawyer.  Am I supposed

3    to be telling these things?

4    Q.      You understand Mr. Sash to have been

5    your lawyer?

6    A.      He wasn't my lawyer.

7    Q.      Do you recall what you said to

8    Mr. Sash?

9    A.      Absolutely not.

10   Q.      When was this that you spoke to

11   Mr. Sash?

12   A.      I really don't remember.

13   Q.      Do you know in what context it was

14   that you spoke with Mr. Sash?

15   A.      I don't remember that, either.

16   Q.      Have you ever spoken with anyone named

17   Jacqueline Gerald?

18   A.      Not that I can recall.

19   Q.      Have you ever spoken with anyone named

20   David Parness?

21   A.      A while ago, yes.

22   Q.      Do you know who Mr. Parness is?

23   A.      He is a very good friend of my

24   son-in-law and daughter.

25   Q.      Do you know the last time you spoke

24

1                     R. Fang

2    with Mr. Parness?

3    A.      No, I don't.

4    Q.      Have you spoken with Mr. Parness about

5    this litigation?  And when I say "this

6    litigation" I mean the captioned matter

7    that's in the subpoena.

8    A.      I don't think this was happening the

9    last time I spoke to him.  I don't know.

10   Q.      Do you recall the last time you spoke

11   with Mr. Parness?

12   A.      No.

13   Q.      Do you speak with Mr. Parness often?

14   A.      No.  He is a little young to be my

15   friend.

16   Q.      Have you spoken with someone by the

17   name of John De La Portez?

18   A.      No, I don't know the name.  It sounds

19   kind of musical.

20   Q.      I remember wondering the expression on

21   your face was kind of odd.

22   A.      It sounds like a very dangerous

23   sounding name, actually.

24   Q.      Have you ever spoken with a man named

25   Evan Michailidis?

1                           R. Fang

2                    MR. LYONS:  Other than this

3           morning?

4    A.      No -- that's you.  I just met

5    Mr. Michailidis today.  That was the first

6    time.

7    Q.      Besides Mr. Genger, and by Mr. Genger

8    I mean Sagi Genger, have you spoken to any

9    other members of your family about this

10   litigation?

11   A.      I am sure I spoke to members of my

12   family.  Wouldn't you?

13   Q.      Fair enough.

14           Who was it?  Could you tell me who it

15   was that you spoke to about this litigation?

16   A.      Mostly my sister.

17   Q.      Who is your sister?

18   A.      My sister is Shirley LaTessa.  I

19   complained to my sister.  That's what sisters

20   are for.

21   Q.      Have you spoken with your daughter

22   about this litigation?

23   A.      Elana?

24   Q.      Yes.

25   A.      You know, considering, I don't

26

```
 1                          R. Fang
 2    remember saying much to her about it.
 3    Q.      Do you recall ever speaking with her
 4    about it?
 5    A.      I may have, I don't recall.
 6    Q.      Do you have any other daughters?
 7    A.      Yes, I have two others.  And no.
 8    Q.      Two other daughters?
 9    A.      And no, I did not speak with them.
10    Q.      Do you recall whether there was anyone
11    else that you spoke to about the litigation
12    as is stated there on the subpoena?
13    A.      My boyfriend.
14    Q.      What is your boyfriend's name?
15    A.      Why is that important?
16    Q.      Well, I am allowed to ask questions
17    that I believe are relevant.
18            Can you please answer the question?
19                 MR. LYONS:  You can answer the
20            question.
21    A.      Barry Marcus.
22    Q.      The last name?
23    A.      M-A-R-C-U-S.
24    Q.      Have you ever heard of a law firm
25    named McLaughlin and Stern?
```

27

 1                          R. Fang

 2     A.      Yes.

 3     Q.      How do you know that name?

 4     A.      It is my son-in-law's firm, or was at

 5     some time.

 6     Q.      Do you recall speaking, ever speaking

 7     with anyone at the law firm of McLaughlin and

 8     Stern?

 9                  MR. LYONS:  You already asked

10              about Alan Sash and Jacqueline Gerard.

11              Other than them?

12     A.      I didn't speak to them about the

13     litigation, I never spoke to anybody by that

14     name, Jacqueline.  I did speak to Alan Sash,

15     I told you I did, the contents of what I

16     don't remember.

17                  MR. LEINBACH:  I would like to

18              mark this as Plaintiff's Exhibit 2.

19                  (Whereupon a letter dated May

20              26, 2011 was marked Plaintiff's

21              Exhibit 2 for identification as of

22              this date.)

23     Q.      I am looking at what was marked as

24     Plaintiff's Exhibit 2.  It is a letter from

25     me dated May 26, 2011 to Rochelle Fang.

28

1                         R. Fang

2             I would like you to take a look at

3    this document marked Plaintiff's Exhibit 2.

4    A.       All right.

5    Q.       Do you recognize this document?

6    A.       Do I recognize it?  Probably I don't

7    recognize it.  Did I get something like this?

8    Very likely I did.  I am sure when I saw that

9    my mind went totally blank.

10   Q.       Do you remember when it was that you

11   received this?

12   A.       No, I don't.

13   Q.       Do you remember whether it was early

14   May or April?

15   A.       I don't remember when I got it.

16   Q.       You don't remember receiving the

17   document?

18   A.       No, I don't remember what time frame

19   it was.

20   Q.       You do remember receiving it?

21   A.       It looks familiar.  I can't tell you

22   if that's the exact wording or anything else.

23   It looks like something I may have gotten,

24   the date of which I have no idea.

25   Q.       Do you remember what you did when you

29

1                           R. Fang

2     got this letter?

3     A.     Besides getting hysterical, no, I

4     don't remember.

5     Q.     Do you remember whether or not you

6     spoke with --

7     A.     I don't remember who I spoke with or

8     what I did and I absolutely don't remember.

9     Q.     Did you speak with an attorney when

10    you received this letter?

11    A.     I don't know.  That's in May.  I don't

12    know.

13    Q.     By you don't know do you mean you

14    don't remember?

15    A.     I don't remember.  It is not that I

16    don't know, I don't remember.

17    Q.     Do you recall whether or not you spoke

18    with your son-in-law Sagi Genger?

19    A.     I don't recall.

20    Q.     Do you recall whether you contacted an

21    attorney when you received this letter?

22    A.     I don't recall.

23    Q.     Do you recall whether you spoke with

24    anyone else?

25    A.     I don't recall.

30

1                          R. Fang

2    Q.      Can you recall when it was that you

3    contacted your current attorney?  By "current

4    attorney" I mean Mr. Lyons.

5    A.      You know, I really don't know the date

6    of my current attorney.  I really don't

7    remember.

8    Q.      How long has your current attorney

9    represented you?  Once again, I mean

10   Mr. Lyons.

11   A.      I know who you mean.  I can't

12   remember.

13   Q.      Do you know how it was that you were

14   introduced to your current attorney?

15   A.      Yes.

16   Q.      Can you please tell me what the

17   circumstances were that you met Mr. Lyons?

18   A.      I am sure it was some sort of

19   irrelevant request and I believe Alan Sash

20   introduced me to Desmond.

21   Q.      Do you recall when this was?

22   A.      No.

23   Q.      Do you recall that conversation with

24   Mr. Sash, what Alan told you?

25   A.      No.

31

```
 1                          R. Fang
 2     Q.      You just recall that Mr. Sash
 3     recommended Mr. Lyons to you?
 4     A.      Yes.
 5     Q.      Did you speak with Mr. Lyons?
 6     A.      I don't remember if I spoke with him
 7     then or not.
 8     Q.      Do you know what contact it was --
 9     A.      No, I don't.
10     Q.      -- that Mr. Sash --
11     A.      No, I don't.
12     Q.      Do you know about when that was?
13     A.      No.  I can't remember how long he has
14     been my attorney, that should be clue enough.
15     Q.      Would it have been before or after
16     receiving the subpoena documents?
17     A.      I don't recall.
18     Q.      You don't recall?
19     A.      I don't recall.
20     Q.      Do you know when you retained
21     Mr. Lyons to be your lawyer?
22     A.      You asked me that.  I don't remember.
23     Q.      Do you pay for Mr. Lyons' services?
24     A.      No.
25     Q.      Who pays for Mr. Lyons' services?
```

32

1                          R. Fang

2    A.      I don't know.

3    Q.      You don't know who pays for Mr. Lyons'

4    services?

5    A.      No, but it is not me.

6    Q.      You don't pay for Mr. Lyons' services?

7    A.      Right.

8    Q.      Do you know who would know?

9    A.      My son-in-law would know.

10   Q.      Your son-in-law would know who pays

11   for your lawyer?

12   A.      Yes.

13   Q.      Do you know whether or not your

14   son-in-law pays for your lawyer?

15   A.      I don't know for sure if he does, I am

16   not involved in the monetary...

17   Q.      I would like you to look at Exhibit

18   number 2 once more.

19   A.      Which is this, yes.

20   Q.      Plaintiff's Exhibit 2 is the letter

21   right in front of you.

22           Do you see here, when I say "here" I

23   will read to you, there is -- the second

24   sentence from the bottom it begins:  "To date

25   we have not received any documents from you.

33

```
 1                         R. Fang
 2    Please provide us with all documents
 3    requested in the subpoena by May 31.  If you
 4    fail to provide us with requested documents,
 5    plaintiff will seek appropriate relief from
 6    the New York County Supreme Court including
 7    an Order holding you in contempt of Court for
 8    your failure to comply with the subpoena."
 9             Do you see that?
10    A.       Yes.
11    Q.       Ms. Fang, do you understand what it
12    means to be held in contempt of Court?
13    A.       Yes.
14    Q.       What do you think that the word
15    contempt means?  What does that mean?
16    A.       That I have not done what the Court
17    asked me to do.
18    Q.       Do you understand the penalty for
19    being held in contempt of Court?
20                  MR. LYONS:  I object to all of
21             this.  I don't think you need to get
22             into it.  The letter is clear.  Your
23             subpoena is clear.
24                  MR. LEINBACH:  Your objection
25             is noted.
```

34

1                          R. Fang

2                   MR. LYONS:  I don't think we

3              need her to have a lecture on what it

4              means to be held in contempt.

5                   MR. LEINBACH:  I understand.

6              Your objection is noted.

7    Q.     Would you please answer the question?

8    A.     What is your question?

9                   MR. LEINBACH:  Could you read

10             back to me the question?

11                  (Whereupon the record was read

12             back by the reporter.)

13                  THE WITNESS:  Is that the

14             question?

15   Q.     Yes.

16   A.     I believe you go to jail.

17   Q.     Do you recall at all whether you were

18   concerned when you received this letter?

19   A.     I was asked for things that I don't

20   have.  Therefore, there was no way that I am

21   holding the Court in contempt when I cannot

22   produce what I do not have, which is anything

23   having to do with Riverside.

24   Q.     Did you feel you had to contact anyone

25   about the subpoena?

```
 1                       R. Fang
 2    A.      I am sure I contacted, but I am
 3    telling you I can't remember what happened in
 4    May, Mr. Leinbach.  I am not that young, I
 5    tend to forget things easily and I am sure I
 6    was highly stressed at the time and I have no
 7    memory of what I did.
 8                 MR. LEINBACH:  Can you mark
 9            this as Plaintiff's Exhibit 3?
10                 (Whereupon an e-mail dated June
11            15, 2011 was marked Plaintiff's
12            Exhibit 3 for identification as of
13            this date.)
14    Q.      Looking at what was marked as
15    Plaintiff's Exhibit 3, it is an e-mail
16    addressed to me from Desmond Lyons dated
17    June 15, 2011.  Attached to that e-mail to me
18    is an affidavit, two pages in length.  The
19    caption is Orly Genger versus Sagi Genger and
20    that proposed affidavit was to be sworn to by
21    Rochelle Fang.
22                 MR. LYONS:  Let me state my
23            objection.  Ms. Fang is not copied on
24            the e-mail, number 1.  To testify to
25            the e-mail itself, to the extent any
```

36

1                        R. Fang

2              question refers to any information,

3              conversation that she had with me

4              prior to my preparation of the

5              affidavit, I am going to object, as

6              well as to her testifying to any

7              conversation she had with me.

8                   Finally, this was a draft in an

9              effort to resolve an issue of the

10             subpoena from lawyer to lawyer,

11             arguably for settlement purposes.  I

12             will object to it on that grounds, as

13             well.

14    Q.       Ms. Fang, can you please take a look

15    at what was marked as Plaintiff's 3?

16    A.       I just did.

17    Q.       Have you ever seen this document

18    before?

19    A.       I don't recall seeing it.

20    Q.       Do you recall when you saw it?

21    A.       I don't recall seeing it.

22    Q.       You don't recall seeing it at all?

23    A.       I may have, but I don't recall.

24    Q.       Is there any document that I could

25    show you other than this that might refresh

37

```
 1                          R. Fang
 2    your recollection as to whether you have seen
 3    this document?
 4    A.      I doubt it.  I am not saying I didn't
 5    see it, I am saying I don't recall seeing it.
 6    Q.      It doesn't look familiar?
 7            Does it look familiar to you?
 8    A.      I don't know, honestly, what it was
 9    supposed to be.  A lot of things were going
10    on in my life.  I may have seen it, but
11    honestly if you asked me when or where or
12    what, I don't remember.  I am not going to
13    say I didn't see it, either.
14    Q.      Understood.
15            Let's take a look at this document.
16    If you look at the document, if you look to
17    paragraph 4, paragraph 4 reads:  "To my
18    knowledge, I do not currently have nor have I
19    ever had any partnership interest in
20    Riverside."
21    A.      As far as I knew.
22    Q.      When you say as far as you knew, what
23    does that mean?
24    A.      I don't know.  I don't know anything
25    about Riverside.  What is in my portfolio
```

38

1                              R. Fang

2    with my son-in-law, I don't know what is in

3    there, so I don't know.  As far as I know, I

4    don't.

5    Q.      You believe paragraph 4 is accurate as

6    you sit here today?

7    A.      Yes, absolutely.

8    Q.      You don't believe you have any

9    interest in it yourself?

10   A.      At this moment I believe I do, but at

11   that time I didn't.

12   Q.      When is it that you came to believe

13   that you had an interest in Riverside?

14                   MR. LYONS:  It is a partnership

15           interest?

16   A.      Just very recently.

17   Q.      When was that?

18   A.      Maybe within the last week.

19   Q.      You learned in the last week?

20   A.      Yes.  I don't know what's in my

21   portfolio, that's not my job.  If I was so

22   interested in that I would do it myself; all

23   right?

24   Q.      When you say your portfolio, what is

25   it that you mean?

39

1                          R. Fang

2    A.      Whatever my investments are.  It is

3    just a broad word, it has no great legal

4    meaning.  I am not selecting it out, it is

5    just a word.  I am not a business person, I

6    don't know what the correct term would be,

7    that's the one I chose.

8    Q.      Would your financial advisors know

9    what is in your portfolio?

10   A.      Well, they should.

11   Q.      By your "financial advisors" I guess

12   would Sagi Genger know?

13   A.      Yes.

14   Q.      Mr. Ran?

15   A.      Absolutely not.

16   Q.      He would not.  Why is it you say that?

17   A.      The kinds of things he invests in are

18   S&P stocks, bonds, that kind of stuff.

19   Q.      The investments that Mr. Genger

20   invests for you is different?

21   A.      I imagine some of that, as well.  He

22   has free reign to do what he wants.  I don't

23   know what else he has in it.

24   Q.      When you say he has free reign --

25   A.      They both do.

1                          R. Fang

2    Q.      When you say free reign, what does

3    that mean?

4    A.      They can buy and sell as they wish.

5    Q.      Do they have to inform you before they

6    buy and sell?

7    A.      No.

8    Q.      Would it be accurate to say that they,

9    by "they" I mean Mr. Genger and Mr. Ran, can

10   buy things without your knowledge?

11   A.      Sure.

12   Q.      Do you know whether or not Mr. Genger,

13   and by "Mr. Genger" I mean Sagi Genger, or

14   Mr. Ran have a power of attorney with regard

15   to you?

16   A.      I don't remember.

17   Q.      You don't recall?

18   A.      I don't recall.

19   Q.      How is it that you learned that you

20   had a partnership interest in Riverside?

21   A.      I don't remember.  I don't know.

22   Q.      Do you remember who told you?

23              MR. LYONS:  I will object to

24           the question.  I am not sure she

25           testified that she learned she had a

41

```
 1                    R. Fang
 2            partnership interest.  I think she
 3            testified she had an interest.
 4     A.     I don't know about partnership
 5     interest.
 6     Q.     What do you mean?  What did you learn
 7     that you had an interest in?
 8                    MR. LYONS:  Can you repeat the
 9            question?
10     Q.     What did you learn that you had an
11     interest in?
12     A.     I didn't learn that I had an interest
13     in anything.  Just that somehow Riverside was
14     included in some of the things my son-in-law
15     has done for me, but I don't know what I have
16     in it.  I don't even know what the hell it
17     is, as I told you numerous times.
18     Q.     I am trying to understand how it is
19     that obviously you came to know, as you said,
20     about a week ago that you had some sort of an
21     interest in Riverside.  That's fairly recent.
22     I am wondering how it was that that happened.
23     A.     I don't really remember.
24     Q.     Let's look at paragraph number 5.
25     A.     There are two paragraph 5s.
```

42

1                          R. Fang

2    Q.        That's a good catch, actually.  Let's

3    look at the first paragraph number 5.

4              As you sit here today do you believe

5    that this statement "I am not in possession

6    of any documents responsive to the subpoena"

7    do you believe that statement is true?

8    A.        Yes.

9    Q.        You believe you don't have any

10   documents in your possession?

11   A.        Having to do with Riverside?

12   Q.        Yes.

13   A.        Absolutely not.

14   Q.        What do you understand the word

15   possession to mean?

16   A.        That I have something to do with this

17   company, some papers in my possession.

18   Q.        To be clear, do you understand that

19   word to mean or do you understand that

20   that -- do you believe that either your

21   accountants or either your present or past

22   lawyers have any documents in their

23   possession which would relate or were

24   responsive to the subpoena?

25   A.        The only person would be my accountant

43

1                        R. Fang

2    and you have that, so that's it.  If I had

3    anything, but I don't have papers in my pile

4    of whatever old magazines and such that would

5    have anything to do with Riverside.

6    Q.      I understand.

7            Did you ask your accountant to provide

8    you with the documents which would relate to

9    Riverside?

10   A.      Eventually I did.

11   Q.      When was that?

12   A.      Are you kidding?  I haven't the

13   vaguest idea of what point I asked him for

14   that.

15   Q.      Do you have an idea as to whether it

16   was before --

17   A.      I don't remember.

18            MR. LYONS:  Let him finish his

19            question.

20            THE WITNESS:  Sorry.

21   Q.      Do you have an idea of whether it was

22   before or after you received the letter?

23   A.      This letter?

24   Q.      The letter which was marked

25   Plaintiff's Exhibit 2.

44

1                          R. Fang

2    A.      I don't know.

3    Q.      Do you recall whether or not you spoke

4    with or asked any of your lawyers to provide

5    documents?

6    A.      After this letter, I don't know for

7    sure.  I can't tell you when I asked.  I

8    don't know.

9    Q.      Let's look at Plaintiff's Exhibit 3,

10   the affidavit, the second paragraph five,

11   that paragraph reads:  "With the exception of

12   my lawyers, I have had no communications with

13   anyone relating to Riverside or the Riverside

14   companies" --

15   A.      That would be true.

16   Q.      Let me finish.

17   A.      Sorry.

18   Q.      -- "nor any material communication

19   with anyone concerning this lawsuit."

20           Do you understand that sentence or do

21   you believe that sentence is true now as you

22   sit here?

23           MR. LYONS:  She did testify

24           earlier that she had some

25           conversations.  I assume your question

45

```
 1                      R. Fang
 2           relates to other conversations?
 3                 MR. LEINBACH:  It relates to
 4           all conversations.
 5                 MR. LYONS:  She already
 6           testified that she had conversations.
 7                 MR. LEINBACH:  I understand.
 8      A.    Talking about Riverside?
 9      Q.    Yes.
10      A.    No, no.  I don't know what it is.  How
11      can I be having conversations about it?
12      Q.    Once you learned that you had an
13      interest in Riverside, as you stated, did you
14      have any conversations with anyone?
15      A.    I really don't remember.
16      Q.    You don't recall?
17      A.    I don't recall.
18      Q.    You don't recall whether you had any
19      conversations or with whom you had
20      conversations with?
21      A.    I don't recall whether I had any
22      conversations.  I talk a lot.  How can I
23      remember what I spoke about to whom or what?
24      Q.    I will ask once again:  Do you believe
25      this statement is true as you sit here now?
```

46

1                          R. Fang

2    A.      How can I talk about Riverside

3    companies when I know nothing about them?  If

4    you are talking about going to a subpoena, of

5    course I told people I am coming to a

6    subpoena.  About what, no, I don't know.  I

7    don't understand why I am here, if you want

8    to know the truth.

9    Q.      You stated you don't understand why

10   you are here?

11   A.      No.

12                  MR. LYONS:  Do you want to take

13          a break?

14                  THE WITNESS:  I wouldn't mind

15          taking a break.

16                  MR. LEINBACH:  There is no

17          question pending at this point.  If

18          you would like to take a break, that's

19          fine.

20                  (Whereupon all parties went to

21          Judge Solomon's chambers.)

22                  THE COURT:  On July 25 I wrote

23          an Order granting a motion directing

24          Ms. Fang to respond to a subpoena

25          duces tecum and ad testificandum by

47

1                    R. Fang

2       showing up on or before today at

3       10:00 o'clock with an original and one

4       legible copy of all arguably

5       responsive documents referred to in

6       the subpoena which I was enforcing by

7       that July 25 Order.

8            Some of the material were tax

9       returns.  I allowed her to do some

10      redacting as explained in something

11      which appears to be scribble.

12           About 20 minutes ago the

13      parties came to the courtroom and when

14      I was able to come out to see what

15      they wanted I understood there was

16      some problem about compliance with

17      this Order.

18           Why don't we do this:

19      Mr. Lyons, she is your client; right?

20           MR. LYONS:  Yes, Your Honor.

21           THE COURT:  This subpoena was

22      served sometime well before my July

23      Order; right?

24           MR. LYONS:  Yes.

25           MR. LEINBACH:  Yes.

48

1                          R. Fang

2              THE COURT:  I am not talking to

3         you.  And resistance was had so the

4         matter was presented to me.

5              Now I need to know, Mr. Lyons,

6         what material your client has today

7         pertaining to her partnership interest

8         in Riverside properties (Canada

9         limited partnership).

10             MR. LYONS:  Your Honor, we

11        produced to the defendant a copy of

12        the Riverside Limited Partnership

13        partnership agreement, as well as

14        Ms. Fang's tax returns from 2006 to

15        2009 tax returns.

16             THE COURT:  Do they reflect

17        anything that is derived from or

18        negatively derived from --

19             MR. LYONS:  It is from

20        Riverside.  Yes, Your Honor.  As you

21        instructed in our last appearance

22        here, Your Honor, I redacted from

23        those tax returns anything that is not

24        related to Riverside or the entities

25        named in the subpoena.

R. Fang

THE COURT: What is the problem with whatever you got in response to number 1, Mr. Leinbach?

MR. LEINBACH: My response is response to all, I can explain. In the deposition as it is taking place, so far Ms. Fang has testified that she does not have any documents in her own possession which relate to Riverside or any of the entities listed in the subpoena.

However, she stated repeatedly that she does not know what documents would be in the possession of others.

THE COURT: Who are the others?

MR. LEINBACH: Her accountant, Mr. Gayer, and also her financial advisors who she identified as her son-in-law Sagi Genger and another individual, an individual named Gary Ran.

THE COURT: I already directed Mr. Gayer to comply with something.

MR. LEINBACH: Yes, you have,

50

1                        R. Fang

2        but unfortunately I need to bring to

3        your attention he has failed to do so,

4        as well, but that's an issue outside

5        of this.

6            THE COURT:  Go ahead.

7            MR. LEINBACH:  She stated she

8        had no idea whether or not she had

9        requested such documents from those

10       parties.

11           THE COURT:  In connection with

12       complying with the subpoena or ever?

13       Let me finish.  It has been a very

14       long day.

15           MR. LEINBACH:  I apologize.

16           THE COURT:  What else?  What

17       other material was brought, Mr. Lyons?

18       Why don't you tell me what else was

19       brought?

20           MR. LYONS:  In addition to

21       redacting tax returns, I brought

22       unredacted tax returns so if

23       Mr. Leinbach were to ask her about the

24       unredacted or what was redacted she

25       could identify things on there and

51

1                          R. Fang

2          identify that nothing else is an AG

3          related entity or having anything to

4          do with Riverside.

5              She is prepared to do that.  He

6          has not asked her any questions about

7          that.  Those were K-1's from

8          Riverside.  The inquiries were made

9          not by Ms. Fang but by me to

10         Mr. Gayer, her accountant, to the

11         attorneys for Mr. Genger who acts as

12         the limited -- the general partner.

13             THE COURT:  You are blocking

14         her.

15             MR. LYONS:  I made inquiries to

16         the attorneys for Mr. Genger, as well

17         as the accountants, to try to get

18         whatever documents they had.  They

19         gave me what they had.  I bought it in

20         here today.  I did as you instructed.

21         I redacted what was supposed to be

22         redacted.

23             THE COURT:  I gave her an

24         option.  I didn't tell her to redact

25         it.  Don't put words in my mouth.

52

1                    R. Fang

2            What is the problem?  What do

3       you want of the Court today?

4            MR. LEINBACH:  I don't think or

5       it sounds to me, based upon everything

6       that I have gotten from the witness

7       and also from the testimony -- the

8       conversations that I had with

9       Mr. Lyons and Mr. Michailidis, I don't

10      believe there has been a complete

11      search for documents responsive to the

12      subpoena.

13           THE COURT:  Were you

14      administered an oath today?  Would you

15      stand up?

16           THE WITNESS:  Yes.

17           THE COURT:  There is no

18      question.  Did you do anything

19      yourself among whatever spaces you

20      controlled to look for material listed

21      in the subpoena?

22           THE WITNESS:  I had -- I don't

23      have it.  I didn't even know what it

24      was, to be honest with you.

25           THE COURT:  Do you keep any

53

1                    R. Fang

2        books and records of your financial

3        affairs?

4              THE WITNESS:  Not really.

5              THE COURT:  Are you somebody's

6        pawn?

7              THE WITNESS:  I wouldn't call

8        myself a pawn.

9              THE COURT:  What do you do to

10       take care of your financial affairs?

11             THE WITNESS:  I have two

12       advisors.

13             THE COURT:  They are?

14             THE WITNESS:  One is Gary Ran,

15       who runs Telemus Capital and has been

16       listed as one of the top ten money

17       managers in the country by Forbes.

18             THE COURT:  Does he take care

19       of your, I will call them investments

20       --

21             THE WITNESS:  Yes.

22             THE COURT:  Could I finish my

23       sentence, please?

24             THE WITNESS:  I am sorry.

25             THE COURT:  I will call them

54

```
 1                    R. Fang
 2      investments to cover any financial
 3      arrangements you have with your
 4      son-in-law.  Does this gentleman have
 5      any role in that?
 6              THE WITNESS:  No.
 7              THE COURT:  You understand this
 8      subpoena here is directed to your
 9      son-in-law's businesses in which you
10      may have an interest?
11              THE WITNESS:  Yes.
12              THE COURT:  Who controls the
13      paper related to your son-in-law's
14      businesses in which you may have an
15      interest?
16              THE WITNESS:  My son-in-law.
17              THE COURT:  Have you demanded
18      that he provide to you copies of
19      everything which might reflect your
20      interest in this so that you will not
21      be found in contempt for failing to
22      have done that?
23              MR. LYONS:  I did that on her
24      behalf.
25              THE COURT:  What did you get
```

55

1                    R. Fang

2       from Mr. Genger?

3              MR. LYONS:  I got it through

4       his attorneys.  I got the limited

5       partnership agreement.

6              THE COURT:  What else?

7              MR. LYONS:  That's it.

8              MR. LEINBACH:  The answer is

9       nothing else.  That's my concern.

10             THE COURT:  You will deal with

11      it professionally.  She is a fool or a

12      pawn or he is in violation of some

13      obligation he has to her and,

14      accordingly, to the Court.  I will

15      determine in due course.

16             MR. LEINBACH:  I believe in

17      standing here today that there is a

18      violation of this subpoena.  If

19      Mr. Genger is Ms. --

20             THE COURT:  Excuse me, Ms. Fang

21      will tell us what request, if any, she

22      made of Mr. Genger, the son-in-law, as

23      opposed to the father-in-law.  We

24      might be able to get a little further

25      along.  You can't speak for her.

56

1                      R. Fang

2              THE WITNESS:  I requested my

3       lawyer to request from my son-in-law

4       whatever documents were necessary for

5       your Court.

6              THE COURT:  Do you not talk to

7       your son-in-law?

8              THE WITNESS:  Yes.

9              THE COURT:  Is there any reason

10      why you didn't ask him yourself?

11      Nobody says you can't talk to him if

12      he is your financial advisor for a

13      certain universe of investments.  Then

14      you directly will at least have done

15      something to suggest that you yourself

16      tried to comply with not only my Order

17      but the subpoena.

18              It is not really funny.

19              THE WITNESS:  I don't think it

20      is funny.  I am trying to think did I

21      ask him.

22              THE COURT:  You got this

23      subpoena quite some time ago.

24              THE WITNESS:  Yes.

25              THE COURT:  It was originally

1                        R. Fang

2        returnable in May.  There was plenty

3        of time to have a sit down with

4        counsel, if necessary, so the material

5        sought could be explained to you if

6        you didn't understand words on the

7        page and then so you could sit down

8        with Sagi Genger and find out what

9        exists.  I think you are derelict, you

10       and Mr. Lyons, in not having had that.

11              She has investments.  Do we

12       have books and records, checkbooks

13       that she may have used to issue

14       transfers to invest in these

15       businesses?  What are we doing?

16              MR. LYONS:  I don't have any of

17       that, Judge.

18              THE COURT:  Did she ever

19       transfer any funds or things of value

20       to Mr. Sagi Genger to use in

21       connection with these real estate

22       transactions?

23              MR. LYONS:  Well, she wouldn't

24       have done that directly.

25              THE COURT:  I don't know, she

58

1                       R. Fang

2       told us the real money guy who I hope

3       protects her real money has nothing to

4       do with Sagi Genger's business.  Did I

5       correctly get it?

6               THE WITNESS:  That is part of

7       my money, the main money is with my

8       nephew, Gary Ran.

9               THE COURT:  We are not

10      interested --

11              THE WITNESS:  You just asked

12      me.

13              THE COURT:  Listen up.  We are

14      not interested in what you brought to

15      the table before you met a Genger and

16      kept separate from a Genger.  Good for

17      you for keeping it separate.

18              What we are interested in is

19      what you did with the Gengers not

20      because we care about your money, but

21      we want to know what came into Sagi's

22      hands and how he treated it in

23      connection with such obligation as he

24      may or may not have had to his sister.

25      That's his only purpose.

59

1                    R. Fang

2            I have no, at the moment,

3       position on who in this lawsuit

4       between the sister and the brother is

5       right or wrong or correct or incorrect

6       in respect of a claim.  All I am doing

7       is trying to get the professionals

8       representing the siblings to have as

9       much information as possible, and you

10      were thought to have some useful

11      information.

12           I don't believe in burdening

13      people unrelated to things.  Mr. Lyons

14      has to get this seriously through his

15      head, your head, and perhaps use the

16      offices of Sagi Genger.

17           MR. MICHAILIDIS:  Mr. Lyons did

18      speak to my colleague, Mr. De La

19      Portez.  We spoke to Sagi.  What we

20      have been dealing with here, which is

21      really no easy way to explain it, we

22      have received several very, very

23      encompassing very broad document

24      requests by plaintiff's counsel.

25           THE COURT:  Right.

60

1                    R. Fang

2          MR. MICHAILIDIS:  Of course,

3     naturally we have made every effort up

4     to this point to produce documents

5     that are responsive.

6          THE COURT:  Give me a list of

7     what was produced that was responsive,

8     that every effort was made.

9          MR. MICHAILIDIS:  I don't have

10    a list with me.  I didn't think it was

11    going to be an issue.  It is our

12    understanding that we produced --

13         THE COURT:  What have you

14    produced?

15         MR. MICHAILIDIS:  Your Honor,

16    the books and records, transaction

17    histories.

18         THE COURT:  Of what?

19         MR. MICHAILIDIS:  The Riverside

20    entities.

21         THE COURT:  What do the books

22    and records of the Riverside entities

23    consist of?

24         MR. MICHAILIDIS:  In terms of

25    the financial history of the entity, I

```
1                    R. Fang
2    would presume.
3            THE COURT:  You presume.  You
4    told me what you produced.  You took
5    the responsibility for producing, so I
6    am asking what did you produce?  You
7    say "I presume."  Now you can't
8    presume if you didn't produce.
9            MR. MICHAILIDIS:  Unfortunately
10   , we are incoming counsel.  If you
11   remember, McLaughlin and Stern
12   previously represented Sagi.  We have
13   been acting in a representative
14   capacity for the past month and a
15   half.  Bryan and I have had
16   conversations and I have had
17   conversations with Mr. Gayer, as well.
18           We have heard that there is --
19   we are trying to work with opposing
20   counsel.  We are not trying to hide
21   anything.  We are of the belief that
22   we have already produced items that
23   are both responsive and nonresponsive,
24   frankly.
25           THE COURT:  You are talking a
```

62

1                    R. Fang

2       lot, but you had Joe agree that you

3       could show up at 2 o'clock and the

4       building is locked tight at 5 o'clock

5       and Eli is going to lock the door at

6       4:30, so you had two and a half hours

7       to accomplish not a lot if you are

8       first talking to me.

9            Either you do or don't know

10      what the witness has that's responsive

11      to items 1 through 8.  It is not very

12      long.  It is not particularly prefaced

13      and it is not hard to follow.

14           Go through this list whenever

15      you reconvene, I take it it will be

16      tomorrow at 10 o'clock, because you

17      didn't use today fully, and go through

18      this list and the witness will say

19      what she did or didn't do that she

20      knows about from other people's work

21      about complying with the subpoena

22      which was issued to her, not to Sagi's

23      lawyer or to her lawyer.

24           MR. LEINBACH:  If I might, Your

25      Honor, I have already asked her

63

1               R. Fang

2       questions about that.

3               THE COURT:  If she answered it,

4       go home.

5               MR. LEINBACH:  All of these

6       questions, her response is she knows

7       nothing about any investments that

8       were made.

9               THE COURT:  She would not be

10      the first woman to say that I relied

11      on a man in my family.

12              MR. LEINBACH:  That's fine.

13              THE COURT:  You can't beat her

14      up on it.

15              MR. LEINBACH:  I understand

16      that, as well.  When I asked her about

17      documents in her possession or control

18      she did not remember.

19              THE COURT:  Between May and now

20      what she did, that's a little hard to

21      believe.  She looks like a functioning

22      person, I assume.  I assume, I don't

23      mean to embarrass you, I want to be

24      sure that whatever is on your left

25      cheekbone on the skin is not

64

```
1                        R. Fang
2        interfering with your functioning
3        today.
4              THE WITNESS:  No.
5              THE COURT:  You are okay?
6              THE WITNESS:  I tend to
7        dehydrate.
8              THE COURT:  I am talking from
9        here it looks like a nasty piece of
10       business, only here.  If your eye is
11       otherwise damaged, I don't know.
12             THE WITNESS:  No, I can see.
13             THE COURT:  You're okay?
14             THE WITNESS:  Yes.
15             THE COURT:  I want to be sure
16       before we keep going.  Go ahead.
17             MR. LEINBACH:  She stated she
18       did not know or recall whether or not
19       she ever talked to anybody.  When I
20       asked her to identify the lawyer who
21       is representing her when she received
22       the subpoena, she couldn't identify
23       who the lawyer was or whether she
24       talked to or asked that person to get
25       documents.
```

65

1                          R. Fang

2              THE COURT:  That's all

3        credibility.  Mr. Lyons will give her

4        advice accordingly.

5              MR. LEINBACH:  When I asked

6        what efforts would be done when we

7        took a break he stated to me the only

8        thing he did was talk to Mr. De La

9        Portez and Mr. Michailidis, and

10       Mr. Michailidis' statement to me is

11       the only thing they did was assume

12       they had already produced everything.

13             There were no additional

14       searches done with regards to

15       documents that related to Rochelle

16       Fang's interest in any companies that

17       she has an interest in.

18             MR. MICHAILIDIS:  That's not

19       true.

20             MR. LYONS:  That's not true.

21             THE COURT:  I made myself

22       clear.  The deposition is finished for

23       today.  I think Ms. Fang and her

24       lawyers should have a little sit down

25       and see how they are going to go about

66

1                        R. Fang

2              complying with some semblance of

3              effort with this Order and the

4              subpoena, tomorrow or whenever you

5              want to do it.

6                    (Time noted:  4:30 p.m.)

7

8              _____

9                    ROCHELLE FANG

10

11   Subscribed and sworn to before

12   me this    day of          , 2011.

13   _____

14         Notary Public

15

16

17

18

19

20

21

22

23

24

25

67

1

2                          E X H I B I T S

3     PLAINTIFF'S

      FOR IDENTIFICATION        DESCRIPTION              PAGE

4

5     1             Subpoena duces tecum ad              13

6                   testificandum

7     2             Letter dated May 26, 2011            27

8     3             E-mail dated June 15, 2011           35

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

68

```
 1

 2                    C E R T I F I C A T E

 3         I, LORI CERRANO, hereby certify that the

 4  DEPOSITION of ROCHELLE FANG was held before me on

 5  the 22nd day of August, 2011; that said witness was

 6  duly sworn before the commencement of the testimony;

 7  that the testimony was taken stenographically by

 8  myself and then transcribed by myself; that the

 9  party was represented by counsel as appears herein;

10         That the within transcript is a true record

11  of the DEPOSITION of said witness;

12         That I am not connected by blood or marriage

13  with any of the parties; that I am not interested

14  directly or indirectly in the outcome of this

15  matter; that I am not in the employ of any of the

16  counsel.

17         IN WITNESS WHEREOF, I have hereunto set my

18  hand this 24th     day of Aug        , 2011.

19

20              - - - - Lori Cerrano

                        LORI CERRANO

21

22

23

24

25
```

69

```
 1
 2                          ERRATA SHEET
            PAGE/LINE                     CORRECTION
 3          _____      _____
 4          _____      _____
 5          _____      _____
 6          _____      _____
 7          _____      _____
 8          _____      _____
 9          _____      _____
10          _____      _____
11          _____      _____
12          _____      _____
13          _____      _____
14          _____      _____
15          _____      _____
16          _____      _____
17          _____      _____
18          _____      _____
19          _____      _____
20          _____      _____
21          _____      _____
22          _____      _____
23          _____      _____
24          _____      _____
25
```

## A

ability 9:24
able 47:14 55:24
absolutely 17:6 22:20 23:9 29:8
  38:7 39:15 42:13
accommodate 9:17
accomplish 62:7
accountant 12:18,20,25 42:25
  43:7 49:17 51:10
accountants 13:6,7 42:21 51:17
accurate 38:5 40:8
acting 61:13
action 3:13
acts 51:11
ad 13:16,21 46:25 67:5
addition 3:9 50:20
additional 65:13
address 4:10 10:6,9,12 11:12
  13:22
addressed 13:21 35:16
administered 52:14
advice 11:19,20 65:4
advised 7:12
advisor 11:10 56:12
advisors 13:11 18:25 39:8,11
  49:19 53:12
affairs 53:3,10
affidavit 35:18,20 36:5 44:10
afternoon 7:25
AG 51:2
ago 23:21 41:20 47:12 56:23
agree 62:2
AGREED 3:3
agreement 48:13 55:5
ahead 50:6 64:16
Alan 22:22 27:10,14 30:19,24
allowed 26:16 47:9
answer 8:19 18:21 19:24 26:18,19
  34:7 55:8
answered 63:3
answering 8:18
anybody 27:13 64:19
apartment 4:11 18:18
apologize 50:15
appearance 48:21
appears 47:11 68:9
appropriate 33:5
April 13:24 28:14
arguably 5:9,13 36:11 47:4

arrangements 54:3
asked 16:18,24 19:11 27:9 31:22
  33:17 34:19 37:11 43:13 44:4,7
  51:6 58:11 62:25 63:16 64:20,24
  65:5
asking 19:23 61:6
assume 44:25 63:22,22 65:11
Attached 35:17
attempt 9:11
attention 50:3
attorney 3:24 14:15 20:21 21:25
  22:2 29:9,21 30:3,4,6,8,14 31:14
  40:14
attorneys 2:4,9,14 3:4 51:11,16
  55:4
attorney-client 21:23
August 1:12 68:5
available 7:20
Avenue 2:5

## B

B 67:2
back 34:10,12
background 6:10
ballpark 10:9,10
bank 4:14 5:2 6:12 7:13
bar 3:11
BARRISTER 1:23
Barry 26:21
based 52:5
beat 63:13
begins 32:24
begun 3:16
behalf 54:24
belief 61:21
believe 26:17 30:19 34:16 38:5,8
  38:10,12 42:4,7,9,20 44:21
  45:24 52:10 55:16 59:12 63:21
bench 7:18
best 15:6
blank 15:19 28:9
blocking 51:13
blood 68:12
bonds 39:18
books 53:2 57:12 60:16,21
bottom 32:24
bought 51:19
boyfriend 26:13
boyfriend's 26:14

break 9:15,20 46:13,15,18 65:7
breakfast 19:10
briefly 8:9
bright 11:6,8
bring 6:7,23 7:4,9 50:2
broad 39:3 59:23
Broadway 1:23 2:10
brother 59:4
brought 50:17,19,21 58:14
Bryan 2:6 7:25 61:15
building 62:4
burdening 59:12
business 39:5 58:4 64:10
businesses 54:9,14 57:15
buy 40:4,6,10

## C

C 2:2 4:2 68:2,2
call 14:15 53:7,19,25
called 15:15 16:16
calls 4:22,24 21:22
Canada 17:19 48:8
capacity 61:14
Capital 11:15 53:15
caption 21:19 35:19
captioned 24:6
care 53:10,18 58:20
carefully 9:2
catch 42:2
caveat 9:18
Centre 1:11
CERRANO 68:3,20
certain 56:13
certainly 19:3 22:7
certify 68:3
chambers 46:21
charge 3:25
check 7:19
checkbooks 57:12
cheekbone 63:25
chose 39:7
circumstances 30:17
claim 59:6
clear 7:4 18:21 19:23 33:22,23
  42:18 65:22
client 47:19 48:6
clue 31:14
colleague 59:18
collect 19:12 20:16 21:8

collected 4:15
collecting 20:6
come 14:21 47:14
comes 11:2
coming 46:5
commencement 68:6
communication 21:24 44:18
communications 44:12
companies 4:21 5:20,20,23 12:7
    44:14 46:3 65:16
company 11:14 42:17
complained 25:19
complete 52:10
compliance 47:16
comply 33:8 49:24 56:16
complying 50:12 62:21 66:2
concern 55:9
concerned 34:18
concerning 44:19
concerns 22:8
concierge 14:23
Conduct 3:6
connected 68:12
connection 50:11 57:21 58:23
considering 25:25
consist 60:23
contact 20:12 31:8 34:24
contacted 29:20 30:3 35:2
contempt 33:7,12,15,19 34:4,21
    54:21
contents 27:15
context 23:13
continuously 10:12
control 63:17
controlled 3:20 12:8 52:20
controls 54:12
conversation 30:23 36:3,7
conversations 22:25 44:25 45:2,4
    45:6,11,14,19,20,22 52:8 61:16
    61:17
copied 35:23
copies 54:18
copy 3:23 47:4 48:11
correct 39:6 59:5
CORRECTION 69:2
correctly 58:5
counsel 3:18 57:4 59:24 61:10,20
    68:9,16
country 53:17

County 1:2 33:6
course 16:17 46:5 55:15 60:2
court 1:2,11 8:22 33:6,7,12,16,19
    34:21 46:22 47:21 48:2,16 49:2
    49:16,23 50:6,11,16 51:13,23
    52:3,13,17,25 53:5,9,13,18,22,25
    54:7,12,17,25 55:6,10,14,20
    56:5,6,9,22,25 57:18,25 58:9,13
    59:25 60:6,13,18,21 61:3,25
    63:3,9,13,19 64:5,8,13,15 65:2
    65:21
courtroom 47:13
cover 54:2
credibility 65:3
current 10:6 12:20 30:3,3,6,8,14
currently 9:19,23 10:14 11:22
    12:7,18 37:18
C.B 2:16
C.P.L.R 3:5,19

D

D 2:6
damaged 64:11
dangerous 24:22
date 13:18 27:22 28:24 30:5 32:24
    35:13
dated 13:23 27:19,25 35:10,16
    67:7,8
daughter 23:24 25:21
daughters 26:6,8
David 23:20
day 50:14 66:12 68:5,18
De 24:17 59:18 65:8
deal 55:10
dealing 59:20
deemed 3:18
defendant 1:7 2:9 48:11
dehydrate 64:7
demanded 54:17
deposed 8:3,4,6
deposition 1:9 3:14,21 8:10 49:7
    65:22 68:4,11
Depositions 3:6
derelict 3:7
derived 48:17,18
DESCRIPTION 67:3
Desmond 2:16 30:20 35:16
determine 55:15
different 9:11 19:5 39:20

directed 49:23 54:8
directing 46:23
directly 56:14 57:24 68:14
disclosure 21:23
discussing 16:9
divorce 8:5
document 14:2,4,9 15:10,13 28:3
    28:5,17 36:17,24 37:3,15,16
    59:23
documents 5:12 7:22,23 15:2,3
    16:13 18:11,16,19,23 19:12 20:6
    20:16 21:4,8 31:16 32:25 33:2,4
    42:6,10,22 43:8 44:5 47:5 49:9
    49:14 50:9 51:18 52:11 56:4
    60:4 63:17 64:25 65:15
doing 57:15 59:6
door 62:5
doorman 14:23 15:4,10,13 16:14
double 7:19
doubt 19:14,15 37:4
draft 36:8
Duane 2:9 22:12,15,16
duces 13:15,21 46:25 67:5
due 55:15
duly 4:3 68:6

E

E 2:2,2 4:2,2 67:2 68:2,2
earlier 44:24
early 28:13
easily 35:5
easy 9:12 59:21
effort 36:9 60:3,8 66:3
efforts 65:6
either 18:25 23:15 37:13 42:20,21
    62:9
Elana 25:23
Eli 62:5
ELLMAN 2:4
embarrass 63:23
employ 13:7 68:15
employed 10:14,16
encompassing 59:23
enforcing 47:6
entities 48:24 49:11 60:20,22
entity 51:3 60:25
ERRATA 69:2
especially 16:17
ESQ 2:6,11,16

essentially 6:18
estate 57:21
Evan 24:25
EVANGELOS 2:11
Eventually 43:10
evidence 4:24
evidences 5:2
exact 28:22
examination 3:9,11,16,18,24 4:6
examined 3:15,25 4:5
exception 44:11
Excuse 55:20
Exhibit 13:14,17,20 27:18,21,24
   28:3 32:17,20 35:9,12,15 43:25
   44:9
exists 57:9
explain 8:9 49:6 59:21
explained 47:10 57:5
expression 24:20
extent 21:22 35:25
eye 64:10
eyes 14:14
e-mail 35:10,15,17,24,25 67:8

**F**

F 4:2 68:2
face 24:21
fail 33:4
failed 50:3
failing 54:21
failure 3:9,17 33:8
Fair 25:13
fairly 7:4 41:21
familiar 8:11 28:21 37:6,7
family 12:9 25:9,12 63:11
Fang 1:10 4:1,9,25 5:1,17,24,25
   6:1,2 7:1 8:1 9:1 10:1,5 11:1
   12:1 13:1,21 14:1 15:1 16:1 17:1
   18:1 19:1 20:1 21:1,15 22:1 23:1
   24:1 25:1 26:1 27:1,25 28:1 29:1
   30:1 31:1 32:1 33:1,11 34:1 35:1
   35:21,23 36:1,14 37:1 38:1 39:1
   40:1 41:1 42:1 43:1 44:1 45:1
   46:1,24 47:1 48:1 49:1,8 50:1
   51:1,9 52:1 53:1 54:1 55:1,20
   56:1 57:1 58:1 59:1 60:1 61:1
   62:1 63:1 64:1 65:1,23 66:1,9
   68:4
Fang's 48:14 65:16

far 37:21,22 38:3 49:8
father 10:22,25
father-in-law 55:23
feel 34:24
filing 3:21
finally 17:22 36:8
financial 11:10 13:10 18:24 39:8
   39:11 49:18 53:2,10 54:2 56:12
   60:25
find 57:8
fine 10:9 46:19 63:12
finish 43:18 44:16 50:13 53:22
finished 65:22
firm 22:15,17 26:24 27:4,7
first 4:3 8:3 17:24 25:5 42:3 62:8
   63:10
five 44:10
follow 62:13
follows 4:5
fool 55:11
Forbes 53:17
forget 35:5
form 3:8 11:2
found 17:18 54:21
frame 28:18
frankly 61:24
free 39:22,24 40:2
friend 23:23 24:15
front 32:21
fully 62:17
functioning 63:21 64:2
funds 7:19
funny 56:18,20
furnished 3:24
further 3:23 55:24

**G**

G 4:2
Gary 11:8,25 49:21 53:14 58:8
Gayer 12:21,22,24 13:3,5 20:6,10
   49:18,24 51:10 61:17
general 51:12
Genger 1:3,6 11:7,18 12:9 13:9,10
   16:8 18:25 19:12 21:12,13 25:7
   25:7,8 29:18 35:19,19 39:12,19
   40:9,12,13,13 49:20 51:11,16
   55:2,19,22 57:8,20 58:15,16
   59:16
Gengers 58:19

Genger's 58:4
gentleman 54:4
Gerald 23:17
Gerard 27:10
getting 29:3
give 9:25 10:6,19 11:12 60:6 65:3
given 8:14
glaze 14:15
go 5:16 6:16 34:16 50:6 62:14,17
   63:4 64:16 65:25
going 7:17 8:9,12 36:5 37:9,12
   46:4 60:11 62:5 64:16 65:25
good 7:25 23:23 42:2 58:16
gotten 28:23 52:6
granting 46:23
great 39:3
grounds 36:12
guess 16:6 39:11
guy 58:2
G-A-Y-E-R 12:21

**H**

H 4:2 67:2
half 61:15 62:6
hand 68:18
hands 58:22
happened 35:3 41:22
happening 24:8
hard 62:13 63:20
head 59:15,15
heard 26:24 61:18
hearing 5:7
held 1:11 33:12,19 34:4 68:4
hell 41:16
hereto 3:4
hereunto 68:17
hide 61:20
highly 35:6
histories 60:17
history 60:25
holding 33:7 34:21
home 63:4
honest 19:6 52:24
honestly 12:10 37:8,11
Honor 47:20 48:10,20,22 60:15
   62:25
hope 58:2
hour 7:19
hours 62:6

hysterical 29:3

## I

idea 7:16 16:18 17:20 19:18,21 28:24 43:13,15,21 50:8
identification 13:18 27:21 35:12 67:3
identified 49:19
identify 50:25 51:2 64:20,22
imagine 39:21
impair 9:24
important 26:15
included 41:14
including 3:7 33:6
income 4:24 5:16 10:20 11:2
incoming 61:10
incorrect 59:5
Index 1:4
indirectly 68:14
individual 49:21,21
inform 40:5
information 36:2 59:9,11
inheritance 10:23 11:3
inherited 10:22,25
inquiries 51:8,15
instructed 48:21 51:20
instruction 9:13,21
instructions 9:6
interest 37:19 38:9,13,15 40:20 41:2,3,5,7,11,12,21 45:13 48:7 54:10,15,20 65:16,17
interested 38:22 58:10,14,18 68:13
Interesting 15:18
interfering 64:2
introduced 30:14,20
invest 57:14
invested 12:7
investing 12:3
investment 11:19
investments 11:4,5,21 12:2,6,15 19:4 39:2,19 53:19 54:2 56:13 57:11 63:7
invests 11:20 39:17,20
involved 32:16
irrelevant 30:19
issue 4:21 36:9 50:4 57:13 60:11
issued 62:22
items 61:22 62:11

## J

Jacqueline 23:17 27:10,14
jail 34:16
jarred 20:20
job 38:21
Joe 62:2
John 24:17
Jonas 12:21
Judge 5:6 6:6 7:3,17 46:21 57:17
July 46:22 47:7,22
June 35:10,17 67:8

## K

keep 52:25 64:16
keeping 58:17
kept 58:16
kidding 43:12
kind 6:14 19:4 24:19,21 39:18
kinds 14:19 39:17
knew 21:5,7 37:21,22
Knollwood 2:15
know 6:11 7:10 11:13,14,23,24 12:2,5,10,12,16,17 14:7 15:7,20 16:3,5,15,20,25 17:17,22,24 18:17,20 19:20,20 22:2 23:13,22 23:25 24:9,18 25:25 27:3 29:11 29:12,13,16 30:5,5,11,13 31:8 31:12,20 32:2,3,8,8,9,10,13,15 37:8,24,24 38:2,3,3,20 39:6,8,12 39:23 40:12,21 41:4,15,16,19 44:2,6,8 45:10 46:3,6,8 48:5 49:14 52:23 57:25 58:21 62:9 64:11,18
knowledge 37:18 40:10
knows 62:20 63:6
KRAUSE 2:4
K-1's 51:7

## L

L 3:2 4:2,2
La 24:17 59:18 65:8
LaTessa 25:18
law 22:15,17,18 26:24 27:7
lawsuit 44:19 59:3
lawyer 15:15,16,17,18,21 16:12 18:9 20:15 23:2,5,6 31:21 32:11 32:14 36:10,10 56:3 62:23,23 64:20,23
lawyers 42:22 44:4,12 65:24

learn 41:6,10,12
learned 17:24 21:3 38:19 40:19,25 45:12
lecture 34:3
left 63:24
legal 14:20 39:3
legible 47:4
Leinbach 2:6 4:7,13,18,23 5:6,11 5:22,25 6:5,16,23 7:3,16 8:2 13:13 27:17 33:24 34:5,9 35:4,8 45:3,7 46:16 47:25 49:4,5,17,25 50:7,15,23 52:4 55:8,16 62:24 63:5,12,15 64:17 65:5
length 35:18
letter 27:19,24 29:2,10,21 32:20 33:22 34:18 43:22,23,24 44:6 67:7
Let's 37:15 41:24 42:2 44:9
Lexington 2:5
life 19:8 37:10
limited 48:9,12 51:12 55:4
list 60:6,10 62:14,18
listed 49:11 52:20 53:16
listen 9:2 58:13
litigation 21:18,19 22:6 24:5,6 25:10,15,22 26:11 27:13
little 24:14 55:24 63:20 65:24
living 10:8,11
LLP 2:4,9,14
lock 62:5
locked 62:4
long 7:17 10:8 30:8 31:13 50:14 62:12
look 13:25 14:2 28:2 32:17 36:14 37:6,7,15,16,16 41:24 42:3 44:9 52:20
looked 15:3,7
looking 12:16 13:19 27:23 35:14
looks 28:21,23 63:21 64:9
LORI 68:3,20
lot 37:9 45:22 62:2,7
lovely 11:8
loving 11:6
Lyons 2:14,16 4:16,19 5:4,9,19,24 6:3,9,12,21,25 7:12,21 15:23,25 21:21 25:2 26:19 27:9 30:4,10 30:17 31:3,5,21,23,25 32:3,6 33:20 34:2 35:16,22 38:14 40:23 41:8 43:18 44:23 45:5 46:12

47:19,20,24 48:5,10,19 50:17,20
51:15 52:9 54:23 55:3,7 57:10
57:16,23 59:13,17 65:3,20

## M

magazines 43:4
mail 14:25
main 58:7
making 18:15
man 22:21 24:24 63:11
managers 53:17
Marcus 26:21
mark 13:14 27:18 35:8
marked 13:16,19 27:20,23 28:3
35:11,14 36:15 43:24
marriage 68:12
material 44:18 47:8 48:6 50:17
52:20 57:4
matter 24:6 48:4 68:15
McGOVERN 2:14
McLaughlin 26:25 27:7 61:11
mean 13:9 14:16,17 16:7 17:8
18:4 21:19 24:6 25:8 29:13 30:4
30:9,11 33:15 37:23 38:25 40:3
40:9,13 41:6 42:15,19 63:23
meaning 39:4
means 10:24 33:12,15 34:4
medications 9:24
member 12:8
members 25:9,11
memory 14:12 20:22 35:7
mentioned 15:6 20:23 22:7
met 25:4 30:17 58:15
Michailidis 2:11 24:25 25:5 52:9
59:17 60:2,9,15,19,24 61:9 65:9
65:10,18
mind 28:9 46:14
mine 17:11
minutes 47:12
moment 10:20 38:10 59:2
monetary 32:16
money 10:21 53:16 58:2,3,7,7,20
monies 10:23,24
month 61:14
morning 25:3
Morris 2:9 22:13,15,16
motion 3:12 46:23
mouth 51:25
move 3:8,10

musical 24:19
M-A-R-C-U-S 26:23

## N

N 2:2 3:2 4:2
name 4:8 7:25 10:3 11:14 24:17
24:18,23 26:14,22 27:3,14
named 22:21 23:16,19 24:24
26:25 48:25 49:21
nasty 64:9
naturally 60:3
necessary 18:22 56:4 57:4
need 7:22 9:15 33:21 34:3 48:5
50:2
negatively 48:18
nephew 11:8,16 58:8
never 27:13
New 1:2,2,11,12,12,13,24 2:5,5,10
2:10,15 4:4,12,12 13:23,23 33:6
nine 10:10,11
nods 8:23
nonresponsive 61:23
Non-Party 1:9 2:14
Notary 1:13 3:15,15 4:4 66:14
noted 23:25 34:6 66:6
noticing 4:13
number 32:18 35:24 41:24 42:3
49:4
numerous 41:17
N.Y 1:24

## O

O 3:2 4:2
oath 8:14 52:14
object 3:7,10 21:21 33:20 36:5,12
40:23
objection 33:24 34:6 35:23
obligation 55:13 58:23
obviously 41:19
occasion 8:7
occasions 5:8,12
odd 24:21
office 18:19 22:19
offices 59:16
okay 8:24 64:5,13
old 19:8 43:4
once 21:3,7 30:9 32:18 45:12,24
one-bedroom 18:18
opposed 55:23
opposing 61:19

option 51:24
order 4:22,23 5:5 8:25 33:7 46:23
47:7,17,23 56:16 66:3
original 3:17,21 47:3
originally 56:25
Orly 1:3 14:13 35:19
outcome 68:14
outside 50:4
oven 18:23
owned 12:8
o'clock 47:3 62:3,4,16

## P

P 2:2,2 3:2
page 57:7 67:3
pages 35:18
PAGE/LINE 69:2
paper 54:13
papers 14:17,18,19,20,21 18:2,3
42:17 43:3
paragraph 37:17,17 38:5 41:24
41:25 42:3 44:10,11
Parness 23:20,22 24:2,4,11,13
part 3:5 58:6
particularly 62:12
parties 3:4 46:20 47:13 50:10
68:13
partner 51:12
partnership 37:19 38:14 40:20
41:2,4 48:7,9,12,13 55:5
party 68:9
pawn 53:6,8 55:12
pay 31:23 32:6
payment 11:3
pays 31:25 32:3,10,14
penalty 33:18
pending 9:19 46:17
people 46:5 59:13
people's 62:20
person 16:9 39:5 42:25 63:22
64:24
pertaining 48:7
piece 64:9
pile 43:3
place 49:7
Plains 2:15
plaintiff 1:4,10 2:4 33:5
plaintiff's 13:17,20 27:18,20,24
28:3 32:20 35:9,11,15 36:15

43:25 44:9 59:24 67:3
please 4:8 9:9,16 10:3 22:24 26:11
30:16 33:2 34:7 36:14 53:23
plenty 57:2
point 43:13 46:17 60:4
Portez 24:17 59:19 65:9
portfolio 37:25 38:21,24 39:9
position 59:3
possession 42:5,10,15,17,23 49:10
49:15 63:17
possible 59:9
post 17:25 18:3,5,6 21:2
power 40:14
prefaced 62:12
preparation 36:4
prepare 12:24
prepared 51:5
prepares 12:22
present 42:21
presented 48:4
presume 61:2,3,7,8
previously 61:12
prior 36:4
probably 16:22,24 28:6
problem 47:16 49:2 52:2
process 8:10
produce 34:22 60:4 61:6,8
produced 7:2 48:11 60:7,12,14
61:4,22 65:12
producing 61:5
professionally 55:11
professionals 59:7
properties 48:8
property 17:19
proposed 35:20
protects 58:3
provide 33:2,4 43:7 44:4 54:18
provided 3:5,19 7:24
provides 11:18 13:3
Public 1:13 3:15,16 4:4 66:14
purpose 58:25
purposes 36:11
pursuant 1:10
put 51:25
p.m 1:13 66:6

Q
question 3:7,10 6:10 8:19 9:4,5,8
9:18,20 16:2 21:22 26:18,20

34:7,8,10,14 36:2 40:24 41:9
43:19 44:25 46:17 52:18
questions 8:2,18 9:3 26:16 51:6
63:2,6
quite 56:23

R
R 2:2 4:1,2 5:1 6:1 7:1 8:1 9:1
10:1 11:1 12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1 62:1 63:1
64:1 65:1 66:1 68:2
Ran 11:8,10,16 12:2 13:9 17:4
18:25 19:3 39:14 40:9,14 49:22
53:14 58:8
Ran's 11:12
read 15:5 32:23 34:9,11
reads 37:17 44:11
real 57:21 58:2,3
really 16:4,25 23:12 30:5,6 41:23
45:15 53:4 56:18 59:21
reason 56:9
recall 5:11 8:8 13:4 14:8 15:6 18:8
18:10,15 20:2,4,5 22:3,9 23:7,18
24:10 26:3,5,10 27:6 29:17,19
29:20,22,23,25 30:2,21,23 31:2
31:17,18,19 34:17 36:19,20,21
36:22,23 37:5 40:17,18 44:3
45:16,17,18,21 64:18
received 15:12 16:13 28:11 29:10
29:21 32:25 34:18 43:22 59:22
64:21
receiving 18:6,9 28:16,20 31:16
recognize 28:5,6,7
recollection 20:20 37:2
recommended 31:3
reconvene 62:15
record 4:8 6:17 10:4 34:11 68:10
records 6:12,19,24 7:5,9,14 53:2
57:12 60:16,22
redact 51:24
redacted 48:22 50:24 51:21,22
redacting 47:10 50:21

referred 5:23 47:5
referring 5:21 15:9
refers 36:2
reflect 5:15 7:5 48:16 54:19
refresh 14:12 36:25
regard 19:13 20:13,16 40:14
regards 8:18 18:16 65:14
reign 39:22,24 40:2
relate 4:20 5:13 42:23 43:8 49:10
related 48:24 51:3 54:13 65:15
relates 45:2,3
relating 44:13
relevant 26:17
relied 63:10
relief 33:5
remember 14:7 15:2,15,17 16:4
16:16,23 17:2,3,22 18:12,13
19:6,7,9,9,11,14 20:8,18 21:9,10
23:12,15 24:20 26:2 27:16 28:10
28:13,15,16,18,20,25 29:4,5,7,8
29:14,15,16 30:7,12 31:6,13,22
35:3 37:12 40:16,21,22 41:23
43:17 45:15,23 61:11 63:18
repeat 41:8
repeatedly 49:13
reporter 8:21,22 34:12
REPORTING 1:23
representative 61:13
represented 30:9 61:12 68:9
representing 59:8 64:21
request 30:19 55:21 56:3
requested 7:23 33:3,4 50:9 56:2
requests 59:24
reserved 3:9,12
resistance 48:3
resolve 36:9
respect 59:6
respective 3:4
respond 9:3,19 46:24
response 49:3,5,6 63:6
responsibility 61:5
responsive 4:17,20 5:10,13 7:24
42:6,24 47:5 52:11 60:5,7 61:23
62:10
retained 31:20
return 3:17
returnable 57:2
returns 12:17 20:11 47:9 48:14,15
48:23 50:21,22

**right** 3:7 28:4 32:7,21 38:23 47:19
    47:23 59:5,25
**rights** 3:5,19
**River** 17:9
**Riverside** 15:6 16:24 17:10,16,17
    17:18 19:19 20:24 21:3,7 34:23
    37:20,25 38:13 40:20 41:13,21
    42:11 43:5,9 44:13,13 45:8,13
    46:2 48:8,12,20,24 49:10 51:4,8
    60:19,22
**Road** 2:15
**Rochelle** 1:9 4:9 10:5 13:22 27:25
    35:21 65:15 66:9 68:4
**role** 54:5
**Rule** 3:19
**rules** 3:6 8:12
**runs** 53:15
**R-A-N** 11:9

_____

**S**

**S** 2:2 3:2,2 67:2
**Sagi** 1:6 11:7 12:12 13:10 16:7
    17:2 19:5 25:8 29:18 35:19
    39:12 40:13 49:20 57:8,20 58:4
    59:16,19 61:12
**Sagi's** 58:21 62:22
**Sash** 22:22,25 23:4,8,11,14 27:10
    27:14 30:19,24 31:2,10
**saw** 28:8 36:20
**saying** 5:14,18 6:18 26:2 37:4,5
**says** 56:11
**scribble** 47:11
**search** 18:10,15,22 21:4 52:11
**searches** 65:14
**searching** 18:19
**second** 32:23 44:10
**see** 4:14 7:19,21 14:14 32:22 33:9
    37:5,13 47:14 64:12 65:25
**seeing** 36:19,21,22 37:5
**seek** 33:5
**seen** 14:4,8 36:17 37:2,10
**selecting** 39:4
**sell** 40:4,6
**semblance** 66:2
**sentence** 32:24 44:20,21 53:23
**separate** 58:16,17
**seriously** 59:14
**served** 14:23 47:22
**SERVICE** 1:23

**services** 13:2 31:23,25 32:4,6
**set** 68:17
**settlement** 36:11
**SHEET** 69:2
**Shirley** 25:18
**show** 6:13 7:14 14:11 36:25 62:3
**showing** 47:2
**siblings** 59:8
**sister** 25:16,17,18,19 58:24 59:4
**sisters** 25:19
**sit** 38:6 42:4 44:22 45:25 57:3,7
    65:24
**skin** 63:25
**slip** 21:14
**Solomon** 5:6 6:6 7:3,17
**Solomon's** 46:21
**somebody's** 53:5
**son-in-law** 11:7,25 16:6,7,21
    19:25 20:3 22:5,9 23:24 29:18
    32:9,10,14 38:2 41:14 49:20
    54:4,16 55:22 56:3,7
**son-in-law's** 27:4 54:9,13
**sorry** 12:23 21:14 43:20 44:17
    53:24
**sort** 15:7 18:10 21:4 30:18 41:20
**sought** 57:5
**sounding** 24:23
**sounds** 7:6,7 24:18,22 52:5
**source** 10:20
**spaces** 52:19
**speak** 17:4 18:24 19:3,5,25 20:9
    20:10,10 22:5,12,18 24:13 26:9
    27:12,14 29:9 31:5 55:25 59:18
**speaking** 20:2,19 26:3 27:6,6
**specific** 14:24
**specifically** 6:7
**spoke** 16:11 18:8 20:5 23:10,14,25
    24:9,10 25:11,15 26:11 27:13
    29:6,7,17,23 31:6 44:3 45:23
    59:19
**spoken** 21:17 22:21 23:16,19 24:4
    24:16,24 25:8,21
**stand** 52:15
**standing** 55:17
**starters** 6:18
**state** 1:2,13 4:4,8 8:20 10:3 35:22
**stated** 6:7 26:12 45:13 46:9 49:13
    50:7 64:17 65:7
**statement** 42:5,7 45:25 65:10

**statements** 4:14 5:3,15
**stenographically** 68:7
**Stern** 26:25 27:8 61:11
**STIPULATED** 3:3,23
**stocks** 39:18
**Street** 1:11 4:11 10:7 13:22
**stressed** 35:6
**strike** 3:8,10
**stuff** 14:13,16 39:18
**subpoena** 1:10 4:17,21 5:21 13:15
    13:20,23 18:5,6,9,16 19:2,13,19
    20:13,17 21:2,20 24:7 26:12
    31:16 33:3,8,23 34:25 36:10
    42:6,24 46:4,6,24 47:6,21 48:25
    49:12 50:12 52:12,21 54:8 55:18
    56:17,23 62:21 64:22 66:4 67:5
**Subscribed** 66:11
**suggest** 56:15
**suggestion** 7:18
**supposed** 23:2 37:9 51:21
**Supreme** 1:2,11 33:6
**sure** 7:8 9:16 12:10 15:24 25:11
    28:8 30:18 32:15 35:2,5 40:11
    40:24 44:7 63:24 64:15
**sworn** 3:14 4:3 8:14 35:20 66:11
    68:6
**S&P** 39:18

_____

**T**

**T** 3:2,2 67:2 68:2,2
**table** 58:15
**take** 8:21 9:15,20 13:25 14:2 28:2
    36:14 37:15 46:12,18 53:10,18
    62:15
**taken** 1:10 68:7
**talk** 45:22 46:2 56:6,11 65:8
**talked** 16:20,23 64:19,24
**talking** 17:14 45:8 46:4 48:2
    61:25 62:8 64:8
**tax** 12:16 20:11 47:8 48:14,15,23
    50:21,22
**taxes** 12:22,24 13:3
**tecum** 13:16,21 46:25 67:5
**Telemus** 11:15 53:15
**tell** 8:14,25 9:9,16 10:19,24 11:21
    11:24 12:14 14:13,18 19:16
    22:24 25:14 28:21 30:16 44:7
    50:18 51:24 55:21
**telling** 23:3 35:3

ten 53:16
tend 35:5 64:6
term 39:6
terms 60:24
testificandum 13:16,21 46:25 67:6
testified 4:5 40:25 41:3 45:6 49:8
testify 15:23,25 35:24 44:23
testifying 36:6
testimony 3:8,11 9:25 52:7 68:6,7
thing 65:8,11
things 5:14 6:6 10:21 12:6 14:14 23:3 34:19 35:5 37:9 39:17 40:10 41:14 50:25 57:19 59:13
think 6:4 12:13 14:24 15:15 21:9 24:8 33:14,21 34:2 41:2 52:4 56:19,20 57:9 60:10 65:23
thought 59:10
tight 62:4
time 14:2,22 16:12 20:15,23 23:25 24:9,10 25:6 27:5 28:18 35:6 38:11 56:23 57:3 66:6
times 41:17
today 6:8,20,24 7:5 9:25 25:5 38:6 42:4 47:2 48:6 51:20 52:3,14 55:17 62:17 64:3 65:23
told 17:2,21,23 20:24 22:10 27:15 30:24 40:22 41:17 46:5 58:2 61:4
tomorrow 62:16 66:4
top 53:16
totally 15:19 28:9
transaction 60:16
transactions 57:22
transcribed 68:8
transcript 68:10
transfer 57:19
transfers 4:25 5:16 6:13,15 7:6,11 7:13,14 57:14
translate 8:22
treated 58:22
trial 3:13
tried 56:16
true 42:7 44:15,21 45:25 65:19,20 68:10
truth 8:14,25 14:14,18 46:8
truthful 9:25
try 51:17
trying 15:14 41:18 56:20 59:7

61:19,20
two 26:7,8 35:18 41:25 53:11 62:6
T-E-L-E-M-U-S 11:15

## U

U 3:2
understand 6:17 7:8 8:12,13,15 9:4,6,8,10,12,13,21 15:24 16:2 23:4 33:11,18 34:5 41:18 42:14 42:18,19 43:6 44:20 45:7 46:7,9 54:7 57:6 63:15
understanding 60:12
understood 37:14 47:15
unfortunately 50:2 61:9
Uniform 3:6
universe 56:13
unredacted 50:22,24
unrelated 59:13
upsetting 16:17
use 57:20 59:15 62:17
useful 59:10

## V

vaguest 16:18 17:20 19:21 43:13
value 57:19
versus 35:19
violation 55:12,18

## W

waived 3:22
waiver 3:12,18
want 6:17 7:7 46:7,12 52:3 58:21 63:23 64:15 66:5
wanted 47:15
wants 39:22
wasn't 18:22 23:6
way 9:11 34:20 59:21
week 38:18,19 41:20
went 28:9 46:20
West 4:11 10:7 13:22
WHEREOF 68:17
White 2:15
wish 40:4
witness 1:9 2:14 3:14,25 6:11,14 15:22 34:13 43:20 46:14 52:6,16 52:22 53:4,7,11,14,21,24 54:6 54:11,16 56:2,8,19,24 58:6,11 62:10,18 64:4,6,12,14 68:5,11 68:17
woman 63:10

wondering 24:20 41:22
word 33:14 39:3,5 42:14,19
wording 28:22
words 51:25 57:6
work 13:6 61:19 62:20
wouldn't 19:21 25:12 46:14 53:7 57:23
wrong 59:5
wrote 46:22

## X

x 1:3,7 67:2
xxxxx 2:19

## Y

year 12:15
years 10:10,12,17 19:8
yesterday 19:10
York 1:2,2,11,12,12,14,24 2:5,5 2:10,10,15 4:4,12,12 13:23,23 33:6
young 24:14 35:4

## Z

ZEICHNER 2:4

## 1

1 13:14,17,20 35:24 49:4 62:11 67:5
10 10:16 62:16
10:00 47:3
10006 2:10
10022 2:5
10023 4:12
100697/08 1:4
10271 1:24
10603 2:15
120 1:23
13 67:5
14A 4:11
15 35:11,17 67:8
1540 2:10

## 2

2 27:18,21,24 28:3 32:18,20 43:25 62:3 67:7
2:30 1:12
20 47:12
2006 48:14
2009 48:15

**2011** 1:12 13:24 27:20,25 35:11,17
  66:12 67:7,8 68:5,18
**212-732-8066** 1:24
**22nd** 1:12 68:5
**221** 3:5
**25** 46:22 47:7
**253** 4:11 10:7 13:22
**26** 27:20,25 67:7
**27** 13:24 67:7

---
### 3
**3** 35:9,12,15 36:15 44:9 67:8
**31** 33:3
**3116** 3:19
**35** 67:8
**399** 2:15

---
### 4
**4** 37:17,17 38:5
**4:30** 62:6 66:6

---
### 5
**5** 41:24 42:3 62:4
**5s** 41:25
**575** 2:5

---
### 6
**60** 1:11
**68** 19:8

---
### 7
**73rd** 4:11 10:7 13:22

---
### 8
**8** 62:11

SURROGATE'S COURT : NEW YORK COUNTY
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
In the Matter of the Trust Established
on December 13, 1993, by ARIE GENGER
for the Benefit of ORLY GENGER.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JAN 0 2 2009

File No. 0017/2008

R O T H , S .

    This is a contested application by the primary beneficiary
(Orly Genger) of an irrevocable inter vivos trust established by
her father, Arie Genger, seeking the appointment of a successor
trustee or, alternatively, the appointment of a "special trustee"
to investigate alleged wrongdoing concerning the trust.
Petitioner's mother, Dalia Genger (grantor's former wife),
contends that she is the duly appointed successor trustee and
that there is no basis to appoint another fiduciary for any
purpose.

    The trust agreement, dated December 13, 1993, provides for
discretionary income and principal distributions to Orly for life
with remainder to her descendants or, if none, to the grantor's
descendants in trust.

    Article SEVENTH (B), (D), (E), and (G) of the trust
instrument sets forth the following procedure for the resignation
of trustees and the appointment of their successors.

    A trustee may resign by delivering a signed and acknowledged
instrument of resignation in person or by certified or registered
mail to the other trustee and to either the grantor or the income
beneficiary. Such resignation is effective upon the receipt of
the acknowledged instrument by the other trustee (if there is

one) and the grantor or the income beneficiary or at such later date as may be specified in the instrument.

A trustee may appoint his or her successor by delivering a signed and acknowledged instrument in the same manner as described above for resignation. Any such appointment, however, is valid only if the appointee qualifies by delivering a signed and acknowledged instrument of acceptance in person or by certified or registered mail to each trustee and the grantor or the income beneficiary within 30 days after the later of 1) the date on which a copy of the appointment instrument is delivered to him or her, and 2) the effective date of the appointment as set forth in the appointment instrument. It is observed that there is no provision that requires a resigning trustee to appoint a successor or that there always be two trustees in office.

The original two trustees served until October 2004, when they resigned and appointed David Parnes and Eric Gribitz as their successors. On February 12, 2007, Mr. Gribitz resigned without appointing a successor. On April 26, 2007, Mr. Parnes resigned and appointed as his successor Leah Fang in a signed and acknowledged instrument. Although Ms. Fang noted her acceptance at the bottom of such instrument, her signature was not acknowledged. However, in another document entitled "Release" executed and acknowledged by Ms. Fang the same day, she, as

2

trustee, purported to discharge Mr. Parnes from liability. It is undisputed that thereafter Ms. Fang acted as trustee. Indeed, Ms. Fang's contention that she received a number of requests for information from petitioner and that petitioner referred to her in writing and orally as trustee is not disputed by petitioner.

On December 12, 2007, Ms. Fang, without resigning in accordance with the trust agreement, attempted to appoint Patricia Enriquez, as successor trustee. Her designation of Ms. Enriquez, however, was by an unacknowledged letter in which she referred to her own resignation as taking effect upon Ms. Enriquez's acceptance of the appointment. Ms. Enriquez accepted by signing the letter, but such acceptance was not acknowledged and, in any event, there is nothing in the record to suggest that such "acceptance" was delivered in accordance with the trust instrument. Two weeks later, an attorney for Ms. Enriquez notified petitioner's counsel by email that her client had advised that she had no intention to overcome the procedural omissions.

On January 3, 2008, Ms. Fang and Dalia Genger signed before a notary a memorandum in which Ms. Fang stated that "to the extent that I am still vested with any powers to appoint trustees of the [trust], I confirm your appointment." The next day, Ms. Fang executed an acknowledged instrument of resignation and appointment of successor trustee naming Dalia as her successor

3

and Dalia, on the same day, executed an acknowledged instrument of acceptance.  It is undisputed that such documents were delivered in accordance with the trust requirements.

We address first that portion of the instant application which seeks the appointment of a successor trustee on the ground that Dalia was not validly appointed.  In such connection, petitioner argues first that, because Ms. Fang's signature on the bottom of Mr. Parnes's appointment instrument was not acknowledged, she never accepted the position in accordance with the trust agreement (and thus could not appoint Dalia her successor).  However, such argument ignores the "Release" mentioned above that Ms. Fang executed the same day.  Such instrument, which was signed and duly acknowledged, unequivocally establishes Ms. Fang's acceptance of the position.  Since petitioner does not challenge the authenticity of such instrument or Mr. Parnes' contention, supported by the record, that it was delivered in accordance with the trust instrument and, as noted above, petitioner thereafter communicated with Ms. Fang as trustee, Ms. Fang properly qualified as successor trustee.

Petitioner's second argument that, in any event, Ms. Fang's appointment of Dalia was ineffective because Ms. Fang had previously resigned as trustee is also without merit.  Simply put, Ms. Fang had not previously resigned because her letter to Ms. Enriquez did not contain the formalities (i.e., an

4

acknowledgment) required by the trust agreement. Moreover, although not a model of clarity, the letter makes clear that Ms. Fang did not intend to leave the trust without a trustee in the event that Ms. Enriquez failed to qualify, which is exactly what happened. Thus, Ms. Fang had authority to appoint Dalia as her successor.

Since there is no dispute that the instrument of resignation and appointment executed by Ms. Fang on January 4, 2008, and Dalia's instrument of acceptance of the same date were executed and delivered in accordance with the trust agreement, Dalia is the duly appointed successor trustee of the trust. To find otherwise would be to ignore the chronology of events and the purpose of the provisions at issue, namely to ensure that the trust always has a fiduciary ready, willing and able to act. The fact that petitioner does not wish her mother to be the fiduciary because she considers her an adversary in a broader intra-family dispute does not provide a basis to ignore the grantor's intent, as reflected in the trust instrument, that an acting trustee, and not the beneficiary, decides who shall become a successor trustee. Accordingly, petitioner's application to appoint a successor trustee is denied.

We next turn to petitioner's alternate request for relief, namely that a "special trustee" be appointed for the "purpose of investigation and taking discovery with respect to the wrongful

5.

dealings concerning the assets and income of the trust."

It is noted initially that petitioner's only allegations of "wrongful dealings" concern a close corporation, TPR Investment Associates, Inc. She contends that her brother Sagi, who is an officer of TPR, and Dalia, who was a shareholder at the time this proceeding was commenced, are engaged in a "wrongful scheme" to divert assets to themselves and, as a result, Dalia "could not possibly" investigate wrongdoing at TPR, which the petition describes as the "greatest" asset of the trust.

However, the premise of the application, namely that the trust's interest in TPR would enable the trustee to investigate or seek relief from TPR, does not appear to be correct. Petitioner does not dispute Dalia's assertion, supported in the record, that the trust is not a shareholder of TPR at all. Rather, D&K LP, an entity in which the trust owns a 48 percent interest, in turn owns approximately 50 percent of TPR. Petitioner does not explain what appears to be a material misstatement concerning TPR's relationship to the trust. Nor does she identify how a trustee under such circumstances might be in a position to "investigate and address the TPR issues".

In any event, assuming arguendo that a trustee would somehow be able to investigate alleged misconduct at TPR, petitioner's vague and speculative allegations of "wrongful conduct" at TPR from which Dalia purportedly benefitted do not warrant the

6

appointment of a "special trustee". Similarly, petitioner's allegations (made upon information and belief) that Dalia had knowledge of alleged improper acts by former trustee, David Parnes, in relation to TPR are patently insufficient to warrant the remedy of a "special trustee". In such connection, it is noted that Mr. Parnes and Ms. Pang have been directed to account for their proceedings as trustees (Matter of Genger, NYLJ, Feb. 25, 2008, at 29, col 3), giving petitioner a forum to seek relief for most of the conduct about which she complains.

Finally, it is observed that petitioner has not alleged that Dalia has refused a request for information, which would warrant relief (SCPA 2102), or has failed as trustee to protect trust assets. Indeed, it appears that Dalia (who states that she is ready and able to act as fiduciary) has yet to assume the duties of trustee in deference to her daughter's position in this litigation. As a validly appointed trustee, she should be given the opportunity to do what she deems necessary to manage and protect the trust's assets.

Based upon the foregoing, the appointment of a "special trustee" is unwarranted at this time and, accordingly, the application is denied, without prejudice to renewal if future

7

circumstances warrant such relief.

This decision constitutes the order of the court.

_____
S U R R O G A T E

Dated: December 31, 2008

8



SULLIVAN❀
WORCESTER

Sullivan & Worcester LLP
1290 Avenue of the Americas
New York, NY 10104

T 212 660 3000
F 212 660 3001
www.sandw.com

November 11, 2008

The Honorable Renee R. Roth
Surrogate's Court, New York County
31 Chambers Street, 5th Floor
New York, New York 10007

Re:    In the Matter of Orly Genger File No.  0017/2008

Dear Surrogate Roth:

We are counsel for Dalia Genger ("Dalia").  We write in response to the letter from Eve
Rachel Markewich, counsel for Petitioner, Orly Genger ("Orly"), dated November 5, 2008.

Ms. Markewich's letter is based on the false pretense that Dalia Genger controls TPR. As set
forth more fully in the Affidavit of Dalia Genger, sworn to on November 10, 2008, and
attached hereto, Dalia is not a shareholder, officer or director of TPR.   Accordingly, there is
no conflict.

Ms. Markewich's letter does, however, finally acknowledge what Dalia has represented to
this Court all along, that the most valuable asset in the Orly Genger Trust, are the shares of
TRI.  In her Amended Petition, Orly claimed that the Orly Genger Trust's greatest asset is
the shares of TPR.  (Petition ¶25).  In her Affidavit sworn to on March 11, 2008, Dalia stated
that neither the Orly Genger Trust nor Orly had any ownership interest in TPR, and that the
Orly Genger Trust's only asset is its 20% ownership interest in TRI.  (Dalia's March 11, 2008
Aff., ¶¶4-7).  Now, contradicting Orly's petition, and confirming the testimony in Dalia's
Affidavit, Ms. Markewich states in the third paragraph of the first page of her letter that the
Orly Genger Trust's most valuable asset is shares of TRI.  Ms. Markewich further concedes
that the TRI shares held by the Orly Trust are potentially worth tens of millions of dollars.
As previously addressed in Dalia's March 11 Affidavit, Orly's interest in TPR is a negative
value.

We respectfully request that Orly's Application be denied.

Respectfully submitted,

Jonathan G. Kortmansky

Direct line:  212 660 3044
jkortmansky@sandw.com

cc:    Eva Rachel Markewich, Esq. (by fax)
       Steven Hyman, Esq. (by fax)
       Matthew Hoffman, Esq.(by fax)
       Seth Rubenstein, Esq. (by fax)
       Mary Santamarina, Esq. (by hand)

{N0130319; 1}
BOSTON  NEW YORK  WASHINGTON, DC

## Meeting of Partners of D&K LP – Jan. 31, 2009 & Agreement

The undersigned partners having reviewed the status of D&K LP ("D&K") and each of its partners vote as follows to:

1. Indemnify and provide a general release from any claim or right at equity, law, or contract or otherwise the current and former general partner, its officers, the partnership's holdings (including TPR Investment Associates, Inc.) and the officers of its holdings to fullest extent permitted in connection with any claim by the partnership and/or its partners. Irrespective of the above, nothing herein shall serve to release or indemnify Arie Genger, William Dowd, Lawrence Small or Edward Klimerman.

2. Authorize the General Partner on behalf of D&K and each limited partner individually to enter and execute such binding compromise as may be possible and deemed prudent by the GP in connection with the outstanding note from D&K guaranteed 50% by each limited partner. Such note having a balance of about $11,204,685 is presently subject to acceleration. Nothing herein shall derogate from authority already granted the General Partner in the Partnership Agreement.

3. The partners wish to clarify that the authority vested in the General Partner to make limited partners' assets subject to a pledge shall be done in substantially the same manner in which TPR Investment Associates, Inc shares were pledged in conjunction with the aforementioned note. However, the General Partner shall be authorized to sign for the partnership and/or each individual partner.

4. Provide such consideration as the GP may deem fit in entering into any compromise.

5. Waive any objection to the dealings of the GP or its officers based on conflict of interest or otherwise.

6. Request that the General Partner make this resolution part of the Partnership Agreement.

7. Attached is a worksheet calculating the amount owed, $11,204,685.

8. TPR Investment Associate, Inc. has agreed to refrain from enforcing the note against each limited partner for thirty days..

_____
Orly Genger 1993 Trust – LP

_____
Sagi Genger 1993 Trust – LP

_____
Sagi Genger on behalf of General Partner

_____
TPR Investment Associates, Inc.

## Meeting of Partners of D&K LP – Jan. 31, 2009 & Agreement

The undersigned partners having reviewed the status of D&K LP ("D&K") and each of its partners vote as follows to:

1. Indemnify and provide a general release from any claim or right at equity, law, or contract or otherwise the current and former general partner, its officers, the partnership's holdings (including TPR Investment Associates, Inc.) and the officers of its holdings to fullest extent permitted in connection with any claim by the partnership and/or its partners. Irrespective of the above, nothing herein shall serve to release or indemnify Arie Genger, William Dowd, Lawrence Small or Edward Klimerman.

2. Authorize the General Partner on behalf of D&K and each limited partner individually to enter and execute such binding compromise as may be possible and deemed prudent by the GP in connection with the outstanding note from D&K, guaranteed 50% by each limited partner. Such note having a balance of about $11,204,685 is presently subject to acceleration. Nothing herein shall derogate from authority already granted the General Partner in the Partnership Agreement.

3. The partners wish to clarify that the authority vested in the General Partner to make limited partner assets subject to a pledge shall be done in substantially the same manner in which TPR Investment Associates, Inc shares were pledged in conjunction with the aforementioned note. However, the General Partner shall be authorized to sign for the partnership and/or each individual partner.

4. Provide such consideration as the GP may deem fit in entering into any compromise.

5. Waive any objection to the dealings of the GP or its officers based on conflict of interest or otherwise.

6. Request that the General Partner make this resolution part of the Partnership Agreement.

7. Attached is a worksheet calculating the amount owed; $11,204,685.

8. TPR Investment Associate, Inc. has agreed to refrain from enforcing the note against each limited partner for thirty days.


_____
Orly Genger 1993 Trust – LP


_____
Sagi Genger 1993 Trust – LP



_____
Sagi Genger on behalf of General Partner



_____
TPR Investment Associates, Inc.

| | |
|---|---|
| Rate | 6.1% |
| | Owing |
| Tuesday, October 26, 2004 | 9,860,000 |
| Portion Not Assumed by Parents | 9,484,800 |
| Friday, October 31, 2008 | 1466 |
| Days in Year | 365 |
| | 4.02 |
| Interest rate for Period | 26.7% |
| Dollars of Interest | 2,528,289.02 |
| Amount Due | 12,013,089.02 |
| Payment | (960,000.00) |
| Net of Payment | 11,053,089.02 |
| Saturday, January 31, 2009 | 92 |
| Days in Year | 365 |
| | 0.25 |
| Interest rate for Period | 1.4% |
| Dollars of Interest | 151,595.73 |
| Current Amount Owed | 11,204,685 |
| | 5,602,342.38 |

January 10, 2009

Dear Mom,

I understand that my petition to appoint Martin Coleman as Trustee of the Orly Genger 1993 Trust ("Trust") has been denied. My attorneys are reviewing the decision and considering all of my options, including whether to appeal.

For now, and until further notice, it is my strong desire to retain all of the shares of Trans-Resources, Inc. ("TRI") that are currently in the Trust, and I direct you not to sell them. If you are approached, or have been approached, with an offer to purchase any of the TRI shares in the Trust, please notify me immediately. If, despite my wishes, you consider accepting an offer, do not sell any shares until I have a reasonable period of time to maximize the benefit to the Trust, including possible alternative transactions.

As you know, the Trust's TRI shares are subject to an Irrevocable Proxy, dated as of October 29, 2004, in favor of my father, Arie Genger, as well as a voting trust letter agreement with a back-up form of voting trust agreement and voting trust certificate delivered in connection with the Proxy. Copies of those documents are attached. If anyone approaches you about the TRI shares, I insist that you inform them of these facts, and provide them with a copy of this letter and attached documents.

*Olenger*    1/10/2009

Orly Genger



# COZEN
# O'CONNOR

A PROFESSIONAL CORPORATION

250 PARK AVENUE    NEW YORK, NY 10177    212.509.9400    800.437.7040    212.986.0604 FAX    www.cozen.com

May 14, 2009

**Judith E. Siegel-Baum**
Direct Phone 212.883.4902
Direct Fax    215.701.2261
jsiegel-baum@cozen.com

**VIA CERTIFIED MAIL/RETURN
RECEIPT REQUESTED
70032260000561427704
AND REGULAR MAIL**

Dalia Genger
200 East 65th Street
Apt. 32W
New York, NY 10021

Re:    Orly Genger 1993 Trust

Ms. Genger:

Please be advised that we represent Orly Genger in her capacity as beneficiary of the Orly Genger 1993 Trust (the "Trust"). You are presently serving as her sole trustee.

Orly has received no information about the assets, income and investments of the Trust and is very concerned that the assets of the Trust have been, or could be, affected by the following lawsuits: Glenclova Investment Co. v. Trans-Resources, Inc., and TPR Investment Associates, Inc. (pending in the Southern District of the State of New York); Robert Smith, TR Investors, LLC and Glenclova Investment Co. v. Trans-Resources, Inc. (pending in Delaware Chancery Court); TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC v. Arie Genger and Trans-Resources, Inc. (pending in Delaware Chancery Court); and New TR Equity, LLC v. Trans-Resources, Inc. (pending in Delaware Chancery Court). Moreover, Orly is concerned that the value of TRI shares owned by the Trust have been impacted by the sale of TRI shares owned by the Sagi Genger 1993 Trust (the "Sagi Trust") to TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC.

Please provide us with the following documents by May 26, 2009:

1.    All documents relating to the assets of the Trust from 2004 through the present.

Dalia Genger
May 14, 2009
Page 2

2.      All documents relating to any and all investments and trades made directly by, or indirectly by, the Trust for the period 2004 through the present including, without limitation, all statements of transactions.

3.      All documents relating to all purchases, sales, transfers and assignments of real or personal property directly by, or indirectly by, the Trust from 2004 through the present including, without limitation, closing statements, deeds, title reports, canceled checks, transfer tax documents, appraisals, catalogues and insurance policy riders.

4.      All documents relating to any and all distributions or payments of money or securities directly by, or indirectly by, the Trust for the period 2004 through the present.

5.      All documents relating to any and all dividends or other payments of money received directly by, or indirectly by, the Trust for the period 2004 through the present.

6.      All documents relating to any and all fees, commissions, reimbursement for expenses and other charges or compensation paid directly by, or indirectly by, the Trust for the period 2004 through the present including, without limitation, canceled checks and wire transfer reports.

7.      All documents relating to any promissory notes, accounts payable and debts and loans owed directly by, or indirectly by, the Trust for the period 1993 through the present.

8.      All U.S. and N.Y. Fiduciary Tax Returns including all back-up documents filed since the Trust's inception.

## D & K GP LLC ("D & K GP")

9.      The Trust has an interest in D & K LP ("D & K"). D & K GP is the general partner of D & K. Accordingly, we request the following documents related to D & K GP for the period 2004 through the present including, without limitation, amendments to the Limited Liability Company Agreement of D & K GP LLC, Schedule A (and amendments) to the Limited Liability Company Agreement of D & K GP LLC (i.e., a list of capital contributions made by the Members), a list of Members from 2004 through the present, subscription documents, tax returns, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes, statements of income distribution to you, the Trust, the Sagi Trust, Sagi Genger ("Sagi") and/or to any other party, records of contributions or investments by you, the Orly Trust, the Sagi Trust, Sagi and/or by any other party, cash receipts, cash disbursements journals, general ledgers, a list of employees from 2004 through the present, a list of appointed management and their compensation schedules from 2004 through the present, W-2s issued and 1099s issued.

Dalia Genger
May 14, 2009
Page 3

## D & K LP ("D & K")

10.     All documents relating to D & K for the period 2004 through the present including, without limitation, all partnership agreements and amendments, a list of capital contributions by each partner from 2004 through the present, a list of all partners from 2004 through the present, subscription documents, tax returns, K-1 statements, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes, statements of income distribution to you, the Trust, the Sagi Trust, Sagi and/or to other parties, records of contributions or investments by you, the Trust, the Sagi Trust, Sagi and/or by other parties, cash receipts, cash disbursements journals, general ledgers, a list of employees, W-2s and 1099s.

11.     All documents relating to the sale or assignment of your interest in D & K to Sagi, D & K GP, the Sagi Trust or any other party including, without limitation, the date on which the sale or assignment was made, the purchase and sale agreement (if by sale and not by assignment), transfer documents, closing documents, canceled checks and appraisals.

12.     All documents relating to the assignment of D & K's promissory note in favor of TPR (dated December 21, 1993) to David Parnes (the "Promissory Note").

## TPR Investment Assocs., Inc. ("TPR")

13.     All documents relating to TPR from 2003 though the present including, without limitation, amendments to TPR Investment Associates, Inc. Shareholders Agreement dated October 30, 2004 ("TPR Shareholder Agreement"), shareholder agreements preceding the present TPR Shareholder Agreement, tax returns, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes from all board meetings and Sale Meetings (as that term is defined in §3.3 of the TPR Shareholder Agreement), records of contributions or investments by you, the Trust, the Sagi Trust and/or Sagi, cash receipts, cash disbursements journals, balance sheets, general ledgers, a list of employees, W-2s, 1099s, statements of income distribution to you, the Trust, the Sagi Trust, Sagi and/or to any other party, a list of the board of directors from 2003 through the present and a list of appointed management from 2003 through the present and each of their compensation schedules.

14.     All verification of loan and interest repayments to and from TPR from 2004 to the present.

15.     All documents relating to the sale, assignment and collections received from David Parnes in connection with the Promissory Note.

16.     All documents relating to your sale of each tranche of TPR shares either back to TPR, to Sagi or to any other party including without limitation, a copy of the "Sale Notice" (as that term is defined in §3.3 of the TPR Shareholder Agreement), the "Evaluated Share Value" (as that term is defined in §3.3(a)(v) of the TPR Shareholder Agreement), closing documents, canceled checks and appraisals.

Dalia Genger
May 14, 2009
Page 4

---

## Trans-Resources, Inc. ("TRI")

17.     All documents relating to TRI from 2003 though the present including, without limitation, shareholder agreements and amendments, tax returns, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes from all board meetings, records of contributions or investments by you, the Trust, the Sagi Trust, Sagi and/or any other party, cash receipts, cash disbursements journals, balance sheets, general ledgers, a list of employees, W-2s, 1099s, and statements of income distribution to you, the Trust, the Sagi Trust, Sagi and/or any other party, a list of all board of director members since 2003 and a list of all appointed management since 2003 and each of their compensation schedules.

18.     The Trust owns TRI shares and as a fiduciary you should have had knowledge that the Sagi Trust sold its TRI shares on August 22, 2008 to TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC.  Provide us with all documents relating to the sale of TRI shares by the Sagi Trust.

19.     The assets of the Trust may be affected by the following lawsuits:

(i)     Glenclova Investment Co. v. Trans-Resources, Inc. and TPR Investment Associates, Inc. pending in the United States District Court, Southern District of New York;

(ii)    Robert Smith, TR Investors, LLC and Glenclova Investment Co. v. Trans-Resources, Inc. pending in the Delaware Chancery Court;

(iii)   TR Investors, LLC, Glenclova Investment Co., New TR Equity 1, LLC and New TR Equity II, LLC v. Arie Genger and Trans-Resources, Inc. pending in the Delaware Chancery Court; and

(iv)    New TR Equity, LLC v. Trans-Resources, Inc., pending in the Delaware Chancery Court.

Accordingly, as trustee provide us with copies of documents relating to the above-set-forth proceedings including, without limitation, the pleadings (i.e., the summons, complaint and all motion papers) and correspondence.

20.     All documents related to TRI shares that were issued to the Trust and are being held by Robert Lack, Esq., Friedman Kaplan Seiler & Adleman LLP, 1633 Broadway, New York, New York 10019.

The term "documents" as used above shall mean the original or duplicate copy or draft(s) of any writing or recording of whatever nature, whether written, typed, printed, photocopied, filmed, videotaped or mechanically or electronically sorted or recorded, which is in your possession, custody or control.  Moreover, the term "documents"  shall include, without limitation, correspondence, e-mails, memoranda, reports, notes, minutes, or records, or telephone conversations, meetings, or conferences, diaries, logs, calendar notes, accounting records, financial statements, books of account, vouchers, invoices, bills, computer tapes, print-outs,

Dalia Genger
May 14, 2009
Page 5

writings, drawings, graphs, charts, photographs, videotape recordings, data compilations from which information can be obtained or translated.

If we do not receive a reply with the information requested on or before May 28, 2009, we will be forced to seek court intervention.

Sincerely,

COZEN O'CONNOR

By:    Judith E. Siegel-Baum

JES:pw
cc:    Orly Genger
       Jonathan G. Kortmansky, Esq.

# PEDOWITZ & MEISTER, LLP

1501 BROADWAY, SUITE 800
NEW YORK, NEW YORK 10036-5501
www.pedowitzmeister.com

212.403.7330 voice
212.354.6614 facsimile
robert.meister@pedowitzmeister.com

June 1, 2009

ARNOLD H. PEDOWITZ
ROBERT A. MEISTER

DAVID HARRISON
RANDI MELNICK

NEW JERSEY OFFICE

285 OLD SHORT HILLS ROAD
SHORT HILLS, N.J. 07078
(973) 912-0005

**EMAIL AND UPS**

Judith E. Siegel-Baum, Esq.
Cozen & Worcester
250 Park Avenue
New York, NY 10177

    Re:    <u>Orly Genger 1993 Trust</u>

Dear Ms. Siegel-Baum:

    I write to respond to your May 14th letter to my client, Dalia Genger in her capacity as Trustee of The 1993 Orly Genger Trust (the Trust).

    May I start by expressing Mrs. Genger's understanding about the concern that your client, Orly Genger, has about the effect her interests of the various lawsuits your letter mentions. Mrs. Genger has the same concern, particularly since, as we understand it, the *Glenclova* action raises the issue of whether the transfer to the Trust of shares of Trans-Resources, Inc. (TRI) was invalid under the TRI shareholders' agreement.

    Having shared that concern, I would like to respond to your letter in narrative form, rather that in the form a response to a litigation demand for production.

    All TRI shares are, I am informed, held for the benefit of the shareholders by TRI. Thus Mrs. Genger does not physically possess a share certificate. I am informed that the absence of such a certificate did not prevent The Sagi Genger Trust from selling the shares it was given.

    As your client knows, Mrs. Genger became Trustee January 4, 2008, as successor trustee to Leah Fang. Ms. Fang has an accounting pending in Surrogate's Court, New York County, File No. 0017/2008.

    Mrs. Genger has not taken any action as Trustee and has not received any dividends or other property or assets in respect of the TRI shares.

    As your client knows, D & K LP pledged its 240 shares of the stock of TPR Investment Associates, Inc. (TPR) to secure its December 21, 1993 Note to TPR in the principal amount of

$8,950,000. I believe that your client has the D&K organization papers; if not I'll be glad to copy them for you at your expense, as they're about an inch think. By notice dated 8/31/2008, TPR declared that Note to be in default and subsequently sold the TPR shares for $2,200,000 on February 27, 2009. I attach papers concerning this transaction.

As a result of the foreclosure, the TRI shares are the Trust's only asset.

To date, Mrs. Genger has not filed and fiduciary tax returns, nor submitted any of her expenses for reimbursement by the Trust nor taken any commissions.

Sincerely,

Robert A. Meister

2

# NOTICE OF DEFAULT & ENFORCEMENT of PLEDGE

**To:**      Sagi Genger, D&K LP General Manager

**From:**    Yonit Sternberg, TPR Investment Associates, Secretary

**Date:**    8/31/2008

**Re:**      Notice of Default and Liquidation of Collateral

---

Please be advised that you are in default in the payment of amounts due under that certain Promissory Note dated December 21, 1993 in the original amount of $8,950,000(the "Note") due to the failure to pay any principal or interest due since 2005 and failing to make regular payments since 2000. Such default has continued for more than ten (10) business days. Please be advised that pursuant to the Note we hereby declare that the entire unpaid principal amount of the Note immediately due and payable.

The shares of TPR Investment Associates pledged to TPR as collateral will be liquidated at a public auction if the full Note is not satisfied.

Sagi Genger - TPR Investment Associates, Inc.

CONFIDENTIAL

1

TO:        D&K LIMITED PARTNERSHIP

FROM:    TPR INVESTMENT ASSOCIATES, INC.

        New York, New York
        Tel: 212-729-5076

---

We will sell all of your 240 shares of common Stock of TPR Investment Associates, Inc. to the highest qualified bidder in public as follows:

Date:        Friday, February 27, 2009

Time:        2:00 p.m.

Place:       Offices of McLaughlin & Stern, LLP, 260 Madison Avenue, 20th Floor, New York, NY 10016

You are entitled to an accounting of the unpaid indebtedness secured by the property we intend to sell. You may request an accounting by calling us at 212-729-5076.

The money that we get from the sale (after paying our costs) will reduce the amount you owe. If we get less money than you owe, you will still owe us the difference. If we get more money than you owe, you will get the extra money, unless we must pay it to someone else.

You can get the property back at any time before we sell it by paying us the full amount you owe (not just the past due payments), including our expenses. To learn the exact amount you must pay, call us at 212-729-5076.

If you want us to explain in writing how we have figured the amount that you owe us, you may call us at 212-729-5076 or write us at _____ and request a written explanation.

If you need more information about the sale, call us at 212-729-5076 or write us at _____.

# CERTIFICATE of SALE and FACT

**Know all men by these presents:** That by virtue of a default in the payment of certain

monies due, and pursuant to the terms of a certain Security Agreement dated 12 / 21 / 93

placed in my hands for execution and foreclosure made by:

D + K Limited Partnership _____ (Borrower)

to TPR Investment Associates, Inc. _____ (Secured Party)

The Secured Party did on the 27 day of Feb. , 2009 in the manner provided by

statute, sell at Public Auction by WILLIAM MANNION, Auctioneer, all the borrower(s) right, title

and interest, in and to the collateral consisting of 240 shares of Capital Stock ~~and the~~

~~appurtenant Proprietary Lease allocated to Apartment No. _____ in the building known as~~

~~and located at:~~ of TPR Investment Associates, Inc

And sold unto TPR Investment Associates, Inc.

of _____

for the sum of $ 2,200,000. — , they being the highest bidder in accordance with the Terms.

of Sale which were available to all bidders.

That public notice of sale was given prior to its taking place and was duly advertised. This

Auction Sale was held at:

McLaughlin + Stern, 200 Madison Ave, NY, NY

✓ Sold to the Secured Party, no money exchanged hands except for the

auctioneer's fees and expenses of the sale.

— The sum of $ _____ ~~of the bid price was paid to the Attorney's for the~~

~~Secured Party as a down payment.~~

IN WITNESS WHEREOF, I have hereunto set my hand on the 27th day of

February , 2009.

_____

**William Mannion, Auctioneer**

2:00
MADISON

Feb. 27, 2009

Steve Rapoport
McLaughlin+Stern

2:00 PM  TPR Secured
2,200,000

r  Robert M. Weiss, partner
McLaughlin + Stern LLP

y  Sagi  Genger

y  Robert  Simensky

# SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

### HON. PAUL G. FEINMAN

PRESENT: _____                    PART __12__

_____ *Justice*

                                                      INDEX NO. __109749/09E__

_v_                                                   MOTION DATE _____

                                                      MOTION SEQ. NO. __001__

                                                      MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|                                                                      | PAPERS NUMBERED |
|----------------------------------------------------------------------|-----------------|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ...     | _____ |
| Answering Affidavits — Exhibits _____             | _____ |
| Replying Affidavits _____                        | _____ |

**Cross-Motion:**  ☐ Yes  ☐ No

Upon the foregoing papers, it is ordered that this motion

MOTION IS ~~AND CROSS-MOTION ARE~~ DECIDED
IN ACCORDANCE WITH ANNEXED DECISION AND ORDER.

Dated: __6/28/10__  6:05 pm                          _____
                                                                    J.S.C.

*(left margin, vertical)* MOTION/CASH IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

Check one:  ☐ **FINAL DISPOSITION**   ☑ **NON-FINAL DISPOSITION**

Check if appropriate:  **DO NOT POST**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: CIVIL TERM: PART 12
-------------------------------------------------------------------X
ORLY GENGER, in her individual capacity and on
behalf of the Orly Genger 1993 Trust (both in its

individual capacity and on behalf of D & K
Limited Partnership),
                        Plaintiff,

                against

DALIA GENGER, SAGI GENGER, D & K GP
LLC, and TPR INVESTMENT ASSOCIATES,
INC.,
                        Defendants.
-------------------------------------------------------------------X

Index No.        109749/2009
Mot. Seq. Nos.   001 through
                 006

**DECISION AND ORDER**

**For the Plaintiff:**
Zeichner Ellman & Krause LLP
575 Lexington Avenue
New York, NY 10022
(212) 223-0400

**For Dalia Genger:**
Pedowitz & Meister LLP
1501 Broadway
New York, NY 10036
(212) 403-7330

**For Sagi Genger:**
McLaughlin & Stern, LLP
260 Madison Avenue
New York, NY 10016
(212) 448-1100

**For D&K GP, LLC:**
Finkelstein Newman Ferrara LLP
225 Broadway
New York, NY 10007

**For TPR:**
Lyons McGovern, LLP
The Hennessy House
16 New Broadway
Sleepy Hollow, NY 10591
(914) 631-1336

E-filed papers considered in review of this motion brought by order to show cause for a preliminary injunction, motions for summary judgment, and motion to amend:

| | Papers: | E-File Number: |
|---|---|---|
| Seq. No. 001 | Order to Show Cause & TRO, Exhibits, Memo of Law in Support | 6 , 7, 7-1, 9 |
| | Affidavit & Affirmation in Opposition, Exhibits, Memo of Law | 35, 35-1 - 35-8, 36, 37 |
| | Affidavit & Affirmation in Opposition, Memo of Law, Exhibit | 38, 39, 40, 40-1 |
| Seq. No. 002 | Notice of Motion, Affirmations, Exhibits | 12, 13, 13-1 - 13-6, 18, 18-1 - 18-9 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52 |
| | Reply Memo of Law (Dalia Genger) | 61 |
| | Reply Memo of Law | 65 |
| Seq. No. 003 | Notice of Motion, Affirmation, Exhibits, Memo of Law | 15, 16, 16-1 - 16-9, 19 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 53 |
| | Memo of Law in Reply, Affirmation, Exhibit | 59, 60, 60-1 |
| | Reply Affirmation, Exhibits, Memo of Law | 62, 62-1, 64 |
| Seq. No. 004 | Notice of Motion, Affirmation, Memo of Law, Exhibits | 20, 21, 22, 22-1 - 22-8 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 54 |
| Seq. No. 005 | Notice of Motion, Affirmation, Memo of Law, Exhibits | 27, 28, 29, 29-1 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 55 |
| Seq. No. 006 | Notice of Motion, Affirmation, Exhibits | 45, 46, 46-1 - 46-7 |
| | Affirmation in Opp., Memo of Law, Exhibits | 47, 48, 48-1 - 48-2 |

1

| Affirmation in Reply & Opp | 49 |
| Affirmation in Opposition | 50 |
| Memo of Law in Reply | 51 |
| Affirmation in Opposition, Memo of Law, Exhibits | 56, 57, 57-1 - 57-2 |
| Memo of Law in Reply | 58 |
| Transcript of Oral Argument | 69 |

## PAUL G. FEINMAN, J.:

The motions bearing sequence numbers 001 through 006 are consolidated for the purpose of decision.

In motion sequence number 001, plaintiff moves by order to show cause for a preliminary injunction and a temporary order restraining defendants from removing from the State or otherwise disturbing shares of D&K Limited Partnership's 48 percent ownership interest in the common stock of TPR Investment Associates, until there is a judicial determination as to who owns these closely held family shares.[1] At oral argument, the court continued the TRO pending determination of these motions.

In motion sequence numbers 002 through 005, each of the defendants originally moved to dismiss the complaint on various grounds. By interim order dated October 21, 2009, these motions were converted pursuant to CPLR 3211 ( c) to motions for summary judgment (Doc. 41, 42, 43, 44).[2]

In motion sequence number 006, plaintiff moves for leave to amend the complaint and submits a proposed amended verified complaint containing additional allegations and naming an additional defendant.

---

[1] Under the terms of the original TRO signed at the time of the signing of the Order to Show Cause, defendants and their agents are stayed from removing or disposing in any manner the shares at issue. Plaintiff was directed to provide an undertaking in the amount of $150,000.

[2] Documents and exhibits are referred herein by their designated e-filing document number in the New York State Court's E-Filing System.

2

All the motions are opposed.

For the reasons set forth below, the motion for a preliminary injunction is granted ; the

motions by defendants for summary judgment are each granted in part and otherwise denied, and

the motion to amend the complaint is granted to the extent indicated.

### *Background*

The litigants are members of a nuclear family and certain of their family-owned

corporations and companies.  The central issue concerns the intent behind the signing of a

promissory note and pledge agreement in December 1993, executed as part of estate planning

tools of the parents of plaintiff Orly Genger and her brother, Sagi Genger, one of the defendants.

Plaintiff contends that the note and pledge agreement were part of an entire estate planning

scheme by which plaintiff's father, Arie Genger, and plaintiff's mother Dalia Genger, planned to

provide for their two children, plaintiff and defendant Sagi Genger, with the greatest amount of

funding possible and with minimum tax consequences.  Arie and Dalia Genger were divorced in

2004 and the gravamen of this complaint is that in the years following the divorce, plaintiff's

mother and brother have deliberately not adhered to the intent behind the promissory note and

pledge, and have schemed to seize control of some of the family's closely held companies.

Their schemes have been to the detriment of one of the entities, the D&K Limited Partnership,

an entity partially owned by the Orly Genger 1993 Trust, and for the benefit of Sagi Genger and

for defendant TPR Investment Associates, on which Sagi and Dalia Genger serve as the

directors, and of which Sagi Genger is chief executive officer.  Among the other relief sought by

plaintiff is an injunction restraining further actions that would irreparably harm D&K Ltd.

Partnership's ability to recover its interest in the shares originally held by it, that defendants be

denied any ability to further erode the holdings of the Orly Genger 1993 Trust, and that shares

3

already sold be returned to the ownership of the Ltd. Partnership.

Plaintiff argues, and none of the defendants dispute her, that as beneficiary of the Orly

Genger 1993 Trust, she has a right to assert causes of action on behalf of the trust, citing *Velez v*

*Feinstein*, 87 AD2d 309 (1st Dept. 1982) (where trustee has failed to enforce a claim on behalf of

the trust, the beneficiary may do so). She further argues that as the Orly Genger 1993 Trust is a

limited partner of D&K Ltd. Partnership, she has the right to assert causes of action on behalf of

the Partnership as against TPR Investment and the other defendants, citing among other cases,

*CCG Assoc. I v Riverside Assoc.*, 157 AD2d 435, 442 (1st Dept. 1990) ("[t]he right of a limited

partner to bring an action on behalf of the partnership to enforce a right belonging to the

partnership is beyond dispute") (Pl Memo of Law [Doc. 9:4] p. 1 n. 1).[3] Defendants' arguments

in opposition are not persuasive.

According to the verified complaint (Doc. 7-1), plaintiff and her brother Sagi are

individually beneficiaries of irrevocable trusts established in 1993 by their parents. Each trust

was funded with a $600,000 gift. As established, the Orly Genger Trust and the Sagi Genger

Trust together owned 96 percent in defendant D&K Ltd. Partnership, a family-owned limited

partnership. Dalia Genger held the remaining four percent interest, and acted as the general

manager. Defendant TPR Investment Associates, Inc. is a corporation founded by plaintiff's

father, Arie Genger who originally was the sole shareholder, and serves as a holding company

for the family's interests. Sagi Genger is presently Chief Executive Officer and a member of the

board. Prior to 1993, TPR Investment held a majority interest in non-party Trans-Resources,

---

[3]Unless otherwise noted, all factual allegations are taken from plaintiff's verified complaint
(Doc. 7-1).

4

Inc., a closely held private corporation.[4]

Around the time the two trusts were funded in 1993, D&K Ltd. Partnership purchased 240 shares of common stock, comprising 49 percent of all shares, in TPR Investment for $10,200,000. The Orly and Sagi Trusts each paid $600,000, Dalia Genger paid $50,000, and D&K Ltd. Partnership executed a promissory note dated December 21, 1993 for $8,950,000, in satisfaction of the balance (Ver. Compl. [Doc. 7-1] ¶ 16, citing attached Ex. 1 [eFile Doc. 7-1:49 *et seq.*]). The note was signed by Dalia Genger as General Partner of D&K Ltd. Partnership. The note required that D&K Ltd. Partnership repay principal and accrued interest in annual installments over a ten-year period. Both trusts, and Dalia Genger, assumed proportional liability for repayment. The note was secured with a Pledge Agreement dated December 21, 1993, signed by Dalia Genger, in which D&K Ltd. Partnership pledged its 240 TPR Investment shares as collateral for repayment of the note (Ver. Compl. [Doc. 7-1] ¶ 18) According to the September 6, 2007, testimony of Sagi Genger in the arbitration proceeding concerning his parents' divorce, the purpose of the note was "[e]ssentially an estate planning tool, to transfer wealth," with the intent to minimize taxes owed by the family members (Doc. 46-5:150-152 [S. Genger EBT, pp. 366, 368]). As a result of the purchase by D&K Ltd. Partnership of TPR Investment stock, the Orly and Sagi trusts each acquired 23.52 percent indirect interest in TPR Investment, and Dalia acquired a 1.96 percent indirect interest. Arie Genger retained 51 percent ownership.

As alleged in the complaint, each member of the family understood and agreed, in the

---

[4]Trans-Resources is the parent company of several subsidiaries that provide growers with specialty fertilizer and industrial chemicals, and is one of the two largest produces of potassium nitrate in the world (Ver. Compl. [Doc. 7-1] ¶ 12).

5

"desire to ensure equal wealth transfer to Sagi and Orly and with the estate-planning purposes underlying the creation of the Trusts and D&K [Ltd. Partnership]'s purchase of the TPR shares," that the note and Pledge Agreement "would never be enforced by any of them" (Ver. Compl. [Doc. 7-1] ¶ 20). Sagi in particular was charged with ensuring that the promissory note and Pledge Agreement would not be enforced and, in the first years, took "specific steps to fulfill that charge," an example of which follows here (Ver. Compl. [Doc. 7-1] ¶ 20).

D&K Ltd. Partnership made payments on the note until 1999 and then ceased. In November 2002, TPR Investment sent a letter to D&K Ltd. Partnership seeking payment of the past due principal and interest (Doc. 29-1:77-78]). Sagi Genger, TPR's CEO, explained during his testimony in the above-mentioned arbitration proceeding that this November 2002 letter was merely "pro forma," and that there was no intent to collect on the note (Doc. 46-5:153 [S. Genger EBT, p. 370]).

In October 2004, Dalia and Arie Genger were divorced, resulting in certain changes to the ownership of certain family entities, memorialized in the Stipulation and Agreement of Settlement, dated October 26, 2004 (Ver. Compl. [Doc. 7-1] ¶ 22, citing Ex. 2 [Doc. 7-1:66 *et seq.*]). In particular, Dalia received sole ownership of Arie Genger's 250 shares of TPR Investment, the Trans-Resources shares were redistributed such that Dalia Genger owned no shares in that company, and Arie Genger was granted a lifetime voting proxy over the family Trans-Resources shares (Stipulation pp. 5, 8-14 [Doc. 7-1:71, 73-80]). The Stipulation and Agreement of Settlement gave Sagi Genger "full and complete authority" to sell non-liquid assets and distribute them as he saw fit, subject to his fiduciary duties to effectuate the intent of the parties entering the Agreement (Stipulation p. 7 [Doc. 7-1:73]). However, the net proceeds were to be distributed so as to minimally fund a "basic escrow account" after which monies were

6

to go to TPR Investment "in satisfaction of the parties' indebtedness" (Stipulation p. 8 [Doc. 7-1:74]).

Despite the changes, both the Orly and Sagi trusts continued to have equal ownership interests in Trans-Resources shares as well as in the TPR Investment shares owned by D&K Ltd. Partnership (Ver. Compl. [Doc. 7-1] ¶ 23).

Also on October 26, 2004, TPR Investment, Arie Genger, and Dalia Genger signed an Assumption Agreement which acknowledged the promissory note's existence and noted that at that juncture, approximately $9,980,000, inclusive of interest, was owed by D&K Ltd. Partnership to TPR Investment (Doc. 22-4).

In addition, also on the same date, Sagi and Dalia Genger formed D&K GP LLC to serve as the general partner for D&K Ltd. Partnership (Pl. Mot. 001, Ex. 5 ¶ 5 [Doc. 7-1:151]). Under the agreement, Dalia Genger transferred her general partnership interest in D&K Ltd. Partnership, in exchange for a 99 percent interest in D&K GP; Sagi Genger was granted power to select the manager. Accordingly, D&K GP LLC now held a four percent interest in D&K Ltd. Partnership.

Plaintiff alleges that in the years subsequent to the divorce, Dalia Genger has sought, in collusion with her son Sagi Genger, to "destroy" her former husband financially, and their actions have threatened to destroy plaintiff financially as well (Ver. Compl.[Doc. 7-1] ¶ 25). Thus, when Dalia in effect ceded her control over D&K Ltd. Partnership to Sagi, the restructuring left only the two trusts liable to TPR Investment for repayment of the promissory note (Ver. Compl.[Doc. 7-1] ¶ 27). In August 2006, Sagi Genger on behalf of TPR Investment,

7

assigned the promissory note to David Parnes,[5] but stated in writing to Parnes that "D&K LP and

its partners have a variety of claims against TPR, and deny the enforceability of the Note." (Ver.

Compl. [Doc. 7-1] ¶ 47, citing Ex. 8 [Doc. 7-1:179-*et seq.*]). In 2007, Sagi Genger allegedly

stripped Dalia Genger of her majority interest in TPR Investment by selling an interest to his

mother-in-law, Rochelle Fang (Ver. Compl. [Doc. 7-1] ¶ 32). In late 2007 or early 2008, Dalia

Genger divested herself of the balance of her TPR Investment shares, leaving Sagi Genger in

direct control of TPR Investment and its interest in the promissory note (Ver. Compl. [Doc. 7-1]

¶ 33). As a result, Sagi Genger in essence now wore two hats, as CEO of TPR Investment, the

creditor of the note, and as manager of D&K Ltd. Partnership, the debtor on the note (Ver.

Compl. [Doc. 7-1] ¶ 34).

In November 2007, Sagi Genger and Leah Fang executed an "Amended and Restated

Limited Partnership Agreement of D&K Limited Partnership," permitting D&K GP to

"mortgage, hypothecate, pledge, create a security interest in or lien upon, or otherwise encumber

the L[imited] P[artner] TRI Interests, for the benefit of the Partnership (Doc. 46-5:218). The

document was signed by Sagi Genger, managing member of D&K GP LLC, the General Partner,

and Leah Fang, as sole trustee for both the Sagi Genger 1993 Trust and the Orly Genger 1993

Trust, the Limited Partners (Doc. 46-5:223). Plaintiff only learned of this document's existence

in 2009.

In January 2008, Dalia Genger was appointed successor trustee to the Orly Genger 1993

Trust (Ver. Compl. [Doc. 7-1] ¶ 39). She succeeded several other individuals, including two

---

[5] Parnes is a former trustee of the Orly Genger 1993 Trust, the present trustee of the Sagi Genger
1993 Trust, an officer of TPR Investment and director of Trans-Resources (Ver. Compl. [Doc. 7-
1] ¶ 46). Parnes testified during the arbitration proceeding that the purpose of the transfer of the
note to him was to prevent collection by any others (*Id.*).

long-term friends of her son's and her son's sister-in-law. As trustee, Dalia has "complete control over the assets of the Orly Trust, including its ownership interests in TPR (through D&K) and TRI" (Ver. Compl. [Doc. 7-1] ¶ 41).

In 2008, TPR Investment, through CEO Sagi Genger, reclaimed the promissory note from Parnes, and in August 2008, notified D&K Ltd. Partnership's general manager (Sagi Genger), that it was in default under the note and that if it failed to satisfy the full terms of the note, its shares would be sold at public auction (Ver. Compl. [Doc. 7-1] ¶ 52, citing Ex. 10 [Doc. 7-1:185-186]). As the payment was not made, D&K Ltd. Partnership was informed by TPR Investment that the latter would sell the former's 240 shares of common stock in TPR Investment to the highest qualified bidder on February 27, 2009 (Ver. Compl., Ex. 11 [Doc. 7-1:187-188]). Notice was not provided to either of the trusts, but was published in THE NEW YORK POST in October 2008 and again in February 2009 (Ver. Compl. [Doc. 7-1] ¶¶ 52-53, citing Ex. 12 [Doc. 7-1:189-191]).

On January 31, 2009, the general partner of D&K Ltd. Partnership, that is to say D&K GP, and the limited partners, the Sagi and Orly trusts, and TPR Investment, memorialized a document called "Meeting of Partners of D&K LP - Jan. 31, 2009 & Agreement," in which it was agreed that D&K GP could sign for the Limited Partnership and for each individual partner when making the limited partners' assets subject to a pledge (Doc. 22-4:17-18).[6] This same agreement included the promise of TPR Investment that it would "refrain from enforcing the

_____

[6]Plaintiff alleges she first learned of this agreement only when the documents were provided as part of defendants' papers submitted in their motions to dismiss (Am. Ver. Compl.[Doc. 46-4] ¶ 94).

9

note against each limited partner for thirty days." (*Id.* [Doc. 22-4:18] ¶ 8).[7]

The note was foreclosed upon on February 27, 2009, less than the 30 days indicated in the Agreement date, and D&K Ltd. Partnership's 240 shares of TPR Investment were purchased back by TPR, decreasing the obligations of D&K Ltd. Partnership under the promissory note, and leaving a balance of approximately $8.8 million that continues to be guaranteed by the Orly and Sagi trusts (Ver. Compl. [Doc. 7-1] ¶ 57, citing Ex. 13 [Doc. 7-1:192-194]).   Plaintiff and her attorney only learned in early June 2009 that the note had been foreclosed and that the pledged shares had been sold back to the company (Ver. Compl. [Doc. 7-1] ¶ 65).  Plaintiff has made a written demand that TPR Investment return the pledged shares to D&K Ltd. Partnership, but TPR has declined to comply (Ver. Compl. [Doc. 7-1] ¶ 69, citing Ex. 20 [Doc. 7-1:225-227]).

Also in August 2008, Rochelle Fang, as trustee of the Sagi Genger 1993 Trust, and Sagi Genger, sold that trust's interest in Trans-Resources to another group (named "Trump"), which sale divested Arie Genger from control and put the company in the control of the Trump group (Ver. Compl. [Doc. 7-1] ¶ 60, citing Ex.14 [Doc. 7-1:195-207]).  The validity of this sale is under challenge in Delaware Chancery Court, although plaintiff Orly Genger has not joined in that action (Ver. Compl. [Doc. 7-1] ¶ 61).

After this purported sale of the Sagi Genger Trust's shares of Trans-Resources, plaintiff feared her trust's shares would not be protected from sale. She requested in writing from her mother as trustee in January 2009 and again in June 2009 that the Orly Genger 1993 Trust retain all of its shares of Trans-Resources and that they not be sold, but Dalia Genger has refused to

---

[7]The copy of the document e-filed with the court is not clear enough to discern who signed on behalf of the trusts, although presumably it was Dalia Genger, or on behalf of TPR Investment.

10

agree, or even to respond (Ver. Compl. [Doc. 7-1] ¶¶ 63, 66, citing Ex. 15, 16 [Doc. 7-1:208-215]). Plaintiff, who had brought a proceeding in Surrogate's Court to remove her mother as trustee at the time of her appointment in January 2008, an application which was denied as being premature (Ver. Compl. [Doc. 7-1] ¶¶ 39-40), brought a second application on June 22, 2009, seeking to enjoin Dalia Genger or her agents from doing anything to affect the Orly Genger 1993 Trust's Trans-Resources shares, to remove Dalia as trustee and appoint another in her stead based on breach of fiduciary duties, and for a surcharge for damages (Ver. Compl.[Doc. 7-1] ¶ 67). At this juncture, the Surrogate's Court has ordered that Dalia Genger provide at least 10 days notice before disposing of any of the trust's Trans-Resources shares (Ver. Compl.[Doc. 7-1] ¶ 68, citing Ex.19 [Doc. 7-1:222- 224]).

Plaintiff contends that Dalia Genger has failed to act in the best interests of the Orly Genger 1993 Trust, that Sagi Genger has acted in a self-dealing manner and together with Dalia Genger has undermined the estate plans that intended for both children to benefit equally from the family's wealth (Ver. Compl. [Doc. 7-1] ¶ 58). Plaintiff fears that through defendants' continued scheming, the Orly Genger 1993 Trust's one remaining asset, its ownership of the Trans-Resources shares, will also be wrongly divested (Ver. Compl. [Doc. 7-1] ¶ 59).

The verified complaint alleged 16 causes of action against the various defendants, including replevin of the shares from TPR Investment back to D&K Ltd. Partnership, and a request for a preliminary injunction.

As stated above, defendants each submitted pre-answer motions to dismiss which, after notice by the Court, have been converted to motions for summary judgment pursuant to CPLR 3211 ( c). Subsequent to the filing by defendants of their motions, plaintiff moved to amend her complaint "to address, among other things," the defendants' "scheme regarding the Orly Trust's

11

TRI Shares," and the involvement in the scheme of Leah Fang, the proposed additional

defendant (Pl. Mot. 006, Ex. D, Part 1, Proposed First Am. Ver. Compl., [Doc. 46-4] ¶ 95). The

proposed first amended verified complaint contains an additional four causes of action, two

against Leah Fang, and two seeking additional declaratory relief, and amends certain of the

original causes of action to include the new allegations and those against Leah Fang.

### *Legal Analysis*

For convenience, the motion to amend will be addressed first, and then the preliminary

injunction, followed by the motions to dismiss. Because the motion to amend the complaint is

granted, the remainder of this decision addresses the claims as alleged in the amended complaint.

A.      Motion to Amend the Verified Complaint (Sequence Number 006)

Leave to amend pleadings is to be freely given upon terms that may be just (CPLR 3025

[b]). In addition, CPLR 3025 (a) permits any party to amend a pleading once, without court

permission provided it is done under one of the following circumstances: within 20 days of the

service of the original pleading; at any time before the period for responding to it has expired, or

within 20 days after the service of a responsive pleading. Plaintiff proffers a proposed amended

complaint to add a new defendant and new causes of action (Doc 46-4).

Contrary to defendants' arguments, case law holds that where a defendant has not

answered the complaint but instead interposed a motion to dismiss, as was done here, the

plaintiff may amend her complaint once as of right, because defendants, by making pre-answer

motions, have extended their time to answer (*see, Johnson v Spence*, 286 AD2d 481 [2d Dept.

2001]; *STS Mgt. Dev., Inc. v New York State Dept. of Taxation & Fin.*, 254 AD2d 409 [2d Dept.

2001]; *Miller v General Motors Corp.*, 99 AD2d 454 [1st Dept. 1984], *aff'd* 64 NY2d 1081

[1985]). Although defendants oppose, plaintiff is entitled to serve and file her amended

12

complaint without review by the court, although the rulings below on defendants' motions shall

refine the scope of the proposed amended complaint and require her to file and serve a second

amended complaint. Defendants' arguments in opposition, including that there is another action

pending, can be pled as affirmative defenses. Plaintiff's motion to amend her complaint is thus

granted to the extent indicated.

B.    <u>Motion for Preliminary Injunction (Sequence Number 001)</u>

Among the purposes of a preliminary injunction are maintaining the status quo and

preventing irreparable injury to a party (*see, e.g., Ma v Lien*, 198 AD2d 186 [1st Dept. 1993], *lv*

*dismissed* 83 NY2d 847 [1994]). To prevail, the party seeking injunctive relief must

demonstrate a likelihood of success on the merits; that it will suffer irreparable injury if the relief

is not granted; and that the equities balance in its favor (*Aetna Ins. Co. v Capasso*, 75 NY2d 860,

862 [1990]). A preliminary injunction should generally not be granted where there are issues of

fact (*Lincoln Plaza Tenants Corp. v MDS Properties Dev. Corp.*, 169 AD2d 509 [1st Dept.

1991]; *but see Ma v Lien, supra* at 187 ["even where the facts are in dispute, the nisi prius court

can find that a plaintiff has a likelihood of success on the merits, from the evidence presented"]).

If money damages are an adequate remedy, irreparable harm does not exist and injunctive relief

should be denied (*Sterling Fifth Assoc. v Carpentille Corp., Inc.*, 5 AD3d 328, 330 [1st Dept.

2004]).

Plaintiff argues that the shares of Ltd. Partnership are unique chattel as contemplated by

CPLR 7109, and that accordingly the court should grant a preliminary injunction restraining

defendants from disposing of the shares until order of the court. She argues that the D&K Ltd.

Partnership shares are unique because they are shares of a closely held family company which

represents an ownership in another closely held family company, TPR Investment, and that their

value is dependent, at least in part, on the outcome of the family litigation currently before the Delaware Chancery Court concerning Trans-Resources (Pl. Memo of Law, 5-6 [Doc. 9:8-9]).

Under CPLR 7109, where the chattel is unique, the court may grant a preliminary injunction or temporary restraining order that it may not be transferred, sold, pledged, assigned or otherwise disposed of until the court orders (CPLR 7109 [a]). Defendants argue that the shares are in essence fungible, and that if appropriate, money damages would fully compensate plaintiff (TPR [S. Genger] Aff. in Opp. [Doc. 39] ¶ 6). Sagi Genger avers that the "TPR shares are currently not for sale and there is no intention to sell them at this time or in the near future." (S. Genger Aff. in Opp. [Doc. 35] ¶ 5]). He makes no statements concerning the TRI shares. Plaintiff's argument, however, is that her parents never meant for the promissory note to be enforced, but rather that the trust funds remain intact for the two children. The recent actions taken by defendants concerning the promissory note which have negatively impacted the Orly Genger 1993 Trust, and the sale of the Trans-Resources shares belonging to the Sagi Genger 1993 Trust, possibly foretell defendants' plans to sell her trust's shares of Trans-Resources and thus she seeks court intervention to prevent further dissipation of the trust.

The granting of a preliminary injunction is a discretionary remedy (*Ross v Schenectady*, 259 App. Div. 774, 774 [3d Dept. 1940]; *Dabrinsky v Seagate Assn.*, 239 NY 321 [1925]). Here, where the family shares at issue are intertwined among various family entities, defendants have not offered sufficient evidence to show that the shares of either TPR Investment or Trans-Resources owned by the Orly Genger 1993 Trust are not "unique" and should not be protected from transfer, sale, or assignment until this litigation is ultimately decided. In addition, given that defendant Sagi Genger states there is no immediate plan to sell or otherwise dispose of the TPR Investment shares, an injunction is not likely to cause much harm to defendants. The

14

balance of equities therefore lies in favor of plaintiff. Accordingly, the motion for a preliminary

injunction is granted.

### *Motions for Summary Judgment*

The proponent of a summary judgment motion must make a prima facie showing of

entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any

material issues of fact from the case (*Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [

]). Evidentiary proof must be submitted in admissible form (*Zuckerman v City of N.Y.*, 49

NY2d 557, 562 [1980]). Parties in opposition must submit "evidentiary facts or materials, by

affidavit or otherwise ... demonstrating the existence of a triable issue of ultimate fact."

(*Tortorello v Carlin*, 260 AD2d 201, 204 [1st Dept. 1999]). "Issue finding and not issue

resolving" is the proper role of the court in deciding such motions (*Winegrad, supra*, at 853).

Regardless of the sufficiency of the opposing papers, in the absence of admissible evidence

sufficient to preclude any material issue of fact, summary judgment is unavailable (*Alvarez v

Prospect Hosp.*, 68 NY2d 320, 324 [1986]).

None of the converted motions for summary judgment contains first-person affidavits,

and all rely upon documentary evidence and the pleadings for the bases of their motions.

Although plaintiff objects to the lack of first-person affidavits, the converted motions are

nonetheless considered by the court and decided on their merits.

Plaintiff argues that all of the motions should be preemptively denied based on the

doctrines of issue preclusion and judicial estoppel, pointing to the testimony and evidence

presented at the arbitration which resulted in the May 6, 2008, award entitled *Dalia Genger v

Arie Genger*, Case No. 13 170 Y 00996 07 (American Arbitration Assn., Commercial

Arbitration Tribunal, NYC). (Doc. 46-5:131 *et seq.*]). The doctrine of issue preclusion serves

15

to bar a party from "relitigating in a subsequent action or proceeding an issue that was raised in a

prior action or proceeding and decided against that party or those in privity, whether or not the

tribunals or causes of action are the same" (*Ryan v New York Tel. Co.*, 62 NY2d 494, 500

[1984]; *see also, Parker v Blauvelt Volunteer Fire Co.*, 93 NY2d 343, 349 [1999]).  The doctrine

of judicial estoppel prohibits a party that has assumed a certain position in a prior legal

proceeding and secured a judgment in its favor, from assuming a contrary position in another

action simply because the party's interests have changed (*City of N.Y. v College Point Sports

Assn., Inc.*, 61 AD3d 33, 44 n. 1 [2d Dept. 2009], citations omitted).  Notably, of course, the

arbitration concerned issues arising from the divorce of plaintiff's parents, and determined,

among other questions, that the promissory note could not be enforced by either parent as against

each other.  This is not the issue raised by plaintiff in her litigation.  Additionally, because the

testimony by Sagi Genger, Dalia Genger, and others in that arbitration was offered to answer the

questions of whether the note was enforceable, and its value, *as between the former husband and

wife*, the witnesses and parties did not address the value or enforceability of the note *as between

the children* of Arie and Dalia Genger, *or the family owned companies*.  Thus, the testimony

adduced in the arbitration may well be admissible in this action, but there is no collateral

estoppel effect.

C.    <u>Dalia Genger's Motion for Summary Judgment (Sequence Number. 002)</u>

The first amended verified complaint alleges three causes of action against Dalia Genger:

breach of fiduciary duty (1st cause of action), fraud (5th cause of action), and conspiracy to

commit fraud (8th cause of action).

As argued by defendant, the claim of breach of fiduciary duty is also at issue in a

proceeding currently before the Surrogate's Court entitled *In the Matter of the Application of

16

*Orly Genger, as a person interested, for the removal of Dalia Genger as Trustee of the Orly Genger 1993 Trust pursuant to SCPA § 711 (1)*, File No. 17/2008 (Surrogate's Court NY County). Plaintiff does not address this argument. Accordingly, in the interest of judicial economy, the branch of defendant's motion seeking summary judgment and dismissal as to the complaint's 1st cause of action, is granted, on the ground that the same claim is pending in another court proceeding (CPLR 3211 [a] [4]).

The 5th Cause of Action sounds in fraud, while the 8th Cause of Action alleges conspiracy to commit fraud among the four defendants. As an initial matter, it is well established that "a mere conspiracy to commit a fraud is never of itself a cause of action," although allegations of conspiracy are permitted to connect the actions of separate defendants with an otherwise actionable tort (*Alexander & Alexander of N.Y. Inc. v Fritzen*, 68 NY2d 968, 969 [1986] [citation omitted]). As explained in *Brackett v Griswold*, "[t]he allegation that there was a conspiracy to commit the fraud does not effect the substantial ground of action," and "[t]he *gravamen* is fraud and damage, and not the conspiracy." (112 NY 454, 466-467 [1889]). "The allegation and proof of a conspiracy in an action of this character is only important to connect a defendant with the transaction and to charge him [*sic*] with the acts and declarations of his [*sic*] co-conspirators, where otherwise he [*sic*] could not have been implicated." (*Id.*). Accordingly, the 8th cause of action is dismissed as against this defendant, and the others.

To state a claim for fraud, plaintiff must allege "a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance . . . and damages" (*Eurycleia Partners, LP v Seward & Kissel, LLP*, 12 NY3d 553, 559 [2009]). In addition, under CPLR 3016 (b), the circumstances constituting the wrong must be stated in detail.

Defendant Dalia Genger argues that plaintiff's claims are unspecific and general in

17

nature. In particular, she argues that there is no allegation of the manner in which plaintiff relied

on any of her statements, or in what manner she, defendant, could have prevented the

enforcement of the promissory note and the foreclosure sale. Although plaintiff argues in

opposition that Dalia Genger made many statements over the years, including sworn statements,

affirming that all interested parties to the note had agreed that TPR Investment would never seek

to enforce the promissory note (Am. Ver. Compl. [Doc. 46-4] ¶¶ 62, 145-147), none of

defendant's statements *explicitly* make this assertion other than in the context of the divorce

proceedings. However, plaintiff also argues that even after she requested that her mother, as

trustee, not encumber the remaining assets of the trust, her mother signed the January 2009

Meeting Agreement which gave power to D&K GP - the company controlled by Dalia and Sagi

Genger - to pledge the Orly Genger 1993 Trust's shares of Trans-Resources as security for the

promissory note, and which indemnified Sagi Genger, among others. There are also the

transactions over the years that apparently have given Sagi Genger, and Dalia Genger, potential

control over family assets in a way that has harmed plaintiff's share.

When claiming that the defendants together acted to commit a fraud, the plaintiff need

not allege and prove that each defendant committed every element of fraud but only facts which

support an inference that the defendants knowingly agreed to cooperate in a fraudulent scheme

(*Snyder v Puente De Brooklyn Realty Corp*, 297 AD2d 432, 435 [3d Dept.2002], *lv denied*, 99

NY2d 506 [2003]; *LeFebre v New York Life Ins. & Ann. Corp.*, 214 AD2d 911, 912 [3d Dept.

1995]). Plaintiff alleges that the various defendants together committed fraud by, for example,

creating the conditions that resulted in the "sham sale" of the TPR Investment assets owed by

D&K Ltd. Partnership, and agreeing in the January 2009 Meeting Agreement to give power to

D&K GP, the company controlled by Dalia and Sagi, to pledge the Orly Trust's shares of Trans-

Resources as security for the promissory note (Am. Ver. Compl. [Doc. 46-4] ¶¶ 76-68, 151).

Plaintiff asked repeatedly for information about her trust, but because defendant has not been

forthcoming nor kept her informed, she did not know that there was any need to attempt to

protect the assets of her trust.

The evidence and arguments provided by both parties show that there is a question of fact

as to whether Dalia Genger acted with intent to commit fraud against plaintiff's trust, and to lull

plaintiff into a false sense of security as to the status of her trust. Accordingly, the branch of

defendant's motion to dismiss the 5th cause of action is denied.

D.    Sagi Genger's Motion for Partial Summary Judgment (Sequence Number 003)

Defendant Sagi Genger seeks summary judgment and dismissal of the 6th, 7th, 8th, and 16th

causes of action.[8]

The 6th cause of action sounds in fraud.  The elements of fraud are set out above in the

discussion of Dalia Genger's motion.  The complaint focuses on the statements made by

defendant in particular during the 2007 - 2008 arbitration proceeding, which helped form the

basis for the arbitrator's decision that the parties never intended for the note to be collected and

that it was not an asset to be valued, statements of which the plaintiff was aware and which

caused her to believe that her trust fund was secure and that no one would enforce the note.

The 7th cause of action alleges aiding and abetting fraud. The elements of aiding and

abetting fraud are that there exists a fraud, the defendant knew of the fraud, and the defendant

provided substantial assistance to advance the fraud's commission (*M&T Bank Corp. v*

*Gemstone CDO VII, Ltd.*, 23 Misc. 3d 1105A; 881 NYS2d 364, 2009 NY Slip Op 50590(U)

---

[8]He does not seek summary judgment as to the 2nd, 3rd, or 4th causes of action, in which he is also
named.

19

{Sup. Ct., Erie County 2009], *aff'd in part, mod in part*, 68 AD3d 1747 [4th Dept. 2009],

quotation and citation omitted). The complaint contends that defendant and D&K GP knowingly

assisted in the "sham sale" of the D&K Ltd. Partnership shares, failed to notify the Partnership

members of the foreclosure and sale, the sale of which harmed the Orly Trust, and entered into

the Meeting Agreement which now allows defendant and D&K GP to pledge or encumber the

Trans-Resources shares owned by the Orly Genger 1993 Trust.

Defendant argues that summary judgment is appropriate based on the documentary

evidence. He contends that prior to this litigation, plaintiff never claimed that the note or pledge

agreement were invalid. Among the evidence he points to in arguing the note's enforceability, is

testimony of Arie Genger acknowledging that payments were made by D&K Ltd. Partnership on

the promissory note (Doc. 16-4:3-4]) , the Assumption Agreement signed by Dalia, Arie, and

Sagi Genger on October 25, 2004, acknowledging the nearly $10,000,000 due under the note

(Doc. 16-6]), the November 19, 2008 letter from plaintiff's counsel to the Surrogate, stating in

part that "D&K [Ltd. Partnership] is indebted on a multi-million dollar note to TPR, which is

secured by D&K's 49% stock interest, and which has not been serviced for years" (Doc. 16-8]),

and a document signed by plaintiff dated December 27, 2007, in which she states that the trust

"is indebted in the amount of approximately $4.5 million" (Doc. 16-9]).

Defendant also argues that the statute of frauds bars plaintiff's 6th and 7th causes of action

because plaintiff claims that the promissory note has been orally modified. General Obligations

Law § 5-701 requires that agreements which by their terms are not to be performed within one

year, or which are promises to answer for the debt or default of another person, must be in

writing and subscribed by the party to be charged therewith (GOL § 5-7-1 [a] [1]-[2]). The parol

evidence rule of the General Obligations Law provides that where a written agreement  contains

20

a provision stating that it cannot be changed orally, then such a document cannot be changed by executory agreement unless it is in writing, signed by the party against whom enforcement of the change is sought (GOL § 15-301 [1]). Thus, defendant argues that plaintiff cannot claim that the parties legally agreed, orally, that the note would not be enforceable.

Defendant's arguments are unpersuasive. Courts have also found, specifically in regard to promissory notes, that when parties contest whether a notice is enforceable, there is an issue of fact that survives summary judgment and the statute of frauds will not prevent the court's examination of parol evidence on the issue. For example, in *Greenleaf v Lachman*, the Court examined a promissory note allegedly executed so as to avoid negative income tax treatment, and found an exception to the parol evidence rule in order to allow admission of parol evidence, not to vary the terms of the writing, but to show that a "writing, although purporting to be a contract, is, in fact, no contract at all." (216 AD2d 65, 66 [1st Dept.1995], *lv denied* 88 NY2d 802 [1996]). Similarly, in *Dayan v Yurkowski*, the Court denied summary judgment and held that the defendant's parol evidence should be considered to show that the note, while valid on its face, was not intended to take effect (238 AD2d 541 [2d Dep't 1997]; *see also, Paolangeli v Cowles*, 208 AD2d 1174, 1175 [3d Dep't 1994]).

Here, where plaintiff and all the defendants copiously cite to factual support, a material issue of fact exists regarding the intention of the note's enforceability. While the documents speak for themselves, plaintiff raises material questions of fact concerning the actual intent behind the promissory note. She argues that the promissory note's purpose was to facilitate the estate planning of Arie Genger and the transfer of funds between the family members with lessened tax consequences. Indeed, it is curious that interest payments were made by the Partnership for several years and then ceased, and that Sagi Genger testified that TPR

21

Investment's 2002 notice was "pro forma" and not meant as an actual request that payment be

made. It could be found that enforcement of the note's terms was only made after Sagi Genger

allegedly came into control of both TPR Investment and D&K Ltd. Partnership. Given the

testimonial evidence in particular, there is a question of fact as to whether the promissory note

was intended to be an enforceable agreement, and it would be premature to apply a Statute of

Frauds analysis to the cause of action. In addition, as plaintiff has established that there are

questions of fact as to whether defendant acted with intent to defraud plaintiff and D&K Ltd.

Partnership and provided substantial assistance to D&K GP in particular to advance the fraud's

commission, the branch of the motion seeking summary judgment and dismissal of the 6th and 7th

causes of action is denied.

The 8th cause of action alleges conspiracy to commit fraud. For the same reasons set

forth above in discussing Dalia Genger's motion, this branch of defendant's motion is granted.

The 16th cause of action alleges promissory estoppel. This is an equitable cause of action

and must allege "a clear and unambiguous promise by defendants upon which [the plaintiff]

reasonably and foreseeably relied to [plaintiff's] detriment." (*401 Hotel, L.P. v MTI/The Image*

*Group, Inc.*, 251 AD2d 125, 126 [1st Dept. 1998]). Here, plaintiff alleges that it was the promise

and intent of Arie Genger and the family as a whole, that the promissory note was not to be

enforced, so as to preserve the trust accounts, and that she relied on that promise these many

years only to learn that one of the main assets of her trust account had been sold in violation of

the promise. Defendant argues not only that the documents state otherwise, but that plaintiff

may not assert promissory estoppel in order to avoid the affirmative defense of the statute of

frauds, citing *Cohen v Brown, Harris, Stevens, Inc.*, 64 NY2d 728 (1984), and *Lowinger v*

*Lowinger*, 287 AD2d 39, 45 (1st Dept. 2001), *lv denied* 98 NY2d 605 (2002).

22

While the assertion of the statute of frauds is often sufficient to cause a dismissal of a claim of promissory estoppel, exceptions include where "the circumstances are such as to render it unconscionable to deny" the promise upon which the plaintiff has relied (*see, Philo Smith & Co. v. USLIFE Corp.*, 554 F.2d 34, 36 [2d Cir. N.Y. 1977]). Here, where there are questions of fact as to whether defendants intentionally breached the family agreement concerning the entirety of the estate planning and unconscionably caused plaintiff to lose a significant amount of her trust funds to their benefit, with the possibility of losing all of the funds, defendant has not established entitlement to summary judgment and dismissal of the claim of promissory estoppel notwithstanding his defense of the statute of frauds (*see, Swerdloff v Mobil Oil Corp.*, 74 AD2d 258, 261 [2d Dep't 1980], *app denied* 50 NY2d 913 [1980]). Accordingly, defendant's motion for summary judgment and dismissal of the 16th cause of action is denied.

E.    <u>D&K GP's Motion for Partial Summary Judgment (Sequence Number 004)</u>

Defendant D&K GP seeks summary judgment and dismissal of "all" the causes of action of the complaint as against it, but its motion papers specifically addresses only the 4th, 6th, 7th, and 8th causes of action.[9]

As an initial issue, D&K GP argues that plaintiff, "in her capacity as beneficiary under the Orly Trust and in the Orly Trust's capacity as limited partner in D&K LP, agreed not to bring an action against D&K GP." (Lyons {D&K GP} Aff. [Doc. 21] ¶ 5). Specifically, defendant points to the "Amended and Restated Limited Partnership Agreement of D&K Limited Partnership," in which Leah Fang as trustee for both the Orly and Sagi trusts, agreed that the trusts expressly waived their right to bring an action against D&K GP, the General Partner; Sagi

---

[9]D&K GP did not seek summary judgment as against the 2nd or 3rd causes of action, in which it is also named as a defendant.

23

Genger signed on behalf of D&K GP (Doc. 22-8). Accordingly, D&K GP argues that summary judgment and dismissal of the claims against it should be dismissed in their entirety. However, this agreement provides that its partners, which include the Orly Genger 1993 Trust, may sue for "fraud, bad faith, or willful misconduct." (Doc. 22-8:5). Plaintiff alleges that there has been bad faith and fraud by various family entities as concerns the enforcement of the promissory note, and including various documents signed on behalf of the Genger trusts, as well as D&K Ltd. Partnership. At the very least, there appear to be irregularities. Summary judgment and dismissal on this ground is not appropriate.

The 4th cause of action, brought by the Orly Genger 1993 Trust and D&K Ltd. Partnership against both defendant D&K GP and Sagi Genger, claims defendants prevented the Ltd. Partnership from honoring its obligations under the note, and that it tortiously interfered with the contract.

Tortious interference with contractual relations consists of four elements: a contract between plaintiff and a third party; the defendant's knowledge of the contract; the defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and resulting damages to plaintiff (*Kronos, Inc. v AVX Corp.*, 81 NY2d 90, 94 [1993], citation omitted). Defendant argues that, as the general partner to D&K Ltd. Partnership, it is a party to the contract at issue, that it, too, has also been injured by the nonpayment and resulting foreclosure, and that a party to a contract cannot tortiously interfere with the contract (Def. Memo of Law § IV [Doc. 22:12]). Plaintiff argues that according to Sagi Genger's testimony during the arbitration proceeding, Dalia Genger had repaid her four percent interest in the promissory note, and that therefore D&K GP was not a party to the agreement.

Here, the contract is the promissory note between D&K Ltd. Partnership and TPR

24