39

```
 1                         R. Fang
 2    A.      Whatever my investments are.  It is
 3    just a broad word, it has no great legal
 4    meaning.  I am not selecting it out, it is
 5    just a word.  I am not a business person, I
 6    don't know what the correct term would be,
 7    that's the one I chose.
 8    Q.      Would your financial advisors know
 9    what is in your portfolio?
10    A.      Well, they should.
11    Q.      By your "financial advisors" I guess
12    would Sagi Genger know?
13    A.      Yes.
14    Q.      Mr. Ran?
15    A.      Absolutely not.
16    Q.      He would not.  Why is it you say that?
17    A.      The kinds of things he invests in are
18    S&P stocks, bonds, that kind of stuff.
19    Q.      The investments that Mr. Genger
20    invests for you is different?
21    A.      I imagine some of that, as well.  He
22    has free reign to do what he wants.  I don't
23    know what else he has in it.
24    Q.      When you say he has free reign --
25    A.      They both do.
```

40

1                          R. Fang

2    Q.       When you say free reign, what does

3    that mean?

4    A.       They can buy and sell as they wish.

5    Q.       Do they have to inform you before they

6    buy and sell?

7    A.       No.

8    Q.       Would it be accurate to say that they,

9    by "they" I mean Mr. Genger and Mr. Ran, can

10   buy things without your knowledge?

11   A.       Sure.

12   Q.       Do you know whether or not Mr. Genger,

13   and by "Mr. Genger" I mean Sagi Genger, or

14   Mr. Ran have a power of attorney with regard

15   to you?

16   A.       I don't remember.

17   Q.       You don't recall?

18   A.       I don't recall.

19   Q.       How is it that you learned that you

20   had a partnership interest in Riverside?

21   A.       I don't remember.  I don't know.

22   Q.       Do you remember who told you?

23                MR. LYONS:  I will object to

24           the question.  I am not sure she

25           testified that she learned she had a

41

```
 1                    R. Fang
 2         partnership interest.  I think she
 3         testified she had an interest.
 4    A.     I don't know about partnership
 5    interest.
 6    Q.     What do you mean?  What did you learn
 7    that you had an interest in?
 8                    MR. LYONS:  Can you repeat the
 9         question?
10    Q.     What did you learn that you had an
11    interest in?
12    A.     I didn't learn that I had an interest
13    in anything.  Just that somehow Riverside was
14    included in some of the things my son-in-law
15    has done for me, but I don't know what I have
16    in it.  I don't even know what the hell it
17    is, as I told you numerous times.
18    Q.     I am trying to understand how it is
19    that obviously you came to know, as you said,
20    about a week ago that you had some sort of an
21    interest in Riverside.  That's fairly recent.
22    I am wondering how it was that that happened.
23    A.     I don't really remember.
24    Q.     Let's look at paragraph number 5.
25    A.     There are two paragraph 5s.
```

```
 1                    R. Fang
 2   Q.      That's a good catch, actually.  Let's
 3   look at the first paragraph number 5.
 4           As you sit here today do you believe
 5   that this statement "I am not in possession
 6   of any documents responsive to the subpoena"
 7   do you believe that statement is true?
 8   A.      Yes.
 9   Q.      You believe you don't have any
10   documents in your possession?
11   A.      Having to do with Riverside?
12   Q.      Yes.
13   A.      Absolutely not.
14   Q.      What do you understand the word
15   possession to mean?
16   A.      That I have something to do with this
17   company, some papers in my possession.
18   Q.      To be clear, do you understand that
19   word to mean or do you understand that
20   that -- do you believe that either your
21   accountants or either your present or past
22   lawyers have any documents in their
23   possession which would relate or were
24   responsive to the subpoena?
25   A.      The only person would be my accountant
```

43

1                          R. Fang

2    and you have that, so that's it.  If I had

3    anything, but I don't have papers in my pile

4    of whatever old magazines and such that would

5    have anything to do with Riverside.

6    Q.      I understand.

7            Did you ask your accountant to provide

8    you with the documents which would relate to

9    Riverside?

10   A.      Eventually I did.

11   Q.      When was that?

12   A.      Are you kidding?  I haven't the

13   vaguest idea of what point I asked him for

14   that.

15   Q.      Do you have an idea as to whether it

16   was before --

17   A.      I don't remember.

18           MR. LYONS:  Let him finish his

19           question.

20           THE WITNESS:  Sorry.

21   Q.      Do you have an idea of whether it was

22   before or after you received the letter?

23   A.      This letter?

24   Q.      The letter which was marked

25   Plaintiff's Exhibit 2.

44

1                           R. Fang

2    A.      I don't know.

3    Q.      Do you recall whether or not you spoke

4    with or asked any of your lawyers to provide

5    documents?

6    A.      After this letter, I don't know for

7    sure.  I can't tell you when I asked.  I

8    don't know.

9    Q.      Let's look at Plaintiff's Exhibit 3,

10   the affidavit, the second paragraph five,

11   that paragraph reads:  "With the exception of

12   my lawyers, I have had no communications with

13   anyone relating to Riverside or the Riverside

14   companies" --

15   A.      That would be true.

16   Q.      Let me finish.

17   A.      Sorry.

18   Q.      -- "nor any material communication

19   with anyone concerning this lawsuit."

20           Do you understand that sentence or do

21   you believe that sentence is true now as you

22   sit here?

23               MR. LYONS:  She did testify

24           earlier that she had some

25           conversations.  I assume your question

45

```
 1                      R. Fang

 2         relates to other conversations?

 3              MR. LEINBACH:  It relates to

 4         all conversations.

 5              MR. LYONS:  She already

 6         testified that she had conversations.

 7              MR. LEINBACH:  I understand.

 8   A.    Talking about Riverside?

 9   Q.    Yes.

10   A.    No, no.  I don't know what it is.  How

11   can I be having conversations about it?

12   Q.    Once you learned that you had an

13   interest in Riverside, as you stated, did you

14   have any conversations with anyone?

15   A.    I really don't remember.

16   Q.    You don't recall?

17   A.    I don't recall.

18   Q.    You don't recall whether you had any

19   conversations or with whom you had

20   conversations with?

21   A.    I don't recall whether I had any

22   conversations.  I talk a lot.  How can I

23   remember what I spoke about to whom or what?

24   Q.    I will ask once again:  Do you believe

25   this statement is true as you sit here now?
```

46

1                         R. Fang

2    A.      How can I talk about Riverside

3    companies when I know nothing about them?  If

4    you are talking about going to a subpoena, of

5    course I told people I am coming to a

6    subpoena.  About what, no, I don't know.  I

7    don't understand why I am here, if you want

8    to know the truth.

9    Q.      You stated you don't understand why

10   you are here?

11   A.      No.

12                   MR. LYONS:  Do you want to take

13           a break?

14                   THE WITNESS:  I wouldn't mind

15           taking a break.

16                   MR. LEINBACH:  There is no

17           question pending at this point.  If

18           you would like to take a break, that's

19           fine.

20                   (Whereupon all parties went to

21           Judge Solomon's chambers.)

22                   THE COURT:  On July 25 I wrote

23           an Order granting a motion directing

24           Ms. Fang to respond to a subpoena

25           duces tecum and ad testificandum by

47

1                          R. Fang

2      showing up on or before today at

3      10:00 o'clock with an original and one

4      legible copy of all arguably

5      responsive documents referred to in

6      the subpoena which I was enforcing by

7      that July 25 Order.

8          Some of the material were tax

9      returns.  I allowed her to do some

10     redacting as explained in something

11     which appears to be scribble.

12         About 20 minutes ago the

13     parties came to the courtroom and when

14     I was able to come out to see what

15     they wanted I understood there was

16     some problem about compliance with

17     this Order.

18         Why don't we do this:

19     Mr. Lyons, she is your client; right?

20         MR. LYONS:  Yes, Your Honor.

21         THE COURT:  This subpoena was

22     served sometime well before my July

23     Order; right?

24         MR. LYONS:  Yes.

25         MR. LEINBACH:  Yes.

1                           R. Fang

2              THE COURT:  I am not talking to

3         you.  And resistance was had so the

4         matter was presented to me.

5              Now I need to know, Mr. Lyons,

6         what material your client has today

7         pertaining to her partnership interest

8         in Riverside properties (Canada

9         limited partnership).

10             MR. LYONS:  Your Honor, we

11        produced to the defendant a copy of

12        the Riverside Limited Partnership

13        partnership agreement, as well as

14        Ms. Fang's tax returns from 2006 to

15        2009 tax returns.

16             THE COURT:  Do they reflect

17        anything that is derived from or

18        negatively derived from --

19             MR. LYONS:  It is from

20        Riverside.  Yes, Your Honor.  As you

21        instructed in our last appearance

22        here, Your Honor, I redacted from

23        those tax returns anything that is not

24        related to Riverside or the entities

25        named in the subpoena.

49

1               R. Fang

2               THE COURT:  What is the problem

3       with whatever you got in response to

4       number 1, Mr. Leinbach?

5               MR. LEINBACH:  My response is

6       response to all, I can explain.  In

7       the deposition as it is taking place,

8       so far Ms. Fang has testified that she

9       does not have any documents in her own

10      possession which relate to Riverside

11      or any of the entities listed in the

12      subpoena.

13              However, she stated repeatedly

14      that she does not know what documents

15      would be in the possession of others.

16              THE COURT:  Who are the others?

17              MR. LEINBACH:  Her accountant,

18      Mr. Gayer, and also her financial

19      advisors who she identified as her

20      son-in-law Sagi Genger and another

21      individual, an individual named Gary

22      Ran.

23              THE COURT:  I already directed

24      Mr. Gayer to comply with something.

25              MR. LEINBACH:  Yes, you have,

50

1                           R. Fang

2        but unfortunately I need to bring to

3        your attention he has failed to do so,

4        as well, but that's an issue outside

5        of this.

6               THE COURT:  Go ahead.

7               MR. LEINBACH:  She stated she

8        had no idea whether or not she had

9        requested such documents from those

10       parties.

11              THE COURT:  In connection with

12       complying with the subpoena or ever?

13       Let me finish.  It has been a very

14       long day.

15              MR. LEINBACH:  I apologize.

16              THE COURT:  What else?  What

17       other material was brought, Mr. Lyons?

18       Why don't you tell me what else was

19       brought?

20              MR. LYONS:  In addition to

21       redacting tax returns, I brought

22       unredacted tax returns so if

23       Mr. Leinbach were to ask her about the

24       unredacted or what was redacted she

25       could identify things on there and

51

1            R. Fang

2       identify that nothing else is an AG

3       related entity or having anything to

4       do with Riverside.

5            She is prepared to do that.  He

6       has not asked her any questions about

7       that.  Those were K-1's from

8       Riverside.  The inquiries were made

9       not by Ms. Fang but by me to

10      Mr. Gayer, her accountant, to the

11      attorneys for Mr. Genger who acts as

12      the limited -- the general partner.

13           THE COURT:  You are blocking

14      her.

15           MR. LYONS:  I made inquiries to

16      the attorneys for Mr. Genger, as well

17      as the accountants, to try to get

18      whatever documents they had.  They

19      gave me what they had.  I bought it in

20      here today.  I did as you instructed.

21      I redacted what was supposed to be

22      redacted.

23           THE COURT:  I gave her an

24      option.  I didn't tell her to redact

25      it.  Don't put words in my mouth.

52

1                              R. Fang

2                    What is the problem?  What do

3           you want of the Court today?

4                    MR. LEINBACH:  I don't think or

5           it sounds to me, based upon everything

6           that I have gotten from the witness

7           and also from the testimony -- the

8           conversations that I had with

9           Mr. Lyons and Mr. Michailidis, I don't

10          believe there has been a complete

11          search for documents responsive to the

12          subpoena.

13                   THE COURT:  Were you

14          administered an oath today?  Would you

15          stand up?

16                   THE WITNESS:  Yes.

17                   THE COURT:  There is no

18          question.  Did you do anything

19          yourself among whatever spaces you

20          controlled to look for material listed

21          in the subpoena?

22                   THE WITNESS:  I had -- I don't

23          have it.  I didn't even know what it

24          was, to be honest with you.

25                   THE COURT:  Do you keep any

53

1                        R. Fang

2        books and records of your financial

3        affairs?

4                THE WITNESS:  Not really.

5                THE COURT:  Are you somebody's

6        pawn?

7                THE WITNESS:  I wouldn't call

8        myself a pawn.

9                THE COURT:  What do you do to

10       take care of your financial affairs?

11               THE WITNESS:  I have two

12       advisors.

13               THE COURT:  They are?

14               THE WITNESS:  One is Gary Ran,

15       who runs Telemus Capital and has been

16       listed as one of the top ten money

17       managers in the country by Forbes.

18               THE COURT:  Does he take care

19       of your, I will call them investments

20       - -

21               THE WITNESS:  Yes.

22               THE COURT:  Could I finish my

23       sentence, please?

24               THE WITNESS:  I am sorry.

25               THE COURT:  I will call them

54

```
 1                    R. Fang
 2       investments to cover any financial
 3       arrangements you have with your
 4       son-in-law.  Does this gentleman have
 5       any role in that?
 6                 THE WITNESS:  No.
 7                 THE COURT:  You understand this
 8       subpoena here is directed to your
 9       son-in-law's businesses in which you
10       may have an interest?
11                 THE WITNESS:  Yes.
12                 THE COURT:  Who controls the
13       paper related to your son-in-law's
14       businesses in which you may have an
15       interest?
16                 THE WITNESS:  My son-in-law.
17                 THE COURT:  Have you demanded
18       that he provide to you copies of
19       everything which might reflect your
20       interest in this so that you will not
21       be found in contempt for failing to
22       have done that?
23                 MR. LYONS:  I did that on her
24       behalf.
25                 THE COURT:  What did you get
```

55

```
 1                    R. Fang

 2       from Mr. Genger?

 3              MR. LYONS:  I got it through

 4       his attorneys.  I got the limited

 5       partnership agreement.

 6              THE COURT:  What else?

 7              MR. LYONS:  That's it.

 8              MR. LEINBACH:  The answer is

 9       nothing else.  That's my concern.

10              THE COURT:  You will deal with

11       it professionally.  She is a fool or a

12       pawn or he is in violation of some

13       obligation he has to her and,

14       accordingly, to the Court.  I will

15       determine in due course.

16              MR. LEINBACH:  I believe in

17       standing here today that there is a

18       violation of this subpoena.  If

19       Mr. Genger is Ms. --

20              THE COURT:  Excuse me, Ms. Fang

21       will tell us what request, if any, she

22       made of Mr. Genger, the son-in-law, as

23       opposed to the father-in-law.  We

24       might be able to get a little further

25       along.  You can't speak for her.
```

56

1                          R. Fang

2              THE WITNESS:  I requested my

3       lawyer to request from my son-in-law

4       whatever documents were necessary for

5       your Court.

6              THE COURT:  Do you not talk to

7       your son-in-law?

8              THE WITNESS:  Yes.

9              THE COURT:  Is there any reason

10      why you didn't ask him yourself?

11      Nobody says you can't talk to him if

12      he is your financial advisor for a

13      certain universe of investments.  Then

14      you directly will at least have done

15      something to suggest that you yourself

16      tried to comply with not only my Order

17      but the subpoena.

18              It is not really funny.

19              THE WITNESS:  I don't think it

20      is funny.  I am trying to think did I

21      ask him.

22              THE COURT:  You got this

23      subpoena quite some time ago.

24              THE WITNESS:  Yes.

25              THE COURT:  It was originally

57

1                          R. Fang

2          returnable in May.  There was plenty

3          of time to have a sit down with

4          counsel, if necessary, so the material

5          sought could be explained to you if

6          you didn't understand words on the

7          page and then so you could sit down

8          with Sagi Genger and find out what

9          exists.  I think you are derelict, you

10         and Mr. Lyons, in not having had that.

11              She has investments.  Do we

12         have books and records, checkbooks

13         that she may have used to issue

14         transfers to invest in these

15         businesses?  What are we doing?

16              MR. LYONS:  I don't have any of

17         that, Judge.

18              THE COURT:  Did she ever

19         transfer any funds or things of value

20         to Mr. Sagi Genger to use in

21         connection with these real estate

22         transactions?

23              MR. LYONS:  Well, she wouldn't

24         have done that directly.

25              THE COURT:  I don't know, she

58

1                       R. Fang

2           told us the real money guy who I hope

3           protects her real money has nothing to

4           do with Sagi Genger's business.  Did I

5           correctly get it?

6                   THE WITNESS:  That is part of

7           my money, the main money is with my

8           nephew, Gary Ran.

9                   THE COURT:  We are not

10          interested --

11                  THE WITNESS:  You just asked

12          me.

13                  THE COURT:  Listen up.  We are

14          not interested in what you brought to

15          the table before you met a Genger and

16          kept separate from a Genger.  Good for

17          you for keeping it separate.

18                  What we are interested in is

19          what you did with the Gengers not

20          because we care about your money, but

21          we want to know what came into Sagi's

22          hands and how he treated it in

23          connection with such obligation as he

24          may or may not have had to his sister.

25          That's his only purpose.

59

```
 1                    R. Fang
 2          I have no, at the moment,
 3     position on who in this lawsuit
 4     between the sister and the brother is
 5     right or wrong or correct or incorrect
 6     in respect of a claim.  All I am doing
 7     is trying to get the professionals
 8     representing the siblings to have as
 9     much information as possible, and you
10     were thought to have some useful
11     information.
12          I don't believe in burdening
13     people unrelated to things.  Mr. Lyons
14     has to get this seriously through his
15     head, your head, and perhaps use the
16     offices of Sagi Genger.
17          MR. MICHAILIDIS:  Mr. Lyons did
18     speak to my colleague, Mr. De La
19     Portez.  We spoke to Sagi.  What we
20     have been dealing with here, which is
21     really no easy way to explain it, we
22     have received several very, very
23     encompassing very broad document
24     requests by plaintiff's counsel.
25          THE COURT:  Right.
```

60

1                        R. Fang

2              MR. MICHAILIDIS:  Of course,

3        naturally we have made every effort up

4        to this point to produce documents

5        that are responsive.

6              THE COURT:  Give me a list of

7        what was produced that was responsive,

8        that every effort was made.

9              MR. MICHAILIDIS:  I don't have

10       a list with me.  I didn't think it was

11       going to be an issue.  It is our

12       understanding that we produced --

13             THE COURT:  What have you

14       produced?

15             MR. MICHAILIDIS:  Your Honor,

16       the books and records, transaction

17       histories.

18             THE COURT:  Of what?

19             MR. MICHAILIDIS:  The Riverside

20       entities.

21             THE COURT:  What do the books

22       and records of the Riverside entities

23       consist of?

24             MR. MICHAILIDIS:  In terms of

25       the financial history of the entity, I

```
 1                          R. Fang
 2        would presume.
 3                    THE COURT:  You presume.  You
 4        told me what you produced.  You took
 5        the responsibility for producing, so I
 6        am asking what did you produce?  You
 7        say "I presume."  Now you can't
 8        presume if you didn't produce.
 9                    MR. MICHAILIDIS:  Unfortunately
10        , we are incoming counsel.  If you
11        remember, McLaughlin and Stern
12        previously represented Sagi.  We have
13        been acting in a representative
14        capacity for the past month and a
15        half.  Bryan and I have had
16        conversations and I have had
17        conversations with Mr. Gayer, as well.
18                    We have heard that there is --
19        we are trying to work with opposing
20        counsel.  We are not trying to hide
21        anything.  We are of the belief that
22        we have already produced items that
23        are both responsive and nonresponsive,
24        frankly.
25                    THE COURT:  You are talking a
```

62

1               R. Fang

2        lot, but you had Joe agree that you

3        could show up at 2 o'clock and the

4        building is locked tight at 5 o'clock

5        and Eli is going to lock the door at

6        4:30, so you had two and a half hours

7        to accomplish not a lot if you are

8        first talking to me.

9              Either you do or don't know

10        what the witness has that's responsive

11        to items 1 through 8.  It is not very

12        long.  It is not particularly prefaced

13        and it is not hard to follow.

14              Go through this list whenever

15        you reconvene, I take it it will be

16        tomorrow at 10 o'clock, because you

17        didn't use today fully, and go through

18        this list and the witness will say

19        what she did or didn't do that she

20        knows about from other people's work

21        about complying with the subpoena

22        which was issued to her, not to Sagi's

23        lawyer or to her lawyer.

24              MR. LEINBACH:  If I might, Your

25        Honor, I have already asked her

63

1              R. Fang

2    questions about that.

3              THE COURT:  If she answered it,

4    go home.

5              MR. LEINBACH:  All of these

6    questions, her response is she knows

7    nothing about any investments that

8    were made.

9              THE COURT:  She would not be

10    the first woman to say that I relied

11    on a man in my family.

12              MR. LEINBACH:  That's fine.

13              THE COURT:  You can't beat her

14    up on it.

15              MR. LEINBACH:  I understand

16    that, as well.  When I asked her about

17    documents in her possession or control

18    she did not remember.

19              THE COURT:  Between May and now

20    what she did, that's a little hard to

21    believe.  She looks like a functioning

22    person, I assume.  I assume, I don't

23    mean to embarrass you, I want to be

24    sure that whatever is on your left

25    cheekbone on the skin is not

64

1               R. Fang

2       interfering with your functioning

3       today.

4               THE WITNESS:  No.

5               THE COURT:  You are okay?

6               THE WITNESS:  I tend to

7       dehydrate.

8               THE COURT:  I am talking from

9       here it looks like a nasty piece of

10      business, only here.  If your eye is

11      otherwise damaged, I don't know.

12              THE WITNESS:  No, I can see.

13              THE COURT:  You're okay?

14              THE WITNESS:  Yes.

15              THE COURT:  I want to be sure

16      before we keep going.  Go ahead.

17              MR. LEINBACH:  She stated she

18      did not know or recall whether or not

19      she ever talked to anybody.  When I

20      asked her to identify the lawyer who

21      is representing her when she received

22      the subpoena, she couldn't identify

23      who the lawyer was or whether she

24      talked to or asked that person to get

25      documents.

65

1              R. Fang

2         THE COURT:  That's all

3    credibility.  Mr. Lyons will give her

4    advice accordingly.

5         MR. LEINBACH:  When I asked

6    what efforts would be done when we

7    took a break he stated to me the only

8    thing he did was talk to Mr. De La

9    Portez and Mr. Michailidis, and

10   Mr. Michailidis' statement to me is

11   the only thing they did was assume

12   they had already produced everything.

13        There were no additional

14   searches done with regards to

15   documents that related to Rochelle

16   Fang's interest in any companies that

17   she has an interest in.

18        MR. MICHAILIDIS:  That's not

19   true.

20        MR. LYONS:  That's not true.

21        THE COURT:  I made myself

22   clear.  The deposition is finished for

23   today.  I think Ms. Fang and her

24   lawyers should have a little sit down

25   and see how they are going to go about

66

```
 1                    R. Fang
 2        complying with some semblance of
 3        effort with this Order and the
 4        subpoena, tomorrow or whenever you
 5        want to do it.
 6             (Time noted:  4:30 p.m.)
 7
 8        _____
 9               ROCHELLE FANG
10
11   Subscribed and sworn to before
12   me this    day of        , 2011.
13   _____
14        Notary Public
15
16
17
18
19
20
21
22
23
24
25
```

67

```
 1
 2                    E X H I B I T S
 3    PLAINTIFF'S
      FOR IDENTIFICATION      DESCRIPTION         PAGE
 4
 5    1          Subpoena duces tecum ad           13
 6               testificandum
 7    2          Letter dated May 26, 2011         27
 8    3          E-mail dated June 15, 2011        35
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

68

```
 1

 2                    C E R T I F I C A T E

 3          I, LORI CERRANO, hereby certify that the

 4     DEPOSITION of ROCHELLE FANG was held before me on

 5     the 22nd day of August, 2011; that said witness was

 6     duly sworn before the commencement of the testimony;

 7     that the testimony was taken stenographically by

 8     myself and then transcribed by myself; that the

 9     party was represented by counsel as appears herein;

10          That the within transcript is a true record

11     of the DEPOSITION of said witness;

12          That I am not connected by blood or marriage

13     with any of the parties; that I am not interested

14     directly or indirectly in the outcome of this

15     matter; that I am not in the employ of any of the

16     counsel.

17          IN WITNESS WHEREOF, I have hereunto set my

18     hand this 24th     day of  Aug,        , 2011.

19

20              - - - - - Lori Cerrano

                    LORI CERRANO

21

22

23

24

25
```

69

```
 1
 2                        ERRATA SHEET
            PAGE/LINE              CORRECTION
 3          _____    _____
 4          _____    _____
 5          _____    _____
 6          _____    _____
 7          _____    _____
 8          _____    _____
 9          _____    _____
10          _____    _____
11          _____    _____
12          _____    _____
13          _____    _____
14          _____    _____
15          _____    _____
16          _____    _____
17          _____    _____
18          _____    _____
19          _____    _____
20          _____    _____
21          _____    _____
22          _____    _____
23          _____    _____
24          _____    _____
25
```

## A

ability 9:24
able 47:14 55:24
absolutely 17:6 22:20 23:9 29:8
  38:7 39:15 42:13
accommodate 9:17
accomplish 62:7
accountant 12:18,20,25 42:25
  43:7 49:17 51:10
accountants 13:6,7 42:21 51:17
accurate 38:5 40:8
acting 61:13
action 3:13
acts 51:11
ad 13:16,21 46:25 67:5
addition 3:9 50:20
additional 65:13
address 4:10 10:6,9,12 11:12
  13:22
addressed 13:21 35:16
administered 52:14
advice 11:19,20 65:4
advised 7:12
advisor 11:10 56:12
advisors 13:11 18:25 39:8,11
  49:19 53:12
affairs 53:3,10
affidavit 35:18,20 36:5 44:10
afternoon 7:25
AG 51:2
ago 23:21 41:20 47:12 56:23
agree 62:2
AGREED 3:3
agreement 48:13 55:5
ahead 50:6 64:16
Alan 22:22 27:10,14 30:19,24
allowed 26:16 47:9
answer 8:19 18:21 19:24 26:18,19
  34:7 55:8
answered 63:3
answering 8:18
anybody 27:13 64:19
apartment 4:11 18:18
apologize 50:15
appearance 48:21
appears 47:11 68:9
appropriate 33:5
April 13:24 28:14
arguably 5:9,13 36:11 47:4

arrangements 54:3
asked 16:18,24 19:11 27:9 31:22
  33:17 34:19 37:11 43:13 44:4,7
  51:6 58:11 62:25 63:16 64:20,24
  65:5
asking 19:23 61:6
assume 44:25 63:22,22 65:11
Attached 35:17
attempt 9:11
attention 50:3
attorney 3:24 14:15 20:21 21:25
  22:2 29:9,21 30:3,4,6,8,14 31:14
  40:14
attorneys 2:4,9,14 3:4 51:11,16
  55:4
attorney-client 21:23
August 1:12 68:5
available 7:20
Avenue 2:5

## B

B 67:2
back 34:10,12
background 6:10
ballpark 10:9,10
bank 4:14 5:2 6:12 7:13
bar 3:11
BARRISTER 1:23
Barry 26:21
based 52:5
beat 63:13
begins 32:24
begun 3:16
behalf 54:24
belief 61:21
believe 26:17 30:19 34:16 38:5,8
  38:10,12 42:4,7,9,20 44:21
  45:24 52:10 55:16 59:12 63:21
bench 7:18
best 15:6
blank 15:19 28:9
blocking 51:13
blood 68:12
bonds 39:18
books 53:2 57:12 60:16,21
bottom 32:24
bought 51:19
boyfriend 26:13
boyfriend's 26:14

break 9:15,20 46:13,15,18 65:7
breakfast 19:10
briefly 8:9
bright 11:6,8
bring 6:7,23 7:4,9 50:2
broad 39:3 59:23
Broadway 1:23 2:10
brother 59:4
brought 50:17,19,21 58:14
Bryan 2:6 7:25 61:15
building 62:4
burdening 59:12
business 39:5 58:4 64:10
businesses 54:9,14 57:15
buy 40:4,6,10

## C

C 2:2 4:2 68:2,2
call 14:15 53:7,19,25
called 15:15 16:16
calls 4:22,24 21:22
Canada 17:19 48:8
capacity 61:14
Capital 11:15 53:15
caption 21:19 35:19
captioned 24:6
care 53:10,18 58:20
carefully 9:2
catch 42:2
caveat 9:18
Centre 1:11
CERRANO 68:3,20
certain 56:13
certainly 19:3 22:7
certify 68:3
chambers 46:21
charge 3:25
check 7:19
checkbooks 57:12
cheekbone 63:25
chose 39:7
circumstances 30:17
claim 59:6
clear 7:4 18:21 19:23 33:22,23
  42:18 65:22
client 47:19 48:6
clue 31:14
colleague 59:18
collect 19:12 20:16 21:8

collected 4:15
collecting 20:6
come 14:21 47:14
comes 11:2
coming 46:5
commencement 68:6
communication 21:24 44:18
communications 44:12
companies 4:21 5:20,20,23 12:7
    44:14 46:3 65:16
company 11:14 42:17
complained 25:19
complete 52:10
compliance 47:16
comply 33:8 49:24 56:16
complying 50:12 62:21 66:2
concern 55:9
concerned 34:18
concerning 44:19
concerns 22:8
concierge 14:23
Conduct 3:6
connected 68:12
connection 50:11 57:21 58:23
considering 25:25
consist 60:23
contact 20:12 31:8 34:24
contacted 29:20 30:3 35:2
contempt 33:7,12,15,19 34:4,21
    54:21
contents 27:15
context 23:13
continuously 10:12
control 63:17
controlled 3:20 12:8 52:20
controls 54:12
conversation 30:23 36:3,7
conversations 22:22 44:25 45:2,4
    45:6,11,14,19,20,22 52:8 61:16
    61:17
copied 35:23
copies 54:18
copy 3:23 47:4 48:11
correct 39:6 59:5
CORRECTION 69:2
correctly 58:5
counsel 3:18 57:4 59:24 61:10,20
    68:9,16
country 53:17

County 1:2 33:6
course 16:17 46:5 55:15 60:2
court 1:2,11 8:22 33:6,7,12,16,19
    34:21 46:22 47:21 48:2,16 49:2
    49:16,23 50:6,11,16 51:13,23
    52:3,13,17,25 53:5,9,13,18,22,25
    54:7,12,17,25 55:6,10,14,20
    56:5,6,9,22,25 57:18,25 58:9,13
    59:25 60:6,13,18,21 61:3,25
    63:3,9,13,19 64:5,8,13,15 65:2
    65:21.
courtroom 47:13
cover 54:2
credibility 65:3
current 10:6 12:20 30:3,3,6,8,14
currently 9:19,23 10:14 11:22
    12:7,18 37:18
C.B 2:16
C.P.L.R 3:5,19

─────────── D ───────────

D 2:6
damaged 64:11
dangerous 24:22
date 13:18 27:22 28:24 30:5 32:24
    35:13
dated 13:23 27:19,25 35:10,16
    67:7,8
daughter 23:24 25:21
daughters 26:6,8
David 23:20
day 50:14 66:12 68:5,18
De 24:17 59:18 65:8
deal 55:10
dealing 59:20
deemed 3:18
defendant 1:7 2:9 48:11
dehydrate 64:7
demanded 54:17
deposed 8:3,4,6
deposition 1:9 3:14,21 8:10 49:7
    65:22 68:4,11
Depositions 3:6
derelict 57:9
derived 48:17,18
DESCRIPTION 67:3
Desmond 2:16 30:20 35:16
determine 55:15
different 9:11 19:5 39:20

directed 49:23 54:8
directing 46:23
directly 56:14 57:24 68:14
disclosure 21:23
discussing 16:9
divorce 8:5
document 14:2,4,9 15:10,13 28:3
    28:5,17 36:17,24 37:3,15,16
    59:23
documents 5:12 7:22,23 15:2,3
    16:13 18:11,16,19,23 19:12 20:6
    20:16 21:4,8 31:16 32:25 33:2,4
    42:6,10,22 43:8 44:5 47:5 49:9
    49:14 50:9 51:18 52:11 56:4
    60:4 63:17 64:25 65:15
doing 57:15 59:6
door 62:5
doorman 14:23 15:4,10,13 16:14
double 7:19
doubt 19:14,15 37:4
draft 36:8
Duane 2:9 22:12,15,16
duces 13:15,21 46:25 67:5
due 55:15
duly 4:3 68:6

─────────── E ───────────

E 2:2,2 4:2,2 67:2 68:2,2
earlier 44:24
early 28:13
easily 35:5
easy 9:12 59:21
effort 36:9 60:3,8 66:3
efforts 65:6
either 18:25 23:15 37:13 42:20,21
    62:9
Elana 25:23
Eli 62:5
ELLMAN 2:4
embarrass 63:23
employ 13:7 68:15
employed 10:14,16
encompassing 59:23
enforcing 47:6
entities 48:24 49:11 60:20,22
entity 51:3 60:25
ERRATA 69:2
especially 16:17
ESQ 2:6,11,16

essentially 6:18
estate 57:21
Evan 24:25
EVANGELOS 2:11
Eventually 43:10
evidence 4:24
evidences 5:2
exact 28:22
examination 3:9,11,16,18,24 4:6
examined 3:15,25 4:5
exception 44:11
Excuse 55:20
Exhibit 13:14,17,20 27:18,21,24
   28:3 32:17,20 35:9,12,15 43:25
   44:9
exists 57:9
explain 8:9 49:6 59:21
explained 47:10 57:5
expression 24:20
extent 21:22 35:25
eye 64:10
eyes 14:14
e-mail 35:10,15,17,24,25 67:8

**F**

F 4:2 68:2
face 24:21
fail 33:4
failed 50:3
failing 54:21
failure 3:9,17 33:8
Fair 25:13
fairly 7:4 41:21
familiar 8:11 28:21 37:6,7
family 12:9 25:9,12 63:11
Fang 1:10 4:1,9,25 5:1,17,24,25
   6:1,2 7:1 8:1 9:1 10:1,5 11:1
   12:1 13:1,22 14:1 15:1 16:1 17:1
   18:1 19:1 20:1 21:1,15 22:1 23:1
   24:1 25:1 26:1 27:1,25 28:1 29:1
   30:1 31:1 32:1 33:1,11 34:1 35:1
   35:21,23 36:1,14 37:1 38:1 39:1
   40:1 41:1 42:1 43:1 44:1 45:1
   46:1,24 47:1 48:1 49:1,8 50:1
   51:1,9 52:1 53:1 54:1 55:1,20
   56:1 57:1 58:1 59:1 60:1 61:1
   62:1 63:1 64:1 65:1,23 66:1,9
   68:4
Fang's 48:14 65:16

far 37:21,22 38:3 49:8
father 10:22,25
father-in-law 55:23
feel 34:24
filing 3:21
finally 17:22 36:8
financial 11:10 13:10 18:24 39:8
   39:11 49:18 53:2,10 54:2 56:12
   60:25
find 57:8
fine 10:9 46:19 63:12
finish 43:18 44:16 50:13 53:22
finished 65:22
firm 22:15,17 26:24 27:4,7
first 4:3 8:3 17:24 25:5 42:3 62:8
   63:10
five 44:10
follow 62:13
follows 4:5
fool 55:11
Forbes 53:17
forget 35:5
form 3:8 11:2
found 17:18 54:21
frame 28:18
frankly 61:24
free 39:22,24 40:2
friend 23:23 24:15
front 32:21
fully 62:17
functioning 63:21 64:2
funds 57:19
funny 56:18,20
furnished 3:24
further 3:23 55:24

**G**

G 4:2
Gary 11:8,25 49:21 53:14 58:8
Gayer 12:21,22,24 13:3,5 20:6,10
   49:18,24 51:10 61:17
general 51:12
Genger 1:3,6 11:7,18 12:9 13:9,10
   16:8 18:25 19:12 21:12,13 25:7
   25:7,8 29:18 35:19,19 39:12,19
   40:9,12,13,13 49:20 51:11,16
   55:2,19,22 57:8,20 58:15,16
   59:16
Gengers 58:19

Genger's 58:4
gentleman 54:4
Gerald 23:17
Gerard 27:10
getting 29:3
give 9:25 10:6,19 11:12 60:6 65:3
given 8:14
glaze 14:15
go 5:16 6:16 34:16 50:6 62:14,17
   63:4 64:16 65:25
going 7:17 8:9,12 36:5 37:9,12
   46:4 60:11 62:5 64:16 65:25
good 7:25 23:23 42:2 58:16
gotten 28:23 52:6
granting 46:23
great 39:3
grounds 36:12
guess 16:6 39:11
guy 58:2
G-A-Y-E-R 12:21

**H**

H 4:2 67:2
half 61:15 62:6
hand 68:18
hands 58:22
happened 35:3 41:22
happening 24:8
hard 62:13 63:20
head 59:15,15
heard 26:24 61:18
hearing 5:7
held 1:11 33:12,19 34:4 68:4
hell 41:16
hereto 3:4
hereunto 68:17
hide 61:20
highly 35:6
histories 60:17
history 60:25
holding 33:7 34:21
home 63:4
honest 19:6 52:24
honestly 12:10 37:8,11
Honor 47:20 48:10,20,22 60:15
   62:25
hope 58:2
hour 7:19
hours 62:6

**hysterical** 29:3

## I

**idea** 7:16 16:18 17:20 19:18,21
  28:24 43:13,15,21 50:8
**identification** 13:18 27:21 35:12
  67:3
**identified** 49:19
**identify** 50:25 51:2 64:20,22
**imagine** 39:21
**impair** 9:24
**important** 26:15
**included** 41:14
**including** 3:7 33:6
**income** 4:24 5:16 10:20 11:2
**incoming** 61:10
**incorrect** 59:5
**Index** 1:4
**indirectly** 68:14
**individual** 49:21,21
**inform** 40:5
**information** 36:2 59:9,11
**inheritance** 10:23 11:3
**inherited** 10:22,25
**inquiries** 51:8,15
**instructed** 48:21 51:20
**instruction** 9:13,21
**instructions** 9:6
**interest** 37:19 38:9,13,15 40:20
  41:2,3,5,7,11,12,21 45:13 48:7
  54:10,15,20 65:16,17
**interested** 38:22 58:10,14,18
  68:13
**Interesting** 15:18
**interfering** 64:2
**introduced** 30:14,20
**invest** 57:14
**invested** 12:7
**investing** 12:3
**investment** 11:19
**investments** 11:4,5,21 12:2,6,15
  19:4 39:2,19 53:19 54:2 56:13
  57:11 63:7
**invests** 11:20 39:17,20
**involved** 32:16
**irrelevant** 30:19
**issue** 4:21 36:9 50:4 57:13 60:11
**issued** 62:22
**items** 61:22 62:11

## J

**Jacqueline** 23:17 27:10,14
**jail** 34:16
**jarred** 20:20
**job** 38:21
**Joe** 62:2
**John** 24:17
**Jonas** 12:21
**Judge** 5:6 6:6 7:3,17 46:21 57:17
**July** 46:22 47:7,22
**June** 35:10,17 67:8

## K

**keep** 52:25 64:16
**keeping** 58:17
**kept** 58:16
**kidding** 43:12
**kind** 6:14 19:4 24:19,21 39:18
**kinds** 14:19 39:17
**knew** 21:5,7 37:21,22
**Knollwood** 2:15
**know** 6:11 7:10 11:13,14,23,24
  12:2,5,10,12,16,17 14:7 15:7,20
  16:3,5,15,20,25 17:17,22,24
  18:17,20 19:20,20 22:2 23:13,22
  23:25 24:9,18 25:25 27:3 29:11
  29:12,13,16 30:5,5,11,13 31:8
  31:12,20 32:2,3,8,8,9,10,13,15
  37:8,24,24 38:2,3,3,20 39:6,8,12
  39:23 40:12,21 41:4,15,16,19
  44:2,6,8 45:10 46:3,6,8 48:5
  49:14 52:23 57:25 58:21 62:9
  64:11,18
**knowledge** 37:18 40:10
**knows** 62:20 63:6
**KRAUSE** 2:4
**K-1's** 51:7

## L

**L** 3:2 4:2,2
**La** 24:17 59:18 65:8
**LaTessa** 25:18
**law** 22:15,17,18 26:24 27:7
**lawsuit** 44:19 59:3
**lawyer** 15:15,16,17,18,21 16:12
  18:9 20:15 23:2,5,6 31:21 32:11
  32:14 36:10,10 56:3 62:23,23
  64:20,23
**lawyers** 42:22 44:4,12 65:24

**learn** 41:6,10,12
**learned** 17:24 21:3 38:19 40:19,25
  45:12
**lecture** 34:3
**left** 63:24
**legal** 14:20 39:3
**legible** 47:4
**Leinbach** 2:6 4:7,13,18,23 5:6,11
  5:22,25 6:5,16,23 7:3,16 8:2
  13:13 27:17 33:24 34:5,9 35:4,8
  45:3,7 46:16 47:25 49:4,5,17,25
  50:7,15,23 52:4 55:8,16 62:24
  63:5,12,15 64:17 65:5
**length** 35:18
**letter** 27:19,24 29:2,10,21 32:20
  33:22 34:1 43:22,23,24 44:6
  67:7
**Let's** 37:15 41:24 42:2 44:9
**Lexington** 2:5
**life** 19:8 37:10
**limited** 48:9,12 51:12 55:4
**list** 60:6,10 62:14,18
**listed** 49:11 52:20 53:16
**listen** 9:2 58:13
**litigation** 21:18,19 22:6 24:5,6
  25:10,15,22 26:11 27:13
**little** 24:14 55:24 63:20 65:24
**living** 10:8,11
**LLP** 2:4,9,14
**lock** 62:5
**locked** 62:4
**long** 7:17 10:8 30:8 31:13 50:14
  62:12
**look** 13:25 14:2 28:2 32:17 36:14
  37:6,7,15,16,16 41:24 42:3 44:9
  52:20
**looked** 15:3,7
**looking** 12:16 13:19 27:23 35:14
**looks** 28:21,23 63:21 64:9
**LORI** 68:3,20
**lot** 37:9 45:22 62:2,7
**lovely** 11:8
**loving** 11:6
**Lyons** 2:14,16 4:16,19 5:4,9,19,24
  6:3,9,12,21,25 7:12,21 15:23,25
  21:21 25:2 26:19 27:9 30:4,10
  30:17 31:3,5,21,23,25 32:3,6
  33:20 34:2 35:16,22 38:14 40:23
  41:8 43:18 44:23 45:5 46:12

47:19,20,24 48:5,10,19 50:17,20
51:15 52:9 54:23 55:3,7 57:10
57:16,23 59:13,17 65:3,20

## M

magazines 43:4
mail 14:25
main 58:7
making 18:15
man 22:21 24:24 63:11
managers 53:17
Marcus 26:21
mark 13:14 27:18 35:8
marked 13:16,19 27:20,23 28:3
35:11,14 36:15 43:24
marriage 68:12
material 44:18 47:8 48:6 50:17
52:20 57:4
matter 24:6 48:4 68:15
McGOVERN 2:14
McLaughlin 26:25 27:7 61:11
mean 13:9 14:16,17 16:7 17:8
18:4 21:19 24:6 25:8 29:13 30:4
30:9,11 33:15 37:23 38:25 40:3
40:9,13 41:6 42:15,19 63:23
meaning 39:4
means 10:24 33:12,15 34:4
medications 9:24
member 12:8
members 25:9,11
memory 14:12 20:22 35:7
mentioned 15:6 20:23 22:7
met 25:4 30:17 58:15
Michailidis 2:11 24:25 25:5 52:9
59:17 60:2,9,15,19,24 61:9 65:9
65:10,18
mind 28:9 46:14
mine 17:11
minutes 47:12
moment 10:20 38:10 59:2
monetary 32:16
money 10:21 53:16 58:2,3,7,7,20
monies 10:23,24
month 61:14
morning 25:3
Morris 2:9 22:13,15,16
motion 3:12 46:23
mouth 51:25
move 3:8,10

musical 24:19
M-A-R-C-U-S 26:23

## N

N 2:2 3:2 4:2
name 4:8 7:25 10:3 11:14 24:17
24:18,23 26:14,22 27:3,14
named 22:21 23:16,19 24:24
26:25 48:25 49:21
nasty 64:9
naturally 60:3
necessary 18:22 56:4 57:4
need 7:22 9:15 33:21 34:3 48:5
50:2
negatively 48:18
nephew 11:8,16 58:8
never 27:13
New 1:2,2,11,12,12,13,24 2:5,5,10
2:10,15 4:4,12,12 13:23,23 33:6
nine 10:10,11
nods 8:23
nonresponsive 61:23
Non-Party 1:9 2:14
Notary 1:13 3:15,15 4:4 66:14
noted 33:25 34:6 66:6
noticing 4:13
number 32:18 35:24 41:24 42:3
49:4
numerous 41:17
N.Y 1:24

## O

O 3:2 4:2
oath 8:14 52:14
object 3:7,10 21:21 33:20 36:5,12
40:23
objection 33:24 34:6 35:23
obligation 55:13 58:23
obviously 41:19
occasion 8:7
occasions 5:8,12
odd 24:21
office 18:19 22:19
offices 59:16
okay 8:24 64:5,13
old 19:8 43:4
once 21:3,7 30:9 32:18 45:12,24
one-bedroom 18:18
opposed 55:23
opposing 61:19

option 51:24
order 4:22,23 5:5 8:25 33:7 46:23
47:7,17,23 56:16 66:3
original 3:17,21 47:3
originally 56:25
Orly 1:3 14:13 35:19
outcome 68:14
outside 50:4
oven 18:23
owned 12:8
o'clock 47:3 62:3,4,16

## P

P 2:2,2 3:2
page 57:7 67:3
pages 35:18
PAGE/LINE 69:2
paper 54:13
papers 14:17,18,19,20,21 18:2,3
42:17 43:3
paragraph 37:17,17 38:5 41:24
41:25 42:3 44:10,11
Parness 23:20,22 24:2,4,11,13
part 3:5 58:6
particularly 62:12
parties 3:4 46:20 47:13 50:10
68:13
partner 51:12
partnership 37:19 38:14 40:20
41:2,4 48:7,9,12,13 55:5
party 68:9
pawn 53:6,8 55:12
pay 31:23 32:6
payment 11:3
pays 31:25 32:3,10,14
penalty 33:18
pending 9:19 46:17
people 46:5 59:13
people's 62:20
person 16:9 39:5 42:25 63:22
64:24
pertaining 48:7
piece 64:9
pile 43:3
place 49:7
Plains 2:15
plaintiff 1:4,10 2:4 33:5
plaintiff's 13:17,20 27:18,20,24
28:3 32:20 35:9,11,15 36:15

43:25 44:9 59:24 67:3
please 4:8 9:9,16 10:3 22:24 26:18
  30:16 33:2 34:7 36:14 53:23
plenty 57:2
point 43:13 46:17 60:4
Portez 24:17 59:19 65:9
portfolio 37:25 38:21,24 39:9
position 59:3
possession 42:5,10,15,17,23 49:10
  49:15 63:17
possible 59:9
post 17:25 18:3,5,6 21:2
power 40:14
prefaced 62:12
preparation 36:4
prepare 12:24
prepared 51:5
prepares 12:22
present 42:21
presented 48:4
presume 61:2,3,7,8
previously 61:12
prior 36:4
probably 16:22,24 28:6
problem 47:16 49:2 52:2
process 8:10
produce 34:22 60:4 61:6,8
produced 7:2 48:11 60:7,12,14
  61:4,22 65:12
producing 61:5
professionally 55:11
professionals 59:7
properties 48:8
property 17:19
proposed 35:20
protects 58:3
provide 33:2,4 43:7 44:4 54:18
provided 3:5,19 7:24
provides 11:18 13:3
Public 1:13 3:15,16 4:4 66:14
purpose 58:25
purposes 36:11
pursuant 1:10
put 51:25
p.m 1:13 66:6

Q

question 3:7,10 6:10 8:19 9:4,5,8
  9:18,20 16:2 21:22 26:18,20

34:7,8,10,14 36:2 40:24 41:9
  43:19 44:25 46:17 52:18
questions 8:2,18 9:3 26:16 51:6
  63:2,6
quite 56:23

R

R 2:2 4:1,2 5:1 6:1 7:1 8:1 9:1
  10:1 11:1 12:1 13:1 14:1 15:1
  16:1 17:1 18:1 19:1 20:1 21:1
  22:1 23:1 24:1 25:1 26:1 27:1
  28:1 29:1 30:1 31:1 32:1 33:1
  34:1 35:1 36:1 37:1 38:1 39:1
  40:1 41:1 42:1 43:1 44:1 45:1
  46:1 47:1 48:1 49:1 50:1 51:1
  52:1 53:1 54:1 55:1 56:1 57:1
  58:1 59:1 60:1 61:1 62:1 63:1
  64:1 65:1 66:1 68:2
Ran 11:8,10,16 12:2 13:9 17:4
  18:25 19:3 39:14 40:9,14 49:22
  53:14 58:8
Ran's 11:12
read 15:5 32:23 34:9,11
reads 37:17 44:11
real 57:21 58:2,3
really 16:4,25 23:12 30:5,6 41:23
  45:15 53:4 56:18 59:21
reason 56:9
recall 5:11 8:8 13:4 14:8 15:6 18:8
  18:10,15 20:2,4,5 22:3,9 23:7,18
  24:10 26:3,5,10 27:6 29:17,19
  29:20,22,23,25 30:2,21,23 31:2
  31:17,18,19 34:17 36:19,20,21
  36:22,23 37:5 40:17,18 44:3
  45:16,17,18,21 64:18
received 15:12 16:13 28:11 29:10
  29:21 32:25 34:18 43:22 59:22
  64:21
receiving 18:6,9 28:16,20 31:16
recognize 28:5,6,7
recollection 20:20 37:2
recommended 31:3
reconvene 62:15
record 4:8 6:17 10:4 34:11 68:10
records 6:12,19,24 7:5,9,14 53:2
  57:12 60:16,22
redact 51:24
redacted 48:22 50:24 51:21,22
redacting 47:10 50:21

referred 5:23 47:5
referring 5:21 15:9
refers 36:2
reflect 5:15 7:5 48:16 54:19
refresh 14:12 36:25
regard 19:13 20:13,16 40:14
regards 8:18 18:16 65:14
reign 39:22,24 40:2
relate 4:20 5:13 42:23 43:8 49:10
related 48:24 51:3 54:13 65:15
relates 45:2,3
relating 44:13
relevant 26:17
relied 63:10
relief 33:5
remember 14:7 15:2,15,17 16:4
  16:16,23 17:2,3,22 18:12,13
  19:6,7,9,9,11,14 20:8,18 21:9,10
  23:12,15 24:20 26:2 27:16 28:10
  28:13,15,16,18,20,25 29:4,5,7,8
  29:14,15,16 30:7,12 31:6,13,22
  35:3 37:12 40:16,21,22 41:23
  43:17 45:15,23 61:11 63:18
repeat 41:8
repeatedly 49:13
reporter 8:21,22 34:12
REPORTING 1:23
representative 61:13
represented 30:9 61:12 68:9
representing 59:8 64:21
request 30:19 55:21 56:3
requested 7:23 33:3,4 50:9 56:2
requests 59:24
reserved 3:9,12
resistance 48:3
resolve 36:9
respect 59:6
respective 3:4
respond 9:3,19 46:24
response 49:3,5,6 63:6
responsibility 61:5
responsive 4:17,20 5:10,13 7:24
  42:6,24 47:5 52:11 60:5,7 61:23
  62:10
retained 31:20
return 3:17
returnable 57:2
returns 12:17 20:11 47:9 48:14,15
  48:23 50:21,22

right 3:7 28:4 32:7,21 38:23 47:19
    47:23 59:5,25
rights 3:5,19
River 17:9
Riverside 15:6 16:24 17:10,16,17
    17:18 19:19 20:24 21:3,7 34:23
    37:20,25 38:13 40:20 41:13,21
    42:11 43:5,9 44:13,13 45:8,13
    46:2 48:8,12,20,24 49:10 51:4,8
    60:19,22
Road 2:15
Rochelle 1:9 4:9 10:5 13:22 27:25
    35:21 65:15 66:9 68:4
role 54:5
Rule 3:19
rules 3:6 8:12
runs 53:15
R-A-N 11:9

_____ S _____

S 2:2 3:2,2 67:2
Sagi 1:6 11:7 12:12 13:10 16:7
    17:2 19:5 25:8 29:18 35:19
    39:12 40:13 49:20 57:8,20 58:4
    59:16,19 61:12
Sagi's 58:21 62:22
Sash 22:22,25 23:4,8,11,14 27:10
    27:14 30:19,24 31:2,10
saw 28:8 36:20
saying 5:14,18 6:18 26:2 37:4,5
says 56:11
scribble 47:11
search 18:10,15,22 21:4 52:11
searches 65:14
searching 18:19
second 32:23 44:10
see 4:14 7:19,21 14:14 32:22 33:9
    37:5,13 47:14 64:12 65:25
seeing 36:19,21,22 37:5
seek 33:5
seen 14:4,8 36:17 37:2,10
selecting 39:4
sell 40:4,6
semblance 66:2
sentence 32:24 44:20,21 53:23
separate 58:16,17
seriously 59:14
served 14:23 47:22
SERVICE 1:23

services 13:2 31:23,25 32:4,6
set 68:17
settlement 36:11
SHEET 69:2
Shirley 25:18
show 6:13 7:14 14:11 36:25 62:3
showing 47:2
siblings 59:8
sister 25:16,17,18,19 58:24 59:4
sisters 25:19
sit 38:6 42:4 44:22 45:25 57:3,7
    65:24
skin 63:25
slip 21:14
Solomon 5:6 6:6 7:3,17
Solomon's 46:21
somebody's 53:5
son-in-law 11:7,25 16:6,7,21
    19:25 20:3 22:5,9 23:24 29:18
    32:9,10,14 38:2 41:14 49:20
    54:4,16 55:22 56:3,7
son-in-law's 27:4 54:9,13
sorry 12:23 21:14 43:20 44:17
    53:24
sort 15:7 18:10 21:4 30:18 41:20
sought 57:5
sounding 24:23
sounds 7:6,7 24:18,22 52:5
source 10:20
spaces 52:19
speak 17:4 18:24 19:3,5,25 20:9
    20:10,10 22:5,12,18 24:13 26:9
    27:12,14 29:9 31:5 55:25 59:18
speaking 20:2,19 26:3 27:6,6
specific 14:24
specifically 6:7
spoke 16:11 18:8 20:5 23:10,14,25
    24:9,10 25:11,15 26:11 27:13
    29:6,7,17,23 31:6 44:3 45:23
    59:19
spoken 21:17 22:21 23:16,19 24:4
    24:16,24 25:8,21
stand 52:15
standing 55:17
starters 6:18
state 1:2,13 4:4,8 8:20 10:3 35:22
stated 6:7 26:12 45:13 46:9 49:13
    50:7 64:17 65:7
statement 42:5,7 45:25 65:10

statements 4:14 5:3,15
stenographically 68:7
Stern 26:25 27:8 61:11
STIPULATED 3:3,23
stocks 39:18
Street 1:11 4:11 10:7 13:22
stressed 35:6
strike 3:8,10
stuff 14:13,16 39:18
subpoena 1:10 4:17,21 5:21 13:15
    13:20,23 18:5,6,9,16 19:2,13,19
    20:13,17 21:2,20 24:7 26:12
    31:16 33:3,8,23 34:25 36:10
    42:6,24 46:4,6,24 47:6,21 48:25
    49:12 50:12 52:12,21 54:8 55:18
    56:17,23 62:21 64:22 66:4 67:5
Subscribed 66:11
suggest 56:15
suggestion 7:18
supposed 23:2 37:9 51:21
Supreme 1:2,11 33:6
sure 7:8 9:16 12:10 15:24 25:11
    28:8 30:18 32:15 35:2,5 40:11
    40:24 44:7 63:24 64:15
sworn 3:14 4:3 8:14 35:20 66:11
    68:6
S&P 39:18

_____ T _____

T 3:2,2 67:2 68:2,2
table 58:15
take 8:21 9:15,20 13:25 14:2 28:2
    36:14 37:15 46:12,18 53:10,18
    62:15
taken 1:10 68:7
talk 45:22 46:2 56:6,11 65:8
talked 16:20,23 64:19,24
talking 17:14 45:8 46:4 48:2
    61:25 62:8 64:8
tax 12:16 20:11 47:8 48:14,15,23
    50:21,22
taxes 12:22,24 13:3
tecum 13:16,21 46:25 67:5
Telemus 11:15 53:15
tell 8:14,25 9:9,16 10:19,24 11:21
    11:24 12:14 14:13,18 19:16
    22:24 25:14 28:21 30:16 44:7
    50:18 51:24 55:21
telling 23:3 35:3

ten 53:16
tend 35:5 64:6
term 39:6
terms 60:24
testificandum 13:16,21 46:25
    67:6
testified 4:5 40:25 41:3 45:6 49:8
testify 15:23,25 35:24 44:23
testifying 36:6
testimony 3:8,11 9:25 52:7 68:6,7
thing 65:8,11
things 5:14 6:6 10:21 12:6 14:14
    23:3 34:19 35:5 37:9 39:17
    40:10 41:14 50:25 57:19 59:13
think 6:4 12:13 14:24 15:15 21:9
    24:8 33:14,21 34:2 41:2 52:4
    56:19,20 57:9 60:10 65:23
thought 59:10
tight 62:4
time 14:2,22 16:12 20:15,23 23:25
    24:9,10 25:6 27:5 28:18 35:6
    38:11 56:23 57:3 66:6
times 41:17
today 6:8,20,24 7:5 9:25 25:5 38:6
    42:4 47:2 48:6 51:20 52:3,14
    55:17 62:17 64:3 65:23
told 17:2,21,23 20:24 22:10 27:15
    30:24 40:22 41:17 46:5 58:2
    61:4
tomorrow 62:16 66:4
top 53:16
totally 15:19 28:9
transaction 60:16
transactions 57:22
transcribed 68:8
transcript 68:10
transfer 57:19
transfers 4:25 5:16 6:13,15 7:6,11
    7:13,14 57:14
translate 8:22
treated 58:22
trial 3:13
tried 56:16
true 42:7 44:15,21 45:25 65:19,20
    68:10
truth 8:14,25 14:14,18 46:8
truthful 9:25
try 51:17
trying 15:14 41:18 56:20 59:7

61:19,20
two 26:7,8 35:18 41:25 53:11 62:6
T-E-L-E-M-U-S 11:15

---
U
---
U 3:2
understand 6:17 7:8 8:12,13,15
    9:4,6,8,10,12,13,21 15:24 16:2
    23:4 33:11,18 34:5 41:18 42:14
    42:18,19 43:6 44:20 45:7 46:7,9
    54:7 57:6 63:15
understanding 60:12
understood 37:14 47:15
unfortunately 50:2 61:9
Uniform 3:6
universe 56:13
unredacted 50:22,24
unrelated 59:13
upsetting 16:17
use 57:20 59:15 62:17
useful 59:10

---
V
---
vaguest 16:18 17:20 19:21 43:13
value 57:19
versus 35:19
violation 55:12,18

---
W
---
waived 3:22
waiver 3:12,18
want 6:17 7:7 46:7,12 52:3 58:21
    63:23 64:15 66:5
wanted 47:15
wants 39:22
wasn't 18:22 23:6
way 9:11 34:20 59:21
week 38:18,19 41:20
went 28:9 46:20
West 4:11 10:7 13:22
WHEREOF 68:17
White 2:15
wish 40:4
witness 1:9 2:14 3:14,25 6:11,14
    15:22 34:13 43:20 46:14 52:6,16
    52:22 53:4,7,11,14,21,24 54:6
    54:11,16 56:2,8,19,24 58:6,11
    62:10,18 64:4,6,12,14 68:5,11
    68:17
woman 63:10

wondering 24:20 41:22
word 33:14 39:3,5 42:14,19
wording 28:22
words 51:25 57:6
work 13:6 61:19 62:20
wouldn't 19:21 25:12 46:14 53:7
    57:23
wrong 59:5
wrote 46:22

---
X
---
x 1:3,7 67:2
xxxxx 2:19

---
Y
---
year 12:15
years 10:10,12,17 19:8
yesterday 19:10
York 1:2,2,11,12,12,14,24 2:5,5
    2:10,10,15 4:4,12,12 13:23,23
    33:6
young 24:14 35:4

---
Z
---
ZEICHNER 2:4

---
1
---
1 13:14,17,20 35:24 49:4 62:11
    67:5
10 10:16 62:16
10:00 47:3
10006 2:10
10022 2:5
10023 4:12
100697/08 1:4
10271 1:24
10603 2:15
120 1:23
13 67:5
14A 4:11
15 35:11,17 67:8
1540 2:10

---
2
---
2 27:18,21,24 28:3 32:18,20 43:25
    62:3 67:7
2:30 1:12
20 47:12
2006 48:14
2009 48:15

**2011** 1:12 13:24 27:20,25 35:11,17
  66:12 67:7,8 68:5,18
**212-732-8066** 1:24
**22nd** 1:12 68:5
**221** 3:5
**25** 46:22 47:7
**253** 4:11 10:7 13:22
**26** 27:20,25 67:7
**27** 13:24 67:7

---
**3**

**3** 35:9,12,15 36:15 44:9 67:8
**31** 33:3
**3116** 3:19
**35** 67:8
**399** 2:15

---
**4**

**4** 37:17,17 38:5
**4:30** 62:6 66:6

---
**5**

**5** 41:24 42:3 62:4
**5s** 41:25
**575** 2:5

---
**6**

**60** 1:11
**68** 19:8

---
**7**

**73rd** 4:11 10:7 13:22

---
**8**

**8** 62:11

**EXHIBIT M**

SURROGATE'S COURT : NEW YORK COUNTY                    JAN 02 2009
---------------------------------------- X
In the Matter of the Trust Established
on December 13, 1993, by ARIE GENGER                   File No. 0017/2008
for the Benefit of ORLY GENGER.
---------------------------------------- X

R O T H ,  S .

        This is a contested application by the primary beneficiary

(Orly Genger) of an irrevocable inter vivos trust established by

her father, Arie Genger, seeking the appointment of a successor

trustee or, alternatively, the appointment of a "special trustee"

to investigate alleged wrongdoing concerning the trust.

Petitioner's mother, Dalia Genger (grantor's former wife),

contends that she is the duly appointed successor trustee and

that there is no basis to appoint another fiduciary for any

purpose.

        The trust agreement, dated December 13, 1993, provides for

discretionary income and principal distributions to Orly for life

with remainder to her descendants or, if none, to the grantor's

descendants in trust.

        Article SEVENTH (B), (D), (E), and (G) of the trust

instrument sets forth the following procedure for the resignation

of trustees and the appointment of their successors.

        A trustee may resign by delivering a signed and acknowledged

instrument of resignation in person or by certified or registered

mail to the other trustee and to either the grantor or the income

beneficiary.  Such resignation is effective upon the receipt of

the acknowledged instrument by the other trustee (if there is

one) and the grantor or the income beneficiary or at such later date as may be specified in the instrument.

A trustee may appoint his or her successor by delivering a signed and acknowledged instrument in the same manner as described above for resignation. Any such appointment, however, is valid only if the appointee qualifies by delivering a signed and acknowledged instrument of acceptance in person or by certified or registered mail to each trustee and the grantor or the income beneficiary within 30 days after the later of 1) the date on which a copy of the appointment instrument is delivered to him or her, and 2) the effective date of the appointment as set forth in the appointment instrument. It is observed that there is no provision that requires a resigning trustee to appoint a successor or that there always be two trustees in office.

The original two trustees served until October 2004, when they resigned and appointed David Parnes and Eric Gribitz as their successors. On February 12, 2007, Mr. Gribitz resigned without appointing a successor. On April 26, 2007, Mr. Parnes resigned and appointed as his successor Leah Fang in a signed and acknowledged instrument. Although Ms. Fang noted her acceptance at the bottom of such instrument, her signature was not acknowledged. However, in another document entitled "Release" executed and acknowledged by Ms. Fang the same day, she, as

2

trustee, purported to discharge Mr. Parnes from liability. It is undisputed that thereafter Ms. Fang acted as trustee. Indeed, Ms. Fang's contention that she received a number of requests for information from petitioner and that petitioner referred to her in writing and orally as trustee is not disputed by petitioner.

On December 12, 2007, Ms. Fang, without resigning in accordance with the trust agreement, attempted to appoint Patricia Enriquez, as successor trustee. Her designation of Ms. Enriquez, however, was by an unacknowledged letter in which she referred to her own resignation as taking effect upon Ms. Enriquez's acceptance of the appointment. Ms. Enriquez accepted by signing the letter, but such acceptance was not acknowledged and, in any event, there is nothing in the record to suggest that such "acceptance" was delivered in accordance with the trust instrument. Two weeks later, an attorney for Ms. Enriquez notified petitioner's counsel by email that her client had advised that she had no intention to overcome the procedural omissions.

On January 3, 2008, Ms. Fang and Dalia Genger signed before a notary a memorandum in which Ms. Fang stated that "to the extent that I am still vested with any powers to appoint trustees of the [trust], I confirm your appointment." The next day, Ms. Fang executed an acknowledged instrument of resignation and appointment of successor trustee naming Dalia as her successor

3

and Dalia, on the same day, executed an acknowledged instrument of acceptance. It is undisputed that such documents were delivered in accordance with the trust requirements.

We address first that portion of the instant application which seeks the appointment of a successor trustee on the ground that Dalia was not validly appointed. In such connection, petitioner argues first that, because Ms. Fang's signature on the bottom of Mr. Parnes's appointment instrument was not acknowledged, she never accepted the position in accordance with the trust agreement (and thus could not appoint Dalia her successor). However, such argument ignores the "Release" mentioned above that Ms. Fang executed the same day. Such instrument, which was signed and duly acknowledged, unequivocally establishes Ms. Fang's acceptance of the position. Since petitioner does not challenge the authenticity of such instrument or Mr. Parnes' contention, supported by the record, that it was delivered in accordance with the trust instrument and, as noted above, petitioner thereafter communicated with Ms. Fang as trustee, Ms. Fang properly qualified as successor trustee.

Petitioner's second argument that, in any event, Ms. Fang's appointment of Dalia was ineffective because Ms. Fang had previously resigned as trustee is also without merit. Simply put, Ms. Fang had not previously resigned because her letter to Ms. Enriquez did not contain the formalities (i.e., an

4

acknowledgment) required by the trust agreement. Moreover, although not a model of clarity, the letter makes clear that Ms. Fang did not intend to leave the trust without a trustee in the event that Ms. Enriquez failed to qualify, which is exactly what happened. Thus, Ms. Fang had authority to appoint Dalia as her successor.

Since there is no dispute that the instrument of resignation and appointment executed by Ms. Fang on January 4, 2008, and Dalia's instrument of acceptance of the same date were executed and delivered in accordance with the trust agreement, Dalia is the duly appointed successor trustee of the trust. To find otherwise would be to ignore the chronology of events and the purpose of the provisions at issue, namely to ensure that the trust always has a fiduciary ready, willing and able to act. The fact that petitioner does not wish her mother to be the fiduciary because she considers her an adversary in a broader intra-family dispute does not provide a basis to ignore the grantor's intent, as reflected in the trust instrument, that an acting trustee, and not the beneficiary, decides who shall become a successor trustee. Accordingly, petitioner's application to appoint a successor trustee is denied.

We next turn to petitioner's alternate request for relief, namely that a "special trustee" be appointed for the "purpose of investigation and taking discovery with respect to the wrongful

5.

dealings concerning the assets and income of the trust."

It is noted initially that petitioner's only allegations of "wrongful dealings" concern a close corporation, TPR Investment Associates, Inc.   She contends that her brother Sagi, who is an officer of TPR, and Dalia, who was a shareholder at the time this proceeding was commenced, are engaged in a "wrongful scheme" to divert assets to themselves and, as a result, Dalia "could not possibly" investigate wrongdoing at TPR, which the petition describes as the "greatest" asset of the trust.

However, the premise of the application, namely that the trust's interest in TPR would enable the trustee to investigate or seek relief from TPR, does not appear to be correct. Petitioner does not dispute Dalia's assertion, supported in the record, that the trust is not a shareholder of TPR at all. Rather, D&K LP, an entity in which the trust owns a 48 percent interest, in turn owns approximately 50 percent of TPR. Petitioner does not explain what appears to be a material misstatement concerning TPR's relationship to the trust.  Nor does she identify how a trustee under such circumstances might be in a position to "investigate and address the TPR issues".

In any event, assuming arguendo that a trustee would somehow be able to investigate alleged misconduct at TPR, petitioner's vague and speculative allegations of "wrongful conduct" at TPR from which Dalia purportedly benefitted do not warrant the

appointment of a "special trustee". Similarly, petitioner's allegations (made upon information and belief) that Dalia had knowledge of alleged improper acts by former trustee, David Parnes, in relation to TPR are patently insufficient to warrant the remedy of a "special trustee". In such connection, it is noted that Mr. Parnes and Ms. Fang have been directed to account for their proceedings as trustees (Matter of Genger, NYLJ, Feb. 25, 2008, at 29, col 3), giving petitioner a forum to seek relief for most of the conduct about which she complains.

Finally, it is observed that petitioner has not alleged that Dalia has refused a request for information, which would warrant relief (SCPA 2102), or has failed as trustee to protect trust assets. Indeed, it appears that Dalia (who states that she is ready and able to act as fiduciary) has yet to assume the duties of trustee in deference to her daughter's position in this litigation. As a validly appointed trustee, she should be given the opportunity to do what she deems necessary to manage and protect the trust's assets.

Based upon the foregoing, the appointment of a "special trustee" is unwarranted at this time and, accordingly, the application is denied, without prejudice to renewal if future

7

circumstances warrant such relief.

This decision constitutes the order of the court.

_____
S U R R O G A T E

Dated: December 31, 2008

8

**EXHIBIT N**



SULLIVAN
WORCESTER

Sullivan & Worcester LLP
1290 Avenue of the Americas
New York, NY 10104

T 212 660 3000
F 212 660 3001
www.sandw.com

November 11, 2008

The Honorable Renee R. Roth
Surrogate's Court, New York County
31 Chambers Street, 5th Floor
New York, New York 10007

Re:    In the Matter of Orly Genger File No. 0017/2008

Dear Surrogate Roth:

We are counsel for Dalia Genger ("Dalia"). We write in response to the letter from Eve
Rachel Markewich, counsel for Petitioner, Orly Genger ("Orly"), dated November 5, 2008.

Ms. Markewich's letter is based on the false pretense that Dalia Genger controls TPR. As set
forth more fully in the Affidavit of Dalia Genger, sworn to on November 10, 2008, and
attached hereto, Dalia is not a shareholder, officer or director of TPR. Accordingly, there is
no conflict.

Ms. Markewich's letter does, however, finally acknowledge what Dalia has represented to
this Court all along, that the most valuable asset in the Orly Genger Trust, are the shares of
TRI. In her Amended Petition, Orly claimed that the Orly Genger Trust's greatest asset is
the shares of TPR. (Petition ¶25). In her Affidavit sworn to on March 11, 2008, Dalia stated
that neither the Orly Genger Trust nor Orly had any ownership interest in TPR, and that the
Orly Genger Trust's only asset is its 20% ownership interest in TRI. (Dalia's March 11, 2008
Aff., ¶¶4-7). Now, contradicting Orly's petition, and confirming the testimony in Dalia's
Affidavit, Ms. Markewich states in the third paragraph of the first page of her letter that the
Orly Genger Trust's most valuable asset is shares of TRI. Ms. Markewich further concedes
that the TRI shares held by the Orly Trust are potentially worth tens of millions of dollars.
As previously addressed in Dalia's March 11 Affidavit, Orly's interest in TPR is a negative
value.

We respectfully request that Orly's Application be denied.

Respectfully submitted,

Jonathan G. Kortmansky

Direct line:  212 660 3044
jkortmansky@sandw.com

cc:    Eva Rachel Markewich, Esq. (by fax)
       Steven Hyman, Esq. (by fax)
       Matthew Hoffman, Esq.(by fax)
       Seth Rubenstein, Esq. (by fax)
       Mary Santamarina, Esq. (by hand)

{N0130319; 1}
BOSTON   NEW YORK   WASHINGTON, DC

**EXHIBIT O**

<u>Meeting of Partners of D&K LP – Jan. 31, 2009 & Agreement</u>

The undersigned partners having reviewed the status of D&K LP ("D&K") and each of its partners vote as follows to:

1. Indemnify and provide a general release from any claim or right at equity, law, or contract or otherwise the current and former general partner, its officers, the partnership's holdings (including TPR Investment Associates, Inc.) and the officers of its holdings to fullest extent permitted in connection with any claim by the partnership and/or its partners. Irrespective of the above, nothing herein shall serve to release or indemnify Arie Genger, William Dowd, Lawrence Small or Edward Klimerman.

2. Authorize the General Partner on behalf of D&K and each limited partner individually to enter and execute such binding compromise as may be possible and deemed prudent by the GP in connection with the outstanding note from D&K guaranteed 50% by each limited partner. Such note having a balance of about $11,204,685 is presently subject to acceleration. Nothing herein shall derogate from authority already granted the General Partner in the Partnership Agreement.

3. The partners wish to clarify that the authority vested in the General Partner to make limited partners' assets subject to a pledge shall be done in substantially the same manner in which TPR Investment Associates, Inc shares were pledged in conjunction with the aforementioned note. However, the General Partner shall be authorized to sign for the partnership and/or each individual partner.

4. Provide such consideration as the GP may deem fit in entering into any compromise.

5. Waive any objection to the dealings of the GP or its officers based on conflict of interest or otherwise.

6. Request that the General Partner make this resolution part of the Partnership Agreement.

7. Attached is a worksheet calculating the amount owed, $11,204,685.

8. TPR Investment Associate, Inc. has agreed to refrain from enforcing the note against each limited partner for thirty days..

Orly Genger 1993 Trust – LP

Sagi Genger 1993 Trust – LP

Sagi Genger on behalf of General Partner

TPR Investment Associates, Inc.

## Meeting of Partners of D&K LP – Jan. 31, 2009 & Agreement

The undersigned partners having reviewed the status of D&K LP ("D&K") and each of its partners vote as follows to:

1. Indemnify and provide a general release from any claim or right at equity, law, or contract or otherwise the current and former general partner, its officers, the partnership's holdings (including TPR Investment Associates, Inc.) and the officers of its holdings to fullest extent permitted in connection with any claim by the partnership and/or its partners, irrespective of the above, nothing herein shall serve to release or indemnify Arie Genger, William Dowd, Lawrence Small or Edward Klimerman.

2. Authorize the General Partner on behalf of D&K and each limited partner individually to enter and execute such binding compromise as may be possible and deemed prudent by the GP in connection with the outstanding note from D&K guaranteed 50% by each limited partner. Such note having a balance of about $11,204,685 is presently subject to acceleration. Nothing herein shall derogate from authority already granted the General Partner in the Partnership Agreement.

3. The partners wish to clarify that the authority vested in the General Partner to make limited partner assets subject to a pledge shall be done in substantially the same manner in which TPR Investment Associates, Inc. shares were pledged in conjunction with the aforementioned note. However, the General Partner shall be authorized to sign for the partnership and/or each individual partner.

4. Provide such consideration as the GP may deem fit in entering into any compromise.

5. Waive any objection to the dealings of the GP or its officers based on conflict of interest or otherwise.

6. Request that the General Partner make this resolution part of the Partnership Agreement.

7. Attached is a worksheet calculating the amount owed, $11,204,685.

8. TPR Investment Associate, Inc. has agreed to refrain from enforcing the note against each limited partner for thirty days.

_____
Orly Genger 1993 Trust – LP

_____
Sagi Genger 1993 Trust – LP

_____
Sagi Genger on behalf of General Partner

_____
TPR Investment Associates, Inc.

| | |
|---|---|
| Rate | 6.1% |
| | Owing |
| Tuesday, October 26, 2004 | 9,860,000 |
| Portion Not Assumed by Parents | 9,484,800 |
| | |
| Friday, October 31, 2008 | 1466 |
| Days in Year | 365 |
| | 4.02 |
| Interest rate for Period | 26.7% |
| | |
| Dollars of Interest | 2,528,289.02 |
| | |
| Amount Due | 12,013,089.02 |
| Payment | (960,000.00) |
| | |
| Net of Payment | 11,053,089.02 |
| | |
| | |
| Saturday, January 31, 2009 | 92 |
| Days in Year | 365 |
| | 0.25 |
| Interest rate for Period | 1.4% |
| Dollars of Interest | 151,595.73 |
| | |
| Current Amount Owed | 11,204,685 |
| | |
| | 5,602,342.38 |

**EXHIBIT P**

January 10, 2009

Dear Mom,

I understand that my petition to appoint Martin Coleman as Trustee of the Orly Genger 1993 Trust ("Trust") has been denied. My attorneys are reviewing the decision and considering all of my options, including whether to appeal.

For now, and until further notice, it is my strong desire to retain all of the shares of Trans-Resources, Inc. ("TRI") that are currently in the Trust, and I direct you not to sell them. If you are approached, or have been approached, with an offer to purchase any of the TRI shares in the Trust, please notify me immediately. If, despite my wishes, you consider accepting an offer, do not sell any shares until I have a reasonable period of time to maximize the benefit to the Trust, including possible alternative transactions.

As you know, the Trust's TRI shares are subject to an Irrevocable Proxy, dated as of October 29, 2004, in favor of my father, Arie Genger, as well as a voting trust letter agreement with a back-up form of voting trust agreement and voting trust certificate delivered in connection with the Proxy. Copies of those documents are attached. If anyone approaches you about the TRI shares, I insist that you inform them of these facts, and provide them with a copy of this letter and attached documents.

*Olenger*   1/10/2009

Orly Genger

**EXHIBIT Q**



**COZEN**
**O'CONNOR**

A PROFESSIONAL CORPORATION

250 PARK AVENUE    NEW YORK, NY 10177    212.509.9400    800.437.7040    212.986.0604 FAX    www.cozen.com

May 14, 2009

**Judith E. Siegel-Baum**
Direct Phone 212.883.4902
Direct Fax   215.701.2261
jsiegel-baum@cozen.com

**VIA CERTIFIED MAIL/RETURN**
**RECEIPT REQUESTED**
**70032260000561427704**
**AND REGULAR MAIL**

Dalia Genger
200 East 65th Street
Apt. 32W
New York, NY  10021

Re:    Orly Genger 1993 Trust

Ms. Genger:

Please be advised that we represent Orly Genger in her capacity as beneficiary of the Orly Genger 1993 Trust (the "Trust"). You are presently serving as her sole trustee.

Orly has received no information about the assets, income and investments of the Trust and is very concerned that the assets of the Trust have been, or could be, affected by the following lawsuits: Glenclova Investment Co. v. Trans-Resources, Inc., and TPR Investment Associates, Inc. (pending in the Southern District of the State of New York); Robert Smith, TR Investors, LLC and Glenclova Investment Co. v. Trans-Resources, Inc. (pending in Delaware Chancery Court); TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC v. Arie Genger and Trans-Resources, Inc. (pending in Delaware Chancery Court); and New TR Equity, LLC v. Trans-Resources, Inc. (pending in Delaware Chancery Court). Moreover, Orly is concerned that the value of TRI shares owned by the Trust have been impacted by the sale of TRI shares owned by the Sagi Genger 1993 Trust (the "Sagi Trust") to TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC.

Please provide us with the following documents by May 26, 2009:

1.    All documents relating to the assets of the Trust from 2004 through the present.

Dalia Genger
May 14, 2009
Page 2

2.    All documents relating to any and all investments and trades made directly by, or indirectly by, the Trust for the period 2004 through the present including, without limitation, all statements of transactions.

3.    All documents relating to all purchases, sales, transfers and assignments of real or personal property directly by, or indirectly by, the Trust from 2004 through the present including, without limitation, closing statements, deeds, title reports, canceled checks, transfer tax documents, appraisals, catalogues and insurance policy riders.

4.    All documents relating to any and all distributions or payments of money or securities directly by, or indirectly by, the Trust for the period 2004 through the present.

5.    All documents relating to any and all dividends or other payments of money received directly by, or indirectly by, the Trust for the period 2004 through the present.

6.    All documents relating to any and all fees, commissions, reimbursement for expenses and other charges or compensation paid directly by, or indirectly by, the Trust for the period 2004 through the present including, without limitation, canceled checks and wire transfer reports.

7.    All documents relating to any promissory notes, accounts payable and debts and loans owed directly by, or indirectly by, the Trust for the period 1993 through the present.

8.    All U.S. and N.Y. Fiduciary Tax Returns including all back-up documents filed since the Trust's inception.

## D & K GP LLC ("D & K GP")

9.    The Trust has an interest in D & K LP ("D & K"). D & K GP is the general partner of D & K. Accordingly, we request the following documents related to D & K GP for the period 2004 through the present including, without limitation, amendments to the Limited Liability Company Agreement of D & K GP LLC, Schedule A (and amendments) to the Limited Liability Company Agreement of D & K GP LLC (i.e., a list of capital contributions made by the Members), a list of Members from 2004 through the present, subscription documents, tax returns, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes, statements of income distribution to you, the Trust, the Sagi Trust, Sagi Genger ("Sagi") and/or to any other party, records of contributions or investments by you, the Orly Trust, the Sagi Trust, Sagi and/or by any other party, cash receipts, cash disbursements journals, general ledgers, a list of employees from 2004 through the present, a list of appointed management and their compensation schedules from 2004 through the present, W-2s issued and 1099s issued.

Dalia Genger
May 14, 2009
Page 3

## D & K LP ("D & K")

10.    All documents relating to D & K for the period 2004 through the present including, without limitation, all partnership agreements and amendments, a list of capital contributions by each partner from 2004 through the present, a list of all partners from 2004 through the present, subscription documents, tax returns, K-1 statements, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes, statements of income distribution to you, the Trust, the Sagi Trust, Sagi and/or to other parties, records of contributions or investments by you, the Trust, the Sagi Trust, Sagi and/or by other parties, cash receipts, cash disbursements journals, general ledgers, a list of employees, W-2s and 1099s.

11.    All documents relating to the sale or assignment of your interest in D & K to Sagi, D & K GP, the Sagi Trust or any other party including, without limitation, the date on which the sale or assignment was made, the purchase and sale agreement (if by sale and not by assignment), transfer documents, closing documents, canceled checks and appraisals.

12.    All documents relating to the assignment of D & K's promissory note in favor of TPR (dated December 21, 1993) to David Parnes (the "Promissory Note").

## TPR Investment Assocs., Inc. ("TPR")

13.    All documents relating to TPR from 2003 though the present including, without limitation, amendments to TPR Investment Associates, Inc. Shareholders Agreement dated October 30, 2004 ("TPR Shareholder Agreement"), shareholder agreements preceding the present TPR Shareholder Agreement, tax returns, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes from all board meetings and Sale Meetings (as that term is defined in §3.3 of the TPR Shareholder Agreement), records of contributions or investments by you, the Trust, the Sagi Trust and/or Sagi, cash receipts, cash disbursements journals, balance sheets, general ledgers, a list of employees, W-2s, 1099s, statements of income distribution to you, the Trust, the Sagi Trust, Sagi and/or to any other party, a list of the board of directors from 2003 through the present and a list of appointed management from 2003 through the present and each of their compensation schedules.

14.    All verification of loan and interest repayments to and from TPR from 2004 to the present.

15.    All documents relating to the sale, assignment and collections received from David Parnes in connection with the Promissory Note.

16.    All documents relating to your sale of each tranche of TPR shares either back to TPR, to Sagi or to any other party including without limitation, a copy of the "Sale Notice" (as that term is defined in §3.3 of the TPR Shareholder Agreement), the "Evaluated Share Value" (as that term is defined in §3.3(a)(v) of the TPR Shareholder Agreement), closing documents, canceled checks and appraisals.

Dalia Genger
May 14, 2009
Page 4

---

## Trans-Resources, Inc. ("TRI")

17.    All documents relating to TRI from 2003 though the present including, without limitation, shareholder agreements and amendments, tax returns, financial statements (including balance sheets, profit and loss statements, income statements, operating and expense statements), minutes from all board meetings, records of contributions or investments by you, the Trust, the Sagi Trust, Sagi and/or any other party, cash receipts, cash disbursements journals, balance sheets, general ledgers, a list of employees, W-2s, 1099s, and statements of income distribution to you, the Trust, the Sagi Trust, Sagi and/or any other party, a list of all board of director members since 2003 and a list of all appointed management since 2003 and each of their compensation schedules.

18.    The Trust owns TRI shares and as a fiduciary you should have had knowledge that the Sagi Trust sold its TRI shares on August 22, 2008 to TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC. Provide us with all documents relating to the sale of TRI shares by the Sagi Trust.

19.    The assets of the Trust may be affected by the following lawsuits:

(i)    Glenclova Investment Co. v. Trans-Resources, Inc., and TPR Investment Associates, Inc. pending in the United States District Court, Southern District of New York;

(ii)    Robert Smith, TR Investors, LLC and Glenclova Investment Co. v. Trans-Resources, Inc. pending in the Delaware Chancery Court;

(iii)    TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC v. Arie Genger and Trans-Resources, Inc. pending in the Delaware Chancery Court; and

(iv)    New TR Equity, LLC v. Trans-Resources, Inc., pending in the Delaware Chancery Court.

Accordingly, as trustee provide us with copies of documents relating to the above-set-forth proceedings including, without limitation, the pleadings (i.e., the summons, complaint and all motion papers) and correspondence.

20.    All documents related to TRI shares that were issued to the Trust and are being held by Robert Lack, Esq., Friedman Kaplan Seiler & Adleman LLP, 1633 Broadway, New York, New York 10019.

The term "documents" as used above shall mean the original or duplicate copy or draft(s) of any writing or recording of whatever nature, whether written, typed, printed, photocopied, filmed, videotaped or mechanically or electronically sorted or recorded, which is in your possession, custody or control. Moreover, the term "documents" shall include, without limitation, correspondence, e-mails, memoranda, reports, notes, minutes, or records, or telephone conversations, meetings, or conferences, diaries, logs, calendar notes, accounting records, financial statements, books of account, vouchers, invoices, bills, computer tapes, print-outs,

Dalia Genger
May 14, 2009
Page 5

---

writings, drawings, graphs, charts, photographs, videotape recordings, data compilations from which information can be obtained or translated.

If we do not receive a reply with the information requested on or before May 28, 2009, we will be forced to seek court intervention.


Sincerely,

COZEN O'CONNOR

By:      Judith E. Siegel-Baum

JES:pw

cc:      Orly Genger
         Jonathan G. Kortmansky, Esq.

# EXHIBIT R

# PEDOWITZ & MEISTER, LLP

1501 BROADWAY. SUITE 800
NEW YORK, NEW YORK 10036-5501
www.pedowitzmeister.com

212.403.7330 voice
212.354.6614 facsimile
robert.meister@pedowitzmeister.com

June 1, 2009

ARNOLD H. PEDOWITZ
ROBERT A. MEISTER

DAVID HARRISON
RANDI MELNICK

NEW JERSEY OFFICE

285 OLD SHORT HILLS ROAD
SHORT HILLS, NJ. 07078
(973) 912-0005

EMAIL AND UPS

Judith E. Siegel-Baum, Esq.
Cozen & Worcester
250 Park Avenue
New York, NY 10177

Re:    Orly Genger 1993 Trust

Dear Ms. Siegel-Baum:

I write to respond to your May 14th letter to my client, Dalia Genger in her capacity as Trustee of The 1993 Orly Genger Trust (the Trust).

May I start by expressing Mrs. Genger's understanding about the concern that your client, Orly Genger, has about the effect her interests of the various lawsuits your letter mentions. Mrs. Genger has the same concern, particularly since, as we understand it, the *Glenclova* action raises the issue of whether the transfer to the Trust of shares of Trans-Resources, Inc. (TRI) was invalid under the TRI shareholders' agreement.

Having shared that concern, I would like to respond to your letter in narrative form, rather that in the form a response to a litigation demand for production.

All TRI shares are, I am informed, held for the benefit of the shareholders by TRI. Thus Mrs. Genger does not physically possess a share certificate. I am informed that the absence of such a certificate did not prevent The Sagi Genger Trust from selling the shares it was given.

As your client knows, Mrs. Genger became Trustee January 4, 2008, as successor trustee to Leah Fang. Ms. Fang has an accounting pending in Surrogate's Court, New York County, File No. 0017/2008.

Mrs. Genger has not taken any action as Trustee and has not received any dividends or other property or assets in respect of the TRI shares.

As your client knows, D & K LP pledged its 240 shares of the stock of TPR Investment Associates, Inc. (TPR) to secure its December 21, 1993 Note to TPR in the principal amount of

$8,950,000. I believe that your client has the D&K organization papers; if not I'll be glad to copy them for you at your expense, as they're about an inch think. By notice dated 8/31/2008, TPR declared that Note to be in default and subsequently sold the TPR shares for $2,200,000 on February 27, 2009. I attach papers concerning this transaction.

As a result of the foreclosure, the TRI shares are the Trust's only asset.

To date, Mrs. Genger has not filed and fiduciary tax returns, nor submitted any of her expenses for reimbursement by the Trust nor taken any commissions.

Sincerely,

Robert A. Meister

2

# EXHIBIT S

# NOTICE OF DEFAULT & ENFORCEMENT of PLEDGE

**To:** Sagi Genger, D&K LP General Manager

**From:** Yonit Sternberg, TPR Investment Associates, Secretary

**Date:** 8/31/2008

**Re:** Notice of Default and Liquidation of Collateral

---

Please be advised that you are in default in the payment of amounts due under that certain Promissory Note dated December 21, 1993 in the original amount of $8,950,000 (the "Note") due to the failure to pay any principal or interest due since 2005 and failing to make regular payments since 2000. Such default has continued for more than ten (10) business days. Please be advised that pursuant to the Note we hereby declare that the entire unpaid principal amount of the Note immediately due and payable.

The shares of TPR Investment Associates pledged to TPR as collateral will be liquidated at a public auction if the full Note is not satisfied.

Sagi Genger - TPR Investment Associates, Inc.


CONFIDENTIAL

1

# EXHIBIT T

TO:        D&K LIMITED PARTNERSHIP

FROM:      TPR INVESTMENT ASSOCIATES, INC.

           New York, New York
           Tel: 212-729-5076

---------------------------------------------------------------------------------------

     We will sell all of your 240 shares of common Stock of TPR Investment Associates, Inc. to the highest qualified bidder in public as follows:

Date:      Friday, February 27, 2009

Time:      2:00 p.m.

Place:     Offices of McLaughlin & Stern, LLP, 260 Madison Avenue, 20th Floor,
           New York, NY 10016

     You are entitled to an accounting of the unpaid indebtedness secured by the property we intend to sell. You may request an accounting by calling us at 212-729-5076.

     The money that we get from the sale (after paying our costs) will reduce the amount you owe. If we get less money than you owe, you will still owe us the difference. If we get more money than you owe, you will get the extra money, unless we must pay it to someone else.

     You can get the property back at any time before we sell it by paying us the full amount you owe (not just the past due payments), including our expenses. To learn the exact amount you must pay, call us at 212-729-5076.

     If you want us to explain in writing how we have figured the amount that you owe us, you may call us at 212-729-5076 or write us at _____ and request a written explanation.

     If you need more information about the sale, call us at 212-729-5076 or write us at _____.

**EXHIBIT U**

# CERTIFICATE of SALE and FACT

**Know all men by these presents:** That by virtue of a default in the payment of certain

monies due, and pursuant to the terms of a certain Security Agreement dated 12 / 21 / 93

placed in my hands for execution and foreclosure made by:

D + K Limited Partnership

to TPR Investment Associates, Inc. _____ (Borrower)

_____ (Secured Party)

The Secured Party did on the 27 day of Feb. , 2009 in the manner provided by

statute, sell at Public Auction by WILLIAM MANNION, Auctioneer, all the borrower(s) right, title

and interest, in and to the collateral consisting of 240 shares of Capital Stock ~~and the~~

~~appurtenant Proprietary Lease allocated to Apartment No._____ in the building known as~~

~~and located at~~ of TPR Investment Associates, Inc

And sold unto TPR Investment Associates, Inc.

of _____

for the sum of $ 2,200,000. — , they being the highest bidder in accordance with the Terms.

of Sale which were available to all bidders.

That public notice of sale was given prior to its taking place and was duly advertised. This

Auction Sale was held at:

McLaughlin + Stern, 260 Madison Ave. NY, NY

✓    Sold to the Secured Party, no money exchanged hands except for the

auctioneer's fees and expenses of the sale.

—    The sum of $ _____ of the bid price was paid to the Attorney's for the

Secured Party as a down payment.

IN WITNESS WHEREOF, I have hereunto set my hand on the 27th day of

February , 2009.

_____
William Mannion, Auctioneer

3600
MADISON

Feb. 27, 2009

2:00 PM   TPR (secured
2,200,000

Steve Rapoport
McLaughlin Stern

r   Robert H. Weiss partner
McLaughlin + Stern LLP

y   Sagi Genger

y   Robert Simensky

# EXHIBIT V

FILED: NEW YORK COUNTY CLERK 07/02/2010

NYSCEF DOC. NO. 71

INDEX NO. 109749/2009

RECEIVED NYSCEF: 07/02/2010

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

HON. PAUL G. FEINMAN

PRESENT: _____

_____
                                          *Justice*

PART __12__

- v -

INDEX NO. ____109749/09 8____

MOTION DATE _____

MOTION SEQ. NO. ____001____

MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____ | _____ |
| Replying Affidavits _____ | _____ |

**Cross-Motion:** ☐ Yes ☐ No

Upon the foregoing papers, it is ordered that this motion

MOTION AND CROSS-MOTION ~~ARE~~ IS DECIDED
IN ACCORDANCE WITH ANNEXED DECISION AND ORDER.

MOTION/CASE IS RESPECTFULLY REFERRED TO ~~JUSTICE~~
FOR THE FOLLOWING REASON(S):

Dated: __6/28/10__ 6:05 am

_____
                                        *J.S.C.*

Check one:    **FINAL DISPOSITION**    ☑ **NON-FINAL DISPOSITION**

Check if appropriate:    **DO NOT POST**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: CIVIL TERM: PART 12
-------------------------------------------------------------------X

ORLY GENGER, in her individual capacity and on
behalf of the Orly Genger 1993 Trust (both in its

individual capacity and on behalf of D & K
Limited Partnership),

　　　　　　　　　　　　Plaintiff,

　　　　　　against

DALIA GENGER, SAGI GENGER, D & K GP
LLC, and TPR INVESTMENT ASSOCIATES,
INC.,

　　　　　　　　　　　　Defendants.
-------------------------------------------------------------------X

| Index No. | 109749/2009 |
|---|---|
| Mot. Seq. Nos. | 001 through |
| | 006 |

**DECISION AND ORDER**

**For the Plaintiff:**
Zeichner Ellman & Krause LLP
575 Lexington Avenue
New York, NY 10022
(212) 223-0400

**For Dalia Genger:**
Pedowitz & Meister LLP
1501 Broadway
New York, NY 10036
(212) 403-7330

**For Sagi Genger:**
McLaughlin & Stern, LLP
260 Madison Avenue
New York, NY 10016
(212) 448-1100

**For D&K GP, LLC:**
Finkelstein Newman Ferrara LLP
225 Broadway
New York, NY 10007

**For TPR:**
Lyons McGovern, LLP
The Hennessy House
16 New Broadway
Sleepy Hollow, NY 10591
(914) 631-1336

E-filed papers considered in review of this motion brought by order to show cause for a preliminary injunction, motions for summary judgment, and motion to amend:

| | Papers: | E-File Number: |
|---|---|---|
| Seq. No. 001 | Order to Show Cause & TRO, Exhibits, Memo of Law in Support | 6 , 7, 7-1,9 |
| | Affidavit & Affirmation in Opposition, Exhibits, Memo of Law | 35, 35-1 - 35-8, 36, 37 |
| | Affidavit & Affirmation in Opposition, Memo of Law, Exhibit | 38, 39, 40, 40-1 |
| Seq. No. 002 | Notice of Motion, Affirmations, Exhibits | 12, 13, 13-1 - 13-6, 18, 18-1 - 18-9 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52 |
| | Reply Memo of Law (Dalia Genger) | 61 |
| | Reply Memo of Law | 65 |
| Seq. No. 003 | Notice of Motion, Affirmation, Exhibits, Memo of Law | 15, 16, 16-1 - 16-9, 19 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 53 |
| | Memo of Law in Reply, Affirmation, Exhibit | 59, 60, 60-1 |
| | Reply Affirmation, Exhibits, Memo of Law | 62, 62-1, 64 |
| Seq. No. 004 | Notice of Motion, Affirmation, Memo of Law, Exhibits | 20, 21, 22, 22-1 - 22-8 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 54 |
| Seq. No. 005 | Notice of Motion, Affirmation, Memo of Law, Exhibits | 27, 28, 29, 29-1 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 55 |
| Seq. No. 006 | Notice of Motion, Affirmation, Exhibits | 45, 46, 46-1 - 46-7 |
| | Affirmation in Opp., Memo of Law, Exhibits | 47, 48, 48-1 - 48-2 |

1

| | |
|---|---|
| Affirmation in Reply & Opp | 49 |
| Affirmation in Opposition | 50 |
| Memo of Law in Reply | 51 |
| Affirmation in Opposition, Memo of Law, Exhibits | 56, 57, 57-1 - 57-2 |
| Memo of Law in Reply | 58 |
| Transcript of Oral Argument | 69 |

**PAUL G. FEINMAN, J.:**

The motions bearing sequence numbers 001 through 006 are consolidated for the purpose

of decision.

In motion sequence number 001, plaintiff moves by order to show cause for a

preliminary injunction and a temporary order restraining defendants from removing from the

State or otherwise disturbing shares of D&K Limited Partnership's 48 percent ownership interest

in the common stock of TPR Investment Associates, until there is a judicial determination as to

who owns these closely held family shares.[1]   At oral argument, the court continued the TRO

pending determination of these motions.

In motion sequence numbers 002 through 005, each of the defendants originally moved

to dismiss the complaint on various grounds.  By interim order dated October 21, 2009, these

motions were converted pursuant to CPLR 3211 ( c) to motions for summary judgment (Doc. 41,

42, 43, 44).[2]

In motion sequence number 006, plaintiff moves for leave to amend the complaint and

submits a proposed amended verified complaint containing additional allegations and naming an

additional defendant.

---

[1]Under the terms of the original TRO signed at the time of the signing of the Order to Show
Cause, defendants and their agents are stayed from removing or disposing in any manner the
shares at issue.  Plaintiff was directed to provide  an undertaking in the amount of $150,000.

[2]Documents and exhibits are referred herein by their designated e-filing document number in the
New York State Court's E-Filing System.

2

All the motions are opposed.

For the reasons set forth below, the motion for a preliminary injunction is granted ; the

motions by defendants for summary judgment are each granted in part and otherwise denied, and

the motion to amend the complaint is granted to the extent indicated.

### Background

The litigants are members of a nuclear family and certain of their family-owned

corporations and companies.  The central issue concerns the intent behind the signing of a

promissory note and pledge agreement in December 1993, executed as part of estate planning

tools of the parents of plaintiff Orly Genger and her brother, Sagi Genger, one of the defendants.

Plaintiff contends that the note and pledge agreement were part of an entire estate planning

scheme by which plaintiff's father, Arie Genger, and plaintiff's mother Dalia Genger, planned to

provide for their two children, plaintiff and defendant Sagi Genger, with the greatest amount of

funding possible and with minimum tax consequences.  Arie and Dalia Genger were divorced in

2004 and the gravamen of this complaint is that in the years following the divorce, plaintiff's

mother and brother have deliberately not adhered to the intent behind the promissory note and

pledge, and have schemed to seize control of some of the family's closely held companies.

Their schemes have been to the detriment of one of the entities, the D&K Limited Partnership,

an entity partially owned by the Orly Genger 1993 Trust, and for the benefit of Sagi Genger and

for defendant TPR Investment Associates, on which Sagi and Dalia Genger serve as the

directors, and of which Sagi Genger is chief executive officer.  Among the other relief sought by

plaintiff is an injunction restraining further actions that would irreparably harm D&K Ltd.

Partnership's ability to recover its interest in the shares originally held by it, that defendants be

denied any ability to further erode the holdings of the Orly Genger 1993 Trust, and that shares

3

already sold be returned to the ownership of the Ltd. Partnership.

Plaintiff argues, and none of the defendants dispute her, that as beneficiary of the Orly Genger 1993 Trust, she has a right to assert causes of action on behalf of the trust, citing *Velez v Feinstein*, 87 AD2d 309 (1st Dept. 1982) (where trustee has failed to enforce a claim on behalf of the trust, the beneficiary may do so). She further argues that as the Orly Genger 1993 Trust is a limited partner of D&K Ltd. Partnership, she has the right to assert causes of action on behalf of the Partnership as against TPR Investment and the other defendants, citing among other cases, *CCG Assoc. I v Riverside Assoc.*, 157 AD2d 435, 442 (1st Dept. 1990) ("[t]he right of a limited partner to bring an action on behalf of the partnership to enforce a right belonging to the partnership is beyond dispute") (Pl Memo of Law [Doc. 9:4] p. 1 n. 1).[3] Defendants' arguments in opposition are not persuasive.

According to the verified complaint (Doc. 7-1), plaintiff and her brother Sagi are individually beneficiaries of irrevocable trusts established in 1993 by their parents. Each trust was funded with a $600,000 gift. As established, the Orly Genger Trust and the Sagi Genger Trust together owned 96 percent in defendant D&K Ltd. Partnership, a family-owned limited partnership. Dalia Genger held the remaining four percent interest, and acted as the general manager. Defendant TPR Investment Associates, Inc. is a corporation founded by plaintiff's father, Arie Genger who originally was the sole shareholder, and serves as a holding company for the family's interests. Sagi Genger is presently Chief Executive Officer and a member of the board. Prior to 1993, TPR Investment held a majority interest in non-party Trans-Resources,

---

[3] Unless otherwise noted, all factual allegations are taken from plaintiff's verified complaint (Doc. 7-1).

4

Inc., a closely held private corporation.[4]

Around the time the two trusts were funded in1993, D&K Ltd. Partnership purchased 240

shares of common stock, comprising 49 percent of all shares, in TPR Investment for

$10,200,000. The Orly and Sagi Trusts each paid $600,000, Dalia Genger paid $50,000, and

D&K Ltd. Partnership executed a promissory note dated December 21, 1993 for $8,950,000, in

satisfaction of the balance (Ver. Compl. [Doc. 7-1] ¶ 16, citing attached Ex. 1 [eFile Doc. 7-1:49

*et seq.*]). The note was signed by Dalia Genger as General Partner of D&K Ltd. Partnership.

The note required that D&K Ltd. Partnership repay principal and accrued interest in annual

installments over a ten-year period. Both trusts, and Dalia Genger, assumed proportional

liability for repayment. The note was secured with a Pledge Agreement dated December 21,

1993, signed by Dalia Genger, in which D&K Ltd. Partnership pledged its 240 TPR Investment

shares as collateral for repayment of the note (Ver. Compl. [Doc. 7-1] ¶ 18) According to the

September 6, 2007, testimony of Sagi Genger in the arbitration proceeding concerning his

parents' divorce, the purpose of the note was "[e]ssentially an estate planning tool, to transfer

wealth," with the intent to minimize taxes owed by the family members (Doc. 46-5:150-152 [S.

Genger EBT, pp. 366, 368]). As a result of the purchase by D&K Ltd. Partnership of TPR

Investment stock, the Orly and Sagi trusts each acquired 23.52 percent indirect interest in TPR

Investment, and Dalia acquired a 1.96 percent indirect interest. Arie Genger retained 51 percent

ownership.

As alleged in the complaint, each member of the family understood and agreed, in the

---

[4]Trans-Resources is the parent company of several subsidiaries that provide growers with
specialty fertilizer and industrial chemicals, and is one of the two largest produces of potassium
nitrate in the world (Ver. Compl. [Doc. 7-1] ¶ 12).

5

"desire to ensure equal wealth transfer to Sagi and Orly and with the estate-planning purposes underlying the creation of the Trusts and D&K [Ltd. Partnership]'s purchase of the TPR shares," that the note and Pledge Agreement "would never be enforced by any of them" (Ver. Compl. [Doc. 7-1] ¶ 20). Sagi in particular was charged with ensuring that the promissory note and Pledge Agreement would not be enforced and, in the first years, took "specific steps to fulfill that charge," an example of which follows here (Ver. Compl. [Doc. 7-1] ¶ 20).

D&K Ltd. Partnership made payments on the note until 1999 and then ceased. In November 2002, TPR Investment sent a letter to D&K Ltd. Partnership seeking payment of the past due principal and interest (Doc. 29-1:77-78]). Sagi Genger, TPR's CEO, explained during his testimony in the above-mentioned arbitration proceeding that this November 2002 letter was merely "pro forma," and that there was no intent to collect on the note (Doc. 46-5:153 [S. Genger EBT, p. 370]).

In October 2004, Dalia and Arie Genger were divorced, resulting in certain changes to the ownership of certain family entities, memorialized in the Stipulation and Agreement of Settlement, dated October 26, 2004 (Ver. Compl. [Doc. 7-1] ¶ 22, citing Ex. 2 [Doc. 7-1:66 *et seq.*]). In particular, Dalia received sole ownership of Arie Genger's 250 shares of TPR Investment, the Trans-Resources shares were redistributed such that Dalia Genger owned no shares in that company, and Arie Genger was granted a lifetime voting proxy over the family Trans-Resources shares (Stipulation pp. 5, 8-14 [Doc. 7-1:71, 73-80]). The Stipulation and Agreement of Settlement gave Sagi Genger "full and complete authority" to sell non-liquid assets and distribute them as he saw fit, subject to his fiduciary duties to effectuate the intent of the parties entering the Agreement (Stipulation p. 7 [Doc. 7-1:73]). However, the net proceeds were to be distributed so as to minimally fund a "basic escrow account" after which monies were

6

to go to TPR Investment "in satisfaction of the parties' indebtedness" (Stipulation p. 8 [Doc. 7-1:74]).

Despite the changes, both the Orly and Sagi trusts continued to have equal ownership interests in Trans-Resources shares as well as in the TPR Investment shares owned by D&K Ltd. Partnership (Ver. Compl. [Doc. 7-1] ¶ 23).

Also on October 26, 2004, TPR Investment, Arie Genger, and Dalia Genger signed an Assumption Agreement which acknowledged the promissory note's existence and noted that at that juncture, approximately $9,980,000, inclusive of interest, was owed by D&K Ltd. Partnership to TPR Investment (Doc. 22-4).

In addition, also on the same date, Sagi and Dalia Genger formed D&K GP LLC to serve as the general partner for D&K Ltd. Partnership (Pl. Mot. 001, Ex. 5 ¶ 5 [Doc. 7-1:151]).  Under the agreement, Dalia Genger transferred her general partnership interest in D&K Ltd. Partnership, in exchange for a 99 percent interest in D&K GP; Sagi Genger was granted power to select the manager.  Accordingly, D&K GP LLC now held a four percent interest in D&K Ltd. Partnership.

Plaintiff alleges that in the years subsequent to the divorce, Dalia Genger has sought, in collusion with her son Sagi Genger, to "destroy" her former husband financially, and their actions have threatened to destroy plaintiff financially as well (Ver. Compl.[Doc. 7-1] ¶ 25). Thus, when Dalia in effect ceded her control over D&K Ltd. Partnership to Sagi, the restructuring left only the two trusts liable to TPR Investment for repayment of the promissory note (Ver. Compl.[Doc. 7-1] ¶ 27). In August 2006, Sagi Genger on behalf of TPR Investment,

7

assigned the promissory note to David Parnes,[5] but stated in writing to Parnes that "D&K LP and

its partners have a variety of claims against TPR, and deny the enforceability of the Note." (Ver.

Compl. [Doc. 7-1] ¶ 47, citing Ex. 8 [Doc. 7-1:179-*et seq.*]). In 2007, Sagi Genger allegedly

stripped Dalia Genger of her majority interest in TPR Investment by selling an interest to his

mother-in-law, Rochelle Fang (Ver. Compl. [Doc. 7-1] ¶ 32). In late 2007 or early 2008, Dalia

Genger divested herself of the balance of her TPR Investment shares, leaving Sagi Genger in

direct control of TPR Investment and its interest in the promissory note (Ver. Compl. [Doc. 7-1]

¶ 33). As a result, Sagi Genger in essence now wore two hats, as CEO of TPR Investment, the

creditor of the note, and as manager of D&K Ltd. Partnership, the debtor on the note (Ver.

Compl. [Doc. 7-1] ¶ 34).

In November 2007, Sagi Genger and Leah Fang executed an "Amended and Restated

Limited Partnership Agreement of D&K Limited Partnership," permitting D&K GP to

"mortgage, hypothecate, pledge, create a security interest in or lien upon, or otherwise encumber

the L[imited] P[artner] TRI Interests, for the benefit of the Partnership (Doc. 46-5:218). The

document was signed by Sagi Genger, managing member of D&K GP LLC, the General Partner,

and Leah Fang, as sole trustee for both the Sagi Genger 1993 Trust and the Orly Genger 1993

Trust, the Limited Partners (Doc. 46-5:223). Plaintiff only learned of this document's existence

in 2009.

In January 2008, Dalia Genger was appointed successor trustee to the Orly Genger 1993

Trust (Ver. Compl. [Doc. 7-1] ¶ 39). She succeeded several other individuals, including two

---

[5] Parnes is a former trustee of the Orly Genger 1993 Trust, the present trustee of the Sagi Genger 1993 Trust, an officer of TPR Investment and director of Trans-Resources (Ver. Compl. [Doc. 7-1] ¶ 46). Parnes testified during the arbitration proceeding that the purpose of the transfer of the note to him was to prevent collection by any others (*Id.*).

8

long-term friends of her son's and her son's sister-in-law. As trustee, Dalia has "complete control over the assets of the Orly Trust, including its ownership interests in TPR (through D&K) and TRI" (Ver. Compl. [Doc. 7-1] ¶ 41).

In 2008, TPR Investment, through CEO Sagi Genger, reclaimed the promissory note from Parnes, and in August 2008, notified D&K Ltd. Partnership's general manager (Sagi Genger), that it was in default under the note and that if it failed to satisfy the full terms of the note, its shares would be sold at public auction (Ver. Compl. [Doc. 7-1] ¶ 52, citing Ex. 10 [Doc. 7-1:185-186]). As the payment was not made, D&K Ltd. Partnership was informed by TPR Investment that the latter would sell the former's 240 shares of common stock in TPR Investment to the highest qualified bidder on February 27, 2009 (Ver. Compl., Ex. 11 [Doc. 7-1:187-188]). Notice was not provided to either of the trusts, but was published in THE NEW YORK POST in October 2008 and again in February 2009 (Ver. Compl. [Doc. 7-1] ¶¶ 52-53, citing Ex. 12 [Doc. 7-1:189-191]).

On January 31, 2009, the general partner of D&K Ltd. Partnership, that is to say D&K GP, and the limited partners, the Sagi and Orly trusts, and TPR Investment, memorialized a document called "Meeting of Partners of D&K LP - Jan. 31, 2009 & Agreement," in which it was agreed that D&K GP could sign for the Limited Partnership and for each individual partner when making the limited partners' assets subject to a pledge (Doc. 22-4:17-18).[6] This same agreement included the promise of TPR Investment that it would "refrain from enforcing the

---

[6]Plaintiff alleges she first learned of this agreement only when the documents were provided as part of defendants' papers submitted in their motions to dismiss (Am. Ver. Compl.[Doc. 46-4] ¶ 94).

9

note against each limited partner for thirty days." (*Id.* [Doc. 22-4:18] ¶ 8).[7]

The note was foreclosed upon on February 27, 2009, less than the 30 days indicated in

the Agreement date, and D&K Ltd. Partnership's 240 shares of TPR Investment were purchased

back by TPR, decreasing the obligations of D&K Ltd. Partnership under the promissory note,

and leaving a balance of approximately $8.8 million that continues to be guaranteed by the Orly

and Sagi trusts (Ver. Compl. [Doc. 7-1] ¶ 57, citing Ex. 13 [Doc. 7-1:192-194]).  Plaintiff and

her attorney only learned in early June 2009 that the note had been foreclosed and that the

pledged shares had been sold back to the company (Ver. Compl. [Doc. 7-1] ¶ 65).  Plaintiff has

made a written demand that TPR Investment return the pledged shares to D&K Ltd. Partnership,

but TPR has declined to comply (Ver. Compl. [Doc. 7-1] ¶ 69, citing Ex. 20 [Doc. 7-1:225-

227]).

Also in August 2008, Rochelle Fang, as trustee of the Sagi Genger 1993 Trust, and Sagi

Genger, sold that trust's interest in Trans-Resources to another group (named "Trump"), which

sale divested Arie Genger from control and put the company in the control of the Trump group

(Ver. Compl. [Doc. 7-1] ¶ 60, citing Ex.14 [Doc. 7-1:195-207]).  The validity of this sale is

under challenge in Delaware Chancery Court, although plaintiff Orly Genger has not joined in

that action (Ver. Compl. [Doc. 7-1] ¶ 61).

After this purported sale of the Sagi Genger Trust's shares of Trans-Resources, plaintiff

feared her trust's shares would not be protected from sale.  She requested in writing from her

mother as trustee in January 2009 and again in June 2009 that the Orly Genger 1993 Trust retain

all of its shares of Trans-Resources and that they not be sold, but Dalia Genger has refused to

---

[7]The copy of the document e-filed with the court is not clear enough to discern who signed on
behalf of the trusts, although presumably it was Dalia Genger, or on behalf of TPR Investment.

10

agree, or even to respond (Ver. Compl. [Doc. 7-1] ¶¶ 63, 66, citing Ex. 15, 16 [Doc. 7-1:208-215]). Plaintiff, who had brought a proceeding in Surrogate's Court to remove her mother as trustee at the time of her appointment in January 2008, an application which was denied as being premature (Ver. Compl. [Doc. 7-1] ¶¶ 39-40), brought a second application on June 22, 2009, seeking to enjoin Dalia Genger or her agents from doing anything to affect the Orly Genger 1993 Trust's Trans-Resources shares, to remove Dalia as trustee and appoint another in her stead based on breach of fiduciary duties, and for a surcharge for damages (Ver. Compl.[Doc. 7-1] ¶ 67). At this juncture, the Surrogate's Court has ordered that Dalia Genger provide at least 10 days notice before disposing of any of the trust's Trans-Resources shares (Ver. Compl.[Doc. 7-1] ¶ 68, citing Ex.19 [Doc. 7-1:222- 224]).

Plaintiff contends that Dalia Genger has failed to act in the best interests of the Orly Genger 1993 Trust, that Sagi Genger has acted in a self-dealing manner and together with Dalia Genger has undermined the estate plans that intended for both children to benefit equally from the family's wealth (Ver. Compl. [Doc. 7-1] ¶ 58). Plaintiff fears that through defendants' continued scheming, the Orly Genger 1993 Trust's one remaining asset, its ownership of the Trans-Resources shares, will also be wrongly divested (Ver. Compl. [Doc. 7-1] ¶ 59).

The verified complaint alleged 16 causes of action against the various defendants, including replevin of the shares from TPR Investment back to D&K Ltd. Partnership, and a request for a preliminary injunction.

As stated above, defendants each submitted pre-answer motions to dismiss which, after notice by the Court, have been converted to motions for summary judgment pursuant to CPLR 3211 ( c). Subsequent to the filing by defendants of their motions, plaintiff moved to amend her complaint "to address, among other things," the defendants' "scheme regarding the Orly Trust's

11

TRI Shares," and the involvement in the scheme of Leah Fang, the proposed additional defendant (Pl. Mot. 006, Ex. D, Part 1, Proposed First Am. Ver. Compl., [Doc. 46-4] ¶ 95). The proposed first amended verified complaint contains an additional four causes of action, two against Leah Fang, and two seeking additional declaratory relief, and amends certain of the original causes of action to include the new allegations and those against Leah Fang.

### *Legal Analysis*

For convenience, the motion to amend will be addressed first, and then the preliminary injunction, followed by the motions to dismiss. Because the motion to amend the complaint is granted, the remainder of this decision addresses the claims as alleged in the amended complaint.

A.    Motion to Amend the Verified Complaint (Sequence Number 006)

Leave to amend pleadings is to be freely given upon terms that may be just (CPLR 3025 [b]). In addition, CPLR 3025 (a) permits any party to amend a pleading once, without court permission provided it is done under one of the following circumstances: within 20 days of the service of the original pleading; at any time before the period for responding to it has expired, or within 20 days after the service of a responsive pleading. Plaintiff proffers a proposed amended complaint to add a new defendant and new causes of action (Doc 46-4).

Contrary to defendants' arguments, case law holds that where a defendant has not answered the complaint but instead interposed a motion to dismiss, as was done here, the plaintiff may amend her complaint once as of right, because defendants, by making pre-answer motions, have extended their time to answer (*see, Johnson v Spence*, 286 AD2d 481 [2d Dept. 2001]; *STS Mgt. Dev., Inc. v New York State Dept. of Taxation & Fin.*, 254 AD2d 409 [2d Dept. 2001]; *Miller v General Motors Corp.*, 99 AD2d 454 [1st Dept. 1984], *aff'd* 64 NY2d 1081 [1985]). Although defendants oppose, plaintiff is entitled to serve and file her amended

12

complaint without review by the court, although the rulings below on defendants' motions shall

refine the scope of the proposed amended complaint and require her to file and serve a second

amended complaint. Defendants' arguments in opposition, including that there is another action

pending, can be pled as affirmative defenses. Plaintiff's motion to amend her complaint is thus

granted to the extent indicated.

B.    Motion for Preliminary Injunction (Sequence Number 001)

Among the purposes of a preliminary injunction are maintaining the status quo and

preventing irreparable injury to a party (see, e.g., Ma v Lien, 198 AD2d 186 [1st Dept. 1993], lv

dismissed 83 NY2d 847 [1994]). To prevail, the party seeking injunctive relief must

demonstrate a likelihood of success on the merits; that it will suffer irreparable injury if the relief

is not granted; and that the equities balance in its favor (Aetna Ins. Co. v Capasso, 75 NY2d 860,

862 [1990]). A preliminary injunction should generally not be granted where there are issues of

fact (Lincoln Plaza Tenants Corp. v MDS Properties Dev. Corp., 169 AD2d 509 [1st Dept.

1991]; but see Ma v Lien, supra at 187 ["even where the facts are in dispute, the nisi prius court

can find that a plaintiff has a likelihood of success on the merits from the evidence presented"]).

If money damages are an adequate remedy, irreparable harm does not exist and injunctive relief

should be denied (Sterling Fifth Assoc. v Carpentille Corp., Inc., 5 AD3d 328, 330 [1st Dept.

2004]).

Plaintiff argues that the shares of Ltd. Partnership are unique chattel as contemplated by

CPLR 7109, and that accordingly the court should grant a preliminary injunction restraining

defendants from disposing of the shares until order of the court. She argues that the D&K Ltd.

Partnership shares are unique because they are shares of a closely held family company which

represents an ownership in another closely held family company, TPR Investment, and that their

13

value is dependent, at least in part, on the outcome of the family litigation currently before the

Delaware Chancery Court concerning Trans-Resources (Pl. Memo of Law, 5-6 [Doc. 9:8-9]).

Under CPLR 7109, where the chattel is unique, the court may grant a preliminary

injunction or temporary restraining order that it may not be transferred, sold, pledged, assigned

or otherwise disposed of until the court orders (CPLR 7109 [a]). Defendants argue that the

shares are in essence fungible, and that if appropriate, money damages would fully compensate

plaintiff (TPR [S. Genger] Aff. in Opp. [Doc. 39] ¶ 6). Sagi Genger avers that the "TPR shares

are currently not for sale and there is no intention to sell them at this time or in the near future."

(S. Genger Aff. in Opp. [Doc. 35] ¶ 5]). He makes no statements concerning the TRI shares.

Plaintiff's argument, however, is that her parents never meant for the promissory note to be

enforced, but rather that the trust funds remain intact for the two children. The recent actions

taken by defendants concerning the promissory note which have negatively impacted the Orly

Genger 1993 Trust, and the sale of the Trans-Resources shares belonging to the Sagi Genger

1993 Trust, possibly foretell defendants' plans to sell her trust's shares of Trans-Resources and

thus she seeks court intervention to prevent further dissipation of the trust.

The granting of a preliminary injunction is a discretionary remedy (*Ross v Schenectady*,

259 App. Div. 774, 774 [3d Dept. 1940]; *Dabrinsky v Seagate Assn.*, 239 NY 321 [1925]). Here,

where the family shares at issue are intertwined among various family entities, defendants have

not offered sufficient evidence to show that the shares of either TPR Investment or Trans-

Resources owned by the Orly Genger 1993 Trust are not "unique" and should not be protected

from transfer, sale, or assignment until this litigation is ultimately decided. In addition, given

that defendant Sagi Genger states there is no immediate plan to sell or otherwise dispose of the

TPR Investment shares, an injunction is not likely to cause much harm to defendants. The

14

balance of equities therefore lies in favor of plaintiff. Accordingly, the motion for a preliminary

injunction is granted.

### *Motions for Summary Judgment*

The proponent of a summary judgment motion must make a prima facie showing of

entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any

material issues of fact from the case (*Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [

]). Evidentiary proof must be submitted in admissible form (*Zuckerman v City of N.Y.*, 49

NY2d 557, 562 [1980]). Parties in opposition must submit "evidentiary facts or materials, by

affidavit or otherwise … demonstrating the existence of a triable issue of ultimate fact."

(*Tortorello v Carlin*, 260 AD2d 201, 204 [1st Dept. 1999]). "Issue finding and not issue

resolving" is the proper role of the court in deciding such motions (*Winegrad, supra*, at 853).

Regardless of the sufficiency of the opposing papers, in the absence of admissible evidence

sufficient to preclude any material issue of fact, summary judgment is unavailable (*Alvarez v

Prospect Hosp.*, 68 NY2d 320, 324 [1986]).

None of the converted motions for summary judgment contains first-person affidavits,

and all rely upon documentary evidence and the pleadings for the bases of their motions.

Although plaintiff objects to the lack of first-person affidavits, the converted motions are

nonetheless considered by the court and decided on their merits.

Plaintiff argues that all of the motions should be preemptively denied based on the

doctrines of issue preclusion and judicial estoppel, pointing to the testimony and evidence

presented at the arbitration which resulted in the May 6, 2008, award entitled *Dalia Genger v

Arie Genger*, Case No. 13 170 Y 00996 07 (American Arbitration Assn., Commercial

Arbitration Tribunal, NYC). (Doc. 46-5:131 *et seq.*]). The doctrine of issue preclusion serves

15

to bar a party from "relitigating in a subsequent action or proceeding an issue that was raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same" (*Ryan v New York Tel. Co.*, 62 NY2d 494, 500 [1984]; *see also, Parker v Blauvelt Volunteer Fire Co.*, 93 NY2d 343, 349 [1999]). The doctrine of judicial estoppel prohibits a party that has assumed a certain position in a prior legal proceeding and secured a judgment in its favor, from assuming a contrary position in another action simply because the party's interests have changed (*City of N.Y. v College Point Sports Assn., Inc.*, 61 AD3d 33, 44 n. 1 [2d Dept. 2009], citations omitted). Notably, of course, the arbitration concerned issues arising from the divorce of plaintiff's parents, and determined, among other questions, that the promissory note could not be enforced by either parent as against each other. This is not the issue raised by plaintiff in her litigation. Additionally, because the testimony by Sagi Genger, Dalia Genger, and others in that arbitration was offered to answer the questions of whether the note was enforceable, and its value, *as between the former husband and wife*, the witnesses and parties did not address the value or enforceability of the note *as between the children* of Arie and Dalia Genger, *or the family owned companies*. Thus, the testimony adduced in the arbitration may well be admissible in this action, but there is no collateral estoppel effect.

C.    Dalia Genger's Motion for Summary Judgment (Sequence Number, 002)

The first amended verified complaint alleges three causes of action against Dalia Genger: breach of fiduciary duty (1st cause of action), fraud (5th cause of action), and conspiracy to commit fraud (8th cause of action).

As argued by defendant, the claim of breach of fiduciary duty is also at issue in a proceeding currently before the Surrogate's Court entitled *In the Matter of the Application of*

16

*Orly Genger, as a person interested, for the removal of Dalia Genger as Trustee of the Orly Genger 1993 Trust pursuant to SCPA § 711 (1)*, File No. 17/2008 (Surrogate's Court NY County). Plaintiff does not address this argument. Accordingly, in the interest of judicial economy, the branch of defendant's motion seeking summary judgment and dismissal as to the complaint's 1st cause of action, is granted, on the ground that the same claim is pending in another court proceeding (CPLR 3211 [a] [4]).

The 5th Cause of Action sounds in fraud, while the 8th Cause of Action alleges conspiracy to commit fraud among the four defendants. As an initial matter, it is well established that "a mere conspiracy to commit a fraud is never of itself a cause of action," although allegations of conspiracy are permitted to connect the actions of separate defendants with an otherwise actionable tort (*Alexander & Alexander of N.Y. Inc. v Fritzen*, 68 NY2d 968, 969 [1986] [citation omitted]). As explained in *Brackett v Griswold*, "[t]he allegation that there was a conspiracy to commit the fraud does not effect the substantial ground of action," and "[t]he *gravamen* is fraud and damage, and not the conspiracy." (112 NY 454, 466-467 [1889]). "The allegation and proof of a conspiracy in an action of this character is only important to connect a defendant with the transaction and to charge him [*sic*] with the acts and declarations of his [*sic*] co-conspirators, where otherwise he [*sic*] could not have been implicated." (*Id.*). Accordingly, the 8th cause of action is dismissed as against this defendant, and the others.

To state a claim for fraud, plaintiff must allege "a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance . . . and damages" (*Eurycleia Partners, LP v Seward & Kissel, LLP*, 12 NY3d 553, 559 [2009]). In addition, under CPLR 3016 (b), the circumstances constituting the wrong must be stated in detail.

Defendant Dalia Genger argues that plaintiff's claims are unspecific and general in

17

nature. In particular, she argues that there is no allegation of the manner in which plaintiff relied

on any of her statements, or in what manner she, defendant, could have prevented the

enforcement of the promissory note and the foreclosure sale. Although plaintiff argues in

opposition that Dalia Genger made many statements over the years, including sworn statements,

affirming that all interested parties to the note had agreed that TPR Investment would never seek

to enforce the promissory note (Am. Ver. Compl. [Doc. 46-4] ¶¶ 62, 145-147), none of

defendant's statements *explicitly* make this assertion other than in the context of the divorce

proceedings. However, plaintiff also argues that even after she requested that her mother, as

trustee, not encumber the remaining assets of the trust, her mother signed the January 2009

Meeting Agreement which gave power to D&K GP - the company controlled by Dalia and Sagi

Genger - to pledge the Orly Genger 1993 Trust's shares of Trans-Resources as security for the

promissory note, and which indemnified Sagi Genger, among others. There are also the

transactions over the years that apparently have given Sagi Genger, and Dalia Genger, potential

control over family assets in a way that has harmed plaintiff's share.

When claiming that the defendants together acted to commit a fraud, the plaintiff need

not allege and prove that each defendant committed every element of fraud but only facts which

support an inference that the defendants knowingly agreed to cooperate in a fraudulent scheme

(*Snyder v Puente De Brooklyn Realty Corp*, 297 AD2d 432, 435 [3d Dept.2002], *lv denied*, 99

NY2d 506 [2003]; *LeFebre v New York Life Ins. & Ann. Corp.*, 214 AD2d 911, 912 [3d Dept.

1995]). Plaintiff alleges that the various defendants together committed fraud by, for example,

creating the conditions that resulted in the "sham sale" of the TPR Investment assets owed by

D&K Ltd. Partnership, and agreeing in the January 2009 Meeting Agreement to give power to

D&K GP, the company controlled by Dalia and Sagi, to pledge the Orly Trust's shares of Trans-

18

Resources as security for the promissory note (Am. Ver. Compl. [Doc. 46-4] ¶¶ 76-68, 151).

Plaintiff asked repeatedly for information about her trust, but because defendant has not been

forthcoming nor kept her informed, she did not know that there was any need to attempt to

protect the assets of her trust.

The evidence and arguments provided by both parties show that there is a question of fact

as to whether Dalia Genger acted with intent to commit fraud against plaintiff's trust, and to lull

plaintiff into a false sense of security as to the status of her trust. Accordingly, the branch of

defendant's motion to dismiss the 5th cause of action is denied.

D.    Sagi Genger's Motion for Partial Summary Judgment (Sequence Number 003)

Defendant Sagi Genger seeks summary judgment and dismissal of the 6th, 7th, 8th, and 16th

causes of action.[8]

The 6th cause of action sounds in fraud. The elements of fraud are set out above in the

discussion of Dalia Genger's motion. The complaint focuses on the statements made by

defendant in particular during the 2007 - 2008 arbitration proceeding, which helped form the

basis for the arbitrator's decision that the parties never intended for the note to be collected and

that it was not an asset to be valued, statements of which the plaintiff was aware and which

caused her to believe that her trust fund was secure and that no one would enforce the note.

The 7th cause of action alleges aiding and abetting fraud. The elements of aiding and

abetting fraud are that there exists a fraud, the defendant knew of the fraud, and the defendant

provided substantial assistance to advance the fraud's commission (*M&T Bank Corp. v

Gemstone CDO VII, Ltd.*, 23 Misc. 3d 1105A; 881 NYS2d 364, 2009 NY Slip Op 50590(U)

---

[8]He does not seek summary judgment as to the 2nd, 3rd, or 4th causes of action, in which he is also
named.

{Sup. Ct., Erie County 2009], *aff'd in part, mod in part*, 68 AD3d 1747 [4ᵗʰ Dept. 2009],

quotation and citation omitted). The complaint contends that defendant and D&K GP knowingly

assisted in the "sham sale" of the D&K Ltd. Partnership shares, failed to notify the Partnership

members of the foreclosure and sale, the sale of which harmed the Orly Trust, and entered into

the Meeting Agreement which now allows defendant and D&K GP to pledge or encumber the

Trans-Resources shares owned by the Orly Genger 1993 Trust.

Defendant argues that summary judgment is appropriate based on the documentary

evidence. He contends that prior to this litigation, plaintiff never claimed that the note or pledge

agreement were invalid. Among the evidence he points to in arguing the note's enforceability, is

testimony of Arie Genger acknowledging that payments were made by D&K Ltd. Partnership on

the promissory note (Doc. 16-4:3-4]) , the Assumption Agreement signed by Dalia, Arie, and

Sagi Genger on October 25, 2004, acknowledging the nearly $10,000,000 due under the note

(Doc. 16-6]), the November 19, 2008 letter from plaintiff's counsel to the Surrogate, stating in

part that "D&K [Ltd. Partnership] is indebted on a multi-million dollar note to TPR, which is

secured by D&K's 49% stock interest, and which has not been serviced for years" (Doc. 16-8]),

and a document signed by plaintiff dated December 27, 2007, in which she states that the trust

"is indebted in the amount of approximately $4.5 million" (Doc. 16-9]).

Defendant also argues that the statute of frauds bars plaintiff's 6ᵗʰ and 7ᵗʰ causes of action

because plaintiff claims that the promissory note has been orally modified. General Obligations

Law § 5-701 requires that agreements which by their terms are not to be performed within one

year, or which are promises to answer for the debt or default of another person, must be in

writing and subscribed by the party to be charged therewith (GOL § 5-7-1 [a] [1]-[2]). The parol

evidence rule of the General Obligations Law provides that where a written agreement contains

20

a provision stating that it cannot be changed orally, then such a document cannot be changed by executory agreement unless it is in writing, signed by the party against whom enforcement of the change is sought (GOL § 15-301 [1]). Thus, defendant argues that plaintiff cannot claim that the parties legally agreed, orally, that the note would not be enforceable.

Defendant's arguments are unpersuasive. Courts have also found, specifically in regard to promissory notes, that when parties contest whether a notice is enforceable, there is an issue of fact that survives summary judgment and the statute of frauds will not prevent the court's examination of parol evidence on the issue. For example, in *Greenleaf v Lachman*, the Court examined a promissory note allegedly executed so as to avoid negative income tax treatment, and found an exception to the parol evidence rule in order to allow admission of parol evidence, not to vary the terms of the writing, but to show that a "writing, although purporting to be a contract, is, in fact, no contract at all." (216 AD2d 65, 66 [1st Dept. 1995], *lv denied* 88 NY2d 802 [1996]). Similarly, in *Dayan v Yurkowski*, the Court denied summary judgment and held that the defendant's parol evidence should be considered to show that the note, while valid on its face, was not intended to take effect (238 AD2d 541 [2d Dep't 1997]; *see also, Paolangeli v Cowles*, 208 AD2d 1174, 1175 [3d Dep't 1994]).

Here, where plaintiff and all the defendants copiously cite to factual support, a material issue of fact exists regarding the intention of the note's enforceability. While the documents speak for themselves, plaintiff raises material questions of fact concerning the actual intent behind the promissory note. She argues that the promissory note's purpose was to facilitate the estate planning of Arie Genger and the transfer of funds between the family members with lessened tax consequences. Indeed, it is curious that interest payments were made by the Partnership for several years and then ceased, and that Sagi Genger testified that TPR

21

Investment's 2002 notice was "pro forma" and not meant as an actual request that payment be made. It could be found that enforcement of the note's terms was only made after Sagi Genger allegedly came into control of both TPR Investment and D&K Ltd. Partnership. Given the testimonial evidence in particular, there is a question of fact as to whether the promissory note was intended to be an enforceable agreement, and it would be premature to apply a Statute of Frauds analysis to the cause of action. In addition, as plaintiff has established that there are questions of fact as to whether defendant acted with intent to defraud plaintiff and D&K Ltd. Partnership and provided substantial assistance to D&K GP in particular to advance the fraud's commission, the branch of the motion seeking summary judgment and dismissal of the 6th and 7th causes of action is denied.

The 8th cause of action alleges conspiracy to commit fraud. For the same reasons set forth above in discussing Dalia Genger's motion, this branch of defendant's motion is granted.

The 16th cause of action alleges promissory estoppel. This is an equitable cause of action and must allege "a clear and unambiguous promise by defendants upon which [the plaintiff] reasonably and foreseeably relied to [plaintiff's] detriment." (*401 Hotel, L.P. v MTI/The Image Group, Inc.*, 251 AD2d 125, 126 [1[st] Dept. 1998]). Here, plaintiff alleges that it was the promise and intent of Arie Genger and the family as a whole, that the promissory note was not to be enforced, so as to preserve the trust accounts, and that she relied on that promise these many years only to learn that one of the main assets of her trust account had been sold in violation of the promise. Defendant argues not only that the documents state otherwise, but that plaintiff may not assert promissory estoppel in order to avoid the affirmative defense of the statute of frauds, citing *Cohen v Brown, Harris, Stevens, Inc.*, 64 NY2d 728 (1984), and *Lowinger v Lowinger*, 287 AD2d 39, 45 (1st Dept. 2001), *lv denied* 98 NY2d 605 (2002).

22

While the assertion of the statute of frauds is often sufficient to cause a dismissal of a claim of promissory estoppel, exceptions include where "the circumstances are such as to render it unconscionable to deny" the promise upon which the plaintiff has relied (*see, Philo Smith & Co. v. USLIFE Corp.*, 554 F.2d 34, 36 [2d Cir. N.Y. 1977]). Here, where there are questions of fact as to whether defendants intentionally breached the family agreement concerning the entirety of the estate planning and unconscionably caused plaintiff to lose a significant amount of her trust funds to their benefit, with the possibility of losing all of the funds, defendant has not established entitlement to summary judgment and dismissal of the claim of promissory estoppel notwithstanding his defense of the statute of frauds (*see, Swerdloff v Mobil Oil Corp.*, 74 AD2d 258, 261 [2d Dep't 1980], *app denied* 50 NY2d 913 [1980]). Accordingly, defendant's motion for summary judgment and dismissal of the 16th cause of action is denied.

E.    D&K GP's Motion for Partial Summary Judgment (Sequence Number 004)

Defendant D&K GP seeks summary judgment and dismissal of "all" the causes of action of the complaint as against it, but its motion papers specifically addresses only the 4th, 6th, 7th, and 8th causes of action.[9]

As an initial issue, D&K GP argues that plaintiff, "in her capacity as beneficiary under the Orly Trust and in the Orly Trust's capacity as limited partner in D&K LP, agreed not to bring an action against D&K GP." (Lyons {D&K GP} Aff. [Doc. 21] ¶ 5). Specifically, defendant points to the "Amended and Restated Limited Partnership Agreement of D&K Limited Partnership," in which Leah Fang as trustee for both the Orly and Sagi trusts, agreed that the trusts expressly waived their right to bring an action against D&K GP, the General Partner; Sagi

---

[9] D&K GP did not seek summary judgment as against the 2nd or 3rd causes of action, in which it is also named as a defendant.

23

Genger signed on behalf of D&K GP (Doc. 22-8). Accordingly, D&K GP argues that summary judgment and dismissal of the claims against it should be dismissed in their entirety. However, this agreement provides that its partners, which include the Orly Genger 1993 Trust, may sue for "fraud, bad faith, or willful misconduct." (Doc. 22-8:5). Plaintiff alleges that there has been bad faith and fraud by various family entities as concerns the enforcement of the promissory note, and including various documents signed on behalf of the Genger trusts, as well as D&K Ltd. Partnership. At the very least, there appear to be irregularities. Summary judgment and dismissal on this ground is not appropriate.

The 4th cause of action, brought by the Orly Genger 1993 Trust and D&K Ltd. Partnership against both defendant D&K GP and Sagi Genger, claims defendants prevented the Ltd. Partnership from honoring its obligations under the note, and that it tortiously interfered with the contract.

Tortious interference with contractual relations consists of four elements: a contract between plaintiff and a third party; the defendant's knowledge of the contract; the defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and resulting damages to plaintiff (*Kronos, Inc. v AVX Corp.*, 81 NY2d 90, 94 [1993], citation omitted). Defendant argues that, as the general partner to D&K Ltd. Partnership, it is a party to the contract at issue, that it, too, has also been injured by the nonpayment and resulting foreclosure, and that a party to a contract cannot tortiously interfere with the contract (Def. Memo of Law § IV [Doc. 22:12]). Plaintiff argues that according to Sagi Genger's testimony during the arbitration proceeding, Dalia Genger had repaid her four percent interest in the promissory note, and that therefore D&K GP was not a party to the agreement.

Here, the contract is the promissory note between D&K Ltd. Partnership and TPR

24

Investment. Defendant D&K GP knew of the contract, but was also the general partner of the Limited Partnership from 2004 onward, and thus is understood to be a party to the contract. This is because the management of the property and the business of the partnership are vested exclusively in the general partners (*Durant v Abendroth*, 97 NY 132, 144 [1884]). By law, a general partner in a limited partnership is subject to all the restrictions and liabilities of a partner in a partnership without limited partners, although it may not undertake certain actions without the written consent of the limited partners, as defined in the statute (Limited Partnerships § 98). Thus, plaintiff's argument that Dalia Genger had repaid the interest she owed on the promissory note, does not divest defendant of its rights and duties as general partner. Accordingly, as it was the general partner of D&K Ltd. Partnership, no claim of tortious interference with the contract may lie. Summary judgment and dismissal of the 4th cause of action against defendant is granted.

The 6th and 7th causes of action are fraud, and aiding and abetting fraud. The elements of both causes of action have been previously set forth. There are questions of material fact as to whether defendant engaged in fraud and in aiding and abetting fraud, and accordingly the branch of defendant's motion for summary dismissal of these two causes of action is denied.

The branch of the motion to dismiss the 8th cause of action, claiming conspiracy to commit fraud, is granted, for the reasons stated previously as concerns the other defendants.

F.     TPR's Motion for Summary Judgment (motion sequence no. 005)

Defendant TPR moves for summary judgment and dismissal of the 8th, 9th, 10th, 11th, 12th, 13th, 14th, 15th, and 16th causes of action as against it. In sum, it argues that the documentary evidence establishes that there are no material questions of fact that would preclude a grant of summary judgment and dismissal of the complaint as against it.

The branch of the motion to dismiss the 8th cause of action, alleging conspiracy to

commit fraud, is granted for the reasons set forth above concerning the other defendants.

The 9th cause of action seeks declaratory relief and damages pursuant to NY UCC §§ 9-627, 610, and 611-614, as concerns the notice of foreclosure and the sale. UCC § 9-610 provides that every aspect of the disposition of collateral after a default must be commercially reasonable. UCC § 9-611 ( c) (2) provides that before the disposition of collateral, the secured party shall send an authenticated notification of disposition to "any secondary obligor." UCC § 9-612 (b) provides that for a non-consumer transaction, 10 days is sufficient notice before the disposition. UCC § 9-613 (a) (4) requires that for the notification of disposition to be sufficient, it must include a statement that the debtor is entitled to an accounting of the unpaid indebtedness and the charge, if any, for an accounting. UCC § 9-613 (a) (5) requires that for the notification of disposition to be sufficient, it must state the time and place of the public disposition or the time after which any other disposition is to be made. UCC § 9-627 provides that simply because a greater amount could have been obtained is not in itself sufficient to preclude the secured party from establishing that the disposition was made in a commercially reasonable manner, and describes what are commercially reasonable dispositions.

The complaint alleges that TPR Investment failed to properly notify the Orly Genger 1993 Trust or Orly Genger of the sale of the shares of TPR owed by D&K Ltd. Partnership, and that the notice of August 31, 2008 failed to state that D&K Ltd. Partnership is entitled to an accounting of its unpaid indebtedness, or to provide the time and place of the disposition of the collateral. In addition, the $2,200,000 sale price was only a "fraction" of the original $10,200,000 purchase price, and failed to take into consideration certain potential monies received from the sale of TRI shares to the Trump group.

Defendant TPR Investment argues that it fully complied with the UCC requirements

26

when noticing the default and conducting the foreclosure sale. In addition, it argues that even if it could be found that plaintiff never received notice of the default and sale, she has not alleged that she suffered redressable damages, as she makes only a generalized statement that the shares sold for a fraction of their original purchase price (Def. Memo of Law [Doc.29] p. 8, citing Ver. Compl. [Doc. 7-1] ¶ 146]). It also argues that plaintiff does not offer any evidence as to what the fair market value of the TPR Investment shares might have been and, as stated explicitly in the statute, an enforcement will not be found commercially unviable simply because a greater amount could have been obtained (UCC § 9-627 [a]).

An examination of the notice shows that certain of the complaint's allegations have no merit but that others are meritorious (Def. Memo of Law [Doc. 29] p. 7, citing Ex. K [Doc. 29-1:136]). The notice is not addressed to either of the limited partners, the Orly or Sagi Genger trusts, who as guarantors, are secondary obligors, and there is no proof of service provided by defendant establishing notification. The notice indicates that the date of the sale was February 27, 2009, but does not indicate the date of the notice itself, meaning that defendant has not established that the 10-day rule was adhered to. Furthermore, given that the January 31, 2009, Meeting Agreement stated in paragraph 8 that TPR would wait 30 days until selling the shares, it appears that the sale on February 27, 2009 was premature in any event (see Doc. 22-4:17-18]). As for the claimed violation of UCC § 9-627, there remain questions of fact as to whether the sale was itself conducted in a commercially reasonable manner as set forth in the statute, whether or not the shares were sold at a value far lesser value than their worth. However, the notice clearly indicates the date, time, and location of the sale, and also that D&K Ltd. Partnership is entitled to an accounting and includes the telephone number to call. Accordingly, the branch of defendant's motion seeking summary judgment and dismissal of the 9th cause of

27

action is granted solely to the extent that the claims seeking declarations of violations of UCC § 9-613 (a) (4) and (a) (5), are dismissed. The remainder of the 9th cause of action remains.

The 10th cause of action alleges conversion and seeks replevin, and the 11th cause of action seeks a judgment declaring that D&K Ltd. Partnership has a superior right to possess chattel under CPLR 7101. Conversion is when a person, without authority, intentionally exercises control over the property of another person and interferes with the other person's right of possession (see, Sporn v MCA Records Inc., 58 NY2d 482, 487 [1983]). Replevin, under Article 71 of the CPLR, is a remedy ancillary to an action to recover a chattel (see Sears Roebuck & Co. v Austin, 60 Misc. 2d 908, 908 [Civ. Ct., NY County 1969]). Defendant argues that plaintiff does not adequately plead the elements of conversion and thus cannot establish that replevin is appropriate, nor does she show that she is entitled in the 11th cause of action to a declaration that she has a superior right to that of defendant's in the TPR Investment shares. It argues that plaintiff does not establish that its assuming ownership rights to the shares was unauthorized, nor does she show that D&K Ltd. Partnership or any other entity had a superior right.

The claim of conversion and replevin, and the declaration as to whose right is superior, go to the heart of plaintiff's complaint. Because, as set forth in the discussion above, there are disputed questions of fact as to the intent of the promissory note and Pledge Agreement and whether enforcement of them was ever contemplated, there can be no summary determination as to who is entitled to the shares and no declaratory relief granted at this time. Accordingly, the branches of defendant's motion for summary dismissal of the 10th and 11th causes of action are denied.

The 12th cause of action seeks a preliminary injunction to enjoin TPR Investment from in

28

any matter disposing of the TPR shares pending a final determination of the declaratory

judgment branch of the complaint. This cause of action is redundant of the motion separately

brought by plaintiff and opposed by defendants on grounds similar to those articulated by

defendant in its motion for summary judgment. As the plaintiff's motion for a preliminary

injunction has been granted as set forth above, summary judgment and dismissal of this cause of

action is granted. Of course, if what plaintiff is seeking is a permanent injunction, the cause of

action would have to be repleaded.

The 13th cause of action seeks a constructive trust on behalf of D&K Ltd. Partnership. In

equity, a constructive trust may be imposed when the movant establishes that there is a

confidential or fiduciary relationship, a promise, a transfer in reliance thereon, and unjust

enrichment (*Sharp v Kosmalski*, 40 NY2d 119, 121 [1976], citations omitted). Defendant argues

that there is no relationship between it and plaintiff, perhaps overlooking that this claim is

brought on behalf of D&K Ltd. Partnership, a minority shareholder of TPR Investment. It is

disputed as to whether TPR Investment owed a fiduciary duty of care to minority shareholder

D&K Ltd. Partnership (*see Alpert v 28 Williams St. Corp.*, 63 NY2d 557, 568 [1984] [fiduciary

duty of majority to minority shareholders; *Salm v Feldstein*, 20 AD3d 469 [2d Dept. 2005]

[fiduciary duty of managing member of company and co-member to plaintiff]). The parties

dispute, of course, whether defendant was among the entities promising that the promissory note

would never be enforced. Defendant argues that there was no transfer in reliance, however

plaintiff sufficiently argues that D&K Ltd. Partnership pledged its shares of TPR in reliance of

the promise that the note would be not enforced, citing *Lester v Zimmer*, 147 AD2d 340, 341-

342 (3d Dept. 1989), which notes that the elements of a constructive trust are "flexible," and the

"transfer" should be interpreted broadly. Whether defendant was unjustly enriched is a matter to

29

be determined at trial. Accordingly, as there are questions of fact, summary judgment is denied as to the 13th cause of action.

The 14th and 15th causes of action, brought on behalf of the Orly Genger 1993 Trust, allege constructive and actual fraudulent conveyance under New York Debtor & Creditor Law §§ 273, 276, and 277. Section 273 of the Debtor and Creditor Law provides that "every conveyance made . . . by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." Section 276 of the Debtor & Creditor Law provides that a conveyance is actually fraudulent if it was made with actual intent "to hinder, delay, or defraud either present or future creditors." Section 277 provides that a conveyance of partnership property made either when the partnership is insolvent or will be rendered insolvent by the conveyance, is fraudulent as to partnership creditors if the conveyance is made (a) to a partner even if there is a promise by the partner to pay partnership debts, or (b) to a non-partner without fair consideration to the partnership.

None of these statutes apply to the facts here, and defendant's motion for summary judgment and dismissal of the two causes of action must be granted based on failure to state a cause of action. In New York, only creditors may maintain actions for fraudulent conveyance (*Geren v Quantum Chemical Corp.*, 99 F3d 401, 1995 WL 737512, **2 [2d Cir. [NY] 1995], *citing Pappa Bros. v Thompson*, 214 NYS2d 13, 15 [Sup. Ct. Nassau County, 1961]). Although plaintiff argues that the Orly Genger 1993 Trust is a creditor, she is misapplying the statute. A creditor is defined as an entity "having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." (Debtors & Creditors Law § 270). The complaint alleges that certain of the assets of the trust were wrongly conveyed to defendant by the actions

30

of Sagi Genger. However, to establish a constructive fraudulent conveyance, plaintiff must demonstrate: (1) that there was a conveyance; (2) that the defendant would become insolvent as a result of the conveyance; and (3) there was no fair consideration for the conveyance (see, *United States v Sweeney*, 418 F. Supp. 2d 492, 498 [SDNY 2006], citation omitted). To establish intentional fraudulent conveyance, plaintiff must show in addition that there was actual intent "to hinder, delay, or defraud . . . creditors" (*Sweeney*, at 498). Not only does plaintiff not establish that she is a creditor who has a claim, but she does not allege that *defendant* became insolvent because of the conveyance of the TPR shares. Furthermore, she offers nothing more than the statement that the shares were bought by TPR Investment for a "fraction" of their original value, to establish that there was no fair consideration. Her reliance on Debtor and Creditor Law § 277 is also misplaced, based on the facts alleged in the pleadings. Accordingly, the 14th and 15th causes of action are dismissed on summary judgment.

The 16th cause of action alleges promissory estoppel on behalf of D&K Ltd. Partnership. Defendant's motion for summary dismissal of this cause of action is granted for the same reasons set forth in the discussion of the branch of Sagi Genger's motion for summary judgment and dismissal of this cause of action.

Therefore,

As to Motion Sequence Number 001, due deliberation having been had, and it appearing to this Court that a cause of action exists in favor of the plaintiff and against the defendants and that the plaintiff is entitled to a preliminary injunction on the ground that the subject of the action is unique and that the defendants threaten to do an act in violation of the plaintiff's rights respecting the subject of the action, tending to render the judgment ineffectual, as set forth in the aforesaid decision, it is

31

ORDERED that the undertaking is continued in the sum of $ 150,000.00 , conditioned that the plaintiff, if it is finally determined that she was not entitled to an injunction, will pay to the defendants all damages and costs which may be sustained by reason of this injunction; and it is further

ORDERED that defendants, their agents, servants, employees and all other persons acting under the jurisdiction, supervision and/or direction of defendants, are enjoined and restrained, during the pendency of this action, from doing or suffering to be done, directly or through any attorney, agent, servant, employee or other person under the supervision or control of defendant or otherwise, any of the following acts: removing the Shares from the state, or otherwise transferring, selling, pledging, assigning, or otherwise disposing of the Shares; and it is further

ORDERED that as to Motion Sequence Number 002, the motion for summary judgment by Dalia Genger is granted only to the extent of dismissing the 1st and 8th causes of action as against her in the first amended verified complaint, and is otherwise denied; and it is further

ORDERED that as to Motion Sequence Number 003, the motion for partial summary judgment by Sagi Genger is granted only to the extent of dismissing the 8th and 16th causes of action as against him in the first amended verified complaint, and is otherwise denied; and it is further

ORDERED that as to Motion Sequence Number 004, the motion for partial summary judgment by D&K GP is granted only to the extent of dismissing the 4th and 8th causes of action against it in the first amended verified complaint, and is otherwise denied, and it is further

ORDERED that as to Motion Sequence Number 005, the motion for summary judgment by TPR Investment Associates, Inc., is granted only to the extent of dismissing the 8th, 12th, 14th,

15th, and 16th causes of action in their entirety as against this defendant, and as to the 9th cause of

action, dismissing the claims alleging violations of UCC § 9-613 (a) (4) and (a) (5); and the

motion is otherwise denied; and it is further

ORDERED that as to Motion Sequence Number 006, the motion to amend the complaint

is granted to the extent set forth above; plaintiff shall  e-file and serve a second amended

complaint incorporating the limitations set forth herein, and serve it on all parties who shall then

serve their answers in accordance with the CPLR; and it is further

ORDERED that the parties shall appear for a preliminary conference in Supreme Court,

60 Centre Street, room 212, on September 15, 2010, at 2:15 p.m.

This constitutes the decision and order of the court.

Dated: June 28, 2010
New York, New York

_____
J.S.C.

(2010 Pt 12D&O_109749_2009_001 - 006_MK & JH)  33

**EXHIBIT W**

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
ORLY GENGER 1993 Trust Pursuant to
SCPA § 711 (11)

**VERIFIED PETITION FOR
REMOVAL OF DALIA GENGER
AS TRUSTEE AND REQUEST
FOR TEMPORARY
RESTRAINING ORDER**

**FILE NO.: 0017/2008**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

TO THE SURROGATE'S COURT, STATE OF NEW YORK
COUNTY OF NEW YORK

Petitioner, Orly Genger ("Petitioner" or "Orly"), by her attorneys Cozen O'Connor,

respectfully alleges as her Verified Petition for Removal of Dalia Genger as Trustee:

1.      Orly, domiciled at 1965 Broadway, Apt. 22G, New York, New York 10024, is the

current beneficiary of the Orly Genger 1993 Trust dated December 13, 1993 (the "Orly Trust")

(annexed hereto as Exhibit A). Dalia Genger, residing at 200 East 65th Street, Apt. 32W, New

York, New York 10021 ("Respondent" or "Dalia"), Orly's mother, is the current sole Trustee of

the Orly Trust, and was appointed successor Trustee in January 2008.

2.      Based upon the allegations contained herein, Petitioner requests that this Court

provide the following relief:

(a)      Enjoining and restraining Respondent, her agents, and all other persons

acting on her behalf from withdrawing, selling, disposing, transferring, assigning, removing,

pledging, redeeming, mortgaging, encumbering, liening, hypothecating, or secreting the Orly

Trust's 19.43% interest in Trans-Resources, Inc. ("TRI"),[1] a closely held corporation, founded

---

[1] TRI is the parent company of several subsidiaries that provide growers with specialty fertilizer and industrial chemicals, including Haifa Chemicals Ltd., Na-Churs Alpine Solutions, Plant Products Co. Ltd., and Eigo Irrigation Co.

by Arie Genger ("Arie"), Petitioner's father and Respondent's former husband, and any other assets which may be remaining in the Orly Trust. The Orly Trust's TRI shares are in imminent danger of being sold by Respondent and her son, Orly's brother, Sagi Genger ("Sagi"), for the purpose of benefiting Sagi Genger and presumably Respondent, and depleting and denuding the value of Orly's Trust;

      (b)    removing Respondent as Trustee of the Orly Trust for breaching her fiduciary duties, wasting and dissipating the assets of the Orly Trust, and imprudently managing and injuring the property committed to her charge. As will be demonstrated herein, Respondent has conspired with, and participated in the diversion of trust assets to, Sagi, who underhandedly sold without any objection from Respondent, the Orly Trust's indirect interest in TPR Investment Associates Inc. ("TPR"), a closely held family-owned corporation.

      (c)    surcharging Respondent in the amount of the loss of the value of Orly's interest in TPR as determined by the Court and awarding the Petitioner costs and attorneys' fees;

      (d)    appointing Michael D. Grohman, Esq., as successor trustee;

      (e)    waiving any requirement that Petitioner post an undertaking; and

      (f)    granting Petitioner such further relief deemed necessary or proper.

3.    To assist the Court in perceiving the severity of Respondent's conduct and the urgency of the provision of extraordinary relief, the following is an overview of the facts supporting this Petition.

## I.   OVERVIEW

4.    Arie and Dalia were married on July 23, 1967, in a ceremony held in Israel. In 2004, however, their marriage ended in divorce. Prior to 1993, at which time Dalia and Arie were married, Dalia and Arie formed D & K LP ("D & K"), a family-owned limited partnership

whose name was shorthand for "Dalia and Kids." At the time of its formation, Dalia, the general partner, held a 4% interest, and Orly and Sagi, the limited partners, each held a 48% interest.

5.      In December 1993, Dalia and Arie also established identical irrevocable *inter vivos* trusts for the benefit of each of their children: the Orly Trust and the Sagi Genger 1993 Trust (the "Sagi Trust"). For estate-planning purposes, Dalia and Arie funded each trust with a $600,000 gift. The intent behind the trusts was to ensure that both children received property of equal value. Sash A. Spencer and Lawrence M. Small were named Co-Trustees of both trusts and remained Co-Trustees until the Genger's divorce. After the Trusts were funded, Orly and Sagi each assigned their 48% interests in D & K to their Trusts.

6.      At the same time in December 1993, D & K purchased 240 shares of common stock (constituting 49% of the outstanding shares) in TPR for $10,200,000. The shares were purchased with $600,000 from each of the Orly Trust and the Sagi Trust and $50,000 from Dalia, totaling $1,250,000, and the balance was satisfied with a recourse $8,950,000 promissory note (the "Note") (a copy of which is annexed hereto as Exhibit B). Pursuant to the Note, principal, together with accrued interest, was to be repaid by D & K in annual installments over ten years. The Note was secured by a pledge of the 240 TPR shares owned by D & K. Each of the Trusts and Dalia assumed liability on the Note in proportion to its/her direct interest in D & K. Accordingly, each of the Orly and Sagi Trusts assumed a 48% liability on the Note and acquired a 23.52% indirect interest in TPR and Dalia assumed a 4% liability on the Note and a 1.96% indirect interest in TPR. Payments were made on the Note until 1999, at which time D & K stopped making payments with the implied consent of the interested parties.

7.      At the time of the above-described transaction, Arie owned the remaining 51% of TPR, which held investments in various securities, including TRI common stock, as well as its

interest in the Note. As of March 30, 2001, TPR held a 52.85% interest in TRI. The remaining

minority interest in TRI (47.15%) was owned by various entities controlled directly and

indirectly by Jules and Eddie Trump (the "Trump Group").

8.     On October 26, 2004, Dalia and Arie entered into a Stipulation and Agreement of

Settlement as a final settlement of their divorce (the "Settlement Agreement") (annexed hereto as

Exhibit C). Pursuant to the Settlement Agreement, Dalia received, *inter alia*, Arie's 51% interest

in TPR and retained her 4% interest in D & K. TPR's 52.85% interest in TRI was transferred to

Arie and the Trusts as follows: (i) 13.99% to Arie, (ii) 19.43% to the Orly Trust, and (iii) 19.43%

to the Sagi Trust. The Orly Trust and the Sagi Trust each granted Arie an irrevocable lifetime

voting proxy over their TRI shares (annexed hereto as Exhibit D). Therefore, after October 29,

2004, Arie and the two Trusts held a controlling interest in TRI, and TPR no longer owned any

TRI common stock.

9.     In connection with the divorce settlement, Dalia took measures to cede

management of D & K and TPR to her son Sagi. On October 21, 2004, days before signing the

Settlement Agreement, Dalia and Sagi formed D & K GP LLC ("D & K GP"), whose sole

purpose was to act as the general partner of D & K. Dalia exchanged her 4% interest in D & K

and $1.00 for a 99% membership interest in D & K GP. Sagi purchased a 1% membership

interest in D & K GP for $1.00. Pursuant to the Limited Liability Agreement of D & K GP

(annexed hereto as Exhibit E), Sagi was given the power to select a manager of D & K GP whose

function would be to control D & K's assets. Sagi selected himself to act as manager; thus, Dalia

effectively handed Sagi the authority to control D & K and its assets. Also, by forming D & K

GP, Dalia and Sagi shielded themselves from any personal liability stemming from D & K,

including any personal liability related to the Note. This left the Trusts solely liable on the Note.

10.    On October 30, 2004, Dalia entered into a shareholder agreement with TPR that provided for the management of TPR. Specifically, pursuant to the shareholder agreement (annexed hereto as Exhibit F), D & K, which owned 49% of TPR, was given authority to appoint one board member to the TPR board. Sagi, as the managing partner of D & K, appointed himself as a board member of TPR. As the majority owner of TPR, Dalia was named as the other board member. In addition, the shareholder agreement appointed Sagi as Chief Executive Officer ("CEO") of TPR. Accordingly, Dalia essentially ceded control of TPR to Sagi, just as she had done with D & K.

11.    Below, for the Court's convenience, is a side-by-side summary of Arie's, Dalia's, the Orly Trust's, and the Sagi Trust's interests in TPR before and after Arie's and Dalia's divorce.[2]

## TPR OWNERSHIP
## BEFORE AND AFTER DIVORCE

| Person | PERCENTAGE | |
| --- | --- | --- |
| | TPR Before | TPR After |
| Arie Genger | 51.00% | 0% |
| Dalia Genger | 1.96% | 52.96% |
| Orly Trust | 23.52% | 23.52% |
| Sagi Trust | 23.52% | 23.52% |
| TOTAL | 100% | 100% |

---

[2] For the Court's convenience, the chart annexed hereto as Exhibit G provides a summary of Arie's, Dalia's, the Orly Trust's, and the Sagi Trust's ownership interests in TPR, TRI, and D & K as of October 26, 2004 – i.e., the date that Arie and Dalia executed the Settlement Agreement.

12.    In connection with the Settlement Agreement, Dalia required that the Trustees of the Orly Trust and the Sagi Trust (Messrs. Sash and Small) resign and be replaced with friends of Sagi. Numerous successor trustees were appointed to the Orly Trust and the Sagi Trust, all of whom were affiliated with Sagi in one way or another. David Parnes and Eric Gribetz (Sagi's longtime friends) and Leah Fang (Sagi's sister-in-law) were appointed as successor trustees to the Orly Trust, and Messrs. Parnes and Gribetz, Rochelle Fang (Sagi's mother-in-law), and Mr. Parnes again, were appointed successor trustees of the Sagi Trust. In January 2008, Dalia was appointed successor trustee of the Orly Trust, despite Orly's objection. By that time, as a result of Dalia's granting him control of TPR and D & K, and through the appointment of his friends and relatives as successor trustees of the Trusts, Sagi effectively had obtained control over the assets held by all of D & K, TPR, the Sagi Trust, and the Orly Trust.

13.    On August 2, 2006, Sagi, as part of his managerial role in D & K GP, D & K, and TPR, assigned the Note – which then had an approximate value of $11,000,000 as a result of accrued interest – to Mr. Parnes for only $12,000. (A copy of the Memorandum dated August 2, 2006, assigning the Note is annexed hereto as Exhibit H.) The assignment stated that D & K "denied enforceability of the Note" (see Exhibit H annexed hereto), which presumably is why it was "sold" for $12,000. Sagi signed the assignment on behalf of both TPR, as the maker, and D & K, as the holder. Dalia was copied on the memorandum assigning the note, but neither Orly, the Orly Trust, nor the then-Trustee of the Orly Trust received copies of the memorandum. At the time of this assignment, Mr. Parnes was acting as trustee of both the Orly Trust and the Sagi Trust. Shortly after the assignment, Mr. Parnes resigned as Trustee of the Orly Trust in recognition of the inherent conflict he faced in that role.

14.    Sometime in 2007, Sagi sold a 2% interest in TPR to Rochelle Fang. The cost of
the 2% interest was based upon a bogus valuation of TPR at $50,000,000. At the time of the
sale, TPR's assets were worth between approximately $11,000,000 and $12,000,000, plus the
value of the Note. This sale effectively stripped Dalia of her majority interest in TPR giving
Sagi unfettered control of TPR, in addition to his control of D & K and D & K GP. In January
2008, when Dalia was appointed successor trustee of the Orly Trust, she completely divested
herself of the balance of her TPR shares. Dalia has not informed either the Court or Orly as to
when she transferred her TPR interest.

15.    On August 22, 2008, unbeknownst to Orly, Rochelle Fang, who had been
appointed Trustee of the Sagi Trust, attempted to sell the Sagi Trust's 19.43% interest in TRI to
the Trump Group, who already owned 47.15% of TRI's outstanding shares, for $26,715,416.
This sale purportedly transferred control of TRI from Arie to the Trump Group who thereafter
purported to hold 66.58% of TRI's outstanding common stock.[3] In connection with the supposed
sale, Sagi and David Parnes were given seats on TRI's board of directors. If given effect, this
purported sale, which was consummated after Dalia was appointed successor trustee of the Orly
Trust, would dilute and diminish the value of the Orly Trust's interest in TRI.

16.    Dalia, who had notice of the supposed sale, made no effort to prevent the sale or
to protect the value of the Orly Trust's interest in TRI. Fearing that Dalia would continue to
neglect her duty to protect the Orly Trust's assets, on January 10, 2009, Petitioner wrote a letter
(annexed hereto as _Exhibit_ I) to her mother stating that "for now, and until further notice, it is my

---

[3] The validity of the sale is at issue in litigation currently pending in Delaware Chancery Court. The
parties to the action are Arie Genger, TRI, and various entities affiliated with the Trump Group. The
not appeared in the action. In that action, the Trump Group claims to have bought the shares either from the Sagi
Trust or from TPR – thus, the approximately $27 million purportedly paid by the Trump Group either belongs to the
Sagi Trust or to TPR, depending on the outcome of the litigation in Delaware.

strong desire to retain all of the shares of TRI that are currently in the Orly Trust, and I direct

you not to sell them." Dalia refused to agree not to dispose of the TRI shares.

## II. THE EVIDENCE DISCOVERED BY PETITIONER ON JUNE 1, 2009, REQUIRES INJUNCTIVE RELIEF AND THE IMMEDIATE REMOVAL OF DALIA AS TRUSTEE

17.    In February 2008, Orly applied to this Court to designate a Trustee, or in the

alternative to appoint a special trustee, claiming that Dalia and all of the preceding successor

trustees of the Orly Trust were improperly appointed and had no authority to act on behalf of the

Orly Trust. Orly also alleged wrongful dealings by Dalia as Trustee of the Orly Trust. In

denying the application without prejudice, this Court stated that Orly had made allegations

without sufficient supporting evidence and suggested that Orly commence an SCPA § 2201

proceeding to obtain the necessary evidence and then renew her application. (A copy of the

Court's decision is annexed hereto as Exhibit J.)

18.    On May 14, 2009, as a prerequisite to the SCPA § 2201 application, Orly's

counsel sent Dalia Genger a letter (annexed hereto as Exhibit K) requesting documents related to

the Orly Trust's assets. Soon thereafter, Orly's counsel was notified that Dalia had retained

Robert A. Meister, Esq., of Pedowitz & Meister, LLP, and Orly's counsel therefore forwarded a

copy of the May 14th letter to Mr. Meister.

19.    On June 1, 2009, Mr. Meister responded to Orly's document demand by advising

Orly's counsel that the Orly Trust no longer owned any interest in TPR. According to the letter,

Sagi, acting as CEO of TPR, had foreclosed on the Note and had sold D & K's 240 shares of

TPR for $2,220,000. (A copy of the Letter dated June 1, 2009, is annexed hereto as Exhibit L.)

Before that time, Dalia had neither advised nor notified Orly that Sagi had foreclosed on the

Note,[4] nor advised Orly that Sagi had sold the TPR shares at auction. Thus, upon receipt of Mr.

Meister's letter, Orly learned for the first time that:

(a)      On August 31, 2008, Sagi, acting as CEO of TPR, notified himself as the

general manager of D & K, that D & K was in default of the Note and declared that unless the

entire unpaid principal amount of the Note was paid immediately, TPR would sell, at auction, the

240 shares pledged as collateral. (A copy of the Notification dated August 31, 2008, is annexed

hereto as Exhibit M.)

(b)      Thereafter, Sagi, again acting as CEO of TPR, purported to notify D & K

(of which he remained the managing partner) that D & K's 240 shares of TPR stock would be

publicly auctioned to the highest bidder on February 27, 2009, and that the money received from

the sale would be used to reduce the outstanding debt. (A copy of the Notification is annexed

hereto as Exhibit N.) Sagi purported to notify the interested parties of the sale by publishing

notice of the sale in the New York Post in October 2008 and February 2009. Although at all

relevant times Sagi had Orly's contact information, he never informed her of the impending sale.

(c)      On February 27, 2009, TPR (still controlled by Sagi) foreclosed on the

240 shares of TPR and "auctioned" the shares. Not coincidentally, the Sagi-controlled TPR

purchased the shares at auction for $2,200,000. (See Exhibit O). The proceeds of the sale – i.e.,

$2,220,000 – were used to decrease D & K's obligations under the Note, leaving a balance of

approximately $8,800,000.

20.      On June 11, 2009, Orly's counsel sent Mr. Meister a letter asking that Dalia, in

accordance with Orly's January 2009 request and in light of the secretive diminution of the Orly

---

[4] While the Note had not been serviced since 1999, TPR had not foreclosed on the Note between 1999 and
2008 because it previously had agreed not to foreclose on the Note in order not to upset the estate-planning goals
underlying the Note.

Trust's interest in TPR, stipulate in writing that she would not, under any circumstances and until all issues were resolved, sell, transfer, or remove the TRI shares from the Orly Trust. (A copy of the Letter dated June 11, 2009, is annexed hereto as Exhibit P.) That same day, Mr. Meister responded to the June 11th letter, but he failed to address the terms of the proposed stipulation. (A copy of Mr. Meister's Letter dated June 11, 2009, is annexed hereto as Exhibit Q.)

A.    A Temporary Restraining Order ("TRO") Is Necessary To Protect The Remaining Assets Held By the Orly Trust

21.    It is clear from Dalia's deliberate inaction and complete deferral to Sagi in all matters related to D & K, TPR, and TRI, that without Court intervention Orly's TRI shares will be: a) sold at a significantly discounted rate so that the proceeds can be used to pay her unpaid portion of the Note, b) used as collateral to secure the Orly Trust's unpaid portion of the Note, or c) used to satisfy a Judgment against the Orly Trust. Since Orly's address was known to her brother and her mother at all relevant times, publishing notice of the sale of the TPR shares alone was a clear and deliberate attempt to prohibit Orly from intervening in the foreclosure and the sale. Dalia, who had knowledge of the events as they were transpiring, easily could have given notice of the auction to Orly, but she intentionally chose not to. There is now reason to believe that Dalia will again remain passive if and when Sagi seeks to hijack, sell, or otherwise meddle with the Orly Trust's TRI shares, even though Orly has specifically advised her mother, in writing, to protect the Trust's ownership of the TRI shares.

22.    There is no reason to trust that Dalia will honor her daughter's wishes and instructions since, from the time of her divorce, she has done nothing but ensure that Sagi has complete control over TPR, D & K, and D & K GP, and has allowed Sagi to do as he pleases. At this time, approximately $8,800,000 of the Note remains unsatisfied, and Sagi, as CEO of TPR, has not voided the notice of default. Based upon Dalia's deliberate inaction and failure to protect

the Orly Trust's assets to date, there is strong evidence to reasonably conclude that Dalia will not protect the Orly Trust's interest in the TRI shares, but rather, will act to benefit herself and Sagi, including by allowing Sagi to obtain the TRI shares to satisfy the Orly Trust's unpaid portion of the Note. Without immediate injunctive relief, Orly will have no recourse and the Orly Trust will be vulnerable to complete depletion. The harm caused to the Orly Trust under these circumstances would be irreparable.

23.    Based on the facts and documentary evidence presented herein it is likely that the Orly Trust will succeed on the merits of her Petition. Accordingly, she meets the criteria necessary to obtain a TRO and a preliminary injunction. Petitioner therefore respectfully requests that the Court grant her Petition for a TRO and a preliminary injunction in order to protect the assets held by the Orly Trust, including the TRI shares.

B.    <u>Dalia Must Be Removed As Trustee Immediately</u>

24.    Based on the information provided to Orly's counsel on June 1, 2009, which confirms Respondent's lack of diligence and disloyal service as Trustee, there now exists sufficient evidence to have Respondent removed as Trustee of the Orly Trust. While serving as Trustee, Dalia intentionally failed to notify Orly that TPR was taking measures to foreclose on the Orly Trust's 23.52% indirect interest in TPR. It was Dalia's duty as a fiduciary of the Orly Trust to be apprised of all activity concerning the Orly Trust and to ensure that Orly received proper notification of the default and auction. Moreover, Dalia actually knew of the foreclosure and the auction, but took no steps to protect the Orly Trust's interest in TPR. Dalia knew of Sagi's plan to foreclose on the Note and sell the TPR shares as early as August 2008; thus, she withheld information concerning the auction from Orly for almost ten months. Dalia did not disclose the foreclosure and share sale until she received the demand letter from Orly's counsel and realized that legal action was imminent. Instead of protecting the Orly Trust's and its

beneficiary's interests, Dalia sat back and silently watched her son strip the Orly Trust of its indirect interest in TPR.

25.    The corporate structure which has intertwined TPR, D & K GP, and D & K's assets, all of which are in some manner controlled by Sagi as a result of Dalia's actions, permits Dalia and Sagi to engage in self-dealing and does not provide for any accountability on either Sagi's or Dalia's part. Unfortunately, the Orly Trust is caught in the middle of Dalia's and Sagi's conspiracy to engage in self-dealing intended to benefit their own interests, while Sagi has been permitted to diminish and dissipate the value of the Orly Trust's assets, including its interests in TPR and, potentially, TRI. By enriching herself and her son at the expense of her daughter, Dalia is in breach of her fiduciary duties as Trustee of the Orly Trust. It is imperative that Orly have a successor trustee appointed who will unbiasedly and loyally protect the Orly Trust's remaining assets.

(1)    **In Direct Conflict With Her Obligations as Fiduciary of The Orly Trust, Dalia Did Nothing To Stop Sagi From Attempting to Sell His Trust's TRI Shares, Which, If Valid, Would Dilute the Value of the Orly Trust's Assets**

26.    The Sagi Trust's attempted sale of its interest in TRI to the Trump Group for $26,715,416, which occurred after Dalia was appointed successor trustee of the Orly Trust, purportedly transferred control of TRI from Arie to the Trump Group. As mentioned above, supra paragraph 15, if this purported sale were given effect, then the value of the Orly Trust's assets would be significantly diminished. If the purported sale were valid and effective, then Arie would no longer own a controlling interest in TRI, and thus the Orly Trust would no longer own a portion of the controlling block of TRI shares.

27.    Dalia, as a fiduciary of the Orly Trust, was obligated to apprise herself of any transactions that could affect the value of the Orly Trust's shares, and, in fact, Dalia was contemporaneously aware of the Sagi Trust sale. But Dalia made no effort to protect the value of

the Orly Trust's TRI shares by challenging the proposed sale. Moreover, she has taken no position with regard to the current value of the TRI shares and has taken no measures to protect the Orly Trust's interest in TRI since the purported sale, despite Orly's urgings. By remaining passive with respect to the Orly Trust's TRI shares, Dalia is completely ignoring the intent behind the establishment of the Orly Trust – to transfer an equal amount of assets to each of the children. Dalia, through her actions and her inaction alike, may have permitted Sagi to secure substantially more value from the Trusts' assets than Orly.

(2)    **In Direct Conflict With Her Obligations as Fiduciary of The Orly Trust, Dalia Took No Action To Protect the Orly Trust's Interest in TPR**

28.    Pursuant to the August 2006 memorandum assigning the Note to David Parnes – on which Dalia was copied – Sagi, acting as the managing partner of D & K, took the position that the Note was unenforceable. (See Paragraph 4 of Exhibit H annexed hereto.) In the exact same memorandum, however, Sagi, acting as the CEO of TPR, took the directly contrary position that TPR reserved its right to enforce the Note. (See Paragraph 8 of Exhibit H annexed hereto.)

29.    On February 14, 2007, Dalia, who participated in the "sham" transaction between Sagi and Mr. Parnes, and in a clear attempt to clean her hands of any impropriety, admitted in a sworn statement to the Court that no one was ever supposed to foreclose on the Note. (See Paragraph 3 of Exhibit R annexed hereto). Additionally, the unpaid Note was the subject of a post-judgment arbitration proceeding between Dalia and Arie, which took place in September 2007. Dalia, who was present at the proceedings, heard Sagi and Mr. Parnes testify that the Note should not be enforced and that Sagi, as CEO of TPR, had no intention of collecting the unpaid portion of the Note. Thus, Dalia knew long before August 2008 that TPR had effectively disclaimed its right to foreclose on the Note.

30.    As described above, however, in August 2008 (eleven months later), Sagi sought

to enforce the Note. Contrary to the position he had taken under oath at the arbitration, and

contrary to the position he had taken as the managing partner of D & K (see Paragraph 4 of

Exhibit H attached hereto), Sagi issued a default notice to D & K on behalf of TPR. Dalia, who

knew the Note was never intended to be enforced and who previously had sworn to as much,

should have immediately sought to block Sagi from foreclosing on the Note and selling the TPR

shares. Notwithstanding her knowledge and her previous statements, however, Dalia failed to

make any effort to stop Sagi when he engaged in this clear act of self-dealing, even though the

Orly Trust had a clear interest in the TPR shares at issue. As a fiduciary of the Orly Trust with

prior, as well as continued knowledge, of the TPR foreclosure, TPR's supposed claims against D

& K, and D & K's ability to challenge those claims based on prior representations, Dalia had a

duty to protect the Orly Trust's indirect ownership of the TPR shares. But instead of taking the

proactive measures required of a fiduciary, Dalia did nothing and allowed Sagi to obtain the TPR

shares for himself to the detriment of the Orly Trust.[5]

31.    Additionally, Dalia's failure to act in the face of the foreclosure and sale of TPR

stock is especially egregious because she has known since August 2008 that the purported sale of

TRI stock to the Trump Group is being challenged in Delaware state court. She also has known

that in that action the Trump Group is asserting that it bought the TRI stock from *either* the Sagi

Trust *or* TPR. Thus, she has known that, depending on the outcome of the litigation in

Delaware, the Orly Trust could have an interest in the $27 million paid by the Trumps in August

---

[5]    Moreover, in connection with her appointment as successor trustee of the Orly Trust in January 2008,
Dalia divested herself of her TPR shares (without informing either the Court or Orly as to when she transferred her
interest) in a further attempt to distance herself from any attributable wrongdoing. Dalia has contended to this Court
that she sold her TPR shares in order to avoid any appearance of impropriety in connection with her appointment as
Trustee. Interestingly, however, Dalia has never informed Orly or this Court whether she continues to maintain a
99% interest in D & K GP, the company that controls D & K and, thus, was obligated to service the Note.

2008 if its interest in TPR were preserved. Accordingly, as trustee of the Orly Trust, she should

have been especially vigilant in protecting the Orly Trust's interest in TPR through D & K. But

instead, she allowed Sagi to essentially steal the Orly Trust's interest in TPR so that Sagi can

attempt to retain the entire $27 million regardless of the outcome in Delaware Chancery Court.

Her inaction in this regard is a blatant violation of her fiduciary duties as trustee.

**III.  DALIA SHOULD BE SUR-CHARGED IN THE AMOUNT OF THE LOSS OF
THE VALUE OF ORLY'S INTEREST IN TPR AS DETERMINED BY THE
COURT AND ORLY SHOULD BE AWARDED ATTORNEYS' FEES**

32.  By failing to take action on behalf of the Orly Trust to prevent Sagi from

foreclosing on the Note and selling D & K's TPR shares, Dalia caused the Orly Trust to lose its

interest in TPR. Accordingly, Dalia should be surcharged in an amount of the loss of the value

of Orly's interest in TPR as determined by the Court and should be required to reimburse the

Orly Trust for its attorneys' fees incurred in connection with bringing this action.

**IV.  MICHAEL D. GROHMAN, ESQ. SHOULD BE APPOINTED AS SUCCESSOR
TRUSTEE**

33.  Based on Dalia's deliberate breach of her fiduciary duties to the Orly Trust, and in

light of Dalia's prior nefarious conduct as the Orly Trust's Trustee, this Court should remove

Dalia as Trustee and replace her with Michael D. Grohman, Esq. Mr. Grohman is a member of

the New York Bar and the head of the Trust and Estates practice group at Duane Morris LLP.

Mr. Grohman is not acquainted with any members of the Genger family, does not have any

interest in TRI, TPR, or D & K, and is willing and prepared to succeed Dalia immediately.

34.  No prior application has been made for the relief requested herein.

### PRAYER FOR RELIEF

WHEREFORE, based upon the allegations contained herein, Petitioner requests that this

Court provide the following relief:

(a)    Enjoining and restraining Respondent, her agents, and all other persons acting on her behalf from withdrawing, selling, disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering, liening, hypothecating, or secreting the Orly Trust's 19.43% interest in TRI and other assets remaining in the Orly Trust;

(b)    removing Respondent as Trustee of the Orly Trust for breaching her fiduciary duties, wasting and dissipating the assets of the Orly Trust, and improvidently managing and injuring the property committed to her charge;

(c)    surcharging Respondent in the amount of the loss of the value of Orly's interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)    appointing Michael D. Grohman, Esq., as successor trustee;

(e)    waiving any requirement that Petitioner post an undertaking; and

(f)    granting Petitioner any other relief it deems necessary and proper.

Dated:    New York, New York
          June 22, 2009

_____
ORLY GENGER
Petitioner

COZEN O'CONNOR

By: _____
    Judith E. Siegel-Baum, Esq.
    Attorney for Petitioner
    250 Park Avenue
    New York, New York 10017
    212-986-1116

# VERIFICATION

STATE OF NEW YORK )
                            )ss.:

COUNTY OF NEW YORK )

      The undersigned, the Petitioner named in the foregoing petition, being duly sworn, says: I have read the foregoing petition subscribed by me and know the contents thereof, and the same is true of my own knowledge, except as to the matters therein stated to be alleged upon information and believe, and as to those matters I believe it to be true.

_____
Signature of Petitioner

ORLY GENGER
Print Name

Sworn to before me this
22nd day of June, 2009.

_____
Notary Public
Commission Expires:
(Affix Notary Stamp or Seal)

ANN MEADE
Notary Public, State of New York
No. 01ME4783921
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires Sept. 30, 2009

**EXHIBIT X**

```
SURROGATE'S COURT OF THE STATE OF N.Y.
COUNTY OF NEW YORK
-----------------------------------x
In the Matter of the                      File No.
                                          0017/2008
          ESTATE OF ARIE GENGER,
                                          FTR Media
                           Deceased.
-----------------------------------x


                                          July 1, 2009

                                          31 Chambers Street
                                          New York, New York 10007



          BEFORE:     HON. TROY K. WEBBER
                      Judge

          APPEARANCES:     JUDITH ELLEN SIEGEL-BAUM, ESQ.
                           STEPHANIE LEHMAN, ESQ.
                           Attorney for the Petitioner,
                           Cozen O'Connor
                           250 Park Avenue
                           New York, New York 10177-0001
                           (212) 883-4902

                           ROBERT ALLEN MEISTER, ESQ.
                           Attorney for Dahlia Genger
                           Pedowitz & Meister LLP
                           1501 Broadway
                           New York, New York 10036-5601
                           (212) 403-7330
```

Estate of Arie Genger - 7/1/09                                    23

1    day delivery; you could do it by --

2              MS. SIEGEL-BAUM:  Okay, but we need --

3              THE COURT:  I mean you need notice.  You know,

4    you could even email; you can fax it; whatever.  You want

5    to do it by overnight, that's fine.  Okay?  That should

6    protect your rights, counsel.

7              The other thing is again, if for some reason --

8    withdrawn.  A lot of this will be dealt with in the

9    accounting proceeding.  There's still a trustee, so there

10   still would be certain ramifications and consequences if in

11   fact there was any wrong doing in terms of that.

12             MS. SIEGEL-BAUM:  Well, I understand.  We do have

13   surcharge; I do understand that.

14             THE COURT:  Right.

15             MS. SIEGEL-BAUM:  Accept the only thing is what

16   I'm concerned about is rather than surcharge you, I'd

17   rather be able to be sure of the assets.

18             THE COURT:  No, I recognize that.  But they're on

19   notice as to all of your fears.  So, for them now to do

20   something which would be obviously against their duties and

21   responsibilities would be somewhat glaring in terms of what

22   the surcharge actually would be.  So, we can deal with

23   that.  So, that's what you'll do; within ten days you'll

24   notify them.

25             MR. MEISTER:  All right, Your Honor.

35

# C E R T I F I C A T E

I, Rochelle Grant, certify that the foregoing transcript of the proceedings in the Surrogate's Court of the State of New York, County of New York, in the Matter of the Estate of Arie Genger, File Number 0017/08, was prepared using four-track electronic transcription equipment and is a true and accurate record of the proceedings.

Rochelle V. Grant

Date audio was transcribed:

July 12, 2009

**EXHIBIT Y**

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of the Application of
ORLY GENGER, as a person interested,
for the removal of DALIA GENGER
as Trustee of the Orly Genger 1993 Trust
pursuant to SCPA §711 (11)

**STIPULATION**

File No.: 0017/2008

Stipulation made and entered into on August ___, 2010 between ORLY

GENGER, Petitioner, and DALIA GENGER, Respondent, collectively referred to as (the

"Parties") and their respective Counsel:

WHEREAS, ORLY GENGER commenced the above-captioned proceeding by

filing an Order to Show Cause in New York County Surrogate's Court on June 22, 2009; and

WHEREAS, by Stipulation of the Parties and their respective counsel, Surrogate

Troy K. Webber signed an Order to Show Cause dated July 1, 2009 confirmed on August 18,

2009 with certain restraints contained therein (a copy of which is annexed as Exhibit A); and

WHEREAS, on July 16, 2010, Orly Genger filed an Order to Show Cause to

Supplement Surrogate Webber's prior Order; and

WHEREAS, on July 28, 2010, Dahlia filed an Answer and Orly filed a Reply

Affidavit.

IT IS HEREBY STIPULATED AND AGREED by and between Parties and their

counsel:

NYC_MIDTOWN\589779\1 252991.000

1.    Upon signing this Stipulation, the Parties will sign and file a Stipulation withdrawing the Order to Show Cause filed July 16, 2010 and the Answer and Reply Affidavit in New York County Surrogate's Court.

2.    In addition to the stipulated restraints in Exhibit A, Orly and Dalia and their respective Counsel agree during the pendency of this proceeding, Dalia and/or her Counsel are required to give notice by overnight mail to Petitioner's Counsel of any attempt to vote any TRI shares held by the Orly Trust for any purpose, including, without limitation, in any election of TRI's directors, with such notice being given at least ten (10) days prior to such attempt being made.

IN WITNESS WHEREOF, the Parties have signed and acknowledged this Stipulation on the day and year written above.

_____              _____
Orly Genger                            Dalia Genger

By: _____          By: _____
Judith E. Siegel-Baum                      Robert A. Meister
Cozen O'Connor                         Pedowitz & Meister LLP
Attorneys for Orly Genger              Attorneys for Dalia Genger
277 Park Avenue                        1501 Broadway
New York, New York 10172               New York, New York 10036
(212) 883-4900                         (212) 403-7330

NYC_MIDTOWN\1569779\1  252931.000

- 2 -

**EXHIBIT 2**

FILED: NEW YORK COUNTY CLERK 08/03/2010

INDEX NO. 109749/2009

NYSCEF DOC. NO. 80

RECEIVED NYSCEF: 08/03/2010

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:        HON. PAUL G. FEINMAN        PART    12

_J.S.C._

Orly Genger, etc.

-v-

Dalia Genger, et al.

_AMENDED DECISION_
_& ORDER_

INDEX NO.    109749/09E

MOT. DATE

MOT. SEQ. NO.    001-006

MOT. CAL. NO.

**E-FILE**

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/Petition/O.S.C. — Affidavits — Exhibits | _____ |
| Answering Affidavits — Exhibits | _____ |
| Replying Affidavits | _____ |

CROSS-MOTION:  ☒ Yes  ☐ No

Upon the foregoing papers, it is

ORDERED that the decision and orders of this court dated June 28, 2010 and filed on July 2, 2010 which resolved motions bearing sequence numbers 001, 002, 003, 004, 005 and 006 are hereby vacated and recalled. This "gray" sheet (short form order) and the annexed Amended Decision & Order shall be substituted in their stead as the decision & order for the motions bearing seq. nos. 001 through 006, inclusive.

So ordered,

_____
J.S.C.

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE

Dated:  7/28/2010
7:25 PM

Check one:  ☐ FINAL DISPOSITION  ☒ NON-FINAL DISPOSITION
Check if appropriate:  ☐ DO NOT POST  ☐ REFERENCE
☐ PC DATE_____  ☐ CC Date_____

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: CIVIL TERM: PART 12
------------------------------------------------------------------X
ORLY GENGER, in her individual capacity and on
behalf of the Orly Genger 1993 Trust (both in its
individual capacity and on behalf of D & K
Limited Partnership),

                                   Plaintiff,

                 against

DALIA GENGER, SAGI GENGER, D & K GP
LLC, and TPR INVESTMENT ASSOCIATES,
INC.,

                                   Defendants.
------------------------------------------------------------------X

Index No.  109749/2009E

Mot. Seq. Nos.   001 through
                 006

**_AMENDED_**
**DECISION AND ORDER**

**For the Plaintiff:**
Zeichner Ellman & Krause LLP
575 Lexington Avenue
New York, NY 10022
(212) 223-0400

**For Dalia Genger:**
Pedowitz & Meister LLP
1501 Broadway
New York, NY 10036
(212) 403-7330

**For Sagi Genger:**
McLaughlin & Stern, LLP
260 Madison Avenue
New York, NY 10016
(212) 448-1100

**For D&K GP, LLC:**
Finkelstein Newman Ferrara LLP
225 Broadway
New York, NY 10007

**For TPR:**
Lyons McGovern, LLP
The Hennessy House
16 New Broadway
Sleepy Hollow, NY 10591
(914) 631-1336

E-filed papers considered in review of this motion brought by order to show cause for a preliminary injunction, motions for summary judgment, and motion to amend:

| | Papers: | E-File Number: |
|---|---|---|
| Seq. No. 001 | Order to Show Cause & TRO, Exhibits, Memo of Law in Support | 6, 7, 7-1, 9 |
| | Affidavit & Affirmation in Opposition, Exhibits, Memo of Law | 35, 35-1 - 35-8, 36, 37 |
| | Affidavit & Affirmation in Opposition, Memo of Law, Exhibit | 38, 39, 40, 40-1 |
| Seq. No. 002 | Notice of Motion, Affirmations, Exhibits | 12, 13, 13-1 - 13-6, 18, 18-1 - 18-9 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52 |
| | Reply Memo of Law (Dalia Genger) | 61 |
| | Reply Memo of Law | 65 |
| Seq. No. 003 | Notice of Motion, Affirmation, Exhibits, Memo of Law | 15, 16, 16-1 - 16-9, 19 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 53 |
| | Memo of Law in Reply, Affirmation, Exhibit | 59, 60, 60-1 |
| | Reply Affirmation, Exhibits, Memo of Law | 62, 62-1, 64 |
| Seq. No. 004 | Notice of Motion, Affirmation, Memo of Law, Exhibits | 20, 21, 22, 22-1 - 22-8 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 54 |
| Seq. No. 005 | Notice of Motion, Affirmation, Memo of Law, Exhibits | 27, 28, 29, 29-1 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 55 |
| Seq. No. 006 | Notice of Motion, Affirmation, Exhibits | 45, 46, 46-1 - 46-7 |
| | Affirmation in Opp., Memo of Law, Exhibits | 47, 48, 48-1 - 48-2 |
| | Affirmation in Reply & Opp | 49 |

| | |
|---|---|
| Affirmation in Opposition | 50 |
| Memo of Law in Reply | 51 |
| Affirmation in Opposition, Memo of Law, Exhibits | 56, 57, 57-1 - 57-2 |
| Memo of Law in Reply | 58 |
| Transcript of Oral Argument | 69 |

**PAUL G. FEINMAN, J.:**

The decision and order dated June 28, 2010, and filed on July 2, 2010, resolving the motions bearing sequence number 001 through 006, is hereby recalled and vacated and the following decision and order substituted in its stead.[1]

The motions bearing sequence numbers 001 through 006 are consolidated for the purpose of decision.

In motion sequence number 001, plaintiff moves by order to show cause for a preliminary injunction and a temporary order restraining defendants from removing from the State or otherwise disturbing shares of D&K Limited Partnership's 48 percent ownership interest in the common stock of TPR Investment Associates, until there is a judicial determination as to who owns these closely held family shares.[2] At oral argument, the court continued the TRO pending determination of these motions.

In motion sequence numbers 002 through 005, each of the defendants originally moved to dismiss the complaint on various grounds. By interim order dated October 21, 2009, these motions were converted pursuant to CPLR 3211 ( c) to motions for summary judgment (Doc. 41,

---

[1] At oral argument held on July 28, 2010 on a related matter, the parties consented to the court's issuance of this revised decision and order without further submissions.

[2] Under the terms of the original TRO signed at the time of the signing of the Order to Show Cause, defendants and their agents are stayed from removing or disposing in any manner the shares at issue. Plaintiff was directed to provide an undertaking in the amount of $150,000.

42, 43, 44).[3]

In motion sequence number 006, plaintiff moves for leave to amend the complaint and submits a proposed amended verified complaint containing additional allegations and naming an additional defendant.

All the motions are opposed.

For the reasons set forth below, the motion for a preliminary injunction is granted; the motions by defendants for summary judgment are each granted in part and otherwise denied, and the motion to amend the complaint is granted to the extent indicated.

### *Background*

The litigants are members of a nuclear family and certain of their family-owned corporations and companies. The central issue concerns the intent behind the signing of a promissory note and pledge agreement in December 1993, executed as part of estate planning tools of the parents of plaintiff Orly Genger and her brother, Sagi Genger, one of the defendants. Plaintiff contends that the note and pledge agreement were part of an entire estate planning scheme by which plaintiff's father, Arie Genger, and plaintiff's mother Dalia Genger, planned to provide for their two children, plaintiff and defendant Sagi Genger, with the greatest amount of funding possible and with minimum tax consequences. Arie and Dalia Genger were divorced in 2004 and the gravamen of this complaint is that in the years following the divorce, plaintiff's mother and brother have deliberately not adhered to the intent behind the promissory note and pledge, and have schemed to seize control of some of the family's closely held companies. Their schemes have been to the detriment of one of the entities, the D&K Limited Partnership,

---

[3]Documents and exhibits are referred herein by their designated e-filing document number in the New York State Court's E-Filing System.

3

an entity partially owned by the Orly Genger 1993 Trust, and for the benefit of Sagi Genger and for defendant TPR Investment Associates, on which Sagi and Dalia Genger serve as the directors, and of which Sagi Genger is chief executive officer. Among the other relief sought by plaintiff is an injunction restraining further actions that would irreparably harm D&K Ltd. Partnership's ability to recover its interest in the shares originally held by it, that defendants be denied any ability to further erode the holdings of the Orly Genger 1993 Trust, and that shares already sold be returned to the ownership of the Ltd. Partnership.

Plaintiff argues, and none of the defendants dispute her, that as beneficiary of the Orly Genger 1993 Trust, she has a right to assert causes of action on behalf of the trust, citing *Velez v Feinstein*, 87 AD2d 309 (1st Dept. 1982) (where trustee has failed to enforce a claim on behalf of the trust, the beneficiary may do so). She further argues that as the Orly Genger 1993 Trust is a limited partner of D&K Ltd. Partnership, she has the right to assert causes of action on behalf of the Partnership as against TPR Investment and the other defendants, citing among other cases, *CCG Assoc. I v Riverside Assoc.*, 157 AD2d 435, 442 (1st Dept. 1990) ("[t]he right of a limited partner to bring an action on behalf of the partnership to enforce a right belonging to the partnership is beyond dispute") (Pl Memo of Law [Doc. 9:4] p. 1 n. 1).[4]  Defendants' arguments in opposition are not persuasive.

According to the verified complaint (Doc. 7-1), plaintiff and her brother Sagi are individually beneficiaries of irrevocable trusts established in 1993 by their parents. Each trust was funded with a $600,000 gift. As established, the Orly Genger Trust and the Sagi Genger Trust together owned 96 percent in defendant D&K Ltd. Partnership, a family-owned limited

---

[4]Unless otherwise noted, all factual allegations are taken from plaintiff's verified complaint (Doc. 7-1).

4

partnership. Dalia Genger held the remaining four percent interest, and acted as the general manager. Defendant TPR Investment Associates, Inc. is a corporation founded by plaintiff's father, Arie Genger who originally was the sole shareholder, and serves as a holding company for the family's interests. Sagi Genger is presently Chief Executive Officer and a member of the board. Prior to 1993, TPR Investment held a majority interest in non-party Trans-Resources, Inc., a closely held private corporation.[5]

Around the time the two trusts were funded in1993, D&K Ltd. Partnership purchased 240 shares of common stock, comprising 49 percent of all shares, in TPR Investment for $10,200,000. The Orly and Sagi Trusts each paid $600,000, Dalia Genger paid $50,000, and D&K Ltd. Partnership executed a promissory note dated December 21, 1993 for $8,950,000, in satisfaction of the balance (Ver. Compl. [Doc. 7-1] ¶ 16, citing attached Ex. 1 [eFile Doc. 7-1:49 *et seq.*]). The note was signed by Dalia Genger as General Partner of D&K Ltd. Partnership. The note required that D&K Ltd. Partnership repay principal and accrued interest in annual installments over a ten-year period. Both trusts, and Dalia Genger, assumed proportional liability for repayment. The note was secured with a Pledge Agreement dated December 21, 1993, signed by Dalia Genger, in which D&K Ltd. Partnership pledged its 240 TPR Investment shares as collateral for repayment of the note (Ver. Compl. [Doc. 7-1] ¶ 18) According to the September 6, 2007, testimony of Sagi Genger in the arbitration proceeding concerning his parents' divorce, the purpose of the note was "[e]ssentially an estate planning tool, to transfer wealth," with the intent to minimize taxes owed by the family members (Doc. 46-5:150-152 [S.

---

[5]Trans-Resources is the parent company of several subsidiaries that provide growers with specialty fertilizer and industrial chemicals, and is one of the two largest produces of potassium nitrate in the world (Ver. Compl. [Doc. 7-1] ¶ 12).

Genger EBT, pp. 366, 368]). As a result of the purchase by D&K Ltd. Partnership of TPR

Investment stock, the Orly and Sagi trusts each acquired 23.52 percent indirect interest in TPR

Investment, and Dalia acquired a 1.96 percent indirect interest. Arie Genger retained 51 percent

ownership.

As alleged in the complaint, each member of the family understood and agreed, in the

"desire to ensure equal wealth transfer to Sagi and Orly and with the estate-planning purposes

underlying the creation of the Trusts and D&K [Ltd. Partnership]'s purchase of the TPR shares,"

that the note and Pledge Agreement "would never be enforced by any of them" (Ver. Compl.

[Doc. 7-1] ¶ 20). Sagi Genger in particular was charged with ensuring that the promissory note

and Pledge Agreement would not be enforced and, in the first years, took "specific steps to fulfill

that charge," an example of which follows here (Ver. Compl. [Doc. 7-1] ¶ 20).

D&K Ltd. Partnership made payments on the note until 1999 and then ceased. In

November 2002, TPR Investment sent a letter to D&K Ltd. Partnership seeking payment of the

past due principal and interest (Doc. 29-1:77-78]). Sagi Genger, TPR's CEO, explained during

his testimony in the above-mentioned arbitration proceeding that this November 2002 letter was

merely "pro forma," and that there was no intent to collect on the note (Doc. 46-5:153 [S.

Genger EBT, p. 370]).

In October 2004, Dalia and Arie Genger were divorced, resulting in certain changes to

the ownership of certain family entities, memorialized in the Stipulation and Agreement of

Settlement, dated October 26, 2004 (Ver. Compl. [Doc. 7-1] ¶ 22, citing Ex. 2 [Doc. 7-1:66 *et

seq.*]). In particular, Dalia Genger received sole ownership of Arie Genger's 250 shares of TPR

Investment, the Trans-Resources shares were redistributed such that Dalia Genger owned no

shares in that company, and Arie Genger was granted a lifetime voting proxy over the family

6

Trans-Resources shares (Stipulation pp. 5, 8-14 [Doc. 7-1:71, 73-80]). The Stipulation and

Agreement of Settlement gave Sagi Genger "full and complete authority" to sell non-liquid

assets and distribute them as he saw fit, subject to his fiduciary duties to effectuate the intent of

the parties entering the Agreement (Stipulation p. 7 [Doc. 7-1:73]). However, the net proceeds

were to be distributed so as to minimally fund a "basic escrow account" after which monies were

to go to TPR Investment "in satisfaction of the parties' indebtedness" (Stipulation p. 8 [Doc. 7-

1:74]).

Despite the changes, both the Orly and Sagi trusts continued to have equal ownership

interests in Trans-Resources shares as well as in the TPR Investment shares owned by D&K Ltd.

Partnership (Ver. Compl. [Doc. 7-1] ¶ 23).

Also on October 26, 2004, TPR Investment, Arie Genger, and Dalia Genger signed an

Assumption Agreement which acknowledged the promissory note's existence and noted that at

that juncture, approximately $9,980,000, inclusive of interest, was owed by D&K Ltd.

Partnership to TPR Investment (Doc. 22-4).

In addition, also on the same date, Sagi and Dalia Genger formed D&K GP LLC to serve

as the general partner for D&K Ltd. Partnership (Pl. Mot. 001, Ex. 5 ¶ 5 [Doc. 7-1:151]). Under

the agreement, Dalia Genger transferred her general partnership interest in D&K Ltd.

Partnership, in exchange for a 99 percent interest in D&K GP; Sagi Genger was granted power

to select the manager. Accordingly, D&K GP LLC now held a four percent interest in D&K Ltd.

Partnership.

Plaintiff alleges that in the years subsequent to the divorce, Dalia Genger has sought, in

collusion with her son Sagi Genger, to "destroy" her former husband financially, and their

actions have threatened to destroy plaintiff financially as well (Ver. Compl.[Doc. 7-1] ¶ 25).

7

Thus, when Dalia in effect ceded her control over D&K Ltd. Partnership to Sagi, the

restructuring left only the two trusts liable to TPR Investment for repayment of the promissory

note (Ver. Compl.[Doc. 7-1] ¶ 27). In August 2006, Sagi Genger on behalf of TPR Investment,

assigned the promissory note to David Parnes,[6] but stated in writing to Parnes that "D&K LP and

its partners have a variety of claims against TPR, and deny the enforceability of the Note." (Ver.

Compl. [Doc. 7-1] ¶ 47, citing Ex. 8 [Doc. 7-1:179-*et seq.*]). In 2007, Sagi Genger allegedly

stripped Dalia Genger of her majority interest in TPR Investment by selling an interest to his

mother-in-law, Rochelle Fang (Ver. Compl. [Doc. 7-1] ¶ 32). In late 2007 or early 2008, Dalia

Genger divested herself of the balance of her TPR Investment shares, leaving Sagi Genger in

direct control of TPR Investment and its interest in the promissory note (Ver. Compl. [Doc. 7-1]

¶ 33). As a result, Sagi Genger in essence now wore two hats, as CEO of TPR Investment, the

creditor of the note, and as manager of D&K Ltd. Partnership, the debtor on the note (Ver.

Compl. [Doc. 7-1] ¶ 34).

In November 2007, Sagi Genger and Leah Fang executed an "Amended and Restated

Limited Partnership Agreement of D&K Limited Partnership," permitting D&K GP to

"mortgage, hypothecate, pledge, create a security interest in or lien upon, or otherwise encumber

the L[imited] P[artner] TRI Interests, for the benefit of the Partnership (Doc. 46-5:218). The

document was signed by Sagi Genger, managing member of D&K GP LLC, the General Partner,

and Leah Fang, as sole trustee for both the Sagi Genger 1993 Trust and the Orly Genger 1993

Trust, the Limited Partners (Doc. 46-5:223). Plaintiff only learned of this document's existence

---

[6] Parnes is a former trustee of the Orly Genger 1993 Trust, the present trustee of the Sagi Genger
1993 Trust, an officer of TPR Investment and director of Trans-Resources (Ver. Compl. [Doc. 7-
1] ¶ 46). Parnes testified during the arbitration proceeding that the purpose of the transfer of the
note to him was to prevent collection by any others (*Id.*).

in 2009.

In January 2008, Dalia Genger was appointed successor trustee to the Orly Genger 1993 Trust (Ver. Compl. [Doc. 7-1] ¶ 39). She succeeded several other individuals, including two long-term friends of her son's and her son's sister-in-law. As trustee, Dalia has "complete control over the assets of the Orly Trust, including its ownership interests in TPR (through D&K) and TRI" (Ver. Compl. [Doc. 7-1] ¶ 41).

In 2008, TPR Investment, through CEO Sagi Genger, reclaimed the promissory note from Parnes, and in August 2008, notified D&K Ltd. Partnership's general manager (Sagi Genger), that it was in default under the note and that if it failed to satisfy the full terms of the note, its shares would be sold at public auction (Ver. Compl. [Doc. 7-1] ¶ 52, citing Ex. 10 [Doc. 7-1:185-186]). As the payment was not made, D&K Ltd. Partnership was informed by TPR Investment that the latter would sell the former's 240 shares of common stock in TPR Investment to the highest qualified bidder on February 27, 2009 (Ver. Compl., Ex. 11 [Doc. 7-1:187-188]). Notice was not provided to either of the trusts, but was published in THE NEW YORK POST in October 2008 and again in February 2009 (Ver. Compl. [Doc. 7-1] ¶¶ 52-53, citing Ex. 12 [Doc. 7-1:189-191]).

On January 31, 2009, the general partner of D&K Ltd. Partnership, that is to say D&K GP, and the limited partners, the Sagi and Orly trusts, and TPR Investment, memorialized a document called "Meeting of Partners of D&K LP - Jan. 31, 2009 & Agreement," in which it was agreed that D&K GP could sign for the Limited Partnership and for each individual partner when making the limited partners' assets subject to a pledge (Doc. 22-4:17-18).[7] This same

---

[7]Plaintiff alleges she first learned of this agreement only when the documents were provided as part of defendants' papers submitted in their motions to dismiss (Am. Ver. Compl.[Doc. 46-4] ¶

9

agreement included the promise of TPR Investment that it would "refrain from enforcing the note against each limited partner for thirty days." (*Id.* [Doc. 22-4:18] ¶ 8).[8]

The note was foreclosed upon on February 27, 2009, less than the 30 days indicated in the Agreement date, and D&K Ltd. Partnership's 240 shares of TPR Investment were purchased back by TPR, decreasing the obligations of D&K Ltd. Partnership under the promissory note, and leaving a balance of approximately $8.8 million that continues to be guaranteed by the Orly and Sagi trusts (Ver. Compl. [Doc. 7-1] ¶ 57, citing Ex. 13 [Doc. 7-1:192-194]). Plaintiff and her attorney only learned in early June 2009 that the note had been foreclosed and that the pledged shares had been sold back to the company (Ver. Compl. [Doc. 7-1] ¶ 65). Plaintiff has made a written demand that TPR Investment return the pledged shares to D&K Ltd. Partnership, but TPR has declined to comply (Ver. Compl. [Doc. 7-1] ¶ 69, citing Ex. 20 [Doc. 7-1:225-227]).

Also in August 2008, Rochelle Fang, as trustee of the Sagi Genger 1993 Trust, and Sagi Genger, sold that trust's interest in Trans-Resources to another group (named "Trump"), which sale divested Arie Genger from control and put the company in the control of the Trump group (Ver. Compl. [Doc. 7-1] ¶ 60, citing Ex.14 [Doc. 7-1:195-207]). The validity of this sale is under challenge in Delaware Chancery Court, although plaintiff Orly Genger has not joined in that action (Ver. Compl. [Doc. 7-1] ¶ 61).

After this purported sale of the Sagi Genger Trust's shares of Trans-Resources, plaintiff feared her trust's shares would not be protected from sale. She requested in writing from her

---

94).

[8]The copy of the document e-filed with the court is not clear enough to discern who signed on behalf of the trusts, although presumably it was Dalia Genger, or on behalf of TPR Investment.

mother as trustee in January 2009 and again in June 2009 that the Orly Genger 1993 Trust retain all of its shares of Trans-Resources and that they not be sold, but Dalia Genger has refused to agree, or even to respond (Ver. Compl. [Doc. 7-1] ¶¶ 63, 66, citing Ex. 15, 16 [Doc. 7-1:208-215]). Plaintiff, who had brought a proceeding in Surrogate's Court to remove her mother as trustee at the time of her appointment in January 2008, an application which was denied as being premature (Ver. Compl. [Doc. 7-1] ¶¶ 39-40), brought a second application on June 22, 2009, seeking to enjoin Dalia Genger or her agents from doing anything to affect the Orly Genger 1993 Trust's Trans-Resources shares, to remove Dalia as trustee and appoint another in her stead based on breach of fiduciary duties, and for a surcharge for damages (Ver. Compl.[Doc. 7-1] ¶ 67). At this juncture, the Surrogate's Court has ordered that Dalia Genger provide at least 10 days notice before disposing of any of the trust's Trans-Resources shares (Ver. Compl.[Doc. 7-1] ¶ 68, citing Ex.19 [Doc. 7-1:222- 224]).

Plaintiff contends that Dalia Genger has failed to act in the best interests of the Orly Genger 1993 Trust, that Sagi Genger has acted in a self-dealing manner and together with Dalia Genger has undermined the estate plans that intended for both children to benefit equally from the family's wealth (Ver. Compl. [Doc. 7-1] ¶ 58). Plaintiff fears that through defendants' continued scheming, the Orly Genger 1993 Trust's one remaining asset, its ownership of the Trans-Resources shares, will also be wrongly divested (Ver. Compl. [Doc. 7-1] ¶ 59).

The verified complaint alleged 16 causes of action against the various defendants, including replevin of the shares from TPR Investment back to D&K Ltd. Partnership, and a request for a preliminary injunction.

As stated above, defendants each submitted pre-answer motions to dismiss which, after notice by the Court, have been converted to motions for summary judgment pursuant to CPLR

11

3211 ( c). Subsequent to the filing by defendants of their motions, plaintiff moved to amend her

complaint "to address, among other things," the defendants' "scheme regarding the Orly Trust's

TRI Shares," and the involvement in the scheme of Leah Fang, the proposed additional

defendant (Pl. Mot. 006, Ex. D, Part 1, Proposed First Am. Ver. Compl., [Doc. 46-4] ¶ 95). The

proposed first amended verified complaint contains an additional four causes of action, two

against Leah Fang, and two seeking additional declaratory relief, and amends certain of the

original causes of action to include the new allegations and those against Leah Fang.

### *Legal Analysis*

For convenience, the motion to amend will be addressed first, and then the preliminary

injunction, followed by the motions to dismiss. Because the motion to amend the complaint is

granted, the remainder of this decision addresses the claims as alleged in the amended complaint.

A.    Motion to Amend the Verified Complaint (Sequence Number 006)

Leave to amend pleadings is to be freely given upon terms that may be just (CPLR 3025

[b]). In addition, CPLR 3025 (a) permits any party to amend a pleading once, without court

permission provided it is done under one of the following circumstances: within 20 days of the

service of the original pleading; at any time before the period for responding to it has expired, or

within 20 days after the service of a responsive pleading. Plaintiff proffers a proposed amended

complaint to add a new defendant and new causes of action (Doc 46-4).

Contrary to defendants' arguments, case law holds that where a defendant has not

answered the complaint but instead interposed a motion to dismiss, as was done here, the

plaintiff may amend her complaint once as of right, because defendants, by making pre-answer

motions, have extended their time to answer (*see, Johnson v Spence*, 286 AD2d 481 [2d Dept.

2001]; *STS Mgt. Dev., Inc. v New York State Dept. of Taxation & Fin.*, 254 AD2d 409 [2d Dept.

12

2001]; *Miller v General Motors Corp.*, 99 AD2d 454 [1ˢᵗ Dept. 1984], *aff'd* 64 NY2d 1081

[1985]). Although defendants oppose, plaintiff is entitled to serve and file her amended

complaint without review by the court, although the rulings below on defendants' motions shall

refine the scope of the proposed amended complaint and require her to file and serve a second

amended complaint. Defendants' arguments in opposition, including that there is another action

pending, can be pled as affirmative defenses. Plaintiff's motion to amend her complaint is thus

granted to the extent indicated.

B.    Motion for Preliminary Injunction (Sequence Number 001)

Among the purposes of a preliminary injunction are maintaining the status quo and

preventing irreparable injury to a party (*see, e.g., Ma v Lien*, 198 AD2d 186 [1ˢᵗ Dept. 1993], *lv*

*dismissed* 83 NY2d 847 [1994]). To prevail, the party seeking injunctive relief must

demonstrate a likelihood of success on the merits; that it will suffer irreparable injury if the relief

is not granted; and that the equities balance in its favor (*Aetna Ins. Co. v Capasso*, 75 NY2d 860,

862 [1990]). A preliminary injunction should generally not be granted where there are issues of

fact (*Lincoln Plaza Tenants Corp. v MDS Properties Dev. Corp.*, 169 AD2d 509 [1ˢᵗ Dept.

1991]; *but see Ma v Lien, supra* at 187 ["even where the facts are in dispute, the nisi prius court

can find that a plaintiff has a likelihood of success on the merits, from the evidence presented"]).

If money damages are an adequate remedy, irreparable harm does not exist and injunctive relief

should be denied (*Sterling Fifth Assoc. v Carpentille Corp., Inc.*, 5 AD3d 328, 330 [1ˢᵗ Dept.

2004]).

Plaintiff argues that the shares of Ltd. Partnership are unique chattel as contemplated by

CPLR 7109, and that accordingly the court should grant a preliminary injunction restraining

defendants from disposing of the shares until order of the court. She argues that the D&K Ltd.

13

Partnership shares are unique because they are shares of a closely held family company which represents an ownership in another closely held family company, TPR Investment, and that their value is dependent, at least in part, on the outcome of the family litigation currently before the Delaware Chancery Court concerning Trans-Resources (Pl. Memo of Law, 5-6 [Doc. 9:8-9]).

Under CPLR 7109, where the chattel is unique, the court may grant a preliminary injunction or temporary restraining order that it may not be transferred, sold, pledged, assigned or otherwise disposed of until the court orders (CPLR 7109 [a]). Defendants argue that the shares are in essence fungible, and that if appropriate, money damages would fully compensate plaintiff (TPR [S. Genger] Aff. in Opp. [Doc. 39] ¶ 6). Sagi Genger avers that the "TPR shares are currently not for sale and there is no intention to sell them at this time or in the near future." (S. Genger Aff. in Opp. [Doc. 35] ¶ 5]). He makes no statements concerning the TRI shares. Plaintiff's argument, however, is that her parents never meant for the promissory note to be enforced, but rather that the trust funds remain intact for the two children. The recent actions taken by defendants concerning the promissory note which have negatively impacted the Orly Genger 1993 Trust, and the sale of the Trans-Resources shares belonging to the Sagi Genger 1993 Trust, possibly foretell defendants' plans to sell her trust's shares of Trans-Resources and thus she seeks court intervention to prevent further dissipation of the trust.

The granting of a preliminary injunction is a discretionary remedy (*Ross v Schenectady*, 259 App. Div. 774, 774 [3d Dept. 1940]; *Dabrinsky v Seagate Assn.*, 239 NY 321 [1925]). Here, where the family shares at issue are intertwined among various family entities, defendants have not offered sufficient evidence to show that the shares of either TPR Investment or Trans-Resources owned by the Orly Genger 1993 Trust are not "unique" and should not be protected from transfer, sale, or assignment until this litigation is ultimately decided. In addition, given

14

that defendant Sagi Genger states there is no immediate plan to sell or otherwise dispose of the
TPR Investment shares, an injunction is not likely to cause much harm to defendants. The
balance of equities therefore lies in favor of plaintiff. Accordingly, the motion for a preliminary
injunction is granted.

## Motions for Summary Judgment

The proponent of a summary judgment motion must make a prima facie showing of
entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any
material issues of fact from the case (*Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853
[1985]). Evidentiary proof must be submitted in admissible form (*Zuckerman v City of N.Y.*, 49
NY2d 557, 562 [1980]). Parties in opposition must submit "evidentiary facts or materials, by
affidavit or otherwise ... demonstrating the existence of a triable issue of ultimate fact."
(*Tortorello v Carlin*, 260 AD2d 201, 204 [1st Dept. 1999]). "Issue finding and not issue
resolving" is the proper role of the court in deciding such motions (*Winegrad, supra,* at 853).
Regardless of the sufficiency of the opposing papers, in the absence of admissible evidence
sufficient to preclude any material issue of fact, summary judgment is unavailable (*Alvarez v
Prospect Hosp.*, 68 NY2d 320, 324 [1986]).

None of the converted motions for summary judgment contains first-person affidavits,
and all rely upon documentary evidence and the pleadings for the bases of their motions.
Although plaintiff objects to the lack of first-person affidavits, the converted motions are
nonetheless considered by the court and decided on their merits.

Plaintiff argues that all of the motions should be preemptively denied based on the
doctrines of issue preclusion and judicial estoppel, pointing to the testimony and evidence
presented at the arbitration which resulted in the May 6, 2008, award entitled *Dalia Genger v*

15