August 22, 2008

TPR Investment Associates, Inc.
c/o Trans-Resources, Inc.
200 West 57th Street
New York, NY 10019

Gentlemen:

Reference is hereby made to that certain Stock Purchase Agreement (the "Purchase Agreement") entered into as of the date hereof, by and among TR Investors, LLC, a Delaware limited liability company ("TR Investors"), Glenclove Investment Co., a Cayman Islands corporation, ("Glenclove"), New TR Equity I, LLC, a Delaware limited liability company ("Equity I") and New TR Equity II, LLC, a Delaware limited liability company ("Equity II" and collectively with TR Investors, Glenclove and Equity I, the "Purchasers"), the Sagi Genger 1993 Trust ("Seller"), and TPR Investment Associates, Inc., a Delaware corporation ("TPR"). Capitalized terms not otherwise defined in this letter shall have the meaning assigned to them in the Purchase Agreement.

In connection with the transactions contemplated by the Purchase Agreement, if at any time following the Closing Date, it is determined that Arie Genger is not the record and beneficial owner of the 794.40 shares of Common Stock of the Company purportedly transferred to him by TPR in October, 2004 and/or that Orly Genger 1993 Trust is not the record and beneficial owner of the 1,102.80 shares of Common Stock of the Company purportedly transferred to such Trust by TPR in October, 2004, and that TPR is the record or beneficial owner of any such shares, in either or both cases by virtue of the transfer of such shares being deemed to have been void or for any other reason (the shares being so affected being referred to herein as the "Affected Shares") then (a) upon written request from the Purchasers, TPR shall promptly take all necessary action to effect the transfer of all Affected Shares (other than the Balance Shares to be transferred pursuant to Section 11 of the Purchaser Agreement) to the Purchasers in the same proportion as the Shares are being sold to them pursuant to the Purchase Agreement, for a price per share equal to the lesser of (i) the value of each Affected Share at the time of the October 2004 purported transfers (the "Transfer Date") based upon an aggregate value for all of the issued and outstanding shares of Common Stock of the Company of $33,000,000 (as determined in the arbitration proceedings between Arie Genger and Dalia Genger by

August 22, 2008
Page 2

Judge Miltonas or such other arbitrator), or (ii) the valuation of each Affected Share at the Transfer Date determined in accordance with the Stockholders Agreement (provided that the determined valuation shall not be deemed to be the $1.00 for which the Affected Shares were transferred by TPR).

In consideration of the foregoing, the parties hereby acknowledge and agree, that (i) within ten (10) days after delivery of the stock certificates required by Section 2.1(e) of the Agreement, Purchasers shall cause to be filed an amended complaint or, if necessary, a motion to file an amended complaint, in the action styled Glenclova Investment Co. v. Trans-Resources, Inc. and TPR Investment Associates, Inc., Case No. 08-CIV-7140 (JFK), pending in the United States District Court for the Southern District of New York, which shall limit the plaintiff's request for relief from TPR to specific performance of the Stockholders Agreement and related declaratory relief, and not seek damages or monetary relief from TPR and (ii) in the event that plaintiff is not awarded the specific performance referenced above, TPR hereby, assigns all of its right, title and interest in and to any claims or causes of action that TPR may have or may have had against Arie Genger and/or the Orly

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

August 22, 2008
Page 3

Gainger 1993 Trust relating to, or arising from, the purported transfer of shares of Common Stock of the Company from TPR to such persons.

Please signify your agreement to the terms of this letter by signing
below.

Sincerely,

TR INVESTORS, LLC

By: _____
Name: Jim Lleh
Title: Executive Vice-President

GLENCLOVA INVESTMENT CO.

By: _____
Name: Robert Smith
Title: Chairman

NEW TR EQUITY I, LLC

By: _____
Name: MARK C. HAUCH
Title: Exec V P / GEN 'L COUNSEL

NEW TR EQUITY II, LLC

By: _____
Name: MARK J. HAUCH
Title: Exec. VP / GEN 'L COUNSEL

Acknowledge and Agreed
as of August 22, 2008

TPR INVESTMENT ASSOCIATES, INC.

By: _____

546391-Wilmington Server 1A - MSW

August 22, 2008
Page 4


Name: Sagi Genger
Title:  President

EFiled: Aug 9 2010 2:48P
Transaction ID 32562561
Case No. 3994-VCS

**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

LEO E. STRINE, JR.
VICE CHANCELLOR

New Castle County Courthouse
Wilmington, Delaware 19801

Date Submitted: August 4, 2010
Date Decided: August 9, 2010

Thomas J. Allingham II, Esquire
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899-0636

Donald J. Wolfe, Jr., Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951

> **RE:** *TR Investors, LLC, et al. v. Arie Genger*, C.A. No. 3994-VCS

Dear Counsel:

This letter addresses an issue raised by the Trump Group's[1] proposed order

implementing my July 23, 2010 memorandum opinion (the "Opinion"). That proposed

order included language determining that the Trump Group had the right to purchase

shares of Trans-Resources, Inc. ("Trans-Resources") that Arie Genger caused TPR

Investment Associates ("TPR") to transfer in 2004 to the trust for his daughter Orly (the

"Orly Trust") and to himself personally.[2] That language differed from my July 23, 2010

memorandum opinion (the "Opinion"), which only held that the Trump Group was

entitled to the Trans-Resources shares transferred in 2004 to the trust of Genger's son

---

[1] There are four named plaintiffs in this action: TR Investors, LLC, Glenclova Investment Co.,
New TR Equity I, LLC, and New TR Equity II, LLC (collectively, the "Trump Group").
[2] Letter from Thomas J. Allingham II to the Hon. Leo E. Strine, Jr. (July 27, 2010) (enclosing
proposed order).

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 2 of 9

Sagi (the "Sagi Trust"). Implicit in the Trump Group's proposed order is the assertion

that I reached an incorrect — or, perhaps more accurately, an incomplete — conclusion

as to the Trump Group's ability to acquire all of Trans-Resources' shares.

      A full blow-by-blow account of the complex series of share transfers and contracts

leading up to the issue at hand can be found in the Opinion. It suffices to say here that

my conclusion that the Trump Group was entitled only to the shares transferred to the

Sagi Trust (the "Sagi Shares") was based on the fact that the Trump Group had entered

into a Purchase Agreement in 2008 for the Sagi Shares. That Purchase Agreement

included a provision indicating that, if the share transfer to the Sagi Trust were found

void, then the share purchase would be between the Trump Group and TPR, which Sagi

Genger controlled by 2008. Thus, the Purchase Agreement appeared to be a broad

settlement of the dispute as to the Trans-Resources shares *held by the Sagi Trust*. For

that reason, I found the Trump Group to have appropriately purchased the shares

transferred to the Sagi Trust. But, I declined to address the control of the shares

improperly transferred to the Orly Trust or Genger himself. In so concluding, I was

motivated by the fact that determining whether the Trump Group was entitled to the

shares wrongly transferred to Genger and the Orly Trust was unnecessary to determine

control in this action pursuant to 8 *Del. C.* § 225.[3]

---

[3] My reasoning was as follows:

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 3 of 9

What I overlooked was a side letter agreement (the "Letter Agreement") executed

contemporaneously with the Purchase Agreement. In that Letter Agreement, the Trump

Group contracted with TPR to purchase the shares that had purportedly been transferred

to Genger and the Orly Trust in 2004 if it were found that those transfers were improper.[4]

When read in conjunction with the Purchase Agreement, the Letter Agreement indicates

that the Trump Group contracted with TPR not only for the shares transferred to the Sagi

---

Although the 2004 Transfers violated the terms of the Stockholders Agreement, which in Section 3.2 provides that the Trump Group can purchase all of TPR's shares, the Trump Group cannot purchase the shares transferred to Arie Genger or the Orly Trust because the Trump Group must abide by the settlement terms to which it agreed in the Purchase Agreement. Because the 2004 Transfers violated the Stockholders Agreement, Arie Genger and the Orly Trust have been found to not be the record or beneficial owners of the shares transferred to them. Per Section 11 of the Purchase Agreement, that entitles the Trump Group to 64% of the Balance Shares, and nothing more beyond the Sagi Shares that it has already bought. As to the Transfer from TPR to Arie Genger himself, the major problem was the lack of notice. Under the Stockholders Agreement, Genger could receive shares from TPR so long as he: (1) gave proper notice to the Trump Group entities; and (2) signed on to the Stockholders Agreement. He did neither and, as a result, cannot exercise any rights under the Stockholders Agreement. Although the Trump Group believes that Genger's violation should require him to transfer all of his Trans-Resources shares to the Trump Group, that remedy is disproportionate. That sort of relief is unnecessary to this control dispute and therefore this § 225 action. Nevertheless, Trans-Resources appears entitled, in any event, to deny Genger the right to vote his shares until he gives formal notice and signs on to the Stockholders Agreement. As to the Orly Trust, it is not before the court, and the shares it was wrongly transferred are also not necessary for the Trump Group to exercise control. Therefore, I do not issue any ruling as to those shares, because that is unnecessary in this § 225 action. Obviously, my finding that the shares were wrongly transferred creates problems for Arie Genger, but that exposure is a result of his own secretive contract breach.

*TR Investors, LLC v. Genger*, 2010 WL 2901704, at *19 (Del. Ch. July 23, 2010).
[4] JX-226 (Letter Agreement (Aug. 22, 2008)) (the "Letter Agreement").

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 4 of 9

Trust, but for all of the shares that TPR originally held before the wrongful transfers were

effected.

Thus, it is clear that I issued my original decision in ignorance of a material fact,

which is that there was a binding contract between TPR and the Trump Group as to the

shares held by Genger and the Orly Trust (the "Arie and Orly Shares"). In addition, in

determining that I need not reach the issue of who owned the Arie and Orly Shares, I

overlooked at that point in my reasoning the fact that, under the Stockholders

Agreement,[5] even though the Trump Group would have the right to appoint four of

Trans-Resources' six directors as the holder of the Sagi Shares, the right to designate the

remaining two directors could depend on who controls the Arie and Orly Shares.[6]

Moreover, I also ignored the reality that Genger himself sought to have this court declare

who was the rightful owner of the Arie and Orly Shares.[7] Although the Orly Trust was

---

[5] JX-101 (Stockholders Agreement (2001)) (the "Stockholders Agreement") at § 1.2(c).
[6] Thus, determining whether the Trump Group is entitled to purchase the Arie and Orly Shares is within the scope of a § 225 action. *See Levinhar v. MDG Med., Inc.*, 2009 WL 4253211, at *11 (Del. Ch. Nov. 24, 2009) ("Although Section 225 actions are summary proceedings, claims that bear on the appropriate composition of the board of directors may be brought in connection with a Section 225 action."); *Agranoff v. Miller*, 1999 WL 219650, at *17 (Del. Ch. Apr. 12, 1999), *aff'd*, 1999 WL 636634 (Del. July 28, 1999) (stating that in a § 225 action, "[t]he court can determine any legal or factual issue, the resolution of which can affect the outcome of a corporate election . . . or of any other stockholder vote").
[7] *See* Genger's Answer and Counterclaim, Claim for Relief ¶ (c) (requesting a declaration that "Mr. Genger is the rightful owner of 13.99% of TRI shares and the Orly Trust is the rightful owner of 19.43% of TRI shares, subject to the Irrevocable Proxy granted to Mr. Genger"); Stipulated Pre-Trial Order § III.A ¶ 3 (stating that an issue of fact remaining to be litigated was "[w]hether the October 2004 transfers of [Trans-Resources] common stock to Arie Genger and to the Orly Genger 1993 Trust (the "Orly Trust") and the Sagi Trust can and should be found void without also voiding or reforming the related transactions"). In light of those requests,

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 5 of 9

not formally before the court, Orly Genger provided testimony in aid of her father's case

and is clearly working in concert with him on a joint legal strategy.  For example, shortly

after the Opinion was issued on July 23, 2010, Arie Genger and Orly Genger jointly

sought and obtained an ex parte temporary restraining order against TPR in New York

state court for the purpose of preventing TPR from transferring any shares.[8]  Her rights

were fully protected and argued by two of the nation's best law firms, who sought to have

me declare that she was the rightful owner of the shares transferred to her.

    After considering these factors, to which I gave inadequate attention, I now

determine the following, which is largely consistent with my original ruling.  As

previously held, all of the transfers Genger caused TPR to make in 2004 were in violation

of the Stockholders Agreement.  In that circumstance, the Trump Group was given the

right to purchase the transferred shares.  In my original decision, I overlooked the reality

that the Trump Group had struck a deal with TPR to remedy the improper transfers not

only as to the transfer of the Sagi Shares, but also as to the transfers of the Arie and Orly

Shares.[9]  In my original decision, I also gave inadequate weight to the principle of

---

Genger's recent arguments that determining ownership of the Arie and Orly Shares is outside the
scope of the § 225 action come with little grace because they are inconsistent with his own
litigation position. *See* Letter from Donald J. Wolfe, Jr. to the Hon. Leo E. Strine, Jr. (Aug. 4,
2010)) (arguing that determining ownership of the Arie and Orly Shares is outside the scope of
this § 225 proceeding).
[8] *See* Letter from Thomas J. Allingham II to the Hon. Leo E. Strine, Jr. (July 27, 2010)
(explaining the ex parte temporary restraining order Arie and Orly Genger obtained over the
weekend).
[9] *See Genger*, 2010 WL 2901704, at *19 ((reflecting an ignorance that the Trump Group had
entered in the Letter Agreement providing that TPR will sell the Arie and Orly Shares to the

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 6 of 9

freedom of contract. Under the plain language of the Letter Agreement, it was the right

of the Trump Group to purchase all the improperly transferred shares, not just the ones

transferred to the Sagi Trust.[10] In issuing what I thought was dictum to the effect that it

would be disproportionate to award the Arie and Orly Shares to the Trump Group,[11] I

ignored the important reality that leaving Genger and the Orly Trust with the Shares

would arguably put Genger in a position to claim two members on the Trans-Resources

board, if he were allowed to cure his transfer to himself and if the Orly Trust were

allowed to keep the shares it had wrongly received.[12] In my view, that error in thinking is

material as it would stick the Trump Group in a continued relationship with Genger after

he had done precisely what the Stockholders Agreement had been designed to prevent —

enmesh the Trump Group in his family disputes.[13] As important, in treating this as a

remedial issue I could side-step, I too lightly overrode the parties' contractual bargain.

The Stockholders Agreement provides the Trump Group with a right to purchase the

shares from TPR when Trans-Resources shares are transferred to a non-permitted

---

Trump Group if Genger and the Orly Trust are not found to be beneficial owners of the Trans-
Resources shares transferred to them).
[10] Letter Agreement 1-2.
[11] *See Genger*, 2010 WL 2901704, at *19 ("Although the Trump Group believes that Genger's
violation should require him to transfer all of his Trans-Resources shares to the Trump Group,
that remedy is disproportionate.").
[12] *See id.* (failing to focus upon this important issue).
[13] *See Genger*, 2010 WL 2901704, at *3-5 (discussing evidence showing that the purpose of the
Stockholders Agreement was to prevent the Genger family's infighting from infecting the
governance of Trans-Resources).

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 7 of 9

transferee.[14] That provision is not ambiguous and given that, it was clearly contractually permissible for the Trump Group to resolve any difference about the repurchase option by a consensual bargain with TPR. My passing sympathetic thought about the extent of the remedy has no place trumping a contractual remedy choice. Nor did that thought adequately consider the reality that Genger would likely attempt to argue that the Trump Group had to elect two of his nominees to the board because he and the Orly Trust supposedly retained control of approximately 32% of the shares. The Trump Group bargained to avoid being in such a tangled relationship with the Gengers if he engaged in improper transfers by securing a right to acquire *all* shares subject to an improper transfer, not just enough to get a voting majority.

My earlier ruling slighted this problem, and suggested that Arie Genger could simply cure the improper transfer to himself by providing proper notice and by signing on to the Stockholders Agreement.[15] It ignored that if he could be let off the hook like that by an equitable softie like me and, if the Orly Trust was left with its shares, he could argue that the Trump Group was bound to elect two directors of his choosing to the board. Now that all the relevant factors have been adequately considered by me, it is clear that I gave these considerations too little weight and improperly reduced the Trump Group's contractual rights.

---

[14] Stockholders Agreement §§ 3.2, 3.3(b); *see also* Letter from Thomas J. Allingham II to the Hon. Leo E. Strine, Jr. (Aug. 4, 2010) at 6.
[15] *See Genger,* 2010 WL 2901704, at *19.

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 8 of 9

Of course, it may well be that the bargain that TPR — a company that Arie Genger allowed to pass out of his control — struck poses some equitable problem for TPR. That is, it may be that Genger and Orly Genger have claims against TPR and Sagi Genger over how the price paid by the Trump Group for the Arie and Orly Shares was allocated. In that sense, the endgame of this struggle would be fitting if regrettable, in that the Gengers would find themselves fighting over a pot of money and who should get what. To that point, it may be that the Trump Group would be wise to pay the consideration for the Arie and Orly Shares into a court in New York, and allow the Gengers to have at it about who gets the proceeds. The resolution of any such dispute, however, is not relevant to the determination that both the Trump Group and Genger have asked me to make.

That determination is whether the Arie and Orly Shares are validly owned by Arie Genger and the Orly Trust. Again, the answer is no, they are not. The transfers were invalid. That left the Trump Group with the right to purchase the Shares from TPR, and thus TPR and the Trump Group were free to settle that dispute by a new bargain for sale. If the Trump Group exercises its rights under the Letter Agreement, it will own the shares improperly transferred to Genger and the Orly Trust, and neither of those transferees ever had a legitimate interest in the shares. If those transferees have any beef with TPR or Sagi Genger, the transferees are free to file suit against them. But the Trump Group may purchase the Arie and Orly Shares per the terms of the Letter Agreement, may vote those

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 9 of 9

Shares, and Trans-Resources need not recognize Genger or the Orly Trust as

stockholders.

In revising my earlier decision to address this issue, I therefore correct my failure

to focus as closely as I should have on the control consequences of the transfers to

Genger and the Orly Trust, the primacy that should be given to the contractual remedy

provision, the bargain-destroying consequences of not according the Trump Group the

full benefit of the Stockholders Agreement, and the inequity of subjecting the Trump

Group to attempts by Genger to relitigate issues that he sought to litigate in this court.

For all these reasons, I treat the proposed order submission of the Trump Group as

a motion for reargument, a motion I hereby grant, and will issue a final judgment in favor

of the Trump Group in conformity with this decision.

Very truly yours,

*/s/ Leo E. Strine, Jr.*

Vice Chancellor

LESJr/eb

At the Surrogate's Court held in and for the County
of New York, at the Courthouse, 31 Chambers
Street, New York, New York on the 1 day of
June 2009
JULY

New York County Surrogate's Court
DATA ENTRY DEPT.
Date: July 1, 2009

PRESENT: HON. __Troy K. Webber__
                                    Surrogate

In the Matter of the Application of

ORLY GENGER, as a person interested
for the removal of DALIA GENGER
as Trustee of the Orly Genger 1993 Trust
pursuant to SCPA §711 (11)

File No.: 0017/2008

ORDER TO SHOW CAUSE
WITH TEMPORARY
RESTRAINTS

On reading and filing the annexed Verified Petition of Petitioner, ORLY GENGER, and

the exhibits, verified on the 22nd day of June, 2009, and the memorandum of law in support of

Petitioner's Verified Petition dated June 22, 2009,

LET the Respondent, DALIA GENGER, the sole fiduciary of the Orly Genger 1993

Trust, show cause before Surrogate __Troy K. webber__ at the Surrogate's Court, 31 Chambers Sitting at 60 Centre

Street, New York, New York, on the 5th day of June August 2009 at 10:00 o'clock in the forenoon of that

day or as soon thereafter as counsel may be heard why an order should not be entered:

         (a)      Enjoining and restraining Respondent, her agents and all other persons

acting on her behalf from withdrawing, selling disposing, transferring, assigning, removing,

pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly

Trust's 19.43% interest in Trans-Resources, Inc., ("TRI"), a closely held corporation, founded by

Arie Genger, Petitioner's father and Respondent's former husband of Respondent and any other

assets which may be remaining in the Orly Trust;

NYO_XFSKA13N03131U

(b)    Removing Respondent as Trustee of the Orly Trust for breaching her

fiduciary duties, wasting and dissipating the assets of the Orly Trust and imprudently managing

and injuring the property committed to her charge;

(c)    Surcharging Respondent in the amount of the loss of the value of Orly's

interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)    Appointing Michael D. Grohman, Esq. as successor trustee;

(e)    Waiving any requirement that Petitioner post an undertaking; and

(f)    Granting Petitioner such further relief deemed necessary or proper.

ORDERED that, during the pendency of this proceeding, Respondent, ~~her agents and all~~ [and/or her counsel
are required to give notice by overnight mail to petitioners counsel of any 1) offer
~~other persons acting on her behalf are temporarily restrained from withdrawing, selling;~~
to purchase the Orly Trust's 19.3% interest in TRI within 10 days of receiving
~~disposing, transferring, assigning, removing pledging, redeeming, mortgaging, encumbering,~~
such offer and 2) act by Respondent, her agents and all other persons
~~liening, hypothecating or securing the Orly Trust's 19.43% interest in TRI and other assets~~
acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell or
~~remaining in the Orly Trust; and it is further~~
otherwise alter the Orly Trust's interest in TRI at least 10 days prin to such act
~~and it ORDERED that~~ service of a copy of this Order and the papers upon which it is based

shall be served on Respondent by personal service at either her residence, located at 200 East

65th Street, Apt. 32W, New York, New York 10021, or any other address at which she can be

located, on or before ~~June 7,~~ July 7, 2009; and it is further

    ORDERED, that any responsive papers shall be filed by
July 29, 2009.

~~ENTER:~~

Surrogate

NYO_XFER03793\1\1

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ARIE GENGER, | § | |
| | § | No. 592, 2010 |
| Defendant/Counterclaim | § | |
| Plaintiff-Below, | § | Court Below: Court of Chancery of |
| Appellant, | § | the State of Delaware |
| | § | |
| v. | § | |
| | § | C.A. No. 3994 |
| TR INVESTORS, LLC, | § | |
| GLENCLOVA INVESTMENT CO., | § | |
| NEW TR EQUITY I, LLC, | § | |
| NEW TR EQUITY II, LLC, and | § | |
| TRANS-RESOURCES, INC., | § | |
| | § | |
| Plaintiffs/Counterclaim | § | |
| Defendants-Below, | § | |
| Appellees. | § | |

Submitted: May 25, 2011
Decided:   July 18, 2011

Before **STEELE**, Chief Justice, **HOLLAND**, **BERGER**, **JACOBS** and **RIDGELY**, Justices, constituting the Court *en Banc*.

Upon Appeal from the Court of Chancery. **AFFIRMED IN PART and REVERSED IN PART**.

Stephen P. Lamb, Esquire (argued), of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Wilmington, Delaware; Of Counsel: Eric Alan Stone and Jaren Elizabeth Janghorbani, Esquires, of Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York; for Appellant.

Thomas J. Allingham II (argued), Anthony W. Clark and Robert A. Weber, Esquires, of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware; for Appellees.

Kevin F. Brady, Esquire, of Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware; Of Counsel: Daniel B. Garrie, Esquire, of Focused Solution Recourse Delivery Group, LLC, Bellevue, Washington; for *Amici Curiae* Focused Solution Resource Delivery Group, the Organization of Legal Professionals, and Security Mentors, LLC.

**JACOBS**, Justice:

This appeal arises out of a contest for control of **Trans-Resources, Inc.**

("Trans-Resources"), a Delaware corporation. The Trump Group, whose members

are the plaintiffs-below appellees,[1] brought a Court of Chancery action under 8

*Del. C.* § 225[2] against Arie Genger ("Genger"), the defendant-below appellant,[3] to

determine which stockholder group possessed the majority voting interest entitled

to elect the Trans-Resources board of directors. In two separate opinions and a

final judgment order, the Court of Chancery concluded that the Trump Group

collectively owned 67.7477% of the Trans-Resources shares, and that the Trump

Group's majority vote would determine the lawful membership of the

corporation's board.[4] The Court of Chancery also determined that Genger had

violated a *status quo* court order prohibiting the destruction of certain

electronically stored documents and materials pending the litigation, and

---

[1] The Trump Group, who are also counter-claim defendants, include TR Investors, LLC ("Investors"), Glenclova Investment Co. ("Glenclova"), New TR Equity I, LLC, and New TR Equity II, LLC (collectively, the "Trump Group").

[2] 8 *Del. C.* § 225 (authorizing the Court of Chancery to "determine the validity of any election, appointment, removal, or resignation of any director or officer of any corporation, and the right of any person to hold or continue to hold such office. . . .").

[3] Genger is also a counterclaim-defendant below.

[4] Final Judgment Order at ¶ 7, C.A. 3994 (Del. Ch. Aug. 18, 2010) (the "Final Judgment Order"); *TR Investors, LLC v. Genger*, 2010 WL 3279385 (Del. Ch. Aug. 9, 2010) (the "Side Letter Op."); *TR Investors, LLC v. Genger*, 2010 WL 2901704, at *22 (Del. Ch. July 23, 2010) (the "Merits Op.").

sanctioned Genger for those violations.[5]   For the reasons discussed below, we affirm in part and reverse in part the judgment of the Court of Chancery.

## *FACTUAL AND PROCEDURAL BACKGROUND*[6]

A. The Stockholders Agreement

In 1985, Genger[7] formed Trans-Resources, a Delaware corporation that specializes in manufacturing fertilizer and producing chemicals for agricultural use.   Trans-Resources was wholly owned by TPR Investment Associates, Inc. ("TPR"), an entity that in turn was wholly owned by Genger, his wife, and his family trusts.   As TPR's majority shareholder, Genger also controlled Trans-Resources.   Genger's wife, Dalia, and their two children, Orly and Sagi, held minority shareholder interests in TPR.   The children's TPR shares were held in two separate trusts, the "Orly Trust" and the "Sagi Trust," respectively.

Although initially successful, by 2001 Trans-Resources was nearly insolvent.   Its bonds were trading at a fraction of their $230 million face value. Genger attempted to negotiate a resolution with Trans-Resources' bondholders, but those negotiations were unsuccessful and Trans-Resources faced the prospect of

---

[5] *TR Investors, LLC v. Genger*, 2009 WL 4696062, at *12, 16 (Del. Ch. Dec. 9, 2009) (hereinafter "Spoliation Op.").

[6] The facts recited are based on the Court of Chancery's post-trial findings of fact.

[7] Because the Genger family members all share the same last name, we refer to Sagi, Orly, and Dalia Genger by their first names to avoid confusion with Arie.

2

bankruptcy. Jules Trump ("Jules"),[8] a close friend of Genger for nearly 25 years, viewed this state of affairs as a valuable business opportunity and caused two Trump Group members, Glenclova and Investors, to purchase $220 million (face value) of Trans-Resources' bonds for $25 million.

Glenclova and Investors then entered into an agreement with Trans-Resources and TPR to convert their bond holdings into an equity interest in Trans-Resources (the "Stockholders Agreement"). Under the Stockholders Agreement, Genger's equity ownership interest in Trans-Resources (through TPR) was reduced from 100% to 52.85%, and Glenclova and Investors owned the remaining 47.15%. In exchange for agreeing to become minority shareholders, Glenclova and Investors extracted certain protections, including significant board representation and veto rights. Those protections were embodied in the Stockholders Agreement.

Glenclova and Investors also sought to ensure that TPR (or some other acceptable Genger-controlled entity) would be the only other Trans-Resources stockholder. To accomplish that, the Stockholders Agreement restricted the transfer of Trans-Resources shares to any persons or entities except those that were designated therein as "Permitted Transferees." If a party to the agreement wished to transfer or sell its shares to a non-Permitted Transferee, the selling party must

---

[8] As with the Genger family, the Trump family members all share the same last name. We refer to Jules and Eddie Trump by their first names to avoid confusion.

3

first give written notice to the other Trans-Resources shareholders, who would then have a right of first refusal. A transfer that failed to comply with those restrictions and the prior notice requirement would automatically be deemed invalid and void, and would trigger the non-selling shareholders' right to purchase the invalidly-transferred shares (the "Purchase Rights").[9]

B. The 2004 Transfers

On October 26, 2004, Arie and Dalia Genger divorced. In the Gengers' divorce settlement agreement, Arie Genger represented that "[e]xcept for the Consent of TPR . . . no consent, approval or similar action of any person is required in connection with the transfer of [Trans-Resources] Stock as contemplated hereby. . . ." That representation was false. In fact, the prior consent of the Trump Group signatories to the Stockholders Agreement (i.e., Glenclova and Investors) was required.

Three days later, on October 29, 2004, Genger transferred his controlling stock interest in TPR to Dalia. Simultaneously, he caused TPR to transfer its 52.85% ownership in Trans-Resources as follows: (i) to himself, approximately 13.9% of those shares; and (ii) to each of the Orly Trust and the Sagi Trust, approximately 19.5% of those shares. Those transfers are collectively referred to in this Opinion as the "2004 Transfers." Under the agreement that documented the

---

[9] Under the Stockholders Agreement, a non-selling shareholder's Purchase Rights would also be triggered if the improper transfer resulted in a change of control of the selling party.

4

2004 Transfers, the trustees of both Trusts purported to give irrevocable lifetime proxies to Genger to vote the Trans-Resources shares held by each Trust (the "Irrevocable Proxies" or "Proxies").

C. The Funding Agreement and The 2008 Purchase Agreement

When he effectuated the 2004 Transfers, Genger knew that neither Trust was a "Permitted Transferee" of the Trans-Resources shares under the Stockholders Agreement. Despite that, Genger did not notify Glenclova or Investors of the 2004 Transfers, nor did he provide to those Trump Group entities copies of the Irrevocable Proxies or his divorce settlement agreement. Genger claims, nonetheless, that Glenclova and Investors had actual notice of the 2004 Transfers, because he (Genger) orally told Jules about them on several occasions. In both the trial court and this Court, the Trump Group (and Jules) disputed that claim, and steadfastly insisted that Genger never told them of the 2004 Transfers. All parties agree that Genger never formally or specifically disclosed the 2004 Transfers to Glenclova or Investors until June 2008—four years after those transactions took place. That disclosure was made in the circumstances next described.

During the spring of 2008, Trans-Resources again ran into financial difficulty and was facing foreclosure on an overdue bank debt. Again, the Trump Group stepped in and offered to provide Trams-Resources the additional funding needed for repayment—this time, however, in exchange for additional equity that

5

would give Glenclova and Investors majority voting control. Genger agreed to those terms, which were documented in the "2008 Funding Agreement." On June 13, 2008, Genger met with Eddie Trump ("Eddie") and Mark Hirsch, the Trump Group's general counsel ("Hirsch"), to discuss the Funding Agreement. At that meeting, Hirsch handed Genger—and asked him to verify—a document that identified and listed the Trans-Resources stockholders as TPR, Glenclova, and Investors. Confronted with that verification request, Genger had no choice but to disclose that: (i) TPR was no longer a stockholder of Trans-Resources, and (ii) TPR's shares in Trans-Resources had been transferred to himself and to the Orly and Sagi Trusts four years earlier, in the 2004 Transfers. Genger claims, nonetheless, that at that meeting and thereafter, the Trump Group "ratified" the 2004 Transfers. The Trump Group assiduously contest that claim as well.

On June 25, 2008, the Trans-Resources board and stockholders met to consider and approve the 2008 Funding Agreement. At that meeting, the Trump Group representatives expressed their frustration over Genger's (hitherto undisclosed) violation of the Stockholders Agreement. At no point during that meeting or thereafter did the Trump Group tell Genger or anyone else that they approved the 2004 Transfers. To induce the Trump Group to enter into the Funding Agreement, Genger assured them that Glenclova and Investors would obtain majority voting control of Trans-Resources. Genger also promised that the

6

Trump Group would not encounter any objection from Sagi, Genger's then-estranged son, to Genger voting the Sagi Trust's Trans-Resources shares under the Irrevocable Proxy. Based on those representations, the Trump Group decided to proceed with the Funding Agreement.

All that turned out to be wasted effort, however, because shortly thereafter Genger backed out of the 2008 Funding Agreement, having devised a solution that would avoid relinquishing his control of Trans-Resources. That solution was to "upstream" sufficient funds from a Trans-Resources subsidiary to pay Trans-Resources' overdue bank debt. The end result was that Trans-Resources no longer needed the additional capital promised by the 2008 Funding Agreement, and the Trump Group did not obtain their promised majority voting control. Having backed away from the 2008 Funding Agreement, Genger then threatened, at an August 1, 2008 meeting, to sue the Trump Group if they challenged the legal validity of the 2004 Transfers.

In response to Genger's litigation threat, on August 8, 2008, Glenclova invoked its Purchase Rights, conferred by the Stockholders Agreement, to acquire all the Trans-Resources shares purportedly covered by the 2004 Transfers.[10]

---

[10] Specifically, the Trump Group claims that its Purchase Rights were triggered by two independent events, to which the Trump Group never consented: (1) when the Trump Group was not given the opportunity to exercise its first refusal rights as to the 2004 Transfers; and (2) when Genger transferred his majority ownership interest in TPR to Dalia as a result of their divorce settlement agreement, which resulted in a change of control of TPR. *See* Complaint at ¶ 2-3, Case No. 08-CIV-7140 (JFK) (S.D.N.Y. Aug. 11, 2008).

7

Genger rejected that Purchase Rights invocation, claiming that he had previously informed Jules of the 2004 Transfers at the time of his divorce, and, thus, whatever Purchase Rights Glenclova may have obtained under the Stockholders Agreement had long expired. In response to Genger's refusal to honor its claimed Purchase Rights, Glenclova filed a lawsuit in the United States District Court for the Southern District of New York (the "New York litigation") to enforce the Stockholders Agreement, including its Purchase Rights provision.[11]   The New York litigation is still pending.

Aware that the New York litigation would be lengthy and perhaps take years to resolve, the Trump Group decided upon a more efficient and expedited course of action: to acquire the Trans-Resources shares that TPR purportedly transferred to the Sagi Trust in the 2004 Transfers (the "Sagi Trust Shares"). Because the Sagi Trust Shares represented a 19.5% stock interest, their acquisition would enlarge the Trump Group's equity interest in Trans-Resources to one of absolute majority control—approximately 67% of the company's voting power. On August 22, 2008, the Trump Group, TPR, and the Sagi Trust reached, and formally entered into, an agreement (the "2008 Purchase Agreement") under which the Trump Group purchased the Sagi Trust Shares. Section 10 of the 2008 Purchase Agreement provided that if the 2004 Transfers were determined to be legally

---

[11] *Glenclova Inv. Co. v. Trans-Resources, Inc.*, Docket No. 08-CIV-7140 (JFK) (S.D.N.Y.).

void—as the Trump Group claimed they were—then the Sagi Trust Shares would be deemed—and treated as if they had been—transferred to the Trump Group directly by TPR (now controlled by Sagi),[12] and not by the Sagi Trust. The purpose of Section 10 was to enable the Trump Group to "cover all its bases," regardless of the outcome of the legal dispute with Genger over the validity of the 2004 Transfers.

That same day, the Trump Group entered into a separate agreement (the "Side Letter Agreement") with TPR (represented by its controller, Sagi), wherein the Trump Group acquired an option to purchase the Trans-Resources shares purportedly transferred to Genger and to the Orly Trust in the 2004 Transfers.[13] The Side Letter Agreement would be triggered only if the 2004 Transfers were judicially determined to be legally void. In that event, the legal and beneficial ownership of those shares would be deemed to have remained with TPR. The only signatories to the Side Letter Agreement were the Trump Group and TPR.[14] The Orly Trust was not a signatory, nor was Genger.

---

[12] Sagi and Dalia serve as the directors of the TPR board, and Sagi is the chief executive officer of TPR.

[13] Specifically, the Side Letter Agreement required that TPR, "upon written request from the [Trump Group] . . . take all necessary action to effect the transfer of [the disputed Trans-Resources] Shares. . . ."

[14] Sagi signed the Side Letter Agreement on behalf of TPR, in his capacity as president of TPR.

9

## D. The Section 225 Chancery Action

By purchasing the Sagi Trust Shares, the Trump Group now owned (through its affiliated entities) the majority equity position in Trans-Resources. On August 25, 2008, the Trump Group exercised its newly-acquired voting control by executing and delivering a written shareholder consent that: (1) removed Genger as a Trans-Resources director, (2) elected Eddie and Hirsch to the Trans-Resources board, and (3) confirmed the prior election of Jules and of Robert Smith to that board. Genger refused to recognize the Trump Group's written consent, claiming that it was invalid and of no legal effect.

The next day, August 26, 2008, the Trump Group filed a Delaware Court of Chancery action under 8 *Del. C.* § 225, for a determination that as Trans-Resources' majority stockholder, the Trump Group was entitled to designate and elect a majority of the members of the Trans-Resources board.[15]   The Trump Group's central claim was that the 2004 Transfers were void *ab initio* because: (i) they did not comply with the notice and consent requirements of the Stockholders Agreement, and (ii) therefore, the Trump Group was contractually entitled, under its Purchase Rights, to acquire all of the Trans-Resources shares transferred by

---

[15] As discussed in *infra*, Part III, the Trump Group initially sought a determination of which stockholder group was entitled to elect four of the six Trans-Resources directors. By the time this case was appealed to this Court, however, the scope of the Section 225 action had been expanded, by agreement of all parties, to encompass a determination of which group was entitled to elect the remaining two directors, as well.

10

TPR in 2004. In response, Genger counterclaimed for a determination that the 2004 Transfers were valid, because he had given Jules oral notice of the 2004 Transfers at the time that transaction occurred, and that Jules did not object. Alternatively, Genger claimed, and asked the Court of Chancery to declare, that: (i) the Trump Group's purchase of the Sagi Trust Shares in 2008 operated to "ratify" the 2004 Transfers, and (ii) as a consequence, Genger continued to control Trans-Resources and was entitled to elect a majority of its board.

On September 26, 2008, one month after the Trump Group commenced the Section 225 action, the parties settled their dispute and entered into a stipulated final judgment, which the Court of Chancery approved. That stipulated judgment declared that the Trump Group's designees constituted a lawful majority of the Trans-Resources board.

E. The Re-Opening of the Section 225
   Action and The Spoliation Opinion

Unfortunately, that did not end the dispute. Two weeks after the entry of the stipulated final judgment, the Trump Group moved for relief from that judgment and to re-open the Section 225 proceeding. The Trump Group claimed that, after taking control of Trans-Resources, they discovered that Genger had destroyed documents relevant to the Section 225 action in violation of a document preservation order entered by the Court of Chancery on August 29, 2008 (the "Status Quo Order"). The Vice Chancellor granted the Trump Group's motion and

11

re-opened the case. After conducting a trial in September 2009, the trial court concluded that Genger had violated, and was in contempt of, the Status Quo Order, because he had caused the deletion of files stored on his work computer at Trans-Resources.[16] The trial court further found that after deleting those computer files, Genger directed an employee to use special software that "wiped" the unallocated free space on both his computer's hard drive and on a Trans-Resources computer server. That made it impossible, even by use of computer forensic techniques, to recover any deleted files that were stored in those computers' unallocated free space.[17]

As a sanction for those acts of spoliation, the Court of Chancery raised Genger's evidentiary burden by one level. That is, on any issue in which Genger had the burden of proof, he would have to satisfy that burden by clear and convincing evidence, rather than by a preponderance of the evidence.[18] Because Genger's conduct called his credibility into question, the trial court also ruled that Genger's uncorroborated testimony would not be sufficient to establish any material fact.[19] Finally, the trial court awarded the Trump Group $750,000 of the

---

[16] *Spoliation Op.*, 2009 WL 4696062, at *12, 16 (Del. Ch. Dec. 9, 2009).

[17] *Id.* at *16-17.

[18] *Id.* at *18-19.

[19] *Id.*

12

attorneys' fees they incurred to investigate and litigate Genger's spoliation of computer documents.[20]   The parties later agreed that Genger would pay an additional $3.2 million fee to the Trump Group, an amount that the court also awarded.[21]

## F.   The Merits Opinion and The Side Letter Opinion

In December 2009, the Court of Chancery conducted a separate trial on the merits of the Section 225 claims.   In its Merits Opinion, handed down on July 23, 2010, the trial court determined that the Trump Group lawfully possessed a majority voting interest and the resulting right to elect the majority of Trans-Resources' board.[22]   Specifically, the Court of Chancery found that Genger never notified the Trump Group of the 2004 Transfers until June 13, 2008.[23]   Nor did the Trump Group ever "ratify" the 2004 Transfers after that disclosure, for two separate reasons.   First, the Trump Group repeatedly and steadfastly took the position that the 2004 Transfers had occurred in violation of the Stockholders

---

[20] *Id.* at *19.

[21] The $3.2 million represented the additional reasonable expert fees, technology consultant fees, special master fees, and other unreimbursed expenses incurred in investigating and litigating Genger's spoliation of evidence.   Final Judgment Order at ¶ 16, C.A. 3994 (Del. Ch. Aug. 18, 2010); *see also TR Investors, LLC v. Genger*, 2010 WL 541687 (Del. Ch. Feb. 3, 2010) (distinguishing between the attorneys' fees, and the expert and technology consultant fees incurred during the investigation of Genger's spoliation).

[22] *Merits Op.*, 2010 WL 2901704, at *22 (Del. Ch. July 23, 2010).

[23] *Id.* at *13.

13

Agreement.[24] Second, Genger failed to prove that the Trump Group had "benefited in any way that suggests ratification," especially given Genger's repudiation of the 2008 Funding Agreement before it was ever signed.[25] Finally, the Court of Chancery held that even if the Trump Group had implicitly ratified the 2004 Transfers, the Trump Group still had lawful voting control of Trans-Resources, because they acquired the Sagi Trust Shares free of the Irrevocable Proxy.[26] The Trump Group, therefore, owned the Sagi Trust Shares by virtue of the 2008 Purchase Agreement, unburdened by any right of Genger to vote those Shares. That 2008 acquisition gave the Trump Group majority voting control of Trans-Resources and the concomitant right to designate and elect four of the company's six directors.

Two weeks later, after issuing its Merits Opinion, the Court of Chancery issued a supplemental opinion (the "Side Letter Opinion") on August 9, 2010.[27] The Side Letter Opinion addressed the ownership of the Trans-Resources shares purportedly transferred to the Orly Trust (the "Orly Trust Shares") and to Genger (the "Genger Shares") in the 2004 Transfers. In the Side Letter Opinion, the Vice

---

[24] *Id.* at *16.

[25] *Id.*

[26] *Id.* at *20-21.

[27] *Side Letter Op.*, 2010 WL 3279385 (Del. Ch. Aug. 9, 2010).

14

Chancellor acknowledged that the Orly Trust "was not formally before the court" in any capacity.[28] The court determined, nonetheless, that neither Genger nor the Orly Trust beneficially owned any Trans-Resources shares.[29] Rather, the Genger Shares and the Orly Trust Shares continued to be owned by TPR, with the result that Trans-Resources "need not recognize Genger or the Orly Trust as stockholders."[30] Therefore, under the Side Letter Agreement, the Trump Group was entitled to vote both the Genger Shares and the Orly Trust Shares, and thereby elect the remaining two members of the six-person Trans-Resources board.[31]

Genger has appealed from the final judgment that flows from all three of these opinions—the Spoliation, the Merits, and the Side Letter Opinions.

## *ANALYSIS*

Genger raises three claims of error on this appeal. *First*, as to the Spoliation Opinion, he contends that the Court of Chancery erroneously concluded that he destroyed evidence in violation of the Status Quo Order; consequently, the court abused its discretion by finding him in contempt and by awarding sanctions

---

[28] *Id.* at *1.

[29] *Id.* at *3; *see also* Final Judgment Order at ¶ 9, C.A. 3994 (Del. Ch. Aug. 18, 2010) ("Arie Genger and the Orly Genger Trust are not . . . the record or beneficial owners of any Trans-Resources shares.").

[30] *Side Letter Op.* at *3; *see also* Final Judgment Order at ¶ 8 ("TPR is the record and beneficial owner of all Trans-Resources shares not presently owned by [the Trump Group].").

[31] *Side Letter Op.* at *3 ("[T]he Trump Group may purchase the [Genger] and Orly [Trust] Shares per the terms of the [Side] Letter Agreement, may vote those shares. . . .")

15

entirely disproportionate to any violation. *Second*, as to the Merits Opinion, Genger claims that the Court of Chancery erred by concluding that: (i) the Trump Group never ratified his transfer of Trans-Resources shares to the Sagi Trust (as part of the 2004 Transfers), and (ii) the Irrevocable Proxy associated with the Sagi Trust Shares was invalid and unenforceable. *Third*, Genger argues that the trial court exceeded its jurisdiction by adjudicating, in the Side Letter Opinion, the beneficial ownership of the Orly Trust Shares and the Genger Shares, because neither the Orly Trust nor TPR—both indispensable parties to any such adjudication—were properly before the trial court or subject to its *in personam* jurisdiction.

Genger's claims rest, in whole or in part, on the premise that the trial court erred as a matter of law. We review a trial court's formulation and application of legal principles *de novo*.[32] To the extent that Genger attacks the trial court's factual findings, we will not disturb those findings unless they are clearly erroneous and not supported by the record.[33]

### *I. The Spoliation Opinion*

Genger's first claims that because the Court of Chancery erroneously found that he caused material evidence to be spoliated, it abused its discretion by holding

---

[32] *Oberly v. Kirby*, 592 A.2d 445, 462 (Del. 1991).

[33] *Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).

him in contempt of the August 29, 2008 Status Quo Order. Alternatively, Genger

argues that even if the trial court's contempt and spoliation findings are correct, the

resulting sanctions were an abuse of the court's discretion, because the $3.2

million expert and attorneys' fee award was disproportionate and excessive.

A trial court has broad discretion to fashion and impose discovery

sanctions.[34]   In exercising appellate review, this Court "will not disturb a trial

judge's decision regarding sanctions imposed for discovery violations absent an

abuse of discretion."[35]  "Although we may not substitute our own notions of what

is right for those of the trial judge, the trial judge's decision to impose sanctions

must be just and reasonable."[36]  To the extent a decision to impose sanctions is

factually based, we accept the trial court's factual findings so long as they are

sufficiently supported by the record, are the product of an orderly and logical

reasoning process, and are not clearly erroneous.[37]  Moreover, "[where] factual

findings are based on determinations regarding the credibility of witnesses . . . the

---

[34] *Lehman Capital v. Lofland*, 906 A.2d 122, 131 (Del. 2006).

[35] *Id.* (internal quotation marks and alteration omitted); *see also Cabrera v. State*, 840 A.2d 1256, 1263 (Del. 2004) ("We review for abuse of discretion the sanction imposed by a trial court because of a discovery violation.").

[36] *Lehman Capital*, 906 A.2d at 131 (quoting *Chavin v. Cope*, 243 A.2d 694, 695 (Del. 1968) and *In re Rinehardt*, 575 A.2d 1079, 1082 (Del. 1990)) (internal quotation marks and alteration marks omitted).

[37] *Stegemeier v. Magness*, 728 A.2d 557, 561 (Del. 1999).

17

deference already required by the clearly erroneous standard of appellate review is enhanced."[38]

For the reasons that follow, we conclude that Genger's arguments are without factual or legal merit. We therefore uphold the Court of Chancery's spoliation and contempt findings and the resulting sanctions imposed.

## A. Was There A Basis For The Trial Court To Find Spoliation And Adjudicate Contempt?

Genger first claims that the evidence was insufficient to establish that he had destroyed relevant documents or that the Trump Group was thereby prejudiced. Because there can be no spoliation without a factually-grounded determination that documents were destroyed, Genger argues, the trial court's spoliation finding lacks record support. Moreover, because the Status Quo Order did not expressly require the unallocated free space on his computer's hard drive to be preserved, no spoliation or contempt finding would be proper.[39] That Order directed only that

---

[38] *Cede & Co. v. Technicolor, Inc.*, 758 A.2d 485, 491 (Del. 2000).

[39] In computing terms, "unallocated space" refers to the logical (as opposed to physical) space on a hard drive that the computer's operating system, such as Microsoft Windows, *can* write to, because it is considered empty or "free." Unallocated space is the opposite of "allocated" space, which is the space on the hard drive where the operating system has already written data files to. Normally, files can only be written to the unallocated "free" space. *See, e.g., What is unallocated space?*, WHERE IS YOUR DATA? (Oct. 3, 2008), http://whereismydata.wordpress.com/ (hereinafter "*Unallocated Space*").

On a new (or newly-formatted) hard drive, virtually all of the hard drive space is unallocated space. That unallocated space is normally filled with zeros (as opposed to ones). As the computer writes files to the hard drive, the zeros are overwritten with the file data. When a file is deleted from a computer, the computer's operating system marks the previously allocated

the parties refrain from "tampering with, destroying or in any way disposing of any [Trans-Resources]-related documents, books or records." Because no provision in the Status Quo Order expressly addressed his computer's unallocated free space, Genger claims that the trial court erred by adjudicating him in contempt.

Genger also urges us to reverse on a broader ground—namely, that requiring a party-litigant to preserve a computer's unallocated free space whenever a document-retention policy is in place, would impossibly burden a company-litigant by effectively requiring the company to refrain from using its computers entirely. Genger argues that in the course of a computer's normal operation, its operating

---

space as unallocated. The data from the file itself, however, remains on the hard drive. *See, e.g., Nucor Corp. v. Bell*, 251 F.R.D. 191, 198 (D.S.C. 2008) (explaining unallocated space as it relates to deleted files). For example, assume that a user saves a 10GB movie file onto a new 500GB hard drive. Once the movie file's data is written to the hard drive, the computer's operating system recognizes that the hard drive is 2% allocated space (*i.e.*, the movie file), and 98% unallocated space. If the user now deletes the movie file, the operating system updates the hard drive status to show that there is 100% unallocated space. Of the 500GB of unallocated space, 10GB of that would be the old movie file data, while the remaining 490GB would be zeros. *See, e.g., Unallocated Space.* With normal computer usage, until new files are written to the hard drive, the movie file data will remain deleted but still be recoverable from the hard drive. Even if new files are written to the hard drive, those new files must overwrite the same unallocated space as the movie file data, before the movie file is destroyed and becomes unrecoverable. *See, e.g., Nucor*, 251 F.R.D. at 198; *MMI Products, Inc. v. Long*, 231 F.R.D. 215, 216 (D. Md. 2005).

By using special software, computer forensic experts can recover the 10GB movie data file, even though that file has already been deleted by the user. This recovery process, however, can be performed only if the unallocated free space has not been "wiped"—*i.e.*, overwritten with zeros—or written over with new data files. In the example above, wiping the unallocated free space would result in overwriting the old movie data with zeros, thereby making recovery of that movie file impossible. *See, e.g., Leon v. IDX Sys. Corp.*, 464 F.3d 951, 956 (9th Cir. 2006) (affirming district court's finding that the unallocated free space on a user's computer had been intentionally wiped, thereby making recovery of any files in that space impossible); *Krumwiede v. Brighton Assoc., L.L.C.*, 2006 WL 1308629, at *5 (N.D. Ill. May 8, 2006) (explaining how defragmentation will overwrite existing unallocated space).

system is constantly overwriting the unallocated free space by creating and deleting temporary files.[40] Given that technological reality, to expand the scope of a routine document-retention order so as to require preservation of unallocated free space would impose an unworkable standard.[41]

We do not read the Court of Chancery's Spoliation Opinion to hold that as a matter of routine document-retention procedures, a computer hard drive's unallocated free space must always be preserved. The trial court rested its spoliation and contempt findings on more specific and narrow factual grounds— that Genger, despite knowing he had a duty to preserve documents, intentionally took affirmative actions to destroy several relevant documents on his work computer. These actions prevented the Trump Group from recovering those deleted documents for use in the Section 225 and the New York litigations.[42] The

---

[40] For example, every time a user powers on a computer, the computer's operating system will write temporary files to the unallocated hard drive space. Those temporary files are then deleted when the computer is shut down. *See, e.g., Mintel Int'l Group, Ltd. v. Neergheen*, 2010 WL 145786, at *8 (N.D. Ill. Jan. 12, 2010) (finding that even non-user initiated software may have destroyed data); *Antioch Co. v. Scrapbook Borders Inc.*, 210 F.R.D. 645, 652 (D. Minn. 2002) (discussing how normal computer usage may destroy data); *see also Schedule Disk Defragmenter to run regularly*, http://windows.microsoft.com/en-US/windows-vista/Schedule-Disk-Defragmenter-to-run-regularly (indicating that Windows automatically schedules disk defragmentation actions to occur at least once a week to improve computer performance).

[41] The *amici curiae,* Focused Solution Recourse Delivery Group, LLC, The Organization of Legal Professionals, and Security Mentors LLC, have also filed a brief in support of Genger's position on broader contention.

[42] *Spoliation Op.*, 2009 WL 4696062, at *7, 16 (Del. Ch. Dec. 9, 2009); *see also id.* at *10 ("I do conclude that [Genger] intended to limit the ability of the Trump Group to find additional documents that might aid it in its litigation battles with him.").

20

record establishes that Genger acted furtively, by (among other things) directing an

employee to wipe his computer's unallocated free space using a program called

"SecureClean" at around 1:00 a.m. on September 8, 2008.[43] Thereafter, that same

employee ran SecureClean on the Trans-Resources company server on September

10, 2008.[44] At no point did Genger ever consult with the Trump Group or its

counsel before directing that those actions be taken.

The Trump Group remained unaware of the impact of Genger's covert

conduct until weeks later, when the Trump Group found itself unable to locate

copies of documents that should have been available on Genger's work computer.[45]

Specifically, copies of eight separate documents and/or emails should have been—

but were not—found on either the Trans-Resources company server or Genger's

work computer.[46]  The absence of those documents was determined to have

prejudiced the Trump Group, because "[d]ifferent versions of documents or e-mail

---

[43] *Id.* at *7. The record shows that Genger's technology advisor, Oren Ohana, had run SecureClean on the "DeepClean" option, which was the most thorough. The DeepClean option permanently overwrote the unallocated free space on the hard drive with new strings of unintelligible data. *Id.*

[44] *Id.*

[45] *Id.* at *11-13.

[46] *Id.* at *11 (explaining that under the established protocol, where Genger would have saved the relevant files on the Trans-Resources server); *id.* at *12 (identifying eight relevant emails, some with attachments, that were not found on the computer image of Genger's hard drive, and noting that Genger "was not a routine 'deleter'" and had accumulated thousands of e-mails in his inbox).

21

chains can take on material importance if there are alterations or additions to them. And who received what and when can be crucial."[47]    From those missing documents the trial court inferred that other relevant documents would likely have been stored on Genger's computer and/or the Trans-Resources server, and had been permanently deleted and were now unrecoverable.[48]    It was on that specific, narrow factual basis that the trial court: (i) found that Genger had spoliated evidence by intentionally destroying documents, (ii) sanctioned him for that spoliation, and (iii) adjudicated him in contempt of the August 29, 2008 Status Quo Order.

We affirm the Court of Chancery's findings and resulting sanctions, because the trial court did not abuse its discretion or commit any erroneous finding of law or fact. Our affirmance should not be viewed as extending beyond the confines of this setting—*i.e.*, where a party is found intentionally to have taken affirmative steps to destroy or conceal information to prevent its discovery at a time that party is under an affirmative obligation to preserve that information. It is noteworthy that there is no evidence or claim in this case, that the use of the SecureClean

---

[47] *Id.* at *12.

[48] *Id.*

22

program fell within Trans-Resources' ordinary and routine data retention and deletion procedures.[49]

To avoid future repetitions of the "unallocated free space" issue presented here, we suggest that the parties and the trial court address any unallocated free space question that might arise before a document retention and preservation order is put in place. We recognize that instances may arise where a party-litigant will have a legitimate reason to preserve unallocated free space on a computer's hard drive. In addressing that issue, the parties must be mindful that court-ordered discovery of electronically-stored information should be limited to what is

---

[49] For example, the outcome perhaps might be different if Trans-Resources had a data retention policy whereby SecureClean was run on employees' computers and the company's servers every three months, and coincidentally, that scheduled run was to occur on September 8, 2008. *See Sears, Roebuck & Co. v. Midcap*, 893 A.2d 542, 548 (Del. 2006) (recognizing that the rationale for giving an adverse inference instruction would not necessarily apply where evidence was destroyed "accidentally or where records are purged under a routine document destruction policy."). We also note that other state and federal courts have differed in their approach to determining whether destruction of evidence due to routine document destruction policies warrants sanctions such as an adverse inference instruction. *Compare, e.g., Reish v. Penn. State Univ.*, 2011 WL 2015350, at *7 (M.D. Pa. May 24, 2011) (finding no spoliation where document destruction was a function of routine company policy) *with R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 24 (S.D.N.Y. 2010) (noting that failure to suspend "any routine document destruction or other processes involved in the ordinary course of business that might result in the destruction of potentially relevant evidence" may result in sanctions); *see also Victor Stanley Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 542-553 (D. Md. 2010) (comparing the various approaches taken by the United States Circuit Courts of Appeal).

"reasonably accessible."[50] That determination, by its very nature, must be made on a case-by-case basis.[51]

## B. Was the $3.2 Million Fee Award An Abuse of Discretion?

Genger next claims that even if the Court of Chancery's spoliation and contempt findings were correct, the court abused its discretion by awarding the Trump Group an additional $3.2 million in fees as a sanction for those violations. He argues that that fee award was disproportionate to any violations, particularly since the trial court had earlier imposed as sanctions a heightened burden of proof and a prior $750,000 attorneys' fees award.

Assuming without deciding that $3.2 million falls on the higher end of the range of a reasonable fee, the record establishes that Genger expressly waived his right to challenge the reasonableness of that award. The Court of Chancery's Final Judgment Order expressly recites that Genger "agree[d] that he w[ould] not challenge the reasonableness of the amount of such fee award (whether on appeal or otherwise), except on the ground that it was improper to award any sanction . . .

---

[50] *See* FED. R. CIV. P. 26(b)(2)(B) (limiting discovery of electronically-stored information to that which is "reasonably accessible"); *Rimkus Consult. Grp. v. Cammarata*, 688 F.Supp.2d 598, 612 (S.D. Tex. 2010) (analyzing the duty to preserve by focusing on proportionality and reasonableness); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216-18 (S.D.N.Y. 2003) (recognizing that a corporation does not have a duty to preserve "every" data source, because such a rule would "cripple large corporations . . . [that] are almost always involved in litigation").

[51] *Rimkus Consult. Grp.*, 688 F.Supp.2d at 613.

for [the Court of Chancery's] contempt finding. . . ."[52]  Therefore, this issue was not properly preserved for appeal and, at most, is reviewable only for plain error.[53]

We find no plain error.  The $3.2 million figure was not arbitrarily determined.  The amount of attorneys, expert, and technology consultant fees was hotly contested, and that $3.2 million figure was the result of the parties' compromise.[54]  In these circumstances, the reasonableness of that fee award does not, nor could it, constitute plain error.  Consequently, that award must be upheld.

## II.  The Merits Opinion

Genger next claims that the Court of Chancery erroneously concluded, in its Merits Opinion, that the Trump Group did not ratify the 2004 Transfer to the Sagi Trust.  Genger contends that the Trump Group, by its conduct, twice ratified those transfers after the June 13, 2008 meeting at which the Trump Group was first told about them.  Genger also attacks, as legally erroneous, the Vice Chancellor's determination that the Irrevocable Proxy associated with the Sagi Trust Shares was invalid under New York law and that, in any event, the Proxy did not run with the Sagi Trust Shares after those shares were sold to the Trump Group.

---

[52] Final Judgment Order at ¶ 16, C.A. 3994 (Del. Ch. Aug. 18, 2010).

[53] *Beebe Med. Ctr., Inc. v. Bailey*, 913 A.2d 543, 550 (Del. 2006) (noting that "waiver occurs where a party fails to object or raise that issue on appeal, unless the error is plain.").

[54] *See* Final Judgment Order at ¶ 16.

Both arguments fail because they ignore the trial court's factual findings and lack legal merit. Our reasons follow.

## A. Did the Trump Group Ratify The 2004 Transfer To the Sagi Trust?

Genger claims that the undisputed facts establish that the Trump Group twice ratified the 2004 Transfers to the Sagi Trust. The first ratification, Genger argues, occurred at the June 25, 2008 meeting when the Trump Group solicited and accepted Genger's vote of the Sagi Trust Shares to approve the (later repudiated) 2008 Funding Agreement. Genger claims that by recognizing his right to vote the Sagi Trust Shares, the Trump Group necessarily ratified the disputed 2004 Transfers. The second ratification is said to have occurred when the Trump Group purchased the disputed Trans-Resources shares from the Sagi Trust under the 2008 Purchase Agreement. Without the 2004 Transfers, Genger insists, the Sagi Trust would have had no Trans-Resources shares to sell to the Trump Group. Therefore, the 2004 Transfers were necessarily ratified if the 2008 Purchase Agreement was to have any legal force. Neither argument, in our view, has merit.

Ratification is an equitable defense[55] that precludes a party "who [has] accept[ed] the benefits of a transaction from thereafter attacking it."[56] Ratification

---

[55] *Frank v. Wilson & Co.*, 32 A.2d 277, 283 (Del. 1943).

[56] *Giammalvo v. Sunshine Min. Co.*, 1994 WL 30547 at *10 (Del. Ch. Jan. 31, 1994) (citing *Kahn v. Household Acq. Corp.*, 591 A.2d 166, 177 (Del. 1991)), *aff'd* 651 A.2d 787 (Del. 1994).

may be either express or implied through a party's conduct, but it is always a "voluntary and positive act."[57]   It is undisputed that the Trump Group never expressly or formally ratified the 2004 Transfers.   The Court of Chancery explicitly found that "[a]t no point did the Trump Group tell Genger that it [had] accepted the 2004 Transfers."[58]   The sole issue, then, becomes whether the Trump Group, by its post-June 13, 2008 conduct,[59] implicitly ratified the 2004 Transfers. The record establishes that no implied ratification of the 2004 Transfers by the Trump Group ever took place.

Implied ratification occurs "[w]here the conduct of a complainant, subsequent to the transaction objected to, is such as reasonably to warrant the conclusion that he has accepted or adopted it, [and] his ratification is implied through his acquiescence."[60]   Ratification of an unauthorized act may be found from conduct "which can be rationally explained *only* if there were an election to treat a supposedly unauthorized act as in fact authorized."[61]   Ratification may also be found where a party "receives and retains the benefit of [that transaction]

---

[57] *Frank*, 32 A.2d at 283.

[58] *Merits Op.*, 2010 WL 2901704, at *16 (Del. Ch. July 23, 2010).

[59] The relevant date is June 13, 2008, because that was when Genger had first informed the Trump Group of the 2004 Transfers. *Id.* at *13-14.

[60] *Frank*, 32 A.2d at 283.

[61] *Dannley v. Murray*, 1980 WL 268061, at *4 (Del. Ch. July 3, 1980) (emphasis added).

without objection, [] thereby ratify[ing] the unauthorized act and estop[ping] itself from repudiating it. . . ."[62]

The Court of Chancery found "no basis to conclude that the Trump Group assented to the 2004 Transfers by accepting Genger's vote on behalf of the Sagi and Orly Trust[s] in favor of the [2008] Funding Agreement."[63]    The record evidence fully supports that finding. The Trump Group never received or retained any benefit from the 2008 Funding Agreement, and ratification is not the only rational explanation for the Trump Group's conduct. The uncontroverted evidence shows that the Trump Group was reluctant to invest additional risk capital into Trans-Resources, and would do that only if given majority voting control. The Trump Group agreed to enter into the 2008 Funding Agreement with Genger, because Genger represented that he "would rectify [his] violation of the Stockholders Agreement by ensuring that the Trump Group had voting control."[64] Moreover—and of critical importance—the parties never performed or even executed the 2008 Funding Agreement, because Genger repudiated it.[65]  In these

---

[62] *Hannigan v. Italo Petroleum Corp. of Am.*, 47 A.2d 169, 172-73 (Del. 1945) (quoting 3 THOMPSON ON CORPS., § 2121 (3d ed.)); *Dannley*, 1980 WL 268061, at *4 (noting that implicit ratification "may arise by the retention of benefits with knowledge of the unauthorized acts"); *see also Frank*, 32 A.2d at 282; *Giammalvo*, 1994 WL 30547, at *10.

[63] *Merits Op.*, 2010 WL 2901704, at *16.

[64] *Id.* at *17.

[65] *Id.* at *16.

circumstances, the Trump Group's willingness to accept Genger's vote on behalf of the Sagi and Orly Trusts in favor of the 2008 Funding Agreement cannot be fairly viewed as acquiescing in the 2004 Transfers. That is because the Trump Group never received the negotiated benefit (*i.e.*, voting control) that was to be the *quid pro quo* for the Trump Group's alleged willingness to accept and recognize Genger's vote on those Trusts' behalf.[66]

Nor can the Trump Group's conduct after the June 13, 2008 meeting be "fairly viewed only as evincing an intent to approve the unauthorized acts"[67] (here, the 2004 Transfers). Contrary to Genger's assertion, the 2008 Purchase Agreement did not implicitly ratify the 2004 Transfers, because in that 2008 Agreement, the Sagi Trust and TPR expressly conveyed only such interest as they may have had in the disputed Trans-Resources shares. Moreover, in Section 10 of the 2008 Purchase Agreement, both the purported transferor (TPR) and the purported transferee (the Sagi Trust) agreed on a mechanism whereby the Trump Group's share acquisition would be fully protected if the 2004 Transfers were determined to be void. Thus, the 2008 Purchase Agreement itself fatally undermines any claim that the Trump Group intended, by its conduct, to "ratify" the 2004 Transfers.

---

[66] *See Hannigan*, 47 A.2d at 172-73; *Dannley*, 1980 WL 268061, at *4.

[67] *Dannley*, 1980 WL 268061, at *5.

At no point did the Trump Group ratify the 2004 Transfers, either expressly or by implication. To the contrary, at all times the Trump Group acted consistently with their position that the 2004 Transfers were void.[68]  Genger's ratification claim, therefore, fails on factual and legal grounds.

## B. Were The Sagi Trust Shares Purchased Subject To The Irrevocable Proxy?

Genger next claims that the Merits Opinion erroneously determined that the Irrevocable Proxy was both legally invalid and, in any event, inapplicable to the shares acquired in the 2008 Purchase Agreement.  The Court of Chancery held that even if the Trump Group did ratify the 2004 Transfer of the Trans-Resources shares to the Sagi Trust, the Sagi Trust Shares, once acquired by the Trump Group under the 2008 Purchase Agreement, were no longer subject to Genger's Irrevocable Proxy.  The court so held for three reasons.  First, the Irrevocable Proxy did not explicitly provide that it was to run with the Sagi Trust Shares if those shares were sold, nor did the Proxy explicitly reserve any voting powers to Genger in the event of a sale or transfer.[69]  Second, even if the Proxy language was ambiguous on that point, public policy considerations relating to the separation of voting control from underlying economic stock ownership, which would result in

---

[68] *Merits Op.*, 2010 WL 2901704, at *16 (finding that "the clear and consistent message from the Trump Group to Genger at all relevant times was that the Stockholders Agreement had been violated.").

[69] *Id.* at *20.

"empty voting," required construing the Proxy strictly against any implied reservation of voting power.[70]    Third, and in any case, the Proxy was not "irrevocable" under New York law, because neither Genger nor the Sagi Trust were Trans-Resources shareholders, as Sections 609 and 620 of the New York Business Corporation Law required that they be, at the time the Proxy was executed.[71]

Genger challenges these conclusions.    With respect to the third issue— whether the Proxy was "irrevocable" under New York law—Genger claims that both he and the Sagi Trust were, in fact, Trans-Resources shareholders at the time the Proxy was executed.    Genger asserts that the Proxy was executed on October 30, 2004, one day after he effectuated the 2004 Transfers to the Sagi Trust and to himself.    Therefore, Genger tells us, the Proxy satisfied the requirements of Sections 609 and 620 of the New York Business Corporation Law.

This argument suffers from two fatal flaws.    First, it was never fairly presented to the trial court.    Second, it is unsupported by the record.    Genger represented to the Vice Chancellor that "the Sagi Trust executed the Irrevocable

---

[70] *Id.* at *20-21.

[71] *Id.* at *21. The Court of Chancery found that New York law governed the Irrevocable Proxy. The trial court's choice of law has not been appealed. Under New York law, a proxy is irrevocable where the proxy is held by "[a] person designed by or under paragraph (a) of section 620." N.Y. BUS. CORP. LAW § 609(f). Section 620, paragraph (a), applies only to "[a]n agreement between two or more shareholders. . . ." N.Y. BUS. CORP. LAW § 620(a).

31

Proxy on October 29, 2004," *the same day* that the 2004 Transfers were executed. At no point did Genger argue to the Court of Chancery (as he now argues to us) that the Irrevocable Proxy was executed *the day after* the 2004 Transfers took place. We therefore decline to consider Genger's first argument, raised for the first time on appeal, because it was never fully and fairly presented to the trial court, as Supreme Court Rule 8 requires.[72]

On the second issue—the Irrevocable Proxy's inapplicability—Genger contends that the Court of Chancery read the Proxy language too narrowly, by incorrectly applying a new, uncharted form of "heightened scrutiny" and thereby concluding that the Proxy created "empty voting" concerns. That was error, Genger argues, because the only legal principle applicable here is that a purchaser that buys shares with notice of an irrevocable proxy takes those shares subject to that proxy. Because the Trump Group knew of the existence of the Proxy at the time it negotiated the 2008 Purchase Agreement, Genger claims, that fact alone triggered the Proxy's applicability. That the Proxy contained no language explicitly binding subsequent transferees is of no relevance.

This argument cannot withstand scrutiny either. First, as a matter of law, the Proxy was not "irrevocable," because it did not satisfy the applicable New York

---

[72] DEL. SUP. CT. R. 8; *see also Russell v. State*, 5 A.3d 622, 627 (Del. 2010) ("Under Supreme Court Rule 8 and general appellate practice, this Court may not consider questions on appeal unless they were first fairly presented to the trial court for consideration.").

statutory requirements. Whether or not the Trump Group knew of the Proxy at the time they purchased the Sagi Trust Shares is immaterial, because a contracting party's knowledge of a proxy's existence cannot cure that proxy's non-compliance with controlling statutory requirements, or transmute a terminable proxy into one that is irrevocable under New York statutory law.

Finally, and apart from its failure to satisfy applicable statutory requirements, the Proxy's plain language defeats Genger's position. The Proxy relevantly provided that:

> The [Sagi Trust] . . . does hereby constitute and appoint Arie Genger . . . to vote as its proxy, all shares of common stock of [Trans-Resources] *which are now or hereafter owned by the Trust*, at any and all meetings of the stockholders of Trans-Resources. . . .

Contrary to Genger's claim, the Court of Chancery did not interpret that Proxy language too narrowly. By its plain terms, the Proxy language applied only to the Trans-Resources shares "owned" by the Sagi Trust. That is, the Proxy would attach only to those Trans-Resources shares that were "now or hereafter *owned by the Trust.*" The Proxy contains no provision that would bind any *subsequent* owner of those shares. Once sold or transferred to a subsequent owner, those shares were no longer "owned by the [Sagi] Trust" and therefore, were no longer subject to the Proxy. Genger cannot complain that the trial court erroneously interpreted the Proxy where its plain language compels that interpretation.

33

For these reasons, we uphold the judgment of the Court of Chancery insofar as it adjudicates the merits of the Trump Group's Section 225 claims.

### III.  The Side Letter Opinion

Genger's third and final claim of error is that the Court of Chancery exceeded its authority by deciding the issues addressed in its August 9, 2010 Side Letter Opinion.  That opinion (to reiterate) invalidated the 2004 Transfers of Trans-Resources shares to the Orly Trust and to Genger himself, and adjudicated the Trump Group as the lawful record and beneficial owner of those transferred shares.[73]

In its Merits Opinion, the trial court initially declined to reach the ownership issues relating to the Orly Trust and the Genger Shares, because those issues were "unnecessary" to resolve the Section 225 voting control dispute.[74]  Later, however, in its supplemental Side Letter Opinion, the court noted that: (i) in deciding the Section 225 issues, it had overlooked the 2008 Side Letter Agreement, and (ii) it was necessary to determine who owned the Orly Trust Shares and the Genger Shares, because the right to elect two of the Trans-Resources' six directors would

---

[73] *Side Letter Op.*, 2010 WL 3279385 (Del. Ch. Aug. 9, 2010).

[74] *Merits Op.*, 2010 WL 2901704, at *19 ("I do not issue any ruling as to [the Orly Trust] shares, because that is unnecessary in this § 225 action."); *see also id.* (finding that requiring Genger to transfer all of his Trans-Resources shares to TPR to be "unnecessary to this control dispute and therefore this § 225 action.").

arguably depend upon that determination.[75]   The trial court justified adjudicating the ownership of the Genger Shares at that late stage, because Genger "himself sought to have this court declare who was the rightful owner of the [Genger] and Orly [Trust] Shares."[76]   In its Final Judgment Order, the court ultimately determined that neither Genger nor the Orly Trust were "the record or beneficial owners of any Trans-Resources shares,"[77] and that TPR was "the record and *beneficial owner* of all Trans-Resources shares not presently owned by the [Trump Group]."[78]

In an about-face, Genger now claims that the Court of Chancery lacked the power to determine that the Trump Group lawfully purchased the Orly Trust Shares and the Genger Shares from TPR. He first argues that the trial court lacked *in personam* jurisdiction over the Orly Trust and TPR, because neither stockholder was made a party to the Section 225 action in any capacity.  Second, he claims that all the Side Letter Agreement gave the Trump Group was an option to purchase the Genger and Orly Trust Shares—an option which was never exercised.  Finally, Genger contends that adjudicating the validity of the 2004 Transfers under the Side

---

[75] *Side Letter Op.*, 2010 WL 3279385, at *1.

[76] *Id.*

[77] Final Judgment Order at ¶ 9, C.A. 3994 (Del. Ch. Aug. 18, 2010).

[78] *Id.* at ¶ 8 (emphasis added).

Letter Agreement exceeded the Court of Chancery's jurisdiction, because the

Trump Group's right to buy, and TPR's right to sell, the Genger Shares and the

Orly Trust Shares were "collateral" issues, *i.e.*, unnecessary to resolve the merits of

the Section 225 claims.  We agree with Genger's first claim, do not reach the

second, and reject the third.[79]

The purpose of a Section 225 action "is to provide a quick method for

review of the corporate election process to prevent a Delaware corporation from

being immobilized by controversies about whether a given officer or director is

properly holding office."[80]  A Section 225 proceeding is summary in character, and

its scope is limited to determining those issues that pertain to the validity of actions

to elect or remove a director or officer.[81]  "In determining what claims are

cognizable in a [Section] 225 action, the most important question that must be

answered is whether the claims, if meritorious, would help the court decide the

---

[79] Because our disposition of the issues relating to the Court of Chancery's Side Letter Opinion rests on jurisdictional grounds, we do not reach or address Genger's argument that the Side Letter Agreement conferred only an option to purchase the Genger Shares and the Orly Trust Shares, and that the Trump Group never exercised that contractual option.

[80] *Box v. Box*, 697 A.2d 395, 398 (Del. 1997).

[81] *See id.; Nevins v. Bryan*, 885 A.2d 233, 244 n.34 (Del. Ch. 2005); *Adlerstein v. Wertheimer*, 2002 WL 205684, at *7 (Del. Ch. Jan. 25, 2002) ("Because it is summary in nature, a Section 225 proceeding is limited to those issues that must necessarily be considered in order to resolve a disputed corporate election process."); *Arbitrium (Cayman Islands) Handels AG v. Johnston*, 1997 WL 589030, at *3 (Del. Ch. Sept. 17, 1997) (explaining that a Section 225 proceeding has the limited scope of determining "the validity of a corporate election or to determine the right of a person to hold a corporate office in the event that such office is claimed by more than one person." (citation omitted)).

proper composition of the corporation's board or management team."[82]  If not, then

those claims "are said to be 'collateral' to the purpose of a [Section] 225 action and

must be raised in a [separate] plenary action."[83]

A Section 225 proceeding is not an *in personam* action. Rather, it is "in the

nature of an *in rem* proceeding,"[84] where the "defendants" are before the court, not

individually, but rather, as respondents being invited to litigate their claims to the

*res* (here, the disputed corporate office) or forever be barred from doing so.  The

one exception is the corporation itself, which is the entity that embodies the *"res*,"

and is only party before the Court in its "individual" capacity.  The *in rem*

character of a Section 225 action "imposes important limits on the scope of [a]

court's remedial powers even as to claims bearing on whether a person lawfully

holds corporate office."[85]  For example, in a Section 225 action, a plaintiff may

claim that a director-respondent does not validly hold corporate office because that

---

[82] *Agranoff v. Miller*, 1999 WL 219650, at *17 (Del. Ch. Apr. 12, 1999) (internal citation omitted), *aff'd as modified*, 737 A.2d 530 (Table), 1999 WL 636634 (Del. 1999).

[83] *Id.* (internal citation omitted); *see also Box*, 697 A.2d at 398 (holding that a Section 225 action should not be used "for trying purely collateral issues").

[84] *Arbitrium*, 1997 WL 589030, at *4.

[85] *Agranoff*, 1999 WL 219650, at *18.

director obtained the office through fraud, deceit, or breach of contract.[86]   The

Court of Chancery may adjudicate that claim in a Section 225 proceeding, but only

for the limited purpose of determining the corporation's *de jure* directors and

officers.  In a Section 225 proceeding the court "cannot go further and actually

rescind a transaction procured through such unlawful behavior or award money

damages to those harmed by that behavior."[87]  That type of ultimate relief can only

be obtained in a plenary action in a court that has *in personam* jurisdiction over any

necessary or indispensable parties.[88]

Given the jurisdictional limitations that inhere in a Section 225 action, we

affirm the judgment of the Court of Chancery insofar as it determines the *record*

ownership of the disputed Trans-Resources shares in the Side Letter Opinion and

the Final Judgment Order.   All parties agree that the adjudication of record

ownership was necessary to determine which side was lawfully entitled to elect the

---

[86] *See, e.g., Kahn Bros. & Co. v. Fischbach Corp.*, 1988 WL 122517, at *5 (Del. Ch. Nov. 15, 1988) (examining whether director obtained position via fraud); *Garrett v. Brown*, 1986 WL 6708, at *2, 6-11 (Del. Ch. June 13, 1986), *aff'd*, 511 A.2d 1044 (Del. 1986) (addressing whether a stockholder's right of first refusal had been violated in a Section 225 proceeding); *Schroder v. Scotten, Dillon Co.*, 299 A.2d 431, 435-36 (Del. Ch. 1972) (deciding whether, under Section 225, the failure to give certain board members notice of special meetings voided the subsequent director elections that occurred at those meetings).

[87] *Agranoff*, 1999 WL 219650, at *18; *Marks v. Menoutis*, 1992 WL 22248, at *5 (Del. Ch. Feb. 3, 1992) ("This Court cannot directly order a transaction to be rescinded in a § 225 proceeding.").

[88] *Agranoff*, 1999 WL 219650, at *18.  The New York litigation is an example of such a plenary proceeding.

38

remaining two directors of the Trans-Resources board. We so conclude, even though initially the scope of the Section 225 action was limited to which side—the Trump Group or Genger—had the lawful power to designate the four directors who would comprise the Trans-Resources board majority.[89]

This procedural posture was altered, however, after the Court of Chancery issued its Merits Opinion. At that point, all parties agreed that the scope of the Section 225 action should be expanded to encompass which side had the right to designate and elect the two remaining Trans-Resources directors. That additional question arose because the parties disputed whether the Trump Group was entitled, under its Purchase Rights conferred by the Stockholders Agreement, to acquire the Trans-Resources shares transferred to Genger and the Orly Trust in the 2004 Transfers.[90] If the Trump Group was so entitled, then as a legal matter those shares would continue to be held by TPR, and Genger and the Orly Trust would have no Trans-Resources shares to vote to elect the remaining two directors. If, however,

---

[89] The Trump Group's complaint initially sought a determination that the Trump Group "ha[d] the right, as majority stockholders, to designate and cause the election of their two new designees to the board and to continue the directorships of their two existing designees." And, in a letter to the trial court, the Trump Group represented that "[t]his summary proceeding concerns a dispute between two groups over which is entitled to elect a *majority* of the board of directors of Trans-Resources. . . ." Even after the stipulated settlement agreement fell through, resulting in the Section 225 action being re-opened and litigated to a conclusion, the Trump Group's position was that "[t]he section 225 action is . . . to resolve a dispute over the composition of [Trans-Resources'] board and who is entitled to elect a *majority* of the directors." Similarly, Genger's counterclaim sought a Court of Chancery declaration that he, as majority stockholder, had the sole right to designate and elect four of the six Trans-Resources directors.

[90] *Side Letter Op.*, 2010 WL 3279385, at *1 (Del. Ch. Aug. 9, 2010).

39

20-01187-jlg   Doc 1-17   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 18
Pg 57 of 150

the Trump Group had no contractual right to purchase the Genger and the Orly

Trust Shares, then under the Stockholders Agreement, Genger would be entitled to

designate the remaining two Trans-Resources directors.[91]   Consequently, despite

having earlier concluded that it was unnecessary to address these issues, the Court

of Chancery, at the urging of all parties, now decided that it was necessary, and

that it had the power to decide which party was entitled to vote the Genger and the

Orly Trust Shares in the Section 225 action.

If the only new issue decided at this late stage was who constituted the

lawful record owners of the Genger and Orly Trust shares, the Court of Chancery's

Side Letter Opinion and subsequent Final Judgment Order would pose no problem.

The trial court determined that TPR was the record owner and entitled to vote.

But, the trial court went further—undoubtedly motivated by a desire to promote

litigation efficiency—and adjudicated questions of ultimate beneficial ownership

---

[91] In that latter scenario, Genger would have a 13.9% stock ownership interest and the Orly Trust would have a 19.5% stock ownership interest.  Section 1.2(c) of the Stockholders Agreement provides that:

> If the TPR Stockholders own less than 50% of the outstanding Shares, the group owning the greater number of Shares as between the TPR Stockholders and the Non-TPR Stockholders shall designate four directors and the other group shall, so long as it owns a number of Shares equal to at least 15% of the [] Shares [initially purchased], designate two directors.

Under the Stockholders Agreement, a non-Permitted Transferee stockholder is designated as a TPR Stockholder or a Non-TPR Stockholder depending upon which of the two groups it acquired its shares from.

as well. In doing that, however, the Court of Chancery crossed a jurisdictional line and exceeded its powers under Section 225.

An adjudication of who has the right to vote disputed corporate shares for Section 225 purposes cannot constitute a binding adjudication of who beneficially owns those shares, because a Section 225 action is by its nature an *in rem*, not a plenary, proceeding. Only in a plenary proceeding before a court that has *in personam* jurisdiction over the litigants may the court adjudicate the litigants' property interest in disputed corporate shares.[92] Here, the Orly Trust and TPR were never made parties to a plenary proceeding where the trial court had *in personam* jurisdiction over them.[93]

---

[92] *See Staar Surgical Co. v. Waggoner*, 588 A.2d 1130, 1131 (Del. 1991) (holding that under Section 225's predecessor statute, the Court of Chancery could not adjudicate equitable ownership of the disputed voting shares). *See also Rosenfield v. Standard Elec. Equip. Corp.*, 83 A.2d 843, 845 (Del. Ch. 1951) ("Where conflicting stock claims arise in connection with the review of an election under [Section 225's predecessor statute,] this court has the power, even though the claimants be not parties, to decide who had the right to vote the stock in dispute. This does not of course constitute a binding determination of ownership as between the conflicting claimants unless they are parties who have been served with effective process."); *Technicorp Int'l II, Inc. v. Johnston*, 1997 WL 538671, at *7 (Del. Ch. Aug. 25, 1997) (acknowledging that even a narrow reading of *Rosenfield* holds that "an adjudication of ultimate title to (or voiding of) a party's stock is not a remedy available in a § 225 proceeding.").

[93] To be more precise, the record contains no evidence that the Orly Trust and TPR were formally summoned or given an opportunity to be heard even in the Section 225 action. Despite that, we affirm the Court of Chancery's record ownership determinations for limited Section 225 purposes, because the Orly Trust's and TPR's interests in the board election were adequately represented by Genger and the Trump Group, respectively, and no party to the Section 225 action has objected to the trial court determining the record ownership of, and right to vote, the TPR and Orly Trust Shares.

41

In this case, Genger voluntarily asked the trial court to determine that he *beneficially* owned 13.99%, and that the Orly Trust *beneficially* owned 19.43%, of the Trans-Resources shares. To be sure, Genger and the Trump Group were legally free to consent to the Court of Chancery exercising plenary *in personam* jurisdiction over themselves personally. What Genger and the Trump Group could not do, however, was consent to that court's exercising personal jurisdiction over anyone else—in this case the Orly Trust or TPR—without valid authorization. Only those entities, through their authorized representatives, were legally empowered to give their consent.

The Court of Chancery never obtained consensual *in personam* jurisdiction over TPR, which was a party to the 2004 Transfers. Without having consented-to personal jurisdiction over TPR, the trial court could not enlarge the Section 225 proceeding into a concurrent plenary action that would empower the court to determine the ultimate beneficial ownership of the Genger and the Orly Trust Shares.

Nor could the trial court exercise personal jurisdiction over the Orly Trust. Although not altogether clear, it appears that personal jurisdiction was exercised on the basis that Orly Genger, a trust beneficiary, had voluntarily appeared as a non-party witness at the Section 225 trial. That trial did not implicate the beneficial

42

ownership of the Orly Trust Shares,[94] and the Court of Chancery itself acknowledged that the Orly Trust was "not formally before the court."[95] The trial transcript shows that Orly's testimony related only to whether her father, Genger, had verbally informed Jules of the 2004 Transfers either at the time Genger and Dalia divorced or at some point thereafter, before the parties' June 13, 2008 meeting. Orly's willingness to testify before the trial court in her individual capacity as Genger's daughter did not constitute legal consent to the Court of Chancery's exercising *in personam* jurisdiction over the Orly Trust.[96] A separate

---

[94] *Cf. Shaffer v. Heitner*, 433 U.S. 186, 213 (1977) (explaining that mere ownership of stock in a Delaware corporation, without more, was insufficient to form a constitutionally sufficient basis for the court to exercise *in personam* jurisdiction over the stockholder, because the stock sequestered was "not the subject matter of [the] litigation," and that "the underlying cause of action [was not] related to the [stock]").

[95] *Side Letter Op.*, 2010 WL 3279385, at *1.

[96] *See India S.S. Co. Ltd. v. Kobil Petroleum Ltd.*, 620 F.3d 160, 161-62 (2d Cir. 2010) ("Jurisdiction over a person is conceptually distinct from jurisdiction over the person's property. . . . The validity of an attachment order [over the person's property] therefore is not settled by a court's attainment of *in personam* jurisdiction over the property owner. Consent to one does not imply or effect consent to the other."). *Cf. In re Real Estate Title & Settlement Servs. Antitrust Litig.*, 869 F.2d 760, 770-71 (3d Cir. 1989), *cert. denied*, 493 U.S. 821 (1989) (concluding that a school board's appearance in federal district court to move to opt out of class action, and appeal of denial of that motion, did not constitute consent to exercise of personal jurisdiction by district court over the school board); *Trans-Asiatic Oil Ltd., S.A. v. Apex Oil Co.*, 804 F.2d 773, 778-79 (1st Cir. 1986) (recognizing that a party's "initial entry of a restricted appearance manifested its lack of consent to personal jurisdiction," but that party's subsequent actions "constituted a waiver of its jurisdictional defenses.").

Although we have recognized that "an individual may submit to the jurisdiction of the court by appearance," those appearances have occurred in the context of "legal arrangements" such as a contractual forum selection clause, an arbitration agreement, or through a party's voluntary use of certain state procedures such as filing a lawsuit in state court. *Massey v. Ball*, 595 A.2d 390, 394 (Del. 1991) (quoting *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703-04 (1982)). None of those "legal arrangements" are implicated here.

43

consent, by an authorized representative of the Orly Trust, was required to accomplish that, and there is no evidence or claim that such consent was ever obtained.

To summarize, the trial court lacked personal jurisdiction over either the Orly Trust or TPR, which was required for a binding adjudication of the beneficial ownership of their respective stock ownership interests.[97]   Without personal jurisdiction over these entities, the Court of Chancery lacked the power to augment TPR's beneficial ownership interest, or diminish the Orly Trust's beneficial ownership interest, in Trans-Resources by adjudicating that TPR beneficially owned the Genger Shares and Orly Trust Shares.[98]   Therefore, the beneficial ownership determinations that flow from the Court of Chancery's August 9, 2010 Side Letter Opinion and its August 18, 2010 Final Judgment Order must be reversed.

### *CONCLUSION*

The judgment of the Court of Chancery is affirmed in so far as it embodies and implements the rulings in the Merits and Spoliation Opinions; and is reversed to the extent it adjudicates the beneficial ownership of the Orly Trust Shares and

---

[97] *Rosenfield v. Standard Elec. Equip. Corp.*, 83 A.2d 843, 845 (Del. Ch. 1951).

[98] Such an adjudication of beneficial ownership can occur only by a court with personal jurisdiction over all indispensable parties.  The federal court in the New York litigation would be such a court.

the Genger Shares based on the determinations made in its August 9, 2010 Side
Letter Opinion and August 18, 2010 Final Judgment Order.

**EFiled: Oct 4 2011 12:39PM EDT**
**Transaction ID 40170462**
**Case No. 6906-**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| DALIA GENGER, as Trustee of the Orly Genger 1993 Trust, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. _____ |
| TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, TRANS-RESOURCES, INC. and TPR INVESTMENT ASSOCIATES, INC., | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

### VERIFIED COMPLAINT

Plaintiff Dalia Genger ("Dalia"), as Trustee of the Orly Genger 1993 Trust (the "Orly Trust"), by her undersigned attorneys, for her Verified Complaint against Defendants TR Investors, LLC ("Investors"), Glenclova Investment Co. ("Glenclova"), TR Equity I, LLC ("Equity I"), TR Equity I, LLC ("Equity II" and together with Investors, Glenclova and Equity I, "The Trump Group"), TPR Investment Associates, Inc. ("TPR") and Trans-Resources, Inc. ("Trans-Resources") alleges upon knowledge, information and belief as follows:

### NATURE OF THE ACTION

1.     On October 29, 2004, as part of a wider multi-million dollar divorce settlement agreement between Arie Genger ("Arie") and Dalia, Arie caused TPR to transfer 794.40 shares (13.99%) of Trans-Resource's stock to himself, and 1,102.80 shares (19.43%) of Trans-Resources stock to each of the 1993 Sagi and Orly Trusts.

I

2.      In reliance upon (i) Arie's representation that no consent or approval was
required for TPR to transfer the shares to her children and (ii) the representation that Arie
caused TPR to make that the shares being transferred to the Orly Trust were "free and
clear of any liens, claims or encumbrances" and that the transfer "does not violate the
certificate of Incorporation of TPR or *any agreement to which TPR is subject*" (emphasis
added), Dalia gave up valuable claims in the divorce settlement to ensure that her
children's trusts would be well funded. The Orly Trust also relied on those
representations in purchasing the Trans-Resources shares.

3.      On October 30, 2004, Trans-Resource issued a share certificate in the
name of the Orly Trust for 1,102.80 shares of Trans-Resources common stock. The share
certificate was signed by Arie, as President of Trans-Resources, and Edward Klimerman,
Assistant Secretary of Trans-Resources and outside counsel to the company.

4.      Trans-Resources delivered the Orly Trust's share certificate to Arie, who
was contractually obligated to act as the Orly Trust's proxy for voting the Trans-
Resources shares. Arie maintained possession of the Orly Trusts' original share
certificate and sent a copy of it to both Dalia and the Orly Trust.

5.      Thus, the Orly Trust is a bona fide and protected purchaser of the Trans-
Resources stock because (i) value was given for the Orly Trust's shares of Trans-
Resources stock, (ii) the Orly Trust did not have notice of any adverse claim to the shares
represented by its share certificate, and (iii) the Orly Trust obtained control of its Trans-
Resources share certificate by way of its delivery to Arie, who held the certificate on the
Orly Trust's behalf.

2

6.    Consequently, the Orly Trust seeks a declaratory judgment that it is the beneficial owner of the 1,102.80 shares of Trans-Resources stock represented by the share certificate.

## PARTIES

7.    The Plaintiff Dalia Genger ("Dalia") is the mother of Sagi Genger ("Sagi") and Orly Genger ("Orly") and the former wife of Arie Genger ("Arie"). Dalia is the trustee of the 1993 Orly Genger Trust.

8.    Defendant Trans-Resources, a privately-held Delaware Corporation, is a manufacturer and worldwide distributor of agricultural fertilizer.

9.    Defendant TPR, a Delaware corporation, is the record holder of the 1,102.80 shares that the Orly Trust purchased in 2004.

10.    Defendant Investors, a New Jersey Limited Liability Company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

11.    Defendant Glenclova, a Cayman Islands company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

12.    Defendant Equity I, a Delaware limited liability company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

13.    Defendant Equity II, a Delaware limited liability company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

3

## JURISDICTION

14.     This Court has jurisdiction over this action pursuant to 8 *Del. C.* § 111 and
10 *Del. C.* § 6501, *et. seq.*

## FACTUAL BACKGROUND

**The 2001 Stockholders Agreement**

15.     In 1985, Arie formed Trans-Resources.

16.     Until 2001, TPR held Arie's 100% stake in Trans-Resources. TPR was
owned by Arie, Dalia and their two children, Sagi and Orly. As TPR's majority (51%)
shareholder, Arie controlled Trans-Resources.

17.     Dalia, Sagi and Orly, through the Sagi and Orly Trusts (which were
established by Arie in 1993 as part of a Genger family estate plan), held a minority (49%)
interest in TPR.

18.     In 2001, Glenclova and Investors entered into an agreement with Trans-
Resources and TPR to convert their bond holdings into an equity interest in Trans-
Resources (the "Stockholders Agreement"). Under the Stockholders Agreement,
Glenclova and Investors acquired 47.15% of Trans-Resources common stock from Arie
(through TPR), thereby reducing Arie's ownership interest in Trans-Resources to 52.85%.

19.     The Stockholders Agreement restricted the transfer of Trans-Resources
stock to any persons or entities except those who were designated as "Permitted
Transferees." If a party to the Stockholders Agreement wished to transfer or sell its
shares to a non-Permitted Transferee, the selling party was required to give written notice
to the other Trans-Resources shareholders, who would have a right of first refusal. A
transfer that failed to comply with those restrictions and the prior notice requirement

4

would be deemed invalid and void, and would trigger the non-selling shareholders' right
to purchase the invalidly-transferred shares.

**The Orly Trust Receives Trans-Resources Stock, for Valuable Consideration,
Without Notice of Any Adverse Claim**

20.    After years of litigation regarding their divorce, on October 30, 2004, Arie
and Dalia executed a stipulation of settlement (the "Divorce Agreement").

21.    The Divorce Agreement equitably divided Arie and Dalia's marriage
assets and provided for certain assets to be transferred to the Sagi and Orly Trusts, assets
in which they already had an equitable stake through their minority ownership in TPR.

22.    Thus, simultaneously with the Divorce Agreement, TPR entered into an
agreement (the "Letter Agreement") with the Sagi and Orly trusts to sell, transfer and
convey 1,102.80 shares of Trans-Resources stock to each of those entities. *See* Letter
Agreement dated October 29, 2004, attached hereto as Exhibit A.

23.    Arie, as CEO of Trans-Resources, represented in the Divorce Agreement
that "[e]xcept for the Consent of TPR . . . no consent, approval or similar action of any
person is required in connection with the transfer of [Trans-Resources] Stock as
contemplated hereby . . . ."

24.    Moreover, in the Letter Agreement, which transferred the Trans-Resources
stock from TPR to the Orly Trust, Arie caused TPR to represent that "the shares are being
transferred hereunder free and clear of any liens, claims or encumbrances and such
transfer does not violate the certificate of Incorporation of TPR or any agreement to
which TPR is subject." Ex. A.

25.    Dalia relied on those representations in giving up certain claims in the
divorce so as to financially benefit her children's trusts and provide for their inheritance.

5

The Orly Trust also relied on those representations in purchasing the Trans-Resources

shares from TPR.

**Trans-Resources Delivers a Stock Certificate to the Orly Trust**

26.     On October 30, 2004, Trans-Resources issued a stock certificate to the

Orly Trust for 1,102.80 shares of its common stock.

27.     The stock certificate was signed by Arie as President of Trans-Resources,

and Edward Klimerman, as Assistant Secretary of Trans-Resources.

28.     The transfer of the Trans-Resources stock to the Orly Trust in October

2004 was registered in the books and records of Trans-Resources.

29.     Trans-Resources delivered the Orly Trust's share certificate to Arie, the

Orly Trust's proxy for voting the Trans-Resources shares.

30.     Arie maintained physical possession of the Orly Trust's stock certificate,

and forwarded a copy of the certificate to both Dalia and the Orly Trust.

**The Trump Group Exercises an Option to Purchase the Orly Trust Shares**

31.     On August 22, 2008, TPR entered into an agreement with the Trump

Group to sell the Trump Group an option to purchase the Trans-Resources shares

transferred to the Orly Trust in 2004 if a court found that the transfers of the Trans-

Resources shares were void (the "Side Letter Agreement").

32.     The Side Letter Agreement expressly provides that if a court determines

"that the Orly Genger 1993 Trust is not the record and beneficial owner of the 1,102.80

shares of Common Stock of the of the Company purportedly transferred to such Trust by

TPR in October, 2004," then Trump Group could exercise an option to purchase those

shares.

6

33.     In February 2011, the Trump Group exercised its option to purchase the

Trans-Resources stock held by the Orly Trust.

**The Supreme Court Reverses this Court's Holding Regarding Beneficial Ownership of the Shares Held in the Orly Trust**

34.     On July 18, 2011, the Delaware Supreme Court affirmed, among other

things, this Court's finding in its August 9, 2010 Side Letter Opinion (the "Side Letter

Opinion") that TPR was the record owner of the shares transferred to Arie pursuant to the

2004 Letter Agreement.

35.     The Delaware Supreme Court reversed this Court's determinations in the

Side Letter Opinion and August 18, 2010 Final Judgment Order to the extent that it

adjudicated "the beneficial ownership of the Orly Trust Shares." (Op. at 44)

36.     This action addresses one of the issues that the Delaware Supreme Court

held that this Court did not have jurisdiction to decide: the Orly Trust's beneficial

ownership of the Trans-Resources shares.

**COUNT I**
**(Declaratory Judgment that the Orly Trust is the Beneficial Owner**
**of 1,102.80 of Trans-Resources Common Stock)**

37.     Plaintiff repeats, re-alleges and incorporates by reference the allegations

set forth above in the preceding paragraphs.

38.     Based upon representations that Arie made or caused to be made that the

restrictions in the Stock Purchase Agreement did not apply or were waived, the Trustee

for the Orly Trust, Dalia (the eventual Trustee) and Orly had no knowledge, either actual

or constructive, of any current or potential adverse claim against those shares.

39.     In reliance upon those representations, Dalia provided valuable

consideration for the Trans-Resources shares that TPR transferred to the Orly Trust by

7

relinquishing significant claims in the divorce. In further reliance upon those representations, the Orly Trust purchased the 1,102.80 shares of Trans-Resources stock.

40.     The share certificate issued to the Orly Trust was signed by authorized officers of Trans-Resources.

41.     Trans-Resources delivered the Orly Trust's share certificate to Arie, who held possession of it as the Orly Trust's proxy for voting the shares. Arie delivered a copy of the share certificate to the Orly Trust and Dalia.

42.     Because the Orly Trust acquired the legal rights to the Trans-Resources shares for value, with no knowledge of any adverse claim, it is a "bona fide purchaser" or protected purchaser whose rights to the Trans-Resources shares may not be nullified by the Trump Group.

43.     The Orly Trust is entitled to a declaratory judgment that it is the beneficial owner of Trans-Resources shares that it purchased from TPR in October 2004.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an order:

a)     Declaring that the Orly Trust is the beneficial owner of the 1,102.80 Trans-Resources shares that it purchased in 2004, for all purposes;

b)     Requiring Trans-Resources to pay to the Orly Trust any dividends that have been issued on the Trans-Resources shares since the Orly Trust acquired them on October 29, 2004.

c)     Granting the Orly Trust such other and further relief as the Court deems just and proper.

8

Dated: October 4, 2011

CONNOLLY BOVE LODGE & HUTZ LLP

*/s/ Jeremy D. Anderson*

Jeremy D. Anderson (No. 4515)
The Nemours Building
1007 N. Orange Street
P. O. Box 2207
Wilmington, DE 19899
Tel: (302) 658-9141
Fax: (302) 658-5614
*Attorneys for Plaintiff*

4493617_1.DOC

9

FILED: NEW YORK COUNTY CLERK 08/03/2010
NYSCEF DOC. NO. 80

Doc 1-17   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 18
Pg 72 of 150
INDEX NO. 109749/2009
RECEIVED NYSCEF: 08/03/2010

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY
PRESENT:       HON. PAUL G. FEINMAN        PART    12
                                    J.S.C.

|  |  |
|---|---|
| Orly Genger, etc. | AMENDED DECISION & ORDER |
| | INDEX NO.   109749/09 E |
| - v - | MOT. DATE   _____ |
| Dalia Genger, et al. | MOT. SEQ. NO.   001-006 |
| | MOT. CAL. NO.   _____ |

**E-FILE**

The following papers, numbered 1 to _____ were read on this motion to/for _____

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/Petition/O.S.C. — Affidavits — Exhibits | _____ |
| Answering Affidavits — Exhibits | _____ |
| Replying Affidavits | _____ |

**CROSS-MOTION:** ☒ Yes  ☐ No

Upon the foregoing papers, it is

ORDERED that the decision and orders of this court dated June 28, 2010 and filed on July 2, 2010 which resolved motions bearing sequence numbers 001, 002, 003, 004, 005 and 006 are hereby vacated and recalled. This "gray" sheet (short-form order) and the annexed Amended Decision & Order shall be substituted in their stead as the decision & order for the motions bearing seq. nos. 001 through 006, inclusive.

So ordered,

_____
J.S.C.

Dated: 7/28/2010
        7:25 PM

_____
J.S.C.

Check one:  ☐ FINAL DISPOSITION  ☒ NON-FINAL DISPOSITION
Check if appropriate:  ☐ DO NOT POST  ☐ REFERENCE
                       ☐ PC DATE_____  ☐ CC Date_____

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: CIVIL TERM: PART 12
------------------------------------------------------------------X
ORLY GENGER, in her individual capacity and on            Index No.  109749/2009E
behalf of the Orly Genger 1993 Trust (both in its         Mot. Seq. Nos.    001 through
individual capacity and on behalf of D & K                                    006
Limited Partnership),

                        Plaintiff,

           against                                    ***AMENDED***
                                **DECISION AND ORDER**

DALIA GENGER, SAGI GENGER, D & K GP
LLC, and TPR INVESTMENT ASSOCIATES,
INC.,

                        Defendants.
------------------------------------------------------------------X

**For the Plaintiff:**
Zeichner Ellman & Krause LLP
575 Lexington Avenue
New York, NY 10022
(212) 223-0400

**For Dalia Genger:**
Pedowitz & Meister LLP
1501 Broadway
New York, NY 10036
(212) 403-7330

**For Sagi Genger:**
McLaughlin & Stern, LLP
260 Madison Avenue
New York, NY 10016
(212) 448-1100

**For D&K GP, LLC:**
Finkelstein Newman Ferrara LLP
225 Broadway
New York, NY 10007

**For TPR:**
Lyons McGovern, LLP
The Hennessy House
16 New Broadway
Sleepy Hollow, NY 10591
(914) 631-1336

       E-filed papers considered in review of this motion brought by order to show cause for a preliminary injunction, motions for summary judgment, and motion to amend:

| | Papers: | E-File Number: |
|---|---|---|
| Seq. No. 001 | Order to Show Cause & TRO, Exhibits, Memo of Law in Support | 6, 7, 7-1, 9 |
| | Affidavit & Affirmation in Opposition, Exhibits, Memo of Law | 35, 35-1 - 35-8, 36, 37 |
| | Affidavit & Affirmation in Opposition, Memo of Law, Exhibit | 38, 39, 40, 40-1 |
| Seq. No. 002 | Notice of Motion, Affirmations, Exhibits | 12, 13, 13-1 - 13-6, 18, 18-1 - 18-9 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52 |
| | Reply Memo of Law (Dalia Genger) | 61 |
| | Reply Memo of Law | 65 |
| Seq. No. 003 | Notice of Motion, Affirmation, Exhibits, Memo of Law | 15, 16, 16-1 - 16-9, 19 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 53 |
| | Memo of Law in Reply, Affirmation, Exhibit | 59, 60, 60-1 |
| | Reply Affirmation, Exhibits, Memo of Law | 62, 62-1, 64 |
| Seq. No. 004 | Notice of Motion, Affirmation, Memo of Law, Exhibits | 20, 21, 22, 22-1 - 22-8 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 54 |
| Seq. No. 005 | Notice of Motion, Affirmation, Memo of Law, Exhibits | 27, 28, 29, 29-1 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 55 |
| Seq. No. 006 | Notice of Motion, Affirmation, Exhibits | 45, 46, 46-1 - 46-7 |
| | Affirmation in Opp., Memo of Law, Exhibits | 47, 48, 48-1 - 48-2 |
| | Affirmation in Reply & Opp | 49 |

1

| | |
|---|---|
| Affirmation in Opposition | 50 |
| Memo of Law in Reply | 51 |
| Affirmation in Opposition, Memo of Law, Exhibits | 56, 57, 57-1 - 57-2 |
| Memo of Law in Reply | 58 |
| Transcript of Oral Argument | 69 |

**PAUL G. FEINMAN, J.:**

The decision and order dated June 28, 2010, and filed on July 2, 2010,  resolving the motions bearing sequence number 001 through 006, is hereby recalled and vacated and the following decision and order substituted in its stead.[1]

The motions bearing sequence numbers 001 through 006 are consolidated for the purpose of decision.

In motion sequence number 001, plaintiff moves by order to show cause for a preliminary injunction and a temporary order restraining defendants from removing from the State or otherwise disturbing shares of D&K Limited Partnership's 48 percent ownership interest in the common stock of TPR Investment Associates, until there is a judicial determination as to who owns these closely held family shares.[2]  At oral argument, the court continued the TRO pending determination of these motions.

In motion sequence numbers 002 through 005, each of the defendants originally moved to dismiss the complaint on various grounds. By interim order dated October 21, 2009, these motions were converted pursuant to CPLR 3211 ( c) to motions for summary judgment (Doc. 41,

---

[1]At oral argument held on July 28, 2010 on a related matter, the parties consented to the court's issuance of this revised decision and order without further submissions.

[2]Under the terms of the original TRO signed at the time of the signing of the Order to Show Cause, defendants and their agents are stayed from removing or disposing in any manner the shares at issue.  Plaintiff was directed to provide  an undertaking in the amount of $150,000.

2

42, 43, 44).[3]

In motion sequence number 006, plaintiff moves for leave to amend the complaint and submits a proposed amended verified complaint containing additional allegations and naming an additional defendant.

All the motions are opposed.

For the reasons set forth below, the motion for a preliminary injunction is granted; the motions by defendants for summary judgment are each granted in part and otherwise denied, and the motion to amend the complaint is granted to the extent indicated.

### *Background*

The litigants are members of a nuclear family and certain of their family-owned corporations and companies. The central issue concerns the intent behind the signing of a promissory note and pledge agreement in December 1993, executed as part of estate planning tools of the parents of plaintiff Orly Genger and her brother, Sagi Genger, one of the defendants. Plaintiff contends that the note and pledge agreement were part of an entire estate planning scheme by which plaintiff's father, Arie Genger, and plaintiff's mother Dalia Genger, planned to provide for their two children, plaintiff and defendant Sagi Genger, with the greatest amount of funding possible and with minimum tax consequences. Arie and Dalia Genger were divorced in 2004 and the gravamen of this complaint is that in the years following the divorce, plaintiff's mother and brother have deliberately not adhered to the intent behind the promissory note and pledge, and have schemed to seize control of some of the family's closely held companies. Their schemes have been to the detriment of one of the entities, the D&K Limited Partnership,

---

[3]Documents and exhibits are referred herein by their designated e-filing document number in the New York State Court's E-Filing System.

3

an entity partially owned by the Orly Genger 1993 Trust, and for the benefit of Sagi Genger and for defendant TPR Investment Associates, on which Sagi and Dalia Genger serve as the directors, and of which Sagi Genger is chief executive officer. Among the other relief sought by plaintiff is an injunction restraining further actions that would irreparably harm D&K Ltd. Partnership's ability to recover its interest in the shares originally held by it, that defendants be denied any ability to further erode the holdings of the Orly Genger 1993 Trust, and that shares already sold be returned to the ownership of the Ltd. Partnership.

Plaintiff argues, and none of the defendants dispute her, that as beneficiary of the Orly Genger 1993 Trust, she has a right to assert causes of action on behalf of the trust, citing *Velez v Feinstein*, 87 AD2d 309 (1st Dept. 1982) (where trustee has failed to enforce a claim on behalf of the trust, the beneficiary may do so). She further argues that as the Orly Genger 1993 Trust is a limited partner of D&K Ltd. Partnership, she has the right to assert causes of action on behalf of the Partnership as against TPR Investment and the other defendants, citing among other cases, *CCG Assoc. I v Riverside Assoc.*, 157 AD2d 435, 442 (1st Dept. 1990) ("[t]he right of a limited partner to bring an action on behalf of the partnership to enforce a right belonging to the partnership is beyond dispute") (Pl Memo of Law [Doc. 9:4] p. 1 n. 1).[4] Defendants' arguments in opposition are not persuasive.

According to the verified complaint (Doc. 7-1), plaintiff and her brother Sagi are individually beneficiaries of irrevocable trusts established in 1993 by their parents. Each trust was funded with a $600,000 gift. As established, the Orly Genger Trust and the Sagi Genger Trust together owned 96 percent in defendant D&K Ltd. Partnership, a family-owned limited

---

[4]Unless otherwise noted, all factual allegations are taken from plaintiff's verified complaint (Doc. 7-1).

partnership. Dalia Genger held the remaining four percent interest, and acted as the general manager. Defendant TPR Investment Associates, Inc. is a corporation founded by plaintiff's father, Arie Genger who originally was the sole shareholder, and serves as a holding company for the family's interests. Sagi Genger is presently Chief Executive Officer and a member of the board. Prior to 1993, TPR Investment held a majority interest in non-party Trans-Resources, Inc., a closely held private corporation.[5]

Around the time the two trusts were funded in 1993, D&K Ltd. Partnership purchased 240 shares of common stock, comprising 49 percent of all shares, in TPR Investment for $10,200,000. The Orly and Sagi Trusts each paid $600,000, Dalia Genger paid $50,000, and D&K Ltd. Partnership executed a promissory note dated December 21, 1993 for $8,950,000, in satisfaction of the balance (Ver. Compl. [Doc. 7-1] ¶ 16, citing attached Ex. 1 [eFile Doc. 7-1:49 *et seq.*]). The note was signed by Dalia Genger as General Partner of D&K Ltd. Partnership. The note required that D&K Ltd. Partnership repay principal and accrued interest in annual installments over a ten-year period. Both trusts, and Dalia Genger, assumed proportional liability for repayment. The note was secured with a Pledge Agreement dated December 21, 1993, signed by Dalia Genger, in which D&K Ltd. Partnership pledged its 240 TPR Investment shares as collateral for repayment of the note (Ver. Compl. [Doc. 7-1] ¶ 18) According to the September 6, 2007, testimony of Sagi Genger in the arbitration proceeding concerning his parents' divorce, the purpose of the note was "[e]ssentially an estate planning tool, to transfer wealth," with the intent to minimize taxes owed by the family members (Doc. 46-5:150-152 [S.

---

[5]Trans-Resources is the parent company of several subsidiaries that provide growers with specialty fertilizer and industrial chemicals, and is one of the two largest produces of potassium nitrate in the world (Ver. Compl. [Doc. 7-1] ¶ 12).

Genger EBT, pp. 366, 368]). As a result of the purchase by D&K Ltd. Partnership of TPR

Investment stock, the Orly and Sagi trusts each acquired 23.52 percent indirect interest in TPR

Investment, and Dalia acquired a 1.96 percent indirect interest. Arie Genger retained 51 percent

ownership.

As alleged in the complaint, each member of the family understood and agreed, in the

"desire to ensure equal wealth transfer to Sagi and Orly and with the estate-planning purposes

underlying the creation of the Trusts and D&K [Ltd. Partnership]'s purchase of the TPR shares,"

that the note and Pledge Agreement "would never be enforced by any of them" (Ver. Compl.

[Doc. 7-1] ¶ 20). Sagi Genger in particular was charged with ensuring that the promissory note

and Pledge Agreement would not be enforced and, in the first years, took "specific steps to fulfill

that charge," an example of which follows here (Ver. Compl. [Doc. 7-1] ¶ 20).

D&K Ltd. Partnership made payments on the note until 1999 and then ceased. In

November 2002, TPR Investment sent a letter to D&K Ltd. Partnership seeking payment of the

past due principal and interest (Doc. 29-1:77-78]). Sagi Genger, TPR's CEO, explained during

his testimony in the above-mentioned arbitration proceeding that this November 2002 letter was

merely "pro forma," and that there was no intent to collect on the note (Doc. 46-5:153 [S.

Genger EBT, p. 370]).

In October 2004, Dalia and Arie Genger were divorced, resulting in certain changes to

the ownership of certain family entities, memorialized in the Stipulation and Agreement of

Settlement, dated October 26, 2004 (Ver. Compl. [Doc. 7-1] ¶ 22, citing Ex. 2 [Doc. 7-1:66 *et

seq.*]). In particular, Dalia Genger received sole ownership of Arie Genger's 250 shares of TPR

Investment, the Trans-Resources shares were redistributed such that Dalia Genger owned no

shares in that company, and Arie Genger was granted a lifetime voting proxy over the family

6

Trans-Resources shares (Stipulation pp. 5, 8-14 [Doc. 7-1:71, 73-80]). The Stipulation and

Agreement of Settlement gave Sagi Genger "full and complete authority" to sell non-liquid

assets and distribute them as he saw fit, subject to his fiduciary duties to effectuate the intent of

the parties entering the Agreement (Stipulation p. 7 [Doc. 7-1:73]).   However, the net proceeds

were to be distributed so as to minimally fund a "basic escrow account" after which monies were

to go to TPR Investment "in satisfaction of the parties' indebtedness" (Stipulation p. 8 [Doc. 7-

1:74]).

Despite the changes, both the Orly and Sagi trusts continued to have equal ownership

interests in Trans-Resources shares as well as in the TPR Investment shares owned by D&K Ltd.

Partnership (Ver. Compl. [Doc. 7-1] ¶ 23).

Also on October 26, 2004, TPR Investment, Arie Genger, and Dalia Genger signed an

Assumption Agreement which acknowledged the promissory note's existence and noted that at

that juncture, approximately $9,980,000, inclusive of interest, was owed by D&K Ltd.

Partnership to TPR Investment (Doc. 22-4).

In addition, also on the same date, Sagi and Dalia Genger formed D&K GP LLC to serve

as the general partner for D&K Ltd. Partnership (Pl. Mot. 001, Ex. 5 ¶ 5 [Doc. 7-1:151]).  Under

the agreement, Dalia Genger transferred her general partnership interest in D&K Ltd.

Partnership, in exchange for a 99 percent interest in D&K GP; Sagi Genger was granted power

to select the manager.  Accordingly, D&K GP LLC now held a four percent interest in D&K Ltd.

Partnership.

Plaintiff alleges that in the years subsequent to the divorce, Dalia Genger has sought, in

collusion with her son Sagi Genger, to "destroy" her former husband financially, and their

actions have threatened to destroy plaintiff financially as well (Ver. Compl.[Doc. 7-1] ¶ 25).

Thus, when Dalia in effect ceded her control over D&K Ltd. Partnership to Sagi, the restructuring left only the two trusts liable to TPR Investment for repayment of the promissory note (Ver. Compl.[Doc. 7-1] ¶ 27).  In August 2006, Sagi Genger on behalf of TPR Investment, assigned the promissory note to David Parnes,[6] but stated in writing to Parnes that "D&K LP and its partners have a variety of claims against TPR, and deny the enforceability of the Note." (Ver. Compl. [Doc. 7-1] ¶ 47, citing Ex. 8 [Doc. 7-1:179-*et seq.*]).  In 2007, Sagi Genger allegedly stripped Dalia Genger of her majority interest in TPR Investment by selling an interest to his mother-in-law, Rochelle Fang (Ver. Compl. [Doc. 7-1] ¶ 32).  In late 2007 or early 2008, Dalia Genger divested herself of the balance of her TPR Investment shares, leaving Sagi Genger in direct control of TPR Investment and its interest in the promissory note (Ver. Compl. [Doc. 7-1] ¶ 33).  As a result, Sagi Genger in essence now wore two hats, as CEO of TPR Investment, the creditor of the note, and as manager of D&K Ltd. Partnership, the debtor on the note (Ver. Compl. [Doc. 7-1] ¶ 34).

In November 2007, Sagi Genger and Leah Fang executed an "Amended and Restated Limited Partnership Agreement of D&K Limited Partnership," permitting D&K GP to "mortgage, hypothecate, pledge, create a security interest in or lien upon, or otherwise encumber the L[imited] P[artner] TRI Interests, for the benefit of the Partnership (Doc. 46-5:218).  The document was signed by Sagi Genger, managing member of D&K GP LLC, the General Partner, and Leah Fang, as sole trustee for both the Sagi Genger 1993 Trust and the Orly Genger 1993 Trust, the Limited Partners (Doc. 46-5:223).  Plaintiff only learned of this document's existence

---

[6] Parnes is a former trustee of the Orly Genger 1993 Trust, the present trustee of the Sagi Genger 1993 Trust, an officer of TPR Investment and director of Trans-Resources (Ver. Compl. [Doc. 7-1] ¶ 46).  Parnes testified during the arbitration proceeding that the purpose of the transfer of the note to him was to prevent collection by any others (*Id.*).

8

in 2009.

In January 2008, Dalia Genger was appointed successor trustee to the Orly Genger 1993 Trust (Ver. Compl. [Doc. 7-1] ¶ 39). She succeeded several other individuals, including two long-term friends of her son's and her son's sister-in-law. As trustee, Dalia has "complete control over the assets of the Orly Trust, including its ownership interests in TPR (through D&K) and TRI" (Ver. Compl. [Doc. 7-1] ¶ 41).

In 2008, TPR Investment, through CEO Sagi Genger, reclaimed the promissory note from Parnes, and in August 2008, notified D&K Ltd. Partnership's general manager (Sagi Genger), that it was in default under the note and that if it failed to satisfy the full terms of the note, its shares would be sold at public auction (Ver. Compl. [Doc. 7-1] ¶ 52, citing Ex. 10 [Doc. 7-1:185-186]). As the payment was not made, D&K Ltd. Partnership was informed by TPR Investment that the latter would sell the former's 240 shares of common stock in TPR Investment to the highest qualified bidder on February 27, 2009 (Ver. Compl., Ex. 11 [Doc. 7-1:187-188]). Notice was not provided to either of the trusts, but was published in THE NEW YORK POST in October 2008 and again in February 2009 (Ver. Compl. [Doc. 7-1] ¶¶ 52-53, citing Ex. 12 [Doc. 7-1:189-191]).

On January 31, 2009, the general partner of D&K Ltd. Partnership, that is to say D&K GP, and the limited partners, the Sagi and Orly trusts, and TPR Investment, memorialized a document called "Meeting of Partners of D&K LP - Jan. 31, 2009 & Agreement," in which it was agreed that D&K GP could sign for the Limited Partnership and for each individual partner when making the limited partners' assets subject to a pledge (Doc. 22-4:17-18).[7] This same

---

[7]Plaintiff alleges she first learned of this agreement only when the documents were provided as part of defendants' papers submitted in their motions to dismiss (Am. Ver. Compl.[Doc. 46-4] ¶

agreement included the promise of TPR Investment that it would "refrain from enforcing the note against each limited partner for thirty days." (*Id.* [Doc. 22-4:18] ¶ 8).[8]

The note was foreclosed upon on February 27, 2009, less than the 30 days indicated in the Agreement date, and D&K Ltd. Partnership's 240 shares of TPR Investment were purchased back by TPR, decreasing the obligations of D&K Ltd. Partnership under the promissory note, and leaving a balance of approximately $8.8 million that continues to be guaranteed by the Orly and Sagi trusts (Ver. Compl. [Doc. 7-1] ¶ 57, citing Ex. 13 [Doc. 7-1:192-194]).   Plaintiff and her attorney only learned in early June 2009 that the note had been foreclosed and that the pledged shares had been sold back to the company (Ver. Compl. [Doc. 7-1] ¶ 65).  Plaintiff has made a written demand that TPR Investment return the pledged shares to D&K Ltd. Partnership, but TPR has declined to comply (Ver. Compl. [Doc. 7-1] ¶ 69, citing Ex. 20 [Doc. 7-1:225-227]).

Also in August 2008, Rochelle Fang, as trustee of the Sagi Genger 1993 Trust, and Sagi Genger, sold that trust's interest in Trans-Resources to another group (named "Trump"), which sale divested Arie Genger from control and put the company in the control of the Trump group (Ver. Compl. [Doc. 7-1] ¶ 60, citing Ex.14 [Doc. 7-1:195-207]).  The validity of this sale is under challenge in Delaware Chancery Court, although plaintiff Orly Genger has not joined in that action (Ver. Compl. [Doc. 7-1] ¶ 61).

After this purported sale of the Sagi Genger Trust's shares of Trans-Resources, plaintiff feared her trust's shares would not be protected from sale.  She requested in writing from her

---

94).

[8]The copy of the document e-filed with the court is not clear enough to discern who signed on behalf of the trusts, although presumably it was Dalia Genger, or on behalf of TPR Investment.

mother as trustee in January 2009 and again in June 2009 that the Orly Genger 1993 Trust retain all of its shares of Trans-Resources and that they not be sold, but Dalia Genger has refused to agree, or even to respond (Ver. Compl. [Doc. 7-1] ¶¶ 63, 66, citing Ex. 15, 16 [Doc. 7-1:208-215]). Plaintiff, who had brought a proceeding in Surrogate's Court to remove her mother as trustee at the time of her appointment in January 2008, an application which was denied as being premature (Ver. Compl. [Doc. 7-1] ¶¶ 39-40), brought a second application on June 22, 2009, seeking to enjoin Dalia Genger or her agents from doing anything to affect the Orly Genger 1993 Trust's Trans-Resources shares, to remove Dalia as trustee and appoint another in her stead based on breach of fiduciary duties, and for a surcharge for damages (Ver. Compl.[Doc. 7-1] ¶ 67). At this juncture, the Surrogate's Court has ordered that Dalia Genger provide at least 10 days notice before disposing of any of the trust's Trans-Resources shares (Ver. Compl.[Doc. 7-1] ¶ 68, citing Ex.19 [Doc. 7-1:222- 224]).

Plaintiff contends that Dalia Genger has failed to act in the best interests of the Orly Genger 1993 Trust, that Sagi Genger has acted in a self-dealing manner and together with Dalia Genger has undermined the estate plans that intended for both children to benefit equally from the family's wealth (Ver. Compl. [Doc. 7-1] ¶ 58). Plaintiff fears that through defendants' continued scheming, the Orly Genger 1993 Trust's one remaining asset, its ownership of the Trans-Resources shares, will also be wrongly divested (Ver. Compl. [Doc. 7-1] ¶ 59).

The verified complaint alleged 16 causes of action against the various defendants, including replevin of the shares from TPR Investment back to D&K Ltd. Partnership, and a request for a preliminary injunction.

As stated above, defendants each submitted pre-answer motions to dismiss which, after notice by the Court, have been converted to motions for summary judgment pursuant to CPLR

3211 ( c). Subsequent to the filing by defendants of their motions, plaintiff moved to amend her complaint "to address, among other things," the defendants' "scheme regarding the Orly Trust's TRI Shares," and the involvement in the scheme of Leah Fang, the proposed additional defendant (Pl. Mot. 006, Ex. D, Part 1, Proposed First Am. Ver. Compl., [Doc. 46-4] ¶ 95). The proposed first amended verified complaint contains an additional four causes of action, two against Leah Fang, and two seeking additional declaratory relief, and amends certain of the original causes of action to include the new allegations and those against Leah Fang.

### Legal Analysis

For convenience, the motion to amend will be addressed first, and then the preliminary injunction, followed by the motions to dismiss. Because the motion to amend the complaint is granted, the remainder of this decision addresses the claims as alleged in the amended complaint.

A.    Motion to Amend the Verified Complaint (Sequence Number 006)

Leave to amend pleadings is to be freely given upon terms that may be just (CPLR 3025 [b]). In addition, CPLR 3025 (a) permits any party to amend a pleading once, without court permission provided it is done under one of the following circumstances: within 20 days of the service of the original pleading; at any time before the period for responding to it has expired, or within 20 days after the service of a responsive pleading. Plaintiff proffers a proposed amended complaint to add a new defendant and new causes of action (Doc 46-4).

Contrary to defendants' arguments, case law holds that where a defendant has not answered the complaint but instead interposed a motion to dismiss, as was done here, the plaintiff may amend her complaint once as of right, because defendants, by making pre-answer motions, have extended their time to answer (*see, Johnson v Spence*, 286 AD2d 481 [2d Dept. 2001]; *STS Mgt. Dev., Inc. v New York State Dept. of Taxation & Fin.*, 254 AD2d 409 [2d Dept.

12

2001]; *Miller v General Motors Corp.*, 99 AD2d 454 [1st Dept. 1984], *aff'd* 64 NY2d 1081

[1985]). Although defendants oppose, plaintiff is entitled to serve and file her amended

complaint without review by the court, although the rulings below on defendants' motions shall

refine the scope of the proposed amended complaint and require her to file and serve a second

amended complaint. Defendants' arguments in opposition, including that there is another action

pending, can be pled as affirmative defenses. Plaintiff's motion to amend her complaint is thus

granted to the extent indicated.

B.    Motion for Preliminary Injunction (Sequence Number 001)

Among the purposes of a preliminary injunction are maintaining the status quo and

preventing irreparable injury to a party (*see, e.g., Ma v Lien*, 198 AD2d 186 [1st Dept. 1993], *lv*

*dismissed* 83 NY2d 847 [1994]). To prevail, the party seeking injunctive relief must

demonstrate a likelihood of success on the merits; that it will suffer irreparable injury if the relief

is not granted; and that the equities balance in its favor (*Aetna Ins. Co. v Capasso*, 75 NY2d 860,

862 [1990]). A preliminary injunction should generally not be granted where there are issues of

fact (*Lincoln Plaza Tenants Corp. v MDS Properties Dev. Corp.*, 169 AD2d 509 [1st Dept.

1991]; *but see Ma v Lien, supra* at 187 ["even where the facts are in dispute, the nisi prius court

can find that a plaintiff has a likelihood of success on the merits, from the evidence presented"]).

If money damages are an adequate remedy, irreparable harm does not exist and injunctive relief

should be denied (*Sterling Fifth Assoc. v Carpentille Corp., Inc.*, 5 AD3d 328, 330 [1st Dept.

2004]).

Plaintiff argues that the shares of Ltd. Partnership are unique chattel as contemplated by

CPLR 7109, and that accordingly the court should grant a preliminary injunction restraining

defendants from disposing of the shares until order of the court. She argues that the D&K Ltd.

13

Partnership shares are unique because they are shares of a closely held family company which represents an ownership in another closely held family company, TPR Investment, and that their value is dependent, at least in part, on the outcome of the family litigation currently before the Delaware Chancery Court concerning Trans-Resources (Pl. Memo of Law, 5-6 [Doc. 9:8-9]).

Under CPLR 7109, where the chattel is unique, the court may grant a preliminary injunction or temporary restraining order that it may not be transferred, sold, pledged, assigned or otherwise disposed of until the court orders (CPLR 7109 [a]). Defendants argue that the shares are in essence fungible, and that if appropriate, money damages would fully compensate plaintiff (TPR [S. Genger] Aff. in Opp. [Doc. 39] ¶ 6). Sagi Genger avers that the "TPR shares are currently not for sale and there is no intention to sell them at this time or in the near future." (S. Genger Aff. in Opp. [Doc. 35] ¶ 5). He makes no statements concerning the TRI shares. Plaintiff's argument, however, is that her parents never meant for the promissory note to be enforced, but rather that the trust funds remain intact for the two children. The recent actions taken by defendants concerning the promissory note which have negatively impacted the Orly Genger 1993 Trust, and the sale of the Trans-Resources shares belonging to the Sagi Genger 1993 Trust, possibly foretell defendants' plans to sell her trust's shares of Trans-Resources and thus she seeks court intervention to prevent further dissipation of the trust.

The granting of a preliminary injunction is a discretionary remedy (*Ross v Schenectady*, 259 App. Div. 774, 774 [3d Dept. 1940]; *Dabrinsky v Seagate Assn.*, 239 NY 321 [1925]). Here, where the family shares at issue are intertwined among various family entities, defendants have not offered sufficient evidence to show that the shares of either TPR Investment or Trans-Resources owned by the Orly Genger 1993 Trust are not "unique" and should not be protected from transfer, sale, or assignment until this litigation is ultimately decided. In addition, given

14

that defendant Sagi Genger states there is no immediate plan to sell or otherwise dispose of the
TPR Investment shares, an injunction is not likely to cause much harm to defendants. The
balance of equities therefore lies in favor of plaintiff. Accordingly, the motion for a preliminary
injunction is granted.

### _Motions for Summary Judgment_

The proponent of a summary judgment motion must make a prima facie showing of
entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any
material issues of fact from the case (_Winegrad v New York Univ. Med. Ctr._, 64 NY2d 851, 853
[1985]). Evidentiary proof must be submitted in admissible form (_Zuckerman v City of N.Y._, 49
NY2d 557, 562 [1980]). Parties in opposition must submit "evidentiary facts or materials, by
affidavit or otherwise ... demonstrating the existence of a triable issue of ultimate fact."
(_Tortorello v Carlin_, 260 AD2d 201, 204 [1ˢᵗ Dept. 1999]). "Issue finding and not issue
resolving" is the proper role of the court in deciding such motions (_Winegrad, supra_, at 853).
Regardless of the sufficiency of the opposing papers, in the absence of admissible evidence
sufficient to preclude any material issue of fact, summary judgment is unavailable (_Alvarez v
Prospect Hosp._, 68 NY2d 320, 324 [1986]).

None of the converted motions for summary judgment contains first-person affidavits,
and all rely upon documentary evidence and the pleadings for the bases of their motions.
Although plaintiff objects to the lack of first-person affidavits, the converted motions are
nonetheless considered by the court and decided on their merits.

Plaintiff argues that all of the motions should be preemptively denied based on the
doctrines of issue preclusion and judicial estoppel, pointing to the testimony and evidence
presented at the arbitration which resulted in the May 6, 2008, award entitled _Dalia Genger v_

*Arie Genger*, Case No. 13 170 Y 00996 07 (American Arbitration Assn., Commercial Arbitration Tribunal, NYC). (Doc. 46-5:131 *et seq.*]). The doctrine of issue preclusion serves to bar a party from "relitigating in a subsequent action or proceeding an issue that was raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same" (*Ryan v New York Tel. Co.*, 62 NY2d 494, 500 [1984]; *see also, Parker v Blauvelt Volunteer Fire Co.*, 93 NY2d 343, 349 [1999]). The doctrine of judicial estoppel prohibits a party that has assumed a certain position in a prior legal proceeding and secured a judgment in its favor, from assuming a contrary position in another action simply because the party's interests have changed (*City of N.Y. v College Point Sports Assn., Inc.*, 61 AD3d 33, 44 n. 1 [2d Dept. 2009], citations omitted). Notably, of course, the arbitration concerned issues arising from the divorce of plaintiff's parents, and determined, among other questions, that the promissory note could not be enforced by either parent as against each other. This is not the issue raised by plaintiff in her litigation. Additionally, because the testimony by Sagi Genger, Dalia Genger, and others in that arbitration was offered to answer the questions of whether the note was enforceable, and its value, *as between the former husband and wife*, the witnesses and parties did not address the value or enforceability of the note *as between the children* of Arie and Dalia Genger, *or the family owned companies*. Thus, the testimony adduced in the arbitration may well be admissible in this action, but there is no collateral estoppel effect.

C.  Dalia Genger's Motion for Summary Judgment (Sequence Number, 002)

The first amended verified complaint alleges three causes of action against Dalia Genger: breach of fiduciary duty (1st cause of action), fraud (5th cause of action), and conspiracy to commit fraud (8th cause of action).

16

As argued by defendant, the claim of breach of fiduciary duty is also at issue in a

proceeding currently before the Surrogate's Court entitled *In the Matter of the Application of*

*Orly Genger, as a person interested, for the removal of Dalia Genger as Trustee of the Orly*

*Genger 1993 Trust pursuant to SCPA § 711 (1)*, File No. 17/2008 (Surrogate's Court NY

County). Plaintiff does not address this argument. Accordingly, in the interest of judicial

economy, the branch of defendant's motion seeking summary judgment and dismissal as to the

complaint's 1ˢᵗ cause of action, is granted, on the ground that the same claim is pending in

another court proceeding (CPLR 3211 [a] [4]).

The 5ᵗʰ Cause of Action sounds in fraud, while the 8ᵗʰ Cause of Action alleges conspiracy

to commit fraud among the four defendants. As an initial matter, it is well established that "a

mere conspiracy to commit a fraud is never of itself a cause of action," although allegations of

conspiracy are permitted to connect the actions of separate defendants with an otherwise

actionable tort (*Alexander & Alexander of N.Y. Inc. v Fritzen*, 68 NY2d 968, 969 [1986] [citation

omitted]). As explained in *Brackett v Griswold*, "[t]he allegation that there was a conspiracy to

commit the fraud does not effect the substantial ground of action," and "[t]he *gravamen* is fraud

and damage, and not the conspiracy." (112 NY 454, 466-467 [1889]). "The allegation and proof

of a conspiracy in an action of this character is only important to connect a defendant with the

transaction and to charge him [*sic*] with the acts and declarations of his [*sic*] co-conspirators,

where otherwise he [*sic*] could not have been implicated." (*Id.*). Accordingly, the 8ᵗʰ cause of

action is dismissed as against this defendant, and the others.

To state a claim for fraud, plaintiff must allege "a material misrepresentation of a fact,

knowledge of its falsity, an intent to induce reliance, justifiable reliance . . . and damages"

(*Eurycleia Partners, LP v Seward & Kissel, LLP*, 12 NY3d 553, 559 [2009]). In addition, under

17

CPLR 3016 (b), the circumstances constituting the wrong must be stated in detail.

Defendant Dalia Genger argues that plaintiff's claims are unspecific and general in nature. In particular, she argues that there is no allegation of the manner in which plaintiff relied on any of her statements, or in what manner she, defendant, could have prevented the enforcement of the promissory note and the foreclosure sale. Although plaintiff argues in opposition that Dalia Genger made many statements over the years, including sworn statements, affirming that all interested parties to the note had agreed that TPR Investment would never seek to enforce the promissory note (Am. Ver. Compl. [Doc. 46-4] ¶¶ 62, 145-147), none of defendant's statements *explicitly* make this assertion other than in the context of the divorce proceedings. However, plaintiff also argues that even after she requested that her mother, as trustee, not encumber the remaining assets of the trust, her mother signed the January 2009 Meeting Agreement which gave power to D&K GP - the company controlled by Dalia and Sagi Genger - to pledge the Orly Genger 1993 Trust's shares of Trans-Resources as security for the promissory note, and which indemnified Sagi Genger, among others. There are also the transactions over the years that apparently have given Sagi Genger, and Dalia Genger, potential control over family assets in a way that has harmed plaintiff's share.

When claiming that the defendants together acted to commit a fraud, the plaintiff need not allege and prove that each defendant committed every element of fraud but only facts which support an inference that the defendants knowingly agreed to cooperate in a fraudulent scheme (*Snyder v Puente De Brooklyn Realty Corp*, 297 AD2d 432, 435 [3d Dept.2002], *lv denied*, 99 NY2d 506 [2003]; *LeFebre v New York Life Ins. & Ann. Corp.*, 214 AD2d 911, 912 [3d Dept. 1995]). Plaintiff alleges that the various defendants together committed fraud by, for example, creating the conditions that resulted in the "sham sale" of the TPR Investment assets owed by

18

D&K Ltd. Partnership, and agreeing in the January 2009 Meeting Agreement to give power to D&K GP, the company controlled by Dalia and Sagi, to pledge the Orly Trust's shares of Trans-Resources as security for the promissory note (Am. Ver. Compl. [Doc. 46-4] ¶¶ 76-68, 151). Plaintiff asked repeatedly for information about her trust, but because defendant has not been forthcoming nor kept her informed, she did not know that there was any need to attempt to protect the assets of her trust.

The evidence and arguments provided by both parties show that there is a question of fact as to whether Dalia Genger acted with intent to commit fraud against plaintiff's trust, and to lull plaintiff into a false sense of security as to the status of her trust. Accordingly, the branch of defendant's motion to dismiss the 5th cause of action is denied.

D.    Sagi Genger's Motion for Partial Summary Judgment (Sequence Number 003)

Defendant Sagi Genger seeks summary judgment and dismissal of the 6th, 7th, 8th, and 16th causes of action.[9]

The 6th cause of action sounds in fraud. The elements of fraud are set out above in the discussion of Dalia Genger's motion. The complaint focuses on the statements made by defendant in particular during the 2007 - 2008 arbitration proceeding, which helped form the basis for the arbitrator's decision that the parties never intended for the note to be collected and that it was not an asset to be valued, statements of which the plaintiff was aware and which caused her to believe that her trust fund was secure and that no one would enforce the note.

The 7th cause of action alleges aiding and abetting fraud. The elements of aiding and abetting fraud are that there exists a fraud, the defendant knew of the fraud, and the defendant

---

[9]He does not seek summary judgment as to the 2nd, 3rd, or 4th causes of action, in which he is also named.

provided substantial assistance to advance the fraud's commission (*M&T Bank Corp. v*

*Gemstone CDO VII, Ltd.*, 23 Misc. 3d 1105A; 881 NYS2d 364, 2009 NY Slip Op 50590(U)

{Sup. Ct., Erie County 2009], *aff'd in part, mod in part*, 68 AD3d 1747 [4th Dept. 2009],

quotation and citation omitted). The complaint contends that defendant and D&K GP knowingly

assisted in the "sham sale" of the D&K Ltd. Partnership shares, failed to notify the Partnership

members of the foreclosure and sale, the sale of which harmed the Orly Trust, and entered into

the Meeting Agreement which now allows defendant and D&K GP to pledge or encumber the

Trans-Resources shares owned by the Orly Genger 1993 Trust.

Defendant argues that summary judgment is appropriate based on the documentary

evidence. He contends that prior to this litigation, plaintiff never claimed that the note or pledge

agreement were invalid. Among the evidence he points to in arguing the note's enforceability, is

testimony of Arie Genger acknowledging that payments were made by D&K Ltd. Partnership on

the promissory note (Doc. 16-4:3-4]) , the Assumption Agreement signed by Dalia, Arie, and

Sagi Genger on October 25, 2004, acknowledging the nearly $10,000,000 due under the note

(Doc. 16-6]), the November 19, 2008 letter from plaintiff's counsel to the Surrogate, stating in

part that "D&K [Ltd. Partnership] is indebted on a multi-million dollar note to TPR, which is

secured by D&K's 49% stock interest, and which has not been serviced for years" (Doc. 16-8]),

and a document signed by plaintiff dated December 27, 2007, in which she states that the trust

"is indebted in the amount of approximately $4.5 million" (Doc. 16-9]).

Defendant also argues that the statute of frauds bars plaintiff's 6th and 7th causes of action

because plaintiff claims that the promissory note has been orally modified. General Obligations

Law § 5-701 requires that agreements which by their terms are not to be performed within one

year, or which are promises to answer for the debt or default of another person, must be in

writing and subscribed by the party to be charged therewith (GOL § 5-7-1 [a] [1]-[2]). The parol

evidence rule of the General Obligations Law provides that where a written agreement contains

a provision stating that it cannot be changed orally, then such a document cannot be changed by

executory agreement unless it is in writing, signed by the party against whom enforcement of the

change is sought (GOL § 15-301 [1]). Thus, defendant argues that plaintiff cannot claim that the

parties legally agreed, orally, that the note would not be enforceable.

Defendant's arguments are unpersuasive. Courts have also found, specifically in regard

to promissory notes, that when parties contest whether a notice is enforceable, there is an issue

of fact that survives summary judgment and the statute of frauds will not prevent the court's

examination of parol evidence on the issue. For example, in *Greenleaf v Lachman*, the Court

examined a promissory note allegedly executed so as to avoid negative income tax treatment,

and found an exception to the parol evidence rule in order to allow admission of parol evidence,

not to vary the terms of the writing, but to show that a "writing, although purporting to be a

contract, is, in fact, no contract at all." (216 AD2d 65, 66 [1st Dept.1995], *lv denied* 88 NY2d 802

[1996]). Similarly, in *Dayan v Yurkowski*, the Court denied summary judgment and held that

the defendant's parol evidence should be considered to show that the note, while valid on its

face, was not intended to take effect (238 AD2d 541 [2d Dept. 1997]; *see also, Paolangeli v*

*Cowles*, 208 AD2d 1174, 1175 [3d Dept. 1994]).

Here, where plaintiff and all the defendants copiously cite to factual support, a material

issue of fact exists regarding the intention of the note's enforceability. While the documents

speak for themselves, plaintiff raises material questions of fact concerning the actual intent

behind the promissory note. She argues that the promissory note's purpose was to facilitate the

estate planning of Arie Genger and the transfer of funds between the family members with

21

lessened tax consequences. Indeed, it is curious that interest payments were made by the
Partnership for several years and then ceased, and that Sagi Genger testified that TPR
Investment's 2002 notice was "pro forma" and not meant as an actual request that payment be
made. It could be found that enforcement of the note's terms was only made after Sagi Genger
allegedly came into control of both TPR Investment and D&K Ltd. Partnership. Given the
testimonial evidence in particular, there is a question of fact as to whether the promissory note
was intended to be an enforceable agreement, and it would be premature to apply a Statute of
Frauds analysis to the cause of action. In addition, as plaintiff has established that there are
questions of fact as to whether defendant acted with intent to defraud plaintiff and D&K Ltd.
Partnership and provided substantial assistance to D&K GP in particular to advance the fraud's
commission, the branch of the motion seeking summary judgment and dismissal of the 6th and 7th
causes of action is denied.

The 8th cause of action alleges conspiracy to commit fraud. For the same reasons set
forth above in discussing Dalia Genger's motion, this branch of defendant's motion is granted.

The 16th cause of action alleges promissory estoppel. This is an equitable cause of action
and must allege "a clear and unambiguous promise by defendants upon which [the plaintiff]
reasonably and foreseeably relied to [plaintiff's] detriment." (*401 Hotel, L.P. v MTI/The Image
Group, Inc.*, 251 AD2d 125, 126 [1st Dept. 1998]). Here, plaintiff alleges that it was the promise
and intent of Arie Genger and the family as a whole, that the promissory note was not to be
enforced, so as to preserve the trust accounts, and that she relied on that promise these many
years only to learn that one of the main assets of her trust account had been sold in violation of
the promise. Defendant argues not only that the documents state otherwise, but that plaintiff
may not assert promissory estoppel in order to avoid the affirmative defense of the statute of

22

frauds, citing *Cohen v Brown, Harris, Stevens, Inc.*, 64 NY2d 728 (1984), and *Lowinger v Lowinger*, 287 AD2d 39, 45 (1st Dept. 2001), *lv denied* 98 NY2d 605 (2002).

While the assertion of the statute of frauds is often sufficient to cause a dismissal of a claim of promissory estoppel, exceptions include where "the circumstances are such as to render it unconscionable to deny" the promise upon which the plaintiff has relied (*see, Philo Smith & Co. v. USLIFE Corp.*, 554 F.2d 34, 36 [2d Cir. [NY] 1977]). Here, where there are questions of fact as to whether defendants intentionally breached the family agreement concerning the entirety of the estate planning and unconscionably caused plaintiff to lose a significant amount of her trust funds to their benefit, with the possibility of losing all of the funds, defendant has not established entitlement to summary judgment and dismissal of the claim of promissory estoppel notwithstanding his defense of the statute of frauds (*see, Swerdloff v Mobil Oil Corp.*, 74 AD2d 258, 261 [2d Dept.], *lv denied* 50 NY2d 913 [1980]). Accordingly, defendant's motion for summary judgment and dismissal of the 16th cause of action is denied.

E.    D&K GP's Motion for Partial Summary Judgment (Sequence Number 004)

Defendant D&K GP seeks summary judgment and dismissal of "all" the causes of action of the complaint as against it, but its motion papers specifically addresses only the 4th, 6th, 7th, and 8th causes of action.[10]

As an initial issue, D&K GP argues that plaintiff, "in her capacity as beneficiary under the Orly Trust and in the Orly Trust's capacity as limited partner in D&K LP, agreed not to bring an action against D&K GP." (Lyons [D&K GP] Aff. [Doc. 21] ¶ 5). Specifically, defendant points to the "Amended and Restated Limited Partnership Agreement of D&K Limited

---

[10]D&K GP did not seek summary judgment as against the 2nd or 3rd causes of action, in which it is also named as a defendant.

23

Partnership," in which Leah Fang as trustee for both the Orly and Sagi trusts, agreed that the trusts expressly waived their right to bring an action against D&K GP, the General Partner; Sagi Genger signed on behalf of D&K GP (Doc. 22-8). Accordingly, D&K GP argues that summary judgment and dismissal of the claims against it should be dismissed in their entirety. However, this agreement provides that its partners, which include the Orly Genger 1993 Trust, may sue for "fraud, bad faith, or willful misconduct." (Doc. 22-8:5). Plaintiff alleges that there has been bad faith and fraud by various family entities as concerns the enforcement of the promissory note, and including various documents signed on behalf of the Genger trusts, as well as D&K Ltd. Partnership. At the very least, there appear to be irregularities. Summary judgment and dismissal on this ground is not appropriate.

The 4th cause of action, brought by the Orly Genger 1993 Trust and D&K Ltd. Partnership against both defendant D&K GP and Sagi Genger, claims defendants prevented the Ltd. Partnership from honoring its obligations under the note, and that it tortiously interfered with the contract.

Tortious interference with contractual relations consists of four elements: a contract between plaintiff and a third party; the defendant's knowledge of the contract; the defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and resulting damages to plaintiff (*Kronos, Inc. v AVX Corp.*, 81 NY2d 90, 94 [1993], citation omitted). Defendant argues that, as the general partner to D&K Ltd. Partnership, it is a party to the contract at issue, that it, too, has also been injured by the nonpayment and resulting foreclosure, and that a party to a contract cannot tortiously interfere with the contract (Def. Memo of Law § IV [Doc. 22:12]). Plaintiff argues that according to Sagi Genger's testimony during the arbitration proceeding, Dalia Genger had repaid her four percent interest in the

24

promissory note, and that therefore D&K GP was not a party to the agreement.

Here, the contract is the promissory note between D&K Ltd. Partnership and TPR Investment. Defendant D&K GP knew of the contract, but was also the general partner of the Limited Partnership from 2004 onward, and thus is understood to be a party to the contract. This is because the management of the property and the business of the partnership are vested exclusively in the general partners (*Durant v Abendroth*, 97 NY 132, 144 [1884]). By law, a general partner in a limited partnership is subject to all the restrictions and liabilities of a partner in a partnership without limited partners, although it may not undertake certain actions without the written consent of the limited partners, as defined in the statute (Limited Partnerships § 98). Thus, plaintiff's argument that Dalia Genger had repaid the interest she owed on the promissory note, does not divest defendant of its rights and duties as general partner. Accordingly, as it was the general partner of D&K Ltd. Partnership, no claim of tortious interference with the contract may lie. Summary judgment and dismissal of the 4th cause of action against defendant is granted.

The 6th and 7th causes of action are fraud, and aiding and abetting fraud. The elements of both causes of action have been previously set forth. There are questions of material fact as to whether defendant engaged in fraud and in aiding and abetting fraud, and accordingly the branch of defendant's motion for summary dismissal of these two causes of action is denied.

The branch of the motion to dismiss the 8th cause of action, claiming conspiracy to commit fraud, is granted, for the reasons stated previously as concerns the other defendants.

F.    TPR's Motion for Summary Judgment (motion sequence no. 005)

Defendant TPR moves for summary judgment and dismissal of the 8th, 9th, 10th, 11th, 12th, 13th, 14th, 15th, and 16th causes of action as against it. In sum, it argues that the documentary evidence establishes that there are no material questions of fact that would preclude a grant of

25

summary judgment and dismissal of the complaint as against it.

The branch of the motion to dismiss the 8th cause of action, alleging conspiracy to commit fraud, is granted for the reasons set forth above concerning the other defendants.

The 9th cause of action seeks declaratory relief and damages pursuant to NY UCC §§ 9-627, 610, and 611-614, as concerns the notice of foreclosure and the sale. UCC § 9-610 provides that every aspect of the disposition of collateral after a default must be commercially reasonable. UCC § 9-611 ( c) (2) provides that before the disposition of collateral, the secured party shall send an authenticated notification of disposition to "any secondary obligor." UCC § 9-612 (b) provides that for a non-consumer transaction, 10 days is sufficient notice before the disposition. UCC § 9-613 (a) (4) requires that for the notification of disposition to be sufficient, it must include a statement that the debtor is entitled to an accounting of the unpaid indebtedness and the charge, if any, for an accounting. UCC § 9-613 (a) (5) requires that for the notification of disposition to be sufficient, it must state the time and place of the public disposition or the time after which any other disposition is to be made. UCC § 9-627 provides that simply because a greater amount could have been obtained is not in itself sufficient to preclude the secured party from establishing that the disposition was made in a commercially reasonable manner, and describes what are commercially reasonable dispositions.

The complaint alleges that TPR Investment failed to properly notify the Orly Genger 1993 Trust or Orly Genger of the sale of the shares of TPR owed by D&K Ltd. Partnership, and that the notice of August 31, 2008 failed to state that D&K Ltd. Partnership is entitled to an accounting of its unpaid indebtedness, or to provide the time and place of the disposition of the collateral. In addition, the $2,200,000 sale price was only a "fraction" of the original $10,200,000 purchase price, and failed to take into consideration certain potential monies

26

received from the sale of TRI shares to the Trump group.

Defendant TPR Investment argues that it fully complied with the UCC requirements when noticing the default and conducting the foreclosure sale. In addition, it argues that even if it could be found that plaintiff never received notice of the default and sale, she has not alleged that she suffered repressible damages, as she makes only a generalized statement that the shares sold for a fraction of their original purchase price (Def. Memo of Law [Doc.29] p. 8, citing Ver. Compl. [Doc. 7-1] ¶ 146]). It also argues that plaintiff does not offer any evidence as to what the fair market value of the TPR Investment shares might have been and, as stated explicitly in the statute, an enforcement will not be found commercially unviable simply because a greater amount could have been obtained (UCC § 9-627 [a]).

An examination of the notice shows that certain of the complaint's allegations have no merit but that others are meritorious (Def. Memo of Law [Doc. 29] p. 7, citing Ex. K [Doc. 29-1:136]). The notice is not addressed to either of the limited partners, the Orly or Sagi Genger trusts, who as guarantors, are secondary obligors, and there is no proof of service provided by defendant establishing notification. The notice indicates that the date of the sale was February 27, 2009, but does not indicate the date of the notice itself, meaning that defendant has not established that the 10-day rule was adhered to. Furthermore, given that the January 31, 2009, Meeting Agreement stated in paragraph 8 that TPR would wait 30 days until selling the shares, it appears that the sale on February 27, 2009 was premature in any event (see Doc. 22-4:17-18]). As for the claimed violation of UCC § 9-627, there remain questions of fact as to whether the sale was itself conducted in a commercially reasonable manner as set forth in the statute, whether or not the shares were sold at a value far lesser value than their worth. However, the notice clearly indicates the date, time, and location of the sale, and also that D&K Ltd.

27

Partnership is entitled to an accounting and includes the telephone number to call. Accordingly, the branch of defendant's motion seeking summary judgment and dismissal of the 9th cause of action is granted solely to the extent that the claims seeking declarations of violations of UCC § 9-613 (a) (4) and (a) (5), are dismissed. The remainder of the 9th cause of action remains.

The 10th cause of action alleges conversion and seeks replevin, and the 11th cause of action seeks a judgment declaring that D&K Ltd. Partnership has a superior right to possess chattel under CPLR 7101. Conversion is when a person, without authority, intentionally exercises control over the property of another person and interferes with the other person's right of possession (*see, Sporn v MCA Records Inc.*, 58 NY2d 482, 487 [1983]). Replevin, under Article 71 of the CPLR, is a remedy ancillary to an action to recover a chattel (*see Sears Roebuck & Co. v Austin*, 60 Misc. 2d 908, 908 [Civ. Ct., NY County 1969]). Defendant argues that plaintiff does not adequately plead the elements of conversion and thus cannot establish that replevin is appropriate, nor does she show that she is entitled in the 11th cause of action to a declaration that she has a superior right to that of defendant's in the TPR Investment shares. It argues that plaintiff does not establish that its assuming ownership rights to the shares was unauthorized, nor does she show that D&K Ltd. Partnership or any other entity had a superior right.

The claim of conversion and replevin, and the declaration as to whose right is superior, go to the heart of plaintiff's complaint. Because, as set forth in the discussion above, there are disputed questions of fact as to the intent of the promissory note and Pledge Agreement and whether enforcement of them was ever contemplated, there can be no summary determination as to who is entitled to the shares and no declaratory relief granted at this time. Accordingly, the branches of defendant's motion for summary dismissal of the 10th and 11th causes of action are

28

denied.

The 12th cause of action seeks a preliminary injunction to enjoin TPR Investment from in any matter disposing of the TPR shares pending a final determination of the declaratory judgment branch of the complaint. This cause of action is redundant of the motion separately brought by plaintiff and opposed by defendants on grounds similar to those articulated by defendant in its motion for summary judgment. As the plaintiff's motion for a preliminary injunction has been granted as set forth above, summary judgment and dismissal of this cause of action is granted. Of course, if what plaintiff is seeking is a permanent injunction, the cause of action would have to be repleaded.

The 13th cause of action seeks a constructive trust on behalf of D&K Ltd. Partnership. In equity, a constructive trust may be imposed when the movant establishes that there is a confidential or fiduciary relationship, a promise, a transfer in reliance thereon, and unjust enrichment (*Sharp v Kosmalski*, 40 NY2d 119, 121 [1976], citations omitted). Defendant argues that there is no relationship between it and plaintiff, perhaps overlooking that this claim is brought on behalf of D&K Ltd. Partnership, a minority shareholder of TPR Investment. It is disputed as to whether TPR Investment owed a fiduciary duty of care to minority shareholder D&K Ltd. Partnership (*see Alpert v 28 Williams St. Corp.*, 63 NY2d 557, 568 [1984] [fiduciary duty of majority to minority shareholders; *Salm v Feldstein*, 20 AD3d 469 [2d Dept. 2005] [fiduciary duty of managing member of company and co-member to plaintiff]). The parties dispute, of course, whether defendant was among the entities promising that the promissory note would never be enforced. Defendant argues that there was no transfer in reliance, however plaintiff sufficiently argues that D&K Ltd. Partnership pledged its shares of TPR in reliance of the promise that the note would be not enforced, citing *Lester v Zimmer*, 147 AD2d 340, 341-

29

342 (3d Dept. 1989), which notes that the elements of a constructive trust are "flexible," and the "transfer" should be interpreted broadly.  Whether defendant was unjustly enriched is a matter to be determined at trial.  Accordingly, as there are questions of fact, summary judgment is denied as to the 13th cause of action.

The 14th and 15th causes of action, brought on behalf of the Orly Genger 1993 Trust, allege constructive and actual fraudulent conveyance under New York Debtor & Creditor Law §§ 273, 276, and 277. Section 273 of the Debtor and Creditor Law provides that "every conveyance made . . . by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." Section 276 of the Debtor & Creditor Law provides that a conveyance is actually fraudulent if it was made with actual intent "to hinder, delay, or defraud either present or future creditors."  Section 277 provides that a conveyance of partnership property made either when the partnership is insolvent or will be rendered insolvent by the conveyance, is fraudulent as to partnership creditors if the conveyance is made (a) to a partner even if there is a promise by the partner to pay partnership debts, or (b) to a non-partner without fair consideration to the partnership.

None of these statutes apply to the facts here, and defendant's motion for summary judgment and dismissal of the two causes of action must be granted based on failure to state a cause of action.  In New York, only creditors may maintain actions for fraudulent conveyance (*Geren v Quantum Chemical Corp.*, 99 F3d 401, 1995 WL 737512, **2  [2d Cir. [NY] 1995], citing *Pappa Bros. v Thompson*, 214 NYS2d 13, 15 [Sup. Ct. Nassau County, 1961]).  Although plaintiff argues that the Orly Genger 1993 Trust is a creditor, she is misapplying the statute.  A creditor is defined as an entity "having any claim, whether matured or unmatured, liquidated or

30

unliquidated, absolute, fixed or contingent." (Debtors & Creditors Law § 270). The complaint
alleges that certain of the assets of the trust were wrongly conveyed to defendant by the actions
of Sagi Genger. However, to establish a constructive fraudulent conveyance, plaintiff must
demonstrate: (1) that there was a conveyance; (2) that the defendant would become insolvent as
a result of the conveyance; and (3) there was no fair consideration for the conveyance (see,
*United States v Sweeney*, 418 F. Supp. 2d 492, 498 [SDNY 2006], citation omitted). To establish
intentional fraudulent conveyance, plaintiff must show in addition that there was actual intent "to
hinder, delay, or defraud . . . creditors" (*Sweeney*, at 498).   Not only does plaintiff not establish
that she is a creditor who has a claim, but she does not allege that *defendant* became insolvent
because of the conveyance of the TPR shares. Furthermore, she offers nothing more than the
statement that the shares were bought by TPR Investment for a "fraction" of their original value,
to establish that there was no fair consideration. Her reliance on Debtor and Creditor Law § 277
is also misplaced, based on the facts alleged in the pleadings. Accordingly, the 14th and 15th
causes of action are dismissed on summary judgment.

The 16th cause of action alleges promissory estoppel on behalf of D&K Ltd. Partnership.
Defendant's motion for summary dismissal of this cause of action is denied for the same reasons
set forth in the discussion of the branch of Sagi Genger's motion for summary judgment and
dismissal of this cause of action.

Therefore,

As to Motion Sequence Number 001, due deliberation having been had, and it appearing
to this Court that a cause of action exists in favor of the plaintiff and against the defendants and
that the plaintiff is entitled to a preliminary injunction on the ground that the subject of the
action is unique and that the defendants threaten to do an act in violation of the plaintiff's rights

31

respecting the subject of the action, tending to render the judgment ineffectual, as set forth in the aforesaid decision, it is

ORDERED that the undertaking is continued in the sum of $150,000.00, conditioned that the plaintiff, if it is finally determined that she was not entitled to an injunction, will pay to the defendants all damages and costs which may be sustained by reason of this injunction; and it is further

ORDERED that defendants, their agents, servants, employees and all other persons acting under the jurisdiction, supervision and/or direction of defendants, are enjoined and restrained, during the pendency of this action, from doing or suffering to be done, directly or through any attorney, agent, servant, employee or other person under the supervision or control of defendant or otherwise, any of the following acts: removing the Shares from the state, or otherwise transferring, selling, pledging, assigning, or otherwise disposing of the Shares; and it is further

ORDERED that as to Motion Sequence Number 002, the motion for summary judgment by Dalia Genger is granted only to the extent of dismissing the 1st and 8th causes of action as against her in the first amended verified complaint, and is otherwise denied; and it is further

ORDERED that as to Motion Sequence Number 003, the motion for partial summary judgment by Sagi Genger is granted only to the extent of dismissing the 8th cause of action as against him in the first amended verified complaint, and is otherwise denied; and it is further

ORDERED that as to Motion Sequence Number 004, the motion for partial summary judgment by D&K GP is granted only to the extent of dismissing the 4th and 8th causes of action against it in the first amended verified complaint, and is otherwise denied, and it is further

ORDERED that as to Motion Sequence Number 005, the motion for summary judgment

32

by TPR Investment Associates, Inc., is granted only to the extent of dismissing the 8th, 12th, 14th, and 15th causes of action in their entirety as against this defendant, and as to the 9th cause of action, dismissing the claims alleging violations of UCC § 9-613 (a) (4) and (a) (5); and the motion is otherwise denied; and it is further

ORDERED that as to Motion Sequence Number 006, the motion to amend the complaint is granted to the extent set forth above; plaintiff shall e-file and serve a second amended complaint incorporating the limitations set forth herein, and serve it on all parties who shall then serve their answers in accordance with the CPLR; and it is further

ORDERED that the parties shall appear for a preliminary conference in Supreme Court, 60 Centre Street, room 212, on September 15, 2010, at 2:15 p.m.

This constitutes the decision and order of the court.

Dated: July 28, 2010
New York, New York

_____
J.S.C.

## SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: _____JAFFE_____          *Amended Decision*
                              *Justice*                    PART _12_

_____Genger_____                    INDEX NO. _651089/2010_

- v -                                    MOTION DATE _____

_____Genger_____                    MOTION SEQ. NO. _006_

                                         MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|                                                                              | PAPERS NUMBERED |
|------------------------------------------------------------------------------|-----------------|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ...             | 1,2,3,          |
| Answering Affidavits — Exhibits _____                                       | 4,5             |
| Replying Affidavits _____                                                   | 6               |

**Cross-Motion:** ☐ Yes ☐ No

Upon the foregoing papers, it is ordered that this motion   *is resolved by the annexed Decision and order*

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):

Dated: _1/2/13_                          _____ J.S.C.

Check one: ☐ FINAL DISPOSITION          ☑ NON-FINAL DISPOSITION

Check if appropriate: ☐ DO NOT POST          ☐ REFERENCE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : PART 12

------------------------------------------------------------------------x

ARIE GENGER and ORLY GENGER, in her individual
capacity and on behalf of THE ORLY GENGER 1993
TRUST,

Index No. 651089/2010

                                 Plaintiffs,

Argued:             3/13/12
Mot. seq. nos.:     006-007,
                     009-011, 015

        -against-

**AMENDED DECISION
AND ORDER**

SAGI GENGER, TPR INVESTMENT ASSOCIATES,
INC., DALIA GENGER, THE SAGI GENGER 1993
TRUST, ROCHELLE FANG, individually and as trustee
of THE SAGI GENGER 1993 TRUST, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC,
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC,
JULES TRUMP, EDDIE TRUMP and MARK HIRSCH,

                              Defendants.

------------------------------------------------------------------------x

BARBARA JAFFE, JSC:

By notices of motion dated October 14, 2011, defendants move pursuant to CPLR 3211

for an order dismissing various causes of action asserted in the third amended and supplemental

complaint of Arie Genger and his daughter Orly Genger, in her individual capacity and on behalf

of the Orly Genger 1993 Trust (complaint). By order to show cause dated September 13, 2012,

defendants Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, New

TR Equity II, LLC, Jules Trump, Eddie Trump, and Mark Hirsch (Trump Group) move pursuant

to CPLR 2214(c) for an order permitting them to supplement the record of its motion (sequence

15) with a recent decision of the Delaware Chancery Court. On or about October 17, 2012, I was

assigned to Part 12 where this action pends.

In his complaint, Arie advances 10 causes of action including, as pertinent here, a

declaratory judgment authorizing him to reform the divorce settlement stipulation between him

and his ex-wife, Dalia Genger, the mother of Orly and Sagi Genger and trustee of the Orly Trust;

constructive trust; breach of fiduciary duty, conspiracy and aiding and abetting breach of

fiduciary duty; unjust enrichment and rescission; breach of contract; tortious interference with

contract, and aiding and abetting tortious interference of contract; and preliminary and permanent

injunctions.

## I. BACKGROUND

The history of this action is set out in opinions rendered by the justice previously

assigned, the Surrogate's Court, the Delaware Chancery Court, the Delaware Supreme Court, and

the United States District Court for the Southern District of New York (Southern District).

Therefore, the only background provided here is for the purpose of addressing the instant

motions.

In 1993, as part of a family estate plan for the benefit of his children Sagi and Orly, Arie

established the Sagi Trust and the Orly Trust (the Trusts). In 2001, TPR Investment Associates

(TPR), a Genger family-controlled corporation, entered into a stockholders agreement with

Trump Group, whereby Trump Group obtained the right to purchase all of TPR's 3,000 shares in

Trans-Resources, Inc. (TRI), another Genger family-controlled corporation. The agreement also

provided that consent was required for any share transfers, except those to a "permitted

transferee." (Stockholders Agreement, § 3.1).

### A. The divorce stipulation

In 2004, Arie and Dalia settled their bitterly contested divorce by entering into a so-

ordered stipulation distributing their marital assets, including their interests in TPR and TRI. At

the time, Arie held 51 percent of TPR's stock with the remaining 49 percent held by D&K

2

Limited Partnership (D&K). Dalia held four percent of D&K; the Sagi Trust, and the Orly Trust held 48 percent each. TPR held 52.85 percent of TRI's common stock, and the remaining 47.15 percent was held by Trump Group.

Pursuant to the divorce stipulation and related documentation, Arie agreed to transfer his 51 percent interest in TPR to Dalia, with the proviso that TPR divest its 3,000 shares of TRI common stock on the following terms: (1) Sagi would become TPR's president and chief executive officer; (2) TPR would transfer to Arie 794.4 shares of TRI common stock (the Arie Shares), representing a 13.4 percent interest in TRI; (3) TPR would transfer to each of the Trusts 1,102.8 shares of TRI common stock (the Sagi Trust Shares and the Orly Trust Shares, each representing a 19.43 percent interest in TRI); and (4) each of the Trusts would execute agreements providing for, *inter alia*, Arie's irrevocable right to vote the Sagi Trust Shares and the Orly Trust Shares in TRI for the duration of his life. (2004 Transfers). The divorce stipulation includes a clause which provides, in effect, that in the event any of the terms therein are voided by a court of competent jurisdiction, the parties thereto may seek a court-ordered reformation of the affected terms to give effect to the parties' original intent. (Divorce Stipulation, Art. XVI, at 47-48).

In 2007, Dalia commenced an arbitration proceeding against Arie, contesting the distribution of marital assets under the divorce stipulation. In 2008, an arbitration award in the proximate amount of $3.85 million was entered in Dalia's favor.

### B. Trump Group's acquisition of TRI shares

In early 2008, when TRI faced financial difficulties, Arie, now in control of TRI by virtue of the 2004 Transfers, explored the possibility of obtaining capital funding for it from

3

Trump Group, in exchange for increasing Trump Group's equity position to become TRI's

majority stockholder. While a funding plan was being negotiated and drafted, TRI's financial

condition significantly improved. Arie then reneged on the funding agreement and threatened to

sue Trump Group if it challenged the 2004 Transfers.

Subsequently, Trump Group asserted its right under the TRI stockholders agreement to

purchase all of TPR's 3,000 TRI shares, and maintained that the 2004 Transfers under the

divorce settlement and underlying transaction documents were invalid because Arie never sought

its consent, as is required by the TRI stockholders agreement. Thus, on August 11, 2008, Trump

Group filed an action in the Southern District against TPR and TRI, asserting that the 2004

Transfers were invalid as violative of the stockholders agreement. Arie intervened, and TPR

interposed a third-party complaint against him, seeking a declaratory judgment that TPR is the

true owner of all TRI shares, and that Arie had tortiously interfered with TPR's contractual and

property rights in executing the divorce stipulation. In response, Arie asserted in his third-party

answer various counterclaims substantially similar to those asserted in the instant action.

On or about August 22, 2008, Trump Group and TPR entered into a stock purchase

agreement, whereby TPR agreed to sell the Sagi Trust's 1102.8 shares of TRI common stock to

Trump Group for $26.7 million, which would result in Trump Group becoming TRI's majority

stockholder. On the same day, the parties entered into a side letter agreement, whereby TPR

agreed that, in the event that the 2004 Transfers of the TRI shares by TPR to the Orly Trust and

Arie were determined to be invalid, Trump Group would be entitled to purchase directly from

TPR the Orly Trust Shares and the Arie Shares at less than 60 percent of the per share price paid

by Trump Group for the Sagi Trust Shares.

4

On August 25, 2008, after purchasing the Sagi Trust Shares from TPR, Trump Group

commenced in the Delaware Chancery Court a "Section 225 proceeding" under Title 8 of the

Delaware Code, asserting that it was in control of TRI via its purchase of the Sagi Trust Shares

pursuant to the stock purchase agreement, and sought a judicial determination of the composition

of TRI's board of directors. In an opinion dated July 23, 2010, the Chancery Court ruled, *inter*

*alia,* that because the 2004 Transfers violated the TRI stockholders agreement, and because

Trump Group never ratified the 2004 Transfers despite Arie's contrary allegation, by virtue of the

stock purchase agreement, Trump Group owned the Sagi Trust Shares, giving it the majority

voting control of TRI. (*TR Investors, LLC, v Genger*, 2010 WL 2901704 [Del. Ch. Ct. 2010]).

The court concluded as follows:

> [T]he Trump Group controls the Trans-Resources board for the following reasons: (1) the
> Trump Group never received notice of the 2004 Transfers, which were made in violation
> of the Stockholders Agreement, until June 2008; and (2) the Trump Group did not ratify
> those Transfers when it bought the transferred shares from Sagi Genger and TPR.
> Because it never ratified the wrongful transaction, the Trump Group was free to deal with
> the relevant transferor, TPR, and its transferee, the Sagi Trust, and settle the matter by
> acquiring the wrongly transferred shares in an agreed upon negotiation. In doing so, the
> Trump Group clearly reserved its position that TPR made a void transfer, has proven that
> its position was correct, and is entitled, as a result, to be deemed to have taken the shares
> from TPR as a settlement of the improper Transfers. In the alternative, even if the Trump
> Group ratified the 2004 Transfers-which it did not-I find that the Trump Group did not
> purchase the shares from Sagi Genger subject to the proxy in favor of Arie Genger.
> Therefore, the Trump Group holds a majority equity and voting stake in Trans-Resources,
> and its ability to vote its shares is unaffected by the proxy.

(*TR Investors, LLC*, 2010 WL 2901704, *2).

Thereafter, in an opinion dated August 9, 2010, the Chancery Court expanded its ruling,

holding that the Arie and Orly Trust Shares transferred in 2004 were also invalid, thereby

entitling Trump Group to buy those shares from TPR pursuant to the side letter agreement if it

chose to do so. (*TR Investors, LLC v Genger*, 2010 WL 3279385 [Del. Ch. Ct. 2010]). Plaintiffs

commenced the instant action promptly after the Chancery Court issued its July 2010 opinion.

While Arie was seeking relief in this court, he appealed the Chancery Court rulings. In an

opinion dated July 19, 2011, the Delaware Supreme Court affirmed that part of the Chancery

Court's findings and rulings that Trump Group had legally purchased the Sagi Trust Shares from

TPR, giving it majority control of TRI, but it reversed the Chancery Court's August opinion as to

the beneficial ownership of the Arie Shares and Orly Trust Shares absent personal jurisdiction

over TPR and the Orly Trust which were not parties to the section 225 proceeding. (*Genger v TR

Investors, LLC*, 26 A3d 180 [Del. Sup. Ct. 2011]). Promptly thereafter, Trump Group and Arie,

which were parties to the Delaware court proceedings, negotiated a form of the Revised Final

Judgment Order (Final Order) that reflected and implemented the various findings and rulings of

the Delaware Chancery Court and the Delaware Supreme Court. It expressly provides that

members of Trump Group are the "owners of . . . 67.7477 percent of the authorized and issued

stock" of TRI, that TPR is the "record owner of all [TRI] shares not presently owned" by Trump

Group, and that Arie and the Orly Trust "are not and have not been since at least the date of

execution of the Stockholders Agreement the record owners of any [TRI] shares." (Final Order,

¶¶ 2-8). The Final Order was adopted and signed by the Chancery Court, and entered in the

docket on or about August 19, 2011.

### C. Additional lawsuits arising from Trump Group's acquisition of TRI shares

On about July 22, 2011, in response to the Delaware Supreme Court's ruling, Trump

Group commenced an action against Arie and TPR in the Delaware Chancery Court, seeking a

declaration that it is both the record and beneficial owner of the Arie Shares. On October 4,

6

2011, Dalia, as trustee of the Orly Trust, also filed an action in the Delaware Chancery Court

against Trump Group and TPR, seeking a declaration that the Orly Trust is the beneficial owner

of the Orly Trust Shares. Pursuant to two separate temporary restraining orders, dated October

26, 2011 and November 9, 2011, and issued by the previously assigned justice, Dalia, TPR and

Trump Group were prohibited from proceeding with the Delaware declaratory judgment actions.

In addition to the foregoing court actions, counsels for TPR and Trump Group, in their capacity

as escrow agents with respect to the sales of the Orly Trust Shares and the Arie Shares to Trump

Group, filed separate interpleader actions in the Southern District and deposited escrowed funds

of approximately $10.3 million and $7.4 million, respectively, with the Southern District clerk.

As a result, there were no less than six separate actions pending in three different jurisdictions

relating to the issue of the beneficial ownership of the Arie Shares and the Orly Trust Shares.

### D. Instant motions

On March 13, 2012, oral argument on defendants' motions was heard by the previously

assigned justice pending the Southern District's determination as to its jurisdiction to hear and

adjudicate the primary issue of whether Arie and the Orly Trust each, respectively, has a

beneficial interest in the Arie Shares and the Orly Trust Shares, which is at the heart of the

parties' dispute. In an opinion dated June 14, 2012, the Southern District observed that the

parties had created "a headache-inducing jurisdictional conflict" in requesting that it "clean up

the mess they made by determining which of the federal or state courts should decide the issue

underpinning all their claims - that is, the beneficial ownership of the Arie Shares and Orly Trust

Shares." (*Glenclova Investments Co. v Trans-Resources, Inc., et al.,* __ F Supp 2d __, 2012 WL

2196670, at *5 [SDNY 2012]). While that court took "no position on the question of forum," in

7

light of the temporary restraining orders staying litigation in Delaware as to the issue of

beneficial ownership of the Orly Trust Shares and "the difficulty the Delaware Chancery Court

may have in obtaining personal jurisdiction over Arie and Orly," the Southern District concluded

that the foregoing "strongly suggests that the parties agree to litigate their claims in the New

York Supreme Court." (*Id.* at 19).

## II. ANALYSIS

In considering a motion to dismiss pursuant to CPLR 3211(a)(7), the court must

determine whether the pleadings state a cause of action. The motion must be denied if, from the

four corners of the pleadings, factual allegations are discerned which, taken together, manifest

any cause of action cognizable at law. (*Richbell Info. Servs. v Jupiter Partners*, 309 AD2d 288,

289 [1ˢᵗ Dept 2003], *quoting 511 W. 232nd Owners Corp. v Jennifer Realty Corp.*, 98 NY2d 144,

151-152 [2002]). The pleadings are afforded a liberal construction, and the court is to accord

plaintiffs the benefit of every possible favorable inference. (*Simkin v Blank,* 19 NY3d 46, 52

[2012]). However, while factual allegations in a complaint should be accorded every favorable

inference, bare legal conclusions and inherently incredible facts are insufficient. (*Matter of Sud v

Sud*, 211 AD2d 423, 424 [1ˢᵗ Dept 1995]).

Moreover, "[w]hen the moving party offers evidentiary material, the court is required to

determine whether the proponent of the [complaint] has a cause of action, not whether [he or] she

has stated one." (*Asgahar v Tringali Realty, Inc.*, 18 AD3d 408, 409 [2d Dept 2005]). And, a

cause of action may not be maintained if it is barred by, *inter alia*, collateral estoppel, res judicata

or issue preclusion. (CPLR 3211[a][5]).

8

### A. Trump Group's motion to dismiss (motion sequence number 011)

The complaint contains the following causes of action against Trump Group: declaratory judgment to reform the divorce stipulation (first cause of action); constructive trust, unjust enrichment, rescission, breach of fiduciary duty, aiding and abetting or conspiracy to commit a breach (second, third, fourth, and fifth causes of action); tortious interference with contract (ninth cause of action); and preliminary and permanent injunction (fifth and tenth causes of action). The gist of the complaint is that, because the 2004 Transfers effected by the divorce stipulation were held void and unenforceable by the Delaware courts, the divorce stipulation must be reformed in such a manner that Arie will resume beneficial ownership of the 3,000 shares of TRI stock that TPR owned before the 2004 Transfers. According to plaintiffs, any act of defendants that is inconsistent with Arie's beneficial ownership in such shares of stock is actionable and warrants the payment of damages.

### 1. Collateral estoppel

Seeking dismissal of the complaint, Trump Group argues that plaintiffs' claims are collaterally estopped by the Delaware courts' determination of factual and legal issues and even if plaintiffs are entitled to relitigate the issues underlying their claims, the complaint nonetheless does not state a cause of action. It identifies the following issues of fact and law that were decided by the Delaware courts: the invalidity of the 2004 Transfers that Arie caused TPR to make to himself and to the Orly and Sagi Trusts in violation of the TRI stockholders agreement, thereby entitling Trump Group to purchase all of TPR's 3,000 shares of stock in TRI; Trump Group's entitlement to control TRI as of 2004 when Arie caused TPR to breach the stockholders agreement; Arie's failure to provide notice of the 2004 Transfers and to obtain Trump Group's

9

consent to the Transfers, which violated the stockholders agreement; and Trump Group's

ownership of 67.7 percent of TRI shares upon its purchase of the Sagi Trust Shares from TPR

pursuant to the 2008 purchase agreement with TPR, which is now controlled by Sagi, as its

current president and chief executive officer.

Arie argues in opposition that because: (1) the issues listed by Trump Group were

decided in a statutorily limited section 225 *in rem* summary proceeding and not in a plenary

action; and (2) the Delaware Supreme Court held that an adjudication of the right to vote

corporate shares is not binding with respect to the beneficial ownership of such shares, the

section 225 proceeding in the Chancery Court did not result in a determination of the beneficial

ownership of all 3,000 TRI shares. He also contends that the Delaware courts' findings do not

bind him because they neither conflict with the causes of action he advances in his complaint, nor

are they essential to the Delaware courts' determinations, and because the court imposed on him

a higher burden of proof. (Arie's Opposition Brief, at 11-13; Hearing Transcript, March 13,

2012, at 63). He does not contend that he did not have a full and fair opportunity to litigate in the

Delaware courts. Rather, he contends that "essential parties were missing." (Arie's opposition

brief, at 14).

Orly joins Arie's arguments and adds that, contrary to the position taken by TPR and

Sagi, as well as Trump Group, she has legal standing to represent the Orly Trust, per the holding

of the previously assigned justice. (*Genger v Genger*, NY County, June 28, 2010, Feinman, J.,

index no. 109749/2009). Thus, both she and Dalia assert that they may act on behalf of the Orly

Trust unless and until the Surrogate's Court rules otherwise in an appropriate action there. Orly

also denies that she is collaterally estopped by the Delaware decisions as she was not a party to

10

those proceedings and had no opportunity to litigate the issues there.

While a non-party may not be estopped from arguing a position previously litigated, many of the issues listed by Trump Group are closely related to the Delaware courts' invalidation of the 2004 Transfers and constitute the primary bases for the instant action, and Orly does not allege that her participation as a litigant or party in the Delaware proceedings would have altered the Delaware courts' findings and rulings that relate to the invalidation. In any event, the Delaware Supreme Court recognized that Delaware has no jurisdiction over the Orly Trust and TPR, and thus specifically left open the issue of the beneficial ownership of the Orly Trust Shares. Thus, that Orly did not litigate the 2004 Transfers issues in Delaware does not appear to have prejudiced her rights, and she does not argue otherwise. And, as Arie is estopped from arguing some of the issues (*infra*, at 12-16), and as Orly does not distinguish her arguments and issues from Arie's, instead fully adopting them, to the extent that the Delaware findings and rulings on the issues relating to such arguments apply to both Arie and Orly, and to which this court gives full faith and credit (US Const, art IV, § 1; *Ho v McCarthy*, 90 AD3d 710, 711 [2d Dept 2011]), they also bind Orly here. In this regard, I need not decide whether there is any merit to Trump Group's argument that, although Orly and the Orly Trust were not parties in the Delaware proceedings, their interest was fully represented by Arie, who acted as a fiduciary, was in privity with Orly, and actively litigated the issues raised in the Delaware proceedings on behalf of Orly and the Orly Trust.

Accordingly, where applicable, or unless otherwise specified or the context otherwise requires, all references hereinafter to "Arie" include "Orly" and the "Orly Trust." However, to avoid any possibility of risk or confusion, the decretal paragraphs set forth at the conclusion of

11

this decision and order will, where applicable, reflect the separate rulings with respect to Arie and Orly and/or the Orly Trust.

In claiming that he retains a beneficial interest in all 3,000 TRI shares including the Sagi Trust Shares purchased by Trump Group from TPR, Arie overlooks the Final Order which he himself negotiated and which gives neither Arie nor the Orly Trust record ownership of any TRI shares. And he identifies no clause or provision in the Delaware courts' opinions suggesting that he has a beneficial ownership interest in the Sagi Trust Shares. Therefore, any allegation or claim by Arie in opposition to Trump Group's motion that TPR's record ownership of all 3,000 TRI shares "remained subject to his beneficial ownership claims" has no factual or legal basis. (Arie's Opposition Brief, at 15-17). Indeed, Arie acknowledges that "[t]he Chancery Court also held that the Trumps owned the Sagi [Trust] shares under the 2008 Agreement and that the Sagi Trust Irrevocable Proxy [held by Arie] was not valid under New York or Delaware law." (*Id.* at 9).

Many of Arie's claims against Trump Group in this action are integrally related to the Delaware courts' invalidation of the 2004 Transfers, and the Delaware Supreme Court noted that Arie had "voluntarily asked the trial court to determine that he beneficially owned 13.99 percent" of TRI shares, and that Arie and Trump Group "were legally free to consent to the jurisdiction of the Court of Chancery exercising plenary *in personam* jurisdiction over themselves personally." (*Genger v TR Investors, LLC*, 26 A3d 180, 202 [Del. Sup. Ct. 2011]).

That a section 225 proceeding was *in rem* has no bearing on the preclusive effect of a decision on a subsequent action. (*Johnston v Arbitrium [Cayman Islands] Handels AG*, 198 F3d 342, 348 [2d Cir 1999] ["Under applicable Delaware law . . . the determination of an issue

12

actually litigated and decided against a defendant in an in rem case may have collateral estoppel

effect in a subsequent in personam proceeding"]). In *Johnston*, the Second Circuit expressly

rejected the argument that issues decided in a section 225 proceeding concerning disputed

ownership and control of corporate shares could not collaterally estop claims raised in a

subsequent *in personam* action involving findings and determinations made in the prior *in rem*

action. And TPR and the Orly Trust's absence from Delaware was the basis for the Delaware

Supreme Court's reversal of the Chancery Court's ruling with respect to the issue of beneficial

ownership of the Arie Shares and the Orly Trust Shares, but not as to other findings and rulings

of the Chancery Court.

The higher burden of proof imposed on Arie in the Chancery Court to prove the factual

issues by clear and convincing evidence is immaterial. The Second Circuit in *Kosakow v New

Rochelle Radiology Assoc.,* analyzed applicable New York law, as set forth by the Court of

Appeals in *Schwartz* and followed in *Parker, supra,* and stated, in relevant part:

> The *Schwartz* opinion counsels that a functional approach should
> be taken in analyzing collateral estoppel in New York, and that it
> should not be applied rigidly . . . Notably, under this functional
> test, the court did not mention the burden of proof, let alone
> describe it as a dispositive factor. While there is a certain logical
> appeal to the decision in *Nesbitt* [that collateral estoppel may not
> apply if there is a difference in the burden of proof], *the value of
> collateral estoppel in fostering judicial economy and avoiding
> inconsistent results would be severely compromised if every shift in
> the burden of proof would make collateral estoppel unavailable.*
> . . . It follows that the New York Court of Appeals would similarly
> reject the proposition that collateral estoppel can never be applied
> where there is a difference in the burden of proof. *Schwartz's*
> practical approach to the issue dictates that parties not be permitted
> to relitigate the same issues, despite differing burdens of proof,
> where it is evident that burden of proof played little or no role in
> the prior factual determination.

13

*(Kosakow*, 274 F3d 706, 731-732 [2d Cir 2001][emphasis added]).  Absent any New York

authority to the contrary offered by Arie, *Kosakow* is persuasive.  Moreover, the Chancery Court

imposed on Arie a higher burden of proof as a sanction for spoliating evidence and contempt of

court.  To permit him to relitigate his claims here would render the sanction nugatory.

And, following *Kosakow*, the Second Circuit recently held that where a plaintiff had a full

and fair opportunity to litigate her claims in an earlier Article 78 proceeding under New York

law, she was collaterally estopped from advancing those claims in the federal action

notwithstanding the difference in the applicable burdens of proof between the proceeding and a

subsequent action in the federal court. (*Constantine v Teachers Coll.*, 448 Fed Appx 92, 94-95,

2011 WL 4509542 [2d Cir 2011]).

Most importantly, the underlying facts and record clearly reflect that Arie had a full and

fair opportunity in the Delaware courts to litigate the issues regarding invalidation of the 2004

Transfers. (*Schwartz v Public Adm'r of County of Bronx*, 24 NY2d 65, 73 [1969] [while burden

of proving identity of issues rests on proponent of collateral estoppel, opponent bears burden of

proving that he or she did not have full and fair opportunity to litigate issues in earlier action]);

*accord Parker v Blauvelt Volunteer Fire Co.*, 93 NY2d 343, 349 [1999]).  Accordingly, to the

extent that the allegations in support of the causes of action asserted in the complaint are

contradicted by the findings and rulings of the Delaware courts, Arie is collaterally estopped

from relitigating them. (CPLR 3211[a][5]).

2. Declaratory judgment to reform the divorce stipulation (first cause of action)

Arie seeks a declaratory judgment against Trump Group and other defendants to reform

the divorce stipulation based on: (1) the provision giving the parties the right to seek a

14

court-ordered reformation to reflect their original intent in the event that any portion of the

stipulation is held to be invalid; (2) the Delaware courts' invalidation of the 2004 Transfers and

the irrevocable proxies held by Arie to vote the Orly Trust Shares and the Sagi Trust Shares; and

(3) his and Dalia's mutual mistake in believing that the 2004 Transfers and the irrevocable

proxies were valid.  In seeking reformation, Arie wants, *inter alia*, the 3,000 TRI shares held by

TPR prior to the 2004 Transfers placed in a new entity to be controlled by him, and for him to

retain all voting rights to such shares. (Complaint, ¶¶ 175-189).  This is the only cause of action

where Orly and the Orly Trust are not co-plaintiffs with Arie.

The Southern District observed not only that the instant action is "little more than a

collateral attack on the Delaware Supreme Court ruling," but that authorizing Arie to reform the

corporate ownership structure in TPR and TRI, including allowing him to retain his voting rights

in all 3,000 shares of TRI stock, constitutes a collateral attack on the Delaware courts'

determinations, whereby they unequivocally ruled, *inter alia*, that he has no right to vote any of

the shares because the irrevocable voting proxies held by him pursuant to the 2004 Transfers are

invalid. (*Glenclova Investments Co. v Trans-Resources, Inc., et al.,* __ F Supp 2d __, 2012 WL

2196670, at *5).  It also noted that Arie's federal counterclaims, which are substantially similar

to those advanced here, including the reformation claim, are directed against 13 counterclaiming

defendants including Dalia, even though 12 of them were not parties to the divorce stipulation,

and "the majority of the counterclaims do not name Dalia at all." (*Id.* at 17).  Moreover, the

Southern District observed that:

> even though Arie is the party who made false representations in the
> [Divorce] Stipulation of Settlement, his reformation claim does not
> seek to right that wrong.  Instead, he wants to change the terms of

15

> the [Stipulation] in a manner designed to undo the Delaware
> Chancery Court's finding of liability against him, thereby allowing
> him to avoid the consequences of his own breach of the 2001 [TRI]
> Stockholders Agreement - Trump Group's right to purchase those
> invalidly transferred shares.

(*Id.* at 17). Consequently, Arie is collaterally estopped from seeking a declaratory judgment to

reform the divorce stipulation, at least as asserted against Trump Group, as it is "little more than

a collateral attack on the Delaware Supreme Court ruling," and as Trump Group is not a party to

the divorce stipulation. Although Arie maintains that Trump Group is a necessary party because

it holds the 3,000 TRI shares needed to implement the reformation, the remedy of reformation or

rescission is unavailable against a nonparty to a contract. (*Baranek v Baranek*, 54 AD3d 789, 790

[2d Dept 2008]).

   And, as Trump Group was not a party to the divorce stipulation, Arie's and Dalie's

alleged "mutual mistake" in effecting the 2004 Transfers is immaterial and may not be used as a

defense in Arie's dispute with Trump Group. Moreover, Arie seeks to undo the Delaware courts'

adverse findings against him and Trump Group's right to buy the "invalidly transferred shares,"

notwithstanding that they were transferred as a result of his misrepresentation in the divorce

stipulation that no consent, other than TPR's, was required for the 2004 Transfers. In any event,

any equitable or contractual right in favor of Arie to reform the divorce stipulation does not

override the pre-existing contractual right of Trump Group to purchase the invalidly transferred

shares, when it was Arie then in control of TPR who caused TPR to breach the TRI stockholders

agreement.

   3.  Constructive trust, unjust enrichment and rescission (second and fourth causes of action)

   The elements of a cause of action for a constructive trust are: "(1) a confidential or

16

fiduciary relation; (2) a promise, express or implied; (3) a transfer made in reliance on that

promise; and (4) unjust enrichment." (*Wachovia Sec., LLC v Joseph*, 56 AD3d 269, 271 [1ˢᵗ Dept

2008]). Arie asserts that New York courts frequently impose constructive trusts with "sufficient

flexibility" to prevent enrichment and that the "constructive trust doctrine is not rigidly limited."

(Arie's Opposition Brief, at 20).

Arie alleges that Trump Group is not a bona fide purchaser, and that a constructive trust

should be imposed in his favor with respect to all 3,000 shares of TRI stock that reverted to TPR

because Trump Group, as well as Sagi, TPR's current president, owe fiduciary and contractual

duties to Arie and the Orly Trust. (*Id.* at 23). According to Trump Group, however, it had neither

a confidential nor fiduciary relationship with Arie and/or the Orly Trust.

Courts have held that "a person wrongfully acquiring property can be treated as a

constructive trustee notwithstanding the lack of a fiduciary relationship." (*See eg In re Koreag,*

*Controle et Revision S.A. v Refco F/X Assoc.*, 961 F2d 341, 353 [2d Cir 1992]), *citing Simonds v*

*Simonds*, 45 NY2d 233, 242 [1978]). Whether Trump Group was a bona fide purchaser or

whether it owed a confidential or fiduciary relationship need not be decided for purposes of

addressing Arie's claim for a constructive trust.

In an earlier decision in this action entered on January 3, 2012 (motion sequence numbers

004 and 005), the previously assigned justice denied plaintiffs' request for an order enjoining

defendants from taking certain actions, including any act to sell or transfer the Arie and Orly

Trust Shares pending a final adjudication of beneficial interest, finding that an injunction would

interfere with TRI's management in which Trump Group holds majority control, that plaintiffs

have alternative remedies even if they obtain a final judicial determination of beneficial interest,

17

and that requiring Trump Group and TPR to comply with the court's order in giving 10 business days' notice to plaintiffs of a proposed future transaction, except with respect to share dilution, is sufficient to maintain the status quo. (*Genger v Genger*, Dec. 28, 2011 [Sup Ct, NY County]).

The same considerations render unnecessary Arie's claim for a constructive trust as, *inter alia*, the notice requirement affords plaintiffs a sufficient opportunity to seek judicial relief in the event that defendants propose to enter into a transaction that may adversely affect plaintiffs' asserted interest in the Arie Shares and the Orly Trust Shares.

In order to plead a cause of action for unjust enrichment adequately, a plaintiff must allege "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." (*Georgia Malone, Inc. v Rieder*, 19 NY3d 511, 515 [2012], *citing Mandarin Trading Ltd. v Wildenstein*, 16 NY3d 173, 182 [2011]).

In his complaint, Arie alleges, *inter alia*, that: (1) TPR/Sagi had no authority to sell the 3,000 TRI shares to Trump Group when the Delaware courts had determined that the 2004 Transfers were void *ab initio* as the shares then reverted to TPR subject to Arie's interest by virtue of the divorce stipulation; (2) the purchase price paid by Trump Group for the 3,000 TRI shares under the purchase agreement for the Sagi Trust Shares and the side letter agreement for the Arie Shares and Orly Trust Shares was a fraction of the value of such shares; and (3) Trump Group was not a bona fide purchaser and would be unjustly enriched if allowed to benefit from TPR's sale of the TRI shares.

Trump Group does not specifically deny that the per share price paid for the Arie and the Orly Trust Shares was significantly lower than that for the Sagi Trust Shares, and its assertion

18

that the Delaware courts have held that it was "entitled to buy TPR's TRI shares at 2004 values,

which were far less than the $26 million Trump Group paid TPR just for the Sagi Trust Shares"

does not defeat a claim of unjust enrichment because that portion of the Chancery Court's

opinion does not address the purchase price for the Arie Shares and Orly Trust Shares or the side

letter agreement, nor does it compare the per share price difference. Moreover, Trump Group's

contention that the claim for unjust enrichment requires a fiduciary or confidential relationship,

and must be pleaded with specificity, is not supported by the opinions it cites in its moving

papers. Rather, a fiduciary or confidential relation is an element of a constructive trust claim.

(*Supra*, at 16-17). Consequently, Arie has sufficiently alleged, for the purpose of CPLR

3211(a)(7), a claim for unjust enrichment.

      Rescission is a part of the fourth cause of action. As Trump Group was not a party to the

divorce stipulation, and for the reasons fully discussed above in connection with the dismissal of

the reformation claim (*supra*, at 16-18), rescission does not lie against Trump Group.

## 4. Permanent injunction (fifth cause of action) and preliminary injunction (tenth cause of action)

      Plaintiffs seek to preliminarily and permanently enjoin Trump Group from transferring,

selling, pledging, assigning, diluting, voting or otherwise disposing of all 3,000 shares of TRI

stock that reverted to TPR as a result of the Delaware court rulings. The reasons set forth above

for dismissing the constructive trust claim (*supra*, at 16-18) apply equally here. In addition, the

Delaware courts held that Arie and the Orly Trust are not the record owners of any TRI shares,

and that no TRI shares owned by Trump Group or owned of record by TPR are subject to any

proxy of any kind in favor of Arie. (Final Order, ¶¶ 7-10). Thus, granting the requested

injunctive relief in plaintiffs' favor to enjoin Trump Group and TPR from exercising their

19

respective voting rights in the TRI shares would constitute a collateral attack on the court rulings.

### 5. Breach of fiduciary duty, conspiracy, and aiding and abetting breach of fiduciary duty (third cause of action)

The elements of a cause of action for a breach of fiduciary duty are: "the existence of a fiduciary relationship . . . misconduct by the defendant, and . . . damages . . . caused by the defendant's misconduct." (*Rut v Young Adult Inst., Inc.*, 74 AD3d 776, 777 [2d Dept 2010]). Arie alleges, *inter alia*, that: (1) upon becoming the majority shareholder of TRI in 2008 after purchasing the Sagi Trust Shares from TPR, Trump Group owed a fiduciary duty to him and the Orly Trust as the "known beneficial owners" of the Arie Shares and Orly Trust Shares in TRI; and (2) as a majority shareholder, Trump Group breached its fiduciary duty by purchasing the Arie Shares and the Orly Trust Shares at a significant discount, thereby advancing its scheme to squeeze Arie out of TRI. (Complaint, ¶¶ 209-214).

Although Trump Group does not deny that it became a majority shareholder of TRI after it purchased the Sagi Trust Shares in 2008 and that as a majority shareholder, it owed a fiduciary duty to TRI minority shareholders (*Richbell Info. Servs.*, 309 AD2d at 300 ["(a) majority shareholder in a close corporation is in a fiduciary relationship with the minority"]), it denies knowing that plaintiffs were beneficial owners of any TRI shares, and thus could owe them no fiduciary duty.

Even assuming that Trump Group was unaware that plaintiffs were beneficial owners in 2008 when it entered into the side letter agreement to buy the Arie Shares and the Orly Trust Shares, it became aware of it by 2011 when it exercised its option to buy Arie's and the Orly Trust's shares, as since at least 2008, they asserted beneficial ownership in the shares, even if it

20

had not yet been judicially determined.

Trump Group also denies owing any duty because when it executed the side letter agreement it was not a majority shareholder, and that, even assuming it owed a fiduciary duty, the sole duty was to refrain from using its majority power to oppress the minority, and Arie does not allege that TPR, the minority shareholder, was oppressed.

Here, the fiduciary duty arose in 2008 after the Sagi Trust Shares were purchased, and the allegation is that the duty was breached in 2011 when Trump Group bought the Arie Shares and the Orly Trust Shares at a deep discount with the intent of removing plaintiffs, who have claimed, at least indirectly, to be putative minority shareholders of TRI through their interest in TPR, after the Delaware courts ruled that the 2004 Transfers were void and the transferred Arie Shares and Orly Trust Shares reverted to TPR. In any event, "whether such [fiduciary] obligation exists is necessarily fact-specific to the particular case," and it would be premature to dismiss the claim before discovery is undertaken to ascertain the facts. (*Weiner v Lazard Freres & Co.*, 241 AD2d 114, 122 [1st Dept 1998]). Consequently, for all of these reasons and for purposes of CPLR 3211(a)(7), the complaint adequately states a claim for breach of fiduciary duty against Trump Group.

It is also alleged, in addition to the direct breach of fiduciary duty, that Trump Group conspired with other defendants, and aided and abetted them in the breach of their fiduciary duty. To state a claim of aiding and abetting a breach of fiduciary duty, the complaint must contain facts to support "a fiduciary duty owed to plaintiff . . . a breach of that duty, and [the] defendant's substantial assistance in effecting the breach,'" which resulted in damages. (*Monaghan v Ford Motor Co.*, 71 AD3d 848, 850 [2d Dept 2010]). While an entity such as TPR owes no fiduciary

21

duty to its shareholders under New York and Delaware laws, as argued by Trump Group, the complaint is replete with allegations that Sagi, as TPR's president, breached fiduciary duties he owed to Arie, as well as other allegations that the 2008 purchase agreement and the side letter agreement constituted a $26.7 million bribe offered by Trump Group to Sagi, to betray and rob his father and sister of their interests in the relevant TRI shares, and to squeeze them out of TRI at unconscionably low prices. (Complaint, ¶¶ 123, 135).

The complaint thus contains sufficient factual allegations supporting a claim that Sagi breached his fiduciary duty to Arie (*infra*, at 27-28), as does the claim that Trump Group aided and abetted Sagi in breaching it. Moreover, "actual knowledge" of the alleged wrongdoing "need only be pleaded generally . . . particularly at the pre-discovery stage." (*Oster v Kirschner*, 77 AD3d 51, 55 [1st Dept 2010]).

However, the complaint is not only bereft of an explicit and independent allegation of conspiracy, but such a cause of action does not exist, as it is well settled that "a mere conspiracy to commit a [tort] is never of itself a cause of action," even though allegations of a conspiracy are permitted to connect defendants with an otherwise actionable tort. (*See Alexander & Alexander v Fritzen*, 68 NY2d 968, 969 [1986]).

### 6. Tortious interference with contract (eighth cause of action)

The elements of a cause of action for tortious interference of contract are: "(1) the existence of a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of that contract, (3) the defendant's intentional procurement of the third party's breach of that contract, and (4) damages." (*Chung v Wang*, 79 AD3d 693, 694 [2d Dept 2010]).

The complaint contains allegations that Trump Group interfered with several contracts,

22

including the divorce stipulation, the 2004 Transfer documents between Arie and TPR, and the

2004 voting trust agreements between Arie and the Orly and Sagi Trusts. However, absent any

allegation in the complaint that Dalia breached the divorce stipulation and the related

documentation, there can be no finding that Trump Group tortiously interfered with the divorce

stipulation and the related documentation.

Although the Delaware courts held that the 2004 Transfers are void, Arie argues that the

Delaware Chancery Court held that the 2004 Transfers are unenforceable, whereas the 2004

Transfer documents and the 2004 voting trust agreements are void. (Arie's Opposition Brief, at

32). He also maintains, however, that "[on] July 23, 2010, the Delaware Chancery Court issued a

lengthy written decision which held that the 2004 transfers of TPR's TRI shares to Arie, the Sagi

Trust and the Orly Trust pursuant to the Divorce Decree were void . . . ." (*Id.* at 9). Arie then

asks that instead of considering the illegal contract void in toto, the illegal provision be severed,

thereby permitting the validation of the balance of the agreement. (*Id.* at 33). In his view,

because the 2004 Transfer documents and voting trust agreements contained "valid and binding

provisions" that required Sagi and TPR to take "all necessary actions . . . to complete or perfect

the transactions contemplated hereby," a tortious interference claim may be alleged against

Trump Group for causing the other defendants to breach these contractual provisions. (*Id.*).

Trump Group, however, rightly maintains that "because the 2001 Stockholders

Agreement prohibited any transfers to the Trusts, any purported obligations on the part of TPR

and Sagi to cooperate with such improper transfers cannot be enforced and cannot give rise to an

interference claim [against Trump Group.]" (Trump Group's Reply Brief, at 19). And, as Arie

failed to provide notice to Trump Group with respect to TPR's transfer of the Arie Shares to

23

himself, which notice was required by the stockholders agreement even though he was a

permitted transferee, the transfer of the Arie Shares was also void, as determined by the Delaware

court.

### B.  Motion of TPR and Sagi Trust to dismiss (motion sequence number 010), motion of Rochelle Fang, individually and as trustee of Sagi Trust to dismiss (motion sequence number 009), and motion of Sagi to dismiss (motion sequence number 007)

The complaint contains various causes of action against TPR, Sagi Trust, Sagi and

Rochelle Fang (Fang), trustee of the Sagi Trust, including: a declaratory judgment to reform the

divorce stipulation (first cause of action); constructive trust (second cause of action); breach of

fiduciary duty, conspiracy and aiding and abetting in the breach of fiduciary duty (third cause of

action); unjust enrichment and rescission (fourth cause of action); breach of contract (sixth and

seventh causes of action); aiding and abetting tortious interference with contract (ninth cause of

action); as well as preliminary and permanent injunctions (fifth and tenth causes of action).

These defendants seek the dismissal of all of these causes of action as asserted against each of

them.  They also contend that this court lacks jurisdiction over the Sagi Trust, but they do not

refute the assertion that the Sagi Trust is a New York trust and that its beneficiary resides in New

York.

#### 1.  Declaratory judgment for reformation (first cause of action)

It cannot be disputed that TPR, Sagi Trust, Sagi, and Fang are not parties to the divorce

stipulation.  Yet, Arie argues in opposition to these defendants' motions to dismiss that, because

reformation of the divorce stipulation requires these defendants' participation, they are

"necessary parties" to the reformation process and that complete relief cannot be obtained in their

absence.  (Arie's Opposition Brief, at 9-10).  The reasons set forth above, in connection with

24

Trump Group's motion to dismiss the declaratory judgment for reformation against it (*supra*, at 14-16), apply equally to the instant claim against these defendants.

### 2. Constructive trust, unjust enrichment and rescission (second and fourth causes of action)

The cause of action for a constructive trust claim against TPR, Sagi, the Sagi Trust and Fang fails for the same reasons set forth above in connection with dismissal of that cause of action against Trump Group. (*Supra*, at 16-18). More specifically, as TPR and Sagi are required to give 10 days' notice to plaintiffs of a proposed transaction (except share dilution) involving the Arie and Orly Trust Shares (*Genger v Genger*, Dec. 28, 2011 [Sup Ct, NY County]), such notice is sufficient to afford them an opportunity to seek any necessary judicial relief.

Arie argues that allowing TPR to retain any benefit arising from its record ownership of the TRI shares that reverted to it as a result of invalidation of the 2004 Transfers constitutes unjust enrichment because TPR had divested itself of such TRI shares "in consideration for and as a condition of Arie giving up his 51 percent ownership interest in TRI." (Arie's Opposition Brief, at 10-12). However, it was Arie who had control of TPR before the 2004 Transfers and it was he who caused TPR to enter into the 2004 Transfers, which were invalidated by the Delaware courts.

However, to the extent that Arie alleges in the complaint that TPR entered into the 2008 side letter agreement with Trump Group to sell the Arie Shares and the Orly Trust Shares at a discount and that TPR benefited from the transaction at his expense and that of Orly and the Orly Trust, there exists a viable claim of unjust enrichment, which the Chancery Court apparently noticed when it observed that "it may be that [Arie] Genger and Orly Genger have claims against TPR and Sagi Genger over how the price paid by Trump Group for the Arie and Orly Shares was

25

allocated . . . If those transferees [i.e., Arie and the Orly Trust] have any beef with TPR or Sagi Genger, the transferees are free to file suit against them." (*TR Investors, LLC v Genger*, 2010 WL 3279385, *3 [Del. Ch. Ct. 2010]).

Arie also argues that an inference must be drawn that "Fang benefited at Arie's expense from her involvement in the conspiracy designed to squeeze [him] out of TRI [and] her central role and complicity in accepting the $26.7 million bribe paid to the Sagi Trust by Trump Group for the purported sale of the Sagi Trust TRI shares." (Arie's Opposition Brief, at 12). He fails to allege, however, with any particularity, that Fang, individually or in her capacity as trustee of the Sagi Trust, was unjustly enriched, and at oral argument, Arie's counsel stated, in relevant part that the "claim is for aiding and abetting. For some reason [Fang] was brought back for a very short period of time . . . to execute the 2008 Stockholders [sic] Agreement, and we have alleged that they aided and abetted each other . . . and that [Fang] was the alter ego and co-agent of Sagi in his breaches of fiduciary duty. That is why she's in the case." (Hearing Transcript, March 13, 2012, at 139). Thus, the claim against Fang is based on her aiding and abetting Sagi in his breach of fiduciary duty, rather than on the allegation that she was unjust enriched, either individually or as trustee for the Sagi Trust. Moreover, Arie does not explain in either the complaint or his Opposition Brief how the Sagi Trust itself was unjustly enriched, and Arie failed in the Delaware court proceedings to mount a successful challenge to Trump Group's purchase of the Sagi Trust Shares.

Sagi contends that as unjust enrichment constitutes a "quasi-contract claim" and as there are "written contracts dealing with the same subject matter," the cause of action for unjust enrichment is not viable. (Sash Affirmation in Support of [Sagi] Motion to Dismiss, ¶ 12).

26

However, Arie, Orly and/or the Orly Trust were not parties to the 2008 side letter agreement and

thus they have no standing to assert a breach of contract claim. Moreover, the side letter

agreement was executed by Trump Group and TPR, by Sagi, and he knew or should have known

that Arie and Orly have asserted beneficial interest claims in the Arie Shares and Orly Trust

Shares since at least 2008, but he nonetheless caused TPR to sell the Shares in 2011 at an

allegedly heavily discounted price. Indeed, Arie asserts that TPR is controlled by Sagi, and that

Sagi, *inter alia*, breached his fiduciary duties and was unjustly enriched. In light of the

foregoing, and given the position of the Delaware Chancery Court on the issue (*supra*, at 25-26),

the unjust enrichment claim against Sagi is viable.

As TPR, Sagi, the Sagi Trust and Fang were not parties to the divorce stipulation,

however, the cause of action seeking rescission has no factual or legal basis. (*Supra*, at 19).

### 3. Breach of fiduciary duty, conspiracy and aiding and abetting breach (third cause of action)

Arie fails to set forth any statutory or decisional law for the proposition that a corporation,

such as TPR, takes on or otherwise assumes the fiduciary duties of its directors and officers such

as Sagi, to its purported shareholders, such as Arie and the Orly Trust. Indeed, a corporation

owes no fiduciary duties to its shareholders. (*See Gates v Bea Assoc., Inc.*, 1990 WL 180137, *6

[SD NY 1990] [to permit aiding and abetting claim against corporation would "completely

undermine and negate the rule that a corporation does not have fiduciary duties to its

shareholders."]).

The breach of fiduciary claim against the Sagi Trust and Fang is based, according to Arie,

on their obligation, individually and as trustee under the divorce stipulation and the 2004

Transaction documents, to ensure that Arie would maintain voting control over the Sagi Trust

27

Shares for the duration of his life. (Arie's Opposition Brief, at 17). However, the voting trust agreements and the proxies held by Arie with respect to the Sagi Trust and Orly Trust Shares as well as the Arie Shares were invalidated by the Delaware courts, due to Arie's breach or violation of the stockholders agreement.

Arie also alleges that the Sagi Trust and Fang aided and abetted Sagi and Trump Group in breaching the respective fiduciary duties they owed to him. As the Delaware courts upheld the sale of the Sagi Trust Shares to Trump Group, and absent any allegation that the Sagi Trust and Fang owe Arie a fiduciary duty with respect to the Arie Shares and the Orly Trust Shares, the Sagi Trust and Fang could not have aided and abetted Trump Group or Sagi in breaching their fiduciary duties in such a transaction. Similarly, the complaint does not set forth facts as to why Orly can assert a breach of fiduciary duty claim against Fang, inasmuch as Orly does not allege that she is also a beneficiary of the Sagi Trust which Fang served as the trustee.

Sagi conclusorily denies owing a fiduciary duty to Arie, just as TPR owes no fiduciary duty to Arie. However, the complaint is replete with allegations of a fiduciary duty owed to Arie by Sagi, individually and as a TPR officer, which was breached by Sagi in causing TPR to enter into the stock purchase and side letter agreements, when he used his position as president of TPR and caused TPR to sell the Arie and Orly Trust Shares to Trump Group at a fraction of their fair market value. And, Sagi does not dispute that a director or officer of a corporation owes fiduciary duties to the corporation and its shareholders. Indeed, the Southern District observed that, even if Arie's reformation counterclaim constitutes a basis for abstaining from exercising jurisdiction, certain of his other counterclaims do not compel abstention, "particularly the claims for breach of fiduciary duty against Sagi and others (premised on Sagi's implementation of the

28

2008 side letter agreements on behalf of TPR) . . . ." (*Glenclova Investments Co. v Trans-Resources, Inc., et al.*, __ F Supp 2d __, 2012 WL 2196670, at *17 [SDNY 2012]).  The aiding and abetting breach of fiduciary duty claim against Sagi also survives Sagi's motion to dismiss, as discussed above relating to the survival of the breach of fiduciary duty claim against Trump Group (*supra*, at 20-22), and it is alleged that Sagi assisted or aided and abetted Trump Group in the breach of such duty.

### 4.  Breach of contract against TPR and Sagi Trust (sixth and seventh causes of action)

To state a claim for breach of contract, the complaint must allege the existence of a contract, plaintiff's performance, defendant's nonperformance, and resulting damages. (*Elisa Dreier Reporting Corp. v Global NAPS Networks, Inc.*, 84 AD3d 122, 127 [2d Dept 2011]).

Arie alleges that "TPR breached the 2004 Transfer Agreement by executing the 2008 Stock Purchase and Side Letter Agreements and purporting to sell the TRI shares to Trump Group in disregard of Arie's beneficial and voting rights, thereby failing to effectuate the express intent of the parties to the 2004 Transaction Documents and the [divorce stipulation.]" (Arie's Opposition Brief, at 22).  As discussed *supra*, at 25, Arie brought about his own loss of voting rights in the TRI shares, in spite of the voting trust agreements and the irrevocable proxies held by him, by causing TPR to enter into the 2004 Transfers without obtaining the required consent, as a result of which the Delaware courts found the proxies unenforceable.  Moreover, Arie was not a party to the 2008 side letter agreements which allegedly sought to deprive Arie and Orly of the asserted claims of beneficial interests in the Arie and Orly Trust Shares when such shares reverted to TRP, albeit such interests have not been judicially determined, and thus has no standing to assert a breach of contract claim as to these agreements.

29

Further, the breach of contract claim in the seventh cause of action against the Sagi Trust

is not viable for the same reason that the breach of fiduciary duty claim against the Sagi Trust is

not, as discussed above. (*Supra*, at 27).

Arie also observes that defendants "conveniently ignore the fact that the Delaware Courts

made no determinations as to the validity of the Back-Up Voting Trust Agreements, the express

intent of which was to ensure that Arie would maintain voting control . . . in the event the

irrevocable proxies were determined to be invalid." (Arie's Opposition Brief, at 23). Having

failed to raise this claim or issue in Delaware, the argument is precluded, and in any event, does

not apply as to Orly as any voting right under the back-up voting trust agreements was held only

by Arie. In the Delaware proceedings, voting right was clearly an important issue for Arie.

Thus, his belated attempt to raise it now is untenable and a waste of judicial resources. (*Olawoyin*

*v 520 W. 43rd St. Partners, LLC*, 34 Misc 3d 130 [A], 2011 NY Slip Op 52328 [U], *1 [App

Term, 1st Dept 2011] [plaintiff's claim "properly dismissed under familiar principles of res

judicata, since the claim could have been litigated in the prior . . . proceeding between the

parties"]; *see also Landau, P.C. v LaRossa, Mitchell & Ross*, 11 NY3d 8, 12-13 [2008] ["once a

claim is brought to a final conclusion, all other claims arising out of the same transaction or

series of transactions are barred, even if based upon different theories or if seeking a different

remedy."]).

### 5. Aiding and abetting tortious interference with contract (ninth cause of action)

In the complaint, Arie alleges that Sagi, Fang and the Sagi Trust "each had knowledge of

[Trump Group's] tortious interference with the 2004 TPR Transaction Agreement and the

[divorce stipulation]" as well as "the 2004 Voting Trust Agreements," and that each had aided

30

and abetted, and provided substantial assistance to Trump Group in committing tortious acts. (Complaint, ¶¶ 253-256). As the tortious interference of contract claim against Trump Group (eighth cause of action) is legally insufficient (*supra*, at 22-24), so too is the aiding and abetting claim against Sagi, Fang and the Sagi Trust as they cannot have aided and abetted Trump Group in committing a tort that could not have been committed. Moreover, no liability for tortious interference generally attaches when the defendant is a party to the subject contract (*UBS Sec. L.L.C. v Highland Capital Mgt., L.P.*, 86 AD3d 469, 476-477 [1st Dept 2011]), and Arie offers no proposition of law to the contrary.

In addition, Arie contends that the Sagi Trust "aided and abetted Trump Group's tortious interference with the Back-Up Voting Trust Agreement between Arie and the Orly Trusts." (Arie's Opposition Brief, at 24). However, as discussed *supra*, at 30, any claim made by Arie with respect to the back-up voting trust agreement is res judicata, and the allegation that the Sagi Trust aided and abetted Trump Group in violating the agreement has no legal basis as the agreement is longer legally enforceable.

### 6. Preliminary and permanent injunctions (fifth and tenth causes of action)

For the reasons set forth in conjunction with the dismissal of the fifth and tenth causes of action against Trump Group (*supra*, at 19-20), these causes of action against TPR, Sagi, Fang and the Sagi Trust are also not viable.

### C. Motion of Dalia Genger to dismiss (motion sequence number 006)

In his complaint, Arie asserts causes of action against Dalia for a declaratory judgment to reform the divorce stipulation (first cause of action), constructive trust (second cause of action), unjust enrichment and rescission (fourth cause of action), and permanent injunction (fifth cause

31

of action).

### 1. Declaratory judgment for reformation (first cause of action)

According to Arie, the reformation claim is based on: (1) the right set forth in the divorce stipulation entitling him to seek reformation when the 2004 Transfers were voided by the Delaware courts; and (2) mutual mistake in that both he and Dalia reasonably believed that the 2004 Transfers were valid when they signed the divorce stipulation.

Dalia argues that the reformation claim must be dismissed because: (1) the relevant provision in the divorce stipulation was not triggered by the Delaware court which held only that Arie failed to give notice or seek consent of the other shareholders, such as the Trump Group, for the 2004 Transfers and did not hold that the provision was void or unenforceable; (2) Arie is barred from altering the economics of the divorce stipulation because the $3.85 million 2007-2008 arbitration award in favor of Dalia effected a final resolution and conclusion of all disputes thereunder; and (3) there was no mutual mistake because Arie knew that the consent of other shareholders was required for the 2004 Transfers.

Although the Delaware courts' ruling voiding the 2004 Transfers arguably gives rise to a claim for contractual reformation, the scope of the reformation sought is precluded because Arie seeks, *inter alia*, full control of all 3,000 shares of TRI stock and the voting rights related thereto, and the Delaware courts ruled that Trump Group outright owns 67.7 percent of all TRI shares, including the 1,100 Sagi Trust Shares, and that TPR is the record owner and has voting rights as to those TRI shares that are not currently owned by Trump Group. Thus, the requested reformation constitutes an impermissible collateral attack on the Delaware court's decisions, which are entitled to full faith and credit. Moreover, as observed by the Southern District,

32

instead of seeking to right the wrong he had committed with respect to the divorce stipulation,
Arie seeks a declaratory judgment to undo the Delaware rulings and avoid the consequences of
his own breach of the TRI stockholders agreement. (*Supra*, at 15-16). Thus, any right to
reformation Arie might have had pursuant to the divorce stipulation is vitiated by the Delaware
court rulings and by his own acts.

As Arie's claim is brought after the 2004 Transfers were invalidated by the Delaware
courts in 2010, it could not have been raised before or during the conclusion of the arbitration
proceedings in 2008. (*See Indosuez Intl. Fin. v National Reserve Bank*, 304 AD2d 429, 430 [1st
Dept 2003] [res judicata inapplicable if claim arose after conclusion of prior action]). Thus, the
arbitration award has no impact on the instant reformation claim.

In the alternative, Arie contends that the divorce stipulation may be equitably, as opposed
to contractually, reformed due to a "mutual mistake." Although he maintains that both he and
Dalia "reasonably believed" that the 2004 Transfers were valid, he was discredited by the
Delaware courts, and Dalia denies it. Moreover, the Delaware Supreme Court specifically stated
that "[Arie's] misrepresentation was false. In fact, the prior consent of Trump Group signatories
to the Stockholders Agreement . . . was required," and that "when [Arie] effectuated the 2004
Transfers, [he] knew that neither [the Orly or the Sagi] Trust was a 'Permitted Transferee' of the
[TRI] shares under the Stockholders Agreement." (*Genger v TR Investors, LLC*, 26 A3d 180,
184, 185 [Del. Sup. Ct. 2011]). Therefore, crediting Arie's unsubstantiated or conclusory
allegation of a "mutual mistake," would result in an improper end run around the Delaware
courts' determinations.

And, the Court of Appeals recently rebuffed a husband's attempt to reopen a divorce

33

settlement based on alleged post-divorce changes in asset valuation. (*Simkin v Blank*, 19 NY3d 46 [2012]). There, the husband alleged that he and his wife were mutually mistaken about the value of an investment account as it had never actually existed due to Bernard Madoff's Ponzi scheme. First, the Court observed that "a claim predicated on mutual mistake must be pleaded with the requisite particularity necessitated under CPLR 3016 (b) . . . [and] that the mutual mistake must exist at the time the contract is entered into and must be substantial," and that any court-ordered relief of reformation is reserved only for "exceptional situations." (*Id.* at 52). The Court, moreover, analogized the circumstances with a dispute over marital assets that unexpectedly gained or lost value after the dissolution of the marriage. (*Id.* at 55). Here, it is apparent that the value of TRI shares increased subsequent to the execution of the divorce stipulation and that Arie did not expect that the economic scheme he had carefully devised under it would be invalidated by the court.

### 2. Constructive trust, unjust enrichment and rescission (second and fourth causes of action)

Arie alleges that Dalia has been unjustly enriched because (1) the 2004 Transfers were voided and the transferred shares reverted to TPR, and (2) if Dalia were permitted to retain the 51 percent interest in TPR she received under the divorce stipulation while Arie was divested of his 14 percent interest in TRI and his right to vote 52.25 percent of the TRI shares which he controlled prior to the voiding of those transfers, Dalia would be unjustly enriched at his expense. Thus, Dalia's alleged unjust enrichment stems from the voiding of the 2004 Transfers by the Delaware court. As the voiding of the 2004 Transfers was due to Arie's own acts in causing TPR to violate the shareholders agreement, as found by the Chancery Court, Arie cannot complain that Dalia was unjustly enriched by it. The same holds true for the cause of action for rescission.

In addition, as unjust enrichment is an element required for the imposition of a constructive trust, and as Arie has failed to show that Dalia was unjustly enriched, the constructive trust cause of action cannot stand as a matter of law. (*Simonds v Simonds*, 45 NY2d 233, 242 [1978] [purpose of constructive trust is to prevent unjust enrichment]). Alternatively, the constructive trust claim fails because the current facts do not warrant the relief requested, the reasons for which are set forth above (*supra*, at 16-18) in conjunction with Trump Group's motion to dismiss an identical claim against it.

### 3. Permanent injunction (fifth cause of action)

Arie argues in opposition to Dalia's motion to dismiss that Dalia should be permanently enjoined from interfering with his asserted interest in the TRI shares because his claims of reformation/rescission, constructive trust and unjust enrichment will result in an unraveling of the 2004 Transaction documents and the divorce stipulation, and will likely result in Dalia holding interests in the TRI shares. Thus, Arie argues that an injunction will prevent her from interfering with his interests in those shares. (Arie's Opposition Brief, at 20-21). Because all of the above claims against Dalia have no merit, there is no basis for granting injunctive relief.

### D. Motion of Trump Group to supplement the record (motion sequence number 015)

The Trump Group's motion to supplement the record on its motion is denied as, in light of the above findings, the documents it seeks to add are unnecessary.

### III. CONCLUSION

Based on all of the foregoing, it is hereby

ORDERED, that with respect to motion sequence number 006, the motion of defendant Dalia Genger seeking dismissal of all causes of action asserted in the complaint as against her is

35

granted in all respects, and the complaint is severed and dismissed as against said defendant with

costs and disbursements as taxed by the Clerk of the Court, and the Clerk is directed to enter

judgment accordingly; it is further

ORDERED, that with respect to motion sequence number 007, the motion of defendant

Sagi Genger seeking dismissal of all causes of action asserted in the complaint as against him is

granted to the extent of dismissing the first, second, fourth (rescission only), fifth, ninth and tenth

causes of action, and is otherwise denied; it is further

ORDERED, that with respect to motion sequence number 009, the motion of defendant

Rochelle Fang, individually and as trustee of the Sagi Genger 1993 Trust (the Sagi Trust),

seeking dismissal of all causes of action asserted in the complaint as against her is granted in all

respects, and the complaint is severed and dismissed as against said defendant with costs and

disbursements as taxed by the Clerk of the Court, and the Clerk is directed to enter judgment

accordingly; it is further

ORDERED, that with respect to motion sequence number 010, the motion of defendant

TPR Investment Associates (TPR) seeking dismissal of all causes of action asserted in the

complaint as against TPR is granted to the extent of dismissing the first, second, third, fourth

(rescission only), fifth, sixth, and tenth causes of action, and is otherwise denied; it is further

ORDERED, that with respect to the motion sequence number 010, the motion of the Sagi

Trust seeking dismissal of all causes of action asserted in the complaint as against the Sagi Trust

is granted in all respects, and the complaint is severed and dismissed as against said defendant

with costs and disbursements as taxed by the Clerk of the Court, and the Clerk is directed to enter

judgment accordingly; it is further

36

ORDERED, that with respect to motion sequence number 011, the motion of defendants Glencova Invesment Company, TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Jules Trump, Eddie Trump and Mark Hirsch (collectively, Trump Group) seeking dismissal of all causes of action asserted in the complaint against Trump Group is granted to the extent of dismissing the first, second, third (conspiracy only), fourth (rescission only), fifth, eighth and tenth causes of action, and is otherwise denied; and it is further

ORDERED, that the conspiracy cause of action asserted against any of the defendants as part of the aiding and abetting causes of action sounding in tort is dismissed; it is further

ORDERED, that defendants Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Jules Trump, Eddie Trump, and Mark Hirsch's motion for permission to supplement the record is denied.

ENTER:

Barbara Jaffe, JSC

DATED:    January 3, 2013
          New York, New York

37

## CREDIT AND FORBEARANCE AGREEMENT AND
## SECOND AMENDMENT AND RESTATEMENT OF PROMISSORY NOTE

THIS CREDIT AND FORBEARANCE AGREEMENT AND SECOND AMENDMENT AND RESTATEMENT OF PROMISSORY NOTE is made effective as of May __, 2012 (this "**Agreement**") by and between the ORLY GENGER 1993 TRUST, a trust settled on December 13, 1993 (the "**Trust**") pursuant to that certain Trust Agreement dated December 13, 1993 (the "**Trust Agreement**") between Arie Genger as grantor and Lawrence M. Small and Sash A. Spenser as original Trustees, acting through Dalia Genger, its current Trustee ("**Dalia**" or "**Trustee**"), and MANHATTAN SAFETY COMPANY, LTD., a corporation organized under the laws of St. Kitts, W.I. ("**Manhattan**"). Capitalized terms not otherwise defined herein have the meanings ascribed to them in Section 1.2 below.

## RECITALS

**A.**     The Trust wishes to obtain additional financing and the forbearance in the enforcement of the 2011 Note so as to improve its ability to assert and defend its rights in the TRI Proceedings to the TRI Shares.

**B.**     Manhattan wishes to obtain certain representations and warranties in consideration for providing additional financing in the amount of up to Four Hundred Thousand Dollars and No Cents ($400,000.00) (the "**Manhattan Financing**") and its agreement to forbear in the enforcement of the 2011 Note.

**C.**     TPR Investment Associates, Inc., a Delaware corporation ("**TPR**"), and the Trust entered into an agreement on or about October 29, 2004 (the "**Share Transfer**") whereby TPR contracted to sell to the Trust 1,102.8 shares (the "**TRI Shares**") of Trans Resources, Inc., a Delaware corporation ("**TRI**"), for a nominal consideration.

**D.**     Certain former indirect shareholders of TRI have challenged the validity of the Share Transfer in various legal proceedings and other parties have engaged in litigation and arbitration proceedings relating to various issues concerning TRI, its shares and the appropriate consideration for the purchase and sale of shares of TRI, as well as the appointment of, and validity of actions taken by, the Trustee (collectively the "**TRI Proceedings**").

**E.**     The Trust, TPR, and D&K LP, a Delaware limited partnership ("**D&K**"), entered into a Settlement Agreement dated October 2, 2011 as subsequently amended and restated in an Amended and Restated Settlement Agreement dated March 16, 2012 (the "**Settlement**").

**F.**     Pursuant to the Settlement, (i) TPR relinquished in favor of the Trust any economic interest held by it in the TRI Shares and assigned to the Trust its right to any economic benefit of the TRI Shares, including any proceeds from the sale thereof, including the approximately Ten Million Three Hundred Thousand Dollars ($10,300,000) (the "**Minimum Payment**") in proceeds from the sale of the TRI Shares to TR Investors, LLC, Glencova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC

DG 00190

(collectively, the "**Trump Group**") pursuant to the terms of a letter agreement dated August 22, 2008 (the "**Trump Sale Agreement**") between TPR and the Trump Group and (ii) an obligation of approximately Four Million Five Hundred Thousand Dollars of D&K to TPR, guaranteed by the Trust, representing the net amount following the partial foreclosure of an Eight Million Nine Hundred and Fifty Thousand Dollars ($8,950,000) obligation evidenced by a promissory note in the original principal amount, was cancelled and replaced by a new promissory note of the Trust in the original principal amount of Four Million Dollars ($4,000,000) payable to TPR (the "**2011 Note**").

G.    In connection with the TRI Proceedings, Pedowitz & Meister, the escrow agent holding funds approximating the Minimum Amount (the "**Escrowed Amount**") pursuant to a certain Escrow Agreement dated as of September 1, 2010 (the "**Escrow Agreement**"), filed an interpleader action (the "**Interpleader Action**") currently pending in the United States District Court for the Southern District of the State of New York (the "**Court**") in *Pedowitz v. TPR*, 11 Civ. 5602 and deposited the Escrowed Amount with the Court to hold pending its determination as to which party is entitled to the Escrowed Amount.

H.    Pursuant to that certain Agreement Amending Terms of Promissory Note dated as of October 3, 2011, certain provisions of the 2011 Note were amended (as so amended, the "**Amended Note**").

I.    TPR has agreed to sell and assign the Note to Manhattan as evidenced by that certain Bill of Sale and Note Assignment of even date herewith.

J.    Manhattan has agreed to make the Manhattan Loan in two installments: (1) an initial advance (the "**Initial Advance**") of Two Hundred Thousand Dollars and No Cents ($200,000.00), as evidenced by a promissory note in the principal amount of Two Hundred Thousand Dollars and No Cents ($200,000.00) (the "**New Note**"), payable as provided herein, and (2) an additional advance (the "**Additional Advance**") of Two Hundred Thousand Dollars and No Cents ($200,000.00) to be made upon request by the Trust, and evidenced by the note as amended and restated to provide for a face amount of Four Million Two Hundred Forty Thousand Dollars and No Cents ($4,240,000.00) (the "**Amended and Restated Note**" or the "**Note**") (inclusive of the Forbearance Fee if paid as provided herein), with the Additional Advance to bear interest from the date made on the terms of this Agreement and the Note. The Manhattan Loan, including both the Initial Advance and the Additional Advance, shall be subject to certain conditions, including the Trust's agreement to amend and restate the 2011 Note and enter into this Agreement.

NOW, **THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, agree as follows:

**1.    Definitions.**

1.1    General.    Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of this Agreement or as otherwise may be provided in other provisions of this Agreement. Terms defined in the Note, the

Settlement or the New Note and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Note, Settlement or New Note, as the case may be. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between this Agreement, the Note, the Settlement or the New Note, this Agreement shall govern and control.

1.2    <u>Definitions</u>. In this Agreement:

"**Additional Advance**" has the meaning set forth in Recital J.

"**Affiliate**" or "**Affiliates**" means "affiliate" as defined in either (a) Bankruptcy Code §101(2) or (b) Rule 144 of the Securities Act.

"**Agreement**" means this Credit and Forbearance Agreement and Second Amended and Restated Promissory Note.

"**Amended Note**" has the meaning set forth in Recital H.

"**Amended and Restated Note**" has the meaning set forth in Recital J.

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, 11 U.S.C. §§101 <u>et seq.</u>, as amended.

"**Bill of Sale**" means the bill of sale and note assignment relating to the assignment of the 2011 Note.

"**Business Day**" means any day that is not (a) a Saturday, (b) a Sunday or (c) any other day on which the Federal Reserve Bank of New York is closed.

"**Claim**" has the meaning specified in Section 7.1.

"**Claimant**" means any person or entity claiming, or having a right to claim, a mechanic's lien against the Minimum Payment or the TRI Shares, or any portion thereof, or who is delivered, or has the right to deliver, a stop notice in connection with the payment by Trust of its obligations under the Note.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated under it.

"**Court**" has the meaning set forth in Recital G.

"**Dalia**" means Dalia Genger, the current Trustee of the Trust.

"**D&K**" means D&K LP, a Delaware limited partnership.

"**Debtor Relief Law**" means the Bankruptcy Code, and together with any other bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, or extensions generally with creditors, or proceedings seeking reorganization, arrangement, liquidation, receivership, or other similar relief.

"**Distribution**" means any payment of principal, interest, penalty or costs paid by or on behalf of the Trust in connection with the Note or the Transferred Rights.

"**Encumbrance**" or, if used as a verb, "**Encumber**," means any (a) mortgage, pledge, lien, security interest, charge, hypothecation, security agreement, security arrangement or encumbrance or other adverse claim against title of any kind; (b) purchase, option, call or put agreement or arrangement; (c) subordination agreement or arrangement; or (d) agreement or arrangement to create or effect any of the foregoing.

"**Entity**" means any individual, partnership, corporation, limited liability company, association, estate, trust, business trust, Governmental Authority, fund, investment account or other entity.

"**Escrow Agreement**" has the meaning set forth in Recital G.

"**Escrowed Amount**" has the meaning set forth in Recital G.

"**Forbearance Fee**" means a fee of Forty Thousand Dollars and No Cents ($40,000), being equal to one percent (1%) of Four Million Dollars and No Cents ($4,000,000.00), the face amount of the 2011 Note, paid in consideration of Manhattan's agreement to forbear as provided in this Agreement.

"**Governmental Authority**" means any federal, state, or other governmental department, agency, institution, authority, regulatory body, court or tribunal, foreign or domestic, and includes arbitration bodies, whether governmental, private or otherwise.

"**Indemnified Party**" has the meaning specified in Section 7.2.

"**Indemnifying Party**" has the meaning specified in Section 7.2.

"**Initial Advance**" has the meaning set forth in Recital J.

"**Insolvent**" has the meaning set forth in Section 4(h).

"**Interpleader Action**" has the meaning set forth in Recital G.

"**Liability**" or "**Liabilities**" shall mean all debts, obligations and other liabilities of any kind or nature (whether known, unknown, accrued, or not accrued, absolute or contingent, liquidated or unliquidated, due or to become due, asserted or unasserted or otherwise).

"**Knowledge**" means the actual knowledge of Trustee.

"**Manhattan**" means Manhattan Safety Company, Ltd., a corporation organized under the laws of St. Kitts, W.I.

"**Manhattan Indemnitees**" has the meaning specified in Section 7.1.

"**Manhattan Loan**" has the meaning set forth in Recital B.

"**Minimum Payment**" means Ten Million Three Hundred Thousand Dollars and No Cents ($10,300,000.00).

"**New Note**" means the promissory note in the face principal amount of Two Hundred Thousand Dollars and No Cents ($200,000.00), comprising the Initial Advance of the Manhattan Loan and having the Trust as maker and Manhattan as payee, which evidences the Manhattan Loan.

"**Note**" has the meaning set forth in Recital J.

"**Party**" means the Trust, Trustee or Manhattan, as applicable, and their respective successors and permitted assigns.

"**Reimbursement Claims**" means any claim of TPR or the Trust arising in connection with the return to, disgorgement by, or reimbursement of, TPR or the Trust, or any other Entity, of all or any portion of any payment or transfer received by TPR or Trust on account of the Transferred Rights, including any claims arising under Bankruptcy Code §502(h).

"**Sagi**" means Sagi Genger, the President and the sole primary beneficiary (together with his children) of the Sagi Genger 1993 Trust, the owner of a majority of the shares of TPR.

"**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§77a et seq., as amended, and the rules and regulations promulgated under it.

"**Settlement**" means that certain amended and restated settlement agreement dated as of March 16, 2012 by and among TPR, the Trust and D&K.

"**Share Proceeds**" means any proceeds in cash or kind paid or payable to the Trust relating to the TRI Shares.

"**Share Transfer**" has the meaning set forth in Recital D.

"**TPR**" means TPR Investment Associates, Inc., a Delaware corporation.

"**TRI**" means Trans Resources, Inc., a Delaware corporation.

"**TRI Shares**" means the 1,102.8 shares of TRI transferred to the Trust pursuant to the Share Transfer.

"**TRI Proceedings**" has the meaning set forth in Recital D.

"**Transferred Rights**" means any and all of Manhattan's right, title, and interest in, to and under the Note and the Settlement (solely to the extent those rights of TPR in the Settlement which have been transferred by TPR to Manhattan relate to amounts payable under the Note), including:

> (a)    all amounts funded by or payable to TPR under the Settlement relating to the Note, and all obligations owed to TPR in connection

with the Note, including but not limited to, accrued and unpaid interest;

(b)    any proof of claim;

(c)    all claims (including "claims" as defined in Bankruptcy Code §101(5)), suits, causes of action, and any other right of TPR, whether known or unknown, against Trust, the Trustee or any of their respective Affiliates, agents, representatives, contractors, advisors, or any other Entity that in any way is based upon, arises out of or is related to any of the foregoing, including, to the extent permitted to be assigned under applicable law, all claims (including contract claims, tort claims, malpractice claims, and claims under any law governing the purchase and sale of, or indentures for, securities), suits, causes of action, and any other right of TPR against any attorney, accountant, financial advisor, or other Entity arising under or in connection with the Note and the Transferee Rights or the transactions related thereto or contemplated thereby;

(d)    all cash, securities, or other property, and all setoffs and recoupments, received, applied, or effected by or for the account of TPR under the Note (whether for principal, interest, fees, reimbursement obligations, or otherwise) from and after the date of this Agreement, and all cash, securities, interest, dividends, and other property that may be exchanged for, or distributed or collected with respect to, any of the foregoing;

(e)    the economic benefit received by TPR relating to the Note transferred to Manhattan; and

(f)    all proceeds of the foregoing.

**"Trump Group"** has the meaning set forth in Recital F.

**"Trump Sale Agreement"** has the meaning set forth in Recital F.

**"Trust"** has the meaning set forth in the heading of this Agreement.

**"Trustee"** has the meaning set forth in the heading of this Agreement.

**"2011 Note"** has the meaning set forth in Recital F.

DG 00195

2.      **Recitals True.** The Recitals are hereby incorporated into this Agreement and made a part hereof. The Trust and the Trustee, jointly and severally, represent and warrant that the Recitals are true and correct in all material respects and do not fail to state a fact necessary to make them not misleading.

3.      **Amendment and Restatement of Note; Agreement to Make the Manhattan Loan.**

3.1     The Trust as maker agrees to amend and restate the 2011 Note, in the form attached as **Exhibit A** hereto (the "**Amended and Restated Note**"), including but not limited to amendments to (i) add covenants with respect to (A) the waiver of defenses to payment of amounts payable under the Note and (B) prohibitions on (1) any Encumbrance on (x) the TRI Shares or (y) the Minimum Payment or any other payment the Trust may receive or be entitled to receive from (a) the Court or (b) any other party, in connection with the TRI Shares or otherwise, and (2) (x) any (a) borrowing or any agreement to borrow money, or (b) guaranty, agreement to indemnify or other agreement to create any contingent monetary obligation, or (y) the incurrence of any material Liability, other than costs for legal services relating to the TRI Proceedings, which in no event, without the prior consent of Manhattan, shall exceed in aggregate Five Hundred Thousand Dollars and No Cents ($500,000.00), and (ii) amend the face amount of the Note to Four Million Two Hundred Forty Thousand Dollars and No Cents ($4,240,000.00) to reflect the Additional Advance of the Manhattan Loan and the Forbearance Fee, in the event such are made and payable under the terms of this Agreement and the Note.

3.2     On the terms set forth in the Amended and Restated Note, in the form attached as **Exhibit A** hereto, and the New Note, in the form attached as **Exhibit B** hereto, and subject to the conditions set forth in this Agreement and in the Amended and Restated Note and the New Note, Manhattan agrees to make, and the Trust agrees to accept, the Manhattan Loan.

4.      **Representations and Warranties of the Trust and Trustee.** Trust and Trustee, each jointly and severally, represents and warrants to Manhattan as of the date of this Agreement that:

        (a)     Trust (i) is duly organized and validly existing under the laws of its jurisdiction of organization or incorporation, (ii) is in good standing under such laws and (iii) has full power and authority to execute, deliver and perform its obligations under this Agreement, the Note and the New Note.

        (b)     Trust's execution, delivery, and performance of this Agreement, , the Note and the New Note will not result in a breach or violation of any provision of (i) Trust's organizational documents, (ii) any statute, law, writ, order, rule or regulation of any Governmental Authority applicable to Trust, (iii) any judgment, injunction, decree or determination of any Governmental Authority applicable to Trust or (iv) any contract, indenture, mortgage, loan agreement, note, lease or other agreement, document or instrument to which