Trust may be a party, by which Trust may be bound or to which any of the assets of Trust is subject.

(c)   (i)   This Agreement, the Note and the New Note each (A) has been duly and validly authorized by Trustee on behalf of Trust, executed and delivered by Trust and (B) are the legal, valid and binding obligations of Trust, enforceable against Trust in accordance with their respective terms, except that such enforceability against Trust may be limited by bankruptcy, insolvency, or other similar laws of general applicability affecting the enforcement of creditors' rights generally and by a court's discretion in relation to equitable remedies; and

(ii)   no notice to, registration with, consent or approval of or any other action by any relevant Governmental Authority or other Entity is or will be required for Trust to execute, deliver, and perform its obligations under, this Agreement, the Note and the New Note.

(d)   Trust is a good faith claimant to the Share Proceeds or the TRI Shares, as the case may be, and its claim thereto is free and clear of any Encumbrance.

(e)   Other than the TRI Proceedings and any other proceedings disclosed in writing by Trust to Manhattan, no proceedings are pending against the Trust, the Trustee or any of their respective Affiliates or, to the best of Trust's and Trustee's Knowledge, threatened against the Trust, the Trustee or any of their respective Affiliates before any relevant Governmental Authority that, individually or in aggregate, may materially and adversely affect any action taken or to be taken by Trust under this Agreement, including the sale and assignment of the Note by TPR to Manhattan and the Transferred Rights to Manhattan, or the Manhattan Loan as evidenced by the New Note.

(f)   Trust has no (A) payment obligation, including any contingent payment obligation in the nature of a guarantee or indemnification or similar obligation, to any individual, Entity or Governmental Authority, and has entered into no agreement that could reasonably result in a payment obligation to any party for any amount that individually or together with other payment obligation of the Trust is equal to or greater than Five Hundred Thousand Dollars and No Cents ($500,000.00) and (B) Liability to any individual, Entity or Governmental Authority that individually or together with any other Liability may adversely affect repayment of the Note or the New Note or the value of Trust's interest in the Minimum Payment or TRI Shares, as the case may be.

(g)     To the best of Trust's and Trustee's Knowledge, neither the Trust
nor the Trustee or any other party to the TRI Proceedings has
received any notice or has any reasonable basis to believe that the
Trust will not be entitled to receive one or the other of (A) an
amount not less than the Minimum Payment or (B) the TRI Shares
upon final determination and exhaustion of all appeals or
challenges to such final determination, of all the material matters at
issue in the TRI Proceedings.

(h)     Trust is not now insolvent and will not be rendered insolvent by
any of the transactions contemplated by this Agreement. As used
herein, **"insolvent"** means that the sum of the debts and probable
Liabilities of Trust exceeds the fair saleable value of its assets.
Trust is not in receivership, nor is an application for receivership
pending.  No proceedings are pending by or against Trust in
bankruptcy or reorganization in any state or federal court under
any Debtor Relief Law, nor has it committed any act of bankruptcy
as such terms are used in the Bankruptcy Code.  Immediately after
giving effect to the consummation of the transactions contemplated
by this Agreement, (i) Trust will be able to pay its Liabilities as
they become due in the usual course of its business; (ii) Trust will
not have assets (calculated at fair market value) that exceed its
Liabilities; and (iii) taking into account all pending and threatened
litigation, final judgments against Trust for money damages are
not reasonably anticipated to be rendered at a time when, or in
amounts such that, Trust will be unable to satisfy any such
judgments promptly in accordance with their terms (taking into
account the maximum probable amount of such judgments in any
such actions and the earliest reasonable time at which such
judgments might be rendered) as well as all other obligations of
Trust. The cash available to Trust, taking into account all other
anticipated uses of cash, as well as taking into account reasonably
anticipated payments on insurance covering such actions and
Liabilities, will be sufficient to pay all such debts and judgments
promptly in accordance with their terms.

(i)     No broker, finder or other Entity acting under the authority of the
Trust, the Trustee or any of their respective Affiliates is entitled to
any broker's commission or other fee in connection with the
transactions contemplated by this Agreement, including but not
limited to the Manhattan Loan and New Note, for which
Manhattan could be responsible.

5.     **Manhattan's Representations and Warranties.**   Manhattan represents and
warrants to Trustee as of the date of this Agreement that:

(a)     Manhattan (i) is duly organized and validly existing under the laws
of its jurisdiction of organization or incorporation, (ii) is in good

standing under such laws and (iii) has full power and authority to execute, deliver and perform its obligations under, this Agreement.

(b)    Manhattan's execution, delivery, and performance of this Agreement have not resulted and will not result in a breach or violation of any provision of (i) Manhattan's organizational documents, (ii) any statute, law, writ, order, rule or regulation of any Governmental Authority applicable to Manhattan, (iii) any judgment, injunction, decree or determination of any Governmental Authority applicable to Manhattan or (iv) any contract, indenture, mortgage, loan agreement, note, lease or other agreement, document or instrument by which Manhattan may be a party, by which Manhattan may be bound or to which any of the assets of Manhattan is subject.

(c)         (i)    This Agreement and the Manhattan Loan each (A) has been duly and validly authorized by Manhattan's board of directors or authorized committee thereof or other party which must approve the same pursuant to Manhattan's organizational documents, executed and delivered by Manhattan and (B) are the legal, valid and binding obligations of Manhattan, enforceable against Manhattan in accordance with their respective terms, except that such enforceability may be limited by bankruptcy, insolvency, or other similar laws of general applicability affecting the enforcement of creditors' rights generally and by a court's discretion in relation to equitable remedies; and

           (ii)    no notice to, registration with, consent or approval of or any other action by any relevant Governmental Authority or other Entity is or will be required for Manhattan to execute, deliver, and perform its obligations this Agreement and the Manhattan Loan.

(d)    No broker, finder or other Entity acting under the authority of Manhattan or any of its Affiliates is entitled to any broker's commission or other fee in connection with the transactions contemplated by this Agreement, including the Manhattan Loan, for which the Trust could be responsible.

(e)    Manhattan is an "accredited investor" as defined in Rule 501 under the Securities Act. Without characterizing the Manhattan Loan and New Note as a "security" within the meaning of applicable securities laws, Manhattan has not made any offers to sell, or solicitations of any offers to buy, all or any portion of the Manhattan Loan or the New Note in violation of any applicable securities laws.

6. **Covenants.**

    6.1    The Trust hereby covenants and agrees as follows:

        (a)    Trust shall not Encumber the TRI Shares, its interest in the TRI Shares or any proceeds of the TRI Shares or any material amount of its assets for so long as any amount is owed under this Note.

        (b)    Trust acknowledges the sale and assignment of the 2011 Note and the Transferred Rights to Manhattan and agrees to deliver all amounts payable with respect to the Note and the Transferred Rights to Manhattan at the address provided to Trust in writing by Manhattan.

        (c)    Trust hereby waives any defenses it may have to payment of amounts payable under the Note, including all defenses it may have with respect to Manhattan, TPR or any other prior holder of the Note.

        (d)    Trust agrees that it shall not borrow or enter into any agreement to borrow an aggregate amount greater than Four Hundred Thousand Dollars and No Cents ($400,000.00), including amounts borrowed as part of the Manhattan Loan; provided, however, that this shall not prevent Trust from engaging in agreements for services with attorneys and others in connection with the TRI Proceedings; and provided, further, that Trust may borrow such additional sums as may be subordinated to the Manhattan Loan, on terms and subject to conditions satisfactory to Manhattan.

    6.2    Manhattan hereby covenants and agrees that notwithstanding any payment default under the Note or the New Note, but subject to the Trust's compliance with all other terms and conditions of the Note and the New Note, Manhattan agrees to forbear from collection of amounts due and owing on the Note, and not take any action, including the commencement of any proceeding, to collect amounts due under the Note or the New Note, until the earliest to occur of (i) the date on which Dalia no longer serves as Trustee of the Trust, (ii) the final resolution of the Interpleader Action or (iii) November 1, 2014; provided, however, that notwithstanding the foregoing, Manhattan may take any action reasonably necessary to ensure the payment of all amounts payable under the Note or the New Note, including, but not limited to, the acceleration of the obligations under the Note or the New Note and the commencement of enforcement actions to collect amounts owing under the Note and or the New Note upon the occurrence of (x) any event of default under the Note or the New Note, other than a payment default or (y) any action by an individual or Entity which Manhattan believes may adversely affect the Trust's ability to fully perform all of its obligations under this Agreement, the Note, the Manhattan Loan or the New Note.

    6.3    The Forbearance Fee shall be payable by increasing the amount outstanding under the Note by the amount of the Forbearance Fee effective November 1, 2012 if the Note is not previously paid in full by such date.

7.    **Indemnification.**

7.1    Trust and the Trustee, jointly and severally, shall indemnify, defend, and hold Manhattan and its officers, directors, agents, partners, members, controlling Entities and employees (collectively, "**Manhattan Indemnitees**") harmless from and against any liability, claim, cost, loss, judgment, damage or expense, including reasonable attorneys' fees and expenses (collectively, a "**Claim**") that any Manhattan Indemnitee incurs or suffers as a result of, or arising out of (i) a breach of any of Trust representations, warranties, covenants or agreements in this Agreement, (ii) any legal or arbitral proceeding, any investigation or any actions preliminary or related to any of the foregoing, which relates to, or arises from, the same factual basis as, the TRI Proceedings, (iii) compliance with any subpoena or other demand to be deposed, testify or produce documents in a proceeding before a Governmental Authority or an arbitrator or (iv) otherwise resulting from any action taken by any Claimant; provided, however, that the indemnification obligations of the Trustee under this Agreement (x) shall not include Claims made after Dalia no longer serves as Trustee of the Trust and (y) are in the nature of a surety for the obligations of the Trust and are conditional upon demand first being made upon, and a good faith attempt made to collect from, the Trust as provided in Section 7.3 below; and provided, further, that the foregoing proviso shall not be construed in any way to limit the indemnification obligations of the Trust under this Agreement.

7.2    If a third party commences any action or makes any demand against Manhattan Indemnities for which any Manhattan Indemnitees ("**Indemnified Party**") is entitled to indemnification under this Agreement, such Indemnified Party shall promptly notify Trust and Dalia (collectively and individually "**Indemnifying Party**") in writing of such action or demand; provided, however, that if the Indemnified Party assumes the defense of the action and fails to provide prompt notice to the Indemnifying Party, such failure shall not limit in any way the Indemnifying Party's obligation to indemnify the Indemnified Party except to the extent that such failure materially prejudices the Indemnifying Party's ability to defend the action. The Indemnifying Party may, at its own expense and without limiting its obligation to indemnify the Indemnified Party, participate in the defense of such action with counsel reasonably satisfactory to the Indemnified Party, or the Indemnifying Party may, at its own expense and without limiting its obligation to indemnify the Indemnified Party, assume the defense of such action with counsel reasonably acceptable to the Indemnified Party. In any event, the Indemnified Party that has assumed the defense of such action shall provide the Trust and Dalia with copies of all notices, pleadings, and other papers filed or served in such action. Neither Party shall make any settlement or adjustment without prior written consent, which consent (a) in the case of the Indemnifying Party will not be unreasonably withheld if the settlement or adjustment involves only the payment of money damages by the Indemnifying Party and (b) in the case of the Indemnified Party may be withheld for any reason if the settlement or adjustment involves performance or admission by the Indemnified Party.

7.3    In the event of the occurrence of a Claim for which an Indemnified Party is entitled to indemnification hereunder, the Indemnified Party shall first make demand upon, and seek payment and performance from, the Trust, and then, and only if, after such demand the Trust fails to pay or perform as required by this Agreement, shall the

Indemnified Party seek payment and performance from the Trustee. Amounts payable by the Indemnifying Party, to the extent not paid by an Indemnifying Party, may be added to the principal amount Note and shall accrue interest from the date of the incurrence of such expense by the Indemnified Party at the prevailing rate of interest as provided under the Note.

7.4    Each indemnity in this Agreement is a continuing obligation, separate and independent from the other obligations of the Trust and Dalia and survives termination of this Agreement or any transfer pursuant to Section 10 of this Agreement. It is not necessary for a Party to incur expense or make payment before enforcing a right of indemnity conferred by this Agreement.

**8.    Costs and Expenses.** Trust and Manhattan each agrees to bear its own, legal and other costs and expenses for preparing, negotiating, executing and delivering this Agreement and any related documents and consummating the transaction contemplated by this Agreement, including legal and other costs and expenses relating to the amendment of the Amended Note, the Manhattan Loan and the New Note.

**9.    Notices.**

9.1    All communications between the Parties in respect of, or notices, requests, directions, consents or other information sent under, this Agreement shall be in writing, hand delivered or sent by overnight courier, electronic transmission or telecopier, addressed to the relevant Party at its address, electronic mail or facsimile number specified in **Schedule 9.1** to this Agreement at such other address, electronic mail or facsimile number as such Party may subsequently request in writing.    All such communications and notices shall be effective upon receipt.

9.2    If Trust receives any notices, correspondence or other documents in respect of the Transferred Rights, the Note or the Settlement that, to the best of Trust's Knowledge, were not sent to Manhattan, Trust shall promptly forward them to Manhattan.

**10.    Further Transfers.**

10.1    Manhattan may sell, assign, grant a participation in, or otherwise transfer all or any portion of the Note or Transferred Rights, this Agreement, its rights under this Agreement, the Manhattan Loan or the New Note, or any interest in any of the foregoing without the consent of or notice to Trust.

10.2    Trust may assign its rights under this Agreement without the prior written consent of Manhattan; provided, however, that Trust may not delegate its obligations under this Agreement without the prior written consent of Manhattan.

**11.    Exercise of Rights and Remedies.**

11.1    No amendment of any provision of this Agreement shall be effective unless it is in writing and signed by the Parties, and no waiver of any provision of this Agreement, nor consent to any departure by either Party from it, shall be effective unless

it is in writing and signed by the affected Party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

11.2   No failure on the part of a party to exercise, and no delay in exercising, any right or remedy under this Agreement shall operate as a waiver by such Party, nor shall any single or partial exercise of any right or remedy under this Agreement preclude any other or further exercise thereof or the exercise of any other right or remedy. The rights and remedies of each Party provided herein (a) are cumulative and are in addition to, and are not exclusive of, any rights or remedies provided by law (except as otherwise expressly set forth in this Agreement) and (b) are not conditional or contingent on any attempt by such Party to exercise any of its rights or remedies under any other related document or against the other Party or any other Entity. In no event may either Party recover from the other Party any special, consequential or punitive damages.

**12.   Survival; Successors and Assigns.**

12.1   All representations, warranties, covenants, indemnities and other provisions made by the Parties shall be considered to have been relied upon by the Parties, shall (as to representations and warranties) be true and correct as of the date of this Agreement and any other date set forth in Sections 4 or 5, as the case may be, and shall survive the execution, delivery and performance of this Agreement.

12.2   This Agreement, including the representations, warranties, covenants and indemnities contained in this Agreement, shall inure to the benefit of, be binding upon and be enforceable by and against the Parties and their respective successors and permitted assigns.

**13.   Further Assurances.** Each Party agrees to (i) execute and deliver, or cause to be executed and delivered, all such other and further agreements, instruments and other documents and (ii) take or cause to be taken all such other and further actions as the other Party may reasonably request to effectuate the intent and purposes, and carry out the terms, of this Agreement.

**14.   Disclosure.**

14.1   Each Party agrees that, without the prior consent of the other Party, it shall not disclose the contents of this Agreement to any individual or Entity, except that any Party may make any such disclosure (a) as required to implement or enforce this Agreement, (b) if required to do so by any law, court, regulation, subpoena or other legal process, (c) to any Governmental Authority or self-regulatory Entity having or asserting jurisdiction over it, (d) if its attorneys advise it that it has a legal obligation to do so or that failure to do so may  result in it incurring a liability to any other Entity or sanctions that may be imposed by any Governmental Authority, (e) to its Affiliates, professional advisors and auditors or (f) as set forth in Section 14.2.

14.2   Manhattan may disclose the contents of this Agreement to any proposed transferee, assignee, participant, or other Entity proposing to enter into contractual relations with Manhattan in respect of the Note or Transferred Rights, the Manhattan Loan or the New Note or any part of them.

15.    **Entire Agreement; Conflict.**

15.1    This Agreement constitutes the entire agreement of the Parties with respect to the transactions contemplated here by and supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, representations and warranties in respect thereof, all of which have become merged and finally integrated into this Agreement.

15.2    As between Manhattan and the Trust, if there is any inconsistency or conflict between this Agreement and any other document, the provisions of this Agreement shall govern and control.

16.    **Counterparts; Telecopies.** This Agreement may be executed in multiple counterparts and all of such counterparts taken together shall be deemed to constitute one and the same instrument. Transmission by telecopier, facsimile or other form of electronic transmission of an executed counterpart of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart, and shall have the same force and effect as a manually executed original. Each fully executed counterpart of this Agreement shall be deemed to be a duplicate original.

17.    **Relationship Between Manhattan and the Trust.** The relationship between Manhattan and the Trust shall be that of lender and borrower. Neither is a trustee or agent for the other, nor does either have any fiduciary obligations to the other. This Agreement shall not be construed to create a partnership or joint venture between the Parties.

18.    **Severability.** The illegality, invalidity or unenforceability of any provision of this Agreement under the law of any jurisdiction shall not affect its legality, validity or enforceability under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision.

19.    **Governing Law.** THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTION (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED AND DETERMINED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION).

20.    **Waiver of Trial by Jury.** THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTION (WHETHER BASED ON CONTRACT,

TORT OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**21.    Jurisdiction.** The Parties irrevocably agree that, should either Party institute any legal action or proceeding in any jurisdiction (whether for an injunction, specific performance, damages or otherwise) in relation to this Agreement or the transactions contemplated by this Agreement, no immunity (to the extent that it may at any time exist, whether on the grounds of sovereignty or otherwise) from such action or proceeding shall be claimed by it or on its behalf, any such immunity being hereby irrevocably waived, and each Party irrevocably agrees that it and its assets are, and shall be, subject to such legal action or proceeding in respect of its obligations under this Agreement.

**22.    Interpretation.**

22.1    This Agreement and any annexes, schedules or other documents attached to or incorporated by reference into the Agreement.

22.2    Terms used in the singular or the plural include the plural and the singular, respectively; "includes" and "including" are not limiting; and "or" is not exclusive.

22.3    Any reference to a Party includes such Party's successors and permitted assigns.

22.4    Unless otherwise indicated, any reference to:

(a)    this Agreement or any other agreement, document or instrument shall be construed as a reference to this date of this Agreement or, as the case may be, such other agreement, document or instrument as the same may have been, or may at any time before the date of this Agreement be, in effect as modified, amended or supplemented as of the date of this Agreement Date; and

(b)    a statute, law, order, rule or regulation shall be construed as a reference to such statute, law, order, rule or regulation as it may have been, or may at any time before the date of this Agreement be, in effect as modified, amended or supplemented as of the date of this Agreement.

22.5    Section and other headings and captions are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

22.6    This Agreement shall be deemed to have been jointly drafted by the Parties and no provision of it shall be interpreted or construed for or against either Party because such Party actually or purportedly prepared or requested such provision, any other provision or the Agreement as a whole.

**23.    Legal Counsel.** Each Party acknowledges that it or she has been represented by its own legal counsel in connection with the negotiation and drafting of this Agreement. Accordingly, this document shall not be construed against the draftsman. Any rule of construction to the contrary shall be ignored.

[SIGNATURE PAGE FOLLOWS]

**DG 00206**

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed as of the date first written above.

**TRUST:**

ORLY GENGER 1993 TRUST

By: _____
     Dalia Genger, Sole Trustee

STATE OF _____ )
                        )SS:
COUNTY OF _____ )

     The foregoing was sworn to, subscribed and acknowledged before me this 15th day of _____ 2012, by Dalia Genger, as Sole Trustee of The Orly Genger 1993 Trust. She is personally known to me or has produced a driver's license as identification.

_____
Print or Stamp Name: _____
Notary Public: _____
Commission No.: _____
My Commission Expires: _____

MAGDALENA CHARLOTTEN
NOTARY PUBLIC, State of New York
No. 01CH6059474
Qualified in New York County
Certificate Filed in Kings, Queens,
Westchester, Bronx Counties
Commission Expires May 29, 20__

**DALIA:**

By: _____
     Dalia Genger, Individually

STATE OF _____ )
                        )SS:
COUNTY OF _____ )

     The foregoing was sworn to, subscribed and acknowledged before me this 15th day of _____ 2012, by Dalia Genger. She is personally known to me or has produced a driver's license as identification.

_____
Print or Stamp Name: _____
Notary Public: _____
Commission No.: _____
My Commission Expires: _____

MAGDALENA CHARLOTTEN
NOTARY PUBLIC, State of New York
No. 01CH6059474
Qualified in New York County
Certificate Filed in Kings, Queens,
Westchester, Bronx Counties
Commission Expires May 29, 20__

DG-00207

**MANHATTAN:**

MANHATTAN SAFETY COMPANY, LTD.,
a corporation organized under the laws of St. Kitts, W.I.

By: _____          _____
        Greg Gilpin-Payne, President          Witness: Leah Crag-Chaderton


_____
Witness: Yulanda Vanterpool

DG 00208

**SCHEDULE 9.1**

**NOTICES**

**Trust:**

Pedowitz & Meister
1501 Broadway, Suite 800
New York NY 10036-5505
Attention: Robert Meister

**Dalia:**
200 East 65th - apt 32w
New York, NY
Attention: Trustee

**Manhattan:**

858 Zenway Blvd
Frigate Bay
St Kitts, W.I.

**DG 00209**

**EXECUTION VERSION**

### AMENDED AND RESTATED
### PROMISSORY NOTE

$4,240,000.00                                                                October 3, 2011

FOR VALUE RECEIVED, the undersigned, the ORLY GENGER 1993 TRUST ("Maker" or the "Trust"), a trust settled on December 13, 1993 pursuant to that certain Trust Agreement dated December 13, 1993 (the "Trust Agreement") and as authorized by its current sole trustee, Dalia Genger ( "DG" or "Trustee"), promises to pay to the order of MANHATTAN SAFETY COMPANY, LTD., a corporation organized under the laws of St. Kitts, W.I. ("Manhattan;" together with its successors and assigns, the "Holder"), the principal amount of FOUR MILLION TWO HUNDRED FORTY THOUSAND DOLLARS AND NO CENTS ($4,240,000.00) ("Principal"), or such other amount as may have been advanced under this Note, as provided herein, together with accrued interest calculated from (i) the date of the Original Note (as herein after defined) on the face amount of the Original Note, (ii) (x) such date or dates, if any, on which an Additional Advance (as herein defined) is made on the amount of the Additional Advance made on such date or dates, (iii) November 1, 2012, in the case of an advance in payment of the Forbearance Fee, on the Forbearance Fee or (iv) the date or dates of the incurrence of any cost or expense by an Indemnified Party on the amount of such cost or expense (each an "Indemnity Payment" and collectively, the "Indemnity Payments") which is not paid by an Indemnifying Party, at the rate of three percent (3%) percent per annum on the unpaid Principal balance or such other interest rate then prevailing and payable under this Note, computed on the basis of the actual number of days elapsed a year of 360 days.

This Amended and Restated Note amends and restates that certain promissory note dated October 3, 2011 in the original principal amount of Four Million Dollars and No Cents ($4,000,000.00) (the "Original Note") and is issued in replacement thereof. This Note is the Note contemplated by that certain Credit and Forbearance Agreement and Second Amendment and Restatement of Promissory Note dated May __, 2012 (the "Agreement") by and between the Trust and Manhattan. Among other things, the Original Note has been amended to provide for the possibility of (i) additional advance(s) ("Additional Advances") made to Maker, (ii) the payment of a Forbearance Fee by Maker under the terms of the Agreement and this Note and (iii) the incurrence by Maker of an obligation to pay an Indemnity Payment. Capitalized terms used herein without definition shall have the meanings ascribed to them in the Agreement.

### 1.  Payments and Prepayments.

1.1    Principal and interest shall be paid to Holder at the address set forth in the Agreement or such other address as may appear the books and records of the Maker or such other place as the Holder hereof from time to time shall designate in writing to Maker.

1.2    Principal and all accrued and unpaid interest shall be due and payable on the date (the "Maturity Date") which is the earliest to occur of:

(a)    November 1, 2012; or

DG 00979

(b)  the date of Maker's receipt of the proceeds ("**TRI Shares Proceeds**") from the sale of shares (the "**TRI Shares**") of Trans Resources, Inc., a Delaware corporation ("**TRI**"), either pursuant to the interpleader action (the "**Interpleader Action**") pending in the United States District Court for the Southern District of the State of New York (the "**Court**") in *Pedowitz v. TPR*, 11 Civ. 5602, or otherwise.

1.3    Notwithstanding anything to the contrary, to the extent that the Court awards the Trust any of the interpleaded funds, the Trust shall first apply such funds to the extent necessary to pay this Note, including all accrued and unpaid interest hereon, in full, before applying such funds for any other purpose.

## 2.  Events of Default.

2.1    Events of Default.  It is expressly agreed that the entire Principal amount of this Note, together with all accrued interest thereon, shall immediately become due and payable (without demand for payment, notice of nonpayment, presentment, notice of dishonor, protest, notice of protest, or any other notice, all of which are hereby expressly waived by Maker) upon the happening of any of the following events (each, an "**Event of Default**"):

(a)    the entry of a decree or order by the court having jurisdiction in the premises adjudging Maker a bankrupt or insolvent, or approving as properly filed a petition seeking arrangement, adjudgment or composition of or in respect of Maker under the Federal Bankruptcy Code or any other applicable Federal or state law, or appointing a receiver, liquidator, assignee, or trustee, sequestrator (or other similar official) of Maker, or of any part of its property, and the continuance of any such decree or order unstayed and in effect for a period of thirty (30) consecutive days; or

(b)    the institution by Maker of proceedings to be adjudicated a bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of the petition or answer or consent by it to the filing of any such petition or answer or consent seeking relief under the Federal Bankruptcy Code or any other applicable Federal or state law or the consent by it to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of Maker or any part of its property, or the making by it of an assignment for the benefit of the creditors, or the admission by it in writing of its inability to pay its debts generally as they come due; or

(c)    the resignation, removal or other change in the Trustee, including, but not limited to, the addition of one or more additional Trustees; or

(d)    the creation of any lien or other Encumbrance on any asset of Maker; or

(e)    the breach by Maker of any of its representations, warranties or covenants under the Agreement; or

(f)    the sale or other transfer of all or any material part of Maker's properties and assets; or

FTLDOCS 5928254 10 2

DG 00980

(g)      a default by Maker in any payment of principal of or interest on any other obligation for money borrowed (or on any obligation under conditional sale or other title retention agreement or on any obligation secured by purchase money mortgage or on any obligation under notes payable or drafts accepted representing extensions of credit but excluding deposits) beyond any period of grace provided with respect thereto, or defaults in the performance of any other agreement under which any such obligation is created (or if any other event of default under any such agreement shall occur and be continuing) if the effect of such event or default is to cause, or to permit the creditor or creditors of such obligation (or a trustee on behalf of such creditor or creditors) to cause, such obligations to become due prior to its stated maturity; or

(h)      the failure to pay any amount payable to Holder when due and payable, subject to the provisions of the Agreement and Section 2.2 of this Note which provide for forbearance by the Holder from collection of amounts payable to Holder under this Note.

2.2      Upon the occurrence of an Event of Default, Holder may, without limiting any other rights it may have at law or in equity, declare the unpaid Principal of and accrued and unpaid interest on this Note due and payable, whereupon the same shall be due and payable without presentment, demand, protest or other notice of any kind, all of which Maker expressly waives, and Holder may proceed to enforce payment of such Principal and accrued and unpaid interest or any part thereof in such manner as it may elect in its sole discretion; provided, however, that Holder agrees to forbear from commencing any action to enforce collection of such amounts to the extent provided in the Agreement.

**3.  Overdue Rate.** From and after November 1, 2012 or upon the occurrence of an Event of Default if earlier, the unpaid indebtedness then evidenced by this Note shall thereafter bear interest at the lesser of rate of twenty five percent (25%) per annum  or the maximum legal rate of interest (the **"Overdue Rate"**).

**4.  Covenants.** The Trust hereby covenants and agrees that (1) it shall not create or permit any Encumbrance on (x) the TRI Shares or (y) the Minimum Payment or any other payment that the Trust may receive or be entitled to receive from (a) the Court or (b) any other party in connection with the Interpleader Action or otherwise relating to the TRI Shares and (2) it will not (x) (a) borrow or enter into any agreement to borrow any amount of money, or (b) guaranty, indemnify or otherwise create any contingent monetary obligation, or (y) incur any material Liability, other than costs for legal services relating to the TRI Proceedings, which in no event, without the prior consent of Holder, exceed in aggregate Five Hundred Thousand Dollars and No Cents ($500,000.00).

**5.  Waiver And Consent.** Maker: (a) waives demand, presentment, protest, notice of dishonor, suit against or joinder of any other person, and all other requirements necessary to charge or hold Maker liable with respect to the obligations evidenced by the Note; and (b) waives any right to immunity from any such action or proceeding and waives any immunity or exemption of any property, wherever located, from garnishment, levy, execution, seizure or attachment prior to or in execution of judgment, or sale under execution or other process for the collection of debts.

FTL DOCS 5928254 10 3

DG 00981

6. **Costs, Indemnities And Expenses**. Maker agrees to pay all filing fees and similar charges and all costs incurred by Holder in collecting or attempting to collect the obligations evidenced by the Note and such right shall extend beyond the entry of a final, non-appealable judgment of a court of competent jurisdiction ("**Final Judgment**") including attorneys' fees, whether or not involving litigation and/or appellate, administrative or bankruptcy proceedings. Such entitlement or attorneys' fees shall not merge with the entry of a Final Judgment and shall continue post-judgment unless and/or until any and all indebtedness due Holder is fully satisfied. Maker agrees to pay any documentary stamp taxes, intangible taxes or other taxes (except for federal or state franchise or income taxes based on Holder's net income) which may now or hereafter apply to this Note, and Maker agrees to indemnify and hold Holder harmless from and against any liability, costs, attorneys' fees, penalties, interest or expenses relating to any such taxes, as and when the same may be incurred. Maker agrees to pay Holder any and all attorneys' and paralegals' fees at all pre-trial, trial and appellate levels in respect of any litigation or collection efforts based hereon, or arising out of, or related hereto whether, under or in connection with this Note and/or any agreement contemplated to be executed in conjunction herewith, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of any party.

7. **Miscellaneous**.

   7.1    **Governing Law**. This Note shall be governed by, and construed and enforced in accordance with the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

   7.2    **Jurisdiction**. Trust and the Trustee each irrevocably agree that, should either of them institute any legal action or proceeding in any jurisdiction (whether for an injunction, specific performance, damages or otherwise) in relation to this Note or the transactions contemplated by this Note, no immunity (to the extent that it may at any time exist, whether on the grounds of sovereignty or otherwise) from such action or proceeding shall be claimed by it or on its behalf, any such immunity being hereby irrevocably waived, and the Trust and the Trustee each irrevocably agrees that their respective assets are, and shall be, subject to such legal action or proceeding in respect of its obligations under this Note.

   7.3    **Time of the Essence**. Time shall be of the essence with respect to the terms of this Note. This Note cannot be changed or modified orally.

   7.4    **Interpretation**. The term "**Holder**" shall be deemed to include any subsequent holder(s) of this Note. Whenever used in this Note, the term "person" means any individual, firm, corporation, trust or other organization or association or other enterprise or any governmental or political subdivision, agency, department or instrumentality thereof. Whenever used in this Note, words in the singular include the plural, words in the plural include the singular, and pronouns of any gender include the other genders, all as may be appropriate. Captions and paragraph headings in this Note are for convenience only and shall not affect its interpretation

   7.5    **Invalidity**. Any provision of this Note which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction only, be ineffective only to the extent of such

DG 00982

prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. To the extent that Maker may lawfully waive any law that would otherwise invalidate any provision of this Note, Maker hereby waives the same, to the end that this Note shall be valid and binding and enforceable against it in accordance with all of its terms.

7.6    Prepayment Permitted. This Note may be prepaid in whole or in part at any time without penalty. Except as otherwise required by law or by the provisions of this Note, payments received by Holder hereunder shall be applied first against expenses and indemnities, next against accrued interest, and next in reduction of the outstanding principal balance of the Note, except that during the continuance of any Event of Default, Holder may apply such payments in any order of priority determined by Holder in its exclusive judgment.

7.7    Notices. Except as otherwise required by the provisions of this Note, any notice required to be given to Maker shall be deemed sufficient if made personally or if mailed, postage prepaid, to such Maker's address as it appears in the Agreement.

7.8    Benefit. All of the terms of this Note shall inure to the benefit of Holder and its heirs, executors, administrators, personal representatives, successors and assigns, and shall be binding upon Maker and its successors and assigns, jointly and severally.

7.9    No Waiver. No failure on the part of the Holder to exercise, and no delay in the exercise of any right, remedy or power hereunder or under any document or agreement executed in connection herewith shall operate as a waiver hereof or thereof nor shall any single or partial exercise by the Holder of any right, remedy or power hereunder or thereunder preclude any other or future exercise of any other right, remedy or power.

7.10    Change, Modification or Waiver. This Note may not be changed or modified orally, nor may any right or provision hereof be waived orally, but in each instance only by an instrument in writing signed by the party against which enforcement of such change, modification or waiver is sought.

7.11    No Usury. In the event, Holder, in enforcing its rights hereunder determines that charges and fees incurred in connection with this Note may, under the applicable laws relating to usury, cause the interest rate herein to exceed the maximum rate allowed by law, then such interest shall be recalculated and any excess over the maximum interest permitted by such laws shall be credited to the then outstanding principal amount of the Note to reduce said balance by the amount of such excess. It is the intent of the Holder that the Maker, under no circumstance, shall Maker be required to pay, nor shall the Holder be entitled to collect, any interest that is in excess of the maximum rate permitted under the applicable laws relative to usury.

7.12    Waiver of Trial by Jury. THE MAKER AND THE HOLDER WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF OR IN ANY WAY CONNECTED TO THIS NOTE.

DG 00983

7.13    <u>Assignment</u>. This Note may be negotiated, endorsed, assigned, transferred and/or pledged subject to compliance with the requirements of applicable federal and state securities law by delivery of the original Note.  This Note shall be binding upon Maker and Maker's successors and assigns.

**[SIGNATURE PAGE TO FOLLOW]**

DG 00984

**IN WITNESS WHEREOF,** Maker has duly executed this Note as of the date first written above.

MAKER:

THE ORLY GENGER 1993 TRUST

By: _Dalia Genger_
    Dalia Genger, sole Trustee

STATE OF _New York_ )
                   )SS:
COUNTY OF _New York_ )

The foregoing was sworn to, subscribed and acknowledged before me this _15_ day of _May_, 2012, by Dalia Genger, as sole Trustee of The Orly Genger 1993 Trust. She is personally known to me or has produced a driver's license as identification.

Print or Stamp Name: _____
Notary Public: _____
Commission No.: _____
My Commission Expires: _____

MAGDALENA CHARLOTTEN
NOTARY PUBLIC, State of New York
No. 01CH6059474
Qualified in New York County
Certificate Filed in Kings, Queens,
Westchester, Bronx Counties
Commission Expires May 29, 20_15_

DG 00985

*ORLY GENGER VS.*
*DALIA GENGER, et al*

---

*DALIA GENGER*
*December 13, 2012*

---



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

**126 East 56th Street, Fifth Floor New York, New York 10022**
PHONE: (212) 750-6434   FAX: (212) 750-1097
**www.ELLENGRAUER.com**

*Original File 102224.TXT*
**Min-U-Script® with Word Index**

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
Pg 22 of 150

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

**Page 1**

1  SUPREME COURT OF THE STATE OF NEW YORK
2  COUNTY OF NEW YORK
   -------------------------------------------X
3  ORLY GENGER in her individual capacity
   and on behalf of the Orly Genger 1993
4  Trust (both in its individual capacity
   and on behalf of D&K Limited Partnership),
5
              Plaintiff,
6
     - against -
7
   DALIA GENGER, SAGI GENGER, LEAH FANG,
8  D&K GP LLC, and TPR INVESTMENT ASSOCIATES,
   INC.,
9
              Defendant
10
   Index No. 100697/08
11 -------------------------------------------X
12
13              575 Lexington Avenue
                New York, New York
14
                December 13, 2012
15              10:37 a.m.
16
17        DEPOSITION of DALIA GENGER, taken
18 before Annette M. Montalvo, RMR, and a Notary
19 Public in and for the State of New York.
20
21
22
23        ELLEN GRAUER COURT REPORTING CO. LLC
             126 East 56th Street, Fifth Floor
24            New York, New York  10022
                   212-750-6434
25                 REF: 102224

**Page 2**

1  A P P E A R A N C E S:
2
3  ZEICHNER ELLMAN & KRAUSE LLP
4  On Behalf of the Plaintiff,
5        575 Lexington Avenue
6        New York, New York  10022
7  BY:  YOAV GRIVER, Esq.
8       BRYAN D. LEINBACH, Esq.
9       212-223-0400
10      ygriver@zeklaw.com
11
12
13 PEDOWITZ & MEISTER LLP
14 On Behalf of the Witness,
15       570 Lexington Avenue
16       New York, New York  10022
17 BY:  ROBERT A. MEISTER, Esq.
18      MARISA H. WARREN, Esq.
19      212-403-7333
20      robert.meister@pedowitzmeister.com
21
22
23
24
25

**Page 3**

1  A P P E A R A N C E S: (Cont'd)
2
3  PAUL S. ZILBERFEIN, Esq.
4  On Behalf of Leah Fang,
5  78 Old Orchard Road
6  New Rochelle, New York  10804
7  914-297-0110
8  paul@zilberfeinlaw.com
9
10
11 DUANE MORRIS LLP
12 On Behalf of TPR Investment Associates, Inc.,
13 1540 Broadway
14 New York, New York  10036
15   BY: JOHN DELLAPORTAS, Esq.
16 212-692-1012
17 dellajo@duanemorris.com
18
19
20   ALSO PRESENT:
21 SAGI GENGER
22 WALTER P. STASIUK, Wachtel Masyr & Missry
23
24
25

**Page 4**

1  ------------------ I N D E X ------------------
2  WITNESS                 EXAMINATION BY      PAGE
3  DALIA GENGER            MR. GRIVER             6
4
5
6  Telephone call to Hon. Barbara Jaffe         134
7
8
9  ---------------- E X H I B I T S ----------------
10 GENGER          DESCRIPTION            FOR I.D.
11 Exhibit 1       Answer to the second         8
12                 Amended complaint
13 Exhibit 2       Summons and second           8
14                 Amended verified
15                 Complaint
16 Exhibit 3       Dalia Genger amended         9
17                 Responses to plaintiff's
18                 Interrogatories
19 Exhibit 4       Leah Fang trust document    37
20 Exhibit 5       Instrument of acceptance    42
21                 Of trustee
22 Exhibit 6       Release                     68
23 Exhibit 7       Document                    68
24 Exhibit 8       Document                    92
25 Exhibit 9       1/4/2008 memo              108

20-01187-jlg Doc 1-18 Filed 06/20/20 Entered 06/20/20 20:19:48 NoR part 19

ORLY GENGER VS.
DALIA GENGER, et al

Pg 23 of 150

DALIA GENGER
December 13, 2012

Page 5

```
1   ----------- E X H I B I T S (Cont'd) -----------
2   GENGER            DESCRIPTION            FOR I.D.
3   Exhibit 10        1993 promissory note and    149
4                     Pledge agreement
5   Exhibit 11        Final arbitration award     151
6   Exhibit 12        Letter                      162
7   Exhibit 13        Document                    168
8   Exhibit 14        Dalia Genger affidavit      173
9   Exhibit 15        1/31/2009 meeting and       209
10                    Agreement
11
12
13          (EXHIBITS RETAINED BY ATTORNEY GRIVER)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1    (WHEREUPON, the witness was duly
2    sworn.)
3    D A L I A   G E N G E R, called as a witness
4    herein, having been first duly sworn by a
5    Notary Public of the State of New York,
6    was examined and testified as follows:
7
8    **EXAMINATION**
9    **BY MR. GRIVER:**
10   Q.  Would you state your name for the
11   record, please.
12   A.  **Dalia Genger.**
13   Q.  And what is your address?
14   A.  **It is 200 East 65th Street, Apartment**
15   **32W. The zip code is 10065.**
16   Q.  Ms. Genger, you understand that you
17   have just been sworn to tell the truth?
18   A.  **Yes.**
19   Q.  And you understand that it is your
20   obligation to tell the truth today?
21   A.  **Absolutely.**
22   Q.  In order to do that, if I ask you a
23   question and you don't understand it, please let
24   me --
25   A.  **Yes, I know the procedure.**

Page 7

1    **GENGER**
2    Q.  You know the procedures?
3    A.  **Yes.**
4    Q.  Okay.  And if you answer the question,
5    I only want you to answer questions that you
6    understand; do you understand that?
7    A.  **Yes.**
8    Q.  What is your date of birth?
9    A.  **June 15, 1946.**
10   Q.  Which would make you how old today?
11   A.  **66, I guess.**
12   Q.  You are the trustee of the Orly Genger
13   trust?
14   A.  **'93 yes.**
15   Q.  Is that correct?
16   A.  **It is correct.  Yes.**
17   Q.  Do you suffer from any mental or
18   physical problem that would prevent you from
19   being a trustee to the Orly Genger trust?
20   A.  **No.**
21   Q.  And in this deposition, as we go
22   through it, whenever I speak about the Orly trust
23   or the trust, I am talking about the Orly Genger
24   1993 trust; do you understand?
25   A.  **Absolutely.  Yes.**

Page 8

1    **GENGER**
2    Q.  I ask you again, do you suffer from any
3    mental or physical problem that would prevent you
4    from --
5    A.  **I said no.**
6    **MR. MEISTER:** Wait until he finishes
7    the question.
8    **BY MR. GRIVER:**
9    Q.  Do you suffer from any mental or
10   physical problem that would prevent you from
11   telling the truth and testifying here today?
12   A.  **No.**
13   **MR. GRIVER:** Let's start with some
14   housekeeping matters.  I am going to hand the
15   witness three exhibits that have been premarked
16   as Dalia Exhibits 1 through 3.
17   Dalia Exhibit 1 is Dalia Genger's
18   answer to the second amended complaint in this
19   action.
20   (Dalia Exhibit 1, answer to the
21   second amended complaint, marked.)
22   **MR. GRIVER:** Dalia Exhibit 2 are copies
23   of the summons and second amended verified
24   complaint in this matter.
25   (Dalia Exhibit 2, summons and

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 9

1    GENGER
2    second amended verified complaint,
3    marked.)
4        MR. GRIVER: And Dalia Exhibit 3 is a
5    copy of defendant Dalia Genger's amended
6    responses to plaintiff's interrogatories in this
7    action.
8        (Dalia Exhibit 3, Dalia Genger
9        amended responses to plaintiff's
10       interrogatories, marked.)
11       BY MR. GRIVER:
12   Q.  Ms. Genger, looking at Dalia Exhibit
13   1 --
14   A.  Yes.
15   Q.  -- your answer, is that your signature
16   on the last page?
17   A.  Yeah, I am sure it is there, if you say
18   so.  Yes, it is my signature.
19   Q.  And so you signed this answer under
20   oath on the 20th day of September 2010?
21   A.  September 30, right.  I won't remember,
22   but it says here, so.
23   Q.  If you look on the last page, because I
24   want to be precise, Ms. Genger.
25       MR. MEISTER: Are you asking her what

Page 10

1    GENGER
2    she remembers or are you asking her what it says?
3        BY THE WITNESS:
4    A.  I don't remember exactly what date, but
5    I believe you that that's the date.
6        BY MR. GRIVER:
7    Q.  When was the last time you saw this
8    answer to the second amended --
9    A.  When was the last time that I saw this
10   document?
11   Q.  Yes.
12   A.  I don't remember.
13   Q.  You didn't look at it in preparing for
14   your deposition today?
15   A.  I think that one should not be prepared
16   for deposition.  Isn't it true?
17   Q.  So you did nothing to prepare yourself
18   for this deposition?  You didn't look at any
19   documents, you didn't speak to your attorney?
20   A.  I did speak with my attorney.
21   Q.  And in the course of that did he show
22   you documents?
23   A.  He gave me some documents, but I didn't
24   look at them.
25   Q.  Okay.  If you look at what's been

Page 11

1    GENGER
2    marked as Exhibit 3?
3    A.  Exhibit 3?
4    Q.  If you look on the last page, page 12,
5    is that your signature?  As sworn by --
6    A.  Yeah, it is my signature.
7    Q.  And that's sworn by you on the 29th day
8    of March 2012?
9    A.  Right.
10   Q.  When was the last time you saw these
11   interrogatory responses?
12   A.  This document, actually, I read again
13   like two days ago.
14   Q.  Okay.  Do you have any changes to this
15   document that you want to make upon reading it
16   again two days ago?
17   A.  No, I don't think so.
18   Q.  Ms. Genger, you are the current trustee
19   of the Orly Genger trust?
20   A.  Can you repeat?
21   Q.  You are the trustee of the Orly Genger
22   trust?
23   A.  Yes.
24   Q.  And you have been the trustee of the
25   Orly Genger trust since January 4 of 2008; is

Page 12

1    GENGER
2    that correct?
3    A.  Right.
4    Q.  And Orly Genger is the lifetime
5    beneficiary of the trust, do you know that?
6    A.  Yes.
7    Q.  And do you understand that as trustee
8    you are supposed to protect the trust?
9    A.  Absolutely.
10   Q.  And as trustee, are you supposed to put
11   the interests of the trust ahead of your
12   interests?
13   A.  Obviously.
14   Q.  And as trust you are supposed to act in
15   the best interests of the trust?
16   A.  Of the trust.  Yes.
17   Q.  And as trustee you are supposed to put
18   the trust of -- the interests of Orly Genger as
19   beneficiary ahead of your own interests?
20   A.  I agree with you.
21   Q.  And, indeed, you are supposed to put
22   her interests ahead of the interest of anybody
23   else?
24   A.  Absolutely.
25   Q.  Have you done so?

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 13

1    GENGER
2  A.  Yes, I believe I did.
3  Q.  Every action that you have done as
4    trustee --
5  A.  Yeah.
6  Q.  Every action that you have done as
7    trustee you have put the interests of the trust
8    and Orly Genger ahead of your interests?
9        MR. ZILBERFEIN: Note my objection to
10    the form.
11        THE WITNESS: What did he say?
12        MR. MEISTER: He made a technical
13    objection.  You can answer.
14        BY THE WITNESS:
15  A.  Yes, obviously, my responsibility as a
16    trustee was obviously the major thing that I was
17    responsible for, and any other -- no other thing
18    would change it, I mean.
19        BY MR. GRIVER:
20  Q.  And you have done so?
21  A.  Yes. I believe I did.
22  Q.  Who are the -- since January 4 of 2008
23    when you became trustee, who are the attorneys
24    for the trust?
25  A.  Well, I really don't remember in 2008.

Page 14

1    GENGER
2    I just know that Robert Meister is currently my
3    attorney, but I am not sure when we began -- when
4    I started to be his client.
5  Q.  Just so the record is clear,
6    Mr. Meister is the attorney for the Orly Genger
7    trust?
8  A.  Yes.
9  Q.  You have retained him as attorney for
10    the trust?
11  A.  Yes.
12  Q.  Are there any other attorneys that you
13    have retained on behalf of the trust?
14  A.  I don't remember.
15  Q.  Does the law firm of Sullivan &
16    Worcester ring a bell?
17  A.  It rings a bell, but I don't remember
18    in connection to what.
19  Q.  Okay. When do you --
20  A.  Wait a minute. Maybe Delaware, I
21    think. I don't remember.
22  Q.  Okay. When did you hire Mr. Meister
23    and his law firm to represent the trust?
24  A.  I just said, I don't remember the date.
25  Q.  Do you remember the year?

Page 15

1    GENGER
2  A.  I believe it was 2008 or '09.  I don't
3    know.
4  Q.  Before you hired Mr. Meister to be the
5    attorney for the trust, had you met Mr. Meister
6    before?
7  A.  No.
8  Q.  How did you find Mr. Meister?
9  A.  He was recommended by another lawyer.
10  Q.  Do you remember the name of this other
11    lawyer?
12  A.  No.
13  Q.  Do you remember who this other lawyer
14    worked for?
15  A.  No.
16  Q.  How is it that you came to be talking
17    to this lawyer?
18  A.  I don't remember.
19  Q.  Was it a lawyer for Sagi?
20  A.  No. I don't think so.
21  Q.  Had Mr. Meister or his law firm ever
22    done work for you as an individual?
23  A.  Yes.
24  Q.  Before he was retained by you to
25    represent the trust?

Page 16

1    GENGER
2  A.  I don't think -- I don't remember it
3    was before or after.
4  Q.  Okay.  What work was Mr. Meister
5    retained on an individual basis for --
6        MR. MEISTER: Objection.
7    Attorney-client privilege.  Instruct the witness
8    not to answer.
9        MR. ZILBERFEIN: I join that objection.
10        MR. GRIVER: Just on the topic?
11        THE WITNESS: On the topic --
12        MR. MEISTER: No.
13        MR. GRIVER: Okay.
14        BY MR. GRIVER:
15  Q.  Is Mr. Meister representing you on an
16    individual -- in an individual capacity?
17  A.  You just asked me that, and I said yes.
18  Q.  Okay.  In what is Mr. Meister
19    representing you in an individual capacity?
20        THE WITNESS: Didn't you say that's a
21    question I should not answer?
22        MR. MEISTER: Well --
23        BY THE WITNESS:
24  A.  It is to fight a lawsuit that Orly has
25    against me, basically.

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                                                              DALIA GENGER
DALIA GENGER, et al                    Pg 26 of 150                    December 13, 2012

Page 17

1    GENGER
2    BY MR. GRIVER:
3 Q.  And you are talking about this lawsuit?
4 A.  I don't know that.  There are so many,
5    I don't keep track of them.
6 Q.  In the lawsuit you have initiated
7    against Orly Genger, who is your lawyer?
8 A.  You mean in the divorce?
9 Q.  In the Dalia Genger versus Arie Genger
10   action?
11 A.  You mean the divorce, right?
12 Q.  Okay.  The reformation?
13 A.  The stipulation --
14 Q.  Yes.
15 A.  -- and all that?  Yeah.
16    MR. ZILBERFEIN: Note my objection to
17   the question.
18    BY MR. GRIVER:
19 Q.  Who is representing you in that?
20 A.  Yeah.  I am trying to remember the name
21   of the firm.  But I remember the name of one
22   lawyer, was a partner.  He's Kortmansky.  And the
23   other guy, I don't remember his name.
24 Q.  Okay.  Just so we are clear on the
25   record as we sit here today, Mr. Meister is

Page 18

1    GENGER
2    representing you both in an individual
3    capacity --
4 A.  That's true.
5 Q.  -- and on behalf of the trust?
6 A.  Uh-huh.
7    MR. ZILBERFEIN: "Uh-huh" means yes?  I
8    don't know.
9    THE WITNESS: What?
10    BY MR. GRIVER:
11 Q.  He is asking that you answer yes or no
12   instead of "uh-huh" or nodding your head.
13 A.  Yes.  Yes.
14 Q.  Do you get two sets of bills from --
15   strike that.
16    When Mr. Meister bills you for the work
17   that he or his firm does on behalf of the Orly
18   Genger trust, do you get a bill?
19 A.  I wish I didn't, but I do get.
20 Q.  Okay.  And it is a physical piece of
21   paper?
22 A.  Absolutely.  Yes.
23 Q.  And when Mr. Meister does work for you
24   as an individual, Dalia Genger, does he bill you
25   for those?

Page 19

1    GENGER
2 A.  Yes.
3 Q.  And do you get a physical piece of
4    paper?
5 A.  Yes.
6 Q.  Are the two pieces of paper different
7    or are they the same?
8 A.  Which two pieces of paper?
9 Q.  Does he bill you separately for the
10   work that he does on behalf of the trust?
11 A.  Yes.
12 Q.  So he makes --
13 A.  He says -- it says Dalia Genger
14   trustee, and, otherwise, it is just Dalia Genger.
15    MR. GRIVER: As representative of the
16   beneficiary of the Orly Genger trust, I would ask
17   for copies of all bills that you have provided to
18   Ms. Genger as trustee of the Orly Genger trust.
19    MR. ZILBERFEIN: I join in all
20   requests.
21    MR. GRIVER: Mr. Meister, any reaction,
22   yes, no, maybe?
23    MR. MEISTER: I have no reaction.  No.
24    Can you give us for a moment, we have a
25   filing issue.

Page 20

1    GENGER
2    MR. GRIVER: Off the record.
3    MR. MEISTER: Thank you.  Let's take a
4    minute or two recess.
5    (WHEREUPON, there was a short
6    interruption from 10:52 a.m. to
7    10:54 a.m.)
8    MR. GRIVER: Back on the record.
9    Can you read my last question back.
10    (WHEREUPON, the record was read by
11    the reporter as requested.)
12    BY MR. GRIVER:
13 Q.  Are you able to distinguish in your
14   mind when you seek Mr. Meister's advice on behalf
15   of the trust and when you seek his advice on an
16   individual basis?
17 A.  Yes.
18 Q.  Do you believe that having the same set
19   of attorneys is in the best interest of the Orly
20   Genger trust?
21    MR. ZILBERFEIN: Note my objection to
22   the form.
23    THE WITNESS: I'm sorry, I don't know
24   what --
25    BY MR. GRIVER:

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                                                              DALIA GENGER
DALIA GENGER, et al                    Pg 27 of 150                          December 13, 2012

Page 21

1     GENGER
2 Q.  I will re-ask the question again.
3     Do you believe that having the same set
4 of attorneys representing the Orly Genger trust
5 and you individually is in the best interest of
6 the Orly Genger trust?
7 A.  Yes, I do, otherwise, I wouldn't do it.
8 Q.  Okay.  Do you believe that that is the
9 best way to protect the Orly Genger trust?
10 A.  Yes.
11 Q.  You have no concern whatsoever that
12 there may be a conflict between your interests
13 and the interests of the trust?
14 A.  No.
15     MR. ZILBERFEIN: Objection.
16     BY MR. GRIVER:
17 Q.  Who has been paying the invoices of the
18 Pedowitz and Meister law firm in connection with
19 its work on behalf of the trust?
20 A.  I am paying it.
21 Q.  You have paid every penny?
22 A.  Every penny.
23     MR. MEISTER: Well, may I just correct
24 the record there?
25     MR. GRIVER: Go ahead.

Page 22

1     GENGER
2     MR. MEISTER: Ms. Genger has paid for
3 work representing her as trustee.  There's a
4 small subset of bills which were rendered for
5 actions in which the trust, through its trustee,
6 was attempting to perfect or secure or get
7 recognized its interests as owners of TRI shares,
8 and those bills were paid for by the trust.
9     MR. GRIVER: That would be the Dalia
10 Delaware action that was stayed by Feinman?
11     MR. MEISTER: The Dalia Delaware action
12 that was stayed by Feinman, and also I believe
13 there were claims asserted in the Pedowitz and
14 Meister interpleader asserted against the Trump
15 Group on the one hand and TRI on the other.
16     BY MR. GRIVER:
17 Q.  Who has been paying the bills that are
18 sent to you directly as an individual?
19 A.  I was paying them.
20 Q.  Has anyone been providing you with
21 funds to pay those bills?
22 A.  No.
23 Q.  Have you been using trust assets to pay
24 those bills?
25 A.  Never.

Page 23

1     GENGER
2 Q.  Have you taken out any loans to pay
3 those bills?
4 A.  No.
5 Q.  Have you taken out any loans to pay the
6 bills that were incurred on behalf of the trust?
7     MR. MEISTER: Can I have it read back,
8 please.
9     (WHEREUPON, the record was read by
10 the reporter as requested.)
11     BY THE WITNESS:
12 A.  Actually, I don't know how to answer
13 this.
14     BY MR. GRIVER:
15 Q.  Do you not understand my question?
16 A.  No, I understand your question, if I
17 took any loans to pay bills.
18     Regarding the Orly trust, right?
19 Q.  Yes.
20 A.  Well, yeah, I think at the end there
21 was a loan made by -- to secure -- whatever
22 safety, there was a firm, a firm that -- the name
23 of which I can't recall exactly, but it is
24 Manhattan Safety whatever.
25 Q.  Okay.  Do you know how much money this

Page 24

1     GENGER
2 Manhattan company lent you?
3 A.  $200,000.
4 Q.  Other than the $200,000 loan from
5 Manhattan Safety Company, has anyone else paid
6 you in order to --
7 A.  Me as Dalia or me as trustee?
8 Q.  You as trustee.  Has anyone paid you as
9 trustee?
10 A.  No.
11 Q.  As we sit here today is Mr. Meister
12 representing you as trustee or is Mr. Meister
13 representing you on an individual basis?
14 A.  As trustee.
15 Q.  Not as an individual, but as trustee?
16 A.  Yeah.
17 Q.  Okay.  When Mr. Meister prepared you
18 for this deposition, was he preparing you as
19 trustee of the trust or was he preparing you as
20 Dalia the individual?
21 A.  Again, he didn't prepare me.
22     MR. ZILBERFEIN: Objection.
23     BY MR. GRIVER:
24 Q.  When you spoke to him before this
25 deposition and he showed you certain documents,

Page 25

1     GENGER
2   he was doing that as the lawyer for the trust --
3   A.  Trust, yes.
4   Q.  -- correct?
5       And what documents did Mr. Meister show
6   you?
7   A.  Basically, he gave me documents, but I
8   did never went over them except this one.
9       MR. MEISTER: Referring to Dalia
10  Exhibit 3.
11      THE WITNESS: Yes.  Exhibit 3.
12      BY MR. GRIVER:
13  Q.  Did he show you Dalia Exhibit 2, the
14  complaint in this case?
15  A.  He probably did, but I didn't read it.
16  Q.  What did Mr. Meister tell you?
17  A.  I don't remember.
18  Q.  When was this preparation session?
19  A.  A few days ago.
20  Q.  Well, today is Thursday.  Was it
21  yesterday, Wednesday?  Was it Tuesday?  Was it
22  Monday?
23  A.  I don't remember exactly what date it
24  was.
25  Q.  Was it this week?

Page 26

1     GENGER
2   A.  Probably, but I don't remember that we
3   talked about it.
4   Q.  So as we sit here today on Thursday,
5   you can't remember if you met with Mr. Meister?
6   A.  I mean, I remember that I met with him,
7   but I don't remember that we went over this
8   paper.
9       MR. MEISTER: Referring to Dalia
10  Exhibit 2.
11      BY MR. GRIVER:
12  Q.  I am simply asking you, on what day did
13  you meet with Mr. Meister this week?
14  A.  I met with him Tuesday and briefly
15  yesterday.
16  Q.  Okay.  And for how long did you meet
17  with Mr. Meister on Tuesday?
18  A.  I don't know.  When I get the bill, I
19  probably will know.  But I can't think of it at
20  this time.
21  Q.  Well, was it the whole day --
22  A.  No, it wasn't the whole day.
23  Q.  Half a day?
24  A.  I can't afford a whole day.
25      What?

Page 27

1     GENGER
2   Q.  Half a day?
3   A.  No.  It is like a couple of hours.
4   Q.  Okay.  So then simply say a couple of
5   hours.
6   A.  Please don't tell me what to say.
7   Q.  And Mr. Meister told you what in those
8   sessions?
9   A.  Well, he raised some points that I
10  might be asked.
11  Q.  And what were those?
12  A.  All this saying interrogatory questions
13  that I already answered.
14  Q.  So as we sit here today, you don't
15  remember what points you and Mr. Meister
16  discussed two days ago?
17  A.  I do remember.
18  Q.  So then please put it on the record and
19  tell me what points did you and Mr. Meister
20  discuss --
21  A.  I am telling you --
22  Q.  -- two days ago.
23  A.  -- we discussed this document, the
24  Exhibit 3 document.
25  Q.  Okay.  But what you said was that he

Page 28

1     GENGER
2   went over topics that might be covered in this
3   deposition, correct?
4   A.  He told me what -- can you ask me
5   again.
6   Q.  Sure.
7       When you and Mr. Meister spoke two
8   days ago on Tuesday --
9   A.  Right.
10  Q.  -- you and he discussed topics that may
11  be raised in this deposition, correct?
12  A.  That's true, and those were the topics,
13  yeah.
14  Q.  Okay.  And could you please tell me
15  which topics you remember Mr. Meister raising on
16  Tuesday?
17  A.  Let me look what it says so I tell you.
18      MR. GRIVER: Let the record reflect
19  that the witness is looking through what's been
20  marked as Dalia Exhibit 3.
21      BY MR. GRIVER:
22  Q.  Ms. Genger, I am going to allow you to
23  look, but let me ask you, absent looking at that
24  document you have no independent recollection of
25  the topics that Mr. Meister went through with you

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 29

1    GENGER
2  two days ago?
3  A.  No, I do have a recollection.
4  Q.  Okay.  So please --
5  A.  Overall, it is how did I manage the
6  Orly trust.  In general, I mean.
7  Q.  Okay.  Any specific things that you did
8  that were discussed on Tuesday, to your
9  recollection?
10  A.  Any specifics?
11  Q.  Uh-huh.
12    THE WITNESS: I think it is a kind of
13  privileged information, don't you think, that
14  whatever I discussed with you --
15    BY MR. GRIVER:
16  Q.  Unless Mr. Meister instructs you not to
17  answer, you must answer my questions.
18  A.  No, I am just encouraging him.
19  Q.  Okay.
20  A.  The topics were, you know, as I became
21  a trustee, why did I become a trustee.
22  Q.  Okay.
23  A.  What is my purpose, what are my
24  responsibilities.  And, in general, that's what
25  it is.  What are my responsibilities.

Page 30

1    GENGER
2  Q.  Did he go over any of the actions you
3  have taken as trustee?
4  A.  Action and nonaction.
5  A.  He went over actions and nonactions.
6    Which actions and nonactions did you
7  discuss with Mr. Meister two days ago?
8  A.  Well, the nonaction that was raised is
9  me not notifying Orly about the foreclosure on
10  the D&K LP note.
11  Q.  Okay.  And was that the only nonaction
12  that you and he discussed?
13  A.  As far as I remember.
14  Q.  And what actions did you and
15  Mr. Meister discuss two days ago?
16  A.  What actions?
17  Q.  Uh-huh.
18  A.  Well, to begin with -- no.
19    That the trust is suing the Trumps,
20  that's kind of the last action, in order to
21  clarify that Orly owns the shares.
22  Q.  The shares of TRI?
23  A.  TRI, yes.
24  Q.  So as we sit here today you believe as
25  trustee of the Orly Genger trust that Orly owns

Page 31

1    GENGER
2  the TI shares, the trust owns --
3  A.  The trust, yeah.
4  Q.  What other actions?
5  A.  What other actions?  I really don't
6  remember any other actions.
7  Q.  Okay.
8  A.  I mean, there were lawsuits and stuff,
9  where, really, my lawyers looked through to
10  answer, but I actively not do anything -- I mean,
11  I read it.  There were lawsuits, and I really am
12  not so familiar with all the lawsuits.  There
13  were many of them.
14  Q.  So you and Mr. Meister --
15  A.  So probably my lawyer answered.
16  Q.  Okay.  Just to be clear, so, yes, two
17  days ago you and Mr. Meister went and discussed
18  the other lawsuits that you are involved in?
19  A.  No.
20  Q.  So then --
21  A.  Actually, we didn't discuss any
22  lawsuits because --
23  Q.  I'm sorry, Ms. Genger, then what were
24  you trying to say to me?
25  A.  I am trying to say --

Page 32

1    GENGER
2    MR. MEISTER: Objection.  I don't
3  understand --
4    MR. GRIVER: You are not under oath.
5    BY MR. GRIVER:
6  Q.  What were you trying to say?
7    MR. MEISTER: I'm objecting to the form
8  of the question.  It's an incomprehensible
9  question.
10    MR. ZILBERFEIN: I join in the
11  objection.
12    MR. MEISTER: She is trying to answer
13  your question.  If you don't put a clear
14  question --
15    MR. GRIVER: Okay.  If she doesn't
16  understand the question, she can ask me to --
17    MR. MEISTER: She understood it.
18    MR. GRIVER: Then she should answer.
19    MR. MEISTER: She did.
20    MR. GRIVER: Excellent.
21    Can I have my question read back then.
22    (WHEREUPON, the record was read by
23    the reporter as requested.)
24    MR. MEISTER: Excuse me.  Waiving your
25  hand is not a question, Mr. Griver.

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.
DALIA GENGER, et al
Pg 30 of 150
DALIA GENGER
December 13, 2012

Page 33

1    GENGER
2    BY MR. GRIVER:
3    Q. Can you answer that question?
4         MR. MEISTER: She's answered it.
5    Please put a fresh question.
6         MR. GRIVER: Can you read Ms. Genger's
7    answer.
8         (WHEREUPON, the record was read by
9         the reporter as requested.)
10        MR. MEISTER: I continue with the
11   objection. She's answered your question. You
12   asked her a question, and she's answered it.
13        BY MR. GRIVER:
14   Q. Ms. Genger, what were you trying to
15   say?
16        MR. MEISTER: Objection. Instruct the
17   witness not to answer you. You are harassing
18   her.
19        MR. GRIVER: And, Robert, I am going to
20   ignore you for the rest of this deposition, but
21   please do not prevent your witness from answering
22   the questions from now on.
23        BY MR. GRIVER:
24   Q. Ms. Genger, how many lawsuits --
25        MR. MEISTER: Mr. Griver, you are

Page 34

1    GENGER
2    entitled to make -- I am going to do my job.
3         BY MR. GRIVER:
4    Q. Ms. Genger, how many lawsuits is the
5    trust involved in?
6    A. I don't know. I can't count. Many
7    lawsuits. I don't know.
8    Q. As trustee of the Orly Genger trust,
9    how many lawsuits is the Orly Genger trust
10   involved in?
11   A. I didn't count.
12   Q. Okay. Well, I would like you to count
13   now.
14        MR. DELLAPORTAS: Why don't you help
15   her by telling her how many times you have sued,
16   Yoav.
17        BY THE WITNESS:
18   A. Yeah, because there are so many
19   lawsuits I can't keep track of it. I just know
20   that my resources are being reduced every month.
21        MR. DELLAPORTAS: Start by telling her
22   how many times you have sued it, Yoav. We are
23   here billing, wasting our time.
24        BY THE WITNESS:
25   A. No, I really don't, because it is hard

Page 35

1    GENGER
2    to follow how many times my daughter sued me. I
3    mean, really.
4         BY MR. GRIVER:
5    Q. How many times -- how many lawsuits has
6    the Dalia Genger -- excuse me.
7         How many lawsuits have you initiated as
8    trustee on behalf of the Orly Genger trust?
9    A. The only lawsuit is against the Trumps,
10   the Trump Group. That's what I remember.
11   Q. And how many other -- and as trustee of
12   the Orly Genger trust, you, as we sit here today,
13   don't know how many lawsuits that the trust is
14   involved in?
15   A. No, I don't keep track of it.
16   Q. When the bills come in from
17   Mr. Meister's law firm, do you review those
18   bills?
19   A. I review the bottom line, yeah.
20   Q. But you don't look to see --
21   A. No, I do. I do.
22   Q. Do you check to -- do you check to make
23   sure that he's charging you for cases that the
24   Orly trust is involved in?
25   A. Yes. I mean --

Page 36

1    GENGER
2    Q. Do you have -- do you keep a list?
3    A. No, I don't keep a list.
4    Q. Okay.
5         MR. MEISTER: May I ask what this has
6    to do with this lawsuit, Mr. Griver?
7         BY MR. GRIVER:
8    Q. How do you keep track --
9         MR. MEISTER: Excuse me. I am asking a
10   question. What does this have to with --
11        BY THE WITNESS:
12   A. I don't keep track. I told you
13   already.
14        MR. MEISTER: Dalia, wait a moment,
15   please.
16        MR. GRIVER: You can instruct her not
17   to answer or you can object to the question --
18        MR. ZILBERFEIN: Let's not talk over
19   each other. You are making the court reporter
20   nervous. One at a time. Please.
21        BY MR. GRIVER:
22   Q. How do you keep track of the lawsuits
23   as the trustee of the Orly --
24   A. I told you, I don't keep track of the
25   lawsuits.

20-01187-jlg    Doc 1-18    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 19
ORLY GENGER VS.                                                                    DALIA GENGER
DALIA GENGER, et al                        Pg 31 of 150                         December 13, 2012

Page 37

1    GENGER
2  Q.  Ms. Genger, we are going to talk now
3  about your actions and inactions --
4  A.  Okay.
5  Q.  -- as the trustee of the trust.
6       You became trustee on January 4, 2008,
7  correct?
8  A.  Right.
9       MR. GRIVER: I have marked this as
10  Dalia Exhibit 4.
11       (Dalia Exhibit 4, Leah Fang trust
12       document, marked.)
13       BY MR. GRIVER:
14  Q.  Ms. Genger, do you recognize what I
15  have marked as Dalia Exhibit 4?
16  A.  I need a minute to look at it.
17       Yes.
18       MR. MEISTER: What's the pending
19  question?
20       BY THE WITNESS:
21  A.  Yeah.
22       BY MR. GRIVER:
23  Q.  And what is Dalia Exhibit 4?
24  A.  What is it?
25  Q.  What is it?

Page 38

1    GENGER
2  A.  Instrument of resignation of trustee
3  and appointment of successor for trustee.
4  Q.  And is that your signature --
5  A.  No.
6  Q.  -- on the document?
7  A.  No. It Leah's signature.
8  Q.  Were you aware of this?
9  A.  That I was designated to be a trustee?
10       MR. ZILBERFEIN: Object to the form.
11       BY MR. GRIVER:
12  Q.  Yes.
13  A.  If I was aware that I was --
14  Q.  Yes.
15  A.  Obviously.
16  Q.  On January 4, 2008?
17  A.  Yes. This is when I became a trustee.
18  Q.  You didn't become a trustee on -- you
19  didn't become a trustee on January 3 or January
20  2, correct?
21       MR. ZILBERFEIN: Object to the form.
22       BY THE WITNESS:
23  A.  I don't remember exactly the dates, but
24  I know that I was a successor trustee.
25       BY MR. GRIVER:

Page 39

1    GENGER
2  Q.  Now, were you aware at the time that
3  you accepted the trusteeship of the Orly Genger
4  trust that beneficiary Orly Genger did not wish
5  for you to be the trustee?
6       MR. ZILBERFEIN: Objection.
7       MR. DELLAPORTAS: Lack of foundation.
8       BY THE WITNESS:
9  A.  I don't know what's going on here.
10       BY MR. GRIVER:
11  Q.  Do you not understand my question?
12  A.  No, I don't understand why -- what the
13  remarks these gentlemen --
14       MR. MEISTER: If other counsel make a
15  statement for the record, that's just for the
16  record, so you don't have to pay attention to it.
17  You just listen to Mr. Griver.
18       THE WITNESS: I didn't know that.
19       So what is the question again?
20       BY MR. GRIVER:
21  Q.  Ms. Genger, so we are clear from here
22  on out, if you don't understand a question, say
23  so, and I will repeat it or fix it.
24  A.  Yeah, I don't remember right now the
25  question. I just did not understand the fact

Page 40

1    GENGER
2  that these gentlemen here are objecting or not
3  objecting or whatever remarks he makes.
4  Q.  His objections are for the record.
5  A.  Okay. For the record. So I don't
6  really have to pay attention to it, right?
7  Q.  You may or you may not. But you still
8  must answer any question I --
9  A.  I didn't say I won't answer. I just
10  didn't know what --
11  Q.  Here's my next question.
12  A.  What is the question?
13  Q.  At the time you accepted appointment as
14  trustee of the Orly Genger trust, were you aware
15  that Orly Genger did not wish for you to be
16  trustee?
17       MR. ZILBERFEIN: Objection.
18       MR. DELLAPORTAS: Lack of foundation.
19       BY THE WITNESS:
20  A.  No. At the beginning I was not aware.
21       BY MR. GRIVER:
22  Q.  Okay. When did you become aware that
23  Orly didn't wish for you --
24  A.  When she start suing me to remove me
25  from being a trustee, and I don't remember what

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                                    Pg 32 of 150                                    DALIA GENGER
DALIA GENGER, et al                                                                          December 13, 2012

Page 41

1    **GENGER**
2    date it was.
3    Q.  Well, before you accepted the
4    trusteeship, did you speak to Orly?
5        MR. ZILBERFEIN: Objection.
6        BY MR. GRIVER:
7    Q.  Did you speak to Orly about whether or
8    not you should accept the trusteeship?
9    **A.  No.**
10   Q.  Did you speak to anyone?
11       MR. ZILBERFEIN: Objection.
12       BY THE WITNESS:
13   **A.  Did I speak to anyone?**
14       BY MR. GRIVER:
15   Q.  Did you speak to anyone about whether
16   or not you should accept the trusteeship of the
17   Orly Genger trust?
18   **A.  Well, I --**
19       MR. ZILBERFEIN: Same objection.
20       BY THE WITNESS:
21   **A.  I did -- no, I don't remember.**
22       BY MR. GRIVER:
23   Q.  Okay.  How did you first become aware
24   that Leah Fang wished to appoint you as trustee
25   of the Orly Genger trust?

Page 42

1    **GENGER**
2        MR. ZILBERFEIN: Objection.
3        BY THE WITNESS:
4    **A.  Can you repeat that.**
5        MR. GRIVER: Can you repeat that,
6    please.
7        (WHEREUPON, the record was read by
8        the reporter as requested.)
9        BY THE WITNESS:
10   **A.  Obviously, when she nominated me.**
11       BY MR. GRIVER:
12   Q.  Okay.  And how did you become aware
13   that she had nominated you to become trustee?
14       MR. ZILBERFEIN: Objection.
15       BY THE WITNESS:
16   **A.  When I got the paper, I was aware of**
17   **it.**
18       MR. GRIVER: Let me have this marked as
19   Dalia Exhibit 5.
20       (Dalia Exhibit 5, instrument of
21       acceptance of trustee, marked.)
22       BY MR. GRIVER:
23   Q.  We have marked as Dalia 4 Leah's
24   resignation and appointment of successor, and we
25   have marked as Dalia 5 the instrument of

Page 43

1    **GENGER**
2    acceptance of trustee.
3    **A.  Right.**
4    Q.  Now, did Leah -- okay.
5        How did you get the document marked as
6    Dalia 5?
7        MR. ZILBERFEIN: Objection.
8        BY THE WITNESS:
9    **A.  I don't remember.**
10       BY MR. GRIVER:
11   Q.  Is it something that you typed up?
12   **A.  No.  I didn't type this up.**
13   Q.  So someone provided it to you to sign?
14   **A.  Obviously.**
15   Q.  And --
16   **A.  It is a lawyer probably.**
17   Q.  Seymour Fang is the notary public.  Do
18   you know who Seymour Fang is?
19   **A.  Yes.**
20   Q.  Does this refresh your recollection as
21   to where you were when you signed this document?
22   **A.  Where I was?**
23   Q.  Yes.
24   **A.  Physically?**
25   Q.  Yes.  Physically.

Page 44

1    **GENGER**
2    **A.  With the notary, of course.**
3    Q.  But do you know where?
4    **A.  Where?**
5    Q.  Yes.
6    **A.  The location?  I don't remember.**
7    Q.  Do you know when you signed this
8    document?
9        MR. ZILBERFEIN: Objection.
10       BY THE WITNESS:
11   **A.  Whenever it says here, January 4.**
12       BY MR. GRIVER:
13   Q.  Do you know what time of the day?
14   **A.  No, I don't remember that.**
15   Q.  Was it in the morning, was it at night?
16   **A.  I don't remember.**
17   Q.  No idea whatsoever?
18   **A.  No, I guess it wasn't midnight, but it**
19   **was during the day.**
20   Q.  But all you can remember is at some
21   time during the day --
22   **A.  Yeah.**
23   Q.  -- you signed this document?
24       Okay.  Before signing this document,
25   did you discuss whether or not you should be

20-01187-jlg    Doc 1-18    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 19
ORLY GENGER VS.                              Pg 33 of 150                    DALIA GENGER
DALIA GENGER, et al                                                         December 13, 2012

Page 45

```
 1    GENGER
 2  trustee with anyone?
 3    MR. ZILBERFEIN: Objection.
 4    BY THE WITNESS:
 5  A.  If I should be a trustee?  Yeah,
 6  actually, it is a big responsibility.
 7    BY MR. GRIVER:
 8  Q.  So before you signed this document when
 9  you were considering whether or not to become
10  the trustee of the Orly Genger trust, who did you
11  discuss --
12  A.  In general.  In general.
13    MR. ZILBERFEIN: Objection.
14    BY THE WITNESS:
15  A.  In general, I knew that a problem will
16  arise when Leah was going to resign as the
17  trustee of Orly Genger trust, and someone should
18  have been -- there was a need for someone to be a
19  trustee.
20    BY MR. GRIVER:
21  Q.  And who did you discuss this with?  Did
22  you discuss it with Leah, did you discuss it with
23  anyone?
24    MR. ZILBERFEIN: Objection.
25    MR. MEISTER: Objection.  Form.
```

Page 46

```
 1    GENGER
 2    BY THE WITNESS:
 3  A.  Well, this is a family affair, okay.
 4  So, obviously, there was a problem, and since it
 5  is very difficult and impossible to find a
 6  trustee or person that would serve as a trustee,
 7  not being paid, and exposed to many lawsuits, I
 8  couldn't find anyone else to do this job.  So I
 9  accepted this nomination in order to serve Orly
10  trust to the best of my ability.
11    BY MR. GRIVER:
12  Q.  Okay.  My question to you, Ms. Genger,
13  was simple.  While you were considering whether
14  or not to become the trustee of the Orly Genger
15  trust, did you speak about that to anybody; yes
16  or no?
17  A.  Yes, I did.
18    MR. ZILBERFEIN: Objection.
19    BY MR. GRIVER:
20  Q.  Who did you speak to?
21  A.  I speak to my family, including Sagi,
22  Rochelle, Leah, because it was a problem that we
23  had to resolve.
24  Q.  Did you speak with Elana?
25  A.  Yes.
```

Page 47

```
 1    GENGER
 2  Q.  And by Elana, I mean Sagi's wife Elana?
 3  A.  That's the one, yeah.
 4  Q.  So you spoke with Sagi, with Rochelle
 5  Fang, with Leah Fang, and with Elana Genger?
 6  A.  With my family, yes.
 7  Q.  Did you speak to anyone else in your
 8  family?
 9  A.  I don't remember.
10  Q.  Did you speak with Orly?
11  A.  No, I did not speak with Orly.
12  Q.  Why didn't you speak with Orly?
13    MR. ZILBERFEIN: Objection.
14    BY THE WITNESS:
15  A.  I didn't speak with Orly because I was
16  sure that she would understand that her best
17  interest -- that I would serve to the best of my
18  ability her interest and take care of her needs,
19  as I did throughout my life as her mother.
20    BY MR. GRIVER:
21  Q.  I see.
22  So is that the only reason you didn't
23  speak to Orly is because you were confident --
24  A.  Yeah.
25  Q.  Is there a reason why you thought Sagi
```

Page 48

```
 1    GENGER
 2  would be uncomfortable about you being trustee so
 3  you had to speak with him?
 4  A.  No.  I didn't think that Sagi would be
 5  uncomfortable or comfortable.
 6  Q.  Then why did you speak with Sagi?
 7  A.  Because the problem -- it was a problem
 8  that somebody had to serve as a trustee.  So
 9  that's why we discussed it.
10  Q.  Did Sagi come to you with the idea of
11  you serving as a trustee?
12  A.  What?  Again?
13  Q.  Did Sagi come to you with the idea of
14  you serving as trustee?
15  A.  No.
16    MR. ZILBERFEIN: Objection.
17    BY THE WITNESS:
18  A.  I volunteered.
19    BY MR. GRIVER:
20  Q.  Who did you volunteer to?
21  A.  I volunteered.  There was --
22    MR. ZILBERFEIN: Objection.
23    BY THE WITNESS:
24  A.  -- an opening, and I volunteered to
25  take the job.
```

20-01187-jlg    Doc 1-18    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 19
ORLY GENGER VS.                                                      DALIA GENGER
DALIA GENGER, et al                Pg 34 of 150                      December 13, 2012

Page 49

1    GENGER
2    BY MR. GRIVER:
3  Q.  How did you know there was an opening?
4  A.  Because --
5    MR. ZILBERFEIN: Objection.
6    BY THE WITNESS:
7  A.  -- Leah was very frustrated, and she
8  wanted to resign. I was aware of it.
9    BY MR. GRIVER:
10 Q.  Okay. And why was Leah frustrated?
11   MR. MEISTER: Objection. Calls for the
12 operation of someone else's mind.
13   MR. ZILBERFEIN: Objection.
14   BY MR. GRIVER:
15 Q.  If you know.
16   MR. ZILBERFEIN: Join. I object.
17   MR. MEISTER: She can't possibly know.
18   BY MR. GRIVER:
19 Q.  You just testified that Leah was
20 frustrated. On what basis did you believe that
21 Leah was frustrated?
22 A.  I am assuming that she was being sued
23 and harassed, and then hospitalized as a
24 consequence of the conduct of Orly, my daughter.
25 Q.  So you mentioned before that there was

Page 50

1    GENGER
2  a problem that you were trying to resolve. What
3  was the problem?
4  A.  The problem was to find a trustee for
5  Orly trust.
6  Q.  Do you know what -- so at this time
7  Orly and Leah Fang were in conflict; is that
8  correct?
9    MR. MEISTER: Objection.
10   MR. ZILBERFEIN: Objection. I join.
11   MR. MEISTER: It is a legal conclusion.
12   MR. GRIVER: Objection noted.
13   THE WITNESS: Can you repeat the
14 question.
15   BY MR. GRIVER:
16 Q.  At the time you believe that Leah was
17 frustrated because you mentioned something about
18 a hospital, you mentioned something about a
19 conflict of some problem, why did Leah -- did you
20 have an understanding as to why Leah wished to
21 resign as trustee?
22   MR. ZILBERFEIN: At what point in time?
23   BY THE WITNESS:
24 A.  Why Leah -- you have to ask her. I
25 don't know.

Page 51

1    GENGER
2    MR. ZILBERFEIN: I object to the
3  question.
4    BY THE WITNESS:
5  A.  I don't know.
6    MR. GRIVER: Can I have the answer
7  back, please.
8    (WHEREUPON, the record was read by
9    the reporter as requested.)
10   BY MR. GRIVER:
11 Q.  At the time --
12   MR. GRIVER: Read my question back,
13 please.
14   (WHEREUPON, the record was read by
15   the reporter as requested.)
16   BY MR. GRIVER:
17 Q.  Did you have an understanding as to why
18 Leah wished to resign as trustee?
19   MR. MEISTER: She just answered that.
20 She said she doesn't know.
21   MR. ZILBERFEIN: Note my objection.
22   MR. MEISTER: Move on to your next
23 question, please.
24   BY MR. GRIVER:
25 Q.  Is that your answer, your full answer,

Page 52

1    GENGER
2  that you don't know?
3  A.  I do not know exactly, but I can assume
4  that a person who takes this kind of --
5  volunteers to take this job and ends up in the
6  hospital is not a happy person.
7  Q.  Okay.
8    MR. ZILBERFEIN: Note my objection to
9  any assumption.
10   BY MR. GRIVER:
11 Q.  You said Leah ended up --
12 A.  I assume. I assume.
13 Q.  That was your assumption at the time --
14 A.  Yeah.
15 Q.  -- that you took the --
16 A.  She was not happy.
17   MR. MEISTER: I am going to put this on
18 the record -- excuse me, Mr. Griver.
19   Dalia, you have to wait, please, until
20 Mr. Griver finishes his question because if you
21 start to talk at the same time --
22   THE WITNESS: Okay.
23   MR. MEISTER: -- the court reporter
24 can't get it.
25   BY MR. GRIVER:

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                              Pg 35 of 150                         DALIA GENGER
DALIA GENGER, et al                                                          December 13, 2012

Page 53

1      GENGER
2 Q.   You said that Leah ended up in the
3 hospital?
4 A.   Yes.  As far as I know.  Yes.
5 Q.   Did you have an understanding as to why
6 Leah ended up in the hospital?
7      MR. ZILBERFEIN: Objection.
8      BY THE WITNESS:
9 A.   Again, I assumed she had a nervous
10 breakdown.
11     BY MR. GRIVER:
12 Q.   Because of her --
13 A.   Harassment.
14 Q.   Okay.  Because of harassment.
15     Harassment by whom?
16 A.   I don't know.  I'm not a doctor.  I
17 really don't know why they hospitalized her.
18 Q.   Okay.  But you understood that Leah was
19 being harassed?
20 A.   Yes.
21     MR. ZILBERFEIN: Objection.
22     BY MR. GRIVER:
23 Q.   Harassed by whom?
24 A.   By Orly's lawyers.
25 Q.   In connection with Leah's functioning

Page 54

1      GENGER
2 as trustee of the trust?
3 A.   I would assume so.
4      MR. ZILBERFEIN: Objection.
5      BY MR. GRIVER:
6 Q.   And did you understand why Leah was
7 being harassed?
8 A.   No.
9      MR. ZILBERFEIN: Objection.  Asked and
10 answered.
11     BY MR. GRIVER:
12 Q.   Did you understand why Orly's attorneys
13 were in conflict with Ms. Fang?
14     MR. ZILBERFEIN: Objection.
15     BY THE WITNESS:
16 A.   No.
17     BY MR. GRIVER:
18 Q.   Did you understand that Orly might not
19 be pleased with the work Leah was doing as
20 trustee?
21     MR. ZILBERFEIN: Objection.
22     BY THE WITNESS:
23 A.   I don't know exactly what Leah at the
24 time did, that Orly did not -- was not happy
25 with.

Page 55

1      GENGER
2      MR. GRIVER: Could you read back that
3 answer, please.
4      (WHEREUPON, the record was read by
5      the reporter as requested.)
6      MR. GRIVER: Mark that answer so I can
7 come back to it.
8      BY MR. GRIVER:
9 Q.   How did you know that Leah was being
10 harassed?
11     MR. ZILBERFEIN: Objection.
12     BY THE WITNESS:
13 A.   How did I know?
14     BY MR. GRIVER:
15 Q.   Uh-huh.
16 A.   Well, she's part of my family, so I
17 guess it was known.
18 Q.   So she told you?
19 A.   Leah did not tell me that.
20 Q.   So Sagi told you?
21 A.   Actually, her mother told me.
22 Q.   Rochelle Fang?
23 A.   Right.
24 Q.   Did you ever pick up the phone to Orly
25 and say, "Orly, what's going on?"

Page 56

1      GENGER
2 A.   No.
3 Q.   Did you ever try to get Orly's side of
4 the story?
5      MR. ZILBERFEIN: Objection.
6      BY THE WITNESS:
7 A.   No, I was not involved then in Orly's
8 affair.
9      BY MR. GRIVER:
10 Q.   Well, at that time you had no -- you
11 had no connection to Orly; is that right?
12     MR. ZILBERFEIN: Objection.
13     BY THE WITNESS:
14 A.   Right.  She tried to avoid me.
15     BY THE WITNESS:
16 Q.   Well, in this case, you chose not to
17 pick up the phone to ask her what was going on;
18 isn't that right?
19     MR. ZILBERFEIN: Objection.
20     BY THE WITNESS:
21 A.   After she never answered my calls and
22 my texts --
23     BY MR. GRIVER:
24 Q.   Did you ever --
25 A.   -- messages.

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
Pg 36 of 150

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 57

1    GENGER
2 Q.  Did you ever call Orly up to find out
3 what her disagreement was with Leah Fang?
4    MR. MEISTER: Objection. Asked and
5 answered.
6    MR. ZILBERFEIN: Objection.
7    BY THE WITNESS:
8 A.  No.
9    BY THE WITNESS:
10 Q.  Did you ever go to Orly's house to talk
11 to her directly and ask her?
12 A.  No.
13    MR. ZILBERFEIN: Objection.
14    BY MR. GRIVER:
15 Q.  Did you ever send her an e-mail?
16    MR. ZILBERFEIN: Objection.
17    BY THE WITNESS:
18 A.  I don't remember.
19    BY MR. GRIVER:
20 Q.  Did you ever write her a letter saying:
21 "What's going on, Orly?  Why are you in conflict
22 with Leah Fang?"
23    MR. DELLAPORTAS: Object to form.
24    MR. ZILBERFEIN: Objection.
25    BY THE WITNESS:

Page 58

1    GENGER
2 A.  No, it wasn't my business, really.
3    MR. DELLAPORTAS: Object to form. And
4 I just note for the record that Ms. Orly Genger
5 is not in attendance today.  You may proceed.
6    BY MR. GRIVER:
7 Q.  In sum or in substance, did you do
8 anything to try and understand what the conflict
9 was between Orly and Leah Fang?
10    MR. ZILBERFEIN: Objection.
11    BY THE WITNESS:
12 A.  No.
13    MR. ZILBERFEIN: Can you read back the
14 question and answer.
15    (WHEREUPON, the record was read by
16    the reporter as requested.)
17    BY MR. GRIVER:
18 Q.  Did Sagi discuss your appointment with
19 you prior to your acceptance of the appointment?
20 A.  Sagi discussed with me prior to my
21    appointment?
22 Q.  Uh-huh.
23 A.  Me taking the trusteeship, you mean?
24 Q.  Taking it or not taking it, did you
25 discuss whether -- did you discuss the potential

Page 59

1    GENGER
2 of you being appointed trustee with Sagi before
3 you accepted the appointment?
4    MR. ZILBERFEIN: Objection.
5    BY THE WITNESS:
6 A.  As far as I remember, I did discuss
7    with Sagi the fact that I am willing to
8    volunteer.
9    BY MR. GRIVER:
10 Q.  And do you recall anything else about
11 that conversation?
12    MR. ZILBERFEIN: Objection.
13    BY THE WITNESS:
14 A.  No.
15    BY MR. GRIVER:
16 Q.  Was there more than one conversation?
17 A.  I don't think so.
18 Q.  Did you talk to any lawyer before you
19 decided to accept the appointment as trustee?
20    MR. ZILBERFEIN: Objection.
21    BY THE WITNESS:
22 A.  I don't remember that.
23    BY MR. GRIVER:
24 Q.  Do you remember what it is -- strike
25 that.

Page 60

1    GENGER
2    Previously you testified that you
3 discussed whether or not you would become trustee
4 of the Orly trust with your family; do you recall
5 that testimony?
6    MR. ZILBERFEIN: Objection.
7    BY THE WITNESS:
8 A.  Yes, I said that I did discuss it
9    because the problem was that somebody has to
10    become a trustee.
11    BY MR. GRIVER:
12 Q.  Did you search for anybody else besides
13 yourself who might be willing to become a
14 trustee?
15    MR. MEISTER: Can I have the question
16    read back, please.
17    BY THE WITNESS:
18 A.  Yeah.  I was --
19    MR. MEISTER: Wait, wait.  I would like
20 to have the question read back.
21    (WHEREUPON, the record was read by
22    the reporter as requested.)
23    MR. ZILBERFEIN: Objection.
24    MR. MEISTER: Object to the form.
25    THE WITNESS: So after all this

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                        Pg 37 of 150                        DALIA GENGER
DALIA GENGER, et al                                                 December 13, 2012

Page 61

1    GENGER
2    objection, what is the question?
3        MR. GRIVER: Repeat the question,
4    please.
5        BY THE WITNESS:
6    A. Well, I was thinking about maybe some
7    kind of firm, an independent firm that might take
8    care of -- might take care of Orly Genger trust,
9    but eventually all the options led to the fact
10   that somebody like me that cares about Orly and
11   is willing to make a lot of sacrifices, I was
12   basically the only person left.
13       MR. GRIVER: Can you repeat my
14   question.
15       Because I am not sure that you answered
16   the question I asked.
17       THE WITNESS: Okay.
18       (WHEREUPON, the record was read by
19       the reporter as requested.)
20       BY THE WITNESS:
21   A. I was thinking about some options.
22       BY MR. GRIVER:
23   Q. Okay. Did you do -- and you identified
24   that option as maybe a firm --
25   A. An independent firm. But then they

Page 62

1    GENGER
2    would want to be paid, and then, obviously, as a
3    trust, there are regular roles.
4    Q. Do you do any investigation, did you --
5    I understand that you thought of it.
6        Did you do any action in order to see
7    if someone else --
8    A. There was no point in doing any action.
9    Q. Why was there no point?
10   A. Because I don't think that anyone would
11   take such a job to be a trustee, to risk
12   resources and being sued constantly, and would
13   have Orly's interest in mind, as I did.
14   Q. Okay. I'm sorry.
15       Had Orly sued anyone before
16   January 1 of 2008?
17       MR. ZILBERFEIN: Objection.
18       BY MR. GRIVER:
19   Q. If you know.
20   A. I don't know. Really, I didn't --
21   Q. You said -- I understand what you said.
22       But let's just -- so we are clear on the record,
23   you did not pick up the phone and talk to anyone
24   to see if they might be interested in serving as
25   the Orly Genger trustee?

Page 63

1    GENGER
2        MR. ZILBERFEIN: Objection.
3        MR. MEISTER: Except as previously
4    testified, Mr. Griver?
5        BY MR. GRIVER:
6    Q. Did you pick up the phone and call
7    anybody to see if they would be willing to serve
8    as trustee?
9    A. No, I didn't know anyone that would
10   potentially be able to do that because of the
11   history of this.
12   Q. Did you task anyone --
13   A. No, I didn't.
14   Q. Did you task anyone with trying to find
15   somebody else besides yourself?
16       MR. ZILBERFEIN: Objection.
17       BY THE WITNESS:
18   A. Didn't you ask me this question before,
19   if I tried to find anyone?
20       BY MR. GRIVER:
21   Q. Did you ask someone else to try and
22   find anyone?
23   A. No. Because there's no point in doing
24   that.
25   Q. Did you -- did Sagi look for anyone

Page 64

1    GENGER
2    besides yourself, do you know?
3    A. I don't know what Sagi did or didn't
4    do.
5    Q. Okay. As far as you know, he didn't
6    look for anybody?
7        MR. ZILBERFEIN: Objection.
8        BY THE WITNESS:
9    A. I do not know what Sagi did or didn't
10   do.
11       BY MR. GRIVER:
12   Q. What about Rochelle Fang?
13   A. I don't know what she did.
14       MR. ZILBERFEIN: Objection.
15       BY MR. GRIVER:
16   Q. Did you ask Rochelle Fang if she did
17   anything?
18   A. No, I didn't ask.
19   Q. Did you ask Leah Fang if she looked for
20   anybody besides you?
21       MR. ZILBERFEIN: Objection.
22       BY THE WITNESS:
23   A. No. I don't remember.
24       BY MR. GRIVER:
25   Q. Do you know who a Patricia Enriquez is?

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                                                    DALIA GENGER
DALIA GENGER, et al                                                December 13, 2012
Pg 38 of 150

Page 65

1    GENGER
2  A.  Who?
3  Q.  Patricia Enriquez?
4  A.  I don't remember this name.
5  Q.  Were you aware that before you became
6    trustee Leah Fang had attempted to appoint a
7    Patricia Enriquez?
8  A.  I was not aware.  I don't know who it
9    is.
10 Q.  Were you --
11     MR. ZILBERFEIN: Objection.
12     BY MR. GRIVER:
13 Q.  Were you aware of the fact that
14   Patricia Enriquez attempted to accept the
15   position of Orly Genger trustee?
16     MR. ZILBERFEIN: Objection.
17     BY THE WITNESS:
18 A.  No, I was not aware of it.
19     BY MR. GRIVER:
20 Q.  Tell me everything you remember about
21   your conversations with Rochelle Fang in
22   connection with whether or not you would or would
23   not become trustee of the Orly trust.
24     MR. ZILBERFEIN: Objection.
25     BY THE WITNESS:

Page 66

1    GENGER
2  A.  I don't remember exactly what we talked
3    about, but we did discuss the fact that there is
4    a need to fulfill -- to fill up the position of
5    being a trustee in Orly trust.
6      BY MR. GRIVER:
7  Q.  And tell me all you can remember about
8    your conversations with Leah Fang regarding
9    whether or not you would become trustee of the
10   Orly trust.
11     MR. ZILBERFEIN: Objection.
12     MR. MEISTER: Was that Leah Fang?
13     MR. GRIVER: Yes.  Leah Fang.
14     THE WITNESS: Again, can you repeat the
15   question.
16     MR. GRIVER: Sure.
17     BY MR. GRIVER:
18 Q.  Tell me everything that you can recall
19   about your conversations with Leah Fang about
20   whether or not you would serve as trustee of the
21   Orly trust.
22     MR. ZILBERFEIN: Objection.
23     BY THE WITNESS:
24 A.  I don't remember what exactly we
25   discussed.

Page 67

1    GENGER
2      BY MR. GRIVER:
3  Q.  Can you please tell me everything you
4    recall about your conversations with Elana
5    Genger?
6  A.  It is all the same kind of
7    conversation, there is a problem and somebody has
8    to be found.
9  Q.  Did you have any conversations with,
10   let's say, Leah's attorneys?
11 A.  No, I never talked to Leah's attorneys.
12   I don't know who they are.
13 Q.  Did you review any documents before you
14   became trustee in order to determine whether or
15   not you would become trustee?
16     MR. ZILBERFEIN: Objection.
17     BY THE WITNESS:
18 A.  I don't remember.
19     BY MR. GRIVER:
20 Q.  You don't recall looking -- asking for
21   any balance sheets or asking for any
22   communications between Leah and Orly, anything
23   like that?  You don't remember anything like
24   that?
25     MR. ZILBERFEIN: Objection.

Page 68

1    GENGER
2      BY THE WITNESS:
3  A.  No, I don't remember.
4      MR. GRIVER: Let me have this marked as
5    Dalia Exhibit 6.
6      (Dalia Exhibit 6, release,
7    marked.)
8      MR. GRIVER: Let me have this marked as
9    Dalia Exhibit 7.
10     (Dalia Exhibit 7, document,
11   marked.)
12     BY MR. GRIVER:
13 Q.  Let's take a look at Dalia 7.
14 A.  Dalia 7?
15 Q.  Yes.
16 A.  Let me look at it first.
17 Q.  Okay.
18 A.  It is very unclear, this copy.  I don't
19   think I have ever seen this document before.
20 Q.  And on about December and January of
21   December of 2007 and January 2008 --
22     MR. MEISTER: I am going to object
23   because you blurred it and I couldn't understand.
24     THE WITNESS: Yeah.
25     MR. GRIVER: I will start over.

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                    Pg 39 of 150                    DALIA GENGER
DALIA GENGER, et al                                               December 13, 2012

Page 69

1     GENGER
2     **MR. MEISTER:** Thank you.
3     **BY MR. GRIVER:**
4   Q.  So at the time that you accepted
5     appointment as trustee of the Orly Genger trust,
6     you were not aware that a Ms. Patricia Enriquez
7     had accepted to act as successor trustee --
8     **MR. ZILBERFEIN:** Objection.
9     **BY MR. GRIVER:**
10  Q.  -- just a few weeks before?
11    **MR. ZILBERFEIN:** Objection.
12    **BY THE WITNESS:**
13  **A.  I was not aware of it.**
14    **BY MR. GRIVER:**
15  Q.  Okay.  I take it that Patricia Enriquez
16    is not a member of the Genger family?
17  **A.  I don't think so.**
18  Q.  You think she is or you think she
19    isn't?
20  **A.  She isn't.**
21  Q.  Okay.  Let's look at Dalia 6, please.
22    Do you recognize this document?
23  **A.  Yes.**
24  Q.  What is this document?
25  **A.  It is giving a release to Leah.**

Page 70

1     GENGER
2   Q.  Is this one of the documents that
3     Mr. Meister showed you on Tuesday or Wednesday of
4     this week?
5   **A.  No.**
6   Q.  When was the last time you saw this
7     document?
8   **A.  When?  At the date that it was written.**
9   Q.  Okay.  Who wrote this document?
10    **MR. ZILBERFEIN:** Objection.
11    **BY THE WITNESS:**
12  **A.  I would assume my lawyer.  I didn't**
13  **write this.**
14    **BY MR. GRIVER:**
15  Q.  Well, I thought you testified that you
16    had not run your acceptance as trustee by any
17    lawyer?
18    **MR. ZILBERFEIN:** Objection.  It doesn't
19    make it --
20    **BY MR. GRIVER:**
21  Q.  Am I correct?
22    **MR. ZILBERFEIN:** It is not related to
23    the document.
24    **MR. GRIVER:** Can I have the question
25    read back, please.

Page 71

1     GENGER
2     (WHEREUPON, the record was read by
3     the reporter as requested.)
4     **THE WITNESS:** So, again, what is the
5     question?
6     **BY MR. GRIVER:**
7   Q.  You had previously testified that you
8     had not discussed with any attorneys whether or
9     not you would become trustee of the Orly trust;
10    do you recall that testimony?
11  **A.  Yes.**
12  Q.  So you have just said now that -- I
13    understand your attorney drafted this on December
14    29, 2007.
15    **MR. ZILBERFEIN:** Objection.
16    **MR. MEISTER:** She said her attorney.
17    **BY MR. GRIVER:**
18  Q.  Do you know which attorney drafted
19    this?
20  **A.  I don't remember which one.**
21  Q.  Was this -- when you are talking about
22    an attorney, are you talking about an attorney
23    for you?
24    **MR. ZILBERFEIN:** Note my objection.
25    She's already stated she doesn't know which

Page 72

1     GENGER
2     attorney drafted this.
3     **BY THE WITNESS:**
4   **A.  I don't remember which one, really.**
5     **BY MR. GRIVER:**
6   Q.  How do you know an attorney drafted
7     this?
8   **A.  Because I wouldn't be able to write**
9   **something like that.**
10  Q.  Okay.  Could this be something that
11    Leah wrote?
12    **MR. ZILBERFEIN:** Objection.
13    **BY THE WITNESS:**
14  **A.  No, for sure not Leah.**
15    **BY MR. GRIVER:**
16  Q.  Leah is an attorney, isn't --
17  **A.  It is to Leah Fang.**
18  Q.  What?
19  **A.  It is addressed to Leah Fang.**
20  Q.  Okay.
21  **A.  So she didn't write it.**
22    **MR. ZILBERFEIN:** Objection.
23    **BY MR. GRIVER:**
24  Q.  Is Leah Fang an attorney?
25  **A.  As far as I know, she is.**

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                                    DALIA GENGER
DALIA GENGER, et al              Pg 40 of 150      December 13, 2012

Page 73

1    GENGER
2 Q. Could she have -- well --
3 A. She didn't write it. That's for sure.
4 Q. How do you know?
5    MR. ZILBERFEIN: Objection.
6    BY THE WITNESS:
7 A. Because I said, a lawyer wrote it, but
8 it is not Leah Fang.
9    BY MR. GRIVER:
10 Q. And on what basis do you say that a
11 lawyer wrote it but not Leah Fang?
12    MR. ZILBERFEIN: Objection.
13    BY THE WITNESS:
14 A. Because it is addressed to her, and I
15 don't believe that Leah would do such a thing.
16    BY MR. GRIVER:
17 Q. It has on the top of it, it says Dalia
18 Genger; do you see that?
19 A. Yes.
20 Q. Is that an indication it came from your
21 computer?
22 A. I don't know if it is my computer or my
23 lawyer's computer.
24 Q. Okay. When you say your lawyer's
25 computer, which lawyer --

Page 74

1    GENGER
2 A. That I told you. I don't remember --
3 Q. You don't remember his name?
4 A. -- which lawyer was at that time my
5 lawyer.
6 Q. Now, is that your signature on the
7 bottom?
8 A. Yes.
9 Q. And do you understand what this
10 document does or purports to do?
11    MR. ZILBERFEIN: Objection.
12    BY MR. GRIVER:
13 Q. To your understanding, what does this
14 document do?
15    MR. ZILBERFEIN: Same objection.
16    BY THE WITNESS:
17 A. Identifies a release, Leah.
18    BY MR. GRIVER:
19 Q. Okay. And it releases Leah to, it
20 says, the maximum extent permissible under law;
21 do you see that?
22 A. What?
23 Q. This document says that it releases
24 Leah and holds her harmless, quote, to the
25 maximum extent permissible under the law and the

Page 75

1    GENGER
2 trust agreement; do you see that?
3 A. I don't see it, but I believe it is
4 there.
5 Q. Look on the third line.
6    MR. MEISTER: Can I point it out?
7    BY THE WITNESS:
8 A. It doesn't matter. I believe you.
9    BY MR. GRIVER:
10 Q. So you were -- on December 29, 2007,
11 you were okay with releasing Leah to the maximum
12 extent permissible under the law in the trust
13 agreements, correct?
14    MR. ZILBERFEIN: Objection.
15    BY THE WITNESS:
16 A. Yeah.
17    BY MR. GRIVER:
18 Q. At the time that you attempted to
19 release Leah to the maximum extent permissible
20 under the law and that trust agreements, did you
21 have any idea what Leah had or had not done as
22 trustee during her time as the trustee of the
23 Orly Genger trust?
24 A. I just don't remember exactly what she
25 had or has not done.

Page 76

1    GENGER
2 Q. Okay. You did no investigation before
3 you signed this document as to what Leah had or
4 had not done; isn't that correct?
5    MR. ZILBERFEIN: Objection.
6    BY THE WITNESS:
7 A. I did -- I really don't remember
8 exactly, but I know that at the time I didn't
9 think that Leah has done anything harmful to
10 Orly.
11    BY MR. GRIVER:
12 Q. Okay.
13    MR. MEISTER: Is this a good time to
14 take a break?
15    MR. GRIVER: No. Let me finish this.
16 I understand. Let me finish this set of
17 questions.
18    BY MR. GRIVER:
19 Q. You said, "At the time I did not think
20 Leah had done anything harmful to Orly"?
21 A. Yeah.
22 Q. But you did no investigation to find
23 that out, did you?
24    MR. ZILBERFEIN: Objection.
25    BY THE WITNESS:

20-01187-jlg  Doc 1-18  Filed 06/20/20  Entered 06/20/20 20:19:48  NoR part 19
ORLY GENGER VS.                                                    DALIA GENGER
DALIA GENGER, et al                                                December 13, 2012
Pg 41 of 150

Page 77

1    GENGER
2  A.  I don't know how you are defining
3  "investigation."
4       BY MR. GRIVER:
5  Q.  You didn't talk to Orly, did you?
6  A.  No.
7       MR. ZILBERFEIN: Objection.
8       BY MR. GRIVER:
9  Q.  Did you talk to Orly's lawyers?
10  A.  No. I already said that.
11  Q.  Did you have your lawyer talk to Orly's
12  lawyers to do an investigation?
13       MR. ZILBERFEIN: Objection.
14       BY THE WITNESS:
15  A.  I don't remember.
16       BY MR. GRIVER:
17  Q.  Do you remember doing anything in sum
18  or in substance to determine what Leah had or had
19  not done before you sent her this exoneration on
20  December 29, 2007?
21  A.  I know that at that time, at the time,
22  I was aware of some of the conflict that -- I
23  mean, some of the conflicts that have happened,
24  and I didn't find anything wrong with whatever
25  Leah did.

Page 78

1    GENGER
2  Q.  And what did Leah do?
3  A.  I don't remember exactly what it was.
4  Q.  Okay. And so in finding out what Leah
5  did or did not do, the most you did was talk to
6  Leah?
7  A.  Yeah.
8       MR. ZILBERFEIN: Objection.
9       BY MR. GRIVER:
10  Q.  And based on what Leah said, you
11  exonerated her, held her harmless and indemnified
12  her for whatever she may or may not have done?
13       MR. ZILBERFEIN: Objection.
14       BY MR. GRIVER:
15  Q.  Isn't that correct?
16       MR. MEISTER: To the maximum extent
17  permitted by law and the trust agreement.
18       MR. ZILBERFEIN: Objection.
19       BY MR. GRIVER:
20  Q.  You can answer.
21  A.  I indemnified her, yes.
22  Q.  Let me ask you this: How is that in
23  the trust's best interest to exonerate someone
24  and indemnify them? You understand what
25  "indemnify" means?

Page 79

1    GENGER
2  A.  Tell me what it means.
3  Q.  "Indemnify" means that if someone sues
4  her, you pay her bills. That's what "indemnify"
5  means. Did you understand that at the time you
6  indemnified her on December 29, 2007?
7       MR. ZILBERFEIN: Objection.
8       BY THE WITNESS:
9  A.  I don't understand what --
10       MR. ZILBERFEIN: Objection to the
11  definition of the attorney's --
12       BY THE WITNESS:
13  A.  I was not aware of this legal term.
14       BY MR. GRIVER:
15  Q.  Then let's be clear.
16       At the time you signed this document
17  did you have an understanding of what
18  "indemnification" meant?
19  A.  No.
20  Q.  None whatsoever?
21       MR. ZILBERFEIN: Objection.
22       BY THE WITNESS:
23  A.  No. I thought that this was a standard
24  way of writing this kind of release.
25       BY MR. GRIVER:

Page 80

1    GENGER
2  Q.  Who told you that it was a standard way
3  of writing this release?
4       MR. ZILBERFEIN: Objection.
5       BY THE WITNESS:
6  A.  I said I thought. I didn't say
7  somebody told me.
8       BY MR. GRIVER:
9  Q.  Okay. What was the basis of your
10  thinking that?
11       MR. ZILBERFEIN: Objection.
12       BY THE WITNESS:
13  A.  Because we have many cases, that there
14  is a standard way of expressing objection or
15  other things, legal things, that it is a kind of
16  standard way of writing things.
17       BY MR. GRIVER:
18  Q.  Understood.
19       But what, to your understanding, at the
20  time that you signed this memo of December 29,
21  2007, that's marked as Dalia 6, what was your
22  understanding of what an indemnification was?
23  A.  That she's not -- that she cannot be
24  sued, I guess. She's released from any
25  wrongdoing.

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                                                        Pg 42 of 150                              DALIA GENGER
DALIA GENGER, et al                                                                                    December 13, 2012

Page 81

1     **GENGER**
2 Q. Okay. Let's look at it. It says the
3 indemnification includes any actions by the
4 beneficiaries and the agents, including any
5 expenses or injury incurred on your part, in
6 connection with service. Do you see that part?
7 It is right here.
8 A. **I am sure it is there. Yes. I see.**
9 **So what's the question?**
10 Q. Okay. So what does "indemnification"
11 mean?
12     **MR. MEISTER:** Objection.
13     **MR. ZILBERFEIN:** Objection.
14     **BY MR. GRIVER:**
15 Q. To your understanding --
16     **MR. MEISTER:** She's answered it. Move
17 on to your next point. And better than that,
18 let's take a break.
19     **MR. ZILBERFEIN:** I join in the break.
20     **MR. DELLAPORTAS:** If we are taking a
21 break, I need to put a statement on the record
22 because we have now gone for 90 minutes, and we
23 have yet to ask any questions relevant to the D&K
24 action.
25     **MR. GRIVER:** Excuse me.

Page 82

1     **GENGER**
2     **MR. DELLAPORTAS:** I am putting a
3 statement on the record.
4     **MR. GRIVER:** You are not putting a
5 statement on the record.
6     **MR. DELLAPORTAS:** I am putting a
7 statement on the record. This has been noticed
8 for a deposition in the D&K action. We have not
9 had a single question relevant to the D&K action.
10     **MR. GRIVER:** Call the judge.
11     **MR. DELLAPORTAS:** Do not interrupt me.
12     **MR. GRIVER:** You are interrupting my
13 questioning of this witness.
14     Can I have the question read back to
15 me.
16     **MR. DELLAPORTAS:** There is no question
17 pending.
18     **THE WITNESS:** You know what? I am
19 going to leave if this is how this --
20     **MR. MEISTER:** Dalia --
21     **MR. GRIVER:** Read my question back,
22 please.
23     **BY MR. GRIVER:**
24 Q. My question is, on May -- on
25 December --

Page 83

1     GENGER
2     **MR. MEISTER:** He started putting a
3 statement on the record.
4     **MR. DELLAPORTAS:** No one is asking a
5 question until I finish putting my statement on
6 the record.
7     **BY MR. GRIVER:**
8 Q. On December 29 --
9     **MR. DELLAPORTAS:** Please give me the
10 courtesy of speaking --
11     **BY MR. GRIVER:**
12 Q. On December 29 --
13     **MR. DELLAPORTAS:** Counsel, I will keep
14 speaking until she puts on the record what I
15 said.
16     **MR. GRIVER:** Put everything he says on
17 the record because I want to go -- that's fine.
18     **THE COURT REPORTER:** Okay. But only
19 one person can speak at a time.
20     **MR. GRIVER:** Can I see if a question is
21 open on the record.
22     **MR. DELLAPORTAS:** No one is doing
23 anything until I speak.
24     **THE COURT REPORTER:** There was a
25 question, and then there was an objection.

Page 84

1     GENGER
2     **MR. MEISTER:** There was an objection
3 because the question was answered. Do you want
4 to go back? Do you want to waste time?
5     **MR. GRIVER:** She did not answer the
6 question.
7     **THE WITNESS:** You did ask me that.
8     **MR. GRIVER:** Did you answer the
9 question?
10     **THE WITNESS:** Yes, I did.
11     **MR. MEISTER:** Yes, she did.
12 Now let's take our break.
13     **MR. DELLAPORTAS:** Anyone can break, and
14 I am putting this on the record.
15 We have been going for -- put this on
16 the record, because in fairness to opposing
17 counsel, I think I need to put this on the record
18 so they are on notice.
19 We have gone for 90 minutes. None of
20 the questions have related to the D&K action.
21 The discovery seems to be geared to, what I can
22 gather, to issues relevant to the surrogate court
23 action. That's fine, but we are not here for
24 that action.
25 I am not counsel to that action. This

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.
DALIA GENGER, et al
Pg 43 of 150
DALIA GENGER
December 13, 2012

Page 85

GENGER

1   deposition hasn't been crossed noticed in that
2   action, and yet my client is incurring legal
3   fees. We intend to apply once this case is over
4   for reimbursement of those legal fees based on
5   the misrepresentation from Orly's counsel that
6   the questioning of this deposition was going to
7   be related to the D&K action.
8       If Orly's counsel wishes to question
9   Ms. Genger about matters as to why she was hired,
10  why she didn't resign, and so and so forth, that
11  should have been noticed in the surrogate court
12  action.
13      We are here based on a
14  misrepresentation, the fees are increasing, and I
15  would strongly recommend to Ms. Orly Genger's
16  counsel that he may move on to some topics
17  relevant to the discussion because, as I said,
18  the bill is increasing.
19      MR. ZILBERFEIN: I join.
20      MR. MEISTER: Now I would like to take
21  a break.
22      MR. ZILBERFEIN: Before you start, I
23  want to join in counsel's statement, and I agree
24  100 percent with what he says. And I don't think

Page 86

GENGER

1   that it is proper for you to be asking this line
2   of questioning, especially since this has not
3   been noticed properly.
4       MR. GRIVER: I would direct both
5   counsel to read count 4 of the operative
6   complaint, it is right there, as Exhibit 2, to
7   Dalia's deposition.
8       BY MR. GRIVER:
9   Q.  Ms. Genger --
10      MR. MEISTER: No, no. We are taking a
11  break.
12      MR. GRIVER: Stop.
13      MR. MEISTER: You are not asking any
14  more questions.
15      MR. GRIVER: I have -- you are
16  asking --
17      MR. MEISTER: Do you want me to urinate
18  on your carpet here, Counsel? We have been going
19  for an hour and a half. We are taking a break.
20      MR. GRIVER: You have two counsel.
21      BY MR. GRIVER:
22  Q.  How is this --
23      MR. MEISTER: No. She's stepping out.
24      MR. GRIVER: All right. You called for

Page 87

GENGER

1   a break.
2       MR. DELLAPORTAS: Just for the record,
3   I see nothing in count 4 which has any relevance
4   to any of the questions.
5       MR. GRIVER: I would note that
6   Mr. Meister and the other counsel are not to
7   discuss the substance of this deposition during
8   the break.
9       MR. MEISTER: I would note that I need
10  to know where the men's room is.
11      MR. ZILBERFEIN: Is there a gag order?
12      (WHEREUPON, a recess was had from
13      12:07 p.m. to 12:19 p.m.)
14      (WHEREUPON, Attorney Lance Harris
15      entered the deposition
16      proceedings.)
17      BY MR. GRIVER:
18  Q.  Ms. Genger, we are back on record. You
19  are still under oath. Do you understand that?
20  A.  Yes.
21  Q.  Ms. Genger, how is it in the Orly
22  trust's best interest for you as trustee to
23  exonerate someone without knowing exactly what
24  they did or did not do?

Page 88

GENGER

1   A.  I believed that Leah did her best to
2   protect Orly.
3   Q.  For example, at the time that you
4   signed this, on December 29, 2007, what is it
5   that you believed that Leah did as trustee of the
6   trust?
7   A.  I don't remember what was at that time.
8   Q.  Now, if you look at Dalia Exhibit 6, it
9   is dated December 29, 2007, correct?
10  A.  Yes.
11  Q.  Were you trustee of the Orly Genger
12  trust on December 29, 2007?
13  A.  Not yet, officially.
14  Q.  Okay.
15  A.  Wasn't it January?
16  Q.  2008?
17  A.  Right.
18  Q.  So you weren't even trustee?
19  A.  Right.
20  Q.  So the first thing you did even before
21  you became trustee was immediately to release
22  Leah to the maximum extent permissible under the
23  law and the trust agreement?
24      MR. MEISTER: Objection.

20-01187-jlg    Doc 1-18    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 19
ORLY GENGER VS.                                    Pg 44 of 150                                    DALIA GENGER
DALIA GENGER, et al                                                                            December 13, 2012

Page 89

```
1      GENGER
2      BY THE WITNESS:
3   A. Well, if I signed it --
4      BY MR. GRIVER:
5   Q. If you signed it?
6   A. I spoke with whatever lawyer I had at
7      the time, and --
8      MR. MEISTER: Objection if you are
9   going to discuss what you discussed with your
10  lawyer. Say you spoke with a lawyer.
11     BY THE WITNESS:
12  A. I spoke with my lawyer.
13     MR. MEISTER: Don't reveal what you
14  said to him or her.
15     BY MR. GRIVER:
16  Q. Did you speak to him in connection with
17  you becoming trustee of the Orly trust?
18  A. Yeah.
19  Q. Did you sign this document as trustee
20  of the 1993 Orly Genger trust?
21  A. Did you -- can you repeat.
22  Q. Yes.
23     You signed this document as trustee of
24  the 1993 Orly Genger trust, correct?
25  A. Yes. And I did so because I had
```

Page 90

```
1      GENGER
2      discussion with my lawyer.
3   Q. Okay. And --
4      MR. ZILBERFEIN: Note my objection to
5   this line of questioning.
6      BY MR. GRIVER:
7   Q. And what did the lawyer tell you?
8      MR. ZILBERFEIN: Can I get my objection
9   in, please.
10     The document, although it has a date on
11  the top, it doesn't have a date near the
12  signature. We don't know when the witness signed
13  this.
14     BY MR. GRIVER:
15  Q. Did you -- what did the lawyer tell
16  you?
17     MR. MEISTER: Objection. Instruct her
18  not to --
19     BY THE WITNESS:
20  A. I can't tell you.
21     MR. GRIVER: You are going to instruct
22  her not to answer for something that she --
23     BY THE WITNESS:
24  A. No, I know that I cannot --
25     MR. MEISTER: Dalia.
```

Page 91

```
1      GENGER
2      MR. GRIVER: Let's set the foundation
3   for this then.
4      BY MR. GRIVER:
5   Q. You purported to sign this memo as
6   trustee of the trust?
7   A. Right. But I don't know which date,
8   really.
9   Q. You spoke to the lawyer, as trustee of
10  the trust, correct?
11     MR. MEISTER: No. Objection. She
12  hasn't said in what capacity she spoke to the
13  lawyer.
14     MR. GRIVER: Why don't you --
15     BY MR. GRIVER:
16  Q. Answer my question.
17     MR. GRIVER: No speaking objections.
18  Thank you.
19     BY THE WITNESS:
20  A. What was the question again?
21     BY MR. GRIVER:
22  Q. When you spoke to the lawyer, it was in
23  order to get this document that you would sign as
24  trustee of the trust?
25     MR. MEISTER: Object on the grounds of
```

Page 92

```
1      GENGER
2   attorney-client privilege. Instruct the witness
3   not to answer.
4      BY MR. GRIVER:
5   Q. Okay. Is that your signature on the --
6   A. Yeah. And it was noted there is no
7   date.
8   Q. So as we sit here today, you don't know
9   whether you signed this document when you were
10  actually trustee?
11  A. I'm not sure. I'm not -- I don't
12  remember if I was or wasn't.
13     MR. GRIVER: Okay. Let me have this
14  marked as Dalia 8.
15     (Dalia Exhibit 8, document,
16     marked.)
17     BY MR. GRIVER:
18  Q. Before you signed the document that was
19  marked as Dalia 6, previous document, had you
20  instructed anyone -- before you signed this
21  document marked as Dalia 6, the December 29, 2007
22  exoneration --
23  A. Can you repeat the question now.
24  Q. Yes.
25     Before you signed the document marked
```

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                    Pg 45 of 150                    DALIA GENGER
DALIA GENGER, et al                                          December 13, 2012

Page 93

```
 1      GENGER
 2  as Dalia 6, the December 29, 2007 exoneration,
 3  did you task anybody with conducting any
 4  investigation as to what Leah did or did not do
 5  as trustee?
 6  A.  I don't remember.
 7  Q.  You don't remember doing so?
 8  A.  I don't remember, yeah, if I did or I
 9  didn't do.
10  Q.  Do you have any documents at home
11  showing the results of any investigation of Leah
12  Fang's activities on or about the time of Dalia
13  6?
14  A.  I have to look.  I didn't look at my
15  files.
16  Q.  Providing --
17  A.  I don't remember now if I do or I don't
18  have any documents.
19  Q.  You remember providing documents in
20  this case?
21  A.  If it was needed, I am sure my lawyer
22  told me to do so.
23  Q.  Have you looked through your files as
24  trustee as part of providing documents in this
25  case?
```

Page 94

```
 1      GENGER
 2  A.  I don't remember.  I don't remember if
 3  I did so or not.
 4      MR. GRIVER:  Could you tag that,
 5  please.
 6      BY MR. GRIVER:
 7  Q.  Let's look at what's been marked as
 8  Dalia 8.
 9  A.  Yes.
10  Q.  Dalia 8 is a memo dated January 4,
11  2008.
12  A.  Yes.
13  Q.  And this is you reiterating your
14  indemnification letter to you of December 29,
15  2007; do you see that?
16  A.  Right.
17      MR. MEISTER:  Objection to form.
18      BY MR. GRIVER:
19  Q.  Do you remember the exact date that you
20  signed what's been marked as Dalia 8?
21  A.  No.
22  Q.  Do you remember whether you signed this
23  document before or after you signed what's been
24  marked as Dalia Exhibit 5?
25  A.  Exhibit 5?  So can you repeat the
```

Page 95

```
 1      GENGER
 2  question.
 3  Q.  Yes.
 4      Do you remember if you signed Exhibit 8
 5  before Exhibit 5?
 6  A.  No.
 7  Q.  Do you remember if you signed Exhibit 8
 8  after Exhibit 5?
 9  A.  No.
10  Q.  As we sit here today it is possible
11  that you signed -- strike that.
12      At some point you became involved in a
13  surrogate proceeding where Orly attempted to have
14  you removed as trustee; do you remember that?
15  A.  Generally, I know that she did that.
16  Q.  At any time did you let Surrogate Roth
17  know about the documents that have been marked as
18  Dalia 6 and Dalia 8?
19  A.  You have to ask my lawyer because I
20  don't know.
21      MR. DELLAPORTAS:  At this point --
22  objection.  Are you seriously --
23      BY THE WITNESS:
24  A.  All day we are going to talk about this
25  point?
```

Page 96

```
 1      GENGER
 2      MR. DELLAPORTAS:  This is pretty
 3  explicitly related to the surrogate court action.
 4  You brought us all here, Yoav.  Can you ask some
 5  questions about this case?  You didn't cross
 6  notice this.
 7      MR. GRIVER:  If you would look to your
 8  left, you see a representative of Leah Fang.
 9  Leah Fang has moved to dismiss the D&K note
10  action based on these releases.
11      MR. DELLAPORTAS:  Great.
12      MR. ZILBERFEIN:  That motion is
13  pending --
14      MR. GRIVER:  Accordingly, this is part
15  of this case, and I can ask --
16      MR. ZILBERFEIN:  That's fully
17  submitted, and the arguments are moot at this
18  point.
19      MR. LEINBACH:  There's no CPLR section
20  whatsoever that prevents us from taking discovery
21  on any point of law which has been raised in this
22  case, either by us or by you.
23      MR. GRIVER:  All right.  Repeat my
24  question.
25      MR. DELLAPORTAS:  We are going to
```

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                                                    DALIA GENGER
DALIA GENGER, et al                                                December 13, 2012
Pg 46 of 150

Page 97

1    GENGER
2  make --
3    THE WITNESS: You know --
4    MR. GRIVER: Repeat my question.
5    BY MR. GRIVER:
6  Q.  I will ask my question again.
7    At any time, to your knowledge, did you
8  let Surrogate Roth know about the documents that
9  have been marked as Dalia 6 and Dalia 8?
10   MR. ZILBERFEIN: Note my objection to
11  this whole line of questioning regarding the
12  surrogate court proceeding.
13   MR. DELLAPORTAS: Same objection.
14   BY THE WITNESS:
15  A.  I don't remember this because my
16  lawyer, whoever it was at the time, I am sure
17  submitted the papers that were -- the judge asked
18  for.
19   BY MR. GRIVER:
20  Q.  What consideration, if any, did the
21  trust receive in exchange for the documents that
22  have been marked as Dalia 6 and Dalia 8?
23   MR. DELLAPORTAS: Object to form.
24   MR. ZILBERFEIN: Objection.
25   MR. DELLAPORTAS: Lack of foundation.

Page 98

1    GENGER
2  Objection.
3    BY THE WITNESS:
4  A.  What was the direction?
5    MR. ZILBERFEIN: Assumes facts that
6  have not been established.
7    BY THE WITNESS:
8  A.  I don't understand the question.
9    BY MR. GRIVER:
10  Q.  What did the trust get in exchange for
11  giving Leah a maximum release and
12  indemnification?
13   MR. DELLAPORTAS: Same objection.
14   MR. ZILBERFEIN: Objection.
15   BY THE WITNESS:
16  A.  I'm not aware of any -- not aware of
17  any consideration with the process.
18   BY MR. GRIVER:
19  Q.  Okay.  Look, please, at what's been
20  marked as Dalia Exhibit 1.
21  A.  Exhibit 1.
22    Are we going to finish this today or
23  next week?  I mean, because there is a limit of
24  how much I can sit here.
25  Q.  Now, this is -- now you verified this

Page 99

1    GENGER
2  answer?
3    MR. MEISTER: Objection.  Asked and
4  answered.
5    BY MR. GRIVER:
6  Q.  Do you understand what a verification
7  is?  If you look at the last page of Exhibit 1.
8  A.  Yes.  "Verified" means that I accepted
9  whatever it is.
10  Q.  And you accepted it under oath?
11  A.  Okay.
12  Q.  And, in other words, you swore to the
13  truth of the allegations except -- to the truth
14  of the statements in your answer, except for
15  those matters which you say were upon information
16  and belief?
17  A.  I guess.
18  Q.  Before you signed that verification,
19  did you read your answer?
20  A.  I did.
21  Q.  Did you work on it with your attorney?
22  A.  At the time.
23  Q.  I note that it is signed by Robert
24  Meister.
25    Did you also --

Page 100

1    GENGER
2  A.  I said at the time.
3  Q.  Okay.  Look at paragraph 5 of your
4  answer, please.
5  A.  Here?  Where?  I don't know what page
6  it is.
7  Q.  It is on page 1.
8  A.  Deny the allegation, you mean?
9  Q.  Yes.  It says, quote:  Denies the
10  allegations contained in paragraph 5 of the
11  complaint, except denies knowledge or information
12  sufficient to form a belief as to the acts of
13  Leah Fang.
14    Do you see that?
15  A.  Let me look at this.  I have to
16  remember what was -- denies the allegation
17  contained in paragraph 5 of the complaint.
18  Q.  Uh-huh.
19  A.  Where is the complaint?
20  Q.  Okay.  That's Exhibit 2.  That's
21  Exhibit 2 to your deposition.  It is right there
22  in front of you.  And there's actually on page 3.
23    MR. MEISTER: It's actually on page
24  numbered 3.
25    THE WITNESS: Page number 3.

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                                                        DALIA GENGER
DALIA GENGER, et al                  Pg 47 of 150                      December 13, 2012

Page 101

1    GENGER
2    BY MR. GRIVER:
3 Q.  So --
4 A.  So paragraph 5 here.
5 Q.  Yes.
6    MR. MEISTER: Is there a question?
7    THE WITNESS: Let me read it first.
8    MR. GRIVER: Mr. Meister, please let
9 your client read paragraph 5.
10    BY THE WITNESS:
11 A.  That I colluded?
12    BY MR. GRIVER:
13 Q.  This is Leah Fang colluded.  Well, you
14 and Leah, yes.
15 A.  That I colluded with Leah?  I am just
16 reading this, telling you right now that there
17 was no collusion whatsoever.  I didn't collude
18 with anyone and --
19    MR. MEISTER: Wait until there's a
20 question, please.
21    BY MR. GRIVER:
22 Q.  I want you to please concentrate on
23 when it talks about the acts of Leah Fang,
24 because --
25    MR. MEISTER: I'm sorry, where what

Page 102

1    GENGER
2 talks about --
3    BY MR. GRIVER:
4 Q.  In response to paragraph 5 of the
5 complaint, you specifically denied under oath
6 knowledge or information sufficient to form a
7 belief as to the acts of Leah Fang.  I am asking
8 you to read about the facts of Leah Fang so we
9 may talk about Leah Fang's acts as to --
10 A.  I didn't investigate, as you know, and
11 it was being recorded that I didn't investigate
12 Leah Fang, as far as I remember.
13 Q.  So as of September 28, 2010 when you
14 signed the answer under oath, you still did not
15 have knowledge or information sufficient for you
16 to form a belief as to the acts of Leah Fang;
17 isn't that correct?
18    MR. MEISTER: As to the allegations in
19 paragraph 9 concerning the acts of Leah Fang.
20    BY MR. GRIVER:
21 Q.  Sufficient to form a belief as to the
22 acts of Leah Fang.
23    MR. MEISTER: As alleged.
24    MR. ZILBERFEIN: Every act she has ever
25 done?  Is that what you --

Page 103

1    GENGER
2    MR. MEISTER: Come on.
3    THE WITNESS: I am going to go.
4 Really.
5    MR. ZILBERFEIN: Objection to the
6 ludicrous question on behalf of counsel.
7    MR. MEISTER: Noted.  Objection to
8 form.
9    MR. GRIVER: I will ask again.
10    MR. ZILBERFEIN: I object to this whole
11 line of questioning.
12    MR. GRIVER: Noted.
13    MR. ZILBERFEIN: The witness has
14 already stated that she didn't remember if she
15 did an investigation or not, and now you are
16 trying to get a different answer.
17    THE WITNESS: Why I am sitting on this
18 so long?  Really.
19    MR. MEISTER: Wait for the question.
20    BY MR. GRIVER:
21 Q.  As of September 28, 2010, did you have
22 knowledge or information --
23 A.  If it says that I didn't have, I didn't
24 have.
25    MR. MEISTER: Excuse me.  Wait until he

Page 104

1    GENGER
2 finishes the question.
3    BY MR. GRIVER:
4 Q.  As we --
5    MR. MEISTER: Mr. Griver, stop when I
6 am speaking or we are walking out of here.  Is
7 that clear?
8    MR. GRIVER: You may object to my
9 questions.
10    MR. MEISTER: That's right.  And when I
11 am in the middle of objecting and instructing,
12 you keep your mouth shut.  Is that clear?
13    Okay.  Ms. Genger, wait until he
14 finishes his question before you start to speak
15 and then answer the question to the best of your
16 ability.  This is not a contest in speaking.
17    THE WITNESS: Okay.
18    BY MR. GRIVER:
19 Q.  Ms. Genger, between the time you became
20 trustee of the Orly Genger trust to the date that
21 you signed your answer --
22 A.  September 30.
23 Q.  -- September 28 of 2010, had you
24 instructed anyone as trustee of the Orly Genger
25 trust to investigate the actions or inactions of

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                                                    DALIA GENGER
DALIA GENGER, et al                                                December 13, 2012
Pg 48 of 150

Page 105

1    GENGER
2  Leah Fang?
3  A.  I don't remember if I did.
4  Q.  Okay.  As trustee of the Orly Genger
5  trust, between January 4 of 2008 and September 28
6  of 2010, did you investigate in any way the
7  actions or inactions of Leah Fang as trustee?
8    MR. ZILBERFEIN: Objection.  Asked and
9  answered.
10    BY THE WITNESS:
11  A.  Is there a question hanging in the air?
12    MR. GRIVER: Yes.
13  Can you read the question back, please.
14  (WHEREUPON, the record was read by
15  the reporter as requested.)
16    BY THE WITNESS:
17  A.  I don't remember.
18    BY MR. GRIVER:
19  Q.  Look, please, at paragraph 75 of both
20  the complaint, which is Exhibit 2 to your
21  deposition, and your answer, which is Exhibit 1
22  to your deposition.
23  A.  Wait.  Again, what is it?
24    MR. MEISTER: I will get it for you.
25    BY MR. GRIVER:

Page 106

1    GENGER
2  Q.  Ms. Genger --
3  A.  Can I just -- I don't know what you are
4  talking about.  I have to -- where should I be
5  looking now?
6  Q.  We will get to that in a second.
7  Before then, just to finish up, have
8  you at any time between January 4, 2008 -- strike
9  that.
10  Have you at any time investigated the
11  actions or inactions of Leah Fang or instructed
12  anybody to do that investigation?
13  A.  I don't remember.
14  Q.  So as we sit here today, you still
15  don't have sufficient information or belief as to
16  what Leah did or did not do as trustee?
17    MR. MEISTER: As alleged in paragraph 5
18  of the complaint?
19    MR. GRIVER: In any way.
20    MR. ZILBERFEIN: Note my objection.
21    BY THE WITNESS:
22  A.  I don't know where you are getting --
23    BY MR. GRIVER:
24  Q.  Okay.  I will make it simple for you.
25  I will withdraw the question and make it simple.

Page 107

1    GENGER
2  A.  Okay.
3  Q.  As we sit here today, you don't know
4  what Leah Fang did or did not do as trustee of
5  the Orly trust, do you?
6  A.  At the time I did, but now I don't
7  remember.  And that's the truth.
8  Q.  Well, when you say at that time --
9  A.  At the time, subsequently when I became
10  a trustee of Orly trust, I don't know when I was
11  aware that -- of her actions.  But today if you
12  ask me, I don't remember what it was.
13  Q.  Well, so you have no recollection as
14  you sit here today what her actions were?
15  A.  Yeah.
16  Q.  Okay.  Have you ever heard of the
17  D&K -- have you ever heard of the D&K agreement,
18  what we have called the D&K agreement?
19    MR. MEISTER: Objection.  Form.
20    BY THE WITNESS:
21  A.  D&K agreement?
22    MR. MEISTER: I don't see how she can
23  answer --
24    BY MR. GRIVER:
25  Q.  Have you ever heard of a document

Page 108

1    GENGER
2  signed by Leah Fang as trustee dated November 22,
3  2007?
4  A.  I don't remember.  I don't know.
5    MR. GRIVER: I am going to mark as
6  Exhibit 9 the amended and restated limited
7  partnership agreement of D&K limited partnership,
8  signed by Leah Fang as sole trustee of the 1993
9  Orly Genger trust on the 22nd day of November
10  2007.  I note for the record that this is also
11  Exhibit 19 to the complaint.
12  (Dalia Exhibit 9, 1/4/2008 memo,
13  marked.)
14    BY MR. GRIVER:
15  Q.  Looking -- seeing this document, does
16  that refresh your recollection, have you ever
17  seen this document before?
18  A.  Amended and restated --
19  Q.  And my question is --
20  A.  I have to read it because everything
21  looks the same to me.
22    MR. GRIVER: Mark the time, please.
23  (Time noted: 12:45 p.m.)
24    BY THE WITNESS:
25  A.  What is this word here?

20-01187-jlg  Doc 1-18  Filed 06/20/20  Entered 06/20/20 20:19:48  NoR part 19
ORLY GENGER VS.                                                    DALIA GENGER
DALIA GENGER, et al              Pg 49 of 150                      December 13, 2012

Page 109

1    GENGER
2    BY MR. GRIVER:
3  Q.  What page are you on?
4  A.  3.
5  Q.  Upon the written election to terminate
6  made by the general firm at any time.
7       Ms. Genger, you have read the first two
8  pages.  Does this refresh your recollection as to
9  whether you have ever seen this document?
10  Ms. Genger?
11      MR. MEISTER: First two pages?
12      MR. GRIVER: Yes.
13      BY MR. GRIVER:
14  Q.  Based on reading the first two pages of
15  this document, do you recall ever seeing this
16  document before?
17  A.  I can't say that it refreshes my
18  memory.
19  Q.  And so far you don't recall ever seeing
20  this document before?
21  A.  I do not recall.  I might have seen it,
22  but I don't recall if I did.
23      MR. MEISTER: Do you want her to
24  continue to read the rest of the 16-page
25  document?

Page 110

1    GENGER
2       MR. GRIVER: I do.  As trustee of the
3  trust, I think it is incumbent upon her to do so,
4  provided she hasn't done so already.
5       BY MR. GRIVER:
6  Q.  Ms. Genger, what page are you on now?
7  A.  4.  It takes me a long time.
8  Q.  I understand.  As we got to -- now
9  having read four pages of what's been marked as
10  Dalia 9, does this refresh your recollection as
11  to whether you have ever seen this document?
12  A.  As I answered you before, I might have
13  seen it, but right now, I can't say for sure --
14  Q.  Okay.
15  A.  -- that I did.  I imagine that I did.
16  Q.  Did you ever --
17      MR. MEISTER: Objection.  Move to
18  strike.
19      BY MR. GRIVER:
20  Q.  Did you ever speak --
21      MR. MEISTER: Mr. Griver, when I am
22  speaking you have to --
23      MR. GRIVER: You move to strike.
24      MR. MEISTER: You have to let me put my
25  objection on the record.

Page 111

1    GENGER
2       MR. GRIVER: Okay.  Go ahead.
3       MR. MEISTER: I've just done it.  I
4  hope you have it all.
5       MR. GRIVER: You moved to strike?
6  Okay.
7       MR. MEISTER: If you don't talk, you
8  can hear.
9       BY MR. GRIVER:
10  Q.  Ms. Genger, do you recall discussing
11  with Leah Fang at any time the document that --
12  this document that Leah Fang signed on --
13  A.  I don't remember.  I don't remember.
14      MR. MEISTER: You have to wait until he
15  finishes the question.
16      BY MR. GRIVER:
17  Q.  You don't remember speaking with Leah
18  Fang about this document before you exonerated
19  her, correct?
20  A.  At any time I don't remember.
21  Q.  So I take it then that as we sit here
22  today, you have no idea what consideration, if
23  any, the Orly trust received in exchange for
24  signing this document that's been marked as Dalia
25  9?

Page 112

1    GENGER
2  A.  I am not aware if there was any
3  consideration.
4  Q.  So --
5  A.  I mean, maybe --
6  Q.  All right.
7       MR. MEISTER: Just answer the question.
8       MR. LEINBACH: I would like the record
9  to reflect that Mr. Meister, counsel for Dalia
10  Genger, has been touching her at many points
11  during the deposition before she answers
12  questions.
13      MR. MEISTER: Actually --
14      THE WITNESS: He didn't touch me.
15  Excuse me.
16      MR. MEISTER: Excuse me, Dalia.  Let me
17  answer.
18      I didn't touch her.  I put my hand out
19  to indicate when she came to the end of the
20  question, to stop speaking.
21      MR. LEINBACH: Okay.  Well, this is
22  obviously a record which is not --
23      THE WITNESS: You know what?  I would
24  like to see from there what's going on under the
25  table.  It is ridiculous.  What are we doing

20-01187-jlg    Doc 1-18    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 19
ORLY GENGER VS.                                                                    DALIA GENGER
DALIA GENGER, et al                    Pg 50 of 150                          December 13, 2012

Page 113

1    GENGER
2  here?
3    MR. DELLAPORTAS: I just want to object
4  for the record.  New York practice is very clear
5  that only one attorney may speak for any one
6  party at a deposition.  That one attorney is
7  Mr. Griver.  I would object to Mr. Leinbach
8  saying word one on the record at this deposition,
9  and I would move to strike that which he just
10  said.  Thank you.
11    MR. MEISTER: While we are in a break,
12  I will notice that it is 4 minutes of 1:00, and I
13  did ask an hour or so ago of Mr. Griver when he
14  is planning on taking a lunch break, and
15  suggested that 1:00 would be a good time.
16    THE WITNESS: Yeah.  I didn't have
17  breakfast.
18    BY MR. GRIVER:
19  Q.  Okay.  I will just ask you this,
20  Ms. Genger.  Do you believe that -- strike that.
21    I will be happy to do a lunch break
22  after Ms. Genger finishes reviewing this document
23  so I may ask three or four questions about this
24  document.  But I would like her to --
25  A.  You know, it is very difficult for a

Page 114

1    GENGER
2  layperson to read legal documents, in general, I
3  believe that's the case.
4    So if you want me really to read it
5  thoroughly, it will take me a long time.  Are you
6  willing to wait?  Because it is a fact.
7  Q.  Ms. Genger, are you aware of the effect
8  of this document on the Orly Genger trust, as we
9  sit here today?
10  A.  No.
11    MR. MEISTER: So it's our lunch break
12  time?
13    BY MR. GRIVER:
14  Q.  So as we sit here today you have no
15  idea why this document was created?
16  A.  Today, I don't remember why it was.
17  Q.  So this document could have been
18  created for a good reason or for a bad reason,
19  you don't know?
20  A.  I don't know for what reason exactly it
21  was created.
22  Q.  So this document could have been
23  created because Leah Fang was conspiring with
24  Sagi Genger, and they created this document?
25  A.  Definitely that's not the case.

Page 115

1    GENGER
2  Q.  Why is it definitely not the case?
3  A.  Because I know the people that I deal
4  with.  And I know my son, and I know Leah, and
5  there is no way -- and you said belief.  There's
6  no way there was any collusion to harm Orly
7  trust.
8  Q.  Doesn't that depend on what Leah did or
9  did not do and why?
10  A.  No.  It depends on the people, okay.
11  And I know the people, and I know that they won't
12  do anything to harm Orly.
13    MR. MEISTER: Okay.  Ms. Genger, I'm
14  going to again instruct you on the record, please
15  wait until the end --
16    MR. GRIVER: So --
17    MR. MEISTER: Excuse me, Mr. Griver.
18    MR. GRIVER: I'm sorry.  Go ahead.
19    MR. MEISTER: Until the end of
20  Mr. Griver's question.
21    THE WITNESS: Are you allowed to touch
22  him, by the way?
23    MR. LEINBACH: I'm not touching him.
24    THE WITNESS: Yeah, you were touching.
25  I think we're not allowed to touch anybody.

Page 116

1    GENGER
2    BY MR. GRIVER:
3  Q.  Okay.  Now, Ms. Genger, look at
4  paragraph --
5    MR. GRIVER: You know what?  Let's take
6  a half hour for lunch.
7    THE WITNESS: Thank you.
8    MR. GRIVER: And we'll come back and
9  start with paragraph 75.  So if you would like
10  to --
11    THE WITNESS: I need more than a half
12  hour.  I didn't eat breakfast, also.
13    MR. GRIVER: Okay.  35 minutes.
14    (WHEREUPON, the deposition was
15  recessed from 12:59 p.m. until
16  2:06 p.m.)
17    (WHEREUPON, Attorney Lance Harris
18  exited the deposition
19  proceedings.)
20    * * * * *
21
22
23
24
25

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                                    Pg 51 of 150                              DALIA GENGER
DALIA GENGER, et al                                                                      December 13, 2012

Page 117

GENGER

1   **MR. GRIVER:** Could you note the time
2   that we left and the time that we came back.
3   On the record. It is 2:06.
4   **MR. ZILBERFEIN:** I just want to put a
5   statement on the record before we get going.
6   What was the attorney's name that was
7   here? Do you have it?
8   **THE COURT REPORTER:** Lance Harris.
9   **MR. ZILBERFEIN:** What was the
10  attorney's name that was here? I want to put a
11  statement on the record before we begin.
12  I am going to note that at about 12:06,
13  after we came -- after a 12:06 break this
14  afternoon, Attorney Lance Harris appeared. His
15  appearance was not put on the record. It is my
16  understanding that Mr. Harris is not an attorney
17  of record for anyone in this litigation.
18  Moreover, it is my understanding after speaking
19  to Mr. Hoffman, that Lance Harris at some point
20  represented Leah Fang, my client, in this
21  proceeding or other proceedings.
22  Therefore, there's an inherent conflict
23  here that I wasn't aware of when Mr. Harris
24  entered the room. Therefore, I am going to
25

Page 118

GENGER

1   preserve my objection to each and every question
2   that was asked after the break when Mr. Harris
3   was present. And if he comes in again, I am
4   going to preserve my objections again to each and
5   every question that's asked if he reappears.
6   That's basically my position. And I am
7   going -- the objection that I preserved is in
8   connection with striking each and every question
9   and answer that has been asked and answered in
10  Mr. Harris' presence.
11  **MR. GRIVER:** All right. I will just
12  note for the record that I am not sure that you
13  can preserve an objection that you didn't
14  actually make, nor did anyone else make at
15  Mr. Harris' presence. Certainly he was not
16  invisible and anybody could have done so.
17  In addition, I think that your factual
18  statements on the record are absolutely -- are
19  incorrect, and, you know, I question where you
20  got them. But you are free to do whatever you
21  want and spend whatever amount of your client's
22  money that you wish to in making those motions.
23  If you can give me a CPLR provision or
24  any kind of ruling that would allow you to do
25

Page 119

GENGER

1   what you have threatened to do, I would
2   appreciate it.
3   **MR. ZILBERFEIN:** Can you give me a CPLR
4   provision that would permit Mr. Harris to be here
5   during this deposition?
6   **MR. GRIVER:** Sure.
7   **MR. LEINBACH:** There was no objection
8   to his presence, as de facto.
9   **MR. DELLAPORTAS:** His presentation
10  wasn't announced.
11  **MR. ZILBERFEIN:** Right. Especially
12  when it wasn't put on the record.
13  **MR. LEINBACH:** His presence was open
14  and notorious. He was sitting in the room.
15  **MR. MEISTER:** It may have been open and
16  notorious. I don't know who he was, and to this
17  moment I still don't.
18  **MR. LEINBACH:** The court reporter did.
19  **MR. MEISTER:** Is he associated with
20  your firm?
21  **MR. ZILBERFEIN:** No, the court reporter
22  didn't know who he was until during the lunch
23  attorney for the plaintiff told her who he was.
24  **MR. GRIVER:** Right, sure, because
25

Page 120

GENGER

1   someone asked the question. Now, if someone did
2   not know who Mr. Harris was, then they were
3   certainly able to ask --
4   **MR. ZILBERFEIN:** You know I didn't know
5   who he was. Why didn't you put a statement on
6   the record? Once again --
7   **MR. GRIVER:** Because he's always
8   been --
9   **MR. ZILBERFEIN:** -- you don't give
10  anyone the benefit of the doubt. You just go
11  ahead and you want to steamroll everybody, and I
12  think that's what you've been doing.
13  **MR. GRIVER:** I think we are done here.
14  **MR. MEISTER:** Just so we are clear, is
15  he associated with your firm?
16  **MR. GRIVER:** No, he is not associated
17  with my firm, he is associated with Orly Genger
18  because he is Orly's attorney.
19  **MR. DELLAPORTAS:** Who invited him to
20  attend this deposition and gave him notice?
21  **MR. ZILBERFEIN:** Yeah. Who invited him
22  to attend and gave him notice?
23  **MR. DELLAPORTAS:** I will just note for
24  the record that TPR did not invite him to attend,
25

20-01187-jlg    Doc 1-18    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 19
ORLY GENGER VS.                                                                    DALIA GENGER
DALIA GENGER, et al                    Pg 52 of 150                       December 13, 2012

---

Page 121

1    GENGER
2    his presence was not announced, and had his
3    presence been announced, we would have
4    immediately objected to it because he has no
5    business being here.
6        MR. GRIVER: John, you are welcome to
7    put in an affidavit saying you didn't notice his
8    presence when he walked in.
9        MR. LEINBACH: I want to make a
10   statement for the record as well.
11       Mr. Dellaportas has been in court with
12   Mr. Harris before, and he knows very well exactly
13   who he is.
14       MR. DELLAPORTAS: That was two years
15   ago. I wasn't sure what he was doing here.
16       MR. ZILBERFEIN: And I knew -- you know
17   what, I am appearing here for Ms. Fang, right,
18   and you assumed I knew?
19       MR. LEINBACH: You can ask.
20       MR. GRIVER: I assume that if you have
21   a question, that's why God gave you a mouth.
22       Let's continue.
23       MR. DELLAPORTAS: We join in the
24   objection. We just note for the record that TPR
25   did not invite him to attend, and had he

---

Page 122

1    GENGER
2    announced his presence, we would have objected.
3        Please proceed.
4        BY MR. GRIVER:
5    Q. Before the break, Ms. Genger, we were
6    speaking about Leah Fang, the beginning of your
7    involvement as a trustee and your purported
8    releases to Ms. Fang.
9        Did you provide Orly Genger with copies
10   of your two supposed releases to Ms. Fang?
11       MR. DELLAPORTAS: Object to form.
12       MR. ZILBERFEIN: Same objection.
13       THE WITNESS: I should answer this?
14       MR. GRIVER: Yes.
15       BY THE WITNESS:
16   A. Okay. If it was required, I am sure my
17   lawyer did that. Otherwise, it wasn't sent to
18   Orly.
19       BY MR. GRIVER:
20   Q. I am asking you, did you --
21   A. I do not remember. I am saying, if it
22   was required of me to do so, I am sure my lawyer
23   did it, sent it. And if it wasn't required, it
24   was not done.
25   Q. As we sit here today, do you think it

---

Page 123

1    GENGER
2    is a good idea for a trustee to provide just the
3    minimum of information to the beneficiary, or all
4    the information that you think is important?
5        MR. MEISTER: Objection.
6        MR. ZILBERFEIN: Same objection.
7        THE WITNESS: I mean, if there is an
8    objection, I should answer?
9        BY MR. GRIVER:
10   Q. Even with an objection, you should
11   answer.
12   A. Okay. I think that all that relevant
13   information to her case should be -- she should
14   be informed.
15   Q. Okay. Do you think it is relevant that
16   you gave Leah Fang maximum releases and
17   indemnifications?
18       MR. MEISTER: Objection. Relevant to
19   what?
20       BY MR. GRIVER:
21   Q. Relevant to your job as a trustee?
22       MR. ZILBERFEIN: Note my objection to
23   "maximum" and the form of the question.
24       MR. MEISTER: Join in.
25       BY THE WITNESS:

---

Page 124

1    GENGER
2    A. My opinion is that Orly and her lawyer,
3    might be you or someone else, obviously knew
4    about the release because you are talking about
5    it. So, obviously, you knew about it. So in one
6    way or another, you did get this document.
7        BY MR. GRIVER:
8    Q. Do you think it would -- do you think
9    that these releases are relevant information that
10   you should have sent to Orly Genger?
11   A. I am not sure.
12   Q. Okay. As trustee of the trust, did you
13   ask counsel for the trust as to whether this is
14   information that should have been sent to Orly
15   Genger? And I am specifically referring to the
16   releases set forth as Exhibits 6 and 8 to your
17   deposition today.
18       MR. MEISTER: Objection.
19       BY THE WITNESS:
20   A. I don't remember.
21       MR. MEISTER: Attorney-client
22   privilege.
23       MR. GRIVER: Are you instructing the
24   witness not to answer about questions she asked
25   as a trustee to counsel for the trust?

---

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                           DALIA GENGER
DALIA GENGER, et al          Pg 53 of 150   December 13, 2012

---

Page 125

GENGER

1
2    **MR. MEISTER:** Yes.
3    **MR. GRIVER:** Okay.
4    **BY MR. GRIVER:**
5  Q. Ms. Genger, did you consult with
6    counsel for the trust as trustee of the trust
7    regarding these indemnifications?
8    **MR. MEISTER:** You may answer that yes
9    or no.
10   **BY THE WITNESS:**
11 A. **I don't remember.**
12   **BY MR. GRIVER:**
13 Q. Do you have any -- who was your
14   attorney at the time?
15 A. **What day was it?**
16 Q. About December 2007, January 2008?
17 A. **January '08, right.**
18 Q. Uh-huh.
19 A. **I guess it was --**
20   **THE WITNESS:** It wasn't you?
21   **BY THE WITNESS:**
22 A. **I don't remember when we started with**
23   **Mr. Meister.**
24   **BY MR. GRIVER:**
25 Q. Was counsel for the trust Jonathan

---

Page 126

GENGER

1
2    Kortmansky?
3  A. **Oh, Kortmansky, right.**
4    **I really don't remember.**
5  Q. But he was --
6  A. **I guess it was, if you say so. I**
7    **really don't remember.**
8  Q. No, I am asking you as trustee of the
9    trust.
10   Was Jonathan Kortmansky an attorney for
11   the trust?
12 A. **I guess he was.**
13   **MR. MEISTER:** She just answered she
14   doesn't remember.
15   **THE WITNESS:** Yeah.
16   **MR. MEISTER:** She is guessing.
17   **BY THE WITNESS:**
18 A. **You are asking me the same thing.**
19   **MR. GRIVER:** Don't put your hand on the
20   witness. Do not tell the witness to stop
21   talking. It is her answer. If it is too long
22   for you, you have instructed her repeatedly to
23   just answer the question. If she chooses to give
24   a speaking answer, she may do so.
25   It is not your job to stop her, either

---

Page 127

GENGER

1
2    by telling her to be quiet or by holding your
3    hand upon her.
4    **MR. MEISTER:** But it is my job --
5    **MR. GRIVER:** It is time for you to stop
6    that.
7    **MR. MEISTER:** It is my job to get my
8    objection out on the record.
9    **MR. GRIVER:** No, it is not your -- you
10   can put that in, you can put that in after she
11   speaks.
12   **MR. MEISTER:** No, I cannot put it in
13   because --
14   **MR. GRIVER:** If you are too slow --
15   **MR. MEISTER:** -- I start to make my
16   objection, and I am entitled to finish.
17   **MR. GRIVER:** And she is entitled to
18   answer the question.
19   **MR. MEISTER:** Not over my objection.
20   **MR. GRIVER:** Okay.
21   **BY MR. GRIVER:**
22 Q. Is Jonathan Kortmansky, is he the
23   attorney for the 1993 trust?
24 A. **He might have been. I really do not**
25   **remember when I stopped my relationship with**

---

Page 128

GENGER

1
2    **Kortmansky and when I hired Robert Meister.**
3  Q. But during your relationship with
4    Mr. Kortmansky, he was the attorney for the Orly
5    Genger trust, correct?
6  A. **I don't remember. I really do not**
7    **remember.**
8  Q. You don't remember? You don't
9    remember --
10 A. **I don't remember who was the lawyer at**
11   **that time -- my lawyer at the time.**
12 Q. Did the Orly Genger trust have a
13   lawyer?
14 A. **Yes, I am sure it did.**
15 Q. Was it Mr. Kortmansky?
16   **MR. MEISTER:** Objection. Asked and
17   answered.
18   **BY THE WITNESS:**
19 A. **You just asked me, and I told you. I**
20   **am not going to change my answer.**
21   **BY MR. GRIVER:**
22 Q. You don't remember?
23 A. **Exactly.**
24 Q. Okay.
25 A. **Really, I don't remember.**

---

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.
DALIA GENGER, et al
Pg 54 of 150
DALIA GENGER
December 13, 2012

Page 129

1    GENGER
2  Q. How is it in the best interest of the
3  Orly trust to not provide Orly Genger with the
4  information that you had released Leah Fang from
5  all liability?
6  A. How -- again, can you ask me.
7    MR. GRIVER: Can you read the question
8  back.
9    (WHEREUPON, the record was read by
10   the reporter as requested.)
11   BY THE WITNESS:
12 A. I think I said before that I wasn't
13 sure if she got the documents or not. If I -- I
14 stated that if it was required, my lawyer did it,
15 and if it wasn't required, it was not sent.
16   BY MR. GRIVER:
17 Q. Okay. Who is the trustee of the trust?
18 You or your lawyer?
19 A. I am the trustee.
20 Q. Okay. So as trustee of the trust,
21 how --
22 A. I asked my lawyer.
23 Q. How is it -- well, you don't remember
24 if you asked your lawyer, do you? You don't
25 remember?

Page 130

1    GENGER
2  A. I don't remember, right. But it
3  doesn't mean that he didn't act upon it.
4    MR. DELLAPORTAS: And I would like to
5  object. There was a representation from counsel
6  that this line of questioning related to cause of
7  action number 4. I have read cause of action
8  number 4. It makes no mention of this release
9  that we're talking about. This is not a claim in
10 this action. It may be a claim in the surrogate
11 court proceeding, but I really resent being
12 dragged here for discovery that has some
13 relevance to the surrogate court proceeding. I
14 will be seeking legal fees for this.
15   MR. GRIVER: You know what? We will be
16 speaking to the court about this because --
17   MR. ZILBERFEIN: Why don't we do that
18 sooner than later.
19   MR. GRIVER: Well, you know what?
20 Let's do that.
21   MR. DELLAPORTAS: I'd rather do that
22 than have you take false discovery for the rest
23 of the deposition. You are wasting our time,
24 Yoav.
25   MR. GRIVER: You know what? One day I

Page 131

1    GENGER
2  hope you actually read the complaint.
3    MR. DELLAPORTAS: I read the complaint.
4  Can you point me to paragraph --
5    MR. ZILBERFEIN: Can put us --
6    MR. GRIVER: Could you read the
7  question back, please.
8    MR. DELLAPORTAS: Point us to the
9  paragraph in the complaint where it is relevant
10 so we can address this.
11   MR. ZILBERFEIN: Why don't you get the
12 judge on the phone now.
13   MR. DELLAPORTAS: I will withdraw my
14 objection if --
15   MR. GRIVER: 48 and 49. And then you
16 might want to look at the motion for summary
17 judgment filed by Leah Fang.
18   Can you read the question and answer
19 back so I can get an answer from the witness,
20 please.
21   MR. DELLAPORTAS: It does not mention
22 the release anywhere in 48 or 49. Let's call the
23 court. Stop it. We are calling the court. We
24 are calling the court. Stop this.
25   MR. GRIVER: All right. Off the

Page 132

1    GENGER
2  record.
3    (WHEREUPON, discussion was had off
4   the record.)
5    MR. LEINBACH: As I stated before, we
6  wanted to call the court and ask for their
7  availability because we thought there were issues
8  that occurred during -- previous to the break.
9    I spoke with -- I believe it was the
10 judge's secretary. She checked the judge's
11 availability and I was told that the judge is
12 available anytime before 4:00 to have a
13 conversation.
14   I suggested 3:30. She said that was
15 fine. Apparently -- I had no idea if you would
16 like to do it now instead --
17   THE COURT REPORTER: Do you want to
18 stay on the record?
19   MR. LEINBACH: I think this should be
20 on the record.
21   MR. GRIVER: I don't think the witness
22 and Sagi should be in the room for this.
23   MR. S. GENGER: What?
24   MR. GRIVER: I don't think the witness
25 or Sagi should be in the room for this.

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                                                    DALIA GENGER
DALIA GENGER, et al              Pg 55 of 150              December 13, 2012

---

**Page 133**

GENGER
1
2  **MR. S. GENGER:** I am a party.
3  **MR. LEINBACH:** Yes, you are a party,
4  but you are not a lawyer.
5  **MR. S. GENGER:** So?
6  **MR. ZILBERFEIN:** What CPLR section is
7  that?
8  **MR. LEINBACH:** You are supposed to be
9  deposed in this.
10  **MR. ZILBERFEIN:** What CPLR section is
11  that?
12  **MR. LEINBACH:** What New York practice
13  actually says is you're not supposed to obtain
14  information --
15  **MR. ZILBERFEIN:** What section --
16  **MR. LEINBACH:** New York practice.
17  **MR. DELLAPORTAS:** He is a party to the
18  action.
19  **MR. S. GENGER:** I am representing
20  myself personally then.
21  **MR. GRIVER:** You are not representing
22  yourself personally.
23  **MR. DELLAPORTAS:** You do not represent
24  yourself personally.
25  (WHEREUPON, at 2:24 p.m., a

---

**Page 134**

1  GENGER
2  telephone call was made to the
3  chambers of Judge Barbara Jaffe,
4  and the following proceedings were
5  had via telephonic communications,
6  to wit:)
7  **MR. LEINBACH:** Hello. This is Bryan
8  Leinbach. Once again, I called about probably
9  five minutes ago to ask for Justice Jaffe's
10  availability for a deposition.
11  **FEMALE VOICE:** Yes.
12  **MR. LEINBACH:** It appears the parties
13  all want to speak right now. So I wanted to see
14  if the justice could speak with us right now.
15  **FEMALE VOICE:** Wait. Hold on one
16  second.
17  **MR. LEINBACH:** Thank you.
18  (WHEREUPON, the following further
19  proceedings were had via
20  telephonic communications with
21  Judge B. Jaffe, to wit:)
22  **THE COURT:** Hello? Judge Jaffe on the
23  phone.
24  **MR. LEINBACH:** Good afternoon, your
25  Honor. This is Bryan Leinbach of Zeichner Ellman

---

**Page 135**

1  GENGER
2  & Krause. And also with me is Yoav Griver.
3  **THE COURT:** Right, right. And you
4  represent again?
5  **MR. LEINBACH:** We represent Orly
6  Genger.
7  I should state right off the bat, of
8  course I told your secretary that we were calling
9  because there were issues that had arisen during
10  the deposition of Dalia Genger. So there's a
11  court reporter --
12  **THE COURT:** Who is here for Dalia
13  again?
14  **MR. MEISTER:** Robert Meister and Marisa
15  Warren, your Honor.
16  **THE COURT:** Okay.
17  **MR. LEINBACH:** I just also wanted to
18  note, of course, because this is a deposition,
19  there's a court reporter here that's
20  transcribing.
21  **THE COURT:** There's a what?
22  **MR. LEINBACH:** There's a court reporter
23  that is present.
24  **THE COURT:** Yes, that I got.
25  **MR. LEINBACH:** I just wanted to inform

---

**Page 136**

1  GENGER
2  you.
3  **MR. ZILBERFEIN:** Do you want everyone's
4  appearance?
5  **THE COURT:** I just want to know who's
6  there and who's going to be talking to me.
7  **MR. GRIVER:** In addition to lawyers for
8  the plaintiff and for the deponent Dalia
9  Genger --
10  **THE COURT:** That's Mr. Griver, right?
11  **MR. GRIVER:** That's correct, your
12  Honor, yes. I'm Yoav Griver. We also have Sagi
13  Genger here. We have the attorney for TPR,
14  Jonathan Dellaportas. We have an attorney here
15  for Leah Fang, Paul Zilberfein.
16  **MR. ZILBERFEIN:** Correct, your Honor.
17  I am cocounsel to Leah Fang.
18  **MR. GRIVER:** And we also have an
19  attorney from Orly's other set of lawyers,
20  Wachtel and Masyr. It is Walter Stasiuk.
21  **THE COURT:** Okay.
22  **MR. GRIVER:** So that's is who is in the
23  room, along with the deponent, Dalia Genger.
24  **THE COURT:** Okay.
25  **MR. GRIVER:** There are a number of

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                                                          DALIA GENGER
DALIA GENGER, et al                  Pg 56 of 150                        December 13, 2012

Page 137

1    GENGER
2    reasons that we're calling during the deposition.
3    There have been some attempts to instruct the
4    witness, contrary to practice. In addition,
5    Mr. Dellaportas has made the assertion that the
6    line of questions that I am asking are irrelevant
7    to the litigation.
8       THE COURT: Wait a minute. What?
9       MR. GRIVER: That the line of
10   questioning that I am questioning the deponent
11   about is irrelevant to this litigation. I
12   believe that Mr. Dellaportas will use that as a
13   tactic to try and prevent a continuation of the
14   deposition of Dalia Genger, should it be
15   necessary.
16      In addition, if the court could
17   instruct the attorneys to limit themselves to
18   nonspeaking objections --
19      THE COURT: Yes. Please do that.
20      MR. GRIVER: -- things will certainly
21   move faster.
22      THE COURT: I do want that to happen.
23   If you have an objection, place it on the record
24   with the word "objection," but move on.
25      MR. GRIVER: Thank you, your Honor.

Page 138

1    GENGER
2       In addition, there should be no
3    attempts to stop the witness from talking by
4    placing your hand upon the witness' shoulder or
5    upon the --
6       THE COURT: Nothing. Nothing. Don't
7    touch the witness at all. Leave it alone. Let's
8    just get through it. Anything that is
9    inadmissible or irrelevant can be redacted later
10   on on motions or at trial or whatever. But not
11   now. Let it go.
12      MR. GRIVER: Thank you, your Honor.
13      MR. MEISTER: Your Honor, this is
14   Robert Meister for Dalia Genger.
15      THE COURT: Yes.
16      MR. MEISTER: I have made some
17   objections on the ground of attorney-client
18   privilege, and I have stated the grounds, and I
19   have also instructed the witness not to answer.
20   Of course --
21      THE COURT: Those should be an
22   exception, would they not? I mean, when it is --
23      MR. MEISTER: Yes.
24      THE COURT: -- something that's
25   privileged or confidential, that is, of course,

Page 139

1    GENGER
2    acceptable.
3       MR. GRIVER: Your Honor, I think that
4    that will be subject to dispute, but I agree with
5    Mr. Meister that that can be a dispute that is
6    taken care of at a later date, and we will make
7    the record at this deposition.
8       THE COURT: Fine. Anything else?
9       MR. DELLAPORTAS: Yes, your Honor.
10   John Dellaportas for TPR.
11      Our concern, and one of the reasons we
12   welcomed getting the court involved early, is we
13   have seen a practice in these Genger family
14   matters where witnesses are subjected to
15   questioning which relates to other matters for
16   which there has not been notice, but not for the
17   matter at hand.
18      And here we have had two hours of
19   questioning. It is related to all matters of
20   issues involving how and why Ms. Genger was
21   appointed, who's paying her legal bills, why she
22   gave release to one party or another --
23      THE COURT: Mr. Dellaportas, as I
24   mentioned, you can place your objection on the
25   record. Period. At another time, at trial, you

Page 140

1    GENGER
2    can, you know, redact it, whatever. I am not
3    interested in it now.
4       MR. DELLAPORTAS: Okay. We understand,
5    your Honor. The only concern was that the
6    questioning relates to a pending surrogate court
7    action which we are not a party to, not all the
8    parties are necessarily here. Doesn't relate to
9    the action for which we are here, and we would
10   like to reserve the right to seek fees at the end
11   of this if we're brought here for questioning on
12   another matter for which there's never been
13   cross --
14      THE COURT: I am not even thinking
15   about it, quite frankly.
16      MR. GRIVER: Your Honor, this is Yoav
17   Griver, and I thank you for your time.
18      It's very simple. The reason I was
19   asking these questions is because they are
20   germane to a summary judgment motion that is
21   currently before your Honor. They are also
22   germane to paragraphs 48 and 49 and 140, at a
23   minimum, of the complaint. Dalia Genger is a
24   trustee. Me being able to ask her about actions
25   as trustee is germane to this action because --

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                              Pg 57 of 150                    DALIA GENGER
DALIA GENGER, et al                                                     December 13, 2012

Page 141

1    GENGER
2    THE COURT: You will put that on the
3    record at some other time. I don't care about it
4    right now. And if it is germane to the summary
5    judgment motion, it is not because it is already
6    submitted, and I am not going to be considering
7    it.
8    MR. GRIVER: Your Honor, well --
9    THE COURT: If that's the one that's
10   been submitted already.
11   MR. ZILBERFEIN: That correct, your
12   Honor. That's the one that's already fully
13   submitted and before your Honor for decision.
14   MR. GRIVER: Your Honor, there's
15   always -- I understand your Honor's position. It
16   is just that the concern is raised because as
17   Sagi Genger did not show up for deposition either
18   on Tuesday or on Wednesday, and, therefore, I do
19   believe based on past practice that
20   Mr. Dellaportas will then try and object on
21   behalf of Ms. Genger, should this deposition
22   carry on past a single day.
23   Now, in these matters, every deposition
24   to date has passed on because while there are few
25   witnesses, they span actions over years and

Page 142

1    GENGER
2    multiple --
3    THE COURT: You know, if this is what
4    the family wants to do, that's what they will do.
5    They haven't been deterred from their litigation
6    for many, many years. That's up to them. They
7    want to stay and get deposed forever, God bless
8    them. If they were sensible, they would settle
9    this case. But they are not. They are not
10   sensible. So they are going to be fighting and
11   paying you guys money and you are getting rich.
12   Okay.
13   MR. GRIVER: Thank you, your Honor. I
14   think your instructions have been helpful.
15   THE COURT: Thank you.
16   MR. MEISTER: Let the record note that
17   the telephone conference is now concluded and the
18   phone is now disconnected.
19   (WHEREUPON, at 2:33 p.m., the
20   telephonic communications were
21   disconnected, and the deposition
22   proceedings resumed, to wit:)
23   THE WITNESS: So what are we -- what
24   does this mean? I don't understand.
25   MR. MEISTER: Just wait for a question.

Page 143

1    GENGER
2    MR. ZILBERFEIN: Can I just say
3    something on the record here? What time are we
4    going to be breaking for the day? Can we get
5    that down on the record?
6    MR. GRIVER: We started at 10:30 as an
7    accommodation, so I think we will end at --
8    instead of ending at 5:00, we will end at 5:30.
9    MR. ZILBERFEIN: Is that okay with
10   everyone?
11   MR. GRIVER: If we are at a point where
12   we have another 15 minutes or so if we continue
13   and get this deposition completed, then I am sure
14   everybody will have the indulgence. You have
15   been in depositions before. You know how it is.
16   But let's try to aim for 5:00, 5:30.
17   MR. ZILBERFEIN: Okay.
18   MR. GRIVER: Okay. Now, if you can
19   read back, please, my last question to the
20   witness so that she may answer it. And if you
21   can on the transcript put the question because it
22   has been a while.
23   (WHEREUPON, the record was read by
24   the reporter as requested, as
25   follows, page 129, line 23,

Page 144

1    GENGER
2    through page 130, line 3:
3    "QUESTION: How is it -- well, you
4    don't remember if you asked your
5    lawyer, do you? You don't
6    remember?
7    "ANSWER: I don't remember, right.
8    But it doesn't mean that he didn't
9    act upon it.)
10   MR. DELLAPORTAS: Same objection.
11   MR. ZILBERFEIN: Join.
12   MR. GRIVER: Okay.
13   BY MR. GRIVER:
14 Q.   As trustee of the Orly Genger trust,
15   how is it in Orly Genger's best interest for you
16   not to tell her about the releases that you
17   attempted to provide Leah Fang as previous --
18   MR. ZILBERFEIN: Objection.
19   BY THE WITNESS:
20 A.   I didn't say that I didn't provide the
21   releases. I said if it was required, she
22   probably got it because my lawyer sent it. And
23   if it wasn't required, she didn't get it.
24   BY MR. GRIVER:
25 Q.   But you are supposed to act in the best

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.
DALIA GENGER, et al
Pg 58 of 150
DALIA GENGER
December 13, 2012

Page 145

1    GENGER
2  interest of the trust, correct?
3      MR. MEISTER: Objection. Asked and
4  answered.
5      MR. ZILBERFEIN: Objection. You keep
6  asking the same question.
7      BY THE WITNESS:
8  A.  So what's the question?
9      BY MR. GRIVER:
10 Q.  You, as trustee, you have the duty --
11 A.  My answer is whatever is required of me
12 to do and act, I do it. Whatever is not
13 required, I don't do it.
14 Q.  And in determining what is or is not
15 required, you, as trustee of the trust, go to the
16 trust attorneys, correct?
17 A.  Yes.
18 Q.  And if they tell you to do something,
19 you do it?
20 A.  Probably.
21 Q.  And if they tell you not to do
22 something, you don't do it?
23 A.  Probably.
24 Q.  So you rely -- yes or no. Not
25 probably.

Page 146

1    GENGER
2  If the attorneys for the trust --
3      MR. DELLAPORTAS: Objection.
4      BY MR. GRIVER:
5  Q.  -- tell you to do something, do you do
6  it?
7      MR. MEISTER: Objection. Hypothetical.
8      MR. ZILBERFEIN: Objection.
9      BY THE WITNESS:
10 A.  It is hypothetical.
11     BY MR. GRIVER:
12 Q.  As a general matter, do you follow your
13 attorney's advice?
14     MR. MEISTER: Objection.
15     MR. ZILBERFEIN: Did she? At what
16 period of time?
17     MR. MEISTER: What advice are you
18 talking about?
19     BY MR. GRIVER:
20 Q.  As trustee of the trust --
21 A.  In general, I --
22     MR. ZILBERFEIN: Objection.
23     BY THE WITNESS:
24 A.  -- I follow the -- I follow whatever my
25 lawyer tells me to do.

Page 147

1    GENGER
2      BY MR. GRIVER:
3  Q.  Okay. And as we sit here today do you
4  remember whether you discussed sending --
5  A.  We said that already.
6  Q.  Did you discuss sending or not
7  sending --
8  A.  I said I didn't remember.
9  Q.  Okay.
10     MR. MEISTER: Several times.
11     BY MR. GRIVER:
12 Q.  Let me finish the question.
13 A.  I'm sorry.
14 Q.  Did you discuss with your -- the
15 attorneys for the trust sending or not sending
16 the releases that you attempted to provide Leah
17 Fang?
18     MR. MEISTER: Objection. Asked and
19 answered several times.
20     THE WITNESS: Yeah.
21     MR. ZILBERFEIN: Objection.
22     BY THE WITNESS:
23 A.  I don't remember. I told you.
24     BY MR. GRIVER:
25 Q.  At some point you and your former

Page 148

1    GENGER
2  husband, Arie Genger, got divorced, correct?
3  A.  At some point, yes.
4  Q.  And there was an estate plan for the
5  benefit of your two children, Sagi and --
6  A.  That's right.
7  Q.  -- Orly, correct?
8  A.  Right. Correct.
9  Q.  And the intent was that Orly and Sagi
10 were to share equally; is that also correct?
11 A.  Yes.
12 Q.  When you began as trustee of the Orly
13 Genger trust, the trust had shares in the D&K LP
14 company?
15     MR. MEISTER: Objection.
16     BY THE WITNESS:
17 A.  Right.
18     BY MR. GRIVER:
19 Q.  Correct?
20     MR. MEISTER: Didn't have shares in the
21 LP.
22     BY MR. GRIVER:
23 Q.  Had an interest --
24 A.  D&K LP had shares.
25 Q.  D&K LP had shares in --

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                          Pg 59 of 150                      DALIA GENGER
DALIA GENGER, et al                                                  December 13, 2012

Page 149

```
1      GENGER
2  A.  Of TPR.
3  Q.  And the Orly trust had an interest in
4  D&K?
5  A.  Yes.
6      MR. GRIVER: Can we have this marked as
7  10.  For the record, Dalia 10 is the promissory
8  note and pledge agreement from 1993.
9      (Dalia Exhibit 10, 1993 promissory
10     note and pledge agreement,
11     marked.)
12     BY MR. GRIVER:
13 Q.  Is that your signature on the second
14 page of Exhibit 10?
15 A.  The second page?
16     MR. MEISTER: Third page.
17     BY THE WITNESS:
18 A.  Here.  In the promissory note, yes.  As
19 a general partner. Yeah.
20     BY MR. GRIVER:
21 Q.  As a general partner of D&K LP,
22 correct?
23 A.  Right.
24 Q.  That's what you were in 1993?
25 A.  Yeah.  Right.
```

Page 150

```
1      GENGER
2  Q.  And do you recognize this promissory
3  note and pledge agreement?
4  A.  Yeah.
5  Q.  Okay.  Can you tell me what was the
6  purpose of this promissory note?
7  A.  That it was really based on the notion
8  that -- it was to establish, really, a -- I can't
9  talk any more.
10     In order for the children to have
11 ownership, some ownership in TPR.  And that's why
12 the note was -- I mean, they got 240 shares, that
13 they worked for the million 2 that they received
14 from Arie and me, and a promissory note, and the
15 D&K note of whatever it is.  So in a way, we were
16 transferring ownership of TPR to the children.
17 It is estate planning.
18 Q.  And the estate plan was both children
19 should share in TPR equally?
20 A.  Right.
21     MR. MEISTER: Objection.  Asked and
22 answered.
23     BY MR. GRIVER:
24 Q.  Now, this note came up in your divorce
25 proceedings, did it not?
```

Page 151

```
1      GENGER
2  A.  It might.  I don't remember.  It might
3  have.
4  Q.  Do you recall the fact that you took
5  the position that the D&K note should be valued
6  at zero dollars as part of your divorce
7  proceedings?
8  A.  Can you repeat the question.
9  Q.  In the marital arbitration before
10 Justice Milonis --
11 A.  Right.
12 Q.  -- do you recall taking the position
13 that the D&K note should be valued at zero?
14 A.  I don't remember such a statement.
15     MR. GRIVER: Let me have marked as
16 Exhibit 11 the final arbitration award from the
17 proceeding before Justice Milonis.
18     (Dalia Exhibit 11, final
19     arbitration award, marked.)
20     BY MR. GRIVER:
21 Q.  And if I could direct your attention to
22 page 15 where it discusses the D&K note.
23 A.  Okay.  I am on 15.
24 Q.  Okay.
25 A.  Any particular part that you want me to
```

Page 152

```
1      GENGER
2  pay attention to?
3  Q.  Yes.  It is the three paragraphs under
4  D&K note.
5  A.  I don't see here where I'm stating that
6  the note really is zero.
7  Q.  Okay.  We will talk about it.
8      First of all, did you attend the
9  arbitration, the marital arbitration?
10 A.  Yes.
11 Q.  Were you there for the testimony of
12 Sagi in the arbitration?
13 A.  Yes.
14 Q.  Were you there for the testimony of
15 David Parnes?
16 A.  Yes.
17 Q.  As you sit here today, do you recall
18 anything that they said that you disagreed with?
19     MR. MEISTER: Objection.  It is
20 improper form.
21     MR. DELLAPORTAS: Object to form.
22     MR. ZILBERFEIN: Join.
23     BY THE WITNESS:
24 A.  I should answer?  I don't remember.
25 Because there were so many things there, I am
```

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                          Pg 60 of 150                         DALIA GENGER
DALIA GENGER, et al                                                    December 13, 2012

Page 153

GENGER

1  sure there was some things that I agreed or
2  disagreed with. I mean, it is natural.
3  BY MR. GRIVER:
4  Q. Okay. Do you recall that Arie was
5  claiming that he should be awarded one-half of
6  the value of the D&K note?
7  A. It says here, Arie claims he should be
8  awarded one-half of the value of D&K note.
9  Q. And that the arbitrator disagreed with
10 him and found for you on that issue; do you see
11 that?
12 A. What? Again?
13 Q. The arbitrator found for you on the
14 issue where you disagreed with Arie?
15 A. I disagree, yeah.
16 Q. And it says here, quote, the D&K note
17 was a part of the estate planning scheme to
18 transfer wealth to the children, period, end
19 quote?
20 A. That's true.
21 Q. And it also goes on to say: The
22 parties never intended for this note to be
23 collected, and to do so would retransfer wealth
24 back to the parents and defeat the estate

Page 154

GENGER

1  planning; do you see that?
2  A. Yes. In '93 it was the intention.
3  Obviously, the circumstances changed since '93.
4  Q. And when exactly did circumstances
5  change?
6  A. When I got divorced.
7  Q. Well, this was something that you were
8  talking about in 2008, correct, this is the --
9  A. After the divorce, obviously, because
10 in actuality, the parents were paying the debt,
11 the note, okay.
12 Q. Okay.
13 A. It is obvious because neither Sagi or
14 Orly didn't have any resources to pay the note.
15 So this was a way that we thought that we can
16 transfer assets to the children. But once I
17 got -- I divorced my husband -- I mean, the
18 circumstances changed because neither I -- I
19 didn't have also the resources to pay the note,
20 and the note was -- the D&K note was paid
21 previously by us, but it should have been paid by
22 the kids. Isn't it?
23 Q. Well, let me ask you this: When did
24 you get divorced from Arie?

Page 155

GENGER

1  A. 2004.
2  Q. 2004.
3  Now, at the time that you entered into
4  the note, you and your husband, Sagi, and Orly,
5  never intended for the note to be collected,
6  correct, it was just there as a mechanism to make
7  an equal distribution between Sagi and Orly?
8  MR. MEISTER: Objection to the form of
9  the question.
10 BY THE WITNESS:
11 A. It is not true. That is not true.
12 BY MR. GRIVER:
13 Q. What is not true about my statement?
14 A. The note should not have been -- never
15 collected.
16 Q. It says here the parties never intended
17 for this note to be collected?
18 A. Yeah. In '93.
19 Q. Well, this was a position you were
20 taking in 2008, correct?
21 MR. MEISTER: Objection.
22 MR. DELLAPORTAS: Object to form.
23 MR. MEISTER: You are reading what
24 someone else said, not what she said.

Page 156

GENGER

1  BY MR. GRIVER:
2  Q. Was that the position you took in the
3  marital arbitration?
4  MR. DELLAPORTAS: Object to form.
5  MR. ZILBERFEIN: Objection.
6  BY MR. GRIVER:
7  Q. Can you answer my question, please?
8  A. Can you ask me again. What is your
9  question?
10 Q. In the marital arbitration, did you not
11 take the position that the note was never to be
12 collected?
13 MR. MEISTER: Object to the form of the
14 question, and also the grammar. At least a
15 double negative.
16 MR. GRIVER: Could you read back the
17 question.
18 THE WITNESS: Again, yeah.
19 (WHEREUPON, the record was read by
20 the reporter as requested.)
21 MR. MEISTER: My objection stands.
22 BY THE WITNESS:
23 A. I want to explain. If I did say so,
24 that note was --

20-01187-jlg    Doc 1-18    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 19
ORLY GENGER VS.                                                    DALIA GENGER
DALIA GENGER, et al                                                December 13, 2012
Pg 61 of 150

Page 157

1    **GENGER**
2    **BY MR. GRIVER:**
3    Q.  First answer my question and then I
4    will let you make any statement that you want.
5        MR. GRIVER: Can you read back the
6    question, because it is a yes or no question.
7        **BY THE WITNESS:**
8    A.  **So where did I say it is not going to**
9    **be collected?**
10       **BY MR. GRIVER:**
11   Q.  I am just asking, in the marital
12   arbitration, did you not take the position that
13   the note was not to be collected?
14       MR. MEISTER: Same objection to form
15   and to grammar.
16       **BY THE WITNESS:**
17   A.  **I didn't say -- I didn't state this**
18   **particular position.**
19       **BY MR. GRIVER:**
20   Q.  What position did you take?
21   A.  **Position that I took, that the D&K note**
22   **is the problem that we have to deal with since**
23   **the kids do not have any resources to pay the**
24   **note. And we should be creative in getting rid**
25   **of the note. We tried to do so by selling the**

Page 158

1    **GENGER**
2    **note to someone that we trust.**
3    Q.  And the problem with the note was that
4    you didn't want anyone to collect on the note,
5    correct?
6    A.  **The problem was that the kids could not**
7    **afford to pay the note.**
8    Q.  And so getting rid of -- giving the
9    note to somebody else --
10   A.  **Selling the note. Selling the note.**
11   Q.  In an attempt to make sure that no one
12   would try to collect the note?
13   A.  **Yes. So we sold it to a friend that**
14   **promised it is not going to collect, foreclose**
15   **the note.**
16   Q.  Because no one in the Genger family
17   intended for the note to be collected?
18       MR. MEISTER: Objection. Compound
19   question. Also requires the operation of other
20   people's minds.
21       MR. DELLAPORTAS: Objection. Calls for
22   speculation.
23       MR. ZILBERFEIN: Objection.
24   Repeat the question.
25   (WHEREUPON, the record was read by

Page 159

1    **GENGER**
2    the reporter as requested.)
3        **BY THE WITNESS:**
4    A.  **At that time when we were divorcing,**
5    **the kids did not have any means to pay the note.**
6    **And since both parents I think wanted to**
7    **accommodate the children, the way that I saw it**
8    **is to somehow get rid of the note, legally,**
9    **because the note is a note and it has to be paid.**
10       **BY MR. GRIVER:**
11   Q.  And you didn't want it to be paid?
12   A.  **What I wanted or don't want really**
13   **doesn't matter. I mean, legally, it has to be**
14   **paid.**
15   Q.  You gave it to David Parnes --
16   A.  **Right.**
17   Q.  -- so that it would not be collected
18   upon?
19   A.  **Yeah. I am telling you that. Because**
20   **he promised he is not going to collect on the**
21   **note. But Orly sued him. Orly sued David**
22   **because he was willing to accommodate us.**
23   Q.  But the reason you gave it to
24   Mr. Parnes is so the note would not be collected?
25       MR. MEISTER: Objection. Asked and

Page 160

1    **GENGER**
2    answered several times.
3        **BY THE WITNESS:**
4    A.  **Yeah, I said we tried to make the life**
5    **of the kids easier so the note will disappear.**
6        **BY MR. GRIVER:**
7    Q.  And you are saying that at some
8    point --
9    A.  **But Orly objected to it, so we got back**
10   **the note. We got back the note that they had to**
11   **pay.**
12   Q.  Did you know that David Parnes had
13   given back the note?
14   A.  **Yes, because he was sued. So he gave**
15   **back the note.**
16   Q.  Did you know at the time that he gave
17   the note back that he had given the note back?
18   A.  **When he did it, yes. I know that he**
19   **gave it back.**
20   Q.  How did you know that?
21   A.  **Because he was sued, and as a result he**
22   **says, "I don't want to do you any favors, go and**
23   **take back the note."**
24   Q.  Did he say that to you?
25   A.  **No. He didn't say it to me.**

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.
DALIA GENGER, et al
Pg 62 of 150
DALIA GENGER
December 13, 2012

Page 161

GENGER

1   Q.  Did he say -- he said it to Sagi,
2   didn't he?
3   A.  He might have said it to Sagi.  I know
4   that's the way that he reacted.  And I think it
5   is very normal, that somebody does a favor and
6   gets sued, so.
7   Q.  Did he react that way to you, or did he
8   react that way to somebody else?
9   A.  To somebody else that informed me about
10  the way he acted.
11  Q.  And that person who informed you about
12  the way David Parnes acted was Sagi Genger?
13  A.  Absolutely.
14  Q.  Did you tell Orly that David Parnes had
15  reacted to a suit and had given the note back?
16  A.  I did not tell her.
17  Q.  As trustee you did not think that was
18  something you needed to do?
19      MR. MEISTER:  Objection.  She wasn't
20  trustee then.  This was 2006.
21      BY THE WITNESS:
22  A.  Yeah.  I became trustee in 2008.
23      BY MR. GRIVER:
24  Q.  You believe that Mr. Parnes rescinded

Page 162

GENGER

1   the assignment in 2006; is that correct?
2   A.  That he gave back the D&K note?  At
3   some point, I don't know exactly when, but --
4   Q.  You thought --
5   A.  Whenever he was sued by Orly, then he
6   said, "Take back the note.  I don't want to get
7   involved in this."
8   Q.  And was that -- when was this?
9   A.  I don't remember when Orly sued him.  I
10  mean, I'm not keeping track of all the suits.
11      MR. GRIVER:  Well, let me have this
12  marked as Exhibit 12.
13      (Dalia Exhibit 12, letter,
14      marked.)
15      MR. GRIVER:  And while Mr. Leinbach is
16  handing out Exhibit 12, I will remind Mr. Meister
17  that the court has just instructed everyone to
18  not testify or instruct the witness as to dates,
19  places, times, or anything else.  And so,
20  therefore, your testimony is not appreciated and
21  is also wrong.
22      MR. MEISTER:  I didn't testify.
23      MR. GRIVER:  Yes, you did.
24      MR. MEISTER:  I made an objection.

Page 163

GENGER

1       MR. GRIVER:  You said it is 2006.
2   That's a speaking objection.
3       MR. DELLAPORTAS:  Trickery doesn't
4   really get us anywhere, Yoav.  Just try to ask
5   questions.
6       BY MR. GRIVER:
7   Q.  Okay.  Looking at Dalia 12, does this
8   refresh your recollection that David Parnes
9   returned the note on November 25 of 2008?
10  A.  As was stated, I did not actually --
11  wait a second.  This letter was addressed to Sagi
12  Genger.
13  Q.  Uh-huh.
14  A.  Okay.
15  Q.  Right.
16  A.  And I remember that Sagi talked about
17  it.
18  Q.  What did he tell you?
19  A.  Because it was outrageous.
20  Q.  And what did he tell you?
21  A.  That David, who had the best
22  intentions, to help us, to get rid of the note,
23  got sued by Orly.  What her motivation is, I do
24  not know, but she wanted, I guess, to owe money.

Page 164

GENGER

1   Q.  And she wanted the note to be collected
2   upon?
3   A.  Yeah.  She wanted to carry a debt of
4   about $5 million.  I mean, it doesn't make sense,
5   but that's the way she reacted.
6   Q.  And you thought that that was against
7   the intent of the parties --
8   A.  I thought it doesn't make sense that
9   somebody will say, "You know what, I'm really
10  dying to pay -- to owe $5 million."
11  Q.  As trustee of the Orly Genger trust,
12  did you speak to Orly about Mr. Parnes' recision
13  of the assignment --
14  A.  No.  No way.
15  Q.  Did you have your attorneys speak to
16  Orly Genger's attorneys about the recision of the
17  assignment?
18  A.  This I don't remember.
19  Q.  Okay.  Did you ever go to your
20  attorneys as trustee of the trust and ask them as
21  attorneys for trustee -- as attorneys for the
22  trust, what should you do in this situation?
23  A.  I don't remember.
24  Q.  Okay.  But you never told Orly about

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                                                      DALIA GENGER
DALIA GENGER, et al                  Pg 63 of 150                December 13, 2012

Page 165

1    GENGER
2  this recision of assignment, correct?
3    MR. MEISTER: Objection. Asked and
4  answered.
5    BY THE WITNESS:
6  A. We were not on speaking terms.
7    BY MR. GRIVER:
8  Q. Well, you could have written her a
9  letter?
10 A. I know.
11   MR. MEISTER: Objection. That's not a
12 question.
13   BY MR. GRIVER:
14 Q. But you chose not to write her a
15 letter?
16   MR. MEISTER: Objection. That's not a
17 question. If you are talking about --
18   BY MR. GRIVER:
19 Q. Isn't that correct?
20 A. I did not notify Orly in any way
21 because her lawyers were aware already that this
22 happened.
23 Q. Her lawyer were aware? How do you know
24 that her lawyers were aware already?
25 A. Because later on there is a

Page 166

1    GENGER
2  continuation to this story. That's why I know.
3  Because she sued David. So, obviously, she knew
4  what's happening.
5  Q. Other than her suing David, you have no
6  other reason to think that --
7  A. I didn't have control of what she's
8  doing by her own initiative.
9  Q. But as trustee of the trust you could
10 have provided her with the information that David
11 was rescinding --
12 A. I could do many things.
13 Q. But you chose not to, correct?
14 A. This particular case, I knew that she
15 knows already.
16 Q. Okay. And who was your lawyer in May
17 of 2008?
18 A. 2008?
19 Q. Uh-huh.
20 A. I think it was Mr. Meister, wasn't it?
21 No? No. So I am wrong then.
22 Q. So you don't recall --
23 A. I don't remember when, really, I
24 started to work with Mr. Meister.
25 Q. Okay. It was never the intent of the

Page 167

1    GENGER
2  parties for TPR to ever collect on the D&K note;
3  isn't that correct?
4    MR. DELLAPORTAS: Objection. Calls for
5  speculation.
6    MR. ZILBERFEIN: Join.
7    BY THE WITNESS:
8  A. Now, can you repeat the question.
9    BY MR. GRIVER:
10 Q. Sure.
11   It was never the intent of any of the
12 parties to --
13 A. Any of the parties, meaning?
14 Q. To the D&K note?
15 A. Who is any of the parties?
16 Q. Well, let's -- okay.
17   When you signed the promissory note --
18 A. Right.
19 Q. -- to TPR on December 21 of 1993, it
20 was never your intent that TPR collect on the
21 note, correct?
22   MR. DELLAPORTAS: Object to form.
23   MR. ZILBERFEIN: Objection.
24   BY THE WITNESS:
25 A. Okay.

Page 168

1    GENGER
2    BY MR. GRIVER:
3  Q. Just a simple yes or no.
4  A. It should have been collected, but we
5  didn't imagine that the kids are going to pay the
6  note, I mean.
7  Q. You were general partner of D&K GP
8  until October of 2004; is that correct?
9  A. Yes.
10 Q. And you divorced your husband in, I
11 think you said, 2005?
12 A. 4.
13 Q. 2004?
14 A. Yes.
15 Q. Now, if I can show you this, which I
16 will mark as Dalia 13.
17   (Dalia Exhibit 13, document,
18   marked.)
19   BY MR. GRIVER:
20 Q. Part of this notice of default --
21 A. Wait a second. What's the date here?
22 Q. August 31 of 2008.
23 A. All right.
24 Q. Part of the notice of default notes
25 that D&K GP had failed to make regular payments

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 169

1    GENGER
2  since 2000.
3    Now, from --
4    MR. MEISTER: Is that a predicate, or
5  are you reading the note -- reading this?
6    BY MR. GRIVER:
7  Q.  Do you see that?
8  A.  Yeah. It is -- you know, this is
9  really complicated so let's take it slowly, okay.
10  Q.  Page 1, line 3.
11  A.  Right.
12  Q.  I will just ask you this:  Isn't it
13  true that D&K GP failed to make regular payments
14  on the notes since 2000?
15  A.  Right.
16  Q.  Okay.  Now, at that time, you were the
17  general partner of D&K GP?
18  A.  Right.
19  Q.  You had the money to make those
20  payments?
21  A.  No, I didn't.
22  Q.  You didn't?
23  A.  No, I didn't.  I mean, the GP was
24  looked upon as a marital debt, okay, and I paid
25  half of it, and my husband paid half of it, okay.

Page 170

1    GENGER
2  And that was the story.  And the fact that my
3  husband stopped paying -- because I was never in
4  charge of the finances in our household.  So he
5  was the one that decided if he is going to pay or
6  not to pay.
7  Q.  Okay.
8  A.  I had nothing to do with that.
9  Q.  At the -- in front of the court --
10  strike that.
11    During the marital -- strike that
12  again.
13    Why did you not want the note to be
14  returned to TPR?
15    MR. MEISTER: Objection. Assumes a
16  fact not in evidence.
17    BY THE WITNESS:
18  A.  Why did I not want the note to be a
19  burden for my children?
20    BY MR. GRIVER:
21  Q.  No.  To be returned to TPR?
22    MR. MEISTER: Same objection.
23    BY THE WITNESS:
24  A.  Because the note is a -- the note had
25  to be paid, okay, and, obviously, I did not want

Page 171

1    GENGER
2  the children to pay the note.
3    BY MR. GRIVER:
4  Q.  And because returning the note to TPR
5  would result in the destruction of the Genger
6  family planning, that Orly and Sagi would share
7  equally in TPR, correct?
8  A.  Yeah, unfortunately, we had a divorce,
9  and things change.  But originally we were hoping
10  that the children will own part of the company,
11  and we will be able to finance the note, pay the
12  note.  But it didn't happen.
13  Q.  Now, when the --
14    MR. GRIVER: Could I have that answer
15  read back, please.
16    (WHEREUPON, the record was read by
17    the reporter as requested.)
18    BY MR. GRIVER:
19  Q.  Now, your intention was that David
20  Parnes would keep the note forever, correct?
21  A.  Yeah.
22  Q.  Past the time of your divorce?
23  A.  Yes.  He will keep it.  And later on, I
24  mean, we might have found some other solution,
25  legal solution, so that no one is going to get --

Page 172

1    GENGER
2  no one will be in a position to collect on the
3  note.
4  Q.  You, yourself, did not want the note to
5  be collected?
6  A.  I did not want the children to pay the
7  note, for the children will pay the note.
8  Q.  You did not want --
9  A.  Because I did not -- I personally did
10  not want the children to owe money to anyone.
11  Q.  You did not want the note to be
12  collected, correct, not by David Parnes, not by
13  anyone?
14  A.  I didn't want, but that's my want.
15    MR. MEISTER: Objection.
16    BY THE WITNESS:
17  A.  But, legally, obviously, it has to be
18  paid.
19    BY MR. GRIVER:
20  Q.  Well, you are not an attorney, correct?
21  A.  What?
22  Q.  You are not an attorney?
23  A.  It is true, but I do have some
24  knowledge about notes.
25  Q.  Okay.  Now, David Parnes returned the

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 173

1    GENGER
2  note in 2008, correct?
3    MR. MEISTER: I'm sorry.  Can you say
4  the end again.
5    BY MR. GRIVER:
6  Q.  David Parnes returned the note in 2008,
7  correct?
8  A.  I guess that's when he did.  Yeah.
9    MR. GRIVER: Okay.  Let me have this
10  marked as Dalia 14.  For the record, Exhibit 14
11  is an affidavit of Dalia Genger.
12    (Dalia Exhibit 14, Dalia Genger
13    affidavit, marked.)
14    BY MR. GRIVER:
15  Q.  Ms. Genger, is that your signature on
16  page 4?
17  A.  Yes.
18  Q.  This is an affidavit that you submitted
19  in the surrogate court on March 11, 2008?
20  A.  Yes.
21  Q.  And this is after your divorce,
22  correct?
23  A.  (Indicating).
24  Q.  And this is after the marital
25  arbitration with Justice Milonis?

---

Page 174

1    GENGER
2  A.  I think so, yeah.
3  Q.  Okay.  Now, if you could look, please,
4  you can read as much as you want, but I am going
5  to ask you about paragraphs 8 and 9.
6  A.  Ask me specifically about what
7  paragraphs?
8  Q.  Paragraphs 8 and 9.
9  A.  8 and 9?
10  Q.  Uh-huh.
11  A.  8 is what we discussed before, right?
12  Yeah.  I didn't get anything.  8.  And then 9,
13  too?
14  Q.  I want you to read as much of this
15  affidavit as you want because, among other
16  things, I want to know whether you still agree
17  with it.
18  A.  So far what I am reading is true.
19  Q.  And you have read --
20  A.  Because it is a disaster to get back
21  the note if you couldn't get rid of it.  I mean,
22  I just don't understand the logic of Orly's
23  actions.  In general, I mean, I always put my
24  children --
25    MR. MEISTER: Is there a question

---

Page 175

1    GENGER
2  pending?
3    THE WITNESS: No, there's no question.
4  Okay.
5    BY MR. GRIVER:
6  Q.  Ms. Genger, in general --
7  A.  In general --
8    MR. MEISTER: No, no.  I insist there
9  be a question.  I object.
10    BY MR. GRIVER:
11  Q.  Please continue.
12  A.  Okay.  I will continue.
13    In general, I always put my children's
14  interests before my interest, my personal
15  interest, and that's the way I behave, and I --
16  that's my philosophy, and that's why I didn't
17  want the kids to bear the consequences of paying
18  $9 million.
19  Q.  And you wanted the children to share
20  equally?
21  A.  I wanted -- the original purpose was
22  the children will share equally the assets that
23  they were given.
24  Q.  Thank you.
25    In paragraph 8, the last sentence:  I

---

Page 176

1    GENGER
2  do not stand to gain anything personally by the
3  agreement, other than protecting the estate plan
4  implemented for the benefit of my children,
5  unquote.  Do you see that language?
6  A.  Yes.  I do not stand to gain.  Yeah.
7  Q.  On March 11, 2008, when you signed this
8  affidavit under oath --
9  A.  Again --
10  Q.  -- was the estate plan still in effect?
11  A.  Can you say this again.
12  Q.  Sure.
13    On March 11, 2008 when you signed this
14  affidavit --
15  A.  This affidavit, yeah.
16  Q.  -- was the estate plan still in effect?
17    MR. DELLAPORTAS: Objection.
18    MR. ZILBERFEIN: Objection.
19    BY MR. GRIVER:
20  Q.  That you had set up?
21    MR. DELLAPORTAS: Object to form.
22    MR. MEISTER: Object to the form of the
23  question.
24    BY THE WITNESS:
25  A.  Well, the way I see it is that the

---

20-01187-jlg Doc 1-18 Filed 06/20/20 Entered 06/20/20 20:19:48 NoR part 19
ORLY GENGER VS.
DALIA GENGER, et al
Pg 66 of 150
DALIA GENGER
December 13, 2012

Page 177

1    GENGER
2  estate planning was done -- was signed in '93,
3  not foreseeing what the future is going to be,
4  namely that I will divorce my husband and there
5  will be no one to pay the note, okay.
6     BY MR. GRIVER:
7  Q. In 2008 when you signed this affidavit,
8  you were trying to prevent Orly from putting in a
9  new trustee because you thought that doing so
10  would destroy the estate plan, correct?
11  A. I prevented what?
12  Q. You say -- just look at paragraph 8.
13  A. 8?
14  Q. Paragraph 8.
15  A. Yes.
16  Q. Was the estate plan implemented for the
17  benefit of your children still in effect in March
18  of 2008?
19     MR. MEISTER: Objection.
20     BY THE WITNESS:
21  A. When you say the estate planning, do
22  you mean that the note is valid?
23     BY MR. GRIVER:
24  Q. No. What I am saying is, is that in
25  March of 2008, you did not want the note returned

Page 178

1    GENGER
2  to TPR?
3  A. It is true.
4  Q. Because to do so would be to destroy
5  the estate plan?
6  A. Right.
7  Q. In fact, you did not want Orly to have
8  a new trustee appointed because you were afraid
9  that one of the things he would do would be to
10  collect on the note and therefore --
11  A. No, I don't remember saying that.
12  Where does it say?
13  Q. Well, look at 9.
14  A. 9.
15  Q. These are your words.
16  A. Okay. Fine.
17  Q. The note --
18  A. I accept that it's my words. I just
19  don't remember the --
20  Q. If the note is returned to TPR --
21  A. If the note is returned to TPR, which
22  my daughter seems to seek through the appointment
23  of a new trustee, it would recreate a related
24  party obligation and would have to be accelerated
25  or forgiven.

Page 179

1    GENGER
2  Q. Okay.
3  A. Yeah.
4  Q. So you did not --
5  A. So basically --
6  Q. Go ahead.
7  A. Basically, this statement came about
8  because I think the candidate that was supposed
9  to serve as a trustee, I did not trust.
10  Q. And you were afraid that --
11  A. Yeah, I was afraid that --
12  Q. -- he would cause the note to be
13  returned to TPR, which would recreate a related
14  party obligation --
15     MR. DELLAPORTAS: Objection.
16     BY THE WITNESS:
17  A. No. The note was returned --
18     MR. DELLAPORTAS: Ms. Genger, when I
19  state an objection, you have to let me state it.
20     THE WITNESS: Okay. I'm sorry.
21     MR. DELLAPORTAS: Object to form.
22  Mischaracterizes the record.
23     MR. ZILBERFEIN: I object as well.
24     BY THE WITNESS:
25  A. Let me understand.

Page 180

1    GENGER
2     MR. MEISTER: Can I have the question
3  read back, please.
4     (WHEREUPON, the record was read by
5     the reporter as requested.)
6     BY MR. GRIVER:
7  Q. Let's start from the beginning.
8     You still agree with paragraph 9 of
9  your affidavit, correct?
10  A. I agree that if someone that I do not
11  trust will be a person that only my husband
12  trusts and not both of us trust, I wasn't sure
13  that he's not going to return the note.
14  Q. And returning the note would destroy
15  the value of the Orly trust?
16  A. Right.
17  Q. And what it would do, it would wipe out
18  the assets of the trust in satisfaction of the
19  obligation under the note, correct?
20  A. It is true, isn't it?
21  Q. And you said that -- and then at the
22  very bottom you say: This result is inconsistent
23  with my responsibilities to my children as their
24  mother and as trustee of the Orly trust, period.
25  Do you see that?

Page 181

GENGER
1
2 A.  I don't see, but, yes, it is.
3 Q.  No, let's take a look at it.  It's the
4 next to the last sentence.
5 A.  Yes.  This result is inconsistent with
6 my responsibilities to my children as their
7 mother, their caring mother, and as a trustee of
8 Orly trust.  Obviously, this would have
9 bankrupt -- I mean, if they had to pay the note,
10 it would bankrupt the trust.
11 Q.  And such a result would be inconsistent
12 with your role as mother and as trustee?
13 A.  It is true.
14 Q.  And you did not want to see the Orly
15 trust -- you did not want to see the value of the
16 Orly trust destroyed, did you?
17 A.  Absolutely.
18 Q.  No matter who destroyed it?
19 A.  Obviously.  I mean, always.  As I said,
20 no matter what, I always had my first -- my first
21 concern was for Orly's interest.
22 Q.  And you were telling the court that
23 unlike Mr. Coleman, who you did not trust, you
24 would be there to protect the trust as trustee of
25 the Orly trust, correct?

Page 182

GENGER
1
2 MR. MEISTER:  Objection.  Is that what
3 you are reading?
4 BY MR. GRIVER:
5 Q.  Is that why you sent in this affidavit,
6 to let the court know you would protect the
7 trust?
8 A.  Where are you seeing this?
9 Q.  I am just asking you.  You wanted to
10 be --
11 A.  I -- okay.  Let me explain.  Okay.  I
12 did not trust my husband or all these other
13 people that were associated with him because they
14 just follow his instructions, okay.  And that
15 caused a lot of problems, okay.  And I did not
16 want to see Orly's trust being wiped out.
17 Q.  Okay.  Now, since you have been
18 trustee, Orly's trust has been wiped out?
19 MR. DELLAPORTAS:  Objection.
20 Mischaracterizes the record.
21 MR. ZILBERFEIN:  Objection.
22 BY MR. GRIVER:
23 Q.  TPR collected on the note, didn't it?
24 MR. DELLAPORTAS:  Objection.  That's a
25 different question.

Page 183

GENGER
1
2 BY THE WITNESS:
3 A.  Sagi --
4 MR. ZILBERFEIN:  Objection.
5 BY MR. GRIVER:
6 Q.  TPR collected on the note, correct?
7 A.  If you are talking about the fact that
8 Sagi sued D&K LP, right?  Are you talking about
9 this?
10 Q.  I am asking, to your knowledge, as
11 trustee of the trust --
12 A.  Orly --
13 Q.  -- has the D&K note been collected by
14 TPR?
15 A.  The D&K note was -- I guess, partially,
16 I mean, yeah.  Again, I mean, it is really very
17 confusing.  Can you ask me again the question.
18 Q.  TPR has collected on the D&K note,
19 correct?
20 A.  TPR has collected on the note -- are
21 you alluding to the fact that Sagi -- TPR sold in
22 an auction the TPR shares?  Are you talking --
23 Q.  TPR bought in an action the TPR shares.
24 A.  Right.
25 Q.  D&K sold --

Page 184

GENGER
1
2 A.  Right.  Yeah.
3 Q.  Sagi sold the shares and bought the
4 shares?
5 A.  Absolutely.  Yes.  I mean, TPR.
6 Q.  So which means that --
7 A.  TPR sold and bought its own shares from
8 D&K LP.
9 Q.  Which is not what you wanted?
10 A.  Yeah, but, I couldn't stop it.  What
11 could I do.
12 Q.  Well, you could not stop it -- well,
13 let me ask you this.
14 Exhibit 13, please.  Did you ever see
15 this --
16 A.  Yeah.
17 Q.  -- notice of default?
18 A.  Yeah.
19 Q.  When did you see this notice of
20 default?
21 A.  I don't remember exactly when.
22 Q.  When did you first see it?
23 A.  I don't remember when.
24 Q.  Well, do you remember -- let me look.
25 Did you ever receive the notice in the

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                    Pg 68 of 150                    DALIA GENGER
DALIA GENGER, et al                                                December 13, 2012

---

Page 185

1    GENGER
2  mail -- strike that.
3     Did you ever receive the notice on or
4  about August 31, 2008?
5  A.  I remember that I saw it.
6  Q.  Okay.  Did you -- let me point you to
7  Dalia Exhibit 3.
8  A.  Yeah.  What page?
9  Q.  Look at interrogatory number 1.  This
10  is a question to you.  Did you receive the
11  8-31-08 notice?  That's the note notice marked --
12  A.  I responded I don't remember receiving
13  the notice.
14  Q.  Okay.  And is that still true?
15  A.  I just said that I don't remember that.
16  But I did say that I remember that I was -- I did
17  see this document.  I don't know if it was -- if
18  it came by mail or whatever.
19  Q.  Well, you do go on to say your attorney
20  Robert Meister received a copy of the notice on
21  May 19, 2009; do you see that?
22  A.  So it is true then.
23  Q.  That's after the sale?
24  A.  Yeah.  I guess.
25  Q.  Do you remember receiving a copy of the

---

Page 186

1    GENGER
2  notice before the sale?
3  A.  Before the sale?  I am trying to
4  remember.  Yeah.  I was aware that Sagi is going
5  to take the step --
6  Q.  I understand that at some point you
7  became aware.  I am asking did you receive the
8  8-31-08 notice prior to your attorney receiving a
9  copy of the notice on May 19?
10  A.  That's the answer.  I don't remember.
11  Q.  Okay.  And you don't remember receiving
12  such a notice then?
13  A.  I don't remember.  I might have.
14  Q.  Or you might not have?
15  A.  Right.
16  Q.  Did you ever tell Orly about the
17  8-31-08 notice?
18  A.  No.
19  Q.  Why not?
20  A.  Because, first of all, I might have not
21  received it, so I didn't tell her.  And, second,
22  this was something that I could not stop.
23  Q.  Okay.  We will -- let's talk about
24  that.  Why could you not stop it?
25  A.  Because TPR -- I didn't have any

---

Page 187

1    GENGER
2  influence on TPR in the way that I can stop them
3  from acting to foreclose on the note.
4  Q.  Did you go to Sagi and say, "What are
5  you doing?  Why are you doing this?"  Did you
6  ever asking Sagi that?
7  A.  I might not have received them, as we
8  said, so I don't know if I said it or not.
9  Q.  At any time before the sale on February
10  27, 2009, did you try and stop the sale by going
11  to Sagi and saying, "don't do this," or words to
12  that effect?
13  A.  If I was aware of that before, I might
14  have told him, but --
15  Q.  I don't want you to speculate.
16  A.  I am saying because I do not remember.
17  Q.  You don't remember ever going to Sagi
18  and saying, "Please don't do this sale"?
19  A.  No, I didn't say that.
20  Q.  Or words to that effect?
21  A.  Right.  I did not say that because it
22  is not my place to say it.  He can do whatever he
23  wants.  He has a note, and he wanted to collect
24  on it.
25     MR. GRIVER:  Could you repeat her

---

Page 188

1    GENGER
2  answer, please.
3     (WHEREUPON, the record was read by
4     the reporter as requested.)
5     BY MR. GRIVER:
6  Q.  Did you as trustee go to the trust
7  attorneys and try and find a way to prevent or
8  delay the sale?
9  A.  I don't remember.
10  Q.  By that time your attorneys would be
11  Mr. Meister?
12  A.  I guess.  Yeah.
13  Q.  Did you ever go to Mr. Meister in an
14  attempt to find a legal way to stop the sale?
15  A.  No.
16  Q.  Let me show you what's been marked
17  as --
18  A.  I tell you, I didn't have intentions to
19  participate in this because there was -- we
20  didn't have any resources to compete, I mean, in
21  auction.
22     MR. MEISTER:  Can we take a break now,
23  please?
24     BY MR. GRIVER:
25  Q.  Ms. Genger, do you need a break?

---

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                                    DALIA GENGER
DALIA GENGER, et al                Pg 69 of 150      December 13, 2012

**Page 189**

1    GENGER
2  A.  I guess so.  Yeah.
3      MR. GRIVER: Okay.  Let's take a break.
4  I ask that you not speak to anyone about your
5  testimony.  Five minutes?
6      MR. MEISTER: Five minutes.
7      (WHEREUPON, a recess was had from
8  3:34 p.m. to 3:42 p.m.)
9      MS. WARREN: Are we on the record?
10     During the break, I was in the bathroom
11  with Ms. Genger, who approached me and said that
12  she might have made a mistake in her past
13  testimony.  I cut her off before she could tell
14  me the substance of any mistake that she thought
15  that she made.  But if she feels that a mistake
16  is made, I would like to just ask that we give
17  her an opportunity to clarify the record.
18     MR. LEINBACH: That sounds absolutely
19  reasonable.
20     BY MR. GRIVER:
21  Q.  Ms. Genger, this correction that you
22  made, did anyone talk to you about this
23  correction?  I am not talking about Ms. Warren.
24  I am saying did you speak with Sagi or anyone
25  else, and that's why you remember this?

**Page 190**

1    GENGER
2  A.  No, no.
3  Q.  Okay.  Why don't you put your
4  correction on the record.
5  A.  Okay.  The correction is that once I
6  was aware that this notice existed, I did consult
7  with my lawyer, and I chose not to inform Orly.
8  Q.  When you say that you consulted with
9  your attorney, you were consulting as trustee of
10  the trust?
11  A.  As a trustee, obviously.
12  Q.  And you were going to this attorney
13  understanding that he represented the trust?
14  A.  The trust.
15  Q.  He represented the trust?
16  A.  The trust.
17  Q.  And you were seeking advice as trustee
18  for what is best for the trust?
19  A.  Right.
20  Q.  And the beneficiary of the trust?
21  A.  Obviously.
22  Q.  And that was Mr. Meister?
23  A.  Uh-huh.
24  Q.  And did he provide you advice?
25  A.  Yes.

**Page 191**

1    GENGER
2  Q.  And what was his advice?
3  A.  I don't think I can tell you that.
4      MR. GRIVER: Mr. Meister, are you --
5      BY MR. GRIVER:
6  Q.  I don't hear any objection from
7  Mr. Meister instructing you not to answer.  So
8  what was Mr. Meister's advice?
9  A.  Okay.  So we weighed our options --
10     MR. ZILBERFEIN: You mean to the extent
11  it is attorney-client privilege?
12     BY THE WITNESS:
13  A.  I think it is privileged, but we --
14     BY MR. GRIVER:
15  Q.  Go ahead.
16  A.  Okay.  So we weighed the options that
17  we had, and we concluded that there is nothing
18  that I can do to stop Sagi from, you know, doing
19  whatever he did with the auction.
20  Q.  There's nothing you could do to stop --
21  A.  Yeah.
22  Q.  Did you -- and how long was this
23  conversation with your attorney?  Was it --
24  A.  You want me to say -- are you kidding?
25  Q.  Did you discuss it for an hour?  Did

**Page 192**

1    GENGER
2  you discuss it for half an hour?
3  A.  I don't know.  I have to look in my
4  bills.  I don't know.
5  Q.  Again, I will ask for the bill --
6  A.  Yeah.
7  Q.  -- so that we can discuss this.
8      Did you at the time -- how long had
9  Mr. Meister been your attorney, the attorney for
10  the trust?
11  A.  I don't remember when we started.  I
12  don't remember when I -- when I started to be
13  the lawyer for the trust.  I don't remember what
14  date it was.
15  Q.  Besides your attorney, did you speak to
16  anybody else about it?
17  A.  No.
18  Q.  Did you speak with Sagi?
19  A.  No.
20  Q.  Do you know --
21     MR. MEISTER: Can we go off the record
22  for a second and take a break?
23     MR. GRIVER: No, not in the middle of
24  this.
25     BY THE WITNESS:

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                                                          DALIA GENGER
DALIA GENGER, et al                    Pg 70 of 150                      December 13, 2012

Page 193

1    GENGER
2  A.  Okay.  What is the question?  I did not
3  discuss with Sagi.
4    BY MR. GRIVER:
5  Q.  Okay.  Well, did your lawyer at the
6  time know about the position you had taken in the
7  marital arbitration?
8  A.  If he knew?  I don't know if he knew.
9  Q.  Okay.  Did you and your attorney
10  discuss --
11    MR. MEISTER: Mr. Griver, you a moment
12  ago asked that we produce a copy of a bill
13  reflecting conversations, and I have a copy of
14  that bill with me.
15    MR. GRIVER: Are these all the bills?
16    MR. MEISTER: Beg pardon?
17    MR. GRIVER: Are these all of your
18  bills?
19    MR. ZILBERFEIN: It's two pages.  I
20  don't think two pages are all of his bills.
21    THE WITNESS: They are concerning the
22  discussion --
23    MR. MEISTER: Dalia, let me say it.
24  It is a bill dated March 5, 2009
25  covering the period of February 4, 2009 through

Page 194

1    GENGER
2  February 27, 2009.  And I do not believe it is
3  privileged.  I do not intend to waive any
4  attorney-client privilege.  If you will let me
5  produce it with that caveat, I am prepared to
6  produce it.
7    MR. GRIVER: Is it your position that
8  that document is privileged?
9    MR. MEISTER: Looking at it, I do not
10  believe that it contains any confidential
11  communications from my client to me, nor any
12  legal advice which I rendered.  It merely
13  reflects the facts of the conversations and the
14  dates and the times.
15    MR. GRIVER: I will take that because
16  then it is certainly not privileged, but I will
17  tell you it is my position that if you are the
18  attorney for the trust giving advice to the
19  trustee of the trust, that there is no privilege.
20    MR. MEISTER: I understand that's your
21  contention.  What I'm saying is without acceding
22  to that, if you will accept it without that being
23  a concession, I am prepared to produce it.
24    MR. GRIVER: That is fine.
25    MR. MEISTER: Would you like to make

Page 195

1    GENGER
2  copies?
3    MR. LEINBACH: Sure, and I will give it
4  back.  I will make one for every one.
5    MR. MEISTER: Thank you.
6    BY MR. GRIVER:
7  Q.  All right.  What options did you
8  discuss --
9    MR. MEISTER: Why don't you wait
10  until -- because it is going to enable her to
11  answer some questions which she didn't remember
12  which you just asked.
13    MR. GRIVER: All it is is your time.
14  That's for your deposition we will get into that.
15  What I am talking about now with Ms. Genger is
16  her memory.
17    BY MR. GRIVER:
18  Q.  What options did you discuss with
19  Mr. Meister at that time regarding --
20  A.  The option, if I have any tools that I
21  can use to stop Sagi from having this auction.
22  Q.  Did you --
23  A.  You know, he had a note, and legally he
24  was collecting on the note.  I mean --
25  Q.  Any --

Page 196

1    GENGER
2  A.  I mean TPR.
3    MR. GRIVER: Any memoranda, any
4  documents, any e-mails related to these
5  conversations between you as trust -- and
6  regarding any advice that you gave to Dalia
7  Genger as trustee, did or did not give to Dalia
8  Gener as trustee, I would like that.  And I am
9  putting my demand on the record right now.
10    BY MR. GRIVER:
11  Q.  Did you discuss with Mr. Meister the
12  possibility of calling up Sagi and saying, "Hey,
13  please stop"?
14  A.  I don't remember that I -- I believe
15  I -- I never had any chance of stopping him, so I
16  didn't call.
17  Q.  Did you discuss with Mr. Meister the
18  possibility of suing Sagi to stop him?
19  A.  What?
20  Q.  Suing TPR to stop him?
21  A.  I'm sorry?
22  Q.  Did you discuss the possibility of
23  suing to prevent the sale?
24  A.  No.  Because I am not really believing
25  in taking legal actions and spending money of the

20-01187-jlg  Doc 1-18  Filed 06/20/20  Entered 06/20/20 20:19:48  NoR part 19
ORLY GENGER VS.  Pg 71 of 150  DALIA GENGER
DALIA GENGER, et al  December 13, 2012

Page 197

1     GENGER
2  trust to be defeated in this case.
3  Q.  Okay.  Did you tell -- at the time that
4  you were speaking with Mr. Meister, did he have
5  all of the documentation for the marital
6  arbitration, do you know?
7  A.  I don't know if he had.  He might.
8  Q.  Did you discuss with Mr. Meister the
9  possibility of letting Orly know about the sale?
10  A.  I don't remember it.
11  Q.  Did you discuss with -- strike that.
12     You know what an auction is, correct?
13  A.  Yes, I do.
14  Q.  People show up, you try and get the
15  most money?
16  A.  Yeah, the most money.  This is how
17  you --
18  Q.  Did you discuss with Mr. Meister the
19  possibility of letting Orly know so that other
20  people could go in and bid on the TPR asset?
21  A.  No, I did not discuss this.
22  Q.  That was not an option that you
23  considered?
24  A.  No.
25  Q.  Is that an option that was raised by

Page 198

1     GENGER
2  Mr. Meister?
3  A.  I don't think so.
4  Q.  Did you consider letting Arie know
5  about the sale?
6  A.  I presume that if I didn't notice Orly,
7  of course I didn't notify Arie.  It is not my
8  duty to notify Arie if there is a sale, an
9  auction of shares.
10  Q.  If there is -- is it your duty as a
11  trustee to try and get the best price for the
12  shares?
13  A.  It is why --
14     MR. MEISTER:  Objection.
15     BY THE WITNESS:
16  A.  This is why there is an auction.
17     BY MR. GRIVER:
18  Q.  And so do you think that Arie --
19  A.  It is Sagi's responsibility.  Wherever
20  he's selling the shares, it is his responsibility
21  to let people know that there is an auction and
22  get bids on that.
23  Q.  And you did not think that --
24  A.  It is not my responsibility.
25  Q.  It is not your responsibility as

Page 199

1     GENGER
2  trustee to do that?
3  A.  No.
4  Q.  How is it --
5  A.  Because I didn't.
6  Q.  Because you didn't?
7  A.  Because it wasn't my auction.
8  Q.  Okay.  Well, but it was -- but the Orly
9  trust had an interest in that auction?
10  A.  It is true.
11  Q.  Okay.  And so why didn't you call up
12  Arie and say, "Hey, Arie, those TPR shares are
13  for sale"?
14  A.  Because Arie's interest is not the same
15  as my interest or Orly's interest.
16  Q.  Isn't it Orly's interest to get the
17  best price for her interest?
18  A.  It is.
19  Q.  Okay.  So isn't getting as many people
20  as possible who want to buy the shares --
21  A.  But it is not my responsibility to
22  collect people that will participate in the
23  auction.  Sagi followed the procedure that he
24  should have, the procedure for an auction, and he
25  followed whatever he was supposed to do.  And

Page 200

1     GENGER
2  whoever was aware of it is fine and participated
3  in the auction.
4  Q.  And you weren't going to let Arie know?
5  A.  Not Arie or anybody else.
6  Q.  How do you know that it is Sagi's
7  responsibility only to get people to show up at
8  his auction?  Is that something that Mr. Meister
9  told you?
10     MR. MEISTER:  Objection.  Compound.
11     BY THE WITNESS:
12  A.  In general, in general, if you have --
13  you auction something, you want people to be
14  aware of the auction and bid on it, and, you
15  know, have the highest price possible.
16     BY MR. GRIVER:
17  Q.  Did Mr. Meister or anyone at his law
18  firm tell you that it was not your responsibility
19  as trustee to try and get the highest price for
20  the TPR D&K interest?
21     MR. MEISTER:  Read that back, please.
22     (WHEREUPON, the record was read by
23     the reporter as requested.)
24     BY THE WITNESS:
25  A.  He never said that.  He never told me

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                          Pg 72 of 150                          DALIA GENGER
DALIA GENGER, et al                                                       December 13, 2012

Page 201

1      **GENGER**
2   **that I shouldn't look for -- what was the**
3   **question again?**
4      **BY MR. GRIVER:**
5  Q.  Yes.
6      Did Mr. Meister tell you that you
7  shouldn't look for other people to participate in
8  the auction?
9      MR. MEISTER: Just so we are clear,
10 your question is should not?
11     MR. GRIVER: Should not.
12     **BY THE WITNESS:**
13 A.  **That other people --**
14     **BY MR. GRIVER:**
15 Q.  Let me rephrase it, and please listen.
16     Did Mr. Meister or anyone else at his
17 law firm tell you that it was not your
18 responsibility as trustee to try and maximize the
19 price at the auction?
20 A.  **I don't remember that we discussed that**
21 **subject, that option.**
22 Q.  Did you and Mr. Meister discuss what
23 your responsibilities are as trustee with regard
24 to the UCC auction?
25 A.  **The UCC?**

Page 202

1      **GENGER**
2  Q.  With regard to the auction?
3  A.  **Again, I am getting tired. What are**
4  **you saying?**
5  Q.  Did you and Mr. Meister discuss what
6  your responsibilities were as trustee with regard
7  to the auction?
8  A.  **With regard to the auction? I think,**
9  **basically, what was discussed is if I -- if the**
10 **trust in any way can be a participant in the**
11 **auction.**
12 Q.  And what did Mr. Meister say?
13 A.  **And, obviously, we didn't have the**
14 **resources to participate.**
15 Q.  What about other people participating
16 in the auction?
17 A.  **I don't know about other people.**
18 Q.  Who had the resources? You never asked
19 Mr. Meister?
20     MR. MEISTER: Can I have the question
21 read back, please.
22     **BY THE WITNESS:**
23 A.  **I never --**
24     MR. GRIVER: Wait, Dalia.
25     (WHEREUPON, the record was read by

Page 203

1      GENGER
2   the reporter as requested.)
3      MR. MEISTER: Object to the form.
4      **BY MR. GRIVER:**
5  Q.  Let me clean that up.
6      You never asked Mr. Meister about
7  getting other people involved in the auction?
8  A.  **Participate in the auction. I don't**
9  **remember that we discussed other people.**
10 Q.  Do you understand that it is your job
11 as trustee to get the best price at the auction?
12     MR. MEISTER: Objection. Asked and
13 answered several times now.
14     MR. DELLAPORTAS: Object to form.
15     **BY THE WITNESS:**
16 A.  **Yes, you did ask me.**
17     MR. ZILBERFEIN: Objection.
18     **BY MR. GRIVER:**
19 Q.  One way to get the best price possible
20 is to get as many people bidding as possible.
21     MR. MEISTER: Objection. That's not a
22 question.
23     MR. DELLAPORTAS: Objection. That's
24 not a question.
25     **BY THE WITNESS:**

Page 204

1      GENGER
2  A.  **Do you want to teach me?**
3      MR. MEISTER: No, no. Wait until
4  there's a question, Dalia.
5      **BY MR. GRIVER:**
6  Q.  One way to get the best price is to get
7  as many people bidding as possible?
8      MR. DELLAPORTAS: Object to form.
9      MR. ZILBERFEIN: Objection.
10     **BY MR. GRIVER:**
11 Q.  Correct?
12     MR. MEISTER: Join the objection.
13     **BY MR. GRIVER:**
14 Q.  I am waiting.
15 A.  **Yeah, I guess it is correct. Yeah.**
16 Q.  Why did you then did you not let Arie
17 know that --
18 A.  **Yeah, because I particularly did not**
19 **want Arie to be involved as far as Orly's assets**
20 **are concerned in any way.**
21 Q.  Okay.
22     MR. MEISTER: Can we go off the record
23 for a second?
24     MR. GRIVER: No. Well, I'm almost
25 done.

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                                                          DALIA GENGER
DALIA GENGER, et al                 Pg 73 of 150                    December 13, 2012

Page 205

1    GENGER
2    BY MR. GRIVER:
3  Q.  If Sagi was going to pay $2 million for
4    Orly's assets, and Arie was going to pay $3
5    million for Orly's assets, at the end of the
6    day --
7  A.  At the same time, Arie is doing other
8    things, like paying your bills instead of Orly.
9    You understand?  That's my -- that's where I am
10   going, because you are not objective.  You are
11   being paid not by Orly, but by somebody else,
12   like my husband.  It is financing this
13   deposition.  And that's why I didn't want Arie to
14   be involved in this auction.
15 Q.  Because his money is tainted?
16 A.  No.  Because his interest -- Orly's
17   interest is not the same as Aric's interest.
18   That's why.  Airy's interest is to have control
19   over Orly's assets, I believe.
20 Q.  And if Arie had paid $5 million --
21 A.  He wouldn't.  He didn't have any money
22   because we just split our marital assets, and he
23   got five and I got five.  So how could he pay?
24 Q.  Did you check to see if he could, or
25   did you let --

Page 206

1    GENGER
2  A.  I didn't check because I know.
3  Q.  You didn't check because --
4  A.  Unless he hid some money that I don't
5    know about because then I have to get part of it.
6    I don't know.
7  Q.  You didn't check because -- you didn't
8    check because you didn't want Arie to
9    participate?
10 A.  No, that not true.
11   MR. ZILBERFEIN: Are you testifying?
12   BY THE WITNESS:
13 A.  I'm just saying --
14   MR. ZILBERFEIN: Objection.  The
15   attorney is testifying.
16   BY THE WITNESS:
17 A.  -- that I didn't check because I knew
18   what his financial condition is at that time,
19   because we were supposed to have the same amount
20   of assets or money or whatever you call it, okay.
21   BY MR. GRIVER:
22 Q.  And you don't think --
23 A.  And if he had some extra money, then it
24   was marital money that I was supposed to get part
25   of it.

Page 207

1    GENGER
2  Q.  And you are not sure that he -- and you
3    thought that Arie couldn't find some friends of
4    his who might participate in the auction?
5  A.  I don't know if he has friends.
6  Q.  But if Arie participated and didn't
7    have as much money as Sagi, that's fine.  But
8    isn't it a possibility that he would have been
9    able to get more money?
10 A.  There's always possibilities of
11   anything to happen.  The earthquake, the building
12   going on fire, I don't know.
13 Q.  So as trustee, why didn't you explore
14   that possibility?
15 A.  I told you already.  Because I knew how
16   much Arie has.  And, personally, I know my
17   husband.  I was married 33 years.  And I know
18   what's happening between Arie, unfortunately, and
19   Orly.
20 Q.  And why didn't you tell Orly?
21 A.  What?  Because Orly at this time was
22   brainwashed already, so I couldn't talk to her,
23   candidly, even though I did try.
24 Q.  And if Orly had known, then Arie would
25   have known, correct?

Page 208

1    GENGER
2  A.  This did not occur to me at all.
3  Q.  It didn't occur to you that if you told
4    Orly about the sale that she would tell her
5    father?  That didn't occur to you at all?
6    MR. MEISTER: Objection.  Asked and
7    answered.  The immediately preceding answer.
8    THE WITNESS: I have to have some candy
9    here.  My mouth is very dry.
10   MR. GRIVER: Can you read back my
11   question, please.
12   (WHEREUPON, the record was read by
13   the reporter as requested.)
14   BY THE WITNESS:
15 A.  I didn't think about it at the time.
16   But I am telling you frankly, I didn't want Arie
17   to be involved in this auction.
18   BY MR. GRIVER:
19 Q.  And did it --
20 A.  Because I know my husband.  I'm sorry.
21 Q.  Did it occur to Mr. Meister that if you
22   told Orly, that Orly would tell Sagi?
23 A.  I don't know if it occurred to him.
24   You should ask him.  I don't know.
25 Q.  Did Mr. Meister instruct you that it is

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                                                                    DALIA GENGER
DALIA GENGER, et al                    Pg 74 of 150                          December 13, 2012

Page 209

1    GENGER
2    your job as trustee to get the best price for the
3    trust assets?
4        MR. ZILBERFEIN: Objection. Asked and
5    answered.
6        BY THE WITNESS:
7    A.  Yeah.
8        MR. MEISTER: Join in the objection.
9        BY THE WITNESS:
10   A.  Yeah, I said, I do not remember talking
11   about it.
12       MR. GRIVER: Let me show you what I
13   have marked as Exhibit 15. For the record,
14   Exhibit 15 is the meeting of partners of D&K LP
15   January 31, 2009 and agreement.
16       (Dalia Exhibit 15, 1/31/2009
17       meeting and agreement, marked.)
18       BY MR. GRIVER:
19   Q.  That is you signing on behalf of the
20   Orly Genger trust?
21   A.  Right.
22   Q.  So do you recall this agreement?
23   A.  Yeah.
24   Q.  Could you tell me, please, first of
25   all, who drafted it, do you know?

Page 210

1    GENGER
2    A.  A lawyer. I don't know which one. I
3    didn't draft it.
4    Q.  Was it your lawyer or Sagi's lawyer?
5        MR. MEISTER: Objection. Compound.
6        MR. DELLAPORTAS: Object to form.
7        BY THE WITNESS:
8    A.  I really don't know which lawyer was
9    it.
10       MR. ZILBERFEIN: Objection.
11       BY THE WITNESS:
12   A.  My duty was to read it and sign.
13       BY MR. GRIVER:
14   Q.  Did you read it before you signed it?
15   A.  Yeah.
16   Q.  And do you understand what it does?
17   A.  Yeah.
18   Q.  What does it do?
19   A.  As far as I am concerned, I got what I
20   wanted.
21   Q.  Which is?
22   A.  Which is number 8.
23   Q.  Number 8?
24   A.  Refrain from enforcing the note against
25   each limited partner for 30 days. To calm down

Page 211

1    GENGER
2    everyone.
3    Q.  30 days, okay.
4    A.  Yeah.
5    Q.  And you needed those 30 days to do
6    what, exactly?
7    A.  First of all, to have a conversation
8    with my attorney.
9    Q.  Uh-huh.
10   A.  And, also, my intent was to talk to
11   Sagi and ask him to try -- ask him not to sue his
12   sister, the trust, Orly's trust. And so it did
13   happen that until today, Sagi never sued Orly's
14   trust.
15       Why are you laughing, it is not true?
16   Q.  So in those 30 days --
17   A.  Yeah.
18   Q.  -- you spoke to Sagi?
19   A.  Yeah.
20   Q.  And you told him --
21   A.  I spoke many times to Sagi, that he
22   wanted to act in a way that he felt like acting
23   because he was getting sued right and left, and
24   he was very angry. And I tried to calm him down
25   and tried to talk to him not to sue his sister.

Page 212

1    GENGER
2    Q.  Well, what this says, this 8 doesn't
3    say that TPR Investment Associates, Inc., has
4    agreed to not sue Orly Genger. It doesn't say
5    that.
6    A.  It doesn't say, but for me, my
7    intention was to start pursuing Sagi not to sue
8    Orly Genger trust. And I was successful in doing
9    that.
10   Q.  You were afraid that Sagi would sue
11   Orly's trust for what exactly?
12   A.  There's always something to sue. He
13   can foreclose on the --
14   Q.  On the note?
15   A.  Yeah.
16   Q.  Okay. So he didn't sue, but he did
17   foreclose on the note?
18   A.  He foreclosed on the D&K LP.
19   Q.  He foreclosed on the note, and got --
20   A.  D&K LP, but not directly Orly trust.
21   Q.  What other -- TPR also agreed to
22   refrain from enforcing the note for 30 days,
23   correct?
24   A.  Yeah.
25   Q.  Okay.

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                              DALIA GENGER
DALIA GENGER, et al          Pg 75 of 150   December 13, 2012

Page 213

1    GENGER
2 A.  That's the 30 days we are talking
3  about.
4 Q.  Did you speak to Sagi about not
5  enforcing the note?
6 A.  I spoke to Sagi about not suing Orly's
7  trust.
8 Q.  But it was okay that he sell the note?
9 A.  You mean the auction?
10 Q.  Yes.  You okay with the auction?
11 A.  I wasn't okay with it, but I had
12  nothing that I could do to prevent him.
13 Q.  You didn't tell him don't do it because
14  it will destroy the estate planning?
15 A.  No, I did not tell him.
16 Q.  In sum or in substance you never told
17  him?
18 A.  What?
19 Q.  In sum or in substance you never told
20  him that?
21    MR. ZILBERFEIN: Objection.
22    MR. MEISTER: Objection to form.
23    BY MR. GRIVER:
24 Q.  Correct?
25 A.  We said that -- I said that I did talk

Page 214

1    GENGER
2  with my lawyer, what are the options, and --
3 Q.  I am not talking about your lawyer.  I
4  am talking about Sagi.
5    MR. MEISTER: Please let her finish the
6  answer.
7    BY MR. GRIVER:
8 Q.  I am talking about your conversation
9  with Sagi.  What did you -- what in your
10  conversation -- please tell me all about your
11  conversation.
12 A.  Yes.  The conversation is that Sagi
13  should restrain himself from suing Orly's trust,
14  even though he was very angry at his sister, the
15  way she treated him by, you know, being sued
16  right and left.  And, you know, I understand it.
17  You can be very angry when somebody does it to
18  you.  So I just wanted him not to sue the trust.
19 Q.  So as trustee you got him to not sue
20  the trust?
21 A.  Right.
22 Q.  But you permitted him to proceed with
23  the auction?
24 A.  I didn't permit him.  I didn't permit
25  him.  He did what he thought he can -- he should

Page 215

1    GENGER
2  do.
3 Q.  Did he -- well --
4 A.  He didn't ask my permission.
5 Q.  Did you ask him not to do the auction?
6 A.  You asked me this already, and I
7  answered.
8 Q.  You did not?
9 A.  I did answer.
10 Q.  You did ask him?
11 A.  I did answer this question.
12 Q.  I understand.  Just so we are clear
13  because then I am going to go ask additional
14  questions on it.
15    You did not ask him to not do the
16  auction?
17    MR. MEISTER: Objection.  Compound and
18  negative.
19    MR. DELLAPORTAS: Asked and answered.
20    MR. ZILBERFEIN: Objection.  Asked and
21  answered.
22    MR. DELLAPORTAS: She said it is not
23  her place to tell him what to do.
24    MR. ZILBERFEIN: She is also --
25    MR. DELLAPORTAS: We are all in the

Page 216

1    GENGER
2  room.  We all heard it.
3    MR. ZILBERFEIN: She --
4    THE WITNESS: I am speaking --
5    MR. MEISTER: Don't argue with him.
6  Wait for a question.
7    MR. LEINBACH: You are entitled to
8  objections, pursuant to the judge's --
9    MR. ZILBERFEIN: Yeah, but he can't be
10  asking the same question ten times.
11    THE WITNESS: We have a limited time
12  that I can sit here.  I'm getting tired.
13    MR. ZILBERFEIN: You are getting the
14  same question over and over and over again.
15    THE WITNESS: I am getting tired.
16    MR. MEISTER: Please don't argue with
17  him.
18    THE WITNESS: You ask me so many
19  questions.  I can't -- it's going to be the same
20  answer.
21    BY MR. MEISTER:
22 Q.  Dalia, please just --
23    MR. S. GENGER: It's Ms. Genger.
24    BY MR. GRIVER:
25 Q.  Ms. Genger, please just listen to my

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                          Pg 76 of 150                    DALIA GENGER
DALIA GENGER, et al                                                      December 13, 2012

Page 217

1       GENGER
2   question and answer.
3       MR. S. GENGER: She's not your friend,
4   Yoav. She's the witness.
5       BY MR. GRIVER:
6   Q.  Did you ask Sagi in that conversation
7   to not proceed with the auction, yes or no?
8       MR. DELLAPORTAS: Objection.
9       MR. ZILBERFEIN: Objection.
10      BY THE WITNESS:
11  A.  After consulting with my lawyer, I did
12  not ask him to do that.
13      BY MR. GRIVER:
14  Q.  Because why?
15  A.  Because I didn't think that I would be
16  able to stop him. It was his right to do it. I
17  couldn't ask him to do it, not to do it.
18  Q.  Sagi also has a right to sue --
19  A.  Right.
20  Q.  -- the Orly trust?
21  A.  Yeah. But my focus was on the TRI
22  shares that Orly claimed were worth millions and
23  hundreds of millions of dollars. So in
24  comparison, giving up TPR shares, it was peanuts.
25  Q.  Did you ask Sagi to promise to not do

Page 218

1       GENGER
2   anything with the TI shares after the auction?
3   A.  Obviously. After -- the auction was on
4   TPR shares, not TRI shares.
5   Q.  Did you ask -- since your focus was on
6   the TI shares, did you talk to Sagi about not
7   doing anything to the TI shares in that
8   conversation?
9   A.  Yes, I did, because he could have sued
10  the trust and then foreclosed on the TRI shares.
11  Q.  And what did Sagi tell you? Did he
12  promise not to do that?
13  A.  After many, many arguments and personal
14  fights that we had, he agreed not to do it. And
15  he did until today, he never sued Orly's trust.
16      Is this funny?
17  Q.  In return for TPR agreeing to refrain
18  from enforcing the note for 30 days --
19  A.  I didn't hear the beginning of the
20  question.
21  Q.  If you look at the meeting agreement,
22  TPR agrees to not enforce the note for 30 days,
23  correct?
24  A.  TPR Investment has agreed to refrain
25  from enforcing the note against each limited

Page 219

1       GENGER
2   partner for 30 days. Right.
3   Q.  But TPR did not agree to refrain from
4   enforcing the note against D&K LP directly, or is
5   that included in paragraph 8?
6       MR. MEISTER: Compound and
7   incomprehensible. So I object.
8       BY THE WITNESS:
9   A.  Yes, it is hard for me -- Sagi did sue
10  the D&K LP, but he didn't see Orly's trust.
11      BY MR. GRIVER:
12  Q.  So far?
13  A.  Well, it is many years. I mean, it is
14  a long time. Seeing at least 30 days.
15  Q.  And in exchange you gave him a general
16  release?
17  A.  We both got -- I mean, each party got a
18  release.
19  Q.  You got a release, and he got a
20  release?
21  A.  That's true.
22  Q.  Certain people didn't get a release?
23  A.  Who didn't get a release?
24      MR. MEISTER: Wait for a question.
25      BY MR. GRIVER:

Page 220

1       GENGER
2   Q.  Arie didn't get a release, correct?
3   A.  Arie?
4   Q.  Arie didn't get a release?
5   A.  It is his problem. I don't know.
6   Q.  Okay. William Dowd didn't get a
7   release?
8       MR. MEISTER: Is there a question?
9       BY THE WITNESS:
10  A.  This is not -- they are not partners in
11  D&K LP.
12      MR. MEISTER: Wait for the question.
13  Wait for the question.
14      THE WITNESS: Okay.
15      BY MR. GRIVER:
16  Q.  Well, why were these persons identified
17  by you in this paragraph?
18  A.  It is partnership of the D&K LP. And
19  there were -- the parties that you mentioned are
20  not parties in the D&K LP. That's why they
21  didn't get the release. They are not included in
22  these documents. They are not part of these
23  documents.
24  Q.  But why did you mention them
25  specifically if they weren't included?

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                    Pg 77 of 150                    DALIA GENGER
DALIA GENGER, et al                                                December 13, 2012

Page 221

1     GENGER
2  A.  You asked me about Arie, and I didn't
3     mention these names.
4  Q.  I am asking you why are they mentioned
5     in the bottom of paragraph 1 as not being
6     released?
7  A.  Again, ask me the question.
8  Q.  Why are those included as -- why are
9     those persons, Arie Genger, William Dowd,
10    Lawrence Small, and Edward Kilmerman, not
11    included in the general release?
12 A.  They were not included because they
13    were not part of the D&K LP.  They were not
14    partners in D&K LP.
15 Q.  So why was it necessary to mention them
16    by name?
17 A.  I guess the lawyer found it necessary
18    to mention it.
19    MR. ZILBERFEIN: Take a bathroom break,
20    please.
21    MR. GRIVER: Let's go off the record.
22    (WHEREUPON, a recess was had from
23    4:18 p.m. to 4:28 p.m.)
24    MR. GRIVER: The parties have agreed to
25 adjourn Dalia's deposition until February 7,

Page 222

1     GENGER
2  2013.
3     MR. MEISTER: Also at 10:30, please.
4     MR. GRIVER: Also at 10:30.  That date
5  is okay with the deponent, the deponent's
6  attorney, and all the other attorneys in this
7  case.
8     (WHEREUPON, at 4:28 p.m., by
9     agreement of the parties, the
10    deposition of D. GENGER was
11    adjourned until Thursday, February
12    7, 2013, at 10:30 a.m., and the
13    deponent reserved her right to
14    read and sign the transcript.)
15
16
17
18
19
20
21
22
23
24
25

Page 223

1     A C K N O W L E D G M E N T
2
3  STATE OF        )
4     :ss
5  COUNTY OF       )
6
7     I, DALIA GENGER, hereby certify that I
8  have read the transcript of my testimony taken
9  under oath in my deposition of December 13,
10 2012; that the transcript is a true, complete
11 and correct record of my testimony, and that
12 the answers on the record as given by me are
13 true and correct.
14
15
16
17    _____
17    DALIA GENGER
18
19
20 Signed and Subscribed to
21 before me, this   day
22 of     , 2012.
23    _____
24 Notary Public, State of New York
25

Page 224

1        C E R T I F I C A T E
2
3  STATE OF NEW YORK  )
4                     ) ss.:
5  COUNTY OF NEW YORK )
6
7     I, ANNETTE M. MONTALVO, Registered Merit
8  Reporter and Notary Public within and for the
9  State of New York, do hereby certify:
10    That DALIA GENGER, the witness whose
11 deposition is hereinbefore set forth, was duly
12 sworn by me and that such deposition is a true
13 record of the testimony given by such witness.
14    I further certify that I am not related
15 to any of the parties to this action by blood or
16 marriage and that I am in no way interested in
17 the outcome of this matter.
18    IN WITNESS WHEREOF, I have hereunto set
19 my hand this 27th day of December, 2012.
20
21
22
23
24
25 ANNETTE M. MONTALVO

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                            Pg 78 of 150                    DALIA GENGER
DALIA GENGER, et al                                                       December 13, 2012

Page 225

```
 1                    ***ERRATA***

 2         ELLEN GRAUER COURT REPORTING  CO. LLC
           126 East 56th Street, Fifth Floor
 3                New York, New York 10022
                      212-750-6434
 4

 5   NAME OF CASE: GENGER vs. GENGER
     DATE OF DEPOSITION: December 13, 2012
 6   NAME OF WITNESS: DALIA GENGER

 7   PAGE  LINE   FROM      TO        REASON

 8    ___|__|_____|_____|_____

 9    ___|__|_____|_____|_____

10    ___|__|_____|_____|_____

11    ___|__|_____|_____|_____

12    ___|__|_____|_____|_____

13    ___|__|_____|_____|_____

14    ___|__|_____|_____|_____

15    ___|__|_____|_____|_____

16    ___|__|_____|_____|_____

17    ___|__|_____|_____|_____

18    ___|__|_____|_____|_____

19    ___|__|_____|_____|_____

20    ___|__|_____|_____|_____

21                    _____

22   Subscribed and sworn before me

23   this____ day of _____, 20__.

24   _____    _____

25   (Notary Public)          My Commission Expires:
```

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

## $

**$2 (1)**
205:3
**$200,000 (2)**
24:3,4
**$3 (1)**
205:4
**$5 (3)**
164:5,11;205:20
**$9 (1)**
175:18

## 0

**08 (1)**
125:17
**09 (1)**
15:2

## 1

**1 (13)**
8:16,17,20;9:13;
62:16;98:20,21;99:7;
100:7;105:21;169:10;
185:9;221:5
**1/31/2009 (1)**
209:16
**1/4/2008 (1)**
108:12
**1:00 (2)**
113:12,15
**10 (4)**
149:7,7,9,14
**10:30 (4)**
143:6;222:3,4,12
**10:52 (1)**
20:6
**10:54 (1)**
20:7
**100 (1)**
85:25
**10036 (1)**
3:14
**10065 (1)**
6:15
**10804 (1)**
3:6
**11 (5)**
151:16,18;173:19;
176:7,13
**12 (5)**
11:4;162:13,14,17;
163:8
**12:06 (2)**
117:13,14
**12:07 (1)**
87:14
**12:19 (1)**
87:14
**12:45 (1)**

108:23
**12:59 (1)**
116:15
**129 (1)**
143:25
**13 (4)**
168:16,17;184:14;
223:9
**130 (1)**
144:2
**14 (3)**
173:10,10,12
**140 (1)**
140:22
**15 (7)**
7:9;143:12;151:22,23;
209:13,14,16
**1540 (1)**
3:13
**16-page (1)**
109:24
**19 (3)**
108:11;185:21;186:9
**1946 (1)**
7:9
**1993 (9)**
7:24;89:20,24;108:8;
127:23;149:8,9,24;
167:19

## 2

**2 (10)**
8:22,25;25:13;26:10;
38:20;86:7;100:20,21;
105:20;150:13
**2:06 (2)**
116:16;117:4
**2:24 (1)**
133:25
**2:33 (1)**
142:19
**200 (1)**
6:14
**2000 (2)**
169:2,14
**2004 (4)**
155:2,3;168:8,13
**2005 (1)**
168:11
**2006 (3)**
161:21;162:2;163:2
**2007 (15)**
68:21;71:14;75:10;
77:20;79:6;80:21;88:5,
10,13;92:21;93:2;94:15;
108:3,10;125:16
**2008 (29)**
11:25;13:22,25;15:2;
37:6;38:16;62:16;68:21;
88:17;94:11;105:5;
106:8;125:16;154:9;
155:21;161:23;163:10;

166:17,18;168:22;173:2,
6,19;176:7,13;177:7,18,
25;185:4
**2009 (6)**
185:21;187:10;
193:24,25;194:2;209:15
**2010 (5)**
9:20;102:13;103:21;
104:23;105:6
**2012 (3)**
11:8;223:10,22
**2013 (2)**
222:2,12
**20th (1)**
9:20
**21 (1)**
167:19
**212-692-1012 (1)**
3:16
**22 (1)**
108:2
**22nd (1)**
108:9
**23 (1)**
143:25
**240 (1)**
150:12
**25 (1)**
163:10
**27 (2)**
187:10;194:2
**28 (4)**
102:13;103:21;
104:23;105:5
**29 (13)**
71:14;75:10;77:20;
79:6;80:20;83:8,12;
88:5,10,13;92:21;93:2;
94:14
**29th (1)**
11:7

## 3

**3 (17)**
8:16;9:4,8;11:2,3;
25:10,11;27:24;28:20;
38:19;100:22,24,25;
109:4;144:2;169:10;
185:7
**3:30 (1)**
132:14
**3:34 (1)**
189:8
**3:42 (1)**
189:8
**30 (12)**
9:21;104:22;210:25;
211:3,5,16;212:22;
213:2;218:18,22;219:2,
14
**31 (3)**
168:22;185:4;209:15

**32W (1)**
6:15
**33 (1)**
207:17
**35 (1)**
116:13

## 4

**4 (22)**
11:25;13:22;37:6,10,
11,15,23;38:16;42:23;
44:11;86:6;87:4;94:10;
105:5;106:8;110:7;
113:12;130:7,8;168:12;
173:16;193:25
**4:00 (1)**
132:12
**4:18 (1)**
221:23
**4:28 (2)**
221:23;222:8
**48 (3)**
131:15,22;140:22
**49 (3)**
131:15,22;140:22

## 5

**5 (16)**
42:19,20,25;43:6;
94:24,25;95:5,8;100:3,
10,17;101:4,9;102:4;
106:17;193:24
**5:00 (2)**
143:8,16
**5:30 (2)**
143:8,16

## 6

**6 (13)**
68:5,6;69:21;80:21;
88:9;92:19,21;93:2,13;
95:18;97:9,22;124:16
**65th (1)**
6:14
**66 (1)**
7:11

## 7

**7 (6)**
68:9,10,13,14;221:25;
222:12
**75 (2)**
105:19;116:9
**78 (1)**
3:5

## 8

**8 (24)**

92:14,15;94:8,10,20;
95:4,7,18;97:9,22;
124:16;174:5,8,9,11,12;
175:25;177:12,13,14;
210:22,23;212:2;219:5
**8-31-08 (3)**
185:11;186:8,17

## 9

**9 (12)**
102:19;108:6,12;
110:10;111:25;174:5,8,
9,12;178:13,14;180:8
**90 (2)**
81:22;84:19
**914-297-0110 (1)**
3:7
**93 (5)**
7:14;154:3,4;155:19;
177:2

## A

**ability (3)**
46:10;47:18;104:16
**able (8)**
20:13;63:10;72:8;
120:4;140:24;171:11;
207:9;217:16
**absent (1)**
28:23
**Absolutely (10)**
6:21;7:25;12:9,24;
18:22;118:19;161:14;
181:17;184:5;189:18
**acceding (1)**
194:21
**accelerated (1)**
178:24
**accept (6)**
41:8,16;59:19;65:14;
178:18;194:22
**acceptable (1)**
139:2
**acceptance (4)**
42:21;43:2;58:19;
70:16
**accepted (9)**
39:3;40:13;41:3;46:9;
59:3;69:4,7;99:8,10
**accommodate (2)**
159:7,22
**accommodation (1)**
143:7
**Accordingly (1)**
96:14
**act (8)**
12:14;69:7;102:24;
130:3;144:9,25;145:12;
211:22
**acted (2)**
161:11,13

20-01187-jlg    Doc 1-18    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 19
ORLY GENGER VS.
DALIA GENGER, et al
Pg 80 of 150
DALIA GENGER
December 13, 2012

**acting (2)**
187:3;211:22
**action (31)**
8:19;9:7;13:3,6;17:10;
22:10,11;30:4,20;62:6,8;
81:24;82:8,9;84:20,23,
24,25;85:3,8,13;96:3,10;
130:7,7,10;133:18;
140:7,9,25;183:23
**actions (20)**
22:5;30:2,5,6,14,16;
31:4,5,6;37:3;81:3;
104:25;105:7;106:11;
107:11,14;140:24;
141:25;174:23;196:25
**actively (1)**
31:10
**activities (1)**
93:12
**acts (7)**
100:12;101:23;102:7,
9,16,19,22
**actuality (1)**
154:11
**actually (13)**
11:12;23:12;31:21;
45:6;55:21;92:10;
100:22,23;112:13;
118:15;131:2;133:13;
163:11
**addition (5)**
118:18;136:7;137:4,
16;138:2
**additional (1)**
215:13
**address (2)**
6:13;131:10
**addressed (3)**
72:19;73:14;163:12
**adjourn (1)**
221:25
**adjourned (1)**
222:11
**advice (11)**
20:14,15;146:13,17;
190:17,24;191:2,8;
194:12,18;196:6
**affair (2)**
46:3;56:8
**affidavit (11)**
121:7;173:11,13,18;
174:15;176:8,14,15;
177:7;180:9;182:5
**afford (2)**
26:24;158:7
**afraid (4)**
178:8;179:10,11;
212:10
**afternoon (2)**
117:15;134:24
**again (37)**
8:2;11:12,16;21:2;
24:21;28:5;39:19;48:12;

53:9;66:14;71:4;91:20;
97:6;103:9;105:23;
115:14;118:4,5;120:7;
129:6;134:8;135:4,13;
153:13;156:9,19;
170:12;173:4;176:9,11;
183:16,17;192:5;201:3;
202:3;216:14;221:7
**against (8)**
16:25;17:7;22:14;
35:9;164:7;210:24;
218:25;219:4
**agents (1)**
81:4
**ago (14)**
11:13,16;25:19;27:16,
22;28:8;29:2;30:7,15;
31:17;113:13;121:15;
134:9;193:12
**agree (7)**
12:20;85:24;139:4;
174:16;180:8,10;219:3
**agreed (6)**
153:2;212:4,21;
218:14,24;221:24
**agreeing (1)**
218:17
**agreement (16)**
75:2;78:17;88:24;
107:17,18,21;108:7;
149:8,10;150:3;176:3;
209:15,17,22;218:21;
222:9
**agreements (2)**
75:13,20
**agrees (1)**
218:22
**ahead (10)**
12:11,19,22;13:8;
21:25;111:2;115:18;
120:12;179:6;191:15
**aim (1)**
143:16
**air (1)**
105:11
**Airy's (1)**
205:18
**allegation (2)**
100:8,16
**allegations (3)**
99:13;100:10;102:18
**alleged (2)**
102:23;106:17
**allow (2)**
28:22;118:25
**allowed (2)**
115:21,25
**alluding (1)**
183:21
**almost (1)**
204:24
**alone (1)**
138:7

**along (1)**
136:23
**although (1)**
90:10
**always (8)**
120:8;141:15;174:23;
175:13;181:19,20;
207:10;212:12
**amended (9)**
8:18,21,23;9:2,5,9;
10:8;108:6,18
**among (1)**
174:15
**amount (2)**
118:22;206:19
**angry (3)**
211:24;214:14,17
**announced (4)**
119:11;121:2,3;122:2
**answered (29)**
27:13;31:15;33:4,11,
12;51:19;54:10;56:21;
57:5;61:15;81:16;84:3;
99:4;105:9;110:12;
118:10;126:13;128:17;
145:4;147:19;150:22;
160:2;165:4;203:13;
208:7;209:5;215:7,19,21
**Apartment (1)**
6:14
**Apparently (1)**
132:15
**appearance (2)**
117:16;136:4
**appeared (1)**
117:15
**appearing (1)**
121:17
**appears (1)**
134:12
**apply (1)**
85:4
**appoint (2)**
41:24;65:6
**appointed (3)**
59:2;139:21;178:8
**appointment (10)**
38:3;40:13;42:24;
58:18,19,21;59:3,19;
69:5;178:22
**appreciate (1)**
119:3
**appreciated (1)**
162:21
**approached (1)**
189:11
**arbitration (12)**
151:9,16,19;152:9,9,
12;156:4,11;157:12;
173:25;193:7;197:6
**arbitrator (2)**
153:10,14
**argue (1)**

216:5,16
**arguments (2)**
96:17;218:13
**Arie (33)**
17:9;148:2;150:14;
153:5,8,15;154:25;
198:4,7,8,18;199:12,12;
200:4,5;204:16,19;
205:4,7,13,20;206:8;
207:3,6,16,18,24;
208:16;220:2,3,4;221:2,
9
**Arie's (2)**
199:14;205:17
**arise (1)**
45:16
**arisen (1)**
135:9
**asserted (2)**
22:13,14
**assertion (1)**
137:5
**asset (1)**
197:20
**assets (11)**
22:23;154:17;175:22;
180:18;204:19;205:4,5,
19,22;206:20;209:3
**assignment (4)**
162:2;164:14,18;
165:2
**associated (5)**
119:20;120:16,17,18;
182:13
**Associates (2)**
3:12;212:3
**assume (6)**
52:3,12,12;54:3;
70:12;121:20
**assumed (2)**
53:9;121:18
**Assumes (2)**
98:5;170:15
**assuming (1)**
49:22
**assumption (2)**
52:9,13
**attempt (2)**
158:11;188:14
**attempted (6)**
65:6,14;75:18;95:13;
144:17;147:16
**attempting (1)**
22:6
**attempts (2)**
137:3;138:3
**attend (5)**
120:21,23,25;121:25;
152:8
**attendance (1)**
58:5
**attention (4)**
39:16;40:6;151:21;

152:2
**attorney (46)**
10:19,20;14:3,6,9;
15:5;71:13,16,18,22,22;
72:2,6,16,24;87:15;
99:21;113:5,6;116:17;
117:15,17;119:24;
120:19;125:14;126:10;
127:23;128:4;136:13,14,
19;172:20,22;185:19;
186:8;190:9,12;191:23;
192:9,9,15;193:9;
194:18;206:15;211:8;
222:6
**Attorney-client (6)**
16:7;92:2;124:21;
138:17;191:11;194:4
**attorneys (20)**
13:23;14:12;20:19;
21:4;54:12;67:10,11;
71:8;137:17;145:16;
146:2;147:15;146:16,17,
21,22,22;188:7,10;222:6
**attorney's (4)**
79:11;117:7,11;
146:13
**auction (38)**
183:22;188:21;
191:19;195:21;197:12;
198:9,16,21;199:7,9,23,
24;200:3,8,13,14;201:8,
19,24;202:2,7,8,11,16;
203:7,8,11;205:14;
207:4;208:17;213:9,10;
214:23;215:5,16;217:7;
218:2,3
**August (2)**
168:22;185:4
**availability (1)**
132:7,11;134:10
**available (1)**
132:12
**avoid (1)**
56:14
**award (2)**
151:16,19
**awarded (2)**
153:6,9
**aware (12)**
38:8,13;39:2;40:14,
20,22;41:23;42:12,16;
49:8;65:5,8,13,18;69:6,
13;77:22;79:13;98:16,
16;107:11;112:2;114:7;
117:24;165:21,23,24;
186:4,7;187:13;190:6;
200:2,14

---

**B**

**Back (44)**
20:8;9:23;7:32:21;
51:7,12;55:2,7;58:13;

20-01187-jlg    Doc 1-18    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 19
ORLY GENGER VS.                                      Pg 81 of 150                                      DALIA GENGER
DALIA GENGER, et al                                                                                   December 13, 2012

60:16,20;70:25;82:14,
21;84:4;87:19;105:13;
116:8;117:3;129:8;
131:7,19;143:19;
153:25;156:17;157:5;
160:9,10,13,15,17,17,19,
23;161:16;162:3,7;
171:15;174:20;180:3;
195:4;200:21;202:21;
208:10
**bad (1)**
114:18
**balance (1)**
67:21
**bankrupt (2)**
181:9,10
**Barbara (1)**
134:3
**based (7)**
78:10;85:5,14;96:10;
109:14;141:19;150:7
**basically (7)**
16:25;25:7;61:12;
118:7;179:5,7;202:9
**basis (6)**
16:5;20:16;24:13;
49:20;73:10;80:9
**bat (1)**
135:7
**bathroom (2)**
189:10;221:19
**bear (1)**
175:17
**became (12)**
13:23;29:20;37:6;
38:17;65:5;67:14;88:22;
95:12;104:19;107:9;
161:23;186:7
**become (16)**
29:21;38:18,19;40:22;
41:23;42:12,13;45:9;
46:14;60:3,10,13;65:23;
66:9;67:15;71:9
**becoming (1)**
89:17
**Beg (1)**
193:16
**began (2)**
14:3;148:12
**begin (2)**
30:18;117:12
**beginning (4)**
40:20;122:6;180:7;
218:19
**Behalf (13)**
3:4,12;14:13;18:5,17;
19:10;20:14;21:19;23:6;
35:8;103:6;141:21;
209:19
**behave (1)**
175:15
**belief (7)**
99:16;100:12;102:7,

16,21;106:15;115:5
**believing (1)**
196:24
**bell (2)**
14:16,17
**beneficiaries (1)**
81:4
**beneficiary (6)**
12:5,19;19:16;39:4;
123:3;190:20
**benefit (4)**
120:11;148:5;176:4;
177:17
**besides (5)**
60:12;63:15;64:2,20;
192:15
**best (22)**
12:15;20:19;21:5,9;
46:10;47:16,17;78:23;
87:23;88:2;104:15;
129:2;144:15,25;
163:22;190:18;198:11;
199:17;203:11,19;
204:6;209:2
**better (1)**
81:17
**bid (2)**
197:20;200:14
**bidding (2)**
203:20;204:7
**bids (1)**
198:22
**big (1)**
45:6
**bill (9)**
18:18,24;19:9;26:18;
85:19;192:5;193:12,14,
24
**billing (1)**
34:23
**bills (20)**
18:14,16;19:17;22:4,
8,17,21,24;23:3,6,17;
35:16,18;79:4;139:21;
192:4;193:15,18,20;
205:8
**birth (1)**
7:8
**bless (1)**
142:7
**blurred (1)**
68:23
**both (7)**
18:2;86:5;105:19;
150:18;159:6;180:12;
219:17
**bottom (4)**
35:19;74:7;180:22;
221:5
**bought (3)**
183:23;184:3,7
**brainwashed (1)**
207:22

**break (25)**
76:14;81:18,19,21;
84:12,13;85:22;86:12,
20;87:2,9;113:11,14,21;
114:11;117:14;118:3;
122:5;132:8;188:22,25;
189:3,10;192:22;221:19
**breakdown (1)**
53:10
**breakfast (2)**
113:17;116:12
**breaking (1)**
143:4
**briefly (1)**
26:14
**Broadway (1)**
3:13
**brought (2)**
96:4;140:11
**Bryan (2)**
134:7,25
**building (1)**
207:11
**burden (1)**
170:19
**business (2)**
58:2;121:5
**buy (1)**
199:20

---

## C

**call (9)**
57:2;63:6;82:10;
131:22;132:6;134:2;
196:16;199:11;206:20
**called (4)**
6:3;86:25;107:18;
134:8
**calling (5)**
131:23,24;135:8;
137:2;196:12
**Calls (4)**
49:11;56:21;158:21;
167:4
**calm (2)**
210:25;211:24
**came (8)**
15:16;73:20;112:19;
117:3,14;150:24;179:7;
185:18
**Can (96)**
11:20;13:13;19:24;
20:9;23:7;28:4;32:16,
21;33:3,6;36:16,17;42:4,
5;44:20;50:13;51:6;
52:3;55:6;58:13;60:15;
61:13;66:7,14,18;67:3;
70:24;75:6;78:20;82:14;
83:19,20;84:13,21;
89:21;90:8;92:23;94:25;
96:4,15;98:24;105:13;
106:3;107:22;111:8;

118:14,24;119:4;
121:19;127:10,10;129:6,
7;131:4,5,10,18,19;
138:9;139:5,24;140:2;
143:2,4,18,21;149:6;
150:5;151:8;154:16;
156:8,9;157:5;167:8;
168:15;173:3;174:4;
176:11;180:2;183:17;
187:2,22;188:22;191:3,
18;192:7,21;195:21;
202:10,20;204:22;
208:10;212:13;214:17,
25;216:12
**candidate (1)**
179:8
**candidly (1)**
207:23
**candy (1)**
208:8
**capacity (4)**
16:16,19;18:3;91:12
**care (5)**
47:18;61:8,8;139:6;
141:3
**cares (1)**
61:10
**caring (1)**
181:7
**carpet (1)**
86:19
**carry (2)**
141:22;164:4
**case (16)**
25:14;56:16;85:4;
93:20,25;96:5,15,22;
114:3,25;115:2;123:13;
142:9;166:14;197:2;
222:7
**cases (2)**
35:23;80:13
**cause (3)**
130:6,7;179:12
**caused (1)**
182:15
**caveat (1)**
194:5
**certain (2)**
24:25;219:22
**Certainly (4)**
118:16;120:4;137:20;
194:16
**certify (1)**
223:7
**chambers (1)**
134:3
**chance (1)**
196:15
**change (4)**
13:18;128:20;154:6;
171:9
**changed (2)**
154:4,19

**changes (1)**
11:14
**charge (1)**
170:4
**charging (1)**
35:23
**check (8)**
35:22,22;205:24;
206:2,3,7,8,17
**checked (1)**
132:10
**children (20)**
148:5;150:10,16,18;
153:19;154:17;159:7;
170:19;171:2,10;172:6,
7,10;174:24;175:19,22;
176:4;177:17;180:23;
181:6
**children's (1)**
175:13
**chooses (1)**
126:23
**chose (4)**
56:16;165:14;166:13;
190:7
**circumstances (3)**
154:4,5,19
**claim (2)**
130:9,10
**claimed (1)**
217:22
**claiming (1)**
153:6
**claims (2)**
22:13;153:8
**clarify (2)**
30:21;189:17
**clean (1)**
203:5
**clear (13)**
14:5;17:24;31:16;
32:13;39:21;62:22;
79:15;104:7,12;113:4;
120:15;201:9;215:12
**client (5)**
14:4;85:3;101:9;
117:21;194:11
**client's (1)**
118:22
**cocounsel (1)**
136:17
**code (1)**
6:15
**Coleman (1)**
181:23
**collect (10)**
158:4,12,14;159:20;
167:2,20;172:2;178:10;
187:23;199:22
**collected (1)**
153:24;155:6,16,18;
156:13;157:9,13;
158:17;159:17,24;

20-01187-jlg    Doc 1-18    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 19
ORLY GENGER VS.                    Pg 82 of 150                    DALIA GENGER
DALIA GENGER, et al                                               December 13, 2012

164:2;168:4;172:5,12;
182:23;183:6,13,18,20
**collecting (1)**
195:24
**collude (1)**
101:17
**colluded (3)**
101:11,13,15
**collusion (2)**
101:17;115:6
**comfortable (1)**
48:5
**communications (5)**
67:22;134:5,20;
142:20;194:11
**company (4)**
24:2,5;148:14;171:10
**comparison (1)**
217:24
**compete (1)**
188:20
**complaint (17)**
8:18,21,24;9:2;25:14;
86:7;100:11,17,19;
102:5;105:20;106:18;
108:11;131:2,3,9;140:23
**complete (1)**
223:10
**completed (1)**
143:13
**complicated (1)**
169:9
**Compound (5)**
158:18;200:10;210:5;
215:17;219:6
**computer (4)**
73:21,22,23,25
**concentrate (1)**
101:22
**concern (5)**
21:11;139:11;140:5;
141:16;181:21
**concerned (2)**
204:20;210:19
**concerning (2)**
102:19;193:21
**concession (1)**
194:23
**concluded (2)**
142:17;191:17
**conclusion (1)**
50:11
**condition (1)**
206:18
**conduct (1)**
49:24
**conducting (1)**
93:3
**conference (1)**
142:17
**confident (1)**
47:23
**confidential (2)**

138:25;194:10
**conflict (8)**
21:12;50:7,19;54:13;
57:21;58:8;77:22;
117:23
**conflicts (1)**
77:23
**confusing (1)**
183:17
**connection (8)**
14:18;21:18;53:25;
56:11;65:22;81:6;89:16;
118:9
**consequence (1)**
49:24
**consequences (1)**
175:17
**consider (1)**
198:4
**consideration (4)**
97:20;98:17;111:22;
112:3
**considered (1)**
197:23
**considering (3)**
45:9;46:13;141:6
**conspiring (1)**
114:23
**constantly (1)**
62:12
**consult (2)**
125:5;190:6
**consulted (1)**
190:8
**consulting (2)**
190:9;217:11
**contained (2)**
100:10,17
**contains (1)**
194:10
**Cont'd (1)**
3:1
**contention (1)**
194:21
**contest (1)**
104:16
**continuation (2)**
137:13;166:2
**continue (6)**
33:10;109:24;121:22;
143:12;175:11,12
**contrary (1)**
137:4
**control (2)**
166:7;205:18
**conversation (12)**
59:11,16;67:7;132:13;
191:23;211:7;214:8,10,
11,12;217:6;218:8
**conversations (8)**
65:21;66:8,19;67:4,9;
193:13;194:13;196:5
**copies (4)**

8:22;19:17;122:9;
195:2
**copy (7)**
9:5;68:18;185:20,25;
186:9;193:12,13
**correction (4)**
189:21,23;190:4,5
**counsel (18)**
39:14;83:13;84:17,25;
85:6,9,17;86:6,19,21;
87:7;103:6;112:9;
124:13,25;125:6,25;
130:5
**counsel's (1)**
85:24
**count (5)**
34:6,11,12;86:6;87:4
**COUNTY (1)**
223:5
**couple (2)**
27:3,4
**course (7)**
10:21;44:2;135:8,18;
138:20,25;198:7
**court (55)**
36:19;52:23;83:18,24;
84:22;85:12;96:3;97:12;
117:9;119:19,22;
121:11;130:11,13,16;
131:23,23,24;132:6,17;
134:22;135:3,11,12,16,
19,21,22,24;136:5,10,21,
24;137:8,16,19,22;
138:6,15,21,24;139:8,
12,23;140:6,14;141:2,9;
142:3,15;162:18;170:9;
173:19;181:22;182:6
**courtesy (1)**
83:10
**covered (1)**
28:2
**covering (1)**
193:25
**CPLR (5)**
96:19;118:24;119:4;
133:6,10
**created (5)**
114:15,18,21,23,24
**creative (1)**
157:24
**cross (2)**
96:5;140:13
**crossed (1)**
85:2
**current (1)**
11:18
**currently (2)**
14:2;140:21
**cut (1)**
189:13

**D**

**D&K (51)**
30:10;81:23;82:8,9;
84:20;85:8;96:9;107:17,
17,18,21;108:7;148:13,
24,25;149:4,21;150:15;
151:5,13,22;152:4;
153:7,9,17;154:21;
157:21;162:3;167:2,14;
168:7,25;169:13,17;
183:8,13,15,18,25;
184:8;200:20;209:14;
212:18,20;219:4,10;
220:11,18,20;221:13,14
**Dalia (98)**
6:12;8:16,17,17,20,22,
25;9:4,5,8,8,12;17:9;
18:24;19:13,14;22:9,11;
24:7,20;25:9,13;26:9;
28:20;35:6;36:14;37:10,
11,15,23;42:19,20,23,
25;43:6;52:19;68:5,6,9,
10,13,14;69:21;73:17;
80:21;82:20;88:9;90:25;
92:14,15,19,21;93:2,12;
94:8,10,20,24;95:18,18;
97:9,9,22,22;98:20;
108:12;110:10;111:24;
112:9,16;135:10,12;
136:8,23;137:14;
138:14;140:23;149:7,9;
151:18;162:14;163:8;
168:16,17;173:10,11,12,
12;185:7;193:23;196:6,
7;202:24;204:4;209:16;
216:22;223:7,17
**Dalia's (2)**
86:8;221:25
**date (18)**
7:8;10:4,5;14:24;
25:23;41:2;70:8;90:10,
11;91:7;92:7;94:19;
104:20;139:6;141:24;
168:21;192:14;222:4
**dated (4)**
88:10;94:10;108:2;
193:24
**dates (3)**
38:23;162:19;194:14
**daughter (3)**
35:2;49:24;178:22
**David (15)**
152:15;159:15,21;
160:12;161:13,15;163:9,
22;166:3,5,10;171:19;
172:12,25;173:6
**day (19)**
9:20;11:7;26:12,21,
22,23,24;27:2;44:13,19,
21;95:24;108:9;125:15;
130:25;141:22;143:4;
205:6;223:21
**days (20)**
11:13,16;25:19;27:16,

22;28:7;29:2;30:7,15;
31:17;210:25;211:3,5,
16;212:22;213:2;
218:18,22;219:2,14
**de (1)**
119:9
**deal (2)**
115:3;157:22
**debt (3)**
154:11;164:4;169:24
**December (19)**
68:20,21;71:13;75:10;
77:20;79:6;80:20;82:25;
83:8,12;88:5,10,13;
92:21;93:2;94:14;
125:16;167:19;223:9
**decided (2)**
59:19;170:5
**decision (1)**
141:13
**default (1)**
168:20,24;184:17,20
**defeat (1)**
153:25
**defeated (1)**
197:2
**defendant (1)**
9:5
**defining (1)**
77:2
**Definitely (2)**
114:25;115:2
**definition (1)**
79:11
**Delaware (3)**
14:20;22:10,11
**delay (1)**
188:8
**dellajo@duanemorriscom (1)**
3:17
**DELLAPORTAS (74)**
3:15;34:14,21;39:7;
40:18;57:23;58:3;81:20;
82:2,6,11,16;83:4,9,13,
22;84:13;87:3;95:21;
96:2,11,25;97:13,23,25;
98:13;113:3;119:10;
120:20,24;121:11,14,23;
122:11;130:4,21;131:3,
8,13,21;133:17,23;
136:14;137:5,12;139:9,
10,23;140:4;141:20;
144:10;146:3;152:21;
155:23;156:5;158:21;
163:4;167:4,22;176:17,
21;179:15,18,21;182:19,
24;203:14,23;204:8;
210:6;215:19,22,25;
217:8
**demand (1)**
196:9
**denied (1)**
102:5

20-01187-jlg    Doc 1-18    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 19
ORLY GENGER VS.                          Pg 83 of 150                          DALIA GENGER
DALIA GENGER, et al                                                      December 13, 2012

Denies (3)
  100:9,11,16
Deny (1)
  100:8
depend (1)
  115:8
depends (1)
  115:10
deponent (5)
  136:8,23;137:10;
  222:5,13
deponent's (1)
  222:5
deposed (2)
  133:9;142:7
deposition (43)
  7:21;10:14,16,18;
  24:18,25;28:3,11;33:20;
  82:8;85:2,7;86:8;87:8,
  16;100:21;105:21,22;
  112:11;113:6,8;116:14,
  18;119:6;120:21;
  124:17;130:23;134:10;
  135:10,18;137:2,14;
  139:7;141:17,21,23;
  142:21;143:13;195:14;
  205:13;221:25;222:10;
  223:9
depositions (1)
  143:15
designated (1)
  38:9
destroy (4)
  177:10;178:4;180:14;
  213:14
destroyed (2)
  181:16,18
destruction (1)
  171:5
determine (2)
  67:14;77:18
determining (1)
  145:14
deterred (1)
  142:5
different (3)
  19:6;103:16;182:25
difficult (2)
  46:5;113:25
direct (2)
  86:5;151:21
direction (1)
  98:4
directly (4)
  22:18;57:11;212:20;
  219:4
disagree (1)
  153:16
disagreed (4)
  152:18;153:3,10,15
disagreement (1)
  57:3
disappear (1)

160:5
disaster (1)
  174:20
disconnected (2)
  142:18,21
discovery (4)
  84:21;96:20;130:12,
  22
discuss (35)
  27:20;30:7,15;31:21;
  44:25;45:11,21,22,22;
  58:18,25,25;59:6;60:8;
  66:3;87:8;89:9;147:6,
  14;191:25;192:2,7;
  193:3,10;195:8,18;
  196:11,17,22;197:8,11,
  18,21;201:22;202:5
discussed (18)
  27:16,23;28:10;29:8,
  14;30:12;31:17;48:9;
  58:20;60:3;66:25;71:8;
  89:9;147:4;174:11;
  201:20;202:9;203:9
discusses (1)
  151:22
discussing (1)
  111:10
discussion (4)
  85:18;90:2;132:3;
  193:22
dismiss (1)
  96:9
dispute (2)
  139:4,5
distinguish (1)
  20:13
distribution (1)
  155:8
divorce (9)
  17:8,11;150:24;151:6;
  154:10;171:8,22;
  173:21;177:4
divorced (5)
  148:2;154:7,18,25;
  168:10
divorcing (1)
  159:4
doctor (1)
  53:16
document (61)
  10:10;11:12,15;27:23,
  24;28:24;37:12;38:6;
  43:5,21;44:8,23,24;45:8;
  68:10,19;69:22,24;70:7,
  9,23;74:10,14,23;76:3;
  79:16;89:19,23;90:10;
  91:23;92:9,15,18,19,21,
  25;94:23;107:25;
  108:15,17;109:9,15,16,
  20,25;110:11;111:11,12,
  18,24;113:22,24;114:8,
  15,17,22,24;124:6;
  168:17;185:17;194:8

documentation (1)
  197:5
documents (20)
  10:19,22,23;24:25;
  25:5,7;67:13;70:2;
  93:10,18,19,24;95:17;
  97:8,21;114:2;129:13;
  196:4;220:22,23
dollars (2)
  151:6;217:23
done (20)
  12:25;13:3,6,20;
  15:22;75:21,25;76:4,9,
  20;77:19;78:12;102:25;
  110:4;111:3;118:17;
  120:14;122:24;177:2;
  204:25
double (1)
  156:16
doubt (1)
  120:11
Dowd (2)
  220:6;221:9
down (3)
  143:5;210:25;211:24
draft (1)
  210:3
drafted (5)
  71:13,18;72:2,6;
  209:25
dragged (1)
  130:12
dry (1)
  208:9
DUANE (1)
  3:11
duly (2)
  6:1,4
during (13)
  44:19,21;75:22;87:8;
  112:11;119:6,23;128:3;
  132:8;135:9;137:2;
  170:11;189:10
duty (4)
  145:10;198:8,10;
  210:12
dying (1)
  164:11

## E

early (1)
  139:12
earthquake (1)
  207:11
easier (1)
  160:5
East (1)
  6:14
eat (1)
  116:12
Edward (1)
  221:10

effect (6)
  114:7;176:10,16;
  177:17;187:12,20
either (2)
  96:22;126:25;141:17
Elana (5)
  46:24;47:2,2,5;67:4
election (1)
  109:5
Ellman (1)
  134:25
else (22)
  12:23;24:5;46:8;47:7;
  59:10;60:12;62:7;63:15,
  21;118:15;124:3;139:8;
  155:25;158:9;161:9,10;
  162:20;189:25;192:16;
  200:5;201:16;205:11
else's (1)
  49:12
e-mail (1)
  57:15
e-mails (1)
  196:4
enable (1)
  195:10
encouraging (1)
  29:18
end (10)
  23:20;112:19;115:15,
  19;140:10;143:7,8;
  153:19;173:4;205:5
ended (3)
  52:11;53:2,6
ending (1)
  143:8
ends (1)
  52:5
enforce (1)
  218:22
enforcing (6)
  210:24;212:22;213:5;
  218:18,25;219:4
Enriquez (6)
  64:25;65:3,7,14;69:6,
  15
entered (1)
  87:16;117:25;155:4
entitled (4)
  34:2;127:16,17;216:7
equal (1)
  155:8
equally (5)
  148:10;150:19;171:7;
  175:20,22
especially (2)
  86:3;119:12
Esq (2)
  3:3,15
establish (1)
  150:8
established (1)
  98:6

estate (7)
  148:4;150:17,18;
  153:18,25;176:3,10,16;
  177:2,10,16,21;178:5;
  213:14
even (6)
  88:19,21;123:10;
  140:14;207:23;214:14
eventually (1)
  61:9
everybody (2)
  120:12;143:14
everyone (3)
  143:10;162:18;211:2
everyone's (1)
  136:3
evidence (1)
  170:16
exact (1)
  94:19
exactly (20)
  10:4;23:23;25:23;
  38:23;52:3;54:23;66:2,
  24;75:24;76:8;78:3;
  87:24;114:20;121:12;
  128:23;154:5;162:4;
  184:21;211:6;212:11
EXAMINATION (1)
  6:8
examined (1)
  6:6
example (1)
  88:4
Excellent (1)
  32:20
except (5)
  25:8;63:3;99:13,14;
  100:11
exception (1)
  138:22
exchange (4)
  97:21;98:10;111:23;
  219:15
Excuse (9)
  32:24;35:6;36:9;
  52:18;81:25;103:25;
  112:15,16;115:17
Exhibit (59)
  8:17,20,22,25;9:4,8,
  12;11:2,3;25:10,11,13;
  26:10;27:24;28:20;
  37:10,11,15,23;42:19,
  20;68:5,6,9,10;86:7;
  88:9;92:15;94:24,25;
  95:4,5,7,8;98:20,21;
  99:7;100:20,21;105:20,
  21;108:6,11,12;149:9,
  14;151:16,18;162:13,14,
  17;168:17;173:10,12;
  184:14;185:7;209:13,14,
  16
exhibits (3)
  8:15,16;124:16

**existed (1)**
190:6
**exited (1)**
116:18
**exonerate (2)**
78:23;87:24
**exonerated (2)**
78:11;111:18
**exoneration (3)**
77:19;92:22;93:2
**expenses (1)**
81:5
**explain (2)**
156:24;182:11
**explicitly (1)**
96:3
**explore (1)**
207:13
**exposed (1)**
46:7
**expressing (1)**
80:14
**extent (7)**
74:20,25;75:12,19;
78:16;88:23;191:10
**extra (1)**
206:23

**F**

**fact (12)**
39:25;59:7;61:9;
65:13;66:3;114:6;151:4;
170:2,16;178:7;183:7,21
**facto (1)**
119:9
**facts (3)**
98:5;102:8;194:13
**factual (1)**
118:18
**failed (2)**
168:25;169:13
**fairness (1)**
84:16
**false (1)**
130:22
**familiar (1)**
31:12
**family (11)**
46:3,21;47:6,8;55:16;
60:4;69:16;139:13;
142:4;158:16;171:6
**Fang (60)**
3:4;37:11;41:24;
43:17,18;47:5,5;50:7;
54:13;55:22;57:3,22;
58:9;64:12,16,19;65:6,
21;66:8,12,13,19;72:17,
19,24;73:8,11;96:8,9;
100:13;101:13,23;102:7,
8,12,16,19,22;105:2,7;
106:11;107:4;108:2,8;
111:11,12,18;114:23;

117:21;121:17;122:6,8,
10;123:16;129:4;
131:17;136:15,17;
144:17;147:17
**Fang's (2)**
93:12;102:9
**far (11)**
30:13;53:4;59:6;64:5;
72:25;102:12;109:19;
174:18;204:19;210:19;
219:12
**faster (1)**
137:21
**father (1)**
208:5
**favor (1)**
161:6
**favors (1)**
160:22
**February (5)**
187:9;193:25;194:2;
221:25;222:11
**feels (1)**
189:15
**fees (5)**
85:4,5,15;130:14;
140:10
**Feinman (2)**
22:10,12
**felt (1)**
211:22
**FEMALE (2)**
134:11,15
**few (3)**
25:19;69:10;141:24
**fight (1)**
16:24
**fighting (1)**
142:10
**fights (1)**
218:14
**filed (1)**
131:17
**files (2)**
93:15,23
**filing (1)**
19:25
**fill (1)**
66:4
**final (2)**
151:16,18
**finance (1)**
171:11
**finances (1)**
170:4
**financial (1)**
206:18
**financing (1)**
205:12
**find (13)**
15:8;46:5,8;50:4;57:2;
63:14,19,22;76:22;
77:24;188:7,14;207:3

**finding (1)**
78:4
**fine (8)**
83:17;84:23;132:15;
139:8;178:16;194:24;
200:2;207:7
**finish (8)**
76:15,16;83:5;98:22;
106:7;127:16;147:12;
214:5
**finishes (6)**
8:6;52:20;104:2,14;
111:15;113:22
**fire (1)**
207:12
**firm (19)**
14:15,23;15:21;17:21;
18:17;21:18;23:22,22;
35:17;61:7,7,24,25;
109:6;119:21;120:16,
18;200:18;201:17
**first (16)**
6:4;41:23;68:16;
88:21;101:7;109:7,11,
14;152:8;157:3;181:20,
20;184:22;186:20;
209:24;211:7
**five (5)**
134:9;189:5,6;205:23,
23
**fix (1)**
39:23
**focus (2)**
217:21;218:5
**follow (5)**
35:2;146:12,24,24;
182:14
**followed (2)**
199:23,25
**following (2)**
134:4,18
**follows (2)**
6:6;143:25
**foreclose (4)**
158:14;187:3;212:13,
17
**foreclosed (3)**
212:18,19;218:10
**foreclosure (1)**
30:9
**foreseeing (1)**
177:3
**forever (2)**
142:7;171:20
**forgiven (1)**
178:25
**form (35)**
13:10;20:22;32:7;
38:10,21;45:25;57:23;
58:3;60:24;94:17;97:23;
100:12;102:6,16,21;
103:8;107:19;122:11;
123:23;152:20,21;155:9,

23;156:5,14;157:14;
167:22;176:21,22;
179:21;203:3,14;204:8;
210:6;213:22
**former (1)**
147:25
**forth (2)**
85:11;124:16
**found (5)**
67:8;153:11,14;
171:24;221:17
**foundation (4)**
39:7;40:18;91:2;97:25
**four (2)**
110:9;113:23
**frankly (2)**
140:15;208:16
**free (1)**
118:21
**fresh (1)**
33:5
**friend (2)**
158:13;217:3
**friends (2)**
207:3,5
**front (2)**
100:22;170:9
**frustrated (5)**
49:7,10,20,21;50:17
**fulfill (1)**
66:4
**full (1)**
51:25
**fully (2)**
96:16;141:12
**functioning (1)**
53:25
**funds (1)**
22:21
**funny (1)**
218:16
**further (1)**
134:18
**future (1)**
177:3

**G**

**gag (1)**
87:12
**gain (2)**
176:2,6
**gather (1)**
84:22
**gave (15)**
10:23;25:7;120:21,23;
121:21;123:16;139:22;
159:15,23;160:14,16,19;
162:3;196:6;219:15
**geared (1)**
84:21
**Gener (1)**
196:8

**general (21)**
29:6,24;45:12,12,15;
109:6;114:2;146:12,21;
149:19,21;168:7;
169:17;174:23;175:6,7,
13;200:12,12;219:15;
221:11
**Generally (1)**
95:15
**GENGER (363)**
3:21;6:12,16;7:1,12,
19,23;8:1;9:1,8,12,24;
10:1;11:1,18,19,21,25;
12:1,4,18;13:1,8;14:1,6;
15:1;16:1;17:1,7,9,9;
18:1,18,24;19:1,13,14,
16,18,18;20:1,20;21:1,4,
6,9;22:1,2;23:1;24:1;
25:1;26:1;27:1;28:1,22;
29:1;30:1,25;31:1,23;
32:1;33:1,14,24;34:1,4,
8,9;35:1,6,8,12;36:1;
37:1,2,14;38:1;39:1,3,4,
21;40:1,14,15;41:1,17,
25;42:1;43:1;44:1;45:1,
10,17;46:1,12,14;47:1,5;
48:1;49:1;50:1;51:1;
52:1;53:1;54:1;55:1;
56:1;57:18;58:4;59:1;
60:1;61:1,8;62:1,15,25;
63:1;64:1;65:1,15;66:1;
67:1,5;68:1;69:1,5,16;
70:1;71:1;72:1;73:1,18;
74:1;75:1,23;76:1;77:1;
78:1;79:1;80:1;81:1;
82:1;83:1;84:1;85:1,10;
86:1,10;87:1,19,22;88:1,
12;89:1,20,24;90:1;
91:1;92:1;93:1;94:1;
95:1;96:1;97:1;98:1;
99:1;100:1;101:1;102:1;
103:1;104:1,13,19,20,
24;105:1,4;106:1,2;
107:1;108:1,9;109:1,7,
10;110:1,6;111:1,10;
112:1,10;113:1,20,22;
114:1,7,8,24;115:1,13;
116:1,3;117:1;118:1;
119:1;120:1,18;121:1;
122:1,5,9;123:1;124:1,
10,15;125:1,5;126:1;
127:1;128:1,5,12;129:1,
3;130:1;131:1;132:1,23;
133:1,2,5,19;134:1;
135:1,6,10;136:1,9,13,
23;137:1,14;138:1,14;
139:1,13,20;140:1,23;
141:1,17,21;142:1;
143:1;144:1,14;145:1;
146:1;147:1;148:1,2,13;
149:1;150:1;151:1;
152:1;153:1;154:1;
155:1;156:1;157:1;

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

158:1,16;159:1;160:1;
161:1,13;162:1;163:1,
13;164:1,12;165:1;
166:1;167:1;168:1;
169:1;170:1;171:1,5;
172:1;173:1,11,12,15;
174:1;175:1,6;176:1;
177:1;178:1;179:1,18;
180:1;181:1;182:1;
183:1;184:1;185:1;
186:1;187:1;188:1,25;
189:1,11,21;190:1;
191:1;192:1;193:1;
194:1;195:1,15;196:1,7;
197:1;198:1;199:1;
200:1;201:1;202:1;
203:1;204:1;205:1;
206:1;207:1;208:1;
209:1,20;210:1;211:1;
212:1,4,8;213:1;214:1;
215:1;216:1,23,23,25;
217:1,3;218:1;219:1;
220:1;221:1,9;222:1,10;
223:7,17
**Genger's (6)**
  8:17;9:5;33:6;85:16;
  144:15;164:17
**gentlemen (2)**
  39:13;40:2
**germane (4)**
  140:20,22,25;141:4
**gets (1)**
  161:7
**given (5)**
  160:13,17;161:16;
  175:23;223:12
**giving (5)**
  69:25;98:11;158:8;
  194:18;217:24
**God (2)**
  121:21;142:7
**goes (1)**
  153:22
**good (5)**
  76:13;113:15;114:18;
  123:2;134:24
**GP (5)**
  168:7,25;169:13,17,23
**grammar (2)**
  156:15;157:15
**Great (1)**
  96:11
**GRIVER (422)**
  6:9;8:8,13,22;9:4,11;
  10:6;13:19;16:10,13,14;
  17:2,18;18:10;19:15,21;
  20:2,8,12,25;21:16,25;
  22:9,16;23:14;24:23;
  25:12;26:11;28:18,21;
  29:15;32:4,5,15,18,20,
  25;33:2,6,13,19,23,25;
  34:3;35:4;36:6,7,16,21;
  37:9,13,22;38:11,25;

39:10,17,20;40:21;41:6,
14,22;42:5,11,18,22;
43:10;44:12;45:7,20;
46:11,19;47:20;48:19;
49:2,9,14,18;50:12,15;
51:6,10,12,16,24;52:10,
18,20,25;53:11,22;54:5,
11,17;55:2,6,8,14;56:9,
23;57:14,19;58:6,17;
59:9,15,23;60:11;61:3,
13,22;62:18;63:4,5,20;
64:11,15,24;65:12,19;
66:6,13,16,17;67:2,19;
68:4,8,12,25;69:3,9,14;
70:14,20,24;71:6,17;
72:5,15,23;73:9,16;
74:12,18;75:9,17;76:11,
15,18;77:4,8,16;78:9,14,
19;79:14,25;80:8,17;
81:14,25;82:4,10,12,21,
23;83:7,11,16,20;84:5,8;
86:5,9,13,16,21,22,25;
87:6,18;89:4,15;90:6,14,
21;91:2,4,14,15,17,21;
92:4,13,17;94:4,6,18;
96:7,14,23;97:4,9,19;
98:9,18;99:5;101:2,8,12,
21;102:3,20;103:9,12,
20;104:3,5,8,18;105:12,
18,25;106:19,23;107:24;
108:5,14,22;109:2,12,
13;110:2,5,19,21,23;
111:2,5,9,16;113:7,13,
18;114:13;115:16,17,18;
116:2,5,8,13;117:2;
118:12;119:7,25;120:8,
14,17;121:6,20;122:4,
14,19;123:9,20;124:7,
23;125:3,4,12,24;
126:19;127:5,9,14,17,
20,21;128:21;129:7,16;
130:15,19,25;131:6,15,
25;132:21,24;133:21;
135:2;136:7,10,11,12,
18,22,25;137:9,20,25;
138:12;139:3;140:16,
17;141:8,14;142:13;
143:6,11,18;144:12,13,
24;145:9;146:4,11,19;
147:2,11,24;148:18,22;
149:6,12,20;150:23;
151:15,20;153:4;
155:13;156:2,7,17;
157:2,5,10,19;159:10;
160:6;161:24;162:12,16,
24;163:2,7;165:7,13,18;
167:9;168:2,19;169:6;
170:20;171:3,14,18;
172:19;173:5,9,14;
175:5,10;176:19;177:6,
23;180:6;182:4,22;
183:5;187:25;188:5,24;
189:3,20;191:4,5,14;

192:23;193:4,11,15,17;
194:7,15,24;195:6,13,
17;196:3,10;198:17;
200:16;201:4,11,14;
202:24;203:4,18;204:5,
10,13,24;205:2;206:21;
208:10,18;209:12,18;
210:13;213:23;214:7;
216:24;217:5,13;219:11,
25;220:15;221:21,24;
222:4
**Griver's (1)**
  115:20
**ground (1)**
  138:17
**grounds (2)**
  91:25;138:18
**Group (2)**
  22:15;35:10
**guess (16)**
  7:11;44:18;55:17;
  80:24;99:17;125:19;
  126:6,12;163:25;173:8;
  183:15;185:24;188:12;
  189:2;204:15;221:17
**guessing (1)**
  126:16
**guy (1)**
  17:23
**guys (1)**
  142:11

## H

**Half (8)**
  26:23;27:2;86:20;
  116:6,11;169:25,25;
  192:2
**hand (4)**
  8:14;22:15;32:25;
  112:18;126:19;127:3;
  138:4;139:17
**handing (1)**
  162:17
**hanging (1)**
  105:11
**happen (4)**
  137:22;171:12;
  207:11;211:13
**happened (2)**
  77:23;165:22
**happening (2)**
  166:4;207:18
**happy (4)**
  52:6,16;54:24;113:21
**harassed (5)**
  49:23;53:19,23;54:7;
  55:10
**harassing (1)**
  33:17
**Harassment (3)**
  53:13,14,15
**hard (2)**

34:25;219:9
**harm (2)**
  115:6,12
**harmful (2)**
  76:9,20
**harmless (2)**
  74:24;78:11
**Harris (11)**
  87:15;116:17;117:9,
  15,17,20,24;118:3;
  119:5;120:3;121:12
**Harris' (2)**
  118:11,16
**head (1)**
  18:12
**hear (3)**
  111:8;191:6;218:19
**heard (4)**
  107:16,17,25;216:2
**held (1)**
  78:11
**Hello (2)**
  134:7,22
**help (2)**
  34:14;163:23
**helpful (1)**
  142:14
**hereby (1)**
  223:7
**herein (1)**
  6:4
**Here's (1)**
  40:11
**Hey (2)**
  196:12;199:12
**hid (1)**
  206:4
**highest (2)**
  200:15,19
**himself (1)**
  214:13
**hire (1)**
  14:22
**hired (3)**
  15:4;85:10;128:2
**history (1)**
  63:11
**Hoffman (1)**
  117:20
**Hold (1)**
  134:15
**holding (1)**
  127:2
**holds (1)**
  74:24
**home (1)**
  93:10
**Honor (17)**
  134:25;135:15;
  136:12,16;137:25;
  138:12,13;139:3,9;
  140:5,16,21;141:8,12,
  13,14;142:13

**Honor's (1)**
  141:15
**hope (2)**
  111:4;131:2
**hoping (1)**
  171:9
**hospital (4)**
  50:18;52:6;53:3,6
**hospitalized (2)**
  49:23;53:17
**hour (6)**
  86:20;113:13;116:6,
  12;191:25;192:2
**hours (3)**
  27:3,5;139:18
**house (1)**
  57:10
**household (1)**
  170:4
**housekeeping (1)**
  8:14
**hundreds (1)**
  217:23
**husband (12)**
  148:2;154:18;155:5;
  168:10;169:25;170:3;
  177:4;180:11;182:12;
  205:12;207:17;208:20
**Hypothetical (2)**
  146:7,10

## I

**idea (8)**
  44:17;48:10,13;75:21;
  111:22;114:15;123:2;
  132:15
**identified (2)**
  61:23;220:16
**Identifies (1)**
  74:17
**ignore (1)**
  33:20
**imagine (2)**
  110:15;168:5
**immediately (3)**
  88:22;121:4;208:7
**implemented (2)**
  176:4;177:16
**important (1)**
  123:4
**impossible (1)**
  46:5
**improper (1)**
  152:20
**inactions (4)**
  37:3;104:25;105:7;
  106:11
**inadmissible (1)**
  138:9
**Inc (2)**
  3:12;212:3
**included (6)**

**219**:5;220:21,25;
  221:8,11,12
**includes (1)**
  81:3
**including (2)**
  46:21;81:4
**incomprehensible (2)**
  32:8;219:7
**inconsistent (3)**
  180:22;181:5,11
**incorrect (1)**
  118:20
**increasing (2)**
  85:15,19
**incumbent (1)**
  110:3
**incurred (2)**
  23:6;81:5
**incurring (1)**
  85:3
**indeed (1)**
  12:21
**indemnification (6)**
  79:18;80:22;81:3,10;
  94:14;98:12
**indemnifications (2)**
  123:17;125:7
**indemnified (3)**
  78:11,21;79:6
**indemnify (4)**
  78:24,25;79:3,4
**independent (2)**
  28:24;61:7,25
**indicate (1)**
  112:19
**Indicating (1)**
  173:23
**indication (1)**
  73:20
**individual (12)**
  15:22;16:5,16,16,19;
  18:2,24;20:16;22:18;
  24:13,15,20
**individually (1)**
  21:5
**indulgence (1)**
  143:14
**influence (1)**
  187:2
**inform (2)**
  135:25;190:7
**information (15)**
  29:13;99:15;100:11;
  102:6,15;103:22;
  106:15;123:3,4,13;
  124:9,14;129:4;133:14;
  166:10
**informed (3)**
  123:14;161:10,12
**inherent (1)**
  117:23
**initiated (2)**
  17:6;35:7

**initiative (1)**
  166:8
**injury (1)**
  81:5
**insist (1)**
  175:8
**instead (4)**
  18:12;132:16;143:8;
  205:8
**Instruct (11)**
  16:7;33:16;36:16;
  90:17,21;92:2;115:14;
  137:3,17;162:19;208:25
**instructed (6)**
  92:20;104:24;106:11;
  126:22;138:19;162:18
**instructing (1)**
  104:11;124:23;191:7
**instructions (2)**
  142:14;182:14
**instructs (1)**
  29:16
**Instrument (3)**
  38:2;42:20,25
**intend (2)**
  85:4;194:3
**intended (4)**
  153:23;155:6,17;
  158:17
**intent (6)**
  148:9;164:8;166:25;
  167:11,20;211:10
**intention (3)**
  154:3;171:19;212:7
**intentions (2)**
  163:23;188:18
**interest (27)**
  12:22;20:19;21:5;
  47:17,18;62:13;78:23;
  87:23;129:2;144:15;
  145:2;148:23;149:3;
  175:14,15;181:21;199:9,
  14,15,15,16,17;200:20;
  205:16,17,17,18
**interested (2)**
  62:24;140:3
**interests (12)**
  12:11,12,15,18,19,22;
  13:7,8;21:12,13;22:7;
  175:14
**interpleader (1)**
  22:14
**interrogatories (2)**
  9:6,10
**interrogatory (3)**
  11:11;27:12;185:9
**interrupt (1)**
  82:11
**interrupting (1)**
  82:12
**interruption (1)**
  20:6
**into (2)**

155:4;195:14
**investigate (4)**
  102:10,11;104:25;
  105:6
**investigated (1)**
  106:10
**investigation (9)**
  62:4;76:2,22;77:3,12;
  93:4,11;103:15;106:12
**Investment (3)**
  3:12;212:3;218:24
**invisible (1)**
  118:17
**invite (2)**
  120:25;121:25
**invited (2)**
  120:20,22
**invoices (1)**
  21:17
**involved (13)**
  31:18;34:5,10;35:14,
  24;56:7;95:12;139:12;
  162:8;203:7;204:19;
  205:14;208:17
**involvement (1)**
  122:7
**involving (1)**
  139:20
**irrelevant (3)**
  137:6,11;138:9
**issue (3)**
  19:25;153:11,15
**issues (4)**
  84:22;132:7;135:9;
  139:20

**J**

**Jaffe (3)**
  134:3,21,22
**Jaffe's (1)**
  134:9
**January (17)**
  11:25;13:22;37:6;
  38:16,19,19;44:11;
  62:16;68:20,21;88:16;
  94:10;105:5;106:8;
  125:16,17;209:15
**job (11)**
  34:2;46:8;48:25;52:5;
  62:11;123:21;126:25;
  127:4,7;203:10;209:2
**JOHN (3)**
  3:15;121:6;139:10
**join (15)**
  16:9;19:19;32:10;
  49:16;50:10;81:19;
  85:20,24;121:23;
  123:24;144:11;152:22;
  167:6;204:12;209:8
**Jonathan (4)**
  125:25;126:10;
  127:22;136:14

**judge (7)**
  82:10;97:17;131:12;
  132:11;134:3,21,22
**judge's (3)**
  132:10,10;216:8
**judgment (2)**
  131:17;140:20;141:5
**June (1)**
  7:9
**Justice (5)**
  134:9,14;151:10,17;
  173:25

**K**

**keep (14)**
  17:5;34:19;35:15;
  36:2,3,8,12,22,24;83:13;
  104:12;145:5;171:20,23
**keeping (1)**
  162:11
**kidding (1)**
  191:24
**kids (7)**
  154:23;157:23;158:6;
  159:5;160:5;168:5;
  175:17
**Kilmerman (1)**
  221:10
**kind (8)**
  29:12;30:20;52:4;
  61:7;67:6;79:24;80:15;
  118:25
**knew (11)**
  45:15;121:16,18;
  124:3,5;166:3,14;193:8,
  8;206:17;207:15
**knowing (1)**
  87:24
**knowledge (7)**
  97:7;100:11;102:6,15;
  103:22;172:24;183:10
**known (3)**
  55:17;207:24,25
**knows (2)**
  121:12;166:15
**Kortmansky (8)**
  17:22;126:2,3,10;
  127:22;128:2,4,15
**Krause (1)**
  135:2

**L**

**Lack (3)**
  39:7;40:18;97:25
**Lance (5)**
  87:15;116:17;117:9,
  15,20
**language (1)**
  176:5
**last (13)**
  9:16,23;10:7,9;11:4,

10;20:9;30:20;70:6;
  99:7;143:19;175:25;
  181:4
**later (5)**
  130:18;138:9;139:6;
  165:25;171:23
**laughing (1)**
  211:15
**law (14)**
  14:15,23;15:21;21:18;
  35:17;74:20,25;75:12,
  20;78:17;88:24;96:21;
  200:17;201:17
**Lawrence (1)**
  221:10
**lawsuit (5)**
  16:24;17:3,6;35:9;
  36:6
**lawsuits (16)**
  31:8,11,12,18,22;
  33:24;34:4,7,9,19;35:5,
  7,13;36:22,25;46:7
**lawyer (59)**
  15:9,11,13,17,19;17:7,
  22;25:2;31:15;43:16;
  59:18;70:12,17;73:7,11,
  25;74:4,5;77:11;89:6,10,
  10,12;90:2,7,15;91:9,13,
  22;93:21;95:19;97:16;
  122:17,22;124:2;128:10,
  11,13;129:14,18,22,24;
  133:4;144:5,22;146:25;
  165:23;166:16;190:7;
  192:13;193:5;210:2,4,4,
  8;214:2,3;217:11;
  221:17
**lawyers (8)**
  31:9;53:24;77:9,12;
  136:7,19;165:21,24
**lawyer's (2)**
  73:23,24
**layperson (1)**
  114:2
**Leah (104)**
  3:4;37:11;41:24;43:4;
  45:16,22;46:22;47:5;
  49:7,10,19,21;50:7,16,
  19,20,24;51:18;52:11;
  53:2,6,18;54:6,19,23;
  55:9,19;57:3,22;58:9;
  64:19;65:6;66:8,12,13,
  19;67:22;69:25;72:11,
  14,16,17,19,24;73:8,11,
  15;74:17,19,24;75:11,
  19,21;76:3,9,20;77:18,
  25;78:2,4,6,10;88:2,6,
  23;93:4,11;96:8,9;
  98:11;100:13;101:13,14,
  15,23;102:7,8,9,12,16,
  19,22;105:2,7;106:11,
  16;107:4;108:2,8;
  111:11,12,17;114:23;
  115:4,8;117:21;122:6;

20-01187-jlg    Doc 1-18    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 19
ORLY GENGER VS.                          Pg 87 of 150                          DALIA GENGER
DALIA GENGER, et al                                                        December 13, 2012

123:16;129:4;131:17;
136:15,17;144:17;
147:16
**Leah's (5)**
38:7;42:23;53:25;
67:10,11
**least (2)**
156:15;219:14
**leave (2)**
82:19;138:7
**led (1)**
61:9
**left (5)**
61:12;96:8;117:3;
211:23;214:16
**legal (12)**
50:11;79:13;80:15;
85:3,5;114:2;130:14;
139:21;171:25;188:14;
194:12;196:25
**legally (4)**
159:8,13;172:17;
195:23
**LEINBACH (30)**
96:19;112:8,21;113:7;
115:23;119:8,14,19;
121:9,19;132:5,19;
133:3,8,12,16;134:7,8,
12,17,24,25;135:5,17,22,
25;162:16;189:18;
195:3;216:7
**lent (1)**
24:2
**letter (6)**
57:20;94:14;162:14;
163:12;165:9,15
**letting (3)**
197:9,19;198:4
**liability (1)**
129:5
**life (2)**
47:19;160:4
**lifetime (1)**
12:4
**limit (2)**
98:23;137:17
**limited (5)**
108:6,7;210:25;
216:11;218:25
**line (12)**
35:19;75:5;86:2;90:5;
97:11;103:11;130:6;
137:6,9;143:25;144:2;
169:10
**list (2)**
36:2,3
**listen (3)**
39:17;201:15;216:25
**litigation (4)**
117:18;137:7,11;
142:5
**LLP (1)**
3:11

**loan (2)**
23:21;24:4
**loans (3)**
23:2,5,17
**location (1)**
44:6
**logic (1)**
174:22
**long (8)**
26:16;103:18;110:7;
114:5;126:21;191:22;
192:8;219:14
**look (39)**
9:23;10:13,18,24,25;
11:4;28:17,23;35:20;
37:16;63:25;64:6;68:13,
16;69:21;75:5;81:2;
88:9;93:14,14;94:7;
96:7;98:19;99:7;100:3,
15;105:19;116:3;
131:16;174:3;177:12;
178:13;181:3;184:24;
185:9;192:3;201:2,7;
218:21
**looked (4)**
31:9;64:19;93:23;
169:24
**looking (8)**
9:12;28:19,23;67:20;
106:5;108:15;163:8;
194:9
**looks (1)**
108:21
**lot (2)**
61:11;182:15
**LP (18)**
30:10;148:13,21,24,
25;149:21;183:8;184:8;
209:14;212:18,20;219:4,
10;220:11,18,20;221:13,
14
**ludicrous (1)**
103:6
**lunch (5)**
113:14,21;114:11;
116:6;119:23

---

## M

**mail (2)**
185:2,18
**major (1)**
13:16
**makes (3)**
19:12;40:3;130:8
**making (2)**
36:19;118:23
**manage (1)**
29:5
**Manhattan (3)**
23:24;24:2,5
**many (30)**
17:4;31:13;33:24;

34:4,6,9,15,18,22;35:2,5,
5,7,11,13;46:7;80:13;
112:10;142:6,6;152:25;
166:12;199:19;203:20;
204:7;211:21;216:18;
218:13,13;219:13
**March (7)**
11:8;173:19;176:7,13;
177:17,25;193:24
**Marisa (1)**
135:14
**marital (12)**
151:9;152:9;156:4,11;
157:11;169:24;170:11;
173:24;193:7;197:5;
205:22;206:24
**Mark (4)**
55:6;108:5,22;168:16
**marked (46)**
8:21;9:3,10;11:2;
28:20;37:9,12,15;42:18,
21,23,25;43:5;68:4,7,8,
11;80:21;92:14,16,19,
21,25;94:7,20,24;95:17;
97:9,22;98:20;108:13;
110:9;111:24;149:6,11;
151:15,19;162:13,15;
168:18;173:10,13;
185:11;188:16;209:13,
17
**married (1)**
207:17
**Masyr (2)**
3:22;136:20
**matter (8)**
8:24;75:8;139:17;
140:12;146:12;159:13;
181:18,20
**matters (7)**
8:14;85:10;99:15;
139:14,15,19;141:23
**maximize (1)**
201:18
**maximum (9)**
74:20,25;75:11,19;
78:16;88:23;98:11;
123:16,23
**may (23)**
21:12,23;28:10;36:5;
40:7,7;58:5;78:12,12;
82:24;85:17;102:9;
104:8;113:5,23;119:16;
125:8;126:24;130:10;
143:20;166:16;185:21;
186:9
**Maybe (5)**
14:20;19:22;61:6,24;
112:5
**mean (45)**
13:18;17:8,11;26:6;
29:6;31:8,10;35:3,25;
47:2;58:23;77:23;81:11;
98:23;100:8;112:5;

123:7;130:3;138:22;
142:24;144:8;150:12;
153:3;154:18;159:13;
162:11;164:5;168:6;
169:23;171:24;174:21,
23;177:22;181:9,19;
183:16,16;184:5;
188:20;191:10;195:24;
196:2;213:9;219:13,17
**meaning (1)**
167:13
**means (8)**
18:7;78:25;79:2,3,5;
99:8;159:5;184:6
**meant (1)**
79:18
**mechanism (1)**
155:7
**meet (2)**
26:13,16
**meeting (3)**
209:14,17;218:21
**MEISTER (272)**
8:6;9:25;13:12;14:2,6,
22;15:4,5,8,21;16:4,6,
12,15,18,22;17:25;
18:16,23;19:21,23;20:3;
21:18,23;22:2,11,14;
23:7;24:11,12,17;25:5,9,
16;26:5,9,13,17;27:7,15,
19;28:7,15,25;29:16;
30:7,15;31:14,17;32:2,7,
12,17,19,24;33:4,10,16,
25;36:5,9,14;37:18;
39:14;45:25;49:11,17;
50:9,11;51:19,22;52:17,
23;57:4;60:15,19,24;
63:3;66:12;68:22;69:2;
70:3;71:16;75:6;76:13;
78:16;81:12,16;82:20;
83:2;84:2,11;85:21;
86:11,14,18,24;87:7,10;
88:25;89:8,13;90:17,25;
91:11,25;94:17;99:3,24;
100:23;101:6,8,19,25;
102:18,23;103:2,7,19,
25;104:5,10;105:24;
106:17;107:19,22;
109:11,23;110:17,21,24;
111:3,7,14;112:7,9,13,
16;113:11;114:11;
115:13,17,19;119:16,20;
120:15;123:5,18,24;
124:18,21;125:2,8,23;
126:13,16;127:4,7,12,
15,19;128:2,16;135:14,
14;138:13,14,16,23;
139:5;142:16,25;145:3;
146:7,14,17;147:10,18;
148:15,20;149:16;
150:21;152:19;155:9,22,
24;156:14,22;157:14;
158:18;159:25;161:20;

162:17,23,25;165:3,11,
16;166:20,24;169:4;
170:15,22;172:15;
173:3;174:25;175:8;
176:22;177:19;180:2;
182:2;185:20;188:11,13,
22;189:6;190:22;191:4,
7;192:9,21;193:11,16,
23;194:9,20,25;195:5,9,
19;196:11,17;197:4,8,
18;198:2,14;200:8,10,
17,21;201:6,9,16,22;
202:5,12,19,20;203:3,6,
12,21;204:3,12,22;
208:6,21,25;209:8;
210:5;213:22;214:5;
215:17;216:5,16,21;
219:6,24;220:8,12;222:3
**Meister's (3)**
20:14;35:17;191:8
**member (1)**
69:16
**memo (4)**
80:20;91:5;94:10;
108:12
**memoranda (1)**
196:3
**memory (2)**
109:18;195:16
**men's (1)**
87:11
**mental (3)**
7:17;8:3,9
**mention (6)**
130:8;131:21;220:24;
221:3,15,18
**mentioned (6)**
49:25;50:17,18;
139:24;220:19;221:4
**merely (1)**
194:12
**messages (1)**
56:25
**met (4)**
15:5;26:5,6,14
**middle (2)**
104:11;192:23
**midnight (1)**
44:18
**might (24)**
27:10;28:2;54:18;
60:13;61:7,8;62:24;
109:21;110:12;124:3;
127:24;131:16;151:2,2;
161:4;171:24;186:13,14,
20;187:7,13;189:12;
197:7;207:4
**million (7)**
150:13;164:5,11;
175:18;205:3,5,20
**millions (2)**
217:22,23
**Milonis (3)**

20-01187-jlg    Doc 1-18    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 19
ORLY GENGER VS.                              Pg 88 of 150                              DALIA GENGER
DALIA GENGER, et al                                                              December 13, 2012

151:10,17;173:25

**mind (3)**
20:14;49:12;62:13

**minds (1)**
158:20

**minimum (2)**
123:3;140:23

**minute (4)**
14:20;20:4;37:16;
137:8

**minutes (8)**
81:22;84:19;113:12;
116:13;134:9;143:12;
189:5,6

**Mischaracterizes (2)**
179:22;182:20

**misrepresentation (2)**
85:6,15

**Missry (1)**
3:22

**mistake (3)**
189:12,14,15

**moment (4)**
19:24;36:14;119:18;
193:11

**Monday (1)**
25:22

**money (17)**
23:25;118:23;142:11;
163:25;169:19;172:10;
196:25;197:15,16;
205:15,21;206:4,20,23,
24;207:7,9

**month (1)**
34:20

**moot (1)**
96:17

**more (5)**
59:16;86:15;116:11;
150:9;207:9

**Moreover (1)**
117:19

**morning (1)**
44:15

**MORRIS (1)**
3:11

**most (3)**
78:5;197:15,16

**mother (6)**
47:19;55:21;180:24;
181:7,7,12

**motion (4)**
96:12;131:16;140:20;
141:5

**motions (2)**
118:23;138:10

**motivation (1)**
163:24

**mouth (3)**
104:12;121:21;208:9

**Move (8)**
51:22;81:16;85:17;
110:17,23;113:9;137:21,

24

**moved (2)**
96:9;111:5

**much (6)**
23:25;98:24;174:4,14;
207:7,16

**multiple (1)**
142:2

**must (2)**
29:17;40:8

**myself (1)**
133:20

**N**

**name (11)**
6:10;15:10;17:20,21,
23;23:22;65:4;74:3;
117:7,11;221:16

**namely (1)**
177:4

**names (1)**
221:3

**natural (1)**
153:3

**near (1)**
90:11

**necessarily (1)**
140:8

**necessary (3)**
137:15;221:15,17

**need (8)**
37:16;45:18;66:4;
81:21;84:17;87:10;
116:11;188:25

**needed (3)**
93:21;161:19;211:5

**needs (1)**
47:18

**negative (2)**
156:16;215:18

**neither (2)**
154:14,19

**nervous (2)**
36:20;53:9

**New (12)**
3:6,6,14,14;6:5;113:4;
133:12,16;177:9;178:8,
23;223:24

**next (5)**
40:11;51:22;81:17;
98:23;181:4

**night (1)**
44:15

**nodding (1)**
18:12

**nominated (2)**
42:10,13

**nomination (1)**
46:9

**nonaction (3)**
30:4,8,11

**nonactions (2)**

30:5,6

**None (2)**
79:20;84:19

**nonspeaking (1)**
137:18

**nor (2)**
118:15;194:11

**normal (1)**
161:6

**Notary (4)**
6:5;43:17;44:2;223:24

**Note (145)**
13:9;17:16;20:21;
30:10;51:21;52:8;58:4;
71:24;87:6,10;90:4;
96:9;97:10;99:23;
106:20;108:10;117:2,
13;118:13;120:24;
121:24;123:22;135:18;
142:16;149:8,10,18;
150:3,6,12,14,15,24;
151:5,13,22;152:4,6;
153:7,9,17,23;154:12,
15,20,21,21;155:5,6,15,
18;156:12,25;157:13,21,
24,25;158:2,3,4,7,9,10,
10,12,15,17;159:5,8,9,9,
21,24;160:5,10,10,13,15,
17,17,23;161:16;162:3,
7;163:10,23;164:2;
167:2,14,17,21;168:6;
169:5;170:13,18,24,24;
171:2,4,11,12,20;172:3,
4,7,7,11;173:2,6;174:21;
177:5,22,25;178:10,17,
20,21;179:12,17;180:13,
14,19;181:9;182:23;
183:6,13,15,18,20;
185:11;187:3,23;195:23,
24;210:24;212:14,17,19,
22;213:5,8;218:18,22,
25;219:4

**noted (5)**
50:12;92:6;103:7,12;
108:23

**notes (3)**
168:24;169:14;172:24

**notice (24)**
84:18;96:6;113:12;
120:21,23;121:7;
139:16;168:20,24;
184:17,19,25;185:3,11,
11,13,20;186:2,8,9,12,
17;190:6;198:6

**noticed (4)**
82:7;85:2,12;86:4

**notify (3)**
165:20;198:7,8

**notifying (1)**
30:9

**notion (1)**
150:7

**notorious (2)**

30:5,6

**None (2)**
79:20;84:19

119:15,17

**November (3)**
108:2,9;163:10

**number (7)**
100:25;130:7,8;
136:25;185:9;210:22,23

**numbered (1)**
100:24

**O**

**oath (8)**
9:20;32:4;87:20;
99:10;102:5,14;176:8;
223:9

**object (33)**
36:17;38:10,21;49:16;
51:2;57:23;58:3;60:24;
68:22;91:25;97:23;
103:10;104:8;113:3,7;
122:11;130:5;141:20;
152:21;155:23;156:5,
14;167:22;175:9;
176:21,22;179:21,23;
203:3,14;204:8;210:6;
219:7

**objected (3)**
121:4;122:2;160:9

**objecting (4)**
32:7;40:2,3;104:11

**objection (210)**
13:9,13;16:6,9;17:16;
20:21;21:15;24:22;32:2,
11;33:11,16;39:6;40:17;
41:5,11,19;42:2,14;43:7;
44:9;45:3,13,24,25;
46:18;47:13;48:16,22;
49:5,11,13;50:9,10,12;
51:21;52:8,23;57:21;
54:4,9,14,21;55:11;56:5,
12,19;57:4,6,13,16,24;
58:10;59:4,12,20;60:6,
23;61:2;62:17;63:2,16;
64:7,14,21;65:11,16,24;
66:11,22;67:16,25;69:8,
11;70:10,18;71:15,24;
72:12,22;73:5,12;74:11,
15;75:14;76:5,24;77:7,
13;78:8,13,18;79:7,10,
21;80:4,11,14;81:12,13;
83:25;84:2;88:25;89:8;
90:4,8,17;91:11;94:17;
95:22;97:10,13,24;98:2,
13,14;99:3;103:5,7;
105:8;106:20;107:19;
110:17,25;118:2,8,14;
119:8;121:24;122:12;
123:5,6,8,10,18,22;
124:18;127:8,16,19;
128:16;131:14;137:23,
24;139:24;144:10,18;
145:3,5;146:3,7,8,14,22;
147:18,21;148:15;

150:21;152:19;155:9,
22;156:6,22;157:14;
158:18,21,23;159:25;
161:20;162:25;163:3;
165:3,11,16;167:4,23;
170:15,22;172:15;
176:17,18;177:19;
179:15,19;182:2,19,21,
24;183:4;191:6;198:14;
200:10;203:12,17,21,23;
204:9,12;206:14;208:6;
209:4,8;210:5,10;
213:21,22;215:17,20;
217:8,9

**objections (6)**
40:4;91:17;118:5;
137:18;138:17;216:8

**objective (1)**
205:10

**obligation (4)**
6:20;178:24;179:14;
180:19

**obtain (1)**
133:13

**obvious (1)**
154:14

**Obviously (22)**
12:13;13:15,16;38:15;
42:10;43:14;46:4;62:2;
112:22;124:3,5;154:4,
10;166:3;170:25;
172:17;181:8,19;190:11,
21;202:13;218:3

**occur (4)**
208:2,3,5,21

**occurred (2)**
132:8;208:23

**October (1)**
168:8

**Off (8)**
20:2;131:25;132:3;
135:7;189:13;192:21;
204:22;221:21

**officially (1)**
88:14

**Old (2)**
3:5;7:10

**once (5)**
85:4;120:7;134:8;
154:17;190:5

**one (36)**
10:15;17:21;22:15;
25:8;36:20;47:3;59:16;
70:2;71:20;72:4;83:4,
19,22;113:5,5,6,8;124:5;
130:25;134:15;139:11,
22;141:9,12;158:11,16;
170:5;171:25;172:2;
177:5;178:9;195:4,4;
203:19;204:6;210:2

**one-half (2)**
153:6,9

**only (10)**

20-01187-jlg    Doc 1-18    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 19
Pg 89 of 150
ORLY GENGER VS.
DALIA GENGER, et al
DALIA GENGER
December 13, 2012

7:5;30:11;35:9;47:22;
61:12;83:18;113:5;
140:5;180:11;200:7
open (3)
83:21;119:14,16
opening (1)
48:24;49:3
operation (2)
49:12;158:19
operative (1)
86:6
opinion (1)
124:2
opportunity (1)
189:17
opposing (1)
84:16
option (5)
61:24;195:20;197:22,
25;201:21
options (7)
61:9,21;191:9,16;
195:7,18;214:2
Orchard (1)
3:5
order (9)
6:22;24:6;30:20;46:9;
62:6;67:14;87:12;91:23;
150:10
original (1)
175:21
originally (1)
171:9
Orly (160)
7:12,19,22,23;11:19,
21,25;12:4,18;13:8;
14:6;16:24;17:7;18:17;
19:16,18;20:19;21:4,6,9;
23:18;29:6;30:9,21,25,
25;34:8,9;35:8,12,24;
36:23;39:3,4;40:14,15,
23;41:4,7,17,25;45:10,
17;46:9,14;47:10,11,12,
15,23;49:24;50:5,7;
54:18,24;55:24,25;
56:11;57:2,21;58:4,9;
60:4;61:8,10;62:15,25;
65:15,23;66:5,10,21;
67:22;69:5;71:9;75:23;
76:10,20;77:5;85:16;
87:22;88:3,12;89:17,20,
24;95:13;104:20,24;
105:4;107:5,10;108:9;
111:23;114:8;115:6,12;
120:18;122:9,18;124:2,
10,14;128:4,12;129:3,3;
135:5;144:14,15;148:7,
9,12;149:3;154:15;
155:5,8;159:21,21;
160:9;161:15;162:6,10;
163:24;164:12,13,17,25;
165:20;171:6;177:8;
178:7;180:15,24;181:8,

14,16,25;183:12;186:16;
190:7;197:9,19;198:6;
199:8;205:8,11;207:19,
20,21,24;208:4,22,22;
209:20;212:4,8,20;
217:20,22
Orly's (30)
53:24;54:12;56:3,7;
57:10;62:13;77:9,11;
85:6,9;120:19;136:19;
174:22;181:21;182:16,
18;199:15,16;204:19;
205:4,5,16,19;211:12,
13;212:11;213:6;
214:13;218:15;219:10
otherwise (3)
19:14;21:7;122:17
out (15)
23:2,5;39:22;57:2;
75:6;76:23;78:4;86:24;
104:6;112:18;127:8;
162:17;180:17;182:16,
18
outrageous (1)
163:20
over (14)
25:8;26:7;28:2;30:2,5;
36:18;68:25;85:4;
127:19;141:25;205:19;
216:14,14,14
Overall (1)
29:5
owe (3)
163:25;164:11;172:10
own (4)
12:19;166:8;171:10;
184:7
owners (1)
22:7
ownership (3)
150:11,11,16
owns (3)
30:21,25;31:2

P

page (21)
9:16,23;11:4,4;99:7;
100:5,7,22,23,25;109:3;
110:6;143:25;144:2;
149:14,15,16;151:22;
169:10;173:16;185:8
pages (6)
109:8,11,14;110:9;
193:19,20
paid (18)
21:21;22:2,8;24:5,8;
46:7;62:2;154:21,22;
159:9,11,14;169:24,25;
170:25;172:18;205:11,
20
paper (6)
18:21;19:4,6,8;26:8;

42:16
papers (1)
97:17
paragraph (20)
100:3,10,17;101:4,9;
102:4,19;105:19;
106:17;116:4,9;131:4,9;
175:25;177:12,14;
180:8;219:5;220:17;
221:5
paragraphs (5)
140:22;152:3;174:5,7,
8
pardon (1)
193:16
parents (3)
153:25;154:11;159:6
Parnes (12)
152:15;159:15,24;
160:12;161:13,15,25;
163:9;171:20;172:12,
25;173:6
Parnes' (1)
164:13
part (15)
55:16;81:5,6;93:24;
96:14;151:6,25;153:18;
168:20,24;171:10;206:5,
24;220:22;221:13
partially (1)
183:15
participant (1)
202:10
participate (7)
188:19;199:22;201:7;
202:14;203:8;206:9;
207:4
participated (2)
200:2;207:6
participating (1)
202:15
particular (3)
151:25;157:18;166:14
particularly (1)
204:18
parties (13)
134:12;140:8;153:23;
155:17;164:8;167:2,12,
13,15;220:19,20;221:24;
222:9
partner (7)
17:22;149:19,21;
168:7;169:17;210:25;
219:2
partners (3)
209:14;220:10;221:14
partnership (3)
108:7,7;220:18
party (9)
113:6;133:2,3,17;
139:22;140:7;178:24;
179:14;219:17
passed (1)

141:24
past (4)
141:19,22;171:22;
189:12
Patricia (6)
64:25;65:3,7,14;69:6,
15
PAUL (2)
3:3;136:15
paul@zilberfeinlawcom (1)
3:8
pay (28)
22:21,23;23:2,5,17;
39:16;40:6;79:4;122:2;
154:15,20;157:23;
158:7;159:5;160:11;
164:11;168:5;170:5,6;
171:2,11;172:6,7;177:5;
181:9;205:3,4,23
paying (10)
21:17,20;22:17,19;
139:21;142:11;154:11;
170:3;175:17;205:8
payments (3)
168:25;169:13,20
peanuts (1)
217:24
Pedowitz (2)
21:18;22:13
pending (5)
37:18;82:17;96:13;
140:6;175:2
penny (2)
21:21,22
people (20)
115:3,10,11;182:13;
197:14,20;198:21;
199:19,22;200:7,13;
201:7,13;202:15,17;
203:7,9,20;204:7;219:22
people's (1)
158:20
percent (1)
85:25
perfect (1)
22:6
Period (5)
139:25;146:16;
153:19;180:24;193:25
permissible (5)
74:20,25;75:12,19;
88:23
permission (1)
215:4
permit (3)
119:5;214:24,24
permitted (2)
78:17;214:22
person (7)
46:6;52:4,6;61:12;
83:19;161:12;180:11
personal (2)
175:14;218:13

personally (6)
133:20,22,24;172:9;
176:2;207:16
persons (2)
220:16;221:9
philosophy (1)
175:16
phone (7)
55:24;56:17;62:23;
63:6;131:12;134:23;
142:18
physical (5)
7:18;8:3,10;18:20;
19:3
Physically (2)
43:24,25
pick (4)
55:24;56:17;62:23;
63:6
piece (2)
18:20;19:3
pieces (2)
19:6,8
place (3)
137:23;139:24;
187:22;215:23
places (1)
162:20
placing (1)
138:4
plaintiff (2)
119:24;136:8
plaintiff's (2)
9:6,9
plan (8)
148:4;150:18;176:3,
10,16;177:10,16;178:5
planning (8)
113:14;150:17;
153:18;154:2;171:6;
177:2,21;213:14
please (62)
6:11,23;23:8;27:6,18;
28:14;29:4;33:5,21;
36:15,20;42:6;51:7,13,
23;52:19;55:3;60:16;
61:4;67:3;69:21;70:25;
82:22;83:9;90:9;94:5;
98:19;100:4;101:8,20,
22;105:13,19;108:22;
115:14;122:3;131:7,20;
137:19;143:19;156:8;
171:15;174:3;175:11;
180:3;184:14;187:18;
188:2,23;196:13;
200:21;201:15;202:21;
208:11;209:24;214:5,
10;216:16,22,25;221:20;
222:3
pleased (1)
54:19
pledge (2)
149:8,10;150:3

20-01187-jlg    Doc 1-18    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 19
ORLY GENGER VS.                                                    DALIA GENGER
DALIA GENGER, et al                Pg 90 of 150              December 13, 2012

**pm (12)**
87:14,14;108:23;
116:15,16;133:25;
142:19;189:8,8;221:23,
23;222:8

**point (21)**
50:22;62:8,9;63:23;
75:6;81:17;95:12,21,25;
96:18,21;117:20;131:4,
8;143:11;147:25;148:3;
160:8;162:4;185:6;
186:6

**points (4)**
27:9,15,19;112:10

**position (17)**
65:15;66:4;118:7;
141:15;151:5,12;
155:20;156:3,12;157:12,
18,20,21;172:2;193:6;
194:7,17

**possibilities (1)**
207:10

**possibility (7)**
196:12,18,22;197:9,
19;207:8,14

**possible (6)**
95:10;199:20;200:15;
203:19,20;204:7

**possibly (1)**
49:17

**potential (1)**
58:25

**potentially (1)**
63:10

**practice (6)**
113:4;133:12,16;
137:4;139:13;141:19

**preceding (1)**
208:7

**precise (1)**
9:24

**predicate (1)**
169:4

**premarked (1)**
8:15

**preparation (1)**
25:18

**prepare (2)**
10:17;24:21

**prepared (4)**
10:15;24:17;194:5,23

**preparing (3)**
10:13;24:18,19

**presence (8)**
118:11,16;119:9,14;
121:2,3,8;122:2

**PRESENT (3)**
3:20;118:4;135:23

**presentation (1)**
119:10

**preserve (3)**
118:2,5,14

**preserved (1)**

**118:8**

**presume (1)**
198:6

**pretty (1)**
96:2

**prevent (9)**
7:18;8:3,10;33:21;
137:13;177:8;188:7;
196:23;213:12

**prevented (1)**
177:11

**prevents (1)**
96:20

**previous (3)**
92:19;132:8;144:17

**Previously (4)**
60:2;63:3;71:7;154:22

**price (9)**
198:11;199:17;
200:15,19;201:19;
203:11,19;204:6;209:2

**prior (3)**
58:19,20;186:8

**privilege (7)**
16:7;92:2;124:22;
138:18;191:11;194:4,19

**privileged (6)**
29:13;138:25;191:13;
194:3,8,16

**probably (10)**
25:15;26:2,19;31:15;
43:16;134:8;144:22;
145:20,23,25

**problem (18)**
7:18;8:3,10;45:15;
46:4,22;48:7,7;50:2,3,4,
19;60:9;67:7;157:22;
158:3,6;220:5

**problems (1)**
182:15

**procedure (3)**
6:25;199:23,24

**procedures (1)**
7:2

**proceed (4)**
58:5;122:3;214:22;
217:7

**proceeding (6)**
95:13;97:12;117:22;
130:11,13;151:17

**proceedings (8)**
87:17;116:19;117:22;
134:4,19;142:22;
150:25;151:7

**process (1)**
98:17

**produce (4)**
193:12;194:5,6,23

**promise (2)**
217:25;218:12

**promised (2)**
158:14;159:20

**promissory (7)**

149:7,9,18;150:2,6,14;
167:17

**proper (1)**
86:2

**properly (1)**
86:4

**protect (5)**
12:8;21:9;88:3;
181:24;182:6

**protecting (1)**
176:3

**provide (7)**
122:9;123:2;129:3;
144:17,20;147:16;
190:24

**provided (4)**
19:17;43:13;110:4;
166:10

**providing (4)**
22:20;93:16,19,24

**provision (2)**
118:24;119:5

**Public (3)**
6:5;43:17;223:24

**purported (2)**
91:5;122:7

**purports (1)**
74:10

**purpose (3)**
29:23;150:6;175:21

**pursuant (1)**
216:8

**pursuing (1)**
212:7

**put (30)**
12:10,17,21;13:7;
27:18;32:13;33:5;52:17;
81:21;83:16;84:15,17;
110:24;112:18;117:5,11,
16;119:13;120:6;121:7;
126:19;127:10,10,12;
131:5;141:2;143:21;
174:23;175:13;190:3

**puts (1)**
83:14

**putting (8)**
82:2,4,6;83:2,5;84:14;
177:8;196:9

---

## Q

**quiet (1)**
127:2

**quite (1)**
140:15

**quote (4)**
74:24;100:9;153:17,
20

---

## R

**raised (6)**
27:9;28:11;30:8;

**96:21;141:16;197:25**

**raising (1)**
28:15

**rather (1)**
130:21

**react (2)**
161:8,9

**reacted (3)**
161:5,16;164:6

**reaction (2)**
19:21,23

**read (71)**
11:12;20:9,10;23:7,9;
25:15;31:11;32:21,22;
33:6,8;42:7;51:8,12,14;
55:2,4;58:13,15;60:16,
20,21;61:18;70:25;71:2;
82:14,21;86:6;99:19;
101:7,9;102:8;105:13,
14;108:20;109:7,24;
110:9;114:2,4;129:7,9;
130:7;131:2,3,6,18;
143:19,23;156:17,20;
157:5;158:25;171:15,
16;174:4,14,19;180:3,4;
188:3;200:21,22;202:21,
25;208:10,12;210:12,14;
222:14;223:8

**reading (8)**
11:15;101:16;109:14;
155:24;169:5,5;174:18;
182:3

**really (33)**
13:25;31:5,9,11;
34:25;35:3;40:6;53:17;
58:2;62:20;72:4;76:7;
91:8;103:4,18;114:4;
126:4,7;127:24;128:6,
25;130:11;150:7,8;
152:6;159:12;163:5;
164:10;166:23;169:9;
183:16;196:24;210:8

**reappears (1)**
118:6

**re-ask (1)**
21:2

**reason (8)**
47:22,25;114:18,18,
20;140:18;159:23;166:6

**reasonable (1)**
189:19

**reasons (2)**
137:2;139:11

**recall (18)**
23:23;59:10;60:4;
66:18;67:4,20;71:10;
109:15,19,21,22;111:10;
151:4,12;152:17;153:5;
166:22;209:22

**receive (5)**
97:21;184:25;185:3,
10;186:7

**received (5)**

**111:23;150:13;**
185:20;186:21;187:7

**receiving (4)**
185:12,25;186:8,11

**recess (4)**
20:4;87:13;189:7;
221:22

**recessed (1)**
116:15

**recision (3)**
164:13,17;165:2

**recognize (1)**
37:14;69:22;150:2

**recognized (1)**
22:7

**recollection (9)**
28:24;29:3,9;43:20;
107:13;108:16;109:8;
110:10;163:9

**recommend (1)**
85:16

**recommended (1)**
15:9

**record (97)**
6:11;14:5;17:25;20:2,
8,10;21:24;23:9;27:18;
28:18;32:22;33:8;39:15,
16;40:4,5;42:7;51:8,14;
52:18;55:4;58:4,15;
60:21;61:18;62:22;71:2;
81:21;82:3,5,7;83:3,6,
14,17,21;84:14,16,17;
87:3,19;105:14;108:10;
110:25;112:8,22;113:4,
8;115:14;117:4,6,12,16,
18;118:13,19;119:13;
120:7;25;121:10,24;
127:8;129:9;132:2,4,18,
20;137:23;139:7,25;
141:3;142:16;143:3,5,
23;149:7;156:20;
158:25;171:16;173:10;
179:22;180:4;182:20;
188:3;189:9,17;190:4;
192:21;196:9;200:22;
202:25;204:22;208:12;
209:13;221:21;223:11,
12

**recorded (1)**
102:11

**recreate (2)**
178:23;179:13

**redact (1)**
140:2

**redacted (1)**
138:9

**reduced (1)**
34:20

**Referring (3)**
25:9;26:9;124:15

**reflect (2)**
28:18;112:9

**reflecting**

20-01187-jlg    Doc 1-18    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 19
ORLY GENGER VS.                                Pg 91 of 150                        DALIA GENGER
DALIA GENGER, et al                                                            December 13, 2012

193:13
**reflects (1)**
194:13
**reformation (1)**
17:12
**Refrain (5)**
210:24;212:22;
218:17,24;219:3
**refresh (5)**
43:20;108:16;109:8;
110:10;163:9
**refreshes (1)**
109:17
**regard (4)**
201:23;202:2,6,8
**Regarding (6)**
23:18;66:8;97:11;
125:7;195:19;196:6
**regular (3)**
62:3;168:25;169:13
**reimbursement (1)**
85:5
**reiterating (1)**
94:13
**relate (1)**
140:8
**related (9)**
70:22;84:20;85:8;
96:3;130:6;139:19;
178:23;179:13;196:4
**relates (2)**
139:15;140:6
**relationship (2)**
127:25;128:3
**release (23)**
68:6;69:25;74:17;
75:19;79:24;80:3;88:22;
98:11;124:4;130:8;
131:22;139:22;219:16,
18,19,20,22,23;220:2,4,
7,21;221:11
**released (3)**
80:24;129:4;221:6
**releases (11)**
74:19,23;96:10;122:8,
10;123:16;124:9,16;
144:16,21;147:16
**releasing (1)**
75:11
**relevance (2)**
87:4;130:13
**relevant (10)**
81:23;82:9;84:22;
85:18;123:12,15,18,21;
124:9;131:9
**rely (1)**
145:24
**remarks (2)**
39:13;40:3
**remember (148)**
9:21;10:4,12;13:25;
14:14,17,21,24,25;
15:10,13,18;16:2;17:20,

21,23;25:17,23;26:2,5,6,
7;27:15,17;28:15;30:13;
31:6;35:10;38:23;39:24;
40:25;41:21;43:9;44:6,
14,16,20;47:9;57:18;
59:6,22,24;64:23;65:4,
20;66:2,7,24;67:18,23;
68:3;71:20;72:4;74:2,3;
75:24;76:7;77:15,17;
78:3;88:8;92:12;93:6,7,
8,17,19;94:2,2,19,22;
95:4,7,14;97:15;100:16;
102:12;103:14;105:3,
17;106:13;107:7,12;
108:4;111:13,13,17,20;
114:16;122:21;124:20;
125:11,22;126:4,7,14;
127:25;128:6,7,8,9,10,
22,25;129:23,25;130:2;
144:4,6,7;147:4,8,23;
151:2,14;152:24;
162:10;163:17;164:19,
24;166:23;178:11,19;
184:21,23,24;185:5,12,
15,16,25;186:4,10,11,
13;187:16,17;188:9;
189:25;192:11,12,13;
195:11;196:14;197:10;
201:20;203:9;209:10
**remembers (1)**
10:2
**remind (1)**
162:17
**remove (1)**
40:24
**removed (1)**
95:14
**rendered (2)**
22:4;194:12
**repeat (17)**
11:20;39:23;42:4,5;
50:13;61:3,13;66:14;
89:21;92:23;94:25;
96:23;97:4;151:8;
158:24;167:8;187:25
**repeatedly (1)**
126:22
**rephrase (1)**
201:15
**reporter (34)**
20:11;23:10;32:23;
33:9;36:19;42:8;51:9,
15;52:23;55:5;58:16;
60:22;61:19;71:3;83:18,
24;105:15;117:9;
119:19,22;129:10;
132:17;135:11,19,22;
143:24;156:21;159:2;
171:17;180:5;188:4;
200:23;203:2;208:13
**represent (5)**
14:23;15:25;133:23;
135:4,5

**representation (1)**
130:5
**representative (2)**
19:15;96:8
**represented (3)**
117:21;190:13,15
**representing (10)**
16:15,19;17:19;18:2;
21:4;22:3;24:12,13;
133:19,21
**requested (23)**
20:11;23:10;32:23;
33:9;42:8;51:9,15;55:5;
58:16;60:22;61:19;71:3;
105:15;129:10;143:24;
156:21;159:2;171:17;
180:5;188:4;200:23;
203:2;208:13
**requests (1)**
19:20
**required (10)**
122:16,22,23;129:14,
15;144:21,23;145:11,13,
15
**requires (1)**
158:19
**rescinded (1)**
161:25
**rescinding (1)**
166:11
**resent (1)**
130:11
**reserve (1)**
140:10
**reserved (1)**
222:13
**resign (5)**
45:16;49:8;50:21;
51:18;85:11
**resignation (2)**
38:2;42:24
**resolve (2)**
46:23;50:2
**resources (8)**
34:20;62:12;154:15,
20;157:23;188:20;
202:14,18
**responded (1)**
185:12
**response (1)**
102:4
**responses (3)**
9:6,9;11:11
**responsibilities (6)**
29:24,25;180:23;
181:6;201:23;202:6
**responsibility (10)**
13:15;45:6;198:19,20,
24,25;199:21;200:7,18;
201:18
**responsible (1)**
13:17
**rest (3)**

33:20;109:24;130:22
**restated (2)**
108:6,18
**restrain (1)**
214:13
**result (5)**
160:21;171:5;180:22;
181:5,11
**results (1)**
93:11
**resumed (1)**
142:22
**retained (4)**
14:9,13;15:24;16:5
**retransfer (1)**
153:24
**return (2)**
180:13;218:17
**returned (10)**
163:10;170:14,21;
172:25;173:6;177:25;
178:20,21;179:13,17
**returning (2)**
171:4;180:14
**reveal (1)**
89:13
**review (3)**
35:17,19;67:13
**reviewing (1)**
113:22
**rich (1)**
142:11
**rid (5)**
157:24;158:8;159:8;
163:23;174:21
**ridiculous (1)**
112:25
**right (78)**
9:21;11:9;12:3;17:11;
23:18;28:9;37:8;39:24;
40:6;43:3;55:23;56:11,
14,18;81:7;86:7,25;
88:18,20;91:7;94:16;
96:23;100:21;101:16;
104:10;110:13;112:6;
118:12;119:12,25;
121:17;125:17;126:3;
130:2;131:25;134:13,
14;135:3,3,7;136:10;
140:10;141:4;144:7;
148:6,8,17;149:23,25;
150:20;151:11;159:16;
163:16;167:18;168:23;
169:11,15,18;174:11;
178:6;180:16;183:8,24;
184:2;186:15;187:21;
190:19;195:7;196:9;
209:21;211:23;214:16,
21;217:16,18,19;219:2;
222:13
**ring (1)**
14:16
**rings (1)**

14:17
**risk (1)**
62:11
**Road (1)**
3:5
**Robert (7)**
14:2;33:19;99:23;
128:2;135:14;138:14;
185:20
**Rochelle (7)**
3:6;46:22;47:4;55:22;
64:12,16;65:21
**role (1)**
181:12
**roles (1)**
62:3
**room (7)**
87:11;117:25;119:15;
132:22,25;136:23;216:2
**Roth (2)**
95:16;97:8
**ruling (1)**
118:25
**run (1)**
70:16

**S**

**sacrifices (1)**
61:11
**safety (3)**
23:22,24;24:5
**SAGI (71)**
3:21;15:19;46:21;
47:4,25;48:4,6,10,13;
55:20;58:18,20;59:2,7;
63:25;64:3,9;114:24;
132:22,25;136:12;
141:17;148:5,9;152:12;
154:14;155:5,8;161:2,4,
13;163:12,17;171:6;
183:3,8,21;184:3;186:4;
187:4,6,11,17;189:24;
191:18;192:18;193:3;
195:21;196:12,18;
199:23;205:3;207:7;
208:22;211:11,13,18,21;
212:7,10;213:4,6;214:4,
9,12;217:6,18,25;218:6,
11;219:9
**Sagi's (4)**
47:2;198:19;200:6;
210:4
**sale (15)**
185:23;186:2,3;187:9,
10,18;188:8,14;196:23;
197:9;198:5,8;199:13;
208:4
**same (24)**
19:7;20:18;21:3;
41:19;52:21;67:6;74:15;
97:13;98:13;108:21;
122:12;123:6;126:18;

20-01187-jlg   Doc 1-18   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 19
ORLY GENGER VS.                         Pg 92 of 150                    DALIA GENGER
DALIA GENGER, et al                                                    December 13, 2012

144:10;145:6;157:14;
170:22;199:14;205:7,
17;206:19;216:10,14,19
**satisfaction (1)**
180:18
**saw (6)**
10:7;9;11:10;70:6;
159:7;185:5
**saying (16)**
27:12;57:20;113:8;
121:7;122:21;160:7;
177:24;178:11;187:11,
16,18;189:24;194:21;
196:12;202:4;206:13
**scheme (1)**
153:18
**search (1)**
60:12
**second (14)**
8:18,21,23;9:2;10:8;
106:6;134:16;149:13,
15;163:12;168:21;
186:21;192:22;204:23
**secretary (2)**
132:10;135:8
**section (4)**
96:19;133:6,10,15
**secure (2)**
22:6;23:21
**seeing (5)**
108:15;109:15,19;
182:8;219:14
**seek (4)**
20:14,15;140:10;
178:22
**seeking (2)**
130:14;190:17
**seems (2)**
84:21;178:22
**sell (1)**
213:8
**selling (4)**
157:25;158:10,10;
198:20
**send (1)**
57:15
**sending (5)**
147:4,6,7,15,15
**sense (2)**
164:5,9
**sensible (2)**
142:8,10
**sent (9)**
22:18;77:19;122:17,
23;124:10,14;129:15;
144:22;182:5
**sentence (2)**
175:25;181:4
**separately (1)**
19:9
**September (7)**
9:20,21;102:13;
103:21;104:22,23;105:5

**seriously (1)**
95:22
**serve (7)**
46:6,9;47:17;48:8;
63:7;66:20;179:9
**service (1)**
81:6
**serving (3)**
48:11,14;62:24
**session (1)**
25:18
**sessions (1)**
27:8
**set (7)**
20:18;21:3;76:16;
91:2;124:16;136:19;
176:20
**sets (1)**
18:14
**settle (1)**
142:8
**Several (4)**
147:10,19;160:2;
203:13
**Seymour (2)**
43:17,18
**share (5)**
148:10;150:19;171:6;
175:19,22
**shares (27)**
22:7;30:21,22;31:2;
148:13,20,24,25;150:12;
183:22,23;184:3,4,7;
198:9,12,20;199:12,20;
217:22,24;218:2,4,4,6,7,
10
**sheets (1)**
67:21
**short (1)**
20:5
**shoulder (1)**
138:4
**show (9)**
10:21;25:5,13;141:17;
168:15;188:16;197:14;
200:7;209:12
**showed (2)**
24:25;70:3
**showing (1)**
93:11
**shut (1)**
104:12
**side (1)**
56:3
**sign (6)**
43:13;89:19;91:5,23;
210:12;222:14
**signature (11)**
9:15,18;11:5,6;38:4,7;
74:6;90:12;92:5;149:13;
173:15
**signed (37)**
9:19;43:21;44:7,23;

45:8;76:3;79:16;80:20;
88:5;89:3,5,23;90:12;
92:9,18,20,25;94:20,22,
23;95:4,7,11;99:18,23;
102:14;104:21;108:2,8;
111:12;167:17;176:7,
13;177:2,7;210:14;
223:20
**signing (3)**
44:24;111:24;209:19
**simple (5)**
46:13;106:24,25;
140:18;168:3
**simply (2)**
26:12;27:4
**single (2)**
82:9;141:22
**sister (3)**
211:12,25;214:14
**sit (19)**
17:25;24:11;26:4;
27:14;30:24;35:12;92:8;
95:10;98:24;106:14;
107:3,14;111:21;114:9,
14;122:25;147:3;
152:17;216:12
**sitting (2)**
103:17;119:15
**situation (1)**
164:23
**slow (1)**
127:14
**slowly (1)**
169:9
**small (2)**
22:4;221:10
**sold (5)**
158:13;183:21,25;
184:3,7
**sole (1)**
108:8
**solution (2)**
171:24,25
**somebody (13)**
48:8;60:9;61:10;
63:15;67:7;80:7;158:9;
161:6,9,10;164:10;
205:11;214:17
**somehow (1)**
159:8
**someone (15)**
43:13;45:17,18;49:12;
62:7;63:21;78:23;79:3;
87:24;120:2,2;124:3;
155:25;158:2;180:10
**son (1)**
115:4
**sooner (1)**
130:18
**sorry (10)**
20:23;31:23;62:14;
101:25;115:18;147:13;
173:3;179:20;196:21;

208:20
**sounds (1)**
189:18
**span (1)**
141:25
**speak (35)**
7:22;10:19,20;41:4,7,
10,13,15;46:15,20,21,
24;47:7,10,11,12,15,23;
48:3,6;83:19,23;89:16;
104:14;110:20;113:5;
134:13,14;164:13,16;
189:4,24;192:15,18;
213:4
**speaking (16)**
83:10,14;91:17;104:6,
16;110:22;111:17;
112:20;117:19;122:6;
126:24;130:16;163:3;
165:6;197:4;216:4
**speaks (1)**
127:11
**specific (1)**
29:7
**specifically (4)**
102:5;124:15;174:6;
220:25
**specifics (1)**
29:10
**speculate (1)**
187:15
**speculation (2)**
158:22;167:5
**spend (1)**
118:22
**spending (1)**
196:25
**split (1)**
205:22
**spoke (13)**
24:24;28:7;47:4;89:6,
10,12;91:9,12,22;132:9;
211:18,21;213:6
**ss (1)**
223:4
**stand (2)**
176:2,6
**standard (4)**
79:23;80:2,14,16
**stands (1)**
156:22
**start (11)**
8:13;34:21;40:24;
52:21;68:25;85:23;
104:14;116:9;127:15;
180:7;212:7
**started (7)**
14:4;83:2;125:22;
143:6;166:24;192:11,12
**STASIUK (2)**
3:22;136:20
**State (8)**
6:5,10;135:7;157:17;

179:19,19;223:3,24
**stated (6)**
71:25;103:14;129:14;
132:5;138:18;163:11
**statement (16)**
39:15;81:21;82:3,5,7;
83:3,5;85:24;117:6,12;
120:6;121:10;151:14;
155:14;157:4;179:7
**statements (2)**
99:14;118:19
**stating (1)**
152:5
**stay (2)**
132:18;142:7
**stayed (2)**
22:10,12
**steamroll (1)**
120:12
**step (1)**
186:5
**stepping (1)**
86:24
**still (11)**
40:7;87:20;102:14;
106:14;119:18;174:16;
176:10,16;177:17;
180:8;185:14
**stipulation (1)**
17:13
**Stop (23)**
86:13;104:5;112:20;
126:20,25;127:5;131:23,
24;138:3;184:10,12;
186:22,24;187:2,10;
188:14;191:18,20;
195:21;196:13,18,20;
217:16
**stopped (2)**
127:25;170:3
**stopping (1)**
196:15
**story (3)**
56:4;166:2;170:2
**Street (1)**
6:14
**strike (13)**
18:15;59:24;95:11;
106:8;110:18,23;111:5;
113:9,20;170:10,11;
185:2;197:11
**striking (1)**
118:9
**strongly (1)**
85:16
**stuff (1)**
31:8
**subject (2)**
139:4;201:21
**subjected (1)**
139:14
**submitted (6)**
96:17;97:17;141:6,10,

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

13;173:18
**Subscribed (1)**
223:20
**subsequently (1)**
107:9
**subset (1)**
22:4
**substance (6)**
58:7;77:18;87:8;
189:14;213:16,19
**successful (1)**
212:8
**successor (4)**
38:3,24;42:24;69:7
**sue (11)**
211:11,25;212:4,7,10,
12,16;214:18,19;217:18;
219:9
**sued (22)**
34:15,22;35:2;49:22;
62:12,15;80:24;159:21,
21;160:14,21;161:7;
162:6,10;163:24;166:3;
183:8;211:13,23;
214:15;218:9,15
**sues (1)**
79:3
**suffer (3)**
7:17;8:2,9
**sufficient (5)**
100:12;102:6,15,21;
106:15
**suggested (2)**
113:15;132:14
**suing (8)**
30:19;40:24;166:5;
196:18,20,23;213:6;
214:13
**suit (1)**
161:16
**suits (1)**
162:11
**Sullivan (1)**
14:15
**sum (4)**
58:7;77:17;213:16,19
**summary (3)**
131:16;140:20;141:4
**summons (2)**
8:23,25
**supposed (13)**
12:8,10,14,17,21;
122:10;133:8,13;
144:25;179:8;199:25;
206:19,24
**sure (31)**
9:17;14:3;28:6;35:23;
47:16;61:15;66:16;
72:14;73:3;81:8;92:11;
93:21;97:16;110:13;
118:13;119:7,25;
121:15;122:16,22;
124:11;128:14;129:13;

143:13;153:2;158:11;
167:10;176:12;180:12;
195:3;207:2
**surrogate (11)**
84:22;85:12;95:13,16;
96:3;97:8,12;130:10,13;
140:6;173:19
**swore (1)**
99:12
**sworn (5)**
6:2,4,17;11:5,7

---

**T**

**table (1)**
112:25
**tactic (1)**
137:13
**tag (1)**
94:4
**tainted (1)**
205:15
**talk (22)**
36:18;37:2;52:21;
57:10;59:18;62:23;77:5,
9,11;78:5;95:24;102:9;
111:7;150:9;152:7;
186:23;189:22;207:22;
211:10,25;213:25;218:6
**talked (4)**
26:3;66:2;67:11;
163:17
**talking (24)**
7:23;15:16;17:3;
71:21,22;106:4;124:4;
126:21;130:9;136:6;
138:3;146:18;154:9;
165:17;183:7,8,22;
189:23;195:15;209:10;
213:2;214:3,4,8
**talks (2)**
101:23;102:2
**task (3)**
63:12,14;93:3
**teach (1)**
204:2
**technical (1)**
13:12
**telephone (2)**
134:2;142:17
**telephonic (3)**
134:5,20;142:20
**telling (9)**
8:11;27:21;34:15,21;
101:16;127:2;159:19;
181:22;208:16
**tells (1)**
146:25
**ten (1)**
216:10
**term (1)**
79:13
**terminate (1)**

109:5
**terms (1)**
165:6
**testified (6)**
6:6;49:19;60:2;63:4;
70:15;71:7
**testify (2)**
162:19,23
**testifying (3)**
8:11;206:11,15
**testimony (9)**
60:5;71:10;152:11,14;
162:21;189:5,13;223:8,
11
**texts (1)**
56:22
**Therefore (5)**
117:23,25;141:18;
162:21;178:10
**thinking (4)**
61:6,21;80:10;140:14
**third (2)**
75:5;149:16
**thoroughly (1)**
114:5
**though (2)**
207:23;214:14
**thought (14)**
47:25;62:5;70:15;
79:23;80:6;132:7;
154:16;162:5;164:7,9;
177:9;189:14;207:3;
214:25
**threatened (1)**
119:2
**three (3)**
8:15;113:23;152:3
**throughout (1)**
47:19
**Thursday (3)**
25:20;26:4;222:11
**TI (4)**
31:2;218:2,6,7
**times (12)**
34:15,22;35:2,5;
147:10,19;160:2;
162:20;194:14;203:13;
211:21;216:10
**tired (3)**
202:3;216:12,15
**today (29)**
6:20;7:10;8:11;10:14;
17:25;24:11;25:20;26:4;
27:14;30:24;35:12;58:5;
92:8;95:10;98:22;
106:14;107:3,11,14;
111:22;114:9,14,16;
122:25;124:17;147:3;
152:17;211:13;218:15
**told (26)**
27:7;28:4;36:12,24;
55:18,20,21;74:2;80:2,7;
93:22;119:24;128:19;

132:11;135:8;147:23;
164:25;187:14;200:9,
25;207:15;208:3,22;
211:20;213:16,19
**took (5)**
23:17;52:15;151:4;
156:3;157:21
**tools (1)**
195:20
**top (2)**
73:17;90:11
**topic (2)**
16:10,11
**topics (7)**
28:2,10,12,15,25;
29:20;85:17
**touch (5)**
112:14,18;115:21,25;
138:7
**touching (3)**
112:10;115:23,24
**TPR (46)**
3:12;120:25;121:24;
136:13;139:10;149:2;
150:11,16,19;167:2,19,
20;170:14,21;171:4,7;
178:2,20,21;179:13;
182:23;183:6,14,18,20,
21,22,23,23;184:5,7;
186:25;187:2;196:2,20;
197:20;199:12;200:20;
212:3,21;217:24;218:4,
17,22,24;219:3
**track (8)**
17:5;34:19;35:15;
36:8,12,22,24;162:11
**transcribing (1)**
135:20
**transcript (3)**
143:21;222:14;223:8,
10
**transfer (2)**
153:19;154:17
**transferring (1)**
150:16
**treated (1)**
214:15
**TRI (7)**
22:7,15;30:22,23;
217:21;218:4,10
**trial (2)**
138:10;139:25
**Trickery (1)**
163:4
**tried (6)**
56:14;63:19;157:25;
160:4;211:24,25
**true (21)**
10:16;18:4;28:12;
153:21;155:12,12,14;
169:13;172:23;174:18;
178:3;180:20;181:13;
185:14,22;199:10;

206:10;211:15;219:21;
223:10,13
**Trump (2)**
22:14;35:10
**Trumps (2)**
30:19;35:9
**trust (181)**
7:13,19,22,23,24;
11:19,22,25;12:5,8,11,
14,15,16,18;13:7,24;
14:7,10,13,23;15:5,25;
18:5,18;19:10,16,18;
20:15,20;21:4,6,9,13,19;
22:5,8,23,23;24:6,18;24:19;
25:2,3;29:6;30:19,25;
31:2,3;34:5,8,9;35:8,12,
13,24;37:5,11;39:4;
40:14;41:17,25;45:10,
17;46:10,15;50:5;54:2;
60:4;61:8;62:3;65:23;
66:5,10,21;69:5;71:9;
75:2,12,20,23;78:17;
88:7,13,24;89:17,20,24;
91:6,10,24;97:21;98:10;
104:20,25;105:5;107:5,
10;108:9;110:3;111:23;
114:8;115:7;124:12,13,
25;125:6,6,25;126:9,11;
127:23;128:5,12;129:3,
17,20;144:14;145:2,15,
16;146:2,20;147:15;
148:13,13;149:3;158:2;
164:12,21,23;166:9;
179:9;180:11,12,15,18,
24;181:8,10,15,16,23,24,
25;182:7,12,16,18;
183:11;188:6;190:10,13,
14,15,16,18,20;192:10,
13;194:18,19;196:5;
197:2;199:9;202:10;
209:3,20;211:12,12,14;
212:8,11,20;213:7;
214:13,18,20;217:20;
218:10,15;219:10
**trustee (163)**
7:12,19;11:18,21,24;
12:7,10,10,17;13:4,7,16,23;
19:14,18;22:3,5;24:7,8,
9,12,14,15,19;29:21,21;
30:3,25;34:8;35:8,11;
36:23;37:5,6;38:2,3,9,
17,18,19,24;39:5;40:14,
16,25;41:24;42:13,21;
43:2;45:2,5,10,17,19;
46:6,6,14;48:2,8,11,14;
50:4,21;51:18;54:2,20;
59:2,19;60:3,10,14;
62:11,25;63:8;65:6,15,
23;66:5,9,20;67:14,15;
69:5,7;70:16;71:9;
75:22,22;87:23;88:6,12,
19,22;89:17,19,23;91:6,
9,24;92:10;93:5,24;

20-01187-jlg     Doc 1-18     Filed 06/20/20     Entered 06/20/20 20:19:48     NoR part 19
ORLY GENGER VS.                                         DALIA GENGER
DALIA GENGER, et al                                     December 13, 2012
Pg 94 of 150

95:14;104:20,24;105:4,
7;106:16;107:4,10;
108:2,8;110:2;122:7;
123:2,21;124:12,25;
125:6;126:8;129:17,19,
20;140:24,25;144:14;
145:10,15;146:20;
148:12;161:18,21,23;
164:12,21,22;166:9;
177:9;178:8,23;179:9;
180:24;181:7,12,24;
182:18;183:11;188:6;
190:9,11,17;194:19;
196:7,8;198:11;199:2;
200:19;201:18,23;
202:6;203:11;207:13;
209:2;214:19
**trusteeship (5)**
39:3;41:4,8,16;58:23
**trusts (1)**
180:12
**trust's (2)**
78:23;87:23
**truth (6)**
6:17,20;8:11;99:13,
13;107:7
**try (16)**
56:3;58:8;63:21;
137:13;141:20;143:16;
158:12;163:5;187:10;
188:7;197:14;198:11;
200:19;201:18;207:23;
211:11
**trying (11)**
17:20;31:24,25;32:6,
12;33:14;50:2;63:14;
103:16;177:8;186:3
**Tuesday (8)**
25:21;26:14,17;28:8,
16;29:8;70:3;141:18
**two (23)**
11:13,16;18:14;19:6,
8;20:4;27:16,22;28:7;
29:2;30:7,15;31:16;
86:21;109:7,11,14;
121:14;122:10;139:18;
148:5;193:19,20
**type (1)**
43:12
**typed (1)**
43:11

## U

**UCC (2)**
201:24,25
**unclear (1)**
68:18
**uncomfortable (2)**
48:2,5
**under (6)**
9:19;32:4;74:20,25;
75:12,20;87:20;88:23;

99:10;102:5,14;112:24;
152:3;176:8;180:19;
223:9
**understood (3)**
32:17;53:18;80:18
**unfortunately (2)**
171:8;207:18
**Unless (2)**
29:16;206:4
**unlike (1)**
181:23
**unquote (1)**
176:5
**up (23)**
43:11,12;52:5,11;
53:2,6;55:24;56:17;
57:2;62:23;63:6;66:4;
106:7;141:17;142:6;
150:24;176:20;196:12;
197:14;199:11;200:7;
203:5;217:24
**upon (12)**
11:15;99:15;109:5;
110:3;127:3;130:3;
138:4,5;144:9;159:18;
164:3;169:24
**urinate (1)**
86:18
**use (2)**
137:12;195:21
**using (1)**
22:23

## V

**valid (1)**
177:22
**value (4)**
153:7,9;180:15;
181:15
**valued (2)**
151:5,13
**verification (2)**
99:6,18
**verified (4)**
8:23;9:2;98:25;99:8
**versus (1)**
17:9
**via (1)**
134:5,19
**VOICE (2)**
134:11,15
**volunteer (2)**
48:20;59:8
**volunteered (3)**
48:18,21,24
**volunteers (1)**
52:5

## W

**Wachtel (2)**
3:22;136:20

**Wait (26)**
8:6;14:20;36:14;
52:19;60:19,19;101:19;
103:19,25;104:13;
105:23;111:14;114:6;
115:15;134:15;137:8;
142:25;163:12;168:21;
195:9;202:24;204:3;
216:6;219:24;220:12,13
**waiting (1)**
204:14
**waive (1)**
194:3
**Waiving (1)**
32:24
**walked (1)**
121:8
**walking (1)**
104:6
**WALTER (2)**
3:22;136:20
**wants (2)**
142:4;187:23
**Warren (3)**
135:15;189:9,23
**waste (1)**
84:4
**wasting (2)**
34:23;130:23
**way (33)**
21:9;79:24;80:2,14,
16;105:6;106:19;115:5,
6,22;124:6;150:15;
154:16;159:7;161:5,8,9,
11,13;164:6,15;165:20;
175:15;176:25;187:2;
188:7,14;202:10;
203:19;204:6,20;
211:22;214:15
**wealth (2)**
153:19,24
**Wednesday (3)**
25:21;70:3;141:18
**week (4)**
25:25;26:13;70:4;
98:23
**weeks (1)**
69:10
**weighed (2)**
191:9,16
**welcome (1)**
121:6
**welcomed (1)**
139:12
**weren't (3)**
88:19;200:4;220:25
**what's (18)**
10:25;28:19;37:18;
39:9;55:25;57:21;81:9;
94:7,20,23;98:19;110:9;
112:24;145:8;166:4;
168:21;188:16;207:18
**whatsoever (5)**

21:11;44:17;79:20;
96:20;101:17
**whenever (3)**
7:22;44:11;162:6
**WHEREUPON (36)**
6:1;20:5,10;23:9;
32:22;33:8;42:7;51:8,
14;55:4;58:15;60:21;
61:18;71:2;87:13,15;
105:14;116:14,17;
129:9;132:3;133:25;
134:18;142:19;143:23;
156:20;158:25;171:16;
180:4;188:3;189:7;
200:22;202:25;208:12;
221:22;222:8
**Wherever (1)**
198:19
**whole (5)**
26:21;22,24;97:11;
103:10
**who's (3)**
136:5,6;139:21
**wife (1)**
47:2
**William (2)**
220:6;221:9
**willing (6)**
59:7;60:13;61:11;
63:7;114:6;159:22
**wipe (1)**
180:17
**wiped (2)**
182:16,18
**wish (5)**
18:19;39:4;40:15,23;
118:23
**wished (3)**
41:24;50:20;51:18
**wishes (1)**
85:9
**wit (3)**
134:6,21;142:22
**withdraw (2)**
106:25;131:13
**without (3)**
87:24;194:21,22
**witness (212)**
6:1,3;8:15;10:3;13:11,
14;16:7,11,20,23;18:9;
20:23;23:11;25:11;
28:19;29:12;33:17,21;
34:17,24;36:11;37:20;
38:22;39:8,18;40:19;
41:12,20;42:3,9,15;43:8;
44:10;45:4,14;46:2;
47:14;48:17,23;49:6;
50:13,23;51:4;52:22;
53:8;54:15,22;55:12;
56:6,13,15,20;57:7,9,17,
25;58:11;59:5,13,21;
60:7,17,25;61:5,17,20;
63:17;64:8,22;65:17,25;

66:14,23;67:17;68:2,24;
69:12;70:11;71:4;72:3,
13;73:6,13;74:16;75:7,
15;76:6,25;77:14;79:8,
12,22;80:5,12;82:13,18;
84:7,10;89:2,11;90:12,
19,23;91:19;92:2;95:23;
97:3,14;98:3,7,15;
100:25;101:7,10;103:3,
13,17;104:17;105:10,16;
106:21;107:20;108:24;
112:14,23;113:16;
115:21,24;116:7,11;
122:13,15;123:7,25;
124:19,24;125:10,20,21;
126:15,17,20,20;128:18;
129:11;131:19;132:21,
24;137:4;138:3,7,19;
142:23;143:20;144:19;
145:7;146:9,23;147:20,
22;148:16;149:17;
152:23;155:11;156:19,
23;157:7,16;159:3;
160:3;161:22;162:19;
165:5;167:7,24;170:17,
23;172:16;175:3;
176:24;177:20;179:16,
20,24;183:2;191:12;
192:25;193:21;198:15;
200:11,24;201:12;
202:22;203:15,25;
206:12,16;208:8,14;
209:6,9;210:7,11;216:4,
11,15,18;217:4,10;
219:8;220:9,14
**witness' (1)**
138:4
**witnesses (2)**
139:14;141:25
**Worcester (1)**
14:16
**word (3)**
108:25;113:8;137:24
**words (5)**
99:12;178:15,18;
187:11,20
**work (10)**
15:22;16:4;18:16,23;
19:10;21:19;22:3;54:19;
99:21;166:24
**worked (2)**
15:14;150:13
**worth (1)**
217:22
**write (6)**
57:20;70:13;72:8,21;
73:3;165:14
**writing (3)**
79:24;80:3,16
**written (3)**
70:8;109:5;165:8
**wrong (3)**
77:24;162:22;166:21

**ORLY GENGER VS.
DALIA GENGER, et al**

**DALIA GENGER
December 13, 2012**

**wrongdoing (1)**
   80:25
**wrote (4)**
   70:9;72:11;73:7,11

## Y

**year (1)**
   14:25
**years (5)**
   121:14;141:25;142:6;
   207:17;219:13
**yesterday (2)**
   25:21;26:15
**Yoav (9)**
   34:16,22;96:4;130:24;
   135:2;136:12;140:16;
   163:5;217:4
**York (8)**
   3:6,14,14;6:5;113:4;
   133:12,16;223:24

## Z

**Zeichner (1)**
   134:25
**zero (3)**
   151:6,13;152:6
**ZILBERFEIN (173)**
   3:3;13:9;16:9;17:16;
   18:7;19:19;20:21;21:15;
   24:22;32:10;36:18;
   38:10,21;39:6;40:17;
   41:5,11,19;42:2,14;43:7;
   44:9;45:3,13,24;46:18;
   47:13;48:16,22;49:5,13,
   16;50:10,22;51:2,21;
   52:8;53:7,21;54:4,9,14,
   21;55:11;56:5,12,19;
   57:6,13,16,24;58:10,13;
   59:4,12,20;60:6,23;
   62:17;63:2,16;64:7,14,
   21;65:11,16,24;66:11,
   22;67:16,25;69:8,11;
   70:10,18,22;71:15,24;
   72:12,22;73:5,12;74:11,
   15;75:14;76:5,24;77:7,
   13;78:8,13,18;79:7,10,
   21;80:4,11;81:13,19;
   85:20,23;87:12;90:4,8;
   96:12,16;97:10,24;98:5,
   14;102:24;103:5,10,13;
   105:8;106:20;117:5,10;
   119:4,12,22;120:5,10,
   22;121:16;122:12;
   123:6,22;130:17;131:5,
   11;133:6,10,15;136:3,
   15,16;141:11;143:2,9,
   17;144:11,18;145:5;
   146:8,15,22;147:21;
   152:22;156:6;158:23;
   167:6,23;176:18;
   179:23;182:21;183:4;

191:10;193:19;203:17;
204:9;206:11,14;209:4;
210:10;213:21;215:20,
24;216:3,9,13;217:9;
221:19
**zip (1)**
   6:15

I

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2

3    REALTIME ROUGH DRAFT AND UNCERTIFIED TRANSCRIPT

4        The realtime/rough ASCII draft is

5    unedited and uncertified and may contain

6    untranslated stenographic symbols, an occasional

7    Reporter's note, a misspelled proper name and/or

8    nonsensical word combinations.

9

10        (WHEREUPON, the witness was duly

11        affirmed.)

12        (Resumed)

13

14        Examination resumed

15

16    BY MR. GRIVER:

17    Q.   Mrs. Genger, you understand you have

18    just been resworn in this deposition?

19    A.   Uh-huh.

20    Q.   Ms. Genger, I would ask that you

21    verbalize your answers, don't go uh-huh

22    A.   I am sorry. Yes. Because I saw that

23    you did that in my deposition, so I thought it is

24    allowed. But I will remember that.

25    Q.   Okay. So let me ask you again --

2

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.   Yes.

3    Q.   Just let me ask you again for the

4    record, you understand --

5    A.   Yes, I do understand

6        MR. MEISTER:  Wait until he finishes

7    his questions before you give the answer.

8    Otherwise the court reporter --

9        THE WITNESS:  Okay, Bob.

10    BY MR. GRIVER:

11    Q.   I place before you a copy of your --

12    the original 15 exhibits to your deposition as

13    well as the transcript of your prior day of

14    deposition on December 13, at 2012. Did you

15    review your transcript before today?

16    A.   The transcript, you mean whatever that

17    I was deposed on?

18    Q.   Yes.

19    A.   I went through it. Yes.

20    Q.   You read it?

21    A.   Briefly. But not like thoroughly,

22    because I notice that there are some mistakes

23    that has -- not substantial maybe, but like

24    somebody said something, it wasn't the person

25    that said it, but I don't know exactly what it is

3

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    over here.

3    Q.   Do you have any answers that you would

4    like to amend based on your review of the

5    transcript?

6    A.   I have to read it more thoroughly, you

7    know, in order to answer that.

8    Q.   But as we sit here today, you did not

9    in your review identify any questions that you

10    misanswered?

11    A.   I cannot answer it because I didn't

12    read it thoroughly.

13    Q.   But in whatever review you did, you did

14    not identify any questions that you need to

15    reanswer?

16    A.   No.

17    Q.   And have you reviewed the exhibits 1

18    through 15, before today?

19    A.   No. I didn't. These are the exhibits?

20    Q.   Yes.

21    A.   No, I didn't. I mean, maybe some of

22    them I did.

23    Q.   Did you meet with Mr. Meister or any

24    other counsel to prepare for today's deposition?

25    A.   Yes. Yes, I did.

4

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2    Q.   Who did you meet with?
3    A.   With Bob and his assistant.
4    Q.   That's Marissa Warren?
5    THE WITNESS:  What?
6    A.   Yes.
7    Q.   And when did you meet with them?
8    A.   It was yesterday.  No.  The day before.
9    Q.   And for how long did you meet?
10    A.   I think it was like two hours, or so.
11    Q.   Did Mr. Meister or his assistant
12    provide you with any documents?
13    A.   They provided me with documents that I
14    should have had before, I think.
15    Q.   And which documents were those?
16    A.   I don't remember.
17    Q.   But these are documents that you did
18    not think you had before?

12    BY MR. GRIVER:
13    Q.   Ms. Genger, if you can please look at
14    Dalia Exhibit 6.  Did Sagi Genger prepare --
15    A.   Let me just get through it and see what
16    it is.
17    Q.   Okay.
18    A.   It is to Leah from me --
19    MR. MEISTER:  Don't.
20    THE WITNESS:  I am just saying it
21    aloud.
22    MR. MEISTER:  What you say aloud, the
23    court reporter has to write it down.
24    THE WITNESS:  I'm sorry.  It is so much
25    work.  I'm sorry.

6

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2    BY THE WITNESS:
3    A.   Okay.
4    BY MR. GRIVER:

19    A.   I might have had, I don't remember.
20    MR. GRIVER:  Robert, to the extent that
21    you provided Ms. Genger with new documents, I
22    would ask that they be produced.
23    MR. MEISTER:  I don't know what you
24    mean by new documents.
25    MR. GRIVER:  She says there are

5

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2    documents she has seen before to the extent any
3    other documents you showed her have not been
4    produced in in action.
5    MR. MEISTER:  Okay.
6    MR. GRIVER:  I ask they be produced.
7    MR. MEISTER:  For the record, I don't
8    think I showed her any documents that haven't
9    been produced to you.
10    THE WITNESS:  No.  The point is that --
11    okay.

5    Q.   Ms. Genger, did Sagi Genger draft this
6    document that's been marked Exhibit 6?
7    A.   Not to my knowledge.
8    Q.   Did you draft it?
9    A.   No.
10    MR. MEISTER:  Objection.  Asked and
11    answered.
12    BY THE WITNESS:
13    A.   I did not draft it.
14    BY MR. GRIVER:
15    Q.   Do you recall as we sit here today who
16    did?
17    MR. MEISTER:  Objection.  Asked and
18    answered.
19    A.   No.  As I said, the lawyer drafted it.
20    I don't know how to draft my legal matters.
21    Q.   Was that lawyer David Parnes?
22    A.   I don't know.
23    Q.   You don't remember which lawyer?
24    A.   No.
25    Q.   You don't even remember if it was your

7

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   lawyer?

3   A.  I know it is a lawyer.  Because I

4   didn't do it.

5   Q.  All right.  Look at Exhibit 8, please.

6   A.  Exhibit 8.

7   Q.  Wait a second.  One question.

8       You say that you know a lawyer did it

9   because?

10  A.  Because it is not my --

11  Q.  You didn't do it?

12  A.  It is not my style of writing.

13  Q.  How do you know that Sagi didn't

14  prepare this?

15  A.  How did I know that Sagi didn't prepare

16  it?

17  Q.  Yes.

18  A.  Because he is not a lawyer.

19  Q.  You think that only lawyers can prepare

20  a document like this?

21  A.  Yes.

22  Q.  Is that the only reason you don't

23  believe Sagi prepared the document marked as

24  Exhibit 6?

25  A.  Yes.

8

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   Q.  Look at Exhibit 8?

3   A.  Yeah.

4   Q.  Did Sagi Genger prepare this document?

5   A.  I have no idea.

6   Q.  Did Sagi Genger give you this document

7   for you to sign?

8   A.  I don't remember.

9   Q.  Look at Exhibit 6 again.  Did Sagi

10  Genger give you Exhibit 6 for you to sign?

11  A.  I don't remember.

12  Q.  Ms. Genger, if you could look please at

13  page 207 of your transcript, from the first day

14  of your deposition.

15  A.  Yeah.  What do you want?

16  Q.  On page -- on page 207, at line 22, you

17  call Orly brainwashed already.  Do you see that?

18  A.  Right.

19  Q.  What did you mean by that?

20  A.  That she was talked about, certain

21  subject, over and over, and she was convinced

22  that whoever talked to her is telling her the

23  truth, and she should believe in it.

24  Q.  And the person who was talking to her

25  is Arie Genger?

9

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   A   Only this time -- brainwashed I

3   couldn't talk to her, candidly, even though I did

4   try (/STP-FPLT quoting from exhibit).

5       I didn't mention Arie's name here in

6   this answer.

7   Q.  But when you say that Orly was

8   brainwashed, brainwashed by whom?

9   A.  By whoever talked to her.

10  Q.  And who do you think that is?

11  A.  Somebody that had interest in her

12  thinking whatever she was thinking.

13  Q.  And who would that be?

14  A.  Could be anyone.  I mean, anyone that

15  has interest in whatever she answered.

16  Q.  Okay.  And when you said that she was

17  brainwashed you did not mean she was brainwashed

18  by Arie, is that what your testimony is now?

19  A.  No.  I didn't say that.

20  Q.  Okay.  So who did you --

21  A.  I said that it might be any person that

22  had interest for her to think a certain way or

23  believe in something that she believes in.

24  Q.  So on that basis you could have been

25  brainwashed, for example, by Sagi Genger?

10

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   A.   Might be

3   Q.   And is there any reason why you don't

4   want to identify Arie as a person who you

5   believed --

6   A.   I didn't say I don't want to.

7   Q.   Is that who you believed brainwashed

8   Orly?

9   A.   That's the end of the question?

10   Q.   Yes. I would like you to answer.

11   A.   I don't know if it was Arie, or it

12   might have been her lawyer, one of her lawyers,

13   for example. I mean, there are certain people

14   that want her to believe in certain things. And

15   that's why I cannot say if it was Sagi or Arie,

16   or one of her lawyers.

17   Q.   Okay. And what certain things did they

18   want her to believe?

19   A.   I didn't read the whole thing, so I

20   don't know what we are talking about.

21   Q.   Well, in this line of questioning, I

22   will represent to you, this is when you made the

23   decision not to let Arie Genger know about the

24   sale, about the UCC sale of the TPR shares, and

25   you decided not to let Orly know about the UCC

11

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   sale of the TPR shares?

3   A.   I want to read this.

4   MR. MEISTER: Wait wait.

5   THE WITNESS: I am not going to --

6   MR. MEISTER: Wait, Dalia. Let me put

7   my objection.

8   I object that that mischaracterizes the

9   testimony. I don't think this testimony that she

10   made a decision not to tell Orly --

11   BY MR. GRIVER:

12   Q.   You did not tell Orly about the UCC

13   sale, did you?

14   A.   That's true. That's what I said.

15   Q.   And why did you not tell Arie about the

16   UCC sale?

17   A.   Because I had no interest to tell him.

18   Q.   Why?

19   A.   Because it is not my role to tell him

20   and inform him about the UCC sale.

21   Q.   Why isn't it your role to tell him

22   about the UCC sale?

23   A.   I have many things that are not my

24   role. I mean, should I inform him about other

25   things that happened? No.

12

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   Q.   Did you know at the time that Arie

3   Genger had an interest in obtaining the TPR

4   shares?

5   A.   No.

6   Q.   You didn't think that at is all is --

7   A.   How should I know? He never

8   communicated with me.

9   Q.   You didn't suspect that all he might be

10   interested in obtaining shares of his family

11   company?

12   MR. MEISTER: Put it on the record.

13   Mrs. Genger, please wait until

14   Mr. Griver finishes --

15   A.   You are right. You are right.

16   I am sorry.

17   Q.   Can you read my question back please

18   A.   That was the question? Yes. ( Read

19   back).

20   A.   No.

21   BY MR. GRIVER:

22   Q.   That thought never crossed your mind?

23   A.   No.

24   Q.   What about Orly -- strike that.

25   Did you tell Orly about the UCC sale

13

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   before it happened?

3       A   We went over it. No, I didn't tell

4   her.

5       Q   Okay. Why didn't you tell Orly?

6       MR. MEISTER: Objection. Asked and

7   answered.

8       A   Because you asked me that.

9       Q   Yes.

10      A   And I did answer, and I will give you

11   the same answer.

12      Q   By all means.

13      A   The answer is that there was no way

14   that the trust could fight any -- had no means to

15   buy or compete in the auction, that's one. Of

16   the reasons that I didn't tell her.

17      And, secondly, I don't think it is one

18   of my roles to tell her about the auction. The

19   thing is that TPR went through legal procedures

20   in order to go through the auction. They did

21   follow the procedure, and unfortunately, the

22   results were what they were. Whatever they were.

23      Q   I am asking you Ms. Genger --

24      A   Yes.

25      Q   -- it never crossed your mind that this

14

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   might be something that Orly would be interested

3   in, that --

4       A   She never conveyed to me any desires or

5   things that she wants or doesn't want. She

6   didn't communicate with me. I mean, I am her

7   mother and she knows I am her trustee, too. She

8   could have picked up the phone and tell me,

9   mommy, or my trustee, I am not interested in -- I

10   want to participate in this auction. She didn't

11   do that.

12      Q   Okay. And you never thought to apprise

13   her? You never thought to tell her about it?

14      A   No. Because if it would have been

15   important enough for her, she would pick up the

16   phone and tell me.

17      Q   Okay. And how would Orly know about

18   the auction in order to tell you?

19      A   She -- there was a procedure. She

20   should have been aware of the procedure. Legal

21   procedure.

22      Q   And what is the legal procedure?

23      A   To advertise it in -- and that was in

24   New York post.

25      Q   Right. And there was no requirement

15

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   you believe to -- for the -- for TPR to apprise

3   you as the trustee of the upcoming sale?

4       A   Again, who do you -- repeat the

5   question.

6       Q   You don't believe that there was a

7   requirement for TPR to apprise you as trustee of

8   the sale?

9       MR. MEISTER: Objection. Calls for

10   legal conclusion.

11      A   TPR?

12      Q   Yes.

13      A   Requires me? Why should TPR require me

14   to do anything? What my role is in TPR? I am

15   the trustee of Orly trust.

16      Q   Do you believe that TPR had a

17   responsibility to tell you --

18      A   I have no idea what TPR's

19   responsibilities are.

20      MR. MEISTER: Dalia, let him finish the

21   question.

22   BY THE WITNESS:

23      A   I have no idea what the

24   responsibilities are.

25      Q   Did it ever occur to you that perhaps

16

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Orly might be able to find financing in order to

3    show up at the UCC sale?

4    A.    No, it never occurred to me.

5    Q.    Did you ever seek financing for the

6    trust?

7    A.    I said that I did entertain, I did --

8    no. Actually. No. That was another question

9    that you asked me. Ask me again. I am sorry.

10    Q.    Did you seek any financing in order to

11    be able to appear at the UCC sale and maintain

12    control of the TPR shares?

13    A.    No.

14    Q.    Did you talk to any bank?

15    MR. MEISTER: About that?

16    THE WITNESS: Yeah.

17    Q.    Did you talk to any bank about the fact

18    that there was an UCC sale and you would like to

19    show up to bid?

20    A.    No, I did not talk to any bank.

14    BY THE WITNESS:

15    A.    I didn't think --

16    Q.    Yes or no.

17    A.    -- it is my role.

18    Q.    So you decided it wasn't your role so

19    you weren't going to tell Arie, correct?

20    A.    I decided that I don't have to notify

21    anyone about the auction, okay.

22    Q.    Did --

23    A.    Including Arie.

24    Q.    Did you talk to a lawyer in your

25    capacity as trustee of the Orly Genger trust

18

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    about stopping the sale?

3    MR. MEISTER: Objection. This was all

4    gone over at the prior deposition.

5    Wait a minute, wait a minute, wait a

6    minute.

21    Q.    Any financing source of any kind?

22    A.    No. No. No.

23    Q.    Any friends?

24    A.    No. I didn't.

25    Q.    Okay. So you just looked at how much

17

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    money the Orly Genger trust had on the account?

3    A.    Yes.

4    Q.    And said well that's less than 4

5    million dollars so I am done; is that correct?

6    A.    More or less. Yes.

7    Q.    And you said I am not going to tell

8    Arie, correct?

9    MR. MEISTER: Objection.

10    A.    No, I didn't say that.

11    Q.    You decided you were not going to tell

12    Arie; isn't that correct?

13    MR. MEISTER: Objection.

7    THE WITNESS: I am not going to sit

8    here the whole day. I can't.

9    MR. MEISTER: Dalia, please.

10    A.    I am not 20 years old. I can't --

11    MR. MEISTER: Please don't interrupt

12    me. I object to you asking the same questions.

13    If you don't have fresh questions, then

14    I will consider the deposition --

15    MR. GRIVER: I most certainly do, and I

16    have a reason for asking it, and thank you very

17    much. From now on no speaking objections. Just

18    make your objection and be done.

19    THE WITNESS: Okay.

20    BY MR. GRIVER:

21    Q.    As for you, Ms. Genger, did you talk to

22    a lawyer about trying to stop the sale, yes or

23    no?

24    MR. MEISTER: Objection. Asked and

25    answered.

19

D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.   What was the question again?

3    Q.   Did you talk to a lawyer about trying

4    to stop the UCC sale?

5    A.   I don't remember.

6    Q.   You are not -- are you relying on

7    advice of counsel to protect your actions as

8    trustee in not trying to stop the UCC sale?

9         MR. MEISTER:  Objection.  Calls for

10   legal conclusion.  Let move on you have covered

11   this.  Dalia, wait a minute.

12        You have covered all of this at the

13   beginning of the first session of the deposition.

14   We are not going to have this first session of

15   the deposition repeated.

16        THE WITNESS:  Again?

17        MR. MEISTER:  So if you would like to

18   move on to fresh material --

19        MR. GRIVER:  Bob, it is not being

20   repeated.  What I am doing is laying a foundation

21   in order to find out if she's relying on advice

15        MR. MEISTER:  No, no, I am sorry.

16   Mr. Griver.

17        MR. GRIVER:  Find me the question where

18   I asked her this question, and you can do that,

19   she is going to ask it in the meantime.

20        MR. MEISTER:  No, she is not.  Wait a

21   minute.

22   BY MR. GRIVER:

23   Q.   Did -- strike that.

24        Ms. Genger, are you relying on advice?

25   A.   I am going to get up and walk away.  I

21

D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    can't take this.  I can't take this.

3    Q.   Mrs. Genger, simple question.  Are you

4    relying on advice of counsel?

5    A.   Usually I do.

6    Q.   To shield your actions in not

7    attempting to stop the UCC sale?

22   of counsel.  If she is, then I will get that

23   advice.

24        MR. MEISTER:  You can put it --

25        MR. GRIVER:  I will get that advice

20

D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    from her right now.

3         MR. MEISTER:  You had questions on

4    this.  She told you her answers.

5         MR. GRIVER:  And we had subsequent --

6         MR. MEISTER:

7         MR. GRIVER:  Subsequent communications

8    where you said, you know, make your case, and

9    bring it to the Court.  So I am going --

10        MR. MEISTER:  I don't understand what

11   you are talking about.

12        Do you want me to find the section

13   where you asked this?

14        MR. GRIVER:  I am not talking to you.

8    A.   Usually when I decide something, in

9    general, I take the advice and I consult with my

10   lawyer, okay.

11   Q.   I am not talking about generally.  I am

12   talking specifically with regard to your decision

13   not to attempt to stop the UCC sale?

14   A.   So specifically I told you then that I

15   don't remember.

16   Q.   Okay.  So in that event you are not

17   relying on advice of counsel?

18   A.   I didn't say that.

19        MR. MEISTER:  Objection.

20   A.   I said I don't remember.  I might have

21   Q.   Okay.  But as we sit here today you

22   don't remember what that advice was, as we sit

23   here today you don't remember if you were given

24   advice?

25   A.   No.

22

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Q.   Or you don't remember what that advice

3    was?

4    A.   I didn't say that. I said I don't

5    remember if I asked for advice. I didn't say

6    that I didn't get any advice, or which advice did

7    I get.

8    Q.   Read back her last question. (Read

9    back)?

10    THE WITNESS: Thank you.

11    BY MR. GRIVER:

12    Q.   Read that again, please.

13    (WHEREUPON, the record was read by

14    the reporter as requested.)

15    BY MR. GRIVER:

16    Q.   Did you get advice regarding the UCC

17    sale?

18    MR. MEISTER: Objection. Asked and

19    answered.

20    BY THE WITNESS:

21    A.   You just asked me. I mean, really, are

---

22    we going to -- I mean, this costs me money, you

23    know. This costs me money, if you are going to

24    ask me ten times the same question, I am giving

25    you ten times the same answer, I am not going to

23

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    pay my lawyer, and I am going to go to court. I

3    mean this is -- you are harassing me.

4    Q.   Mrs. Genger, calm down. If you

5    would --

6    A.   I would like to calm down.

7    Q.   If you would provide yes or no answers,

8    it will be helpful. If you quit changing your

9    answer, it will be helpful.

10    A.   I am not changing. If you read my

11    answers, you would see that I am very consistent

12    with my answers.

13    Q.   Read her last answer.

14    And Mrs. Genger I would like you to pay

---

15    attention to where you stated something that

16    makes it unclear whether or not you actually got

17    advice.

18    (Read back?)

19    MR. MEISTER: For the record, the first

20    session of the deposition, at page 191, after

21    Mr. Genger asked whether she consulted with a

22    lawyer (Mr. Griver, thank you, he asked the

23    question at line 2, what was his advice. And

24    then after dialogue, there was an answer at line

25    16, quote: Okay. We weighed the options we had

24

---

8    Q.   What options did you weigh? If you are

9    going with that testimony, that you actually did

10    seek a lawyer's advice. Then I will ask you what

11    options did you weigh?

12    A.   I don't remember. I don't remember.

13    Q.   Okay. What actions did you take as a

14    result of that advice?

15    A.   Of what?

16    Q.   Did you speak to anyone about trying to

17    stop the sale after you spoke to your attorney?

18    A.   Can you repeat the question.

19    (WHEREUPON, the record was read by

20    the reporter as requested.)

21    BY THE WITNESS:

22    A.   No.

23    BY MR. GRIVER:

24    Q.   Okay. On page 208 of your transcript,

25    if you could read, please, pages --

25

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    and we concluded there's nothing I can do to stop

3    Sagi, you know, doing whatever he did, with the

4    auction.

5    And it goes on. This topic was covered

6    in extenso.

7    BY MR. GRIVER:

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2      MR. MEISTER:  Just a second.
3      A.  We have to get to the right page here.
4      Q.  Page 208 lines 15 through 20.
5      A.  Sorry, what line you said?
6      MR. MEISTER:  15.
7  BY MR. GRIVER:
8      Q.  Lines 15 through 20.
9      A.  You have to --
10     MR. MEISTER:  You have to go back to
11  the question, though.
12     A.  Question.  Was, can you -- from where?
13  No, the question is --
14     MR. MEISTER:  The question is in line
15  3.
16     THE WITNESS:  Question, if you told
17  Orly about the sale, she would tell her father,
18  that didn't occur to you at all.
19     MR. MEISTER:  And the answer at line
20  15.
21
22     A.  Answer:  I didn't think about it at the

23  time.  But I am telling you frankly, I didn't
24  want Arie to be involved in this auction.
25  (Quoting from transcript(
                    26

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2      Okay.
3  BY MR. GRIVER:
4      Q.  And you continue on and say, because I
5  know my husband, do you see that?
6      A.  Yes, I do know my husband.
7      Q.  What did you mean by that?
8      A.  My ex-husband.
9      MR. MEISTER:  Your ex-husband.
10     A.  His character.  It -- /REU.
11     Q.  Okay.  Why -- what was it about your
12  ex-husband Arie Genger that made you not want him
13  to be involved in the auction?
14     A.  He is dishonest person, that's my
15  conclusion.

16     Q.  Okay.  And how did you believe that
17  that dishonesty might affect the auction?  What
18  was your --
19     A.  It will affect the results of the
20  auction in a way that will not benefit Orly.
21     Q.  By him buying the TPR shares?
22     A.  I don't know if he would buy or not.
23  How should I know?  Hypothetically, I cannot
24  answer you.  It is a hypothetical question.
25     Q.  You said you didn't want him to be
                    27

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2  involved.  I am asking you if Arie Genger had
3  bought the TPR shares --
4      A.  If if if.  I don't know.  What
5  happened.
6      Q.  One second --
7      A.  If if if.
8      Q.  If -- let's explore all the options.

9      Either Arie could show up and not buy
10  the TPR shares --
11     A.  I am not answering hypothetical
12  questions, okay, because it is hypothetical
13  answer.  So I don't know.  I don't know what
14  would happen.
15     Q.  You considered what might happen if
16  Arie Genger bid in deciding not to tell him about
17  the UCC sale, so I am asking you?
18     MR. MEISTER:  Objection.  That's not
19  her testimony.  The testimony that you just asked
20  her to read, what, is quote, did you -- I didn't
21  think about it at the time.  Closed quote.  Okay.
22  So don't mischaracterize her prior testimony.
23  BY MR. GRIVER:
24     Q.  Ms. Genger, what -- how could Arie's
25  presence at the UCC sale harm the Orly Genger
                    28

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   Trust?

3       MR. MEISTER: Objection.

4   BY MR. GRIVER:

5       Q.   As trustee, please answer the question

6       A.   First of all, I said at the time I

7   didn't think about involvement

8       Q.   Please answer my question. Please just

9   answer my question. Read back the question

10  please.

11      A.   I don't want my ex-husband to be

12  involved in finances that I am responsible for

13  being a trustee. I don't want him -- I didn't

14  want him to be involved in anything financial

15  that I will also responsible. Things that has to

16  do with Orly because I don't trust him.

17      Q.   Okay.

18      A.   Okay.

19      Q.   How would Arie's participation in

20  the --

21      A.   He is a dishonest person. I am cutting

22  you short because I told you that already.

16      A.   That's what happened

17      Q.   -- as trustee I am asking you --

18      A.   Okay.

19      Q.   If Arie Genger had paid more money than

20  TPR did for the TPR shares, how would that have

21  harmed the Orly Genger Trust?

22      A.   You really trying my patience.

23      Q.   I just want an answer to that question,

24  please.

25      A.   I said before, that I would stay away

                    30

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   from any financial involvement of Arie that has

3   to do with Orly financial affairs. That's my

4   answer.

5       Q.   Okay.

6       A.   If he paid more or less or much more,

7   it doesn't matter. I just don't trust the guy,

8   and I am the trustee and I made this decision,

23      Q.   Okay. Other than your belief in his

24  dishonesty, how is his buying the TPR shares for

25  more money --

                    29

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2       A.   No other ways

3       Q.   -- for more money than TPR was willing

4   to buy the TPR shares, how would that harm the

5   trust?

6       MR. MEISTER: Objection.

7       THE WITNESS: As I said, we discussed

8   it before. How would you know that I -- are you

9   assuming that Arie would buy the shares in a

10  higher price than whoever bought the shares?

11      Q.   If he had?

12      A.   If. If he.

13      Q.   Yes

14      A.   If if if. But if I don't know if

15      Q.   Ms. Genger --

9   okay. Because I happen to know the guy. It is

10  not a stranger. It is somebody that I lived with

11  like 35 years. So I know with whom I am dealing,

12  okay? Is this clear?

13      Q.   And, again, I am going to ask you.

14      A.   Again?

15      Q.   Excuse me. I don't understand. How

16  does Arie Genger's honesty, how does that taint

17  any moneys that he would pay for shares?

18      MR. MEISTER: Objection.

19      Q.   I am just --

20      A.   Because that's not the end of the

21  story, you know. There's things come after

22  buying the shares.

23      Q.   Such as?

24      A.   Consequences.

25      Q.   Such as?

                    31

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.  Of something.

3    Q.  Such as?

4    A.  I don't know, we are talking if.  I

5    don't know.  If.  If he would have paid.  If he

6    would have paid.  Then I would have -- discuss

7    with you, but.

8    Q.  If he had paid 8 million dollars for

9    the TPR shares, what future consequences would

10   have been negative for the trust?

11        MR. MEISTER:  Objection.

12   Q.  Ms. Genger, you are trustee.  You swore

13   that you would protect the trust.  You swore you

14   are able to protect the trust I am asking a

15   simple question.

16        I am asking you what negative

17   consequences do you believe would have resulted

18   from Arie Genger paying more money for the TPR

19   shares than TPR did?

20        MR. MEISTER:  Objection.

21   A.  You are very naive, you know.  You have

22   only just want to spend time, just spending time

23   asking questions, around, around the same

24   subject, okay.

25   Q.  And answer -- please answer my

                        32

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    question.

3    A.  And it is a fact that Arie was not able

4    to get his hand on the Orly's shares, okay.  It

5    is very disappointing to him, and to you, who you

6    are being paid by Arie, okay.  So that's why I

7    think that your reputation is a little bit

8    tainted in objectivity, is tainted when you ask

9    me this questions, okay.

10   Q.  Perhaps --

11        MR. MEISTER:  Can we take a break for a

12   minute.

13        MR. GRIVER:  I am brainwashed, too,

14   perhaps.

15        MR. MEISTER:  Can we take a break for a

16   minute.

17        MR. GRIVER:  I ask that she answer my

18   question, and then she can take a break.

19   BY MR. GRIVER:

20   Q.  Please repeat my question for the

21   record, type it out on the record, please.

22        ) Read back) insert text of question in

23   read back)?

24        MR. MEISTER.  Note my objection.

25

                        33

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.  Where are we standing now?

3    Q.  I am waiting for you to answer the

4    question

5    A.  What?  This is the question that you

6    asked like 20 minutes ago?

7    Q.  The one that you have not answered,

8    that she repeated for you, for your convenience.

9    Yes  Would you like her to repeat it again?

10   A.  Yes.

11        MR. GRIVER:  Madam court reporter

12   please.

13

14        (WHEREUPON, the record was read by

15        the reporter as requested.)

16        MR. MEISTER:  Objection

17        THE WITNESS:  What negative

18   consequences?  You asked?

19   Q.  Yes

20   A.  The negative consequences, I cannot

21   answer this question because I don't believe that

22   your question comes in good faith to protect

23   Orly's interest, because as we sit here, as we

24   sit here, your mind is also thinking about, I

25   mean, Arie's interest.  Specifically you are

                        34

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    asking about Arie's interest over and over and

3    over, okay. So it is obvious that somebody is

4    pushing Arie's name here all the time. Okay.

5    And that's why I don't feel comfortable

6    to answer you questions that are not objectively

7    being put forward as -- I have to find the word.

8    As pushing Orly's benefit in this kind of auction

9    or sale.

10    Q.    As an attorney for Orly and Orly's

11    trust, I believe that if someone had come into

12    that auction and paid more money, it would have

13    benefited the trust because the trust would have

14    had more money?

15    A.    If somebody would have come.

16    MR. MEISTER:    Objection

17    BY MR. GRIVER:

18    Q.    That's why I am asking. So I would ask

19    that you please answer the question.

20    A.    I am answering.

21    Q.    As trustee, what negative consequences

22    did you believe might result if Arie Genger had

23    paid more money for the TPR shares than TPR?

24    MR. MEISTER:    Excuse me. Objection

25    A.    Arie would have come, if he wanted to.

35

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Q.    He --

3    A.    He could have come if he wanted to. If

4    he was so eager, he should have read the

5    newspapers every day and come. But he didn't do

6    it. So he didn't come. So my role is to go and

7    call him and tell him?

8    Q.    Your role is not to call him --

9    A.    I could have called also another

10    millionaire or billionaire and asked him to come

11    and participate, but I didn't do it, because I am

12    not going to sit here every day and make phone

13    calls to all the millionaires in the country.

14    MR. MEISTER:    Let the record reflect in

15    part of your answer where she said, so my role is

16    to call him and tell him to come here, she was --

17    inflection indicated she was asking a question.

18    It was not a declarative statement.

19    Okay. Can we take our break please.

20    MR. GRIVER:    Sure. Let me have it

21    Exhibit 16.

22

23    (Dalia Exhibit /*, marked.)

24    (WHEREUPON, a recess was had.)

25    11:19, 1124)

36

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    BY MR. GRIVER:

3    Q.    You are aware that at the time that

4    Sagi Genger on behalf of TPR began taking steps

5    to foreclose on the note, that Orly was seeking

6    to have you removed as trustee?

7    A.    Right.

8    Q.    And you know that before you were

9    appointed as trustee, Orly had been in conflict

10    with Leah Fang the previous trustee?

11    A.    Yes.

12    Q.    Okay. And you testified I believe

13    previously that you never -- that you don't know

14    what exactly the conflict was, and you had not

15    sought to understand what that conflict was?

16    A.    Right.

17    Q.    But you knew, did you not, from the

18    conflict with Leah Fang and from Orly's actions

19    against you that Orly was, in fact, deeply

20    concerned about her trust and her trust assets?

21    MR. MEISTER:    Objection. You misspoke.

22    THE WITNESS:    Can you repeat

23    A.    Orly what?

24    Q.    Did you not understand from Orly's

25    actions with regard to Leah Fang and with regard

37

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    to you that Orly was concerned about?

3    A.    Concerned about protection of?

4    Concerned about?

5    Q.    Protection of her trust assets?

6    A.    Concerned?  You mean, did I --

7    Q.    Yes.  Did you think that Orly was

8    concerned about her trust assets?

9    A.    No, I was not aware of that.

10    Q.    You -- so did you believe that Orly did

11    not care what happened to the assets of her

12    trust?

13    A.    I am sure she, like any normal person,

14    she is concerned about her assets.

15    Q.    Okay.  So knowing that like any other

16    normal person she would be concerned about her

17    trust assets, why didn't you tell her, by phone,

18    by mail, by any means you chose?

19    A.    Yeah.

20    Q.    About the fact that those assets were

21    about to be sold?

22    A.    Why --

23        MR. MEISTER:  Objection.  Assumes a

24    fact not in evidence.

25    BY THE WITNESS:

                    38

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.    I --

3        MR. MEISTER:  And.

4    A.    Is there a connection --

5        MR. MEISTER:  Objection to the form.

6        THE WITNESS:

7    A.    Is there -- I don't understand.  Is

8    there a connection between the question that you

9    asked me now to the question before that she's

10    concerned about her assets, and now you are

11    asking me what?

12    Q.    If you assumed that Orly like any

13    normal person was concerned about her trust

14    assets, why did you not provide the courtesy of

15    calling up and letting her know that TPR was

16    foreclosing on some of those asset?

17        MR. MEISTER:  Objection.  Assumes a

18    fact not in evidence.  Objection to form.  And

19    objection to this whole line has been gone over

20    and over and over.

21    A.    My answer is, if Orly was so concerned

22    she could have given me a phone call.  I am her

23    mother and she knows my number.

24    Q.    And as her mother you didn't think you

25    should call up and let your daughter know?

                    39

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2        MR. MEISTER:  Objection.  Asked and

3    answered.  Numerous times.

4    A.    How many times, I mean, really.  You

5    know.

6    Q.    Answer the question.

7    A.    So I told you, if she was so concerned

8    that I am doing something wrong, when she was

9    very concerned she did write me a letter, okay

10    Apparently this time she didn't find the time or

11    the necessity to write me any letter concerning

12    me, selling the shares to the trump group, for

13    example.  Then she did.  Now she didn't.  Why?

14    Because she was concerned less?  Or she didn't

15    have the time?  I have no idea.

16    Q.    As her mother, don't you think you

17    should have called on the phone and let her know

18    about the sale?

19        MR. MEISTER:  Objection.  Asked and

20    answered.

21    BY MR. GRIVER:

22    Q.    Just yes or no.

23    A.    The same question that we --

24    Q.    Yes.  Until you give me an answer, yes.

25        As her mother don't you think you

                    40

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    should have picked up the phone and told her

3    about the foreclosing on the TPR assets?

4   A.   No.

5       MR. MEISTER:  Objection.  Asked and

6   answered.

7   BY MR. GRIVER:

8   Q.   Okay.  Take a look at what's been

9   marked as Exhibit 16, please.  This is, for the

10  record, Exhibit 16 is an affirmation in support

11  of the motion to dismiss further amended petition

12  signed by Robert Meister on or about November 19,

13  2012.

14      Did you review this document before it

15  was submitted on behalf of -- purportedly on

16  behalf of the Orly Genger Trust and you as

17  trustee?

18      MR. MEISTER:  First of all, I note that

19  this is a document submitted in a different

20  litigation.  Secondly, it was not submitted on

21  behalf of the Orly Genger trust.  So it is

22  mischaracterizing it.  Submitted on behalf of

23  Ms. Genger, as trustee, in response to a

24  petition, third amended petition to remove her as

18  case.

19      MR. GRIVER:  That's not true at all,

20  but thank you for that, Robert.

21  Q.   If you would look at paragraph 8.

22  Actually, paragraph 21, says it better.

23  Paragraph 21

24  A.   21.  Okay.

25      MR. MEISTER:  Page 12.

                    42

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   BY THE WITNESS:

3   A.   Okay.

4       MR. GRIVER:

5   A.   So what part of 21?

6   Q.   Yes.  But first I will ask you because

7   I don't believe I received an answer to my

8   question, did you review this document before it

9   was submitted in the --

10  A.   I don't remember.

25  trustee.

                    41

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2       I further note that this is not a

3   deposition in that action.

4       MR. GRIVER:  And I will simply note

5   that one of the actions against Ms. Genger in

6   this case is for fraud in her actions as trustee.

7       THE WITNESS:  Fraud?

8   Q.   Fraud.  That's correct.

9       MR. MEISTER:  Actually, I think --

10  A.   Get to the point.

11      MR. MEISTER:  It is not interactions as

12  trustee, what is left in this case after the

13  trustee claims were dismissed by -- in the very

14  first motion, is an allegation that Mrs. Genger

15  colluded and committed fraud individually,

16  colluded with Sagi Genger.  None of these

17  questions seem to relate to what is left in this

11  Q.   -- action?

12      Okay.  If you can look at paragraph 21

13  particularly the second sentence.

14  A.   When you say the note, which note do

15  you mean?  The D&K note?

16  Q.   The D&K note, yes.

17  A.   Yes, I remember that.

18  Q.   And --

19  A.   I was -- yeah.

20      MR. MEISTER:  Wait until there's a

21  question.

22  BY MR. GRIVER:

23  Q.   So does it -- is it your position

24  that --

25  A.   I am sorry.  What is TAP?

                    43

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   Q.   Third amended petition.

3   A.   What?

4    Q.   Third amended petition.

5    A.   (Reading document).

6    Q

7    A.   Okay.  I read it

8    Q.   Are you taking the position that you

9    could not tell Orly Genger about the notice of

10   default of the D&K note which was dated August

11   31, 2008, because you had been instructed by

12   Surrogate Roth to take no action?

13   A.   Actually, yes.  I remember that I

14   was -- I was notified that I shouldn't do

15   anything because Orly asked from the judge that I

16   shouldn't take any action.

17   Q.   And so because of Surrogate Roth's

18   order you took no auction --

19   A.   I don't remember it because of this or

20   because of that.  But I knew that I couldn't take

21   any action.  I don't remember.

22   Q.   You couldn't take any action of

23   Surrogate Roth's order?

24   A.   It says so

25   Q.   I know that's -- I know that's what

---

44

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Mr. Meister's claims.  I am asking you as

3    trustee, did you believe that Surrogate Roth

4    order required to you to take no action?

5    A.   Yes.  I believe so.

6    Q.   No.  Let me finish.

7         So Surrogate Roth's order required to

8    you to take no action of any kind as --

9    A.   I was not allowed --

10   Q.   -- as trustee?

11   A.   Yeah.

12   Q.   You were not allowed?

13   A.   Yeah

14   Q.   You couldn't even call your daughter

15   and tell her because of that, is that your

16   position because Surrogate Roth told you to take

17   no action to harm the sales of the trust?

18        MR. MEISTER:  Objection.

---

19   Mischaracterizes what Surrogate Roth said.

20   A.   So what's the question?

21   Q.   Well, I will rephrase it.

22        So what was your understanding of

23   Surrogate Roth's impact on your ability to act?

24   A.   That I don't have a ability to act.

25   Q.   In any way?

45

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.   If she said not to act, so I would say

3    in any way.  She didn't say in any way, but I

4    assumed that that's what she meant.  Otherwise

5    she would specify in which way I can take an

6    action.

7    Q.   Okay.

8    A.   I would assume.

9    Q.   I am not asking you to assume,

10   Ms. Genger.

11   A.   I am not a lawyer.  I don't know the

---

12   way these things are written.

13   Q.   But as trustee, what was -- I'm asking

14   simply what your understanding was as trustee?

15   A.   That I shouldn't take any action.

16   Q.   And your understanding, did that

17   prevent you from even calling up your daughter

18   and letting her know about the sale?

19   A.   Yeah.

20   Q.   So your understanding is that Justice

21   Roth's order even prevented you letting people

22   knowing about a sale?  It was that broad,

23   correct?

24   A.   I was instructed not to take any

25   action, and that's what I did.  I didn't take any

46

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    action

3    Q.   And what was the basis for your

4    understanding, that you could take no action?

5    A.   What's the basis?  Because the judge
6    said so.
7    Q.   Okay.  Any other basis?
8    A.   Maybe, but I don't remember at the
9    moment.
10    Q.   Did you discuss -- strike that.
11        Did you discuss Justice Roth's --
12    excuse me.
13        Did you discuss Surrogate Roth's order
14    with Sagi?
15    A.   No.
16    Q.   Now, Justice Roth issued the order we
17    have been discussing where you were not to take
18    any actions to effect the trust assets in March
19    of 2008.  Do you recall that?
20    A.   Is this regarding to the trump group?
21    Q.   No.  This is in -- the trump group --
22    this is regarding to you --
23    A.   Yes.
24    Q.   -- not taking any action as trustee
25    because at the time Orly was seeking to remove

47

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2    you as trustee because she did not believe that
3    you --
4    A.   Okay.  The fraudulent and so and so
5    forth?
6    Q.   No, just that you were you would not be
7    a good trustee.  Just that you would not --
8    Ms. Genger.
9        MR. MEISTER:  Don't make jokes,
10    Mrs. Genger.  This is anything you say on the
11    record --
12        MR. GRIVER:  I don't think she was
13    joking.
14        MR. GRIVER:
15    Q.   Ms. Genger, were you joking?
16    A.   Of course I was joking.  Would I say
17    about myself that I am --
18    Q.   Ms. --

19    A.   -- fraudulent?
20    Q.   Then I ask you just simply answer the
21    question --
22    A.   Okay.  What is the question?
23    Q.   -- because you are under oath.
24        Do you recall that Surrogate Roth's
25    direction that no actions were to be taken by you

48

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2    in reference to the trust assets, that that order
3    was issued on or about March 4 of 2008, do you
4    recall that?
5    A.   I recall that it was something like
6    that, but the date, I am not sure about.
7    Q.   I will represent to you it was March 4,
8    2008, and it lasted until January 1 of 2009.
9    A.   Okay.
10    Q.   So during that time, you were not
11    allowed to take any actions whatsoever, correct?

12    A.   Okay.
13    Q.   Did she answer?
14        Court reporter:  She said okay.
15        MR. GRIVER:  Okay.  Let's have this
16    marked as 17.
17        (Dalia Exhibit /*, marked.)
18    BY MR. GRIVER:
19    Q.   Is that your signature, Ms. Genger?
20    A.   All right.  Yes.  But I have to
21    familiarize myself because you know, I am not --
22    Q.   Go ahead and do that.  But is that your
23    signature on Exhibit 17?
24    A.   Yes.  I know, I know.  I said, I know.
25    But I have now to --

49

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2    Q.   Now that you have identified you as
3    having signed this document, go ahead and read
4    it.

5    A.   Yes.  Now I am reading it.  And I am

6    trying to see to what we are talking here about.

7    Amending something.

8    Q.   Okay.  For the --

9    A.   Paragraph 32, what is paragraph 32.

10   Q.   Ms. Genger, you can read it.  If you

11   look at Exhibit 9 of your Exhibit 9, that's the

12   D&K restated and amended partnership agreement

13   A.   Okay.  I am just -- okay.

14        MR. MEISTER:  Everything you say

15   including, I am turning to this, the reporter has

16   to write down.

17        THE WITNESS:  She has to write it down

18   I'm sorry.

19        MR. MEISTER:  So don't say anything

20   except when Mr. Griver asks you a question and

21   then you answer.

22        THE WITNESS:  Okay.  I'm fine.  Okay.

23   BY MR. GRIVER:

24   Q.   For the record, Exhibit 17 is an

25   amendment on or about August 22, 2008, to the

                    50

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    amended and restated limited partnership

3    agreement of D&K limited partnership

4    A.   Paragraph 22?  With authority of

5    general partners, this is what you mean?  Page

6    11.

7    Q.   Yeah.

8    A.   What is it?

9    Q.   Ms. Genger, this is an amendment to the

10   D&K limited partnership agreement, to which the

11   Orly Genger Trust was a partner.  And this is a

12   change that took place in August of 2008 --

13   A.   Yeah.

14   Q.   -- during the time of Surrogate Roth's

15   order.

16   A.   Order that what, that I shouldn't --

17        MR. MEISTER:  Just wait for the

18   question.

19        THE WITNESS:  I don't -- no.  I don't

---

20   get it.  That's why I am talking.

21        MR. MEISTER:  But don't talk -- if you

22   wait for the question, and then when the question

23   is over and you can answer.

24   BY MR. GRIVER:

25   Q.   Ms. Genger, who drafted this amendment?

                    51

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.   I wouldn't know.

3    Q.   Did Sagi Genger draft this amendment?

4    A.   When I say I wouldn't know, it includes

5    Sagi, other lawyers, I wouldn't know.  Somebody

6    drafted it.  I didn't draft it.

7    Q.   Did you have --

8    A.   I did not draft it.

9    Q.   Do you recall anything related to your

10   signing of this amendment?

11   A.   I have to refresh my memory.  I don't

12   remember.

---

13   Q.   Well, I have given you an opportunity

14   to read the amendment.  Does that refresh your

15   recollection as to the circumstances?

16   A.   I need time to read it.

17   Q.   Take it.

18   A.   Okay.  (Witness reading document)

19        MR. GRIVER:  Let me have this marked as

20   18 while we're waiting.

21        (Dalia Exhibit /*, marked.)

22        MR. MEISTER:  As far as the I know, the

23   only question is, have you signed Exhibit 17, and

24   you answered that, or he asked you if that's your

25   signature.

                    52

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.   What is the question?

3    BY MR. GRIVER:

4    Q.   Do you recall the circumstances of you

5    signing this amendment?

6    A.   The circumstances?  You mean about what

7    was it, you mean?

8    Q.   About what was it, when you signed it,

9    who was there when you signed it, anything?

10   A.   I want to make sure that I am looking

11   at the right paragraph, because it says paragraph

12   22, is corrected to read so and so, right.

13        So paragraph 22 --

14   Q.   Amended?

15   A.   Right.  And it is in page 11, right?

16   Is what you mean?  I want to make sure we are

17   looking at the same document.

18   Q.   Page 11 through 12.

19   A.   Okay.  I am just trying to find the

20   exact -- the correcting number here, right?  The

21   number of shares, I am trying to see what it is,

22   and it is probably something that I was --

23   Q.   If you look at the end of 22-A the very

24   first line very last thing is --

25   A.   22.

                      53


20   of this amendment?

21   A.   No, I don't remember that.

22   Q.   Okay.  Was this change in the

23   amendment, was this your idea or somebody else's

24   idea?

25   A.   I'm sorry, I didn't understand.

                      54


1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Q.   This amendment that's been marked as

3    Exhibit 17, was this your idea or somebody else's

4    idea?

5    A.   Idea, you said, you mean?

6    Q.   Yes.

7    A.   I don't know whose idea it was.

8    Q.   You don't even remember if it was your

9    idea, is that your testimony?

10   A.   I don't remember whose idea it was,

11   that's what I am saying.

12   Q.   Was it your idea?


1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Q.   Very last thing is 102.80.

3    A.   22-A okay.  Okay.  So there is a

4    correction to the percentage, I guess.

5    Q.   Okay.

6    A.   Because here it says percentage, and

7    here it says shares.

8    Q.   There's also a relaxation, saying

9    termination or termination of restrictions,

10   right, language was added at the end, do you see

11   that, in the amendment?

12   A.   At the end --

13   Q.   If you look at Exhibit 17, you will see

14   that additional language was added at its end.

15   Do you see that?

16   A.   Certain restriction might be relaxed.

17   Okay.

18   Q.   Do you recall -- do you have any

19   recollection of the circumstances of the signing


13   A.   I said I don't remember so I -- it

14   might be mine, it might be somebody else  I

15   don't remember.

16   Q.   So at the time when you were -- at the

17   time that you were instructed by Surrogate Roth

18   not to take any action, it could have been your

19   idea to amend the D&K agreement?

20   A.   I said I don't remember.  I didn't say

21   that I did.

22   Q.   So it would have been?

23   A.   I said I don't remember.

24   Q.   So it is a possibility correct?

25   A.   If they want to hang on possibilities,

                      55


1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    hang on possibilities --

3        MR. MEISTER:  Objection calls for

4    hypothetical.

5        THE WITNESS:  Hypothetical.

6   Q   If you can't remember whether or not it
7   was your idea, then it is possible it is your
8   idea, correct?
9       MR. MEISTER: Stop badgering the
10  witness. She said she doesn't matter.
11      Excuse me. Dalia. Dalia. Let me get
12  my objection on the record.
13      She said she answered your question.
14  Don't ask her hypothetical questions. Let's not
15  have to get the judge on the phone again.
16      MR. GRIVER: Every time we get the
17  judge on the phone, it goes against you.
18      MR. MEISTER: It don't go against me
19  Yonv
20  BY MR. GRIVER:
21  Q   You don't remember if this was your
22  idea or not, correct?
23  A   I do not remember if it was my idea,
24  and that's my answer.
25  Q   Okay. It could have been your idea, it
                    56

21  Q   Okay. Ms. Genger, how would it be in
22  the Orly Genger Trust's best interests to add the
23  language at the end that provided that the
24  restrictions of paragraph 22 of the D&K amended
25  and restated agreement could be relaxed or
                    57

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2   terminated with the consent of the general
3   partner, which is Sagi Genger and TRI associates
4   Inc., where Sagi Genger was the CEO at the time?
5   A   I don't remember.
6       MR. MEISTER: Objection.
7   Mischaracterization.
8   A   I told you I don't remember. That I
9   made this correction. So how can I answer this
10  question now.
11  BY MR. GRIVER:
12  Q   At the time that you signed this --
13  well, strike that.

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2   could have been Rochelle Fang's idea, it could
3   have been Sagi Genger's idea, correct?
4   A   Or my lawyer's idea.
5   Q   And who was your lawyer at the time?
6   A   Indicating. Sitting next to me.
7       MR. MEISTER: No. Objection.
8   BY MR. GRIVER:
9   Q   Mr. Kortmansky?
10  A   Either -- Kortmansky, okay. So just
11  show you how much I remember.
12  Q   And this was an amendment that you
13  signed as trustee of the Orly Genger Trust,
14  correct?
15      MR. MEISTER: Objection. Asked and
16  answered.
17  BY MR. GRIVER:
18  Q
19  A   Yes, you said that's when I was not
20  supposed to. So I guess I was --

14      Ms. Genger, you are the trustee of the
15  trust now. Okay?
16  A   Right.
17  Q   You are still charged with protecting
18  the trust. So I am asking you --
19  A   I am charged?
20  Q   With protecting the trust. It is your
21  responsibility to protect the trust, correct?
22  A   Yeah.
23  Q   So --
24  A   It is my privilege.
25  Q   As trustee of the trust, what possible
                    58

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2   best interest could there be for the Orly Genger
3   trust for those restrictions to be relaxed or
4   terminated in a way set forth in the amendment?
5       MR. MEISTER: Objection.
6   BY THE WITNESS:

7    A.    At the time, I am sure I had my

8    reasons, but now I don't remember what they were.

9    BY MR. GRIVER:

10    Q.    Okay.  As trust of the trust, on what

11    basis, as we sit here today, could you possibly

12    think?

13    A.    As I sit here today, I don't know what

14    I was thinking then.

15    Q.    Okay.  At the time that you signed this

16    amendment, had you received a copy of the amended

17    and restated limited partnership agreement that

18    was being amended?

19    A.    I don't remember

20    Q.    Had you read it?

21    A.    I don't remember.

22    Q.    Do you recall whether or not you

23    provided this amendment to an attorney to review,

24    before you signed it?

25    A.    I don't remember.

59

21    MR. MEISTER:  Objection  Calls --

22    first of all, objection to form.  Secondly, it

23    calls for a legal conclusion, and it has nothing

24    whatsoever to do with this case.

25    BY THE WITNESS:

60

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.    I repeat what he is saying.

3    BY MR. GRIVER

4    Q.    Okay.  And as trustee do you think you

5    should have apprised Surrogate Roth about this

6    amendment?  Yes or no?

7    A.    I don't have any idea if I should or

8    shouldn't at the time.

9    Q.    Okay.  As we sit here today, do you

10    think it would have been appropriate for you to

11    do so?

12    A.    I don't remember what was it about.  So

13    I can't tell you what I thought -- who should

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Q.    Okay.  Did Sagi Genger just give you

3    this document and ask you to sign it?

4    A.    I didn't say that Sagi Genger gave me

5    the document.  Why you putting words in my mouth?

6    Q.    You don't remember how it came to be

7    given to you for signature?

8    A.    No, I don't remember.

9    Q.    All right.  At any time did you let the

10    surrogate court know that this amendment had been

11    made to the D&K amended and restated limited

12    partnership agreement?

13    A.    I don't remember.

14    Q.    Okay.  At anytime while -- let me ask

15    you, as you sit here today, should you have -- I

16    will represent to you that there's nothing in the

17    files that indicate that you did.

18    As we sit here today do you believe

19    that you should have let the surrogate court know

20    about this amendment?

14    have done.

15    Q.    Let me show you what's been marked as

16    Exhibit 18.

17    (Daha Exhibit /*, marked )

18    BY MR. GRIVER:

19    Q.    Ms. Genger this is another document for

20    the record, called amendment to the amended and

21    restated limited partnership agreement of D&K

22    limited partnership.

23    It is dated as of November 2008.

24    A.    November?  November 22.  Yes.  So what

25    is the question?

61

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Q.    Is that your signature on the second

3    page?

4    A.    I didn't say it was my signature here.

5    Q.    Did you ever give anyone permission to

6    sign on your behalf this document?

7    A.   I don't see my name here, so.

8    Q.   Well, at the -- in November of 2008,

9 you were trustee of the trust, correct?

10    A.   In November 2008, I was the trustee of

11 the trust.  Right.

12    Q.   Okay.  Do you recognize the signature

13 directly on top of yours?

14    MR. MEISTER:  Objection.  There is no

15 signature of hers.

16 BY MR. GRIVER:

17    Q.   Directly on top of -- do you see the

18 signature?

19    A.   It doesn't spell my name anywhere so

20 why should I sign?

21    Q.   Did you see the signature for the 1993

22 Sagi Genger trust, do you recognize --

23    A.   No.

24    Q.   Do you recognize the second for D&K

25 LLP?

                    62

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.   I don't recall Orly signature here  I

3 don't see if it is a line.

4    Q.   Do you recognize Sagi Genger's

5 signature?

6    A.   On the top I do.

7    Q.   But as we sit here today, you don't

8 believe that's your signature on behalf of the

9 1993 Orly Genger Trust?

10    A.   No.

11    Q.   And as we sit here today you don't

12 recall ever giving anyone permission to sign on

13 your behalf this document that's been marked?

14    A.   I know that my son has some rights to

15 sign, but no, I don't think in this case.

16    Q.   Well, that's not the question.

17    A.   Not as a trustee for sure

18    Q.   My question is, did you give anyone

19 permission to sign?

20    A.   No.

21    Q.   On your behalf, this document that's

---

22 been marked as Exhibit 18?

23    A.   No. No.

24    Q.   Okay.  Now, I note that you -- that I

25 note that this document was produced by you, it

                    63

---

15 was produced by you in this litigation?

16    A.   That's what you said.  I don't know if

17 it is true.

18    MR. MEISTER:  It means it was produced

19 by her including her counsel, as to anything she

20 or her counsel had in their possession

21    MR. GRIVER:  Okay.

22 BY MR. GRIVER:

23    Q.   Ms. Genger?

24    A.   What?  Something happened?

25    MR. MEISTER:  That's the way you

                    64

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2 has Bates stamps, DG 146 and 147.

3    A.   Where is this document?

4    MR. MEISTER:  Wait for a question.

5 BY MR. GRIVER:

6    Q.   Do you see those exhibits, those Bates

7 numbers?

8    A.   I don't know who put the stamps on

9    Q.   No, no.  Look at the bottom.  It says

10 DG 146 and 147?

11    MR. MEISTER:  If the question is, does

12 this document have DG 146 and 147, I will

13 stipulate it does.

14    Q.   And that means, Ms. Genger, that this

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2 requested the draft for production.

3    Q.   Ms. Genger?

4    A.   I don't understand.

5    Q.   Ms. Genger, when did you receive this

6 document?

7    A.   I don't remember.

8    Q.  Did you ever -- did you ever seek to

9    understand why someone was purporting to sign on

10    behalf of the 1993 Orly Genger Trust when it was

11    not your signature on this document?

12    A.  No.  Because I don't remember when I

13    got it, and when I saw it, and when I read it.

14    Q.  I am not asking when  I am asking do

15    you recall ever doing anything to understand who

16    signed --

17    A.  No, I don't recall.

18    Q.  Okay.  Do you recall any effort by you

19    to understand the meaning and effect of this

20    document?

21    A.  No, I don't recall.

22    Q.  How would this amendment be in the best

23    interest of the Orly Genger Trust?

24    MR. MEISTER:  This amendment, that she

25    didn't sign, that she doesn't remember ever

65

---

22    MR. MEISTER:  Dalia, wait.

23    A.  Thanks to you.

24    MR. MEISTER:  Please don't make

25    speeches  Wait for his question.  Listen to the

66

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    question.  If you can answer it, answer it

3    BY MR. GRIVER:

4    Q.  How does Exhibit 18 protect your child?

5    A.  I don't know.

6    Q.  Okay.  Did you ever task anyone with

7    investigating who purported sign on behalf of

8    Orly Genger Trust?

9    A.  I don't remember.

10    Q.  Did you ever --

11    A.  I don't remember.  If I ever

12    Q.  Did you ever task anyone with

13    attempting understand the effect of --

14    A.  I don't remember --

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    seeing before?  No.  No.

3    MR. GRIVER:  It came from --

4    MR. MEISTER:  Objection.

5    MR. GRIVER:  It came from her

6    possession or from --

7    MR. MEISTER:  It didn't come from her,

8    it came from her or her counsel because that's

9    the way you drafted your --

10    MR. GRIVER:

11    Q.  Ms. Genger, did it come from your

12    possession?

13    A.  I am saying you are harassing me, you

14    know that

15    Q.  No, I am asking you --

16    A.  You are harassing me.

17    Q.  Ms. Genger, you are trustee?

18    A.  I know that I am trustee, and I am

19    doing the best that I can.

20    Q.  Okay.  As trustee --

21    A.  In order to protect my child okay.

---

15    Q.  -- this amendment?

16    A.  -- if I ever did this

17    Q.  Did you ever attempt to determine why

18    these changes were being made?

19    A.  I don't remember if I ever did.

20    Q.  Ms. Genger, if you look at Exhibit 9, I

21    will make this very simple.

22    A.  You promise?

23    Q.  I am only going to try.

24    MR. MEISTER:  Dalia, please don't do

25    this.

67

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    BY MR. GRIVER:

3    Q.  To your knowledge, was Exhibit 9 ever

4    altered, amended, changed, revised, fixed,

5    superceded, in any way by you?

6    A.  I don't remember.

7    MR. MEISTER:  Objection.

8   BY MR. GRIVER:

9       Q.   Okay.  Are there any other alterations,

10   amendments, changes, revisions, fixes, or

11   supersessions of Exhibit 9 other than the one we

12   have discussed today?

13          MR. MEISTER:  Objection to the form the

14   question

15       A.   I don't remember anyway.

16       Q.   If there were other changes to Exhibit

17   9, would they not be in your possession as

18   trustee?

19       A.   I don't remember if I have it or don't

20   have it.

21       Q.   Do you keep files as trustee?

22       A.   I do have some files.  Yes.

23       Q.   Did you produce all of those files to

24   your counsel for review and production?

25       A.   Yes.

                    68


1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2        Q.   In November of 2008, who was your

3    counsel?

4        A.   I believe it was -- 2008?

5        Q.   Uh-huh.

6           MR. MEISTER:  You told her before it

7    was Mr. Kortmansky.  She says she didn't remember

8    and you told her it was --

9        A.   I said I don't remember, even for

10   something that happened five minutes ago.

11       Q.   And it was Mr. Kortmansky?

12       A.   I guess if you tell me so.

13       Q.   Ms. Genger, I am asking you, do you

14   have any recollection as to who your attorney was

15   in November of 2008?

16       A.   I recall what you told me that it was

17   Mr. Kortmansky.

18       Q.   In producing documents in this case,

19   did you go to Mr. Kortmansky and ask him to

20   review his files?

21       A.   I don't remember.

22       Q.   You -- you don't remember seeking that?


23       A.   No.  I don't remember.

24       Q.   Do you know if your production includes

25   files from Mr. Kortmansky?

                    69


1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2        A.   Whatever I had, I gave to my lawyer.

3        Q.   I am not asking for what you have, I am

4    asking did you make sure that Mr. Kortmansky

5    provided documents to Mr. Meister?

6        A.   To Mr. Meister?  I believe he did.

7        Q.   And on what do you base that belief?

8        A.   Because he is an honest lawyer who does

9    his job correctly, and that's Mr. Meister

10   received it.

11       Q.   How do you know that Mr. Meister

12   received files from Mr. Kortmansky?

13          MR. MEISTER:  That wasn't the question.

14   Your question was did she believe.

15          THE WITNESS:  Which I do believe.


16          MR. MEISTER:  You are asking whether

17   she knows.

18          THE WITNESS:  Yeah.  I don't know for

19   fact.  I didn't go and check page by page.  But I

20   believe that lawyers behave honestly, and this

21   is --

22          MR. MEISTER:  Not off the record.

23   Instead of berating the witness, you can ask me

24   simply when I became successor counsel, did I ask

25   Kortmansky for his files, in the firm, and the

                    70


1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    answer would be yes.  I have an envelope or

3    whatever the thing was that he turned over as his

4    files.

5           THE WITNESS:  So why are you asking me

6    these kind of questions?  I cannot answer.

7    BY MR. GRIVER:

8        Q.   Did this document mark as Exhibit 8,

9    did this come from your file?

10   A.   You think I see from here.

11   Q.   You have a copy.  This document --

12        MR. MEISTER:  We are back on 18.

13   BY MR. GRIVER:

14   Q.   This document marked as Exhibit 18.

15   Did this -- was this -- did this come from your

16   files or Mr. Kortmansky's files?

17        MR. MEISTER:  Objection.  Form,

18   disjunctive compound.

19   A.   That's the one without the signature?

20   Q.   Well, it came from your files or it

21   came from Mr. Kortmansky's files?

22        MR. MEISTER:  Objection to form.

23   Disjunctive compound.

24   BY THE WITNESS:

25   A.   I don't remember.

                        71

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

23   Q.   Ms. Genger, when you signed the

24   amendment to the D&K limited partnership

25   agreement marked as Exhibit 17, were you aware

                        72

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    that TPR had entered into a side letter agreement

3    with the Trump Group as to the sale of the Orly

4    Genger Trust shares of TRI?

5    A.   A side letter agreement?

6    Q.   Uh-huh.

7         MR. MEISTER:  Read the question back,

8    please.

9    A.   Yeah.  I am not so sure.

10        MR. MEISTER:  Listen to the question.

11   (Read back).

12   BY THE WITNESS:

13   A.   I have nothing to do with the TPR, so I

14   they didn't notify me.  I am not aware.  I was

15   not aware.

2         MR. GRIVER:

3    Q.   You don't remember this came from your

4    files?

5    A.   I don't remember from which file it

6    came.

7    Q.   Okay.  You don't remember this came

8    from Mr. Kortmansky's files, correct?

9    A.   What I said, I don't remember, from

10   which, I mean also from Kortmansky.

11   Q.   In producing documents in this case --

12   A.   Yeah.

13   Q.   -- other than yourself and

14   Mr. Kortmansky and Mr. Meister's files, was there

15   any other places that you went to in order to

16   produce documents in this case?

17   A.   I don't think so.

18        MR. GRIVER:  Before we go -- take a

19   two-minute break.

20        (WHEREUPON, a recess was had.)

21        12:06 to 12:18

22        MR. GRIVER:

16   BY MR. GRIVER:

17   Q.   Okay.  Did you seek to ascertain why

18   this document was presented to you as of August

19   22, 2008?

20   A.   Can you ask these question again.

21   Q.   Sure.

22        Did you seek to ascertain why this

23   document was presented to you as of August 22,

24   2008?

25   A.   I did not seek to ascertain why

                        73

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Q.   Ms. Genger, if you can please look at

3    what's been previously marked as Exhibit 15

4    Ms. Genger, do you recall when you found out

5    about the August 2008 TPR TI transactions?

6         MR. MEISTER:  Can I have that read back

7    please.

8    A.   It is hard for me to -- all these

9    names.

10    Q.    Okay.  Just listen to the question,

11    Ms. Genger, and if you don't understand the

12    question, I will be happy to rephrase it.

13    A.    Everything, and I don't -- I am getting

14    confused.

15    Q.    If you are confused, you don't

16    understand the question, as I instructed you

17    before, I will be happy to repeat it until you do

18    understand.

19    A.    Okay.  So ask me, please.

20    BY MR. GRIVER:

21    Q.    I will ask it again.

22        When did you find out about the August

23    2008 TPR TI transaction?

24    A.    2008?

25    Q.    August 2008, TPR TI transactions with

74

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

24    it as they were taking place?

25        MR. MEISTER:  Objection.

75

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.    I may or may not.  I said I don't

3    remember.

4    BY MR. GRIVER:

5    Q.    Can you think of anything that would

6    refresh your recollection as to when you did find

7    out about those transactions?

8    A.    No.

9    Q.    Look at Exhibit 15, please.

10    A.    Okay.  Yes, if you want me -- I have to

11    read it carefully because, and this is

12    completely -- I can't read it.  I mean, this is

13    the same here?  The two pages are the same as --

14    Q.    We have discussed some of it in your

15    prior deposition.

16    A.    Yeah.  Is this -- these two pages are

2    the Trump Group?

3    A.    You are talking about something else

4    about 2008.

5    Q.    Ms. Genger, there were transactions

6    involving the TPR and TRI shares with the Trump

7    Group in August of 2008, involving your son Sagi

8    Genger?

9    A.    Yes.

10    Q.    And TPR and the Sagi trust.

11        My question is when did you find out

12    about these transactions?

13    A.    I can't tell you.  I don't remember.

14    Q.    Did you know about those transactions

15    when they were both happening?

16    A.    I knew there was some transaction

17    between Sagi Genger and the Trump Group, but I

18    don't remember the date.

19    Q.    Okay.  When you found out about it,

20    were the transactions taking place or had they

21    already taken place?

22    A.    I don't remember.

23    Q.    So it is -- so you may have known about

17    the same?  One and two?

18    Q.    1 and 2 and then there's --

19    A.    I know.  But these are two pages are

20    the same because this one I cannot read.  And

21    this one is --

22    Q.    Oh, is it -- it is the same document

23    with different signatures, right?

24    A.    Different signature.  Okay.

25    Q.    Signatures are a little better?

76

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.    Okay.  Okay.  So what is the question

3    now?

4    Q.    My question to you is, was this an

5    actual physical meeting?

6    A.    You mean, if it was at the firm

7    physically

8    Q.    Yes.

9    A.    I would say physically.

10   Q.   And who was at the meeting?

11   A.   First of all, I'm not -- I don't see

12   my -- the trust.  Yeah.  I see here, yes.  Sagi

13   Genger.

14       MR. MEISTER:  Can you read back the

15   question please.

16   A.   The question again.

17       (WHEREUPON, the record was read by

18       the reporter as requested.)

19   A.   Who was at the meeting?  Whoever signed

20   it, per the document.

21   Q.   Okay.

22   A.   Which is me.

23   Q.   Okay.

24   A.   Okay.  Which is Sagi, and document --

25   okay.  I would say TPR Investment Associates

                    77

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Inc., I cannot recall who this person was because

24       MR. MEISTER:  Objection.  Move to

25   strike because she --

                    78

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    BY MR. GRIVER:

3    Q.   Are you speculating?

4    A.   I am speculating.

5    Q.   I am asking you please not to

6    speculate.

7    A.   Yeah.  No, I am assuming, that's why I

8    am saying.

9    Q.   I am asking you --

10   A.   So I don't know then.

11   Q.   You should --

12   A.   I don't remember.

13   Q.   You don't remember bringing a lawyer to

14   the meeting?

15   A.   I don't remember, yeah.  That's why I

16   said I assume because usually I would.

3    it is hard also to read.

4    Q.   Could it also have been Sagi in his

5    capacity?

6       MR. MEISTER:  Objection.  Hypothetical.

7    A.   It could.  I mean, but I don't know.

8    BY MR. GRIVER:

9    Q.   All right.

10   A.   I really don't know.

11   Q.   And who represented the Sagi Genger

12   trust?

13   A.   Rochelle.  Probably at the time, I

14   would think.

15   Q.   Were there any lawyers there?

16   A.   Lawyers?

17   Q.   Yes.

18   A.   I don't remember.

19   Q.   Did you bring a lawyer to the meeting?

20   A.   Again, I am sorry?

21   Q.   Did you bring a lawyer to the meeting?

22   A.   I would assume, yes, because I wouldn't

23   sign anything without a lawyer.

17   Q.   Now, we have discussed in your prior

18   deposition day what efforts you did or did not

19   make between the signing of this meeting and the

20   UCC sale.  And we also discussed, if you recall,

21   that you wanted the 30 days to try and convince

22   Sagi not to sue his sister?

23   A.   Right.

24   Q.   Correct?

25   A.   I mean --

                    79

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2       MR. MEISTER:  There's no question.

3    Wait.

4    A.   For the trust.  I am correcting him.

5    The trust.

6       MR. MEISTER:  Dalia, wait for the

7    question.

8       THE WITNESS:  Okay.

9    Q.   So you wanted to spend 30 days to

10  convince Sagi not to sue the Orly Genger Trust?

11    A.  I was hoping that that's what I will

12  going to achieve.

13    Q.  And it was a standstill for 30 days,

14  correct?

15    A.  It was stand still until today.

16    Q.  No, but the meeting agreement provided

17  for --

18    A.  30 days.

19    Q.  Okay.  Did TPR actually wait for 30

20  days?

21    A.  To not to sue?

22    Q.  Not to enforce the note, if you look

23  at --

24    A.  Not to sue Orly's trust.

25    Q.  Look at Exhibit -- look at paragraph 8

                         80


1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  of Exhibit 15.

25    A.  I am Orly's trustee, I am not Sagi's

                         81


1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  trust trustee.  I am not trustee of Sagi's trust.

3  My concern is for Orly trust.

4    Q.  Okay.  And as trustee you made sure

5  that TPR abided by its agreement not to enforce

6  the note for 30 days, correct?

7      MR. MEISTER:  Objection.

8  Mischaracterizes.

9      MR. GRIVER:  Well, let me --

10     MR. MEISTER:  No, you are not going to

11  play that game.

12     MR. GRIVER:  As trustee --

13     MR. GRIVER:

14    Q.  As trustee --

15    A.  Why are you harassing me?  Why are you

16  doing this?  We want to finish.  I mean -- I told

17  you, he did not enforce.  He did not enforce

3    A.  TPR investments -- agreed to refrain

4  from enforcing the note against each limited

5  partner for 30 days (reading from exhibit).

6    Q.  Now the two limited partners were the

7  Orly Genger and 1993 trust and the Sagi Genger

8  1993 trust, correct?

9    A.  Okay.  Yes.

10    Q.  Did TPR refrain from enforcing the note

11  against the Orly Genger Trust for 30 days?

12    A.  Yes.

13    Q.  And on what do you base that answer?

14    A.  Because they didn't enforce the note.

15    Q.  Well --

16    A.  As far as I know.

17    Q.  Okay.  At the time that you signed

18  this, did you check to see whether there was an

19  actual risk of enforcement of the note against

20  the Sagi Genger trust?

21      MR. MEISTER:  Objection.

22    A.  It is not my business.

23      MR. MEISTER:  To form.

24  BY THE WITNESS:

18  the -- he did not enforce the note on Orly's

19  trust.

20    Q.  Never?

21    A.  Not in this 30 days.

22    Q.  And you as trustee made sure that that

23  was -- that that happened, correct?

24    A.  That that did happen.

25    Q.  That the 30 days was honored by TPR?

                         82


1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.  Right.

3    Q.  .

4      (Dalia Exhibit /*, marked.)

5      MR. GRIVER:  For the record, what's

6  been marked as Exhibit 19 is a memo from Sagi

7  Genger to David Parnes cc D&K GP and dated August

8  2, 2006.

9      MR. GRIVER:

10    Q.  Ms. Genger, do you recall seeing this

11  memo before?

12      MR. MEISTER: Before her preparation

13  for this?

14  BY MR. GRIVER:

15  Q.  At anytime?

16  A.  I saw it today. I saw it today

17  actually.

18  Q.  You saw it today.

19      Did you see it two days ago in your

20  preparation for --

21  A.  No. I saw it today actually.

22  Q.  Is is that the first time you recall

23  seeing this document?

24  A.  Yes.

25  Q.  Okay. As far as you recall you did not

83

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  actually receive this memorandum; is that

3  correct?

25      MR. MEISTER: Asking her to construe a

84

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  document which isn't hers, and you are

3  mischaracterizing what it states.

4      MR. GRIVER: Well, she can certainly --

5      MR. MEISTER: Objection as to form.

6  Come on, your cant can't be that weak that you

7  have to resort to trickery.

8      MR. GRIVER: You know, my case is very

9  strong, and I think that these two days of

10  depositions have demonstrated that.

11      We will move on.

12      MR. MEISTER: We don't --

13      MR. GRIVER: I am going to ask you the

14  question again.

15  BY MR. GRIVER:

16  Q.  And ignore Mr. Meister for the rest of

17  this deposition.

4  A.  I don't remember if I received this.

5  Q.  Okay.

6  A.  But today I did see it.

7  Q.  Okay. You saw this -- you saw this

8  particular document before we began this

9  deposition?

10  A.  Yeah. I didn't read it, but I saw it

11  today, and I noted to my lawyer that this -- that

12  this paper I didn't see before.

13  Q.  So if you look at paragraph 4, it says,

14  D&K LP and its partners have a variety of claims

15  against TPR and deny the enforceability of the

16  note.

17      And this is a memorandum that's signed

18  by Sagi, both as on behalf of D&K LP and behalf

19  of TPR investments?

20  A.  It says.

21  Q.  Okay. So this is Mr. Sagi on behalf of

22  D&K and TPR stating to Mr. Parnes that D&K LP

23  have a variety of claims against TPR and deny the

24  enforceability of the note, correct?

18  A.  What?

19  Q.  Okay. The when --

20  A.  What do did you say? To ignore my

21  lawyer?

22  Q.  When Sagi stated that D&K denies

23  enforceability of the note in paragraph 4 of this

24  memorandum, do you know why he was denying the

25  enforceability of the note?

85

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  A.  No. I have no idea. Because I have

3  seen this like -- I told you. I saw it today

4  before I saw it.

5      MR. MEISTER: Just answer the question.

6  A.  I don't know what Sagi was thinking.

7  Q.  Okay. When you were trying to

8  determine whether or not to -- strike that.

9      Was there ever a time when you were

10  tried to determine whether or not you could stop

11  the UCC sale of the D&K note?

12      MR. MEISTER:  Objection.  Asked and

13  answered, not only today but also --

14      MR. GRIVER:  Withdrawn.

15  Q.   You testified there was a time when you

16  explored whether or not you could stop the UCC

17  sale, correct?

18  A.   I was contemplating whether it can be

19  stopped.  But there was no -- I couldn't find any

20  solution to this event from stopping.

21  Q.   Did you speak with Sagi in trying to

22  stop it, in trying to stop the UCC sale, did you

23  speak with Sagi Genger?

24  A.   I don't remember if I spoke with him.

25  Q.   Okay.  In trying to stop --

86

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  A.   At the time.

3  Q.   In trying to stop the sale, did you ask

87

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  for any documents it might have related to the

3  enforceability of the note?

4  A.   I don't remember.

5  Q.   Okay.  Did you ask TPR for any

6  documents it might have related to the

7  enforceability of the note?

8  A.   No, I don't remember.

9  Q.   Did you ask anybody --

10  A.   I don't remember.

11  Q.   Okay.  Well, come on, Ms. Genger, you

12  would remember if you asked somebody for

13  documents?

14      MR. MEISTER:  Don't argue with the

15  witness.

16  A.   No, no.

17      MR. MEISTER:  Don't argue with the

18  witness.  You have asked the question, she says

4  Mr. Sagi Genger to provide you any documents that

5  might be relevant to the enforceability of the

6  note?

7  A.   I don't remember if I talked to him, so

8  how do I know if I asked him.

9  Q.   Did you seek to collect documents

10  relevant to the enforceability of the note?

11  A.   No, I didn't seek.

12  Q.   Did you -- you did not ask Sagi, for

13  example, to provide you any documents he may have

14  related to the enforceability of the note, isn't

15  that correct?

16  A.   Can you ask me the question, not this

17  one, the one before you asked me, not this one,

18  the one before.

19  Q.   Did you ask Sagi Genger to provide you

20  with documents related to the enforceability of

21  the note so you could determine whether --

22  A.   I said no.  Now you are saying, for

23  example, did you ask this, or, obviously, it is

24  included in the answer that was before.

25  Q.   As a limited partner, did you ask D&K

19  she doesn't remember.  Next question.

20  Q.   Do you really not recall whether you

21  asked anybody for documents?

22      MR. MEISTER:  Objection.  Asked and

23  answered.

24  A.   If you said "really," it doesn't

25  change.  When I said I don't remember, I don't

88

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  remember.  Really or not really.

3  Q.   If you had asked -- if you had asked

4  for documents don't you think you would remember?

5      MR. MEISTER:  Objection.

6  BY THE WITNESS:

7  A.   No, I don't think I would remember.

8  Q.   Do you recall looking through stacks of

9  documents looking for any possibility to prevent

10  the sale of the TPR shares at the UCC sale?

11  A.   Can you repeat

12   Q.   Read the question?

13   A.   No, not the question  Can you repeat

14   the ten last questions that the lawyer asked me

15   Q.   Ms. Genger --

16   A.   No, because it is the same question so

17   I have to concentrate now.

18   Q.   In paragraph 6 of the memorandum?

19   A.   Of this memorandum that I saw five

20   minutes ago?  Yes

21   Q.   You saw it today this morning?

22   A.   Yes.  Before I saw Bob, I saw that

23   Q.   Who showed it to you?

24   A.   It was on the pile of some papers.

25   Q.   Where were these papers?

89

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   A.   On his desk.

3   Q.   On Mr. Meister's desk?

4   A.   Yes.  And I said I am not familiar with

90

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   not the easiest case, okay, for a layperson.

3        I am really not familiar with this

4   document, so if you ask me about number 6 or 5 or

5   4, my answer is that I do not understand the

6   circumstances of when this was born, this was

7   created

8   Q.   Okay.  When you became trustee, you

9   knew that the collection of the D&K note was an

10  issue, correct?

11  A.   Yes.

12  Q.   Did you ever seek from D&K or TPR as a

13  result all documents related to the

14  enforceability of the note so you could best

15  protect the trust?

16  A.   We had a settlement agreement

17  Q.   From anytime when you became trustee on

18  or about January 4, 2008?

5   it.

6   Q.   Did you meet with Mr. Meister today,

7   did you prepare for your deposition?

8   A.   I came to pick him up to come here.

9   Q.   And it was --

10  A.   It wasn't when we prepared for the

11  deposition

12  Q.   You just saw this document for the

13  first time today?

14  A.   Yes, yes

15  Q.   Okay  Do you have any idea why in

16  paragraph 6 D&K was talking about making a

17  counterclaim against TPR upon any attempt --

18  A.   I can't -- don't talk too fast.  I am

19  getting tired

20  Q.   In paragraph 6 D&K says if collection

21  efforts are made, it could result in D&K making a

22  counterclaim against TPR.  Do you know the basis

23  for --

24  A.   Let me read this  You know, let me

25  read this, okay.  Because you know that that's

91

19  A.   Yeah

20  Q.   -- all the way until the UCC sale in

21  February 2009, did you at any time in that period

22  of time, did you seek to collect documents

23  related to the enforceability of the note so that

24  you could best protect the trust?

25  A.   No.

91

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2        MR MEISTER:  We are changing to a new

3   line?  Can we take our lunch break now please?

4        MR GRIVER:  Let's go off the record  )

5        (WHEREUPON, the deposition was

6        recessed until TIME/TIME,

7        DATE/DATE ) 12 43 to 1:38

8

9

10

11

MR. GRIVER: On the record.

BY MR. GRIVER:

Q. Ms. Genger, directing your attention to Exhibit 13, this is the notice of enforcement. When did you receive -- strike that.

Did you ever receive this document?

A. No.

Q. Let me have this --

A. Maybe my lawyer did, but I don't remember.

Q. Did you or your lawyer receive this document before the UCC sale?

A. I personally did not receive it.

Q. Did your lawyer receive this document before the UCC sale?

A. Did you?

MR. MEISTER: I wasn't your lawyer then.

THE WITNESS: Oh, you weren't? So we have to ask the other lawyer.

BY MR. GRIVER:

Q. Okay. In the files of Mr. Kortmansky, was there a copy of this notice in them?

MR. MEISTER: There was not.

MR. GRIVER: Let me have this marked as Exhibit 20.

(Dalia Exhibit /*, marked.)

MR. GRIVER: For the record, Exhibit 20 is an undated memorandum or notice to D&K limited partnership from TPR Investment Associates Inc., informing D&K of the UCC sale.

THE WITNESS: So TPR --

MR. MEISTER: Wait for a question.

BY MR. GRIVER:

Q. Ms. Genger, have you seen this document before?

A. No.

Q. Did you see this document anytime before the UCC sale?

A. No. I don't remember if I have seen this before.

Q. Was this document that's been marked as Exhibit 20, was it in the files of Mr. Kortmansky?

A. Really, I don't know.

MR. GRIVER: Was it in the files of Mr. Kortmansky?

MR. MEISTER: This document does not

look familiar to me. I am not sure I have seen it before. If it were in the files of Mr. Kortmansky, I think I would have produced it in response to your discovery request.

MR. GRIVER: Let me show you what I will mark as Exhibit 21

(Dalia Exhibit /*, marked.)

BY MR. GRIVER:

Q. For the record, Exhibit 21 are certain documents sent to Robert Meister from David Parnes, on or about May 19, 2009. Included in

13   those documents is what's been previously marked

14   as Exhibit 20.

15      A    Okay.

16      Q    Ms. Genger, what I am going to ask you

17   to do is look through those documents and

18   identify any documents in this package that you

19   received prior to the UCC sale.

20      A    I will look quickly over it.

21         MR. MEISTER:  Take your time.

22   BY MR. GRIVER:

23      Q    Take your time.  If there's any

24   document that you received prior to the UCC sale,

25   please let me know.

95

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2      A    This is something that you showed me

3    before right.

4      Q    That's correct.  That's Exhibit 13.  My

5    only question --

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2      A    Right.

3      Q    You did not attend the UCC sale?

4      A    No.

5      Q    Did you send anyone --

6      A    No.

7      Q    You didn't send any lawyers or anybody

8    to represent the interests of the Orly Genger

9    Trust?

10     A    Right.

11     Q    All right.  Ms. Genger if you could

12   look at Exhibit 1 to your deposition.  I will

13   remind you since it has been a while on the last

14   page is your signature, saying that you have read

15   the answer and know the con --

16     A    Answer to what.

17     Q    You have read this document?

18     A    Oh, that I read the document.

19     Q    Exhibit 1 is your answer to the second

---

6      A    No, I didn't see it before.

7      Q    Okay.

8      A    But it looked familiar because I saw --

9      Q    Uh-huh.

10     A    No.

11     Q    Just to make it clear on the record,

12   you have -- strike that.

13        Just to make it clear on the record,

14   you did not receive any of the documents that

15   comprise Exhibit 21 to your affidavit before the

16   UCC sale; is that correct?

17        MR. MEISTER:  Objection to the form.  I

18   thank you mean Exhibit 21 to your affidavit.

19        MR. MEISTER:  Strike that.

20        I think that was the previous same as

21   the previous question, and she answered correct.

22        MR. GRIVER:  Okay.

23     A    I did not.

24     Q    You did not receive any of these

25   documents before the UCC sale; is that correct?

96

---

20   amended complaint in this action.  And it is

21   verified which means --

22     A    Wait a second.  You are saying that I

23   signed this as what?  As an answer to?

24     Q    You signed this -- you signed this

25   answer to the second amended complaint.  If you

97

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    look on the last page you verified its contents

3    as being true?

4      A    That I read it and whatever is in here

5    is true?  That's what it says?  Okay.  Okay, yeah

6    I am getting slower now, because I am tired

7    already  Okay.

8         MR. MEISTER:  So what's the question.

9    BY MR. GRIVER:

10     Q    I am just setting the stage.  If you

11   look at paragraph 3?

12     A    3, okay.

13   Q.   You deny -- I will read it.

14        You in paragraph 3 you quote, deny

15   knowledge or information sufficient to form a

16   belief as to whether the default was improperly

17   noticed or whether the foreclosure was improper,

18   period, unquote.

19        Do you see that?

20   A.   Yes.  I want to read it loud so I --

21   this is paragraph 3 what I am reading now right

22   Q.   Right.

23   A.   (Read document.)

24        Yeah.

25   Q.   Okay.  Ms. Genger, my question to you

98

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   is, quite simple.  As trustee, why did you not

3   obtain the knowledge or information sufficient

4   for you to determine whether the default was

5   improperly noticed before the UCC sale occurred?

6   A.   Can you ask me again.

7   Q.   Read it back

8        (WHEREUPON, the record was read by

9        the reporter as requested.)

10   A.   Because I knew that I mean, I knew the

11   procedures were the legal procedures that TPR was

12   supposed to follow, and I knew that they -- the

13   note was in default.  So what's the question

14   then?

15   Q.   Well, as -- in 2010, in verifying this

16   answer, you stated that you did not have

17   knowledge or information sufficient to form a

18   belief as to whether the default was improperly

19   noticed?

20   A.   But I noticed nobody paid the note so

21   it's sufficient for me.

22   Q.   The notice.  The UCC sale requires

23   certain things to happen.

24        As trustee why is it that --

25   A.   I don't know.  TPR should have sent me

99

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   a notice.

3   Q.   Okay.  TPR did not send you a notice?

4   A.   They might have.  But I didn't receive

5   it.  That's my answer.

6   Q.   But as of 2010 -- well, did you ever

7   ask, did you ever ask TPR whether they sent it to

8   you?

9   A.   How would I know that they are supposed

10   to send it to me?

11   Q.   In determining whether the UCC sale was

12   accurate, didn't you ask Sagi for all documents

13   that he sent to you, just to make sure?

14        MR. Meister:  Objection.  Assumes a

15   fact not in evidence.

16   BY THE WITNESS:

17   A.   I cannot determine ahead of time what

18   Sagi's supposed to do.  I don't know exactly what

19   he's supposed to do.

20   Q.   All right.  And you did not -- you did

21   not conduct an investigation, did you?

22   A.   No.  I am not -- I'm not in the

23   investigation business.

24   Q.   Why is it that you as trustee did not

25   obtain knowledge or information sufficient to

100

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   determine whether or not the foreclosure was

3   improper, either before the foreclosure or after

4   the foreclosure?

5   A.   Whether it was --

6   Q.   How do you know?

7   A.   Because it went ahead and it was

8   proper, somebody bought it, somebody bought the

9   stock.

10   Q.   Do you understand one of the things

11   Orly is seeking in this litigation is to unwind

12   that sale?

13   A.   Okay.  She can do that.  It is her

14  right.

15    Q.  Okay.  As you as trustee, did you not

16  have any responsibility to make sure that the

17  foreclosure was proper before it happened?

18    A.  But it was proper, I said in my opinion

19  it was proper.

20    Q.  Are you your opinion based on what?

21    A.  Because the procedure was followed,

22  Sagi -- whatever requirements were -- he had to

23  meet in order to have the auction going on, he

24  fulfilled and it looked to me that it was proper.

25    Q.  So what procedures is it that you

                       101


1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  believe were followed that made this sale proper?

3    A.  The procedure I knew that the

4  procedures were that he should put in the

5  newspaper, some notice about the public auction,

6  and he did so, apparently.


1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  it is your responsibility to make sure that the

3  foreclosure was proper or improper?

4    A.  Can you ask this again.

5      MR. MEISTER:  Read it back please.

6         (WHEREUPON, the record was read by

7         the reporter as requested.)

8  BY MR. GRIVER:

9    Q.  Strike that.  Let me ask the question

10  better.

11      As trustee of the trust, isn't it your

12  responsibility to determine whether the

13  foreclosure sale was proper?

14    A.  If I had doubts I would have

15  investigated, but I didn't have any doubts.

16    Q.  And that's based on --

17    A.  On what was proper.

18    Q.  And that's based on what Sagi told you?

19    A.  It is based on the fact that I have

20  trust in whatever Sagi told me.

7    Q.  And is it -- who is it that told you

8  that that was the procedure that was required to

9  be done?  Was it Sagi or was it somebody else?

10    A.  No.  Sagi.

11    Q.  Sagi told you?

12    A.  Yeah.

13    Q.  Anybody else?

14    A.  No.

15    Q.  As we sit here today have you done any

16  investigation since the UCC sale until today to

17  determine whether the foreclosure was proper or

18  improper?

19    A.  I didn't investigate if it was proper

20  or improper.

21    Q.  Have you asked any of your attorneys to

22  determine whether the foreclosure was proper or

23  improper.

24    A.  No, I didn't ask.

25    Q.  As trustee of the trust don't you think

                       102


21    Q.  Okay.  Any other basis?

22    A.  And the fact that he told me what the

23  procedure is.

24    Q.  Okay.  And any other basis?

25    A.  I don't remember if there were any

                       103


1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  other basis.

3    Q.  Is there anything I can show you today

4  that would refresh your recollection?

5    A.  I am sure you do have.

6    Q.  I am asking you now is there -- do you

7  have -- other than Sagi explained to you what the

8  procedure is and you trusting Sagi, is there any

9  or basis for your determination that the sale was

10  proper?

11    A.  No.  I don't remember any other.

12    Q.  And you have not charged your attorneys

13  with investigating to make sure that the sale was

14  proper?

15    A.  I don't remember that I changed -- that

16  attorney charged me for that, they might have.

17    Q.  No.  That you instructed your -- strike

18  that.

19        And you have never instructed your

20  attorneys to determine --

21    A.  I never say never because I don't

22  remember.  I don't use this word even with me

23  because I don't remember.

24    Q.  Fine.

25        You don't remember ever instructing

                    104

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  your attorneys to determine whether the

3  foreclosure was proper, is that fair?

4    A.  I don't remember that I ever instructed

5  my lawyer to investigate if it is proper or

6  improper.  I don't remember if I did that or not.

---

7    Q.  Okay.  Ms. Genger, I am really quite

8  curious why don't you just resign as trustee?

9    A.  Because I want to -- because I want to

10  protect my daughter's assets.

11    Q.  And why don't you agree to accept a

12  cotrustee acceptable to your daughter?

13        MR. MEISTER:  Objection.  Assumes a

14  fact not in evidence.

15        MR. GRIVER:  I will --

16    Q.  Would you accept a cotrustee acceptable

17  to your daughter?

18        MR. Meister:  Objection.  This is not a

19  question relating to the litigation.

20        MR. GRIVER:  That's not true.  It has

21  never come up.

22    Q.  I am asking you now as we sit here

23  today under oath as trustee?

24    A.  When Orly will sit with me and talk

25  with me, then I will discuss it with her.  If

                    105

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  Orly is willing to sit with me and talk with me,

3  then I will discuss it with her.  With all

4  honesty.  Because I just want whatever is good

5  for her.  Yes.  And if you will show me --

6        MR. Meister:  You have answered the

7  question.

8        THE WITNESS:  Okay.

9        MR. Meister:  Mr. Griver, can I ask

10  that you not grunt after the witness' answer.

11        (Dalia Exhibit /*, marked.) 22

12    Q.  Ms. Genger, do you recall on or about

13  October 24 -- strike that.

14        Do you recall on or about October 4,

15  2011, you filed an action in the chancery court

16  of the state of Delaware on behalf of the trust?

17    A.  Right.

18    Q.  And this is a copy of the verified

19  complaint in that --

20    A.  I believe you, yeah.

21    Q.  And that's your signature before the

---

22  exhibits, verifying the allegations --

23    A.  Yes, that's my signature, right.

24    Q.  So before this complaint was filed, you

25  read it, you considered what it said, and you

                    106

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  agreed with its --

3    A.  Yeah.

4    Q.  Okay.  And I take it that before

5  verifying it, you read this complaint carefully?

6    A.  Yeah.

7    Q.  Whose idea was it to bring a lawsuit in

8  the state of Delaware on behalf of the trust?

9    A.  It was my idea.

10    Q.  And did anyone -- did you discuss that

11  idea with anyone?

12    A.  I might discuss it with Bob.

13    Q.  Did you discuss it with -- did you

14  discuss it with Sagi?

15    A.    No.

16    Q.    Did you discuss it with anybody else?

17    A.    No. Only with my lawyer.

18    Q.    Okay. Do you know if your lawyer

19    discussed it with Sagi or anybody else?

20    A.    I have no idea what he discussed with

21    Sagi. He doesn't tell me.

22    Q.    Okay.

23        MR. GRIVER:  Robert, I asked for this

24    before but I would like to -- I think that the

25    actions of Ms. Genger as trustee, there is no

107

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    privilege as to them.  And so on behalf of the

3    beneficiary I would ask for all records,

4    communications, et cetera, in your possession,

5    related to the Dalia Delaware action.  I put this

6    in writing after Ms. Genger's first deposition,

7    and I reiterate it today.

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    23?

3    A.    Yes.

4    Q.    That's if you look at the --

5    A.    End.

6    Q.    Response is October 21, 2010.

7    A.    October 2, 2010.

8    Q.    Right.

9    A.    Okay.

10    Q.    So the year before?

11    A.    I just want to ask a question, that it

12    is a technical question.

13    Q.    Sure.

14    A.    That the addresses that are mentioned

15    here are current for this date?

16    Q.    The other --

17    A.    Like, for example, reside at 26

18    hundred.

19        MR. MEISTER:  He can't answer.  This is

20    not --

21    A.    From the court okay I got it.

---

8    BY MR. GRIVER:

9    Q.    How is it that you got the idea of

10    bringing a lawsuit in Delaware, Ms. Genger?

11    A.    It was I think quite simple decision,

12    because in Delaware, they courts were familiar

13    with the Genger case, so to speak, and they spend

14    a lot of time, and very familiar with the case,

15    and I wanted the trust to be represented, and to

16    solidify Orly's claim to the TRI shares.

17    Q.    Okay. Let me mark this as 23

18        (Dalia Exhibit /*, marked.)

19    A.    Let me get a chance to read it.

20    BY MR. GRIVER:

21    Q.    Now, Ms. Genger --

22    A.    What date was it, by the way?

23    Q.    Was what? This is --

24    A.    What date was it

25    Q.    The New York complaint that's Exhibit

108

---

22    Q.    Ms. Genger, this is a complaint brought

23    by you and your attorneys on behalf of yourself

24    and on behalf of the Orly Genger trust?

25    A.    Okay.  Against Arie Genger.

109

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Q.    Yes. Do you recall authorizing this

3    complaint?

4    A.    I am sure I did.  But I have to -- I

5    read it because I don't remember.

6    Q.    You don't remember bringing a

7    complaint --

8    A.    No, I remember that I did, but I have

9    to read it in order to remember exactly the

10    details, if this is, you know, that's what I

11    mean. Because my capacity to remember all these

12    documents is getting really limited.

13    Q.    Ms. Genger, my question to you is this:

14    Having already brought a lawsuit a year before on

15  behalf of the Orly trust, and with regard to the
16  Delaware actions effects upon the trust, why did
17  you bring a separate action in Delaware a year
18  later?
19      MR. MEISTER: I object. This is first
20  of all.
21      MR. GRIVER: This is her action as
22  trustee. You are working for her, she is not
23  working for you. I ask you limit yourself to
24  objections, just saying the word, and asked and
25  answered, objection to form.

110

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2        THE WITNESS: Okay. So ask me again
3  the question
4      Q.  Read the question back please.
5      A.  Why.
6          (WHEREUPON, the record was read by
7          the reporter as requested.)

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2          the reporter as requested.)
3  BY THE WITNESS:
4      A.  So you mean why did I do it in New York
5  and then the Delaware?
6      Q.  Yes.
7      A.  That's what you meant?
8      Q.  Yes.
9      A.  There was some technical reason
10     Q.  And that was?
11     A.  And at the moment I don't remember what
12  it was, but my lawyer told me at the time what
13  was it. But at the moment, I don't remember what
14  it was.
15     Q.  And that was Mr. Meister?
16     A.  Yes
17     Q.  Okay
18     A.  It was some technicality.
19         MR. GRIVER: Mr. Meister, I would ask
20  you provide any information regarding why the
21  decision was made to bring a separate Delaware
22  action as opposed to bringing an action in New

8        MR. MEISTER: And now I will object --
9  wait a minute. I am putting my objection here on
10  the record
11         Because first of all I object to the
12  form of the question. In part --
13         MR. GRIVER: No speaking objections.
14  Speaking objections are not allowed in New York.
15  Thank you. Objection to the form. That's fine.
16         MR. MEISTER: And because it
17  mischaracterizes --
18         MR. GRIVER: The time of trial, that
19  will be up to a court of law.
20         MR. GRIVER
21     Q.  Ms. Genger, let me ask the question be
22  read back to you so you can make sure that you
23  have it and duly considered in your answer.
24
25         (WHEREUPON, the record was read by

111

23  York.
24  BY MR. GRIVER:
25     Q.  Mrs. Genger, you do understand that New

112

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2  York courts are more than able to determine
3  whether someone is a holder in due course of
4  stock?
5      A.  Again, the question.
6      Q.  Ms. Genger, do you know the basis for
7  your Delaware action?
8      A.  The basis?
9      Q.  Yes
10     A.  No, you didn't ask me this question
11  before
12     Q.  I am going to ask the question.
13     A.  Asked me before, you asked me a
14  question, and I want --
15         MR. MEISTER: There's a new question.

16    MR. GRIVER: It is a new question.

17    A.   New question okay.

18    BY MR. GRIVER:

19    Q.   Do you understand the basis for your

20    Delaware action?

21    A.   Yes.  I wanted the trust to be

22    represented in Delaware in order to solidify

23    Orly's claim for the TRI shares, because they

24    discussed over there and she went by herself to

25    represent herself in the trial that they had over

113

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    there, and I wanted to intervene for her benefit

3    as her trustee.  I mean, my motivation were only

4    good not bad.

5    Q.   Well, so you said let me ask you this.

6

7    MR. MEISTER: Object to the form of the

8    question.  Excuse me.  I am going to object to

9    the form of the question   Now you start a new

10    question.

11    BY MR. GRIVER:

12    Q.   Do you understand what is the legal

13    basis for your claim in Delaware that the Orly

14    trust still owns the shares?

15    MR. MEISTER: Objection.

16    Mischaracterizes evidence.  So therefore it is on

17    objection as to form.

18    A.   The question is, if I understand the

19    legal basis?

20    Q.   Yes.

21    A.   On which I complained?

22    Q.   On which you claimed that the Orly

23    trust still owns the shares.

24    THE WITNESS: Yeah.

25    MR. MEISTER: Same objection

114

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    BY THE WITNESS:

3    A.   I am not a lawyer, but I believe that

4    Orly has the right to get her shares because she

5    is a victim of what her father did, not follow

6    the procedures when he transferred or improperly

7    transferred supposedly Orly's shares from a TPR

8    to her trust.

9    Q.   And is there any reason --

10    A.   And she is a victim that she has to get

11    her shares.

12    Q.   Is there any reason you couldn't have

13    made that same claim in New York?

14    A.   I have no idea.  I have no idea.  I am

15    not a lawyer.  I have no idea.

16    Q.   Did you understand at the time you

17    brought this action in Delaware, that the

18    chancery court had determined that the 3,000

19    shares of TRI stock the Orly trust shares were

20    owned by TPR?  Did you understand that that is

21    what the chancery court in Delaware had

22    determined?

23    MR. MEISTER: Objection as to form.

24    And mischaracterizes the decision.

25    MR. GRIVER:

115

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Q.   I am just asking yes or no, Ms. Genger?

3    A.   Ask me the question again please

4    Q.   Did you know when you brought the

5    Delaware action that the chancery court in

6    Delaware?

7    A.   Chancery is the Supreme Court.

8    Q.   Lower court.

9    A.   Lower court.  Okay.

10    Q.   That did you know that the Delaware

11    chancery court, which is the court in which you

12    filed the Delaware action?

13    A.   Yeah.

14    Q.   Had determined that the 3,000 shares of

15    TRI stock in the Orly trust were owned by TPR?

16   A.   Well --

17        MR. MEISTER:   Objection.

18        MR. GRIVER:   Strike that.

19

20   Q.   That all shares -- strike that.

21        That the --

22        MR. MEISTER:   Put a fresh question.

23        MR. GRIVER:   I will do that

24   BY MR. GRIVER:

25   Q.   Were you aware when you filed in

                    116

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Delaware court that the 1,102.8 shares of TRI

3    stock, that the Delaware court had already

4    determined that those shares and other shares of

5    TRI stock were owned by TPR?

6        MR. MEISTER:   Objection.

7    BY THE WITNESS:

8    A.   Yeah.

2    that correct?

3        MR. MEISTER:   Can I have that read back

4    please

5        (WHEREUPON, the record was read by

6        the reporter as requested.)

7    Q.   I will refer to you paragraph 22 of

8    your New York complaint if you need to refresh

9    your recollection.

10   A.   No, no, I remember there was a decision

11   like that, however, this did not stop me from

12   challenging the court and looking in a fresh way

13   at the case of Orly.

14   Q.   But given the choice between filing in

15   New York state and filing your case in Delaware,

16   why did you choose to go to Delaware where the

17   chancery court had already determined that the

18   TRI stock were owned by TPR? Why didn't you go

19   to New York where that determination had not yet

20   been made?

21       MR. MEISTER:   Objection as to form.

22   A.   That's what my lawyer suggested to do.

23   Q.   You're relying on --

9    BY MR. GRIVER:

10   Q.   Did you know that?

11   A.   I knew that there was a question of

12   owning a share or benefiting from the share   I

13   knew that there was a question of owning or

14   benefiting, and that was the question that I

15   based my complaint on.  I know that there was a

16   question there that was not clear if owning the

17   share means also benefiting from the shares.

18   There was something that was unclear, I know it

19   was unclear by also my lawyer.  It was not clear.

20   Q.   But you understood did you not that on

21   August 18, 2010, the Delaware chancery court

22   issued a final judgment order in the TRI investor

23   V Arie Genger case, that found that the 3,000

24   shares of TRI stock, including the shares of the

25   Orly trust were in fact owned by TPR, you knew

                    117

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

24   A.   Yeah.

25   Q.   That would be Mr. Meister?

                    118

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.   Yeah.  I rely on my lawyer's advice.

3    Q.   And Mr. Meister --

4    A.   You think that I know exactly what

5    court is better for me to win for Orly for

6    shares?  I am trying to do whatever is good for

7    her.

8    Q.   And this determination to bring a case

9    in Delaware as opposed to New York was a decision

10   made exclusively by yourself and your lawyer

11   Mr. Meister?

12   A.   The decision to sue?

13   Q.   In Delaware?

14   A.   The complaint in Delaware was

15   exclusively made by us

16   Q.   And by us, you mean yourself and

17  Mr. Meister?

18  A.  Right.

19  Q.  Okay.  With no input from anybody else?

20  A.  Right.

21  Q.  No input from any one else, be it a

22  lawyer, or another member of the Genger family?

23  A.  No, no.

24  Q.  Or the Trump Group?

25  A.  It is my complaint.  It is not somebody

119

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  else's complaint.

3  Q.  And no one else -- was anyone else

4  surprised of the bringing of this lawsuit?

5  A.  What do you mean, did they check in the

6  street from one person to another?

7  BY MR. GRIVER:

8  Q.  Did you tell anybody, did you tell

9  anyone you were bringing this action before the

3  Q.  With no input from anybody?

4  A.  Right.

5  Q.  No discussion with anybody?

6  A.  Right.  You are going to ask me again?

7  Q.  You understand that the Delaware

8  chancery court was overturned as to its

9  determination that the Orly trust shares actually

10  belonged to TPR based on the fact that the Orly

11  trust was not in front of the Delaware courts?

12  Were you aware that that --

13  A.  You have to repeat it again.  It is

14  getting late.

15  Q.  Were you aware?

16  A.  Yeah.

17  Q.  When you filed your Delaware case?

18  A.  Yeah, right.

19  Q.  That the Delaware Supreme Court had

20  reversed the chancery court determination that

21  the Orly trust TRI shares, belonged to TPR, were

22  owned by TPR, because the Orly trust was not --

23  A.  Represented.

10  date of filing?

11  A.  I don't remember

12  Q.  Did Mr. Meister tell anyone before the

13  date of filing?

14  A.  Ask him.  I don't know.  I don't know.

15  Q.  To your knowledge did Mr. Meister tell

16  anybody?

17  A.  I don't know.  I don't remember if he

18  said.  I have no knowledge.

19  Q.  Did you tell Orly before you filed

20  this?

21  A.  No.

22  Q.  Did you tell anybody else to your

23  memory?

24  A.  You asked me this question.  I said no.

25  No.  This is -- this was a decision made by my

120

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  lawyer and me, that it is the right thing to do.

24  Q.  In Delaware?

25  A.  And that's why I went there, and I

121

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  represented as a trustee.

3  Q.  And Mr. Meister --

4  A.  And hoping that that will help Orly's

5  case, because I was a trustee before they said

6  that she was not represented, she couldn't

7  represent herself because she needed a trustee to

8  represent her.

9  Q.  And that was -- and that was --

10  A.  That's how I came to the idea that I

11  should go there and fight for her.

12  Q.  As opposed to fighting for her in New

13  York?

14  A.  I don't know why you putting this New

15  York thing.

16  Q.  Because --

17    A    The thing is that we want to win the

18    shares. What does it matter if it is in New York

19    or Delaware.

20    Q.    Because you had already sued in New

21    York, why didn't you just sue again in New York?

22    A    Because if you sue again, you have

23    another chance. As many times as you sue, your

24    chances are getting bigger and bigger. You

25    should know that by now.

                            122


1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Q.    You had to sue again either in Delaware

3    or you had to sue again in New York. Why did you

4    choose Delaware? Because it's based on

5    Mr. Meister's advice?

6       MR. MEISTER: Objection. Compound

7    objection. Asked and answered.

8    BY THE WITNESS:

9    A    I sued in Delaware, I told you why.

3    Was your -- is it your testimony here

4    today that your decision to sue in the state of

5    Delaware as opposed to the state of New York or

6    any other state is based on the advice of

7    Mr. Meister?

8    A    Yes.

9    Q.    And that based on that advice you as

10    trustee determined to sue in the state of

11    Delaware?

12    A    Right.

13    Q.    And you did that with a full

14    understanding of what had happened in -- what the

15    chancery court decision was?

16    A    Yes.

17    Q.    Correct? And with a full understanding

18    of what the Delaware Supreme Court had said,

19    correct?

20    A    Yes.

21       MR. GRIVER: Okay. Mr. Meister I would

22    like to see any information regarding that

23    decision. And I would like that as soon as

24    possible.

10    BY MR. GRIVER:

11    Q.    But why not New York?

12    A    Because I sued already in New York.

13    Q.    And you didn't want to sue twice?

14       MR. MEISTER: Sue who twice?

15    Objection. No. Objection.

16       THE WITNESS: You are getting me

17    confused.

18       MR. MEISTER: Dalia. Wait until I get

19    my objection out, please.

20       THE WITNESS: He is confusing me. I

21    don't know. He confuses me.

22       MR. MEISTER: Because the question is

23    improper.

24    BY MR. GRIVER:

25    Q.    You didn't -- you had sued -- strike

                            123


1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    that.

25       MR. MEISTER: I will note for the

                            124


1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    record I don't see what that has to do with any

3    of the allegations in this action, or for that

4    matter, any other action.

5       MR. LEINBACH: Verified complaint was

6    filed after our complaint was filed. Delaware

7    action, so obviously we couldn't --

8       THE WITNESS: What? What happened?

9       MR. LEINBACH: Couldn't plead events

10    that took place when the action was brought.

11       MR. GRIVER: As on behalf of the

12    beneficiary of trust, I am asking the trustee, to

13    provide the information relate -- all

14    information, all conversations, all input

15    provided, all conversations had, related to the

16    bringing of a Delaware complaint.

17       THE WITNESS: Okay.

18          MR. MEISTER:  I suggest you put that in

19   writing pursuant to the CPLR, so that I can file

20   my formal response.

21          MR. GRIVER:  I have put that -- I have

22   already written to you about that.

23          MR. GRIVER:  Can we take a break

24   please

25          (WHEREUPON, a recess was had.)

                          125

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2          2 23-226.

3    BY MR. GRIVER:

4    Q.   The Orly Genger trust is paying for the

5    Delaware DJ action filed by you?

6    A.   The Orly Genger trust is paying for the

7    Delaware action?  At the time I told you that I

8    seek and I don't know if that's the case, that I

9    -- at the time I told you that I was paying the

10   bills by myself at the point where I needed

4    Q.   Okay

5    A.   Who is suing?  Orly suing?  The trust

6    is suing?

7          MR. MEISTER:  This was asked and

8    answered

9    Q.   The trust is suing?

10   A.   Obviously.

11   Q.   Okay. In the New York action, the

12   complaint that's been marked as Exhibit 23, who

13   is paying?

14   A.   The UCC, so to speak?

15   Q.   No. This New York action, brought on

16   behalf of yourself individually and behalf the

17   Orly trust?

18   A.   Whoever is suing, this is the one that

19   pays.

20   Q.   In this case you are suing both

21   individually and purportedly on behalf of the

22   trust?

23   A.   Yeah.

24   Q.   So my question is who is paying it?

11   financial help, and some of it came with a

12   settlement with TPR where we got $100,000, and

13   then there was the note from Manhattan safety,

14   whatever name it is.  Safety Manhattan.

15   Q.   So to sum up the Delaware --

16   A.   My bill, I guess, one of those

17   accounts.

18   Q.   The Delaware action is being paid for

19   by the Orly trust, correct?

20          MR. MEISTER:  I think this was covered

21   in the first session of deposition.

22          THE WITNESS:  I told you, somebody --

23          MR. MEISTER:  She testified.

24          THE WITNESS:  Somebody has to pay it.

25   Q.   And who's paying?  That my only

                          126

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    question?

3    A.   Whoever is suing.

25          MR. MEISTER:  She answered the question

                          127

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    already.

3    A.   Financially I do the proper thing.

4    When it is individually, me, I pay.  When it is

5    the trust, the trust pays, from whatever finances

6    we can, you know, have available.  In the

7    beginning I paid everything for the trust.

8    Q.   In this case, you are sawing both

9    individually and on -- 50/50?

10          MR. MEISTER:  No.  Excuse me.  She

11   answered this  You got an answer on the record.

12   I corrected the record the first time.  This is

13   clear.

14          MR. GRIVER:  Show me.

15          MR. MEISTER:  Show you.  All right.  We

16   are going to suspend.  We are going to suspend.

17   I am going to show him --

18    MR. GRIVER:  I withdraw the instruction

19    that you show me.

20    BY MR. GRIVER:

21    Q.   I want to know it was a 50/50 split?

22        MR. MEISTER:  There whereas no 50/50

23    split.  She paid for the action against Arie,

24    paid for the Delaware action, as this was stated

25    before.  If you either listen to your answers or

128

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    read the transcript.  You will know that.

3    BY MR. GRIVER:

4    Q.   As we sit here now who paying for the

5    Arie action in New York, is it you or is it the

6    trust?

7    A.   Let me tell you something.

8    Q.   I just want an answer to my question.

9    A.   Whoever sues -- that's the person who

10    pays.  If I sue, I pay.  If the trust sues, the

4    Q.   Whose idea was it to bring an

5    interpleader action?

6    A.   Okay.  This is an open issue, and it --

7    I am glad that you brought it up, because it

8    might be that the firm would have to pay for it

9    because I did not initiate it.

10    Q.   You did not okay this?

11    A.   The interpleader, no.  So we will have

12    a discussion about it.

13    Q.   Okay.

14    A.   And we see who going to pay.

15    Q.   Have they -- has Pedowitz & Meister

16    tried to bill you as trustee for the time spent

17    on the interpleader action?

18    A.   Truly, I don't know.

19    Q.   Mr. Meister, to the extent that --

20    A.   This will be resolved.

21        MR. MEISTER:  As I stated on the

22    record, first session, the first time you asked

23    these series of questions.

24        MR. GRIVER:  I never asked these

25    questions on this.

11    trust pays.  That's how it was.  So I don't know

12    specifically if you ask me this or this or that.

13    Q.   Okay.

14    A.   That's what it is.  That's the rule, I

15    think.

16    Q.   So the whose idea was it?

17    A.   Can I collect now the money that trust

18    owes me, my money?

19        MR. MEISTER:  Don't ask questions.

20    Just wait for the next question, if he asks a

21    permissible question.  Especially if it's a fresh

22    question.

23    BY MR. GRIVER:

24    Q.   Are you aware at some point Pedowitz &

25    Meister brought interpleader action in the

129

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    southern district of New York?

3    A.   Yes.  Right.

130

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2        MR. MEISTER:  You want an answer or

3    just want to harass the witness?

4        MR. GRIVER:  I will take an answer from

5    you.

6        MR. MEISTER:  Okay.  The charges for

7    bringing the interpleader action have not been

8    billed to anyone.  The charges for the trust's

9    answer and claim over against TPR, which resulted

10    in TPR agreeing that the trust was the beneficial

11    owner was billed to the trust.

12    BY MR. GRIVER:

13    Q.   Did Pedowitz & Meister consult with

14    you, Ms. Genger, before bringing the interpleader

15    action?

16    A.   No, they did not consult with me.

17    Q.   To your knowledge, did Pedowitz &

18    Meister consult with anybody before bringing the

19  interpleader action?

20    A.   I have no idea.

21    Q.   You never asked them on what --

22    A.   No, why should I ask him, I mean.

23    Q.   You never asked him why they were

24  bringing an interpleader?

25    A.   No, I have other things in my life.  I

131

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  don't pick up the phone and ask Bob, why did you

3  do the interpleader, the action, or, I hardly

4  know what is an interpleader action even.

5    Q.   Did you ask him if they were doing it

6  on your behalf or on behalf of the trust since

7  they represent you in both capacities?

8    A.   I knew that there is some kind of legal

9  move that apparently Meister and Pedowitz &

10  Meister decided to do with the escrow account.

11  And I thought to myself, that that's the right

5  he did it

6    Q.   Okay.  Do you think --

7    A.   I don't know even what is an

8  interpleader.  I don't know, that's taking the

9  escrow account from his company to the court,

10  this is what it is?

11    Q.   Yes.

12    A.   Okay.

13    Q.   And on what basis would it be to the

14  benefit of the Orly trust to do that?

15    A.   I have no idea.

16    Q.   Well, as the trustee you are charged

17  with making sure the actions taken on your

18  behalf --

19    A.   I trusted that he has a good judgment

20  to do something for benefit of Orly trust, I am

21  going start suspecting my own lawyer for the

22  trust is going to action that would be against

23  the beneficiary of the trust?

24    Q.   Did you ask him to explain why he --

25  why Pedowitz & Meister did what it did?

12  thing to do.  I didn't ask him if it is necessary

13  thing, I am not a lawyer.  I mean, I am just the

14  client.  If he thinks that that's the right thing

15  to do, you know, I follow him.  Whatever he says.

16  And if it is a mistake, or if he did it by his

17  own initiative, and it was not correct, he should

18  be paying for it, or we should discuss this,

19  later on.  Nobody's trying to steal money from

20  each other.  I mean, this is --

21    Q.   Did you think this was -- on what basis

22  did you think that this was a good thing to bring

23  the --

24    A.   I didn't think it is a good thing.

25    Q.   Did you ask Mr. Meister whether he was

132

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  bringing it on behalf of yourself as an

3  individual, or --

4    A.   I didn't talk to him.  I just knew that

133

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.   No.

3    Q.   Okay.  Did you ask Pedowitz & Meister

4  whether it took this action to benefit you as an

5  individual as opposed to you as trustee?

6    A.   An individual?

7    Q.   Sure.  They represent -- Pedowitz &

8  Meister represents you as an individual, correct?

9    A.   Right.  No, I never thought about this

10  as an individual  I thought about it as an

11  action that has to do with the trust.  Because it

12  is an account, it was an account for Orly.

13    Q.   As we sit here today, can you explain

14  to me why the Pedowitz & Meister interpleader

15  action would have benefited the Orly trust?

16    A.   I have no idea.  That's -- it is

17  something technical that the lawyers decided to

18  do.  And I don't know why.

19    MR. GRIVER:  Okay.  Mr. Meister to the

20    extent that you take the position that Pedowitz &

21    Meister did this to -- on behalf of Dalia Genger

22    as trustee or Orly Genger trust, I would ask for

23    all records in the interpleader action why it was

24    taken, who you discussed it with, what was the

25    basis for doing so, including but not limited to

134

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    any discussions that you had with co defendants

3    or co defendant's counsel.

4       THE WITNESS:  This is a long list of

5    requests, you want us to write it down because I

6    won't remember.

7       MR. MEISTER:  Don't answer.

8       THE WITNESS:  She is taking it.  Okay.

9

10      MR. GRIVER:  Let's have this marked as

11   Exhibit 24.

5    There's so many papers.  I don't remember.

6       MR. MEISTER:  You have answered the

7    question.

8       MR. GRIVER:  Let me have this marked as

9    25.

10      (Dalia Exhibit /*, marked.)

11   BY MR. GRIVER:

12      Q.   For the record, what's been marked as

13   Exhibit 25 is a letter dated December 17, 2007,

14   and a promissory note in connection with letter

15   agreement 12-17-07.  It has been Bates stamped DG

16   1 through 5.

17      Ms. Genger, let me know when you are

18   ready to discuss what's been marked --

19      A.   Ask me the question maybe it will be

20   easier for me to read it if I can focus more on

21   the answer.

22      Q.   Okay.  Why don't you also look at Dalia

23   3  I have think the easiest way to get this.

24   Look at Dalia 3, what's been marked as Dalia 3.

25   Those are your amended responses to plaintiff's

136

12      (Dalia Exhibit /*, marked.)

13      MR. GRIVER:  For the record, Exhibit 24

14   is the interpleader complaint, Pedowitz & Meister

15   LLP, the TPR Investment Associates Inc., et al..

16      A.   Yeah.

17   BY MR. GRIVER:

18      Q.   You are telling me, Ms. Genger, you had

19   no advance knowledge that this complaint was

20   going to be filed?

21      MR. MEISTER:  Is that a new question or

22   is it -- the question is, whether or not he had

23   told you before.

24   BY MR. GRIVER:

25      Q.   Ms. Genger, did you have advance

135

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    knowledge that this complaint was going to be

3    filed by Pedowitz & Meister?

4       A.   I don't remember.  I don't remember.

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    interrogatories and please look at interrogatory

3    30.

4       MR. MEISTER:  Is there a pending

5    question.

6       MR. GRIVER:  I am waiting for her to be

7    ready.

8       A.   You told me to look at interrogatory --

9       Q.   Number 30 in your response?

10      A.   And the response.  Yeah.

11      Q.   Okay.  Interrogatory number 30 says,

12   Ms. Genger why don't you read into the record

13   interrogatory number 30.

14      MR. MEISTER:  Read a.

15      A.   Said each transfer of your shares.

16      State each transfer, pledge, and/or

17   sale of your shares of TPR, including in your

18   answer, the date of each transfer, pledge, or

19   sale; the recipient of the TPR share, the number

20 of shares transferred, pledged or sold, and the
21 consideration for each transfer, pledge or sale.
22     The response is, on December 17, 2007,
23 I sold 250 shares of the common stock of TPR to
24 TPR for its 5 million dollars note.
25     Q.  When you gave that interrogatory

137

D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2 response, were you referring to the documents
3 that have been marked as Exhibit 25?
4     A.  The question is, as I understand it, me
5 selling the shares, right, to TPR.
6     Q.  That's the thing.  What happened on
7 12-17-07?
8     A.  Wait a second.
9     Q.  Was a redemption?
10    A.  Okay.  12-17, yeah.  I said, that I
11 sold it, 250 shares.
12    Q.  And when you said that you were

6     A.  To TPR.
7     Q.  You sold the shares to TPR?
8     A.  Yeah.
9     Q.  And what you call a sale, but what I
10 would characterize as redemption is what's marked
11 as Exhibit 25, these are the documents,
12 memorializing that redemption?
13    A.  Yes.  I sold all my shares to TPR.
14    Q.  Okay.  For 5 million dollars?
15    A.  Right.
16    Q.  Did you -- okay.
17       And those were all the shares of TPR?
18    A.  All the shares.  All my share.
19    Q.  And that took place on December 17,
20 2007?
21    A.  Yes.
22    Q.  So as of December 17, 2007, you were no
23 longer a shareholder?
24    MR. MEISTER:  As of December 18
25    A.  Yeah.  I guess.

139

13 referencing the documents that have been marked
14 as Exhibit 25, correct?
15    A.  Can you repeat that.  I am sorry.
16    Q.  Here's my concern, Ms. Genger, and it
17 is a small one.
18    A.  Yeah.  A small one.
19    Q.  What's been marked as Exhibit 25, is
20 actually a redemption, it is not a sale.  Those
21 are different things.  When you redeem shares to
22 a company, and they become -- and they go back to
23 the company that's called a redemption not a
24 sale.
25       So I just wanted to make sure that your

138

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2 answer is based on these documents --
3     A.  I sold the shares.  I don't have the
4 shares to TPR.
5     Q.  To TPR?

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2     Q.  As December 17 or 18, 2007, you were no
3 longer a shareholder?
4     A.  Yeah.  17 or 18.  Yeah.
5     Q.  And why is it that you decided to sell
6 your shares on December 17?
7     A.  On that date?
8     Q.  Yes.
9     A.  I wouldn't know why this specific date.
10    Q.  Was it because Ms. Enriquez attempted
11 to make you the trustee of the trust on December
12 18?
13    A.  I don't think so.
14    Q.  Was it in preparation for -- become
15 trustee?
16    A.  No, I knew that I am going to assume
17 the -- I knew that potentially, I will have to be
18 Orly's trustee, and enjoy the your company so
19 many times here.  So I prepared myself to be

20  eligible to have this honor to be trustee of Orly

21  trust and be sued countless times.

22  Q.

23  A.  I am just explaining to you what is --

24  MR. MEISTER:  Adding additional things

25  to express your emotions don't help the record.

140

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  So just answer the question.

3  BY MR. GRIVER:

4  Q.  Now, why is it that you sold your

5  shares -- strike that.

6  Why is it that you allowed TPR to

7  redeem your shares for 5 million dollars?

8  A.  Why?  I can do whatever I want.  What

9  do you mean?

10  Q.  Strike that.  Didn't you apply TPR to

11  redeem the shares of the company because that --

12  A.  You said redeem.  Is that not sale?  I

6  MR. MEISTER:  Yes.

7  A.  Okay.  I got it  Affidavit of Dalia

8  Genger.  Okay.  I'm sorry.  It is number ten you

9  said.

10  Q.  Yes.  Paragraph 10?

11  A.  Yeah.

12  Okay.  So, what?  So I guess redeem

13  means that I am kind of giving -- I am selling

14  the shares to the company?

15  Q.  Selling --

16  A.  The shares --

17  Q.  Letting the shares go back to the

18  company?

19  A.  I mean going from me.

20  Q.  To TPR?

21  A.  To TPR.  Okay.

22  Q.  And --

23  A.  For my ownership to TPR ownership.

24  Q.  And you did that because both Orly and

25  Sagi would share equally?

142

13  want to understand.  What are you telling me?

14  Redeem or sell?  I want to understand what is the

15  difference is

16  Q.  Okay.

17  A.  When you are saying that.

18  Q.  Look at Exhibit 14, paragraph 10,

19  Exhibit 14 is an affidavit of yours.  Sworn to on

20  March 11, 2008 and look at paragraph 10.  Page 3

21  to 4.

22  A.  Okay.

23  Q.  Second sentence.

24  A.  Okay.  You mean this is what Orly's

25  writing?

141

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  Q  This is what you wrote.  You signed it?

3  A  Where?  Where does it say, Orly Genger,

4  petitioner, against me.

5  Q  Dalia 14.  Affidavit of Dalia Genger?

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  A.  Yeah.

3  Q.  And it was important to you that that

4  happened because you wanted to treat both your

5  children equally?

6  A.  Obviously.

7  Q.  And it was important to you that you

8  let the court know that in its decision as to

9  whether or not you should be trustee?

10  A.  I don't know if that was the reason,

11  but, yeah, obviously I want both my kids to be

12  treated equally.

13  Q.  And this was information that you chose

14  to share with the trustee in --

15  A.  With the trustee?

16  Q.  Excuse me.  This is information --

17  strike that.

18  The fact that you were redeeming your

19  shares back to TPR was information you wanted the

20  surrogate court to know in connection with the

21  surrogate court's determination as to whether you

22  should be trustee, correct?

23    A.   Yeah.

24    Q.   All right.  So now let's -- and now

25  let's look at what's known as Exhibit 25.

143

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.   Okay.

3    Q.   This is TPR's redemption of your 250

4  shares, correct?

5    A.   Right.  This is the same 250 that we

6  were talking before, right?

7    Q.   Yes.

8         Did the shares go back to TPR?

9    A.   Yes.

10    Q.   Did the -- has TPR been paying the

11  promissory note as agreed?

12    A.   Yes.

13    Q.   So as of January 15, 2013, you have

---

14  received $180,000 from TPR in exchange for your

15  250 shares?

16    A.   If you calculate it, correctly

17  calculate it, whatever it is.  Yeah.  I did get

18  that.

19    Q.   That's -- okay.  So if we were to look

20  at your tax returns it would show both the

21  redemption of your shares and exchange for the $5

22  million note and it would show these yearly

23  payments about TPR, correct?

24    A.   Again.

25         MR. MEISTER:   Objection.  I don't see

144

---

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  how the -- tax returns showed the redemption.  I

3  don't understand what --

4         MR. GRIVER:   Well, because she is

5  getting paid by TPR.

6    A.   Yes.  I am getting paid by TPR.

---

7         MR. GRIVER:   Okay.

8  BY MR. GRIVER:

9    Q.   Is the agreement evidenced by the

10  documents that have been marked as Exhibit 25,

11  that is the 12-17-07 letter, and the promissory

12  note in connection with that letter --

13    A.   I have to stop you, because you have to

14  start again start at beginning again.  I didn't

15  get it.

16    Q.   I will start over.

17    A.   I didn't get it.

18    Q.   Has the agreement memorialized by --

19    A.   Here --

20    Q.   By the documents attached as Exhibit

21  25?

22    A.   Yeah.

23    Q.   That is the 12-17-07 letter, and the

24  attached promissory note, was that agreement

25  later altered, amended, changed, revised, fixed,

145

---

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  or superceded in any way?

3    A.   I don't remember that it was.  I don't

4  remember that it was revised.

5    Q.   Okay.  Have you gotten only $180,000 in

6  exchange for your 250 shares or have you gotten

7  more than that?

8    A.   I got whatever I was supposed to get.

9    Q.   Pursuant to this agreement?

10    A.   Yeah.

11    Q.   There was --

12    A.   I mean, I gave the shares -- I sold the

13  shares.

14    Q.   So the shares are now with TPR?

15    A.   Yes.  100 percent over there.  I don't

16  have a single share at home.

17    Q.   No, but I am asking are those shares

18  still with TPR?

19         MR. MEISTER:   How would she know.

20    A.   Ask TPR?  Do you know what TPR is

21  doing? I'm not there. I am not a director. Do

22  I know where they are?

23  Q.  So you had no way of knowing what

24  happened, whether those shares are still with

25  TPR?

146

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  A.  I am not part of TPR. I don't know.

3  Q.  Let me ask you this. Is there any

4  board resolution approving the redemption of

5  these 250 shares back to TPR?

6  A.  I didn't understand the question.

7  Q.  Is there a board resolution?

8  A.  Board resolution of TPR.

9  Q.  Yes. Is there a TPR board resolution

10  approving of the redemption to you -- excuse me.

11  Is there a TPR board resolution approving of the

12  redemption of these 250 shares back to TPR in

13  exchange for $5 million?

7  Q.  All I am simply asking, is there a TPR

8  resolution --

9  A.  We have to check. We have to check.

10  I'm not sure.

11  Q.  I will represent to you I have received

12  none in production in this case.

13  A.  Okay.

14  Q.  Do you recall there being one?

15  A.  I don't recall.

16  Q.  Who drafted these documents?

17  A.  You know my answer. I don't draft

18  these. I am not a lawyer. I don't know how to

19  draft it. A lawyer draft it, and who was the

20  lawyer, I do not know.

21  Q.  Are you sure --

22  A.  This is always the answer that I will

23  give you because I really don't know.

24  Q.  Are you sure that a lawyer drafted it,

25  or do you think that Sagi drafted it?

148

14  A.  You mean if there is a paper that TPR

15  issued for my giving them the 250 -- selling them

16  or whatever, the 250 shares?

17  Q.  Yes.

18  A.  If they issued such a paper?

19  Q.  Yes.

20  A.  I don't know. But I imagine that yes,

21  I mean, it should be.

22      MR. MEISTER: Just --

23  BY MR. GRIVER:

24  Q.  Ms. Genger, that means at that time you

25  were a director of TPR, so I am asking you --

147

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  A.  No, I was immediately not directly

3  after that.

4  Q.  And was there a --

5  A.  Immediately I gave my shares, I was not

6  a director.

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2      MR. MEISTER: Objection. Compound,

3  calls for speculation.

4  BY MR. GRIVER:

5  Q.  Well --

6  A.  If Sagi is a lawyer then he might have

7  drafted it, but he is not a lawyer.

8  Q.  The lawyer who drafted it, do you

9  know -- would the lawyer who drafted it, was it a

10  lawyer for Sagi or TPR?

11  A.  I do not know. I told you.

12  Q.  If you don't know, you don't know?

13  A.  I don't know this.

14  Q.  How did the purchase price of -- how

15  was the purchase price of $5 million determined?

16  A.  Sagi had an estimate of the value of

17  the company, and this is how it came about, the

18  number.

19  Q.  He had a written estimate or he just

20  told you that he thought that was a fair price?

21  A.  Maybe he had a written. I don't

22   remember if he had it written or not.

23     Q.  Okay.  And was there any --

24     A.  This was close to my divorce, that's

25   why it was easy to calculate at the time.

<div align="center">149</div>

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2     Q.  Did you have a TPR stock certificates

3   at that time that you signed over to TPR?

4     A.  I think I might have, yeah.  Yes.  Yes.

5   Yes, I did.

6     Q.  Let's go back to the valuation.  This

7   was -- as we sit here today do you know whether

8   it was a written valuation or not?

9     A.  I don't know.

10     MR. MEISTER:  She answered that.

11     THE WITNESS:  I don't know.  I know

12   that it was close to my divorce so it was kind of

13   easy because, you know, we had mediation and you

14   know, with my husband.  And so it was quite easy

---

15   to know how much the value of my shares is

16     Q.  The valuation, was it valuation done by

17   Sagi?

18     A.  I don't know who did the valuation.

19     Q.  You didn't do the valuation?

20     A.  No.  I am not qualified to do that.

21     Q.  Do you recall any third party company

22   or third party of any kind doing a valuation to

23   come up with the $5 million figure?

24     A.  I don't recall that.

25     Q.  How long were there any negotiations

<div align="center">150</div>

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   whatsoever with regard to this document?

3     MR. MEISTER:  Referring to.

4     A.  The $5 million you mean?

5   BY MR. GRIVER:

6     Q.  What do you mean by close to the

7   divorce?

---

8     A.  It was close to the divorce, the

9   arbitration that we had.  We had arbitration

10   after the divorce.

11     Q.  And do you know when this arbitration

12   ended?

13     A.  I don't remember the date.

14     MR. MEISTER:  We would like to take a

15   five-minute break while you are searching.

16     MR. GRIVER:  I have it right here.

17     THE WITNESS:  Okay.  So ask me.

18   BY MR. GRIVER:

19     Q.  The final arbitration award is dated

20   May 6, 2008.  It is Dalia Exhibit 11 to this

21   deposition.

22     So this was during -- this was

23   during --

24     A.  During, yeah, yeah, I see.  It is --

25     MR. MEISTER:  Can we take a break now

<div align="center">151</div>

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2     MR. GRIVER:  Last question then we will

3   take a break.

4   BY MR. GRIVER:

5     Q.  Was there agreement provided to the --

6   provided as part of the arbitration by you or by

7   Sagi?

8     A.  No.

9     Q.  Okay.  We can take a break.

10     (WHEREUPON, a recess was had.)

11     3:04-310.

12     MR. GRIVER:  Back on the record.

13   BY MR. GRIVER:

14     Q.  Ms. Genger I am going to have to

15   correct one thing on the record.  If you look at

16   the December 17, 2007 --

17     A.  Wait a second.

18     Q.  -- letter, it says you will be paid not

19   30,000 a year over the next 25 years, $30,000 a

20   month?

21     A.  That's true.

22   Q.   Over the next 25 years?

23        So my question to you is has TPR been

24   paying that amount of money to you $30,000 a

25   month?

152

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.   Yeah.

3    Q.   Since January 15, 2008?

4    A.   That was actually the amount that the

5    judge awarded me when we had the beginning when

6    we were divorcing, that's the amount that the

7    judge awarded me monthly, by the way.

8    Q.   Okay.  I am just asking whether TPR has

9    been paying you $30,000 a month instruments?

10   A.   They were paying me, yeah.

11   Q.   Before the redemption of the 250

12   shares?

13        MR. MEISTER:  I'm sorry.

14   A.   Before the redemption

8    TPR on January 15, 2013?

9    A.   Yeah, I am getting checks from TPR.

10   Q.   Are you getting checks for these 250

11   shares, that's what I am asking you?

12   A.   Yeah.  I am getting checks from TPR for

13   the shares.  I mean, what's -- it is a new

14   question?

15   Q.   And you have been receiving $30,000 a

16   month since January 15, 2008 for these 250

17   shares?

18   A.   I am receiving not exactly 30,000,

19   because I don't need exactly 30,000.  When I --

20   there is -- this is a document between TPR,

21   right, and me.

22   Q.   Correct.

23   A.   Okay.  Now, whenever I need and I don't

24   need, whenever there is a necessity for me to

25   get money, I ask for the money, if there's no

154

15        MR. MEISTER:  New question.

16   A.   No.  No.  They didn't pay me anything

17   before they got the shares.

18   BY MR. GRIVER:

19   Q.   Since January 15 of 2008, as provided

20   in this letter dated December 17, 2007 that's

21   what I am looking at, Ms. Genger.

22   A.   Yeah.

23   Q.   It says will you receive $30,000 a

24   month starting on January 15, 2008.  So my

25   question to you is, has TPR been paying you

153

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    $30,000 a month since January 15, 2008?

3    A.   I have to check and come back to you.

4    Q.   You don't --

5    A.   I have to check and come back to you

6    Q.   Well, let me ask you this.

7        Last month, did you get a check from

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    need, I don't ask for it.

3    Q.   And you ask for that money from Sagi?

4    A.   From TPR.

5    Q.   And who through Sagi -- you let Sagi

6    know you need money and he gives you?

7    A.   There's nobody else there.

8    Q.   And --

9    A.   I mean -- who else.

10   Q.   And is it however much money you need

11   or is it limited to $30,000?

12   A.   It is limited to whatever they owe me

13   Q.   And is there a subsequent document of

14   any kind memorializing that change in the terms

15   of the agreement?

16        MR. MEISTER:  Asked and answered.  So

17   objection.

18   BY THE WITNESS:

19   A.   I don't recall if there is any

20   document.

21   BY MR. GRIVER:

22   Q.   When you gave your shares --

23   A.   You mean redeem, right?

24        MR. MEISTER:   Don't use that word

25   again.

155

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2        THE WITNESS:   He said redeem so I have

3    to ask.

4        MR. MEISTER:   You don't have to ask

5    BY MR. GRIVER:

6    Q.   When you signed over your stock

7    certificates to TPR as part of the redemption,

8    did you keep a copy for your records?

9    A.   I am sure there is a copy somewhere.

10   Q.   Okay.   I would ask for a copy of those.

11   A.   It is probably TPR has it.

12   Q.   No, I asked whether you kept a copy?

13        MR. MEISTER:   And she said she is sure

14   there is a copy.

15   A.   I don't know.   If I had it, I gave it

9    Q.   Did TPR give you anything after you

10   signed over the stock certificates to it?

11        MR. MEISTER:   You mean anything other

12   than the checks?   Money.

13   BY MR. GRIVER:

14   Q    Anything other than the checks?

15   A.   You mean like gold, jewelry?

16   Q.   Any kind of documentation.

17   A.   Again, after I gave them the 250

18   shares, if they gave me any additional some kind

19   of papers?

20   Q.   Yes.

21   A.   To establish that there is some kind of

22   an exchange you mean

23   Q.   Yes.

24   A.   I don't remember, but --

25   Q.   To the extent you have copies of these

157

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

16   to Sagi   I don't know if I kept for my records

17   because I thought that Sagi wouldn't ask me again

18   for 250 shares.

19   Q.   Okay.   If TPR redeemed your 250 shares,

20   then D&K owned -- okay

21        Did TPR give you anything when you gave

22   them the stock certificates?   Any document, did

23   they give you any document?

24   A.   When I give them the shares?

25   Q.   When you signed over the shares?

156

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.   If they gave me any document?

3    Q.   Yes.

4    A.   I don't remember if they did.

5    Q    To the extent that Ms. Genger has a

6    copy of that I would appreciate that.

7        THE WITNESS:   Okay.

8    BY MR. GRIVER:

2    checks from TPR memorializing these payments?

3    A.   Okay.

4    Q.   These monthly payments, I would --

5    A.   Appreciate.

6    Q.   -- appreciate a copy.

7        When you get these checks, are these

8    checks from TPR or are these checks from Sagi, or

9    is this from some other company?

10   A.   No.   They are not checks from Sagi.

11   Q.   Are they checks from TPR?

12   A.   I couldn't say.

13   Q.   Do you recall -- do you recall what

14   entity is -- what entity's checks these are?

15   A.   No, I cannot.

16   Q.   As we sit here today you are not sure

17   those checks are TPR checks?

18   A.   I didn't say that they are checks   You

19   are assuming that they are checks.

20   Q.   Okay.   Do you get checks?

21   A.   No.

22   Q.   Do you get wire transfers?

23   A.   Yes.

24   Q.   Are these wire transfers from TPR

25   accounts?

158

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   A.   I don't know.

3   Q.   Are these wire --

4   A.   I think --

5   Q.   Transfers from Sagi?

6   A.   No, not from Sagi.

7   Q.   How do you know they are from Sagi, but

8   you don't know anything else.

9   A.   I know they are not from Sagi.

10   Q.   How?

11   A.   Because Sagi is not supporting me.  He

12   cannot afford to support me.

13   Q.   Are these checks from -- are these

14   checks from E&G -- strike that.  Are these wire

15   transfers E&G.

16        MR. MEISTER:  E&G?

17   A.   What is E&G?

18   Q.   It is a company that's -- a company

19   that Sagi has?

20   A.   No.

21   Q.   Are these --

22   A.   I don't know what is E&G.

23   Q.   Are these wire transfers from Bazzad

24   /(?

25   A.   No.

159

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2        MR. GRIVER:  B-a-t-z-a-d-

3   BY THE WITNESS:

4   A.   I don't remember if they are

5   Q.   Okay.  These wire transfers do you know

6   what bank they are coming from?

7   A.   No.

8   Q.   Do you know what bank they are going

9   into?

10   A.   To my bank.

11   Q.   And which bank is that?

12   A.   Citibank.

13   Q.   Citibank?

14   A.   Yes.

15   Q.   Do you know which specific branch?

16        MR. MEISTER:  Which specific branch the

17   wires go into?

18        MR. GRIVER:  Yes.  It has been a long

19   day.

20        MR. MEISTER:  Yes, it has.

21   BY MR. GRIVER:

22   Q.   Do you know the account, do you know

23   which account it goes into?

24   A.   If I know my account number, by heart?

25   No, I don't.

160

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2        MR. MEISTER:  He wants to know whether

3   it is your account.

4   A.   My account, my account.

5   Q.   It goes into your account?

6   A.   The -- yes.

7   Q.   The account for Dalia Genger?

8   A.   Yes.

9   Q.   Okay.  Upon redemption, D&K LLP then

10   would have controlled approximately 96 percent of

11   TPR, is that your recollection?

12        MR. MEISTER:  You are using the word

13   redemption.  If you mean redemption or sale

14   A.   I am losing you now.  If it is D&K and

15   this -- I am losing.  I don't understand any more

16   what you are saying.

17   Q.   When shares are redeemed, they become

18   treasury shares, and they no longer count towards

19   the percentage of ownership.  So that means if

20   your 250 shares were redeemed by TPR, it made the

21   remaining shares more valuable, which is why

22   redeeming the shares allowed the Orly trust and

23   the Sagi trust to share equally.

24    A.   What I have to consult an accountant.

25    I don't know what you are --

161

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2        MR. MEISTER:  Wait for a question.

3    A.   I don't know what you are talking

4    about.

5        MR. MEISTER:  Wait until a question.

6    BY MR. GRIVER:

7    Q.   To your knowledge, was there ever a

8    time when the -- when D&K LLP owned 96 percent of

9    TPR?

10    A.   96 percent of TPR?

11    Q.   Yes.

12    A.   I am getting confused.

13    Q.   Well, I will just repeat it again.  I

14    think it is simple question.

15        Was there ever a time to your

16    understanding when D&K LLP owned approximately 96

10    Q.   What was the effect on the Orly trust

11    of the redemption?

12        MR. MEISTER:  I'm going to object to

13    the form of the question.

14    A.   The whole exercise was for me to be

15    available for Orly to be a trustee.  I don't know

16    what you are asking me now.

17    Q.   All right.  Let me show you what I am

18    going to mark as Exhibit 26.

19        (Dalia Exhibit /*, marked.)

20        MR. GRIVER:

21        (WHEREUPON, the record was read by

22        the reporter as requested.)

23    THE WITNESS:  Now, can I read this

24    quietly?  Because it is hard for me to

25    concentrate already.

163

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2        MR. GRIVER:  Sure

17    percent of TPR?

18    A.   In the beginning of history, before we

19    got divorce when it was --

20    Q.   How about after December 17, of 2007,

21    did D&K LLP own approximately 96 percent of TPR?

22    A.   Can you ask me again, what is the date?

23    What -- can we schedule another date?  I am

24    getting --

25        MR. MEISTER:  Read the question back.

162

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    He is referring to this date.

3    A.   What are you saying now.

4        MR. GRIVER:  Repeat the question,

5    please.

6        (WHEREUPON, the record was read by

7        the reporter as requested.)

8    A.   I don't know  That's my answer

9    BY MR. GRIVER:

3    THE WITNESS:  (Witness reading

4    document).

5    THE WITNESS:  Okay.  Now when you say

6    security agreement, you mean the note that D&K

7    note.

8    Q.   Yes, the D&K note.

9    A.   It will be clear to me.

10    Q.   This is from the sale of the UCC sale

11    of the D&K

12        MR. MEISTER:  Is there a pending

13    question?

14    Q.   Let me ask you the question so when you

15    go through it you will be able to know.

16    A.   So this was an action --

17    Q.   On the date of the auction?

18    A.   Yeah.

19    Q.   Who else owned TPR shares, to your

20    knowledge?

21    A.   Except, I mean -- I mean, TPR

22    obviously, and the I guess the D&K limited,

23    right.

24    Q.   Uh-huh.  Rochelle Fang owned ten shares.

25    I believe.

                        164

1     D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2     A.   You know, all these little things, I am

3     not familiar with.

4     Q.   Anyone else that you know?

5         MR. MEISTER:  Just so it is clear, she

6     says she is not familiar.  You are telling her

7     something and she says she is not familiar.

8         MR. GRIVER:  Okay.

9         THE WITNESS:  I am not familiar I just

10    understand that this is something that you showed

11    me before and I told you it is part of this

12    auction and I wasn't there, I don't know and

13    whatever you say.

14    Q.   On that date did Sagi own shares?

15    A.   What.

16    Q.   On that date did Sagi own shares?

17    A.   He -- if he owned shares.

18    Q.   In TPR?

19    A.   I don't remember when he bought the

20    shares from the group.  I don't remember what

21    date it was.  Because Sagi -- no.  Sagi --

22    shares.  I mixing things around I'm sorry.

23    Q.   I am talking about TPR shares?

24    A.   Yes.  TPR shares.

25    Q.   On this date did Sagi own TPR shares?

                        165

1     D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2     A.   I don't know.

3     Q.   On this date did you own TPR shares?

4     A.   On this --

5     Q.   On February 27, 2009 did you own TPR

6     shares?

7     A.   When did I sell the shares?  I don't

8     remember any more the date.  December 17, 07, and

9     when this took place?  So no, I didn't because

10    this happened in February 09.  So I didn't.  I

11    didn't because I sold my shares, so.

12        MR. GRIVER:  Okay.  I am going to ask

13    that the redacted bank statements be provided

14    evidencing those wire transfers from TPR.

15        THE WITNESS:  What?

16        MR. GRIVER:  That was to Mr. Meister.

17        THE WITNESS:  Oh, okay.

18        MR. GRIVER:  Not to you.

19        MR. GRIVER:  So I am clear on the

20    record what I would like is redacted bank

21    statements showing the wire transfers into

22    Ms. Genger's account from whatever source those

23    transfers come.

24    Q.   Whose idea was it, Ms. Genger, to try

25    and settle the D&K note case without Orly Genger?

                        166

1     D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2     A.   Whose idea was it to sell?

3     Q.   To settle --

4     A.   To settle?

5     Q.   -- without Orly Genger, yes.  Strike

6     that.  Let's create a record

7         On or about October --

8     A.   Show me the papers so I remember.

9         MR. MEISTER:  Wait for the question.

10    BY MR. GRIVER:

11    Q.   Do you recall entering into a

12    settlement agreement trying --

13    A.   There was some kind of settlement

14    hoping that we would finish this nightmare, yes.

15    Q.   Okay.  And whose idea was it to try and

16    enter into the settlement agreement?

17    A.   All the people that wanted peace and

18    not war.

19    Q.   Well, I would like a name instead of a

20    description.  Whose idea --

21    A.   My idea, my son's idea, TPR's idea.

22    Q.   The lawyers idea?

23    A.   Yes.  People who want to finish with

24    the case.