25   Q.  Okay.  Mr. Meister's idea?

167

---

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   A.  Right.

3   Q.  Mr. Dellaportas' idea?

4   A.  But not your idea, because you want to

5   continue and continue with this.

6       MR. MEISTER:  Just answer the question.

7   BY MR. GRIVER:

8   Q.  Just answer the question.

9   A.  So that's part of my answer.

10   Q.  Just answer the question I asked.

11   A.  Somebody who doesn't want to settle.

12   You don't you understand that.

13   Q.  Your idea, correct?

14   A.  Yes.  I want to settle.

15   Q.  Sagi's idea?

16   A.  I hope you also want to settle.

17       MR. MEISTER:  Excuse me.  Dalia, just

---

11       MR. GRIVER:  That's it, and then a few

12   additional questions.

13       THE WITNESS:  And what?

14       MR. MEISTER:  Dalia.  Let's take a

15   five-minute break.

16       MR. GRIVER:  That's the key area.

17       MR. MEISTER:  And I am going to suggest

18   you and I go outside and get some fresh air.

19       THE WITNESS:  Okay.  Let's go.

20       (WHEREUPON, a recess was had.)

21       3:34-351.

22

23       MR. GRIVER:  Exhibit 27.

24       (Dalia Exhibit /*, marked.)

25   BY MR. GRIVER:

169

---

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   Q.  Ms. Genger, do you recognize this

3   document for the record this document is titled

---

18   answer the question, or we will be here today

19   until midnight and tomorrow.

20       THE WITNESS:  That's really incentive.

21       MR. GRIVER:  Do you need a break,

22   Ms. Genger?

23   A.  I might need a break soon.

24       MR. GRIVER:  Why don't we take just a

25   break so that --

168

---

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   A.  No, I am getting frustrated because you

3   know, we want to finish this, we want to finish

4   this.

5       MR. MEISTER:  How much longer do you

6   have, Yoav?

7       MR. GRIVER:  I have the 8 agreements

8   that involve the Manhattan safety company and

9   their attempt at settlement.

10       MR. MEISTER:  That's it?

---

4   settlement agreement, and there's Bates ranges DG

5   1101 to 1110.

6       Ms. Genger, do you recognize this

7   document?

8   A.  Although it looks familiar --

9       MR. MEISTER:  The question is --

10   A.  Can I ask Bob something?  Because --

11   Q.  Is it a privilege issue?

12   A.  I'm not sure if this is the settlement

13   agreement because I thought -- there was

14   something else.

15   Q.  Well, there are additional documents,

16   but I will note on page 7 of the document, which

17   is Bates stamp DG 107 is your signature?

18   A.  Right.  Yes.

19   Q.  But if you want to take a break and

20   ask --

21   A.  I just want to look over it one more

22   time, okay.

23   Q.  Yes.

24       MR. MEISTER:  While she's doing that, I

25   will note for the record that I thought we had

170

1     D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2   produced a copy which also had the counterpart
3   signature, of TPR.
4        MR. GRIVER:  You anticipated one of my
5   questions.  Is there a counterpart signature of
6   TPR?
7        MR. MEISTER:  Yes.
8        THE WITNESS:  I'm not sure that that's
9   the exhibit I looked at.
10       MR. GRIVER:  Do you know who signed it?
11       MR. MEISTER:  I believe it was Yonite
12   Sternberg.
13       MR. GRIVER:  She signed the amended and
14   restated.
15       MR. MEISTER:  As far as I believe.
16
17   A.   So in general, what is the question?

11   represent to you that we have not received any
12   drafts of the settlement agreement.  Are there
13   drafts that have not been provided?
14       MR. MEISTER:  I don't think we have any
15   drafts.  I know we have a copy which has -- or
16   signature page which has the signature for TPR.
17   BY MR. GRIVER:
18   Q.   Ms. Genger, do you know who took the
19   laboring hand in drafting this settlement
20   agreement?
21   A.   Who drafted this?
22   Q.   Yes.  Was it your lawyer was it his
23   lawyers?  Who took --
24   A.   Whoever signed it, their lawyer did
25   this document.

172

1     D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2   Q.   Did Mr. Meister discuss with you any
3   drafts of the settlement agreement?

18   So I will read it --
19   Q.   I have a bunch of questions.
20   A.   A bunch?
21       MR. MEISTER:  Start with the first one.
22   What's the pending question.
23   BY MR. GRIVER:
24   Q.   Whether there were any drafts of this
25   settlement agreement.  That would be my first

171

1     D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2   question.  Electronic or otherwise.
3   A.   I don't know if there are drafts.
4   Q.   So let me ask -- is that on the record?
5        Court reporter:  Yes.
6   BY MR. GRIVER:
7   Q.   As we sit here today, you don't recall
8   there being any drafts of this agreement?
9   A.   I don't recall.
10       MR. GRIVER:  Mr. Meister, I will

4   A.   I do not remember.
5   Q.   Do you recall making any changes to the
6   settlement agreement?
7   A.   No.
8   Q.   Was it your lawyer's who, you know, had
9   the major responsibility of issuing a draft of
10   the settlement agreement for all parties or did
11   your lawyers receive the settlement agreement for
12   comment?
13   A.   No.  It is -- it is a mutual --
14       (WHEREUPON, there was a short
15        interruption.)
16       MR. GRIVER:  Let's go back.
17
18   BY MR. GRIVER:
19   Q.   So we're clear, you did not make any
20   changes to the settlement agreement that --
21   A.   I don't recall that there were any
22   changes.  But the lawyers worked together in
23   order to come to this settlement.
24   Q.   Which law firm or lawyer took the hand
25   in drafting this agreement?

173

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2        MR. MEISTER: Took the hand?
3   Q.   Yes.
4        MR. MEISTER: Objection as to form.
5        MR. GRIVER:
6   Q.   Which lawyer --
7   A.   Who participated --
8   Q.   Someone had to be in charge of drafting
9   the settlement agreement and circulating it for
10  comments. Which lawyer or law firm did that?
11  A.   It was -- this came as the lawyers came
12  together with ideas, and they put it in writing.
13  I don't think there was one single lawyer that
14  came with this and said you sign, you sign. It
15  is kind of cooperation between parties that
16  wanted to settle.
17       MR. GRIVER: Okay. Mr. Meister, to the
18  extent there are any drafts available, electronic

12  discussed.
13  Q.   You were present?
14  A.   Yeah.
15  Q.   Where were you?
16  A.   I think it was Bob's office? No. I --
17  Q.   Because Duane Morris' offices? Sagi's
18  lawyer's office?
19  A.   Sagi lawyer's office maybe.
20  Q.   Sagi lawyer's office?
21  A.   Maybe, yeah, because I said something,
22  wrong, obviously.
23       MR. MEISTER: If you don't remember you
24  don't remember.
25  BY THE WITNESS:

175

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2   A.   I thought it was there, but I was
3   wrong.
4   Q.   Was there a lawyer there in these --

19  or otherwise of the settlement agreement, or the
20  amended and restated settlement agreement or any
21  of the other documents --
22       THE WITNESS: This I don't know.
23       MR. GRIVER: -- I would ask they be
24  provided.
25  BY MR. GRIVER:

174

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2   Q.   How long did these discussions take to
3   reach the settlement agreement? Was it decided
4   in a day, in a week, how long?
5   A.   I don't remember. I have no idea.
6   Q.   Were these in person discussions, were
7   they over the phone, were you involved in
8   these -- strike that.
9        Let's ask this: Were you involved in
10  any of these discussions?
11  A.   Yes. I was there when it was

5   A.   One of the lawyers.
6   Q.   Okay. Was there a lawyer there in
7   these discussions representing you personally?
8   A.   Representing me personally?
9   Q.   Uh-huh.
10  A.   You know that Bob represents me
11  personally, and represents the trust.
12  Q.   Okay.
13  A.   So I didn't ask him at one moment, at a
14  certain moment if he's talking on this side of
15  his mouth or the other side of his mouth. I
16  don't know. I can't tell you.
17  Q.   Mr. Meister was representing both the
18  trust and you personally in these settlement
19  negotiations?
20  A.   No. This settlement is not between me.
21  It is between the trust.
22  Q.   But it does release you from all
23  liability?
24       MR. MEISTER: Objection.
25  Q.   Doesn't it?

176

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   A.  Where does it say so?

3   Q.  Let's take a look.  Page 5, paragraph 4

4  mutually releases?

5   A.  1105.

6   Q.  1105.  E.  Paragraph 4 mutual releases

7   A.  Release one another.  Including --

8   Q.  Okay.

9   A.  Yeah.  No.  But I'm trying to see if

10  I'm part of this personally.  I don't see

11  personally that I am represented here.

12   Q.  You see that it --

13   A.  I don't see personally, Dalia Genger.

14   Q.  You see -- well, let me read it to you.

15  The parties to the settlement agreement hereby

16  irrevocably and fully release one another

17  including all current directors officers

18  trustees, et cetera, et cetera

12  didn't release Dalia.

13    THE WITNESS:  You made sure it is not

14  there

15  BY MR. GRIVER:

16   Q.  D&K LLP also released you as trustee,

17  correct?

18   A.  If it says so.  I don't remember.

19   Q.  And motions for --

20   A.  I was in the capacity as trustee, not

21  as Dalia Genger.

22   Q.  Okay.  Let's go -- why would it be in

23  the trust's best interest in release you as

24  trustee?

25    MR. MEISTER:  Objection.

178

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2  BY MR. GRIVER:

3   Q.  From all claims?

4    MR. MEISTER:  Objection.  Trust didn't

19  You are the trustee, correct?

20   A.  Right.  As the trustee I am released,

21  but not personally

22   Q.  Okay.  Well --

23    MR. MEISTER:  Just so we are clear,

24  release the other parties, there's no release by

25  the trust to the trustee

177

1   D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2   Q.  It says the parties to the settlement

3  agreement hereby irrevocably fully release one

4  another.

5    MR. MEISTER:  Right.  One another.

6    MR. GRIVER:  So the trust is released,

7  and the trustee is released

8    MR. MEISTER:  By TPR.

9    MR. MEISTER:  I know you are trying to

10  mischaracterize this as the trust releasing

11  Dalia, but it is not there because the trust

5  release her, and I really don't like your trying

6  to confuse the witness, at 4:00, in the end of a

7  day, by misrepresenting the legal documents to a

8  layperson.

9    THE WITNESS:  And I just said that I

10  just went -- we repeated.  I repeated that we

11  made sure that I personally was not released.

12   Q.  Okay.

13   A.  Only as a trustee, not as an

14  individual.  Please.

15   Q.  Very good.  Let's look at paragraph 8,

16  attorneys' fees.

17   A.  What?

18   Q.  Attorneys' fees.  Do you understand

19  what paragraph 8 does?

20   A.  Let me get to it first.  Exhibit A you

21  mean.

22   Q.  Paragraph 8 on DG 1106

23   A.  I mean, it is not enumerated.  Oh, I'm

24  sorry.  Attorneys' fees.

25  BY MR. GRIVER:

179

D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2    Q.  Do you understand what paragraph 8
3    does?
4    A.  I have to read it. I am very slow.
5    Q.  We will wait it is important you.
6    understand this document.
7    A.  Yes. It takes me a long time. It is
8    hard for me.
9    Q.  Let me know when I can ask you.
10   A.  Okay. So ask me the question and then
11   I will read if again. Because it is difficult.
12   Q.  This paragraph provides that if a
13   beneficiary of a party --
14   A.  Of this agreement.
15   Q.  Right. A beneficiary of a party of
16   this agreement, beneficiary of a party to this
17   agreement would be Orly?
18   A.  Right. Orly trust you mean?
19   Q.  No. It is because the Orly is

20    beneficiary?
21    A.  Of the trust, okay.
22    Q.  So if Orly either asserts a new claim
23    against TPR or D&K, or continues with an existing
24    claim against TPR and D&K and is unsuccessful,
25    then the trust is liable for the attorneys' fees
                           180

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2    of D&K and TPR. That's what this paragraph does.
3        My question to you, Ms. Genger, is how
4    is that in the benefit of the trust?
5    A.  Okay. So what you are saying -- let me
6    see if I understand. Okay. That Orly here is a
7    beneficiary -- is a beneficiary, right?
8    Q    Correct.
9    A.  Okay. Who else is a beneficiary,
10   except Orly? I am asking you because I am not --
11   I don't understand.
12   Q.  The Orly Genger 1993 trust who is the

13   beneficiary of the Orly Genger 1993 trust?
14   A.  It is Orly. So who else is a --
15   another beneficiary.
16   Q.  But Orly is a beneficiary?
17   A.  Yes. I am saying yes. But are there
18   any other beneficiaries that we are talking here?
19   Q    Contingent beneficiaries, but a
20   beneficiary, Orly is the beneficiary?
21   A.  Orly is beneficiary, yes, I agree.
22   Q.  So if she either continues with her
23   claims, or asserts a new claim against TPR or D&K
24   and is unsuccessful, the Orly trust is liable for
25   the attorneys' fees of D&K and/or TPR.
                           181

6    know if I understood, that Orly is a beneficiary
7    if she continues.
8    Q.  Yes.
9    A.  To sue, to sue?
10   Q.  Yes.
11   A.  The other parties that are involved in
12   this agreement?
13   Q.  Yes.
14   A.  She -- the trust will be liable for the
15   cost of her suing, right?
16   Q.  That's correct.
17   MR. MEISTER:  If the defendant wins.
18   THE WITNESS:  If the -- if she wins.
19   MR. MEISTER:  If she loses and
20   defendants win.
21   THE WITNESS:  If she loses, usually it
22   is customary --
23   Q.  Not in America. No.
24   A.  So what country is it --
25   Q.  Let me ask you this: When you signed
                           182

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2        Did you understand that that was the
3    result of this paragraph when you signed it as
4    trustee on October 3, 2011?
5    A.  I just want to understand. I want to

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2  this agreement?
3    A.  No.  The agreement is to make the
4  parties come to a point that they won't sue each
5  other, that they will come to a point when they
6  agree that we should come to terms where everyone
7  is satisfied with what is getting and it not
8  going to continue to sue.
9    Q.  How is it in the Orly -- strike that.
10    First of all, when you signed this
11  agreement did you understand the settlement
12  agreement when you signed it?
13    A.  I thought I did.
14    Q.  Did you review it with your attorneys?
15    A.  Yes.
16    Q.  Did they explain it to you?
17    A.  Yeah.
18    Q.  Did you understand that you were --
19  that you are providing that the Orly trust would

20  be paying -- paying attorneys' fees?
21    A.  I don't want Orly to continue with out
22  basis, I am saying, without basis.  If she has
23  basis to sue she should sue.  But without basis
24  she shouldn't sue any of the other participants
25  here because it cost money to the trust.  And she
183

13    A.  We said that we --
14    Q.  Just answer my question?
15    A.  We work together.  So I don't know if
16  it was Bob or John, or his assistant or Bob's
17  assistant, I do not know.  I did not put it there
18  because I am not smart enough, okay, to write
19  this document.  But one of the lawyers put it
20  there because settlement is settlement.  We want
21  to finish with the story.
22    Q.  And this meeting where this agreement
23  was reached, where -- how long did this agreement
24  take place?
25    A.  You asked me this.
184

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2    Q.  No.  How long?
3    A.  I don't remember.
4    Q.  Half a day, one day, more than a day?
5    A.  I don't remember.  I really don't

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2  owns the trust and she's going to lose money.
3    Q.  And so --
4    A.  And that's why we want everybody stop
5  suing each other, because it costs money.  This
6  is the settlement.  That's why it is called a
7  settlement.  People want -- they will stop suing
8  each other.  That's the whole point.
9    Q.  Whose idea was it to have this attorney
10  fees provision?
11    A.  I don't know whose idea.
12    Q.  And you thought it was --

6  remember
7    Q.  When you got there were they still
8  drafting the agreement, or was it ready for
9  signature when you got there?
10    A.  I don't remember.  There were so many
11  papers written, who can remember.
12    Q.  In your previous answer you talked
13  about John.  Who is John?
14    A.  John -- John Dellaportas, that is
15  Sagi's lawyer I think.  I think that's the one.
16    Q.  What other lawyers were there?
17    A.  I don't remember there was another
18  lawyer.
19    Q.  Is there anyone representing -- were
20  there any other lawyers there representing Sagi
21  other than Mr. Dellaportas?
22    A.  I don't believe so.
23    Q.  Do you remember what John said?
24    A.  Are you kidding me?  No.  I don't
25  remember what he said.
185

D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2  Q   So --
3  A   This is -- the result of --
4  Q   And so you thought it would be a good
5  idea to put in an attorney's fees provision that
6  would try and prevent Orly from suing on behalf
7  of her trust?
8  A   I think that what the product of the
9  work of the lawyers of the parties concerned
10 thought that this is a very good idea to settle
11 once and for all this arguments and fights that
12 we have about Orly's rights.
13 Q   When was this meeting was it on October
14 3?
15 A   Whenever it says. I don't know.
16 Q   This meeting was on the date that this
17 agreement was executed; is that correct?
18 A   If is says so. You think I remember
19 what date it was?
20 Q   Well, it says --

14 A   It is for Orly's benefit. I am not
15 suing --
16 Q   But if you lose, you have to pay?
17 A   I am not going to lose.
18 Q   You are not going to lose?
19 A   I am not going to lose.
20 Q   I see.
21     So Orly's got -- any lawsuit Orly
22 brings, she is going to lose, but any lawsuit you
23 bring, you are going to win?
24     MR. MEISTER: Wait a minute. You are
25 arguing with the witness.

187

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2     MR. GRIVER: I am trying to understand
3  if that's her belief.
4  A   What I am saying is, first of all, I am
5  not sure if that was the day it says so, but I'm
6  not sure that that was exactly the date that I

21     MR. MEISTER: If you don't remember --
22 BY MR. GRIVER:
23 Q   Signature, October 23, 2011?
24 A   Whatever it says. I don't remember if
25 it was then it was then.

186

1  D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2  Q   Well, the day after you signed this
3  agreement you brought suit in Delaware didn't
4  you?
5  A   What?
6  Q   The day after you signed this agreement
7  to try and stop all these lawsuits from
8  proliferating, you brought a new lawsuit in
9  Delaware; isn't that correct?
10 A   But this --
11 Q   Correct? It is correct, right?
12 A   Yeah, but in all --
13 Q   That doesn't count?

7  signed was the date that really it happened
8  because many times we know that things are signed
9  and it is not the same exactly the same date
10 Q   Let me understand this. You are saying
11 it is possible you put an incorrect date as the
12 date of your signature?
13 A   What I am saying is, that many times,
14 by the time the document is printed it is not
15 exactly the date that it is signed.
16 Q   Okay.
17 A   It happens.
18 Q   Fine.
19    Well, on August 8 of 2011, your
20 lawyers --
21 A   I mean aren't you --
22    MR. MEISTER: Wait for the question.
23 Don't argue with him.
24 BY MR. GRIVER:
25 Q   Now, on August 8, 2011 Pedowitz &

188

D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2    Meister brought this interpleader action, right,
3    that's an additional lawsuit, correct?
4        A.   Ask him. It is not my idea,
5    interpleader.
6        Q.   All right. And on October -- let's
7    look at paragraph one, the consideration.
8            On behalf of the trust, you disclaimed
9    any --
10       A.   Wait, wait, wait a second. You are
11   looking at number 1, page 1104.
12       Q.   Yes.
13       A.   Consideration.
14       Q.   Yes. Subpart B the OG trust.
15       A.   Where is subpart B? I don't know
16       Q.   It is after subpart A it is about 1, 2,
17   3, 4 -- it is about six lines down?
18       A.   Okay. Okay. So what are you
19   complaining that TPR --
20           MR. MEISTER: He is not complaining

14       A.   Aren't you one of the lawyers?
15       Q.   What else?
16       A.   You should look for it.
17       Q.   What else?
18       A.   (Reading document). What are you
19   asking me? What is what?
20       Q.   I am asking as trustee, what was the --
21   what did the OG trust give up in order to reach
22   the settlement?
23       A.   Okay. What I see here is that TPR
24   relinquished all economic interest in favor of
25   Orly Genger Trust, okay. It is a good thing,
                    190

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2    right.
3        Q.   I am asking you what did the OG trust
4    give up?
5        A    OG trust?
6        Q    What is the Orly Genger Trust give up

21   He may be asking you a question. He hasn't yet.
22   BY MR. GRIVER
23       Q.   In this -- you will agree with me that
24   in this paragraph one, the OG trust disposed of
25   its interest in TPR and gave them to TPR?
                    189

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13
2            MR. MEISTER: Objection. Not what it
3    says.
4    BY MR. GRIVER
5        Q    Well, let me put it this way. What is
6    your understanding of what the OG trust did in
7    order to get into this settlement? What was its
8    consideration that it provided, as trustee, what
9    consideration did the OG trust provide?
10       A.   That Orly Genger Trust got from TPR
11   $100,000 for legal fees. Okay.
12       Q.   So the lawyers got paid. Good.
13           What else?

7    in order to reach settlement?
8        A    Let me continue to read it because in
9    the many time it just -- it is getting to
10   something.
11           (Reading document).
12           I don't see anything here that Orly
13   Genger trust is giving up actually.
14       Q.   At the time -- at the time that you
15   signed this agreement, what was your
16   understanding as to what the OG trust gave up?
17       A.   My Orly Genger Trust, my understanding
18   was that Orly Genger Trust was getting things
19       Q.   And giving up nothing?
20       A.   In this particular, paragraph I don't
21   see she is giving up anything.
22       Q    Look at --
23       A.   She is getting economic benefits from
24   the shares, that we know that she should maybe
25   not get if TPR would not be generous enough to do
                    191

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    it.

3    Q.   So at the time that you signed this

4    agreement, you did not believe that the OG trust

5    was giving up anything?

6    A.   I am saying based on this.

7    Q.   Please answer my question.

8        At the time that you signed this

9    agreement, wasn't it your understanding that the

10   OG trust was gig giving up nothing?

11   A.   There would be some release.

12   Q.   Other than claims against the other

13   people?

14   A.   Yeah.

15   Q.   You did not believe the OG trust was

16   giving up anything else?

17   A.   Is this a question?

18   Q.   It is --

19   A.   Or a statement? A question? I have to

20   read the whole thing because I --

21   Q.   Read my question back.

22   A.   No, I have to read the whole thing

23   because I so far, did not find anything.

24   Q.   I am just asking, at the time that you

25   signed the agreement, what did you believe that

192

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    OG trust was giving up?

3    A.   At the time I believe that Orly Genger

4    trust its debt was reduced to $4 million, I mean

5    the note was reduced to $4 million.

6    Q.   I am not talking?

7    A.   To 4 and a half million.  What, it is

8    not true?

9    Q.   Go ahead and answer the question as you

10   see fit.

11   A.   You have $100,000 from TPR.  Okay.  You

12   got economic benefits for the shares of TRI.

13   Okay.  And I am thinking what else.  There was

14   something else that they got.  What the trust

15   gave, I at the moment cannot see.  Maybe you can

16   point it out to me.  I don't see it here.

17   Q.   Can I have that read back?

18   A.   And the release.

19   Q.   If you finished, I will have the court

20   report read it back so that you can listen to

21   your answer and add anything that you may have

22   missed.

23       (Read back)

24       THE WITNESS:  Okay.  So tell me what --

25   BY MR. GRIVER:

193

---

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    Q.   Any other benefits that you believe the

3    trust got from this agreement?

4    A.   The release.

5    Q.   Anything else?

6    A.   I have to read it because I am really

7    tired, and I have to start reading it from the

8    beginning.

9    Q.   Look at paragraph one B to show what

10   the OG trust gave up.

11   A.   One B.

12   Q.   One B.  Page 4.  DG 1104?

13   A.   Consideration.

14   Q.   Look at B.  The OG trust.

15   A.   B that's what we looked at before,

16   right.

17   Q.   Yes.

18   A.   The OG trust.

19       (Reading document).

20       If you mean that it is -- OG trust --

21   how do you mean, that the transfer to TPR is

22   limited partnership interests in D&K, that's what

23   you meant?

24   Q.   Yes.  Did OG trust transfer to TPR's

25   limited partnership interest in D&K the D&K

194

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    interest; do you see that? ^ SpEx

3    A.  Yes.

4    Q.  So on that date you as trustee

5    transferred to TPR the trust's D&K interest,

6    correct?

7    A.  The trust's -- D&K interest

8    Q.  Yes.  That's how it is defined here.

9    A.  Right.  I am trying to think on -- I am

10    getting confused already.

11    Q.  Well, I will start it simple.

12    A.  I am confused already.

13    Q.  On the date you signed this settlement

14    agreement?

15    A.  Yeah.

16    Q.  Did you know that the trust was

17    transferring to TPR its D&K interest, yes or no?

18    A.  It says so.  It says so.  But I just --

19    I just for my own thing, because I just -- I now

20    am getting confused, who was the trust D&K

21    interest that was -- that was given up.

15    interest.  At the time that you signed the

16    agreement, did you understand that the OG trust

17    was giving up its D&K interest?

18    A.  I don't know what's the D&K interest.

19    Q.  Okay.  Did you understand --

20    A.  I don't know.  Maybe at the time I

21    understood.  But right now I can't understand it

22    any more.  I am confused completely.

23    Q.  Did you understand on or about October

24    3, 2011 when you signed this agreement, that the

25    OG trust was a limited partner in D&K?

196

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.  I don't know how to answer this

3    question.

4    Q.  On the date that you signed this

5    agreement, what was the monetary value of the

6    Orly Genger Trust's D&K interest?

7    A.  This is where I am getting confused.

22    Q.  Well, my first question is, at the time

23    that you signed this agreement, did you know that

24    the Orly Genger Trust was transferring to TPR its

25    D&K interest?  Did you know that?

195

1    D. GENGER - UNCERTIFIED ROUGH DRAFT - 2/7/13

2    A.  Can you repeat this.

3    Q.  Sure

4        On the day that you signed the

5    settlement agreement, did you understand that the

6    Orly Genger Trust was transferring to TPR its D&K

7    interest?

8    A.  Are you talking now about the sale of

9    the TPR shares?

10    Q.  No I am talking about --

11    A.  I am getting completely confused now.

12    If you know --

13    Q.  Ms. Genger, it says in this document,

14    that the OG trust hereby transfers to TPR its D&K

8    Q.  Had you valued the D&K interest in any

9    way?

10    A.  Whatever you are asking now, I don't

11    know how to answer because I am completely

12    confused.  Really.  I am confused.  You have to

13    come again or --

14    MR. GRIVER:  Let's take a break.

15    A.  I am confused already.

16    MR. GRIVER:  Let's take a break.

17    Off the record.

18    (WHEREUPON, a recess was had from

19    4:31-4:35.)

20    MR. GRIVER:  On the record.  The

21    parties have agreed to continue Ms. Genger's

22    deposition to Monday, the 11 of February,

23    commencing at 11 am, to take half a day, which

24    means three to four hours of questioning.

25        * * * * *

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X                    6-14-12
GLENCLOVA INVESTMENT CO.,                     :
                                              :
                        Plaintiff,            :
                                              :
        -against-                             :    No. 08 Civ. 7140 (JFK)
                                              :
TRANS-RESOURCES, INC. and TPR                 :
INVESTMENT ASSOCIATES, INC.,                  :
                                              :
                        Defendants.           :
----------------------------------X
PEDOWITZ & MEISTER LLP,                       :
                                              :
                        Plaintiff,            :
                                              :
        -against-                             :    No. 11 Civ. 5602 (JFK)
                                              :
TPR INVESTMENT ASSOCIATES, INC.,              :
GLENCLOVA INVESTMENT CO., TR                  :
INVESTORS, LLC, NEW TR EQUITY I,              :
LLC, NEW TR EQUITY II, LLC, DALIA             :
GENGER, as trustee of the Orly               :
Genger 1993 Trust, and ORLY                   :
GENGER,                                       :
                                              :
                        Defendants.           :
----------------------------------X
SKADDEN, ARPS, SLATE, MEAGHER &               :
FLOM, LLP,                                    :
                                              :
                        Plaintiff,            :
                                              :
        -against-                             :    No. 11 Civ. 7923 (JFK)
                                              :
TPR INVESTMENT ASSOCIATES, INC.,              :
GLENCLOVA INVESTMENT CO., TR                  :
INVESTORS, LLC, NEW TR EQUITY I,              :
LLC, NEW TR EQUITY II, LLC, and               :
ARIE GENGER,                                  :    **Opinion and Order**
                                              :
                        Defendants.           :
----------------------------------X

1

20-01187-jlg    Doc 1-19    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 20
Case 1:11-cv-05602-JFK    Document 64    Filed 06/14/12    Page 2 of 52
Pg 12 of 150

APPEARANCES:

> For Glenclova Investment Co.; TR Investors, LLC; New TR
> Equity I, LLC; New TR Equity II, LLC; Eddie Trump; Jules
> Trump; Mark Hirsch; Skadden, Arps, Slate, Meagher & Flom,
> LLP
> Thomas Allingham
> Anthony Clark
> William Frank
> SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
>
> For TPR Investment Associates, Inc.
> John Dellaportas
> DUANE MORRIS, LLP
>
> Evangelos Michailidis
> SNOW BECKER KRAUSS, P.C.
>
> For Arie Genger
> Paul Montclare
> Lauren Wachtler
> MITCHELL SILBERBERG & KNUPP LLP
>
> For Dalia Genger; Pedowitz & Meister LLP
> Robert Meister
> Marisa Warren
> PEDOWITZ & MEISTER LLP
>
> For Sagi Genger
> Alan Sash
> McLAUGHLIN & STERN LLP
>
> For Orly Genger
> Elliot Silverman
> WACHTEL, MASYR & MISSRY LLP

**JOHN F. KEENAN, United States District Judge:**

Before the Court are ten motions, variously styled, taking

competing views on whether the Southern District of New York,

the New York Supreme Court, or the Delaware Chancery Court

should determine the beneficial ownership of shares in a

closely-held corporation.

2

## I.     Background

### A.     The Parties and Procedural History

These three cases, along with numerous other state court
cases, constitute a bitter and seemingly endless battle for
control of Trans-Resources, Inc. ("Trans-Resources"), a Delaware
corporation that manufactures and sells chemicals for
agricultural use.  The contenders include Arie Genger ("Arie")
and his adult daughter Orly Genger ("Orly") in one camp;
Glenclova Investment Co. ("Glenclova"), TR Investors, LLC
("Investors"), New TR Equity I, LLC, New TR Equity II, LLC,
Eddie Trump, Jules Trump, and Mark Hirsch (collectively, the
"Trump Group") in a second camp; Arie's former wife Dalia Genger
("Dalia"), who is the trustee of a trust benefitting her
estranged daughter Orly, in a third; and, indirectly, former
Trans-Resources majority owner TPR Investment Associates, Inc.
("TPR") and its current President, Sagi Genger ("Sagi"), who is
Arie and Dalia's adult son.  The following facts are taken from
the findings of the Delaware Chancery Court in TR Investors, LLC
v. Genger, C.A. No. 3994-VCS, 2010 WL 2901704 (Del. Ch. July 23,
2010); they are consistent with all of the many pleadings in
these cases and, unless otherwise noted, are undisputed.

Arie formed Trans-Resources in 1985.  Trans-Resources was a
wholly-owned subsidiary of TPR, a Genger family holding company.
Arie owned a 51% majority of TPR, through which he controlled

3

Trans-Resources; his wife and children owned minority interests in TPR. By 2001, Trans-Resources had run into financial difficulty; to save the company from bankruptcy, Jules Trump caused two Trump Group members, Glenclova and Investors to purchase the vast majority of Trans-Resources' outstanding bonds at a substantial discount. Then, on March 31, 2001, Glenclova and Investors entered into a Stockholders Agreement with Trans-Resources and TPR, pursuant to which Glenclova and Investors converted their bond holdings into a 47.15% equity stake in Trans-Resources. TPR, which was controlled by Arie, retained the 52.85% majority share. The Stockholders Agreement prohibited either party from transferring their shares in Trans-Resources to anyone other than a limited number of permitted transferees and required written notice prior to any transfer. Violation of the terms of the Stockholders Agreement gives non-selling shareholders the right to purchase any invalidly transferred shares.

In 2004, Arie and Dalia divorced. In connection with their divorce settlement, on October 29, 2004, Arie caused TPR to transfer its 52.85% stake in Trans-Resources as follows: approximately 13.9% to Arie himself (the "Arie Shares"); approximately 19.5% to the Sagi Genger 1993 Trust (the "Sagi Trust"), a trust created for his son's benefit (the "Sagi Trust Shares"); and 19.5% to the Orly Genger 1993 Trust (the "Orly

4

Trust"), a trust created for his daughter's benefit (the "Orly
Trust Shares").[1]  The legitimacy of these transfers is at the
heart of the Glenclova, Pedowitz, and Skadden complaints.

In 2008, Trans-Resources again ran into financial
difficulty, so Arie offered the Trump Group additional shares in
Trans-Resources in exchange for a capital infusion.  The
Chancery Court found that in the course of finalizing the deal
in June 2008, but not before, the Trump Group learned about
Arie's 2004 transfer of Trans-Resources shares to himself and
his children's trusts.  Despite the fact that these transfers
violated the terms of the 2001 Stockholders Agreement, the Trump
Group agreed to go forward with the deal, likely because it
would give them majority control of Trans-Resources.  Shortly
thereafter, however, Arie reneged on the funding agreement and
threatened to sue the Trump Group if they challenged the
validity of the 2004 share transfers.  In response, Glenclova
invoked its right under the 2001 Stockholders Agreement to
purchase all of the Trans-Resources shares Arie transferred to
himself, the Sagi Trust, and the Orly Trust in 2004.  Arie
disputed Glenclova's right to purchase the shares, so Glenclova
filed suit in the Southern District of New York on August 11,

---

[1] For the sake of clarity, the Court adopts the rounded
percentage figures as referenced by the parties, cognizant of
the fact that they do not add up to 52.85% exactly.

2008 to enforce the Stockholders Agreement.  <u>See</u> <u>Glenclova Inv.</u>
<u>Co. v. Trans-Resources, Inc.</u>, No. 08 Civ. 7140 (JFK).

     To cover all of its bases, the Trump Group also entered
into two agreements to separately purchase the shares Arie
purported to transfer to himself and his children's trusts in
2004.  First, on August 22, 2008, the Trump Group entered into a
stock purchase agreement with TPR, which is controlled by Sagi,
and the Sagi Trust to acquire the Sagi Trust Shares - either
from TPR or the Sagi Trust, whichever party was judicially
determined to own the shares.  Second, the Trump Group entered
into a side letter agreement with TPR giving the Trump Group an
option to purchase the Arie Shares and the Orly Trust Shares,
should a court determine that the 2004 transfers were void such
that TPR (and not Arie or the Orly Trust) retained legal and
beneficial ownership of the disputed shares.

     After acquiring the Sagi Trust Shares, on August 25, 2008,
the Trump Group, believing itself to be the majority shareholder
of Trans-Resources, elected four representatives to the board of
directors and removed Arie as a director.  Arie refused to
recognize the Trump Group's majority ownership position, so the
Trump Group filed suit in Delaware Chancery Court for a
determination pursuant to Title 8, Delaware Code, Section 225
that it was entitled to designate and elect a majority of the
board of directors of Trans-Resources.  <u>See</u> <u>TR Investors, LLC v.</u>

20-01187-jlg   Doc 1-19   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 20
Case 1:11-cv-05602-JFK   Document 64   Filed 06/14/12   Page 7 of 52
Pg 17 of 150

Arie Genger, C.A. No. 3994-VCS (Del. Ch. Ct.). The TR Investors
and Glenclova cases, filed in the span of just two weeks, form
the first layer of the jurisdictional conflict now facing the
Court.

The Trump Group filed two lawsuits, but the parties were
initially able to agree that the dispute should proceed in a
single court. Although Arie moved to intervene as a defendant
in the Glenclova action on September 5, 2008, the Court
adjourned oral argument on that motion thirteen times while the
Delaware Chancery action advanced through discovery and a three-
day trial. This was done at Arie's request because he
represented to this Court that the Delaware proceedings would
likely resolve the issues in the federal Glenclova case.
Finally, on July 23, 2010, then-Vice Chancellor Strine issued a
comprehensive opinion in the Delaware Chancery case, finding in
relevant part that: (1) Arie did not give the Trump Group
notice of the 2004 transfer of Trans-Resources shares to
himself, the Sagi Trust, and the Orly Trust as required under
the 2001 Stockholders Agreement; (2) the 2004 share transfers
were void; and (3) by virtue of the August 22, 2008 letter
agreement, the Trump Group owned the Sagi Trust Shares, giving
the Trump Group majority voting control of Trans-Resources. TR
Investors, 2010 WL 2901704, at *13-20. In an opinion dated
August 9, 2010, Vice Chancellor Strine expanded his ruling,

7

holding that the Arie and Orly Trust share transfers in 2004
were similarly

> invalid.    That left the Trump Group with the right to
> purchase the Shares from TPR, and thus TPR and the
> Trump Group were free to settle that dispute by a new
> bargain for sale.    If the Trump Group exercises its
> rights under the [2008 side] Letter Agreement, it will
> own the shares improperly transferred to [Arie] and
> the Orly Trust, and neither of those transferees ever
> had a legitimate interest in the shares.

TR Investors, LLC v. Genger, C.A. No. 3994-VCS, 2010 WL 3279385,
at *3 (Del. Ch. Aug. 9, 2010).

In light of this ruling, on September 1, 2010, the Trump
Group entered into an escrow agreement with TPR, the Orly Trust,
Orly, as beneficiary of the trust, and the law firm of Pedowitz
& Meister LLP ("Pedowitz").    (Escrow Agreement, Declaration of
Robert A. Meister in Support of Dalia Genger's Motion to Enjoin,
Ex. A).    Pursuant to this agreement, in February 2011, the Trump
Group exercised its right to purchase the Orly Trust Shares, but
agreed to deposit the $10,314,005 proceeds of the sale in escrow
with Pedowitz in light of continuing litigation.    Similarly, in
September 2010, the Trump Group entered into an escrow agreement
with TPR and the law firm of Skadden, Arps, Slate, Meagher &
Flom LLP ("Skadden, Arps").    (Escrow Agreement, Declaration of
Lauren J. Wachtler in Support of Arie Genger's Motion to
Dismiss, Ex. I).    In February 2011, the Trump Group exercised
its option to purchase the Arie Shares for $7,428,994.

$5,928,994 of the proceeds from the sale of the Arie Shares was deposited in an escrow account with Skadden, Arps, and the remaining $1.5 million was eventually deposited in a second, separate escrow account.

## B.    Additional Litigation

Immediately following Vice Chancellor Strine's July 23, 2010 opinion, Arie and Orly filed suit in New York Supreme Court against TPR, Sagi, and Dalia seeking a declaration that Arie was entitled to reform his divorce settlement as if the 2004 Trans-Resources share transfers never happened; this is little more than a collateral attack on the Delaware Supreme Court ruling. The complaint was later amended to add the Trump Group parties, the Sagi Trust, and Rochelle Fang, the trustee of the Sagi Trust, to the lawsuit.  See Arie & Orly Genger v. Sagi Genger, et al., Index No. 651089/2010 (N.Y. Sup. Ct.).  Arie then obtained several orders in New York Supreme Court, including: (1) an October 5, 2010 order directing that the proceeds of the sale of the Arie Shares to the Trump Group be held in escrow pending a preliminary injunction hearing; and (2) a February 17, 2011 order enjoining TPR and Sagi from using or converting $1.5 million in proceeds they received from the sale of the Arie Shares to the Trump Group.  Thus, Skadden, Arps holds in escrow $1.5 million of the $7,428,994 proceeds of the sale of the Arie Shares, subject to a New York state court injunction.

On August 16, 2010, TPR filed a third-party complaint
against Arie in the Glenclova action and stipulated to Arie's
right to intervene.  This stipulation resolved Arie's long-
delayed motion to intervene.  Arie then filed a number of
counterclaims against various parties generally seeking to
reform his 2004 divorce settlement so that his 2004 share
transfers and loss of control of Trans-Resources would be
voided.  The Glenclova counterclaims are identical to the claims
in the Arie & Orly Genger New York Supreme Court action.

At the same time Arie was pursuing relief in New York
Supreme Court, the Delaware Chancery case went up on appeal to
the Delaware Supreme Court.  On July 18, 2011, the Delaware
Supreme Court affirmed in part, leaving intact the Chancery
Court's findings that the 2004 share transfers were invalid, and
that the Trump Group legally purchased the Sagi Trust's 19.5%
stake in Trans-Resources, giving the Trump Group majority voting
control of the corporation.  However, the Delaware Supreme Court
reversed the Chancery Court's August 9, 2010 supplemental
determination regarding the beneficial ownership of the Trans-
Resources shares transferred to Arie and the Orly Trust.  The
Court found that

> [a]n adjudication of who has the right to vote
> disputed corporate shares for Section 225 purposes
> cannot constitute a binding adjudication of who
> beneficially owns those shares, because a Section 225
> action is by its nature an in rem, not a plenary,

10

20-01187-jlg   Doc 1-19   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 20
Case 1:11-cv-05602-JFK   Document 84   Filed 06/14/12   Page 11 of 52
Pg 21 of 150

proceeding. Only in a plenary proceeding before a
court that has in personam jurisdiction over the
litigants may the court adjudicate the litigants'
property interest in disputed corporate shares. Here,
the Orly Trust and TPR were never made parties to a
plenary proceeding where the trial court had in
personam jurisdiction over them.

Genger v. TR Investors, LLC, 26 A.3d 180, 201-02 (Del. 2011).

Absent in personam jurisdiction, the Chancery Court erred in

determining the beneficial ownership of the Arie Shares and the

Orly Trust Shares. Id. at 202-03. The Delaware Supreme Court

suggested that the Glenclova case in this District would be "an

example of such a plenary proceeding" where jurisdiction could

be obtained over the necessary parties. Id. at 200 n.88.

In response to the Delaware Supreme Court ruling, on July

22, 2011, the Trump Group filed a plenary action against Arie

and TPR in Delaware Chancery Court seeking a declaration that it

is both the record and beneficial owner of the Arie Shares. See

TR Investors, LLC, et al. v. Arie Genger, et al., C.A. No. 6697-

CS (Del. Ch.).

On August 11, 2011, Pedowitz, the escrow agent for the

$10,314,005 proceeds of the sale of the Orly Trust Shares to the

Trump Group, filed an interpleader action pursuant to 28 U.S.C.

§ 1335 in the Southern District of New York. See Pedowitz &

Meister LLP v. TPR Inv. Assocs., Inc., et al., 11 Civ. 5602

(S.D.N.Y.). The Pedowitz complaint states that no party to the

September 1, 2010 Escrow Agreement has made a demand for payment

11

of the escrowed funds, but Orly, as beneficiary of the Orly

Trust, objects to any release of escrowed funds without her

consent.   Nevertheless, plaintiff Pedowitz alleges that two or

more of TPR, the Trump Group, Dalia, as trustee of the Orly

Trust, and Orly are adverse claimants to the funds held in

escrow and seeks a determination as to which party is entitled

to the funds.   The escrowed funds have since been deposited with

the Clerk of Court.

On October 4, 2011, Dalia, as trustee of the Orly Trust,

filed a plenary action in Delaware Chancery Court against the

Trump Group and TPR seeking a declaration that the Orly Trust is

the beneficial owner of the Orly Trust Shares.   See Dalia Genger

v. TR Investors, LLC, et al., C.A. No. 6906-CS (Del. Ch.).

However, on October 26, 2011, Orly obtained a temporary

restraining order in New York Supreme Court preventing Dalia

from proceeding with her plenary action in Delaware Chancery

Court.   On November 9, 2011 Orly obtained another temporary

restraining order preventing TPR and the Trump Group from

proceeding in the Dalia Genger plenary action in Delaware

Chancery Court.   Thus, the New York Supreme Court has

effectively stayed litigation of the beneficial ownership of the

Orly Trust Shares in Delaware.

On November 7, 2011, Skadden, Arps, the escrow agent for

the $7,428,994 proceeds of the sale of the Arie Shares from TPR

12

to the Trump Group, filed an interpleader action pursuant to 28

U.S.C. § 1335 in the Southern District of New York.  See

Skadden, Arps, Slate, Meagher & Flom LLP v. TPR Inv. Assocs.,

Inc., et al., No. 11 Civ. 7923 (S.D.N.Y.).  The Skadden

complaint does not state that any party has made a demand for

payment of the escrowed funds, but Arie asserts an interest in

the funds and objects to any release.  Thus, plaintiff Skadden,

Arps alleges that two or more of TPR, the Trump Group, and Arie

are adverse claimants to the funds held in escrow and seeks a

determination as to which party is entitled to the funds.

$5,928,994 of the escrowed funds has been deposited with the

Clerk of Court; the remaining $1.5 million continues to be

restrained by the New York Supreme Court.

In summary, there are no fewer than six pending lawsuits in

three jurisdictions, all relating to the beneficial ownership of

the Arie and Orly Trust Shares:

| Court | Caption | Docket No. | Subject |
|---|---|---|---|
| S.D.N.Y. | Glenclova Inv. Co. v. Trans-Resources, Inc. | 08 Civ. 7140 | Arie Shares and Orly Trust Shares |
| S.D.N.Y. | Pedowitz & Meister LLP v. TPR Inv. Assocs., Inc., et al. | 11 Civ. 5602 | Orly Trust Shares |
| S.D.N.Y. | Skadden, Arps, Slate, Meagher & Flom LLP v. TPR Inv. Assocs., Inc., et al. | 11 Civ. 7923 | Arie Shares |
| N.Y. Sup. | Arie & Orly Genger v. Sagi Genger, et al. | 651089/2010 | Arie Shares and Orly Trust Shares |
| Del. Ch. | Dalia Genger v. TR Investors, LLC, et al. | 6906-CS | Orly Trust Shares |

13

| Del. Ch. | TR Investors, LLC, et al. v. Arie Genger, et al. | 6697-CS | Arie Shares |
|---|---|---|---|

There are, however, other cases pending in New York Supreme
Court that present related claims flowing from the same facts as
recounted above. For example, on July 9, 2009, Orly filed suit
against her mother Dalia, her brother Sagi, and TPR seeking,
inter alia, breach of fiduciary duty and fraud damages for their
alleged "looting" of the Orly Trust, including the Orly Trust's
interest in TPR. See Orly Genger v. Dalia Genger, et. al.,
Index No. 109749/2009 (N.Y. Sup. Ct.). Additionally, on October
21, 2010, Dalia, in both her individual and trustee capacities,
filed suit against her ex-husband Arie, alleging that his
failure to validly transfer Trans-Resources shares to the Orly
Trust violated their stipulated divorce settlement. See Dalia
Genger v. Arie Genger, Index No. 113862/2010 (N.Y. Sup. Ct.).

## II.    Discussion

By their own actions, the parties have created a headache-
inducing jurisdictional conflict; they now ask this Court to
clean up the mess they made by determining which of the federal
or state courts should decide the issue underpinning all of
their claims – that is, the beneficial ownership of the Arie
Shares and Orly Trust Shares. As a general proposition, the
Anti-Injunction Act restrains the district court from
"grant[ing] an injunction to stay proceedings in a State court

14

except as expressly authorized by Act of Congress." 28 U.S.C. §
2283. Consequently, prior to August 2011, the Court had no
authority to head off this jurisdictional train wreck by
directing the New York and/or Delaware state courts to stay
their hands. However, after the filing of no fewer than six
state court lawsuits, the stakeholder plaintiffs came back to
the federal court seeking interpleader. Interestingly, most of
the parties have no interest in a federal court determination of
the rights of the claimants to the Arie Share and Orly Trust
Share proceeds; instead, they ask the Court to use the
interpleader statute injunction power under 28 U.S.C. § 2361 to
direct them to a single forum. Their requests come in the form
of various motions to dismiss, stay, and enjoin which,
unsurprisingly, fall into three categories: (1) TPR and Dalia
want the Court to stay the New York Supreme Court actions and
the Delaware Chancery Court plenary actions and decide on the
merits who beneficially owns the Arie Shares and the Orly Trust
Shares; (2) Arie and Orly move to dismiss the federal actions to
which they are parties and ask the Court to stay the Delaware
Chancery Court actions so the merits of their claims can proceed
in New York Supreme Court; and (3) the Trump Group asks this
Court to stay the federal actions and the New York Supreme Court
actions so the merits of their claims can proceed in Delaware
Chancery Court.

15

## A.   **Pedowitz** and **Skadden** Statutory Interpleaders

As all the parties invoke the interpleader injunction power
as the mechanism for their requested relief, the Court begins
its analysis with the viability of the Pedowitz and Skadden
interpleader actions.  Orly has moved to dismiss or stay the
Pedowitz interpleader (Pedowitz Docket No. 8) and Arie has moved
to dismiss or stay the Skadden interpleader (Skadden Docket No.
25) on largely identical grounds, so the Court will address them
collectively.

### 1.   § 1335 Jurisdiction

First, Arie argues that the Skadden interpleader action
should be dismissed for lack of subject matter jurisdiction.
The Court will also consider this argument in relation to the
Pedowitz interpleader since "subject-matter jurisdiction,
because it involves a court's power to hear a case, can never be
forfeited or waived," obliging the district court "to determine
whether subject-matter jurisdiction exists, even in the absence
of a challenge from any party."  Arbaugh v. Y&H Corp., 546 U.S.
500, 514 (2006) (internal citation omitted).

The sole basis of jurisdiction alleged in the Pedowitz and
Skadden interpleader complaints is the federal interpleader
statute, 28 U.S.C. § 1335.  Pursuant to this section, the
district court has original jurisdiction over statutory
interpleader cases where "[t]wo or more adverse claimants, of

16

diverse citizenship . . . are claiming or may claim to be
entitled" to money or property worth at least $500.  Only
minimal diversity – that is, diversity of citizenship between at
least two claimants – is necessary.  See Truck-A-Tune, Inc. v.
Re, 23 F.3d 60, 62 (2d Cir. 1994).  The diversity and amount in
controversy requirements are prerequisites to the district
court's exercise of jurisdiction in a statutory interpleader
case.  See Franceskin v. Credit Suisse, 214 F.3d 253, 259 (2d
Cir. 2000) (dismissing statutory interpleader claims for lack of
subject matter jurisdiction where claimants were all citizens of
Argentina, failing to satisfy § 1335's diversity requirement);
RCA Records v. Hanks, 548 F. Supp. 979, 981 (S.D.N.Y. 1982)
("Subject matter jurisdiction in statutory interpleader actions
rests on diversity of citizenship between any two adverse
claimants and an amount in controversy of $500 or more.").
Similarly, in this Circuit, "a deposit [with the court of the
res in controversy] or a bond is a jurisdictional prerequisite
for statutory interpleader relief."  Fed. Ins. Co. v. Tyco Int'l
Ltd., 422 F. Supp. 2d 357, 396 (S.D.N.Y. 2006) (internal
quotation omitted); see Metal Transp. Corp. v. Pac. Venture S.S.
Corp., 288 F.2d 363, 365 (2d Cir. 1961) ("As a general rule,
when a sum of money is involved, a district court has no
jurisdiction of an action of interpleader if the stakeholder
deposits a sum smaller than that claimed by the claimants.").

With respect to the <u>Pedowitz</u> interpleader, the complaint
alleges that TPR is a Delaware corporation, Investors, New TR
Equity I, and New TR Equity II are Delaware limited liability
companies, Glenclova is a Cayman Islands corporation, and Dalia
and Orly are New York residents. Thus, there is minimal
diversity amongst the potential claimants. The $10,314,005 res
more than satisfies the amount in controversy requirement, and
the entirety of the res has been deposited with the Clerk of
Court. With respect to the <u>Skadden</u> interpleader, the complaint
alleges that TPR is a Delaware corporation, Investors is a New
Jersey limited liability company, New TR Equity I and New TR
Equity II are Delaware limited liability companies, Glenclova is
a Cayman Islands corporation, and Arie is a Florida resident.
Again, there is minimal diversity amongst the potential
claimants to the $7,428,994 at stake. However, only $5,928,994
of the res has been deposited with the Clerk of Court. Skadden,
Arps still holds in escrow $1.5 million that it has not
deposited into the Court's registry, likely because of the New
York Supreme Court restraining order. Although this
jurisdictional defect could be cured by the posting of a bond,
it is not the sole barrier to the exercise of jurisdiction. <u>See</u>
<u>Fed. Ins. Co.</u>, 422 F. Supp. 2d at 396; <u>Phillips, Son & Neal,</u>
<u>Inc. v. Borghi & Co.</u>, No. 86 Civ. 8544, 1987 WL 27690, at *2
(S.D.N.Y. Dec. 10, 1987).

18

20-01187-jlg  Doc 1-19  Filed 06/20/20  Entered 06/20/20 20:19:48  NoR part 20
Case 1:11-cv-05602-JFK  Document 64  Filed 06/14/12  Page 19 of 52
Pg 29 of 150

Arie's main challenge to subject matter jurisdiction
involves the adverse claimants requirement of § 1335. Although
some courts in this Circuit treat the existence of adverse
claimants as an element of the interpleader claim, adversity is
more commonly considered a necessary prerequisite to the
maintenance of subject matter jurisdiction over statutory
interpleader cases. Compare Coopers & Lybrand, L.L.P. v.
Michaels, No. 94 Civ. 5643, 1995 WL 860760, at *5 (E.D.N.Y. Oct.
31, 1995) ("A jurisdictional prerequisite to [statutory]
interpleader is the existence of adverse claims to property held
in plaintiff's possession."), Pine Run Props., Inc. v. Pine Run
Ltd., No. 90 Civ. 6289, 1991 WL 280719, at *8 (S.D.N.Y. Dec. 26,
1991) (dismissing statutory interpleader claim for lack of
subject matter jurisdiction because "In order to invoke
statutory interpleader, there must exist adverse claims to the
property held in plaintiffs' possession, so that plaintiffs risk
multiple or inconsistent liabilities with respect to the
property"), and Phillips, Son & Neal, Inc., 1987 WL 27690, at *2
("An additional prerequisite for interpleader jurisdiction is
that there be adverse claims to the property made by claimants
of diverse citizenship."), with Catizone v. Memry Corp., 897 F.
Supp. 732, 740 (S.D.N.Y. 1995) (denying plaintiff's motion for
summary judgment on interpleader claim for failure to establish
existence of competing claims to certain securities). Thus, the

19

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

File No. 0017/2008

In the Matter of the Application of ORLY GENGER,
as a person interested, for the removal of DALIA
GENGER, as Trustee of the ORLY GENGER 1993
TRUST pursuant to SCPA § 711(11)

AFFIDAVIT OF SERVICE
BY FEDERAL EXPRESS

STATE OF NEW YORK       )
                        ) ss.:
COUNTY OF NEW YORK  )

New York County Surrogate's Court
MISCELLANEOUS DEPT.

FEB 1 4 2013

FILED
Clerk

     Kishah Robinson, being duly sworn, deposes and says that deponent is not a party to the action, is over 18 years of age, and resides in Kings County, New York.

     That on February 1, 2013, deponent served a copy of the **THIRD AMENDED VERIFIED PETITION OF ORLY GENGER TO REMOVE DALIA GENGER AS TRUSTEE**, upon:

> David Parnes, Esq.
> as Trustee of the Sagi Genger Trust
> 29 Elkachi Street
> Tel Aviv, Israel 69497

to the address designated by said individual or entity for that purpose, by mailing a true copy of same via Federal Express Overnight International Mail.

Kishah Robinson

Sworn to before me this
13th day of February, 2013

Notary Public

ANNA E. WIERZBICKA-TURNER
NOTARY PUBLIC - STATE OF NEW YORK
NO. 02WI6248463
QUALIFIED IN NEW YORK COUNTY
COMMISSION EXPIRES SEPT. 19, 2015

g:\skolnick & hochberg\wordproc\genger\aos_fedex2.doc

*Index No.*    **0017**    *Year 20*  **08**

## SURROGATE'S COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

**In the Matter of the Application of ORLY GENGER, as a person interested, for the removal of DALIA GENGER as Trustee of the ORLY GENGER 1993 Trust Pursuant to SCPA § 711(11)**

### AFFIDAVIT OF SERVICE OF
### THIRD AMENDED PETITION UPON DAVID PARNES

### PLATZER, SWERGOLD, KARLIN, LEVINE,
### GOLDBERG & JASLOW, LLP

*Attorneys for* **Petitioner ORLY GENGER**

1065 AVENUE OF THE AMERICAS, 18th FLOOR
NEW YORK, NEW YORK 10018
TEL. (212) 593-3000
FAX: (212) 593-0353

*Pursuant to 22 NYCRR 130-1.1-a, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, (1) the contentions contained in the annexed document are not frivolous and that (2) if the annexed document is an initiating pleading, (i) the matter was not obtained through illegal conduct, or that if it was, the attorney or other persons responsible for the illegal conduct are not participating in the matter or sharing in any fee earned therefrom and that (ii) if the matter involves potential claims for personal injury or wrongful death, the matter was not obtained in violation of 22 NYCRR 1200.41-a.*

*Dated:* ........................................    Signature ...............................................

Print Signer's Name.........................................

*Service of a copy of the within* ..................................................    *is hereby admitted.*

*Dated:*

...................................................................
*Attorney(s) for*

*PLEASE TAKE NOTICE*

☐ **NOTICE OF ENTRY**    *that the within is a (certified) true copy of a*
*entered in the office of the clerk of the within-named Court on*    *20*

☐ **NOTICE OF SETTLEMENT**    *that an Order of which the within is a true copy will be presented for settlement to the Hon.*    *, one of the judges of the within-named Court,*
*at*
*on*    *20*    *, at*    *M.*

*Dated:*

### PLATZER, SWERGOLD, KARLIN, LEVINE,
### GOLDBERG & JASLOW, LLP

*Attorneys for*

*To:*    1065 AVENUE OF THE AMERICAS, 18th FLOOR
NEW YORK, NEW YORK 10018

*Attorney(s) for*

At the Surrogate's Court held in and for the County
of New York, at the Courthouse, 31 Chambers Street,
New York, NY on the 19 day of February, 2013

P R E S E N T:

      Honorable Nora S. Anderson,
          Surrogate

---

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER, as Trustee of the

Orly Genger 1993 Trust pursuant to SCPA § 711(11)

---

File No. 0017/2008

**ORDER TO SHOW
CAUSE**

New York County Surrogate's Court
DATA ENTRY
Date: 2/19/13

**UPON** the reading and filing the annexed affidavit of petitioner, Orly Genger ("Petitioner" or "Orly"), duly sworn to on the 13th day of February, 2013 in support of the Motion with the exhibits annexed thereto, the annexed Affirmation of Ralph R. Hochberg dated the 13th day of February, 2013 and the exhibits annexed thereto, the annexed Memorandum of Law in support of the Motion (the "Motion"), and together with all of the pleadings and proceedings heretofore had herein;

**LET** the Respondent, Dalia Genger, the sole Trustee of the Orly Genger 1993 Trust (the "Orly Trust") and her attorney, show cause before Surrogate Nora S. Anderson at the Surrogate's Court located at 31 Chambers Street, Room 509, on the 5th day of March 2013 at 10:00 a.m. in the forenoon of that day or as soon thereafter as counsel may be heard why an order should not be entered:

    (1) Granting Petitioner's Motion for a preliminary injunction enjoining the Respondent, Dalia Genger, as Trustee of the Orly Trust, together with any and all of her agents, assigns, employees, representatives, attorneys, and/or anyone acting on Dalia's behalf

either directly or indirectly or in concert with her, from: (i) proceeding with and/or taking any action of any kind or nature, with respect to the action Dalia previously commenced in the Delaware Chancery Court entitled, *"Dalia Genger as Trustee of the Orly Genger 1993 Trust v. TR Investors LLC,* C.A. No. 6906-CS" (the "Delaware Chancery Action") including, but not limited to, the continuation of the prosecution said Delaware Chancery Action; and, (ii) proceeding with any other existing actions or proceedings and/or commencing any future actions or proceedings in the Delaware Chancery Court, and/or any other local, state or federal courts on behalf of the Orly Trust (other than those actions and proceedings which are already pending in the Supreme Court of the State of New York, County of New York) which concern, relate to, pertain to and/or have any effect whatsoever upon any and all assets of the Orly Trust including, but not limited to, the Orly Trust's direct, indirect or beneficial interests in Trans-Resources, Inc. and TPR Investment Associates, Inc; and,

(2) Granting such other and further relief as this Court deems to be just, equitable and proper; and it is

ORDERED, that pending the hearing and determination of this Motion, and until further Order of this Court, Dalia Genger, as Trustee, and any and all of her agents, assigns, employees, representatives, attorneys, and/or anyone acting on Dalia's behalf either directly or indirectly or in concert with her are hereby temporarily restrained from: (i) proceeding with and/or taking any action with respect to the Delaware Chancery Action; (ii) proceeding with any other existing actions or proceedings and/or commencing any future actions or proceedings in the Delaware Chancery Court, and/or any other local, state or federal courts on behalf of the Orly Trust (other than those actions and proceedings which are already pending in the Supreme Court of the State

2

of New York, County of New York) which concern, relate to, pertain to and/or have any effect whatsoever upon any and all assets of the Orly Trust including, but not limited to, the Orly Trust's direct, indirect or beneficial interests in Trans-Resources, Inc. and TPR Investment Associates, Inc., together with such other and further relief as this Court deems to be just, equitable and proper;

**SUFFICIENT CAUSE BEING ALLEGED, IT IS HEREBY ORDERED** that a copy of this Order to Show Cause, together with copies of the papers upon which it is made, shall be served upon Respondent, Dalia Genger, by service upon her counsel: (i) Pedowitz & Meister LLP, 570 Lexington Avenue, 18th Floor, New York, New York 10022-6837 by overnight delivery service on or before February **21**, 2013, and (ii) David Parnes, Esq., as Trustee of the Sagi Trust, 29 El Kachi Street, Tel Aviv, Israel 69497 via Federal Express-International Delivery and that such service shall be deemed good and sufficient service; and it is further

**ORDERED,** that opposition papers to the Motion, if any, shall be served ~~so that they are~~ ∧and fild with the Court by 12:00 pm on ~~received by Petitioner's counsel, Platzer, Swergold, Karlin, Levine, Goldberg & Jaslow, LLP Attn: Ralph R. Hochberg, Esq., 1065 Avenue of the Americas, New York, NY 10018 on or before~~ **March 1, 2013**, 2013; and it is further

~~ORDERED, that Petitioner shall serve its reply to any opposition to the Motion so that it is received by Respondent's counsel on or before _____, 2013, with a copy to David Parnes, Esq. as Trustee of the Sagi Trust served by Federal Express, International Delivery.~~

_____
Surrogate

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

File No. 0017/2008

In the Matter of the Application of ORLY GENGER,
as a person interested, for the removal of DALIA
GENGER, as Trustee of the ORLY GENGER 1993
TRUST pursuant to SCPA § 711(11)

AFFIDAVIT OF SERVICE
BY FEDERAL EXPRESS

New York County Surrogate's Court
MISCELLANEOUS DEPT.

FEB 2 5 2013

FILED

Clerk_____

STATE OF NEW YORK   )
                    ) ss.:
COUNTY OF NEW YORK  )

WENDI LEON, being duly sworn, deposes and says that deponent is not a party to the action, is over 18 years of age, and resides in Queens County, New York.

That on February 20, 2013, deponent served copies of the within **(i) ORDER TO SHOW CAUSE AND AFFIDAVIT OF ORLY GENGER IN SUPPORT OF MOTION SEEKING TEMPORARY RESTRAINING ORDER AND OTHER INJUNCTIVE RELIEF AND EXHIBITS ANNEXED THERETO; (ii) AFFIRMATION OF RALPH R. HOCHBERG IN SUPPORT OF ORDER TO SHOW CAUSE AND MOTION PURSUANT TO 22 NYCRR § 202.7(f) AND EXHIBITS ANNEXED THERETO; AND, (iii) PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF ORDER TO SHOW CAUSE AND MOTION**, upon:

**Federal Express Overnight Delivery**
Robert A. Meister, Esq.
Pedowitz & Meister LLP
570 Lexington Avenue, 18th Floor
New York, New York 10022

**Federal Express International Delivery**
David Parnes, Esq.
as Trustee of the Sagi Genger Trust
29 Elkachi Street
Tel Aviv, Israel 69497

at the address(es) designated by said individual(s) and/or entity(ies) by depositing a true copy of same enclosed in a properly addressed envelope, for overnight delivery, under the exclusive care and custody of Federal Express within the State of New York.

_____
Wendi Leon

Sworn to before me this
21st day of February, 2013

_____
Notary Public

TERESA SADUTTO CARLEY
NOTARY PUBLIC, STATE OF NY
REG. # 02SA6204737
NY COUNTY, EXP. 4-20-2013

c:\documents and settings\wendi\local settings\temporary internet files\content.outlook\czvp09j2\aos(order to show cause papers).doc

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

File No. 0017/2008

In the Matter of the Application of ORLY GENGER,
as a person interested, for the removal of DALIA
GENGER, as Trustee of the ORLY GENGER 1993
TRUST pursuant to SCPA § 711(11)

AFFIDAVIT OF SERVICE
BY FEDERAL EXPRESS

New York County Surrogate's Court
MISCELLANEOUS DEPT

FEB 2 7 2013

FILED

Clerk

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

MITCHELL KAPLAN, being duly sworn, deposes and says that deponent is not a party
to the action, is over 18 years of age, and resides in New York County, New York.

That on February 26, 2013, deponent served copies of the within **(i) ATTORNEY'S
STATEMENT IN OPPOSITION TO RESPONDENT DALIA GENGER'S MOTION TO
DISMISS PETITIONER'S THIRD AMENDED PETITION TO REMOVE
RESPONDENT AS TRUSTEE and EXHIBITS "JJ" through "PP"; (ii) APPENDIX
EXHIBITS TO ATTORNEY'S STATEMENT IN OPPOSITION TO RESPONDENT,
DALIA GENGER'S MOTION TO DISMISS RESPONDENT'S THIRD AMENDED
PETITION TO REMOVE RESPONDENT AS TRUSTEE; and, (iii) PETITIONER, ORLY
GENGER'S MEMORANDUM OF LAW IN OPPOSITION TO RESPONDENT, DALIA
GENGER'S MOTION TO DISMISS THE PETITIONER'S THIRD AMENDED
PETITION TO REMOVE RESPONDENT AS TRUSTEE**

**Federal Express Overnight Delivery**
Robert A. Meister, Esq.
Pedowitz & Meister LLP
570 Lexington Avenue, 18th Floor
New York, New York 10022

**Federal Express International Delivery**
David Parnes, Esq.
as Trustee of the Sagi Genger Trust
29 Elkachi Street
Tel Aviv, Israel 69497

at the address(es) designated by said individual(s) and/or entity(ies) by depositing a true copy of
same enclosed in a properly addressed envelope, for overnight delivery, under the exclusive care
and custody of Federal Express within the State of New York.

Mitchell Kaplan

Sworn to before me this
27th day of February, 2013

Notary Public

TERESA SADUTTO CARLEY
NOTARY PUBLIC, STATE OF NY
REG. # 02SA6204737
NY COUNTY, EXP. 4-20-2013

g:\skolnick & hochberg\wordproc\genger\aos(opposition papers to motion to dismiss).doc

PLATZER, SWERGOLD, KARLIN, LEVINE,

ALL-STATE LEGAL®
07191-BF • 07192-BI • 07193-GY • 07194-WH
800.222.0510 www.aslegal.com

*Index No.*    **0017**          *Year 20*<sup>2008</sup>

# SURROGATE'S COURT OF THE STATE OF NEW YORK
# COUNTY OF NEW YORK

**IN THE MATTER OF THE APPLICATION OF ORLY GENGER, AS A PERSON INTERESTED, FOR THE REMOVAL OF DALIA GENGER , AS TRUSTEE OF THE ORLY GENGER 1993 TRUST PURSUANT TO SCPA §711(11)**

## AFFIDAVIT OF SERVICE BY FEDERAL EXPRESS

### PLATZER, SWERGOLD, KARLIN, LEVINE, GOLDBERG & JASLOW, LLP
*Attorneys for*    ### ORLY GENGER

1065 AVENUE OF THE AMERICAS. 18TH FLOOR
NEW YORK, NEW YORK 10018
TEL.: (212) 593-3000
FAX: (212) 593-0353

*Pursuant to 22 NYCRR 130-1.1-a, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, (1) the contentions contained in the annexed document are not frivolous and that (2) if the annexed document is an initiating pleading, (i) the matter was not obtained through illegal conduct, or that if it was, the attorney or other persons responsible for the illegal conduct are not participating in the matter or sharing in any fee earned therefrom and that (ii) if the matter involves potential claims for personal injury or wrongful death, the matter was not obtained in violation of 22 NYCRR 1200.41-a.*

*Dated:* 2/27/13               Signature _____

                              Print Signer's Name _____

---

*Service of a copy of the within*                                    *is hereby admitted.*

*Dated:*

_____
*Attorney(s) for*

---

## PLEASE TAKE NOTICE

☐ **NOTICE OF ENTRY**
*that the within is a (certified) true copy of a*
*entered in the office of the clerk of the within-named Court on*                    *20*

☐ **NOTICE OF SETTLEMENT**
*that an Order of which the within is a true copy will be presented for settlement to the*
*Hon.*                    , *one of the judges of the within-named Court,*
*at*
*on*                    *20*    , *at*                *M.*

*Dated:*

                              **PLATZER, SWERGOLD, KARLIN, LEVINE,**
                              **GOLDBERG & JASLOW, LLP**
*Attorneys for*

*To:*                         1065 AVENUE OF THE AMERICAS. 18TH FLOOR
                              NEW YORK. NEW YORK 10018

*Attorney(s) for*

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

File No. 0017/2008

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER, as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA § 711(11)



New York County Surrogate's Court
MISCELLANEOUS DEPT.

FEB 2 7 2013

FILED

Clerk

# MEMORANDUM OF LAW IN SUPPORT OF PETITIONER ORLY GENGER'S
## OPPOSITION TO RESPONDENT DALIA GENGER'S MOTION
## TO DISMISS PETITIONER'S THIRD AMENDED PETITION
## TO REMOVE RESPONDENT AS TRUSTEE

**Platzer, Swergold, Karlin, Levine, Goldberg & Jaslow, LLP**
1065 Avenue of the Americas, 18th Floor
New York, New York 10018
Tel: 212-593-300

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................. II

PRELIMINARY STATEMENT ........................................................................................................ 1

SUMMARY OF FACTS .................................................................................................................... 4

DISCUSSION ..................................................................................................................................... 4

I.      RESPONDENT DALIA FAILS TO MEET HER HEAVY BURDEN OF
        CONCLUSIVELY PROVING PETITIONER ORLY HAS NO CLAIM
        SUPPORTING DALIA'S REMOVAL AS TRUSTEE .......................................................... 4

II.     PETITIONER ORLY HAS MORE THAN SUFFICIENTLY PLED
        CLAIMS SUPPORTING DALIA'S REMOVAL AS TRUSTEE BASED
        UPON DALIA'S VARIOUS BREACHES OF HER FIDUCIARY DUTIES
        AS TRUSTEE ........................................................................................................................ 5

III.    DALIA AND ORLY'S CONTINUED ESTRANGEMENT, DALIA'S
        DELIBERATE CONCEALMENT OF HER ACTIONS AS TRUSTEE
        FROM ORLY, AND DALIA'S HOSTILITY TO ORLY, CONSTITUTE
        ADDITIONAL GROUNDS TO REMOVE DALIA AS TRUSTEE ..................................... 7

IV.     DALIA'S ARGUMENT IN THE MOTION TO DISMISS THAT
        THE D & K NOTE WAS NEVER REVOKED IN WRITING AND
        THEREFORE, IS STILL IN FULL FORCE AND EFFECT FAILS, AND,
        IN ANY EVENT, DOES NOT PREVENT DALIA'S REMOVAL AS
        TRUSTEE ............................................................................................................................... 9

CONCLUSION ................................................................................................................................. 11

# TABLE OF AUTHORITIES

Page(s)

CASES

Birnbaum v. Birnbaum,
    73 N.Y.2d 461, 539 N.E.2d 574, 541 N.Y.S.2d 746 (1989)..................................................5, 6

Estate of Granowitz,
    150, A.D.2d 446, 541 N.Y.S.2d (2d Dept. 1989) ...................................................................10

In re Estate of Saxton,
    179 Misc.2d 681, 686 N.Y.S.2d 573 (Sur. Ct. Broome Cty. 1998)..........................................5

In re Van Deusen's Estate,
    37 A.D.2d 131, 322 N.Y.S.2d 951 (1st Dept. 1971).................................................................5

Lawrence v. Miller,
    11 N.Y.3d 588 (2008) ........................................................................................................4, 11

Matter of the Estate of Helen Thompson,
    232 A.D.2d 219, 647 N.Y.S.2d 950 (1st Dept. 1996)..............................................................8

Matter of the Estate of Manny E. Duell, Deceased,
    258 A.D.2d 382, 685 N.Y.S.2d 686 (1st Dept. 1999) .............................................................8

Matter of the Proceeding to Remove David M. Mergenhagen as Trustee,
    50 A.D.3d 1486, 856 N.Y.S.2d 389 (4th Dept. 2008) .............................................................8

Matter of Wood,
    177 A.D.2d 161, 581 N.Y.S.2d 405 (2d Dept. 1992) ..........................................................5, 6

Meinhard v. Salmon,
    249 N.Y. 458, 164 N.E. 545 (1928).........................................................................................5

STATUTES

CPLR 3211(a)(7) ...........................................................................................................................4

CPLR § 105(u)................................................................................................................................4

SCPA § 711(3)................................................................................................................................5

## PRELIMINARY STATEMENT

Ultimately, petitioner Orly Genger ("Orly" or "Petitioner") seeks the removal of respondent Dalia Genger ("Dalia" or "Respondent") as Trustee of the Orly Genger 1993 Trust (the "Orly Trust"). However, the question currently before the Court on the Dalia's instant Motion to Dismiss (the "Motion to Dismiss") is far narrower: Has Orly pled facts in her Third Amended Petition for Removal of Dalia Genger as Trustee (the "TAP")[1] – facts required to be taken as true by the Court on a motion to dismiss – sufficient to remove Dalia as Trustee of the Orly Trust? Because the answer to that question is unquestionably "Yes", Dalia's Motion to Dismiss should be entirely denied, and the parties permitted to move quickly to discovery and a removal hearing.

In the TAP, Orly detailed at length how Dalia – still incredibly angry toward her ex-husband Arie, and toward Orly, who she views as a "brainwashed" extension of Arie – has colluded, and continues to collude,[2] with Orly's older brother, Sagi Genger ("Sagi"), to loot the Orly Trust of its interests in two closely-held Genger family businesses – TPR Investment Associates, Inc. ("TPR") and Trans-Resources, Inc. ("TRI"). Dalia has done so in deliberate violation of her fiduciary duties as Trustee, which requires Dalia at all times to place the interests of Orly and the Orly Trust ahead of her own interests, desires, and bitter obsessions. See TAP ¶¶ 1-96 and Exhs. A-II.

---

[1] Orly originally commenced a Petition seeking to remove Dalia as Trustee of the Orly Trust pursuant to Surrogate's Court Procedure Act § 711. Orly's Petition was subsequently amended on two occasions to incorporate newly discovered and previously concealed actions taken by Dalia constituting additional breaches of her fiduciary duties to the Orly Trust and Petitioner.

[2] On February 14, 2013, Orly was forced to bring a Motion by Order to Show Cause to protect the status quo and the Orly Trust from additional harm by Dalia. Specifically, Dalia is trying to spend precious Trust assets bringing an unnecessary Delaware Chancery Action (regarding issues already being litigated in New York). The only true purpose of this Delaware Chancery Action is to ensure the Orly Trust loses all claim and right to its shares of TRI. See Order to Show Cause and related papers.

Dalia should never have become Trustee, and materially misled this Court in 2008, when Orly first sought Dalia's removal as Trustee. Since her appointment as Trustee, Dalia has actively acted, or deliberately failed to act, in ways designed to harm Orly and the Orly Trust. Dalia's many breaches of her fiduciary duties to the Orly Trust and Petitioner – each of which justify her removal as Trustee – include, but are not limited to:

(a)     Dalia deliberately failed to inform, affirmatively concealed from Orly and others, and failed to try to prevent, the sham foreclosure sale by Sagi of the Orly Trust's valuable stock interests in TPR (the "Sham TPR Foreclosure Sale"), so Sagi could greatly benefit to the detriment and injury of Orly and the Orly Trust. Had Dalia been a true Trustee, she would have acted to enjoin the sale, or at least provided notice to other potential bidders known to her so the best price possible was obtained for the TPR Shares. Instead, Dalia did nothing. This lack of notice prevented Orly from protecting the asset by either trying to enjoin the sale or ensuring additional bidding at the sale;

(b)     Dalia is attempting to dissipate the Orly Trust's sole remaining asset, the Orly Trust TRI Shares (as previously defined in the TAP), by commencing an action in the Delaware Chancery Court (the "Delaware Chancery Action") in which she sought a declaratory judgment with respect to the beneficial ownership and disposition of the Orly Trust TRI Shares. Dalia's commencement of the Delaware Chancery Action was a calculated strategy on her part to injure the Orly Trust because this same Chancery Court had previously ruled that TPR (which is controlled by Sagi) was the beneficial owner of the Orly Trust TRI Shares, and not the Orly Trust. The Delaware Supreme Court reversed the Chancery Court on the happy technicality that the Chancery Court lacked personal jurisdiction over the Orly Trust, as the Orly Trust was not party to that Delaware *in rem* proceeding. Dalia's action is designed to cure that jurisdictional defect, and give the Chancery Court jurisdiction over the Orly Trust. In other words, Dalia has deliberately chosen to spend precious Trust assets bringing an action in the very Court that already has ruled against the Orly Trust;

(c)     Dalia commenced the Delaware Chancery Action even though all the parties to Dalia's purported Delaware action (the Orly Trust, TPR, and the Trump Group entities) are located in New York, and Petitioner had previously commenced an action in New York County Supreme Court (previously defined in the TAP as the "New York TRI Action") that will determine the beneficial ownership and disposition of the Orly Trust TRI Shares. Notably, the Court in the New York TRI Action enjoined Trustee Dalia (and all other parties) from prosecuting or otherwise proceeding with the Delaware Chancery Action and further determined that Orly was authorized to seek a determination concerning the ownership of the Orly Trust TRI Shares on behalf of the Orly Trust;

2

(d)    Dalia's counsel has recently indicated that Dalia intends to continue her prosecution of the Delaware Chancery Action notwithstanding the fact that: (i) the Court's prior Orders and rulings in the New York TRI Action have enjoined Dalia from doing so and have further authorized Orly to proceed on behalf of the Orly Trust; (ii) Dalia, as trustee of the Orly Trust, has been enjoined from prosecuting the Delaware Chancery Action since its initial inception approximately sixteen (16) months ago, without any resulting prejudice to the Orly Trust; (iii) Dalia is seeking the same "beneficial ownership" determination in the Delaware Chancery Action that Orly has been actively litigating on behalf of the Orly Trust in the New York TRI Action for more than the past two (2) years and as such, Dalia's prosecution of the Delaware Chancery Action constitutes duplicative litigation and a waste of the Orly Trust's assets; and (iv) the Chancery Court is certain to rule against the Orly Trust's interests, just as it did before[3];

(e)    Dalia entered into the Secret Agreements (as previously defined in the TAP) on purported behalf of the Orly Trust without prior notice to Petitioner and deliberately concealed same from Petitioner and the New York Supreme Court for almost a year. Dalia's entry into the Secret Agreements has placed $4.44 million dollars and any other remaining assets of the Orly Trust in peril of being foreclosed upon and dissipated by a newly-created and unknown St. Kitts entity;

(f)    Dalia has made the defeat of an interpleader proceeding brought by her counsel; her removal as Trustee; and/or appointment of a co-Trustee, "conditions of default" making the $4.44 million immediately payable to the St. Kitt's entity, and the rest of the Orly Trust assets subject to immediate foreclosure without notice anywhere in the world. Notably, the interpleader action already has been defeated, having been correctly labeled by the United States District Court for the Southern District of New York as a "gratuitous" "sham";

(g)    Dalia violated the restraints and injunctions imposed upon her as provided in this Court's July 2009 Order by commencing the Delaware Chancery Action and entering into the Secret Agreements without prior notice to Petitioner; and,

(h)    Dalia's entry into the Settlement Agreements violated restraints and injunctions imposed upon her in both the New York TRI Action and the New York TPR Action, that were imposed to protect the status quo until those cases were determined on the merits by the New York Supreme Court.

See TAP ¶¶ 1-96 and Exhs. A-II.

---

[3] For all of the forgoing reasons, Petitioner has filed an Order to Show Cause with this Court seeking to enjoin Dalia as Trustee from prosecuting or otherwise proceeding with the Delaware Chancery Action. In addition, the New York Supreme Court has given Orly permission to seek clarification that the Supreme Court's recent Order dismissing Dalia as an individual from the New York TRI Action was not meant to affect the injunction preventing Dalia as Trustee from prosecuting her Delaware Chancery Action.

For all the reasons set forth in Orly's TAP, the exhibits accompanying this opposition, and the other papers and proceedings heretofore had herein, Dalia's Motion to Dismiss the TAP should be quickly and summarily denied, and the parties permitted to proceed to the removal hearing as soon as possible, so the Orly Trust can be protected from Dalia.

## SUMMARY OF FACTS

The facts are fully set forth in the TAP[4] and accompanying exhibits; the Attorney's Statement of Ralph Hochberg and accompanying exhibits ("Hochberg Stmt."), filed contemporaneously with this Memorandum of Law; and the Order to Show Cause seeking to stay Dalia from continuing to prosecute her Delaware Chancery Action on behalf of the Orly Trust, with the accompanying Affidavit of Orly Genger, Attorney's Statement, and exhibits submitted in support thereof. The facts and information contained therein are incorporated herein by reference.

## DISCUSSION

## I.   RESPONDENT DALIA FAILS TO MEET HER HEAVY BURDEN OF CONCLUSIVELY PROVING PETITIONER ORLY HAS NO CLAIM SUPPORTING DALIA'S REMOVAL AS TRUSTEE

> On a motion to dismiss a petition we [the Court], of course, must accept the facts alleged in the petition as true, petitioner must be afforded every possible favorable inference, and we must determine whether the facts alleged by petitioner fit within any cognizable legal theory (*see Leon v Martinez*, 84 NY2d 83, 87-88, 638 NE2d 511, 614 NYS2d 972 [1994]). Affidavits submitted by a respondent will almost never warrant dismissal under CPLR 3211 *unless* they "establish conclusively that [petitioner] has no [claim or] cause of action" (*Rovello v Orofino Realty Co.*, 40 NY2d 633, 635-636, 357 NE2d 970, 389 NYS2d 314 [1976])

Lawrence v. Miller, 11 N.Y.3d 588, 595 (2008); NY CPLR 3211(a)(7). Respondent Dalia falls far short of meeting her heavy burden of "conclusively" proving that, accepting the facts in

---

[4] Because it is verified, the TAP also functions as a sworn affidavit, and its contents constitute sworn evidence of Dalia's wrongdoing. See NY CPLR § 105(u) (A "verified pleading" may be utilized as an affidavit whenever the latter is required").

4

Orly's TAP as true and affording Orly every possible favorable inference, Orly has absolutely "no claim" justifying Dalia's removal as Trustee. To the contrary, all of the facts and inferences strongly support Dalia's immediate removal as Trustee of the Orly Trust. Accordingly, Dalia's Motion to Dismiss should be entirely denied.

## II.    PETITIONER ORLY HAS MORE THAN SUFFICIENTLY PLED CLAIMS SUPPORTING DALIA'S REMOVAL AS TRUSTEE BASED UPON DALIA'S VARIOUS BREACHES OF HER FIDUCIARY DUTIES AS TRUSTEE

As Trustee, Dalia is obligated to "be as a watchman in the night, ever vigilant and always dedicated to the best interest of the *cestui que trust*." In re Estate of Saxton, 179 Misc.2d 681, 693, 686 N.Y.S.2d 573, 581 (Sur. Ct. Broome Cty. 1998). She has "the duty of communicating all the material facts to the beneficiary," Matter of Wood, 177 A.D.2d 161, 167, 581 N.Y.S.2d 405, 409 (2d Dept. 1992) (rejecting trustee bank's contention that it had no duty to inform the trust beneficiary of its intent to liquidate the stock and bond portfolio of the trust), and is required to place Orly's interests above her own. Birnbaum v. Birnbaum, 73 N.Y.2d 461, 466, 539 N.E.2d 574, 576, 541 N.Y.S.2d 746, 748 (1989) (fiduciary "is bound to single-mindedly pursue the interests of those to whom a duty of loyalty is owed"); Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928) (trustee bound to standard "stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive"); In re Van Deusen's Estate, 37 A.D.2d 131, 133, 322 N.Y.S.2d 951, 953 (1st Dept. 1971) (same). Additional grounds to remove a fiduciary exist where he or she "has willfully refused or without good cause neglected to obey any lawful direction of the court contained in any decree or order or any provision of law relating to the discharge of his duty." SCPA § 711(3).

The TAP more than sufficiently pleads that Dalia has breached, and is breaching, her fiduciary duties as Trustee, including her obligation to keep the beneficiary informed; her obligation of undivided loyalty to Orly; her duty to place Orly's interests above her own; and her

5

duty to honor the language and intent of court orders in discharging her duty to protect Orly and the Orly Trust. See, e.g., Birnbaum, 73 N.Y.2d at 466; Wood, 177 A.D.2d at 167.

Indeed, if anything, Dalia's actions as Trustee support the conclusion that she seeks to deliberately harm Petitioner and dissipate the Orly Trust's assets, as part of her continued attack against Arie and those, like Orly, she views to be on his side. It is respectfully submitted that a deliberate desire to harm Orly and the Orly Trust is the most logical explanation for Dalia's actions in: (i) failing to inform Orly of the August 31, 2008 Notice, the Sale Notice, the Sham TPR Foreclosure Sale, the Meeting Agreement, or the D&K Agreement, in multiple violations of her duty to inform and ensure that the value of Orly Trust's shares of TPR would be maximized; (ii) entering into the Meeting Agreement, which purports to allow D&K GP to loot the Orly Trust at will and tries to indemnify herself and her friends (but not her enemies) from liability, in violation of her duty to place Orly's interests above her own; (iii) failing to make any effort to stop collection of the D & K Note by Sagi-controlled TPR, in violation of her duty of undivided loyalty, and despite her sworn representations to the Surrogate Court that she should be Trustee precisely because she would prevent any enforcement of the D & K Note; (vi) refusing under any circumstances to tell Arie about the Sham TPR Foreclosure Sale so he could bid at the sale, because of her own abiding hatred of Arie, in violation of her duty to place Orly's interests above her own and ensure the value of Orly Trust's interest in TPR would be maximized; (v) commencing an action before a Delaware Chancery Court that had already ruled Sagi-controlled TPR, and not the Orly Trust, owned the Orly Trust TRI Shares (and by bringing the action intentionally providing the Delaware Chancery Court with the personal jurisdiction over the Orly Trust the Delaware Chancery Court had previously lacked); (vi) pledging over $4 million of Orly Trust assets in Secret Agreements to an unknown, newly-created St. Kitts entity, and risking the

6

rest of the Orly Trust's assets to foreclosure by this mysterious St. Kitts entity in the event of default; (vii) making the failure of a "sham" and "gratuitous" interpleader action a "condition of default" under the Secret Agreements; (viii) making her removal as Trustee, or the appointment of a co-trustee, a "condition of default" under the Secret Agreements; (ix) violating multiple orders to maintain the status quo in giving up all of the Orly Trust's valuable interest in TPR to Sagi, encumbering the Orly Trust's TRI assets, releasing all of the Orly Trust's claims against Sagi and Dalia, and making the Orly Trust liable to pay everyone's attorneys fees if it continued to press its legal claims in Court; and (x) releasing the Orly Trust's prior Trustee, Leah Fang, from all possible claims, including fraud claims, while making no investigation, despite knowing Orly was unhappy with Leah Fang's service as Trustee. See TAP; accord Hochberg Stmt.

In sum, the TAP sets forth in great detail how Dalia's actions as Trustee have helped cause, and continue to threaten, the complete dissipation and looting of the Orly Trust's assets, in manifest violation of Dalia's fiduciary duties as Trustee. Accordingly, Dalia's Motion to Dismiss should be entirely denied.

## III.    DALIA AND ORLY'S CONTINUED ESTRANGEMENT, DALIA'S DELIBERATE CONCEALMENT OF HER ACTIONS AS TRUSTEE FROM ORLY, AND DALIA'S HOSTILITY TO ORLY, CONSTITUTE ADDITIONAL GROUNDS TO REMOVE DALIA AS TRUSTEE

Dalia and Orly have been estranged for many years. In violation of her fiduciary duty as Trustee, Dalia has never informed Orly of any of her actions as Trustee (and has deliberately hidden those actions from her). Every agreement has remained hidden; every action revealed only when it was too late. See TAP. The simple truth of the matter is that Dalia does not want Orly informed because Dalia does not want Orly to intervene and prevent further harm to the Orly Trust.

Dalia's hostile attitude toward Orly is apparent from her actions, but also crystallized for

7

the Court by Dalia's recent testimony. Specifically, in her recent December 13, 2012 deposition,

Dalia failed to identify Orly as part of her "family." (She did, however, include co-conspirators

Sagi and Leah Fang as family members.) See Dalia Dep. Tr. (Ex. JJ) at 41-48. Dalia also called

Orly "brainwashed." Id. at 207; Ex. LL, at 237-239. Conveniently, if Orly is brainwashed, Dalia

remains free to continue ignoring Orly's wishes and concerns (as they are not really Orly's

concerns).

In Matter of the Proceeding to Remove David M. Mergenhagen as Trustee, the Appellate

Division, Fourth Department reversed the Surrogate's Court's decision and removed the Trustee,

noting the Trustee's

> open hostility toward the other beneficiaries directly conflicts with his duty to the
> trust where, as here, that hostility has "interfere[d] with the proper administration
> of the trust" (citing *Matter of Rudin*, 15 AD3d 199, 200, 789 NYS2d 123 [2005],
> *lv denied* 4 NY3d 710, 830 NE2d 1146, 797 NYS2d 817 [2005].

50 A.D.3d 1486, 1488, 856 N.Y.S.2d 389, 391 (4th Dept. 2008). Similarly, in Matter of the

Estate of Manny E. Duell, Deceased, the Appellate Division, First Department, affirmed the

Surrogate's decision to remove the co-trustee and held:

> In light of the demonstrated antagonisms between appellant co-trustee and the
> trust beneficiaries, and between appellant and his co-trustee, and the evidence
> establishing that those antagonisms resulted in actions by appellant co-trustee
> interfering with the proper administration of the estate, and upon the proof
> tending to demonstrate that future cooperation was unlikely, the Surrogate's
> determination to remove appellant as co-trustee was a proper exercise of
> discretion. (citations omitted)

258 A.D.2d 382, 383, 685 N.Y.S.2d 686 (1st Dept. 1999). See also Matter of the Estate of Helen

Thompson, 232 A.D.2d 219, 647 N.Y.S.2d 950 (1st Dept. 1996) ("it is well settled that the

Surrogate may disqualify a person from receiving letters of administration where the friction

between such a person and a beneficiary or cofiduciaries interferes with the proper

administration of the estate and future cooperation is unlikely") (citations omitted).

8

In this case, Dalia, the Trustee and Orly, the sole present beneficiary, have long been estranged, and, given Dalia's actions, will likely remain estranged for some time to come. Moreover, Dalia has allowed her hostility and antagonism toward Arie and Orly, and her (misplaced) love and confidence toward Sagi, to interfere with her proper administration of the Orly Trust. See TAP; Hochberg Stmt. Finally, all of Dalia's actions in this regard were concealed from Petitioner in violation of this Court's July 2009 Order and the prior Orders of the other Courts in both the New York TPR Action and the New York TRI Action. See TAP; see also Hochberg Stmt.

All of the foregoing provides additional well-pled and readily inferred grounds for removing Dalia as Trustee of the Orly Trust, and additional grounds for denying Dalia's Motion to Dismiss.

IV.   **DALIA'S ARGUMENT IN THE MOTION TO DISMISS THAT THE D & K NOTE WAS NEVER REVOKED IN WRITING AND THEREFORE, IS STILL IN FULL FORCE AND EFFECT FAILS, AND, IN ANY EVENT, DOES NOT PREVENT DALIA'S REMOVAL AS TRUSTEE**

In the Motion to Dismiss, and in direct contrast to Dalia's prior sworn pleadings and testimony, Dalia asserts that the D & K Note was always intended to be enforced. Dalia's belated attempt to justify the Sham TPR Foreclosure Sale, and her serial failures as Trustee, are unpersuasive.

As set forth in the TAP and the Hochberg Stmt., pursuant to prior sworn testimony and pleadings submitted to the Court, Dalia, Sagi, and David Parnes (Sagi's lawyer and business partner) all testified in the Genger divorce arbitration that the D & K Note was never to be enforced because to do so would destroy the Genger family estate plan to distribute Arie and Dalia's wealth equally to both Orly and Sagi.

Dalia's counsel also contends the D & K Note was never cancelled or renounced in

9

writing as purportedly required under the Uniform Commercial Code and the Statute of Frauds and, therefore, is purportedly still enforceable. This argument already has been rejected. Specifically, Justice Feinman denied Dalia's Motion for Summary Judgment in the New York TPR Action with respect to this issue of the D & K Note's enforceability, determining that:

> a material issue of fact exists regarding the intention of the note's [the D & K Note's] enforceability. While the documents speak for themselves, plaintiff raises material questions of fact concerning the actual intent behind the promissory note. **Given the testimonial evidence in particular, there is a question of fact as to whether the promissory note was intended to be an enforceable agreement, and it would be premature to apply a Statute of Frauds analysis to the cause of action.** (emphasis added)
> (See **Exhibit "Z"** to TAP Pages "21" and "22")

Dalia never appealed the New York Supreme Court's decision, and Justice Feinman was absolutely right that issues of fact remain regarding the enforceability of the D & K Note. Dalia successfully argued before Justice Milonas (see **Exhibit "J"**, Final Arbitration Award in Genger divorce proceeding, Page "15" and TAP, **Exhibit "I"**, excerpt from Dalia's Pre-Trial Memorandum Page "26"), and submitted a sworn Affidavit to this Court (**Exhibit "KK"**), that enforcing the D & K Note was not intended or appropriate, because doing so would un-do the Genger estate planning scheme to equally distribute the family wealth to the children. Now, Dalia (and Sagi) shamelessly try to take the exact opposite position. Dalia's convenient "epiphany" that the D & K Note is suddenly enforceable (now that she allowed it to be enforced) is contrary to her and Sagi's prior sworn statements and testimony,[5] and is still an issue which is being litigated by the parties and will ultimately be determined by the Court in the New York TPR Action. See, e.g., Estate of Granowitz, 150 A.D.2d 446, 541 N.Y.S.2d 66 (2d Dept. 1989)

---

[5] Since these litigations started, Dalia has sometimes advanced the curious position that, while she and Arie could not collect on the D & K Note, Sagi was free to do so. This newly-minted excuse cannot withstand Dalia's March 11, 2008 Affidavit to the Court (Ex. KK): By March 11, 2008 Dalia had sold her shares in TPR, and Sagi controlled TPR. Yet, Dalia still argued to the Surrogate Court that she should be trustee, so she could prevent Sagi-controlled TPR from enforcing the D & K Note. See Ex. KK at ¶ 8. Of course, Dalia materially misled Surrogate Roth, and did nothing to prevent Sagi-controlled TPR from wrongly enforcing the D & K Note.

(In familial dispute, Appellate Division affirmed Surrogate Court's denial of Motion to Dismiss because there were issues of fact concerning the validity of the familial agreement and agreed value of decedent's shares).

More importantly, for purposes of the instant motion, whether or not the D & K Note is enforceable (it isn't), Dalia remains a materially inadequate trustee. In this regard, Dalia remarkably testified her only basis for believing the Sham TPR Foreclosure Sale was proper is because Sagi told her so ("It is based on the fact that I have trust in whatever Sagi told me") (Dalia Dep. Tr. 334-337) (Ex. LL). Dalia never even asked her attorneys to investigate if the auction was proper or improper. Id. pg. 337. Dalia never told Orly about the auction because "I don't think it is one of my roles to tell her about the auction." Id. at 242. Dalia also "had no interest" in telling Arie about the auction so he could bid at the sale and maximize the value of the TPR Shares, arguing that "it is not my role to tell him and inform him about the UCC sale." Id. at 240. Plainly, Dalia does not understand what it means to be a trustee, how to act as a trustee, or how to place Orly's interests above her own. Certainly, Dalia cannot properly claim she has conclusively demonstrated no claim exists supporting her removal. Miller, supra, 11 N.Y.3d at 595. Accordingly, the Motion to Dismiss must be entirely denied.

## CONCLUSION

For each and every one of the foregoing reasons, respondent Dalia Genger has failed to "conclusively prove" there is "no claim" justifying Dalia's removal as Trustee. To the contrary, petitioner Orly Genger has more than sufficiently pled claims to remove Dalia as Trustee. Accordingly, it is respectfully submitted that Dalia Genger's Motion to Dismiss should be quickly and entirely denied.

11

Dated: New York, New York
February 26, 2013

              PLATZER, SWERGOLD, KARLIN, LEVINE,
              GOLDBERG, & JASLOW, LLP

              By: _____

                 Ralph R. Hochberg
                 Mitchell L. Kaplan
                 For the Firm
                 1065 Avenue of the Americas – 18th Floor
                 New York, New York 10018
                 (212) 593-3000

              ZEICHNER ELLMAN & KRAUSE, LLP
              Yoav M. Griver
              Bryan D. Leinbach
              575 Lexington Avenue – 10th Floor
              New York, New York 10022
              (212) 223-0400

              Attorneys for Petitioner Orly Genger

PLATZER, SWERGOLD, KARLIN, LEVINE,

*Index No.*   **0017**   *Year 20*<sup>2008</sup>

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

IN THE MATTER OF THE APPLICATION OF ORLY GENGER, AS A PERSON INTERESTED,
FOR THE REMOVAL OF DALIA GENGER, AS TRUSTEE OF THE ORLY GENGER 1993
TRUST PURSUANT TO SCPA §711(11)

ORLY GENGER'S MEMORANDUM OF LAW IN OPPOSITION TO RESPONDENT,
DALIA GENGER'S MOTION TO DISMISS

PLATZER, SWERGOLD, KARLIN, LEVINE,
GOLDBERG & JASLOW, LLP

*Attorneys for*   ORLY GENGER

1065 AVENUE OF THE AMERICAS. 18TH FLOOR
NEW YORK. NEW YORK 10018
TEL: (212) 593-3000
FAX: (212) 593-0353

*Pursuant to 22 NYCRR 130-1.1-a, the undersigned, an attorney admitted to practice in the courts of New York State,
certifies that, upon information and belief and reasonable inquiry, (1) the contentions contained in the annexed
document are not frivolous and that (2) if the annexed document is an initiating pleading, (i) the matter was not
obtained through illegal conduct, or that if it was, the attorney or other persons responsible for the illegal conduct are
not participating in the matter or sharing in any fee earned therefrom and that (ii) if the matter involves potential
claims for personal injury or wrongful death, the matter was not obtained in violation of 22 NYCRR 1200.41-a.*

Dated: _____   Signature _____

Print Signer's Name _____

*Service of a copy of the within*   *is hereby admitted.*

Dated:

_____
*Attorney(s) for*

PLEASE TAKE NOTICE

☐    *that the within is a (certified) true copy of a*
NOTICE OF    *entered in the office of the clerk of the within-named Court on*   20
ENTRY

☐    *that an Order of which the within is a true copy will be presented for settlement to the*
NOTICE OF    *Hon.                                  , one of the judges of the within-named Court,*
SETTLEMENT    *at*
*on*   20   *, at*   *M.*

Dated:

PLATZER, SWERGOLD, KARLIN, LEVINE,
GOLDBERG & JASLOW, LLP

*Attorneys for*

To:
1065 AVENUE OF THE AMERICAS. 18th FLOOR
NEW YORK. NEW YORK 10018

*Attorney(s) for*

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER, as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA § 711(11)

File No. 0017/2008



New York County Surrogate's Court
MISCELLANEOUS DEPT.

FEB 2 7 2013

FILED
Clerk

---

### ATTORNEY'S STATEMENT IN OPPOSITION TO RESPONDENT DALIA GENGER'S MOTION TO DISMISS PETITIONER'S THIRD AMENDED PETITION TO REMOVE RESPONDENT AS TRUSTEE

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

     **Ralph R. Hochberg**, an attorney duly admitted to practice law in the courts of the State of New York, affirms the following under penalties of perjury:

     1.     I am a Partner of the law firm of Platzer, Swergold, Karlin, Levine, Goldberg & Jaslow, LLP, the attorneys for the petitioner, Orly Genger (the "Petitioner" or "Orly") and am fully familiar with the facts and circumstances herein by virtue of the records and documents kept in the legal file maintained by this office.

     2.     This Affidavit is respectfully submitted in opposition to Dalia Genger's ("Dalia" or "Respondent") Motion to Dismiss (the "Motion to Dismiss") the Third Amended Petition (the "TAP")[1] which seeks a decree:

> (a)     Providing for the immediate removal of Dalia as Trustee of the Orly Genger 1993 Trust (the "Orly Trust") as a result of her: (i) numerous and continuous breaches of her fiduciary duties to the Orly Trust and

---

[1] Because it is verified, the TAP also functions as a sworn affidavit, and its contents constitute sworn evidence of Dalia's wrongdoing. See NY CPLR § 105(u) (A "verified pleading" may be utilized as an affidavit whenever the latter is required"). A copy of the TAP with Exhibits is annexed hereto and made part of the Appendix Exhibits to this Affirmation.

Petitioner as its sole present beneficiary; (ii) waste and dissipation of the
Orly Trust's assets; (iii) repeated and willful engagement in an ongoing
fraudulent scheme with Sagi to loot, encumber, pledge and transfer the
assets of the Orly Trust; (iv) deliberate and willful violation and contempt
of the prior Order of this Court dated July 1, 2009 (the "July 2009 Order")
(as well as her deliberate and willful violation and contempt of prior
restraining Orders imposed upon her by other New York Courts in related
proceedings) as set forth herein; and, (v) imprudent management and
injury to the assets of the Orly Trust committed to her charge;

(b)     Suspending the Letters of Appointment heretofore issued to Dalia;

(c)     Appointing Joel Isaacson as successor trustee; and,

(d)     Granting such other and further relief as this Court deems to be just
equitable and proper.

## PRELIMINARY STATEMENT

3.      Dalia's Motion to Dismiss should be denied. It is clear that both prior to and after

becoming Trustee, Dalia has acted in a manner which has solely benefitted and continues to

solely benefit her and her son, Sagi Genger ("Sagi"), and which has injured and continues to

injure Orly as beneficiary of the Orly Trust. The facts and documents set forth in the TAP show

that Dalia has breached and continues to breach her fiduciary obligations as Trustee in numerous

instances and is clearly unfit to serve as Orly's Trustee.

4.      Specifically, Dalia has egregiously breached her fiduciary duties as Trustee of the

Orly Trust by engaging in a scheme with Sagi to loot the assets the Orly Trust to benefit her and

Sagi, as evidenced by her actions and inactions, which include, but are not limited to, the

following:

(a)     Dalia deliberately failed to inform, affirmatively concealed from Orly and others,
and failed to try to prevent, the sham foreclosure sale by Sagi of the Orly Trust's
valuable stock interests in TPR (the "Sham TPR Foreclosure Sale"), so Sagi could
greatly benefit to the detriment and injury of Orly and the Orly Trust. Had Dalia
been a true Trustee, she would have acted to enjoin the sale, or at least provided
notice to other potential bidders known to her so the best price possible was
obtained for the TPR Shares. Instead, Dalia did nothing. This lack of notice

2

prevented Orly from protecting the asset by either trying to enjoin the sale or ensuring additional bidding at the sale;

(b)    Dalia is attempting to dissipate the Orly Trust's sole remaining asset, the Orly Trust TRI Shares (as previously defined in the TAP), by commencing an action in the Delaware Chancery Court (the "Delaware Chancery Action") in which she sought a declaratory judgment with respect to the beneficial ownership and disposition of the Orly Trust TRI Shares. Dalia's commencement of the Delaware Chancery Action was a calculated strategy on her part to injure the Orly Trust because this same Chancery Court had previously ruled that TPR (which is controlled by Sagi) was the beneficial owner of the Orly Trust TRI Shares, and not the Orly Trust. The Delaware Supreme Court reversed the Chancery Court on the happy technicality that the Chancery Court lacked personal jurisdiction over the Orly Trust, as the Orly Trust was not party to that Delaware *in rem* proceeding. Dalia's action is designed to cure that jurisdictional defect, and give the Chancery Court jurisdiction over the Orly Trust. In other words, Dalia has deliberately chosen to spend precious Trust assets bringing an action in the very Court that already has ruled against the Orly Trust;

(c)    Dalia commenced the Delaware Chancery Action even though all the parties to Dalia's purported Delaware action (the Orly Trust, TPR, and the Trump Group entities) are located in New York, and Petitioner had previously commenced an action in New York County Supreme Court (previously defined in the TAP as the "New York TRI Action") that will determine the beneficial ownership and disposition of the Orly Trust TRI Shares. Notably, the Court in the New York TRI Action enjoined Trustee Dalia (and all other parties) from prosecuting or otherwise proceeding with the Delaware Chancery Action and further determined that the Orly was authorized to seek a determination concerning the ownership of the Orly Trust TRI Shares on behalf of the Orly Trust;

(d)    Dalia's counsel has recently indicated that Dalia intends to continue her prosecution of the Delaware Chancery Action notwithstanding the fact that: (i) the Court's prior Orders and rulings in the New York TRI Action have enjoined Dalia from doing so and have further authorized Orly to proceed on behalf of the Orly Trust; (ii) Dalia has been enjoined from prosecuting the Delaware Chancery Action since its initial inception approximately sixteen (16) months ago; (iii) Dalia is seeking the same "beneficial ownership" determination in the Delaware Chancery Action that Orly has been actively litigating on behalf of the Orly Trust in the New York TRI Action for more than the past two (2) years and as such, Dalia's prosecution of the Delaware Chancery Action constitutes duplicative litigation and a complete waste of the Orly Trust's assets; and (iv) the Chancery Court is certain to rule against the Orly Trust's interests as it previously did before[2];

---

[2] For all of the forgoing reasons, Petitioner has previously filed an Order to Show Cause with this Court seeking to enjoin Dalia as Trustee from prosecuting or otherwise proceeding with the Delaware Chancery Action. In addition, the New York Supreme Court has given Orly permission to seek clarification that the Supreme Court's recent Order

(e)     Dalia entered into the Secret Agreements (as previously defined in the TAP) on purported behalf of the Orly Trust without prior notice to Petitioner and deliberately concealed same from Petitioner and the New York Supreme Court for almost a year. Dalia's entry into the Secret Agreements has placed $4.44 million dollars and any other remaining assets of the Orly Trust in peril of being foreclosed upon and dissipated by a newly-created and unknown St. Kitts entity;

(f)     Dalia has made the defeat of an interpleader proceeding brought by her counsel; her removal as Trustee; and/or appointment of a co-Trustee, "conditions of default" making the $4.44 million immediately payable to the St. Kitt's entity, and the rest of the Orly Trust's assets subject to immediate foreclosure without notice anywhere in the world. Notably, the interpleader action (defined in the TAP as the "Pedowitz & Meister Interpleader Action") already has been defeated, having been correctly labeled by the United States District Court for the Southern District Of New York as a "gratuitous," "sham" proceeding;

(g)     Dalia violated the restraints and injunctions imposed upon her as provided in this Court's July 2009 Order by commencing the Delaware Chancery Action and entering into the Secret Agreements without prior notice to Petitioner; and,

(h)     Dalia violated the restraints and injunctions imposed upon her as provided in both the New York TRI Action and the New York TPR Action.

5.     Dalia's serial violations of her duties as Trustee resulted from the bitter and acrimonious divorce proceeding between Arie Genger ("Arie") and Dalia, which created an irreconcilable schism in the Genger family. Dalia and Sagi perceived that Orly sided with Arie in the 2004 divorce, with Dalia even testifying that she considers Orly to have been "brainwashed."

6.     Dalia has lost all sense of objectivity with respect to her duties and obligations as the Trustee of the Orly Trust and the fiduciary duties that she owes Orly as the Orly Trust's sole present beneficiary.[3] Even worse, Dalia's every action and inaction as Trustee of the Orly Trust

---

dismissing Dalia as an individual from the New York TRI Action was not meant to affect the injunction preventing Dalia as Trustee from prosecuting her Delaware Chancery Action. Copies of the Affidavit of Orly Genger and Affirmation of Ralph Hochberg submitted in support of the Order to Show Cause (without Exhibits) are annexed hereto as part of the Appendix Exhibits and are incorporated herein by reference.

[3] In the Motion to Dismiss, Dalia asserts the novel theory that, because the Orly Trust provides for remainder

4

is designed to <u>hurt</u> Orly, benefit Sagi and satisfy Dalia's need to revenge herself upon Arie. As a result, with the exception of Sagi, Dalia is possibly the <u>worst</u> person to serve as Trustee. She is inherently conflicted and prevented from exercising her fiduciary duties as Trustee because her true loyalty lies with Orly's older brother, Sagi, the person who is determined to loot the Orly Trust of all of its assets. Moreover, she is hostile towards Orly because she views Orly as the "brain washed" extension of Arie.

7.      Without the intervention of this Court, and the immediate removal of Dalia as Trustee, the Orly Trust and its remaining assets will continue to be in immediate peril.

8.      Notably, Dalia testified during her deposition taken on December 13, 2012 in the New York TPR Action that the decision for her to become Trustee of the Orly Trust was a "family decision." When asked to identify her family, Dalia did <u>not</u> include Orly, the sole present beneficiary of the Orly Trust. Rather, she included Sagi, his wife, Elana, his sister-in-law, Leah, (the prior Trustee of the Orly Trust) and Sagi's Mother-in-law, Rochelle. Dalia's exclusion of Orly as part of the "family" is telling. See Dalia Dep. Tr. At 41-48. (Annexed hereto as **Exhibit "JJ"** is a true and complete copy of Dalia's deposition transcript.)

9.      Given the family dynamics, Dalia's motivation for becoming Trustee of the Orly Trust is clear: to obtain control over the Orly Trust's assets in order to pledge, encumber, transfer and dissipate same for her and Sagi's benefit. By simply allowing Joel Isaacson to step in as the disinterested third-party successor trustee to the Orly Trust, Dalia could end years of bitter litigation before this Court. <u>It is respectfully submitted that her unwillingness to do so speaks volumes as to where her true motivations lie.</u> While Dalia claimed she was acting as Trustee only

---

interests to Orly's children (which Orly does not presently have) and that, upon her death, her interest passes to the beneficiaries of the Sagi Trust, this somehow means that Orly has less of an interest in the Orly Trust and its assets. This is obviously not the case. As the sole present beneficiary of the Orly Trust, Orly has a clear vested interest in how the Orly Trust's assets are managed, cared for and disposed of, and is acting to protect those assets.

to protect Orly from Arie, the sad fact is that at the end of the day, Dalia's actions may leave Orly with nothing. Dalia's hatred of Arie has motivated her to exact retribution upon Orly.

10.     In any event, the gross distortions of the facts and the prior legal proceedings offered by Dalia in her Motion to Dismiss cannot successfully obscure that Orly has set forth sufficient evidence to support Dalia's removal as trustee. Certainly, Dalia falls far short of "conclusively" proving that, accepting the facts in Orly's TAP as true and affording Orly every possible favorable inference, Orly has absolutely "no claim" justifying Dalia's removal as Trustee. Having failed to meet this legal standard, (See, e.g., Lawrence v. Miller, 11 N.Y.2d 588, 595 (2008), cited to in accompanying Memorandum of Law), Dalia's Motion to Dismiss must be entirely denied.

**SURROGATE ROTH'S PRIOR DENIAL OF PETITIONER'S INITIAL PETITION TO REMOVE DALIA AS TRUSTEE WAS EXPRESSLY WITHOUT PREJUDICE TO RENEW. THE TAP SETS FORTH NEW AND ADDITIONAL GROUNDS TO REMOVE DALIA AS TRUSTEE**

11.     In the Motion to Dismiss, Dalia alleges that "...little has occurred since the Prior Decision [Judge Roth's December 31, 2008 Decision]...". (Motion to Dismiss, Paragraph "5"). Nothing could be further from the truth. Every amendment of the Petition to remove Dalia as Trustee of the Orly Trust has been precipitated by Petitioner's discovery of new acts which Dalia has taken, without any prior notice to Orly, in violation of her fiduciary obligations to the Orly Trust.

12.     For example, unbeknownst to Orly or Surrogate Roth, Dalia and Sagi were already acting to strip the Orly Trust of its shares of TPR (as described in the TAP) when Surrogate Roth rendered her December 31, 2008 decision. Indeed, Orly only discovered the Sham TPR Foreclosure Sale of the Orly Trust's shares of TPR approximately six months after Surrogate Roth's decision. (See TAP, Paragraph "57" and **Exhibit "R"**).

6

13.    Likewise, the filing of the TAP was precipitated by discovery of the Secret

Agreements, which Dalia hid from Orly and the New York Supreme Court for almost a year.[4]

14.    Although Dalia's attempt to portray Surrogate Roth's prior decision as somehow

precluding Orly from seeking her removal, the language contained in Surrogate Roth's decision

clearly shows that this is not the case:

> [T]he appointment of a "special trustee" is unwarranted **at this time** and
> accordingly, the application is denied, **without prejudice to renewal if
> future circumstances warranted such relief.** (emphasis added)
> (See TAP, **Exhibit "M"**, Pages "7" and "8")

15.    For the reasons set forth herein and in the TAP, it is respectfully submitted that

Dalia's actions subsequent to Surrogate Roth's Decision (and those actions and events Dalia hid

from Surrogate Roth prior to Surrogate Roth's Decision) warrant her immediate removal as

Trustee of the Orly Trust.

### DALIA'S ACTIONS PRIOR TO HER BEING APPOINTED AS TRUSTEE OF THE ORLY TRUST ALLOWED SAGI TO GAIN CONTROL OVER BOTH TPR AND D & K AND PAVED THE GROUND WORK FOR THEIR SCHEME TO LOOT THE ORLY TRUST OF ITS ASSETS

16.    Dalia would like this Court to completely disregard all of her actions prior to her

appointment as successor Trustee in 2008. By these pre-2008 actions (i.e., giving Sagi control

over TPR and D & K), Dalia set the stage for her scheme with Sagi to loot the Orly Trust's assets

which scheme has continued throughout Dalia's tenure as Trustee.

---

[4]    Dalia contends the forgoing amendments to the Petition as an attempt to "judge shop". (Motion to Dismiss, Paragraph "4"). This is untrue. Certainly, this is an ironic accusation coming from Dalia's counsel, who initiated The Pedowitz & Meister Interpleader Action that Judge Keenan accurately described as a "sham," as "gratuitous," and as being specifically designed "to strong-arm adversaries into a particular forum of choice." (See Glencova Inv. Co. v. Trans-Resources, Inc., 874 F. Supp. 2d 292 (S.D.N.Y. 2012).

### A. At Dalia's urging the D & K Note is found to be uncollectible as a matter of law

17.     As set forth in the TAP, both the Orly Trust and the Sagi Trust were liable to TPR under the D & K Note. Dalia, Sagi and David Parnes (Sagi's lawyer and business partner) all testified in the Genger divorce arbitration, that the D & K Note (also referred to by the parties as the "Note") was never intended to be enforced against D & K or the two Trusts because doing so would destroy the family estate planning.

18.     Based upon the forgoing and at Dalia's own urging, the Honorable E. Leo Milonas issued a Final Arbitration Award specifically finding that, from its inception, everyone knew the D & K Note was never to be collected:

> "The arbitrator finds for Dalia on this issue. The D&K note was part of the estate planning scheme to transfer wealth to the children. The parties never intended for this note to be collected and to do so would re-transfer wealth back to the parents and defeat their estate plan.
> (See **Exhibit "J"**, Final Arbitration Award in Genger divorce proceeding, Page "15")

19.     Dalia specifically urged the arbitrator and took the position in a sworn pleading that the D & K Note was not collectible because it would undo her and Arie's estate planning to transfer wealth to Orly and Sagi:

> "...collection by TPR of the D & K Note would simply transfer wealth from the children, Sagi and Orly, to their parents, Arie and Dalia, thus undoing the estate planning scheme which had transferred that wealth to the children.
> (See TAP, **Exhibit "I"**, excerpt from Dalia's Pre-Trial Memorandum Page "26")

20.     Sagi and David Parnes supported Dalia's position on this issue through their sworn testimony.

- the Note "was uncollectible." Testimony of TPR Vice President and Officer David Parnes (TAP Ex. "G", p. 453);

8

- collecting the Note would improperly "revers[e] the estate planning that was contemplated to begin with." Testimony of TPR CEO and D&K GP Manager Sagi Genger (TAP Ex. "H", p. 380)

- "There was like 14 percent of TRI given to the kids under the estate planning. No one was reversing the estate planning." Sagi Testimony (TAP Ex. "H", p. 380-381);

- Sagi determined that the D & K Note (a TPR asset) was worthless because it was uncollectible: "Please note that in my analysis I'm adjusting downwards the value of the personal assets to reflect the worthlessness of the D&K Note which is stated at nominal value on the auditor's balance sheet." TAP Ex. "H" (Sagi Testimony), p. 375

- the D & K Note "was part of a tax planning mechanism that was put back in 1993" and the Genger family agreed to "bury [the Note] in the woods" to prevent collection. Parnes Testimony (TAP Ex. "G", p. 460-461);

- Sagi was in charge of burying the Note in the woods. Parnes Testimony (id.);

21.    Dalia has reiterated her position taken in the Genger divorce arbitration that collection of the D & K Note would undo the Genger family estate planning in her Affidavit previously submitted to this Court and sworn to on March 11, 2008. Annexed hereto as **Exhibit "KK"** is a copy of Dalia's Affidavit. (See, e.g., Paragraph "9")[5]

22.    At Dalia's urging and to her multi-million dollar benefit[6], Justice Milonas made his finding that the D & K Note was never intended to be collected. Now that she has allowed

---

[5] Notably, Dalia maintained the sworn position that the D & K Note was uncollectible by TPR even after she divested herself of all TPR shares and Sagi took control of TPR. Id. Contrary to her sworn statement to Surrogate Roth, however, Dalia did nothing to prevent Sagi-controlled TPR from enforcing the D & K Note. Indeed, Dalia deliberately told no one about the impending sale, did nothing to prevent the Sham TPR Foreclosure Sale, and made no attempt to obtain the best price possible for the TPR Shares (so those shares could go to her son, Sagi), which would have directly benefitted the Orly Trust.

[6] Because the matrimonial arbitrator determined that the D & K Note was worthless and uncollectible as argued by Dalia in the arbitration, Dalia ultimately received a substantially greater amount of money in the divorce settlement than she would have otherwise received without such a finding.

9

the D & K Note to be collected by TPR (i.e., Sagi) to the Orly Trust's harm, Dalia has conveniently reversed her position and claimed that the D & K Note was clearly collectible.

### B.    Dalia and Sagi's scheme to put Sagi in charge of TPR

23.    As previously set forth in the TAP, Dalia and Sagi schemed to put Sagi in charge of both TPR, the holder of the D & K Note, and D & K, the Note's maker. (See TAP, Paragraphs "23" and "24" for example).    Dalia and Sagi's machinations allowed Sagi as CEO of TPR to notify *himself* as the general manager of D & K, that D & K was in default under the D & K Note paving the way for the Sham TPR Foreclosure Sale of the Orly Trust's shares of TPR, which were pledged as collateral.    Sagi's obvious conflict of interest in these dual roles is self-apparent and was intended by both him and Dalia.

24.    Dalia's feigned innocence concerning the events that led to the Sham TPR Foreclosure Sale (See Motion to Dismiss, Paragraph "16") are belied by the fact that Dalia was previously the 51% majority owner of TPR as a result of Arie and Dalia's divorce settlement and was directly responsible for appointing Sagi as both TPR's CEO and as a board member. (See TAP, Paragraphs "24" and "25", Footnote "1").

25.    Indeed, Dalia's divestiture of her TPR shares only strengthened Sagi's control over TPR.    After Dalia's sale of her TPR shares, Sagi was in effective control of the majority of the shares of TPR because: (a) approximately 49% of the shares of TPR were owned by D & K (which Sagi controlled); and (b) 2% of TPR's shares were beneficially owned by Rochelle Fang (Sagi's Mother-in-law) and were also controlled by Sagi.    (See Generally, TAP, Paragraph "39", Footnote "3")

26.    Sagi's control over the management of TPR was crucial to Dalia and Sagi's scheme in many ways.

27.    Sagi's control over TPR allowed him to orchestrate the Sham TPR Foreclosure Sale. As indicated above, the Orly Trust owned its shares of TPR indirectly through its interest in D & K. Because of Dalia's actions, Sagi was in effective control of both TPR, the holder of the D & K Note, and D & K, the maker of the D & K Note. This was also in stark contradiction to Dalia's prior sworn Affidavit submitted to this Court in which she represented that the D & K Note should not be returned to or enforced by TPR because it would destroy the value of both the Orly Trust and the Sagi Trust. (See **Exhibit "KK",** Paragraph "9").

28.    TPR's (i.e. Sagi's) Sham TPR Foreclosure Sale of the Orly Trust's shares of TPR was devastating to the Orly Trust because it resulted in the loss of this valuable asset. Moreover, this foreclosure paved the groundwork for Sagi and Dalia's subsequent attempts to loot the Orly Trust of its sole remaining asset, the Orly Trust TRI Shares. This was only possible because Dalia ceded control of TPR to Sagi before she became Trustee.

29.    Therefore, Dalia's actions subsequent to her appointment as Trustee of the Orly Trust must be viewed in this context and not in the "vacuum" preferred by her counsel. There is no "bright dividing line" between Dalia's actions prior to becoming the Trustee of the Orly Trust and her actions subsequent thereto. They are all intertwined as part of her and Sagi's overall scheme to loot the Orly Trust of its assets.

30.    Once Sagi was in charge of both TPR and D & K, and Dalia was appointed Trustee of the Orly Trust, Dalia and Sagi carried out the scheme they set in motion prior to Dalia's appointment. Dalia needed to be appointed as the Trustee of the Orly Trust for the scheme to work. As set forth below, Dalia's actions and inactions subsequent to her appointment as Trustee of the Orly Trust clearly indicate that she was either a willing participant or a pawn in

this scheme. In either case, her actions and inactions as Trustee constitute a breach of her

fiduciary duties to Petitioner and warrant her removal.

### DALIA'S CLAIM THAT SHE DID NOT ACT IMPROPERLY WITH RESPECT TO THE SHAM TPR FORECLOSURE SALE IS BOTH ERRONEOUS AND DISINGENUOUS

31.    Dalia alleges in Paragraph "8" of the Motion to Dismiss that she cannot be held

accountable for TPR's declaration of a default under the D & K Note (See copy of default notice

previously annexed as **Exhibit "S"** to TAP) which led to the Sham TPR Foreclosure Sale of the

Orly Trust's interest in TPR.[7] Dalia also claims that she was prohibited from taking any action

to stop the Sham TPR Foreclosure Sale by Surrogate Roth. Lastly, Dalia alleges that the Sham

TPR Foreclosure Sale was proper because contrary to Petitioner's assertion, the D & K Note was

always intended to be enforced. (See Motion to Dismiss Paragraphs "15" through "21").

32.    These statements are all belied by the sworn facts and testimony set forth on the

TAP.

33.    First, Surrogate Roth's Order instructed Dalia to take no action to harm the Orly

Trust and its assets. The Court's Order could not reasonably be construed as a purported "gag

order" preventing Dalia from notifying Orly or others about TPR's notice of default. Moreover,

Surrogate Roth's instructions did not compel Dalia to abrogate her fiduciary duties to protect the

assets of the Orly Trust from dissipation. Nor did it prevent Dalia from apprising the Court of

the impending sale and seeking a lift of the purported "gag order." Finally, Dalia's broad

construction of this Order stands in distinct contrast to the way Dalia ignored – and now claims

---

[7] Dalia further claims that Petitioner has alleged "...no act that Dalia Genger did to participate in the foreclosure..." and that "...Dalia could not prevent TPR from declaring a default and foreclosing on the promissory Note made by D & K LP that the Orly Trust had guaranteed." (See Motion to Dismiss, Paragraph "15"). This is simply not true. First, as a fiduciary, Dalia's failure to act is a violation. Second, Dalia could have gone to Court to prevent the foreclosure. Indeed, the New York Supreme Court already has found that "a material issue of fact exists regarding the intention of the note's enforceability". July 28, 2010 Order (Ex. Z to TAP) at 21.

to narrowly construe – the various restraints she violated in filing the Delaware Chancery Action, and in entering into the Secret Agreements.

34.    As set forth in the TAP, Dalia knew of Sagi's plan to foreclose on the D & K Note as early as August, 2008, and withheld this information from Petitioner for almost ten months. Even then, Dalia only provided the information after the Sham TPR Foreclosure Sale had taken place, and only after she received a demand letter from Orly's prior counsel. (See TAP, **Exhibit "R"**)

35.    Dalia does not dispute this. By her testimony, she expressly acknowledges that "I [Dalia] chose not to inform Orly" about the default notice issued by TPR in connection with the Sham TPR Foreclosure Sale. See **Exhibit "JJ"**, Page 190, Lines "3" through "11")

36.    Dalia's conscious decision not to inform Orly of TPR's (i.e., Sagi's) default notice under the D & K Note is completely inexcusable and constitutes a gross violation of her fiduciary duties. The fact that Dalia purportedly consulted with counsel before choosing not to inform Orly does not absolve her from her fiduciary duties.

37.    Further, Dalia testified that she made no efforts to stop Sagi from proceeding with the Sham TPR Foreclosure Sale.

> Q.    You don't remember ever going to Sagi and saying, "Please don't do this sale"?
> A.    No, I didn't say that.
> Q.    Or words to that effect?
> A.    Right, I did not say it because its's not my place to say it. He [Sagi] can do whatever he wants. He has a note and he wanted to collect on it.
> (See **Exhibit "JJ"**, Page 187, Lines "17" through "24")

38.    Dalia also testified that she made no efforts to inform Petitioner of the foreclosure auction of the Orly Trust's shares of TPR:

> Q.    Did you discuss with Mr. Meister the possibility of letting Orly know [of the auction] so that other people could go in and bid on the TPR Asset?

13

> A.    No, I did not discuss this.
> Q.    That was not an option you considered?
> A.    No.
> (See **Exhibit "JJ"**, Page 197, Lines "18" through "24")

39.    Dalia also testified that she made no efforts to find any additional bidders for the

auction to maximize the potential value of the TPR asset.

> Q.    Isn't it Orly's interest to get the best price for her interest?
> A.    It is.
> Q.    Okay. So isn't getting as many people as possible who want to buy the
>        shares-
> A.    But it is not my responsibility to collect people that will participate in the
>        auction.
> (See **Exhibit "JJ"**, Page 199, Lines "16" through "23")

40.    Notably, Dalia has testified that the sole basis for thinking the foreclosure sale

was proper was because Sagi told her so.  See **Exhibit "LL"**, (Pages 334-336) annexed hereto,

which is a copy of the transcript of Dalia's continued deposition on February 7, 2013.

41.    As set forth above and in the TAP, Dalia acknowledged that it was her and Arie's

estate plan for Sagi and Orly to share equally in the distribution of the Genger family's wealth as

brother and sister (See **Exhibit "I"**, excerpt from Dalia's Pre-Trial Memorandum Page "26").

42.    Dalia confirmed this in her testimony:

> Q.    And there was an estate plan for the benefit of your two children,
>        Sagi and –
> A.    That's right.
> Q.    --Orly, correct?
> A.    Right. Correct.
> Q.    And the intent was that <u>Orly and Sagi were to share equally</u>; is that also
>        correct?
> A.    Yes.
> (emphasis supplied) (See **Exhibit "JJ"**, Page 148, Lines "4" through "11")

43.    Despite the Genger family estate plan and her testimony, Dalia alleges in the

Motion to Dismiss that the D & K Note was enforceable and thus, the Sham TPR Foreclosure

Sale was proper. Petitioner sets forth at length above and in the TAP all of the reasons why the

14

D & K Note was never intended to be enforced.  (See TAP, Paragraphs "31" through "35" and

**Exhibits "G" through "J"**)  Once again, Dalia's allegations are belied by the evidence.

44.     In fact, Justice Feinman specifically denied Dalia's Motion for Summary

Judgment in the New York TPR Action with respect to this issue of the D & K Note's

enforceability.  Justice Feinman determined in his July 28, 2010 decision that:

> "...a material issue of fact exists regarding the intention of the note's [the D & K
> Note's] enforceability.  While the documents speak for themselves, plaintiff raises
> material questions of fact concerning the actual intent behind the promissory note.
> Given the testimonial evidence in particular, there is a question of fact as to
> whether the promissory note was intended to be an enforceable agreement,
> and it would be premature to apply a Statute of Frauds analysis to the cause
> of action."
> (See **Exhibit "Z"** to TAP Pages "21" and "22)

45.     In summary, Dalia's scheme to place Sagi in a position which enabled him to loot

the Orly Trust's shares of TPR, combined with: (i) Dalia's conscious and willful decision not to

inform Orly of TPR's purported default under the D & K Note; (ii) Dalia's conscious and willful

decision not to notify Orly about the Sham TPR Foreclosure Sale and give Orly an opportunity to

protect the Orly Trust's interests in TPR; (iii) Dalia's lack of any effort to stop Sagi-controlled

TPR from looting the Orly Trust of its shares of TPR, notwithstanding Dalia's testimony under

oath about the Genger family estate plan to treat both children equally; (iv) Dalia's complete lack

of oversight and intervention in the sham auction; (v) the fact that the D & K Note was never

intended to be enforced for the reasons set forth here and in the TAP; (vi) Dalia's deliberate

attempt to conceal the sale from Orly until many months after the sale occurred; and (vii) her

refusal to try to maximize the value of the TPR shares at the auction to ensure the shares went to

her son, Sagi, and not her hated ex-husband, Arie, all represent clear and un-controvertible

breaches of her fiduciary duties as trustee of the Orly Trust.

## DALIA ACTIONS AND INACTIONS WITH RESPECT TO
## THE ORLY TRUST TRI SHARES CONSTITUTE A
## <u>GROSS BREACH OF HER FIDUCIARY DUTIES</u>

46.    In the Motion to Dismiss, Dalia alleges that her actions and inactions with respect

to the Orly Trust TRI Shares were proper because: (i) she was not a trustee of the Sagi Trust and

therefore, she did not cause the sale of the Sagi Trust's shares of TRI nor could she have

prevented it in any way; and, (ii) she commenced the Delaware Chancery Action against the

Trump Group and TRI to purportedly "protect" the Orly Trust's interests in the Orly Trust TRI

Shares.

47.    As set forth below, these contentions are meritless.    Indeed, Dalia's actions and

inactions with respect to the Orly Trust TRI Shares were specifically intended to dissipate and

further harm the Orly Trust's assets, not protect it as she claims.

48.    As set forth in the TAP, TPR previously held a 52.85% interest in TRI.    The

remaining minority interest in TRI (47.15%) was owned by the Trump Group.    As part of Arie

and Dalia's divorce Settlement Agreement entered into in 2004, TPR's 52.85% interest in TRI

was transferred as follows: (i) 13.99% to Arie (the "<u>Arie TRI Shares</u>"); (ii) 19.43% to the Orly

Trust (previously defined as the "<u>Orly Trust TRI Shares</u>"); and, (iii) 19.43% to the Sagi Trust

(the "<u>Sagi Trust TRI Shares</u>"), (collectively, the "<u>2004 Genger TRI Transfer</u>")[8]

49.    This equal distribution of the shares of TRI to the Orly Trust and the Sagi Trust

was consistent with the Genger family estate plan and Dalia's testimony that Sagi and Orly were

to share equally in the distribution of the Genger family's wealth as brother and sister.

---

[8]    The Orly Trust and the Sagi Trust each granted Arie an irrevocable lifetime voting proxy over their respective
shares of TRI. (See TAP, **Exhibit "C"**).    The clear and obvious intent behind the voting proxies and the Genger's
divorce Settlement Agreement was for Arie to maintain majority 58.85% controlling voting rights for the Arie TRI
Shares, the Orly Trust TRI Shares and the Sagi Trust TRI Shares for the duration of his life.

50.    On August 22, 2008, unbeknownst to Petitioner, Rochelle Fang (Sagi's Mother-in-law) who had been appointed Trustee of the Sagi Trust, attempted to sell the Sagi Trust TRI Shares to the Trump Group for the sum of $26.7 million dollars, who thereafter purported to hold 66.58% of TRI's outstanding common stock.  In connection with the supposed sale, Sagi and David Parnes (the present Trustee of the Sagi Trust) were given seats on TRI's board of directors.  This sale, which was consummated after Dalia was appointed successor trustee of the Orly Trust, has diluted and diminished the value of the Orly Trust TRI Shares since Arie will no longer have a controlling interest in TRI (which he previously had by virtue of his voting proxy over the Trusts' shares, see **Exhibit "C"** to the TAP) and thus, the Orly Trust would no longer own a portion of the controlling block of TRI shares, thereby greatly decreasing their value.

51.    To make matters worse, unbeknownst to Orly, Sagi also entered into a side agreement with the Trump Group whereby he purportedly agreed as President of TPR that in the event the 2004 Genger TRI Transfer by TPR was deemed to be void, Sagi on behalf of TPR would: (a) be entitled to keep the $26.7 million dollar purchase price for the Sagi Trust TRI Shares; and, (b) have the purported right on behalf of TPR to sell the Orly Trust TRI Shares at a price that was $10.3 million dollars or approximately 60% less than that which was paid by the Trump Group for the Sagi Trust TRI Shares notwithstanding the fact that the Orly Trust and the Sagi Trust held the exact same amount of shares of TRI.[9]

52.    The shares of TRI were worth multiples of what the Trump Group paid to Sagi for the Sagi Trust TRI Shares, let alone the 60% discount for said price that Sagi purportedly negotiated with the Trump Group for the Orly Trust TRI Shares without Petitioner's knowledge

---

[9]  The side agreement also provided that Sagi would have the purported right on behalf of TPR to sell the Arie TRI Shares to the Trump Group for the sum of approximately $7.4 million dollars, which is also a fraction of their true value.

or consent. Upon information and belief, in 2008, at the time that Sagi purported to agree to the $26.7 million dollar purchase price and the 60% discount for the Orly Trust TRI Shares, TRI had after tax earnings in excess of $150,000,000 and sales of approximately $1 billion dollars.

53.     As set forth in the TAP, in response to Sagi's actions, Arie and Orly commenced the New York TRI Action to determine, *inter alia*, the ownership of the Orly Trust TRI Shares.

54.     As if the proposed sale of the Orly Trust TRI Shares for a grossly inadequate amount of consideration was not damaging enough to Orly, Dalia's actions taken in response to the proposed sale of the Orly Trust TRI Shares to the Trump Group <u>were specifically designed to assist Sagi in causing further harm to the Orly Trust</u>.

55.     In an *in rem* summary proceeding commenced by the Trump Group in 2008 in the Delaware Chancery Court, the Trump Group sought, *inter alia,* a determination that the 2004 Genger TRI Transfer was void and that the shares reverted to TPR (i.e. Sagi), thus paving the way for Sagi to consummate the sale of the Orly Trust TRI Shares (and the Arie TRI Shares) for a fraction of their value. (See *TR Investors, LLC et al v. Arie Genger and TPR Investment Associates, Inc.*, Delaware Chancery Court, Civil Action No. 6697-CS, the "<u>TRI Chancery Action</u>") Sagi has aligned himself with the Trump Group in both the TRI Chancery Action and in the New York TRI Action. Sagi would avariciously like to see the TRI shares revert back to TPR, because essentially, <u>he is TPR</u>.

56.     By decision dated August 28, 2010, Chancellor Strine determined in the TRI Chancery Action that the 2004 Genger TRI Transfer by TPR was void, that Arie and the Orly Trust had no beneficial ownership interest in the Arie Shares or the Orly Trust TRI Shares and thus, the shares reverted to TPR (i.e Sagi). Chancellor Strine made this decision notwithstanding

the fact that neither the Orly Trust nor Petitioner were a party to that proceeding (the "Chancellor Strine Decision").

57.    The Delaware Supreme Court ultimately reversed the portion of the Chancellor Strine Decision which determined that Arie and the Orly Trust were not the beneficial owners of the Arie Shares and the Orly Trust TRI Shares on the grounds that it was beyond the jurisdiction of the Court. The Delaware Supreme Court further held that the beneficial ownership of those shares needed to be adjudicated in a plenary action in a jurisdiction where the Court has *in personam* jurisdiction over **all** indispensable parties.

58.    Arie and Orly commenced the New York TRI Action to adjudicate this issue.  In 2011, many months after the commencement of the New York TRI Action and without prior notice to Petitioner as required under the July 2009 Order, Dalia, as Trustee of the Orly Trust, commenced the Delaware Chancery Action seeking a declaration that the Orly Trust is the beneficial owner of the Orly Trust TRI Shares.  Dalia has been restrained from pursuing this action pursuant to a prior Order of the Court issued in the New York TRI Action.[10]

59.    Dalia's commencement of the action before the same Delaware Chancery Court that previously ruled against the Orly Trust and Petitioner's interests as beneficiary, was intended for the devious and transparent purpose of helping Sagi complete TPR's sale of the Orly Trust TRI Shares (and the Arie TRI Shares) to the Trump Group at a fraction of their true value, all to the detriment of the Orly Trust.

---

[10]    Dalia's counsel has asserted that this restraint has been lifted by Justice Barbara Jaffe in the New York TRI Action and that Dalia intends to proceed with the Delaware Chancery Action.  As a result, Petitioner filed an Order to Show Cause with this Court seeking a temporary restraining order and injunction restraining Dalia from doing so because of the potential devastating detrimental effect that Dalia proceeding with the Delaware Chancery Action would have upon the Orly Trust's assets and Petitioner as its beneficiary.

60.     Specifically, Chancellor Strine's August 28, 2010 decision (previously defined as the "Chancellor Strine Decision") that the Orly Trust had no beneficial ownership interest in the Orly Trust TRI Shares, was reversed on the grounds that the Delaware Court did not have personal jurisdiction over the Orly Trust.

61.     By commencing the Delaware Chancery Action, Dalia clearly and transparently attempted to cure the very jurisdictional defect that had protected the Orly Trust!   Dalia commenced the Delaware Chancery Action knowing full well that the Chancery Court was pre-disposed to ruling against Petitioner's best interests.  With the jurisdictional issue out of the way; Dalia would know it was almost a certainty that the Chancery Court would rule once again that the 2004 Genger TRI Transfer was void and that the Orly Trust TRI Shares would revert back to TPR.  Not surprisingly, the Delaware Chancery Court recently affirmed its findings in a related case.  See **Exhibit "MM"**, Memorandum and Opinion of Chancellor Strine dated February 18, 2013.

62.     To date, Dalia has provided no reason why she had to spend Orly Trust funds to file a separate action in the very court most likely to rule against the Orly Trust.  Nor has she explained why she is still seeking to litigate that case 16 months later, rather than let it remain stayed.

## THE MEETING AGREEMENT WAS GROSSLY IMPROPER AND CONSTITUTED A BREACH OF DALIA'S FIDUCIARY DUTIES

63.     On or about January 31, 2009, only weeks after making sworn statements to the Surrogate Court that she intended to protect the Orly Trust's assets, Dalia executed a document entitled "Meeting of Partners of D & K LP- Jan. 31, 2009 & Agreement" (the "Meeting Agreement").  (See **Exhibit "O"** to TAP).  The Meeting Agreement purported to grant D & K

20

GP (i.e., Sagi) unfettered authority to encumber the Orly Trust TRI Shares and purported to indemnify and release Sagi and Dalia of any actions taken in connection with same. (See **Exhibit "O"**, Paragraphs "1" and "3")

64.    As set forth in the TAP, the Orly Trust received no consideration and no direct or indirect benefit in exchange for the substantial concession, Dalia, acting as Trustee, gave to D & K GP (controlled by Sagi) under the Meeting Agreement.

65.    Significantly, the Meeting Agreement was negotiated and executed without ever informing Petitioner or her counsel.  Moreover, Dalia never informed Orly of the Meeting Agreement's existence, even though Orly repeatedly requested information from Dalia about the Orly Trust's assets during this time.  Indeed, the Meeting Agreement was only disclosed, some ten months later in connection with the New York TPR Action.

66.    In the Motion to Dismiss, Dalia alleges that the Meeting Agreement does not provide D & K GP (i.e. Sagi) with unfettered authority to encumber the Orly Trust TRI Shares and attempts to depict the Meeting Agreement as an innocuous "clarification of pre-existing rights".  Further Dalia alleges that there "...was no harm from D&K LP's 2009 pro forma indemnification and release of D&K LP's former general partner." [Dalia] (See Motion to Dismiss, Paragraphs "22" and "23")  Once again, Dalia's arguments are refuted by the plain language of the Meeting Agreement:

> The partners wish to clarify that the authority vested in the General
> Partner to make limited partners' assets subject to a pledge shall be
> done in substantially the same manner in which TPR Investment
> Associates, Inc. shares were pledged in conjunction with the
> aforementioned note [the D & K Note]. However, the General
> Partner shall be authorized to sign for the partnership and/or each
> individual partner.
> (See **Exhibit "O"** to TAP Paragraph "3")

67.     This language allows D & K GP to pledge the Orly Trust TRI Shares without Petitioner's consent in order to provide the groundwork for another sham foreclosure sale of the Orly Trust TRI Shares.

68.     That Dalia and Sagi might attempt to orchestrate another sham foreclosure sale to loot the Orly Trust of the Orly Trust TRI Shares is no idle concern.  As set forth below and in the TAP, as a result of Dalia and Sagi's actions in entering into the Secret Agreements, the Orly Trust TRI Shares have already been placed in peril of being foreclosed upon by Manhattan Safety Company ("MSCo"), a recently created St. Kitts entity, without a notice to the Orly Trust and anywhere in the world.  (See TAP, Paragraphs Numbered "79" through "93")

69.     Remarkably, Dalia kept these Secret Agreements hidden from Orly and the New York Supreme Court for nine months, from October 2011 until July 2012.

70.     Clearly, Dalia's entry into the Secret Agreements are not the actions of a trustee who wishes to comply with her fiduciary duties or the Courts' restraining orders.  Rather, they constitute the actions of an individual who shows no regard for her fiduciary duties whatsoever.  Moreover, Dalia's attempt to indemnify herself from any actions taken in conjunction with the Meeting Agreement only further highlights this point.[11]

## THE TPR SETTLEMENT AGREEMENT AND AMENDED TPR SETTLEMENT AGREEMENT ARE NOT BENEFICIAL TO THE ORLY TRUST'S INTERESTS

71.     Dalia alleges in the Motion to Dismiss that the TPR Settlement Agreement and

---

[11] Dalia's contentions in the Motion to Dismiss that her release is purportedly limited in some way because it only releases her to the "fullest extent permitted [by law]" is unpersuasive. (See Motion to Dismiss, Paragraph "23") Further, in addition to the purported Release, Dalia makes the Orly Trust responsible for paying everyone's attorneys fees, should Orly continue to sue for recovery of the stolen Orly Trust assets. (See e.g., TAP, **Exhibit "HH"**, Amended TPR Settlement Agreement, Paragraph "7")

the TPR Amended Settlement Agreement (collectively, the "TPR Settlement Agreements") were purportedly beneficial to the Orly Trust. (See Motion to Dismiss Paragraphs "29" and "30").

72.     Nothing could be further from the truth. In examining Dalia's allegations that the TPR Settlement Agreements (both of which were entered into by Dalia without any prior notice to Petitioner and her counsel in violation of the July 2009 Order and the Supreme NY Restraining Orders) were purportedly beneficial to the Orly Trust, it is important to note that both TPR Settlement Agreements attempt to legitimize the TPR Sham Foreclosure Sale and the purported deficiency under the D & K Note.

73.     In other words, the TPR Settlement Agreements are premised on (i) the enforceability of the Note; (ii) the legality of the Sham TPR Foreclosure Sale; and, (iii) the legality of the deficiency resulting from the Sham TPR Foreclosure Sale. Each of these premises, however, are still being adjudicated by the parties in the New York TPR Action! In fact, Justice Feinman specifically denied Dalia's Motion for Summary Judgment in the New York TPR Action with respect to this issue holding that material issues of fact exist regarding the D & K Note's enforceability. (See **Exhibit "Z"** to TAP Pages 21-22)

74.     Dalia also alleges that the Orly Trust benefitted under the terms of the TPR Settlement Agreements because TPR purportedly relinquished its rights to the proceeds of the Orly Trust TRI Shares, specifically the grossly inadequate $10.3 million dollar purchase price which was negotiated by Sagi without Petitioner's knowledge or consent. This contention is nothing more than a further attempt by Dalia to legitimize Sagi's purported agreement with the Trump Group to sell the Orly Trust TRI Shares at a fraction of their value. (See Motion to Dismiss, Paragraph "30(b)"). Further, this purported concession is meaningless and is truly a "mirage in the desert" in light of the Secret Agreements and MSCo's purported right to collect

23

$4.44 million from the Orly Trust, and then foreclose upon the remaining of Orly Trust TRI

Shares, anywhere in the world and without any notice whatsoever.

75.    Dalia further alleges that the TPR Settlement Agreements "...ends the

relationship between the Orly Trust and D & K and "cancel[s] and void[s] the Amended D & K

Partnership Agreement and the "Meeting Agreement" of which Orly complains in this action,

eliminating any contention that the Orly Trust was damaged by those agreements..." (See

Motion to Dismiss, Paragraph "30(c)")

76.    In other words, the TPR Settlement Agreements purport to have the Orly Trust

transfer all its interests in D & K and disclaim all interest in TPR.  However, the whole purpose

behind Petitioner's commencement of the New York TPR Action is for Petitioner to reclaim the

improperly foreclosed shares of TPR for the Orly Trust.  Therefore, the TPR Settlement

Agreements constituted nothing more than an extra-judicial "stealth mission" by Dalia and Sagi

to avoid the Court's adjudication of the New York TPR Action.

77.    Dalia alleges that the TPR Settlement Agreements contain "...no release in favor

of Dalia Genger... and no benefits for Dalia Genger  (See Motion to Dismiss, Paragraph

"30(d)").   This is unequivocally false.  Paragraph "3" of the Amended TPR Settlement

Agreement provides as follows:

> Mutual Releases.  The parties to this settlement agreement hereby irrevocably and fully
> release one another, including all current and former directors, officers, trustees,
> fiduciaries, agents, advisors and other representatives of each of the parties...whether for
> acts in their fiduciary or individual capacities...from all claims, causes of action,
> lawsuits, demands, liability of any kind, asserted or unasserted, known or unknown,
> suspected or unsuspected, direct or derivative, in connection with the 1993 Note, the TRI
> Shares, the Share Transfer, the DK Interest, the TPR Interest, the 2008 Letter Agreement,
> or any other matters, through the date of this Agreement
> (emphasis added) (See **Exhibit "HH"** to TAP, Amended TPR Settlement Agreement,
> Paragraph "3")

78.    Dalia alleges that the Credit and Forbearance Agreement (defined as the "Credit

Agreement" in the TAP) and the Notes do not "...pledge anything as security or otherwise

"allow the potential foreclosure against valuable collateral" as alleged in TAP ¶8." (See Motion

to Dismiss, Paragraph "32"). This is also unequivocally false. In fact, the Orly Trust TRI Shares

are subject to potential foreclosure without any notice to Petitioner or her counsel whatsoever.

The Amended Promissory Note provides:

> Upon the occurrence of an Event of Default, Holder may...declare the unpaid
> Principal of and accrued and unpaid interest on this Note due and payable,
> whereupon the same shall be due and payable without presentment, demand,
> protest or other notice of any kind, all of which Maker expressly waives, and
> Holder may proceed to enforce payment of such Principal and accrued and unpaid
> interest or any part thereof in such manner as it may elect in its sole discretion...
> (emphasis supplied) (**Exhibit "DD"** to TAP, Amended Promissory Note,
> Paragraph "2.2")

79.     The Credit Agreement also provides that

> ... each Party [including the Orly Trust] irrevocably agrees that it is and **its assets**
> **are**, and shall be subject to such legal action or proceeding in respect of its
> obligations under this Agreement. (emphasis added)
> (See **Exhibit "CC"** to TAP, Credit Agreement, Paragraph "21")

80.     Dalia's allegation that the dismissal of the Pedowitz & Meister Interpleader

Action is not an "Event of Default" under the Secret Agreements (See Motion to Dismiss,

Paragraph "32", Footnote 8) is belied by the clear and unequivocal language contained in the

Credit Agreement:

> "Manhattan [MSCo] hereby covenants and agrees that ... Manhattan
> agrees to forbear from collection of amounts due and owing on the Note,
> ... until the earliest to occur of (i) the date on which Dalia no longer
> serves as Trustee of the Trust, (ii) the final resolution of the Interpleader
> Action [the Pedowitz & Meister Interpleader Action] or (iii) November 1,
> 2014" (emphasis added)
> (See **Exhibit "CC"** to TAP, Credit Agreement, Paragraph "6.2")

81.     It is not disputed that the Pedowitz & Meister Interpleader Action has been

dismissed and is thus "finally resolved", thereby triggering the above-mentioned Event of

Default.[12]

82.    Finally, Dalia's making her removal as Trustee, or the appointment of a co-Trustee, an "Event of Default" under the Secret Agreements is clear and unimpeachable evidence of why Dalia is not a suitable trustee.

## DALIA CLEARLY AND BLATANTLY VIOLATED THE PROVISIONS OF THE JULY 2009 ORDER NOTWITHSTANDING HER CLAIMS TO THE CONTRARY

83.    In the Motion to Dismiss, Dalia alleges that she has always complied with the provisions of the July 2009 Order which provides in relevant part that Dalia is required:

> "to give notice by overnight mail to petitioner's [Orly's] counsel of any 1) offer to purchase the Orly Trust's 19.3% interest in TRI within 10 days of receiving such offer and 2) act by Respondent [Dalia], her agents, and all other persons acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell or otherwise alter the Orly Trust's interest in TRI at least 10 days prior to such act."
> (See Motion to Dismiss, Paragraphs "25" and "26" and Exhibit "10")
> (A copy of the July 2009 Order is annexed hereto as **Exhibit "NN"**)

84.    As previously stated above, without prior notice to Petitioner, and in a transparent forum shopping move designed to further Sagi's scheme of selling the Orly Trust TRI Shares to the Trump Group at a fraction of their value, Dalia deviously commenced the Delaware Chancery Action to determine the beneficial ownership interest of the Orly Trust TRI Shares.

85.    Plainly, Dalia's commencement of the Delaware Chancery Action to purportedly determine the ownership of the Orly Trust TRI Shares constitutes an action which "alters" the Orly Trust's interest in the Orly Trust TRI Shares. Notwithstanding the forgoing, Dalia deliberately chose not to inform Petitioner and in doing so, violated the July 2009 Order.

---

[12] Dalia's newly-minted contention that her attorneys filed the Pedowitz & Meister Interpleader Action without telling her (See **Exhibit "LL"**, Pages 363-367) is frankly unbelievable. Dalia's contention that this was a "rogue act" by her counsel is belied by the multiple documents she signed making final resolution of the Pedowitz & Meister Interpleader Action an "Event of Default."

86.     As previously set forth in the TAP, Dalia's entry into the Secret Agreements without prior notice to Petitioner also violated the July 2009 Order. <u>Dalia does not and cannot contend that she provided Petitioner or her counsel with any prior notice of the Secret Agreements.</u> Rather, she audaciously asserts that she did not do anything that constitutes a "purchase, assignment, mortgage, pledge, redemption, encumbrance, sale or other alteration of the Orly Trust's interest in TRI" (See Motion to Dismiss, Paragraph "25"). This position is absurd, given the plain language of the Secret Agreements.[13]

87.     Dalia's execution of the Notes on purported behalf of the Orly Trust in favor of TPR (i.e. Sagi), which were subsequently assigned by TPR to MSCo were clearly "...act[s] by Dalia, her agents and all other persons acting on her behalf to **assign**, mortgage, pledge, redeem, encumber, sell or otherwise **alter** the Orly Trust's interest in TRI..." (emphases added).

88.     Further, as a result of the Secret Agreements, the Orly Trust TRI Shares have clearly been been "pledged", "encumbered" or "altered" because in the event of a default, they are subject to potential foreclosure by MSCo as a result of the assignment.

89.     As indicated above, the Orly Trust TRI Shares are subject to potential foreclosure without any notice to Petitioner or her counsel whatsoever. (See: (i) provisions of Paragraph "2.2" of the Amended Promissory Note attached as **Exhibit "DD"** to TAP, cited to above; and (ii) provisions of Paragraph "21" of the Credit Agreement attached as **Exhibit "CC"** to TAP previously cited to above)

90.     As discussed above and previously stated in the TAP, one of these purported

---

[13] The way Dalia treats the July 2009 Order stands in marked contrast with her extremely broad interpretation of Surrogate Roth's "do no harm" order as a "gag order" that somehow prevented Dalia even from telling Orly about the upcoming Sham TPR Foreclosure Sale. The only way to harmonize these two differing approaches by Dalia is to recognize that Dalia will adopt whatever interpretation supposedly excuses her harmful acts and breaches of fiduciary duty.

"Events of Default" – the dismissal of the Pedowitz & Meister Interpleader Action -- has already occurred. Another "Event of Default" – Dalia's removal as Trustee or the appointment of a co-trustee – is a direct challenge to this Court, and cannot be squared with Dalia's duty to put Orly, and not Dalia, first.

91.     The Notes "alter" and constitute a "pledge" of and "encumbrance" against the Orly Trust's interest in Orly Trust TRI Shares by allowing MSCo. to enforce the Notes against all the Orly Trust's assets upon Dalia's removal, or a determination of the Pedowitz & Meister Interpleader Action.

92.     In conclusion, it is respectfully submitted that Dalia was well aware of the provisions contained in the July 2009 Order and willfully disobeyed them by entering into the Secret Agreements without any prior notice to Petitioner and her counsel as mandated by the Order.    It is further respectfully submitted that Dalia's actions in entering into the Secret Agreements, which has ultimately placed the Orly Trust TRI Shares in jeopardy, is such an egregious breach of Dalia's fiduciary duties that it alone, constitutes grounds for her removal as Trustee.

93.     Dalia's claim that her actions with respect to the Orly Trust TRI Shares did not violate the Stipulation entered into between the parties on or about September 8, 2010 because it did not involve any "attempts to vote the Orly Trust TRI Shares" is similarly unavailing.    As specifically set forth in the Stipulation, the prior restraints against Dalia which were previously ordered by Surrogate Webber on July 1, 2009 (the July 2009 Order) were included as part of the Stipulation.    In other words, the Stipulation only adds additional restraints previously imposed by the July 2009 Order, it doesn't limit same.    Thus, Dalia violated the stipulated restraints contained in the September 8, 2010 Stipulation for the exact same above-described reasons that

she violated the July 2009 Order.

## DALIA VIOLATED THE PROVISIONS OF THE SUPREME COURT'S JULY 28, 2010 ORDER ENTERED IN THE NEW YORK TPR ACTION

94.    Dalia boldly states in her Motion to Dismiss that nothing contained in the Secret

Agreements violates the provisions of Justice Feinman's July 28, 2010 Order and Injunction[14] in

the New York TPR Action. Dalia is wrong.

95.    Justice Feinman issued a preliminary injunction and determined:

> Due deliberation having been had, and it appearing to this Court that a cause of
> action exists in favor of the plaintiff and against the defendants and that plaintiff
> is entitled to a preliminary injunction on the ground that the subject of the action
> is unique and that the defendants threaten to do an act in violation of the
> plaintiff's rights respecting the subject of the action, tending to render the
> judgment ineffectual, as set forth in the aforesaid decision, it is ...

> ORDERED that defendants, their agents, servants, employees, and all other
> persons acting under the jurisdiction, supervision, and/or direction of defendants,
> are enjoined and restrained, during the pendency of this action, from doing or
> suffering to be done, directly, or through any attorney, agent, servant, employee,
> or other person under the supervision or control of defendant or otherwise, any of
> the following acts: removing the Shares from the state, or otherwise transferring,
> selling, pledging, assigning, or otherwise disposing of the Shares.

(See TAP, **Exhibit "Z",** July 28, 2010 Order and Injunction at 31-32 (emphases added).

The "Shares" mean the "D&K Limited Partnership's 48 percent ownership interest in the

common stock of TPR Investment Associates." Id. at 2.

96.    Dalia violated the provisions of the July 28, 2010 Order and Injunction by

purporting to relinquish the Orly Trust's interest in TPR and transfer the Orly Trust's interest in

D&K.  In doing so, Dalia violated the provisions of the July 28, 2010 Order and Injunction

---

[14] The July 28, 2010 Order which is annexed as **Exhibit "Z"** to the TAP, amended the Court's prior Order dated
June 28, 2010, which is annexed as **Exhibit "V"** to the TAP. The July 28, 2010 Order , contains the same language
enjoining Dalia from taking any action with respect to Orly Trust's shares of TPR as contained in the June 28, 2010
Order.

which forbade her from "transferring, pledging, assigning or otherwise disposing of the [Orly Trust TPR] Shares. Id. at 31-32. A summary of Dalia's violation of the July 28, 2010 Order and Injunction appears immediately below.

| What the Court Ordered | What Dalia Did |
|---|---|
| ORDERED that defendants...are enjoined and restrained, during the pendency of this action, from...transferring,[15] selling, pledging, assigning, or otherwise disposing[16] of the [TPR] Shares.<br><br>**Exhibit "Z"-** July 28, 2010 Order and Injunction at 32 (emphases added) | ... the OG Trust [the Orly Trust] – irrespective of any claim made or asserted on its behalf by Orly Genger – hereby transfers to TPR its limited partnership interest in DK (the "DK Interest"), and disclaims[17] any interest in, any shares of or TPR, either directly or indirectly through DK (the "TPR Interest").<br><br>See **Exhibit "GG"** to TAP, TPR Settlement Agreement ¶ 1 (emphases added) See **Exhibit "HH"** to TAP, Amended TPR Settlement Agreement ¶ 1 |

97.     The above-referenced provisions of the TPR Settlement Agreements cannot be squared with either the language or plain intent of the July 28, 2010 Order and Injunction.   It is respectfully submitted that, based upon this provision alone, the Court can conclude that Dalia breached her fiduciary duty to Petitioner.

98.     Dalia laughably contends that nothing in the Secret Agreements:

> ...transferred, sold, pledged, assigned, or otherwise disposed of the [Orly Trust TPR] Shares, which in fact the Orly Trust no longer owned

---

[15] "transfer [trans-fûr] vt to carry, convey, to another place; to give, hand over, to another person, esp legally; ..." WEBSTER'S DICTIONARY & THESAURUS 401 (2005) (emphasis added); "transfer, n. 1. Any mode of disposing of or parting with an asset or an interest in an asset...The term embraces every method – direct or indirect, absolute or conditional, voluntary or involuntary – of disposing of or parting with property or with an interest in property..." BLACK'S LAW DICTIONARY 1216 (7th ed. 2000)

[16] "dispose [dis-pōź] vt to arrange; to influence-vi to settle a matter finally..." WEBSTER'S DICTIONARY & THESAURUS 111 (2005) (emphasis added); "disposition (dis-pə-zish-ən), n. 1. The act of transferring something to another's care or possession, esp. by deed or will; the relinquishing of property..." BLACK'S LAW DICTIONARY 382 (7th ed. 2000).

[17] "disclaim [dis-klām] vi . . . to renounce all legal claim to – n disclaimer, a denial of legal claim; a writing embodying this." WEBSTER'S DICTIONARY & THESAURUS 109 (2005).

and were owned by TPR by virtue of the foreclosure. Thus, contrary
to the TAP's assertion (e.g., ¶90 (b)), there was no violation of the
Supreme Court's June 28, 2010 Order. (Motion to Dismiss, Paragraph "38")

99.    Dalia's contention ignores the fact that the Supreme Court issued the July 28,

2010 Order and Injunction after the Sham TPR Foreclosure Sale, and to preserve the status quo.

Dalia (and the co-defendants to that action) were forbidden from any further transfer or disposal

of the Orly Trust's indirect interest in the shares of TPR until that Court - and not Dalia or her

co-defendants - determined who would own those shares.

> Here, where the family shares at issue are intertwined among various family entities,
> defendants have not offered sufficient evidence to show that the shares of TPR
> Investment or Trans-Resources owned by the Orly Genger 1993 Trust are not
> "unique" and should not be protected from transfer, sale or assignment until this
> litigation is ultimately decided....Accordingly, the motion for a preliminary
> injunction is granted.
>
> **See Exhibit "Z",** Id. at 14-15 (emphases added); see also id. at 32.

100.    Plainly, the TPR Settlement Agreements did exactly what the July 28, 2010 Order

and Injunction specifically prohibited.  The TPR Settlement Agreements purport to transfer the

Orly Trust's D&K interest; the TPR Settlement Agreements also purportedly dispose of the Orly

Trust's claimed interest in TPR's common stock by "settl[ing]...finally" the matter of the Orly

Trust's interest in TPR. See **Exhibit "GG",** TPR Settlement Agreement ¶ 1 and **Exhibit "HH",**

Amended TPR Settlement Agreement ¶ 1.  In other words, instead of deferring "until this

litigation is ultimately decided" (See **Exhibit "Z",** July 28, 2010 Order and Injunction at 14, 32),

Dalia has disposed of the Orly Trust's "direct[] or indirect[]" interest in TPR "irrespective of any

claim" (and, by extension, any "ultimate decision") by the New York Supreme Court in the New

York TPR Action.

101.    By its very nature and intent, the secret settlement entered into by Dalia (without

Petitioner!) violated the July 28 2010 Order and Injunction.  Simply put: the July 28, 2010 Order

31

and Injunction (which sought to preserve the status quo ownership of the TPR Shares until the

New York Supreme Court decided Petitioner's claims) cannot be squared with the TPR

Settlement Agreements (which sought to extinguish Petitioner's claims by violently rearranging

who owned the TPR Shares). It is respectfully submitted that if Dalia's actions in this regard are

not a violation of the July 28, 2010 Order and Injunction, then said Order is meaningless.

### DALIA VIOLATED THE PROVISIONS OF THE SUPREME COURT'S DECEMBER 28, 2011 ORDER ENTERED IN THE NEW YORK TRI ACTION

102.    Dalia alleges in the Motion to Dismiss that she did not violate the December 28,

2011 Order and Injunction (the "December 28, 2011 Order and Injunction") in the New York

TRI Action because the only injunctive relief entered by the Court in said action was solely

against TPR and the Trump Group. (See Motion to Dismiss, Paragraph "39")

103.    Specifically, Dalia alleges "That Order [the December 28, 2011 Order] did not

impose any restrictions on Dalia Genger." (See Motion to Dismiss, Paragraph "39").

104.    This is completely false. The December 28, 2011 Order and Injunction contains

the following injunctive language which enjoins Dalia from taking certain actions:

> "ORDERED that the portion of plaintiffs' motions seeking to enjoin the
> the defendants [which includes Dalia] from making demands upon and
> using or spending the proceeds derived from the purported sale by TPR
> Investment Associates, Inc. (TPR) to the Trump Group (as such term is
> defined above) of the Arie shares and the Orly Trust shares is granted,
> pending the determination by a court of competent jurisdiction the
> beneficial ownership of such shares;..."
> (See copy of December 28, 2011 Order and Injunction annexed as
> **Exhibit "AA"** to the TAP, Page "14")

105.    A summary of Dalia's violation of the December 28, 2011 Order and Injunction

appears immediately below:

| What Court Ordered | What Dalia Did |
|---|---|
| ORDERED that the portion of plaintiffs' [Arie | 1.2 Principal [$4,240,000] and all accrued and |

| What Court Ordered | What Dalia Did |
|---|---|
| and Orly Genger] motions seeking to enjoin the defendants [including Dalia, Sagi, and TPR] from making demands upon and using[18] or spending[19] the proceeds derived from the purported sale by TPR Investment Associates, Inc. (TPR) to the Trump Group (as such term is defined above) of the Arie shares and the Orly Trust shares is granted, pending the determination by a court of competent jurisdiction the beneficial ownership of such shares.<br><br>December 28, 2011 Order at 14 (emphases added) [Index No. 651089, Docket No. 210] | unpaid interest shall be due and payable on the date (the "Maturity Date") which is the earliest to occur of:<br>(a) November 1, 2012; or<br>(b) the date of Maker's receipt of the proceeds ("TRI Shares Proceeds") from the sale of shares (the "TRI Shares") of Trans Resources, Inc., a Delaware corporation ("TRI") either pursuant to the [Pedowitz] Interpleader action (the "Interpleader Action") ... or otherwise.<br><br>1.3 Notwithstanding anything to the contrary, to the extent that the Court awards the Trust any of the interpleaded funds, the Trust shall first apply such funds to the extent necessary to pay this Note, including all accrued and unpaid interest thereon, in full, before applying such funds for any other purpose.<br><br>See **Exhibit "DD"** to TAP, Amended Promissory Note §§ 1.2, 1.3 |
|  | Notwithstanding anything to the contrary, to the extent that the Court awards the Trust any of the interpleaded funds, the Trust shall first apply such funds to the extent necessary to pay this Note, including all accrued and unpaid interest thereon, in full, before applying such funds for any other purpose.<br><br>See **Exhibit EE** TAP, 200K Note § 1.3 |
|  | 3.2 On the terms set forth in the Amended and Restated Note . . . and the New Note [200K Note], and subject to the conditions set forth in this Agreement and in the Amended and Restated Note and the New Note, Manhattan |

---

[18] "use [ūz] *vt* to put to some purpose; to avail oneself of; to employ as an instrument; make use of (a person); to exercise; to deal with; treat; to consume; expend (often with up)." WEBSTER'S DICTIONARY & THESAURUS 416 (2005).

[19] "spend [spend] *vt* to expend, to pay out (money); to give, bestow, employ (eg one's energies) for any purpose;...*vi* to expend money." WEBSTER'S DICTIONARY & THESAURUS 362 (2005).

| What Court Ordered | What Dalia Did |
|---|---|
| | agrees to make, and the Trust agrees to accept, the Manhattan Loan. |
| | See **Exhibit "CC"**, Credit Agreement § 3.2 |

106.    Based upon the forgoing, Dalia's actions by entering into the Secret Agreements violated the provisions of the December 28, 2011 Order and Injunction because they constitute both a use and expenditure of the proceeds of the Orly Trust TRI Shares.

**DALIA'S ADDITIONAL BREACH OF FIDUCIARY DUTY
BY RELEASING THE PRIOR TRUSTEE, LEAH FANG, WITHOUT
ANY INVESTIGATION WHATSOEVER**

107.    Dalia recently testified at her deposition that her first act as Trustee was to try to release Sagi's sister-in-law, Leah Fang, from all possible claims (including fraud claims) while acting as prior Trustee of the Orly Trust.  Dalia testified that she did so without conducting any investigation whatsoever.  (See **Exhibit "JJ"**, Pages 75-78).  Dalia further testified that she did so without speaking with Orly or her counsel (See **Exhibit "JJ"**, Page 76-77).  Dalia further testified that she did so notwithstanding her acknowledgment that there was some issue between Orly and Leah, who was purportedly being "harassed" by Orly's attorneys in connection with her acting as Trustee of the Orly Trust.  (See **Exhibit "JJ"**, Pages 53-54).  Annexed collectively hereto as **Exhibit "OO"** are copies of the forgoing releases.

108.    Of course, Dalia never informed Surrogate Roth that she had tried to release Leah Fang from all claims, without any investigation or other basis for knowing what Leah had done as Trustee of the Orly Trust.  Unsurprisingly, what Leah Fang had done during her time as Trustee was assist her brother-in-law, Sagi, in defrauding the Orly Trust.  See TAP.

109.    All of the forgoing further demonstrates that Dalia has breached her fiduciary duties to Orly.  Indeed, rather than worry about protecting the best interests of the Orly Trust and

her daughter, Orly, as beneficiary, Dalia was more concerned with Sagi's sister-in-law's purported "nervous breakdown," allegedly caused by the "harassment" of Orly and Orly's attorneys. (See **Exhibit "JJ"**, Pages 53-54.)

## NOTICE OF THE TAP TO SAGI

110.   Dalia alleges in the Motion to Dismiss that Petitioner was required to serve a copy of the TAP upon the Sagi Genger Trust, as it is a contingent remainder beneficiary under the provisions of the Orly Trust in the event that Petitioner dies without children.

111.   David Parnes, the Trustee of the Sagi Trust was previously served with copies of the Petition to remove Dalia as Trustee of the Orly Trust and the Second Amended Petition by overnight delivery. The Sagi Trust has never appeared or never opposed the relief sought therein and accordingly has defaulted.

112.   Notwithstanding the Sagi Trust's forgoing default and expressly without prejudice to Petitioner's right to assert that the Sagi Trust is not entitled to any further notice, undersigned counsel caused Mr. Parnes to be served with a copy of the TAP on February 1, 2013, and will serve him with any subsequent papers filed by Petitioner in this proceeding via overnight delivery. Annexed hereto as **Exhibit "PP"** is a copy of the Affidavit of Service of the TAP upon David Parnes. Therefore, there is no further basis for Dalia to complain about same, especially in light of the fact that Sagi is well aware of what is presently transpiring in this Court through Dalia and her counsel.

## **CONCLUSION**

113.    For all the reasons set forth herein and previously set forth in the TAP, it is respectfully submitted that Petitioner has sufficiently set forth claims of relief in the TAP to immediately remove Dalia as Trustee of the Orly Trust and for the other relief requested therein, and that the Motion to Dismiss should be denied in its entirety.

RALPH HOCHBERG

Sworn to before me this
26th day, of February, 2013

Notary Public

TERESA SADUTTO CARLEY
NOTARY PUBLIC, STATE OF NY
REG. # 02SA6204737
NY COUNTY, EXP. 4-20-2013

36

*ORLY GENGER VS.*
*DALIA GENGER, et al*

*DALIA GENGER*
*December 13, 2012*



**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
**www.ELLENGRAUER.com**

*Original File 102224.TXT*
Min-U-Script® with Word Index

20-01187-jlg    Doc 1-19    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 20
Pg 91 of 150

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

## Page 1

1  SUPREME COURT OF THE STATE OF NEW YORK

2  COUNTY OF NEW YORK

3  ---------------------------------------x
ORLY GENGER in her individual capacity
and on behalf of the Orly Genger 1993
4  Trust (both in its individual capacity
and on behalf of D&K Limited Partnership),

5                                    Plaintiff,

6     - against -

7  DALIA GENGER, SAGI GENGER, LEAH FANG,
D&K GP LLC, and TPR INVESTMENT ASSOCIATES,
8  INC.,

9                                    Defendant

10  Index No. 100697/08

11  ---------------------------------------x

12

13              575 Lexington Avenue
               New York, New York
14
               December 13, 2012
15             10:37 a.m.

16

17          DEPOSITION of DALIA GENGER, taken

18  before Annette M. Montalvo, RMR, and a Notary

19  Public in and for the State of New York.

20

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
24             New York, New York 10022
                  212-750-6434
25                REF: 102224

## Page 2

1  A P P E A R A N C E S:

2

3  ZEICHNER ELLMAN & KRAUSE LLP

4  On Behalf of the Plaintiff,

5       575 Lexington Avenue

6       New York, New York  10022

7  BY:  YOAV GRIVER, Esq.

8       BRYAN D. LEINBACH, Esq.

9       212-223-0400

10       ygriver@zeklaw.com

11

12

13  PEDOWITZ & MEISTER LLP

14  On Behalf of the Witness,

15       570 Lexington Avenue

16       New York, New York  10022

17  BY:  ROBERT A. MEISTER, Esq.

18       MARISA H. WARREN, Esq.

19       212-403-7333

20       robert.meister@pedowitzmeister.com

21

22

23

24

25

## Page 3

1  A P P E A R A N C E S: (Cont'd)

2

3  PAUL S. ZILBERFEIN, Esq.

4  On Behalf of Leah Fang,

5  78 Old Orchard Road

6  New Rochelle, New York  10804

7  914-297-0110

8  paul@zilberfeinlaw.com

9

10

11  DUANE MORRIS LLP

12  On Behalf of TPR Investment Associates, Inc.,

13  1540 Broadway

14  New York, New York  10036

15     BY: JOHN DELLAPORTAS, Esq.

16  212-692-1012

17  dellajo@duanemorris.com

18

19

20     ALSO PRESENT:

21  SAGI GENGER

22  WALTER P. STASIUK, Wachtel Masyr & Missry

23

24

25

## Page 4

1  ------------------ I N D E X -------------------

2  WITNESS                    EXAMINATION BY        PAGE

3  DALIA GENGER               MR. GRIVER               6

4

5

6  Telephone call to Hon. Barbara Jaffe           134

7

8

9  ---------------- E X H I B I T S ---------------

10  GENGER        DESCRIPTION              FOR I.D.

11  Exhibit 1     Answer to the second          8

12                Amended complaint

13  Exhibit 2     Summons and second            8

14                Amended verified

15                Complaint

16  Exhibit 3     Dalia Genger amended          9

17                Responses to plaintiff's

18                Interrogatories

19  Exhibit 4     Leah Fang trust document     37

20  Exhibit 5     Instrument of acceptance     42

21                Of trustee

22  Exhibit 6     Release                      68

23  Exhibit 7     Document                     68

24  Exhibit 8     Document                     92

25  Exhibit 9     1/4/2008 memo               108

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

**Page 5**

1  ------------ E X H I B I T S (Cont'd) ------------
2  GENGER            DESCRIPTION         FOR I.D.
3  Exhibit 10        1993 promissory note and    149
4                    Pledge agreement
5  Exhibit 11        Final arbitration award     151
6  Exhibit 12        Letter                      162
7  Exhibit 13        Document                    168
8  Exhibit 14        Dalia Genger affidavit      173
9  Exhibit 15        1/31/2009 meeting and       209
10                   Agreement
11
12
13        (EXHIBITS RETAINED BY ATTORNEY GRIVER)
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 6**

1      (WHEREUPON, the witness was duly
2   sworn.)
3   D A L I A  G E N G E R, called as a witness
4   herein, having been first duly sworn by a
5   Notary Public of the State of New York,
6   was examined and testified as follows:
7
8   EXAMINATION
9      BY MR. GRIVER:
10  Q.  Would you state your name for the
11   record, please.
12  A.  Dalia Genger.
13  Q.  And what is your address?
14  A.  It is 200 East 65th Street, Apartment
15   32W.  The zip code is 10065.
16  Q.  Ms. Genger, you understand that you
17   have just been sworn to tell the truth?
18  A.  Yes.
19  Q.  And you understand that it is your
20   obligation to tell the truth today?
21  A.  Absolutely.
22  Q.  In order to do that, if I ask you a
23   question and you don't understand it, please let
24   me --
25  A.  Yes, I know the procedure.

---

**Page 7**

1      GENGER
2   Q.  You know the procedures?
3   A.  Yes.
4   Q.  Okay.  And if you answer the question,
5   I only want you to answer questions that you
6   understand; do you understand that?
7   A.  Yes.
8   Q.  What is your date of birth?
9   A.  June 15, 1946.
10  Q.  Which would make you how old today?
11  A.  66, I guess.
12  Q.  You are the trustee of the Orly Genger
13   trust?
14  A.  '93 yes.
15  Q.  Is that correct?
16  A.  It is correct.  Yes.
17  Q.  Do you suffer from any mental or
18   physical problem that would prevent you from
19   being a trustee to the Orly Genger trust?
20  A.  No.
21  Q.  And in this deposition, as we go
22   through it, whenever I speak about the Orly trust
23   or the trust, I am talking about the Orly Genger
24   1993 trust; do you understand?
25  A.  Absolutely.  Yes.

---

**Page 8**

1      GENGER
2   Q.  I ask you again, do you suffer from any
3   mental or physical problem that would prevent you
4   from --
5   A.  I said no.
6      MR. MEISTER: Wait until he finishes
7   the question.
8      BY MR. GRIVER:
9   Q.  Do you suffer from any mental or
10   physical problem that would prevent you from
11   telling the truth and testifying here today?
12  A.  No.
13      MR. GRIVER: Let's start with some
14   housekeeping matters.  I am going to hand the
15   witness three exhibits that have been premarked
16   as Dalia Exhibits 1 through 3.
17      Dalia Exhibit 1 is Dalia Genger's
18   answer to the second amended complaint in this
19   action.
20      (Dalia Exhibit 1, answer to the
21   second amended complaint, marked.)
22      MR. GRIVER: Dalia Exhibit 2 are copies
23   of the summons and second amended verified
24   complaint in this matter.
25      (Dalia Exhibit 2, summons and

---

Page 9

1    GENGER
2    second amended verified complaint,
3    marked.)
4        MR. GRIVER: And Dalia Exhibit 3 is a
5    copy of defendant Dalia Genger's amended
6    responses to plaintiff's interrogatories in this
7    action.
8        (Dalia Exhibit 3, Dalia Genger
9        amended responses to plaintiff's
10       interrogatories, marked.)
11       BY MR. GRIVER:
12   Q.  Ms. Genger, looking at Dalia Exhibit
13   1 --
14   A.  Yes.
15   Q.  -- your answer, is that your signature
16   on the last page?
17   A.  Yeah, I am sure it is there, if you say
18   so.  Yes, it is my signature.
19   Q.  And so you signed this answer under
20   oath on the 20th day of September 2010?
21   A.  September 30, right.  I won't remember,
22   but it says here, so.
23   Q.  If you look on the last page, because I
24   want to be precise, Ms. Genger.
25       MR. MEISTER: Are you asking her what

Page 10

1    GENGER
2    she remembers or are you asking her what it says?
3        BY THE WITNESS:
4    A.  I don't remember exactly what date, but
5    I believe you that that's the date.
6        BY MR. GRIVER:
7    Q.  When was the last time you saw this
8    answer to the second amended --
9    A.  When was the last time that I saw this
10   document?
11   Q.  Yes.
12   A.  I don't remember.
13   Q.  You didn't look at it in preparing for
14   your deposition today?
15   A.  I think that one should not be prepared
16   for deposition.  Isn't it true?
17   Q.  So you did nothing to prepare yourself
18   for this deposition?  You didn't look at any
19   documents, you didn't speak to your attorney?
20   A.  I did speak with my attorney.
21   Q.  And in the course of that did he show
22   you documents?
23   A.  He gave me some documents, but I didn't
24   look at them.
25   Q.  Okay.  If you look at what's been

Page 11

1    GENGER
2    marked as Exhibit 3?
3    A.  Exhibit 3?
4    Q.  If you look on the last page, page 12,
5    is that your signature?  As sworn by --
6    A.  Yeah, it is my signature.
7    Q.  And that's sworn by you on the 29th day
8    of March 2012?
9    A.  Right.
10   Q.  When was the last time you saw these
11   interrogatory responses?
12   A.  This document, actually, I read again
13   like two days ago.
14   Q.  Okay.  Do you have any changes to this
15   document that you want to make upon reading it
16   again two days ago?
17   A.  No, I don't think so.
18   Q.  Ms. Genger, you are the current trustee
19   of the Orly Genger trust?
20   A.  Can you repeat?
21   Q.  You are the trustee of the Orly Genger
22   trust?
23   A.  Yes.
24   Q.  And you have been the trustee of the
25   Orly Genger trust since January 4 of 2008; is

Page 12

1    GENGER
2    that correct?
3    A.  Right.
4    Q.  And Orly Genger is the lifetime
5    beneficiary of the trust, do you know that?
6    A.  Yes.
7    Q.  And do you understand that as trustee
8    you are supposed to protect the trust?
9    A.  Absolutely.
10   Q.  And as trustee, are you supposed to put
11   the interests of the trust ahead of your
12   interests?
13   A.  Obviously.
14   Q.  And as trust you are supposed to act in
15   the best interests of the trust?
16   A.  Of the trust.  Yes.
17   Q.  And as trustee you are supposed to put
18   the trust of -- the interests of Orly Genger as
19   beneficiary ahead of your own interests?
20   A.  I agree with you.
21   Q.  And, indeed, you are supposed to put
22   her interests ahead of the interest of anybody
23   else?
24   A.  Absolutely.
25   Q.  Have you done so?

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

**Page 13**

```
 1    GENGER
 2 A.  Yes, I believe I did.
 3 Q.  Every action that you have done as
 4    trustee --
 5 A.  Yeah.
 6 Q.  Every action that you have done as
 7    trustee you have put the interests of the trust
 8    and Orly Genger ahead of your interests?
 9       MR. ZILBERFEIN: Note my objection to
10    the form.
11       THE WITNESS: What did he say?
12       MR. MEISTER: He made a technical
13    objection. You can answer.
14       BY THE WITNESS:
15 A.  Yes, obviously, my responsibility as a
16    trustee was obviously the major thing that I was
17    responsible for, and any other -- no other thing
18    would change it, I mean.
19       BY MR. GRIVER:
20 Q.  And you have done so?
21 A.  Yes. I believe I did.
22 Q.  Who are the -- since January 4 of 2008
23    when you became trustee, who are the attorneys
24    for the trust?
25 A.  Well, I really don't remember in 2008.
```

**Page 14**

```
 1    GENGER
 2    I just know that Robert Meister is currently my
 3    attorney, but I am not sure when we began -- when
 4    I started to be his client.
 5 Q.  Just so the record is clear,
 6    Mr. Meister is the attorney for the Orly Genger
 7    trust?
 8 A.  Yes.
 9 Q.  You have retained him as attorney for
10    the trust?
11 A.  Yes.
12 Q.  Are there any other attorneys that you
13    have retained on behalf of the trust?
14 A.  I don't remember.
15 Q.  Does the law firm of Sullivan &
16    Worcester ring a bell?
17 A.  It rings a bell, but I don't remember
18    in connection to what.
19 Q.  Okay. When do you --
20 A.  Wait a minute. Maybe Delaware, I
21    think. I don't remember.
22 Q.  Okay. When did you hire Mr. Meister
23    and his law firm to represent the trust?
24 A.  I just said, I don't remember the date.
25 Q.  Do you remember the year?
```

**Page 15**

```
 1    GENGER
 2 A.  I believe it was 2008 or '09. I don't
 3    know.
 4 Q.  Before you hired Mr. Meister to be the
 5    attorney for the trust, had you met Mr. Meister
 6    before?
 7 A.  No.
 8 Q.  How did you find Mr. Meister?
 9 A.  He was recommended by another lawyer.
10 Q.  Do you remember the name of this other
11    lawyer?
12 A.  No.
13 Q.  Do you remember who this other lawyer
14    worked for?
15 A.  No.
16 Q.  How is it that you came to be talking
17    to this lawyer?
18 A.  I don't remember.
19 Q.  Was it a lawyer for Sagi?
20 A.  No. I don't think so.
21 Q.  Had Mr. Meister or his law firm ever
22    done work for you as an individual?
23 A.  Yes.
24 Q.  Before he was retained by you to
25    represent the trust?
```

**Page 16**

```
 1    GENGER
 2 A.  I don't think -- I don't remember it
 3    was before or after.
 4 Q.  Okay. What work was Mr. Meister
 5    retained on an individual basis for --
 6       MR. MEISTER: Objection.
 7    Attorney-client privilege. Instruct the witness
 8    not to answer.
 9       MR. ZILBERFEIN: I join that objection.
10       MR. GRIVER: Just on the topic?
11       THE WITNESS: On the topic --
12       MR. MEISTER: No.
13       MR. GRIVER: Okay.
14       BY MR. GRIVER:
15 Q.  Is Mr. Meister representing you on an
16    individual -- in an individual capacity?
17 A.  You just asked me that, and I said yes.
18 Q.  Okay. In what is Mr. Meister
19    representing you in an individual capacity?
20       THE WITNESS: Didn't you say that's a
21    question I should not answer?
22       MR. MEISTER: Well --
23       BY THE WITNESS:
24 A.  It is to fight a lawsuit that Orly has
25    against me, basically.
```

---

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 17

GENGER
BY MR. GRIVER:
3 Q.  And you are talking about this lawsuit?
4 A.  I don't know that.  There are so many,
5 I don't keep track of them.
6 Q.  In the lawsuit you have initiated
7 against Orly Genger, who is your lawyer?
8 A.  You mean in the divorce?
9 Q.  In the Dalia Genger versus Arie Genger
10 action?
11 A.  You mean the divorce, right?
12 Q.  Okay.  The reformation?
13 A.  The stipulation --
14 Q.  Yes.
15 A.  -- and all that?  Yeah.
16 MR. ZILBERFEIN: Note my objection to
17 the question.
18 BY MR. GRIVER:
19 Q.  Who is representing you in that?
20 A.  Yeah.  I am trying to remember the name
21 of the firm.  But I remember the name of one
22 lawyer, was a partner.  He's Kortmansky.  And the
23 other guy, I don't remember his name.
24 Q.  Okay.  Just so we are clear on the
25 record as we sit here today, Mr. Meister is

Page 18

GENGER
2 representing you both in an individual
3 capacity --
4 A.  That's true.
5 Q.  -- and on behalf of the trust?
6 A.  Uh-huh.
7 MR. ZILBERFEIN: "Uh-huh" means yes?  I
8 don't know.
9 THE WITNESS: What?
10 BY MR. GRIVER:
11 Q.  He is asking that you answer yes or no
12 instead of "uh-huh" or nodding your head.
13 A.  Yes.  Yes.
14 Q.  Do you get two sets of bills from --
15 strike that.
16 When Mr. Meister bills you for the work
17 that he or his firm does on behalf of the Orly
18 Genger trust, do you get a bill?
19 A.  I wish I didn't, but I do get.
20 Q.  Okay.  And it is a physical piece of
21 paper?
22 A.  Absolutely.  Yes.
23 Q.  And when Mr. Meister does work for you
24 as an individual, Dalia Genger, does he bill you
25 for those?

Page 19

GENGER
2 A.  Yes.
3 Q.  And do you get a physical piece of
4 paper?
5 A.  Yes.
6 Q.  Are the two pieces of paper different
7 or are they the same?
8 A.  Which two pieces of paper?
9 Q.  Does he bill you separately for the
10 work that he does on behalf of the trust?
11 A.  Yes.
12 Q.  So he makes --
13 A.  He says -- it says Dalia Genger
14 trustee, and, otherwise, it is just Dalia Genger.
15 MR. GRIVER: As representative of the
16 beneficiary of the Orly Genger trust, I would ask
17 for copies of all bills that you have provided to
18 Ms. Genger as trustee of the Orly Genger trust.
19 MR. ZILBERFEIN: I join in all
20 requests.
21 MR. GRIVER: Mr. Meister, any reaction,
22 yes, no, maybe?
23 MR. MEISTER: I have no reaction.  No.
24 Can you give us for a moment, we have a
25 filing issue.

Page 20

GENGER
2 MR. GRIVER: Off the record.
3 MR. MEISTER: Thank you.  Let's take a
4 minute or two recess.
5 (WHEREUPON, there was a short
6 interruption from 10:52 a.m. to
7 10:54 a.m.)
8 MR. GRIVER: Back on the record.
9 Can you read my last question back.
10 (WHEREUPON, the record was read by
11 the reporter as requested.)
12 BY MR. GRIVER:
13 Q.  Are you able to distinguish in your
14 mind when you seek Mr. Meister's advice on behalf
15 of the trust and when you seek his advice on an
16 individual basis?
17 A.  Yes.
18 Q.  Do you believe that having the same set
19 of attorneys is in the best interest of the Orly
20 Genger trust?
21 MR. ZILBERFEIN: Note my objection to
22 the form.
23 THE WITNESS: I'm sorry, I don't know
24 what --
25 BY MR. GRIVER:

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 21

1    GENGER
2  Q.  I will re-ask the question again.
3        Do you believe that having the same set
4    of attorneys representing the Orly Genger trust
5    and you individually is in the best interest of
6    the Orly Genger trust?
7  A.  Yes, I do, otherwise, I wouldn't do it.
8  Q.  Okay.  Do you believe that that is the
9    best way to protect the Orly Genger trust?
10 A.  Yes.
11 Q.  You have no concern whatsoever that
12   there may be a conflict between your interests
13   and the interests of the trust?
14 A.  No.
15      MR. ZILBERFEIN: Objection.
16 BY MR. GRIVER:
17 Q.  Who has been paying the invoices of the
18   Pedowitz and Meister law firm in connection with
19   its work on behalf of the trust?
20 A.  I am paying it.
21 Q.  You have paid every penny?
22 A.  Every penny.
23      MR. MEISTER: Well, may I just correct
24   the record there?
25      MR. GRIVER: Go ahead.

Page 22

1    GENGER
2      MR. MEISTER: Ms. Genger has paid for
3    work representing her as trustee.  There's a
4    small subset of bills which were rendered for
5    actions in which the trust, through its trustee,
6    was attempting to perfect or secure or get
7    recognized its interests as owners of TRI shares,
8    and those bills were paid for by the trust.
9      MR. GRIVER: That would be the Dalia
10   Delaware action that was stayed by Feinman?
11     MR. MEISTER: The Dalia Delaware action
12   that was stayed by Feinman, and also I believe
13   there were claims asserted in the Pedowitz and
14   Meister interpleader asserted against the Trump
15   Group on the one hand and TRI on the other.
16 BY MR. GRIVER:
17 Q.  Who has been paying the bills that are
18   sent to you directly as an individual?
19 A.  I was paying them.
20 Q.  Has anyone been providing you with
21   funds to pay those bills?
22 A.  No.
23 Q.  Have you been using trust assets to pay
24   those bills?
25 A.  Never.

Page 23

1    GENGER
2  Q.  Have you taken out any loans to pay
3    those bills?
4  A.  No.
5  Q.  Have you taken out any loans to pay the
6    bills that were incurred on behalf of the trust?
7      MR. MEISTER: Can I have it read back,
8    please.
9      (WHEREUPON, the record was read by
10     the reporter as requested.)
11     BY THE WITNESS:
12 A.  Actually, I don't know how to answer
13   this.
14     BY MR. GRIVER:
15 Q.  Do you not understand my question?
16 A.  No, I understand your question, if I
17   took any loans to pay bills.
18     Regarding the Orly trust, right?
19 Q.  Yes.
20 A.  Well, yeah, I think at the end there
21   was a loan made by -- to secure -- whatever
22   safety, there was a firm, a firm that -- the name
23   of which I can't recall exactly, but it is
24   Manhattan Safety whatever.
25 Q.  Okay.  Do you know how much money this

Page 24

1    GENGER
2    Manhattan company lent you?
3  A.  $200,000.
4  Q.  Other than the $200,000 loan from
5    Manhattan Safety Company, has anyone else paid
6    you in order to --
7  A.  Me as Dalia or me as trustee?
8  Q.  You as trustee.  Has anyone paid you as
9    trustee?
10 A.  No.
11 Q.  As we sit here today is Mr. Meister
12   representing you as trustee or is Mr. Meister
13   representing you on an individual basis?
14 A.  As trustee.
15 Q.  Not as an individual, but as trustee?
16 A.  Yeah.
17 Q.  Okay.  When Mr. Meister prepared you
18   for this deposition, was he preparing you as
19   trustee of the trust or was he preparing you as
20   Dalia the individual?
21 A.  Again, he didn't prepare me.
22     MR. ZILBERFEIN: Objection.
23     BY MR. GRIVER:
24 Q.  When you spoke to him before this
25   deposition and he showed you certain documents,

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 25

GENGER

1   GENGER
2   he was doing that as the lawyer for the trust --
3   A.   Trust, yes.
4   Q.   -- correct?
5       And what documents did Mr. Meister show
6   you?
7   A.   Basically, he gave me documents, but I
8   did never went over them except this one.
9       MR. MEISTER: Referring to Dalia
10  Exhibit 3.
11      THE WITNESS: Yes.  Exhibit 3.
12      BY MR. GRIVER:
13  Q.   Did he show you Dalia Exhibit 2, the
14  complaint in this case?
15  A.   He probably did, but I didn't read it.
16  Q.   What did Mr. Meister tell you?
17  A.   I don't remember.
18  Q.   When was this preparation session?
19  A.   A few days ago.
20  Q.   Well, today is Thursday.  Was it
21  yesterday, Wednesday?  Was it Tuesday?  Was it
22  Monday?
23  A.   I don't remember exactly what date it
24  was.
25  Q.   Was it this week?

---

Page 26

GENGER

1   GENGER
2   A.   Probably, but I don't remember that we
3   talked about it.
4   Q.   So as we sit here today on Thursday,
5   you can't remember if you met with Mr. Meister?
6   A.   I mean, I remember that I met with him,
7   but I don't remember that we went over this
8   paper.
9       MR. MEISTER: Referring to Dalia
10  Exhibit 2.
11      BY MR. GRIVER:
12  Q.   I am simply asking you, on what day did
13  you meet with Mr. Meister this week?
14  A.   I met with him Tuesday and briefly
15  yesterday.
16  Q.   Okay.  And for how long did you meet
17  with Mr. Meister on Tuesday?
18  A.   I don't know.  When I get the bill, I
19  probably will know.  But I can't think of it at
20  this time.
21  Q.   Well, was it the whole day --
22  A.   No, it wasn't the whole day.
23  Q.   Half a day?
24  A.   I can't afford a whole day.
25      What?

---

Page 27

GENGER

1   GENGER
2   Q.   Half a day?
3   A.   No.  It is like a couple of hours.
4   Q.   Okay.  So then simply say a couple of
5   hours.
6   A.   Please don't tell me what to say.
7   Q.   And Mr. Meister told you what in those
8   sessions?
9   A.   Well, he raised some points that I
10  might be asked.
11  Q.   And what were those?
12  A.   All this saying interrogatory questions
13  that I already answered.
14  Q.   So as we sit here today, you don't
15  remember what points you and Mr. Meister
16  discussed two days ago?
17  A.   I do remember.
18  Q.   So then please put it on the record and
19  tell me what points did you and Mr. Meister
20  discuss --
21  A.   I am telling you --
22  Q.   -- two days ago.
23  A.   -- we discussed this document, the
24  Exhibit 3 document.
25  Q.   Okay.  But what you said was that he

---

Page 28

GENGER

1   GENGER
2   went over topics that might be covered in this
3   deposition, correct?
4   A.   He told me what -- can you ask me
5   again.
6   Q.   Sure.
7       When you and Mr. Meister spoke two days
8   ago on Tuesday --
9   A.   Right.
10  Q.   -- you and he discussed topics that may
11  be raised in this deposition, correct?
12  A.   That's true, and those were the topics,
13  yeah.
14  Q.   Okay.  And could you please tell me
15  which topics you remember Mr. Meister raising on
16  Tuesday?
17  A.   Let me look what it says so I tell you.
18      MR. GRIVER: Let the record reflect
19  that the witness is looking through what's been
20  marked as Dalia Exhibit 3.
21      BY MR. GRIVER:
22  Q.   Ms. Genger, I am going to allow you to
23  look, but let me ask you, absent looking at that
24  document you have no independent recollection of
25  the topics that Mr. Meister went through with you

---

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 29

1    GENGER
2    two days ago?
3  A.  No, I do have a recollection.
4  Q.  Okay.  So please --
5  A.  Overall, it is how did I manage the
6    Orly trust.  In general, I mean.
7  Q.  Okay.  Any specific things that you did
8    that were discussed on Tuesday, to your
9    recollection?
10  A.  Any specifics?
11  Q.  Uh-huh.
12    THE WITNESS: I think it is a kind of
13    privileged information, don't you think, that
14    whatever I discussed with you --
15    BY MR. GRIVER:
16  Q.  Unless Mr. Meister instructs you not to
17    answer, you must answer my questions.
18  A.  No, I am just encouraging that.
19  Q.  Okay.
20  A.  The topics were, you know, as I became
21    a trustee, why did I become a trustee.
22  Q.  Okay.
23  A.  What is my purpose, what are my
24    responsibilities.  And, in general, that's what
25    it is.  What are my responsibilities.

---

Page 30

1    GENGER
2  Q.  Did he go over any of the actions you
3    have taken as trustee?
4  A.  Action and nonaction.
5  Q.  He went over actions and nonactions.
6    Which actions and nonactions did you
7    discuss with Mr. Meister two days ago?
8  A.  Well, the nonaction that was raised is
9    me not notifying Orly about the foreclosure on
10    the D&K LP note.
11  Q.  Okay.  And was that the only nonaction
12    that you and he discussed?
13  A.  As far as I remember.
14  Q.  And what actions did you and
15    Mr. Meister discuss two days ago?
16  A.  What actions?
17  Q.  Uh-huh.
18  A.  Well, to begin with -- no.
19    That the trust is suing the Trumps,
20    that's kind of the last action, in order to
21    clarify that Orly owns the shares.
22  Q.  The shares of TRI?
23  A.  TRI, yes.
24  Q.  So as we sit here today you believe as
25    trustee of the Orly Genger trust that Orly owns

---

Page 31

1    GENGER
2    the TI shares, the trust owns --
3  A.  The trust, yeah.
4  Q.  What other actions?
5  A.  What other actions?  I really don't
6    remember any other actions.
7  Q.  Okay.
8  A.  I mean, there were lawsuits and stuff,
9    where, really, my lawyers looked through to
10    answer, but I actively not do anything -- I mean,
11    I read it.  There were lawsuits, and I really am
12    not so familiar with all the lawsuits.  There
13    were many of them.
14  Q.  So you and Mr. Meister --
15  A.  So probably my lawyer answered.
16  Q.  Okay.  Just to be clear, so, yes, two
17    days ago you and Mr. Meister went and discussed
18    the other lawsuits that you are involved in?
19  A.  No.
20  Q.  So then --
21  A.  Actually, we didn't discuss any
22    lawsuits because --
23  Q.  I'm sorry, Ms. Genger, then what were
24    you trying to say to me?
25  A.  I am trying to say --

---

Page 32

1    GENGER
2    MR. MEISTER: Objection.  I don't
3    understand --
4    MR. GRIVER: You are not under oath.
5    BY MR. GRIVER:
6  Q.  What were you trying to say?
7    MR. MEISTER: I'm objecting to the form
8    of the question.  It's an incomprehensible
9    question.
10    MR. ZILBERFEIN: I join in the
11    objection.
12    MR. MEISTER: She is trying to answer
13    your question.  If you don't put a clear
14    question --
15    MR. GRIVER: Okay.  If she doesn't
16    understand the question, she can ask me to --
17    MR. MEISTER: She understood it.
18    MR. GRIVER: Then she should answer.
19    MR. MEISTER: She did.
20    MR. GRIVER: Excellent.
21    Can I have my question read back then.
22    (WHEREUPON, the record was read by
23    the reporter as requested.)
24    MR. MEISTER: Excuse me.  Waiving your
25    hand is not a question, Mr. Griver.

---

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

**Page 33**

GENGER
BY MR. GRIVER:
Q.  Can you answer that question?
MR. MEISTER: She's answered it.
Please put a fresh question.
MR. GRIVER: Can you read Ms. Genger's
answer.
(WHEREUPON, the record was read by
the reporter as requested.)
MR. MEISTER: I continue with the
objection. She's answered your question. You
asked her a question, and she's answered it.
BY MR. GRIVER:
Q.  Ms. Genger, what were you trying to
say?
MR. MEISTER: Objection. Instruct the
witness not to answer you. You are harassing
her.
MR. GRIVER: And, Robert, I am going to
ignore you for the rest of this deposition, but
please do not prevent your witness from answering
the questions from now on.
BY MR. GRIVER:
Q.  Ms. Genger, how many lawsuits --
MR. MEISTER: Mr. Griver, you are

---

**Page 34**

GENGER
entitled to make -- I am going to do my job.
BY MR. GRIVER:
Q.  Ms. Genger, how many lawsuits is the
trust involved in?
A.  I don't know. I can't count. Many
lawsuits. I don't know.
Q.  As trustee of the Orly Genger trust,
how many lawsuits is the Orly Genger trust
involved in?
A.  I didn't count.
Q.  Okay. Well, I would like you to count
now.
MR. DELLAPORTAS: Why don't you help
her by telling her how many times you have sued,
Yoav.
BY THE WITNESS:
A.  Yeah, because there are so many
lawsuits I can't keep track of it. I just know
that my resources are being reduced every month.
MR. DELLAPORTAS: Start by telling her
how many times you have sued it, Yoav. We are
here billing, wasting our time.
BY THE WITNESS:
A.  No, I really don't, because it is hard

---

**Page 35**

GENGER
to follow how many times my daughter sued me. I
mean, really.
BY MR. GRIVER:
Q.  How many times -- how many lawsuits has
the Dalia Genger -- excuse me.
How many lawsuits have you initiated as
trustee on behalf of the Orly Genger trust?
A.  The only lawsuit is against the Trumps,
the Trump Group. That's what I remember.
Q.  And how many other -- and as trustee of
the Orly Genger trust, you, as we sit here today,
don't know how many lawsuits that the trust is
involved in?
A.  No, I don't keep track of it.
Q.  When the bills come in from
Mr. Meister's law firm, do you review those
bills?
A.  I review the bottom line, yeah.
Q.  But you don't look to see --
A.  No, I do. I do.
Q.  Do you check to -- do you check to make
sure that he's charging you for cases that the
Orly trust is involved in?
A.  Yes. I mean --

---

**Page 36**

GENGER
Q.  Do you have -- do you keep a list?
A.  No, I don't keep a list.
Q.  Okay.
MR. MEISTER: May I ask what this has
to do with this lawsuit, Mr. Griver?
BY MR. GRIVER:
Q.  How do you keep track --
MR. MEISTER: Excuse me. I am asking a
question. What does this have to with --
BY THE WITNESS:
A.  I don't keep track. I told you
already.
MR. MEISTER: Dalia, wait a moment,
please.
MR. GRIVER: You can instruct her not
to answer or you can object to the question --
MR. ZILBERFEIN: Let's not talk over
each other. You are making the court reporter
nervous. One at a time. Please.
BY MR. GRIVER:
Q.  How do you keep track of the lawsuits
as the trustee of the Orly --
A.  I told you, I don't keep track of the
lawsuits.

---

ORLY GENGER VS.                                                        DALIA GENGER
DALIA GENGER, et al                                                  December 13, 2012

---

Page 37

1    **GENGER**
2  Q.  Ms. Genger, we are going to talk now
3    about your actions and inactions --
4  **A.  Okay.**
5  Q.  -- as the trustee of the trust.
6       You became trustee on January 4, 2008,
7    correct?
8  **A.  Right.**
9       **MR. GRIVER:** I have marked this as
10   Dalia Exhibit 4.
11      (Dalia Exhibit 4, Leah Fang trust
12      document, marked.)
13   **BY MR. GRIVER:**
14 Q.  Ms. Genger, do you recognize what I
15   have marked as Dalia Exhibit 4?
16 **A.  I need a minute to look at it.**
17   **Yes.**
18      **MR. MEISTER:** What's the pending
19   question?
20      **BY THE WITNESS:**
21 **A.  Yeah.**
22      **BY MR. GRIVER:**
23 Q.  And what is Dalia Exhibit 4?
24 **A.  What is it?**
25 Q.  What is it?

---

Page 38

1    **GENGER**
2  **A.  Instrument of resignation of trustee**
3    **and appointment of successor for trustee.**
4  Q.  And is that your signature --
5  **A.  No.**
6  Q.  -- on the document?
7  **A.  No. It Leah's signature.**
8  Q.  Were you aware of this?
9  **A.  That I was designated to be a trustee?**
10     **MR. ZILBERFEIN:** Object to the form.
11     **BY MR. GRIVER:**
12 Q.  Yes.
13 **A.  If I was aware that I was --**
14 Q.  Yes.
15 **A.  Obviously.**
16 Q.  On January 4, 2008?
17 **A.  Yes. This is when I became a trustee.**
18 Q.  You didn't become a trustee on -- you
19   didn't become a trustee on January 3 or January
20   2, correct?
21     **MR. ZILBERFEIN:** Object to the form.
22     **BY THE WITNESS:**
23 **A.  I don't remember exactly the dates, but**
24   **I know that I was a successor trustee.**
25     **BY MR. GRIVER:**

---

Page 39

1    GENGER
2  Q.  Now, were you aware at the time that
3    you accepted the trusteeship of the Orly Genger
4    trust that beneficiary Orly Genger did not wish
5    for you to be the trustee?
6       **MR. ZILBERFEIN:** Objection.
7       **MR. DELLAPORTAS:** Lack of foundation.
8       **BY THE WITNESS:**
9  **A.  I don't know what's going on here.**
10      **BY MR. GRIVER:**
11 Q.  Do you understand my question?
12 **A.  No, I don't understand why -- what the**
13   **remarks these gentlemen --**
14      **MR. MEISTER:** If other counsel make a
15   statement for the record, that's just for the
16   record, so you don't have to pay attention to it.
17   You just listen to Mr. Griver.
18      **THE WITNESS:** I didn't know that.
19      So what is the question again?
20      **BY MR. GRIVER:**
21 Q.  Ms. Genger, so we are clear from here
22   on out, if you don't understand a question, say
23   so, and I will repeat it or fix it.
24 **A.  Yeah, I don't remember right now the**
25   **question.  I just did not understand the fact**

---

Page 40

1    **GENGER**
2    **that these gentlemen here are objecting or not**
3    **objecting or whatever remarks he makes.**
4  Q.  His objections are for the record.
5  **A.  Okay. For the record. So I don't**
6    **really have to pay attention to it, right?**
7  Q.  You may or you may not. But you still
8    must answer any question I --
9  **A.  I didn't say I won't answer. I just**
10   **didn't know what --**
11 Q.  Here's my next question.
12 **A.  What is the question?**
13 Q.  At the time you accepted appointment as
14   trustee of the Orly Genger trust, were you aware
15   that Orly Genger did not wish for you to be
16   trustee?
17     **MR. ZILBERFEIN:** Objection.
18     **MR. DELLAPORTAS:** Lack of foundation.
19     **BY THE WITNESS:**
20 **A.  No. At the beginning I was not aware.**
21     **BY MR. GRIVER:**
22 Q.  Okay. When did you become aware that
23   Orly didn't wish for you --
24 **A.  When she start suing me to remove me**
25   **from being a trustee, and I don't remember what**

---

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 41

1     **GENGER**
2   date it was.
3   Q.  Well, before you accepted the
4   trusteeship, did you speak to Orly?
5     **MR. ZILBERFEIN:** Objection.
6     **BY MR. GRIVER:**
7   Q.  Did you speak to Orly about whether or
8   not you should accept the trusteeship?
9   **A.  No.**
10  Q.  Did you speak to anyone?
11    **MR. ZILBERFEIN:** Objection.
12    **BY THE WITNESS:**
13  **A.  Did I speak to anyone?**
14    **BY MR. GRIVER:**
15  Q.  Did you speak to anyone about whether
16  or not you should accept the trusteeship of the
17  Orly Genger trust?
18  **A.  Well, I --**
19    **MR. ZILBERFEIN:** Same objection.
20    **BY THE WITNESS:**
21  **A.  I did -- no, I don't remember.**
22    **BY MR. GRIVER:**
23  Q.  Okay.  How did you first become aware
24  that Leah Fang wished to appoint you as trustee
25  of the Orly Genger trust?

---

Page 42

1     **GENGER**
2     **MR. ZILBERFEIN:** Objection.
3     **BY THE WITNESS:**
4   **A.  Can you repeat that.**
5     **MR. GRIVER:** Can you repeat that,
6   please.
7     (WHEREUPON, the record was read by
8     the reporter as requested.)
9     **BY THE WITNESS:**
10  **A.  Obviously, when she nominated me.**
11    **BY MR. GRIVER:**
12  Q.  Okay.  And how did you become aware
13  that she had nominated you to become trustee?
14    **MR. ZILBERFEIN:** Objection.
15    **BY THE WITNESS:**
16  **A.  When I got the paper, I was aware of**
17  **it.**
18    **MR. GRIVER:** Let me have this marked as
19  Dalia Exhibit 5.
20    (Dalia Exhibit 5, instrument of
21    acceptance of trustee, marked.)
22    **BY MR. GRIVER:**
23  Q.  We have marked as Dalia 4 Leah's
24  resignation and appointment of successor, and we
25  have marked as Dalia 5 the instrument of

---

Page 43

1     **GENGER**
2   acceptance of trustee.
3   **A.  Right.**
4   Q.  Now, did Leah -- okay.
5     How did you get the document marked as
6   Dalia 5?
7     **MR. ZILBERFEIN:** Objection.
8     **BY THE WITNESS:**
9   **A.  I don't remember.**
10    **BY MR. GRIVER:**
11  Q.  Is it something that you typed up?
12  **A.  No.  I didn't type this up.**
13  Q.  So someone provided it to you to sign?
14  **A.  Obviously.**
15  Q.  And --
16  **A.  It is a lawyer probably.**
17  Q.  Seymour Fang is the notary public.  Do
18  you know who Seymour Fang is?
19  **A.  Yes.**
20  Q.  Does this refresh your recollection as
21  to where you were when you signed this document?
22  **A.  Where I was?**
23  Q.  Yes.
24  **A.  Physically?**
25  Q.  Yes.  Physically.

---

Page 44

1     **GENGER**
2   **A.  With the notary, of course.**
3   Q.  But do you know where?
4   **A.  Where?**
5   Q.  Yes.
6   **A.  The location?  I don't remember.**
7   Q.  Do you know when you signed this
8   document?
9     **MR. ZILBERFEIN:** Objection.
10    **BY THE WITNESS:**
11  **A.  Whenever it says here, January 4.**
12    **BY MR. GRIVER:**
13  Q.  Do you know what time of the day?
14  **A.  No, I don't remember that.**
15  Q.  Was it in the morning, was it at night?
16  **A.  I don't remember.**
17  Q.  No idea whatsoever?
18  **A.  No, I guess it wasn't midnight, but it**
19  **was during the day.**
20  Q.  But all you can remember is at some
21  time during the day --
22  **A.  Yeah.**
23  Q.  -- you signed this document?
24    Okay.  Before signing this document,
25  did you discuss whether or not you should be

---

ORLY GENGER VS.                                          DALIA GENGER
DALIA GENGER, et al                                      December 13, 2012

---

Page 45

1   GENGER
2   trustee with anyone?
3       MR. ZILBERFEIN: Objection.
4       BY THE WITNESS:
5   A.  If I should be a trustee?  Yeah,
6   actually, it is a big responsibility.
7       BY MR. GRIVER:
8   Q.  So before you signed this document when
9   you were considering whether or not to become
10  trustee of the Orly Genger trust, who did you
11  discuss --
12  A.  In general.  In general.
13      MR. ZILBERFEIN: Objection.
14      BY THE WITNESS:
15  A.  In general, I knew that a problem will
16  arise when Leah was going to resign as the
17  trustee of Orly Genger trust, and someone should
18  have been -- there was a need for someone to be a
19  trustee.
20      BY MR. GRIVER:
21  Q.  And who did you discuss this with?  Did
22  you discuss it with Leah, did you discuss it with
23  anyone?
24      MR. ZILBERFEIN: Objection.
25      MR. MEISTER: Objection.  Form.

---

Page 46

1   GENGER
2       BY THE WITNESS:
3   A.  Well, this is a family affair, okay.
4   So, obviously, there was a problem, and since it
5   is very difficult and impossible to find a
6   trustee or person that would serve as a trustee,
7   not being paid, and exposed to many lawsuits, I
8   couldn't find anyone else to do this job. So I
9   accepted this nomination in order to serve Orly
10  trust to the best of my ability.
11      BY MR. GRIVER:
12  Q.  Okay.  My question to you, Ms. Genger,
13  was simple.  While you were considering whether
14  or not to become the trustee of the Orly Genger
15  trust, did you speak about that to anybody; yes
16  or no?
17  A.  Yes, I did.
18      MR. ZILBERFEIN: Objection.
19      BY MR. GRIVER:
20  Q.  Who did you speak to?
21  A.  I speak to my family, including Sagi,
22  Rochelle, Leah, because it was a problem that we
23  had to resolve.
24  Q.  Did you speak with Elana?
25  A.  Yes.

---

Page 47

1   GENGER
2   Q.  And by Elana, I mean Sagi's wife Elana?
3   A.  That's the one, yeah.
4   Q.  So you spoke with Sagi, with Rochelle
5   Fang, with Leah Fang, and with Elana Genger?
6   A.  With my family, yes.
7   Q.  Did you speak to anyone else in your
8   family?
9   A.  I don't remember.
10  Q.  Did you speak with Orly?
11  A.  No, I did not speak with Orly.
12  Q.  Why didn't you speak with Orly?
13      MR. ZILBERFEIN: Objection.
14      BY THE WITNESS:
15  A.  I didn't speak with Orly because I was
16  sure that she would understand that her best
17  interest -- that I would serve to the best of my
18  ability her interest and take care of her needs,
19  as I did throughout my life as her mother.
20      BY MR. GRIVER:
21  Q.  I see.
22      So is that the only reason you didn't
23  speak to Orly is because you were confident --
24  A.  Yeah.
25  Q.  Is there a reason why you thought Sagi

---

Page 48

1   GENGER
2   would be uncomfortable about you being trustee so
3   you had to speak with him?
4   A.  No.  I didn't think that Sagi would be
5   uncomfortable or comfortable.
6   Q.  Then why did you speak with Sagi?
7   A.  Because the problem -- it was a problem
8   that somebody had to serve as a trustee.  So
9   that's why we discussed it.
10  Q.  Did Sagi come to you with the idea of
11  you serving as a trustee?
12  A.  What?  Again?
13  Q.  Did Sagi come to you with the idea of
14  you serving as trustee?
15  A.  No.
16      MR. ZILBERFEIN: Objection.
17      BY THE WITNESS:
18  A.  I volunteered.
19      BY MR. GRIVER:
20  Q.  Who did you volunteer to?
21  A.  I volunteered.  There was --
22      MR. ZILBERFEIN: Objection.
23      BY THE WITNESS:
24  A.  -- an opening, and I volunteered to
25  take the job.

---

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 49

1       GENGER
2       BY MR. GRIVER:
3  Q.   How did you know there was an opening?
4  A.   Because --
5       MR. ZILBERFEIN: Objection.
6       BY THE WITNESS:
7  A.   -- Leah was very frustrated, and she
8  wanted to resign. I was aware of it.
9       BY MR. GRIVER:
10 Q.   Okay. And why was Leah frustrated?
11      MR. MEISTER: Objection. Calls for the
12 operation of someone else's mind.
13      MR. ZILBERFEIN: Objection.
14      BY MR. GRIVER:
15 Q.   If you know.
16      MR. ZILBERFEIN: Join. I object.
17      MR. MEISTER: She can't possibly know.
18      BY MR. GRIVER:
19 Q.   You just testified that Leah was
20 frustrated. On what basis did you believe that
21 Leah was frustrated?
22 A.   I am assuming that she was being sued
23 and harassed, and then hospitalized as a
24 consequence of the conduct of Orly, my daughter.
25 Q.   So you mentioned before that there was

Page 50

1       GENGER
2  a problem that you were trying to resolve. What
3  was the problem?
4  A.   The problem was to find a trustee for
5  Orly trust.
6  Q.   Do you know what -- so at this time
7  Orly and Leah Fang were in conflict; is that
8  correct?
9       MR. MEISTER: Objection.
10      MR. ZILBERFEIN: Objection. I join.
11      MR. MEISTER: It is a legal conclusion.
12      MR. GRIVER: Objection noted.
13      THE WITNESS: Can you repeat the
14 question.
15      BY MR. GRIVER:
16 Q.   At the time you believe that Leah was
17 frustrated because you mentioned something about
18 a hospital, you mentioned something about a
19 conflict of some problem, why did Leah -- did you
20 have an understanding as to why Leah wished to
21 resign as trustee?
22      MR. ZILBERFEIN: At what point in time?
23      BY THE WITNESS:
24 A.   Why Leah -- you have to ask her. I
25 don't know.

Page 51

1       GENGER
2       MR. ZILBERFEIN: I object to the
3  question.
4       BY THE WITNESS:
5  A.   I don't know.
6       MR. GRIVER: Can I have the answer
7  back, please.
8       (WHEREUPON, the record was read by
9       the reporter as requested.)
10      BY MR. GRIVER:
11 Q.   At the time --
12      MR. GRIVER: Read my question back,
13 please.
14      (WHEREUPON, the record was read by
15      the reporter as requested.)
16      BY MR. GRIVER:
17 Q.   Did you have an understanding as to why
18 Leah wished to resign as trustee?
19      MR. MEISTER: She just answered that.
20 She said she doesn't know.
21      MR. ZILBERFEIN: Note my objection.
22      MR. MEISTER: Move on to your next
23 question, please.
24      BY MR. GRIVER:
25 Q.   Is that your answer, your full answer,

Page 52

1       GENGER
2  that you don't know?
3  A.   I do not know exactly, but I can assume
4  that a person who takes this kind of --
5  volunteers to take this job and ends up in the
6  hospital is not a happy person.
7  Q.   Okay.
8       MR. ZILBERFEIN: Note my objection to
9  any assumption.
10      BY MR. GRIVER:
11 Q.   You said Leah ended up --
12 A.   I assume. I assume.
13 Q.   That was your assumption at the time --
14 A.   Yeah.
15 Q.   -- that you took the --
16 A.   She was not happy.
17      MR. MEISTER: I am going to put this on
18 the record -- excuse me, Mr. Griver.
19 Dalia, you have to wait, please, until
20 Mr. Griver finishes his question because if you
21 start to talk at the same time --
22      THE WITNESS: Okay.
23      MR. MEISTER: -- the court reporter
24 can't get it.
25      BY MR. GRIVER:

ORLY GENGER VS.                                          DALIA GENGER
DALIA GENGER, et al                                      December 13, 2012

---

Page 53

```
 1      GENGER
 2  Q.  You said that Leah ended up in the
 3   hospital!
 4  A.  Yes.  As far as I know.  Yes.
 5  Q.  Did you have an understanding as to why
 6   Leah ended up in the hospital?
 7      MR. GRIVER: Objection.
 8      BY THE WITNESS:
 9  A.  Again, I assumed she had a nervous
10  breakdown.
11      BY MR. GRIVER:
12  Q.  Because of her --
13  A.  Harassment.
14  Q.  Okay.  Because of harassment.
15      Harassment by whom?
16  A.  I don't know.  I'm not a doctor.  I
17  really don't know why they hospitalized her.
18  Q.  Okay.  But you understood that Leah was
19   being harassed?
20  A.  Yes.
21      MR. ZILBERFEIN: Objection.
22      BY MR. GRIVER:
23  Q.  Harassed by whom?
24  A.  By Orly's lawyers.
25  Q.  In connection with Leah's functioning
```

---

Page 54

```
 1      GENGER
 2   as trustee of the trust?
 3  A.  I would assume so.
 4      MR. ZILBERFEIN: Objection.
 5      BY MR. GRIVER:
 6  Q.  And did you understand why Leah was
 7   being harassed?
 8  A.  No.
 9      MR. ZILBERFEIN: Objection.  Asked and
10  answered.
11      BY MR. GRIVER:
12  Q.  Did you understand why Orly's attorneys
13   were in conflict with Ms. Fang?
14      MR. ZILBERFEIN: Objection.
15      BY THE WITNESS:
16  A.  No.
17      BY MR. GRIVER:
18  Q.  Did you understand that Orly might not
19   be pleased with the work Leah was doing as
20   trustee?
21      MR. ZILBERFEIN: Objection.
22      BY THE WITNESS:
23  A.  I don't know exactly what Leah at the
24   time did, that Orly did not -- was not happy
25   with.
```

---

Page 55

```
 1      GENGER
 2      MR. GRIVER: Could you read back that
 3  answer, please.
 4      (WHEREUPON, the record was read by
 5      the reporter as requested.)
 6      MR. GRIVER: Mark that answer so I can
 7  come back to it.
 8      BY MR. GRIVER:
 9  Q.  How did you know that Leah was being
10  harassed?
11      MR. ZILBERFEIN: Objection.
12      BY THE WITNESS:
13  A.  How did I know?
14      BY MR. GRIVER:
15  Q.  Uh-huh.
16  A.  Well, she's part of my family, so I
17   guess it was known.
18  Q.  So she told you?
19  A.  Leah did not tell me that.
20  Q.  So Sagi told you?
21  A.  Actually, her mother told me.
22  Q.  Rochelle Fang?
23  A.  Right.
24  Q.  Did you ever pick up the phone to Orly
25   and say, "Orly, what's going on?"
```

---

Page 56

```
 1      GENGER
 2  A.  No.
 3  Q.  Did you ever try to get Orly's side of
 4   the story?
 5      MR. ZILBERFEIN: Objection.
 6      BY THE WITNESS:
 7  A.  No, I was not involved then in Orly's
 8   affair.
 9      BY MR. GRIVER:
10  Q.  Well, at that time you had no -- you
11   had no connection to Orly; is that right?
12      MR. ZILBERFEIN: Objection.
13      BY THE WITNESS:
14  A.  Right.  She tried to avoid me.
15      BY THE WITNESS:
16  Q.  Well, in this case, you chose not to
17   pick up the phone to ask her what was going on;
18   isn't that right?
19      MR. ZILBERFEIN: Objection.
20      BY THE WITNESS:
21  A.  After she never answered my calls and
22   my texts --
23      BY MR. GRIVER:
24  Q.  Did you ever --
25  A.  -- messages.
```

---

ORLY GENGER VS.                                                      DALIA GENGER
DALIA GENGER, et al                                                  December 13, 2012

---

Page 57

GENGER

2 Q.  Did you ever call Orly up to find out
3 what her disagreement was with Leah Fang?
4     MR. MEISTER: Objection.  Asked and
5 answered.
6     MR. ZILBERFEIN: Objection.
7     BY THE WITNESS:
8 A.  No.
9     BY THE WITNESS:
10 Q.  Did you ever go to Orly's house to talk
11 to her directly and ask her?
12 A.  No.
13     MR. ZILBERFEIN: Objection.
14     BY MR. GRIVER:
15 Q.  Did you ever send her an e-mail?
16     MR. ZILBERFEIN: Objection.
17     BY THE WITNESS:
18 A.  I don't remember.
19     BY MR. GRIVER:
20 Q.  Did you ever write her a letter saying:
21 "What's going on, Orly?  Why are you in conflict
22 with Leah Fang?"
23     MR. DELLAPORTAS: Object to form.
24     MR. ZILBERFEIN: Objection.
25     BY THE WITNESS:

---

Page 58

GENGER

2 A.  No, it wasn't my business, really.
3     MR. DELLAPORTAS: Object to form.  And
4 I just note for the record that Ms. Orly Genger
5 is not in attendance today.  You may proceed.
6     BY MR. GRIVER:
7 Q.  In sum or in substance, did you do
8 anything to try and understand what the conflict
9 was between Orly and Leah Fang?
10     MR. ZILBERFEIN: Objection.
11     BY THE WITNESS:
12 A.  No.
13     MR. ZILBERFEIN: Can you read back the
14 question and answer.
15     (WHEREUPON, the record was read by
16     the reporter as requested.)
17     BY MR. GRIVER:
18 Q.  Did Sagi discuss your appointment with
19 you prior to your acceptance of the appointment?
20 A.  Sagi discussed with me prior to my
21 appointment?
22 Q.  Uh-huh.
23 A.  Me taking the trusteeship, you mean?
24 Q.  Taking it or not taking it, did you
25 discuss whether -- did you discuss the potential

---

Page 59

GENGER

2 of you being appointed trustee with Sagi before
3 you accepted the appointment?
4     MR. ZILBERFEIN: Objection.
5     BY THE WITNESS:
6 A.  As far as I remember, I did discuss
7 with Sagi the fact that I am willing to
8 volunteer.
9     BY MR. GRIVER:
10 Q.  And do you recall anything else about
11 that conversation?
12     MR. ZILBERFEIN: Objection.
13     BY THE WITNESS:
14 A.  No.
15     BY MR. GRIVER:
16 Q.  Was there more than one conversation?
17 A.  I don't think so.
18 Q.  Did you talk to any lawyer before you
19 decided to accept the appointment as trustee?
20     MR. ZILBERFEIN: Objection.
21     BY THE WITNESS:
22 A.  I don't remember that.
23     BY MR. GRIVER:
24 Q.  Do you remember what it is -- strike
25 that.

---

Page 60

GENGER

2     Previously you testified that you
3 discussed whether or not you would become trustee
4 of the Orly trust with your family; do you recall
5 that testimony?
6     MR. ZILBERFEIN: Objection.
7     BY THE WITNESS:
8 A.  Yes, I said that I did discuss it
9 because the problem was that somebody has to
10 become a trustee.
11     BY MR. GRIVER:
12 Q.  Did you search for anybody else besides
13 yourself who might be willing to become a
14 trustee?
15     MR. MEISTER: Can I have the question
16     read back, please.
17     BY THE WITNESS:
18 A.  Yeah.  I was --
19     MR. MEISTER: Wait, wait.  I would like
20 to have the question read back.
21     (WHEREUPON, the record was read by
22     the reporter as requested.)
23     MR. ZILBERFEIN: Objection.
24     MR. MEISTER: Object to the form.
25     THE WITNESS: So after all this

---

Ellen Grauer Court Reporting Co. LLC                    (15) Page 57 - Page 60

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 61

1    GENGER
2  objection, what is the question?
3     MR. GRIVER: Repeat the question,
4  please.
5     BY THE WITNESS:
6  A.  Well, I was thinking about maybe some
7  kind of firm, an independent firm that might take
8  care of -- might take care of Orly Genger trust,
9  but eventually all the options led to the fact
10  that somebody like me that cares about Orly and
11  is willing to make a lot of sacrifices, I was
12  basically the only person left.
13     MR. GRIVER: Can you repeat my
14  question.
15     Because I am not sure that you answered
16  the question I asked.
17     THE WITNESS: Okay.
18     (WHEREUPON, the record was read by
19     the reporter as requested.)
20     BY THE WITNESS:
21  A.  I was thinking about some options.
22     BY MR. GRIVER:
23  Q.  Okay.  Did you do -- and you identified
24  that option as maybe a firm --
25  A.  An independent firm.  But then they

---

Page 62

1    GENGER
2  would want to be paid, and then, obviously, as a
3  trust, there are regular roles.
4  Q.  Do you do any investigation, did you --
5  I understand that you thought of it.
6     Did you do any action in order to see
7  if someone else --
8  A.  There was no point in doing any action.
9  Q.  Why was there no point?
10  A.  Because I don't think that anyone would
11  take such a job to be a trustee, to risk
12  resources and being sued constantly, and would
13  have Orly's interest in mind, as I did.
14  Q.  Okay.  I'm sorry.
15     Had Orly Genger sued anyone before
16  January 1 of 2008?
17     MR. ZILBERFEIN: Objection.
18     BY MR. GRIVER:
19  Q.  If you know.
20  A.  I don't know.  Really, I didn't --
21  Q.  You said -- I understand what you said.
22  But let's just -- so we are clear on the record,
23  you did not pick up the phone and talk to anyone
24  to see if they might be interested in serving as
25  the Orly Genger trustee?

---

Page 63

1    GENGER
2     MR. ZILBERFEIN: Objection.
3     MR. MEISTER: Except as previously
4  testified, Mr. Griver?
5     BY MR. GRIVER:
6  Q.  Did you pick up the phone and call
7  anybody to see if they would be willing to serve
8  as trustee?
9  A.  No, I didn't know anyone that would
10  potentially be able to do that because of the
11  history of this.
12  Q.  Did you task anyone --
13  A.  No, I didn't.
14  Q.  Did you task anyone with trying to find
15  somebody else besides yourself?
16     MR. ZILBERFEIN: Objection.
17     BY THE WITNESS:
18  A.  Didn't you ask me this question before,
19  if I tried to find anyone?
20     BY MR. GRIVER:
21  Q.  Did you ask someone else to try and
22  find anyone?
23  A.  No.  Because there's no point in doing
24  that.
25  Q.  Did you -- did Sagi look for anyone

---

Page 64

1    GENGER
2  besides yourself, do you know?
3  A.  I don't know what Sagi did or didn't
4  do.
5  Q.  Okay.  As far as you know, he didn't
6  look for anybody?
7     MR. ZILBERFEIN: Objection.
8     BY THE WITNESS:
9  A.  I do not know what Sagi did or didn't
10  do.
11     BY MR. GRIVER:
12  Q.  What about Rochelle Fang?
13  A.  I don't know what she did.
14     MR. ZILBERFEIN: Objection.
15     BY MR. GRIVER:
16  Q.  Did you ask Rochelle Fang if she did
17  anything?
18  A.  No, I didn't ask.
19  Q.  Did you ask Leah Fang if she looked for
20  anybody besides you?
21     MR. ZILBERFEIN: Objection.
22     BY THE WITNESS:
23  A.  No.  I don't remember.
24     BY MR. GRIVER:
25  Q.  Do you know who a Patricia Enriquez is?

---

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 65

1   GENGER
2 A.  Who?
3 Q.  Patricia Enriquez?
4 A.  I don't remember this name.
5 Q.  Were you aware that before you became
6   trustee Leah Fang had attempted to appoint a
7   Patricia Enriquez?
8 A.  I was not aware. I don't know who it
9   is.
10 Q.  Were you --
11     MR. ZILBERFEIN: Objection.
12     BY MR. GRIVER:
13 Q.  Were you aware of the fact that
14   Patricia Enriquez attempted to accept the
15   position of Orly Genger trustee?
16     MR. ZILBERFEIN: Objection.
17     BY THE WITNESS:
18 A.  No, I was not aware of it.
19     BY MR. GRIVER:
20 Q.  Tell me everything you remember about
21   your conversations with Rochelle Fang in
22   connection with whether or not you would or would
23   not become trustee of the Orly trust.
24     MR. ZILBERFEIN: Objection.
25     BY THE WITNESS:

---

Page 66

1   GENGER
2 A.  I don't remember exactly what we talked
3   about, but we did discuss the fact that there is
4   a need to fulfill -- to fill up the position of
5   being a trustee in Orly trust.
6     BY MR. GRIVER:
7 Q.  And tell me all you can remember about
8   your conversations with Leah Fang regarding
9   whether or not you would become trustee of the
10   Orly trust.
11     MR. ZILBERFEIN: Objection.
12     MR. MEISTER: Was that Leah Fang?
13     MR. GRIVER: Yes. Leah Fang.
14     THE WITNESS: Again, can you repeat the
15   question.
16     MR. GRIVER: Sure.
17     BY MR. GRIVER:
18 Q.  Tell me everything that you can recall
19   about your conversations with Leah Fang about
20   whether or not you would serve as trustee of the
21   Orly trust.
22     MR. ZILBERFEIN: Objection.
23     BY THE WITNESS:
24 A.  I don't remember what exactly we
25   discussed.

---

Page 67

1   GENGER
2     BY MR. GRIVER:
3 Q.  Can you please tell me everything you
4   recall about your conversations with Elana
5   Genger?
6 A.  It is all the same kind of
7   conversation, there is a problem and somebody has
8   to be found.
9 Q.  Did you have any conversations with,
10   let's say, Leah's attorneys?
11 A.  No, I never talked to Leah's attorneys.
12   I don't know who they are.
13 Q.  Did you review any documents before you
14   became trustee in order to determine whether or
15   not you would become trustee?
16     MR. ZILBERFEIN: Objection.
17     BY THE WITNESS:
18 A.  I don't remember.
19     BY MR. GRIVER:
20 Q.  You don't recall looking -- asking for
21   any balance sheets or asking for any
22   communications between Leah and Orly, anything
23   like that? You don't remember anything like
24   that?
25     MR. ZILBERFEIN: Objection.

---

Page 68

1   GENGER
2     BY THE WITNESS:
3 A.  No, I don't remember.
4     MR. GRIVER: Let me have this marked as
5   Dalia Exhibit 6.
6     (Dalia Exhibit 6, release,
7   marked.)
8     MR. GRIVER: Let me have this marked as
9   Dalia Exhibit 7.
10     (Dalia Exhibit 7, document,
11   marked.)
12     BY MR. GRIVER:
13 Q.  Let's take a look at Dalia 7.
14 A.  Dalia 7?
15 Q.  Yes.
16 A.  Let me look at it first.
17 Q.  Okay.
18 A.  It is very unclear, this copy. I don't
19   think I have ever seen this document before.
20 Q.  And on about December and January of
21   December of 2007 and January 2008 --
22     MR. MEISTER: I am going to object
23   because you blurred it and I couldn't understand.
24     THE WITNESS: Yeah.
25     MR. GRIVER: I will start over.

---

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 69

GENGER
2 MR. MEISTER: Thank you.
3 BY MR. GRIVER:
4 Q. So at the time that you accepted
5 appointment as trustee of the Orly Genger trust,
6 you were not aware that a Ms. Patricia Enriquez
7 had accepted to act as successor trustee --
8 MR. ZILBERFEIN: Objection.
9 BY MR. GRIVER:
10 Q. -- just a few weeks before?
11 MR. ZILBERFEIN: Objection.
12 BY THE WITNESS:
13 A. I was not aware of it.
14 BY MR. GRIVER:
15 Q. Okay. I take it that Patricia Enriquez
16 is not a member of the Genger family?
17 A. I don't think so.
18 Q. You think she is or you think she
19 isn't?
20 A. She isn't.
21 Q. Okay. Let's look at Dalia 6, please.
22 Do you recognize this document?
23 A. Yes.
24 Q. What is this document?
25 A. It is giving a release to Leah.

Page 70

GENGER
2 Q. Is this one of the documents that
3 Mr. Meister showed you on Tuesday or Wednesday of
4 this week?
5 A. No.
6 Q. When was the last time you saw this
7 document?
8 A. When? At the date that it was written.
9 Q. Okay. Who wrote this document?
10 MR. ZILBERFEIN: Objection.
11 BY THE WITNESS:
12 A. I would assume my lawyer. I didn't
13 write this.
14 BY MR. GRIVER:
15 Q. Well, I thought you testified that you
16 had not run your acceptance as trustee by any
17 lawyer?
18 MR. ZILBERFEIN: Objection. It doesn't
19 make it --
20 BY MR. GRIVER:
21 Q. Am I correct?
22 MR. ZILBERFEIN: It is not related to
23 the document.
24 MR. GRIVER: Can I have the question
25 read back, please.

Page 71

GENGER
2 (WHEREUPON, the record was read by
3 the reporter as requested.)
4 THE WITNESS: So, again, what is the
5 question?
6 BY MR. GRIVER:
7 Q. You had previously testified that you
8 had not discussed with any attorneys whether or
9 not you would become trustee of the Orly trust;
10 do you recall that testimony?
11 A. Yes.
12 Q. So you have just said now that -- I
13 understand your attorney drafted this on December
14 29, 2007.
15 MR. ZILBERFEIN: Objection.
16 MR. MEISTER: She said her attorney.
17 BY MR. GRIVER:
18 Q. Do you know which attorney drafted
19 this?
20 A. I don't remember which one.
21 Q. Was this -- when you are talking about
22 an attorney, are you talking about an attorney
23 for you?
24 MR. ZILBERFEIN: Note my objection.
25 She's already stated she doesn't know which

Page 72

GENGER
2 attorney drafted this.
3 BY THE WITNESS:
4 A. I don't remember which one, really.
5 BY MR. GRIVER:
6 Q. How do you know an attorney drafted
7 this?
8 A. Because I wouldn't be able to write
9 something like that.
10 Q. Okay. Could this be something that
11 Leah wrote?
12 MR. ZILBERFEIN: Objection.
13 BY THE WITNESS:
14 A. No, for sure not Leah.
15 BY MR. GRIVER:
16 Q. Leah is an attorney, isn't --
17 A. It is to Leah Fang.
18 Q. What?
19 A. It is addressed to Leah Fang.
20 Q. Okay.
21 A. So she didn't write it.
22 MR. ZILBERFEIN: Objection.
23 BY MR. GRIVER:
24 Q. Is Leah Fang an attorney?
25 A. As far as I know, she is.

Page 73

```
 1     GENGER
 2  Q. Could she have -- well --
 3  A. She didn't write it. That's for sure.
 4  Q. How do you know?
 5     MR. ZILBERFEIN: Objection.
 6     BY THE WITNESS:
 7  A. Because I said, a lawyer wrote it, but
 8   it is not Leah Fang.
 9     BY MR. GRIVER:
10  Q. And on what basis do you say that a
11   lawyer wrote it but not Leah Fang?
12     MR. ZILBERFEIN: Objection.
13     BY THE WITNESS:
14  A. Because it is addressed to her, and I
15   don't believe that Leah would do such a thing.
16     BY MR. GRIVER:
17  Q. It has on the top of it, it says Dalia
18   Genger; do you see that?
19  A. Yes.
20  Q. Is that an indication it came from your
21   computer?
22  A. I don't know if it is my computer or my
23   lawyer's computer.
24  Q. Okay. When you say your lawyer's
25   computer, which lawyer --
```

Page 74

```
 1     GENGER
 2  A. That I told you. I don't remember --
 3  Q. You don't remember his name?
 4  A. -- which lawyer was at that time my
 5   lawyer.
 6  Q. Now, is that your signature on the
 7   bottom?
 8  A. Yes.
 9  Q. And do you understand what this
10   document does or purports to do?
11     MR. ZILBERFEIN: Objection.
12     BY MR. GRIVER:
13  Q. To your understanding, what does this
14   document do?
15     MR. ZILBERFEIN: Same objection.
16     BY THE WITNESS:
17  A. Identifies a release, Leah.
18     BY MR. GRIVER:
19  Q. Okay. And it releases Leah to, it
20   says, the maximum extent permissible under law;
21   do you see that?
22  A. What?
23  Q. This document says that it releases
24   Leah and holds her harmless, quote, to the
25   maximum extent permissible under the law and the
```

Page 75

```
 1     GENGER
 2   trust agreement; do you see that?
 3  A. I don't see it, but I believe it is
 4   there.
 5  Q. Look on the third line.
 6     MR. MEISTER: Can I point it out?
 7     BY THE WITNESS:
 8  A. It doesn't matter. I believe you.
 9     BY MR. GRIVER:
10  Q. So you were -- on December 29, 2007,
11   you were okay with releasing Leah to the maximum
12   extent permissible under the law in the trust
13   agreements, correct?
14     MR. ZILBERFEIN: Objection.
15     BY THE WITNESS:
16  A. Yeah.
17     BY MR. GRIVER:
18  Q. At the time that you attempted to
19   release Leah to the maximum extent permissible
20   under the law and the trust agreements, did you
21   have any idea what Leah had or had not done as
22   trustee during her time as the trustee of the
23   Orly Genger trust?
24  A. I just don't remember exactly what she
25   had or has not done.
```

Page 76

```
 1     GENGER
 2  Q. Okay. You did no investigation before
 3   you signed this document as to what Leah had or
 4   had not done; isn't that correct?
 5     MR. ZILBERFEIN: Objection.
 6     BY THE WITNESS:
 7  A. I did -- I really don't remember
 8   exactly, but I know that at the time I didn't
 9   think that Leah has done anything harmful to
10   Orly.
11     BY MR. GRIVER:
12  Q. Okay.
13     MR. MEISTER: Is this a good time to
14   take a break?
15     MR. GRIVER: No. Let me finish this.
16   I understand. Let me finish this set of
17   questions.
18  Q. You said, "At the time I did not think
19   Leah had done anything harmful to Orly"?
20  A. Yeah.
21  Q. But you did no investigation to find
22   that out, did you?
23     MR. ZILBERFEIN: Objection.
24     BY THE WITNESS:
```

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 77

1    GENGER
2  A.  I don't know how you are defining
3  "investigation."
4      BY MR. GRIVER:
5  Q.  You didn't talk to Orly, did you?
6  A.  No.
7      MR. ZILBERFEIN: Objection.
8      BY MR. GRIVER:
9  Q.  Did you talk to Orly's lawyers?
10 A.  No.  I already said that.
11 Q.  Did you have your lawyer talk to Orly's
12 lawyers to do an investigation?
13     MR. ZILBERFEIN: Objection.
14     BY THE WITNESS:
15 A.  I don't remember.
16     BY MR. GRIVER:
17 Q.  Do you remember doing anything in sum
18 or in substance to determine what Leah had or had
19 not done before you sent her this exoneration on
20 December 29, 2007?
21 A.  I know that at that time, at the time,
22 I was aware of some of the conflict that -- I
23 mean, some of the conflicts that have happened,
24 and I didn't find anything wrong with whatever
25 Leah did.

Page 78

1    GENGER
2  Q.  And what did Leah do?
3  A.  I don't remember exactly what it was.
4  Q.  Okay.  And so in finding out what Leah
5  did or did not do, the most you did was talk to
6  Leah?
7  A.  Yeah.
8      MR. ZILBERFEIN: Objection.
9      BY MR. GRIVER:
10 Q.  And based on what Leah said, you
11 exonerated her, held her harmless and indemnified
12 her for whatever she may or may not have done?
13     MR. ZILBERFEIN: Objection.
14     BY MR. GRIVER:
15 Q.  Isn't that correct?
16     MR. MEISTER: To the maximum extent
17 permitted by law and the trust agreement.
18     MR. ZILBERFEIN: Objection.
19     BY MR. GRIVER:
20 Q.  You can answer.
21 A.  I indemnified her, yes.
22 Q.  Let me ask you this:  How is that in
23 the trust's best interest to exonerate someone
24 and indemnify them?  You understand what
25 "indemnify" means?

Page 79

1    GENGER
2  A.  Tell me what it means.
3  Q.  "Indemnify" means that if someone sues
4  her, you pay her bills.  That's what "indemnify"
5  means.  Did you understand that at the time you
6  indemnified her on December 29, 2007?
7      MR. ZILBERFEIN: Objection.
8      BY THE WITNESS:
9  A.  I don't understand what --
10     MR. ZILBERFEIN: Objection to the
11 definition of the attorney's --
12     BY THE WITNESS:
13 A.  I was not aware of this legal term.
14     BY MR. GRIVER:
15 Q.  Then let's be clear.
16     At the time you signed this document
17 did you have an understanding of what
18 "indemnification" meant?
19 A.  No.
20 Q.  None whatsoever?
21     MR. ZILBERFEIN: Objection.
22     BY THE WITNESS:
23 A.  No.  I thought that this was a standard
24 way of writing this kind of release.
25     BY MR. GRIVER:

Page 80

1    GENGER
2  Q.  Who told you that it was a standard way
3  of writing this release?
4      MR. ZILBERFEIN: Objection.
5      BY THE WITNESS:
6  A.  I said I thought.  I didn't say
7  somebody told me.
8      BY MR. GRIVER:
9  Q.  Okay.  What was the basis of your
10 thinking that?
11     MR. ZILBERFEIN: Objection.
12     BY THE WITNESS:
13 A.  Because we have many cases, that there
14 is a standard way of expressing objection or
15 other things, legal things, that it is a kind of
16 standard way of writing things.
17     BY MR. GRIVER:
18 Q.  Understood.
19     But what, to your understanding, at the
20 time that you signed this memo of December 29,
21 2007, that's marked as Dalia 6, what was your
22 understanding of what an indemnification was?
23 A.  That she's not -- that she cannot be
24 sued, I guess.  She's released from any
25 wrongdoing.

ORLY GENGER VS.                                              DALIA GENGER
DALIA GENGER, et al                                        December 13, 2012

Page 81

1      GENGER
2  Q.  Okay.  Let's look at it.  It says the
3  indemnification includes any actions by the
4  beneficiaries and the agents, including any
5  expenses or injury incurred on your part, in
6  connection with service.  Do you see that part?
7  It is right here.
8  A.  I am sure it is there.  Yes.  I see.
9  So what's the question?
10 Q.  Okay.  So what does "indemnification"
11 mean?
12     MR. MEISTER:  Objection.
13     MR. ZILBERFEIN:  Objection.
14     BY MR. GRIVER:
15 Q.  To your understanding --
16     MR. MEISTER:  She's answered it.  Move
17 on to your next point.  And better than that,
18 let's take a break.
19     MR. ZILBERFEIN:  I join in the break.
20     MR. DELLAPORTAS:  If we are taking a
21 break, I need to put a statement on the record
22 because we have now gone for 90 minutes, and we
23 have yet to ask any questions relevant to the D&K
24 action.
25     MR. GRIVER:  Excuse me.

Page 82

1      GENGER
2      MR. DELLAPORTAS:  I am putting a
3  statement on the record.
4      MR. GRIVER:  You are not putting a
5  statement on the record.
6      MR. DELLAPORTAS:  I am putting a
7  statement on the record.  This has been noticed
8  for a deposition in the D&K action.  We have not
9  had a single question relevant to the D&K action.
10     MR. GRIVER:  Call the judge.
11     MR. DELLAPORTAS:  Do not interrupt me.
12     MR. GRIVER:  You are interrupting my
13 questioning of this witness.
14     Can I have the question read back to
15 me.
16     MR. DELLAPORTAS:  There is no question
17 pending.
18     THE WITNESS:  You know what?  I am
19 going to leave if this is how this --
20     MR. MEISTER:  Dalia --
21     MR. GRIVER:  Read my question back,
22 please.
23     BY MR. GRIVER:
24 Q.  My question is, on May -- on
25 December --

Page 83

1      GENGER
2      MR. MEISTER:  He started putting a
3  statement on the record.
4      MR. DELLAPORTAS:  No one is asking a
5  question until I finish putting my statement on
6  the record.
7      BY MR. GRIVER:
8  Q.  On December 29 --
9      MR. DELLAPORTAS:  Please give me the
10 courtesy of speaking --
11     BY MR. GRIVER:
12 Q.  On December 29 --
13     MR. DELLAPORTAS:  Counsel, I will keep
14 speaking until she puts on the record what I
15 said.
16     MR. GRIVER:  Put everything he says on
17 the record because I want to go -- that's fine.
18     THE COURT REPORTER:  Okay.  But only
19 one person can speak at a time.
20     MR. GRIVER:  Can I see if a question is
21 open on the record.
22     MR. DELLAPORTAS:  No one is doing
23 anything until I speak.
24     THE COURT REPORTER:  There was a
25 question, and then there was an objection.

Page 84

1      GENGER
2      MR. MEISTER:  There was an objection
3  because the question was answered.  Do you want
4  to go back?  Do you want to waste time?
5      MR. GRIVER:  She did not answer the
6  question.
7      THE WITNESS:  You did ask me that.
8      MR. GRIVER:  Did you answer the
9  question?
10     THE WITNESS:  Yes, I did.
11     MR. MEISTER:  Yes, she did.
12     Now let's take our break.
13     MR. DELLAPORTAS:  Anyone can break, and
14 I am putting this on the record.
15     We have been going for -- put this on
16 the record, because in fairness to opposing
17 counsel, I think I need to put this on the record
18 so they are on notice.
19     We have gone for 90 minutes.  None of
20 the questions have related to the D&K action.
21 The discovery seems to be geared to, what I can
22 gather, to issues relevant to the surrogate court
23 action.  That's fine, but we are not here for
24 that action.
25     I am not counsel to that action.  This

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 85

GENGER

1   GENGER
2   deposition hasn't been crossed noticed in that
3   action, and yet my client is incurring legal
4   fees. We intend to apply once this case is over
5   for reimbursement of those legal fees based on
6   the misrepresentation from Orly's counsel that
7   the questioning of this deposition was going to
8   be related to the D&K action.
9      If Orly's counsel wishes to question
10  Ms. Genger about matters as to why she was hired,
11  why she didn't resign, so and so forth, that
12  should have been noticed in the surrogate court
13  action.
14     We are here based on a
15  misrepresentation, the fees are increasing, and I
16  would strongly recommend to Ms. Orly Genger's
17  counsel that he may move on to some topics
18  relevant to the discussion because, as I said,
19  the bill is increasing.
20     MR. ZILBERFEIN: I join.
21     MR. MEISTER: Now I would like to take
22  a break.
23     MR. ZILBERFEIN: Before you start, I
24  want to join in counsel's statement, and I agree
25  100 percent with what he says. And I don't think

---

Page 86

GENGER

1   GENGER
2   that it is proper for you to be asking this line
3   of questioning, especially since this has not
4   been noticed properly.
5      MR. GRIVER: I would direct both
6   counsel to read count 4 of the operative
7   complaint, it is right there, as Exhibit 2, to
8   Dalia's deposition.
9      BY MR. GRIVER:
10  Q. Ms. Genger --
11     MR. MEISTER: No, no. We are taking a
12  break.
13     MR. GRIVER: Stop.
14     MR. MEISTER: You are not asking any
15  more questions.
16     MR. GRIVER: I have -- you are
17  asking --
18     MR. MEISTER: Do you want me to urinate
19  on your carpet here, Counsel? We have been going
20  for an hour and a half. We are taking a break.
21     MR. GRIVER: You have two counsel.
22     BY MR. GRIVER:
23  Q. How is this --
24     MR. MEISTER: No. She's stepping out.
25     MR. GRIVER: All right. You called for

---

Page 87

GENGER

1   GENGER
2   a break.
3      MR. DELLAPORTAS: Just for the record,
4   I see nothing in count 4 which has any relevance
5   to any of the questions.
6      MR. GRIVER: I would note that
7   Mr. Meister and the other counsel are not to
8   discuss the substance of this deposition during
9   the break.
10     MR. MEISTER: I would note that I need
11  to know where the men's room is.
12     MR. ZILBERFEIN: Is there a gag order?
13     (WHEREUPON, a recess was had from
14     12:07 p.m. to 12:19 p.m.)
15     (WHEREUPON, Attorney Lance Harris
16     entered the deposition
17     proceedings.)
18     BY MR. GRIVER:
19  Q. Ms. Genger, we are back on record. You
20  are still under oath. Do you understand that?
21  A. Yes.
22  Q. Ms. Genger, how is it in the Orly
23  trust's best interest for you as trustee to
24  exonerate someone without knowing exactly what
25  they did or did not do?

---

Page 88

GENGER

1   GENGER
2   A. I believed that Leah did her best to
3   protect Orly.
4   Q. For example, at the time that you
5   signed this, on December 29, 2007, what is it
6   that you believed that Leah did as trustee of the
7   trust?
8   A. I don't remember what was at that time.
9   Q. Now, if you look at Dalia Exhibit 6, it
10  is dated December 29, 2007, correct?
11  A. Yes.
12  Q. Were you trustee of the Orly Genger
13  trust on December 29, 2007?
14  A. Not yet, officially.
15  Q. Okay.
16  A. Wasn't it January?
17  Q. 2008?
18  A. Right.
19  Q. So you weren't even trustee?
20  A. Right.
21  Q. So the first thing you did even before
22  you became trustee was immediately to release
23  Leah to the maximum extent permissible under the
24  law and the trust agreement?
25     MR. MEISTER: Objection.

---

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 89

1   GENGER
2   BY THE WITNESS:
3 A.  Well, if I signed it --
4   BY MR. GRIVER:
5 Q.  If you signed it?
6 A.  I spoke with whatever lawyer I had at
7   the time, and --
8   MR. MEISTER: Objection if you are
9   going to discuss what you discussed with your
10  lawyer.  Say you spoke with a lawyer.
11  BY THE WITNESS:
12 A.  I spoke with my lawyer.
13  MR. MEISTER: Don't reveal what you
14  said to him or her.
15  BY MR. GRIVER:
16 Q.  Did you speak to him in connection with
17  you becoming trustee of the Orly trust?
18 A.  Yeah.
19 Q.  Did you sign this document as trustee
20  of the 1993 Orly Genger trust?
21 A.  Did you -- can you repeat.
22 Q.  Yes.
23     You signed this document as trustee of
24  the 1993 Orly Genger trust, correct?
25 A.  Yes.  And I did so because I had

Page 90

1   GENGER
2   discussion with my lawyer.
3 Q.  Okay.  And --
4   MR. ZILBERFEIN: Note my objection to
5   this line of questioning.
6   BY MR. GRIVER:
7 Q.  And what did the lawyer tell you?
8   MR. ZILBERFEIN: Can I get my objection
9   in, please.
10     The document, although it has a date on
11  the top, it doesn't have a date near the
12  signature.  We don't know when the witness signed
13  this.
14  BY MR. GRIVER:
15 Q.  Did you -- what did the lawyer tell
16  you?
17  MR. MEISTER: Objection.  Instruct her
18  not to --
19  BY THE WITNESS:
20 A.  I can't tell you.
21  MR. GRIVER: You are going to instruct
22  her not to answer for something that she --
23  BY THE WITNESS:
24 A.  No, I know that I cannot --
25  MR. MEISTER: Dalia.

Page 91

1   GENGER
2   MR. GRIVER: Let's set the foundation
3   for this then.
4   BY MR. GRIVER:
5 Q.  You purported to sign this memo as
6   trustee of the trust?
7 A.  Right.  But I don't know which date,
8   really.
9 Q.  You spoke to the lawyer, as trustee of
10  the trust, correct?
11  MR. MEISTER: No.  Objection.  She
12  hasn't said in what capacity she spoke to the
13  lawyer.
14  MR. GRIVER: Why don't you --
15  BY MR. GRIVER:
16 Q.  Answer my question.
17  MR. GRIVER: No speaking objections.
18  Thank you.
19  BY THE WITNESS:
20 A.  What was the question again?
21  BY MR. GRIVER:
22 Q.  When you spoke to the lawyer, it was in
23  order to get this document that you would sign as
24  trustee of the trust?
25  MR. MEISTER: Object on the grounds of

Page 92

1   GENGER
2   attorney-client privilege.  Instruct the witness
3   not to answer.
4   BY MR. GRIVER:
5 Q.  Okay.  Is that your signature on the --
6 A.  Yeah.  And it was noted there is no
7   date.
8 Q.  So as we sit here today, you don't know
9   whether you signed this document when you were
10  actually trustee?
11 A.  I'm not sure.  I'm not -- I don't
12  remember if I was or wasn't.
13  MR. GRIVER: Okay.  Let me have this
14  marked as Dalia 8.
15     (Dalia Exhibit 8, document,
16     marked.)
17  BY MR. GRIVER:
18 Q.  Before you signed the document that was
19  marked as Dalia 6, previous document, had you
20  instructed anyone -- before you signed this
21  document marked as Dalia 6, the December 29, 2007
22  exoneration --
23 A.  Can you repeat the question now.
24 Q.  Yes.
25     Before you signed the document marked

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 93

GENGER

1    as Dalia 6, the December 29, 2007 exoneration,
2
3    did you task anybody with conducting any
4    investigation as to what Leah did or did not do
5    as trustee?
6  A.  I don't remember.
7  Q.  You don't remember doing so?
8  A.  I don't remember, yeah, if I did or I
9    didn't do.
10  Q.  Do you have any documents at home
11   showing the results of any investigation of Leah
12   Fang's activities on or about the time of Dalia
13   6?
14  A.  I have to look.  I didn't look at my
15   files.
16  Q.  Providing --
17  A.  I don't remember now if I do or I don't
18   have any documents.
19  Q.  You remember providing documents in
20   this case?
21  A.  If it was needed, I am sure my lawyer
22   told me to do so.
23  Q.  Have you looked through your files as
24   trustee as part of providing documents in this
25   case?

Page 94

GENGER

1
2  A.  I don't remember.  I don't remember if
3    I did so or not.
4    MR. GRIVER:  Could you tag that,
5    please.
6    BY MR. GRIVER:
7  Q.  Let's look at what's been marked as
8    Dalia 8.
9  A.  Yes.
10  Q.  Dalia 8 is a memo dated January 4,
11   2008.
12  A.  Yes.
13  Q.  And this is you reiterating your
14   indemnification letter to you of December 29,
15   2007; do you see that?
16  A.  Right.
17    MR. MEISTER:  Objection to form.
18    BY MR. GRIVER:
19  Q.  Do you remember the exact date that you
20   signed what's been marked as Dalia 8?
21  A.  No.
22  Q.  Do you remember whether you signed this
23   document before or after you signed what's been
24   marked as Dalia Exhibit 5?
25  A.  Exhibit 5?  So can you repeat the

Page 95

GENGER

1
2    question.
3  Q.  Yes.
4    Do you remember if you signed Exhibit 8
5    before Exhibit 5?
6  A.  No.
7  Q.  Do you remember if you signed Exhibit 8
8    after Exhibit 5?
9  A.  No.
10  Q.  As we sit here today it is possible
11   that you signed -- strike that.
12    At some point you became involved in a
13   surrogate proceeding where Orly attempted to have
14   you removed as trustee; do you remember that?
15  A.  Generally, I know that she did that.
16  Q.  At any time did you let Surrogate Roth
17   know about the documents that have been marked as
18   Dalia 6 and Dalia 8?
19  A.  You have to ask my lawyer because I
20   don't know.
21    MR. DELLAPORTAS:  At this point --
22   objection.  Are you seriously --
23    BY THE WITNESS:
24  A.  All day we are going to talk about this
25   point?

Page 96

GENGER

1
2    MR. DELLAPORTAS:  This is pretty
3    explicitly related to the surrogate court action.
4    You brought us all here, Yoav.  Can you ask some
5    questions about this case?  You didn't cross
6    notice this.
7    MR. GRIVER:  If you would look to your
8    left, you see a representative of Leah Fang.
9    Leah Fang has moved to dismiss the D&K note
10   action based on these releases.
11    MR. DELLAPORTAS:  Great.
12    MR. ZILBERFEIN:  That motion is
13   pending --
14    MR. GRIVER:  Accordingly, this is part
15   of this case, and I can ask --
16    MR. ZILBERFEIN:  That's fully
17   submitted, and the arguments are moot at this
18   point.
19    MR. LEINBACH:  There's no CPLR section
20   whatsoever that prevents us from taking discovery
21   on any point of law which has been raised in this
22   case, either by us or by you.
23    MR. GRIVER:  All right.  Repeat my
24   question.
25    MR. DELLAPORTAS:  We are going to

ORLY GENGER VS.                                    DALIA GENGER
DALIA GENGER, et al                               December 13, 2012

---

Page 97

1     GENGER
2   make --
3     THE WITNESS: You know --
4     MR. GRIVER: Repeat my question.
5     BY MR. GRIVER:
6  Q.  I will ask my question again.
7       At any time, to your knowledge, did you
8   let Surrogate Roth know about the documents that
9   have been marked as Dalia 6 and Dalia 8?
10      MR. ZILBERFEIN: Note my objection to
11  this whole line of questioning regarding the
12  surrogate court proceeding.
13      MR. DELLAPORTAS: Same objection.
14      BY THE WITNESS:
15 A.  I don't remember this because my
16  lawyer, whoever it was at the time, I am sure
17  submitted the papers that were -- the judge asked
18  for.
19      BY MR. GRIVER:
20 Q.  What consideration, if any, did the
21  trust receive in exchange for the documents that
22  have been marked as Dalia 6 and Dalia 8?
23      MR. DELLAPORTAS: Object to form.
24      MR. ZILBERFEIN: Objection.
25      MR. DELLAPORTAS: Lack of foundation.

---

Page 98

1     GENGER
2   Objection.
3     BY THE WITNESS:
4  A.  What was the direction?
5     MR. ZILBERFEIN: Assumes facts that
6   have not been established.
7     BY THE WITNESS:
8  A.  I don't understand the question.
9     BY MR. GRIVER:
10 Q.  What did the trust get in exchange for
11  giving Leah a maximum release and
12  indemnification?
13      MR. DELLAPORTAS: Same objection.
14      MR. ZILBERFEIN: Objection.
15      BY THE WITNESS:
16 A.  I'm not aware of any -- not aware of
17  any consideration with the process.
18      BY MR. GRIVER:
19 Q.  Okay. Look, please, at what's been
20  marked as Dalia Exhibit 1.
21 A.  Exhibit 1.
22      Are we going to finish this today or
23  next week? I mean, because there is a limit of
24  how much I can sit here.
25 Q.  Now, this is -- now you verified this

---

Page 99

1     GENGER
2   answer?
3     MR. MEISTER: Objection. Asked and
4   answered.
5     BY MR. GRIVER:
6  Q.  Do you understand what a verification
7   is? If you look at the last page of Exhibit 1.
8  A.  Yes. "Verified" means that I accepted
9   whatever it is.
10 Q.  And you accepted it under oath?
11 A.  Okay.
12 Q.  And, in other words, you swore to the
13  truth of the allegations except -- to the truth
14  of the statements in your answer, except for
15  those matters which you say were upon information
16  and belief?
17 A.  I guess.
18 Q.  Before you signed that verification,
19  did you read your answer?
20 A.  I did.
21 Q.  Did you work on it with your attorney?
22 A.  At the time.
23 Q.  I note that it is signed by Robert
24  Meister.
25      Did you also --

---

Page 100

1     GENGER
2  A.  I said at the time.
3  Q.  Okay. Look at paragraph 5 of your
4   answer, please.
5  A.  Here? Where? I don't know what page
6   it is.
7  Q.  It is on page 1.
8  A.  Deny the allegation, you mean?
9  Q.  Yes. It says, quote: Denies the
10  allegations contained in paragraph 5 of the
11  complaint, except denies knowledge or information
12  sufficient to form a belief as to the acts of
13  Leah Fang.
14      Do you see that?
15 A.  Let me look at this. I have to
16  remember what was -- denies the allegation
17  contained in paragraph 5 of the complaint.
18 Q.  Uh-huh.
19 A.  Where is the complaint?
20 Q.  Okay. That's Exhibit 2. That's
21  Exhibit 2 to your deposition. It is right there
22  in front of you. And there's actually on page 3.
23      MR. MEISTER: It's actually on page
24  numbered 3.
25      THE WITNESS: Page number 3.

---

Ellen Grauer Court Reporting Co. LLC                    (25) Page 97 - Page 100

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 101

1     GENGER
2     BY MR. GRIVER:
3  Q.  So --
4  A.  So paragraph 5 here.
5  Q.  Yes.
6     MR. MEISTER: Is there a question?
7     THE WITNESS: Let me read it first.
8     MR. GRIVER: Mr. Meister, please let
9  your client read paragraph 5.
10     BY THE WITNESS:
11  A.  That I colluded?
12     BY MR. GRIVER:
13  Q.  This is Leah Fang colluded.  Well, you
14  and Leah, yes.
15  A.  That I colluded with Leah?  I am just
16  reading this, telling you right now that there
17  was no collusion whatsoever.  I didn't collude
18  with anyone and --
19     MR. MEISTER: Wait until there's a
20  question, please.
21     BY MR. GRIVER:
22  Q.  I want you to please concentrate on
23  when it talks about the acts of Leah Fang,
24  because --
25     MR. MEISTER: I'm sorry, where what

Page 102

1     GENGER
2  talks about --
3     BY MR. GRIVER:
4  Q.  In response to paragraph 5 of the
5  complaint, you specifically denied under oath
6  knowledge or information sufficient to form a
7  belief as to the acts of Leah Fang.  I am asking
8  you to read about the facts of Leah Fang so we
9  may talk about Leah Fang's acts as to --
10  A.  I didn't investigate, as you know, and
11  it was being recorded that I didn't investigate
12  Leah Fang, as far as I remember.
13  Q.  So as of September 28, 2010 when you
14  signed the answer under oath, you still did not
15  have knowledge or information sufficient for you
16  to form a belief as to the acts of Leah Fang;
17  isn't that correct?
18     MR. MEISTER: As to the allegations in
19  paragraph 9 concerning the acts of Leah Fang.
20     BY MR. GRIVER:
21  Q.  Sufficient to form a belief as to the
22  acts of Leah Fang.
23     MR. MEISTER: As alleged.
24     MR. ZILBERFEIN: Every act she has ever
25  done?  Is that what you --

Page 103

1     GENGER
2     MR. MEISTER: Come on.
3     THE WITNESS: I am going to go.
4  Really.
5     MR. ZILBERFEIN: Objection to the
6  ludicrous question on behalf of counsel.
7     MR. MEISTER: Noted.  Objection to
8  form.
9     MR. GRIVER: I will ask again.
10     MR. ZILBERFEIN: I object to this whole
11  line of questioning.
12     MR. GRIVER: Noted.
13     MR. ZILBERFEIN: The witness has
14  already stated that she didn't remember if she
15  did an investigation or not, and now you are
16  trying to get a different answer.
17     THE WITNESS: Why I am sitting on this
18  so long?  Really.
19     MR. MEISTER: Wait for the question.
20     BY MR. GRIVER:
21  Q.  As of September 28, 2010, did you have
22  knowledge or information --
23  A.  If it says that I didn't have, I didn't
24  have.
25     MR. MEISTER: Excuse me.  Wait until he

Page 104

1     GENGER
2  finishes the question.
3     BY MR. GRIVER:
4  Q.  As we --
5     MR. MEISTER: Mr. Griver, stop when I
6  am speaking or we are walking out of here.  Is
7  that clear?
8     MR. GRIVER: You may object to my
9  questions.
10     MR. MEISTER: That's right.  And when I
11  am in the middle of objecting and instructing,
12  you keep your mouth shut.  Is that clear?
13  Okay.  Ms. Genger, wait until he
14  finishes his question before you start to speak
15  and then answer the question to the best of your
16  ability.  This is not a contest in speaking.
17     THE WITNESS: Okay.
18     BY MR. GRIVER:
19  Q.  Ms. Genger, between the time you became
20  trustee of the Orly Genger trust to the date that
21  you signed your answer --
22  A.  September 30.
23  Q.  -- September 28 of 2010, had you
24  instructed anyone as trustee of the Orly Genger
25  trust to investigate the actions or inactions of

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 105

1   GENGER
2   Leah Fang?
3   A.  I don't remember if I did.
4   Q.  Okay.  As trustee of the Orly Genger
5   trust, between January 4 of 2008 and September 28
6   of 2010, did you investigate in any way the
7   actions or inactions of Leah Fang as trustee?
8       MR. ZILBERFEIN: Objection.  Asked and
9   answered.
10      BY THE WITNESS:
11  A.  Is there a question hanging in the air?
12      MR. GRIVER: Yes.
13      Can you read the question back, please.
14      (WHEREUPON, the record was read by
15      the reporter as requested.)
16      BY THE WITNESS:
17  A.  I don't remember.
18      BY MR. GRIVER:
19  Q.  Look, please, at paragraph 75 of both
20  the complaint, which is Exhibit 2 to your
21  deposition, and your answer, which is Exhibit 1
22  to your deposition.
23  A.  Wait.  Again, what is it?
24      MR. MEISTER: I will get it for you.
25      BY MR. GRIVER:

Page 106

1   GENGER
2   Q.  Ms. Genger --
3   A.  Can I just -- I don't know what you are
4   talking about.  I have to -- where should I be
5   looking now?
6   Q.  We will get to that in a second.
7       Before then, just to finish up, have
8   you at any time between January 4, 2008 -- strike
9   that.
10      Have you at any time investigated the
11  actions or inactions of Leah Fang or instructed
12  anybody to do that investigation?
13  A.  I don't remember.
14  Q.  So as we sit here today, you still
15  don't have sufficient information or belief as to
16  what Leah did or did not do as trustee?
17      MR. MEISTER: As alleged in paragraph 5
18  of the complaint?
19      MR. GRIVER: In any way.
20      MR. ZILBERFEIN: Note my objection.
21      BY THE WITNESS:
22  A.  I don't know where you are getting --
23      BY MR. GRIVER:
24  Q.  Okay.  I will make it simple for you.
25  I will withdraw the question and make it simple.

Page 107

1   GENGER
2   A.  Okay.
3   Q.  As we sit here today, you don't know
4   what Leah Fang did or did not do as trustee of
5   the Orly trust, do you?
6   A.  At the time I did, but now I don't
7   remember.  And that's the truth.
8   Q.  Well, when you say at that time --
9   A.  At the time, subsequently when I became
10  a trustee of Orly trust, I don't know when I was
11  aware that -- of her actions.  But today if you
12  ask me, I don't remember what it was.
13  Q.  Well, so you have no recollection as
14  you sit here today what her actions were?
15  A.  Yeah.
16  Q.  Okay.  Have you ever heard of the
17  D&K -- have you ever heard of the D&K agreement,
18  what we have called the D&K agreement?
19      MR. MEISTER: Objection.  Form.
20      BY THE WITNESS:
21  A.  D&K agreement?
22      MR. MEISTER: I don't see how she can
23  answer --
24      BY MR. GRIVER:
25  Q.  Have you ever heard of a document

Page 108

1   GENGER
2   signed by Leah Fang as trustee dated November 22,
3   2007?
4   A.  I don't remember.  I don't know.
5       MR. GRIVER: I am going to mark as
6   Exhibit 9 the amended and restated limited
7   partnership agreement of D&K limited partnership,
8   signed by Leah Fang as sole trustee of the 1993
9   Orly Genger trust on the 22nd day of November
10  2007. I note for the record that this is also
11  Exhibit 19 to the complaint.
12      (Dalia Exhibit 9, 1/4/2008 memo,
13      marked.)
14      BY MR. GRIVER:
15  Q.  Looking -- seeing this document, does
16  that refresh your recollection, have you ever
17  seen this document before?
18  A.  Amended and restated --
19  Q.  And my question is --
20  A.  I have to read it because everything
21  looks the same to me.
22      MR. GRIVER: Mark the time, please.
23      (Time noted: 12:45 p.m.)
24      BY THE WITNESS:
25  A.  What is this word here?

ORLY GENGER VS.                                                                    DALIA GENGER
DALIA GENGER, et al                                                              December 13, 2012

Page 109

1    **GENGER**
2    **BY MR. GRIVER:**
3  Q.  What page are you on?
4  A.  3.
5  Q.  Upon the written election to terminate
6    made by the general firm at any time.
7        Ms. Genger, you have read the first two
8    pages.  Does this refresh your recollection as to
9    whether you have ever seen this document?
10  Ms. Genger?
11      MR. MEISTER:  First two pages?
12      MR. GRIVER:  Yes.
13      **BY MR. GRIVER:**
14  Q.  Based on reading the first two pages of
15    this document, do you recall ever seeing this
16    document before?
17  **A.  I can't say that it refreshes my**
18  **memory.**
19  Q.  And so far you don't recall ever seeing
20    this document before?
21  **A.  I do not recall.  I might have seen it,**
22  **but I don't recall if I did.**
23      MR. MEISTER:  Do you want her to
24    continue to read the rest of the 16-page
25    document?

Page 110

1    **GENGER**
2      MR. GRIVER:  I do.  As trustee of the
3    trust, I think it is incumbent upon her to do so,
4    provided she hasn't done so already.
5      **BY MR. GRIVER:**
6  Q.  Ms. Genger, what page are you on now?
7  A.  4.  It takes me a long time.
8  Q.  I understand.  As we got to -- now
9    having read four pages of what's been marked as
10    Dalia 9, does this refresh your recollection as
11    to whether you have ever seen this document?
12  **A.  As I answered you before, I might have**
13  **seen it, but right now, I can't say for sure --**
14  Q.  Okay.
15  **A.  -- that I did.  I imagine that I did.**
16  Q.  Did you ever --
17      MR. MEISTER:  Objection.  Move to
18    strike.
19      **BY MR. GRIVER:**
20  Q.  Did you ever speak --
21      MR. MEISTER:  Mr. Griver, when I am
22    speaking you have to --
23      MR. GRIVER:  You move to strike.
24      MR. MEISTER:  You have to let me put my
25    objection on the record.

Page 111

1    GENGER
2      MR. GRIVER:  Okay.  Go ahead.
3      MR. MEISTER:  I've just done it.  I
4    hope you have it all.
5      MR. GRIVER:  You moved to strike?
6    Okay.
7      MR. MEISTER:  If you don't talk, you
8    can hear.
9      **BY MR. GRIVER:**
10  Q.  Ms. Genger, do you recall discussing
11    with Leah Fang at any time the document that --
12    this document that Leah Fang signed on --
13  **A.  I don't remember.  I don't remember.**
14      MR. MEISTER:  You have to wait until he
15    finishes the question.
16      **BY MR. GRIVER:**
17  Q.  You don't remember speaking with Leah
18    Fang about this document before you exonerated
19    her, correct?
20  **A.  At any time I don't remember.**
21  Q.  So I take it then that as we sit here
22    today, you have no idea what consideration, if
23    any, the Orly trust received in exchange for
24    signing this document that's been marked as Dalia
25    9?

Page 112

1    GENGER
2  **A.  I am not aware if there was any**
3  **consideration.**
4  Q.  So --
5  **A.  I mean, maybe --**
6  Q.  All right.
7      MR. MEISTER:  Just answer the question.
8      MR. LEINBACH:  I would like the record
9    to reflect that Mr. Meister, counsel for Dalia
10    Genger, has been touching her at many points
11    during the deposition before she answers
12    questions.
13      MR. MEISTER:  Actually --
14      THE WITNESS:  He didn't touch me.
15    Excuse me.
16      MR. MEISTER:  Excuse me, Dalia.  Let me
17    answer.
18      I didn't touch her.  I put my hand out
19    to indicate when she came to the end of the
20    question, to stop speaking.
21      MR. LEINBACH:  Okay.  Well, this is
22    obviously a record which is not --
23      THE WITNESS:  You know what?  I would
24    like to see from there what's going on under the
25    table.  It is ridiculous.  What are we doing

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 113

1    GENGER
2  here?
3    MR. DELLAPORTAS: I just want to object
4  for the record. New York practice is very clear
5  that only one attorney may speak for any one
6  party at a deposition. That one attorney is
7  Mr. Griver. I would object to Mr. Leinbach
8  saying word one on the record at this deposition,
9  and I would move to strike that which he just
10  said. Thank you.
11    MR. MEISTER: While we are in a break,
12  I will notice that it is 4 minutes of 1:00, and I
13  did ask an hour or so ago of Mr. Griver when he
14  is planning on taking a lunch break, and
15  suggested that 1:00 would be a good time.
16    THE WITNESS: Yeah. I didn't have
17  breakfast.
18    BY MR. GRIVER:
19  Q. Okay. I will just ask you this,
20  Ms. Genger. Do you believe that -- strike that.
21    I will be happy to do a lunch break
22  after Ms. Genger finishes reviewing this document
23  so I may ask three or four questions about this
24  document. But I would like her to --
25  A. You know, it is very difficult for a

Page 114

1    GENGER
2  layperson to read legal documents, in general, I
3  believe that's the case.
4    So if you want me really to read it
5  thoroughly, it will take me a long time. Are you
6  willing to wait? Because it is a fact.
7  Q. Ms. Genger, are you aware of the effect
8  of this document on the Orly Genger trust, as we
9  sit here today?
10  A. No.
11    MR. MEISTER: So it's our lunch break
12  time?
13    BY MR. GRIVER:
14  Q. So as we sit here today you have no
15  idea why this document was created?
16  A. Today, I don't remember why it was.
17  Q. So this document could have been
18  created for a good reason or for a bad reason,
19  you don't know?
20  A. I don't know for what reason exactly it
21  was created.
22  Q. So this document could have been
23  created because Leah Fang was conspiring with
24  Sagi Genger, and they created this document?
25  A. Definitely that's not the case.

Page 115

1    GENGER
2  Q. Why is it definitely not the case?
3  A. Because I know the people that I deal
4  with. And I know my son, and I know Leah, and
5  there is no way -- and you said belief. There's
6  no way there was any collusion to harm Orly
7  trust.
8  Q. Doesn't that depend on what Leah did or
9  did not do and why?
10  A. No. It depends on the people, okay.
11  And I know the people, and I know that they won't
12  do anything to harm Orly.
13    MR. MEISTER: Okay. Ms. Genger, I'm
14  going to again instruct you on the record, please
15  wait until the end --
16    MR. GRIVER: So --
17    MR. MEISTER: Excuse me, Mr. Griver.
18    MR. GRIVER: I'm sorry. Go ahead.
19    MR. MEISTER: Until the end of
20  Mr. Griver's question.
21    THE WITNESS: Are you allowed to touch
22  him, by the way?
23    MR. LEINBACH: I'm not touching him.
24    THE WITNESS: Yeah, you were touching.
25  I think we're not allowed to touch anybody.

Page 116

1    GENGER
2    BY MR. GRIVER:
3  Q. Okay. Now, Ms. Genger, look at
4  paragraph --
5    MR. GRIVER: You know what? Let's take
6  a half hour for lunch.
7    THE WITNESS: Thank you.
8    MR. GRIVER: And we'll come back and
9  start with paragraph 75. So if you would like
10  to --
11    THE WITNESS: I need more than a half
12  hour. I didn't eat breakfast, also.
13    MR. GRIVER: Okay. 35 minutes.
14    (WHEREUPON, the deposition was
15  recessed from 12:59 p.m. until
16  2:06 p.m.)
17    (WHEREUPON, Attorney Lance Harris
18  exited the deposition
19  proceedings.)
20  * * * * *
21
22
23
24
25

Page 117

GENGER

2    MR. GRIVER: Could you note the time
3 that we left and the time that we came back.
4    On the record. It is 2:06.
5    MR. ZILBERFEIN: I just want to put a
6 statement on the record before we get going.
7    What was the attorney's name that was
8 here? Do you have it?
9    THE COURT REPORTER: Lance Harris.
10    MR. ZILBERFEIN: What was the
11 attorney's name that was here? I want to put a
12 statement on the record before we begin.
13    I am going to note that at about 12:06,
14 after we came -- after a 12:06 break this
15 afternoon, Attorney Lance Harris appeared. His
16 appearance was not put on the record. It is my
17 understanding that Mr. Harris is not an attorney
18 of record for anyone in this litigation.
19 Moreover, it is my understanding after speaking
20 to Mr. Hoffman, that Lance Harris at some point
21 represented Leah Fang, my client, in this
22 proceeding or other proceedings.
23    Therefore, there's an inherent conflict
24 here that I wasn't aware of when Mr. Harris
25 entered the room. Therefore, I am going to

Page 119

GENGER

2 what you have threatened to do, I would
3 appreciate it.
4    MR. ZILBERFEIN: Can you give me a CPLR
5 provision that would permit Mr. Harris to be here
6 during this deposition?
7    MR. GRIVER: Sure.
8    MR. LEINBACH: There was no objection
9 to his presence, as de facto.
10    MR. DELLAPORTAS: His presentation
11 wasn't announced.
12    MR. ZILBERFEIN: Right. Especially
13 when it wasn't put on the record.
14    MR. LEINBACH: His presence was open
15 and notorious. He was sitting in the room.
16    MR. MEISTER: It may have been open and
17 notorious. I don't know who he was, and to this
18 moment I still don't.
19    MR. LEINBACH: The court reporter did.
20    MR. MEISTER: Is he associated with
21 your firm?
22    MR. ZILBERFEIN: No, the court reporter
23 didn't know who he was until during the lunch
24 attorney for the plaintiff told her who he was.
25    MR. GRIVER: Right, sure, because

Page 118

GENGER

2 preserve my objection to each and every question
3 that was asked after the break when Mr. Harris
4 was present. And if he comes in again, I am
5 going to preserve my objections again to each and
6 every question that's asked if he reappears.
7    That's basically my position. And I am
8 going -- the objection that I preserved is in
9 connection with striking each and every question
10 and answer that has been asked and answered in
11 Mr. Harris' presence.
12    MR. GRIVER: All right. I will just
13 note for the record that I am not sure that you
14 can preserve an objection that you didn't
15 actually make, nor did anyone else make at
16 Mr. Harris' presence. Certainly he was not
17 invisible and anybody could have done so.
18    In addition, I think that your factual
19 statements on the record are absolutely -- are
20 incorrect, and, you know, I question where you
21 got them. But you are free to do whatever you
22 want and spend whatever amount of your client's
23 money that you wish to in making those motions.
24    If you can give me a CPLR provision or
25 any kind of ruling that would allow you to do

Page 120

GENGER

2 someone asked the question. Now, if someone did
3 not know who Mr. Harris was, then they were
4 certainly able to ask --
5    MR. ZILBERFEIN: You know I didn't know
6 who he was. Why didn't you put a statement on
7 the record? Once again --
8    MR. GRIVER: Because he's always
9 been --
10    MR. ZILBERFEIN: -- you don't give
11 anyone the benefit of the doubt. You just go
12 ahead and you want to steamroll everybody, and I
13 think that's what you've been doing.
14    MR. GRIVER: I think we are done here.
15    MR. MEISTER: Just so we are clear, is
16 he associated with your firm?
17    MR. GRIVER: No, he is not associated
18 with my firm, he is associated with Orly Genger
19 because he is Orly's attorney.
20    MR. DELLAPORTAS: Who invited him to
21 attend this deposition and gave him notice?
22    MR. ZILBERFEIN: Yeah. Who invited him
23 to attend and gave him notice?
24    MR. DELLAPORTAS: I will just note for
25 the record that TPR did not invite him to attend,

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 121

```
 1      GENGER
 2   his presence was not announced, and had his
 3   presence been announced, we would have
 4   immediately objected to it because he has no
 5   business being here.
 6      MR. GRIVER: John, you are welcome to
 7   put in an affidavit saying you didn't notice his
 8   presence when he walked in.
 9      MR. LEINBACH: I want to make a
10   statement for the record as well.
11      Mr. Dellaportas has been in court with
12   Mr. Harris before, and he knows very well exactly
13   who he is.
14      MR. DELLAPORTAS: That was two years
15   ago. I wasn't sure what he was doing here.
16      MR. ZILBERFEIN: And I knew -- you know
17   what, I am appearing here for Ms. Fang, right,
18   and you assumed I knew?
19      MR. LEINBACH: You can ask.
20      MR. GRIVER: I assume that if you have
21   a question, that's why God gave you a mouth.
22      Let's continue.
23      MR. DELLAPORTAS: We join in the
24   objection. We just note for the record that TPR
25   did not invite him to attend, and had he
```

Page 122

```
 1      GENGER
 2   announced his presence, we would have objected.
 3      Please proceed.
 4      BY MR. GRIVER:
 5   Q.  Before the break, Ms. Genger, we were
 6   speaking about Leah Fang, the beginning of your
 7   involvement as a trustee and your purported
 8   releases to Ms. Fang.
 9      Did you provide Orly Genger with copies
10   of your two supposed releases to Ms. Fang?
11      MR. DELLAPORTAS: Object to form.
12      MR. ZILBERFEIN: Same objection.
13      THE WITNESS: I should answer this?
14      MR. GRIVER: Yes.
15      BY THE WITNESS:
16   A.  Okay. If it was required, I am sure my
17   lawyer did that. Otherwise, it wasn't sent to
18   Orly.
19      BY MR. GRIVER:
20   Q.  I am asking you, did you --
21   A.  I do not remember. I am saying, if it
22   was required of me to do so, I am sure my lawyer
23   did it, sent it. And if it wasn't required, it
24   was not done.
25   Q.  As we sit here today, do you think it
```

Page 123

```
 1      GENGER
 2   is a good idea for a trustee to provide just the
 3   minimum of information to the beneficiary, or all ·
 4   the information that you think is important?
 5      MR. MEISTER: Objection.
 6      MR. ZILBERFEIN: Same objection.
 7      THE WITNESS: I mean, if there is an
 8   objection, I should answer?
 9      BY MR. GRIVER:
10   Q.  Even with an objection, you should
11   answer.
12   A.  Okay. I think that all that relevant
13   information to her case should be -- she should
14   be informed.
15   Q.  Okay. Do you think it is relevant that
16   you gave Leah Fang maximum releases and
17   indemnifications?
18      MR. MEISTER: Objection. Relevant to
19   what?
20      BY MR. GRIVER:
21   Q.  Relevant to your job as a trustee?
22      MR. ZILBERFEIN: Note my objection to
23   "maximum" and the form of the question.
24      MR. MEISTER: Join in.
25      BY THE WITNESS:
```

Page 124

```
 1      GENGER
 2   A.  My opinion is that Orly and her lawyer,
 3   might be you or someone else, obviously knew
 4   about the release because you are talking about
 5   it. So, obviously, you knew about it. So in one
 6   way or another, you did get this document.
 7      BY MR. GRIVER:
 8   Q.  Do you think it would -- do you think
 9   that these releases are relevant information that
10   you should have sent to Orly Genger?
11   A.  I am not sure.
12   Q.  Okay. As trustee of the trust, did you
13   ask counsel for the trust as to whether this is
14   information that should have been sent to Orly
15   Genger? And I am specifically referring to the
16   releases set forth as Exhibits 6 and 8 to your
17   deposition today.
18      MR. MEISTER: Objection.
19      BY THE WITNESS:
20   A.  I don't remember.
21      MR. MEISTER: Attorney-client
22   privilege.
23      MR. GRIVER: Are you instructing the
24   witness not to answer about questions she asked
25   as a trustee to counsel for the trust?
```

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 125

1    GENGER
2    MR. MEISTER: Yes.
3    MR. GRIVER: Okay.
4    BY MR. GRIVER:
5    Q.  Ms. Genger, did you consult with
6    counsel for the trust as trustee of the trust
7    regarding these indemnifications?
8    MR. MEISTER: You may answer that yes
9    or no.
10   BY THE WITNESS:
11   A.  I don't remember.
12   BY MR. GRIVER:
13   Q.  Do you have any -- who was your
14   attorney at the time?
15   A.  What day was it?
16   Q.  About December 2007, January 2008?
17   A.  January '08, right.
18   Q.  Uh-huh.
19   A.  I guess it was --
20   THE WITNESS: It wasn't you?
21   BY THE WITNESS:
22   A.  I don't remember when we started with
23   Mr. Meister.
24   BY MR. GRIVER:
25   Q.  Was counsel for the trust Jonathan

Page 126

1    GENGER
2    Kortmansky?
3    A.  Oh, Kortmansky, right.
4    I really don't remember.
5    Q.  But he was --
6    A.  I guess it was, if you say so.  I
7    really don't remember.
8    Q.  No, I am asking you as trustee of the
9    trust.
10   Was Jonathan Kortmansky an attorney for
11   the trust?
12   A.  I guess he was.
13   MR. MEISTER: She just answered she
14   doesn't remember.
15   THE WITNESS: Yeah.
16   MR. MEISTER: She is guessing.
17   BY THE WITNESS:
18   A.  You are asking me the same thing.
19   MR. GRIVER: Don't put your hand on the
20   witness.  Do not tell the witness to stop
21   talking.  It is her answer.  If it is too long
22   for you, you have instructed her repeatedly to
23   just answer the question.  If she chooses to give
24   a speaking answer, she may do so.
25   It is not your job to stop her, either

Page 127

1    GENGER
2    by telling her to be quiet or by holding your
3    hand upon her.
4    MR. MEISTER: But it is my job --
5    MR. GRIVER: It is time for you to stop
6    that.
7    MR. MEISTER: It is my job to get my
8    objection out on the record.
9    MR. GRIVER: No, it is not your -- you
10   can put that in, you can put that in after she
11   speaks.
12   MR. MEISTER: No, I cannot put it in
13   because --
14   MR. GRIVER: If you are too slow --
15   MR. MEISTER: -- I start to make my
16   objection, and I am entitled to finish.
17   MR. GRIVER: And she is entitled to
18   answer the question.
19   MR. MEISTER: Not over my objection.
20   MR. GRIVER: Okay.
21   BY MR. GRIVER:
22   Q.  Is Jonathan Kortmansky, is he the
23   attorney for the 1993 trust?
24   A.  He might have been.  I really do not
25   remember when I stopped my relationship with

Page 128

1    GENGER
2    Kortmansky and when I hired Robert Meister.
3    Q.  But during your relationship with
4    Mr. Kortmansky, he was the attorney for the Orly
5    Genger trust, correct?
6    A.  I don't remember.  I really do not
7    remember.
8    Q.  You don't remember?  You don't
9    remember --
10   A.  I don't remember who was the lawyer at
11   that time -- my lawyer at the time.
12   Q.  Did the Orly Genger trust have a
13   lawyer?
14   A.  Yes, I am sure it did.
15   Q.  Was it Mr. Kortmansky?
16   MR. MEISTER: Objection.  Asked and
17   answered.
18   BY THE WITNESS:
19   A.  You just asked me, and I told you.  I
20   am not going to change my answer.
21   BY MR. GRIVER:
22   Q.  You don't remember?
23   A.  Exactly.
24   Q.  Okay.
25   A.  Really, I don't remember.

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

---

Page 129

1    **GENGER**
2  Q.  How is it in the best interest of the
3  Orly trust to not provide Orly Genger with the
4  information that you had released Leah Fang from
5  all liability?
6  A.  **How -- again, can you ask me.**
7      MR. GRIVER: Can you read the question
8  back.
9      (WHEREUPON, the record was read by
10     the reporter as requested.)
11     **BY THE WITNESS:**
12 A.  **I think I said before that I wasn't**
13 **sure if she got the documents or not. If I -- I**
14 **stated that if it was required, my lawyer did it,**
15 **and if it wasn't required, it was not sent.**
16     **BY MR. GRIVER:**
17 Q.  Okay. Who is the trustee of the trust?
18  You or your lawyer?
19 A.  **I am the trustee.**
20 Q.  Okay. So as trustee of the trust,
21  how --
22 A.  **I asked my lawyer.**
23 Q.  How is it -- well, you don't remember
24  if you asked your lawyer, do you? You don't
25  remember?

Page 130

1    GENGER
2  A.  **I don't remember, right. But it**
3  **doesn't mean that he didn't act upon it.**
4      MR. DELLAPORTAS: And I would like to
5  object. There was a representation from counsel
6  that this line of questioning related to cause of
7  action number 4. I have read cause of action
8  number 4. It makes no mention of this release
9  that we're talking about. This is not a claim in
10  this action. It may be a claim in the surrogate
11  court proceeding, but I really resent being
12  dragged here for discovery that has some
13  relevance to the surrogate court proceeding. I
14  will be seeking legal fees for this.
15     MR. GRIVER: You know what? We will be
16  speaking to the court about this because --
17     MR. ZILBERFEIN: Why don't we do that
18  sooner than later.
19     MR. GRIVER: Well, you know what?
20  Let's do that.
21     MR. DELLAPORTAS: I'd rather do that
22  than have you take false discovery for the rest
23  of the deposition. You are wasting our time,
24  Yoav.
25     MR. GRIVER: You know what? One day I

Page 131

1    GENGER
2  hope you actually read the complaint.
3      MR. DELLAPORTAS: I read the complaint.
4  Can you point me to paragraph --
5      MR. ZILBERFEIN: Can put us --
6      MR. GRIVER: Could you read the
7  question back, please.
8      MR. DELLAPORTAS: Point us to the
9  paragraph in the complaint where it is relevant
10  so we can address this.
11     MR. ZILBERFEIN: Why don't you get the
12  judge on the phone now.
13     MR. DELLAPORTAS: I will withdraw my
14  objection if --
15     MR. GRIVER: 48 and 49. And then you
16  might want to look at the motion for summary
17  judgment filed by Leah Fang.
18     Can you read the question and answer
19  back so I can get an answer from the witness,
20  please.
21     MR. DELLAPORTAS: It does not mention
22  the release anywhere in 48 or 49. Let's call the
23  court. Stop it. We are calling the court. We
24  are calling the court. Stop this.
25     MR. GRIVER: All right. Off the

Page 132

1    GENGER
2  record.
3      (WHEREUPON, discussion was had off
4  the record.)
5      MR. LEINBACH: As I stated before, we
6  wanted to call the court and ask for their
7  availability because we thought there were issues
8  that occurred during -- previous to the break.
9      I spoke with -- I believe it was the
10  judge's secretary. She checked the judge's
11  availability and I was told that the judge is
12  available anytime before 4:00 to have a
13  conversation.
14     I suggested 3:30. She said that was
15  fine. Apparently -- I had no idea if you would
16  like to do it now instead --
17     THE COURT REPORTER: Do you want to
18  stay on the record?
19     MR. LEINBACH: I think this should be
20  on the record.
21     MR. GRIVER: I don't think the witness
22  and Sagi should be in the room for this.
23     MR. S. GENGER: What?
24     MR. GRIVER: I don't think the witness
25  or Sagi should be in the room for this.

Page 133

1    GENGER
2    MR. S. GENGER: I am a party.
3    MR. LEINBACH: Yes, you are a party,
4    but you are not a lawyer.
5    MR. S. GENGER: So?
6    MR. ZILBERFEIN: What CPLR section is
7    that?
8    MR. LEINBACH: You are supposed to be
9    deposed in this.
10   MR. ZILBERFEIN: What CPLR section is
11   that?
12   MR. LEINBACH: What New York practice
13   actually says is you're not supposed to obtain
14   information --
15   MR. ZILBERFEIN: What section --
16   MR. LEINBACH: New York practice.
17   MR. DELLAPORTAS: He is a party to the
18   action.
19   MR. S. GENGER: I am representing
20   myself personally then.
21   MR. GRIVER: You are not representing
22   yourself personally.
23   MR. DELLAPORTAS: You do not represent
24   yourself personally.
25   (WHEREUPON, at 2:24 p.m., a

Page 134

1    GENGER
2    telephone call was made to the
3    chambers of Judge Barbara Jaffe,
4    and the following proceedings were
5    had via telephonic communications,
6    to wit:)
7    MR. LEINBACH: Hello. This is Bryan
8    Leinbach. Once again, I called about probably
9    five minutes ago to ask for Justice Jaffe's
10   availability for a deposition.
11   FEMALE VOICE: Yes.
12   MR. LEINBACH: It appears the parties
13   all want to speak right now. So I wanted to see
14   if the justice could speak with us right now.
15   FEMALE VOICE: Wait. Hold on one
16   second.
17   MR. LEINBACH: Thank you.
18   (WHEREUPON, the following further
19   proceedings were had via
20   telephonic communications with
21   Judge B. Jaffe, to wit:)
22   THE COURT: Hello? Judge Jaffe on the
23   phone.
24   MR. LEINBACH: Good afternoon, your
25   Honor. This is Bryan Leinbach of Zeichner Ellman

Page 135

1    GENGER
2    & Krause. And also with me is Yoav Griver.
3    THE COURT: Right, right. And you
4    represent again?
5    MR. LEINBACH: We represent Orly
6    Genger.
7    I should state right off the bat, of
8    course I told your secretary that we were calling
9    because there were issues that had arisen during
10   the deposition of Dalia Genger. So there's a
11   court reporter --
12   THE COURT: Who is here for Dalia
13   again?
14   MR. MEISTER: Robert Meister and Marisa
15   Warren, your Honor.
16   THE COURT: Okay.
17   MR. LEINBACH: I just also wanted to
18   note, of course, because this is a deposition,
19   there's a court reporter here that's
20   transcribing.
21   THE COURT: There's a what?
22   MR. LEINBACH: There's a court reporter
23   that is present.
24   THE COURT: Yes, that I got.
25   MR. LEINBACH: I just wanted to inform

Page 136

1    GENGER
2    you.
3    MR. ZILBERFEIN: Do you want everyone's
4    appearance?
5    THE COURT: I just want to know who's
6    there and who's going to be talking to me.
7    MR. GRIVER: In addition to lawyers for
8    the plaintiff and for the deponent Dalia
9    Genger --
10   THE COURT: That's Mr. Griver, right?
11   MR. GRIVER: That's correct, your
12   Honor, yes. I'm Yoav Griver. We also have Sagi
13   Genger here. We have the attorney for TPR,
14   Jonathan Dellaportas. We have an attorney here
15   for Leah Fang, Paul Zilberfein.
16   MR. ZILBERFEIN: Correct, your Honor.
17   I am cocounsel to Leah Fang.
18   MR. GRIVER: And we also have an
19   attorney from Orly's other set of lawyers,
20   Wachtel and Masyr. It is Walter Stasiuk.
21   THE COURT: Okay.
22   MR. GRIVER: So that's is who is in the
23   room, along with the deponent, Dalia Genger.
24   THE COURT: Okay.
25   MR. GRIVER: There are a number of

ORLY GENGER VS.                                                        DALIA GENGER
DALIA GENGER, et al                                                    December 13, 2012

Page 137

1    GENGER
2    reasons that we're calling during the deposition.
3    There have been some attempts to instruct the
4    witness, contrary to practice. In addition,
5    Mr. Dellaportas has made the assertion that the
6    line of questions that I am asking are irrelevant
7    to the litigation.
8        THE COURT: Wait a minute. What?
9        MR. GRIVER: That the line of
10   questioning that I am questioning the deponent
11   about is irrelevant to this litigation. I
12   believe that Mr. Dellaportas will use that as a
13   tactic to try and prevent a continuation of the
14   deposition of Dalia Genger, should it be
15   necessary.
16       In addition, if the court could
17   instruct the attorneys to limit themselves to
18   nonspeaking objections --
19       THE COURT: Yes. Please do that.
20       MR. GRIVER: -- things will certainly
21   move faster.
22       THE COURT: I do want that to happen.
23   If you have an objection, place it on the record
24   with the word "objection," but move on.
25       MR. GRIVER: Thank you, your Honor.

Page 138

1    GENGER
2        In addition, there should be no
3    attempts to stop the witness from talking by
4    placing your hand upon the witness' shoulder or
5    upon the --
6        THE COURT: Nothing. Nothing. Don't
7    touch the witness at all. Leave it alone. Let's
8    just get through it. Anything that is
9    inadmissible or irrelevant can be redacted later
10   on on motions or at trial or whatever. But not
11   now. Let it go.
12       MR. GRIVER: Thank you, your Honor.
13       MR. MEISTER: Your Honor, this is
14   Robert Meister for Dalia Genger.
15       THE COURT: Yes.
16       MR. MEISTER: I have made some
17   objections on the ground of attorney-client
18   privilege, and I have stated the grounds, and I
19   have also instructed the witness not to answer.
20   Of course --
21       THE COURT: Those should be an
22   exception, would they not? I mean, when it is --
23       MR. MEISTER: Yes.
24       THE COURT: -- something that's
25   privileged or confidential, that is, of course,

Page 139

1    GENGER
2    acceptable.
3        MR. GRIVER: Your Honor, I think that
4    that will be subject to dispute, but I agree with
5    Mr. Meister that that can be a dispute that is
6    taken care of at a later date, and we will make
7    the record at this deposition.
8        THE COURT: Fine. Anything else?
9        MR. DELLAPORTAS: Yes, your Honor.
10   John Dellaportas for TPR.
11       Our concern, and one of the reasons we
12   welcomed getting the court involved early, is we
13   have seen a practice in these Genger family
14   matters where witnesses are subjected to
15   questioning which relates to other matters for
16   which there has not been notice, but not for the
17   matter at hand.
18       And here we have had two hours of
19   questioning. It is related to all matters of
20   issues involving how and why Ms. Genger was
21   appointed, who's paying her legal bills, why she
22   gave release to one party or another --
23       THE COURT: Mr. Dellaportas, as I
24   mentioned, you can place your objection on the
25   record. Period. At another time, at trial, you

Page 140

1    GENGER
2    can, you know, redact it, whatever. I am not
3    interested in it now.
4        MR. DELLAPORTAS: Okay. We understand,
5    your Honor. The only concern was that the
6    questioning relates to a pending surrogate court
7    action which we are not a party to, not all the
8    parties are necessarily here. Doesn't relate to
9    the action for which we are here, and we would
10   like to reserve the right to seek fees at the end
11   of this if we're brought here for questioning on
12   another matter for which there's never been
13   cross --
14       THE COURT: I am not even thinking
15   about it, quite frankly.
16       MR. GRIVER: Your Honor, this is Yoav
17   Griver, and I thank you for your time.
18       It's very simple. The reason I was
19   asking these questions is because they are
20   germane to a summary judgment motion that is
21   currently before your Honor. They are also
22   germane to paragraphs 48 and 49 and 140, at a
23   minimum, of the complaint. Dalia Genger is a
24   trustee. Me being able to ask her about actions
25   as trustee is germane to this action because --

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 141

1    GENGER
2    THE COURT: You will put that on the
3 record at some other time. I don't care about it
4 right now. And if it is germane to the summary
5 judgment motion, it is not because it is already
6 submitted, and I am not going to be considering
7 it.
8    MR. GRIVER: Your Honor, well --
9    THE COURT: If that's the one that's
10 been submitted already.
11    MR. ZILBERFEIN: That correct, your
12 Honor. That's the one that's already fully
13 submitted and before your Honor for decision.
14    MR. GRIVER: Your Honor, there's
15 always -- I understand your Honor's position. It
16 is just that the concern is raised because as
17 Sagi Genger did not show up for deposition either
18 on Tuesday or on Wednesday, and, therefore, I do
19 believe based on past practice that
20 Mr. Dellaportas will then try and object on
21 behalf of Ms. Genger, should this deposition
22 carry on past a single day.
23    Now, in these matters, every deposition
24 to date has passed on because while there are few
25 witnesses, they span actions over years and

Page 142

1    GENGER
2 multiple --
3    THE COURT: You know, if this is what
4 the family wants to do, that's what they will do.
5 They haven't been deterred from their litigation
6 for many, many years. That's up to them. They
7 want to stay and get deposed forever, God bless
8 them. If they were sensible, they would settle
9 this case. But they are not. They are not
10 sensible. So they are going to be fighting and
11 paying you guys money and you are getting rich.
12 Okay.
13    MR. GRIVER: Thank you, your Honor. I
14 think your instructions have been helpful.
15    THE COURT: Thank you.
16    MR. MEISTER: Let the record note that
17 the telephone conference is now concluded and the
18 phone is now disconnected.
19    (WHEREUPON, at 2:33 p.m., the
20    telephonic communications were
21    disconnected, and the deposition
22    proceedings resumed, to wit:)
23    THE WITNESS: So what are we -- what
24 does this mean? I don't understand.
25    MR. MEISTER: Just wait for a question.

Page 143

1    GENGER
2    MR. ZILBERFEIN: Can I just say
3 something on the record here? What time are we
4 going to be breaking for the day? Can we get
5 that down on the record?
6    MR. GRIVER: We started at 10:30 as an
7 accommodation, so I think we will end at --
8 instead of ending at 5:00, we will end at 5:30.
9    MR. ZILBERFEIN: Is that okay with
10 everyone?
11    MR. GRIVER: If we are at a point where
12 we have another 15 minutes or so if we continue
13 and get this deposition completed, then I am sure
14 everybody will have the indulgence. You have
15 been in depositions before. You know how it is.
16 But let's try to aim for 5:00, 5:30.
17    MR. ZILBERFEIN: Okay.
18    MR. GRIVER: Okay. Now, if you can
19 read back, please, my last question to the
20 witness so that she may answer it. And if you
21 can on the transcript put the question because it
22 has been a while.
23    (WHEREUPON, the record was read by
24    the reporter as requested, as
25    follows, page 129, line 23,

Page 144

1    GENGER
2 through page 130, line 3:
3    "QUESTION: How is it -- well, you
4 don't remember if you asked your
5 lawyer, do you? You don't
6 remember?
7    "ANSWER: I don't remember, right.
8 But it doesn't mean that he didn't
9 act upon it.)
10    MR. DELLAPORTAS: Same objection.
11    MR. ZILBERFEIN: Join.
12    MR. GRIVER: Okay.
13    BY MR. GRIVER:
14 Q.  As trustee of the Orly Genger trust,
15 how is it in Orly Genger's best interest for you
16 not to tell her about the releases that you
17 attempted to provide Leah Fang as previous --
18    MR. ZILBERFEIN: Objection.
19    BY THE WITNESS:
20 A.  I didn't say that I didn't provide the
21 releases. I said if it was required, she
22 probably got it because my lawyer sent it. And
23 if it wasn't required, she didn't get it.
24    BY MR. GRIVER:
25 Q.  But you are supposed to act in the best

ORLY GENGER VS.                                                    DALIA GENGER
DALIA GENGER, et al                                                December 13, 2012

Page 145

1   GENGER
2   interest of the trust, correct?
3       MR. MEISTER: Objection. Asked and
4   answered.
5       MR. ZILBERFEIN: Objection. You keep
6   asking the same question.
7       BY THE WITNESS:
8   A. So what's the question?
9       BY MR. GRIVER:
10  Q. You, as trustee, you have the duty --
11  A. My answer is whatever is required of me
12   to do and act, I do it. Whatever is not
13   required, I don't do it.
14  Q. And in determining what is or is not
15   required, you, as trustee of the trust, go to the
16   trust attorneys, correct?
17  A. Yes.
18  Q. And if they tell you to do something,
19   you do it?
20  A. Probably.
21  Q. And if they tell you not to do
22   something, you don't do it?
23  A. Probably.
24  Q. So you rely -- yes or no. Not
25   probably.

Page 146

1   GENGER
2   If the attorneys for the trust --
3       MR. DELLAPORTAS: Objection.
4       BY MR. GRIVER:
5   Q. -- tell you to do something, do you do
6   it?
7       MR. MEISTER: Objection. Hypothetical.
8       MR. ZILBERFEIN: Objection.
9       BY THE WITNESS:
10  A. It is hypothetical.
11      BY MR. GRIVER:
12  Q. As a general matter, do you follow your
13   attorney's advice?
14      MR. MEISTER: Objection.
15      MR. ZILBERFEIN: Did she? At what
16   period of time?
17      MR. MEISTER: What advice are you
18   talking about?
19      BY MR. GRIVER:
20  Q. As trustee of the trust --
21  A. In general, I --
22      MR. ZILBERFEIN: Objection.
23      BY THE WITNESS:
24  A. -- I follow the -- I follow whatever my
25   lawyer tells me to do.

Page 147

1   GENGER
2       BY MR. GRIVER:
3   Q. Okay. And as we sit here today do you
4   remember whether you discussed sending --
5   A. We said that already.
6   Q. Did you discuss sending or not
7   sending --
8   A. I said I didn't remember.
9   Q. Okay.
10      MR. MEISTER: Several times.
11      BY MR. GRIVER:
12  Q. Let me finish the question.
13  A. I'm sorry.
14  Q. Did you discuss with your -- the
15   attorneys for the trust sending or not sending
16   the releases that you attempted to provide Leah
17   Fang?
18      MR. MEISTER: Objection. Asked and
19   answered several times.
20      THE WITNESS: Yeah.
21      MR. ZILBERFEIN: Objection.
22      BY THE WITNESS:
23  A. I don't remember. I told you.
24      BY MR. GRIVER:
25  Q. At some point you and your former

Page 148

1   GENGER
2   husband, Aric Genger, got divorced, correct?
3   A. At some point, yes.
4   Q. And there was an estate plan for the
5   benefit of your two children, Sagi and --
6   A. That's right.
7   Q. -- Orly, correct?
8   A. Right. Correct.
9   Q. And the intent was that Orly and Sagi
10   were to share equally; is that also correct?
11  A. Yes.
12  Q. When you began as trustee of the Orly
13   Genger trust, the trust had shares in the D&K LP
14   company?
15      MR. MEISTER: Objection.
16      BY THE WITNESS:
17  A. Right.
18      BY MR. GRIVER:
19  Q. Correct?
20      MR. MEISTER: Didn't have shares in the
21   LP.
22      BY MR. GRIVER:
23  Q. Had an interest --
24  A. D&K LP had shares.
25  Q. D&K LP had shares in --

ORLY GENGER VS.                                                    DALIA GENGER
DALIA GENGER, et al                                                December 13, 2012

---

Page 149

1    GENGER
2  A.  Of TPR.
3  Q.  And the Orly trust had an interest in
4    D&K?
5  A.  Yes.
6      MR. GRIVER:  Can we have this marked as
7    10.  For the record, Dalia 10 is the promissory
8    note and pledge agreement from 1993.
9      (Dalia Exhibit 10, 1993 promissory
10     note and pledge agreement,
11     marked.)
12     BY MR. GRIVER:
13 Q.  Is that your signature on the second
14   page of Exhibit 10?
15 A.  The second page?
16     MR. MEISTER:  Third page.
17     BY THE WITNESS:
18 A.  Here.  In the promissory note, yes.  As
19   a general partner.  Yeah.
20     BY MR. GRIVER:
21 Q.  As a general partner of D&K LP,
22   correct?
23 A.  Right.
24 Q.  That's what you were in 1993?
25 A.  Yeah.  Right.

---

Page 150

1    GENGER
2  Q.  And do you recognize this promissory
3    note and pledge agreement?
4  A.  Yeah.
5  Q.  Okay.  Can you tell me what was the
6    purpose of this promissory note?
7  A.  That it was really based on the notion
8    that -- it was to establish, really, a -- I can't
9    talk any more.
10     In order for the children to have
11   ownership, some ownership in TPR.  And that's why
12   the note was -- I mean, they got 240 shares, that
13   they worked for the million 2 that they received
14   from Arie and me, and a promissory note, and the
15   D&K note of whatever it is.  So in a way, we were
16   transferring ownership of TPR to the children.
17   It is estate planning.
18 Q.  And the estate plan was both children
19   should share in TPR equally?
20 A.  Right.
21     MR. MEISTER:  Objection.  Asked and
22   answered.
23     BY MR. GRIVER:
24 Q.  Now, this note came up in your divorce
25   proceedings, did it not?

---

Page 151

1    GENGER
2  A.  It might.  I don't remember.  It might
3    have.
4  Q.  Do you recall the fact that you took
5    the position that the D&K note should be valued
6    at zero dollars as part of your divorce
7    proceedings?
8  A.  Can you repeat the question.
9  Q.  In the marital arbitration before
10   Justice Milonis --
11 A.  Right.
12 Q.  -- do you recall taking the position
13   that the D&K note should be valued at zero?
14 A.  I don't remember such a statement.
15     MR. GRIVER:  Let me have marked as
16   Exhibit 11 the final arbitration award from the
17   proceeding before Justice Milonis.
18     (Dalia Exhibit 11, final
19     arbitration award, marked.)
20     BY MR. GRIVER:
21 Q.  And if I could direct your attention to
22   page 15 where it discusses the D&K note.
23 A.  Okay.  I am on 15.
24 Q.  Okay.
25 A.  Any particular part that you want me to

---

Page 152

1    GENGER
2    pay attention to?
3  Q.  Yes.  It is the three paragraphs under
4    D&K note.
5  A.  I don't see here where I'm stating that
6    the note really is zero.
7  Q.  Okay.  We will talk about it.
8      First of all, did you attend the
9    arbitration, the marital arbitration?
10 A.  Yes.
11 Q.  Were you there for the testimony of
12   Sagi in the arbitration?
13 A.  Yes.
14 Q.  Were you there for the testimony of
15   David Parnes?
16 A.  Yes.
17 Q.  As you sit here today, do you recall
18   anything that they said that you disagreed with?
19     MR. MEISTER:  Objection.  It is
20   improper form.
21     MR. DELLAPORTAS:  Object to form.
22     MR. ZILBERFEIN:  Join.
23     BY THE WITNESS:
24 A.  I should answer?  I don't remember.
25   Because there were so many things there, I am

---

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 153

1   GENGER
2   sure there was some things that I agreed or
3   disagreed with. I mean, it is natural.
4   BY MR. GRIVER:
5   Q.   Okay. Do you recall that Arie was
6   claiming that he should be awarded one-half of
7   the value of the D&K note?
8   A.   It says here, Arie claims he should be
9   awarded one-half of the value of D&K note.
10  Q.   And that the arbitrator disagreed with
11  him and found for you on that issue; do you see
12  that?
13  A.   What? Again?
14  Q.   The arbitrator found for you on the
15  issue where you disagreed with Arie?
16  A.   I disagree, yeah.
17  Q.   And it says here, quote, the D&K note
18  was a part of the estate planning scheme to
19  transfer wealth to the children, period, end
20  quote?
21  A.   That's true.
22  Q.   And it also goes on to say: The
23  parties never intended for this note to be
24  collected, and to do so would retransfer wealth
25  back to the parents and defeat the estate

Page 154

1   GENGER
2   planning; do you see that?
3   A.   Yes. In '93 it was the intention.
4   Obviously, the circumstances changed since '93.
5   Q.   And when exactly did circumstances
6   change?
7   A.   When I got divorced.
8   Q.   Well, this was something that you were
9   talking about in 2008, correct, this is the --
10  A.   After the divorce, obviously, because
11  in actuality, the parents were paying the debt,
12  the note, okay.
13  Q.   Okay.
14  A.   It is obvious because neither Sagi or
15  Orly didn't have any resources to pay the note.
16  So this was a way that we thought that we can
17  transfer assets to the children. But once I
18  got -- I divorced my husband -- I mean, the
19  circumstances changed because neither I -- I
20  didn't have also the resources to pay the note,
21  and the note was -- the D&K note was paid
22  previously by us, but it should have been paid by
23  the kids. Isn't it?
24  Q.   Well, let me ask you this: When did
25  you get divorced from Arie?

Page 155

1   GENGER
2   A.   2004.
3   Q.   2004.
4   Now, at the time that you entered into
5   the note, you and your husband, Sagi, and Orly,
6   never intended for the note to be collected,
7   correct, it was just there as a mechanism to make
8   an equal distribution between Sagi and Orly?
9   MR. MEISTER: Objection to the form of
10  the question.
11  BY THE WITNESS:
12  A.   It is not true. That is not true.
13  BY MR. GRIVER:
14  Q.   What is not true about my statement?
15  A.   The note should not have been -- never
16  collected.
17  Q.   It says here the parties never intended
18  for this note to be collected?
19  A.   Yeah. In '93.
20  Q.   Well, this was a position you were
21  taking in 2008, correct?
22  MR. MEISTER: Objection.
23  MR. DELLAPORTAS: Object to form.
24  MR. MEISTER: You are reading what
25  someone else said, not what she said.

Page 156

1   GENGER
2   BY MR. GRIVER:
3   Q.   Was that the position you took in the
4   marital arbitration?
5   MR. DELLAPORTAS: Object to form.
6   MR. ZILBERFEIN: Objection.
7   BY MR. GRIVER:
8   Q.   Can you answer my question, please?
9   A.   Can you ask me again. What is your
10  question?
11  Q.   In the marital arbitration, did you not
12  take the position that the note was never to be
13  collected?
14  MR. MEISTER: Object to the form of the
15  question, and also the grammar. At least a
16  double negative.
17  MR. GRIVER: Could you read back the
18  question.
19  THE WITNESS: Again, yeah.
20  (WHEREUPON, the record was read by
21  the reporter as requested.)
22  MR. MEISTER: My objection stands.
23  BY THE WITNESS:
24  A.   I want to explain. If I did say so,
25  that note was --

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 157

1    **GENGER**
2    **BY MR. GRIVER:**
3    Q.  First answer my question and then I
4    will let you make any statement that you want.
5        MR. GRIVER: Can you read back the
6    question, because it is a yes or no question.
7        **BY THE WITNESS:**
8    **A.  So where did I say it is not going to**
9    **be collected?**
10        **BY MR. GRIVER:**
11    Q.  I am just asking, in the marital
12    arbitration, did you not take the position that
13    the note was not to be collected?
14        MR. MEISTER: Same objection to form
15    and to grammar.
16        **BY THE WITNESS:**
17    **A.  I didn't say -- I didn't state this**
18    **particular position.**
19        **BY MR. GRIVER:**
20    Q.  What position did you take?
21    **A.  Position that I took, that the D&K note**
22    **is the problem that we have to deal with since**
23    **the kids do not have any resources to pay the**
24    **note. And we should be creative in getting rid**
25    **of the note. We tried to do so by selling the**

Page 158

1    **GENGER**
2    **note to someone that we trust.**
3    Q.  And the problem with the note was that
4    you didn't want anyone to collect on the note,
5    correct?
6    **A.  The problem was that the kids could not**
7    **afford to pay the note.**
8    Q.  And so getting rid of -- giving the
9    note to somebody else --
10    **A.  Selling the note. Selling the note.**
11    Q.  In an attempt to make sure that no one
12    would try to collect the note?
13    **A.  Yes. So we sold it to a friend that**
14    **promised it is not going to collect, foreclose**
15    **the note.**
16    Q.  Because no one in the Genger family
17    intended for the note to be collected?
18        MR. MEISTER: Objection. Compound
19    question. Also requires the operation of other
20    people's minds.
21        MR. DELLAPORTAS: Objection. Calls for
22    speculation.
23        MR. ZILBERFEIN: Objection.
24    Repeat the question.
25        (WHEREUPON, the record was read by

Page 159

1    GENGER
2    the reporter as requested.)
3        **BY THE WITNESS:**
4    **A.  At that time when we were divorcing,**
5    **the kids did not have any means to pay the note.**
6    **And since both parents I think wanted to**
7    **accommodate the children, the way that I saw it**
8    **is to somehow get rid of the note, legally,**
9    **because the note is a note and it has to be paid.**
10        **BY MR. GRIVER:**
11    Q.  And you didn't want it to be paid?
12    **A.  What I wanted or don't want really**
13    **doesn't matter. I mean, legally, it has to be**
14    **paid.**
15    Q.  You gave it to David Parnes --
16    **A.  Right.**
17    Q.  -- so that it would not be collected
18    upon?
19    **A.  Yeah. I am telling you that. Because**
20    **he promised he is not going to collect on the**
21    **note. But Orly sued him. Orly sued David**
22    **because he was willing to accommodate us.**
23    Q.  But the reason you gave it to
24    Mr. Parnes is so the note would not be collected?
25        MR. MEISTER: Objection. Asked and

Page 160

1    GENGER
2    answered several times.
3        **BY THE WITNESS:**
4    **A.  Yeah, I said we tried to make the life**
5    **of the kids easier so the note will disappear.**
6        **BY MR. GRIVER:**
7    Q.  And you are saying that at some
8    point --
9    **A.  But Orly objected to it, so we got back**
10    **the note. We got back the note that they had to**
11    **pay.**
12    Q.  Did you know that David Parnes had
13    given back the note?
14    **A.  Yes, because he was sued. So he gave**
15    **back the note.**
16    Q.  Did you know at the time that he gave
17    the note back that he had given the note back?
18    **A.  When he did it, yes. I know that he**
19    **gave it back.**
20    Q.  How did you know that?
21    **A.  Because he was sued, and as a result he**
22    **says, "I don't want to do you any favors, go and**
23    **take back the note."**
24    Q.  Did he say that to you?
25    **A.  No. He didn't say it to me.**

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 161

1    GENGER
2  Q.  Did he say -- he said it to Sagi,
3   didn't he?
4  A.  He might have said it to Sagi.  I know
5   that's the way that he reacted.  And I think it
6   is very normal, that somebody does a favor and
7   gets sued, so.
8  Q.  Did he react that way to you, or did he
9   react that way to somebody else?
10 A.  To somebody else that informed me about
11  the way he acted.
12 Q.  And that person who informed you about
13  the way David Parnes acted was Sagi Genger?
14 A.  Absolutely.
15 Q.  Did you tell Orly that David Parnes had
16  reacted to a suit and had given the note back?
17 A.  I did not tell her.
18 Q.  As trustee you did not think that was
19  something you needed to do?
20     MR. MEISTER:  Objection.  She wasn't
21  trustee then.  This was 2006.
22     BY THE WITNESS:
23 A.  Yeah.  I became trustee in 2008.
24     BY MR. GRIVER:
25 Q.  You believe that Mr. Parnes rescinded

Page 162

1    GENGER
2   the assignment in 2006; is that correct?
3  A.  That he gave back the D&K note?  At
4   some point, I don't know exactly when, but --
5  Q.  You thought --
6  A.  Whenever he was sued by Orly, then he
7   said, "Take back the note.  I don't want to get
8   involved in this."
9  Q.  And was that -- when was this?
10 A.  I don't remember when Orly sued him.  I
11  mean, I'm not keeping track of all the suits.
12     MR. GRIVER:  Well, let me have this
13  marked as Exhibit 12.
14     (Dalia Exhibit 12, letter,
15     marked.)
16     MR. GRIVER:  And while Mr. Leinbach is
17  handing out Exhibit 12, I will remind Mr. Meister
18  that the court has just instructed everyone to
19  not testify or instruct the witness as to dates,
20  places, times, or anything else.  And so,
21  therefore, your testimony is not appreciated and
22  is also wrong.
23     MR. MEISTER:  I didn't testify.
24     MR. GRIVER:  Yes, you did.
25     MR. MEISTER:  I made an objection.

Page 163

1    GENGER
2     MR. GRIVER:  You said it is 2006.
3   That's a speaking objection.
4     MR. DELLAPORTAS:  Trickery doesn't
5   really get us anywhere, Yoav.  Just try to ask
6   questions.
7     BY MR. GRIVER:
8  Q.  Okay.  Looking at Dalia 12, does this
9   refresh your recollection that David Parnes
10  returned the note on November 25 of 2008?
11 A.  As was stated, I did not actually --
12  wait a second.  This letter was addressed to Sagi
13  Genger.
14 Q.  Uh-huh.
15 A.  Okay.
16 Q.  Right.
17 A.  And I remember that Sagi talked about
18  it.
19 Q.  What did he tell you?
20 A.  Because it was outrageous.
21 Q.  And what did he tell you?
22 A.  That David, who had the best
23  intentions, to help us, to get rid of the note,
24  got sued by Orly.  What her motivation is, I do
25  not know, but she wanted, I guess, to owe money.

Page 164

1    GENGER
2  Q.  And she wanted the note to be collected
3   upon?
4  A.  Yeah.  She wanted to carry a debt of
5   about $5 million.  I mean, it doesn't make sense,
6   but that's the way she reacted.
7  Q.  And you thought that that was against
8   the intent of the parties --
9  A.  I thought it doesn't make sense that
10  somebody will say, "You know what, I'm really
11  dying to pay -- to owe $5 million."
12 Q.  As trustee of the Orly Genger trust,
13  did you speak to Orly about Mr. Parnes' recision
14  of the assignment?
15 A.  No.  No way.
16 Q.  Did you have your attorneys speak to
17  Orly Genger's attorneys about the recision of the
18  assignment?
19 A.  This I don't remember.
20 Q.  Okay.  Did you ever go to your
21  attorneys as trustee of the trust and ask them as
22  attorneys for trustee -- as attorneys for the
23  trust, what should you do in this situation?
24 A.  I don't remember.
25 Q.  Okay.  But you never told Orly about

20-01187-jlg   Doc 1-19   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 20
Pg 132 of 150
ORLY GENGER VS.                                                        DALIA GENGER
DALIA GENGER, et al                                                  December 13, 2012

Page 165

1    GENGER
2    this recision of assignment, correct?
3        MR. MEISTER: Objection. Asked and
4    answered.
5        BY THE WITNESS:
6    A.  We were not on speaking terms.
7        BY MR. GRIVER:
8    Q.  Well, you could have written her a
9    letter?
10   A.  I know.
11       MR. MEISTER: Objection. That's not a
12   question.
13       BY MR. GRIVER:
14   Q.  But you chose not to write her a
15   letter?
16       MR. MEISTER: Objection. That's not a
17   question. If you are talking about --
18       BY MR. GRIVER:
19   Q.  Isn't that correct?
20   A.  I did not notify Orly in any way
21   because her lawyers were aware already that this
22   happened.
23   Q.  Her lawyer were aware? How do you know
24   that her lawyers were aware already?
25   A.  Because later on there is a

Page 166

1        GENGER
2    continuation to this story. That's why I know.
3    Because she sued David. So, obviously, she knew
4    what's happening.
5    Q.  Other than her suing David, you have no
6    other reason to think that --
7    A.  I didn't have control of what she's
8    doing by her own initiative.
9    Q.  But as trustee of the trust you could
10   have provided her with the information that David
11   was rescinding --
12   A.  I could do many things.
13   Q.  But you chose not to, correct?
14   A.  This particular case, I knew that she
15   knows already.
16   Q.  Okay. And who was your lawyer in May
17   of 2008?
18   A.  2008?
19   Q.  Uh-huh.
20   A.  I think it was Mr. Meister, wasn't it?
21   No? No. So I am wrong then.
22   Q.  So you don't recall --
23   A.  I don't remember when, really, I
24   started to work with Mr. Meister.
25   Q.  Okay. It was never the intent of the

Page 167

1        GENGER
2    parties for TPR to ever collect on the D&K note;
3    isn't that correct?
4        MR. DELLAPORTAS: Objection. Calls for
5    speculation.
6        MR. ZILBERFEIN: Join.
7        BY THE WITNESS:
8    A.  Now, can you repeat the question.
9        BY MR. GRIVER:
10   Q.  Sure.
11   It was never the intent of any of the
12   parties to --
13   A.  Any of the parties, meaning?
14   Q.  To the D&K note?
15   A.  Who is any of the parties?
16   Q.  Well, let's -- okay.
17   When you signed the promissory note --
18   A.  Right.
19   Q.  -- to TPR on December 21 of 1993, it
20   was never your intent that TPR collect on the
21   note, correct?
22       MR. DELLAPORTAS: Object to form.
23       MR. ZILBERFEIN: Objection.
24       BY THE WITNESS:
25   A.  Okay.

Page 168

1        GENGER
2        BY MR. GRIVER:
3    Q.  Just a simple yes or no.
4    A.  It should have been collected, but we
5    didn't imagine that the kids are going to pay the
6    note, I mean.
7    Q.  You were general partner of D&K GP
8    until October of 2004; is that correct?
9    A.  Yes.
10   Q.  And you divorced your husband in, I
11   think you said, 2005?
12   A.  4.
13   Q.  2004?
14   A.  Yes.
15   Q.  Now, if I can show you this, which I
16   will mark as Dalia 13.
17       (Dalia Exhibit 13, document,
18       marked.)
19       BY MR. GRIVER:
20   Q.  Part of this notice of default --
21   A.  Wait a second. What's the date here?
22   Q.  August 31 of 2008.
23   A.  All right.
24   Q.  Part of the notice of default notes
25   that D&K GP had failed to make regular payments

Page 169

1    GENGER
2 since 2000.
3    Now, from --
4    MR. MEISTER: Is that a predicate, or
5 are you reading the note -- reading this?
6    BY MR. GRIVER:
7 Q. Do you see that?
8 A. Yeah. It is -- you know, this is
9 really complicated so let's take it slowly, okay.
10 Q. Page 1, line 3.
11 A. Right.
12 Q. I will just ask you this: Isn't it
13 true that D&K GP failed to make regular payments
14 on the notes since 2000?
15 A. Right.
16 Q. Okay. Now, at that time, you were the
17 general partner of D&K GP?
18 A. Right.
19 Q. You had the money to make those
20 payments?
21 A. No, I didn't.
22 Q. You didn't?
23 A. No, I didn't. I mean, the GP was
24 looked upon as a marital debt, okay, and I paid
25 half of it, and my husband paid half of it, okay.

Page 170

1    GENGER
2 And that was the story. And the fact that my
3 husband stopped paying -- because I was never in
4 charge of the finances in our household. So he
5 was the one that decided if he is going to pay or
6 not to pay.
7 Q. Okay.
8 A. I had nothing to do with that.
9 Q. At the -- in front of the court --
10 strike that.
11    During the marital -- strike that
12 again.
13    Why did you not want the note to be
14 returned to TPR?
15    MR. MEISTER: Objection. Assumes a
16 fact not in evidence.
17    BY THE WITNESS:
18 A. Why did I not want the note to be a
19 burden for my children?
20    BY MR. GRIVER:
21 Q. No. To be returned to TPR?
22    MR. MEISTER: Same objection.
23    BY THE WITNESS:
24 A. Because the note is a -- the note had
25 to be paid, okay, and, obviously, I did not want

Page 171

1    GENGER
2 the children to pay the note.
3    BY MR. GRIVER:
4 Q. And because returning the note to TPR
5 would result in the destruction of the Genger
6 family planning, that Orly and Sagi would share
7 equally in TPR, correct?
8 A. Yeah, unfortunately, we had a divorce,
9 and things change. But originally we were hoping
10 that the children will own part of the company,
11 and we will be able to finance the note, pay the
12 note. But it didn't happen.
13 Q. Now, when the --
14    MR. GRIVER: Could I have that answer
15 read back, please.
16    (WHEREUPON, the record was read by
17    the reporter as requested.)
18    BY MR. GRIVER:
19 Q. Now, your intention was that David
20 Parnes would keep the note forever, correct?
21 A. Yeah.
22 Q. Past the time of your divorce?
23 A. Yes. He will keep it. And later on, I
24 mean, we might have found some other solution,
25 legal solution, so that no one is going to get --

Page 172

1    GENGER
2 no one will be in a position to collect on the
3 note.
4 Q. You, yourself, did not want the note to
5 be collected?
6 A. I did not want the children to pay the
7 note, for the children will pay the note.
8 Q. You did not want --
9 A. Because I did not -- I personally did
10 not want the children to owe money to anyone.
11 Q. You did not want the note to be
12 collected, correct, not by David Parnes, not by
13 anyone?
14 A. I didn't want, but that's my want.
15    MR. MEISTER: Objection.
16    BY THE WITNESS:
17 A. But, legally, obviously, it has to be
18 paid.
19    BY MR. GRIVER:
20 Q. Well, you are not an attorney, correct?
21 A. What?
22 Q. You are not an attorney?
23 A. It is true, but I do have some
24 knowledge about notes.
25 Q. Okay. Now, David Parnes returned the

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 173

1    GENGER
2    note in 2008, correct?
3       MR. MEISTER: I'm sorry. Can you say
4    the end again.
5       BY MR. GRIVER:
6    Q. David Parnes returned the note in 2008,
7    correct?
8    A. I guess that's when he did. Yeah.
9       MR. GRIVER: Okay. Let me have this
10   marked as Dalia 14. For the record, Exhibit 14
11   is an affidavit of Dalia Genger.
12      (Dalia Exhibit 14, Dalia Genger
13      affidavit, marked.)
14      BY MR. GRIVER:
15   Q. Ms. Genger, is that your signature on
16   page 4?
17   A. Yes.
18   Q. This is an affidavit that you submitted
19   in the surrogate court on March 11, 2008?
20   A. Yes.
21   Q. And this is after your divorce,
22   correct?
23   A. (Indicating).
24   Q. And this is after the marital
25   arbitration with Justice Milonis?

Page 174

1    GENGER
2    A. I think so, yeah.
3    Q. Okay. Now, if you could look, please,
4    you can read as much as you want, but I am going
5    to ask you about paragraphs 8 and 9.
6    A. Ask me specifically about what
7    paragraphs?
8    Q. Paragraphs 8 and 9.
9    A. 8 and 9?
10   Q. Uh-huh.
11   A. 8 is what we discussed before, right?
12   Yeah. I didn't get anything. 8. And then 9,
13   too?
14   Q. I want you to read as much of this
15   affidavit as you want because, among other
16   things, I want to know whether you still agree
17   with it.
18   A. So far what I am reading is true.
19   Q. And you have read --
20   A. Because it is a disaster to get back
21   the note if you couldn't get rid of it. I mean,
22   I just don't understand the logic of Orly's
23   actions. In general, I mean, I always put my
24   children --
25      MR. MEISTER: Is there a question

Page 175

1    GENGER
2    pending?
3       THE WITNESS: No, there's no question.
4    Okay.
5       BY MR. GRIVER:
6    Q. Ms. Genger, in general --
7    A. In general --
8       MR. MEISTER: No, no. I insist there
9    be a question. I object.
10      BY MR. GRIVER:
11   Q. Please continue.
12   A. Okay. I will continue.
13      In general, I always put my children's
14   interests before my interest, my personal
15   interest, and that's the way I behave, and I --
16   that's my philosophy, and that's why I didn't
17   want the kids to bear the consequences of paying
18   $9 million.
19   Q. And you wanted the children to share
20   equally?
21   A. I wanted -- the original purpose was
22   the children will share equally the assets that
23   they were given.
24   Q. Thank you.
25      In paragraph 8, the last sentence: I

Page 176

1    GENGER
2    do not stand to gain anything personally by the
3    agreement, other than protecting the estate plan
4    implemented for the benefit of my children,
5    unquote. Do you see that language?
6    A. Yes. I do not stand to gain. Yeah.
7    Q. On March 11, 2008, when you signed this
8    affidavit under oath --
9    A. Again --
10   Q. -- was the estate plan still in effect?
11   A. Can you say this again.
12   Q. Sure.
13      On March 11, 2008 when you signed this
14   affidavit --
15   A. This affidavit, yeah.
16   Q. -- was the estate plan still in effect?
17      MR. DELLAPORTAS: Objection.
18      MR. ZILBERFEIN: Objection.
19      BY MR. GRIVER:
20   Q. That you had set up?
21      MR. DELLAPORTAS: Object to form.
22      MR. MEISTER: Object to the form of the
23   question.
24      BY THE WITNESS:
25   A. Well, the way I see it is that the

Page 177

GENGER

1     estate planning was done -- was signed in '93,
2     not foreseeing what the future is going to be,
3     namely that I will divorce my husband and there
4     will be no one to pay the note, okay.
5        BY MR. GRIVER:
6  Q.  In 2008 when you signed this affidavit,
7     you were trying to prevent Orly from putting in a
8     new trustee because you thought that doing so
9     would destroy the estate plan, correct?
10 A.  I prevented what?
11 Q.  You say -- just look at paragraph 8.
12 A.  8?
13 Q.  Paragraph 8.
14 A.  Yes.
15 Q.  Was the estate plan implemented for the
16    benefit of your children still in effect in March
17    of 2008?
18    MR. MEISTER: Objection.
19    BY THE WITNESS:
20 A.  When you say the estate planning, do
21    you mean that the note is valid?
22    BY MR. GRIVER:
23 Q.  No.  What I am saying is, is that in
24    March of 2008, you did not want the note returned

Page 178

GENGER

1     to TPR?
2  A.  It is true.
3  Q.  Because to do so would be to destroy
4     the estate plan?
5  A.  Right.
6  Q.  In fact, you did not want Orly to have
7     a new trustee appointed because you were afraid
8     that one of the things he would do would be to
9     collect on the note and therefore --
10 A.  No, I don't remember saying that.
11    Where does it say?
12 Q.  Well, look at 9.
13 A.  9.
14 Q.  These are your words.
15 A.  Okay.  Fine.
16 Q.  The note --
17 A.  I accept that it's my words.  I just
18    don't remember the --
19 Q.  If the note is returned to TPR --
20 A.  If the note is returned to TPR, which
21    my daughter seems to seek through the appointment
22    of a new trustee, it would recreate a related
23    party obligation and would have to be accelerated
24    or forgiven.

Page 179

GENGER

1  Q.  Okay.
2  A.  Yeah.
3  Q.  So you did not --
4  A.  So basically --
5  Q.  Go ahead.
6  A.  Basically, this statement came about
7     because I think the candidate that was supposed
8     to serve as a trustee, I did not trust.
9  Q.  And you were afraid that --
10 A.  Yeah, I was afraid that --
11 Q.  -- he would cause the note to be
12    returned to TPR, which would recreate a related
13    party obligation --
14    MR. DELLAPORTAS: Objection.
15    BY THE WITNESS:
16 A.  No.  The note was returned --
17    MR. DELLAPORTAS: Ms. Genger, when I
18    state an objection, you have to let me state it.
19    THE WITNESS: Okay.  I'm sorry.
20    MR. DELLAPORTAS: Object to form.
21    Mischaracterizes the record.
22    MR. ZILBERFEIN: I object as well.
23    BY THE WITNESS:
24 A.  Let me understand.

Page 180

GENGER

1     MR. MEISTER: Can I have the question
2     read back, please.
3     (WHEREUPON, the record was read by
4     the reporter as requested.)
5     BY MR. GRIVER:
6  Q.  Let's start from the beginning.
7     You still agree with paragraph 9 of
8     your affidavit, correct?
9  A.  I agree that if someone that I do not
10    trust will be a person that only my husband
11    trusts and not both of us trust, I wasn't sure
12    that he's not going to return the note.
13 Q.  And returning the note would destroy
14    the value of the Orly trust?
15 A.  Right.
16 Q.  And what it would do, it would wipe out
17    the assets of the trust in satisfaction of the
18    obligation under the note, correct?
19 A.  It is true, isn't it?
20 Q.  And you said that -- and then at the
21    very bottom you say:  This result is inconsistent
22    with my responsibilities to my children as their
23    mother and as trustee of the Orly trust, period.
24    Do you see that?

ORLY GENGER VS.                                                    DALIA GENGER
DALIA GENGER, et al                                          December 13, 2012

Page 181

GENGER

1
2  A.  I don't see, but, yes, it is.
3  Q.  No, let's take a look at it. It's the
4  next to the last sentence.
5  A.  Yes. This result is inconsistent with
6  my responsibilities to my children as their
7  mother, their caring mother, and as a trustee of
8  Orly trust. Obviously, this would have
9  bankrupt -- I mean, if they had to pay the note,
10  it would bankrupt the trust.
11  Q.  And such a result would be inconsistent
12  with your role as mother and as trustee?
13  A.  It is true.
14  Q.  And you did not want to see the Orly
15  trust -- you did not want to see the value of the
16  Orly trust destroyed, did you?
17  A.  Absolutely.
18  Q.  No matter who destroyed it?
19  A.  Obviously. I mean, always. As I said,
20  no matter what, I always had my first -- my first
21  concern was for Orly's interest.
22  Q.  And you were telling the court that
23  unlike Mr. Coleman, who you did not trust, you
24  would be there to protect the trust as trustee of
25  the Orly trust, correct?

Page 182

GENGER

1
2  MR. MEISTER: Objection. Is that what
3  you are reading?
4  BY MR. GRIVER:
5  Q.  Is that why you sent in this affidavit,
6  to let the court know you would protect the
7  trust?
8  A.  Where are you seeing this?
9  Q.  I am just asking you. You wanted to
10  be --
11  A.  I -- okay. Let me explain. Okay. I
12  did not trust my husband or all these other
13  people that were associated with him because they
14  just follow his instructions, okay. And that
15  caused a lot of problems, okay. And I did not
16  want to see Orly's trust being wiped out.
17  Q.  Okay. Now, since you have been
18  trustee, Orly's trust has been wiped out?
19  MR. DELLAPORTAS: Objection.
20  Mischaracterizes the record.
21  MR. ZILBERFEIN: Objection.
22  BY MR. GRIVER:
23  Q.  TPR collected on the note, didn't it?
24  MR. DELLAPORTAS: Objection. That's a
25  different question.

Page 183

GENGER

1
2  BY THE WITNESS:
3  A.  Sagi --
4  MR. ZILBERFEIN: Objection.
5  BY MR. GRIVER:
6  Q.  TPR collected on the note, correct?
7  A.  If you are talking about the fact that
8  Sagi sued D&K LP, right? Are you talking about
9  this?
10  Q.  I am asking, to your knowledge, as
11  trustee of the trust --
12  A.  Orly --
13  Q.  -- has the D&K note been collected by
14  TPR?
15  A.  The D&K note was -- I guess, partially,
16  I mean, yeah. Again, I mean, it is really very
17  confusing. Can you ask me again the question.
18  Q.  TPR has collected on the D&K note,
19  correct?
20  A.  TPR has collected on the note -- are
21  you alluding to the fact that Sagi -- TPR sold in
22  an auction the TPR shares? Are you talking --
23  Q.  TPR bought in an action the TPR shares.
24  A.  Right.
25  Q.  D&K sold --

Page 184

GENGER

1
2  A.  Right. Yeah.
3  Q.  Sagi sold the shares and bought the
4  shares?
5  A.  Absolutely. Yes. I mean, TPR.
6  Q.  So which means that --
7  A.  TPR sold and bought its own shares from
8  D&K LP.
9  Q.  Which is not what you wanted?
10  A.  Yeah, but, I couldn't stop it. What
11  could I do.
12  Q.  Well, you could not stop it -- well,
13  let me ask you this.
14  Exhibit 13, please. Did you ever see
15  this --
16  A.  Yeah.
17  Q.  -- notice of default?
18  A.  Yeah.
19  Q.  When did you see this notice of
20  default?
21  A.  I don't remember exactly when.
22  Q.  When did you first see it?
23  A.  I don't remember when.
24  Q.  Well, do you remember -- let me look.
25  Did you ever receive the notice in the

Page 185

1    GENGER
2  mail -- strike that.
3    Did you ever receive the notice on or
4  about August 31, 2008?
5  A.  I remember that I saw it.
6  Q.  Okay.  Did you -- let me point you to
7  Dalia Exhibit 3.
8  A.  Yeah.  What page?
9  Q.  Look at interrogatory number 1.  This
10  is a question to you.  Did you receive the
11  8-31-08 notice?  That's the note notice marked --
12  A.  I responded I don't remember receiving
13  the notice.
14  Q.  Okay.  And is that still true?
15  A.  I just said that I don't remember that.
16  But I did say that I remember that I was -- I did
17  see this document.  I don't know if it was -- if
18  it came by mail or whatever.
19  Q.  Well, you do go on to say your attorney
20  Robert Meister received a copy of the notice on
21  May 19, 2009; do you see that?
22  A.  So it is true then.
23  Q.  That's after the sale?
24  A.  Yeah.  I guess.
25  Q.  Do you remember receiving a copy of the

Page 186

1    GENGER
2  notice before the sale?
3  A.  Before the sale?  I am trying to
4  remember.  Yeah.  I was aware that Sagi is going
5  to take the step --
6  Q.  I understand that at some point you
7  became aware.  I am asking did you receive the
8  8-31-08 notice prior to your attorney receiving a
9  copy of the notice on May 19?
10  A.  That's the answer.  I don't remember.
11  Q.  Okay.  And you don't remember receiving
12  such a notice then?
13  A.  I don't remember.  I might have.
14  Q.  Or you might not have?
15  A.  Right.
16  Q.  Did you ever tell Orly about the
17  8-31-08 notice?
18  A.  No.
19  Q.  Why not?
20  A.  Because, first of all, I might have not
21  received it, so I didn't tell her.  And, second,
22  this was something that I could not stop.
23  Q.  Okay.  We will -- let's talk about
24  that.  Why could you not stop it?
25  A.  Because TPR -- I didn't have any

Page 187

1    GENGER
2  influence on TPR in the way that I can stop them
3  from acting to foreclose on the note.
4  Q.  Did you go to Sagi and say, "What are
5  you doing?  Why are you doing this?"  Did you
6  ever asking Sagi that?
7  A.  I might not have received them, as we
8  said, so I don't know if I said it or not.
9  Q.  At any time before the sale on February
10  27, 2009, did you try and stop the sale by going
11  to Sagi and saying, "don't do this," or words to
12  that effect?
13  A.  If I was aware of that before, I might
14  have told him, but --
15  Q.  I don't want you to speculate.
16  A.  I am saying because I do not remember.
17  Q.  You don't remember ever going to Sagi
18  and saying, "Please don't do this sale"?
19  A.  No, I didn't say that.
20  Q.  Or words to that effect?
21  A.  Right.  I did not say that because it
22  is not my place to say it.  He can do whatever he
23  wants.  He has a note, and he wanted to collect
24  on it.
25    MR. GRIVER:  Could you repeat her

Page 188

1    GENGER
2  answer, please.
3    (WHEREUPON, the record was read by
4  the reporter as requested.)
5  BY MR. GRIVER:
6  Q.  Did you as trustee go to the trust
7  attorneys and try and find a way to prevent or
8  delay the sale?
9  A.  I don't remember.
10  Q.  By that time your attorneys would be
11  Mr. Meister?
12  A.  I guess.  Yeah.
13  Q.  Did you ever go to Mr. Meister in an
14  attempt to find a legal way to stop the sale?
15  A.  No.
16  Q.  Let me show you what's been marked
17  as --
18  A.  I tell you, I didn't have intentions to
19  participate in this because there was -- we
20  didn't have any resources to compete, I mean, in
21  auction.
22    MR. MEISTER:  Can we take a break now,
23  please?
24  BY MR. GRIVER:
25  Q.  Ms. Genger, do you need a break?

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 189

1   GENGER
2 A. I guess so. Yeah.
3       MR. GRIVER: Okay. Let's take a break.
4   I ask that you not speak to anyone about your
5   testimony. Five minutes?
6       MR. MEISTER: Five minutes.
7       (WHEREUPON, a recess was had from
8       3:34 p.m. to 3:42 p.m.)
9   MS. WARREN: Are we on the record?
10      During the break, I was in the bathroom
11  with Ms. Genger, who approached me and said that
12  she might have made a mistake in her past
13  testimony. I cut her off before she could tell
14  me the substance of any mistake that she thought
15  that she made. But if she feels that a mistake
16  is made, I would like to just ask that we give
17  her an opportunity to clarify the record.
18      MR. LEINBACH: That sounds absolutely
19  reasonable.
20      BY MR. GRIVER:
21 Q. Ms. Genger, this correction that you
22  made, did anyone talk to you about this
23  correction? I am not talking about Ms. Warren.
24  I am saying did you speak with Sagi or anyone
25  else, and that's why you remember this?

Page 190

1   GENGER
2 A. No, no.
3 Q. Okay. Why don't you put your
4  correction on the record.
5 A. Okay. The correction is that once I
6  was aware that this notice existed, I did consult
7  with my lawyer, and I chose not to inform Orly.
8 Q. When you say that you consulted with
9  your attorney, you were consulting as trustee of
10  the trust?
11 A. As a trustee, obviously.
12 Q. And you were going to this attorney
13  understanding that he represented the trust?
14 A. The trust.
15 Q. He represented the trust?
16 A. The trust.
17 Q. And you were seeking advice as trustee
18  for what is best for the trust?
19 A. Right.
20 Q. And the beneficiary of the trust?
21 A. Obviously.
22 Q. And that was Mr. Meister?
23 A. Uh-huh.
24 Q. And did he provide you advice?
25 A. Yes.

Page 191

1   GENGER
2 Q. And what was his advice?
3 A. I don't think I can tell you that.
4       MR. GRIVER: Mr. Meister, are you --
5       BY MR. GRIVER:
6 Q. I don't hear any objection from
7  Mr. Meister instructing you not to answer. So
8  what was Mr. Meister's advice?
9 A. Okay. So we weighed our options --
10      MR. ZILBERFEIN: You mean to the extent
11  it is attorney-client privilege?
12      BY THE WITNESS:
13 A. I think it is privileged, but we --
14      BY MR. GRIVER:
15 Q. Go ahead.
16 A. Okay. So we weighed the options that
17  we had, and we concluded that there is nothing
18  that I can do to stop Sagi from, you know, doing
19  whatever he did with the auction.
20 Q. There's nothing you could do to stop --
21 A. Yeah.
22 Q. Did you -- and how long was this
23  conversation with your attorney? Was it --
24 A. You want me to say -- are you kidding?
25 Q. Did you discuss it for an hour? Did

Page 192

1   GENGER
2  you discuss it for half an hour?
3 A. I don't know. I have to look in my
4  bills. I don't know.
5 Q. Again, I will ask for the bill --
6 A. Yeah.
7 Q. -- so that we can discuss this.
8       Did you at the time -- how long had
9  Mr. Meister been your attorney, the attorney for
10  the trust?
11 A. I don't remember when we started. I
12  don't remember when I -- when he started to be
13  the lawyer for the trust. I don't remember what
14  date it was.
15 Q. Besides your attorney, did you speak to
16  anybody else about it?
17 A. No.
18 Q. Did you speak with Sagi?
19 A. No.
20 Q. Do you know --
21      MR. MEISTER: Can we go off the record
22  for a second and take a break?
23      MR. GRIVER: No, not in the middle of
24  this.
25      BY THE WITNESS:

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 193

1     GENGER
2  A.  Okay.  What is the question?  I did not
3  discuss with Sagi.
4     BY MR. GRIVER:
5  Q.  Okay.  Well, did your lawyer at the
6  time know about the position you had taken in the
7  marital arbitration?
8  A.  If he knew?  I don't know if he knew.
9  Q.  Okay.  Did you and your attorney
10  discuss --
11     MR. MEISTER:  Mr. Griver, you a moment
12  ago asked that we produce a copy of a bill
13  reflecting conversations, and I have a copy of
14  that bill with me.
15     MR. GRIVER:  Are these all the bills?
16     MR. MEISTER:  Beg pardon?
17     MR. GRIVER:  Are these all of your
18  bills?
19     MR. ZILBERFEIN:  It's two pages.  I
20  don't think two pages are all of his bills.
21     THE WITNESS:  They are concerning the
22  discussion --
23     MR. MEISTER:  Dalia, let me say it.
24     It is a bill dated March 5, 2009
25  covering the period of February 4, 2009 through

Page 194

1     GENGER
2  February 27, 2009.  And I do not believe it is
3  privileged.  I do not intend to waive any
4  attorney-client privilege.  If you will let me
5  produce it with that caveat, I am prepared to
6  produce it.
7     MR. GRIVER:  Is it your position that
8  that document is privileged?
9     MR. MEISTER:  Looking at it, I do not
10  believe that it contains any confidential
11  communications from my client to me, nor any
12  legal advice which I rendered.  It merely
13  reflects the facts of the conversations and the
14  dates and the times.
15     MR. GRIVER:  I will take that because
16  then it is certainly not privileged, but I will
17  tell you it is my position that if you are the
18  attorney for the trust giving advice to the
19  trustee of the trust, that there is no privilege.
20     MR. MEISTER:  I understand that's your
21  contention.  What I'm saying is without acceding
22  to that, if you will accept it without that being
23  a concession, I am prepared to produce it.
24     MR. GRIVER:  That is fine.
25     MR. MEISTER:  Would you like to make

Page 195

1     GENGER
2  copies?
3     MR. LEINBACH:  Sure, and I will give it
4  back.  I will make one for every one.
5     MR. MEISTER:  Thank you.
6     BY MR. GRIVER:
7  Q.  All right.  What options did you
8  discuss --
9     MR. MEISTER:  Why don't you wait
10  until -- because it is going to enable her to
11  answer some questions which she didn't remember
12  which you just asked.
13     MR. GRIVER:  All it is is your time.
14  That's for your deposition we will get into that.
15  What I am talking about now with Ms. Genger is
16  her memory.
17     BY MR. GRIVER:
18  Q.  What options did you discuss with
19  Mr. Meister at that time regarding --
20  A.  The option, if I have any tools that I
21  can use to stop Sagi from having this auction.
22  Q.  Did you --
23  A.  You know, he had a note, and legally he
24  was collecting on the note.  I mean --
25  Q.  Any --

Page 196

1     GENGER
2  A.  I mean TPR.
3     MR. GRIVER:  Any memoranda, any
4  documents, any e-mails related to these
5  conversations between you as trust -- and
6  regarding any advice that you gave to Dalia
7  Genger as trustee, did or did not give to Dalia
8  Gener as trustee, I would like that.  And I am
9  putting my demand on the record right now.
10     BY MR. GRIVER:
11  Q.  Did you discuss with Mr. Meister the
12  possibility of calling up Sagi and saying, "Hey,
13  please stop"?
14  A.  I don't remember that I -- I believe
15  I -- I never had any chance of stopping him, so I
16  didn't call.
17  Q.  Did you discuss with Mr. Meister the
18  possibility of suing Sagi to stop him?
19  A.  What?
20  Q.  Suing TPR to stop him?
21  A.  I'm sorry?
22  Q.  Did you discuss the possibility of
23  suing to prevent the sale?
24  A.  No.  Because I am not really believing
25  in taking legal actions and spending money of the

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 197

1    GENGER
2    trust to be defeated in this case.
3    Q. Okay. Did you tell -- at the time that
4    you were speaking with Mr. Meister, did he have
5    all of the documentation for the marital
6    arbitration, do you know?
7    A. I don't know if he had. He might.
8    Q. Did you discuss with Mr. Meister the
9    possibility of letting Orly know about the sale?
10   A. I don't remember it.
11   Q. Did you discuss with -- strike that.
12   You know what an auction is, correct?
13   A. Yes, I do.
14   Q. People show up, you try and get the
15   most money?
16   A. Yeah, the most money. This is how
17   you --
18   Q. Did you discuss with Mr. Meister the
19   possibility of letting Orly know so that other
20   people could go in and bid on the TPR asset?
21   A. No, I did not discuss this.
22   Q. That was not an option that you
23   considered?
24   A. No.
25   Q. Is that an option that was raised by

Page 198

1    GENGER
2    Mr. Meister?
3    A. I don't think so.
4    Q. Did you consider letting Arie know
5    about the sale?
6    A. I presume that if I didn't notice Orly,
7    of course I didn't notify Arie. It is not my
8    duty to notify Arie if there is a sale, an
9    auction of shares.
10   Q. If there is -- is it your duty as a
11   trustee to try and get the best price for the
12   shares?
13   A. It is why --
14   MR. MEISTER: Objection.
15   BY THE WITNESS:
16   A. This is why there is an auction.
17   BY MR. GRIVER:
18   Q. And so do you think that Arie --
19   A. It is Sagi's responsibility. Wherever
20   he's selling the shares, it is his responsibility
21   to let people know that there is an auction and
22   get bids on that.
23   Q. And you did not think that --
24   A. It is not my responsibility.
25   Q. It is not your responsibility as

Page 199

1    GENGER
2    trustee to do that?
3    A. No.
4    Q. How is it --
5    A. Because I didn't.
6    Q. Because you didn't?
7    A. Because it wasn't my auction.
8    Q. Okay. Well, but it was -- but the Orly
9    trust had an interest in that auction?
10   A. It is true.
11   Q. Okay. And so why didn't you call up
12   Arie and say, "Hey, Arie, those TPR shares are
13   for sale"?
14   A. Because Arie's interest is not the same
15   as my interest or Orly's interest.
16   Q. Isn't it Orly's interest to get the
17   best price for her interest?
18   A. It is.
19   Q. Okay. So isn't getting as many people
20   as possible who want to buy the shares --
21   A. But it is not my responsibility to
22   collect people that will participate in the
23   auction. Sagi followed the procedure that he
24   should have, the procedure for an auction, and he
25   followed whatever he was supposed to do. And

Page 200

1    GENGER
2    whoever was aware of it is fine and participated
3    in the auction.
4    Q. And you weren't going to let Arie know?
5    A. Not Arie or anybody else.
6    Q. How do you know that it is Sagi's
7    responsibility only to get people to show up at
8    his auction? Is that something that Mr. Meister
9    told you?
10   MR. MEISTER: Objection. Compound.
11   BY THE WITNESS:
12   A. In general, in general, if you have --
13   you auction something, you want people to be
14   aware of the auction and bid on it, and, you
15   know, have the highest price possible.
16   BY MR. GRIVER:
17   Q. Did Mr. Meister or anyone at his law
18   firm tell you that it was not your responsibility
19   as trustee to try and get the highest price for
20   the TPR D&K interest?
21   MR. MEISTER: Read that back, please.
22   (WHEREUPON, the record was read by
23   the reporter as requested.)
24   BY THE WITNESS:
25   A. He never said that. He never told me

Page 201

1    GENGER
2  that I shouldn't look for -- what was the
3  question again?
4    BY MR. GRIVER:
5  Q.   Yes.
6    Did Mr. Meister tell you that you
7  shouldn't look for other people to participate in
8  the auction?
9    MR. MEISTER: Just so we are clear,
10  your question is should not?
11    MR. GRIVER: Should not.
12    BY THE WITNESS:
13 A.  That other people --
14    BY MR. GRIVER:
15 Q.  Let me rephrase it, and please listen.
16    Did Mr. Meister or anyone else at his
17  law firm tell you that it was not your
18  responsibility as trustee to try and maximize the
19  price at the auction?
20 A.  I don't remember that we discussed that
21  subject, that option.
22 Q.  Did you and Mr. Meister discuss what
23  your responsibilities are as trustee with regard
24  to the UCC auction?
25 A.  The UCC?

Page 202

1    GENGER
2  Q.  With regard to the auction?
3  A.  Again, I am getting tired.  What are
4  you saying?
5  Q.  Did you and Mr. Meister discuss what
6  your responsibilities were as trustee with regard
7  to the auction?
8  A.  With regard to the auction?  I think,
9  basically, what was discussed is if I -- if the
10  trust in any way can be a participant in the
11  auction.
12 Q.  And what did Mr. Meister say?
13 A.  And, obviously, we didn't have the
14  resources to participate.
15 Q.  What about other people participating
16  in the auction?
17 A.  I don't know about other people.
18 Q.  Who had the resources?  You never asked
19  Mr. Meister?
20    MR. MEISTER: Can I have the question
21  read back, please.
22    BY THE WITNESS:
23 A.  I never --
24    MR. GRIVER: Wait, Dalia.
25    (WHEREUPON, the record was read by

Page 203

1    GENGER
2  the reporter as requested.)
3    MR. MEISTER: Object to the form.
4    BY MR. GRIVER:
5  Q.  Let me clean that up.
6    You never asked Mr. Meister about
7  getting other people involved in the auction?
8  A.  Participate in the auction.  I don't
9  remember that we discussed other people.
10 Q.  Do you understand that it is your job
11  as trustee to get the best price at the auction?
12    MR. MEISTER: Objection.  Asked and
13  answered several times now.
14    MR. DELLAPORTAS: Object to form.
15    BY THE WITNESS:
16 A.  Yes, you did ask me.
17    MR. ZILBERFEIN: Objection.
18    BY MR. GRIVER:
19 Q.  One way to get the best price possible
20  is to get as many people bidding as possible.
21    MR. MEISTER: Objection.  That's not a
22  question.
23    MR. DELLAPORTAS: Objection.  That's
24  not a question.
25    BY THE WITNESS:

Page 204

1    GENGER
2  A.  Do you want to teach me?
3    MR. MEISTER: No, no.  Wait until
4  there's a question, Dalia.
5    BY MR. GRIVER:
6  Q.  One way to get the best price is to get
7  as many people bidding as possible?
8    MR. DELLAPORTAS: Object to form.
9    MR. ZILBERFEIN: Objection.
10    BY MR. GRIVER:
11 Q.  Correct?
12    MR. MEISTER: Join the objection.
13    BY MR. GRIVER:
14 Q.  I am waiting.
15 A.  Yeah, I guess it is correct.  Yeah.
16 Q.  Why did you then did you not let Arie
17  know that --
18 A.  Yeah, because I particularly did not
19  want Arie to be involved as far as Orly's assets
20  are concerned in any way.
21 Q.  Okay.
22    MR. MEISTER: Can we go off the record
23  for a second?
24    MR. GRIVER: No.  Well, I'm almost
25  done.

Page 205

```
 1    GENGER
 2    BY MR. GRIVER:
 3  Q.  If Sagi was going to pay $2 million for
 4    Orly's assets, and Arie was going to pay $3
 5    million for Orly's assets, at the end of the
 6    day --
 7  A.  At the same time, Arie is doing other
 8    things, like paying your bills instead of Orly.
 9    You understand? That's my -- that's where I am
10    going, because you are not objective. You are
11    being paid not by Orly, but by somebody else,
12    like my husband. It is financing this
13    deposition. And that's why I didn't want Arie to
14    be involved in this auction.
15  Q.  Because his money is tainted?
16  A.  No. Because his interest -- Orly's
17    interest is not the same as Arie's interest.
18    That's why. Airy's interest is to have control
19    over Orly's assets, I believe.
20  Q.  And if Arie had paid $5 million --
21  A.  He wouldn't. He didn't have any money
22    because we just split our marital assets, and he
23    got five and I got five. So how could he pay?
24  Q.  Did you check to see if he could, or
25    did you let --
```

Page 206

```
 1    GENGER
 2  A.  I didn't check because I know.
 3  Q.  You didn't check because --
 4  A.  Unless he hid some money that I don't
 5    know about because then I have to get part of it.
 6    I don't know.
 7  Q.  You didn't check because -- you didn't
 8    check because you didn't want Arie to
 9    participate?
10  A.  No, that not true.
11     MR. ZILBERFEIN: Are you testifying?
12     BY THE WITNESS:
13  A.  I'm just saying --
14     MR. ZILBERFEIN: Objection. The
15    attorney is testifying.
16     BY THE WITNESS:
17  A.  -- that I didn't check because I knew
18    what his financial condition is at that time,
19    because we were supposed to have the same amount
20    of assets or money or whatever you call it, okay.
21     BY MR. GRIVER:
22  Q.  And you don't think --
23  A.  And if he had some extra money, then it
24    was marital money that I was supposed to get part
25    of it.
```

Page 207

```
 1    GENGER
 2  Q.  And you are not sure that he -- and you
 3    thought that Arie couldn't find some friends of
 4    his who might participate in the auction?
 5  A.  I don't know if he has friends.
 6  Q.  But if Arie participated and didn't
 7    have as much money as Sagi, that's fine. But
 8    isn't it a possibility that he would have been
 9    able to get more money?
10  A.  There's always possibilities of
11    anything to happen. The earthquake, the building
12    going on fire, I don't know.
13  Q.  So as trustee, why didn't you explore
14    that possibility?
15  A.  I told you already. Because I knew how
16    much Arie has. And, personally, I know my
17    husband. I was married 33 years. And I know
18    what's happening between Arie, unfortunately, and
19    Orly.
20  Q.  And why didn't you tell Orly?
21  A.  What? Because Orly at this time was
22    brainwashed already, so I couldn't talk to her,
23    candidly, even though I did try.
24  Q.  And if Orly had known, then Arie would
25    have known, correct?
```

Page 208

```
 1    GENGER
 2  A.  This did not occur to me at all.
 3  Q.  It didn't occur to you that if you told
 4    Orly about the sale that she would tell her
 5    father? That didn't occur to you at all?
 6     MR. MEISTER: Objection. Asked and
 7    answered. The immediately preceding answer.
 8     THE WITNESS: I have to have some candy
 9    here. My mouth is very dry.
10     MR. GRIVER: Can you read back my
11    question, please.
12     (WHEREUPON, the record was read by
13    the reporter as requested.)
14     BY THE WITNESS:
15  A.  I didn't think about it at the time.
16    But I am telling you frankly, I didn't want Arie
17    to be involved in this auction.
18     BY MR. GRIVER:
19  Q.  And did it --
20  A.  Because I know my husband. I'm sorry.
21  Q.  Did it occur to Mr. Meister that if you
22    told Orly, that Orly would tell Sagi?
23  A.  I don't know if it occurred to him.
24    You should ask him. I don't know.
25  Q.  Did Mr. Meister instruct you that it is
```

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 209

1    GENGER
2    your job as trustee to get the best price for the
3    trust assets?
4        MR. ZILBERFEIN: Objection. Asked and
5    answered.
6        BY THE WITNESS:
7    A. Yeah.
8        MR. MEISTER: Join in the objection.
9        BY THE WITNESS:
10   A. Yeah, I said, I do not remember talking
11   about it.
12       MR. GRIVER: Let me show you what I
13   have marked as Exhibit 15. For the record,
14   Exhibit 15 is the meeting of partners of D&K LP
15   January 31, 2009 and agreement.
16       (Dalia Exhibit 15, 1/31/2009
17       meeting and agreement, marked.)
18       BY MR. GRIVER:
19   Q.  That is you signing on behalf of the
20   Orly Genger trust?
21   A. Right.
22   Q.  So do you recall this agreement?
23   A. Yeah.
24   Q.  Could you tell me, please, first of
25   all, who drafted it, do you know?

Page 210

1    GENGER
2    A. A lawyer. I don't know which one. I
3    didn't draft it.
4    Q.  Was it your lawyer or Sagi's lawyer?
5        MR. MEISTER: Objection. Compound.
6        MR. DELLAPORTAS: Object to form.
7        BY THE WITNESS:
8    A. I really don't know which lawyer was
9    it.
10       MR. ZILBERFEIN: Objection.
11       BY THE WITNESS:
12   A. My duty was to read it and sign.
13       BY MR. GRIVER:
14   Q.  Did you read it before you signed it?
15   A. Yeah.
16   Q.  And do you understand what it does?
17   A. Yeah.
18   Q.  What does it do?
19   A. As far as I am concerned, I got what I
20   wanted.
21   Q.  Which is?
22   A. Which is number 8.
23   Q.  Number 8?
24   A. Refrain from enforcing the note against
25   each limited partner for 30 days. To calm down

Page 211

1    GENGER
2    everyone.
3    Q.  30 days, okay.
4    A. Yeah.
5    Q.  And you needed those 30 days to do
6    what, exactly?
7    A. First of all, to have a conversation
8    with my attorney.
9    Q.  Uh-huh.
10   A. And, also, my intent was to talk to
11   Sagi and ask him to try -- ask him not to sue his
12   sister, the trust, Orly's trust. And so it did
13   happen that until today, Sagi never sued Orly's
14   trust.
15       Why are you laughing, it is not true?
16   Q.  So in those 30 days --
17   A. Yeah.
18   Q.  -- you spoke to Sagi?
19   A. Yeah.
20   Q.  And you told him --
21   A. I spoke many times to Sagi, that he
22   wanted to act in a way that he felt like acting
23   because he was getting sued right and left, and
24   he was very angry. And I tried to calm him down
25   and tried to talk to him not to sue his sister.

Page 212

1    GENGER
2    Q.  Well, what this says, this 8 doesn't
3    say that TPR Investment Associates, Inc., has
4    agreed to not sue Orly Genger. It doesn't say
5    that.
6    A. It doesn't say, but for me, my
7    intention was to start pursuing Sagi not to sue
8    Orly Genger trust. And I was successful in doing
9    that.
10   Q.  You were afraid that Sagi would sue
11   Orly's trust for what exactly?
12   A. There's always something to sue. He
13   can foreclose on the --
14   Q.  On the note?
15   A. Yeah.
16   Q.  Okay. So he didn't sue, but he did
17   foreclose on the note?
18   A. He foreclosed on the D&K LP.
19   Q.  He foreclosed on the note, and got --
20   A. D&K LP, but not directly Orly trust.
21   Q.  What other -- TPR also agreed to
22   refrain from enforcing the note for 30 days,
23   correct?
24   A. Yeah.
25   Q.  Okay.

20-01187-jlg   Doc 1-19   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 20
Pg 144 of 150
ORLY GENGER VS.                                        DALIA GENGER
DALIA GENGER, et al                                    December 13, 2012

Page 213

1   GENGER
2 A.  That's the 30 days we are talking
3 about.
4 Q.  Did you speak to Sagi about not
5 enforcing the note?
6 A.  I spoke to Sagi about not suing Orly's
7 trust.
8 Q.  But it was okay that he sell the note?
9 A.  You mean the auction?
10 Q.  Yes.  You okay with the auction?
11 A.  I wasn't okay with it, but I had
12 nothing that I could do to prevent him.
13 Q.  You didn't tell him don't do it because
14 it will destroy the estate planning?
15 A.  No, I did not tell him.
16 Q.  In sum or in substance you never told
17 him?
18 A.  What?
19 Q.  In sum or in substance you never told
20 him that?
21   MR. ZILBERFEIN: Objection.
22   MR. MEISTER: Objection to form.
23   BY MR. GRIVER:
24 Q.  Correct?
25 A.  We said that -- I said that I did talk

Page 214

1   GENGER
2 with my lawyer, what are the options, and --
3 Q.  I am not talking about your lawyer.  I
4 am talking about Sagi.
5   MR. MEISTER: Please let her finish the
6 answer.
7   BY MR. GRIVER:
8 Q.  I am talking about your conversation
9 with Sagi.  What did you -- what in your
10 conversation -- please tell me all about your
11 conversation.
12 A.  Yes.  The conversation is that Sagi
13 should restrain himself from suing Orly's trust,
14 even though he was very angry at his sister, the
15 way she treated him by, you know, being sued
16 right and left.  And, you know, I understand it.
17 You can be very angry when somebody does it to
18 you.  So I just wanted him not to sue the trust.
19 Q.  So as trustee you got him to not sue
20 the trust?
21 A.  Right.
22 Q.  But you permitted him to proceed with
23 the auction?
24 A.  I didn't permit him.  I didn't permit
25 him.  He did what he thought he can -- he should

Page 215

1   GENGER
2 do.
3 Q.  Did he -- well --
4 A.  He didn't ask my permission.
5 Q.  Did you ask him not to do the auction?
6 A.  You asked me this already, and I
7 answered.
8 Q.  You did not?
9 A.  I did answer.
10 Q.  You did ask him?
11 A.  I did answer this question.
12 Q.  I understand.  Just so we are clear
13 because then I am going to go ask additional
14 questions on it.
15   You did not ask him to not do the
16 auction?
17   MR. MEISTER: Objection.  Compound and
18 negative.
19   MR. DELLAPORTAS: Asked and answered.
20   MR. ZILBERFEIN: Objection.  Asked and
21 answered.
22   MR. DELLAPORTAS: She said it is not
23 her place to tell him what to do.
24   MR. ZILBERFEIN: She is also --
25   MR. DELLAPORTAS: We are all in the

Page 216

1   GENGER
2 room.  We all heard it.
3   MR. ZILBERFEIN: She --
4   THE WITNESS: I am speaking --
5   MR. MEISTER: Don't argue with him.
6 Wait for a question.
7   MR. LEINBACH: You are entitled to
8 objections, pursuant to the judge's --
9   MR. ZILBERFEIN: Yeah, but he can't be
10 asking the same question ten times.
11   THE WITNESS: We have a limited time
12 that I can sit here.  I'm getting tired.
13   MR. ZILBERFEIN: You are getting the
14 same question over and over and over again.
15   THE WITNESS: I am getting tired.
16   MR. MEISTER: Please don't argue with
17 him.
18   THE WITNESS: You ask me so many
19 questions.  I can't -- it's going to be the same
20 answer.
21   BY MR. MEISTER:
22 Q.  Dalia, please just --
23   MR. S. GENGER: It's Ms. Genger.
24   BY MR. GRIVER:
25 Q.  Ms. Genger, please just listen to my

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

Page 217

1    GENGER
2  question and answer.
3    MR. S. GENGER: She's not your friend,
4  Yoav. She's the witness.
5    BY MR. GRIVER:
6  Q.  Did you ask Sagi in that conversation
7  to not proceed with the auction, yes or no?
8    MR. DELLAPORTAS: Objection.
9    MR. ZILBERFEIN: Objection.
10    BY THE WITNESS:
11  A.  After consulting with my lawyer, I did
12  not ask him to do that.
13    BY MR. GRIVER:
14  Q.  Because why?
15  A.  Because I didn't think that I would be
16  able to stop him. It was his right to do it. I
17  couldn't ask him to do it, not to do it.
18  Q.  Sagi also has a right to sue --
19  A.  Right.
20  Q.  -- the Orly trust?
21  A.  Yeah. But my focus was on the TRI
22  shares that Orly claimed were worth millions and
23  hundreds of millions of dollars. So in
24  comparison, giving up TPR shares, it was peanuts.
25  Q.  Did you ask Sagi to promise to not do

Page 218

1    GENGER
2  anything with the TI shares after the auction?
3  A.  Obviously. After -- the auction was on
4  TPR shares, not TRI shares.
5  Q.  Did you ask -- since your focus was on
6  the TI shares, did you talk to Sagi about not
7  doing anything to the TI shares in that
8  conversation?
9  A.  Yes, I did, because he could have sued
10  the trust and then foreclosed on the TRI shares.
11  Q.  And what did Sagi tell you? Did he
12  promise not to do that?
13  A.  After many, many arguments and personal
14  fights that we had, he agreed not to do it. And
15  he did until today, he never sued Orly's trust.
16    Is this funny?
17  Q.  In return for TPR agreeing to refrain
18  from enforcing the note for 30 days --
19  A.  I didn't hear the beginning of the
20  question.
21  Q.  If you look at the meeting agreement,
22  TPR agrees to not enforce the note for 30 days,
23  correct?
24  A.  TPR Investment has agreed to refrain
25  from enforcing the note against each limited

Page 219

1    GENGER
2  partner for 30 days. Right.
3  Q.  But TPR did not agree to refrain from
4  enforcing the note against D&K LP directly, or is
5  that included in paragraph 8?
6    MR. MEISTER: Compound and
7  incomprehensible. So I object.
8    BY THE WITNESS:
9  A.  Yes, it is hard for me -- Sagi did sue
10  the D&K LP, but he didn't see Orly's trust.
11    BY MR. GRIVER:
12  Q.  So far?
13  A.  Well, it is many years. I mean, it is
14  a long time. Seeing at least 30 days.
15  Q.  And in exchange you gave him a general
16  release?
17  A.  We both got -- I mean, each party got a
18  release.
19  Q.  You got a release, and he got a
20  release?
21  A.  That's true.
22  Q.  Certain people didn't get a release?
23  A.  Who didn't get a release?
24    MR. MEISTER: Wait for a question.
25    BY MR. GRIVER:

Page 220

1    GENGER
2  Q.  Arie didn't get a release, correct?
3  A.  Arie?
4  Q.  Arie didn't get a release?
5  A.  It is his problem. I don't know.
6  Q.  Okay. William Dowd didn't get a
7  release?
8    MR. MEISTER: Is there a question?
9    BY THE WITNESS:
10  A.  This is not -- they are not partners in
11  D&K LP.
12    MR. MEISTER: Wait for the question.
13  Wait for the question.
14  THE WITNESS: Okay.
15    BY MR. GRIVER:
16  Q.  Well, why were these persons identified
17  by you in this paragraph?
18  A.  It is partnership of the D&K LP. And
19  there were -- the parties that you mentioned are
20  not parties in the D&K LP. That's why they
21  didn't get the release. They are not included in
22  these documents. They are not part of these
23  documents.
24  Q.  But why did you mention them
25  specifically if they weren't included?

ORLY GENGER VS.                                          DALIA GENGER
DALIA GENGER, et al                                      December 13, 2012

---

Page 221

1    GENGER
2 A.  You asked me about Arie, and I didn't
3    mention these names.
4 Q.  I am asking you why are they mentioned
5    in the bottom of paragraph 1 as not being
6    released?
7 A:  Again, ask me the question.
8 Q.  Why are those included as -- why are
9    those persons, Arie Genger, William Dowd,
10   Lawrence Small, and Edward Kilmerman, not
11   included in the general release?
12 A.  They were not included because they
13   were not part of the D&K LP. They were not
14   partners in D&K LP.
15 Q.  So why was it necessary to mention them
16   by name?
17 A.  I guess the lawyer found it necessary
18   to mention it.
19     MR. ZILBERFEIN: Take a bathroom break,
20   please.
21     MR. GRIVER: Let's go off the record.
22     (WHEREUPON, a recess was had from
23   4:18 p.m. to 4:28 p.m.)
24     MR. GRIVER: The parties have agreed to
25   adjourn Dalia's deposition until February 7,

---

Page 222

1    GENGER
2  2013.
3      MR. MEISTER: Also at 10:30, please.
4      MR. GRIVER: Also at 10:30. That date
5   is okay with the deponent, the deponent's
6   attorney, and all the other attorneys in this
7   case.
8      (WHEREUPON, at 4:28 p.m., by
9    agreement of the parties, the
10    deposition of D. GENGER was
11    adjourned until Thursday, February
12    7, 2013, at 10:30 a.m., and the
13    deponent reserved her right to
14    read and sign the transcript.)
15
16
17
18
19
20
21
22
23
24
25

---

Page 223

1    A C K N O W L E D G M E N T
2
3  STATE OF        )
4              :ss
5  COUNTY OF       )
6
7      I, DALIA GENGER, hereby certify that I
8  have read the transcript of my testimony taken
9  under oath in my deposition of December 13,
10  2012; that the transcript is a true, complete
11  and correct record of my testimony, and that
12  the answers on the record as given by me are
13  true and correct.
14
15
16  _____
17  DALIA GENGER
18
19
20  Signed and Subscribed to
21  before me, this   day
22  of     , 2012.
23                  _____
24  Notary Public, State of New York
25

---

Page 224

1         C E R T I F I C A T E
2
3  STATE OF NEW YORK  )
4                    ) ss.:
5  COUNTY OF NEW YORK )
6
7      I, ANNETTE M. MONTALVO, Registered Merit
8  Reporter and Notary Public within and for the
9  State of New York, do hereby certify:
10      That DALIA GENGER, the witness whose
11  deposition is hereinbefore set forth, was duly
12  sworn by me and that such deposition is a true
13  record of the testimony given by such witness.
14      I further certify that I am not related
15  to any of the parties to this action by blood or
16  marriage and that I am in no way interested in
17  the outcome of this matter.
18      IN WITNESS WHEREOF, I have hereunto set
19  my hand this 27th day of December, 2012.
20
21
22
23
24
25  ANNETTE M. MONTALVO

---

Page 225

```
1              ***ERRATA***

2       ELLEN GRAUER COURT REPORTING  CO. LLC
             126 East 56th Street, Fifth Floor
3                New York, New York 10022
                     212-750-6434
4

5   NAME OF CASE: GENGER vs. GENGER
    DATE OF DEPOSITION: December 13, 2012
6   NAME OF WITNESS: DALIA GENGER

7   PAGE  LINE  FROM     TO        REASON

8     __|__|_____|_____|_____

9     __|__|_____|_____|_____

10    __|__|_____|_____|_____

11    __|__|_____|_____|_____

12    __|__|_____|_____|_____

13    __|__|_____|_____|_____

14    __|__|_____|_____|_____

15    __|__|_____|_____|_____

16    __|__|_____|_____|_____

17    __|__|_____|_____|_____

18    __|__|_____|_____|_____

19    __|__|_____|_____|_____

20    __|__|_____|_____|_____

21    _____

22   Subscribed and sworn before me

23   this____day of _____, 20__.

24   _____        _____

25   (Notary Public)         My Commission Expires:
```

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

**$**

**$2 (1)**
205:3
**$200,000 (2)**
24:3,4
**$3 (1)**
205:4
**$5 (3)**
164:5,11;205:20
**$9 (1)**
175:18

**0**

**08 (1)**
125:17
**09 (1)**
15:2

**1**

**1 (13)**
8:16,17,20;9:13;
62:16;98:20,21;99:7;
100:7;105:21;169:10;
185:9;221:5
**1/31/2009 (1)**
209:16
**1/4/2008 (1)**
108:12
**1:00 (2)**
113:12,15
**10 (4)**
149:7,7,9,14
**10:30 (4)**
143:6;222:3,4,12
**10:52 (1)**
20:6
**10:54 (1)**
20:7
**100 (1)**
85:25
**10036 (1)**
3:14
**10065 (1)**
6:15
**10804 (1)**
3:6
**11 (5)**
151:16,18;173:19;
176:7,13
**12 (5)**
11:4;162:13,14,17;
163:8
**12:06 (2)**
117:13,14
**12:07 (1)**
87:14
**12:19 (1)**
87:14
**12:45 (1)**

108:23
**12:59 (1)**
116:15
**129 (1)**
143:25
**13 (4)**
168:16,17;184:14;
223:9
**130 (1)**
144:2
**14 (3)**
173:10,10,12
**140 (1)**
140:22
**15 (7)**
7:9;143:12;151:22,23;
209:13,14,16
**1540 (1)**
3:13
**16-page (1)**
109:24
**19 (3)**
108:11;185:21;186:9
**1946 (1)**
7:9
**1993 (9)**
7:24;89:20,24;108:8;
127:23;149:8,9,24;
167:19

**2**

**2 (10)**
8:22,25;25:13;26:10;
38:20;86:7;100:20,21;
105:20;150:13
**2:06 (2)**
116:16;117:4
**2:24 (1)**
133:25
**2:33 (1)**
142:19
**200 (1)**
6:14
**2000 (2)**
169:2,14
**2004 (4)**
155:2,3;168:8,13
**2005 (1)**
168:11
**2006 (3)**
161:21;162:2;163:2
**2007 (15)**
68:21;71:14;75:10;
77:20;79:6;80:21;88:5,
10,13;92:21;93:2;94:15;
108:3,10;125:16
**2008 (29)**
11:25;13:22,25;15:2;
37:6;38:16;62:16;68:21;
88:17;94:11;105:5;
106:8;125:16;154:9;
155:21;161:23;163:10;

166:17,18;168:22;173:2,
6,19;176:7,13;177:7,18,
25;185:4
**2009 (6)**
185:21;187:10;
193:24,25;194:2;209:15
**2010 (5)**
9:20;102:13;103:21;
104:23;105:6
**2012 (3)**
11:8;223:10,22
**2013 (2)**
222:2,12
**20th (1)**
9:20
**21 (1)**
167:19
**212-692-1012 (1)**
3:16
**22 (1)**
108:2
**22nd (1)**
108:9
**23 (1)**
143:25
**240 (1)**
150:12
**25 (1)**
163:10
**27 (2)**
187:10;194:2
**28 (4)**
102:13;103:21;
104:23;105:5
**29 (13)**
71:14;75:10;77:20;
79:6;80:20;83:8,12;
88:5,10,13;92:21;93:2;
94:14
**29th (1)**
11:7

**3**

**3 (17)**
8:16;9:4,8;11:2,3;
25:10,11;27:24;28:20;
38:19;100:22,24,25;
109:4;144:2;169:10;
185:7
**3:30 (1)**
132:14
**3:34 (1)**
189:8
**3:42 (1)**
189:8
**30 (12)**
9:21;104:22;210:25;
211:3,5,16;212:22;
213:2;218:18,22;219:2,
14
**31 (3)**
168:22;185:4;209:15

**32W (1)**
6:15
**33 (1)**
207:17
**35 (1)**
116:13

**4**

**4 (22)**
11:25;13:22;37:6,10,
11,15,23;38:16;42:23;
44:11;86:6;87:4;94:10;
105:5;106:8;110:7;
113:12;130:7,8;168:12;
173:16;193:25
**4:00 (1)**
132:12
**4:18 (1)**
221:23
**4:28 (2)**
221:23;222:8
**48 (3)**
131:15,22;140:22
**49 (3)**
131:15,22;140:22

**5**

**5 (16)**
42:19,20,25;43:6;
94:24,25;95:5,8;100:3,
10,17;101:4,9;102:4;
106:17;193:24
**5:00 (2)**
143:8,16
**5:30 (2)**
143:8,16

**6**

**6 (13)**
68:5,6;69:21;80:21;
88:9;92:19,21;93:2,13;
95:18;97:9,22;124:16
**65th (1)**
6:14
**66 (1)**
7:11

**7**

**7 (6)**
68:9,10,13,14;221:25;
222:12
**75 (2)**
105:19;116:9
**78 (1)**
3:5

**8**

**8 (24)**

92:14,15;94:8,10,20;
95:4,7,18;97:9,22;
124:16;174:5,8,9,11,12;
175:25;177:12,13,14;
210:22,23;212:2;219:5
**8-31-08 (3)**
185:11;186:8,17

**9**

**9 (12)**
102:19;108:6,12;
110:10;111:25;174:5,8,
9,12;178:13,14;180:8
**90 (2)**
81:22;84:19
**914-297-0110 (1)**
3:7
**93 (5)**
7:14;154:3,4;155:19;
177:2

**A**

**ability (3)**
46:10;47:18;104:16
**able (8)**
20:13;63:10;72:8;
120:4;140:24;171:11;
207:9;217:16
**absent (1)**
28:23
**Absolutely (10)**
6:21;7:25;12:9,24;
18:22;118:19;161:14;
181:17;184:5;189:18
**acceding (1)**
194:21
**accelerated (1)**
178:24
**accept (6)**
41:8,16;59:19;65:14;
178:18;194:22
**acceptable (1)**
139:2
**acceptance (4)**
42:21;43:2;58:19;
70:16
**accepted (9)**
39:3;40:13;41:3;46:9;
59:3;69:4,7;99:8,10
**accommodate (2)**
159:7,22
**accommodation (1)**
143:7
**Accordingly (1)**
96:14
**act (8)**
12:14;69:7;102:24;
130:3;144:9,25;145:12;
211:22
**acted (2)**
161:11,13

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

**acting (2)**
187:3;211:22
**action (31)**
8:19;9:7;13:3,6;17:10;
22:10,11;30:4,20;62:6,8;
81:24;82:8,9;84:20,23,
24,25;85:3,8,13;96:3,10;
130:7,7,10;133:18;
140:7,9,25;183:23
**actions (20)**
22:5;30:2,5,6,14,16;
31:4,5,6;37:3;81:3;
104:25;105:7;106:11;
107:11,14;140:24;
141:25;174:23;196:25
**actively (1)**
31:10
**activities (1)**
93:12
**acts (7)**
100:12;101:23;102:7,
9,16,19,22
**actuality (1)**
154:11
**actually (13)**
11:12;23:12;31:21;
45:6;55:21;92:10;
100:22,23;112:13;
118:15;131:2;133:13;
163:11
**addition (5)**
118:18;136:7;137:4,
16;138:2
**additional (1)**
215:13
**address (2)**
6:13;131:10
**addressed (3)**
72:19;73:14;163:12
**adjourn (1)**
221:25
**adjourned (1)**
222:11
**advice (11)**
20:14,15;146:13,17;
190:17,24;191:2,8;
194:12,18;196:6
**affair (2)**
46:3;56:8
**affidavit (11)**
121:7;173:11,13,18;
174:15;176:8,14,15;
177:7;180:9;182:5
**afford (2)**
26:24;158:7
**afraid (2)**
178:8;179:10,11;
212:10
**afternoon (2)**
117:15;134:24
**again (37)**
8:2;11:12,16;21:2;
24:21;28:5;39:19;48:12;

53:9;66:14;71:4;91:20;
97:6;103:9;105:23;
115:14;118:4,5;120:7;
129:6;134:8;135:4,13;
153:13;156:9,19;
170:12;173:4;176:9,11;
183:16,17;192:5;201:3;
202:3;216:14;221:7
**against (8)**
16:25;17:7;22:14;
35:9;164:7;210:24;
218:25;219:4
**agents (1)**
81:4
**ago (14)**
11:13,16;25:19;27:16,
22;28:8;29:2;30:7,15;
31:17;113:13;121:15;
134:9;193:12
**agree (7)**
12:20;85:24;139:4;
174:16;180:8,10;219:3
**agreed (6)**
153:2;212:4,21;
218:14,24;221:24
**agreeing (1)**
218:17
**agreement (16)**
75:2;78:17;88:24;
107:17,18,21;108:7;
149:8,10;150:3;176:3;
209:15,17,22;218:21;
222:9
**agreements (2)**
75:13,20
**agrees (1)**
218:22
**ahead (10)**
12:11,19,22;13:8;
21:25;111:2;115:18;
120:12;179:6;191:15
**aim (1)**
143:16
**air (1)**
105:11
**Airy's (1)**
205:18
**allegation (2)**
100:8,16
**allegations (3)**
99:13;100:10;102:18
**alleged (2)**
102:23;106:17
**allow (1)**
28:22;118:25
**allowed (2)**
115:21,25
**alluding (1)**
183:21
**almost (1)**
204:24
**alone (1)**
138:7

**along (1)**
136:23
**although (1)**
90:10
**always (8)**
120:8;141:15;174:23;
175:13;181:19,20;
207:10;212:12
**amended (9)**
8:18,21,23;9:2,5,9;
10:8;108:6,18
**among (1)**
174:15
**amount (2)**
118:22;206:19
**angry (3)**
211:24;214:14,17
**announced (4)**
119:11;121:2,3;122:2
**answered (29)**
27:13;31:15;33:4,11,
12;51:19;54:10;56:21;
57:5;61:15;81:16;84:3;
99:4;105:9;110:12;
118:10;126:13;128:17;
145:4;147:19;150:22;
160:2;165:4;203:13;
208:7;209:5;215:7,19,21
**Apartment (1)**
6:14
**Apparently (1)**
132:15
**appearance (2)**
117:16;136:4
**appeared (1)**
117:15
**appearing (1)**
121:17
**appears (1)**
134:12
**apply (1)**
85:4
**appoint (2)**
41:24;65:6
**appointed (3)**
59:2;139:21;178:8
**appointment (10)**
38:3;40:13;42:24;
58:18,19,21;59:3,19;
69:5;178:22
**appreciate (1)**
119:3
**appreciated (1)**
162:21
**approached (1)**
189:11
**arbitration (12)**
151:9,16,19;152:9,9,
12;156:4,11;157:12;
173:25;193:7;197:6
**arbitrator (2)**
153:10,14
**argue (2)**

216:5,16
**arguments (2)**
96:17;218:13
**Arie (33)**
17:9;148:2;150:14;
153:5,8,15;154:25;
198:4,7,8,18;199:12,12;
200:4,5;204:16,19;
205:4,7,13,20;206:8;
207:3,6,16,18,24;
208:16;220:2,3,4;221:2,
9
**Arie's (2)**
199:14;205:17
**arise (1)**
45:16
**arisen (1)**
135:9
**asserted (2)**
22:13,14
**assertion (1)**
137:5
**asset (1)**
197:20
**assets (11)**
22:23;154:17;175:22;
180:18;204:19;205:4,5,
19,22;206:20;209:3
**assignment (4)**
162:2;164:14,18;
165:2
**associated (5)**
119:20;120:16,17,18;
182:13
**Associates (2)**
3:12;212:3
**assume (6)**
52:3,12,12;54:3;
70:12;121:20
**assumed (2)**
53:9;121:18
**Assumes (2)**
98:5;170:15
**assuming (1)**
49:22
**assumption (2)**
52:9,13
**attempt (2)**
158:11;188:14
**attempted (6)**
65:6,14;75:18;95:13;
144:17;147:16
**attempting (1)**
22:6
**attempts (2)**
137:3;138:3
**attend (5)**
120:21,23,25;121:25;
152:8
**attendance (1)**
58:5
**attention (4)**
39:16;40:6;151:21;

152:2
**attorney (46)**
10:19,20;14:3,6,9;
15:5;71:13,16,18,22,22;
72:2,6,16,24;87:15;
99:21;113:5,6;116:17;
117:15,17;119:24;
120:19;125:14;126:10;
127:23;128:4;136:13,14,
19;172:20,22;185:19;
186:8;190:9,12;191:23;
192:9,9,15;193:9;
194:18;206:15;211:8;
222:6
**Attorney-client (6)**
16:7;92:2;124:21;
138:17;191:11;194:4
**attorneys (20)**
13:23;14:12;20:19;
21:4;54:12;67:10,11;
71:8;137:17;145:16;
146:2;147:15;164:16,17,
21,22,22;188:7,10;222:6
**attorney's (4)**
79:11;117:7,11;
146:13
**auction (38)**
183:22;188:21;
191:19;195:21;197:12;
198:9,16,21;199:7,9,23,
24;200:3,8,13,14;201:8,
19,24;202:2,7,8,11,16;
203:7,8,11;205:14;
207:4;208:17;213:9,10;
214:23;215:5,16;217:7;
218:2,3
**August (2)**
168:22;185:4
**availability (3)**
132:7,11;134:10
**available (1)**
132:12
**avoid (1)**
56:14
**award (2)**
151:16,19
**awarded (2)**
153:6,9
**aware (33)**
38:8,13;39:2;40:14,
20,22;41:23;42:12,16;
49:8;65:5,8,13,18;69:6,
13;77:22;79:13;98:16,
16;107:11;112:2;114:7;
117:24;165:21,23,24;
186:4,7;187:13;190:6;
200:2,14

---

**B**

**Back (44)**
20:8,9;23:7;32:21;
51:7,12;55:2,7;58:13;

ORLY GENGER VS.
DALIA GENGER, et al

DALIA GENGER
December 13, 2012

60:16,20;70:25;82:14,
21;84:4;87:19;105:13;
116:8;117:3;129:8;
131:7,19;143:19;
153:25;156:17;157:5;
160:9,10,13,15,17,17,19,
23;161:16;162:3,7;
171:15;174:20;180:3;
195:4;200:21;202:21;
208:10
**bad (1)**
  114:18
**balance (1)**
  67:21
**bankrupt (2)**
  181:9,10
**Barbara (1)**
  134:3
**based (7)**
  78:10;85:5,14;96:10;
  109:14;141:19;150:7
**basically (7)**
  16:25;25:7;61:12;
  118:7;179:5,7;202:9
**basis (6)**
  16:5;20:16;24:13;
  49:20;73:10;80:9
**bat (1)**
  135:7
**bathroom (2)**
  189:10;221:19
**bear (1)**
  175:17
**became (12)**
  13:23;29:20;37:6;
  38:17;65:5;67:14;88:22;
  95:12;104:19;107:9;
  161:23;186:7
**become (16)**
  29:21;38:18,19;40:22;
  41:23;42:12,13;45:9;
  46:14;60:3,10,13;65:23;
  66:9;67:15;71:9
**becoming (1)**
  89:17
**Beg (1)**
  193:16
**began (2)**
  14:3;148:12
**begin (2)**
  30:18;117:12
**beginning (4)**
  40:20;122:6;180:7;
  218:19
**Behalf (13)**
  3:4,12;14:13;18:5,17;
  19:10;20:14;21:19;23:6;
  35:8;103:6;141:21;
  209:19
**behave (1)**
  175:15
**belief (7)**
  99:16;100:12;102:7,

16,21;106:15;115:5
**believing (1)**
  196:24
**bell (2)**
  14:16,17
**beneficiaries (1)**
  81:4
**beneficiary (6)**
  12:5,19;19:16;39:4;
  123:3;190:20
**benefit (4)**
  120:11;148:5;176:4;
  177:17
**besides (5)**
  60:12;63:15;64:2,20;
  192:15
**best (22)**
  12:15;20:19;21:5,9;
  46:10;47:16,17;78:23;
  87:23;88:2;104:15;
  129:2;144:15,25;
  163:22;190:18;198:11;
  199:17;203:11,19;
  204:6;209:2
**better (1)**
  81:17
**bid (2)**
  197:20;200:14
**bidding (2)**
  203:20;204:7
**bids (1)**
  198:22
**big (1)**
  45:6
**bill (9)**
  18:18,24;19:9;26:18;
  85:19;192:5;193:12,14,
  24
**billing (1)**
  34:23
**bills (20)**
  18:14,16;19:17;22:4,
  8,17,21,24;23:3,6,17;
  35:16,18;79:4;139:21;
  192:4;193:15,18,20;
  205:8
**birth (1)**
  7:8
**bless (1)**
  142:7
**blurred (1)**
  68:23
**both (7)**
  18:2;86:5;105:19;
  150:18;159:6;180:12;
  219:17
**bottom (4)**
  35:19;74:7;180:22;
  221:5
**bought (3)**
  183:23;184:3,7
**brainwashed (1)**
  207:22

**break (25)**
  76:14;81:18,19,21;
  84:12,13;85:22;86:12,
  20;87:2,9;113:11,14,21;
  114:11;117:14;118:3;
  122:5;132:8;188:22,25;
  189:3,10;192:22;221:19
**breakdown (1)**
  53:10
**breakfast (2)**
  113:17;116:12
**breaking (1)**
  143:4
**briefly (1)**
  26:14
**Broadway (1)**
  3:13
**brought (2)**
  96:4;140:11
**Bryan (2)**
  134:7,25
**building (1)**
  207:11
**burden (1)**
  170:19
**business (2)**
  58:2;121:5
**buy (1)**
  199:20

## C

**call (9)**
  57:2;63:6;82:10;
  131:22;132:6;134:2;
  196:16;199:11;206:20
**called (4)**
  6:3;86:25;107:18;
  134:8
**calling (5)**
  131:23,24;135:8;
  137:2;196:12
**Calls (4)**
  49:11;56:21;158:21;
  167:4
**calm (2)**
  210:25;211:24
**came (8)**
  15:16;73:20;112:19;
  117:3,14;150:24;179:7;
  185:18
**Can (96)**
  11:20;13:13;19:24;
  20:9;23:7;28:4;32:16,
  21;33:3,6;36:16,17;42:4,
  5;44:20;50:13;51:6;
  52:3;55:6;58:13;60:15;
  61:13;66:7,14,18;67:3;
  70:24;75:6;78:20;82:14;
  83:19,20;84:13,21;
  89:21;90:8;92:23;94:25;
  96:4,15;98:24;105:13;
  106:3;107:22;111:8;

118:14,24;119:4;
121:19;127:10,10;129:6,
7;131:4,5,10,18,19;
138:9;139:5,24;140:2;
143:2,4,18,21;149:6;
150:5;151:8;154:16;
156:8,9;157:5;167:8;
168:15;173:3;174:4;
176:11;180:2;183:17;
187:2,22;188:22;191:3,
18;192:7,21;195:21;
202:10,20;204:22;
208:10;212:13;214:17,
25;216:12
**candidate (1)**
  179:8
**candidly (1)**
  207:23
**candy (1)**
  208:8
**capacity (4)**
  16:16,19;18:3;91:12
**care (5)**
  47:18;61:8,8;139:6;
  141:3
**cares (1)**
  61:10
**caring (1)**
  181:7
**carpet (1)**
  86:19
**carry (2)**
  141:22;164:4
**case (16)**
  25:14;56:16;85:4;
  93:20,25;96:5,15,22;
  114:3,25;115:2;123:13;
  142:9;166:14;197:2;
  222:7
**cases (2)**
  35:23;80:13
**cause (3)**
  130:6,7;179:12
**caused (1)**
  182:15
**caveat (1)**
  194:5
**certain (2)**
  24:25;219:22
**Certainly (4)**
  118:16;120:4;137:20;
  194:16
**certify (1)**
  223:7
**chambers (1)**
  134:3
**chance (1)**
  196:15
**change (4)**
  13:18;128:20;154:6;
  171:9
**changed (2)**
  154:4,19

**changes (1)**
  11:14
**charge (1)**
  170:4
**charging (1)**
  35:23
**check (8)**
  35:22,22;205:24;
  206:2,3,7,8,17
**checked (1)**
  132:10
**children (20)**
  148:5;150:10,16,18;
  153:19;154:17;159:7;
  170:19;171:2,10;172:6,
  7,10;174:24;175:19,22;
  176:4;177:17;180:23;
  181:6
**children's (1)**
  175:13
**chooses (1)**
  126:23
**chose (4)**
  56:16;165:14;166:13;
  190:7
**circumstances (3)**
  154:4,5,19
**claim (2)**
  130:9,10
**claimed (1)**
  217:22
**claiming (1)**
  153:6
**claims (2)**
  22:13;153:8
**clarify (1)**
  30:21;189:17
**clean (1)**
  203:5
**clear (13)**
  14:5;17:24;31:16;
  32:13;39:21;62:22;
  79:15;104:7,12;113:4;
  120:15;201:9;215:12
**client (5)**
  14:4;85:3;101:9;
  117:21;194:11
**client's (1)**
  118:22
**cocounsel (1)**
  136:17
**code (1)**
  6:15
**Coleman (1)**
  181:23
**collect (10)**
  158:4,12,14;159:20;
  167:2,20;172:2;178:10;
  187:23;199:22
**collected (19)**
  153:24;155:6,16,18;
  156:13;157:9,13;
  158:17;159:17,24;