by Arie Genger ("Arie"), Petitioner's father and Respondent's former husband, and any other assets which may be remaining in the Orly Trust. The Orly Trust's TRI shares are in imminent danger of being sold by Respondent and her son, Orly's brother, Sagi Genger ("Sagi"), for the purpose of benefiting Sagi Genger and presumably Respondent, and depleting and denuding the value of Orly's Trust;

(b)    removing Respondent as Trustee of the Orly Trust for breaching her fiduciary duties, wasting and dissipating the assets of the Orly Trust, and imprudently managing and injuring the property committed to her charge. As will be demonstrated herein, Respondent has conspired with, and participated in the diversion of trust assets to, Sagi, who underhandedly sold without any objection from Respondent, the Orly Trust's indirect interest in TPR Investment Associates Inc. ("TPR"), a closely held family-owned corporation.

(c)    surcharging Respondent in the amount of the loss of the value of Orly's interest in TPR as determined by the Court and awarding the Petitioner costs and attorneys' fees;

(d)    appointing Michael D. Grohman, Esq., as successor trustee;

(e)    waiving any requirement that Petitioner post an undertaking; and

(f)    granting Petitioner such further relief deemed necessary or proper.

3.    To assist the Court in perceiving the severity of Respondent's conduct and the urgency of the provision of extraordinary relief, the following is an overview of the facts supporting this Petition.

I.    **OVERVIEW**

4.    Arie and Dalia were married on July 23, 1967, in a ceremony held in Israel. In 2004, however, their marriage ended in divorce. Prior to 1993, at which time Dalia and Arie were married, Dalia and Arie formed D & K LP ("D & K"), a family-owned limited partnership

whose name was shorthand for "Dalia and Kids." At the time of its formation, Dalia, the general partner, held a 4% interest, and Orly and Sagi, the limited partners, each held a 48% interest.

5.    In December 1993, Dalia and Arie also established identical irrevocable *inter vivos* trusts for the benefit of each of their children: the Orly Trust and the Sagi Genger 1993 Trust (the "Sagi Trust"). For estate-planning purposes, Dalia and Arie funded each trust with a $600,000 gift. The intent behind the trusts was to ensure that both children received property of equal value. Sash A. Spencer and Lawrence M. Small were named Co-Trustees of both trusts and remained Co-Trustees until the Genger's divorce. After the Trusts were funded, Orly and Sagi each assigned their 48% interests in D & K to their Trusts.

6.    At the same time in December 1993, D & K purchased 240 shares of common stock (constituting 49% of the outstanding shares) in TPR for $10,200,000. The shares were purchased with $600,000 from each of the Orly Trust and the Sagi Trust and $50,000 from Dalia, totaling $1,250,000, and the balance was satisfied with a recourse $8,950,000 promissory note (the "Note") (a copy of which is annexed hereto as Exhibit B). Pursuant to the Note, principal, together with accrued interest, was to be repaid by D & K in annual installments over ten years. The Note was secured by a pledge of the 240 TPR shares owned by D & K. Each of the Trusts and Dalia assumed liability on the Note in proportion to its/her direct interest in D & K. Accordingly, each of the Orly and Sagi Trusts assumed a 48% liability on the Note and acquired a 23.52% indirect interest in TPR and Dalia assumed a 4% liability on the Note and a 1.96% indirect interest in TPR. Payments were made on the Note until 1999, at which time D & K stopped making payments with the implied consent of the interested parties.

7.    At the time of the above-described transaction, Arie owned the remaining 51% of TPR, which held investments in various securities, including TRI common stock, as well as its

interest in the Note. As of March 30, 2001, TPR held a 52.85% interest in TRI. The remaining minority interest in TRI (47.15%) was owned by various entities controlled directly and indirectly by Jules and Eddie Trump (the "Trump Group").

8.　　On October 26, 2004, Dalia and Arie entered into a Stipulation and Agreement of Settlement as a final settlement of their divorce (the "Settlement Agreement") (annexed hereto as Exhibit C). Pursuant to the Settlement Agreement, Dalia received, *inter alia*, Arie's 51% interest in TPR and retained her 4% interest in D & K. TPR's 52.85% interest in TRI was transferred to Arie and the Trusts as follows: (i) 13.99% to Arie, (ii) 19.43% to the Orly Trust, and (iii) 19.43% to the Sagi Trust. The Orly Trust and the Sagi Trust each granted Arie an irrevocable lifetime voting proxy over their TRI shares (annexed hereto as Exhibit D). Therefore, after October 29, 2004, Arie and the two Trusts held a controlling interest in TRI, and TPR no longer owned any TRI common stock.

9.　　In connection with the divorce settlement, Dalia took measures to cede management of D & K and TPR to her son Sagi. On October 21, 2004, days before signing the Settlement Agreement, Dalia and Sagi formed D & K GP LLC ("D & K GP"), whose sole purpose was to act as the general partner of D & K. Dalia exchanged her 4% interest in D & K and $1.00 for a 99% membership interest in D & K GP. Sagi purchased a 1% membership interest in D & K GP for $1.00. Pursuant to the Limited Liability Agreement of D & K GP (annexed hereto as Exhibit E), Sagi was given the power to select a manager of D & K GP whose function would be to control D & K's assets. Sagi selected himself to act as manager; thus, Dalia effectively handed Sagi the authority to control D & K and its assets. Also, by forming D & K GP, Dalia and Sagi shielded themselves from any personal liability stemming from D & K, including any personal liability related to the Note. This left the Trusts solely liable on the Note.

10.    On October 30, 2004, Dalia entered into a shareholder agreement with TPR that provided for the management of TPR. Specifically, pursuant to the shareholder agreement (annexed hereto as Exhibit F), D & K, which owned 49% of TPR, was given authority to appoint one board member to the TPR board. Sagi, as the managing partner of D & K, appointed himself as a board member of TPR. As the majority owner of TPR, Dalia was named as the other board member. In addition, the shareholder agreement appointed Sagi as Chief Executive Officer ("CEO") of TPR. Accordingly, Dalia essentially ceded control of TPR to Sagi, just as she had done with D & K.

11.    Below, for the Court's convenience, is a side-by-side summary of Arie's, Dalia's, the Orly Trust's, and the Sagi Trust's interests in TPR before and after Arie's and Dalia's divorce.[2]

## TPR OWNERSHIP
## BEFORE AND AFTER DIVORCE

|  | **PERCENTAGE** | |
| --- | --- | --- |
| Person | TPR Before | TPR After |
| Arie Genger | 51.00% | 0% |
| Dalia Genger | 1.96% | 52.96% |
| Orly Trust | 23.52% | 23.52% |
| Sagi Trust | 23.52% | 23.52% |
| **TOTAL** | **100%** | **100%** |

---

[2] For the Court's convenience, the chart annexed hereto as Exhibit G provides a summary of Arie's, Dalia's, the Orly Trust's, and the Sagi Trust's ownership interests in TPR, TRI, and D & K as of October 26, 2004 – i.e., the date that Arie and Dalia executed the Settlement Agreement.

12.    In connection with the Settlement Agreement, Dalia required that the Trustees of the Orly Trust and the Sagi Trust (Messrs. Sash and Small) resign and be replaced with friends of Sagi. Numerous successor trustees were appointed to the Orly Trust and the Sagi Trust, all of whom were affiliated with Sagi in one way or another. David Parnes and Eric Gribetz (Sagi's longtime friends) and Leah Fang (Sagi's sister-in-law) were appointed as successor trustees to the Orly Trust, and Messrs. Parnes and Gribetz, Rochelle Fang (Sagi's mother-in-law), and Mr. Parnes again, were appointed successor trustees of the Sagi Trust. In January 2008, Dalia was appointed successor trustee of the Orly Trust, despite Orly's objection. By that time, as a result of Dalia's granting him control of TPR and D & K, and through the appointment of his friends and relatives as successor trustees of the Trusts, Sagi effectively had obtained control over the assets held by all of D & K, TPR, the Sagi Trust, and the Orly Trust.

13.    On August 2, 2006, Sagi, as part of his managerial role in D & K GP, D & K, and TPR, assigned the Note – which then had an approximate value of $11,000,000 as a result of accrued interest – to Mr. Parnes for only $12,000. (A copy of the Memorandum dated August 2, 2006, assigning the Note is annexed hereto as Exhibit H.) The assignment stated that D & K "denied enforceability of the Note" (see Exhibit H annexed hereto), which presumably is why it was "sold" for $12,000. Sagi signed the assignment on behalf of both TPR, as the maker, and D & K, as the holder. Dalia was copied on the memorandum assigning the note, but neither Orly, the Orly Trust, nor the then-Trustee of the Orly Trust received copies of the memorandum. At the time of this assignment, Mr. Parnes was acting as trustee of both the Orly Trust and the Sagi Trust. Shortly after the assignment, Mr. Parnes resigned as Trustee of the Orly Trust in recognition of the inherent conflict he faced in that role.

14.     Sometime in 2007, Sagi sold a 2% interest in TPR to Rochelle Fang. The cost of the 2% interest was based upon a bogus valuation of TPR at $50,000,000. At the time of the sale, TPR's assets were worth between approximately $11,000,000 and $12,000,000, plus the value of the Note. This sale effectively stripped Dalia of her majority interest in TPR giving Sagi unfettered control of TPR, in addition to his control of D & K and D & K GP. In January 2008, when Dalia was appointed successor trustee of the Orly Trust, she completely divested herself of the balance of her TPR shares. Dalia has not informed either the Court or Orly as to when she transferred her TPR interest.

15.     On August 22, 2008, unbeknownst to Orly, Rochelle Fang, who had been appointed Trustee of the Sagi Trust, attempted to sell the Sagi Trust's 19.43% interest in TRI to the Trump Group, who already owned 47.15% of TRI's outstanding shares, for $26,715,416. This sale purportedly transferred control of TRI from Arie to the Trump Group who thereafter purported to hold 66.58% of TRI's outstanding common stock.[3] In connection with the supposed sale, Sagi and David Parnes were given seats on TRI's board of directors. If given effect, this purported sale, which was consummated after Dalia was appointed successor trustee of the Orly Trust, would dilute and diminish the value of the Orly Trust's interest in TRI.

16.     Dalia, who had notice of the supposed sale, made no effort to prevent the sale or to protect the value of the Orly Trust's interest in TRI. Fearing that Dalia would continue to neglect her duty to protect the Orly Trust's assets, on January 10, 2009, Petitioner wrote a letter (annexed hereto as Exhibit I) to her mother stating that "for now, and until further notice, it is my

_____

[3] The validity of the sale is at issue in litigation currently pending in Delaware Chancery Court. The parties to the action are Arie Genger, TRI, and various entities affiliated with the Trump Group. The Orly Trust has not appeared in the action. In that action, the Trump Group claims to have bought the shares either from the Sagi Trust or from TPR – thus, the approximately $27 million purportedly paid by the Trump Group either belongs to the Sagi Trust or to TPR, depending on the outcome of the litigation in Delaware.

strong desire to retain all of the shares of TRI that are currently in the Orly Trust, and I direct

you not to sell them." Dalia refused to agree not to dispose of the TRI shares.

## II.    THE EVIDENCE DISCOVERED BY PETITIONER ON JUNE 1, 2009, REQUIRES INJUNCTIVE RELIEF AND THE IMMEDIATE REMOVAL OF DALIA AS TRUSTEE

17.    In February 2008, Orly applied to this Court to designate a Trustee, or in the

alternative to appoint a special trustee, claiming that Dalia and all of the preceding successor

trustees of the Orly Trust were improperly appointed and had no authority to act on behalf of the

Orly Trust. Orly also alleged wrongful dealings by Dalia as Trustee of the Orly Trust. In

denying the application without prejudice, this Court stated that Orly had made allegations

without sufficient supporting evidence and suggested that Orly commence an SCPA § 2201

proceeding to obtain the necessary evidence and then renew her application. (A copy of the

Court's decision is annexed hereto as Exhibit J.)

18.    On May 14, 2009, as a prerequisite to the SCPA § 2201 application, Orly's

counsel sent Dalia Genger a letter (annexed hereto as Exhibit K) requesting documents related to

the Orly Trust's assets. Soon thereafter, Orly's counsel was notified that Dalia had retained

Robert A. Meister, Esq., of Pedowitz & Meister, LLP, and Orly's counsel therefore forwarded a

copy of the May 14th letter to Mr. Meister.

19.    On June 1, 2009, Mr. Meister responded to Orly's document demand by advising

Orly's counsel that the Orly Trust no longer owned any interest in TPR. According to the letter,

Sagi, acting as CEO of TPR, had foreclosed on the Note and had sold D & K's 240 shares of

TPR for $2,220,000. (A copy of the Letter dated June 1, 2009, is annexed hereto as Exhibit L.)

Before that time, Dalia had neither advised nor notified Orly that Sagi had foreclosed on the

Note,[4] nor advised Orly that Sagi had sold the TPR shares at auction. Thus, upon receipt of Mr. Meister's letter, Orly learned for the first time that:

(a)    On August 31, 2008, Sagi, acting as CEO of TPR, notified himself as the general manager of D & K, that D & K was in default of the Note and declared that unless the entire unpaid principal amount of the Note was paid immediately, TPR would sell, at auction, the 240 shares pledged as collateral. (A copy of the Notification dated August 31, 2008, is annexed hereto as Exhibit M.)

(b)    Thereafter, Sagi, again acting as CEO of TPR, purported to notify D & K (of which he remained the managing partner) that D & K's 240 shares of TPR stock would be publicly auctioned to the highest bidder on February 27, 2009, and that the money received from the sale would be used to reduce the outstanding debt. (A copy of the Notification is annexed hereto as Exhibit N.) Sagi purported to notify the interested parties of the sale by publishing notice of the sale in the New York Post in October 2008 and February 2009. Although at all relevant times Sagi had Orly's contact information, he never informed her of the impending sale.

(c)    On February 27, 2009, TPR (still controlled by Sagi) foreclosed on the 240 shares of TPR and "auctioned" the shares. Not coincidentally, the Sagi-controlled TPR purchased the shares at auction for $2,200,000. (See Exhibit O). The proceeds of the sale – i.e., $2,220,000 – were used to decrease D & K's obligations under the Note, leaving a balance of approximately $8,800,000.

20.    On June 11, 2009, Orly's counsel sent Mr. Meister a letter asking that Dalia, in accordance with Orly's January 2009 request and in light of the secretive diminution of the Orly

---

[4] While the Note had not been serviced since 1999, TPR had not foreclosed on the Note between 1999 and 2008 because it previously had agreed not to foreclose on the Note in order not to upset the estate-planning goals underlying the Note.

Trust's interest in TPR, stipulate in writing that she would not, under any circumstances and until all issues were resolved, sell, transfer, or remove the TRI shares from the Orly Trust. (A copy of the Letter dated June 11, 2009, is annexed hereto as <u>Exhibit P.</u>) That same day, Mr. Meister responded to the June 11th letter, but he failed to address the terms of the proposed stipulation. (A copy of Mr. Meister's Letter dated June 11, 2009, is annexed hereto as <u>Exhibit Q.</u>)

A.   <u>A Temporary Restraining Order ("TRO") Is Necessary To Protect The Remaining Assets Held By the Orly Trust</u>

21.   It is clear from Dalia's deliberate inaction and complete deferral to Sagi in all matters related to D & K, TPR, and TRI, that without Court intervention Orly's TRI shares will be:  a) sold at a significantly discounted rate so that the proceeds can be used to pay her unpaid portion of the Note, b) used as collateral to secure the Orly Trust's unpaid portion of the Note, or c) used to satisfy a Judgment against the Orly Trust.  Since Orly's address was known to her brother and her mother at all relevant times, publishing notice of the sale of the TPR shares alone was a clear and deliberate attempt to prohibit Orly from intervening in the foreclosure and the sale.  Dalia, who had knowledge of the events as they were transpiring, easily could have given notice of the auction to Orly, but she intentionally chose not to.  There is now reason to believe that Dalia will again remain passive if and when Sagi seeks to hijack, sell, or otherwise meddle with the Orly Trust's TRI shares, even though Orly has specifically advised her mother, in writing, to protect the Trust's ownership of the TRI shares.

22.   There is no reason to trust that Dalia will honor her daughter's wishes and instructions since, from the time of her divorce, she has done nothing but ensure that Sagi has complete control over TPR, D & K, and D & K GP, and has allowed Sagi to do as he pleases.  At this time, approximately $8,800,000 of the Note remains unsatisfied, and Sagi, as CEO of TPR, has not voided the notice of default.  Based upon Dalia's deliberate inaction and failure to protect

the Orly Trust's assets to date, there is strong evidence to reasonably conclude that Dalia will not protect the Orly Trust's interest in the TRI shares, but rather, will act to benefit herself and Sagi, including by allowing Sagi to obtain the TRI shares to satisfy the Orly Trust's unpaid portion of the Note. Without immediate injunctive relief, Orly will have no recourse and the Orly Trust will be vulnerable to complete depletion. The harm caused to the Orly Trust under these circumstances would be irreparable.

23.    Based on the facts and documentary evidence presented herein it is likely that the Orly Trust will succeed on the merits of her Petition. Accordingly, she meets the criteria necessary to obtain a TRO and a preliminary injunction. Petitioner therefore respectfully requests that the Court grant her Petition for a TRO and a preliminary injunction in order to protect the assets held by the Orly Trust, including the TRI shares.

B.    **Dalia Must Be Removed As Trustee Immediately**

24.    Based on the information provided to Orly's counsel on June 1, 2009, which confirms Respondent's lack of diligence and disloyal service as Trustee, there now exists sufficient evidence to have Respondent removed as Trustee of the Orly Trust. While serving as Trustee, Dalia intentionally failed to notify Orly that TPR was taking measures to foreclose on the Orly Trust's 23.52% indirect interest in TPR. It was Dalia's duty as a fiduciary of the Orly Trust to be apprised of all activity concerning the Orly Trust and to ensure that Orly received proper notification of the default and auction. Moreover, Dalia actually knew of the foreclosure and the auction, but took no steps to protect the Orly Trust's interest in TPR. Dalia knew of Sagi's plan to foreclose on the Note and sell the TPR shares as early as August 2008; thus, she withheld information concerning the auction from Orly for almost ten months. Dalia did not disclose the foreclosure and share sale until she received the demand letter from Orly's counsel and realized that legal action was imminent. Instead of protecting the Orly Trust's and its

beneficiary's interests, Dalia sat back and silently watched her son strip the Orly Trust of its indirect interest in TPR.

25.    The corporate structure which has intertwined TPR, D & K GP, and D & K's assets, all of which are in some manner controlled by Sagi as a result of Dalia's actions, permits Dalia and Sagi to engage in self-dealing and does not provide for any accountability on either Sagi's or Dalia's part. Unfortunately, the Orly Trust is caught in the middle of Dalia's and Sagi's conspiracy to engage in self-dealing intended to benefit their own interests, while Sagi has been permitted to diminish and dissipate the value of the Orly Trust's assets, including its interests in TPR and, potentially, TRI. By enriching herself and her son at the expense of her daughter, Dalia is in breach of her fiduciary duties as Trustee of the Orly Trust. It is imperative that Orly have a successor trustee appointed who will unbiasedly and loyally protect the Orly Trust's remaining assets.

   (I)    **In Direct Conflict With Her Obligations as Fiduciary of The Orly Trust, Dalia Did Nothing To Stop Sagi From Attempting to Sell His Trust's TRI Shares, Which, If Valid, Would Dilute the Value of the Orly Trust's Assets**

   26.    The Sagi Trust's attempted sale of its interest in TRI to the Trump Group for $26,715,416, which occurred after Dalia was appointed successor trustee of the Orly Trust, purportedly transferred control of TRI from Arie to the Trump Group. As mentioned above, supra paragraph 15, if this purported sale were given effect, then the value of the Orly Trust's assets would be significantly diminished. If the purported sale were valid and effective, then Arie would no longer own a controlling interest in TRI, and thus the Orly Trust would no longer own a portion of the controlling block of TRI shares.

   27.    Dalia, as a fiduciary of the Orly Trust, was obligated to apprise herself of any transactions that could affect the value of the Orly Trust's shares, and, in fact, Dalia was contemporaneously aware of the Sagi Trust sale. But Dalia made no effort to protect the value of

the Orly Trust's TRI shares by challenging the proposed sale. Moreover, she has taken no position with regard to the current value of the TRI shares and has taken no measures to protect the Orly Trust's interest in TRI since the purported sale, despite Orly's urgings. By remaining passive with respect to the Orly Trust's TRI shares, Dalia is completely ignoring the intent behind the establishment of the Orly Trust – to transfer an equal amount of assets to each of the children. Dalia, through her actions and her inaction alike, may have permitted Sagi to secure substantially more value from the Trusts' assets than Orly.

    (2)   **In Direct Conflict With Her Obligations as Fiduciary of The Orly Trust, Dalia Took No Action To Protect the Orly Trust's Interest in TPR**

    28.    Pursuant to the August 2006 memorandum assigning the Note to David Parnes – on which Dalia was copied – Sagi, acting as the managing partner of D & K, took the position that the Note was unenforceable. (See Paragraph 4 of Exhibit H annexed hereto.) In the exact same memorandum, however, Sagi, acting as the CEO of TPR, took the directly contrary position that TPR reserved its right to enforce the Note. (See Paragraph 8 of Exhibit H annexed hereto.)

    29.    On February 14, 2007, Dalia, who participated in the "sham" transaction between Sagi and Mr. Parnes, and in a clear attempt to clean her hands of any impropriety, admitted in a sworn statement to the Court that no one was ever supposed to foreclose on the Note. (See Paragraph 3 of Exhibit R annexed hereto). Additionally, the unpaid Note was the subject of a post-judgment arbitration proceeding between Dalia and Arie, which took place in September 2007. Dalia, who was present at the proceedings, heard Sagi and Mr. Parnes testify that the Note should not be enforced and that Sagi, as CEO of TPR, had no intention of collecting the unpaid portion of the Note. Thus, Dalia knew long before August 2008 that TPR had effectively disclaimed its right to foreclose on the Note.

30.     As described above, however, in August 2008 (eleven months later), Sagi sought to enforce the Note. Contrary to the position he had taken under oath at the arbitration, and contrary to the position he had taken as the managing partner of D & K (see Paragraph 4 of Exhibit H attached hereto), Sagi issued a default notice to D & K on behalf of TPR. Dalia, who knew the Note was never intended to be enforced and who previously had sworn to as much, should have immediately sought to block Sagi from foreclosing on the Note and selling the TPR shares. Notwithstanding her knowledge and her previous statements, however, Dalia failed to make any effort to stop Sagi when he engaged in this clear act of self-dealing, even though the Orly Trust had a clear interest in the TPR shares at issue. As a fiduciary of the Orly Trust with prior, as well as continued knowledge, of the TPR foreclosure, TPR's supposed claims against D & K, and D & K's ability to challenge those claims based on prior representations, Dalia had a duty to protect the Orly Trust's indirect ownership of the TPR shares. But instead of taking the proactive measures required of a fiduciary, Dalia did nothing and allowed Sagi to obtain the TPR shares for himself to the detriment of the Orly Trust.[5]

31.     Additionally, Dalia's failure to act in the face of the foreclosure and sale of TPR stock is especially egregious because she has known since August 2008 that the purported sale of TRI stock to the Trump Group is being challenged in Delaware state court. She also has known that in that action the Trump Group is asserting that it bought the TRI stock from *either* the Sagi Trust *or* TPR. Thus, she has known that, depending on the outcome of the litigation in Delaware, the Orly Trust could have an interest in the $27 million paid by the Trumps in August

---

[5] Moreover, in connection with her appointment as successor trustee of the Orly Trust in January 2008, Dalia divested herself of her TPR shares (without informing either the Court or Orly as to when she transferred her interest) in a further attempt to distance herself from any attributable wrongdoing. Dalia has contended to this Court that she sold her TPR shares in order to avoid any appearance of impropriety in connection with her appointment as Trustee. Interestingly, however, Dalia has never informed Orly or this Court whether she continues to maintain a 99% interest in D & K GP, the company that controls D & K and, thus, was obligated to service the Note.

2008 if its interest in TPR were preserved. Accordingly, as trustee of the Orly Trust, she should have been especially vigilant in protecting the Orly Trust's interest in TPR through D & K. But instead, she allowed Sagi to essentially steal the Orly Trust's interest in TPR so that Sagi can attempt to retain the entire $27 million regardless of the outcome in Delaware Chancery Court. Her inaction in this regard is a blatant violation of her fiduciary duties as trustee.

### III.   DALIA SHOULD BE SUR-CHARGED IN THE AMOUNT OF THE LOSS OF THE VALUE OF ORLY'S INTEREST IN TPR AS DETERMINED BY THE COURT AND ORLY SHOULD BE AWARDED ATTORNEYS' FEES

32.   By failing to take action on behalf of the Orly Trust to prevent Sagi from foreclosing on the Note and selling D & K's TPR shares, Dalia caused the Orly Trust to lose its interest in TPR. Accordingly, Dalia should be surcharged in an amount of the loss of the value of Orly's interest in TPR as determined by the Court and should be required to reimburse the Orly Trust for its attorneys' fees incurred in connection with bringing this action.

### IV.   MICHAEL D. GROHMAN, ESQ. SHOULD BE APPOINTED AS SUCCESSOR TRUSTEE

33.   Based on Dalia's deliberate breach of her fiduciary duties to the Orly Trust, and in light of Dalia's prior nefarious conduct as the Orly Trust's Trustee, this Court should remove Dalia as Trustee and replace her with Michael D. Grohman, Esq. Mr. Grohman is a member of the New York Bar and the head of the Trust and Estates practice group at Duane Morris LLP. Mr Grohman is not acquainted with any members of the Genger family, does not have any interest in TRI, TPR, or D & K, and is willing and prepared to succeed Dalia immediately.

34.   No prior application has been made for the relief requested herein.

### PRAYER FOR RELIEF

WHEREFORE, based upon the allegations contained herein, Petitioner requests that this Court provide the following relief:

(a)    Enjoining and restraining Respondent, her agents, and all other persons acting on her behalf from withdrawing, selling, disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering, liening, hypothecating, or secreting the Orly Trust's 19.43% interest in TRI and other assets remaining in the Orly Trust;

(b)    removing Respondent as Trustee of the Orly Trust for breaching her fiduciary duties, wasting and dissipating the assets of the Orly Trust, and improvidently managing and injuring the property committed to her charge;

(c)    surcharging Respondent in the amount of the loss of the value of Orly's interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)    appointing Michael D. Grohman, Esq., as successor trustee;

(e)    waiving any requirement that Petitioner post an undertaking; and

(f)    granting Petitioner any other relief it deems necessary and proper.

Dated:   New York, New York
         June 22, 2009

                                    _____
                                    ORLY GENGER
                                    Petitioner


COZEN O'CONNOR

By: _____
    Judith E. Siegel-Baum, Esq.
    Attorney for Petitioner
    250 Park Avenue
    New York, New York 10017
    212-986-1116

**VERIFICATION**

STATE OF NEW YORK )                    )

                                       )ss.:

COUNTY OF NEW YORK )                    )

        The undersigned, the Petitioner named in the foregoing petition, being duly sworn, says: I
have read the foregoing petition subscribed by me and know the contents thereof, and the same is
true of my own knowledge, except as to the matters therein stated to be alleged upon information
and believe, and as to those matters I believe it to be true.


                                       _____
                                       Signature of Petitioner


                                       ORLY GENGER
                                       Print Name


Sworn to before me this
22nd day of June, 2009.

_____
Notary Public
Commission Expires:
(Affix Notary Stamp or Seal)

                              ANN MEADE
                    Notary Public, State of New York
                            No. 01ME4783921
                         Qualified in Nassau County
                    Certificate Filed in New York County
                    Commission Expires Sept. 30, 2009

SURROGATE'S COURT OF THE STATE OF N.Y.
COUNTY OF NEW YORK
-----------------------------------x
In the Matter of the                    File No.
                                        0017/2008
        ESTATE OF ARIE GENGER,
                                        FTR Media
                        Deceased.
-----------------------------------x

                                        July 1, 2009

                                        31 Chambers Street
                                        New York, New York 10007


        BEFORE:    HON. TROY K. WEBBER
                   Judge

APPEARANCES:       JUDITH ELLEN SIEGEL-BAUM, ESQ.
                   STEPHANIE LEHMAN, ESQ.
                   Attorney for the Petitioner,
                   Cozen O'Connor
                   250 Park Avenue
                   New York, New York 10177-0001
                   (212) 883-4902

                   ROBERT ALLEN MEISTER, ESQ.
                   Attorney for Dahlia Genger
                   Pedowitz & Meister LLP
                   1501 Broadway
                   New York, New York 10036-5601
                   (212) 403-7330

AAA ELECTRONIC SOUND REPORTERS
1133 Broadway, Suite 706, New York, New York 10010
(888) 866-5135 ◆ (800) 860-5722 fax

Estate of Arie Genger - 7/1/09                    23

1    day delivery; you could do it by --

2              MS. SIEGEL-BAUM:  Okay, but we need --

3              THE COURT:  I mean you need notice.  You know,

4    you could even email; you can fax it; whatever.  You want

5    to do it by overnight, that's fine.  Okay?  That should

6    protect your rights, counsel.

7              The other thing is again, if for some reason --

8    withdrawn.  A lot of this will be dealt with in the

9    accounting proceeding.  There's still a trustee, so there

10   still would be certain ramifications and consequences if in

11   fact there was any wrong doing in terms of that.

12             MS. SIEGEL-BAUM:  Well, I understand.  We do have

13   surcharge; I do understand that.

14             THE COURT:  Right.

15             MS. SIEGEL-BAUM:  Accept the only thing is what

16   I'm concerned about is rather than surcharge you, I'd

17   rather be able to be sure of the assets.

18             THE COURT:  No, I recognize that.  But they're on

19   notice as to all of your fears.  So, for them now to do

20   something which would be obviously against their duties and

21   responsibilities would be somewhat glaring in terms of what

22   the surcharge actually would be.  So, we can deal with

23   that.  So, that's what you'll do; within ten days you'll

24   notify them.

25             MR. MEISTER:  All right, Your Honor.

## C E R T I F I C A T E

I, Rochelle Grant, certify that the foregoing transcript of the proceedings in the Surrogate's Court of the State of New York, County of New York, in the Matter of the Estate of Arie Genger, File Number 0017/08, was prepared using four-track electronic transcription equipment and is a true and accurate record of the proceedings.

_____
Rochelle V. Grant

Date audio was transcribed:

July 12, 2009

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of the Application of
ORLY GENGER, as a person interested,
for the removal of DALIA GENGER
as Trustee of the Orly Genger 1993 Trust
pursuant to SCPA §711 (11)

**STIPULATION**

File No.: 0017/2008

Stipulation made and entered into on August ___, 2010 between ORLY

GENGER, Petitioner, and DALIA GENGER, Respondent, collectively referred to as (the

"Parties") and their respective Counsel:

WHEREAS, ORLY GENGER commenced the above-captioned proceeding by

filing an Order to Show Cause in New York County Surrogate's Court on June 22, 2009; and

WHEREAS, by Stipulation of the Parties and their respective counsel, Surrogate

Troy K. Webber signed an Order to Show Cause dated July 1, 2009 confirmed on August 18,

2009 with certain restraints contained therein (a copy of which is annexed as Exhibit A); and

WHEREAS, on July 16, 2010, Orly Genger filed an Order to Show Cause to

Supplement Surrogate Webber's prior Order; and

WHEREAS, on July 28, 2010, Dahlia filed an Answer and Orly filed a Reply

Affidavit.

IT IS HEREBY STIPULATED AND AGREED by and between Parties and their

counsel:

NYC_MIDTOWN\589779\1 252931.000

1.    Upon signing this Stipulation, the Parties will sign and file a Stipulation withdrawing the Order to Show Cause filed July 16, 2010 and the Answer and Reply Affidavit in New York County Surrogate's Court.

2.    In addition to the stipulated restraints in Exhibit A, Orly and Dalia and their respective Counsel agree during the pendency of this proceeding, Dalia and/or her Counsel are required to give notice by overnight mail to Petitioner's Counsel of any attempt to vote any TRI shares held by the Orly Trust for any purpose, including, without limitation, in any election of TRI's directors, with such notice being given at least ten (10) days prior to such attempt being made.

IN WITNESS WHEREOF, the Parties have signed and acknowledged this Stipulation on the day and year written above.

_____
Orly Genger

_____
Dalia Genger

By: _____
Judith E. Siegel-Baum
Cozen O'Connor
Attorneys for Orly Genger
277 Park Avenue
New York, New York 10172
(212) 883-4900

By: _____
Robert A. Meister
Pedowitz & Meister LLP
Attorneys for Dalia Genger
1501 Broadway
New York, New York 10036
(212) 403-7330

- 2 -

FILED: NEW YORK COUNTY CLERK 08/03/2010
INDEX NO. 109749/2009
NYSCEF DOC. NO. 80

RECEIVED NYSCEF: 08/03/2010

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY
PRESENT:     HON. PAUL G. FEINMAN          PART   12
                        J.S.C.

|  |  |
|---|---|
| Orly Genger, etc. | AMENDED DECISION & ORDER |
|  | INDEX NO. _109749/09E_ |
| - v - | MOT. DATE _____ |
|  | MOT. SEQ. NO. _001-006_ |
| Dalia Genger, et al. | MOT. CAL. NO. _____ |

**E-FILE**

The following papers, numbered 1 to _____ were read on this motion to/for _____

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/Petition/O.S.C. — Affidavits — Exhibits | _____ |
| Answering Affidavits — Exhibits | _____ |
| Replying Affidavits | _____ |

**CROSS-MOTION:** ☒ Yes  ☐ No

Upon the foregoing papers, it is

ORDERED that the decision and orders of this court dated June 28, 2010 and filed on July 2, 2010 which resolved motions bearing sequence numbers 001, 002, 003, 004, 005 and 006 are hereby vacated and recalled. This "gray" sheet (short-form order) and the annexed Amended Decision & Order shall be substituted in their stead as the decision & order for the motions bearing seq. nos. 001 through 006, inclusive.

So ordered,

Dated: _7/28/2010_
        7:35 PM
        _____
                J.S.C.

Check one: ☐ FINAL DISPOSITION  ☒ NON-FINAL DISPOSITION
Check if appropriate:  ☐ DO NOT POST  ☐ REFERENCE
                       ☐ PC DATE_____  ☐ CC Date_____

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: CIVIL TERM: PART 12

-------------------------------------------------------------------X

ORLY GENGER, in her individual capacity and on
behalf of the Orly Genger 1993 Trust (both in its
individual capacity and on behalf of D & K
Limited Partnership),

                                        Plaintiff,

                    against

DALIA GENGER, SAGI GENGER, D & K GP
LLC, and TPR INVESTMENT ASSOCIATES,
INC.,

                                        Defendants.

-------------------------------------------------------------------X

Index No. __109749/2009E__
Mot. Seq. Nos.    __001 through__
                         __006__

***AMENDED***
**DECISION AND ORDER**

**For the Plaintiff:**
Zeichner Ellman & Krause LLP
575 Lexington Avenue
New York, NY 10022
(212) 223-0400

**For Dalia Genger:**
Pedowitz & Meister LLP
1501 Broadway
New York, NY 10036
(212) 403-7330

**For Sagi Genger:**
McLaughlin & Stern, LLP
260 Madison Avenue
New York, NY 10016
(212) 448-1100

**For D&K GP, LLC:**
Finkelstein Newman Ferrara LLP
225 Broadway
New York, NY 10007

**For TPR:**
Lyons McGovern, LLP
The Hennessy House
16 New Broadway
Sleepy Hollow, NY 10591
(914) 631-1336

E-filed papers considered in review of this motion brought by order to show cause for a preliminary injunction, motions for summary judgment, and motion to amend:

| | Papers: | E-File Number: |
|---|---|---|
| Seq. No. 001 | Order to Show Cause & TRO, Exhibits, Memo of Law in Support | 6, 7, 7-1, 9 |
| | Affidavit & Affirmation in Opposition, Exhibits, Memo of Law | 35, 35-1 - 35-8, 36, 37 |
| | Affidavit & Affirmation in Opposition, Memo of Law, Exhibit | 38, 39, 40, 40-1 |
| Seq. No. 002 | Notice of Motion, Affirmations, Exhibits | 12, 13, 13-1 - 13-6, 18, 18-1 - 18-9 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52 |
| | Reply Memo of Law (Dalia Genger) | 61 |
| | Reply Memo of Law | 65 |
| Seq. No. 003 | Notice of Motion, Affirmation, Exhibits, Memo of Law | 15, 16, 16-1 - 16-9, 19 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 53 |
| | Memo of Law in Reply, Affirmation, Exhibit | 59, 60, 60-1 |
| | Reply Affirmation, Exhibits, Memo of Law | 62, 62-1, 64 |
| Seq. No. 004 | Notice of Motion, Affirmation, Memo of Law, Exhibits | 20, 21, 22, 22-1 - 22-8 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 54 |
| Seq. No. 005 | Notice of Motion, Affirmation, Memo of Law, Exhibits | 27, 28, 29, 29-1 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 55 |
| Seq. No. 006 | Notice of Motion, Affirmation, Exhibits | 45, 46, 46-1 - 46-7 |
| | Affirmation in Opp., Memo of Law, Exhibits | 47, 48, 48-1 - 48-2 |
| | Affirmation in Reply & Opp | 49 |

1

| | |
|---|---|
| Affirmation in Opposition | 50 |
| Memo of Law in Reply | 51 |
| Affirmation in Opposition, Memo of Law, Exhibits | 56, 57, 57-1 - 57-2 |
| Memo of Law in Reply | 58 |
| Transcript of Oral Argument | 69 |

**PAUL G. FEINMAN, J.:**

The decision and order dated June 28, 2010, and filed on July 2, 2010, resolving the

motions bearing sequence number 001 through 006, is hereby recalled and vacated and the

following decision and order substituted in its stead.[1]

The motions bearing sequence numbers 001 through 006 are consolidated for the purpose

of decision.

In motion sequence number 001, plaintiff moves by order to show cause for a

preliminary injunction and a temporary order restraining defendants from removing from the

State or otherwise disturbing shares of D&K Limited Partnership's 48 percent ownership interest

in the common stock of TPR Investment Associates, until there is a judicial determination as to

who owns these closely held family shares.[2] At oral argument, the court continued the TRO

pending determination of these motions.

In motion sequence numbers 002 through 005, each of the defendants originally moved

to dismiss the complaint on various grounds. By interim order dated October 21, 2009, these

motions were converted pursuant to CPLR 3211 ( c) to motions for summary judgment (Doc. 41,

---

[1] At oral argument held on July 28, 2010 on a related matter, the parties consented to the court's
issuance of this revised decision and order without further submissions.

[2] Under the terms of the original TRO signed at the time of the signing of the Order to Show
Cause, defendants and their agents are stayed from removing or disposing in any manner the
shares at issue. Plaintiff was directed to provide an undertaking in the amount of $150,000.

2

42, 43, 44).[3]

In motion sequence number 006, plaintiff moves for leave to amend the complaint and submits a proposed amended verified complaint containing additional allegations and naming an additional defendant.

All the motions are opposed.

For the reasons set forth below, the motion for a preliminary injunction is granted; the motions by defendants for summary judgment are each granted in part and otherwise denied, and the motion to amend the complaint is granted to the extent indicated.

### Background

The litigants are members of a nuclear family and certain of their family-owned corporations and companies. The central issue concerns the intent behind the signing of a promissory note and pledge agreement in December 1993, executed as part of estate planning tools of the parents of plaintiff Orly Genger and her brother, Sagi Genger, one of the defendants. Plaintiff contends that the note and pledge agreement were part of an entire estate planning scheme by which plaintiff's father, Arie Genger, and plaintiff's mother Dalia Genger, planned to provide for their two children, plaintiff and defendant Sagi Genger, with the greatest amount of funding possible and with minimum tax consequences. Arie and Dalia Genger were divorced in 2004 and the gravamen of this complaint is that in the years following the divorce, plaintiff's mother and brother have deliberately not adhered to the intent behind the promissory note and pledge, and have schemed to seize control of some of the family's closely held companies. Their schemes have been to the detriment of one of the entities, the D&K Limited Partnership,

---

[3] Documents and exhibits are referred herein by their designated e-filing document number in the New York State Court's E-Filing System.

3

an entity partially owned by the Orly Genger 1993 Trust, and for the benefit of Sagi Genger and for defendant TPR Investment Associates, on which Sagi and Dalia Genger serve as the directors, and of which Sagi Genger is chief executive officer. Among the other relief sought by plaintiff is an injunction restraining further actions that would irreparably harm D&K Ltd. Partnership's ability to recover its interest in the shares originally held by it, that defendants be denied any ability to further erode the holdings of the Orly Genger 1993 Trust, and that shares already sold be returned to the ownership of the Ltd. Partnership.

Plaintiff argues, and none of the defendants dispute her, that as beneficiary of the Orly Genger 1993 Trust, she has a right to assert causes of action on behalf of the trust, citing *Velez v Feinstein*, 87 AD2d 309 (1st Dept. 1982) (where trustee has failed to enforce a claim on behalf of the trust, the beneficiary may do so). She further argues that as the Orly Genger 1993 Trust is a limited partner of D&K Ltd. Partnership, she has the right to assert causes of action on behalf of the Partnership as against TPR Investment and the other defendants, citing among other cases, *CCG Assoc. I v Riverside Assoc.*, 157 AD2d 435, 442 (1st Dept. 1990) ("[t]he right of a limited partner to bring an action on behalf of the partnership to enforce a right belonging to the partnership is beyond dispute") (Pl Memo of Law [Doc. 9;4] p. 1 n. 1).[4] Defendants' arguments in opposition are not persuasive.

According to the verified complaint (Doc. 7-1), plaintiff and her brother Sagi are individually beneficiaries of irrevocable trusts established in 1993 by their parents. Each trust was funded with a $600,000 gift. As established, the Orly Genger Trust and the Sagi Genger Trust together owned 96 percent in defendant D&K Ltd. Partnership, a family-owned limited

---

[4]Unless otherwise noted, all factual allegations are taken from plaintiff's verified complaint (Doc. 7-1).

partnership. Dalia Genger held the remaining four percent interest, and acted as the general manager. Defendant TPR Investment Associates, Inc. is a corporation founded by plaintiff's father, Arie Genger who originally was the sole shareholder, and serves as a holding company for the family's interests. Sagi Genger is presently Chief Executive Officer and a member of the board. Prior to 1993, TPR Investment held a majority interest in non-party Trans-Resources, Inc., a closely held private corporation.[5]

Around the time the two trusts were funded in1993, D&K Ltd. Partnership purchased 240 shares of common stock, comprising 49 percent of all shares, in TPR Investment for $10,200,000. The Orly and Sagi Trusts each paid $600,000, Dalia Genger paid $50,000, and D&K Ltd. Partnership executed a promissory note dated December 21, 1993 for $8,950,000, in satisfaction of the balance (Ver. Compl. [Doc. 7-1] ¶ 16, citing attached Ex. 1 [eFile Doc. 7-1:49 *et seq.*]). The note was signed by Dalia Genger as General Partner of D&K Ltd. Partnership. The note required that D&K Ltd. Partnership repay principal and accrued interest in annual installments over a ten-year period. Both trusts, and Dalia Genger, assumed proportional liability for repayment. The note was secured with a Pledge Agreement dated December 21, 1993, signed by Dalia Genger, in which D&K Ltd. Partnership pledged its 240 TPR Investment shares as collateral for repayment of the note (Ver. Compl. [Doc. 7-1] ¶ 18) According to the September 6, 2007, testimony of Sagi Genger in the arbitration proceeding concerning his parents' divorce, the purpose of the note was "[e]ssentially an estate planning tool, to transfer wealth," with the intent to minimize taxes owed by the family members (Doc. 46-5:150-152 [S.

---

[5]Trans-Resources is the parent company of several subsidiaries that provide growers with specialty fertilizer and industrial chemicals, and is one of the two largest produces of potassium nitrate in the world (Ver. Compl. [Doc. 7-1] ¶ 12).

5

Genger EBT, pp. 366, 368]).  As a result of the purchase by D&K Ltd. Partnership of TPR

Investment stock, the Orly and Sagi trusts each acquired 23.52 percent indirect interest in TPR

Investment, and Dalia acquired a 1.96 percent indirect interest.  Arie Genger retained 51 percent

ownership.

As alleged in the complaint, each member of the family understood and agreed, in the

"desire to ensure equal wealth transfer to Sagi and Orly and with the estate-planning purposes

underlying the creation of the Trusts and D&K [Ltd. Partnership]'s purchase of the TPR shares,"

that the note and Pledge Agreement "would never be enforced by any of them" (Ver. Compl.

[Doc. 7-1] ¶ 20).  Sagi Genger in particular was charged with ensuring that the promissory note

and Pledge Agreement would not be enforced and, in the first years, took "specific steps to fulfill

that charge," an example of which follows here (Ver. Compl. [Doc. 7-1] ¶ 20).

D&K Ltd. Partnership made payments on the note until 1999 and then ceased.  In

November 2002, TPR Investment sent a letter to D&K Ltd. Partnership seeking payment of the

past due principal and interest (Doc. 29-1:77-78]).  Sagi Genger, TPR's CEO, explained during

his testimony in the above-mentioned arbitration proceeding that this November 2002 letter was

merely "pro forma," and that there was no intent to collect on the note  (Doc. 46-5:153 [S.

Genger EBT, p. 370]).

In October 2004, Dalia and Arie Genger were divorced, resulting in certain changes to

the ownership of certain family entities, memorialized in the Stipulation and Agreement of

Settlement, dated October 26, 2004 (Ver. Compl. [Doc. 7-1] ¶ 22, citing Ex. 2 [Doc. 7-1:66 *et

seq.*]).  In particular, Dalia Genger received sole ownership of Arie Genger's 250 shares of TPR

Investment, the Trans-Resources shares were redistributed such that Dalia Genger owned no

shares in that company, and Arie Genger was granted a lifetime voting proxy over the family

6

Trans-Resources shares (Stipulation pp. 5, 8-14 [Doc. 7-1:71, 73-80]). The Stipulation and

Agreement of Settlement gave Sagi Genger "full and complete authority" to sell non-liquid

assets and distribute them as he saw fit, subject to his fiduciary duties to effectuate the intent of

the parties entering the Agreement (Stipulation p. 7 [Doc. 7-1:73]). However, the net proceeds

were to be distributed so as to minimally fund a "basic escrow account" after which monies were

to go to TPR Investment "in satisfaction of the parties' indebtedness" (Stipulation p. 8 [Doc. 7-

1:74]).

Despite the changes, both the Orly and Sagi trusts continued to have equal ownership

interests in Trans-Resources shares as well as in the TPR Investment shares owned by D&K Ltd.

Partnership (Ver. Compl. [Doc. 7-1] ¶ 23).

Also on October 26, 2004, TPR Investment, Arie Genger, and Dalia Genger signed an

Assumption Agreement which acknowledged the promissory note's existence and noted that at

that juncture, approximately $9,980,000, inclusive of interest, was owed by D&K Ltd.

Partnership to TPR Investment (Doc. 22-4).

In addition, also on the same date, Sagi and Dalia Genger formed D&K GP LLC to serve

as the general partner for D&K Ltd. Partnership (Pl. Mot. 001, Ex. 5 ¶ 5 [Doc. 7-1:151]). Under

the agreement, Dalia Genger transferred her general partnership interest in D&K Ltd.

Partnership, in exchange for a 99 percent interest in D&K GP; Sagi Genger was granted power

to select the manager. Accordingly, D&K GP LLC now held a four percent interest in D&K Ltd.

Partnership.

Plaintiff alleges that in the years subsequent to the divorce, Dalia Genger has sought, in

collusion with her son Sagi Genger, to "destroy" her former husband financially, and their

actions have threatened to destroy plaintiff financially as well (Ver. Compl.[Doc. 7-1] ¶ 25).

7

Thus, when Dalia in effect ceded her control over D&K Ltd. Partnership to Sagi, the restructuring left only the two trusts liable to TPR Investment for repayment of the promissory note (Ver. Compl.[Doc. 7-1] ¶ 27). In August 2006, Sagi Genger on behalf of TPR Investment, assigned the promissory note to David Parnes,[6] but stated in writing to Parnes that "D&K LP and its partners have a variety of claims against TPR, and deny the enforceability of the Note." (Ver. Compl. [Doc. 7-1] ¶ 47, citing Ex. 8 [Doc. 7-1:179-*et seq.*]). In 2007, Sagi Genger allegedly stripped Dalia Genger of her majority interest in TPR Investment by selling an interest to his mother-in-law, Rochelle Fang (Ver. Compl. [Doc. 7-1] ¶ 32). In late 2007 or early 2008, Dalia Genger divested herself of the balance of her TPR Investment shares, leaving Sagi Genger in direct control of TPR Investment and its interest in the promissory note (Ver. Compl. [Doc. 7-1] ¶ 33). As a result, Sagi Genger in essence now wore two hats, as CEO of TPR Investment, the creditor of the note, and as manager of D&K Ltd. Partnership, the debtor on the note (Ver. Compl. [Doc. 7-1] ¶ 34).

In November 2007, Sagi Genger and Leah Fang executed an "Amended and Restated Limited Partnership Agreement of D&K Limited Partnership," permitting D&K GP to "mortgage, hypothecate, pledge, create a security interest in or lien upon, or otherwise encumber the L[imited] P[artner] TRI Interests, for the benefit of the Partnership (Doc. 46-5:218). The document was signed by Sagi Genger, managing member of D&K GP LLC, the General Partner, and Leah Fang, as sole trustee for both the Sagi Genger 1993 Trust and the Orly Genger 1993 Trust, the Limited Partners (Doc. 46-5:223). Plaintiff only learned of this document's existence

---

[6] Parnes is a former trustee of the Orly Genger 1993 Trust, the present trustee of the Sagi Genger 1993 Trust, an officer of TPR Investment and director of Trans-Resources (Ver. Compl. [Doc. 7-1] ¶ 46). Parnes testified during the arbitration proceeding that the purpose of the transfer of the note to him was to prevent collection by any others (*Id.*).

in 2009.

In January 2008, Dalia Genger was appointed successor trustee to the Orly Genger 1993 Trust (Ver. Compl. [Doc. 7-1] ¶ 39). She succeeded several other individuals, including two long-term friends of her son's and her son's sister-in-law. As trustee, Dalia has "complete control over the assets of the Orly Trust, including its ownership interests in TPR (through D&K) and TRI" (Ver. Compl. [Doc. 7-1] ¶ 41).

In 2008, TPR Investment, through CEO Sagi Genger, reclaimed the promissory note from Parnes, and in August 2008, notified D&K Ltd. Partnership's general manager (Sagi Genger), that it was in default under the note and that if it failed to satisfy the full terms of the note, its shares would be sold at public auction (Ver. Compl. [Doc. 7-1] ¶ 52, citing Ex. 10 [Doc. 7-1:185-186]). As the payment was not made, D&K Ltd. Partnership was informed by TPR Investment that the latter would sell the former's 240 shares of common stock in TPR Investment to the highest qualified bidder on February 27, 2009 (Ver. Compl., Ex. 11 [Doc. 7-1:187-188]). Notice was not provided to either of the trusts, but was published in THE NEW YORK POST in October 2008 and again in February 2009 (Ver. Compl. [Doc. 7-1] ¶¶ 52-53, citing Ex. 12 [Doc. 7-1:189-191]).

On January 31, 2009, the general partner of D&K Ltd. Partnership, that is to say D&K GP, and the limited partners, the Sagi and Orly trusts, and TPR Investment, memorialized a document called "Meeting of Partners of D&K LP - Jan. 31, 2009 & Agreement," in which it was agreed that D&K GP could sign for the Limited Partnership and for each individual partner when making the limited partners' assets subject to a pledge (Doc. 22-4:17-18).[7] This same

---

[7] Plaintiff alleges she first learned of this agreement only when the documents were provided as part of defendants' papers submitted in their motions to dismiss (Am. Ver. Compl.[Doc. 46-4] ¶

9

agreement included the promise of TPR Investment that it would "refrain from enforcing the note against each limited partner for thirty days." (*Id.* [Doc. 22-4:18] ¶ 8).[8]

The note was foreclosed upon on February 27, 2009, less than the 30 days indicated in the Agreement date, and D&K Ltd. Partnership's 240 shares of TPR Investment were purchased back by TPR, decreasing the obligations of D&K Ltd. Partnership under the promissory note, and leaving a balance of approximately $8.8 million that continues to be guaranteed by the Orly and Sagi trusts (Ver. Compl. [Doc. 7-1] ¶ 57, citing Ex. 13 [Doc. 7-1:192-194]). Plaintiff and her attorney only learned in early June 2009 that the note had been foreclosed and that the pledged shares had been sold back to the company (Ver. Compl. [Doc. 7-1] ¶ 65). Plaintiff has made a written demand that TPR Investment return the pledged shares to D&K Ltd. Partnership, but TPR has declined to comply (Ver. Compl. [Doc. 7-1] ¶ 69, citing Ex. 20 [Doc. 7-1:225-227]).

Also in August 2008, Rochelle Fang, as trustee of the Sagi Genger 1993 Trust, and Sagi Genger, sold that trust's interest in Trans-Resources to another group (named "Trump"), which sale divested Arie Genger from control and put the company in the control of the Trump group (Ver. Compl. [Doc. 7-1] ¶ 60, citing Ex.14 [Doc. 7-1:195-207]). The validity of this sale is under challenge in Delaware Chancery Court, although plaintiff Orly Genger has not joined in that action (Ver. Compl. [Doc. 7-1] ¶ 61).

After this purported sale of the Sagi Genger Trust's shares of Trans-Resources, plaintiff feared her trust's shares would not be protected from sale. She requested in writing from her

94).

[8]The copy of the document e-filed with the court is not clear enough to discern who signed on behalf of the trusts, although presumably it was Dalia Genger, or on behalf of TPR Investment.

10

mother as trustee in January 2009 and again in June 2009 that the Orly Genger 1993 Trust retain

all of its shares of Trans-Resources and that they not be sold, but Dalia Genger has refused to

agree, or even to respond (Ver. Compl. [Doc. 7-1] ¶¶ 63, 66, citing Ex. 15, 16 [Doc. 7-1:208-

215]). Plaintiff, who had brought a proceeding in Surrogate's Court to remove her mother as

trustee at the time of her appointment in January 2008, an application which was denied as being

premature (Ver. Compl. [Doc. 7-1] ¶¶ 39-40), brought a second application on June 22, 2009,

seeking to enjoin Dalia Genger or her agents from doing anything to affect the Orly Genger 1993

Trust's Trans-Resources shares, to remove Dalia as trustee and appoint another in her stead

based on breach of fiduciary duties, and for a surcharge for damages (Ver. Compl.[Doc. 7-1] ¶

67). At this juncture, the Surrogate's Court has ordered that Dalia Genger provide at least 10

days notice before disposing of any of the trust's Trans-Resources shares (Ver. Compl.[Doc. 7-1]

¶ 68, citing Ex.19 [Doc. 7-1:222- 224]).

Plaintiff contends that Dalia Genger has failed to act in the best interests of the Orly

Genger 1993 Trust, that Sagi Genger has acted in a self-dealing manner and together with Dalia

Genger has undermined the estate plans that intended for both children to benefit equally from

the family's wealth (Ver. Compl. [Doc. 7-1] ¶ 58). Plaintiff fears that through defendants'

continued scheming, the Orly Genger 1993 Trust's one remaining asset, its ownership of the

Trans-Resources shares, will also be wrongly divested (Ver. Compl. [Doc. 7-1] ¶ 59).

The verified complaint alleged 16 causes of action against the various defendants,

including replevin of the shares from TPR Investment back to D&K Ltd. Partnership, and a

request for a preliminary injunction.

As stated above, defendants each submitted pre-answer motions to dismiss which, after

notice by the Court, have been converted to motions for summary judgment pursuant to CPLR

11

3211 ( c). Subsequent to the filing by defendants of their motions, plaintiff moved to amend her complaint "to address, among other things," the defendants' "scheme regarding the Orly Trust's TRI Shares," and the involvement in the scheme of Leah Fang, the proposed additional defendant (Pl. Mot. 006, Ex. D, Part 1, Proposed First Am. Ver. Compl., [Doc. 46-4] ¶ 95). The proposed first amended verified complaint contains an additional four causes of action, two against Leah Fang, and two seeking additional declaratory relief, and amends certain of the original causes of action to include the new allegations and those against Leah Fang.

### Legal Analysis

For convenience, the motion to amend will be addressed first, and then the preliminary injunction, followed by the motions to dismiss. Because the motion to amend the complaint is granted, the remainder of this decision addresses the claims as alleged in the amended complaint.

A.     Motion to Amend the Verified Complaint (Sequence Number 006)

Leave to amend pleadings is to be freely given upon terms that may be just (CPLR 3025 [b]). In addition, CPLR 3025 (a) permits any party to amend a pleading once, without court permission provided it is done under one of the following circumstances: within 20 days of the service of the original pleading; at any time before the period for responding to it has expired, or within 20 days after the service of a responsive pleading. Plaintiff proffers a proposed amended complaint to add a new defendant and new causes of action (Doc 46-4).

Contrary to defendants' arguments, case law holds that where a defendant has not answered the complaint but instead interposed a motion to dismiss, as was done here, the plaintiff may amend her complaint once as of right, because defendants, by making pre-answer motions, have extended their time to answer (*see, Johnson v Spence*, 286 AD2d 481 [2d Dept. 2001]; *STS Mgt. Dev., Inc. v New York State Dept. of Taxation & Fin.*, 254 AD2d 409 [2d Dept.

12

2001]; *Miller v General Motors Corp.*, 99 AD2d 454 [1ˢᵗ Dept. 1984], *aff'd* 64 NY2d 1081

[1985]). Although defendants oppose, plaintiff is entitled to serve and file her amended

complaint without review by the court, although the rulings below on defendants' motions shall

refine the scope of the proposed amended complaint and require her to file and serve a second

amended complaint. Defendants' arguments in opposition, including that there is another action

pending, can be pled as affirmative defenses. Plaintiff's motion to amend her complaint is thus

granted to the extent indicated.

B.   Motion for Preliminary Injunction (Sequence Number 001)

    Among the purposes of a preliminary injunction are maintaining the status quo and

preventing irreparable injury to a party (*see, e.g., Ma v Lien*, 198 AD2d 186 [1ˢᵗ Dept. 1993], *lv*

*dismissed* 83 NY2d 847 [1994]). To prevail, the party seeking injunctive relief must

demonstrate a likelihood of success on the merits; that it will suffer irreparable injury if the relief

is not granted; and that the equities balance in its favor (*Aetna Ins. Co. v Capasso*, 75 NY2d 860,

862 [1990]). A preliminary injunction should generally not be granted where there are issues of

fact (*Lincoln Plaza Tenants Corp. v MDS Properties Dev. Corp.*, 169 AD2d 509 [1ˢᵗ Dept.

1991]; *but see Ma v Lien, supra* at 187 ["even where the facts are in dispute, the nisi prius court

can find that a plaintiff has a likelihood of success on the merits, from the evidence presented"]).

If money damages are an adequate remedy, irreparable harm does not exist and injunctive relief

should be denied (*Sterling Fifth Assoc. v Carpentille Corp., Inc.*, 5 AD3d 328, 330 [1ˢᵗ Dept.

2004]).

    Plaintiff argues that the shares of Ltd. Partnership are unique chattel as contemplated by

CPLR 7109, and that accordingly the court should grant a preliminary injunction restraining

defendants from disposing of the shares until order of the court. She argues that the D&K Ltd.

Partnership shares are unique because they are shares of a closely held family company which represents an ownership in another closely held family company, TPR Investment, and that their value is dependent, at least in part, on the outcome of the family litigation currently before the Delaware Chancery Court concerning Trans-Resources (Pl. Memo of Law, 5-6 [Doc. 9:8-9]).

Under CPLR 7109, where the chattel is unique, the court may grant a preliminary injunction or temporary restraining order that it may not be transferred, sold, pledged, assigned or otherwise disposed of until the court orders (CPLR 7109 [a]). Defendants argue that the shares are in essence fungible, and that if appropriate, money damages would fully compensate plaintiff (TPR [S. Genger] Aff. in Opp. [Doc. 39] ¶ 6). Sagi Genger avers that the "TPR shares are currently not for sale and there is no intention to sell them at this time or in the near future." (S. Genger Aff. in Opp. [Doc. 35] ¶ 5]). He makes no statements concerning the TRI shares. Plaintiff's argument, however, is that her parents never meant for the promissory note to be enforced, but rather that the trust funds remain intact for the two children. The recent actions taken by defendants concerning the promissory note which have negatively impacted the Orly Genger 1993 Trust, and the sale of the Trans-Resources shares belonging to the Sagi Genger 1993 Trust, possibly foretell defendants' plans to sell her trust's shares of Trans-Resources and thus she seeks court intervention to prevent further dissipation of the trust.

The granting of a preliminary injunction is a discretionary remedy (*Ross v Schenectady*, 259 App. Div. 774, 774 [3d Dept. 1940]; *Dabrinsky v Seagate Assn.*, 239 NY 321 [1925]). Here, where the family shares at issue are intertwined among various family entities, defendants have not offered sufficient evidence to show that the shares of either TPR Investment or Trans-Resources owned by the Orly Genger 1993 Trust are not "unique" and should not be protected from transfer, sale, or assignment until this litigation is ultimately decided. In addition, given

14

that defendant Sagi Genger states there is no immediate plan to sell or otherwise dispose of the TPR Investment shares, an injunction is not likely to cause much harm to defendants. The balance of equities therefore lies in favor of plaintiff. Accordingly, the motion for a preliminary injunction is granted.

### *Motions for Summary Judgment*

The proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case (*Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [1985]). Evidentiary proof must be submitted in admissible form (*Zuckerman v City of N.Y.*, 49 NY2d 557, 562 [1980]). Parties in opposition must submit "evidentiary facts or materials, by affidavit or otherwise ... demonstrating the existence of a triable issue of ultimate fact." (*Tortorello v Carlin*, 260 AD2d 201, 204 [1ˢᵗ Dept. 1999]). "Issue finding and not issue resolving" is the proper role of the court in deciding such motions (*Winegrad, supra*, at 853). Regardless of the sufficiency of the opposing papers, in the absence of admissible evidence sufficient to preclude any material issue of fact, summary judgment is unavailable (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]).

None of the converted motions for summary judgment contains first-person affidavits, and all rely upon documentary evidence and the pleadings for the bases of their motions. Although plaintiff objects to the lack of first-person affidavits, the converted motions are nonetheless considered by the court and decided on their merits.

Plaintiff argues that all of the motions should be preemptively denied based on the doctrines of issue preclusion and judicial estoppel, pointing to the testimony and evidence presented at the arbitration which resulted in the May 6, 2008, award entitled *Dalia Genger v*

15

*Arie Genger*, Case No. 13 170 Y 00996 07 (American Arbitration Assn., Commercial

Arbitration Tribunal, NYC). (Doc. 46-5:131 *et seq.*]). The doctrine of issue preclusion serves

to bar a party from "relitigating in a subsequent action or proceeding an issue that was raised in a

prior action or proceeding and decided against that party or those in privity, whether or not the

tribunals or causes of action are the same" (*Ryan v New York Tel. Co.*, 62 NY2d 494, 500

[1984]; *see also, Parker v Blauvelt Volunteer Fire Co.*, 93 NY2d 343, 349 [1999]). The doctrine

of judicial estoppel prohibits a party that has assumed a certain position in a prior legal

proceeding and secured a judgment in its favor, from assuming a contrary position in another

action simply because the party's interests have changed (*City of N.Y. v College Point Sports

Assn., Inc.*, 61 AD3d 33, 44 n. 1 [2d Dept. 2009], citations omitted). Notably, of course, the

arbitration concerned issues arising from the divorce of plaintiff's parents, and determined,

among other questions, that the promissory note could not be enforced by either parent as against

each other. This is not the issue raised by plaintiff in her litigation. Additionally, because the

testimony by Sagi Genger, Dalia Genger, and others in that arbitration was offered to answer the

questions of whether the note was.enforceable, and its value, *as between the former husband and

wife*, the witnesses and parties did not address the value or enforceability of the note *as between

the children* of Arie and Dalia Genger, *or the family owned companies*. Thus, the testimony

adduced in the arbitration may well be admissible in this action, but there is no collateral

estoppel effect.

C.   Dalia Genger's Motion for Summary Judgment (Sequence Number. 002)

The first amended verified complaint alleges three causes of action against Dalia Genger:

breach of fiduciary duty (1st cause of action), fraud (5th cause of action), and conspiracy to

commit fraud (8th cause of action).

As argued by defendant, the claim of breach of fiduciary duty is also at issue in a proceeding currently before the Surrogate's Court entitled *In the Matter of the Application of Orly Genger, as a person interested, for the removal of Dalia Genger as Trustee of the Orly Genger 1993 Trust pursuant to SCPA § 711 (1)*, File No. 17/2008 (Surrogate's Court NY County). Plaintiff does not address this argument. Accordingly, in the interest of judicial economy, the branch of defendant's motion seeking summary judgment and dismissal as to the complaint's 1st cause of action, is granted, on the ground that the same claim is pending in another court proceeding (CPLR 3211 [a] [4]).

The 5th Cause of Action sounds in fraud, while the 8th Cause of Action alleges conspiracy to commit fraud among the four defendants. As an initial matter, it is well established that "a mere conspiracy to commit a fraud is never of itself a cause of action," although allegations of conspiracy are permitted to connect the actions of separate defendants with an otherwise actionable tort (*Alexander & Alexander of N.Y. Inc. v Fritzen*, 68 NY2d 968, 969 [1986] [citation omitted]). As explained in *Brackett v Griswold*, "[t]he allegation that there was a conspiracy to commit the fraud does not effect the substantial ground of action," and "[t]he *gravamen* is fraud and damage, and not the conspiracy." (112 NY 454, 466-467 [1889]). "The allegation and proof of a conspiracy in an action of this character is only important to connect a defendant with the transaction and to charge him [*sic*] with the acts and declarations of his [*sic*] co-conspirators, where otherwise he [*sic*] could not have been implicated." (*Id.*). Accordingly, the 8th cause of action is dismissed as against this defendant, and the others.

To state a claim for fraud, plaintiff must allege "a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance ... and damages" (*Eurycleia Partners, LP v Seward & Kissel, LLP*, 12 NY3d 553, 559 [2009]). In addition, under

17

CPLR 3016 (b), the circumstances constituting the wrong must be stated in detail.

Defendant Dalia Genger argues that plaintiff's claims are unspecific and general in nature. In particular, she argues that there is no allegation of the manner in which plaintiff relied on any of her statements, or in what manner she, defendant, could have prevented the enforcement of the promissory note and the foreclosure sale. Although plaintiff argues in opposition that Dalia Genger made many statements over the years, including sworn statements, affirming that all interested parties to the note had agreed that TPR Investment would never seek to enforce the promissory note (Am. Ver. Compl. [Doc. 46-4] ¶¶ 62, 145-147), none of defendant's statements *explicitly* make this assertion other than in the context of the divorce proceedings. However, plaintiff also argues that even after she requested that her mother, as trustee, not encumber the remaining assets of the trust, her mother signed the January 2009 Meeting Agreement which gave power to D&K GP - the company controlled by Dalia and Sagi Genger - to pledge the Orly Genger 1993 Trust's shares of Trans-Resources as security for the promissory note, and which indemnified Sagi Genger, among others. There are also the transactions over the years that apparently have given Sagi Genger, and Dalia Genger, potential control over family assets in a way that has harmed plaintiff's share.

When claiming that the defendants together acted to commit a fraud, the plaintiff need not allege and prove that each defendant committed every element of fraud but only facts which support an inference that the defendants knowingly agreed to cooperate in a fraudulent scheme (*Snyder v Puente De Brooklyn Realty Corp*, 297 AD2d 432, 435 [3d Dept.2002], *lv denied*, 99 NY2d 506 [2003]; *LeFebre v New York Life Ins. & Ann. Corp.*, 214 AD2d 911, 912 [3d Dept. 1995]). Plaintiff alleges that the various defendants together committed fraud by, for example, creating the conditions that resulted in the "sham sale" of the TPR Investment assets owed by

18

D&K Ltd. Partnership, and agreeing in the January 2009 Meeting Agreement to give power to D&K GP, the company controlled by Dalia and Sagi, to pledge the Orly Trust's shares of Trans-Resources as security for the promissory note (Am. Ver. Compl. [Doc. 46-4] ¶¶ 76-68, 151). Plaintiff asked repeatedly for information about her trust, but because defendant has not been forthcoming nor kept her informed, she did not know that there was any need to attempt to protect the assets of her trust.

The evidence and arguments provided by both parties show that there is a question of fact as to whether Dalia Genger acted with intent to commit fraud against plaintiff's trust, and to lull plaintiff into a false sense of security as to the status of her trust. Accordingly, the branch of defendant's motion to dismiss the 5th cause of action is denied.

D.    Sagi Genger's Motion for Partial Summary Judgment (Sequence Number 003)

Defendant Sagi Genger seeks summary judgment and dismissal of the 6th, 7th, 8th, and 16th causes of action.[9]

The 6th cause of action sounds in fraud. The elements of fraud are set out above in the discussion of Dalia Genger's motion. The complaint focuses on the statements made by defendant in particular during the 2007 - 2008 arbitration proceeding, which helped form the basis for the arbitrator's decision that the parties never intended for the note to be collected and that it was not an asset to be valued, statements of which the plaintiff was aware and which caused her to believe that her trust fund was secure and that no one would enforce the note.

The 7th cause of action alleges aiding and abetting fraud. The elements of aiding and abetting fraud are that there exists a fraud, the defendant knew of the fraud, and the defendant

---

[9] He does not seek summary judgment as to the 2nd, 3rd, or 4th causes of action, in which he is also named.

19

provided substantial assistance to advance the fraud's commission (*M&T Bank Corp. v Gemstone CDO VII, Ltd.*, 23 Misc. 3d 1105A; 881 NYS2d 364, 2009 NY Slip Op 50590(U) {Sup. Ct., Erie County 2009], *aff'd in part, mod in part*, 68 AD3d 1747 [4th Dept. 2009], quotation and citation omitted). The complaint contends that defendant and D&K GP knowingly assisted in the "sham sale" of the D&K Ltd. Partnership shares, failed to notify the Partnership members of the foreclosure and sale, the sale of which harmed the Orly Trust, and entered into the Meeting Agreement which now allows defendant and D&K GP to pledge or encumber the Trans-Resources shares owned by the Orly Genger 1993 Trust.

Defendant argues that summary judgment is appropriate based on the documentary evidence. He contends that prior to this litigation, plaintiff never claimed that the note or pledge agreement were invalid. Among the evidence he points to in arguing the note's enforceability, is testimony of Arie Genger acknowledging that payments were made by D&K Ltd. Partnership on the promissory note (Doc. 16-4:3-4]) , the Assumption Agreement signed by Dalia, Arie, and Sagi Genger on October 25, 2004, acknowledging the nearly $10,000,000 due under the note {Doc. 16-6]), the November 19, 2008 letter from plaintiff's counsel to the Surrogate, stating in part that "D&K [Ltd. Partnership] is indebted on a multi-million dollar note to TPR, which is secured by D&K's 49% stock interest, and which has not been serviced for years" (Doc. 16-8]), and a document signed by plaintiff dated December 27, 2007, in which she states that the trust "is indebted in the amount of approximately $4.5 million" (Doc. 16-9]).

Defendant also argues that the statute of frauds bars plaintiff's 6th and 7th causes of action because plaintiff claims that the promissory note has been orally modified. General Obligations Law § 5-701 requires that agreements which by their terms are not to be performed within one year, or which are promises to answer for the debt or default of another person, must be in

20

writing and subscribed by the party to be charged therewith (GOL § 5-7-1 [a] [1]-[2]).  The parol

evidence rule of the General Obligations Law provides that where a written agreement contains

a provision stating that it cannot be changed orally, then such a document cannot be changed by

executory agreement unless it is in writing, signed by the party against whom enforcement of the

change is sought (GOL § 15-301 [1]).  Thus, defendant argues that plaintiff cannot claim that the

parties legally agreed, orally, that the note would not be enforceable.

Defendant's arguments are unpersuasive.  Courts have also found, specifically in regard

to promissory notes, that when parties contest whether a notice is enforceable, there is an issue

of fact that survives summary judgment and the statute of frauds will not prevent the court's

examination of parol evidence on the issue.  For example, in *Greenleaf v Lachman*, the Court

examined a promissory note allegedly executed so as to avoid negative income tax treatment,

and found an exception to the parol evidence rule in order to allow admission of parol evidence,

not to vary the terms of the writing, but to show that a "writing, although purporting to be a

contract, is, in fact, no contract at all." (216 AD2d 65, 66 [1ˢᵗ Dept.1995], *lv denied* 88 NY2d 802

[1996]).  Similarly, in *Dayan v Yurkowski*, the Court denied summary judgment and held that

the defendant's parol evidence should be considered to show that the note, while valid on its

face, was not intended to take effect (238 AD2d 541 [2d Dept. 1997]; *see also, Paolangeli v

Cowles*, 208 AD2d 1174, 1175 [3d Dept. 1994]).

Here, where plaintiff and all the defendants copiously cite to factual support, a material

issue of fact exists regarding the intention of the note's enforceability.  While the documents

speak for themselves, plaintiff raises material questions of fact concerning the actual intent

behind the promissory note.  She argues that the promissory note's purpose was to facilitate the

estate planning of Arie Genger and the transfer of funds between the family members with

21

lessened tax consequences. Indeed, it is curious that interest payments were made by the
Partnership for several years and then ceased, and that Sagi Genger testified that TPR
Investment's 2002 notice was "pro forma" and not meant as an actual request that payment be
made. It could be found that enforcement of the note's terms was only made after Sagi Genger
allegedly came into control of both TPR Investment and D&K Ltd. Partnership. Given the
testimonial evidence in particular, there is a question of fact as to whether the promissory note
was intended to be an enforceable agreement, and it would be premature to apply a Statute of
Frauds analysis to the cause of action. In addition, as plaintiff has established that there are
questions of fact as to whether defendant acted with intent to defraud plaintiff and D&K Ltd.
Partnership and provided substantial assistance to D&K GP in particular to advance the fraud's
commission, the branch of the motion seeking summary judgment and dismissal of the 6th and 7th
causes of action is denied.

The 8th cause of action alleges conspiracy to commit fraud. For the same reasons set
forth above in discussing Dalia Genger's motion, this branch of defendant's motion is granted.

The 16th cause of action alleges promissory estoppel. This is an equitable cause of action
and must allege "a clear and unambiguous promise by defendants upon which [the plaintiff]
reasonably and foreseeably relied to [plaintiff's] detriment." (*401 Hotel, L.P. v MTI/The Image
Group, Inc.*, 251 AD2d 125, 126 [1[st] Dept. 1998]). Here, plaintiff alleges that it was the promise
and intent of Arie Genger and the family as a whole, that the promissory note was not to be
enforced, so as to preserve the trust accounts, and that she relied on that promise these many
years only to learn that one of the main assets of her trust account had been sold in violation of
the promise. Defendant argues not only that the documents state otherwise, but that plaintiff
may not assert promissory estoppel in order to avoid the affirmative defense of the statute of

22

frauds, citing *Cohen v Brown, Harris, Stevens, Inc.*, 64 NY2d 728 (1984), and *Lowinger v Lowinger*, 287 AD2d 39, 45 (1st Dept. 2001), *lv denied* 98 NY2d 605 (2002).

While the assertion of the statute of frauds is often sufficient to cause a dismissal of a claim of promissory estoppel, exceptions include where "the circumstances are such as to render it unconscionable to deny" the promise upon which the plaintiff has relied (*see, Philo Smith & Co. v. USLIFE Corp.*, 554 F.2d 34, 36 [2d Cir. [NY] 1977]). Here, where there are questions of fact as to whether defendants intentionally breached the family agreement concerning the entirety of the estate planning and unconscionably caused plaintiff to lose a significant amount of her trust funds to their benefit, with the possibility of losing all of the funds, defendant has not established entitlement to summary judgment and dismissal of the claim of promissory estoppel notwithstanding his defense of the statute of frauds (*see, Swerdloff v Mobil Oil Corp.*, 74 AD2d 258, 261 [2d Dept.], *lv denied* 50 NY2d 913 [1980]). Accordingly, defendant's motion for summary judgment and dismissal of the 16th cause of action is denied.

E.    D&K GP's Motion for Partial Summary Judgment (Sequence Number 004)

Defendant D&K GP seeks summary judgment and dismissal of "all" the causes of action of the complaint as against it, but its motion papers specifically addresses only the 4th, 6th, 7th, and 8th causes of action.[10]

As an initial issue, D&K GP argues that plaintiff, "in her capacity as beneficiary under the Orly Trust and in the Orly Trust's capacity as limited partner in D&K LP, agreed not to bring an action against D&K GP." (Lyons [D&K GP] Aff. [Doc. 21] ¶ 5). Specifically, defendant points to the "Amended and Restated Limited Partnership Agreement of D&K Limited

---

[10]D&K GP did not seek summary judgment as against the 2nd or 3rd causes of action, in which it is also named as a defendant.

Partnership," in which Leah Fang as trustee for both the Orly and Sagi trusts, agreed that the trusts expressly waived their right to bring an action against D&K GP, the General Partner; Sagi Genger signed on behalf of D&K GP (Doc. 22-8). Accordingly, D&K GP argues that summary judgment and dismissal of the claims against it should be dismissed in their entirety. However, this agreement provides that its partners, which include the Orly Genger 1993 Trust, may sue for "fraud, bad faith, or willful misconduct." (Doc. 22-8:5). Plaintiff alleges that there has been bad faith and fraud by various family entities as concerns the enforcement of the promissory note, and including various documents signed on behalf of the Genger trusts, as well as D&K Ltd. Partnership. At the very least, there appear to be irregularities. Summary judgment and dismissal on this ground is not appropriate.

The 4th cause of action, brought by the Orly Genger 1993 Trust and D&K Ltd. Partnership against both defendant D&K GP and Sagi Genger, claims defendants prevented the Ltd. Partnership from honoring its obligations under the note, and that it tortiously interfered with the contract.

Tortious interference with contractual relations consists of four elements: a contract between plaintiff and a third party; the defendant's knowledge of the contract; the defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and resulting damages to plaintiff (*Kronos, Inc. v AVX Corp.*, 81 NY2d 90, 94 [1993], citation omitted). Defendant argues that, as the general partner to D&K Ltd. Partnership, it is a party to the contract at issue, that it, too, has also been injured by the nonpayment and resulting foreclosure, and that a party to a contract cannot tortiously interfere with the contract (Def. Memo of Law § IV [Doc. 22:12]). Plaintiff argues that according to Sagi Genger's testimony during the arbitration proceeding, Dalia Genger had repaid her four percent interest in the

24

promissory note, and that therefore D&K GP was not a party to the agreement.

Here, the contract is the promissory note between D&K Ltd. Partnership and TPR Investment. Defendant D&K GP knew of the contract, but was also the general partner of the Limited Partnership from 2004 onward, and thus is understood to be a party to the contract. This is because the management of the property and the business of the partnership are vested exclusively in the general partners (*Durant v Abendroth*, 97 NY 132, 144 [1884]). By law, a general partner in a limited partnership is subject to all the restrictions and liabilities of a partner in a partnership without limited partners, although it may not undertake certain actions without the written consent of the limited partners, as defined in the statute (Limited Partnerships § 98). Thus, plaintiff's argument that Dalia Genger had repaid the interest she owed on the promissory note, does not divest defendant of its rights and duties as general partner. Accordingly, as it was the general partner of D&K Ltd. Partnership, no claim of tortious interference with the contract may lie. Summary judgment and dismissal of the 4th cause of action against defendant is granted.

The 6th and 7th causes of action are fraud, and aiding and abetting fraud. The elements of both causes of action have been previously set forth. There are questions of material fact as to whether defendant engaged in fraud and in aiding and abetting fraud, and accordingly the branch of defendant's motion for summary dismissal of these two causes of action is denied.

The branch of the motion to dismiss the 8th cause of action, claiming conspiracy to commit fraud, is granted, for the reasons stated previously as concerns the other defendants.

F.    TPR's Motion for Summary Judgment (motion sequence no. 005)

Defendant TPR moves for summary judgment and dismissal of the 8th, 9th, 10th, 11th, 12th, 13th, 14th, 15th, and 16th causes of action as against it. In sum, it argues that the documentary evidence establishes that there are no material questions of fact that would preclude a grant of

25

summary judgment and dismissal of the complaint as against it.

The branch of the motion to dismiss the 8th cause of action, alleging conspiracy to commit fraud, is granted for the reasons set forth above concerning the other defendants.

The 9th cause of action seeks declaratory relief and damages pursuant to NY UCC §§ 9-627, 610, and 611-614, as concerns the notice of foreclosure and the sale. UCC § 9-610 provides that every aspect of the disposition of collateral after a default must be commercially reasonable. UCC § 9-611 ( c) (2) provides that before the disposition of collateral, the secured party shall send an authenticated notification of disposition to "any secondary obligor." UCC § 9-612 (b) provides that for a non-consumer transaction, 10 days is sufficient notice before the disposition. UCC § 9-613 (a) (4) requires that for the notification of disposition to be sufficient, it must include a statement that the debtor is entitled to an accounting of the unpaid indebtedness and the charge, if any, for an accounting. UCC § 9-613 (a) (5) requires that for the notification of disposition to be sufficient, it must state the time and place of the public disposition or the time after which any other disposition is to be made. UCC § 9-627 provides that simply because a greater amount could have been obtained is not in itself sufficient to preclude the secured party from establishing that the disposition was made in a commercially reasonable manner, and describes what are commercially reasonable dispositions.

The complaint alleges that TPR Investment failed to properly notify the Orly Genger 1993 Trust or Orly Genger of the sale of the shares of TPR owed by D&K Ltd. Partnership, and that the notice of August 31, 2008 failed to state that D&K Ltd. Partnership is entitled to an accounting of its unpaid indebtedness, or to provide the time and place of the disposition of the collateral. In addition, the $2,200,000 sale price was only a "fraction" of the original $10,200,000 purchase price, and failed to take into consideration certain potential monies

26

received from the sale of TRI shares to the Trump group.

Defendant TPR Investment argues that it fully complied with the UCC requirements when noticing the default and conducting the foreclosure sale. In addition, it argues that even if it could be found that plaintiff never received notice of the default and sale, she has not alleged that she suffered repressible damages, as she makes only a generalized statement that the shares sold for a fraction of their original purchase price (Def. Memo of Law [Doc.29] p. 8, citing Ver. Compl. [Doc. 7-1] ¶ 146]). It also argues that plaintiff does not offer any evidence as to what the fair market value of the TPR Investment shares might have been and, as stated explicitly in the statute, an enforcement will not be found commercially unviable simply because a greater amount could have been obtained (UCC § 9-627 [a]).

An examination of the notice shows that certain of the complaint's allegations have no merit but that others are meritorious (Def. Memo of Law [Doc. 29] p. 7, citing Ex. K [Doc. 29-1:136]). The notice is not addressed to either of the limited partners, the Orly or Sagi Genger trusts, who as guarantors, are secondary obligors, and there is no proof of service provided by defendant establishing notification. The notice indicates that the date of the sale was February 27, 2009, but does not indicate the date of the notice itself, meaning that defendant has not established that the 10-day rule was adhered to. Furthermore, given that the January 31, 2009, Meeting Agreement stated in paragraph 8 that TPR would wait 30 days until selling the shares, it appears that the sale on February 27, 2009 was premature in any event (see Doc. 22-4:17-18]). As for the claimed violation of UCC § 9-627, there remain questions of fact as to whether the sale was itself conducted in a commercially reasonable manner as set forth in the statute, whether or not the shares were sold at a value far lesser value than their worth. However, the notice clearly indicates the date, time, and location of the sale, and also that D&K Ltd.

27

Partnership is entitled to an accounting and includes the telephone number to call. Accordingly, the branch of defendant's motion seeking summary judgment and dismissal of the 9th cause of action is granted solely to the extent that the claims seeking declarations of violations of UCC § 9-613 (a) (4) and (a) (5), are dismissed. The remainder of the 9th cause of action remains.

The 10th cause of action alleges conversion and seeks replevin, and the 11th cause of action seeks a judgment declaring that D&K Ltd. Partnership has a superior right to possess chattel under CPLR 7101. Conversion is when a person, without authority, intentionally exercises control over the property of another person and interferes with the other person's right of possession (*see, Sporn v MCA Records Inc.*, 58 NY2d 482, 487 [1983]). Replevin, under Article 71 of the CPLR, is a remedy ancillary to an action to recover a chattel (*see Sears Roebuck & Co. v Austin*, 60 Misc. 2d 908, 908 [Civ. Ct., NY County 1969]). Defendant argues that plaintiff does not adequately plead the elements of conversion and thus cannot establish that replevin is appropriate, nor does she show that she is entitled in the 11th cause of action to a declaration that she has a superior right to that of defendant's in the TPR Investment shares. It argues that plaintiff does not establish that its assuming ownership rights to the shares was unauthorized, nor does she show that D&K Ltd. Partnership or any other entity had a superior right.

The claim of conversion and replevin, and the declaration as to whose right is superior, go to the heart of plaintiff's complaint. Because, as set forth in the discussion above, there are disputed questions of fact as to the intent of the promissory note and Pledge Agreement and whether enforcement of them was ever contemplated, there can be no summary determination as to who is entitled to the shares and no declaratory relief granted at this time. Accordingly, the branches of defendant's motion for summary dismissal of the 10th and 11th causes of action are

28

denied.

The 12th cause of action seeks a preliminary injunction to enjoin TPR Investment from in any matter disposing of the TPR shares pending a final determination of the declaratory judgment branch of the complaint. This cause of action is redundant of the motion separately brought by plaintiff and opposed by defendants on grounds similar to those articulated by defendant in its motion for summary judgment. As the plaintiff's motion for a preliminary injunction has been granted as set forth above, summary judgment and dismissal of this cause of action is granted. Of course, if what plaintiff is seeking is a permanent injunction, the cause of action would have to be repleaded.

The 13th cause of action seeks a constructive trust on behalf of D&K Ltd. Partnership. In equity, a constructive trust may be imposed when the movant establishes that there is a confidential or fiduciary relationship, a promise, a transfer in reliance thereon, and unjust enrichment (*Sharp v Kosmalski*, 40 NY2d 119, 121 [1976], citations omitted). Defendant argues that there is no relationship between it and plaintiff, perhaps overlooking that this claim is brought on behalf of D&K Ltd. Partnership, a minority shareholder of TPR Investment. It is disputed as to whether TPR Investment owed a fiduciary duty of care to minority shareholder D&K Ltd. Partnership (*see Alpert v 28 Williams St. Corp.*, 63 NY2d 557, 568 [1984] [fiduciary duty of majority to minority shareholders; *Salm v Feldstein*, 20 AD3d 469 [2d Dept. 2005] [fiduciary duty of managing member of company and co-member to plaintiff]). The parties dispute, of course, whether defendant was among the entities promising that the promissory note would never be enforced. Defendant argues that there was no transfer in reliance, however plaintiff sufficiently argues that D&K Ltd. Partnership pledged its shares of TPR in reliance of the promise that the note would be not enforced, citing *Lester v Zimmer*, 147 AD2d 340, 341-

29

342 (3d Dept. 1989), which notes that the elements of a constructive trust are "flexible," and the
"transfer" should be interpreted broadly. Whether defendant was unjustly enriched is a matter to
be determined at trial. Accordingly, as there are questions of fact, summary judgment is denied
as to the 13th cause of action.

The 14th and 15th causes of action, brought on behalf of the Orly Genger 1993 Trust,
allege constructive and actual fraudulent conveyance under New York Debtor & Creditor Law
§§ 273, 276, and 277. Section 273 of the Debtor and Creditor Law provides that "every
conveyance made . . . by a person who is or will be thereby rendered insolvent is fraudulent as to
creditors without regard to his actual intent if the conveyance is made or the obligation is
incurred without a fair consideration." Section 276 of the Debtor & Creditor Law provides that a
conveyance is actually fraudulent if it was made with actual intent "to hinder, delay, or defraud
either present or future creditors." Section 277 provides that a conveyance of partnership
property made either when the partnership is insolvent or will be rendered insolvent by the
conveyance, is fraudulent as to partnership creditors if the conveyance is made (a) to a partner
even if there is a promise by the partner to pay partnership debts, or (b) to a non-partner without
fair consideration to the partnership.

None of these statutes apply to the facts here, and defendant's motion for summary
judgment and dismissal of the two causes of action must be granted based on failure to state a
cause of action. In New York, only creditors may maintain actions for fraudulent conveyance
(*Geren v Quantum Chemical Corp.*, 99 F3d 401, 1995 WL 737512, **2 [2d Cir. [NY] 1995],
*citing Pappa Bros. v Thompson*, 214 NYS2d 13, 15 [Sup. Ct. Nassau County, 1961]). Although
plaintiff argues that the Orly Genger 1993 Trust is a creditor, she is misapplying the statute. A
creditor is defined as an entity "having any claim, whether matured or unmatured, liquidated or

30

unliquidated, absolute, fixed or contingent." (Debtors & Creditors Law § 270). The complaint alleges that certain of the assets of the trust were wrongly conveyed to defendant by the actions of Sagi Genger. However, to establish a constructive fraudulent conveyance, plaintiff must demonstrate: (1) that there was a conveyance; (2) that the defendant would become insolvent as a result of the conveyance; and (3) there was no fair consideration for the conveyance (see, *United States v Sweeney*, 418 F. Supp. 2d 492, 498 [SDNY 2006], citation omitted). To establish intentional fraudulent conveyance, plaintiff must show in addition that there was actual intent "to hinder, delay, or defraud . . . creditors" (*Sweeney*, at 498). Not only does plaintiff not establish that she is a creditor who has a claim, but she does not allege that *defendant* became insolvent because of the conveyance of the TPR shares. Furthermore, she offers nothing more than the statement that the shares were bought by TPR Investment for a "fraction" of their original value, to establish that there was no fair consideration. Her reliance on Debtor and Creditor Law § 277 is also misplaced, based on the facts alleged in the pleadings. Accordingly, the 14th and 15th causes of action are dismissed on summary judgment.

The 16th cause of action alleges promissory estoppel on behalf of D&K Ltd. Partnership. Defendant's motion for summary dismissal of this cause of action is denied for the same reasons set forth in the discussion of the branch of Sagi Genger's motion for summary judgment and dismissal of this cause of action.

Therefore,

As to Motion Sequence Number 001, due deliberation having been had, and it appearing to this Court that a cause of action exists in favor of the plaintiff and against the defendants and that the plaintiff is entitled to a preliminary injunction on the ground that the subject of the action is unique and that the defendants threaten to do an act in violation of the plaintiff's rights

respecting the subject of the action, tending to render the judgment ineffectual, as set forth in the aforesaid decision, it is

ORDERED that the undertaking is continued in the sum of $150,000.00, conditioned that the plaintiff, if it is finally determined that she was not entitled to an injunction, will pay to the defendants all damages and costs which may be sustained by reason of this injunction; and it is further

ORDERED that defendants, their agents, servants, employees and all other persons acting under the jurisdiction, supervision and/or direction of defendants, are enjoined and restrained, during the pendency of this action, from doing or suffering to be done, directly or through any attorney, agent, servant, employee or other person under the supervision or control of defendant or otherwise, any of the following acts: removing the Shares from the state, or otherwise transferring, selling, pledging, assigning, or otherwise disposing of the Shares; and it is further

ORDERED that as to Motion Sequence Number 002, the motion for summary judgment by Dalia Genger is granted only to the extent of dismissing the 1st and 8th causes of action as against her in the first amended verified complaint, and is otherwise denied; and it is further

ORDERED that as to Motion Sequence Number 003, the motion for partial summary judgment by Sagi Genger is granted only to the extent of dismissing the 8th cause of action as against him in the first amended verified complaint, and is otherwise denied; and it is further

ORDERED that as to Motion Sequence Number 004, the motion for partial summary judgment by D&K GP is granted only to the extent of dismissing the 4th and 8th causes of action against it in the first amended verified complaint, and is otherwise denied, and it is further

ORDERED that as to Motion Sequence Number 005, the motion for summary judgment

32

by TPR Investment Associates, Inc., is granted only to the extent of dismissing the 8th, 12th, 14th, and 15th causes of action in their entirety as against this defendant, and as to the 9th cause of action, dismissing the claims alleging violations of UCC § 9-613 (a) (4) and (a) (5); and the motion is otherwise denied; and it is further

ORDERED that as to Motion Sequence Number 006, the motion to amend the complaint is granted to the extent set forth above; plaintiff shall e-file and serve a second amended complaint incorporating the limitations set forth herein, and serve it on all parties who shall then serve their answers in accordance with the CPLR; and it is further

ORDERED that the parties shall appear for a preliminary conference in Supreme Court, 60 Centre Street, room 212, on September 15, 2010, at 2:15 p.m.

This constitutes the decision and order of the court.

Dated: July 28, 2010
New York, New York

_____
J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY
PRESENT:     HON. PAUL G. FEINMAN          PART  12

_Justice_

GENGER, Arie, et al.

- v -

GENGER, Sagi, et al.

| | |
|---|---|
| INDEX NO. | 651089/10 E |
| MOTION DATE | |
| MOTION SEQ. NO. | 004 |

The papers considered on this motion (□ and cross motion) are enumerated in the attached decision/order.

**Cross-Motion:** □ Yes  ☑ No

Upon the foregoing papers, it is ORDERED that this motion (~~and cross motion~~) is (~~are~~) decided in accordance with the annexed decision and order.

Dated: 12/20/2011                                                _____
                                                                                     J.S.C.

1. Check one:                         □ FINAL DISPOSITION          ☑ NON-FINAL DISPOSITION

2. Check as appropriate: Motion is  □ GRANTED □ DENIED ☑ GRANTED IN PART □ OTHER

3. Check if appropriate:              □ SETTLE ORDER/JUDGMENT    □ SUBMIT ORDER/JUDGMENT
                                                  □ DO NOT POST                       □ FIDUCIARY APPOINTMENT
                                                  □ REFERENCE
                                                  ☑ PC CC  2/1/12  2:15pm

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: CIVIL TERM: PART 12

---------------------------------------------------------------------------x

ARIE GENGER and ORLY GENGER, in her individual
capacity and on behalf of THE ORLY GENGER 1993 TRUST,

Plaintiffs,

-against-

Index No. 651089/2010
Mot. Seq. Nos. 004 & 005

SAGI GENGER, TPR INVESTMENT ASSOCIATES, INC.,
DALIA GENGER, THE SAGI GENGER 1993 TRUST,
ROCHELLE FANG, individually and as trustee of THE SAGI
GENGER 1993 TRUST, GLENCLOVA INVESTMENT
COMPANY, TR INVESTORS, LLC, NEW TR EQUITY I,
LLC, NEW TR EQUITY II, LLC, JULES TRUMP, EDDIE
TRUMP and MARK HIRSCH,

Defendants.

**DECISION AND ORDER**

---------------------------------------------------------------------------x

*APPEARANCES:*

**PLAINTIFFS ORLY GENGER
THE ORLY GENGER 1993 TRUST**
Wachtel & Masyr, LLP
By: William B. Wachtel, Esq.
    Elliot Silverman, Esq.
    Matthew M. Spritz, Esq.
1 Dag Hammerskjold Plaza
New York NY 10017
        &
Zeichner Ellman & Krause, LLP
By: Yoav M. Griver, Esq.
    Bryan D. Leinbach, Esq.
575 Lexington Avenue
New York NY 10024

**PLAINTIFF ARIE GENGER**
Mitchell Silberberg & Knupp, LLP
By: Lauren J. Wachtler, Esq.
    Paul D. Montclare, Esq.
12 East 49th Street, 30th fl.
New York NY 10017
        &
Paul, Weiss, Rifkind, Wharton &
Garrison, LLP
By: Stephen P. Lamb, Esq.
1285 Avenue of the Americas
New York NY 10019

**DEFENDANTS GLENCLOVA INVESTEMENT COMPANY, TR INVESTORS,
LLC, NEW TR EQUITY I, LLC NEW TR EQUITY II, LLC, JULES
TRUMP, EDDIE TRUMP & MARK HIRSCH**
Skadden, Arps, Slate, Meagher & Flom, LLP
By: William P. Frank, Esq.
    Thomas J. Allingham, II, esq.
    Anthony W. Clark, Esq.
Four Times Square
New York NY 10036

**DEFENDANT DALIA GENGER**
Pedowitz & Meister, LLP
By: Robert A. Meister, Esq.
1501 Broadway
New York NY 10036

**DEFENDANT SAGI GENGER**
McLaughlin & Stern, LLP
By: Alan Sash, Esq.
260 Madison Avenue
New York NY 10016

**DEFENDANT ROCHELLE FANG**
Lyons McGover, LLP
By: Desmond C.B. Lyons, Esq.
989 Avenue of the Americas
New York NY 10018

**DEFENDANT TPR INVESTMENT ASSOCIATES, INC.**
Duane Morris, LLP
By: John Dellaportas, Esq.
1540 Broadway
New York NY 10036

1

**Papers considered on review of these motions:**

| PAPERS | E-FILING DOC. NOS. |
|---|---|
| Seq. 004 Proposed and Conformed Copy of Order to Show Cause | 88, 97, 99 |
| Supporting Affs., Exhibits, Memorandum of Law | 89 through 96 |
| Memorandum of Law in Opposition, Aff. in Opposition | 105, 106 |
| Seq. 005 Proposed and Conformed Copy of Order to Show Cause | 68, 98 |
| Affs. in Support, Exhibits, Memoranda of Law | 69 through 87 |
| Affs. In Opposition, Exhibits, Memoranda of Law | 100, 103, 104, 107 through 110 |
| Aff. In Reply, Memorandum of Law | 123 through, 124-8 |
| Transcript of October 11, 2011 Oral Argument | * |

\* A hard copy of the oral argument transcript was received and considered by the court. However, movants are directed to upload a copy of the transcript to the NYSCEFS, per the terms of the signed order to show cause. As explained therein, "The N.Y. County protocol requires counsel to upload all supporting papers into the NYSCEF system. The failure to upload any papers considered on an OSC/motion, ... may result in an incomplete official case file." When, as here, a case has been converted to electronic filing, no paper documents whatsoever are retained by the County Clerk or Clerk of Court. Accordingly, movants are directed to upload the transcript into the NYSCEFS within 15 days of entry of this decision and order.

## PAUL G. FEINMAN, J.:

This decision and order addresses the motions bearing sequence numbers 004 and 005 filed by Arie Genger (Arie) and his daughter Orly Genger (Orly) (collectively, Plaintiffs), which seek various forms of injunctive relief against the defendants in the above-captioned action (collectively, Defendants).

In a prior decision dated February 17, 2011 (the Prior Decision), this court granted a preliminary injunction in favor of Arie, which enjoined Sagi Genger (Arie's estranged son) and TPR Investment Associates, Inc. (TPR) from using or spending the $1.5 million proceeds that arose from TPR's purported sale to the Trump Group,[1] of certain common stock in Trans-Resources, Inc. (TRI) in which Arie claims an interest, pending the resolution of certain issues by the Delaware state courts.

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Prior Decision.

2

On July 18, 2011, the Delaware Supreme Court issued a detailed decision which held, among other things, that: Arie's deletion of relevant computer files constituted spoliation of evidence; the Trump Group did not ratify Arie's unauthorized transfers made in 2004 of TPR's interest in TRI to the Sagi Trust and the Orly Trust (the Trusts); the TRI shares transferred to the Trusts were not subject to irrevocable proxies in favor of Arie; and the Chancery Court did not have personal jurisdiction over TPR and the Orly Trust to determine beneficial ownership of such TRI shares due to the *in rem* nature of the proceedings. *See Genger v TR Investors, LLC*, 26 A3d 180 (Del 2011). On July 22, 2011, the Trump Group commenced another action in the Delaware Chancery Court, seeking a declaratory judgment that the Trump Group is the owner of the Arie shares for all purposes. Arie opposed the action and moved to dismiss, or to stay, such action.

Thereafter, on August 30, 2011, the Chancery Court entered the Revised Final Judgment Order, which incorporated the rulings of the Delaware Supreme Court. As a result of the entry of the Revised Final Judgement Order, all prior status quo orders issued by the Chancery Court were terminated and dissolved, which, among other reasons, prompted Plaintiffs to file the instant motions with this court seeking injunctive relief against Defendants.

For the reasons stated below, the various forms of requested injunctive relief are granted in part, and denied in part.

## Background

The background information relating to this action has been discussed in great detail in numerous decisions (including the Prior Decision) of this court. Therefore, the readers of this decision are assumed to have familiarity with the overly litigious history of the Genger family

3

members, the companies (including TPR and TRI) in which they have an interest, and the prior

litigations that were commenced by the parties in, among others, the Delaware courts, the United

States District Court for the Southern District of New York (the SDNY), and this court.

Subsequent to the parties' submissions in connection with the instant motions (via orders

to show cause) for injunctive relief, a flurry of legal maneuvers took place in the Delaware court,

the SDNY, and this court. These maneuvers included, among others: (1) counsel for Dalia

Genger,[2] as escrow agent under the escrow agreement by and among such counsel, the Trump

Group, TPR and the Orly Trust, filed an interpleader action with the SDNY, and deposited with

the Clerk of such court the proceeds of TPR's purported sale to the Trump Group of the Orly

Trust shares in TRI (about $10.3 million); (2) counsel for the Trump Group, as escrow agent

under the escrow agreement by and among such counsel, the Trump Group and TPR, similarly

filed an interpleader action with the SDNY, and deposited with the Clerk of such court the

proceeds of TPR's purported sale to the Trump Group of the Arie shares in TRI (about $7.4

million, which included the $1.5 million referenced in the Prior Decision); (3) Dalia, as trustee of

the Orly Trust, commenced an action in the Delaware court seeking a declaratory judgment with

respect to the beneficial ownership of the Orly Trust shares; (4) TPR appeared in the Delaware

court and sought a similar declaratory judgment; (5) the Trump Group filed a motion with the

Delaware court, seeking to enjoin Arie and Orly from prosecuting the instant motions; and (6)

Orly filed two motions (both via orders to show cause) with this court (motions bearing sequence

numbers 012 and 013) seeking to enjoin the Trump Group, as well as Dalia and TPR, from

---

[2]   Dalia is Orly's mother and the trustee of the Orly Trust..

4

proceeding with the declaratory judgment actions in Delaware.[3] In light of the foregoing, it is apparent that the litigants feverishly tried racing to the various courts, in an attempt to seek a perceived favorable forum or certain tactical advantages, to adjudicate or advance their respective claims or positions.

With respect to the instant motions for injunctive relief, Orly's motion (sequence number 004) seeks to enjoin: (1) TPR and Sagi from making demand for payment under the escrow agreement for the Orly Trust shares; (2) Defendants from taking or spending the sale proceeds of the Orly Trust shares and related dividends; (3) Defendants from taking any action to transfer, sell or dilute the Orly Trust shares and related dividends; and (4) Defendants from taking any action to recognize, conclude or acknowledge the validity of TPR's purported sale to the Trump Group of the Orly Trust shares, and to direct that any such sale be declared null and void. Similarly, Arie's motion (sequence number 005) seeks to enjoin Defendants from taking any action relating to the Arie shares and the Orly Trust shares,[4] as to: (i) spending or using the proceeds of the purported sales to the Trump Group of such shares and related dividends; (ii) transferring, selling or diluting such shares and related dividends; (iii) recognizing, concluding or acknowledging the validity of the purported sales to the Trump Group of such shares, and directing that any such sales be declared null and void; and (iv) directing and authorizing Arie to exercise all rights, including TPR's voting rights, with respect to such shares.

## Discussion

[3] Pursuant to two temporary restraining orders issued by this court, dated October 26, 2011 and November 9, 2011, Dalia, TPR and the Trump Group are prohibited from proceeding with the Delaware declaratory judgment actions. The TROs were continued after oral argument on December 14, 2011.

[4] An issue has been raised as to whether Arie has standing to seek relief on behalf of Orly and the Orly Trust. The issue appears moot because Orly has sought relief independently.

5

Under New York law, a request for a preliminary injunction may be granted only if the party seeking such relief shows the following elements: (1) an irreparable harm to the party if the relief requested is withheld; (2) a likelihood of success on the merits of the party's claims; and (3) a balance of the equities tips in favor of the party. *Jones v Park Front Apartments, LLC*, 73 AD3d 612, 612 (1st Dept 2010); CPLR 6301.

The Escrowed Proceeds

With respect to Plaintiffs' request to enjoin Defendants from making demands for payment under the escrow agreements and from using or spending the proceeds thereof, Defendants initially argued that Plaintiffs cannot show irreparable harm because no demands have been made for the release of funds from the escrows, and the escrow agents would provide Plaintiffs with ample notice before distributing any funds.

As noted above, the escrowed funds have now been deposited with the Clerk of the SDNY in connection with the interpleader actions. However, when the instant motions seeking injunctive relief were filed, the funds had not yet been deposited into court and the status quo orders issued by the Chancery Order had just expired. Thus, Plaintiffs requested this court to maintain the status quo as to such funds, a remedy afforded by a preliminary injunction. *See Dinner Club Corp. v Hamlet on Olde Oyster Bay Homeowners Assn., Inc.*, 21 AD3d 777, 778 (1st Dept 2005)("Where the suit involves plaintiff's claims to a specific fund, that fund is 'the subject of the action' and a preliminary injunction is appropriate"). It is noteworthy that at the hearing held on October 11, 2011 to consider oral arguments on these motions, the focus of the litigants was on the issues of transfer and dilution of the Arie and Orly Trust shares, rather than the status of the escrowed funds. Hearing Transcript of 10/11/2011, at 6.

6

In light of the foregoing, that portion of Plaintiffs' motions seeking to enjoin Defendants from making demands upon and using or spending the proceeds of the funds, which arose from the purported sales by TPR to the Trump Group of the Arie shares and the Orly Trust shares, is granted (albeit the granting of relief is academic because the escrowed proceeds are deposited with the SDNY), pending the determination by a court of competent jurisdiction the beneficial ownership of such shares. As noted, the parties have commenced actions in multiple jurisdictions and requested the courts to determine virtually identical issues, including the beneficial ownership issue. Judge John F. Keenan of the SDNY has graciously informed this court that he has undertaken the responsibility to expeditiously decide motions, filed just prior to the close of this calendar year, which will determine the appropriate forum to hear and adjudicate these issues.

The Voting Rights

Arie's motion seeks to enjoin TPR and Sagi, during the pendency of this action, from taking any action relating to the Arie shares and the Orly Trust shares without his prior consent. Notably, he also seeks an order authorizing him to exercise all rights, including TPR's voting rights, to such shares.

The relief requested, at least with respect to the voting rights, has little or no likelihood of success. First, the Revised Final Judgment Order of the Chancery Court[5] incorporated the rulings of the Delaware Supreme Court and provided, inter alia, that "TPR is the record owner of all [TRI] shares not presently owned by the [Trump Group;]" that "Arie Genger and Orly Genger

---

[5] Upon information, the litigants negotiated and drafted a proposed form of such order, which was adopted and signed by the Chancery Court. Hearing Transcript of 10/11/2011, at 19.

are not ... the record owners of any [TRI] shares;" and that "no [TRI] shares owned by [the

Trump Group] or owned of record by TPR are subject to any proxy of any kind in favor of Arie

Genger." *Id.* at 2. Arie has not appealed the Revised Final Judgment Order, nor has he argued

why this court should not give full faith and credit to the Chancery Court's judgment order.

Nonetheless, he argues that this court should enjoin TPR/Sagi from exercising the voting rights

as to the Arie and Orly Trust shares or that TPR's voting rights should be exercised at his

direction, because of his "beneficial interest in these voting rights." Plaintiffs' Reply Brief, at 18.

The requested relief is tantamount to asking this court to ignore the decision of the Delaware

Supreme Court, as explained below.

Notably, the Supreme Court affirmed the Chancery Court's determination of "record

ownership" of the Orly Trust shares because in the Section 225 proceeding, "the Orly Trust's and

TPR's interests in the [TRI] board election were adequately represented by [Arie] Genger and the

Trump Group, respectively," and nobody "objected to the trial court determining the record

ownership of, and right to vote, the TPR and Orly Trust Shares." *Genger,* 26 AD3d at 202, n. 93.

Thus, in upholding the trial court's determination of record ownership of such shares, the

Supreme Court equated "record ownership" to "voting rights." Here, both TPR and TRI are

Delaware corporations, and are subject to the jurisdiction of the Delaware courts, at least with

respect to corporate governance issues. Therefore, the relief sought by Plaintiffs with respect to

"voting rights" is denied, because it has little or no likelihood of success on the merits.

The issue as to whether TPR and Sagi should be enjoined in taking actions relating to the

Arie shares and the Orly Trust shares, other than voting, is discussed below.

The Transfer or Sale of Shares

8

As to whether TPR and Sagi, as well as the Trump Group, should be enjoined from taking actions that may affect the Arie and Orly Trust shares without Arie's consent, including the sales of such shares by TPR to the Trump Group, Defendants oppose any grant of injunctive relief. Specifically, the Trump Group argues that: (1) because the purchase of the Arie and Orly Trust shares was closed in February 2011, granting any injunctive relief and declaring the purchase null and void is tantamount to unwinding the transaction; (2) the Revised Final Judgment Order stated that the transfers of shares Arie caused TPR to make in 2004 violated the [TRI] Stockholders Agreement and were thus void, and "the purportedly transferred shares continued at all times to be owned of record by TPR, and [the Trump Group] had the right under Section 3.2 of the Stockholders Agreement to buy all of the shares purportedly transferred by TPR;" and (3) the requested "mandatory injunctive relief" must be denied because it is directly contrary to the ruling of the Delaware courts. Trump Group Opposition Brief, at 6, 13-14, quoting Revised Final Judgment Order, at 2-3.

In response, Arie contends that: (1) the alleged closing in February 2011 is not supported by any affidavit or document, and is contradicted by the affidavit of Eleanor Parnes, a director of TPR, filed in September 2011 in opposition to Orly's motion for a TPR temporary receiver; (2) the purported sale of the Arie and Orly Trust shares to the Trump Group under the 2008 Side Letter Agreement has not been consummated, as per the Parnes affidavit and the Side Letter Agreement, because such sale is conditioned upon a final judicial determination of the beneficial ownership in such shares, which has not yet occurred; and (3) the finding by the Chancery Court that the Trump Group "had the right" to purchase shares is "meaningless" because it never purchased such shares under the 2001 Stockholders Agreement, and instead it tried to "short cut"

9

the process by means of the 2008 Stock Purchase Agreement.[6] Plaintiffs' Reply Brief, at 8-9, 23-24.

Based on the foregoing, and the hearing held on October 11, 2011 in which the Trump Group did not specifically deny Arie's contention that the February 2011 closing probably has not yet taken place, granting the relief described hereinbelow will not effectuate an "unwinding" of the purported closing, as argued by the Trump Group. Inasmuch as the closing might not have been fully consummated, and because the Trump Group has agreed to give Plaintiffs at least 5 business days notice[7] before it will engage in any of the actions (other than dilution of the shares, as discussed below) that Plaintiffs now seek to enjoin, it is fair and equitable to require the Trump Group and TPR to provide Plaintiffs with such advance notice with regard to the future transactions (other than share dilution), including any future intent to fully consummate the Trump Group-TPR share purchase transaction. Any such notice, in the event it involves the disclosure of non-public and/or proprietary information, may require the parties' entry into a confidentiality agreement.

It is also noteworthy that during the October 11, 2011 hearing, this court stated that it was less concerned about the uniqueness of these shares in a closely held corporation (TRI), than with issuing an injunction that would interfere with the management of TRI, in which the Trump

---

[6] The Chancery Court noted that the only difference between enforcing the right under the 2001 Stockholders Agreement and the 2008 Stock Purchase Agreement, both of which would give the Trump Group majority control in TRI, was speed. *TR Investors, LLC v Genger*, 2010 WL 2901703 *18. (Del Ch July 23, 2010). Notably, although Arie argues that the Trump Group "had the right" to purchase, he does not argue that the Trump Group does not have the right to purchase, shares under the Stockholders Agreement, which was negotiated by him on behalf of TPR in 2001. Also, Arie is a non-party to the 2008 Stock Purchase Agreement.

[7] Indeed, the Trump Group indicated that it would agree to even give 10 business days advance notice of a particularized transaction. Hearing Transcript of 10/11/2011, at 22.

10

Group currently holds majority control. Hearing Transcript of 10/11/2011, at 20. Thus, in balancing the equities and the relative harm to the parties, requiring the Trump Group and TPR to give 10 business days notice of a proposed future transaction is sufficient to maintain the status quo, such that Plaintiffs will have an adequate opportunity to seek any needed relief from a court of competent jurisdiction.[8] This is a more equitable solution than granting Plaintiffs' overly broad request to freeze all the actions that they seek to enjoin, which will likely hamper the Trump Group in the operation of business, and may result in damages that are difficult to assess.

Moreover, even though Plaintiffs argue that the Trump Group and TPR must be enjoined from taking actions (and Plaintiffs are entitled to a constructive trust) with respect to the subject shares pending a final court adjudication of beneficial interest, they implicitly acknowledge that they are not without any remedy if an injunction is not issued, which is a countervailing factor in the determination of granting equitable injunctive relief. Plaintiffs' Reply Brief, at 20-21, quoting *Compaq Computer Corp. v Inacom Corp.*, 2001 WL 789408 *4 (D Del, July 12, 2001)("[w]here a person holding property in which another has a beneficial interest transfers title to the property in violation of his duty to the other, the transferee holds the property subject to the interest of the other, unless he is a bona fide purchaser") (quotation marks in original). Indeed, even after a final judicial determination of beneficial ownership, Arie indicates that he has alternative remedies: (1) if Arie is determined to be the beneficial owner of the subject shares, the sale proceeds will be refunded to the Trump Group and such shares will be returned to Arie and

---

[8] The Stockholders Agreement designated the SDNY as the forum of choice for litigation, and the Delaware Supreme Court has suggested that the SDNY is a proper forum to determine beneficial interest in the subject shares. *Genger v TR Investors, LLC*, 26 AD3d at 186, 200 n.88, and 203 n.98.

11

the Orly Trust as beneficial owners; or (2) if it is not so determined, the sale proceeds will be

distributed to Arie and the Orly Trust, and actions will be commenced against Sagi for his

"egregious breaches of his fiduciary duties to Arie and the Orly Trust ... ." Plaintiffs' Reply

Brief, at 10-11.

Accordingly, that portion of Plaintiffs' motions seeking an order to enjoin Defendants

from taking any action with respect to the Arie and Orly Trust shares, including any action to

transfer, sell, recognize, conclude or otherwise acknowledge the validity of TPR's purported sale

to the Trump Group of the subject shares  and to direct any such sale be declared null and void, is

denied; however, the Trump Group and TPR shall provide to Plaintiffs ten business days of

notice with respect to the future transactions that impact the subject shares (except for share

dilution), including the sale of such shares by TPR to the Trump Group.

The Dilution or Devaluation of Shares

With respect to that portion of Plaintiffs' motions which seeks to enjoin any action that

may dilute or devalue the subject shares, the Trump Group contends: (1) TRI's charter has no

restrictions as to when it may issue additional shares; (2) the Revised Final Judgment Order

affirmed that the Trump Group owns more than 67% of TRI's issued and outstanding shares, and

even if Plaintiffs were to prevail on their claims as to the subject shares, the Trump Group still

holds a "veto-proof super-majority" position sufficient to permit the issuance of additional shares

without notice to or consent from Plaintiffs; and (3) Plaintiffs are protected against unfair

dilution or devaluation of their claimed share interests because Delaware law imposes fiduciary

duties upon TRI's board of directors in the issuances of additional shares. Trump Group

Opposition Brief, at 11-12.

12

motions (via orders to show cause), and the parties have not briefed this court on the relevant

issues, there is no basis to grant the orally requested relief. Further, at this stage of the litigation,

this court need not decide whether Arie may rescind or reform the Divorce Settlement and related

Transaction Documents, or whether a constructive trust should be imposed on the disputed

shares. Until the SDNY renders a decision as to the appropriate forum to hear and adjudicate the

beneficial ownership issue, it is premature for this court to determine the additional issues raised

by the parties.

### Conclusion

Based on all of the foregoing, it is hereby

ORDERED that the motions of plaintiffs Orly Genger and Arie Genger for a preliminary

injunction (motion sequence numbers 004 and 005, respectively) are granted in part and denied

in part, to the extent stated hereinbelow; and it is further

ORDERED that the portion of plaintiffs' motions seeking to enjoin the defendants from

making demands upon and using or spending the proceeds derived from the purported sale by

TPR Investment Associates, Inc. (TPR) to the Trump Group (as such term is defined above) of

the Arie shares and the Orly Trust shares is granted, pending the determination by a court of

competent jurisdiction the beneficial ownership of such shares; and it is further

ORDERED that the portion of plaintiffs' motion seeking to enjoin TPR and Sagi Genger,

during the pendency of this action, to vote the Arie shares and the Orly Trust shares that are

currently held by TPR (as the record owner of such shares) and to authorize Arie Genger to

exercise TPR's voting rights as to such shares is denied; and it is further

ORDERED that the portion of plaintiffs' motions seeking to enjoin the defendants from

14

taking any action with respect to the Arie shares and the Orly Trust shares, including any action

to transfer, sell, recognize, conclude or acknowledge the validity of TPR's purported sale to the

Trump Group of the subject shares and to direct any such sale be declared null and void, is

denied; however, the Trump Group and TPR shall have to give plaintiffs ten business days notice

of future transactions that may impact the subject shares (except for share dilution), including the

sale of such shares by TPR to the Trump Group; and it is further

ORDERED that the portion of plaintiffs' motions seeking to enjoin the Trump Group

from taking any action that may dilute or otherwise devalue the Arie shares and the Orly Trust

shares is denied, and the Trump Group is not required to give plaintiffs any advance notice with

respect thereto; and it is further

ORDERED that the parties shall appear in Part 12, 60 Centre Street, Room 212, New

York, NY 10007 on February 1, 2011 at 2:15 for a status conference.

This constitutes the decision and order of the court.

Dated:   December 28, 2011
       New York, New York

_____
J.S.C.

2011 Pt 12 D&O_651089_2010_004_005_LD_JN

15

## PROMISSORY NOTE

$4,000,000

October 3, 2011

FOR VALUE RECEIVED, the undersigned, the Orly Genger 1993 Trust ("Borrower"), by way of its current sole trustee, Dalia Genger, promises to pay to TPR Investment Associates, Inc., a Delaware corporation ("Lender") the sum of $4,000,000 ("Principal") together with interest thereon at the rate of three percent (3%) percent per annum, payable as follows, and further covenants, to Lender, as follows:

The Principal together with all interest accrued thereon shall be due and payable to, or to the order of, Lender on the earliest of:

    (i)    November 1, 2012;

    (ii)    Immediately upon Borrower's receipt of the proceeds from the sale of TRI shares either pursuant to the interpleader action pending in the United States District Court for the Southern District of New York (the "Court") in *Pedowitz v. TPR*, 11 Civ. 5602, or otherwise.

Notwithstanding anything to the contrary herein or in the parties' accompanying Settlement Agreement, to the extent that the Court awards Lender any of the interpleaded funds, Lender shall first retain such funds to the extent necessary to pay down this Note in full, and then transfer any remaining funds to Borrower.

The occurrence and continuation of any one or more of the following events shall constitute an event of default under this New Note ("Event of Default"):

    (a)    <u>Payment Default</u>. Borrower shall fail to make any required payment due in connection with this New Note.

    (b)    <u>Third Party Lien or Caveat</u>. The creation of a lien on Borrower's property, or the entry of a caveat (which Lender deems material), that has not been removed ten (10) days of its creation.

    (c)    <u>Change of Trustee</u>. The resignation, removal, or otherwise change of trustee of Borrower.

    (d)    <u>Bankruptcy Default</u>. The Borrower shall (i) commence any case, proceeding or other action under any existing or future law of any jurisdiction relating to seeking to have an order for relief entered with respect to it or its debts, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other such relief with respect to it or its debts, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or substantially all of its assets (each of

DG 01109

the foregoing, a "Bankruptcy Action"); (ii) become the debtor named in any Bankruptcy Action which results in the entry of an order for relief or any such adjudication or appointment described in the immediately preceding clause (i), or remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) make a general assignment for the benefit of its creditors.

In each and every Event of Default, the Lender may, without limiting any other rights it may have at law or in equity, by written notice to the Borrower, declare the unpaid Principal of and Interest on this New Note due and payable, whereupon the same shall be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which the Borrower hereby expressly waives, and the Lender may proceed to enforce payment of such Principal and Interest or any part thereof in such manner as it may elect in its discretion.

This Note may be prepaid in whole or in part at any time without premium or penalty.

All prepayments shall be applied first to interest, then to principal payments in the order of their maturity.

The undersigned agrees to pay all costs and expenses, including all reasonable attorneys' fees, for the collection of this Note upon default. All payments shall be made at 1211 Park Avenue, New York, NY, 10128, or at such other place as the holder hereof may from time to time designate in writing.

Upon default, whether pursuant to an Event of Default or otherwise, the interest rate shall be increased to an amount ("Overdue Rate") equal to the maximum legal rate of interest permitted by applicable law.

If this New Note is not paid when due, Borrower promises to pay all costs and expenses of collection and attorneys' fees incurred by the holder hereof on account of such collection, whether or not suit is filed thereon. Borrower consents to renewals, replacements and extensions of time for payment hereof, before, at, or after maturity; consents to the acceptance, release or substitution of security for this note, and waives protest, presentment, demand for payment, notice of default or nonpayment and notice of dishonor and the right to assert any statute of limitations. The indebtedness evidenced hereby shall be payable in lawful money of the United States.

This New Note shall be governed by, and shall be construed and enforced in accordance with, the laws of the state of Delaware without giving effect to the conflict of law rules thereof, and shall be adjudicated before the appropriate Courts of the State of Delaware.

THE ORLY GENGER 4993 TRUST

## CREDIT AND FORBEARANCE AGREEMENT AND
## SECOND AMENDMENT AND RESTATEMENT OF PROMISSORY NOTE

THIS CREDIT AND FORBEARANCE AGREEMENT AND SECOND AMENDMENT AND RESTATEMENT OF PROMISSORY NOTE is made effective as of May __, 2012 (this "**Agreement**") by and between the ORLY GENGER 1993 TRUST, a trust settled on December 13, 1993 (the "**Trust**") pursuant to that certain Trust Agreement dated December 13, 1993 (the "**Trust Agreement**") between Arie Genger as grantor and Lawrence M. Small and Sash A. Spenser as original Trustees, acting through Dalia Genger, its current Trustee ("**Dalia**" or "**Trustee**"), and MANHATTAN SAFETY COMPANY, LTD., a corporation organized under the laws of St. Kitts, W.I. ("**Manhattan**"). Capitalized terms not otherwise defined herein have the meanings ascribed to them in Section 1.2 below.

### RECITALS

A.      The Trust wishes to obtain additional financing and the forbearance in the enforcement of the 2011 Note so as to improve its ability to assert and defend its rights in the TRI Proceedings to the TRI Shares.

B.      Manhattan wishes to obtain certain representations and warranties in consideration for providing additional financing in the amount of up to Four Hundred Thousand Dollars and No Cents ($400,000.00) (the "**Manhattan Financing**") and its agreement to forbear in the enforcement of the 2011 Note.

C.      TPR Investment Associates, Inc., a Delaware corporation ("**TPR**"), and the Trust entered into an agreement on or about October 29, 2004 (the "**Share Transfer**") whereby TPR contracted to sell to the Trust 1,102.8 shares (the "**TRI Shares**") of Trans Resources, Inc., a Delaware corporation ("**TRI**"), for a nominal consideration.

D.      Certain former indirect shareholders of TRI have challenged the validity of the Share Transfer in various legal proceedings and other parties have engaged in litigation and arbitration proceedings relating to various issues concerning TRI, its shares and the appropriate consideration for the purchase and sale of shares of TRI, as well as the appointment of, and validity of actions taken by, the Trustee (collectively the "**TRI Proceedings**").

E.      The Trust, TPR, and D&K LP, a Delaware limited partnership ("**D&K**"), entered into a Settlement Agreement dated October 2, 2011 as subsequently amended and restated in an Amended and Restated Settlement Agreement dated March 16, 2012 (the "**Settlement**").

F.      Pursuant to the Settlement, (i) TPR relinquished in favor of the Trust any economic interest held by it in the TRI Shares and assigned to the Trust its right to any economic benefit of the TRI Shares, including any proceeds from the sale thereof, including the approximately Ten Million Three Hundred Thousand Dollars ($10,300,000) (the "**Minimum Payment**") in proceeds from the sale of the TRI Shares to TR Investors, LLC, Glencova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC

(collectively, the "**Trump Group**") pursuant to the terms of a letter agreement dated August 22, 2008 (the "**Trump Sale Agreement**") between TPR and the Trump Group and (ii) an obligation of approximately Four Million Five Hundred Thousand Dollars of D&K to TPR, guaranteed by the Trust, representing the net amount following the partial foreclosure of an Eight Million Nine Hundred and Fifty Thousand Dollars ($8,950,000) obligation evidenced by a promissory note in the original principal amount, was cancelled and replaced by a new promissory note of the Trust in the original principal amount of Four Million Dollars ($4,000,000) payable to TPR (the "**2011 Note**").

G.   In connection with the TRI Proceedings, Pedowitz & Meister, the escrow agent holding funds approximating the Minimum Amount (the "**Escrowed Amount**") pursuant to a certain Escrow Agreement dated as of September 1, 2010 (the "**Escrow Agreement**"), filed an interpleader action (the "**Interpleader Action**") currently pending in the United States District Court for the Southern District of the State of New York (the "**Court**") in *Pedowitz v. TPR*, 11 Civ. 5602 and deposited the Escrowed Amount with the Court to hold pending its determination as to which party is entitled to the Escrowed Amount.

H.   Pursuant to that certain Agreement Amending Terms of Promissory Note dated as of October 3, 2011, certain provisions of the 2011 Note were amended (as so amended, the "**Amended Note**").

I.   TPR has agreed to sell and assign the Note to Manhattan as evidenced by that certain Bill of Sale and Note Assignment of even date herewith.

J.   Manhattan has agreed to make the Manhattan Loan in two installments: (1) an initial advance (the "**Initial Advance**") of Two Hundred Thousand Dollars and No Cents ($200,000.00), as evidenced by a promissory note in the principal amount of Two Hundred Thousand Dollars and No Cents ($200,000.00) (the "**New Note**"), payable as provided herein, and (2) an additional advance (the "**Additional Advance**") of Two Hundred Thousand Dollars and No Cents ($200,000.00) to be made upon request by the Trust, and evidenced by the note as amended and restated to provide for a face amount of Four Million Two Hundred Forty Thousand Dollars and No Cents ($4,240,000.00) (the "**Amended and Restated Note**" or the "**Note**") (inclusive of the Forbearance Fee if paid as provided herein), with the Additional Advance to bear interest from the date made on the terms of this Agreement and the Note. The Manhattan Loan, including both the Initial Advance and the Additional Advance, shall be subject to certain conditions, including the Trust's agreement to amend and restate the 2011 Note and enter into this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, agree as follows:

1.   **Definitions.**

1.1   General.   Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of this Agreement or as otherwise may be provided in other provisions of this Agreement. Terms defined in the Note, the

Settlement or the New Note and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Note, Settlement or New Note, as the case may be. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between this Agreement, the Note, the Settlement or the New Note, this Agreement shall govern and control.

1.2 Definitions. In this Agreement:

"Additional Advance" has the meaning set forth in Recital J.

"Affiliate" or "Affiliates" means "affiliate" as defined in either (a) Bankruptcy Code §101(2) or (b) Rule 144 of the Securities Act.

"Agreement" means this Credit and Forbearance Agreement and Second Amended and Restated Promissory Note.

"Amended Note" has the meaning set forth in Recital H.

"Amended and Restated Note" has the meaning set forth in Recital J.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978, 11 U.S.C. §§101 et seq., as amended.

"Bill of Sale" means the bill of sale and note assignment relating to the assignment of the 2011 Note.

"Business Day" means any day that is not (a) a Saturday, (b) a Sunday or (c) any other day on which the Federal Reserve Bank of New York is closed.

"Claim" has the meaning specified in Section 7.1.

"Claimant" means any person or entity claiming, or having a right to claim, a mechanic's lien against the Minimum Payment or the TRI Shares, or any portion thereof, or who is delivered, or has the right to deliver, a stop notice in connection with the payment by Trust of its obligations under the Note.

"Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated under it.

"Court" has the meaning set forth in Recital G.

"Dalia" means Dalia Genger, the current Trustee of the Trust.

"D&K" means D&K LP, a Delaware limited partnership.

"Debtor Relief Law" means the Bankruptcy Code, and together with any other bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, or extensions generally with creditors, or proceedings seeking reorganization, arrangement, liquidation, receivership, or other similar relief.

"**Distribution**" means any payment of principal, interest, penalty or costs paid by or on behalf of the Trust in connection with the Note or the Transferred Rights.

"**Encumbrance**" or, if used as a verb, "**Encumber**," means any (a) mortgage, pledge, lien, security interest, charge, hypothecation, security agreement, security arrangement or encumbrance or other adverse claim against title of any kind; (b) purchase, option, call or put agreement or arrangement; (c) subordination agreement or arrangement; or (d) agreement or arrangement to create or effect any of the foregoing.

"**Entity**" means any individual, partnership, corporation, limited liability company, association, estate, trust, business trust, Governmental Authority, fund, investment account or other entity.

"**Escrow Agreement**" has the meaning set forth in Recital G.

"**Escrowed Amount**" has the meaning set forth in Recital G.

"**Forbearance Fee**" means a fee of Forty Thousand Dollars and No Cents ($40,000), being equal to one percent (1%) of Four Million Dollars and No Cents ($4,000,000.00), the face amount of the 2011 Note, paid in consideration of Manhattan's agreement to forbear as provided in this Agreement.

"**Governmental Authority**" means any federal, state, or other governmental department, agency, institution, authority, regulatory body, court or tribunal, foreign or domestic, and includes arbitration bodies, whether governmental, private or otherwise.

"**Indemnified Party**" has the meaning specified in Section 7.2.

"**Indemnifying Party**" has the meaning specified in Section 7.2.

"**Initial Advance**" has the meaning set forth in Recital J.

"**Insolvent**" has the meaning set forth in Section 4(h).

"**Interpleader Action**" has the meaning set forth in Recital G.

"**Liability**" or "**Liabilities**" shall mean all debts, obligations and other liabilities of any kind or nature (whether known, unknown, accrued, or not accrued, absolute or contingent, liquidated or unliquidated, due or to become due, asserted or unasserted or otherwise).

"**Knowledge**" means the actual knowledge of Trustee.

"**Manhattan**" means Manhattan Safety Company, Ltd., a corporation organized under the laws of St. Kitts, W.I.

"**Manhattan Indemnitees**" has the meaning specified in Section 7.1.

"**Manhattan Loan**" has the meaning set forth in Recital B.

DG 00193

"**Minimum Payment**" means Ten Million Three Hundred Thousand Dollars and No Cents ($10,300,000.00).

"**New Note**" means the promissory note in the face principal amount of Two Hundred Thousand Dollars and No Cents ($200,000.00), comprising the Initial Advance of the Manhattan Loan and having the Trust as maker and Manhattan as payee, which evidences the Manhattan Loan.

"**Note**" has the meaning set forth in Recital J.

"**Party**" means the Trust, Trustee or Manhattan, as applicable, and their respective successors and permitted assigns.

"**Reimbursement Claims**" means any claim of TPR or the Trust arising in connection with the return to, disgorgement by, or reimbursement of, TPR or the Trust, or any other Entity, of all or any portion of any payment or transfer received by TPR or Trust on account of the Transferred Rights, including any claims arising under Bankruptcy Code §502(h).

"**Sagi**" means Sagi Genger, the President and the sole primary beneficiary (together with his children) of the Sagi Genger 1993 Trust, the owner of a majority of the shares of TPR.

"**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§77a et seq., as amended, and the rules and regulations promulgated under it.

"**Settlement**" means that certain amended and restated settlement agreement dated as of March 16, 2012 by and among TPR, the Trust and D&K.

"**Share Proceeds**" means any proceeds in cash or kind paid or payable to the Trust relating to the TRI Shares.

"**Share Transfer**" has the meaning set forth in Recital D.

"**TPR**" means TPR Investment Associates, Inc., a Delaware corporation.

"**TRI**" means Trans Resources, Inc., a Delaware corporation.

"**TRI Shares**" means the 1,102.8 shares of TRI transferred to the Trust pursuant to the Share Transfer.

"**TRI Proceedings**" has the meaning set forth in Recital D.

"**Transferred Rights**" means any and all of Manhattan's right, title, and interest in, to and under the Note and the Settlement (solely to the extent those rights of TPR in the Settlement which have been transferred by TPR to Manhattan relate to amounts payable under the Note), including:

(a)     all amounts funded by or payable to TPR under the Settlement relating to the Note, and all obligations owed to TPR in connection

DG 00194

with the Note, including but not limited to, accrued and unpaid interest;

(b)    any proof of claim;

(c)    all claims (including "claims" as defined in Bankruptcy Code §101(5)), suits, causes of action, and any other right of TPR, whether known or unknown, against Trust, the Trustee or any of their respective Affiliates, agents, representatives, contractors, advisors, or any other Entity that in any way is based upon, arises out of or is related to any of the foregoing, including, to the extent permitted to be assigned under applicable law, all claims (including contract claims, tort claims, malpractice claims, and claims under any law governing the purchase and sale of, or indentures for, securities), suits, causes of action, and any other right of TPR against any attorney, accountant, financial advisor, or other Entity arising under or in connection with the Note and the Transferee Rights or the transactions related thereto or contemplated thereby;

(d)    all cash, securities, or other property, and all setoffs and recoupments, received, applied, or effected by or for the account of TPR under the Note (whether for principal, interest, fees, reimbursement obligations, or otherwise) from and after the date of this Agreement, and all cash, securities, interest, dividends, and other property that may be exchanged for, or distributed or collected with respect to, any of the foregoing;

(e)    the economic benefit received by TPR relating to the Note transferred to Manhattan; and

(f)    all proceeds of the foregoing.

"Trump Group" has the meaning set forth in Recital F.

"Trump Sale Agreement" has the meaning set forth in Recital F.

"Trust" has the meaning set forth in the heading of this Agreement.

"Trustee" has the meaning set forth in the heading of this Agreement.

"2011 Note" has the meaning set forth in Recital F.

DG 00195

2.    **Recitals True.** The Recitals are hereby incorporated into this Agreement and made a part hereof. The Trust and the Trustee, jointly and severally, represent and warrant that the Recitals are true and correct in all material respects and do not fail to state a fact necessary to make them not misleading.

3.    **Amendment and Restatement of Note; Agreement to Make the Manhattan Loan.**

3.1    The Trust as maker agrees to amend and restate the 2011 Note, in the form attached as **Exhibit A** hereto (the "Amended and Restated Note"), including but not limited to amendments to (i) add covenants with respect to (A) the waiver of defenses to payment of amounts payable under the Note and (B) prohibitions on (1) any Encumbrance on (x) the TRI Shares or (y) the Minimum Payment or any other payment the Trust may receive or be entitled to receive from (a) the Court or (b) any other party, in connection with the TRI Shares or otherwise, and (2) (x) any (a) borrowing or any agreement to borrow money, or (b) guaranty, agreement to indemnify or other agreement to create any contingent monetary obligation, or (y) the incurrence of any material Liability, other than costs for legal services relating to the TRI Proceedings, which in no event, without the prior consent of Manhattan, shall exceed in aggregate Five Hundred Thousand Dollars and No Cents ($500,000.00), and (ii) amend the face amount of the Note to Four Million Two Hundred Forty Thousand Dollars and No Cents ($4,240,000.00) to reflect the Additional Advance of the Manhattan Loan and the Forbearance Fee, in the event such are made and payable under the terms of this Agreement and the Note.

3.2    On the terms set forth in the Amended and Restated Note, in the form attached as **Exhibit A** hereto, and the New Note, in the form attached as **Exhibit B** hereto, and subject to the conditions set forth in this Agreement and in the Amended and Restated Note and the New Note, Manhattan agrees to make, and the Trust agrees to accept, the Manhattan Loan.

4.    **Representations and Warranties of the Trust and Trustee.** Trust and Trustee, each jointly and severally, represents and warrants to Manhattan as of the date of this Agreement that:

(a)    Trust (i) is duly organized and validly existing under the laws of its jurisdiction of organization or incorporation, (ii) is in good standing under such laws and (iii) has full power and authority to execute, deliver and perform its obligations under this Agreement, the Note and the New Note.

(b)    Trust's execution, delivery, and performance of this Agreement, , the Note and the New Note will not result in a breach or violation of any provision of (I) Trust's organizational documents, (ii) any statute, law, writ, order, rule or regulation of any Governmental Authority applicable to Trust, (iii) any judgment, injunction, decree or determination of any Governmental Authority applicable to Trust or (iv) any contract, indenture, mortgage, loan agreement, note, lease or other agreement, document or instrument to which

DG 00196

Trust may be a party, by which Trust may be bound or to which any of the assets of Trust is subject.

(c)   (i)   This Agreement, the Note and the New Note each (A) has been duly and validly authorized by Trustee on behalf of Trust, executed and delivered by Trust and (B) are the legal, valid and binding obligations of Trust, enforceable against Trust in accordance with their respective terms, except that such enforceability against Trust may be limited by bankruptcy, insolvency, or other similar laws of general applicability affecting the enforcement of creditors' rights generally and by a court's discretion in relation to equitable remedies; and

(ii)   no notice to, registration with, consent or approval of or any other action by any relevant Governmental Authority or other Entity is or will be required for Trust to execute, deliver, and perform its obligations under, this Agreement, the Note and the New Note.

(d)   Trust is a good faith claimant to the Share Proceeds or the TRI Shares, as the case may be, and its claim thereto is free and clear of any Encumbrance.

(e)   Other than the TRI Proceedings and any other proceedings disclosed in writing by Trust to Manhattan, no proceedings are pending against the Trust, the Trustee or any of their respective Affiliates or, to the best of Trust's and Trustee's Knowledge, threatened against the Trust, the Trustee or any of their respective Affiliates before any relevant Governmental Authority that, individually or in aggregate, may materially and adversely affect any action taken or to be taken by Trust under this Agreement, including the sale and assignment of the Note by TPR to Manhattan and the Transferred Rights to Manhattan, or the Manhattan Loan as evidenced by the New Note.

(f)   Trust has no (A) payment obligation, including any contingent payment obligation in the nature of a guarantee or indemnification or similar obligation, to any Individual, Entity or Governmental Authority, and has entered into no agreement that could reasonably result in a payment obligation to any party for any amount that individually or together with other payment obligation of the Trust is equal to or greater than Five Hundred Thousand Dollars and No Cents ($500,000.00) and (B) Liability to any individual, Entity or Governmental Authority that individually or together with any other Liability may adversely affect repayment of the Note or the New Note or the value of Trust's interest in the Minimum Payment or TRI Shares, as the case may be.

DG 00197

(g)     To the best of Trust's and Trustee's Knowledge, neither the Trust nor the Trustee or any other party to the TRI Proceedings has received any notice or has any reasonable basis to believe that the Trust will not be entitled to receive one or the other of (A) an amount not less than the Minimum Payment or (B) the TRI Shares upon final determination and exhaustion of all appeals or challenges to such final determination, of all the material matters at issue in the TRI Proceedings.

(h)     Trust is not now insolvent and will not be rendered insolvent by any of the transactions contemplated by this Agreement. As used herein, "insolvent" means that the sum of the debts and probable Liabilities of Trust exceeds the fair saleable value of its assets. Trust is not in receivership, nor is an application for receivership pending. No proceedings are pending by or against Trust in bankruptcy or reorganization in any state or federal court under any Debtor Relief Law, nor has it committed any act of bankruptcy as such terms are used in the Bankruptcy Code. Immediately after giving effect to the consummation of the transactions contemplated by this Agreement, (i) Trust will be able to pay its Liabilities as they become due in the usual course of its business; (ii) Trust will not have assets (calculated at fair market value) that exceed its Liabilities; and (iii) taking into account all pending and threatened litigation, final judgments against Trust for money damages are not reasonably anticipated to be rendered at a time when, or in amounts such that, Trust will be unable to satisfy any such judgments promptly in accordance with their terms (taking into account the maximum probable amount of such judgments in any such actions and the earliest reasonable time at which such judgments might be rendered) as well as all other obligations of Trust. The cash available to Trust, taking into account all other anticipated uses of cash, as well as taking into account reasonably anticipated payments on insurance covering such actions and Liabilities, will be sufficient to pay all such debts and judgments promptly in accordance with their terms.

(i)     No broker, finder or other Entity acting under the authority of the Trust, the Trustee or any of their respective Affiliates is entitled to any broker's commission or other fee in connection with the transactions contemplated by this Agreement, including but not limited to the Manhattan Loan and New Note, for which Manhattan could be responsible.

5.      **Manhattan's Representations and Warranties.** Manhattan represents and warrants to Trustee as of the date of this Agreement that:

(a)     Manhattan (i) is duly organized and validly existing under the laws of its jurisdiction of organization or incorporation, (ii) is in good

standing under such laws and (iii) has full power and authority to execute, deliver and perform its obligations under, this Agreement.

(b)     Manhattan's execution, delivery, and performance of this Agreement have not resulted and will not result in a breach or violation of any provision of (i) Manhattan's organizational documents, (ii) any statute, law, writ, order, rule or regulation of any Governmental Authority applicable to Manhattan, (iii) any judgment, injunction, decree or determination of any Governmental Authority applicable to Manhattan or (iv) any contract, indenture, mortgage, loan agreement, note, lease or other agreement, document or instrument by which Manhattan may be a party, by which Manhattan may be bound or to which any of the assets of Manhattan is subject.

(c)     (i)     This Agreement and the Manhattan Loan each (A) has been duly and validly authorized by Manhattan's board of directors or authorized committee thereof or other party which must approve the same pursuant to Manhattan's organizational documents, executed and delivered by Manhattan and (B) are the legal, valid and binding obligations of Manhattan, enforceable against Manhattan in accordance with their respective terms, except that such enforceability may be limited by bankruptcy, insolvency, or other similar laws of general applicability affecting the enforcement of creditors' rights generally and by a court's discretion in relation to equitable remedies; and

(ii)     no notice to, registration with, consent or approval of or any other action by any relevant Governmental Authority or other Entity is or will be required for Manhattan to execute, deliver, and perform its obligations this Agreement and the Manhattan Loan.

(d)     No broker, finder or other Entity acting under the authority of Manhattan or any of its Affiliates is entitled to any broker's commission or other fee in connection with the transactions contemplated by this Agreement, including the Manhattan Loan, for which the Trust could be responsible.

(e)     Manhattan is an "accredited investor" as defined in Rule 501 under the Securities Act. Without characterizing the Manhattan Loan and New Note as a "security" within the meaning of applicable securities laws, Manhattan has not made any offers to sell, or solicitations of any offers to buy, all or any portion of the Manhattan Loan or the New Note in violation of any applicable securities laws.

DG 00199

6.    Covenants.

6.1    The Trust hereby covenants and agrees as follows:

(a)    Trust shall not Encumber the TRI Shares, its interest in the TRI Shares or any proceeds of the TRI Shares or any material amount of its assets for so long as any amount is owed under this Note.

(b)    Trust acknowledges the sale and assignment of the 2011 Note and the Transferred Rights to Manhattan and agrees to deliver all amounts payable with respect to the Note and the Transferred Rights to Manhattan at the address provided to Trust in writing by Manhattan.

(c)    Trust hereby waives any defenses it may have to payment of amounts payable under the Note, including all defenses it may have with respect to Manhattan, TPR or any other prior holder of the Note.

(d)    Trust agrees that it shall not borrow or enter into any agreement to borrow an aggregate amount greater than Four Hundred Thousand Dollars and No Cents ($400,000.00), including amounts borrowed as part of the Manhattan Loan; provided, however, that this shall not prevent Trust from engaging in agreements for services with attorneys and others in connection with the TRI Proceedings; and provided, further, that Trust may borrow such additional sums as may be subordinated to the Manhattan Loan, on terms and subject to conditions satisfactory to Manhattan.

6.2    Manhattan hereby covenants and agrees that notwithstanding any payment default under the Note or the New Note, but subject to the Trust's compliance with all other terms and conditions of the Note and the New Note, Manhattan agrees to forbear from collection of amounts due and owing on the Note, and not take any action, including the commencement of any proceeding, to collect amounts due under the Note or the New Note, until the earliest to occur of (i) the date on which Dalia no longer serves as Trustee of the Trust, (ii) the final resolution of the Interpleader Action or (iii) November 1, 2014; provided, however, that notwithstanding the foregoing, Manhattan may take any action reasonably necessary to ensure the payment of all amounts payable under the Note or the New Note, including, but not limited to, the acceleration of the obligations under the Note or the New Note and the commencement of enforcement actions to collect amounts owing under the Note and or the New Note upon the occurrence of (x) any event of default under the Note or the New Note, other than a payment default or (y) any action by an individual or Entity which Manhattan believes may adversely affect the Trust's ability to fully perform all of its obligations under this Agreement, the Note, the Manhattan Loan or the New Note.

6.3    The Forbearance Fee shall be payable by increasing the amount outstanding under the Note by the amount of the Forbearance Fee effective November 1, 2012 if the Note is not previously paid in full by such date.

DG 00200

7.    Indemnification.

7.1    Trust and the Trustee, jointly and severally, shall indemnify, defend, and hold Manhattan and its officers, directors, agents, partners, members, controlling Entities and employees (collectively, "**Manhattan Indemnitees**") harmless from and against any liability, claim, cost, loss, judgment, damage or expense, including reasonable attorneys' fees and expenses (collectively, a "**Claim**") that any Manhattan Indemnitee incurs or suffers as a result of, or arising out of (i) a breach of any of Trust representations, warranties, covenants or agreements in this Agreement, (ii)  any legal or arbitral proceeding, any investigation or any actions preliminary or related to any of the foregoing, which relates to, or arises from, the same factual basis as, the TRI Proceedings, (iii) compliance with any subpoena or other demand to be deposed, testify or produce documents in a proceeding before a Governmental Authority or an arbitrator or (iv) otherwise resulting from any action taken by any Claimant; provided, however, that the indemnification obligations of the Trustee under this Agreement (x) shall not include Claims made after Dalia no longer serves as Trustee of the Trust and (y) are in the nature of a surety for the obligations of the Trust and are conditional upon demand first being made upon, and a good faith attempt made to collect from, the Trust as provided in Section 7.3 below; and provided, further, that the foregoing proviso shall not be construed in any way to limit the indemnification obligations of the Trust under this Agreement.

7.2    If a third party commences any action or makes any demand against Manhattan Indemnities for which any Manhattan Indemnitees ("**Indemnified Party**") is entitled to indemnification under this Agreement, such Indemnified Party shall promptly notify Trust and Dalia (collectively and individually "**Indemnifying Party**") in writing of such action or demand; provided, however, that if the Indemnified Party assumes the defense of the action and fails to provide prompt notice to the Indemnifying Party, such failure shall not limit in any way the Indemnifying Party's obligation to indemnify the Indemnified Party except to the extent that such failure materially prejudices the Indemnifying Party's ability to defend the action.  The Indemnifying Party may, at its own expense and without limiting its obligation to indemnify the Indemnified Party, participate in the defense of such action with counsel reasonably satisfactory to the Indemnified Party, or the Indemnifying Party may, at its own expense and without limiting its obligation to indemnify the Indemnified Party, assume the defense of such action with counsel reasonably acceptable to the Indemnified Party.  In any event, the Indemnified Party that has assumed the defense of such action shall provide the Trust and Dalia with copies of all notices, pleadings, and other papers filed or served in such action. Neither Party shall make any settlement or adjustment without prior written consent, which consent (a) in the case of the Indemnifying Party will not be unreasonably withheld if the settlement or adjustment involves only the payment of money damages by the Indemnifying Party and (b) in the case of the Indemnified Party may be withheld for any reason if the settlement or adjustment involves performance or admission by the Indemnified Party.

7.3    In the event of the occurrence of a Claim for which an Indemnified Party is entitled to indemnification hereunder, the Indemnified Party shall first make demand upon, and seek payment and performance from, the Trust, and then, and only if, after such demand the Trust fails to pay or perform as required by this Agreement, shall the

DG 00201

Indemnified Party seek payment and performance from the Trustee. Amounts payable by the Indemnifying Party, to the extent not paid by an Indemnifying Party, may be added to the principal amount Note and shall accrue interest from the date of the incurrence of such expense by the Indemnified Party at the prevailing rate of interest as provided under the Note.

7.4      Each indemnity in this Agreement is a continuing obligation, separate and independent from the other obligations of the Trust and Dalia and survives termination of this Agreement or any transfer pursuant to Section 10 of this Agreement. It is not necessary for a Party to incur expense or make payment before enforcing a right of indemnity conferred by this Agreement.

8.      **Costs and Expenses.** Trust and Manhattan each agrees to bear its own, legal and other costs and expenses for preparing, negotiating, executing and delivering this Agreement and any related documents and consummating the transaction contemplated by this Agreement, including legal and other costs and expenses relating to the amendment of the Amended Note, the Manhattan Loan and the New Note.

9.      **Notices.**

9.1      All communications between the Parties in respect of, or notices, requests, directions, consents or other information sent under, this Agreement shall be in writing, hand delivered or sent by overnight courier, electronic transmission or telecopier, addressed to the relevant Party at its address, electronic mail or facsimile number specified in **Schedule 9.1** to this Agreement at such other address, electronic mail or facsimile number as such Party may subsequently request in writing. All such communications and notices shall be effective upon receipt.

9.2      If Trust receives any notices, correspondence or other documents in respect of the Transferred Rights, the Note or the Settlement that, to the best of Trust's Knowledge, were not sent to Manhattan, Trust shall promptly forward them to Manhattan.

10.      **Further Transfers.**

10.1      Manhattan may sell, assign, grant a participation in, or otherwise transfer all or any portion of the Note or Transferred Rights, this Agreement, its rights under this Agreement, the Manhattan Loan or the New Note, or any interest in any of the foregoing without the consent of or notice to Trust.

10.2      Trust may assign its rights under this Agreement without the prior written consent of Manhattan; *provided, however,* that Trust may not delegate its obligations under this Agreement without the prior written consent of Manhattan.

11.      **Exercise of Rights and Remedies.**

11.1      No amendment of any provision of this Agreement shall be effective unless it is in writing and signed by the Parties, and no waiver of any provision of this Agreement, nor consent to any departure by either Party from it, shall be effective unless

it is in writing and signed by the affected Party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

11.2   No failure on the part of a party to exercise, and no delay in exercising, any right or remedy under this Agreement shall operate as a waiver by such Party, nor shall any single or partial exercise of any right or remedy under this Agreement preclude any other or further exercise thereof or the exercise of any other right or remedy. The rights and remedies of each Party provided herein (a) are cumulative and are in addition to, and are not exclusive of, any rights or remedies provided by law (except as otherwise expressly set forth in this Agreement) and (b) are not conditional or contingent on any attempt by such Party to exercise any of its rights or remedies under any other related document or against the other Party or any other Entity. In no event may either Party recover from the other Party any special, consequential or punitive damages.

## 12.   Survival; Successors and Assigns.

12.1   All representations, warranties, covenants, indemnities and other provisions made by the Parties shall be considered to have been relied upon by the Parties, shall (as to representations and warranties) be true and correct as of the date of this Agreement and any other date set forth in Sections 4 or 5, as the case may be, and shall survive the execution, delivery and performance of this Agreement.

12.2   This Agreement, including the representations, warranties, covenants and indemnities contained in this Agreement, shall inure to the benefit of, be binding upon and be enforceable by and against the Parties and their respective successors and permitted assigns.

## 13.   Further Assurances. Each Party agrees to (i) execute and deliver, or cause to be executed and delivered, all such other and further agreements, instruments and other documents and (ii) take or cause to be taken all such other and further actions as the other Party may reasonably request to effectuate the intent and purposes, and carry out the terms, of this Agreement.

## 14.   Disclosure.

14.1   Each Party agrees that, without the prior consent of the other Party, it shall not disclose the contents of this Agreement to any individual or Entity, except that any Party may make any such disclosure (a) as required to implement or enforce this Agreement, (b) if required to do so by any law, court, regulation, subpoena or other legal process, (c) to any Governmental Authority or self-regulatory Entity having or asserting jurisdiction over it, (d) if its attorneys advise it that it has a legal obligation to do so or that failure to do so may result in it incurring a liability to any other Entity or sanctions that may be imposed by any Governmental Authority, (e) to its Affiliates, professional advisors and auditors or (f) as set forth in Section 14.2.

14.2   Manhattan may disclose the contents of this Agreement to any proposed transferee, assignee, participant, or other Entity proposing to enter into contractual relations with Manhattan in respect of the Note or Transferred Rights, the Manhattan Loan or the New Note or any part of them.

DG 00203

15.   Entire Agreement; Conflict.

15.1   This Agreement constitutes the entire agreement of the Parties with respect to the transactions contemplated here by and supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, representations and warranties in respect thereof, all of which have become merged and finally integrated into this Agreement.

15.2   As between Manhattan and the Trust, if there is any inconsistency or conflict between this Agreement and any other document, the provisions of this Agreement shall govern and control.

16.   Counterparts; Telecopies. This Agreement may be executed in multiple counterparts and all of such counterparts taken together shall be deemed to constitute one and the same instrument. Transmission by telecopier, facsimile or other form of electronic transmission of an executed counterpart of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart, and shall have the same force and effect as a manually executed original. Each fully executed counterpart of this Agreement shall be deemed to be a duplicate original.

17.   Relationship Between Manhattan and the Trust. The relationship between Manhattan and the Trust shall be that of lender and borrower. Neither is a trustee or agent for the other, nor does either have any fiduciary obligations to the other. This Agreement shall not be construed to create a partnership or joint venture between the Parties.

18.   Severability. The illegality, invalidity or unenforceability of any provision of this Agreement under the law of any jurisdiction shall not affect its legality, validity or enforceability under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision.

19.   Governing Law. THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTION (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED AND DETERMINED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION).

20.   Waiver of Trial by Jury. THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTION (WHETHER BASED ON CONTRACT,

DG 00204

TORT OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO
REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS
REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY
WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE
FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER
PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY,
AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN
THIS SECTION.

21.    **Jurisdiction.** The Parties irrevocably agree that, should either Party institute any
legal action or proceeding in any jurisdiction (whether for an injunction, specific
performance, damages or otherwise) in relation to this Agreement or the transactions
contemplated by this Agreement, no immunity (to the extent that it may at any time
exist, whether on the grounds of sovereignty or otherwise) from such action or
proceeding shall be claimed by it or on its behalf, any such immunity being hereby
irrevocably waived, and each Party irrevocably agrees that it and its assets are, and shall
be, subject to such legal action or proceeding in respect of its obligations under this
Agreement.

22.    **Interpretation.**

22.1    This Agreement and any annexes, schedules or other documents attached
to or incorporated by reference into the Agreement.

22.2    Terms used in the singular or the plural include the plural and the singular,
respectively; "includes" and "including" are not limiting; and "or" is not exclusive.

22.3    Any reference to a Party includes such Party's successors and permitted
assigns.

22.4    Unless otherwise indicated, any reference to:

(a)    this Agreement or any other agreement, document or instrument
shall be construed as a reference to this date of this Agreement or,
as the case may be, such other agreement, document or instrument
as the same may have been, or may at any time before the date of
this Agreement be, in effect as modified, amended or
supplemented as of the date of this Agreement Date; and

(b)    a statute, law, order, rule or regulation shall be construed as a
reference to such statute, law, order, rule or regulation as it may
have been, or may at any time before the date of this Agreement
be, in effect as modified, amended or supplemented as of the date
of this Agreement.

22.5    Section and other headings and captions are included solely for
convenience of reference and are not intended to affect the interpretation of any provision
of this Agreement.

DG 00205

22.6    This Agreement shall be deemed to have been jointly drafted by the Parties and no provision of it shall be interpreted or construed for or against either Party because such Party actually or purportedly prepared or requested such provision, any other provision or the Agreement as a whole.

23.    **Legal Counsel.** Each Party acknowledges that it or she has been represented by its own legal counsel in connection with the negotiation and drafting of this Agreement. Accordingly, this document shall not be construed against the draftsman. Any rule of construction to the contrary shall be ignored.

[SIGNATURE PAGE FOLLOWS]

DG 00206

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first written above.

TRUST:

ORLY GENGER 1993 TRUST

By: _Dalia Genger_____
    Dalia Genger, Sole Trustee

STATE OF _New York_____)
                          )SS:
COUNTY OF _New York____)

The foregoing was sworn to, subscribed and acknowledged before me this 15th day of Mar, 2012, by Dalia Genger, as Sole Trustee of The Orly Genger 1993 Trust. She is personally known to me or has produced a driver's license as identification.

Print or Stamp Name: _____
Notary Public: _____
Commission No.: _____
My Commission Expires: _____

MAGDALENA CHARLOTTEN
NOTARY PUBLIC, State of New York
No. 01CH6059474
Qualified in New York County
Certificate Filed in Kings, Queens,
Westchester, Bronx Counties
Commission Expires May 29, 20 15

DALIA:

By: _Dalia Genger_____
    Dalia Genger, Individually

STATE OF _New York_____)
                          )SS:
COUNTY OF _New York____)

The foregoing was sworn to, subscribed and acknowledged before me this 15th day of Mar, 2012, by Dalia Genger. She is personally known to me or has produced a driver's license as identification.

Print or Stamp Name: _____
Notary Public: _____
Commission No.: _____
My Commission Expires: _____

MAGDALENA CHARLOTTEN
NOTARY PUBLIC, State of New York
No. 01CH6059474
Qualified in New York County
Certificate Filed in Kings, Queens,
Westchester, Bronx Counties
Commission Expires May 29, 20 15

DG 00207

MANHATTAN:

MANHATTAN SAFETY COMPANY, LTD.,
a corporation organized under the laws of St. Kitts, W.I.

By: _____

    Greg Gilpin-Payne, President

                              Witness: Leah Crag-Chaderton

                              Witness: Yulanda Vanterpool

DG 00208

<u>**SCHEDULE 9.1**</u>

**NOTICES**

**Trust:**

Pedowitz & Meister
1501 Broadway, Suite 800
New York NY 10036-5505
Attention: Robert Meister

**Dalia:**
200 East 65th - apt 32w
New York, NY
Attention: Trustee

**Manhattan:**

858 Zenway Blvd
Frigate Bay
St Kitts, W.I.

DG 00209

EXECUTION VERSION

### AMENDED AND RESTATED
### PROMISSORY NOTE

$4,240,000.00

October 3, 2011

FOR VALUE RECEIVED, the undersigned, the ORLY GENGER 1993 TRUST ("Maker" or the "Trust"), a trust settled on December 13, 1993 pursuant to that certain Trust Agreement dated December 13, 1993 (the "Trust Agreement") and as authorized by its current sole trustee, Dalia Genger ("DG" or "Trustee"), promises to pay to the order of MANHATTAN SAFETY COMPANY, LTD., a corporation organized under the laws of St. Kitts, W.I. ("Manhattan;" together with its successors and assigns, the "Holder"), the principal amount of FOUR MILLION TWO HUNDRED FORTY THOUSAND DOLLARS AND NO CENTS ($4,240,000.00) ("Principal"),  or such other amount as may have been advanced under this Note, together with accrued interest calculated from (i) the date of the Original Note (as herein after defined) on the face amount of the Original Note, (ii) (x) such date or dates, if any, on which an Additional Advance (as herein defined) is made on the amount of the Additional Advance made on such date or dates, (iii) November 1, 2012, in the case of an advance in payment of the Forbearance Fee, on the amount of the Forbearance Fee or (iv) the date or dates of the incurrence of any cost or expense by an Indemnified Party on the amount of such cost or expense (each an "Indemnity Payment" and collectively, the "Indemnity Payments") which is not paid by an Indemnifying Party, at the rate of three percent (3%) percent per annum on the unpaid Principal balance or such other interest rate then prevailing and payable under this Note, computed on the basis of the actual number of days elapsed a year of 360 days.

This Amended and Restated Note amends and restates that certain promissory note dated October 3, 2011 in the original principal amount of Four Million Dollars and No Cents ($4,000,000.00) (the "Original Note") and is issued in replacement thereof. This Note is the Note contemplated by that certain Credit and Forbearance Agreement and Second Amendment and Restatement of Promissory Note dated May __, 2012 (the "Agreement") by and between the Trust and Manhattan.  Among other things, the Original Note has been amended to provide for the possibility of (i) additional advance(s) ("Additional Advances") made to Maker, (ii) the payment of a Forbearance Fee by Maker under the terms of the Agreement and this Note and (iii) the incurrence by Maker of an obligation to pay an Indemnity Payment.  Capitalized terms used herein without definition shall have the meanings ascribed to them in the Agreement.

## 1. Payments and Prepayments.

1.1     Principal and interest shall be paid to Holder at the address set forth in the Agreement or such other address as may appear the books and records of the Maker or such other place as the Holder hereof from time to time shall designate in writing to Maker.

1.2     Principal and all accrued and unpaid interest shall be due and  payable on the date (the "Maturity Date") which is the earliest to occur of:

(a)     November 1, 2012; or

DG 00979

(b)     the date of Maker's receipt of the proceeds ("TRI Shares Proceeds") from the sale of shares (the "TRI Shares") of Trans Resources, Inc., a Delaware corporation ("TRI"), either pursuant to the interpleader action (the "Interpleader Action") pending in the United States District Court for the Southern District of the State of New York (the "Court") in *Pedowitz v. TPR*, 11 Civ. 5602, or otherwise.

1.3     Notwithstanding anything to the contrary, to the extent that the Court awards the Trust any of the interpleaded funds, the Trust shall first apply such funds to the extent necessary to pay this Note, including all accrued and unpaid interest hereon, in full, before applying such funds for any other purpose.

## 2.  Events of Default.

2.1     Events of Default.  It is expressly agreed that the entire Principal amount of this Note, together with all accrued interest thereon, shall immediately become due and payable (without demand for payment, notice of nonpayment, presentment, notice of dishonor, protest, notice of protest, or any other notice, all of which are hereby expressly waived by Maker) upon the happening of any of the following events (each, an "Event of Default"):

(a)     the entry of a decree or order by the court having jurisdiction in the premises adjudging Maker a bankrupt or insolvent, or approving as properly filed a petition seeking arrangement, adjudgment or composition of or in respect of Maker under the Federal Bankruptcy Code or any other applicable Federal or state law, or appointing a receiver, liquidator, assignee, or trustee, sequestrator (or other similar official) of Maker, or of any part of its property, and the continuance of any such decree or order unstayed and in effect for a period of thirty (30) consecutive days; or

(b)     the institution by Maker of proceedings to be adjudicated a bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of the petition or answer or consent by it to the filing of any such petition or answer or consent seeking relief under the Federal Bankruptcy Code or any other applicable Federal or state law or the consent by it to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of Maker or any part of its property, or the making by it of an assignment for the benefit of the creditors, or the admission by it in writing of its inability to pay its debts generally as they come due; or

(c)     the resignation, removal or other change in the Trustee, including, but not limited to, the addition of one or more additional Trustees; or

(d)     the creation of any lien or other Encumbrance on any asset of Maker; or

(e)     the breach by Maker of any of its representations, warranties or covenants under the Agreement; or

(f)     the sale or other transfer of all or any material part of Maker's properties and assets; or

FTL.DOCS 5928254 10 2

DG 00980

(g)     a default by Maker in any payment of principal of or interest on any other obligation for money borrowed (or on any obligation under conditional sale or other title retention agreement or on any obligation secured by purchase money mortgage or on any obligation under notes payable or drafts accepted representing extensions of credit but excluding deposits) beyond any period of grace provided with respect thereto, or defaults in the performance of any other agreement under which any such obligation is created (or if any other event of default under any such agreement shall occur and be continuing) if the effect of such event or default is to cause, or to permit the creditor or creditors of such obligation (or a trustee on behalf of such creditor or creditors) to cause, such obligations to become due prior to its stated maturity; or

(h)     the failure to pay any amount payable to Holder when due and payable, subject to the provisions of the Agreement and Section 2.2 of this Note which provide for forbearance by the Holder from collection of amounts payable to Holder under this Note.

2.2    Upon the occurrence of an Event of Default, Holder may, without limiting any other rights it may have at law or in equity, declare the unpaid Principal of and accrued and unpaid interest on this Note due and payable, whereupon the same shall be due and payable without presentment, demand, protest or other notice of any kind, all of which Maker expressly waives, and Holder may proceed to enforce payment of such Principal and accrued and unpaid interest or any part thereof in such manner as it may elect in its sole discretion; provided, however, that Holder agrees to forbear from commencing any action to enforce collection of such amounts to the extent provided in the Agreement.

**3. Overdue Rate.** From and after November 1, 2012 or upon the occurrence of an Event of Default if earlier, the unpaid indebtedness then evidenced by this Note shall thereafter bear interest at the lesser of rate of twenty five percent (25%) per annum or the maximum legal rate of interest (the "Overdue Rate").

**4. Covenants.** The Trust hereby covenants and agrees that (1) it shall not create or permit any Encumbrance on (x) the TRI Shares or (y) the Minimum Payment or any other payment that the Trust may receive or be entitled to receive from (a) the Court or (b) any other party in connection with the Interpleader Action or otherwise relating to the TRI Shares and (2) it will not (x) (a) borrow or enter into any agreement to borrow any amount of money, or (b) guaranty, indemnify or otherwise create any contingent monetary obligation, or (y) incur any material Liability, other than costs for legal services relating to the TRI Proceedings, which in no event, without the prior consent of Holder, exceed in aggregate Five Hundred Thousand Dollars and No Cents ($500,000.00).

**5. Waiver And Consent.** Maker: (a) waives demand, presentment, protest, notice of dishonor, suit against or joinder of any other person, and all other requirements necessary to charge or hold Maker liable with respect to the obligations evidenced by the Note; and (b) waives any right to immunity from any such action or proceeding and waives any immunity or exemption of any property, wherever located, from garnishment, levy, execution, seizure or attachment prior to or in execution of judgment, or sale under execution or other process for the collection of debts.

FTLDOCS 5928254 10 3

DG 00981

6. <u>Costs, Indemnities And Expenses</u>. Maker agrees to pay all filing fees and similar charges and all costs incurred by Holder in collecting or attempting to collect the obligations evidenced by the Note and such right shall extend beyond the entry of a final, non-appealable judgment of a court of competent jurisdiction ("**Final Judgment**") including attorneys' fees, whether or not involving litigation and/or appellate, administrative or bankruptcy proceedings. Such entitlement or attorneys' fees shall not merge with the entry of a Final Judgment and shall continue post-judgment unless and/or until any and all indebtedness due Holder is fully satisfied. Maker agrees to pay any documentary stamp taxes, intangible taxes or other taxes (except for federal or state franchise or income taxes based on Holder's net income) which may now or hereafter apply to this Note, and Maker agrees to indemnify and hold Holder harmless from and against any liability, costs, attorneys' fees, penalties, interest or expenses relating to any such taxes, as and when the same may be incurred. Maker agrees to pay Holder any and all attorneys' and paralegals' fees at all pre-trial, trial and appellate levels in respect of any litigation or collection efforts based hereon, or arising out of, or related hereto whether, under or in connection with this Note and/or any agreement contemplated to be executed in conjunction herewith, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of any party.

7. <u>Miscellaneous</u>.

7.1    <u>Governing Law</u>. This Note shall be governed by, and construed and enforced in accordance with the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

7.2    <u>Jurisdiction</u>. Trust and the Trustee each irrevocably agree that, should either of them institute any legal action or proceeding in any jurisdiction (whether for an injunction, specific performance, damages or otherwise) in relation to this Note or the transactions contemplated by this Note, no immunity (to the extent that it may at any time exist, whether on the grounds of sovereignty or otherwise) from such action or proceeding shall be claimed by it or on its behalf, any such immunity being hereby irrevocably waived, and the Trust and the Trustee each irrevocably agrees that their respective assets are, and shall be, subject to such legal action or proceeding in respect of its obligations under this Note.

7.3    <u>Time of the Essence</u>. Time shall be of the essence with respect to the terms of this Note. This Note cannot be changed or modified orally.

7.4    <u>Interpretation</u>. The term "Holder" shall be deemed to include any subsequent holder(s) of this Note. Whenever used in this Note, the term "person" means any individual, firm, corporation, trust or other organization or association or other enterprise or any governmental or political subdivision, agency, department or instrumentality thereof. Whenever used in this Note, words in the singular include the plural, words in the plural include the singular, and pronouns of any gender include the other genders, all as may be appropriate. Captions and paragraph headings in this Note are for convenience only and shall not affect its interpretation

7.5    <u>Invalidity</u>. Any provision of this Note which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction only, be ineffective only to the extent of such

FTLDOCS 5928254 10 4

DG 00982

prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. To the extent that Maker may lawfully waive any law that would otherwise invalidate any provision of this Note, Maker hereby waives the same, to the end that this Note shall be valid and binding and enforceable against it in accordance with all of its terms.

7.6    Prepayment Permitted. This Note may be prepaid in whole or in part at any time without penalty. Except as otherwise required by law or by the provisions of this Note, payments received by Holder hereunder shall be applied first against expenses and indemnities, next against accrued interest, and next in reduction of the outstanding principal balance of the Note, except that during the continuance of any Event of Default, Holder may apply such payments in any order of priority determined by Holder in its exclusive judgment.

7.7    Notices. Except as otherwise required by the provisions of this Note, any notice required to be given to Maker shall be deemed sufficient if made personally or if mailed, postage prepaid, to such Maker's address as it appears in the Agreement.

7.8    Benefit. All of the terms of this Note shall inure to the benefit of Holder and its heirs, executors, administrators, personal representatives, successors and assigns, and shall be binding upon Maker and its successors and assigns, jointly and severally.

7.9    No Waiver. No failure on the part of the Holder to exercise, and no delay in the exercise of any right, remedy or power hereunder or under any document or agreement executed in connection herewith shall operate as a waiver hereof or thereof nor shall any single or partial exercise by the Holder of any right, remedy or power hereunder or thereunder preclude any other or future exercise of any other right, remedy or power.

7.10    Change, Modification or Waiver. This Note may not be changed or modified orally, nor may any right or provision hereof be waived orally, but in each instance only by an instrument in writing signed by the party against which enforcement of such change, modification or waiver is sought.

7.11    No Usury. In the event, Holder, in enforcing its rights hereunder determines that charges and fees incurred in connection with this Note may, under the applicable laws relating to usury, cause the interest rate herein to exceed the maximum rate allowed by law, then such interest shall be recalculated and any excess over the maximum interest permitted by such laws shall be credited to the then outstanding principal amount of the Note to reduce said balance by the amount of such excess. It is the intent of the Holder that the Maker, under no circumstance, shall Maker be required to pay, nor shall the Holder be entitled to collect, any interest that is in excess of the maximum rate permitted under the applicable laws relative to usury.

7.12    Waiver of Trial by Jury. THE MAKER AND THE HOLDER WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF OR IN ANY WAY CONNECTED TO THIS NOTE.

FTLDOCS 5928254 10 5

7.13    Assignment. This Note may be negotiated, endorsed, assigned, transferred and/or pledged subject to compliance with the requirements of applicable federal and state securities law by delivery of the original Note. This Note shall be binding upon Maker and Maker's successors and assigns.

[SIGNATURE PAGE TO FOLLOW]

DG 00984

IN WITNESS WHEREOF, Maker has duly executed this Note as of the date first written above.

MAKER:

THE ORLY GENGER 1993 TRUST

By: _____
   Dalia Genger, sole Trustee

STATE OF _____ )
                         )SS:
COUNTY OF _____ )

The foregoing was sworn to, subscribed and acknowledged before me this ___ day of _____, 2012, by Dalia Genger, as sole Trustee of The Orly Genger 1993 Trust. She is personally known to me or has produced a driver's license as identification.

_____

Print or Stamp Name: _____
Notary Public: _____
Commission No.: _____
My Commission Expires: _____

MAGDALENA CHARLOTTEN
NOTARY PUBLIC, State of New York
No. 01CH9059474
Qualified in New York County
Certificate Filed in Kings, Queens,
Westchester, Bronx Counties
Commission Expires May 29, 20__

7

DG 00985

EXECUTION VERSION

## PROMISSORY NOTE

$200,000.00

May _15_, 2012

FOR VALUE RECEIVED, the undersigned, the ORLY GENGER 1993 TRUST ("Maker" or the "Trust"), a trust settled on December 13, 1993 pursuant to that certain Trust Agreement dated December 13, 1993 (the "Trust Agreement") and as authorized by its current sole trustee, Dalia Genger ( "DG" or "Trustee"), promises to pay to the order of MANHATTAN SAFETY COMPANY, LTD., a corporation organized under the laws of St. Kitts, W.I. ("Manhattan;" together with its successors and assigns, the "Holder"), the principal amount of TWO HUNDRED THOUSAND DOLLARS AND NO CENTS ($200,000.00), or so much of the principal sum as shall have been advanced ("Principal"), together with accrued interest calculated from the date hereof at the rate of five percent (5%) percent per annum on the unpaid Principal balance, computed on the basis of the actual number of days elapsed and a year of 360 days.

This New Note is the Note contemplated by that certain Credit and Forbearance Agreement and Second Amendment and Restatement of Promissory Note dated May __, 2012 (the "Agreement") by and between the Trust and Manhattan. Capitalized terms used herein without definition shall have the meanings ascribed to them in the Agreement.

### 1.   Payments and Prepayments.

1.1    Principal and interest shall be paid to Holder at the address set forth in the Agreement or such other address as may appear the books and records of the Maker or such other place as the Holder hereof from time to time shall designate in writing to Maker.

1.2    Principal and all accrued and unpaid interest shall be due and  payable  on the date (the "Maturity Date") which is the earliest to occur of:

(a) November 1, 2014; or

(b) the date of Maker's receipt of the proceeds ("TRI Shares Proceeds") from the sale of shares (the "TRI Shares") of Trans Resources, Inc., a Delaware corporation ("TRI"), either pursuant to the interpleader action (the "Interpleader Action") pending in the United States District Court for the Southern District of the State of New York (the "Court") in *Pedowitz v. TPR*, 11 Civ. 5602, or otherwise.

1.3    Notwithstanding anything to the contrary, to the extent that the Court awards the Trust any of the interpleaded funds, the Trust shall first apply such funds to the extent necessary to pay this Note, including all accrued and unpaid interest hereon, in full, before applying such funds for any other purpose.

### 2.   Events of Default.

2.1    Events of Default.  It is expressly agreed that the entire Principal amount of this Note, together with all accrued interest thereon, shall immediately become due and payable (without demand for payment, notice of nonpayment, presentment, notice of dishonor, protest, notice of

FTLDOCS 5931444 6

DG 00989

protest, or any other notice, all of which are hereby expressly waived by Maker) upon the happening of any of the following events (each, an "**Event of Default**"):

(a)    the entry of a decree or order by the court having jurisdiction in the premises adjudging Maker a bankrupt or insolvent, or approving as properly filed a petition seeking arrangement, adjudgment or composition of or in respect of Maker under the Federal Bankruptcy Code or any other applicable Federal or state law, or appointing a receiver, liquidator, assignee, or trustee, sequestrator (or other similar official) of Maker, or of any part of its property, and the continuance of any such decree or order unstayed and in effect for a period of thirty (30) consecutive days; or

(b)    the institution by Maker of proceedings to be adjudicated a bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of the petition or answer or consent by it to the filing of any such petition or answer or consent seeking relief under the Federal Bankruptcy Code or any other applicable Federal or state law or the consent by it to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of Maker or any part of its property, or the making by it of an assignment for the benefit of the creditors, or the admission by it in writing of its inability to pay its debts generally as they come due; or

(c)    the resignation, removal or other change in the Trustee, including, but not limited to, the addition of one or more additional Trustees; or

(d)    the creation of any lien or other Encumbrance on any asset of Maker; or

(e)    the breach by Maker of any of its representations, warranties or covenants under the Agreement; or

(f)    the sale or other transfer of all or any material part of Maker's properties and assets; or

(g)    a default by Maker in any payment of principal of or interest on any other obligation for money borrowed (or on any obligation under conditional sale or other title retention agreement or on any obligation secured by purchase money mortgage or on any obligation under notes payable or drafts accepted representing extensions of credit but excluding deposits) beyond any period of grace provided with respect thereto, or defaults in the performance of any other agreement under which any such obligation is created (or if any other event of default under any such agreement shall occur and be continuing) if the effect of such event or default is to cause, or to permit the creditor or creditors of such obligation (or a trustee on behalf of such creditor or creditors) to cause, such obligations to become due prior to its stated maturity; or

(h)    the failure to pay any amount payable to Holder when due and payable.

2.2    Upon the occurrence of an Event of Default, Holder may, without limiting any other rights it may have at law or in equity, declare the unpaid Principal of and accrued and unpaid interest on this Note due and payable, whereupon the same shall be due and payable without presentment, demand, protest or other notice of any kind, all of which Maker expressly waives, and Holder may proceed to enforce payment of such Principal and accrued and unpaid interest or any

DG 00990

part thereof in such manner as it may elect in its sole discretion; provided, however, that Holder agrees to forbear from commencing any action to enforce collection of such amounts to the extent provided in the Agreement.

3. **Overdue Rate.** From and after November 1, 2012 or upon the occurrence of an Event of Default if earlier, the unpaid indebtedness then evidenced by this Note shall thereafter bear interest at the lesser of rate of twenty five percent (25%) per annum or the maximum legal rate of interest (the "Overdue Rate").

4. **Covenants.** The Trust hereby covenants and agrees that (1) it shall not create or permit any Encumbrance on (x) the TRI Shares or (y) the Minimum Payment or any other payment that the Trust may receive or be entitled to receive from (a) the Court or (b) any other party in connection with the Interpleader Action or otherwise relating to the TRI Shares and (2) it will not (x) (a) borrow or enter into any agreement to borrow any amount of money, or (b) guaranty, indemnify or otherwise create any contingent monetary obligation, or (y) incur any material Liability, other than costs for legal services relating to the TRI Proceedings, which in no event, without the prior consent of Holder, exceed in aggregate Five Hundred Thousand Dollars and No Cents ($500,000.00).

5. **Waiver And Consent.** Maker: (a) waives demand, presentment, protest, notice of dishonor, suit against or joinder of any other person, and all other requirements necessary to charge or hold Maker liable with respect to the obligations evidenced by the Note; and (b) waives any right to immunity from any such action or proceeding and waives any immunity or exemption of any property, wherever located, from garnishment, levy, execution, seizure or attachment prior to or in execution of judgment, or sale under execution or other process for the collection of debts.

6. **Costs, Indemnities And Expenses.** Maker agrees to pay all filing fees and similar charges and all costs incurred by Holder in collecting or securing or attempting to collect or secure the obligations evidenced by the Note and such right shall extend beyond the entry of a final, non-appealable judgment of a court of competent jurisdiction ("**Final Judgment**") including attorneys' fees, whether or not involving litigation and/or appellate, administrative or bankruptcy proceedings. Such entitlement or attorneys' fees shall not merge with the entry of a Final Judgment and shall continue post-judgment unless and/or until any and all indebtedness due Holder is fully satisfied. Maker agrees to pay any documentary stamp taxes, intangible taxes or other taxes (except for federal or state franchise or income taxes based on Holder's net income) which may now or hereafter apply to this Note, and Maker agrees to indemnify and hold Holder harmless from and against any liability, costs, attorneys' fees, penalties, interest or expenses relating to any such taxes, as and when the same may be incurred. Maker agrees to pay Holder any and all attorneys' and paralegals' fees at all pre-trial, trial and appellate levels in respect of any litigation or collection efforts based hereon, or arising out of, or related hereto whether, under or in connection with this Note and/or any agreement contemplated to be executed in conjunction herewith, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of any party.

DG 00991

## 7. Miscellaneous.

**7.1**   Governing Law.   This Note shall be governed by, and construed and enforced in accordance with the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

**7.2**   Jurisdiction.   Trust and the Trustee each irrevocably agree that, should either of them institute any legal action or proceeding in any jurisdiction (whether for an injunction, specific performance, damages or otherwise) in relation to this Note or the transactions contemplated by this Note, no immunity (to the extent that it may at any time exist, whether on the grounds of sovereignty or otherwise) from such action or proceeding shall be claimed by it or on its behalf, any such immunity being hereby irrevocably waived, and the Trust and the Trustee each irrevocably agrees that their respective assets are, and shall be, subject to such legal action or proceeding in respect of its obligations under this Note.

**7.3**   Time of the Essence.   Time shall be of the essence with respect to the terms of this Note. This Note cannot be changed or modified orally.

**7.4**   Interpretation.   The term "Holder" shall be deemed to include any subsequent holder(s) of this Note. Whenever used in this Note, the term "person" means any individual, firm, corporation, trust or other organization or association or other enterprise or any governmental or political subdivision, agency, department or instrumentality thereof. Whenever used in this Note, words in the singular include the plural, words in the plural include the singular, and pronouns of any gender include the other genders, all as may be appropriate. Captions and paragraph headings in this Note are for convenience only and shall not affect its interpretation

**7.5**   Invalidity.   Any provision of this Note which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction only, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. To the extent that Maker may lawfully waive any law that would otherwise invalidate any provision of this Note, Maker hereby waives the same, to the end that this Note shall be valid and binding and enforceable against it in accordance with all of its terms.

**7.6**   Prepayment Permitted.   This Note may be prepaid in whole or in part at any time without penalty. Except as otherwise required by law or by the provisions of this Note, payments received by Holder hereunder shall be applied first against expenses and indemnities, next against accrued interest, and next in reduction of the outstanding principal balance of the Note, except that during the continuance of any Event of Default, Holder may apply such payments in any order of priority determined by Holder in its exclusive judgment.

**7.7**   Notices.   Except as otherwise required by the provisions of this Note, any notice required to be given to Maker shall be deemed sufficient if made personally or if mailed, postage prepaid, to such Maker's address as it appears in the Agreement.

DG 00992

7.8     Benefit.  All of the terms of this Note shall inure to the benefit of Holder and its heirs, executors, administrators, personal representatives, successors and assigns, and shall be binding upon Maker and its successors and assigns, jointly and severally.

7.9     No Waiver.  No failure on the part of the Holder to exercise, and no delay in the exercise of any right, remedy or power hereunder or under any document or agreement executed in connection herewith shall operate as a waiver hereof or thereof nor shall any single or partial exercise by the Holder of any right, remedy or power hereunder or thereunder preclude any other or future exercise of any other right, remedy or power.

7.10    Change, Modification or Waiver.  This Note may not be changed or modified orally, nor may any right or provision hereof be waived orally, but in each instance only by an instrument in writing signed by the party against which enforcement of such change, modification or waiver is sought.

7.11    No Usury.  In the event, Holder, in enforcing its rights hereunder determines that charges and fees incurred in connection with this Note may, under the applicable laws relating to usury, cause the interest rate herein to exceed the maximum rate allowed by law, then such interest shall be recalculated and any excess over the maximum interest permitted by such laws shall be credited to the then outstanding principal amount of the Note to reduce said balance by the amount of such excess. It is the intent of the Holder that the Maker, under no circumstance, shall Maker be required to pay, nor shall the Holder be entitled to collect, any interest that is in excess of the maximum rate permitted under the applicable laws relative to usury.

7.12    Waiver of Trial by Jury.  THE MAKER AND THE HOLDER WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF OR IN ANY WAY CONNECTED TO THIS NOTE.

7.13    Assignment.  This Note may be negotiated, endorsed, assigned, transferred and/or pledged subject to compliance with the requirements of applicable federal and state securities law by delivery of the original Note. This Note shall be binding upon Maker and Maker's successors and assigns.

[SIGNATURE PAGE FOLLOWS]

FTLDOCS 5931444 6

5

DG 00993

IN WITNESS WHEREOF, Maker has duly executed this Note as of the date first written above,

MAKER:

THE ORLY GENGER 1993 TRUST

By: _Dalia Genger_
Dalia Genger, Sole Trustee

STATE OF _New York_ )
COUNTY OF _New York_ )SS:

The foregoing was sworn to, subscribed and acknowledged before me this 15th day of May, 2012, by Dalia Genger, as Sole Trustee of The Orly Genger 1993 Trust. She is personally known to me or has produced a driver's license as identification.

Print or Stamp Name: _____
Notary Public: _____
Commission No.: _____
My Commission Expires: _____

MAGDALENA CHARLOTTEN
NOTARY PUBLIC, State of New York
No. 01CH6059474
Qualified in New York County
Certificate Filed in Kings, Queens,
Westchester, Bronx Counties
Commission Expires May 29, 2015

FTLDOCS 5931444 6

6

DG 00994

## AGREEMENT AMENDING TERMS OF PROMISSORY NOTE

THIS AMENDMENT AGREEMENT (the "Agreement") is entered into by and among TPR Investment Associates, Inc., a Delaware corporation ("TPR"), the Orly Genger 1993 Trust, a trust settled on December 13, 1993, with Dalia Genger currently serving as trustee (the "OG Trust") and D&K LP, a Delaware limited partnership ("DK"). (collectively, the "Parties;" each, a "Party"), as of October 3, 2011.

WHEREAS, The Parties entered into a Settlement Agreement dated October 3, 2011, as was subsequently amended and restated in an Amended and Restated Settlement Agreement dated March 16, 2012 (the "Restated Settlement"); and

WHEREAS, per Section 2 of the Restated Settlement a new enforceable promissory note in the amount of $4,000,000 was made by the OG Trust in favour of TPR – substantially in the form of Exhibit A attached to the Restated Settlement (the "2011 Note", or as referred interchangeably elsewhere as the "New Note"); and

WHEREAS, the Parties seek to amend the terms of the 2011 Note with respect to the governing laws, the choice of courts, and the procedures necessary to amend the 2011 Note;

NOW, THEREFORE, for good and valuable consideration, and intending to be legally bound, the Parties hereto agree as follows:

1. The last paragraph of the 2011 Note which reads as follows:

> "This New Note shall be governed by, and shall be construed and enforced in accordance with the laws of the State of Delaware without giving effect to the conflict of law rules thereof, and shall be adjudicated before the appropriate Courts of the State of Delaware"

is hereby rendered null and void, deemed deleted in its entirety and replaced by the following paragraph:

"This Note shall be governed by, and shall be construed and enforced in accordance with the laws of the State of New York, without giving effect

DG 01227

to the conflict of law rules thereof. This Note may be enforced against Borrower in any court of competent jurisdiction."

2. The following paragraph shall be deemed to be added to the 2011 Note, and the Parties agree that any amendment to the 2011 Note shall be done in the following manner:

"This Note may be amended, altered or modified at any time or from time to time, solely in writing executed by Borrower and Lender[1]. Any such amendment may be executed in one or more counterparts, all of which shall be considered one and the same instrument."

3. The 2011 Note remains fully enforceable. Except as otherwise provided herein, all other terms and conditions of the 2011 Note remain unchanged.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall be considered one instrument.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date indicated below.

TPR Investment Associates, Inc.

By: _____
Date: _____

The Orly Genger 1993 Trust

By: _Dalia Genger, Trustee_
Date: _____

D&K LP

By: _Sagi Genger, Manager_
Date: _3/21/2012_

---

[1] As such terms are defined in the original promissory note dated October 3, 2011.

DG 01228

## SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT (the "Agreement") is entered into by and among TPR Investment Associates, Inc., a Delaware corporation ("TPR"), the Orly Genger 1993 Trust, a trust settled on December 13, 1993, with Dalia Genger currently serving as trustee (the "OG Trust") and D&K LP, a limited partnership ("DK") (collectively, the "Parties"; each, a "Party"), as of the dates executed below.

WHEREAS, TPR and OG Trust entered into an agreement on or about October 29, 2004 (the "Share Transfer"), whereby TPR contracted to sell to the OG Trust 1,102.8 shares of Trans Resources, Inc., a Delaware corporation ("TRI" and the "TRI Shares"); and

WHEREAS, TPR relied on representations by Arie Genger that the liabilities stemming from the "Bogolusa Lawsuit" against TPR, TRI and Arie Genger personally exceeded the combined assets of TRI and TPR by at least $30 million, implying that TRI was worthless (the "Bogolusa Representation"); and

WHEREAS, Arie Genger further represented that the Share Transfer only required the consent of TPR, and that no further consents were required by any third party (the "Transferability Representation"); and

WHEREAS, in reliance on both the Bogolusa Representation and the Transferability Representation, TPR and the OG Trust agreed that OG Trust would pay TPR, for the Share Transfer, a nominal consideration in the amount of one dollar per share; and

WHEREAS, the Bogolusa Representation was subsequently deemed false, as determined by Judge Leo Milonas in arbitration proceeding between Arie Genger and

-1-

DG 01101

Dalia Genger in her personal capacity; and whereas in said arbitration proceeding Judge Milonas concluded that the value of the net assets of TRI as of October 2004 was approximately $55 million ("Milonas Value"), implying a possible value for the 1,102.8 TRI Shares of $10.3 million as of that same date (without discount to reflect a minority interest); and

WHEREAS, the Supreme Court of Delaware has recently affirmed the findings of the Delaware Chancery Court that the Transferability Representation was false, that pursuant to a Shareholder Agreement of TRI, which was entered into as of March 30, 2001, while Arie Genger controlled both TPR and TRI (the "TRI Shareholders Agreement"), the consent of other TRI shareholders (collectively, the "Trump Group") was required, that Arie Genger failed to provide such notice as required; and that TPR therefore remained the lawful record owner of the TRI Shares; and

WHEREAS, the Trump Group is claiming that beneficial ownership of the TRI Shares was not lawfully transferred to the OG Trust, a claim the Courts have not yet finally resolved; and

WHEREAS, the OG Trust is a guarantor of a certain Promissory Note in favor of TPR dated as of December 21, 1993, made by D&K Limited Partnership in the face value of $8,950,000 (the "1993 Note"); and

WHEREAS, following a partial foreclosure, approximately $4.5 million of the amount currently due and owing under the 1993 Note remains guaranteed by the OG Trust; and

WHEREAS Orly Genger, as beneficiary of the OG Trust, filed a Complaint in the New York State Supreme Court, which she personally verified on July 8, 2009 as truthful

-2-

DG 01102

to her own knowledge, alleging that if the Delaware litigation resulted in a determination that the TRI shares were not transferred but remained with TPR the value of TPR's shares would increase by $250 to $350 million, so that the OG Trust's claimed beneficial ownership interest in the TRI Shares could be over $200 million; and

WHEREAS Orly Genger, as beneficiary of the OG Trust, earlier submitted a letter to the Surrogate's Court on November 8, 2008, stating that the TRI shares that TPR had contracted in 2004 to sell to the Sagi Genger 1993 Trust (the same number of shares that TPR had simultaneously contracted to sell to the OG Trust) were worth "in excess of $150,000,000"; and

WHEREAS, the OG Trust seeks to secure the economic benefit of its claimed beneficial ownership interest in the TRI Shares, which Orly Genger, as set forth above, has previously valued at $150-200 million; and

WHEREAS, pursuant to a letter agreement dated August 22, 2008 (the "2008 Letter Agreement"), TPR executed documents to transfer the TRI Shares to the Trump Group at the Milonas Value; and

WHEREAS, TPR believes that the transfer pursuant to the 2008 Letter Agreement is final, but the OG Trust reserves the right to challenge the Trump Group's title to the TRI Shares or alternatively claim the proceeds of the sale from the TRI Shares to the Trump Group, net of amounts due under the 2011 Note (as defined hereunder); and

WHEREAS, at a hearing before the New York State Supreme Court on September 13, 2011, counsel for Orly Genger in her personal capacity expressed to the Court his client's concern that the value of the OG Trust's claimed beneficial ownership interest in the TRI Shares would be "diminished" by litigation positions to be taken by

-3-

DG 01103

TPR before the Delaware Chancery Court;

WHEREAS, TPR, the OG Trust, and DK now seek to finally settle all other disputes and controversies that exist among them, in such a manner as to: (a) resolve Orly Genger's concern by having TPR relinquish any interest in the TRI Shares and thereby enable the OG Trust to fully pursue the economic value of its claimed beneficial ownership interest in the TRI Shares; and (b) eliminate, or at least reduce, the drain on all sides' resources from the endless litigation of these issues in multiple forums;

NOW, THEREFORE, in consideration of the promises and commitments set forth herein, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    <u>Consideration</u>. In exchange for the consideration set forth herein: (a) TPR hereby relinquishes in favor of the OG Trust any economic interest in the TRI Shares and assigns to the OG Trust its right to any economic benefits of the TRI shares including any proceeds from the sale thereof, including but not limited to the $10.3 million in proceeds otherwise owing to TPR in the future pursuant to the terms of the August 22, 2008 letter agreement; (b) the OG Trust – irrespective of any claim made or asserted on its behalf by Orly Genger – hereby transfers to TPR its limited partnership interest in DK (the "DK Interest"), and disclaims any interest in, any shares of or TPR, either directly or indirectly through DK (the "TPR Interest"); and (c) TPR agrees to pay $100,000 for the legal fees of the OG Trust.

3.    <u>2011 Note</u>. The OG Trust is hereby released from any obligation under or as guarantor of the 1993 Note currently payable and owing in the amount of $4.5 million or the D&K Partnership Agreement, and the 1993 Note is hereby cancelled and replaced

-4-

DG 01104

by an updated new promissory note, from the OG Trust in favor of TPR, substantially in the form attached hereto as Exhibit A, in the amount of $4.0 million (the "2011 Note"). TPR hereby relinquishes its claim to the remaining approximately $500,000 due under the 1993 Note. The terms of the 2011 Note are incorporated by reference as if fully set forth herein.

4. <u>Mutual Releases</u>. The parties to this Settlement Agreement hereby irrevocably and fully release one another, including all current directors, officers, trustees, fiduciaries, agents, advisors and other representatives (serving the various parties from November 1, 2004 to present day) and their respective successors and assigns from all claims, causes of action, lawsuits, demands, liability of any kind, asserted or unasserted, known or unknown, suspected or unsuspected, direct or derivative, in connection with the 1993 Note, the TRI Shares, the Share Transfer, the DK Interest, the TPR Interest, the 2008 Letter Agreement, or any other matters, through the date of this Agreement. Nothing herein shall release any rights under this Agreement.

5. <u>Binding Nature</u>. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

6. <u>Titles</u>. Titles and headings to articles, sections or paragraphs in this Agreement are inserted for convenience of reference only and are not intended to affect the interpretation or construction of the Agreement.

7. <u>Choice of Law and Forum</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without reference to its conflicts of laws principles. The parties hereto hereby irrevocably and unconditionally submit, for themselves and their respective property, to the exclusive jurisdiction of the

DG 01105

state and federal courts located in Wilmington, Delaware.

8.    <u>Attorney's Fees</u>.  In the event that, following execution of this Agreement, a Party hereto, or a beneficiary of a Party hereto for the benefit of that Party, either asserts a new claim or continues to pursue an existing claim (including, without limitation, any claim asserted in an arbitral proceeding, proceeding for the obtaining of provisional remedies, trial, appeal or enforcement proceeding) against another Party hereto concerning, arising out of, or relating to this Agreement, the 1993 Note, the TRI Shares, the Share Transfer, the DK Interest, the TPR Interest, the 2008 Letter Agreement, or any matters, through the date of this Agreement.and such claim is unsuccessful, then the prevailing defendant, cross-claim defendant, counterclaim-defendant or arbitration respondent shall be entitled to recover its post-Agreement costs, expenses (including, without limitation, the reasonable costs of retaining experts or professional consultants) and reasonable attorneys' fees, in addition to all other remedies available to such Party.

9.    <u>Interpretation</u>.  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law.  No term shall be construed against any Party as drafter.

10.    <u>Further Assurances</u>. Each of the Parties agrees to execute and deliver, or to cause to be executed and delivered, all such instruments, and to take all such action as the other Party may reasonably request, in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement.

11.    <u>Modification and Waiver</u>.  This Agreement may be amended or modified only by a written instrument signed by each of the Parties.  No waiver of any provision of this Agreement by a Party shall be effective unless embodied in a written instrument

-6-

DG 01106

signed by such Party. The waiver by any of the Parties of any breach of this Agreement shall not be deemed a waiver of any prior or subsequent breach of this Agreement.

12.    Entire Agreement.  This Agreement constitutes the entire agreement between the Parties regarding the subject matter herein, superseding all prior oral or written representations, negotiations, understandings and agreements, on the subject matter herein.

13.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall be considered one instrument and shall become binding when one or more counterparts have been signed by each of the Parties and delivered to the other.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date indicated below.

TPR Investment Associates, Inc.

By: _____
Date: _____

The Orly Genger 1993 Trust

By: _Dalia Genger_ _Trustee_
Date: _Oct 2, 2011_

D&K LP

By: _Its general partner, manager_
Date: _10/3/11_

-7-

DG 01107

# EXHIBIT A

DG 01108

# PROMISSORY NOTE

$4,000,000

October 3, 2011

FOR VALUE RECEIVED, the undersigned, the Orly Genger 1993 Trust ("Borrower"), by way of its current sole trustee, Dalia Genger, promises to pay to TPR Investment Associates, Inc., a Delaware corporation ("Lender") the sum of $4,000,000 ("Principal") together with interest thereon at the rate of three percent (3%) percent per annum, payable as follows, and further covenants, to Lender, as follows:

The Principal together with all interest accrued thereon shall be due and payable to, or to the order of, Lender on the earliest of:

    (i)    November 1, 2012;

    (ii)    Immediately upon Borrower's receipt of the proceeds from the sale of TRI shares either pursuant to the interpleader action pending in the United States District Court for the Southern District of New York (the "Court") in *Pedowitz v. TPR*, 11 Civ. 5602, or otherwise.

Notwithstanding anything to the contrary herein or in the parties' accompanying Settlement Agreement, to the extent that the Court awards Lender any of the interpleaded funds, Lender shall first retain such funds to the extent necessary to pay down this Note in full, and then transfer any remaining funds to Borrower.

The occurrence and continuation of any one or more of the following events shall constitute an event of default under this New Note ("Event of Default"):

    (a)    <u>Payment Default</u>. Borrower shall fail to make any required payment due in connection with this New Note.

    (b)    <u>Third Party Lien or Caveat</u>. The creation of a lien on Borrower's property, or the entry of a caveat (which Lender deems material), that has not been removed ten (10) days of its creation.

    (c)    <u>Change of Trustee</u>. The resignation, removal, or otherwise change of trustee of Borrower.

    (d)    <u>Bankruptcy Default</u>. The Borrower shall (i) commence any case, proceeding or other action under any existing or future law of any jurisdiction relating to seeking to have an order for relief entered with respect to it or its debts, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other such relief with respect to it or its debts, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or substantially all of its assets (each of

DG 01109

the foregoing, a "Bankruptcy Action"); (ii) become the debtor named in any Bankruptcy Action which results in the entry of an order for relief or any such adjudication or appointment described in the immediately preceding clause (i), or remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) make a general assignment for the benefit of its creditors.

In each and every Event of Default, the Lender may, without limiting any other rights it may have at law or in equity, by written notice to the Borrower, declare the unpaid Principal of and Interest on this New Note due and payable, whereupon the same shall be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which the Borrower hereby expressly waives, and the Lender may proceed to enforce payment of such Principal and Interest or any part thereof in such manner as it may elect in its discretion.

This Note may be prepaid in whole or in part at any time without premium or penalty.

All prepayments shall be applied first to interest, then to principal payments in the order of their maturity.

The undersigned agrees to pay all costs and expenses, including all reasonable attorneys' fees, for the collection of this Note upon default. All payments shall be made at 1211 Park Avenue, New York, NY, 10128, or at such other place as the holder hereof may from time to time designate in writing.

Upon default, whether pursuant to an Event of Default or otherwise, the interest rate shall be increased to an amount ("Overdue Rate") equal to the maximum legal rate of interest permitted by applicable law.

If this New Note is not paid when due, Borrower promises to pay all costs and expenses of collection and attorneys' fees incurred by the holder hereof on account of such collection, whether or not suit is filed thereon. Borrower consents to renewals, replacements and extensions of time for payment hereof; before, at, or after maturity; consents to the acceptance, release or substitution of security for this note, and waives protest, presentment, demand for payment, notice of default or nonpayment and notice of dishonor and the right to assert any statute of limitations. The indebtedness evidenced hereby shall be payable in lawful money of the United States.

This New Note shall be governed by, and shall be construed and enforced in accordance with, the laws of the state of Delaware without giving effect to the conflict of law rules thereof, and shall be adjudicated before the appropriate Courts of the State of Delaware.

THE ORLY GENGER 1993 TRUST

DG 01110

## AMENDED AND RESTATED SETTLEMENT AGREEMENT

This AMENDED AND RESTATED SETTLEMENT AGREEMENT (the "Agreement") is entered into as of March 16, 2012, by and among TPR Investment Associates, Inc., a Delaware corporation ("TPR"), the Orly Genger 1993 Trust, a trust settled on December 13, 1993, with Dalia Genger currently serving as trustee (the "OG Trust"), and D&K LP, a limited partnership ("DK") (collectively, the "Parties"; each, a "Party").

WHEREAS, this Agreement amends and restates the Settlement Agreement entered into by the same parties on October 3, 2011 and sets forth all current understandings and replaces all former understandings between the OG Trust, on the one hand, and any other Party or Parties hereto, on the other hand;

WHEREAS, TPR and OG Trust entered into an agreement on or about October 29, 2004 (the "Share Transfer"), whereby TPR contracted to sell to the OG Trust 1,102.8 shares of Trans Resources, Inc., a Delaware corporation ("TRI" and the "TRI Shares"); and

WHEREAS, TPR relied on representations by Arie Genger that the liabilities stemming from the "Bogolusa Lawsuit" against TPR, TRI and Arie Genger personally exceeded the combined assets of TRI and TPR by at least $30 million, implying that TRI was worthless (the "Bogolusa Representation"); and

WHEREAS, Arie Genger further represented that the Share Transfer only required the consent of TPR, and that no further consents were required by any third party (the "Transferability Representation"); and

WHEREAS, in reliance on both the Bogolusa Representation and the

-1-

DG 01111

Transferability Representation, TPR and the OG Trust agreed that OG Trust would pay

TPR, for the Share Transfer, a consideration in the amount of one dollar per share; and

WHEREAS, the Bogolusa Representation was subsequently deemed false, as

determined by Judge Leo Milonas in arbitration proceeding between Arie Genger and

Dalia Genger in her personal capacity; and whereas in said arbitration proceeding Judge

Milonas concluded that the value of the net assets of TRI as of October 2004 was

approximately $55 million ("Milonas Value"), implying a possible value for the 1,102.8

TRI Shares of $10.3 million as of that same date (without discount to reflect a minority

interest); and

WHEREAS, the Supreme Court of Delaware has recently affirmed the findings of

the Delaware Chancery Court that the Transferability Representation was false, that

pursuant to a Shareholder Agreement of TRI, which was entered into as of March 30,

2001, while Arie Genger controlled both TPR and TRI (the "TRI Shareholders

Agreement"), the consent of other TRI shareholders (collectively, the "Trump Group")

was required, that Arie Genger failed to provide such notice as required; and that TPR

therefore remained the lawful record owner of the TRI Shares; and

WHEREAS, the Trump Group is claiming that beneficial ownership of the TRI

Shares was not lawfully transferred to the OG Trust, a claim the Courts have not yet

finally resolved; and

WHEREAS, the OG Trust is a guarantor of a certain Promissory Note in favor of

TPR dated as of December 21, 1993, made by D&K Limited Partnership in the face value

of $8,950,000 (the "1993 Note"); and

WHEREAS, following a partial foreclosure, approximately $4.5 million of the

-2-

amount currently due and owing under the 1993 Note remains guaranteed by the OG Trust; and

WHEREAS Orly Genger, as beneficiary of the OG Trust, filed a Complaint in the New York State Supreme Court, which she personally verified on July 8, 2009 as truthful to her own knowledge, alleging that if the Delaware litigation resulted in a determination that the TRI shares were not transferred but remained with TPR the value of TPR's shares would increase by $250 to $350 million, so that the OG Trust's claimed beneficial ownership interest in the TRI Shares could be over $200 million; and

WHEREAS Orly Genger, as beneficiary of the OG Trust, earlier submitted a letter to the Surrogate's Court on November 8, 2008, stating that the TRI shares that TPR had contracted in 2004 to sell to the Sagi Genger 1993 Trust (the same number of shares that TPR had simultaneously contracted to sell to the OG Trust) were worth "in excess of $150,000,000"; and

WHEREAS, the OG Trust seeks to secure the economic benefit of its claimed beneficial ownership interest in the TRI Shares, which Orly Genger, as set forth above, has previously valued at $150-200 million; and

WHEREAS, pursuant to a letter agreement dated August 22, 2008 (the "2008 Letter Agreement"), TPR executed documents to transfer the TRI Shares to the Trump Group at the Milonas Value; and

WHEREAS, TPR believes that the transfer pursuant to the 2008 Letter Agreement is final, but the OG Trust reserves the right to challenge the Trump Group's title to the TRI Shares or alternatively claim the proceeds of the sale from the TRI Shares to the Trump Group, net of amounts due under the 2011 Note (as defined hereunder); and

-3-

DG 01113

WHEREAS, at a hearing before the New York State Supreme Court on September 13, 2011, counsel for Orly Genger in her personal capacity expressed to the Court his client's concern that the value of the OG Trust's claimed beneficial ownership interest in the TRI Shares would be "diminished" by litigation positions to be taken by TPR before the Delaware Chancery Court;

WHEREAS, TPR, the OG Trust, and DK now seek to finally settle all other disputes and controversies that exist among them, in such a manner as to: (a) resolve Orly Genger's concern by having TPR relinquish any interest in the TRI Shares and thereby enable the OG Trust to fully pursue the economic value of its claimed beneficial ownership interest in the TRI Shares; and (b) eliminate, or at least reduce, the drain on all sides' resources from the endless litigation of these issues in multiple forums;

NOW, THEREFORE, in consideration of the promises and commitments set forth herein, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.   Consideration.  In exchange for the consideration set forth herein: (a) TPR hereby relinquishes in favor of the OG Trust any economic interest in the TRI Shares and assigns to the OG Trust its right to any economic benefits of the TRI shares including any proceeds from the sale thereof, including but not limited to the $10.3 million in proceeds otherwise owing to TPR in the future pursuant to the terms of the August 22, 2008 letter agreement; (b) the OG Trust – irrespective of any claim made or asserted on its behalf by Orly Genger – hereby transfers to TPR its limited partnership interest in DK (the "DK Interest"), and disclaims any interest in, any shares of or TPR, either directly or indirectly through DK (the "TPR Interest"); (c) TPR has paid $100,000 for the legal fees of the OG

-4-

DG 01114

Trust; and (d) DK and TPR agree that all rights of DK and/or TPR vis-à-vis the OG Trust created by (i) the Amended and Restated Limited Partnership Agreement of D&K Limited Partnership dated as of October 30, 2004 and signed November 22, 2007, and/or (ii) the Meeting of Partners of D&K L.P. January 31, 2009 & Agreement, are canceled and void *ab initio*.

2.    2011 Note.    The OG Trust is hereby released from any obligation under or as guarantor of the 1993 Note currently payable and owing in the amount of $4.5 million or the D&K Partnership Agreement, and the 1993 Note is hereby cancelled and replaced by an updated new promissory note, from the OG Trust in favor of TPR, substantially in the form attached hereto as Exhibit A, in the amount of $4.0 million (the "2011 Note"). TPR hereby relinquishes its claim to the remaining approximately $500,000 due under the 1993 Note. The terms of the 2011 Note are incorporated by reference as if fully set forth herein.

3.    Mutual Releases.    The parties to this Settlement Agreement hereby irrevocably and fully release one another, including all current and former directors, officers, trustees, fiduciaries, agents, advisors and other representatives of each of the parties, as well as their shareholders, their partners, and/or their subsidiaries, who have served at any time from November 1, 2004 to the present day, whether for acts in their fiduciary or individual capacities, and their respective successors and assigns, from all claims, causes of action, lawsuits, demands, liability of any kind, asserted or unasserted, known or unknown, suspected or unsuspected, direct or derivative, in connection with the 1993 Note, the TRI Shares, the Share Transfer, the DK Interest, the TPR Interest, the 2008 Letter Agreement, or any other matters,

-5-

DG 01115

through the date of this Agreement. Nothing herein shall release any rights under this Agreement. Nothing herein shall release any claim or defense that any Party hereto has or may have as against any of the following persons and entities: Glenclova Investment Co., TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Jules Trump, Eddie Trump, Mark Hirsch, Trans-Resources, Inc., Avi Pelossof, William Dowd, Lawrence Small, Robert Smith, Arie Genger, Edward Klimerman, SNR Denton (along with its predecessor firms and all current and former partners thereof), and/or any other non-Party person who currently is litigating claims against any of the parties hereto.

4.   <u>Binding Nature</u>. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

5.   <u>Titles</u>. Titles and headings to articles, sections or paragraphs in this Agreement are inserted for convenience of reference only and are not intended to affect the interpretation or construction of the Agreement.

6.   <u>Choice of Law and Forum</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to its conflicts of laws principles. The parties hereto hereby irrevocably and unconditionally submit, for themselves and their respective property, to the non-exclusive jurisdiction of the state and federal courts located in Wilmington, Delaware.

7.   <u>Attorney's Fees</u>. In the event that, following execution of this Agreement, a Party hereto, or a beneficiary of a Party hereto for the benefit of that Party, either asserts a new claim or continues to pursue an existing claim (including, without limitation, any claim asserted in an arbitral proceeding, proceeding for the obtaining of

-6-

DG 01116

provisional remedies, trial, appeal or enforcement proceeding) against another Party hereto concerning, arising out of, or relating to this Agreement, the 1993 Note, the TRJ Shares, the Share Transfer, the DK Interest, the TPR Interest, the 2008 Letter Agreement, or any matters, through the date of this Agreement and such claim is unsuccessful, then the prevailing defendant, cross-claim defendant, counterclaim-defendant or arbitration respondent shall be entitled to recover its post-Agreement costs, expenses (including, without limitation, the reasonable costs of retaining experts or professional consultants) and reasonable attorneys' fees, in addition to all other remedies available to such Party.

8.    Interpretation. Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law. No term shall be construed against any Party as drafter.

9.    Further Assurances. Each of the Parties agrees to execute and deliver, or to cause to be executed and delivered, all such instruments, and to take all such action as the other Party may reasonably request, in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement.

10.    Modification and Waiver. This Agreement may be amended or modified only by a written instrument signed by each of the Parties. No waiver of any provision of this Agreement by a Party shall be effective unless embodied in a written instrument signed by such Party. The waiver by any of the Parties of any breach of this Agreement shall not be deemed a waiver of any prior or subsequent breach of this Agreement.

11.    Entire Agreement. This Agreement constitutes the entire agreement between the Parties regarding the subject matter herein, superseding all prior oral or written representations, negotiations, understandings and agreements, on the subject

-7-

DG 01117

matter herein.

12.    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall be considered one instrument and shall become binding when one or more counterparts have been signed by each of the Parties and delivered to the other.

13.    Confidentiality. This Agreement and its terms are confidential.

14.    Additional Covenant. DK covenants that it has received authorization from the Sagi Genger 1993 Trust to enter into this Agreement, to the extent such authority is required.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date indicated below.

TPR Investment Associates, Inc.

By: _Yoav Sternberg_
Date: _16.2.17_

The Orly Genger 1993 Trust

By: _Dalia Weese_, Trustee
Date: _March 16, 2012_

D&K LP

By: _Manager of GP_
Date: _March 16, 2012_

-8-

DG 01118

**PROMISSORY NOTE**

$4,000,000

October 3, 2011

FOR VALUE RECEIVED, the undersigned, the Orly Genger 1993 Trust ("Borrower"), by way of its current sole trustee, Dalia Genger, promises to pay to TPR Investment Associates, Inc., a Delaware corporation ("Lender") the sum of $4,000,000 ("Principal") together with interest thereon at the rate of three percent (3%) percent per annum, payable as follows, and further covenants, to Lender, as follows:

The Principal together with all interest accrued thereon shall be due and payable to, or to the order of, Lender on the earliest of:

    (i)    November 1, 2012;

    (ii)    Immediately upon Borrower's receipt of the proceeds from the sale of TRI shares either pursuant to the interpleader action pending in the United States District Court for the Southern District of New York (the "Court") in *Pedowitz v. TPR*, 11 Civ. 5602, or otherwise.

Notwithstanding anything to the contrary herein or in the parties' accompanying Settlement Agreement, to the extent that the Court awards Lender any of the interpleaded funds, Lender shall first retain such funds to the extent necessary to pay down this Note in full, and then transfer any remaining funds to Borrower.

The occurrence and continuation of any one or more of the following events shall constitute an event of default under this New Note ("Event of Default"):

    (a)    <u>Payment Default</u>. Borrower shall fail to make any required payment due in connection with this New Note.

    (b)    <u>Third Party Lien or Caveat</u>. The creation of a lien on Borrower's property, or the entry of a caveat (which Lender deems material), that has not been removed ten (10) days of its creation.

    (c)    <u>Change of Trustee</u>. The resignation, removal, or otherwise change of trustee of Borrower.

    (d)    <u>Bankruptcy Default</u>. The Borrower shall (i) commence any case, proceeding or other action under any existing or future law of any jurisdiction relating to seeking to have an order for relief entered with respect to it or its debts, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other such relief with respect to it or its debts, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or substantially all of its assets (each of

DG 01119

the foregoing, a "Bankruptcy Action"); (ii) become the debtor named in any Bankruptcy Action which results in the entry of an order for relief or any such adjudication or appointment described in the immediately preceding clause (i), or remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) make a general assignment for the benefit of its creditors.

In each and every Event of Default, the Lender may, without limiting any other rights it may have at law or in equity, by written notice to the Borrower, declare the unpaid Principal of and interest on this New Note due and payable, whereupon the same shall be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which the Borrower hereby expressly waives, and the Lender may proceed to enforce payment of such Principal and interest or any part thereof in such manner as it may elect in its discretion.

This Note may be prepaid in whole or in part at any time without premium or penalty.

All prepayments shall be applied first to interest, then to principal payments in the order of their maturity.

The undersigned agrees to pay all costs and expenses, including all reasonable attorneys' fees, for the collection of this Note upon default. All payments shall be made at 1211 Park Avenue, New York, NY, 10128, or at such other place as the holder hereof may from time to time designate in writing.

Upon default, whether pursuant to an Event of Default or otherwise, the interest rate shall be increased to an amount ("Overdue Rate") equal to the maximum legal rate of interest permitted by applicable law.

If this New Note is not paid when due, Borrower promises to pay all costs and expenses of collection and attorneys' fees incurred by the holder hereof on account of such collection, whether or not suit is filed thereon. Borrower consents to renewals, replacements and extensions of time for payment hereof, before, at, or after maturity; consents to the acceptance, release or substitution of security for this note, and waives protest, presentment, demand for payment, notice of default or nonpayment and notice of dishonor and the right to assert any statute of limitations. The indebtedness evidenced hereby shall be payable in lawful money of the United States.

This New Note shall be governed by, and shall be construed and enforced in accordance with, the laws of the state of Delaware without giving effect to the conflict of law rules thereof, and shall be adjudicated before the appropriate Courts of the State of Delaware.

*Dalia Genger*

THE ORLY GENGER 4993 TRUST

DG 01120

FILED: NEW YORK COUNTY CLERK 08/13/2050     INDEX NO. 109749/2009
NYSCEF DOC. NO. 259                                    RECEIVED NYSCEF: 08/13/2012

EXECUTION VERSION

BILL OF SALE
AND
ASSIGNMENT OF PROMISSORY NOTE

**BILL OF SALE AND ASSIGNMENT OF PROMISSORY NOTE** dated May 15, 2012 (this "**Assignment**"), is being delivered by TPR INVESTMENT ASSOCIATES, INC., a Delaware corporation ("**Assignor**"), to MANHATTAN SAFETY COMPANY, LTD., a corporation organized under the laws of St. Kitts, W.I. ("**Assignee**").

**KNOW ALL BY THESE PRESENTS**, that for good and valuable consideration given and received, Assignor does hereby sell, transfer, convey, assign and deliver to, and vest in, Assignee all of Assignor's right, title and interest in and to that certain Promissory Note dated October 2, 2011 in the original principal amount of Four Million Dollars and No Cents ($4,000,000.00), having the Orly Genger 1993 Trust (the "**Trust**"), acting through Dalia Genger as its sole trustee (the "**Trustee**"), as the maker and Seller as the payee, as amended by that certain Amendment Agreement dated as of October 3, 2011 (as so amended, the "**Note**").

Nothing contained in this Assignment shall be deemed to create any new right or obligation, or expand or affect any of the existing rights and obligations, of the maker or payee under the Note.

Assignor agrees to take such actions, including but not limited to the execution and delivery such instruments or other documents and take such other actions as shall be reasonably necessary to carry out the purposes and intent of this Assignment.

This Assignment shall be binding upon Assignor and inure to the benefit of the Assignee and their respective successors and assigns.

This Assignment shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to its choice of law provisions.

[SIGNATURE PAGE FOLLOWS]

FTL.DOCS 5926525 5

**IN WITNESS WHEREOF**, Assignor has caused this Bill of Sale and Assignment of Note to be executed and delivered as of the date first above written.

ASSIGNOR:

TPR INVESTMENT ASSOCIATES, INC.,
a Delaware corporation

By: _____
Yonit Sternberg, Vice President

_____ )
                       )SS:
_____ )

The foregoing instrument was acknowledged before me this ___ day of _____, 2012 by Yonit Sternberg, as Vice President of TPR Investment Associates, Inc., a Delaware corporation, on behalf of and as an act of said entity. He is personally known to me or has produced a driver's license as identification.

_____
Print or Stamp Name: _____
Notary Public, _____
Commission No.: _____
My Commission Expires: _____

**Acknowledged and Accepted:**

MANHATTAN SAFETY COMPANY, LTD.,
a corporation organized under the laws of St. Kitts, W.I.

_____          _____
Greg Gilpin-Payne, President     Witness: Leah Crag-Chaderton

                                 _____
                                 Witness: Yulanda Vanterpool

- 2 -

IN WITNESS WHEREOF, Assignor has caused this Bill of Sale and Assignment of Note to be executed and delivered as of the date first above written.

ASSIGNOR:

TPR INVESTMENT ASSOCIATES, INC., a Delaware corporation

By: _____
      Yonit Sternberg, Vice President

_____ )
                )SS:
_____ )

The foregoing instrument was acknowledged before me this 13 day of MAY, 2012 by Yonit Sternberg, as Vice President of TPR Investment Associates, Inc., a Delaware corporation, on behalf of and as an act of said entity. He is personally known to me or has produced a driver's license as identification.

_____

**DAVID A. PARNES**
Advocate, Israel Bar
License No. 22585

Print or Stamp Name: _____
Notary Public: _____
Commission No.: _____
My Commission Expires: _____

**Acknowledged and Accepted:**

MANHATTAN SAFETY COMPANY, LTD.,
a corporation organized under the laws of St. Kitts, W.I.

_____
Greg Gilpin-Payne, President

_____
Witness: Leah Crag-Chaderton

_____
Witness: Yulanda Vanterpool

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER, as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA § 711(11)

File No. 0017/2008

---

## SWORN STATEMENT OF ORLY GENGER
## IN SUPPORT OF HER ORDER TO SHOW CAUSE

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK  )

**ORLY GENGER**, being duly sworn, deposes and says the following:

1.    I am the Petitioner (the "Petitioner") in the above-captioned proceeding. I am also the sole present beneficiary of the Orly Genger 1993 Trust (the "Orly Trust"). Respondent, Dalia Genger ("Dalia")[1], is my mother and the sole Trustee of the Orly Trust.

2.    The relief I seek is narrow, but crucial – to continue restraining Dalia from prosecuting an unnecessary, duplicative litigation specifically designed to destroy the only asset in my Orly Trust she has not already destroyed. Sixteen months ago, the New York Supreme Court immediately stayed this "Delaware Chancery Action," and it remains partially restrained to this day. I simply ask that this Court stay Dalia from proceeding with the Delaware Chancery Action until my Petition to remove her is decided.

## THE REQUESTED RELIEF

3.    I submit this Affidavit in support of my Order to Show Cause and Motion (the "Motion") for an Order:

---

[1] Unless otherwise defined herein, capitalized terms utilized in this Affidavit shall have the same meanings ascribed to them as in the Third Amended Petition (the "TAP").

(a) Granting Petitioner's Motion for a preliminary injunction enjoining Dalia, together with any and all of her agents, assigns, employees, representatives, attorneys, and/or anyone acting on Dalia's behalf either directly or indirectly or in concert with her, from: (i) proceeding with and/or taking any action of any kind or nature, with respect to the action Dalia previously commenced in the Delaware Chancery Court entitled, *"Dalia Genger as Trustee of the Orly Genger 1993 Trust v. TR Investors LLC*, C.A. No. 6906-CS" (the "Delaware Chancery Action") including, but not limited to, the continuation of the prosecution of said Delaware Chancery Action; and, (ii) proceeding with any other existing actions or proceedings and/or commencing any future actions or proceedings in the Delaware Chancery Court, and/or any other local, state or federal courts on behalf of the Orly Trust (other than those actions and proceedings which are already pending in the Supreme Court of the State of New York, County of New York) which concern, relate to, pertain to and/or have any effect whatsoever upon any and all assets of the Orly Trust including, but not limited to, the Orly Trust's direct, indirect or beneficial interests in Trans-Resources, Inc. and TPR Investment Associates, Inc; and,

(b) Granting such other and further relief as this Court deems to be just, equitable and proper.

4.    I am also requesting that pending the hearing and determination of this Motion and until further Order of this Court, Dalia Genger, as Trustee, and any and all of her agents, assigns, employees, representatives, attorneys, and/or anyone acting on Dalia's behalf either directly or indirectly or in concert with her are hereby temporarily restrained from: (i) proceeding with and/or taking any action with respect to the Delaware Chancery Action; (ii) proceeding with any other existing actions or proceedings and/or commencing any future actions or proceedings in the Delaware Chancery Court, and/or any other local, state or federal courts on behalf of the Orly Trust (other than in those actions and proceedings which are already pending in the Supreme Court of the State of New York, County of New York) which concern, relate to, pertain to and/or have any effect whatsoever upon any and all assets of the Orly Trust including, but not limited to, the Orly Trust's direct, indirect or beneficial interests in Trans-Resources, Inc. and TPR Investment Associates, Inc., together with such other and further relief as this Court deems to be just, equitable and proper.

## WHY A PRELIMINARY INJUNCTION AND TEMPORARY
## RESTRAINING ORDER ARE NEEDED

5.    I need a preliminary injunction and temporary restraining order to enjoin
Dalia, from, *inter alia*, continuing to prosecute the Delaware Chancery Action she filed as part
of legal maneuver to rob the New York Supreme Court of jurisdiction. Dalia's prosecution of
the Delaware Chancery Action: (i) is an unnecessary waste of Orly Trust assets; (ii) will rob
me of my chosen forum; (iii) is an integral part of her scheme with my brother, Sagi Genger
("Sagi"), to pledge, encumber, transfer, dissipate and loot all of Orly Trust's assets; (iv) is an
egregious breach of her fiduciary duties to me and the Orly Trust; and, (v) will result in
irreparable injury to me and the Orly Trust.

6.    Dalia purports to bring this Delaware Chancery Action to obtain a
declaration that the Orly Trust beneficially owns the Orly Trust TRI Shares (defined below).
However, the same Delaware Chancery Court previously ruled <u>against</u> the Orly Trust,
determining the Orly Trust <u>did not have</u> a beneficial ownership interest in the Orly Trust TRI
Shares.

7.    The Delaware Supreme Court overturned this ruling on a crucial
technicality, finding that the Chancery Court lacked personal jurisdiction over the Orly Trust
because the Orly Trust was not a party to that action. <u>Dalia's Delaware Chancery Action is
designed to cure this jurisdictional defect that protects the Orly Trust, and subject the Orly
Trust to the jurisdiction of a court that already has ruled against the Orly Trust.</u> There is no
other reason for Dalia bringing this action in Delaware, instead of New York.

8.    If Dalia is allowed to continue her prosecution of the Delaware Chancery
Action, a Court pre-disposed and almost certain to rule against the Orly Trust's interests, the
Orly Trust TRI Shares will be stripped from the Orly Trust and revert back to TPR (<u>i.e.</u>, to my
brother, Sagi).[2]  Indeed, as set forth below, Dalia's past actions show that she has previously

---

[2] As set forth in my TAP, Dalia was responsible for improperly placing Sagi in complete control over TPR, and
thus, in a position of power over Petitioner by allowing Sagi to control the management and majority ownership of
TPR. Thus, for all practical purposes, TPR and Sagi are one and the same. <u>What benefits TPR benefits Sagi.</u> Dalia
and TPR (<u>i.e.</u> Sagi) previously orchestrated the sham foreclosure sale of the Orly Trust's only other significant asset,

taken action to dissipate the Orly Trust's assets in contravention of her fiduciary duties to me, as the sole present beneficiary. As a result, Dalia should not be allowed to take further action to harm me by continuing to prosecute the Delaware Chancery Action in a venue and in a manner that is contrary to my interests.

9.   Beneficial ownership should be decided in New York, in an action brought and prosecuted by me, rather than by someone like Dalia who already has shown herself unfit to be Trustee. (For a full description of Dalia's various wrongful acts as a trustee, see the TAP and the Hochberg Affirmation filed contemporaneously herewith). Indeed, the Delaware Supreme Court stated that who owns the Orly Trust TRI Shares should be determined in New York – where my New York TRI Action (defined below) is pending. Ignoring this instruction, Dalia is wasting my Orly Trust assets by hiring additional Delaware counsel to start a new proceeding in a foreign jurisdiction, rather than just proceeding in New York. The Delaware Chancery Action has been stayed for over a year without prejudice to Dalia or the Orly Trust, and all other parties to the Delaware Chancery Action remain stayed.

10.   Finally, there is no reason why Dalia must prosecute the Delaware Chancery Action now, prior to the Surrogate Court ruling on my petition to remove Dalia.

11.   Dalia <u>now</u> claims a recent decision as to her personally now allows her to continue her harmful Delaware Chancery Action as the Trustee of my Orly Trust. She is wrong. This motion to restrain Dalia follows.

## I COMMENCED THE NEW YORK TRI ACTION ON BEHALF OF THE ORLY TRUST TO PROTECT MY INTERESTS IN THE ORLY TRUST TRI SHARES

12.   In 2004 as part of my father Arie and mother Dalia's divorce settlement,

---

its interest in shares of TPR which caused the Orly Trust's interest in the shares to be stripped away. Petitioner commenced a separate action against Dalia, TPR and Sagi as a result of their actions taken in regard to this sham foreclosure sale which is still pending before the Court in New York (defined in the TAP as the "New York TPR Action"). Dalia and Sagi's scheme to strip away the Orly Trust's shares of TPR is also connected to their scheme to strip the Orly Trust of the Orly Trust TRI Shares, because Sagi's control over TPR also means control over the Orly Trust TRI Shares.

TPR transferred its 52.85% interest in TRI[3] as follows: (i) 13.99% to Arie (the "Arie TRI Shares"); (ii) 19.43% to the Orly Trust (previously defined as the "Orly Trust TRI Shares"); and, (iii) 19.43% to the Sagi Trust (the "Sagi Trust TRI Shares"), (collectively, the "2004 Genger TRI Transfer")[4] The 2004 Genger TRI Transfer was also made in furtherance of the Genger family estate plan that both my brother, Sagi, and I should share equally in the family's wealth.[5]

13.    Unbeknownst to me, in August 2008, Rochelle Fang, the Trustee of the Sagi Trust for only two weeks (and Sagi's mother-in-law) and Sagi, as President of TPR, attempted to sell the Sagi Trust TRI Shares to various entities controlled directly and indirectly by Jules and Eddie Trump (the "Trump Group") for the sum of $26.7 million dollars.[6]

14.    At the same time and without my prior knowledge, Sagi, as President of TPR, entered into a letter agreement dated August 22, 2008 with the Trump Group (the "Side Letter Agreement"). Pursuant to the Side Letter Agreement, TPR (controlled by Sagi) purportedly agreed to sell the Orly Trust TRI Shares to the Trump Group at a price that was $10.3 million dollars - approximately 60% less than the Trump Group paid for the Sagi Trust TRI Shares.[7] Annexed hereto as **Exhibit "1"** is a copy of the Side Letter Agreement.

15.    After executing the Side Letter Agreement, the Trump Group commenced

---

[3] TRI is a successful and valuable company which was formed by Arie and is engaged in the business of manufacturing specialty chemical products for agricultural and industrial end uses. Upon information and belief, in 2008, TRI had after tax earnings in excess of $150,000,000 and sales of approximately $1 billion dollars. Thus, the Orly Trust TRI Shares are an extremely valuable asset which are worth in excess of tens of millions of dollars.

[4] The Orly Trust and the Sagi Trust each granted Arie an irrevocable lifetime voting proxy over their respective shares of TRI. (See TAP, **Exhibit "C"**). The intent behind the voting proxies and the Genger's divorce Settlement Agreement was for Arie to maintain majority 58.85% controlling voting rights for the Arie TRI Shares, the Orly Trust TRI Shares and the Sagi Trust TRI Shares for the duration of his life.

[5] Dalia has acknowledged in prior pleadings and sworn testimony (as recently as December 13, 2012) that it was always her and Arie's original intent to equally distribute their wealth to both me and Sagi. See, e.g., TAP, **Exhibit "I,"** p. 26 (excerpt from Dalia's Pre-Trial Memorandum); Petitioner's Opposition Affidavit, **Exhibit "JJ,"** p. 148:4-11 (Dalia 12/13/12 Dep Tr.); Petitioner's Opposition Affidavit, **Exhibit "KK,"** ¶ 8 (Dalia 03/11/08 Aff.). Of course, as set forth in my papers, Dalia has worked hard to make sure, despite her words to the contrary, everything I have goes to Sagi.

[6] The Trump Group owned the 47.15% remaining minority interest in TRI.

[7] Under the Side Letter Agreement, Sagi-controlled TPR also purported to sell the Arie TRI Shares, once again for a fraction of what the Trump Group paid for the Sagi Trust TRI Shares, without Arie Genger's knowledge or consent.

a special proceeding under Section 225 of the Delaware General Corporation Law in the Delaware Chancery Court, seeking a determination of the composition of TRI's board of directors and who had the right to vote TRI's shares of common stock. (See *TR Investors, LLC et al v. Arie Genger and TPR Investment Associates, Inc.*, Delaware Chancery Court, Civil Action No. 6697-CS, the "TRI Chancery Action.") In the TRI Chancery Action, Sagi and TPR (controlled by Sagi) aligned himself with the Trump Group. Sagi and TPR (controlled by Sagi) also have aligned themselves with the Trump Group in the New York TRI Action.

16.   By decision dated August 9, 2010 (which amended an earlier decision dated July 23, 2010), the Delaware Chancery Court held, among other things, that the 2004 Genger TRI Transfer by TPR was void and that Arie and the Orly Trust had no beneficial ownership interest in the Arie TRI Shares or the Orly Trust TRI Shares even though neither the Orly Trust nor I were parties to that case (the "August 2010 Delaware Decision"). Annexed hereto as **Exhibit "2"** is a copy of the August 2010 Delaware Decision.

17.   In July 2009, I renewed my Petition to remove Dalia as Trustee of the Orly Trust by commencing this proceeding. In connection with my petition to remove Dalia, I obtained an Order from this Court that expressly prohibited Dalia from taking any action which "...otherwise alter[s] the Orly Trust's interests in TRI at least ten days prior to such act" (the "July 2009 Order"). Annexed hereto as **Exhibit "3"** is a copy of the July 2009 Order.

18.   In response to TPR (i.e Sagi's) attempts to sell the Orly Trust TRI Shares without my knowledge or consent, I commenced an action entitled *Arie Genger and Orly Genger, in her individual capacity and on behalf of The Orly Genger 1993 Trust v. Sagi Genger, TPR Investment Associates, Inc., Dalia Genger, The Sagi Genger 1993 Trust, Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, Jules Trump, Eddie Trump and Mark Hirsch*, Index No. 651089/2010 (the "New York TRI Action") on July 26, 2010, seeking, among other things, a determination that the Orly Trust was the beneficial owner of the Orly Trust TRI Shares.

19.   On July 28, 2011, the Delaware Supreme Court ultimately reversed the

August Delaware Decision regarding Arie and the Orly Trust, finding that the Delaware Chancery Court lacked the necessary personal jurisdiction over Arie or the Orly Trust, and therefore, the Court <u>could not</u> determine the beneficial ownership of the Arie TRI Shares and the Orly Trust TRI Shares. The Delaware Supreme Court further held that the beneficial ownership of the Arie TRI Shares and the Orly Trust TRI Shares should be determined in a Court that had jurisdiction over all the indispensable parties. Indeed, the Delaware Supreme Court <u>did not remand</u> the TRI Chancery Action to the Delaware Chancery Court and stated instead that beneficial ownership of the Orly Trust TRI Shares should be decided in <u>New York</u>. Annexed hereto as **Exhibit "4"** is a copy of the Delaware Supreme Court's decision. (<u>See</u> Page 44 and Page 44, n.98)

## DALIA'S COMMENCED THE DELAWARE CHANCERY ACTION IN A DELIBERATE AND TRANSPARENT ATTEMPT TO <u>HARM THE ORLY TRUST AND PETITIONER</u>

20.   On October 4, 2011, <u>fifteen (15) months after I commenced the New York TRI Action</u> and <u>without informing me</u>, Dalia commenced the Delaware Chancery Action, seeking the same thing that I am seeking in the New York TRI Action: a determination that the Orly Trust is the beneficial owner of the Orly Trust TRI Shares. Annexed hereto as **Exhibit "5"** is a copy of Dalia's complaint in the Delaware Chancery Action.

21.   By commencing the Delaware Chancery Action without prior notice to me, Dalia knowingly violated this Court's July 2009 Order in this case. Specifically, Dalia did not give me any notice of her intention to commence the Delaware Chancery Action. If Dalia had told me of her intention to file the Delaware Chancery Action ten days before she filed it, <u>as this Court's Order requires</u>, I would have immediately sought a ruling from this Court to prevent her from filing the case.

22.   In addition, by filing the Delaware Chancery Action, Dalia specifically ignored the rulings of the New York Supreme Court that I had the authority to bring actions on behalf of the Orly Trust. Specifically, by Amended Decision dated July 28, 2010, the New

7

York Supreme Court found:

> Plaintiff argues, and none of the defendants dispute her, that as beneficiary of the Orly Genger 1993 Trust, she has the right to assert causes of action on behalf of the trust, citing *Velez v Feinstein*, 87 AD2d 309 (1st Dept. 1982) (where trustee has failed to enforce a claim on behalf of the trust, the beneficiary may do so)...Defendants' [including Dalia, Sagi and TPR] arguments in opposition are not persuasive.

(See Amended Decision and Order dated July 28, 2010, annexed hereto as **Exhibit "6"**, p. 4.) The New York County Supreme Court later recognized its prior ruling in an Amended Decision and Order dated January 2, 2013 in the New York TRI Action (See Amended Decision and Order dated January 2, 2013, annexed hereto as **Exhibit "7"**, p. 10.)

23.   In its July 28, 2010 Amended Decision, the New York Supreme Court also refused to dismiss claims for fraud, aiding and abetting fraud, and breach of fiduciary duty against Dalia, holding that I had asserted a credible, *prima facie* case against her for fraud. See Ex. 6, pp. 17-19.

24.   Further, by filing the Delaware Chancery Action in Delaware, Dalia specifically ignores the ruling of the Delaware Supreme Court's direction that the beneficial ownership of the Orly Trust TRI Shares should be determined in New York, where all indispensible parties, including me and the Orly Trust, are subject to jurisdiction. Both Dalia and I are residents of New York. In addition, the Orly Trust is a trust that was created by and governed by New York law. (See TAP, **Exhibit "A"**, copy of Orly Trust, Article Sixth (Governing Law)). Indeed, every party necessary to a determination of who owns the Orly Trust TRI Shares are parties to, and have appeared in the pending New York TRI Action. The Orly Trust would not be subject to jurisdiction in Delaware, absent Dalia's unilateral and improper attempt to submit the Orly Trust to Delaware jurisdiction.

25.   By filing the Delaware Chancery Action in Delaware, Dalia is affirmatively wasting Trust assets. To prosecute the Delaware Chancery Action, Dalia had to hire a separate set of Delaware lawyers, in addition to the New York lawyers that represent her

in her capacity as Trustee of the Orly Trust. Dalia's decision to file a complaint on behalf of the Orly Trust in Delaware is even more suspect when you consider that, only one year earlier, Dalia commenced an action on behalf of the Orly Trust in New York County Supreme Court entitled *DALIA GENGER, as Trustee on behalf of the Orly Genger 1993 Trust, and DALIA GENGER, in her individual capacity, v. ARIE GENGER*, Index No. 113862/2010, thus recognizing the New York Supreme Court's ability to protect the Orly Trust and decide all issues.

26. To "fund" her Delaware Chancery Action, Dalia has also jeopardized Trust assets, pledging millions of dollars to a mysterious St. Kitts entity, MSCo., and making her removal as Trustee a "condition of default" that will allow that entity to foreclose on all the Orly Trust's assets without notice anywhere in the world.

> Events of Default. It is expressly agreed that the entire principal amount of this Note, together with all accrued interest thereon, shall immediately become due and payable... upon the happening of any of the following events (each an "Event of Default"):
>
> ...
>
> (c) the resignation, removal or other change in the Trustee...

***

> 21. Jurisdiction. The Parties irrevocably agree that, should either Party [the Orly Trust or MSCo.] institute any legal action or proceeding in any jurisdiction ... each Party irrevocably agrees that it and its assets are, and shall be, subject to such legal action or proceeding in respect of its obligations under this Agreement.

Credit and Forbearance Agreement dated May 15, 2012, annexed hereto as **Exhibit "8"** at sec. § 21; and $4,420,000 Amended and Restated Promissory Note dated May 15, 2012, annexed hereto as **Exhibit "9"** at sec. 2.1, respectively.

27. Most troubling, during a recent deposition. Dalia could identify no other reason or jurisdiction for her Delaware Chancery Action. The best Dalia could do was to plead

9

that she chose to commence the Delaware Chancery Action in Delaware because "[T]hat's what my lawyer suggested to do." Annexed hereto as **Exhibit "10"** are true and complete copies of the December 13, 2012 and February 7, 2013 transcripts of Dalia's deposition (See pp. 107:8-25; 108:1-20.)

28.   This is not the first time Dalia's counsel, attorney Robert Meister, has tried to divest the New York Court of jurisdiction, acting against the interests of me and my Orly Trust. Specifically, on August 11, 2011, Mr. Meister's firm brought an interpleader action – apparently without telling Dalia (Dalia's February 7, 2013 deposition transcript, Exhibit 10, pp. 129:24-131:16)[8] – to try to divest the NY Court of jurisdiction. Unsurprisingly, the SDNY court labeled this maneuver, paid for by my Trust, and which I had to oppose with my own monies, both a "sham" and entirely "gratuitous," and summarily dismissed the Interpleader. (See Opinion and Order of SDNY Court dated June 14, 2012, annexed hereto as **Exhibit "11"** at pp. 38-39 (emphasis added) ("In this Court's view, the only way to put a stop to, or at least lessen, the forum shopping and jurisdictional sparring is for this Court to bow out of the race, abstain from entertaining these sham interpleader actions as a matter of equitable discretion, and let the state courts (likely the New York Supreme Court) proceed to the merits.")

29.   The facts (and common sense) demonstrate that Dalia's decision to commence the Delaware Chancery Action was not taken with my interests in mind. Indeed, the only possible explanation for Dalia's decision to commence the Delaware Chancery Action

---

[8] While Dalia now claims she did not know about, or authorize, the Interpleader, this cannot be true given that her purported "settlement" of the litigations I brought to protect my interests from her makes denial of the Interpleader a "condition of default . . "

> Manhattan hereby covenants and agrees that … Manhattan agrees to forbear from collection of amounts due and owing on the Note, … until the earliest to occur of (i) the date on which Dalia no longer serves as Trustee of the Trust, (ii) the final resolution of the Interpleader Action, or (iii) November 1, 2014

Credit and Forbearance Agreement dated May 15, 2012, Exhibit 7 at sec. 6.2 (emphasis added). Upon "default," $4.424 million of my Trust's assets becomes immediately due and payable to a mysterious St. Kitt's entity (MSCo.), and the rest of my Orly Trust assets become subject to foreclosure.

was to try to <u>lose</u> there, and cause beneficial ownership of the Orly Trust TRI Shares to go to TPR and Sagi instead).

## DALIA AND ALL OF THE CO-DEFENDANTS TO THE NEW YORK TRI ACTION HAVE BEEN ENJOINED BY JUSTICE FEINMAN FROM PURSUING THE DELAWARE CHANCERY ACTION

30.    When I learned of the Delaware Chancery Action, I immediately sought and obtained relief from the New York Court Supreme Court restraining Dalia from prosecuting the action. Specifically, by Order dated October 26, 2011, the New York Supreme Court (Feinman, J.) enjoined Dalia from prosecuting the Delaware Chancery Action. Annexed hereto as **Exhibit "12"** is a copy of the New York Supreme Court's October 26, 2011 Order.

31.    I also sought and obtained Orders from the New York County Supreme Court which stopped the other parties to the Delaware Chancery Action – TPR and the Trump Group – from prosecuting the Delaware Chancery Action. Specifically, by Orders dated November 9, 2011, Justice Feinman enjoined TPR and the Trump Group from prosecuting the Delaware Chancery Action and further confirmed his October 26, 2011 Order which enjoined Dalia from pursuing the Delaware Chancery Action. On April 9, 2012, the New York County Supreme Court issued an Interim Order confirming that Dalia, TPR, and the Trump Group were restrained from continuing to prosecute the Delaware Chancery Action until further order from this Court. Annexed hereto as **Exhibits "13" and "14"** are copies of the New York Supreme Court's November 9, 2011 Order and April 9, 2012 Interim Decision and Order, respectively.

32.    By Decision and Order dated December 17, 2012, the New York Supreme Court (Jaffe, J.) (as amended by Amended Decision and Order dated January 2, 2013) dismissed all causes of action against Dalia in the New York TRI Action. I have timely appealed the New York Supreme Court's December 17, 2012 and January 2, 2013 Decisions to the First Department. Dalia's dismissal was later set forth in a January 24, 2013 Judgment, which states that:

11

all claims against Defendant Dalia Genger are severed and dismissed with prejudice, and all temporary restraining orders and preliminary injunctions issued against her in this action are vacated <u>unless the subject(s) thereof has/have been restrained in another pending action in which case they/it shall not be vacated...</u>

(Judgment dated January 24, 2013 in New York TRI Action, annexed hereto as **Exhibit "15"**) (emphasis added). <u>Thus, the Supreme Court has expressly invited Orly to seek supporting restraints against Dalia in this and other courts.</u>

33.  Dalia's counsel, Robert Meister, has taken the position that the January 24, 2013 Judgment in the New York TRI Action has lifted the New York Supreme Court's prior injunctions restraining Dalia <u>as trustee</u> from prosecuting the Delaware Chancery Action on behalf of the Orly Trust. (<u>See</u> January 29, 2013 Letter from Robert Meister, annexed hereto as **Exhibit "16"**).  By contrast, I am informed my counsel in the New York TRI Action told Mr. Meister the January 24, 2013 Judgment does not release the Orly Trust from the injunctions because the Orly Trust remains a party in the New York TRI Action and the New York Supreme Court has already ruled that I have the right to prosecute these actions on behalf of the Orly Trust.

34.  A compliance conference in the New York TRI Action is scheduled for February 20, 2013.  Both my Supreme Court counsel and Dalia's counsel, Mr. Meister, intend to address the New York Supreme Court's January 24, 2013 Judgment.  Notably, the restraints against TPR and the Trump Group remain in place and unchanged.

35.  If Dalia is allowed to continue to prosecute the Delaware Chancery Action in Delaware where the Delaware Chancery Court has already ruled (without jurisdiction to do so) that the Orly Trust does not beneficially own the Orly Trust TRI Shares, the Orly Trust will be effectively stripped of its TRI Shares.[9]

---

[9] Dalia alleged in her Motion to Dismiss the TAP that the Orly Trust benefitted under the terms of certain settlement agreements which were entered into by her in secret and without Petitioner's knowledge (See TAP and Petitioner's Opposition Affidavit for the detailed discussion pertaining to the TPR Settlement Agreements).  In exchange for giving Sagi all rights to TPR, and releasing Sagi and Dalia from all claims, the Orly Trust gets the TRI Shares (still subject to attack in Delaware) and still owes over $4 million, and has pledged all its assets, to MSCo. Demonstrably, this purported settlement harms the Orly Trust.  The "value" is deliberately meaningless and is truly

36.   As set forth above, Dalia has no reasonable or logical reason for seeking to continue the Delaware Chancery Action.  The NewYork TRI Action is still pending and has been actively litigated by the parties for more than the past two years. All of the parties that would be necessary to make a determination of ownership to the Orly Trust TRI shares, including the Orly Trust, are already parties to the New York TRI Action.  As a result, the relief Dalia seeks in the Delaware Chancery Action is duplicative of the determination I'm already seeking in the New York TRI Action on the Orly Trust's behalf: a determination that the Orly Trust beneficially owns the Orly Trust TRI Shares.

37.   Moreover, there is no reason the Delaware Chancery Action must be reinvigorated now, before the Court decides whether Dalia has been working for or against the Orly Trust.

## DALIA SHOULD NOT BE ALLOWED TO TAKE ANY ACTION ON BEHALF OF THE ORLY TRUST PENDING THIS COURT'S DETERMINATION OF THE TAP IN LIGHT OF HER NUMEROUS BREACHES OF HER FIDUCIARY DUTIES

38.   Dalia should not be allowed to prosecute the Delaware Chancery Action, because she has already shown time and again that she is not acting in my interests or the Trust's interests, but for the benefit of herself and my brother Sagi.  A summary of these various actions, many of which are underscored by recent testimony and documents, include:

(i)     Dalia deliberately failed to inform me and affirmatively concealed from me, Sagi's actions with respect to the sham foreclosure sale of the Orly Trust's indirect interest in the common stock of TPR, all of which greatly benefitted Sagi and injured me as beneficiary of the Orly Trust. The lack of notice prevented me from protecting the asset by either trying to enjoin the sale or bidding at the sale (see TAP ¶¶ 55-56);

(ii)    In January 2009, Dalia entered in to the Meeting Agreement, which allowed Sagi (as manager of D & K Limited Partnership) to encumber the Orly Trust TRI Shares in order to set the stage for a sham foreclosure of

---

a "mirage in the desert" in light of the Secret Agreements and MSCo's purported right to foreclose and collect upon the Notes and seize all the proceeds from TPR's purported sale of the Orly Trust TRI Shares.

the Orly Trust TRI shares, thus stripping the Orly Trust of this valuable asset (see TAP ¶¶ 48-54);

(iii)    Dalia entered into the various Secret Agreements (as previously defined in the TAP) on purported behalf of the Orly Trust without prior notice to me and has deliberately concealed same from Petitioner. Dalia's entry into the Secret Agreements has placed the remaining assets of the Orly Trust in peril of being foreclosed upon and dissipated by an unknown entity which was recently formed in St. Kitts (see TAP ¶¶ 76-78);

(iv)    As part of the above-mentioned Secret Agreements, Dalia made her own removal an "Event of Default" that would make millions in debt immediately due and payable by the Orly Trust, without the cash to pay (see $4,420,000 Amended and Restated Promissory Note dated May 15, 2012, Exhibit "9" at sec. 2.1);

(iv)    Dalia violated the restraints and injunctions imposed upon her as provided in this Court's July 2009 Order by commencing the Dalia Delaware Chancery Action and entering into the Secret Agreements without prior notice to Petitioner (see July 2009 Order, Exhibit "3"); and,

(v)    Dalia violated the restraints and injunctions imposed upon her as provided in both the New York TRI Action and the New York TPR Action (see Reply Memo of Law dated August 13, 2012, annexed hereto as **Exhibit "17"** at pp. 2-10).

39.    Dalia's actions since her initial appointment as Trustee have all been craftily designed to dissipate and encumber the Orly Trust's assets to benefit herself and my brother Sagi to my detriment.

40.    Demonstrably, I am the one that has the most to lose. In light of her prior breach of her fiduciary duties, my mother, Dalia, should not be allowed to take any further action on behalf of the Orly Trust, especially while my TAP to remove her as Trustee is still pending before this Court.

## PETITIONER HAS NO ADEQUATE REMEDY AT LAW

41.    Petitioner has no adequate legal remedy and must seek the assistance of this Court in equity. As the New York County Supreme Court already has determined, monetary damages are insufficient to remedy the Orly Trust and the Petitioner in this case should Dalia be allowed to proceed with her dubious and unnecessary Delaware Chancery

14

Action.

42.   I have no reason to believe that Dalia will ever be able to satisfy any judgment against her for the catastrophic damages caused by Dalia's breaches of her fiduciary duties and the looting of the Orly Trust's assets.  Any such judgment is likely to amount to in excess of tens of millions of dollars.  The only real relief this Court can provide is to issue the requested restraints.  By issuing these restraints and others, the Court simply maintains the status quo, while keeping Dalia from further harming the Orly Trust.

## **PROCEDURAL RECITALS**

43.   Pursuant to CPLR §6001, I hereby attest that I have never sought nor secured any provisional remedies against Dalia, except as specifically set forth herein.  As stated above, I previously obtained an injunction in the New York TRI Action enjoining Dalia from proceeding with the Delaware Chancery Action.  (See Exhibit "12".)

44.   Dalia has asserted that this injunction has been lifted and intends to proceed with the Delaware Chancery Action.  (See Exhibit "16").  I disagree that the injunction has been lifted, but, in any event, it is respectfully submitted that Dalia's actions directly affect my TAP and proceedings before this Court to remove her as Trustee and compel her to provide a compulsory accounting.  Therefore, this Court is an appropriate forum to hear and determine this Motion.

45.   Pursuant to CPLR §2217(b), no prior application for the relief requested herein has been made either to this or any other Court except as set forth immediately above.

**WHEREFORE,** Petitioner respectfully requests that the relief sought in Petitioner's Motion be granted in its entirety together with such other and further relief as this Court deems to be just equitable and proper.

_____
ORLY GENGER

Sworn to before me this
_13_ day of February, 2013

_____
Notary Public

PETER JANOVSKY
Notary Public, State of New York
No. 31-4949976
Qualified in New York County
Commission Expires April 17, 20__

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER, as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA § 711(11)

File No. 0017/2008

---

## AFFIRMATION IN SUPPORT OF PETITIONER'S
## ORDER TO SHOW CAUSE PURSUANT TO 22 NYCRR § 202.7(f)

**Ralph R. Hochberg,** an attorney duly admitted to practice law in the courts of the State

of New York, affirms the following under penalties of perjury:

## I. INTRODUCTION

1.      I am a Partner of the law firm of Platzer, Swergold, Karlin, Levine,

Goldberg & Jaslow, LLP, the attorneys for the petitioner, Orly Genger (the "Petitioner" or

"Orly") and am fully familiar with the facts and circumstances herein by virtue of the records

and documents kept in the legal file maintained by this office.  I certify that to the best of my

knowledge, information and belief, formed after an inquiry reasonable under the circumstances,

the contentions made herein are not frivolous as defined in subsection (c) of Section 130-1.1 of

the New York Court Rules.

2.      I submit this Affirmation pursuant to 22 NYCRR § 202.7(f) and in support

of Petitioner's Order to Show Cause and Motion (the "Motion") for an Order:

> (a) Granting Petitioner's Motion for a preliminary injunction enjoining the
> Respondent, Dalia Genger, as Trustee ("Dalia"), together with any and all of
> her agents, assigns, employees, representatives, attorneys, and/or anyone
> acting on Dalia's behalf either directly or indirectly or in concert with her,
> from: (i) proceeding with and/or taking any action of any kind or nature, with
> respect to the action Dalia previously commenced in the Delaware Chancery
> Court entitled, "*Dalia Genger as Trustee of the Orly Genger 1993 Trust v. TR
> Investors LLC,*  C.A. No. 6906-CS" (the "Delaware Chancery Action")
> including, but not limited to, the continuation of the prosecution of said

Delaware Chancery Action; and, (ii) proceeding with any other existing actions or proceedings and/or commencing any future actions or proceedings in the Delaware Chancery Court, and/or any other local, state or federal courts on behalf of the Orly Genger 1993 Trust (the "Orly Trust") (other than those actions and proceedings which are already pending in the Supreme Court of the State of New York, County of New York) which concern, relate to, pertain to and/or have any effect whatsoever upon any and all assets of the Orly Trust including, but not limited to, the Orly Trust's direct, indirect or beneficial interests in Trans-Resources, Inc. and TPR Investment Associates, Inc; and,

(b) Granting such other and further relief as this Court deems to be just, equitable and proper

2.      Petitioner is also requesting that pending the hearing and determination of this

Motion and until further Order of this Court, Dalia Genger, as Trustee, and any and all of her

agents, assigns, employees, representatives, attorneys, and/or anyone acting on Dalia's behalf

either directly or indirectly or in concert with her are hereby temporarily restrained from: (i)

proceeding with and/or taking any action with respect to the Delaware Chancery Action; (ii)

proceeding with any other existing actions or proceedings and/or commencing any future actions

or proceedings in the Delaware Chancery Court, and/or any other local, state or federal courts on

behalf of the Orly Trust (other than those actions and proceedings which are already pending in

the Supreme Court of the State of New York, County of New York) which concern, relate to,

pertain to and/or have any effect whatsoever upon any and all assets of the Orly Trust including,

but not limited to, the Orly Trust's direct, indirect or beneficial interests in Trans-Resources, Inc.

and TPR Investment Associates, Inc., together with such other and further relief as this Court

deems to be just, equitable and proper.

3.      Accompanying this Affirmation are copies of: (i) Orly Genger's Affidavit in

Support of the Motion and Order to Show Cause (the "Orly Affidavit"); (ii) the Petitioner's

Third Amended Petition seeking, *inter alia,* the removal of her Mother, Dalia, as Trustee of the

Orly Trust (the "TAP" and all accompanying Exhibits); and (iii) Petitioner's Memorandum of

2

Law in Support of the Motion.[1]

## PETITIONER'S COMPLIANCE WITH 22 NYCRR § 202.7(f)

4.      In accordance with 22 NYCRR § 202.7(f), on February 13, 2013, I E-Maile

faxed a letter to Dalia's counsel, Robert Meister, and informed him that Petitioner inter

file the Motion and Order to Show Cause with the Court on February 14, 2013 and indica

this law firm will be requesting a temporary restraining order on behalf of the Petitioner.

5.      Since the Order to Show Cause and Motion is only seeking affirmative reli

against Dalia, it is respectfully submitted that prior notice of same to David Parnes, the

of the Sagi Trust is not necessary. The Sagi Trust is a contingent remainder beneficiar

the provisions of the Orly Trust. Mr. Parnes was previously served with copies of the Pe

remove Dalia as Trustee of the Orly Trust, Petitioner's Second Amended Petition and t

by overnight delivery.    Upon information and belief, the Sagi Trust never opposed th

sought therein and accordingly has defaulted.

6.      Notwithstanding the Sagi Trust's forgoing default and expressly without p

to Petitioner's right to assert that the Sagi Trust is not entitled to any further notice, Pet

counsel will serve Mr. Parnes with a copy of the Order to Show Cause and all supportin

via overnight delivery once it is entered by the Court (presuming that it is entered by the

## PETITIONER'S  MOTION IS MERITORIOUS

7.      The Orly Affidavit and all Exhibits annexed thereto and the accom

Memorandum of Law in support of the Motion, set forth all of the reasons why the

Show Cause and Motion should be granted in its entirety and Affirmant does not wish t

---

[1] Unless otherwise defined herein, capitalized terms utilized in this Affidavit shall have the same meanin
to them as in the TAP and the Orly Affidavit..

this Court with a lengthy and repetitive recitation of the facts and legal arguments c
therein in this Affirmation.

8.      As set forth in the Motion, unbeknownst to Petitioner and in violation of t
Court's prior Order dated July 1, 2009, Dalia commenced the Delaware Chancery
purportedly on behalf of the Orly Trust, more than <u>fifteen months</u> after Petitioner con
the New York TRI Action (as defined in the Orly Affidavit), seeking the same relief s
Petitioner in the New York TRI Action: a judgment affirming the Orly Trust's b
ownership to the Orly Trust TRI Shares (as defined in the Orly Affidavit).

9.      As also set forth in the Motion, by commencing the Delaware Chancery A
purported behalf of the Orly Trust and now seeking to continue the prosecution of sar
deliberately selected the <u>worst</u> possible option for the Orly Trust, bringing a plenary acti
Delaware Chancery Court, the same Court that had previously rendered a decision ag
Orly Trust's interests in a related action.   Although the Delaware Chancery Cou
decision was reversed by the Delaware Supreme Court on the grounds that the Chanc
never had jurisdiction over the Orly Trust and Petitioner because they were not partic
proceeding, by commencing the Delaware Chancery Action, Dalia intentionally c
jurisdictional defect that protected the Orly Trust and its interest in the Orly Trust TI
from the Delaware Chancery Court's prior decision. (<u>See</u> Orly Affidavit, **Exhibits "4"a**

10.     In other words, in an egregious breach of her fiduciary duties and in furth
of her scheme with her son and Petitioner's brother, Sagi Genger ("<u>Sagi</u>") to loot the C
of all of its assets, Dalia commenced the Delaware Chancery Court because she knew a
in advance that the Orly Trust would lose.

11.     Justice Feinman has signed three (3) restraining orders which have enjoi
and all other parties to the Delaware Chancery Action (who are the same parties to the I

4