2.    The Trustees are further authorized and empowered, by an acknowledged instrument in writing (with such instrument to be filed with the court, if any, then having jurisdiction over the trust to which such power relates, if such court shall accept such instrument for filing), to revoke any power created by the Trustees pursuant to the provisions of paragraph 1 of this Section B at any time prior to the death of the beneficiary in whom such power was created, and to release, in the manner set forth in Article THIRTEENTH hereof, the right to create such a power. The Trustees shall not be liable for any exercise, release or failure to exercise the authority and power granted to them by the provisions of said paragraph 1 or for the revocation of any power created by them pursuant to the provisions of said paragraph 1, provided they utilize good faith in considering whether or not to exercise or release such power or to cause such revocation, whether such consideration be at their own instance or at the request of an individual who is a beneficiary of a trust hereunder, the guardian or other fiduciary of such an individual, or a member of his or her family.

C.    1.    Notwithstanding any other provision in this Trust Agreement to the contrary, if at any time any property is to be placed in a trust under the provisions of any Article of this Trust Agreement, the Trustees shall, if need be, and if it is possible to do so, divide such property and place the same in separate trusts to the end that one such trust shall have an

-35-

inclusion ratio of zero, and if any property which is directed to be added to a trust hereunder shall have an inclusion ratio which is different than the inclusion ratio of such trust, the Trustees shall not make such addition but shall instead administer such property in a separate trust under this Trust Agreement; and, in each such instance, the property to be placed or held in such a separate trust shall be held, administered and disposed of by the Trustees pursuant to provisions identical to the provisions of the trust to which, but for the provisions of this paragraph 1, such property would have been placed or added.

2.   If, pursuant to the provisions of paragraph 1 of this Section C, any property that would otherwise be held in a single trust hereunder is instead held in separate trusts hereunder, the Trustees of such trusts may, at any time or from time to time, (i) make different tax elections and allocations with respect to each such trust, (ii) expend principal and income and exercise any discretionary power differently with respect to each such trust, (iii) invest each such trust differently, and/or (iv) take all other actions consistent with such trusts being separate entities.  Furthermore, the donee of any power of appointment with respect to such trusts may exercise such power differently with respect to each such trust.

D.   Notwithstanding the provisions of the foregoing Sections of this Article to the contrary, if any Trustee hereunder is a current beneficiary of the income of any trust here-

-36-

under, or may, in the discretion of the Trustees, be a current income beneficiary of any such trust, then, in such event, such Trustee shall not, in his or her capacity as a Trustee of such trust, have any voice or vote or otherwise participate in any decision pertaining to the matters relating to such trust that are addressed in the foregoing Sections of this Article, and, in each such event, the other Trustee or Trustees of such trust shall make all decisions relating to such trust that pertain to such matters.

THIRTEENTH:   Release of Powers.

Any beneficiary and any Trustee hereunder may at any time or times release any discretionary power of appointment or discretionary power to distribute principal or income or any other discretionary power hereby given to such beneficiary or Trustee, either with or without consideration, with respect to the whole or any part of the property subject to such power and also in such manner as to reduce or limit the persons or objects or classes of persons or objects in whose favor such power would otherwise be exercisable, by an instrument signed and acknowledged by the beneficiary or Trustee releasing such power and delivered to (i) each Trustee then acting hereunder (other than the Trustee, if any, who shall have executed such instrument), (ii) the Grantor (or, if the Grantor is not then living, to the executors, administrators or personal representatives of the

-37-

Grantor's estate), or (iii) any one or more of the adult indi-
viduals to whom or for whose use or benefit the income of any
trust hereunder may then be paid or applied.  In the event of
the release of any such power by any Trustee, the remaining
Trustee or Trustees hereunder, if any, may thereafter exercise
such power, other than any discretionary power which was not
initially vested in such remaining Trustee or Trustees.  The
release of any power by any Trustee hereunder pursuant to the
provisions of this Article shall not be binding upon any Trustee
who may thereafter act as a Trustee hereunder unless such power
shall have been released by all of the Trustees then in office
who are vested with such power by their execution of a signed
and acknowledged instrument specifically providing that such
release is to be binding upon all successor Trustees hereunder.

       FOURTEENTH:    Provision With Respect To
                         Closely Held Businesses.

Without limiting the powers and authority conferred
upon the Trustees by Article ELEVENTH hereof but in extension
thereof, the Trustees are specifically authorized and empowered,
in their discretion, to retain for as long as they, in their
discretion, shall deem advisable, any or all shares of stock in
any closely held corporation, or any indebtedness owing by any
such corporation, or any or all interests in any proprietorship,
unincorporated business, partnership, joint venture, realty or

-38-

any other asset, whether owned individually, as tenant-in-common, partner or otherwise, regardless of whether such asset or assets shall be producing profits or losses through ownership or operation thereof, and regardless of the percentage of the trusts hereunder which such assets or similar assets may constitute; and their decision to retain and hold any such asset or liability shall be binding and conclusive upon and shall not be subject to question by any person interested, or who may become interested, in any of the trusts hereunder, and the Trustees shall not incur any liability by reason thereof.

FIFTEENTH:   Headings.

The Article headings contained herein are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope hereof or the intent of any provision hereof.

SIXTEENTH:   Severability.

Should any part, clause, provision or condition hereof be held to be void or invalid, then such invalidity shall not affect any other part, clause, provision or condition hereof, but the remainder hereof shall be effective as though such void

-39-

part, clause, provision or condition had not been contained herein.

WITNESS the due execution hereof by the Grantor and Trustees on the day and year first above written.

_____
ARIE GENGER,
as Grantor

_____
LAWRENCE M. SMALL,
as Trustee

_____
SASH A. SPENCER,
as Trustee

-40-

INDEX NO. 109749/2009

NYSCEF DOC. NO. 167                                          RECEIVED NYSCEF: 11/16/2011

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------x
                                                        :
ORLY GENGER in her individual capacity and              :
on behalf of the Orly Genger 1993 Trust (both in        :
its individual capacity and on behalf of D & K          :   Index No. 109749/09
Limited Partnership),                                   :
                                                        :
            Plaintiff,                                  :   Hon. Paul G. Feinman
                                                        :
                                                        :   **AFFIDAVIT OF SAGI GENGER**
        -against-                                       :   **IN FURTHER OPPOSITION TO**
                                                        :   **ORLY GENGER'S MOTION FOR**
DALIA GENGER, SAGI GENGER, LEAH                         :   **A TEMPORARY RECEIVER**
FANG, D & K GP LLC, and TPR INVESTMENT                  :
ASSOCIATES, INC.,                                       :
                                                        :
            Defendants.                                 :
-------------------------------------------------------------x

STATE OF NEW YORK       )
                        ) ss.:
COUNTY OF NEW YORK  )

        SAGI GENGER, being duly sworn, deposes and says:

        1.      Since October 2004, I have served as President of TPR Investment Associates,

Inc. ("TPR"). The company is overseen by an independent Board of Directors, currently made

up of Eleanor Parnes and Yonit Sternberg. I respectfully submit this affidavit in opposition to

the motion of my sister, Orly Genger, to replace the company's independent Board of Directors

and myself with a Court-appointed receiver of her choosing. In particular, I wish to respond to

the allegations my sister raises in her recently submitted affidavit.

        2.      The instant motion is only the latest in a seemingly-endless string of lawsuits and

motions that my father Arie has brought and/or instigated in recent years against me personally

and the company I run, TPR, since perceiving that I sided with my mother Dalia in their divorce.

I have repeatedly proposed to my father and sister that we mediate our family disputes, rather

than burden the Courts with them, but they have rejected all offers.

3.     At this point, I believe that Arie's and Orly's extreme litigiousness is an end in
and of itself. Indeed, testimony in the Delaware trial revealed that Arie's attorney had threatened
to "drag ... through the New York courts for four or five years" a party whom he thought would
challenge Arie's scheme to maintain corporate control. *See* Exh. A at 364. This strategy has, to
some degree, already borne fruit, in that TPR has had to focus its resources and energies on the
mortal threat of receivership, rather than on its core business.

4.     I am not an attorney; however, I understand that Orly is moving pursuant to
CPLR 6401, which requires the movant to establish, by clear and convincing evidence, "a danger
that the property will be removed from the state, or lost, materially injured or destroyed." Here, I
see no allegation that either I or TPR's Board plan to cause company property to be removed
from the state, lost, injured or destroyed. In fact, we do not now, and have never had, such plans.
Rather, Orly only complains about events that happened several years ago, and appears to parrot
fallacious arguments that her teams of lawyers have recently thought up.

5.     I address each of Orly's latest arguments in turn. First, however, I believe it
useful to provide the Court with some relevant background facts – most of which are drawn from
relevant judicial decisions, and all of which should be beyond dispute.

## Background

6.     Prior to October 30, 2004, TPR owned 3,000 shares of the stock of Trans-
Resources, Inc. ("TRI"), or 52.85% of the company. The Trump Group owned the remaining
47.15% of TRI's stock. On that date, as part of a resolution to his divorce case, Arie caused
TPR, which he then controlled, to transfer 794.40 shares of TRI stock to himself, and another
1,102.80 shares of TRI stock to each of the Sagi Genger 1993 Trust (the "Sagi Trust") and the
Orly Genger 1993 Trust (the "Orly Trust"), for consideration of $1.00 per share. Both Trusts, at
Arie's behest, also signed lifetime proxies in Arie's favor.

-2-

7.    In 2008, Justice Milonas, serving as post-divorce arbitrator, found that these transfers were made pursuant to a "significantly misleading" representation by Arie Genger that TRI bore a liability rendering the shares worthless (the so-called "Bogalusa liability"), when in fact the equity value of TRI was actually in the "$53-67 million range." Thus, the circumstances that the Court presently confronts are a direct result of Dalia, my mother, being duped by Arie into allowing TPR to rely on a gross misrepresentation of TRI's value.

8.    Later in 2008, the Trump Group learned of the TRI stock transfers. The Trump Group took the position that the conveyances violated TRI's Stockholder Agreement, rendering them void, and giving the Trump Group the right to purchase the shares from TPR at their 2004 fair market value. As revealed by evidence in the Delaware trial, Arie and Orly's response was to try to exploit Arie's own breach of the TRI's Stockholder Agreement as a means to force the Sagi Trust to sell its shares on the cheap and thereby further enrich themselves.

9.    Later in 2008, the Trump Group reached a compromise with Arie whereby the entire Genger family would have been able to retain their TRI shares despite the breach. Arie then reneged on the deal. The Trump Group, in turn, responded by suing Arie in Delaware Chancery Court and TPR in the United States District Court for the Southern District of New York. *See TR Investors, LLC, et al v. Arie Genger*, C.A. No. 3994-VCS (Del. Chanc. Ct.); *Glenclova Inv. Co. v. Trans-Resources, Inc.*, Docket No. 08-CIV-7140 (JFK) (S.D.N.Y.).

10.    By this time, I was President of TPR, and came to understand the difficult legal situation into which Arie's and Orly's actions had placed TPR. If successful, the Trump Group would have had the right to buy the transferred shares at 2004 fair market value (a lower value than in 2008, as TRI was losing money in 2004). Rather than litigate, the Sagi Trust decided to sell its 1,102.80 TRI shares to the Trump Group and share the proceeds with TPR.

11.    The Delaware Chancery Court subsequently ruled that "the Trump Group …

-3-

appropriately purchased the shares transferred to the Sagi Trust." The Delaware Supreme Court affirmed this aspect of the Chancery Court's ruling. *See* Exhs. B at 1, C at 33.

12.     It was very important to me at that time that my father and sister be offered a similar opportunity with respect to the shares which were purportedly transferred to them. Thus, TPR conditioned its deal with the Trump Group upon their agreeing to a one-week standstill of the litigations, in order to afford Arie and Orly the chance to sell based on comparable terms. *See* Exh. D at 1 ("In connection with certain disputes and litigations between one or more of the Purchasers (and their related parties) and the Company, TPR and Arie Genger (and their related parties), you have asked us to agree not to proceed with the litigations or to bring any further litigations until Thursday, September 4, 2008, at 9:00 a.m. Eastern Standard Time, while the parties attempt to negotiate a resolution of their disputes.").

13.     For the ensuing week, I shuttled back and forth between Arie and the Trump Group, in an effort to broker a business resolution between them that would resolve all of the litigation between the Trump Group and the Genger family. Out of these discussions that I facilitated, the Trump Group offered to waive their objections to the 2004 purported transfers to Arie and Orly. Thus, they would have been allowed to retain the TRI shares that TPR had contracted to transfer to them (shares which Arie and Orly claim, to this day, are worth hundreds of millions of dollars), merely in exchange for Arie recognizing the Trump Group's majority interest of TPR. Arie and Orly refused these offers.

14.     For his part, Arie decided to continue litigating against the Trump Group in the Delaware Chancery Court. Against my advice, Orly followed Arie's lead. Indeed, so confident was Orly that my father would win his litigation against the Trump Group that she commanded the trustee of the Orly Trust not to sell the Trust's 1,102.80 shares of TRI, claiming the shares were worth "in excess of $150,000,000." In order to ensure that the trustee complied with her

-4-

directive, Orly procured an Order from the Surrogate's Court which prohibited the trustee (our

mother Dalia) from selling the TRI shares. *See* Exhs. E, F.

15.    In sum, Arie and Orly decided to reject my advice and instead roll the dice in

litigation. As a result, there are now judicial findings that Arie engaged in "wrongful behavior"

and "perfidy," and that Orly gave trial testimony in support of Arie that was "vague, at best" and

"undermine[d] her credibility." By contrast, the same court found that the Sagi Trust was "an

arguably innocent purchaser for value," and that the transaction by which the Sagi Trust and TPR

sold their TRI shares to the Trump Group was final. *See* Exh. G at 12-13, 37, 40.

16.    In return for my efforts to bring this family out of this spiral of endless litigation,

my father and sister have brought venomous and false charges against me and the company I run,

TPR. While it remains my hope that we may someday be able to resolve our issues as a family, I

am compelled to respond to Orly's latest charges. As set forth below, TPR has acted properly in

all respects, and should be allowed to continue its business undisturbed.

### The Proceeds From the Sale of
### the Sagi Trust's TPR Shares

17.    Here, Orly takes completely inconsistent positions. In the instant motion, Orly

contends that a Court-appointed receiver should be appointed because I allegedly "dissipated"

the sale proceeds from the Sagi Trust's TRI shares, and that instead: "TPR should have received

the $27 million paid for the Sagi Trust TRI Shares ...." (Emphasis added.) However, Orly is

currently pursuing another suit before this Court, in which she has recently obtained two TROs

on the ground that the Orly Trust, as opposed to TPR, has beneficial ownership of its TRI shares.

In other words, Orly simultaneously claims both: (a) that her own Trust should obtain all of the

economic benefit from its 1,102.80 shares of TRI stock; but that (b) TPR, and not the Sagi Trust,

whose current beneficiaries include my children, should receive all of the economic benefit for

-5-

its 1,102.80 shares of TRI stock. Orly offers no explanation for this inconsistency.

18.     Unlike my sister, I have endeavored, as President of TPR, to treat the Orly and
Sagi Trust equivalently. Namely, to the extent either Trust owes money to TPR, it should pay
that first. When the Sagi Trust settled with the Trump Group, it turned over millions in proceeds
to TPR, which exceeded what it then owed TPR under the D&K Note. By contrast, Orly has
prevented the Orly Trust from selling its TRI shares like the Sagi Trust did, and so continues to
owe TPR over $4 million. Subject to repayment of that indebtedness, however, TPR has
relinquished any claim to the proceeds from the sale of the Orly Trust's TRI shares. This follows
the original arrangement by which TPR was to receive full payment of the D&K Note, with the
future excess to go to the two Trusts. Orly, by contrast, is seeking a windfall by taking exact
opposite positions in related cases.

19.     Orly also alleges "improper self-dealing" in connection with the August 22, 2008
letter agreement that TPR entered into with the Trump Group. That agreement only provides
that, if TPR is found by a Court to be the record and beneficial owner of the TRI shares at issue,
then it shall sell them at their 2004 fair market value as determined by Justice Milonas. *See* Exh.
H. TPR, however, has never taken a position as to who has beneficial ownership of the Orly
Trust's TRI shares, nor interfered with the Trust's ability to obtain such a determination. Only
Orly has obstructed her own trustee's efforts in that regard.

## TPR's Bad Debt Deduction
## For The D&K Note

20.     Next, Orly claims that I have caused "TPR to violate the laws of the United States
and Canada," by allowing TPR's tax accountants (who, upon information and belief, remain as
Orly's personal accountants) to take a bad deduction in 2002 and 2003 for the amounts owing
under the D&K Note. The only basis Orly offers is a letter from Anthony P. Valenti, a licensed

-6-

private investigator who is neither a tax attorney nor a CPA Mr. Valenti, in turn, alleges that TPR should not have taken a deduction for the unpaid D&K Note in 2002 and 2003, but eschews the balance of Orly's claims against me, stating that: "I have not received sufficient information or documents to render findings or opinions."

21.    TPR's 2002 and 2003 amended tax returns containing the deduction in question were prepared, executed and filed by qualified tax accountants, and have never been challenged by the I.R.S. or Canadian tax authorities. Nor should they have been. As CPA Samuel Gunther explains in his accompanying Expert Report (*see* Exh. I), the tax deduction: (a) was entirely proper; and (b) in any event, did not cause TPR to pay less taxes. As Mr. Gunther further points out, Mr. Valenti misunderstands or misrepresents the applicable IRS rules, which expressly permit, not prohibit, bad debt deductions by corporations. And Mr. Valenti also concludes that "the parties never intended to collect the [D&K Note]," even though TPR collected $1.3 million in principal and $3 million in interest on that Note (*see* Exh. J) – facts which, under IRS rules, make the D&K Note a valid debt.[1]

22.    In short, Mr. Gunther concludes that the deduction was proper. In a separate, accompanying affidavit, Brian Glasberg, the accountant who prepared the Canadian tax filings, attests that such filings were also compliant with Canadian law. *See* Exh. K.

23.    I am very troubled that my own sister, in her malice towards me, would falsely

---

[1]    Mr. Valenti distorts not only the tax rules but also my own testimony in the divorce arbitration, false claiming that I testified that the D&K Note was "never" intended to be collected. In my cited testimony, I actually stated that "there were payments through the year 2000," but that the parties, in my opinion, did not intend to collect the note in connection with the 2002 default notice. *See* Valenti Exh. 2a at 369-70. Nowhere did I state that the D&K Note was not a legally enforceable debt. To the contrary, the parties were then operating under the belief that D&K did not have sufficient assets at that time to pay the Note. That understanding changed with Judge Milonas' decision in early 2008. The decision revealed that D&K, TPR and TRI were not subject to the massive Bogalusa liability, as had been misrepresented by Arie Genger.

-7-

and frivolously accuse me of "criminal" actions for allowing TPR's tax accountants to take tax deductions which, as Mr. Gunther concludes, were lawful and proper.

### TPR's Board of Directors

24.    Lastly, Orly characterizes TPR's independent Board of Directors as my "cronies." As a small, family-owned company, TPR will naturally seek Board members who are known and trusted within the Genger family. However, that does not make them cronies. Ms. Parnes is a professional fiduciary in Israel. The fact that she is married to David Parnes, a trusted, long-time attorney for Genger-family entities from well before the intra-family litigation, does not render her dishonest or incompetent. As for Ms. Sternberg, Orly's main charge against her is that she is "Sagi's cousin." That is true. That also makes her Orly's cousin. She is also an honest person and a fine Board member who does not deserve this sort of bile.

### TPR's Corporate Funds

25.    Lastly, Orly alleges, without any evidentiary basis, that I have "misappropriated" and "commingled" TPR funds. I have not. Further, I would have hoped that, before swearing under penalty of perjury to a charge that serious, Orly would put forward evidence to substantiate her claims. Instead, she annexes only a deposition transcript in which my testimony contradicts her own characterization of it. At all times as TPR's President, I have sought to husband TPR's resources, and I plan to continue in that role for as long as the company's Board wishes. A receivership, by contrast, would irreparably disrupt TPR's ongoing business and damage its investments. Unfortunately, I believe that is indeed Orly's intent.

-8-

## Conclusion

26.    Orly's efforts to destroy TPR have gone on long enough.  On behalf of TPR, I

respectfully request that the instant motion be denied, and TPR be permitted to return to its real

estate business.  I thank the Court for its consideration.

SAGI GENGER

Sworn to before me this
14th day of November, 2011

Notary Public

JOHN DELLAPORTAS
Notary Public, State of New York
No.02DE5054932
Qualified in New York County
COMMISSION EXPIRES 01/29/2014

At the Surrogate's Court held in and for the County
of New York, at the Courthouse, 31 Chambers
Street, New York, New York on the 1 day of
~~June~~ 2009
~~July~~

New York County Surrogate's Court
DATA ENTRY DEPT.
Date: July 1, 2009

PRESENT: HON. Troy K. Webber
Surrogate

In the Matter of the Application of

ORLY GENGER, as a person interested,
for the removal of DALIA GENGER
as Trustee of the Orly Genger 1993 Trust
pursuant to SCPA §711 (11)

File No.: 0017/2008

ORDER TO SHOW CAUSE
WITH TEMPORARY
RESTRAINTS

On reading and filing the annexed Verified Petition of Petitioner, ORLY GENGER, and

the exhibits, verified on the 22nd day of June, 2009, and the memorandum of law in support of

Petitioner's Verified Petition dated June 22, 2009,

LET the Respondent, DALIA GENGER, the sole fiduciary of the Orly Genger 1993

Trust, show cause before Surrogate Troy K. Webber at the Surrogate's Court sitting at 60 Centre

Street, New York, New York, on the 5th day of ~~June~~ August 2009 at 10:00 o'clock in the forenoon of that
Room 309

day or as soon thereafter as counsel may be heard why an order should not be entered:

(a)    Enjoining and restraining Respondent, her agents and all other persons

acting on her behalf from withdrawing, selling disposing, transferring, assigning, removing,

pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly

Trust's 19.43% interest in Trans-Resources, Inc., ("TRI"), a closely held corporation, founded by

Arie Genger, Petitioner's father and Respondent's former husband of Respondent and any other

assets which may be remaining in the Orly Trust;

NYO_XFER\137033/\1

(b)    Removing Respondent as Trustee of the Orly Trust for breaching her

fiduciary duties, wasting and dissipating the assets of the Orly Trust and imprudently managing

and injuring the property committed to her charge;

(c)    Surcharging Respondent in the amount of the loss of the value of Orly's

interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)    Appointing Michael D. Grohman, Esq. as successor trustee;

(e)    Waiving any requirement that Petitioner post an undertaking; and

(f)    Granting Petitioner such further relief deemed necessary or proper.

ORDERED that, during the pendency of this proceeding, Respondent ~~her agents and all~~ [and/or her counsel]
are required to give notice by overnight mail to petitioners counsel of any 1) offer
~~other persons acting on her behalf are temporarily restrained from withdrawing, selling,~~
to purchase the Orly Trust's 19.3% interest in TRI within 10 days of receiving
~~disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering,~~
such offer and 2) act by Respondent, her agents and all other persons
~~liening, hypothecating or secreting the Orly Trust's 19.43% interest in TRI and other assets~~
acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell or
~~remaining in the Orly Trust; and it is further~~
otherwise alter the Orly Trust's interest in TRI at least 10 days prior to such act
and it ~~ORDERED~~ that service of a copy of this Order and the papers upon which it is based

shall be served on Respondent by personal service at either her residence, located at 200 East

65th Street, Apt. 32W, New York, New York 10021, or any other address at which she can be

located, on or before ~~June~~ July 7, 2009; and it is further

ORDERED, that any responsive papers shall be filed by
July 29, 2009.

~~ENTER:~~

Surrogate

EFiled: Jul 23 2010 3:21PM EDT
Transaction ID 32302253
Case No. 3994-VCS

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, and TRANS-RESOURCES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ARIE GENGER, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) |

C.A. No. 3994-VCS

| | |
|---|---|
| ARIE GENGER, <br><br> Counterclaim Plaintiff, <br><br> v. <br><br> TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, and TRANS-RESOURCES, INC., <br><br> Counterclaim Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

MEMORANDUM OPINION

Date Submitted: April 26, 2010
Date Decided: July 23, 2010

Thomas J. Allingham II, Esquire, Anthony W. Clark, Esquire, Robert A. Weber, Esquire, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware, *Attorneys for Plaintiffs.*

Donald J. Wolfe, Jr., Esquire, Brian C. Ralston, Esquire, Scott B. Czerwonka, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Michael P. Carroll, Esquire, Avi Gesser, Esquire, DAVIS POLK & WARDWELL LLP, New York, New York, *Attorneys for Defendant.*

**STRINE, Vice Chancellor.**

## I. Introduction

This dispute over the control of Trans-Resources, Inc. ("Trans-Resources") is between the company's founder and former chief executive officer, Arie Genger, and the plaintiffs, who provided capital to Trans-Resources when the company was in financial distress.  The plaintiffs are all entities controlled by the Trump family, led by Jules Trump and his brother Eddie Trump (collectively, with the plaintiffs, the "Trump Group").  Jules Trump was a long-time friend of Arie Genger, and he was happy to help Genger when Trans-Resources neared insolvency in 2001.

In return for retiring nearly all of Trans-Resources' outstanding bonds, the Trump Group received a minority stake in the company and a number of protections in a stockholders agreement (the "Stockholders Agreement").  The Stockholders Agreement prohibited either party from transferring their shares in Trans-Resources to anyone other than a limited number of permitted transferees.  That prohibition against transfer was particularly important to the Trump Group, which was concerned that Genger might transfer his shares that were held through an entity under his control, TPR Investment Associates, Inc. ("TPR"), to a member of his family.  A bitter dispute had arisen between Genger and his son, Sagi Genger, during the time Genger's marriage unraveled in the early 2000s, and the Trump Group wanted no part of the family drama.

In 2004, Genger caused TPR to transfer its shares in Trans-Resources, subject to an irrevocable proxy in his favor, to his children's trusts (the "2004 Transfers"), under a settlement in the contentious divorce between him and his wife.  Because those trusts were not permitted transferees, the 2004 Transfers violated the terms of the Stockholders

1

Agreement. Under the terms of the Stockholders Agreement, that violation rendered the

transfers ineffective and gave the Trump Group the right to acquire the shares that were

transferred.

But Genger did not notify the Trump Group of the transfers at that time, and

thereby deprived the Trump Group of its right to declare the transfers void or exercise its

right to acquire the shares in 2004. Genger claims that he mentioned the 2004 Transfers

to Jules Trump during a private conversation in 2004, but his testimony did not convince

me that this was true. The most convincing reading of the evidence is that the Trump

Group did not receive notice of the 2004 Transfers until nearly four years later, when

Genger once again asked Jules Trump for help when Trans-Resources was in financial

distress. Moreover, informal notice to Jules Trump would not constitute the notice that

was required to be given to the Trump Group entities under the Stockholders Agreement.

By 2008, Trans-Resources' bank was unwilling to negotiate with Genger, so

Genger asked Jules Trump not only for money but also to negotiate a reduction in Trans-

Resources' debt with the bank. The evidence shows that, while Genger and the Trump

Group were negotiating the terms of the second round of funding, Genger disclosed for

the first time that the 2004 Transfers had occurred.

Although shocked at Genger's failure to notify him of the 2004 Transfers, Jules

Trump nevertheless negotiated a reduction in Trans-Resources' debt and agreed to pay

that debt in return for voting control of the company. Genger initially agreed to those

terms as a compromise for the Transfer violation, but, after securing an alternative source

of financing, backed out of the deal. Angered that he had favorably renegotiated Trans-

2

Resources' debt obligations and that the Trump Group was left without their key part of the bargain, Jules Trump initiated litigation and also contacted Sagi Genger in order to negotiate a deal with both TPR and the trust controlled by Sagi Genger (the "Sagi Trust") whereby the Trump Group would buy all of the shares transferred to the Sagi Trust by TPR in the 2004 Transfers. Having made a bargain with both the wrongful transferor, TPR, and the transferee, the Sagi Trust, the Trump Group viewed itself as having covered all its bases in addressing Genger's violation of the Stockholders Agreement. With the shares wrongfully transferred to the Sagi Trust by TPR, the Trump Group held a majority of Trans-Resources' stock.

The Trump Group then purported to reconstitute the Trans-Resources board of directors and, when Genger challenged the reconstitution, filed this action pursuant to 8 *Del. C.* § 225 to determine who controlled the board. Making that determination largely turns upon interpreting how the Stockholders Agreement applies to both parties' often excessively sharp conduct. As explained fully below, I conclude that the Trump Group controls the Trans-Resources board for the following reasons: (1) the Trump Group never received notice of the 2004 Transfers, which were made in violation of the Stockholders Agreement, until June 2008; and (2) the Trump Group did not ratify those Transfers when it bought the transferred shares from Sagi Genger and TPR. Because it never ratified the wrongful transaction, the Trump Group was free to deal with the relevant transferor, TPR, and its transferee, the Sagi Trust, and settle the matter by acquiring the wrongly transferred shares in an agreed upon negotiation. In doing so, the Trump Group clearly reserved its position that TPR made a void transfer, has proven that its position

3

was correct, and is entitled, as a result, to be deemed to have taken the shares from TPR

as a settlement of the improper Transfers. In the alternative, even if the Trump Group

ratified the 2004 Transfers — which it did not — I find that the Trump Group did not

purchase the shares from Sagi Genger subject to the proxy in favor of Arie Genger.

Therefore, the Trump Group holds a majority equity and voting stake in Trans-Resources,

and its ability to vote its shares is unaffected by the proxy.

## II. Factual Background

The following are the facts as I find them after trial.

### A. The Trump Group Saves Genger's Company, Trans-Resources, From Bankruptcy In 2001

In 1985, Genger formed Trans-Resources, a Delaware corporation that eventually

became the parent of three specialty fertilizer and industrial chemical companies.[1] As

mentioned before, Genger's majority stake in Trans-Resources was held through TPR,

another Delaware corporation. By 2001, Trans-Resources was nearly insolvent as its

subsidiaries struggled in the marketplace due to a strong euro, vigorous competition from

South American rivals, and miscalculations in a recent decision to expand a key plant.[2]

At that time, Trans-Resources' bonds had a notional value of $230 million, but their

market value had plummeted.[3]

Because negotiations with the fractious group of investors that had invested in

Trans-Resources' bonds were proving futile, Genger was delighted when Jules Trump

---

[1] Tr. 830 (A. Genger); Stipulated Pretrial Order at 3.
[2] Tr. 837-38 (A. Genger).
[3] *Id.* at 12 (J. Trump).

4

approached him with an offer to buy Trans-Resources' bonds.[4]  Genger and Jules Trump,

who both had residences on Williams Island in Miami, Florida, had been friends since at

least the late 1990s.[5]  From that time until very near the commencement of this litigation,

Genger and Jules Trump's families regularly socialized, dined, and vacationed together.[6]

Eventually, two entities controlled by Jules and Eddie Trump, plaintiff TR

Investors, LLC ("TR Investors") and plaintiff Glenclova Investment Co. ("Glenclova"),

bought all but $100,000 of Trans-Resources' debt.[7]  Shortly after buying Trans-

Resources' bonds, TR Investors and Glenclova converted their debt into equity.[8]  Under

an exchange agreement, TR Investors and Glenclova collectively received 2,676.4428

Trans-Resources shares, which amounted to a substantial stake equal to 47.15% of Trans-

Resources' equity.[9]

B. Genger And The Trump Group Execute A Stockholders Agreement That Requires
Notice To Be Given If Genger Transfers His Shares In Trans-Resources

Jules Trump's offer came with strings.  In exchange for bailing out Trans-

Resources and agreeing to take a minority interest in Trans-Resources, Trump insisted on

the Stockholders Agreement that gave the Trump Group strong representation and veto

rights.[10]  Importantly in light of the present dispute, the Stockholders Agreement

---

[4] *Id.* at 938 (A. Genger).

[5] J. Trump Dep. 27, 88; A. Genger Dep. 62-63.

[6] J. Trump Dep. 27-28; E. Trump Dep. 32; *see also* A. Genger Dep. 156-57 (indicating that
Genger and Jules Trump also took regular strolls together around the walking path on Williams
Island).

[7] Tr. 117 (J. Trump), 837 (A. Genger).

[8] *Id.* at 119 (J. Trump).

[9] JX-100 (Exchange Agreement (March 30, 2001)).

[10] Tr. 843 (A. Genger) ("[P]art of the deal was to reconstitute the board and to enable Trump
family — to enable the Trump family to be on the board, to have — we created a balance of —

provided restrictions on, and in some instances prohibitions against, the transfer of

stock.[11]

In particular, Section 2.1 of the Stockholders Agreement prevented a party from

transferring or pledging Trans-Resources stock to any party other than a party expressly

permitted to receive such a transfer (a "Permitted Transferee"). Section 2.1 provides in

relevant part:

> From and after the date hereof, no Stockholder shall directly or indirectly,
> offer, *transfer*, sell, assign, *pledge*, encumber, hypothecate or otherwise
> dispose of any Shares (including any derivative transaction) (a) until after
> December 21, 2003, and, thereafter, only as provided in Articles 3, 4, and 5
> of this Agreement, or (b) after *written notice* to the Company and the other
> Stockholders . . . to (i) in the case of either of the Initial Non-TPR
> Stockholders or their respective Permitted Transferees (A) to [certain
> Permitted Transferees], or (ii) in the case of TPR or a Permitted Transferee
> thereof, to (w) Arie Genger, (x) any entity or entities in which TPR or Arie
> Genger directly owns a majority of the equity interest and directly controls
> a majority of the voting power . . . (y) the estate o[f] Arie Genger or (z) any
> immediate family members or lineal descendants of Arie Genger, or trusts
> of which they are the sole beneficiaries-in-interest, who receive such Shares
> in consequence of the death of Arie Genger, which transferee(s) become a
> party to this Agreement. . . .[12]

That is, Permitted Transferees were: (1) in the case of transfers from any of the Trump

Group entities, any entity in which either TR Investors or Glenclova had at least a 20%

economic interest and a least a 30% voting interest; and (2) in the case of transfers from

TPR, any of the following: (i) Arie Genger himself; (ii) any entity in which TPR or

Genger directly owned a majority of the equity interest and a majority of the voting

---

so that I cannot do anything which is not unanimous. There were all kinds of provisions on
that.").
[11] JX-101 (Stockholders Agreement (2001)) (the "Stockholders Agreement") §§ 2.1, 2.4, 3.1,
3.2, 3.3).
[12] *Id.* § 2.1 (emphasis added).

power at the time of the transfer, and Genger agreed to continue to maintain such

ownership at all times thereafter; (iii) the estate of Arie Genger; or (iv) any of Genger's

immediate family members or lineal descendants, or trusts of which they are the sole

beneficiaries-in-interest, who receive the transfer of shares as a result of Genger's

death.[13]  If a party to the Stockholders Agreement intended to make a transfer to a non-

Permitted Transferee, then the other party had a right of first refusal, under Section 3.1,

which provides in relevant part:

> [I]f a Stockholder (the "Selling Stockholder") shall desire to sell, assign or
> transfer any Shares held by it to any person other than a Permitted
> Transferee (the "Offered Shares") and shall be in receipt of a bona fide
> written offer to purchase the Offered Shares (the "Offer"), [t]he Selling
> Stockholders shall give the Company and to each Covered Stockholder who
> is not the Selling Stockholder (the "Non-Selling Stockholders") written
> notice containing the terms and conditions of the Offer . . . provided that for
> purposes of this Section 3.1, if the Selling Stockholder is (x) a TPR
> Stockholder, then only the Non-TPR Stockholders shall be deemed to be
> Non-Selling Stockholders; and (y) a Non-TPR Stockholder, then only the
> TPR Stockholders shall be deemed to be Non-Selling Stockholders. . . .
>
> Until 30 days after receipt of such notice, the Non-Selling Stockholders
> shall have the right to elect to purchase all of the Offered Shares at the price
> offered by the prospective purchaser and specified in such notice.[14]

The purpose of expressly limiting transfers to an enumerated list of Permitted

Transferees was to ensure that the Trump Group would be dealing only with Genger, or

one of the entities he controlled, in the future, and not with anyone else.[15]  Jules Trump

was particularly concerned about limiting the Trump Group's exposure to the acrimony

---

[13] *Id.*

[14] *Id.* § 3.1.

[15] Tr. 121 (J. Trump), 842-44, 854, 891-92 (A. Genger).

plaguing Genger's family,[16] but, after much pressure from Genger, reluctantly acceded to

including Genger's family members as Permitted Transferees *only* as an estate planning

consequence in the event of Genger's death.[17]

If a transfer was made in violation of Section 2.1, then the Stockholders

Agreement provided two remedies. First, Section 2.4 provided that "[a]ny attempt by a

Stockholder to transfer Shares in violation of this Agreement shall be void and the

Company agrees that it will not effect such a transfer or treat any alleged transferee as the

holder of such Shares."[18] Second, Section 3.2(a) of the Stockholders Agreement gave the

Trump Group the right to purchase TPR's shares in Trans-Resources if Genger: (1)

transferred shares to a non-Permitted Transferee; or (2) effected a change of control in

TPR. Section 3.2(a) provides in relevant part:

> The Covered Stockholders other than the hereinafter defined Terminating
> Stockholder (the "Purchasing Stockholders") shall have the right to elect to
> purchase the Shares held by a Stockholder (the "Terminating Stockholder" .
> . . ) at the Agreement Price (as defined in Section 3.4) and on the
> Agreement Terms upon the occurrence of any of the following events for a
> period ending on the later of 60 days after determination of the Agreement
> Price for the Terminating Shares and 90 days after the Company and the
> Purchasing Stockholders receive notice from any source of the occurrence
> of any of the following events (each Stockholder agreeing to give the others
> and the Company notice of any such event promptly after its knowledge of
> the occurrence thereof) . . . .
>
> (iv) the Terminating Stockholder sells, *pledges*, encumbers, hypothecates or
> *otherwise transfers* any interest in (including any derivative transaction), or

---

[16] *Id.* at 121 (J. Trump) ("I had confidence in Arie and we were willing to go forward with him.
But I was not willing to go forward with a bunch of people who would be fighting with each
other and ultimately end up greenmailing each other."); *see also id.* at 805-06 (O. Genger)
(acknowledging the "nightmar[ish]" relations in the Genger family).
[17] *Id.* at 252 (Hirsch).
[18] Stockholders Agreement § 2.4.

8

> *purports to* sell, *pledge*, encumber, hypothecate or otherwise transfer any
> interest in (including any derivative transaction), any of its Shares, except
> as permitted by and in full compliance with the terms of this
> Agreement. . . .[19]

Therefore, Section 3.2(a) gave the Trump Group 90 days to elect to purchase TPR's

shares after it "receive[d] notice from any source" that a transfer had been made to a non-

Permitted Transferee, or that a change of control had occurred.[20]

Section 6.5 outlined the form of notice required under the various provisions of the

Stockholders Agreement:

> All notices required to be delivered pursuant to this Agreement shall be
> delivered in person or by telegraphic or other facsimile transmission or sent
> by certified mail, return receipt requested, and shall by addressed to the
> Company at its principal business office, to the attention of its Chief
> Executive Officer, to a Non-TPR Stockholder, to the Representatives, and
> any other Stockholders at the address of the Stockholder shown in the
> Company's stock ledger or to such other address as such other Stockholder
> may indicate by duly giving written notice to the Company.[21]

Thus, formal notice of an event such as a share transfer was to be given directly to the

Trump Group entities, *i.e.* TR Investors and Glenclova, who were parties to the

Agreement, and not to Jules Trump personally.[22] The Stockholders Agreement also

contained a non-waiver clause, which provided that "[n]o waiver or failure on the part of

a Company or a Stockholder in the exercise of any right, power or remedy shall operate

as a waiver thereof, nor shall any single or particular exercise by them of any right, power

---

[19] *Id.* § 3.2(a) (emphasis added).

[20] *Id.*

[21] *Id.* § 6.5.

[22] As to TR Investors, it appears that notice was to be given through Mark Hirsch at TR
Investors' official address, and as to Glenclova, notice was to be given through Robert Smith at
Glenclova's official address. *See id.* at 40. Jules Trump was not an officer or director of either
TR Investors or Glenclova. Tr. 117 (J. Trump).

9

or remedy preclude other or further exercise thereof, or the exercise of any other right,

power or remedy."[23]

Finally, under Section 1.6 of the Stockholders Agreement, TR Investors and

Glenclova were entitled to an addition 1.85% of TPR's shares in Trans-Resources (the

"Balance Shares").[24] The Balance Shares refer to shares that Bank Hapoalim had the

option to purchase, the exercise of which would reduce TPR's shareholding by 1.85%.

Because of that option, the Trump Group allowed TPR to hold 52.85% of Trans-

Resources' stock, even though the parties agreed to a 51%/49% split, on the condition

that the Balance Shares would revert to TR Investors and Glenclova if the Bank's option

should expire unexercised.[25]

C. In 2004, As Part Of The Settlement Of His Acrimonious Divorce, Genger Transfers Trans-Resources Stock From TPR To The Sagi Trust, The Orly Trust, And To Himself

On October 26, 2004, after a drawn-out and contentious divorce proceeding,

Genger entered into a final marital settlement agreement with his then-wife, Dalia

Genger. Under that settlement agreement, Genger transferred his equity interest in TPR

to Dalia Genger on October 29, 2004. On that same day, the Trans-Resources shares that

TPR previously held were transferred as follows: approximately 13.9% of the shares

were transferred to Genger himself, and separate trusts established for his two children,

Orly and Sagi Genger (respectively, the "Orly Trust" and the "Sagi Trust"), were each

transferred approximately 19.5% of the shares (collectively, the aforementioned "2004

---

[23] Stockholders Agreement § 6.8.
[24] *Id.* § 1.6.
[25] *Id.*; *see also* Tr. 255-57 (Hirsh).

10

Transfers"). According to the transfer agreements, the trustees of each Trust agreed to

irrevocable lifetime proxies in favor of Genger (the "Proxies").[26]

At the time the 2004 Transfers were made, Genger did not notify TR Investors or

Glenclova of the Transfers as required by the Stockholders Agreement. Genger admits

that he never gave the written notice required by the Stockholders Agreement, provided

the Trump Group with copies of the Proxies, or passed on a copy of the marital

settlement agreement.[27] Nevertheless, Genger argues that TR Investors and Glenclova

received notice because he orally told Jules Trump about the 2004 Transfers. In

particular, Genger testified that he told Jules Trump about the 2004 Transfers "many

times" from the "inception, [when] the idea germinated of how to resolve my divorce, to

the execution [of the 2004 Transfers]."[28] Genger testified that he told Jules Trump of the

2004 Transfers during their regular strolls on Williams Island.[29]

For his part, however, Jules Trump categorically denied that Genger ever

mentioned the 2004 Transfers.[30] The only other person who testified to hearing any

conversations between Genger and Jules Trump relating to the 2004 Transfers was

Genger's daughter, Orly. At trial, Orly Genger testified that her father "shared . . .

everything" with the Trumps,[31] and that she was present during at least one discussion

between Genger and Jules Trump about the 2004 Transfers. In particular, she testified

---

[26] JX-113 (Letter Agreement and Proxy (Oct. 29, 2004)) (the "Proxy").
[27] Pretrial Stipulation and Order 4; Tr. 936, 940 (A. Genger), 99 (J. Trump), 628 (Dowd).
[28] Tr. 856 (A. Genger).
[29] Id.
[30] Id. at 159 (J. Trump) ("Q. From the time that you became — TR Investors became a stockholder in 2001 to June 13th, 2008, did anyone give you any notice of the 2004 transfers, or the change in control of TPR? Trump. Never. Never, ever.").
[31] Id. at 783 (O. Genger).

about a discussion in "late '04 or early '05" at Jules Trump's residence on Williams

Island.[32]  But, Orly Genger's testimony regarding that conversation was vague, at best:

> They talked about how TPR and [Trans-Resources] were split, how my —
> my dad spoke about how he split those two, how he hoped that now that my
> brother, since was sort of — it was now me, my mother, and my brother,
> and my brother was supposedly the financial guy supposed to take care of
> us in a sense, he was hoping that — that he would.[33]

When asked for further details, she only elaborated as follows:

> Q. And were there details?  Was your father providing details to Mr.
> Trump —
>
> O. Genger. Yeah.
>
> Q. — in those discussions?
>
> O. Genger.  The fact that my brother was in the middle of it, you know, and
> just the awful nature of it.  Everything was told to Jules.[34]

On cross-examination, Orly Genger clarified that the discussion between her father and

Jules Trump some time in late 2004 or early 2005 definitely took place *after* the 2004

Transfers occurred,[35] and that she did not remember her father specifically discussing the

transfer of Trans-Resources shares to the Sagi Trust.[36]  But she did not provide further

---

[32] *Id.* at 787. Orly Genger also briefly mentioned a conversation between Genger and Jules
Trump sometime during 2007, when her brother brought a lawsuit against her father. *Id.* at 799.
But the only details she provided regarding that discussion was that she remembered "them
speaking specifically about th[e] lawsuit and how incredible it was that my father had given my
brother TPR [Investment], [and] he was actually against him now." *Id.*

[33] *Id.* at 786.

[34] *Id.* at 789.

[35] *Id.* at 801 ("Q.  And I want to make sure I understand.  [The conversation between Genger and
Jules Trump] — it definitely occurred after the 2004 transfers had occurred; is that right?  O.
Genger.  Yes.").

[36] The precise colloquy was as follows:
> Q. Now, in this conversation the issue that you recall being discussed was the
> transfer of control of TPR [Investment] to your brother.  He would be in charge.

details about the substance of the discussion between her father and Jules Trump other than to say that the "essence" of the discussion was "that [Sagi] was now sort of in charge."[37] The lack of specific details in her testimony undermines her credibility because of her personal interest in the outcome of this case and her obvious desire to protect her father in his feud with her brother,[38] and because Genger himself testified that no one else was present during his alleged conversations with Jules Trump, even his daughter Orly.[39]

---

O. Genger. That was the essence, that he was now sort of in charge.

Q. That was the essence of it.

O. Genger. Right.

Q. Yeah. And the question of the transfer of TPR's shares of [Trans-Resources] to your trust and your brother's trust and your father, you don't recall that that was discussed during this conversation?

O. Genger. I'm sorry. Can you say it again?

Q. Yes. The question of the transfer by TPR [Investment] of its [Trans-Resources] shares —

O. Genger. Right.

Q. — to your trust, your brother's trust, and your father, that was not discussed in this conversation?

O. Genger. Not that I remember.
*Id.* at 803-04.
[37] *Id.*
[38] *Id.* at 813 ("Q. You stand to benefit if your father prevails in this litigation? O. Genger: I hope. Yeah, I think.").
[39] *Id.* at 895 (A. Genger) ("The Court: It was just the two of you? Genger: Just the two of us. The Court: Not your daughter? Genger: Not my daughter.").

Besides his own testimony and the testimony of his daughter, the only other
evidence to which Genger points as proof that he told the Trumps about the 2004
Transfers are two after-the-fact events. First, Genger points to a written consent that
Trans-Resources' shareholders were required to sign in 2005 (the "2005 Written
Consent") in order to resolve a dispute with Bank Hapoalim, with whom Trans-
Resources had a long-term relationship, over Trans-Resources' outstanding debt. The
signature page of the 2005 Written Consent included signature blocks for not only Arie
Genger, but also the Orly Trust and the Sagi Trust, and identified Arie Genger as the
proxy for the two Trusts.[40] That is, by including signature lines for the Orly Trust and the
Sagi Trust as shareholders, the 2005 Written Consent disclosed that some sort of transfer
had taken place. For their part, the Trumps credibly claim that they did not notice the
additional signature lines in the 2005 Written Consent when they signed the page.[41]

Second, Genger claims that he mentioned the 2004 Transfers during a Trans-
Resources board meeting in November 2007 at which Jules Trump was present (the
"November 2007 Board Meeting").[42] For support, Genger points to the minutes of that
meeting, which reflect that "Mr. Genger advised the directors that both he and Mr. Dowd
had been sued by TPR Investment Associates, Inc. and other related entities with respect
to their activities as officers and/or directors of TPR Investment Associates, Inc., *the
former parent Company of [Trans-Resources]*."[43] Genger avers that this passing

---

[40] JX-125 (executed written consent (July 26, 2005)) (the "2005 Written Consent").
[41] Tr. 101-05 (J. Trump), 185-92 (Hirsch)
[42] JX-149 (Trans-Resources board meeting minutes (Nov. 19, 2007)).
[43] *Id.*

14

reference to TPR being the former parent of Trans-Resources should have tipped Trump

off that the 2004 Transfers were made. As we will see, that argument is undercut,

however, by the reality that Genger's loyal subordinate, Bill Dowd, appears to have

manipulated the corporate minutes on other occasions to suit Genger's interests.

D.  Genger Finally Tells The Trumps About The 2004 Transfers During Negotiations To
    Restructure Trans-Resources' Debt

In the spring of 2008, Trans-Resources was once again having financial troubles,

now in a dispute with Bank Hapoalim, which was pressuring Trans-Resources to sell its

main subsidiary, Haifa Chemical, Inc., in order to avoid foreclosure.[44]  Genger turned to

the Trumps for help, asking Jules Trump if the Trump Group would provide the capital

necessary to retire Trans-Resources' bank debt in exchange for an increased equity

position that would give the Trump Group control of Trans-Resources.[45]  Genger relied

on Jules Trump in particular not only because of their past relationship but also because

Bank Hapoalim, which had indicated that it had lost confidence in Genger, was however

willing to negotiate with Trump in regard to Trans-Resources' debt.[46]  On May 31, 2008,

Genger and Jules Trump met to discuss the general contours of an agreement (the

"Funding Agreement"), which would provide for a capital infusion into Trans-

Resources.[47]  After that meeting, Trump negotiated with Bank Hapoalim to reduce Trans-

---

[44] Tr. 38-39 (J. Trump).
[45] *Id.* at 41-42 (J. Trump).
[46] *Id.* at 124-27, 146 (J. Trump).
[47] *Id.* at 872 (A. Genger); 43-44, 135-36 (J. Trump).

Resources' debt load, and asked Genger to meet with Eddie Trump and Mark Hirsch, the

Trumps' lawyer, in New York to work out the details of the Funding Agreement.[48]

### 1. Genger, Eddie Trump, And Mark Hirsch Meet On June 13, 2008

Genger met with Eddie Trump and Hirsch in New York on June 13, 2008 (the

"June 13 Meeting"). Early in the June 13 Meeting, Hirsch gave Genger a draft of the

Funding Agreement. That draft listed TPR, Glenclova, and TR Investors as the

company's sole shareholders, thereby strongly suggesting that the Trump Group was

unaware at that time of the 2004 Transfers.[49]  Upon reviewing the draft, Genger

commented that TPR was no longer a Trans-Resources stockholder.[50]  Both Eddie Trump

and Hirsch expressed shock upon hearing that, and Hirsch reminded Genger that he was

not permitted to transfer his stake in Trans-Resources without first providing notice and a

right of first refusal to the Trump Group.[51]

Upon seeing their surprise, Genger did not stop and say what one would expect to

be the first thing out of his mouth if Genger had already given repeated notice to Jules

---

[48] *Id.* at 868-69 (A. Genger).

[49] JX-170 (email from Mark Hirsch to Jules Trump with draft agreements attached (June 12, 2008)).

[50] Tr. 283 (Hirsch), 498-99 (E. Trump).

[51] *Id.* at 284-85 (Hirsch), 499 (E. Trump). Interestingly, the trial record includes an email from Hirsch to Jules Trump, dated June 11, 2008, in which Hirsch describes the transfer restrictions and the right of first refusal provisions in the Stockholders Agreement. JX-167 (email from Mark Hirsch to Jules Trump (June 11, 2008)). The timing of that email suggests that the Trumps might have known about the 2004 Transfers before the June 13, 2008 meeting. But I do not find this email to be proof that Genger had given the Trumps oral notice because: (1) the Trumps may have simply suspected on their own that something like the 2004 Transfers had taken place; or (2) the Trumps may have heard rumors from sources other than Genger that the 2004 Transfers had occurred. In either event, notice as required under Stockholders Agreement had not been given. Furthermore, even if the email did indicate that notice had been given, it still suggests that the timing of that notice was no earlier than June 2008.

16

Trump: "Why are you acting so surprised? I told Jules all about these Transfers years ago."[52] Rather, Genger acknowledged that he had not provided notice of the 2004 Transfers, but insisted that he had lived within the spirit of the Stockholders Agreement by maintaining control of the stock through the Proxies.[53] And, Genger spent the better part of that day explaining the 2004 Transfers to Eddie Trump and Hirsch,[54] which would have been unnecessary had they already known about the Transfers.

Finally, at the end of the meeting, Genger offered to arrange a meeting with his lawyer, David Lentz, who was most familiar with the details of the 2004 Transfers.[55] Eddie Trump and Hirsch met with Lentz three days later, on June 16, 2008, to discuss the details of the 2004 Transfers. It is also noteworthy that, before that meeting, Genger never told Lentz that he had given Jules Trump oral notice of the 2004 Transfers.[56] If notice of the 2004 Transfers had indeed been given, one would have expected Arie Genger to have at least mentioned that important detail to his own counsel. During that

---

[52] Tr. 501 (E. Trump) ("At any time during the meeting did Mr. Genger say, 'Well, I told your brother, Jules. Let's get him on the phone,' or words to that effect? E. Trump: No."). Genger's testimony on this important issue was vague at best. He only recalled telling Eddie Trump and Hirsh something to the effect of "Jules knows about it" at some point during the June 13 Meeting. *Id.* at 900 (A. Genger). But, Genger could give no further details, and he admitted that he never pressed the point or suggested that they get Jules Trump on the phone to clarify the issue. *Id.*

[53] *Id.* at 284 (Hirsch) ("I took out the agreement to show [Genger] specifically why he could not have transferred the shares, that this was not permitted under the agreement. And he said, 'All right. You know, so I didn't tell you about it, but I didn't think I had to. I mean, what's changed? I still – I still vote the shares.'").

[54] *Id.* at 893-94, 899 (A. Genger).

[55] *Id.* at 902-03 (A. Genger).

[56] *Id.* at 7 (Lentz) ("Q: And Mr. Genger didn't tell you [before the June 16th meeting] that he claimed to have given some sort of notice to Jules Trump. That's correct; right? . . . Lentz: I believe your statement is correct.").

meeting, Lentz never suggested that Jules Trump had already known about the 2004

Transfers because Genger had told him about them years ago.[57]

2. Later Communications Between Genger, William Dowd, And David Lentz Admit
   That Genger Never Gave The Trump Group Notice Of The 2004 Transfers

In a series of emails and memoranda produced over the two weeks following the

June 16 meeting, Lentz repeatedly acknowledged Genger's failure to provide any notice

of the 2004 Transfers. In a June 17, 2008 email, Lentz wrote that "[t]he Trumps *never*

*consented to* and don't want [the Sagi] Trust or [Orly] Trust . . . as minority partners

(shareholders) in [Trans-Resources]."[58] And, in a June 26, 2008 email, Lentz wrote that

"no notice was given" to the Trumps about the 2004 Transfers.[59] But, Lentz's most

telling admission came in a memorandum he wrote for Genger analyzing the parties'

various bargaining positions and how likely machinations by Sagi Genger would affect

the outcome of the dispute (the "Lentz Memo"). In that Memo, Lentz wrote:

> *While it is true the Trumps never got notice*, the entire intent of the
> Shareholder's agreement has been carried out anyway. In other words, *why
> did AG not give them actual notice?* Because, AG will testify, using the
> TPR shell was never the intention of the Trumps and AG — the real
> intention was to keep the ownership of [Trans-Resources] in the Genger
> family under the voting and operational control of AG and the Stipulation
> did just that. So, AG becomes SG's best witness. AG will not say I just
> forgot to tell the Trumps. He will not say I tried to get away with
> something and thought the Trumps would not find out. He will testify that

---

[57] *Id.* at 990 (Lentz) ("Q. Nobody said at the meeting, then, that any notice had been given in
substance; right? Lentz. Correct."); *see also id.* at 994 (Lentz) ("Q. [Y]ou went through an
entire meeting about the absence of notice and people asking what, in fact, occurred. And no one
from your side of the discussion spoke a peep refuting that contention; right? Lentz: Nobody
refuted it, that's correct.").

[58] JX-331 (email from David Lentz to Arie Genger, Bill Dowd, and Christopher Gengaro (June
17, 2008)) (emphasis added).

[59] JX-337 (email from David Lentz to Arie Genger, Bill Dowd, and Christopher Gengaro (June
26, 2008)).

18

whether the corporate form of TPR or the kids' trusts w[as] used made no difference. The essence of these protections was to make sure the Genger family owned roughly 50% and that AG could vote all of those shares. That's what happened. So, *while there was a technical violation*, the Trumps got what they bargained for.[60]

Later in that same Memo, Lentz added: "AG does not have clean hands because like SG, *AG never told the Trumps*."[61] Thus, Genger's own attorney repeatedly acknowledged that Genger had never given the Trumps *any* type of notice.

3. At The June 25, 2008 Meeting Of Trans-Resources' Board And Stockholders, Genger Himself Indicates That Notice Of The 2004 Transfers Was Not Given To The Trumps

The Trans-Resources board met on June 25, 2008 (the "June 25 Board Meeting") and unanimously approved the Funding Agreement, which provided that the Trumps would invest an additional $57.5 million in the company in exchange for 50% of Trans-Resources' outstanding stock, which would give the Trumps clear voting control and by far the largest equity position in the company.[62] That is, the totality of the Funding Agreement would address the injury to the Trump Group from the 2004 Transfers by giving it voting control of Trans-Resources. Handwritten notes by Bill Dowd, a director and Trans-Resources' chief executive officer, recorded that "AG describe[d] [Trans-Resources] stock transfer *in violation of agreement*" during the meeting.[63] That is, Genger acknowledged that the 2004 Transfers were made without providing notice to the

---

[60] JX-332 (memorandum from David Lentz to Arie Genger, Bill Dowd, and Chris Gengaro) (the "Lentz Memo") (emphasis added).

[61] *Id.* (emphasis added).

[62] JX-181 (minutes of joint meeting of the board of directors and stockholders of Trans-Resources, Inc. (June 25, 2008)).

[63] JX-179 (handwritten notes of Bill Dowd (June 25, 2008)) (emphasis added).

19

Trumps. Tellingly, Dowd, who had worked for Genger for years, omitted that important admission from the formal minutes he drafted following the meeting.[64]

### E. Negotiations To Restructure Trans-Resources Break Down, And The Parties Eventually Commence This Litigation

Although the Funding Agreement solved the problem with Bank Hapoalim, Genger and the Trumps still had to sort out how to ensure that the Trumps were given control of the Trans-Resources board as required under the Funding Agreement. That was a problem because Genger and the Trumps anticipated that Sagi Genger, who now had a claim to be a Trans-Resources stockholder on account of the 2004 Transfers, would litigate any attempt to transfer control from Genger to the Trumps, if for no other reason than to spite his father.[65] During June and July of 2008, Genger and the Trumps discussed options for dealing with Sagi Genger. One of the options the Trumps suggested was confronting Sagi Genger with the argument that the 2004 Transfers violated the Stockholders Agreement, and that he was therefore not a beneficial owner of the Shares.[66] Importantly, Genger resisted this approach, likely because that would expose him to liability for representing falsely in the divorce settlement that the 2004 Transfers were not made in violation of any agreement.[67]

---

[64] *See* JX-179 (draft meeting minutes (June 25, 2008)) (omitting any reference to the 2004 Transfers being made in violation of the Stockholders Agreement).

[65] Tr. 318-19 (Hirsch).

[66] *Id.*

[67] *Id.* at 304 (Hirsch).

20

1. <u>Genger Reneges On The Funding Agreement, And The Trumps Respond With A Lawsuit</u>

Genger and the Trumps never reached common ground on how to approach Sagi, because Genger began to back-track on the draft terms of the Funding Agreement. Genger could afford to back out of the Funding Agreement because he had devised a way — albeit one of questionable propriety — to upstream funds from the Haifa Chemical, Inc. subsidiary to Trans-Resources, thus allowing Trans-Resources to fulfill its obligations to Bank Hapoalim, which Jules Trump had successfully reduced during his negotiations with the bank on behalf of Trans-Resources.[68] Because Genger had secured an alternative source of capital, the Funding Agreement with the Trumps was no longer the only mechanism for rescuing Trans-Resources. From that position of increased leverage, Genger began to disengage from the Funding Agreement deal. First, despite the fact that Bank Hapoalim required payment by late August, Genger requested that execution of the Funding Agreement be postponed upon the advice of counsel. Wielding a problem of his own creation, Genger asserted that Trans-Resources' Delaware lawyers had advised him that Trans-Resources needed to establish an independent committee to review the fairness of the Funding Agreement because the recipients of the 2004 Transfers might complain. Second, at an August 1, 2008 meeting, Genger's lawyers claimed, for the first time, that Genger had given Jules Trump oral notice of the 2004

---

[68] Dowd Dep. 281.

Transfers years ago, and threatened litigation if the Trumps chose to challenge the 2004 Transfers.[69]

The Trumps responded on August 8, 2008 with a letter to TPR and Trans-Resources indicating that Glenclova was exercising its right under Section 3.2 of the Stockholders Agreement to purchase all of the shares subject to the 2004 Transfers, and requesting that the Trans-Resources board begin the process of establishing their purchase price.[70] On August 11, 2008, Glenclova filed a suit in the United States District Court for the Southern District of New York seeking to enforce the Funding Agreement and its rights under the Stockholders Agreement.[71] On August 13, 2008, Genger responded through a letter from his attorneys, claiming that Glenclova had no right to purchase the shares because he had kept Jules Trump fully informed of the 2004 Transfers at the time they were made four years prior.[72]

2. The Trump Group Purchases The Sagi Trust's Shares And Reconstitutes Trans-Resources' Board Of Directors, Leading To This Section 225 Action

The lawsuit in federal court in New York was not the only course of action the Trumps took. On August 21, 2008, Jules Trump contacted Sagi Genger to explore the possibility of acquiring the 1,102.8 shares purportedly transferred to the Sagi Trust in 2004 (the "Sagi Shares").[73] And, on August 22, 2008, the Trumps purchased the Sagi Shares pursuant to a stock purchase agreement (the "Purchase Agreement") between the

---

[69] Tr. 65, 155-56 (J. Trump), 364 (Hirsch).

[70] JX-198 (letter from Glenclova to TPR and Trans-Resources (Aug. 8, 2008)).

[71] JX-204 (Complaint, *New TR Equity, LLC v. Trans-Resources, Inc.* (S.D.N.Y. Aug. 11, 2008)).

[72] JX-350 (letter from Charles Weissman to Barry Adelman (Aug. 13, 2008)).

[73] Tr. 111 (J. Trump).

Sagi Trust, TPR, and the Trumps' entities, TR Investors, Glenclova, New TR Equity I,

LLC ("Equity I"), and New TR Equity II, LLC ("Equity II").[74]  Importantly, the

transaction included not only the Sagi Trust as a party but also the wrongful transferor,

TPR.  Sagi Genger could act for TPR because, after making the 2004 Transfers, Genger

had ceded control of TPR to Dalia Genger, who subsequently sold her interest in TPR to

her son, Sagi.[75]  The Purchase Agreement contained a specific section addressing the

reality that the Trump Group viewed the 2004 Transfers as void and that TPR still owned

them and was obliged to sell them to the Trump Group at 2004 values.  To wit, the

Purchase Agreement provided that it would be considered consummated between the

Trump Group and *TPR* if the 2004 Transfers were to be found void:

> If at any time following the Closing Date, it is determined that Seller is not
> the record and beneficial owner of the Shares as of the date hereof, by
> virtue of the transfer of the Shares to it by TPR being deemed to have been
> void or for any other reason, and that all right, title and interest in and to the
> Shares is held by TPR, subject only to the plaintiff's asserted rights under
> the Stockholders Agreement asserted in the action styled Glenclova
> Investment Co. v. Trans-Resources, Inc. and TPR Investment Associates,
> Inc., Case No. 08-CIV-7140 (JFK), pending the United States District
> Court for the Southern District of New York, the parties hereby agree that
> (a) *this Agreement and the transactions contemplated hereby shall be
> deemed to have been entered into and consummated with TPR, (b) the
> Purchasers shall retain all right, title and interest in and to the Shares as if
> purchased from TPR pursuant to this Agreement, (c) TPR shall look only to
> Seller for any payments made by the Purchasers pursuant to this
> Agreement, (d) the Purchasers shall have no liability or obligation to TPR
> in respect of the Shares, and (e) all representations, warranties, covenants
> and agreements made by Seller herein, shall be deemed to have been made
> by TPR as of the date hereof.*[76]

---

[74] JX-225 (the "Purchase Agreement").

[75] Tr. 547 (S. Genger).

[76] Purchase Agreement § 10 (emphasis added).

Thus, by signing an agreement with both the Sagi Trust and TPR, the wrongful

transferee, the Trump Group dealt with the Genger-caused problem that Genger exploited

in order to derail the Funding Agreement. By dealing directly with both the allegedly

innocent transferee — the Sagi Trust — and the wrongdoer — TPR — the Trump Group

covered all of its bases.

Having purchased the Sagi Shares, which gave them a majority equity position in

Trans-Resources, the Trump Group then executed a written consent on August 25, 2008

that removed Genger from the Trans-Resources board, elected Eddie Trump and Hirsch

to the board, and affirmed the election of Jules Trump and Robert Smith to the board.

The Trump Group delivered that written consent to Trans-Resources, but Genger rejected

it.[77]

In response, the Trump Group filed a single-count complaint pursuant to 8 *Del. C.*

§ 225 in order to determine the composition of the Trans-Resources board (the "Section

225 Action"). Consistent with their position throughout the summer of 2008, the Trump

Group's central claim was that the 2004 Transfers were made in violation of the

Stockholders Agreement, and that it therefore had the right to purchase all of TPR's

shares pursuant to Section 3 of the Stockholders Agreement.[78] Genger responded with a

counterclaim, raising a number of arguments for why the 2004 Transfers were made

appropriately — chief among them his assertions that he told Jules Trump of the

Transfers at the time they were made, and that, in any event, the Trump Group's purchase

---

[77] Tr. 403-06 (Hirsch).
[78] Compl. ¶ 10.

24

of the Sagi Shares in 2008 ratified the 2004 Transfers — and claiming that, therefore, he still controlled Trans-Resources' board. Genger also argues that the Trump Group violated Section 2.1 of the Stockholders Agreement when Equity I and Equity II pledged Trans-Resources shares in return for financing to buy the Sagi Shares.

Soon after the Section 225 Action was filed, the parties promptly settled the matter, which resulted in a stipulated final judgment that declared that the Trump Group's designees constituted a majority of the board.[79] But, like any other moment of agreement between the parties in this case on anything, that settlement was short-lived. On October 10, 2008 — two weeks after the final judgment was entered — the Trump Group moved to re-open the Section 225 Action. They moved to reopen because they alleged that, after taking control of Trans-Resources, they discovered that Genger had destroyed documents relevant to the Section 225 Action in violation of a status quo order.

The issue of whether Genger should be held in contempt for destroying documents in violation of this court's status quo order was decided in 2009 in a separate trial.[80] It is unnecessary to recount here the facts or analysis involved in that trial, which are summarized in the opinion that resulted.[81] What matters for present purposes is the outcome: Genger was found to be in contempt, which raises Genger's evidentiary burden on any issue on which he has the burden of proof by one level and renders his uncorroborated testimony insufficient to establish material facts.[82]

---

[79] See *TR Investors, LLC v. Arie Genger*, C.A. No. 3994-VCS (Sept. 26, 2008) (ORDER).
[80] *TR Investors, LLC v. Genger*, 2009 WL 4696062 (Del. Ch. Dec. 9, 2009).
[81] See *id.* at *1-15.
[82] See *id.* at *18-19.

25

### III. Legal Analysis

Genger has proliferated a host of theories — including new ones after trial — as to why he retains voting control over Trans-Resources, and the Trump Group has accurately described its efforts to address Genger's ever-changing arguments as playing a game of "Whack-a-Mole."[83] It is possible, nevertheless, to sift through the heaping stew pot filled with every conceivable exculpatory theory that ever crossed his lawyers' inventive minds that Genger has cooked up and identify the chunkier ingredients. Genger's main theory is that the 2004 Transfers were made appropriately, either because he gave the Trump Group notice or because the Trump Group ratified the Transfers. Genger's primary alternative theory is that, even if the 2004 Transfers were not appropriate, the Trump Group took the Sagi Shares subject to the Proxy in his favor.

In the analysis that follows, I do not address all of the alternative theories Genger concocted, but rather focus on his two fundamental theories. Treating all of his secondary arguments is unnecessary because Genger has failed to bear his evidentiary burden as to those core theories on which the rest of his case depends. That is, Genger has failed to prove that he properly notified the Trump Group of the 2004 Transfers at any time before the June 13 Meeting, or that the Trump Group somehow ratified the 2004 Transfers after the fact. And, even if the Trump Group did ratify the 2004 Transfers —

---

[83] *See* Trump Post-Trial Ans. Br. 3. For example, Genger's counsel spent a great deal of time at post-trial oral argument in a befuddling exposition of a theory *introduced into the case as a footnote in its post-trial answering brief. Compare* Post-Trial Tr. 128-58 *with* Genger Post-Trial Ans. Br. 24, n. 18.

26

which it did not — Genger has failed to prove that it took the Sagi Shares subject to the

Proxy.

## A. Standard Of Review

The standard of review I apply in analyzing the aforementioned issues is different

in this case than what is typical. The party attempting to gain control of an entity in an

action pursuant to 8 *Del. C.* § 225 bears the burden of proof on any issue, the outcome of

which would affect the determination of the Trans-Resources' board.[84] Generally

speaking, the burden of proof in civil cases is that the party with the burden must prove

his position by a preponderance of the evidence.[85] But, because of this court's prior

ruling in the contempt trial, Genger's burden is raised a level, meaning that he must

prevail on any issue in which he bears the burden of proof by clear and convincing

evidence. And, as mentioned before, Genger's own uncorroborated testimony will not be

sufficient to establish any material fact.[86]

## B. Arie Genger Did Not Notify The Trump Group Of The 2004 Transfers Until June 13, 2008

The first issue I must address is Genger's argument that he gave the Trump Group

notice of the 2004 Transfers during his conversations in late 2004 or early 2005 with

Jules Trump about his divorce and that the Trump Group is chargeable with laches.[87]

---

[84] *See Agranoff v. Miller*, 1999 WL 219650, at *12 (Del. Ch. Apr. 12, 1999), *aff'd*, 737 A.2d 530 (Del. 1999). Genger conceded that he bears the burden of proof. Contempt Trial Tr. 355.
[85] *See SinoMab Bioscience Ltd. v. Immunomedics, Inc.*, 2009 WL 1707891, at *12 (Del. Ch. June 16, 2009).
[86] *See supra* page 25.
[87] Laches operates to bar a claim where "(a) [the] plaintiff knew (or should have known) of its rights or claim; (b) [the] plaintiff failed to assert its rights or claim; and (c) [the] defendant has materially changed its position or otherwise materially relied on plaintiff's failure to assert."

27

This argument is central to the case because the Stockholders Agreement provides that, upon receiving notice of an improper transfer from any source, the Trump Group has 90 days to elect to purchase the shares held by the stockholder making the transfer, *i.e.* TPR.[88] If the first time the Trumps heard about the 2004 Transfers was at the June 13 Meeting, then the Trump Group acted within the 90-day window provided in the contract because it elected to purchase TPR's shares on August 8, 2008, when it sent TPR a letter indicating that it elected to exercise its rights under Section 3.2 of the Stockholders Agreement.[89] But, if the Trumps received notice some time before May 8, 2008, then their demand to exercise their purchase rights under the Stockholders Agreement on August 8, 2008 would arguably be tardy.

Tellingly, Genger spent only one and a half pages in his post-trial briefing on this argument.[90] That is likely because he knew, as shown below, that he has failed to bear his evidentiary burden on this issue. There is no credible evidence indicating that Genger ever told Jules Trump about the 2004 Transfers in late 2004 or early 2005.

At trial, Genger offered little more than his unbelievable and uncorroborated testimony to support his claim that he notified the Trump Group. As discussed earlier, Genger testified that he told Jules Trump about the 2004 Transfers on a number of occasions in late 2004 or early 2005 while the two discussed developments in Genger's

---

*Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 714 A.2d 96, 104 (Del. Ch. 1998); *see also Fed. United Corp. v. Havender*, 11 A.2d 331, 344 (Del. 1940) ("Sitting by inactive and in what amounts to silence, when every consideration for the rights of others demanded prompt and vigorous action, and until affairs had become so complicated that a restoration of former status was difficult, if not impossible, is conduct amounting to laches.").

[88] Stockholders Agreement § 3.2(a).

[89] JX-198 (Letter from Glenclova to Trans-Resources and TPR (Aug. 8, 2008)).

[90] *See* Genger Post-Trial Op. Br. 28-30.

divorce during their strolls on Williams Island.[91]  For his part, Jules Trump categorically

denied that Genger ever mentioned the 2004 Transfers in late 2004 or early 2005.[92]  The

only other person who testified to hearing Genger and Trump discuss the matter was Orly

Genger.  But her testimony gave little detail about what was actually said during those

alleged conversations, and it was contradicted by Genger himself, who said that she was

not present at the key conversation when he told Jules Trump about the Transfers.[93]

Therefore, I do not find her testimony of the alleged conversations between Genger and

Jules Trump credible, especially in light of her personal interest in this case.

Moreover, if Genger did in fact tell Jules Trump about the 2004 Transfers in late

2004 or early 2005, then why did he not press that point at the June 13 Meeting when

Eddie Trump and Hirsch appeared shocked to hear the news?  The natural thing to say in

that situation would have been to make the obvious point that he had told Jules about it

years ago.  But, at trial, Genger only testified vaguely, haltingly, and meekly that he told

them something along the lines of "Jules knows about it," and gave no other details of

what he said in that regard.[94]  Genger also admitted that he never pressed the point any

further, even though he became "[v]ery frustrated" with the repeated questions Eddie

Trump and Hirsch were asking.[95]  For example, Genger never said that they should get

Jules Trump on the phone to confirm that Genger had indeed told him about the

---

[91] *See supra* page 11.

[92] *See supra* page 11.

[93] *See supra* page 11-13.

[94] Tr. 900 (A. Genger).

[95] *Id.*

29

Transfers.[96] Rather, Genger attempted to justify the Transfers on the grounds that he still had voting control through the Proxies.[97]

Genger also failed to mention his alleged conversations with Jules Trump even when he spoke with his lawyer, David Lentz, after the June 13 Meeting.[98] Such an important detail would, if true, have been one of the first things Genger told his counsel. But, the evidence indicates Lentz believed at the time that Genger had never informed Jules Trump of the 2004 Transfers.[99] That fact is reflected most clearly in the Lentz Memo, which stated repeatedly that notice had never been provided to the Trump Group.[100]

Thus, the overwhelming thrust of the evidence indicates that everyone in Genger's camp knew full well that he had never told the Trump Group about the 2004 Transfers before the June 13 Meeting.[101] Indeed, Bill Dowd's notes of the June 25 Board Meeting indicate that Genger himself admitted that the Transfers were made in violation of the Stockholders Agreement.[102] The inescapable conclusion is that Genger did not provide the Trump Group with any form of notice before the June 13 Meeting, choosing rather to trust in his savvy to manage the Trumps if the issue ever arose.

Nor can Genger rely on the passing references to the possibility of a transfer in the 2005 Written Consents and the minutes of the November 2007 Board Meeting. As noted,

---

[96] *Id.*

[97] *See supra* page 17.

[98] *See supra* page 17.

[99] *See supra* page 17-19.

[100] *See supra* page 18-19.

[101] *See* Tr. 631 (Dowd), 1008 (Lentz).

[102] *See supra* page 19.

the accuracy of the minutes of the November 2007 Board Meeting appears to be

suspect.[103]  Furthermore, the Stockholders Agreement required a specific form of notice

to be given to TR Investors and Glenclova.[104]  Even if Genger told Jules Trump about the

2004 Transfers in late 2004 or early 2005, which I conclude he did not, that would not

constitute notice to TR Investors or Glenclova.  But more important is the fact that

passing references in the 2005 Written Notices or the minutes of the November 2007

Board Meeting do not constitute proper notice of any kind or even put the Trump Group

on effective inquiry notice.  Business people can miss things.  The idea that the Trump

Group had to review every stray reference in the board minutes or to read between the

lines on the signature page of the 2005 Written Consents for signs of a possible transfer is

wrong.  The notice provision in the Stockholders Agreement was specific and designed to

ensure that the Trump Group did not have to police the world in this way, as was the

Stockholders Agreement's strong anti-waiver provision.[105]  Finally, I am persuaded by,

among other things, the draft Funding Agreement the Trump Group proposed that

indicated that the Trump Group did not know of the 2004 Transfers.  Notably, I conclude

that the Trump Group would prevail on this issue even if they had the burden to show

that they had not been given proper notice.  But, because Genger admits he did not give

proper notice as required under the contract,[106] it was his burden to show that he should

nevertheless be alleviated of his obligations under the Stockholders Agreement because

---

[103] *See supra* pages 19-20.
[104] *See* Stockholders Agreement § 6.5.
[105] *See id.* at §§ 6.5, 6.8.
[106] *See* Pretrial Stipulation and Order 4.

31

he gave Jules Trump oral notice and, certainly, it was his burden to prove a laches defense.

## C. The Trump Group Did Not Ratify The 2004 Transfers

Genger next argues that the Trump Group nevertheless ratified the 2004 Transfers. The defense of ratification is perhaps best understood by reference to its closest cousin, the doctrine of acquiescence.[107] Acquiescence occurs when a party "has knowledge of an improper act by another, yet stands by without objection and allows the other party to act in a manner inconsistent with the claimant's property rights."[108] Ratification differs primarily in timing: "[a]quiescence properly speaks of assent by words or conduct *during the progress* of a transaction, while ratification suggests an assent *after the fact*."[109] Thus, to find that a party ratified a prior act, it is first necessary to find that the ratifying party had "[k]knowledge, actual or imputed, of all material facts."[110] Second, ratification requires an affirmative act by the ratifying party. Assent can be "implied from conduct,

---

[107] *See Frank v. Wilson & Co.*, 32 A.2d 277, 283 (Del. 1943) ("Acquiescence and ratification are closely related.").

[108] *Brandywine Dev. Group, L.L.C. v. Alpha Trust*, 2003 WL 241727, at *4 (Del. Ch. Jan. 30, 2003).

[109] *Frank*, 32 A.2d at 283 (emphasis added); *see also* 1 DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY, § 11.03[a], at 11-20 (2009) ("Acquiescence involves assent during the progress of a transaction, while ratification suggests assent after the fact.").

[110] *Frank*, 32 A.2d at 283; *see also Papaioanu v. Comm'rs of Rehoboth*, 186 A.2d 745, 749-50 (Del. Ch. 1962).

as well as expressed by words" but is always a "voluntary and positive act."[111] Accepting

the benefits of a transaction can be an indication of that assent.[112]

### 1. Genger Has Not Met His Burden Of Proof As To His Ratification Claim

Realizing that he had a very weak argument that he gave effective notice of the

2004 Transfers to the Trump Group, Genger spent most of his briefing attempting to

argue that the Trump Group ratified the 2004 Transfers. Because of his prior acts of

spoliation, Genger bears the burden to prove ratification by clear and convincing

evidence. He has not done so.

Genger argues that the Trump Group ratified the 2004 Transfers on two occasions:

(1) when it accepted shareholder approval of the Funding Agreement at the June 25

Board Meeting; and (2) when it purchased the Sagi Shares on August 22, 2008.[113] As to

---

[111] *Frank*, 32 A.2d at 283; *see also* WOLFE & PITTENGER, § 11.03[a] at 11-19 to 11-20 (stating that ratification requires proof of a relinquishment of existing, known rights, and the "acceptance of new replacement rights or benefits").

[112] *See Kahn v. Household Acquisition Corp.*, 591 A.2d 166, 177 (Del. 1991) (stating that accepting the benefits of a transaction, even though the conduct in question is a breach of some duty owed to the shareholder, may bar the shareholder from obtaining equitable relief); *Frank*, 32 A.2d at 282 (finding that a shareholder "could not accept the benefit offered by the [transaction] and at the same time deny its validity"); *Giammalvo v. Sunshine Mining Co.*, 1994 WL 30547, at *10 (Del. Ch. Jan. 31, 1994), *aff'd*, 651 A.2d 787 (Del. 1994) ("The equitable defenses of ratification and acquiescence are closely related. Under the proper circumstances, both doctrine prevent one who accepts the benefits of a transaction from thereafter attacking it."); *Dannley v. Murray*, 1980 WL 268061, at *4 (Del. Ch. July 3, 1980) ("The 'affirmance' required to create ratification . . . may arise by the retention of benefits with knowledge of the unauthorized acts.") (citations omitted); *Trounstine v. Remington Rand*, 194 A. 95, 99 (Del. Ch. 1937) ("[E]quity will not hear a complainant stultify himself by complaining against acts in which he participated or of which he has demonstrated his approval by sharing in their benefits.").

[113] Later in the briefing process, Genger recast his argument about the 2005 Written Consents and the minutes of the November 2007 Board Meeting in ratification terms. That is, Genger argued that the 2005 Written Consents and the minutes of the November 2007 Board Meeting indicate that the Trump Group ratified the 2004 Transfers. The argument fares no better presented within a ratification analysis. As explained above, I find this argument unconvincing

the June 25 Board Meeting, Genger's theory is that the Trump Group accepted Genger's

vote on behalf of the Sagi and Orly Trusts at the June 25 Board Meeting when the Trans-

Resources stockholders approved the Funding Agreement. Genger argues that the Trump

Group benefited when Genger purportedly voted the Proxies at the June 25 Board

Meeting because approval of the Funding Agreement was a step towards giving them

control of the company. As to the second theory, Genger argues that the Trump Group

acknowledged the Sagi Trust as the transferee of the Sagi Shares, and benefited from

purchasing the Sagi Shares because buying directly from Sagi Genger allowed the Trump

Group to avoid the uncertainty and cost of enforcing their rights under Section 3.2 of the

Stockholders Agreement.

Genger's ratification argument fails for two primary reasons. First, Genger's

argument that the Trump Group ratified the 2004 Transfers is belied by the fact that the

Trump Group repeatedly stated that the Transfers were made in violation of the

Stockholders Agreement. Eddie Trump and Hirsch made that point at the June 13

Meeting.[114] The fact that the Transfers were made in violation of the Agreement was

---

because, although representatives of the Trump Group received the 2005 Written Consent and
signed its signature pages, and approved the minutes of the November 2007 Board Meeting,
neither document involved the communication of a material amount of information about the
2004 Transfers to properly notify the Trump Group of the Transfers. Before a party can ratify
something, it must first have "sufficient notice or means of knowledge" of the transaction or act
in question. *Papaioanu*, 186 A.2d at 749-50. The 2005 Written Consent and the 2007 Board
Minutes made, at best, an oblique suggestion that some event might have changed the
shareholdings of Trans-Resources' stock. But neither the 2005 Written Consent nor the minutes
of the November 2007 Board Meeting indicate any particular information about the 2004
Transfers, and neither event even occurred in a context where the Trump Group would have been
alerted that something like the Transfers may have taken place. Therefore, Genger's ratification
argument based on those pieces of evidence fails.
[114] *See supra* page 16.

repeated at the June 25 Board Meeting.[115]  The letter the Trump Group sent to Trans-

Resources on August 8, 2008, whereby it expressed its intention to exercise its rights to

buy the 2004 Transfer shares, indicated that the 2004 Transfers were made in violation of

the Stockholders Agreement.[116]  And, the Trump Group's complaint in this matter

claimed that the 2004 Transfers violated the Stockholders Agreement.[117]  Thus, the clear

and consistent message from the Trump Group to Genger at all relevant times was that

the Stockholders Agreement had been violated.  At no point did the Trump Group tell

Genger that it accepted the 2004 Transfers.

Second, Genger has also failed to show that the Trump Group benefited in any

way that suggests ratification.  That is, Genger's argument that the Trump Group ratified

the 2004 Transfers at the June 25 Board Meeting must be rejected because Genger

reneged on the Funding Agreement.  Because the Agreement was never executed, the

Trump Group never received the benefit that was the condition upon which it might

actually not challenge the 2004 Transfers.  Without the Trump Group having received the

benefit that was to be given for relinquishing its claim that the 2004 Transfers were void,

there is no basis to conclude that the Trump Group assented to the 2004 Transfers by

accepting Genger's vote on behalf of the Sagi and Orly Trust in favor of the Funding

Agreement.[118]

---

[115] *See supra* page 19.

[116] *See supra* page 22.

[117] *See* Compl. ¶ 8.

[118] Genger argues that it was enough that the Trump Group "accepted for themselves as
shareholders the pecuniary benefits" of the Funding Agreement, even though they never actually
received those benefits because that deal was never consummated.  Genger's Post-Trial Op. Br.

Indeed, the Funding Agreement proves the point. The Trump Group was willing

to consider a resolution of the violation of the Stockholders Agreement that remedied that

violation by giving them voting control of Trans-Resources. In so doing, they were

willing to accept some risk, based on Arie Genger's assurances that he did not face a

problem from Sagi Genger if he voted the disputed shares. If that was so, and if the

Trump Group was able to reach an accord that gave them voting control, all the parties

affected by the 2004 Transfers would have been on board. But the lynchpin of the deal

was the Genger would rectify the violation of the Stockholders Agreement by ensuring

that the Trump Group had voting control. He then reneged on his assurances that the

Transfers were a problem by claiming that Funding Agreement could not be

---

21. In other words, according to Genger's theory, not only is receiving a benefit an indication of
ratification, but a step taken during a negotiation to receive a benefit is also. Tellingly, Genger
cites no case law supporting his position.
    I reject this argument for the following reason: acceptance of the benefit of a voidable
transaction is an *alternative* basis upon which to ground a conclusion that a party ratified the
transaction. It is a suitable alternative to an express affirmation of the transaction because
acceptance of a benefit is a relatively concrete factual occurrence that inspires confidence in a
conclusion that, even though the ratifying party did not expressly enunciate her assent to the
voidable transaction, she has nonetheless done some "voluntary and positive act" to indicate that
assent. *Frank*, 32 A.2d at 283. Negotiations relating to a potential benefit arising from a
contractual breach are a less sure foundation upon which to base a finding of a ratification
because, as sophisticated commercial parties know, discussions often range across a number of
different options, many of which never come to pass. In other words, negotiations about the
potential benefit arising from a voidable transaction are unreliable. For that reason they cannot
reasonably be considered to induce the other party's reliance, and therefore there is no basis to
conclude that the party who suffered the breach is estopped from enforcing the contract. *See
Romer v. Porcelain Products, Inc.*, 2 A.2d 75, 76 (Del. Ch. July 28, 1938) (finding that a
complaining stockholder was barred by "the estoppel of his acquiescence"); *see generally Frank*,
32 A.2d at 283 ("The defenses of laches, acquiescence, ratification and estoppel all have some
element in common."). That is, until the ratifying party actually takes the benefit, there is no
basis for the estoppel. For that additional reason, I reject Genger's claim that the Trump Group
ratified the 2004 Transfers at the June 25 Board Meeting.

accomplished because Sagi Genger might challenge the substantive fairness of the required stock issuance to the Trump Group.

Of course, the Trump Group received a benefit when it purchased the Sagi Shares from the Sagi Trust and TPR, but that benefit is not an indication of the Trump Group's ratification of the 2004 Transfers. Rather it is consideration of a settlement that resolved the very problem Genger had created. In other words, Genger's argument confuses the benefits that come from compromising claims away in return for a settlement with taking a benefit from a voidable transaction that indicates ratification. A benefit that indicates ratification is one where the ratifying party would be getting something for nothing if she were allowed to enforce the contract.[119] Here, the Trump Group was not attempting to take advantage of the 2004 Transfers in a way that would have allowed it to obtain more than it was entitled to under the Stockholders Agreement.

By entering into the Purchase Agreement, the Trump Group dealt with the problem that Genger's misconduct had caused it. Genger had just reneged on the compromise Funding Agreement that would have rectified his wrongful behavior, in large measure by claiming that Sagi Genger, as an arguably innocent purchaser for value, would cause trouble and upset any deal. The Trumps reasonably suspected that Genger's resistance was also inspired by his desire to retain control. To address this problem, the Trump Group dealt with both the wrongful transferor, TPR, and the purported transferee, the Sagi Trust, so that it could cover all its bases. In doing so, the Trump Group never

---

[119] *See, e.g., id.* at 278-83 (finding that a stockholder who had benefitted for years from a recapitalization plan "could not accept the benefit offered by the plan and at the same time deny its validity").

accepted the legitimacy of the 2004 Transfers; indeed, its consistent position was that the

Transfers were void.[120]  But by binding both TPR and the Sagi Trust, it could resolve the

issue of ownership and control over the bloc definitively.  That is, under the deal with

TPR and the Sagi Trust, the Trump Group extinguished any claims it had against either

TPR or the Sagi Trust as to the Sagi Shares in return for a majority stake in the

company.[121]  Thus, the Trump Group was only attempting to recapture from TPR what it

was owed under the Stockholders Agreement: control over Trans-Resources.  Indeed, the

Trump Group was giving up its right to purchase the shares from TPR at 2004 prices,

which likely would have allowed the Trump Group to obtain the Shares for much less

than the approximately $26 million it paid to purchase the Sagi Shares.

The only difference between enforcing its rights under Section 3.2 of the

Stockholders Agreement against TPR and acquiring control directly through the purchase

of the Sagi Shares was speed.  That is, negotiating directly with both TPR and the Sagi

Trust had the advantage of providing a quick and certain resolution to the problem, while

enforcing Section 3.2 would likely have involved lengthy litigation.  Of course, a speedy

solution has value, but that value is the benefit of any settlement, and is one of the

primary reasons parties settle their disputes.  Undermining that incentive cuts against the

public's well-established interest in promoting settlement.[122]  At all times, the Trump

---

[120] *See supra* pages 16-25.

[121] *See supra* pages 22-24.

[122] *See Marie Raymond Revocable Trust v. MAT Five LLC*, 980 A.2d 388, 402 (Del. Ch. 2008)
("It is well established that Delaware law favors the voluntary settlement of contested issues.
Settlements are encouraged because they promote judicial economy and because the litigants are
generally in the best position to evaluate the strengths and weaknesses of their case." (internal

Group took the position that the 2004 Transfers were void, and mentioned that position to Genger and in litigation. All the Trump did by entering into the Purchase Agreement was ensure that, if the Trump Group were proven wrong in litigation about the 2004 Transfers, it had acquired whatever interests Sagi Genger held and, therefore, he was not a further obstacle. By making a deal directly with the wrongdoer whose shares it was entitled to receive under the Stockholders Agreement, the Trump Group settled TPR's violation of that Agreement by accepting the shares on the terms negotiated, rather than under the price setting process of Section 3.2. In this regard, it is also important to note that the Trump Group was entitled to control of Trans-Resources *as of 2004*, when Genger breached the Stockholders Agreement. Genger's secret transfers had deprived the Trump Group of the benefits of the Stockholders Agreement for four years, and it comes with little grace for Genger now to argue that the Trump Group had to wait even longer or else it would relinquish its rights to those benefits.

Finally, I note that finding that the Trump Group did not ratify the 2004 Transfers leads to, in my view, an equitable result, despite Genger's protestations to the contrary. The problem Genger created by his serious, secretive contractual breach — the insertion of Genger's dysfunctional family into the management of Trans-Resources — was precisely what the Stockholders Agreement was designed to avoid.[123] The Trump Group could only rectify that problem outside of litigation by negotiating with TPR and the Sagi Trust because, by effecting the Transfers, Genger made it impossible to deal with TPR

---

citations omitted)), *aff'd sub nom. Whitson v. Marie Raymond Revocable Trust*, 976 A.2d 172 (Del. 2009).
[123] *See supra* pages 5-8.

alone. Genger's argument that the Trump Group ratified the 2004 Transfers because it

dealt with Sagi Genger rather than telling him that the Transfers were void is particularly

cynical because Genger himself insisted that the Trump Group not challenge the Sagi

Trust's ownership of its Trans-Resources shares.[124]   Genger was the source of all of these

problems, and to find that the Trump Group ratified Genger's behavior would only

reward him for his own perfidy.[125]   In that regard, Genger's argument that a finding that

the Trump Group did not ratify the 2004 Transfers would work an inequity because it

would require the unwinding of his divorce settlement is baseless.  Genger only has

himself to blame for whatever mess his decision to make the 2004 Transfers has caused

for his divorce settlement.  If Arie Genger's violation of the Stockholders Agreement has

deepened the Genger family's internecine feud, that is unfortunate.  But it is not the

Trump Group's problem, nor is it a basis for an appeal to this court's sense of equity.

2. The Trump Group Holds A Majority Of Trans-Resources' Stock But Is Not Entitled
   To The Shares Transferred To Arie Genger Personally Or To The Orly Trust

That the purchase of the Sagi Shares was a bargain with TPR and the Sagi Trust

that resolved Genger's violation of the Stockholders Agreement also has ramifications for

the Trump Group's claims, which include a theory that it has a right to purchase all of the

shares TPR transferred in the 2004 Transfers — including the shares transferred to Arie

Genger personally and the Orly Trust — under the terms of the Stockholders Agreement.

In the Purchase Agreement whereby the Trump Group bought the Sagi Shares, the parties

---

[124] *See supra* page 20.

[125] *See* 3 FARNSWORTH ON CONTRACTS § 12.20 (3d ed. 2004) ("A person is not permitted to
profit by his own wrong at the expense of another.").

included a provision that ensured that, if the 2004 Transfers were found to be improper,

the Agreement would be deemed to have been consummated with TPR, not the Sagi

Trust.[126] Thus, the Purchase Agreement was a broad settlement that gave the Trump

Group the assurance that it had all its bases covered in regard to the Sagi Shares, and that

it would retain control over Trans-Resources. The Purchase Agreement also provided in

relation to the shares transferred to Arie Genger personally and the Orly Trust that:

> If at any time following the Closing Date, it is determined that Arie Genger
> is not the record and beneficial owner of the 794.40 shares of Common
> Stock of the Company purportedly transferred to him by TPR in October,
> 2004 and/or that the Orly Genger 1993 Trust is not the record and
> beneficial owner of the 1,102.80 shares of Common Stock of the Company
> purportedly transferred to such Trust by TPR in October, 2004, and that
> TPR is determined to be the record or beneficial owner of any such shares,
> in either or both cases by virtue of the transfer of such shares being deemed
> to have been void or for any other reason (the shares being so affected
> being referred to herein as the "Affected Shares") *then TPR shall promptly
> transfer 64% of the Balance Shares* (as such term is defined in the
> Stockholders Agreement dated March 30, 2001, among TPR, TR Investors,
> Glenclova and the Company (the "Stockholders Agreement")) to TR
> Investors and Glenclova in accordance with the terms of Section 1.6 of the
> Stockholders Agreement whether or not such agreement is then still in
> effect.[127]

Thus, the Purchase Agreement provided that, if the transfer of TPR shares to Arie Genger

and the Orly Trust was found to be improper, then 64% of the Balance Shares[128] would

be transferred from TPR to the Trump Group.

Although the 2004 Transfers violated the terms of the Stockholders Agreement,

which in Section 3.2 provides that the Trump Group can purchase all of TPR's shares, the

---

[126] *See supra* pages 23-24.
[127] Purchase Agreement § 11 (emphasis added).
[128] *See supra* page 10.

41

Trump Group cannot purchase the shares transferred to Arie Genger or the Orly Trust

because the Trump Group must abide by the settlement terms to which it agreed in the

Purchase Agreement. Because the 2004 Transfers violated the Stockholders Agreement,

Arie Genger and the Orly Trust have been found to not be the record or beneficial owners

of the shares transferred to them. Per Section 11 of the Purchase Agreement, that entitles

the Trump Group to 64% of the Balance Shares, and nothing more beyond the Sagi

Shares that it has already bought. As to the Transfer from TPR to Arie Genger himself,

the major problem was the lack of notice. Under the Stockholders Agreement, Genger

could receive shares from TPR so long as he: (1) gave proper notice to the Trump Group

entities; and (2) signed on to the Stockholders Agreement.[129] He did neither and, as a

result, cannot exercise any rights under the Stockholders Agreement. Although the

Trump Group believes that Genger's violation should require him to transfer all of his

Trans-Resources shares to the Trump Group, that remedy is disproportionate. That sort

of relief is unnecessary to this control dispute and therefore this § 225 action.

Nevertheless, Trans-Resources appears entitled, in any event, to deny Genger the right to

vote his shares until he gives formal notice and signs on to the Stockholders Agreement.

As to the Orly Trust, it is not before the court, and the shares it was wrongly transferred

are also not necessary for the Trump Group to exercise control. Therefore, I do not issue

any ruling as to those shares, because that is unnecessary in this § 225 action.[130]

---

[129] Stockholders Agreement § 2.1.

[130] *See Arbitrium (Cayman Islands) Handels AG v. Johnston*, 1997 WL 589030, at *3 (Del. Ch. Sept. 17, 1997) (discussing that a § 225 proceeding should generally only resolve issues affecting

Obviously, my finding that the shares were wrongly transferred creates problems for Arie

Genger, but that exposure is a result of his own secretive contract breach.

    D.  <u>The Trump Group Did Not Take The Sagi Shares Subject To The Proxy</u>

Even if the Trump Group ratified the 2004 Transfers — which it did not — it

would still have voting control over Trans-Resources because it did not take the Sagi

Shares subject to the Proxy. That conclusion is required for two reasons.

First, the language of the Proxy itself does not plainly indicate that the Proxy was

to run with the Shares if they are sold. The explicit terms of the Proxy establish that it

only applies so long as the Sagi Trust owns the Shares. For example, the Proxy states

that the Sagi Trust appoints Genger "to vote as *its* proxy, all shares of common stock of

TRI which are not or hereafter *owned by the Trust*."[131] Also, it permits Genger to vote

only "in the same manner and to the same extent as *the Trust* might, were *the Trust*

present at said meeting."[132] In this regard, the Proxy is different, for example, from the

proxy at issue in *Haft v. Dart Group. Corp.*, which gave the proxy holder the "right to

exercise all rights to vote *the Shares* on all matter on which *they* are entitled to vote."[133]

Here, the Proxy does not give Genger the right to vote on all matters in which the Sagi

Shares are entitled to vote; rather, the Proxy gives Genger the right to vote on all matters

in which the Sagi *Trust* is entitled to vote, suggesting that the Proxy does not extend to

subsequent owners of the Shares.

---

voting control of the corporation); *Bossier v. Connell*, 1986 WL 11534, at *2 (Del. Ch. Oct. 7, 1986) (same).
[131] Proxy at 1 (emphasis added).
[132] *Id.* (emphasis added).
[133] 1997 WL 154049, at *2 n.5 (Del. Ch. Mar. 14, 1997) (emphasis added).

Most importantly, the Proxy does not provide in any way for the reservation of voting powers to Genger after such a sale. The only language Genger points to as evidence that the Proxy is meant to run with the Sagi Shares is the phrase that the Proxy "shall continue for the duration of Arie Genger's life."[134] But, in the context of the entire document, that language only means that the Sagi Trust would be bound by the Proxy until Genger died, not that the Proxy would continue to bind later owners if the Shares were transferred. If Genger wanted to keep the Proxy after a transfer, he could have easily inserted clear language — such as "this Proxy shall bind any subsequent transferees" — into the Proxy to that effect. He did not, and thus there is no reason found in the text of the Proxy to indicate that it is binding upon the Trump Group.

Even if the language of the Proxy was ambiguous — which it is not — public policy concerns require that the Proxy be strictly construed. Historically, proxies have been interpreted narrowly and when there is an ambiguity, read as not restricting the right to vote the shares.[135] Recent market developments have only reinforced the utility of the presumption that irrevocable proxies should be narrowly construed. Separating voting control from stock ownership — which can result in "empty voting," where an investor votes stock without having an accompanying economic interest — raises important

---

[134] Proxy at 1.

[135] See *Eliason v. Englehart*, 733 A.2d 944 (Del. 1999) (finding a proxy to be revocable where the words expressly stating that it was an "Irrevocable Proxy" were only found in the authentication to the document, not in the language of the proxy itself); *Freeman v. Fabiniak*, 1985 WL 11583 (Del. Ch. Aug. 15, 1985) (narrowly interpreting the grant of authority made in a proxy instrument and holding that the instrument, which conveyed the right to vote at shareholder meetings, did not authorize other action by consent); *State ex rel. McKaig v. Bd. of Directors of H.F. Dangberg Land & Live Stock Co.*, 110 P.2d 212, 214 (Nev. 1941) ("The instrument granting the vote by proxy will be strictly construed.").

public policy concerns.[136] For example, the decoupling of shareholder voting rights and economic interest, which is increasingly common and only loosely regulated by the securities laws,[137] is of concern because empty voting can theoretically allow investors with voting power but with an economic interest adverse to the firm to vote in ways that reduce the company's share price.[138]

Our Supreme Court's recent decision in *Crown EMAK Partners, LLC v. Kurz* underscores the importance of those public policy concerns.[139] There, the Supreme Court affirmed this court's decision that third-party vote buying merits judicial review when it disenfranchises shareholders by affecting the outcome of a vote, and confirmed this court's conclusion that the voting arrangement at issue was proper.[140] Its reason for so concluding is important: "[w]e hold that the Court of Chancery correctly concluded that there was no improper vote buying, *because the economic interests and the voting interests of the shares remained aligned* since both sets of interests were transferred from Boutros to Kurz by the Purchase Agreement."[141] In other instances, the temptations for self-dealing that arise when persons with a relatively small economic interest in a

---

[136] *See* Henry T.C. Hu & Bernard Black, *Empty Voting and Hidden (Morphable) Ownership: Taxonomy, Implications, and Reforms,* 61 BUS. LAW. 1011, 1014 (2006) ("*Empty Voting*"); *see also* Shaun Martin & Frank Partnoy, *Encumbered Shares,* 2005 U. ILL. L. REV. 775.

[137] *See* Henry T.C. Hu & Bernard Black, *Equity and Debt Decoupling and Empty Voting II: Importance and Extensions,* 156 U. PA. L. REV. 625 (2008)

[138] *See Empty Voting* at 1014.

[139] 992 A.2d 377, 388 (Del. 2010) ("For many years, Delaware decisions have expressed consistent concerns about transactions that create a misalignment between the voting interest and the economic interest of shares.") (citations omitted).

[140] *Id.* at 388-90.

[141] *Id.* at 390 (emphasis added).

corporation has voting control have resulted in serious harm to the corporation and its

other investors.[142]

In light of those concerns, a proxy purporting to irrevocably decouple voting rights

from economic interest should be strictly construed. Because there is no such clear intent

manifested in the Proxy here, prudent public policy requires the conclusion that the Proxy

does not survive the sale of the Sagi Shares to the Trump Group.

Second, the Proxy is not irrevocable because it does not satisfy § 609 of the New

York Business Corporation Law, which I conclude governs the Letter Agreement and the

Proxy attached thereto in view of the lack of any policy conflict between it and the

DGCL.[143]  Section 609 provides that:

> A proxy which is entitled "irrevocable proxy" and which states that it is
> irrevocable, is irrevocable when it is held by any of the following or a
> nominee of any of the following: (1) A pledgee; (2) A person who has
> purchased or agreed to purchase the shares; (3) A creditor or creditors of
> the corporation who extend or continue credit to the corporation in
> consideration of the proxy if the proxy states that it was given in

---

[142] *See, e.g., Hollinger Intern., Inc. v. Black*, 844 A.2d 1022 (Del. Ch. 2004).

[143] Letter Agreement at 2 ("This Letter Agreement shall be governed by the laws of the State of New York without regard to conflicts of law principles."). Given Delaware's respect for contractual freedom, *see Abry Partners V, L.P. v. H&W Acquisition LLC*, 891 A.2d 1032, 1061 (Del. Ch. 2006) (noting that "there is also a strong American tradition of freedom of contract, and that tradition is especially strong in our State" and citing authorities), it respects choice of law agreements. *See J.S. Alberici Const. Co., Inc. v. Mid-W. Conveyor Co., Inc.*, 750 A.2d 518, 520 (Del. 2000) ("Delaware courts will generally honor a contractually-designated choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction."). Although our law relating to the voting of corporate shares is of paramount interest to Delaware, there is no offense to Delaware of allowing parties to subject agreements about irrevocable proxies to a law that places different strictures on such proxies than does Delaware law, absent some reason that those strictures offend a fundamental protection by the DGCL. Section 609 of the N.Y. Bus. Corp. Law does not conflict with any fundamental Delaware corporate law policies or doctrines. Therefore, I find no reason to apply Delaware law in a situation where the parties have made a clear choice of law in favor of a sister state.

consideration of such extension or continuation of credit, the amount
thereof, and the name of the person extending or continuing credit; (4) A
person who has contracted to perform services as an officer of the
corporation, if a proxy is required by the contract of employment, if the
proxy states that it was given in consideration of such contract of
employment, the name of the employee and the period of employment
contracted for; (5) A person designated by or under paragraph (a) of section
620.[144]

Genger obviously does not qualify under sub-sections (1), (2), (3), or (4) — that is, he is

not a pledgee, creditor, contract officer, or purchaser of the Shares sold to the Sagi Trust.

And, he does not qualify under sub-section (5), because § 620 of the New York Business

Corporation Law applies to an agreement "between two or more shareholders," and

neither Genger nor the Sagi Trust were shareholders of Trans-Resources when the Letter

Agreement and the Proxy were executed.[145]  Thus, the Proxy is not irrevocable under

New York Law, and was revoked by the sale of the Sagi Shares to the Trump Group.[146]

## IV.  Conclusion

Genger violated the Stockholders Agreement when he made the 2004 Transfers,

and the Trump Group did not ratify those Transfers after the fact.  Furthermore, the

---

[144] *N.Y. Bus. Corp. Law* § 609; *cf.* 8 *Del. C.* § 212(e) (providing that a duly executed proxy will
be deemed irrevocable where it: (1) states that it is irrevocable; and (2) is coupled with an
interest sufficient in law to support an irrevocable power, regardless of whether the interest is in
the stock itself or the corporation generally).

[145] *N.Y. Bus. Corp. Law* § 620.

[146] *See Tompers v. Bank of Am.*, 217 N.Y.S. 67, 75 (N.Y. App. Div. 1926) (holding that a
revocable proxy terminated "through sale of . . . stock").  Even if the Proxy were irrevocable,
Genger would still be bound to vote his shares for a majority of the Trump Group's directors
because the Stockholders Agreement provides that "the group owning the greater number of
shares as between the TPR Stockholders and the Non-TPR Stockholders shall designate four
directors."  Stockholders Agreement § 1.2.  That is, Genger would have to vote the Proxy for the
Trump Group's directors, because the Trump Group is indisputably the owner of a majority of
Trans-Resources' shares.  Economic ownership trumps, so to speak, any interest Genger has as
an owner of the Proxy.

Trump Group did not take the Sagi Shares subject to the irrevocable Proxy. Therefore,

the Trump Group retains the Sagi Shares,[147] is entitled to 64% of the Balance Shares, and

can vote all of the Trans-Resources shares it holds as it wishes. The parties shall submit

an implementing order by Wednesday, July 28, 2010.

---

[147] Genger's claim that he is entitled to purchase the Sagi Shares under § 3.2 of the Stockholders Agreement because the Trump Group pledged (a disputed amount of) those Shares to a party from which they obtained purchase financing fails because Genger never signed on to the Stockholders Agreement. Tr. 950 (A. Genger). Until he accepts the burdens of that contract, Genger cannot expect to enjoy its benefits. *See, e.g., Red Clay Educ. Ass'n v. Bd. of Educ. of Red Clay Consol. School Dist.,* 1992 WL 14965, at *10 (Del. Ch. Jan. 16, 1992) (holding that plaintiff could not "accept the benefits of a contract without also bearing the corresponding burdens"). Furthermore, Genger cannot now claim entitlements under a contract that he intentionally flaunted. *See PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.,* 857 A.2d 998, 1014-15 (Del. Ch. 2004) (holding that a party that repudiates or breaches a contract cannot then claim the benefits of that contract).

JAN 02 2009

SURROGATE'S COURT : NEW YORK COUNTY
------------------------------------------ X
In the Matter of the Trust Established
on December 13, 1993, by ARIE GENGER          File No. 0017/2008
for the Benefit of ORLY GENGER.
------------------------------------------ X

R O T H , S .

        This is a contested application by the primary beneficiary
(Orly Genger) of an irrevocable inter vivos trust established by
her father, Arie Genger, seeking the appointment of a successor
trustee or, alternatively, the appointment of a "special trustee"
to investigate alleged wrongdoing concerning the trust.
Petitioner's mother, Dalia Genger (grantor's former wife),
contends that she is the duly appointed successor trustee and
that there is no basis to appoint another fiduciary for any
purpose.

        The trust agreement, dated December 13, 1993, provides for
discretionary income and principal distributions to Orly for life
with remainder to her descendants or, if none, to the grantor's
descendants in trust.

        Article SEVENTH (B), (D), (E), and (G) of the trust
instrument sets forth the following procedure for the resignation
of trustees and the appointment of their successors.

        A trustee may resign by delivering a signed and acknowledged
instrument of resignation in person or by certified or registered
mail to the other trustee and to either the grantor or the income
beneficiary.  Such resignation is effective upon the receipt of
the acknowledged instrument by the other trustee (if there is

one) and the grantor or the income beneficiary or at such later
date as may be specified in the instrument.

A trustee may appoint his or her successor by delivering a
signed and acknowledged instrument in the same manner as
described above for resignation.  Any such appointment, however,
is valid only if the appointee qualifies by delivering a signed
and acknowledged instrument of acceptance in person or by
certified or registered mail to each trustee and the grantor or
the income beneficiary within 30 days after the later of 1) the
date on which a copy of the appointment instrument is delivered
to him or her, and 2) the effective date of the appointment as
set forth in the appointment instrument.  It is observed that
there is no provision that requires a resigning trustee to
appoint a successor or that there always be two trustees in
office.

The original two trustees served until October 2004, when
they resigned and appointed David Parnes and Eric Gribitz as
their successors.  On February 12, 2007, Mr. Gribitz resigned
without appointing a successor.  On April 26, 2007, Mr. Parnes
resigned and appointed as his successor Leah Fang in a signed and
acknowledged instrument.  Although Ms. Fang noted her acceptance
at the bottom of such instrument, her signature was not
acknowledged.  However, in another document entitled "Release"
executed and acknowledged by Ms. Fang the same day, she, as

2

trustee, purported to discharge Mr. Parnes from liability.  It is undisputed that thereafter Ms. Fang acted as trustee.  Indeed, Ms. Fang's contention that she received a number of requests for information from petitioner and that petitioner referred to her in writing and orally as trustee is not disputed by petitioner.

On December 12, 2007, Ms. Fang, without resigning in accordance with the trust agreement, attempted to appoint Patricia Enriquez, as successor trustee.  Her designation of Ms. Enriquez, however, was by an unacknowledged letter in which she referred to her own resignation as taking effect upon Ms. Enriquez's acceptance of the appointment.  Ms. Enriquez accepted by signing the letter, but such acceptance was not acknowledged and, in any event, there is nothing in the record to suggest that such "acceptance" was delivered in accordance with the trust instrument.  Two weeks later, an attorney for Ms. Enriquez notified petitioner's counsel by email that her client had advised that she had no intention to overcome the procedural omissions.

On January 3, 2008, Ms. Fang and Dalia Genger signed before a notary a memorandum in which Ms. Fang stated that "to the extent that I am still vested with any powers to appoint trustees of the [trust], I confirm your appointment."  The next day, Ms. Fang executed an acknowledged instrument of resignation and appointment of successor trustee naming Dalia as her successor

3

and Dalia, on the same day, executed an acknowledged instrument
of acceptance.  It is undisputed that such documents were
delivered in accordance with the trust requirements.

We address first that portion of the instant application
which seeks the appointment of a successor trustee on the ground
that Dalia was not validly appointed.  In such connection,
petitioner argues first that, because Ms. Fang's signature on the
bottom of Mr. Parnes's appointment instrument was not
acknowledged, she never accepted the position in accordance with
the trust agreement (and thus could not appoint Dalia her
successor).  However, such argument ignores the "Release"
mentioned above that Ms. Fang executed the same day.  Such
instrument, which was signed and duly acknowledged, unequivocally
establishes Ms. Fang's acceptance of the position.  Since
petitioner does not challenge the authenticity of such instrument
or Mr. Parnes' contention, supported by the record, that it was
delivered in accordance with the trust instrument and, as noted
above, petitioner thereafter communicated with Ms. Fang as
trustee, Ms. Fang properly qualified as successor trustee.

Petitioner's second argument that, in any event, Ms. Fang's
appointment of Dalia was ineffective because Ms. Fang had
previously resigned as trustee is also without merit.  Simply
put, Ms. Fang had not previously resigned because her letter to
Ms. Enriquez did not contain the formalities (i.e., an

4

acknowledgment) required by the trust agreement. Moreover,
although not a model of clarity, the letter makes clear that Ms.
Fang did not intend to leave the trust without a trustee in the
event that Ms. Enriquez failed to qualify, which is exactly what
happened. Thus, Ms. Fang had authority to appoint Dalia as her
successor.

Since there is no dispute that the instrument of resignation
and appointment executed by Ms. Fang on January 4, 2008, and
Dalia's instrument of acceptance of the same date were executed
and delivered in accordance with the trust agreement, Dalia is
the duly appointed successor trustee of the trust. To find
otherwise would be to ignore the chronology of events and the
purpose of the provisions at issue, namely to ensure that the
trust always has a fiduciary ready, willing and able to act. The
fact that petitioner does not wish her mother to be the fiduciary
because she considers her an adversary in a broader intra-family
dispute does not provide a basis to ignore the grantor's intent,
as reflected in the trust instrument, that an acting trustee, and
not the beneficiary, decides who shall become a successor
trustee. Accordingly, petitioner's application to appoint a
successor trustee is denied.

We next turn to petitioner's alternate request for relief,
namely that a "special trustee" be appointed for the "purpose of
investigation and taking discovery with respect to the wrongful

5

dealings concerning the assets and income of the trust."

It is noted initially that petitioner's only allegations of
"wrongful dealings" concern a close corporation, TPR Investment
Associates, Inc.   She contends that her brother Sagi, who is an
officer of TPR, and Dalia, who was a shareholder at the time this
proceeding was commenced, are engaged in a "wrongful scheme" to
divert assets to themselves and, as a result, Dalia "could not
possibly" investigate wrongdoing at TPR, which the petition
describes as the "greatest" asset of the trust.

However, the premise of the application, namely that the
trust's interest in TPR would enable the trustee to investigate
or seek relief from TPR, does not appear to be correct.
Petitioner does not dispute Dalia's assertion, supported in the
record, that the trust is not a shareholder of TPR at all.
Rather, D&K LP, an entity in which the trust owns a 48 percent
interest, in turn owns approximately 50 percent of TPR.
Petitioner does not explain what appears to be a material
misstatement concerning TPR's relationship to the trust.   Nor
does she identify how a trustee under such circumstances might be
in a position to "investigate and address the TPR issues".

In any event, assuming arguendo that a trustee would somehow
be able to investigate alleged misconduct at TPR, petitioner's
vague and speculative allegations of "wrongful conduct" at TPR
from which Dalia purportedly benefitted do not warrant the

appointment of a "special trustee". Similarly, petitioner's allegations (made upon information and belief) that Dalia had knowledge of alleged improper acts by former trustee, David Parnes, in relation to TPR are patently insufficient to warrant the remedy of a "special trustee". In such connection, it is noted that Mr. Parnes and Ms. Fang have been directed to account for their proceedings as trustees (Matter of Genger, NYLJ, Feb. 25, 2008, at 29, col 3), giving petitioner a forum to seek relief for most of the conduct about which she complains.

Finally, it is observed that petitioner has not alleged that Dalia has refused a request for information, which would warrant relief (SCPA 2102), or has failed as trustee to protect trust assets. Indeed, it appears that Dalia (who states that she is ready and able to act as fiduciary) has yet to assume the duties of trustee in deference to her daughter's position in this litigation. As a validly appointed trustee, she should be given the opportunity to do what she deems necessary to manage and protect the trust's assets.

Based upon the foregoing, the appointment of a "special trustee" is unwarranted at this time and, accordingly, the application is denied, without prejudice to renewal if future

7

circumstances warrant such relief.

This decision constitutes the order of the court.

_____
S U R R O G A T E

Dated: December 31, 2008

8

```
 2  SUPREME COURT OF THE STATE OF NEW YORK

 3  COUNTY OF NEW YORK : TRIAL TERM:   PART 12
    - - - - - - - - - - - - - - - - - - - - - - - -X
 4  ARIE GENGER and ORLY GENGER, in her
    individual capacity and on behalf of
 5  THE ORLY GENGER 1993 TRUST,

 6                          Plaintiffs,

 7                       - against -

 8  SAGI GENGER, TPR INVESTMENT ASSOCIATES,
    INC., DALIA GENGER, THE SAGI GENGER 1993
 9  TRUST, ROCHELLE FANG, individually and
    as trustee of THE SAGI GENGER 1993
10  TRUST, GLENCLOVA INVESTMENT COMPANY,
    TR INVESTORS, LLC, NEW TR EQUITY I, LLC,
11  NEW TR EQUITY II, LLC, JULES TRUMP,
    EDDIE TRUMP and MARK HIRSCH,

12
                            Defendants.
13  - - - - - - - - - - - - - - - - - - - - - - - - X

14  Index No. 651089/2010

15                         October 26, 2011
                           60 Centre Street
16                         New York, New York 10007

17  B E F O R E:   HON.  PAUL G. FEINMAN, Justice

18


19  A P P E A R A N C E S:

20
    MITCHELL SILBERBERG & KNUPP, LLP
21  Attorneys for Arie Genger
    12 East 49th Street
22  New York, New York 10017
    BY:  LAUREN J. WACHTLER, ESQ.
23       PAUL D. MONTCLARE, ESQ.

24  ZEICHNER ELLMAN & KRAUSE, LLP
    Attorneys for Orly Genger
25  575 Lexington Avenue
    New York, New York 10022
26  BY:  YOAV M. GRIVER, ESQ.
```

2 | A P P E A R A N C E S:   (Cont'd)

3

4

5 | PEDOWITZ & MEISTER, LLP
Attorneys for Dalia Genger
6 | 1501 Broadway
New York, New York 10036
7 | BY:   ROBERT A. MEISTER, ESQ.
       MARISA H. WARREN, ESQ.

8

9

10

11 |                              Debra Salzman, RMR
                                Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1                          Proceedings

2              A F T E R N O O N   S E S S I O N

3              THE COURT:  Back so soon.

4              MS. WACHTLER:  Apologize for that.

5              THE COURT:  So what's happening?

6              Dalia has gone to court.

7              MR. GRIVER:  Dalia has gone to court, but not

8    here; she's gone to court in Delaware.  And we are asking

9    the Court to put in a temporary restraining order and to

10   enjoin Dalia from continuing to prosecute her duplicative

11   action.

12             In my papers I cite cases and it's is clear that

13   the Court has the equitable power to enjoin Dalia in order

14   to protect Orly, protect the court and preserve this

15   court's jurisdiction.  And so I think I'm going to spend a

16   little time talking to you about why the Court should

17   impose a TRO.

18             First, there's no question that the case that

19   Dalia started is duplicative.  It has the exact same legal

20   issue as what's before the Court in the 2010 matter, the

21   beneficial ownership of the TRI shares.  That's it.  If you

22   compare the first count of the third amended complaint

23   before your Honor and the first count of Dalia's case in

24   Delaware, they're the same.  They both make claims as to

25   who owns the beneficial ownership of the exact same shares.

26             More importantly, there's no reason that the case

1              Proceedings

2    should be in Delaware.  Everything is in New York and this

3    is where this issue should be decided.  Dalia isn't a

4    resident of Delaware.  She lives in New York.  Orly lives

5    in New York.  The Orly Trust is a New York trust.

6              THE COURT:  There aren't too many places in

7    Delaware -- I shouldn't say this on the record -- there are

8    a couple of beautiful places in Delaware along the shore,

9    Bethany, I think, is the name of the town, and Rehoboth,

10   Delaware and some of the towns up along that coastline are

11   beautiful.  And other than the credit cards, you like to be

12   in Wilmington, there's not too many places to --

13             MS. WACHTLER:  You're not convincing me.

14             THE COURT:  The shoreline is beautiful.  But any

15   way, you're right, they don't live in Delaware.

16             MR. GRIVER:  They don't.  The Orly Trust, it

17   calls for the application of New York law.  TPR is located

18   in New York.  All the contracts at issue are located in New

19   York.  The stipulation and divorce decree is New York.  The

20   divorce is a New York divorce.  The marriage was a New York

21   marriage.  All the parties necessary for determination of

22   this issue are before this Court.

23             THE COURT:  If they had gone to a bet din in

24   Israel then maybe we wouldn't have had all these problems.

25             MR. GRIVER:  Maybe.  But Orly chose to be here.

26   All kidding aside, Orly chose to be here and she chose to

| | Proceedings |
|---|---|
| 1 | |
| 2 | be here 15 months ago.  She asked this court to decide |
| 3 | this.  Dalia is in this court.  The Orly Genger Trust is in |
| 4 | this court.  There are parties that should be part of this |
| 5 | decision, a part of this adjudication that are not in |
| 6 | Delaware.  Orly, for example, is not part of that suit. |
| 7 | Arie is not part of that suit. |
| 8 | You know, I made a list of all of the reasons |
| 9 | that this case should be in New York and then I made a list |
| 10 | of why this case is now in Delaware and I came up with one, |
| 11 | and that's Chancellor Strine.  Delaware should be the last |
| 12 | place that the Orly Trust would want to be because |
| 13 | Chancellor Strine, as you know from the papers, or perhaps |
| 14 | you don't, already ruled on this issue and ruled against |
| 15 | the Orly Trust. |
| 16 | The Orly Trust actually has that as part of her |
| 17 | complaint in the action that she's brought.  She actually |
| 18 | talks about the fact that the court that she chooses to be |
| 19 | in front of has already ruled against her.  That's |
| 20 | paragraph 34 of her complaint.  And she's absolutely right, |
| 21 | because this court ruled in paragraph 8 of its final |
| 22 | judgment that TPR owned the trust, not -- that TPR owned |
| 23 | the TRI shares, not the Orly Trust.  And what this case is |
| 24 | designed to do, your Honor, is get this case in front of a |
| 25 | judge that has already decided this issue against the |
| 26 | trust. |

Debra Salzman, Official Court Reporter

6

| | |
|---|---|
| 1 | Proceedings |
| 2 | Now, granted, it should not have made that |
| 3 | decision.  It made that decision as part of an in rem |
| 4 | proceeding.  It had no right to make that decision.  The |
| 5 | Delaware Supreme Court reversed it and they reversed it |
| 6 | saying, look, you don't have, among other things, |
| 7 | jurisdiction over the Orly Trust. |
| 8 | So Dalia did that.  And just last night, your |
| 9 | Honor, the Trump Group filed an answer to a motion to |
| 10 | dismiss.  And on page 31 of their brief -- |
| 11 | THE COURT:  Motion to dismiss in Delaware. |
| 12 | MR. GRIVER:  Yes, the motion to dismiss the |
| 13 | Delaware action.  They tried to bring a plenary proceeding |
| 14 | and that's being opposed because -- |
| 15 | MR. MEISTER:  Excuse me.  That's not the Orly |
| 16 | action. |
| 17 | MR. GRIVER:  This is another case in Delaware. |
| 18 | THE COURT:  Okay. |
| 19 | MR. GRIVER:  That involves the Trump Group and |
| 20 | the attempt to sue TPR and Arie Genger over the Arie Genger |
| 21 | portion of the TRI shares. |
| 22 | THE COURT:  Okay. Arie Genger. |
| 23 | MR. GRIVER:  Yes.  And Arie Genger has moved to |
| 24 | dismiss saying, among other things, "You don't have |
| 25 | jurisdiction over me.  You don't have personal jurisdiction |
| 26 | over me." |

Debra Salzman, Official Court Reporter

1           Proceedings

2                But the Trump Group filed papers there and they

3      said -- and this is on page 31.  I'll give a copy to you

4      and your Honor, if you'd like -- they say the Orly Trust is

5      now before this court.  And they drop a footnote and they

6      say, "On October 4, 2011, Dalia Genger, as trustee, filed

7      an action in this court on the Orly Trust behalf seeking a

8      determination as to beneficial ownership and, accordingly,

9      this court now has the power to make these decisions."

10               This could not have been an accident.  This has

11     to have been the intent.  And, your Honor, the cases are

12     clear that in a situation like this, the first filed

13     authority, that is you, protects its authority and the

14     desire --

15               THE COURT:  It's about time I won something,

16     right?

17               MR. GRIVER:  And the desire of Orly Genger.

18               And, finally, you have to ask yourself, why is

19     Dalia doing this?  And more importantly, is Dalia really

20     going to protect the Orly Trust?

21               THE COURT:  Better going into it having the judge

22     on your side, right?  She knows that.

23               MR. GRIVER:  I think the Court has to ask itself

24     who is more likely to protect the assets of the Orly Genger

25     Trust; is it Orly Genger, the beneficiary, or is it Dalia

26     Genger as trustee?

1            Proceedings

2            And the Court knows because we've put it out

3    before you --

4            THE COURT:  Well, let me ask you.  I haven't

5    asked this before.  But if you are so convinced that Dalia

6    is set about ruining her daughter financially or helping

7    the brother ruin the daughter financially, why not go back

8    to the Surrogate's Court and renew your application to

9    remove her?

10            MR. GRIVER:  You know, we thought about that, but

11    there's differences between the two actions.  There's a

12    reason why there are two actions.  We are seeking to remove

13    Dalia.  What Dalia has done is going to be placed on top of

14    everything else she has done as a reason that she needs to

15    be removed.  But the issue of the beneficial ownership of

16    the shares is before this Court and the issue of the

17    beneficial ownership of the shares Dalia is now trying to

18    place in front of the Delaware court.

19            THE COURT:  I understand the issue.  I was just

20    wondering.

21            MR. GRIVER:  We will make this known to the

22    Surrogate Court.  The Surrogate Court is in the midst of

23    its application.  It is moving at its own speed.  What we

24    need is we need a TRO to protect --

25            MS. WACHTLER:  December.

26            MR. GRIVER:  -- there's been a motion to dismiss

| 1 | Proceedings |

2   pending since, I believe, December 12th of 2010, with all

3   deliberate speed.

4          THE COURT:   The 60-day rule doesn't apply there.

5          MS. WACHTLER:   I don't think any rules apply in

6   the Surrogate's Court.

7          MR. GRIVER:   Mr. Meister practices there more

8   than I do.

9          THE COURT:   120 is on the outside.

10          MR. MONTCLARE:   That court is very overworked,

11   Judge, really, truthfully.

12          MR. GRIVER:   There are only two surrogates.

13          THE COURT:   They have a staff that I tell you is

14   unrivaled.   It is what it is.   Okay.

15          MR. GRIVER:   It is what it is.

16          THE COURT:   The bottom line is you have the

17   application pending.   I didn't remember that or maybe I

18   didn't know that and that's why I didn't remember that.

19          MR. GRIVER:   Right.   We do have an application

20   pending and we actually put in an affidavit from Judith

21   Seigel-Baum, who is Orly's lawyer in the surrogate

22   proceeding, to explain the difference between the two

23   actions and why this is the only court who can protect Orly

24   in this case.   She can't go to Delaware without placing

25   herself under the jurisdiction of that court, which she

26   does not want to do.

1                          Proceedings

2              THE COURT:  She doesn't want to do it for the

3       same reason they want to do it.  I understand that.

4              MR. GRIVER:  But she's faced with a Hobson's

5       choice.

6              THE COURT:  Who was it who said, you know, the

7       goal here is to get everything in one court with

8       jurisdiction.  Was that the Southern District who dropped

9       that footnote?

10             MR. GRIVER:  That was the Delaware Supreme Court

11      suggested New York.

12             THE COURT:  Right.

13             MR. GRIVER:  Justice Solomon a few weeks ago --

14             THE COURT:  I think they actually suggested the

15      Southern District.

16             MR. MONTCLARE:  Like a court in New York like the

17      Southern District.  And the reason for that, Judge, just so

18      you know, is that in the briefing that was brought up by

19      the other side that there's already a case in the Southern

20      District.

21             MR. GRIVER:  Right.  But all of the cases that I

22      cite stand for the proposition that a court has equitable

23      power to do this and must do this because it should not

24      permit another court proceeding to interfere with its

25      determination of issues that are already before it.

26             THE COURT:  The question is, whether it would

1        Proceedings

2    render any order that I might issue ineffectual.

3            So what say you?

4            MR. MEISTER:  Let me answer in similar aspects.

5            First, just to apprise the Court, this morning,

6    in the Delaware action, the Trump Group and TRI filed an

7    answer and counterclaim seeking a determination from that

8    court.  The Orly Trust does not beneficially own the

9    shares.  So issue is joined, addressed to the question of

10   the stay, which would prohibit Dalia from prosecuting the

11   Delaware action.  If that stay were granted, presumably she

12   wouldn't respond to the counterclaim.

13           So I think starting with a balance of harms --

14           THE COURT:  Well, wait a minute.

15           There's a stay in effect.  It's not like she's

16   going to lose her right to reply if and when such stay is

17   vacated.  I mean I'm not expert on Delaware civil

18   procedure, but I can't imagine a code that would --

19   Delaware is a great court of equity, the chancellor's

20   court, that's going to say you lose your right to reply to

21   a counterclaim because you were stayed.

22           MR. MEISTER:  I don't know, your Honor.  We just

23   found out about it literally this morning.

24           THE COURT:  That may not be your strongest

25   argument, that she's going to lose her right to respond to

26   the counterclaim because I find that hard to believe.

Debra Salzman, Official Court Reporter

| | |
|---|---|
| 1 | Proceedings |
| 2 | MR. MEISTER:  Let me then answer on the |
| 3 | question -- |
| 4 | THE COURT:  If necessary, you could always |
| 5 | fashion a stay such that "but for her right to file her |
| 6 | reply to a counterclaim," you know. |
| 7 | MR. MEISTER:  Let me answer then on, if you will, |
| 8 | the points under the heading of probability of success of |
| 9 | this motion. |
| 10 | First, my colleague says that this action before |
| 11 | your Honor seeks the determination of the beneficial |
| 12 | ownership and cites the first count in the complaint.  The |
| 13 | first count -- I have it in front of me -- Orly is not a |
| 14 | party to.  It's a claim by Arie that seeks, in effect, to |
| 15 | undo the whole kit and caboodle from the divorce. |
| 16 | Arie and Orly are parties on the second count. |
| 17 | The second count, even more tellingly, doesn't seek to |
| 18 | recover the TRI shares for the Orly Trust any more than the |
| 19 | first does.  The second count seeks to recover the TRI |
| 20 | shares, if you will, for Arie.  They seek a constructive |
| 21 | trust against the Orly Trust in favor of Arie. |
| 22 | And what that seeks in those two counts is that |
| 23 | the TRI shares go back to TPR and that TPR shares go back |
| 24 | to Arie for his life.  In other words, this is an attempt |
| 25 | to renegotiate the seven-year-old divorce settlement |
| 26 | agreement. |

Debra Salzman, Official Court Reporter

1                                     Proceedings

2               But what it isn't is, it isn't a claim seeking to

3     recover for the Orly Trust the TRI shares, as Orly in her

4     affidavit in support of the motion here says.  Those

5     issues, with much respect, are not before your Honor.  They

6     haven't been brought before your Honor.  In fact, the Orly

7     Trust is not before your Honor.

8               Dalia Genger is a defendant in the action in her

9     capacity as, if you will, former wife and party to the

10    separation stipulation and the attempt to undo seven years

11    of whatever, due to Arie's concealing the fact that there

12    was a consent needed from the Trumps.

13               I would add as further evidence of this that TRI,

14    the issuer of the shares in question, was not even added to

15    this action as a party until the supplemental summons was

16    filed on September 20th of this year.

17               Now, as to Orly Trust not being a party, I

18    emphasize that Dalia is a party in her individual capacity

19    and, respectfully, Orly, although she is a beneficiary, she

20    is not the sole beneficiary, as one of the affidavits says,

21    I think it's Ms. Seigel-Baum, who should know better

22    because my first motion to dismiss her complaint --

23    petitioner, I should say -- in the Surrogate Court, was the

24    failure to join the other beneficiary, which is a

25    contingent beneficiary coming into existence if she doesn't

26    have children during her life.

Debra Salzman, Official Court Reporter

1         Proceedings

2              But it's a basic question of trust law.  The

3    trustee has discretion to do things with the corpus of the

4    trust of which the attempts to get these shares declared

5    beneficially owned by the trust is quintessentially a right

6    of the trustee.  It's not the beneficiary.

7              The fact that the trust agreement says it's

8    governed by New York law is interesting but irrelevant.  It

9    doesn't affect who owns the shares.  The fact that the

10   beneficiary happens to live here and in fact the trustee

11   happens to live here is also irrelevant.

12             In essence -- oh, the last thing I should say is

13   to the degree that there are claims asserted in this action

14   before your Honor, all of the defendants have moved to

15   dismiss those claims.  And at the request of counsel for

16   Arie, the briefing on that was extended so that those

17   motions won't be fully briefed until December 9th.

18             Respectfully, I can't speak for the other ones.

19   We feel pretty confident about our motion to dismiss the

20   motion to, in effect, undo the divorce, which is what Dalia

21   is being sued for in this action.

22             Some of the moving affidavits, particularly

23   Ms. Seigel-Baum's, talks about the other action --

24             THE COURT:  Why the rush in Delaware?

25             MR. MEISTER:  Why the rush?

26             THE COURT:  Yes.

Debra Salzman, Official Court Reporter

| 1 | Proceedings |

2    MR. MEISTER:  I don't know --

3    THE COURT:  Why not let this work its way through

4    and why, at the end of the day, if Delaware needs to rule,

5    let them.

6    MR. MEISTER:  Well, the end of what day, your

7    Honor?  The issues aren't before your Honor.

8    THE COURT:  The end of the case -- well, so say

9    you, not so say them.

10   MR. MEISTER:  Well, that's true.  They don't say

11   that but their pleading does.  Your Honor, respectfully, is

12   bound by the pleading, not by what my colleague across the

13   way suddenly says is before your Honor and is not before

14   your Honor.  It is before Judge Keenan in the Southern

15   District of New York where they have made an application

16   for permission to make a motion to dismiss or stay.  That

17   will be discussed with Judge Keenan November 3rd.

18   MR. MONTCLARE:  That's a motion to stay based on

19   abstention.

20   MR. MEISTER:  Among other grounds -- that's

21   solely?  Okay.  I haven't seen your motion yet.

22   MR. GRIVER:  It's abstention based on the fact

23   that this is a New York divorce proceeding and federal

24   courts generally give deference to a New York court.

25   MR. MONTCLARE:  And even under Colorado River

26   abstention, Judge, which is basically there's two exact set

1              Proceedings

2    of motions filed in both courts on the same day with the

3    same return dates, you're going to have two courts -- and

4    they're very complicated motions -- it's just senseless to

5    proceed in two courts.

6              THE COURT:  What if the other judge is smarter

7    than I am, should I let him do it or her?

8              MR. MEISTER:  He's probably wondering the same

9    question in the obverse.

10             MR. MONTCLARE:  We're sitting with Judge Keenan

11   on, I think, next Thursday.

12             MS. WACHTLER:  On November 3rd.

13             MR. MONTCLARE:  And he's going to address our

14   abstention motion and a briefing schedule generally on the

15   motions to dismiss.

16             MR. MEISTER:  So returning to the question you

17   put to me.  Frankly, the reason to get this decided is to

18   get it decided, you know, this has been hanging around now

19   since 2008 when the Trumps first filed their first action.

20   I think the federal case has been pending since 2008.

21             If we can defeat the Trumps' argument that the

22   Orly Trust is precluded by collateral estoppel or

23   res judicata from contending that the shares belong to the

24   trust, and we hope we can, it puts us in a position to

25   negotiate with them because, when all is said and done,

26   there are two ways this can wind up.

              Debra Salzman, Official Court Reporter

| 1 | Proceedings |

2        The shares can wind up --

3        THE COURT:  Now Dalia is going to stand up to the

4    Trumps on behalf of Orly's beneficial interest?

5        MR. MEISTER:  Yes.

6        THE COURT:  Okay.

7        MR. MEISTER:  I mean the action down there is not

8    to find out who owns the shares as they characterize it.

9    It seeks a declaration that the Dalia -- that the Orly

10   Trust is the beneficial owner of the shares.

11        Now, that may be a tough argument, even apart

12   from the collateral estoppel issues, which we feel a little

13   bit better about, and it may be a tough argument, but we're

14   entitled to try to make it.

15        If we make it, then the Trumps Group beneficially

16   own the shares and the trust does, which I think would

17   strengthen any hand in negotiation.  If for some reason it

18   loses, then we have an action, an interpleader action, as

19   your Honor knows, dealing with the $10.3 million which was

20   paid by the Trump Group, assuming they had the right to

21   purchase the shares.  And that would put at least

22   $10.3 million to the benefit of the trust, which at the

23   moment is sitting, you know, with a corpus solely of this

24   possible right, which we hope it is a right, to the TRI

25   shares.

26        If it gets the TRI shares, they will be sitting

| | |
|---|---|
| 1 | Proceedings |
| 2 | with shares which don't pay a significant dividend.  Any |
| 3 | dividends that have been paid have been held in escrow, I'm |
| 4 | told, shares that can't be sold to anyone, shares that are |
| 5 | pieces of paper, if in fact they're pieces of paper now as |
| 6 | opposed to bookkeeping, which would only have value to the |
| 7 | organization, the trust, if someone buys them and as a |
| 8 | practical matter, there ain't nobody going to buy these |
| 9 | things but the Trumps. |
| 10 | So the name of the game seems to be either to |
| 11 | increase our leverage with the Trumps, on the one hand, or |
| 12 | to get the shares and sit there and hold them in the hopes |
| 13 | that the Trumps, in fact, do what counsel have represented |
| 14 | in court is their hidden intention, not the Trumps' counsel |
| 15 | mind you, of taking the company public for a billion |
| 16 | dollars $2 billion.  I've heard various figures thrown out. |
| 17 | But sitting around here and litigating in -- I |
| 18 | can't think of how many courts -- one, two, three, four, |
| 19 | five courts is not in anyone's interest and the Delaware |
| 20 | court seems able to move the case quickly and hopefully |
| 21 | with a favorable result.  Either way the trust will |
| 22 | benefit. |
| 23 | MR. MONTCLARE:  Just on behalf of Arie, and it's |
| 24 | very important that just -- |
| 25 | MR. MEISTER:  Can I just object here because |
| 26 | Arie, with much respect, shouldn't be a party to this |

| 1 | Proceedings |

2    argument.  Arie is trying to take the shares away from --

3        MR. MONTCLARE:  We have an interest in these

4    shares as well.  We have a voting interest in these shares

5    and I do have an interest and I have to correct absolute

6    mistakes you've just made.

7        The caption in this case is Orly individually in

8    her capacity as a beneficiary of the Orly Trust.  She's a

9    plaintiff in this case.  She's not a defendant in this case

10    and Dalia is in this case for the reasons that Mr. Meister

11    mentioned, but the main target here is the Trumps.  And the

12    idea is that in this constructive trust we believe that

13    Arie has a beneficial interest in the voting rights to

14    these shares.  He has a beneficial interest in his own

15    shares obviously.

16        In terms of the matrimonial case, again it's

17    skewed.  If you take a look at the relief we're requesting

18    in the first claim, in the reformation cases, we want to

19    put everything back to status quo ante, with the trust

20    having its percentages that it had indirectly before

21    through D & K, which the Court is aware, and that there be

22    distributions during the lifetime of Mr. Genger equal to

23    the exact percentage of the Orly Trust shares as they exist

24    now 19 percent and that only on death it's going to go to

25    Orly, and TPR is going to go back to being unowned by a

26    majority by Mr. Genger without any other assets in it but

| | |
|---|---|
| 1 | Proceedings |
| 2 | TRI. |
| 3 | It's a little complicated, Judge, but the reality |
| 4 | is, is that the issue of beneficial ownership is going to |
| 5 | be determined here.  The constructive trust issues are |
| 6 | going to be determined here.  To suggest that it's a smart |
| 7 | move because it's quicker to go to Delaware and that |
| 8 | they're going to defeat a collateral estoppel decision by |
| 9 | the judge who is reversed by the Delaware Supreme Court is |
| 10 | unlikely. |
| 11 | And what concerns me is -- and we can't prove |
| 12 | this here and I'm not blaming Mr. Meister -- but we think |
| 13 | that Sagi is behind all this with his little puppeteer |
| 14 | strings saying, "Okay, I'll fix all these problems.  We'll |
| 15 | get back to Delaware by, one, having TPR, who I control, |
| 16 | bringing a separate action in Delaware."  The Trump say, |
| 17 | "Oh yeah, and we'll sue Arie in Delaware."  And now |
| 18 | Mr. Meister's client Dalia, all of a sudden, says the trust |
| 19 | is going to go into Delaware. |
| 20 | And now all of a sudden they push everything back |
| 21 | to Delaware in a court which is an equity court.  It's not |
| 22 | dealing with issues relating to reformation.  It's not |
| 23 | dealing with the constructive issues that we're bringing |
| 24 | up.  And now we have this pleading where they're claiming |
| 25 | on the other side collateral estoppel.  And you know what |
| 26 | it sounds like to me, Judge.  It sounds like to me that |

1                           Proceedings

2      there is no adversary proceeding here.

3              And you know -- and then what -- and the question

4      arises to me -- I'll be quiet -- is to why anybody

5      representing the Orly Trust interest or Orly's interests as

6      a beneficiary would intentionally select the court, the

7      only court in the world that has already formed an opinion

8      that she was not truthful in some way or another in her

9      testimony, which he rejected in the case there down in

10     Delaware, and who's made specific rulings adverse to her,

11     which have been reversed by the Delaware Supreme Court.

12              It's just very confusing to me.

13              MR. MEISTER:  Your Honor, may I just respond to

14     that?

15              THE COURT:  In a moment.  Let me hear Mr. Griver.

16              MR. GRIVER:  Let me just address some of the

17     things that Mr. Meister said so that Mr. Meister can

18     respond to both of us at once.

19              The reason I pointed out the first cause of

20     action in the third amended complaint before your Honor,

21     there's a second cause of action where Orly is asking for a

22     constructive trust on behalf of her trust, but if you look

23     at paragraph 181(5), it asks that Orly Trust and Sagi Trust

24     each be declared the owner of 24.5 percent of TPR, so

25     together they own the remaining 49 percent of TPR.

26              The reformation that they're seeking will protect

                  Debra Salzman, Official Court Reporter

Proceedings

1

2    the Orly Trust because the TRI shares will be put back into

3    TPR and then the Orly Trust and the Sagi Trust will be

4    given the equivalent shares of TPR so that they will own

5    the same amount of TRI shares.

6          In a different way, they are asking that the Orly

7    Trust be given the TRI shares back.  So it is the exact

8    same lawsuit except we have more people and we have more

9    issues and we actually have context in New York.

10          As for the Orly Trust not being here because

11   Dalia is the trustee, this court already decided in the

12   2009 action before your Honor that Orly has the right to

13   bring an action on behalf of her trust as the sole actual

14   non-contingent beneficiary.

15          And Mr. Meister says that this is a situation of

16   trust law.  I would say it's simpler than that.  It's a

17   question of who do you trust.  And is Dalia really going to

18   be in Delaware fighting tooth and nail the way Orly is

19   fighting here to protect the Orly Trust?  I would suggest

20   to you that based on past is prologue, the answer is

21   absolutely not, not just in her choice to go to the worst

22   jurisdiction and get this case before the worst possible

23   judge in the United States of America, but if you think

24   about it look about what happened --

25          THE COURT:  Be careful what you say.  These

26   transcripts are put up on the Web.

Debra Salzman, Official Court Reporter

| 1 | Proceedings |
|---|---|

2      MR. GRIVER:  They're going up on the Web and

3  they're being sent directly to Judge Strine.

4      MR. MONTCLARE:  They've already been sent to

5  Judge Strine.

6      MS. WACHTLER:  Everything we say in this court on

7  the record is put before Judge Strine too.

8      THE COURT:  Well, let him know that I actually

9  have vacationed many times in Delaware and think it's a

10  beautiful state on the coastline.

11      MS. WACHTLER:  Thank you for that help.

12      MR. GRIVER:  Mr. Meister said that the trust

13  doesn't really have anything except these potential

14  interests.  That's true.  But when Dalia became the trustee

15  of the trust, the trust had a corpus, it had assets.  Those

16  have been given away.  And the lawsuits about that where

17  the court has held that there are issues of fact as to

18  whether Dalia is acting with fraudulent intent in the

19  things that she do, you denied motions for summary judgment

20  brought by the defendants in the 2009 case.  Dalia has

21  acted to dissipate those assets and povertize Orly.

22          With regard to the TPI shares, she allowed Sagi

23  to enforce a D & K note that she had successfully argued to

24  another judge was never to be enforced.  With the TRI

25  shares she signed a piece of paper.  And what fiduciary

26  does this?  She signs a piece of paper that says the

1                          Proceedings

2       following:  You, Sagi -- who, by this time, is already in

3       litigation with Orly -- you, Sagi, may sell the TRI shares

4       to whomever you want, whenever you want, for whatever price

5       you want.  You don't have to tell me about it.  And I also

6       hereby absolve you of all liability.  I give you a full and

7       complete release for whatever you may do with this power,

8       with this unfettered power.  And I'm doing this as a

9       trustee of the trust.

10              If Dalia is successful in Delaware and the shares

11      go back into the trust, she signed a piece of paper that

12      says sell it, sell it for a penny to the beggar outside in

13      the street and it won't matter to me and I absolve you.

14              This is not the type of person that you want to

15      have deciding and fighting and clawing about this issue.

16      You want Orly here with Orly's counsel, the way Orly

17      intended 15 months ago when you were placed in charge of

18      this legal issue and you should not as a matter of equity,

19      as a matter of fairness, allow Dalia to do this and then go

20      into the Delaware court and be done with it.

21              There is no legitimate reason why Delaware is

22      chosen except to allow the Trump Group to win.  That is the

23      only possible answer for why they did this.  And because of

24      that, your Honor, because just as a general matter someone

25      should not be allowed to remove the jurisdiction of this

26      court in this way.

| 1 | Proceedings |
|---|---|

2      The general principle that says there should be

3   no duplicative litigation, because what the heck is the

4   Orly Trust doing spending money for another set of lawyers,

5   spending money on another litigation?  Why are they not

6   here with Mr. Meister, who is a capable and fantastic

7   attorney, fighting for the Orly Trust along with Orly?

8   That's the way it should be, that's the way it must be and

9   that's why this Court must grant the TRO.

10      And I hope Chancellor Strine reads that.

11      MR. MEISTER:  Okay.

12      THE COURT:  Careful what you wish for.

13      MR. MEISTER:  Two points I'd like to make.

14      First, let me quote, because my friend

15   Mr. Genger --

16      MR. GRIVER:  Griver.

17      Are you talking about me?

18      MR. MEISTER:  To you.

19      MR. GRIVER:  Okay.  Griver.

20      THE COURT:  Genger is his client.

21      MR. MEISTER:  I'm sorry.

22      He says in the second count in this complaint

23   before your Honor seeks a constructive trust for the Orly

24   Trust.  Let me read you from page 63, the claim for relief,

25   subparagraph 3:  "Upon TPR becoming the record owner of the

26   11,002 shares of TRI stock comprising the Orly Trust TRI

1 |                              Proceedings

2 |      shares, a constructive trust was immediately created in

3 |      favor of Arie with respect to the Orly Trust shares."

4 |              MR. MONTCLARE:  Subject to the rights.  You have

5 |      to read the whole sentence.  It's unfair not to read the

6 |      whole sentence.

7 |              MR. MEISTER:  "Including but not limited to the

8 |      voting rights appertinent to such shares, all of which were

9 |      held by TPR for the benefit of Arie subject to the Orly

10 |     Trust's right to receive the Orly Trust TRI shares upon

11 |     Arie's death."

12 |             So it's not merely my paraphrasing.  Those are

13 |     the words and it seeks not a constructive trust in favor of

14 |     the Orly Trust.  It seeks a constructive trust imposed on

15 |     the Orly Trust in favor of Arie who is going to keep these

16 |     shares for life.  So as long as we're going to be factual.

17 |             Secondly, the question of being in a court which

18 |     found Orly to be untruthful, I would say two things about

19 |     that.  It's not my fault that she made up testimony which

20 |     was contradicted by her father when she testified that she

21 |     was at a meeting which her father said she wasn't at and

22 |     that her father told the Trumps things that were

23 |     contradicted.

24 |             But more importantly, her testimony is totally

25 |     irrelevant and wouldn't be admissible on the issue here of

26 |     the beneficial ownership of these shares.  This is a

1               Proceedings

2    question of interpretation of a contract which is an issue

3    of law.   It's a question, if you will, of whether notices

4    were given, and a question of the arguments which the Trump

5    Group made in their motion to dismiss this claim against

6    them, this question of collateral estoppel and res

7    judicata, and now we find ourselves on what I assume is

8    Orly's side of this because we don't think collateral

9    estoppel applies.

10              I don't know if that was quite what Mr. Montclare

11   was saying, but we don't think we're collaterally estopped

12   and we researched to show and to argue that we're not

13   collaterally estopped to argue that these shares belonged

14   to the Orly Trust beneficially.

15              As to the voting, that's already been decided by

16   the Supreme Court of Delaware.   So I don't know what all

17   this stuff is, but that's not my issue.

18              MS. WACHTLER:   Your Honor, just one thing.   I

19   think we're running far afield and I'm not exactly sure

20   where Mr. Meister is going with this.   But this is for a

21   TRO to prevent extraordinary litigation which this trust

22   has started for no apparent reason.   No one has ever said

23   why this action was brought in Delaware other than what

24   Mr. Griver has shown is the real reason, because

25   Mr. Meister never says it, and to say that things can be

26   adjudicated more quickly in Delaware is just not the case.

1                              Proceedings

2              And the fact of the matter is we have been trying

3     to get the issue of beneficial ownership determined by this

4     court in the jurisdiction which the trust has chosen, which

5     Orly has chosen, which Arie has chosen, and every time we

6     take a step forward, we're drawn back to somehow them

7     trying to get this court back to Delaware to deprive this

8     court of its jurisdiction and that simply should not be.

9     And that's what this TRO is all about and what this

10    injunctive relief is about, so that we can proceed here

11    where we were told to proceed by the Delaware Supreme Court

12    and where the plaintiffs in this case want to proceed.

13             And to say that he's protecting the interests or

14    Dalia is somehow protecting the interests of the trust by

15    wasting these assets, by starting an interpleader action

16    when the money was safe in an escrow account, by bringing

17    an action in Delaware, by trying to dismiss to our case

18    here for no reason and then taking a contrary position in

19    Delaware, it just seems to me that this really needs to be

20    stopped.

21             MR. GRIVER:  Let me just read your Honor a case

22    by the First Department in 2006.  It was a unanimous

23    decision and I nothing that Mr. Meister has said takes this

24    case away from this Franco case.

25             It said:  "In the interests of preventing

26    duplicative litigation that might lead to conflicting

                Debra Salzman, Official Court Reporter

| 1 | Proceedings |
|---|---|

2    results, and to prevent the waste of judicial resources and

3    unnecessary legal expenses, the court did not improvidently

4    exercise its discretion by invoking its equity power to

5    enjoin defendants from prosecuting the California action."

6    All you have to do is substitute California for Delaware

7    and this is the situation that we are in.

8            And again, your Honor, the only person who has a

9    real interest in protecting the Orly Trust is Orly, the

10   beneficiary.  And even if you don't believe me, fine.  New

11   York is the only jurisdiction where both Orly is here to

12   protect herself and Dalia is here to protect herself.  Orly

13   is not in Delaware.  Orly does not want to be in Delaware.

14   Dalia is here.  This is where Dalia lives.  Let us have

15   that determination from this judge.  Let the judge protect

16   itself.  If Dalia is the one who ends up protecting the

17   trust, God bless.  If Arie and Orly are the ones who end up

18   protecting the trust, well, God bless us.

19           But if the opposite -- if what I am saying is

20   true, and the fix is in, and there's at least a possibility

21   of that, then this Court is the only one who can stop that.

22   Put in a TRO.  Stop them from doing this.  Decide the case.

23   If Mr. Meister wants us to go along as quickly as possible,

24   if the other defendants want this case to move along, you

25   know what?  I will clear my schedule.

26           THE COURT:  Well, I certainly don't think that if

| | Proceedings |
|---|---|
| 1 | |
| 2 | I were to grant the TRO that it is meant to impugn the |
| 3 | integrity of the Delaware Chancery Court, the fix is in. |
| 4 | So, again, I just urge you to be careful with your |
| 5 | language. |
| 6 | MR. GRIVER: Not with the judge, your Honor, not |
| 7 | with the judge. I'm talking about -- |
| 8 | THE COURT: You're talking about the cooperation. |
| 9 | MR. GRIVER: I'm talking about the cooperation. |
| 10 | I'm talking about the interests of the parties. |
| 11 | MR. MEISTER: May I speak to that, because I did |
| 12 | receive this afternoon, or maybe it was late morning, a |
| 13 | call from Skadden Arps, who found somewhere in these papers |
| 14 | a reference impugning the integrity of the lawyer in |
| 15 | Delaware who's representing the Orly Trust, saying that he |
| 16 | used to be associated with Skadden, which is true. But he |
| 17 | and his firm were on Arie's side in two peripheral matters |
| 18 | against the Trumps in the main litigation. |
| 19 | MR. MONTCLARE: Maybe they should be |
| 20 | disqualified. I didn't know that. |
| 21 | MR. MEISTER: Well, you probably should. He |
| 22 | represented a witness and they apparently filed some |
| 23 | affidavit saying Arie was in such pure heart that he |
| 24 | couldn't possibly have spoliated the documents which he was |
| 25 | found to have spoliated. |
| 26 | So they're going to be bringing that to the |

```
 1                          Proceedings
 2    Court's attention.  Frankly, there's no fix in.
 3               THE COURT:  All right.  What type of schedule are
 4    you looking for?
 5               MR. GRIVER:  Well, the opposition papers would
 6    have to be filed by when?
 7               MR. MEISTER:  Where are we?  We're in end of
 8    October.
 9               MR. GRIVER:  Yes.
10               MR. MEISTER:  November 18th, your Honor.
11               THE COURT:  Okay.  And reply.
12               MR. GRIVER:  We hit Thanksgiving, don't we?
13               THE COURT:  We certainly do.
14               MR. MEISTER:  We do.
15               THE COURT:  I'm not here the Wednesday before
16    Thanksgiving.  It basically looks to me like you're looking
17    for an early December.
18               MR. GRIVER:  Either Friday the --
19               THE COURT:  Maybe the surrogate will rule at the
20    one-year mark.
21               MR. GRIVER:  How about December 7th?  That's
22    always a historical date.
23               THE COURT:  Let me get the calendar.
24               (A discussion was held off the record.)
25               THE COURT:  That was going to be for the
26    argument.  I was going to give you 11/18 and start with the
```

| | |
|---|---|
| 1 | Proceedings |
| 2 | date to come in for the argument and work backwards. |
| 3 | Change the date to the 14th for the hearing and the papers |
| 4 | in on the 7th.  Hearing date December 14, 2:15. |
| 5 | MR. GRIVER:  The 14th.  Papers then due on the |
| 6 | 5th. |
| 7 | THE COURT:  I will give you to the 21st. |
| 8 | MR. MEISTER:  November 21st? |
| 9 | THE COURT:  Yes. |
| 10 | MR. MEISTER:  Thank you. |
| 11 | THE COURT:  And reply December -- file them by |
| 12 | the 9th.  Can you do that? |
| 13 | MR. GRIVER:  Yes.  Thank you. |
| 14 | THE COURT:  I granted the TRO and we will see you |
| 15 | at 2:15. |
| 16 | MR. MEISTER:  As written? |
| 17 | THE COURT:  I was about to bring myself to that |
| 18 | point. |
| 19 | So I'm signing the proposed order to show cause |
| 20 | and we've worked out a schedule for briefing papers of |
| 21 | opposition by the 21st of November.  Reply papers by the |
| 22 | 9th of December and oral argument at 2:15 on the 14th of |
| 23 | December. |
| 24 | I'm inclined to grant the temporary restraining |
| 25 | order.  It doesn't necessarily mean that it will get |
| 26 | continued in the form of a preliminary injunction and |

Debra Salzman, Official Court Reporter

| 1 | Proceedings |

2    obviously one issue that you need to address is whether it

3    would be appropriate to require any sort of undertaking or

4    a bond pursuant to Article 63, should I actually grant the

5    injunction, Article 63 or 62, anyway, whichever.

6            MR. MONTCLARE:  It's 63.

7            THE COURT:  It's been a lot of, how shall I put

8    it, concern expressed out in the bar about courts

9    overlooking the mandatory undertaking.  So I'm not

10    overlooking it, but I leave it to you to address.

11    Sometimes it gets overlooked because nobody raises it.  So

12    that's one issue I just want to put out there.

13            Now, to the extent of the wording, the way it's

14    currently worded, it says:  "That until further order of

15    this court, Dalia, along with Dalia's agents, assigns,

16    attorneys and/or anyone acting on Dalia's behalf shall be

17    prohibited from prosecuting the Delaware action," which, I

18    guess, is previously defined in the order as "Genger as

19    Trustee of the Orly Genger 1993 Trust v. TR Investors LLC,

20    et al."

21            You don't actually have an index number there

22    from Delaware.

23            MR. GRIVER:  I didn't have an index number.

24            THE COURT:  All right.

25            "Or commencing any new actions as trustee of the

26    Orly Trust concerning the matter of the operative complaint

| | |
|---|---|
| 1 | Proceedings |
| 2 | in this action." |
| 3 | Now, I know what my concerns are about that |
| 4 | language, but I'm curious about what your concerns are, |
| 5 | because I'll tell you what I'm trying to do.  I have no |
| 6 | intention of stopping Judge Keenan from doing as much as |
| 7 | he'd like in this case and having them resolve these issues |
| 8 | here in New York.  But I am concerned that that Delaware |
| 9 | action just sort of be put on hold until I can have a |
| 10 | reasoned reconsideration of the points.  I don't need any |
| 11 | second, third, fourth actions there. |
| 12 | MR. MEISTER:  I don't envision any second, third, |
| 13 | fourth actions.  But my question would be, your Honor |
| 14 | talked about carving out an ability to respond to the |
| 15 | counterclaim that the Trumps filed.  The other party TPR |
| 16 | filed an answer before which does not have a counterclaim, |
| 17 | a cross-claim, so we don't have to worry about them, in |
| 18 | Delaware. |
| 19 | MS. WACHTLER:  Well, wouldn't your remedy be in |
| 20 | Delaware then to say that you're stayed and that you need |
| 21 | to have some sort of -- |
| 22 | MR. MEISTER:  I don't know Delaware procedure, |
| 23 | your Honor.  I never practiced in their courts.  I would |
| 24 | think that if your Honor allows the Delaware counsel to |
| 25 | answer -- |
| 26 | THE COURT:  It seems to me that if you become |

Proceedings

1

2  aware after consulting with your Delaware counsel that

3  there's an issue of being precluded, that you come back and

4  ask me for the carve out at that point.

5       I mean at this point --

6       MR. MEISTER:  How are they harmed?

7       THE COURT:  I don't know that they are, I don't

8  know that you are.  That's the whole point.  I mean we're

9  all sort of imagining a harm.

10      MR. MEISTER:  The harm I imagine is if it were

11  here, I don't know what would happen if counterclaim were

12  unanswered.  I would think there's the possibility of a

13  default.  I would think there's the possibility that the

14  Trumps can move either for a default judgment or possibly

15  for summary judgment.

16      I would think that if we filed a reply, I guess

17  it's called, to the counterclaim denying their request for

18  relief, et cetera, then everyone's interests would be

19  protected and I would assume once the pleading was over,

20  the next step -- this I know because I've been following

21  peripherally the other action down there -- the next step

22  in Delaware is one goes to the court and askings for a

23  scheduling order, and at that time I presume Mr. Anderson,

24  the Delaware counsel, could apprise the court that the

25  action is stayed.

26      MS. WACHTLER:  Wouldn't the Trumps -- wouldn't

Debra Salzman, Official Court Reporter

```
1                              Proceedings

2    you ask the Trumps' consent?

3                THE COURT:  My gut reaction is that this is in

4    effect a stay of that action and so that you have the

5    benefit of a stay until such time that it's vacated.

6                MR. GRIVER:  When this happened in this case,

7    what the parties did was they got together, they informed

8    this Court about it and put together a stipulation staying

9    the case until procedures in Delaware were completed.

10               I don't see any reason why, although I've never

11   done this in Delaware, I've done this in other

12   jurisdictions and other court systems, there's no reason

13   why the --

14               THE COURT:  You don't go to Delaware.

15               MR. GRIVER:  I would be happy to provide advice

16   on the issue.

17               MR. MEISTER:  Your Honor, I feel confident that

18   if Skadden would agree to a stay, I can't imagine that the

19   court there is eager to hear the case, but I don't know if

20   Skadden is going to agree to a stay.  I don't know.

21   They're adversaries.  If they have us at a disadvantage,

22   which you've now put us, they may take advantage of it.

23               MS. WACHTLER:  Then you have to come back here.

24               MR. MONTCLARE:  They have to come back here in

25   with the Trumps.

26               THE COURT:  Why don't you talk to them and tell
```

```
1                          Proceedings

2        them what I've done.  And if you need to, we'll give you

3        the carve out.

4                 (Proceedings concluded.)

5                     *      *      *

6                   C E R T I F I C A T E

7            I, Debra Lynn Salzman, an Official Court

8   Reporter of the State of New York, do hereby certify

9   that the foregoing is a true and accurate transcript

10  of my stenographic notes.

11

12  _____

13  Debra Lynn Salzman, RMR

14  Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

26
```

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

TR INVESTORS, LLC, GLENCLOVA          :
INVESTMENT CO., NEW TR EQUITY I, LLC, :
NEW TR EQUITY II, LLC, and TRANS-     :
RESOURCES, INC.,                      :
                                      :
            Plaintiffs,               :
                                      :
      v                               :   Civil Action
                                      :   No. 6697-CS
ARIE GENGER and TPR INVESTMENT        :
ASSOCIATES, INC.,                     :
                                      :
            Defendants.               :

- - -

Chancery Court Chambers
New Castle County Courthouse
500 North King Street
Wilmington, Delaware
Thursday, November 10, 2011
1 p.m.

- - -

BEFORE:  HON. LEO E. STRINE, JR., Chancellor.

- - -

TELEPHONE CONFERENCE

- - -

------------------------------------------------------------
CHANCERY COURT REPORTERS
New Castle County Courthouse
500 North King Street - Suite 11400
Wilmington, Delaware 19801
(302) 255-0524

2

1    APPEARANCES:   (via speakerphone)

2        THOMAS J. ALLINGHAM, II, ESQ.
         ANTHONY W. CLARK, ESQ.
3        Skadden, Arps, Slate, Meagher & Flom LLP
           for Plaintiffs
4
         STEPHEN P. LAMB, ESQ.
5        JOSEPH L. CHRISTENSEN, ESQ.
         Paul, Weiss, Rifkind, Wharton & Garrison LLP
6          for Defendants

7                            -  -  -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3

1          THE COURT:  Good afternoon.  May we

2    have appearances for the record.

3          MR. ALLINGHAM:  Yes.  This is Tom

4    Allingham at Skadden Arps, Your Honor.  And with me,

5    if it's acceptable to the Court, is Tony Clark and

6    some members of my team.

7          THE COURT:  Sure.

8          MR. LAMB:  Your Honor, this is Stephen

9    Lamb from Paul Weiss, and on the phone with us is my

10   associate, Joseph Christensen.

11         THE COURT:  Well, the reason I'm

12   calling is, I got a flurry of correspondence.  And,

13   you know, I want to figure out how to -- a sensible

14   way of moving forward, which has been rather difficult

15   to achieve over a number of years in this matter.

16         I regret the fact that this family is

17   so riven -- and I'm talking about the Genger family --

18   is so riven that the time of three court systems is

19   taken up with them.  I -- I found the transcript that

20   was cited to me rather dismaying.  And I feel the need

21   to say something on the record that I am going to

22   order be sent to the judges involved, which is the

23   following about the Court of Chancery:

24         I have been a member of the Court of

CHANCERY COURT REPORTERS

4

1  Chancery since 1998.  If there was an occasion on

2  which I ordered action in the absence of a party who

3  was affected, I, frankly -- I can't even recall it.

4  It is a historic practice of this Court to match its

5  willingness to act with speed with a deep commitment

6  to due process.

7          The first thing that this Court, and

8  this judge in particular, makes sure, is that all

9  interested parties always have an opportunity to

10 appear before the Court and that the Court does not

11 act on an ex parte basis.  That is a tradition in

12 Chancery.  Other courts have different traditions, but

13 the tradition of proceeding with all parties

14 represented and only employing an ex parte proceeding

15 in the most exigent of circumstances is the one that

16 persists in Chancery.

17         So nonimpulsive is my involvement in

18 this matter, that the intricacies of the separate

19 action involving Orly and her mother are simply not

20 complications which have burdened my simple mind.

21 There is no impulse on my part to take action in any

22 of these matters that is not properly briefed up, with

23 every party with an interest having a full and fair

24 opportunity to participate.  In fact, I believe I made

CHANCERY COURT REPORTERS

5

1    that clear earlier in this very litigation when I set,

2    I believe at Arie Genger's instance, a more relaxed

3    briefing schedule than the Trump parties wished.

4              It is dismaying to see words like --

5    and I'm going to quote -- "fix," end quote, be used in

6    any way that is suggestive that this Court would

7    facilitate a nonadversarial resolution to the

8    detriment of a party with a legitimate interest.   If

9    someone wants to engage in loose talk about gamblers

10   or boxers, that's fine.   It's pretty shocking to be

11   used about the Delaware Court of Chancery.

12             One of the other historic traditions

13   of this Court is that we do not lightly cause train

14   wrecks.   To the extent that there are reckless,

15   irresponsible folks who are willing to play games of

16   chicken with important things, we don't tend to

17   contribute to the brinkmanship.   It's not our style.

18   It's not mine.

19             In terms of how we're going to proceed

20   with this case, I'm going to ask Mr. Lamb a very

21   specific question in a minute.   But if the answer to

22   that question is no, that his client has no intention

23   to do something in particular, then my inclination is

24   going to be to put off the oral argument in this case

6

1   to allow the federal court to issue the ruling it said

2   it was willing to issue in early December and to see

3   what light that might shed for folks on a murky and

4   confusing situation that is motivated by family and

5   personal dynamics that I, frankly, don't grasp.

6           I have no skin in this fight other

7   than the normal skin of a judge assigned a case.  The

8   idea that this Court has any other interest is,

9   frankly, wrong.  The idea that, to the extent that

10  this Court is worried that there was part of its

11  ruling that was reversed by the Supreme Court, as both

12  of the excellent lead litigators on the phone have

13  experienced in different roles, that's just a reality

14  of the judicial system.  We all move on.  And it's

15  just really interesting for anyone to suggest to

16  another court that there's some sort of fix on.  And I

17  understand one can read the transcript to suggest that

18  that's really something involving Genger family

19  dynamics; but it was a lot of loose language, a lot of

20  it.

21          And so, again, I want to reiterate,

22  the one court that you can most rely upon anywhere not

23  to act on an ex parte basis when that would not be

24  appropriate would be the Delaware Court of Chancery.

CHANCERY COURT REPORTERS

7

1   There is no example in handling this matter over the
2   years of this Court impulsively doing that, no example
3   of any party with a legitimate right to be heard being
4   denied that opportunity.  None.  I'm not sure why one
5   can confidently say that that's always -- that the
6   courtesies of similar notice were always extended in
7   other jurisdictions, but in Delaware, they universally
8   have been.  And I don't consider anything about the
9   present fight to be an emergency that would impel me
10  in any way to deny any party their opportunity to be
11  heard.
12                  So my inclination is, honestly, to the
13  extent that my good federal colleague was willing to
14  actually take on the consideration of his thoughts
15  about a knotty jurisdictional matter, recognizing the
16  supremacy of the federal courts and as -- and the
17  inability of this Court to enjoin, if it wanted to --
18  and I rarely want to.  I don't go around enjoining
19  litigants.  I think you'll find a very limited use of
20  that technique by me.  And to the extent it was used
21  in thé present case in any way brought on by rather
22  extraordinary circumstances, it seems to me it would
23  be useful for all to hear from the good federal judge.
24  And if it is really true that Arie Genger has no

CHANCERY COURT REPORTERS

8

1   intention of trying to seek an injunction from a state

2   judge about the procession of this action, then I

3   don't see any reason why we can't get a ruling from

4   the federal court.

5           And since I have probably had to do

6   more work on these cases than any of my good federal

7   colleagues or my good state colleagues in whom I have

8   a lot of confidence, I'm perfectly happy to approach

9   the Macy's Thanksgiving Day parade and the Christmas

10   season free of worrying about the Trump Group or the

11   Genger family and concentrate on my other judicial

12   matters and seeing what new float will fly above the

13   streets of New York and then to hear what a wise

14   federal judge thinks early in next year and then take

15   up the action from there.

16           But if Mr. Genger is going to run in

17   to court in New York and seek to enjoin the Trump

18   Group or in any way interfere with the governance of a

19   Delaware entity and to do it, you know, in the

20   meantime, then, I can't proceed in that way.  And the

21   way I will proceed is the way the Trump Group has

22   suggested, which is I will simultaneously hear their

23   application for an injunction, along with the

24   dismissal motions.  That seems to me to be an

9

1    inefficient and unnecessary thing; but unless

2    Mr. Genger is willing to make a binding commitment not

3    to seek to -- a judicial ruling interfering with this

4    action, I don't really see how I can deny the Trump

5    Group the opportunity to present their injunction

6    application.  It's not my preference that I add to my

7    burden, but I need something binding.

8              It would also be helpful to know a

9    little bit more from Mr. Lamb about the extent to

10   which he and Mr. Christensen are involved in the

11   strategy in New York.  It's -- you know, frankly,

12   there was no secret that Orly and her father are

13   close.  The judge in New York seems to recognize a

14   sort of divide in which mother and son are against

15   father and daughter.  It's sad.  It's genuinely sad to

16   see a family riven like this.  And it's obviously

17   difficult, though, you know, when you have a situation

18   where other people's interests are caught up in a

19   family fight.

20             But the idea that Arie Genger is not

21   communicating with Orly Genger is not immediately

22   apparent.  And it is kind of dismaying, this notion

23   of, for example, that some -- that counsel for Arie

24   Genger would sit before the Court in New York and be a

CHANCERY COURT REPORTERS

10

1  party to this kind of colloquy that suggests that

2  actually action could have been taken somehow.  I

3  mean, really, there's absolutely no way that any

4  action would be taken in this Court that would affect

5  either of these cases without incredibly rapid action

6  by Mr. Lamb and Mr. Christensen.  They're just too

7  good a lawyers.  And there's also no way it would

8  happen because there's no way they wouldn't get notice

9  from Mr. Allingham.

10          So, you know -- but when you see -- I

11  take very seriously the reputation of this Court and

12  the perception about its fairness.  And it was good to

13  see my judicial colleague in New York resist this kind

14  of inflammatory -- I think was the word used aptly by

15  Mr. Lamb.  But it's not just inflammatory.  It really

16  went a long way to being misleading and insulting.

17  And -- and I don't mean personally.  I don't really

18  care when they mean -- when they talk about the worst

19  judge in the world.  I took that actually to mean if,

20  on the merits of the economic ownership, you have a

21  judge who's already ruled one way and that way is

22  adverse to your interests, you probably don't want

23  that judge to decide it.  I mean, I -- I'm a very

24  thick-skinned person who's lived in a much more

CHANCERY COURT REPORTERS

11

1   intensive world than any litigation.

2               So -- but it's more the insinuation

3   that this Court would somehow be acting impulsively

4   and without regard to the due process rights of the

5   litigants.  And for people to be suggesting that,

6   frankly, in counsel for Arie Genger's presence, I just

7   have a hard time believing, frankly, that the -- the

8   distinguished lawyers who are representing Arie Genger

9   here were really quite involved in that.

10              So I'm going to finish with that.  I

11  know it's -- it's extensive, but it's important that

12  this be on the record.  And I want it transmitted to

13  my judicial colleagues, and I want it transmitted

14  jointly without commentary.

15              Mr. Lamb, what I'm asking you is:  Is

16  your client committing to this Court that he's not

17  going to seek an injunction against the procession of

18  this action in the New York state courts?

19              MR. LAMB:  Your Honor, I am -- don't

20  have any authority from my client to say that in so

21  many words, but I'm sure it's true.  As I said in my

22  letters, we have never done anything to interfere with

23  the procession of this Court -- of this case in New

24  York or anywhere.  As Your Honor knows, what we've

CHANCERY COURT REPORTERS

12

1  done instead is moved to dismiss and to stay and,

2  quite frankly, devoted very substantial resources to

3  briefing the issue without any thought of interfering

4  with Your Honor's ability to hear it.

5              I feel confident, confident, Your

6  Honor, that I can commit that there is no intention to

7  do that, no plan to do that, and that we will not do

8  that.

9              As to the other matters Your Honor has

10 raised, I, of course, also -- I mean, let me say I --

11 I have some involvement in -- in the New York matters,

12 as Mr. Allingham knows.  I have -- I've seen him at

13 least on two occasions, once in the New York state

14 Supreme Court, not on the day of the transcript that

15 was sent to Your Honor, and once in the federal

16 District Court.

17              I -- I have no -- I take no -- I

18 certainly eschew any responsibility for the things

19 that were said.  Your Honor, I believe that the way

20 you are interpreting them is how they were meant.  It

21 was no commentary on Your Honor's fitness as a judge

22 or the fitness of the Court, of any Delaware Court

23 but, rather -- rather, that a question of why a

24 fiduciary such as Orly's mother would choose to bring

CHANCERY COURT REPORTERS

13

1   a case in a court that had already ruled against her.

2                    And as to the comment about the fix

3   being in, I believe that also -- I understand that

4   also was directed at understandings between

5   Mr. Allingham's clients and TPR and Dalia Genger or

6   whomever but not the Court.  It is, I think, as

7   Justice Feinman pointed out, it was a very poor choice

8   of phrase.  And when that is, I think quite honestly,

9   by Your Honor taken, as taken in the wrong way, and I

10  think it should be.

11                   But leaving that aside, I mean, I -- I

12  have involvement in the strategy of litigating this

13  case in New York where the Delaware Supreme Court said

14  it should be litigated.  You will recall, Your Honor,

15  that when the mandate issued, there were already in

16  different courts in New York two matters -- two

17  litigations that raised all these problems.  It is

18  Mr. Allingham and his clients who have chosen to

19  embroil the Court of Chancery in this again by filing

20  this case that we've moved to dismiss.

21                   So I -- I'm confident, as I said, that

22  between Justice Feinman and Judge Keenan, they will

23  work out where the matter will progress, whether it's

24  going to be in state court or in federal court.  I

CHANCERY COURT REPORTERS

14

1   think it is just unfortunate that Your Honor has been

2   brought -- dragged back into this matter by the

3   Trumps' filing this complaint they filed that.  And

4   for all the reasons I've already said, we've stated in

5   our briefs, you know, they lack jurisdiction over

6   Mr. Genger.  You lack -- or your Court lacks

7   jurisdiction over the matter, and so on and so forth.

8   In any event, it's the third-filed action and it

9   shouldn't proceed.

10                  Your Honor, I --

11                  THE COURT:  No.  And, Mr. Lamb, I

12  appreciate that.  And you -- and I just want to say on

13  the record again, I think one of the things that was a

14  bit dismaying about the transcript was that there was

15  nothing in my reaction to this new lawsuit which

16  suggests that I'm not totally impartial in hearing

17  your perspective on the prior-pending litigations.  In

18  fact, that's why I set the schedule the way I did.

19                  MR. LAMB:  I appreciate --

20                  THE COURT:  And -- and what I'm --

21  where I am now, though, is I actually, having been

22  involved in this -- you know, we're back where we

23  were; right?  We were at one point in three courts,

24  but it was a -- a matter involving, you know, who

CHANCERY COURT REPORTERS

15

1   controlled a Delaware corporation.  I ended up going

2   first.  I think there would be substantial utility to

3   hear from my distinguished federal judicial colleague.

4   And to the extent that the Trump Group is willing to

5   complete the briefing on that and hear from the

6   federal court, you could all provide me with short

7   letters after what -- after, I believe it's Judge

8   Keenan; right?

9           MR. LAMB:  It is Judge Keenan, Your

10  Honor.  I wouldn't expect that any of this will be

11  decided before Christmas.

12          THE COURT:  Yeah.  I understand.

13          MR. LAMB:  It may be substantially

14  later than that.  The briefing schedules are just now

15  being set and will require filing briefs and argument,

16  and so forth.  I'm sure it will be sometime next year

17  before any of that's decided by Judge Keenan.

18          THE COURT:  Well, all I'm suggesting

19  is -- you know, I had seen a suggestion that Judge

20  Keenan was willing to step in, make a determination

21  that would provide -- shed some important light.  I

22  think that would be very useful and it might provide a

23  way forward.

24          MR. LAMB:  Well, in any event, Your

CHANCERY COURT REPORTERS

16

1    Honor, the issue of -- that we've raised in our motion

2    will have to be -- unless this action that we're

3    addressing today is simply stayed, which we could do,

4    the issue is going to have to be resolved.

5                    THE COURT:  No.  I understand.  But

6    what I'm -- what I heard -- and what I read -- and

7    maybe Mr. Allingham -- and I cannot spend too much

8    more time with you gentlemen, which you're probably

9    glad of, for -- but the -- I -- what I read the Trump

10   Group to be saying is that if Judge Keenan were to

11   determine that he would decide all the issues, that

12   your preference -- again -- and I don't take this

13   personally -- your legitimate preference to be in New

14   York, right?

15                    MR. LAMB:  Oh, I think it's our

16   preference to be in state Supreme Court.

17                    THE COURT:  Oh, no, no.  I understand

18   that.  But --

19                    MR. LAMB:  In any event, it seems,

20   Your Honor, what you're -- what you're getting at is

21   that Mr. -- that the Trumps, with their sort of

22   offering to Your Honor is to trade this case that

23   should be dismissed for some -- some --

24                    THE COURT:  I'm not offering to trade

CHANCERY COURT REPORTERS

17

1   anything.  I'm saying --

2                   MR. LAMB:  Not you, Your Honor; the

3   Trumps.

4                   THE COURT:  I'm saying the objective

5   reality is this:  There are cases in three courts.  We

6   went down to two courts for awhile.  We're now back to

7   three courts.  Even if I dismiss this case, we're back

8   to two courts.  It just might be -- I'm not ruling out

9   anything.  But I do take very seriously that if a

10  federal judge determines that he is going to go and do

11  something that has effect on the shape of things -- if

12  he decides, for example, Mr. Lamb, that he's deferring

13  to the New York state court or to the Delaware courts,

14  I'll go next.  It's just your clients, frankly, don't

15  want me to go at all.

16                  So the answer that they want me to go

17  before Judge Keenan, I'm sorry, that doesn't move me.

18                  MR. LAMB:  Well, that's fine, Your

19  Honor.

20                  THE COURT:  What I'm saying is I

21  believe we're handling this in a way that doesn't put

22  any -- you know, I mean, you can make an argument --

23  I'm sure the Trumps can make an argument that the

24  nonprocession of the lawsuits actually hurts them most

CHANCERY COURT REPORTERS

18

1    of all because it is them who are continuing to be

2    inmeshed in a Genger family dispute.   And --

3                    MR. LAMB:   Well, Your Honor ---

4                    THE COURT:   -- and all I'm saying --

5    and I'll be real candid about this.   I have often

6    seen -- one of the great things we know about this

7    Court is that people are happy to watch us go ahead

8    and do a lot of work.   And I'm not saying that the

9    federal judge -- I saw a federal judge, from what I

10   saw, was willing to step up and give useful guidance

11   to people.   Federal judges have some power that those

12   of us in state courts don't.

13                   And so what I'm suggesting is if

14   Mr. Genger will make the commitment in a formal way so

15   it's -- I have no doubt we're trusting your word; but,

16   honestly, Mr. Lamb, respected counsel in these cases

17   before has had situations occur where -- without their

18   knowledge.   And so if we can get that binding

19   commitment from Mr. Genger, what I'm suggesting is

20   that you-all get back before Judge Keenan, get it on

21   his schedule.   Nobody's going to enjoin anybody from

22   going forward with this case, but I have no intention

23   to do anything in this case until we hear from Judge

24   Keenan.   You can all put in short letters about how

CHANCERY COURT REPORTERS

19

1   that affects what you've already written and we'll go

2   from there.

3                    MR. LAMB:  That's fine, Your Honor.

4   We're happy to take the -- take the matter off Your

5   Honor's plate.  And I will provide the Court with a

6   letter to the effect that you're asking, hopefully by

7   the end of the day, if not tomorrow.

8                    THE COURT:  Mr. Lamb -- I mean

9   Mr. Allingham, does that work for you?

10                   MR. ALLINGHAM:  Your Honor, I -- I've

11  managed not to say anything at all to this point.

12                   Last -- yesterday afternoon, Justice

13  Feinman issued another TRO enjoining us from taking

14  any action at all in the Orly Trust declaratory

15  judgment matter in which the trust seeks a declaration

16  that it is the beneficial owner of the Orly Trust

17  shares.

18                   I -- I think that what Your Honor has

19  proposed, notwithstanding that we are now the subject

20  of at least two TROs plus a pending preliminary

21  injunction application brought by both the Orly Genger

22  Trust and the -- and Arie Genger in Judge Feinman's

23  court --

24                   THE COURT:  Where -- what --

CHANCERY COURT REPORTERS

1           MR. LAMB:  Which has nothing to do

2 with this action, Your Honor.

3           MR. ALLINGHAM:  Well, yes, Your Honor,

4 it does; but Mr. Lamb and I can -- can -- can contest

5 that later on.

6           THE COURT:  Does this have to do with

7 the other action before me?

8           MR. ALLINGHAM:  One of --

9           MR. LAMB:  Yes.

10           MR. ALLINGHAM:  The one entered

11 yesterday afternoon does.  The one pending before

12 Justice Feinman imposes extraordinary constraints on

13 what the Trump -- Trump Group can do with respect to

14 TRI, including it would enjoin us from issuing any

15 shares of the company in any context because that

16 would dilute the so-called Arie and Orly Trust shares.

17           MR. LAMB:  Your Honor, that

18 preliminary injunction application has been argued and

19 is, as I -- tell me, Mr. Allingham, has it been argued

20 or is it just a TRO at this point?  There's a PI

21 coming up and --

22           MR. ALLINGHAM:  It has been argued on

23 a preliminary injunction basis and it is sub judice.

24           MR. LAMB:  Sub judice, Your Honor.

1              MR. ALLINGHAM:   And Justice Feinman

2    indicated yesterday that he was working on an opinion.

3    So --

4              THE COURT:   See, and this is the

5    thing.  My simple mind doesn't really divide among

6    these actions.  As I said before, I really know

7    nothing about the Orly action or the Dalia action,

8    however you wish to call it, because nothing has been

9    done.

10             MR. ALLINGHAM:   Your Honor, if I

11   may -- and I know the Court is -- is pressed for

12   time -- we -- we -- I -- I lack authority as well.

13   I -- I would like to talk to my clients.  I think that

14   what Your Honor has proposed is extraordinarily

15   sensible; but we do have some complicating --

16   complicating factors, including this preliminary

17   injunction application pending before Justice Feinman.

18   One possibility might be that the parties simply agree

19   to stay the state court proceeding voluntarily

20   throughout to permit Judge Keenan to act.  But let

21   me --

22             THE COURT:   Yeah.  Why don't --

23             MR. ALLINGHAM:   If you would permit,

24   let me consult with my clients, and I will commit to

22

1  provide the Court with a response by the end of the
2  day.
3            THE COURT:  Yeah.  Well, why don't you
4  do this:  Why don't you -- before anybody sends me
5  anything, make sure you and Mr. Lamb speak directly.
6            And let me again reiterate.  I'm not
7  doing anything impulsive.  The idea that people are
8  running around taking a busy judge and getting TRO
9  applications -- you know, one of the easiest TRO
10 applications that ever would have been granted to Orly
11 Genger would have been one in the Orly Genger action
12 pending before me, to say, "Your Honor, I just want a
13 clarification that until my counsel are heard, you're
14 not going to do anything."  I would have found it
15 humorous because I would have said "I'm happy to
16 provide this obvious answer to you for insurance"
17 because I never the heck would have done it.
18            So I -- I understand when we're --
19 when we talk about "this action," just limited to a
20 civil action number --
21            MR. LAMB:  Yes, sir.
22            THE COURT:  -- that's a little --
23 everybody's -- there's a big kind of family dispute
24 that's tying up both the family, the Trump Group, and

CHANCERY COURT REPORTERS

23

1    the underlying business.  And I think what people need

2    to get clear with each other is how are they going to

3    spend their time?  Is there going to be coordination

4    among counsel so that the people don't say "Oh, well,

5    that's just the Orly action"?  Because I don't really

6    intend -- I mean, again, I was -- I'm not even sure

7    what the Orly action is, I'll confess.  I don't go

8    around reading every complaint that's filed with me

9    because I would never get to do the actual motions

10   that are pending.

11                  But I think what -- it sounds like --

12   I think the two of you, if you discuss this with a

13   cool head and a warm heart -- and, honestly, I even

14   thought about bringing in Orly and what's counsel.  I

15   think you ought to talk to them, and you ought to

16   figure out what's going on so that we stop this.  I

17   mean, I -- you know, I, frankly, am -- I do find some

18   of the proceedings disorienting.  And, Mr. Allingham,

19   can I make a suggestion to you and your team?

20                  MR. ALLINGHAM:  Of course, Your Honor.

21                  THE COURT:  Do not skip any proceeding

22   in New York that you know anything about.

23                  MR. ALLINGHAM:  I take the point, Your

24   Honor.

CHANCERY COURT REPORTERS

24

1          THE COURT:  If you need to occupy the
2    doorstep to the courthouse, to pick a term of the
3    moment, occupy it.
4          MR. ALLINGHAM:  Understood, Your
5    Honor.
6          MR. LAMB:  Your Honor, just for
7    clarity, I'm not aware -- I -- I'm quite sure that any
8    application that's been made since the summer of 2010
9    has been on notice to Mr. Allingham.  And --
10          THE COURT:  Oh, no, no.  And that was
11    my point.  I believe there was something about this
12    one transcript where they had been told it really
13    didn't affect Arie and they didn't show up.
14          MR. ALLINGHAM:  It didn't affect the
15    Trump Group, Your Honor.
16          THE COURT:  Okay.  And I just think --
17          MR. ALLINGHAM:  Yes, I understand.
18          THE COURT:  -- it's such a complicated
19    web of family and business relationships, that it's
20    just not wise.  And I don't think it helps Judge
21    Feinman.  None of us want unnecessary party -- that's
22    why I said.  I thought about Orly and whatever, but
23    it's not this case.  And I urge you to share this
24    immediately with both their counsel and to share it

CHANCERY COURT REPORTERS

25

 1   with the world.

 2              I'm going to finish with this:  I

 3   appreciate the prompt getting-together.  I'm not going

 4   to do anything impulsive.  I'm not going to do

 5   anything without full participation of all interested

 6   parties.  We just don't do that in Chancery.  I'm also

 7   happy to talk to any of my judicial colleagues, if

 8   anybody thinks that's sensible.  But I do think

 9   getting a ruling from Judge Keenan has got to be a

10   useful thing even if you assume this Court wasn't even

11   in the mix.

12              And so to the extent that he's willing

13   to step up, that's something that I am extremely

14   grateful for as a judicial colleague.  I've spent an

15   awful lot of time on this case.  And if somebody wants

16   to take a crack at something that will help all the

17   parties move forward, I applaud that and I applaud the

18   cooperative spirit of your -- the participation by

19   counsel today.  And I will see you-all soon.  Some of

20   you sooner than later, I think.

21              MR. LAMB:  Yes.  Sooner than later

22   here.

23              THE COURT:  Okay.

24              MR. ALLINGHAM:  Thank you, Your Honor.

26

1          THE COURT:   Take care.

2          MR. LAMB:   Thank you.

3      (The proceedings concluded at 1:31 p.m.)

4                    - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CHANCERY COURT REPORTERS

27

1                              CERTIFICATE

2

3                    I, NEITH D. ECKER, Official Court

4    Reporter for the Court of Chancery of the State of

5    Delaware, do hereby certify that the foregoing pages

6    numbered 3 through 26 contain a true and correct

7    transcription of the proceedings as stenographically

8    reported by me at the hearing in the above cause

9    before the Chancellor of the State of Delaware, on the

10   date therein indicated.

11                   IN WITNESS WHEREOF I have hereunto set

12   my hand at Wilmington, this 11th day of November 2011.

13

14

15                              /s/ Neith D. Ecker

16                              - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                 Official Court Reporter
17                                 of the Chancery Court
                                     State of Delaware
18

19

20   Certificate Number:  113-PS
     Expiration:  Permanent
21

22

23

24

CHANCERY COURT REPORTERS

EFiled: Dec 9 2009 3:48PM EST
Transaction ID 28427867
Case No. 3994-VCS

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, and TRANS-RESOURCES, INC., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ARIE GENGER, | ) ) | |
| Defendant. | ) | Civil Action No. 3994-VCS |
| ARIE GENGER, | ) ) | |
| Counterclaim Plaintiff, | ) ) | |
| v. | ) ) | |
| TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, and TRANS-RESOURCES, INC., | ) ) ) ) ) | |
| Counterclaim Defendants. | ) | |

MEMORANDUM OPINION

Date Submitted: October 30, 2009
Date Decided: December 9, 2009

Thomas J. Allingham II, Esquire, Anthony W. Clark, Esquire, Robert A. Weber, Esquire, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware, *Attorneys for Plaintiffs.*

Donald J. Wolfe, Jr., Esquire, Brian C. Ralston, Esquire, Scott B. Czerwonka, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Michael P. Carroll, Esquire, Avi Gesser, Esquire, DAVIS POLK & WARDWELL LLP, New York, New York, *Attorneys for Defendant.*

**STRINE, Vice Chancellor.**

## I. Introduction

Plaintiffs TR Investors, LLC, Glenclova Investment Co., New TR Equity I,

LLC, New TR Equity II, LLC, and Trans-Resources, Inc. (collectively, the

"Trump Group") seek sanctions against defendant Arie Genger for causing

computer "wiping" software to be employed to destroy all the information on the

unallocated space of TRI's computer database. Genger's conduct occurred in the

midst of expedited litigation over the control of Trans-Resources, Inc. (or "TRI").

In connection with that litigation under 8 *Del. C.* § 225, attorneys for TRI worked

with Genger throughout the weekend of September 5-7, 2008 to identify and

segregate documents on TRI's computer system that were personal to Genger and

not related to the business or affairs of TRI. This work was in anticipation of

Genger's potential involuntary relinquishment of control over TRI to the Trump

Group.

After the attorneys for TRI had left on September 7, 2008, Genger had a

conversation with Oren Ohana — the computer consultant he had long employed

to assist both TRI and himself personally — about the computer work the

attorneys (and their technology consultants) had performed throughout the

weekend. As a result of that discussion, Ohana was authorized by Genger to take

measures to destroy information on TRI's computer system. That conduct was a

violation of a status quo order entered on August 29, 2008 (the "August Status

Quo Order") in connection with the § 225 dispute, which provided in relevant part

that "the parties to the [§ 225 dispute] . . . are hereby restrained and enjoined from,

1

directly or indirectly . . . tampering with, destroying or in any way disposing of any Company-related documents."[1]  Before embarking on that course of document destruction, Genger did not consult with counsel for TRI despite his awareness of the terms of the August Status Quo Order, and the fact that counsel had been working with him throughout the weekend of September 5, 2008.  Consistent with Genger's failure to consult counsel before acting, Ohana acted in the dead of night to wipe the unallocated portions of the TRI server clean.  Like people who do things in the dark that they do not wish others to know about, neither Genger nor Ohana later informed TRI, its counsel, or the Trump Group about the use of the wiping software.  In other words, Genger and Ohana tried to keep their activities secret.

But, once the Trump Group gained control over TRI, the wiping activity came to light.  The revelation of this misconduct coincided with the unraveling of a settlement of the § 225 action, and has resulted in an expensive case within a case.  While the parties dueled over whether the Trump Group properly exercised consents to replace the TRI board, they also spent enormous resources on whether Genger's actions constituted contempt of court and spoliation of evidence and, if so, what the appropriate consequences were.

In this opinion, I resolve the parties' feud regarding Genger's destruction of information.  Although I reject the Trump Group's preferred remedy of entering a default judgment against Genger in the § 225 action, I conclude that a potent

---

[1] JX-2 (Status Quo Order (Aug. 28, 2009)).

remedy is justified by Genger's intentional violation of a clear judicial order and contempt of this court. Moreover, I conclude that Genger intentionally sought to reduce the base of information available to the Trump Group in the § 225 action, and that, even more indisputably, his conduct was reckless — both findings that render him accountable for spoliation.

In the § 225 action, Genger contends, through a variety of legal and equitable theories, that the Trump Group does not have majority voting power despite ownership of a majority of the equity of TRI. Because Genger's destructive conduct had the effect of preventing the Trump Group's access to the full array of information that should have been available in the § 225 action, I conclude that a proportionate and fitting remedy is to require Genger, as to any affirmative defense or counterclaim raised by him in the § 225 action, to meet his burden of persuasion by meeting an evidentiary burden one level higher than would otherwise be applicable. Thus, if Genger would otherwise have to meet a mere preponderance standard, he will now have to prevail by producing clear and convincing evidence. Additionally, because his secretive conduct has left me with serious doubts about his credibility and because that conduct rendered the documentary record incomplete, Genger will be unable to meet his burden of persuasion if the only evidence on a contested matter is his own testimony. Rather, he will need to present corroborating evidence, either in the form of documents or another person's testimony, to meet his burden. To supplement this relief and directly address Genger's shrinking of the evidentiary record, I order

3

Genger to turn over certain relevant documents to which he had made a claim of privilege.

Having found Genger to be in contempt and to have destroyed relevant evidence, I must also balance his actions against some disconcerting actions of the Trump Group following Genger's violations. In rejecting a more extreme order, I give weight to conduct by the Trump Group after they took over control of TRI. That conduct, while in a grayer area than Genger's, also showed disrespect for stipulated court orders, illustrating the high stakes the Trump Group and Genger place on their dispute over control of TRI and both side's willingness to employ sharp elbows. Although not a factor that disentitles it from any relief at all, the Trump Group's behavior convinces me that justice requires that an adjudication resolve this ownership disagreement, if, as seems likely, the Trump Group and Genger are unable to settle their differences in a rational, consensual manner.

Finally, because Genger violated an important order of this court and failed to own up for his misconduct in a timely way, an award of attorneys' fees is warranted. In that connection, I suggest an amount that strikes me as reasonable in light of what was at stake, and that is consistent with my impression that both sides have engaged in overkill.

## II.  Factual Background

These are the facts as I find them after trial.

4

A. <u>The Trump Group Purports To Remove Genger From The TRI Board Of Directors</u>

As of June 2008, defendant Arie Genger was the Chief Executive Officer of TRI, a company that he founded. At that time, the Trump Group owned a large, but non-majority, bloc of the outstanding TRI stock.[2] The Trump Group brought large amounts of financial capital to the table that helped TRI out of an earlier credit crunch, and that resulted in its ownership of its initial 47% interest in TRI. From the record, one senses that Genger and the Trump Group bring a similar mindset to business. Although they seemed to work together cooperatively to advance TRI's interests, Genger and the Trump Group viewed business as business, and neither would hesitate to seize an advantage, even if that advantage meant causing commercial injury to someone else, regardless of whether one had served with that someone else on a board for several years.

In 2007 and 2008, TRI fell behind in making payments to its largest lender, Bank Hapoalim.[3] In the spring and summer of 2008, the Trump Group and Genger began to work together to re-finance TRI's debt to Bank Hapoalim.[4] One difficulty that both Genger and the Trump Group were interested in avoiding was putting in place a change in ownership structure that might inspire a legal challenge from Sagi Genger, Genger's son.[5] Arie Genger had a bitter divorce from Sagi's mother, and has been estranged from his son for several years. It

---

[2] Tr. at 140:15-17 (Hirsch).
[3] *Id.* at 142:4-24.
[4] *Id.* at 147:6-149:6.
[5] *Id.* at 152:9-153:15.

seems that as of this time, the Trump Group favored continuing Genger as CEO

and working together with him to determine TRI's fate.  But the effort to

consummate a Genger/Trump Group-sponsored refinancing deal began to unwind

in late June 2008 and, ultimately, the parties abandoned these efforts.[6]

      With a refinancing out of reach and TRI facing the potential for its creditors

to take adverse action, the Trump Group shifted course in a major way.  Litigation

in this court and another forum broke out in early August 2008 between the Trump

Group and Genger over TRI.  Then, without any advance notice to Genger, on

August 22, 2008, the Trump Group purchased an additional 19% bloc of TRI

shares from a trust to benefit Sagi, called the Sagi Genger Trust, for $26.7

million.[7]  This bloc of shares will feature prominently in the upcoming § 225 trial,

because it was transferred by Arie Genger to the trust in connection with his

divorce from Sagi's mother, Dalia Barshishat.  Arie Genger and the Trump Group

have sharply differing views about who gets to vote this bloc.  For now, suffice it

to say that the Trump Group believed that the purchase of this bloc, along with

other shares they own, gave it sufficient voting control of TRI to remove the TRI

board and install a new board.[8]  As of August 25, 2008, the original board

consisted of five members:  Genger and his trusted business associates William

Dowd and Avi Pelossof, as well as Robert Smith and Jules Trump, both

appointees of the Trump Group.

---

[6] *Id.* at 162:2-163:20.
[7] *Id.* at 140:18-141:4, 163:21-164:10.
[8] *Id.* at 164:12-165:14.

At a board of directors meeting held on August 25, 2008, the Trump Group delivered written consents of its shares, including those acquired from the Sagi Genger Trust, and proposed to reconstitute TRI's board as follows: first, the Trump proposed to increase the number of directors on the board from five to six; second, the Trump Group proposed to remove Arie Genger from the board and from his position as CEO; and third, the Trump Group proposed that Eddie Trump and Mark Hirsch would take the two new seats on the TRI board.[9]  Because Eddie Trump and Mark Hirsch were Trump Group appointees, the practical effect of this proposal was to eliminate Genger's control over TRI.  At the August 28, 2008 meeting, Genger, Pessolof, and Dowd rejected the proposal, believing that the Trump Group did not have the voting power to reconstitute the board.

B.  The Section 225 Action Is Filed And A Status Quo Order Is Implemented

TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC, and New TR Equity II, LLC promptly filed the § 225 action on August 25, 2008, asking, among other things, for this court to: (a) declare the Trump Group the majority stockholder of TRI; (b) enjoin TRI from recognizing Genger as a director; (c) declare them entitled, as the majority shareholders, to designate and elect two more of their designees to the TRI board, and to continue the terms of Jules Trump and Robert Smith; (d) declare the TRI board to be composed of their four designees — Jules Trump, Robert Smith, Mark Hirsch, and Eddie Trump —

---

[9] Pl. Compl. at Ex. A (Action by Written Consent of the Stockholders of [TRI] (Aug. 25, 2008)).

7

plus William Dowd and Avi Pelossof; and (e) declare invalid any actions taken by

a board not comprised of their designees from and after the August 25, 2008

delivery of their written consents. On August 26, 2008, the Trump Group also

filed an action under 8 *Del. C.* § 220 asking, among other things, for this court to

order TRI to permit it to inspect and copy books and records from TRI.

On August 28, 2008, the parties to the § 225 action entered into a Standstill

Agreement, which was scheduled to terminate on September 4, 2008, for the

purpose of giving the disputing parties time to try to settle their dispute and, until

such settlement was reached or the § 225 action completed, to sort out how TRI

would be managed. This Standstill Agreement provided, among other things,

"[e]xcept as otherwise provided herein, no action will be taken to prosecute or

defend any of the Litigations during the Term of this Agreement."[10] The next day,

the parties submitted a stipulated status quo order (the aforementioned "August

Status Quo Order"). Importantly, the August Status Quo Order had a provision

that is standard when parties are disputing the control of a business and where

there exists a motive for the destruction of unfavorable information. That

provision states in relevant part:

> Unless and until otherwise ordered by the Court or agreed to in
> writing by each of the parties to the above action, the plaintiffs and
> the defendants, and their respective officers, directors, agents,
> servants, subsidiaries, affiliates, employees, attorneys, advisors and
> all persons acting in concert or participation with any of them, and
> each of their successors and assigns, are hereby restrained and
> enjoined from, directly or indirectly . . . tampering with, destroying

---

[10] JX-1 (Standstill Agreement (Aug. 28, 2009)).

or in any way disposing of any Company-related documents, books or records . . . .[11]

Because neither settlement nor a favorable verdict in the § 225 action were guaranteed, Genger faced the possibility that he might lose control of the company he founded twenty-five years ago.  Relatedly, Genger faced the prospect that the Trump Group, if it assumed control, would review the documents and files he had accumulated over the twenty-five years he had spent at TRI, not to mention the chance that they would get to see those documents as a result of discovery in the pending litigations.  Therefore, at the direction of TRI's outside counsel, Friedman Kaplan Seiler & Adelman LLP ("Friedman Kaplan"), on the weekend of September 5-7, 2008, the entire contents of Genger's TRI office — both physical and electronic — were packaged, sealed, and sent to the office of Genger's personal counsel, Dechert LLP pending the outcome of the lawsuits.  The goal of Friedman Kaplan's efforts was not only to segregate the non-TRI documents and to protect Genger's interest in keeping those documents confidential, but also to ensure that all of the documents relevant to TRI's business and affairs were preserved and available both for those managing the corporation and for possible use as evidence by the parties in the pending litigation.

---

[11] August Status Quo Order at ¶ 1.