C. Genger Allows Files To Be Erased From His Computer At TRI In Violation Of
The August Status Quo Order

1. Genger Has Unusual Concerns About His Personal Documents At TRI

Aside from the usual motivations that pertain in these situations, Genger

had special concerns that made him reluctant to permit the Trump Group to

control TRI because the Trump Group would have access to personal electronic

documents that Genger had generated while at TRI. Although Mike Myers may

have made millions by bringing to the big screen his take on what it is like to be an

"international man of mystery," Arie Genger, as it turns out, is such a man. Aside

from his business interests, Genger apparently has high level contacts within the

Israeli government for whom he performed sensitive tasks relating to Israel's

national security. It seems that these tasks involved work by Genger within the

United States — apparently on a secret basis — although there is no indication in

the record that Genger has openly identified his work to anyone of authority in the

United States or has diplomatic or other official credentials. What this work

involved is unknown to me, but what is known is that Genger used TRI's

computer system to create and receive documents implicating Israel's national

security.

Genger also had personal documents relating to his family finances and

divorce dispute on the TRI system. Although Genger's use of TRI's computer

system for these personal purposes was a violation of TRI's policies for computer

use as articulated by Genger himself, Genger had breached these policies

pervasively. He was worried that the Trump Group would gain access to his personal documents, and, through his lawyers, Genger voiced concern about the security of these documents in view of the Trump Group's possible impending control of TRI.

### 2. Steps Were Taken To Preserve Relevant Information

Because of the ongoing dispute and his possible departure from TRI, Genger needed to gather his personal effects and desired to protect his personal documents, including those that involved his work for the Israeli government. At the same time, safeguards were needed to ensure that Genger did not leave with documents relevant to TRI's business and affairs. To help protect the integrity of this process of information segregation, attorneys from Friedman Kaplan were charged with supervising the process by which Genger would remove his personal materials from TRI's offices. Most pertinent to the current dispute, Friedman Kaplan reviewed TRI's electronic files with the goal of identifying those of Genger's documents that were purely personal. Those personal documents were then to be encrypted in a manner that ensured that the confidentiality of those documents would be protected. As to non-personal documents, it was Friedman Kaplan's task to preserve those documents for use by TRI in its business and to ensure they were available if relevant in the pending litigations. To do that,

attorneys opened documents and e-mails that were potential targets for encryption to review their contents.[12]

This process was a hurried one that was largely accomplished during the weekend of Friday, September 5, 2008 through Sunday, September 7, 2008, with Friedman Kaplan endeavoring to complete the review and encryption process before Monday, September 8, 2008, when the Trump Group's purportedly reconstituted board was scheduled to meet. To assist in its efforts, Friedman Kaplan employed an outside technology firm, Kraft & Kennedy, Inc. ("K & K"), to preserve Genger's electronic files and e-mails and, where necessary, to separate and encrypt Genger's personal files from his TRI-related files.[13]

As part of the preservation process, K & K "imaged"[14] parts of TRI's computer system on September 7, 2008 in order to have a "snapshot" of everything on the system as of that date.[15] Specifically, K & K imaged hard drives of various computers at TRI, including Genger's computer's hard drive and the TRI server's hard drive.[16] But K & K did not do a complete job, as will soon be

---

[12] JX-5 at ¶¶ 8-10 (Ohana Aff. (Oct. 20, 2008)).

[13] JX-7 at ¶¶ 1-4 (Leicht Aff. (Oct. 31, 2008)); Tr. at 251:6-252:11 (Genger).

[14] The "images" taken were digital pictures of the computers' hard drives. These digital pictures are essentially exact copies of the computers' hard drives, which computer technicians can then use to reconstruct and examine the data stored on the drives.

[15] JX-7 at ¶¶ 2-3 (Leicht Aff. (Oct. 31, 2008)).

[16] A computer server is a computer with a large amount of memory that runs the operating system and other software programs for individual computers. These individual computers are often linked to one another by an electronic network. The server often stores the data for the entire network and for all users. Thus, for example, saving a file to the network from Genger's computer would allow another user to access that saved data from another computer linked to the same server.

discussed, perhaps in part because it did not have a deep understanding of how TRI maintained its computer records.

The person who did fully understand how TRI maintained its computer records was Oren Ohana, who had served for years as a technology consultant for both TRI and Genger personally. Genger trusted Ohana, and Ohana had established protocols for Genger to use in his own handling of important documents. Genger was in contact with Ohana throughout the document review process on the weekend of September 5, 2008.[17]

### 3. Temporary Files Were Stored On The Unallocated Space Of Genger's Hard Drive

To understand the present dispute's origins — the events of the weekend of September 5, 2008 — one must grasp the key point that the deletion of a document or e-mail from the active space of a computer's hard drive or from a server does not mean that that the deleted file or e-mail is no longer retrievable from the computer system.

By way of a directly relevant example, if the Friedman Kaplan attorneys opened a document on Genger's computer from his files that weekend to review whether it was confidential and kept it open long enough for the program's autosave feature to function, the computer system would create a temporary copy of that file on Genger's computer. These temporary copies are different than

---

[17] *See* JX-22 (e-mail between Arie Genger and Oren Ohana (Sept. 4, 2008)) (asking Genger, "[c]an I call you[?]"); JX-23 (e-mail between Arie Genger and Amir Shvetz, an Ohana employee (Sept. 5, 2008)); JX-25 (e-mails between Arie Genger and Amir Shvetz, an Ohana employee (Sept. 5-6, 2008)).

normal user-created files, such as word-processing documents. A user-created

document is stored on the active, or allocated, space, of a computer or server

where it is visible to a user. A temporary file, however, is only in the active, or

allocated, space so long as the file is open. When the file is closed by the user, the

recently created temporary copy (or its contents) physically, or digitally, remains

in the inactive, or unallocated, space of the machine's hard drive where it stays,

invisible to the user, until the computer needs that space to run a process or store

another file. When the computer needs this space, it overwrites the previous data

that had been stored on that portion of the unallocated space, and this process

starts anew. Additionally, when a user deletes a file from his or her computer or a

server (*e.g.*, deletes a file from the "trash bin"), the data from that file remains —

as it was — in what is now the unallocated space. Data in the unallocated space is

not visible to normal users, but can be recovered with the aid of technology

consultants like Ohana or K & K.

Although e-mails and e-mail attachments also create temporary files, they

are contained within a smaller, segregated segment of the computer's hard drive

dedicated to the computer's e-mail program. The e-mail programs themselves

create files for different e-mail users or e-mail accounts, but these files (and their

unallocated space) are much smaller than the computer's main unallocated space

section. Therefore, files in the smaller, unallocated space on the computer's hard

drive reserved for e-mails, such as deleted e-mail messages, get overwritten much

faster as a result of normal usage.

To narrow the factual disputes between the parties about technological issues, I directed the parties to identify a neutral, independent IT consultant — ultimately, Protiviti, Inc., a risk and business consulting firm — to facilitate the exchange of electronic information between the parties.[18] In its expert report, Protiviti concluded that non-encrypted copies of Genger's documents could have been created during the encryption process.[19] This inadvertent creation of temporary copies would have defeated the point of the encryption process because, as discussed above, trained computer technicians would be able to obtain access to these confidential files even without the encryption key.

The possibility of extra, or unintentional, copies of various files — temporary or deleted files, for example — also applies to Genger's TRI-related work. During the September 5-7 review process, temporary copies of TRI-related files (*i.e.*, not personal Genger documents) would have been created. These temporary copies would have remained on the computer's unallocated space at the conclusion of the weekend.

Even more importantly, Genger and others at TRI would almost certainly have created many such TRI-related documents *before* the August Status Quo Order had been entered, simply by their normal computer usage.[20] The information on the unallocated space of the TRI system therefore acted somewhat

---

[18] Stipulation and Confidentiality Order Governing the Exchange of Certain Information (Mar. 3, 2009) at ¶ 5.
[19] JX-19 (expert report of Kevin Faulkner) at 13.
[20] Tr. at 54:14-55:6 (Faulkner).

as a back-stop reservoir of documents that had been deleted from the active files of TRI users. Although users may have believed that their deletion activity rendered the affected documents irretrievable, that was not so — as long as the unallocated space had sufficient room to store them. The unallocated space on the TRI server was likely filled with several months of TRI-related data as of September 7, 2008.

4. Ohana Removes The Temporary Files Stored On Genger's Hard Drive

Genger's advisor Ohana was keenly aware of how and where TRI stores its electronic files and e-mails. And, on Sunday, September 7, 2008, Ohana actually joined Genger, Friedman Kaplan, and K & K for parts of the review process. During the time that Friedman Kaplan and K & K were there, Ohana did not express any concerns to them about the possibility that unencrypted versions of Genger's files were being created during the review process.

But after the attorneys and K & K had left TRI's offices, Genger claims that Ohana informed him that non-encrypted copies of Genger's personal files may have been created and left on the unallocated space of his computer and the TRI server.[21] Ohana recommended that he "take care of" the problem by "wiping" the unallocated space on both machines, and Genger agreed with Ohana's suggested course of action.[22] At around 1:00 a.m. on September 8, 2008, Ohana ran a wiping software program called "SecureClean," and selected the

---

[21] JX-5 at ¶ 13 (Ohana Aff. (Oct. 20, 2008)); JX-20 at ¶¶ 12-14 (Genger Aff. (Oct. 31, 2008)); Tr. at 256:4-13 (Genger).

[22] JX-5 at ¶ 13 (Ohana Aff. (Oct. 20, 2008)); JX-20 at ¶¶ 12-14 (Genger Aff. (Oct. 31, 2008)); Tr. at 257:4-258:2 (Genger).

16

"DeepClean" option (the most thorough) for use on the hard drive of Genger's computer.[23] Ohana then ran SecureClean on the hard drive of TRI's server on September 10, 2008.[24] This option permanently overwrites — or, effectively erases — data on the unallocated space of a hard drive by saving new strings of unintelligible data on that unallocated space.[25]

Neither Ohana nor Genger spoke with Friedman Kaplan, K & K, or even Genger's own lawyers before Ohana ran SecureClean on September 8 and 10, 2008. Genger did not seek advice from Friedman Kaplan about whether getting rid of files, even copies, was permissible under the terms of the August Status Quo Order, despite knowing that Friedman Kaplan had been charged with ensuring compliance with the August Status Quo Order and the preservation of documents.

Notably, neither Ohana nor Genger disclosed their conduct after the fact. That is, they did not leave a note saying "oh by the way, we wiped clean the unallocated space during the dead of night." Rather, they kept their furtive conduct secret.

Their destructive conduct was especially harmful because K & K had not preserved an image of the entire TRI hard drive. K & K had only preserved an image of the active files on the TRI system, and the information on the unallocated space had not been imaged or reviewed. Furthermore, the review process did not

---

[23] JX-5 at ¶ 6 (Ohana Aff. (Oct. 20, 2008)); JX-19 at 15-16 (expert report of Kevin Faulkner).
[24] JX-19 at 15-16 (expert report of Kevin Faulkner); *see* JX-5 at ¶ 15 (Ohana Aff. (Oct. 20, 2008)).
[25] Tr. at 8:21-9:10 (Faulkner).

include the information on TRI's e-mail server, because, unknown to K & K and
Friedman Kaplan — but known to Ohana and therefore likely his client, Genger
— the e-mail server was maintained at an off-site facility controlled by Ohana.

It is difficult to determine whether Genger and Ohana knew before running
SecureClean that K & K had not imaged the unallocated space of Genger's
computer or the TRI server. For his part, Genger pleads computer ignorance,
claiming only to have thought that Ohana was getting rid of "copies" of
information that was encrypted, and that the underlying originals were preserved.
Genger's lawyers even tried to convince me that Genger was unaware that Ohana
would be using a form of deletion software, suggesting that he believed Ohana had
somehow engaged in a more targeted deletion effort. In support of their argument
that Genger had no intent to destroy evidence relevant to the § 225 dispute, his
lawyers point to the lack of any evidence that Genger deleted a large amount of
documents before his departure from TRI. Such a pattern, of course, would have
provided support for a motive for the use of SecureClean as it would have
completed the job of eradicating traces of documents Genger had deleted from the
active files of TRI. Ohana claims that he simply intended to erase the temporary
versions of the encrypted files that may have been created during the review
process.[26]

Although I am not free from all doubt on the point, I do not, in the end,
embrace Genger's version of events. He is a very sophisticated man who operates

---

[26] JX-5 at ¶ 13 (Ohana Aff. (Oct. 20, 2008)).

in the national security field. Precisely because he recognizes the importance of computer security, he has employed Ohana as an advisor for many years. The fact that Genger is not a computer expert does not mean that he does not understand that there are products that can erase documents; he has someone like Ohana at his disposal precisely to bring to bear the specific skills that Genger himself lacks.

Genger and Ohana were both involved in the document review process, but Ohana was not continuously involved. It therefore makes no sense that Ohana could easily find and delete simply those copies of the documents that were encrypted. If that were the case, there was no reason for them not to have called Friedman Kaplan and K & K, asked them to come back in the office, and done it in an above-board way. Certainly, that could have been done on September 9, before the final wiping on September 10. The idea that Genger was reluctant (because of the sensitivities about the work strain it would impose) to burden them further with a discussion of whether the wiping was proper makes no sense and has no credible basis. Likewise, if (as I find) Genger knew that Ohana would run a computer program that deleted all the information on the unallocated space and believed (as I do not find) that there was nothing wrong with doing that, Genger had no reason not to engage the lawyers and K & K. He could have pointed out the problem and sought permission to proceed.

The most natural inference that arises when sophisticated people act secretively in a process that is governed by a court order and that has been placed under the purview of counsel to ensure compliance is that they have something to

19

hide. In this case, I believe that Genger, with Ohana's advice, felt that there was a chance not only to reduce the risk that his personal information would be misused but also to narrow the information available to TRI in the § 225 action and the other pending cases. In so finding, I am influenced by the incompleteness of the work done by K & K, which did not include imaging the unallocated space. Ohana was involved in the document review process and, while he and Genger were present, none of the review involved the unallocated space. Moreover, Ohana did not reveal to K & K or Friedman Kaplan that TRI's e-mail server was located off of TRI's premises.

I believe it more likely than not that Ohana (and therefore his client, Genger) knew the unallocated space had not been imaged and knew that it was likely to contain a large amount of information that had not been reviewed that weekend. By having Ohana run SecureClean secretly, Genger would never have to worry about the files contained on the unallocated space. By contrast, if Ohana and Genger raised this issue with Friedman Kaplan and K & K, they would have signaled the existence of the unallocated space and the information on it, thereby providing another source of documents for the Trump Group and perhaps triggering a deeper inquiry into other sources of TRI information that were available, including the off-site e-mail server.

Given that the only downside of proceeding in an open manner was that Friedman Kaplan and K & K would have been in on the process used to protect any documents made during the encryption process, Genger's behavior is more

consistent with a darker intent of getting rid of what he and Ohana thought the

lawyers and their consultant did not need to know about. Admittedly, this was a

clumsy effort. But tricksters are often ham-handed, and they are not absolved of

wrongdoing simply because their improper conduct was not completely effective.

Put simply, I conclude that Genger, upon the advice of Ohana, authorized

Ohana to run wiping software with the purpose not only of protecting his non-TRI

documents but also of narrowing the information base available to the Trump

Group. I cannot and do not conclude that he had any particular piece of

information in mind when he made this hurried and ill-advised decision. But I do

conclude that he intended to limit the ability of the Trump Group to find additional

documents that might aid it in its litigation battles with him.

### D. A Status Conference Is Held To Address, Among Other Things, Genger's Concern About His Personal Documents

On September 12, 2008, this court held a status conference regarding the

§ 220 and § 225 actions. One concern raised by the Trump Group was that TRI,

under Genger's instructions, was not permitting the Trump Group to inspect all of

TRI's books and records, some of which Friedman Kaplan had gathered during the

September 5 weekend and sent to Dechert's offices for safe-keeping. Another

concern the Trump Group raised was that Genger was still acting as a manager,

that Genger had "the keys" to TRI, even though the Trump Group purported to

have control over TRI. This court responded to both of these concerns by

suggesting the parties file an amended status quo order addressing these and other issues.

Additionally, to accommodate Genger's concerns about his personal documents, it was agreed that attorneys from Morris, Nichols, Arsht & Tunnell LLP ("Morris Nichols"), on behalf of TRI, would review both the electronic and hard copies of documents that Friedman Kaplan had gathered during the September 5-7, 2008 weekend, some of which were being held at Dechert's office. Morris Nichols was to segregate Genger's personal and national security documents from those of his documents that related to TRI's business.

Following the September 12, 2008 status conference, the parties submitted an amended status quo order on September 23, 2008 in which they agreed that Avi Pessolof, William Dowd, Arie Genger, Jules Trump, and Robert Smith would constitute the board of TRI until the § 225 action was resolved. The amended status quo order also provided that the senior management team who was running TRI as of August 25, 2008 would stay in place.

At the September 12, 2008 status conference, Genger's lawyers did not inform the court and the Trump Group about their client's use of wiping software just days before.[27] After the conference, K & K discovered, on its own, that TRI's e-mails were handled by the off-site third-party server maintained by Ohana.[28] On

---

[27] I do not imply that any of Genger's lawyers had been told of the wiping. Of course, if that was the case, it again illustrates Genger's sense of shame over the conduct.
[28] JX-7 at ¶ 10 (Leicht Aff. (Oct. 31, 2008)).

September 23, 2008, K & K made an image of the active files of that third-party e-mail server's hard drive.[29]

E. Genger's Misconduct Is Discovered And An Expensive Process To Determine
What Information Went Missing Is Undertaken

1. The Trump Group Discovers That Files Have Been Erased From TRI's
Computers

Because K & K did not image the unallocated space on the TRI's computers, it is impossible to tell exactly what was erased from the unallocated space.[30] We will never know, to a certainty, what exactly was erased — precisely because of the use of SecureClean.[31]

The use of SecureClean was discovered by the Trump Group in early October 2008 — just days after Genger had settled the § 225 action by stipulating to a final judgment that provided for the TRI board of directors to be composed of Eddie Trump, Mark Hirsch, Jules Trump, Robert Smith, William Dowd, and Avi Pelossof, and that effectively ended Genger's managerial role in TRI. After it assumed control of TRI's offices, the Trump Group employed a computer consultant of its own, FTI Consulting, Inc. ("FTI"). FTI discovered that on

---

[29] *Id.* at ¶ 11.
[30] When SecureClean is run on any computer or file, it leaves an electronic "trace," or a type of marker, that the program had been run — even after using the DeepClean option. FTI found these markers of SecureClean activity on Genger's computer and the TRI server.
[31] *See* Tr. at 8:21-9:10 (Faulkner).

September 8 and 10, 2008, SecureClean had been used to "wipe," or permanently overwrite, the unallocated space on a TRI computer and server.[32]

Within days of discovering the use of SecureClean, on October 10, 2008 the Trump Group filed a motion to reopen the § 225 case and for an order to show cause as to why Genger should not be held in contempt.[33]  In the same general time period, the settlement in the § 225 action unwound and Genger began to again challenge his removal from the TRI board.  Eventually, the § 225 action was reopened, and Genger and the Trump Group agreed to seek a determination of who controlled the economic and voting interests in the bloc of shares the Trump Group had bought from the Sagi Genger Trust.  The § 225 action was to proceed before other litigation pending among Genger, the Trump Group, and certain other parties in New York, which touched on several of the same issues.

Genger's destruction of documents, however, created a question about the adequacy of the factual record and what, if any, consequences, should result from his conduct.  A great deal of discovery was taken to determine whether any evidence was lost because of Genger's conduct.  That discovery included the performance of an analysis by Protiviti Inc., the neutral IT consultant selected by the parties.

---

[32] Tr. at 70:11-22; *see* JX-10 at ¶ 7; JX-11 at ¶¶ 6-8.
[33] *See* Pl.'s Motion To Reopen Case And For Order To Show Cause Why Arie Genger Should Not Be Held In Contempt (Oct. 10, 2008).

## 2. An Important Memorandum Is Not Found On Genger's Computer

Despite these efforts, neither party could definitively answer the question of whether any evidence was lost because no record existed of what was on the unallocated space before the wiping occurred. At trial, one document, known in this case as the "Lentz Memo,"[34] took on special importance. That document was authored by David Lentz, of the law firm Lentz & Gengaro LLP, and was sent to Arie Genger, Bill Dowd, and Christopher Gengaro. The memorandum addresses matters directly relevant to the issue of control over certain TRI shares and thus the § 225 action. The document was important to Genger, as evidenced by the fact that he reacted to it by asking Lentz and the other two memo recipients to convene a meeting the following Monday to discuss the issues covered by the memo.[35]

Under the protocol established by Ohana for Genger's use and storage of information, Genger should have placed that document on the TRI server in either a personal file, called "P," or a TRI-related file, called "T." In either event, that would have resulted in a copy of the Lenz Memo being saved on the TRI server. When discovery was conducted in this case and when the TRI server was reviewed by FTI and Protiviti, no copy of the version of the Lentz Memo sent to Genger — or the e-mail to which it was attached — was found on the TRI server, on Genger's TRI computer, or in Genger's e-mail inbox. Thus, contrary to what was his typical practice, Genger must have deleted this e-mail and the attached

---

[34] JX-9 (memorandum from David Lentz to Arie Genger, William Dowd, and Christopher Gengaro (June 6, 2008)) ("Lentz Memo").

[35] JX-17 (e-mail from Arie Genger to David Lentz and William Dowd (June 20, 2008)).

25

document. Had he, however, followed his protocol and saved a copy of the memo to the T file on the TRI server, a copy of that document would have been on the allocated space of the TRI server. Alternatively, had he opened and reviewed but not saved the file, it most likely would have been stored on the unallocated space of the TRI server or Genger's computer.

Although one cannot say with certainty what happened to Genger's copy of the Lentz Memo, other than that Genger must have at some point deleted it from his e-mail inbox, it does illustrate the grave doubts that Genger's destructive conduct creates about the integrity of the evidentiary record. At trial, Genger proffered no explanation about what happened to his copy of the Lentz Memo, and whether he deleted it or not. He did not explain whether he followed his typical protocol. All that is known is that his copy is gone from his TRI computer and the TRI server. In his defense, Genger notes that a copy of the Lentz Memo was found on the TRI system in the active files of TRI's then-president, Bill Dowd. But Genger presented no convincing evidence about what happened to his copy of the Lentz Memo, leading me to conclude that he, at some point, deleted it from his work computer at TRI. Even if Genger had deleted the memo from another computer, it would have remained in the "deleted items" folder on his TRI computer unless Genger chose to empty that file, or until it was overwritten by the computer's natural operating process.

The fact that Genger's copy cannot be found remains important. Different versions of documents or e-mail chains can take on material importance if there

26

are alterations or additions to them. And who received what and when can be

crucial. The bottom line is that Genger himself viewed the Lentz Memo as

important and yet apparently deleted it from the TRI system at a time when he and

the Trump Group were involved in contentious discussions.

The Lentz Memo is not the only document missing from the image of

TRI's and Genger's hard drives. After trial, Lentz finally produced documents in

connection with his deposition in the § 225 action.[36] In those documents were

---

[36] The Trump Group has moved to supplement the trial record with these documents.
The decision whether to allow this evidence is entrusted to my discretion. *In re
Transamerica Airlines, Inc.*, 2008 WL 509817, at *4 (Del. Ch. Feb, 25, 2008) ("A motion
to supplement the record is addressed to the discretion of the trial court."). For sensible
reasons, the admission of late-submitted evidence is not favored, but this is an unusual
context. The documents were just produced by Lentz on November 23, 2009, a day
before a deposition he gave for the § 225 action. Although Genger claims that the Trump
Group could and therefore should have obtained these documents before the contempt
trial, the record shows that Genger himself successfully moved to narrow discovery in the
contempt action, including raising concerns about the Trump Group's desire to depose
and obtain documents from Lentz. *See* Letter from Brian C. Ralston to the Honorable
Leo E. Strine, Jr. (Mar. 31, 2009) at 3 (requesting that the court limit discovery of
documents to Genger, Ohana, a representative of Friedman Kaplan, and the parties'
experts and "opposing [the Trump Group's] motions for commissions to all other
witnesses on the grounds that [the Trump Group] is abusing the discovery process"); *TR
Investors, LLC, et al. v. Arie Genger, et al.*, C.A. No. 3994-VCS, at 26 (Del. Ch. Apr. 29,
2009) (TRANSCRIPT) (limiting the number of depositions). That is, Genger
discouraged the pre-trial discovery of documents from Lentz that had been sought by the
Trump Group. Admittedly, very shortly before trial, Genger changed course and decided
to call Lentz as a witness, but that was at a time when the parties were in the last days of
preparing for trial. Although Lentz's deposition was taken, he did not produce
documents at that time. Only after trial did Lentz, through Genger's own counsel, finally
produce documents. Among those documents were communications to Genger that are
clearly relevant to the § 225 action and that bear directly on the effect of Genger's
destructive conduct

On balance, I find that the interests of justice are best served by allowing
supplementation of the record. Having resisted the broader discovery plan for the
contempt action proposed by the Trump Group that would have encompassed discovery
of Lentz's documents — including documents that involved communications between
Lentz and Genger himself — it comes with ill grace for Genger to complain that he is

eight e-mails, some with attachments, that discussed the same subject matter as the

Lentz Memo.[37] None of these eight relevant documents were found on Genger's

hard drive, even though opening an e-mail and its attachment would have typically

created a copy of the documents in the unallocated space on the computer's hard

drive. Therefore, it is likely that the wiping of Genger's hard drive also eliminated

these documents.

Neither the Trump Group nor the court can do anything but speculate what

other documents Genger may have deleted during this critical time. The absence

of large volumes of deletions is, I suppose, of some comfort, but the quality rather

---

now confronted with additional documents relevant to the § 225 action that were sent to
him by Lentz at TRI and that also cannot be found on the image of the hard drive taken
by K & K. Moreover, Genger is well-positioned to show that his copies of these
documents are present on the image of his hard drive or TRI's server. There is therefore
no prejudice to Genger. That Genger cannot rebut the fact that the documents sent to him
are not on either the hard drive or the server does not constitute unfair prejudice
justifying keeping this evidence out. Rather, Genger's inability to rebut that fact just
demonstrates that additional relevant documents were likely destroyed by his conduct.
[37] Pl's Motion to Supplement the Record at Ex. A (e-mail between David Lentz, Arie
Genger, William Dowd, and Christopher Gengaro (June 17, 2008)) (discussing the legal
restrictions on all Genger trusts and the options available to avoid a legal challenge by
Sagi Genger to any sale by one of the trusts to the Trump Group and Genger); *id.* at Ex. B
(e-mail between David Lentz, Arie Genger, William Dowd, and Christopher Gengaro
(June 26, 2008) (discussing developments in the discussions with the Trump Group and
implications for control of TRI); *id.* at Ex. C (e-mail between David Lentz, Arie Genger,
William Dowd, and Christopher Gengaro (July 2, 2008)); *id.* at Ex. D (notes of Chris
Gengaro (July 2, 2008)) (describing the termination provisions of a proposed
stockholders agreement that was being negotiated); *id.* at Ex. E (e-mail between David
Lentz, Arie Genger, and William Dowd (July 9, 2008)) (discussing edits to the language
in the proposed stockholders agreement ); *id.* at Ex. F (e-mail between David Lentz,
William Dowd, Arie Genger, and Christopher Gengaro (June 30, 2008)) (discussing
developments in the discussions with the Trump Group and implications for control of
TRI); *id.* at Ex. G (notes of meeting between Arie Genger, William Dowd, David Lentz,
and Christopher Gengaro (June 19, 2008)) (discussing financing for TRI and Sagi
Genger's strategy ); *id.* at Ex. H (notes of meeting between Arie Genger, William Dowd,
and Eddie Trump (June 16, 2008)) (discussing strategy for dealing with Sagi Genger
Trust in light of proposed financing deal for TRI).

than the quantity of deletions matters more. This is particularly the case because Genger was not a routine "deleter" — he had accumulated thousands of e-mails in his in-box.[38]

There is no real doubt that the unallocated space of the TRI server contained a large mass of TRI-related information from the months immediately preceding the use of SecureClean which would have included copies of information that had been deleted from the active files of TRI. That large mass would likely have included Genger's copy of the Lentz Memo, the newly discovered documents sent to Genger that addressed the same general subject matter, and other versions of documents Genger had used that involved TRI's business and affairs. Therefore, I conclude that Genger's behavior had the effect of destroying evidence that was likely relevant to the § 225 action in the sense used in the discovery rules.

In reaching that conclusion, I do not wish to overstate the point. The reality is that K & K did image all of the active files available at TRI. And, as will be discussed, the Trump Group located a back-up tape for TRI that was current as of July 2007, a period fourteen months before SecureClean was run. From those available data sources, the Trump Group has had sufficient information to operate TRI as a business and has been able to collect a very large amount of evidence for trial.

---

[38] See *TR Investors, LLC v. Arie Genger*, C.A. No. 3994, at 4-8 (Del. Ch. Oct. 26, 2009) (TRANSCRIPT) at 86:6-87:1; JX-19 (expert report of Kevin Faulkner) at 22.

But the reality remains that Genger caused a large data source to be entirely deleted, a data source that would have acted as a back-stop in case relevant evidence had been deleted in the months when the motivation to delete would have been at a zenith. Genger argues that the loss of any data he deleted from the active files before the August Status Quo Order formally went into effect is irrelevant. That is nonsense. By his improper destruction of the unallocated space, Genger likely destroyed relevant evidence — including evidence that he deleted during July and August, at times when he realized that litigation was likely and, indeed, when it had already commenced.

### F. The Trump Group Assumes Control And Uses TRI's Records

Almost as soon as the Trump Group assumed control of TRI, it began reviewing documents both for purposes of running TRI and for purposes of litigating against Genger. To both ends, the Trump Group had its consultant, FTI, preserve its own image of Genger's computer and the TRI server.[39] The Trump Group then had another computer consultant, i365, Inc., use that image along with data-building software called MetaLINCS, to create a user-friendly and searchable database, which was designed to help the Trump Group prepare for the § 225 action.[40] But the MetaLINCS database was also used by the Trump Group in their day-to-day operations of TRI.[41]

---

[39] *Id.* at 166:14-24 (Hirsch).
[40] *See TR Investors, LLC v. Arie Genger*, C.A. No. 3994, at 4-8 (Del. Ch. Oct. 26, 2009) (TRANSCRIPT) at 131:12-132:1.
[41] Tr. at 169:5-16 (Hirsch).

In itself, these activities were not problematic. But yet another amended

status quo order, created after an argument before this court on December 29,

2008 (the "December Status Quo Order") also contained a provision that stated:

> Unless and until otherwise ordered by the Court or agreed to in
> writing by the parties to the above action, Plaintiffs and their
> respective officers, directors, [and] agents . . . shall not cause TRI,
> Inc. and/or its subsidiaries and affiliates . . . to take any material
> action that is out of the ordinary course of business, including but
> not limited to those actions enumerated in subparagraphs 2(i)-2(xii)
> below, without having first provided to Defendant Arie Genger not
> less than five (5) business days notice of the proposed action: . . .
> (xii) accessing or attempting to access any Genger documents,
> except in accordance with the protocols outlined by the Court at the
> December 29 . . . . At the December 29 hearing, the Court outlined
> the protocols that the parties should follow for reviewing Genger
> documents at TRI's offices or in electronic files that the Company
> has sought to access.[42]

In the Standstill Agreement, "Genger documents" had been defined as "[t]he

documents, objects, and electronic files stored at [TRI] that Arie Genger contends

are solely personal in nature and do not belong to the Company . . . ."[43]

Inspired in part by a zealous desire to find out exactly what information had

been lost by Genger's use of SecureClean, the Trump Group's general counsel,

Mark Hirsch, began working with Sagi Genger to develop information that would

be useful to the Trump Group's contempt motion and, more generally, in the

litigations involving Genger. To that end, Sagi Genger provided Hirsch with

information in Sagi's own possession that Sagi thought would be on the TRI

system. That included a document with valuations of some of his father's

---

[42] JX-4 (Second Amended Status Quo Order (Dec. 30, 2008)) at ¶¶ 2, 8.
[43] *See* Standstill Agreement.

financial holdings, which did not relate to TRI.[44] On its face, the document

appears to have been of the kind that Genger legitimately sought to protect

through the encryption process. The parties had agreed in the December Status

Quo Order that documents personal to Genger were only to be reviewed in accord

with the protocols laid out by this court at the December 29, 2008 hearing.

Hirsch took a see no evil, hear no evil approach to his dealings with Sagi.

Hirsh did not ask Sagi how he had come into possession of the documents he was

turning over to Hirsch and whether Sagi had a legitimate right to their use.[45]

Hirsch then took the documents he received from Sagi and searched the

MetaLINCS database to see if he could find copies of them. When he found a

different e-mail copy of the document relating to Genger's financial holdings,

Hirsch sent it on to Sagi, who used the version from TRI's database in other,

unrelated family litigation against his father.[46] Hirsch says he now "regrets" this

action.[47]

Moreover, when the Trump Group located the TRI Server July 2007 back-

up tape in September 2008, it did not disclose that discovery to Genger. This

back-up tape was loaded on to the MetaLINCS system in early October 2008.

Because the back-up tape was comprehensive, it likely included personal

information of Genger's that was unrelated to TRI. But the 2007 back-up tape

---

[44] JX-34 (e-mail from Arie Genger to Dalia Barshishat (Aug. 27, 2004)).
[45] Tr. at 220:9-221:17 (Hirsch).
[46] *Id.* at 183:5-184:19, 186:2-8.
[47] *Id.* at 186:13-18.

was not reviewed to segregate (or encrypt) such information and was placed in searchable form on the MetaLINCS system. It was not until May 2009 that a copy of the back-up tape was turned over to Genger's counsel. The production of the tape followed a long period of wrangling between the parties over a host of issues, including whether the Trump Group was being scrupulous in protecting Genger's confidentiality interests in his personal documents.

Although Genger does not accuse the Trump Group's litigation counsel of recognizing that the 2007 back-up tape could have Genger's confidential, personal information on it, he does accuse the Trump Group of realizing that possibility. In that regard, I do find it likely that Hirsch was aware of the existence of the 2007 back-up tape for months before it was disclosed to Genger's counsel and did not undertake to protect Genger's personal information. In so finding, I do not conclude that Hirsch affirmatively sought to review information personal to Genger. Indeed, I believe it was Hirsch's obsessive focus on finding information relevant to the Trump Group's feud with Genger over TRI and finding information supportive of the Trump Group's contempt motion that led Hirsch to gather as much data as he could.

Nonetheless, Hirsch displayed no concern about whether there was information on the MetaLINCS system that was personal to Genger. Hirsch gave TRI's comptroller, Gail Glazebrook, unfettered access to the MetaLINCS system, including access to the unencrypted information on the July 2008 backup tapes, therefore giving her what she needed if she wished to obtain access to Genger's

33

Israeli national security (and personal) e-mails.[48]  Although the Trump Group

claims that it "self-policed,"[49] and I have no reason to believe that Glazebrook had

any motive to be interested in Genger's personal affairs, granting someone like

Glazebrook unfettered access is not in keeping with protocols discussed during the

December hearing and memorialized in the December Status Quo Order, which

prohibited "accessing or attempting to access any Genger documents" except in

accordance with these protocols.[50]

Genger has asked me to consider, in determining what sanctions, if any, to

award, that the Trump Group was less than assiduous in honoring the provisions of

the December Status Quo Order that protected his confidentiality interests.  I will

give appropriate weight to the Trump Group's behavior in fashioning a remedy for

Genger's violation of the August Status Quo Order.

### III. Legal Analysis

Two claims by the Trump Group were the focus of trial: one alleging

contempt of court by Genger; the other alleging spoliation of evidence by Genger.

I analyze each claim separately, but I award one set of sanctions based on my

finding that Genger violated the August Status Quo Order because the two

separate theories are so closely related.

---

[48] Tr. at 228:18-230:13 (Hirsch); Glazebrook Dep. at 158:4-160:14.
[49] Tr. at 300:23-301:15.
[50] See Amended Status Quo Order (Sept. 23, 2008).

## A.  Contempt Of Court

### 1.  This Court Has Broad Power To Sanction For Violation Of Its Orders

"To establish civil contempt, [the petitioning party] must demonstrate that

the [contemnors] violated an order of this Court of which they had notice and by

which they were bound."[51] Court of Chancery Rule 70(b) supplies this court with

the power — and broad latitude — to remedy violations of its orders.[52] A party

petitioning for a finding of contempt bears the burden to show contempt by clear

and convincing evidence; the burden then shifts to the contemnors to show why

they were unable to comply with the order.[53]

In *Gallagher v. Long*, the Delaware Supreme Court stated, "[a] trial judge

has broad discretion to impose sanctions for failure to abide by its orders," so long

as the sanctions are "just and reasonable."[54] *Gallagher* affirmed this court's entry

of final judgment on all claims for the plaintiffs after the defendants' continued

failure to respond and "willful[ ] and conscious disregard for the Court of

---

[51] *Arbitrium v. Johnston*, 1997 WL 589030, at *3 (Del. Ch. Sept. 17, 2009); *see City of Wilmington v. Gen. Teamsters Local Union 326*, 321 A.2d 123,125 (Del. 1974) (explaining that civil contempt actions are "instituted to preserve and enforce the rights of private parties to suits, and to compel obedience to orders and decrees made to enforce the rights and administer the remedies to which the court has found them to be entitled").
[52] Ct. Ch. R. 70(b).
[53] *State ex rel. Oberly v. Atlas Sanitation Co. Inc.*, 1988 WL 88494, at *2 (Del. Ch. Aug. 17, 1988) ("[O]nce the party with the burden of proof has introduced evidence from which a fact finder could conclude that he has established a *prima facie* case, then the burden of going forward with the evidence shifts to the alleged contemnor to . . . [show] it was impossible to comply with the court order."); *see Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996); *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999); *see also* AM. JUR. 2D *Injunctions* § 321.
[54] 940 A.2d 945, 2007 WL 3262150, at *2 (Del. 2007).

Chancery's orders."[55] *Gallagher* did note that the entry of judgment as a consequence is appropriate only where there is "an element of willfulness or conscious disregard of a court order" by a party.[56]

Finally, the purpose of a civil, as opposed to criminal, contempt determination must be "coercive or remedial."[57] Therefore, an aggrieved party must also show that the sanction desired is coercive or remedial, as opposed to punitive.[58]

### 2. Genger Acted In Contempt Of Court By Directing His Agent To Delete Company-Related Documents

The Trump Group has shown, by clear and convincing evidence, that Genger consciously violated the August Status Quo Order, which prohibited him from tampering with or destroying any TRI-related files. Genger was keenly aware of that order, because the presence of Friedman Kaplan during the crucial weekend served as a constant reminder of it. But, once Friedman Kaplan left the scene, Genger and his agent Ohana engaged in a secretive scheme of document destruction.

By the clear terms of the August Status Quo Order, Genger had no right to make any unilateral decision about the disposition of information belonging to

---

[55] *Id.*

[56] *Id.*

[57] *Del. State Bar Ass'n v. Alexander*, 386 A.2d 652, 665 (Del. 1978); *see Mother African Union First Colored Methodist Protestant Church v. Conference of African Union First Colored Methodist Protestant*, 1992 WL 83518, at *6 (Del. Ch. Apr. 22, 1992) ("[F]or the plaintiffs to establish a civil contempt, they must show that the defendants violated an order of this court, and that the sanction they seek is coercive or remedial in nature.").

[58] *See Del. State Bar Ass'n*, 386 A.2d at 665.

TRI. The order plainly stated that "the parties to the [§ 225 dispute] . . . are hereby

restrained and enjoined from, directly or indirectly . . . tampering with, destroying

or in any way disposing of any Company-related documents." Rather than ask

permission from counsel for TRI (or even his own litigation counsel) to destroy

the information on TRI's computers, Genger conspired with Ohana to do it

secretly, in the dead of night.

Genger's defense to the contempt motion largely involves the notion that he

was an innocent who thought he was just disposing of copies. But he did not

behave like an innocent. An innocent would have called all the relevant players

together and fashioned a legitimate solution to the problem that supposedly

inspired Genger and Ohana. Instead, Genger and Ohana acted like sharpies,

hoping to take advantage of the incomplete job done by Friedman Kaplan and

K & K.

Genger also argues that there is no evidence that any particular documents

were lost. But, even if that were true, "no harm, no foul" is not a cognizable

defense to a contempt allegation.[59] Earlier this year, in *Triton v. Eastern Shore

Electrical Services,* the defendant — despite a preliminary injunction to refrain

from soliciting bids for projects identified in the injunction — solicited a bid on a

project listed in the preliminary injunction and also did not inform the bidder of

---

[59] *Triton v. Eastern Shore Electrical Services, Inc.,* 2009 WL 1387115, at *6-7 (Del. Ch. May 18, 2009).

the injunction.[60]  Vice Chancellor Parsons sanctioned the defendants and noted it

was irrelevant that the defendant's solicitation efforts were unsuccessful; contrary

to the defendants' assertions that this conduct was just a "comedy of unfortunate

circumstances," Vice Chancellor Parsons held that violating a court order is a

serious matter and one worthy of appropriate sanctions.[61]  Therefore, Vice

Chancellor Parsons made a finding that the defendant's attempts to circumvent the

preliminary injunction undermined his credibility as a witness.[62]

For a party to intentionally violate an order not to destroy or tamper with

information and then to claim that he did little harm because no one can prove

how much information he eradicated takes immense chutzpah.  For a court to

accept such a defense would render the court unable to govern situations like this

in the future, as parties would know that they could argue extenuation using the

very uncertainty their own misconduct had created.

Moreover, there is evidence that relevant documents have been lost due to

Genger's misconduct.  It is troubling that the Lentz Memo was not found in

Genger's TRI files.  And the recently produced documents from Lentz show that

Genger likely deleted several other documents relevant to the § 225 action from

TRI's hard drive.  Copies of those documents would likely have been on the

unallocated space if they had not been erased.

---

[60] 2009 WL 1387115, at *6-7.
[61] *Id.*
[62] *Id.* at *7.

Although I have little doubt that Genger and Ohana did not think out their document destruction scheme very well, I have no doubt that Genger knew he was violating this court's order and limiting the Trump Group's ability to obtain access to all the information that would have otherwise been available both as managers of TRI and as litigants in this court and others. Therefore, I find that Genger acted in contempt of court.

## B. Spoliation of Evidence

### 1. An Adverse Inference Sanction For Spoliation Requires A Finding Of Reckless Or Intentional Spoliation Of Evidence

"A party in litigation or who has reason to anticipate litigation has an affirmative duty to preserve evidence that might be relevant to the issues in the lawsuit."[63] Often, this duty attaches even before litigation has been commenced "when a party should have known that the evidence may be relevant to future litigation."[64] A party does not, however, have a duty to "preserve every shred of paper, every e-mail or electronic document," but instead must "preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to

---

[63] *Beard Research v. Kates*, 981 A.2d 1175, 1185 (Del. Ch. May 29, 2009).

[64] *Acierno v. Goldstein*, 2005 WL 3111993, at *6 (Del. Ch. 2005) (quoting *Zubulake v. UBS Warburg*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)); *see also Triton*, 2009 WL 1387115, at *8 ("An affirmative duty to preserve evidence attaches upon discovery of facts and circumstances that would lead to a conclusion that litigation is imminent or should be otherwise expected.").

be requested during discovery and/or is the subject of a pending discovery request."[65]

Dispositive sanctions, including dismissal of claims or imposition of an adverse inference, are only appropriate where a party acts to "intentionally or recklessly destroy evidence, when it knows that the item in question is relevant to a legal dispute *or it was otherwise under a legal duty to preserve the item.*"[66] Delaware courts have defined recklessness in the spoliation context as a conscious awareness of the risk that one's action or inaction may cause evidence to be despoiled.[67] Intentional destruction simply means that the spoliator acted "with purpose."[68]

Additionally, to obtain an adverse inference, the aggrieved party must make some showing that the allegedly destroyed evidence existed and supported the aggrieved party's position.[69] If a party intentionally destroys evidence, then a

---

[65] *Zubulake*, 220 F.R.D. at 217; *see also In re Wechsler*, 121 F. Supp. 2d 404, 420 (D. Del. 2000) ("[T]he scope of the duty to preserve evidence is not boundless. However, . . . a party still must act reasonably under the circumstances.").

[66] *Sears, Roebuck & Co. v. Midcap*, 893 A.2d 542, 552 (Del. 2006) (emphasis added); *see also Beard Research*, 981 A.2d at 1192 ("[D]rawing an adverse inference is appropriate when an actor is under a duty to preserve evidence and takes part in the destruction of evidence while being consciously aware of a risk that he or she will cause or allow evidence to be spoiled by action or inaction . . . .").

[67] *Beard Research*, 981 A.2d at 1192 ("Reckless conduct reflects a *knowing disregard* of a substantial and unjustifiable risk. It amounts to an 'I don't care attitude.'").

[68] *Id.* at 1191 (citing BLACK'S LAW DICTIONARY 826 (8th ed. 2004) (defining "intentional" as "[d]one with the aim of carrying out the act")).

[69] *Beard Research*, 981 A.2d at 1193 ("[A] party must offer more than mere speculation and conjecture that a particular document existed."); *cf.* AM. JUR. 2D *Trial* § 1100 ("A [party] must show that the lost or destroyed evidence would have played a significant role in his or her [case] and that comparable evidence could not be obtained elsewhere.").

court must "adopt a view of the facts as unfavorable to the wrongdoer as the known circumstances will reasonably admit."[70]

## 2. Genger Committed Spoliation Of Evidence

Here, a finding of intentional spoliation is made easier by the reality that Genger was under a clear duty to preserve evidence because of: (1) the ongoing litigation between Genger and the Trump Group, and (2) the clear language of the August Status Quo Order. This is not a situation where a party is accused of having committed spoliation by destroying business records before there was any hint that litigation would arise that may implicate the affected records.[71] Rather, in this case, Genger was clearly aware of his affirmative duty to preserve evidence that might be relevant to the issues in the § 225 action and other pending cases.[72] Moreover, as indicated earlier, I find that Genger and Ohana believed that their conduct would limit the information base the Trump Group would have to use in the pending litigation. Therefore, I conclude that Genger intentionally despoiled evidence.

---

[70] *Equitable Trust Co. v. Gallagher*, 102 A.2d 538, 541 (Del. 1954).

[71] In *Midcap v. Sears, Roebuck and Co.*, for example, Sears was unable to produce documents about who had delivered and installed a gas range in 1994, which was claimed to have caused a gas explosion in 1999. 2004 WL 1588329, at *1 (Del. Super. May 26, 2004), *rev'd*, 893 A.2d 542 (Del. 2006). Although Sears had disposed of the documents five years before it had any reason to anticipate litigation, the jury was improperly instructed that it may draw an adverse inference from Sears' loss of the documents without any finding that Sears had acted intentionally or recklessly to despoil evidence. *Sears*, 809 A.2d at 547 (describing the adverse jury instruction, which did not require the jury to find that Sears had acted intentionally or recklessly in failing to retain documents, and finding the instruction to be reversible error).

[72] *See* JX-2 (Status Quo Order (Aug. 29, 2008)).

In any event, at the very least Genger acted recklessly. If it was not reckless for Genger secretly to cause Ohana to wipe the unallocated space of TRI's server clean when he could have called Friedman Kaplan and gotten their view of whether that was permissible, it is hard to say what would be reckless. Even if Genger did not act with a malevolent intent to limit the universe of evidence available to the Trump Group, he was certainly reckless in charging Ohana to erase all the information of the unallocated space of TRI's computer system in the face of pending litigation and a judicial order not to destroy or tamper with TRI's information. If Genger believes that running wiping software without advice of counsel or court permission in this context does not constitute recklessness, he has an unusual dictionary. The law uses a more traditional lexicon.

Of course, the Trump Group as the moving party is required to point to specific documents that existed and would have supported its position but for Genger's actions.[73] As discussed previously, the Trump Group has shown that, but for Genger's destructive conduct, Genger's copies of the Lentz Memo and other recently identified documents also relevant to the § 225 action would have been on the unallocated space of TRI's computer system. Anyone experienced in

---

[73] *See In re DaimlerChrysler AG*, 2003 WL 22951696, at * 2 (D. Del. Nov. 25, 2003) (explaining that, to support an adverse inference sanction for spoliation, the aggrieved party "must show 'a reasonable possibility, based on concrete evidence rather than a fertile imagination' that access to the lost material would have produced evidence favorable to his cause") (quoting *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 167 F.R.D. 90, 104 (D. Colo. 1996)).

litigation realizes that different versions of the same document can affect a case

materially, and Genger has left the Trump Group without versions of important

documents. These are just the *known* effects of Genger's wholesale deletion. It is

likely that other relevant information was also lost. Therefore, the Trump Group

has met its burden to show that Genger destroyed information that would have

helped it in the § 225 action.

## VI. Stringent, But Not Ultimate, Sanctions Are Appropriate And Provide A Fair Remedy

The remedial inquiries relevant to the contempt and spoliation claims are

similar. A court has inherent power to fashion a remedy for contempt that is

proportionate to the level of harm committed so long as the court exercises

restraint.[74] In determining what remedy to award for spoliation, the court should

consider: (1) the culpability of the spoliating party; (2) the degree of prejudice

suffered by the aggrieved party; and (3) the availability of lesser sanctions that

could both avoid unfairness to the aggrieved party and serve as an adequate

penalty to deter such future conduct.[75]

---

[74] *See Gallagher*, 940 A.2d at 945 (explaining that a trial judge must only impose sanctions for civil contempt that are "just and reasonable"); *see also* Am. JUR. 2D *Contempt* § 195 ("Courts have the inherent power to enforce compliance with their lawful orders . . . [but ] . . . [i]n selecting contempt sanctions, a court is obligated to use the least possible power adequate to the end proposed."); *cf. State ex rel. Oberly v. Atlas Sanitation Co., Inc.*, 1988 WL 88494, at *3 (Del. Ch. Aug. 17, 1988) (explaining that "the inadvertence of the violation [of a court order] may be taken into account in fashioning a remedy").

[75] *Beard Research*, 981 A.2d at 1189 (citing *Positran Mfg., Inc. v. Diebold, Inc.*, 2003 WL 21104954, at *2 (D. Del. May 15, 2003)).

Here, these standards guide my determination to put in place a stringent remedy, but one that is short of a default judgment. First, although I believe that Genger was improperly motivated and intended to limit the Trump Group's ability to gather evidence in its disputes with him, I also accept that part of his motivation was to protect his confidentiality interests in his personal information. In accepting this as part of his motivation, I do not retract my finding that Genger acted intentionally and was motivated by a desire to limit the Trump Group's access to a valuable source of additional information in the § 225 action.

Second, I find that the Trump Group did not suffer a high degree of prejudice because Genger's misconduct only affected the unallocated space on his computer and TRI's server, while the active files, which were not deleted, contained a good deal of relevant information. Additionally, I give weight to the Trump Group's own conduct in failing to take reasonable steps to protect Genger's personal information once it assumed control of TRI. Although that conduct is not sufficiently egregious to warrant denying TRI any relief, I do believe it is relevant in deciding to deny it a default judgment.

Third, I find that the extreme remedy of a default judgment is not appropriate to remedy any unfairness to the Trump Group because lesser available sanctions provide an adequate remedy. Given the law's preference for an adjudication on the merits where possible,[76] I think a stringent remedy that directly

---

[76] *See id.* at *10 (holding that entering a default judgment "should be regarded as a last resort") (internal citations omitted); *see also Beckett v. Beebe Med. Ctr., Inc.*, 897 A.2d

44

relates to the effects of Genger's misconduct is most fitting. Such a remedy will deprive Genger of the advantages of any evidentiary gaps that his own misbehavior might have been caused.

That remedy will have the following elements. First, because Genger has diminished the evidence base that would otherwise be available to the Trump Group, I conclude that he must produce relevant documents to which he may have otherwise made a claim of privilege.[77] I have previously held that Genger waived his attorney-client privilege with respect to the Lentz Memorandum because TRI paid Lentz to prepare the memorandum, which was shared with TRI's then-president, Dowd.[78] As a partial remedy for Genger's conduct, I hereby hold that Genger must allow the Trump Group access to ten of the remaining "disputed documents" discussed in the parties' briefs in support of, and opposing, the Trump Group's motion for a protective order.[79]

---

753, 757-58 (Del. 2006) ("Courts should apply rules with a liberal construction because of the underlying public policy that favors a trial on the merits, as distinguished from a judgment based on a default.") (internal citations omitted).

[77] I specifically do not waive Genger's privilege claims with respect to a document described in Genger's Privilege Log as a "Handwritten markup of draft complaint regarding Genger matrimonial dispute." This document is irrelevant to this dispute. This document was identified in the parties' briefs on the Motion for Protective Order as Document No. 13, bearing Bates No. TRI INV 00017686–17701.

[78] *TR Investors, LLC v. Arie Genger*, C.A. No. 3994, at 4-8 (Del. Ch. Sept. 18, 2009) (TRANSCRIPT).

[79] *See* Pl.'s Op. Br. in Supp. of Motion for Protective Order at 26-33; Def.'s Ans. Br. in Opp. to Pl.'s Motion for Protective Order at 7–14. The disputed documents are identified as Document Nos. 3 through 10, No. 12, and No. 14. These documents were identified in both parties' briefs as those documents bearing Bates numbers: TR INV 00022041-22043; TR INV 00017721; TRI INV 00048830-48832; TRI INV 00048833-48834; TRI INV 0004890-48909; TRI INV 00048917; TRI INV 00048930; TRI INV 00048974; TRI INV 00049062; and TR INV 00017702-17708. Genger has withdrawn his claim of

45

Second, I elevate by one level the burden of persuasion upon Genger to prevail on any affirmative defense or counter-claim that he has raised in the § 225 action.[80] By way of example, if Genger would have to prevail only by a preponderance of the evidence, he will have to prevail at trial by producing clear and convincing evidence. Additionally, because Genger's conduct leaves me with severe doubts about his credibility, Genger will be unable to prevail on any material factual issue if the only evidence in support of his position is his own testimony. Absent corroborating testimony or documents, his mere word will be insufficient to meet his burden of persuasion.

Finally, because Genger's misconduct has occasioned great expense, I award the Trump Group their reasonable attorneys' fees and expenses related to the motions for contempt and spoliation. Because the parties have shown a propensity to fight about everything and because there is reason to believe that the Trump Group (and Genger himself) engaged in a bit of overkill in litigating these motions, I suggest an award of $750,000 to be reasonable in the first instance and in the hopes that the parties can live with that figure and avoid additional litigation costs. If the parties decide to haggle over that amount, the parties shall exchange information about their respective attorneys' fees and costs in connection with the contempt and spoliation motions and attempt to reach accord in good faith. If no

---

privilege on Document Nos. 1 (Bates No. TR INV 00049045), 11 (Bates No. TR INV 00048941), and a single page of notes related to the September 2008 board letter (Bates No. TR INV 00048944). Therefore, I do not address these documents.

accord is reached, I shall appoint a special master who will address the fee dispute,

with the costs of the master being charged in full against the party whose position

as to the amount deviates the most from the final amount awarded by the court.

V. Conclusion

For all these reasons, the Trump Group's motion for contempt and motion

for spoliation is hereby granted and the Trump Group shall file an implementing

order, upon notice as to form, within five days.

SUPREME COURT: NEW YORK COUNTY

ORLY GENGER in her individual capacity and on
behalf of the Orly Genger 1993 Trust (both in its
individual capacity and on behalf of D & K
Limited Partnership),

                         Plaintiff,

                - against -

DALIA GENGER, SAGI GENGER, D & K GP
LLC, and TPR INVESTMENT ASSOCIATES,
INC.,

                   Defendants.

Index No.:

**SUMMONS**

Plaintiff designates New York County
as the place of trial based on plaintiff's
place of residence, located at 1965
Broadway, Apt. 22G, New York,
New York

**FILED**

JUL 0 9 2009

COUNTY CLERK'S OFFICE
NEW YORK

09109749

TO THE ABOVE NAMED DEFENDANTS:

         YOU ARE HEREBY SUMMONED to answer the complaint in this

action and to serve a copy of your answer, or if the complaint is not served with this

summons, to serve a notice of appearance, on the plaintiff's attorneys within twenty (20)

days after the service of this summons, exclusive of the day of service (or within thirty

(30) days after the service is complete if this summons is not personally delivered to

you within the State of New York); and in case of your failure to appear or answer,

judgment will be taken against you by default for the relief demanded in the complaint.

Dated:    New York, New York
          July 8, 2009

                  ZEICHNER ELLMAN & KRAUSE LLP

            By:

               Stephen F. Ellman, Esq.
               Yoav M. Griver, Esq.
               Bryan D. Leinbach, Esq.
               Attorneys for Plaintiff
               575 Lexington Avenue
               New York, New York 10022
               (212) 223-0400

TO:    DALIA GENGER
       200 East 65th Street, Apt. 32W
       New York, New York 10021

       SAGI GENGER
       1211 Park Avenue
       New York, New York 10128

       D & K GP LLC
       c/o Sagi Genger
       1211 Park Avenue
       New York, New York 10128

       TPR INVESTMENT ASSOCIATES, INC.
       c/o Sagi Genger
       1211 Park Avenue
       New York, New York 10128

SUPREME COURT: NEW YORK COUNTY

---

ORLY GENGER in her individual capacity and on
behalf of the Orly Genger 1993 Trust (both in its
individual capacity and on behalf of D & K
Limited Partnership),

                Plaintiff,

        - against -

DALIA GENGER, SAGI GENGER, D & K GP
LLC, and TPR INVESTMENT ASSOCIATES,
INC.,

            Defendants.

Index No.:

**VERIFIED COMPLAINT**

FILED
JUL 0 9 2009
COUNTY CLERK'S OFFICE
NEW YORK

09103749

---

    Plaintiff Orly Genger in her individual capacity and on behalf of the Orly Genger

1993 Trust (both in its individual capacity and on behalf of D & K Limited Partnership), by her

attorneys, Zeichner Ellman & Krause LLP, alleges, upon information and belief, for her Verified

Complaint against Defendants in this action as follows:

## NATURE OF THE ACTION

    1.    As described below, Dalia and Sagi Genger, together with various business

entities controlled by them, engaged in a fraud and conspiracy designed to loot the Orly Genger

1993 Trust of its value. Defendants' various acts of self-dealing, material misrepresentations, and

material omissions, in breach of their respective fiduciary duties and in violation of New York law,

injured Orly Genger, the Orly Genger 1993 Trust, and D & K Limited Partnership.

    2.    Specifically, Dalia and Sagi Genger used various closely held family

corporations, limited partnerships, and other entities as instrumentalities to improperly foreclose

upon, and conduct a sham sale of, the Orly Genger 1993 Trust's ownership interest in valuable and

unique stock of defendant TPR Investment Associates, Inc. ("TPR"). The TPR stock is unique

because TPR is a closely held Genger family corporation, and because the value of the TPR stock at

issue is largely dependent upon the outcome of a litigation currently pending in Delaware Chancery

Court (discussed below, *infra* ¶¶ 60-62). Based upon the ultimate outcome of that litigation, TPR

may increase many fold in value.

## THE PARTIES

3.     Plaintiff Orly Genger ("Plaintiff" or "Orly") resides at 1965 Broadway, Apt.

22G, New York, New York 10024. She is the beneficiary of the Orly Genger 1993 Trust dated

December 13, 1993 (the "Orly Trust"). The Orly Trust is a limited partner of D & K Limited

Partnership ("D&K"), a Delaware limited partnership with a principal office at 1211 Park Avenue,

New York, New York 10128. The Orly Trust and the Sagi Genger 1993 Trust (the "Sagi Trust"),

each hold a 48% interest in D&K.

4.     Defendant Dalia Genger ("Dalia"), Orly's mother, resides at 200 East 65th

Street, Apt. 32W, New York, New York 10021. Dalia is the current sole Trustee of the Orly Trust,

being appointed successor Trustee in January 2008. She also holds a 99% interest in defendant

D & K GP LLC.

5.     Defendant Sagi Genger ("Sagi"), Orly's brother, maintains an office at 1211

Park Avenue, New York, New York 10128. Sagi is the Chief Executive Officer of TPR and a

member of TPR's Board of Directors. Sagi also is the manager of D & K GP LLC ("D&K GP"),

holding a 1% interest in D&K GP. Sagi also is a board member of Trans-Resources, Inc. Sagi also

is the beneficiary of the Sagi Trust, which holds a 48% interest in D&K.

2

6.      Defendant D&K GP is a Delaware limited liability company with a principal office located at 1211 Park Avenue, New York, New York 10128. D&K GP is the general partner of D&K, holding a 4% interest in D&K. As manager of D&K GP, Sagi controls and acts on behalf of D&K.

7.      Defendant TPR is a Delaware corporation with a principal office located at 1211 Park Avenue, New York, New York 10128. As Chief Executive Officer of TPR, Sagi controls and acts on behalf of TPR. Upon information and belief, Sagi and Dalia serve as directors on TPR's two-member board of directors.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over Defendants pursuant to Sections 301 and 302 of the New York Civil Practice Law and Rules ("CPLR").

9.      Venue is proper in this county pursuant to CPLR 503.

## FACTS COMMON TO ALL COUNTS

### A.      The Genger Family, TPR, and TRI

10.     Orly is an accomplished artist and sculptor, who has had little schooling or experience in business or finance. Her brother, defendant Sagi, has an MBA from the Wharton School of Business and years of practical experience as a businessman. In the past, Sagi often provided business advice to Orly, and Orly reposed in Sagi her trust, confidence and reliance as to those matters. In the past, Orly also reposed such trust, confidence and reliance in her mother, Dalia.

3

11.    Orly's and Sagi's father, Arie Genger ("Arie"), and mother, defendant Dalia, were married in Israel on July 23, 1967, and remained so until they divorced in New York in October 2004.

12.    Arie, an accomplished entrepreneur, founded Trans-Resources, Inc. ("TRI"), a closely held private corporation, in 1985. TRI is the parent company of several subsidiaries that provide growers with specialty fertilizer and industrial chemicals, including Haifa Chemicals Ltd., Na-Churs Alpine Solutions and Plant Products Co. Ltd. Arie served as TRI's CEO from 1985 until 2007, and was chairman of TRI's Board of Directors until late September 2008. Under Arie's direction, TRI became one of the two largest producers of potassium nitrate in the world, controlling approximately 40% of the global market, and, in recent years, generated record sales and profits. In 2008, TRI had sales of over $1 billion, with over $230 million in earnings before interest, tax, depreciation, and amortization, and over $150 million in net income.

13.    Prior to 1993, Arie also was the sole shareholder of defendant TPR, a closely held corporation also founded by Arie as a holding company for the family's interests, which, among other things, held a controlling interest in TRI. As of March 30, 2001, TPR held a 52.85% interest in TRI, with the remaining minority interest in TRI (47.15%) owned by various entities controlled directly and indirectly by Jules and Eddie Trump (the "Trump Group").

**B.    The Orly Trust and the Sagi Trust**

14.    In December 1993, Arie and Dalia established two identical irrevocable *inter vivos* trusts for the benefit of each of their children: the Orly Trust and the Sagi Trust (together, the "Trusts"). The Trusts were created, in part, as estate planning tools of Arie and Dalia and as a means of ensuring that each child received property of equal value. To this end, Dalia and

4

Arie funded each trust with a $600,000 gift. Sash A. Spencer and Lawrence M. Small were named
Co-Trustees of the Trusts and remained Co-Trustees until Arie and Dalia were divorced in 2004.

15.    After the Trusts were funded, each was assigned a 48% interest in D&K, a
family-owned limited partnership formed sometime prior to 1993. D&K is shorthand for "Dalia
and Kids." As a result of the assignment, the Orly Trust and the Sagi Trust became D&K's sole
limited partners. Arie's wife, Dalia, held the remaining 4% interest of D&K and served as the
partnership's general manager.

16.    Around the same time that the Trusts were funded, D&K purchased 240
shares of common stock (constituting 49% of the outstanding shares) in TPR for $10,200,000. The
purchase price of the TPR shares was satisfied as follows: (a) the Orly Trust and the Sagi Trust
each paid $600,000; (b) Dalia paid $50,000; and (c) Dalia, as general partner of D&K, executed a
recourse $8,950,000 Promissory Note dated December 21, 1993 (the "Note") in satisfaction of the
balance. A copy of the Note is attached hereto as **Exhibit 1.**

17.    The Note provided that D&K was required to repay principal, together with
accrued interest, in annual installments over a ten-year period. In addition, each of the Trusts and
Dalia assumed liability for repayment of the Note in proportion to its/her ownership interest in
D&K.

18.    The Note was secured by a Pledge Agreement dated December 21, 1993 (the
"Pledge Agreement"), pursuant to which D&K pledged its 240 TPR shares as collateral for
repayment of the Note. A copy of the Pledge Agreement also is attached hereto as **Exhibit 1.**

19.    As a result of D&K's purchase of TPR stock, the Orly Trust and the Sagi

5

Trust each acquired an equal 23.52% indirect interest in TPR, and Dalia acquired a 1.96% indirect interest in TPR. Arie retained his ownership in the remaining 51% of TPR, which held investments in various securities, including TRI common stock, as well as its interest in the Note.

20.     In keeping with the desire to ensure equal wealth transfer to Sagi and Orly and with the estate-planning purposes underlying the creation of the Trusts and D&K's purchase of the TPR shares, every member of the Genger family understood and agreed before the time of their execution that the Note and Pledge Agreement would never be enforced by any of them. Indeed, as described below, Sagi was charged with ensuring that the Note and Pledge Agreement would never be enforced, and, prior to the fraud at issue, he took specific steps to fulfill that charge.

## C.     Arie and Dalia's Divorce and Property Settlement

21.     Dalia and Arie were divorced in October 2004.

22.     On October 26, 2004, Dalia and Arie entered into a Stipulation and Agreement of Settlement as a final settlement of their divorce (the "Settlement Agreement") (attached hereto as **Exhibit 2**). The Settlement Agreement was structured around the understanding and condition that Dalia would obtain control over TPR and, in exchange, Arie and the children would directly hold their interests in TRI while Arie retained control over TRI during his lifetime. To that end, pursuant to the Settlement Agreement, Dalia received, *inter alia,* Arie's 51% interest in TPR and retained her 4% interest in D&K. TPR's 52.85% interest in TRI was transferred to Arie and the Trusts as follows: (i) 13.99% of TRI stock to Arie, (ii) 19.43% of TRI stock to the Orly Trust, and (iii) 19.43% of TRI stock to the Sagi Trust. At the same time, in consideration of the transfer, the Orly Trust and the Sagi Trust each granted Arie an irrevocable lifetime voting proxy over their TRI shares (attached hereto as **Exhibit 3**) so that Arie would continue to control TRI as

6

he always had. Thus, after October 29, 2004, Arie and the two Trusts held a majority interest in TRI, Arie controlled TRI, and TPR no longer owned any TRI common stock.

23.    Below is a side-by-side summary of Arie's, Dalia's, the Orly Trust's, and the Sagi Trust's interests in TPR before and after Arie's and Dalia's divorce.

### TPR OWNERSHIP
### BEFORE AND AFTER DIVORCE

|  | PERCENTAGE | |
| Person | TPR Before | TPR After |
|---|---|---|
| Arie Genger | 51.00% | 0% |
| Dalia Genger | 1.96% | 52.96% |
| Orly Trust (through D&K) | 23.52% | 23.52% |
| Sagi Trust (through D&K) | 23.52% | 23.52% |
| **TOTAL** | **100%** | **100%** |

After the divorce, in keeping with the understanding of the parties that the children, Orly and Sagi, would be treated equally, both the Orly Trust and the Sagi Trust continued to have equal ownership interests in the TRI shares (which were owned by the Trusts directly) and in the TPR shares (through the Trusts' interest in D&K).

24.    The chart annexed hereto as **Exhibit 4,** and incorporated into the body of this Verified Complaint by reference, provides a summary of Arie's, Dalia's, the Orly Trust's, and the Sagi Trust's respective ownership interests in TPR, TRI, and D&K as of October 26, 2004 – *i.e.*, the date that Arie and Dalia executed the Settlement Agreement.

### D.    Dalia Gives Sagi Complete Control of D&K

25.    Unfortunately, the Genger divorce was extremely bitter, and has split the

7

Genger family. Dalia, in her anger and hatred of Arie, and in collusion with Sagi, decided to destroy Arie financially. To achieve this goal, Dalia and Sagi are also willing, and have taken action, to financially destroy Orly.

26.    On October 21, 2004, days before signing the Settlement Agreement, Dalia and Sagi formed D&K GP with the sole business purpose of acting as D&K's general partner. Pursuant to D&K GP's Limited Liability Agreement (attached hereto as **Exhibit 5**), Dalia exchanged her 4% interest in D&K and $1.00 for a 99% membership interest in D&K GP. Sagi purchased a 1% membership interest in D&K GP for $1.00. Under D&K GP's Limited Liability Agreement, Sagi was given the power to appoint himself as D&K GP's manager, and he did so. As D&K GP's manager, Sagi obtained complete control over D&K.

27.    Thus, Dalia effectively ceded complete control over D&K and its assets to Sagi. By forming D&K GP, Dalia and Sagi also attempted to shield themselves from any personal liability stemming from their interests in D&K, while leaving the Orly Trust and the Sagi Trust potentially liable to TPR on the Note.

28.    As manager of D&K GP (which, in turn, was general partner of D&K), Sagi owes an undiluted fiduciary duty to the partnership's limited partners, including the Orly Trust, to monitor, manage, maintain, and protect D&K's assets, including its ownership interest in TPR, from challenge or diminution in value.

29.    In the same way, D&K GP, as general partner of D&K, also owes an undiluted fiduciary duty to the partnership's limited partners, including the Orly Trust, to monitor, manage, maintain, and protect D&K's assets, including its ownership interest in TPR, from challenge or diminution in value.

8

30.    In addition, Sagi owes fiduciary duties to Orly arising from the close familial relationship between him and his sister. Orly reposed complete trust, confidence and reliance upon her brother Sagi to protect both her interests and her Trust's interests, including her Trust's ownership interests in TPR and TRI, and to alert her to anything that may adversely affect her or her Trust's assets.

### E.    Dalia Gives Sagi Complete Control of TPR

31.    On October 30, 2004, Dalia, as 52.96% owner of TPR, entered into a shareholder agreement with TPR, concerning the future management of the company. Pursuant to this shareholder agreement (attached hereto as **Exhibit 6**), Dalia gave D&K, which owned 49% of TPR, the authority to appoint one board member to TPR's two-member board of directors. Sagi used his managerial control over D&K to appoint himself as D&K's representative on TPR's board. In addition, the shareholder agreement appointed Sagi as CEO of TPR. As TPR's majority shareholder, Dalia named herself as TPR's remaining board member.

32.    Sometime in 2007, Sagi stripped Dalia of her majority interest in TPR by selling a 2% interest in TPR to Rochelle Fang, his mother-in-law. At the time of the sale, TPR's assets were worth between approximately $11,000,000 and $12,000,000, plus the value of the Note.

33.    Around the time of her appointment as successor trustee to the Orly Trust in January 2008, Dalia divested herself of the balance of her TPR shares.

34.    Through the above-mentioned transactions, Sagi obtained direct control over TPR and its interest in the Note. Notably, Sagi's role as CEO of TPR (the creditor on the Note) is in direct conflict with his role as manager of D&K (the debtor on the Note), whose role was to

9

repay the Note or to contest the Note's enforceability.

35.    Moreover, Sagi's dual control over both TPR and D&K directly conflicts with Sagi's and D&K GP's undiluted fiduciary duties to D&K's limited partners, including the Orly Trust, to manage, maintain and protect D&K's assets from challenge or diminution in value. Sagi would later use his dual positions at TPR and D&K to engage in self-dealing in connection with the Note and to damage the Orly Trust and Orly, in violation of his fiduciary duties.

36.    Notably, other New York courts have recognized Sagi's willingness to engage in self-dealing, ignore clear conflicts of interest, and collude with his mother, Dalia, to the detriment of the other Genger family members. See Orders and Transcripts attached hereto as **Exhibit 7**.

## F.    **Dalia Gains Control over the Orly Trust**

37.    In connection with the Settlement Agreement, Dalia required that the Trustees of the Orly Trust and the Sagi Trust (Sash A. Spencer and Lawrence M. Small) resign and be replaced with friends of Sagi.

38.    Numerous successor trustees were appointed to the Orly Trust and the Sagi Trust, all of whom were affiliated with Sagi in one way or another. David Parnes and Eric Gribetz (Sagi's longtime friends) and Leah Fang (Sagi's sister-in-law) were appointed as successor trustees to the Orly Trust. Likewise, Mr. Parnes, Mr. Gribetz, and Rochelle Fang (Sagi's mother-in-law) were each appointed successor trustees of the Sagi Trust.

39.    In January 2008, Dalia was appointed successor Trustee of the Orly Trust. Orly objected to Dalia's appointment and sought her removal before the New York County

10

Surrogate's Court out of fear that Dalia would not protect Orly's interests while serving as Trustee. Indeed, by that time, it had become apparent that Dalia and Sagi were colluding together in an effort to damage Arie and Orly.

40.     In response to Orly's objection to her mother's appointment as Trustee, the Surrogate's Court held that Orly's motion was premature, in that Dalia should be given an opportunity to act as Trustee. As a result, Dalia remained Trustee of the Orly Trust. Of course, as detailed herein, Orly's concerns regarding Dalia were entirely justified, and Orly has now renewed her request to the Surrogate's Court that Dalia be removed as Trustee of the Orly Trust.

41.     As a result of her appointment as Trustee of the Orly Trust, Dalia obtained complete control over the assets of the Orly Trust, including its ownership interests in TPR (through D&K) and TRI.

42.     As Trustee of the Orly Trust, Dalia owes an undiluted fiduciary duty to the Trust's beneficiary, Orly, to monitor, manage, maintain, and protect the Orly Trust's assets, including the Orly Trust's ownership interests in TPR and TRI, from challenge or diminution in value. Indeed, in becoming Trustee, and then fighting to maintain that status, Dalia represented to Orly and to the Surrogate's Court that she was capable and committed to fulfilling her fiduciary duties to the Orly Trust and to Orly.

43.     In addition, Dalia owes fiduciary duties to Orly arising from the familial relationship between herself and her daughter. Orly reasonably relied upon her mother to protect her interests, including her Trust's ownership interests in TPR and TRI and to alert her of any developments that may adversely affect her or her Trust's assets, particularly where Dalia assured Orly and the Surrogate's Court that she would fulfill her duties loyally.

11

### G.    The Non-Enforceability of the Note

44.    Payments were made on the Note until 1999, at which time D&K stopped making payments. In keeping with the parties' understanding at the time the Note was made, no attempt was made to enforce the Note during the near decade from when payments ceased to when Sagi sought to enforce the Note on TPR's behalf.

45.    During the divorce proceedings, Sagi and Dalia again confirmed to Orly and to others that the estate planning would not be changed or reversed, and that TPR would never seek to enforce the Note. Indeed, Sagi has testified under oath that the changes to the ownership of TPR and TRI that occurred in connection with the divorce proceedings were designed, at least in part, for estate-planning purposes and to ensure that the Note would not be enforced by TPR. Indeed, Sagi and Dalia claimed that to allow collection of the Note would reverse the estate planning that caused Arie and Dalia to create the Orly and Sagi Trusts and execute the Note in the first place.

46.    David Parnes is the former trustee of the Orly Trust, the present trustee of the Sagi Trust, an officer of TPR, and a director of TRI (allegedly representing TPR). Mr. Parnes has testified under oath that Orly, Dalia, and Arie tasked Sagi with ensuring that the Note would not be enforced. In fulfillment of that task, on August 2, 2006, Sagi, as part of his managerial role in D&K GP, assigned the Note to David Parnes for $12,000, it being agreed that, as trustee of both Trusts and as an officer of TPR, Parnes would be the person best suited to prevent collection of the Note. The very purpose of Sagi's transfer of the Note to Parnes, and Parnes' acceptance of the Note, was to ensure that the Note remained uncollectible, as previously agreed by all parties.

47.    To this end, in the August 2, 2006 Memorandum assigning the Note to Parnes (attached hereto as **Exhibit 8**), Sagi expressly memorialized that D&K "denied

12

enforceability of the Note." Dalia was copied on the Memorandum.

48.    Likewise, in a February 17, 2007 affidavit,[1] Dalia affirmed that the Genger

family had agreed "that I [Dalia] not be in a position to foreclose on the [] Note, and to take for

myself an interest that Arie and I intended for the children." (Dalia Genger Feb. 17, 2007 Aff. ¶ 3

(attached hereto as **Exhibit 9**)). Dalia further affirmed that Sagi assigned the Note to Mr. Parnes as

part of an effort to implement the understanding and agreement among the members of the Genger

family that the Note was never to be enforced. (*Id.* at ¶ 4.)

49.    Orly was well aware of, and relied upon, the agreement that the Note would

never be enforced. She also was aware of, and relied upon, Defendants' various statements and

averments, including those set forth above, disclaiming enforceability of the Note.

**H.    Dalia and Sagi Collude to Divest D&K of the TPR Shares**

50.    Despite the clear and consistent agreement that the Note would not be

enforced, after they had obtained direct control over D&K, TPR and the Orly Trust, Dalia and Sagi

engaged in a scheme – using TPR, D&K, and D&K GP as their instrumentalities – to completely

divest the Orly Trust of its ownership interest in TPR, to Orly's direct detriment.

51.    Pursuant to Defendants' scheme, Sagi caused TPR to reclaim the Note from

Parnes. On August 31, 2008, Sagi, acting as CEO of TPR, sent a Notice (the "8/31/08 Notice") to

himself as the general manager of D&K purporting to declare a default under the Note:

> Please be advised that you are in default in the payment amounts due
> under [the Note] due to the failure to pay any principal or interest

---

[1]    This affidavit was submitted to the court in connection with proceedings related to Arie's and
Dalia's divorce.

13

due since 2005 and failing to make regular payments since 2000. Such default has continued for more than ten (10) business days. Please be advised that pursuant to the Note we hereby declare that the entire unpaid principal amount of the Note immediately due and payable.

The shares of [TPR] pledged to TPR as collateral will be liquidated at a public auction if the full Note is not satisfied.

(A copy of the 8/31/08 Notice, is annexed hereto as **Exhibit 10.**)

52.    Thereafter, Sagi, again acting as CEO of TPR, purported to notify D&K (of which he remained the managing partner) that D&K's 240 shares of TPR stock would be publicly auctioned to the highest bidder on February 27, 2009, and that the money received from the sale would be used to reduce the outstanding debt (the "Sale Notice," attached hereto as **Exhibit 11**). Notably, the 8/31/08 Notice and the Sale Notice are both addressed only from Sagi, on behalf of TPR, to Sagi, on behalf of D&K.  Besides specifically providing notice to himself by way of the Sale Notice, Sagi arranged for notice of the sale to be published in the *New York Post* in October 2008 and February 2009 (*see* **Exhibit 12**).

53.    Sagi did not provide notice to the other parties holding interests in D&K – in particular, Sagi did not provide notice to Orly so that she could make an effort to protect her Trust's interests.  Sagi's failure to inform Orly of the purported default and proposed sale was deliberate and intended to prevent Orly from intervening in Sagi's and Dalia's plot to strip the Orly Trust of its interest in TPR (and any interest that Orly may have in the $27 million that may have been paid to TPR in August 2008, *see infra* ¶¶ 60-62).

54.    Although D&K previously had denied enforceability of the Note, Sagi, as the manager of D&K GP (and thereby a managing agent of D&K), never objected to the 8/31/08

14

Notice or took any action to prevent the declaration of default or the subsequent sale. Nor did Sagi, as the manager of D&K GP and D&K, ever attempt to make payments under the Note or cure the default. Through his actions and inactions, Sagi breached his fiduciary duties as manager of D&K GP and D&K, and his duty of care and loyalty owed directly to Orly as a result of their familial relationship.

55. Likewise, though aware of the 8/31/08 Notice and the subsequent "auction," Dalia neither objected to the Notice nor took any action to prevent the declaration of default or the subsequent sale. Nor did Dalia ever attempt to ensure that D&K made payments under the Note or otherwise seek to cure the default. Through her actions and inactions, Dalia breached her fiduciary duties as trustee of the Orly Trust and her duty of care and loyalty as Orly's mother.

56. Orly never received the 8/31/08 Notice or the Sale Notice. Further, Defendants never informed Orly of the material fact that TPR, despite multiple promises, agreements, and prior acts to the contrary, was seeking to enforce the Note. Of course, Defendants all knew that the Orly Trust and its beneficiary, Orly herself, had financial interests in the Note. Additionally, at all relevant times, Defendants knew Orly's address and other contact information, but never notified her of the impending foreclosure and auction, leaving Orly without any opportunity to protect herself and her Trust's interests.

57. In consummation of the above-mentioned scheme, on February 27, 2009, TPR (still controlled by Sagi) foreclosed on the Note and purported to conduct an "auction" of the 240 TPR shares previously pledged in connection with the Note (the "Pledged Shares") at the office of Sagi's attorneys, McLaughlin & Stern LLP. Not coincidentally, the Sagi-controlled TPR purchased the Pledged Shares at this "auction" for $2,200,000. (*See* **Exhibit 13**). The proceeds of

15

the sale allegedly were used to decrease D&K's obligations under the Note, leaving a balance of approximately $8,800,000 that, purportedly, continues to be guaranteed by the Orly Trust and the Sagi Trust.

58.     As a result of Sagi's self-dealing and Dalia's failure to act in the best interests of the Orly Trust, D&K's only asset – its ownership interest in TPR – was transferred to TPR, which is controlled by Sagi. The foregoing scheme injured Orly and the Orly Trust, and benefited Sagi and Dalia, in a number of ways. The Orly Trust's interest in D&K is now worthless, as it purportedly no longer owns any interest in TPR, while Sagi now has direct control over all of the TPR shares. The scheme also destroyed Arie's and Dalia's tax and estate-planning intent that both children have equal shares in the family's wealth.

59.     Upon information and belief, if not restrained from further meddling, Dalia and Sagi will inflict additional harm upon Orly by divesting the Orly Trust of its one remaining asset – its ownership interest in the TRI shares.

**I.     Orly's Discovery of Sagi's and Dalia's Scheme**

60.     On or about August 22, 2008, and unbeknownst to Orly, Rochelle Fang, as Trustee of the Sagi Trust, and Sagi, as President/CEO of TPR, attempted to sell the Sagi Trust's 19.43% interest in TRI to the Trump Group, who already owned 47.15% of TRI's outstanding shares, for $26,715,416. This sale purportedly transferred control of TRI from Arie to the Trump Group who thereafter purported to hold 66.58% of TRI's outstanding common stock. A copy of the Stock Purchase Agreement is attached hereto as **Exhibit 14**.

61.     The validity of this approximately $27 million sale of TRI stock currently is

16

being disputed in litigation in Delaware Chancery Court. The parties to the action are Arie, TRI, and various entities affiliated with the Trump Group. The Orly Trust has not appeared in that action.[2]

62.    In that action, the Trump Group claims to have bought the shares either from the Sagi Trust or from TPR – thus, the approximately $27 million purportedly paid by the Trump Group either belongs to the Sagi Trust or to TPR, depending on the outcome of the litigation in Delaware. Notably, both Sagi and David Parnes maintain seats on TRI's Board of Directors on behalf of TPR. By, among other things, maintaining those seats on TPR's behalf, Sagi has taken the position that TPR owned the TRI stock, and is entitled to the $27 million. Upon information and belief, TPR is in possession of the $27 million, where it is at risk of dissipation by Sagi. Indeed, that dissipation already has begun: The Stock Purchase Agreement provided that $500,000 would be given to charity (in Sagi's name and at his choosing), and, upon information and belief, large sums from the $27 million have been given by Sagi to his niece, Yonit Sternberg.[3]

63.    After learning of the Sagi Trust's purported sale of its TRI shares and out of fear that Dalia would not protect the TRI shares held in her Trust, Orly instructed Dalia to protect the Orly Trust's interest in its TRI shares. Specifically, by letter dated January 10, 2009, Orly requested that "for now, and until further notice, it is my strong desire to retain all of the shares of TRI that are currently in the Orly Trust, and I direct you not to sell them." Letter from Orly Genger to Dalia Genger (Jan. 10, 2009) (a copy of which is attached hereto as **Exhibit 15**). Dalia refused to

---

[2]  Orly continues to reserve her right to bring an action related to this attempted sale of TRI shares and the resulting loss of her Trust's control premium, but she has not yet done so.

[3]  Orly continues to reserve her right to bring an shareholder derivative action on behalf of D&K related to Sagi's (and Dalia's) improper management and dissipation of TPR's assets, but she has not yet done so.

17

agree to retain the TRI shares in the Orly Trust.

64.    As detailed previously, the Surrogate's Court previously had declined to grant Orly's application to remove Dalia as Trustee of the Orly Trust. Instead, the Surrogate's Court suggested that Orly commence an SCPA § 2201 proceeding to obtain evidence necessary to support a future application to have Dalia removed. Pursuant to the Surrogate Court's suggestion, Orly's counsel sent Dalia a letter dated May 14, 2009 (attached hereto as **Exhibit 16**) requesting documents related to the Orly Trust's assets. A copy of this May 14th letter was forwarded to Dalia's counsel, Robert A. Meister, Esq., once Orly's counsel learned of Mr. Meister's retention.

65.    On June 1, 2009, Mr. Meister responded to Orly's document demand by informing Orly's counsel that the Orly Trust no longer owned any interest in TPR. Letter from Robert A. Meister, Esq., to Judith E. Siegel-Baum, Esq. (June 1, 2009) (a copy of which is attached hereto as **Exhibit 17**). It was at this time that Orly first learned that TPR purportedly had foreclosed on the Note and sold the Pledged Shares back to TPR for $2,220,000.

66.    By letter dated June 11, 2009, Orly's counsel specifically requested that Dalia stipulate in writing that she would refrain from selling, transferring, or removing the Orly Trust's remaining asset – its TRI shares – until all issues between Orly and Dalia were resolved. Letter from Judith E. Siegel-Baum, Esq., to Robert A. Meister, Esq. (June 11, 2009) (a copy of which is attached hereto as **Exhibit 18**). Dalia failed even to respond to this request, let alone agree to refrain from divesting the Orly Trust of its TRI shares until the issues between the Trustee and the Trust's beneficiary were resolved.

18

**J.    The June 22, 2009 Surrogate Court Application**

67.    Based, in part, upon Dalia's failure to respond to Orly's request, Orly made a second application to the New York County Surrogate's Court on June 22, 2009, by order to show cause seeking, among other things: a) to immediately enjoin and restrain Dalia or her agents from withdrawing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly Trust's TRI shares; b) removing Dalia as Trustee of the Orly Trust; c) seeking to surcharge Dalia for damages; and d) appointing Michael D. Grohman, Esq., as successor Trustee (the "Removal Application"), on the grounds that Dalia has intentionally and blatantly breached her fiduciary duties as Trustee of the Orly Trust, as set forth in this Verified Complaint.

68.    Given the urgency of Orly's request and the possibility for immediate and irreparable harm, the Surrogate's Court scheduled a July 1, 2009 hearing on Orly's Removal Application. At the July 1 hearing (which Dalia declined to attend), the Surrogate's Court ordered that Dalia would be required to give Orly at least ten days' notice before in any way disposing of the Orly Trust's TRI shares, to allow Orly sufficient time to seek relief from the Surrogate's Court. The Court's decision is attached hereto as **Exhibit 19**.

69.    On July 2, 2009, Orly, on behalf of herself, her Trust, and D&K, made written demand upon TPR to return the Pledged Shares to D&K by July 7, 2009. A copy of that written demand is attached hereto as **Exhibit 20**. To date, TPR has declined to do comply with this demand.

19

Supreme Court Records OnLine Library - page 21 of 48

## FIRST CAUSE OF ACTION
### (Claim for Breach of Fiduciary Duty On Behalf of Orly Against Dalia)

70.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 69.

71.     As Trustee of the Orly Trust, Dalia owes an undiluted fiduciary duty to the Trust's beneficiary, Orly, to monitor, manage, maintain, and protect the Orly Trust's assets, including the Orly Trust's ownership interests in TPR and TRI, from challenge or diminution in value.

72.     In addition, Dalia also owes duties of care and loyalty to Orly arising from the close familial relationship between herself and her daughter. Orly relied upon her mother to protect her interests, including her Trust's ownership interests in TPR and TRI, and alert her to anything that may adversely affect her or her Trust's assets.

73.     Dalia breached her fiduciary duties to Orly by: (a) failing to inform Orly of TPR's foreclosure on the Note and the sale of the Pledged Shares, which completely divested the Orly Trust of its 23.52% indirect interest in TPR; (b) failing to take any action to protect or defend the Orly Trust's interest in TPR, in the face of Sagi's purported enforcement of the Note; and (c) failing to defend the Orly Trust's ownership interest in the Pledged Shares despite Orly's repeated requests that Dalia protect her interests.

74.     As stated above, Dalia understood and agreed before signing the Note and the Pledge Agreement that the Note would never be enforced by her or by any of the interested parties and, therefore, that TPR would never seek to foreclose on the Note or repossess the Pledged Shares.

20

75.     Thereafter, Dalia made sworn statements affirming that all interested parties to the Note (Arie, Sagi, Orly, TPR and D&K) had agreed that TPR would never seek to enforce the Note, and Sagi (acting through TPR) assigned the Note to his longtime friend David Parnes (then acting as Trustee of the Orly and Sagi Trusts and as an officer of TPR) in order to prevent anyone from enforcing the Note.

76.     Dalia's sworn statements and assertions of material fact were intended to be accepted as true and relied upon by interested parties to the Note, including Orly.  Orly was aware of Dalia's repeated statements and assertions that the Note would never be enforced, and she relied upon those statements and assertions.  Furthermore, Orly reasonably believed, based upon Dalia's statements and assertions, that Dalia would not allow anyone to enforce the Note against D&K. Additionally, Orly relied on Dalia, as Trustee of the Orly Trust and as her mother, to protect both her individual interests and the interests of the Orly Trust, of which she is the beneficiary.

77.     However, at the time that Dalia made these sworn statements and factual assertions, she never intended to abide by or honor the parties' agreement that the Note would not be enforced, and she never intended to protect the Orly Trust's interest in D&K's Pledged Shares.

78.     Upon information and belief, Dalia knew but deliberately and intentionally failed to notify Orly that Sagi: (a) was not making payments on the Note as manager of D&K GP; (b) intended to and eventually purported to declare a default under the Note on behalf of TPR; (c) sent the Sale Notice supposedly notifying D&K that its shares of TPR stock were to be auctioned as a result of the purported default under the Note; and (d) conducted a sham "auction" where Sagi (on behalf of TPR) "bought" the Pledged Shares at a significant discount to their actual value.

21

Supreme Court Records OnLine Library - page 23 of 48

79.     Dalia's intentional failure to notify Orly about the foreclosure on the Note and sale of D&K's Pledged Shares were material omissions of fact that were intended to be, and in fact were, relied upon by Orly. As Trustee, at a minimum Dalia had a fiduciary duty to speak, and she could not properly remain silent regarding these material facts. She also had a duty to act with the utmost of loyalty on behalf of the Trust, which required her to take action to protect the Orly Trust's interests, particularly, its financial interests.

80.     As a direct and proximate result of Dalia's material misrepresentations, failure to inform Orly of the foreclosure and sale, and failure to take action as Trustee to protect the Orly Trust's interests, Orly has suffered damages, including the total loss of the Orly Trust's interest in TPR, the Orly Trust's potential liability for the outstanding indebtedness under the Note (which, by failing to contest the foreclosure and sale, Dalia failed to challenge as unenforceable), as well as attorneys' fees incurred by Orly in connection with her attempts to ensure that her rights and interests are protected, including her rights and interests stemming from her position as beneficiary of the Orly Trust.

81.     Upon information and belief, Dalia's material misstatements, material omissions, acts and failures to act, were malicious, wanton and intentionally or recklessly designed to cause harm to Orly and, as such, Orly is entitled to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**(Claim for Breach of Fiduciary Duty On Behalf of the Orly Trust and**
**D&K Against Sagi and D&K GP)**

82.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 81.

22

83.     Orly, as beneficiary of the Orly Trust, has the right to assert causes of action on behalf of the Orly Trust.  Further, given Dalia's involvement in the fraud and Orly's renewed attempt to remove Dalia as Trustee, it would be futile for Orly to demand that Dalia commence legal action on behalf of the Orly Trust.

84.     The Orly Trust, as limited partner of D&K, has the right to assert causes of action on behalf of D&K against both D&K GP and Sagi.  Moreover, it would be futile for the Orly Trust to demand that Sagi and D&K GP, as general partner of D&K, commence a legal action against themselves.

85.     Alternatively, the Orly Trust has the right to assert claims against Sagi directly because D&K GP is a mere instrumentality or alter ego of Sagi that should be ignored in its entirety, in the interests of justice.  D&K GP was formed for the sole purpose of attempting to shield Sagi (and Dalia) from personal liability arising from their planned fraudulent acts.  Thus, D&K GP was created for a fraudulent purpose, and, as a result, should be treated as a mere alter ego or instrumentality of Sagi.

86.     As manager of D&K GP (which, in turn, is general partner of D&K), Sagi owes an undiluted fiduciary duty to the partnership's limited partners, including the Orly Trust, to manage, maintain and protect D&K's assets, including its ownership interest in TPR, from challenge or diminution in value.

87.     In the same way, D&K GP, as general partner of D&K, owes an undiluted fiduciary duty to D&K to monitor, manage, maintain, and protect D&K's assets, including its ownership interest in TPR, from challenge or diminution in value.

23

Supreme Court Records OnLine Library - page 25 of 48

88.   Sagi breached these fiduciary duties by engaging in blatant self-dealing and willful fraud using D&K GP, D&K and TPR as instrumentalities to orchestrate a sham transaction which stripped D&K of its ownership in TPR while simultaneously inuring to Sagi's benefit, and to the detriment of the Orly Trust and his sister, Orly.

89.   Specifically, Sagi (purportedly acting on behalf of TPR):

a)   sent the 8/31/08 Notice only to himself as manager of D&K's assets, purporting to declare a default under the Note;

b)   then sent the Sale Notice only to himself as manager of D&K's assets, purporting to notify D&K that its shares of TPR stock were to be auctioned off as a result of the purported default under the Note; and

c)   orchestrated a sham auction at the offices of his attorneys, McLaughlin & Stern LLP, where Sagi purported to foreclose upon the Note, and purchase D&K's TPR shares for a fraction of the shares' actual value.

90.   At the same time, Sagi and D&K GP (purportedly acting on behalf of D&K):

a)   Failed to make payments on the Note;

b)   failed to challenge or defend D&K's principle asset – the Pledged Shares – in the face of Sagi's own use of TPR to foreclose upon the Note; and

c)   failed to notify Orly of Sagi's intent and attempt to enforce the Note through TPR.

91.   Sagi and D&K GP failed to honor their fiduciary duties to manage and protect D&K's assets with knowledge that the interested parties to the Note (Arie, Dalia, Sagi, Orly, TPR, and D&K) had expressly disavowed enforceability of the Note.

24

92.     As stated above, all parties understood and agreed before the time of their signing that the Note and Pledge Agreement would never be enforced by any of them.

93.     Thereafter, Sagi, on behalf of both himself and D&K GP, made statements and assertions of material fact, including during the divorce proceedings, intended to induce all interested parties to the Note, including Orly, to rely upon the promise that the Note and Pledge Agreement would never be enforced against the Note's debtors.

94.     Orly was aware of Sagi's repeated assertions, on behalf of both himself and D&K GP, that the Note and Pledge Agreement would never be enforced, and she justifiably relied upon Sagi's assertions. Further, Orly was aware that Sagi had been tasked with ensuring the non-enforcement of the Note, and that Sagi had acted to prevent enforcement of the Note by assigning it to Parnes. Given all these facts, Orly reasonably believed and justifiably relied on Sagi, as manager of D&K's assets and as her brother, to protect both her and the Orly Trust's interests in D&K and D&K's interest in TPR.

95.     However, at the time Sagi made these statements, on behalf of both himself and D&K GP, he never intended to abide by or honor the agreement not to enforce the Note and never intended to protect the Orly Trust's interest in D&K's Pledged Shares. Indeed, Sagi knew his statements materially misrepresented and hid his true intentions – to convert D&K's assets for his own benefit and to the detriment of Orly, the Orly Trust, and D&K.

96.     As a direct and proximate result of Sagi's and D&K GP's material misrepresentations and material omissions, the Orly Trust has suffered damages, including the total loss of the Orly Trust's interest in TPR, the Orly Trust's potential liability for the outstanding indebtedness under the Note (which, despite his previous statements, Sagi sought to enforce on

25

behalf of TPR), as well as extensive attorneys' fees that have been incurred in connection with Orly's efforts to protect the Orly Trust's rights and interests.

97.    As a direct and proximate result of Sagi's and D&K GP's material misrepresentations and material omissions, D&K has suffered damages, including the total loss of D&K's interest in TPR.

98.    Upon information and belief, both Sagi's and D&K GP's actions were malicious, wanton and intentionally or recklessly designed to cause harm to D&K and to the Orly Trust, and, as such, D&K and the Orly Trust are entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Claim for Aiding and Abetting Breach of Fiduciary Duty On Behalf of Orly, the Orly Trust, and D&K Against Sagi and D&K GP)**

99.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 98.

100.    Sagi knowingly participated and assisted Dalia's breaches of the fiduciary duties owed to Orly by, among other things: (a) seeking to enforce the Note on behalf of TPR despite repeated assurances that the Note would never be enforced; (b) purporting to foreclose on the Note on behalf of TPR; (c) purporting to sell the Pledged Shares at "auction" and purporting to purchase those shares on behalf of TPR; (d) failing to provide notice to Orly of the purported enforcement of the Note and foreclosure thereon; (e) failing to provide notice to Orly of the purported sale of the Pledged Shares; and (f) failing to monitor, manage and protect D&K's (and, thereby, the Orly Trust's) interests in the Pledged Shares.

101.    D&K GP knowingly participated and assisted Dalia's breaches of the fiduciary duties owed to Orly by, among other things: (a) failing to make payments on the Note if

26

such payments were required; (b) failing to defend against TPR's attempt to enforce the Note, foreclose thereon, and sell the Pledged Shares for a mere fraction of their actual value; (c) failing to provide notice to Orly of the purported enforcement of the Note and the purported foreclosure thereon; (d) failing to provide notice to Orly of the purported sale of the Pledged Shares; and (e) failing to monitor, manage and protect D&K's interest in the Pledged Shares.

102.   As a direct and proximate result of Sagi's and D&K GP's aiding and abetting, Orly has suffered damages, including the total loss of the Orly Trust's interest in TPR, the Orly Trust's potential liability for the outstanding indebtedness under the Note, as well as extensive attorneys' fees that have been incurred in connection with Orly's efforts to protect the Orly Trust's rights and interests.

103.   As a direct and proximate result of Sagi's and D&K GP's aiding and abetting, the Orly Trust has suffered damages, including the total loss of the Orly Trust's interest in TPR, the Orly Trust's potential liability for the outstanding indebtedness under the Note, as well as extensive attorneys' fees that have been incurred in connection with Orly's efforts to protect the Orly Trust's rights and interests.

104.   As a direct and proximate result of Sagi's and D&K GP's aiding and abetting, D&K has suffered damages, including the total loss of D&K's interest in TPR, D&K's potential liability for the outstanding indebtedness under the Note, as well as extensive attorneys' fees incurred in connection with Orly's efforts to protect D&K's rights and interests.

105.   Upon information and belief, Sagi's and D&K GP's actions were malicious, wanton and intentionally or recklessly designed to cause harm to Orly, the Orly Trust, and D&K, and, as such, Orly, the Orly Trust, and D&K are entitled to an award of punitive damages.

27

## FOURTH CAUSE OF ACTION
### (Claim for Tortious Interference with Contract On Behalf of the Orly
### Trust and D&K Against Sagi and D&K GP)

106.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 105.

107.    Sagi and D&K GP tortiously interfered with D&K's contractual obligations under the Note by preventing D&K from honoring its obligations under the Note, without any justification.

108.    Under the Note, D&K was required to repay principal, together with accrued interest, in annual installments over a ten-year period.  Though the Note was disavowed by Sagi, when he chose to seek its enforcement on behalf of TPR, he implicitly acknowledged that D&K had obligations under the Note.

109.    Sagi and D&K GP were well aware of D&K's rights and obligations under the Note.

110.    As a direct and proximate result of Sagi and D&K GP's interference with D&K's payment obligations under the Note, both D&K, and its limited partners, including the Orly Trust, have suffered damages, including the total loss of D&K's interest in TPR.

111.    Upon information and belief, Sagi and D&K GP actions were malicious, wanton and intentionally or recklessly designed to cause harm to D&K and the Orly Trust.  As such, D&K and the Orly Trust are entitled to an award of punitive damages.

28

## FIFTH CAUSE OF ACTION
### (Claim for Fraud On Behalf of Orly Against Dalia)

112.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 111.

113.    As stated above, every member of the Genger family, including Dalia, understood and agreed before the time of their signing that the Note and Pledge Agreement would never be enforced by any of them.

114.    Thereafter, Dalia made statements, including sworn statements, affirming that all interested parties to the Note (Arie, Sagi, Orly, TPR and D&K) had agreed that TPR would never seek to enforce the Note, and Sagi (acting through TPR) assigned the Note to his longtime friend David Parnes (then acting as Trustee of the Orly and Sagi Trusts and an officer of TPR) in an attempt to prevent anyone from enforcing the Note.

115.    Dalia's sworn statements and assertions of material fact were intended to be accepted as true and relied upon by interested parties to the Note, including Orly.

116.    Orly was aware of Dalia's repeated assertions that the Note would never be enforced, and she relied upon Dalia's assertions that the Note would never be enforced.  Further, Orly reasonably believed, based upon Dalia's assertions, that Dalia would not allow anyone to enforce the Note against D&K.  Further, Orly justifiably relied on Dalia, as Trustee of the Orly Trust and as her mother, to protect both her and the Orly Trust's interests.

117.    However, at the time Dalia made these statements and factual assertions, she never intended to abide by or honor the agreement not to enforce the Note and never intended to protect the Orly Trust's interest in D&K's Pledged Shares.

29

118.    Upon information and belief, Dalia knew but deliberately and intentionally failed to notify Orly that Sagi: (a) was not making payments on the Note as manager of D&K GP; (b) was purporting to declare a default under the Note on behalf of TPR; (c) sent notice of the sale to himself as manager of D&K, but did not intend to inform Orly of the sale; and (d) conducted a sham "auction" during which Sagi "bought" D&K's Pledged Shares on behalf of TPR at a fraction of their actual value.

119.    Dalia's intentional failure to notify Orly about the foreclosure on the Note and sale of the Pledged Shares were material omissions of fact that were intended to be, and in fact were, relied upon by Orly. As Trustee, at a minimum Dalia had a fiduciary duty to speak, and she could not properly remain silent regarding these material facts. She also had a duty to act with the utmost of loyalty on behalf of the Trust, which required her to take action to protect the Orly Trust's interests, particularly, its financial interests.

120.    As a direct and proximate result of Dalia's material misrepresentations and material failure to inform Orly of the foreclosure and the sale of the Orly Trust's indirect interest in TPR, Orly has suffered damages, including the total loss of the Orly Trust's interest in TPR, the Orly Trust's potential liability for the outstanding indebtedness under the Note, as well as extensive attorneys' fees that have been incurred in connection with Orly's efforts to protect the Orly Trust's rights and interests.

121.    Upon information and belief, Dalia's material misstatements, material omissions, acts and failures to act were malicious, wanton and intentionally or recklessly designed to cause harm to Orly, and, as such, Orly is entitled to an award of punitive damages.

30

### SIXTH CAUSE OF ACTION
#### (Claim for Fraud On Behalf of the Orly Trust and D&K Against Sagi and D&K GP)

122.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 121.

123.    As stated above, every interested party understood and agreed before the time of their signing that the Note and Pledge Agreement would never be enforced by any of them.

124.    Thereafter, Sagi, on behalf of both himself and D&K GP, made statements and assertions of material fact, including during the divorce proceeding, that the Note and Pledge Agreement were not intended to be, and would not be, enforced.

125.    Orly was aware of Sagi's repeated assertions, on behalf of both himself and D&K GP, that the Note and Pledge Agreement would never be enforced, and she relied upon Sagi's assertions. Further, Orly reasonably believed that Sagi would not allow anyone to enforce the Note against D&K. Further, Orly justifiably relied on Sagi, as manager of D&K's assets and as her brother, to protect both her and the Orly Trust's interests in D&K.

126.    However, at the time Sagi made these statements, on behalf of both himself and D&K GP, he never intended to abide by or honor the agreement not to enforce the Note and never intended to protect the Orly Trust's interest in the TPR shares which D&K owned. Indeed, Sagi knew his statements materially misrepresented and hid his true intentions – to take D&K assets for his own benefit, to the detriment of both D&K and the Orly Trust.

127.    As a direct and proximate result of Sagi's and D&K GP's material misrepresentations and material silence, the Orly Trust has suffered damages, including the total loss of the Orly Trust's interest in TPR, the Orly Trust's potential liability for the outstanding

31

indebtedness under the Note, as well as extensive attorneys' fees that have been incurred in connection with Orly's efforts to protect the Orly Trust's rights and interests.

128. As a direct and proximate result of Sagi's and D&K GP's material misrepresentations and material silence, D&K has suffered damages, including the total loss of D&K's interest in TPR, D&K's potential liability for the outstanding indebtedness under the Note, as well as extensive attorneys' fees incurred in connection with Orly's efforts to protect D&K's rights and interests.

129. Upon information and belief, both Sagi's and D&K GP's actions were malicious, wanton and intentionally or recklessly designed to cause harm to D&K and the Orly Trust and, as such, D&K and the Orly Trust are entitled to an award of punitive damages.

### SEVENTH CAUSE OF ACTION
**(Claim for Aiding and Abetting Fraud On Behalf of the Orly Trust and D&K Against Sagi and D&K GP)**

130. Plaintiff repeats and realleges the allegations in paragraphs 1 through 129.

131. Sagi and D&K GP knowingly participated and assisted Dalia in committing fraud against Orly by, among other things, assisting in the sham sale of the Pledged Shares, making misrepresentations regarding the Note, and failing properly to notify D&K's members of the purported foreclosure and sale.

132. As a direct and proximate result of Sagi's and D&K GP's aiding and abetting of Dalia's fraud, the Orly Trust has suffered damages, including the total loss of the Orly Trust's interest in TPR, the Orly Trust's potential liability for the outstanding indebtedness under

32

the Note, as well as extensive attorneys' fees that have been incurred in connection with Orly's efforts to protect the Orly Trust's rights and interests.

133.    As a direct and proximate result of Sagi's and D&K GP's aiding and abetting of Dalia's fraud, D&K has suffered damages, including the total loss of D&K's interest in TPR, D&K's potential liability for the outstanding indebtedness under the Note, as well as extensive attorneys' fees that have been incurred in connection with Orly's efforts to protect D&K's rights and interests.

134.    Upon information and belief, Sagi's and D&K GP's actions were malicious, wanton and intentionally or recklessly designed to cause harm to the Orly Trust and D&K, and, as such, the Orly Trust and D&K are entitled to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### (Claim for Conspiracy to Commit Fraud On Behalf of Orly, the Orly Trust, and D&K Against Sagi, Dalia, D&K GP and TPR)

135.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 134.

136.    As set forth above, Dalia and Sagi agreed upon and engaged in a scheme, using TPR and D&K GP as their instrumentalities (collectively, the "Conspirators"), to fraudulently divest D&K of its ownership interest in TPR, thereby depriving the Orly Trust of its ownership interest in TPR, to Orly's direct detriment.

137.    By himself or through the instrumentalities, Sagi furthered the conspiracy by, among other things:

a)    failing to make payment on the Note, if such payments were required;

33

b)    sending the 8/31/08 Notice – purporting to declare a default under the Note – only to himself as manager of D&K's assets;

c)    sending the Sale Notice – purporting to notify D&K that its Pledged Shares were to be auctioned as a result of the purported default under the Note – only to himself as manager of D&K's assets;

d)    orchestrating a sham auction at the offices of his attorneys, McLaughlin & Stern LLP, where Sagi purported to foreclose upon the Note, and simultaneously sell and purchase the Pledged Shares for a fraction of their actual value; and

e)    failing to notify or inform Orly about the foreclosure and the sale of the Pledged Shares.

138.    Likewise, by herself or through the instrumentalities, Dalia furthered the conspiracy by, among other things:

a)    failing to notify or inform Orly about the foreclosure and the sale of the Pledged Shares; and

b)    failing to challenge the foreclosure and the sale or otherwise defend the Orly Trust's interests in the Pledged Shares.

139.    As a direct and proximate result of the above-mentioned conspiracy to commit fraud, Orly, the Orly Trust, and D&K have suffered damages, including the total loss of D&K's and the Orly Trust's interest in TPR, D&K's and the Orly Trust's potential liability for the outstanding indebtedness under the Note, as well as extensive attorneys' fees that have been incurred in connection with Orly's efforts to protect D&K's, the Orly Trust's, and her own rights and interests.

140.    Upon information and belief, the Conspirators' actions were malicious, wanton, and intentionally or recklessly designed to harm D&K, the Orly Trust, and Orly, and, as such, D&K, the Orly Trust, and Orly are entitled to an award of punitive damages.

34

**NINTH CAUSE OF ACTION**
**(Claim for Declaratory Relief and Damages Pursuant to NY UCC**
**§§ 9-627, 610, 611-614 On Behalf of the Orly Trust Against TPR)**

141.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 140.

142.    TPR orchestrated a sham sale that purported to dispose of D&K's Pledged Shares. However, the sale of these Pledged Shares was not "commercially reasonable" within the meaning of NY UCC Article 9.

143.    Upon information and belief, TPR failed to send timely authenticated notification of disposition of the Pledged Shares to the Orly Trust, or its beneficiary Orly, in violation of NY UCC §§9-611(c)(2) and 9-612(b).   Although aware of her financial interest in D&K and the TPR shares, TPR made no attempt to contact Orly to inform her of the UCC sale.

144.    As a secondary obligor under the Note, the Orly Trust had a right to be given notice of the sale of the Pledged Shares.   TPR's failure to send proper authenticated notification to either the Orly Trust or Orly is commercially unreasonable.

145.    In addition, the 8/31/08 Notice fails to satisfy the requirements for a proper notification before disposition of collateral.   Specifically, the 8/31/08 Notice:  (a) fails to state that D&K is entitled to an accounting of the unpaid indebtedness, in violation of NY UCC § 9-613(a)(4); and (b) fails to state the time and place of Sagi's purported disposition of collateral, in violation of NY UCC § 9-613(a)(5).

146.    Further, the purported sale price for D&K's Pledged Shares ($2,200,000) was only a fraction of the original purchase price for the shares ($10,200,000).   Moreover, the sale price did not take into account the $27 million potentially received by TPR from the purported sale

35

of TRI stock to the Trump Group, or the substantial dollar value of TRI. Similarly, the sale price

did not take into account TPR's limited partnership interest in Riverside Properties (Canada) LP, an

entity which owns extremely valuable residential real estate complexes in Canada.

147.    Due to TPR's and Sagi's failure to proceed in accordance with UCC

Article 9, Part 6, the Orly Trust is entitled, under NY UCC §9-625(b), to the recovery of the loss

caused by such noncompliance.

### TENTH CAUSE OF ACTION
**(Claim for Conversion and Replevin On Behalf of D&K Against TPR)**

148.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 147.

149.    Around December 1993, D&K purchased the Pledged Shares.

150.    Pursuant to this purchase, D&K had a possessory right and interest in the

Pledged Shares at the time when TPR (controlled by Sagi) conducted the "auction" of those shares

and took possession of those shares through an unlawful act of conversion.

151.    Although TPR currently has possession of the Pledged Shares, TPR has no

lawful right to possess or control those shares.

152.    On July 2, 2009, Orly, acting on behalf of the Orly Trust, in turn acting on

behalf of D&K, made a demand to TPR for recovery of the Pledged Shares. A copy of the July 2,

2009 demand letter is attached hereto as **Exhibit 20.**

153.    TPR failed to return the Pledged Shares in response to the above-mentioned

request for their return.

36

154.    The Pledged Shares are unique because TPR is a closely held Genger family corporation, and because the value of the TPR stock at issue is largely dependent on the outcome of an action currently pending in Delaware Chancery Court concerning the ownership of TRI. Based upon the outcome of this litigation, the value of TPR's shares may increase by $250 to $350 million.

155.    As a direct and proximate result of the conversion of D&K's Pledged Shares by TPR, D&K has suffered damages in the amount of the value of the TPR shares on February 27, 2009, the date of the purported auction.

156.    Further, D&K is entitled to an order directing TPR to return the Pledged Shares at issue to D&K.

### ELEVENTH CAUSE OF ACTION
**(Claim for Declaratory Judgment of D&K's Superior Right to Possess
Chattel Under CPLR 7101 On Behalf of D&K Against TPR)**

157.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 156.

158.    As set forth above, D&K had a possessory right and interest in the Pledged Shares at the time when TPR (controlled by Sagi) conducted the sham sale of those shares and took possession of these shares through an unlawful act of conversion.

159.    Although TPR currently has possession of the Pledged Shares, TPR has no lawful right to possess or control those shares.

160.    In addition, TPR has refused Orly's demand for the return of D&K's Pledged Shares.

37

161.    As a direct and proximate result of TPR's conversion of the Pledged Shares,
D&K has suffered damages, including the total loss of its interest in TPR.

162.    The Pledged Shares are unique because TPR is a closely-held Genger family
corporation, and because the value of the TPR stock at issue is largely dependent on the outcome of
an action currently pending in Delaware Chancery Court concerning the ownership of TRI. Based
upon the outcome of this litigation, the value of TPR's shares may increase by $250 to $350
million.

163.    As a result, D&K is entitled to a declaratory judgment pursuant to CPLR
7101 which, in turn, would allow this Court to enter an Order of Seizure pursuant to CPLR 7102,
directing the sheriff to seize the Pledged Shares for return to D&K.

## TWELFTH CAUSE OF ACTION
### (Claim for Preliminary Injunction to Recover Chattel Under
### CPLR 7109 On Behalf of D&K Against TPR)

164.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 163.

165.    As set forth above, D&K has a possessory interest in the Pledged Shares that
is superior to TPR's purported possessory interest in those shares. Indeed, TPR has no legal right to
the possession of the Pledged Shares.

166.    Due to D&K's superior possessory interest in the Pledged Shares, this Court
should grant D&K a temporary restraining order preventing TPR from removing those shares from
the state or otherwise transferring, selling, pledging, assigning or otherwise disposing of those
shares until further order from this Court, pending a final determination of D&K's request for
declaratory judgment for right to possession of the Pledged Shares.

38

167.    Without action by this Court, there is a strong chance that TPR will attempt to assign or dispose of the property in order to prevent D&K from recovering the Pledged Shares, causing irreparable harm to D&K and its limited partners, including the Orly Trust.

168.    The speculative and contingent value of TPR, a closely held family corporation, makes TPR's shares unique. Indeed, based upon the outcome of the litigation over TRI, TPR may increase many fold in value.

### THIRTEENTH CAUSE OF ACTION
**(Claim for Constructive Trust On Behalf of D&K Against TPR)**

169.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 168.

170.    A constructive trust is appropriate because this case involves fraud and self-dealing. Specifically, TPR participated in a fraudulent scheme to defraud D&K of its shares in TPR.

### FOURTEENTH CAUSE OF ACTION
**(Claim for Constructive Fraudulent Conveyance Under NY Debtor & Creditor Law Sections 273 and 277 On Behalf of the Orly Trust Against TPR)**

171.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 170.

172.    As secondary obligor under the Note, the Orly Trust is a contingent creditor of D&K. In addition, the Orly Trust is a future creditor of TPR arising from their tort liability to the Orly Trust, as set forth in this Verified Complaint.

173.    Sagi, acting in his capacity as manager of D&K GP, caused D&K to convey D&K's Pledged Shares to TPR by purposely and intentionally failing to act to prevent the

39

foreclosure and the sale of those shares to TPR for $2,200,000, far less than fair consideration as defined in Section 272 of the New York Debtor and Creditor Law.

174.   Sagi, acting on behalf of D&K GP, caused the above-mentioned conveyance of the Pledged Shares to TPR to occur at a time when D&K was insolvent, or at a time when D&K became insolvent as a result of the transfer, as defined in Section 271 of the New York Debtor and Creditor Law.

175.   Based upon the above, the transfer of the Pledged Shares to TPR constitutes a fraudulent conveyance under to Sections 273 and 277 of the New York Debtor and Creditor Law.

176.   As a result, the transfer of the Pledged Shares to TPR shall be set aside pursuant to Section 278 and 279 of the New York Debtor and Creditor Law.

### FIFTEENTH CAUSE OF ACTION
**(Claim for Actual Fraudulent Conveyance Under Section 276 of the
New York Debtor and Creditor Law On Behalf of the Orly Trust
Against TPR)**

177.   Plaintiff repeats and realleges the allegations in paragraphs 1 through 176.

178.   As a secondary obligor under the Note, the Orly Trust is a contingent creditor of D&K. In addition, the Orly Trust is a future creditor of TPR arising from their tort liability to the Orly Trust, as set forth in this Verified Complaint.

179.   At the direction of Sagi, acting in his capacity as manager of D&K GP, D&K transferred its Pledged Shares to TPR as part of a sham sale specifically designed to divest the Orly Trust of its ownership interest in TPR and to benefit TPR, and Sagi himself.

40

180. As set forth above, Sagi used both D&K GP and TPR as his instrumentalities to effectuate a transfer of the Pledged Shares to TPR with the actual intent of hindering, delaying or defrauding the Orly Trust and its beneficiary, Orly, constituting a violation of Section 276 of the New York Debtor and Creditor Law.

181. As a result, the transfer of the Pledged Shares shall be set aside pursuant to Sections 278 and 279 of the New York Debtor and Creditor Law.

182. In addition, the Orly Trust is entitled to a judgment against TPR in the amount of the reasonable attorneys' fees incurred in connection with its efforts to protect its interests, as fixed by this Court pursuant to Section 276-a of the New York Debtor and Creditor Law.

## SIXTEENTH CAUSE OF ACTION
**(Claim for Promissory Estoppel On Behalf of D&K and the Orly Trust Against Sagi and TPR)**

183. Plaintiff repeats and realleges the allegations in paragraphs 1 through 182.

184. As stated above, every interested party, including Sagi and TPR, understood and agreed before the time of their signing that the Note and Pledge Agreement would never be enforced by any of them.

185. Thereafter, both Sagi and TPR made statements and took actions that were intended to, and did induce, D&K and the Orly Trust to reasonably rely upon the fact that the Note and Pledge Agreement would not be enforced against D&K.

41

186.   As a direct and proximate result of Sagi's and TPR's statements and actions, and D&K's and the Orly Trust's reliance upon them, D&K and the Orly Trust have suffered damages, including the total loss of their interest in TPR, their potential liability for the outstanding indebtedness under the Note, as well as extensive attorneys' fees incurred in connection with Orly's efforts to protect their rights and interests.

## DEMAND FOR RELIEF

WHEREFORE, Orly Genger, in her individual capacity, and on behalf of the Orly Genger 1993 Trust both in its individual capacity and on behalf of D&K Limited Partnership, demands judgment as follows:

(a)   on the first cause of action, against Dalia in an amount equal to Orly's compensatory and punitive damages to be determined at trial with interest accruing from February 27, 2009;

(b)   on the second cause of action, against Sagi and D&K GP, in an amount equal to the Orly Trust's and/or D&K's compensatory and punitive damages to be determined at trial with interest accruing from February 27, 2009;

(c)   on the third cause of action, against Sagi and D&K GP in an amount equal to Orly's compensatory and punitive damages to be determined at trial with interest accruing from February 27, 2009;

(d)   on the fourth cause of action, against Sagi and D&K GP in an amount equal to the Orly Trust's and/or D&K's compensatory and punitive damages to be determined at trial with interest accruing from February 27, 2009;

(e)   on the fifth cause of action, against Dalia in an amount equal to Orly's compensatory and punitive damages to be determined at trial with interest accruing from February 27, 2009;

(f)   on the sixth cause of action, against Sagi and D&K GP in an amount equal to the Orly Trust's and/or D&K's compensatory and punitive damages to be determined at trial with interest accruing from February 27, 2009;

42

(g) on the seventh cause of action, against Sagi and D&K GP in an amount equal to Orly's compensatory and punitive damages to be determined at trial with interest accruing from February 27, 2009;

(h) on the eighth cause of action, against Sagi, Dalia, D&K GP and TPR in an amount equal to Orly's, the Orly Trust's, and/or D&K's compensatory and punitive damages to be determined at trial with interest accruing from February 27, 2009;

(i) on the ninth cause of action, declaring that TPR's purported sale of the Pledged Shares was "commercially unreasonable" pursuant to Article 9 of the New York Uniform Commercial Code and awarding damages to the Orly Trust pursuant to N.Y. U.C.C. § 9-625(b);

(j) on the tenth cause of action, against TPR in an amount equal to the value of the Pledged Shares as of February 27, 2009, and an order directing TPR to return the Pledged Shares to D&K;

(k) on the eleventh cause of action, declaring that D&K, and not TPR, has the superior right to possess the Pledged Shares;

(l) on the twelfth cause of action, enjoining TPR from removing the Pledged Shares from the state or otherwise transferring, selling, pledging, assigning or otherwise disposing of those TPR shares until further Order from this Court;

(m) on the thirteenth cause of action, establishing a constructive trust in favor of D&K over Pledged Shares;

(n) on the fourteenth cause of action, against TPR to set aside the constructive fraudulent conveyance of the Pledged Shares orchestrated by Sagi in his capacity as manager of D&K GP;

(o) on the fifteenth cause of action, against TPR to set aside the actual fraudulent conveyance of the Pledged Shares orchestrated by Sagi in his capacity as manager of D&K GP and awarding the Orly Trust its reasonable attorneys' fees;

(p) on the sixteenth cause of action, awarding damages to the Orly Trust and/or D&K arising from Sagi's and TPR's breach of promise, in an amount to be determined at trial with interest accruing from February 27, 2009;

(q) for costs, fees and disbursements; and

43

(r)    such further and other relief as the Court deems just and proper.

Dated:    New York, New York
            July 8, 2009

ZEICHNER ELLMAN & KRAUSE LLP

By: _____
Stephen F. Ellman
Yoav M. Griver
Bryan D. Leinbach
Attorneys for Plaintiff
575 Lexington Avenue
New York, New York 10022
(212) 223-0400

## VERIFICATION

STATE OF NEW YORK,
COUNTY OF NEW YORK.

      ORLY GENGER, being duly sworn, says that she is the plaintiff named in the

foregoing complaint; that she has read the foregoing complaint, and that the complaint is true to her

own knowledge except as to those matters therein stated to be alleged upon information and belief,

and that as to those matters she believes them to be true.

 

_____
                            ORLY GENGER

Sworn to before me this
8th day of July, 2009

_____
              Notary Public

      MICHAEL W. ANTONIVICH
    Notary Public, State of New York
        No. 01AN4762190
      Qualified in Nassau County
  Commission Expires June 30, 20_1 0_

SUPREME COURT: NEW YORK COUNTY                    Index No.:

ORLY GENGER in her individual capacity
and on behalf of the Orly Genger 1993 Trust
(both in its individual capacity and on behalf
of D & K Limited Partnership),

                              Plaintiff,

          - against -

DALIA GENGER, SAGI GENGER, D & K
GP LLC, and TPR INVESTMENT
ASSOCIATES, INC.,

                              Defendants.

## SUMMONS AND
## VERIFIED COMPLAINT

### ZEICHNER ELLMAN & KRAUSE LLP
575 LEXINGTON AVENUE
NEW YORK, NEW YORK 10022
TEL.: (212) 223-0400
FAX: (212) 753-0396
www.zeklaw.com

# MARKEWICH AND ROSENSTOCK LLP

8 East 41ˢᵗ Street • Fifth Floor • New York, New York 10017

tel: (212) 542-3156  fax: (212) 481 1761  emarkewich@mrlawllp.com

Lawrence M. Rosenstock
Eve Rachel Markewich

Robert Markewich
of counsel

November 5, 2008

Hon. Renee R. Roth
Surrogate's Court, New York County
31 Chambers Street, 5ᵗʰ Floor
New York, New York 10007

Re:   In the Matter of Orly Genger
      File No. 0017/2008

Dear Surrogate Roth:

We write on behalf of the Petitioner, Orly Genger, with reference to her *sub judice* Petition as beneficiary of the Orly Genger Trust ("Orly Trust"). Recent events require that we, again, urge you to appoint Martin Coleman as Trustee. As set forth in detail below, there are several litigations in process that will impact the value of Trust assets, and the Orly Trust needs to have a Trustee who can participate in those litigations without conflict. There is also an outstanding matter regarding possession of a stock certificate belonging to the Orly Trust, but which is currently being held captive by another party.

Our Amended Petition sought the immediate appointment of a Trustee to administer the Orly Trust and safeguard its assets. We were thwarted in that request by objections from Sagi Genger ("Sagi"), the remote contingent remainderman of the Orly Trust, who manipulated various friends and relatives of his (his friend, David Parnes ("Parnes"); his sister-in-law Leah Fang; his sister-in-law's romantic partner, Patricia Enriquez; and his mother Dalia Genger ("Dalia")) to, seriatim, name one another Trustee and to take control of the Orly Trust, to the detriment of Orly.

Since our last contact with the Court, we believe Sagi and Dalia have acted in concert to devalue the Trust's most valuable asset, shares of a privately-held company called Trans Resources Inc. ("TRI"), a company founded by Orly's and Sagi's father, Arie Genger ("Arie").

The Orly Trust and a trust for the benefit of Sagi, (the "Sagi Trust"), were created by Arie in 1993. In 2004, when Arie and Dalia divorced, the two Trusts purchased TRI stock that at one time was marital property. This stock previously had been held by TPR[1], an entity in which Arie and Dalia held their family resources. As part of the marital settlement, the TRI stock held by TPR was sold to the Orly Trust, the Sagi Trust and Arie. As a result of the sales, the Sagi Trust and the Orly Trust each owned to approximately 19% of the outstanding TRI stock, and Arie owned approximately 15% of the TRI stock. The Trusts also executed irrevocable proxies granting to Arie the right to vote their shares of TRI stock. As a result, Arie continued to control TRI through the Genger family holdings of approximately 53% of the stock.

The remaining 47% TRI stock is held by third parties unrelated to the Gengers but related to each other ("Third Parties"). Last month, the Third Parties attempted a coup, by convincing Sagi to arrange the sale to them of the Sagi Trust's shares ("Sagi TRI Shares"). The purported sale was effected by a document signed by Rochelle Fang, Sagi's mother-in-law, who was then Trustee of the Sagi Trust. As soon as Rochelle, as Trustee, signed the purchase and sale agreement (the "PSA") regarding the Sagi TRI Shares, Rochelle – presumably at Sagi's request – resigned as Trustee. In Rochelle's place, David Parnes became Trustee of the Sagi Trust. Of course, this musical chairs game with the Trustee to the Sagi Trust is the same game played by the same people – Parnes, Sagi and Sagi's in-laws, the Fangs – regarding the trusteeship of the Orly Trust.

The PSA reflected a price for the Sagi TRI–Shares that is merely a fractional amount of their worth. Based on the 2008 earnings of TRI, the value of the Sagi TRI Shares is in excess of $150,000,000. Nonetheless, under the PSA, the Third Parties purport to purchase the Sagi TRI Shares for $26,715,416 – ie. at a discount of approximately $125,000,000 or more.

In the meantime, the Third Parties also have filed suit seeking to void the original transfer of the TRI shares from TPR to the two Trusts, claiming the sale was improper under the TRI shareholders agreement. Since the Third Parties claim that the stock owned by the Sagi Trust was never rightfully transferred to the Sagi Trust, the Third Parties insisted that the PSA be approved and executed not only by the Sagi Trust, but also by TPR. Upon information and belief, Dalia, as the controlling shareholder of TPR, consented to the sales

---

[1] In the Amended Petition, Orly requested limited letters to investigate the operations of TPR. TPR originally was owned 49%, indirectly, and equally, by the Sagi Trust and the Orly Trust, and 51% by Dalia. Recently, Dalia sold 2% of her shares to Sagi's mother-in-law, Rochelle Fang. Of particular concern to Orly is the fact that TPR has paid out well over a million dollars in compensation and other funds to Sagi and Dalia, without making comparable payments to Orly.

document affirming that if the Sagi Trust's TRI shares are, in fact, still owned by TPR, then TPR agrees to the sale to the Third Parties. By consenting to the sale, Dalia, simultaneously: (i) agreed to a share price for TRI at significantly below its actual value; (ii) conceded the possibility that the Orly Trust is not the owner of its most valuable asset – the TRI shares that had been transferred to it by TPR; (iii) agreed to cede control of TRI to the Third Parties; (iv) potentially caused a de-valuation of the Orly Trust's TRI shares; and (v) potentially caused a de-valuation of the Orly Trust's interest in TPR.

There are currently several litigations involving TPR and/or TRI, which directly affect the Orly Trust, including:

- GLENCLOVA INVESTMENT CO. v. TRANS-RESOURCES, INC. and TPR INVESTMENT ASSOCIATES INC. pending in the United States District Court, Southern District of New York;

- ROBERT SMITH, TR INVESTORS, LLC AND GLENCLOVA INVESTMENT CO. v. TRANS-RESOURCES, INC. pending in the Delaware Chancery Court;

- TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, and NEW TR EQUITY II, LLC v. ARIE GENGER and TRANS-RESOURCES, INC. pending in the Delaware Chancery Court.

- NEW TR EQUITY, LLC v. TRANS-RESOURCES, INC., pending in the Delaware Chancery Court.

These actions will have a direct impact on the Orly Trust's holdings, and the control and value of such holdings. It is, therefore, essential that a trustee immediately be appointed for the Orly Trust, so that decisions can be made to determine what steps to take with respect to these litigations and, in particular, whether the Orly Trust should seek to intervene in these lawsuits. It is likely that the only way to preserve the value of the TRI shares in the Orly Trust will be to intervene in some if not all of the litigations.

Sagi and Dalia are acting on their own accounts in the litigations. There is no one acting on behalf of Orly or the Orly Trust. The Orly Trust must have representation in the litigations that is independent from the Sagi Trust and TPR, as controlled by Dalia. Clearly, Dalia would not be independent. She is obviously in a position of conflict, having already approved a severely depressed valuation of the TRI stock. This conflict is separate and apart from the conflict that already existed, as set forth in the Amended Petition, as a result of Dalia taking money out of TPR, to the exclusion of the Orly Trust,

which has an Independent significant ownership interest in TPR, albeit indirectly through another entity controlled by Dalia.

In addition to our concerns about the extant litigations, we are also concerned that Dalia and Sagi will attempt to sell the Orly Trust's TRI shares to the Third Parties – again, at a depressed value. In fact, we have sought to obtain the share certificate evidencing the Orly Trust's ownership of the TRI shares and have been thwarted by TRI's counsel. The need to take possession of that share certificate is yet another, separate, reason, why there is immediate need for the appointment of a Trustee other than Dalia.

For these reasons we respectfully request that the Court immediately resolve the outstanding application and appoint Martin Coleman as Trustee. (Although the Trustee must serve without commission, pursuant to the Trust instrument, Mr. Coleman has agreed to take on this job.)

Respectfully yours,

Eve Rachel Markewich

ERM:js

cc:   Jonathan G. Kortmansky, Esq.
      Steven Hyman, Esq.
      Matthew Hoffman, Esq.
      Seth Rubenstein, Esq.
      Mary Santamarina, Esq.

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------x
                                         :

In the Matter of the Application of ORLY       :     File No. 0017/2008
GENGER, as a person interested, for the        :
removal of DALIA GENGER, as Trustee of the   :
Orly Genger 1993 Trust pursuant to SCPA § 711(11)  :
                                           :

-------------------------------------------------------------------x

## RESPONDENT SAGI TRUST'S OPPOSITION TO ORLY GENGER'S MOTION FOR TEMPORARY RESTRAINTS

John Dellaportas
Evan Michailidis
DUANE MORRIS LLP
1540 Broadway
New York, New York 10036
(212) 692-1000
*Attorneys for Defendant*
  *The Sagi Genger 1993 Trust*

Defendant the Sagi Genger 1993 Trust (the "Sagi Trust") respectfully submits this response in opposition to plaintiff Orly Genger's motion to enjoin defendant Dalia Genger, the trustee of the Orly Genger 1993 trust (the "Orly Trust"), *et al.* from proceeding in Delaware Chancery Court with respect to the 1,102.80 shares of Trans-Resources, Inc. ("TRI") stock in which the Orly Trust claims an interest.[1]

By this motion, Orly seeks to enjoin the Orly Trust from suing in Delaware Chancery Court for a declaratory judgment affirming the Trust's beneficial ownership of the TRI shares. Orly's motion is premised on her claim that the Delaware case is "duplicative." *See* Orly Br. at 10. It is not. The Chancery Court action seeks "a declaratory judgment that [the Orly Trust] is the beneficial owner of Trans-Resources shares that it purchased from TPR in October 2004" pursuant to a "purchaser for fair value" theory previously adopted by Chancellor Strine. *See* Exh. A ¶ 43. Arie and Orly Genger's shared "Third Amended and Supplemental Complaint," by contrast, seeks to reform Arie's 2004 divorce decree so those shares be "placed in a newly formed single purpose entity controlled by Arie ("TPR2") ... [and] that Arie be declared the 51% owner of TPR2 ...." *See* Exh. B ¶ 181(iii)-(iv). The Orly Trust, in turn, would be granted a 24.5% interest in TPR2, effectively reducing her equity interest in TRI from 19.4% to 12.9%. *Id.* ¶ 181(v). (The TRI shares of the Sagi Trust would suffer an equal dilution in its TRI equity interest. *Id.*) The Supreme Court has already dismissed it. *See* Exh C.

The upside would all go to Arie Genger – who is Orly's father but who is not a beneficiary of the Orly Trust. His equity interest in TRI would increase from 14.0% to 27.0%, at the expense of the Orly Trust. *Id.* ¶ 181(iv). This chart summarizes the relief sought:

---

1    The Sagi Trust appears herein for the limited purpose of opposing petitioner's motion, without waiver of any jurisdictional objections to this proceeding it may have. *See Town of Clarkstown v. Howe*, 206 A.D.2d 377 (2d Dept. 1994) (holding that appearance in opposition to preliminary injunction motion does not waive jurisdictional objection, where defendant raised lack of personal jurisdiction in timely motion to dismiss).

-1-

**% EQUITY INTERESTS IN TRI**

|  | Under 2004 Divorce Decree: | Under Count I, Third Amended and Supplemental Complaint: |
|---|---|---|
| **Arie Genger:** | **14.0%** (794.40 of 3,000 TRI shares, which represented 52.85% of the company's equity) | **27.0%** (51% of TPR2, which would hold 52.85% of TRI) |
| **The Orly Trust:** | **19.4%** (1,102.80 of 3,000 TRI shares, which represented 52.85% of the company's equity) | **12.9%** (24.5% of TPR2, which would hold 52.85% of TRI) |

In other words, <u>Orly is seeking the Court's assistance to give away TRI shares to Arie, rather than try to procure them for the Orly Trust</u>. The Orly Trust only would inherit the TRI shares "upon Arie's death." *See* Exh. B ¶ 181(vii). All economic advantage from those shares, including the right to sell them, would be denied the Trust during Arie's life.

Orly claims the right to do this on behalf of the Orly Trust because she is, in her words, "its beneficiary." *See* Orly Br. at 3. Even if this were completely accurate, it is *per se* improper for a beneficiary to try to direct assets out of a trust. But the statement is also inaccurate and misleading, as it conveniently omits the fact that the Sagi Trust is a contingent beneficiary of the Orly Trust. If Orly continues to have no descendants (she has none yet), then the Trust's assets will all go to the Sagi Trust. *See* Exh. D at 3. Yet, notwithstanding the Sagi Trust's interest, Orly procured a TRO from the Supreme Court without notifying the Sagi Trust of the hearing, at which she falsely represented to the Supreme Court that she was the "sole beneficiary" of the Trust. Now that her lies have been exposed and the Court has lifted the fraudulently obtained TRO, Orly runs to this Court seeking the same relief on the same false grounds. This is an attempted theft, plain and simple. Orly is seeking to rob the Orly Trust of its assets in order to hand over to her father, whose misconduct is the source of all this mess.

-2-

Unfortunately, since her parents' divorce, Orly has been hard at work wrecking trust assets. First, Orly helped her dad torpedo deals with the Trump Group that would have enabled the Orly Trust to either retain its TRI shares or sell them for a value similar to that obtained by the Sagi Trust. *See* Exh. E ¶¶ 6-15. Then, she came over to this Court and got a TRO keeping the Orly Trust from selling its TRI shares. *See* Exh. F. Next, she went to Delaware and gave false trial testimony which helped sink Arie's claims. *See* Exh. G at 11-13. She also tried to have her mother replaced as trustee, only to have this Court reject her application on the ground, *inter alia*, that it was based on a "material misstatement." *See* Exh. H at 6.

More recently, Arie and Orly have cavalierly disregarded the burdens on the Court's docket, plaguing this Court with repeated motions and submissions seeking various forms of questionable "emergency relief." This practice reached its nadir at an October 26, 2011 hearing at which then-Supreme Court Justice Feinman asked: "why not go back to the Surrogate's Court and renew your application to remove [Dalia]?" *See* Exh. I at 8. Orly's counsel – Mr. Griver, who also is one of the counsel of record in this proceeding – responded by disparaging this Court for supposedly having a slow docket. *Id.* at 8.

As a subject of Orly's criticism, the Surrogate's Court is in good company. At the very same October 26, 2011 hearing, Orly Genger's counsel also chose to impugn the integrity of the Delaware Chancery Court for daring to rule against Orly's father, Arie Genger. Counsel called Chancellor Strine "the worst possible judge in the United States of America" and claimed "the fix is in." *See* Exh. I at 22, 29. Justice Feinman repeatedly cautioned to: "Be careful what you say" and "again, I just urge you to be careful with your language" (*id.* at 22, 30), all to no effect. Orly's counsel responded: "I hope Chancellor Strine reads that." *Id.* at 25. Chancellor Strine did so, and needless to say he did not take it well. *See* Exh. J.

-3-

The underlying flaw in Orly's motion is that she conflates the interests of Arie Genger –

who, by all accounts, is responsible for this mess – with those of the Orly Trust. The fact that

Orly is merely acting as a stalking horse for her father is apparent not from her pleading, which

she filed jointly with her father, seeking identical relief. In reality, there are crucial distinctions

between those two parties' legal positions, ones that – assuming "the fix is not in" – the

Chancery Court is perfectly equipped to deal with. One might start with the fact that Chancellor

Strine has no particular affinity for the Trumps. *E.g.*, the Chancery Court, in its December 9,

2009 Memorandum Opinion, observes that:

> From the record, one senses that Genger and the Trump Group bring a
> similar mindset to business. Although they seemed to work together cooperatively
> to advance TRI's interests, Genger and the Trump Group viewed business as
> business, and neither would hesitate to seize an advantage, even if that advantage
> meant causing commercial injury to someone else, regardless of whether one
> had served with that someone else on a board for several years.

*See* Exh. K at 5. Arie lost due not to any judicial bias, but rather to Arie's "own perfidy," and

the Court's conclusion that Arie "only has himself to blame for whatever mess his decision to

make the 2004 Transfers has caused for his divorce settlement." *See* Exh. G at 40.

While Orly gave false testimony in Chancery Court, her Trustee, Dalia Genger, is

blameless. We trust that Chancellor Strine can distinguish between the blameless Trustee and

Orly. If anything, the Chancery Court's decisions should provide a basis for optimism. Most

significantly, in his July 23, 2010 Memorandum Opinion, Chancellor Strine called the Sagi Trust

"an arguably innocent purchaser for value." *See* Exh. G at 37. Since the Sagi and Orly Trusts

obtained their shares in the same manner, this finding should apply equally to the Orly Trust. If

it does, then the Orly Trust has an argument that, as an innocent purchaser for fair value, it gets

to retain beneficial ownership of the TRI shares. That argument would not require relitigating the

Chancery Court's prior factual findings, but rather would flow from the Court's finding that Arie

-4-

lied. The argument was not made in the prior Delaware trial, as the Orly Trust did not appear in the case, and Arie could not plausibly claim to be an "innocent" purchaser.

And so we return to the basic falsehood upon which rests this entire, rotten motion: namely, Orly's claim that "Orly - not Dalia - is the only person truly interested in protecting her Orly Trust." *See* Orly Br. at 9. *The pleadings, as opposed to the rhetoric, reveal the opposite to be the case.* Orly is not even trying to obtain ownership of the TRI shares on behalf of the Trust, but rather to give them away for free to Arie. Dalia, by contrast, has taken decisive action to win beneficial ownership of the TRI shares on behalf of the Orly Trust. This is Dalia Genger's right and responsibility as trustee, and Orly has set forth no basis to upset it.

Given the foregoing, the Sagi Trust respectfully submits that Orly has fallen woefully short of satisfying the standard necessary to obtain a preliminary injunction. "Where the facts are in sharp dispute, a temporary injunction will not be granted." *Matter of Related Props., Inc. v. Town Bd. of Town/Village of Harrison*, 22 A.D.3d 587, 590 (2d Dep't 2005); *accord T & N West Galla Pizzeria, Inc. v. CF White Plains Assoc.*, 185 A.D.2d 270, 272 (2d Dep't 1992) (since parties sharply disputed terms of lease, preliminary injunction was not warranted); *Eklund v. Pinkey*, 31 A.D.3d 908, 909 (3d Dep't 2006) (reversing preliminary injunction where there were "sharp factual·disputes obscuring the likelihood of success"). Here, underlined everything Orly says is in dispute, none of it can be proven, and most of it is just plain false.

Lastly, should this Court grant Orly any relief, than a stiff undertaking is needed to cure the harm such relief will surely inflict upon the Sagi Trust. Under CPLR 6312, an undertaking would be required. *See, e.g., Gerstner v. Katz*, 38 A.D.3d 835, 836 (2d Dep't 2007) (reversing court order which "granted the plaintiff's request for a preliminary injunction without requiring him to give an undertaking which would 'reimburse the defendant for damages sustained if it

[were] later finally determined that the preliminary injunction was erroneously granted'") (citations omitted). The only issue would be as to the correct amount.

Under New York law, the undertaking amount should be "rationally related to the damages the nonmoving party might suffer if the court later determines that the relief should not have been granted." *1523 Real Estate, Inc. v. East Atl. Props., LLC*, 41 A.D.3d 567, 567 (2d Dep't 2007) (citation omitted); *accord Clover St. Assocs. v. Nilsson*, 244 A.D.2d 312, 313 (2d Dep't 1997). Here, the harm is the lost value of the TRI shares to the Sagi Trust, should Orly prevent the Orly Trust from winning beneficial ownership of the TRI shares for the Trust, in favor of her lawsuit which seeks to give away those same shares to Arie.

On the issue of share value, Orly should be taken at her word. In a Complaint in a related case, Orly personally verified that if the Delaware litigation resulted in a determination that the 3,000 TRI shares were not validly transferred but remained with TPR, then the value of D&K's 240 shares of TPR stock (representing 49% of TPR's total equity) would increase by $250 to $350 million. *See* Exh. L ¶¶ 154, 162. If correct, that would mean TPR's entire 3,000 TRI shares are worth roughly twice that amount, or $500 to $700 million, and the Orly Trust's proportionate beneficial ownership of 1,102.80 TRI shares is worth approximately $185-260 million. This is no math error. In a November 8, 2008 letter to this Court, Orly's counsel represented that the TRI shares TPR had contracted in 2004 to sell to the Sagi Genger 1993 Trust (the same number of shares TPR had contracted to sell to the Orly Trust) were worth "in excess of $150,000,000." *See* Exh. M at 2. That is the harm to the Sagi Trust.

Accordingly, the Sagi Trust respectfully requests that the preliminary injunction be denied. If granted, it should be conditioned upon an undertaking of no less than $150 million. Orly is not the only beneficiary and so should not be permitted to destroy the Trust.

-6-

Dated:   New York, New York
         March 1, 2013

                              DUANE MORRIS LLP

                              By: __/s/ John Dellaportas_____
                                    John Dellaportas
                                    Evan Michailidis
                              1540 Broadway
                              New York, New York 10036
                              (212) 692-1000
                              *Attorneys for Respondent*
                                *The Sagi Genger 1993 Trust*

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------------x
                       :

In the Matter of the Application of ORLY      :     File No. 0017/2008
GENGER, as a person interested, for the       :
removal of DALIA GENGER, as Trustee of the   :
Orly Genger 1993 Trust pursuant to SCPA § 711(11)  :
                       :

------------------------------------------------------------------------x

**NOTICE OF APPEARANCE**

      PLEASE TAKE NOTICE that the undersigned attorney is appearing on behalf of

respondent The Sagi Genger 1993 Trust in the above-captioned proceeding and requests that all

papers in connection with the above-captioned proceeding be served upon the undersigned at the

address listed below.

Dated:    New York, New York
         March 1, 2013

                            DUANE MORRIS LLP

                            By:   */s/ John Dellaportas*
                                John Dellaportas
                                Evan Michailidis
                            1540 Broadway
                            New York, New York 10036
                            (212) 692-1000
                            *Attorneys for Respondent*
                              *The Sagi Genger 1993 Trust*

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| In the Matter of the Application of ORLY GENGER, as a person interested, for the removal of DALIA GENGER, as Trustee of the Orly Genger 1993 Trust pursuant to SCPA § 711(11) | **Index No. 0017/2008** |
|  | **AFFIDAVIT OF SERVICE** |

STATE OF NEW YORK   )
                 : ss.:
COUNTY OF NEW YORK   )

GRACE GIAMPIETRO, being duly sworn, deposes and says:

1.    I am employed by the firm of Duane Morris LLP.

2.    I am over 18 years of age, reside in Queens, New York and am not a party to this action.

3.    On March 1, 2013, I caused service by mailing a copy of a **NOTICE OF APPEARANCE, RESPONDENT SAGI TRUST'S OPPOSITION TO ORLY GENGER'S MOTION FOR TEMPORARY RESTRAINTS and AFFIRMATION OF JOHN DELLAPORTAS ON BEHALF OF RESPONDENT SAGI TRUST** by depositing same in the official depository maintained and exclusively controlled by the United States Government, true and correct copies of the same, properly enclosed in a postpaid wrapper addressed to counsel at the following address designated by them for that purpose upon and via e-mail upon:

Ralph R. Hochberg
Mitchell L. Kaplan
PLATZER, SWERGOLD, KARLIN, LEVINE,
GOLDBERG, & JASLOW, LLP
1065 Avenue of the Americas - 18th Floor
New York, New York 10018
(212) 593-3000

Yoav Griver, Esq.
Bryan Leinbach, Esq.
Zeichner Ellman & Krause LLP

DM1\3748818.1

575 Lexington Avenue
New York, New York 10022
(212) 223-0400

Robert Meister, Esq.
Pedowitz & Meister, LLP
570 Lexington Avenue, 18th Floor
New York, NY 10022
(212) 403-7365



_____
Grace Giampietro


Sworn to before me this
1st day of March, 2013

_____
Notary Public


2

STATE OF NEW YORK
SURROGATE'S COURT: COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - x
In the Matter of the Application of
ORLY GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA §711(11)
- - - - - - - - - - - - - - - - - - - - - - - - x    File No. 0017/2008

New York County Surrogate's Court
MISCELLANEOUS DEPT.

MAR 0 1 2013

FILED

Clerk

## AFFIDAVIT OF JEREMY D. ANDERSON

STATE OF DELAWARE          )
                          ) ss.
COUNTY OF NEW CASTLE       )

I, Jeremy D. Anderson, having been first duly sworn, hereby depose and say:

1.      I am member of the Bar of the State of Delaware and am an attorney in the Delaware office of Fish & Richardson P.C.

2.      I represent Dalia Genger, as the Trustee of the Orly Genger 1993 Trust, in an action filed on October 4, 2011 in the Court of Chancery of the State of Delaware that is captioned *Dalia Genger, as Trustee of the Orly Genger 1993 Trust v. TR Investors LLC, et al.,* C.A. No. 69006-CS (the "Delaware Action").

3.      On October 12, 2011 Defendant TPR Investment Associates, Inc. answered the Complaint.

4.      On October 24, 2011, TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC, New TR Equity II, LLC, and Trans-Resources, Inc. answered the Complaint and filed counterclaims and cross-claims.

5.      Ms. Genger did not answer, move or otherwise respond to the counterclaims and cross-claims that were asserted because she and her attorneys were temporarily restrained from prosecuting the Delaware Action by the Supreme Court of New York.

6.      If Ms. Genger is not further restrained or stayed from prosecuting the Delaware
Action, she will answer, move or otherwise respond to the counterclaims and cross-claims, and
will then work with the Defendants to submit to the Court of Chancery a Scheduling Stipulation
and Order that governs the pre-trial proceedings in the Delaware Action (the "Scheduling
Order"). The Scheduling Order will include, among other things, dates for the completion of
discovery, case-dispositive motions and pre-trial briefing. The Delaware Action could proceed
to trial within 8-12 months, and pursuant to Delaware law, the Delaware Court of Chancery
would issue an opinion no later than 90 days after the completion of post-trial briefing.

_____
                            Jeremy D. Anderson

Subscribed and sworn to before me this
27th day of February, 2013 by Jeremy D.
Anderson who is personally known to me.

_____
Signature of Notary Public

Patricia H. Blazer
NOTARY PUBLIC, STATE OF DELAWARE
My Commission Expires April 11, 2014

**PATRICIA H. BLAZER**
**NOTARY PUBLIC**
**STATE OF DELAWARE**
My commission expires April 11, 2014



New York County Notary Public
MISCELLANEOUS DEPT.

MAR 0 1 2013

FILED

Clerk_____

STATE OF NEW YORK
SURROGATE'S COURT: COUNTY OF NEW YORK
--------------------------------------------------------------------------X
In the Matter of the Application of
ORLY GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA §711(11)                Index #: 0017/2008

**AFFIDAVIT OF SERVICE**

--------------------------------------------------------------------------X
State of New York      )
                       ) ss:
County of New York     )

     David Bartky, being sworn, deposes and says:

     I am over the age of 18, and reside at 570 Lexington Avenue, 18th Floor, New York, New York 10022.

     On the 28th day of February, 2013, deponent served the attached AFFIDAVIT OF JEREMY D. ANDERSON; MEMORANDUM IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION AGAINST TRUSTEE PROSECUTING ACTION TO DECLARE TRUST'S INTEREST IN TRANS-RESOURCES, INC. SHARES; and AFFIRMATION OF ROBERT A. MEISTER IN OPPOSITION TO ORLY GENGER'S MOTION FOR PRELIMINARY INJUNCTION AGAINST TRUSTEE PROSECUTING ACTION TO DECLARE TRUST'S INTEREST IN TRANS-RESOURCES, INC. SHARES, via UPS overnight courier to:

     Ralph Hochberg
     Platzer, Swergold, Karlin, et al
     1065 Avenue of the Americas, 18th Fl.
     New York, NY 10018

     David Bartky

Subscribed and Sworn to
before me this 28th day
of February, 2013

Notary Public

ROBERT A. MEISTER
Notary Public, State of New York
No. 31-02ME2653350
Qualified in New York County
Commission Expires March 30, 2015

# FAX TRANSMISSION

**PLATZER, SWERGOLD, KARLIN, LEVINE, GOLDBERG & JASLOW**
1065 Avenue of the Americas
NEW YORK, NEW YORK 10018
PHONE NO.: 212-593-3000
FAX NO.: 212-593-0353

TO:   Surrogates' Court of the State of NY
     Attn:   Clerk of the Miscellaneous Dept.

**Date:**   March 11, 2013

FACSIMILE:   212-748-5971

**Pages:**   8, page(s), including this cover sheet.

FROM:   Mitchell L. Kaplan, Esq.

RE:   In the Matter of the Application of ORLY GENGER, as a person interested, for the removal of DALIA GENGER, as Trustee of the Orly Genger 1993 Trust pursuant to SCPA § 711(11)   **File No. 0017/2008**

In the Matter of the Application for a Compulsory Accounting and Related Relief by ORLY GENGER, as a person interested in the Orly Genger 1993 Trust **File No. 0017/2008/A**

Notice:

The information contained in this facsimile message is attorney privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient or the employee or agent responsible to deliver it to the intended recipient you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone, and return the original message to us at the above address via U.S. Postal Service.

Tax Advice Disclosure:

To ensure compliance with the requirements imposed by the IRS in Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein. Thank you.

# PLATZER, SWERGOLD, KARLIN,
# LEVINE, GOLDBERG & JASLOW, LLP
*COUNSELORS AT LAW*

1065 AVENUE OF THE AMERICAS
SUITE 1800
NEW YORK, NEW YORK 10018
TELEPHONE 212.593.3000
FACSIMILE 212.593.0353

PLAZA 1000 AT MAIN STREET
SUITE 208
VOORHEES, NEW JERSEY 08043
TELEPHONE 856.782.8644

WWW.PLATZERLAW.COM
NY DCL # 1315219

☐ *If checked, reply to*
*New Jersey Office*

March 11, 2013

VIA FACSIMILE ONLY
212-748-5971
Surrogate's Court of the State of New York
County of New York
31 Chambers Street
New York, NY 10007

Attention:  Clerk of the Miscellaneous Department

Re:  In the Matter of the Application of ORLY GENGER, as a person interested,
for the removal of DALIA GENGER, as Trustee of the Orly Genger 1993 Trust
pursuant to SCPA § 711(11)
**File No. 0017/2008**

In the Matter of the Application for a Compulsory Accounting and Related Relief
by ORLY GENGER, as a person interested in the Orly Genger 1993 Trust
**File No. 0017/2008/A**

Dear Clerk of the Court:

This law firm is counsel to Petitioner, Orly Genger, (the "Petitioner") in both of the above-referenced proceedings.

In furtherance of the hearing and conference before the Court and Mary Santamarina on March 5, 2013, what follows is the Stipulation executed by counsel for all parties agreeing to a thirty (30) day "standstill" agreement of the removal proceeding pursuant to the terms and conditions set forth therein. The accounting proceeding shall remain unaffected by the standstill agreement as directed by the Court.

)

g:\skolnick & hochberg\wordproc\genger\letter to miscellaneous department clerk4.doc

PLATZER, SWERGOLD, KARLIN,
LEVINE, GOLDBERG & JASLOW, LLP
*COUNSELORS AT LAW*

Clerk of the Miscellaneous Department
Page -2-
March 11, 2013

Thank you for the Court's courtesies with these matters.

Respectfully submitted,
PLATZER, SWERGOLD, KARLIN, LEVINE,
GOLDBERG & JASLOW, LLP

By: _____
Mitchell L. Kaplan

MLK:wl
Enclosure
cc:     Chambers of the Honorable Nora S. Anderson
        31 Chambers Street
        New York, NY 10007
        Attention: Mary Santamarina, Esq. **(Via Federal Express)**

Robert Meister, Esq (Counsel to Respondent, Dalia Genger) – **Via E-Mail Only**
John Dellaportas, Esq. (Counsel to the Sagi Genger 1993 Trust)- **Via E-Mail Only**
Ralph R. Hochberg, Esq., Yoav Griver, Esq. and Bryan Leinbach, Esq. **Via E-Mail Only**

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER, as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA § 711(11)

File No. 0017/2008

## STIPULATION

WHEREAS, Petitioner, Orly Genger ("Petitioner"), having previously filed a Third Amended Petition (the "Third Amended Petition") seeking, *inter alia*, the immediate removal of respondent, Dalia Genger (the "Respondent"), as Trustee of the Orly Genger 1993 Trust (the "Orly Trust") in the above-captioned matter (the "Removal Proceeding"); and,

WHEREAS, the Respondent having filed a Motion to Dismiss (the "Motion to Dismiss") the Third Amended Petition; and,

WHEREAS, the Petitioner having submitted papers in opposition to the Motion to Dismiss; and,

WHEREAS, the Petitioner having filed an Order to Show Cause and Motion with the Court on February 14, 2013 seeking, *inter alia*, a temporary restraining order and certain injunctive relief as set forth therein (the "Order to Show Cause"); and,

WHEREAS, the Order to Show Cause having been opposed by the Respondent and the Sagi Genger 1993 Trust (the "Sagi Trust"), which is a contingent remainder beneficiary under the Orly Trust; and,

WHEREAS, both the Motion to Dismiss and the Order to Show Cause were heard by the Court on March 5, 2013 and counsel for the parties having conferenced these matters before the Court;

IT IS HEREBY STIPULATED, AGREED AND CONSENTED to by and among the
undersigned on behalf of the respective parties as follows:

1     The Removal Proceeding, the Motion to Dismiss, and the Order to Show Cause
shall be stayed for a thirty (30) day period from March 5, 2013 to and including April 4, 2013
(the "Thirty Day Stay Period").

2.     During the Thirty Day Stay Period, the Petitioner, Respondent, and the Sagi Trust
together with any and all of their respective agents, assigns, employees, representatives,
attorneys, and/or anyone acting on their respective behalves either directly or indirectly or in
concert with them agree not to proceed with and/or take any action of any kind or nature against
one another, with respect to the prosecution or defense of the action entitled "*Dalia Genger as
Trustee of the Orly Genger 1993 Trust v. TR Investors LLC*, C.A. No. 6906-CS" pending in the
Delaware Chancery Court.

3.     The parties will inform the Court in *Orly Genger v. Dalia Genger et al.*, Sup. Ct.,
N.Y. CO, Index no. 109749/09, and in *Arie Genger and Orly Genger v. Sagi Genger et al.*, Sup.
Ct., N.Y. CO, Index no 651089/2010 (collectively "The Supreme Court Actions"), that they
intend to temporarily forego their respective litigation efforts on behalf of the Orly Trust, not to
proceed with and/or take any action of any kind or nature with respect to the prosecution or
defense of The Supreme Court Actions during the Thirty Day Stay Period and shall request an
appropriate extension of discovery cut-off dates.    Unless that Court communicates its
disapproval, the Petitioner, Respondent, and the Sagi Trust together with any and all of their
respective agents, assigns, employees, representatives, attorneys, and/or anyone acting on their
respective behalves either directly or indirectly or in concert with them agree during the Thirty
Day Stay Period: (i) not to proceed with and/or take any action of any kind or nature with respect

for the prosecution or defense of The Supreme Court Actions;  (ii) not to commence any new actions or proceedings in any court on behalf of the Orly Trust and/or which concern, relate to, pertain to and/or has any effect whatsoever upon any and all assets or liabilities of the Orly Trust including, but not limited to, the Orly Trust's direct, indirect or beneficial interests in Trans-Resources, Inc. and TPR Investment Associates, Inc.; and, (iii) not to take any other actions of any kind or nature, which concern, relate to, pertain to and/or has any effect whatsoever upon any and all assets or liabilities of the Orly Trust including, but not limited to, the Orly Trust's direct, indirect or beneficial interests in Trans-Resources, Inc. and TPR Investment Associates, Inc. Notwithstanding the provisions of this Paragraph "3" of this Stipulation, the parties agree that the pending mediation between them in certain actions currenly pending in New York County Supreme Court scheduled for March 13, 2013 or any rescheduled or continued date shall proceed and shall not be subject to the Thirty Day Stay Period.

4.   Specifically excluded from the scope and limitation of this Stipulation is Petitioner's previously filed Petition for a Compulsory Accounting, which shall not be subject to the Thirty Day Stay Period and shall proceed as has been directed by the Court.

5.   During the Thirty Day Stay Period, Petitioner, Respondent and the Sagi Genger 1993 Trust, through their counsel, shall cooperate in good faith in an effort to identify a mutually acceptable, neutral, disinterested person or institution who would be willing to serve as successor Trustee to Respondent.

6.   The undersigned counsel represent that they are authorized to enter into and execute this Stipulation on behalf of their respective clients and are duly authorized to bind them to the terms and conditions contained herein.

7.   This Stipulation may be executed in counterparts and by facsimile or E-Mail

scanned signature, each of which shall be deemed an original, together which shall for all

purposes constitute one Stipulation binding upon each of the parties hereto.

Dated: March 11, 2013
        New York, NY

PLATZER, SWERGOLD, KARLIN, LEVINE,   ZEICHNER ELLMAN & KRAUSE LLP
GOLDBERG & JASLOW, LLP                   Attorneys for Petitioner, Orly Genger in the
    Attorneys for Petitioner, Orly Genger      Supreme Court Actions

By: _____          By: _____
        Ralph R. Hochberg, Esq.              Yoav Griver, Esq.
        Mitchell L. Kaplan, Esq.             Bryan D. Leinbach, Esq.
        1065 Avenue of the Americas          575 Lexington Avenue
        New York, New York 10018             New York, New York 10022
        Tel (212) 593-3000                   (Tel) (212) 826-5338

Dated: March ____, 2013
        New York, NY

FEDOWITZ & MEISTER, LLP
Attorneys for Respondent, Dalia Genger

By: _____
Robert Meister, Esq.
570 Lexington Avenue, 18th Floor
New York, NY 10022-6837
(Tel) (212) 403-7393

Dated: March ____, 2013
        New York, NY

DUANE MORRIS LLP
Attorneys for the Sagi Genger 1993 Trust

By: _____
        John Dellaportas, Esq.
        1540 Broadway
        New York, NY 10036
        (Tel) (212) 692-1012

scanned signature, each of which shall be deemed an original, together which shall for all

purposes constitute one Stipulation binding upon each of the parties hereto.

Dated: March  , 2013
New York, NY

PLATZER, SWERGOLD, KARLIN, LEVINE,    ZEICHNER ELLMAN & KRAUSE LLP
GOLDBERG & JASLOW, LLP                         Attorneys for Petitioner, Orly Genger in the
   Attorneys for Petitioner, Orly Genger       Supreme Court Actions

By: _____          By: _____
         Ralph R. Hochberg, Esq.                     Yoav Griver, Esq.
         Mitchell L. Kaplan, Esq.                     Bryan D. Leinbach, Esq.
         1065 Avenue of the Americas           575 Lexington Avenue
         New York, New York 10018             New York, New York 10022
         Tel (212) 593-3000                          (Tel) (212) 826-5338

Dated:  March  . . ., 2013
New York, NY

PEDOWITZ & MEISTER, LLP
Attorneys for Respondent, Dalia Genger

By: _____
Robert Meister, Esq.
570 Lexington Avenue, 18th Floor
New York, NY  10022-6837
(Tel)  (212) 403-7333

Dated:  March ____, 2013
New York, NY

DUANE MORRIS LLP
Attorneys for the Sagi Genger 1993 Trust

By: _____
      John Dellaportas, Esq.
      1540 Broadway
      New York, NY  10036
      (Tel) (212) 692-1012

SURROGATE'S COURT : NEW YORK COUNTY

---------------------------------------- X

In the Matter of the Application for
a Compulsory Accounting and Related
Relief by Orly Genger, as a Person          File No. 2008-0017/A
Interested in the ORLY GENGER 1993
Trust established by Arie Genger

---------------------------------------- X

New York County Surrogate's Court
DATA ENTRY DEPT.

MAR 2 1 2013

A N D E R S O N,    S.

At the call of the calendar, this proceeding to compel an

accounting by the trustee of the trust established in 1993 by

Arie Genger for the benefit of his daughter, Orly Genger, was

granted.  Dalia Genger is directed to file an account of her

proceedings, together with a petition for its judicial

settlement, on or before May 6, 2013.

This decision constitutes the order of the court.

S U R R O G A T E

Dated: March 2 1, 2013

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------------------X

ACCOUNTING BY Dalia Genger

as the   successor Trustee of the Orly Genger 1993 Trust
established under the Agreement dated December 31, 1993
for the period January 3, 2008 through April 30, 2013

--------------------------------------------------------------------------X

ACCOUNTING BY:

[  ]    Executor with Trust
[ X ]   Trustee
[  ]    Other [Specify]_____

File No. _____

TO THE SURROGATE'S COURT OF THE COUNTY OF NEW YORK

The undersigned does hereby render the account of proceedings as follows:

Period of account from  January 4, 2008           to   April 30, 2013          .
This is a intermediate account.

[The instructions concerning the schedules need not be stated at the head of each schedule.  It will be sufficient to set forth only the schedule letter and heading.  For convenience of reference, the schedule letter and page number of the schedule should be shown at the bottom of each sheet of the account.]

## PRINCIPAL

| | | |
|---|---|---|
| Schedule A | - | Principal Received, page ___13___ |
| Schedule A - 1 | - | Realized Increases, page ___15___ |
| Schedule B | - | Realized Decreases, page ___17___ |
| Schedule C | - | Funeral and Administration Expenses and Taxes, page ___18___ |
| Schedule C - 1 | - | Unpaid Administration Expenses, page ___19___ |
| Schedule D | - | Creditor's Claims, page ___21___   **[Does not apply in a trustee's account]** |
| Schedule E | - | Distributions of Principal, page ___22___ |
| Schedule F | - | New Investments, Exchanges and Stock Distribution, page ___24___ |
| Schedule G | - | Principal remaining on Hand, page ___25___ |

## INCOME

| | | |
|---|---|---|
| Schedule A-2 | - | Income Collected, page ___16___ |
| Schedule C-2 | - | Administration, Expenses Chargeable to Income, page ___20___ |
| Schedule E-1 | - | Distributions of Income,  page ___23___ |
| Schedule G-1 | - | Income Remaining on Hand,  page ___26___ |
| Schedule H | - | Interested Parties, page ___27___ |
| Schedule I | - | Computation of Commissions, page ___NONE___ |
| Schedule J | - | Other Pertinent Facts and Cash Reconciliation, page ___28___ |
| Schedule K | - | Estate Taxes Paid and Allocation of Estate Taxes, page ___34___ |

## **SUMMARY**

### **PRINCIPAL ACCOUNT**

CHARGES:

| | | | |
|---|---|---|---|
| Schedule "A" | - | (Principal received) | $ 319,416.51 & See Schedule J |
| Schedule "A - 1" | - | (Realized increases in principal) | $ 0.00 |
| | | Total principal charges | $ 319,416.51 & See Schedule J |

CREDITS:

| | | | |
|---|---|---|---|
| Schedule "B" | - | (Realized decreases in principal) | $ 0.00 |
| Schedule "C" | - | (Funeral and administration expenses) | $ 111,688.83 |
| Schedule "D" | - | (Creditor's claims actually paid) **[Does not apply in trustee's account]** | $ 0.00 |
| Schedule "E" | - | (Distributions of principal) | $ 0.00 |
| | | Total principal credits | $ 111,688.83 |

Principal balance on hand shown by Schedule "G"          $ 207,747.68 & See Schedule J

### **INCOME ACCOUNT**

CHARGES:

| | | | |
|---|---|---|---|
| Schedule "A-2" | - | (Income collected) | $ 0.00 |
| | | Total income charges | $ 0.00 |

CREDITS

| | | | |
|---|---|---|---|
| Schedule "C-2" | - | (Administration expenses) | $ 0.00 |
| Schedule "E-1" | - | (Distributions of Income) | $ 0.00 |
| | | Total income credits | $ 0.00 |

Balance of undistributed income remaining on hand as shown in Schedule "G-1"     $ 0.00

**COMBINED ACCOUNTS**

| | | |
|---|---|---|
| Principal on hand | Cash | $ _207,747.68_ |
| | Other Property | $ _See Schedule J_ |
| | Total | $ _207,747.68 and See Schedule J_ |
| | | |
| Income on hand: | Cash | $ _0.00_ |
| | Other Property | $ _0.00_ |
| | Total | $ _0.00_ |
| | | |
| Total on hand as of April 30, 2013 | | $ _0.00_ |

The foregoing principal balance of $207,747.68 & See Schedule J consists of $207,747.68 in cash and $ See Schedule J  in other property on hand as of April 30, 2013. It is subject to deduction of estimated principal commissions amounting to $   0.00   as shown in  Schedule I, and to the proper charge to principal of expenses of this accounting.

The foregoing income balance of $   0.00   consists of $   0.00   in cash and $ 0.00   in other property on hand as of the 30th day of April, 2013.  It is subject to deduction of estimated income commissions amounting to $   0.00   as shown in  Schedule I, and to the proper charge to income expenses of this accounting.

The attached schedules are part of this account.


| | |
|---|---|
| _____ | _____ |
| (Name of Corporate Fiduciary) | (Signature of Fiduciary) |
| _____ | _Dalia Lengh_ |
| (Signature of Officer) | (Signature of Fiduciary) |

**AFFIDAVIT OF ACCOUNTING PARTY**

STATE OF NEW YORK                          )

COUNTY OF __New York_____ )   ss.:

    Dalia Genger being duly sworn, says: that the schedules of assets of the estate reported herein are true and complete and include all money and property of any kind, and all increment thereon, which have come into the hands of any of the accounting parties or have been received by any other persons for the use of any accounting party by order of authority of such accounting party, and include all indebtedness due by any accounting party to the estate whether discharged or not; that the moneys stated in the account as collected were all that could be collected; that all claims for credit for losses or decreases of value of assets are correctly reported; that the reported payments out of estate assets for funeral and administration expenses were actually made and made in the amounts scheduled; that the reported payments to creditors and beneficiaries were actually made at the dates and in the amounts scheduled; that no payments have been made by any accounting party on any fiduciary's claims against the estate except after prior approval and allowance by the Surrogate; that all receipts and disbursements are correctly and fully reported and scheduled; that the accounting parties do not know of any error in the account or in any schedule thereof or of any matter or thing relating to the estate omitted therefrom to the prejudice of rights of any creditor or of any person interested in the estate; and that the schedule of commissions has been computed in conformity with the statute regulating commissions and the Rules of the Surrogate's Court applicable thereto.

Sworn to before me on
__May 9__, 20_13_

Notary Public
Commission Expires:
(Affix Notary Stamp or Seal)

        ROBERT A. MEISTER
    Notary Public, State of New York
       No. 31-02ME2653350
    Qualified in New York County
   Commission Expires March 30, 201_

_____
Signature

_____
Print Name

Signature of Attorney: _____

Address of Attorney: Pedowitz & Meister, LLP
        570 Lexington Avenue, 18th Fl.
        New York, NY 10022

Tel. No.: 212-403-7333

**PRINCIPAL**

### Schedule A
Statement of Principal Received

This schedule must contain an itemized statement of all the moneys and other personal property constituting principal for which each accounting party is charged, together with the date of receipt or acquisition of such money or property. If real property has been sold by the fiduciary, this schedule must set forth the proceeds of sale of such property, including a copy of the closing statement.

### Schedule A-1
Statement of Increases on Sales, Liquidation or Distribution

This schedule must contain a full and complete statement of all realized increases derived from principal assets whether due to sale, liquidation, or distribution or any other reason. It should also show realized increases on new investments or exchanges. In each instance, the date of realization of the increase must be shown and the property from which the increase was derived must be identified.

### Schedule B
Statement of Decreases Due to Sales, Liquidation, Collection, Distribution or Uncollectibility

This schedule must contain a full and complete statement of all realized decreases on principal assets whether due to sale, liquidation, collection or distribution, or any other reason. It should show decreases on new investments or exchanges and also sales, liquidations or distributions that result in neither gain nor loss. In each instance, the date of realization of the decrease must be shown and the property from which the decrease was incurred must be identified. It should also report any asset which the fiduciary intends to abandon as worthless, together with a full statement of the reasons for abandoning it.

### Schedule C
Statement of Funeral and Administration Expenses and Taxes Charged to Principal

This schedule must contain an itemized statement of all moneys chargeable and paid for funeral, administration and other necessary expenses, together with the date and the reason for each expenditure. Consolidate all similar expenditures; i.e. funeral expenses, taxes, accountant fees, legal fees, filing fees, commissions, other. Where the will directs that all inheritance and death taxes are to be paid out of the estate, credit for payment of the same should be taken in this schedule.

### Schedule C-1
Statement of Unpaid Administration Expenses

This schedule must contain an itemized statement of all unpaid claims for administration and other necessary expenses, together with a statement of the basis for each such claim.

### Schedule D
Statement of All Creditor's Claims

This schedule must contain an itemized statement of all creditor's claims subdivided to show:

1. Claims presented, allowed, paid and credited and appearing in the Summary Statement together with the date of payment.
2. Claims presented and allowed but not paid.
3. Claims presented but rejected, and the date of and the reason for such rejection.
4. Contingent and possible claims.
5. Personal claims requiring approval by the court pursuant to SCPA §1805.

In the event of insolvency, preference of various claims should be stated, with the order of their priority.

### Schedule E
Statement of Distributions of Principal

This schedule must contain an itemized statement of all moneys paid and all property delivered from principal to the beneficiaries, legatees, trustees, surviving spouse or distributees of the deceased, the date of payment or delivery thereof, and the name of the person to whom payment or delivery was actually made.

Where estate taxes are required to be apportioned and payments have been made on account of the taxes, the amounts apportioned in Schedule K against beneficiaries of the estate shall be charged against the respective individuals share.

### Schedule F
Statement of New Investments, Exchanges and Stock Distributions

This schedule must contain an itemized statement of (a) all new investments made by the fiduciary with the date of acquisition and cost of all property purchased, (b) all exchanges made by the fiduciary, specifying dates and items received and items surrendered, and (c) all stock dividends, stock splits, right and warrants received by the fiduciary, showing the securities to which each relates and their allocation as between principal and income.

### Schedule G
Statement of Principal Remaining on Hand

This schedule must contain an itemized statement showing all property constituting principal remaining on hand including a statement of all uncollected receivables and property rights due to the estate.  Show the date and cost of all such property that was acquired by purchase, exchange or transfers made or received, together with the date of acquisition and the cost thereof and indicate such sums in the appropriate lines of the summary schedule.  Show all unrealized increases and decreases relating to assets on hand, and report the same in the appropriate places in the summary schedule.

### INCOME
### Schedule A-2

Statement of All Income Collected

This schedule must contain a full and complete statement of all interest, dividends, rents and other income received, and the date of each receipt.  Each receipt must be separately accounted for and identified, except that where a security had been held for an entire year, the interest or ordinary dividends may be reported on a calendar year basis.

### Schedule C-2
Statement of Administration Expenses Charged to Income

This schedule must contain an itemized statement of all moneys chargeable to income and paid for administration, maintenance and other expenses, together with the date and reason for each such expenditure.

### Schedule E-1
Statement of Distribution of Income

This schedule must contain an itemized statement of all moneys paid and of property delivered out of income to the beneficiaries, the date of payment or delivery thereof and the name of the person to whom payment or delivery was actually made.  If convenient, distributions of income to any one beneficiary may be reported by the calendar year.



**Schedule G-1**

Statement of Income on Hand

This schedule must contain a statement showing all undistributed income.

**Schedule H**

Statement of Interested Parties

This schedule must contain the names of all persons entitled as beneficiary, legatee, devisee, trustee, surviving spouse, distributee, unpaid creditor or otherwise to a share of the estate or fund, with their post office addresses and the degree of relationship, if any, of each to the deceased, and a statement showing the nature of and the value or approximate value of the interest of each such person.

This schedule also must contain a statement that the records of this court have been searched for powers of attorney and assignments and encumbrances made and executed by any of the persons interested in or entitled to a share of the estate and a list detailing each power of attorney, assignment and encumbrance, disclosed by such search, with the date of its recording and the name and address of each attorney in fact and of each assignee and of each person beneficially interested under the encumbrance to in the respective instruments, and also whether the accounting party had any knowledge of the execution of any such power of attorney or assignment not so filed and recorded.

**Schedule I**

Statement of Computation of Commissions

This schedule must contain a computation of the amount of commissions due upon this accounting. See Uniform Court Rule, §207.40 (d).

**Schedule J**

Statement of Other Pertinent Facts, and Cash Reconciliation

This schedule must contain a statement of all other pertinent facts affecting the administration of the estate and the rights of those interested therein. It must also contain a statement of any real property left by the decedent that it is not necessary to include as an estate asset to be accounted for, a brief description thereof, its gross value, and the amount of mortgages or liens thereon at the date of death of the deceased. A cash reconciliation must also be set forth in this schedule so that verification with bank statements and cash on hand may be readily made.

**Schedule K**

Statement of Estate Taxes Paid and Allocation Thereof

This schedule must contain a statement showing all estate taxes assessed and paid with respect to any property required to be included in the gross estate of the decedent under the provisions of the Tax Law or under the laws of the United States. This schedule must also contain a computation setting forth the proposed allocation of taxes paid and to be paid and the amounts due the estate from each person in whose behalf a tax payment has been made and also the proportionate amount of the tax paid by each of the named persons interested in this estate or charged against their respective interest, as provided in §2-1.8 of the Estates, Powers and Trusts Law.

Where an allocation of taxes is required, the method of computing the allocation of said taxes must be shown in this schedule.

-12-

## Orly Genger Trust

### Schedule A:
### Statement of Principle Received

**Real Estate**

| Item | Date Acquired | Description | Inventory Value |
|------|---------------|-------------|-----------------|
| 0 | | NONE | 0.00 |
| **TOTAL Real Estate** | | | **$0.00** |

**Stocks and Bonds**

| Item | Date Acquired | Description | Inventory Value |
|------|---------------|-------------|-----------------|
| 1 | 12/21/93 | 48% L.P. interest in D&K LP | See Schedule J |
| 2 | 10/3/11 | Economic interest of TPR Investment Associates, Inc. in $1,102.8 shares of Trans Resources, Inc. stock | See Schedule J |
| **TOTAL Stocks and Bonds** | | | **See Schedule J** |

**Mortgages, Notes, and Cash (Bank Accounts)**

| Item | Date Acquired | Description | Inventory Value |
|------|---------------|-------------|-----------------|
| 1 | 10/3/11 | TPR Investment Associates, Inc., settlement payment | $100,000 |
| 2 | 10/3/11 | Release of Guarantee of D&K LP 6.06% Note to TPR | See Schedule J |
| 3 | 5/15/12 | Orly Genger trust 3% note to TPR Investment Associates, Inc. | See Schedule J |
| 4. | 5/15/12 | Loan from Manhattan Safety Company, Ltd. | $200,000 |
| 5. | 5/22/12 | Refund by Delaware counsel - retainer not earned to date | $19,416.51 |
| **TOTAL Mortages, Notes, and Cash (Bank Accounts)** | | | **$319,416.51** |

**Life Insurance and Annuities Payable to Estate**

| Item | Date Acquired | Description | Inventory Value |
|------|---------------|-------------|-----------------|
| 0 | | NONE | 0.00 |
| **TOTAL Life Insurance and Annuities Payable to Estate** | | | **$0.00** |

**Miscellaneous**

| Item | Date Acquired | Description | Inventory Value |
|------|---------------|-------------|-----------------|
| 1 | 12/21/93 | Guarantee owed by trust of 48% of Note by D&K LP to TPR Investment Associates, Inc. | See Schedule J |
| **TOTAL Miscellaneous** | | | **See Schedule J** |
| **TOTAL Schedule A** | | | **$319,416.51 & See Schedule J** |

**Orly Genger Trust**

**Schedule A-1:**
**Statement of Increases on Sales, Liquidation or Distribution**

**Sales**

| Item | Date | Description | Net Proceeds | Inventory Value | Increases |
|------|------|-------------|--------------|-----------------|-----------|
| 0 | | NONE | 0.00 | 0.00 | 0.00 |
| **TOTAL Sales** | | | **$0.00** | **$0.00** | **$0.00** |

**Liquidation**

| Item | Date | Description | Net Proceeds | Inventory Value | Increases |
|------|------|-------------|--------------|-----------------|-----------|
| 0 | | NONE | 0.00 | 0.00 | 0.00 |
| **TOTAL Liquidation** | | | **$0.00** | **$0.00** | **$0.00** |

**Distribution (Assets Revalued to Market)**

| Item | Date | Description | Net Proceeds | Inventory Value | Increases |
|------|------|-------------|--------------|-----------------|-----------|
| 0 | | NONE | 0.00 | 0.00 | 0.00 |
| **TOTAL Distribution (Assets Revalued to Market)** | | | **$0.00** | **$0.00** | **$0.00** |
| TOTAL Schedule A-1 | | | $0.00 | $0.00 | $0.00 |

**Orly Genger Trust**

### Schedule A-2:
### Statement of Income Collected

**Rent**

| Item | Date | Description | Market Value |
|------|------|-------------|--------------|
| 0 |  | NONE | 0.00 |
| **TOTAL Rent** | | | **$0.00** |

**Other Income**

| Item | Date | Description | Market Value |
|------|------|-------------|--------------|
| 0 |  | NONE | 0.00 |
| **TOTAL Other Income** | | | **$0.00** |

| **TOTAL Schedule A-2** | **$0.00** |
|------------------------|-----------|

16

**Orly Genger Trust**

### Schedule B:
### Statement of Decreases Due to Sales Liquidation, Collection, Distribution or Uncollectibility

**Sales**

| Item | Date | Description | Net Proceeds | Inventory Value | Decrease |
|------|------|-------------|--------------|-----------------|----------|
| 0 | | NONE | 0.00 | 0.00 | 0.00 |
| TOTAL Sales | | | $0.00 | $0.00 | $0.00 |

**Liquidation**

| Item | Date | Description | Net Proceeds | Inventory Value | Decrease |
|------|------|-------------|--------------|-----------------|----------|
| 0 | | NONE | 0.00 | 0.00 | 0.00 |
| TOTAL Liquidation | | | $0.00 | $0.00 | $0.00 |

**Collection**

| Item | Date | Description | Net Proceeds | Inventory Value | Decrease |
|------|------|-------------|--------------|-----------------|----------|
| 0 | | NONE | 0.00 | 0.00 | 0.00 |
| **TOTAL Collection** | | | **$0.00** | **$0.00** | **$0.00** |

**Assets Revalued to Market for Distribution**

| Item | Date | Description | Net Proceeds | Inventory Value | Decrease |
|------|------|-------------|--------------|-----------------|----------|
| 0 | | NONE | 0.00 | 0.00 | 0.00 |
| **TOTAL Assets Revalued to Market for Distribution** | | | **$0.00** | **$0.00** | **$0.00** |

**Uncollectibility**

| Item | Date | Description | Net Proceeds | Inventory Value | Decrease |
|------|------|-------------|--------------|-----------------|----------|
| 0 | | NONE | 0.00 | 0.00 | 0.00 |
| **TOTAL Uncollectiblity** | | | **$0.00** | **$0.00** | **$0.00** |

**Abandoned, Lost, or Destroyed**

| Item | Date | Description | Net Proceeds | Inventory Value | Increases |
|------|------|-------------|--------------|-----------------|-----------|
| 0 | | NONE | 0.00 | 0.00 | 0.00 |
| **TOTAL Abandoned, Lost, or Destroyed** | | | **$0.00** | **$0.00** | **$0.00** |
| **TOTAL Schedule B** | | | **$0.00** | **$0.00** | **$0.00** |

**Orly Genger Trust**

## Schedule C:
## Statement of Funeral and Administration Expenses and Tax Charged to Principal

**Funeral Expenses**

| Item | Date | Description | Amount |
|------|------|-------------|--------|
| 0 | | NONE | 0.00 |
| **TOTAL Funeral Expenses** | | | |

**Administration Expenses**

| Item | Date | Description | Amount |
|------|------|-------------|--------|
| 1 | 10/7/11 | Retainer for legal expenses and expenses of Delaware counsel for litigation to establish trusts's rights vis-a-vis 1,102.8 shares Trans Resources Inc. stock | $50,000 |
| 2 | 11/7/11-6/6/12 | Legal expenses and expenses paid Pedowitz & Meister, LLP for litigation to establish trust's rights vis-a-vis 1,102.8 shares Trans Resources Inc. stock | $51,668.83 |
| 3 | 7/18/12 | Indemnification of Leah Fang for legal fees as former trustee. | $10,000 |
| **TOTAL Administration Expenses** | | | **$111,688.83** |

18

**Orly Genger Trust**

### Schedule C-1:
### Statement of Unpaid Administration Expenses

| Item | Date Billed | Description | Amount |
|------|-------------|-------------|--------|
| 1 | 3/5/09 – 3/4/13 | Legal fees and Expenses for Defense of Dalia Genger, Respondent Trustee in Surrogate's Court proceedings, paid to Pedowitz & Meister, LLP by Dalia Genger. | $189,327.47 |
| 2 | 4/8/13 | Legal fees and Expenses for Defense of Dalia Genger, Respondent Trustee in Surrogate's Court proceedings, not yet paid to Pedowitz & Meister, LLP by Dalia Genger. | $8,089.04 |
| 3 | 8/10/09 – 1/4/13 | Legal fees and Expenses for Defense of Dalia Genger, sued for alleged misconduct as Trustee, in *Orly Genger v. Dalia Genger et al.,* Index No. 109749/2009 (N.Y. Co., Sup. Ct.) paid to Pedowitz & Meister, LLP by Dalia Genger. | $223,313.18 |
| 4 | 2/6/13 – 4/8/13 | Legal fees and Expenses for Defense of Dalia Genger sued for alleged misconduct as Trustee in *Orly Genger v. Dalia Genger et al.,* Index No. 109749/2009 (N.Y. Co., Sup. Ct.) not yet paid to Pedowitz & Meister, LLP by Dalia Genger. | $69,817.66 |
| 5 | 10/1/10 – 6/6/12 | Legal fees and Expenses for Litigation by Dalia Genger as Trustee to establish trust's rights vis-à-vis 1,102.8 shares of Trans Resources Inc. stock paid to Pedowitz & Meister, LLP by Dalia Genger. | $24,839.00 |
| 6 | 1/14/13 | Legal fees and Expenses for Litigation by Dalia Genger as Trustee to establish trust's rights vis-à-vis 1,102.8 shares of Trans Resources Inc. stock not yet paid to Pedowitz & Meister, LLP by Dalia Genger. | $3,321.50 |
| 7 | 9/1/11, 1/14/13 | Legal Fees and Expenses for advice regarding claim for Trust to establish trust's right-s vis-à-vis 1,102.8 shares of Trans Resources Inc. stock paid to Pedowitz & Meister, LLP by Dalia Genger. | $16,484 |
| 8 | 3/21/12 | Trust's 1/5 share of invoice of Meyers Tersigni Feldman & Gray LLP for Supreme Court ordered meditation of Genger family litigiation | $3,456.00 |
| **TOTAL Schedule C-1** | | | **$538,647.85** |

**Orly Genger Trust**

**Schedule C-2:**
**Statement of Administration Expenses Chargeable to Income**

**Income Taxes**

| Item | Date Paid | Description | Amount |
|------|-----------|-------------|--------|
| 0 | | NONE | 0.00 |
| **TOTAL Income Taxes** | | | **$0.00** |

**Administration Expenses**

| Item | Date | Description | Market Value |
|------|------|-------------|--------------|
| 0 | | NONE | 0.00 |
| **TOTAL Administration Expenses** | | | **$0.00** |

| **TOTAL Schedule C-2** | **$0.00** |
|------------------------|-----------|

20

## Orly Genger Trust

### Schedule D:
### Statement of All Creditor's Claims

**(1) Claims presented, allowed, paid and credited and appearing in the Summary Statement, together with date of payment**

| Item | Date Billed | Description | Amount |
|------|-------------|-------------|--------|
| 0 | | NONE | 0.00 |
| **TOTAL Claims Paid** | | | $0.00 |

**(2) Claims presented and allowed but not paid**

| Item | Date Billed | Description | Amount |
|------|-------------|-------------|--------|
| 0 | | NONE | 0.00 |
| **TOTAL Claims Presented and Allowed but not Paid** | | | $0.00 |

**(3) Claims Presented but rejected**

| Item | Date Billed | Description | Amount |
|------|-------------|-------------|--------|
| 0 | | NONE | 0.00 |
| **TOTAL Claims Presented but Rejected** | | | $0.00 |

**(4) Contingent and possible claims**

| Item | Date Billed | Description | Amount |
|------|-------------|-------------|--------|
| 0 | | NONE | |
| **TOTAL Continent and Possible Claims** | | | |

**(5) Personal claims requiring approval by the court, pursuant to SPCA 1805**

| Item | Date Billed | Description | Amount |
|------|-------------|-------------|--------|
| 0 | | NONE | 0.00 |
| **TOTAL Claims Requiring Approval** | | | $0.00 |
| **TOTAL Schedule D** | | | **$0.00** |

**Orly Genger Trust**

### Schedule E:
### Statement of Distribution Made

**Specific Bequests**

| | |
|---|---|
| **TOTAL Specific Bequests** | $0.00 |

**General Bequests**

| | |
|---|---|
| **TOTAL General Bequests** | $0.00 |

**Residuary Bequests**

| | |
|---|---|
| **TOTAL Residuary Bequests** | $0.00 |
| **TOTAL Schedule E** | **$0.00** |

**Orly Genger Trust**

### Schedule E-1:
### Statement of Distribution of Income

| Item | Will/Codicil | Date | Person | Description | Value |
|------|-------------|------|--------|-------------|-------|
| 0 | NONE | | NONE | NONE | 0.00 |
| **TOTAL Distribution of Income** | | | | | **$0.00** |

23

**Orly Genger Trust**

**Schedule F:**
**Statement of New Investments, Exchanges and Stock Distribution**

**(a) New Investments**

| Date | Description | Value |
|------|-------------|-------|
| 0 | NONE | $ |
| **TOTAL New Investments** | | $ |

**(b) Exchanges**

| Item | Date | Item Surrendered | Inventory Value |
|------|------|------------------|-----------------|
| 1 | 12/21/93 | 48% guarantee of D&K LP $8.95 million 6.06% Note to TPR Investment Associates, Inc. | $4,296,000 |
| 2 | 10/3/11 | 48% L.P. interest in D&K L.P. | Unknown |
| 3 | 10/3/11 | Orly Genger Trust 3% Note to TPR Investment Associates, Inc. | $4,000,000 |
| 4 | 5/15/12 | Orly Genger Trust 3% Note to Manhattan Safety Company Ltd. | $4,240,000 |
| **TOTAL Exchanges** | | | $ |

**Orly Genger Trust**

## Schedule G:
## Statement of Principal Remaining on Hold

**Cash**

| Item | Description | Market Value |
|------|-------------|--------------|
| 1 | Cash | $207,747.68 |
| **TOTAL Cash** | | **$0.00** |

**Securities**

| Item | Description | Market Value |
|------|-------------|--------------|
| 1 | Economic interest in 1,102.8 shares of Trans-Resources, Inc. Stock | See Schedule J |
| **TOTAL Securities** | | See Schedule J |

**Other Property**

| Item | Description | Market Value |
|------|-------------|--------------|
| 0 | NONE | 0.00 |
| **TOTAL Other Property** | | **$0.00** |
| **TOTAL Schedule G** | | **$207,747.68 & See Schedule J** |

**Orly Genger Trust**

### Schedule G-1:
### Statement of Undistributed Income Remaining on Hand

**Cash**

| Item | Description | Market Value |
|------|-------------|--------------|
| 0 | NONE | 0.00 |
| **TOTAL Cash** | | **$0.00** |

**Other Property**

| Item | Description | Market Value |
|------|-------------|--------------|
| 0 | NONE | 0.00 |
| **TOTAL Other Property** | | **$0.00** |
| **TOTAL Other Property** | | **$0.00** |

26

**Orly Genger Trust**

### Schedule H:
### Statement of Interested Parties

Persons of full age and sound mind entitled to share in estate (beneficiary, legatee, devisee, trustee, surviving spouse, distributee, unpaid creditor, etc.):

| Name and Post Office Address | Relationship, if any | Nature of Interest and Approximate Value |
|---|---|---|
| Orly Genger | Daughter of Arie Genger (grantor) | Beneficiary |
| Sagi Genger | Son of Arie Genger (Grantor) | Lifetime Beneficiary of Sagi Genger 1993 Trust |
| Sagi Genger 1993 Trust | Contingent remainderman | Contingent remainderman |
| Dalia Genger | Trustee | |
| Leah Fang | Prior trustee | Trustee from April 26, 2007 to January 4, 2008 |

Persons under disability entitled to share in estate (beneficiary, legatee, devisee, surviving spouse, distributee, unpaid creditor, etc.):

The records of the Surrogate's Court of ***Surrogate Court County*** County have been searched for powers of authority, assignments and encumbrances made and executed by any of the persons interested in or entitled to a share of the estate and the following have been found:

| Power of attorney or assignment of encumbrance | Date of Recording | Attorney name and address | Assignee name and address | Person Beneficially Interested Name and Address |
|---|---|---|---|---|
| None | None | None | None | None |

27

### Schedule J
Statement of Other Pertinent Facts, and Cash Reconciliation

### The Orly Genger 1993 Trust

The Orly Genger 1993 Trust was created in 1993 by agreement between the Grantor, Arie Genger, and the original Trustees. A copy of that agreement is **Exhibit A.**

### D&K LP

When Dalia Genger first became Trustee of the Orly Trust, in January 2008, the Trust held a highly illiquid 48% limited partnership interest in D&K LP ("D&K") and had guaranteed D&K's Note to TPR Investors, Inc. ("TPR"), then owned by the Grantor, Arie Genger. The value of these assets are currently subject to litigation and therefore are currently of undetermined value.

D&K was also created in 1993. On its creation, D&K purchased 240 shares of TPR stock paying $1,250,000, which Arie Genger and Dalia Genger (then married) contributed, and D&K's $8,950,000, 6.06% interest-bearing, secured, ten-year Note TPR (the "D&K Note"). The D&K Note was secured by D&K's simultaneous pledge of those purchased 240 shares of TPR stock and guaranteed as to 48% by the Orly Trust. The Orly Trust's guarantee expressly provides "that the Holder may enforce this Note, to the extent of such liability, as if the [Orly Trust] were the Maker thereof." (Emphasis added.) That guarantee was signed in 1993 for the Orly Trust by its trustees at that time, who did not include Dalia Genger.

D&K was a special purpose entity that had no assets other than the 240 TPR shares. Through dividends from TPR, D&K made payments on the D&K Note until 1999 but then the dividends stopped. Those payments are listed on a schedule that Dalia's former husband

28

produced their divorce proceeding, showing that as of the end of 2006, D&K owed over $10.4 million on the D&K Note.

In October, 2004, as part of the settlement of their divorce, Dalia Genger and her former husband paid 4% of the then balance of the D&K Note, and after that amount of the remainder of the D&K Note that the Orly Trust had guaranteed exceeded $4.5 million. In her first Petition to this Court that life beneficiary Orly Genger (Orly) verified on December 27, 2007 (¶ 7 a. (iii)), Orly admitted that with respect to the D&K Note "the Trust is indebted in the amount of approximately $4.5 million," and as recently as October 15, 2012, Orly's Third Amended Petition (¶29) admits that "as of mid-2006, the D&K Note 'had an approximate value of $11,000,000 as a result of accrued interest.'"

On August 31, 2008, while Dalia was under Surrogate Roth's direction to take no action, TPR declared that the D&K Note was in default, and TPR subsequently foreclosed on D&K's TPR shares that D&K had pledged to secure the Note. Trustee, Dalia Genger did not participate in the foreclosure; after consulting counsel, she did not see any way to prevent it. TPR completed the foreclosure on D&K's pledged 240 TPR shares in February, 2009, and that after the proceeds of that foreclosure sale TPR stated that the D&K Note balance exceeded $9 million. See TPR's document which is **Exhibit B.** Thus after the 2009 foreclosure, the Orly Trust owed TPR more than $4.5 million on its guarantee of the D&K Note, and D&K had no other assets.

### The Orly Trust's Interest in TRI Shares

Pursuant to Dalia Genger and Arie Genger's 2004 Divorce Settlement Agreement, on October 29, 2004, Dalia's former husband, Arie Genger, caused TPR to *purport* to sell the Orly Trust 1,102.8 Shares of the common stock of Trans-Resources, Inc. ("TRI"), which the Orly Trust agreed to the purchase for $1 a share, acting through its trustees at the time, not the current

29

trustee Dalia Genger. The Orly Trust purchased the 1,102.8 shares for one dollar per share, a total of $1,102.80. A copy of the purchase and sale agreement is **Exhibit C hereto.**

However, in July and August, 2010, In *TR Investors, LLC et al. v Arie Genger*, C.A. No. 3994-VCS, the Delaware Chancery Court held that the 2004 purported sale of TRI shares violated the TRI stockholders agreement and was therefore void. **Exhibit D.** That decision raised the question as to whether the Orly Trust had acquired <u>any interest at all</u> in the Orly Trust TRI Shares in 2004 or whether they still belonged to TPR. And under the TRI shareholders agreement, the other shareholders has the right to purchase any shares purportedly transferred in violation of its terms at a price set by that agreement. And in 2008, TPR had agreed to sell the Orly Trust TRI Shares for $10.3 million to the Trump Group, at the Trump Group's option.

Because of this question, after the Delaware Chancery Court decision, Trustee, Dalia Genger, entered into an escrow agreement, as Trustee of the Orly Trust, pursuant to which the Trump Group, TPR, the Orly Trust, and <u>Orly Genger herself</u> agreed that if the Trump Group did purport to purchase the Orly Trust TRI Shares from TPR, the purchase price would be held in escrow by counsel for Dalia Genger, Trustee, pending a final determination by the Delaware Supreme Court of the ownership of those TRI shares or an agreement of all parties, including Orly. When the Trump Group did subsequently purport to purchase the Orly Trust TRI Shares from TPR for $10.3 million, those funds were deposited into the escrow, where they remain today.

In October, 2010, also in response to the Delaware Chancery Court decision, Trustee Dalia Genger filed a breach of contract action against her former husband seeking damages *for*

*the Orly Trust* arising from his failure to cause the transfer of the Orly Trust TRI Shares to the

Orly Trust. *Dalia Genger, as Trustee on behalf of the Orly Genger 1993 Trust, and Dalia

Genger, in her individual capacity v. Arie Genger*, Sup. Ct., N.Y. Co., index no. 113862/2010.

In July, 2011, on appeal, the Delaware Supreme Court ruled that the 2004 sale did not

transfer record or legal title to the TRI shares, but because the Orly Trust was not a party, the

Court held that it lacked personal jurisdiction to decide who owned the beneficial interest in the

Orly Trust TRI Shares. *Genger v.TR Investors et al.,* 26 A.3d 180 (De. 2011).

After that decision, Trustee Dalia Genger acted to protect the Orly Trust's interest in the

Orly Trust TRI Shares. In October, 2011, as Trustee of the Orly Trust, Dalia Genger entered into

a Settlement Agreement with TPR and D&K. **Exhibit E.**[1] As Trustee, Dalia Genger has the

legal authority to settle claims by and against the Trust. *See* N.Y. E.P.T.L. § 11-1.1(13) (A

trustee has the power "[t]o contest, compromise or otherwise settle any claim in favor of the

estate, trust or fiduciary or in favor of third persons and against the estate, trust or fiduciary.");

see also Orly Genger 1993 Trust Agreement, Eleventh Article, Sec. 7 at page 26 (which states

that "[i]n addition to and in amplification of the powers given by law to trustees," the trustee of

the Orly Trust shall have the power "[t]o settle, adjust, compromise, or submit to arbitration any

dispute, claim, or controversy in which any trust hereunder may be in any way interested.")

**Exhibit A.**

This settlement with TPR and D&K was beneficial to the Orly Trust's interests. Prior to

the settlement the Orly Trust owed TPR approximately $4.5 million on its guarantee of the D&K

---

[1] While the original Settlement Agreement provided it was controlled by Delaware Law and for exclusive
Delaware jurisdiction over any disputes, subsequently the original settlement agreement was amended
and restated to provide that it is controlled by New York law and that Delaware jurisdiction is non-
exclusive.

Note.  The settlement (i) cancelled that liability; (ii) instead the Orly Trust issued a new $4

million, 3% unsecured Note to TPR (the "Orly Trust Note")(**Exhibit F**), (iii) TPR paid the Orly

Trust $100,000, which provided moneys to pay for some of litigation expenses to establish the

interest of the Orly Trust with respect to the Orly Trust TRI Shares, and (iv) the Trust

relinquished its interest in D&K LP.  (**Exhibit E,** Settlement Agreement ¶1, pg. 4). Thus the Orly

Trust gained $600,000.

In addition, in the settlement TPR relinquished to the Orly Trust any economic interest

TPR had in the Orly Trust TRI Shares and assigned TPR's rights to any economic benefits of the

TRI shares to the Orly Trust.  This includes, but is not limited to, any proceeds from TPR's

purported 2008 sale thereof, *i.e.,* the $10.3 million otherwise owed to TPR pursuant to TPR's

August 22, 2008 letter agreement with the Trump entities if a court determines that such sale

conveyed the Orly Trust TRI Shares to the Trump Group.  This is a benefit to the Orly Trust of at

least the $10.3 million that Trustee, Dalia Genger's attorneys hold in escrow, and possibly more

as Orly has contended in her November 5, 2008 letter to this Court, **Exhibit G.**

Shortly thereafter, Dalia Genger, as Trustee, commenced an action in Delaware Chancery

Court seeking a declaration that the Orly Trust was the beneficial owner of all the TRI shares

that it purported to purchase in 2008 and was entitled to all dividends thereon and related relief.

However, Orly obtained a Temporary Restraining Order from the New York Supreme Court,

N.Y. Co., enjoining Dalia Genger from prosecuting that action.  While the Supreme Court never

decided Orly's motion for a preliminary injunction and in fact in January, 2013, dismissed all

claims against Dalia Genger, that Court purported to continue the TRO staying her prosecution

of the Delaware action.

32

In or about May, 2012, TPR decided to sell the Orly Trust Note to Manhattan Safety Company, Ltd. ("Manhattan"), which agreed to loan an additional $200,000 to the Orly Trust. Trustee Dalia Genger anticipated the need for additional funds for its litigation to establish the Orly Trust's right with respect to the Orly Trust TRI shares. Thus, Dalia Genger, as Trustee, entered into a new Credit and Forbearance Agreement and Second Amendment and Restated Promissory Note with Manhattan together with new unsecured Notes (**Exhibit H**); the Orly Trust's 2011 Note to TPR was returned to the Orly Trust (**Exhibits I**) and on May 15, 2012, Manhattan wired into Dalia Genger's lawyer's escrow account the $200,000 for the benefit of the Orly Trust, where it remains. After this new Agreement and Notes, the Orly Trust's debt was $4.2 million, still less that its prior $4.5 obligation to TPR as guarantor of the D&K Note, and the Trust has received a S100,000 payment from TPR and a $200,000 loan from Manhattan.

Dalia Genger personally received no funds from the Settlement or the transaction with Manhattan. Indeed she has received no funds from the Trust – the Trust Agreement provides that the Trustee shall receive no commissions. *See* **Exhibit A,** Orly Genger 1993 Trust Agreement, Eighth Article, at page 18.

**Orly Genger Trust**

**Schedule K:**
**Statement of Estate Taxes Paid and Allocated Thereof**

**Federal Estate Tax**
Tax due: $0.00
Tax paid: $0.00

**State Estate Tax**
Tax due: $0.00
Tax paid: $0.00

**Allocation of Taxes**

34

For Office Use Only

Filing Fee Paid $ _____
Receipt No: _____

## DO NOT LEAVE ANY ITEMS BLANK

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF New York

-----------------------------------------------------------------------X

ACCOUNTING BY  Dalia Genger

as successor Trustee of the Orly Genger Irrevocable Trust
established by Agreement dated December 31, 1993, attached
as Exhibit A, for the period January 4, 2008 through April 30, 2013

-----------------------------------------------------------------------X

PETITION FOR JUDICIAL
SETTLEMENT OF ACCOUNT OF

[ ]    Executor
[ ]    Administrator
[ x ]   Trustee
[ ]    Other [specify]_____

File No. 0017/2008/A

TO THE SURROGATE'S COURT, COUNTY OF New York

It is respectfully alleged:

1.    The name(s), and address(es) of the petitioner(s), the type and date of letters issued, and the amount and surety of petitioner's (s') bond, if any, are as follows:

Name:  Dalia Genger

Address:  200 East 65th Street                                                New York
              (Street Address)                                              (City/Town/Village)

New York                NY                10065              (212) 446-1290
(County)                (State)            (Zip)            (Telephone Number)

Mailing address: _____
              (if different from above)

Type of Accounting: Interim _____

Amount of bond: $  0.00

2.    The grantor's name and domicile are as follows:

Name:  Arie Genger

Domicile:  2600 Island Boulevard                                    Williams Island, Aventura
              (Street Address)                                      (City/Town/Village)

Florida                                                          33160
_____                    _____
                (State)                                         (Zip Code)

County of: Miami-Dade _____

3.   The petitioner(s) present (s) and render (s) herewith, a verified account of petitioner's (s') proceedings in this
     estate or trust, for the period from January 4, 2008   to April 30, 2013 _____, showing the gross value
     of assets, including principal and income, to be the sum of $ 207,747.68 & see Schedule J.

4.   [ ]    (a)   An order was entered in this Court on _____, 20___.

            [ ]   Exempting the estate from tax

            [ ]   Fixing and assessing the tax due

     [Attach a copy of the tax order and receipt]

     [ ]    (b)   The following return (s) (was) (were) filed:

            [ ]   ET-90  [For decedent's dying on or after May 25, 1990].
                  A copy was filed with the Surrogate's Court          [ ] Yes        [ ] No

            [ ]   TT-385 [For decedent's dying before May 25, 1990]

            [ ]   706 or 706NA

     The estate taxes with respect to this estate were paid in full.
     [Attach a copy of letter of discharge.]

     [x]    (c.)  No tax proceeding or return was required for this estate.

5.   The rendering of such account at this time is proper because
     check appropriate reason]

     [ ]    seven months have elapsed since letters were issued to petitioner(s);

     [ ]    letters issued to the petitioner(s) have been revoked,

     [ ]    more than one year has elapsed since the preceding account of the petitioner(s)
            was settled;

     [x]    other reason [specify]: Compulsory account pursuant to Court Order.

6.   The names and post-office addresses of all persons and parties interested in this proceeding who are required to
     be cited under the provisions of Surrogate's Court Procedure Act §2210, or otherwise, or concerning whom or
     which the Court is required to have information, are set forth in subdivision (a) or (b):

     (a)    All persons and parties so interested herein who are of full age and sound mind, or which are
            corporations or associations, are as follows:

| Name | Nature of Interest | P.O. Address |
|------|--------------------|--------------|
| Orly Genger | Beneficiary, Arie Genger's daughter | 780 Greenwich Avenue, #4P |
|  |  | New York, NY 10014 |
|  |  |  |

| Sagi Genger 1993 Trust | Contingent remainderman | c/o John Dellaportas, Esq. |
| | | Duane Morris, LLP |
| | | 1540 Broadway, NY, NY 10036-4086 |
| | | |
| Sagi Genger | Lifetime Beneficiary of | 1211 Park Avenue |
| | Sagi Genger 1993 Trust | New York, NY 10128 |
| | Orly Genger's brother | |
| | | |
| Leah Fang | Trustee from 4/26/07 until 1/4/08 | 630 First Avenue, #25G |
| | | New York, NY 10016 |

(b)  All persons so interested herein who are infants or incompetents or persons believed to be mentally incapable to adequately protect their rights, or persons whose existence, identity, or whereabouts are unknown (including persons who are virtually represented under SCPA §315) are as follows:

[Furnish all information specified in **NOTE** at bottom of page]

| Name | Nature of Interest | P.O. Address |
| NONE | | |
| | | |
| | | |
| | | |
| | | |

[NOTE: In the case of each infant, state   (a)  name, birth date, age, nature of interest, domicile, residence address, and the person with whom he/she resides;   (b)  whether or not he/she has a guardian or testamentary guardian, and whether or not his/her father, or if he/she be dead, his/her mother is living; and   (c) the name and post office address of any guardian and any living parent. In the case of each incompetent or person incapable of adequately protecting his/her rights, state   (a) name, nature of interest, and post office address;   (b) facts regarding his/her incompetency, including whether or not a committee has been appointed and whether or not he/she has been committed at any institution;   (c) the names and post office addresses of any committee, conservator, guardian, and person or institution having care and custody of him/her, and any relative or friend having an interest in his/her welfare. In the case of unknowns, describe in identical language to be used in citation for publication. In the case of a person confined as a prisoner, state place of incarceration. With respect to virtual representation see Uniform Court Rule, §207.18.]

7.   There are no persons interested in this proceeding other than those herein about mentioned.

8.   No prior application has been made to this or any other court for the relief requested in this
petition.

WHEREFORE the petitioner(s) pray (s) that the account of proceedings be judicially settled
and Attorneys' fees be awarded.

[specify any other relief requested.]

_____

_____

_____

_____

_____

and that process be issued to all necessary parties who have not appeared to show cause why the relief requested should
not be granted; and that an order be granted directing the service of process pursuant to the provisions of  SCPA Article 3
upon such persons named in Paragraph   (6)   whose names or whereabouts are unknown and cannot be ascertained or
who may be persons on whom service by personal delivery cannot be made.

Dated: May  9  , 2013

1.   _____         2.   _____
        (Signature of Petitioner)                              (Signature of Petitioner)


     Dalia Genger                                               _____
        (Print Name)                                                  (Print Name)


3.   _____
        (Name of Corporate Petitioner)

     _____
        (Signature of Officer)

     _____
        (Print Name and Title of Officer)

VERIFICATION

[For use when petitioner is an individual]

STATE OF NEW YORK          )
COUNTY OF   NEW YORK          )   ss.:

The undersigned, the petitioner (s), named in the foregoing petition, being duly sworn, say (s): (I) (We) have read the foregoing petition subscribed by me (us) and know the contents thereof, and the same is true of (my) (our) own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters (I) (we) believe it to be true.

_____
(Signature of Petitioner)

Dalia Genger
_____
(Print Name)

_____
(Signature of Petitioner)

_____
(Print Name)

Sworn to before me on _____ day of
_____May_____, 2013

Notary Public/
Commission/Expires:
(Affix Notary Stamp or Seal)

ROBERT A. MEISTER
Notary Public, State of New York
No. 31-02ME2653350
Qualified in New York County
Commission Expires March 30, 2014

Signature of Attorney: _____

Print Name:   Robert A. Meister

Name of Attorney: Pedowitz & Meister, LLP          Tel. No.: 212-403-7330

Address of Attorney:   570 Lexington Avenue, 18th Fl, New York, NY 10022

# EXHIBIT "A"

TRUST AGREEMENT

BETWEEN



ARIE GENGER

AS GRANTOR

AND

LAWRENCE M. SMALL AND SASH A. SPENCER

AS TRUSTEES

CREATING

THE ORLY GENGER 1993 TRUST

Dated:  December  _13_ , 1993

Copy 2 of 4

RUBIN BAUM LEVIN CONSTANT & FRIEDMAN

30 ROCKEFELLER PLAZA  •  NEW YORK, N.Y. 10112

DG 01005

## Index to the Orly Genger 1993 Trust Agreement

| Article | Contents | Page |
|---|---|---|
| FIRST: | Disposition of Principal and Income During the Life of the Grantor's Daughter, ORLY GENGER . . . . . . . . . . . . . . . . | 1 |
| SECOND: | Continuing Trust for Descendants of the Grantor's Daughter, ORLY GENGER . . . . . . | 5 |
| THIRD: | Disposition of Property if No Descendant of the Grantor is Living . . . . . . . . . . | 9 |
| FOURTH: | Additions to the Trusts . . . . . . . . . . . . | 13 |
| FIFTH: | Irrevocability . . . . . . . . . . . . . . . . | 13 |
| SIXTH: | Governing Law . . . . . . . . . . . . . . . . | 13 |
| SEVENTH: | Trustees . . . . . . . . . . . . . . . | 13 |
| EIGHTH: | Compensation of Trustees . . . . . . . . . . | 18 |
| NINTH: | Settlement of Trustees' Accounts; Exoneration of Trustees . . . . . . . . . . . . | 18 |
| TENTH: | Definitions . . . . . . . . . . . . . . . . . | 21 |
| ELEVENTH: | Administrative Powers . . . . . . . . . . . . | 22 |
| TWELFTH: | Provisions Relating to the GST . . . . . . . . | 32 |
| THIRTEENTH: | Release of Powers . . . . . . . . . . . . . | 37 |
| FOURTEENTH: | Provision with Respect to Closely Held Businesses . . . . . . . . . . . . | 38 |
| FIFTEENTH: | Headings . . . . . . . . . . . . . . . . | 39 |
| SIXTEENTH: | Severability . . . . . . . . . . . . . . . . | 39 |