TRUST AGREEMENT dated December /3 , 1993, between ARIE GENGER (now residing at 1067 Fifth Avenue, New York, New York), as Grantor, and LAWRENCE M. SMALL (now residing at 2804 Woodland Drive, Washington, D.C. 20008) and SASH A. SPENCER (now residing at 251 Crandon Boulevard, Townhouse 164, Key Biscayne, Florida 33149), as Trustees.

The Grantor hereby transfers to the Trustees, and the Trustees hereby acknowledge receipt of, the sum of Six Hundred Thousand Dollars ($600,000.00), to be held, administered and disposed of in accordance with the provisions of Article FIRST hereof. Said sum and any other property that may be received by the Trustees pursuant to the provisions of Article FOURTH hereof, and all investments and reinvestments thereof, and all proceeds thereof which constitute principal, are hereinafter collectively called "principal."

This Trust Agreement shall be known as the "Orly Genger 1993 Trust Agreement" and the trust created by Article FIRST hereof shall be known as the "Orly Genger 1993 Trust."

FIRST:  Disposition of Principal and Income During the Life of the Grantor's Daughter, ORLY GENGER.

A.   The Trustees shall hold, manage, invest and reinvest the principal of the trust created by this Article, IN TRUST, and, so long as the Grantor's daughter, ORLY GENGER, shall live, the Trustees are authorized and empowered to pay such part, parts or all, if any, of the net income of the trust

DG 01007

created by this Article (hereinafter referred to in this Article as "Orly's Trust") to, or apply such part, parts or all, if any, of such net income for the use or benefit of, such one or more of the following individuals living from time to time in such equal or unequal amounts or proportions, and at such time or times, as the Trustees, in their discretion, shall determine:

      1.   The Grantor's daughter, ORLY GENGER.

      2.   Each descendant of ORLY GENGER.

The Trustees shall accumulate all income of Orly's Trust not so paid to or applied and, at least annually, add such net income to the principal of Orly's Trust.

      In making such distributions, the Trustees are requested (but they are not directed) to limit the total amount of the distributions made to any descendant of ORLY GENGER with respect to any calendar year to the amount necessary to increase such descendant's taxable income for United States income tax purposes for such year to the greatest amount that shall still result in such descendant not being subject to United States income taxes at the highest marginal rate in effect for such year, after taking into account all of such descendant's other income and deductions for such year.

      B.   The Trustees are authorized and empowered to pay to, or apply for the use or benefit of, the Grantor's said daughter such part, parts or all, if any, of the principal of Orly's Trust, and at such time or times, as said Trustees, in

-2-

DG 01008

their discretion, shall determine, without regard to the interest in the trust of any other person and without regard to the fact that any such payment or application may result in the termination of Orly's Trust.

C.    Upon the death of the Grantor's said daughter, the Trustees shall pay the then principal of Orly's Trust, together with all net income thereof then accrued but not yet collected; and collected but not yet disposed of, as follows:

1.    The Trustees shall pay one-half (1/2) of such income and principal, in such equal or unequal amounts or proportions, to or for the use or benefit of such one or more of the descendants of the Grantor's said daughter, and upon such terms, conditions and trusts, if any, as the Grantor's said daughter, by a provision in her Will expressly referring to this Article of this Trust Agreement, shall validly direct and appoint. If, or to the extent that, the Grantor's said daughter shall fail so validly to direct and appoint such principal and income, the Trustees, at the death of the Grantor's said daughter, shall pay the same, per stirpes, to such of the descendants of the Grantor's said daughter as shall survive her, subject, however, to the provisions of Article SECOND hereof, or, if no descendant of the Grantor's said daughter shall survive her, per stirpes, to such of the Grantor's descendants as shall so survive, or, if no descendant of the Grantor shall so survive, in accordance with the provisions of Article THIRD hereof.

-3-

DG 01009

2.    The Trustees shall pay one-half (1/2) of
such income and principal, per stirpes, to such of the descen-
dants of the Grantor's said daughter as shall survive her, sub-
ject, however, to the provisions of Article SECOND hereof, or,
if no descendant of the Grantor's said daughter shall survive
her, per stirpes, to such of the Grantor's descendants as shall
so survive, or, if no descendant of the Grantor shall so sur-
vive, in accordance with the provisions of Article THIRD hereof

3.    If, pursuant to the provisions of paragraph
1 or paragraph 2 of this Section C, the Trustees are directed to
pay a per stirpital share of such income and principal to a
descendant of the Grantor, and if at the time the Trustees are
so directed there shall be in existence a trust for such descen-
dant under a trust agreement between Arie Genger, as grantor,
and Lawrence M. Small and Sash A. Spencer, as trustees, executed
on the date hereof and known as the "Sagi Genger 1993 Trust
Agreement," the Trustees shall not pay such per stirpital share
to such descendant but shall instead pay such per stirpital
share to the trustees then acting under said trust agreement, to
be disposed of by them pursuant to the provisions of the trust
for such descendant under said trust agreement.

D.    Notwithstanding anything herein to the contrary,
if any Trustee hereunder shall be one of the potential income
beneficiaries of Orly's Trust, such Trustee shall not, in his or
her capacity as such a Trustee, have any voice or vote or other-

-4-

DG 01010

wise participate in any decision pertaining to the payment or application of the income or principal of Orly's Trust to or for the use or benefit of him or her in his or her capacity as a beneficiary of such trust or to or for the use or benefit of any person whom he or she has an obligation to support, and, in each such event, the other Trustee or Trustees shall make all decisions relating to such trust that pertain to such matters.

SECOND:    Continuing Trusts for
Descendants of the Grantor's Daughter,
ORLY GENGER.

A.    If, under any provision of this Trust Agreement, any property is directed to be paid to a descendant of the Grantor's daughter, ORLY GENGER, subject to the provisions of this Article, such property shall not be distributed or paid to such descendant. Instead, the Trustees shall continue to hold such property, IN TRUST (in a separate trust for each such descendant which is referred to in this Article as "such descendant's trust"; provided, however, that if there shall be property so directed to be paid on more than one occasion to any such descendant, all such property shall be held in a single trust for such descendant), and, so long as such descendant shall live before attaining the age of twenty-one (21) years, the Trustees, other than such descendant if he or she shall be a Trustee hereunder, are authorized and empowered to pay to, or apply for the use or benefit of, such descendant, such part, parts or all, if any, of the net income of such descendant's

-5-

DG 01011

trust, and at such time or times, as said Trustees, in their discretion, shall determine, and the Trustees shall accumulate the balance of such net income, if any, and, at least annually, add it to the principal of such descendant's trust, and, so long as such descendant shall live after attaining the age of twenty-one (21) years, the Trustees shall pay to such descendant all of the net income of such descendant's trust in at least quarterly installments.

B.   The Trustees, other than such descendant if he or she shall be a Trustee hereunder, are authorized and empowered to pay to, or apply for the use or benefit of, such descendant, such part, parts or all, if any, of the principal of such descendant's trust, and at such time or times, as said Trustees, in their discretion, shall determine, without regard to the interest in the trust of any other person and without regard to the fact that any such payment or application may result in the termination of the trust.'

C.   Upon the death of such descendant (hereinafter referred to in this Article as "such deceased descendant"), the Trustees shall pay the then principal of such deceased descendant's trust, together with all net income thereof accrued but not yet collected, and collected but not yet disposed of, as follows:

-6-

DG 01012

1.   The Trustees shall pay one-half (1/2) of such income and principal, in such equal or unequal amounts or proportions, to or for the use or benefit of such one or more of the descendants of such deceased descendant, and upon such terms, conditions and trusts, if any, as such deceased descendant, by a provision in his or her Will expressly referring to this Article of this Trust Agreement, shall validly direct and appoint. If, or to the extent that, such deceased descendant shall fail so expressly and so validly to direct and appoint such principal and income, the Trustees shall, at the death of such deceased descendant, pay the same, per stirpes, to such of the descendants of such deceased descendant as shall survive such deceased descendant, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, per stirpes, to such of the descendants as shall so survive of the ancestor of such deceased descendant closest in degree of relationship to such deceased descendant who (i) shall have descendants who shall so survive and (ii) shall have been a descendant of the Grantor or shall have been the Grantor, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, in accordance with the provisions of Article THIRD hereof.

2.   The Trustees shall pay one-half (1/2) of such income and principal, per stirpes, to such of the descendants of such deceased descendant as shall survive such deceased

-7-

DG 01013

descendant, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, per stirpes, to such of the descendants as shall so survive of the ancestor of such deceased descendant closest in degree of relationship to such deceased descendant who (i) shall have descendants who shall so survive and (ii) shall have been a descendant of the Grantor or shall have been the Grantor, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, in accordance with the provisions of Article THIRD hereof.

3.   If, pursuant to the provisions of paragraph 1 or paragraph 2 of this Section C, the Trustees are directed to pay a per stirpital share of such income and principal to a descendant of the Grantor subject to the provisions of this Article, and if at the time the Trustees are so directed there shall be in existence a trust for such descendant under a trust agreement between Arie Genger, as grantor and Lawrence M. Small and Sash A. Spencer, as trustees, executed on the date hereof and known as the "Sagi Genger 1993 Trust Agreement," the Trustees shall not pay such per stirpital share to such descendant subject to the provisions of this Article but shall instead pay such per stirpital share to the trustees then acting under said trust agreement, to be disposed of by them pursuant to the provisions of the trust for such descendant under said trust agreement.

-8-

D.    Notwithstanding anything herein to the contrary, each trust created by the terms of this Article shall terminate, if not sooner terminated, upon the expiration of twenty-one (21) years after the death of the last surviving descendant of the Grantor's parents, SHARGA GENGER and DORA GENGER, who shall have been in being on the date hereof; and the Trustees shall thereupon pay the then principal of any trust terminated in accordance with the provisions of this Section, together with all net income thereof accrued but not yet collected and collected but not yet disposed of, to the descendant of the Grantor with respect to whom such trust is being held.

THIRD:    Disposition of Property if No Descendant of the Grantor is Living.

A.    As used in this Article:

1.    The words "such time" shall mean the time as of which any property is directed to be paid in accordance with the provisions of this Article.

2.    The term "Qualified Charitable Organization" shall mean an organization that shall be qualified as an organization to which contributions and bequests are deductible for both United States income tax, gift tax and estate tax purposes under the provisions of Section 170, Section 2522 and Section 2055 of the Internal Revenue Code.

-9-

DG 01015

B.   If, under any provision of this Trust Agreement, any property is directed to be paid in accordance with the provisions of this Article, the Trustees shall pay such property as follows:

1.   If the Grantor, the Grantor's spouse and/or any one or more descendants of the Grantor shall have caused there to be created a foundation known as The Genger Foundation, and if at such time said Foundation shall be in existence and shall be a Qualified Charitable Organization, then, in such event, the Trustees shall pay such property to said Foundation.

2.   If at such time either The Genger Foundation created as aforesaid shall not be in existence or said Foundation shall be in existence but shall not be a Qualified Charitable Organization, and if at such time the Trustees are authorized under applicable law to cause to be organized a corporation under and in accordance with the laws of any state of the United States which the Trustees, in their discretion, shall select, which corporation (i) shall be known by the name of The Genger Foundation (or by such other name as the Trustees, in their discretion, shall select if the name of The Genger Foundation shall not be available to be utilized as the name of said corporation), (ii) shall have as its purposes the encouragement, promotion, support and enhancement of non-orthodox study and education for children in the State of Israel pertaining to the customs, practices and ancient and modern history of the Jewish

-10-

people and shall maintain all of the property held by it, and use all of the net income thereof received from time to time, for the encouragement, promotion, support and enhancement of such study and education for children, (iii) shall be required to maintain all of the property held by it, and use all of the net income thereof received from time to time, for such purposes, with such property and income to be expended for such purposes in such amounts, at such time or times and to or for the use or benefit of such recipient or recipients as the directors, trustees and/or the officers of such corporation shall, in their discretion, determine from time to time, subject, however, to the other provisions of this paragraph 2, (iv) shall have as its initial directors or trustees the Trustees hereunder, the Grantor's cousin, JEREMIAH WOHLBERG (now residing at 2325 Lindenmere Drive, Merrick, New York), if he shall not then be a Trustee hereunder, and also such other individual or individuals, if any, as may be designated by the Trustees, and thereafter to have as directors or trustees such individuals as shall from time to time be determined as provided for in the certificate of incorporation and/or by-laws of said corporation, and (v) shall be organized and maintained in such manner as to be and continue to be a Qualified Charitable Organization, then, in such event, the Trustees shall organize such a corporation, and the Trustees shall pay such property to such corporation.

-11-

DG 01017

3.   If at such time (i) either The Genger Foundation created as aforesaid shall not be in existence or said Foundation shall be in existence but shall not be a Qualified Charitable Organization, and (ii) the Trustees are not authorized under applicable law to cause to be organized a corporation of the nature referred to in paragraph 2 of this Section B, then, in such event, the Trustees shall pay such property to the JEWISH COMMUNAL FUND OF NEW YORK, New York, New York, to be held, administered and disposed of pursuant to the rules and regulations thereof as an Undesignated Philanthropic Fund to be known as the Genger Philanthropic Fund and with the privilege of making advisory recommendations with respect thereto to be held in the first instance by the Trustees, said JEREMIAH WOHLBERG, if he shall not then be a Trustee hereunder, and also by such other individual or individuals, if any as the Trustees may designate, and thereafter by such other individual or individuals as such designees and their successors acting in such capacity may from time to time designate, and it is requested (but not directed) that the principal and income of such Fund shall be utilized to encourage, promote, support and enhance non-orthodox study and education for children in the State of Israel pertaining to the customs, practices and ancient and modern history of the Jewish people.

-12-

DG 01018

FOURTH:   Additions to the Trusts.

Any person, including the Grantor, by a transfer to take effect during the life of such person or upon the death of such person, may, at any time or times, add to the principal of any trust hereunder any property of any kind or nature acceptable to the Trustees, and any such additional property so received by the Trustees pursuant to the provisions of this Article shall thereafter be deemed to be part of the principal of such trust subject to all of the terms, provisions and conditions of this Trust Agreement.

FIFTH:   Irrevocability.

This Trust Agreement and the trusts hereby created are irrevocable and not subject to amendment or change.

SIXTH:   Governing Law.

This Trust Agreement and the trusts hereby created shall be governed by the laws of the State of New York.

SEVENTH:   Trustees.

A.   The initial Trustees acting hereunder shall be LAWRENCE M. SMALL and SASH A. SPENCER.

B.   Each individual acting as a Trustee hereunder (whether such Trustee is initially a party to this Trust Agreement or a successor Trustee named in Section C of this Article

-13-

DG 01019

or appointed pursuant to the provisions of this Section B) is authorized and empowered to appoint another individual (other than the Grantor) to act in his or her place and stead as a Trustee hereunder. Each appointment of a successor Trustee hereunder shall be made by the execution of an instrument of appointment signed and acknowledged by the individual who shall have made such appointment and by delivering such instrument in accordance with the provisions of Section G of this Article; and any such appointment may be revoked in the same manner by the individual Trustee who shall have made it at any time before the occurrence of the event or events as of which such appointment shall, by its provisions, become effective. Any appointment made in accordance with the provisions of this Section B shall be valid only if the individual so appointed shall, within thirty (30) days after the later of (i) the date on which a copy of such instrument of appointment is so delivered to him or her, and (ii) the occurrence of the event or events as of which such appointment shall, by its provisions, become effective, qualify as a successor Trustee under this Trust Agreement in accordance with the provisions of Section D of this Article. Each successor Trustee named in Section C of this Article or appointed in accordance with the provisions of this Section B shall be vested with the same powers and authority as the initial Trustees who are parties to this Trust Agreement; provided, however, that no such Trustee shall be permitted to exercise any authority or

-14-

DG 01020

power which such Trustee shall be prohibited from exercising by
an express provision of this Trust Agreement.

       C.   1.   If either LAWRENCE M. SMALL or SASH A.
SPENCER shall cease to act as a Trustee hereunder, and no suc-
cessor Trustee appointed by him pursuant to the provisions of
Section B of this Article shall qualify and act as a Trustee
hereunder, MARTIN A. COLEMAN (now residing at 51 Cambridge Road,
Great Neck, New York 11023) shall act as Trustee hereunder.

       2.   If MARTIN A. COLEMAN shall fail or cease
cease to act as a Trustee hereunder, and no successor Trustee
appointed by him pursuant to the provisions of Section B of this
Article shall qualify and act as a Trustee hereunder, THOMAS G.
HARDY (now residing at 935 Park Avenue, New York, New York
10028) shall act as a Trustee hereunder.

       D.   Each successor Trustee hereunder shall qualify as
such by accepting the trusteeship by the execution of a signed
and acknowledged instrument of acceptance and by delivering such
instrument in accordance with the provisions of Section G of
this Article.

       E.   Any individual Trustee hereunder may resign as
such a Trustee by the execution of a signed and acknowledged
instrument of resignation and by delivering such instrument in
accordance with the provisions of Section G of this Article.

-15-

DG 01021

Any such resignation shall become effective upon the receipt of such instrument of resignation by each individual to whom it is delivered or mailed as aforesaid or at such later date as may be specified therein.

F.   If any individual while acting as a Trustee hereunder shall become incapable of discharging his or her responsibilities and duties as such a Trustee by reason of a physical, emotional or intellectual incapacity and such incapacity shall be confirmed by each of two medical doctors in written statements, copies of which shall be delivered or mailed as hereinafter provided, the individual who is so incapacitated shall be deemed for the purposes of construing and applying all of the provisions of this Trust Agreement to have effectively resigned as such Trustee in compliance with the provisions of Section E of this Article, such resignation to be deemed to be effective upon the delivery or mailing of the aforesaid statements as hereinafter provided. Each of the aforesaid statements shall be signed and acknowledged by the medical doctor making the same and copies of the same shall be delivered or mailed by registered or certified mail to the individual, if any, who will become the successor Trustee hereunder in the place and stead of the incapacitated Trustee to whom such statement pertains, to each Trustee, if any, then acting hereunder (other than the incapacitated Trustee to whom such statement pertains), and also to either (1) the Grantor (or, if the Grantor shall not then be

-16-

living, to the executors, administrators or personal representatives of the Grantor's estate), or (ii) any one or more of the adult individuals to whom or for whose use or benefit the income of any trust hereunder may then be paid or applied.

G.   Each instrument directed to be delivered in accordance with the provisions of this Section G shall be delivered in person or by mailing a copy of the same by registered or certified mail to each Trustee, if any, then acting hereunder (other than the Trustee, if any, who shall have executed such instrument), and to either (i) the Grantor (or, if the Grantor is not then living, to the executors, personal representatives or administrators of the Grantor's estate), or (ii) any one or more of the adult individuals to whom or for whose use or benefit the income of any trust hereunder may then be paid or applied.

H.   No bond or other security shall be given by or required in any jurisdiction (whether in the State of New York or elsewhere) of any Trustee at any time acting hereunder (whether such Trustee is named herein or appointed pursuant to the provisions hereof) for the faithful performance of such Trustee's fiduciary duties in any capacity hereunder regardless of whether such Trustee is or may become a non-resident of the State of New York or elsewhere.

-17-

EIGHTH:   Compensation of Trustees.

No Trustee hereunder, whether such Trustee is herein-
above named or appointed pursuant to the provisions hereof,
shall be entitled to any compensation (other than reimbursement
for out-of-pocket expenses) for services rendered as a Trustee
hereunder; and each Trustee who is a party to this Trust Agree-
ment or who qualifies as a successor Trustee hereunder as pro-
vided herein shall be deemed to have agreed to serve as such
Trustee without receiving any such compensation.

NINTH:   Settlement of Trustees' Accounts;
Exoneration of Trustees.

A.   To the fullest extent permitted by law, the
Trustees shall not be required to file with or render to, and
the Grantor waives and excuses the filing with or rendering to,
any Court an account of their transactions or inventories, ac-
counts, statements or reports of principal and/or income with
respect to any trust created hereunder.   Nevertheless, the
Trustees may at any time have their accounts judicially settled
with respect to any trust created hereunder, and in any such
proceeding it shall not be necessary to serve any person who is
under a disability if there is another party to the proceeding
who is not under any disability and who has the same interest as
the person who is under a disability, and, in such event, it
shall not be necessary to appoint a guardian ad litem for any
such party who is under a disability.   The expenses of any such

-18-

DG 01024

account shall be a proper administration expense of the trust to which such account relates.

B. If any Trustee shall resign as a Trustee hereunder, the continuing Trustee, if any, or, if there is no continuing Trustee, any successor Trustee who shall have qualified to act in accordance with the provisions of Section D of Article SEVENTH hereof, may deliver to the Trustee so resigning an instrument whereby such resigning Trustee shall be released and discharged, to the extent stated therein, of and from any and all accountability, liability and responsibility for acts or omissions as Trustee. Any such release and discharge shall be binding upon all persons, whether or not then in being, then or thereafter interested in either the income or the principal of any trust hereunder and shall have the force and effect of a final decree, judgment or order of a court of competent jurisdiction rendered in an appropriate action or proceeding for the judicial settlement of the account of such Trustee in which jurisdiction was obtained of all necessary and proper parties. The foregoing provision, however, shall not preclude any Trustee so resigning from having his or her account judicially settled, and in any such proceeding it shall not be necessary to serve any person who is under a disability if there is another party to the proceeding who is not under any disability and who has the same interest as the person who is under a disability, and, in such event, it shall not be necessary to appoint a guardian

-19-

CPA43                                                           DG 01025

ad litem for any such party who is under a disability.  The
expenses of any judicial account rendered by a Trustee who shall
resign shall be a proper administration expense of the trust to
which such account relates.

C.   In addition to the foregoing, the Trustees are
hereby authorized, at any time and from time to time, with re-
spect to any trust hereunder, to settle the account of the
Trustees by agreement between the Trustees and the then adult
individual or individuals to whom or for whose use or benefit
the income of such trust may then be paid or applied and the
adult or adults who would be entitled to the principal in case
such trust were to terminate at the time of such agreement,
excluding any such individual who is under a disability if there
is a party to the agreement who is not under any disability and
who has the same interest as the individual who is under a dis-
ability, which agreement shall bind all persons, whether or not
then in being, then or thereafter interested in either the
income or the principal of such trust.  Any such settlement
shall have the same force and effect as a final decree, judgment
or order of a court of competent jurisdiction rendered in an
appropriate action or proceeding for the judicial settlement of
such account in which jurisdiction was obtained of all necessary
and proper parties.  The expenses of any such account shall be
a proper administration expense of such trust.

-20-

DG 01026

D.    To the extent permitted by law, no Trustee shall be accountable, liable or responsible for any act, default, negligence, or omission of any other Trustee.

TENTH:    Definitions.

Wherever used in this Trust Agreement:

1.    The word "Trustees" and all references to the Trustees shall mean and refer to the Trustees and successor Trustees hereinabove named, any successor Trustee appointed pursuant to the provisions hereof, any substitute Trustee appointed by a court of competent jurisdiction, the survivors or survivor of them, and their and each of their successors or successor, as may be acting hereunder from time to time.

2.    The words "IN TRUST" shall mean "in trust, nevertheless, to hold, manage, invest and reinvest, and, until payment thereof as hereinafter directed, to receive the income thereof."

3.    The word "pay" shall, where applicable, mean "convey, transfer and pay" and the word "payment" shall, where applicable, mean "conveyance, transfer and payment."

4.    The words "descendant" and "descendants," when used with respect to any person, shall be deemed to include (i) every individual who is born to such person, (ii) every individual who is lawfully adopted by such person, and (iii)

-21-

DG 01027

every individual who is otherwise descended from such person, whether by birth, or by lawful adoption, or by a combination thereof.

5. The words "Internal Revenue Code" shall mean and refer to "the United States Internal Revenue Code of 1986 (as amended from time to time)," and any reference to a specific section, chapter or other provision of the Internal Revenue Code shall mean and refer to said section, chapter or other provision and any successor statute thereto pertaining to the same subject matter as said section, chapter or other provision.

ELEVENTH: Administrative Powers

A.   In addition to and in amplification of the powers given by law to trustees, the Trustees, but solely in their fiduciary capacities, are hereby authorized and empowered, in their discretion:

1.   To sell, exchange, make contracts with respect to, grant options on or otherwise dispose of, at public or private sale, at such prices, on such terms (including sales on credit with or without security) and at such time or times as the Trustees shall determine, any property, real or personal, which may at any time form part of any trust hereunder.

2.   To lease, for such periods (whether or not any such period shall extend beyond the period prescribed by law

-22-

DG 01028

or the probable term of any trust hereunder), on such terms and conditions and at such time or times as the Trustees shall determine, the whole or any portion or portions of any property, real or personal, which may at any time form part of any trust hereunder, whether the same be held in severalty or as tenant-in-common with others or in a partnership, syndicate or joint venture or otherwise, and release and convey any undivided interest in any such property for the purpose of effecting partition of the whole or any part thereof; and make, place, extend or renew mortgages, pledges, building loan agreements or building loan mortgages upon or affecting any and all such property; and make, execute and deliver such mortgages, pledges and agreements, together with proper bonds, notes or other instruments of indebtedness to accompany the same, and such extension or renewal agreements, as to the Trustees shall seem necessary, advisable or proper; and also to repair, alter, reconstruct, build upon or improve any such property and on such terms and at such time or times as the Trustees shall determine, give and grant to others the right so to do, or agree in, or so modify any lease affecting any such property that the lessee may alter, repair, reconstruct, build upon, improve, mortgage and pledge any such property; and generally to make, alter and modify all agreements, leases, mortgages, pledges, building loans, sales, exchanges, transfers and conveyances of or affecting any such property which the Trustees shall determine to be necessary, advisable or proper for the preservation, improvement, enhance-

-23-

ment in value of, or betterment of or addition to, such property.

3.    To hold any part or all of the assets of any trust hereunder invested in the same form of property in which the same shall be invested when received by the Trustees, and invest and reinvest the assets of any such trust, or any portion thereof, in any form of investment which the Trustees may determine (including, without limitation, mutual funds, common trust funds, investment trusts, general partnerships and limited partnerships), whether or not such investment is of the nature prescribed by law as a legal investment for fiduciaries or is speculative in nature, and without regard to the percentage of the assets of such trust which such investment or similar investments may constitute.  .

4.    To vote in person or by proxy all stocks and other securities held by any trust hereunder; grant, exercise, sell or otherwise turn to account rights to subscribe for stock and securities and options of any nature  amortize or refrain from amortizing premiums on bonds or other securities which the Trustees may purchase or receive; participate in reorganizations, mergers, liquidations or dissolutions, and contribute to the expenses of, and deposit securities with, protective committees in connection therewith; participate in voting trusts; and generally exercise, in respect of said stock and securities, all

-24-

rights, powers or privileges which may be lawfully exercised by any person owning similar property in his or her own right.

5.  To employ any investment counsel, corporate custodians, agents, accountants, brokers and attorneys which the Trustees may select and pay the charges thereof (including charges for preparation of trust tax returns, the Trustees' accounts and any other necessary trust records); and the Trustees, or a partnership, corporation or other entity in which any Trustee shall be interested, or by which any Trustee may be employed, may be retained in any such capacity, and, in such event, the charges which shall be payable to such Trustee, or to any such partnership, corporation or other entity, shall be in addition to compensation otherwise allowable to such Trustee and may be paid without prior judicial approval.

6.  In any case in which the Trustees are authorized or required to pay or distribute any share of any trust hereunder, to make such payment or distribution in kind, or partly in kind and partly in money and, in connection therewith, to allocate equal or unequal interests in, or amounts of, specific property in satisfaction of such payment or distribution; provided, however, that any property distributed in kind shall be valued, for purposes of such distribution, at its fair market value on the date of distribution.

-25-

DG 01031

7.   To settle, adjust, compromise or submit to arbitration any dispute, claim or controversy in which any trust hereunder may be in any way interested.

8.   To borrow money from any person, partnership, corporation or other entity, who may be any Trustee or a partnership, corporation or other entity in which any Trustee may be interested, or by which any Trustee may be employed, for the purpose of meeting any and all charges against any trust hereunder or for any other purpose connected with the administration, preservation, improvement or enhancement in value of any such trust, and, in connection with any such borrowing, to pledge, hypothecate or mortgage any part or all of the assets of any such trust.

9.   To keep any or all of the securities at any time forming a part of any trust hereunder in the name of one or more nominees.

10.   In any case where doubt or uncertainty exists under applicable law or this Trust Agreement, to credit receipts and charge expenses to principal or income, or partly to each.

11.   By instrument or instruments signed by all of the Trustees qualified and acting as such at any time with respect to any trust hereunder, to delegate, in whole or in part, to any person or persons (including any one or more of the

-26-

DG 01032

Trustees) the authority and power to (i) sign checks, drafts or orders for the payment or withdrawal of funds from any bank account or other depository in which funds of such trust shall be held, (ii) endorse for sale, transfer or delivery, or sell, transfer or deliver, or purchase or otherwise acquire, any and all stocks, stock warrants, stock rights, bonds or other securities whatsoever with respect to such trust, and (iii) gain access to any safe deposit box which may be in the names of the Trustees and remove part or all of the contents of any such safe deposit box and release and surrender the same.

12.    To pay or deliver to either parent or to the guardian of the property of any minor or to an adult with whom such minor resides, and, with respect to any person for whom it is permissible to do so under applicable law, to a custodian for such person under a Uniform Gifts to Minors Act or Uniform Transfers to Minors Act of any state until the age of eighteen (18) years (or until such age in excess of eighteen (18) years as shall be permissible under applicable law and which the Trustees, in their discretion, shall select) any sum or property, including income, which such minor or such person shall either be entitled to receive or to have applied for his or her use or benefit under any of the provisions hereof, without requiring that such parent, adult or custodian obtain letters of guardianship or that such parent, guardian, adult or custodian give any bond or other security for any such payment or delivery

-27-

so made; and the receipt of such parent, guardian, adult or custodian for the amount of such payment, or for the property so delivered, shall be an absolute protection to the Trustees and a complete release and discharge from all further accountability in respect of any such payment or delivery.

13.   If any beneficiary of any trust hereunder shall, in the opinion of the Trustees, be or become incapacitated (whether by reason of illness, age or other causes) the Trustees may, in their discretion, wholly or partly in lieu of paying net income or principal of such trust to such beneficiary as authorized or directed by this Trust Agreement, dispose of the same in one or more of the following ways:

(a)  by making payment of such net income or principal to a legally appointed guardian or other fiduciary of such beneficiary;

(b)  by making payment of such net income or principal, on behalf of such beneficiary, to any person with whom such beneficiary resides or who has charge of his or her care; and/or

(c)  by applying such net income or principal directly for the use or benefit of such beneficiary.

-28-

DG 01034

14.   To remove the assets of, hold and administer any such assets in, and/or move the situs of the administration of any trust hereunder to, such location or locations (which may be in a state or other jurisdiction other than the State of New York) as the Trustees, in their discretion, shall select.   If the Trustees, in their discretion, shall determine it advisable to move the situs of the administration of any trust hereunder to a location where the judicial administration of trusts is required or permitted, the Trustees are authorized to select and request a court in such location having jurisdiction over the administration of trusts to accept jurisdiction over the administration of such trust, and it is requested that such court accept, and that it be permitted to accept, jurisdiction over the administration of such trust; and it is directed that the administration of such trust shall be governed from time to time by the laws of the jurisdiction in which the administration of such trust is then located.

15.   To make, or refrain from making, elections or allocations permitted under any applicable tax law without regard to the effect of any such election or allocation on the interest of any beneficiary of any trust hereunder and, if any such election or allocation shall be made, to apportion, or refrain from apportioning, any benefits thereof among the respective interests of the beneficiaries of such trust, all in such manner as the Trustees shall deem appropriate.

-29-

DG 01035

16. To retain or invest in solido the property held in any trust hereunder with the property held in one or more of the other trusts hereunder or with the property held in any other trust created by the Grantor or by any other person for purposes of convenience or for the better investment thereof.

17. To exercise all authority, powers, privileges and discretion conferred in this Article after the termination of any trust created hereunder and until all of the assets of such trust are fully distributed.

B. No person or party dealing with the Trustees shall be bound to see to the application of any money or other consideration paid by him or her to the Trustees.

C. Neither the principal nor the income of any trust hereunder, or any part thereof, shall or may at any time be liable or subject in any manner whatsoever to the debts or liabilities of any beneficiary entitled to receive any principal or income therefrom; nor shall the principal or income of any trust hereunder be liable to attachment by garnishment proceedings or other legal process issued by any creditor of any beneficiary of such trust for debts heretofore or hereafter contracted by such beneficiary; nor shall any assignment, conveyance, charge, encumbrance or order, either of principal or income, given by any such beneficiary be valid.

-30-

DG 01036

D.   Whenever in this Trust Agreement it is provided that an instrument is to be "acknowledged," such instrument shall be acknowledged in such manner as would be required if the same were a conveyance of real property entitled to be recorded in the State of New York.

E.   1.   To the fullest extent permitted by law, no transaction or decision involving any trust hereunder shall be deemed invalidated in any way by reason of any personal, beneficial or other interest which any Trustee may have with respect to such transaction or decision, including, without limitation, any transaction or decision with respect to any corporation, company, partnership, association, estate, trust or other entity in which any Trustee may have an interest in a capacity other than as a Trustee hereunder, regardless of any conflict of interest as to any such transaction or decision, and any such transaction or decision shall be lawful and proper and shall not be questioned unless such Trustee is guilty of fraud with respect thereto.   Without limiting the foregoing, no Trustee shall be disqualified or barred from acting as such or have any liability hereunder in exercising any power, authority or discretion conferred upon the Trustees by reason of the fact that such Trustee may be a stockholder, officer director, partner, executor, administrator, personal representative, trustee, beneficiary, or in any other way interested in the corporation, company, partnership, association, estate, trust or other entity

-31-

whose securities or property are the subject matter of the exercise of such power, authority or discretion.

2.   The Trustees hereunder shall be entitled to compensation as officers, directors, fiduciaries or other participants in any such entity notwithstanding the fact that they are Trustees hereunder and are also entitled to receive reimbursement for their out-of-pocket expenses as such Trustees.

F.   The Trustees shall be under no duty or obligation and shall not be liable to any trust hereunder or to any person or persons interested in any trust hereunder or be surcharged for failure to buy, sell or engage in any transaction directly or indirectly involving securities issued or to be issued by any corporation or other business organization concerning which any of the Trustees, in a capacity other than as a Trustee hereunder, may have acquired any information which has not been disclosed to the public.

TWELFTH:   Provisions Relating to the GST.

A.   As used in this Article:

1.   "GST" shall mean and refer to "the United States generation-skipping transfer tax imposed by Chapter 13 of the Internal Revenue Code."

-33-

DG 01038

2.   The words "inclusion ratio" shall have the same meaning as those words are given in Section 2642 of the Internal Revenue Code.

3.   The words "Net Death Taxes" shall mean and refer to "the aggregate death taxes (including, without limitation, United States, state, local and other estate taxes and inheritance taxes but not including any interest and penalties thereon), after taking into account all applicable credits, payable with respect to the estate of such beneficiary."

B.   1.   Notwithstanding any other provision in this Trust Agreement to the contrary, and in addition to any other power of appointment hereinabove given by the previous provisions of this Trust Agreement to any individual at whose death the inclusion ratio with respect to any trust under this Trust Agreement would, but for the provisions of this Section B, be more than zero (such individual being referred to in this Article as "such beneficiary"), the Trustees of such trust are authorized and empowered, by an acknowledged instrument in writing (with such instrument to be filed with the court, if any, then having jurisdiction over such trust, if such court shall accept such instrument for filing), (i) to create in such beneficiary a power (hereinafter referred to in this Section B as "such power"), to be exercised by a provision in his or her Will expressly referring to this Article of this Trust Agreement, to appoint to the creditors of his or her estate any portion of the

-33-

property held in such trust at the death of such beneficiary,
and (ii) to limit such power, by formula or otherwise, to less
than all of the property held in such trust at the death of such
beneficiary; provided, however, that with respect to each such
trust, the maximum amount of property over which such power may
be created shall not, after taking into account the property, if
any, over which any other such power is created in such benefi-
ciary, exceed the amount, if any, above which any further addi-
tion to the amount subject to such power would increase the Net
Death Taxes determined with respect to such beneficiary's estate
by an amount equal to or greater than the net decrease in the
aggregate of (x) the GST and (y) any state and/or local tax on
generation-skipping transfers imposed as a result of the death
of such beneficiary that would result from such further addi-
tion.   Unless such beneficiary's Will otherwise provides by
express reference to this Trust Agreement and such power, the
increase in the Net Death Taxes on such beneficiary's estate
resulting from such power shall be paid from that part of the
principal of such trust over which such power is exercisable.
If, or to the extent that, such beneficiary shall fail so
expressly and so validly to exercise any power created in such
beneficiary by the Trustees pursuant to the provisions of this
paragraph, the unappointed portion (or, as the case may be, all)
of the property subject to such power shall pass pursuant to the
provisions of this Trust Agreement otherwise applicable to such
property.

-34-

DG 01040

2.   The Trustees are further authorized and empowered, by an acknowledged instrument in writing (with such instrument to be filed with the court, if any, then having jurisdiction over the trust to which such power relates, if such court shall accept such instrument for filing), to revoke any power created by the Trustees pursuant to the provisions of paragraph 1 of this Section B at any time prior to the death of the beneficiary in whom such power was created, and to release, in the manner set forth in Article THIRTEENTH hereof, the right to create such a power.  The Trustees shall not be liable for any exercise, release or failure to exercise the authority and power granted to them by the provisions of said paragraph 1 or for the revocation of any power created by them pursuant to the provisions of said paragraph 1, provided they utilize good faith in considering whether or not to exercise or release such power or to cause such revocation, whether such consideration be at their own instance or at the request of an individual who is a beneficiary of a trust hereunder, the guardian or other fiduciary of such an individual, or a member of his or her family.

C.   1.   Notwithstanding any other provision in this Trust Agreement to the contrary, if at any time any property is to be placed in a trust under the provisions of any Article of this Trust Agreement, the Trustees shall, if need be, and if it is possible to do so, divide such property and place the same in separate trusts to the end that one such trust shall have an

-35-

DG 01041

inclusion ratio of zero, and if any property which is directed to be added to a trust hereunder shall have an inclusion ratio which is different than the inclusion ratio of such trust, the Trustees shall not make such addition but shall instead administer such property in a separate trust under this Trust Agreement; and, in each such instance, the property to be placed or held in such a separate trust shall be held, administered and disposed of by the Trustees pursuant to provisions identical to the provisions of the trust to which, but for the provisions of this paragraph 1, such property would have been placed or added.

2.     If, pursuant to the provisions of paragraph 1 of this Section C, any property that would otherwise be held in a single trust hereunder is instead held in separate trusts hereunder, the Trustees of such trusts may, at any time or from time to time, (i) make different tax elections and allocations with respect to each such trust, (ii) expend principal and income and exercise any discretionary power differently with respect to each such trust, (iii) invest each such trust differently, and/or (iv) take all other actions consistent with such trusts being separate entities. Furthermore, the donee of any power of appointment with respect to such trusts may exercise such power differently with respect to each such trust.

D.     Notwithstanding the provisions of the foregoing Sections of this Article to the contrary, if any Trustee hereunder is a current beneficiary of the income of any trust here-

-36-

DG 01042

under, or may, in the discretion of the Trustees, be a current income beneficiary of any such trust, then, in such event, such Trustee shall not, in his or her capacity as a Trustee of such trust, have any voice or vote or otherwise participate in any decision pertaining to the matters relating to such trust that are addressed in the foregoing Sections of this Article, and, in each such event, the other Trustee or Trustees of such trust shall make all decisions relating to such trust that pertain to such matters.

THIRTEENTH:    Release of Powers.

Any beneficiary and any Trustee hereunder may at any time or times release any discretionary power of appointment or discretionary power to distribute principal or income or any other discretionary power hereby given to such beneficiary or Trustee, either with or without consideration, with respect to the whole or any part of the property subject to such power and also in such manner as to reduce or limit the persons or objects or classes of persons or objects in whose favor such power would otherwise be exercisable, by an instrument signed and acknowledged by the beneficiary or Trustee releasing such power and delivered to (i) each Trustee then acting hereunder (other than the Trustee, if any, who shall have executed such instrument), (ii) the Grantor (or, if the Grantor is not then living, to the executors, administrators or personal representatives of the

-37-

Grantor's estate), or (iii) any one or more of the adult indi
viduals to whom or for whose use or benefit the income of any
trust hereunder may then be paid or applied.  In the event of
the release of any such power by any Trustee, the remaining
Trustee or Trustees hereunder, if any, may thereafter exercise
such power, other than any discretionary power which was not
initially vested in such remaining Trustee or Trustees.  The
release of any power by any Trustee hereunder pursuant to the
provisions of this Article shall not be binding upon any Trustee
who may thereafter act as a Trustee hereunder unless such power
shall have been released by all of the Trustees then in office
who are vested with such power by their execution of a signed
and acknowledged instrument specifically providing that such
release is to be binding upon all successor Trustees hereunder.

FOURTEENTH:   Provision With Respect To
              Closely Held Businesses.

Without limiting the powers and authority conferred
upon the Trustees by Article ELEVENTH hereof but in extension
thereof, the Trustees are specifically authorized and empowered,
in their discretion, to retain for as long as they, in their
discretion, shall deem advisable, any or all shares of stock in
any closely held corporation, or any indebtedness owing by any
such corporation, or any or all interests in any proprietorship,
unincorporated business, partnership, joint venture, realty or

-38-

DG 01044

part, clause, provision or condition had not been contained
herein.

WITNESS the due execution hereof by the Grantor and
Trustees on the day and year first above written.

ARIE GENGER,
as Grantor;

LAWRENCE M. SMALL,
as Trustee

SASH A. SPENCER,
as Trustee

-40-

DG 01046

STATE OF NEW YORK        )
                         )    ss.:
COUNTY OF NEW YORK       )

On this 13 day of December, 1993, before me personally appeared ARIE GENGER, to me known and known to me to be a person described in and who executed the foregoing instrument, and he duly acknowledged to me that he executed the same.

_____
Notary Public

BRIT GENGER
Notary Public, State of New York
No. 24-4602?'9 Qual. in Kings Co.
Certificate Fil. o n New York County
Commission Expires June 30, 1995

District of Columbia

STATE OF                 )
                         )    ss.:
COUNTY OF                )

On this 15th day of December, 1993, before me personally appeared LAWRENCE M. SMALL, to me known and known to me to be a person described in and who executed the foregoing instrument, and he duly acknowledged to me that he executed the same.

Jeanne M. Meister
_____
Notary Public

My Commission Expires July 21, 1997

STATE OF New York        )
                         )    ss.:
COUNTY OF New York       )

On this 16th day of December, 1993, before me personally appeared SASH A. SPENCER, to me known and known to me to be a person described in and who executed the foregoing instrument, and he duly acknowledged to me that he executed the same.

Stella M. Orso
_____
Notary Public

STELLA M. ORSO
Notary Public, State of New York
No. 24-4234837
Qualified in Kings County
Certificate Filed in New York County
Commission Expires March 30, 1994

-41-

DG 01047

# EXHIBIT "B"

| | |
|---|---|
| Rate | 6.1% |
| | **Owing** |
| Tuesday, October 26, 2004 | 9,880,000 |
| Portion Not Assumed by Parents | 9,484,800 |
| | |
| Friday, October 31, 2008 | 1466 |
| Days in Year | 365 |
| | 4.02 |
| Interest rate for Period | 26.7% |
| | |
| Dollars of Interest | 2,528,289.02 |
| | |
| Amount Due | 12,013,089.02 |
| Payment | (960,000.00) |
| | |
| Net of Payment | 11,053,089.02 |
| | |
| | |
| Saturday, January 31, 2009 | 92 |
| Days in Year | 365 |
| | 0.25 |
| Interest rate for Period | 1.4% |
| Dollars of Interest | 151,595.73 |
| | |
| Current Amount Owed | 11,204,685 |
| | |
| | 5,602,342.38 |

# EXHIBIT "C"

**TPR INVESTMENT ASSOCIATES, INC.**
200 West 57ᵗʰ Street
New York, NY 10019

October *Of*, 2004

Mr. Arie Genger
2600 Island Blvd., Penthouse One
Williams Island, Aventura, FL 33160

Sagi Genger 1993 Trust
200 West 57ᵗʰ Street
New York, NY 10019

Orly Genger 1993 Trust
200 West 57ᵗʰ Street
New York, NY 10019

Ladies and Gentlemen:

This letter will set forth our agreement pursuant to which you will purchase the 3,000 shares of common stock ("the Shares") of Trans-Resources, Inc. ("TRI") owned by TPR Investment Associates, Inc. ("TPR"). TPR hereby sells, transfers and conveys the Shares to you as follows:

(i)    794.40 Shares to Arie Genger ;

(ii)   1,102.80 Shares to the Sagi Genger 1993 Trust , and

(iii)  1,102.80 Shares to the Orly Genger 1993 Trust.

The purchase price is $1.00 per share, receipt of which is hereby acknowledged.

The Shares represent 52.85% of the issued and outstanding shares of TRI. The Shares are being transferred hereunder free and clear of any liens, claims or encumbrances and such transfer does not violate the Certificate of Incorporation of TPR or any agreement to which TPR is subject.

The trustees of the Sagi Genger 1993 Trust and of the Orly Genger 1993 Trust ("Trusts") have agreed to execute on behalf of the Trusts (i) an Irrevocable Proxy to appoint Arie Genger to vote the Shares owned by the Trusts and (ii) a voting trust letter agreement, copies of which are annexed hereto.

In case, at any time hereinafter, any further action is necessary or desirable to carry out the purposes of this Letter Agreement, each of the parties hereto shall take or cause to be taken all necessary action, including, without limitation, the execution and delivery of such

DG 00884

Page 2
Mr. Arie Genger
Sagi Genger 1993 Trust
Orly Genger 1993 Trust

further instruments and documents as may be reasonably requested by any party for such purpose
or otherwise to complete or perfect the transactions contemplated hereby.

This Letter Agreement shall be governed by the laws of the State of New York
without regard to conflicts of law principles.

Very truly yours,

TPR INVESTMENT ASSOCIATES, INC.

By: _____
Sagi Genger, President

AGREED TO AND ACCEPTED
THIS ___ DAY OF OCTOBER, 2004

_____
ARIE GENGER

SAGI GENGER 1993 TRUST

By: _____
David A. Parnes, Trustee

_____
Eric Gribetz, Trustee

ORLY GENGER 1993 TRUST

By: _____
David A. Parnes, Trustee

_____
Eric Gribetz, Trustee

DG 00885

# EXHIBIT "D"

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, and TRANS-RESOURCES, INC., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ARIE GENGER, | ) ) | |
| Defendant. | ) | C.A. No. 3994-VCS |
| ARIE GENGER, | ) ) | |
| Counterclaim Plaintiff, | ) ) | |
| v. | ) ) | |
| TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, and TRANS-RESOURCES, INC., | ) ) ) ) ) | |
| Counterclaim Defendants. | ) | |

MEMORANDUM OPINION

Date Submitted: April 26, 2010
Date Decided: July 23, 2010

Thomas J. Allingham II, Esquire, Anthony W. Clark, Esquire, Robert A. Weber, Esquire, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware, *Attorneys for Plaintiffs.*

Donald J. Wolfe, Jr., Esquire, Brian C. Ralston, Esquire, Scott B. Czerwonka, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Michael P. Carroll, Esquire, Avi Gesser, Esquire, DAVIS POLK & WARDWELL LLP, New York, New York, *Attorneys for Defendant*.

**STRINE, Vice Chancellor.**

## I. Introduction

This dispute over the control of Trans-Resources, Inc. ("Trans-Resources") is between the company's founder and former chief executive officer, Arie Genger, and the plaintiffs, who provided capital to Trans-Resources when the company was in financial distress. The plaintiffs are all entities controlled by the Trump family, led by Jules Trump and his brother Eddie Trump (collectively, with the plaintiffs, the "Trump Group"). Jules Trump was a long-time friend of Arie Genger, and he was happy to help Genger when Trans-Resources neared insolvency in 2001.

In return for retiring nearly all of Trans-Resources' outstanding bonds, the Trump Group received a minority stake in the company and a number of protections in a stockholders agreement (the "Stockholders Agreement"). The Stockholders Agreement prohibited either party from transferring their shares in Trans-Resources to anyone other than a limited number of permitted transferees. That prohibition against transfer was particularly important to the Trump Group, which was concerned that Genger might transfer his shares that were held through an entity under his control, TPR Investment Associates, Inc. ("TPR"), to a member of his family. A bitter dispute had arisen between Genger and his son, Sagi Genger, during the time Genger's marriage unraveled in the early 2000s, and the Trump Group wanted no part of the family drama.

In 2004, Genger caused TPR to transfer its shares in Trans-Resources, subject to an irrevocable proxy in his favor, to his children's trusts (the "2004 Transfers"), under a settlement in the contentious divorce between him and his wife. Because those trusts were not permitted transferees, the 2004 Transfers violated the terms of the Stockholders

1

Agreement. Under the terms of the Stockholders Agreement, that violation rendered the transfers ineffective and gave the Trump Group the right to acquire the shares that were transferred.

But Genger did not notify the Trump Group of the transfers at that time, and thereby deprived the Trump Group of its right to declare the transfers void or exercise its right to acquire the shares in 2004. Genger claims that he mentioned the 2004 Transfers to Jules Trump during a private conversation in 2004, but his testimony did not convince me that this was true. The most convincing reading of the evidence is that the Trump Group did not receive notice of the 2004 Transfers until nearly four years later, when Genger once again asked Jules Trump for help when Trans-Resources was in financial distress. Moreover, informal notice to Jules Trump would not constitute the notice that was required to be given to the Trump Group entities under the Stockholders Agreement.

By 2008, Trans-Resources' bank was unwilling to negotiate with Genger, so Genger asked Jules Trump not only for money but also to negotiate a reduction in Trans-Resources' debt with the bank. The evidence shows that, while Genger and the Trump Group were negotiating the terms of the second round of funding, Genger disclosed for the first time that the 2004 Transfers had occurred.

Although shocked at Genger's failure to notify him of the 2004 Transfers, Jules Trump nevertheless negotiated a reduction in Trans-Resources' debt and agreed to pay that debt in return for voting control of the company. Genger initially agreed to those terms as a compromise for the Transfer violation, but, after securing an alternative source of financing, backed out of the deal. Angered that he had favorably renegotiated Trans-

2

Resources' debt obligations and that the Trump Group was left without their key part of the bargain, Jules Trump initiated litigation and also contacted Sagi Genger in order to negotiate a deal with both TPR and the trust controlled by Sagi Genger (the "Sagi Trust") whereby the Trump Group would buy all of the shares transferred to the Sagi Trust by TPR in the 2004 Transfers. Having made a bargain with both the wrongful transferor, TPR, and the transferee, the Sagi Trust, the Trump Group viewed itself as having covered all its bases in addressing Genger's violation of the Stockholders Agreement. With the shares wrongfully transferred to the Sagi Trust by TPR, the Trump Group held a majority of Trans-Resources' stock.

The Trump Group then purported to reconstitute the Trans-Resources board of directors and, when Genger challenged the reconstitution, filed this action pursuant to 8 *Del. C.* § 225 to determine who controlled the board. Making that determination largely turns upon interpreting how the Stockholders Agreement applies to both parties' often excessively sharp conduct. As explained fully below, I conclude that the Trump Group controls the Trans-Resources board for the following reasons: (1) the Trump Group never received notice of the 2004 Transfers, which were made in violation of the Stockholders Agreement, until June 2008; and (2) the Trump Group did not ratify those Transfers when it bought the transferred shares from Sagi Genger and TPR. Because it never ratified the wrongful transaction, the Trump Group was free to deal with the relevant transferor, TPR, and its transferee, the Sagi Trust, and settle the matter by acquiring the wrongly transferred shares in an agreed upon negotiation. In doing so, the Trump Group clearly reserved its position that TPR made a void transfer, has proven that its position

3

was correct, and is entitled, as a result, to be deemed to have taken the shares from TPR as a settlement of the improper Transfers. In the alternative, even if the Trump Group ratified the 2004 Transfers — which it did not — I find that the Trump Group did not purchase the shares from Sagi Genger subject to the proxy in favor of Arie Genger. Therefore, the Trump Group holds a majority equity and voting stake in Trans-Resources, and its ability to vote its shares is unaffected by the proxy.

## II. Factual Background

The following are the facts as I find them after trial.

### A. The Trump Group Saves Genger's Company, Trans-Resources, From Bankruptcy In 2001

In 1985, Genger formed Trans-Resources, a Delaware corporation that eventually became the parent of three specialty fertilizer and industrial chemical companies.[1] As mentioned before, Genger's majority stake in Trans-Resources was held through TPR, another Delaware corporation. By 2001, Trans-Resources was nearly insolvent as its subsidiaries struggled in the marketplace due to a strong euro, vigorous competition from South American rivals, and miscalculations in a recent decision to expand a key plant.[2] At that time, Trans-Resources' bonds had a notional value of $230 million, but their market value had plummeted.[3]

Because negotiations with the fractious group of investors that had invested in Trans-Resources' bonds were proving futile, Genger was delighted when Jules Trump

---

[1] Tr. 830 (A. Genger); Stipulated Pretrial Order at 3.
[2] Tr. 837-38 (A. Genger).
[3] *Id.* at 12 (J. Trump).

4

approached him with an offer to buy Trans-Resources' bonds.[4] Genger and Jules Trump,

who both had residences on Williams Island in Miami, Florida, had been friends since at

least the late 1990s.[5] From that time until very near the commencement of this litigation,

Genger and Jules Trump's families regularly socialized, dined, and vacationed together.[6]

Eventually, two entities controlled by Jules and Eddie Trump, plaintiff TR

Investors, LLC ("TR Investors") and plaintiff Glenclova Investment Co. ("Glenclova"),

bought all but $100,000 of Trans-Resources' debt.[7] Shortly after buying Trans-

Resources' bonds, TR Investors and Glenclova converted their debt into equity.[8] Under

an exchange agreement, TR Investors and Glenclova collectively received 2,676.4428

Trans-Resources shares, which amounted to a substantial stake equal to 47.15% of Trans-

Resources' equity.[9]

### B. Genger And The Trump Group Execute A Stockholders Agreement That Requires Notice To Be Given If Genger Transfers His Shares In Trans-Resources

Jules Trump's offer came with strings. In exchange for bailing out Trans-

Resources and agreeing to take a minority interest in Trans-Resources, Trump insisted on

the Stockholders Agreement that gave the Trump Group strong representation and veto

rights.[10] Importantly in light of the present dispute, the Stockholders Agreement

---

[4] *Id.* at 938 (A. Genger).

[5] J. Trump Dep. 27, 88; A. Genger Dep. 62-63.

[6] J. Trump Dep. 27-28; E. Trump Dep. 32; *see also* A. Genger Dep. 156-57 (indicating that Genger and Jules Trump also took regular strolls together around the walking path on Williams Island).

[7] Tr. 117 (J. Trump), 837 (A. Genger).

[8] *Id.* at 119 (J. Trump).

[9] JX-100 (Exchange Agreement (March 30, 2001)).

[10] Tr. 843 (A. Genger) ("[P]art of the deal was to reconstitute the board and to enable Trump family — to enable the Trump family to be on the board, to have — we created a balance of —

5

provided restrictions on, and in some instances prohibitions against, the transfer of

stock.[11]

In particular, Section 2.1 of the Stockholders Agreement prevented a party from

transferring or pledging Trans-Resources stock to any party other than a party expressly

permitted to receive such a transfer (a "Permitted Transferee"). Section 2.1 provides in

relevant part:

> From and after the date hereof, no Stockholder shall directly or indirectly,
> offer, *transfer*, sell, assign, *pledge*, encumber, hypothecate or otherwise
> dispose of any Shares (including any derivative transaction) (a) until after
> December 21, 2003, and, thereafter, only as provided in Articles 3, 4, and 5
> of this Agreement, or (b) after *written notice* to the Company and the other
> Stockholders . . . to (i) in the case of either of the Initial Non-TPR
> Stockholders or their respective Permitted Transferees (A) to [certain
> Permitted Transferees], or (ii) in the case of TPR or a Permitted Transferee
> thereof, to (w) Arie Genger, (x) any entity or entities in which TPR or Arie
> Genger directly owns a majority of the equity interest and directly controls
> a majority of the voting power . . . (y) the estate o[f] Arie Genger or (z) any
> immediate family members or lineal descendants of Arie Genger, or trusts
> of which they are the sole beneficiaries-in-interest, who receive such Shares
> in consequence of the death of Arie Genger, which transferee(s) become a
> party to this Agreement. . . .[12]

That is, Permitted Transferees were: (1) in the case of transfers from any of the Trump

Group entities, any entity in which either TR Investors or Glenclova had at least a 20%

economic interest and a least a 30% voting interest; and (2) in the case of transfers from

TPR, any of the following: (i) Arie Genger himself; (ii) any entity in which TPR or

Genger directly owned a majority of the equity interest and a majority of the voting

---

so that I cannot do anything which is not unanimous. There were all kinds of provisions on
that.").
[11] JX-101 (Stockholders Agreement (2001)) (the "Stockholders Agreement") §§ 2.1, 2.4, 3.1,
3.2, 3.3).
[12] *Id.* § 2.1 (emphasis added).

6

power at the time of the transfer, and Genger agreed to continue to maintain such

ownership at all times thereafter; (iii) the estate of Arie Genger; or (iv) any of Genger's

immediate family members or lineal descendants, or trusts of which they are the sole

beneficiaries-in-interest, who receive the transfer of shares as a result of Genger's

death.[13] If a party to the Stockholders Agreement intended to make a transfer to a non-

Permitted Transferee, then the other party had a right of first refusal, under Section 3.1,

which provides in relevant part:

> [I]f a Stockholder (the "Selling Stockholder") shall desire to sell, assign or
> transfer any Shares held by it to any person other than a Permitted
> Transferee (the "Offered Shares") and shall be in receipt of a bona fide
> written offer to purchase the Offered Shares (the "Offer"), [t]he Selling
> Stockholders shall give the Company and to each Covered Stockholder who
> is not the Selling Stockholder (the "Non-Selling Stockholders") written
> notice containing the terms and conditions of the Offer . . . provided that for
> purposes of this Section 3.1, if the Selling Stockholder is (x) a TPR
> Stockholder, then only the Non-TPR Stockholders shall be deemed to be
> Non-Selling Stockholders; and (y) a Non-TPR Stockholder, then only the
> TPR Stockholders shall be deemed to be Non-Selling Stockholders. . . .
>
> Until 30 days after receipt of such notice, the Non-Selling Stockholders
> shall have the right to elect to purchase all of the Offered Shares at the price
> offered by the prospective purchaser and specified in such notice.[14]

The purpose of expressly limiting transfers to an enumerated list of Permitted

Transferees was to ensure that the Trump Group would be dealing only with Genger, or

one of the entities he controlled, in the future, and not with anyone else.[15] Jules Trump

was particularly concerned about limiting the Trump Group's exposure to the acrimony

---

[13] *Id.*

[14] *Id.* § 3.1.

[15] Tr. 121 (J. Trump), 842-44, 854, 891-92 (A. Genger).

7

plaguing Genger's family,[16] but, after much pressure from Genger, reluctantly acceded to including Genger's family members as Permitted Transferees *only* as an estate planning consequence in the event of Genger's death.[17]

If a transfer was made in violation of Section 2.1, then the Stockholders Agreement provided two remedies. First, Section 2.4 provided that "[a]ny attempt by a Stockholder to transfer Shares in violation of this Agreement shall be void and the Company agrees that it will not effect such a transfer or treat any alleged transferee as the holder of such Shares."[18] Second, Section 3.2(a) of the Stockholders Agreement gave the Trump Group the right to purchase TPR's shares in Trans-Resources if Genger: (1) transferred shares to a non-Permitted Transferee; or (2) effected a change of control in TPR. Section 3.2(a) provides in relevant part:

> The Covered Stockholders other than the hereinafter defined Terminating Stockholder (the "Purchasing Stockholders") shall have the right to elect to purchase the Shares held by a Stockholder (the "Terminating Stockholder" . . ) at the Agreement Price (as defined in Section 3.4) and on the Agreement Terms upon the occurrence of any of the following events for a period ending on the later of 60 days after determination of the Agreement Price for the Terminating Shares and 90 days after the Company and the Purchasing Stockholders receive notice from any source of the occurrence of any of the following events (each Stockholder agreeing to give the others and the Company notice of any such event promptly after its knowledge of the occurrence thereof) . . . .
>
> (iv) the Terminating Stockholder sells, *pledges*, encumbers, hypothecates or *otherwise transfers* any interest in (including any derivative transaction), or

---

[16] *Id.* at 121 (J. Trump) ("I had confidence in Arie and we were willing to go forward with him. But I was not willing to go forward with a bunch of people who would be fighting with each other and ultimately end up greenmailing each other."); *see also id.* at 805-06 (O. Genger) (acknowledging the "nightmar[ish]" relations in the Genger family).

[17] *Id.* at 252 (Hirsch).

[18] Stockholders Agreement § 2.4.

8

> *purports to* sell, *pledge*, encumber, hypothecate or otherwise transfer any
> interest in (including any derivative transaction), any of its Shares, except
> as permitted by and in full compliance with the terms of this
> Agreement. . . .[19]

Therefore, Section 3.2(a) gave the Trump Group 90 days to elect to purchase TPR's

shares after it "receive[d] notice from any source" that a transfer had been made to a non-

Permitted Transferee, or that a change of control had occurred.[20]

Section 6.5 outlined the form of notice required under the various provisions of the

Stockholders Agreement:

> All notices required to be delivered pursuant to this Agreement shall be
> delivered in person or by telegraphic or other facsimile transmission or sent
> by certified mail, return receipt requested, and shall by addressed to the
> Company at its principal business office, to the attention of its Chief
> Executive Officer, to a Non-TPR Stockholder, to the Representatives, and
> any other Stockholders at the address of the Stockholder shown in the
> Company's stock ledger or to such other address as such other Stockholder
> may indicate by duly giving written notice to the Company.[21]

Thus, formal notice of an event such as a share transfer was to be given directly to the

Trump Group entities, *i.e.* TR Investors and Glenclova, who were parties to the

Agreement, and not to Jules Trump personally.[22] The Stockholders Agreement also

contained a non-waiver clause, which provided that "[n]o waiver or failure on the part of

a Company or a Stockholder in the exercise of any right, power or remedy shall operate

as a waiver thereof, nor shall any single or particular exercise by them of any right, power

---

[19] *Id.* § 3.2(a) (emphasis added).
[20] *Id.*
[21] *Id.* § 6.5.
[22] As to TR Investors, it appears that notice was to be given through Mark Hirsch at TR
Investors' official address, and as to Glenclova, notice was to be given through Robert Smith at
Glenclova's official address. *See id.* at 40. Jules Trump was not an officer or director of either
TR Investors or Glenclova. Tr. 117 (J. Trump).

9

or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy."[23]

Finally, under Section 1.6 of the Stockholders Agreement, TR Investors and Glenclova were entitled to an addition 1.85% of TPR's shares in Trans-Resources (the "Balance Shares").[24] The Balance Shares refer to shares that Bank Hapoalim had the option to purchase, the exercise of which would reduce TPR's shareholding by 1.85%. Because of that option, the Trump Group allowed TPR to hold 52.85% of Trans-Resources' stock, even though the parties agreed to a 51%/49% split, on the condition that the Balance Shares would revert to TR Investors and Glenclova if the Bank's option should expire unexercised.[25]

C.  In 2004, As Part Of The Settlement Of His Acrimonious Divorce, Genger Transfers Trans-Resources Stock From TPR To The Sagi Trust, The Orly Trust, And To Himself

On October 26, 2004, after a drawn-out and contentious divorce proceeding, Genger entered into a final marital settlement agreement with his then-wife, Dalia Genger. Under that settlement agreement, Genger transferred his equity interest in TPR to Dalia Genger on October 29, 2004. On that same day, the Trans-Resources shares that TPR previously held were transferred as follows: approximately 13.9% of the shares were transferred to Genger himself, and separate trusts established for his two children, Orly and Sagi Genger (respectively, the "Orly Trust" and the "Sagi Trust"), were each transferred approximately 19.5% of the shares (collectively, the aforementioned "2004

---

[23] Stockholders Agreement § 6.8.
[24] Id. § 1.6.
[25] Id.; see also Tr. 255-57 (Hirsh).

10

Transfers"). According to the transfer agreements, the trustees of each Trust agreed to irrevocable lifetime proxies in favor of Genger (the "Proxies").[26]

At the time the 2004 Transfers were made, Genger did not notify TR Investors or Glenclova of the Transfers as required by the Stockholders Agreement. Genger admits that he never gave the written notice required by the Stockholders Agreement, provided the Trump Group with copies of the Proxies, or passed on a copy of the marital settlement agreement.[27] Nevertheless, Genger argues that TR Investors and Glenclova received notice because he orally told Jules Trump about the 2004 Transfers. In particular, Genger testified that he told Jules Trump about the 2004 Transfers "many times" from the "inception, [when] the idea germinated of how to resolve my divorce, to the execution [of the 2004 Transfers]."[28] Genger testified that he told Jules Trump of the 2004 Transfers during their regular strolls on Williams Island.[29]

For his part, however, Jules Trump categorically denied that Genger ever mentioned the 2004 Transfers.[30] The only other person who testified to hearing any conversations between Genger and Jules Trump relating to the 2004 Transfers was Genger's daughter, Orly. At trial, Orly Genger testified that her father "shared . . . everything" with the Trumps,[31] and that she was present during at least one discussion between Genger and Jules Trump about the 2004 Transfers. In particular, she testified

---

[25] JX-113 (Letter Agreement and Proxy (Oct. 29, 2004)) (the "Proxy").

[27] Pretrial Stipulation and Order 4; Tr. 936, 940 (A. Genger), 99 (J. Trump), 628 (Dowd).

[28] Tr. 856 (A. Genger).

[29] *Id.*

[30] *Id.* at 159 (J. Trump) ("Q. From the time that you became — TR Investors became a stockholder in 2001 to June 13th, 2008, did anyone give you any notice of the 2004 transfers, or the change in control of TPR? Trump. Never. Never, ever.").

[31] *Id.* at 783 (O. Genger).

about a discussion in "late '04 or early '05" at Jules Trump's residence on Williams

Island.[32] But, Orly Genger's testimony regarding that conversation was vague, at best:

> They talked about how TPR and [Trans-Resources] were split, how my —
> my dad spoke about how he split those two, how he hoped that now that my
> brother, since was sort of — it was now me, my mother, and my brother,
> and my brother was supposedly the financial guy supposed to take care of
> us in a sense, he was hoping that — that he would.[33]

When asked for further details, she only elaborated as follows:

> Q. And were there details? Was your father providing details to Mr.
> Trump —
>
> O. Genger. Yeah.
>
> Q. — in those discussions?
>
> O. Genger. The fact that my brother was in the middle of it, you know, and
> just the awful nature of it. Everything was told to Jules.[34]

On cross-examination, Orly Genger clarified that the discussion between her father and

Jules Trump some time in late 2004 or early 2005 definitely took place *after* the 2004

Transfers occurred,[35] and that she did not remember her father specifically discussing the

transfer of Trans-Resources shares to the Sagi Trust.[36] But she did not provide further

---

[32] *Id.* at 787. Orly Genger also briefly mentioned a conversation between Genger and Jules
Trump sometime during 2007, when her brother brought a lawsuit against her father. *Id.* at 799.
But the only details she provided regarding that discussion was that she remembered "them
speaking specifically about th[e] lawsuit and how incredible it was that my father had given my
brother TPR [Investment], [and] he was actually against him now." *Id.*

[33] *Id.* at 786.

[34] *Id.* at 789.

[35] *Id.* at 801 ("Q. And I want to make sure I understand. [The conversation between Genger and
Jules Trump] — it definitely occurred after the 2004 transfers had occurred; is that right? O.
Genger. Yes.").

[36] The precise colloquy was as follows:
> Q. Now, in this conversation the issue that you recall being discussed was the
> transfer of control of TPR [Investment] to your brother. He would be in charge.

12

2/25/2013 1:27 PM

details about the substance of the discussion between her father and Jules Trump other
than to say that the "essence" of the discussion was "that [Sagi] was now sort of in
charge."[37] The lack of specific details in her testimony undermines her credibility
because of her personal interest in the outcome of this case and her obvious desire to
protect her father in his feud with her brother,[38] and because Genger himself testified that
no one else was present during his alleged conversations with Jules Trump, even his
daughter Orly.[39]

---

O. Genger.  That was the essence, that he was now sort of in charge.

Q.  That was the essence of it.

O. Genger.  Right.

Q.  Yeah.  And the question of the transfer of TPR's shares of [Trans-Resources]
to your trust and your brother's trust and your father, you don't recall that that
was discussed during this conversation?

O. Genger.  I'm sorry.  Can you say it again?

Q.  Yes.  The question of the transfer by TPR [Investment] of its [Trans-
Resources] shares —

O. Genger.  Right.

Q.  — to your trust, your brother's trust, and your father, that was not discussed in
this conversation?

O. Genger.  Not that I remember.

*Id.* at 803-04.
[37] *Id.*
[38] *Id.* at 813 ("Q.  You stand to benefit if your father prevails in this litigation?  O. Genger:  I
hope.  Yeah, I think.").
[39] *Id.* at 895 (A. Genger) ("The Court: It was just the two of you?  Genger:  Just the two of us.
The Court: Not your daughter?  Genger: Not my daughter.").

13

Besides his own testimony and the testimony of his daughter, the only other evidence to which Genger points as proof that he told the Trumps about the 2004 Transfers are two after-the-fact events. First, Genger points to a written consent that Trans-Resources' shareholders were required to sign in 2005 (the "2005 Written Consent") in order to resolve a dispute with Bank Hapoalim, with whom Trans-Resources had a long-term relationship, over Trans-Resources' outstanding debt. The signature page of the 2005 Written Consent included signature blocks for not only Arie Genger, but also the Orly Trust and the Sagi Trust, and identified Arie Genger as the proxy for the two Trusts.[40] That is, by including signature lines for the Orly Trust and the Sagi Trust as shareholders, the 2005 Written Consent disclosed that some sort of transfer had taken place. For their part, the Trumps credibly claim that they did not notice the additional signature lines in the 2005 Written Consent when they signed the page.[41]

Second, Genger claims that he mentioned the 2004 Transfers during a Trans-Resources board meeting in November 2007 at which Jules Trump was present (the "November 2007 Board Meeting").[42] For support, Genger points to the minutes of that meeting, which reflect that "Mr. Genger advised the directors that both he and Mr. Dowd had been sued by TPR Investment Associates, Inc. and other related entities with respect to their activities as officers and/or directors of TPR Investment Associates, Inc., *the former parent Company of [Trans-Resources]*."[43] Genger avers that this passing

---

[40] JX-125 (executed written consent (July 26, 2005)) (the "2005 Written Consent").
[41] Tr. 101-05 (J. Trump), 185-92 (Hirsch)
[42] JX-149 (Trans-Resources board meeting minutes (Nov. 19, 2007)).
[43] *Id.*

14

reference to TPR being the former parent of Trans-Resources should have tipped Trump

off that the 2004 Transfers were made. As we will see, that argument is undercut,

however, by the reality that Genger's loyal subordinate, Bill Dowd, appears to have

manipulated the corporate minutes on other occasions to suit Genger's interests.

### D. Genger Finally Tells The Trumps About The 2004 Transfers During Negotiations To Restructure Trans-Resources' Debt

In the spring of 2008, Trans-Resources was once again having financial troubles,

now in a dispute with Bank Hapoalim, which was pressuring Trans-Resources to sell its

main subsidiary, Haifa Chemical, Inc., in order to avoid foreclosure.[44]  Genger turned to

the Trumps for help, asking Jules Trump if the Trump Group would provide the capital

necessary to retire Trans-Resources' bank debt in exchange for an increased equity

position that would give the Trump Group control of Trans-Resources.[45]  Genger relied

on Jules Trump in particular not only because of their past relationship but also because

Bank Hapoalim, which had indicated that it had lost confidence in Genger, was however

willing to negotiate with Trump in regard to Trans-Resources' debt.[46]  On May 31, 2008,

Genger and Jules Trump met to discuss the general contours of an agreement (the

"Funding Agreement"), which would provide for a capital infusion into Trans-

Resources.[47]  After that meeting, Trump negotiated with Bank Hapoalim to reduce Trans-

---

[44] Tr. 38-39 (J. Trump).
[45] Id. at 41-42 (J. Trump).
[46] Id. at 124-27, 146 (J. Trump).
[47] Id. at 872 (A. Genger); 43-44, 135-36 (J. Trump).

15

Resources' debt load, and asked Genger to meet with Eddie Trump and Mark Hirsch, the

Trumps' lawyer, in New York to work out the details of the Funding Agreement.[48]

### 1. Genger, Eddie Trump, And Mark Hirsch Meet On June 13, 2008

Genger met with Eddie Trump and Hirsch in New York on June 13, 2008 (the

"June 13 Meeting"). Early in the June 13 Meeting, Hirsch gave Genger a draft of the

Funding Agreement. That draft listed TPR, Glenclova, and TR Investors as the

company's sole shareholders, thereby strongly suggesting that the Trump Group was

unaware at that time of the 2004 Transfers.[49] Upon reviewing the draft, Genger

commented that TPR was no longer a Trans-Resources stockholder.[50] Both Eddie Trump

and Hirsch expressed shock upon hearing that, and Hirsch reminded Genger that he was

not permitted to transfer his stake in Trans-Resources without first providing notice and a

right of first refusal to the Trump Group.[51]

Upon seeing their surprise, Genger did not stop and say what one would expect to

be the first thing out of his mouth if Genger had already given repeated notice to Jules

---

[48] *Id.* at 868-69 (A. Genger).

[49] JX-170 (email from Mark Hirsch to Jules Trump with draft agreements attached (June 12, 2008)).

[50] Tr. 283 (Hirsch), 498-99 (E. Trump).

[51] *Id.* at 284-85 (Hirsch), 499 (E. Trump). Interestingly, the trial record includes an email from Hirsch to Jules Trump, dated June 11, 2008, in which Hirsch describes the transfer restrictions and the right of first refusal provisions in the Stockholders Agreement. JX-167 (email from Mark Hirsch to Jules Trump (June 11, 2008)). The timing of that email suggests that the Trumps might have known about the 2004 Transfers before the June 13, 2008 meeting. But I do not find this email to be proof that Genger had given the Trumps oral notice because: (1) the Trumps may have simply suspected on their own that something like the 2004 Transfers had taken place; or (2) the Trumps may have heard rumors from sources other than Genger that the 2004 Transfers had occurred. In either event, notice as required under Stockholders Agreement had not been given. Furthermore, even if the email did indicate that notice had been given, it still suggests that the timing of that notice was no earlier than June 2008.

16

Trump: "Why are you acting so surprised? I told Jules all about these Transfers years ago."[52] Rather, Genger acknowledged that he had not provided notice of the 2004 Transfers, but insisted that he had lived within the spirit of the Stockholders Agreement by maintaining control of the stock through the Proxies.[53] And, Genger spent the better part of that day explaining the 2004 Transfers to Eddie Trump and Hirsch,[54] which would have been unnecessary had they already known about the Transfers.

Finally, at the end of the meeting, Genger offered to arrange a meeting with his lawyer, David Lentz, who was most familiar with the details of the 2004 Transfers.[55] Eddie Trump and Hirsch met with Lentz three days later, on June 16, 2008, to discuss the details of the 2004 Transfers. It is also noteworthy that, before that meeting, Genger never told Lentz that he had given Jules Trump oral notice of the 2004 Transfers.[56] If notice of the 2004 Transfers had indeed been given, one would have expected Arie Genger to have at least mentioned that important detail to his own counsel. During that

---

[52] Tr. 501 (E. Trump) ("At any time during the meeting did Mr. Genger say, 'Well, I told your brother, Jules. Let's get him on the phone,' or words to that effect? E. Trump: No."). Genger's testimony on this important issue was vague at best. He only recalled telling Eddie Trump and Hirsh something to the effect of "Jules knows about it" at some point during the June 13 Meeting. *Id.* at 900 (A. Genger). But, Genger could give no further details, and he admitted that he never pressed the point or suggested that they get Jules Trump on the phone to clarify the issue. *Id.*

[53] *Id.* at 284 (Hirsch) ("I took out the agreement to show [Genger] specifically why he could not have transferred the shares, that this was not permitted under the agreement. And he said, 'All right. You know, so I didn't tell you about it, but I didn't think I had to. I mean, what's changed? I still – I still vote the shares.'").

[54] *Id.* at 893-94, 899 (A. Genger).

[55] *Id.* at 902-03 (A. Genger).

[56] *Id.* at 7 (Lentz) ("Q: And Mr. Genger didn't tell you [before the June 16th meeting] that he claimed to have given some sort of notice to Jules Trump. That's correct; right? . . . Lentz: I believe your statement is correct.").

17

meeting, Lentz never suggested that Jules Trump had already known about the 2004

Transfers because Genger had told him about them years ago.[57]

### 2. Later Communications Between Genger, William Dowd, And David Lentz Admit That Genger Never Gave The Trump Group Notice Of The 2004 Transfers

In a series of emails and memoranda produced over the two weeks following the

June 16 meeting, Lentz repeatedly acknowledged Genger's failure to provide any notice

of the 2004 Transfers. In a June 17, 2008 email, Lentz wrote that "[t]he Trumps *never*

*consented to* and don't want [the Sagi] Trust or [Orly] Trust . . . as minority partners

(shareholders) in [Trans-Resources]."[58] And, in a June 26, 2008 email, Lentz wrote that

"no notice was given" to the Trumps about the 2004 Transfers.[59] But, Lentz's most

telling admission came in a memorandum he wrote for Genger analyzing the parties'

various bargaining positions and how likely machinations by Sagi Genger would affect

the outcome of the dispute (the "Lentz Memo"). In that Memo, Lentz wrote:

> *While it is true the Trumps never got notice,* the entire intent of the
> Shareholder's agreement has been carried out anyway. In other words, *why
> did AG not give them actual notice?* Because, AG will testify, using the
> TPR shell was never the intention of the Trumps and AG — the real
> intention was to keep the ownership of [Trans-Resources] in the Genger
> family under the voting and operational control of AG and the Stipulation
> did just that. So, AG becomes SG's best witness. AG will not say I just
> forgot to tell the Trumps. He will not say I tried to get away with
> something and thought the Trumps would not find out. He will testify that

---

[57] *Id.* at 990 (Lentz) ("Q. Nobody said at the meeting, then, that any notice had been given in substance; right? Lentz. Correct."); *see also id.* at 994 (Lentz) ("Q. [Y]ou went through an entire meeting about the absence of notice and people asking what, in fact, occurred. And no one from your side of the discussion spoke a peep refuting that contention; right? Lentz: Nobody refuted it, that's correct.").

[58] JX-331 (email from David Lentz to Arie Genger, Bill Dowd, and Christopher Gengaro (June 17, 2008)) (emphasis added).

[59] JX-337 (email from David Lentz to Arie Genger, Bill Dowd, and Christopher Gengaro (June 26, 2008)).

18

whether the corporate form of TPR or the kids' trusts w[as] used made no difference. The essence of these protections was to make sure the Genger family owned roughly 50% and that AG could vote all of those shares. That's what happened. So, *while there was a technical violation*, the Trumps got what they bargained for.[60]

Later in that same Memo, Lentz added: "AG does not have clean hands because like SG, *AG never told the Trumps*."[61] Thus, Genger's own attorney repeatedly acknowledged that Genger had never given the Trumps *any* type of notice.

### 3.  At The June 25, 2008 Meeting Of Trans-Resources' Board And Stockholders, Genger Himself Indicates That Notice Of The 2004 Transfers Was Not Given To The Trumps

The Trans-Resources board met on June 25, 2008 (the "June 25 Board Meeting") and unanimously approved the Funding Agreement, which provided that the Trumps would invest an additional $57.5 million in the company in exchange for 50% of Trans-Resources' outstanding stock, which would give the Trumps clear voting control and by far the largest equity position in the company.[62] That is, the totality of the Funding Agreement would address the injury to the Trump Group from the 2004 Transfers by giving it voting control of Trans-Resources. Handwritten notes by Bill Dowd, a director and Trans-Resources' chief executive officer, recorded that "AG describe[d] [Trans-Resources] stock transfer *in violation of agreement*" during the meeting.[63] That is, Genger acknowledged that the 2004 Transfers were made without providing notice to the

---

[60] JX-332 (memorandum from David Lentz to Arie Genger, Bill Dowd, and Chris Gengaro) (the "Lentz Memo") (emphasis added).

[61] *Id.* (emphasis added).

[62] JX-181 (minutes of joint meeting of the board of directors and stockholders of Trans-Resources, Inc. (June 25, 2008)).

[63] JX-179 (handwritten notes of Bill Dowd (June 25, 2008)) (emphasis added).

19

Trumps. Tellingly, Dowd, who had worked for Genger for years, omitted that important admission from the formal minutes he drafted following the meeting.[64]

### E. Negotiations To Restructure Trans-Resources Break Down, And The Parties Eventually Commence This Litigation

Although the Funding Agreement solved the problem with Bank Hapoalim, Genger and the Trumps still had to sort out how to ensure that the Trumps were given control of the Trans-Resources board as required under the Funding Agreement. That was a problem because Genger and the Trumps anticipated that Sagi Genger, who now had a claim to be a Trans-Resources stockholder on account of the 2004 Transfers, would litigate any attempt to transfer control from Genger to the Trumps, if for no other reason than to spite his father.[65] During June and July of 2008, Genger and the Trumps discussed options for dealing with Sagi Genger. One of the options the Trumps suggested was confronting Sagi Genger with the argument that the 2004 Transfers violated the Stockholders Agreement, and that he was therefore not a beneficial owner of the Shares.[66] Importantly, Genger resisted this approach, likely because that would expose him to liability for representing falsely in the divorce settlement that the 2004 Transfers were not made in violation of any agreement.[67]

---

[64] *See* JX-179 (draft meeting minutes (June 25, 2008)) (omitting any reference to the 2004 Transfers being made in violation of the Stockholders Agreement).
[65] Tr. 318-19 (Hirsch).
[66] *Id.*
[67] *Id.* at 304 (Hirsch).

1. <u>Genger Reneges On The Funding Agreement, And The Trumps Respond With A Lawsuit</u>

Genger and the Trumps never reached common ground on how to approach Sagi, because Genger began to back-track on the draft terms of the Funding Agreement. Genger could afford to back out of the Funding Agreement because he had devised a way — albeit one of questionable propriety — to upstream funds from the Haifa Chemical, Inc. subsidiary to Trans-Resources, thus allowing Trans-Resources to fulfill its obligations to Bank Hapoalim, which Jules Trump had successfully reduced during his negotiations with the bank on behalf of Trans-Resources.[68] Because Genger had secured an alternative source of capital, the Funding Agreement with the Trumps was no longer the only mechanism for rescuing Trans-Resources. From that position of increased leverage, Genger began to disengage from the Funding Agreement deal. First, despite the fact that Bank Hapoalim required payment by late August, Genger requested that execution of the Funding Agreement be postponed upon the advice of counsel. Wielding a problem of his own creation, Genger asserted that Trans-Resources' Delaware lawyers had advised him that Trans-Resources needed to establish an independent committee to review the fairness of the Funding Agreement because the recipients of the 2004 Transfers might complain. Second, at an August 1, 2008 meeting, Genger's lawyers claimed, for the first time, that Genger had given Jules Trump oral notice of the 2004

---

[68] Dowd Dep. 281.

21

2/25/2013 1:27 PM

Transfers years ago, and threatened litigation if the Trumps chose to challenge the 2004 Transfers.[69]

The Trumps responded on August 8, 2008 with a letter to TPR and Trans-Resources indicating that Glenclova was exercising its right under Section 3.2 of the Stockholders Agreement to purchase all of the shares subject to the 2004 Transfers, and requesting that the Trans-Resources board begin the process of establishing their purchase price.[70] On August 11, 2008, Glenclova filed a suit in the United States District Court for the Southern District of New York seeking to enforce the Funding Agreement and its rights under the Stockholders Agreement.[71] On August 13, 2008, Genger responded through a letter from his attorneys, claiming that Glenclova had no right to purchase the shares because he had kept Jules Trump fully informed of the 2004 Transfers at the time they were made four years prior.[72]

2. The Trump Group Purchases The Sagi Trust's Shares And Reconstitutes Trans-Resources' Board Of Directors, Leading To This Section 225 Action

The lawsuit in federal court in New York was not the only course of action the Trumps took. On August 21, 2008, Jules Trump contacted Sagi Genger to explore the possibility of acquiring the 1,102.8 shares purportedly transferred to the Sagi Trust in 2004 (the "Sagi Shares").[73] And, on August 22, 2008, the Trumps purchased the Sagi Shares pursuant to a stock purchase agreement (the "Purchase Agreement") between the

---

[69] Tr. 65, 155-56 (J. Trump); 364 (Hirsch).
[70] JX-198 (letter from Glenclova to TPR and Trans-Resources (Aug. 8, 2008)).
[71] JX-204 (Complaint, *New TR Equity, LLC v. Trans-Resources, Inc.* (S.D.N.Y. Aug. 11, 2008)).
[72] JX-350 (letter from Charles Weissman to Barry Adelman (Aug. 13, 2008)).
[73] Tr. 111 (J. Trump).

Sagi Trust, TPR, and the Trumps' entities, TR Investors, Glenclova, New TR Equity I, LLC ("Equity I"), and New TR Equity II, LLC ("Equity II").[74] Importantly, the transaction included not only the Sagi Trust as a party but also the wrongful transferor, TPR. Sagi Genger could act for TPR because, after making the 2004 Transfers, Genger had ceded control of TPR to Dalia Genger, who subsequently sold her interest in TPR to her son, Sagi.[75] The Purchase Agreement contained a specific section addressing the reality that the Trump Group viewed the 2004 Transfers as void and that TPR still owned them and was obliged to sell them to the Trump Group at 2004 values. To wit, the Purchase Agreement provided that it would be considered consummated between the Trump Group and *TPR* if the 2004 Transfers were to be found void:

> If at any time following the Closing Date, it is determined that Seller is not the record and beneficial owner of the Shares as of the date hereof, by virtue of the transfer of the Shares to it by TPR being deemed to have been void or for any other reason, and that all right, title and interest in and to the Shares is held by TPR, subject only to the plaintiff's asserted rights under the Stockholders Agreement asserted in the action styled Glenclova Investment Co. v. Trans-Resources, Inc. and TPR Investment Associates, Inc., Case No. 08-CIV-7140 (JFK), pending the United States District Court for the Southern District of New York, the parties hereby agree that (a) *this Agreement and the transactions contemplated hereby shall be deemed to have been entered into and consummated with TPR, (b) the Purchasers shall retain all right, title and interest in and to the Shares as if purchased from TPR pursuant to this Agreement, (c) TPR shall look only to Seller for any payments made by the Purchasers pursuant to this Agreement, (d) the Purchasers shall have no liability or obligation to TPR in respect of the Shares, and (e) all representations, warranties, covenants and agreements made by Seller herein, shall be deemed to have been made by TPR as of the date hereof.*[76]

---

[74] JX-225 (the "Purchase Agreement").

[75] Tr. 547 (S. Genger).

[76] Purchase Agreement § 10 (emphasis added).

23

Thus, by signing an agreement with both the Sagi Trust and TPR, the wrongful transferee, the Trump Group dealt with the Genger-caused problem that Genger exploited in order to derail the Funding Agreement. By dealing directly with both the allegedly innocent transferee — the Sagi Trust — and the wrongdoer — TPR — the Trump Group covered all of its bases.

Having purchased the Sagi Shares, which gave them a majority equity position in Trans-Resources, the Trump Group then executed a written consent on August 25, 2008 that removed Genger from the Trans-Resources board, elected Eddie Trump and Hirsch to the board, and affirmed the election of Jules Trump and Robert Smith to the board. The Trump Group delivered that written consent to Trans-Resources, but Genger rejected it.[77]

In response, the Trump Group filed a single-count complaint pursuant to 8 *Del. C.* § 225 in order to determine the composition of the Trans-Resources board (the "Section 225 Action"). Consistent with their position throughout the summer of 2008, the Trump Group's central claim was that the 2004 Transfers were made in violation of the Stockholders Agreement, and that it therefore had the right to purchase all of TPR's shares pursuant to Section 3 of the Stockholders Agreement.[78] Genger responded with a counterclaim, raising a number of arguments for why the 2004 Transfers were made appropriately — chief among them his assertions that he told Jules Trump of the Transfers at the time they were made, and that, in any event, the Trump Group's purchase

---

[77] Tr. 403-06 (Hirsch).
[78] Compl. ¶ 10.

of the Sagi Shares in 2008 ratified the 2004 Transfers — and claiming that, therefore, he still controlled Trans-Resources' board. Genger also argues that the Trump Group violated Section 2.1 of the Stockholders Agreement when Equity I and Equity II pledged Trans-Resources shares in return for financing to buy the Sagi Shares.

Soon after the Section 225 Action was filed, the parties promptly settled the matter, which resulted in a stipulated final judgment that declared that the Trump Group's designees constituted a majority of the board.[79] But, like any other moment of agreement between the parties in this case on anything, that settlement was short-lived. On October 10, 2008 — two weeks after the final judgment was entered — the Trump Group moved to re-open the Section 225 Action. They moved to reopen because they alleged that, after taking control of Trans-Resources, they discovered that Genger had destroyed documents relevant to the Section 225 Action in violation of a status quo order.

The issue of whether Genger should be held in contempt for destroying documents in violation of this court's status quo order was decided in 2009 in a separate trial.[80] It is unnecessary to recount here the facts or analysis involved in that trial, which are summarized in the opinion that resulted.[81] What matters for present purposes is the outcome: Genger was found to be in contempt, which raises Genger's evidentiary burden on any issue on which he has the burden of proof by one level and renders his uncorroborated testimony insufficient to establish material facts.[82]

---

[79] See TR Investors, LLC v. Arie Genger, C.A. No. 3994-VCS (Sept. 26, 2008) (ORDER).
[80] TR Investors, LLC v. Genger, 2009 WL 4696062 (Del. Ch. Dec. 9, 2009).
[81] See id. at *1-15.
[82] See id. at *18-19.

### III. Legal Analysis

Genger has proliferated a host of theories — including new ones after trial — as to why he retains voting control over Trans-Resources, and the Trump Group has accurately described its efforts to address Genger's ever-changing arguments as playing a game of "Whack-a-Mole."[83] It is possible, nevertheless, to sift through the heaping stew pot filled with every conceivable exculpatory theory that ever crossed his lawyers' inventive minds that Genger has cooked up and identify the chunkier ingredients. Genger's main theory is that the 2004 Transfers were made appropriately, either because he gave the Trump Group notice or because the Trump Group ratified the Transfers. Genger's primary alternative theory is that, even if the 2004 Transfers were not appropriate, the Trump Group took the Sagi Shares subject to the Proxy in his favor.

In the analysis that follows, I do not address all of the alternative theories Genger concocted, but rather focus on his two fundamental theories. Treating all of his secondary arguments is unnecessary because Genger has failed to bear his evidentiary burden as to those core theories on which the rest of his case depends. That is, Genger has failed to prove that he properly notified the Trump Group of the 2004 Transfers at any time before the June 13 Meeting, or that the Trump Group somehow ratified the 2004 Transfers after the fact. And, even if the Trump Group did ratify the 2004 Transfers —

---

[83] *See* Trump Post-Trial Ans. Br. 3. For example, Genger's counsel spent a great deal of time at post-trial oral argument in a befuddling exposition of a theory *introduced into the case as a footnote in its post-trial answering brief. Compare* Post-Trial Tr. 128-58 *with* Genger Post-Trial Ans. Br. 24, n. 18.

26

which it did not — Genger has failed to prove that it took the Sagi Shares subject to the Proxy.

## A. Standard Of Review

The standard of review I apply in analyzing the aforementioned issues is different in this case than what is typical. The party attempting to gain control of an entity in an action pursuant to 8 *Del. C.* § 225 bears the burden of proof on any issue, the outcome of which would affect the determination of the Trans-Resources' board.[84] Generally speaking, the burden of proof in civil cases is that the party with the burden must prove his position by a preponderance of the evidence.[85] But, because of this court's prior ruling in the contempt trial, Genger's burden is raised a level, meaning that he must prevail on any issue in which he bears the burden of proof by clear and convincing evidence. And, as mentioned before, Genger's own uncorroborated testimony will not be sufficient to establish any material fact.[86]

## B. Arie Genger Did Not Notify The Trump Group Of The 2004 Transfers Until June 13, 2008

The first issue I must address is Genger's argument that he gave the Trump Group notice of the 2004 Transfers during his conversations in late 2004 or early 2005 with Jules Trump about his divorce and that the Trump Group is chargeable with laches.[87]

---

[84] *See Agranoff v. Miller*, 1999 WL 219650, at *12 (Del. Ch. Apr. 12, 1999), *aff'd*, 737 A.2d 530 (Del. 1999). Genger conceded that he bears the burden of proof. Contempt Trial Tr. 355.
[85] *See SinoMab Bioscience Ltd. v. Immunomedics, Inc.*, 2009 WL 1707891, at *12 (Del. Ch. June 16, 2009).
[86] *See supra* page 25.
[87] Laches operates to bar a claim where "(a) [the] plaintiff knew (or should have known) of its rights or claim; (b) [the] plaintiff failed to assert its rights or claim; and (c) [the] defendant has materially changed its position or otherwise materially relied on plaintiff's failure to assert."

27

This argument is central to the case because the Stockholders Agreement provides that, upon receiving notice of an improper transfer from any source, the Trump Group has 90 days to elect to purchase the shares held by the stockholder making the transfer, *i.e.* TPR.[88] If the first time the Trumps heard about the 2004 Transfers was at the June 13 Meeting, then the Trump Group acted within the 90-day window provided in the contract because it elected to purchase TPR's shares on August 8, 2008, when it sent TPR a letter indicating that it elected to exercise its rights under Section 3.2 of the Stockholders Agreement.[89] But, if the Trumps received notice some time before May 8, 2008, then their demand to exercise their purchase rights under the Stockholders Agreement on August 8, 2008 would arguably be tardy.

Tellingly, Genger spent only one and a half pages in his post-trial briefing on this argument.[90] That is likely because he knew, as shown below, that he has failed to bear his evidentiary burden on this issue. There is no credible evidence indicating that Genger ever told Jules Trump about the 2004 Transfers in late 2004 or early 2005.

At trial, Genger offered little more than his unbelievable and uncorroborated testimony to support his claim that he notified the Trump Group. As discussed earlier, Genger testified that he told Jules Trump about the 2004 Transfers on a number of occasions in late 2004 or early 2005 while the two discussed developments in Genger's

---

*Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,* 714 A.2d 96, 104 (Del. Ch. 1998); *see also Fed. United Corp. v. Havender,* 11 A.2d 331, 344 (Del. 1940) ("Sitting by inactive and in what amounts to silence, when every consideration for the rights of others demanded prompt and vigorous action, and until affairs had become so complicated that a restoration of former status was difficult, if not impossible, is conduct amounting to laches.").

[88] Stockholders Agreement § 3.2(a).

[89] JX-198 (Letter from Glenclova to Trans-Resources and TPR (Aug. 8, 2008)).

[90] *See* Genger Post-Trial Op. Br. 28-30.

28

divorce during their strolls on Williams Island.[91] For his part, Jules Trump categorically

denied that Genger ever mentioned the 2004 Transfers in late 2004 or early 2005.[92] The

only other person who testified to hearing Genger and Trump discuss the matter was Orly

Genger. But her testimony gave little detail about what was actually said during those

alleged conversations, and it was contradicted by Genger himself, who said that she was

not present at the key conversation when he told Jules Trump about the Transfers.[93]

Therefore, I do not find her testimony of the alleged conversations between Genger and

Jules Trump credible, especially in light of her personal interest in this case.

Moreover, if Genger did in fact tell Jules Trump about the 2004 Transfers in late

2004 or early 2005, then why did he not press that point at the June 13 Meeting when

Eddie Trump and Hirsch appeared shocked to hear the news? The natural thing to say in

that situation would have been to make the obvious point that he had told Jules about it

years ago. But, at trial, Genger only testified vaguely, haltingly, and meekly that he told

them something along the lines of "Jules knows about it," and gave no other details of

what he said in that regard.[94] Genger also admitted that he never pressed the point any

further, even though he became "[v]ery frustrated" with the repeated questions Eddie

Trump and Hirsch were asking.[95] For example, Genger never said that they should get

Jules Trump on the phone to confirm that Genger had indeed told him about the

---

[91] *See supra* page 11.
[92] *See supra* page 11.
[93] *See supra* page 11-13.
[94] Tr. 900 (A. Genger).
[95] *Id.*

29

Transfers.[96]  Rather, Genger attempted to justify the Transfers on the grounds that he still had voting control through the Proxies.[97]

Genger also failed to mention his alleged conversations with Jules Trump even when he spoke with his lawyer, David Lentz, after the June 13 Meeting.[98]  Such an important detail would, if true, have been one of the first things Genger told his counsel. But, the evidence indicates Lentz believed at the time that Genger had never informed Jules Trump of the 2004 Transfers.[99]  That fact is reflected most clearly in the Lentz Memo, which stated repeatedly that notice had never been provided to the Trump Group.[100]

Thus, the overwhelming thrust of the evidence indicates that everyone in Genger's camp knew full well that he had never told the Trump Group about the 2004 Transfers before the June 13 Meeting.[101]  Indeed, Bill Dowd's notes of the June 25 Board Meeting indicate that Genger himself admitted that the Transfers were made in violation of the Stockholders Agreement.[102]  The inescapable conclusion is that Genger did not provide the Trump Group with any form of notice before the June 13 Meeting, choosing rather to trust in his savvy to manage the Trumps if the issue ever arose.

Nor can Genger rely on the passing references to the possibility of a transfer in the 2005 Written Consents and the minutes of the November 2007 Board Meeting.  As noted,

---

[96] *Id.*

[97] *See supra* page 17.

[98] *See supra* page 17.

[99] *See supra* page 17-19.

[100] *See supra* page 18-19.

[101] *See* Tr. 631 (Dowd), 1008 (Lentz).

[102] *See supra* page 19.

the accuracy of the minutes of the November 2007 Board Meeting appears to be suspect.[103] Furthermore, the Stockholders Agreement required a specific form of notice to be given to TR Investors and Glenclova.[104] Even if Genger told Jules Trump about the 2004 Transfers in late 2004 or early 2005, which I conclude he did not, that would not constitute notice to TR Investors or Glenclova. But more important is the fact that passing references in the 2005 Written Notices or the minutes of the November 2007 Board Meeting do not constitute proper notice of any kind or even put the Trump Group on effective inquiry notice. Business people can miss things. The idea that the Trump Group had to review every stray reference in the board minutes or to read between the lines on the signature page of the 2005 Written Consents for signs of a possible transfer is wrong. The notice provision in the Stockholders Agreement was specific and designed to ensure that the Trump Group did not have to police the world in this way, as was the Stockholders Agreement's strong anti-waiver provision.[105] Finally, I am persuaded by, among other things, the draft Funding Agreement the Trump Group proposed that indicated that the Trump Group did not know of the 2004 Transfers. Notably, I conclude that the Trump Group would prevail on this issue even if they had the burden to show that they had not been given proper notice. But, because Genger admits he did not give proper notice as required under the contract,[106] it was his burden to show that he should nevertheless be alleviated of his obligations under the Stockholders Agreement because

---

[103] *See supra* pages 19-20.
[104] *See* Stockholders Agreement § 6.5.
[105] *See id.* at §§ 6.5, 6.8.
[106] *See* Pretrial Stipulation and Order 4.

31

he gave Jules Trump oral notice and, certainly, it was his burden to prove a laches
defense.

### C. The Trump Group Did Not Ratify The 2004 Transfers

Genger next argues that the Trump Group nevertheless ratified the 2004 Transfers.
The defense of ratification is perhaps best understood by reference to its closest cousin,
the doctrine of acquiescence.[107] Acquiescence occurs when a party "has knowledge of an
improper act by another, yet stands by without objection and allows the other party to act
in a manner inconsistent with the claimant's property rights."[108] Ratification differs
primarily in timing: "[a]quiescence properly speaks of assent by words or conduct *during
the progress* of a transaction, while ratification suggests an assent *after the fact*."[109]
Thus, to find that a party ratified a prior act, it is first necessary to find that the ratifying
party had "[k]nowledge, actual or imputed, of all material facts."[110] Second, ratification
requires an affirmative act by the ratifying party. Assent can be "implied from conduct,

---

[107] *See Frank v. Wilson & Co.*, 32 A.2d 277, 283 (Del. 1943) ("Acquiescence and ratification are closely related.").

[108] *Brandywine Dev. Group, L.L.C. v. Alpha Trust*, 2003 WL 241727, at *4 (Del. Ch. Jan. 30, 2003).

[109] *Frank*, 32 A.2d at 283 (emphasis added); *see also* 1 DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY, § 11.03[a], at 11-20 (2009) ("Acquiescence involves assent during the progress of a transaction, while ratification suggests assent after the fact.").

[110] *Frank*, 32 A.2d at 283; *see also Papaioanu v. Comm'rs of Rehoboth*, 186 A.2d 745, 749-50 (Del. Ch. 1962).

32

as well as expressed by words" but is always a "voluntary and positive act."[111] Accepting

the benefits of a transaction can be an indication of that assent.[112]

### 1. Genger Has Not Met His Burden Of Proof As To His Ratification Claim

Realizing that he had a very weak argument that he gave effective notice of the

2004 Transfers to the Trump Group, Genger spent most of his briefing attempting to

argue that the Trump Group ratified the 2004 Transfers. Because of his prior acts of

spoliation, Genger bears the burden to prove ratification by clear and convincing

evidence. He has not done so.

Genger argues that the Trump Group ratified the 2004 Transfers on two occasions:

(1) when it accepted shareholder approval of the Funding Agreement at the June 25

Board Meeting; and (2) when it purchased the Sagi Shares on August 22, 2008.[113] As to

---

[111] *Frank*, 32 A.2d at 283; *see also* WOLFE & PITTENGER, § 11.03[a] at 11-19 to 11-20 (stating that ratification requires proof of a relinquishment of existing, known rights, and the "acceptance of new replacement rights or benefits").

[112] *See Kahn v. Household Acquisition Corp.*, 591 A.2d 166, 177 (Del. 1991) (stating that accepting the benefits of a transaction, even though the conduct in question is a breach of some duty owed to the shareholder, may bar the shareholder from obtaining equitable relief); *Frank*, 32 A.2d at 282 (finding that a shareholder "could not accept the benefit offered by the [transaction] and at the same time deny its validity"); *Giammalvo v. Sunshine Mining Co.*, 1994 WL 30547, at *10 (Del. Ch. Jan. 31, 1994), *aff'd*, 651 A.2d 787 (Del. 1994) ("The equitable defenses of ratification and acquiescence are closely related. Under the proper circumstances, both doctrine prevent one who accepts the benefits of a transaction from thereafter attacking it."); *Dannley v. Murray*, 1980 WL 268061, at *4 (Del. Ch. July 3, 1980) ("The 'affirmance' required to create ratification . . . may arise by the retention of benefits with knowledge of the unauthorized acts.") (citations omitted); *Trounstine v. Remington Rand*, 194 A. 95, 99 (Del. Ch. 1937) ("[E]quity will not hear a complainant stultify himself by complaining against acts in which he participated or of which he has demonstrated his approval by sharing in their benefits.").

[113] Later in the briefing process, Genger recast his argument about the 2005 Written Consents and the minutes of the November 2007 Board Meeting in ratification terms. That is, Genger argued that the 2005 Written Consents and the minutes of the November 2007 Board Meeting indicate that the Trump Group ratified the 2004 Transfers. The argument fares no better presented within a ratification analysis. As explained above, I find this argument unconvincing

33

the June 25 Board Meeting, Genger's theory is that the Trump Group accepted Genger's

vote on behalf of the Sagi and Orly Trusts at the June 25 Board Meeting when the Trans-

Resources stockholders approved the Funding Agreement. Genger argues that the Trump

Group benefited when Genger purportedly voted the Proxies at the June 25 Board

Meeting because approval of the Funding Agreement was a step towards giving them

control of the company. As to the second theory, Genger argues that the Trump Group

acknowledged the Sagi Trust as the transferee of the Sagi Shares, and benefited from

purchasing the Sagi Shares because buying directly from Sagi Genger allowed the Trump

Group to avoid the uncertainty and cost of enforcing their rights under Section 3.2 of the

Stockholders Agreement.

Genger's ratification argument fails for two primary reasons. First, Genger's

argument that the Trump Group ratified the 2004 Transfers is belied by the fact that the

Trump Group repeatedly stated that the Transfers were made in violation of the

Stockholders Agreement. Eddie Trump and Hirsch made that point at the June 13

Meeting.[114] The fact that the Transfers were made in violation of the Agreement was

---

because, although representatives of the Trump Group received the 2005 Written Consent and
signed its signature pages, and approved the minutes of the November 2007 Board Meeting,
neither document involved the communication of a material amount of information about the
2004 Transfers to properly notify the Trump Group of the Transfers. Before a party can ratify
something, it must first have "sufficient notice or means of knowledge" of the transaction or act
in question. *Papaioanu*, 186 A.2d at 749-50. The 2005 Written Consent and the 2007 Board
Minutes made, at best, an oblique suggestion that some event might have changed the
shareholdings of Trans-Resources' stock. But neither the 2005 Written Consent nor the minutes
of the November 2007 Board Meeting indicate any particular information about the 2004
Transfers, and neither event even occurred in a context where the Trump Group would have been
alerted that something like the Transfers may have taken place. Therefore, Genger's ratification
argument based on those pieces of evidence fails.
[114] *See supra* page 16.

34

repeated at the June 25 Board Meeting.[115]  The letter the Trump Group sent to Trans-

Resources on August 8, 2008, whereby it expressed its intention to exercise its rights to

buy the 2004 Transfer shares, indicated that the 2004 Transfers were made in violation of

the Stockholders Agreement.[116]  And, the Trump Group's complaint in this matter

claimed that the 2004 Transfers violated the Stockholders Agreement.[117]  Thus, the clear

and consistent message from the Trump Group to Genger at all relevant times was that

the Stockholders Agreement had been violated.  At no point did the Trump Group tell

Genger that it accepted the 2004 Transfers.

Second, Genger has also failed to show that the Trump Group benefited in any

way that suggests ratification.  That is, Genger's argument that the Trump Group ratified

the 2004 Transfers at the June 25 Board Meeting must be rejected because Genger

reneged on the Funding Agreement.  Because the Agreement was never executed, the

Trump Group never received the benefit that was the condition upon which it might

actually not challenge the 2004 Transfers.  Without the Trump Group having received the

benefit that was to be given for relinquishing its claim that the 2004 Transfers were void,

there is no basis to conclude that the Trump Group assented to the 2004 Transfers by

accepting Genger's vote on behalf of the Sagi and Orly Trust in favor of the Funding

Agreement.[118]

---

[115] *See supra* page 19.

[116] *See supra* page 22.

[117] *See* Compl. ¶ 8.

[118] Genger argues that it was enough that the Trump Group "accepted for themselves as
shareholders the pecuniary benefits" of the Funding Agreement, even though they never actually
received those benefits because that deal was never consummated.  Genger's Post-Trial Op. Br.

35

Indeed, the Funding Agreement proves the point. The Trump Group was willing

to consider a resolution of the violation of the Stockholders Agreement that remedied that

violation by giving them voting control of Trans-Resources. In so doing, they were

willing to accept some risk, based on Arie Genger's assurances that he did not face a

problem from Sagi Genger if he voted the disputed shares. If that was so, and if the

Trump Group was able to reach an accord that gave them voting control, all the parties

affected by the 2004 Transfers would have been on board. But the lynchpin of the deal

was the Genger would rectify the violation of the Stockholders Agreement by ensuring

that the Trump Group had voting control. He then reneged on his assurances that the

Transfers were a problem by claiming that Funding Agreement could not be

---

21. In other words, according to Genger's theory, not only is receiving a benefit an indication of
ratification, but a step taken during a negotiation to receive a benefit is also. Tellingly, Genger
cites no case law supporting his position.

I reject this argument for the following reason: acceptance of the benefit of a voidable
transaction is an *alternative* basis upon which to ground a conclusion that a party ratified the
transaction. It is a suitable alternative to an express affirmation of the transaction because
acceptance of a benefit is a relatively concrete factual occurrence that inspires confidence in a
conclusion that, even though the ratifying party did not expressly enunciate her assent to the
voidable transaction, she has nonetheless done some "voluntary and positive act" to indicate that
assent. *Frank*, 32 A.2d at 283. Negotiations relating to a potential benefit arising from a
contractual breach are a less sure foundation upon which to base a finding of a ratification
because, as sophisticated commercial parties know, discussions often range across a number of
different options, many of which never come to pass. In other words, negotiations about the
potential benefit arising from a voidable transaction are unreliable. For that reason they cannot
reasonably be considered to induce the other party's reliance, and therefore there is no basis to
conclude that the party who suffered the breach is estopped from enforcing the contract. *See
Romer v. Porcelain Products, Inc.*, 2 A.2d 75, 76 (Del. Ch. July 28, 1938) (finding that a
complaining stockholder was barred by "the estoppel of his acquiescence"); *see generally Frank*,
32 A.2d at 283 ("The defenses of laches, acquiescence, ratification and estoppel all have some
element in common."). That is, until the ratifying party actually takes the benefit, there is no
basis for the estoppel. For that additional reason, I reject Genger's claim that the Trump Group
ratified the 2004 Transfers at the June 25 Board Meeting.

accomplished because Sagi Genger might challenge the substantive fairness of the required stock issuance to the Trump Group.

Of course, the Trump Group received a benefit when it purchased the Sagi Shares from the Sagi Trust and TPR, but that benefit is not an indication of the Trump Group's ratification of the 2004 Transfers. Rather it is consideration of a settlement that resolved the very problem Genger had created. In other words, Genger's argument confuses the benefits that come from compromising claims away in return for a settlement with taking a benefit from a voidable transaction that indicates ratification. A benefit that indicates ratification is one where the ratifying party would be getting something for nothing if she were allowed to enforce the contract.[119] Here, the Trump Group was not attempting to take advantage of the 2004 Transfers in a way that would have allowed it to obtain more than it was entitled to under the Stockholders Agreement.

By entering into the Purchase Agreement, the Trump Group dealt with the problem that Genger's misconduct had caused it. Genger had just reneged on the compromise Funding Agreement that would have rectified his wrongful behavior, in large measure by claiming that Sagi Genger, as an arguably innocent purchaser for value, would cause trouble and upset any deal. The Trumps reasonably suspected that Genger's resistance was also inspired by his desire to retain control. To address this problem, the Trump Group dealt with both the wrongful transferor, TPR, and the purported transferee, the Sagi Trust, so that it could cover all its bases. In doing so, the Trump Group never

---

[119] *See, e.g., id.* at 278-83 (finding that a stockholder who had benefitted for years from a recapitalization plan "could not accept the benefit offered by the plan and at the same time deny its validity").

37

accepted the legitimacy of the 2004 Transfers; indeed, its consistent position was that the Transfers were void.[120] But by binding both TPR and the Sagi Trust, it could resolve the issue of ownership and control over the bloc definitively. That is, under the deal with TPR and the Sagi Trust, the Trump Group extinguished any claims it had against either TPR or the Sagi Trust as to the Sagi Shares in return for a majority stake in the company.[121] Thus, the Trump Group was only attempting to recapture from TPR what it was owed under the Stockholders Agreement: control over Trans-Resources. Indeed, the Trump Group was giving up its right to purchase the shares from TPR at 2004 prices, which likely would have allowed the Trump Group to obtain the Shares for much less than the approximately $26 million it paid to purchase the Sagi Shares.

The only difference between enforcing its rights under Section 3.2 of the Stockholders Agreement against TPR and acquiring control directly through the purchase of the Sagi Shares was speed. That is, negotiating directly with both TPR and the Sagi Trust had the advantage of providing a quick and certain resolution to the problem, while enforcing Section 3.2 would likely have involved lengthy litigation. Of course, a speedy solution has value, but that value is the benefit of any settlement, and is one of the primary reasons parties settle their disputes. Undermining that incentive cuts against the public's well-established interest in promoting settlement.[122] At all times, the Trump

---

[120] *See supra* pages 16-25.

[121] *See supra* pages 22-24.

[122] *See Marie Raymond Revocable Trust v. MAT Five LLC*, 980 A.2d 388, 402 (Del. Ch. 2008) ("It is well established that Delaware law favors the voluntary settlement of contested issues. Settlements are encouraged because they promote judicial economy and because the litigants are generally in the best position to evaluate the strengths and weaknesses of their case." (internal

38

Group took the position that the 2004 Transfers were void, and mentioned that position to Genger and in litigation. All the Trump did by entering into the Purchase Agreement was ensure that, if the Trump Group were proven wrong in litigation about the 2004 Transfers, it had acquired whatever interests Sagi Genger held and, therefore, he was not a further obstacle. By making a deal directly with the wrongdoer whose shares it was entitled to receive under the Stockholders Agreement, the Trump Group settled TPR's violation of that Agreement by accepting the shares on the terms negotiated, rather than under the price setting process of Section 3.2. In this regard, it is also important to note that the Trump Group was entitled to control of Trans-Resources *as of 2004*, when Genger breached the Stockholders Agreement. Genger's secret transfers had deprived the Trump Group of the benefits of the Stockholders Agreement for four years, and it comes with little grace for Genger now to argue that the Trump Group had to wait even longer or else it would relinquish its rights to those benefits.

Finally, I note that finding that the Trump Group did not ratify the 2004 Transfers leads to, in my view, an equitable result, despite Genger's protestations to the contrary. The problem Genger created by his serious, secretive contractual breach — the insertion of Genger's dysfunctional family into the management of Trans-Resources — was precisely what the Stockholders Agreement was designed to avoid.[123] The Trump Group could only rectify that problem outside of litigation by negotiating with TPR and the Sagi Trust because, by effecting the Transfers, Genger made it impossible to deal with TPR

---

citations omitted)), *aff'd sub nom. Whitson v. Marie Raymond Revocable Trust*, 976 A.2d 172 (Del. 2009).
[123] *See supra* pages 5-8.

2/25/2013 1:27 PM

alone. Genger's argument that the Trump Group ratified the 2004 Transfers because it dealt with Sagi Genger rather than telling him that the Transfers were void is particularly cynical because Genger himself insisted that the Trump Group not challenge the Sagi Trust's ownership of its Trans-Resources shares.[124] Genger was the source of all of these problems, and to find that the Trump Group ratified Genger's behavior would only reward him for his own perfidy.[125] In that regard, Genger's argument that a finding that the Trump Group did not ratify the 2004 Transfers would work an inequity because it would require the unwinding of his divorce settlement is baseless. Genger only has himself to blame for whatever mess his decision to make the 2004 Transfers has caused for his divorce settlement. If Arie Genger's violation of the Stockholders Agreement has deepened the Genger family's internecine feud, that is unfortunate. But it is not the Trump Group's problem, nor is it a basis for an appeal to this court's sense of equity.

2. The Trump Group Holds A Majority Of Trans-Resources' Stock But Is Not Entitled To The Shares Transferred To Arie Genger Personally Or To The Orly Trust

That the purchase of the Sagi Shares was a bargain with TPR and the Sagi Trust that resolved Genger's violation of the Stockholders Agreement also has ramifications for the Trump Group's claims, which include a theory that it has a right to purchase all of the shares TPR transferred in the 2004 Transfers — including the shares transferred to Arie Genger personally and the Orly Trust — under the terms of the Stockholders Agreement. In the Purchase Agreement whereby the Trump Group bought the Sagi Shares, the parties

---

[124] *See supra* page 20.
[125] *See* 3 FARNSWORTH ON CONTRACTS § 12.20 (3d ed. 2004) ("A person is not permitted to profit by his own wrong at the expense of another.").

40

included a provision that ensured that, if the 2004 Transfers were found to be improper,

the Agreement would be deemed to have been consummated with TPR, not the Sagi

Trust.[126]  Thus, the Purchase Agreement was a broad settlement that gave the Trump

Group the assurance that it had all its bases covered in regard to the Sagi Shares, and that

it would retain control over Trans-Resources.  The Purchase Agreement also provided in

relation to the shares transferred to Arie Genger personally and the Orly Trust that:

> If at any time following the Closing Date, it is determined that Arie Genger
> is not the record and beneficial owner of the 794.40 shares of Common
> Stock of the Company purportedly transferred to him by TPR in October,
> 2004 and/or that the Orly Genger 1993 Trust is not the record and
> beneficial owner of the 1,102.80 shares of Common Stock of the Company
> purportedly transferred to such Trust by TPR in October, 2004, and that
> TPR is determined to be the record or beneficial owner of any such shares,
> in either or both cases by virtue of the transfer of such shares being deemed
> to have been void or for any other reason (the shares being so affected
> being referred to herein as the "Affected Shares") *then TPR shall promptly
> transfer 64% of the Balance Shares* (as such term is defined in the
> Stockholders Agreement dated March 30, 2001, among TPR, TR Investors,
> Glenclova and the Company (the "Stockholders Agreement")) to TR
> Investors and Glenclova in accordance with the terms of Section 1.6 of the
> Stockholders Agreement whether or not such agreement is then still in
> effect.[127]

Thus, the Purchase Agreement provided that, if the transfer of TPR shares to Arie Genger

and the Orly Trust was found to be improper, then 64% of the Balance Shares[128] would

be transferred from TPR to the Trump Group.

Although the 2004 Transfers violated the terms of the Stockholders Agreement,

which in Section 3.2 provides that the Trump Group can purchase all of TPR's shares, the

---

[126] *See supra* pages 23-24.

[127] Purchase Agreement § 11 (emphasis added).

[128] *See supra* page 10.

41

Trump Group cannot purchase the shares transferred to Arie Genger or the Orly Trust

because the Trump Group must abide by the settlement terms to which it agreed in the

Purchase Agreement. Because the 2004 Transfers violated the Stockholders Agreement,

Arie Genger and the Orly Trust have been found to not be the record or beneficial owners

of the shares transferred to them. Per Section 11 of the Purchase Agreement, that entitles

the Trump Group to 64% of the Balance Shares, and nothing more beyond the Sagi

Shares that it has already bought. As to the Transfer from TPR to Arie Genger himself,

the major problem was the lack of notice. Under the Stockholders Agreement, Genger

could receive shares from TPR so long as he: (1) gave proper notice to the Trump Group

entities; and (2) signed on to the Stockholders Agreement.[129] He did neither and, as a

result, cannot exercise any rights under the Stockholders Agreement. Although the

Trump Group believes that Genger's violation should require him to transfer all of his

Trans-Resources shares to the Trump Group, that remedy is disproportionate. That sort

of relief is unnecessary to this control dispute and therefore this § 225 action.

Nevertheless, Trans-Resources appears entitled, in any event, to deny Genger the right to

vote his shares until he gives formal notice and signs on to the Stockholders Agreement.

As to the Orly Trust, it is not before the court, and the shares it was wrongly transferred

are also not necessary for the Trump Group to exercise control.. Therefore, I do not issue

any ruling as to those shares, because that is unnecessary in this § 225 action.[130]

---

[129] Stockholders Agreement § 2.1.
[130] *See Arbitrium (Cayman Islands) Handels AG v. Johnston*, 1997 WL 589030, at *3 (Del. Ch. Sept. 17, 1997) (discussing that a § 225 proceeding should generally only resolve issues affecting

Obviously, my finding that the shares were wrongly transferred creates problems for Arie

Genger, but that exposure is a result of his own secretive contract breach.

### D. The Trump Group Did Not Take The Sagi Shares Subject To The Proxy

Even if the Trump Group ratified the 2004 Transfers — which it did not — it

would still have voting control over Trans-Resources because it did not take the Sagi

Shares subject to the Proxy. That conclusion is required for two reasons.

First, the language of the Proxy itself does not plainly indicate that the Proxy was

to run with the Shares if they are sold. The explicit terms of the Proxy establish that it

only applies so long as the Sagi Trust owns the Shares. For example, the Proxy states

that the Sagi Trust appoints Genger "to vote as *its* proxy, all shares of common stock of

TRI which are not or hereafter *owned by the Trust*."[131] Also, it permits Genger to vote

only "in the same manner and to the same extent as *the Trust* might, were *the Trust*

present at said meeting."[132] In this regard, the Proxy is different, for example, from the

proxy at issue in *Haft v. Dart Group. Corp.*, which gave the proxy holder the "right to

exercise all rights to vote *the Shares* on all matter on which *they* are entitled to vote."[133]

Here, the Proxy does not give Genger the right to vote on all matters in which the Sagi

Shares are entitled to vote; rather, the Proxy gives Genger the right to vote on all matters

in which the Sagi *Trust* is entitled to vote, suggesting that the Proxy does not extend to

subsequent owners of the Shares.

---

voting control of the corporation); *Bossier v. Connell*, 1986 WL 11534, at *2 (Del. Ch. Oct. 7,
1986) (same).
[131] Proxy at 1 (emphasis added).
[132] *Id.* (emphasis added).
[133] 1997 WL 154049, at *2 n.5 (Del. Ch. Mar. 14, 1997) (emphasis added).

Most importantly, the Proxy does not provide in any way for the reservation of voting powers to Genger after such a sale. The only language Genger points to as evidence that the Proxy is meant to run with the Sagi Shares is the phrase that the Proxy "shall continue for the duration of Arie Genger's life."[134] But, in the context of the entire document, that language only means that the Sagi Trust would be bound by the Proxy until Genger died, not that the Proxy would continue to bind later owners if the Shares were transferred. If Genger wanted to keep the Proxy after a transfer, he could have easily inserted clear language — such as "this Proxy shall bind any subsequent transferees" — into the Proxy to that effect. He did not, and thus there is no reason found in the text of the Proxy to indicate that it is binding upon the Trump Group.

Even if the language of the Proxy was ambiguous — which it is not — public policy concerns require that the Proxy be strictly construed. Historically, proxies have been interpreted narrowly and when there is an ambiguity, read as not restricting the right to vote the shares.[135] Recent market developments have only reinforced the utility of the presumption that irrevocable proxies should be narrowly construed. Separating voting control from stock ownership — which can result in "empty voting," where an investor votes stock without having an accompanying economic interest — raises important

---

[134] Proxy at 1.

[135] *See Eliason v. Englehart,* 733 A.2d 944 (Del. 1999) (finding a proxy to be revocable where the words expressly stating that it was an "Irrevocable Proxy" were only found in the authentication to the document, not in the language of the proxy itself); *Freeman v. Fabiniak,* 1985 WL 11583 (Del. Ch. Aug. 15, 1985) (narrowly interpreting the grant of authority made in a proxy instrument and holding that the instrument, which conveyed the right to vote at shareholder meetings, did not authorize other action by consent); *State ex rel. McKaig v. Bd. of Directors of H.F. Dangberg Land & Live Stock Co.,* 110 P.2d 212, 214 (Nev. 1941) ("The instrument granting the vote by proxy will be strictly construed.").

44

public policy concerns.[136] For example, the decoupling of shareholder voting rights and economic interest, which is increasingly common and only loosely regulated by the securities laws,[137] is of concern because empty voting can theoretically allow investors with voting power but with an economic interest adverse to the firm to vote in ways that reduce the company's share price.[138]

Our Supreme Court's recent decision in *Crown EMAK Partners, LLC v. Kurz* underscores the importance of those public policy concerns.[139] There, the Supreme Court affirmed this court's decision that third-party vote buying merits judicial review when it disenfranchises shareholders by affecting the outcome of a vote, and confirmed this court's conclusion that the voting arrangement at issue was proper.[140] Its reason for so concluding is important: "[w]e hold that the Court of Chancery correctly concluded that there was no improper vote buying, *because the economic interests and the voting interests of the shares remained aligned* since both sets of interests were transferred from Boutros to Kurz by the Purchase Agreement."[141] In other instances, the temptations for self-dealing that arise when persons with a relatively small economic interest in a

---

[136] *See* Henry T.C. Hu & Bernard Black, *Empty Voting and Hidden (Morphable) Ownership: Taxonomy, Implications, and Reforms*, 61 BUS. LAW. 1011, 1014 (2006) ("*Empty Voting*"); *see also* Shaun Martin & Frank Partnoy, *Encumbered Shares*, 2005 U. ILL. L. REV. 775.

[137] *See* Henry T.C. Hu & Bernard Black, *Equity and Debt Decoupling and Empty Voting II: Importance and Extensions*, 156 U. PA. L. REV. 625 (2008)

[138] *See Empty Voting* at 1014.

[139] 992 A.2d 377, 388 (Del. 2010) ("For many years, Delaware decisions have expressed consistent concerns about transactions that create a misalignment between the voting interest and the economic interest of shares.") (citations omitted).

[140] *Id.* at 388-90.

[141] *Id.* at 390 (emphasis added).

corporation has voting control have resulted in serious harm to the corporation and its

other investors.[142]

In light of those concerns, a proxy purporting to irrevocably decouple voting rights

from economic interest should be strictly construed. Because there is no such clear intent

manifested in the Proxy here, prudent public policy requires the conclusion that the Proxy

does not survive the sale of the Sagi Shares to the Trump Group.

Second, the Proxy is not irrevocable because it does not satisfy § 609 of the New

York Business Corporation Law, which I conclude governs the Letter Agreement and the

Proxy attached thereto in view of the lack of any policy conflict between it and the

DGCL.[143] Section 609 provides that:

> A proxy which is entitled "irrevocable proxy" and which states that it is
> irrevocable, is irrevocable when it is held by any of the following or a
> nominee of any of the following: (1) A pledgee; (2) A person who has
> purchased or agreed to purchase the shares; (3) A creditor or creditors of
> the corporation who extend or continue credit to the corporation in
> consideration of the proxy if the proxy states that it was given in

---

[142] *See, e.g., Hollinger Intern., Inc. v. Black*, 844 A.2d 1022 (Del. Ch. 2004).

[143] Letter Agreement at 2 ("This Letter Agreement shall be governed by the laws of the State of New York without regard to conflicts of law principles."). Given Delaware's respect for contractual freedom, *see Abry Partners V, L.P. v. H&W Acquisition LLC*, 891 A.2d 1032, 1061 (Del. Ch. 2006) (noting that "there is also a strong American tradition of freedom of contract, and that tradition is especially strong in our State" and citing authorities), it respects choice of law agreements. *See J.S. Alberici Const. Co., Inc. v. Mid-W. Conveyor Co., Inc.*, 750 A.2d 518, 520 (Del. 2000) ("Delaware courts will generally honor a contractually-designated choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction."). Although our law relating to the voting of corporate shares is of paramount interest to Delaware, there is no offense to Delaware of allowing parties to subject agreements about irrevocable proxies to a law that places different strictures on such proxies than does Delaware law, absent some reason that those strictures offend a fundamental protection by the DGCL. Section 609 of the N.Y. Bus. Corp. Law does not conflict with any fundamental Delaware corporate law policies or doctrines. Therefore, I find no reason to apply Delaware law in a situation where the parties have made a clear choice of law in favor of a sister state.

46

consideration of such extension or continuation of credit, the amount thereof, and the name of the person extending or continuing credit; (4) A person who has contracted to perform services as an officer of the corporation, if a proxy is required by the contract of employment, if the proxy states that it was given in consideration of such contract of employment, the name of the employee and the period of employment contracted for; (5) A person designated by or under paragraph (a) of section 620.[144]

Genger obviously does not qualify under sub-sections (1), (2), (3), or (4) — that is, he is not a pledgee, creditor, contract officer, or purchaser of the Shares sold to the Sagi Trust. And, he does not qualify under sub-section (5), because § 620 of the New York Business Corporation Law applies to an agreement "between two or more shareholders," and neither Genger nor the Sagi Trust were shareholders of Trans-Resources when the Letter Agreement and the Proxy were executed.[145] Thus, the Proxy is not irrevocable under New York Law, and was revoked by the sale of the Sagi Shares to the Trump Group.[146]

## IV. Conclusion

Genger violated the Stockholders Agreement when he made the 2004 Transfers, and the Trump Group did not ratify those Transfers after the fact. Furthermore, the

---

[144] *N.Y. Bus. Corp. Law* § 609; *cf.* 8 *Del. C.* § 212(e) (providing that a duly executed proxy will be deemed irrevocable where it: (1) states that it is irrevocable; and (2) is coupled with an interest sufficient in law to support an irrevocable power, regardless of whether the interest is in the stock itself or the corporation generally).

[145] *N.Y. Bus. Corp. Law* § 620.

[146] *See Tompers v. Bank of Am.*, 217 N.Y.S. 67, 75 (N.Y. App. Div. 1926) (holding that a revocable proxy terminated "through sale of . . . stock"). Even if the Proxy were irrevocable, Genger would still be bound to vote his shares for a majority of the Trump Group's directors because the Stockholders Agreement provides that "the group owning the greater number of shares as between the TPR Stockholders and the Non-TPR Stockholders shall designate four directors." Stockholders Agreement § 1.2. That is, Genger would have to vote the Proxy for the Trump Group's directors, because the Trump Group is indisputably the owner of a majority of Trans-Resources' shares. Economic ownership trumps, so to speak, any interest Genger has as an owner of the Proxy.

47

Trump Group did not take the Sagi Shares subject to the irrevocable Proxy. Therefore,

the Trump Group retains the Sagi Shares,[147] is entitled to 64% of the Balance Shares, and

can vote all of the Trans-Resources shares it holds as it wishes. The parties shall submit

an implementing order by Wednesday, July 28, 2010.

---

[147] Genger's claim that he is entitled to purchase the Sagi Shares under § 3.2 of the Stockholders
Agreement because the Trump Group pledged (a disputed amount of) those Shares to a party
from which they obtained purchase financing fails because Genger never signed on to the
Stockholders Agreement. Tr. 950 (A. Genger). Until he accepts the burdens of that contract,
Genger cannot expect to enjoy its benefits. *See, e.g., Red Clay Educ. Ass'n v. Bd. of Educ. of
Red Clay Consol. School Dist.*, 1992 WL 14965, at *10 (Del. Ch. Jan. 16, 1992) (holding that
plaintiff could not "accept the benefits of a contract without also bearing the corresponding
burdens"). Furthermore, Genger cannot now claim entitlements under a contract that he
intentionally flaunted. *See PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1014-15
(Del. Ch. 2004) (holding that a party that repudiates or breaches a contract cannot then claim the
benefits of that contract).

48

**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

LEO E. STRINE, JR.
VICE CHANCELLOR

New Castle County Courthouse
Wilmington, Delaware 19801

Date Submitted: August 4, 2010
Date Decided: August 9, 2010

Thomas J. Allingham II, Esquire
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899-0636

Donald J. Wolfe, Jr., Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951

*RE:   TR Investors, LLC, et al. v. Arie Genger*, C.A. No. 3994-VCS

Dear Counsel:

This letter addresses an issue raised by the Trump Group's[1] proposed order

implementing my July 23, 2010 memorandum opinion (the "Opinion"). That proposed

order included language determining that the Trump Group had the right to purchase

shares of Trans-Resources, Inc. ("Trans-Resources") that Arie Genger caused TPR

Investment Associates ("TPR") to transfer in 2004 to the trust for his daughter Orly (the

"Orly Trust") and to himself personally.[2] That language differed from my July 23, 2010

memorandum opinion (the "Opinion"), which only held that the Trump Group was

entitled to the Trans-Resources shares transferred in 2004 to the trust of Genger's son

---

[1] There are four named plaintiffs in this action: TR Investors, LLC, Glenclova Investment Co.,
New TR Equity I, LLC, and New TR Equity II, LLC (collectively, the "Trump Group").
[2] Letter from Thomas J. Allingham II to the Hon. Leo E. Strine, Jr. (July 27, 2010) (enclosing
proposed order).

DG 00164

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 2 of 9

Sagi (the "Sagi Trust"). Implicit in the Trump Group's proposed order is the assertion

that I reached an incorrect — or, perhaps more accurately, an incomplete — conclusion

as to the Trump Group's ability to acquire all of Trans-Resources' shares.

A full blow-by-blow account of the complex series of share transfers and contracts

leading up to the issue at hand can be found in the Opinion. It suffices to say here that

my conclusion that the Trump Group was entitled only to the shares transferred to the

Sagi Trust (the "Sagi Shares") was based on the fact that the Trump Group had entered

into a Purchase Agreement in 2008 for the Sagi Shares. That Purchase Agreement

included a provision indicating that, if the share transfer to the Sagi Trust were found

void, then the share purchase would be between the Trump Group and TPR, which Sagi

Genger controlled by 2008. Thus, the Purchase Agreement appeared to be a broad

settlement of the dispute as to the Trans-Resources shares *held by the Sagi Trust*. For

that reason, I found the Trump Group to have appropriately purchased the shares

transferred to the Sagi Trust. But, I declined to address the control of the shares

improperly transferred to the Orly Trust or Genger himself. In so concluding, I was

motivated by the fact that determining whether the Trump Group was entitled to the

shares wrongly transferred to Genger and the Orly Trust was unnecessary to determine

control in this action pursuant to 8 *Del. C.* § 225.[3]

---

[3] My reasoning was as follows:

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 3 of 9

What I overlooked was a side letter agreement (the "Letter Agreement") executed

contemporaneously with the Purchase Agreement. In that Letter Agreement, the Trump

Group contracted with TPR to purchase the shares that had purportedly been transferred

to Genger and the Orly Trust in 2004 if it were found that those transfers were improper.[4]

When read in conjunction with the Purchase Agreement, the Letter Agreement indicates

that the Trump Group contracted with TPR not only for the shares transferred to the Sagi

---

Although the 2004 Transfers violated the terms of the Stockholders Agreement,
which in Section 3.2 provides that the Trump Group can purchase all of TPR's
shares, the Trump Group cannot purchase the shares transferred to Arie Genger or
the Orly Trust because the Trump Group must abide by the settlement terms to
which it agreed in the Purchase Agreement. Because the 2004 Transfers violated
the Stockholders Agreement, Arie Genger and the Orly Trust have been found to
not be the record or beneficial owners of the shares transferred to them. Per
Section 11 of the Purchase Agreement, that entitles the Trump Group to 64% of
the Balance Shares, and nothing more beyond the Sagi Shares that it has already
bought. As to the Transfer from TPR to Arie Genger himself, the major problem
was the lack of notice. Under the Stockholders Agreement, Genger could receive
shares from TPR so long as he: (1) gave proper notice to the Trump Group
entities; and (2) signed on to the Stockholders Agreement. He did neither and, as
a result, cannot exercise any rights under the Stockholders Agreement. Although
the Trump Group believes that Genger's violation should require him to transfer
all of his Trans-Resources shares to the Trump Group, that remedy is
disproportionate. That sort of relief is unnecessary to this control dispute and
therefore this § 225 action. Nevertheless, Trans-Resources appears entitled, in any
event, to deny Genger the right to vote his shares until he gives formal notice and
signs on to the Stockholders Agreement. As to the Orly Trust, it is not before the
court, and the shares it was wrongly transferred are also not necessary for the
Trump Group to exercise control. Therefore, I do not issue any ruling as to those
shares, because that is unnecessary in this § 225 action. Obviously, my finding
that the shares were wrongly transferred creates problems for Arie Genger, but
that exposure is a result of his own secretive contract breach.

*TR Investors, LLC v. Genger*, 2010 WL 2901704, at *19 (Del. Ch. July 23, 2010).
[4] JX-226 (Letter Agreement (Aug. 22, 2008)) (the "Letter Agreement").

DG 00166

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 4 of 9

Trust, but for all of the shares that TPR originally held before the wrongful transfers were effected.

Thus, it is clear that I issued my original decision in ignorance of a material fact, which is that there was a binding contract between TPR and the Trump Group as to the shares held by Genger and the Orly Trust (the "Arie and Orly Shares"). In addition, in determining that I need not reach the issue of who owned the Arie and Orly Shares, I overlooked at that point in my reasoning the fact that, under the Stockholders Agreement,[5] even though the Trump Group would have the right to appoint four of Trans-Resources' six directors as the holder of the Sagi Shares, the right to designate the remaining two directors could depend on who controls the Arie and Orly Shares.[6] Moreover, I also ignored the reality that Genger himself sought to have this court declare who was the rightful owner of the Arie and Orly Shares.[7] Although the Orly Trust was

---

[5] JX-101 (Stockholders Agreement (2001)) (the "Stockholders Agreement") at § 1.2(c).
[6] Thus, determining whether the Trump Group is entitled to purchase the Arie and Orly Shares is within the scope of a § 225 action. *See Levinhar v. MDG Med., Inc.*, 2009 WL 4253211, at *11 (Del. Ch. Nov. 24, 2009) ("Although Section 225 actions are summary proceedings, claims that bear on the appropriate composition of the board of directors may be brought in connection with a Section 225 action."); *Agranoff v. Miller*, 1999 WL 219650, at *17 (Del. Ch. Apr. 12, 1999), *aff'd*, 1999 WL 636634 (Del. July 28, 1999) (stating that in a § 225 action, "[t]he court can determine any legal or factual issue, the resolution of which can affect the outcome of a corporate election . . . or of any other stockholder vote").
[7] *See* Genger's Answer and Counterclaim, Claim for Relief ¶ (c) (requesting a declaration that "Mr. Genger is the rightful owner of 13.99% of TRI shares and the Orly Trust is the rightful owner of 19.43% of TRI shares, subject to the Irrevocable Proxy granted to Mr. Genger"); Stipulated Pre-Trial Order § III.A ¶ 3 (stating that an issue of fact remaining to be litigated was "[w]hether the October 2004 transfers of [Trans-Resources] common stock to Arie Genger and to the Orly Genger 1993 Trust (the "Orly Trust") and the Sagi Trust can and should be found void without also voiding or reforming the related transactions"). In light of those requests,

DG 00167

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 8 of 9

Of course, it may well be that the bargain that TPR — a company that Arie Genger allowed to pass out of his control — struck poses some equitable problem for TPR. That is, it may be that Genger and Orly Genger have claims against TPR and Sagi Genger over how the price paid by the Trump Group for the Arie and Orly Shares was allocated. In that sense, the endgame of this struggle would be fitting if regrettable, in that the Gengers would find themselves fighting over a pot of money and who should get what. To that point, it may be that the Trump Group would be wise to pay the consideration for the Arie and Orly Shares into a court in New York, and allow the Gengers to have at it about who gets the proceeds. The resolution of any such dispute, however, is not relevant to the determination that both the Trump Group and Genger have asked me to make.

That determination is whether the Arie and Orly Shares are validly owned by Arie Genger and the Orly Trust. Again, the answer is no, they are not. The transfers were invalid. That left the Trump Group with the right to purchase the Shares from TPR, and thus TPR and the Trump Group were free to settle that dispute by a new bargain for sale. If the Trump Group exercises its rights under the Letter Agreement, it will own the shares improperly transferred to Genger and the Orly Trust, and neither of those transferees ever had a legitimate interest in the shares. If those transferees have any beef with TPR or Sagi Genger, the transferees are free to file suit against them. But the Trump Group may purchase the Arie and Orly Shares per the terms of the Letter Agreement, may vote those

*TR Investors, LLC, et al. v. Arie Genger*
C.A. No. 3994-VCS
August 9, 2010
Page 9 of 9

Shares, and Trans-Resources need not recognize Genger or the Orly Trust as
stockholders.

In revising my earlier decision to address this issue, I therefore correct my failure
to focus as closely as I should have on the control consequences of the transfers to
Genger and the Orly Trust, the primacy that should be given to the contractual remedy
provision, the bargain-destroying consequences of not according the Trump Group the
full benefit of the Stockholders Agreement, and the inequity of subjecting the Trump
Group to attempts by Genger to relitigate issues that he sought to litigate in this court.

For all these reasons, I treat the proposed order submission of the Trump Group as
a motion for reargument, a motion I hereby grant, and will issue a final judgment in favor
of the Trump Group in conformity with this decision.

Very truly yours,

*/s/ Leo E. Strine, Jr.*

Vice Chancellor

LESJr/eb

DG 00169

# EXHIBIT "E"

## SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT (the "Agreement") is entered into by and among TPR Investment Associates, Inc., a Delaware corporation ("TPR"), the Orly Genger 1993 Trust, a trust settled on December 13, 1993, with Dalia Genger currently serving as trustee (the "OG Trust") and D&K LP, a limited partnership ("DK") (collectively, the "Parties"; each, a "Party"), as of the dates executed below.

WHEREAS, TPR and OG Trust entered into an agreement on or about October 29, 2004 (the "Share Transfer"), whereby TPR contracted to sell to the OG Trust 1,102.8 shares of Trans Resources, Inc., a Delaware corporation ("TRI" and the "TRI Shares"); and

WHEREAS, TPR relied on representations by Arie Genger that the liabilities stemming from the "Bogolusa Lawsuit" against TPR, TRI and Arie Genger personally exceeded the combined assets of TRI and TPR by at least $30 million, implying that TRI was worthless (the "Bogolusa Representation"); and

WHEREAS, Arie Genger further represented that the Share Transfer only required the consent of TPR, and that no further consents were required by any third party (the "Transferability Representation"); and

WHEREAS, in reliance on both the Bogolusa Representation and the Transferability Representation, TPR and the OG Trust agreed that OG Trust would pay TPR, for the Share Transfer, a nominal consideration in the amount of one dollar per share; and

WHEREAS, the Bogolusa Representation was subsequently deemed false, as determined by Judge Leo Milonas in arbitration proceeding between Arie Genger and

-1-

DG 01101

Dalia Genger in her personal capacity; and whereas in said arbitration proceeding Judge Milonas concluded that the value of the net assets of TRI as of October 2004 was approximately $55 million ("Milonas Value"), implying a possible value for the 1,102.8 TRI Shares of $10.3 million as of that same date (without discount to reflect a minority interest); and

WHEREAS, the Supreme Court of Delaware has recently affirmed the findings of the Delaware Chancery Court that the Transferability Representation was false, that pursuant to a Shareholder Agreement of TRI, which was entered into as of March 30, 2001, while Arie Genger controlled both TPR and TRI (the "TRI Shareholders Agreement"), the consent of other TRI shareholders (collectively, the "Trump Group") was required, that Arie Genger failed to provide such notice as required; and that TPR therefore remained the lawful record owner of the TRI Shares; and

WHEREAS, the Trump Group is claiming that beneficial ownership of the TRI Shares was not lawfully transferred to the OG Trust, a claim the Courts have not yet finally resolved; and

WHEREAS, the OG Trust is a guarantor of a certain Promissory Note in favor of TPR dated as of December 21, 1993, made by D&K Limited Partnership in the face value of $8,950,000 (the "1993 Note"); and

WHEREAS, following a partial foreclosure, approximately $4.5 million of the amount currently due and owing under the 1993 Note remains guaranteed by the OG Trust; and

WHEREAS Orly Genger, as beneficiary of the OG Trust, filed a Complaint in the New York State Supreme Court, which she personally verified on July 8, 2009 as truthful

DG 01102

to her own knowledge, alleging that if the Delaware litigation resulted in a determination
that the TRI shares were not transferred but remained with TPR the value of TPR's
shares would increase by $250 to $350 million, so that the OG Trust's claimed beneficial
ownership interest in the TRI Shares could be over $200 million; and

WHEREAS Orly Genger, as beneficiary of the OG Trust, earlier submitted a
letter to the Surrogate's Court on November 8, 2008, stating that the TRI shares that TPR
had contracted in 2004 to sell to the Sagi Genger 1993 Trust (the same number of shares
that TPR had simultaneously contracted to sell to the OG Trust) were worth "in excess of
$150,000,000"; and

WHEREAS, the OG Trust seeks to secure the economic benefit of its claimed
beneficial ownership interest in the TRI Shares, which Orly Genger, as set forth above,
has previously valued at $150-200 million; and

WHEREAS, pursuant to a letter agreement dated August 22, 2008 (the "2008
Letter Agreement"), TPR executed documents to transfer the TRI Shares to the Trump
Group at the Milonas Value; and

WHEREAS, TPR believes that the transfer pursuant to the 2008 Letter Agreement
is final, but the OG Trust reserves the right to challenge the Trump Group's title to the
TRI Shares or alternatively claim the proceeds of the sale from the TRI Shares to the
Trump Group, net of amounts due under the 2011 Note (as defined hereunder); and

WHEREAS, at a hearing before the New York State Supreme Court on
September 13, 2011, counsel for Orly Genger in her personal capacity expressed to the
Court his client's concern that the value of the OG Trust's claimed beneficial ownership
interest in the TRI Shares would be "diminished" by litigation positions to be taken by

DG 01103

TPR before the Delaware Chancery Court;

WHEREAS, TPR, the OG Trust, and DK now seek to finally settle all other disputes and controversies that exist among them, in such a manner as to: (a) resolve Orly Genger's concern by having TPR relinquish any interest in the TRI Shares and thereby enable the OG Trust to fully pursue the economic value of its claimed beneficial ownership interest in the TRI Shares; and (b) eliminate, or at least reduce, the drain on all sides' resources from the endless litigation of these issues in multiple forums;

NOW, THEREFORE, in consideration of the promises and commitments set forth herein, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      <u>Consideration</u>. In exchange for the consideration set forth herein: (a) TPR hereby relinquishes in favor of the OG Trust any economic interest in the TRI Shares and assigns to the OG Trust its right to any economic benefits of the TRI shares including any proceeds from the sale thereof, including but not limited to the $10.3 million in proceeds otherwise owing to TPR in the future pursuant to the terms of the August 22, 2008 letter agreement; (b) the OG Trust – irrespective of any claim made or asserted on its behalf by Orly Genger – hereby transfers to TPR its limited partnership interest in DK (the "DK Interest"), and disclaims any interest in, any shares of or TPR, either directly or indirectly through DK (the "TPR Interest"); and (c) TPR agrees to pay $100,000 for the legal fees of the OG Trust.

3.      <u>2011 Note</u>. The OG Trust is hereby released from any obligation under or as guarantor of the 1993 Note currently payable and owing in the amount of $4.5 million or the D&K Partnership Agreement, and the 1993 Note is hereby cancelled and replaced

-4-

by an updated new promissory note, from the OG Trust in favor of TPR, substantially in the form attached hereto as Exhibit A, in the amount of $4.0 million (the "2011 Note"). TPR hereby relinquishes its claim to the remaining approximately $500,000 due under the 1993 Note. The terms of the 2011 Note are incorporated by reference as if fully set forth herein.

4.    Mutual Releases.   The parties to this Settlement Agreement hereby irrevocably and fully release one another, including all current directors, officers, trustees, fiduciaries, agents, advisors and other representatives (serving the various parties from November 1, 2004 to present day) and their respective successors and assigns from all claims, causes of action, lawsuits, demands, liability of any kind, asserted or unasserted, known or unknown, suspected or unsuspected, direct or derivative, in connection with the 1993 Note, the TRI Shares, the Share Transfer, the DK Interest, the TPR Interest, the 2008 Letter Agreement, or any other matters, through the date of this Agreement. Nothing herein shall release any rights under this Agreement.

5.    Binding Nature.   This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

6.    Titles.   Titles and headings to articles, sections or paragraphs in this Agreement are inserted for convenience of reference only and are not intended to affect the interpretation or construction of the Agreement.

7.    Choice of Law and Forum.   This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without reference to its conflicts of laws principles. The parties hereto hereby irrevocably and unconditionally submit, for themselves and their respective property, to the exclusive jurisdiction of the

-5-

state and federal courts located in Wilmington, Delaware.

8.    <u>Attorney's Fees</u>.  In the event that, following execution of this Agreement, a Party hereto, or a beneficiary of a Party hereto for the benefit of that Party, either asserts a new claim or continues to pursue an existing claim (including, without limitation, any claim asserted in an arbitral proceeding, proceeding for the obtaining of provisional remedies, trial, appeal or enforcement proceeding) against another Party hereto concerning, arising out of, or relating to this Agreement, the 1993 Note, the TRI Shares, the Share Transfer, the DK Interest, the TPR Interest, the 2008 Letter Agreement, or any matters, through the date of this Agreement and such claim is unsuccessful, then the prevailing defendant, cross-claim defendant, counterclaim-defendant or arbitration respondent shall be entitled to recover its post-Agreement costs, expenses (including, without limitation, the reasonable costs of retaining experts or professional consultants) and reasonable attorneys' fees, in addition to all other remedies available to such Party.

9.    <u>Interpretation</u>.  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law.  No term shall be construed against any Party as drafter.

10.    <u>Further Assurances</u>. Each of the Parties agrees to execute and deliver, or to cause to be executed and delivered, all such instruments, and to take all such action as the other Party may reasonably request, in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement.

11.    <u>Modification and Waiver</u>.  This Agreement may be amended or modified only by a written instrument signed by each of the Parties. No waiver of any provision of this Agreement by a Party shall be effective unless embodied in a written instrument

DG 01106

signed by such Party. The waiver by any of the Parties of any breach of this Agreement shall not be deemed a waiver of any prior or subsequent breach of this Agreement.

12. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the Parties regarding the subject matter herein, superseding all prior oral or written representations, negotiations, understandings and agreements, on the subject matter herein.

13. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall be considered one instrument and shall become binding when one or more counterparts have been signed by each of the Parties and delivered to the other.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date indicated below.

TPR Investment Associates, Inc.

By: _____
Date: _____

The Orly Genger 1993 Trust

By: _Dahlia Genger_
_Trustee_
Date: _Oct 2, 2011_

D&K LP

By: _It's general partner's manager_
Date: _10/3/11_

-7-

DG 01107

signed by such Party. The waiver by any of the Parties of any breach of this Agreement shall not be deemed a waiver of any prior or subsequent breach of this Agreement.

12.   **Entire Agreement.**   This Agreement constitutes the entire agreement between the Parties regarding the subject matter herein, superseding all prior oral or written representations, negotiations, understandings and agreements, on the subject matter herein.

13.   **Counterparts.**   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall be considered one instrument and shall become binding when one or more counterparts have been signed by each of the Parties and delivered to the other.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date indicated below.

TPR Investment Associates, Inc.

By: _YONIT STERNBERG_

Date: _OCT 3, 2011_

The Orly Genger 1993 Trust

By: _Dalia Genger     Trustee_

Date: _Oct 2, 2011_

D&K LP

By: _ITS general partners manager_

Date: _10/3/11_

-7-

DG 01127

# EXHIBIT A

DG 01108

# PROMISSORY NOTE

$4,000,000                                                    October 3, 2011

FOR VALUE RECEIVED, the undersigned, the Orly Genger 1993 Trust ("Borrower"),
by way of its current sole trustee, Dalia Genger, promises to pay to TPR Investment
Associates, Inc., a Delaware corporation ("Lender") the sum of $4,000,000 ("Principal")
together with interest thereon at the rate of three percent (3%) percent per annum,
payable as follows, and further covenants, to Lender, as follows:

The Principal together with all interest accrued thereon shall be due and payable to, or to
the order of, Lender on the earliest of:

   (i)    November 1, 2012;

   (ii)   Immediately upon Borrower's receipt of the proceeds from the sale
          of TRI shares either pursuant to the interpleader action pending in
          the United States District Court for the Southern District of New
          York (the "Court") in *Pedowitz v. TPR*, 11 Civ. 5602, or otherwise.

Notwithstanding anything to the contrary herein or in the parties' accompanying
Settlement Agreement, to the extent that the Court awards Lender any of the interpleaded
funds, Lender shall first retain such funds to the extent necessary to pay down this Note
in full, and then transfer any remaining funds to Borrower.

The occurrence and continuation of any one or more of the following events shall
constitute an event of default under this New Note ("Event of Default"):

   (a)    Payment Default. Borrower shall fail to make any required payment due in
connection with this New Note.

   (b)    Third Party Lien or Caveat. The creation of a lien on Borrower's property,
or the entry of a caveat (which Lender deems material), that has not been removed ten (10)
days of its creation.

   (c)    Change of Trustee. The resignation, removal, or otherwise change of trustee
of Borrower.

   (d)    Bankruptcy Default. The Borrower shall (i) commence any case, proceeding
or other action under any existing or future law of any jurisdiction relating to seeking to
have an order for relief entered with respect to it or its debts, or seeking reorganization,
arrangement, adjustment, winding-up, liquidation, dissolution, composition or other such
relief with respect to it or its debts, or seeking appointment of a receiver, trustee, custodian
or other similar official for it or for all or substantially all of its assets (each of

the foregoing, a "Bankruptcy Action"); (ii) become the debtor named in any Bankruptcy Action which results in the entry of an order for relief or any such adjudication or appointment described in the immediately preceding clause (i), or remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) make a general assignment for the benefit of its creditors.

In each and every Event of Default, the Lender may, without limiting any other rights it may have at law or in equity, by written notice to the Borrower, declare the unpaid Principal of and Interest on this New Note due and payable, whereupon the same shall be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which the Borrower hereby expressly waives, and the Lender may proceed to enforce payment of such Principal and Interest or any part thereof in such manner as it may elect in its discretion.

This Note may be prepaid in whole or in part at any time without premium or penalty.

All prepayments shall be applied first to interest, then to principal payments in the order of their maturity.

The undersigned agrees to pay all costs and expenses, including all reasonable attorneys' fees, for the collection of this Note upon default. All payments shall be made at 1211 Park Avenue, New York, NY, 10128, or at such other place as the holder hereof may from time to time designate in writing.

Upon default, whether pursuant to an Event of Default or otherwise, the interest rate shall be increased to an amount ("Overdue Rate") equal to the maximum legal rate of interest permitted by applicable law.

If this New Note is not paid when due, Borrower promises to pay all costs and expenses of collection and attorneys' fees incurred by the holder hereof on account of such collection, whether or not suit is filed thereon. Borrower consents to renewals, replacements and extensions of time for payment hereof, before, at, or after maturity; consents to the acceptance, release or substitution of security for this note, and waives protest, presentment, demand for payment, notice of default or nonpayment and notice of dishonor and the right to assert any statute of limitations. The indebtedness evidenced hereby shall be payable in lawful money of the United States.

This New Note shall be governed by, and shall be construed and enforced in accordance with, the laws of the state of Delaware without giving effect to the conflict of law rules thereof, and shall be adjudicated before the appropriate Courts of the State of Delaware.

_Dalia Genger_

THE ORLY GENGER 1993 TRUST

# EXHIBIT "F"

# PROMISSORY NOTE

$4,000,000                                                                                    October 3, 2011

FOR VALUE RECEIVED, the undersigned, the Orly Genger 1993 Trust ("Borrower"),
by way of its current sole trustee, Dalia Genger, promises to pay to TPR Investment
Associates, Inc., a Delaware corporation ("Lender") the sum of $4,000,000 ("Principal")
together with interest thereon at the rate of three percent (3%) percent per annum,
payable as follows, and further covenants, to Lender, as follows:

The Principal together with all interest accrued thereon shall be due and payable to, or to
the order of, Lender on the earliest of:

    (i)    November 1, 2012;

    (ii)    Immediately upon Borrower's receipt of the proceeds from the sale
    of TRI shares either pursuant to the interpleader action pending in
    the United States District Court for the Southern District of New
    York (the "Court") in *Pedowitz v. TPR*, 11 Civ. 5602, or otherwise.

Notwithstanding anything to the contrary herein or in the parties' accompanying
Settlement Agreement, to the extent that the Court awards Lender any of the interpleaded
funds, Lender shall first retain such funds to the extent necessary to pay down this Note
in full, and then transfer any remaining funds to Borrower.

The occurrence and continuation of any one or more of the following events shall
constitute an event of default under this New Note ("Event of Default"):

    (a)    <u>Payment Default</u>. Borrower shall fail to make any required payment due in
connection with this New Note.

    (b)    <u>Third Party Lien or Caveat</u>. The creation of a lien on Borrower's property,
or the entry of a caveat (which Lender deems material), that has not been removed ten (10)
days of its creation.

    (c)    <u>Change of Trustee</u>. The resignation, removal, or otherwise change of trustee
of Borrower.

    (d)    <u>Bankruptcy Default</u>. The Borrower shall (i) commence any case, proceeding
or other action under any existing or future law of any jurisdiction relating to seeking to
have an order for relief entered with respect to it or its debts, or seeking reorganization,
arrangement, adjustment, winding-up, liquidation, dissolution, composition or other such
relief with respect to it or its debts, or seeking appointment of a receiver, trustee, custodian
or other similar official for it or for all or substantially all of its assets (each of

the foregoing, a "Bankruptcy Action"); (ii) become the debtor named in any Bankruptcy Action which results in the entry of an order for relief or any such adjudication or appointment described in the immediately preceding clause (i), or remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) make a general assignment for the benefit of its creditors.

In each and every Event of Default, the Lender may, without limiting any other rights it may have at law or in equity, by written notice to the Borrower, declare the unpaid Principal of and Interest on this New Note due and payable, whereupon the same shall be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which the Borrower hereby expressly waives, and the Lender may proceed to enforce payment of such Principal and Interest or any part thereof in such manner as it may elect in its discretion.

This Note may be prepaid in whole or in part at any time without premium or penalty.

All prepayments shall be applied first to interest, then to principal payments in the order of their maturity.

The undersigned agrees to pay all costs and expenses, including all reasonable attorneys' fees, for the collection of this Note upon default. All payments shall be made at 1211 Park Avenue, New York, NY, 10128, or at such other place as the holder hereof may from time to time designate in writing.

Upon default, whether pursuant to an Event of Default or otherwise, the interest rate shall be increased to an amount ("Overdue Rate") equal to the maximum legal rate of interest permitted by applicable law.

If this New Note is not paid when due, Borrower promises to pay all costs and expenses of collection and attorneys' fees incurred by the holder hereof on account of such collection, whether or not suit is filed thereon. Borrower consents to renewals, replacements and extensions of time for payment hereof, before, at, or after maturity; consents to the acceptance, release or substitution of security for this note, and waives protest, presentment, demand for payment, notice of default or nonpayment and notice of dishonor and the right to assert any statute of limitations. The indebtedness evidenced hereby shall be payable in lawful money of the United States.

This New Note shall be governed by, and shall be construed and enforced in accordance with, the laws of the state of Delaware without giving effect to the conflict of law rules thereof, and shall be adjudicated before the appropriate Courts of the State of Delaware.

_Dalia Genger_
THE ORLY GENGER 1993 TRUST

DG 01110

# EXHIBIT "G"

OCT-17-2008 16:03 From:                              To:12126603001              Page:2/5

# MARKEWICH AND ROSENSTOCK LLP

8 East 41st Street • Fifth Floor • New York, New York 10017
tel: (212) 542-3156   fax: (212) 481 1761   cmarkewich@mirlawllp.com

Lawrence M. Rosenstock
Eve Rachel Markowich

Robert Markewich
of counsel

November 5, 2008

Hon. Renee R. Roth
Surrogate's Court, New York County
31 Chambers Street, 5th Floor
New York, New York 10007

Re:   In the Matter of Orly Genger
File No. 0017/2008

Dear Surrogate Roth:

We write on behalf of the Petitioner, Orly Genger, with reference to her *sub judice* Petition as beneficiary of the Orly Genger Trust ("Orly Trust"). Recent events require that we, again, urge you to appoint Martin Coleman as Trustee. As set forth in detail below, there are several litigations in process that will impact the value of Trust assets, and the Orly Trust needs to have a Trustee who can participate in those litigations without conflict. There is also an outstanding matter regarding possession of a stock certificate belonging to the Orly Trust, but which is currently being held captive by another party.

Our Amended Petition sought the immediate appointment of a Trustee to administer the Orly Trust and safeguard its assets. We were thwarted in that request by objections from Sagi Genger ("Sagi"), the remote contingent remainderman of the Orly Trust, who manipulated various friends and relatives of his (his friend, David Parnes ("Parnes"); his sister-in-law Leah Fang; his sister-in-law's romantic partner, Patricia Enriquez; and his mother Dalia Genger ("Dalia")) to, seriatim, name one another Trustee and to take control of the Orly Trust, to the detriment of Orly.

Since our last contact with the Court, we believe Sagi and Dalia have acted in concert to devalue the Trust's most valuable asset, shares of a privately-held company called Trans Resources Inc. ("TRI"), a company founded by Orly's and Sagi's father, Arie Genger ("Arie").

OCT-17-2008 16:03 From:                                    To:12126603001              Page:3/5

The Orly Trust and a trust for the benefit of Sagi, (the "Sagi Trust"), were created by Arie in 1993. In 2004, when Arie and Dalia divorced, the two Trusts purchased TRI stock that at one time was marital property. This stock previously had been held by TPR[1], an entity in which Arie and Dalia held their family resources. As part of the marital settlement, the TRI stock held by TPR was sold to the Orly Trust, the Sagi Trust and Arie. As a result of the sales, the Sagi Trust and the Orly Trust each owned to approximately 19% of the outstanding TRI stock, and Arie owned approximately 15% of the TRI stock. The Trusts also executed irrevocable proxies granting to Arie the right to vote their shares of TRI stock. As a result, Arie continued to control TRI through the Genger family holdings of approximately 53% of the stock.

The remaining 47% TRI stock is held by third parties unrelated to the Gengers but related to each other ("Third Parties"). Last month, the Third Parties attempted a coup, by convincing Sagi to arrange the sale to them of the Sagi Trust's shares ("Sagi TRI Shares"). The purported sale was effected by a document signed by Rochelle Fang, Sagi's mother-in-law, who was then Trustee of the Sagi Trust. As soon as Rochelle, as Trustee, signed the purchase and sale agreement (the "PSA") regarding the Sagi TRI Shares, Rochelle – presumably at Sagi's request – resigned as Trustee. In Rochelle's place, David Parnes became Trustee of the Sagi Trust. Of course, this musical chairs game with the Trustee to the Sagi Trust is the same game played by the same people – Parnes, Sagi and Sagi's in-laws, the Fangs – regarding the trusteeship of the Orly Trust.

The PSA reflected a price for the Sagi TRI-Shares that is merely a fractional amount of their worth. Based on the 2008 earnings of TRI, the value of the Sagi TRI Shares is in excess of $150,000,000. Nonetheless, under the PSA, the Third Parties purport to purchase the Sagi TRI Shares for $26,715,416 – ie. at a discount of approximately $125,000,000 or more.

In the meantime, the Third Parties also have filed suit seeking to void the original transfer of the TRI shares from TPR to the two Trusts, claiming the sale was improper under the TRI shareholders agreement. Since the Third Parties claim that the stock owned by the Sagi Trust was never rightfully transferred to the Sagi Trust, the Third Parties insisted that the PSA be approved and executed not only by the Sagi Trust, but also by TPR. Upon information and belief, Dalia, as the controlling shareholder of TPR, consented to the sales

---

[1] In the Amended Petition, Orly requested limited letters to investigate the operations of TPR. TPR originally was owned 49%, indirectly, and equally, by the Sagi Trust and the Orly Trust, and 51% by Dalia. Recently, Dalia sold 2% of her shares to Sagi's mother-in-law, Rochelle Fang. Of particular concern to Orly is the fact that TPR has paid out well over a million dollars in compensation and other funds to Sagi and Dalia, without making comparable payments to Orly.

OCT-17-2008 16:03 From:                          To:12126603001              Page:4/5

document affirming that if the Sagi Trust's TRI shares are, in fact, still owned by TPR, then TPR agrees to the sale to the Third Parties. By consenting to the sale, Dalia, simultaneously: (i) agreed to a share price for TRI at significantly below its actual value; (ii) conceded the possibility that the Orly Trust is not the owner of its most valuable asset – the TRI shares that had been transferred to it by TPR; (iii) agreed to cede control of TRI to the Third Parties; (iv) potentially caused a de-valuation of the Orly Trust's TRI shares; and (v) potentially caused a de-valuation of the Orly Trust's interest in TPR.

There are currently several litigations involving TPR and/or TRI, which directly affect the Orly Trust, including:

- GLENCLOVA INVESTMENT CO. v. TRANS-RESOURCES, INC. and TPR INVESTMENT ASSOCIATES INC. pending in the United States District Court, Southern District of New York;

- ROBERT SMITH, TR INVESTORS, LLC AND GLENCLOVA INVESTMENT CO. v. TRANS-RESOURCES, INC. pending in the Delaware Chancery Court;

- TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, and NEW TR EQUITY II, LLC v. ARIE GENGER and TRANS-RESOURCES, INC. pending in the Delaware Chancery Court.

- NEW TR EQUITY, LLC v. TRANS-RESOURCES, INC., pending in the Delaware Chancery Court.

These actions will have a direct impact on the Orly Trust's holdings, and the control and value of such holdings. It is, therefore, essential that a trustee immediately be appointed for the Orly Trust, so that decisions can be made to determine what steps to take with respect to these litigations and, in particular, whether the Orly Trust should seek to intervene in these lawsuits. It is likely that the only way to preserve the value of the TRI shares in the Orly Trust will be to intervene in some if not all of the litigations.

Sagi and Dalia are acting on their own accounts in the litigations. There is no one acting on behalf of Orly or the Orly Trust. The Orly Trust must have representation in the litigations that is independent from the Sagi Trust and TPR, as controlled by Dalia. Clearly, Dalia would not be independent. She is obviously in a position of conflict, having already approved a severely depressed valuation of the TRI stock. This conflict is separate and apart from the conflict that already existed, as set forth in the Amended Petition, as a result of Dalia taking money out of TPR, to the exclusion of the Orly Trust,

OCT-17-2008 16:03 From:                                To:12126603001              Page:5/5

which has an independent significant ownership interest in TPR, albeit indirectly through another entity controlled by Dalia.

In addition to our concerns about the extant litigations, we are also concerned that Dalia and Sagi will attempt to sell the Orly Trust's TRI shares to the Third Parties – again, at a depressed value. In fact, we have sought to obtain the share certificate evidencing the Orly Trust's ownership of the TRI shares and have been thwarted by TRI's counsel. The need to take possession of that share certificate is yet another, separate, reason, why there is immediate need for the appointment of a Trustee other than Dalia.

For these reasons we respectfully request that the Court immediately resolve the outstanding application and appoint Martin Coleman as Trustee. (Although the Trustee must serve without commission, pursuant to the Trust instrument, Mr. Coleman has agreed to take on this job.)

Respectfully yours,

Eve Rachel Markewich

ERM:js

cc:   Jonathan G. Kortmansky, Esq.
      Steven Hyman, Esq.
      Matthew Hoffman, Esq.
      Seth Rubenstein, Esq.
      Mary Santamarina, Esq.

# EXHIBIT "H"

## CREDIT AND FORBEARANCE AGREEMENT AND
## SECOND AMENDMENT AND RESTATEMENT OF PROMISSORY NOTE

THIS CREDIT AND FORBEARANCE AGREEMENT AND SECOND AMENDMENT AND RESTATEMENT OF PROMISSORY NOTE is made effective as of May __, 2012 (this "**Agreement**") by and between the ORLY GENGER 1993 TRUST, a trust settled on December 13, 1993 (the "**Trust**") pursuant to that certain Trust Agreement dated December 13, 1993 (the "**Trust Agreement**") between Arie Genger as grantor and Lawrence M. Small and Sash A. Spenser as original Trustees, acting through Dalia Genger, its current Trustee ("**Dalia**" or "**Trustee**"), and MANHATTAN SAFETY COMPANY, LTD., a corporation organized under the laws of St. Kitts, W.I. ("**Manhattan**"). Capitalized terms not otherwise defined herein have the meanings ascribed to them in Section 1.2 below.

### RECITALS

A.   The Trust wishes to obtain additional financing and the forbearance in the enforcement of the 2011 Note so as to improve its ability to assert and defend its rights in the TRI Proceedings to the TRI Shares.

B.   Manhattan wishes to obtain certain representations and warranties in consideration for providing additional financing in the amount of up to Four Hundred Thousand Dollars and No Cents ($400,000.00) (the "**Manhattan Financing**") and its agreement to forbear in the enforcement of the 2011 Note.

C.   TPR Investment Associates, Inc., a Delaware corporation ("**TPR**"), and the Trust entered into an agreement on or about October 29, 2004 (the "**Share Transfer**") whereby TPR contracted to sell to the Trust 1,102.8 shares (the "**TRI Shares**") of Trans Resources, Inc., a Delaware corporation ("**TRI**"), for a nominal consideration.

D.   Certain former indirect shareholders of TRI have challenged the validity of the Share Transfer in various legal proceedings and other parties have engaged in litigation and arbitration proceedings relating to various issues concerning TRI, its shares and the appropriate consideration for the purchase and sale of shares of TRI, as well as the appointment of, and validity of actions taken by, the Trustee (collectively the "**TRI Proceedings**").

E.   The Trust, TPR, and D&K LP, a Delaware limited partnership ("**D&K**"), entered into a Settlement Agreement dated October 2, 2011 as subsequently amended and restated in an Amended and Restated Settlement Agreement dated March 16, 2012 (the "**Settlement**").

F.   Pursuant to the Settlement, (i) TPR relinquished in favor of the Trust any economic interest held by it in the TRI Shares and assigned to the Trust its right to any economic benefit of the TRI Shares, including any proceeds from the sale thereof, including the approximately Ten Million Three Hundred Thousand Dollars ($10,300,000) (the "**Minimum Payment**") in proceeds from the sale of the TRI Shares to TR Investors, LLC, Glencova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC

DG 00190

(collectively, the "**Trump Group**") pursuant to the terms of a letter agreement dated August 22, 2008 (the "**Trump Sale Agreement**") between TPR and the Trump Group and (ii) an obligation of approximately Four Million Five Hundred Thousand Dollars of D&K to TPR, guaranteed by the Trust, representing the net amount following the partial foreclosure of an Eight Million Nine Hundred and Fifty Thousand Dollars ($8,950,000) obligation evidenced by a promissory note in the original principal amount, was cancelled and replaced by a new promissory note of the Trust in the original principal amount of Four Million Dollars ($4,000,000) payable to TPR (the "**2011 Note**").

    **G.**    In connection with the TRI Proceedings, Pedowitz & Meister, the escrow agent holding funds approximating the Minimum Amount (the "**Escrowed Amount**") pursuant to a certain Escrow Agreement dated as of September 1, 2010 (the "**Escrow Agreement**"), filed an interpleader action (the "**Interpleader Action**") currently pending in the United States District Court for the Southern District of the State of New York (the "**Court**") in *Pedowitz v. TPR*, 11 Civ. 5602 and deposited the Escrowed Amount with the Court to hold pending its determination as to which party is entitled to the Escrowed Amount.

    **H.**    Pursuant to that certain Agreement Amending Terms of Promissory Note dated as of October 3, 2011, certain provisions of the 2011 Note were amended (as so amended, the "**Amended Note**").

    **I.**    TPR has agreed to sell and assign the Note to Manhattan as evidenced by that certain Bill of Sale and Note Assignment of even date herewith.

    **J.**    Manhattan has agreed to make the Manhattan Loan in two installments: (1) an initial advance (the "**Initial Advance**") of Two Hundred Thousand Dollars and No Cents ($200,000.00), as evidenced by a promissory note in the principal amount of Two Hundred Thousand Dollars and No Cents ($200,000.00) (the "**New Note**"), payable as provided herein, and (2) an additional advance (the "**Additional Advance**") of Two Hundred Thousand Dollars and No Cents ($200,000.00) to be made upon request by the Trust, and evidenced by the note as amended and restated to provide for a face amount of Four Million Two Hundred Forty Thousand Dollars and No Cents ($4,240,000.00) (the "**Amended and Restated Note**" or the "**Note**") (inclusive of the Forbearance Fee if paid as provided herein), with the Additional Advance to bear interest from the date made on the terms of this Agreement and the Note. The Manhattan Loan, including both the Initial Advance and the Additional Advance, shall be subject to certain conditions, including the Trust's agreement to amend and restate the 2011 Note and enter into this Agreement.

    **NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, agree as follows:

**1.**    **Definitions.**

    1.1    <u>General</u>.    Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of this Agreement or as otherwise may be provided in other provisions of this Agreement. Terms defined in the Note, the

Settlement or the New Note and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Note, Settlement or New Note, as the case may be. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between this Agreement, the Note, the Settlement or the New Note, this Agreement shall govern and control.

1.2     Definitions. In this Agreement:

"Additional Advance" has the meaning set forth in Recital J.

"Affiliate" or "Affiliates" means "affiliate" as defined in either (a) Bankruptcy Code §101(2) or (b) Rule 144 of the Securities Act.

"Agreement" means this Credit and Forbearance Agreement and Second Amended and Restated Promissory Note.

"Amended Note" has the meaning set forth in Recital H.

"Amended and Restated Note" has the meaning set forth in Recital J.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978, 11 U.S.C. §§101 et seq., as amended.

"Bill of Sale" means the bill of sale and note assignment relating to the assignment of the 2011 Note.

"Business Day" means any day that is not (a) a Saturday, (b) a Sunday or (c) any other day on which the Federal Reserve Bank of New York is closed.

"Claim" has the meaning specified in Section 7.1.

"Claimant" means any person or entity claiming, or having a right to claim, a mechanic's lien against the Minimum Payment or the TRI Shares, or any portion thereof, or who is delivered, or has the right to deliver, a stop notice in connection with the payment by Trust of its obligations under the Note.

"Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated under it.

"Court" has the meaning set forth in Recital G.

"Dalia" means Dalia Genger, the current Trustee of the Trust.

"D&K" means D&K LP, a Delaware limited partnership.

"Debtor Relief Law" means the Bankruptcy Code, and together with any other bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, or extensions generally with creditors, or proceedings seeking reorganization, arrangement, liquidation, receivership, or other similar relief.

DG 00192

"**Distribution**" means any payment of principal, interest, penalty or costs paid by or on behalf of the Trust in connection with the Note or the Transferred Rights.

"**Encumbrance**" or, if used as a verb, "**Encumber,**" means any (a) mortgage, pledge, lien, security interest, charge, hypothecation, security agreement, security arrangement or encumbrance or other adverse claim against title of any kind; (b) purchase, option, call or put agreement or arrangement; (c) subordination agreement or arrangement; or (d) agreement or arrangement to create or effect any of the foregoing.

"**Entity**" means any individual, partnership, corporation, limited liability company, association, estate, trust, business trust, Governmental Authority, fund, investment account or other entity.

"**Escrow Agreement**" has the meaning set forth in Recital G.

"**Escrowed Amount**" has the meaning set forth in Recital G.

"**Forbearance Fee**" means a fee of Forty Thousand Dollars and No Cents ($40,000), being equal to one percent (1%) of Four Million Dollars and No Cents ($4,000,000.00), the face amount of the 2011 Note, paid in consideration of Manhattan's agreement to forbear as provided in this Agreement.

"**Governmental Authority**" means any federal, state, or other governmental department, agency, institution, authority, regulatory body, court or tribunal, foreign or domestic, and includes arbitration bodies, whether governmental, private or otherwise.

"**Indemnified Party**" has the meaning specified in Section 7.2.

"**Indemnifying Party**" has the meaning specified in Section 7.2.

"**Initial Advance**" has the meaning set forth in Recital J.

"**Insolvent**" has the meaning set forth in Section 4(h).

"**Interpleader Action**" has the meaning set forth in Recital G.

"**Liability**" or "**Liabilities**" shall mean all debts, obligations and other liabilities of any kind or nature (whether known, unknown, accrued, or not accrued, absolute or contingent, liquidated or unliquidated, due or to become due, asserted or unasserted or otherwise).

"**Knowledge**" means the actual knowledge of Trustee.

"**Manhattan**" means Manhattan Safety Company, Ltd., a corporation organized under the laws of St. Kitts, W.I.

"**Manhattan Indemnitees**" has the meaning specified in Section 7.1.

"**Manhattan Loan**" has the meaning set forth in Recital B.

"**Minimum Payment**" means Ten Million Three Hundred Thousand Dollars and No Cents ($10,300,000.00).

"**New Note**" means the promissory note in the face principal amount of Two Hundred Thousand Dollars and No Cents ($200,000.00), comprising the Initial Advance of the Manhattan Loan and having the Trust as maker and Manhattan as payee, which evidences the Manhattan Loan.

"**Note**" has the meaning set forth in Recital J.

"**Party**" means the Trust, Trustee or Manhattan, as applicable, and their respective successors and permitted assigns.

"**Reimbursement Claims**" means any claim of TPR or the Trust arising in connection with the return to, disgorgement by, or reimbursement of, TPR or the Trust, or any other Entity, of all or any portion of any payment or transfer received by TPR or Trust on account of the Transferred Rights, including any claims arising under Bankruptcy Code §502(h).

"**Sagi**" means Sagi Genger, the President and the sole primary beneficiary (together with his children) of the Sagi Genger 1993 Trust, the owner of a majority of the shares of TPR.

"**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§77a et seq., as amended, and the rules and regulations promulgated under it.

"**Settlement**" means that certain amended and restated settlement agreement dated as of March 16, 2012 by and among TPR, the Trust and D&K.

"**Share Proceeds**" means any proceeds in cash or kind paid or payable to the Trust relating to the TRI Shares.

"**Share Transfer**" has the meaning set forth in Recital D.

"**TPR**" means TPR Investment Associates, Inc., a Delaware corporation.

"**TRI**" means Trans Resources, Inc., a Delaware corporation.

"**TRI Shares**" means the 1,102.8 shares of TRI transferred to the Trust pursuant to the Share Transfer.

"**TRI Proceedings**" has the meaning set forth in Recital D.

"**Transferred Rights**" means any and all of Manhattan's right, title, and interest in, to and under the Note and the Settlement (solely to the extent those rights of TPR in the Settlement which have been transferred by TPR to Manhattan relate to amounts payable under the Note), including:

> (a)    all amounts funded by or payable to TPR under the Settlement relating to the Note, and all obligations owed to TPR in connection

DG 00194

with the Note, including but not limited to, accrued and unpaid interest;

(b) any proof of claim;

(c) all claims (including "claims" as defined in Bankruptcy Code §101(5)), suits, causes of action, and any other right of TPR, whether known or unknown, against Trust, the Trustee or any of their respective Affiliates, agents, representatives, contractors, advisors, or any other Entity that in any way is based upon, arises out of or is related to any of the foregoing, including, to the extent permitted to be assigned under applicable law, all claims (including contract claims, tort claims, malpractice claims, and claims under any law governing the purchase and sale of, or indentures for, securities), suits, causes of action, and any other right of TPR against any attorney, accountant, financial advisor, or other Entity arising under or in connection with the Note and the Transferee Rights or the transactions related thereto or contemplated thereby;

(d) all cash, securities, or other property, and all setoffs and recoupments, received, applied, or effected by or for the account of TPR under the Note (whether for principal, interest, fees, reimbursement obligations, or otherwise) from and after the date of this Agreement, and all cash, securities, interest, dividends, and other property that may be exchanged for, or distributed or collected with respect to, any of the foregoing;

(e) the economic benefit received by TPR relating to the Note transferred to Manhattan; and

(f) all proceeds of the foregoing.

"**Trump Group**" has the meaning set forth in Recital F.

"**Trump Sale Agreement**" has the meaning set forth in Recital F.

"**Trust**" has the meaning set forth in the heading of this Agreement.

"**Trustee**" has the meaning set forth in the heading of this Agreement.

"**2011 Note**" has the meaning set forth in Recital F.

**2.     Recitals True.**  The Recitals are hereby incorporated into this Agreement and made a part hereof.  The Trust and the Trustee, jointly and severally, represent and warrant that the Recitals are true and correct in all material respects and do not fail to state a fact necessary to make them not misleading.

**3.     Amendment and Restatement of Note; Agreement to Make the Manhattan Loan.**

3.1     The Trust as maker agrees to amend and restate the 2011 Note, in the form attached as **Exhibit A** hereto (the "**Amended and Restated Note**"), including but not limited to amendments to (i) add covenants with respect to (A) the waiver of defenses to payment of amounts payable under the Note and (B) prohibitions on (1) any Encumbrance on (x) the TRI Shares or (y) the Minimum Payment or any other payment the Trust may receive or be entitled to receive from (a) the Court or (b) any other party, in connection with the TRI Shares or otherwise, and (2) (x) any (a) borrowing or any agreement to borrow money, or (b) guaranty, agreement to indemnify or other agreement to create any contingent monetary obligation, or (y) the incurrence of any material Liability, other than costs for legal services relating to the TRI Proceedings, which in no event, without the prior consent of Manhattan, shall exceed in aggregate Five Hundred Thousand Dollars and No Cents ($500,000.00), and (ii) amend the face amount of the Note to Four Million Two Hundred Forty Thousand Dollars and No Cents ($4,240,000.00) to reflect the Additional Advance of the Manhattan Loan and the Forbearance Fee, in the event such are made and payable under the terms of this Agreement and the Note.

3.2     On the terms set forth in the Amended and Restated Note, in the form attached as **Exhibit A** hereto, and the New Note, in the form attached as **Exhibit B** hereto, and subject to the conditions set forth in this Agreement and in the Amended and Restated Note and the New Note, Manhattan agrees to make, and the Trust agrees to accept, the Manhattan Loan.

**4.     Representations and Warranties of the Trust and Trustee.**  Trust and Trustee, each jointly and severally, represents and warrants to Manhattan as of the date of this Agreement that:

(a)     Trust (i) is duly organized and validly existing under the laws of its jurisdiction of organization or incorporation, (ii) is in good standing under such laws and (iii) has full power and authority to execute, deliver and perform its obligations under this Agreement, the Note and the New Note.

(b)     Trust's execution, delivery, and performance of this Agreement, , the Note and the New Note will not result in a breach or violation of any provision of (i) Trust's organizational documents, (ii) any statute, law, writ, order, rule or regulation of any Governmental Authority applicable to Trust, (iii) any judgment, injunction, decree or determination of any Governmental Authority applicable to Trust or (iv) any contract, indenture, mortgage, loan agreement, note, lease or other agreement, document or instrument to which

DG 00196

Trust may be a party, by which Trust may be bound or to which any of the assets of Trust is subject.

(c)    (i)    This Agreement, the Note and the New Note each (A) has been duly and validly authorized by Trustee on behalf of Trust, executed and delivered by Trust and (B) are the legal, valid and binding obligations of Trust, enforceable against Trust in accordance with their respective terms, except that such enforceability against Trust may be limited by bankruptcy, insolvency, or other similar laws of general applicability affecting the enforcement of creditors' rights generally and by a court's discretion in relation to equitable remedies; and

(ii)    no notice to, registration with, consent or approval of or any other action by any relevant Governmental Authority or other Entity is or will be required for Trust to execute, deliver, and perform its obligations under, this Agreement, the Note and the New Note.

(d)    Trust is a good faith claimant to the Share Proceeds or the TRI Shares, as the case may be, and its claim thereto is free and clear of any Encumbrance.

(e)    Other than the TRI Proceedings and any other proceedings disclosed in writing by Trust to Manhattan, no proceedings are pending against the Trust, the Trustee or any of their respective Affiliates or, to the best of Trust's and Trustee's Knowledge, threatened against the Trust, the Trustee or any of their respective Affiliates before any relevant Governmental Authority that, individually or in aggregate, may materially and adversely affect any action taken or to be taken by Trust under this Agreement, including the sale and assignment of the Note by TPR to Manhattan and the Transferred Rights to Manhattan, or the Manhattan Loan as evidenced by the New Note.

(f)    Trust has no (A) payment obligation, including any contingent payment obligation in the nature of a guarantee or indemnification or similar obligation, to any individual, Entity or Governmental Authority, and has entered into no agreement that could reasonably result in a payment obligation to any party for any amount that individually or together with other payment obligation of the Trust is equal to or greater than Five Hundred Thousand Dollars and No Cents ($500,000.00) and (B) Liability to any individual, Entity or Governmental Authority that individually or together with any other Liability may adversely affect repayment of the Note or the New Note or the value of Trust's interest in the Minimum Payment or TRI Shares, as the case may be.

DG 00197

(g)  To the best of Trust's and Trustee's Knowledge, neither the Trust nor the Trustee or any other party to the TRI Proceedings has received any notice or has any reasonable basis to believe that the Trust will not be entitled to receive one or the other of (A) an amount not less than the Minimum Payment or (B) the TRI Shares upon final determination and exhaustion of all appeals or challenges to such final determination, of all the material matters at issue in the TRI Proceedings.

(h)  Trust is not now insolvent and will not be rendered insolvent by any of the transactions contemplated by this Agreement. As used herein, "**insolvent**" means that the sum of the debts and probable Liabilities of Trust exceeds the fair saleable value of its assets. Trust is not in receivership, nor is an application for receivership pending. No proceedings are pending by or against Trust in bankruptcy or reorganization in any state or federal court under any Debtor Relief Law, nor has it committed any act of bankruptcy as such terms are used in the Bankruptcy Code. Immediately after giving effect to the consummation of the transactions contemplated by this Agreement, (i) Trust will be able to pay its Liabilities as they become due in the usual course of its business; (ii) Trust will not have assets (calculated at fair market value) that exceed its Liabilities; and (iii) taking into account all pending and threatened litigation, final judgments against Trust for money damages are not reasonably anticipated to be rendered at a time when, or in amounts such that, Trust will be unable to satisfy any such judgments promptly in accordance with their terms (taking into account the maximum probable amount of such judgments in any such actions and the earliest reasonable time at which such judgments might be rendered) as well as all other obligations of Trust. The cash available to Trust, taking into account all other anticipated uses of cash, as well as taking into account reasonably anticipated payments on insurance covering such actions and Liabilities, will be sufficient to pay all such debts and judgments promptly in accordance with their terms.

(i)  No broker, finder or other Entity acting under the authority of the Trust, the Trustee or any of their respective Affiliates is entitled to any broker's commission or other fee in connection with the transactions contemplated by this Agreement, including but not limited to the Manhattan Loan and New Note, for which Manhattan could be responsible.

5.  **Manhattan's Representations and Warranties.** Manhattan represents and warrants to Trustee as of the date of this Agreement that:

(a)  Manhattan (i) is duly organized and validly existing under the laws of its jurisdiction of organization or incorporation, (ii) is in good

DG 00198

standing under such laws and (iii) has full power and authority to execute, deliver and perform its obligations under, this Agreement.

(b)     Manhattan's execution, delivery, and performance of this Agreement have not resulted and will not result in a breach or violation of any provision of (i) Manhattan's organizational documents, (ii) any statute, law, writ, order, rule or regulation of any Governmental Authority applicable to Manhattan, (iii) any judgment, injunction, decree or determination of any Governmental Authority applicable to Manhattan or (iv) any contract, indenture, mortgage, loan agreement, note, lease or other agreement, document or instrument by which Manhattan may be a party, by which Manhattan may be bound or to which any of the assets of Manhattan is subject.

(c)              (i)     This Agreement and the Manhattan Loan each (A) has been duly and validly authorized by Manhattan's board of directors or authorized committee thereof or other party which must approve the same pursuant to Manhattan's organizational documents, executed and delivered by Manhattan and (B) are the legal, valid and binding obligations of Manhattan, enforceable against Manhattan in accordance with their respective terms, except that such enforceability may be limited by bankruptcy, insolvency, or other similar laws of general applicability affecting the enforcement of creditors' rights generally and by a court's discretion in relation to equitable remedies; and

                 (ii)    no notice to, registration with, consent or approval of or any other action by any relevant Governmental Authority or other Entity is or will be required for Manhattan to execute, deliver, and perform its obligations this Agreement and the Manhattan Loan.

(d)     No broker, finder or other Entity acting under the authority of Manhattan or any of its Affiliates is entitled to any broker's commission or other fee in connection with the transactions contemplated by this Agreement, including the Manhattan Loan, for which the Trust could be responsible.

(e)     Manhattan is an "accredited investor" as defined in Rule 501 under the Securities Act. Without characterizing the Manhattan Loan and New Note as a "security" within the meaning of applicable securities laws, Manhattan has not made any offers to sell, or solicitations of any offers to buy, all or any portion of the Manhattan Loan or the New Note in violation of any applicable securities laws.

**6.    Covenants.**

6.1    The Trust hereby covenants and agrees as follows:

(a)    Trust shall not Encumber the TRI Shares, its interest in the TRI Shares or any proceeds of the TRI Shares or any material amount of its assets for so long as any amount is owed under this Note.

(b)    Trust acknowledges the sale and assignment of the 2011 Note and the Transferred Rights to Manhattan and agrees to deliver all amounts payable with respect to the Note and the Transferred Rights to Manhattan at the address provided to Trust in writing by Manhattan.

(c)    Trust hereby waives any defenses it may have to payment of amounts payable under the Note, including all defenses it may have with respect to Manhattan, TPR or any other prior holder of the Note.

(d)    Trust agrees that it shall not borrow or enter into any agreement to borrow an aggregate amount greater than Four Hundred Thousand Dollars and No Cents ($400,000.00), including amounts borrowed as part of the Manhattan Loan; provided, however, that this shall not prevent Trust from engaging in agreements for services with attorneys and others in connection with the TRI Proceedings; and provided, further, that Trust may borrow such additional sums as may be subordinated to the Manhattan Loan, on terms and subject to conditions satisfactory to Manhattan.

6.2    Manhattan hereby covenants and agrees that notwithstanding any payment default under the Note or the New Note, but subject to the Trust's compliance with all other terms and conditions of the Note and the New Note, Manhattan agrees to forbear from collection of amounts due and owing on the Note, and not take any action, including the commencement of any proceeding, to collect amounts due under the Note or the New Note, until the earliest to occur of (i) the date on which Dalia no longer serves as Trustee of the Trust, (ii) the final resolution of the Interpleader Action or (iii) November 1, 2014; provided, however, that notwithstanding the foregoing, Manhattan may take any action reasonably necessary to ensure the payment of all amounts payable under the Note or the New Note, including, but not limited to, the acceleration of the obligations under the Note or the New Note and the commencement of enforcement actions to collect amounts owing under the Note and or the New Note upon the occurrence of (x) any event of default under the Note or the New Note, other than a payment default or (y) any action by an individual or Entity which Manhattan believes may adversely affect the Trust's ability to fully perform all of its obligations under this Agreement, the Note, the Manhattan Loan or the New Note.

6.3    The Forbearance Fee shall be payable by increasing the amount outstanding under the Note by the amount of the Forbearance Fee effective November 1, 2012 if the Note is not previously paid in full by such date.

7.    **Indemnification.**

7.1    Trust and the Trustee, jointly and severally, shall indemnify, defend, and hold Manhattan and its officers, directors, agents, partners, members, controlling Entities and employees (collectively, "**Manhattan Indemnitees**") harmless from and against any liability, claim, cost, loss, judgment, damage or expense, including reasonable attorneys' fees and expenses (collectively, a "**Claim**") that any Manhattan Indemnitee incurs or suffers as a result of, or arising out of (i) a breach of any of Trust representations, warranties, covenants or agreements in this Agreement, (ii) any legal or arbitral proceeding, any investigation or any actions preliminary or related to any of the foregoing, which relates to, or arises from, the same factual basis as, the TRI Proceedings, (iii) compliance with any subpoena or other demand to be deposed, testify or produce documents in a proceeding before a Governmental Authority or an arbitrator or (iv) otherwise resulting from any action taken by any Claimant; provided, however, that the indemnification obligations of the Trustee under this Agreement (x) shall not include Claims made after Dalia no longer serves as Trustee of the Trust and (y) are in the nature of a surety for the obligations of the Trust and are conditional upon demand first being made upon, and a good faith attempt made to collect from, the Trust as provided in Section 7.3 below; and provided, further, that the foregoing proviso shall not be construed in any way to limit the indemnification obligations of the Trust under this Agreement.

7.2    If a third party commences any action or makes any demand against Manhattan Indemnities for which any Manhattan Indemnitees ("**Indemnified Party**") is entitled to indemnification under this Agreement, such Indemnified Party shall promptly notify Trust and Dalia (collectively and individually "**Indemnifying Party**") in writing of such action or demand; provided, however, that if the Indemnified Party assumes the defense of the action and fails to provide prompt notice to the Indemnifying Party, such failure shall not limit in any way the Indemnifying Party's obligation to indemnify the Indemnified Party except to the extent that such failure materially prejudices the Indemnifying Party's ability to defend the action. The Indemnifying Party may, at its own expense and without limiting its obligation to indemnify the Indemnified Party, participate in the defense of such action with counsel reasonably satisfactory to the Indemnified Party, or the Indemnifying Party may, at its own expense and without limiting its obligation to indemnify the Indemnified Party, assume the defense of such action with counsel reasonably acceptable to the Indemnified Party. In any event, the Indemnified Party that has assumed the defense of such action shall provide the Trust and Dalia with copies of all notices, pleadings, and other papers filed or served in such action. Neither Party shall make any settlement or adjustment without prior written consent, which consent (a) in the case of the Indemnifying Party will not be unreasonably withheld if the settlement or adjustment involves only the payment of money damages by the Indemnifying Party and (b) in the case of the Indemnified Party may be withheld for any reason if the settlement or adjustment involves performance or admission by the Indemnified Party.

7.3    In the event of the occurrence of a Claim for which an Indemnified Party is entitled to indemnification hereunder, the Indemnified Party shall first make demand upon, and seek payment and performance from, the Trust, and then, and only if, after such demand the Trust fails to pay or perform as required by this Agreement, shall the

Indemnified Party seek payment and performance from the Trustee. Amounts payable by the Indemnifying Party, to the extent not paid by an Indemnifying Party, may be added to the principal amount Note and shall accrue interest from the date of the incurrence of such expense by the Indemnified Party at the prevailing rate of interest as provided under the Note.

7.4     Each indemnity in this Agreement is a continuing obligation, separate and independent from the other obligations of the Trust and Dalia and survives termination of this Agreement or any transfer pursuant to Section 10 of this Agreement. It is not necessary for a Party to incur expense or make payment before enforcing a right of indemnity conferred by this Agreement.

**8.     Costs and Expenses.** Trust and Manhattan each agrees to bear its own, legal and other costs and expenses for preparing, negotiating, executing and delivering this Agreement and any related documents and consummating the transaction contemplated by this Agreement, including legal and other costs and expenses relating to the amendment of the Amended Note, the Manhattan Loan and the New Note.

**9.     Notices.**

9.1     All communications between the Parties in respect of, or notices, requests, directions, consents or other information sent under, this Agreement shall be in writing, hand delivered or sent by overnight courier, electronic transmission or telecopier, addressed to the relevant Party at its address, electronic mail or facsimile number specified in **Schedule 9.1** to this Agreement at such other address, electronic mail or facsimile number as such Party may subsequently request in writing. All such communications and notices shall be effective upon receipt.

9.2     If Trust receives any notices, correspondence or other documents in respect of the Transferred Rights, the Note or the Settlement that, to the best of Trust's Knowledge, were not sent to Manhattan, Trust shall promptly forward them to Manhattan.

**10.     Further Transfers.**

10.1     Manhattan may sell, assign, grant a participation in, or otherwise transfer all or any portion of the Note or Transferred Rights, this Agreement, its rights under this Agreement, the Manhattan Loan or the New Note, or any interest in any of the foregoing without the consent of or notice to Trust.

10.2     Trust may assign its rights under this Agreement without the prior written consent of Manhattan; provided, however, that Trust may not delegate its obligations under this Agreement without the prior written consent of Manhattan.

**11.     Exercise of Rights and Remedies.**

11.1     No amendment of any provision of this Agreement shall be effective unless it is in writing and signed by the Parties, and no waiver of any provision of this Agreement, nor consent to any departure by either Party from it, shall be effective unless

it is in writing and signed by the affected Party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

11.2    No failure on the part of a party to exercise, and no delay in exercising, any right or remedy under this Agreement shall operate as a waiver by such Party, nor shall any single or partial exercise of any right or remedy under this Agreement preclude any other or further exercise thereof or the exercise of any other right or remedy.  The rights and remedies of each Party provided herein (a) are cumulative and are in addition to, and are not exclusive of, any rights or remedies provided by law (except as otherwise expressly set forth in this Agreement) and (b) are not conditional or contingent on any attempt by such Party to exercise any of its rights or remedies under any other related document or against the other Party or any other Entity.  In no event may either Party recover from the other Party any special, consequential or punitive damages.

**12.    Survival; Successors and Assigns.**

12.1    All representations, warranties, covenants, indemnities and other provisions made by the Parties shall be considered to have been relied upon by the Parties, shall (as to representations and warranties) be true and correct as of the date of this Agreement and any other date set forth in Sections 4 or 5, as the case may be, and shall survive the execution, delivery and performance of this Agreement.

12.2    This Agreement, including the representations, warranties, covenants and indemnities contained in this Agreement, shall inure to the benefit of, be binding upon and be enforceable by and against the Parties and their respective successors and permitted assigns.

**13.    Further Assurances.** Each Party agrees to (i) execute and deliver, or cause to be executed and delivered, all such other and further agreements, instruments and other documents and (ii) take or cause to be taken all such other and further actions as the other Party may reasonably request to effectuate the intent and purposes, and carry out the terms, of this Agreement.

**14.    Disclosure.**

14.1    Each Party agrees that, without the prior consent of the other Party, it shall not disclose the contents of this Agreement to any individual or Entity, except that any Party may make any such disclosure (a) as required to implement or enforce this Agreement, (b) if required to do so by any law, court, regulation, subpoena or other legal process, (c) to any Governmental Authority or self-regulatory Entity having or asserting jurisdiction over it, (d) if its attorneys advise it that it has a legal obligation to do so or that failure to do so may result in it incurring a liability to any other Entity or sanctions that may be imposed by any Governmental Authority, (e) to its Affiliates, professional advisors and auditors or (f) as set forth in Section 14.2.

14.2    Manhattan may disclose the contents of this Agreement to any proposed transferee, assignee, participant, or other Entity proposing to enter into contractual relations with Manhattan in respect of the Note or Transferred Rights, the Manhattan Loan or the New Note or any part of them.

**15.    Entire Agreement; Conflict.**

15.1    This Agreement constitutes the entire agreement of the Parties with respect to the transactions contemplated here by and supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, representations and warranties in respect thereof, all of which have become merged and finally integrated into this Agreement.

15.2    As between Manhattan and the Trust, if there is any inconsistency or conflict between this Agreement and any other document, the provisions of this Agreement shall govern and control.

**16.    Counterparts; Telecopies.** This Agreement may be executed in multiple counterparts and all of such counterparts taken together shall be deemed to constitute one and the same instrument. Transmission by telecopier, facsimile or other form of electronic transmission of an executed counterpart of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart, and shall have the same force and effect as a manually executed original. Each fully executed counterpart of this Agreement shall be deemed to be a duplicate original.

**17.    Relationship Between Manhattan and the Trust.** The relationship between Manhattan and the Trust shall be that of lender and borrower. Neither is a trustee or agent for the other, nor does either have any fiduciary obligations to the other. This Agreement shall not be construed to create a partnership or joint venture between the Parties.

**18.    Severability.** The illegality, invalidity or unenforceability of any provision of this Agreement under the law of any jurisdiction shall not affect its legality, validity or enforceability under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision.

**19.    Governing Law.** THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTION (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED AND DETERMINED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION).

**20.    Waiver of Trial by Jury.** THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTION (WHETHER BASED ON CONTRACT,

TORT OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**21.     Jurisdiction.** The Parties irrevocably agree that, should either Party institute any legal action or proceeding in any jurisdiction (whether for an injunction, specific performance, damages or otherwise) in relation to this Agreement or the transactions contemplated by this Agreement, no immunity (to the extent that it may at any time exist, whether on the grounds of sovereignty or otherwise) from such action or proceeding shall be claimed by it or on its behalf, any such immunity being hereby irrevocably waived, and each Party irrevocably agrees that it and its assets are, and shall be, subject to such legal action or proceeding in respect of its obligations under this Agreement.

**22.     Interpretation.**

22.1     This Agreement and any annexes, schedules or other documents attached to or incorporated by reference into the Agreement.

22.2     Terms used in the singular or the plural include the plural and the singular, respectively; "includes" and "including" are not limiting; and "or" is not exclusive.

22.3     Any reference to a Party includes such Party's successors and permitted assigns.

22.4     Unless otherwise indicated, any reference to:

(a)     this Agreement or any other agreement, document or instrument shall be construed as a reference to this date of this Agreement or, as the case may be, such other agreement, document or instrument as the same may have been, or may at any time before the date of this Agreement be, in effect as modified, amended or supplemented as of the date of this Agreement Date; and

(b)     a statute, law, order, rule or regulation shall be construed as a reference to such statute, law, order, rule or regulation as it may have been, or may at any time before the date of this Agreement be, in effect as modified, amended or supplemented as of the date of this Agreement.

22.5     Section and other headings and captions are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

22.6   This Agreement shall be deemed to have been jointly drafted by the Parties and no provision of it shall be interpreted or construed for or against either Party because such Party actually or purportedly prepared or requested such provision, any other provision or the Agreement as a whole.

**23.    Legal Counsel.** Each Party acknowledges that it or she has been represented by its own legal counsel in connection with the negotiation and drafting of this Agreement. Accordingly, this document shall not be construed against the draftsman. Any rule of construction to the contrary shall be ignored.

[SIGNATURE PAGE FOLLOWS]

DG 00206

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed as of the date first written above.

**TRUST:**

ORLY GENGER 1993 TRUST


By: _____

Dalia Genger, Sole Trustee


STATE OF _____ )
                            )SS:
COUNTY OF _____ )

The foregoing was sworn to, subscribed and acknowledged before me this _____ day of _____ 2012, by Dalia Genger, as Sole Trustee of The Orly Genger 1993 Trust. She is personally known to me or has produced a driver's license as identification.

_____

Print or Stamp Name: _____
Notary Public: _____
Commission No.: _____
My Commission Expires: _____

MAGDALENA CHARLOTTEN
NOTARY PUBLIC, State of New York
No. 01CH6059474
Qualified in New York County
Certificate Filed in Kings, Queens,
Westchester, Bronx Counties
Commission Expires May 29, 20__

**DALIA:**


By: _____

Dalia Genger, Individually


STATE OF _____ )
                            )SS:
COUNTY OF _____ )

The foregoing was sworn to, subscribed and acknowledged before me this _____ day of _____ 2012, by Dalia Genger. She is personally known to me or has produced a driver's license as identification.

_____

Print or Stamp Name: _____
Notary Public: _____
Commission No.: _____
My Commission Expires: _____

MAGDALENA CHARLOTTEN
NOTARY PUBLIC, State of New York
No. 01CH6059474
Qualified in New York County
Certificate Filed in Kings, Queens,
Westchester, Bronx Counties
Commission Expires May 29, 20__

BG 00207

**MANHATTAN:**

MANHATTAN SAFETY COMPANY, LTD.,
a corporation organized under the laws of St. Kitts, W.I.

_____          _____
Greg Gilpin-Payne, President                    Witness: Leah Crag-Chaderton

                                                _____
                                                Witness:  Yulanda Vanterpool

FTLDOCS 5926229 12

DG 00188

**SCHEDULE 9.1**

## NOTICES

**Trust:**

Pedowitz & Meister
1501 Broadway, Suite 800
New York NY 10036-5505
Attention: Robert Meister

**Dalia:**
200 East 65th - apt 32w
New York, NY
Attention: Trustee

**Manhattan:**

858 Zenway Blvd
Frigate Bay
St Kitts, W.I.

DG 00189

**EXECUTION VERSION**

**AMENDED AND RESTATED**
**PROMISSORY NOTE**

$4,240,000.00                                                                October 3, 2011

FOR VALUE RECEIVED, the undersigned, the ORLY GENGER 1993 TRUST ("**Maker**" or the "**Trust**"), a trust settled on December 13, 1993 pursuant to that certain Trust Agreement dated December 13, 1993 (the "**Trust Agreement**") and as authorized by its current sole trustee, Dalia Genger ("**DG**" or "**Trustee**"), promises to pay to the order of MANHATTAN SAFETY COMPANY, LTD., a corporation organized under the laws of St. Kitts, W.I. ("**Manhattan;**" together with its successors and assigns, the "**Holder**"), the principal amount of FOUR MILLION TWO HUNDRED FORTY THOUSAND DOLLARS AND NO CENTS ($4,240,000.00) ("**Principal**"), or such other amount as may have been advanced under this Note, as provided herein, together with accrued interest calculated from (i) the date of the Original Note (as herein after defined) on the face amount of the Original Note, (ii) (x) such date or dates, if any, on which an Additional Advance (as herein defined) is made on the amount of the Additional Advance made on such date or dates, (iii) November 1, 2012, in the case of an advance in payment of the Forbearance Fee, on the Forbearance Fee or (iv) the date or dates of the incurrence of any cost or expense by an Indemnified Party on the amount of such cost or expense (each an "**Indemnity Payment**" and collectively, the "**Indemnity Payments**") which is not paid by an Indemnifying Party, at the rate of three percent (3%) percent per annum on the unpaid Principal balance or such other interest rate then prevailing and payable under this Note, computed on the basis of the actual number of days elapsed a year of 360 days.

This Amended and Restated Note amends and restates that certain promissory note dated October 3, 2011 in the original principal amount of Four Million Dollars and No Cents ($4,000,000.00) (the "**Original Note**") and is issued in replacement thereof. This Note is the Note contemplated by that certain Credit and Forbearance Agreement and Second Amendment and Restatement of Promissory Note dated May __, 2012 (the "**Agreement**") by and between the Trust and Manhattan. Among other things, the Original Note has been amended to provide for the possibility of (i) additional advance(s) ("**Additional Advances**") made to Maker, (ii) the payment of a Forbearance Fee by Maker under the terms of the Agreement and this Note and (iii) the incurrence by Maker of an obligation to pay an Indemnity Payment. Capitalized terms used herein without definition shall have the meanings ascribed to them in the Agreement.

1. **Payments and Prepayments**.

1.1    Principal and interest shall be paid to Holder at the address set forth in the Agreement or such other address as may appear the books and records of the Maker or such other place as the Holder hereof from time to time shall designate in writing to Maker.

1.2    Principal and all accrued and unpaid interest shall be due and payable on the date (the "**Maturity Date**") which is the earliest to occur of:

(a)    November 1, 2012; or

7

DG 00979

(b)      the date of Maker's receipt of the proceeds ("**TRI Shares Proceeds**") from the sale of shares (the "**TRI Shares**") of Trans Resources, Inc., a Delaware corporation ("**TRI**"), either pursuant to the interpleader action (the "**Interpleader Action**") pending in the United States District Court for the Southern District of the State of New York (the "**Court**") in *Pedowitz v. TPR*, 11 Civ. 5602, or otherwise.

1.3      Notwithstanding anything to the contrary, to the extent that the Court awards the Trust any of the interpleaded funds, the Trust shall first apply such funds to the extent necessary to pay this Note, including all accrued and unpaid interest hereon, in full, before applying such funds for any other purpose.

## 2. Events of Default.

2.1      Events of Default. It is expressly agreed that the entire Principal amount of this Note, together with all accrued interest thereon, shall immediately become due and payable (without demand for payment, notice of nonpayment, presentment, notice of dishonor, protest, notice of protest, or any other notice, all of which are hereby expressly waived by Maker) upon the happening of any of the following events (each, an "**Event of Default**"):

(a)      the entry of a decree or order by the court having jurisdiction in the premises adjudging Maker a bankrupt or insolvent, or approving as properly filed a petition seeking arrangement, adjudgment or composition of or in respect of Maker under the Federal Bankruptcy Code or any other applicable Federal or state law, or appointing a receiver, liquidator, assignee, or trustee, sequestrator (or other similar official) of Maker, or of any part of its property, and the continuance of any such decree or order unstayed and in effect for a period of thirty (30) consecutive days; or

(b)      the institution by Maker of proceedings to be adjudicated a bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of the petition or answer or consent by it to the filing of any such petition or answer or consent seeking relief under the Federal Bankruptcy Code or any other applicable Federal or state law or the consent by it to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of Maker or any part of its property, or the making by it of an assignment for the benefit of the creditors, or the admission by it in writing of its inability to pay its debts generally as they come due; or

(c)      the resignation, removal or other change in the Trustee, including, but not limited to, the addition of one or more additional Trustees; or

(d)      the creation of any lien or other Encumbrance on any asset of Maker; or

(e)      the breach by Maker of any of its representations, warranties or covenants under the Agreement; or

(f)      the sale or other transfer of all or any material part of Maker's properties and assets; or

(g)     a default by Maker in any payment of principal of or interest on any other obligation for money borrowed (or on any obligation under conditional sale or other title retention agreement or on any obligation secured by purchase money mortgage or on any obligation under notes payable or drafts accepted representing extensions of credit but excluding deposits) beyond any period of grace provided with respect thereto, or defaults in the performance of any other agreement under which any such obligation is created (or if any other event of default under any such agreement shall occur and be continuing) if the effect of such event or default is to cause, or to permit the creditor or creditors of such obligation (or a trustee on behalf of such creditor or creditors) to cause, such obligations to become due prior to its stated maturity; or

(h)     the failure to pay any amount payable to Holder when due and payable, subject to the provisions of the Agreement and Section 2.2 of this Note which provide for forbearance by the Holder from collection of amounts payable to Holder under this Note.

2.2     Upon the occurrence of an Event of Default, Holder may, without limiting any other rights it may have at law or in equity, declare the unpaid Principal of and accrued and unpaid interest on this Note due and payable, whereupon the same shall be due and payable without presentment, demand, protest or other notice of any kind, all of which Maker expressly waives, and Holder may proceed to enforce payment of such Principal and accrued and unpaid interest or any part thereof in such manner as it may elect in its sole discretion; **provided, however,** that Holder agrees to forbear from commencing any action to enforce collection of such amounts to the extent provided in the Agreement.

**3. Overdue Rate.**  From and after November 1, 2012 or upon the occurrence of an Event of Default if earlier, the unpaid indebtedness then evidenced by this Note shall thereafter bear interest at the lesser of rate of twenty five percent (25%) per annum or the maximum legal rate of interest (the "Overdue Rate").

**4. Covenants.**  The Trust hereby covenants and agrees that (1) it shall not create or permit any Encumbrance on (x) the TRI Shares or (y) the Minimum Payment or any other payment that the Trust may receive or be entitled to receive from (a) the Court or (b) any other party in connection with the Interpleader Action or otherwise relating to the TRI Shares and (2) it will not (x) (a) borrow or enter into any agreement to borrow any amount of money, or (b) guaranty, indemnify or otherwise create any contingent monetary obligation, or (y) incur any material Liability, other than costs for legal services relating to the TRI Proceedings, which in no event, without the prior consent of Holder, exceed in aggregate Five Hundred Thousand Dollars and No Cents ($500,000.00).

**5. Waiver And Consent.**  Maker: (a) waives demand, presentment, protest, notice of dishonor, suit against or joinder of any other person, and all other requirements necessary to charge or hold Maker liable with respect to the obligations evidenced by the Note; and (b) waives any right to immunity from any such action or proceeding and waives any immunity or exemption of any property, wherever located, from garnishment, levy, execution, seizure or attachment prior to or in execution of judgment, or sale under execution or other process for the collection of debts.

DG 00981

6. **Costs, Indemnities And Expenses**. Maker agrees to pay all filing fees and similar charges and all costs incurred by Holder in collecting or attempting to collect the obligations evidenced by the Note and such right shall extend beyond the entry of a final, non-appealable judgment of a court of competent jurisdiction ("**Final Judgment**") including attorneys' fees, whether or not involving litigation and/or appellate, administrative or bankruptcy proceedings. Such entitlement or attorneys' fees shall not merge with the entry of a Final Judgment and shall continue post-judgment unless and/or until any and all indebtedness due Holder is fully satisfied. Maker agrees to pay any documentary stamp taxes, intangible taxes or other taxes (except for federal or state franchise or income taxes based on Holder's net income) which may now or hereafter apply to this Note, and Maker agrees to indemnify and hold Holder harmless from and against any liability, costs, attorneys' fees, penalties, interest or expenses relating to any such taxes, as and when the same may be incurred. Maker agrees to pay Holder any and all attorneys' and paralegals' fees at all pre-trial, trial and appellate levels in respect of any litigation or collection efforts based hereon, or arising out of, or related hereto whether, under or in connection with this Note and/or any agreement contemplated to be executed in conjunction herewith, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of any party.

7. **Miscellaneous**.

    7.1    **Governing Law**. This Note shall be governed by, and construed and enforced in accordance with the laws of the State of New York, without giving effect to the principles of conflicts of law thereof.

    7.2    **Jurisdiction**. Trust and the Trustee each irrevocably agree that, should either of them institute any legal action or proceeding in any jurisdiction (whether for an injunction, specific performance, damages or otherwise) in relation to this Note or the transactions contemplated by this Note, no immunity (to the extent that it may at any time exist, whether on the grounds of sovereignty or otherwise) from such action or proceeding shall be claimed by it or on its behalf, any such immunity being hereby irrevocably waived, and the Trust and the Trustee each irrevocably agrees that their respective assets are, and shall be, subject to such legal action or proceeding in respect of its obligations under this Note.

    7.3    **Time of the Essence**. Time shall be of the essence with respect to the terms of this Note. This Note cannot be changed or modified orally.

    7.4    **Interpretation**. The term "**Holder**" shall be deemed to include any subsequent holder(s) of this Note. Whenever used in this Note, the term "person" means any individual, firm, corporation, trust or other organization or association or other enterprise or any governmental or political subdivision, agency, department or instrumentality thereof. Whenever used in this Note, words in the singular include the plural, words in the plural include the singular, and pronouns of any gender include the other genders, all as may be appropriate. Captions and paragraph headings in this Note are for convenience only and shall not affect its interpretation

    7.5    **Invalidity**. Any provision of this Note which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction only, be ineffective only to the extent of such

FTL.DOCS 5928254 10 4

DG 00982

prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. To the extent that Maker may lawfully waive any law that would otherwise invalidate any provision of this Note, Maker hereby waives the same, to the end that this Note shall be valid and binding and enforceable against it in accordance with all of its terms.

7.6     Prepayment Permitted. This Note may be prepaid in whole or in part at any time without penalty. Except as otherwise required by law or by the provisions of this Note, payments received by Holder hereunder shall be applied first against expenses and indemnities, next against accrued interest, and next in reduction of the outstanding principal balance of the Note, except that during the continuance of any Event of Default, Holder may apply such payments in any order of priority determined by Holder in its exclusive judgment.

7.7     Notices. Except as otherwise required by the provisions of this Note, any notice required to be given to Maker shall be deemed sufficient if made personally or if mailed, postage prepaid, to such Maker's address as it appears in the Agreement.

7.8     Benefit. All of the terms of this Note shall inure to the benefit of Holder and its heirs, executors, administrators, personal representatives, successors and assigns, and shall be binding upon Maker and its successors and assigns, jointly and severally.

7.9     No Waiver. No failure on the part of the Holder to exercise, and no delay in the exercise of any right, remedy or power hereunder or under any document or agreement executed in connection herewith shall operate as a waiver hereof or thereof nor shall any single or partial exercise by the Holder of any right, remedy or power hereunder or thereunder preclude any other or future exercise of any other right, remedy or power.

7.10     Change, Modification or Waiver. This Note may not be changed or modified orally, nor may any right or provision hereof be waived orally, but in each instance only by an instrument in writing signed by the party against which enforcement of such change, modification or waiver is sought.

7.11     No Usury. In the event, Holder, in enforcing its rights hereunder determines that charges and fees incurred in connection with this Note may, under the applicable laws relating to usury, cause the interest rate herein to exceed the maximum rate allowed by law, then such interest shall be recalculated and any excess over the maximum interest permitted by such laws shall be credited to the then outstanding principal amount of the Note to reduce said balance by the amount of such excess. It is the intent of the Holder that the Maker, under no circumstance, shall Maker be required to pay, nor shall the Holder be entitled to collect, any interest that is in excess of the maximum rate permitted under the applicable laws relative to usury.

7.12     Waiver of Trial by Jury. THE MAKER AND THE HOLDER WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF OR IN ANY WAY CONNECTED TO THIS NOTE.

DG 00983

7.13   <u>Assignment</u>. This Note may be negotiated, endorsed, assigned, transferred and/or pledged subject to compliance with the requirements of applicable federal and state securities law by delivery of the original Note. This Note shall be binding upon Maker and Maker's successors and assigns.

**[SIGNATURE PAGE TO FOLLOW]**

DG 00984