necessary parties -- Arie, TPR, Sagi, Orly, the Orly Trust and the Trump Group -- are all parties to this New York action , and have been served and have appeared in this case.

171.    The Delaware Chancery Court's holdings were limited to an in rem proceeding to determine who held the record ownership of the shares at a point in time in order to determine voting rights to elect members of the TRI Board based on the record owners of those shares at the time of the election.

172.    The Delaware Chancery Court was without jurisdiction to determine the ultimate ownership of the Arie and Orly Trust TRI shares or any of the tort claims asserted by Plaintiffs in this action.  Nor did the Delaware Chancery Court have jurisdiction to determine Arie's claims for rescission, unjust enrichment, constructive trust or reformation arising from and in connection with the Court-ordered Stipulation of Settlement, the 2004 Transaction Documents, or the authority of Sagi to act on behalf of TPR.

173.    The Delaware Supreme Court affirmed that portion of the Chancery Court ruling that held that TPR's 2004 transfers of TRI shares pursuant to the Stipulation of Settlement in the Genger divorce and implementing 2004 TPR Transaction Documents violated the 2001 TRI Stockholders Agreement and were void ab initio, for the purpose of the Delaware § 225 proceeding to determine composition of the TRI Board.

## FIRST CAUSE OF ACTION ON BEHALF OF PLAINTIFF ARIE GENGER

(For a Declaratory Judgment Under CPLR 3001 that the
Stipulation of Settlement Entitles Plaintiff Arie to a
Court-Ordered Reformation of the Terms of the Stipulation
of Settlement as Against All Defendants)

174.    Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 173.

175. Article XVI of the Stipulation of Settlement provides that the parties to the Stipulation of Settlement have a right to seek court-ordered reformation in a New York court in order to reflect the parties' original intent in the event a portion of the "So-Ordered" Stipulation of Settlement is held to be invalid for any reason.

176. The concurrent transfer of Arie's ownership of his 51% interest in TPR in consideration of receiving a 14% interest in TRI and the right to control the voting rights of 52.85% of TRI Shares for the duration of Arie's life was an essential, fundamental condition of the transfers of TPR and TRI shares set forth in the Court-Ordered Stipulation of Settlement.

177. The Delaware Chancery Court, as affirmed by the Delaware Supreme Court, held that TPR's 2004 transfers of 52.85% of the shares of TRI Stock under the Stipulation of Settlement and 2004 TPR Transfer Documents were invalid and void *ab initio*, and that the Putative Irrevocable Proxies were invalid.

178. The provisions of the Court-Ordered Stipulation of Settlement relating to the transfer of ownership of TPR in consideration of the 2004 Transfers were based upon the mutual mistake of Dalia and Arie that the 2004 Transfers and Irrevocable Proxies were valid.

179. The Court-Ordered Stipulation of Settlement specifically provides that the parties agree that if any of the terms of the Stipulation of Settlement is declared invalid by any court of competent jurisdiction for any reason, Arie is entitled to seek an Order from this Court to reform the Stipulation of Settlement, or obtain such other equitable or legal relief as is necessary to give full meaning and expression to the original intent of the parties to the Court-Ordered Stipulation of Settlement.

45

180.    Arie is entitled to an Order of the New York Supreme Court to reform the terms of the Court-Ordered Stipulation of Settlement to reflect the parties' original intent to the greatest extent possible.

181.    Accordingly, Arie seeks an Order and declaratory judgment to reform the Court-Ordered Stipulation of Settlement to provide as follows:

(i)    That the transfer by Arie of his 51% interest in TPR to Dalia and the concurrent transfer of the 3000 shares of TRI stock to Arie, the Orly Trust and the Sagi Trust, respectively, as originally set forth in the Stipulation of Settlement is voided *ab initio* as a result of the Delaware Court finding that the 2004 Transfers are invalid;

(ii)    that all the assets of TPR, other than the 3000 Arie, Orly Trust and Sagi Trust TRI shares, remain the property of TPR or any successor in interest to those assets;

(iii)    that pursuant to a further order of this Court the Court-Ordered Stipulation of Settlement is modified *ab initio* to provide that the 3000 shares of TRI common stock that were returned to TPR as a result of the Delaware Court Action voiding the original 2004 Transfers be placed in a newly formed single purpose entity controlled by Arie ("TPR2");

(iv)    that Arie be declared the 51% owner of TPR2, which in turn shall be declared, *ab initio* the record and beneficial owner of all of such 3000 TRI shares, as though no 2004 Transfers were consummated under the original terms of the Stipulation of Settlement;

(v)    that the Orly Trust and Sagi Trust each be declared the owner of 24.5% of TPR2 so that together they own the remaining 49% of TPR2;

(vi)    that TPR2 shall not sell or transfer the 3000 TRI shares prior to Arie's death, unless such sale would be otherwise permitted and would not violate the terms of the 2001 Stockholders Agreement including, but not limited to, Article 2 of such agreement;

(vii)    upon Arie's death, 1102.8 of TRI shares, plus any stock dividends relating thereto ("the Sagi Trust TRI Shares") will be transferred by TPR2 outright to the Sagi Trust, and 1102.8 of TRI shares plus any stock dividends relating thereto ("the Orly Trust TRI Shares") will be transferred outright to the Orly Trust;

(viii)    All cash dividends relating to the Sagi Trust and the Orly Trust TRI Shares received by TPR2 during Arie's lifetime will be distributed, after payment of taxes and expenses to the Shareholders of TPR2, as if (a) Arie owned 794.40 shares, representing 13.99468% of the common stock of TRI, and (b) the Sagi Trust and the Orly Trust each owned 1102.8 shares, representing 19.42766% of TRI common stock;

(ix)    Arie through his 51% control of TPR2 will retain all voting rights to the 3000 TRI shares and any additional TRI shares issued to TPR or TPR2 as stock dividends or otherwise for the duration of his life.

(x)    The Trump Group shall deliver to TPR2 the 1102.8 shares of TRI common stock purportedly purchased under the 2008 Stock Purchase Agreement.

182.    The $26,715,416.00 paid by the Trump Group to the Sagi Trust under the 2008 Stock Purchase Agreement will be returned to the Trump Group by TPR and the Sagi Trust.

183.    The Trump Group shall deliver to TPR2 the 794.40 Arie and the 1102.8 Orly Trust TRI shares purportedly sold to TPR under the Side Letter Agreement and 2010 Transaction.

47

184.    The purported sales by TPR of the Arie and Orly Trust TRI shares to The Trump Group, while the Delaware Supreme Court appeal was pending, will be declared null and void, and the proceeds from these purported sales now held in escrow will be released to The Trump Group.

185.    TRI shall record on its books that TPR2 is the record owner of 3000 shares of TRI Common Stock, representing 52.85% of the issued common stock of TRI.

186.    TPR2 will consent to the terms of the 2001 Stockholders Agreement.

187.    Arie, Orly, Dalia, Sagi, TPR and TRI shall be directed to take all other necessary action and to execute all documents necessary to give full meaning to the intention of the parties to the Court Ordered Stipulation of Settlement in light of the ruling of the Delaware court that the 2004 Transfers were invalid.

188.    There is a justiciable controversy.

189.    There is no adequate remedy at law.

## SECOND CAUSE OF ACTION ON BEHALF OF ARIE AND ORLY

**(For the Imposition of a Constructive Trust against Sagi, TPR, Dalia, the Sagi Trust, Fang, and the Trump Parties)**

190.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 189, and incorporate the allegations contained in paragraphs 209-219.

191.    Upon the Delaware Court voiding TPR's 2004 transfer of 52.85% of TRI shares to Arie, the Sagi Trust and the Orly Trust, legal title to such TRI shares reverted to TPR subject to Arie's rights as a constructive beneficial owner of 51% of the shares of TPR with respect to TPR's ownership of 52.85% of TRI shares.

48

192.   TPR is not entitled, in equity or good conscience, to retain any direct or indirect benefit resulting from the record ownership of the 3000 shares of TRI stock reverting to TPR as a result of the ruling of the Delaware courts .

193.   TPR would be unjustly enriched at the expense of Arie if it were permitted to retain any direct or indirect ownership or benefit from the sale of the 3000 shares of TRI stock because record ownership of such TRI shares reverted to TPR as a result of the Delaware court rulings.

194.   Upon TPR becoming the record owner of Arie's 794.4 shares of TRI stock as a result of the Delaware Court rulings, such shares were immediately held in a constructive trust by TPR for the benefit of Arie as the beneficial owner of those shares.

195.   Upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Orly Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Orly Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Orly Trust's right to receive the Orly Trust TRI Shares upon Arie's death.

196.   Upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Sagi Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Sagi Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Sagi Trust's right to receive the Sagi Trust TRI Shares upon Arie's death.

49

197.   Upon TPR becoming the record owner of all 3000 shares of TRI stock comprising the Orly Trust Shares, the Sagi Trust Shares and the Arie Shares, TPR held the voting rights to such 3000 shares in a constructive trust for the benefit of Arie.

198.   Arie's beneficial ownership and voting rights with respect to the 3000 TRI shares, which were held by TPR in a constructive trust for his benefit, were protected from further transfer to The Trump Group from the moment record title reverted to TPR.

199.   TPR was not authorized to transfer any of the 3000 TRI shares as to which it became the record owner, without the consent of Arie as the beneficial owner of such TRI Shares.

200.   TPR is not authorized to vote any of the 3000 TRI shares that reverted to TPR as record owner as a result of the Delaware Court rulings, except at the direction of Arie.

201.   The Trump Group are not bona fide purchasers of any of the 3000 TRI shares that reverted to TPR.

202.   The Trump Group was on notice of Arie's ownership and voting right claims with respect to the 3000 TRI shares that reverted to TPR, as record owners.

203.   The Trump Group knew and were on notice that TPR was not authorized to sell TPR's TRI shares without the prior consent of Arie.

204.   The Trump Group knew and was on notice that Arie objected to the sale to The Trump Group of any of the 3000 TRI shares that reverted to TPR, as record owner under the 2008 Stock Purchase Agreement, the Side Letter Agreement or the 2010 purported sale of the Arie and Orly Trust TRI shares.

50

205.    The Constructive Trust in favor of Arie imposed upon the Arie, the Orly Trust

and the Sagi Trust TRI shares existed at the moment record ownership reverted to TPR, and

attaches to any purported sale of these shares to The Trump Group, who were not bona fide

purchasers.

206.    The Trump Group, in addition to TPR, would be unjustly enriched if they were

permitted to keep the benefit of the purported sale by TPR of the 3000 TRI shares to The Trump

Group, which sale Sagi was not authorized to enter into on behalf of TPR without the prior

consent of Arie because, inter alia,

(i) the Trump Group would become the owner of the Arie, Sagi Trust and Orly

Trust Shares, over the objection of Arie and without Arie's required prior permission and

consent;

(ii)    the Trump Group would obtain Arie's right to vote these shares for the

duration of his lifetime, without Arie's required prior permission and consent; and

(iii)    these shares would be acquired substantially below their true value

without Arie's required prior permission and consent;

(iv)    the purported transaction by TPR was in derogation of Arie's

beneficial ownership and voting rights appurtenant to such shares; and

(v)    the Trump Group are not bona fide purchasers of such shares.

207.    Plaintiffs have no adequate remedy at law.

**THIRD CAUSE OF ACTION**
**ON BEHALF OF ARIE AND ORLY**

**(Claim for Breach of Fiduciary Duty, Aiding and Abetting Breach of Fiduciary Duty and Conspiracy to Breach Fiduciary Duty Against Sagi, TPR, the Sagi Trust, Fang, the Trump Parties and TRI)**

208.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 207.

209.   Sagi, individually and as an officer of TPR, owed a fiduciary duty of trust, confidence and loyalty to Arie and the Orly Trust because, among other things, (i) he was entrusted to manage TPR's ownership of the TRI shares for the benefit of Arie and the Orly Trust upon the Chancery Court voiding the 2004 TPR transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust, and the resulting ownership of such 52.85 % of TRI shares by TPR; (ii) he was entrusted to manage TPR's record ownership of the TRI shares for the benefit of Arie and the Orly Trust upon the Delaware Chancery Court voiding the 2004 TPR transfer of TRI shares to Arie, the Sagi Trust and the Orly Trust; (iii) pursuant to the 2004 TPR Transfer Agreement, Sagi was entrusted to take all actions necessary to ensure that Arie would maintain voting control of 52.85% of the stock of TRI in accordance with the express intent of all parties to the Stipulation of Settlement and 2004 TPR Transaction Documents; (iv) through Fang and the Sagi Trust, as his co-agents and alter egos, Sagi owed a duty of trust and confidence to Arie under the 2004 Voting Trust Agreement; and (v) as the successor to the rights and liabilities of Dalia under the Stipulation of Settlement and the manager of TPR, as a family holding company, Sagi owed a fiduciary duty to protect the assets of the Orly Trust for the benefit of his sister Orly and his father, Arie, in connection with the ownership of TPR, TPR's ownership of the TRI shares and D&K's minority ownership of TPR.

52

210.    As a fiduciary Sagi, individually, and as an officer of TPR, owed a duty of fidelity and undivided loyalty to Arie, Orly, and the Orly Trust regarding the TRI shares.

211.    Fang, individually and as the trustee of the Sagi Trust, owed a fiduciary duty to Arie under the 2004 Voting Trust Agreement and Side Letter.

212.    The Trump Group, on becoming the majority shareholder of record in TRI, owed a fiduciary duty of fidelity and loyalty to Arie as the known beneficial owner of record of the Arie TRI shares.

213.    Jules Trump and Mark Hirsch, each individually and on behalf of the Trump Group, and as Directors of TRI owed a fiduciary duty to TPR, and Arie as the beneficial owner of TRI shares to read TRI corporate documents presented to him in their entirety and have knowledge of the shareholders of record of TRI, a close corporation.

214.    Sagi, TPR, the Sagi Trust, Fang, the Trump Parties each breached their respective fiduciary duties as a result of the conduct set forth in the allegations of this complaint, including, but not limited to their respective conduct in connection with the negotiation, execution and implementation of the 2008 Stock Purchase Agreement and the Side Letters and the subsequent transfer of the Arie and Orly Trust TRI Shares.

215.    Sagi, TPR, the Sagi Trust, Fang, and the Trump Parties also knowingly aided, abetted, induced, participated in, enabled and substantially assisted each other to breach each of the other's respective fiduciary duties to Arie, Orly and the Orly Trust by the conduct alleged herein, including but not limited to misrepresenting to the Delaware Chancery Court that the share certificates for the Sagi Trust TRI shares were lost despite having actual knowledge that

53

such share certificates were held by Arie, and had not been delivered to the Sagi Trust, Sagi or Fang.

216.    TRI also knowingly aided, abetted, induced, participated in, enabled and substantially assisted the respective breaches of fiduciary duties owed to Arie, Orly and the Orly Trust by Sagi, TPR, the Sagi Trust, Fang and the Trump Parties.

217.    Sagi, TPR, the Sagi Trust, Fang, and the Trump Parties, each acting in conspiracy with, and as the co-agent of one another, entered into an illegal scheme, agreement, plan, and artifice to breach each other's respective fiduciary duties owed to Arie, Orly, and the Orly Trust by the conduct alleged herein in furtherance of this conspiracy.

218.    As a result of such breaches of fiduciary duty, aiding and abetting of breaches of fiduciary duties and conspiracies to breach fiduciary duty, by Sagi, TPR, the Sagi Trust, Fang, the Trump Parties and TRI, and each of them, Arie suffered compensatory damages in an amount to be determined.

219.    As a result of such breaches of fiduciary duty, aiding and abetting of breaches of fiduciary duty and conspiracies to breach fiduciary duty, by Sagi, TPR, the Sagi Trust, Fang, the Trump Parties and TRI, and each of them, Orly, individually and as the beneficiary of the Orly Trust, suffered compensatory damages in an amount to be determined.

### FOURTH CAUSE OF ACTION
### ON BEHALF OF ARIE AND ORLY

**(Claim for Unjust Enrichment and Rescission Against Sagi, TPR, Dalia, the Sagi Trust, Fang, and the Trump Parties)**

220.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 219.

221.    As a result of the Delaware Chancery Court holding, Dalia, TPR, Sagi, the Sagi Trust and the Trump Parties would each be unjustly enriched at the expense of Arie and the Orly

54

Trust if each or any of them were allowed to retain any direct or indirect benefit or consideration received by each of them from TPR's ownership of TRI Shares, which none of them are entitled, in equity or good conscience, to retain.

222.   Plaintiff Arie is entitled to rescind the transfer of his 51% interest in TPR to Dalia pursuant to the Stipulation of Settlement and 2004 Transaction Documents based on failure of consideration because, as a result of the holding by the Delaware Chancery Court, Arie did not receive any of the consideration that was due to him pursuant to such Agreements, including and not limited to (a) his 14% interest in the Arie TRI Shares, and his right to vote 52.85% of the TRI Shares that he controlled prior to the Delaware Court voiding the 2004 Transfers.

223.   Plaintiff the Orly Trust, is entitled to rescind the 2004 Transaction Documents based on failure of consideration because as a result of the holding by the Delaware Court the Orly Trust did not receive any of the consideration due to the Orly Trust pursuant to the 2004 Transfers.

224.   Arie and the Orly Trust are each also entitled to rescission because of failure of consideration based on mutual mistake as to the enforceability of the 2004 TPR Transfers of TRI stock to Arie, the Sagi Trust and the Orly Trust pursuant to the Stipulation of Settlement and the 2004 Transaction Documents.

225.   Arie and the Orly Trust are each entitled to an accounting.

226.   Arie and the Orly Trust have no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### (Claim for Permanent Injunction Against Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties)

227.   Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 226.

55

228.    Plaintiffs are entitled to the issuance of a permanent injunction enjoining and restraining Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties, and each of them, from directly or indirectly transferring, selling, acquiring, pledging, assigning, diluting, voting, valuing, replacing, conveying, using, removing from the jurisdiction, or otherwise disposing of, or encumbering the 3000 shares of TRI stock that reverted to TPR's control as a result of the Delaware Court rulings.

229.    The failure to grant such permanent injunction will result in irreparable injury to the Plaintiffs.

230.    There is no adequate remedy at law.

231.    The balance of equities favor the Plaintiffs.

### SIXTH CAUSE OF ACTION

**(Claim for Breach of Contract against TPR on Behalf of Arie and Orly)**

232.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 231.

233.    TPR entered into the 2004 TPR Transfer Agreement with Arie.

234.    TPR entered into the 2004 TPR Transfer Agreement with the Orly Trust.

235.    TPR breached its express and implied covenants and representations thereunder in connection with the transfer of TRI shares to Arie.

236.    TPR breached its express and implied covenants and representations thereunder by purporting to agree to transfer the Arie, Sagi Trust and Orly Trust TRI Shares to the Trump Parties.

237.    Arie and the Orly Trust performed their respective obligations under the 2004 TPR Transfer Agreement.

56

238. As a result of such breach of contract, Arie lost the benefit of his bargain and suffered damages in an amount yet to be determined.

239. TPR breached its express and implied covenants and representations under the 2004 Transaction Documents in connection with the transfer of TRI shares to the Orly Trust.

240. The Orly Trust performed its obligations under the 2004 TPR Transfer Agreement.

241. As a result of such breach of contract, the Orly Trust lost the benefit of its bargain and suffered damages in an amount yet to be determined, but believed to be in an amount to be determined.

### SEVENTH CAUSE OF ACTION
### ON BEHALF OF ARIE

#### (Claim for Breach of Contract against the Sagi Trust)

242. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 241.

243. The Sagi Trust entered into the 2004 Voting Trust Agreement with Arie.

244. The Sagi Trust breached its express and implied covenants and representations thereunder in connection with Arie's voting rights and control of TRI shares.

245. Arie performed his obligations under the 2004 Voting Trust Agreement.

246. As a result of such breach of contract, Arie lost the benefit of his bargain and suffered damages in an amount yet to be determined.

### EIGHTH CAUSE OF ACTION
### ON BEHALF OF ARIE AND ORLY

#### (Claim for Tortious Interference with Contract Against the Trump Parties)

247. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 246.

57

248.    The Trump Parties, and each of them, tortiously interfered with, among other things, (i) the Stipulation of Settlement between Arie and Dalia, (ii) the 2004 TPR Transfer Documents between Arie and the Orly Trust and TPR, (iii) the 2004 Voting Trust Agreement between Arie and the Sagi Trust, and (iv) the 2004 Voting Trust Agreement between Arie and the Orly Trust.

249.    The Trump Parties, and each of them, intentionally caused such breaches of contract without justification, as a result of the conduct set forth herein.

250.    As a result of the Trump Parties' tortious interference with contract, Arie suffered damages in an amount yet to be determined.

251.    As a result of the Trump Parties' tortious interference with contract, Orly and the Orly Trust suffered damages in an amount yet to be determined.

## NINTH CAUSE OF ACTION ON BEHALF OF ARIE AND ORLY

**(Claim for Aiding and Abetting Tortious Interference with Contract Against Sagi, Fang, and the Sagi Trust)**

252.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 251.

253.    Sagi, Fang, and the Sagi Trust each had knowledge of the Trump Parties' tortious interference with the 2004 TPR Transaction Agreement and the Stipulation of Settlement, and each such defendant caused, encouraged and substantially assisted the Trump Parties in the commission of the foregoing acts of tortious interference with 2004 TPR Transaction Agreement and the Stipulation of Settlement.

254.    Sagi, Fang, and TPR each had knowledge of the Trump Parties' tortious interference with the 2004 Voting Trust Agreement, and the Stipulation of Settlement, and each such defendant caused, encouraged and substantially assisted the Trump Parties in the

58

commission of the foregoing acts of tortious interference with the 2004 Voting Trust
Agreements.

255.    By reason of the foregoing, Arie has been damaged in an amount to be
determined.

256.    By reason of the foregoing, Orly, individually and as the beneficiary of the Orly
Trust has been damaged in an amount to be determined.

### TENTH CAUSE OF ACTION ON BEHALF OF ARIE AND ORLY

**(Claim for Preliminary Injunction Against the Trump Parties, Sagi Genger TPR and the
Sagi Trust Under CPLR 7109)**

257.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 256.

258.    The Arie and Orly Trust TRI shares are unique chattel.

259.    By virtue of the facts set forth above, Arie is the beneficial owner of the Arie TRI
shares.

260.    Sagi is not authorized to take any action on behalf of TPR to sell, transfer, pledge,
dilute, or take any action on behalf of TPR relating to or concerning the 3000 TRI shares that
reverted to TPR, without the prior written consent of Arie and Sagi is not authorized to exercise
any and all rights, including TPR's voting rights with respect to such 3000 TRI shares, except as
so directed by Arie as the beneficial owner of such shares and the voting rights appurtenant
thereto.

261.    Sagi is not authorized to take any action on behalf of TPR to sell, transfer, pledge,
dilute, or take any action on behalf of TPR relating to or concerning the Orly Trust TRI shares.

262.    By virtue of the facts set forth above, the Orly Trust is entitled to the benefits
provided to it under the Stipulation of Settlement.

59

263.   The Arie TRI shares, the Orly Trust TRI shares, and the Sagi Trust shares are wrongfully being held by the Trump Parties.

264.   Plaintiffs are entitled to a preliminary injunction, under CPLR 7109, that the Arie TRI shares, the Orly Trust TRI shares, and the Sagi Trust TRI shares shall be restrained and enjoined from transferring, selling, diluting, pledging, assigning or otherwise disposing of or removing such shares from the State until the further order of the Court.

**WHEREFORE,** Plaintiffs demand Judgment in favor of Plaintiffs against the Defendants as follows:

(a) on the **First Cause of Action against all Defendants:** that this Court find and declare that Arie is entitled to an Order from this Court to reform the terms of the Court-Ordered Stipulation of Settlement to provide as follows:

(i) that the transfer by Arie of his 51% interest in TPR to Dalia and the concurrent transfer of the 3000 shares of TRI stock to Arie, the Orly Trust and the Sagi Trust, respectively, as originally set forth in the Stipulation of Settlement is voided *ab initio* as a result of the Delaware Court finding that the 2004 Transfers are invalid;

(ii) that all the assets of TPR, other than the 3000 Arie, Orly Trust and Sagi Trust TRI shares, remain the property of TPR or any successor in interest to those assets;

(iii) that pursuant to a further order of this Court the Court-Ordered Stipulation of Settlement is modified *ab initio* to provide that the 3000 shares of TRI common stock that were returned to TPR as a result of the Delaware Court Action voiding the original 2004 Transfers be placed in a newly formed single purpose entity controlled by Arie (hereinafter, "TPR2");

(iv) that Arie be declared the 51% owner of TPR2 which in turn shall be declared, ab initio, the record and beneficial owner of all such 3000 TRI shares, as though no 2004 Transfers were consummated under the original terms of the Stipulation of Settlement;

(v) that the Orly Trust and Sagi Trust each be declared the owner of 24.5% of TPR2 so that together they own the remaining 49% of TPR2;

(vi) that TPR2 shall not sell or transfer the 3000 TRI shares prior to Arie's death, unless such sale would otherwise be permitted and would not violate the terms of the 2001 Stockholders Agreement, including, but not limited to, Article 2 of such Agreement;

(vii) upon Arie's death, 1102.8 of TRI shares, plus any stock dividends relating thereto ("the Sagi Trust TRI shares") will be transferred by TPR2 outright to the Sagi Trust, and 1102.8 of TRI shares, plus any stock dividends relating thereto ("the Orly Trust TRI Shares") will be transferred outright to the Orly Trust;

(viii) all cash dividends relating to the Sagi Trust and the Orly Trust TRI Shares received by TPR2 during Arie's lifetime will be distributed, after payment of taxes and expenses to the Shareholders of TPR2, as if (a) Arie owned 794.40 shares, representing 13.99468% of the common stock of TRI, and (b) the Sagi Trust and the Orly Trust each owned 1102.8 shares, representing 19.42766% of TRI common stock;

(ix) Arie through his 51% control of TPR2 will retain all voting rights to the 3000 TRI shares and any additional TRI shares issued to TPR or TPR2 as stock dividends or otherwise for the duration of his life.

(x) The Trump Group shall deliver to TPR2 the 1102.8 shares of TRI common stock purportedly purchased under the 2008 Stock Purchase Agreement.

(xi) The $26,715,416.00 paid by the Trump Group to the Sagi Trust under the 2008 Stock Purchase Agreement will be returned to the Trump Group by TPR and the Sagi Trust.

(xii) The Trump Group shall deliver to TPR2 the 794.40 Arie and the 1102.8 Orly Trust TRI shares purportedly sold to TPR under the Side Letter Agreement and 2010 Transaction.

(xiii) The purported sales by TPR of the Arie and Orly Trust TRI Shares to the Trump Group, while the Delaware Supreme Court appeal was pending, will be declared null and void and the proceeds from these purported sales now held in escrow will be released to the Trump Group.

(xiv) TRI shall record on its books that TPR2 is the record owner of 3000 shares of TRI Common Stock, representing 52.85% of the issued common stock of TRI.

(xv)    TPR2 will consent to the terms of the 2001 Stockholders Agreement.

(xvi) Arie, Orly, Dalia, Sagi, TPR and TRI shall be directed to take all other necessary action and to execute all documents necessary to give full meaning to the intention of the parties to the Court-Ordered Stipulation of Settlement in light of the rulings of the Delaware Court that the 2004 Transfers were invalid.

(xvii) Any other declaration as the Court may deem fair and reasonable to give effect to the Original Intent of the parties to the Stipulation of Settlement.

(b) on the Second Cause of Action against Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties, that the Court find and declare that:

62

(i) upon the Delaware Court voiding TPR's 2004 transfer of 52.85% of TRI shares to Arie, the Sagi Trust and the Orly Trust, legal title to such TRI shares reverted to TPR subject to Arie's rights as a constructive beneficial owner of 51% of the shares of TPR with respect to TPR's ownership of 52.85% of TRI shares;

(ii) upon TPR becoming the record owner of Arie's 794.4 shares of TRI stock as a result of the Delaware Court rulings, such shares were immediately held in a constructive trust by TPR for the benefit of Arie as the beneficial owner of those shares;

(iii) upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Orly Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Orly Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Orly Trust's right to receive the Orly Trust TRI Shares upon Arie's death;

(iv) upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Sagi Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Sagi Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Sagi Trust's right to receive the Sagi Trust TRI Shares upon Arie's death;

(v) upon TPR becoming the record owner of all 3000 shares of TRI stock comprising the Orly Trust Shares, the Sagi Shares and the Arie Shares, TPR held the voting rights to such 3000 shares in a constructive trust for the benefit of Arie;

63

(vi) TPR was not authorized to transfer any of the 3000 TRI shares as to which it became the record owner, without the consent of Arie as the beneficial owner of such TRI Shares;

(vii) TPR is not authorized to vote any of the 3000 TRI shares that reverted to TPR as record owner as a result of the Delaware Court rulings, except at the direction of Arie;

(viii) The Constructive Trust in favor of Arie imposed upon Arie, the Orly Trust and the Sagi Trust TRI shares existed at the moment record ownership reverted to TPR, and attaches to any purported sale of these shares to the Trump Group, who were not and are not bona fide purchasers of any of the 3000 TRI shares that reverted to TPR.

(c) on the **Third Cause of Action against Defendants Sagi, TPR, the Sagi Trust, Fang, the Trump Parties and TRI, jointly and severally, as follows:**

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys fees and costs incurred in connection with this action;

(ii) awarding compensatory damages to the Plaintiff Orly Genger individually and as the beneficiary of the Orly Trust in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys fees and costs incurred in connection with this action;

(d) on the **Fourth Cause of Action against Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang, and the Trump Parties:**

(i) rescinding Plaintiff Arie's transfer of his 51% interest in TPR to Dalia pursuant to the Stipulation of Settlement and 2004 Transaction Documents;

64

(ii) rescinding the 2004 Transaction Documents;

(iii) Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties must account to Arie and Orly, individually and as the beneficiary of the Orly Trust, for 3000 TRI Shares and/or their respective value that are now or ever have been in their respective possession, custody or control; and

(iv) such other equitable relief as the Court may deem fair and reasonable;

(e) on the **Fifth Cause of Action against Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties,** permanently enjoining and restraining these Defendants, and each of them, from directly or indirectly transferring, selling, acquiring, pledging, assigning, diluting, voting, valuing, replacing, conveying, using, removing from the jurisdiction, or otherwise disposing of, or encumbering the 3000 shares of TRI common stock that reverted to TPR as a result of the Delaware court rulings.

(f) on the **Sixth Cause of Action against Defendant TPR:**

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action; and

(ii) awarding compensatory damages to the Plaintiff Orly individually and as the beneficiary of the Orly Trust in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action.

(g) on the **Seventh Cause of Action against Defendant Sagi Trust,** a money judgment awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

65

(h) on the **Eighth Cause of Action Against the Defendant Trump Parties, jointly and** severally:

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(ii) awarding compensatory damages to the Plaintiff Orly individually and as the beneficiary of the Orly Trust in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(i) on the **Ninth Cause of Action Against Sagi, Fang, and the Sagi Trust:**

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(ii) awarding compensatory damages to the Plaintiff Orly, individually and as the beneficiary of the Orly Trust, in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(j) on the **Tenth Cause of Action for a Preliminary Injunction Against the Trump Parties, Sagi Genger, TPR and the Sagi Trust Under CPLR 7109**, and each of them for an injunction or temporary restraining order under CPLR 7109, restraining and enjoining each of them from transferring, selling, diluting, pledging, assigning or otherwise disposing of or

removing the Arie TRI Shares, the Orly Trust TRI shares, and the Sagi Trust TRI shares from the State until the further Order of the Court.

(k)    On all causes of action set forth in this Complaint, such other relief as this court may deem just, together with the costs and disbursements incurred by plaintiffs in this action, including the recovery of plaintiffs' reasonable attorneys' fees.

DATED: New York, New York
September 20, 2011

MITCHELL SILBERBERG & KNUPP LLP

By: _____

Paul D. Montclare (PM 4454)
Lauren J. Wachtler (LW 4205)
12 E. 49th Street, 30th Floor
New York, New York 10017
(212) 509-3900

Attorneys for Plaintiff ARIE GENGER

ZEICHNER ELLMAN & KRAUSE LLP

By: _____

Yoav M. Griver
Bryan D. Leinbach
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 223-0400
Facsimile: (212) 753-0396

Attorneys for Plaintiff ORLY GENGER, in
her individual capacity and on behalf of the
ORLY GENGER 1993 Trust

68

# Exhibit 10

At the Surrogate's Court held in and for the County
of New York, at the Courthouse, 31 Chambers
Street, New York, New York on the _1_ day of
~~June~~ 2009
July

New York County Surrogate's Court
DATA ENTRY DEPT.
Date: _July 1, 2009_

PRESENT: HON. __Troy K. Webber__
Surrogate

In the Matter of the Application of

ORLY GENGER, as a person interested,
for the removal of DALIA GENGER
as Trustee of the Orly Genger 1993 Trust
pursuant to SCPA §711 (11)

File No.: 0017/2008

ORDER TO SHOW CAUSE
WITH TEMPORARY
RESTRAINTS

On reading and filing the annexed Verified Petition of Petitioner, ORLY GENGER, and

the exhibits, verified on the 22nd day of June, 2009, and the memorandum of law in support of

Petitioner's Verified Petition dated June 22, 2009,

LET the Respondent, DALIA GENGER, the sole fiduciary of the Orly Genger 1993
[Sitting at 60 Centre]
Trust, show cause before Surrogate __Troy K. Webber__ at the Surrogate's Court, 31 Chambers
[Room 509]                                        th  August
Street, New York, New York, on the _5_ day of ~~June~~ 2009 at 10:00 o'clock in the forenoon of that

day or as soon thereafter as counsel may be heard why an order should not be entered:

(a)    Enjoining and restraining Respondent, her agents and all other persons

acting on her behalf from withdrawing, selling disposing, transferring, assigning, removing,

pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly

Trust's 19.43% interest in Trans-Resources, Inc., ("TRI"), a closely held corporation, founded by

Arie Genger, Petitioner's father and Respondent's former husband of Respondent and any other

assets which may be remaining in the Orly Trust;



(b)   Removing Respondent as Trustee of the Orly Trust for breaching her

fiduciary duties, wasting and dissipating the assets of the Orly Trust and imprudently managing

and injuring the property committed to her charge;

(c)   Surcharging Respondent in the amount of the loss of the value of Orly's

interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)   Appointing Michael D. Grohman, Esq. as successor trustee;

(e)   Waiving any requirement that Petitioner post an undertaking; and

(f)   Granting Petitioner such further relief deemed necessary or proper.

ORDERED that, during the pendency of this proceeding, Respondent, ~~her agents and all~~ *and/or her counsel*
*are required to give notice by overnight mail to petitioners council of any 1) offer*
~~other persons acting on her behalf are temporarily restrained from withdrawing, selling,~~
*to purchase the Orly Trust's 19.3% interest in TRI within 10 days of receiving*
~~disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering,~~
*such offer and 2) act by Respondent, her agents and all other persons*
~~licing, hypothecating or secreting the Orly Trust's 19.43% interest in TRI and other assets~~
*acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell or*
~~remaining in the Orly Trust; and it is further~~
*otherwise alter the Orly Trust's interest in TRI at least 10 days prior to such act*
*and it is further* ORDERED that service of a copy of this Order and the papers upon which it is based

shall be served on Respondent by personal service at either her residence, located at 200 East

65th Street, Apt. 32W, New York, New York 10021, or any other address at which she can be

located, on or before ~~June~~ *July 7,* 2009; *and it is further*

*ORDERED, that any responsive papers shall be filed by*
*July 29, 2009.*

~~ENTER:~~

Surrogate

# Exhibit 11

# Exhibit 11

In re IBJ Schroder Bank & Trust Co., Index No. 101530/98,
Supreme Ct., N.Y. Co. (Aug. 16, 2000)

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: Hon. Beatrice Shainswit          PART 10
_____
                    Justice

In Re IBJ Schroder Bank+          INDEX NO. 101530/98
Trust

                                 MOTION DATE _____

            - v -                MOTION SEQ. NO. 001

                                 MOTION CAL. NO. _____

_____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|                                                                    | PAPERS NUMBERED |
|--------------------------------------------------------------------|-----------------|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ...   |                 |
| Answering Affidavits — Exhibits _____    |                 |
| Replying Affidavits _____    |                 |

Cross-Motion:  ☐ Yes  ☑ No

Upon the foregoing papers, it is ordered that this motion

On remand, Pursuant to the order of
the Appellate division, First department
dated April 20, 2000

MOTION IS DECIDED IN ACCORDANCE WITH
ACCOMPANYING MEMORANDUM DECISION

FILED

OCT 03 2000

COUNTY CLERK'S OFFICE
NEW YORK

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE _____

Dated: 8/16/00 _____

Check one:  ☑ FINAL DISPOSITION   ☐ NON-FINAL DISPOSITION

CDISPSS

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY : IAS PART 10
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In the Matter of the Application of                          Index No. 101530/98

IBJ SCHRODER BANK & TRUST COMPANY (not
in its individual capacity but in its capacity as Trustee
under a Trust Agreement dated as of December 21, 1985
among Resources Satellite Corp., J. Henry Schroder
Bank & Trust Company and the Beneficiaries thereunder),
                                                        Petitioner,

for an order, pursuant to CPLR § 7701, for a Construction
of an Indenture and Approval of a Settlement.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SHAINSWIT, J.:

In this special proceeding, brought pursuant to CPLR Article 77,

petitioner-trustee seeks a declaratory judgment concerning the construction of an

Investor Trust Agreement, together with approval of the trustee's proposed settlement

of another action presently pending in this Court, involving assets of the Trust, entitled

IBJ Schroder Bank & Trust Co. v GE Capital Spacenet Services, Inc., Index No.

601299/96 (the "Spacenet" action).

The Trust was established in 1985 to facilitate investments by more than

400 beneficiaries in a project involving the launching and operation of a

communications satellite during the years 1985 through 1994.  The Trust involved a

complex series of financial transactions involving the development and placement in

space of the communications satellite.

The Spacenet action involves a certain master lease relating to the lease

of 24 satellite transponders carried on a satellite which was launched into orbit in 1985.

The satellite earned money for the Trust through receipt of sums from television and radio broadcasters for the use of electronic signals transmitted for television and radio broadcasting by the satellite's "transponders." A transponder automatically transmits a broadcasting signal upon reception of such a signal from another transmitter.

Because adequate supply of fuel was crucial to the operation of the satellite, the trustee and the satellite owner executed the Agreement Regarding Fuel ("Fuel Agreement"), whereby the satellite owner agreed to make certain stipulated fuel shortfall payments, entitled "Stipulated Loss Value" payments, in the event of a fuel shortage. It is alleged that such a fuel shortage occurred, thereby triggering the trustee's rights to demand payment from the satellite owner under the terms of the Fuel Agreement. Accordingly, in the Spacenet action, the trustee seeks to recover from the satellite owner the sum of $40,785,455, representing a "Stipulated Loss Value" payment set forth for in the Fuel Agreement.

The satellite owner served its answer in the Spacenet action, denying all liability and pleading defenses and counterclaims, including, among other things, that: (a) the provision in the Fuel Agreement as to Stipulated Loss Value was an unenforceable penalty under New York law; (b) the satellite's failure resulted from a catastrophic event or mechanical failure and not from a lack of fuel; and (c) the satellite in fact had sufficient fuel on the applicable date.

In September 1997, the trustee and the defendants in the Spacenet litigation conditionally agreed to a proposed settlement which provides for the satellite owner to pay $8.5 million, of which $6.97 million would be paid to the Trust.

2

The trustee thereupon commenced this action by "Verified Petition For Construction of Trust and Approval of Proposed Settlement," seeking, among other things: (a) a declaration that it had the authority to commence the Spacenet action; (b) a declaration that it had the authority to settle the Spacenet action; and (c) judicial approval of the proposed settlement of the Spacenet action.  186 trust beneficiaries, jointly represented by one law firm, have submitted opposition to the trustee's application for a declaratory judgment and approval of the proposed settlement.

The trustee predicates his commencement of the Spacenet action, vis-a-vis the beneficiaries of the Trust, upon section 5.02 of the Investor Trust Agreement. That section provides that, in the event of an event of a default under the master lease:

> the Trustee shall give prompt written notice of such event of default to the Lessee, the Grantor and the Beneficiaries by certified mail, postage prepaid.  In the event that such event of default has not been cured within 30 days after mailing of such notice, the Trustee shall take such action or shall refrain from taking such action, not inconsistent with the provisions of the Agreements, with respect to such event of default as the Trustee shall be directed in writing by all of the Beneficiaries, or, <u>if no such direction has been received from all of the Beneficiaries within 30 days after the mailing of such notice to the Beneficiaries, the Trustee shall, in its sole discretion ... take such action as shall be necessary to terminate the Master Lease, to obtain the benefits of the Master Collateral Assignment Agreement and to cause the Lessee thereunder to perform all of its obligations upon such termination</u>.

(emphasis supplied).

Prior to commencing the Spacenet action, the trustee sent the requisite notice under Section 5.02 of the Investor Trust Agreement to the proper parties, including the beneficiaries, and did not, in return, receive any "directions" from the beneficiaries.

3

By decision and judgment dated October 21, 1998, this Court held that the Trust Agreement did not confer upon the trustee authority to settle the action in question.[1] Having decided that such authority to settle the Spacenet action was lacking, the Court never reached the trustee's further request for judicial approval of the proposed settlement. The trustee appealed from the October 21, 1998 decision and judgment.

The Appellate Division reversed (__ AD2d __ , 706 NYS2d 114 [First Dept 2000]). The Appellate Division held that the trustee was, in fact, vested with the authority to settle the Spacenet action, stating that:

It is settled that the duties and powers of a trustee are defined by the terms of the trust agreement and are tempered only by the fiduciary obligation of loyalty to the beneficiaries (see, United States Trust Co. of N. Y. v First Nat. City Bank, 57 AD2d 285, 295-296 affd 45 NY2d 869; Restatement [Second] of Trusts § 186, comments a, d). In this matter, the same provision of the trust agreement which, the parties do not dispute, gave the trustee the power to commence the underlying action, also vests the trustee with the power to "take such action as shall be necessary" with respect to the subject matter of the underlying action. We now find that this provision includes the power to settle that action. We take no position on whether the settlement agreement, in its present form, should be approved and remand the matter to the IAS court to consider all relevant factors in determining whether such approval is warranted.

(Id.).

Thus, this matter is now before this Court on remand to determine

_____

[1] On a motion seeking, inter alia, reargument and clarification of the October 21, 1998 decision and judgment, this Court held that the trustee had the authority, pursuant to section 5.02 of the Investor Trust Agreement, to "take such action" as might be necessary under the circumstances, including commencing the Spacenet action (Decision and Order dated April 12, 1999).

4

whether or not approval of the proposed settlement is warranted.

As set forth in the Petition, the trustee maintains that the proposed settlement of the Spacenet action is reasonable and prudent, and the best way to conserve and protect the Trust's assets. In support, the trustee argues that: (a) there is a serious risk that the Spacenet defendants may prevail on one or more of the defenses asserted by them in the Spacenet action, thereby precluding any recovery by the trustee in the Spacenet action; and (b) prosecution of the Spacenet action would be very costly and time consuming, because such cases are extremely expert-intensive and technically complex.

The opposition offered by the 186 trust beneficiaries goes primarily to their belief that the settlement amount is too low. They claim that the proposed settlement is unreasonable and contrary to their best interests, arguing that: (a) the plain terms of the Fuel Agreement require payment of the "Stipulated Loss Value" of approximately $40 million (now over $60 million with interest); (b) the proposed settlement would substantially compromise that amount to $8.5 million; and (c) the trustee has not in any way tested any of the defenses raised in the Spacenet litigation, but rather agreed to that substantial compromise despite having failed to take any discovery or to file any dispositive motions in the Spacenet litigation.

Since the objecting beneficiaries have not submitted any evidence to show that the trustee's actions may have been based on some ulterior motive or that the trustee is somehow itself interested in the transaction other than in its fiduciary capacity, the trustee submits that the dispute comes down to whose view as to the

5



wisdom of the proposed settlement should prevail -- that of the trustee or that of the objecting beneficiaries.

Here, the trustee is the entity to whom the Investor Trust Agreement gives sole power to "take such action as shall be necessary" with respect to the subject matter of the underlying action. While there is some question as to whether the applicable standard of review here is the business judgment rule or the prudent man standard, the conclusion is the same under either standard -- the trustee's decision to compromise the Spacenet action is within the scope of the trustee's powers, is reasonable and prudent, and is entitled to judicial deference. Thus, in view of the trustee's showing of the reasonableness of the proposed settlement herein, and in the absence of any evidence tending to show a breach by the trustee of its fiduciary duties, the trustee's view must prevail. The Court will not invalidate the proposed settlement merely because certain beneficiaries believe a greater recovery might be obtained if the Spacenet action is submitted to an expensive and unpredictable litigation.

CONCLUSION

Accordingly, on remand, the Court holds that approval of the proposed settlement of the Spacenet action is warranted, and grants the trustee's motion to that extent. Settle order/judgment.

Dated: August 16, 2000

ENTER:

_____

J.S.C.

6

# Exhibit 12

**David Parnes**

# Memo

| | |
|---|---|
| **To:** | Robert Meister |
| **From:** | David Parnes |
| **CC:** | Robert Brighton |
| **Date:** | 5/15/2012 |
| **Re:** | Original Note of $4mm in Favor of TPR |

Attached is the original note of $4,000,000 made by the Orly Genger 1993 Trust in favor of TPR Investment Associates, Inc. The note is being purchased by the Manhattan Safety Company ("Manhattan"). We understand, that you are swapping this note for a different instrument in favor of Manhattan. At their request, we are delivering you this instrument to be held until they receive physical possession of the original new instrument. At that time, you may return this original to the Orly Genger 1993 Trust.

1

### PROMISSORY NOTE

$4,000,000                                               October 3, 2011

FOR VALUE RECEIVED, the undersigned, the Orly Genger 1993 Trust ("Borrower"), by way of its current sole trustee, Dalia Genger, promises to pay to TPR Investment Associates, Inc., a Delaware corporation ("Lender") the sum of $4,000,000 ("Principal") together with interest thereon at the rate of three (3%) percent per annum, payable as follows, and further covenants, to Lender, as follows:

The Principal together with all interest accrued thereon shall be due and payable to, or to the order of, Lender on the earliest of:

      (i)     November 1, 2012;

      (ii)    Immediately upon Borrower's receipt of the proceeds from the sale of TRI shares either pursuant to the interpleader action pending in the United States District Court for the Southern District of New York (the "Court") in *Pedowitz v. TPR*, 11 Civ. 5602, or otherwise.

Notwithstanding anything to the contrary herein or in the parties' accompanying Settlement Agreement, to the extent that the Court awards Lender any of the interpleaded funds, Lender shall first retain such funds to the extent necessary to pay down this Note in full, and then transfer any remaining funds to Borrower.

The occurrence and continuation of any one or more of the following events shall constitute an event of default under this New Note ("Event of Default"):

      (a)     Payment Default. Borrower shall fail to make any required payment due in connection with this New Note.

      (b)     Third Party Lien or Caveat. The creation of a lien on Borrower's property, or the entry of a caveat (which Lender deems material), that has not been removed ten (10) days of its creation.

      (c)     Change of Trustee. The resignation, removal, or otherwise change of trustee of Borrower.

      (d)     Bankruptcy Default. The Borrower shall (i) commence any case, proceeding or other action under any existing or future law of any jurisdiction relating to seeking to have an order for relief entered with respect to it or its debts, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other such relief with respect to it or its debts, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or substantially all of its assets (each of

the foregoing, a "Bankruptcy Action"); (ii) become the debtor named in any Bankruptcy Action which results in the entry of an order for relief or any such adjudication or appointment described in the immediately preceding clause (i), or remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) make a general assignment for the benefit of its creditors.

In each and every Event of Default, the Lender may, without limiting any other rights it may have at law or in equity, by written notice to the Borrower, declare the unpaid Principal of and Interest on this New Note due and payable, whereupon the same shall be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which the Borrower hereby expressly waives, and the Lender may proceed to enforce payment of such Principal and Interest or any part thereof in such manner as it may elect in its discretion.

This Note may be prepaid in whole or in part at any time without premium or penalty.

All prepayments shall be applied first to interest, then to principal payments in the order of their maturity.

The undersigned agrees to pay all costs and expenses, including all reasonable attorneys' fees, for the collection of this Note upon default. All payments shall be made at 1211 Park Avenue, New York, NY, 10128, or at such other place as the holder hereof may from time to time designate in writing.

Upon default, whether pursuant to an Event of Default or otherwise, the interest rate shall be increased to an amount ("Overdue Rate") equal to the maximum legal rate of interest permitted by applicable law.

If this New Note is not paid when due, Borrower promises to pay all costs and expenses of collection and attorneys' fees incurred by the holder hereof on account of such collection, whether or not suit is filed thereon. Borrower consents to renewals, replacements and extensions of time for payment hereof, before, at, or after maturity; consents to the acceptance, release or substitution of security for this note, and waives protest, presentment, demand for payment, notice of default or nonpayment and notice of dishonor and the right to assert any statute of limitations. The indebtedness evidenced hereby shall be payable in lawful money of the United States.

This New Note shall be governed by, and shall be construed and enforced in accordance with, the laws of the state of Delaware without giving effect to the conflict of law rules thereof, and shall be adjudicated before the appropriate Courts of the State of Delaware.

THE ORLY GENGER 4993 TRUST

# Exhibit 13

Robert Meister

| | |
|---|---|
| From: | Allingham II, Thomas J <Thomas.Allingham@skadden.com> |
| Sent: | Monday, April 23, 2012 5:19 PM |
| To: | 'Yoav M. Griver' |
| Cc: | ljw@msk.com; pdm@msk.com; Dellajo@duanemorris.com; emichailidis@duanemorris.com; robert.meister@pedowitzmeister.com; Bryan D. Leinbach; asash@mclaughlinstern.com; dcavanaugh@lyons-mcgovern.com; esilverman@wmllp.com; William Wachtel; robert.meister@pedowitzmeister.com; Frank, William P; Clark, Anthony W |
| Subject: | TRI Dividends |

Dear Yoav:

In response to your letter of April 17, 2012, without acknowledging any obligation to respond to this or any other requests regarding TRI business, please note the following (numbered items correspond to your numbered questions):

1.  An aggregate amount of $27,000,000 of dividends were paid during calendar 2011.

2.  2. Yes, 32.5% of those dividends were escrowed with Skadden ($8,707,500) and, as of today, that amount plus interest accrued remains escrowed with Skadden.

3.  3. TRI's Board of Directors has authorized dividends during 2012 aggregating $25,618,968 and as with the above, 32.25% of such dividends is being escrowed with Skadden under the escrow arrangement previously discussed among all the parties.

Tom

---

**From:** Yoav M. Griver [mailto:YGriver@zeklaw.com]
**Sent:** Tuesday, April 17, 2012 4:55 PM
**To:** Allingham II, Thomas J (WIL)
**Cc:** ljw@msk.com; pdm@msk.com; Dellajo@duanemorris.com; emichailidis@duanemorris.com; robert.meister@pedowitzmeister.com; Bryan D. Leinbach; asash@mclaughlinstern.com; dcavanaugh@lyons-mcgovern.com; esilverman@wmllp.com; William Wachtel; robert.meister@pedowitzmeister.com; Frank, William P (NYC); Clark, Anthony W (WIL)
**Subject:** Genger -- Letter

Letter to your attention. Thank you.

Yoav M. Griver, Esq.
Partner
Zeichner Ellman & Krause LLP

575 Lexington Avenue
New York, New York 10022
Tel. (212) 826-5338
Fax (212) 753-0396
ygriver@zeklaw.com

1

<u>NEW YORK</u> | <u>NEW JERSEY</u> | <u>CONNECTICUT</u>

www.zeklaw.com

This transmission may contain sensitive and/or privileged information. The sender does not waive any privilege or confidentiality in the event of an inadvertent transmission to an unauthorized recipient. In the event of such a transmission, kindly contact the sender to arrange retrieval. IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.

---

************************************************************

To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.
************************************************************
************************************************************

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.
************************************************************

---

STATE OF NEW YORK
SURROGATE'S COURT:  COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - x
In the Matter of the Application of
ORLY GENGER, as a person interested, for the                    AFFIDAVIT OF SERVICE
removal of DALIA GENGER as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA §711(11)                File No. 0017/2008
- - - - - - - - - - - - - - - - - - - - - - - - - x


STATE OF NEW YORK          )
                           : ss.:
COUNTY OF NEW YORK         )


      JORDANA PALGON, being duly sworn, deposes and says: I am over the age of

18 years and not a party to this action, and have an office at 570 Lexington Avenue, 18th

Floor, New York, NY 10022.  On the 19th day of November, 2012, I served the annexed

NOTICE OF MOTION TO DISMISS THIRD AMENDED PETITION by sending same

via pre-paid Priority U.S. mail to counsel for Petitioner at the following address:

Ralph Hochberg, Esq.
Platzer, Swergold, Karlin, Levine,
Goldberg & Jaslow, LLP
1065 Avenue of the Americas
18th Floor
New York, NY 10018


                                          _____
                                            Jordana Palgon

Sworn to before me this
19th day of November, 2012.

_____
Notary Public

         ROBERT A. MEISTER
      Notary Public, State of New York
          No. 31-02ME2653350
        Qualified in New York County
    Commission Expires March 30, 2015

**New York Law Journal**                          **NOT FOR REPRINT**

✉   Click to Print or Select 'Print' in your browser menu to print this document.

Page printed from: _New York Law Journal_

This material may be protected by
copyright law (Title 17 U.S. Code).

# ESTATE OF ARIE GENGER, Grantor

July 28, 2014

ESTATE OF ARIE GENGER, Grantor. (08/0017/B) — The decision in this matter dated July 15, 2014, is vacated and the following is substituted in its place.

Orly Genger, the primary beneficiary of an irrevocable inter vivos trust established by her father, Arie Genger, on December 13, 1993, seeks removal of her mother, Dalia Genger, as trustee. Dalia, in turn, moves to dismiss Orly's third amended petition for failure to state a ground for relief (CPLR 3211[a] [7]) and for failure to join all necessary parties (CPLR 3211 [a] [10]).[1]

The trust at issue (the "Orly Trust") provides for discretionary principal distributions to Orly for life, with remainder to her descendants, or, if none, to a trust Arie created for the benefit of Orly's brother, Sagi Genger (the "Sagi Trust"). The original and successor trustees served until January 2008, at which time Dalia was appointed pursuant to the terms of the instrument. Orly immediately challenged the validity of her mother's appointment and, in the alternative, sought the appointment of a "special trustee" to investigate alleged "wrongful dealings concerning the assets and income of the trust." The court ruled that Dalia's appointment was valid and that Orly had set forth no grounds that would warrant the appointment of a "special trustee" (Matter of Genger, NYLJ, Jan. 9, 2009, at 34, col 2 [Sur Ct, NY County 2009]). Less than seven months later, Orly commenced the instant proceeding to remove her mother as trustee and to appoint Michael D. Grohman, Esq., as successor trustee. After Orly amended the petition for the third time, Dalia made the instant motion to dismiss.

As a threshold matter, we address movant's argument that Orly failed to join the Sagi Trust as contingent remainder beneficiary and to serve it with the third amended petition. The Sagi Trust is unquestionably a proper party to this proceeding. Where removal of a fiduciary is sought on the ground of misconduct, contingent remainder beneficiaries are considered necessary parties, since they have a cognizable interest in the proper administration of the trust (see e.g. Matter of Bellinger, 35 AD2d 1078 [4th Dept 1970]; Matter of Silver, 72 Misc 2d 963 [Sur Ct, Kings County 1973]).

This proceeding was commenced by an order to show cause dated July 1, 2009. Although the trustee of the Sagi Trust, David Parnes, was not initially served with that order to show cause, Orly subsequently amended her petition to name the Sagi Trust as a party. A supplemental order to show cause, which provided for service of process on Mr. Parnes in his capacity as trustee of the Sagi Trust, issued thereafter. An affidavit of service filed with

the court confirms that service was effected in the manner directed. On the return date, September 8, 2009, Mr. Parnes did not answer or appear, i.e., the Sagi Trust defaulted. Thereafter, Orly amended her pleading for a second time. Although the changes to the pleading were substantive in nature, Orly provided only informal notice of the new pleading on Mr. Parnes as trustee.

Under these circumstances, the issue is what, if any, notice of the third amended pleading was required. Orly contends that, because Mr. Parnes initially defaulted, she had no obligation to give him any notice of the third amended pleading, but, in the event notice was required, she provided sufficient notice by mailing him a copy.

If an amended pleading does not affect the interests of a defaulting party, service of process, defined in SCPA §103(43) as a "[c]itation, order to show cause, subpoena and any other mandate of the surrogate's court by which jurisdiction is obtained of a party," is not required. However, where an amended pleading includes "allegations or prayers [for relief that] are modified to any meaningful extent, all parties should be given notice thereof and an opportunity to be heard" (1 Warren's Heaton on Surrogate's Court Practice, §9.04[1], at 9-12 [7th ed]; compare CPLR §3012 [a], providing that "[a] subsequent pleading asserting new or additional claims for relief shall be served upon a party who has not appeared in the manner provided for service of a summons"). In other words, service of process on a party who has defaulted is required if the changes to the pleading, as they relate to the defaulting party, are substantive in nature.

Here, the third amended petition bears little resemblance to the original pleading.[2] Although Orly seeks some of the same relief as in that pleading, i.e., removal of Dalia, she has substantially expanded the grounds for her removal. For example, she has now alleged conduct that occurred in the more than three years between the time of her initial removal petition and the third amended petition. Orly also asks the court to appoint a successor trustee different from the one proposed in the original pleading. The amended pleading thus represents a substantial modification of the prior pleading. As a result, it cannot be said with any degree of certainty that, if the initial pleading had contained the allegations in the third amended pleading, the Sagi Trust would have defaulted. Under these circumstances, Orly's argument that she had no obligation to give any notice of the third amended petition to the trustee of the Sagi Trust fails.

Similarly, Orly's contention that, in any event, she gave sufficient notice of the third amended pleading is without merit. The record shows that Orly did in fact mail a copy of the pleading to the trustee. However, Orly's provision of informal notice did not confer jurisdiction, since, as shown above, service of process was required. Further, the defect was never cured by the filing of a waiver of service or by the trustee's appearance.[3]

Contrary to movant's contention, however, dismissal of the pleading is not required. The court has authority under SCPA §312 to join "any person necessary or proper to the final determination" through the issuance of supplemental process (see also Matter of Bellinger, 35 AD2d 1078 [failure to cite interested parties in a removal proceeding did not require dismissal of the petition, but issuance of a supplemental citation]). Accordingly, Orly is directed to obtain and serve process on the Sagi Trust in connection with the third amended petition. The balance of Dalia's motion, which seeks dismissal for failure to state a claim (CPLR 3211[a] [7]), is held in abeyance pending completion of jurisdiction. If the trustee of

ESTATE OF ARIE GENGER Grantor | New York Law Journal                                    Page 3 of 3

the Sagi Trust appears, the motion to dismiss must be re-noticed and served upon the trustee so that he is afforded the opportunity to respond.

This decision constitutes the order of the court.

Dated: July 24, 2014

1. Dalia's motion papers do not expressly invoke CPLR 3211 ("Motion to dismiss"). However, since the motion is made preanswer and claims that the petition fails to "state a valid claim for removal" and "fails to name, join and serve all persons interested," the court will treat the motion as one seeking dismissal under CPLR 3211(a) (7) and (a) (10).

2. Had Orly served process on the trustee in relation to her second amended petition, that pleading would have been the operative one for comparison. In any event, it is noted that the third amended petition bears little resemblance to its immediate predecessor as well.

3. The trustee's "participation" in the proceeding in connection with Orly's motion for a preliminary injunction did not constitute an appearance within the meaning of SCPA §401. For reasons that are unclear, Orly served the motion upon Mr. Parnes as trustee of the Sagi Trust. The motion was eventually withdrawn, but, before then, Mr. Parnes filed an affidavit in opposition, and his counsel came to court on the motion's return date and participated in a court conference. However, the trustee never attempted to participate formally in the proceeding. For example, his counsel never attempted to file a responsive pleading or a notice of appearance.

Copyright 2014. ALM Media Properties, LLC. All rights reserved.

# Exhibit J

FILED: NEW YORK COUNTY CLERK 09/20/2011    INDEX NO. 651089/2010

NYSCEF DOC. NO. 112    RECEIVED NYSCEF: 09/20/2011

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| ARIE GENGER and ORLY GENGER, in her individual capacity and on behalf of the ORLY GENGER 1993 Trust, | INDEX NO.  651089/2010 |
| Plaintiffs, | **THIRD AMENDED AND SUPPLEMENTAL COMPLAINT** |
| -against- | |
| SAGI GENGER, TPR INVESTMENT ASSOCIATES, INC., DALIA GENGER, THE SAGI GENGER 1993 TRUST, ROCHELLE FANG, Individually and as Trustee of THE SAGI GENGER 1993 TRUST, GLENCLOVA INVESTMENT COMPANY, TR INVESTORS, LLC, NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, JULES TRUMP, EDDIE TRUMP, MARK HIRSCH, and TRANS-RESOURCES, INC. | |
| Defendants. | |

Plaintiffs Arie Genger and Orly Genger, in her individual capacity and on behalf of the

Orly Genger 1993 Trust, by their respective attorneys, for their Third Amended and

Supplemental Complaint against the defendants in this action allege, on information and belief,

as follows:

## I.    THE PARTIES

1.    Plaintiff Arie Genger ("Arie") is a resident of the State of Florida, and the father

of the Plaintiff Orly Genger ("Orly") and the defendant Sagi Genger ("Sagi").

2.    Plaintiff Orly Genger is the adult daughter of Arie Genger and Dalia Genger, and

the beneficiary of the Orly Trust, and a resident of the State of New York and is the beneficiary

of the Orly Genger 1993 Trust (the "Orly Trust").  She brings this action on behalf of the Orly

Trust as the beneficiary of the Orly Trust to protect her interests thereunder.

3.    Defendant Sagi Genger ("Sagi") is the estranged adult son of plaintiff Arie Genger and Defendant Dalia Genger, and is a resident of the City, County, and State of New York, and maintains an office at 1211 Park Avenue, New York, NY 10128.

4.    Defendant TPR Investment Associates, Inc. ("TPR") is a Delaware Corporation with a principal office located at 1211 Park Avenue, New York, NY 10128.

5.    At all relevant times to this Complaint Sagi is the President of defendant TPR and continues to be a controlling member of TPR's Board of Directors.

6.    Defendant Dalia Genger ("Dalia") is the mother of Sagi Genger and Orly Genger and the former wife of the Plaintiff Arie Genger, and is a resident of the City, County and State of New York. Dalia is the putative trustee of the Orly Trust and at relevant times to this Complaint is believed to have been a director of TPR.

7.    Defendant The Sagi Genger 1993 Trust ("Sagi Trust") is a trust entity, and the beneficiary of the Sagi Trust is Sagi.

8.    Defendant Rochelle Fang ("Fang") is the mother-in-law of the Defendant Sagi Genger and was the Trustee of the Sagi Trust during relevant periods in 2008, and is a resident of the City, County and State of New York.

9.    Defendant Glenclova Investment Company ("Glenclova") is a Cayman Islands company with a business address in the Bahamas, and an owner of common stock of Trans-Resources, Inc. ("TRI"). On information and belief Glenclova is in turn owned by other off-shore companies directly or indirectly controlled by the Trump Parties as defined below.

10.    Defendant TR Investors, LLC ("TR Investors") is a New Jersey Limited Liability Company and an owner of common stock of TRI. On information and belief TR Investors is in

2

turn owned by other off-shore companies directly or indirectly controlled by the Trump Parties as defined below.

11.    Together Glenclova and TR Investors are controlled by the Trump Group of South Africa and are collectively referred to herein as the "Trump Group".

12.    Defendant New TR Equity I, LLC ("New TR I") is a Delaware Limited Liability Company, controlled by Jules Trump and/or Eddie Trump.

13.    Defendant New TR Equity II, LLC ("New TR II") is a Delaware Limited Liability Company, controlled by Jules Trump and/or Eddie Trump.

14.    Defendant Jules Trump is a resident of Florida, and an officer and director of Glenclova.

15.    Defendant Eddie Trump is a resident of Florida, and an officer and director of Glenclova.

16.    Defendant Mark Hirsch is a resident of New York, and an officer and director of Glenclova.

17.    The Trump Group, New TR I , New TR II, Jules Trump, Eddie Trump and Mark Hirsch are referred to herein as the "Trump Parties."

18.    Defendant Trans-Resources, Inc. ("TRI") is a Delaware Corporation which is doing business in the City, County and State of New York, with its principal place of business located in the City, County and State of New York.

19.    The claims set forth in this Complaint arise from the conduct of each of the defendants, or their respective agents and co-conspirators, who committed one or more (i) tortious acts within the state, (ii) tortious acts without New York State causing injury to the

3

Plaintiffs or their property within New York State, and (iii) breaches of contract or fiduciary duty arising from contractual obligations, transactions and fiduciary obligations performed or to be performed in New York State.

## II.    NATURE OF THE CASE

20.    In this case, Plaintiffs Arie and Orly, in her individual capacity and on behalf of the Orly Trust, are seeking declaratory, injunctive, and other equitable relief, as well as additional compensatory damages in an amount yet to be determined arising from, inter alia, the loss of Arie's voting control of TRI and the tortious conduct of the defendants as set forth herein, in connection with the Trump Parties' campaign to take over and dilute the value of plaintiffs' interests in TRI, a company founded by Arie nearly three decades ago, including the defendants' wrongful, concerted efforts to strip Arie of his ownership and control of 52.85% of the shares of TRI's common stock, including the Orly Trust's interest in a portion of this TRI stock, and to oust Arie from his management control of TRI—all in an audacious series of breaches of contractual, fiduciary and legal obligations giving rise to each of the causes of action alleged in this Complaint.

## III.    FACTS RELEVANT TO ALL CLAIMS

### A.    **Background**

21.    The Plaintiff Arie is the founder and former Chairman of TRI, a private corporation which, through its subsidiaries, is a leading distributor and manufacturer of agricultural fertilizer worldwide.

22.    Arie founded TRI in 1985. Until 2001, TRI was wholly-owned by TPR Investment Associates, Inc. ("TPR"), a Genger family corporation established by Arie.

4

23.    Prior to October 30, 2004, TPR was controlled by Plaintiff Arie who owned 51% of TPR stock.

24.    Prior to October 30, 2004, Arie maintained majority control of TRI through his 51% majority ownership and control of TPR.

25.    The minority 49% interest in TPR, prior to October 30, 2004, was owned by D&K, Ltd. Partnership ("D&K"), also a Genger family company, which was in turn owned by Arie's wife, Dalia, (4%), the Sagi Trust and the Orly Trust (48% each).

26.    The Sagi and Orly Trusts were established in 1993 by Arie as part of a family estate plan.

27.    In 2001, defendants Glenclova and TR Investors became minority shareholders of TRI, acquiring approximately 47.15% of TRI common stock.

28.    As a result of the Trump Group acquiring 47.15% of TRI common stock, TPR became the owner of 52.85% of TRI stock with Arie maintaining a 51% controlling interest in TPR. Through his 51% ownership of TPR, Arie maintained control of a majority 52.85% interest in TRI, the company he founded.

29.    When the Trump Group became a minority shareholder of TRI, the Trump Group and TPR entered into the 2001 TRI Stockholders Agreement, dated March 30, 2001 (the "2001 TRI Stockholders Agreement") which, among other things, was intended to ensure that Arie (through his controlling interest in TPR) would continue to control the majority voting rights of TRI shares for the duration of his life.

5

30.    The 2001 TRI Stockholders Agreement specifically recognized that Arie was the

51% owner of TPR and that Dalia and the Orly Trust and the Sagi Trust through the D&K

Limited Partnership together owned 49% of TPR.

31.    The 2001 TRI Stockholders Agreement contains certain provisions restricting

the transfer of TPR's majority interest in TRI to someone other than Arie during his lifetime,

except under certain enumerated conditions intended to ensure that Arie, as the majority

shareholder of TPR, would maintain control over 52.85% of TRI shares during his life. The

2001 Stockholders Agreement specifically provides that exclusive jurisdiction over disputes

relating to this 2001 TRI Stockholders Agreement shall be in Federal courts or New York State

courts sitting in the City, State, and County of New York. The full terms and conditions of the

2001 TRI Stockholders Agreement are incorporated herein by reference.

**B.    The Genger Divorce and Court-Ordered Stipulation of Settlement**

32.    In 2002, Dalia and Arie became embroiled in a bitter divorce action venued in the

Supreme Court, New York County, entitled *Dalia Genger v. Arie Genger*, Index No. 302436-

2002 ("Genger Divorce Action").

33.    In October of 2004, Dalia and Arie agreed to a Stipulation of Settlement, which

was incorporated into a Judgment of Divorce in the Genger Divorce Action on January 7, 2005

("Stipulation of Settlement"), attached hereto as Exhibit A. This Court-Ordered Stipulation of

Settlement, among other things equitably distributed between Arie and Dalia various marital

assets, including the ownership interests in the family holding company TPR which then held

52.85% of TRI common stock which was controlled by Arie through his control of TPR.

Pursuant to the terms of the Judgment of Divorce, the New York State Supreme Court retained

6

jurisdiction over the parties with respect to the enforcement of the terms of the Stipulation of
Settlement.

34.    Pursuant to the terms of the Stipulation of Settlement and certain 2004 TPR
Transaction Documents (described below) implementing the Stipulation of Settlement, it was
agreed by and among Arie, Dalia, Sagi, Orly, the Orly Trust, and the Sagi Trust that as part of
the settlement of the Genger Divorce Action, that Arie would transfer his 51% interest in the
TPR marital asset to Dalia, in consideration of TPR concurrently divesting itself of its 52.85%
majority interest in TRI on the following terms and conditions, which were all part of a single
integrated transaction:

    i.    The defendant Sagi would become the President of TPR;

    ii.    TPR, by Sagi as President of TPR, would transfer to the plaintiff Arie
direct ownership of 794.40 shares of TRI common stock representing
13.99468% of the common stock of TRI;

    iii.    TPR, by Sagi as President of TPR, would transfer to each of the Sagi Trust
and Orly Trust, record ownership of 1,102.80 shares (or 19.42766 % each)
of TRI stock, subject to and on the further conditions that:

(a) the Sagi Trust and the Orly Trust would each execute and deliver a
2004 Voting Trust Agreement to Arie which provides further that:

(i) the Sagi Trust and the Orly Trust would immediately execute
and deliver to Arie an irrevocable voting proxy ("Putative
Irrevocable Proxies") intended to ensure that Arie would maintain
voting control over the Sagi Trust TRI shares and the Orly Trust
TRI Shares for the duration of Arie's life, and

(ii) in the event that the Putative Irrevocable Proxies granted by the
Sagi Trust and the Orly Trust to Arie were ever held to be invalid
then:

(1) a Back-up Voting Trust Agreement would be entered
into promptly between each of the Sagi and Orly Trusts and Arie
which:

7

> (a) **grants Arie the right to vote the Orly Trust and Sagi Trust TRI shares for the duration of Arie's life,**
>
> (b) provides that Arie is entitled to keep possession of the Sagi Trust and Orly Trust TRI Shares pursuant to a Voting Trust Agreement in a form attached to the 2004 Voting Trust Agreement, and
>
> (c) provides that the Orly and Sagi Trust TRI shares would not be sold without a prior Court order,

and the 2004 Voting Trust Agreement further provides that:

> (2) **pending the execution of the Back–up Voting Trust Agreement, the Orly and Sagi Trusts would be obligated to vote the Orly Trust and Sagi Trust Shares as directed by Arie during his lifetime.**

**Id.(emphasis added)**

35.    The Court-Ordered Stipulation of Settlement in the Genger Divorce Action is

attached as Exhibit A hereto.

36.    Article II of the Stipulation of Settlement in the Divorce Action, entitled

"Distribution of Assets," specifically provides, in pertinent part, as follows:

> [2. (a)] "(ii) [Dalia] shall receive . . . sole ownership of the husband's [Arie's] two hundred and fifty (250) shares of common stock of TPR Investment Associates, Inc. ("TPR"), . . . which represents fifty-one percent (51%) of the issued and outstanding shares of common stock of TPR (exclusive of the 1.96% ownership of TPR, which the wife [Dalia] owns indirectly through her general partnership interests in D&K [partnership].
>
> \* \* \*
>
> "9. (a) TPR owns 3,000 shares of stock in Trans-Resources, Inc. ("TRI Stock") . . . . Concurrently with the execution of this agreement, the TRI Stock shall be distributed as follows:
>
> **"(i) The husband [Arie], shall receive 794.40 shares of the TRI Stock, representing 13.99468% of the common stock of TRI;**

8

> **(ii) Each of Sagi Genger and Orly Genger, will receive
> in trust 1,102.80 shares of TRI Stock representing 19.42766%
> of the common stock of TRI for each of Sagi and Orly, and
> such trusts will simultaneously therewith execute and deliver
> irrevocable proxies to the husband for all of the TRI Stock
> owned by the trusts; and**
>
> **"(c)    Concurrently with the execution of this Agreement,
> each of the Husband and Wife will execute and deliver or cause
> TPR to execute and deliver (i) all documents reasonably
> necessary to effect the transfers required by subparagraph (a)
> of this Section 9, and (ii) duly executed stock powers to transfer
> the shares as required by subparagraph (a) of this Section 9.**
>
> * * *
>
> "(e) Following the foregoing transfers of the TRI Stock, the wife
> [Dalia] will have no ownership interest in TRI."

(Stipulation of Settlement, Exhibit A hereto, Article II, paragraph 2(a) (ii), p.5, and paragraph 9
(a), (c) & (e) at pp. 13, 14) (emphasis added).

37.    The Stipulation of Settlement also provides that this TPR/TRI transaction was a

fundamental part of the Stipulation of Settlement, and specifically states in pertinent part, in

bold and capital letter type:

> **"A FUNDAMENTAL PART OF THIS AGREEMENT IS THE
> HUSBAND'S RELINQUISHMENT OF HIS OWNERSHIP
> OF SHARES OF COMMON STOCK IN TPR, AND THE
> TRANSFER OF SUCH OWNERSHIP TO THE WIFE."**

Stipulation of Settlement, Exhibit A hereto, Article 3, para. 1.

38.    The Stipulation of Settlement also included an express reformation clause which

provides that in the event that any term of the Stipulation of Settlement were to be voided by a

court of competent jurisdiction for any reason, then either Dalia or Arie would be entitled to seek

court-ordered reformation of the Stipulation of Settlement in a New York Court to give effect to

9

the intent of the parties to the fullest extent permitted by the laws of the State of New York. This

reformation clause of the Stipulation of Settlement provides:

### "ARTICLE XVI

### POSSIBLE INVALIDITY

> "If any provision of this [Stipulation of Settlement], for any reason
> whatsoever, be declared . . . unenforceable by any Court of
> competent jurisdiction . . . the remainder of this Agreement and
> the application of such provision to any person or situations, other
> than those as to which such provision may have been invalid or
> unenforceable shall not be affected thereby and shall continue to be
> enforced to the fullest extent that such severance of the invalid
> portions is possible without vitiating the original intent and
> purposes and economic intentions of the parties (the "Original
> Intent"), as herein set forth.... **In the event a provision is
> superseded under this [Stipulation of Settlement], either party
> may seek reformation of the affected provision in any court of
> competent jurisdiction which shall be empowered to revise the
> provision to reflect the parties' Original Intent to the greatest
> extent possible, consistent with New York law.** It is the
> intention of the parties hereto that this provision may be enforced
> in equity in addition to, and not to the exclusion of, any other
> remedies which may be available to the parties."

(Stipulation of Settlement, ARTICLE XVI, Exhibit A at pages 47-48) (emphasis added)).

39.    Dalia was represented by separate, independent legal counsel in connection with

the negotiation and her execution of the Stipulation of Settlement.

40.    Dalia, through her counsel, received a complete copy of the 2001 TRI

Stockholders Agreement prior to the execution of the Stipulation of Settlement.

41.    Sagi had full knowledge of the terms of the Stipulation of Settlement prior to, and

at the time that it was negotiated and executed, and was named as a fiduciary with regard to

certain marital property distributed or to be distributed under the Stipulation of Settlement.

10

42.     Sagi and his own counsel were provided with a full and complete copy of the 2001 TRI Stockholders Agreement prior to the execution of the Stipulation of Settlement.

43.     Edward Klimmerman, a partner at Sonnenschein, Nath & Rosenthal, LLP (now known as SNR Denton), represented Arie in the Genger Divorce Action, had full knowledge of the negotiation and terms of the Stipulation of Settlement at the time the Stipulation of Settlement was executed.  Mr. Klimmerman signed the Stipulation of Settlement as a witness. Mr. Klimmerman was also legal counsel for TRI and TPR at the time the Stipulation of Settlement was executed.

44.     As counsel for TRI and TPR, Mr. Klimmerman participated in the actual drafting of the 2001 TRI Stockholders Agreement.  As Arie's counsel in the Genger Divorce Action, he did not advise Arie that anything in the Stipulation of Settlement violated any term of the 2001 TRI Stockholders Agreement between TPR and the Trump Group.

45.     Arie reasonably believed that the transfers set forth in the 2004 Transfer Documents and Court-Ordered Stipulation of Settlement were valid and enforceable.

46.     Dalia and her legal representatives reasonably believed that the 2004 Transfers provided for in the Stipulation of Settlement were valid and enforceable at the time Dalia entered into the Stipulation of Settlement.

47.     Defendant Jules Trump, a representative of the Trump Group was aware of the Genger Divorce Action, and prior to the execution of the Stipulation of Settlement testified as a witness in the Genger Divorce Action in connection with the ownership of TRI shares.

11

C.     **The 2004 TPR Transfer of TRI Shares Pursuant to the Stipulation of
       Settlement**

48.     To implement the TPR and TRI share transfer provisions in the Stipulation of

Settlement, Arie, the Sagi Trust, the Orly Trust and TPR, concurrently with the execution of the

Stipulation of Settlement, entered into the following "2004 TPR Transaction Documents" in

accordance with the express terms and intent set forth in the Stipulation of Settlement:

>           (i) a 2004 TPR Agreement to Transfer TRI Shares, dated
> October 29, 2004 (the "2004 TPR Transfer Agreement", attached
> hereto as Exhibit B); and

>           (ii) a 2004 Voting Trust Agreement, dated October 29,
> 2004 (the "2004 Voting Trust Agreement", attached hereto as
> Exhibit C), which attached:

>           (a) Executed Documents referred to as Putative Irrevocable
> Proxies, dated October 29, 2004, executed by the Sagi Trust and
> the Orly Trust ("Putative Irrevocable Proxies", attached hereto as
> Exhibit D) which by their specific terms purported to grant to the
> Plaintiff Arie the right to control and vote the Sagi Trust TRI
> shares and the Orly Trust TRI shares for the duration of his life,
> and

>           (b) a form Back-up Voting Trust Agreements ("Back up
> Voting Trust Agreements", attached here to Exhibit E), which
> were to be executed promptly by the Sagi Trust and the Orly Trust
> in the event that the Putative Irrevocable Proxies granted by the
> Sagi Trust and the Orly Trust to Arie were ever held to be invalid,
> and provided that:

>           (i) the Sagi Trust and the Orly Trust were required
> to vote the TRI shares in accordance with Arie's directions
> pending the execution of the Back-up Voting Trust Agreements in
> accordance with the express intent in the Stipulation of Settlement
> that Arie was to maintain voting control of the Sagi Trust and Orly
> Trust TRI shares for the duration of his life;

>           (ii) Arie would be entitled to keep possession of the
> Sagi Trust and Orly Trust TRI Shares pursuant to a Voting Trust
> Agreement in the form attached to the 2004 Voting Trust
> Agreement; and

(iii) the Orly and Sagi Trust TRI shares would not be sold without a prior Court Order.

49.     Each of the 2004 Transaction Documents confirm the stated intention of the parties to the Stipulation of Settlement and 2004 Transaction Documents that Arie, for the duration of his life, would continue to have voting control over 52.85% of the outstanding shares of TRI that were previously owned by TPR and controlled in turn by Arie through his 51% ownership of TPR.

**D.     The 2004 TPR Transfer Agreement-Exhibit B**

50.     The 2004 Transfer Agreement executed by Sagi himself on behalf of TPR, provides :

> "This letter will set forth our agreement pursuant to which you will purchase the 3,000 shares of common stock ("the Shares") of Trans-Resources, Inc. ("TRI") owned by TPR Investment Associates, Inc. ("TPR"). TPR hereby sells, transfers and conveys the Shares to you as follows:
>
> (i)     794.40 shares to Arie Genger;
>
> (ii)    1,102.80 Shares to the Sagi Genger 1993 Trust, and
>
> (iii)   1,102.80 Shares to the Orly Genger 1993 Trust.
>
> \* \* \*
>
> "The Shares represent 52.85% of the issued and outstanding shares of TRI. The Shares are being transferred hereunder free and clear of any liens, claims or encumbrances and **such transfer does not violate the Certificate of Incorporation of TPR or any agreement to which TPR is subject.**
>
> **"The trustees of the Sagi Genger 1993 Trust and of the Orly Genger 1993 Trust ("Trusts") have agreed to execute on behalf of the Trusts (i) an Irrevocable Proxy to appoint Arie Genger to vote the Shares owned by the Trusts and (ii) a voting trust letter agreement, copies of which are annexed hereto."**

13

> "In case, at any time hereinafter, any further action is
> necessary or desirable to carry out the purposes of this Letter
> Agreement, each of the parties hereto shall take or cause to be
> taken all necessary action, including, without limitation, the
> execution and delivery of such further instruments and documents
> which may be reasonably requested by any party for such purpose
> or otherwise to complete or perfect the transactions
> contemplated hereby."

> This Letter Agreement shall be governed by the laws of the State
> of New York without regard to conflicts of law principles.

(2004 TPR Transfer Agreement, Exhibit B) (emphasis added)

### E.   The 2004 Voting Trust Agreements (Exhibit C hereto)

51.   In accordance with the terms of the Stipulation of Settlement (Exhibit A) and the

2004 TPR Transfer Agreement (Exhibit B), Arie and the Sagi and Orly Trusts, respectively,

entered into identical 2004 Voting Trust Letter Agreements in favor of Arie (Exhibit C) which

provide as follows:

> "In connection with the transfer to the [Sagi and Orly Trusts] of
> 1,102.80 shares [each] of common stock (the "Shares") of Trans-
> Resources, Inc. (TRI) **pursuant to the terms and conditions of
> the Stipulation of Settlement of even date herewith**, the [Sagi
> and Orly] trust is [each] granting to Arie Genger an irrevocable
> proxy ("the Proxy") for the shares, a copy of which is annexed
> hereto.

(Exhibit C)(emphasis added).

### F.   The 2004 Putative Irrevocable Proxies Executed By The Sagi and Orly Trusts (Exhibit D, hereto)

52.   In accordance with the 2004 TPR Transfer Agreement, the Stipulation of

Settlement, and the 2004 Voting Trust Agreement, the Sagi and Orly Trusts executed two

identical Putative Irrevocable Proxies, each of which states, in relevant part, that:

> "[The Sagi Trust and Orly Trust, each respectively], ("the Trust")
> being the current record and beneficial owner of 1,102.80 shares of
> common stock of [TRI] **does hereby constitute and appoint Arie**

14

> **Genger, Chairman of the Board, Chief Executive Officer, and
> owner of approximately fourteen percent (14%) of the shares
> of common stock of TRI to vote as its proxy, all shares of
> common stock of TRI** which are now or hereafter owned by
> the Trust, at any and all meetings of the stockholders of TRI,
> regular or special, or by consent in lieu of meeting or any
> adjournments thereof in the same manner and to the same extent
> that the Trust might were the Trust present at said meeting (or
> executing such consent), upon any issue or proposal which may be
> brought before such meeting or by such consent.
>
> **"This Irrevocable Proxy shall he deemed coupled with an
> interest and be irrevocable from the date hereof, and shall
> continue for the duration of Arie Genger's life."**

(Exhibit D)(emphasis added).

53. The 2004 Voting Trust Agreement further provides that **in the event that the
Putative Irrevocable Proxies were ever declared invalid**, the Orly and Sagi Trusts would be
obligated to enter into a Back-up Voting Trust Agreement (Exhibit E) to assure that Arie would
maintain voting control over a majority of TRI shares for the duration of his life. This part of the
2004 Voting Trust Agreement, executed by the Sagi Trust and the Orly Trust, provides:

> **"In the event that for any reason the Proxy is declared invalid
> and is no longer in effect, the Trust agrees, as promptly as
> practicable, to enter into a Voting Trust Agreement (the
> "Voting Agreement") with Arie Genger as the voting trustee,
> which shall be substantially in the form annexed hereto.
> During the time the Proxy is not in effect and prior to the time
> the Voting Agreement is entered into, the Sagi Trust agrees to
> vote the shares as directed in writing by Arie Genger."**

(2004 Voting Trust Agreement, Exhibit C ) (emphasis added).

G. **Back-Up Voting Trust Agreement –(Exhibit E hereto)**

54. The Backup Voting Trust Agreement, which springs into effect upon the Putative
Irrevocable Proxies being voided, provides:

"**The Trust Securities [the Sagi and Orly TRI Shares subject to the Voting Trust] shall be held by the Trustee [Arie Genger] for the purposes of and in accordance with this Agreement <u>and none of the Trust Securities shall be sold or otherwise disposed of by the Trustee except as herein expressly provided or in accordance with a final order of any Court or administrative agency with jurisdiction thereover.</u>**"

\* \* \*

"**This Agreement shall continue in effect for the duration of Arie Genger's Life**"

Exhibit E. (emphasis added)

55.    In order to ensure that he maintained absolute control of the TRI shares for the duration of his life, Arie never delivered physical copies of TPR's TRI shares to the Orly or Sagi Trusts.

### H.    The Intent of the Parties

56.    The written 2004 Transaction Documents and the Stipulation of Settlement reflect the stated intention of all the parties to these collective documents, <u>to wit</u>, that in order to resolve the contested Genger Divorce Action, Arie agreed as part of the distribution of marital assets to transfer his 51% interest in the family holding company, TPR, to Dalia, in exchange for Dalia agreeing that TPR would concurrently divest itself of its 52.85% interest in the common stock of TRI by distributing TPR's 52.85% majority interest in TRI to Arie (14%), the Sagi Trust (19.425%), and the Orly Trust (19.425%) each, **on the express further condition that Arie maintain voting rights for the Sagi Trust and Orly Trust TRI shares for the duration of his life.**

57.    Arie, Dalia, Sagi and Orly each reasonably believed that the 2004 Transfers provided for in the Stipulation of Settlement were valid and enforceable.

16

58.   Arie, Dalia, Sagi and Orly each reasonably believed that the Putative Irrevocable Proxies and Voting Trust Agreements were valid and assured that Arie would be able to maintain 58.85% voting control for the duration of his life.

59.   Accordingly, the concurrently executed integrated 2004 Transfer Documents were intended to implement the terms of the Stipulation of Settlement which provided expressly that Arie was to retain his 52.85% voting control over TRI and concomitantly continue to control the management and Board of TRI during his lifetime.

60.   It was also the parties' stated intention, and all parties reasonably believed, that the terms of the court-ordered Stipulation of Settlement with Dalia would not violate the terms or intent of the 2001 TRI Stockholders Agreement because Arie would still control what had been TPR's voting majority of TRI shares.

61.   The Genger Divorce Action was not concealed from TRI, the Trump Group, or the Trump Parties at any time.

62.   The 2004 transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust were reflected in the books and records of TRI.

63.   Prior to 2008, Jules Trump, and Mark Hirsch, each individually and on behalf of the Trump Group between 2004 and 2008 had access to the books and records of TRI.

64.   Between 2004 and 2008, as a Director of TRI, Jules Trump and Mark Hirsch, each had a fiduciary duty and legal duty of reasonable care to the record and beneficial owners, including TPR and TRI, to know the identity of all TRI shareholders of record as set forth in the books and records of TRI- a close corporation.

17

65.     As a Directors of TRI, Jules Trump, and Mark Hirsch, each individually and on behalf of TRI, had a fiduciary and legal duty of reasonable care to TPR and Arie to read all corporate Board minutes and other documents presented to the Directors and/or shareholders of TRI, in their entirety, prior to signing such documents.

66.     Prior to 2008, the books and records of TRI show that:

(i) Arie was record owner of 794.40 shares of TRI, representing 13.9946% of the common stock of TRI;

(ii) the Sagi Trust was the record owner of 1102.80 TRI shares, representing 19.42766% of the common stock of TRI; and

(iii) the Orly Trust was the record owner of 1102.80 TRI shares, representing 19.42766% of the common stock of TRI.

67.     Prior to 2008, the 2004 Transfers and the record ownership of TRI shares was known by:

(i) the officers and directors of TRI, in addition to Arie

(ii) TRI's legal counsel; and

(iii) TRI's Certified Public Accountant.

68.     Jules Trump, and Mark Hirsch, each individually and on behalf of the Trump Group executed corporate TRI documents as Director and/or on behalf of a shareholder of TRI which indicated that Arie, the Orly Trust and the Sagi Trust were the record owners of TRI shares.

18

69.     The terms of the Stipulation of Settlement relating to the distribution of TPR and TRI shares as marital assets in connection with the Genger Divorce Action were not in any way or at any time concealed from TRI, the Trump Group, or the Trump Parties.

70.     Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, and otherwise knew, and was aware that the Genger Divorce Action could involve in some way the equitable distribution of TPR shares owned by Arie as part of the divorce action.

71.     Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, knew, and was aware that the Genger Divorce Action involved in some way the value of TPR's ownership of TRI shares.

72.     Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, knew, and was aware that the Genger Divorce Action involved in some way Arie's management and control over TRI, the company that he had founded and managed since 1985.

73.     Prior to 2008, Jules Trump knew that ownership of TPR, as a marital asset which owned 52.85% of TRI shares, was a major asset and was the subject of a claim by Dalia for equitable distribution in the Genger Divorce Action.

74.     Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, knew, and was aware that the Genger Divorce Action would involve in some way the equitable distribution of TPR assets, including Arie's 51% majority ownership of TPR.

75.     Prior to 2008, the Trump Group, through Jules Trump who testified in the Genger Divorce Action, and otherwise knew, and was aware that the Genger Divorce Action could

19

involve D&K Limited Partnership, which was identified in the 2001 TRI Stockholders Agreement as an owner of 49% of TPR (the majority Shareholder of TRI) and further disclosed that in turn this 49% minority ownership of TPR by D&K was owned by Arie's wife Dalia (4%) the Sagi Trust (48%) and the Orly Trust (48%), and that these Trust interests could be effected by the equitable distribution of TPR assets as part of the Genger Divorce Action.

76.    The Trump Group knew that the 2001 TRI Stockholders Agreement did not contain an express provision setting forth the rights and obligations of TPR, Arie or the Trump Group in the event of a contested divorce involving Arie's ownership of TPR shares as marital property, including TPR's ownership of TRI shares under New York's equitable distribution laws or otherwise.

77.    Prior to 2008, Arie had reason to believe that The Trump Group, through Jules Trump, and otherwise, had notice of the 2004 Transfers.

78.    Prior to 2008, Arie had reason to believe that The Trump Group had notice of the 2004 Transfers which were reflected in TRI corporate documents.

79.    Prior to 2008, the Trump Group and Jules Trump, in particular, had knowledge of facts in 2002-2004 including, but not limited, to the fact that Arie was involved in a bitter contested divorce, and that the issue of Arie's ownership interests in TRI, through TPR or otherwise, was an issue raised in the Genger Divorce Action.

80.    Between 2004 and 2008, Directors of TRI, its legal counsel, Secretary, as well as its Controller, knew of the 2004 transfers.

20

81.    Between 2004 and 2008, TRI, under Arie's management, reported the new company ownership resulting from the 2004 transfers to its lead bank, the IRS, and TRI's insurance company.

82.    Between October 2004 and August of 2008 nothing prevented the Trump Group, Jules Trump, TRI or its officers or directors, or any of them, from making any inquiry whatsoever of Arie, Orly, TPR, TRI, TRI's general counsel, Dalia,  Sagi, the Sagi Trust, the Orly Trust, or D&K, concerning the effect, if any, that the Genger Divorce Action, or any judgment or resolution of the Genger Divorce Action had, would or could have, on (i) the ownership of TPR, (ii) Arie's ownership of a majority interest of TPR, (iii) TPR's ownership of TRI, (iv) Dalia's interest in D&K minority ownership of TRI, or the rights of the Sagi Trust or the Orly Trust as limited partners of D&K which owned approximately 49% each of TPR -- which ownership was acknowledged by the Trump Group in the 2001 TRI Stockholders Agreement.

83.    Between October 2004 and August of 2008 nothing prevented the Trump Group, Jules Trump, TRI or its officers or directors, or any of them, from making any inquiry whatsoever of Arie, Orly, TPR, TRI, TRI's general counsel, Dalia, Sagi, the Sagi Trust, the Orly Trust, or D&K as to the identity of the record owners of TRI.

84.    Jules Trump, Eddie Trump and Mark Hirsch (an attorney) at all times relevant to this complaint were sophisticated business individuals, with special expertise in corporate governance and ownership.

85.    At all times relevant to this action the Trump Parties had access to independent legal counsel.

21

86.    Prior to 2008, the Trump Group, by Jules Trump, and otherwise, acted with willful blindness and indifference to facts which put The Trump Group on notice of (i) the 2004 Transfers, and (ii) that Arie, the Sagi Trust and the Orly Trust were record owners of their respective TRI shares.

87.    The Trump Group, by Jules Trump, and otherwise, waived any objection to the 2004 Transfers.

88.    Between 2004 and 2008, under Arie's management, TRI's business performance improved consistently without any complaint or objection by TRI's Board of Directors including but not limited to representatives of the Trump Group.

**I.    The Trump Parties' 2008 Scheme and Conspiracy to Seize Majority Control of TRI, Squeeze Out Arie as an Officer, Director and Shareholder of TRI and Dilute the Value of Arie's, Orly's and the Orly Trust's Interests in the Affected TRI Shares**

89.    There was no hint of any substantial disagreement between Arie and the Trump Group relating to the Genger Divorce Action, or otherwise, until June of 2008, when TRI's value increased substantially as a result of improved performance.

90.    In the early Spring of 2008, TRI was facing a threat of foreclosure of one of its major operating units by Bank Hapoalim, a long-time lender of TRI.

91.    To address this foreclosure threat, Arie and the Trump Group explored the possibility of a sale of assets and restructuring plan involving the spin-off of all of TRI's North American assets to a separate entity and a capital loan by the Trump Group into a residual TRI to retire the Bank Hapoalim debt in exchange for increasing the equity position of the Trump Group in the restructured TRI so that the Trump Group would obtain a majority position (the "Funding Plan").

22

92.     Had the Funding Plan been implemented, in return for providing funding Jules and Eddie Trump through TR-I and TR-II would, for the first time, have been permitted to obtain a direct ownership interest in TRI, and the Trump Parties, under the Funding Plan, would have obtained majority control over TRI, the company that Arie had founded and worked so hard to make succeed.

93.     TRI's legal counsel advised that it would be necessary for a special committee of the Board to be constituted in order for the Board to approve the Funding Plan without the vote of Jules Trump who was an interested Director with a conflict of interest.

94.     Despite requests from Arie to constitute such a committee, the Trump Group Directors failed to agree to the appointment of such committee.

95.     The Board of TRI never constituted a special committee in order for the Board to approve the Funding Plan.

96.     The implementation of the Funding Plan was also subject to other conditions relating to the value of the transaction which conditions were never met.

97.     While the proposed Funding Plan was being worked on, the financial condition of TRI began to improve substantially. By late June 2004, TRI was generating positive cash flow of $15-20 million per month. This represented a dramatic improvement in TRI's earnings within a matter of months in 2008, and rendered the Funding Plan unnecessary.

98.     As a result, there was no longer a need for TRI or Arie to move forward with the Trump Group Funding Plan that would have given the Trump Parties' majority control of TRI.

23

99. To proceed with the Funding Agreement would have diluted the shares of existing shareholders and cause TRI to pay the Trump Group unreasonable fees for a loan that was not needed.

100. Based on the advice of TRI's Delaware corporate counsel concerning the establishment of an independent committee of the Board to approve the Funding Plan, which the Trump Group refused to empanel, and the fact such a Funding Plan was no longer necessary because of improved performance of TRI which permitted the satisfaction of the Bank Hapoalim loan, the Funding Plan was rejected and the Bank Hapoalim loan satisfied with TRI's own substantially improved earnings without the need for funding from the Trump Parties or any other third-party.

101. On information and belief, the Bank Haopolim's threat of foreclosure and the Funding Plan takeover proposed by the Trump Group were also engineered by Jules Trump, individually, and on behalf of the Trump Group with the aid, assistance and further illegal conduct of the Trump Group and a principal officer of Bank Haopolim with whom the Trump Group had other business entanglements.

102. Thwarted in their effort to take over the controlling interest in TRI through the rejected Funding Plan, the Trump Group, Mark Hirsch, Eddie Trump, and Jules Trump formulated a further illegal scheme and plan to take over the then very profitable TRI, and oust Arie as its CEO, and steal the Genger family TRI shares at a fraction of their value.

103. In furtherance of this plan, the Trump Group leveled an extortionate threat at Arie demanding that unless Arie agreed to turn over majority control of TRI to the Trump Group pursuant to the Funding Plan (which was no longer necessary ), the Trump Group would declare

24

that the 2004 TPR transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust under the

Stipulation of Settlement were void under the 2001 TRI Stockholders Agreement even though

Arie as a permitted Transferee held 14% of TRI outright, and had received a Voting Trust

Agreement and Putative Irrevocable Proxies from the Sagi Trust and the Orly Trust which, on

their face, gave Arie the right during his lifetime to control the management of TRI, and vote the

same 52.85% shares of TRI stock that had been controlled by Arie through his 51% ownership of

TPR prior to the Stipulation of Settlement and the execution of the 2004 Transfer Documents.

Thus, there was virtually no effective difference in Arie's control of TRI Shares as between his

majority control of TPR prior to the execution of the Stipulation of Settlement, and the intended

control that Arie would exercise after the Stipulation of Settlement and 2004 Transfer

Documents were executed.

104.    At the time they made this threat in 2008, the Trump Parties, among other things,

knew that:

(i) the intent of the parties pursuant to the 2001 TRI Stockholders Agreement in

restricting certain transfers to Genger family members was to ensure that (a) Arie, personally,

would continue to have management and majority shareholder voting control over TPR's TRI

shares for the duration of his life, and (b) prevent any other Genger family member from having

any management or voting control over TRI during Arie's lifetime;

(ii) pursuant to the terms of the Stipulation of Settlement and the 2004 TPR-TRI

Transfer Documents Arie, Dalia, Orly and Sagi, specifically intended to preserve Arie's

management and voting control of TRI, in the context of resolving the equitable distribution of

marital property issues concerning TPR raised in the Genger Divorce Action;

25

(iii) that as a condition for Arie transferring his 51% interest in TPR to Dalia in the Genger Divorce Action, it was intended that pursuant to the Stipulation of Settlement and 2004 Transaction Documents Arie would receive valid Putative Irrevocable Proxies and Back-up Voting Trust Agreements from the Sagi Trust and the Orly Trust designed to ensure that Arie would retain voting control over a majority of TRI shares for the duration of his life even if the Putative Irrevocable Proxies were held to be invalid; and

(iv) that if the 2004 TPR transfer of TRI shares were voided, as threatened by the Trump Group, then:

(a)     52.85% of TRI shares would revert to TPR, which would be unjustly enriched because TPR, under the Stipulation of Settlement and implementing 2004 Transaction Documents, had already divested itself of those TRI shares in consideration of Arie relinquishing his 51% ownership of TPR to Dalia;

(b) that Arie would be the beneficial owners of such 3000 TRI Shares, and Arie would have the right to vote the 52.85% of TRI shares that were returned to TPR, subject to the Orly and Sagi Trust rights to receive certain of these shares upon Arie's death;

(c)     Sagi was not authorized to act on behalf of TPR to sell any of the TRI shares without the consent of Arie as the beneficial owner of the Arie TRI Shares, and the beneficial holder of the voting rights to TPR's TRI Shares;

(d)     Arie would be entitled to reform the Stipulation of Settlement, pursuant to the express terms of the Stipulation of Settlement, so that Arie would regain control of 51% of TPR's ownership and control of 52.85% of TRI's shares;

26

(e) that the New York Supreme Court under the Judgment of Divorce, had retained jurisdiction over Arie and Dalia in connection with enforcing the terms of the Stipulation of Settlement, including Arie's reformation claims; and

(f)    TPR, under Sagi's control, was not authorized to sell TRI shares to the Trump Group without the consent of Arie, as beneficial owner of TPR's record ownership of the TRI shares, in the event the 2004 Transfers were held to be invalid;

(v) that if the Putative Irrevocable Proxies (Exhibit D) were held to be invalid, that the Sagi and Orly Trust shares would be subject to the Back-Up Voting Trust Agreement Exhibit E) which was referred to in the 2004 Voting Trust Agreement (Exhibit C).

105.    Nevertheless, on August 8, 2008, the Trump Group, in furtherance of their plan to pressure Arie and take over a majority control of TRI, sent a letter to TPR asserting that it had the right under Section 3.2 of the 2001 TRI Stockholders Agreement to purchase all of the TRI shares that were the subject of the Stipulation of Settlement transfers in 2004, **at 2004 prices** – a small fraction of what is believed to have been a TRI value in excess of $1 billion in 2008, which had net after-tax income in excess of $150 million in that year.  The Trump Group provided no such letter or notice to Orly or the Orly Trust or the Sagi Trust.

106.    Three days later, on August 11, 2008, the Trump Parties, through Glenclova, commenced an action in the Federal District Court of the Southern District of New York against TPR (the "Federal Action") claiming that the transfer of the TRI shares by TPR to Arie Genger, the Orly Trust and the Sagi Trust pursuant to the express terms of the Stipulation of Settlement and 2004 Transaction Documents, was void.

27

107.    Notwithstanding the Trump Parties' respective specific knowledge in 2008 of the existence and terms of the Court-ordered Stipulation of Settlement and the 2004 TPR Transfer Documents, the Trump Group did not name Arie, Dalia, the Sagi Trust or the Orly Trust as parties in the Federal Action.

108.    The Trump Parties knew at the time they commenced the Federal Action that Arie was a known third party beneficiary under the 2001 TRI Stockholders Agreement and that the 2004 Transfers were approved in a Court-Ordered Stipulation of Settlement in the Genger Divorce Action, but nevertheless opposed Arie's motion to intervene in the Federal Action.

109.    The Trump Parties also knew that Sagi, as a result of the Stipulation of Settlement and 2004 TPR Transfer Documents, became the president of TPR, but that he had since become estranged from his father, and that Sagi had installed his mother-in-law Rochelle Fang as the nominal trustee of the Sagi Trust and that he exercised total dominion and control over her.

110.    The Trump Parties also knew that if the 2004 TPR transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust pursuant to the "So-Ordered" Stipulation of Settlement and 2004 Transfer Documents were voided, that Arie's transfer of his 51% ownership in TPR to Dalia would also have to be voided, and that as a consequence Dalia, or Sagi as her successor-in-interest, as a matter of New York law, would have to hold this 51% TPR interest in a constructive trust for the benefit of Arie with respect to TPR's ownership of the TRI Shares.

111.    The Trump Parties knew that neither TPR, nor Sagi as its President, would be authorized to sell any of TPR's shares of TRI to the Trump Group in the event that the 2004 TPR Transfers of TRI Shares to Arie, the Sagi Trust or the Orly Trust were voided because in that

28

event those TRI shares would be returned to TPR subject to a constructive trust for the benefit of
Arie.

112.    Prior to August 22, 2008, the Trump Group also knew that in the event that the
2004 transfers by TPR of TRI Shares to Arie, the Sagi Trust or the Orly Trust were voided, Sagi,
as the President of TPR, also owed a separate fiduciary duty to Arie and the Orly Trust with
respect to the 3000 TRI shares that would revert to TPR.

113.    TPR and Sagi each had a fiduciary and contractual duty to Arie to hold any TRI
shares that reverted to TPR in a constructive trust for their respective benefits as the beneficial
owner of such shares, and also owed a fiduciary duty to Orly and the Orly Trust with respect to
her interest in a portion of these shares.

114.    Nevertheless, in August, 2008, the Trump Group met, conspired and schemed
with Sagi and/or his representatives to contrive a plan to offer Sagi approximately $26.7 million
to induce Sagi to cause the Sagi Trust, through his mother-in-law Fang, to transfer to the Trump
Parties the Sagi Trust's 19.425% of TRI shares that the Sagi Trust received pursuant to the
Stipulation of Settlement and 2004 TPR Transaction Documents. This $26.7 million payment
was a fraction of the value of those shares at that time given the performance of TRI which, in
2008 had after tax earnings of $150,000,000 of sales of approximately $1 billion.

115.    As part of this conspiracy and scheme, the purchase of the Sagi Trust Shares was
to be conditioned on Sagi, purportedly as the President of TPR, further agreeing that if the Court
in the Federal Action, or any other court, held that the 2004 TPR Transactions were void, then
TPR would be "deemed" the Seller of the Sagi Shares, even though the Sagi Trust could keep the
$26.7 million, and even though TPR had no right or authority to sell the Arie, the Sagi Trust and

29

Orly Trust Shares without the consent of Arie as beneficial owners of these respective shares,

subject to Orly's interest to receive the Orly Trust TRI Shares upon Arie's death, and Arie's

beneficial interest in the voting rights for the Sagi Trust, Orly Trust and Arie TRI Shares.

116.    The Trump Group defendants knew that if the $26.7 million purported purchase

price of the Sagi Trust Shares was paid to the Sagi Trust that the money would need to be

returned to TPR.

117.    The Trump Group defendants knew that Sagi, on behalf of TPR was not

authorized to sell the Sagi Trust Shares, in the event the 2004 Transfers were declared invalid.

118.    The Trump Group defendants never sought or received a representation by TPR

or Sagi that Sagi, on behalf of TPR was authorized to sell any TRI Shares to the Trump Group.

119.    The Trump Group defendants knew that Sagi on behalf of TPR was not

authorized to sell any of TPR's TRI shares to the Trump Group in the event that the 2004 Shares

reverted to TPR that Sagi and TPR had a fiduciary and contractual duty to protect Arie's control

over the 52.85% of TRI Shares for the duration of his life.

120.    The Trump Group did not obtain a representation from Sagi or TPR as to whether

any sale by the Sagi Trust or TPR would be subject to Arie's right to vote those Shares for the

duration of his life in accordance with the terms of the Court-ordered Stipulation of Settlement

and the 2004 Transaction Documents.

121.    As part of this conspiracy and scheme the Trump Parties also required that in

order for Sagi to get the $26.7 million put in his Trust, Sagi purportedly as the President of TPR

would have to further agree in a "side letter" that if the Court in the Federal Action, or any other

court, held that the 2004 TPR Transactions were void, then TPR would also agree to sell the 14%

30

Arie TRI shares and the 19.425% Orly Trust Shares, which TPR had already sold to Arie and the

Orly Trust pursuant to the Stipulation of Settlement and the 2004 Transaction Documents, to the

Trump Parties at a price that was 60% less than the price per share to be paid to the Sagi Trust.

Again, Sagi had no authority to make this sale on behalf of TPR.

    122.    As part of the same conspiracy and scheme, the Trump Parties also insisted that

neither the Sagi Trust nor TPR take any action to protect the voting rights of Arie that were

granted to Arie by the Sagi Trust and the Orly Trust under the 2004 Voting Trust Agreements in

accordance with the 2004 TPR Transfer Agreement.

    123.    To induce Sagi to sell the Sagi Trust Shares to the Trump Parties, the Trump

Group proposed a scheme and conspiracy that the Trump Parties knew would require Sagi to use

his position as President of TPR to obtain a personal benefit by having $26.7 million paid to his

Sagi Trust, while selling out Arie's and the Orly Trust's TRI shares for a fraction of their real

value in an obvious breach of Sagi's fiduciary and contractual duties to Arie and the Orly Trust,

which breaches of duty arose from, among other things, (i) Sagi's self-dealing transactions as an

officer of TPR to get $26.7 million from the Trump Group for his Sagi Trust shares while at the

same time and at the expense of Arie and the Orly Trust agreeing to sell their TRI shares at a

price per share that was 60% lower than the deal Sagi was making for himself through the sale of

the Sagi Trust shares to the Trump Parties, (ii) ignoring Arie's and the Orly Trust's beneficial

interest in the value of TPR's ownership of specific TRI stock that TPR had already transferred

to Arie and the Orly Trust for valuable consideration pursuant to the Stipulation of Settlement

and the 2004 TPR Transaction documents; (iii) inducing Fang as the Trustee of the Sagi Trust to

violate the 2004 Voting Trust Agreement with Arie; (iv) inducing the trustees of the Orly Trust

31

to violate their fiduciary obligations to the Orly Trust and Orly; (v) failing to protect Arie's

voting rights to 52.85% of TRI shares in accordance with the express intent and provisions of the

Stipulation of Settlement and the 2004 Transaction Documents; (vi) disposing of and

substantially devaluing the asset value of TPR's ownership of TRI shares, with knowledge that

such shares would be subject to Arie's claims for imposing a constructive trust on such shares,

reformation and/or rescission under the terms of the Stipulation of Settlement with respect to

restoring Arie's rights to a 51 % ownership of TPR insofar as TPR's ownership of TRI shares

was concerned; (vii) failing to disclose to Arie, Orly, or the Orly Trust the terms of the Trump

Parties' proposed scheme and plan to purchase the same TRI shares that TPR previously sold to

Arie and the Orly Trust under the Stipulation of Settlement and 2004 TPR Transfer Agreement,

(viii) failing to take all actions necessary to comply with the stated intentions of the parties to the

Stipulation of Settlement and 2004 Transaction Documents, and (ix) entering a self-interested,

unauthorized, ultra-vires agreement, ostensibly on behalf of TPR but in reality using his position

as President of TPR for his own personal gain to the detriment of Arie's and the Orly Trust's

legal and equitable interests in TPR's ownership of the TRI shares that were transferred to each

of them by TPR four years earlier, pursuant to the Stipulation of Settlement and 2004

Transaction Documents.

124.    In furtherance of this scheme and conspiracy, the Trump Parties, the Sagi Trust,

by Rochelle Fang, and Sagi, purportedly on behalf of TPR, executed a 2008 Stock Purchase

Agreement with the Sagi Trust without the knowledge or consent of Arie or the Orly Trust, to

sell the 1102.80 Sagi Trust Shares of TRI common stock representing 19.425% of the shares of

32

stock to the Trump Group and two new entities – TR I and TR II – for $26,715,416.00. ("2008
Stock Purchase Agreement", attached hereto as Exhibit F).

125.    When combined with the Trump Parties' minority share of 47.15 %, this Sagi
Trust sale would give the Trump Parties a 66.575% majority and controlling voting interest in
TRI, in direct derogation of the intent of the Court–Ordered Stipulation of Settlement and the
Putative Irrevocable Proxies and 2004 Voting Trust Letter Agreement.

126.    The Trump Parties acknowledged the existence of the Putative Irrevocable
Proxies and 2004 Voting Trust Letter Agreement in the 2008 Stock Purchase Agreement,
representing and warranting that:

> "Such Purchaser hereby acknowledges receipt of copies of the
> irrevocable proxy dated as of October 29, 2004, issued by Seller
> ["Sagi Trust"] in favor of Arie Genger with respect to the shares
> (the "Proxy"), a backup form of voting trust agreement and voting
> trust certificate delivered in connection with the Proxy and the
> Letter Agreement dated October 29, 2004 [2004 Voting Trust
> Letter Agreement] with respect to the transfer of shares from TPR
> to Seller"

127.    The 2008 Stock Purchase Agreement also states that if the 2004 transfer of TRI
shares by TPR to the Sagi Trust were determined to be void and the shares returned to TPR then
**TPR** would be deemed the seller of the Sagi Trust Shares to the Trump Parties for $26.7 million,
even though this $26.7 million would have already been paid to the Sagi Trust controlled by Sagi
through his mother-in-law Fang. There was no provision with respect to the reallocation of the
sales proceeds to TPR.

128.    The 2008 Stock Purchase Agreement violated the terms of the 2001 Stockholders
Agreement, including, but not limited to, Section 3.2 of that Agreement.

33

129.    By entering into the 2008 Stock Purchase Agreement, the Trump Group voluntarily and intentionally waived any right to purchase the Sagi Trust Shares under the 2001 Stockholders Agreement.

130.    Also through its intentional conduct, including its violation of the 2001 Stockholders Agreement, the Trump Group is estopped from utilizing any purported right to purchase under the 2001 Stockholders Agreement.

131.    In addition, Sagi, ostensibly acting for TPR, but without authority and in violation of his contractual, legal and fiduciary duties owed to Arie and Orly, signed a side letter on the very same day as the 2008 Stock Purchase Agreement that provides that if the 2004 transfer by TPR of TRI Shares to Arie and the Orly Trust under the Stipulation of Settlement and 2004 Transaction Documents were declared void, then Sagi, purportedly on behalf of TPR, would transfer the Arie Shares and Orly Trust Shares to the Trump Parties at a price per share 60% per share lower than the Sagi Trust was to receive under the 2008 Stock Purchase Agreement, which would then be deemed a sale by TPR ("2008 Stock Purchase Side Letter Agreement", attached hereto as Exhibit G).

132.    The terms of both the 2008 Stock Purchase Agreement and the Side Letter violated the 2001 Stockholders Agreement, including, but not limited to Section 3.2 of the 2001 Stockholders Agreement.

133.    The Trump Group defendants waived, and are estopped from asserting, any right under the 2001 Stockholders Agreement to purchase the Arie and Orly Trust TRI Shares from TPR.

34

134.    Neither Arie on behalf of TRI or the Board of Directors of TRI approved the transaction set forth in the 2008 Stock Purchase Agreement and Side Letter.

135.    This Side Letter was not only an insidious requirement mandated by the Trump Parties to get a majority interest in TRI for the first time, but was tantamount to a $26.7 million bribe offered by the Trump Parties to Sagi, the estranged son of Arie, to betray his father and rob his sister of the true value of their respective legal and equitable interests in the TRI stock previously owned by TPR in order for the Trump Group to completely squeeze out Arie and the Orly Trust at unconscionably low prices.

136.    At the time the Trump Parties, TR-I and TR II, the Sagi Trust and Sagi purportedly on behalf of TPR, executed the 2008 Stock Purchase Agreement, the Trump Parties also knew that if the 2004 transactions were voided, TPR, Sagi, the Sagi Trust and the Trump Parties would all be unjustly enriched by the 2008 Stock Purchase Agreement and Side Letter.

137.    The Trump Parties also knew that if the 2004 TPR Transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust were voided, that these TRI shares recovered by TPR would be the subject of a constructive trust established for the benefit of Arie, the Orly Trust and the Sagi Trust.

138.    The Trump Parties, Sagi, and the Sagi Trust knew that Sagi, as an officer and director of TPR, owed a fiduciary duty to Arie, the Orly Trust, and the Sagi Trust, not to devalue or alienate Arie's and the Orly Trust's beneficial ownership of TPR insofar as TPR's ownership of the TRI shares was concerned, and not to strip Arie of his voting rights with respect to these TRI Shares.

35

139.    The Trump Parties, Sagi and the Sagi Trust knew at the time they executed the 2008 Stock Purchase Agreement that pursuant to the Court –Ordered Stipulation of Settlement, Arie had a contractual right to seek to reform the terms of the Stipulation of Settlement in order to give full effect to the intent of the parties with respect to his relinquishment of control in TPR in exchange for Arie's continuing control of 52.85% of TRI shares and outright ownership of 14% of TRI's stock, as a permitted transferee.

140.    The Trump Parties, Sagi, and the Sagi Trust knew at the time they executed the 2008 Stock Purchase Agreement and Side Letter that Arie was entitled to rescission for failure of consideration of that part of the Stipulation of Settlement that transferred his 51% of TPR to Dalia, in exchange for Dalia's agreement to have TPR concurrently transfer 14% of TRI's shares to Arie outright, and  that Arie would maintain voting control, or 52.85% of TRI for the duration of his life.

141.    In connection with the 2008 Stock Purchase Agreement and in furtherance of the plan and scheme to wrest control of TRI from Arie's control, the Trump Parties aided and abetted the preparation of a sworn affidavit swearing that the Sagi Trust shares had been lost, when the Trump Parties knew that was not a true statement.

**J.      The Trump Parties Declare Themselves The Majority Owners Of TRI, and Commence An Action In The Delaware Chancery Court To Determine The Composition of TRI's Board of Directors**

142.    On August 25, 2008, only three days after the 2008 Stock Purchase Agreement and 2008 Stock Purchase Side Letter Agreement were executed, the Trump Group asserted that it was in control of TRI through the acquisition of 1102.80 shares that were purportedly transferred to them by the Sagi Trust.

36

143.    On August 25, 2008, the Trump Parties commenced a Chancery Court in rem summary proceeding in the State of Delaware pursuant to 8 Del.C § 225(a) to determine the composition of the Board of Directors of TRI ("The Delaware Action") and to declare, inter alia that:

i.      the Trump Parties are the majority shareholders of TRI and have the right to vote all of its shares including the shares which were allegedly purchased pursuant to the Stock Purchase Agreement;

ii.     the 2004 transfers to Arie Genger, the Sagi Trust and the Orly Trust are void and continue to belong to TPR; and

iii.    that the Putative Irrevocable Proxies do not apply to the shares transferred pursuant to the Stock Purchase Agreement.

144.    Neither TPR, the Sagi Trust, nor the Orly Trust were a party to the Delaware Action, although TPR was given an opportunity to participate in that action, and refused to do so.

145.    The Trump Group as interested Directors in control of TRI had a fiduciary and legal duty to authorize the appointment of separate, independent counsel for TRI in connection with the Delaware proceeding and otherwise with respect to determining the beneficial and record ownership of the Arie, Orly Trust and Sagi Trust TRI shares.

### K.   The July 23, 2010 Opinion of the Delaware Chancery Court

146.    On July 23, 2010 the Delaware Chancery Court issued a lengthy written decision which held that the transfers of TPR's TRI shares to Arie, the Sagi Trust and the Orly Trust pursuant to the Stipulation of Settlement and 2004 Transaction Documents were void and ownership reverted to TPR and that TPR's sale of the Sagi Trust TRI Shares to the Trump Group pursuant to the 2008 Stockholders Agreement was valid.

37

147.    The Chancery Court also held that the Sagi Trust Irrevocable Proxy was not valid under New York or Delaware law. The Chancery Court in this § 225 proceeding held that the Trump Group was entitled to elect a majority of TRI Board members.

148.    While voiding the 2004 Transfers, however, the Chancery Court in this July 23 decision also held that because Arie was a "permitted transferee" under the 2001 TRI Stockholders Agreement, the transfer of the TRI shares to him did not warrant a forfeiture of Arie's TRI Shares.

149.    Because Arie was a permitted transferee of the TRI shares owned by TPR (a Genger family holding company that Arie had created) the Trump Group would have no right to stop the transfer of these TPR TRI shares to Arie once it received contractual notice and Arie agreed to be personally bound by the TRI Stockholders Agreement.

150.    Under the Delaware Chancery Court's July 23 decision, Arie would retain his TRI shares once he gave formal notice of TPR's 2004 transfer and agreed to be bound by the 2001 TRI Stockholders Agreement, which Arie promptly agreed to do shortly thereafter.

151.    In its July 23, 2010 decision, the Court of Chancery also held that because neither Orly nor the Orly Trust were parties to the Delaware Chancery Court action, the Delaware Court declined to issue any ruling with respect to the Orly Trust TRI Shares.

**L.    The July 26, 2010 TRO in this New York Action**

152.    Based on the July 23, 2010 Chancery Court decision, Arie and Orly sought and obtained a temporary restraining order from this Court, restraining Sagi and TPR from selling or encumbering the Arie and Orly Trust TRI shares. This temporary restraining order was granted on July 26, 2010 and extended by this Court on July 28, 2010.

38

**M.    The August Opinion of the Delaware Chancery Court**

153.    After being advised by the Trump Group of plaintiff being granted a TRO in this

New York Action,  the Delaware Chancery Court indicated that it would reexamine its rulings

with regard to the Arie and Orly Trust TRI shares, and expressed concern about whether the New

York TRO was designed to undermine its ruling in the Delaware Court, which it was not.

154.    On August 3, 2010, to allay the Court of Chancery's concerns, Arie's counsel in

this case wrote to this Court advising that because defendants Sagi and TPR had agreed to abide

by a *status quo order* entered by the Delaware Chancery Court, which provided that Arie would

be given notice in the event TPR or Sagi intended to sell the Arie and Orly TRI Shares to the

Trump Group, it was agreed among counsel for TPR, Sagi, Dalia and the plaintiffs, that the

temporary restraining order would be vacated and plaintiffs in this action would accordingly

withdraw their application for a preliminary injunction, without prejudice.

155.    On August 9, 2010, the Chancery Court made an abrupt "about face" regarding its

determination earlier relating to the Arie and Orly Trust TRI Shares. In this second opinion, the

Delaware Chancery reversed itself regarding the ownership of the Arie and Orly Trust Shares,

and held that the Trump Group had the right to purchase the Arie and Orly Trust TRI shares from

TPR under the 2008 Side Letter Agreement, even though the Court had held only two weeks

earlier that Arie was a permitted transferee under the Stockholders Agreement and should be

permitted to keep his shares, and that the Orly Trust was never a party to the § 225 proceeding.

The Chancery Court also held that Arie and the Orly Trust had no beneficial interest in the Arie

and Orly Trust TRI shares—even though TPR, Sagi, the Sagi Trust and the Orly Trust were

never parties to the Delaware § 225 proceeding.

39

**N.    The Delaware Chancery Court's Final Judgment Order of August 18, 2010**

156.    On August 18, 2010, the Delaware Chancery Court entered a Final Judgment

Order which found (i) that TPR's 2004 transfers of the Arie TRI Shares, and the Orly Trust TRI

shares were void under the 2001 TRI Stockholders Agreement, (ii) that title to the Sagi Trust

TRI Shares, the Orly Trust TRI Shares and the Arie TRI Shares, all reverted to TPR; (iii) that the

Irrevocable Proxy for the Sagi Trust was not valid; (iv) that the sale of the Sagi Trust TRI shares

by Sagi on behalf of TPR was valid; (v) that the Side Letter was a valid agreement; and (vi) that

Arie and the Orly Trust had no beneficial or legal ownership interest in the Arie and Orly Trust

TRI shares.

157.    There was no discussion or finding in the Chancery Court Decision as to whether

Sagi was authorized to sell the Arie, Orly and Sagi Trust TRI Shares out of TPR.

158.    In addition to these holdings, the Chancery Court entered an anti-lawsuit

injunction, which prohibited Arie from "commenc[ing] or prosecut[ing] any legal proceeding . .

. in any [state] court [including the action in this Court which had already been commenced]

constituting a collateral attack on, attempt to prevent implementation of, or relitigation of any of

the [Chancery] Court's holdings set out in paragraphs 2 through 16 inclusive (summarized

above), of this final judgment order" pending a determination of an appeal to the Delaware

Supreme Court, with certain limited exceptions, but even the Chancery Court specifically

recognized Arie's right to apply to this Court to seek to escrow the proceeds from TPR's

impending sale of the Arie TRI Shares to the Trump Group, as follows:

> "Arie Genger shall have the right to seek an order from a court of
> competent jurisdiction requiring TPR Investment Associates, Inc.
> and its officers and directors to place in escrow the proceeds of
> sale of the shares of TRI referenced in paragraph 14 of this Order.
> [the "Arie TRI Shares"]."

40

**O.**    **Arie Appeals From the Chancery Court's Final Judgment Order**

159.    Arie timely appealed from the Chancery Court's rulings, arguing, inter alia, that

(i) the Trumps ratified the 2004 transfers, as a matter of law; (ii) the Irrevocable Proxy was valid

under New York law; and (iii) the Delaware Chancery Court had no jurisdiction to determine the

ownership of the Arie and Orly TRI shares or the validity of the Side Letter.

160.    Under threat of contempt, Arie agreed to stay this case pending a final

determination by the Delaware Supreme Court.

**P.**    **The Purported Sale by TPR of the Arie and Orly Trust TRI Shares**

161.    While Arie's appeal was pending, Arie was informed that TPR, without Arie's

consent or approval, intended to sell the Arie TRI shares to the Trump Group for $7,424,994.

162.    While the Trump Group and TPR agreed to hold $5,924,944 of these sale

proceeds in escrow pending a determination by the Delaware Supreme Court relative to the

ownership of the Arie and Orly Trust TRI shares, Sagi, as the CEO of TPR, insisted that TPR

was entitled to keep and spend the $1.5 million of the proceeds from the sale of the Arie TRI

shares, notwithstanding the pending appeal challenging the Chancery Court's rulings relating to

the ownership of the Arie and Orly Trust TRI Shares.

163.    While the appeal to the Delaware Supreme Court was pending, TPR, without the

consent or approval of Arie or Orly, also entered into an agreement to sell the Orly Trust TRI

Shares to the Trump Group for $10,314,005, with the proceed to be held in escrow by counsel

for Dalia as the nominal trustee of the Orly Trust.

164.    The Trump Group as interested Directors in control of TRI had a fiduciary and

legal duty to authorize the appointment of separate, independent counsel for TRI in connection

with the Delaware proceeding and otherwise with respect to determining the beneficial and

41

record ownership of the Arie, Orly Trust and Sagi Trust TRI shares prior to TRI recording the

transfer of the Arie and Orly Trust Shares to the Trump Group in 2010.

165.    Neither Sagi nor TPR had any authority to sell the Arie or Orly Trust Shares to

the Trump Group.

**Q.    This Court Enjoins TPR and Sagi From Taking or Using the $1.5 million Sale Proceeds From the Purported TPR Sale of the Arie Shares to the Trump Group**

166.    Arie moved by Order to Show Cause to restrain and enjoin Sagi and TPR from

using or disposing of the $1.5 million sale proceeds that were about to be released to TPR, and

requested that these specifically identified funds be placed in an acceptable escrow account or

paid into Court. This Court by its February 17, 2011 Decision and Order decreed as follows:

> "ORDERED that the defendants Sagi Genger and TPR
> Investment Associates, Inc., and their agents, servants, employees
> and all other persons acting under the jurisdiction, supervision
> and/or direction of the defendants, are enjoined and restrained,
> during the pendency of this action, from doing or suffering to be
> done, directly or through any attorney, agent, servant, or employee
> or other person under the supervision or control of the defendants,
> from taking, using, or spending or converting to their own use
> otherwise, the $1.5 million proceeds from the sale of certain
> common stock in Trans-Resources, Inc. in which plaintiff claims
> an interest"

**R.    The Decision of the Delaware Supreme Court**

167.    On July 18, 2011, the Delaware Supreme Court reversed that part of the Delaware

Chancery Court's Judgment that held that Arie and the Orly Trust were not the beneficial owners

of the Arie and Orly Trust TRI Shares.

168.    On Arie's appeal the Delaware Supreme Court described the limited nature of the

§225 proceeding as follows:

> A Section 225 proceeding is not an *in personam* action.
> Rather, it is "in the nature of an *in rem* proceeding," where the

42

> "defendants" are before the court, not individually, but rather, as
> respondents being invited to litigate their claims to the *res* (here,
> the disputed corporate office) or forever barred from doing so.

* * *

> [For example] in a Section 225 proceeding the court "cannot go
> further and actually rescind a transaction procured through such
> unlawful behavior or award money damages to those harmed by
> that behavior." That type of ultimate relief can only be obtained in
> a plenary action in a court that has *in personam* jurisdiction over
> any necessary or indispensable parties.

169.   Further explaining the limited holding of the Delaware Chancery Court, the

Delaware Supreme Court held:

> Given the jurisdictional limitations that inhere in a Section 225
> action, we affirm the judgment of the Court of Chancery insofar as
> it determines the *record* [emphasis in original] ownership of the
> disputed Trans-Resources shares in the Side Letter Opinion and the
> Final Judgment Order.

* * *

> An adjudication of who has the right to vote disputed corporate
> shares for Section 225 purposes cannot constitute a binding
> adjudication of who beneficially owns those shares, because a
> Section 225 action is by its nature an *in rem*, not a plenary,
> proceeding. **Only in a plenary proceeding before a court that
> has *in personam* jurisdiction over the litigants may the court
> adjudicate the litigants' property interest in disputed
> corporate shares.**

(Emphasis added)

170.   The Delaware Supreme Court also held that the issue of ultimate beneficial

ownership of the Arie TRI Shares and the Orly Trust TRI Shares was beyond the equity

jurisdiction of the Chancery Court in the summary § 225 *in rem* proceeding, and that the issue of

the beneficial ownership of those shares needed to be adjudicated in a plenary action in a

jurisdiction where the Court has *in personam* jurisdiction over all indispensible parties. These

43

necessary parties -- Arie, TPR, Sagi, Orly, the Orly Trust and the Trump Group -- are all parties
to this New York action , and have been served and have appeared in this case.

171.    The Delaware Chancery Court's holdings were limited to an in rem proceeding to
determine who held the record ownership of the shares at a point in time in order to determine
voting rights to elect members of the TRI Board based on the record owners of those shares at
the time of the election.

172.    The Delaware Chancery Court was without jurisdiction to determine the ultimate
ownership of the Arie and Orly Trust TRI shares or any of the tort claims asserted by Plaintiffs
in this action. Nor did the Delaware Chancery Court have jurisdiction to determine Arie's claims
for rescission, unjust enrichment, constructive trust or reformation arising from and in
connection with the Court-ordered Stipulation of Settlement, the 2004 Transaction Documents,
or the authority of Sagi to act on behalf of TPR.

173.    The Delaware Supreme Court affirmed that portion of the Chancery Court ruling
that held that TPR's 2004 transfers of TRI shares pursuant to the Stipulation of Settlement in the
Genger divorce and implementing 2004 TPR Transaction Documents violated the 2001 TRI
Stockholders Agreement and were void ab initio, for the purpose of the Delaware § 225
proceeding to determine composition of the TRI Board.

### FIRST CAUSE OF ACTION ON BEHALF OF PLAINTIFF ARIE GENGER

**(For a Declaratory Judgment Under CPLR 3001 that the
Stipulation of Settlement Entitles Plaintiff Arie to a
Court-Ordered Reformation of the Terms of the Stipulation
of Settlement as Against All Defendants)**

174.    Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 173.

44

175.    Article XVI of the Stipulation of Settlement provides that the parties to the
Stipulation of Settlement have a right to seek court-ordered reformation in a New York court in
order to reflect the parties' original intent in the event a portion of the "So-Ordered" Stipulation
of Settlement is held to be invalid for any reason.

176.    The concurrent transfer of Arie's ownership of his 51% interest in TPR in
consideration of receiving a 14% interest in TRI and the right to control the voting rights of
52.85% of TRI Shares for the duration of Arie's life was an essential, fundamental condition of
the transfers of TPR and TRI shares set forth in the  Court-Ordered Stipulation of Settlement.

177.    The Delaware Chancery Court, as affirmed by the Delaware Supreme Court, held
that TPR's 2004 transfers of 52.85% of the shares of TRI Stock under the Stipulation of
Settlement and 2004 TPR Transfer Documents were invalid and void *ab initio*, and that the
Putative Irrevocable Proxies were invalid.

178.    The provisions of the Court-Ordered Stipulation of Settlement relating to the
transfer of ownership of TPR in consideration of the 2004 Transfers were based upon the mutual
mistake of Dalia and Arie that the 2004 Transfers and Irrevocable Proxies were valid.

179.    The Court-Ordered Stipulation of Settlement specifically provides that the parties
agree that if any of the terms of the Stipulation of Settlement is declared invalid by any court of
competent jurisdiction for any reason, Arie is entitled to seek an Order from this Court to reform
the Stipulation of Settlement, or obtain such other equitable or legal relief as is necessary to give
full meaning and expression to the original intent of the parties to the Court–Ordered Stipulation
of Settlement.

45

180.    Arie is entitled to an Order of the New York Supreme Court to reform the terms of the Court-Ordered Stipulation of Settlement to reflect the parties' original intent to the greatest extent possible.

181.    Accordingly, Arie seeks an Order and declaratory judgment to reform the Court-Ordered Stipulation of Settlement to provide as follows:

(i)    That the transfer by Arie of his 51% interest in TPR to Dalia and the concurrent transfer of the 3000 shares of TRI stock to Arie, the Orly Trust and the Sagi Trust, respectively, as originally set forth in the Stipulation of Settlement is voided *ab initio* as a result of the Delaware Court finding that the 2004 Transfers are invalid;

(ii)    that all the assets of TPR, other than the 3000 Arie, Orly Trust and Sagi Trust TRI shares, remain the property of TPR or any successor in interest to those assets;

(iii)    that pursuant to a further order of this Court the Court-Ordered Stipulation of Settlement is modified *ab initio* to provide that the 3000 shares of TRI common stock that were returned to TPR as a result of the Delaware Court Action voiding the original 2004 Transfers be placed in a newly formed single purpose entity controlled by Arie ("TPR2");

(iv)    that Arie be declared the 51% owner of TPR2, which in turn shall be declared, *ab initio* the record and beneficial owner of all of such 3000 TRI shares, as though no 2004 Transfers were consummated under the original terms of the Stipulation of Settlement;

(v)    that the Orly Trust and Sagi Trust each be declared the owner of 24.5% of TPR2 so that together they own the remaining 49% of TPR2;

46

(vi)    that TPR2 shall not sell or transfer the 3000 TRI shares prior to Arie's death, unless such sale would be otherwise permitted and would not violate the terms of the 2001 Stockholders Agreement including, but not limited to, Article 2 of such agreement;

(vii) upon Arie's death, 1102.8 of TRI shares, plus any stock dividends relating thereto ("the Sagi Trust TRI Shares") will be transferred by TPR2 outright to the Sagi Trust, and 1102.8 of TRI shares plus any stock dividends relating thereto ("the Orly Trust TRI Shares") will be transferred outright to the Orly Trust;

(viii)   All cash dividends relating to the Sagi Trust and the Orly Trust TRI Shares received by TPR2 during Arie's lifetime will be distributed, after payment of taxes and expenses to the Shareholders of TPR2, as if (a) Arie owned 794.40 shares, representing 13.99468% of the common stock of TRI, and (b) the Sagi Trust and the Orly Trust each owned 1102.8 shares, representing 19.42766% of TRI common stock;

(ix)    Arie through his 51% control of TPR2 will retain all voting rights to the 3000 TRI shares and any additional TRI shares issued to TPR or TPR2 as stock dividends or otherwise for the duration of his life.

(x)    The Trump Group shall deliver to TPR2 the 1102.8 shares of TRI common stock purportedly purchased under the 2008 Stock Purchase Agreement.

182.    The $26,715,416.00 paid by the Trump Group to the Sagi Trust under the 2008 Stock Purchase Agreement will be returned to the Trump Group by TPR and the Sagi Trust.

183.    The Trump Group shall deliver to TPR2 the 794.40 Arie and the 1102.8 Orly Trust TRI shares purportedly sold to TPR under the Side Letter Agreement and 2010 Transaction.

47

184.    The purported sales by TPR of the Arie and Orly Trust TRI shares to The Trump Group, while the Delaware Supreme Court appeal was pending, will be declared null and void, and the proceeds from these purported sales now held in escrow will be released to The Trump Group.

185.    TRI shall record on its books that TPR2 is the record owner of 3000 shares of TRI Common Stock, representing 52.85% of the issued common stock of TRI.

186.    TPR2 will consent to the terms of the 2001 Stockholders Agreement.

187.    Arie, Orly, Dalia, Sagi, TPR and TRI shall be directed to take all other necessary action and to execute all documents necessary to give full meaning to the intention of the parties to the Court Ordered Stipulation of Settlement in light of the ruling of the Delaware court that the 2004 Transfers were invalid.

188.    There is a justiciable controversy.

189.    There is no adequate remedy at law.

## SECOND CAUSE OF ACTION ON BEHALF OF ARIE AND ORLY

### (For the Imposition of a Constructive Trust against Sagi, TPR, Dalia, the Sagi Trust, Fang, and the Trump Parties)

190.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 189, and incorporate the allegations contained in paragraphs 209-219.

191.    Upon the Delaware Court voiding TPR's 2004 transfer of 52.85% of TRI shares to Arie, the Sagi Trust and the Orly Trust, legal title to such TRI shares reverted to TPR subject to Arie's rights as a constructive beneficial owner of 51% of the shares of TPR with respect to TPR's ownership of 52.85% of TRI shares.

48

192.   TPR is not entitled, in equity or good conscience, to retain any direct or indirect benefit resulting from the record ownership of the 3000 shares of TRI stock reverting to TPR as a result of the ruling of the Delaware courts .

193.   TPR would be unjustly enriched at the expense of Arie if it were permitted to retain any direct or indirect ownership or benefit from the sale of the 3000 shares of TRI stock because record ownership of such TRI shares reverted to TPR as a result of the Delaware court rulings.

194.   Upon TPR becoming the record owner of Arie's 794.4 shares of TRI stock as a result of the Delaware Court rulings, such shares were immediately held in a constructive trust by TPR for the benefit of Arie as the beneficial owner of those shares.

195.   Upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Orly Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Orly Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Orly Trust's right to receive the Orly Trust TRI Shares upon Arie's death.

196.   Upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Sagi Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Sagi Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Sagi Trust's right to receive the Sagi Trust TRI Shares upon Arie's death.

49

197.   Upon TPR becoming the record owner of all 3000 shares of TRI stock comprising the Orly Trust Shares, the Sagi Trust Shares and the Arie Shares, TPR held the voting rights to such 3000 shares in a constructive trust for the benefit of Arie.

198.   Arie's beneficial ownership and voting rights with respect to the 3000 TRI shares, which were held by TPR in a constructive trust for his benefit, were protected from further transfer to The Trump Group from the moment record title reverted to TPR.

199.   TPR was not authorized to transfer any of the 3000 TRI shares as to which it became the record owner, without the consent of Arie as the beneficial owner of such TRI Shares.

200.   TPR is not authorized to vote any of the 3000 TRI shares that reverted to TPR as record owner as a result of the Delaware Court rulings, except at the direction of Arie.

201.   The Trump Group are not bona fide purchasers of any of the 3000 TRI shares that reverted to TPR.

202.   The Trump Group was on notice of Arie's ownership and voting right claims with respect to the 3000 TRI shares that reverted to TPR, as record owners.

203.   The Trump Group knew and were on notice that TPR was not authorized to sell TPR's TRI shares without the prior consent of Arie.

204.   The Trump Group knew and was on notice that Arie objected to the sale to The Trump Group of any of the 3000 TRI shares that reverted to TPR, as record owner under the 2008 Stock Purchase Agreement, the Side Letter Agreement or the 2010 purported sale of the Arie and Orly Trust TRI shares.

50

205.    The Constructive Trust in favor of Arie imposed upon the Arie, the Orly Trust and the Sagi Trust TRI shares existed at the moment record ownership reverted to TPR, and attaches to any purported sale of these shares to The Trump Group, who were not bona fide purchasers.

206.    The Trump Group, in addition to TPR, would be unjustly enriched if they were permitted to keep the benefit of the purported sale by TPR of the 3000 TRI shares to The Trump Group, which sale Sagi was not authorized to enter into on behalf of TPR without the prior consent of Arie because, inter alia,

(i) the Trump Group would become the owner of the Arie, Sagi Trust and Orly Trust Shares, over the objection of Arie and without Arie's required prior permission and consent;

(ii)    the Trump Group would obtain Arie's right to vote these shares for the duration of his lifetime, without Arie's required prior permission and consent; and

(iii)    these shares would be acquired substantially below their true value without Arie's required prior permission and consent;

(iv)    the purported transaction by TPR was in derogation of Arie's beneficial ownership and voting rights appurtenant to such shares; and

(v)    the Trump Group are not bona fide purchasers of such shares.

207.    Plaintiffs have no adequate remedy at law.

51

## THIRD CAUSE OF ACTION
## ON BEHALF OF ARIE AND ORLY

### (Claim for Breach of Fiduciary Duty, Aiding and Abetting Breach of Fiduciary Duty and Conspiracy to Breach Fiduciary Duty Against Sagi, TPR, the Sagi Trust, Fang, the Trump Parties and TRI)

208.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 207.

209.   Sagi, individually and as an officer of TPR, owed a fiduciary duty of trust, confidence and loyalty to Arie and the Orly Trust because, among other things, (i) he was entrusted to manage TPR's ownership of the TRI shares for the benefit of Arie and the Orly Trust upon the Chancery Court voiding the 2004 TPR transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust, and the resulting ownership of such 52.85% of TRI shares by TPR; (ii) he was entrusted to manage TPR's record ownership of the TRI shares for the benefit of Arie and the Orly Trust upon the Delaware Chancery Court voiding the 2004 TPR transfer of TRI shares to Arie, the Sagi Trust and the Orly Trust; (iii) pursuant to the 2004 TPR Transfer Agreement, Sagi was entrusted to take all actions necessary to ensure that Arie would maintain voting control of 52.85% of the stock of TRI in accordance with the express intent of all parties to the Stipulation of Settlement and 2004 TPR Transaction Documents; (iv) through Fang and the Sagi Trust, as his co-agents and alter egos, Sagi owed a duty of trust and confidence to Arie under the 2004 Voting Trust Agreement; and (v) as the successor to the rights and liabilities of Dalia under the Stipulation of Settlement and the manager of TPR, as a family holding company, Sagi owed a fiduciary duty to protect the assets of the Orly Trust for the benefit of his sister Orly and his father, Arie, in connection with the ownership of TPR, TPR's ownership of the TRI shares and D&K's minority ownership of TPR.

52

210.    As a fiduciary Sagi, individually, and as an officer of TPR, owed a duty of fidelity and undivided loyalty to Arie, Orly, and the Orly Trust regarding the TRI shares.

211.    Fang, individually and as the trustee of the Sagi Trust, owed a fiduciary duty to Arie under the 2004 Voting Trust Agreement and Side Letter.

212.    The Trump Group, on becoming the majority shareholder of record in TRI, owed a fiduciary duty of fidelity and loyalty to Arie as the known beneficial owner of record of the Arie TRI shares.

213.    Jules Trump and Mark Hirsch, each individually and on behalf of the Trump Group, and as Directors of TRI owed a fiduciary duty to TPR, and Arie as the beneficial owner of TRI shares to read TRI corporate documents presented to him in their entirety and have knowledge of the shareholders of record of TRI, a close corporation.

214.    Sagi, TPR, the Sagi Trust, Fang, the Trump Parties each breached their respective fiduciary duties as a result of the conduct set forth in the allegations of this complaint, including, but not limited to their respective conduct in connection with the negotiation, execution and implementation of the 2008 Stock Purchase Agreement and the Side Letters and the subsequent transfer of the Arie and Orly Trust TRI Shares.

215.    Sagi, TPR, the Sagi Trust, Fang, and the Trump Parties also knowingly aided, abetted, induced, participated in, enabled and substantially assisted each other to breach each of the other's respective fiduciary duties to Arie, Orly and the Orly Trust by the conduct alleged herein, including but not limited to misrepresenting to the Delaware Chancery Court that the share certificates for the Sagi Trust TRI shares were lost despite having actual knowledge that

53

such share certificates were held by Arie, and had not been delivered to the Sagi Trust, Sagi or Fang.

216.    TRI also knowingly aided, abetted, induced, participated in, enabled and substantially assisted the respective breaches of fiduciary duties owed to Arie, Orly and the Orly Trust by Sagi, TPR, the Sagi Trust, Fang and the Trump Parties.

217.    Sagi, TPR, the Sagi Trust, Fang, and the Trump Parties, each acting in conspiracy with, and as the co-agent of one another, entered into an illegal scheme, agreement, plan, and artifice to breach each other's respective fiduciary duties owed to Arie, Orly, and the Orly Trust by the conduct alleged herein in furtherance of this conspiracy.

218.    As a result of such breaches of fiduciary duty, aiding and abetting of breaches of fiduciary duties and conspiracies to breach fiduciary duty, by Sagi, TPR, the Sagi Trust, Fang, the Trump Parties and TRI, and each of them, Arie suffered compensatory damages in an amount to be determined.

219.    As a result of such breaches of fiduciary duty, aiding and abetting of breaches of fiduciary duty and conspiracies to breach fiduciary duty, by Sagi, TPR, the Sagi Trust, Fang, the Trump Parties and TRI, and each of them, Orly, individually and as the beneficiary of the Orly Trust, suffered compensatory damages in an amount to be determined.

### FOURTH CAUSE OF ACTION
### ON BEHALF OF ARIE AND ORLY

**(Claim for Unjust Enrichment and Rescission Against Sagi, TPR, Dalia, the Sagi Trust, Fang, and the Trump Parties)**

220.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 219.

221.    As a result of the Delaware Chancery Court holding, Dalia, TPR, Sagi, the Sagi Trust and the Trump Parties would each be unjustly enriched at the expense of Arie and the Orly

Trust if each or any of them were allowed to retain any direct or indirect benefit or consideration received by each of them from TPR's ownership of TRI Shares, which none of them are entitled, in equity or good conscience, to retain.

222.    Plaintiff Arie is entitled to rescind the transfer of his 51% interest in TPR to Dalia pursuant to the Stipulation of Settlement and 2004 Transaction Documents based on failure of consideration because, as a result of the holding by the Delaware Chancery Court, Arie did not receive any of the consideration that was due to him pursuant to such Agreements, including and not limited to (a) his 14% interest in the Arie TRI Shares, and his right to vote 52.85% of the TRI Shares that he controlled prior to the Delaware Court voiding the 2004 Transfers.

223.    Plaintiff the Orly Trust, is entitled to rescind the 2004 Transaction Documents based on failure of consideration because as a result of the holding by the Delaware Court the Orly Trust did not receive any of the consideration due to the Orly Trust pursuant to the 2004 Transfers.

224.    Arie and the Orly Trust are each also entitled to rescission because of failure of consideration based on mutual mistake as to the enforceability of the 2004 TPR Transfers of TRI stock to Arie, the Sagi Trust and the Orly Trust pursuant to the Stipulation of Settlement and the 2004 Transaction Documents.

225.    Arie and the Orly Trust are each entitled to an accounting.

226.    Arie and the Orly Trust have no adequate remedy at law.

### FIFTH CAUSE OF ACTION

**(Claim for Permanent Injunction Against Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties)**

227.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 226.

55

228.    Plaintiffs are entitled to the issuance of a permanent injunction enjoining and restraining Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties, and each of them, from directly or indirectly transferring, selling, acquiring, pledging, assigning, diluting, voting, valuing, replacing, conveying, using, removing from the jurisdiction, or otherwise disposing of, or encumbering the 3000 shares of TRI stock that reverted to TPR's control as a result of the Delaware Court rulings.

229.    The failure to grant such permanent injunction will result in irreparable injury to the Plaintiffs.

230.    There is no adequate remedy at law.

231.    The balance of equities favor the Plaintiffs.

### SIXTH CAUSE OF ACTION

**(Claim for Breach of Contract against TPR on Behalf of Arie and Orly)**

232.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 231.

233.    TPR entered into the 2004 TPR Transfer Agreement with Arie.

234.    TPR entered into the 2004 TPR Transfer Agreement with the Orly Trust.

235.    TPR breached its express and implied covenants and representations thereunder in connection with the transfer of TRI shares to Arie.

236.    TPR breached its express and implied covenants and representations thereunder by purporting to agree to transfer the Arie, Sagi Trust and Orly Trust TRI Shares to the Trump Parties.

237.    Arie and the Orly Trust performed their respective obligations under the 2004 TPR Transfer Agreement.

56

238.    As a result of such breach of contract, Arie lost the benefit of his bargain and suffered damages in an amount yet to be determined.

239.    TPR breached its express and implied covenants and representations under the 2004 Transaction Documents in connection with the transfer of TRI shares to the Orly Trust.

240.    The Orly Trust performed its obligations under the 2004 TPR Transfer Agreement.

241.    As a result of such breach of contract, the Orly Trust lost the benefit of its bargain and suffered damages in an amount yet to be determined, but believed to be in an amount to be determined.

## SEVENTH CAUSE OF ACTION
## ON BEHALF OF ARIE

### (Claim for Breach of Contract against the Sagi Trust)

242.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 241.

243.    The Sagi Trust entered into the 2004 Voting Trust Agreement with Arie.

244.    The Sagi Trust breached its express and implied covenants and representations thereunder in connection with Arie's voting rights and control of TRI shares.

245.    Arie performed his obligations under the 2004 Voting Trust Agreement.

246.    As a result of such breach of contract, Arie lost the benefit of his bargain and suffered damages in an amount yet to be determined.

## EIGHTH CAUSE OF ACTION
## ON BEHALF OF ARIE AND ORLY

### (Claim for Tortious Interference with Contract Against the Trump Parties)

247.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 246.

57

248.     The Trump Parties, and each of them, tortiously interfered with, among other things, (i) the Stipulation of Settlement between Arie and Dalia, (ii) the 2004 TPR Transfer Documents between Arie and the Orly Trust and TPR, (iii) the 2004 Voting Trust Agreement between Arie and the Sagi Trust, and (iv) the 2004 Voting Trust Agreement between Arie and the Orly Trust.

249.     The Trump Parties, and each of them, intentionally caused such breaches of contract without justification, as a result of the conduct set forth herein.

250.     As a result of the Trump Parties' tortious interference with contract, Arie suffered damages in an amount yet to be determined.

251.     As a result of the Trump Parties' tortious interference with contract, Orly and the Orly Trust suffered damages in an amount yet to be determined.

### NINTH CAUSE OF ACTION ON BEHALF OF ARIE AND ORLY

### (Claim for Aiding and Abetting Tortious Interference with Contract Against Sagi, Fang, and the Sagi Trust)

252.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 251.

253.     Sagi, Fang, and the Sagi Trust each had knowledge of the Trump Parties' tortious interference with the 2004 TPR Transaction Agreement and the Stipulation of Settlement, and each such defendant caused, encouraged and substantially assisted the Trump Parties in the commission of the foregoing acts of tortious interference with 2004 TPR Transaction Agreement and the Stipulation of Settlement.

254.     Sagi, Fang, and TPR each had knowledge of the Trump Parties' tortious interference with the 2004 Voting Trust Agreement, and the Stipulation of Settlement, and each such defendant caused, encouraged and substantially assisted the Trump Parties in the

58

commission of the foregoing acts of tortious interference with the 2004 Voting Trust

Agreements.

255. By reason of the foregoing, Arie has been damaged in an amount to be

determined.

256. By reason of the foregoing, Orly, individually and as the beneficiary of the Orly

Trust has been damaged in an amount to be determined.

### TENTH CAUSE OF ACTION ON BEHALF OF ARIE AND ORLY

**(Claim for Preliminary Injunction Against the Trump Parties, Sagi Genger TPR and the
Sagi Trust Under CPLR 7109)**

257. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 256.

258. The Arie and Orly Trust TRI shares are unique chattel.

259. By virtue of the facts set forth above, Arie is the beneficial owner of the Arie TRI

shares.

260. Sagi is not authorized to take any action on behalf of TPR to sell, transfer, pledge,

dilute, or take any action on behalf of TPR relating to or concerning the 3000 TRI shares that

reverted to TPR, without the prior written consent of Arie and Sagi is not authorized to exercise

any and all rights, including TPR's voting rights with respect to such 3000 TRI shares, except as

so directed by Arie as the beneficial owner of such shares and the voting rights appurtenant

thereto.

261. Sagi is not authorized to take any action on behalf of TPR to sell, transfer, pledge,

dilute, or take any action on behalf of TPR relating to or concerning the Orly Trust TRI shares.

262. By virtue of the facts set forth above, the Orly Trust is entitled to the benefits

provided to it under the Stipulation of Settlement.

263.    The Arie TRI shares, the Orly Trust TRI shares, and the Sagi Trust shares are wrongfully being held by the Trump Parties.

264.    Plaintiffs are entitled to a preliminary injunction, under CPLR 7109, that the Arie TRI shares, the Orly Trust TRI shares, and the Sagi Trust TRI shares shall be restrained and enjoined from transferring, selling, diluting, pledging, assigning or otherwise disposing of or removing such shares from the State until the further order of the Court.

**WHEREFORE**, Plaintiffs demand Judgment in favor of Plaintiffs against the Defendants as follows:

(a) on the **First Cause of Action against all Defendants**: that this Court find and declare that Arie is entitled to an Order from this Court to reform the terms of the Court-Ordered Stipulation of Settlement to provide as follows:

(i)    that the transfer by Arie of his 51% interest in TPR to Dalia and the concurrent transfer of the 3000 shares of TRI stock to Arie, the Orly Trust and the Sagi Trust, respectively, as originally set forth in the Stipulation of Settlement is voided *ab initio* as a result of the Delaware Court finding that the 2004 Transfers are invalid;

(ii)    that all the assets of TPR, other than the 3000 Arie, Orly Trust and Sagi Trust TRI shares, remain the property of TPR or any successor in interest to those assets;

(iii)    that pursuant to a further order of this Court the Court-Ordered Stipulation of Settlement is modified *ab initio* to provide that the 3000 shares of TRI common stock that were returned to TPR as a result of the Delaware Court Action voiding the original 2004 Transfers be placed in a newly formed single purpose entity controlled by Arie (hereinafter, "TPR2");

60

(iv) that Arie be declared the 51% owner of TPR2 which in turn shall be declared, ab initio, the record and beneficial owner of all such 3000 TRI shares, as though no 2004 Transfers were consummated under the original terms of the Stipulation of Settlement;

(v) that the Orly Trust and Sagi Trust each be declared the owner of 24.5% of TPR2 so that together they own the remaining 49% of TPR2;

(vi) that TPR2 shall not sell or transfer the 3000 TRI shares prior to Arie's death, unless such sale would otherwise be permitted and would not violate the terms of the 2001 Stockholders Agreement, including, but not limited to, Article 2 of such Agreement;

(vii) upon Arie's death, 1102.8 of TRI shares, plus any stock dividends relating thereto ("the Sagi Trust TRI shares") will be transferred by TPR2 outright to the Sagi Trust, and 1102.8 of TRI shares, plus any stock dividends relating thereto ("the Orly Trust TRI Shares") will be transferred outright to the Orly Trust;

(viii) all cash dividends relating to the Sagi Trust and the Orly Trust TRI Shares received by TPR2 during Arie's lifetime will be distributed, after payment of taxes and expenses to the Shareholders of TPR2, as if (a) Arie owned 794.40 shares, representing 13.99468% of the common stock of TRI, and (b) the Sagi Trust and the Orly Trust each owned 1102.8 shares, representing 19.42766% of TRI common stock;

(ix) Arie through his 51% control of TPR2 will retain all voting rights to the 3000 TRI shares and any additional TRI shares issued to TPR or TPR2 as stock dividends or otherwise for the duration of his life.

(x) The Trump Group shall deliver to TPR2 the 1102.8 shares of TRI common stock purportedly purchased under the 2008 Stock Purchase Agreement.

61

(xi) The $26,715,416.00 paid by the Trump Group to the Sagi Trust under the 2008 Stock Purchase Agreement will be returned to the Trump Group by TPR and the Sagi Trust.

(xii) The Trump Group shall deliver to TPR2 the 794.40 Arie and the 1102.8 Orly Trust TRI shares purportedly sold to TPR under the Side Letter Agreement and 2010 Transaction.

(xiii) The purported sales by TPR of the Arie and Orly Trust TRI Shares to the Trump Group, while the Delaware Supreme Court appeal was pending, will be declared null and void and the proceeds from these purported sales now held in escrow will be released to the Trump Group.

(xiv) TRI shall record on its books that TPR2 is the record owner of 3000 shares of TRI Common Stock, representing 52.85% of the issued common stock of TRI.

(xv)    TPR2 will consent to the terms of the 2001 Stockholders Agreement.

(xvi) Arie, Orly, Dalia, Sagi, TPR and TRI shall be directed to take all other necessary action and to execute all documents necessary to give full meaning to the intention of the parties to the Court-Ordered Stipulation of Settlement in light of the rulings of the Delaware Court that the 2004 Transfers were invalid.

(xvii) Any other declaration as the Court may deem fair and reasonable to give effect to the Original Intent of the parties to the Stipulation of Settlement.

(b) on the **Second Cause of Action against Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties**, that the Court find and declare that:

62

(i) upon the Delaware Court voiding TPR's 2004 transfer of 52.85% of TRI shares to Arie, the Sagi Trust and the Orly Trust, legal title to such TRI shares reverted to TPR subject to Arie's rights as a constructive beneficial owner of 51% of the shares of TPR with respect to TPR's ownership of 52.85% of TRI shares;

(ii) upon TPR becoming the record owner of Arie's 794.4 shares of TRI stock as a result of the Delaware Court rulings, such shares were immediately held in a constructive trust by TPR for the benefit of Arie as the beneficial owner of those shares;

(iii) upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Orly Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Orly Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Orly Trust's right to receive the Orly Trust TRI Shares upon Arie's death;

(iv) upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Sagi Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Sagi Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Sagi Trust's right to receive the Sagi Trust TRI Shares upon Arie's death;

(v) upon TPR becoming the record owner of all 3000 shares of TRI stock comprising the Orly Trust Shares, the Sagi Shares and the Arie Shares, TPR held the voting rights to such 3000 shares in a constructive trust for the benefit of Arie;

63

(vi) TPR was not authorized to transfer any of the 3000 TRI shares as to which it became the record owner, without the consent of Arie as the beneficial owner of such TRI Shares;

(vii) TPR is not authorized to vote any of the 3000 TRI shares that reverted to TPR as record owner as a result of the Delaware Court rulings, except at the direction of Arie;

(viii) The Constructive Trust in favor of Arie imposed upon Arie, the Orly Trust and the Sagi Trust TRI shares existed at the moment record ownership reverted to TPR, and attaches to any purported sale of these shares to the Trump Group, who were not and are not bona fide purchasers of any of the 3000 TRI shares that reverted to TPR.

(c) on the **Third Cause of Action against Defendants Sagi, TPR, the Sagi Trust, Fang, the Trump Parties and TRI, jointly and severally,** as follows:·

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys fees and costs incurred in connection with this action;

(ii) awarding compensatory damages to the Plaintiff Orly Genger individually and as the beneficiary of the Orly Trust in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys fees and costs incurred in connection with this action;

(d) on the **Fourth Cause of Action against Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang, and the Trump Parties**:

(i) rescinding Plaintiff Arie's transfer of his 51% interest in TPR to Dalia pursuant to the Stipulation of Settlement and 2004 Transaction Documents;

64

(ii) rescinding the 2004 Transaction Documents;

(iii) Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties must account to Arie and Orly, individually and as the beneficiary of the Orly Trust, for 3000 TRI Shares and/or their respective value that are now or ever have been in their respective possession, custody or control; and

(iv) such other equitable relief as the Court may deem fair and reasonable;

(e) on the **Fifth Cause of Action against Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties**, permanently enjoining and restraining these Defendants, and each of them, from directly or indirectly transferring, selling, acquiring, pledging, assigning, diluting, voting, valuing, replacing, conveying, using, removing from the jurisdiction, or otherwise disposing of, or encumbering the 3000 shares of TRI common stock that reverted to TPR as a result of the Delaware court rulings.

(f) on the **Sixth Cause of Action against Defendant TPR**:

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action; and

(ii) awarding compensatory damages to the Plaintiff Orly individually and as the beneficiary of the Orly Trust in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action.

(g) on the **Seventh Cause of Action against Defendant Sagi Trust**, a money judgment awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus Plainitiff's attorneys' fees and costs incurred in connection with this action;

65

(h) on the **Eighth Cause of Action Against the Defendant Trump Parties, jointly and severally**:

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(ii) awarding compensatory damages to the Plaintiff Orly individually and as the beneficiary of the Orly Trust in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(i) on the **Ninth Cause of Action Against Sagi, Fang, and the Sagi Trust**:

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(ii) awarding compensatory damages to the Plaintiff Orly, individually and as the beneficiary of the Orly Trust, in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(j) on the **Tenth Cause of Action for a Preliminary Injunction Against the Trump Parties, Sagi Genger, TPR and the Sagi Trust Under CPLR 7109**, and each of them for an injunction or temporary restraining order under CPLR 7109, restraining and enjoining each of them from transferring, selling, diluting, pledging, assigning or otherwise disposing of or

removing the Arie TRI Shares, the Orly Trust TRI shares, and the Sagi Trust TRI shares from the State until the further Order of the Court.

    (k)    **On all causes of action set forth in this Complaint,** such other relief as this court may deem just, together with the costs and disbursements incurred by plaintiffs in this action, including the recovery of plaintiffs' reasonable attorneys' fees.

DATED: New York, New York
September 20, 2011

MITCHELL SILBERBERG & KNUPP LLP

By: _____

Paul D. Montclare (PM 4454)
Lauren J. Wachtler (LW 4205)
12 E. 49th Street, 30th Floor
New York, New York 10017
(212) 509-3900

Attorneys for Plaintiff ARIE GENGER

ZEICHNER ELLMAN & KRAUSE LLP

By: _____

Yoav M. Griver
Bryan D. Leinbach
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 223-0400
Facsimile: (212) 753-0396

Attorneys for Plaintiff ORLY GENGER, in
her individual capacity and on behalf of the
ORLY GENGER 1993 Trust

68

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------------------------x

In the Matter of the Application of ORLY      :    File No.: 0017/2008
GENGER, as a person interested, for the removal   :
of DALIA GENGER as Trustee of the Orly      :    **AFFIRMATION OF SERVICE OF**
Genger 1993 Trust pursuant to SCPA § 711(11)   :    **MARY C. PENNISI**

----------------------------------------------------------------x

      I, MARY C. PENNISI, an attorney duly admitted to practice law before the Courts of the State of

New York, hereby affirms pursuant to CPLR § 2106, as follows:

      1.      I am a member of the New York State Bar and associated with the firm of Morgan, Lewis &

Bockius LLP;

      2.      I hereby affirm that I am not a party to this action, I am over 18 years of age, I am an attorney

duly admitted to the Courts of the State of New York, and that on July 7, 2015, I caused to be served a true

and correct copy of the attached motion papers, on the following counsel of record via OVERNIGHT

DELIVERY, postage pre-paid:

Robert A. Meister                        Yoav Griver
Pedowitz & Meister LLP             Zeichner Elliman & Krause LLP
570 Lexington Avenue – 18th Floor      1211 Avenue of the Americas, 40th Floor
New York, NY 10022                 New York, New York 10036
212.403.7330                         212.223.0400
*Attorneys for Dalia Genger,*          *Attorneys for Orly Genger*
*as Trustee of the Orly Genger 1993 Trust*

Steven Riker, Esq.
Law Office of Steven Riker
110 E. 59th Street, 23rd Floor
New York, New York 10022
212.661.6410
*Guardian At Litem*

      I also served a second supplemental notice of motion by first class mail on July 8, 2015.

Dated:   New York, New York             _(signature)_
        July 8, 2015                     MARY C. PENNISI

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

======================================

File No.: 0017/2008

In the Matter of the Application of ORLY
GENGER, as a person interested, for the removal
of DALIA GENGER as Trustee of the Orly
Genger 1993 Trust pursuant to SCPA § 711(11)

======================================

### MOTION TO DISMISS
### THIRD AMENDED VERIFIED PETITION
### OF ORLY GENGER

======================================

MORGAN, LEWIS & BOCKIUS LLP

ATTORNEYS FOR
THE SAGI GENGER 1993 TRUST

OFFICE & POST OFFICE ADDRESS
101 PARK AVENUE
NEW YORK, NY 10178-0060
212-309-6000

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------x

| | |
|---|---|
| In the Matter of the Application of ORLY GENGER, as a person interested, for the removal of DALIA GENGER as Trustee of the Orly Genger 1993 Trust pursuant to SCPA § 711(11) | File No.: 0017/2008<br><br>**SECOND SUPPLEMENTAL NOTICE OF MOTION TO DISMISS THIRD VERIFIED AMENDED PETITION OF ORLY GENGER** |

---------------------------------------------------------------x

PLEASE TAKE NOTICE that upon the annexed verified affirmation of John Dellaportas, the Supplemental Citation to Show Cause issued by the Honorable Nora S. Anderson on May 6, 2015, and all prior proceedings had herein, the Sagi Genger 1993 Trust ("the Sagi Trust"), which is the contingent remainderman beneficiary of the Orly Genger 1993 Trust, by its attorneys, Morgan, Lewis & Bockius LLP, will move this Court sitting, at 31 Chambers Street, New York City, in the courtroom of the Honorable Nora S. Anderson in Room 509, at 10:00 a.m., September 4, 2015, or as soon as counsel can be heard, for an Order dismissing the Third Amended Verified Petition for Removal of Dalia Genger as Trustee filed by Orly Genger on October 15, 2012.

Pursuant to CPLR 2214(b), any answering papers must be served so as to be received no later than seven days before the return date.

Dated:     New York, New York          Respectfully submitted,
           July 8, 2015

                                        MORGAN, LEWIS & BOCKIUS LLP

                                        By:  _____
                                             John Dellaportas
                                             101 Park Avenue
                                             New York, New York 10178
                                             (212) 309-6690
                                             *Attorneys for the Sagi Genger 1993 Trust*

TO:

Robert A. Meister
Pedowitz & Meister LLP
570 Lexington Avenue – 18th Floor
New York, NY 10022
212.403.7330
*Attorneys for Dalia Genger,*
*as Trustee of the Orly Genger 1993 Trust*

Yoav Griver
Zeichner Elliman & Krause LLP
1211 Avenue of the Americas, 40th Floor
New York, New York 10036
212.223.0400
*Attorneys for Orly Genger*

Steven Riker, Esq.
Law Office of Steven Riker
110 E. 59th Street, 23rd Floor
New York, New York 10022
212.661.6410

*Guardian At Litem*

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------x
:    File No.: 0017/2008
:
In the Matter of the Application of ORLY       :    **VERIFIED AFFIRMATION**
GENGER, as a person interested, for the removal :    **OF JOHN DELLAPORTAS**
of DALIA GENGER as Trustee of the Orly         :    **IN SUPPORT OF MOTION TO**
Genger 1993 Trust pursuant to SCPA § 711(11)   :    **DISMISS THIRD AMENDED**
:    **VERIFIED PETITION OF**
:    **ORLY GENGER**
------------------------------------------------------------------x

JOHN DELLAPORTAS, an attorney duly admitted to practice law before the Courts of

the State of New York, hereby affirms pursuant to CPLR § 2106, as follows:

1.      I am admitted to the Bar of the State of New York and a member of the law firm

of Morgan, Lewis & Bockius LLP, which represents the Sagi Genger 1993 Trust (the "Sagi

Trust"), the contingent remainderman beneficiary of the Orly Genger 1993 Trust (the "Orly

Trust"), in the above-referenced action.  Pursuant to the Supplemental Citation to Show Cause

issued by the Honorable Nora S. Anderson on May 6, 2015 (the "Citation"), I respectfully submit

this verified affirmation in support of the Sagi Trust's motion for an Order dismissing the Third

Amended Verified Petition for Removal of Dalia Genger (the "Trustee") as Trustee of petitioner

Orly Genger ("Orly") dated October 15, 2012 (the "Petition"). (A copy of the Citation is annexed

as Exhibit A.  A copy of the Petition is annexed as Exhibit B.)

2.      As set forth below, the Petition should be dismissed on three separate grounds.

First, it is premised upon a false statement, made by Orly under penalty of perjury, concerning

her proposed successor trustee.  Second, Orly is exploiting this proceeding, and the pendency of

her petition, to delay a determination on the Trustee's application for the return of $32.3 million

that Orly monetized and retained from claims she brought on behalf of the Orly Trust.  Third,

Orly's Petition fails to state a valid claim for the removal of the Trustee.

**Dismissal Basis #1:**
**Orly's Fraud on the Court**

3.  In her Petition, Orly demands that the current Trustee, Dalia Genger, be replaced with Joel Isaacson, an accountant at the firm of Joel Isaacson & Co. LLC. Orly suggests that Mr. Isaacson would be suitable successor trustee because, most significantly, "**Mr. Isaacson is not acquainted with any members of the Genger family ....**" Exh. B, p. 31 ¶ 96. At the end of her Petition, Orly verifies under penalty of perjury that she has "read the annexed Third Amended Verified Petition, knows the contents thereof and the same are true to [her] knowledge, except those matters thereon which are stated to be alleged upon information and belief, and as to those matters [she] believe[s] them to be true." Exh. B, p. 32. ¶ 2.

4.  There is one problem with this statement. It is not true, and Orly knows it is not true. At a recent trial in another, unrelated matter in New York State Supreme Court, Orly took the stand and proceeded to admit on the stand that Mr. Isaacson was actually Orly's personal accountant whom she had retained for various matters, including a meeting with her brother and her mother. (A relevant excerpt of Orly's March 23, 2015 trial testimony is annexed hereto as Exhibit C.) In other words, Mr. Isaacson is not some sort of neutral independent nominee. He is a persona who is very well acquainted with the Gengers.

5.  It is difficult to believe Orly simply innocently *forgot* that Mr. Isaacson was her personal accountant. In her trial testimony, which was just a few months ago, Orly provided some 55 pages of highly detailed recollections about her interactions with Mr. Isaacson and their meeting with her family members. Nor can this merely be written off as some sort of attorney's error. The law firm representing Orly in this case also represented Orly in the case at which she gave the aforementioned trial testimony. Rather, the Sagi Trust believes that this was a willful attempt to mislead the Court as to her proposed successor trustee.

6.      Given that Orly's false statement was made under oath, and relates to a central

aspect of this case, this is particularly serious matter.  In *CDR Creances S.A.S. v. Cohen*, 23

N.Y.3d 307, 321 (2014), the Court of Appeals reinforced that the courts of this state should not

be exploited and misused as Orly has done here.  "[W]hen a party lies to the court and [its]

adversary intentionally, repeatedly, and about issues central to the truth-finding process, it can

fairly be said that [the party] has forfeited [the] right to have [the] claim decided on the merits."

(Citation omitted.)  That is because fraud on the court "strikes a discordant chord and threatens

the integrity of the legal system as a whole, constituting 'a wrong against the institutions set up

to protect and safeguard the public.'" *Id.* at 318 (quoting *Hazel-Atlas Glass Co. v. Hartford-

Empite*, 322 U.S. 238, 246 (1944)).  "Fraud on the court warrants heavy sanctions, including the

striking of an offending party's pleadings and dismissal of the action." *Id.* at 319.

7.      When Orly swore to this Court that her proposed successor trustee Mr. Isaacson

"is not acquainted with any members of the Genger family" that was plainly false, and there is no

reason to believe she thought it to be true.   That Mr. Isaacson was actually her personal

accountant, and well acquainted with the Gengers, were important facts about which she should

have told the Court.  Her failure to do so warrants dismissal of her Petition.

## Dismissal Basis #2:
## Orly's Misuse of Trust Assets

8.      In 2010, Orly and her father Arie filed a Third Amended and Supplemental

Complaint (the "Complaint") in a Supreme Court action entitled *Arie Genger et al. v. Sagi

Genger et al.,* Index No. 651089/2010.  In her Complaint, Orly asserted claims against, *inter

alia,* a group of defendants collectively known as the "Trump Parties."  As stated in paragraph 2

of her pleading, Orly Genger "brings this action on behalf of the Orly Trust as the beneficiary of

the Orly Trust to protect her interests thereunder."  In the section of the Complaint entitled

"NATURE OF THE CASE" in her Complaint, Orly made clear her claims against the Trump Parties were based on her accusation that they **misappropriated from the Orly Trust** "the Orly Trust's interest in a portion of [its] TRI stock," that being the Trust's main asset. (A copy of the Complaint is annexed hereto as Exhibit J.)

9.      Thereafter, Orly moved to restrain the Trustee from seeking a declaratory judgment in Delaware Chancery Court that the Orly Trust was the beneficial owner of the TRI shares. In an affidavit in support of that motion, Orly urged the Court to enjoin Dalia because the Delaware declaratory judgment action was "duplicative" of this action. According to Orly: "In the instant action …, I seek, among other things, the return of those TRI Shares to the Orly Trust." In further support of her motion, Orly submitted a brief advocating the Court's authority to enjoin "duplicative" suits. According to Orly, "Dalia's contention that the Orly Trust is not a party to this action … is meritless. Orly is prosecuting this action on behalf of the Orly Trust." Over the Sagi Trust's objection, this Court adopted Orly's position and granted her motion to enjoin the Trustee from prosecuting the Delaware action.

10.      In June 2013, Orly settled her claims on behalf of the Orly Trust, pursuant to a settlement agreement (the "Settlement Agreement") which she refused to produce to either the Sagi Trust or the Trustee, *claiming confidentiality*. More significantly, Orly did not turn over a single dollar of the proceeds from the settlement to the Orly Trust. Indeed, Orly refused even to identify for how much she settled the case. We now know it to be $32.3 million.

11.      Under New York law, when a derivative plaintiff such as Orly brings derivative claims on behalf of a direct plaintiff like the Orly Trust, she is required to turn over any settlement proceeds to the Trust. In *Steinberg v. Steinberg*, 106 Misc. 2d 720, 722 (Sup. Ct. N.Y. Cnty. 1980), for example, the derivative plaintiff merely offered to discontinue her derivative claims "on the condition that she be paid a premium of approximately one million dollars above

-4-

market value for her outstanding shares." Even that mere offer was too much for the Court, which flatly condemned such conduct, explaining that it "evinces a possibility, and indeed, a likelihood, that the instant action would be discontinued with prejudice before its conclusion" as well as "a strong financial inducement for her to settle on terms advantageous to her as an individual, rather than as a fiduciary...." *Id.* Yet here, Orly did not merely *offer* to cash in on the Orly Trust's claims; she actually *cashed* in, and turned over nothing to the Trust.

12.     Late last year, the Settlement Agreement was ordered to be produced – without confidentiality restriction – in another proceeding, *Sagi Genger v. Orly Genger,* 14-cv-5683 (KBF). After reviewing the document, the federal court described it as follows: **"Orly [has] monetized her beneficial interest in the Orly Trust shares for $32.3 million ...."** (A copy of the Settlement Agreement is annexed hereto as Exhibit D. A copy of the federal court decision concerning that Agreement is annexed hereto as Exhibit E.)

13.     Specifically, on page 2, the Settlement Agreement sets forth as its purpose "to resolve all issues, disputes and disagreements between [Orly and the other Settling Parties], including but not limited to the issue of ownership of all [TRI] shares." Consistent with this purpose, Orly signed the Agreement both "in her individual capacity and in her capacity as beneficiary of the Orly Genger 1993 Trust" (*id.* at 1, emphasis added) – the latter being the very capacity by which this Court permitted Orly to assert derivative claims.

14.     In Section 6(a) of the Settlement Agreement, Orly expressly agreed to release her claims against the Trump Parties "in all capacities" (*i.e.*, including her derivative capacity). (*Id.* at 10.) In Section 8(a), in turn, Orly agreed to cooperate with the Trump Parties *against* the Orly Trust by, *inter alia*, "caus[ing] the Orly Genger 1993 Trust to release any and all claims against the Trump Group Released Parties ...." (*Id.* at 16.)

15.     In exchange for the extinguishment of the Orly Trust's claim to the TRI shares,

the Trump Parties agreed, in Sections 2 and 3, to pay Orly, Arie and the Brosers $32.3 million. Orly, in turn, agreed to indemnify the Trump Parties for TPR's and the Sagi Trust's claims, and "covenants that for so long as the indemnity … remains in effect, … she … shall not contribute or deposit any amounts, or permit to be contributed or deposited any amounts (including, without limitation, any payments made under Paragraphs 2 and 3), to or with the Orly [] Trust …." (*Id.* at 17.) In other words, the Trust gets nothing.

16.    Of particular significance to this motion, under Section 8(b) of the Settlement Agreement, Orly agreed that, "as a condition to any agreement by the AG Group to a replacement trustee for the Orly Genger 1993 Trust, [Orly *et al.*] shall use [their] best efforts to cause such trustee to agree in writing on behalf of the Orly Genger 1993 Trust that it shall be a member of the AG Group for purposes of providing the indemnity contained in Paragraph 5."

17.    In other words, although the Orly Trust is contractually barred from receiving even one red cent of the $32.3 million in settlement payments received in consideration for the extinguishment of the Trust's claims against the Trump Parties, Orly agreed to cause the new trustee she wishes to install in place of Dalia (*i.e.*, Mr. Isaacson) to cause the Orly Trust to indemnify the Trump Parties for potentially significant liabilities.

18.    Notably, Orly continued to try to conceal the Settlement Agreement from the Sagi Trust (and the Trustee) even after Your Honor ruled in this case, on July 24, 2014, that this Court could not consider the Petition because "Orly failed to join the Sagi Trust as contingent remainder beneficiary and to serve it with the third amended petition." (A copy of the Court's July 24, 2014 Decision and Order is annexed hereto as Exhibit I.) The Sagi Trust submits that Orly has demonstrated her lack of fitness to weigh in on the Trustee.

19.    In the 2010 Action, the Trustee has brought a motion to recover, for the Orly Trust, the $32.3 million in Trust assets which Orly misappropriated for her own benefit and that

-6-

TO:

Robert A. Meister
Pedowitz & Meister LLP
570 Lexington Avenue – 18th Floor
New York, NY 10022
212.403.7330
*Attorneys for Dalia Genger,*
*as Trustee of the Orly Genger 1993 Trust*

Yoav Griver
Zeichner Elliman & Krause LLP
1211 Avenue of the Americas, 40th Floor
New York, New York 10036
212.223.0400
*Attorneys for Orly Genger*

Steven Riker, Esq.
Law Office of Steven Riker
110 E. 59th Street, 23rd Floor
New York, New York 10022
212.661.6410

*Guardian At Litem*

of her father and the hedge fund investors who fund his lawsuits, Arnold and David Broser. (A copy of the Trustee's motion papers, without exhibits, is attached as Exhibit F.) Orly opposed the motion on the ground, *inter alia*, that she was seeking to remove the Trustee in this action, and therefore the Trustee should not be permitted to pursue the motion. Unfortunately, the Supreme Court accepted this position, and by Interim Order dated May 7, 2015, held the Trustee's motion in abeyance pending this Court's resolution of the Petition. (A copy of the Supreme Court's Interim Order is annexed hereto as Exhibit G.)

20.    In the meantime, there is no judicial restraint upon the use of the Orly Trust's settlement proceeds, which are in danger of being dissipated. Accordingly, the Sagi Trust beseeches Your Honor to promptly dismiss the Petition, so that Dalia's motion to recover these assets for the Orly Trust may proceed without further delay.

### Dismissal Basis #3:
### Orly's Failure to State a Claim

21.    Lastly, the Sagi Trust has reviewed the Motion to Dismiss Third Amended Petition filed by the Trustee on December 5, 2012, and shares its position. In order to spare the Court duplicative submissions, the Sagi Trust hereby adopts the arguments set forth in the Trustee's motion with respect to Orly's failure to state a valid claim for the removal of Dalia Genger as trustee of the Orly Trust. (A copy of those motion papers is annexed hereto as Exhibit H, and is incorporated by reference as if fully set forth herein.)

### CONCLUSION

22.    Accordingly, the Petition should be dismissed with prejudice.

Dated: New York, New York
       July 7, 2015

JOHN DELLAPORTAS

## VERIFICATION

STATE OF NEW YORK        )
                             )
COUNTY OF NEW YORK    )

      I, John Dellaportas, state that I am an attorney for the Sagi Genger 1993 Trust (the "Sagi Trust") in this action. I have read my attached affirmation in support of the Sagi Trust's motion for an Order dismissing the Third Amended Verified Petition for Removal of Dalia Genger as Trustee filed by Orly Genger on October 15, 2012, and all the contents thereof are true to the best of my knowledge, except as to matters therein stated to be alleged on information and belief, and that, as to those matters, I believe them to be true. Pursuant to CPLR 3020(d)(3), I am making this verification on behalf of the Sagi Trust because the trustee of the Sagi Genger 1993 Trust is a foreign non-domiciliary residing abroad.

Dated: New York, New York
       July 7, 2015

                                               _____
                                             JOHN DELLAPORTAS

Sworn to before me this
7th day of July, 2015

Notary Public

         MARY C. PENNISI
      Notary Public, State of New York
          No. 02PE6266530
        Qualified in Kings County
    Commission Expires on 08/06/2016

# Exhibit A



**SUPPLEMENTAL CITATION**

SURROGATE'S COURT, NEW YORK COUNTY

THE PEOPLE OF THE STATE OF NEW YORK

File No. 2008-0017 /B

TO:   Assaf Sternberg, as Trustee of the Sagi Genger 1993 Trust

A petition having been duly filed by Orly Genger, domiciled at 780 Greenwich Street, Apt. 4P, New York, New York 10014.

YOU ARE HEREBY CITED TO SHOW CAUSE before the Surrogate's Court, New York County, at 31 Chambers Street, New York, New York 10007, Room 509 on _JULY 8_____, 2015, at 10:00 o'clock in the forenoon of that day, why a decree should not be issued (i) removing Dalia Genger as trustee of the Orly Genger 1993 Trust created under agreement dated December 13, 1993; (ii) suspending Dalia Genger as trustee pending determination of her fitness to serve; (iii) appointing Joel Isaacson as successor trustee of the Orly Genger 1993 Trust; and (iv) awarding to Petitioner such other and further relief as the Court deems equitable and proper.

IN TESTIMONY WHEREOF, we have cause the seal of the Surrogate's Court of our said County of New York to be hereunto affixed.

Dated, Attested and Sealed,  _May 6, 2015_
(L.S.)


HON.   _NORA S. ANDERSON_____
Surrogate, New York County


_Diana Sanabria_
Chief Clerk

**Attorneys for Petitioner:**

**ZEICHNER ELLMAN & KRAUSE LLP**
1211 Avenue of the Americas
New York, NY  10036
(212) 223-0400
   Attn:  Yoav M. Griver, Esq.
      Bryan D. Leinbach, Esq.


**This citation is served upon you as required by law.   You are not obliged to appear in person.   If you fail to appear, it will be assumed that you consent to the proceedings, unless you file written verified objections thereto.   You have a right to have an attorney-at-law appear for you.**

Proof of Service shall be filed with the Clerk of the Court at least ten (10) days before the return date.

# Exhibit B

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

In the Matter of the Application of ORLY
GENGER, as a person interested, for the
removal of DALIA GENGER, as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA § 711(11)

File No. 0017/2008

---

## THIRD AMENDED VERIFIED PETITION FOR REMOVAL
## OF DALIA GENGER AS TRUSTEE

TO THE SURROGATE'S COURT, STATE OF NEW YORK
COUNTY OF NEW YORK

Petitioner, Orly Genger ("Petitioner" or "Orly"), by her attorneys, Platzer, Swergold,

Karlin, Levine, Goldberg & Jaslow, LLP, respectfully alleges as her Third Amended Verified

Petition (the "Third Amended Petition") for Removal of Dalia Genger as Trustee as follows:

1.     Orly, domiciled at 780 Greenwich Street, Apartment #4P, New York, New

York 10014, is the current and sole beneficiary of the Orly Genger 1993 Trust dated December

13, 1993 (the "Orly Trust"). Annexed hereto as **Exhibit "A"** is a copy of the Orly Trust.

2.     Dalia Genger ("Dalia" or "Respondent"), residing at 200 East 65th Street,

Apartment #32W, New York, New York 10021 is Orly's mother and is the current sole Trustee

of the Orly Trust. Dalia was appointed successor Trustee in January, 2008.

3.     The Orly Trust provides for discretionary payments of income and principal

to Petitioner during her lifetime with the remainder to be distributed to her descendants, per

stirpes. If Petitioner dies leaving no descendants, the remainder of the trust property is to be

distributed to the Sagi Genger 1993 Trust (the "Sagi Trust"). Sagi Genger ("Sagi") is Orly's

brother.

4.    For the reasons set forth herein, Petitioner respectfully requests that this Court enter an order:

(a)    Pursuant to Surrogate Court's Procedure Act ("SCPA") § 711(2)(3)(7) and/or (8) providing for the immediate removal of Dalia as Trustee of the Orly Trust as a result of her: (i) numerous and continuous breaches of her fiduciary duties to the Orly Trust and Petitioner as its sole beneficiary; (ii) waste and dissipation of the Orly Trust's assets; (iii) repeated and willful engagement in an ongoing fraudulent scheme with Sagi to loot, encumber, pledge and transfer the assets of the Orly Trust; (iv) deliberate and willful violation and contempt of the prior Order of this Court dated July 1, 2009 (the "July 2009 Order") (as well as her deliberate and willful violation and contempt of prior restraining Orders imposed upon her by other New York Courts in related proceedings) as set forth herein; and, (v) imprudent management and injury to the assets of the Orly Trust committed to her charge, all as set forth in this Third Amended Petition;

(b)    Suspending the Letters of Appointment heretofore issued to Dalia;

(c)    Appointing Joel Isaacson as successor trustee; and,

(d)    Granting such other and further relief as this Court deems to be just equitable and proper.

## PRELIMINARY STATEMENT

5.    Petitioner is the sole beneficiary of the Orly Trust. Dalia is Petitioner's mother and is the sole Trustee of the Orly Trust. Petitioner is filing this Third Amended Petition as a result of Dalia's egregious, willful, malicious, deliberate and surreptitious scheme to pledge, encumber, transfer and dissipate all of the assets of the Orly Trust in violation of her fiduciary duties as Trustee and in violation of the July 2009 Order.

6.    As will be set forth further below in this Third Amended Petition, Dalia

-2-

and Sagi have continuously engaged in a secretive and machiavellian scheme to loot, encumber, pledge, waste, dissipate and transfer the assets of the Orly Trust for personal gain and/or as punishment of Orly for her maintaining her relationship with her father, Arie Genger ("Arie"), during and after acrimonious divorce proceedings between Arie and Dalia.

7.    In addition to this scheme being an egregious breach of Dalia's fiduciary duties to the Orly Trust, Dalia's actions in this regard also constitute a blatant and willful disobedience of the July 2009 Order by pledging and encumbering the assets of the Orly Trust and completely dissipating their value without any prior notice to Petitioner as required under the July 2009 Order, all in breach of Dalia's fiduciary obligations.

8.    Most recently, the Petitioner discovered that Dalia and Sagi entered into various secretive agreements (as will be set forth in this Third Amended Petition) to loot, dissipate, pledge, encumber and transfer the assets of the Orly Trust by agreeing to allow the potential foreclosure against valuable assets of the Orly Trust by Manhattan Safety Company ("MSCo"), a recently created entity in St. Kitts, which upon information and belief is controlled by a professional gambler. All of these recent secret agreements were entered into by Dalia and Sagi without prior notice to Petitioner as required under the July 2009 Order.

9.    As further set forth below, Dalia and Sagi's secretive scheme to loot, pledge, encumber and transfer the assets of the Orly Trust is so brazen in its nature, constitutes such an egregious breach of Dalia's fiduciary duties as Trustee and Dalia's contempt of the July 2009 Order is so clear, that her immediate removal as Trustee of the Orly Trust is both warranted and necessary in order to prevent any further irreparable harm from occurring to the assets of the Orly Trust and Petitioner, as its sole beneficiary.

10.    Dalia's immediate removal as Trustee is necessary because it is clear that

-3-

the prior Orders and warnings of this Court (and as will be shown in this Third Amended Petition, the prior Orders of other courts as well) mean absolutely nothing to her and Sagi. Thus, as long as Dalia is Trustee, any assets of the Orly Trust will remain vulnerable and subject to immediate irreparable harm as a result of her ongoing scheme with Sagi.

11.     Dalia's ongoing conspiracy and scheme with Sagi in this regard is akin to Dalia "thumbing her nose" at this Court and Petitioner, as sole beneficiary of the Orly Trust.

12.     A summary of the timeline of critical factual and procedural events surrounding this matter as well as the events which precipitated the filing of this Third Amended Petition appears immediately below and will provide the Court with the proper context in which to appreciate the severity of Dalia's misconduct. As set forth below, the lengthy summarization of the factual history is necessary in order to show that Dalia's actions cannot be viewed in a "vacuum" and constitute a pattern of ongoing conduct for approximately the past four (4) years which is specifically intended to harm Petitioner and the Orly Trust.

## THE FORMATION OF D & K LP AND THE FORMATION AND INITIAL FUNDING OF THE ORLY TRUST FOR PETITIONER'S BENEFIT, AS SOLE BENEFICIARY

13.     Dalia and Arie were married in 1967 and their marriage subsequently ended in divorce in 2004.

14.     Prior to 1993, Dalia and Arie formed D & K LP ("D & K") a family owned limited partnership, whose name was shorthand for "Dalia and Kids". At the time of its formation, Dalia was the general partner and held a 4% interest. Petitioner and her brother, Sagi, were the limited partners who each held a 48% interest.

15.     In December, 1993, Dalia and Arie established identical irrevocable inter vivos trusts for the benefit of Petitioner and Sagi, the Orly Trust and the Sagi Trust (jointly, the Orly Trust and the Sagi Trust shall be referred to hereinafter as the "Trusts"). For estate-

-4-

planning purposes, Dalia and Arie funded each trust with a $600,000 gift. <u>The intent behind the</u> <u>Trusts was to ensure that both Petitioner and her brother received property of equal value.</u> Sash A. Spencer and Lawrence M. Small were named Co-Trustees of both Trusts and remained Co-Trustees until Petitioner's parents' divorce in 2004. After the Trusts were funded, Sagi and Petitioner each assigned their 48% interests in D & K to their respective Trusts.

<u>THE CREATION OF THE D & K NOTE</u>

16.    At the same time in December 1993, D & K purchased 240 shares of common stock (constituting 49% of the outstanding shares) of TPR Investment Associates, Inc. ("TPR"), a closely held family corporation for the sum of $10,200,000. The shares were purchased with $600,000 from each of the Orly Trust and the Sagi Trust and $50,000 from Dalia, totaling $1,250,000. The balance was satisfied with a recourse $8,950,000 Promissory Note (the "D & K Note"). Annexed hereto as **Exhibit "B"** is a copy of the D & K Note.

17.    As set forth further below in this Third Amended Petition, there was never any intention by Arie, Dalia, Sagi and Orly for TPR to collect upon the D & K Note.

18.    Pursuant to the D & K Note, principal, together with accrued interest, was to be repaid by D & K in annual installments over ten years. The D & K Note was secured by a pledge of the 240 TPR shares owned by D & K. (See **Exhibit "B"- Pledge Agreement**) Each of the Trusts and Dalia assumed liability on the D & K Note in proportion to its/her direct interest in D & K. Accordingly, each of the Trusts, assumed a 48% liability on the D & K Note and acquired a 23.52% indirect interest in TPR. Dalia assumed a 4% liability on the D & K Note and acquired a 1.96% indirect interest in TPR.

19.    At the time of the above-described transaction, Arie owned the remaining 51% of TPR, which held investments in various securities including common stock in Trans-Resources, Inc ("TRI"), as well as its interest in the D & K Note. TRI was a successful and

valuable company which was engaged in the business of manufacturing specialty chemical products for agricultural and industrial end uses.

20.    Payments were made on the D & K Note out of dividends paid by TRI until 1999. Thereafter, when TRI stopped paying dividends, D & K stopped making payments under the D & K Note with the consent of the interested parties.

21.    As of March 20, 2001, TPR held a 52.85% interest in TRI. The remaining minority interest in TRI (47.15%) was owned by various entities controlled directly and indirectly by Jules and Eddie Trump (the "Trump Group").

## ARIE AND DALIA'S DIVORCE IN 2004 AND ITS EFFECT ON THE TRUSTS' ASSETS

22.    On October 26, 2004, Dalia and Arie entered into a Stipulation and Agreement of Settlement as a final settlement of their divorce (the "Settlement Agreement"). Pursuant to the Settlement Agreement, Dalia received, *inter alia,* Arie's 51% interest in TPR and retained her 4% interest in D & K. TPR's 52.85% interest in TRI was transferred to Arie and the Trusts as follows: (i) 13.99% to Arie, (ii) 19.43% to the Orly Trust (the "Orly Trust TRI Shares") and (iii) 19.43% to the Sagi Trust. The Orly Trust and the Sagi Trust each granted Arie an irrevocable lifetime voting proxy over their TRI shares (annexed hereto as **Exhibit "C"**). Therefore, after October 29, 2004, Arie and the Trusts held a controlling interest in TRI and TPR no longer owned any TRI common stock.

## DALIA CEDES CONTROL OF D & K AND TPR TO SAGI AND THE FORMATION OF D & K GP LLC

23.    In connection with the divorce settlement, Dalia took measures to cede management of D & K to Sagi. On October 21, 2004, days before signing the Settlement Agreement, Dalia and Sagi formed D & K GP LLC ("D & K GP"). Dalia exchanged her 4% interest in D & K and $1.00 for a 99% membership interest in D & K GP. Sagi purchased a 1%

-6-

membership interest in D & K GP for $1.00. Pursuant to D & K GP's Limited Liability Agreement (annexed hereto as **Exhibit "D"**), Sagi was given the power to select a manager of D & K GP whose function would be to control D & K's assets. Sagi selected himself to act as manager; thus, Dalia effectively handed Sagi the authority to control D & K and its assets. Also, by forming D & K GP, Dalia and Sagi shielded themselves from any personal liability stemming from D & K, including any personal liability related to the D & K Note. This left the Trusts solely liable for any obligations due under the D & K Note.

24.    On October 30, 2004, Dalia entered into a shareholder's agreement with TPR that provided for the management of TPR. Specifically, pursuant to the TPR shareholder's agreement (annexed hereto as **Exhibit "E"**), D & K, which owned 49% of TPR, was given authority to appoint one board member to the TPR board. Sagi, as the managing partner of D & K appointed himself as a board member of TPR. As the majority owner of TPR, Dalia was named as the other board member. In addition, the shareholder agreement appointed Sagi as Chief Executive Officer ("CEO") of TPR. Accordingly, Dalia essentially ceded control of TPR to Sagi, just as she had done with D & K.

25.    For the Court's convenience, below is a summary of Arie, Dalia, and the Trusts' interests in TPR both before and after the divorce and Settlement Agreement:

-7-

| Person | TPR Interest Before | TPR Interest After |
|---|---|---|
| Arie Genger | 51.00% | 0% |
| Dalia Genger | 1.96% | 52.96%[1] |
| Orly Trust (indirectly through D & K) | 23.52% | 23.52% |
| Sagi Trust (indirectly through D & K) | 23.52% | 23.52% |
| Total | 100% | 100% |

26.    In connection with the Settlement Agreement, Dalia required that the Trustees of the Orly Trust and the Sagi Trust (Messrs. Sash and Small) resign and be replaced with friends of Sagi. Numerous successor trustees were appointed to the Orly Trust and the Sagi Trust, all of whom were affiliated with Sagi in one way or another and were controlled by him. David Parnes and Eric Gribetz (Sagi's longtime friends) and Leah Fang (Sagi's sister-in-law) were appointed as successor trustees to the Orly Trust, and Messrs. Parnes and Gribetz, Rochelle Fang (Sagi's mother-in-law), and Mr. Parnes again, were appointed successor trustees of the Sagi Trust.

## THE SHAM ASSIGNMENT AND SALE OF THE D & K NOTE

27.    On or about October 31, 2004, the TPR Board (consisting of Dalia and Sagi) passed a resolution to sell the D & K Note. Sagi was charged with the responsibility of selling the D & K Note to a "third party".

28.    In December, 2005, Sagi filed amended 2002 and 2003 tax returns for

---

[1] Dalia held a 1.96% indirect interest in TPR prior to the divorce as a result of her 4% interest in D & K. Pursuant to the Settlement Agreement, Dalia received an additional 51% direct interest in TPR from Arie. Just prior to the Settlement Agreement, as stated above, Dalia transferred her 4% interest in D & K (and thus, her 1.96% indirect interest in TPR) to D & K GP.

-8-

TPR, writing off the entire D & K Note and declaring it as a loss in the approximate amount of $8,700,000.

29.    On August 2, 2006, Sagi, as part of his managerial role in D & K GP, D & K and TPR, assigned and sold the D & K Note, which then had an approximate value of $11,000,000 as a result of the accrued interest, to Mr. Parnes in his individual capacity for the sum of only $12,000 (a copy of the Memorandum dated August 2, 2006 (the "D & K Note Memorandum"), assigning and selling the D & K Note is annexed hereto as Exhibit "F"). The D & K Note Memorandum asserts unspecified claims by D & K against TPR and Sagi expressly memorialized that D & K "denies enforceability of the [D & K Note]". (See Exhibit "F")

30.    Sagi signed the D & K Note Memorandum on behalf of both TPR as the holder and D & K as the maker. Dalia was copied on the D & K Note Memorandum but Petitioner did not receive a copy of same. At the time of the D & K Note Memorandum, Mr. Parnes was acting as trustee of both Trusts. Shortly after the D & K Note Memorandum, Mr. Parnes summarily resigned as Trustee of the Orly Trust without explanation.

### THE D & K NOTE WAS NEVER INTENDED TO BE ENFORCED

31.    Mr. Parnes testified in Arie and Dalia's matrimonial arbitration (See Exhibit "G", which contains the relevant portions of the transcript of Mr. Parnes' testimony from the arbitration) that:

    (i)    As the Trustee of both Trusts, he was a "trusted" person to keep the D & K Note to make sure it would never be collected. (See Pages 460-461);

    (ii)    D & K does not have to make payments to TPR; (Page 452)

    (iii)    The D & K Note is uncollectible (Page 453); and,

    (iv)    Sagi's job was to "bury the D & K Note in the woods" (Page 461)

32.    Sagi testified in the same arbitration (See Exhibit "H", which contains the relevant portions of the transcript of Sagi's testimony from the arbitration) that:

-9-

(i)      The purpose of the D & K Note was for estate planning (Pages 367-380);

(ii)     The D & K Note was never declared in default (Page 370);

(iii)    There was no intention of collecting the D & K Note (Page 370); and,

(iv)    The D & K Note is worth nothing (Pages 375-377)

33.     In addition, Dalia, who was copied on the D & K Note Memorandum,
previously admitted in her Pre-Hearing Memorandum submitted to the Court in connection with
the matrimonial arbitration that the D & K Note was never intended to be collected upon because
the:

> "...collection by TPR of the D & K Note would simply transfer
> wealth from the children, Sagi and Orly, to their parents,
> Arie and Dalia, thus undoing the estate planning scheme which
> had transferred that wealth to the children.
> (See **Exhibit "I"**, excerpt from Dalia's Pre-Trial Memorandum
> Page "26")

34.     Ultimately, the Gengers' matrimonial arbitrator, Judge I. Leo Milonas,
specifically determined that the D & K Note was never intended to be collected from its
inception.

> "The arbitrator finds for Dalia on this issue. The D & K [N]ote
> was part of the estate planning scheme to transfer wealth to the
> children. The parties never intended for this note to be collected
> and to do so would re-transfer wealth back to the parents and
> defeat their estate plan.
> (See **Exhibit "J"**, Final Arbitration Award in Genger divorce
> proceeding, Page "15")

35.     Petitioner was well aware of, and relied upon, the agreement that the D &
K Note would never be enforced. Petitioner was also aware of, and relied upon, Judge Milonas'
award declaring the D & K Note worthless and uncollectible, and Dalia, Sagi and Mr. Parnes'
sworn statements and/or written submissions to that effect.

## THE D & K AGREEMENT IS ENTERED INTO WITHOUT PETITIONER'S KNOWLEDGE AND PURPORTEDLY AUTHORIZES D & K TO PLEDGE AND ENCUMBER THE ORLY TRUST TRI SHARES

36.    On or about November 23, 2007, Leah Fang (Sagi's sister-in-law), the then sole Trustee of both Trusts[2], and Sagi, acting in his capacity as manager of D & K GP, executed an "Amended and Restated Limited Partnership Agreement of D & K Limited Partnership (the "D & K Agreement"). Among other things, the D & K Agreement purported to grant D & K GP authority to "mortgage, hypothecate, pledge, create, a security interest in or lien upon, or otherwise encumber [the Orly Trust TRI Shares] for the benefit of [D & K] or that of third parties, in connection with the [D & K Note]". (See a copy of the D & K Agreement attached hereto as **Exhibit "K"**, Page "11"). There was no legitimate need or purpose for the amendment. It was a preliminary step in Sagi and Dalia's scheme to punish Petitioner and attempt to loot the Orly Trust of this valuable asset.

37.    By its terms, the D & K Agreement, does not require D & K GP (i.e. Sagi) to give notice to anyone, including Petitioner or the Orly Trust, if a decision is made to encumber the Orly Trust TRI Shares in any way.

38.    Upon information and belief, the Orly Trust received no consideration and no direct or indirect benefit in exchange for the substantial concession it gave to D & K GP under the D & K Agreement. Indeed, the D & K Agreement was merely an instrument created for the specific purpose of encumbering the Orly Trust and Petitioner as its beneficiary, with debt.

39.    Leah Fang never informed Petitioner of the existence of the D & K

---

[2] In 2007, Mr. Gribetz resigned as the trustee of both Trusts, without appointing a successor, thereby leaving Mr. Parnes as the sole remaining trustee. Thereafter, as set forth above, Mr. Parnes resigned as trustee of the Orly Trust appointing Leah Fang as successor Trustee.

-11-

Agreement. In January, 2008, Dalia was appointed successor trustee of the Orly Trust, despite

Petitioner's objections. At that time, Dalia, notwithstanding her knowledge that the D & K Note

was not intended to be collected, did nothing to attempt to rescind or nullify the D & K

Agreement, nor did she do anything to advise Petitioner as beneficiary that the prior trustee had

granted D & K GP authority to encumber the Orly Trust TRI shares. By that time, as a result of

Dalia's granting Sagi control of TPR and D & K through the appointment of his friends and

relatives as successor trustee of the Trusts, Sagi had effectively obtained control over all of the

assets held by D & K, TPR, the Sagi Trust and the Orly Trust.[3]

40.    Through the above-mentioned transactions, Dalia allowed Sagi to obtain

direct control over TPR and its interest in the D & K Note to the detriment of Petitioner and the

Orly Trust. Notably, Sagi's role as CEO of TPR, (the creditor on the D & K Note) is in direct

conflict with his role as manager of D & K (the debtor on the D & K Note), whose role was to

repay the D & K Note or contest its enforceability.

## ORLY'S INITIAL APPLICATION TO REMOVE DALIA AS TRUSTEE

41.    In February, 2008, Petitioner filed an initial application with this Court

(the "Initial Application") to remove Dalia as Trustee of the Orly Trust on the grounds that she

feared Dalia would not protect her interests while serving as Trustee because of Dalia's

animosity towards Arie, and her collusion with Sagi.

42.    Surrogate Roth denied the Initial Application as premature, believing

---

[3] In addition, by stock purchase agreement dated January 18, 2007, Sagi as CEO of TPR sold 2% of TPR's shares to his mother-in-law, Rochelle Fang, thereby eliminating Dalia's majority ownership interest of TPR by diluting it to 49%. Around the time that she became sole Trustee to the Orly Trust in January 2008, Dalia purportedly divested herself of the balance of her TPR shares. Thus, in addition to being CEO, Sagi effectively controlled TPR through the 49% owned by D & K, which Sagi controlled and the 2% owned by Rochelle Fang, also controlled by Sagi. (See Exhibit "L", Transcript of Hearing before the Honorable Jane S. Solomon dated August 22, 2011 in the action entitled Orly Genger v. Sagi Genger, Supreme Court of the State of New York, County of New York, Index No. 100697/2008) (Pages "53" to "55" for example)

-12-

Dalia should be given the chance to demonstrate whether she intended to act in Orly's interests or against Orly's interests. Surrogate Roth gave Dalia the benefit of the doubt based, in part, on sworn statements by Dalia to the Surrogate Court that she intended to protect the Orly Trust and its assets.

> "[I]t appears that Dalia (who states that she is ready and able to act as fiduciary) has yet to assume the duties of trustee in deference to her daughter's position in this litigation. As a validly appointed trustee, she should be given the opportunity to do what she deems necessary to manage and protect the trust's assets.
>
> Based upon the foregoing, the appointment of a "special trustee" is unwarranted at this time and, accordingly, the application is denied, <u>without prejudice to renewal if future circumstances warrant such relief.</u>
> (See copy of Surrogate Court Decision dated December 31, 2008 annexed hereto as **Exhibit "M"**, Pages 7-8) (emphasis added).

43.    At the time of the Surrogate's decision, the extent of Dalia's complicity in the conspiracy with Sagi was not fully understood.

## WITHIN WEEKS OF SURROGATE ROTH'S DECISION, RATHER THAN PROTECT THE ORLY TRUST, DALIA HELPED SAGI STRIP THE ORLY TRUST OF ITS ONLY ASSETS

44.    Sadly, Dalia's every action since Surrogate Roth's decision has proven Petitioner's fears were well grounded and the benefit of the doubt given to Dalia by Surrogate Roth was unjustified. As described below, rather than protecting the Orly Trust, Dalia has used her position as Trustee to help Sagi Genger strip the Orly Trust of its two assets: (1) 1,102.80 shares of common stock in TRI; and (2) a 23.52% indirect interest in TPR.

45.    As set forth below, Dalia was an active and willing participant in Sagi's scheme to strip the Orly Trust of its assets, thereby causing harm to Petitioner as the Orly Trust's sole beneficiary.

-13-

## DALIA HELPS SAGI TRY TO STRIP THE ORLY TRUST OF THE ORLY TRUST TRI SHARES

46.     Dalia has always understood the true value and importance of the Orly Trust TRI Shares to Petitioner and to the Orly Trust. Indeed, during the Initial Application to remove Dalia as Trustee, Dalia's attorney sent Surrogate Roth a letter stating that "the most valuable asset in the Orly Genger Trust is the shares of TRI'" and "the TRI Shares held by the Orly Trust are potentially worth tens of millions of dollars." See November 11, 2008 Letter to Hon. Renee R. Roth from J.G. Kortmansky, Esq. annexed hereto as **Exhibit "N"**. (emphasis supplied)

47.     On August 22, 2008, unbeknownst to Petitioner, Rochelle Fang, (Sagi's mother-in-law) who had been appointed Trustee of the Sagi Trust, attempted to sell the Sagi Trust's 19.43% in TRI to the Trump Group who thereafter purported to hold 66.58% of TRI's outstanding common stock.[4]  In connection with the supposed sale, Sagi and David Parnes were given seats on TRI's board of directors.  This sale, which was consummated after Dalia was appointed successor trustee of the Orly Trust, has diluted and diminished the value of the Orly Trust's interest in TRI since Arie will no longer have a controlling interest in TRI (which he previously had by virtue of his voting proxy over the Trust's shares, see **Exhibit "C"**) and thus, the Orly Trust would no longer own a portion of the controlling block of TRI shares.[5]

---

[4] In response to Dalia and Sagi's collusive efforts to sell the TRI shares to the Trump Group, Petitioner, on behalf of herself, individually and the Orly Trust, commenced an action in the Supreme Court for New York County seeking to determine, among other things, the ownership of the Orly Trust TRI Shares. See Arie Genger and Orly Genger, in her individual capacity and on behalf of The Orly Genger 1993 Trust v. Sagi Genger, TPR Investment Associates, Inc., Dalia Genger, The Sagi Genger 1993 Trust, Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, Jules Trump, Eddie Trump and Mark Hirsch, Index No. 651089/2010 (the "New York TRI Action"). The New York TRI Action is still pending before Justice Feinman.

[5] In 2011, without prior notice to Petitioner as required under the July 2009 Order, Dalia, as Trustee of the Orly Trust and in a transparent forum shopping move, commenced an action in the Delaware Chancery Court seeking a declaration that the Orly Trust is the beneficial owner of the Orly Trust TRI Shares. Dalia has been restrained from pursuing this action pursuant to a prior Order of the Court issued in the New York TRI Action.

48.     On or about January 31, 2009, only weeks after making sworn statements

to the Surrogate Court that she intended to protect the Orly Trust and its assets, Dalia executed a

document entitled "Meeting of Partners of D & K LP- Jan. 31, 2009 & Agreement (the "Meeting

Agreement"). Annexed hereto as **Exhibit "O"** is a copy of the Meeting Agreement. Like the D

& K Agreement, the Meeting Agreement purported to grant D & K GP (i.e., Sagi) unfettered

authority to encumber the Orly Trust TRI Shares:

> "The partners wish to clarify that the authority vested in the General
> Partner to make limited partners' assets subject to a pledge shall be
> done in substantially the same manner in which TPR Investment
> Associates, Inc. shares were pledged in conjunction with the
> aforementioned note [the D & K Note]. However, the General
> Partner shall be authorized to sign for the partnership and/or each
> individual partner."
> (See **Exhibit "O"**, Paragraph "3")

49.     In another naked act of self-dealing in violation of Dalia's fiduciary duties

as Trustee, the Meeting Agreement also purports to:

> "Indemnify and provide a general release from any claim or
> right at equity, law, or contract or otherwise the current and
> former general partner, its officers, the partnership's holdings
> (including TPR Investment Associates, inc.) and the officers
> of its holdings to fullest extent permitted in connection with
> any claim by the partnership and/or its partners. Irrespective
> of the above, nothing herein shall serve to release or indemnify
> Arie Genger, William Dowd, Lawrence Small or Edward
> Klimerman." (See **Exhibit "O"**, Paragraph "1")

50.     Upon information and belief, the Orly Trust received no consideration and

no direct or indirect benefit in exchange for the substantial concession, Dalia, acting as trustee,

gave to D & K GP under the Meeting Agreement. Indeed, the Meeting Agreement, like the D &

K Agreement, was merely another instrument created for the specific purpose of depleting the

Orly Trust of its assets.

51.     Both the D & K Agreement and the Meeting Agreement were negotiated

-15-

and executed without ever informing Petitioner. Moreover, Dalia never subsequently informed Petitioner of the existence of either agreement, even though Petitioner made repeated requests to Dalia for information about the Orly Trust and its assets during her tenure as Trustee. The Meeting Agreement was only disclosed on or about October 2009 in connection with the New York TPR Action (defined and discussed below) which was commenced by Petitioner in the Supreme Court for New York County.

52.     Notably on January 10, 2009, just days before Dalia signed the Meeting Agreement granting Sagi unfettered authority to dispose of the Orly Trust TRI Shares (and purporting to indemnify Sagi regardless of any actions he took in connection with same), Petitioner sent Dalia a letter reminding her (once again) that the Orly Trust TRI Shares needed to be protected and retained.

> "For now, and until further notice, <u>it is my strong desire to retain all of the shares of Trans-Resources., Inc. ("TRI") that are currently in the Trust,</u> and I direct you not to sell them. If you are approached, or have been approached, with an offer to purchase any of the TRI shares in the Trust, please notify me immediately. If, despite my wishes, you consider accepting an offer, do not sell any shares until I have a reasonable period of time to maximize the benefit to the Trust, including possible alternative transactions."
> (See January 10, 2009 letter from Petitioner to Dalia (emphasis added), a copy of which is annexed hereto as **Exhibit "P"**)

53.     Dalia, in violation of her fiduciary obligations refused to agree not to dispose of the Orly Trust TRI Shares. To do so would be contrary to the fraudulent scheme in which Dalia was a willing participant.

54.     Likewise, although Dalia has given sworn statements to the Surrogate Court regarding the Orly Trust, she never disclosed the existence of the D & K Agreement or the Meeting Agreement to either Surrogate Roth or her successor Surrogate Webb. Basically, through the D & K Agreement, the Meeting Agreement and by ceding management of D & K

-16-

and TPR to Sagi, Dalia gave Sagi total control to pilfer the Orly Trust assets for his own use and benefit.

## DALIA HELPS SAGI TRY TO STRIP THE ORLY TRUST OF ITS INDIRECT INTEREST IN TPR

55.    In Surrogate Roth's decision, she noted that in the Initial Application, "...petitioner has not alleged that Dalia has refused a request for information, which would warrant relief (SCPA 2102), or has failed as trustee to protect trust assets" (see Exhibit "M", Page "7").

56.    On May 14, 2009, Petitioner's then counsel, Judith Siegel-Baum, sent Dalia's attorney, Robert Meister, a document demand relating to the Orly Trust's assets. (annexed hereto as **Exhibit "Q"**).

57.    On June 1, 2009, Mr. Meister responded to Ms. Sigel-Baum's document demand by advising her that the Orly Trust no longer owned any interest in TPR. According to the letter, Sagi, acting as CEO for TPR, had foreclosed on the D & K Note and sold D & K's 240 shares of TPR for $2,200,000. A copy of the letter is annexed hereto as **Exhibit "R"**. Before that time, Dalia had neither advised nor notified Petitioner that Sagi had foreclosed on the D & K Note, nor advised Petitioner that Sagi had sold the TPR shares at auction. This news came as a complete and utter shock to Petitioner.

58.    Despite the clear and consistent agreement among the Genger family members that the D & K Note was never to be collected upon or enforced, the sworn testimony and/or Court submissions of Dalia, Sagi and Mr. Parnes, the assignee and purchaser of the D & K Note, and Judge Milonas' award and specific determination to this effect, upon receipt of Mr. Meister's letter, Petitioner learned for the first time that:

-17-