(a)     Sagi caused TPR to reclaim the D & K Note from Mr. Parnes.[6]  Then, on August 31, 2008, Sagi, acting as CEO of TPR, notified himself as the general manager of D & K, that D & K was in default under the D & K Note and declared that unless the entire unpaid principal amount of the D & K Note was paid immediately, TPR would sell, at auction, the 240 shares pledged as collateral.  A copy of this purported Notification dated August 31, 2008 is annexed hereto as **Exhibit "S"**.  Dalia, who knew that the D & K Note was never intended to be enforced and who previously had sworn to as such, in violation of her fiduciary duties as Trustee, never sought to block Sagi from foreclosing on the D & K Note and selling the TPR shares. Notwithstanding her knowledge and her previous sworn statement, Dalia failed to make any effort to stop Sagi when he engaged in this clear act of self-dealing, even though the Orly Trust had a clear interest in the TPR shares at issue.

(b)     Thereafter, Sagi, again acting as CEO of TPR, purported to notify D & K (of which he remained managing partner) that D & K's 240 shares of TPR stock would be auctioned to the highest bidder on February 27, 2009, and that the money received from the sale would be used to reduce the outstanding debt under the D & K Note.  A copy of this purported Notification is annexed hereto as **Exhibit "T"**.  Sagi purported to notify the interested parties of the sale by publishing notice of the sale in the New York Post in October 2008 and February 2009.  At all relevant times, Sagi had Petitioner and Dalia's contact information.  Despite this, Petitioner was never informed of the impending sale.  At the time that Sagi secretly schemed with the connivance of Dalia to structure the bogus sale, it was clear that the value of the TPR shares was significantly higher than any purported value of the D & K Note (although as previously stated the D & K Note had no value).

---

[6] On or about May 25, 2008, Mr. Parnes rescinded, *ab initio*, the assignment of the D & K Note.  Petitioner was also not notified of that action.

(c)    On February 27, 2009, TPR (still controlled by Sagi) foreclosed on the 240 shares of TPR and "auctioned" the shares (the "TPR Sale"). Not coincidentally, TPR purchased the shares at auction for $2,200,000, which was substantially less than their estimated value, making no effort to collect on the D & K Note from the Sagi Trust. (See **Exhibit "U"**). The $2,200,000 proceeds of the TPR Sale were purportedly used to decrease D & K's obligations under the D & K Note. The deficiency under the D & K Note was deliberately manufactured by this sham auction in order to provide Sagi and TPR with a future basis to foreclose upon the Orly Trust's only remaining principal asset, the Orly Trust TRI Shares.

59.    TPR and Sagi, with the connivance of Dalia in breach of her fiduciary duty, effectively stripped the Orly Trust of its indirect interest in the TPR shares by improperly foreclosing on the D & K Note and conducting the TPR Sale notwithstanding the fact that the Genger family never intended the D & K Note to be enforced. Notably, this alleged and purported notification process and sham TPR Sale took place without Dalia objecting in any way, taking preventive action of any kind, or notifying Petitioner in any way. In short, Dalia, allowed the sham TPR Sale to transpire, did not notify Petitioner of same and clearly violated her duties as a fiduciary to the Orly Trust and Petitioner, as sole beneficiary by failing to protect the valuable trust asset.

60.    The forgoing scheme injured Petitioner and the Orly Trust in a number of ways. The Orly Trust's interest in D & K is now worthless, as it purportedly no longer owns any interest in TPR, while Sagi now has control over the foreclosed TPR shares. The scheme also destroyed Arie and Dalia's tax and estate planning intent that both children have equal shares in the family wealth.

61.    Dalia, who knew that the D & K Note was never intended to be enforced, should have immediately sought to block Sagi from foreclosing on the D & K Note and selling

the TPR shares. Certainly, she should have informed Petitioner so Petitioner could make her own efforts to block the sham TPR sale or, at the least, arrange for other bidders to be at the sale. Notwithstanding her knowledge and her previous sworn statement, Dalia failed to make any effort to stop Sagi when he engaged in this clear act of self-dealing, even though the Orly Trust has a clear interest in the TPR shares at issue.

62.     As if this was not an egregious enough breach of Dalia's fiduciary duties to the Orly Trust, Dalia has made no effort whatsoever to date to seek any contribution from the Sagi Trust for its share of purported amounts due under the D & K Note (although as previously stated at length herein, no such purported sums are due under the D & K Note because it was never intended to be enforced). In other words, if the D & K Note was truly a "liability" of both Trusts, in theory, TPR should have foreclosed on the Sagi Trust's interests as well. Of course, this will never happen as long as Sagi is still the CEO of TPR (the holder of the D & K Note) and the manager of D & K, (the maker of the D & K Note). By ceding management authority of TPR and D & K to Sagi, Dalia deliberately created Sagi's clear and unequivocal conflict of interest and "paved the road" for his self-dealing. This has resulted in Sagi looting the Orly Trust for his own benefit with the tacit or express approval of Dalia.

63.     As a fiduciary of the Orly Trust with prior, as well as continued knowledge, of the TPR foreclosure, Dalia had a duty to protect the Orly Trust's indirect ownership of the TPR shares. Instead of taking proactive measures required of a fiduciary, Dalia did nothing and allowed Sagi to obtain the TPR shares for himself to the detriment of the Orly Trust. Moreover, in connection with her appointment as successor trustee of the Orly Trust in January, 2008, as previously stated above, Dalia purportedly divested herself of her TPR shares for the sum of $5,000,000 (without informing the Court or Petitioner as to when she transferred her interest) in a further attempt to distance herself from any attributable wrongdoing.

-20-

64.    Dalia knew of Sagi's plan to foreclose on the D & K Note as early as August, 2008, thus she withheld information from Petitioner concerning the TPR Sale for almost 10 months. Even then, she only provided the information until she received a demand letter from Petitioner's counsel and realized that legal action was imminent.

65.    In fact, the notice of the TPR Sale in the New York Post was specifically designed by Dalia and Sagi not to provide Petitioner with notice and an opportunity to object to same. Dalia and Sagi were both aware of Petitioner's address at this time but instead of notifying Petitioner, they chose to deceive her by publishing notice in the newspaper.

66.    As a result of the sham TPR Sale, on or about June 9, 2009, Petitioner commenced an action which is pending before the Supreme Court for New York County entitled, Orly Genger et al v. Dalia Genger, Sagi Genger, D & K GP LLC, TPR Investment Associates, Inc. and Leah Fang, Index No. 109749/2009 (the "New York TPR Action"). In the New York TPR Action, Petitioner is seeking, inter alia, monetary damages and the return of the TPR shares.[7]

### THE JULY 2009 ORDER AND INJUNCTION AND PETITIONER'S RENEWED APPLICATION WITH THIS COURT TO REMOVE DALIA AS TRUSTEE

67.    Upon learning of the sham TPR Sale, which stripped the Orly Trust of its indirect interest in its shares of TPR, Petitioner renewed her petition with this Court to remove Dalia as Trustee of the Orly Trust by filing same on or about June 22, 2009. Petitioner also filed a Motion with this Court and sought a temporary restraining order which enjoined and prohibited

---

[7] By Decision and Order of the Honorable Paul G. Feinman dated June 28, 2010 in the New York TPR Action, Justice Feinman determined that the Petitioner's claim with respect to Dalia's breach of her fiduciary duty as sole Trustee of the Orly Trust should be decided by the Surrogate's Court. Further, in the same Decision and Order, Justice Feinman denied Dalia's Motion for Summary Judgment and determined that there is a "...question of fact as to whether Dalia Genger acted with intent to commit fraud against plaintiff's trust [the Orly Trust], and to lull plaintiff [Orly] into a false sense of security as to the status of her trust." (See Exhibit "V", Decision and Order of Justice Feinman dated June 28, 2010, Pages "17" and 19")

Dalia, *inter alia,* and anyone acting on her behalf from attempting to sell, transfer, pledge and

encumber or take any act with respect to the Orly Trust TRI Shares without providing Petitioner

with at least 10 days prior notice. A copy of the June 22, 2009 Petition (without the exhibits

attached to it which are duplicative) is annexed hereto as **Exhibit "W"**.

68.      As a result of the Petitioner's forgoing motion for a restraining order, the

July 1, 2009 Order was entered pending the outcome of this proceeding and which imposed

certain protective restraints (the "Restraints") upon Dalia as previously set forth above. Dalia

declined to attend the hearing.

69.      During counsel's oral argument of Petitioner's motion for a restraining

order, Surrogate Webber noted to Dalia's counsel that:

> "They [Dalia and Sagi] are on notice of all of your fears
> [with respect to the dissipation of the Orly Trust's assets].
> So for them now to do something which would obviously
> be against their duties and responsibilities would be
> somewhat glaring in terms of what the surcharge [to be
> imposed against Dalia] would be." (emphasis supplied)
> (See excerpt from transcript from July 1, 2009
> hearing annexed hereto as **Exhibit "X"**, Page "23")

70.      The Restraints were later confirmed by this Court on August 18, 2009,

reconfirmed and supplemented with additional restraints by this Court on July 16, 2010 and

made a part of a stipulation between Petitioner and Dalia which was entered on September 8,

2010 (see **Exhibit "Y"**).

71.      On or about September 21, 2010, Petitioner filed the Second Amended

Verified Petition (the "Second Amended Petition") to remove Dalia as Trustee. Dalia has filed a

Motion to Dismiss the Second Amended Petition and the decision on the Motion to Dismiss still

remains *sub judice.*

## THE ADDITIONAL RESTRAINTS PLACED UPON DALIA AND
## SAGI BY THE NEW YORK COURTS IN THE NEW YORK TRI ACTION
## AND THE NEW YORK TPR ACTION

72.    In addition to the Restraints imposed upon Dalia by the July 2009 Order, on or about July 28, 2010, the Court in the New York TPR Action also restrained Dalia, Sagi and the co-defendants to that action from transferring, selling, pledging, assigning, or otherwise disposing of D & K's 48% ownership interest in TPR. (the "TPR Action Restraints") (See Exhibit "Z" at page "32")

73.    The Court in the New York TRI Action also entered certain restraints against Dalia, Sagi and the other co-defendants to that action with respect to the Orly Trust TRI Shares.[8] (the "TRI Action Restraints") (See Exhibit "AA", December 28, 2011 Order in New York TRI Action, Pages "14" through "15").

## DALIA HAS WILLFULLY AND REPEATEDLY DISOBEYED
## THE JULY 2009 ORDER BY ENTERING INTO A FURTHER
## SCHEME TO ENCUMBER AND DISSIPATE THE ORLY TRUST'S ASSETS

74.    Petitioner submits that it could not be any more clear to Dalia, her counsel, Sagi and the other co-defendants to the New York TPR Action and the New York TRI Action that Dalia was forbidden from transferring, pledging, encumbering, assigning, selling and/or dissipating any assets of the Orly Trust without prior notice to Petitioner as a result of: (i) the Restraints set forth in the July 1, 2009 Order; (ii) Surrogate Webb's statement to Dalia's counsel on the return date that Dalia and Sagi are on notice of Petitioner's fears that the Orly Trust's assets will be dissipated (and therefore, any actions taken by Dalia against her duties and responsibilities would obviously be "glaring") (See Exhibit "X", Page "23"); (iii) the Stipulation entered into between Petitioner and Orly further confirming the Restraints (See Exhibit "Y";

---

[8] Both the New York TRI Action and the New York TPR Action are before Justice Paul Feinman.

and, (iv) the restraints imposed by Justice Feinman in the New York TRI Action and New York

TPR Action (collectively, the "<u>Supreme NY Restraints</u>").  All these restraints were specifically

and expressly intended to preserve the "status quo" until the Courts rendered a final decision.

75.     Notwithstanding the forgoing, rather than honor <u>any</u> of these restraints,

subsequent to the Petitioner's filing of the Second Amended Petition, Dalia, Sagi and their

cohorts, have continued to conspire together and in secret to render all of these restraints a

nullity.

76.     Instead of treating this Court's July 2009 Order and the Supreme NY

Restraints as Orders to be obeyed and boundaries to be honored, Dalia, Sagi and their cohorts

saw them as obstacles to be hurdled.  To that end, Dalia, D & K (through D & K GP), and/or

TPR (in other words, Dalia and Sagi) secretly executed eight (8) agreements[9] encumbering the

Orly Trust with $4.44 million in new debt, which the Orly Trust has no hope of paying off.

77.     In breach of Dalia's fiduciary duties as Trustee, the Secret Agreements

were specifically designed and intended as part of Dalia and Sagi's scheme to encumber the Orly

Trust with debt but not to similarly encumber the Sagi Trust with any debt whatsoever.

78.     Petitioner discovered the existence of the Secret Agreements on or about

July 6, 2012 solely in response to discovery requests made by Petitioner's counsel in the New

York TPR Action.  These documents were only first produced on or about July 6, 2012

notwithstanding the fact that: (i) the initial Secret Agreements, namely, the $4,000,000

---

[9] These eight secret agreements (collectively, the "<u>Secret Agreements</u>") will be further described immediately below and are: (i) the $4,000,000 Promissory Note dated October 3, 2011 (See Exhibit "BB"); (ii) the Credit and Forbearance Agreement and Second Amendment and Restatement of Promissory Note executed on May 15, 2012 (See Exhibit "CC"); (iii) the $4,240,000 Amended and Restated Promissory Note dated May 15, 2012 (See Exhibit "DD"); (iv) the $200,000 Promissory Note dated May 15, 2012 (See Exhibit "EE"); (v) the Agreement Amending Terms of Promissory Note dated March, 2012 (See Exhibit "FF"); (vi) the purported TPR Settlement Agreement dated October 3, 2011 (See Exhibit "GG"); (vii) the purported Amended and Restated TPR Settlement Agreement dated March 16, 2012 (See Exhibit "HH"); and, (viii) the Bill of Sale and Note Assignment dated May 15, 2012 (See Exhibit "II").

Promissory Note and the TPR Settlement Agreement were both executed approximately nine (9) months earlier on October 3, 2011; (ii) the July 2009 Order expressly required that Dalia provide Petitioner with prior notice of any and all acts which would affect the Orly Trust TRI Shares; and, (iii) the Supreme NY Restraining Orders expressly required that Dalia provide prior notice of any and all acts which would affect the Orly Trust's respective interests in the Orly Trust TRI Shares and TPR.

### THE 2011 PROMISSORY NOTE

79.     Unbeknownst to Petitioner, on October 3, 2011, Dalia and TPR purported to cancel the $4,500,000 deficiency remaining on the D & K Note after the disputed TPR Sale and replace it with a $4,000,000 promissory note that directly obligated the Orly Trust to pay TPR (the "2011 Promissory Note"). (See **Exhibit "BB"**, copy of 2011 Promissory Note and the TPR Settlement Agreement (defined below), **Exhibit "GG"**).

80.     By so doing, Dalia wrongly attempted to: (i) transfer $4 million dollars of liability from D & K to the Orly Trust (See **Exhibit "GG"**, TPR Settlement Agreement at 5); (ii) replace the unenforceable D & K Note with a putatively enforceable one (id); (iii) acknowledge the legality of the sham TPR Sale and the resulting deficiency (id. at 2-3); and, (iv) ensure that this $4 million dollar liability would not fall within the release that was part of the purported TPR Settlement Agreement reached that same day between Dalia, Sagi and the other defendants to the New York TPR Action, but would continue to burden the Orly Trust (id. at 5).

81.     The 2011 Promissory Note was payable to TPR the earlier of: (a) November 1, 2012; or, (b) the receipt of any proceeds from the sale of the Orly Trust TRI Shares, "notwithstanding anything to the contrary herein or in the parties' accompanying [TPR] Settlement Agreement". See **Exhibit "BB"** at 1.

82.    By executing the 2011 Promissory Note on behalf of the Orly Trust, Dalia (i) obligated the Orly Trust to pay all of TPR's legal fees (See **Exhibit "BB"** at 2); (ii) **made her removal as Trustee an "Event of Default" making the 2011 Promissory Note immediately due and payable** (id. at 1, emphasis added); and, (iii) agreed to the law and jurisdiction of the State of Delaware (id at 2)[10]

## THE 200K PROMISSORY NOTE AND THE CREDIT AGREEMENT

83.    In May, 2012, TPR assigned the 2011 Promissory Note to MSCo, a St. Kitts entity. In exchange for an alleged $400,000 received from MSCo, Dalia had the Orly Trust sign another promissory note for $200,000 (the "200K Note") (See **Exhibit "EE"**) and increased the 2011 Promissory Note to $4,240,000.[11] (See **Exhibit "CC"**, Credit and Forbearance Agreement and Second Amendment and Restatement of Promissory Note (the "Credit Agreement" and Exhibit "EE", (the 200K Note).

84.    Further, Dalia, purporting to act as Trustee wrongfully attempted to: (i) waive any defenses the Orly Trust would have to payment, including any defenses with respect to MSCo., TPR, or any prior holder of the 2011 Promissory Note (See **Exhibit "CC"**, Credit Agreement, §6.1(c)); (ii) have the Orly Trust broadly indemnify MSCo., should Orly or any future Trustee legally attack the 2011 Promissory Note, the Amended Promissory Note, or the Credit Agreement (id., §7); (iii) make the Orly Trust liable for all costs of collection, including attorneys' fees (See **Exhibit "DD"**, Amended and Restated Promissory Note (the "Amended 2011 Note") § 6); (iv) **make Dalia's replacement as the Orly Trust Trustee an "Event of**

---

[10] In March, 2012, unbeknownst to Petitioner, TPR, D & K and the Orly Trust (i.e. Dalia and Sagi) purported to enter into an "Agreement Amending Terms of Promissory Note" to provide for New York law and jurisdiction in any competent court (See **Exhibit "FF"**). This Agreement also gave Dalia and Sagi the power to amend the 2011 Promissory Note at will.

[11] In other words, Dalia pledged $440,000 of Orly Trust assets in exchange for a purported $400,000.

Default" making the Amended 2011 Note and the 200K Note (jointly, the "Notes")

immediately due and payable (See **Exhibit "CC"**, Credit Agreement, § 6.2, emphasis added);

(v) agree to pay the 200K Note from the sale of the Orly Trust TRI Shares "notwithstanding

anything to the contrary" (**Exhibit "EE"**, 200K Note, §1.3); and, (vi) make the Credit

Agreement and Notes fully assignable without the consent of, or notice to, the Orly Trust (See

**Exhibit "CC"**, Credit Agreement, § 10).


## THE PURPORTED SETTLEMENT AND AMENDED SETTLEMENT

85.     On October 3, 2011, Dalia (supposedly on behalf of the Orly Trust), TPR

and D & K (by Sagi Genger) purported to settle the New York TPR Action.

86.     Petitioner and her counsel in the New York TPR Action were not

informed of this purported settlement nor was Petitioner consulted in any way regarding its

terms.

87.     In violation of the July 2009 Order, the Supreme NY Restraints, Surrogate

Webb's admonishment to Dalia concerning the dissipation of the Orly Trust's Assets, and the

Stipulation entered into between Petitioner and Dalia, the purported settlement agreement (the

"TPR Settlement Agreement", which incorporates the 2011 Promissory Note by reference)

purports to have the Orly Trust transfer all its interests in D & K and disclaim all interest in TPR.

The settlement agreement also has TPR relinquish its claims to the Orly Trust TRI Shares:

> (a) TPR hereby relinquishes in favor of the OG Trust [the Orly Trust] any
> economic interest in the TRI Shares [the Orly Trust TRI Shares] and assigns
> to the OG Trust its right to any economic benefits of the TRI Shares
> including any proceeds from the sale thereof, including but not limited to
> the $10.3 million in proceeds otherwise owing to TPR in the future pursuant
> to the terms of the August 22, 2008 letter agreement; (b) the OG Trust -
> irrespective of any claim made or asserted on its behalf by Orly Genger –
> hereby transfers to TPR its limited partnership interest in DK (the "DK
> Interest"), and disclaims any interest in, any shares of or TPR, either directly

or indirectly through DK (the "TPR Interest");... . and (c) TPR agrees to pay
$100,000 for the legal fees of the OG Trust.[12]
(See **Exhibit "GG"**, TPR Settlement Agreement, Paragraph "1")

88.    On March 16, 2012, Dalia (supposedly on behalf of the Orly Trust), TPR,
and D & K GP (by Sagi Genger) entered into a purported Amended and Restated Settlement
Agreement (the "Amended TPR Settlement Agreement"). Once again, Petitioner was not
informed or consulted in any way. The purported "settlement" was restated, and then amended
to purportedly cancel and void "the (i) the Amended and Restated Limited Partnership
Agreement of D&K Limited Partnership dated as of October 30, 2004 and signed November 22,
2007, and/or (ii) the Meeting of Partners of D&K L.P. January 31, 2009 and Agreement." See
**Exhibit "HH"**, March 16, 2012 Amended TPR Settlement Agreement, Paragraph "1").

89.    Importantly, though the Amended TPR Settlement Agreement purported
to void these two agreements *ab* initio, the purported settlement did nothing to reverse or unwind
the sham TPR Sale that these two agreements purported to enable, or to cancel the supposed
deficiency resulting from the TPR Sale.[13]

90.    Demonstrably, these various actions and agreements (agreed to in secret
and never revealed to the Court or Petitioner despite numerous Court appearances, filings and
outstanding documents requests) in the New York TPR Action and New York TRI Action
violated the protective restraints imposed by this Court and the other New York Courts in a

---

[12] Dalia, Sagi, TPR, and D & K also purported to require the Orly Trust to pay D & K and TPR's attorneys'
fees, should Petitioner continue to advance claims on the Orly Trust's behalf (see **Exhibit "GG"**, Paragraph "8")
and purported to release one another from all claims, causes of action, lawsuits, demands, liability of any kind,
asserted or unasserted, known or unknown, suspected or unsuspected, direct or derivative, in connection with the
1993 Note [D & K Note], the [Orly Trust] TRI Shares, the Share Transfer, the DK Interest, the TPR Interest, the
2008 Letter Agreement, or any other matters, through the date of the Agreement Id. at Paragraph "4")

[13] The parties also made sure that the Release in the TPR Settlement Agreement did not cover anyone on Sagi and
Dalia's "enemies list" (See **Exhibit "HH"**, Amended TPR Settlement Agreement, Paragraph "3"), changed the
governing law to New York law (id. at Paragraph "6"), and made their agreement to Delaware jurisdiction non-
exclusive (id.).

number of independent ways. As to the TPR Settlement Agreement and the Amended TPR
Settlement Agreement:

(a)   Pursuant to the July 2009 Order, Dalia and her counsel were required to
give Petitioner 10 days advance notice of any transaction that impacted the
Orly Trust TRI Shares, but failed to provide notice of either the TPR
Settlement Agreement or the Amended TPR Settlement Agreement;

(b)   By agreeing in the TPR Settlement Agreement and the Amended TPR
Settlement Agreement to have the Orly Trust relinquish its interest in TPR
and transfer its interest in D & K to TPR, Dalia, Sagi, D & K GP, and TPR
jointly and severally violated the TPR Action Restraints which forbade
each of them from "transferring, pledging, assigning or otherwise
disposing of the [Orly Trust TPR] Shares." (See **Exhibit "Z"** at 31-32)

91.   As to the Notes and the Credit Agreement, TPR's assignment of the 2011
Promissory Note to MSCo was an "...act by Respondent, her agents and all other persons acting
on her behalf to assign, mortgage, pledge, redeem, encumber, sell or otherwise alter the Orly
Trust's interest in TRI..." Accordingly, pursuant to the July 2009 Order, Dalia was required to
give Petitioner at least 10 days notice of the transaction but completely failed to do so. This
failure to notify Petitioner also violated various provisions of the Supreme NY Restraining
Orders.

**THE EVENT OF DEFAULT UNDER THE NOTES HAS BEEN TRIGGERED
AS A RESULT OF THE DISMISSAL OF DALIA'S COUNSEL'S
FEDERAL INTERPLEADER ACTION**

92.   As a result of Dalia, TPR, D & K (through D & K GP) (i.e, Dalia and
Sagi's) actions, the $4.44 million dollars in new debt to MSCo is immediately due and payable
because of one of the poison pills that litter the Secret Agreements (in addition to the one that
provides an event of default if Dalia is removed as Trustee of the Orly Trust) has already been
triggered[14], and thus, MSCo is able to immediately proceed against the Orly Trust's assets in any

---

[14]The resolution of an interpleader action commenced by Dalia's counsel, Pedowitz & Meister LLP
("Pedowitz & Meister") is a triggering Event of Default under the Secret Agreements. Pedowitz & Meister was the

jurisdiction in the world (Delaware, St. Kitts, etc.) without notice or warning to the Orly Trust or to anyone.

93.    Thus, by her actions Dalia has created a situation where the assets of the Orly Trust could be in immediate peril of dissipation.

## DALIA NEEDS TO BE REMOVED AS TRUSTEE IMMEDIATELY

94.    As a result of all of Dalia's forgoing actions and inactions described in this Third Amended Verified Petition, her breach of her fiduciary duties to Petitioner as beneficiary of the Orly Trust, her violation of the terms and conditions of this Court's July 2009 Order and the Supreme NY Restraints, her ongoing conspiracy and scheme with Sagi to loot, transfer, pledge, encumber and dissipate the Orly Trust's assets and the immediate peril to those assets, Petitioner submits that Dalia's should be immediately removed as Trustee of the Orly Trust.

## JOEL ISAACSON SHOULD BE APPOINTED AS SUCCESSOR TRUSTEE

95.    As a result of Dalia's forgoing actions and inactions described in this Third Amended Verified Petition, her breach of her fiduciary duties to Petitioner as beneficiary

---

Escrow Agent with respect to the proceeds of the disputed sale of the Orly Trust TRI Shares and commenced an interpleader action against Petitioner, Dalia as Trustee of the Orly Trust and other parties in the United States District Court for the Southern District of New York, Pedowitz & Meister LLP v. TPR Investment Associates, Inc. Orly Genger, et al (Case No. 11 Civ. 5602) (the "Pedowitz & Meister Interpleader Action") whereby it sought, *inter alia*, a judgment from the Court determining who was entitled to the proceeds of the disputed sale of the Orly Trust TRI Shares. Petitioner's counsel moved to dismiss the Pedowitz & Meister Interpleader Action on the grounds, *inter alia*, that the District Court lacked subject matter jurisdiction and in any event, all the parties and claims involved in the Pedowitz & Meister Interpleader Action were already pending before Justice Feinman in the New York TRI Action. The Pedowitz & Meister Interpleader Action was recently dismissed by Judge John F. Keenan in the United States District Court for the Southern District of New York by Opinion and Order dated June 14, 2012, due to lack of subject matter jurisdiction and described by him as a "sham". See Case No.'s 08 Civ. 7140 (JFK), 11 Civ. 5602 (JFK), et al), Docket No. 64). Thus, the resolution of this sham action has triggered an Event of Default under the Secret Agreements. It is worth noting that Pedowitz & Meister represents both Dalia in her individual capacity and as Trustee of the Orly Trust.

of the Orly Trust and her violation of the terms and conditions of this Court's July 2009 Order, Dalia should be immediately removed as Trustee and replaced with Joel Isaacson.

96.   Mr. Isaacson is the founder and CEO of Joel Isaacson & Co. LLC, which has been a leading independent wealth management firm in New York City for almost 20 years, and which is located at 546 Fifth Avenue, 20th Floor, New York, NY 10036. Mr. Isaacson specializes in financial services and tax planning and has acted as trustee for more than 100 trusts. He holds a Bachelors of Science Degree in accounting and a Masters of Business Administration degree in financial planning. Mr. Isaacson is not acquainted with any members of the Genger family, does not have any interest in TRI, TPR or D & K, is willing and prepared to succeed Dalia as Trustee immediately and has an understanding of the current status of the Orly Trust.

**WHEREFORE**, respectfully requests that an Order be entered: (i) immediately removing Dalia Genger as Trustee of the Orly Trust; (ii) suspending the Letters of Appointment heretofore issued to Dalia; (iii) appointing Joel Isaacson as successor trustee; and, (iv) granting such other and further relief as this Court deems to be just equitable and proper.

Dated: New York, New York
        October 15, 2012

_____
ORLY GENGER

-31-

## VERIFICATION

STATE OF NEW YORK            )
                                        ) ss.:

COUNTY OF NEW YORK     )

       ORLY GENGER, the petitioner named in the foregoing Third Amended Verified

Petition, being duly sworn, deposes and says:

     1.     I am the Petitioner in this matter.

     2.     I have read the annexed Third Amended Verified Petition, know the contents thereof and the same are true to my knowledge, except those matters thereon which are stated to be alleged upon information and belief, and as to those matters I believe them to be true.

                                          ORLY GENGER

Sworn to before me this
15th day of October, 2012

Notary Public

**Daniel B Fix**
Notary Public State of New York
New York County, LIC# 02F16239452
Comm Exp 04/18/2015

# Exhibit C

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
1
2    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK:    CIVIL TERM: PART - 12
3    ----------------------------------------------X
     ORLY GENGER,
4
                         Plaintiff
5                                    INDEX NUMBER:
                                        100697/08
6            -against-
7    SAGI GENGER,
8                         Defendant
     ----------------------------------------------X
9                    80 Centre Street
                     New York, New York 10013
10                   March 23, 2015
11   BEFORE:
             HONORABLE:  Barbara Jaffe, JSC
12
13   APPEARANCES:
14           Zeichner Ellman & Krause, LLP
             Attorneys for Plaintiff
15           1211 Avenue of the Americas
             New York, New York 10036
16           By:  Bryan D. Leinbach, Esq.
                  -and-
17           Kasowitz Benson Torres & Friedman, LLP
             1633 Broadway
18           New York,  New York 10019
             By:  Eric D. Herschmann, Esq.
19                Michael Paul Bowen, Esq.
20           Morgan, Lewis & Bockius, LLP
             Attorneys for the Defendant
21           101 Park Avenue
             New York, New York 10178-0060
22           By:  John Dellaportas, Esq.
                  Mary Pennisi, Esq.
23
24
25                       Delores Hilliard
                         Vicki K. Glover
26                   Official Court Reporters
                - OFFICIAL COURT REPORTER
```

3/23/2015 Genger -v- Genger Proceeding 032315

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2     accounting firm?
 3         A    Yes.
 4         Q    What was the reason that you obtained a different
 5     accounting firm?
 6         A    Well, around this time in 2007, I was trying to get
 7     information about my finances from my brother.  He did not want
 8     to deal with Bill Fischer and told me that, you know, if I
 9     wanted to have any conversations with him about it, I'd have
10     to --
11         Q    I think you have to slow down.
12         A    Sorry.
13              If I wanted to have any conversations with him
14     about my finances, I would have to work with an accountant that
15     was a new accountant, someone who was independent.  So I hired a
16     new accountant.
17         Q    Who did you hire?
18         A    Joel Isaacson.
19         Q    Did Joel Isaacson have anything to do with Raines &
20     Fischer?
21         A    No.
22         Q    Did Joel Isaacson & Associates have anything to do with
23     your father?
24         A    No.
25         Q    How did you come to hire Joel Isaacson?
26         A    A friend of mine referred me to them.
```

### 3/23/2015  Genger -v- Genger Proceeding 032315

1              O. Genger - Plaintiff - Direct/Herschmann

2      Q    And a friend that was independent of Raines & Fischer

3   or your parents?

4      A    Yes.

5      Q    And after you hired Joel Isaacson & Company, then what

6   happened regarding your finances?

7      A    They started trying to help me gather information, and

8   I know they contacted Sagi and tried to get information from

9   him.  We tried to set up a meeting, and we finally were able to

10  set up a meeting with Sagi.

11     Q    Do you recall, approximately, when you were able to set

12  up that meeting with your brother?

13     A    I believe it was in November of 2007.

14     Q    Do you recall whether or not your brother had sent

15  information to your new accountants Isaacson & Associates prior

16  to your having a meeting together with your brother?

17     A    No, I know that he didn't.

18     Q    Now, as far as the actual time period of the meeting,

19  do you recall how that actually got set or what transpired?

20     A    How the meeting transpired?

21     Q    Yes.

22     A    Well, as I said, I was trying to get information from

23  my brother.  I hired these new accountants, Joel Isaacson, and I

24  knew that my brother had all this information, and we contacted

25  him several times to try to set it up, and we finally --

26     Q    I think you have to slow down.

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1              O. Genger - Plaintiff - Direct/Herschmann

 2      A    We finally were able to set up a meeting.

 3      Q    Let me show you what's been marked as Exhibit 234 for

 4   identification, and it's been previously discussed in this

 5   matter.

 6              (Handing to defense counsel.)

 7              MR. HERSCHMANN:  I'm providing a copy again to

 8   defense counsel.

 9              (Handing to witness.)

10              (Handing to the Court.)

11      Q    I'm going to hand you an exhibit, what's been

12   previously marked as Exhibit 228 for identification, which is

13   Bates stamped JI 429.  I'm providing again a copy to defense

14   counsel.

15              (Handing to defense counsel.)

16              (Handing to witness.)

17      Q    Will you take a look at Exhibit 228 as well?

18              (Handing to the Court.)

19      Q    I'm going to hand you also what's been marked as

20   266-135 as well.  I'm providing a copy to defense counsel.

21              (Handing to defense counsel.)

22              (Handing to witness.)

23      Q    Let me start with Exhibit 266-135.

24              (Handing to the Court.)

25      Q    Do you see that this is an e-mail from Stan Altmark to

26   your brother?
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
1                    O. Genger - Plaintiff - Direct/Herschmann
2        A    Yes.
3        Q    And you've seen this e-mail before today, correct?
4        A    Yes.
5        Q    Now, looking at the e-mail, does it refresh your
6    recollection as to whether or not you had requested via Isaacson
7    & Company certain information in June of 2007 from your brother?
8        A    Yes, I did.
9        Q    And is it accurate that after making requests from your
10   brother in June of 2007, you had not received specific
11   information that you wanted prior to meeting with him?
12       A    Yes.
13       Q    Now, looking at Exhibit 228, if you could, for a
14   moment, have you seen Exhibit 228 previously?
15       A    Yes.
16       Q    And do you recognize this as an e-mail from Joel
17   Isaacson to your brother dated November 6th of 2007?
18       A    Yes.
19             MR. HERSCHMANN:  Your Honor, at this time I would
20   offer Exhibit 228 for identification into evidence.
21             MR. DELLAPORTAS:  Objection.  Hearsay.
22             MR. HERSCHMANN:  Your Honor, we're offering it as
23   a communication that was sent as a representative from Orly
24   Genger to her brother.  The actual content is irrelevant,
25   except for the fact that he actually received it.
26             MR. DELLAPORTAS:  It's definitely being offered
```

### 3/23/2015  Genger -v- Genger Proceeding 032315

```
1                O. Genger - Plaintiff - Direct/Herschmann
2         for the truth of the matter, and it's hearsay, and it
3         hasn't been authenticated.  It's from Joel Isaacson's
4         files.
5                THE COURT:  Yeah, sustained.
6         Q    Well, Ms. Genger, looking at Exhibit 228, do you recall
7    whether or not your brother was advised that Isaacson & Company
8    had no affiliation with Raines & Fischer?
9         A    Yes.
10        Q    And did you believe at the time Isaacson & Company was
11   making requests from your brother for certain documents, that
12   you were actually entitled to those documents?
13        A    Yes.
14        Q    Did you retain Isaacson & Company to help advise you on
15   the state of affair of your assets?
16        A    Yes.
17        Q    Who was the accountant handling the tax returns for
18   White Box in the 2007 time period?  Was it Jonas Gayer, to your
19   knowledge, or was it Raines & Fischer, if you recall?
20        A    Raines & Fischer.
21        Q    Now, can you look at Exhibit 234, please?  Do you have
22   the exhibit in front of you?
23        A    Yes.
24        Q    And you mentioned earlier that there was an agenda that
25   was put together for the November 8th, 2007 meeting.
26                Does this exhibit refresh your recollection as to
```

### 3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - Plaintiff - Direct/Herschmann
2     what was covered during the course of the meeting, as far as
3     your side was concerned?
4              MR. DELLAPORTAS:  Objection.  There's been no
5         testimony that she lacks recollection subject that it needs
6         to be refreshed.
7     Q    Do you recall everything that happened at the November
8     8, 2007 meeting?
9     A    I don't know if I recall everything, but I --
10    Q    Is there a document that would help refresh your
11    recollection as to what was the agenda covered at the November
12    8, 2007 meeting?
13    A    Yes.
14    Q    Is the actual agenda the document that would help you
15    refresh your recollection?
16    A    Yes.
17    Q    So, now looking at Exhibit 234, does that refresh your
18    recollection as to what was expected to be covered by your
19    representatives with your brother on November 8, 2007?
20    A    Yes.
21    Q    So, can you first tell us how long did it take for you,
22    for your representatives, to arrange a meeting with your brother
23    to discuss your finances?  Was it a week?  Was it more than
24    that?  And if the prior documents that I've handed you, Exhibit
25    266-135, refresh your recollection, please let us know.
26             MR. DELLAPORTAS:  It's kind of leading.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - Plaintiff - Direct/Herschmann
2              THE COURT:  You're putting the cart before the
3     horse.
4              MR. HERSCHMANN:  Okay.  Well, let me ask it.
5         Q    Do you recall how long it took you to set up a meeting
6     with your brother?
7         A    I know it was months.
8         Q    Now, can you describe for us the general tenure of the
9     meeting; where it occurred, if you recall, what happened when
10    you got there?
11        A    The meeting happened at Joel Isaacson's office, and the
12    people who were there who attended the meeting were Joel
13    Isaacson, Stan Altmark, Don Mullen, my mother, myself and my
14    brother.  And the tenure was, I was trying to get information,
15    which is in this agenda.  I had a lot of questions that I wanted
16    answered.
17        Q    I want you to leave the agenda aside.  If you can give
18    us the general -- was it in a conference room?  What happened?
19        A    It was in one of the conference rooms at Isaacson's
20    office.
21        Q    And was Don Mullen the person who referred you to
22    Isaacson & Company?
23        A    Yes, he was.
24        Q    Now, just tell us generally what happened, and then
25    we'll cover the specifics in the course of the meeting.
26        A    Generally, what happened was, all these people were
```

**3/23/2015 Genger -v- Genger Proceeding 032315**

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2    sitting in a room together.  Joel Isaacson and Stan Altmark were
 3    asking certain questions of Sagi.  Sagi was not happy with the
 4    fact that we were asking questions.  He did most of the talking.
 5    Stan or Joel would ask him a question and he would give a
 6    five-minute speech on something and run -- I mean, just run
 7    circles around everyone.  He was not really answering questions.
 8    And we were getting nowhere.  And he became very upset by the
 9    fact that we were asking him questions.
10              (Continued on next page.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
```

### 3/23/2015  Genger -v- Genger Proceeding 032315

1            O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2        Q    And did you attempt to go through the agenda that  is

3    contained in exhibit 234?

4        A    Yes, we did.

5        Q    Now, was the meeting to discuss your getting access to

6    financial information and to take control of your financial

7    life?

8        A    Yes.

9        Q    Was that expressed to your brother?

10        A    Yes.

11        Q    Did you address in anything -- well, withdrawn.

12            Do you recall specifically what you addressed regarding

13    your 1993 trust?

14            Just a foundational question that I have to ask before

15    I present the exhibit.

16            Do you recall specifically what was addressed?

17        A    Without looking at it?

18        Q    Without looking at it?

19        A    Okay.  I mean, generally, I know.

20        Q    Would the agenda refresh your recollection as to

21    specifically what you were asking about your trust?

22        A    Yes.

23            MR. HERSCHMANN:  I would offer it in as a past

24    recollection refreshed and make the process easier or I can

25    do it this way.

26            THE COURT:  Mr. Dellaportas, what do you say?

**3/23/2015  Genger -v- Genger Proceeding 032315**

1      O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2              MR. DELLAPORTAS:  This agenda, do you mean?

3              THE COURT:  Yes.

4              MR. DELLAPORTAS:  It is hearsay.

5              MR. HERSCHMANN:  Well, the past recollection

6      recorded, the present recollection refreshed.

7              THE COURT:  I don't know that she recorded it.

8              MR. HERSCHMANN:  She doesn't have to have recorded

9      it.  She has to be able to articulate that this was an

10     accurate document of what was discussed at the meeting.  She

11     doesn't have to be the actual person who sat down and

12     recorded it.

13             THE COURT:  Is that your understanding, Mr.

14     Dellaportas?

15             MR. DELLAPORTAS:  No.

16             THE COURT:  I'm not sure either.

17             MR. HERSCHMANN:  We can pull it up.

18             THE COURT:  Just to refresh my own recollection.

19             Who has The Richardson?

20             MR. HERSCHMANN:  I don't have it.  And I think the

21     rule, and I can articulate it this way, if your secretary

22     sat there and took copious notes of the entire process and

23     said this accurately reflects what happened at the

24     meeting --

25             THE COURT:  We don't know when it was prepared.  I

26     don't know.  Let's just get the rule.

**3/23/2015  Genger -v- Genger Proceeding 032315**

1        O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2            MR. HERSCHMANN:  Okay.

3            (Short pause)

4            MR. DELLAPORTAS:  There is a Judge Friedman's

5    section on it.  It says, under the past recollection

6    recorded doctrine the memoranda of a fact known for an event

7    offered in the past for which the witness lacks sufficient

8    present recollection may be received in evidence to the

9    witness' oral testimony.

10           THE COURT:  It doesn't say anything about having to

11   be prepared by the witness.

12           MR. DELLAPORTAS:  There is a whole section in here.

13           THE COURT:  I don't know, Mr. Herschmann.

14           MR. HERSCHMANN:  If you want testimony, take a

15   moment, we can look at it.  I have no problem.

16           But, I'm pretty confident the rule is exactly as

17   Mr. Dellaportas just read it.

18           It is not necessary that the witness be the one

19   that actually recorded it as much as they can say that

20   recording is accurate.

21           THE COURT:  I'm pleased that you're confident.  I

22   am not.

23           It didn't say anything about it, but that doesn't

24   mean --

25           MR. DELLAPORTAS:  As I understand it this is the

26   agenda prepared before the meeting and thus isn't --

**3/23/2015  Genger -v- Genger Proceeding 032315**

1        O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2            THE COURT: That is what I mean, also.  It is not

3    contemporaneous.

4            MR. DELLAPORTAS:  It is not notes from the meeting.

5    It is agenda in advance of the meeting.

6            MR. HERSCHMANN:  Your Honor, the rule is as I

7    understand it, and Mr. Dellaportas if he wants to share that

8    with us and we can take a 5 minute recess.

9            THE COURT:  I can go in the back and look at it.

10           MR. HERSCHMANN:  If you would do that, your Honor,

11   that would be great.

12           Thank you, very much.

13           (Short recess; time is now 2:42 PM)

14           (2:45 PM)

15           THE COURT:  I don't think so, Mr. Herschmann.  Not

16   according to Richardson under the old book, which I'm sure

17   hasn't been changed too much, 66213, I don't know what it is

18   in the next edition.  But, while the memorandum, any

19   memorandum made by anybody can be used to refresh, if you

20   want it in evidence when a witness has so far forgotten

21   facts that he cannot recall them even after looking at a

22   memorandum of them and he testified that he once knew them

23   and made a memorandum of them at the time or soon after,

24   which he intended to make correctly and which he believes to

25   be correct, such memorandum in his own handwriting may be

26   received as evidence of the facts contained although the

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1            O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2       witness has no present recollection of them.
 3            MR. HERSCHMANN:  Your Honor, I think that's why I
 4       raised the issue of past recollection refreshed or present
 5       recollection recorded.
 6            As I said, there are two ways to address.  I can
 7       address it with the witness as present recollection
 8       refreshed, which is the process that the witness looks at
 9       it.
10            THE COURT:  Right.  Then, this doesn't come into
11       evidence.  But, you want it in evidence.
12            MR. HERSCHMANN:  That's correct.
13            The reason I had it the way I did is that there are
14       two ways of dealing with it.
15            There is what I call the simpler process.
16            THE COURT:  It is not coming into evidence.
17            MR. HERSCHMANN:  Okay.
18            THE COURT: She can use it to refresh her
19       recollection if it indeed refreshes her recollection.
20            As I recall this whole exercise is because you
21       wanted to offer it into evidence.
22            MR. HERSCHMANN:  That's correct.  And the reason
23       doesn't matters.
24            THE COURT:  Okay.
25       Q    So, Ms. Genger, let me, I'm going to walk you through
26       the process.
```

3/23/2015 Genger -v- Genger Proceeding 032315

```
1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2              I'm going to ask you specific questions.  If you recall

3     something specifically you should answer it.  If you don't

4     recall specifically, then I'm going to ask you is there

5     something that would refresh your recollection.  And the process

6     is then you can look at it and then say the document refreshes

7     my recollection and then answer it.  Okay?

8              So, I'm going to go back to the November 8, 2007

9     meeting.

10             And do you recall specifically what was discussed in

11    the first topic dealing with Orly Genger 1993 Trust?

12    A     Specifically, no.

13    Q     Would the agenda refresh your recollection as to what

14    was discussed?

15    A     Yes.

16    Q     Can you take a moment to look at the agenda and tell us

17    after looking at it does it refresh your recollection as to what

18    was the first topic discussed as it related to the Orly Genger

19    1993 Trust?

20    A     Yes.

21    Q     Okay.  What was of the first topic discussed?

22    A     D&K.

23    Q     And what was discussed after D&K was raised?

24    A     Who was the general partner.  Did Sagi have a copy of

25    the partnership agreement, the note.

26             Then, there is  a topic of the note, who owns the note.
```

2839

**3/23/2015  Genger -v- Genger Proceeding 032315**

1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2          Q    When you say who is the general partner do you recall

3     the specific discussions as to percentages about your mother and

4     whether she remained the general partner, without looking at

5     document first?

6          A    No.

7          Q    If you look at the document does that  refresh your

8     recollection?

9          A    Yes.

10         Q    And what was the first thing that was discussed after

11    you asked who were the general partners of D&K?

12              MR. DELLAPORTAS:  I object on relevance grounds as

13         to this line of testimony.

14              MR. HERSCHMANN:  I'm doing this as a general

15         proposition as to the subject matters that were discussed.

16              I can offer the agenda in and make it simple and go

17         through it or I can only do it this way, your Honor.  That

18         is why I raised it in the first place.

19              I'm not saying it is proof.  I'll do it any way Mr.

20         Dellaportas prefers.

21              THE COURT:  He doesn't prefer anything.  It is not

22         depending upon what he prefers.  It is what you want to

23         prove.

24              He says it is not relevant.

25              Why is it relevant?

26         Q    Well, did you generally discuss your trust and

2840

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2      associations with the D&K note?
3          A    Yes.
4          Q    Okay.  After discussing your trust and the D&K note did
5      you then have discussions about TPR?
6          A    Yes.
7          Q    Okay.  Do you recall specifically about what was
8      discussed in relationship to TPR and what percentages were not
9      owned by D&K, first, without looking at the document?
10         A    No.
11         Q    Looking at the document, does it refresh your
12     recollection as to what was the first thing you discussed about
13     TPR?
14         A    Yes.
15         Q    And what was that ?
16         A    Who owns and what percentages the 49 percent not owned
17     by D&K.
18         Q    And do you recall whether there was any discussion
19     about Rochell, R-O-C-H-E-L-L, Fang and your mother's interest?
20         A    Yes.
21         Q    After that did you have a discussion about whether or
22     not you can get copies of the minutes of meetings from TPR?
23         A    Yes.
24         Q    Did your brother agree to give you copies of the
25     minutes of meetings with TPR?
26         A    No.
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

1            O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2       Q    Did you then discuss with your brother what is the

3    distribution he was receiving from TPR?

4                 MR. DELLAPORTAS:  Objection.  Relevance.

5                 THE COURT:  Overruled.

6       A    Yes.

7       Q    Okay.  And do you recall raising the amount of his

8    getting $45,000 per month?

9       A    Yes.

10      Q    And did your brother ever answer as to why he was

11   getting $45,000 from TPR per month and how it was being

12   categorized?

13                MR. DELLAPORTAS:  Objection, compound.

14                THE COURT:  Let's take it one at a time.

15      Q    Okay.  Did your brother ascribe for you why he was

16   receiving $45,000 per month?

17      A    He may have and I don't remember.

18           His answers were long winded.  So, I just don't

19   remember them.

20      Q    Was there a  discussion about why your mother was

21   receiving $30,000 per month?

22                MR. DELLAPORTAS:  Objection, lack of foundation.

23                THE COURT:  Yes.  Sustained.

24      Q    Well, do you recall a discussion about what

25   distributions your mother was getting from TPR?

26      A    Generally, yes.

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann

 2         Q    Looking at the exhibit, does it refresh your

 3    recollection as to what dollar amount your brother was being

 4    questioned about regarding how much money your mother was

 5    receiving?

 6         A    Yes.

 7         Q    What number did you question your brother about?

 8         A    $30,000 a month.

 9         Q    Per month?

10         A    Yes.

11         Q    Do you recall then discussing with your brother how

12    could distributions be evened out between you, your mother and

13    your brother?

14         A    Yes.

15         Q    Did your brother at that time indicate his willingness

16    to even out the distribution between you, and your mother and

17    himself?

18         A    No, he didn't.

19         Q    Did your brother answer any questions about what are

20    the assets of TPR?

21         A    Whatever answers he gave were so complicated and he

22    gave answers that  confused everyone.

23         Q    Well, did the Isaacson representatives say to your

24    brother during the course of the meeting that they were

25    satisfied with his answers?

26         A    No.
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2      Q    What did they say generally about the answers your

3    brother was giving?

4              MR. DELLAPORTAS:  Objection.  Hearsay.

5              THE COURT:  Sustained.

6      Q    Did you then cover what receivables were due TPR, just

7    generally?

8      A    I don't remember.

9      Q    Okay.  If you look at exhibit 234, the agenda in front

10   of you, does that refresh your recollection as to what questions

11   were asked about the receivables due TPR?

12     A    Yes.

13     Q    And looking at that , does it refresh your recollection

14   about asking what happened to the $1.9 million that your brother

15   owed TPR?

16             MR. DELLAPORTAS:  Objection.  Lack of foundation

17     and leading.

18             THE COURT:  How about a foundation?

19     Q    Okay.  Well, does exhibit 234 refresh your recollection

20   as to whether the subject matters of how much money your brother

21   owed TPR was discussed on November 8, 2007?

22     A    Yes.

23     Q    Okay.  Looking at exhibit 234 does it refresh your

24   recollection about the specific amount of money that was

25   discussed with your brother regarding how much money he owed

26   TPR?

**3/23/2015  Genger -v- Genger Proceeding 032315**

1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2      A    Yes.

3      Q    What was the amount of money that your brother was

4   asked about that he owed TPR?

5               MR. DELLAPORTAS:  Just objection, your Honor.

6               This doesn't feel like a refreshed recollection.

7   It just fees like reading a document.

8               MR. HERSCHMANN:  It's the only way to do it.

9               If Mr. Dellaportas wants me to go down --

10              THE COURT:  You know, she was there.  So, I do

11  believe there is a --

12              MR. DELLAPORTAS:  Okay.

13     Q    What is the amount?

14     A    $1.9 million.

15     Q    Do you recall then having other discussions about other

16  monies that were owed TPR or owed by other officers to TPR?

17     A    Yes.

18     Q    Do you recall what was next discussed independent of

19  looking at the exhibit?

20     A    No.

21     Q    Looking at the exhibit, does it refresh your

22  recollection as to the next item that you discussed with your

23  brother?

24     A    Yes.

25     Q    Okay.  What was the next item that you discussed with

26  your brother?

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2      A    The annual expense of TPR and then after that there was
 3    trust administration.
 4      Q    I think you have to speak a little louder.
 5      A    Sorry.
 6           Right after that there was what are the annual expenses
 7    of TPR exclusive of above distributions to Sagi and Ariel Orly.
 8      Q    Did your brother answer what was the annual expense to
 9    TPR when Isaacson & Company posed the question to him?
10      A    Again, his answers were really convoluted and --
11      Q    How about, was there a discussion about the amount of
12    lawsuits that TPR was involved with as either a plaintiff or a
13    defendant?
14      A    Were there discussions?
15      Q    Yes?
16      A    Yes.
17      Q    After that was there a discussion about potentially
18    buying out your interests?
19      A    Yes.
20      Q    And looking at exhibit 234 does it refresh your
21    recollection, specifically, about what you asked of your
22    brother?
23      A    Yes.
24      Q    What was asked?
25      A    Was TPR, meaning Sagi, consider buying out Orly's
26    interest in TPR.  -- Or D&K now giving proper discounts to the
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

1        O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2   D&K note and credit for the losses.

3              THE COURT:  Well --

4              MR. HERSCHMANN:  Those were the subject matters

5   that were discussed.

6              THE COURT:  She is reading from it, though.

7    Q    Now --

8              THE COURT:  You're kind of abusing it now.  She

9   cannot read from it.

10   Q    All right.

11        So, the document is not in evidence, so you cannot read

12  from it.  You can only look at it to refresh your recollection

13  and then answer the question.  So.

14             THE COURT:  And if you cannot answer the question,

15  then you cannot answer the question.

16   Q    Now, was there a discussion about capital contributions

17  made to White Box?

18   A    Yes.

19   Q    After that do you recall what was discussed about TPR

20  and its relationship to White Box?

21   A    Yes.

22   Q    And do you recall at some point asking could you have

23  control of the tax filings of White Box?

24   A    Yes.

25   Q    Now, did you then move on to discuss your trustees and

26  administration of your trust?

**3/23/2015 Genger -v- Genger Proceeding 032315**

```
1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2      A    Yes.

3      Q    Who were the trustees back in 2007?

4      A    It was Lea Fang.

5      Q    Did you discuss wanting someone else to become the

6   trustee of your trust?

7      A    Yes.

8               MR. DELLAPORTAS:  Objection, relevance.

9               THE COURT:  Sustained.

10     Q    In the course of this meeting was the agenda dealing

11  with your parents' divorce?

12     A    No.

13     Q    If you look at the agenda does it refresh your

14  recollection as to whether or not you had raised TRI or had

15  intended to raise TRI in any way?

16     A    Does it refresh?

17     Q    Yes?

18     A    Yes, it does.

19     Q    And is TRI something that was on your agenda to cover?

20     A    No.

21     Q    Now, did you then cover the Canadian ventures?

22     A    Yes.

23     Q    And do you recall, approximately, when you learned

24  about Riverside related entities?

25     A    It was some time prior in '07, prior to this meeting.

26     Q    And when you say some time prior to '07, was that in
```

2848

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2     relationship with your trying to get a better understanding of
 3     finances?
 4          A    Yes.
 5          Q    And prior to having this meeting in November of 2007
 6     had you met personally with Isaacson and Company
 7     representatives?
 8          A    Before this meeting?
 9          Q    Yes?
10          A    Yes.
11          Q    If you go now to the issues, let's focus now on the
12     Canadian ventures.
13          Do you recall specifically what you first or what was
14     first asked of your brother in the November 8, 2007 meeting
15     regarding the Canadian ventures?
16          A    Without -- Without looking at it?  No.
17          Q    Okay.  Looking at exhibit 234 can you tell us if that
18     refreshes your recollection as to what was, what was the first
19     thing that you discussed in relationship to the Canadian
20     ventures?
21          A    Yes.
22          Q    What was the first thing that was discussed?
23               THE COURT:  Without reading from this.
24          Q    Without reading?
25          A    What did I sell to my brother?
26          Q    Was that a question that the representatives of
```

### 3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2    Isaacson & Company asked your brother even in November of 2007?
 3               MR. DELLAPORTAS:  Objection, hearsay.
 4               THE COURT:  Sustained.
 5      Q    How did your brother respond to the question of what
 6    you had sold to him?
 7      A    To that particular question, I don't remember what his
 8    response was.
 9      Q    Without looking at the agenda do you recall what was
10    discussed in connection with your brother about it?
11               THE COURT:  About?
12      Q    About the Canadian ventures?
13               THE COURT:  Okay the Canadian ventures.
14      Q    Yes?
15      A    I mean, I have a specific --
16      Q    Tell us what you recall being discussed about the
17    Canadian ventures, of the transfer.  And then we can get into
18    the specifics.  Tell us generally first what you recall?
19      A    About the Canadian ventures what was discussed?
20      Q    Yes?
21      A    Specifically, I specifically asked my brother if we
22    could now transfer back my shares to me like he said he would
23    do.  And I specifically remember my brother looking at me and
24    laughing and said, I don't know why you would want to do that,
25    it is valueless.
26      Q    Did you believe him when he said that?
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2        A    Did I believe what, that it was valueless?

3        Q    Yes?

4        A    What I believed is that, is that my brother tricked me.

5        Q    And after that conversation did you still try to get

6    more information about the Canadian ventures from your brother

7    in that meeting?

8        A    I don't remember what happened specifically right after

9    that. I know there was other, there was more conversation about

10   it. But, I cannot tell you specifically.

11       Q    Looking at exhibit 234 did you have a discussion to

12   refresh your recollection specifically about the dollar values?

13       A    Yes.

14       Q    Okay. And does exhibit 234 refresh your recollection?

15       A    Yes.

16       Q    And what do you recall about discussing with your

17   brother in that meeting dealing with the valuations?

18       A    That I had, I had sold my interest to him for 100,000

19   when I bought it for 150.

20       Q    And then do you recall any discussions about the

21   valuations of the businesses currently?

22       A    I am sorry, what was the question?

23       Q    Could we read it back, please?

24            THE COURT:  Yes, please.

25            (Record read)

26       Q    I meant, generally.  I mean the Canadian business?

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
1            O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2       A    Yes.

3       Q    Did your brother in the course of that meeting provide

4  you with any financial information as to where the money had

5  gone from the Canadian ventures?

6       A    No.

7       Q    Let me show you what you has been marked as exhibit

8  266-71, which is admitted into evidence.

9            And do you see on the bottom portion of the exhibit

10  266-71 that there is a reference that the White Paper -- I am

11  sorry, that the White Box papers were supposed to transfer to

12  Jonah from Bill Fischer and then Jonah can be reached at (212)

13  758-0000.

14           Do you see that ?

15      A    Yes.

16      Q    Does that refresh your recollection as to who were the

17  accountants for White Box in 2007?

18      A    Yes.

19      Q    Is that Jonah Gayer and Associates?

20      A    I mean, it was supposed to be, it wasn't.

21      Q    Do you know at some point whether Gayer and Associates

22  became the accountants for White Box?  And I'm focused on the

23  2007 time period.

24      A    I don't know that it ever actually switched to Jonah

25  Gayer.

26      Q    Now, going back to the meeting in November, 2007, do
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2     you recall that at the conclusion of the agenda there was an
 3     over all subject matter that you wanted to address with your
 4     brother?
 5          A    Yes.
 6               (Continued on the next page)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
```

### 3/23/2015 Genger -v- Genger Proceeding 032315

```
1                O. Genger - Plaintiff - Direct/Herschmann

2        Q    And what was the general tenure for what you were

3    looking to get from your brother in the November 2007 meeting?

4        A    Information.  Information about my finances.

5        Q    And did you get information that was satisfactory to

6    you from your brother in that meeting?

7        A    No.

8        Q    Let me show you what's been previously received in

9    evidence as Exhibit 230.

10               MR. HERSCHMANN:  Again, I'm providing an extra

11       copy to defense counsel.

12               (Handing to defense counsel.)

13               (Handing to witness.)

14               (Handing to the Court.)

15       Q    Do you recall that after the meeting Isaacson &

16   Associates sent a letter to your brother?

17               THE COURT:  Yeah, this is very leading.

18               MR. HERSCHMANN:  I'm sorry?

19               THE COURT:  Ask a question.

20               MR. HERSCHMANN:  I'm trying to lay a foundation

21       for the exhibit.

22               THE COURT:  It's too leading.

23       Q    First, have you seen Exhibit 230 beforehand?

24       A    Yes.

25       Q    Did you have discussions with Isaacson & Associates

26   before Exhibit 230 was sent to your brother?
```

# Exhibit C

### 3/23/2015 Genger -v- Genger Proceeding 032315

```
1
2    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK:   CIVIL TERM: PART - 12
3    ---------------------------------------------X
     ORLY GENGER,
4
                        Plaintiff
5                                 INDEX NUMBER:
                                      100697/08
6             -against-
7    SAGI GENGER,
8                        Defendant
     ---------------------------------------------X
9                   80 Centre Street
                    New York, New York 10013
10                  March 23, 2015
11   BEFORE:
             HONORABLE:  Barbara Jaffe, JSC
12
13   APPEARANCES:
14           Zeichner Ellman & Krause, LLP
             Attorneys for Plaintiff
15           1211 Avenue of the Americas
             New York, New York 10036
16           By:  Bryan D. Leinbach, Esq.
                  -and-
17           Kasowitz Benson Torres & Friedman, LLP
             1633 Broadway
18           New York,  New York 10019
             By:  Eric D. Herschmann, Esq.
19                Michael Paul Bowen, Esq.
20           Morgan, Lewis & Bockius, LLP
             Attorneys for the Defendant
21           101 Park Avenue
             New York, New York 10178-0060
22           By:  John Dellaportas, Esq.
                  Mary Pennisi, Esq.
23
24
25                        Delores Hilliard
                          Vicki K. Glover
26                   Official Court Reporters
               - OFFICIAL COURT REPORTER
```

**3/23/2015 Genger -v- Genger Proceeding 032315**

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2    accounting firm?
 3       A    Yes.
 4       Q    What was the reason that you obtained a different
 5    accounting firm?
 6       A    Well, around this time in 2007, I was trying to get
 7    information about my finances from my brother.  He did not want
 8    to deal with Bill Fischer and told me that, you know, if I
 9    wanted to have any conversations with him about it, I'd have
10    to --
11       Q    I think you have to slow down.
12       A    Sorry.
13              If I wanted to have any conversations with him
14    about my finances, I would have to work with an accountant that
15    was a new accountant, someone who was independent.  So I hired a
16    new accountant.
17       Q    Who did you hire?
18       A    Joel Isaacson.
19       Q    Did Joel Isaacson have anything to do with Raines &
20    Fischer?
21       A    No.
22       Q    Did Joel Isaacson & Associates have anything to do with
23    your father?
24       A    No.
25       Q    How did you come to hire Joel Isaacson?
26       A    A friend of mine referred me to them.
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

1                O. Genger - Plaintiff - Direct/Herschmann

2        Q     And a friend that was independent of Raines & Fischer

3    or your parents?

4        A     Yes.

5        Q     And after you hired Joel Isaacson & Company, then what

6    happened regarding your finances?

7        A     They started trying to help me gather information, and

8    I know they contacted Sagi and tried to get information from

9    him.  We tried to set up a meeting, and we finally were able to

10   set up a meeting with Sagi.

11       Q     Do you recall, approximately, when you were able to set

12   up that meeting with your brother?

13       A     I believe it was in November of 2007.

14       Q     Do you recall whether or not your brother had sent

15   information to your new accountants Isaacson & Associates prior

16   to your having a meeting together with your brother?

17       A     No, I know that he didn't.

18       Q     Now, as far as the actual time period of the meeting,

19   do you recall how that actually got set or what transpired?

20       A     How the meeting transpired?

21       Q     Yes.

22       A     Well, as I said, I was trying to get information from

23   my brother.  I hired these new accountants, Joel Isaacson, and I

24   knew that my brother had all this information, and we contacted

25   him several times to try to set it up, and we finally --

26       Q     I think you have to slow down.

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
1                O. Genger - Plaintiff - Direct/Herschmann
2        A    We finally were able to set up a meeting.
3        Q    Let me show you what's been marked as Exhibit 234 for
4    identification, and it's been previously discussed in this
5    matter.
6                 (Handing to defense counsel.)
7                 MR. HERSCHMANN:  I'm providing a copy again to
8    defense counsel.
9                 (Handing to witness.)
10                (Handing to the Court.)
11       Q    I'm going to hand you an exhibit, what's been
12   previously marked as Exhibit 228 for identification, which is
13   Bates stamped JI 429.  I'm providing again a copy to defense
14   counsel.
15                (Handing to defense counsel.)
16                (Handing to witness.)
17       Q    Will you take a look at Exhibit 228 as well?
18                (Handing to the Court.)
19       Q    I'm going to hand you also what's been marked as
20   266-135 as well.  I'm providing a copy to defense counsel.
21                (Handing to defense counsel.)
22                (Handing to witness.)
23       Q    Let me start with Exhibit 266-135.
24                (Handing to the Court.)
25       Q    Do you see that this is an e-mail from Stan Altmark to
26   your brother?
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

1              O. Genger - Plaintiff - Direct/Herschmann

2       A    Yes.

3       Q    And you've seen this e-mail before today, correct?

4       A    Yes.

5       Q    Now, looking at the e-mail, does it refresh your

6    recollection as to whether or not you had requested via Isaacson

7    & Company certain information in June of 2007 from your brother?

8       A    Yes, I did.

9       Q    And is it accurate that after making requests from your

10   brother in June of 2007, you had not received specific

11   information that you wanted prior to meeting with him?

12      A    Yes.

13      Q    Now, looking at Exhibit 228, if you could, for a

14   moment, have you seen Exhibit 228 previously?

15      A    Yes.

16      Q    And do you recognize this as an e-mail from Joel

17   Isaacson to your brother dated November 6th of 2007?

18      A    Yes.

19           MR. HERSCHMANN:  Your Honor, at this time I would

20   offer Exhibit 228 for identification into evidence.

21           MR. DELLAPORTAS:  Objection.  Hearsay.

22           MR. HERSCHMANN:  Your Honor, we're offering it as

23   a communication that was sent as a representative from Orly

24   Genger to her brother.  The actual content is irrelevant,

25   except for the fact that he actually received it.

26           MR. DELLAPORTAS:  It's definitely being offered

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
1                  O. Genger - Plaintiff - Direct/Herschmann
2          for the truth of the matter, and it's hearsay, and it
3          hasn't been authenticated.  It's from Joel Isaacson's
4          files.
5                  THE COURT:  Yeah, sustained.
6          Q    Well, Ms. Genger, looking at Exhibit 228, do you recall
7      whether or not your brother was advised that Isaacson & Company
8      had no affiliation with Raines & Fischer?
9          A    Yes.
10         Q    And did you believe at the time Isaacson & Company was
11     making requests from your brother for certain documents, that
12     you were actually entitled to those documents?
13         A    Yes.
14         Q    Did you retain Isaacson & Company to help advise you on
15     the state of affair of your assets?
16         A    Yes.
17         Q    Who was the accountant handling the tax returns for
18     White Box in the 2007 time period?  Was it Jonas Gayer, to your
19     knowledge, or was it Raines & Fischer, if you recall?
20         A    Raines & Fischer.
21         Q    Now, can you look at Exhibit 234, please?  Do you have
22     the exhibit in front of you?
23         A    Yes.
24         Q    And you mentioned earlier that there was an agenda that
25     was put together for the November 8th, 2007 meeting.
26                  Does this exhibit refresh your recollection as to
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
1              O. Genger - Plaintiff - Direct/Herschmann
2    what was covered during the course of the meeting, as far as
3    your side was concerned?
4              MR. DELLAPORTAS:  Objection.  There's been no
5         testimony that she lacks recollection subject that it needs
6         to be refreshed.
7         Q    Do you recall everything that happened at the November
8    8, 2007 meeting?
9         A    I don't know if I recall everything, but I --
10        Q    Is there a document that would help refresh your
11   recollection as to what was the agenda covered at the November
12   8, 2007 meeting?
13        A    Yes.
14        Q    Is the actual agenda the document that would help you
15   refresh your recollection?
16        A    Yes.
17        Q    So, now looking at Exhibit 234, does that refresh your
18   recollection as to what was expected to be covered by your
19   representatives with your brother on November 8, 2007?
20        A    Yes.
21        Q    So, can you first tell us how long did it take for you,
22   for your representatives, to arrange a meeting with your brother
23   to discuss your finances?  Was it a week?  Was it more than
24   that?  And if the prior documents that I've handed you, Exhibit
25   266-135, refresh your recollection, please let us know.
26             MR. DELLAPORTAS:  It's kind of leading.
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

1           O. Genger - Plaintiff - Direct/Herschmann

2           THE COURT:  You're putting the cart before the

3     horse.

4           MR. HERSCHMANN:  Okay.  Well, let me ask it.

5     Q     Do you recall how long it took you to set up a meeting

6     with your brother?

7     A     I know it was months.

8     Q     Now, can you describe for us the general tenure of the

9     meeting; where it occurred, if you recall, what happened when

10    you got there?

11    A     The meeting happened at Joel Isaacson's office, and the

12    people who were there who attended the meeting were Joel

13    Isaacson, Stan Altmark, Don Mullen, my mother, myself and my

14    brother.  And the tenure was, I was trying to get information,

15    which is in this agenda.  I had a lot of questions that I wanted

16    answered.

17    Q     I want you to leave the agenda aside.  If you can give

18    us the general -- was it in a conference room?  What happened?

19    A     It was in one of the conference rooms at Isaacson's

20    office.

21    Q     And was Don Mullen the person who referred you to

22    Isaacson & Company?

23    A     Yes, he was.

24    Q     Now, just tell us generally what happened, and then

25    we'll cover the specifics in the course of the meeting.

26    A     Generally, what happened was, all these people were

**3/23/2015  Genger -v- Genger Proceeding 032315**

1           O. Genger - Plaintiff - Direct/Herschmann

2      sitting in a room together.  Joel Isaacson and Stan Altmark were

3      asking certain questions of Sagi.  Sagi was not happy with the

4      fact that we were asking questions.  He did most of the talking.

5      Stan or Joel would ask him a question and he would give a

6      five-minute speech on something and run -- I mean, just run

7      circles around everyone.  He was not really answering questions.

8      And we were getting nowhere.  And he became very upset by the

9      fact that we were asking him questions.

10           (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
1            O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2       Q    And did you attempt to go through the agenda that  is
3   contained in exhibit 234?
4       A    Yes, we did.
5       Q    Now, was the meeting to discuss your getting access to
6   financial information and to take control of your financial
7   life?
8       A    Yes.
9       Q    Was that expressed to your brother?
10      A    Yes.
11      Q    Did you address in anything -- well, withdrawn.
12           Do you recall specifically what you addressed regarding
13  your 1993 trust?
14           Just a foundational question that I have to ask before
15  I present the exhibit.
16           Do you recall specifically what was addressed?
17      A    Without looking at it?
18      Q    Without looking at it?
19      A    Okay.  I mean, generally, I know.
20      Q    Would the agenda refresh your recollection as to
21  specifically what you were asking about your trust?
22      A    Yes.
23           MR. HERSCHMANN:  I would offer it in as a past
24      recollection refreshed and make the process easier or I can
25      do it this way.
26           THE COURT:  Mr. Dellaportas, what do you say?
```

3/23/2015 Genger -v- Genger Proceeding 032315

```
 1        O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2            MR. DELLAPORTAS:  This agenda, do you mean?
 3            THE COURT:  Yes.
 4            MR. DELLAPORTAS:  It is hearsay.
 5            MR. HERSCHMANN:  Well, the past recollection
 6    recorded, the present recollection refreshed.
 7            THE COURT:  I don't know that she recorded it.
 8            MR. HERSCHMANN:  She doesn't have to have recorded
 9    it.  She has to be able to articulate that this was an
10    accurate document of what was discussed at the meeting.  She
11    doesn't have to be the actual person who sat down and
12    recorded it.
13            THE COURT:  Is that your understanding, Mr.
14    Dellaportas?
15            MR. DELLAPORTAS:  No.
16            THE COURT:  I'm not sure either.
17            MR. HERSCHMANN:  We can pull it up.
18            THE COURT:  Just to refresh my own recollection.
19            Who has The Richardson?
20            MR. HERSCHMANN:  I don't have it.  And I think the
21    rule, and I can articulate it this way, if your secretary
22    sat there and took copious notes of the entire process and
23    said this accurately reflects what happened at the
24    meeting --
25            THE COURT:  We don't know when it was prepared.  I
26    don't know.  Let's just get the rule.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1        O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2             MR. HERSCHMANN:  Okay.
3             (Short pause)
4             MR. DELLAPORTAS:  There is a Judge Friedman's
5    section on it.  It says, under the past recollection
6    recorded doctrine the memoranda of a fact known for an event
7    offered in the past for which the witness lacks sufficient
8    present recollection may be received in evidence to the
9    witness' oral testimony.
10            THE COURT:  It doesn't say anything about having to
11   be prepared by the witness.
12            MR. DELLAPORTAS:  There is a whole section in here.
13            THE COURT:  I don't know, Mr. Herschmann.
14            MR. HERSCHMANN:  If you want testimony, take a
15   moment, we can look at it.  I have no problem.
16            But, I'm pretty confident the rule is exactly as
17   Mr. Dellaportas just read it.
18            It is not necessary that the witness be the one
19   that actually recorded it as much as they can say that
20   recording is accurate.
21            THE COURT:  I'm pleased that you're confident.  I
22   am not.
23            It didn't say anything about it, but that doesn't
24   mean --
25            MR. DELLAPORTAS:  As I understand it this is the
26   agenda prepared before the meeting and thus isn't --
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
 1        O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2             THE COURT:  That is what I mean, also.  It is not
 3        contemporaneous.
 4             MR. DELLAPORTAS:  It is not notes from the meeting.
 5        It is agenda in advance of the meeting.
 6             MR. HERSCHMANN:  Your Honor, the rule is as I
 7        understand it, and Mr. Dellaportas if he wants to share that
 8        with us and we can take a 5 minute recess.
 9             THE COURT:  I can go in the back and look at it.
10             MR. HERSCHMANN:  If you would do that, your Honor,
11        that would be great.
12             Thank you, very much.
13             (Short recess; time is now 2:42 PM)
14             (2:45 PM)
15             THE COURT:  I don't think so, Mr. Herschmann.  Not
16        according to Richardson under the old book, which I'm sure
17        hasn't been changed too much, 66213, I don't know what it is
18        in the next edition.  But, while the memorandum, any
19        memorandum made by anybody can be used to refresh, if you
20        want it in evidence when a witness has so far forgotten
21        facts that he cannot recall them even after looking at a
22        memorandum of them and he testified that he once knew them
23        and made a memorandum of them at the time or soon after,
24        which he intended to make correctly and which he believes to
25        be correct, such memorandum in his own handwriting may be
26        received as evidence of the facts contained although the
```

2837

**3/23/2015  Genger -v- Genger Proceeding 032315**

1        O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2     witness has no present recollection of them.

3            MR. HERSCHMANN:  Your Honor, I think that's why I

4     raised the issue of past recollection refreshed or present

5     recollection recorded.

6            As I said, there are two ways to address.  I can

7     address it with the witness as present recollection

8     refreshed, which is the process that the witness looks at

9     it.

10           THE COURT:  Right.  Then, this doesn't come into

11    evidence.  But, you want it in evidence.

12           MR. HERSCHMANN:  That's correct.

13           The reason I had it the way I did is that there are

14    two ways of dealing with it.

15           There is what I call the simpler process.

16           THE COURT:  It is not coming into evidence.

17           MR. HERSCHMANN:  Okay.

18           THE COURT:  She can use it to refresh her

19    recollection if it indeed refreshes her recollection.

20           As I recall this whole exercise is because you

21    wanted to offer it into evidence.

22           MR. HERSCHMANN:  That's correct.  And the reason

23    doesn't matters.

24           THE COURT:  Okay.

25    Q    So, Ms. Genger, let me, I'm going to walk you through

26    the process.

**3/23/2015  Genger -v- Genger Proceeding 032315**

1           O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2           I'm going to ask you specific questions.  If you recall

3    something specifically you should answer it.  If you don't

4    recall specifically, then I'm going to ask you is there

5    something that would refresh your recollection.  And the process

6    is then you can look at it and then say the document refreshes

7    my recollection and then answer it.  Okay?

8           So, I'm going to go back to the November 8, 2007

9    meeting.

10          And do you recall specifically what was discussed in

11   the first topic dealing with Orly Genger 1993 Trust?

12   A    Specifically, no.

13   Q    Would the agenda refresh your recollection as to what

14   was discussed?

15   A    Yes.

16   Q    Can you take a moment to look at the agenda and tell us

17   after looking at it does it refresh your recollection as to what

18   was the first topic discussed as it related to the Orly Genger

19   1993 Trust?

20   A    Yes.

21   Q    Okay.  What was of the first topic discussed?

22   A    D&K.

23   Q    And what was discussed after D&K was raised?

24   A    Who was the general partner.  Did Sagi have a copy of

25   the partnership agreement, the note.

26          Then, there is  a topic of the note, who owns the note.

3/23/2015  Genger -v- Genger Proceeding 032315

```
1            O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2       Q    When you say who is the general partner do you recall
3    the specific discussions as to percentages about your mother and
4    whether she remained the general partner, without looking at
5    document first?
6       A    No.
7       Q    If you look at the document does that  refresh your
8    recollection?
9       A    Yes.
10      Q    And what was the first thing that was discussed after
11   you asked who were the general partners of D&K?
12           MR. DELLAPORTAS:  I object on relevance grounds as
13      to this line of testimony.
14           MR. HERSCHMANN:  I'm doing this as a general
15      proposition as to the subject matters that were discussed.
16           I can offer the agenda in and make it simple and go
17      through it or I can only do it this way, your Honor.  That
18      is why I raised it in the first place.
19           I'm not saying it is proof.  I'll do it any way Mr.
20      Dellaportas prefers.
21           THE COURT:  He doesn't prefer anything.  It is not
22      depending upon what he prefers.  It is what you want to
23      prove.
24           He says it is not relevant.
25           Why is it relevant?
26      Q    Well, did you generally discuss your trust and
```

3/23/2015 Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2     associations with the D&K note?
 3          A    Yes.
 4          Q    Okay.  After discussing your trust and the D&K note did
 5     you then have discussions about TPR?
 6          A    Yes.
 7          Q    Okay.  Do you recall specifically about what was
 8     discussed in relationship to TPR and what percentages were not
 9     owned by D&K, first, without looking at the document?
10          A    No.
11          Q    Looking at the document, does it refresh your
12     recollection as to what was the first thing you discussed about
13     TPR?
14          A    Yes.
15          Q    And what was that ?
16          A    Who owns and what percentages the 49 percent not owned
17     by D&K.
18          Q    And do you recall whether there was any discussion
19     about Rochell, R-O-C-H-E-L-L, Fang and your mother's interest?
20          A    Yes.
21          Q    After that did you have a discussion about whether or
22     not you can get copies of the minutes of meetings from TPR?
23          A    Yes.
24          Q    Did your brother agree to give you copies of the
25     minutes of meetings with TPR?
26          A    No.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2         Q    Did you then discuss with your brother what is the
3    distribution he was receiving from TPR?
4              MR. DELLAPORTAS:  Objection.  Relevance.
5              THE COURT:  Overruled.
6         A    Yes.
7         Q    Okay.  And do you recall raising the amount of his
8    getting $45,000 per month?
9         A    Yes.
10        Q    And did your brother ever answer as to why he was
11   getting $45,000 from TPR per month and how it was being
12   categorized?
13             MR. DELLAPORTAS:  Objection, compound.
14             THE COURT:  Let's take it one at a time.
15        Q    Okay.  Did your brother ascribe for you why he was
16   receiving $45,000 per month?
17        A    He may have and I don't remember.
18             His answers were long winded.  So, I just don't
19   remember them.
20        Q    Was there a  discussion about why your mother was
21   receiving $30,000 per month?
22             MR. DELLAPORTAS:  Objection, lack of foundation.
23             THE COURT:  Yes.  Sustained.
24        Q    Well, do you recall a discussion about what
25   distributions your mother was getting from TPR?
26        A    Generally, yes.
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann

 2      Q    Looking at the exhibit, does it refresh your

 3   recollection as to what dollar amount your brother was being

 4   questioned about regarding how much money your mother was

 5   receiving?

 6      A    Yes.

 7      Q    What number did you question your brother about?

 8      A    $30,000 a month.

 9      Q    Per month?

10      A    Yes.

11      Q    Do you recall then discussing with your brother how

12   could distributions be evened out between you, your mother and

13   your brother?

14      A    Yes.

15      Q    Did your brother at that time indicate his willingness

16   to even out the distribution between you, and your mother and

17   himself?

18      A    No, he didn't.

19      Q    Did your brother answer any questions about what are

20   the assets of TPR?

21      A    Whatever answers he gave were so complicated and he

22   gave answers that  confused everyone.

23      Q    Well, did the Isaacson representatives say to your

24   brother during the course of the meeting that they were

25   satisfied with his answers?

26      A    No.
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2       Q    What did they say generally about the answers your

3  brother was giving?

4              MR. DELLAPORTAS:  Objection.  Hearsay.

5              THE COURT:  Sustained.

6       Q    Did you then cover what receivables were due TPR, just

7  generally?

8       A    I don't remember.

9       Q    Okay.  If you look at exhibit 234, the agenda in front

10 of you, does that refresh your recollection as to what questions

11 were asked about the receivables due TPR?

12      A    Yes.

13      Q    And looking at that , does it refresh your recollection

14 about asking what happened to the $1.9 million that your brother

15 owed TPR?

16             MR. DELLAPORTAS:  Objection.  Lack of foundation

17    and leading.

18             THE COURT:  How about a foundation?

19      Q    Okay.  Well, does exhibit 234 refresh your recollection

20 as to whether the subject matters of how much money your brother

21 owed TPR was discussed on November 8, 2007?

22      A    Yes.

23      Q    Okay.  Looking at exhibit 234 does it refresh your

24 recollection about the specific amount of money that was

25 discussed with your brother regarding how much money he owed

26 TPR?

```
1            O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2        A    Yes.
3        Q    What was the amount of money that your brother was
4    asked about that he owed TPR?
5              MR. DELLAPORTAS:  Just objection, your Honor.
6              This doesn't feel like a refreshed recollection.
7    It just fees like reading a document.
8              MR. HERSCHMANN:  It's the only way to do it.
9              If Mr. Dellaportas wants me to go down --
10             THE COURT:  You know, she was there.  So, I do
11   believe there is a --
12             MR. DELLAPORTAS:  Okay.
13       Q    What is the amount?
14       A    $1.9 million.
15       Q    Do you recall then having other discussions about other
16   monies that were owed TPR or owed by other officers to TPR?
17       A    Yes.
18       Q    Do you recall what was next discussed independent of
19   looking at the exhibit?
20       A    No.
21       Q    Looking at the exhibit, does it refresh your
22   recollection as to the next item that you discussed with your
23   brother?
24       A    Yes.
25       Q    Okay.  What was the next item that you discussed with
26   your brother?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2        A     The annual expense of TPR and then after that there was
 3   trust administration.
 4        Q     I think you have to speak a little louder.
 5        A     Sorry.
 6              Right after that there was what are the annual expenses
 7   of TPR exclusive of above distributions to Sagi and Ariel Orly.
 8        Q     Did your brother answer what was the annual expense to
 9   TPR when Isaacson & Company posed the question to him?
10        A     Again, his answers were really convoluted and --
11        Q     How about, was there a discussion about the amount of
12   lawsuits that TPR was involved with as either a plaintiff or a
13   defendant?
14        A     Were there discussions?
15        Q     Yes?
16        A     Yes.
17        Q     After that was there a discussion about potentially
18   buying out your interests?
19        A     Yes.
20        Q     And looking at exhibit 234 does it refresh your
21   recollection, specifically, about what you asked of your
22   brother?
23        A     Yes.
24        Q     What was asked?
25        A     Was TPR, meaning Sagi, consider buying out Orly's
26   interest in TPR.  -- Or D&K now giving proper discounts to the
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2     D&K note and credit for the losses.
 3               THE COURT:  Well --
 4               MR. HERSCHMANN:  Those were the subject matters
 5     that were discussed.
 6               THE COURT:  She is reading from it, though.
 7     Q    Now --
 8               THE COURT:  You're kind of abusing it now.  She
 9     cannot read from it.
10     Q    All right.
11          So, the document is not in evidence, so you cannot read
12     from it.  You can only look at it to refresh your recollection
13     and then answer the question.  So.
14               THE COURT:  And if you cannot answer the question,
15     then you cannot answer the question.
16     Q    Now, was there a discussion about capital contributions
17     made to White Box?
18     A    Yes.
19     Q    After that do you recall what was discussed about TPR
20     and its relationship to White Box?
21     A    Yes.
22     Q    And do you recall at some point asking could you have
23     control of the tax filings of White Box?
24     A    Yes.
25     Q    Now, did you then move on to discuss your trustees and
26     administration of your trust?
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

| | | |
|---|---|---|
| 1 | | O. Genger – by Plaintiff – Direct/by Mr. Herschmann |
| 2 | A | Yes. |
| 3 | Q | Who were the trustees back in 2007? |
| 4 | A | It was Lea Fang. |
| 5 | Q | Did you discuss wanting someone else to become the |
| 6 | | trustee of your trust? |
| 7 | A | Yes. |
| 8 | | MR. DELLAPORTAS:  Objection, relevance. |
| 9 | | THE COURT:  Sustained. |
| 10 | Q | In the course of this meeting was the agenda dealing |
| 11 | | with your parents' divorce? |
| 12 | A | No. |
| 13 | Q | If you look at the agenda does it refresh your |
| 14 | | recollection as to whether or not you had raised TRI or had |
| 15 | | intended to raise TRI in any way? |
| 16 | A | Does it refresh? |
| 17 | Q | Yes? |
| 18 | A | Yes, it does. |
| 19 | Q | And is TRI something that was on your agenda to cover? |
| 20 | A | No. |
| 21 | Q | Now, did you then cover the Canadian ventures? |
| 22 | A | Yes. |
| 23 | Q | And do you recall, approximately, when you learned |
| 24 | | about Riverside related entities? |
| 25 | A | It was some time prior in '07, prior to this meeting. |
| 26 | Q | And when you say some time prior to '07, was that in |

2848

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2     relationship with your trying to get a better understanding of

3     finances?

4          A    Yes.

5          Q    And prior to having this meeting in November of 2007

6     had you met personally with Isaacson and Company

7     representatives?

8          A    Before this meeting?

9          Q    Yes?

10         A    Yes.

11         Q    If you go now to the issues, let's focus now on the

12    Canadian ventures.

13              Do you recall specifically what you first or what was

14    first asked of your brother in the November 8, 2007 meeting

15    regarding the Canadian ventures?

16         A    Without -- Without looking at it?  No.

17         Q    Okay.  Looking at exhibit 234 can you tell us if that

18    refreshes your recollection as to what was, what was the first

19    thing that you discussed in relationship to the Canadian

20    ventures?

21         A    Yes.

22         Q    What was the first thing that was discussed?

23              THE COURT:  Without reading from this.

24         Q    Without reading?

25         A    What did I sell to my brother?

26         Q    Was that a question that the representatives of
```

3/23/2015  Genger -v- Genger Proceeding 032315

1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2     Isaacson & Company asked your brother even in November of 2007?

3               MR. DELLAPORTAS:  Objection, hearsay.

4               THE COURT:  Sustained.

5          Q    How did your brother respond to the question of what

6     you had sold to him?

7          A    To that particular question, I don't remember what his

8     response was.

9          Q    Without looking at the agenda do you recall what was

10    discussed in connection with your brother about it?

11              THE COURT:  About?

12         Q    About the Canadian ventures?

13              THE COURT:  Okay the Canadian ventures.

14         Q    Yes?

15         A    I mean, I have a specific --

16         Q    Tell us what you recall being discussed about the

17    Canadian ventures, of the transfer.  And then we can get into

18    the specifics.  Tell us generally first what you recall?

19         A    About the Canadian ventures what was discussed?

20         Q    Yes?

21         A    Specifically, I specifically asked my brother if we

22    could now transfer back my shares to me like he said he would

23    do.  And I specifically remember my brother looking at me and

24    laughing and said, I don't know why you would want to do that,

25    it is valueless.

26         Q    Did you believe him when he said that?

2850

3/23/2015  Genger -v- Genger Proceeding 032315

1        O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2        A    Did I believe what, that it was valueless?

3        Q    Yes?

4        A    What I believed is that, is that my brother tricked me.

5        Q    And after that conversation did you still try to get

6    more information about the Canadian ventures from your brother

7    in that meeting?

8        A    I don't remember what happened specifically right after

9    that.  I know there was other, there was more conversation about

10   it.  But, I cannot tell you specifically.

11       Q    Looking at exhibit 234 did you have a discussion to

12   refresh your recollection specifically about the dollar values?

13       A    Yes.

14       Q    Okay.  And does exhibit 234 refresh your recollection?

15       A    Yes.

16       Q    And what do you recall about discussing with your

17   brother in that meeting dealing with the valuations?

18       A    That I had, I had sold my interest to him for 100,000

19   when I bought it for 150.

20       Q    And then do you recall any discussions about the

21   valuations of the businesses currently?

22       A    I am sorry, what was the question?

23       Q    Could we read it back, please?

24            THE COURT:  Yes, please.

25            (Record read)

26       Q    I meant, generally.  I mean the Canadian business?

### 3/23/2015  Genger -v- Genger Proceeding 032315

1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2          A    Yes.

3          Q    Did your brother in the course of that meeting provide

4     you with any financial information as to where the money had

5     gone from the Canadian ventures?

6          A    No.

7          Q    Let me show you what you has been marked as exhibit

8     266-71, which is admitted into evidence.

9               And do you see on the bottom portion of the exhibit

10    266-71 that there is a reference that the White Paper -- I am

11    sorry, that the White Box papers were supposed to transfer to

12    Jonah from Bill Fischer and then Jonah can be reached at (212)

13    758-0000.

14              Do you see that ?

15         A    Yes.

16         Q    Does that refresh your recollection as to who were the

17    accountants for White Box in 2007?

18         A    Yes.

19         Q    Is that Jonah Gayer and Associates?

20         A    I mean, it was supposed to be, it wasn't.

21         Q    Do you know at some point whether Gayer and Associates

22    became the accountants for White Box?  And I'm focused on the

23    2007 time period.

24         A    I don't know that it ever actually switched to Jonah

25    Gayer.

26         Q    Now, going back to the meeting in November, 2007, do

2852

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
1           O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2       you recall that at the conclusion of the agenda there was an
3       over all subject matter that you wanted to address with your
4       brother?
5           A    Yes.
6               (Continued on the next page)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2      Q    And what was the general tenure for what you were
 3   looking to get from your brother in the November 2007 meeting?
 4      A    Information.  Information about my finances.
 5      Q    And did you get information that was satisfactory to
 6   you from your brother in that meeting?
 7      A    No.
 8      Q    Let me show you what's been previously received in
 9   evidence as Exhibit 230.
10              MR. HERSCHMANN:  Again, I'm providing an extra
11        copy to defense counsel.
12              (Handing to defense counsel.)
13              (Handing to witness.)
14              (Handing to the Court.)
15      Q    Do you recall that after the meeting Isaacson &
16   Associates sent a letter to your brother?
17              THE COURT:  Yeah, this is very leading.
18              MR. HERSCHMANN:  I'm sorry?
19              THE COURT:  Ask a question.
20              MR. HERSCHMANN:  I'm trying to lay a foundation
21        for the exhibit.
22              THE COURT:  It's too leading.
23      Q    First, have you seen Exhibit 230 beforehand?
24      A    Yes.
25      Q    Did you have discussions with Isaacson & Associates
26   before Exhibit 230 was sent to your brother?
```

# Exhibit C

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1
 2    SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF NEW YORK:    CIVIL TERM: PART - 12
 3    ------------------------------------------------X
      ORLY GENGER,
 4
                              Plaintiff
 5                                      INDEX NUMBER:
                                         100697/08
 6              -against-
 7    SAGI GENGER,
 8                            Defendant
      ------------------------------------------------X
 9                      80 Centre Street
                        New York, New York 10013
10                      March 23, 2015
11    BEFORE:
              HONORABLE:  Barbara Jaffe, JSC
12
13    APPEARANCES:
14              Zeichner Ellman & Krause, LLP
                Attorneys for Plaintiff
15              1211 Avenue of the Americas
                New York, New York 10036
16              By:  Bryan D. Leinbach, Esq.
                   -and-
17              Kasowitz Benson Torres & Friedman, LLP
                1633 Broadway
18              New York,  New York 10019
                By:  Eric D. Herschmann, Esq.
19                   Michael Paul Bowen, Esq.
20              Morgan, Lewis & Bockius, LLP
                Attorneys for the Defendant
21              101 Park Avenue
                New York, New York 10178-0060
22              By:  John Dellaportas, Esq.
                   Mary Pennisi, Esq.
23
24
25                              Delores Hilliard
                                Vicki K. Glover
26                              Official Court Reporters
                    - OFFICIAL COURT REPORTER
```

2709

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - Plaintiff - Direct/Herschmann
2    accounting firm?
3         A    Yes.
4         Q    What was the reason that you obtained a different
5    accounting firm?
6         A    Well, around this time in 2007, I was trying to get
7    information about my finances from my brother.  He did not want
8    to deal with Bill Fischer and told me that, you know, if I
9    wanted to have any conversations with him about it, I'd have
10   to --
11        Q    I think you have to slow down.
12        A    Sorry.
13             If I wanted to have any conversations with him
14   about my finances, I would have to work with an accountant that
15   was a new accountant, someone who was independent.  So I hired a
16   new accountant.
17        Q    Who did you hire?
18        A    Joel Isaacson.
19        Q    Did Joel Isaacson have anything to do with Raines &
20   Fischer?
21        A    No.
22        Q    Did Joel Isaacson & Associates have anything to do with
23   your father?
24        A    No.
25        Q    How did you come to hire Joel Isaacson?
26        A    A friend of mine referred me to them.
```

2826

### 3/23/2015  Genger -v- Genger Proceeding 032315

1            O. Genger - Plaintiff - Direct/Herschmann

2       Q     And a friend that was independent of Raines & Fischer

3   or your parents?

4       A     Yes.

5       Q     And after you hired Joel Isaacson & Company, then what

6   happened regarding your finances?

7       A     They started trying to help me gather information, and

8   I know they contacted Sagi and tried to get information from

9   him.  We tried to set up a meeting, and we finally were able to

10  set up a meeting with Sagi.

11      Q     Do you recall, approximately, when you were able to set

12  up that meeting with your brother?

13      A     I believe it was in November of 2007.

14      Q     Do you recall whether or not your brother had sent

15  information to your new accountants Isaacson & Associates prior

16  to your having a meeting together with your brother?

17      A     No, I know that he didn't.

18      Q     Now, as far as the actual time period of the meeting,

19  do you recall how that actually got set or what transpired?

20      A     How the meeting transpired?

21      Q     Yes.

22      A     Well, as I said, I was trying to get information from

23  my brother.  I hired these new accountants, Joel Isaacson, and I

24  knew that my brother had all this information, and we contacted

25  him several times to try to set it up, and we finally --

26      Q     I think you have to slow down.

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1              O. Genger - Plaintiff - Direct/Herschmann

 2       A    We finally were able to set up a meeting.

 3       Q    Let me show you what's been marked as Exhibit 234 for

 4    identification, and it's been previously discussed in this

 5    matter.

 6              (Handing to defense counsel.)

 7              MR. HERSCHMANN:  I'm providing a copy again to

 8    defense counsel.

 9              (Handing to witness.)

10              (Handing to the Court.)

11       Q    I'm going to hand you an exhibit, what's been

12    previously marked as Exhibit 228 for identification, which is

13    Bates stamped JI 429.  I'm providing again a copy to defense

14    counsel.

15              (Handing to defense counsel.)

16              (Handing to witness.)

17       Q    Will you take a look at Exhibit 228 as well?

18              (Handing to the Court.)

19       Q    I'm going to hand you also what's been marked as

20    266-135 as well.  I'm providing a copy to defense counsel.

21              (Handing to defense counsel.)

22              (Handing to witness.)

23       Q    Let me start with Exhibit 266-135.

24              (Handing to the Court.)

25       Q    Do you see that this is an e-mail from Stan Altmark to

26    your brother?
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
1               O. Genger - Plaintiff - Direct/Herschmann
2      A    Yes.
3      Q    And you've seen this e-mail before today, correct?
4      A    Yes.
5      Q    Now, looking at the e-mail, does it refresh your
6    recollection as to whether or not you had requested via Isaacson
7    & Company certain information in June of 2007 from your brother?
8      A    Yes, I did.
9      Q    And is it accurate that after making requests from your
10   brother in June of 2007, you had not received specific
11   information that you wanted prior to meeting with him?
12     A    Yes.
13     Q    Now, looking at Exhibit 228, if you could, for a
14   moment, have you seen Exhibit 228 previously?
15     A    Yes.
16     Q    And do you recognize this as an e-mail from Joel
17   Isaacson to your brother dated November 6th of 2007?
18     A    Yes.
19          MR. HERSCHMANN:  Your Honor, at this time I would
20   offer Exhibit 228 for identification into evidence.
21          MR. DELLAPORTAS:  Objection.  Hearsay.
22          MR. HERSCHMANN:  Your Honor, we're offering it as
23   a communication that was sent as a representative from Orly
24   Genger to her brother.  The actual content is irrelevant,
25   except for the fact that he actually received it.
26          MR. DELLAPORTAS:  It's definitely being offered
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - Plaintiff - Direct/Herschmann
2         for the truth of the matter, and it's hearsay, and it
3         hasn't been authenticated.  It's from Joel Isaacson's
4         files.
5              THE COURT:  Yeah, sustained.
6         Q    Well, Ms. Genger, looking at Exhibit 228, do you recall
7    whether or not your brother was advised that Isaacson & Company
8    had no affiliation with Raines & Fischer?
9         A    Yes.
10        Q    And did you believe at the time Isaacson & Company was
11   making requests from your brother for certain documents, that
12   you were actually entitled to those documents?
13        A    Yes.
14        Q    Did you retain Isaacson & Company to help advise you on
15   the state of affair of your assets?
16        A    Yes.
17        Q    Who was the accountant handling the tax returns for
18   White Box in the 2007 time period?  Was it Jonas Gayer, to your
19   knowledge, or was it Raines & Fischer, if you recall?
20        A    Raines & Fischer.
21        Q    Now, can you look at Exhibit 234, please?  Do you have
22   the exhibit in front of you?
23        A    Yes.
24        Q    And you mentioned earlier that there was an agenda that
25   was put together for the November 8th, 2007 meeting.
26              Does this exhibit refresh your recollection as to
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1                  O. Genger - Plaintiff - Direct/Herschmann
 2    what was covered during the course of the meeting, as far as
 3    your side was concerned?
 4                  MR. DELLAPORTAS:  Objection.  There's been no
 5         testimony that she lacks recollection subject that it needs
 6         to be refreshed.
 7         Q    Do you recall everything that happened at the November
 8    8, 2007 meeting?
 9         A    I don't know if I recall everything, but I --
10         Q    Is there a document that would help refresh your
11    recollection as to what was the agenda covered at the November
12    8, 2007 meeting?
13         A    Yes.
14         Q    Is the actual agenda the document that would help you
15    refresh your recollection?
16         A    Yes.
17         Q    So, now looking at Exhibit 234, does that refresh your
18    recollection as to what was expected to be covered by your
19    representatives with your brother on November 8, 2007?
20         A    Yes.
21         Q    So, can you first tell us how long did it take for you,
22    for your representatives, to arrange a meeting with your brother
23    to discuss your finances?  Was it a week?  Was it more than
24    that?  And if the prior documents that I've handed you, Exhibit
25    266-135, refresh your recollection, please let us know.
26                  MR. DELLAPORTAS:  It's kind of leading.
```

3/23/2015 Genger -v- Genger Proceeding 032315

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2              THE COURT:  You're putting the cart before the
 3        horse.
 4              MR. HERSCHMANN:  Okay.  Well, let me ask it.
 5        Q    Do you recall how long it took you to set up a meeting
 6        with your brother?
 7        A    I know it was months.
 8        Q    Now, can you describe for us the general tenure of the
 9        meeting; where it occurred, if you recall, what happened when
10        you got there?
11        A    The meeting happened at Joel Isaacson's office, and the
12        people who were there who attended the meeting were Joel
13        Isaacson, Stan Altmark, Don Mullen, my mother, myself and my
14        brother.  And the tenure was, I was trying to get information,
15        which is in this agenda.  I had a lot of questions that I wanted
16        answered.
17        Q    I want you to leave the agenda aside.  If you can give
18        us the general -- was it in a conference room?  What happened?
19        A    It was in one of the conference rooms at Isaacson's
20        office.
21        Q    And was Don Mullen the person who referred you to
22        Isaacson & Company?
23        A    Yes, he was.
24        Q    Now, just tell us generally what happened, and then
25        we'll cover the specifics in the course of the meeting.
26        A    Generally, what happened was, all these people were
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2      sitting in a room together.  Joel Isaacson and Stan Altmark were
 3      asking certain questions of Sagi.  Sagi was not happy with the
 4      fact that we were asking questions.  He did most of the talking.
 5      Stan or Joel would ask him a question and he would give a
 6      five-minute speech on something and run -- I mean, just run
 7      circles around everyone.  He was not really answering questions.
 8      And we were getting nowhere.  And he became very upset by the
 9      fact that we were asking him questions.
10                  (Continued on next page.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
```

2833

**3/23/2015  Genger -v- Genger Proceeding 032315**

1        O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2        Q    And did you attempt to go through the agenda that  is

3   contained in exhibit 234?

4        A    Yes, we did.

5        Q    Now, was the meeting to discuss your getting access to

6   financial information and to take control of your financial

7   life?

8        A    Yes.

9        Q    Was that expressed to your brother?

10       A    Yes.

11       Q    Did you address in anything -- well, withdrawn.

12            Do you recall specifically what you addressed regarding

13   your 1993 trust?

14            Just a foundational question that I have to ask before

15   I present the exhibit.

16            Do you recall specifically what was addressed?

17       A    Without looking at it?

18       Q    Without looking at it?

19       A    Okay.  I mean, generally, I know.

20       Q    Would the agenda refresh your recollection as to

21   specifically what you were asking about your trust?

22       A    Yes.

23            MR. HERSCHMANN:  I would offer it in as a past

24       recollection refreshed and make the process easier or I can

25       do it this way.

26            THE COURT:  Mr. Dellaportas, what do you say?

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1        O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2             MR. DELLAPORTAS:  This agenda, do you mean?
 3             THE COURT:  Yes.
 4             MR. DELLAPORTAS:  It is hearsay.
 5             MR. HERSCHMANN:  Well, the past recollection
 6   recorded, the present recollection refreshed.
 7             THE COURT:  I don't know that she recorded it.
 8             MR. HERSCHMANN:  She doesn't have to have recorded
 9   it.  She has to be able to articulate that this was an
10   accurate document of what was discussed at the meeting.  She
11   doesn't have to be the actual person who sat down and
12   recorded it.
13             THE COURT:  Is that your understanding, Mr.
14   Dellaportas?
15             MR. DELLAPORTAS:  No.
16             THE COURT:  I'm not sure either.
17             MR. HERSCHMANN:  We can pull it up.
18             THE COURT:  Just to refresh my own recollection.
19             Who has The Richardson?
20             MR. HERSCHMANN:  I don't have it.  And I think the
21   rule, and I can articulate it this way, if your secretary
22   sat there and took copious notes of the entire process and
23   said this accurately reflects what happened at the
24   meeting --
25             THE COURT:  We don't know when it was prepared.  I
26   don't know.  Let's just get the rule.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2                MR. HERSCHMANN:  Okay.
3          (Short pause)
4                MR. DELLAPORTAS:  There is a Judge Friedman's
5    section on it.  It says, under the past recollection
6    recorded doctrine the memoranda of a fact known for an event
7    offered in the past for which the witness lacks sufficient
8    present recollection may be received in evidence to the
9    witness' oral testimony.
10               THE COURT:  It doesn't say anything about having to
11   be prepared by the witness.
12               MR. DELLAPORTAS:  There is a whole section in here.
13               THE COURT:  I don't know, Mr. Herschmann.
14               MR. HERSCHMANN:  If you want testimony, take a
15   moment, we can look at it.  I have no problem.
16               But, I'm pretty confident the rule is exactly as
17   Mr. Dellaportas just read it.
18               It is not necessary that the witness be the one
19   that actually recorded it as much as they can say that
20   recording is accurate.
21               THE COURT:  I'm pleased that you're confident.  I
22   am not.
23               It didn't say anything about it, but that doesn't
24   mean --
25               MR. DELLAPORTAS:  As I understand it this is the
26   agenda prepared before the meeting and thus isn't --
```

2836

**3/23/2015  Genger -v- Genger Proceeding 032315**

1         O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2              THE COURT:  That is what I mean, also.  It is not

3    contemporaneous.

4              MR. DELLAPORTAS:  It is not notes from the meeting.

5    It is agenda in advance of the meeting.

6              MR. HERSCHMANN:  Your Honor, the rule is as I

7    understand it, and Mr. Dellaportas if he wants to share that

8    with us and we can take a 5 minute recess.

9              THE COURT:  I can go in the back and look at it.

10             MR. HERSCHMANN:  If you would do that, your Honor,

11   that would be great.

12             Thank you, very much.

13             (Short recess; time is now 2:42 PM)

14             (2:45 PM)

15             THE COURT:  I don't think so, Mr. Herschmann.  Not

16   according to Richardson under the old book, which I'm sure

17   hasn't been changed too much, 66213, I don't know what it is

18   in the next edition.  But, while the memorandum, any

19   memorandum made by anybody can be used to refresh, if you

20   want it in evidence when a witness has so far forgotten

21   facts that he cannot recall them even after looking at a

22   memorandum of them and he testified that he once knew them

23   and made a memorandum of them at the time or soon after,

24   which he intended to make correctly and which he believes to

25   be correct, such memorandum in his own handwriting may be

26   received as evidence of the facts contained although the

**3/23/2015  Genger -v- Genger Proceeding 032315**

1        O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2    witness has no present recollection of them.

3        MR. HERSCHMANN:  Your Honor, I think that's why I

4    raised the issue of past recollection refreshed or present

5    recollection recorded.

6        As I said, there are two ways to address.  I can

7    address it with the witness as present recollection

8    refreshed, which is the process that the witness looks at

9    it.

10        THE COURT:  Right.  Then, this doesn't come into

11    evidence.  But, you want it in evidence.

12        MR. HERSCHMANN:  That's correct.

13        The reason I had it the way I did is that there are

14    two ways of dealing with it.

15        There is what I call the simpler process.

16        THE COURT:  It is not coming into evidence.

17        MR. HERSCHMANN:  Okay.

18        THE COURT: She can use it to refresh her

19    recollection if it indeed refreshes her recollection.

20        As I recall this whole exercise is because you

21    wanted to offer it into evidence.

22        MR. HERSCHMANN:  That's correct.  And the reason

23    doesn't matters.

24        THE COURT:  Okay.

25    Q    So, Ms. Genger, let me, I'm going to walk you through

26    the process.

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1         O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2            I'm going to ask you specific questions.  If you recall
 3    something specifically you should answer it.  If you don't
 4    recall specifically, then I'm going to ask you is there
 5    something that would refresh your recollection.  And the process
 6    is then you can look at it and then say the document refreshes
 7    my recollection and then answer it.  Okay?
 8            So, I'm going to go back to the November 8, 2007
 9    meeting.
10            And do you recall specifically what was discussed in
11    the first topic dealing with Orly Genger 1993 Trust?
12    A     Specifically, no.
13    Q     Would the agenda refresh your recollection as to what
14    was discussed?
15    A     Yes.
16    Q     Can you take a moment to look at the agenda and tell us
17    after looking at it does it refresh your recollection as to what
18    was the first topic discussed as it related to the Orly Genger
19    1993 Trust?
20    A     Yes.
21    Q     Okay.  What was of the first topic discussed?
22    A     D&K.
23    Q     And what was discussed after D&K was raised?
24    A     Who was the general partner.  Did Sagi have a copy of
25    the partnership agreement, the note.
26            Then, there is  a topic of the note, who owns the note.
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2      Q    When you say who is the general partner do you recall

3   the specific discussions as to percentages about your mother and

4   whether she remained the general partner, without looking at

5   document first?

6      A    No.

7      Q    If you look at the document does that  refresh your

8   recollection?

9      A    Yes.

10     Q    And what was the first thing that was discussed after

11  you asked who were the general partners of D&K?

12          MR. DELLAPORTAS:  I object on relevance grounds as

13     to this line of testimony.

14          MR. HERSCHMANN:  I'm doing this as a general

15     proposition as to the subject matters that were discussed.

16          I can offer the agenda in and make it simple and go

17     through it or I can only do it this way, your Honor.  That

18     is why I raised it in the first place.

19          I'm not saying it is proof.  I'll do it any way Mr.

20     Dellaportas prefers.

21          THE COURT:  He doesn't prefer anything.  It is not

22     depending upon what he prefers.  It is what you want to

23     prove.

24          He says it is not relevant.

25          Why is it relevant?

26     Q    Well, did you generally discuss your trust and
```

2840

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2      associations with the D&K note?
3          A    Yes.
4          Q    Okay.  After discussing your trust and the D&K note did
5      you then have discussions about TPR?
6          A    Yes.
7          Q    Okay.  Do you recall specifically about what was
8      discussed in relationship to TPR and what percentages were not
9      owned by D&K, first, without looking at the document?
10         A    No.
11         Q    Looking at the document, does it refresh your
12     recollection as to what was the first thing you discussed about
13     TPR?
14         A    Yes.
15         Q    And what was that ?
16         A    Who owns and what percentages the 49 percent not owned
17     by D&K.
18         Q    And do you recall whether there was any discussion
19     about Rochell, R-O-C-H-E-L-L, Fang and your mother's interest?
20         A    Yes.
21         Q    After that did you have a discussion about whether or
22     not you can get copies of the minutes of meetings from TPR?
23         A    Yes.
24         Q    Did your brother agree to give you copies of the
25     minutes of meetings with TPR?
26         A    No.
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

| | | |
|---|---|---|
| 1 | | O. Genger - by Plaintiff - Direct/by Mr. Herschmann |
| 2 | Q | Did you then discuss with your brother what is the |
| 3 | | distribution he was receiving from TPR? |
| 4 | | MR. DELLAPORTAS:  Objection.  Relevance. |
| 5 | | THE COURT:  Overruled. |
| 6 | A | Yes. |
| 7 | Q | Okay.  And do you recall raising the amount of his |
| 8 | | getting $45,000 per month? |
| 9 | A | Yes. |
| 10 | Q | And did your brother ever answer as to why he was |
| 11 | | getting $45,000 from TPR per month and how it was being |
| 12 | | categorized? |
| 13 | | MR. DELLAPORTAS:  Objection, compound. |
| 14 | | THE COURT:  Let's take it one at a time. |
| 15 | Q | Okay.  Did your brother ascribe for you why he was |
| 16 | | receiving $45,000 per month? |
| 17 | A | He may have and I don't remember. |
| 18 | | His answers were long winded.  So, I just don't |
| 19 | | remember them. |
| 20 | Q | Was there a  discussion about why your mother was |
| 21 | | receiving $30,000 per month? |
| 22 | | MR. DELLAPORTAS:  Objection, lack of foundation. |
| 23 | | THE COURT:  Yes.  Sustained. |
| 24 | Q | Well, do you recall a discussion about what |
| 25 | | distributions your mother was getting from TPR? |
| 26 | A | Generally, yes. |

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2         Q    Looking at the exhibit, does it refresh your
3    recollection as to what dollar amount your brother was being
4    questioned about regarding how much money your mother was
5    receiving?
6         A    Yes.
7         Q    What number did you question your brother about?
8         A    $30,000 a month.
9         Q    Per month?
10        A    Yes.
11        Q    Do you recall then discussing with your brother how
12   could distributions be evened out between you, your mother and
13   your brother?
14        A    Yes.
15        Q    Did your brother at that time indicate his willingness
16   to even out the distribution between you, and your mother and
17   himself?
18        A    No, he didn't.
19        Q    Did your brother answer any questions about what are
20   the assets of TPR?
21        A    Whatever answers he gave were so complicated and he
22   gave answers that  confused everyone.
23        Q    Well, did the Isaacson representatives say to your
24   brother during the course of the meeting that they were
25   satisfied with his answers?
26        A    No.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2         Q    What did they say generally about the answers your
3    brother was giving?
4              MR. DELLAPORTAS:  Objection.  Hearsay.
5              THE COURT:  Sustained.
6         Q    Did you then cover what receivables were due TPR, just
7    generally?
8         A    I don't remember.
9         Q    Okay.  If you look at exhibit 234, the agenda in front
10   of you, does that refresh your recollection as to what questions
11   were asked about the receivables due TPR?
12        A    Yes.
13        Q    And looking at that , does it refresh your recollection
14   about asking what happened to the $1.9 million that your brother
15   owed TPR?
16             MR. DELLAPORTAS:  Objection.  Lack of foundation
17        and leading.
18             THE COURT:  How about a foundation?
19        Q    Okay.  Well, does exhibit 234 refresh your recollection
20   as to whether the subject matters of how much money your brother
21   owed TPR was discussed on November 8, 2007?
22        A    Yes.
23        Q    Okay.  Looking at exhibit 234 does it refresh your
24   recollection about the specific amount of money that was
25   discussed with your brother regarding how much money he owed
26   TPR?
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

1            O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2       A    Yes.

3       Q    What was the amount of money that your brother was

4    asked about that he owed TPR?

5            MR. DELLAPORTAS:  Just objection, your Honor.

6            This doesn't feel like a refreshed recollection.

7    It just fees like reading a document.

8            MR. HERSCHMANN:  It's the only way to do it.

9            If Mr. Dellaportas wants me to go down --

10           THE COURT:  You know, she was there.  So, I do

11   believe there is a --

12           MR. DELLAPORTAS:  Okay.

13      Q    What is the amount?

14      A    $1.9 million.

15      Q    Do you recall then having other discussions about other

16   monies that were owed TPR or owed by other officers to TPR?

17      A    Yes.

18      Q    Do you recall what was next discussed independent of

19   looking at the exhibit?

20      A    No.

21      Q    Looking at the exhibit, does it refresh your

22   recollection as to the next item that you discussed with your

23   brother?

24      A    Yes.

25      Q    Okay.  What was the next item that you discussed with

26   your brother?

3/23/2015 Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2     A    The annual expense of TPR and then after that there was
 3   trust administration.
 4     Q    I think you have to speak a little louder.
 5     A    Sorry.
 6          Right after that there was what are the annual expenses
 7   of TPR exclusive of above distributions to Sagi and Ariel Orly.
 8     Q    Did your brother answer what was the annual expense to
 9   TPR when Isaacson & Company posed the question to him?
10     A    Again, his answers were really convoluted and --
11     Q    How about, was there a discussion about the amount of
12   lawsuits that TPR was involved with as either a plaintiff or a
13   defendant?
14     A    Were there discussions?
15     Q    Yes?
16     A    Yes.
17     Q    After that was there a discussion about potentially
18   buying out your interests?
19     A    Yes.
20     Q    And looking at exhibit 234 does it refresh your
21   recollection, specifically, about what you asked of your
22   brother?
23     A    Yes.
24     Q    What was asked?
25     A    Was TPR, meaning Sagi, consider buying out Orly's
26   interest in TPR.  -- Or D&K now giving proper discounts to the
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

1           O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2     D&K note and credit for the losses.

3                    THE COURT:  Well --

4                    MR. HERSCHMANN:  Those were the subject matters

5     that were discussed.

6                    THE COURT:  She is reading from it, though.

7     Q    Now --

8                    THE COURT:  You're kind of abusing it now.  She

9     cannot read from it.

10    Q    All right.

11            So, the document is not in evidence, so you cannot read

12    from it.  You can only look at it to refresh your recollection

13    and then answer the question.  So.

14                   THE COURT:  And if you cannot answer the question,

15    then you cannot answer the question.

16    Q    Now, was there a discussion about capital contributions

17    made to White Box?

18    A    Yes.

19    Q    After that do you recall what was discussed about TPR

20    and its relationship to White Box?

21    A    Yes.

22    Q    And do you recall at some point asking could you have

23    control of the tax filings of White Box?

24    A    Yes.

25    Q    Now, did you then move on to discuss your trustees and

26    administration of your trust?

**3/23/2015  Genger -v- Genger Proceeding 032315**

1           O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2      A    Yes.

3      Q    Who were the trustees back in 2007?

4      A    It was Lea Fang.

5      Q    Did you discuss wanting someone else to become the

6    trustee of your trust?

7      A    Yes.

8           MR. DELLAPORTAS:  Objection, relevance.

9           THE COURT:  Sustained.

10     Q    In the course of this meeting was the agenda dealing

11   with your parents' divorce?

12     A    No.

13     Q    If you look at the agenda does it refresh your

14   recollection as to whether or not you had raised TRI or had

15   intended to raise TRI in any way?

16     A    Does it refresh?

17     Q    Yes?

18     A    Yes, it does.

19     Q    And is TRI something that was on your agenda to cover?

20     A    No.

21     Q    Now, did you then cover the Canadian ventures?

22     A    Yes.

23     Q    And do you recall, approximately, when you learned

24   about Riverside related entities?

25     A    It was some time prior in '07, prior to this meeting.

26     Q    And when you say some time prior to '07, was that in

**3/23/2015  Genger -v- Genger Proceeding 032315**

1        O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2    relationship with your trying to get a better understanding of

3    finances?

4        A    Yes.

5        Q    And prior to having this meeting in November of 2007

6    had you met personally with Isaacson and Company

7    representatives?

8        A    Before this meeting?

9        Q    Yes?

10       A    Yes.

11       Q    If you go now to the issues, let's focus now on the

12   Canadian ventures.

13           Do you recall specifically what you first or what was

14   first asked of your brother in the November 8, 2007 meeting

15   regarding the Canadian ventures?

16       A    Without -- Without looking at it?  No.

17       Q    Okay.  Looking at exhibit 234 can you tell us if that

18   refreshes your recollection as to what was, what was the first

19   thing that you discussed in relationship to the Canadian

20   ventures?

21       A    Yes.

22       Q    What was the first thing that was discussed?

23           THE COURT:  Without reading from this.

24       Q    Without reading?

25       A    What did I sell to my brother?

26       Q    Was that a question that the representatives of

3/23/2015  Genger -v- Genger Proceeding 032315

```
1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2     Isaacson & Company asked your brother even in November of 2007?
3               MR. DELLAPORTAS:  Objection, hearsay.
4               THE COURT:  Sustained.
5          Q    How did your brother respond to the question of what
6     you had sold to him?
7          A    To that particular question, I don't remember what his
8     response was.
9          Q    Without looking at the agenda do you recall what was
10    discussed in connection with your brother about it?
11              THE COURT:  About?
12         Q    About the Canadian ventures?
13              THE COURT:  Okay the Canadian ventures.
14         Q    Yes?
15         A    I mean, I have a specific --
16         Q    Tell us what you recall being discussed about the
17    Canadian ventures, of the transfer.  And then we can get into
18    the specifics.  Tell us generally first what you recall?
19         A    About the Canadian ventures what was discussed?
20         Q    Yes?
21         A    Specifically, I specifically asked my brother if we
22    could now transfer back my shares to me like he said he would
23    do.  And I specifically remember my brother looking at me and
24    laughing and said, I don't know why you would want to do that,
25    it is valueless.
26         Q    Did you believe him when he said that?
```

3/23/2015  Genger -v- Genger Proceeding 032315

1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2     A     Did I believe what, that it was valueless?

3     Q     Yes?

4     A     What I believed is that, is that my brother tricked me.

5     Q     And after that conversation did you still try to get

6     more information about the Canadian ventures from your brother

7     in that meeting?

8     A     I don't remember what happened specifically right after

9     that.  I know there was other, there was more conversation about

10    it.  But, I cannot tell you specifically.

11    Q     Looking at exhibit 234 did you have a discussion to

12    refresh your recollection specifically about the dollar values?

13    A     Yes.

14    Q     Okay.  And does exhibit 234 refresh your recollection?

15    A.    Yes.

16    Q     And what do you recall about discussing with your

17    brother in that meeting dealing with the valuations?

18    A     That I had, I had sold my interest to him for 100,000

19    when I bought it for 150.

20    Q     And then do you recall any discussions about the

21    valuations of the businesses currently?

22    A     I am sorry, what was the question?

23    Q     Could we read it back, please?

24          THE COURT:  Yes, please.

25          (Record read)

26    Q     I meant, generally.  I mean the Canadian business?

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1           O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2      A    Yes.
 3      Q    Did your brother in the course of that meeting provide
 4   you with any financial information as to where the money had
 5   gone from the Canadian ventures?
 6      A    No.
 7      Q    Let me show you what you has been marked as exhibit
 8   266-71, which is admitted into evidence.
 9           And do you see on the bottom portion of the exhibit
10   266-71 that there is a reference that the White Paper -- I am
11   sorry, that the White Box papers were supposed to transfer to
12   Jonah from Bill Fischer and then Jonah can be reached at (212)
13   758-0000.
14           Do you see that ?
15      A    Yes.
16      Q    Does that refresh your recollection as to who were the
17   accountants for White Box in 2007?
18      A    Yes.
19      Q    Is that Jonah Gayer and Associates?
20      A    I mean, it was supposed to be, it wasn't.
21      Q    Do you know at some point whether Gayer and Associates
22   became the accountants for White Box?  And I'm focused on the
23   2007 time period.
24      A    I don't know that it ever actually switched to Jonah
25   Gayer.
26      Q    Now, going back to the meeting in November, 2007, do
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

1        O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2    you recall that at the conclusion of the agenda there was an

3    over all subject matter that you wanted to address with your

4    brother?

5        A    Yes.

6            (Continued on the next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**3/23/2015  Genger -v- Genger Proceeding 032315**

1                    O. Genger - Plaintiff - Direct/Herschmann

2        Q    And what was the general tenure for what you were

3    looking to get from your brother in the November 2007 meeting?

4        A    Information.  Information about my finances.

5        Q    And did you get information that was satisfactory to

6    you from your brother in that meeting?

7        A    No.

8        Q    Let me show you what's been previously received in

9    evidence as Exhibit 230.

10                   MR. HERSCHMANN:  Again, I'm providing an extra

11        copy to defense counsel.

12                   (Handing to defense counsel.)

13                   (Handing to witness.)

14                   (Handing to the Court.)

15       Q    Do you recall that after the meeting Isaacson &

16    Associates sent a letter to your brother?

17                   THE COURT:  Yeah, this is very leading.

18                   MR. HERSCHMANN:  I'm sorry?

19                   THE COURT:  Ask a question.

20                   MR. HERSCHMANN:  I'm trying to lay a foundation

21        for the exhibit.

22                   THE COURT:  It's too leading.

23       Q    First, have you seen Exhibit 230 beforehand?

24       A    Yes.

25       Q    Did you have discussions with Isaacson & Associates

26    before Exhibit 230 was sent to your brother?

# Exhibit C

**3/23/2015 Genger -v- Genger Proceeding 032315**

```
1
2      SUPREME COURT OF THE STATE OF NEW YORK
       COUNTY OF NEW YORK:   CIVIL TERM: PART - 12
3      ------------------------------------------------X
       ORLY GENGER,
4
                              Plaintiff
5                                      INDEX NUMBER:
                                         100697/08
6             -against-
7      SAGI GENGER,
8                             Defendant
       ------------------------------------------------X
9                         80 Centre Street
                          New York, New York 10013
10                        March 23, 2015
11     BEFORE:
                  HONORABLE:  Barbara Jaffe, JSC
12
13     APPEARANCES:
14            Zeichner Ellman & Krause, LLP
              Attorneys for Plaintiff
15            1211 Avenue of the Americas
              New York, New York 10036
16            By:  Bryan D. Leinbach, Esq.
                 -and-
17            Kasowitz Benson Torres & Friedman, LLP
              1633 Broadway
18            New York,  New York 10019
              By:  Eric D. Herschmann, Esq.
19                 Michael Paul Bowen, Esq.
20            Morgan, Lewis & Bockius, LLP
              Attorneys for the Defendant
21            101 Park Avenue
              New York, New York 10178-0060
22            By:  John Dellaportas, Esq.
                   Mary Pennisi, Esq.
23
24
25                            Delores Hilliard
                              Vicki K. Glover
26                        Official Court Reporters
              - OFFICIAL COURT REPORTER
```

2709

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2    accounting firm?
 3        A    Yes.
 4        Q    What was the reason that you obtained a different
 5    accounting firm?
 6        A    Well, around this time in 2007, I was trying to get
 7    information about my finances from my brother.  He did not want
 8    to deal with Bill Fischer and told me that, you know, if I
 9    wanted to have any conversations with him about it, I'd have
10    to --
11        Q    I think you have to slow down.
12        A    Sorry.
13              If I wanted to have any conversations with him
14    about my finances, I would have to work with an accountant that
15    was a new accountant, someone who was independent.  So I hired a
16    new accountant.
17        Q    Who did you hire?
18        A    Joel Isaacson.
19        Q    Did Joel Isaacson have anything to do with Raines &
20    Fischer?
21        A    No.
22        Q    Did Joel Isaacson & Associates have anything to do with
23    your father?
24        A    No.
25        Q    How did you come to hire Joel Isaacson?
26        A    A friend of mine referred me to them.
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
1              O. Genger - Plaintiff - Direct/Herschmann

2      Q    And a friend that was independent of Raines & Fischer

3  or your parents?

4      A    Yes.

5      Q    And after you hired Joel Isaacson & Company, then what

6  happened regarding your finances?

7      A    They started trying to help me gather information, and

8  I know they contacted Sagi and tried to get information from

9  him.  We tried to set up a meeting, and we finally were able to

10 set up a meeting with Sagi.

11     Q    Do you recall, approximately, when you were able to set

12 up that meeting with your brother?

13     A    I believe it was in November of 2007.

14     Q    Do you recall whether or not your brother had sent

15 information to your new accountants Isaacson & Associates prior

16 to your having a meeting together with your brother?

17     A    No, I know that he didn't.

18     Q    Now, as far as the actual time period of the meeting,

19 do you recall how that actually got set or what transpired?

20     A    How the meeting transpired?

21     Q    Yes.

22     A    Well, as I said, I was trying to get information from

23 my brother.  I hired these new accountants, Joel Isaacson, and I

24 knew that my brother had all this information, and we contacted

25 him several times to try to set it up, and we finally --

26     Q    I think you have to slow down.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1               O. Genger - Plaintiff - Direct/Herschmann

 2        A    We finally were able to set up a meeting.

 3        Q    Let me show you what's been marked as Exhibit 234 for

 4    identification, and it's been previously discussed in this

 5    matter.

 6               (Handing to defense counsel.)

 7               MR. HERSCHMANN:  I'm providing a copy again to

 8    defense counsel.

 9               (Handing to witness.)

10               (Handing to the Court.)

11        Q    I'm going to hand you an exhibit, what's been

12    previously marked as Exhibit 228 for identification, which is

13    Bates stamped JI 429.  I'm providing again a copy to defense

14    counsel.

15               (Handing to defense counsel.)

16               (Handing to witness.)

17        Q    Will you take a look at Exhibit 228 as well?

18               (Handing to the Court.)

19        Q    I'm going to hand you also what's been marked as

20    266-135 as well.  I'm providing a copy to defense counsel.

21               (Handing to defense counsel.)

22               (Handing to witness.)

23        Q    Let me start with Exhibit 266-135.

24               (Handing to the Court.)

25        Q    Do you see that this is an e-mail from Stan Altmark to

26    your brother?
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
1                    O. Genger - Plaintiff - Direct/Herschmann
2        A    Yes.
3        Q    And you've seen this e-mail before today, correct?
4        A    Yes.
5        Q    Now, looking at the e-mail, does it refresh your
6    recollection as to whether or not you had requested via Isaacson
7    & Company certain information in June of 2007 from your brother?
8        A    Yes, I did.
9        Q    And is it accurate that after making requests from your
10   brother in June of 2007, you had not received specific
11   information that you wanted prior to meeting with him?
12       A    Yes.
13       Q    Now, looking at Exhibit 228, if you could, for a
14   moment, have you seen Exhibit 228 previously?
15       A    Yes.
16       Q    And do you recognize this as an e-mail from Joel
17   Isaacson to your brother dated November 6th of 2007?
18       A    Yes.
19            MR. HERSCHMANN:  Your Honor, at this time I would
20       offer Exhibit 228 for identification into evidence.
21            MR. DELLAPORTAS:  Objection.  Hearsay.
22            MR. HERSCHMANN:  Your Honor, we're offering it as
23       a communication that was sent as a representative from Orly
24       Genger to her brother.  The actual content is irrelevant,
25       except for the fact that he actually received it.
26            MR. DELLAPORTAS:  It's definitely being offered
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

1              O. Genger - Plaintiff - Direct/Herschmann

2        for the truth of the matter, and it's hearsay, and it

3        hasn't been authenticated.  It's from Joel Isaacson's

4        files.

5              THE COURT:  Yeah, sustained.

6        Q    Well, Ms. Genger, looking at Exhibit 228, do you recall

7   whether or not your brother was advised that Isaacson & Company

8   had no affiliation with Raines & Fischer?

9        A    Yes.

10       Q    And did you believe at the time Isaacson & Company was

11  making requests from your brother for certain documents, that

12  you were actually entitled to those documents?

13       A    Yes.

14       Q    Did you retain Isaacson & Company to help advise you on

15  the state of affair of your assets?

16       A    Yes.

17       Q    Who was the accountant handling the tax returns for

18  White Box in the 2007 time period?  Was it Jonas Gayer, to your

19  knowledge, or was it Raines & Fischer, if you recall?

20       A    Raines & Fischer.

21       Q    Now, can you look at Exhibit 234, please?  Do you have

22  the exhibit in front of you?

23       A    Yes.

24       Q    And you mentioned earlier that there was an agenda that

25  was put together for the November 8th, 2007 meeting.

26              Does this exhibit refresh your recollection as to

### 3/23/2015  Genger -v- Genger Proceeding 032315

```
1                    O. Genger - Plaintiff - Direct/Herschmann
2        what was covered during the course of the meeting, as far as
3        your side was concerned?
4                    MR. DELLAPORTAS:  Objection.  There's been no
5             testimony that she lacks recollection subject that it needs
6             to be refreshed.
7             Q    Do you recall everything that happened at the November
8        8, 2007 meeting?
9             A    I don't know if I recall everything, but I --
10            Q    Is there a document that would help refresh your
11       recollection as to what was the agenda covered at the November
12       8, 2007 meeting?
13            A    Yes.
14            Q    Is the actual agenda the document that would help you
15       refresh your recollection?
16            A    Yes.
17            Q    So, now looking at Exhibit 234, does that refresh your
18       recollection as to what was expected to be covered by your
19       representatives with your brother on November 8, 2007?
20            A    Yes.
21            Q    So, can you first tell us how long did it take for you,
22       for your representatives, to arrange a meeting with your brother
23       to discuss your finances?  Was it a week?  Was it more than
24       that?  And if the prior documents that I've handed you, Exhibit
25       266-135, refresh your recollection, please let us know.
26                   MR. DELLAPORTAS:  It's kind of leading.
```

### 3/23/2015  Genger -v- Genger Proceeding 032315

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2              THE COURT:  You're putting the cart before the
 3         horse.
 4              MR. HERSCHMANN:  Okay.  Well, let me ask it.
 5         Q    Do you recall how long it took you to set up a meeting
 6    with your brother?
 7         A    I know it was months.
 8         Q    Now, can you describe for us the general tenure of the
 9    meeting; where it occurred, if you recall, what happened when
10    you got there?
11         A    The meeting happened at Joel Isaacson's office, and the
12    people who were there who attended the meeting were Joel
13    Isaacson, Stan Altmark, Don Mullen, my mother, myself and my
14    brother.  And the tenure was, I was trying to get information,
15    which is in this agenda.  I had a lot of questions that I wanted
16    answered.
17         Q    I want you to leave the agenda aside.  If you can give
18    us the general -- was it in a conference room?  What happened?
19         A    It was in one of the conference rooms at Isaacson's
20    office.
21         Q    And was Don Mullen the person who referred you to
22    Isaacson & Company?
23         A    Yes, he was.
24         Q    Now, just tell us generally what happened, and then
25    we'll cover the specifics in the course of the meeting.
26         A    Generally, what happened was, all these people were
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
 1              O. Genger - Plaintiff - Direct/Herschmann
 2    sitting in a room together.  Joel Isaacson and Stan Altmark were
 3    asking certain questions of Sagi.  Sagi was not happy with the
 4    fact that we were asking questions.  He did most of the talking.
 5    Stan or Joel would ask him a question and he would give a
 6    five-minute speech on something and run -- I mean, just run
 7    circles around everyone.  He was not really answering questions.
 8    And we were getting nowhere.  And he became very upset by the
 9    fact that we were asking him questions.
10              (Continued on next page.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2        Q    And did you attempt to go through the agenda that  is
3   contained in exhibit 234?
4        A    Yes, we did.
5        Q    Now, was the meeting to discuss your getting access to
6   financial information and to take control of your financial
7   life?
8        A    Yes.
9        Q    Was that expressed to your brother?
10       A    Yes.
11       Q    Did you address in anything -- well, withdrawn.
12            Do you recall specifically what you addressed regarding
13  your 1993 trust?
14            Just a foundational question that I have to ask before
15  I present the exhibit.
16            Do you recall specifically what was addressed?
17       A    Without looking at it?
18       Q    Without looking at it?
19       A    Okay.  I mean, generally, I know.
20       Q    Would the agenda refresh your recollection as to
21  specifically what you were asking about your trust?
22       A    Yes.
23            MR. HERSCHMANN:  I would offer it in as a past
24       recollection refreshed and make the process easier or I can
25       do it this way.
26            THE COURT:  Mr. Dellaportas, what do you say?
```

2834

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2               MR. DELLAPORTAS:  This agenda, do you mean?
 3               THE COURT:  Yes.
 4               MR. DELLAPORTAS:  It is hearsay.
 5               MR. HERSCHMANN:  Well, the past recollection
 6     recorded, the present recollection refreshed.
 7               THE COURT:  I don't know that she recorded it.
 8               MR. HERSCHMANN:  She doesn't have to have recorded
 9     it.  She has to be able to articulate that this was an
10     accurate document of what was discussed at the meeting.  She
11     doesn't have to be the actual person who sat down and
12     recorded it.
13               THE COURT:  Is that your understanding, Mr.
14     Dellaportas?
15               MR. DELLAPORTAS:  No.
16               THE COURT:  I'm not sure either.
17               MR. HERSCHMANN:  We can pull it up.
18               THE COURT:  Just to refresh my own recollection.
19               Who has The Richardson?
20               MR. HERSCHMANN:  I don't have it.  And I think the
21     rule, and I can articulate it this way, if your secretary
22     sat there and took copious notes of the entire process and
23     said this accurately reflects what happened at the
24     meeting --
25               THE COURT:  We don't know when it was prepared.  I
26     don't know.  Let's just get the rule.
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1        O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2              MR. HERSCHMANN:  Okay.
3              (Short pause)
4              MR. DELLAPORTAS:  There is a Judge Friedman's
5        section on it.  It says, under the past recollection
6        recorded doctrine the memoranda of a fact known for an event
7        offered in the past for which the witness lacks sufficient
8        present recollection may be received in evidence to the
9        witness' oral testimony.
10             THE COURT:  It doesn't say anything about having to
11       be prepared by the witness.
12             MR. DELLAPORTAS:  There is a whole section in here.
13             THE COURT:  I don't know, Mr. Herschmann.
14             MR. HERSCHMANN:  If you want testimony, take a
15       moment, we can look at it.  I have no problem.
16             But, I'm pretty confident the rule is exactly as
17       Mr. Dellaportas just read it.
18             It is not necessary that the witness be the one
19       that actually recorded it as much as they can say that
20       recording is accurate.
21             THE COURT:  I'm pleased that you're confident.  I
22       am not.
23             It didn't say anything about it, but that doesn't
24       mean --
25             MR. DELLAPORTAS:  As I understand it this is the
26       agenda prepared before the meeting and thus isn't --
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

1        O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2              THE COURT:  That is what I mean, also.  It is not

3        contemporaneous.

4              MR. DELLAPORTAS:  It is not notes from the meeting.

5        It is agenda in advance of the meeting.

6              MR. HERSCHMANN:  Your Honor, the rule is as I

7        understand it, and Mr. Dellaportas if he wants to share that

8        with us and we can take a 5 minute recess.

9              THE COURT:  I can go in the back and look at it.

10             MR. HERSCHMANN:  If you would do that, your Honor,

11       that would be great.

12             Thank you, very much.

13             (Short recess; time is now 2:42 PM)

14             (2:45 PM)

15             THE COURT:  I don't think so, Mr. Herschmann.  Not

16       according to Richardson under the old book, which I'm sure

17       hasn't been changed too much, 66213, I don't know what it is

18       in the next edition.  But, while the memorandum, any

19       memorandum made by anybody can be used to refresh, if you

20       want it in evidence when a witness has so far forgotten

21       facts that he cannot recall them even after looking at a

22       memorandum of them and he testified that he once knew them

23       and made a memorandum of them at the time or soon after,

24       which he intended to make correctly and which he believes to

25       be correct, such memorandum in his own handwriting may be

26       received as evidence of the facts contained although the

### 3/23/2015  Genger -v- Genger Proceeding 032315

```
1        O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2   witness has no present recollection of them.
3        MR. HERSCHMANN:  Your Honor, I think that's why I
4   raised the issue of past recollection refreshed or present
5   recollection recorded.
6        As I said, there are two ways to address.  I can
7   address it with the witness as present recollection
8   refreshed, which is the process that the witness looks at
9   it.
10       THE COURT:  Right.  Then, this doesn't come into
11  evidence.  But, you want it in evidence.
12       MR. HERSCHMANN:  That's correct.
13       The reason I had it the way I did is that there are
14  two ways of dealing with it.
15       There is what I call the simpler process.
16       THE COURT:  It is not coming into evidence.
17       MR. HERSCHMANN:  Okay.
18       THE COURT: She can use it to refresh her
19  recollection if it indeed refreshes her recollection.
20       As I recall this whole exercise is because you
21  wanted to offer it into evidence.
22       MR. HERSCHMANN:  That's correct.  And the reason
23  doesn't matters.
24       THE COURT:  Okay.
25   Q   So, Ms. Genger, let me, I'm going to walk you through
26  the process.
```

3/23/2015  Genger -v- Genger Proceeding 032315

1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2          I'm going to ask you specific questions.  If you recall

3     something specifically you should answer it.  If you don't

4     recall specifically, then I'm going to ask you is there

5     something that would refresh your recollection.  And the process

6     is then you can look at it and then say the document refreshes

7     my recollection and then answer it.  Okay?

8          So, I'm going to go back to the November 8, 2007

9     meeting.

10          And do you recall specifically what was discussed in

11     the first topic dealing with Orly Genger 1993 Trust?

12     A    Specifically, no.

13     Q    Would the agenda refresh your recollection as to what

14     was discussed?

15     A    Yes.

16     Q    Can you take a moment to look at the agenda and tell us

17     after looking at it does it refresh your recollection as to what

18     was the first topic discussed as it related to the Orly Genger

19     1993 Trust?

20     A    Yes.

21     Q    Okay.  What was of the first topic discussed?

22     A    D&K.

23     Q    And what was discussed after D&K was raised?

24     A    Who was the general partner.  Did Sagi have a copy of

25     the partnership agreement, the note.

26          Then, there is  a topic of the note, who owns the note.

**3/23/2015 Genger -v- Genger Proceeding 032315**

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2        Q    When you say who is the general partner do you recall
3    the specific discussions as to percentages about your mother and
4    whether she remained the general partner, without looking at
5    document first?
6        A    No.
7        Q    If you look at the document does that  refresh your
8    recollection?
9        A    Yes.
10       Q    And what was the first thing that was discussed after
11   you asked who were the general partners of D&K?
12            MR. DELLAPORTAS:  I object on relevance grounds as
13       to this line of testimony.
14            MR. HERSCHMANN:  I'm doing this as a general
15       proposition as to the subject matters that were discussed.
16            I can offer the agenda in and make it simple and go
17       through it or I can only do it this way, your Honor.  That
18       is why I raised it in the first place.
19            I'm not saying it is proof.  I'll do it any way Mr.
20       Dellaportas prefers.
21            THE COURT:  He doesn't prefer anything.  It is not
22       depending upon what he prefers.  It is what you want to
23       prove.
24            He says it is not relevant.
25            Why is it relevant?
26       Q    Well, did you generally discuss your trust and
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2     associations with the D&K note?
 3          A    Yes.
 4          Q    Okay.  After discussing your trust and the D&K note did
 5     you then have discussions about TPR?
 6          A    Yes.
 7          Q    Okay.  Do you recall specifically about what was
 8     discussed in relationship to TPR and what percentages were not
 9     owned by D&K, first, without looking at the document?
10          A    No.
11          Q    Looking at the document, does it refresh your
12     recollection as to what was the first thing you discussed about
13     TPR?
14          A    Yes.
15          Q    And what was that ?
16          A    Who owns and what percentages the 49 percent not owned
17     by D&K.
18          Q    And do you recall whether there was any discussion
19     about Rochell, R-O-C-H-E-L-L, Fang and your mother's interest?
20          A    Yes.
21          Q    After that did you have a discussion about whether or
22     not you can get copies of the minutes of meetings from TPR?
23          A    Yes.
24          Q    Did your brother agree to give you copies of the
25     minutes of meetings with TPR?
26          A    No.
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
 1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
 2        Q    Did you then discuss with your brother what is the
 3   distribution he was receiving from TPR?
 4                   MR. DELLAPORTAS:  Objection.  Relevance.
 5                   THE COURT:  Overruled.
 6        A    Yes.
 7        Q    Okay.  And do you recall raising the amount of his
 8   getting $45,000 per month?
 9        A    Yes.
10        Q    And did your brother ever answer as to why he was
11   getting $45,000 from TPR per month and how it was being
12   categorized?
13                   MR. DELLAPORTAS:  Objection, compound.
14                   THE COURT:  Let's take it one at a time.
15        Q    Okay.  Did your brother ascribe for you why he was
16   receiving $45,000 per month?
17        A    He may have and I don't remember.
18             His answers were long winded.  So, I just don't
19   remember them.
20        Q    Was there a  discussion about why your mother was
21   receiving $30,000 per month?
22                   MR. DELLAPORTAS:  Objection, lack of foundation.
23                   THE COURT:  Yes.  Sustained.
24        Q    Well, do you recall a discussion about what
25   distributions your mother was getting from TPR?
26        A    Generally, yes.
```

3/23/2015 Genger -v- Genger Proceeding 032315

1            O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2       Q    Looking at the exhibit, does it refresh your

3  recollection as to what dollar amount your brother was being

4  questioned about regarding how much money your mother was

5  receiving?

6       A    Yes.

7       Q    What number did you question your brother about?

8       A    $30,000 a month.

9       Q    Per month?

10      A    Yes.

11      Q    Do you recall then discussing with your brother how

12  could distributions be evened out between you, your mother and

13  your brother?

14      A    Yes.

15      Q    Did your brother at that time indicate his willingness

16  to even out the distribution between you, and your mother and

17  himself?

18      A    No, he didn't.

19      Q    Did your brother answer any questions about what are

20  the assets of TPR?

21      A    Whatever answers he gave were so complicated and he

22  gave answers that  confused everyone.

23      Q    Well, did the Isaacson representatives say to your

24  brother during the course of the meeting that they were

25  satisfied with his answers?

26      A    No.

3/23/2015  Genger -v- Genger Proceeding 032315

```
1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2      Q    What did they say generally about the answers your
3   brother was giving?
4          MR. DELLAPORTAS:  Objection.  Hearsay.
5          THE COURT:  Sustained.
6      Q    Did you then cover what receivables were due TPR, just
7   generally?
8      A    I don't remember.
9      Q    Okay.  If you look at exhibit 234, the agenda in front
10  of you, does that refresh your recollection as to what questions
11  were asked about the receivables due TPR?
12     A    Yes.
13     Q    And looking at that , does it refresh your recollection
14  about asking what happened to the $1.9 million that your brother
15  owed TPR?
16         MR. DELLAPORTAS:  Objection.  Lack of foundation
17     and leading.
18         THE COURT:  How about a foundation?
19     Q    Okay.  Well, does exhibit 234 refresh your recollection
20  as to whether the subject matters of how much money your brother
21  owed TPR was discussed on November 8, 2007?
22     A    Yes.
23     Q    Okay.  Looking at exhibit 234 does it refresh your
24  recollection about the specific amount of money that was
25  discussed with your brother regarding how much money he owed
26  TPR?
```

3/23/2015  Genger -v- Genger Proceeding 032315

```
1           O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2      A    Yes.
3      Q    What was the amount of money that your brother was
4  asked about that he owed TPR?
5           MR. DELLAPORTAS:  Just objection, your Honor.
6           This doesn't feel like a refreshed recollection.
7  It just fees like reading a document.
8           MR. HERSCHMANN:  It's the only way to do it.
9           If Mr. Dellaportas wants me to go down --
10          THE COURT:  You know, she was there.  So, I do
11  believe there is a --
12          MR. DELLAPORTAS:  Okay.
13     Q    What is the amount?
14     A    $1.9 million.
15     Q    Do you recall then having other discussions about other
16  monies that were owed TPR or owed by other officers to TPR?
17     A    Yes.
18     Q    Do you recall what was next discussed independent of
19  looking at the exhibit?
20     A    No.
21     Q    Looking at the exhibit, does it refresh your
22  recollection as to the next item that you discussed with your
23  brother?
24     A    Yes.
25     Q    Okay.  What was the next item that you discussed with
26  your brother?
```

2845

**3/23/2015 Genger -v- Genger Proceeding 032315**

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann

 2      A   The annual expense of TPR and then after that there was

 3   trust administration.

 4      Q   I think you have to speak a little louder.

 5      A   Sorry.

 6          Right after that there was what are the annual expenses

 7   of TPR exclusive of above distributions to Sagi and Ariel Orly.

 8      Q   Did your brother answer what was the annual expense to

 9   TPR when Isaacson & Company posed the question to him?

10      A   Again, his answers were really convoluted and --

11      Q   How about, was there a discussion about the amount of

12   lawsuits that TPR was involved with as either a plaintiff or a

13   defendant?

14      A   Were there discussions?

15      Q   Yes?

16      A   Yes.

17      Q   After that was there a discussion about potentially

18   buying out your interests?

19      A   Yes.

20      Q   And looking at exhibit 234 does it refresh your

21   recollection, specifically, about what you asked of your

22   brother?

23      A   Yes.

24      Q   What was asked?

25      A   Was TPR, meaning Sagi, consider buying out Orly's

26   interest in TPR.  -- Or D&K now giving proper discounts to the
```

**3/23/2015  Genger -v- Genger Proceeding 032315**

1           O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2    D&K note and credit for the losses.

3                THE COURT:  Well --

4                MR. HERSCHMANN:  Those were the subject matters

5        that were discussed.

6                THE COURT:  She is reading from it, though.

7        Q    Now --

8                THE COURT:  You're kind of abusing it now.  She

9        cannot read from it.

10       Q    All right.

11           So, the document is not in evidence, so you cannot read

12   from it.  You can only look at it to refresh your recollection

13   and then answer the question.  So.

14               THE COURT:  And if you cannot answer the question,

15       then you cannot answer the question.

16       Q    Now, was there a discussion about capital contributions

17   made to White Box?

18       A    Yes.

19       Q    After that do you recall what was discussed about TPR

20   and its relationship to White Box?

21       A    Yes.

22       Q    And do you recall at some point asking could you have

23   control of the tax filings of White Box?

24       A    Yes.

25       Q    Now, did you then move on to discuss your trustees and

26   administration of your trust?

3/23/2015  Genger -v- Genger Proceeding 032315

```
1              O. Genger - by Plaintiff - Direct/by Mr. Herschmann
2       A    Yes.
3       Q    Who were the trustees back in 2007?
4       A    It was Lea Fang.
5       Q    Did you discuss wanting someone else to become the
6    trustee of your trust?
7       A    Yes.
8              MR. DELLAPORTAS:  Objection, relevance.
9              THE COURT:  Sustained.
10      Q    In the course of this meeting was the agenda dealing
11   with your parents' divorce?
12      A    No.
13      Q    If you look at the agenda does it refresh your
14   recollection as to whether or not you had raised TRI or had
15   intended to raise TRI in any way?
16      A    Does it refresh?
17      Q    Yes?
18      A    Yes, it does.
19      Q    And is TRI something that was on your agenda to cover?
20      A    No.
21      Q    Now, did you then cover the Canadian ventures?
22      A    Yes.
23      Q    And do you recall, approximately, when you learned
24   about Riverside related entities?
25      A    It was some time prior in '07, prior to this meeting.
26      Q    And when you say some time prior to '07, was that in
```

2848

3/23/2015 Genger -v- Genger Proceeding 032315

1        O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2    relationship with your trying to get a better understanding of

3    finances?

4        A    Yes.

5        Q    And prior to having this meeting in November of 2007

6    had you met personally with Isaacson and Company

7    representatives?

8        A    Before this meeting?

9        Q    Yes?

10       A    Yes.

11       Q    If you go now to the issues, let's focus now on the

12   Canadian ventures.

13           Do you recall specifically what you first or what was

14   first asked of your brother in the November 8, 2007 meeting

15   regarding the Canadian ventures?

16       A    Without -- Without looking at it?  No.

17       Q    Okay.  Looking at exhibit 234 can you tell us if that

18   refreshes your recollection as to what was, what was the first

19   thing that you discussed in relationship to the Canadian

20   ventures?

21       A    Yes.

22       Q    What was the first thing that was discussed?

23           THE COURT:  Without reading from this.

24       Q    Without reading?

25       A    What did I sell to my brother?

26       Q    Was that a question that the representatives of

**3/23/2015  Genger -v- Genger Proceeding 032315**

```
 1          O. Genger - by Plaintiff - Direct/by Mr. Herschmann

 2     Isaacson & Company asked your brother even in November of 2007?

 3               MR. DELLAPORTAS:  Objection, hearsay.

 4               THE COURT:  Sustained.

 5     Q    How did your brother respond to the question of what

 6     you had sold to him?

 7     A    To that particular question, I don't remember what his

 8     response was.

 9     Q    Without looking at the agenda do you recall what was

10     discussed in connection with your brother about it?

11               THE COURT:  About?

12     Q    About the Canadian ventures?

13               THE COURT:  Okay the Canadian ventures.

14     Q    Yes?

15     A    I mean, I have a specific --

16     Q    Tell us what you recall being discussed about the

17     Canadian ventures, of the transfer.  And then we can get into

18     the specifics.  Tell us generally first what you recall?

19     A    About the Canadian ventures what was discussed?

20     Q    Yes?

21     A    Specifically, I specifically asked my brother if we

22     could now transfer back my shares to me like he said he would

23     do.  And I specifically remember my brother looking at me and

24     laughing and said, I don't know why you would want to do that,

25     it is valueless.

26     Q    Did you believe him when he said that?
```

3/23/2015  Genger -v- Genger Proceeding 032315

1       O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2    A   Did I believe what, that it was valueless?

3    Q   Yes?

4    A   What I believed is that, is that my brother tricked me.

5    Q   And after that conversation did you still try to get

6 more information about the Canadian ventures from your brother

7 in that meeting?

8    A   I don't remember what happened specifically right after

9 that.  I know there was other, there was more conversation about

10 it.  But, I cannot tell you specifically.

11   Q   Looking at exhibit 234 did you have a discussion to

12 refresh your recollection specifically about the dollar values?

13   A   Yes.

14   Q   Okay.  And does exhibit 234 refresh your recollection?

15   A   Yes.

16   Q   And what do you recall about discussing with your

17 brother in that meeting dealing with the valuations?

18   A   That I had, I had sold my interest to him for 100,000

19 when I bought it for 150.

20   Q   And then do you recall any discussions about the

21 valuations of the businesses currently?

22   A   I am sorry, what was the question?

23   Q   Could we read it back, please?

24      THE COURT:  Yes, please.

25      (Record read)

26   Q   I meant, generally.  I mean the Canadian business?

3/23/2015  Genger -v- Genger Proceeding 032315

1            O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2       A    Yes.

3       Q    Did your brother in the course of that meeting provide

4  you with any financial information as to where the money had

5  gone from the Canadian ventures?

6       A    No.

7       Q    Let me show you what you has been marked as exhibit

8  266-71, which is admitted into evidence.

9            And do you see on the bottom portion of the exhibit

10  266-71 that there is a reference that the White Paper -- I am

11  sorry, that the White Box papers were supposed to transfer to

12  Jonah from Bill Fischer and then Jonah can be reached at (212)

13  758-0000.

14           Do you see that ?

15      A    Yes.

16      Q    Does that refresh your recollection as to who were the

17  accountants for White Box in 2007?

18      A    Yes.

19      Q    Is that Jonah Gayer and Associates?

20      A    I mean, it was supposed to be, it wasn't.

21      Q    Do you know at some point whether Gayer and Associates

22  became the accountants for White Box?  And I'm focused on the

23  2007 time period.

24      A    I don't know that it ever actually switched to Jonah

25  Gayer.

26      Q    Now, going back to the meeting in November, 2007, do

**3/23/2015  Genger -v- Genger Proceeding 032315**

1     O. Genger - by Plaintiff - Direct/by Mr. Herschmann

2     you recall that at the conclusion of the agenda there was an

3     over all subject matter that you wanted to address with your

4     brother?

5     A    Yes.

6          (Continued on the next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

### 3/23/2015  Genger -v- Genger Proceeding 032315

1              O. Genger - Plaintiff - Direct/Herschmann

2       Q    And what was the general tenure for what you were

3    looking to get from your brother in the November 2007 meeting?

4       A    Information.  Information about my finances.

5       Q    And did you get information that was satisfactory to

6    you from your brother in that meeting?

7       A    No.

8       Q    Let me show you what's been previously received in

9    evidence as Exhibit 230.

10             MR. HERSCHMANN:  Again, I'm providing an extra

11        copy to defense counsel.

12             (Handing to defense counsel.)

13             (Handing to witness.)

14             (Handing to the Court.)

15      Q    Do you recall that after the meeting Isaacson &

16   Associates sent a letter to your brother?

17             THE COURT:  Yeah, this is very leading.

18             MR. HERSCHMANN:  I'm sorry?

19             THE COURT:  Ask a question.

20             MR. HERSCHMANN:  I'm trying to lay a foundation

21        for the exhibit.

22             THE COURT:  It's too leading.

23      Q    First, have you seen Exhibit 230 beforehand?

24      A    Yes.

25      Q    Did you have discussions with Isaacson & Associates

26   before Exhibit 230 was sent to your brother?

2854

## SETTLEMENT AGREEMENT AND RELEASE

This settlement agreement and release (this "Agreement") is entered into as of June 16, 2013, by and between Arie Genger and Orly Genger (in her individual capacity and in her capacity as beneficiary of the Orly Genger 1993 Trust), Arnold Broser, David Broser, (in their individual capacity and on behalf of all entities managed, owned or controlled in any way by Arnold Broser or David Broser and which are in any way related to the subject matter hereof ("Broser Entities" and collectively with Arie Genger and Orly Genger in all capacities referenced above, the "AG Group"), and TR Investors, LLC ("TR Investors"), Glenclova Investment Co. ("Glenclova"), New TR Equity I, LLC ("New TR I"), New TR Equity II, LLC ("New TR II" and, together with TR Investors, Glenclova and New TR I, the "Trump Entities"), Trans-Resources, LLC (the successor to Trans-Resources, Inc. and together with its predecessor entities referred to herein as, "Trans-Resources"), Jules Trump, Eddie Trump and Mark Hirsch (collectively, with the Trump Entities and Trans-Resources, the "Trump Group"). The members of the AG Group and the Trump Group are each referred to herein individually as a "Party" and together as the "Parties".

WHEREAS, in March 2001, TR Investors, Glenclova, Trans-Resources and TPR Investment Associates, Inc. ("TPR") entered into a stockholders agreement with respect the common stock of Trans-Resources (the "Stockholders Agreement");

1

WHEREAS, since August 2008, Arie Genger, Orly Genger, the Trump Group and others have been engaged in various litigations (described below) concerning the ownership and control of Trans-Resources; and

WHEREAS, the Parties wish to resolve all issues, disputes and disagreements between them, including but not limited to the issue of ownership of all Trans-Resources shares;

NOW, THEREFORE, in consideration of the promises and representations contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.     **Recitals.**     The above recitals are incorporated into and made a part of this Agreement and are binding on all Parties hereto.

2.     **Initial Consideration from the Trump Group.**     Upon dismissal with prejudice of the claims, counterclaims, cross-claims, third-party claims, issues and matters as provided in Paragraph 4 below, the Trump Group shall promptly:

(a)     release all claims they may have to the (i) $7,428,994.00 plus interest held by Skadden, Arps, Slate, Meagher & Flom LLP as escrow agent (the "Skadden Escrow") and (ii) $10,314,005.00 plus interest held by with Pedowitz & Meister as escrow agent (the "P&M Escrow");

(b)     pay to Wachtel, Masyr & Missry, LLP as attorneys for the AG Group ("Wachtel") an amount in cash equal to $35,000,000.00 minus (i) the amount held in the Skadden Escrow, and (ii) the amount held in the P&M Escrow.

2

3.   **Further Consideration from the Trump Group.**   Trans-Resources on behalf of the Trump Group shall pay: (i) $7,500,000 to Wachtel on the third  anniversary of the Effective Date (defined below), and (ii) $7,500,000 to Wachtel 364 days following the third anniversary of the Effective Date The payments provided under this paragraph shall be (a) subject to the terms and conditions herein and (b) evidenced by two (2) promissory notes that are substantially in the form attached as Exhibit A hereto (the "Notes").  Notwithstanding anything else herein, the maturity of the two $7,500,000 Notes shall be delayed beyond their due date until the earlier (the "Extended Maturity Date") of  (A) such time as all pending claims, cross-claims and counter-claims brought by any of TPR, Sagi Genger, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than the Orly Trust Action (as defined below)), D&K Limited Partnership, D&K GP LLC, Rochelle Fang, and/or David Parnes (collectively, the "Sagi Group") against any member of the Trump Group have been dismissed with prejudice and the statute of limitations shall have run with respect to any other potential claims of the Sagi Group that might be the subject of the Indemnification provided for by Paragraph 5 below or (B) such time as each member of the Sagi Group shall have provided the Trump Group with a release of the Trump Group Released Parties (as defined below) and covenant not to sue in form and substance that is the same as the AG release and covenant not to sue contained in Paragraph 6(a) below (the "Sagi Group Release").

Subject to the foregoing, the Notes shall become immediately due and payable upon the occurrence of any transaction or series of transactions which shall result in the Trump Group owning or controlling neither (i) a majority of the voting stock of Trans-Resources or its successors or each of its two principal subsidiaries, Haifa Chemicals, Ltd. and Na-Churs Plant

3

Food Company or their successors, nor (ii) directly or indirectly, a majority of the assets

currently owned by Trans-Resources and its subsidiaries; provided, however, that in such event,

at the request of the Trump Group, the amounts then payable on the Notes shall be placed in

escrow for the duration of their original term or until the Extended Maturity Date (if applicable)

under the provisions of an escrow agreement on reasonable terms to be negotiated at such time in

good faith between Trans-Resources, the payee and an escrow agent selected by their mutual

consent, which shall provide for their release to the Trump Group in payment of Indemnification

Amounts, AG Group Release Amounts and Discovery Costs (as such terms are defined below),

if any, and payment to the payee of such amounts after reduction for Indemnification Amounts,

AG Group Release Amounts and Discovery Costs, if any, upon their original maturity date or the

Extended Maturity Date (if applicable).  If Trans-Resources is unable to pay the Notes as and

when they mature, the Trump Group will be obligated to make payment thereon in an amount

equal to the lesser of (x) the outstanding amounts not paid by the obligor thereunder and (y) any

amount by which cash payments received by members of the Trump Group (other than Trans-

Resources) from Trans-Resources and its subsidiaries since the Effective Date (whether in the

form of dividends, distributions, compensation or otherwise) exceeds reasonable compensation

for services rendered plus payments for goods, services and assets provided by such persons in

amounts that would have been paid for such goods, services and assets in arms' length

transactions with unaffiliated third parties; provided, however, that in neither case shall the

Trump Group be obligated to pay any amount that exceeds the outstanding amounts not paid by

Trans-Resources on the Notes (subject to any Indemnification Amounts, AG Group Release

Amounts or Discovery Costs).

4

      4.    **Dismissal of Claims with Prejudice.**  Within two (2) business days of the

Effective Date (defined below), the AG Group and the Trump Group shall take all actions

necessary or desirable to:  (i) effect the dismissal with prejudice of all claims, counterclaims,

cross-claims, third-party claims, issues and matters between them, and to vacate all court orders

which restrain, enjoin or in any way limit actions by any members of the Trump Group, in each

pending action in which members of the AG Group and the Trump Group are parties (whether or

not service of process with respect thereto has been effected), including, without limitation, each

of the following pending actions (collectively, the "Litigation"):  *Genger v. TR Investors, LLC*,

No. 168, 2013 (Del.); *TR Investors, LLC v. Genger*, C.A. No. 6697-CS (Del. Ch.); *Trans-*

*Resources, Inc. v. Genger*, C.A. No. 4391-CS (Del. Ch.) (with respect to Arie Genger only); *TR*

*Investors, LLC, et al. v. Genger*, C.A. No. 3994-CS (Del. Ch.); *Glenclova Investment Co. v.*

*Trans-Resources, Inc., at al.*, No. 08 Civ. 7140 (JFK) (S.D.N.Y.); *Arie Genger and Orly Genger*

*v. Sagi Genger, et al.*, Index No. 651089/2010 (N.Y. Supr.); and (ii) have the New York State

Supreme Court enter a definitive non-appealable order declaring that members of the Trump

Group own all right, title and interest (beneficially, of record and otherwise) to the shares of

Trans-Resources purportedly transferred by TPR in October 2004 to Arie Genger (the ("Arie

Shares") and to the Orly Genger 1993 Trust (the "Orly Trust Shares"),  with the understanding

and agreement that should the request for the entry of such an order with respect to the "Orly

Trust Shares" be denied or not entered in a reasonably timely fashion,  then the AG Group and

the Trump Group shall take all action necessary or desirable to have the New York State

Supreme Court vacate all court orders which restrain, enjoin or in any way limit actions by the

parties to the pending action captioned *Dalia Genger, as Trustee of the Orly Genger 1993 Trust*

*v. TR Investors, LLC, et al.,* C.A. No. 6906-CS (Del. Ch.) (the "Orly Trust Action"), to prosecute,

defend, compromise, settle and otherwise deal with all claims, counterclaims, cross-claims, third-

party claims, issues and matters asserted therein; provided, however, that nothing in this

Agreement is intended to require or permit the dismissal of any claims, counterclaims, cross-

claims, third-party claims, issues and matters, (i) in *Trans-Resources, Inc. v. Genger,* C.A. No.

4391-CS (Del. Ch.) (the "Breach of Fiduciary Duty Case"), as between the Trump Group and

Avi Pelossof and/or William Dowd (subject to the exchange of general releases between the

members of the Trump Group and William Dowd as contemplated below) and (b) against TPR,

the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust, D&K Limited Partnership, D&K GP

LLC, Sagi Genger or Dalia Genger. Any member of the AG Group including, without

limitation, Orly Genger, who is called to testify in the Litigation or the Orly Trust Action, agrees

to testify that he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993 Trust,~~ and as

beneficiary of the Orly Genger 1993 Trust) or it has waived all claims he, she (in her individual

capacity, ~~on behalf of the Orly Genger 1993 Trust,~~ and as beneficiary of the Orly Genger 1993

Trust) or it had or may have to ownership (record, beneficial or otherwise) of any shares of

Trans-Resources and that he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993~~

~~Trust,~~ and as beneficiary of the Orly Genger 1993 Trust) or it is opposed to the Orly Genger

1993 Trust seeking any remedy of any kind against any member of the Trump Group.

Notwithstanding the foregoing, upon receipt by the Trump Group of a general release in form

and substance reasonably satisfactory to it, the Trump Group shall provide the same general

6

release to William Dowd and cause the dismissal of the Breach of Fiduciary Duty Case as
between the Trump Group and him.

     5.    **Indemnification.**

     (a)    Upon closing of this Agreement, each of the members of the AG
Group with the exception of Arnold Broser and David Broser and the Broser Entities, jointly
and severally, agrees to indemnify and hold harmless (i) each of the members of the Trump
Group, and their respective past and present affiliates and direct and indirect subsidiaries, and (ii)
each of the past and present agents, representatives, officers, directors, advisors, employees,
general partners, limited partners, shareholders, members, predecessors, successors, heirs,
executors, administrators and assigns of each person and entity referenced in clause (i), from all
reasonable costs, expenses, attorneys' fees of counsel selected by the Trump Group (it being
agreed that the Trump Group will cooperate with the AG Group in all reasonable respects to
cause the amount of such costs, expenses and its attorneys' fees to be minimized), settlements
and/or judgments (whether direct or related to joint and several liability) (the "Indemnification
Amounts") incurred as a result of, in connection with, or relating in any way to any (x) claims,
counterclaims, cross-claims or third-party claims raised or that could have been raised in the
Litigation, and (y) claims that are pending, have been brought, or that may in the future be
brought by or on behalf of any of TPR, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust
(other than those claims currently pending in the Orly Trust Action), D&K Limited Partnership,
D&K GP LLC, Sagi Genger, David Parnes or Dalia Genger, regardless of whether they were or
could have been raised in the Litigation or the Orly Trust Action, relating in any way, whether
directly or indirectly, to (A) the Shareholders Agreement entered into by Trans-Resources

shareholders and Trans-Resources on March 30, 2001, (B) the transfer of interests in TPR or the

purported transfer of shares of Trans-Resources by TPR in October 2004, (C) any activities or

developments relating to or conducted by Trans-Resources or any of its direct or indirect

subsidiaries that occurred prior to September 26, 2008, (D) the acquisition by the Trump Group

of all interests (record, beneficial or otherwise) of the so called "Arie Shares", "Orly Trust

Shares" and the shares of Trans-Resources purportedly transferred by TPR in October 2004 to

the Sagi Genger 1993 Trust (the "Sagi Trust Shares") (including, without limitation, the

negotiations for the ownership or acquisition of such shares), (E) the control of Trans-Resources

or any of its direct or indirect subsidiaries by the Trump Group through its acquisition of the

aforementioned shares, (F) records and documents (including but not limited to electronic files)

in the possession, custody or control of Trans-Resources or any of its direct or indirect

subsidiaries, (G) misrepresentations made or improper acts conducted prior to September 26,

2008 by any officer or director of Trans-Resources, (H) this Agreement, (I) the business or

operations of Trans-Resources or any of its direct or indirect subsidiaries conducted prior to

September 26, 2008 arising from or in any way related to the conduct of any member of the AG

Group, Avi Pelossof or William Dowd, or (J) the conduct of any other individual to the extent

Arie Genger is aware, or should have been aware, thereof. Notwithstanding the foregoing, the

indemnity provided for above shall not apply to any claims which may be brought subsequent to

the Effective Date (and which are entirely unrelated to any claim brought prior to such date) by

any of Sagi Genger, the Sagi Genger 1993 Trust or TPR and which arise solely out of actions

taken or not taken by members of the Trump Group which actions or inactions no member of the

AG Group was aware of or should have been aware of; provided, however, that such claim was

8

not encouraged or solicited by any member of the AG Group and no member thereof cooperates in asserting, instituting or prosecuting such claim. Notwithstanding anything herein to the contrary, the undertaking of William Wachtel hereunder shall not exceed under any circumstance an amount greater than $5,000,000.

      (b)  The Trump Group may request payment or reimbursement of the Indemnification Amounts at any time by providing a written statement or copy of an underlying invoice or expense documentation to any member of the AG Group at the addresses set forth in Paragraph 16 below, and the AG Group shall pay such indemnified expenses in full and in cash within five (5) business days of the date such request is made.  The supporting documentation submitted with any payment or reimbursement request hereunder may be redacted as necessary to preserve attorney-client privilege, attorney work product, or confidential information the Trump Group may, in its reasonable determination, need to protect.  The Trump Group will provide the AG Group with reasonable notice prior to making any motion or taking any appeal with respect to, or in, any past, present or future action or claim for which the Trump Group is seeking indemnification, and such notice will be accompanied by a non-binding estimate of the legal fees and costs associated with such motion or appeal. The Trump Group authorizes the AG Group and their respective counsel to discuss directly with the Trump Group's appointed counsel the amount and scope of any invoice for which the Trump Group is seeking indemnification. The AG Group in its sole discretion may settle any indemnified claim so long as there is no monetary contribution to be paid by the Trump Group, and the Trump Group is released, in form and substance reasonably satisfactory to it, from any liability relating to any such indemnified

9

claim. The Trump Group shall not enter into any settlement of any indemnified claim, or

discussions with respect thereto, without the express written consent of the AG Group.

       (c)    With respect to each Indemnification Amount, until such time as it

has been paid over to the Trump Group, the members of the AG Group shall remain jointly and

severally liable for such Indemnification Amount and, the Trump Group may at its option pursue

all legal remedies available to it and/or withhold an amount equal to such unreimbursed

Indemnification Amount from any payments by Trans-Resources to be made pursuant to the

Notes.

      6.    **Releases.**

       (a)    **The AG Group Release.**  Effective on the Effective Date, each of

the members of the AG Group, for itself, himself or herself, and in all capacities, and on behalf

of its (and its respective affiliates' and direct and indirect subsidiaries'), his or her respective

agents, representatives, officers, directors, advisors, employees, general partners, limited partners,

shareholders, members, subsidiaries and affiliates, and each of their respective predecessors,

successors, heirs, executors, administrators and assigns, and any other persons or entities acting

in concert with any of them including, without limitation, any member of the Sagi Group which

he, she or it shall at any time directly or indirectly control or be deemed authorized to act on

behalf of (individually, an "AG Group Releasing Party" and collectively, the "AG Group

Releasing Parties"): (i) fully, finally, irrevocably and unconditionally waives, releases and

discharges each of the members of the Trump Group and its (and its respective past and present

affiliates' and direct and indirect subsidiaries'), his or her respective past and present agents

10

(including Skadden, Arps, Slate, Meagher & Flom LLP in any capacity, including as Escrow

Agent for the Skadden Escrow or for any escrow in which it held, holds, or may hold, any

dividends or distributions from Trans-Resources), representatives, officers, directors, advisors,

employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates,

and each of their respective predecessors, successors, heirs, executors, administrators and assigns

(collectively, the "Trump Group Released Parties"), from any and all claims, counterclaims,

demands, proceedings, actions, causes of action, orders, obligations, damages, debts, costs,

expenses and other liabilities whatsoever and however arising, whether known or unknown, past,

present or future, suspected or unsuspected, contingent or actual, both at law and in equity,

including without limitation, claims for fraud or fraud in the inducement (collectively, "Claims"),

which such AG Group Releasing Party now has, has ever had or may hereafter claim to have

against any Trump Group Released Party or its, his or her assets, liabilities or operations from

the beginning of the world through the Effective Date (individually, an "AG Group Released

Claim" and collectively, the "AG Group Released Claims"); and (ii) agrees not to assert, institute

or prosecute, or encourage, solicit or cooperate with any other person or entity in asserting,

instituting or prosecuting, any proceeding against any of the Trump Group Released Parties in

any jurisdiction (domestic or foreign, including, without limitation, the State of Israel) with

respect to any AG Group Released Claim or any other Claim relating in any way, directly or

indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or

acquisition of Trans-Resources shares (including any dividends or distributions relating thereto

or any escrow in which such dividends or distributions may currently be or in the past have been

held), the Litigation, the Orly Trust Action, control of Trans-Resources or any of its direct or

11