E4TATPRA

10  time ago.  And at the time, it was right after the Delaware
11  Supreme Court had ruled, somewhat ambiguously.  And Mr. Meister
12  came at that time and said, there are adverse claimants, there
13  is vexation litigation.  And your Honor said no.  And I think,
14  you know, it wasn't the position we took, but in retrospect we
15  didn't appeal it.  We think it was pretty common sense and the
16  legally correct decision, which is, there is no real adversity
17  here and thus no subject matter jurisdiction here under 28
18  U.S.C. 1335 because, as your Honor wrote, "All potential
19  claimants acknowledge that if Arie and the Orly Trust are
20  deemed -- if the 2004 transfer of shares to Arie and the Orly
21  Trust is found to be invalid, then TPR had the right to sell
22  the shares to the Trump Group and TPR would be entitled to the
23  interpleader funds".
24           Now, what's significant about this ruling is, this was
25  after the Delaware Supreme Court ruled how it did, because
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            16

E4TATPRAps
1   they're taking the position that once the Delaware Supreme
2   Court didn't affirm under the escrow agreement all bets are
3   off.  Section 2.B.3 which talks about -- 2.B.2 -- which talks
4   about affirming, that doesn't count any more.  But that's not
5   what your Honor ruled.  What your Honor said is that any court
6   of competent jurisdiction can decide the beneficial ownership
7   and that will automatically determine who gets the shares.  And
8   your Honor said that the New York courts are well equipped to
9   do so and the Delaware courts are well equipped to do so and
10  probably New York is better, but you're going to leave that to
11  the parties to figure it out.  And you sent us all on our way.
12           So what happened next?  Well, TPR didn't file any
13  suits.  But this being it the Gengers, TPR didn't get sued just
14  in New York and didn't get sued just in Delaware.  We got sued
15  in both.  And I just heard that no court has made a finding of
16  beneficial ownership of the shares.  Absolutely incorrect.
17  Both courts have made a finding of beneficial ownership of the
18  shares.  Both are conclusive and final.
19           So let me just very briefly go through what happened
20  after your Honor made that ruling.  Your Honor knows some of it
21  from one of the prior skirmishes, but let me take you all the
22  way through it just again.
23           First, there was only one claim about beneficial
24  ownership of the shares -- that's what we're talking about
25  here -- in the 2010 action.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            17

E4TATPRAps
1            It's important to note, by the way, that the 2010
2   action that they're asking you to stay for, that was filed
3   before the escrow agreement was signed.  So Orly understood and
4   contracted that the determination of beneficial ownership of
5   the shares wasn't going to be determined by the 2010 action; it
6   was going to be determined by Delaware.  The 2010 action
7   already existed when she signed that agreement.
8            THE COURT:  Well, you were down in Delaware, right?
9            DELLAPORTAS:  I was, your Honor.
10           THE COURT:  Didn't the chancellor down there,
11  Chancellor Strine, didn't he tell you that once the stipulation
12  was signed in Delaware, that the place to go was New York
13  Supreme, not -- he didn't say anything about filing a new
14  action before me.  Isn't that why the stipulation in Delaware
                        Page 8

E4TATPRA
15   reads, quote, a court in New York, close quote?
16        DELLAPORTAS:  Chancellor Strine said a court in New
17   York.  It did not say a state court in New York or a federal
18   court in New York.
19        THE COURT:  He knows the difference between a federal
20   court and a state court.  Come on.  He referred twice in that
21   proceeding specifically to me.  And I read the minutes.  I read
22   them yesterday and I read them again this morning.  And both
23   place -- he talks about federal court and me, and he even
24   mentions something about the Constitution.  If he meant federal
25   court, he would have said federal court.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              18

E4TATPRAps
1         DELLAPORTAS:  He expressed the concern that perhaps
2    there wouldn't be diversity jurisdiction.  There is.  And even
3    if he meant state court, Chancellor Strine is a great judge but
4    he doesn't have the authority to tell us which court to go to.
5    He kicked us all out of his court and after that --
6         THE COURT:  He certainly did.
7         DELLAPORTAS:  After that it's up to us.
8         THE COURT:  He didn't express a great deal of pleasure
9    with any of you that I read.
10        DELLAPORTAS:  Yes.  And I think he's had his fill of
11   the Gengers, as have many judges.  But before he did, he
12   entered a final order saying that beneficial ownership of the
13   shares was TPR's and TPR properly sold them.
14        Let's compare what your Honor ruled versus what he
15   then ruled.  Your Honor said, "If the 2004 transfer of shares
16   to Arie Genger to the Orly trust is found to be invalid, then
17   TPR has the right to sell the shares to the Trump Group and TPR
18   would be entitled to the interpleader funds."
19        Now we did to what Chancellor Strine ruled.  He ruled
20   that the shares were invalid.  He used the term "void" but it's
21   the same thing.  The transfers were void and the stock reverted
22   to TPR and the Trump Group had the right to buy all of the
23   improperly transferred Trans-Resources stock from TPR.  And
24   then he said, it's now -- that transaction is complete.  These
25   are paragraphs 1 and 26 his ruling.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              19

E4TATPRAps
1         So his ruling gave exactly the ruling that your Honor
2    said we would need to obtain in order to satisfy the
3    interpleader the last time around.
4         Now, he didn't rule that we're entitled to the money.
5    He didn't want to rule that.  He said go to New York to figure
6    out who's entitled to the money.  But that doesn't stop the res
7    judicata or collateral estoppel effect on which the Court
8    ruled, on which your Honor ruled.
9         Just to be clear, we don't say Chancellor Strine said
10   we're entitled to the money.  We say this Court said under
11   express conditions we would be entitled to the money.
12        THE COURT:  You make a big point here, as I understand
13   it, as I read this, that Orly filed a state court action last
14   December and that she never claimed the funds in the original
15   Supreme Court action.  Right?  You make a point about that,
16   don't you?
17        DELLAPORTAS:  She never claimed ownership of them.
18   What she claimed was that by our obtaining them --
19        THE COURT:  Isn't that what the unjust enrichment
                              Page 9

E4TATPRA

20   claim is?
21          DELLAPORTAS:  Your Honor said exactly the opposite.
22   With respect to Arie's shares, which is the same shares, when
23   this was before your Honor last time -- and this is on page 24
24   of your Honor's decision -- your Honor noted the difference.
25   You said, "Well" -- and this is about Arie but it's the same
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              20

E4TATPRAps
1    shares -- "Well, Arie asserts a beneficial ownership in the
2    underlying Trans-Resources shares.  In no case does he have a
3    claim against the interpleaded funds themselves.  Instead,
4    Arie's numerous counterclaims seek money damages for a breach
5    of fiduciary duties that are ancillary to and beyond the scope
6    of the Skadden interpleader."
7          That is the same thing here.  They have money damages
8    claims.  Your Honor asked exactly the right question:  If they
9    give us the money, do they still have money damages claims?
10   Absolutely.  Absolutely they still have money damages claims.
11   And maybe they'll win and maybe they will be worth more than
12   10.3, maybe they will be less than 10.3.  But what's been
13   noted, that the first element of a claim for unjust enrichment
14   is that we were enriched.  And so far we're being sued for
15   unjust enrichment and we haven't been enriched.  So our point
16   is, at least allow us to be enriched.  And then we can have a
17   trial over whether it was just or unjust.
18          THE COURT:  Let me ask you one more question and I'll
19   wrap it up.  Are you saving time for rebuttal too?
20          DELLAPORTAS:  I will save a couple minutes.  But I
21   have a couple of great points, your Honor.
22          THE COURT:  Let me ask you this.  You're arguing that
23   the Delaware stipulation satisfies section 2.B.2 of the escrow
24   agreement, right?
25          DELLAPORTAS:  It does, your Honor.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              21

E4TATPRAps
1          THE COURT:  OK.  Well, I don't know whether that's
2    technically true.  Aren't you really making a different
3    argument?  Aren't you really making an argument that there's a
4    drafting error here and that it would be consistent with the
5    spirit of the agreement, not with the verbiage?  Isn't that
6    what you're preliminarily saying?
7          DELLAPORTAS:  We're arguing two things, your Honor.
8    We make both points it our papers.  Number one is that this has
9    been litigated.  And once it's been litigated it doesn't matter
10   that somebody comes up with a clever argument after the fact.
11   They had an obligation.  If they thought it could only be the
12   Delaware Supreme Court, they had to speak up again, because if
13   that were the case, then we should have been before your Honor
14   two years ago and had this resolved.  But they said no.  They
15   took the opposite position.  They said it's impossibly to be
16   vexatious because everybody agrees how this thing should be
17   read.  Now they are saying, never mind, it actually should be
18   read some other way.
19          In the courts we only get to litigate things once,
20   your Honor.  And whether it's res judicata or collateral
21   estoppel --
22          THE COURT:  Not in this case.
23          DELLAPORTAS:  Well, there's a first time for
24   everything, your Honor.  And that's how it was interpreted by
                              Page 10

E4TATPRA
25   the Court.  And it was absolutely a necessary finding to the
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

E4TATPRAps
1   decision, but it's on what the Court pinned its finding of lack
2   of diversity.  That's where lack of subject matter jurisdiction
3   came from.  If they had said then that, oh, you can only have
4   the Delaware Supreme Court -- the Delaware Supreme Court had
5   already dismissed the case at that point.  But your Honor
6   said -- and they agreed, they urged this result -- that any
7   court of competent jurisdiction can decide it.
8         So now we haven't had one, we've had two courts, your
9   Honor, who have ruled on beneficial ownership.  And that's, I
10   think, something we're missing here.
11         Justice Jaffe, on January 3rd, 2012, issued her
12   decision where they only had one count of beneficial ownership.
13   If you look at the third amended supplemental complaint, Count
14   One is their count seeking beneficial ownership of the shares,
15   which is what we're talking about here.  And in it they sought
16   the following relief:  The 2004 transfer should be undone.  All
17   the shares should come back to TPR.  TPR should give them to
18   TPR2, a new company.  Arie should be put in control of TPR2.
19   And then 50 other ridiculous events.
20         This goes before Justice Jaffe, and Justice Jaffe
21   dismisses it.  Justice Jaffe rules, quote, Arie seeks to undo
22   the Delaware court's adverse findings against him and the Trump
23   Group's right to buy the invalidly transferred shares
24   notwithstanding the fact that they were transferred as a result
25   of his misrepresentation in the divorce.  In any event, any
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23

E4TATPRAps
1   equitable or contractual right in favor of Arie to reform the
2   diverse stipulation does not override the preexisting
3   contractual right of the Trump Group to purchase the invalidly
4   transferred shares."  So she threw out their only claims of
5   beneficial ownership.
6         It goes up on appeal, your Honor -- and your Honor
7   asked before it.  It doesn't go up on appeal on that issue.
8   I'd like to read to you, because this is very important -- and
9   this happened after the last time we were here before your
10   Honor.  Last time your Honor said the beneficial ownership
11   claim is on life support or almost dead but not quite dead.
12   Since your Honor made that ruling, both Arie and Orly have
13   pulled the plug on that.  And so this is from her suit, this is
14   from her brief.  She says, "In June 2013, Orly and Arie entered
15   into a settlement agreement with the Trump Group that resolved
16   all issues between them in this case.  By this settlement, Orly
17   settled her individual claims and, as a result, is no longer
18   seeking beneficial ownership of the Orly Trust GRI shares."
19         Now, she says she still wants the money.  Good for
20   her.  But the shares, that's no longer pending in any court.
21   It was conclusively decided by Justice Jaffe.  It was
22   conclusively decided by Chancellor Strine.
23         Now, Chancellor Strine read a decision.  He thinks
24   she's got -- Orly's got a good unjust enrichment claim.  Maybe
25   he'll come and testify for her.  I don't know.  But that's not
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

E4TATPRAps

E4TATPRA

```
 1   what we're here for today.  We're not here on Orly's money
 2   damages claims.  Your Honor said time and again, this Court is
 3   not going to hear money damages claims again.  Those are in the
 4   state court for better, for worse.  We respect that decision.
 5   We're not seeking to challenge it.  All we're seeking to do is
 6   implement the very strict ruling of this Court on June 12th
 7   that if we satisfied certain conditions, that we would be
 8   entitled to the funds.  We have satisfied those conditions.
 9              THE COURT:  OK.  You saved time for rebuttal.
10              DELLAPORTAS:  Very briefly, your Honor?
11              THE COURT:  Very briefly, if you're going to do
12   rebuttal.
13              DELLAPORTAS:  You asked if we proceed under 2.B.2.
14   And we do proceed under 2.B.2.  We don't think it's a drafting
15   error.  We think that, inconsistent with the case we cited in
16   our brief, that it needs to be read that every provision of an
17   escrow agreement needs to be read to fulfill the overall
18   purpose.  And the overall purpose of this agreement was, if we
19   owned the shares and we sold the shares, to give us our
20   proceeds from selling the shares.  It's not complicated.
21              We also proceed under 2.B.5.  We made a written
22   request under 2.B.5.  We said, why don't we all just agree, why
23   don't we all not be Gengers for once in our life and agree just
24   to release this, subject to all your money damages claims.  And
25   we made that on November 18th.  That's Exhibit C to our papers.
```

25

E4TATPRAps

```
 1   They responded, no, we object.  That's Exhibit D to their
 2   papers.
 3              When you get a written letter --
 4              THE COURT:  All right.  Come on.
 5              DELLAPORTAS:  Yes.  When you get a written request and
 6   you have an objection --
 7              THE COURT:  Thank you.  Save your time for rebuttal.
 8              DELLAPORTAS:  -- the only way for the escrow agent to
 9   release the funds is by order of the court.  So at this point
10   we need an order of some court, and we believe this court is
11   the correct court.  Thank you, your Honor.
12              THE COURT:  Thank you.
13              All right.  Now, who is going to argue here on behalf
14   of Pedowitz & Meister?
15              MR. MEISTER:  I would, your Honor, but I think it may
16   make sense that Ms. Bachman argue briefly on behalf of
17   Ms. Genger.
18              THE COURT:  All right.
19              MS. BACHMAN:  Good afternoon, your Honor.
20              THE COURT:  Good afternoon.
21              MS. BACHMAN:  I do not believe I'll need any time for
22   rebuttal because I'll be very brief.
23              As I understand it, Ms. Genger's crossclaim,
24   counterclaim here was pursuant to the settlement agreement that
25   the parties have made that the Orly Trust was entitled to the
```

26

E4TATPRAps

```
 1   proceeds, which are currently being held in escrow.  As this
 2   Court is aware from the numerous papers that have been filed,
 3   Justice Jaffe tells us that settlement agreement was either
 4   void or voidable, and subsequently on appeal to the First
 5   Department, the First Department affirmed that decision.
```

E4TATPRA

```
 6            Accordingly, it seems that the logic behind
 7  Ms. Genger's claims is now in jeopardy and therefore we don't
 8  object if this Court would direct that the escrow be given to
 9  TPR.  TPR has represented to the Court and there is an oral
10  understanding, to my knowledge, that if on further appeal of
11  the First Department decision the settlement agreement is
12  deemed to be valid, then TPR will act in accordance with the
13  settlement agreement and return the money to the trust.
14            THE COURT:  Let me ask you this question.  You
15  represent Dalia now, right?
16            MS. BACHMAN:  That is correct, your Honor.
17            THE COURT:  Personally, right?
18            MS. BACHMAN:  As the trust -- her role here, I
19  believe, is as the trustee of the trust.
20            THE COURT:  Well, how can she do both?  She is the
21  trustee for the Orly Trust.  Right?
22            MS. BACHMAN:  That is correct.
23            THE COURT:  And as I read Chancellor Strine's -- now
24  he's chief justice down there, chief judge.  As I read his
25  remarks, he kept suggesting that she no longer should be
```

<div align="center">SOUTHERN DISTRICT REPORTERS, P.C.<br/>(212) 805-0300</div>

<div align="right">27</div>

E4TATPRAps

```
 1  trustee, didn't he?  Did you read that?
 2            MS. BACHMAN:  I am familiar with that.  To my
 3  knowledge, your Honor, the surrogate court in New York has, at
 4  least to date, deemed that Dalia is an appropriate
 5  representative of the trust.
 6            THE COURT:  Aren't she and Arie estranged?
 7            MS. BACHMAN:  They are clearly at odds, your Honor.
 8  But that does not -- that's not, if you will -- in the
 9  structure that we have of trusts, I believe that a beneficiary
10  does not necessarily have the discretion to choose the trustee.
11  It's the trust document itself that determines who should be
12  the trustee and how that trustee is appointed.  And until the
13  surrogates court rules otherwise, I believe that she is the
14  appropriate representative of the trust.
15            THE COURT:  All right.
16            Anything else you want to say?
17            MS. BACHMAN:  That's all, your Honor.
18            THE COURT:  Thank you.
19            MS. BACHMAN:  Thank you.
20            THE COURT:  I'll hear from you, Mr. Meister, briefly.
21            MR. MEISTER:  Your Honor, Robert Meister for Pedowitz
22  & Meister, pro se.
23            I also will be brief.  I don't think I will need any
24  time for rebuttal.
25            First, as trustee -- escrow agent, I should say -- we
```

<div align="center">SOUTHERN DISTRICT REPORTERS, P.C.<br/>(212) 805-0300</div>

<div align="right">28</div>

E4TATPRAps

```
 1  received multiple claims for the same proceeds.  We didn't
 2  commence an interpleader action.  Rather, we filed an answer
 3  using rule interpleader, defense of interpleader.
 4            I heard my colleague, Mr. Griver, say that the escrow
 5  agreement says we can't do that.  But I've read the escrow
 6  agreement many times.  In fact, I blush to say I drafted it.
 7  And it doesn't say that.  It says that if there are conflicting
 8  claims, the escrow agent can, among other things, do nothing.
 9  It also says other things that it may do.  It doesn't say
10  anything that it can't do, in terms of the interpleader.
```

<div align="center">Page 13</div>

E4TATPRA
11          So while the escrow agent could have started an
12    interpleader seeking arbitration, we didn't.  We didn't start
13    any interpleader.  And I don't believe that even if the
14    agreement purported to prevent the escrow agent from taking
15    advantage of federal law, that that would be lawful.  But we
16    don't have to worry about that.  It didn't.
17          Why do we like interpleader as opposed to your Honor
18    just saying, here's judgment, here's the proceeds where the
19    proceeds go, the way any normal case would be decided?  The
20    interpleader gives the parties who have -- whoever the Court
21    determines has the right to the money -- gives them the same
22    thing.  It gives the interpleader, as escrow agent, a
23    discharge.  And since my colleague, Mr. Griver, has come up
24    with numerous creative theories in the course of these
25    litigations, in particular his December action, which seeks
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                            29
      E4TATPRAps
1     damages against the escrow agent for not turning all the funds
2     over to Orly, we think that discharge by this Court would
3     surely be something good to have, something we're entitled to
4     as a matter of law.
5           The only other thing I would say to the Court is, I
6     did check the account.  The current balance in the escrow is
7     $10,376,163.20.  That's going to change on April 30.  So I take
8     it that when the Court decides this, if the Court decides that
9     the money should go to someone or the other --
10          THE COURT:  It can be tomorrow.
11          MR. MEISTER:  If it's tomorrow --
12          THE COURT:  Tomorrow's April 30th.
13          MR. MEISTER:  It is.  It is.  The way Chase credits
14    things, I send out a notice to all the parties every month.
15    The credit comes in on April 30th.  Not in a huge amount of
16    money.  It's now earning 0.15 percent interest.
17          THE COURT:  Yes.  I'm aware of the bank statements.
18          MR. MEISTER:  The only thing that I would say apropos
19    of the claim against the escrow agent is that there was an
20    objection to the Orly claim.  It's attached to my papers.  The
21    notice went out.  Mr. Griver says he doesn't remember receiving
22    it.  His client doesn't open her mail, so it's not a problem
23    there.  But the point is, the escrow agreement does not require
24    the escrow agent to send out notices of objection.  It does
25    require notices of claims.  There's no argument that notices of
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                            30
      E4TATPRAps
1     claims weren't sent out.  So I don't see how the escrow agent
2     can be faulted in that case.
3           And with that I'll just remind your Honor of the old
4     Russian proverb, which I should have borne in mind when
5     agreeing to become here, as escrow agent, that no good deed
6     remains unpunished.
7           THE COURT:  Thank you.
8           All right.  So first we're going to have Mr. Griver's
9     rebuttal.  Go ahead.
10          MR. GRIVER:  Thank you, you, your Honor.  As
11    demonstrated, TPR's plea is that you allow it to ignore the
12    escrow agreement because it's as if they had met its
13    requirements.  Orly gave up fundamental rights to reach the
14    specific language of the escrow agreement.  They admit they
15    don't need it.
                         Page 14

E4TATPRA

16    They say instead that beneficial ownership has been
17  decided.  Well, look at what the New York court said on May 29,
18  2013.  And this was at page 3 of our memo.  It says, "Nor can
19  TPR's unilateral declaration of ownership be reconciled with
20  the undisputed fact that the issues of ultimate beneficial
21  ownership in such shares and the related proceeds have not yet
22  been judicially determined by a court of competent
23  jurisdiction."  Look at what you said just one week before they
24  came in and said, oh, it's been determined.  You said,
25  "Therefore, it is inaccurate for TPR to suggest that the issue
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                            31
E4TATPRAps
1  of beneficial ownership is conclusively resolved."
2    What Mr. Dellaportas does is, he mixes and matches the
3  arguments of Arie Genger and Orly Genger.  I am in front of you
4  have representing Orly Genger and the Orly proceeds and the
5  Orly shares.  Arie Genger is completely and entirely different.
6  Look at what your Honor said about what Orly was seeking to do.
7  "Orly moves to dismiss the federal action, to which they are
8  party, and asks the Court to stay the Delaware court chancery
9  action so the merits of their claim can proceed in New York
10  Supreme Court."  That's what Orly asked for.  That's on page 15
11  of your decision dated June 14, 2012.  Orly didn't say, I don't
12  care where it's being decided.  She said it should be in front
13  of the New York State court.
14    And your Honor went on to say that the decision on
15  beneficial ownership does not void or amend the escrow
16  agreement.  You have said that the proceeds will be provided
17  pursuant to the escrow agreement that all of the parties
18  contracted to.
19    As far as the Delaware stipulation is concerned, your
20  Honor, which, Orly has no part in that proceeding or in the
21  stipulation, paragraph 1 just references -- it said "in an
22  action styled TR Investments, LLC, the Court found that" -- it
23  isn't making new findings.  It is just memorializing what
24  happened before.  It does not go on to say, but those findings
25  as to the Orly Trust and the Orly Trust shares and the Orly
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                            32
E4TATPRAps
1  proceeds have been voided by the Delaware Supreme Court --
2  which is exactly what happened.
3    Paragraph 2 does not say -- and Mr. Dellaportas said
4  this but it's not true.  It does not say TPR had beneficial
5  ownership.  All paragraph 2 says is that the Trump Group owns
6  those shares.  It talks about the buyer.  It does not talk
7  about the seller.
8    In paragraph 3, Dalia and TPR get together and try and
9  amend the escrow agreement to say, well, you can go to a court
10  of competent jurisdiction.  But paragraph 9 of the escrow
11  agreement, in two places, says everybody has to agree.  And
12  they keep forgetting about Orly and they keep forgetting about
13  the fact that Orly is a party to this.
14    And finally, your Honor, it can't be a decision of
15  TPR's right to the sale of proceeds because --
16    THE COURT:  Hold it.  Slowly.  Slowly.
17    MR. GRIVER:  OK.  It cannot be, your Honor, a decision
18  of TPR's right to the sale of proceeds, because it specifically
19  memorializes the fact that those claims were dismissed prior to
20  this stipulation.  That was language that acknowledged the fact
                              Page 15

E4TATPRA

21  TPR chose to dismiss its claims and as a result the stipulation
22  has nothing do with its rights to those proceeds.
23           Your Honor, I think that they're ignoring Orly at
24  every stage of the proceeding and ignoring the agreement that
25  they reached with Orly in the escrow agreement.  It runs

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

33

E4TATPRAps

1   through this entire case.  The escrow agent, right, had a clear
2   conflict of interest.  We raised it.  We've raised it in the
3   New York State action.  The waiver that he says he obtained, he
4   never obtained it from the beneficiary of the trust.  He went
5   to his client Dalia and said, is it OK if I represent you and
6   somebody else.  But he never went and say, hey, how can I do
7   this.  For Dalia to stand up as trustee and say, oh, give it to
8   TPR, is exactly why we have been trying through Dalia for years
9   now, why we objected to appointment in the first place, and why
10  Dalia was recently found to have violated her fiduciary duties
11  in one of the secret agreements that she entered into with TPR.
12           THE COURT:  You said "finally" about five minutes ago.
13           MR. GRIVER:  Well, your Honor, then I'm pleased to say
14  that I am finally done.
15           DELLAPORTAS:  One minute?
16           THE COURT:  Yes.  There is a little time.  Go ahead.
17           DELLAPORTAS:  I just wanted to respond to a couple
18  things that were said.  It was alleged that we've mixed Arie
19  and Orly.  Exhibit N to our papers, page 26, is Orly's
20  appellate brief, which was filed with the Appellate Division
21  after your Honor ruled that the beneficial ownership of the
22  shares was on life support but not yet dead.  And then Orly
23  says she settled with the Trumps and, quote, Orly is no longer
24  seeking beneficial ownership of the Orly Trust PRI shares.
25           Beneficial ownership is over, your Honor, of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

34

E4TATPRAps

1   shares.  Now they say, now we want the money.  Great.  But
2   that's not what the ruling is, your Honor.
3           They also said that Chancellor Strine's ruling,
4   paragraph 2, speaks only as the buyer and not the seller.
5   Absolutely incorrect.  What Chancellor Strine ruled in
6   paragraph 2 was, "The Trump Group, having closed on the
7   purchase of the so-called Orly Trust shares" -- here's the
8   important part -- "pursuant to and under the terms of the side
9   letter agreement between TPR and the Trump Group."  That's the
10  ruling.  The side letter agreement is in the record.  That's a
11  contract whereby we sold those shares to them.  Exactly the
12  ruling your Honor said we needed to get in order to get our
13  proceeds.
14           We've gotten the ruling that the Court asked us to
15  get.  We would now like our proceeds.  Thank you very much,
16  your Honor.
17           THE COURT:  Thank you.  All right.  Decision is
18  reserved.  Thanks very much.
19           MR. GRIVER:  Thank you, your Honor.
20                          oOo
21
22
23
24
25

Page 16

E4TATPRA
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DALIA GENGER, as Trustee of the
Orly Genger 1993 Trust,                    :
                                           :
            Plaintiff,                      :
                                           :
       v                                   :    Civil Action
                                           :    No. 6906-CS
TR INVESTORS, LLC. GLENCLOVA INVESTMENT:
CO., NEW TR EQUITY I, LLC, NEW TR          :
EQUITY II, LLC, TRANS-RESOURCES, INC.,    :
and TPR INVESTMENT ASSOCIATES, INC.,      :
                                           :
            Defendants.                    :
_____ :
TR INVESTORS, LLC, GLENCLOVA INVESTMENT:
CO., NEW TR EQUITY I, LLC, NEW TR          :
EQUITY II, LLC, and TRANS-RESOURCES,      :
INC.,                                      :
                                           :
       Counterclaim and Crossclaim         :
       Plaintiffs,                         :
                                           :
       v                                   :
                                           :
DALIA GENGER, as Trustee of the           :
Orly Genger 1993 Trust,                   :
                                           :
       Counterclaim Defendant,            :
                                           :
       and                                 :
                                           :
TPR INVESTMENT ASSOCIATES, INC.,          :
                                           :
       Crossclaim Defendant.              :
                        - - -
                        Thursday, August 1, 2013
                        10:05 a.m.
                        - - -
BEFORE:  HON. LEO E. STRINE, JR., Chancellor.
                        - - -
       STATUS CONFERENCE AND RULINGS OF THE COURT

----------------------------------------------------------

CHANCERY COURT REPORTERS
New Castle County Courthouse
500 North King Street - Suite 11400
Wilmington, Delaware 19801
(302) 255-0523

2

1   HELD AT:

2          Chancery Court Conference Room
           New Castle County Courthouse
3          500 North King Street
           Wilmington, Delaware
4

5                      - - -

6   APPEARANCES:

7

8          JEREMY D. ANDERSON, ESQ. (Telephonically)
           JOSEPH B. WARDEN, ESQ.
9          Fish & Richardson P.C.
              for Plaintiff/Counterclaim Defendant Dalia
10            Genger

11         THOMAS J. ALLINGHAM, II, ESQ.
           DOUGLAS D. HERRMANN, ESQ.
12         Skadden, Arps, Slate, Meagher & Flom LLP
              for Defendants/Counterclaim and Crossclaim
13            Plaintiffs TR Investors, LLC, Glenclova
              Investment Co., New TR Equity I, LLC, New TR
14            Equity II, LLC and Trans-Resources, Inc.

15         AMY M. DUDASH, ESQ.
           Morgan, Lewis & Bockius LLP
16                -and-
           JOHN DELLAPORTAS, ESQ.
17         of the New York Bar
           Morgan, Lewis & Bockius LLP
18            for Defendant/Crossclaim Defendant TPR
              Investment Associates, Inc.

19

20                     - - -

21

22

23

24

CHANCERY COURT REPORTERS

3

```
 1              THE COURT:  I appreciate everybody
 2   being here on this beautiful morning.  I am trying to
 3   understand the remaining mysteries of the Genger
 4   family that relate to state of Delaware.  I have
 5   absolutely no interest -- I'm not saying that in a
 6   cold way, but I have no professional or personal
 7   interest in other mysteries of the Genger family.
 8              I'm not getting it.  And what I mean
 9   is, there's something behind the curtain here that's
10   going on.  And part of what I need to understand, for
11   example, with the Orly Trust, is whether the mother
12   has some residual interest economically in the trust.
13   I understood the adversity before of -- to the extent
14   that Orly was aligned with her father, and I thought
15   one of the concerns about the suit brought by Dalia
16   was that Dalia was -- I think Dalia is the mother, as
17   I recall -- that Dalia was essentially aligned with
18   Sagi; was, in fact, not really bringing the lawsuit in
19   good faith on behalf of the beneficiary of the trust,
20   who was her daughter, but because the mother and the
21   son were in a sad rift with the father and daughter.
22              So that was perhaps my confusion, but
23   if I could understand what's going on.  Because I had
24   some modest hope, to be honest, that when Arie Genger
```

4

1   and Orly Genger resolved their disputes with the Trump

2   Group, that this would all go away.

3                    Now, it may be that the Genger family

4   are united in their love of our profession, and what

5   they wish to do is simply pay lawyers to the end of

6   time.   But we will be done with this case and it will

7   be done rapidly.   But before we get going on a case, I

8   want to know what's going on.

9                    And I don't mean -- don't tell me

10  technical terms.   Tell me who, flesh and blood, wants

11  money from someone else in their family.

12                   MR. ALLINGHAM:   Why don't I start,

13  because I think I actually can start and then step

14  back.   I think our position -- Tom Allingham for the

15  Trump Group.   Our position -- and this is actually

16  pretty simple.   When Dalia, on behalf of the Orly

17  Trust, filed the declaratory judgment in this court

18  seeking an order that she owned, beneficially owned

19  the Orly Trust shares, we counterclaimed saying that

20  the Trump Group beneficially owned the Orly Trust

21  shares, record ownership having already been decided.

22                   And from our perspective, no Court has

23  ever issued an order saying that the Trump Group has

24  beneficial ownership of the Orly Trust shares.   I

5

1  think it flows as the night to day from other orders,

2  but that's the position that we're in.

3           And so we currently --

4           THE COURT:  But is it your

5  understanding -- and I want to get everybody's

6  understanding -- that when Dalia filed this on behalf

7  of the Orly Trust --

8           MR. ALLINGHAM:  Correct.

9           THE COURT:  She was -- she is the

10 trustee of the Orly Trust?

11          MR. ALLINGHAM:  She's currently the

12 trustee of the Orly Trust.  I think one complicating

13 factor, Your Honor, is that there is -- and I'll let

14 Mr. Dellaportas speak to this -- but there is an

15 argument that the Sagi Trust or some members of Sagi's

16 family have a residual interest in the Orly Trust.

17          THE COURT:  Well, has anybody -- have

18 you seen the Orly Trust?

19          MR. ALLINGHAM:  I'm sorry?

20          THE COURT:  Have you seen the terms of

21 the Orly Trust?

22          MR. ALLINGHAM:  No.

23          THE COURT:  Okay.  Tomorrow, everybody

24 will see the terms of the Orly Trust.  So this is like

6

1   Dalia wasn't really representing Orly -- or as --

2             MR. ALLINGHAM:  No.  I think Dalia was

3   representing the Orly Trust, and I think Dalia -- I'll

4   talk about flesh and blood people.  It is my

5   understanding that Dalia was concerned that Orly was

6   being dominated by her father.

7             THE COURT:  Okay.

8             MR. ALLINGHAM:  And so Dalia was

9   trying to protect the interests of the Orly Trust and

10  its primary beneficiary, Orly Genger.

11            THE COURT:  But the argument in the

12  papers, as I reread the thing, was I gave up stuff in

13  the divorce so my child could have an inheritance.

14            MR. ALLINGHAM:  That is one of the

15  claims, yes.

16            THE COURT:  And that -- you know, this

17  is all part of the redo the divorce thing.  But that's

18  a strange -- I mean if the child of hers was

19  benefiting from that trust, for example, if the

20  idea -- I don't know when the trust terminated.

21  Again, everybody's doing, you know, their little --

22  nobody knows what's going on.

23            It seems a little strange that it

24  was -- it maybe was Dalia was genuinely inspired by a

CHANCERY COURT REPORTERS

7

1   loyalty to Orly.  As I recall, Orly, through counsel,

2   expressed the idea that this was not a lawsuit that

3   she was all that hep on, and I believe argued that it

4   was -- yeah.  I think there was even concerns about

5   collusion at some point; that it was really a

6   collusive move with Sagi -- and in fact, your

7   clients -- to get a lay-down judgment by, you know,

8   putting into a court that had already ruled on the key

9   issue the question, and then getting essentially

10   another decision.

11              MR. ALLINGHAM:  That argument was

12   made.

13              THE COURT:  Have your clients -- I

14   mean who has spoken to who?  Have you spoken --

15              MR. ALLINGHAM:  We've all spoken, and

16   I -- it may be that John Dellaportas, who is here

17   representing the Sagi Trust, might --

18              THE COURT:  Well, who's

19   representing --

20              MR. ALLINGHAM:  I'm sorry.  TPR.

21              MR. DELLAPORTAS:  I'm here, Your

22   Honor, pro hac vice for TPR.  Mr. Connolly is out of

23   the country this week, so I'm --

24              THE COURT:  And TPR is controlled by

8

1   Sagi?

2            MR. DELLAPORTAS:  Yes, sir.  He's the

3   president, yeah.

4            THE COURT:  Well, does anybody else

5   own any stock in it?

6            MR. DELLAPORTAS:  The company is 99

7   percent owned by the Sagi Genger 1993 Trust, of which

8   Sagi Genger is one of several beneficiaries.

9            THE COURT:  Who are the others?

10           MR. DELLAPORTAS:  His five children.

11           THE COURT:  Okay.  That's basically

12   his line?

13           MR. DELLAPORTAS:  Uh-huh.  Yes, Your

14   Honor.

15           THE COURT:  Okay.

16           MR. DELLAPORTAS:  There's an

17   independent trustee.

18           THE COURT:  So what's going on with

19   the family?

20           MR. DELLAPORTAS:  Okay.  Your Honor, I

21   mean we're here today -- not to speak in legal terms.

22   As you asked, just cut to the chase.  And I've been

23   with these litigations for about -- the litigations

24   have gone on for about 12 years, Your Honor.  I've

9

1   only been for the last three years, so I can't say

2   that I've captured everything.

3               THE COURT:  The litigations within the

4   Genger family?

5               MR. DELLAPORTAS:  Yes.  Yes, Your

6   Honor.  But I think I have insight into a lot of

7   what's going on.

8               So from our standpoint, we're a

9   corporate entity, TPR.  We sold 1100 shares to -- of

10  TRI to the Trump Group conditioned on there being a

11  finding that the Orly Trust is not the beneficial

12  owner.

13              At a certain point, we made a demand

14  for the $11 million.  The escrow agent, who is another

15  law firm in New York, got a competing demand from

16  someone else and deposited it in an interpleader with

17  Judge Keenan in the Southern District of New York.

18              Judge Keenan said there's no

19  interpleader jurisdiction because there's no real

20  competing claims on the funds.  This case is very

21  simple.  There's only one of two possibilities:

22  Either, number 1, the transfer of those shares -- the

23  original transfer of those shares to the Orly Trust is

24  valid, in which case the Orly Trust keeps the shares

10

1   and the Trumps get their money back; or the transfer

2   is invalid, in which case TPR had the right to sell

3   it, and did sell it, to the Trump Group, and TPR gets

4   their money.

5            But then Judge Keenan said, "But it's

6   not for me to decide who has beneficial ownership and

7   whether the original transfer was valid or invalid."

8   A state court should do that.  And so he basically

9   dismissed the interpleader case.

10           So where we are now is we need a

11  finding of beneficial ownership, whether it be the

12  Orly Trust or whether it be the Trump Group.  So --

13           THE COURT:  Now, I -- you know, I kind

14  of get that.

15           MR. DELLAPORTAS:  Yeah.

16           THE COURT:  You need -- as in this is

17  a law school hypothetical, and this is compelling redo

18  of something that's already done?  I'm talking about

19  human flesh and blood.  What is going on?  Orly

20  stepped out of this; right?

21           MR. DELLAPORTAS:  Yes.  Orly has

22  settled with the Trump Group and is still suing her

23  brother and her mother in various forms, and TPR.

24           THE COURT:  And so the mother, as

11

1    you -- I want to get your understanding.

2                   MR. DELLAPORTAS:  Okay.

3                   THE COURT:  The mother is suing on

4    Orly's behalf while the mother is suing Orly

5    elsewhere, and vice versa?  But she's suing on behalf

6    of Orly's trust even though Orly has definitively

7    renounced her interest to any assets of the trust?

8                   MR. DELLAPORTAS:  I don't think that

9    Orly -- Orly has definitively renounced her interest

10   to any claims against the Trump Group.  And I

11   believe -- although she has not shown the settlement

12   agreement, that's one of the things we're trying to

13   get to the bottom of.  But there's been allusions in

14   some of the pleadings filed in New York that Orly has

15   also renounced her claim to the beneficial ownership

16   of the shares, and she did that in the context of a

17   derivative suit she brought on behalf of the Orly

18   Trust.

19                   So one of the things we were hoping to

20   see is that settlement agreement, because if she took

21   actions derivatively on behalf of the trust which have

22   been approved by the Court, we think that resolves

23   this case automatically.

24                   THE COURT:  And is Mr. Anderson on the

12

1   phone?

2               MR. ANDERSON:  Yes, Your Honor.  I'm

3   on the phone.

4               THE COURT:  You purport to represent

5   Ms. Dalia Genger?

6               MR. ANDERSON:  I don't purport to

7   represent her, Your Honor.  I do represent Dalia

8   Genger.

9               THE COURT:  Okay.  Dalia Genger

10  purports to represent her daughter's best interest in

11  this?

12              MR. ANDERSON:  Yes, Your Honor.

13              THE COURT:  She claims her daughter is

14  incompetent?

15              MR. ANDERSON:  No.  Not at all, Your

16  Honor.  Actually --

17              THE COURT:  So, Mr. Anderson, explain

18  what's going on.  Because it's -- again, something's

19  got to start making sense to me.

20              MR. ANDERSON:  Sure.  I spoke with my

21  client, Your Honor, yesterday in anticipation of this

22  phone call, and as Mr. Allingham said -- first of all,

23  I'll speak in terms of flesh and blood.  My client

24  Dalia really is acting as the trustee and wants to act

CHANCERY COURT REPORTERS

13

1   in the best interests of her daughter here.  She wants

2   her daughter, Orly, to get the best deal possible for

3   the price of her shares, and she's trying to do

4   everything she can in her power, you know, to act in

5   Orly's best interest here.

6                    THE COURT:  So she --

7                    MR. ANDERSON:  We don't know --

8                    THE COURT:  Okay.  Pause for a second.

9   She is now -- so she is now in a position adverse to

10  her son?

11                   MR. ANDERSON:  In this action?

12                   THE COURT:  Well, and in general;

13  right?

14                   MR. ANDERSON:  I -- yes, Your Honor.

15                   THE COURT:  So this is a change of her

16  alignment?

17                   MR. ANDERSON:  I don't understand, you

18  know, all of the history of the case as well as

19  Mr. Allingham and Mr. Dellaportas understand it, but

20  she's seeking to act in the best interests of her

21  daughter here.

22                   THE COURT:  Well, right.  But this

23  isn't -- I'm not sure that you've been -- I mean,

24  look.  If you're a magic man we're all going to be

14

1    happy, because if you can turn this into something

2    where the Trump Group gets what it wants, Sagi gets

3    what he wants, and your client gets what she wants on

4    behalf of her daughter, then you've found a way to

5    have money reproduce itself.

6              MR. DELLAPORTAS:  Your Honor --

7              THE COURT:  This is a zero sum game.

8    The Trump Group is not going to -- they paid for

9    something.  They -- they're going to -- you know,

10   they're going to get money back or they're going to

11   get control of the shares.  And there's proceeds, and

12   they're either going to go to TPR or they're going to

13   go to the Orly Trust.

14             You know, if she wants to -- your

15   client wants to have, Mr. Anderson, a family

16   meeting -- because she's been betwixt and between and

17   her loyalties within the family are constantly

18   shifting -- that's one thing.  But you got to

19   understand, this is a profoundly strange context to be

20   in here.  That's why I'm confused.

21             MR. DELLAPORTAS:  I can --

22             THE COURT:  Because I thought this

23   action would go away as soon as Orly and everybody

24   worked out.  Because if Sagi -- I assume what you're

15

1   saying, Mr. Dellaportas, is if there's no claim from

2   the Orly Trust, this all is kind of worked out.  But

3   the only holdup here is certainty, right?  That the

4   Trumps don't want to relinquish -- there's a claim on

5   the money until somebody knows who gets it, because --

6   and nobody wants to play chase the money.  Is that

7   correct?

8                  MR. DELLAPORTAS:  Well, Your Honor, I

9   think that the sale isn't complete until there's a

10  finding of beneficial ownership in favor of the

11  Trumps.

12                 THE COURT:  Yeah.  It's either a

13  finding or people agree on something; right?

14                 MR. DELLAPORTAS:  And that's what I'd

15  like to address, Your Honor.  Because you asked about

16  the alignment.  Sagi and his mother are still

17  friendly.  There's been no non-alignment.

18                 At a certain point in time after a

19  settlement with Orly directly proved unfeasible, after

20  talks and talks and talks, TPR and the Orly Trust did

21  enter into a settlement agreement which provided that

22  TPR would get releases, and TPR actually was going to

23  assign over the proceeds, the $10.3 million under the

24  settlement agreement, to the Orly Trust.  And we

16

1    thought that was going to be the end of things.

2                    Orly objected and moved to the Supreme

3    Court to void it on the ground that it violated a

4    preliminary injunction that had been issued.  We

5    disagreed.

6                    The New York Supreme Court, somewhat

7    surprisingly, in our view, found in favor of Orly and

8    voided the settlement agreement by which TPR had

9    agreed to assign the $10.3 million of proceeds to the

10   Orly Trust.

11                   We've now appealed that to the New

12   York Appellate Division.  We asked for a stay pending

13   appeal, which was denied.  And the Orly Trust -- and

14   Orly personally is opposing that.

15                   THE COURT:  On what ground?

16                   MR. DELLAPORTAS:  Well, it's a bit --

17                   THE COURT:  On the fact that people

18   have been so hurtful to each other and have hardened

19   into alliances for so long that common sense entirely

20   goes out the window?

21                   MR. DELLAPORTAS:  We --

22                   THE COURT:  I mean because the point

23   is -- Mr. Anderson, is that true?  Is your client

24   still willing to do this?

17

1            Are TPR and Dalia Genger still willing

2    to do this?

3            MR. DELLAPORTAS:  Yes, Your Honor,

4    except that we were -- just to be clear, not only was

5    the settlement agreement voided, but we were

6    sanctioned by -- for entering into a settlement

7    agreement.  And so now we're in a position where --

8            THE COURT:  Well, but here's the

9    reason why -- I don't have to waste the judicial

10   resources of the State of Delaware or the Trump Group

11   on people who want to hurt each other irrationally

12   before there's been process.  One of the things that

13   never has occurred here -- which I think everyone

14   understands to probably be an indisputable reality but

15   is not a matter of record -- is that Orly Genger was

16   fully a part of all the proceedings here before.

17           She was a trial witness.  She was

18   represented by her father and his lawyers.  They

19   sought relief affirmatively on her behalf.  She is a

20   very intelligent person.  She is a gifted artist.  She

21   knows her own mind.  And that may be one of the things

22   that is legitimately hacking her off, is that people

23   are treating her like she's three.

24           But the idea that the people of

CHANCERY COURT REPORTERS

18

1   Delaware have to waste precious resources, like our

2   court reporters, law clerks, court clerks, register's

3   time, because a New York-based family is engaged in

4   nihilistic, hateful behavior towards each other --

5   which is undoubtedly personally painful, and it's

6   regrettable to see -- I don't get that.

7            One of the things, has anybody gone

8   back -- now that Orly has dropped her things, has

9   anybody gone back since the recent things and seen

10  whether you can get the New York thing undone?

11  Whether, if Orly signs on -- who is Orly's counsel

12  now?

13            MR. DELLAPORTAS:  She has four

14  separate law firms, but --

15            THE COURT:  Is Mr. Alan Stone still

16  involved?

17            MR. ALLINGHAM:  No.

18            THE COURT:  Didn't he used to be?

19            MR. ALLINGHAM:  Yes.  Briefly.

20            MR. DELLAPORTAS:  That predates me.

21            THE COURT:  Well, Allen is a person

22  that members of this court respect.  He was a lawyer

23  for many years at Morris Nichols, and joined the New

24  York bar.

19

1          Who is lead counsel for Orly now?

2          MR. DELLAPORTAS:  She has two New York

3   firms, one is called Zeichner Ellman and the other is

4   Wachtel Missry.  Not the Wachtell Lipton firm.

5   Another Wachtel firm.

6          THE COURT:  That's not just a nickname

7   that litigants gave it?  I direct that this transcript

8   be sent directly to Marty, and "Wachtell Misery" is

9   the new name.

10         Okay.  Because I'm not really getting

11  it.  Like -- okay.  So she's hacked off enough that

12  she wouldn't want $10.6 million in her trust, or is it

13  the following:  She doesn't want Mommy as her trustee

14  anymore?

15         MR. ALLINGHAM:  It's a little hard to

16  speak for Orly, but --

17         THE COURT:  Well, but what I'm saying

18  is -- you know, you all are going to have me write

19  another opinion; right?  I got this wonderful news

20  that you're all going to do summary judgment and get

21  it all briefed up over the next five months or

22  something so that my aging mind can come at this fresh

23  again.

24         MR. ALLINGHAM:  Your Honor --

1              THE COURT:  And over something -- this
2   is ridiculous.  It is -- listening to this transcript,
3   if anybody reads it -- I just want to say, if you're
4   some third party reading this transcript and you're
5   thinking this is ridiculous and you can't understand
6   it, you got it.  You've got exactly it.
7              So what I'm trying to figure out is
8   people sanctioned -- there was a point in time where
9   the concern was, obviously, it was somehow collusive;
10  right?  Wasn't that the concern, Mr. Dellaportas, at
11  that point?
12             MR. DELLAPORTAS:  That allegation was
13  raised, yeah.  It's not true, but it was raised.
14             THE COURT:  Okay.  I'm not -- can we
15  just drop it?  I understand nobody is waiving any
16  argument that any client has ever made.  The fact was,
17  Orly didn't trust any deal that was done between Sagi
18  and his mother; right?
19             And one of the issues about the $10.6
20  million is that -- who is the trustee of the Orly
21  Trust?  Mr. Anderson, is it your client?
22             MR. ANDERSON:  Yes, Your Honor.
23             THE COURT:  Is your client the sole
24  trustee of the Orly Trust?

1                    MR. ANDERSON:  Yes.

2                    THE COURT:  Okay.  Has anybody gone

3    back to Orly and suggested, "Would you do this

4    deal" -- is there any other assets in the Orly Trust?

5                    MR. DELLAPORTAS:  Other than the

6    various -- no.  No.

7                    THE COURT:  Okay.

8                    MR. DELLAPORTAS:  But I --

9                    THE COURT:  No, no.  Let --

10                   MR. DELLAPORTAS:  Okay.  Sorry.

11                   THE COURT:  -- let me finish my

12   thought.

13                   MR. DELLAPORTAS:  Sure.

14                   THE COURT:  See, because one of the

15   wonderful things about this court is we get to

16   experience the full range of human behavior; in the

17   business world, and also in the world in which the

18   money made from the business world becomes family

19   money.  See, we do trusts and estates, we do

20   guardianships, we do all that stuff.  You mentioned

21   the word misery.  Seen a lot of human misery, by

22   people who have money that could clean up an entire

23   favela in Rio, but they're miserable.

24                   Had fights by people who had a quarter

22

1   of a billion dollar trust, but their brothers and

2   sisters had access to a billion dollar trust.  And

3   that hurts, believe it or not.  So we're pretty

4   experienced here.

5            Could part of -- and I'm going to ask

6   Dalia's counsel and I'm going to ask Sagi's counsel.

7   Could part of the thing be that the settlement would

8   put the funds back in a trust where the trustee is a

9   parent who has an extremely strained relationship with

10  the beneficiary of the trust, and where the solution

11  to this might be that if Dalia would resign as the

12  trustee of the trust, that Orly might be treated as an

13  adult and substituted as her own trustee, or someone

14  that she has a better relationship with would be the

15  trustee?  Then the mother and daughter can go about

16  repairing their relationship, when one doesn't have

17  economic power over the other.

18            Sound like something that might

19  have -- might bridge a gap?

20            MR. DELLAPORTAS:  Well, I don't

21  represent the trustee.  There have been extensive

22  talks with Orly's counsel about finding an independent

23  person to put in Dalia's place.

24            THE COURT:  Okay.  Mr. Anderson, is

23

1   your client prepared to resign as part of a Solomonic

2   settlement to get her daughter, whose best interests

3   she is supposedly representing, the proceeds of this

4   sale?

5                    MR. ANDERSON:  Your Honor, my -- me

6   and my client Mrs. Genger haven't discussed her

7   desire --

8                    THE COURT:  Okay.  You will talk to

9   her today, and you will report back to this Court and

10  the parties about whether she would agree to a

11  settlement of this litigation -- I'm assuming TPR is

12  still willing to do that; right?

13                   MR. DELLAPORTAS:  Under all the terms.

14  Now, just to be clear, the terms included releases.

15  We don't want to -- we --

16                   THE COURT:  You don't want to fight

17  each other anymore.

18                   MR. DELLAPORTAS:  Yes.

19                   THE COURT:  Okay.  What I'm saying is

20  it seems very critically -- if I were Orly -- and I'm

21  not, but if I were in Orly's position, it would be

22  very different for me to agree to a settlement in

23  which I were able to select an independent trustee of

24  my own; not to be beholden to a parent who I've had a

24

1   disputatious relationship with and been on the other

2   side of a family divide for.  And it's an entirely

3   different settlement.

4             One settlement involves getting $10.6

5   million and freedom and economic independence and an

6   end to hurtful emotional ties being wrapped up in

7   money.  And the other is I'm now beholden to a mother

8   who has been aligned with my brother against me and my

9   dad in this tremendously drawn-out and hurtful human

10  drama.

11            So, Mr. Anderson, you will report

12  back.  Have you had this discussion before?

13            MR. ANDERSON:  About my client's

14  willingness to resign as the trustee?

15            THE COURT:  Yes.

16            MR. ANDERSON:  No, Your Honor.  We

17  have not.

18            THE COURT:  What is your understanding

19  of why Orly wouldn't go along with this deal?  Was it

20  partly based on that?

21            MR. ANDERSON:  Well, there's a lot

22  going on in New York, including the fact that Orly has

23  sued my client.  We know there's been a settlement

24  agreement reached up there, but we haven't seen the

 1  terms of that.  So that's part of it.
 2              THE COURT:  Okay.  Guys -- come on,
 3  Mr. Anderson.  All of you.
 4              MR. DELLAPORTAS:  I --
 5              THE COURT:  None of you -- no.  Listen
 6  to me.  And I have the right to say this on behalf of
 7  all the judges who have been involved in this in
 8  various states:  Not one of you is living up to your
 9  obligations to your client or the Court if you don't
10  have the full window into this.  That is outrageous,
11  if there's anybody in this room who is representing
12  somebody who is party to relevant litigation that
13  bears on this dispute, if you don't know about it.
14  And vice versa with the other counsel.  You're not
15  going to come before this Court without being fully
16  prepared.  And, honestly, the Trump Group deserves to
17  be able to move on.
18              It's painful enough that a family
19  hurts itself this much, but the collateral injuries to
20  others -- and, frankly, to the societal resources of
21  tying up court systems at a time when budgets are
22  under constraint -- I don't find it humorous.
23              So get with your client.  You're going
24  to file weekly reports in this.  The Trump Group is

26

 1    alleviated from those.  They will receive them.
 2    Dalia's counsel and TPR will file weekly reports.  You
 3    will engage with Orly's counsel after we hear the
 4    answer to whether Dalia is willing to step out of the
 5    trust.

 6                   And the terms of the trust will be
 7    produced for everybody to see by tomorrow.  The
 8    terms -- if there are settlement agreements of
 9    relevant related litigation, those will be produced to
10    everybody tomorrow, so we know what's going on.

11                   There was a wonderful State Senator
12    who was a treasure to our state, and she chaired our
13    budget committee for probably a generation.  She told
14    governors of both parties regularly to take their
15    smart pills.  Start taking your smart pills.

16                   Mr. Anderson, are you lead counsel for
17    Dalia?

18                   MR. ANDERSON:  I am in the Delaware
19    action, but not in all of the New York actions.

20                   THE COURT:  Who is the majordomo?  Who
21    is --

22                   MR. ANDERSON:  Dalia's counsel up in
23    New York is Robert Meister.

24                   THE COURT:  Well, you ought to get

CHANCERY COURT REPORTERS

27

1   ahold of Mr. Meister right away.  Who is the majordomo

2   for Orly, to everyone's knowledge?

3                    MR. DELLAPORTAS:  It's hard to say.

4                    MR. ALLINGHAM:  It's hard to say.

5   Either Yoav Grinever or William Wachtel, or maybe

6   both.  We can't tell.

7                    THE COURT:  Well, I would get both or

8   one of them this transcript as soon as it's available.

9   And I would encourage -- if Sagi and his mother -- I

10  mean maybe you need to have a family meeting between

11  Sagi and his mom.

12                   MR. DELLAPORTAS:  Your Honor, I'm

13  fully informed of my client's position.  I can tell

14  you right now, my client would jump for joy if we

15  could reinstitute the prior settlement agreement with

16  the added term that his mother be replaced as trustee.

17  We have no objection to that whatsoever.

18                   THE COURT:  Is Arie involved at all

19  anymore?

20                   MR. ALLINGHAM:  Yes.  There's still

21  litigation among -- not with us, but there's still

22  plenty of litigation among Sagi and Arie and Dalia.

23                   THE COURT:  About the proceeds, or how

24  they were cut up, or --

28

1              MR. ALLINGHAM:  Yes.  Breach of

2    fiduciary duty claims.  I don't even know all of them.

3    I --

4              MR. DELLAPORTAS:  I mean that was

5    Orly's objection, is that we obtained, as part of that

6    settlement agreement, releases which were going to

7    free us of Orly's claims which were being brought on

8    behalf of the trust.

9              And Orly apparently thinks those

10   claims were worth more than the settlement -- than she

11   was going to get in the settlements.  We think her

12   claims were worth less, and we did it for family

13   peace.  But I -- but again, Your Honor, we're happy to

14   adopt that prior settlement.

15             THE COURT:  What you're saying is her

16   idea is that the claims are worth more because she

17   would have gotten more if -- I mean under the

18   settlement, is she treated pro rata with Sagi for the

19   sale proceeds?

20             MR. DELLAPORTAS:  I'm under the --

21   well, her view of the world is that TPR sold what

22   people call the Orly Trust shares for too little money

23   to the Trump Group.

24             THE COURT:  Okay.

29

```
 1                    MR. DELLAPORTAS:  And --
 2                    THE COURT:  That's not what I asked.
 3                    MR. DELLAPORTAS:  Oh.
 4                    THE COURT:  The question is not
 5      whether Sagi is Warren Buffett or, as I like to say,
 6      even Jimmy Buffett, who was probably a better business
 7      person than any of the Trumps or the Gengers.  Dude's
 8      a really good business person.
 9                    The question is, did she get her pro
10      rata cut of the total pie?  Or did Sagi -- is there a
11      question about a premium that Sagi received?
12                    MR. ALLINGHAM:  I think I understand
13      the question.  TPR, for the Sagi shares -- which is
14      what Your Honor's opinion was earlier -- got 27
15      million.  The proceeds that would go to the Orly Trust
16      in the settlement would be 10.7.
17                    THE COURT:  Were they an identical
18      block of shares and terms?
19                    MR. ALLINGHAM:  Yes, yes.
20                    MR. DELLAPORTAS:  And that's when sued
21      by the Trump Group, TPR immediately settled, within
22      weeks, did not litigate with the Trumps up to the
23      Delaware Supreme Court, back and forth, and so, did
24      not roll the dice on winning in a Delaware litigation
```

30

1   and put this Court through multiple trials, but simply
2   settled early on.
3                   THE COURT:   This is -- the 27 was
4   something paid when?
5                   MR. ALLINGHAM:   2008.   August of 2008.
6                   THE COURT:   That was the control
7   thing?
8                   MR. ALLINGHAM:   Correct.   That was the
9   block that gave the Trump Group control.
10                  THE COURT:   But then Sagi also
11  negotiated this contingent thing for the other trust?
12                  MR. ALLINGHAM:   That's correct.   Which
13  was determined --
14                  THE COURT:   Yeah.   See --
15  Mr. Dellaportas, come on.   Look, I had to live through
16  all this crap.   So I mean so Sagi is like projecting
17  the -- the point is, when he bargained and did all
18  these shares on behalf of TPR --
19                  MR. DELLAPORTAS:   Uh-huh.
20                  THE COURT:   -- he didn't allocate the
21  purchase price ratably over all the shares he was
22  wielding control over.
23                  MR. DELLAPORTAS:   That's right.
24  Because he was delivering two different things.   For

CHANCERY COURT REPORTERS

31

1    the Sagi Trust shares he was delivering clear title,
2    because that settlement was on behalf of both
3    claimants, the Sagi Trust and TPR.  For the Orly Trust
4    all he was giving the Trump Group was a right to go
5    sue and try to win a beneficial ownership.  So it was
6    two very different things that were being sold.
7               MR. ALLINGHAM:  And I don't want to be
8    on either side of this, but I think that the record is
9    clear that Sagi did try to sell the same deal to the
10   other -- for the other -- on behalf of the other
11   blocks.
12               MR. DELLAPORTAS:  That's absolutely
13   true.  Sagi went to his father and his sister and said
14   "I can get you the same deal or I can get you
15   something even better.  Which is, you think your
16   shares are worth more than this.  The Trump Group will
17   actually let you keep your shares if you just sign
18   onto this thing and agree with the funding agreement,"
19   and so forth.
20               And they said, "No.  We're going to
21   litigate this."  So, you know, they went for broke.
22               THE COURT:  I understand that.  But in
23   a representative capacity; right?  I mean, the point
24   is, I guess you would argue that the Orly Trust never

32

1    had anything and that TPR should just claim

2    everything?

3              MR. DELLAPORTAS:   That's why it was a

4    contingent sale.   It was contingent on the Orly Trust

5    not having it.   If the Orly Trust had it then there's

6    no sale, and if TPR has it then TPR got the best price

7    it could from the Trumps for that particular block,

8    knowing that it couldn't deliver clear title, but only

9    a right for the Trumps to go sue over it.

10             THE COURT:   Okay.   Yeah, I mean that's

11   your client's view of the world.   There's other ways

12   of looking at it.   And I think one of the other ways

13   of looking at it is, remember, you've got two distinct

14   questions, which is the whole issue -- and this is one

15   of the things -- the distinct issue of what were the

16   rights of the Trumps, to the extent that those

17   rights -- you know, that proper notice wasn't given.

18   And, therefore, what right did they have to acquire

19   the shares from TPR in those circumstances.

20             The reality is that the family

21   proceeded in resolving some fairly important dynamics,

22   and this was -- the Trump Group could have said we're

23   not into the divorce and how you all cut the pie

24   within the family; right?   And the New York courts, I

1    think, are still doing that, which this was -- I mean
2    there wasn't allocation of wealth within the family
3    that was premised upon these prior transfers.

4              It's nifty to say they had the chance
5    to like go in with your client, and they should have
6    used him as their investment banker and all this kind
7    of stuff and they didn't.  All I'm saying is I
8    understand a little bit more why Orly might be saying
9    10.6, that's not near pro rata.  27 million would have
10   been pro rata.  Okay.  There's been a lot of costs and
11   other sorts of things, but you're not offering to even
12   top up at all.

13             And it was very convenient for you,
14   who wanted to sell the business, to take the position
15   that you did and to take the premium for yourself.
16   But the reality is, you've left me with a lot less
17   money, right?

18             MR. DELLAPORTAS:  That's not true at
19   all.  We didn't leave her with a lot less money.  She
20   could have taken the same price we had or she could
21   have kept her shares.

22             THE COURT:  You didn't listen to a
23   word I said.

24             MR. DELLAPORTAS:  No; I understood it,

34

1    Your Honor.

2                    THE COURT:  Do you understand that she

3    did not wish for her father to lose control of the

4    business that he helped to build?

5                    MR. DELLAPORTAS:  Yes.

6                    THE COURT:  You may not understand

7    that.  I actually don't have parents who ever built a

8    multi-million-dollar business but, you know, I have

9    enough sense of human empathy that I kind of get it.

10                   I also am not insensitive to the

11   potential that part of Sagi's motivation was that he

12   and dad weren't in a good relationship, and that doing

13   something that was emotionally injurious to his

14   father -- that's the sad thing about these family

15   disputes.  People -- you know, I don't think in the

16   end anybody gains from this kind of stuff.

17                   The other side -- you won't win, and

18   you might lose, but you're probably not going to gain

19   in the long run.  But they don't necessarily see it

20   that way, and sometimes they -- you know, causing some

21   hurt -- I want you to hurt like I do kind of thing.

22                   So, I'm getting a little bit,

23   Mr. Dellaportas, where I understand a little bit more

24   of what you're saying.  You want a release where any

35

1    of that overage claim -- that's not really that

2    generous.    I mean I get what you're doing, but it's

3    not really generous.    You basically offered the

4    bottom --

5                    MR. DELLAPORTAS:    Your Honor, I --

6                    THE COURT:    I mean my understanding is

7    there's no way that TPR gets to keep the 10.6 million,

8    is there?

9                    MR. DELLAPORTAS:    The Court, Judge

10   Keenan has ruled that if the transfer to the Orly

11   Trust was void, in a case where Orly and the Orly

12   Trust was found void, that TPR is entitled to the

13   proceeds.

14                   THE COURT:    Right.    But that

15   doesn't -- that has -- that may be you're entitled to

16   something.    That doesn't mean that it doesn't have

17   collateral consequences for whether people get to

18   reopen allocations of wealth that were made in the

19   divorce proceeding.

20                   MR. DELLAPORTAS:    That was -- that was

21   a claim that was brought in the New York State Court.

22                   THE COURT:    Is it over?

23                   MR. DELLAPORTAS:    That portion of it

24   is.    The New York State Court ruled that the divorce

CHANCERY COURT REPORTERS

36

 1    allocation is final and can't be reopened.  The New

 2    York Court also said that you can have breach of

 3    fiduciary duty or unjust enrichment claims, money

 4    damages claims.

 5                    THE COURT:  Yeah.  Against your

 6    client.

 7                    MR. DELLAPORTAS:  Yes.

 8                    THE COURT:  Which you've valued at

 9    zero?

10                    MR. DELLAPORTAS:  No.  That's not

11    correct, Your Honor.

12                    THE COURT:  Well, because you're

13    saying you gave the 10.6 that he originally

14    negotiated.

15                    MR. DELLAPORTAS:  Well, because

16    otherwise that's a TPR entitlement.  And I don't think

17    Your Honor's characterization is necessarily fair

18    about TPR selling -- the initial bid as intending to

19    injure --

20                    THE COURT:  I'm sure -- I'm not

21    saying -- I'm being observational.  To the extent that

22    your client happened to end up in control of TPR and

23    then turns it into a Powerball award for himself,

24    leaving his sister -- apparently you believe -- in a

37

1   cold, ruthless way, out of the family settlement.
2   Orly would be entitled to bupkis.  That's your
3   client's ruthless belief; and that he, by virtue of
4   the father having not given the prior notices of the
5   transfers, that -- you know, "Heck, life's tough, Sis.
6   Hope your art sells well."
7                MR. DELLAPORTAS:  Your Honor, it's not
8   that at all.
9                THE COURT:  Well, then, don't put it
10  that way.
11               MR. DELLAPORTAS:  Can I put it this
12  way, Your Honor?
13               THE COURT:  No.  I don't even need to
14  know any more.
15               MR. DELLAPORTAS:  Okay.
16               THE COURT:  What I'm saying is this:
17  You go back to your client, too, because you also
18  ought to be pricing the following:  There's no fee
19  shifting here; right?  Because -- you're at Morgan
20  Lewis?
21               MR. DELLAPORTAS:  Yes.
22               THE COURT:  Have your rates changed in
23  some way, where it not pricy for you to write summary
24  judgment briefs?

38

1            MR. DELLAPORTAS:  None of this -- none
2    of these litigations are in any way cost-effective for
3    any of the parties, I will say, Your Honor.

4            THE COURT:  Okay.  Which means $10.6
5    million, you know, can't be like your -- the only
6    thing that you could potentially think about.  Unless
7    your client is really not at all -- is not even like
8    capable of pricing a Denny's buffet.  Because if it's
9    going to cost hundreds of thousands or millions of
10   dollars just to litigate, and you have the uncertainty
11   of it, that needs to be factored in.

12            So I want you -- and you don't need to
13   tell me.  I want you to report back in a week that
14   you've gone over litigation budgets through appeal in
15   this case and through appeal in New York; that you've
16   also talked about the realities that I indicated just
17   as a division of courtroom equity, that there's a
18   fairly large gap between 27 million and 10.6.  No
19   doubt the world has to be taken into account, in terms
20   of the fact that there was all this litigation and
21   Orly took her chances.  But that, from a fundamental
22   equitable basis, the idea that -- again, that the
23   world -- that this was just a Powerball ticket handed
24   to Sagi Genger; that this lack of notice gave him all

39

1    the family wealth -- it's not, certainly, something

2    that strikes a Delaware judge, and it's not going to

3    be my ultimate opinion, it doesn't strike me as why

4    courts of equity were ever founded.  It seems

5    capricious.

6               MR. DELLAPORTAS:  Your Honor, if I

7    could just address one point.  TPR has now -- and

8    Sagi, have been sued in seven separate forums.  TPR --

9    all out of the original act of settling with the Trump

10   Group.  And so for the past five years we've been

11   enduring litigation -- we haven't filed any suits.

12   All we've been doing is being sued.  And it's been a

13   real torment, and it's not something we wanted.

14               And we -- at least in the three years

15   I've been involved -- I've been involved in nonstop

16   settlement negotiations with anyone and everyone who

17   would listen.  I've been involved in formal

18   mediations, informal mediations, but there are

19   feelings on the other side driving this.

20               And it is absolutely not some sort of

21   ruthlessness or coldheartedness.  We have tried again

22   and again to resolve this, and the most hurtful,

23   hateful things have been said about my client.

24               THE COURT:  I understand that.  This

40

1    family is not nice to each other.  And every day that
2    they hire expensive lawyers to engage in economic
3    warfare against each other is another day where they
4    won't heal.  It's another day of emotional pain.  And
5    as I said, I don't believe any of them are going to be
6    pulling an Ochocinco in the end zone of life about
7    this.  You don't win in cases like this.  You don't.
8    Because there's no way doing a touchdown celebration
9    at the expense of someone who is your flesh and blood.
10                Anyway, put it this way:  I don't like
11   to think that anybody can ultimately do a pure
12   expression of celebratory joy at the defeat of their
13   father, their mother, their ex-wife, their sister or
14   their brother.  I just don't like to think about
15   people being that ruthless and soulless.
16                So I get you say that Sagi just got
17   sued everywhere, he was just a passive dude.  Well,
18   no, he wasn't.  Because, you know, in a lot of
19   families, you know what would have happened?  In a
20   normal family?  Even normal families that fight,
21   brother and sister would have stood behind dad and
22   said, "Ain't no way you're taking our business."
23                This family was already so torn apart
24   that your client cut a deal, and cut a deal in which

1   he didn't give ratable treatment on behalf of the

2   other family members.  And now, in your view, what

3   you're saying is, as a cold, ruthless legal matter he

4   claims to have won some sort of life's Powerball

5   because he ended up with control of TPR.

6                    So what you need to effectively

7   represent your client is for you and Mr. Connolly, who

8   is a really very fine lawyer, to do what I'm saying

9   Mr. Anderson needs to do with his client and what

10  Mr. Wachtel and the other lawyer need to do with their

11  client.  You need to look at the way the world looks

12  from the other perspective and from the perspective of

13  Sagi's family members.

14                   Let's put aside -- this happened.  The

15  pie wasn't cut up equally.  10.6 doesn't come close --

16  nobody's saying -- there's a big difference between

17  cutting it up equally pro rata and no movement.

18  There's a big difference between an offer in which not

19  only is there no movement, but Dalia Genger remains

20  Orly's trustee.  I don't -- again, we're going to see

21  the terms of the trust tomorrow, but trustees can have

22  very important power, like determining how much you

23  get out of the trust or not.  Right?

24                   MR. DELLAPORTAS:  And, Your Honor, the

42

1   trust agreement has been an exhibit in multiple

2   filings in various states, so it's not a secret.

3                   THE COURT:  Then people should have

4   been able to tell me who the residual beneficiaries

5   are and stuff like that.

6                   MR. DELLAPORTAS:  I can speak to that,

7   Your Honor.  There is a sole beneficiary, Orly Genger.

8   If she has children, they will become additional

9   beneficiaries.  And then there's what's called a

10  remainderman beneficiary, which is if she dies without

11  issue, as they say, then the Sagi Trust becomes the

12  remainderman beneficiary of the Orly Trust.  And vice

13  versa.

14                  THE COURT:  Right.  So there's no

15  beneficiary interest for Dalia in any way, shape or

16  form in this?

17                  MR. DELLAPORTAS:  No, Your Honor.

18                  THE COURT:  Which, again, makes this a

19  very weird lawsuit.

20                  MR. DELLAPORTAS:  I --

21                  THE COURT:  But, look.  Is this also

22  why Orly -- right?  Orly is not aligned with Dalia.

23                  MR. DELLAPORTAS:  No doubt.

24                  THE COURT:  So when Dalia brings a

43

1  lawsuit that Orly doesn't want, and when Dalia's

2  aligned with Sagi and Sagi and Dalia are willing to

3  settle it, but on terms that Orly gives up any claim

4  that she has; that Sagi didn't exactly cut the pie

5  fairly -- you know, it doesn't sound strange to me

6  that now, because you're saying that you want to cut

7  off her pie cutting claims, you weren't willing to

8  just settle this litigation.  You want to continue to

9  defend those.  So it makes sense to me why this isn't

10  resolved.

11                 MR. DELLAPORTAS:  Well, I --

12                 THE COURT:  And guess what?  There

13  will be process.  And one of the first things we will

14  do, there will be discovery into Orly's position on

15  this.  I'm not going to proceed without knowing Orly's

16  position.  I'm also going to need to know -- I'm not

17  going to have a case where a trustee is proceeding on

18  behalf of an adult beneficiary where there's the

19  potential that the very procession of the

20  litigation -- you know, I mean why is this litigation

21  even going on?  Is it because the Trump Group -- I

22  guess you don't get your -- you don't get free and

23  clear things of your share?

24                 MR. ALLINGHAM:  We have proposed that

44

1   we stipulate that the Trump Group has beneficial and

2   record ownership of the shares, and that however the

3   proceeds get parceled out is not our problem.

4                    THE COURT:  And has that been proposed

5   to Orly?  And just let everybody fight about the pot

6   of money in New York in the existing litigation?

7                    MR. ALLINGHAM:  Well, Orly is not a

8   party to this case.  And so --

9                    THE COURT:  No, no, no.  But Orly was

10  a party to a settlement over there.

11                   MR. ALLINGHAM:  Yes.  Orly is a party

12  to the settlement up there.  Orly did sign the

13  settlement agreement, and that's a settlement in which

14  real money is changing hands and will continue to

15  change hands.

16                   So I don't believe that Orly has ever

17  been asked to take a position.  Since the settlement,

18  I don't think Orly has been asked to take a position

19  in this case.

20                   With respect to something that may be

21  of considerable importance in these status reports --

22  and I raise this with some trepidation -- the

23  settlement agreement itself has a confidentiality

24  stipulation.  It obviously says you can't produce it

CHANCERY COURT REPORTERS

45

1    unless you're required to by law.  Your Honor has just

2    said I have to produce it tomorrow.  It does --

3              THE COURT:  No.  I thought there was

4    some other derivative litigation that was settled.

5              MR. DELLAPORTAS:  That's the one.

6              THE COURT:  Okay.

7              MR. DELLAPORTAS:  And legally, it's

8    critically important to understand the dynamic between

9    Orly and the Orly Trust.

10              MR. ALLINGHAM:  And I have said to

11   everyone who will listen, I'm happy to produce the

12   settlement agreement, but I've got this

13   confidentiality provision.  Required by law, I think,

14   is if a court order tells me to do it, I'll do it.

15              THE COURT:  Well, I don't want to jump

16   to -- you know, but what you're saying here -- what

17   I'm not going to have -- and I really don't care if I

18   ruin the vacations of these clients -- I will do

19   process.  I will require process out the wazoo, as an

20   aid to the world.

21              You are almost to a goal line.  Get

22   across it.  You ought to look at yourself in the

23   mirror as professionals and say, "We need to get this

24   to the goal line."

1          For example, if the Trump Group
2  already, you know, essentially topped up Arie -- and I
3  don't want to put it that way -- topped up Arie and
4  Orly to some extent; which is, they had to essentially
5  pay twice, you know, that's obviously a relevant
6  factor.  It shouldn't make Sagi think that life is
7  cost-free.
8          MR. DELLAPORTAS:  I don't want to
9  reveal settlement communications, but that was exactly
10 one of the things we said when we had settlement,
11 which is -- I won't reveal what they said, but what I
12 said is, "You're saying there's an inequity here.  I
13 don't know how much you got.  You may have gotten more
14 than -- you may have gotten nothing, you may have
15 gotten more.  I have no idea."  They won't tell us.
16         And it's relevant -- it's not the
17 Trump Group which is objecting.  It's, I guess, Orly.
18 Orly objects to the production of this settlement
19 agreement, which we think is discoverable for a number
20 of different --
21         THE COURT:  Is Arie still suing Sagi?
22         MR. DELLAPORTAS:  Yes.
23         MR. ALLINGHAM:  And what I started to
24 say, Your Honor, is --

1            THE COURT:  No.  I'm not going to
2    spontaneously roll grenades without pins in them.  So
3    I'm not going to have you produce that until it's
4    thought about more.  What I am suggesting,
5    Mr. Allingham, is that perhaps it might be useful for
6    you all to talk to Mr. Wachtel, and to talk to Arie's
7    people in light of the conference today.
8            And I'm not sure -- I'm not sure how
9    productive it is for these other parties to do so in
10   the first instance, because I'm not -- I'm not really
11   getting that there's any change in alignment.  What I
12   am getting is that there's a very bizarre litigation
13   that's going to go on in which a trustee who is not
14   really a champion of the beneficiary is litigating
15   against someone who she's aligned with.
16            MR. DELLAPORTAS:  Well, I don't know
17   that that's totally accurate.  It's a claim for
18   declaratory judgment, first and foremost, against the
19   Trump Group for the ownership of the shares.
20            What we are seeking is the proceeds
21   from the sale which if the Trump Group owns it is
22   ours.  If the Orly Trust owns it we get nothing.  So I
23   think that the adversity is first and foremost between
24   the Orly Trust and the Trump Group.  I'm just

CHANCERY COURT REPORTERS

48

1   curious --

2              THE COURT:   But, again, Dalia Genger

3   has no residual interest in the trust.   The

4   beneficiary of the trust has not sought to have her

5   bring this action.   And the beneficiary of the trust,

6   by all objective evidence, seems to not believe that

7   the trustee really is her best representative.

8              So, yeah, Mr. Dellaportas.   I'm sorry.

9   You can formally say what you say.   There is a

10  concern, a long-standing tradition in Anglo-American

11  jurisprudence of being very careful about having

12  actual real adversity, rather than something like

13  this.

14             And, Mr. Anderson, you're going to

15  need to be attentive to this and you're going to give

16  the report that I talked about.   Because I'm not

17  getting it.   As I said, it appears that the Trump

18  Group has agreed.

19             You know, one of the things is -- you

20  can do the same thing.   You can be in the same

21  posture, but reduce transactional costs for all, by

22  the Trump Group's suggestion, which is that the

23  settlement can be -- everybody agrees that the issue

24  of beneficial ownership is settled; that the $10.6

49

1  million is interpled up in New York where the

2  litigation is, and you go fight about it.

3              MR. DELLAPORTAS:  Your Honor, that's

4  what happened two years ago, which is the 10.6 was

5  interpled.

6              THE COURT:  It was interpled into a

7  federal court.  I believe Judge Keenan's decision had

8  everything to do with -- and I respect this.

9  Remember, I was hoping -- the only reason I burdened

10  my distinguished colleague Judge Keenan was I do

11  believe in hierarchy, and I respect the Constitutional

12  hierarchy.  And there was a fight about where the case

13  would go.

14              And in an attempt to save the family

15  money and to save society's resources, it struck me as

16  the place where the Court with the most Eric Cartman

17  "authoritah" might have been the U.S. District Court,

18  and that if the District Court could have decided

19  everything then perhaps everybody would have respected

20  that.

21              I think the interpleading the funds

22  into a state court -- which is currently actually

23  hearing the substantive claims between the parties,

24  and there was a state settlement of this action about

50

1   this state question of beneficial ownership -- is a

2   little different situation.  Right?

3               MR. DELLAPORTAS:  Well, I'm not the

4   custodian of the funds.

5               THE COURT:  Well, I know.  And we have

6   to have another painstaking discussion if everybody's

7   like -- the custodian is -- is a custodian; right?

8               MR. DELLAPORTAS:  Uh-huh.

9               THE COURT:  The custodian doesn't

10  care.  Custodians, like indenture trustees, care about

11  one thing:  I don't want to be sued and incur costs in

12  excess of the administerial fees that I am paid to do

13  this role.  Right?

14               MR. DELLAPORTAS:  Uh-huh.

15               THE COURT:  Isn't that -- does anybody

16  have a different -- do we have an unusual custodian

17  here who has a bolder understanding of her duties?

18               MR. DELLAPORTAS:  No.

19               THE COURT:  No.  So that's another

20  possible form of settlement.

21               Mr. Anderson, would your client have

22  some problem with that kind of settlement?

23  Mr. Anderson?

24               MR. ANDERSON:  Sorry, Your Honor.  I

CHANCERY COURT REPORTERS

51

1    was on mute.  I'm in the airport right now.  I just

2    wanted to cut out the background noise.  That

3    certainly is the discussion that we will have.

4                    THE COURT:  Because I mean I can't

5    believe that -- that Dalia Genger has a strong feeling

6    on the beneficial ownership question.  Because she

7    really has gotten Sagi, then; right?

8                    MR. DELLAPORTAS:  I'm sorry?

9                    THE COURT:  She's gotten your boy.

10                   MR. DELLAPORTAS:  Meaning if the Orly

11   Trust obtains its --

12                   THE COURT:  Meaning, put it this way:

13   If there is no beneficial ownership in the Trump Group

14   of these shares, how's her son and how's TPR have

15   anything?

16                   MR. DELLAPORTAS:  That's correct.

17   That's what Judge Keenan ruled.  Or that if the

18   Orly --

19                   THE COURT:  No.  It's not just that.

20   It's totally inconsistent with your client's position,

21   which Dalia supported.

22                   MR. DELLAPORTAS:  Well, just to be

23   clear, we disagree that the Orly Trust has beneficial

24   ownership of the shares.

CHANCERY COURT REPORTERS

52

```
 1                  THE COURT:  I agree --
 2                  MR. DELLAPORTAS:  Okay.
 3                  THE COURT:  -- you disagree on the
 4    same ground that would support TPR's ability to sell,
 5    and the shares sold on behalf of the Arie Genger
 6    Trust -- is that dealt with separately or was --
 7                  MR. DELLAPORTAS:  Separate, yeah.
 8    It's just Arie Genger.  It's not a trust.
 9                  THE COURT:  Right.  But there was the
10    Sagi Trust; right?
11                  MR. DELLAPORTAS:  Uh-huh.  Yeah.  The
12    Sagi Trust, the Orly Trust, and then Arie personally.
13                  THE COURT:  Yeah.  I mean, you know,
14    and I believe, what I mean is there's the formal legal
15    position Dalia took here -- that was why it was argued
16    by Orly that it was collusive -- is that all the other
17    transfers she was ducky with because she supported her
18    son Sagi and his position.  Am I wrong in thinking
19    there's not really meaningful distinctions here?
20                  MR. DELLAPORTAS:  I don't know that
21    Dalia or the Orly Trust took a position with respect
22    to the other two transfers.  She didn't -- it wasn't
23    really her issue.  They're on a personal level
24    friendly, mother and son.
```

CHANCERY COURT REPORTERS

53

1          THE COURT:  My point is this:  My

2   reasoning, if the Dalia trust succeeds in this case,

3   then it will mean that I was -- that I've now

4   concluded I was incorrect in my previous rulings.

5          MR. ALLINGHAM:  I believe that's

6   correct.  And I --

7          MR. DELLAPORTAS:  We --

8          THE COURT:  And I believe during the

9   previous litigation Dalia was aligned with Sagi; that

10  Orly and Arie did not believe the bringing of this

11  lawsuit was designed to aid Orly's cause; that Orly

12  objected.  Right?  Did Sagi and you-all talk with

13  Dalia before this lawsuit was brought?

14         MR. DELLAPORTAS:  I'm sorry.  Did we

15  talk with Dalia about the bringing of this lawsuit?

16  No.

17         THE COURT:  Yeah.

18         MR. DELLAPORTAS:  Did not.

19         THE COURT:  And you were representing

20  Sagi at the time?

21         MR. DELLAPORTAS:  I represent TPR and

22  Sagi in various litigations, yes.

23         THE COURT:  You had at the time this

24  was brought?

CHANCERY COURT REPORTERS

54

1           MR. DELLAPORTAS:  Yes, yes.

2           THE COURT:  And, Mr. Anderson, have

3  you been counsel for Dalia the whole time?

4           MR. WARDEN:  Your Honor, in the

5  Delaware action -- Mr. Anderson has been involved the

6  whole time in the Delaware action, yes.

7           THE COURT:  Okay.  And the same

8  counsel in New York has been involved?

9           MR. HERRMANN:  That's correct.

10          MR. ALLINGHAM:  Yes.

11          MR. WARDEN:  I don't know the answer

12  to that.

13          THE COURT:  Okay.  Well, I'm not going

14  to go round and round anymore, but I want weekly

15  reports from -- I'm calling it Sagi, you can call it

16  TPR or whatever you want, and Dalia.  Because I have a

17  more human understanding of this.  I think the formal

18  roles are actually quite confused here.

19          MR. DELLAPORTAS:  And, Your Honor,

20  just to be clear, the weekly reports should be on my

21  client's position and his client's position?

22          THE COURT:  Yes.  And what they're

23  doing.  And I expect that you're going to engage with

24  counsel for Orly, and I expect that you're going to

CHANCERY COURT REPORTERS

55

1   share this transcript.  And I think that, at the very

2   least, you ought to consider what Mr. Allingham's

3   clients suggested.

4               And I would not confuse what Judge

5   Keenan did in a very disciplined opinion, recognizing

6   the limits of federal jurisdiction, with the more

7   propitious jurisdiction afforded to the New York

8   courts.  And it would seem to me to be a great

9   reduction of transaction costs, at the very least, to

10  put the funds before the Court up there, stipulate to

11  the beneficial ownership interest, and move on.

12              Because I'm also going to -- look.

13  I'm going to need to know, Mr. Anderson -- or you're

14  Mr. Anderson's colleague; right?

15              MR. WARDEN:  Yes.

16              THE COURT:  I'm going to need to know

17  that there is a good faith basis for your client's

18  contentions.  Discovery will go into her motivations,

19  her position on this.  Because I got to know that I

20  have an adversary proceeding that's just not made up.

21              I also -- you know, we got the whole

22  issue of whether Orly was here before, right, and all

23  this kind of stuff.  But, you know, to be -- trustees

24  are usually not bold.  I mean they're like custodians.

CHANCERY COURT REPORTERS

56

1   And the idea that trustees are going to go on

2   behalf -- a trustee of a trust where the trustee has

3   no beneficial ownership interest herself is going to

4   proceed with a litigation, with the sole beneficiary

5   of the trust -- well, I mean what's even more -- the

6   sole beneficiary of the trust is Orly and her issue,

7   and if she has no issue, then Sagi.

8                   MR. DELLAPORTAS:  Well, then the Sagi

9   Trust, yeah, which has the grandchildren.

10                  THE COURT:  Yeah.  Sagi.  And I don't

11  think -- does the Sagi Trust, Mr. Dellaportas, wish to

12  align with the Dalia Trust in this litigation?

13                  MR. DELLAPORTAS:  I'm sorry.  With the

14  Orly Trust?

15                  THE COURT:  With the Orly Trust.

16                  MR. DELLAPORTAS:  I don't think the

17  Sagi Trust has taken a position.

18                  THE COURT:  What do you think?  Do you

19  suspect it will be taking a position?

20                  MR. DELLAPORTAS:  Well the Sagi Trust

21  is a 99 percent shareholder of TPR.

22                  THE COURT:  See.  Do we suspect they

23  won't be?

24                  MR. DELLAPORTAS:  Well, as of now they

57

1   haven't, and I would suspect they would share TPR's
2   position, because they're the 99 percent shareholder.
3              THE COURT: You suspect that, huh? So
4   do I. That's why I was kind of making this
5   observation. I -- from a third-party perspective, do
6   you get me about Dalia's position being a little odd,
7   that the singular beneficiary, the most likely
8   beneficiary of the trust, is Orly, any issue she has.
9   And Orly is -- you know, last I saw her, looked fit,
10  young, many decades of life to come. So she really
11  should be the focus, and then the remainder should be
12  the Sagi Trust.
13             So as I get it, Orly, the principal
14  beneficiary, she doesn't support the suit. It's not
15  her fight. Doesn't really want to fight about
16  beneficial ownership.
17             She thinks it should be more than 10.6
18  million. She thinks 10.6 million for sure should be
19  coming to her. She thinks it should be more, but
20  she's not really in a fight with the Trumps anymore
21  about beneficial ownership. She hasn't taken that
22  position. That fight has been done, she respects
23  that. Or may not respects it, but has learned to live
24  with it. Perhaps because she got paid some money to

58

1   learn to live with it.

2               Then, as I understand it, if Orly

3   leaves this earth without having children, the Sagi

4   Trust will be the beneficiary.  And the Sagi Trust

5   opposes the suit.  So the only beneficiaries on whose

6   behalf the suit is brought don't support it.  That's

7   what you-all who represent Dalia have to confront.

8   Because it also sounds like a very odd thing for me to

9   have to decide -- like I said, it gets back to is this

10  just a law school moot court?  Or like there's "Ground

11  Hog Day."  You know, "Ground Hog Day," the movie.

12               MR. DELLAPORTAS:  Uh-huh.

13               THE COURT:  Is this like the most evil

14  "Ground Hog Day" that was ever invented?  And I have

15  always wanted in some ways to be like Bill Murray, but

16  I get to be Bill Murray in the Genger beneficial

17  ownership "Ground Hog Day," where I wake up and I have

18  to again determine whether proper notice was given and

19  what the implications are.

20               Do you see my point, Mr. Dellaportas?

21               MR. DELLAPORTAS:  Uh-huh.

22               THE COURT:  I mean you're a very smart

23  guy.  I could tell that in a second.  Get a little

24  less boxy.  I'm sorry, but you represent Sagi.

59

1           MR. DELLAPORTAS:  Your Honor --

2           THE COURT:  His children are -- how

3    old are his children?

4           MR. DELLAPORTAS:  They run from -- I'd

5    say zero, just a newborn, to 13.

6           THE COURT:  Right.  So I'm not saying

7    Sagi doesn't have representative duties to others.

8    Part of that's what this lawsuit is about with his

9    sister.  What I'm saying is you basically -- when you

10   have client meetings, nothing -- there's no picture of

11   a trust.  There's no picture of TPR.  There's a human

12   being named Sagi Genger who shows up, and that -- and

13   you talk to him.  Now, he's supposed to honor his

14   duties to other people, but that's who you're talking

15   to.

16           And you-all are talking to Dalia.  And

17   then there are people talking to Orly, and Arie's

18   still on the scene.

19           So I am going to think about it this

20   way as we go forward, because I need to know who's

21   trying to do what to whom, and why.

22           Mr. Anderson, can you hear me?  Well,

23   you need to report back to him.

24           MR. ANDERSON:  Yes, Your Honor.

CHANCERY COURT REPORTERS

60

1    Sorry.  I can hear you.

2              THE COURT:  Take this seriously.

3    Because, you know, I don't understand -- and you can

4    always have releases, too.  Because to the extent

5    Dalia is worried about her liability as a trustee,

6    that's really easy to solve when the two principal

7    beneficiaries can do a release.  Most trustees -- you

8    know what most trustees would want to do?  Want a vote

9    in the room?  I want any lawyer who believes that most

10   corporate trustees in this wouldn't be glad to be out

11   of the middle of this.

12             MR. DELLAPORTAS:  Your Honor --

13             THE COURT:  Anybody disagree with

14   that?

15             MR. DELLAPORTAS:  Your Honor, there

16   were extensive discussions about replacing Dalia -- my

17   clients were in favor of it -- with an independent

18   trustee.  The one holdup was that Dalia did want a

19   release as trustee and Orly said she could not have a

20   release as trustee.  Orly wanted to retain the right

21   to continue to sue Dalia after Dalia resigned.  And

22   that's what killed the deal, essentially.

23             THE COURT:  Well, I assume it's more

24   than just that.

CHANCERY COURT REPORTERS

61

1               MR. DELLAPORTAS:  It is more than just
2   that.  Orly objects to various actions that Dalia took
3   as trustee.  And so, you know, everyone -- everyone
4   objects to everything everybody's done in this family
5   over the past 12 years.  It's a very difficult dynamic
6   to get over.
7               The one thing, Your Honor, that I
8   think is absolutely essential is --
9               THE COURT:  Yeah.  But what I'm saying
10  about this is there's a long distance between, for
11  example, the suits -- I don't know what the suits are
12  about the trustee, because the only asset of the trust
13  were the shares; right?
14              MR. DELLAPORTAS:  Yes.
15              THE COURT:  And so I don't know what
16  she's suing about her actions as a trustee.  It may be
17  more issues of aligning with Sagi about the selling of
18  the shares; right?
19              MR. DELLAPORTAS:  Uh-huh.
20              THE COURT:  I mean if that's what
21  you're talking about, Mr. Dellaportas, which is she
22  wasn't too hep to Mommy being in alignment with Sagi
23  on selling the shares, and if Mommy knew that Sagi was
24  selling the shares for $10.6 million when he was

CHANCERY COURT REPORTERS

62

1    selling his own for 27, that, as a trustee, she may

2    have had some duties to do something; right?  That's a

3    different kind of situation.  And again, what I'm

4    talking about here is I'm not sure how fighting about

5    beneficial ownership provides any protection to Dalia

6    Genger in any way.

7            MR. DELLAPORTAS:  I can't speak for

8    Dalia but, Your Honor, from my client's perspective --

9    whether you call it TPR, Sagi, whatever -- to have a

10   frank talk with my client, the whole -- what Your

11   Honor called the topping off issue, it can't remain a

12   secret.  Otherwise -- it could be they could have

13   topped off for $1, it could have topped off for $100

14   million.  We have no conception one way or the other.

15            And so --

16            THE COURT:  But what I'm -- again, I'm

17   saying here, because your client is going to be

18   talking to his mom, because he's been talking to his

19   mom all along.

20            And when I'm talking to counsel for

21   Dalia, all I'm saying is, you know, having a

22   collateral war over beneficial ownership, where does

23   that get you?  You know, I -- I don't know that it

24   gets you anywhere, even if you win.  Does it gets the

63

1    shares back, and that's what she wants?  I guess.  I

2    mean how -- does she even believe it?

3                    What I mean by "believe it" is, you

4    know, you're really not supposed to come before a

5    Court and argue a position that you don't believe in.

6    That's actually kind of uncool.  There's a Rule

7    between 10 and 12.  You're not really supposed to be

8    doing that stuff.

9                    So, I mean, I get that -- you know,

10   Dalia wanted a release, but to the extent that the

11   theory against her was that she was complicit in what

12   Sagi did, that's a different -- that's a lot different

13   than haggling -- has nothing to do with haggling over

14   beneficial ownership.

15                   And if you can get past the beneficial

16   ownership thing, I don't understand how Dalia is in a

17   worse position and she won't be spending -- and

18   there's also going to be the issue here, too, is Dalia

19   paying her own fees, Mr. Anderson, or is this

20   litigation going to be funded by the Orly Trust?

21                   MR. WARDEN:  Your Honor, I don't know

22   the answer to that question.  I'm sorry.

23                   THE COURT:  Well, I think it's kind of

24   an important question to ask.

64

         MR. DELLAPORTAS:  I can speak to it
tangentially, Your Honor.  There is a TRO in place
prohibiting any movement of assets of the Orly Trust
pending the outcome of that litigation in New York.

         THE COURT:  Well, so how do we even
proceed here?  Dalia's going to pay her own funds to
you guys to litigate?

         MR. WARDEN:  Again, Your Honor, I
apologize.  Mr. Anderson is not available and I don't
know the answer to that.  He'd have to address that.

         THE COURT:  Well, it ain't going to be
cheap.  And if you think -- I mean since Mr. Allingham
and Mr. Herrmann face the really unusual situation
that I did, to have an amazingly distinguished set of
lawyers from an extremely distinguished firm, Davis
Polk, be then replaced by another distinguished set of
lawyers from an extremely distinguished firm, Paul
Weiss, you know, there is a fairly deep history here.

         So I don't know what you're going to
discover that's new.  But, you know, it is a new --
I'm going to have to look at collateral and all that
kind of stuff, but it's going to be expensive.

         And Dalia's going to want to go out of
pocket?  Because I think the TRO kind of puts it -- I

65

1   mean Orly's not going to be happy to have hundreds of

2   thousands of dollars -- if not millions -- spent by

3   her mother in a suit where neither she nor the

4   contingent beneficiary supports the lawsuit.  The one

5   thing Sagi, the contingent beneficiary, and Orly agree

6   on, as I understand it, is that there was -- this suit

7   should not have been filed.

8                   MR. DELLAPORTAS:  From TPR's

9   perspective, if we could have a stipulation that has

10  the force of judgment, or whatever, that the

11  beneficial ownership is vested in the Trump Group, we

12  would be very happy.

13                  THE COURT:  And the funds could be

14  placed into the court in New York and everybody could

15  fight about the remaining claims, win or lose?

16                  MR. DELLAPORTAS:  From our

17  perspective, we believe that we would be entitled to

18  the funds under those circumstances.  But where

19  they --

20                  THE COURT:  That's not what I asked.

21                  MR. DELLAPORTAS:  Yeah.

22                  THE COURT:  If you're sure of victory

23  then you should have no hesitance going into the ring.

24                  MR. DELLAPORTAS:  Well, there's

66

1   already an escrow agreement by all the parties to this

2   case, including Orly, which provides that the funds

3   stay in escrow until all objections are resolved.

4                    THE COURT:  Okay.

5                    MR. DELLAPORTAS:  So I don't know that

6   there needs to --

7                    THE COURT:  So we need to hear from

8   Dalia about that; right?  Because that would be fine

9   with the Trump Group; right?

10                   MR. ALLINGHAM:  All the Trump Group

11  wants is an order for beneficial ownership.  That's

12  all we've ever wanted.  Yes.  That would be fine with

13  the Trump Group.

14                   THE COURT:  Okay.  I expect to hear

15  from counsel for Dalia.

16                   MR. WARDEN:  Yes, Your Honor.

17                   THE COURT:  After reading this

18  transcript, I want you to get up -- I need you to --

19  this is not going anywhere productive.  This will be

20  an extremely cost-effective use of all your time and

21  your clients' money if you listen to the discussion

22  today.  If all you do is do this minimal thing and

23  stipulate to beneficial ownership and then go fight in

24  New York, you will have undoubtedly saved your clients

67

1   hundreds of thousands of dollars.

2               You may also be on the road to

3   something, too, if you listen -- by listening I mean

4   is really take -- from the perspective I said of

5   looking how it is.  I respect Mr. Allingham's

6   reluctance to -- and that's why I'm not going to force

7   disclosure of the settlement agreement, because I

8   don't know enough about the dynamic to know whether

9   that's productive or not.

10              I can understand Sagi's desire to see

11  it.  I also think this is another situation of

12  alignment with Dalia, not with Orly, because I think

13  Sagi and Dalia want to see it and say, "Well, wait a

14  minute.  How much was Arie and Orly -- how much were

15  they able to essentially claw back and force the

16  Trumps, by this legal battle, to top them up to

17  something close to what we got out of the deal?"

18  Right?  "Before we -- we don't want to close a gap

19  where they end up with more than we got.  And we're

20  not even sure we want to close the entire gap.  We

21  might understand closing it to some extent, but we did

22  go through a lot.  They sued it."

23              I get that, right?  But I think you

24  need to get to a point where there's some

68

1    understanding, where you're close enough to some basic

2    things that maybe Orly has some reason -- and her

3    father on her behalf, right, because Arie is still

4    suing your client.  Right?

5                    MR. DELLAPORTAS:  Uh-huh.

6                    THE COURT:  You know, and part of why

7    he may be suing them is because he cares about his

8    daughter, too.  I mean there's all the other hate

9    stuff which, again, I think is really -- I think any

10   of them who are doing it for those reasons really are

11   going to regret it.  And that's a human dynamic.

12                   But he also, if you're talking more

13   human -- one of the things he may be concerned about

14   is that his daughter got shorted; that he built wealth

15   up over time, he was hoping for his children to

16   benefit from, and that one of them is coming out --

17   now maybe he knows that she got now twice as much as

18   Sagi.  That doesn't seem -- I understand there could

19   be substantial amounts of money, but "substantial"

20   doesn't mean that that's necessarily so.

21                   But I think you got to get to -- you

22   got to start, all of you.  And, you know, there's no

23   mail-in representations here.  Don't act like I'm --

24   because I'm not going to leave you alone.  Because

CHANCERY COURT REPORTERS

69

1   you're not leaving me alone. You keep coming back
2   with these memory tests about the same darned thing.
3           And the thing about Orly getting out
4   from under Dalia probably has some real value. You
5   know? I mean -- and again, I don't know whether she
6   wanted an independent trustee, but I don't really
7   think, given the structure of this, that the Sagi
8   Trust ought to be whining if Orly wants to be her own
9   trustee, if that's possible. I'm sure Orly wants to
10  go her own way, just like Sagi does.
11          And so if your client, Dalia -- you
12  know, she's got to recognize that human dynamic. And
13  really, long-term, if what her motivation is is to
14  somehow repair her relationship with her daughter,
15  then sometimes it takes that act of grace to actually
16  step back and make the first move.
17          But part of why I'm asking you,
18  Mr. Dellaportas, to go through the litigation budget,
19  and part of why I'm asking counsel for Dalia to do the
20  same thing, is it's irrational not to put any price at
21  all on that.
22          And, look. I do, frankly, put a low
23  probability on the notion that a judge in New York is
24  going to conclude that Sagi won the Powerball.

70

1   Because who was going to get the 10.6 million?  It was
2   going to be TPR?

3                MR. DELLAPORTAS:  TPR is the seller of
4   the shares.  I will say, just to be --

5                THE COURT:  No, no, no.  Actually, I
6   don't want you to go over and make a probably
7   technically very precise but equitably insensate
8   argument.

9                I -- again, there's like Woolley's
10  over on that shelf, and there are decisions by
11  Marvell, and cites and all.  The idea that TPR could
12  sell that block, get 10.6 million, and be controlled
13  by Sagi, and that Sagi gets it all and Orly gets
14  zero --

15               MR. DELLAPORTAS:  But, Your Honor,
16  that's the opposite of our intent.  Our intent is to
17  stop being sued.

18               THE COURT:  No, no, no.

19               MR. DELLAPORTAS:  So we don't want to
20  be sued for the next five years, Your Honor, and incur
21  millions and millions.  And at the same time, if we're
22  going to give up the 10.7 -- which we absolutely have
23  a legal entitlement to -- then in that case we'd like
24  to stop being sued.  And it's not unreasonable for my

71

1    client not to have to be put through this.

2                    THE COURT:  Mr. Dellaportas, you just

3    went back -- what I just said, you just confirmed.

4    You just made an argument, a legally precise argument,

5    and what did I say it was going to be?  Equitably

6    insensate.

7                    MR. DELLAPORTAS:  Your Honor, it's not

8    a legal argument.

9                    THE COURT:  No, no.  Equitably

10   insensate.  Do you understand what that means?

11                   MR. DELLAPORTAS:  Your Honor, Latin

12   was never my thing.

13                   THE COURT:  No?  Well, I don't think

14   it's Latin so much, but maybe --

15                   MR. DELLAPORTAS:  But I think I

16   understand Your Honor's concept.

17                   THE COURT:  Here is the point.  That

18   transaction in which those shares went to the Orly

19   Trust might have been void.  I think I found it was

20   void.  I think I found it was void more than once.  I

21   agreed with -- you know, I don't always go back and

22   read myself and I agree with it, but usually I do.

23   And, actually, I'm kind of like, "Man, that sounds

24   pretty good."  I must have been smarter when I wrote

72

1   that or something.

2               But I agree with your position.  See,

3   here's a -- we're a court of equity.  The fact that

4   something's legally void and, therefore, ownership

5   returned to somebody doesn't mean that that someone

6   has the authority to deal with that property, sell it,

7   get proceeds, and keep it for itself.  That is what

8   equity is about.  The term "beneficial ownership" is a

9   term that comes out of the equitable concept of for

10  whose benefit are the shares held.

11              So what I'm saying about being

12  equitably insensate is you may have the world's

13  greatest technical/legal argument, but the English

14  Court of Chancery was created a long time ago.  One of

15  the reasons I know that, Mr. Dellaportas, is that the

16  jurisdiction of this court was originally to exercise

17  all the jurisdiction of the English Court of Chancery

18  as of the time of the separation, and whatever

19  jurisdiction we're given since.  So you wouldn't have

20  won on this purely legal argument in 1743 in my law

21  clerk's home country.

22              So when you keep saying, you know,

23  they should be grateful, what Orly's contention would

24  be -- and it's one that I'm telling you is a colorable

73

1    argument to someone grounded in the traditional

2    concepts of equity, which have acted as an overlay to

3    the purely legal for at least 500 -- it's probably 500

4    years -- is the minimum that the Orly Trust gets is

5    the price that Sagi negotiated for it.  That's the

6    minimum.

7                    The question that Orly raises, is that

8    what a faithful person would do when they were

9    exercising fiduciary power over property whose

10   equitable ownership was in someone else?

11                   Now, you can check with Mr. Connolly.

12   Now, he's spent a lot of his career in criminal law,

13   but he's an extremely gifted lawyer, and I think he

14   will tell you that what I'm saying about equitable

15   principles is by no means something I just made up.

16                   And so you need to focus on -- and

17   again, everybody should always come into something and

18   try to look at it a little bit from another's

19   perspective.  That is, I believe, what Orly is going

20   to argue.  Irrespective of whether the -- frankly, we

21   tried to beat the Trump Group and say that he

22   shouldn't have been able to sell this at all.  Hey, we

23   lost on that.

24                   But the one thing that's been clear,

74

1    and the Delaware judge -- I was clear on this from the

2    beginning:  Dividing up the pie claims, whether your

3    client was a faithful -- whether what he did with

4    those proceeds was fair to others who may have had an

5    equitable entitlement to them, that was for the New

6    York courts.  And so you want to keep that in mind,

7    because this idea, again, this free lunch concept that

8    this was just Sagi's greatest day, I --

9                MR. DELLAPORTAS:  It's not a free

10   lunch, Your Honor.  We just want some peace in

11   exchange for it.

12               THE COURT:  No, no.  Wait a minute.

13   Again, you're not -- you need to listen.  When I first

14   heard what you were saying I kind of thought it was

15   reasonable.  Then, when I realized what you were

16   trying to do was to require Orly to release anything

17   involving any lack of pro rata treatment or anything

18   like that, then it's not so immediately appealing.

19               That's also true in terms of Dalia.

20   Which is, to the extent that Orly has a reason to

21   believe that Dalia and Sagi were in regular contact

22   when all these transactions with the Trumps happened,

23   and Dalia was the trustee of Orly's trust and didn't

24   reflect Orly's view of the matter, I think you're back

CHANCERY COURT REPORTERS

75

to the same situation.  I'm being very -- I agree with
you.  I understand exactly why you want to look at
their settlement agreement, but I think you also have
got to get to a place where there might be a reason
for them to show it.

            And if you're -- I'm just encouraging
everybody to be a little bit supple.  I think Orly
would be being not very supple if she didn't realize
that she is in a different position than Sagi.  She
put the Trumps through a lot, she put everybody
through a lot, and there's a price being paid for not
being certain.

            On the other hand, the difference
between 27 million and 10.6 -- it's pretty big.  And
you're giving no weight to that, that I can tell.  And
maybe you're negotiating, but don't -- you know,
you're in front of a judge.  And so, if you want to
take a -- I mean put it this way:  You haven't gotten
even a whelming to me on the point of arguing that
there's no plausibility to the argument that Sagi had
a gesture of good faith to try to maximize the sale
proceeds for the beneficiaries of all the things,
regardless of whether the sales -- the original
transactions were void.

CHANCERY COURT REPORTERS

76

1              But I really am going to cut this off.

2    I appreciate, Mr. Dellaportas.  I have a much better

3    understanding.

4              Mr. Anderson, I gave you guys the

5    chance, you know, to be here by phone.  Let's next

6    time be here by phone.

7              And I want to hear back.

8              MR. ANDERSON:  Thank you, Your Honor.

9              THE COURT:  Thank you.

10             (Hearing concluded at 11:45 a.m.)

11

12                      -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

77

## REPORTER'S CERTIFICATE

I, JULIANNE LaBADIA, Official Court Reporter for the Court of Chancery of the State of Delaware, Registered Diplomate Reporter, Certified Realtime Reporter, and Delaware Notary Public, do hereby certify the foregoing pages numbered 3 through 76, contain a true and correct transcription of the proceedings as stenographically reported by me at the hearing before the Chancelor of the State of Delaware, on the date therein indicated.

IN WITNESS WHEREOF, I have hereunto set my hand this 5th day of August, 2013, at Wilmington.

/s/ Julianne LaBadia
_____
Julianne LaBadia
Official Court Reporter
Registered Diplomate Reporter
Certified Realtime Reporter
Delaware Notary Public

CHANCERY COURT REPORTERS

263

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

------------------------------------------------x

ORLY GENGER,

       Plaintiff,

                           Index No.

                           100697/2008

   -against-

SAGI A. GENGER,

       Defendants.


------------------------------------------------x


       CONTINUED EXAMINATION BEFORE TRIAL of the
Defendant, SAGI A. GENGER, taken by the Plaintiff,
pursuant to, Order, held at the offices of Zeichner,
Ellman & Krause, LLP, 575 Lexington Avenue, New York,
New York, on July 27th, 2012 at 10:16 a.m., before a
Notary Public of the State of New York.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

        BARRISTER REPORTING SERVICE, INC.

             120 Broadway

         New York, N.Y. 10271

           212-732-8066

264

```
 1   A P P E A R A N C E S:

 2

 3           ZEICHNER, ELLMAN & KRAUSE
                     Attorneys for Plaintiff
 4                   575 Lexington Avenue
                     New York, New York 10022
 5
             BY:   YOAV M. GRIVER, ESQ.
 6                 BRYAN D. LEINBACH, ESQ.

 7

 8
             DUANE MORRIS, LLP
 9                   Attorneys for Defendant
                     1540 Broadway
10                   New York, New York 10036
11           BY:   JOHN DELLAPORTAS, ESQ.
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

432

1                          S. Genger

2    be Orly.  I just don't know.

3    Q.    Anyone else?

4    A.    I don't remember that I've prepared it

5    so it's purely theoretical.  I mean, she's

6    the one who signed it so I just don't

7    remember.

8    Q.    This issue that led to the

9    clarification, this was an issue that

10   involved you, Orly and Raines & Fischer.

11   And anybody else?

12   A.    Could have involved David.

13   Q.    Other than David Parnes, who else?

14   A.    I mean, it's pure speculation.  I just

15   don't remember.

16   Q.    Well, at some point, you began to be

17   contacted by people from Joel Isaacson &

18   Associates; do you recall that?

19   A.    Yes.

20   Q.    Do you remember who began contacting

21   you?

22   A.    I remember the names there.  I don't

23   remember who it is that contacted me.

24   Q.    Did Mr. Isaacson contact you?

25   A.    It's possible.  I don't remember.  It

433

1               S. Genger

2    was Stan Altmark and Joel Isaacson.  There

3    could be another person.  They're all

4    interchangeable inside my head.  I don't

5    know.

6    Q.    When they contacted you, what did they

7    tell you?

8    A.    That they were working with my sister

9    and they wanted to understand what was going

10   on with her finances.

11   Q.    Did they tell you why your sister

12   wanted to know what was going on with her

13   finances?

14   A.    They may have.  I don't remember.

15   Q.    Do you remember anything else about the

16   first contact with you?

17   A.    Or I'm not sure if that's even the

18   first contact that I just described.

19   Q.    Okay.  What was their first contact

20   between you and --

21   A.    I don't remember.  I just don't

22   remember.

23   Q.    The first contact that you remember,

24   was that by phone, by e-mail, by letter, by

25   in person?  How?

434

1                        S. Genger

2    A.    We've had an in-person meeting and

3    there was a correspondence, but I don't

4    remember.  I don't remember.  I don't

5    remember the order of things.

6    Q.    How many meetings did you have with

7    anyone from Joel Isaacson & Associates?

8    A.    Well, at least one.  There may have

9    been more, but I remember at least one.

10   Q.    How many telephone conversations did

11   you have with anyone from Joel Isaacson &

12   Associates?

13   A.    I'm not sure there was ever a telephone

14   conversation.

15   Q.    How many e-mails between you and anyone

16   from Joel Isaacson & Associates?

17   A.    It's whatever we have there in the

18   record and I think there's two or something

19   like that.

20   Q.    Any letters or memoranda?

21   A.    The e-mails and the memoranda is all,

22   in my mind is all same so I don't remember.

23   Q.    And you don't recall why Joel Isaacson

24   was contacting you for an understanding of

25   your sister's finances?

436

1                    S. Genger

2    course, in the context of my parents'

3    arbitration.  My father was claiming that

4    TRI was worthless a few months before he and

5    she claims it was worth a billion dollars,

6    so that was the -- that was a backdrop to

7    the conversation, basically to convince me

8    that my mother's position that TRI had any

9    value was ridiculous.

10   Q.   That was your belief at the time of

11   these meetings and communications with Joel

12   Isaacson?

13   A.   That was the purpose of the meeting?

14   Q.   Yes.

15   A.   At some point, I came to that

16   conclusion.

17   Q.   Now, let's talk about the face-to-face

18   meeting that you had, that was in Joel

19   Isaacson's offices?

20   A.   Their offices, I presume they're his

21   offices.  I don't know.

22   Q.   That was on or about November 8, 2007;

23   do you recall?

24   A.   It could be.  I don't remember.

25   Q.   Did you bring any document with you to

437

1                          S. Genger

2    the meeting?

3    A.    Could be.  I don't remember.  It could

4    be that they had documents.  I just don't

5    remember.

6    Q.    Let me show a memorandum dated November

7    8, 2007, to you from Stan Altmark, ray items

8    needed.

9              (Whereupon Document Bates stamped

10             OG17-OG17 was marked as Plaintiff's

11             Exhibit 15 for identification as of

12             this date.)

13             MR. GRIVER:  For the record, what

14             we've marked is Bates stamped numbers

15             OG16 through 17.

16   Q.    Let me know when you're finished

17   reading that memorandum, Mr. Genger.

18   A.    Okay.

19   Q.    Do you recall receiving this memoranda?

20   A.    No.

21   Q.    Does this memoranda refresh your

22   recollection that you provided documents at

23   the meeting on November 8th?

24   A.    Not really.

25   Q.    Let me show you what's been marked,

438

1                     S. Genger

2    what's been Bates stamped as OG11 through

3    14.  Is that documentation that you provided

4    at the meeting?

5         MR. DELLAPORTAS:  What's the exhibit

6         on this?

7         MR. GRIVER:  We haven't.  If he

8         recognizes it, then I'll mark it as

9         an exhibit.

10   A.   You're asking me if I provided this at

11   the meeting?

12   Q.   Yeah.  Is this a documentation you

13   provided at the meeting, if you recall?

14   A.   I don't recall, no.

15   Q.   Do you recall Joel Isaacson sending you

16   an e-mail on November 6th, 2007?

17   A.   No.

18   Q.   Did you ever produce a November 6, 2007

19   e-mail?

20   A.   I don't remember the existence of the

21   e-mail.  I know there is an e-mail between

22   me him and me in which he apologizes for

23   asking to set up a meeting and not being

24   there when my mother and I showed up, so I

25   remember that was there's.  I've seen that

439

1                          S. Genger

2      somewhere.

3      Q.    There was only one meeting?

4      A.    I don't remember.  I remember there was

5      one meeting we set a time and he forgot to

6      show up.  And then there was another meeting

7      that we actually had, and I don't remember

8      if there was an additional meeting.

9      Q.    Now, at the meeting at Joel Isaacson's

10     offices, who was there, if you recall?

11     A.    Orly was there, my mother was there, I

12     was there.  I think her latest boyfriend was

13     there, that's it.

14     Q.    Joel Isaacson was there?

15     A.    Honestly, because if Joel Isaacson was

16     sitting in the room, I wouldn't have known

17     it was him so I just don't remember who's

18     who.  Someone from that accounting firm.  I

19     don't know if it was him or Stan or someone

20     else or both of them.

21     Q.    So we're clear, Orly was there, you

22     were there, correct?

23     A.    Yes.

24     Q.    Your mother Dalia Genger was there?

25     A.    Yep.

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT: _____ *JAFFE* _____                    PART _12_
                              *Justice*

_____                    INDEX NO. _109749/09_

Coenger,                                      MOTION DATE _____
              -v-
                                             MOTION SEQ. NO. _42_
Coenger,
_____

The following papers, numbered 1 to _____, were read on this motion to/for _Confirm / Reject Ref_

| | No(s). |
|---|---|
| Notice of Motion/Order to Show Cause — Affidavits — Exhibits | No(s). _____ |
| Answering Affidavits — Exhibits | No(s). _____ |
| Replying Affidavits | No(s). _____ |

Upon the foregoing papers, it is ordered that this motion is

**DECIDED IN ACCORDANCE WITH ACCOMPANYING DECISION / ORDER**

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE _____
FOR THE FOLLOWING REASON(S):

**BARBARA JAFFE**
*J.S.C.*, J.S.C.

Dated: _3/18/15_

1. CHECK ONE: .................................  ☐ CASE DISPOSED        ☒ NON-FINAL DISPOSITION
2. CHECK AS APPROPRIATE: ...............MOTION IS:  ☐ GRANTED  ☐ DENIED  ☒ GRANTED IN PART  ☐ OTHER
3. CHECK IF APPROPRIATE: ..............................  ☐ SETTLE ORDER        ☐ SUBMIT ORDER
                                         ☐ DO NOT POST  ☐ FIDUCIARY APPOINTMENT  ☐ REFERENCE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : PART 12

-----------------------------------------------------------------------x

ORLY GENGER, in her individual capacity and on behalf
of the Orly Genger 1993 Trust (both in its individual
capacity and on behalf of D & K Limited Partnership),

                            Plaintiff,

               -against-

DALIA GENGER, SAGI GENGER, LEAH FANG,
D & K GP LLC, and TPR INVESTMENT ASSOCIATES,
INC.,

                            Defendants.

-----------------------------------------------------------------------x

Index No. 109749/09
Motion seq. no. 042

**DECISION AND
JUDGMENT**

BARBARA JAFFE, JSC:

     By decision and order dated June 9, 2014, I granted plaintiff's request for fees and costs

incurred in connection with motion sequence 30. In that decision, I resolved several issues raised

by defendants, and found that given the appellate affirmance of my holdings that TPR and D&K

GP were properly ordered to pay plaintiff's fees and costs, and that the releases under the

settlement agreements were voidable at plaintiff's option, "the fees and costs related to the appeal

are properly awarded to plaintiff, to the extent that they are reasonable." I also held that the

original amount of $139,541.38 should be reduced by the matters attributable to plaintiff's

motion for a pre-judgment order of attachment which I had denied, plaintiff's motion for

sanctions against Sagi, Dalia, and Fang, and plaintiff's opposition to Fang's motion for summary

judgment; and "other unrelated matters" filed under NYSCEF 464-466.

     Given the parties' litigiousness and inability to settle their voluminous motions, I

appointed a Special Referee to hear and report to recommend the reasonable fees and costs to be awarded to plaintiff.

On October 8, 2014, the referee held a telephone conference with the parties during which he discussed his recommendation as follows:

(1)     The referee stated that in my order, "the sanction that [I] imposed is the attorney's fees that were incurred in connection with the motion, that resulted in the order finding contempt . . ."

(2)     He also observed that plaintiff's attorneys requested additional fees, "which, in [his] judgment, are not covered" by my order, and he therefore limited his recommendation to the fees that he believed fell within the terms of my order, by eliminating "fees relating to an appeal and fees relating to the contempt or the alleged contempt of the defendants who the Appellate Division determined were not guilty of contempt";

(3)     The referee found that the hourly rates requested by plaintiff's attorneys were not exorbitant and thus did not reduce them; and

(4)     The referee found that there was "substantial" block billing, which he reduced by 20 percent.

The referee thus recommended an award of $104,735, and indicated that he did not include any costs that had been redacted from the billing statements. (NYSCEF 719).

By motion, plaintiff seeks an order confirming in part and rejecting in part the referee's report and recommendation. By cross-motion, defendants TPR Investment Associates, Inc. and D&K GP LLC (collectively, defendants) move for an order rejecting the report.

Plaintiff argues that the referee erred in excluding the legal fees she incurred related to the appeal of my sanctions order, as I granted her the right to recover such fees in my June 2014 order. She submits proof that the fees incurred for the appeal totaled $80,240.34 and, applying the referee's 20 percent reduction for the block billing, requests that I grant her $64,192.27 in

2

fees. Plaintiff therefore requests that I confirm the referee's report to the extent of directing entry of judgment in her favor in the amount of $168,927.27. (NYSCEF 718).

Defendants object to the award of appellate costs, arguing that the referee properly determined that the reasonable fee to be awarded did not include such costs, and observe that I found that the costs may, rather than must, be awarded. They also argue that an award of appellate costs is unwarranted as the Appellate Division did not award costs on the appeal. They otherwise agree with the referee's recommendation. However, they also maintain that no fee award is reasonable given events post-dating my order, specifically, that the lawsuit "has now been revealed to be brought on by false pretenses." (NYSCEF 776).

As I specifically directed that fees and costs related to the appeal may be awarded to the extent that they are reasonable, the referee erred in excluding them on the ground that they were not covered in my order. And, as both parties agree with the referee's reduction of the billing by 20 percent, plaintiff has established her entitlement to the additional $64,192.27. Defendants' current argument that no fees should be awarded based on plaintiff's alleged fraud on the court is fatally conclusory and has no bearing on her entitlement to costs here. Moreover, their argument regarding the Appellate Division's decision not to award appeal costs is untimely.

Accordingly, it is hereby

ADJUDGED and ORDERED, that plaintiff's motion is granted and the referee's report of October 8, 2014 is confirmed to the extent of directing judgment in favor of plaintiff and against defendants TPR Investment Associates, Inc. and D&K GP LLC, jointly and severally, in the sum of $168,927.27, and the clerk is directed to enter judgment accordingly; and it is further

ORDERED, that defendants TPR Investment Associates, Inc.'s and D&K GP LLC's

3

cross motion is denied.

ENTER:

Barbara Jaffe, J.S.C.

**BARBARA J**

Dated:      March 18, 2015
            New York, New York

4

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

## BARBARA JAFFE
### J.S.C.

PRESENT: _____                    PART ___12___
_____
                            *Justice*

Genger, Orly                          INDEX NO. __109749/200__
        -v-
Genger, Dalia                         MOTION DATE _____
_____     MOTION SEQ. NO. __041__

The following papers, numbered 1 to _____, were read on this motion to/for   _Prelim Inj / TRO_

Notice of Motion/Order to Show Cause — Affidavits — Exhibits _____ | No(s). _____
Answering Affidavits — Exhibits _____ | No(s). _____
Replying Affidavits _____ | No(s). _____

Upon the foregoing papers, it is ordered that this motion is

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE _____
FOR THE FOLLOWING REASON(S): _____

**DECIDED IN ACCORDANCE WITH
ACCOMPANYING DECISION / ORDER**

Dated: __MAY 0 4 2015__                          _____, J.S.C.
                                                **BARBARA JAFFE**
                                                    J.S.C.

1. CHECK ONE: ............................................ ☐ CASE DISPOSED   ☑ NON-FINAL DISPOSITION
2. CHECK AS APPROPRIATE: ....................MOTION IS: ☐ GRANTED ☑ DENIED ☑ GRANTED IN PART ☐ OTHER
3. CHECK IF APPROPRIATE: ................................ ☐ SETTLE ORDER      ☐ SUBMIT ORDER
                                                ☐ DO NOT POST   ☐ FIDUCIARY APPOINTMENT   ☐ REFERENCE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK  : IAS PART 12

-----------------------------------------------------------------x

ORLY GENGER, in her individual capacity and on
behalf of the Orly Genger 1993 Trust (both in its
individual capacity and on behalf of D & K Limited
Partnership),

                                        Plaintiff,

              -against-

DALIA GENGER, SAGI GENGER, LEAH FANG,
D & K GP LLC, and TPR INVESTMENT
ASSOCIATES, INC.,

                                 Defendants.

-----------------------------------------------------------------x

Index No. 109749/09

Mot. seq. no. 041

**DECISION AND ORDER**

BARBARA JAFFE, JSC:

       Defendant TPR Investment Associates, Inc. (TPR) seeks an order dissolving or lifting the

preliminary injunction issued by this court on May 29, 2013 (NYSCEF 418) in favor of plaintiff.

(NYSCEF 686).  Plaintiff opposes and cross-moves for an order restricting TPR from filing

further motions without prior leave of this court. (NYSCEF 701).

<div align="center">I.  TPR'S MOTION</div>

<div align="center">A.  Background</div>

       The background for this motion was set forth in an opinion in which I determined, among

other things, that the transactions and settlements entered into by defendants were voidable

because they violated prior injunctions. (*Genger v Genger*, 39 Misc 3d 1235 [A], 2013 NY Slip

Op 50886 [U] [Sup Ct, NY County 2013]).  That determination was affirmed on appeal, and

modified in certain respects that are irrelevant to the disposition of this motion. (*Genger v

Genger*, 120 AD3d 1102 [1st Dept 2014]).  The court upheld my finding that TPR and D&K GP

LLP (D&K GP), the general partner of D&K Limited Partnership (D&K LP), had disobeyed "a

lawful mandate of the court" for which sanctions were appropriate, and that defendant Dalia

Genger, trustee of the Orly Trust, had a conflict of interest in entering into the transactions and

settlements, including issuing a D&K LP note in 2011 to TPR in place of a note issued by D&K

in 1993 which "contained provisions that were plainly intended to entrench [Dalia] as sole trustee

of the Orly Trust." (*Id.* at 1103-1104). The Orly Trust guaranteed the 2011 note while the Sagi

Trust was released from liability pursuant to the same voidable transactions and settlements. The

note was then sold or assigned by TPR to Manhattan Safety Company, a foreign company located

in St. Kitts.

## B. Contentions

TPR alleges that following the issuance of the May 2013 injunction, it discovered new

facts that "directly contradict" the original basis of the injunction, and that the new facts

constitute "changed circumstances" that, pursuant to CPLR 6314, warrant dissolution of the

injunction. (NYSCEF 687 at 2). The new facts are plaintiff's April 2014 opposition to a cross

motion TPR brought to add certain affirmative defenses (NYSCEF 637 at 2), wherein plaintiff

stated that "[t]he undisputed contemporaneous documentary evidence and testimony shows,

however, the [1993] Note was always intended to be repaid by the family," and a memorandum

prepared in 1994 by William Fischer, the Genger family accountant, in which he wrote that, "[a]t

some point it will be necessary to refinance [the 1993] D&K's debt. It may be possible to find a

third party lender who will lend D&K sufficient amounts to allow D&K to repay both TPR and

Arie Genger." (NYSCEF 687 at 3, quoting NYSCEF 631 [filed under seal] at 3).

TPR argues that because the statements made by plaintiff are contrary to the assertions

advanced in her second amended complaint (NYSCEF 83 at 8), namely, that the 1993 note was

2

"worthless and uncollectible," the circumstances supporting the May 2013 injunction no longer

exist and, thus, it should be dissolved. (NYSCEF 687 at 3). In other words, TPR contends that

because Orly "recently admitted" that the 1993 note was not worthless and that it was intended to

be repaid by the family, TPR's sale of the 2011 note to Manhattan Safety, the third party lender,

did not encumber the Orly Trust with new debt, and thus the original premise of the injunction is

no longer applicable or has otherwise evaporated. (NYSCEF 709 at 1-2).

In her April 2014 opposition, however, plaintiff also asserted that "Sagi improperly

conflates the family agreement not to forcibly collect the 1993 note, with a nonexistent

agreement that the note was never meant to be voluntarily repaid by the family," and that the note

"was in fact repaid by Arie for many years. Indeed, it was Sagi who chose not to pay the Note

from 2004-2009, although he had the means to do so." (NYSCEF 637 at 2). And, in the second

amended complaint, she explains that the assertion that the note was "worthless and

uncollectible" was derived from the findings of the arbitrator in the course of Arie's and Dalia's

post-divorce arbitration, which findings were based on Sagi's testimony. (NYSCEF 83 at 8-9,

noting that every Genger family member understood and agreed that the 1993 note was a "tax

planning mechanism" to facilitate the family's estate planning, and that "Sagi was charged with

ensuring that the Note . . . would never be enforced . . . ." (*Id.*). Plaintiff thereby denies that she

has advanced contradictory positions regarding the 1993 note.

The voidable transactions and settlements, as the appellate division pointed out, include,

among other things, that the removal of Dalia, as trustee of the Orly Trust, would constitute an

event of default rendering the new D&K note due and payable by the Orly Trust. (*Genger*, 120

AD3d at 1104). After issuance of the appellate opinion, plaintiff's petition to remove Dalia as

trustee remains pending before the Surrogate's Court notwithstanding the conflict of interest recognized by the appellate division. (*Id.*)

## C.  Discussion

CPLR 6314 provides that "[a] defendant enjoined by a preliminary injunction may move at any time, on notice to the plaintiff, to vacate or modify it."  Moreover, "[a] motion to vacate a preliminary injunction is addressed to the sound discretion of the court and may be granted either upon compelling or changed circumstances that render continuation of the injunction inequitable."  (*Wellbilt Equip. Corp. v Red Eye Grill,* 308 AD2d 411, 411 [1st Dept 2003]).

Defendant improperly relies on selected portions of plaintiff's pleadings, and ignores other relevant portions which permit the reasonable inference that any assertion to the effect that the Genger family members had agreed that the 1993 note was not to be forcibly enforced, means that the family had agreed that no legal action would be taken to enforce the note even though the family did not intend to repay it.  Thus, TPR has not demonstrated that plaintiff has taken a position contrary to that taken in the second amended complaint, and consequently, shows no compelling or changed circumstances sufficient to render the continuation of the injunction inequitable.

And, until the Surrogate's Court resolves the issue of the Orly Trust trustee, the transactions and any refinancing of the new D&K note cannot proceed because they require a trustee's participation on behalf of the Orly Trust.  Also, because the proposed refinancing, as evidenced by the D&K note that was purportedly sold by TPR to Manhattan Safety, would be an integral part of the voided transactions, Fischer's memorandum, prepared more than 20 years ago, is of no legal significance.

4

## II. PLAINTIFF'S CROSS MOTION

In her cross motion, Orly asks that the court require that TPR obtain my permission before filing motions, arguing that it has been engaging in delaying tactics in this case and filing frivolous motions. In opposition, TPR contends that it is Orly who has been stalling the progression of this case.

In motions filed by the parties in this case and in the several companion cases, some of the relief sought has been duplicative and/or based on substantially similar facts, thereby monopolizing judicial resources and placing an inordinately heavy burden on an already crowded docket. (*See eg* 651089/2010, seq. no. 31, and 109749/2009, seq. no. 34; 109749/2009, seq. nos. 39 and 41). To reduce similar practice in the future, the parties are hereby directed to comply with Rule 24 of the Commercial Division (Advance Notice of Motions) before filing motions.

## III. CONCLUSION

Based on all of the foregoing reasons, it is hereby

ORDERED, that the relief requested in motion sequence number 041 by defendant TPR Investment Associates, Inc. is denied; and it is further

ORDERED, that the relief requested by plaintiff Orly Genger in her cross motion to motion sequence number 041 is granted to the extent that the parties are directed to comply with Rule 24 of the Commercial Division before filing any future motions.

ENTER:

Barbara Jaffe, JSC

Dated:      May    , 2015
New York, New York

5

## II.  PLAINTIFF'S CROSS MOTION

In her cross motion, Orly asks that the court require that TPR obtain my permission before filing motions, arguing that it has been engaging in delaying tactics in this case and filing frivolous motions.  In opposition, TPR contends that it is Orly who has been stalling the progression of this case.

In motions filed by the parties in this case and in the several companion cases, some of the relief sought has been duplicative and/or based on substantially similar facts, thereby monopolizing judicial resources and placing an inordinately heavy burden on an already crowded docket.  (*See eg* 651089/2010, seq. no. 31, and 109749/2009, seq. no. 34; 109749/2009, seq. nos. 39 and 41).  To reduce similar practice in the future, the parties are hereby directed to comply with Rule 24 of the Commercial Division (Advance Notice of Motions) before filing motions.

## III. CONCLUSION

Based on all of the foregoing reasons, it is hereby

ORDERED, that the relief requested in motion sequence number 041 by defendant TPR Investment Associates, Inc. is denied; and it is further

ORDERED, that the relief requested by plaintiff Orly Genger in her cross motion to motion sequence number 041 is granted to the extent that the parties are directed to comply with Rule 24 of the Commercial Division before filing any future motions.

ENTER:

_____
Barbara Jaffe, JSC

Dated:        May 4, 2015
              New York, New York

5

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:  JAFFE _____          PART  12 _____

_Justice_

Genger, Orly in her individual          INDEX NO. 109749/09
capacity + on behalf of the Orly Genger
1993 Trust ...)                          MOTION DATE _____
Genger, Dalia, et al                     MOTION SEQ. NO.  39

The following papers, numbered 642 to 712, were read on this motion to/for _an order striking the complaint_

Notice of Motion/Order to Show Cause — Affidavits — Exhibits  _+ cross motion_   | No(s). _____

Answering Affidavits — Exhibits _____ | No(s). _____

Replying Affidavits _____ | No(s). _____

Upon the foregoing papers, it is ordered that this motion _+ cross motion are denied._

_Motion denied for reasons set forth in decision + order dated May 4, 2015, seq. 41. Cross motion for sanctions is denied._

Dated:  5/5/15 _____              BARBARA JAFFE, J.S.C.
                                                         J.S.C.

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

1. CHECK ONE: .................................................. ☐ CASE DISPOSED    ☑ NON-FINAL DISPOSITION

2. CHECK AS APPROPRIATE: .........................MOTION IS: ☐ GRANTED  ☑ DENIED  ☐ GRANTED IN PART  ☐ OTHER

3. CHECK IF APPROPRIATE: ................................................ ☐ SETTLE ORDER    ☐ SUBMIT ORDER
                                                    ☐ DO NOT POST   ☐ FIDUCIARY APPOINTMENT   ☐ REFERENCE

# FILED UNDER SEAL

SURROGATE'S COURT : NEW YORK COUNTY                    JAN 0 2 2009
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
In the Matter of the Trust Established
on December 13, 1993, by ARIE GENGER              File No. 0017/2008
for the Benefit of ORLY GENGER.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

R O T H , S .

    This is a contested application by the primary beneficiary

(Orly Genger) of an irrevocable inter vivos trust established by

her father, Arie Genger, seeking the appointment of a successor

trustee or, alternatively, the appointment of a "special trustee"

to investigate alleged wrongdoing concerning the trust.

Petitioner's mother, Dalia Genger (grantor's former wife),

contends that she is the duly appointed successor trustee and

that there is no basis to appoint another fiduciary for any

purpose.

    The trust agreement, dated December 13, 1993, provides for

discretionary income and principal distributions to Orly for life

with remainder to her descendants or, if none, to the grantor's

descendants in trust.

    Article SEVENTH (B), (D), (E), and (G) of the trust

instrument sets forth the following procedure for the resignation

of trustees and the appointment of their successors.

    A trustee may resign by delivering a signed and acknowledged

instrument of resignation in person or by certified or registered

mail to the other trustee and to either the grantor or the income

beneficiary.  Such resignation is effective upon the receipt of

the acknowledged instrument by the other trustee (if there is

one) and the grantor or the income beneficiary or at such later
date as may be specified in the instrument.

A trustee may appoint his or her successor by delivering a
signed and acknowledged instrument in the same manner as
described above for resignation. Any such appointment, however,
is valid only if the appointee qualifies by delivering a signed
and acknowledged instrument of acceptance in person or by
certified or registered mail to each trustee and the grantor or
the income beneficiary within 30 days after the later of 1) the
date on which a copy of the appointment instrument is delivered
to him or her, and 2) the effective date of the appointment as
set forth in the appointment instrument. It is observed that
there is no provision that requires a resigning trustee to
appoint a successor or that there always be two trustees in
office.

The original two trustees served until October 2004, when
they resigned and appointed David Parnes and Eric Gribitz as
their successors. On February 12, 2007, Mr. Gribitz resigned
without appointing a successor. On April 26, 2007, Mr. Parnes
resigned and appointed as his successor Leah Fang in a signed and
acknowledged instrument. Although Ms. Fang noted her acceptance
at the bottom of such instrument, her signature was not
acknowledged. However, in another document entitled "Release"
executed and acknowledged by Ms. Fang the same day, she, as

2

trustee, purported to discharge Mr. Parnes from liability. It is undisputed that thereafter Ms. Fang acted as trustee. Indeed, Ms. Fang's contention that she received a number of requests for information from petitioner and that petitioner referred to her in writing and orally as trustee is not disputed by petitioner.

On December 12, 2007, Ms. Fang, without resigning in accordance with the trust agreement, attempted to appoint Patricia Enriquez, as successor trustee. Her designation of Ms. Enriquez, however, was by an unacknowledged letter in which she referred to her own resignation as taking effect upon Ms. Enriquez's acceptance of the appointment. Ms. Enriquez accepted by signing the letter, but such acceptance was not acknowledged and, in any event, there is nothing in the record to suggest that such "acceptance" was delivered in accordance with the trust instrument. Two weeks later, an attorney for Ms. Enriquez notified petitioner's counsel by email that her client had advised that she had no intention to overcome the procedural omissions.

On January 3, 2008, Ms. Fang and Dalia Genger signed before a notary a memorandum in which Ms. Fang stated that "to the extent that I am still vested with any powers to appoint trustees of the [trust], I confirm your appointment." The next day, Ms. Fang executed an acknowledged instrument of resignation and appointment of successor trustee naming Dalia as her successor

3

and Dalia, on the same day, executed an acknowledged instrument
of acceptance. It is undisputed that such documents were
delivered in accordance with the trust requirements.

We address first that portion of the instant application
which seeks the appointment of a successor trustee on the ground
that Dalia was not validly appointed. In such connection,
petitioner argues first that, because Ms. Fang's signature on the
bottom of Mr. Parnes's appointment instrument was not
acknowledged, she never accepted the position in accordance with
the trust agreement (and thus could not appoint Dalia her
successor). However, such argument ignores the "Release"
mentioned above that Ms. Fang executed the same day. Such
instrument, which was signed and duly acknowledged, unequivocally
establishes Ms. Fang's acceptance of the position. Since
petitioner does not challenge the authenticity of such instrument
or Mr. Parnes' contention, supported by the record, that it was
delivered in accordance with the trust instrument and, as noted
above, petitioner thereafter communicated with Ms. Fang as
trustee, Ms. Fang properly qualified as successor trustee.

Petitioner's second argument that, in any event, Ms. Fang's
appointment of Dalia was ineffective because Ms. Fang had
previously resigned as trustee is also without merit. Simply
put, Ms. Fang had not previously resigned because her letter to
Ms. Enriquez did not contain the formalities (i.e., an

4

acknowledgment) required by the trust agreement.  Moreover,
although not a model of clarity, the letter makes clear that Ms.
Fang did not intend to leave the trust without a trustee in the
event that Ms. Enriquez failed to qualify, which is exactly what
happened.  Thus, Ms. Fang had authority to appoint Dalia as her
successor.

Since there is no dispute that the instrument of resignation
and appointment executed by Ms. Fang on January 4, 2008, and
Dalia's instrument of acceptance of the same date were executed
and delivered in accordance with the trust agreement, Dalia is
the duly appointed successor trustee of the trust.  To find
otherwise would be to ignore the chronology of events and the
purpose of the provisions at issue, namely to ensure that the
trust always has a fiduciary ready, willing and able to act.  The
fact that petitioner does not wish her mother to be the fiduciary
because she considers her an adversary in a broader intra-family
dispute does not provide a basis to ignore the grantor's intent,
as reflected in the trust instrument, that an acting trustee, and
not the beneficiary, decides who shall become a successor
trustee.  Accordingly, petitioner's application to appoint a
successor trustee is denied.

We next turn to petitioner's alternate request for relief,
namely that a "special trustee" be appointed for the "purpose of
investigation and taking discovery with respect to the wrongful

5

dealings concerning the assets and income of the trust."

It is noted initially that petitioner's only allegations of "wrongful dealings" concern a close corporation, TPR Investment Associates, Inc.  She contends that her brother Sagi, who is an officer of TPR, and Dalia, who was a shareholder at the time this proceeding was commenced, are engaged in a "wrongful scheme" to divert assets to themselves and, as a result, Dalia "could not possibly" investigate wrongdoing at TPR, which the petition describes as the "greatest" asset of the trust.

However, the premise of the application, namely that the trust's interest in TPR would enable the trustee to investigate or seek relief from TPR, does not appear to be correct. Petitioner does not dispute Dalia's assertion, supported in the record, that the trust is not a shareholder of TPR at all. Rather, D&K LP, an entity in which the trust owns a 48 percent interest, in turn owns approximately 50 percent of TPR. Petitioner does not explain what appears to be a material misstatement concerning TPR's relationship to the trust.   Nor does she identify how a trustee under such circumstances might be in a position to "investigate and address the TPR issues".

In any event, assuming arguendo that a trustee would somehow be able to investigate alleged misconduct at TPR, petitioner's vague and speculative allegations of "wrongful conduct" at TPR from which Dalia purportedly benefitted do not warrant the

6

appointment of a "special trustee". Similarly, petitioner's
allegations (made upon information and belief) that Dalia had
knowledge of alleged improper acts by former trustee, David
Parnes, in relation to TPR are patently insufficient to warrant
the remedy of a "special trustee". In such connection, it is
noted that Mr. Parnes and Ms. Fang have been directed to account
for their proceedings as trustees (<u>Matter of Genger</u>, NYLJ, Feb.
25, 2008, at 29, col 3), giving petitioner a forum to seek relief
for most of the conduct about which she complains.

Finally, it is observed that petitioner has not alleged that
Dalia has refused a request for information, which would warrant
relief (SCPA 2102), or has failed as trustee to protect trust
assets. Indeed, it appears that Dalia (who states that she is
ready and able to act as fiduciary) has yet to assume the duties
of trustee in deference to her daughter's position in this
litigation. As a validly appointed trustee, she should be given
the opportunity to do what she deems necessary to manage and
protect the trust's assets.

Based upon the foregoing, the appointment of a "special
trustee" is unwarranted at this time and, accordingly, the
application is denied, without prejudice to renewal if future

7

circumstances warrant such relief.

This decision constitutes the order of the court.

S U R R O G A T E

Dated: December 31, 2008

8

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

ARIE GENGER and ORLY GENGER, in her individual
capacity and on behalf of the ORLY GENGER 1993
TRUST,

      Plaintiffs,

      - against -

SAGI GENGER, TPR INVESTMENT ASSOCIATES,
INC., DALIA GENGER, THE SAGI GENGER 1993
TRUST, ROCHELLE FANG, individually and as Trustee
of the SAGI GENGER 1993 TRUST, GLENCLOVA
INVESTMENT CO., TR INVESTORS, LLC, NEW TR
EQUITY I, LLC, NEW TR EQUITY II, LLC, JULES
TRUMP, EDDIE TRUMP, MARK HIRSCH, and
TRANS-RESOURCES, INC.,

      Defendants.

SAGI GENGER, individually and as assignee of THE
SAGI GENGER 1993 TRUST, and TPR INVESTMENT
ASSOCIATES, INC.,

      Cross-Claimants, Counterclaimants, and Third-
      Party Claimants,

      - against -

ARIE GENGER, ORLY GENGER, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC,
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC,
JULES TRUMP, EDDIE TRUMP, MARK HIRSCH,
TRANS-RESOURCES, INC., and WILLIAM DOWD,

      Cross-Claim, Counterclaim and/or Third-Party
      Defendants.

INDEX NO. 651089/2010

( SECOND )
AMENDED STIPULATION OF
DISCONTINUANCE WITH
PREJUDICE

Hon. Barbara Jaffe

Part 12

5385242.1/43419-00001

GLENCLOVA INVESTMENT CO., TR INVESTORS,
LLC, NEW TR EQUITY I, LLC, NEW TR EQUITY II,
LLC, JULES TRUMP, EDDIE TRUMP, MARK
HIRSCH, and TRANS-RESOURCES, INC.,

      Counterclaimants, Cross-Claimants, and Third-
      Party Plaintiffs,

          - against —

ARIE GENGER, ORLY GENGER, SAGI GENGER,
TPR INVESTMENT ASSOCIATES, INC., THE SAGI
GENGER 1993 TRUST, WILLIAM DOWD, ARNOLD
BROSER, DAVID BROSER, and ONE OR MORE
ENTITIES DIRECTED, OWNED OR CONTROLLED
BY ARNOLD BROSER AND/OR DAVID BROSER,

      Counterclaim, Cross-Claim, and/or Third-Party
      Defendants.

WHEREAS no party hereto is an infant or an incompetent as to whom a committee has been appointed;

WHEREAS the parties hereto have entered into a confidential agreement finally resolving the disputes between them as it relates to the subject matter of this action;

IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned counsel for Plaintiffs/Counterclaim Defendants Arie Genger and Orly Genger ("Orly"), in her individual capacity (as *beneficiary of*) and ~~on behalf of~~ the Orly Genger 1993 Trust, and Third-Party Defendants Arnold Broser, David Broser and One or More Entities Directed, Owned or Controlled by Arnold Broser and/or David Broser (collectively, the "AG Group"), and Defendants/Counterclaimants/Third-Party Plaintiffs Glenclova Investment Co., TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Jules Trump, Eddie Trump, Mark Hirsch, and Trans-Resources, Inc. (collectively, the "Trump Group"), that:



1

1.         All claims, counterclaims and third-party claims of the AG Group in this action against the Trump Group are discontinued with prejudice and without costs;

2.         All claims, counterclaims and third-party claims of the Trump Group in this action against the AG Group are discontinued with prejudice and without costs;

3.         Any and all orders, including, without limitation, the Order to Show Cause dated August 8, 2011 (Mot. Seq. 5), the Order to Show Cause for Temporary Restraining Order and Preliminary Injunction dated August 11, 2011 (Mot. Seq. 4), the Order to Show Cause and Temporary Restraining Order dated November 9, 2011 (Mot. Seq. 13) (the "November 9, 2011 OSC") and the Decision and Order dated December 28, 2011 entered in this action which restrain, enjoin or in any way limit actions by any members of the Trump Group shall be, and are hereby, vacated and dissolved. Except as specifically provided in paragraph 4 of this Stipulation, nothing in this Stipulation is intended to vacate or dissolve any order entered in this action restraining, enjoining or in any way limiting acts by Sagi Genger, TPR Investment Associates, Inc., Dalia Genger, individually and/or as Trustee of the Orly Genger 1993 Trust, William Dowd, the Sagi Genger 1993 Trust, or Rochelle Fang, individually and/or as Trustee of the Sagi Genger 1993 Trust.

4.         Orly's applications that resulted in the Order to Show Cause and Temporary Restraining Order entered October 26, 2011 (the "October 26, 2011 OSC") (Mot. Seq. 012) and the November 9, 2011 OSC are hereby withdrawn. The parties hereto stipulate and agree that any and all orders, restraints, injunctions or other limiting actions in the October 26, 2011 OSC and the November 9, 2011, which restrain, enjoin or in any way limit actions by any party, individual or entity from proceeding in the matter entitled *Dalia Genger, as Trustee of the Orly Genger 1993 Trust v. TR Investors LLC et al.*, C.A. No. 6906-CS ( Del. Ch) shall be, and are hereby, vacated and dissolved.

2

5389781.1/43419-00001

5.        Nothing in this Stipulation is intended to dismiss, discontinue or release any claim

asserted in this action as against Sagi Genger, TPR Investment Associates, Inc., Dalia Genger,

individually and/or as Trustee of the Orly Genger 1993 Trust, William Dowd, the Sagi Genger 1993

Trust, or Rochelle Fang, individually and/or as Trustee of the Sagi Genger 1993 Trust.

[INTENTIONALLY BLANK]

3

IT IS FURTHER STIPULATED AND AGREED that this Stipulation may be executed by facsimile and in counterparts that together shall constitute one and the same Stipulation.

DATED:  New York, New York
        June 21, 2013

MITCHELL SILBERBERG & KNUPP LLP

By: _____
    Paul D. Montclare
    pdm@msk.com
    12 East 49th Street, 30th Floor
    New York, New York 10017-1028
    Telephone: (212) 509-3900
    Facsimile: (212) 509-7239

    *Attorneys for Plaintiff Arie Genger*

FELDMAN GALE P. A.
&
LAWRENCE, WORDEN, RAINIS, & BARD P.C.

By: _____
    Michael P. Hogan
    Jeffrey D. Feldman
    Ashley G. Kessler
    mhogan@feldmangale.com
    1700 Market Street, Suite 3010
    Philadelphia, Pennsylvania 19103
    (305) 358-5001
    &
    Russell T. McHugh
    rmchugh@lwrlawyer.com
    225 Broad Hollow Road, Suite 105E
    Melville, New York 11747
    (631) 694-0033

    *Attorneys for Third-Party Defendant
    Arnold Broser*

SKADDEN, ARPS, SLATE MEAGHER & FLOM LLP

By: _____
    William P. Frank
    Thomas J. Allingham II
    John Boyle
    William.Frank@skadden.com
    Thomas.Allingham@skadden.com
    John.Boyle@skadden.com
    Four Times Square
    New York, New York 10036
    (212) 735-3000

    *Attorneys for Third Party Glenclova
    Investment Company, TR Investors, LLC,
    New TR Equity I, LLC, New TR Equity II,
    LLC, Jules Trump, Eddie Trump, Mark
    Hirsch And Trans-Resources, Inc.
    (Collectively, The "Trump Group")*

4

5389781.1/43419-00001

IT IS FURTHER STIPULATED AND AGREED that this Stipulation may be executed by facsimile and in counterparts that together shall constitute one and the same Stipulation.

DATED:  New York, New York
        June 20, 2013

MITCHELL SILBERBERG & KNUPP LLP

By: _____
    Paul D. Montclare
    pdm@msk.com
    12 East 49th Street, 30th Floor
    New York, New York 10017-1028
    Telephone: (212) 509-3900
    Facsimile: (212) 509-7239

    *Attorneys for Plaintiff Arie Genger*

FELDMAN GALE P. A.
&
LAWRENCE, WORDEN, RAINIS, & BARD
P.C.

By: _____
    Michael P. Hogan
    Jeffrey D. Feldman
    Ashley G. Kessler
    mhogan@feldmangale.com
    1700 Market Street, Suite 3010
    Philadelphia, Pennsylvania 19103
    (305) 358-5001
    &
    Russell T. McHugh
    rmchugh@lwrlawyer.com
    225 Broad Hollow Road, Suite 105E
    Melville, New York 11747
    (631) 694-0033

    *Attorneys for Third-Party Defendant
    Arnold Broser*

SKADDEN, ARPS, SLATE MEAGHER &
FLOM LLP

By: _____
    William P. Frank
    Thomas J. Allingham II
    John Boyle
    William.Frank@skadden.com
    Thomas.Allingham@skadden.com
    John.Boyle@skadden.com
    Four Times Square
    New York, New York 10036
    (212) 735-3000

    *Attorneys for Third Party Glenclova
    Investment Company, TR Investors, LLC,
    New TR Equity I, LLC, New TR Equity II,
    LLC, Jules Trump, Eddie Trump, Mark
    Hirsch And Trans-Resources, Inc.
    (Collectively, The "Trump Group")*

3

5389781.1/43419-00001

ZEICHNER, ELLMAN & KRAUSE LLP          THE FREYBERG LAW GROUP

By: _____          By: _____
    Yoav M. Griver                        Mark L. Freyberg
    Brian D. Leinbach                      Mitchell Goldberg
    YGriver@zeklaw.com                     mfreyberg@freyberglaw.com
    BLeinbach@zeklaw.com                   mitchell@oglaw.net
    575 Lexington Avenue                   950 Third Avenue, 32nd Floor
    New York, New York 10022               New York, New York 10022
    (212) 223-0400                         (212) 754-9200

*Attorneys for Plaintiff Orly Genger, in her*        *Attorneys for Third Party Defendant*
*individual capacity and ~~on behalf of~~ the Orly*  *David Broser*
*Genger 1993 Trust*

as beneficiary of (YMG)

So-Ordered: _____

        Hon. Barbara Jaffe

5

ZEICHNER, ELLMAN & KRAUSE LLP

By: _____
    Yoav M. Griver
    Brian D. Leinbach
    YGriver@zeklaw.com
    BLeinbach@zeklaw.com
    575 Lexington Avenue
    New York, New York 10022
    (212) 223-0400

*Attorneys for Plaintiff Orly Genger, in her*
*individual capacity and on behalf of the Orly*
*Genger 1993 Trust*

THE FREYBERG LAW GROUP

By: _____
    Mark L. Freyberg
    Mitchell Goldberg
    mfreyberg@freyberglaw.com
    mitchell@oglaw.net
    950 Third Avenue, 32nd Floor
    New York, New York 10022
    (212) 754-9200

*Attorneys for Third Party Defendant*
*David Broser*

So-Ordered: _____   BARBARA JAFFE J.S.C.
    Hon. Barbara Jaffe

5

Page 1

1        SUPREME COURT OF THE STATE OF NEW YORK
2              Index No. 109749/09
3    ORLY GENGER in her      :      **CERTIFIED COPY**
     individual capacity     :
4    and on behalf of the    :
     Orly Genger 1993        :
5    Trust (both in its      :
     individual capacity     :
6    and on behalf of D&K    :
     Limited Partnership),   :
7                            :
              Plaintiff,     :
8    -against-               :      DEPOSITION OF:
     ECF Case DALIA          :
9    GENGER, SAGI GENGER,    :      ORLY GENGER
     LEAH FANG, D&K GP       :
10   LLC, and TPR            :
     INVESTMENT              :
11   ASSOCIATES, INC.,       :
                             :
12            Defendants.    :
13   - - - - - - - - - - - - -
14        VIDEOTAPED DEPOSITION OF ORLY GENGER
15        TRANSCRIPT of the stenographic notes
16   of the proceedings in the above-entitled
17   matter, as taken by and before
18   CAROLYN CHEVANCE, a Shorthand Reporter, and
19   Notary Public of the State of New Jersey, held
20   at the office of Morgan, Lewis & Bockius LLP, 101
21   Park Avenue, New York, New York, on October
22   25, 2013, commencing at 10:15 a.m.
23
24   Reporter: Carolyn Chevance
25   Job 66709

1

2   A P P E A R A N C E S:

3

4          ZEICHNER ELLMAN & KRAUSE
           BY:  YOAV GRIVER, ESQ.
5          575 Lexington Avenue
           New York, New York  10022
6          Attorneys for Plaintiff

7          MORGAN, LEWIS & BOCKIUS
           BY:  NICHOLAS SCHRETZMAN, ESQ.
8          101 Park Avenue
           New York, New York  10178
9          Attorneys for Defendant

10

11   Also present:

12

13   Dale Swindell, Videographer

14

15

16

17

18

19

20

21

22

23

24

25

Page 93

1                           ORLY GENGER

2    attempted sale of TRI shares and the loss of her

3    trust control premium but she has not yet done

4    so", you then brought a -- you then brought that

5    lawsuit, correct?

6          A       Yes.

7          Q       And you brought that lawsuit as you

8    did this one, both individually and on behalf of

9    your trust; is that correct?

10         A       Just to be certain, if you want to

11   give me a copy of my Complaint if you're going to

12   ask me questions about that lawsuit.

13         Q       I'm not going to ask you many

14   questions about it, I promise.  Just whether you

15   brought those claims, if you can remember,

16   whether you brought them both as you did in this

17   action, whether you brought them individually and

18   on behalf of the Orly trust alleging injury to

19   you and injury to the trust?

20         A       Yes.

21         Q       You did.  You brought that claim

22   against the parties in this action, as Sagi and

23   TPR as well as the Trump Group?

24         A       Yes.

25         Q       And you since settled your claims

Page 94

ORLY GENGER

2   against the Trump Group; is that correct?

3        A      I settled with the Trump Group.

4        Q      And you settled your claims that

5   you brought on your own behalf and on behalf of

6   the trust, correct?

7             MR. GRIVER:  Objection,

8        mischaracterizes.  Objection, foundation.

9        Objection, mischaracterizes facts.

10       A      I settled on behalf of myself as an

11  individual.

12       Q      You did not settle the claims that

13  were brought on behalf of the trust?

14       A      Well, if there -- if the trustee of

15  my trust decides to file a complaint with the

16  Trumps regarding this matter they can.

17       Q      Sorry, the Complaint has already

18  been filed alleging these injuries to the trust,

19  right?

20       A      Correct.

21       Q      Your testimony today is that when

22  you settled your claims against the Trumps you

23  did not settle those claims on behalf of the

24  trust, is that right?

25             MR. GRIVER:  Can I have that back?

Page 95

1          ORLY GENGER

2          (The record was read.)

3          MR. GRIVER:  Objection, asked and

4     answered.

5     A      I settled with the Trumps on my

6  behalf as an individual.  Not -- I am not the

7  trustee of my trust.  So I couldn't settle with

8  them as a trustee of my trust.

9          If the trustee decides to pursue

10 this matter with the Trumps they can.

11 Q      So no consideration was paid to the

12 trust, is that correct?

13          MR. GRIVER:  Can I have the

14     question back?

15          (The record was read.)

16 Q      In connection with the settlement?

17          MR. GRIVER:  I'm going to object

18     because you are seeking a legal conclusion

19     from a lay witness.

20 Q      I will actually rephrase that.

21          No money was paid to the Orly trust

22 in exchange for the dismissal of the settlement

23 of claims, is that correct?

24          MR. GRIVER:  Let's go off the

25     record.  I'm going to say that the reason

# In The Matter Of:

*ARIE GENGER and ORLY GENGER*
*v.*
*SAGI GENGER*

---

## *ORLY GENGER - Vol. 1*
### *February 14, 2014*

---

**MERRILL CORPORATION**
**LegaLink, Inc.**                    225 Varick Street
10th Floor
New York, NY 10017
Phone: 212.557.7400
Fax: 212.692.9171

ORLY GENGER - 2/14/2014

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

-----------------------------------x

ARIE GENGER and ORLY GENGER, in her

individual capacity and on behalf of

the ORLY GENGER 1993 Trust,

                    Plaintiffs,

     -against-          Index No. 651089/2010

SAGI GENGER, TPR INVESTMENT ASSOCIATES,

INC., DALIA GENGER, THE SAGI GENGER

1993 TRUST, ROCHELLE FANG, Individually

and as Trustee of THE SAGI GENGER 1993

TRUST, GLENCLOVA INVESTMENT COMPANY, TR

INVESTORS, LLC, NEW TR EQUITY I, LLC,

NEW TR EQUITY II, LLC, JULES TRUMP,

EDDIE TRUMP, MARK HIRSCH, and

TRANS-RESOURCES, INC.,

                    Defendants.

-----------------------------------x

                    February 14, 2014

                    10:17 a.m.


     Videotaped Deposition of ORLY GENGER,

taken by Defendants, pursuant to Notice, at

the offices of Morgan Lewis & Bockius LLP,

101 Park Avenue, New York, New York, before

ERIC J. FINZ, a Shorthand Reporter and

Notary Public within and for the State of

New York.

ORLY GENGER - 2/14/2014

Page 2

```
 1
 2     A P P E A R A N C E S:
 3     ZEICHNER ELLMAN & KRAUSE LLP
       Attorneys for Plaintiff Orly Genger
 4          1211 Avenue of the Americas
            New York, New York 10036
 5
       BY:  YOAV M. GRIVER, ESQ.
 6          (ygriver@zeklaw.com)
 7          -AND-
 8     WACHTEL MISSRY
            885 Third Avenue
 9          New York, New York 10017
10     BY:  WALTER P. STASIUK, ESQ.
            (wstasiuk@wmllp.com)
11
12                                                    10:18:32
       MITCHELL SILBERBERG & KNUPP LLP
13     Attorneys for Plaintiff Arie Genger
            12 East 49th Street
14          New York, New York 10017
15     BY:  LAUREN J. WACHTLER, ESQ.
            (ljw@msk.com)
16
17                                                    10:17:51
       MORGAN LEWIS & BOCKIUS LLP
18     Attorneys for Defendants Sagi Genger and TPR
       Investment Associates
19          101 Park Avenue
            New York, New York 10178
20
       BY:  NICHOLAS SCHRETZMAN, ESQ.
21          (nschretzman@morganlewis.com)
                 -and-
22          JESSICA JOY, ESQ.
            (jjoy@morganlewis.com)
23
24
25
```

ORLY GENGER - 2/14/2014

```
 1
 2    A P P E A R A N C E S: (Continued)              10:18:02
 3    SKADDEN ARPS SLATE MEAGHER & FLOM LLP            10:18:05
      Attorneys for Defendants Glenclova
 4    Investment Company, TR Investors LLC, New TR     10:18:13
      Equity I LLC, New TR Equity II LLC,
 5    Trans-Resources, Mark Hirsch, Jules Trump
      and Eddie Trump
 6         One Rodney Square
           P.O. Box 636
 7         Wilmington, Delaware 19899
 8    BY:  DOUGLAS D. HERRMANN, ESQ.
           (douglas.herrmann@skadden.com)
 9
10                                                     10:18:19
      GOLDBERG SEGALLA LLP
11    Attorneys for William Dowd
           11 Martine Avenue
12         White Plains, New York 10606
13    BY:  BRIAN T. STAPLETON, ESQ.
           (bstapleton@goldbergsegalla.com)
14
15
16
      ALSO PRESENT:
17
           SAGI GENGER
18
           WILLIAM PACE, Videographer
19
20
21
22
23
24
25
```

ORLY GENGER - 2/14/2014

Page 69

| | | |
|---|---|---|
| 1 | ORLY GENGER | 12:08:26 |
| 2 | MS. WACHTLER:  Object to the | 12:08:27 |
| 3 | form. | 12:08:27 |
| 4 | MR. HERRMANN:  Objection to the | 12:08:28 |
| 5 | form of the question. | 12:08:30 |
| 6 | MS. WACHTLER:  When? | 12:08:31 |
| 7 | MR. GRIVER:  Objection; seeks | 12:08:32 |
| 8 | legal conclusion from a lay witness. | 12:08:40 |
| 9 | THE WITNESS:  Could you repeat | 12:08:41 |
| 10 | the question, please? | 12:08:48 |
| 11 | (Record read as requested.) | 12:08:53 |
| 12 | MR. GRIVER:  Same objection, | 12:08:56 |
| 13 | objection to form. | 12:08:58 |
| 14 | MR. HERRMANN:  Me too. | 12:09:00 |
| 15 | A.   I believe that -- I believe that | 12:09:05 |
| 16 | he was. | 12:10:28 |
| 17 | BY MR. SCHRETZMAN: | 12:10:28 |
| 18 | Q.   As part of this lawsuit, you | 12:10:32 |
| 19 | sued Sagi, TPR and members of The Trump | 12:10:40 |
| 20 | Group.  Is that correct? | 12:10:41 |
| 21 | MR. HERRMANN:  Object to the | 12:10:43 |
| 22 | form of the question. | 12:10:43 |
| 23 | Q.   As well as others. | 12:10:45 |
| 24 | MR. HERRMANN:  Same objection. | 12:10:46 |
| 25 | A.   At the time that this was filed, | |

ORLY GENGER - 2/14/2014

Page 70

| | | |
|---|---|---|
| 1 | ORLY GENGER | 12:10:49 |
| 2 | yes. | 12:10:51 |
| 3 | Q.    And you filed this complaint on | 12:10:56 |
| 4 | your behalf individually and on behalf of | 12:10:58 |
| 5 | your trust.  Is that correct? | 12:10:59 |
| 6 | A.    Yes. | 12:11:00 |
| 7 | Q.    And have you since settled your | 12:11:07 |
| 8 | claims against The Trump Group that you | 12:11:09 |
| 9 | brought in this action? | 12:11:13 |
| 10 | MR. HERRMANN:  Object to the | 12:11:14 |
| 11 | form of the question. | 12:11:16 |
| 12 | A.    I settled with the Trumps other | 12:11:24 |
| 13 | than with regards to my trust.  So I settled | 12:11:29 |
| 14 | with them as an individual. | 12:11:31 |
| 15 | Q.    So are you still suing them on | 12:11:33 |
| 16 | behalf of the trust? | 12:11:36 |
| 17 | A.    No.  I'm not currently suing | 12:11:43 |
| 18 | them on behalf of the trust. | 12:11:51 |
| 19 | Q.    So you aren't suing them in your | 12:12:00 |
| 20 | individual capacity or on behalf of the | 12:12:02 |
| 21 | trust; correct? | 12:12:04 |
| 22 | MR. GRIVER:  Can I have that | 12:12:06 |
| 23 | question read back, please. | 12:12:12 |
| 24 | (Record read as requested.) | 12:12:14 |
| 25 | A.    Correct. | |



<div style="border:1px solid black; text-align:center;">

# GRANTED

</div>

## IN THE COURT OF CHANCERY FOR THE STATE OF DELAWARE

| | |
|---|---|
| DALIA GENGER, as Trustee of the<br>Orly Genger 1993 Trust,<br><br>    Plaintiff,<br>  v.<br><br>TR INVESTORS, LLC, GLENCLOVA<br>INVESTMENT CO., NEW TR EQUITY I,<br>LLC, NEW TR EQUITY II, LLC,<br>TRANS-RESOURCES, INC., and<br>TPR INVESTMENT ASSOCIATES, INC.<br><br>    Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

C.A. No. 6906-CS

| | |
|---|---|
| TR INVESTORS, LLC, GLENCLOVA<br>INVESTMENT CO., NEW TR EQUITY I,<br>LLC, NEW TR EQUITY II, LLC, and<br>TRANS-RESOURCES, INC.,<br><br>    Counterclaim and Crossclaim<br>    Plaintiffs,<br>  v.<br><br>DALIA GENGER, as Trustee of the<br>Orly Genger 1993 Trust,<br><br>    Counterclaim Defendant,<br><br>  and<br><br>TPR INVESTMENT ASSOCIATES, INC.,<br><br>    Crossclaim Defendant | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

| | |
|---|---|
| TPR INVESTMENT ASSOCIATES, INC.,<br>    Counterclaim and Crossclaim<br>    Plaintiff, | :<br>:<br>:<br>: |

v.                                  :

                                         :

DALIA GENGER, as Trustee of the      :
Orly Genger 1993 Trust,

                                         :

         Counterclaim Defendant,      :

                                         :

    and                                    :

                                       :

TR INVESTORS, LLC, GLENCLOVA   :
INVESTMENT CO., NEW TR EQUITY I,  :
LLC, NEW TR EQUITY II, LLC, and    :
TRANS-RESOURCES, INC.,

                                       :

        Crossclaim Defendant       :

---

## STIPULATION AND PROPOSED ORDER OF DISMISSAL

Plaintiff/Counterclaim Defendant Dalia Genger, as Trustee of the Orly Genger 1993 Trust (the "Trustee of the Orly Trust"), Defendants/Counterclaim and Crossclaim Plaintiffs/Crossclaim Defendants TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC, New TR Equity II, LLC and Trans-Resources, Inc. (collectively, the "Trump Group") and Defendant/Counterclaim and Crossclaim Plaintiff/Crossclaim Defendant TPR Investment Associates, Inc. ("TPR"), through the undersigned counsel, pursuant to Chancery Court Rules 41(a)(1)(ii) and 41(1)(c), hereby stipulate and agree as follows:

1. In the action styled *TR Investors, LLC, et al. v. Genger*, C.A. No. 3994-CS (the "3994 Action"), the Court found that (i) the transfers in October 2004 of Trans-Resources, Inc. ("Trans-Resources) stock out of TPR were in violation of the March 2001 Stockholders Agreement among Trans-Resources, TPR, TR Investors, LLC and Glenclova Investment Co., (ii) the transfers were void and the

stock reverted to TPR, and (iii) the Trump Group had the right to buy all of the improperly transferred Trans-Resources stock from TPR. These determinations and findings were essential to the Court's determinations and findings in the 3994 Action.

2. The Trump Group, having closed on the purchase of the so-called Orly Trust Shares (representing 1102.8 shares of Trans-Resources stock) pursuant to and under the terms of the Side Letter Agreement between TPR and the Trump Group entered into in August 2008, as was the Trump Group's right under that agreement, owns, for all purposes, all right, title and interest (beneficially, of record and otherwise) to the shares of Trans-Resources purportedly transferred by TPR to the Orly Genger 1993 Trust. As a result, the Trump Group owns, for all purposes, all right, title and interest (beneficially, of record and otherwise) to all authorized and issued shares of Trans-Resources.[1]

3. The $10,314,005 plus accrued interest in proceeds from the sale referenced in paragraph 2 above currently held in escrow (the "Sale Proceeds") shall remain in escrow, pursuant to that Escrow Agreement between and among all of the parties hereto, Orly Genger, as beneficiary of the Orly Trust, and Pedowitz & Meister LLP, as escrow agent, until such time as a court in New York shall direct the disposition of the Sale Proceeds, or as the parties to such Escrow Agreement shall otherwise jointly agree, provided that the escrow agent may interplead the Sale

---

[1] This amount equals 5,676.4428 Trans-Resources shares and includes all of the shares that were determined to be owned by the Trump Group in the 3994 Action, in the action captioned *TR Investors v. Genger*, C.A. No. 6697-CS (Del. Ch.) and that are the subject of the above-captioned litigation.

Proceeds into a court in New York at any time.   Upon the so-ordering of

paragraphs 1-2 above concerning beneficial ownership, the Trump Group shall

disclaim any and all claims to the Sale Proceeds and any and all rights under the

Escrow Agreement.   Nothing herein shall constitute an adjudication of any claim

for monetary damages pending in any other Court.

4. The claims brought on behalf of the Orly Genger 1993 Trust by the Trustee of the

Orly Trust against the Trump Group are dismissed with prejudice and the claims

brought by the Trump Group against the Orly Trust and TPR are dismissed with

prejudice.

5. The claims brought by TPR for the Sale Proceeds against the Trustee of the Orly

Trust and the Trump Group have already been dismissed without prejudice.

6. Each party shall bear its own costs.

/s/ *Thomas J. Allingham*
Thomas J. Allingham II (I.D. No. 476)
Anthony W. Clark (I.D. No. 2015)
Douglas D. Herrmann (I.D. No. 4872)
Amy C. Huffman (I.D. No. 5022)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000

*Attorneys for TR Investors, LLC, Glenclova
Investment Co., New TR Equity I, LLC,
New TR Equity II, LLC, and Trans-
Resources, Inc.*

/s/ *Jeremy D. Anderson*
Jeremy D. Anderson (I.D. No. 4515)
Joseph B. Warden (I.D. No. 5401)
FISH & RICHARDSON P.C.
222 Delaware Avenue, 17th Floor
P.O. Box 1114
Wilmington, Delaware  19899

*Attorneys for Dalia Genger, as Trustee of
the Orly Genger 1993 Trust*

/s/ *Colm F. Connolly*
Colm F. Connolly (I.D. No. 3151)
Amy M. Dudash (#5741)
MORGAN, LEWIS & BOCKIUS LLP
The Nemours Building
1007 North Orange Street
Suite 501
Wilmington, Delaware 19801
(302) 574-3000

*Attorneys for TPR Investment Associates,
Inc.*

IT IS SO ORDERED this _____ day of _____, 2013.

_____
Chancellor Leo E. Strine, Jr.

This document constitutes a ruling of the court and should be treated as such.

|  |  |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Leo E Strine |
| **File & Serve Transaction ID:** | 53943155 |
| **Current Date:** | Aug 30, 2013 |
| **Case Number:** | 6906-CS |
| **Case Name:** | Genger, Dalia vs T R Investors LLC |
| **Court Authorizer:** | Strine, Leo E |

**/s/ Judge Strine, Leo E**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------x
ARIE GENGER and ORLY GENGER, in her          :
individual capacity and on behalf of
THE ORLY GENGER 1993 TRUST,                   :         Index No. 651089/2010
                                                        (Jaffe, B. JSC)
                                              :
          Plaintiffs,
                                              :

          -against-                           :

SAGI GENGER, TPR INVESTMENT                   :
ASSOCIATES, INC., DALIA GENGER, THE
SAGI GENGER 1993 TRUST, ROCHELLE              :
FANG, individually and as trustee of THE SAGI
GENGER 1993 TRUST, GLENCLOVA                  :
INVESTMENT COMPANY, TR INVESTORS,
LLC, NEW TR EQUITY I, LLC, NEW TR             :
EQUITY II, LLC, JULES TRUMP, EDDIE
TRUMP AND MARK HIRSCH,                        :

          Defendants.
-----------------------------------------------------------------x
SAGI GENGER, individually and as assignee of  :
THE SAGI GENGER 1993 TRUST, and TPR
INVESTMENT ASSOCIATES, INC.                   :

          Cross-Claimants, Counterclaimants, and  :
          Third-Party Claimants,

                                              :

          -against-                           :

                                              :
ARIE GENGER, ORLY GENGER,
GLENCLOVA INVESTMENT COMPANY,                 :
TR INVESTORS, LLC, NEW TR EQUITY I, LLC,
NEW TR EQUITY II, LLC, JULES TRUMP,           :
EDDIE TRUMP, MARK HIRSCH,
TRANS-RESOURCES, INC., WILLIAM                :
DOWD, and THE ORLY GENGER 1993 TRUST,

                                              :
          Cross-Claim, Counterclaim and/or
          Third-Party Defendants.             :
-----------------------------------------------------------------x

MEMORANDUM OF LAW IN SUPPORT
OF TRUSTEE DALIA GENGER'S MOTION
TO SUBSTITUTE FOR PLAINTIFF ORLY GENGER
ON HER DERIVATIVE CLAIMS AGAINST THE TRUMP GROUP
AND FOR AN ORDER DIRECTING
SETTLEMENT PROCEEDS TO
BE PAID INTO COURT

Judith Lisa Bachman, Esq.
254 S. Main Street, Suite 306
New City, New York 10956
845-639-3210

Table of Contents

Table of Authorities                                                                        i

Preliminary Statement                                                                 1

Statement of Facts                                                                       1

Argument

    Point I

        Substitution of Derivative Plaintiff Orly Genger
        Is Necessary Because She No Longer
        Represents the Orly Trust on the
        Trump Group Claims And She Has Suggested the Trustee
        "Pick Up the Cudgel" on those Claims                            4

    Point II

        The Proceeds of the Settlement
        Should be Paid into Court
        To Protect the Fund                                                      5

Conclusion                                                                               10

Table of Authorities

Cases

Bonham v Coe, 249 A.D. 428, 292 N.Y.S. 423 (4th Dep't 1937)                    9

Clarke v. Greenberg, 71 N.E.2d 443, 296 N.Y. 146 (1947)                        6

Conforti v. Goradia, 234 A.D.2d 237, 651 N.Y.S.2d 506  (1st Dep't 1996)        6

Gusinsky v. Bailey, 21 Misc.3d 1107(A), 873 N.Y.S.2d 234 (Table)
(Sup. Ct. N.Y. County 2008), rev'd on other grounds,
66 A.D.3d 614, 887 N.Y.S.2d 585 (1st Dep't 2008)                              6

In re Carroll's Estate, 153 Misc. 649, 275 N.Y.S. 911 (Sur. Ct. 1934)          9

In re Martin's Estate, 96 N.Y.S.2d 842 (Surr. Ct. 1950)                        9

In re Roosevelt's Estate, 131 Misc. 800, 228 N.Y.S. 323 (Sup. Ct. 1928)        9

James v. Bernhard, 106 A.D.3d 435, 965 N.Y.S.2d 56 (1st Dep't 2013)          4, 5

Lade v. Levitt, 33 A.D.2d 956, 306 N.Y.S.2d 704 (3d Dep't 1970)             6, 9

Rice v. DiNapoli, 23 Misc.3d 1128(A), 889 N.Y.S.2d 507 (Table)
(Sup. Ct. Albany County 2009)                                              6, 9

Titus v. Empire Mink Corp., 17 N.Y.S.2d 909  (Sup. Ct. 1939)                   9

Werner v. Werner, 70 Misc.2d 1051, 334 N.Y.S.2d 966 (Sup. Ct. Albany County 1982)  6


Statutes and Rules

CPLR 2701                                                                   6, 9

## Preliminary Statement

Dalia Genger, as trustee for the Orly Trust, moves to be substituted in for derivative plaintiff Orly Genger on the claims Orly brought on behalf of the Orly Trust against the Trump Group since "Orly no longer represents the Orly Trust as to the Trump Group".

As the substituted plaintiff, Dalia Genger, as trustee for the Orly Trust, respectfully requests an order pursuant to CPLR 2701 directing that the settlement fund from the Trump Group be paid into court since the Court "cannot determine whether some or all of the settlement proceeds with the Trump Group belong to Orly or the Orly Trust." Order of the Court, Filed May 13, 2014, Doc. 925 at 4 (emphasis added).

## Statement of Facts

Dalia Genger is the trustee of the Orly Genger 1993 Trust ("Orly Trust"). In this action, Orly Genger ("Orly") instituted direct and derivative claims on behalf of the Orly Trust against various defendants, including the so-called Trump Group.

Orly settled with the Trump Group defendants. Memorandum of Law of Orly Genger, Doc. 775 at 2, attached as Exhibit 1 to the Affirmation of Judith Bachman, dated August 11, 2014 ("Bachman Aff.').

"A material term of the agreement among the settling parties was the dismissal of *all* claims presently pending against one another, in whatever capacity they were brought. [If the settlement stipulation was drafted so as to] have the effect of *not* dismissing Orly Genger's derivative claims against the Trump Group, contrary to the agreement of the settling parties. Excluding such claims from the claims that are to be dismissed is not what the Trump Group bargained and paid for in the settlement . . ." Letter to the Court from Thomas J. Allingham II, dated June 28, 2010, Doc. 728 at 2, attached as Exhibit 2 to the Bachman Aff. (emphasis added).

The Trump Group later reaffirmed this aspect of the settlement:

> "[any suggestion] that the confidential settlement agreement *might* only dismiss Orly's individual claims against the Trump Group, but not resolve the Orly Trust's claims against the Trump Group and the TPR Group. (Opp'n Br. at 28) . . . is counterfactual. This Court has already held that certain of Orly's claims in this action, including the remaining claims, are derivative in nature, and may be maintained by Orly on behalf of the Orly Genger 1993 Trust. *See Genger v. Genger*, 966 N.Y.S.2d 346, 2013 WL 221485, at *6 (N.Y. Sup. Ct. Jan. 3, 2013) (TABLE) (citing *Genger v. Genger*, No. 109749/2009 (N.Y. Sup. Ct. June 28, 2010)). In settling the claims among them, the Trump Group, Trans-Resources, Orly and Arie agreed to the dismissal of all claims presently pending against one another. This agreement is memorialized in the Second Amended Stipulation of Discontinuance.

Reply Memorandum of Law of Trump Group, Filed April 17, 2014, Doc. 888 at 22-23, attached as Exhibit 3 to the Bachman Aff.

Evidencing this intent, in paragraph 8 of her settlement agreement, Orly agreed to "cooperate" and "cause" the Orly Trust to release any and all claims against the Trump Group." Order of the Court, Filed May 13, 2014, Doc. 925 at 4, attached as Exhibit 4 to the Bachman Aff.

Pursuant to that duty, Orly not only settled all her claims in this case; she also caused the Orly Trust to release claims against the Trump Group in a parallel Delaware case. Specifically, at the time of the Trump Group settlement, the Orly Trust was maintaining a proceeding in Delaware Chancery Court. Following her Trump Group settlement, Orly's counsel twice wrote to Chancellor Strine urging "the dismissal of the last remaining Genger related case in Delaware" and "acknowledg[ing] individually and in her capacity as the beneficiary of her trust that the Trump Group are the record and beneficial owners of the TRI shares which had been distributed to the Orly Trust." Exhibit M, Filed June 2, 2014, Doc. 1034, attached as Exhibit 5 to the Bachman Aff. Satisfied that Orly no longer wanted the Orly Trust to pursue its claims, the

2

Chancery Court dismissed the Orly Trust's claims in that case with prejudice. Exhibit N, Filed June 2, 2014, Doc. 1034, attached as Exhibit 6 to the Bachman Aff.

Notwithstanding the provisions of her own Trump Group settlement agreement and her representations to the Delaware Chancery Court, Orly told <u>this Court</u> that her Trump Group settlement "only dismisses Orly's individual claims against the Trump Group, but does not resolve or dismiss any claims of the Orly Trust against the Trump Group". Memorandum of Law of Orly Genger, Doc. 775 at 2, attached as Exhibit 1 to the Bachman Aff. Moreover, Orly stated that she "no longer represents the Orly Trust as to the Trump Group (<u>while allowing Dalia Genger to pick up the cudgel if she so chooses</u>) . . ." Id. (emphasis added).

In light of these conflicting statements, this Court "invite[d] the parties to the settlement agreement to set forth the claims given up by Orly in her individual and beneficial capacities, and to explain why any derivative claims advanced in the complaint are not released in the agreement." Order of the Court, Filed May 13, 2014, Doc. 925 at 4, attached as Exhibit 4 to the Bachman Aff.

Conveniently for them, none of the parties to the settlement agreement complied with the Court's request to "set forth the claims given up by Orly in her individual and beneficial capacities, and to explain why any derivative claims advanced in the complaint are not released in the agreement." Id. In fact, Orly's counsel explicitly refused to comply with that request. Email Correspondence dated May 26, 2014, attached as Exhibit 7 to the Bachman Aff.

Accordingly, this Court held that "[u]nless and until the issue of [the status of the] derivative claims is resolved, I cannot determine whether <u>some or all</u> of the settlement proceeds with the Trump Group belong to <u>Orly or the Orly Trust</u> . . ." Order of the Court, Filed May 13, 2014, Doc. 925 at 4 (emphasis added), attached as Exhibit 4 to the Bachman Aff.