1                    DALIA GENGER

2         A.     I do.

3         Q.     It's a Toshiba?

4         A.     Right.

5         Q.     Okay, did you ever look through

6    that in response to the document requests in

7    this case?

8         A.     No, I don't look.

9         Q.     Do you recall anyone looking

10   through your computer for documents in this

11   case?

12        A.     No.

13        Q.     Do you recall Mr. Meister, anyone

14   from his law firm?

15        A.     I don't recall such a thing.

16        Q.     Do you remember taking the computer

17   and providing it to Mr. Meister or someone from

18   his law firm in order to look to see if there

19   was a response to documentation?

20        A.     You mean did I schlep my computer

21   to his office?

22        Q.     Do you remember schlepping your

23   computer to his office?

24        A.     No.

25        Q.     Do you remember anyone from

1                    DALIA GENGER
2    Mr. Meister schlepping themselves to your
3    computer?
4         A.    No, I don't remember such a thing.
5         Q.    Well, Ms. Genger, why is it in
6    response to interrogatories which you signed
7    under oath and for which you provided the
8    information, why is it that in response to
9    interrogatory number 30 you did not --
10        A.    Thirty?
11        Q.    -- identify the Assignment and
12   Assumption Agreement?
13        A.    Which document?
14        Q.    Interrogatory 30 of Exhibit 14 --
15   excuse me, Exhibit 3.  If you look at
16   interrogatory 30, which is part of Dalia
17   Exhibit 3.
18        A.    Yeah, so what you're talking, 30?
19        Q.    In interrogatory 30 you identified
20   the December 17, 2007 sale.  You did not
21   identify the cancellation of that sale through
22   the Assignment and Assumption Agreement?
23             MR. MEISTER:  Excuse me, I object
24        to the form of the question.
25             MR. GRIVER:  You have your

```
1                      DALIA GENGER
2              MR. MEISTER:  Could you --
3         Q.    As we sit here today, Ms. Genger --
4         A.    Yeah.
5         Q.    -- do you consider this Assignment
6    and Assumption Agreement to treat your son and
7    your daughter equally?
8              MR. MEISTER:  Same objections.
9         A.    I don't know.  I really do not
10   know.
11        Q.    All right.  How many shares of TPR
12   did your son get from this Assignment and
13   Assumption Agreement?
14        A.    Whatever it says here.
15        Q.    Okay.  At that time did you, at
16   that time, okay, if you can look at D --
17             MR. GRIVER:  What was her last
18        answer?
19             (The requested portion of the
20        record was read back by the reporter.)
21        Q.    As trustee of the Orly Genger
22   Trust, did you let Orly know about the
23   Assignment and Assumption Agreement?
24        A.    I don't remember.
25        Q.    As trustee of the Orly Genger Trust
```

                        DALIA GENGER
1
2    did you let Orly's attorneys know about the
3    Assignment and Assumption Agreement when you --
4    on or about the time that you signed it?
5            A.    I really don't remember.
6            Q.    Okay.  At any time between August 1
7    of 2008 and the time that the Surrogate Court
8    rendered its decision, did you let either Orly
9    Genger or Orly Genger's attorneys know about
10   the Assignment and Assumption Agreement?
11           A.    I do not recall that.
12           Q.    Okay.  In part of any proceeding in
13   front of the Surrogate Court involving yourself
14   and Orly Genger and your fitness to act as
15   trustee of the Orly Genger Trust, have you let
16   the Surrogate Court know about this Assignment
17   and Assumption Agreement?
18                   MR. MEISTER:  Objection, first on
19              the grounds of form, and secondly, on the
20              grounds this has nothing to do with the
21              issues in this case, so it's irrelevant.
22              The issues in this case --
23                   MR. GRIVER:  Do we have to call the
24              court again?  You have your objection.
25                   Could you repeat the question for

```
 1                    DALIA GENGER
 2            the witness?
 3                 MR. MEISTER:  Aren't we being
 4            macho.
 5                 (The requested portion of the
 6            record was read back by the reporter.)
 7            A.    And I answer that I don't remember.
 8            Q.    In assessing your fitness to be
 9     trustee of the Orly Genger Trust, do you
10     believe that this Assignment and Assumption
11     Agreement is something that the Surrogate Court
12     should know about?
13                 MR. MEISTER:  Objection, relevance.
14            Objection, calls for speculation.
15            Objection, calls for a legal conclusion.
16            Q.    I'm asking for your opinion as
17     trustee of the Orly Genger Trust.  Do you think
18     this is something the Surrogate Court should
19     know about?
20            A.    I'm not a lawyer.  I don't know if
21     they should know.  I don't know.
22            Q.    Okay, have you provided this
23     document to any of your attorneys for their
24     legal opinion to be provided to you?
25            A.    I --
```

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

— — — — — — — — — — — — — — — — — — — — — — — — — — — — — —X

DALIA GENGER,

                      Index No. 302436/02

                    Plaintiff,

          -against-                **STIPULATION**

ARIE GENGER,

                    Defendant.

— — — — — — — — — — — — — — — — — — — — — — — — — — — — — —X

Stipulation of Settlement ("Stipulation" or "Agreement") made as of

October 26, 2004, by and between Dalia Genger (the "Wife"), residing at 210 East 65th

Street, Apt. 11J, New York, NY 10021, (Soc. Sec. No. 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), and Arie Genger

(the "Husband), residing at 2600 Island Blvd., Penthouse One, Williams Island,

Aventura, FL 33160, (Soc. Sec. No. 114-42-294).

                  W I T N E S S E T H:

WHEREAS, the parties were duly married to each other on July 23, 1967

in a religious ceremony held in Israel; and

WHEREAS, the children of the marriage, Sagi Genger and Orly Genger,

are all emancipated and there are no expected additional children of the marriage; and

WHEREAS, the Wife has commenced the above-captioned action against

the Husband seeking a divorce (the "Divorce Action") and the parties desire to resolve

and settle all issues in that action except the entitlement of either party to a divorce; and

WHEREAS, except as otherwise provided or reflected herein, it is the

intention of the parties that upon completion of implementation of this Agreement, each

party will have received distributions equal to approximately 50% of the aggregate value of the Husband and the Wife's net marital assets.

NOW THEREFORE, it is agreed as follows:

## ARTICLE I

## ARTICLE HEADINGS, RECITALS AND DRAFTING

1.    The headings at the beginning of each Article of this Agreement are for reference purposes only and shall not in any manner, constitute terms or conditions of this Agreement; nor shall they be applicable to any interpretation of the intention or meaning of the parties or of any part of this Agreement.

2.    The "Whereas" clauses at the beginning of this Agreement are an integral part of this Agreement and shall be considered in any interpretation of the intention or meaning of the parties or of any part of this Agreement.

3.    This Agreement is entered into after negotiation and comments by each party and by counsel for both parties.  The fact that the following have participated in the  drafting shall not be a consideration in the interpretation of this Agreement: Blank Rome LLP, David Parnes, Esq., Sonnenschein Nath & Rosenthal LLP, Carter Ledyard & Milburn LLP, Goldman & Greenbaum, P.C., and Philip Greenhaus, Esq.

2

## ARTICLE II

## DISTRIBUTION OF ASSETS

1.  The parties' marital property shall be divided and disposed of as is set

forth in this Article and Articles III and IV, with the exception of the parties' debts and

other obligations to third parties (provisions for which are set forth in Article V).

Schedule II(1), annexed hereto and made part hereof, sets forth an itemized list of all of

the marital property of the Husband and the Wife, as of January 31, 2002 and as of the

date of this Agreement with the values as of the dates indicated on such Schedule. The

Husband and the Wife (to her knowledge) each represent to the other that such Schedule

completely and correctly sets forth all such marital property as of such dates and to the

best of each of his/her knowledge with the values of such property as of the dates

indicated in such Schedule; the Husband and the Wife represent to the other party that

he/she has no knowledge of any marital property not set forth on such Schedule.

2.  Distributions Upon Execution of this Agreement.

(a)      *Cash and Other Distributions*.  The Husband and the Wife shall

each receive concurrently with the execution of this Agreement certain distributions (for

each party, the "Immediate Payment(s)"). The Immediate Payments will be made from

cash accounts maintained in the Husband and Wife's joint or individual names,

investments made jointly or individually, as well as from an escrow account maintained

by Blank Rome LLP for the parties' benefit, with approximately $2,504,537.00 dollars

("BR Escrow"), as of the date of this Agreement, all as more fully detailed, and the

sources of which specifically identified, in Schedule II(2)(a) annexed hereto and made

1270083.3
1745188RV-2

part hereof. The Husband's and the Wife's Immediate Payments, upon execution of this Agreement, shall be as follows:

(i)   Husband:  The Husband shall receive (A) the sole ownership of all life insurance policies (set forth on Schedule II(2)(a)(i), annexed hereto and made part hereof) which as of January 15, 2004 had an aggregate cash surrender value of $2,447,782; provided, however, that (w) the life insurance policy (Equitable Single Life Split Dollar #150224782) in the face amount of $1,950,000 and with a cash surrender value to the Husband of $147,833 and with a total death benefit of $2,097,833 shall provide from the date hereof that the net death benefit payable to the Wife shall be at least $2,000,000, (x) if for any reason the total net death benefit payable to the Wife shall be less than $2,000,000 during the first year of this Agreement, the Husband shall immediately notify the Wife and deposit $50,000 in escrow with David A. Parnes, Esq. to be paid to the Wife upon the Husband's death prior to the first anniversary of this Agreement, (y) the amount of the net death benefit payable to the Wife may be reduced at every anniversary hereof by $200,000, and (z) the Husband has directly authorized the insurance broker to provide the Wife all information regarding such policy and hereby agrees not to revoke such authorization prior to the tenth anniversary hereof;  (B) all of the Husband and Wife's investment in Conservation Securities, which has an estimated value

4

of $2,128,000; (C) a cash distribution from several cash accounts,
including the BR Escrow, of $1,345,000; and (D) 79,045 shares of
common stock of Lumenis Ltd. ("Lumenis") held in certain
retirement accounts.

(ii)    Wife: The Wife shall receive (A) sole ownership of the
Husband's two hundred and fifty (250) shares of common stock of
TPR Investment Associates Inc. ("TPR"), free and clear of any liens
or other encumbrances initially valued as set forth on Schedule II(1),
annexed hereto and made part hereof, which represents fifty one
percent (51%) of the issued and outstanding shares of common stock
of TPR (exclusive of the 1.96% ownership of TPR which the Wife
owns indirectly through her general partnership interest in D&K
defined below), together with a duly executed stock power
transferring said shares to the Wife and all documents in the
Husband's possession, custody or control relating to TPR, including
the adjusted tax basis thereof, (accordingly, the marital asset consists
of 52.96% of the outstanding shares of common stock of TPR (the
"Marital TPR Percentage") and (B) a cash distribution from several
cash accounts, including the BR Escrow, of $1,345,000.


(b) *Marketable Securities.* All securities in the Smith Barney account
referenced as Item F. 1 on Schedule II(1) will, to the extent possible, be divided between

5

the Husband and the Wife in kind, so that the Husband and the Wife shall each have sole ownership of fifty percent (50%) of such securities.

(c) *Retirement Accounts.* With the exception of 79,045 shares of common stock of Lumenis allocated to the Husband from various IRA accounts per paragraph (a) above, all IRA accounts, pension plans, retirement accounts and the like (the "Pension Accounts"), whether in the name of the Husband or in the name of the Wife, shall be divided equally as follows: each party shall cause fifty percent (50%) of the amount accrued and existing in each Pension Account of such party, to be transferred to the other party and shall use his reasonable best efforts to cause such transfer to be made to a Pension Account of the other party, as more fully described in Article IV of this Agreement.

(d) *Disposition of TRI Stock.* See Article II(9)(b) below.

3.    Residual Cash.  To the extent not distributed pursuant to Section 2 of this Article II, any cash available at the time of execution of this Agreement, and at any time thereafter until distribution thereof ("Residual Cash"), shall be placed in escrow ("RC Escrow Account") with David A. Parnes, Esq., ("RC Escrow Agent") or with any other individual or entity designated for such purpose by Sagi Genger (and if Sagi Genger does not promptly make such designation, Orly Genger) pursuant to an Escrow Agreement substantially in the form of Exhibit II(3), annexed hereto.

4.    Non-Liquid Assets.

(a)    All of the parties' other marital assets which are not distributed pursuant to Section 2 of this Article II, including, but not limited to, personal and real property, and securities and investment accounts that cannot be divided in kind (the "Non

6

Liquid Assets"), shall be sold as promptly as practicable on terms determined by agreement of the parties; provided, however, that if the parties cannot agree on such terms within six (6) months of the date of execution of this Agreement (the "Initial Period"), the Husband and the Wife agree that thereafter authority and control over any then unsold Non Liquid Assets as to which the terms of sale have not been agreed on by the parties shall be vested in Sagi Genger pursuant to a power of attorney substantially in the form of Exhibit II(4)(a) (the "P/A"). Sagi Genger shall have full and complete authority to sell any and all Non-Liquid Assets at such prices and upon such terms and to distribute the proceeds of such sales as he, in his sole discretion, sees fit, subject however to paragraph (b) of this Section 4 of this Article II below, the terms of the P/A and his fiduciary duties to effectuate the intent of the parties in entering into this Agreement. Concurrently with the execution of this Agreement, each of the parties will execute the P/A and deliver it to Sagi Genger. After the Initial Period and during such time as there exist any unsold Non-Liquid Assets as to which the parties have not agreed on sale terms during the Initial Period, each of the parties will promptly execute and deliver to Sagi Genger any and all additional documents requested by Sagi Genger to effectuate the provisions of this paragraph (a) of this Section 4. At any time, the Husband and the Wife may mutually revoke the authority and control vested in Sagi Genger over such Non-Liquid Assets by providing him with written notice signed by the Husband and the Wife to that effect ("Revocation Notice"), in which case Sagi Genger will immediately surrender the P/A, the other documents and the Non Liquid Assets, to a party designated in the written notice by the Husband and the Wife in his stead (the "Successor Attorney in Fact"). If no Successor Attorney in Fact is designated in the Revocation Notice, David

7.

1270083.3
1745148NV-2

A. Pames, Esq. is designated as Successor Attorney in Fact. If Mr. Pames is unwilling to act in such capacity or the parties revoke the authority and control vested in him by providing him with written notice signed by both of them to that effect and fail to designate a Successor Attorney in Fact in such notice, Eric Gribetz is designated as Successor Attorney in Fact. If Mr. Gribetz is unwilling to act in such capacity or the parties revoke the authority and control vested in him by providing him with written notice signed by both of them to that effect and fail to designate a Successor Attorney in Fact in such notice, Orly Genger is designated as Successor Attorney in Fact. If Sagi Genger is unable to act and the Husband and Wife do not promptly send the Revocation Notice, then Elana Genger (the spouse of Sagi Genger) together with either the Husband or the Wife may send the Revocation Notice to Sagi Genger, and in such event David A. Pames, Esq. shall be designated as Successor Attorney-in-Fact.

(b)      The net proceeds of the sales of the Non-Liquid Assets, whether effectuated within the Initial Period or thereafter, shall be distributed as follows: (i) such amount as would be required to cause the balance in the RC Escrow Amount to equal Twenty Five Thousand dollars ($25,000) ("Basic Escrow Amount") to the RC Escrow Account; and (ii) all amounts in excess of the Basic Escrow Amount to TPR in satisfaction of the parties' indebtedness to TPR as set forth in Article V hereof. Upon payment in full of such indebtedness to TPR, subject to the provisions of this Article II, Sagi Genger (or a Successor Attorney in Fact) shall, subject to his fiduciary duties to effectuate the intent of the parties in entering into this Agreement, have the complete authority, in his sole discretion, to determine the equitable distribution of the remaining net proceeds of the sales of the Non-Liquid Assets, whether to the Husband, the Wife or

1270083.3
I74S188BW.2

to the RC Escrow Account. The Husband and the Wife shall each be obligated to pay any Federal, state or local taxes due by them upon the sale of the Non-Liquid Assets.

5.   <u>First Anniversary Distributions</u>. Within twenty (20) days of the first anniversary of this Agreement ("First Anniversary"), Sagi Genger (or a Successor Attorney in Fact) will provide the Husband and the Wife with a reasonably detailed written summary of the proceeds of the sale of the assets, and the distributions received by each party or deposited into the RC Escrow Account and any related expenses from and including the date of execution of this Agreement through the First Anniversary. The parties agree that, should there be an imbalance in the distributions received by either party ("Imbalance") in favor of either the Husband or the Wife (the "Overpaid Party") Sagi Genger will cause the RC Escrow Agent to pay to the other party ("Underpaid Party") promptly a sum in cash equal to the Imbalance. In determining any Imbalance with regard to the assets of TPR, the parties will adjust the value attributed to the assets of TPR, as set forth on Schedule III(1) annexed hereto and made a part hereof, based on the net proceeds from the sales of such assets from the execution of this Agreement through the First Anniversary.

6.   <u>Second Anniversary Distributions</u>.

(a)     Within twenty (20) days of the second anniversary of this Agreement ("Second Anniversary"), Sagi Genger (or a Successor Attorney in Fact) will provide the Husband and the Wife with a reasonably detailed written cumulative summary of the proceeds of sale or the Assets, and the distributions received by each party from and including the date of this Agreement through the Second Anniversary or deposited in the RC Escrow Account and any related expenses. Should an Imbalance

9

1270083.3
I74S1B8BV-2

exist, at the election of Sagi Genger (or a Successor Attorney in Fact), either (i) the Overpaid Party shall promptly pay the Underpaid Party a portion of such Imbalance in cash, as instructed by Sagi Genger and/or (ii) Sagi Genger shall instruct the RC Escrow Agent to distribute the balance of the RC Escrow Account, in each case, to redress the Imbalance as of the Second Anniversary. With regard to TPR, the parties will adjust the value attributed to the assets of TPR, as set forth on Schedule II(1) annexed hereto and made a part hereof, based on the net proceeds from the sales of such assets from the execution of this Agreement through the Second Anniversary.

(b)     Any Non-Liquid Asset that has not been sold by the Second Anniversary shall be valued and distributed as the Husband and the Wife mutually agree. If there are any assets as to which such agreement has not been reached (the "Remaining Assets") by the 45th day after the Second Anniversary, the Husband and the Wife agree to purchase from, or to sell to, the other party the Remaining Assets, in accordance with the following procedure:

(i) a coin will be tossed in the air, by Orly Genger or in her absence by a person mutually acceptable to the Husband and the Wife;

(ii) the Husband will be designated as "Head" (i.e. – the side of the coin where the profile of a person is impressed) and the Wife will be designated as "Tail" (i.e. – the other side of the coin);

(iii) if the Head side of the coin shall lay face up, the Husband will become the Evaluating Party for the first Remaining Asset selected by the person tossing the coin, and if the Tail side of the coin shall lay face up, the Wife shall become the

10

Evaluating Party for the first Remaining Asset selected by the person tossing the coin;

(iv) the Evaluating Party shall value and indicate in writing by five business days following the coin toss to the other party, the sum at which he or she values such Remaining Asset ("Evaluated RA Value");

(v) by the fifth business day following receipt of the Evaluated RA Value from the Evaluating Party ("Determination Date"), the other party shall notify the Evaluating Party in writing whether he or she intends to acquire from, or to sell to, the Evaluating Party his or her fifty percent (50%) interest in such Remaining Asset, in which case the other party shall either remit to the Evaluating Party fifty percent (50%) of the Evaluated RA Value or receive from the Evaluating Party fifty percent (50%) of the Evaluated RA Value in cash, within thirty (30) business days following the Determination Date, against receipt of such Remaining Asset. If the Evaluating Party does not deliver to the other party the Evaluated RA Value within 30 days of the Determination Date, the other party shall be entitled to take the Remaining Asset in question free of any payment or obligation.

In the event that there is more than one Remaining Asset, the party who was not the Evaluating Party for the prior Remaining Asset, shall be entitled to select the next Remaining Asset to be evaluated and shall be the Evaluating Party for such Remaining Asset and the procedures in paragraphs (iv) and (v) above shall be followed. The parties shall thereafter alternate selection of the Remaining Asset for evaluation and acting as Evaluating Party as provided above, until all Remaining Assets have been evaluated and disposed of, as provided above.

11

7.      Notwithstanding anything to the contrary contained herein, with a view to avoid the need for direct payments between the Husband and the Wife, when distributing proceeds from the sales of Non-Liquid Assets from time to time, Sagi Genger (or a Successor Attorney in Fact) will take into consideration anticipated changes caused by the sales of assets of TPR.

8.      (a)      Sagi Genger shall be entitled, in his sole discretion and subject to his fiduciary duty to implement the intent of the parties, to incur reasonable expenses necessary for the maintenance of the marital property (with the exception of the apartment (the "Apartment") at 2600 Island Boulevard, Penthouse One, Williams Island, Aventura, Florida 33160), where all maintenance and other ordinary monthly expenses (including, without limitation, taxes and insurance) shall be borne solely by the Husband, in accordance with paragraph (b) below), the expenses of selling the Non-Liquid Assets and other related activities, and to pay such expenses from the RC Escrow Account.

(b)      Concurrently with the execution of this Agreement, the Wife hereby acknowledges the Husband's sole occupation and use of the Apartment until such time as the apartment is sold. The Husband will assume and promptly pay all maintenance and other ordinary monthly expenses incurred in connection with the Apartment until the time of sale of Apartment. The Husband and the Wife agree to cooperate in the sale of the Apartment during the Initial Period and to cooperate and not to interfere in any way with the sale of the Apartment by Sagi Genger (or a Successor Attorney in Fact) as part of the sale of the Non-Liquid Assets, after the Initial Period.

9.      (a) TPR owns three thousand (3,000) shares of common stock in Trans - Resources, Inc. ("TRI Stock"). The Husband represents and warrants to the Wife that the

12

TRI Stock represents 52.85% of the issued and outstanding shares of common stock of TRI, and that the balance of 47.15% of the common stock of TRI is owned beneficially and of record, pursuant to an arm's length transaction with TRI, by (i) Glencova Investment Co., and (ii) TR Investors LLC, subject to a Shareholders Agreement, dated as of March 30, 2001, a complete and correct copy of which has been delivered to the Wife (the "TRI Shareholders Agreement"). The Husband further represents and warrants to Wife that he has no interest in Glencova Investment Co. or in TR Investors LLC and except for the options provided to Bank Hapoalim B.M. (a copy of the agreement granting an option to Bank Hapoalim has been delivered to the Wife), there exist no other direct or indirect ownership interests in TRI, whether by way of issuance of additional shares of any other class of stock, share options, warrants, convertible debt or the like and there is no agreement or understanding among the parties to the TRI Shareholders Agreement except as provided therein. Except for the Consent of TPR, the Husband further represents and warrants that no consent, approval or similar action of any person is required in connection with the transfer of TRI Stock as contemplated hereby and that such transfer will not conflict with any agreement to which the Husband is party or by which he is bound. The Husband further represents and warrants to the Wife that TRI equity may reasonably be considered to be a distressed private security. Concurrently with the execution of this Agreement, the TRI Stock shall be distributed as follows:

(i)    The Husband will receive 794.40 shares of the TRI Stock representing 13.99468% of the common stock of TRI;

(ii)    Each of Sagi Genger and Orly Genger, will receive in trust 1,102.80 shares of the TRI Stock representing 19.42766% of the common stock of

13

TRI for each of Sagi and Orly and such trusts will simultaneously therewith execute and deliver irrevocable proxies to Husband for all of the TRI stock owned by the trusts; and

(c)    Concurrently with the execution of this Agreement, each of the Husband and Wife will execute and deliver or cause TPR to execute and deliver (i) all documents reasonably necessary to effect the transfers required by subparagraph (a) of this Section 9, and (ii) duly executed stock powers to transfer the shares as required by subparagraph (a) of this Section 9.

(d)    The parties will cause TRI to provide the Husband, Sagi Genger and Orly Genger with all documents in TRI's possession, custody and control relating to the adjusted tax basis of the TRI Stock.

(e)    Following the foregoing transfers of the TRI Stock, the Wife will have no ownership interest in TRI.

10.    Lumenis Stock Options. The Husband is the owner of 1,400,000 stock options to purchase shares of Lumenis common stock ("Options") as set forth on Schedule II(10) annexed hereto and made part hereof, of which (i) 100,000 Options were granted to the Husband after the Commencement Date, (ii) prior to the Commencement Date the Husband transferred the economic interest in 250,000 Options to a third party (the options specified in (i) and (ii) are not marital property, and (iii) 1,050,000 options which are marital property (hereinafter referred to "Marital Options"); such Schedule II(10) will include the exercise prices of the Options.

(a)    The parties agree that the Wife shall be the beneficial owner of and receive the economic benefits of 525,000 Options as set forth on Schedule 11(10),

representing 50% of Marital Options hereinafter referred to as the "Wife's Options"); the remaining 525,000 Marital Options are referred to herein as the "Husband's Options." Pursuant to the Options' governing documents, the Husband is not allowed to transfer any of the Options. Accordingly, the Wife can not receive an actual transfer or assignment of the Wife's Options and the Wife has no claim directly or indirectly against Lumenis with respect to the Wife's Options.

(b)    The Husband agrees to notify Lumenis of the exercise of Wife's Options, at her written direction, as promptly as practicable and no later then the fifth (5th) business day following the date on which the Husband shall receive "actual notice" (as defined below) in writing from the Wife requesting the exercise, provided that the Wife simultaneously with such notice remits payment of the appropriate exercise price by wire transfer to the Husband or, if directed by the Husband, directly to Lumenis, with respect to those of the Wife's Options that she wishes to exercise, and, further provided that there are no legal impediments to such exercise, including, without limitation, any restrictions as set forth in the applicable agreements covering such Options, any "blackout periods" imposed by Lumenis on its officers and directors, or restrictions under the Federal Securities Laws or the rules and regulations of any applicable stock exchange. "Actual notice" shall mean the Husband's actual receipt of the written notice, which shall include the number of Wife's Options of each Class of Options she directs him to exercise, and, if required, appropriate payment from the Wife. In addition, the Wife also agrees to give written notice of any exercise of the Wife's Options to the person then designated to receive copies of notices to the Husband (see Article XX) concurrently with any notice to the Husband. The Husband shall not be liable with regard to any diminution in value or

15

divestiture of option rights between the Wife's sending of notice and either (x) the Husband's receipt of the same and (y) the Husband's exercise of the Wife's Options on the Wife's behalf, provided that the Husband provides actual notice to Lumenis as promptly as practicable and no later than the 3rd business day following his receipt of notice from the Wife  Upon any exercise of the Wife's Options, the Husband will deliver or cause to be delivered to the Wife the shares of Lumenis stock received upon such exercise as promptly as practicable.

(c)        The parties recognize the possibility that the Husband's interest in the Options may terminate for reasons specified in applicable agreements or otherwise, and the Husband may thereby lose his rights to the Options.  As long as the Wife's Options are outstanding, the Husband will use his best efforts to maintain his rights to such Options.  If there is nonetheless a forfeiture or loss of all or any portion of the Options while Wife's Options remain outstanding, the Husband shall give the Wife notice of such forfeiture or loss and the Husband and the Wife shall each sustain a fifty percent (50%) share in the loss of his and her outstanding share in the Marital Options.

11.    (a)        It is the intention and agreement of the parties that, pursuant to the provisions of Section 1041 of the Internal Revenue Code, the transfers and payments between them pursuant to this Article are not taxable transactions to either party. Moreover it is the intention and agreement of the parties that such transfers and payments between them are not includible in the income of either the Wife or Husband pursuant to Sections 61 or 71(a) of the Code, and shall not be deductible by either the Wife or Husband pursuant to Section 215 of the Code.  Both parties further agree that they shall not henceforth assert a position (in filing future tax returns) inconsistent with this

.16

1270083.3
1745188RV-2

Agreement or with this undertaking, and each will be liable to the other for damages, including taxes, penalties and interest, as well as reasonable attorneys' and accountants' and other professional fees, expenses and court costs, occasioned by breach of this covenant.

(b)     In the event that the tax assumptions set forth in paragraph (a) of this paragraph should ever prove to be incorrect, the relevant provisions of this Agreement will be modified by the parties so as to approximate as closely as possible the after-tax effects to the parties anticipated by paragraph (a). If the parties have not so agreed within 30 days, one or both parties shall give notice of the failure to agree to Sagi Genger (or in his absence David A. Parnes, Esq.) who shall promptly appoint tax counsel in his discretion, subject to his fiduciary obligations to the parties, and such tax counsel shall have full authority to resolve the matter.

## ARTICLE III

## VALUATION OF TPR ASSETS FOLLOWING EXECUTION OF THIS AGREEMENT

1. TPR has agreed, by resolutions of its Board of Directors (substantially in the form attached hereto as Exhibit III(1)), to be bound by the provisions of this Article III and the other provisions that contemplate action by it, and will cooperate with the Husband and the Wife in order to fulfill the provisions hereof.

**A FUNDAMENTAL PART OF THIS AGREEMENT IS THE HUSBAND'S RELINQUISHMENT OF HIS OWNERSHIP OF SHARES OF COMMON STOCK IN TPR, AND THE TRANSFER OF SUCH OWNERSHIP TO THE WIFE. THE PARTIES ARE UNABLE TO DETERMINE THE PRECISE VALUE OF TPR UPON EXECUTION OF THIS AGREEMENT AND ARE RELYING AT THE TIME OF EXECUTION OF THIS AGREEMENT ON TPR'S BOOK VALUE, AS SET FORTH ON SCHEDULE III(1).**

17

2. The parties agree that the assets of TPR as listed on Schedule III(1) are divided into three (3) categories;

   (i) Cash and marketable securities, designated as (Category A) on Schedule III(1).

   (ii) Assets valued designated as (Category B) on Schedule III(1).

   (iii) Assets as to which neither party accepts the valuation, designated as (Category C) on Schedule III(1).

The parties accept the value of the assets in Category A as binding upon them (subject to updating due to the passage of time).

   (a)   The Husband represents to the Wife that TPR's total liabilities are no more than $10,000.

   (b)   TPR, by its Chief Executive Officer or Vice President, within one hundred twenty (120) days of the date of execution of this Agreement must notify the Husband, in writing, whether it accepts the value of the assets in Category B. Should TPR either (x) fail to notify its acceptance in writing or (y) express disagreement with the valuations of the assets in Category B, TPR will be obligated to sell the assets in its discretion, but subject to its duties to its shareholders, and the sales price will be definitive and binding upon the parties as the value of the assets in Category B.

   (c)   All of the assets in Category C will either be (x) sold or (y) appraised, by an appraiser selected by Sagi Genger or David A. Parnes, Esq., as determined by TPR in its discretion, but subject to its duties to its shareholders. The sale or appraised value of each asset will be definitive and binding upon the parties as the value of the assets in Category C.

18

(d)    In the event that by the Second Anniversary there remains disagreement as to the valuation of assets in Category B, or if any assets in Category B or Category C have not been sold (the "Non Sold Assets"), the Husband and TPR agree to purchase or to sell, from or to, the other party such Non Sold Assets, in accordance with the following procedure:

(i) a coin will be tossed in the air, by Orly Genger or in her absence by a person mutually acceptable to the Husband and TPR;

(ii) the Husband will be designated as "Head" (i.e. – the side of the coin where the profile of a person is impressed) and TPR will be designated as "Tail" (i.e. – the other side of the coin);

(iii) if the Head side of the coin shall lay face up, the Husband will become the Evaluating Party for the first Non Sold Asset selected by the person tossing the coin, and if the Tail side of the coin shall lay face up, TPR shall become the Evaluating Party for the first Non Sold Asset selected by the person tossing the coin;

(iv) the Evaluating Party shall value and indicate in writing by the fifth business day following the coin toss to the other party, the sum at which it values such Non Sold Asset ("Evaluated NSA Value");

(v) by the fifth business day, following receipt of the Evaluated NSA Value from the Evaluating Party ("TPR Determination Date"), the other party shall notify the Evaluating Party in writing whether it intends to acquire from, or to sell to, the Evaluating Party its part of such Non Sold Asset, in which case the other party shall either remit to the Evaluating Party its Obligated

19

Share (as defined below) of the Evaluated NSA Value or receive from the Evaluating Party its Obligated Share of the Evaluated NSA Value, within 30 business days following the TPR Determination Date against receipt of such Non Sold Asset.  If the Evaluating Party does not deliver to the other party the Evaluated NSA Value, within 30 days of the TPR Determination Date, the other party shall be entitled to take the Non Sold Asset in question free of any payment or obligation.

In the event that there is more than one Non Sold Asset, the party who was not the Evaluation Party for the prior Non Sold Asset shall be entitled to select the next Non Sold Asset to be evaluated and shall be the Evaluating Party for such Non Sold Asset; and the procedures in paragraphs (iv) and (v) above shall be followed.  The parties shall thereafter alternate selection of the Non Sold Asset for evaluation and acting as Evaluating Party as provided above, until all Non Sold Assets have been evaluated. "Obligated Share" shall mean (a) for TPR, 26.48% and (b) for the Husband, 73.52%.

## ARTICLE IV

## PENSION RIGHTS

1.      The parties shall divide all of their IRA's and other retirement vehicles as provided in this Article and Article II.  All such IRA's and retirement vehicles are included in Schedule II(1).

2. The Husband's IRA's and retirement vehicles included in Schedule II(1) contain 79,045 shares of Lumenis which were purchased after the commencement of the parties' divorce action; such shares shall be the Husband's separate property.  The

1270083.3
1745188RV-2

remainder of the assets contained in such IRA's, as of the date of execution of this

Agreement shall be divided into two equal portions and one of those portions will be

transferred by direct transfer into an IRA owned by the Wife as promptly as practicable

after the entry of the Judgment of Divorce.

3.    One half (1/2) of any other IRA's owned by either party, as of the

date of execution of this Agreement will be transferred to the other party by direct

transfer to an IRA owned by the other party as promptly as practicable after the entry of

the Judgment of Divorce.

4.    One-half (1/2) of the assets (other than Lumenis shares referred to

in paragraph IV(2) above) in each of the parties' other pension plans and retirement plans

(including but not limited to any plan qualified under § 401 of the Internal Revenue Code

to which Section 401(a)(11)(B) of the Code or Section 205(b) (1) of ERISA shall apply)

(hereafter a "Qualified Plan") shall be transferred to the other party pursuant to a

Qualified Domestic Relations Order ("QDRO") as promptly as practicable and in any

event within ninety (90) days after service by one party or the other of notice of entry of a

judgment of divorce between the parties. With respect to the portion of the electing

party's Qualified Plans as described in this paragraph 4 which the electing party is to

retain, the other party consents to the electing party's current and future designation of

beneficiaries under any of such Qualified Plans other than the consenting party (and to

any and all revocations and/or modifications of such designations), including any of such

plans referred to in Section 401(a)(11)(B)(iii) of the Code or Section 205(b)(1)(C) of

ERISA.

21

5.     Except as is specifically provided to the contrary in the prior

provisions of this Article and Article II, each party forever waives any interest that he or

she may have to any IRA, Keogh plan, pension plan, profit sharing plan, 401(k) plan,

individual retirement plan, employee stock ownership plan or stock bonuses or other

employee benefit or other retirement plan of any description whatsoever (including,

without limitation, any life insurance benefits contained therein), in the future held in the

other's name or associated with any employer of the other or with any entity owned, now

or previously, by the other.

6.     Each party has simultaneously executed and delivered to the other

(and in the future will, without further consideration or remuneration, promptly execute

and deliver to the other) all documents that are presented to him or her and that are

reasonably required in order to effectuate the intentions and provisions of this Article.

## ARTICLE V

## RESPONSIBILITY FOR DEBTS

1.     Except for certain obligations (provisions for which are set forth in

paragraph 3 of this Article), the Wife represents that she has not heretofore incurred or

contracted, or caused to be incurred or contracted, for herself, any debt, charge,

obligations or liability whatsoever (contingent or otherwise) for which the Husband or his

estate is or may become liable.  The Wife shall not hereafter incur or contract or cause to

be incurred or contracted any debt, charge, obligation or liability whatsoever, for

necessaries or otherwise, upon the credit of the Husband for which the Husband or his

estate may become liable.  Except as provided otherwise in paragraph 3 of this Article,

the Wife shall satisfy and shall indemnify the Husband against all debts, charges,

22

obligations or liabilities of every kind and nature whatsoever (including reasonable fees of attorneys and other professionals and costs of litigation) which were heretofore or may hereafter be incurred or contracted solely by her.

2.      Except for certain obligations (provisions for which are set forth in paragraph 3 of this Article), the Husband represents that he has not heretofore incurred or contracted, or caused to be incurred or contracted, for himself, any debt, charge, obligations or liability whatsoever (contingent or otherwise) for which the Wife or her estate is or may become liable. The Husband shall not hereafter incur or contract or cause to be incurred or contracted any debt, charge, obligation or liability whatsoever, for necessaries or otherwise, upon the credit of the Wife for which the Wife or her estate may become liable. Except as provided otherwise in paragraph 3 of this Article, the Husband shall satisfy and shall indemnify the Wife against all debts, charges, obligations or liabilities of every kind and nature whatsoever (including reasonable fees of attorneys and other professionals and costs of litigation) which were heretofore or may hereafter be incurred or contracted solely by him.

3.      (a) The Husband shall indemnify, defend, and hold harmless the Wife, from and against 100% of any and all liabilities, damages, claims, actions, losses, settlements, penalties, judgments or obligations, (each a "Claim") including her reasonable counsel and other professional fees, expenses and costs, including but not limited to or arising from, existing, threatened and/or future actions, or proceedings naming the Wife (either solely or jointly with other parties) as a party, arising out of, or due to, events that occurred on or before the date of this Agreement. In addition, the Husband shall indemnify, defend and hold harmless the Wife from and against 100% of

23

any and all Claims which arise by reason of any transaction made hereunder between the Wife or any affiliate of the Wife and any third party without sufficient consideration.

(b) (i)  The Husband shall indemnify, defend, and hold harmless the Wife, from and against 100% of the Marital TPR Percentage of any and all Claims, including her reasonable counsel and other professional fees, expenses and costs (except as otherwise specified in sub-paragraph (ii) below), naming TPR as a party arising out of, or due to, events that occurred on or before the date of this Agreement.

(ii)  The Husband shall indemnify, defend, and hold harmless the Wife, from and against 50% of the Marital TPR Percentage of any and all existing or threatened Claims, including her reasonable counsel and other professional fees, expenses and costs arising from the action against TRI pending in Louisiana and Mississippi referred to as the Bogalusa Litigation.  Schedule V(3)(ii) attached to this Agreement contains an update of the status of the Bogalusa litigation.  Husband represents and warrants to Wife that to the best of his knowledge there is no other Claim naming TPR as a party, arising out of, or due to, events that occurred on or before the date of this Agreement.

(c) Husband further represents and warrants to Wife she has no liability with respect to the promissory note, dated December 31, 2001 made by the Husband in favor of Sash A. Spencer in the principal amount of one hundred twenty thousand dollars ($120,274.20), a copy of which is annexed hereto as Exhibit V(3)(c) .  In any event, the Husband shall indemnify, defend, and hold harmless the Wife from and against 100% of any and all liabilities, damages, claims, actions, losses, settlements, penalties, judgments

24

or obligations, including her reasonable counsel and other professional fees, expenses and costs in connection with such note.

4. The Husband or the Wife may each, prior to the Second Anniversary, submit a request to an Arbitrator (as such term is defined Article XIII, and upon the terms detailed therein), with notice to the other party, to prevent distribution to the indemnifying party, by Sagi Genger (or his successor Attorney in Fact) of Non Liquid Assets, and Arbitrator shall be entitled to prevent the distribution of Non Liquid Assets to the indemnifying party provided Arbitrator has reasonable grounds to believe that on the preponderance of evidence submitted to him by the parties (i) an actual liability exists, and (ii) the indemnifying party has not provided reasonably satisfactory assurances that assets are available to cover such liability pursuant to indemnities made hereunder. The Arbitrator may order the non-distribution of Non Liquid Assets to the indemnifying party only in the amount and to the extent necessary to cover the Arbitrator's expected value of such liability; a notice to that effect will be promptly delivered to Sagi Genger (or to his successor Attorney in Fact).

5. Concurrently with the execution of this Agreement, the Husband and the Wife shall each assume two percent (2%) of the amount due (as of the date hereof, approximately $9,880,000, inclusive of interest) under the promissory note to TPR, dated December 21, 1993, in the original principal amount of $8,950,000 made by D&K Limited Partnership ("D&K") of which the Wife is general partner (the "D&K Note"). A copy of the D&K Note, together with the form of the Instrument of Assumption by Husband and Wife and the Acknowledgment and Consent by TPR is annexed hereto as

25

1270083.3
17451888v.2

Exhibit V(5). The Husband's and the Wife's aggregate liability of four percent (4%) represents the entire marital obligation and indebtedness under the D&K Note.

6. Concurrently with the execution of this Agreement, each of the parties will assume one half (1/2) of the liability under certain promissory notes (the "TPR Notes") made by the Husband in favor of TPR in the aggregate amount including outstanding principal and interest of $920,143.36 as of the date of this Agreement. Husband represents and warrants that as of the date of this Agreement the TPR Notes are legal, valid and binding obligations of Husband. Copies of the TPR Notes, together with the form of the Instrument of Assumption by Husband and Wife and the Acknowledgment and Consent by TPR are annexed hereto as Exhibit V(6).

7. Concurrently with the execution of this Agreement, the Husband will forgive all obligations owed to him by D&K in the aggregate amount including outstanding principal and interest of $772,880.16 as of the date of this Agreement ("D&K Obligations to Husband"). A copy of a schedule of the D&K Obligations is annexed hereto as Exhibit V(7). Husband hereby forgives the D&K Obligations to Husband and hereby acknowledges that they are cancelled.

8. The Husband represents and warrants that to the best of his actual knowledge, the obligations set forth in Schedule II(1) and as specifically described above in this Article represent a complete and accurate list of all marital obligations and liabilities in excess of $10,000 that he has entered into, or has caused the Wife to enter into or become responsible for, prior to the date of this Agreement and to the best of his knowledge all material contingent liabilities to which he or she or D&K may be subject arising from any events, actions or omissions prior to the date of this Agreement. The

26

Wife represents and warrants, to the best of her actual knowledge, that the obligations set forth in Schedule II(1) and as specifically described above in this Article represent a complete and accurate list of all marital obligations and liabilities in excess of $10,000 that she has entered into, or has caused D&K to enter into, prior to the date of this Agreement and all material contingent liabilities to which she or D&K may be subject as a result of her actions or omissions prior to the date of this Agreement.

9. Except as specifically stated to the contrary in this Agreement, each party will be solely responsible for the payment of all debts in his or her own name, whether incurred previously or in the future.

## ARTICLE VI

### INCOME TAX RETURNS

1.     The parties have previously filed joint, federal, state and local income tax returns for all tax years through the year ended December 31, 2003 for the following jurisdictions:

US Federal Income Tax

New York State

New York City

(the "Joint Tax Returns"). The Husband represents and warrants that there are not any pending or threatened investigations or audits of any of the Joint Tax Returns.

2.     With respect to any tax return either party filed separately for any tax year, any refunds received or liabilities incurred in connection with such return shall be for the account of the party filing such return. With respect to the parties' joint tax returns for the years 2002 and 2003, any refunds received or liabilities incurred in connection with such returns shall be for the benefit of the Husband.

3.     Promptly after either party receives notice of any investigations or audit after the date hereof, he or she shall give prompt written notice to the other party. The parties shall endeavor in good faith to agree on the handling of the investigation or audit. If the parties have not so agreed within 30 days of notice to the other party, one or both parties shall give notice of the failure to agree to Sagi Genger (or in his absence David Parnes), who shall promptly appoint tax counsel in his discretion, subject to his fiduciary obligations to the parties, and such tax counsel shall have full authority to determine handling of the investigation or audit, including without limitation settling with

28

the investigatory or auditing authority and apportioning liability for any deficiency . (including penalties and interest), entitlement to any refund and costs of the investigation or audit including reasonable attorneys', accountants' and other professional fees in accordance with relative responsibility therefor. Husband and Wife may at any time by joint written notice to Sagi Genger (or David A. Parnes, Esq.) and tax counsel appointed as described above revoke the authority of tax counsel and proceed according to mutual agreement. In any such case, liability for any deficiency (including penalty and interest), entitlement to any refund and costs of the investigation or audit including reasonable attorneys', accountants' and other professional fees shall be apportioned in accordance with relative responsibility therefor. In the event that either the Husband or the Wife pays more than his or her share (as determined by this Article) of any deficiency, tax, penalty, or interest relating to a previously filed Joint Tax Return, the Husband or Wife, as the case may be, shall reimburse the other for 50% of the same, together with any reasonable expenses the other party may incur in connection with payment of the excess, including without limitation the other's reasonable attorneys', accountants' and other professional fees and costs of litigation.

4. Husband and Wife shall cooperate in the handling of the investigation or audit, including without limitation execution of such powers of attorney as may be required to enable Sagi Genger (or David A. Parnes, Esq.) and tax counsel to act as contemplated by this Article, execution of amended tax returns or other documents as may be reasonably appropriate in connection with such investigation or audit (provided that the execution of any such other document would not adversely affect the party's financial interest) and promptly and without any charge or other consideration making

I270083.3
I741I688V-2

available such papers, records, documents and information as may be reasonably

appropriate in connection with such investigation or audit.

## ARTICLE VII

### MEDICAL INSURANCE AND RELATED
### EXPENSES FOR THE PARTIES

1. The Husband will maintain his own medical insurance for his own

benefit without contribution by the Wife to the cost thereof. He shall be responsible for

all of his own unreimbursed medical expenses (whether incurred before or after the date

of execution of this Agreement), including, but not limited to, doctors, dentists,

orthodontists, pharmacists, psychiatrists, psychologists or other mental health

professionals. Such unreimbursed medical expenses include, but are not limited to,

insurance deductibles, co-payments and uninsured medical expenses.

2. If the Wife may lawfully choose to do so, she may elect at her expense

to obtain coverage through the Husband's plan of medical insurance under the

Consolidated Omnibus Budget Reconciliation Act of 1985 (commonly referred to as

"COBRA") or other similar laws (or if such coverage is not available for any reason she

may obtain other substantially equivalent coverage reasonably satisfactory to her) for a

period of 36 months. The Wife shall be responsible for all of her own medical expenses

(whether incurred before or after the date of execution of this Agreement) unreimbursed

by such COBRA or other coverage, including, but not limited to, doctors, dentists,

orthodontists, pharmacists, psychiatrists, psychologists or other mental health

professionals. Such unreimbursed medical expenses include, but are not limited to,

insurance deductibles, co-payments and uninsured medical expenses.

30

1270083.3
1745188RV-2

**ARTICLE VIII**

**EQUITABLE DISTRIBUTION**

1.      The parties acknowledge and agree that the resources of the parties

and the provisions of this Agreement, including the transactions contemplated hereby, are

intended, except as otherwise provided or reflected herein, , to effect approximately a 50-

50 distribution of their net marital assets and represent and set forth a fair, reasonable and

equitable distribution of each of their maintenance, necessaries, property and other rights

arising from their marital relationship or otherwise and that the payments, property

transfers and releases, whether past, present or due in the future ("Distribution") represent

an agreeable and equitable division of such rights.  Henceforth all such rights shall be

governed solely by this Agreement.

2.      Without limiting paragraph 1 of this Article, but subject to

paragraph 5 of this Article, Wife's audit rights as provided in Article XII, the Wife

further acknowledges and agrees that:

(a) she is accepting any and all Distributions and other rights under or

contemplated by this Agreement in full satisfaction of any claim for equitable distribution

or maintenance or spousal support from the Husband, all payments due pursuant to the

*pendente lite* order of Judge Judith Gische made on December 3, 2002 and of any claim

to any property of the Husband whether owned directly or beneficially by him

individually or jointly with the Wife or any third party or parties, that she may have, or

may have asserted, including any claim under Section 236(B)(5) of the Domestic

Relations Law of New York commonly known as the Equitable Distribution Law, or any

applicable law of the United States, the State of New York, or any other state, nation,

territory or province now or hereafter having jurisdiction over the parties, or over any of their marital assets; and

(b) in accepting the said Distributions and rights, she is waiving any and all rights, either under the Equitable Distribution Law or any other provision of law to any property of the Husband which she has heretofore claimed or may hereafter claim, constitutes "marital property" as defined by Section 236 Part B(1)(c) of the Domestic Relations Law, as well as to all Husband's separate property disclosed to her.

3. Without limiting paragraph 1 of this Article, but subject to paragraph 5 of this Article, the Husband further acknowledges and agrees that:

(a) he is accepting any and all Distributions and other rights under or contemplated by this Agreement in full satisfaction of any claim for equitable distribution or maintenance or spousal support from the Wife, and of any claim to any property of the Wife whether owned directly or beneficially by her individually or jointly with the Husband or any third party or parties, that he may have, or may have asserted, including any claim under Section 236(B)(5) of the Domestic Relations Law of New York commonly known as the Equitable Distribution Law, or any applicable law of the United States, the State of New York, or any other state, nation, territory or province now or hereafter having jurisdiction over the parties, or over any of their marital assets; and

(b) in accepting the said Distributions and rights, he is waiving any and all rights, either under the Equitable Distribution Law or any other provision of law to any property of the Wife which he has heretofore claimed or may hereafter claim, constitutes "marital property" as defined by Section 236 Part B(1)(c) of the Domestic Relations Law, as well as to all Wife's separate property.

32

4. Subject to paragraph 5 of this Article, each of the parties forever waives, releases, renounces and relinquishes any and all rights or claims to the other's licenses and certificates, degrees, professional practices, business, anticipated income, career, goodwill, earned but as yet undistributed income, enhanced earning capacity, bank accounts, retirement vehicles (including, without limitation, IRAs, 401(k) plans and insurance policies), constructive trusts, equitable liens, pensions, automobiles, claims to intangible assets of the other party, any and all rights or claims based upon the active or passive role of either party in the management of a particular asset, as well as any other rights or claims against the past, present or future property of the other, whether such rights or claims arise at law, in equity or by virtue of the marital relationship.

5. Notwithstanding any other provision of this Agreement, the parties agree that neither party is waiving any rights, claims, liabilities, causes of action or other obligations that may arise from a breach of any representation or any other term of this Agreement, including, without limitation, the representation contained in Article II(9)(a).

## ARTICLE IX

### MUTUAL RELEASE AND DISCHARGE OF CLAIMS AND CLAIMS TO ESTATES

Subject to paragraph 5 of Article VIII:

1. The Husband hereby remises, releases and forever discharges the Wife, the Wife's heirs, executors, administrators, successors and assigns from all actions, causes of action, suits, debts including without limitation the D&K Obligations to Husband, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages,

.33

judgments, expenses, executions, claims, and demands whatsoever, in law, admiralty or

equity, known or unknown, which the Husband, the Husband's heirs, executors,

administrators, successors and assigns ever had or now has against the Wife, for, upon, or

by reason of any matter, cause or thing whatsoever from the beginning of the world to the

day of the date of this Agreement, including (without limitation) claims with respect to

all "separate property" and all "marital property" as those terms are defined in Section

236(B) of the Domestic Relations Law or arising out of the marital relationship, except

for any cause of action for Divorce, Annulment or Separation and any defenses thereto.

      2.     The Wife hereby remises, releases and forever discharges the

Husband, the Husband's heirs, executors, administrators, successors and assigns from all

actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds,

bills, specialties, covenants, contracts, controversies, agreements, promises, variances,

trespasses, damages, judgments, expenses, executions, claims, and demands whatsoever,

in law, admiralty or equity, known or unknown, which the Husband, the Husband's heirs,

executors, administrators, successors and assigns ever had or now has against the Wife,

for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of

the world to the day of the date of this Agreement, including (without limitation) claims

with respect to all "separate property" and all "marital property" as those terms are

defined in Section 236(B) of the Domestic Relations Law or arising out of the marital

relationship, except for (a) any amounts that may be due pursuant to the audits referred to

in Article XII and (b) any cause of action for Divorce, Annulment or Separation and any

defenses thereto.

1270083.3
1745I8R6V-2

3. Each of the parties recognizes the existence of certain imbalances, resulting from (a) inequality of distribution of marital assets prior to the date of this Agreement; (b) the unequal bearing of marital expenses prior to the date of this Agreement; and (c) the misuse by the Husband of marital IRA or other retirement funds for the purchase of Lumenis stock. Each party agrees to disregard such past imbalances, and to release the other, forever and for all purposes whatsoever from, any and all rights and claims arising from such past imbalances.

4.     Each party waives, renounces, grants, remises and releases to the other, forever and for all purposes whatsoever any and all rights and claims against the other's estate including dower, curtesy and community property rights and interests, any right of election under the relevant provisions of the Estates, Powers and Trusts Law of the State of New York ("EPTL") or similar laws of other States or jurisdictions, domestic or foreign, including, without limitation, EPTL Sections 5-1.1-A and 5-3.1 or under the laws of testacy or intestacy (including, without limitation, EPTL Sections 4-1.1) in any jurisdiction whatsoever, which he or she ever had, now has or may hereafter acquire in the real or personal property or estate of the other, wherever situated and whether acquired before or subsequent to the date of this Agreement, by reason of inheritance or descent or by virtue of any decedent estate law or any other statute or custom, or arising of the marital relationship, or for any other reason whatsoever.

5. (a) Each of the parties expressly revokes his or her Last Will and Testament ("Will") insofar as the same makes any disposition (whether outright or in trust) to or for the benefit of the other party and further expressly revokes any nomination

1270083.3
17451888RV-2

of the other party as an estate representative or in any other representative or fiduciary capacity thereunder.

(b) It is furthermore the intent of the parties that all Wills made and executed by either of them prior to the execution of this Agreement shall be read and administered as if the other party had predeceased him or her for purposes of distribution of his or her respective estate and of the property interests otherwise passing thereunder.

6. Where a party may be designated a beneficiary or survivor in a testamentary substitute (as defined in Section 5-1.1-A of the EPTL) or any other interest in property passing outside of the Will by operation of law (including but not limited to life insurance but excluding any life insurance specifically required to be maintained by one party for the benefit of the other pursuant to the terms of this Agreement) pursuant to which any interest in property does not pass under a Will, each of the parties will be irrevocably and permanently deemed to have renounced any such designation.

7. Each of the parties irrevocably and irrebuttably renounces any right of administration upon the estate of the other or nomination by the other as estate representative, contained in the other party's Will.

8. Neither party shall object to the probate of the other's Will, and in the event that either party dies intestate, the surviving party shall allow administration upon the estate and personal effects of the deceased party to be taken and received by any person who would have been entitled thereto had the surviving party predeceased the deceased party unmarried.

9. Each party shall, upon request by the executors, administrators or other legal representatives of the other party and receipt of the relevant instruments,

promptly execute, acknowledge and deliver (without charge or other consideration) any instrument which in the opinion of said executors, administrators or other legal representatives is reasonably necessary to effectuate the waivers and other provisions of this Article.

10.    Notwithstanding the foregoing, nothing contained in this Agreement shall bar a claim on the part of either party for any cause arising out of a breach of any representation or other term of this Agreement arising or accruing during the lifetime of the deceased party against whose estate such a claim may be made, and such claim shall be in addition to any other remedies which may be available.

## ARTICLE X

### SEPARATE OWNERSHIP

Except as specifically provided to the contrary in this Agreement, each party shall own, as his or her separate property, free of any claim or right of the other, all of the items of property, real, personal and mixed, of any kind, nature or description and wherever situate, which are now or hereafter in his or her name, control or possession, with full power to dispose of the same as fully and effectually in all respects and for all purposes as if unmarried, provided that this provision shall not in any way limit the ability of the Husband or the Wife to enforce his or her rights with respect to breach of any representation or any other breach of the terms of this Agreement by the other party.

1270083.3
1745188811V-2

## ARTICLE XI

### RESIDENCE AND NONINTERFERENCE

1. It is, and shall be, lawful for the Husband and Wife at all times to reside from time at such places as each may see fit and to contract, carry on and engage in any employment, profession, business or trade, which either may deem fit, free from control, restraint or interference, direct or indirect, by the other in all respects as if and she were single and unmarried.

2. Neither the Husband nor the Wife shall in any way molest, disturb, trouble, or interfere with the peace and comfort of the other or compel or seek to compel the other to associate, cohabit or dwell with him or her by any action or proceeding for restoration of conjugal rights or by any means whatsoever.

3. The foregoing provisions of this Article shall not in any way limit the ability of the Husband or the Wife to enforce his or her rights with respect to breach of any representation or any other breach of the terms of this Agreement by the other party, as provided in Article XIII.

## ARTICLE XII

### THE WIFE'S RIGHT TO CERTAIN AUDITS OF THE HUSBAND'S ASSETS

1. On the Wife's request, upon not less than ten (10) business days' written notice, the Husband shall allow the Wife to audit his assets and liabilities as of the date of commencement of the parties' matrimonial action, i.e. January 31, 2002, as set forth on Schedule II(1) annexed hereto and made part hereof and as of the date of this Agreement in order to test the correctness and completeness of the items included on such Schedules

38

1270083.3
1701000v.2

(including contingent liabilities) and the values assigned to each such item based on all information available at the time of audit.

    (a)    The Wife shall be entitled to conduct a total of five (5) such audits during the Husband's lifetime.

    (b)    Each such audit is to be conducted by a reputable accounting firm.

    (i)    Within two (2) weeks of the date of execution of this Agreement, the Husband will provide the Wife with the names of two accounting firms and the principals thereof who will be acceptable to the Husband to perform all of the audits. If the Wife chooses one of those accounting firms and principals, that firm and principal will conduct the audits when requested by the Wife in accordance with the guidelines set forth herein.

    (ii)    If the Wife does not choose one of those two firms and principals, the Husband shall have the right on one occasion and only one occasion prior to the commencement of an audit to reject the Wife's selection of any other accounting firm to conduct the audits. Provided that the Husband has not previously exercised that right, he may do so on any of the remaining audits. If the Husband elects to exercise that right, the Wife may not utilize the rejected firm in that or any other audit.

    (c)    The Husband will cooperate, and will cause persons under his control to cooperate, with the auditors and will promptly furnish such documents as the auditors may request from time to time. It is expressly understood that the auditors' document requests may relate to matters up to and including the date of the audit.

1270083.3
17451888RV-2

(d)    Such audits shall be at the Wife's sole expense, except that if the audits find assets not previously disclosed by the Husband on Schedule II(1) with a cumulative value greater than two hundred fifty thousand dollars ($250,000), the Husband will be responsible for the entire reasonable cost of all audits which may have been performed.

2.    (a)    If the audits, individually or cumulatively, find that the Husband owned any property on January 31, 2002, which is not listed on Schedule II(1), the Husband will pay to the Wife one-half (1/2) of the value of that property.

(b)    In addition, if the audits, individually or cumulatively, find assets not listed on Schedule II(1) with a cumulative value greater than two hundred fifty thousand dollars ($250,000), then (i) such error will be presumed willful on the Husband's part, and (ii) the Husband will pay to the Wife one-half (1/2) of three (3) times of that value (in addition to paying audit expenses as provided above). However, the Husband will have the opportunity to rebut the presumption of willful error at an arbitration conducted in accordance with Article XIII and at his expense by a "preponderance of evidence" test. If the Husband has previously made payments pursuant to subparagraph 2 (a) of this Article, in respect of those assets, he shall receive a credit therefor against the amounts owed pursuant to this subparagraph (b).

(c)    If the Wife conducts a third audit, (i) after two consecutive audits have failed to find assets not listed on Schedule II(1) or have failed to find a difference in assets between the first and second of such consecutive audits of more than twenty five thousand dollars ($25,000), and (ii) the third audit fails to find assets not listed on such Schedule or finds a difference of less than twenty five thousand dollars ($25,000) from

1270083.3
1745188RW-2

the previous two audits, then the Wife will be liable to the Husband for his reasonable

expenses incurred as a consequence of cooperating with the third consecutive audit.

(d)     If the Husband disputes the results of any audits or asserts that the

cumulative errors (if greater than two hundred fifty thousand dollars ($250,000)) were

not willful, the dispute will be determined by arbitration as is provided in Article XIII of

this Agreement.

(e)     Any payments due under paragraphs 2 (a) and (b) above shall be

made in cash within 60 days of the later of the completion of the audit or the receipt of

the arbitration decision.

## ARTICLE XIII

## GOVERNING LAW AND ARBITRATION

1.     This Agreement will be governed and interpreted in accordance

with laws of the State of New York, without application of its conflicts of law provisions.

This provision for arbitration shall be specifically enforceable by the parties.

Any controversy, claim or dispute between the parties directly or indirectly arising out of

this Agreement shall be finally settled by arbitration as provided herein.  Either party may

give written notification to the other party requesting arbitration to resolve any

controversy, claim or dispute arising out of this Agreement between the parties.

2.     Subject to the provisions of paragraph 5 of this Article, any award

rendered by the Arbitrator (as defined below) may be confirmed in any court having

jurisdiction thereof.  Notwithstanding the foregoing paragraphs of this Article, either

party may file a claim for temporary emergency relief  or other temporary remedies not

otherwise available through arbitration, in a court of competent jurisdiction, without first

41

having to arbitrate the dispute, provided that such claim for injunctive relief arises from an alleged breach of a specific term of this Agreement.

3.      In the event that a dispute is submitted to arbitration, there shall be one (1) arbitrator (the "Arbitrator") selected (x) by the parties or (y) if the parties fail to select an Arbitrator within twenty (20) days following receipt of a list of potential arbitrators from the American Arbitration Association ("AAA"), the Arbitrator shall be selected by the AAA.  The Arbitration shall be conducted as promptly as practicable after the selection of the Arbitrator in accordance with the Commercial Arbitration Rules and Mediation Procedures.  The Arbitrator shall be someone who has at least fifteen (15) years of commercial law experience or who was a judge of a court of general jurisdiction.

(a)      The arbitration hearing shall be held in Manhattan, New York, pursuant to the Commercial Arbitration Rules and Mediation Procedures, except where those rules conflict with the provisions of this Article, in which case the provisions of this Article shall control.

(b)      The Arbitrator shall arrange a hearing at a mutually agreeable time and location in Manhattan, New York, which hearing shall be not less than thirty (30) calendar days, and not more than sixty (60) calendar days, after the date on which the Arbitrator was appointed.

(c)      The parties shall each have the right to submit documents, testimony, information, data and memoranda to the Arbitrator in support of their respective positions.

(d)      Within sixty (60) calendar days after such hearing, the Arbitrator shall render a decision with respect to the dispute.

42

(e)    The party against whom the Arbitrator found shall bear the total costs, Arbitrator's fees and other expenses of the arbitration between the parties, including the legal fees borne by the other party in bringing or defending the action.

4.    The Arbitrator shall have the authority to require the submission (at hearing or otherwise) of such documents, information, testimony, and other items as the Arbitrator may deem necessary to make a fair and reasonable decision, including the authority to issue subpoenas and similar process to compel production of such documents, information, testimony and other items.

5.    Subject to the remaining provisions of this paragraph 5, any award rendered by the Arbitrator shall be conclusive and binding upon the parties hereto; provided, however, that any such award shall be accompanied by a written opinion of the Arbitrator giving the reasons for the award.

(a)    The findings of the Arbitrator may not change the express terms of this Agreement and shall be consistent with the Arbitrator's belief as to what findings a court of proper jurisdiction would have made in applying the applicable law to the facts underlying the dispute.

(b)    There shall be no right of appeal from the Arbitrator's determination unless the Arbitrator shall not have complied with the provisions of this Article.

(c)    The Arbitrator shall have no authority to award relief in excess of what this Agreement provides. Moreover, the Arbitrator shall have no authority to award non-monetary or equitable relief.

**ARTICLE XIV**

43

1270083.3
1745188RW-2

## LEGAL AND EXPERT FEES

1.      (a)  The Wife has previously been represented in the parties'
matrimonial litigation and/or in the negotiation, preparation and execution of this
Agreement by Dominic Barbara and Marilyn B. Chinitz, of the Law Offices of Dominic
Barbara, 1100 Stewart Avenue, Garden City, NY 11530; Sheldon M. Greenbaum of
Goldman & Greenbaum, P.C., 60 East 42nd Street, New York, NY 10165; Philip
Greenhaus, 50 East 42nd Street, New York, NY 10017; and, as to certain commercial
aspects of this Agreement, Carol Robinson Schepp of Carter Ledyard & Milburn LLP, 2
Wall Street, New York, New York  10005.

(b)  The Husband has been represented in the parties' matrimonial
litigation and in the negotiation, preparation and execution of this Agreement by Stanford
G. Lotwin and Jay D. Silverstein of Blank Rome LLP, 405 Lexington Avenue, New
York, New York 10174, and Edward Klimerman of Sonnenschein Nath & Rosenthal
LLP, 1221 Avenue of the Americas, New York, NY 10020.

2.      (a)  Except as otherwise provided in sub-paragraph (b) of this
Section 2, each party will be solely responsible for the payment of all legal fees, expert
fees and expenses incurred by him or her for services in connection with their
matrimonial litigation and with the negotiation, preparation and execution of this
Agreement (or in connection with any subsequent divorce) and each shall indemnify the
other from all loss and/or expense arising from any claims for counsel fees and
disbursements made by any attorney (or claims for fees and disbursements by any other
professional or expert) in reference to the negotiation and preparation of this Agreement,
and in reference to any other matters related to the matrimonial difficulties existing

44

between the Husband and the Wife including the procurement of an undefended judgment of divorce.

(b) The following legal fees (i) approximately $200,000 prepaid by the Wife to the Law Offices of Dominic Barbara, prior to May 24, 2004, for which legal services are in dispute, and (ii) all legal fees, owed to the lawyers enumerated in Section 3 of Article I and in Section 1(b) of this Article XIV and their respective firms, and incurred by the Husband and the Wife in connection with the negotiations of this Agreement from May 24, 2004 until the date of execution of this Agreement, shall be paid by Sagi Genger (or David A. Parnes, Esq.), or reimbursed to the parties, from the assets made available to him pursuant to Article II, as soon as practicable.

(c) In consideration for sharing the expense of legal fees, and their payment from assets made available pursuant to Article II, the Wife will pursue in good faith (personally, or – at her election – appoint Sagi Genger to pursue in her stead) the Law Offices of Dominic Barbara, to reclaim the approximately $200,000 prepaid by the Wife which shall be equally shared by the parties.

## ARTICLE XV

## FULL DISCLOSURE

1.      Each party acknowledges that:

(a)      he or she understands, and has been advised of, his or her right: (i) to obtain full and complete financial disclosure from the other with respect to all assets and income owned by the other party whether titularly or beneficially, and (ii) to obtain appraisals from independent appraisers of his or her own choosing of any property owned

45

by the parties' collectively, or either party individually, including, without limitation, appraisals of tangible and intangible assets;

(b)     he or she has utilized the rights specified in paragraph 1(a) of this Article to the fullest extent that he or she wishes to do so both in the parties' litigation, including depositions and appraisals, and in earlier extensive voluntary document discovery;

(c) that he or she is satisfied with the disclosure that he or she has received from the other; and

(d) that he or she has knowingly and intentionally directed his or her counsel not to seek further disclosure from the other party or to cause appraisals to be made.

2. (a)   The Wife acknowledges that she has made inquiry into the financial circumstances of the Husband to the extent that she wishes to do so at this time;

(b)     The Wife has had a full opportunity to consult with, and has consulted at length with, her attorneys identified or referenced in Article XIV regarding all of the circumstances hereof to the extent that she wishes to do so at this time;

(c)     The Wife acknowledges that this Agreement has not knowingly been the result of any fraud, duress or undue influence exercised upon her by the Husband or by any other person or persons; and

(d) The Wife acknowledges that she is fully satisfied with the services rendered on her behalf by her attorneys identified or referenced in Article XIV.

46

1270083.3
1745185RV-2

3.     The Wife's acknowledgments in paragraphs (1) and (2) above are based on her ability to seek remedies in the event of a breach of any representation in this Agreement and to exercise her audit rights as provided in Article XII.

4.     The Husband acknowledges that (x) he has made inquiry into the financial circumstances of the Wife to the extent that he wishes to do so, and (y) that he cannot appropriately make a claim against the Wife by reason of her non-willful failure to disclose or his failure of knowledge of the financial circumstances of the Wife;

(a)  The Husband has had a full opportunity to consult with, and has consulted at length with, his attorneys, to wit: Blank Rome LLP and Sonnenschein Nath & Rosenthal LLP regarding all of the circumstances hereof;

(b)  The Husband acknowledges that this Agreement has not knowingly been the result of any fraud, duress or undue influence exercised upon him by the Wife or by any other person or persons; and

(c) The Husband acknowledges that he is fully satisfied with the services rendered on his behalf by Blank Rome LLP and by Stanford G. Lotwin and Jay D. Silverstein in particular.

## ARTICLE XVI

## POSSIBLE INVALIDITY

If any provision of this Agreement, for any reason whatsoever, be declared invalid or unenforceable by any Court of competent jurisdiction, by statute or governmental regulation, the remainder of this Agreement and the application of such provision to any person or situations, other than those as to which such provision may have been held invalid or unenforceable shall not be affected thereby and shall continue

47

to be enforced to the fullest extent that such severance of the invalid portions is possible without vitiating the original intent and purposes and economic intentions of the parties (the "Original Intent"), as herein set forth. If it shall appear impossible or impracticable to continue this Agreement in force after such severance, then and in such event, the parties hereto each undertake and agree that they will, upon request of the other party, make, execute, acknowledge and deliver any and all instruments which may be lawfully effective to again reflect the parties Original Intent, without diminishing the rights of the parties or increasing their obligations, financial or otherwise, herein. In the event a provision is superseded under this Article XVI, either party may seek reformation of the affected provision in any court of competent jurisdiction, which shall be empowered to revise the provision to reflect the parties' Original Intent to the greatest extent possible, consistent with New York law. It is the intention of the parties hereto that this provision may be enforced in equity in addition to, and not to the exclusion of, any other remedies which may be available to the parties. The parties do not intend by this paragraph to imply the illegality, invalidity and/or unenforceability of any term, provision, article or paragraph of this Agreement.

## ARTICLE XVII

## RECONCILIATION AND MATRIMONIAL DECREES

1.       Simultaneously with the execution of this Agreement, each of the parties will execute and deliver to the other, and in the future will promptly execute and deliver (without further consideration) to the other:

(a)(i)    All documents reasonably necessary to vacate any and all restraining orders and injunctions that have been issued in any action between the parties

1270083.3
1745188NV-2

including, but not limited to, their Divorce Action. A listing of the said restraining orders and injunctions is annexed as Schedule XVII(1)(a).

(ii)   Notwithstanding the provisions of paragraph 1(a)(i), the Husband will pay the Wife maintenance of thirty thousand dollars ($30,000) for the month during which this Agreement is executed and for one month thereafter, and his obligation to pay maintenance under prior orders in the Divorce Action will cease upon the thirtieth (30th) day of the month following the month during which this Agreement is executed, provided all maintenance for prior months has been paid in full.

(b)   All documents reasonably necessary to effect the immediate withdrawal of any and all motions now pending in any Court in any litigation between the parties. A listing of the said motions is annexed as Schedule XVII(1)(b) hereto and made part hereof.

(c)   All documents appropriate to immediately notify the Court before whom the parties' Divorce Action is being prosecuted of the parties' having reached a settlement of all of their rights and claims excepting the right to a divorce.

(d)   All documents reasonably necessary to facilitate the immediate grant to the Wife, on papers, of an undefended divorce on the grounds of the Husband's constructive abandonment of the Wife.

2.   This Agreement shall not be invalidated or otherwise affected by a reconciliation or a resumption of marital relations between the parties unless they have executed and acknowledged (with the same formality as this Agreement) a written statement expressly setting forth that they are canceling this Agreement. Accordingly, this Agreement will not be terminated, annulled or modified by (a) the parties'

49

resumption of cohabitation and/or sexual relationships even if on a permanent basis or (b) the parties' actual remarriage (irrespective of whether or not that marriage ever ends).

3.    This Agreement shall not be invalidated or otherwise affected by any decree or judgment made in any Court in any pending or future action or proceeding between the parties.

4.    Each party agrees that the provisions of this Agreement shall be submitted to any court in which either party may seek a judgment, order or decree in a matrimonial action or any other action or proceeding affecting the marital status of the parties and that the provisions of this Agreement shall be incorporated in said judgment, order or decree with such specificity as the Court shall deem permissible and by reference as may be appropriate under law and under the rules of the Court. However, notwithstanding said incorporation, the provisions of this Agreement shall survive any decree, order or judgment and shall not merge therein, and this Agreement may be independently enforced.

5.    Both parties will fully cooperate with each other in obtaining a religious divorce or annulment and each will promptly execute and deliver (without further consideration) all documents reasonably required therefor by the religious court, tribunal or body. In addition, each party will, if requested, appear (at any reasonable time and location) before any religious court, tribunal or body in order to effectuate the purposes of this paragraph. All the costs of such religious divorce or annulment shall be borne equally by the parties.

50

## ARTICLE XVIII

### IMPLEMENTATION

The Husband and Wife shall, at any and all times, upon request by the other party or his or her legal representatives, promptly make, execute and deliver (without charge or other consideration) any and all other and further instruments as may be reasonably required for the purpose of giving full force and effect to the provisions of this Agreement.

## ARTICLE XIX

### GENERAL PROVISIONS

1.      No failure by either party to exercise any right hereunder or to insist upon strict compliance by the other party with any obligation hereunder and no custom or practice of the parties at variance with the terms hereof shall constitute a waiver of either party's right to demand exact compliance with the terms hereof. Any waiver by either party (whether formal or informal) nonetheless found to exist by an Arbitrator with respect to any particular default by the other party shall not affect or impair the waiving party's rights in respect of any subsequent default of the same or of a different nature, nor shall any delay or omission of either party to exercise any right arising from such a default affect or impair his or her rights as to such default or any subsequent default.

2.      This Agreement shall inure to the benefit of and shall be binding and obligatory upon the heirs, personal representatives, administrators, executors and assignees of the parties herein.

51

1270083.3
I745188NV-2

3.      Neither this Agreement nor any provision hereof shall be terminated, amended or modified in any respect except by an agreement in writing duly subscribed and acknowledged by both parties with the same formality as this Agreement. Any asserted termination, annulment or modification not so subscribed and acknowledged shall be without effect even if it was substantially and detrimentally relied upon.

4.      The parties may at any time amend, modify or annul this Agreement (in the manner set forth in paragraph 3 of this Article) without the consent of any third person and no third person shall be deemed to have been given any interest or right hereunder.

5.      This Agreement may be executed in counterpart copies and shall become effective when copies executed by both parties have been exchanged. The parties intend to execute in all eight (8) counterpart copies hereof.

## ARTICLE XX

## NOTICES

Any notice required by this Agreement shall be in writing and shall be made to the addresses first listed above (or to any address changed by like notice) or to the facsimile numbers listed below:

Arie Genger
2600 Island Boulevard
Penthouse One
Williams Island
Aventura, Florida  33160

With a copy to:

52

Edward Klimerman, Esq.
Sonnenschein Nath & Rosenthal LLP
1221 Ave. of the Americas,
New York, NY 10010-1089
Fax: (212) 768 6800

Dalia Genger
210 East 65th Street
New York, NY   10021
Fax  (212) 735-9021

With a copy to

Carol Robinson Schepp, Esq.
Carter Ledyard & Milburn LLP
2 Wall Street
New York, NY 10005
Fax  (212) 732-3200

Any such notice shall be delivered by certified mail, return receipt

requested or by personal (receipted) delivery or by confirmed facsimile.  Unless

otherwise provided, such notice shall be effective one (1) day after actual receipt of

personal or faxed delivery or ten (10) days after mailing, whichever is applicable.


## ARTICLE XXI

## ENTIRE UNDERSTANDING

This Agreement contains the entire understanding of the parties who

hereby acknowledge that between them there have been and are no representations,

warranties, covenants or undertakings (whether written or oral, express or implied) with

respect to the subject matter hereof including, without limitation, all rights or claims

arising at law, in equity or pursuant to the parties' marital relationship other than those

expressly set forth herein or in the transactions contemplated hereby or entered into

concurrently herewith.

1270083.3
I7451866v-2

# ARTICLE XXII

## REPRESENTATIONS AS TO UNDERSTANDING OF THE TERMS OF THIS AGREEMENT

1.      Each party represents that:

(a)      He or she has had independent legal counsel of his or her own selection;

(b)      His or her legal counsel has advised him or her fully (i) with respect to his or her rights in and to the property and income and estate of the other party if they were divorced in the absence of an agreement such as this one and (ii) with respect to the effect of this Agreement on those rights and (iii) with respect to the rights and obligations set forth in this Agreement. Each party additionally acknowledges that he or she understands such advice from counsel and the terms of this Agreement;

(c)      He or she has given due consideration to all the facts and circumstances likely to influence his or her judgment with respect to matters embodied in this Agreement;

(d)      He or she has no educational, medical (including the use of medications, whether prescription or otherwise), psychological, addictive, sociological, language or cultural disability which would prevent him or her from understanding each and every aspect of this Agreement and the legal and economic and personal consequences of executing this Agreement; and

(e)      He or she believes that the provisions of this Agreement are fair and reasonable as of the date of execution of this Agreement, and that he or she believes

54.

1270083_3
1745188AV-2

that the provisions of this Agreement are not unconscionable now will not be

unconscionable in the future.

2.    After time to reflect upon the significance and terms of this

Agreement, he or she makes this Agreement freely and voluntarily by him or her and

acknowledges that this Agreement has not knowingly been the result of any fraud, duress,

coercion or undue influence exercised by either party upon the other or by any other

person or persons upon such party.

1270083.3
t74s1888tv-2

EACH OF THE PARTIES ACKNOWLEDGES:

THAT HE OR SHE HAS CAREFULLY READ THIS AGREEMENT ;

THAT HE OR SHE UNDERSTANDS THE TERMS OF THIS AGREEMENT;

INCLUDING ARTICLE XXII OF THIS AGREEMENT;

THAT HE OR SHE UNDERSTANDS THAT THIS AGREEMENT WILL BE

BINDING ON HIM OR HER IN ALL CIRCUMSTANCES; AND

THAT HE OR SHE HAS HAD A FULL OPPORTUNITY TO CONSULT WITH

(AND HAS CONSULTED WITH) COUNSEL OF HIS OR HER OWN

SELECTION WITH RESPECT THERETO.

IN WITNESS WHEREOF, the parties have hereunto set their respective

hands and seals as of the day and year first above written to eight (8) counterparts hereof,

each of which shall constitute an original.

| | |
|---|---|
| _____ | _____ |
| Witness for the Wife | DALIA GENGER |
| Carol Robinson Schepp, Esq. | |
| | |
| _____ | _____ |
| Witness for the Husband | ARIE GENGER |
| Edward Klimerman, Esq. | |

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

On this 30 day of Oct 2004, before me, the undersigned, a Notary Public in and for the State, personally appeared DALIA GENGER, personally known to me known or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual executed the instrument.

_Deborah Kempf_
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-OIKE 4999904
Qualified in New York County
Commission Expires August 3, 200__

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

On this 2__ day of OCT 2004, before me, the undersigned, a Notary Public in and for said State, personally appeared ARIE GENGER, personally known to me known or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that his executed the same in his capacity, and that by his signature on the instrument, the individual executed the instrument.

_Deborah Kempf_
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-OIKE 4999904
Qualified in New York County
Commission Expires August 3, 2006

57

1268492.3
1745168\V-2

CERTIFICATE OF SUBSCRIBING WITNESS

State of New York )
                  ) ss.
County of New York )

On the _30_ day of _Oct_ in the year 2004 before me, the undersigned, a Notary Public in and for said State, personally appeared CAROL ROBINSON SCHEPP, the subscribing witness to the foregoing instrument, with whom I am personally acquainted, who, being by me duly sworn, did depose and say that she resides at _165 Circle Drive, Manhasset NY 11030_ ; that she knows DALIA GENGER to be the individual described in and who executed the foregoing instrument; that said subscribing witness was present and saw said DALIA GENGER execute the same; and that said witness at the same time subscribed her name as a witness thereto.

Deborah Kempf
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-OIKE 4999904
Qualified in New York County
Commission Expires August 3, 2006

CERTIFICATE OF SUBSCRIBING WITNESS

State of New York )
                  ) ss.:
County of New York )

On the _28_ day of _OCT_ in the year 2004 before me, the undersigned, a Notary Public in and for said State, personally appeared EDWARD KLIMERMAN, the subscribing witness to the foregoing instrument, with whom I am personally acquainted, who, being by me duly sworn, did depose and say that he resides at _14 EAST 75 STREET NEW YORK, NY 10021_ ; that he knows ARIE GENGER to be the individual described in and who executed the foregoing instrument; that said subscribing witness was present and saw said ARIE GENGER execute the same; and that said witness at the same time subscribed his name as a witness thereto.

Deborah Kempf
Notary Public

DEBORAH KEMPF
Notary Public, State of New York
No. 31-OIKE 4999904
Qualified in New York County
Commission Expires August 3, 2006

1268492.3
17451888V-2

58

**Sagi Genger**
**1121 Park Avenue,**
**New York, NY 10028**

October 30, 2004

Dalia Genger
210 East 65th St.
New York, NY 10021

**Promise**

Dear Mom,

    This letter confirms our understanding with respect to certain payments that I am prepared to make to you in consideration of the following. My sister Orly and I are benefiting by the receipt of a total of 794.40 shares of Trans-Resources, Inc. ("TRI"), or beneficial interests in those shares, by trusts for our benefit. In reliance on this letter and in consideration of the trusts' receipt of these shares and other consideration, you are giving up valuable marital rights, and you desire further assurance that you will have sufficient funds to support your lifestyle.

    If you, in your sole and absolute discretion, from time to time desire funds to support your lifestyle, you may request in writing that I make payment to you as provided in this letter. Promptly upon receipt of the request, I will pay to you (1) an amount equal to all dividends, distributions, proceeds or other payments attributable to 794.40 shares of TRI (adjusted for any splits or similar action) that have previously been paid to Orly, me or any trust for the benefit of either of us, less any amounts previously paid to you pursuant to this letter, or (2) any lesser amount indicated in your request.

    We intend for this letter to be a binding agreement under New York law. Please confirm that this letter correctly reflects your understanding by signing below.

Sincerely,

Sagi Genger

Agreed

Dalia Genger

1268584.3

**Sagi Genger**
**1121 Park Avenue**
**New York, NY  10028**

November 10, 2004

Orly Genger
1965 Broadway
New York, NY

Dear Orly:

In connection with the attached letter (the "Promise") from me to our mother, Dalia Genger, dated October 30, 2004, you agree to indemnify, defend, and hold me harmless, for and against one-half (1/2) of any and all payments, liabilities, damages, claims, actions, losses, settlements, penalties, judgments or obligations (each a "Claim"), including my reasonable counsel and other professional fees, expenses and costs, which arise from my undertakings in the Promise.

I will notify you  promptly of any Claims.

Very truly yours,

Sagi Genger

AGREED TO AND ACCEPTED
THIS     DAY OF NOVEMBER, 2004

Orly Genger

*ORLY GENGER VS.*
*DALIA GENGER, et al*

---

*DALIA GENGER*
*December 13, 2012*

---



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

**126 East 56th Street, Fifth Floor New York, New York 10022**
**PHONE: (212) 750-6434   FAX: (212) 750-1097**
**www.ELLENGRAUER.com**

*Original File 102224.TXT*
*Min-U-Script® with Word Index*

```
 1   SUPREME COURT OF THE STATE OF NEW YORK

 2   COUNTY OF NEW YORK
     -------------------------------------------X
 3   ORLY GENGER in her individual capacity
     and on behalf of the Orly Genger 1993
 4   Trust (both in its individual capacity
     and on behalf of D&K Limited Partnership),
 5
                              Plaintiff,
 6
         - against -
 7
     DALIA GENGER, SAGI GENGER, LEAH FANG,
 8   D&K GP LLC, and TPR INVESTMENT ASSOCIATES,
     INC.,
 9
                              Defendant
10
     Index No. 100697/08
11   -------------------------------------------X

12

13                            575 Lexington Avenue
                              New York, New York
14
                              December 13, 2012
15                            10:37 a.m.

16

17           DEPOSITION of DALIA GENGER, taken

18   before Annette M. Montalvo, RMR, and a Notary

19   Public in and for the State of New York.

20

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24             New York, New York  10022
                    212-750-6434
25                  REF:  102224
```

```
 1   A P P E A R A N C E S:

 2

 3   ZEICHNER ELLMAN & KRAUSE LLP

 4   On Behalf of the Plaintiff,

 5        575 Lexington Avenue

 6        New York, New York   10022

 7   BY:  YOAV GRIVER, Esq.

 8        BRYAN D. LEINBACH, Esq.

 9        212-223-0400

10        ygriver@zeklaw.com

11

12

13   PEDOWITZ & MEISTER LLP

14   On Behalf of the Witness,

15        570 Lexington Avenue

16        New York, New York   10022

17   BY:  ROBERT A. MEISTER, Esq.

18        MARISA H. WARREN, Esq.

19        212-403-7333

20        robert.meister@pedowitzmeister.com

21

22

23

24

25
```

```
 1   A P P E A R A N C E S: (Cont'd)

 2

 3   PAUL S. ZILBERFEIN, Esq.

 4   On Behalf of Leah Fang,

 5        78 Old Orchard Road

 6        New Rochelle, New York  10804

 7        914-297-0110

 8        paul@zilberfeinlaw.com

 9

10

11   DUANE MORRIS LLP

12   On Behalf of TPR Investment Associates, Inc.,

13        1540 Broadway

14        New York, New York  10036

15   BY:  JOHN DELLAPORTAS, Esq.

16        212-692-1012

17        dellajo@duanemorris.com

18

19

20   ALSO PRESENT:

21   SAGI GENGER

22   WALTER P. STASIUK, Wachtel Masyr & Missry

23

24

25
```

```
1                         GENGER
2   notice before the sale?
3       A.    Before the sale?  I am trying to
4   remember.  Yeah.  I was aware that Sagi is going
5   to take the step --
6       Q.    I understand that at some point you
7   became aware.  I am asking did you receive the
8   8-31-08 notice prior to your attorney receiving a
9   copy of the notice on May 19?
10      A.    That's the answer.  I don't remember.
11      Q.    Okay.  And you don't remember receiving
12  such a notice then?
13      A.    I don't remember.  I might have.
14      Q.    Or you might not have?
15      A.    Right.
16      Q.    Did you ever tell Orly about the
17  8-31-08 notice?
18      A.    No.
19      Q.    Why not?
20      A.    Because, first of all, I might have not
21  received it, so I didn't tell her.  And, second,
22  this was something that I could not stop.
23      Q.    Okay.  We will -- let's talk about
24  that.  Why could you not stop it?
25      A.    Because TPR -- I didn't have any
```

```
1                          GENGER
2       A.    I guess so.  Yeah.
3              MR. GRIVER:  Okay.  Let's take a break.
4   I ask that you not speak to anyone about your
5   testimony.  Five minutes?
6              MR. MEISTER:  Five minutes.
7                   (WHEREUPON, a recess was had from
8                   3:34 p.m. to 3:42 p.m.)
9              MS. WARREN:  Are we on the record?
10             During the break, I was in the bathroom
11  with Ms. Genger, who approached me and said that
12  she might have made a mistake in her past
13  testimony.  I cut her off before she could tell
14  me the substance of any mistake that she thought
15  that she made.  But if she feels that a mistake
16  is made, I would like to just ask that we give
17  her an opportunity to clarify the record.
18             MR. LEINBACH:  That sounds absolutely
19  reasonable.
20  BY MR. GRIVER:
21      Q.    Ms. Genger, this correction that you
22  made, did anyone talk to you about this
23  correction?  I am not talking about Ms. Warren.
24  I am saying did you speak with Sagi or anyone
25  else, and that's why you remember this?
```

1                          GENGER

2        A.      No, no.

3        Q.      Okay.   Why don't you put your

4   correction on the record.

5        A.      Okay.   The correction is that once I

6   was aware that this notice existed, I did consult

7   with my lawyer, and I chose not to inform Orly.

8        Q.      When you say that you consulted with

9   your attorney, you were consulting as trustee of

10  the trust?

11       A.      As a trustee, obviously.

12       Q.      And you were going to this attorney

13  understanding that he represented the trust?

14       A.      The trust.

15       Q.      He represented the trust?

16       A.      The trust.

17       Q.      And you were seeking advice as trustee

18  for what is best for the trust?

19       A.      Right.

20       Q.      And the beneficiary of the trust?

21       A.      Obviously.

22       Q.      And that was Mr. Meister?

23       A.      Uh-huh.

24       Q.      And did he provide you advice?

25       A.      Yes.

1               GENGER

2                   the reporter as requested.)

3           MR. MEISTER:  Object to the form.

4    BY MR. GRIVER:

5       Q.    Let me clean that up.

6            You never asked Mr. Meister about

7    getting other people involved in the auction?

8       A.    Participate in the auction.  I don't

9    remember that we discussed other people.

10      Q.    Do you understand that it is your job

11   as trustee to get the best price at the auction?

12           MR. MEISTER:  Objection.  Asked and

13   answered several times now.

14           MR. DELLAPORTAS:  Object to form.

15   BY THE WITNESS:

16      A.    Yes, you did ask me.

17           MR. ZILBERFEIN:  Objection.

18   BY MR. GRIVER:

19      Q.    One way to get the best price possible

20   is to get as many people bidding as possible.

21           MR. MEISTER:  Objection.  That's not a

22   question.

23           MR. DELLAPORTAS:  Objection.  That's

24   not a question.

25   BY THE WITNESS:

1                          GENGER

2      A.    Do you want to teach me?

3            MR. MEISTER:  No, no.  Wait until

4  there's a question, Dalia.

5  BY MR. GRIVER:

6      Q.    One way to get the best price is to get

7  as many people bidding as possible?

8            MR. DELLAPORTAS:  Object to form.

9            MR. ZILBERFEIN:  Objection.

10  BY MR. GRIVER:

11     Q.    Correct?

12           MR. MEISTER:  Join the objection.

13  BY MR. GRIVER:

14     Q.    I am waiting.

15     A.    Yeah, I guess it is correct.  Yeah.

16     Q.    Why did you then did you not let Arie

17  know that --

18     A.    Yeah, because I particularly did not

19  want Arie to be involved as far as Orly's assets

20  are concerned in any way.

21     Q.    Okay.

22           MR. MEISTER:  Can we go off the record

23  for a second?

24           MR. GRIVER:  No.  Well, I'm almost

25  done.

```
 1                        GENGER
 2    BY MR. GRIVER:
 3        Q.    If Sagi was going to pay $2 million for
 4    Orly's assets, and Arie was going to pay $3
 5    million for Orly's assets, at the end of the
 6    day --
 7        A.    At the same time, Arie is doing other
 8    things, like paying your bills instead of Orly.
 9    You understand?  That's my -- that's where I am
10    going, because you are not objective.  You are
11    being paid not by Orly, but by somebody else,
12    like my husband.  It is financing this
13    deposition.  And that's why I didn't want Arie to
14    be involved in this auction.
15        Q.    Because his money is tainted?
16        A.    No.  Because his interest -- Orly's
17    interest is not the same as Arie's interest.
18    That's why.  Airy's interest is to have control
19    over Orly's assets, I believe.
20        Q.    And if Arie had paid $5 million --
21        A.    He wouldn't.  He didn't have any money
22    because we just split our marital assets, and he
23    got five and I got five.  So how could he pay?
24        Q.    Did you check to see if he could, or
25    did you let --
```

GENGER

1

2     A.    I didn't check because I know.

3     Q.    You didn't check because --

4     A.    Unless he hid some money that I don't

5  know about because then I have to get part of it.

6  I don't know.

7     Q.    You didn't check because -- you didn't

8  check because you didn't want Arie to

9  participate?

10    A.    No, that not true.

11          MR. ZILBERFEIN:  Are you testifying?

12  BY THE WITNESS:

13    A.    I'm just saying --

14          MR. ZILBERFEIN:  Objection.  The

15  attorney is testifying.

16  BY THE WITNESS:

17    A.    -- that I didn't check because I knew

18  what his financial condition is at that time,

19  because we were supposed to have the same amount

20  of assets or money or whatever you call it, okay.

21  BY MR. GRIVER:

22    Q.    And you don't think --

23    A.    And if he had some extra money, then it

24  was marital money that I was supposed to get part

25  of it.

GENGER

1

2     Q.     And you are not sure that he -- and you

3     thought that Arie couldn't find some friends of

4     his who might participate in the auction?

5     A.     I don't know if he has friends.

6     Q.     But if Arie participated and didn't

7     have as much money as Sagi, that's fine.  But

8     isn't it a possibility that he would have been

9     able to get more money?

10    A.     There's always possibilities of

11    anything to happen.  The earthquake, the building

12    going on fire, I don't know.

13    Q.     So as trustee, why didn't you explore

14    that possibility?

15    A.     I told you already.  Because I knew how

16    much Arie has.  And, personally, I know my

17    husband.  I was married 33 years.  And I know

18    what's happening between Arie, unfortunately, and

19    Orly.

20    Q.     And why didn't you tell Orly?

21    A.     What?  Because Orly at this time was

22    brainwashed already, so I couldn't talk to her,

23    candidly, even though I did try.

24    Q.     And if Orly had known, then Arie would

25    have known, correct?

SUPREME COURT: NEW YORK COUNTY

ORLY GENGER in her individual capacity and on       Index No.:   109749/09
behalf of the Orly Genger 1993 Trust (both in its
individual capacity and on behalf of D & K Limited
Partnership),

                                    Plaintiff,       **AFFIDAVIT OF ORLY GENGER**

                    - against -

DALIA GENGER, SAGI GENGER, D & K GP
LLC, TPR INVESTMENT ASSOCIATES, INC.,
and LEAH FANG,

                                    Defendants.

STATE OF NEW YORK,
COUNTY OF NEW YORK.

        ORLY GENGER, being duly sworn, states as follows:

        1.      I make this affidavit in connection with Orly Genger's ("Orly") motion for

partial summary judgment and Sagi Genger ("Sagi"), D & K GP LLC ("D&K GP"), and

TPR Investment Associates, Inc.'s ("TPR") (together, "Defendants") cross-motions for

summary judgment.  Specifically, I respond to Defendants' contention that, even if they had

provided me with actual notice of the purported foreclosure and February 2009 auction of

D&K Limited Partnership's ("D&K LP") shares in TPR, I still would not have appeared to

bid on the TPR shares at the auction.

**The Genger Family Plan and the D&K Note**

        2.      The promissory note at issue in this case between D&K LP and TPR (the

"D&K Note") was originally set up as part of the Genger family plan to ensure that I and my older brother Sagi shared equally in the Genger family wealth. Though the D&K Note was to be voluntarily paid, it was never intended to be forcibly collected in a way that would extinguish our equal indirect interests in TPR, because to do so would have destroyed the Genger family plan. Sagi and I both knew about the Genger family estate plan and the D&K Note's role in that plan.

3.     I sat in and attended David Parnes' April/May 2015 deposition testimony before Justice Stephen Crane. Parnes confirmed again the D&K Note was part of the Genger family plan to have me and my brother share equally in the Genger family wealth, that it was not to be forcibly collected upon, and was not improper. Mr. Parnes' 2015 deposition testimony matches his and Sagi's 2007 testimony on this issue in a marital arbitration between my parents.

4.     After sitting through Parnes' deposition, and all the trial testimony in *Orly Genger v. Sagi Genger*, Index No. 10697/2008, it is clear to me that the purported foreclosure and sale of the D&K Note was part of my older brother's overarching scheme to deprive me of every asset or financial benefit my parents ever gave me and take it for himself.

**The Challenged Auction of D&K LP's TPR Shares**

5.     I did not know about the auction of D&K LP's shares of TPR until after it had occurred. Had I known about the above-mentioned auction before it took place, I would

have done at least the following.

6.     First, I would have told my father, Arie Genger, what was happening, and consulted with my legal counsel.

7.     Second, I would have taken whatever steps were necessary to make sure the auction never occurred.   Indeed, as previously stated, Sagi well-knows, and even has testified, that no one was supposed to forcibly collect on the D&K Note.

8.     Third, if I was unable to stop the auction from occurring, I would have consulted with my father, and approached my friends and business acquaintances to organize a competing bid for D&K LP's TPR shares at the auction.  This bid would have been more than the $2.2 million TPR bid at the auction for the TPR shares.   This is particularly true as TPR had recently increased its potential assets by between $27 and $44 million by selling the Genger family shares in Trans-Resources, Inc. ("TRI"), including my Orly Trust TRI Shares.  I also would have sought to have TPR open its books and records in advance of any attempted default and sale to encourage bidding at the auction.

9.     In short, had Sagi or D&K GP told me about the auction, I would have stopped the auction, or arranged to have TPR outbid at the auction.  I believe this is the real reason they did not tell me about the auction.

ORLY GENGER

Sworn to before me
7 / 27 , 2015

3

Notary Public

DANIEL ALBINO
Notary Public, State of New York
No. 01AL6290023
My Commission Expires 10-07-2017

4



4 of 6 DOCUMENTS

**Orly Genger, in her individual capacity and on behalf of the Orly Genger 1993 Trust (both in its individual capacity and on behalf of D & K Limited Partnership), Plaintiff, against Dalia Genger, SAGI GENGER, LEAH FANG, D & K GP LLC, and TPR INVESTMENT ASSOCIATES, INC., Defendants.**

**109749/09**

**SUPREME COURT OF NEW YORK, NEW YORK COUNTY**

*39 Misc. 3d 1235(A)*; *972 N.Y.S.2d 143*; *2013 N.Y. Misc. LEXIS 2304*; *2013 NY Slip Op 50886(U)*

**May 29, 2013, Decided**

**NOTICE:**      THIS OPINION IS UNCORRECTED AND WILL NOT BE PUBLISHED IN THE PRINTED OFFICIAL REPORTS.

PUBLISHED IN TABLE FORMAT IN THE NEW YORK SUPPLEMENT.

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part, Motion withdrawn by, As moot, Reserved by, in part *Genger v. Genger, 2013 N.Y. Misc. LEXIS 6088 (N.Y. Sup. Ct., Dec. 23, 2013)*
Affirmed in part and modified in part by *Genger v. Genger, 115 A.D.3d 421, 982 N.Y.S.2d 11, 2014 N.Y. App. Div. LEXIS 1386 (N.Y. App. Div. 1st Dep't, 2014)*

**PRIOR HISTORY:** *Genger v. Genger, 38 Misc. 3d 1213(A), 966 N.Y.S.2d 346, 2013 N.Y. Misc. LEXIS 185 (2013)*

**HEADNOTES**

[*1235A]          [**143]          Pleading--Amendment--Answer--Prejudice.          Injunctions--Preliminary Injunction--Prohibiting Foreclosure or Execution upon Trust without Requiring Posting of Additional Undertaking.

**COUNSEL:** [***1] For plaintiff Orly Genger and Orly Genger 1993 Trust: Yoav M. Griver, Bryan D. Leinbach, ZEICHNER ELLMAN & KRAUSE, NEW YORK, NEW YORK.

For defendant Dalia Genger: Robert A. Meister, Marisa Warren, PEDOWITZ & MEISTER LLP, New York, New York.

For defendant TPR Investment Associates, Sagi Genger and Sagi Genger 1993 Trust: John Dellaportas, Evan Michailidis, DUANE MORRIS LLP, NEW YORK, NY.

For defendant Leah Fang: JUDITH LISA BACHMAN, ESQ., NEW YORK, NY.

For defendants: YANKWITT & MCGUIRE, LLP, WHITE PLAINS, N.Y.

For defendant Rochelle Fang and as Trustee for Sagi Genger 1993 Trust: Desmond C.B. Lyons, LYONS MCGOVERN LLP, White Plains, New York.

**JUDGES:** Barbara Jaffe, J.

**OPINION BY:** Barbara Jaffe

**OPINION**

Barbara Jaffe, J.

This decision and order addresses motion sequence numbers 013, 014, 015, and 016. In motion sequence number 013, defendant TPR Investment Associates, Inc. (TPR) seeks an order granting it leave to amend its answer to add an affirmative defense of release, and granting it summary judgment dismissing the second amended complaint (complaint) of Orly Genger, in her individual

20-01187-jlg    Doc 1-46    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 48
Pg 83 of 150

Page 2

39 Misc. 3d 1235(A), *; 972 N.Y.S.2d 143, **;
2013 N.Y. Misc. LEXIS 2304, ***; 2013 NY Slip Op 50886(U)

capacity and on behalf of the Orly Genger 1993 Trust (Orly Trust) and on behalf of D & K Limited Partnership (D & K LP) (collectively, [***2] plaintiff). Plaintiff opposes and, by motion sequence number 014, cross moves for an order lifting the stay of discovery and for sanctions against defendants Dalia Genger, Sagi Genger, Leah Fang, D & K GP, LLC (D & K GP), and TPR.

In motion sequence number 015, brought on by order to show cause, plaintiff seeks, *inter alia*, to enjoin defendants preliminarily from foreclosing on the Orly Trust's interests in TPR and Trans Resources Inc. (TRI, a subsidiary of TPR), and to require Sagi and Dalia to post $4.44 million as security for certain debts that encumbered the Orly Trust's assets in a series of transactions whereby nonparty Manhattan Safety Company Ltd. (Manhattan Safety) was assigned a restated promissory note issued in 1993 by D & K LP in favor of TPR, the assignor.

In motion sequence number 016, Fang, the former trustee of the Orly Trust, seeks an order granting her summary judgment dismissing the complaint as against her.

The motions are consolidated for disposition.

*I. BACKGROUND*

The background of this action is set forth in several opinions and decisions of this court and the Delaware courts, among others. Additional background is furnished here to address the instant motions.

Arie [***3] Genger is Orly and Sagi's father, and Dalia's husband before their 2004 divorce. Arie founded TPR and TRI, and in 1993, he established the Orly Trust and the 1993 Sagi Genger Trust (Sagi Trust) (collectively, the Trusts) for his children as part of a family estate plan. He funded each Trust with a $600,000 gift and assigned each a 48 percent interest in D & K LP (Complaint, ¶ 19). The remaining 4 percent of D & K LP was held by Dalia, who also later held a 99 percent interest in D & K GP, the general partner of D & K LP. As a result, each Trust became a limited partner of D & K LP. (*Id.*, ¶ 20).

After the Trusts were funded, D & K LP purchased 240 shares of TPR's common stock for $10,200,000, a 49 percent interest. The purchase price was satisfied as follows: (1) the Trusts each paid $600,000; (2) Dalia paid $50,000, and (3) Dalia, as the general partner of D & K LP acting on its behalf, executed a promissory note in favor of TPR for $8,950,000 (1993 Note). The 1993 Note required that D & K LP repay principal and interest in annual installments over ten years, and the Trusts and Dalia assumed liability for repayment in proportion to their respective ownership interests in D & K LP. (*Id.*,

[***4] ¶¶ 21-22). The 1993 Note was secured by D & K LP's pledge of its 240 shares in TPR(pledge). (*Id.*, ¶ 23). As a result, each of the Trusts held a 23.52 percent indirect interest in TPR, Dalia held a 1.96 percent indirect interest in TPR, and Arie held a 51 percent direct interest in TPR. (*Id.*, ¶ 24).

In the complaint, it is alleged that all of the Genger family members, including those who manage or control TPR, understood that the 1993 Note and Pledge were created solely for tax and estate planning purposes, and that they were not to be collected and enforced. (*Id.*, ¶ 25). It is also alleged that in the course of the arbitration proceedings conducted in connection with the 2004 Genger divorce, the 1993 Note was adjudicated as "worthless and uncollectible," based on the submissions and testimony of Dalia, as TPR's board member, Sagi, as TPR's president and CEO, and David Parnes, as TPR's vice president, that the 1993 Note and Pledge were "never intended to be enforced."(*Id.*, ¶ 26).

Pursuant to Arie's and Dalia's 2004 divorce settlement, Dalia obtained control of TPR, and in exchange, Arie and the trusts would directly hold their interests in TRI. The divorce stipulation provides that: [***5] (1) Dalia receive Arie's 51 percent interest in TPR and retain her 4 percent interest in D & K LP via D & K GP; and (2) TPR's 52.85 percent interest in TRI be transferred to Arie and the Trusts such that Arie would hold 13.99 percent of the TRI shares and each Trust would hold 19.43 percent of the TRI shares; with the remaining 47.15 percent of the TRI shares to be held by the "Trump Group," a TRI minority shareholder in 2004. (*Id.*, ¶ 28).

Dalia and Arie's bitter divorce spawned the allegations that Dalia and Sagi had colluded to destroy Arie financially, and that their actions threatened Orly's destruction as well. (*Id.*, ¶ 31). Soon after the divorce, Dalia ceded to Sagi control of TPR and D & K LP, and it is alleged that, by forming D & K GP, Dalia and Sagi attempted to shield themselves from personal liability stemming from their interests in D & K LP, while exposing the Trusts to potential liability to TPR on the 1993 Note. (*Id.*, ¶¶ 32-33). After Sagi obtained control from Dalia over TPR and its interest as payee on the 1993 Note, it is also alleged that he used his position as CEO of TPR and as manager of D & K LP to engage in self-dealing with respect to the 1993 Note in order [***6] to disadvantage Orly and the Orly Trust financially. (*Id.*, ¶¶ 37-41).

In 2007, Sagi's sister-in-law, defendant Fang, was appointed trustee of the Orly Trust. Orly alleges that Fang colluded with Sagi to diminish the value of the Orly Trust by entering into agreements that would allow the Orly Trust's interest in the TPR shares and the TRI shares to be pledged or encumbered by Sagi and/or TPR

39 Misc. 3d 1235(A), *; 972 N.Y.S.2d 143, **;
2013 N.Y. Misc. LEXIS 2304, ***; 2013 NY Slip Op 50886(U)

without notice to Orly. (*Id.*, ¶¶ 43-44). Specifically, in November 2007, Fang as trustee and Sagi as manager of D & K GP, the general partner of D & K LP, signed the "Amended and Restated Limited Partnership Agreement" of D & K LP (D & K Agreement), which granted D & K GP the authority to pledge or otherwise encumber Orly Trust's interest in the TRI shares for the benefit of the partnership, without providing any notice or benefit to Orly and the Orly Trust. (*Id.*, ¶¶ 72-75). In January 2008, upon Fang's resignation, Dalia was appointed as successor trustee to the Orly Trust, and then divested herself of her interest in the TPR shares. (*Id.*, ¶ 39).

In January 2009, Dalia, as successor trustee to the Orly Trust, and Sagi, on behalf of D & K GP, along with TPR, then under Sagi's control, entered into [***7] an agreement entitled "Meeting of Partners of D & K LP," in which it was agreed that D & K GP would sign for D & K LP and its limited partners when making their assets subject to a pledge in the same manner that the TPR shares were pledged in conjunction with the 1993 Note (Meeting Agreement). (*Id.*, ¶ 76). The D & K Agreement and the Meeting Agreement were prepared and executed without Orly's knowledge, even though Orly requested information about the Orly Trust's assets during Fang's and Dalia's respective tenures as trustee. (*Id.*, ¶ 79).

Repayments on the 1993 Note were made by D & K LP until 1999, and in keeping with the parties' understanding that the 1993 Note obligation would not be enforced, no attempt was made to collect on it for almost 10 years until August 2008 when Sagi sought to enforce it on behalf of TPR by causing TPR to send a notice of default to himself as the manager of D & K LP. (*Id.*, ¶¶ 50, 64). In February 2009, the 1993 Note was foreclosed upon at an auction at which the 240 shares of TPR stock pledged by D & K LP as collateral were purchased by TPR for $2.2 million, thereby decreasing D & K LP's obligation, but leaving a "deficiency" of approximately $8.8 million [***8] guaranteed by the Trusts. (*Id.*, ¶¶ 65-70). Orly Trust's interest in D & K LP's interest in TPR, the Orly Trust's sole asset, was thereby transferred to TPR, resulting in a serious financial loss to Orly and the Orly Trust. (*Id.*, ¶ 71). Plaintiff alleges that the deficiency "manufactured by this sham auction" gave Sagi and TPR a potential basis upon which to foreclose on the Orly Trust's remaining principal asset, its interest in the TRI shares. (*Id.*, ¶ 70).

On August 22, 2008, the Trump Group and TPR entered into a stock purchase agreement whereby TPR agreed to sell the Sagi Trust's shares of TRI stock to the Trump Group for $26.7 million, which would result in the Trump Group becoming TRI's majority stockholder. (*Id.*,

¶¶ 82-84). Moreover, that same day, the parties entered into a side letter agreement whereby TPR agreed that if the transfers made by TPR of the TRI shares to the Orly Trust and to Arie in the Divorce Stipulation were determined to be invalid, the Trump Group would be entitled to purchase directly from TPR the Orly Trust's TRI shares and Arie's TRI shares at less than 60 percent of the per share price paid by the Trump Group for the Sagi Trust TRI shares. These agreements, [***9] and the transactions contemplated thereunder, engendered significant litigation in various jurisdictions, including Delaware, the Southern District of New York (SDNY), as well as this court and the Surrogate's Court.

In an amended decision dated July 28, 2010, which replaced the June 28, 2010 decision addressing motion sequence numbers 001 through 006, the justice previously assigned to this Part denied defendants' motions to dismiss Orly's first amended complaint, granted Orly's request for leave to file the complaint to add Fang as a defendant, and issued certain injunctive relief against defendants in Orly's favor. (*See Genger v Genger*, New York County, July 28, 2010, Feinman, J., index number 109749/2009) (July 28 decision).

The complaint contains 16 causes of action, including: breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, tortious interference with contract, fraud, aiding and abetting fraud, constructive trust, conversion, replevin, and promissory estoppel, as well as requests for various declaratory judgments and injunctive reliefs. In sum, plaintiff alleges that the defendants acted in concert to defraud Orly and loot the Orly Trust of its assets.

## II. [***10] TPR'S MOTION AND PLAINTIFF'S CROSS MOTION

### A. TPR's motion for leave to amend its answer

TPR filed its answer to the complaint on October 7, 2010, and by motion dated July 12, 2012 (sequence number 013), seeks leave to amend its answer to plead release as an additional affirmative defense, asserting that after filing its answer, it entered into a settlement on March 16, 2012 (2012 Settlement) with the Orly Trust, acting through Dalia, and D & K LP, acting through D & K GP, that restates and amends an earlier settlement dated October 3, 2011 among the same parties (2011 Settlement), pursuant to which they agreed, *inter alia*, to release each other.

Pursuant to the 2011 Settlement, TPR agreed to relinquish in favor of the Orly Trust any economic interest in the Orly Trust's TRI shares and sale proceeds, including the $10.3 million resulting from TPR's sale to the Trump Group of those shares under the 2008 side letter

39 Misc. 3d 1235(A), *; 972 N.Y.S.2d 143, **;
2013 N.Y. Misc. LEXIS 2304, ***; 2013 NY Slip Op 50886(U)

any shares of TPR, either directly or indirectly through DK (the TPR Interest')" (2011 Settlement Agreement, ¶ 1[b]). Therefore, the Orly Trust's direct interest in D & K LP and its indirect interest in TPR (through D & K LP) were adversely affected by the settlement, inasmuch as the Orly Trust was required to disclaim any and all interest in the TPR shares. The 2012 Settlement retained this language. (2012 Settlement Agreement, ¶ 1[b]).

Thus, it is undisputed that any transfer to TPR of the Orly Trust's interest in TPR would involve a transfer through and by D & K LP, because the Orly Trust is a partner of D & K LP which, in turn, is a TPR shareholder. Also, the Orly Trust and D & K LP are parties to the settlements and are purportedly required to exchange mutual releases with TPR which, among other things, release all claims and causes of action in connection with [***16] the DK Interest and the TPR Interest. (*See* 2011 and 2012 Settlement Agreements, ¶ 4). The settlements thus affect or otherwise dispose of the Orly Trust's and D & K LP's interests in TPR.

Moreover, TPR ignores the fact that Orly is suing on behalf of D & K LP, whose interest in TPR is explicitly addressed in the injunctive provision of the July 28 decision. Indeed, TPR admits that Orly Trust's interest in TPR is affected by the settlements, stating that, "even were [defendants] not so released, all of Orly's claims brought on behalf of D & K' would still be barred because, under Section 1 of the Settlement Agreement, the [Orly] Trust has transferred to TPR its limited partnership interest in D & K." (TPR Brief at 9).

TPR also ignores the injunctive relief granted in favor of plaintiff because the court state that "the family shares at issue are intertwined among various family [corporate] entities, [and] defendants have not offered sufficient evidence to show that the shares of either TPR or [TRI] owned by the Orly Trust are not unique' and should not be protected from transfer, sale, or assignment until this litigation is ultimately decided." (July 28 decision, at 14). Yet, TPR and [***17] other defendants entered into settlements that impacted the Orly Trust's interests in the TPR shares and/or the TRI shares before any judicial determination of their ownership. Hence, the settlements violate the letter and spirit of the injunctive provision of the decision.

## C. Plaintiff's cross motion

On December 28, 2011, in the related action under index number 651089/2010, the previously assigned justice enjoined defendants Dalia, Sagi, and TPR from using or spending the proceeds derived from TPR's purported sale to the Trump Group of the Orly Trust shares and the Arie shares in TRI, pending a judicial determination of their beneficial ownership. TPR and the Trump Group were also directed to give plaintiffs Arie and Orly 10 business days' notice of any future transactions that may impact such shares. In her cross motion (sequence number 014) filed in this action, Orly opposes TPR's motion and seeks sanctions against defendants for violating the restraint and injunction set forth in the July 28 and December 28 decisions.

TPR denies that the settlements violate the December 28 decision and the notice requirement set forth therein because TPR was not required to "notify [Orly] before [***18] selling its own promissory note [i.e., the 2011 Note] to a third party [i.e. Manhattan Safety]." (TPR's Brief In Opposition to Plaintiff Cross Motion for Sanctions, filed Aug. 10, 2012 at 4). Notably, in connection with the 2012 Settlement and the May 2012 assignment of the 2011 Note to Manhattan Safety, Dalia, on behalf of the Orly Trust, and TPR agreed to use the proceeds derived from TPR's purported sale of the Orly Trust TRI shares to the Trump Group to pay the 2011 Note and/or New Note. Even though no payment has yet been made, the above arrangement impacts the Orly Trust TRI shares to the extent it seeks to "use" or "spend" the sale proceeds to pay the 2011 Note or New Note, which, according to plaintiff, is a "sham transaction" in that TPR/Sagi tries to revive the worthless 1993 Note, and replace it with a purportedly valid 2011 Note that is assigned to an off-shore entity located outside of this court's jurisdiction.

Accordingly, the transactions under the settlements, as agreed to by defendants including TPR, impact Orly Trust's interest in the TRI shares, and thus defendants should have given Orly 10 days' notice pursuant to the December 28 decision. The failure to do so [***19] violates the court's order and subjects defendants to sanctions, namely, plaintiff's costs in preparing and filing these motions, and in answering defendants' motions.

Plaintiff's request to lift the automatic stay of discovery is mooted by compliance conference order dated September 19, 2012, which lifted the stay in connection with TPR's summary judgment motion. In any event, because TPR's summary judgment motion is denied (supra, II.B.), the stay is unwarranted.

As the settlement agreements are contracts entered into in violation of court orders, they are either void or voidable. (*Crane v New York Council 66 of Am. Fed. of State, County & Mun. Empls., 101 AD2d 682, 475 N.Y.S.2d 165 [3d Dept 1984]; see also Skiff-Murray v Murray, 17 AD3d 807, 793 N.Y.S.2d 243 [3d Dept 2005]* [transfer of subject real property in violation of restraining order would make new deed void or voidable]). At a minimum, the settlements and releases are subject to judicial review and approval, notwithstanding TPR's contention that they are valid and enforceable and that

20-01187-jlg    Doc 1-46    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 48
Pg 86 of 150

Page 6

39 Misc. 3d 1235(A), *; 972 N.Y.S.2d 143, **;
2013 N.Y. Misc. LEXIS 2304, ***; 2013 NY Slip Op 50886(U)

the claims of Orly and the Orly Trust against TPR have been settled and released.

Moreover, TPR's asserted claim to the $10.3 million proceeds, held in escrow in connection with [***20] its sale to the Trump Group of the Orly Trust's interest in the TRI shares, is an untenable attempt to bypass a judicial determination as to the beneficial ownership of the shares and proceeds thereof. In its opposition brief (docket no. 266), TPR asserts that, "[p]ursuant to the Settlement Agreement, TPR does relinquish its economic interest in certain TRI shares to the Orly Trust, of which Orly is the main beneficiary," and that by "relinquishing its right to the aforementioned TRI shares[, TPR obtained] in exchange [] a general release of liability." (TPR Opposition Brief at 1, 10-11). TPR's assertion of ownership interest in the TRI shares and the escrowed $10.3 million cannot be reconciled with its acknowledgment that "Orly is the main beneficiary." Nor can TPR's unilateral declaration of ownership be reconciled with the undisputed fact that the issue of ultimate beneficial ownership in such shares and the related proceeds has not yet been judicially determined by a court of competent jurisdiction. (Dec. 28 decision, at 14). That the Delaware court has determined that TPR is the record owner of the TRI shares is immaterial absent a judicial determination as to their beneficial [***21] ownership.

The complaint also raises significant issues of fact as to whether defendants, including TPR, have breached their fiduciary duties and engaged in collusion and self-dealing.

### III. FANG'S MOTION

Fang, the former trustee of the Orly Trust, seeks dismissal of the complaint against her, contending that: (1) she was given a full release by Dalia, the successor trustee, after she served as trustee for only nine months; (2) the Orly Trust instrument granted the trustee the power to settle any claims, and Dalia was empowered to grant her the release; (3) under the settlement agreements, she was also released of any and all liability; and (4) under New York trust law, a trustee, such as Dalia, is authorized to settle any claim in favor of the trust estate or in favor of third persons against the estate. (*Estates, Powers and Trusts Law [EPTL] § 11-1.1[b][13]*).

As discussed *supra*, II.C., the releases under the settlements are void or voidable because they violate the injunctive and notice provisions of prior court orders. Also, Fang has never explained why she, on behalf of the Orly Trust, signed the D & K Agreement, which granted D & K GP the authority to pledge the Orly Trust's interest [***22] in the TRI shares for the benefit of D & K LP, waived the Orly Trust's right to bring action against D & K GP, and never informed Orly of this arrangement despite her request. Because of Fang's involvement in this arrangement, Orly was granted leave in the July 28 decision to add Fang as a defendant and asserts claims of breach of fiduciary duty and fraud against Fang.

While exculpatory clauses in a trust agreement may be valid and enforceable, the trustee nevertheless remains liable "if he commits a breach of trust in bad faith or intentionally or with reckless indifference to the interests of the beneficiaries, or if he has personally profited through a breach of trust because the trustee must be accountable for acts committed while in a fiduciary relationship." (*Matter of Jastrzebski, 97 AD3d 819, 948 N.Y.S.2d 689 [2d Dept 2012]; see also Matter of Tydings, 32 Misc 3d 1204[A], 932 N.Y.S.2d 763, 2011 NY Slip Op 51177[U] [Sur Ct, Bronx County 2011]*). Similarly, New York's trust law prohibits the inclusion in a trust instrument of a provision exculpating a trustee of liability, as an exculpation for failure to uphold one's fiduciary duty and exercise reasonable care is against public policy. (*EPTL § 11-1.7*).

Here, that the release was signed by [***23] Dalia, the successor trustee, does not vitiate the public policy consideration that a former trustee should not be exculpated for a breach of fiduciary duty simply because a successor trustee has signed a release. And, even if the release was arguably binding on the beneficiary, as Fang urges, without first obtaining Orly's consent or providing her with notice, the complaint contains sufficient allegations of breach of fiduciary duty, fraud, and collusion against defendants Sagi, Dalia and Fang, which raise factual issues.

### IV. PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff seeks, *inter alia*, a temporary restraining order (TRO) and preliminary injunction to restrain and enjoin defendants from encumbering the Orly Trust with debts or selling the trust assets in connection with the settlements and Manhattan Safety transactions. On August 9, 2012, the previously assigned justice issued a TRO (docket no. 242) restraining defendants "from taking any action that encumbers the trust with debt and from liquidating, transferring or selling any stocks or other assets of the trust," and directing them to inform Orly "within 24 hours of the receipt of any notice of default or other attempt [***24] to enforce any provision of the notes in any way." The TRO was continued and modified by interim order dated August 15, 2012 (docket no. 311).

In support of the instant motion, which constitutes an extension of her cross motion to lift the automatic stay and for sanctions (sequence no. 014), Orly argues that

39 Misc. 3d 1235(A), *; 972 N.Y.S.2d 143, **;
2013 N.Y. Misc. LEXIS 2304, ***; 2013 NY Slip Op 50886(U)

additional injunctive relief is necessary to protect the Orly Trust's assets in the Manhattan Safety transactions because defendants have disregarded and violated prior status quo orders of this court. She seeks a preliminary injunction: (1) enjoining the defendants from participating in or allowing any party such as Manhattan Safety to foreclose or otherwise execute upon the Orly Trust's interest in the TRI shares; and (2) requiring Sagi and Dalia to deposit $4.44 million with the court, as security for the debts that were purportedly incurred by the Orly Trust in connection with the Manhattan Safety transactions, including the New Note ($4.24 million), an additional $200,000 promissory note, and any other debt instrument (Notes).

TPR opposes the motion, and argues that the injunctive relief sought by plaintiff should be denied based on the settlements and the releases.

For the reasons [***25] stated above (II.C.), the settlements and releases are void or voidable because they violate the status quo orders of the court and public policy. The request to enjoin defendants including TPR from participating in any attempt by Manhattan Safety or allowing Manhattan Safety to foreclose or otherwise execute upon the Orly Trust's interest in the TRI shares is appropriate under the circumstances, especially as Manhattan Safety is an off-shore entity located outside of this court's jurisdiction and may try to enforce the Notes against the Orly Trust without notice.

Moreover, under the Settlements and related transactions, Manhattan Safety may enforce and collect on the Notes at the earliest of the following events: (a) Dalia no longer serving as the trustee of the Orly Trust; (b) the resolution of the federal interpleader action; or (c) November 1, 2014. As it appears that the interpleader action has been resolved, Manhattan Safety may accelerate the Notes and make them immediately due and payable. This court has also granted specific injunctive relief in plaintiff's favor in the July 28 decision. (*Id.* at 32). Therefore, the requested injunctive relief is warranted.

TPR argues that if [***26] a preliminary injunction is granted, Orly should be required to post a $10.3 million bond pursuant to *CPLR 6312 (b)*, which requires a plaintiff to give "an undertaking in an amount to be fixed by the court." TPR argues that $10.3 million is necessary because it was "the principal consideration TPR paid for the release pursuant to the Settlement Agreement." (TPR Opposition Brief, at 19). As the release is void or voidable, whatever amount TPR had purportedly paid for it is irrelevant.

And, in the July 28 decision, the undertaking first posted by plaintiff in the amount of $150,000 for its original application was continued. (Id. at 32). This amount remains appropriate, and need not be increased

under present circumstances, particularly in light of the fact that TPR has no absolute right to $10.3 million, having conceded that Orly is the main beneficiary.

However, to require Sagi and Dalia to post $4.44 million in personal assets in connection with the settlements and the Manhattan Safety transactions, is unwarranted, and Orly cites no applicable law in support.

*Article 62 of the CPLR* sets forth the grounds for seeking an order of attachment, a provisional remedy, but Orly articulates no [***27] basis for her request, which is akin to a prejudgment attachment. She merely asserts that "[t]he only way to restore and protect the status quo is for defendants Sagi and Dalia pay $4.44 million into the Court, so funds are available to pay [Manhattan Safety,] if and when it seeks to collect [on the Notes.]" (Pl. Reply Brief, at 2).

Orly has failed, however, to demonstrate that a money judgment in her favor will be insufficient to remedy the alleged harm or that she will suffer irreparable injury so as to justify the granting of injunctive relief under *CPLR 6311*. Consequently, the requested injunctive or provisional relief is inappropriate. (*See Zodkevitch v Feibush, 49 AD3d 424, 425, 854 N.Y.S.2d 373 [1st Dept 2008]* ["Supreme Court erred in directing appellant to place into an escrow account the funds her allegedly misappropriated since plaintiffs failed to make a clear showing that they would suffer irreparable injury unless that relief were granted, a necessary element on a motion for a preliminary injunction"]).

## V. CONCLUSION

Accordingly, it is hereby

ORDERED, that with respect to motion sequence number 013, defendant TPR Investment Associates, Inc.'s motion for an order seeking leave of the court to [***28] amend its answer is denied, and its motion for an order granting it summary judgment dismissing the second amended complaint is also denied; it is further

ORDERED, that with respect to motion sequence number 014, the branch of plaintiff's cross motion seeking an order lifting the automatic stay of discovery is denied as moot, and the branch of the cross motion seeking sanctions against defendants is granted to the extent of plaintiff's costs in preparing and filing the cross motions and opposing defendants' motions; it is further

ORDERED, that with respect to motion sequence number 015, defendants named in this action, except defendant Leah Fang, as well as their agents, assigns, and counsel, are preliminarily enjoined from participating in the foreclosure or execution of or permitting any assignee of the notes that were issued in connection with the settlements and the related transactions to foreclose

39 Misc. 3d 1235(A), *; 972 N.Y.S.2d 143, **;
2013 N.Y. Misc. LEXIS 2304, ***; 2013 NY Slip Op 50886(U)

or execute upon the Orly Genger 1993 Trust's interest in the shares of Trans Resources Inc. until further order of this Court, and that plaintiff is not required to post any additional undertaking for the relief granted herein; and it is further

ORDERED, that with respect to motion sequence [***29] number 016, defendant Leah Fang's motion for

an order granting summary judgment dismissing the second amended complaint as against her is denied.

ENTER:

Barbara Jaffe, JSC

DATED: May 29, 2013

New York, New York



### Orly Genger, etc., Plaintiff-Respondent, v Dalia Genger, et al., Defendants-Appellants.

### 11871, 109749/09

## SUPREME COURT OF NEW YORK, APPELLATE DIVISION, FIRST DEPARTMENT

*120 A.D.3d 1102; 993 N.Y.S.2d 297; 2014 N.Y. App. Div. LEXIS 6204; 2014 NY Slip Op 06248*

**September 23, 2014, Decided**
**September 23, 2014, Entered**

**NOTICE:**

THE LEXIS PAGINATION OF THIS DOCUMENT IS SUBJECT TO CHANGE PENDING RELEASE OF THE FINAL PUBLISHED VERSION. THIS OPINION IS UNCORRECTED AND SUBJECT TO REVISION BEFORE PUBLICATION IN THE OFFICIAL REPORTS.

**PRIOR HISTORY:** *Genger v. Genger, 115 A.D.3d 421, 982 N.Y.S.2d 11, 2014 N.Y. App. Div. LEXIS 1386 (N.Y. App. Div. 1st Dep't, 2014)*
*Genger v. Genger, 39 Misc. 3d 1235(A), 972 N.Y.S.2d 143, 2013 N.Y. Misc. LEXIS 2304 (2013)*

**COUNSEL:** [***1] Pedowitz & Meister, L.L.P., New York (Robert A. Meister of counsel), for Dalia Genger, appellant.

Morgan, Lewis & Bockius LLP, New York (John Dellaportas of counsel), for Sagi Genger and TPR Investment Associates, Inc., appellants.

Ira Daniel Tokayer, New York, for D & K GP LLC, appellant.

Zeichner Ellman & Krause LLP, New York (Brian D. Leinbach of counsel), for respondent.

**JUDGES:** Tom, J.P., Friedman, Acosta, Andrias, Richter, JJ.

**OPINION**

[*1102] [**298]    Order, Supreme Court, New York County (Barbara Jaffe, J.), entered May 31, 2013, which, insofar as appealed from, denied the motions of defendants TPR Investment Associates, Inc. (TPR) and D & K GP LLC (D & K GP) to amend their answers and for summary judgment dismissing the claims against them, granted plaintiff's cross motion for sanctions against TPR, D & K [*1103] GP, defendant Dalia Genger (Dalia), and defendant Sagi Genger (Sagi), sanctioned defendant Leah Fang (Fang), and denied Fang's motion for summary judgment dismissing the claims against her, unanimously modified, on the law and the facts, to delete the sanctions against Dalia, Sagi, and Fang, and to grant Fang's motion for summary judgment dismissing the claims against her, and otherwise affirmed, without costs. [***2]

Contrary to the motion court's statement, plaintiff did not cross-move for [**299] sanctions against Fang. Furthermore, Fang did not disobey the 2010 and 2011 injunctions -- she resigned as trustee of indirect plaintiff the Orly Genger 1993 Trust (Orly Trust) in January 2008 and had nothing to do with the 2011 and 2012 settlements challenged by plaintiff. Hence, there was no basis for sanctioning Fang.

Plaintiff's *cross* motion for sanctions was improper as against Dalia and Sagi, who were not movants (*see e.g. Kershaw v Hospital for Special Surgery, 114 AD3d 75, 978 N.Y.S.2d 13 [1st Dept 2013]*).

TPR and D & K GP contend that they should not have been sanctioned because they did not violate the 2010 and 2011 injunctions. This argument is unavailing.

Assuming, arguendo, that the 2010 order merely enjoined transfers, sales, pledges, assignments, or other dispositions of TPR shares (as opposed to transfers, etc., of the Orly Trust's interest in double-derivative plaintiff D & K LP), Orly Trust disclaimed any interest in any shares of TPR via the settlement agreements.

It is true that the October 2011 settlement predated the December 2011 injunction; however, the parties to the settlement amended and restated their agreement in March 2012, i.e., after the injunction. The 2011 order [***3] enjoined Sagi, TPR, and Dalia "from making demands upon and using or spending the proceeds derived from the purported sale by TPR . . . to [nonparty] Trump Group . . . of . . . the Orly Trust['s shares of non-party Trans-Resources, Inc. (TRI)] . . ., pending the determination by a court of competent jurisdiction [of] the beneficial ownership of such shares." The promissory note which is a part of both settlement agreements -- and which replaced a note that D & K LP had given in 1993 (the 1993 Note) -- provides that the principal and accrued interest shall be due "[i]mmediately upon [Orly Trust]'s receipt of the proceeds from the sale of [its] TRI shares."

In sum, the motion court properly found that TPR and D & K GP had disobeyed "a lawful mandate of the court" (Judiciary Law § 753[A][3]) and properly ordered them to pay plaintiff's attorneys' fees (see Davey v Kelly, 57 AD3d 230, 869 N.Y.S.2d 37 [1st Dept 2008]).

For the reasons discussed in the following paragraph, it was a [*1104] provident exercise of the IAS court's discretion to deny TPR's and D & K GP's motions to amend their answers to add the defense of release, based on the release contained in the October 2011 and March 2012 settlement agreements, because the proposed amendment lacked merit and would be futile (see Eighth Ave. Garage Corp. v H.K.L. Realty Corp., 60 AD3d 404, 405, 875 N.Y.S.2d 8 [1st Dept 2009], lv dismissed [***4] 12 NY3d 880, 910 N.E.2d 1003, 883 N.Y.S.2d 174 [2009]). For the same reasons, the court correctly denied the motions by TPR and D & K GP for summary judgment dismissing the claims against them based on the same release.

When a fiduciary has a conflict of interest in entering a transaction and does not disclose that conflict to his/her principal, the transaction is "voidable at the option of" the principal (Wendt v Fischer, 243 NY 439, 443, 154 N.E. 303 [1926]). Moreover, "an agent cannot bind his principal . . . where he is known to be acting for himself, or to have an adverse interest" (Manhattan Life Ins.

Co. v Forty-Second St. & Grand St. Ferry R.R. Co., 139 NY 146, 151, 34 N.E. 776 [1893]). In entering into the aforementioned October 2011 and March 2012 settlement agreements with TPR and D & K LP on behalf of Orly Trust, of which she was sole trustee, Dalia [**300] had a conflict of interest. The new promissory notes executed by Dalia on behalf of Orly Trust pursuant to the settlement agreements contained provisions that were plainly intended to entrench her as sole trustee of Orly Trust, notwithstanding the ongoing disputes and litigation between herself and plaintiff, the trust's beneficiary. Specifically, the replacement notes provided that Dalia's resignation or removal as trustee of Orly Trust, or the appointment of any additional trustee, would constitute an event of default rendering the notes [***5] immediately due and payable by Orly Trust. Further, the purported settlement of the derivative claims that plaintiff asserts on behalf of Orly Trust in this action -- which was already pending at the time the settlement agreements were executed -- required the court's approval, which was never sought. Moreover, as previously discussed, the settlements were entered into in violation of the aforementioned 2010 and 2011 injunctions. For these reasons, the settlements are voidable and, given the expressed intention of plaintiff (the beneficiary of Orly Trust) to void them, the purported releases they contain are not enforceable.

Fang moved for summary judgment based on additional releases given to her by Dalia (as trustee of Orly Trust) in December 2007 and January 2008. As no infirmity has been demonstrated in the December 2007 and January 2008 releases, the IAS court should have granted Fang summary judgment [*1105] based on these instruments.

This determination renders moot the portion of Fang's motion that sought summary judgment based on the infirm releases in the 2011 and 2012 settlement agreements.

The Decision and Order of this Court entered herein on March 4, 2014 is hereby recalled and vacated [***6] (see M-1592 and M-1606 decided simultaneously herewith).

THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.

ENTERED: SEPTEMBER 23, 2014

FILED: NEW YORK COUNTY CLERK 07/16/2012

NYSCEF DOC. NO. 212

INDEX NO. 109749/2009

RECEIVED NYSCEF: 07/16/2012

## AMENDED AND RESTATED SETTLEMENT AGREEMENT

This AMENDED AND RESTATED SETTLEMENT AGREEMENT (the "Agreement") is entered into as of March 16, 2012, by and among TPR Investment Associates, Inc., a Delaware corporation ("TPR"), the Orly Genger 1993 Trust, a trust settled on December 13, 1993, with Dalia Genger currently serving as trustee (the "OG Trust"), and D&K LP, a limited partnership ("DK") (collectively, the "Parties"; each, a "Party").

WHEREAS, this Agreement amends and restates the Settlement Agreement entered into by the same parties on October 3, 2011 and sets forth all current understandings and replaces all former understandings between the OG Trust, on the one hand, and any other Party or Parties hereto, on the other hand;

WHEREAS, TPR and OG Trust entered into an agreement on or about October 29, 2004 (the "Share Transfer"), whereby TPR contracted to sell to the OG Trust 1,102.8 shares of Trans Resources, Inc., a Delaware corporation ("TRI" and the "TRI Shares"); and

WHEREAS, TPR relied on representations by Arie Genger that the liabilities stemming from the "Bogolusa Lawsuit" against TPR, TRI and Arie Genger personally exceeded the combined assets of TRI and TPR by at least $30 million, implying that TRI was worthless (the "Bogolusa Representation"); and

WHEREAS, Arie Genger further represented that the Share Transfer only required the consent of TPR, and that no further consents were required by any third party (the "Transferability Representation"); and

WHEREAS, in reliance on both the Bogolusa Representation and the

-1-

Transferability Representation, TPR and the OG Trust agreed that OG Trust would pay TPR, for the Share Transfer, a consideration in the amount of one dollar per share; and

WHEREAS, the Bogolusa Representation was subsequently deemed false, as determined by Judge Leo Milonas in arbitration proceeding between Arie Genger and Dalia Genger in her personal capacity; and whereas in said arbitration proceeding Judge Milonas concluded that the value of the net assets of TRI as of October 2004 was approximately $55 million ("Milonas Value"), implying a possible value for the 1,102.8 TRI Shares of $10.3 million as of that same date (without discount to reflect a minority interest); and

WHEREAS, the Supreme Court of Delaware has recently affirmed the findings of the Delaware Chancery Court that the Transferability Representation was false, that pursuant to a Shareholder Agreement of TRI, which was entered into as of March 30, 2001, while Arie Genger controlled both TPR and TRI (the "TRI Shareholders Agreement"), the consent of other TRI shareholders (collectively, the "Trump Group") was required, that Arie Genger failed to provide such notice as required; and that TPR therefore remained the lawful record owner of the TRI Shares; and

WHEREAS, the Trump Group is claiming that beneficial ownership of the TRI Shares was not lawfully transferred to the OG Trust, a claim the Courts have not yet finally resolved; and

WHEREAS, the OG Trust is a guarantor of a certain Promissory Note in favor of TPR dated as of December 21, 1993, made by D&K Limited Partnership in the face value of $8,950,000 (the "1993 Note"); and

WHEREAS, following a partial foreclosure, approximately $4.5 million of the

-2-

CONFIDENTIAL                                    TPR 0014108

amount currently due and owing under the 1993 Note remains guaranteed by the OG Trust; and

WHEREAS Orly Genger, as beneficiary of the OG Trust, filed a Complaint in the New York State Supreme Court, which she personally verified on July 8, 2009 as truthful to her own knowledge, alleging that if the Delaware litigation resulted in a determination that the TRI shares were not transferred but remained with TPR the value of TPR's shares would increase by $250 to $350 million, so that the OG Trust's claimed beneficial ownership interest in the TRI Shares could be over $200 million; and

WHEREAS Orly Genger, as beneficiary of the OG Trust, earlier submitted a letter to the Surrogate's Court on November 8, 2008, stating that the TRI shares that TPR had contracted in 2004 to sell to the Sagi Genger 1993 Trust (the same number of shares that TPR had simultaneously contracted to sell to the OG Trust) were worth "in excess of $150,000,000"; and

WHEREAS, the OG Trust seeks to secure the economic benefit of its claimed beneficial ownership interest in the TRI Shares, which Orly Genger, as set forth above, has previously valued at $150-200 million; and

WHEREAS, pursuant to a letter agreement dated August 22, 2008 (the "2008 Letter Agreement"), TPR executed documents to transfer the TRI Shares to the Trump Group at the Milonas Value; and

WHEREAS, TPR believes that the transfer pursuant to the 2008 Letter Agreement is final, but the OG Trust reserves the right to challenge the Trump Group's title to the TRI Shares or alternatively claim the proceeds of the sale from the TRI Shares to the Trump Group, net of amounts due under the 2011 Note (as defined hereunder); and

**CONFIDENTIAL**                                                    **TPR 0014109**

WHEREAS, at a hearing before the New York State Supreme Court on September 13, 2011, counsel for Orly Genger in her personal capacity expressed to the Court his client's concern that the value of the OG Trust's claimed beneficial ownership interest in the TRI Shares would be "diminished" by litigation positions to be taken by TPR before the Delaware Chancery Court;

WHEREAS, TPR, the OG Trust, and DK now seek to finally settle all other disputes and controversies that exist among them, in such a manner as to: (a) resolve Orly Genger's concern by having TPR relinquish any interest in the TRI Shares and thereby enable the OG Trust to fully pursue the economic value of its claimed beneficial ownership interest in the TRI Shares; and (b) eliminate, or at least reduce, the drain on all sides' resources from the endless litigation of these issues in multiple forums;

NOW, THEREFORE, in consideration of the promises and commitments set forth herein, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    Consideration.  In exchange for the consideration set forth herein: (a) TPR hereby relinquishes in favor of the OG Trust any economic interest in the TRI Shares and assigns to the OG Trust its right to any economic benefits of the TRI shares including any proceeds from the sale thereof, including but not limited to the $10.3 million in proceeds otherwise owing to TPR in the future pursuant to the terms of the August 22, 2008 letter agreement; (b) the OG Trust – irrespective of any claim made or asserted on its behalf by Orly Genger – hereby transfers to TPR its limited partnership interest in DK (the "DK Interest"), and disclaims any interest in, any shares of or TPR, either directly or indirectly through DK (the "TPR Interest"); (c) TPR has paid $100,000 for the legal fees of the OG

-4-

Trust; and (d) DK and TPR agree that all rights of DK and/or TPR vis-à-vis the OG Trust created by (i) the Amended and Restated Limited Partnership Agreement of D&K Limited Partnership dated as of October 30, 2004 and signed November 22, 2007, and/or (ii) the Meeting of Partners of D&K L.P. January 31, 2009 & Agreement, are canceled and void *ab initio*.

2.     2011 Note.  The OG Trust is hereby released from any obligation under or as guarantor of the 1993 Note currently payable and owing in the amount of $4.5 million or the D&K Partnership Agreement, and the 1993 Note is hereby cancelled and replaced by an updated new promissory note, from the OG Trust in favor of TPR, substantially in the form attached hereto as Exhibit A, in the amount of $4.0 million (the "2011 Note"). TPR hereby relinquishes its claim to the remaining approximately $500,000 due under the 1993 Note. The terms of the 2011 Note are incorporated by reference as if fully set forth herein.

3.     Mutual Releases.    The parties to this Settlement Agreement hereby irrevocably and fully release one another, including all current and former directors, officers,  trustees, fiduciaries, agents, advisors and other representatives of each of the parties, as well as their shareholders, their partners,  and/or their subsidiaries, who have served at any time from November 1, 2004 to the present day, whether for acts in their fiduciary or individual capacities, and  their respective successors and assigns, from all claims, causes of action, lawsuits, demands, liability of any kind, asserted or unasserted, known or unknown, suspected or unsuspected, direct or derivative, in connection with the 1993 Note, the  TRI Shares, the Share Transfer, the DK Interest, the TPR Interest, the 2008 Letter Agreement, or any other matters,

CONFIDENTIAL

TPR 0014111

through the date of this Agreement. Nothing herein shall release any rights under this Agreement. Nothing herein shall release any claim or defense that any Party hereto has or may have as against any of the following persons and entities: Glenclova Investment Co., TR Investors, LLC, New TR Equity I, LLC, New TR Equity II, LLC, Jules Trump, Eddie Trump, Mark Hirsch, Trans-Resources, Inc., Avi Pelossof, William Dowd, Lawrence Small, Robert Smith, Arie Genger, Edward Klimerman, SNR Denton (along with its predecessor firms and all current and former partners thereof), and/or any other non-Party person who currently is litigating claims against any of the parties hereto.

4. <u>Binding Nature</u>. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

5. <u>Titles</u>. Titles and headings to articles, sections or paragraphs in this Agreement are inserted for convenience of reference only and are not intended to affect the interpretation or construction of the Agreement.

6. <u>Choice of Law and Forum</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to its conflicts of laws principles. The parties hereto hereby irrevocably and unconditionally submit, for themselves and their respective property, to the non-exclusive jurisdiction of the state and federal courts located in Wilmington, Delaware.

7. <u>Attorney's Fees</u>. In the event that, following execution of this Agreement, a Party hereto, or a beneficiary of a Party hereto for the benefit of that Party, either asserts a new claim or continues to pursue an existing claim (including, without limitation, any claim asserted in an arbitral proceeding, proceeding for the obtaining of

-6-

**CONFIDENTIAL**

**TPR 0014112**

provisional remedies, trial, appeal or enforcement proceeding) against another Party hereto concerning, arising out of, or relating to this Agreement, the 1993 Note, the TRI Shares, the Share Transfer, the DK Interest, the TPR Interest, the 2008 Letter Agreement, or any matters, through the date of this Agreement and such claim is unsuccessful, then the prevailing defendant, cross-claim defendant, counterclaim-defendant or arbitration respondent shall be entitled to recover its post-Agreement costs, expenses (including, without limitation, the reasonable costs of retaining experts or professional consultants) and reasonable attorneys' fees, in addition to all other remedies available to such Party.

8.    Interpretation.  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law.  No term shall be construed against any Party as drafter.

9.    Further Assurances. Each of the Parties agrees to execute and deliver, or to cause to be executed and delivered, all such instruments, and to take all such action as the other Party may reasonably request, in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement.

10.    Modification and Waiver.  This Agreement may be amended or modified only by a written instrument signed by each of the Parties.  No waiver of any provision of this Agreement by a Party shall be effective unless embodied in a written instrument signed by such Party.  The waiver by any of the Parties of any breach of this Agreement shall not be deemed a waiver of any prior or subsequent breach of this Agreement.

11.    Entire Agreement.  This Agreement constitutes the entire agreement between the Parties regarding the subject matter herein, superseding all prior oral or written representations, negotiations, understandings and agreements, on the subject

-7-

CONFIDENTIAL                                      TPR 0014113

matter herein.

12.   Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall be considered one instrument and shall become binding when one or more counterparts have been signed by each of the Parties and delivered to the other.

13.   Confidentiality.  This Agreement and its terms are confidential.

14.   Additional Covenant.  DK covenants that it has received authorization from the Sagi Genger 1993 Trust to enter into this Agreement, to the extent such authority is required.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date indicated below.

TPR Investment Associates, Inc.

By: _Yoav Sternberg_
Date: _16.3.12_

The Orly Genger 1993 Trust

_Dalia Genger_, Trustee
By:
Date: _March 16, 2012_

D&K LP

By: _Manager of GP_
Date: _March 16, 2012_

-8-

**CONFIDENTIAL**                                    **TPR 0014114**

# PROMISSORY NOTE

$4,000,000                                                      October 3, 2011

FOR VALUE RECEIVED, the undersigned, the Orly Genger 1993 Trust ("Borrower"), by way of its current sole trustee, Dalia Genger, promises to pay to TPR Investment Associates, Inc., a Delaware corporation ("Lender") the sum of $4,000,000 ("Principal") together with interest thereon at the rate of three percent (3%) percent per annum, payable as follows, and further covenants, to Lender, as follows:

The Principal together with all interest accrued thereon shall be due and payable to, or to the order of, Lender on the earliest of:

    (i)    November 1, 2012;

    (ii)   Immediately upon Borrower's receipt of the proceeds from the sale of TRI shares either pursuant to the interpleader action pending in the United States District Court for the Southern District of New York (the "Court") in *Pedowitz v. TPR*, 11 Civ. 5602, or otherwise.

Notwithstanding anything to the contrary herein or in the parties' accompanying Settlement Agreement, to the extent that the Court awards Lender any of the interpleaded funds, Lender shall first retain such funds to the extent necessary to pay down this Note in full, and then transfer any remaining funds to Borrower.

The occurrence and continuation of any one or more of the following events shall constitute an event of default under this New Note ("Event of Default"):

    (a)    <u>Payment Default</u>. Borrower shall fail to make any required payment due in connection with this New Note.

    (b)    <u>Third Party Lien or Caveat</u>. The creation of a lien on Borrower's property, or the entry of a caveat (which Lender deems material), that has not been removed ten (10) days of its creation.

    (c)    <u>Change of Trustee</u>.  The resignation, removal, or otherwise change of trustee of Borrower.

    (d)    <u>Bankruptcy Default</u>. The Borrower shall (i) commence any case, proceeding or other action under any existing or future law of any jurisdiction relating to seeking to have an order for relief entered with respect to it or its debts, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other such relief with respect to it or its debts, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or substantially all of its assets (each of

CONFIDENTIAL                                    TPR 0014115

the foregoing, a "Bankruptcy Action"); (ii) become the debtor named in any Bankruptcy Action which results in the entry of an order for relief or any such adjudication or appointment described in the immediately preceding clause (i), or remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) make a general assignment for the benefit of its creditors.

In each and every Event of Default, the Lender may, without limiting any other rights it may have at law or in equity, by written notice to the Borrower, declare the unpaid Principal of and Interest on this New Note due and payable, whereupon the same shall be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which the Borrower hereby expressly waives, and the Lender may proceed to enforce payment of such Principal and Interest or any part thereof in such manner as it may elect in its discretion.

This Note may be prepaid in whole or in part at any time without premium or penalty.

All prepayments shall be applied first to interest, then to principal payments in the order of their maturity.

The undersigned agrees to pay all costs and expenses, including all reasonable attorneys' fees, for the collection of this Note upon default. All payments shall be made at 1211 Park Avenue, New York, NY, 10128, or at such other place as the holder hereof may from time to time designate in writing.

Upon default, whether pursuant to an Event of Default or otherwise, the interest rate shall be increased to an amount ("Overdue Rate") equal to the maximum legal rate of interest permitted by applicable law.

If this New Note is not paid when due, Borrower promises to pay all costs and expenses of collection and attorneys' fees incurred by the holder hereof on account of such collection, whether or not suit is filed thereon. Borrower consents to renewals, replacements and extensions of time for payment hereof, before, at, or after maturity; consents to the acceptance, release or substitution of security for this note, and waives protest, presentment, demand for payment, notice of default or nonpayment and notice of dishonor and the right to assert any statute of limitations. The indebtedness evidenced hereby shall be payable in lawful money of the United States.

This New Note shall be governed by, and shall be construed and enforced in accordance with, the laws of the state of Delaware without giving effect to the conflict of law rules thereof, and shall be adjudicated before the appropriate Courts of the State of Delaware.

*Dalia Genger*

THE ORLY GENGER 1993 TRUST

AGREEMENT AMENDING TERMS OF PROMISSORY NOTE

THIS AMENDMENT AGREEMENT (the "Agreement") is entered into by and
among TPR Investment Associates, Inc., a Delaware corporation ("TPR"), the Orly
Genger 1993 Trust, a trust settled on December 13, 1993, with Dalia Genger currently
serving as trustee (the "OG Trust") and D&K LP, a Delaware limited partnership
("DK"). (collectively, the "Parties;" each, a "Party"), as of October 3, 2011.

WHEREAS, The Parties entered into a Settlement Agreement dated October
3, 2011, as was subsequently amended and restated in an Amended and Restated
Settlement Agreement dated March 16, 2012 (the "Restated Settlement"); and

WHEREAS, per Section 2 of the Restated Settlement a new enforceable
promissory note in the amount of $4,000,000 was made by the OG Trust in favour of
TPR - substantially in the form of Exhibit A attached to the Restated Settlement (the
"2011 Note", or as referred interchangeably elsewhere as the "New Note"); and

WHEREAS, the Parties seek to amend the terms of the 2011 Note with respect
to the governing laws, the choice of courts, and the procedures necessary to amend the
2011 Note;

NOW, THEREFORE, for good and valuable consideration, and intending to
be legally bound, the Parties hereto agree as follows:

1. The last paragraph of the 2011 Note which reads as follows:

"This New Note shall be governed by, and shall be construed
and enforced in accordance with the laws of the State of
Delaware without giving effect to the conflict of law rules
thereof, and shall be adjudicated before the appropriate Courts
of the State of Delaware"

is hereby rendered null and void, deemed deleted in its entirety and
replaced by the following paragraph:

"This Note shall be governed by, and shall be construed and enforced in
accordance with the laws of the State of New York, without giving effect

CONFIDENTIAL                    TPR 0014117

to the conflict of law rules thereof. This Note may be enforced against Borrower in any court of competent jurisdiction."

2. The following paragraph shall be deemed to <u>be added</u> to the 2011 Note, and the Parties agree that any amendment to the 2011 Note shall be done in the following manner:

" This Note may be amended, altered or modified at any time or from time to time, solely in writing executed by Borrower and Lender[1]. Any such amendment may be executed in one or more counterparts, all of which shall be considered one and the same instrument."

3. The 2011 Note remains fully enforceable. Except as otherwise provided herein, all other terms and conditions of the 2011 Note remain unchanged.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall be considered one instrument.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date indicated below.

TPR Investment Associates, Inc.

By: _____
Date: _____

The Orly Genger 1993 Trust

By: Dalia Genger Trustee
Date: 3/29/2012

D&K LP

By: Sagi Genger, Manager
Date: 3/21/2012

_____

[1] As such terms are defined in the original promissory note dated October 3, 2011.

**CONFIDENTIAL**                                    **TPR 0014118**

## CREDIT AND FORBEARANCE AGREEMENT AND
## SECOND AMENDMENT AND RESTATEMENT OF PROMISSORY NOTE

THIS CREDIT AND FORBEARANCE AGREEMENT AND SECOND AMENDMENT AND RESTATEMENT OF PROMISSORY NOTE is made effective as of May __, 2012 (this "**Agreement**") by and between the ORLY GENGER 1993 TRUST, a trust settled on December 13, 1993 (the "**Trust**") pursuant to that certain Trust Agreement dated December 13, 1993 (the "**Trust Agreement**") between Arie Genger as grantor and Lawrence M. Small and Sash A. Spenser as original Trustees, acting through Dalia Genger, its current Trustee ("**Dalia**" or "**Trustee**"), and MANHATTAN SAFETY COMPANY, LTD., a corporation organized under the laws of St. Kitts, W.I. ("**Manhattan**"). Capitalized terms not otherwise defined herein have the meanings ascribed to them in Section 1.2 below.

## RECITALS

**A.**  The Trust wishes to obtain additional financing and the forbearance in the enforcement of the 2011 Note so as to improve its ability to assert and defend its rights in the TRI Proceedings to the TRI Shares.

**B.**  Manhattan wishes to obtain certain representations and warranties in consideration for providing additional financing in the amount of up to Four Hundred Thousand Dollars and No Cents ($400,000.00) (the "**Manhattan Financing**") and its agreement to forbear in the enforcement of the 2011 Note.

**C.**  TPR Investment Associates, Inc., a Delaware corporation ("**TPR**"), and the Trust entered into an agreement on or about October 29, 2004 (the "**Share Transfer**") whereby TPR contracted to sell to the Trust 1,102.8 shares (the "**TRI Shares**") of Trans Resources, Inc., a Delaware corporation ("**TRI**"), for a nominal consideration.

**D.**  Certain former indirect shareholders of TRI have challenged the validity of the Share Transfer in various legal proceedings and other parties have engaged in litigation and arbitration proceedings relating to various issues concerning TRI, its shares and the appropriate consideration for the purchase and sale of shares of TRI, as well as the appointment of, and validity of actions taken by, the Trustee (collectively the "**TRI Proceedings**").

**E.**  The Trust, TPR, and D&K LP, a Delaware limited partnership ("**D&K**"), entered into a Settlement Agreement dated October 2, 2011 as subsequently amended and restated in an Amended and Restated Settlement Agreement dated March 16, 2012 (the "**Settlement**").

**F.**  Pursuant to the Settlement, (i) TPR relinquished in favor of the Trust any economic interest held by it in the TRI Shares and assigned to the Trust its right to any economic benefit of the TRI Shares, including any proceeds from the sale thereof, including the approximately Ten Million Three Hundred Thousand Dollars ($10,300,000) (the "**Minimum Payment**") in proceeds from the sale of the TRI Shares to TR Investors, LLC, Glencova Investment Co., New TR Equity I, LLC and New TR Equity II, LLC

DG 00190

(collectively, the "**Trump Group**") pursuant to the terms of a letter agreement dated August 22, 2008 (the "**Trump Sale Agreement**") between TPR and the Trump Group and (ii) an obligation of approximately Four Million Five Hundred Thousand Dollars of D&K to TPR, guaranteed by the Trust, representing the net amount following the partial foreclosure of an Eight Million Nine Hundred and Fifty Thousand Dollars ($8,950,000) obligation evidenced by a promissory note in the original principal amount, was cancelled and replaced by a new promissory note of the Trust in the original principal amount of Four Million Dollars ($4,000,000) payable to TPR (the "**2011 Note**").

G.     In connection with the TRI Proceedings, Pedowitz & Meister, the escrow agent holding funds approximating the Minimum Amount (the "**Escrowed Amount**") pursuant to a certain Escrow Agreement dated as of September 1, 2010 (the "**Escrow Agreement**"), filed an interpleader action (the "**Interpleader Action**") currently pending in the United States District Court for the Southern District of the State of New York (the "**Court**") in *Pedowitz v. TPR*, 11 Civ. 5602 and deposited the Escrowed Amount with the Court to hold pending its determination as to which party is entitled to the Escrowed Amount.

H.     Pursuant to that certain Agreement Amending Terms of Promissory Note dated as of October 3, 2011, certain provisions of the 2011 Note were amended (as so amended, the "**Amended Note**").

I.     TPR has agreed to sell and assign the Note to Manhattan as evidenced by that certain Bill of Sale and Note Assignment of even date herewith.

J.     Manhattan has agreed to make the Manhattan Loan in two installments: (1) an initial advance (the "**Initial Advance**") of Two Hundred Thousand Dollars and No Cents ($200,000.00), as evidenced by a promissory note in the principal amount of Two Hundred Thousand Dollars and No Cents ($200,000.00) (the "**New Note**"), payable as provided herein, and (2) an additional advance (the "**Additional Advance**") of Two Hundred Thousand Dollars and No Cents ($200,000.00) to be made upon request by the Trust, and evidenced by the note as amended and restated to provide for a face amount of Four Million Two Hundred Forty Thousand Dollars and No Cents ($4,240,000.00) (the "**Amended and Restated Note**" or the "**Note**") (inclusive of the Forbearance Fee if paid as provided herein), with the Additional Advance to bear interest from the date made on the terms of this Agreement and the Note. The Manhattan Loan, including both the Initial Advance and the Additional Advance, shall be subject to certain conditions, including the Trust's agreement to amend and restate the 2011 Note and enter into this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, each intending to be legally bound, agree as follows:

1.     **Definitions.**

1.1     General.     Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of this Agreement or as otherwise may be provided in other provisions of this Agreement. Terms defined in the Note, the

Settlement or the New Note and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Note, Settlement or New Note, as the case may be. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between this Agreement, the Note, the Settlement or the New Note, this Agreement shall govern and control.

    1.2    Definitions. In this Agreement:

**"Additional Advance"** has the meaning set forth in Recital J.

**"Affiliate"** or **"Affiliates"** means "affiliate" as defined in either (a) Bankruptcy Code §101(2) or (b) Rule 144 of the Securities Act.

**"Agreement"** means this Credit and Forbearance Agreement and Second Amended and Restated Promissory Note.

**"Amended Note"** has the meaning set forth in Recital H.

**"Amended and Restated Note"** has the meaning set forth in Recital J.

**"Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, 11 U.S.C. §§101 et seq., as amended.

**"Bill of Sale"** means the bill of sale and note assignment relating to the assignment of the 2011 Note.

**"Business Day"** means any day that is not (a) a Saturday, (b) a Sunday or (c) any other day on which the Federal Reserve Bank of New York is closed.

**"Claim"** has the meaning specified in Section 7.1.

**"Claimant"** means any person or entity claiming, or having a right to claim, a mechanic's lien against the Minimum Payment or the TRI Shares, or any portion thereof, or who is delivered, or has the right to deliver, a stop notice in connection with the payment by Trust of its obligations under the Note.

**"Code"** means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated under it.

**"Court"** has the meaning set forth in Recital G.

**"Dalia"** means Dalia Genger, the current Trustee of the Trust.

**"D&K"** means D&K LP, a Delaware limited partnership.

**"Debtor Relief Law"** means the Bankruptcy Code, and together with any other bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, or extensions generally with creditors, or proceedings seeking reorganization, arrangement, liquidation, receivership, or other similar relief.

"**Distribution**" means any payment of principal, interest, penalty or costs paid by or on behalf of the Trust in connection with the Note or the Transferred Rights.

"**Encumbrance**" or, if used as a verb, "**Encumber**," means any (a) mortgage, pledge, lien, security interest, charge, hypothecation, security agreement, security arrangement or encumbrance or other adverse claim against title of any kind; (b) purchase, option, call or put agreement or arrangement; (c) subordination agreement or arrangement; or (d) agreement or arrangement to create or effect any of the foregoing.

"**Entity**" means any individual, partnership, corporation, limited liability company, association, estate, trust, business trust, Governmental Authority, fund, investment account or other entity.

"**Escrow Agreement**" has the meaning set forth in Recital G.

"**Escrowed Amount**" has the meaning set forth in Recital G.

"**Forbearance Fee**" means a fee of Forty Thousand Dollars and No Cents ($40,000), being equal to one percent (1%) of Four Million Dollars and No Cents ($4,000,000.00), the face amount of the 2011 Note, paid in consideration of Manhattan's agreement to forbear as provided in this Agreement.

"**Governmental Authority**" means any federal, state, or other governmental department, agency, institution, authority, regulatory body, court or tribunal, foreign or domestic, and includes arbitration bodies, whether governmental, private or otherwise.

"**Indemnified Party**" has the meaning specified in Section 7.2.

"**Indemnifying Party**" has the meaning specified in Section 7.2.

"**Initial Advance**" has the meaning set forth in Recital J.

"**Insolvent**" has the meaning set forth in Section 4(h).

"**Interpleader Action**" has the meaning set forth in Recital G.

"**Liability**" or "**Liabilities**" shall mean all debts, obligations and other liabilities of any kind or nature (whether known, unknown, accrued, or not accrued, absolute or contingent, liquidated or unliquidated, due or to become due, asserted or unasserted or otherwise).

"**Knowledge**" means the actual knowledge of Trustee.

"**Manhattan**" means Manhattan Safety Company, Ltd., a corporation organized under the laws of St. Kitts, W.I.

"**Manhattan Indemnitees**" has the meaning specified in Section 7.1.

"**Manhattan Loan**" has the meaning set forth in Recital B.

DG 00193

"**Minimum Payment**" means Ten Million Three Hundred Thousand Dollars and No Cents ($10,300,000.00).

"**New Note**" means the promissory note in the face principal amount of Two Hundred Thousand Dollars and No Cents ($200,000.00), comprising the Initial Advance of the Manhattan Loan and having the Trust as maker and Manhattan as payee, which evidences the Manhattan Loan.

"**Note**" has the meaning set forth in Recital J.

"**Party**" means the Trust, Trustee or Manhattan, as applicable, and their respective successors and permitted assigns.

"**Reimbursement Claims**" means any claim of TPR or the Trust arising in connection with the return to, disgorgement by, or reimbursement of, TPR or the Trust, or any other Entity, of all or any portion of any payment or transfer received by TPR or Trust on account of the Transferred Rights, including any claims arising under Bankruptcy Code §502(h).

"**Sagi**" means Sagi Genger, the President and the sole primary beneficiary (together with his children) of the Sagi Genger 1993 Trust, the owner of a majority of the shares of TPR.

"**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§77a et seq., as amended, and the rules and regulations promulgated under it.

"**Settlement**" means that certain amended and restated settlement agreement dated as of March 16, 2012 by and among TPR, the Trust and D&K.

"**Share Proceeds**" means any proceeds in cash or kind paid or payable to the Trust relating to the TRI Shares.

"**Share Transfer**" has the meaning set forth in Recital D.

"**TPR**" means TPR Investment Associates, Inc., a Delaware corporation.

"**TRI**" means Trans Resources, Inc., a Delaware corporation.

"**TRI Shares**" means the 1,102.8 shares of TRI transferred to the Trust pursuant to the Share Transfer.

"**TRI Proceedings**" has the meaning set forth in Recital D.

"**Transferred Rights**" means any and all of Manhattan's right, title, and interest in, to and under the Note and the Settlement (solely to the extent those rights of TPR in the Settlement which have been transferred by TPR to Manhattan relate to amounts payable under the Note), including:

        (a)    all amounts funded by or payable to TPR under the Settlement relating to the Note, and all obligations owed to TPR in connection

DG 00194

with the Note, including but not limited to, accrued and unpaid interest;

(b)    any proof of claim;

(c)    all claims (including "claims" as defined in Bankruptcy Code §101(5)), suits, causes of action, and any other right of TPR, whether known or unknown, against Trust, the Trustee or any of their respective Affiliates, agents, representatives, contractors, advisors, or any other Entity that in any way is based upon, arises out of or is related to any of the foregoing, including, to the extent permitted to be assigned under applicable law, all claims (including contract claims, tort claims, malpractice claims, and claims under any law governing the purchase and sale of, or indentures for, securities), suits, causes of action, and any other right of TPR against any attorney, accountant, financial advisor, or other Entity arising under or in connection with the Note and the Transferee Rights or the transactions related thereto or contemplated thereby;

(d)    all cash, securities, or other property, and all setoffs and recoupments, received, applied, or effected by or for the account of TPR under the Note (whether for principal, interest, fees, reimbursement obligations, or otherwise) from and after the date of this Agreement, and all cash, securities, interest, dividends, and other property that may be exchanged for, or distributed or collected with respect to, any of the foregoing;

(e)    the economic benefit received by TPR relating to the Note transferred to Manhattan; and

(f)    all proceeds of the foregoing.

"**Trump Group**" has the meaning set forth in Recital F.

"**Trump Sale Agreement**" has the meaning set forth in Recital F.

"**Trust**" has the meaning set forth in the heading of this Agreement.

"**Trustee**" has the meaning set forth in the heading of this Agreement.

"**2011 Note**" has the meaning set forth in Recital F.

2.    **Recitals True.**  The Recitals are hereby incorporated into this Agreement and made a part hereof.  The Trust and the Trustee, jointly and severally, represent and warrant that the Recitals are true and correct in all material respects and do not fail to state a fact necessary to make them not misleading.

3.    **Amendment and Restatement of Note; Agreement to Make the Manhattan Loan.**

3.1    The Trust as maker agrees to amend and restate the 2011 Note, in the form attached as **Exhibit A** hereto (the "**Amended and Restated Note**"), including but not limited to amendments to (i) add covenants with respect to (A) the waiver of defenses to payment of amounts payable under the Note and (B) prohibitions on (1) any Encumbrance on (x) the TRI Shares or (y) the Minimum Payment or any other payment the Trust may receive or be entitled to receive from (a) the Court or (b) any other party, in connection with the TRI Shares or otherwise, and (2) (x) any (a) borrowing or any agreement to borrow money, or (b) guaranty, agreement to indemnify or other agreement to create any contingent monetary obligation, or (y) the incurrence of any material Liability, other than costs for legal services relating to the TRI Proceedings, which in no event, without the prior consent of Manhattan, shall exceed in aggregate Five Hundred Thousand Dollars and No Cents ($500,000.00), and (ii) amend the face amount of the Note to Four Million Two Hundred Forty Thousand Dollars and No Cents ($4,240,000.00) to reflect the Additional Advance of the Manhattan Loan and the Forbearance Fee, in the event such are made and payable under the terms of this Agreement and the Note.

3.2    On the terms set forth in the Amended and Restated Note, in the form attached as **Exhibit A** hereto, and the New Note, in the form attached as **Exhibit B** hereto, and subject to the conditions set forth in this Agreement and in the Amended and Restated Note and the New Note, Manhattan agrees to make, and the Trust agrees to accept, the Manhattan Loan.

4.    **Representations and Warranties of the Trust and Trustee.**  Trust and Trustee, each jointly and severally, represents and warrants to Manhattan as of the date of this Agreement that:

(a)    Trust (i) is duly organized and validly existing under the laws of its jurisdiction of organization or incorporation, (ii) is in good standing under such laws and (iii) has full power and authority to execute, deliver and perform its obligations under this Agreement, the Note and the New Note.

(b)    Trust's execution, delivery, and performance of this Agreement, , the Note and the New Note will not result in a breach or violation of any provision of (i) Trust's organizational documents, (ii) any statute, law, writ, order, rule or regulation of any Governmental Authority applicable to Trust, (iii) any judgment, injunction, decree or determination of any Governmental Authority applicable to Trust or (iv) any contract, indenture, mortgage, loan agreement, note, lease or other agreement, document or instrument to which

DG 00196

Trust may be a party, by which Trust may be bound or to which any of the assets of Trust is subject.

(c)   (i)   This Agreement, the Note and the New Note each (A) has been duly and validly authorized by Trustee on behalf of Trust, executed and delivered by Trust and (B) are the legal, valid and binding obligations of Trust, enforceable against Trust in accordance with their respective terms, except that such enforceability against Trust may be limited by bankruptcy, insolvency, or other similar laws of general applicability affecting the enforcement of creditors' rights generally and by a court's discretion in relation to equitable remedies; and

(ii)   no notice to, registration with, consent or approval of or any other action by any relevant Governmental Authority or other Entity is or will be required for Trust to execute, deliver, and perform its obligations under, this Agreement, the Note and the New Note.

(d)   Trust is a good faith claimant to the Share Proceeds or the TRI Shares, as the case may be, and its claim thereto is free and clear of any Encumbrance.

(e)   Other than the TRI Proceedings and any other proceedings disclosed in writing by Trust to Manhattan, no proceedings are pending against the Trust, the Trustee or any of their respective Affiliates or, to the best of Trust's and Trustee's Knowledge, threatened against the Trust, the Trustee or any of their respective Affiliates before any relevant Governmental Authority that, individually or in aggregate, may materially and adversely affect any action taken or to be taken by Trust under this Agreement, including the sale and assignment of the Note by TPR to Manhattan and the Transferred Rights to Manhattan, or the Manhattan Loan as evidenced by the New Note.

(f)   Trust has no (A) payment obligation, including any contingent payment obligation in the nature of a guarantee or indemnification or similar obligation, to any individual, Entity or Governmental Authority, and has entered into no agreement that could reasonably result in a payment obligation to any party for any amount that individually or together with other payment obligation of the Trust is equal to or greater than Five Hundred Thousand Dollars and No Cents ($500,000.00) and (B) Liability to any individual, Entity or Governmental Authority that individually or together with any other Liability may adversely affect repayment of the Note or the New Note or the value of Trust's interest in the Minimum Payment or TRI Shares, as the case may be.

DG 00197

(g)    To the best of Trust's and Trustee's Knowledge, neither the Trust nor the Trustee or any other party to the TRI Proceedings has received any notice or has any reasonable basis to believe that the Trust will not be entitled to receive one or the other of (A) an amount not less than the Minimum Payment or (B) the TRI Shares upon final determination and exhaustion of all appeals or challenges to such final determination, of all the material matters at issue in the TRI Proceedings.

(h)    Trust is not now insolvent and will not be rendered insolvent by any of the transactions contemplated by this Agreement. As used herein, "**insolvent**" means that the sum of the debts and probable Liabilities of Trust exceeds the fair saleable value of its assets. Trust is not in receivership, nor is an application for receivership pending. No proceedings are pending by or against Trust in bankruptcy or reorganization in any state or federal court under any Debtor Relief Law, nor has it committed any act of bankruptcy as such terms are used in the Bankruptcy Code. Immediately after giving effect to the consummation of the transactions contemplated by this Agreement, (i) Trust will be able to pay its Liabilities as they become due in the usual course of its business; (ii) Trust will not have assets (calculated at fair market value) that exceed its Liabilities; and (iii) taking into account all pending and threatened litigation, final judgments against Trust for money damages are not reasonably anticipated to be rendered at a time when, or in amounts such that, Trust will be unable to satisfy any such judgments promptly in accordance with their terms (taking into account the maximum probable amount of such judgments in any such actions and the earliest reasonable time at which such judgments might be rendered) as well as all other obligations of Trust. The cash available to Trust, taking into account all other anticipated uses of cash, as well as taking into account reasonably anticipated payments on insurance covering such actions and Liabilities, will be sufficient to pay all such debts and judgments promptly in accordance with their terms.

(i)    No broker, finder or other Entity acting under the authority of the Trust, the Trustee or any of their respective Affiliates is entitled to any broker's commission or other fee in connection with the transactions contemplated by this Agreement, including but not limited to the Manhattan Loan and New Note, for which Manhattan could be responsible.

5.    **Manhattan's Representations and Warranties.** Manhattan represents and warrants to Trustee as of the date of this Agreement that:

(a)    Manhattan (i) is duly organized and validly existing under the laws of its jurisdiction of organization or incorporation, (ii) is in good

DG 00198

standing under such laws and (iii) has full power and authority to execute, deliver and perform its obligations under, this Agreement.

(b)    Manhattan's execution, delivery, and performance of this Agreement have not resulted and will not result in a breach or violation of any provision of (i) Manhattan's organizational documents, (ii) any statute, law, writ, order, rule or regulation of any Governmental Authority applicable to Manhattan, (iii) any judgment, injunction, decree or determination of any Governmental Authority applicable to Manhattan or (iv) any contract, indenture, mortgage, loan agreement, note, lease or other agreement, document or instrument by which Manhattan may be a party, by which Manhattan may be bound or to which any of the assets of Manhattan is subject.

(c)    (i)    This Agreement and the Manhattan Loan each (A) has been duly and validly authorized by Manhattan's board of directors or authorized committee thereof or other party which must approve the same pursuant to Manhattan's organizational documents, executed and delivered by Manhattan and (B) are the legal, valid and binding obligations of Manhattan, enforceable against Manhattan in accordance with their respective terms, except that such enforceability may be limited by bankruptcy, insolvency, or other similar laws of general applicability affecting the enforcement of creditors' rights generally and by a court's discretion in relation to equitable remedies; and

(ii)    no notice to, registration with, consent or approval of or any other action by any relevant Governmental Authority or other Entity is or will be required for Manhattan to execute, deliver, and perform its obligations this Agreement and the Manhattan Loan.

(d)    No broker, finder or other Entity acting under the authority of Manhattan or any of its Affiliates is entitled to any broker's commission or other fee in connection with the transactions contemplated by this Agreement, including the Manhattan Loan, for which the Trust could be responsible.

(e)    Manhattan is an "accredited investor" as defined in Rule 501 under the Securities Act. Without characterizing the Manhattan Loan and New Note as a "security" within the meaning of applicable securities laws, Manhattan has not made any offers to sell, or solicitations of any offers to buy, all or any portion of the Manhattan Loan or the New Note in violation of any applicable securities laws.

DG 00199

6.    **Covenants.**

6.1    The Trust hereby covenants and agrees as follows:

(a)    Trust shall not Encumber the TRI Shares, its interest in the TRI Shares or any proceeds of the TRI Shares or any material amount of its assets for so long as any amount is owed under this Note.

(b)    Trust acknowledges the sale and assignment of the 2011 Note and the Transferred Rights to Manhattan and agrees to deliver all amounts payable with respect to the Note and the Transferred Rights to Manhattan at the address provided to Trust in writing by Manhattan.

(c)    Trust hereby waives any defenses it may have to payment of amounts payable under the Note, including all defenses it may have with respect to Manhattan, TPR or any other prior holder of the Note.

(d)    Trust agrees that it shall not borrow or enter into any agreement to borrow an aggregate amount greater than Four Hundred Thousand Dollars and No Cents ($400,000.00), including amounts borrowed as part of the Manhattan Loan; provided, however, that this shall not prevent Trust from engaging in agreements for services with attorneys and others in connection with the TRI Proceedings; and provided, further, that Trust may borrow such additional sums as may be subordinated to the Manhattan Loan, on terms and subject to conditions satisfactory to Manhattan.

6.2    Manhattan hereby covenants and agrees that notwithstanding any payment default under the Note or the New Note, but subject to the Trust's compliance with all other terms and conditions of the Note and the New Note, Manhattan agrees to forbear from collection of amounts due and owing on the Note, and not take any action, including the commencement of any proceeding, to collect amounts due under the Note or the New Note, until the earliest to occur of (i) the date on which Dalia no longer serves as Trustee of the Trust, (ii) the final resolution of the Interpleader Action or (iii) November 1, 2014; provided, however, that notwithstanding the foregoing, Manhattan may take any action reasonably necessary to ensure the payment of all amounts payable under the Note or the New Note, including, but not limited to, the acceleration of the obligations under the Note or the New Note and the commencement of enforcement actions to collect amounts owing under the Note and or the New Note upon the occurrence of (x) any event of default under the Note or the New Note, other than a payment default or (y) any action by an individual or Entity which Manhattan believes may adversely affect the Trust's ability to fully perform all of its obligations under this Agreement, the Note, the Manhattan Loan or the New Note.

6.3    The Forbearance Fee shall be payable by increasing the amount outstanding under the Note by the amount of the Forbearance Fee effective November 1, 2012 if the Note is not previously paid in full by such date.

DG 00200

7.    **Indemnification.**

7.1    Trust and the Trustee, jointly and severally, shall indemnify, defend, and hold Manhattan and its officers, directors, agents, partners, members, controlling Entities and employees (collectively, **"Manhattan Indemnitees"**) harmless from and against any liability, claim, cost, loss, judgment, damage or expense, including reasonable attorneys' fees and expenses (collectively, a **"Claim"**) that any Manhattan Indemnitee incurs or suffers as a result of, or arising out of (i) a breach of any of Trust representations, warranties, covenants or agreements in this Agreement, (ii)  any legal or arbitral proceeding, any investigation or any actions preliminary or related to any of the foregoing, which relates to, or arises from, the same factual basis as, the TRI Proceedings, (iii) compliance with any subpoena or other demand to be deposed, testify or produce documents in a proceeding before a Governmental Authority or an arbitrator or (iv) otherwise resulting from any action taken by any Claimant; provided, however, that the indemnification obligations of the Trustee under this Agreement (x) shall not include Claims made after Dalia no longer serves as Trustee of the Trust and (y) are in the nature of a surety for the obligations of the Trust and are conditional upon demand first being made upon, and a good faith attempt made to collect from, the Trust as provided in Section 7.3 below; and provided, further, that the foregoing proviso shall not be construed in any way to limit the indemnification obligations of the Trust under this Agreement.

7.2    If a third party commences any action or makes any demand against Manhattan Indemnities for which any Manhattan Indemnitees ("**Indemnified Party**") is entitled to indemnification under this Agreement, such Indemnified Party shall promptly notify Trust and Dalia (collectively and individually "**Indemnifying Party**") in writing of such action or demand; provided, however, that if the Indemnified Party assumes the defense of the action and fails to provide prompt notice to the Indemnifying Party, such failure shall not limit in any way the Indemnifying Party's obligation to indemnify the Indemnified Party except to the extent that such failure materially prejudices the Indemnifying Party's ability to defend the action.  The Indemnifying Party may, at its own expense and without limiting its obligation to indemnify the Indemnified Party, participate in the defense of such action with counsel reasonably satisfactory to the Indemnified Party, or the Indemnifying Party may, at its own expense and without limiting its obligation to indemnify the Indemnified Party, assume the defense of such action with counsel reasonably acceptable to the Indemnified Party.  In any event, the Indemnified Party that has assumed the defense of such action shall provide the Trust and Dalia with copies of all notices, pleadings, and other papers filed or served in such action.  Neither Party shall make any settlement or adjustment without prior written consent, which consent (a) in the case of the Indemnifying Party will not be unreasonably withheld if the settlement or adjustment involves only the payment of money damages by the Indemnifying Party and (b) in the case of the Indemnified Party may be withheld for any reason if the settlement or adjustment involves performance or admission by the Indemnified Party.

7.3    In the event of the occurrence of a Claim for which an Indemnified Party is entitled to indemnification hereunder, the Indemnified Party shall first make demand upon, and seek payment and performance from, the Trust, and then, and only if, after such demand the Trust fails to pay or perform as required by this Agreement, shall the

Indemnified Party seek payment and performance from the Trustee. Amounts payable by the Indemnifying Party, to the extent not paid by an Indemnifying Party, may be added to the principal amount Note and shall accrue interest from the date of the incurrence of such expense by the Indemnified Party at the prevailing rate of interest as provided under the Note.

7.4     Each indemnity in this Agreement is a continuing obligation, separate and independent from the other obligations of the Trust and Dalia and survives termination of this Agreement or any transfer pursuant to Section 10 of this Agreement. It is not necessary for a Party to incur expense or make payment before enforcing a right of indemnity conferred by this Agreement.

8.     **Costs and Expenses.** Trust and Manhattan each agrees to bear its own, legal and other costs and expenses for preparing, negotiating, executing and delivering this Agreement and any related documents and consummating the transaction contemplated by this Agreement, including legal and other costs and expenses relating to the amendment of the Amended Note, the Manhattan Loan and the New Note.

9.     **Notices.**

9.1     All communications between the Parties in respect of, or notices, requests, directions, consents or other information sent under, this Agreement shall be in writing, hand delivered or sent by overnight courier, electronic transmission or telecopier, addressed to the relevant Party at its address, electronic mail or facsimile number specified in **Schedule 9.1** to this Agreement at such other address, electronic mail or facsimile number as such Party may subsequently request in writing. All such communications and notices shall be effective upon receipt.

9.2     If Trust receives any notices, correspondence or other documents in respect of the Transferred Rights, the Note or the Settlement that, to the best of Trust's Knowledge, were not sent to Manhattan, Trust shall promptly forward them to Manhattan.

10.     **Further Transfers.**

10.1     Manhattan may sell, assign, grant a participation in, or otherwise transfer all or any portion of the Note or Transferred Rights, this Agreement, its rights under this Agreement, the Manhattan Loan or the New Note, or any interest in any of the foregoing without the consent of or notice to Trust.

10.2     Trust may assign its rights under this Agreement without the prior written consent of Manhattan; provided, however, that Trust may not delegate its obligations under this Agreement without the prior written consent of Manhattan.

11.     **Exercise of Rights and Remedies.**

11.1     No amendment of any provision of this Agreement shall be effective unless it is in writing and signed by the Parties, and no waiver of any provision of this Agreement, nor consent to any departure by either Party from it, shall be effective unless

DG 00202

it is in writing and signed by the affected Party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

11.2    No failure on the part of a party to exercise, and no delay in exercising, any right or remedy under this Agreement shall operate as a waiver by such Party, nor shall any single or partial exercise of any right or remedy under this Agreement preclude any other or further exercise thereof or the exercise of any other right or remedy. The rights and remedies of each Party provided herein (a) are cumulative and are in addition to, and are not exclusive of, any rights or remedies provided by law (except as otherwise expressly set forth in this Agreement) and (b) are not conditional or contingent on any attempt by such Party to exercise any of its rights or remedies under any other related document or against the other Party or any other Entity. In no event may either Party recover from the other Party any special, consequential or punitive damages.

## 12.    Survival; Successors and Assigns.

12.1    All representations, warranties, covenants, indemnities and other provisions made by the Parties shall be considered to have been relied upon by the Parties, shall (as to representations and warranties) be true and correct as of the date of this Agreement and any other date set forth in Sections 4 or 5, as the case may be, and shall survive the execution, delivery and performance of this Agreement.

12.2    This Agreement, including the representations, warranties, covenants and indemnities contained in this Agreement, shall inure to the benefit of, be binding upon and be enforceable by and against the Parties and their respective successors and permitted assigns.

**13.    Further Assurances.** Each Party agrees to (i) execute and deliver, or cause to be executed and delivered, all such other and further agreements, instruments and other documents and (ii) take or cause to be taken all such other and further actions as the other Party may reasonably request to effectuate the intent and purposes, and carry out the terms, of this Agreement.

## 14.    Disclosure.

14.1    Each Party agrees that, without the prior consent of the other Party, it shall not disclose the contents of this Agreement to any individual or Entity, except that any Party may make any such disclosure (a) as required to implement or enforce this Agreement, (b) if required to do so by any law, court, regulation, subpoena or other legal process, (c) to any Governmental Authority or self-regulatory Entity having or asserting jurisdiction over it, (d) if its attorneys advise it that it has a legal obligation to do so or that failure to do so may result in it incurring a liability to any other Entity or sanctions that may be imposed by any Governmental Authority, (e) to its Affiliates, professional advisors and auditors or (f) as set forth in Section 14.2.

14.2    Manhattan may disclose the contents of this Agreement to any proposed transferee, assignee, participant, or other Entity proposing to enter into contractual relations with Manhattan in respect of the Note or Transferred Rights, the Manhattan Loan or the New Note or any part of them.

DG 00203

**15.     Entire Agreement; Conflict.**

15.1    This Agreement constitutes the entire agreement of the Parties with respect to the transactions contemplated here by and supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, representations and warranties in respect thereof, all of which have become merged and finally integrated into this Agreement.

15.2    As between Manhattan and the Trust, if there is any inconsistency or conflict between this Agreement and any other document, the provisions of this Agreement shall govern and control.

**16.     Counterparts; Telecopies.** This Agreement may be executed in multiple counterparts and all of such counterparts taken together shall be deemed to constitute one and the same instrument.  Transmission by telecopier, facsimile or other form of electronic transmission of an executed counterpart of this Agreement shall be deemed to constitute due and sufficient delivery of such counterpart, and shall have the same force and effect as a manually executed original.  Each fully executed counterpart of this Agreement shall be deemed to be a duplicate original.

**17.     Relationship Between Manhattan and the Trust.** The relationship between Manhattan and the Trust shall be that of lender and borrower.  Neither is a trustee or agent for the other, nor does either have any fiduciary obligations to the other.  This Agreement shall not be construed to create a partnership or joint venture between the Parties.

**18.     Severability.** The illegality, invalidity or unenforceability of any provision of this Agreement under the law of any jurisdiction shall not affect its legality, validity or enforceability under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision.

**19.     Governing Law.** THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTION (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED AND DETERMINED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION).

**20.     Waiver of Trial by Jury.** THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTION (WHETHER BASED ON CONTRACT,

TORT OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO
REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS
REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY
WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE
FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER
PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY,
AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN
THIS SECTION.

**21.    Jurisdiction.** The Parties irrevocably agree that, should either Party institute any
legal action or proceeding in any jurisdiction (whether for an injunction, specific
performance, damages or otherwise) in relation to this Agreement or the transactions
contemplated by this Agreement, no immunity (to the extent that it may at any time
exist, whether on the grounds of sovereignty or otherwise) from such action or
proceeding shall be claimed by it or on its behalf, any such immunity being hereby
irrevocably waived, and each Party irrevocably agrees that it and its assets are, and shall
be, subject to such legal action or proceeding in respect of its obligations under this
Agreement.

**22.    Interpretation.**

22.1    This Agreement and any annexes, schedules or other documents attached
to or incorporated by reference into the Agreement.

22.2    Terms used in the singular or the plural include the plural and the singular,
respectively; "includes" and "including" are not limiting; and "or" is not exclusive.

22.3    Any reference to a Party includes such Party's successors and permitted
assigns.

22.4    Unless otherwise indicated, any reference to:

(a)    this Agreement or any other agreement, document or instrument
shall be construed as a reference to this date of this Agreement or,
as the case may be, such other agreement, document or instrument
as the same may have been, or may at any time before the date of
this Agreement be, in effect as modified, amended or
supplemented as of the date of this Agreement Date; and

(b)    a statute, law, order, rule or regulation shall be construed as a
reference to such statute, law, order, rule or regulation as it may
have been, or may at any time before the date of this Agreement
be, in effect as modified, amended or supplemented as of the date
of this Agreement.

22.5    Section and other headings and captions are included solely for
convenience of reference and are not intended to affect the interpretation of any provision
of this Agreement.

DG 00205

22.6   This Agreement shall be deemed to have been jointly drafted by the Parties and no provision of it shall be interpreted or construed for or against either Party because such Party actually or purportedly prepared or requested such provision, any other provision or the Agreement as a whole.

**23.**   **Legal Counsel.** Each Party acknowledges that it or she has been represented by its own legal counsel in connection with the negotiation and drafting of this Agreement. Accordingly, this document shall not be construed against the draftsman. Any rule of construction to the contrary shall be ignored.

[SIGNATURE PAGE FOLLOWS]

DG 00206

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed as of the date first written above.

TRUST:

ORLY GENGER 1993 TRUST

By: _____
     Dalia Genger, Sole Trustee

STATE OF _____ )
                        )SS:
COUNTY OF _____ )

The foregoing was sworn to, subscribed and acknowledged before me this 15ᵗᵃ day of _____ 2012, by Dalia Genger, as Sole Trustee of The Orly Genger 1993 Trust. She is personally known to me or has produced a driver's license as identification.

_____
Print or Stamp Name: _____
Notary Public: _____
Commission No.: _____
My Commission Expires: _____

MAGDALENA CHARLOTTEN
NOTARY PUBLIC, State of New York
No. 01CH6059474
Qualified in New York County
Certificate Filed in Kings, Queens,
Westchester, Bronx Counties
Commission Expires May 29, 20 15

**DALIA:**

By: _____
     Dalia Genger, Individually

STATE OF _____ )
                        )SS:
COUNTY OF _____ )

The foregoing was sworn to, subscribed and acknowledged before me this 15ᵗᵃ day of _____ 2012, by Dalia Genger. She is personally known to me or has produced a driver's license as identification.

_____
Print or Stamp Name: _____
Notary Public: _____
Commission No.: _____
My Commission Expires: _____

MAGDALENA CHARLOTTEN
NOTARY PUBLIC, State of New York
No. 01CH6059474
Qualified in New York County
Certificate Filed in Kings, Queens,
Westchester, Bronx Counties
Commission Expires May 29, 20 15

DG-00207

**MANHATTAN:**

MANHATTAN SAFETY COMPANY, LTD.,
a corporation organized under the laws of St. Kitts, W.I.


By: _____        _____
        Greg Gilpin-Payne, President                 Witness: Leah Crag-Chaderton


                                                                _____
                                                                Witness:  Yulanda Vanterpool

DG 00208

<u>**SCHEDULE 9.1**</u>

**NOTICES**

**Trust:**

Pedowitz & Meister
1501 Broadway, Suite 800
New York NY 10036-5505
Attention: Robert Meister

**Dalia:**
200 East 65th - apt 32w
New York, NY
Attention: Trustee

**Manhattan:**

858 Zenway Blvd
Frigate Bay
St Kitts, W.I.

At the Surrogate's Court held in and for the County of New York, at the Courthouse, 31 Chambers Street, New York, New York on the ___ day of ~~June~~ 2009
~~July~~

New York County Surrogate's Court
DATA ENTRY DEPT.
Date: July 1, 2009

PRESENT: HON. _Troy K. Webber_
Surrogate

| | |
|---|---|
| In the Matter of the Application of<br><br>ORLY GENGER, as a person interested,<br>for the removal of DALIA GENGER<br>as Trustee of the Orly Genger 1993 Trust<br>pursuant to SCPA §711 (11) | File No.: 0017/2008<br><br>**ORDER TO SHOW CAUSE<br>WITH TEMPORARY<br>RESTRAINTS** |

On reading and filing the annexed Verified Petition of Petitioner, ORLY GENGER, and the exhibits, verified on the 22nd day of June, 2009, and the memorandum of law in support of Petitioner's Verified Petition dated June 22, 2009,

LET the Respondent, DALIA GENGER, the sole fiduciary of the Orly Genger 1993 Trust, show cause before Surrogate _Troy K. Webber_ at the Surrogate's Court, ~~31 Chambers Street,~~ Sitting at 60 Centre Room 300 New York, New York, on the 5th day of ~~June~~ August 2009 at 10:00 o'clock in the forenoon of that day or as soon thereafter as counsel may be heard why an order should not be entered:

    (a)    Enjoining and restraining Respondent, her agents and all other persons acting on her behalf from withdrawing, selling disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering, liening, hypothecating or secreting the Orly Trust's 19.43% interest in Trans-Resources, Inc., ("TRI"), a closely held corporation, founded by Arie Genger, Petitioner's father and Respondent's former husband of Respondent and any other assets which may be remaining in the Orly Trust;

(b)    Removing Respondent as Trustee of the Orly Trust for breaching her

fiduciary duties, wasting and dissipating the assets of the Orly Trust and imprudently managing

and injuring the property committed to her charge;

(c)    Surcharging Respondent in the amount of the loss of the value of Orly's

interest in TPR as determined by the Court and awarding Petitioner costs and attorneys' fees;

(d)    Appointing Michael D. Grohman, Esq. as successor trustee;

(e)    Waiving any requirement that Petitioner post an undertaking; and

(f)    Granting Petitioner such further relief deemed necessary or proper.

ORDERED that, during the pendency of this proceeding, Respondent ~~her agents and all~~ *and/or her counsel*

*are required to give notice by overnight mail to petitioners counsel of any 1) offer*

~~other persons acting on her behalf are temporarily restrained from withdrawing, selling,~~

*to purchase the Orly Trust's 19.3% interest in TRI within 10 days of receiving*

~~disposing, transferring, assigning, removing, pledging, redeeming, mortgaging, encumbering~~

*such offer and 2) act by Respondent, her agents and all other persons*

~~liening, hypothecating or secreting the Orly Trust's 19.43% interest in TRI and other assets~~

*acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell or*

~~remaining in the Orly Trust; and it is further~~

*otherwise alter the Orly Trust's interest in TRI at least 10 days prior to such act*

*and it is further* ORDERED that service of a copy of this Order and the papers upon which it is based

shall be served on Respondent by personal service at either her residence, located at 200 East

65th Street, Apt. 32W, New York, New York 10021, or any other address at which she can be

located, on or before ~~June 7~~ *July 7*, 2009; *and it is further*

*ORDERED, that any responsive papers shall be filed by*

*July 29, 2009.*

~~ENTER:~~

Surrogate

EFiled: Oct 4 2011 12:39PM EDT
Transaction ID 40170462
Case No. 6906-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DALIA GENGER, as Trustee of the Orly )
Genger 1993 Trust,                    )
                                      )
            Plaintiff,                )
                                      )
    v.                                )
                                      )        Civil Action No. _____
TR INVESTORS, LLC, GLENCLOVA          )
INVESTMENT CO., NEW TR EQUITY I,      )
LLC, NEW TR EQUITY II, LLC, TRANS-    )
RESOURCES, INC. and TPR               )
INVESTMENT ASSOCIATES, INC.,          )
                                      )
            Defendants.               )

### VERIFIED COMPLAINT

Plaintiff Dalia Genger ("Dalia"), as Trustee of the Orly Genger 1993 Trust (the

"Orly Trust"), by her undersigned attorneys, for her Verified Complaint against

Defendants TR Investors, LLC ("Investors"), Glenclova Investment Co. ("Glenclova"),

TR Equity I, LLC ("Equity I"), TR Equity I, LLC ("Equity II" and together with

Investors, Glenclova and Equity I, "The Trump Group"), TPR Investment Associates,

Inc. ("TPR") and Trans-Resources, Inc. ("Trans-Resources") alleges upon knowledge,

information and belief as follows:

### NATURE OF THE ACTION

1.     On October 29, 2004, as part of a wider multi-million dollar divorce

settlement agreement between Arie Genger ("Arie") and Dalia, Arie caused TPR to

transfer 794.40 shares (13.99%) of Trans-Resource's stock to himself, and 1,102.80

shares (19.43%) of Trans-Resources stock to each of the 1993 Sagi and Orly Trusts.

1

2.      In reliance upon (i) Arie's representation that no consent or approval was required for TPR to transfer the shares to her children and (ii) the representation that Arie caused TPR to make that the shares being transferred to the Orly Trust were "free and clear of any liens, claims or encumbrances" and that the transfer "does not violate the certificate of Incorporation of TPR or *any agreement to which TPR is subject*" (emphasis added), Dalia gave up valuable claims in the divorce settlement to ensure that her children's trusts would be well funded. The Orly Trust also relied on those representations in purchasing the Trans-Resources shares.

3.      On October 30, 2004, Trans-Resource issued a share certificate in the name of the Orly Trust for 1,102.80 shares of Trans-Resources common stock. The share certificate was signed by Arie, as President of Trans-Resources, and Edward Klimerman, Assistant Secretary of Trans-Resources and outside counsel to the company.

4.      Trans-Resources delivered the Orly Trust's share certificate to Arie, who was contractually obligated to act as the Orly Trust's proxy for voting the Trans-Resources shares. Arie maintained possession of the Orly Trusts' original share certificate and sent a copy of it to both Dalia and the Orly Trust.

5.      Thus, the Orly Trust is a bona fide and protected purchaser of the Trans-Resources stock because (i) value was given for the Orly Trust's shares of Trans-Resources stock, (ii) the Orly Trust did not have notice of any adverse claim to the shares represented by its share certificate, and (iii) the Orly Trust obtained control of its Trans-Resources share certificate by way of its delivery to Arie, who held the certificate on the Orly Trust's behalf.

2

6. Consequently, the Orly Trust seeks a declaratory judgment that it is the beneficial owner of the 1,102.80 shares of Trans-Resources stock represented by the share certificate.

## PARTIES

7. The Plaintiff Dalia Genger ("Dalia") is the mother of Sagi Genger ("Sagi") and Orly Genger ("Orly") and the former wife of Arie Genger ("Arie"). Dalia is the trustee of the 1993 Orly Genger Trust.

8. Defendant Trans-Resources, a privately-held Delaware Corporation, is a manufacturer and worldwide distributor of agricultural fertilizer.

9. Defendant TPR, a Delaware corporation, is the record holder of the 1,102.80 shares that the Orly Trust purchased in 2004.

10. Defendant Investors, a New Jersey Limited Liability Company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

11. Defendant Glenclova, a Cayman Islands company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

12. Defendant Equity I, a Delaware limited liability company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

13. Defendant Equity II, a Delaware limited liability company, purportedly exercised its rights under the 2008 Side Letter Agreement to purchase from TPR the Trans-Resources common stock that was previously purchased by the Orly Trust.

3

## JURISDICTION

14.    This Court has jurisdiction over this action pursuant to 8 *Del. C.* § 111 and
10 *Del. C.* § 6501, *et. seq.*

## FACTUAL BACKGROUND

### The 2001 Stockholders Agreement

15.    In 1985, Arie formed Trans-Resources.

16.    Until 2001, TPR held Arie's 100% stake in Trans-Resources. TPR was
owned by Arie, Dalia and their two children, Sagi and Orly. As TPR's majority (51%)
shareholder, Arie controlled Trans-Resources.

17.    Dalia, Sagi and Orly, through the Sagi and Orly Trusts (which were
established by Arie in 1993 as part of a Genger family estate plan), held a minority (49%)
interest in TPR.

18.    In 2001, Glenclova and Investors entered into an agreement with Trans-
Resources and TPR to convert their bond holdings into an equity interest in Trans-
Resources (the "Stockholders Agreement"). Under the Stockholders Agreement,
Glenclova and Investors acquired 47.15% of Trans-Resources common stock from Arie
(through TPR), thereby reducing Arie's ownership interest in Trans-Resources to 52.85%.

19.    The Stockholders Agreement restricted the transfer of Trans-Resources
stock to any persons or entities except those who were designated as "Permitted
Transferees." If a party to the Stockholders Agreement wished to transfer or sell its
shares to a non-Permitted Transferee, the selling party was required to give written notice
to the other Trans-Resources shareholders, who would have a right of first refusal. A
transfer that failed to comply with those restrictions and the prior notice requirement

4

would be deemed invalid and void, and would trigger the non-selling shareholders' right to purchase the invalidly-transferred shares.

**The Orly Trust Receives Trans-Resources Stock, for Valuable Consideration, Without Notice of Any Adverse Claim**

20.    After years of litigation regarding their divorce, on October 30, 2004, Arie and Dalia executed a stipulation of settlement (the "Divorce Agreement").

21.    The Divorce Agreement equitably divided Arie and Dalia's marriage assets and provided for certain assets to be transferred to the Sagi and Orly Trusts, assets in which they already had an equitable stake through their minority ownership in TPR.

22.    Thus, simultaneously with the Divorce Agreement, TPR entered into an agreement (the "Letter Agreement") with the Sagi and Orly trusts to sell, transfer and convey 1,102.80 shares of Trans-Resources stock to each of those entities. *See* Letter Agreement dated October 29, 2004, attached hereto as Exhibit A.

23.    Arie, as CEO of Trans-Resources, represented in the Divorce Agreement that "[e]xcept for the Consent of TPR . . . no consent, approval or similar action of any person is required in connection with the transfer of [Trans-Resources] Stock as contemplated hereby . . . ."

24.    Moreover, in the Letter Agreement, which transferred the Trans-Resources stock from TPR to the Orly Trust, Arie caused TPR to represent that "the shares are being transferred hereunder free and clear of any liens, claims or encumbrances and such transfer does not violate the certificate of Incorporation of TPR or any agreement to which TPR is subject." Ex. A.

25.    Dalia relied on those representations in giving up certain claims in the divorce so as to financially benefit her children's trusts and provide for their inheritance.

The Orly Trust also relied on those representations in purchasing the Trans-Resources shares from TPR.

**Trans-Resources Delivers a Stock Certificate to the Orly Trust**

26.    On October 30, 2004, Trans-Resources issued a stock certificate to the Orly Trust for 1,102.80 shares of its common stock.

27.    The stock certificate was signed by Arie as President of Trans-Resources, and Edward Klimerman, as Assistant Secretary of Trans-Resources.

28.    The transfer of the Trans-Resources stock to the Orly Trust in October 2004 was registered in the books and records of Trans-Resources.

29.    Trans-Resources delivered the Orly Trust's share certificate to Arie, the Orly Trust's proxy for voting the Trans-Resources shares.

30.    Arie maintained physical possession of the Orly Trust's stock certificate, and forwarded a copy of the certificate to both Dalia and the Orly Trust.

**The Trump Group Exercises an Option to Purchase the Orly Trust Shares**

31.    On August 22, 2008, TPR entered into an agreement with the Trump Group to sell the Trump Group an option to purchase the Trans-Resources shares transferred to the Orly Trust in 2004 if a court found that the transfers of the Trans-Resources shares were void (the "Side Letter Agreement").

32.    The Side Letter Agreement expressly provides that if a court determines "that the Orly Genger 1993 Trust is not the record and beneficial owner of the 1,102.80 shares of Common Stock of the of the Company purportedly transferred to such Trust by TPR in October, 2004," then Trump Group could exercise an option to purchase those shares.

6

33.     In February 2011, the Trump Group exercised its option to purchase the
Trans-Resources stock held by the Orly Trust.

**The Supreme Court Reverses this Court's Holding Regarding Beneficial Ownership
of the Shares Held in the Orly Trust**

34.     On July 18, 2011, the Delaware Supreme Court affirmed, among other
things, this Court's finding in its August 9, 2010 Side Letter Opinion (the "Side Letter
Opinion") that TPR was the record owner of the shares transferred to Arie pursuant to the
2004 Letter Agreement.

35.     The Delaware Supreme Court reversed this Court's determinations in the
Side Letter Opinion and August 18, 2010 Final Judgment Order to the extent that it
adjudicated "the beneficial ownership of the Orly Trust Shares." (Op. at 44)

36.     This action addresses one of the issues that the Delaware Supreme Court
held that this Court did not have jurisdiction to decide: the Orly Trust's beneficial
ownership of the Trans-Resources shares.

### COUNT I
### (Declaratory Judgment that the Orly Trust is the Beneficial Owner
### of 1,102.80 of Trans-Resources Common Stock)

37.     Plaintiff repeats, re-alleges and incorporates by reference the allegations
set forth above in the preceding paragraphs.

38.     Based upon representations that Arie made or caused to be made that the
restrictions in the Stock Purchase Agreement did not apply or were waived, the Trustee
for the Orly Trust, Dalia (the eventual Trustee) and Orly had no knowledge, either actual
or constructive, of any current or potential adverse claim against those shares.

39.     In reliance upon those representations, Dalia provided valuable
consideration for the Trans-Resources shares that TPR transferred to the Orly Trust by

7

relinquishing significant claims in the divorce. In further reliance upon those representations, the Orly Trust purchased the 1,102.80 shares of Trans-Resources stock.

40.    The share certificate issued to the Orly Trust was signed by authorized officers of Trans-Resources.

41.    Trans-Resources delivered the Orly Trust's share certificate to Arie, who held possession of it as the Orly Trust's proxy for voting the shares. Arie delivered a copy of the share certificate to the Orly Trust and Dalia.

42.    Because the Orly Trust acquired the legal rights to the Trans-Resources shares for value, with no knowledge of any adverse claim, it is a "bona fide purchaser" or protected purchaser whose rights to the Trans-Resources shares may not be nullified by the Trump Group.

43.    The Orly Trust is entitled to a declaratory judgment that it is the beneficial owner of Trans-Resources shares that it purchased from TPR in October 2004.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an order:

a)    Declaring that the Orly Trust is the beneficial owner of the 1,102.80 Trans-Resources shares that it purchased in 2004, for all purposes;

b)    Requiring Trans-Resources to pay to the Orly Trust any dividends that have been issued on the Trans-Resources shares since the Orly Trust acquired them on October 29, 2004;

c)    Granting the Orly Trust such other and further relief as the Court deems just and proper.

8

Dated: October 4, 2011

CONNOLLY BOVE LODGE & HUTZ LLP

*/s/ Jeremy D. Anderson*
Jeremy D. Anderson (No. 4515)
The Nemours Building
1007 N. Orange Street
P. O. Box 2207
Wilmington, DE  19899
Tel:  (302) 658-9141
Fax: (302) 658-5614
*Attorneys for Plaintiff*

4493617_1.DOC

9

FILED: NEW YORK COUNTY CLERK 10/25/2011

NYSCEF DOC. NO. 149

Index No. 651089/2010

RECEIVED NYSCEF: 10/25/2011

SUPREME COURT: NEW YORK COUNTY

|  |  |
|---|---|
| ARIE GENGER and ORLY GENGER, in her individual capacity and on behalf of the ORLY GENGER 1993 Trust, <br><br>                 Plaintiffs, <br><br> -against- <br><br> SAGI GENGER, TPR INVESTMENT ASSOCIATES, INC., DALIA GENGER, THE SAGI GENGER 1993 TRUST, ROCHELLE FANG, Individually and as Trustee of THE SAGI GENGER 1993 TRUST, GLENCLOVA INVESTMENT COMPANY, TR INVESTORS, LLC, NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, JULES TRUMP, EDDIE TRUMP and MARK HIRSCH, <br><br>                 Defendants. | Index No. 651089/10 <br><br> (Justice Paul G. Feinman) |

 

**PLAINTIFF ORLY GENGER'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION TO ENJOIN DEFENDANT DALIA GENGER FROM PROSECUTING DUPLICATIVE LITIGATION IN DELAWARE CHANCERY COURT**

 

**ZEICHNER ELLMAN & KRAUSE LLP**
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 223-0400

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF FACTS .......................................................................................... 2

    The New York TRI Action ................................................................................... 2

    The Delaware DJ Action...................................................................................... 4

    The Delaware Proceedings Before Chancellor Strine ......................................... 5

    Additional Reasons Why Ownership of the TRI Shares should be Decided
    in New York........................................................................................................ 7

ARGUMENT.............................................................................................................. 8

I.      THE COURT SHOULD ENJOIN DALIA FROM CONTINUING
        HER DUPLICATIVE DELAWARE LITIGATION.................................... 8

II.    THIS COURT SHOULD STOP DALIA FROM COLLATERALLY
        ATTACKING THIS COURT'S AUTHORITY AND
        IRREPARABLY HARMING ORLY THROUGH DUPLICATIVE
        LITIGATION.......................................................................................... 12

III.   THE COURT SHOULD ENJOIN DALIA FROM COMMENCING
        ANY FURTHER DUPLICATIVE ACTIONS.......................................... 14

CONCLUSION......................................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

**NEW YORK CASES**

Browne v. Browne,
  53 A.D.2d 134, 385 N.Y.S.2d 983 (4th Dept. 1976) ..................................................9, 13

Bryan v. Bryan,
  275 A.D.2d 688, 713 N.Y.S.2d 348 (1st Dept. 2000)..................................................9, 11

Fernandez v. Fernandez,
  39 Misc.2d 471, 240 N.Y.S.2d 926 (Sup. Ct. Bronx Cty. 1963) ...............................10

Garvin v. Garvin,
  302 N.Y. 96, 96 N.E.2d 721 (1951)...........................................................................9

Hon v. Hon,
  164 Misc.2d 806, 624 N.Y.S.2d 553 (Sup. Ct. Queens Cty. 1995) ...........................9, 13

Interested Underwriters at Lloyd's v. H.D.I. III Associates,
  213 A.D.2d 246, 623 N.Y.S.2d 871 (1st Dept. 1995)................................................11

Jay Franco and Sons Inc. v. G Studios, LLC,
  34 A.D.3d 297, 825 N.Y.S.2d 20 (1st Dept. 2006)....................................................9

Jay Franco and Sons Inc. v. G Studios, LLC,
  Index No. 602236/05, 2006 WL 5110770 (Sup. Ct. N.Y. Cty. June 14, 2006)....................8, 9

Lafferty v. Lafferty,
  243 A.D.2d 541, 663 N.Y.S.2d 108 (2d Dept. 1997) ................................................9, 13

Martin v. Martin,
  62 Misc.2d 703, 309 N.Y.S.2d 477 (Sup. Ct. Nassau Cty. 1970) ...............................10, 14

Palmer v. Palmer,
  268 A.D. 1010, 52 N.Y.S.2d 383 (3d Dept. 1944) ....................................................9, 13

Pavlo v. Pavlo,
  137 Misc.2d 418, 520 N.Y.S.2d 991 (Sup. Ct. Kings Cty. 1987)................................10

Pereia v. Pereria,
  272 A.D. 281, 70 N.Y.S.2d 763 (1st Dept. 1947)......................................................9, 13

## STATUTES AND RULES

8 Del. C. § 225 (2011) .................................................................................................................5, 6

NY CPLR §3211(a)(10)..............................................................................................................11

Court of Chancery Rule 12(b)(7)................................................................................................11

Court of Chancery Rule 19(a)......................................................................................................11

## PRELIMINARY STATEMENT

Orly Genger ("Orly") is the sole beneficiary of the Orly Genger 1993 Trust (the "Orly Trust"). On July 20, 2010, Orly began this action to determine the Orly Trust's ownership interest in the shares of a closely-held family company, Trans-Resources, Inc. ("TRI") (the "New York TRI Action"). On October 4, 2011, defendant Dalia Genger ("Dalia") commenced a declaratory judgment action in Delaware Chancery Court, purportedly seeking to determine the same issue: the Orly Trust's ownership interest in TRI (the "Delaware DJ Action"). To prevent forum shopping and conserve judicial resources, courts have not hesitated to enjoin a party's attempt to pursue duplicative litigation in other jurisdictions. The Court should issue such an injunction here.

An injunction enjoining the Delaware DJ Action is particularly appropriate given that Dalia's only real purpose in commencing the Delaware DJ Action is to help defendants Sagi Genger ("Sagi"), TPR Investment Associates, Inc. ("TPR"), and the Trump Group loot the TRI Shares. By now, the Court is well-aware of Dalia's myriad efforts to pauperize Orly and how, since becoming Trustee, Dalia has misused her position to dissipate all of the Orly Trust's assets. To strip away the Orly Trust's indirect interest in TPR, Dalia permitted Sagi to enforce a Note Dalia and Sagi had successfully argued in a prior legal proceeding was never intended to be enforced. To strip away the Orly Trust's interest in TPR, Dalia granted Sagi the unfettered right to sell the Orly Trust's TRI Shares for a fraction of its true price, while releasing him in advance from all potential claims. The Delaware DJ Action is just another transparent attempt by Dalia to misuse her Trusteeship to harm Orly and the Orly Trust.

No valid reason exists for the Delaware DJ Action. Dalia resides in New York; Orly resides in New York; the Orly Trust is governed by New York law; and the question raised

1

by the Delaware DJ Action is already before this Court. The only reason Dalia filed her action in

Delaware is to provide the Delaware Chancery Court with personal jurisdiction over the Orly

Trust. Specifically, in the course of a limited *in rem* proceeding to decide voting rights,

Chancellor Strine of the Delaware Chancery Court purported to hold that the TRI Shares do not

belong to the Orly Trust, but to TPR (and through TPR to the Trump Group). That holding was

overturned, the Delaware Supreme Court ruling the lower court lacked, in that limited *in rem*

proceeding, the personal jurisdiction over the Orly Trust necessary to decide beneficial

ownership of the TRI Shares. By bringing her action, Dalia deliberately has given the Delaware

Chancery Court the personal jurisdiction it lacked. Little wonder then that, at a recent hearing

before this Court, Thomas J. Allingham II, the Trump Group's attorney, welcomed the filing of

Dalia's new Delaware DJ Action.

Over fifteen months ago, Orly chose this Court as her desired forum for deciding

who beneficially owns the TRI Shares, and it is this Court that should decide that issue. The

Court should not allow Dalia to strip that choice from Orly, as she has stripped Orly of so many

other things. Nor should Dalia be permitted to spark an unnecessary and unhelpful race to

judgment between New York and Delaware. Instead, during the pendency of this action, the

Court should enjoin Dalia from continuing the Delaware DJ Action, or commencing any other

duplicative litigation.

## STATEMENT OF FACTS[1]

### The New York TRI Action

On July 20, 2010, Orly, on behalf of herself and the Orly Trust, and together with

---

[1] The Statement of Facts is supported by the Affidavit of plaintiff Orly Genger ("Orly Aff.") and
exhibits attached thereto; the Attorney's Statement of Bryan D. Leinbach ("Leinbach Decl.") and
exhibits attached thereto; and the Attorney's Statement of Judith Siegel-Baum ("Siegel-Baum
Decl.") and exhibits attached thereto.

her father Arie Genger ("Arie"), commenced the instant New York TRI Action. Leinbach Decl. ¶ 2; Orly Aff. ¶ 2. The New York TRI Action seeks reformation of a Stipulation and Agreement of Settlement between Arie and Dalia in consummation of their divorce proceedings (the "Stipulation"), and a final determination of who beneficially owns the shares of TRI purportedly transferred to Arie, the Orly Trust, and the Sagi Genger 1993 Trust ("Sagi Trust") pursuant to that Stipulation. Complaint ¶¶ 32-173.[2]

The Stipulation provides, *inter alia*, that defendant TPR would transfer a 13.99% interest in TRI to Arie Genger (the "Arie TRI Shares") and 19.43% interests to the Orly Trust (the "Orly Trust TRI Shares") and Sagi Trust (the "Sagi Trust TRI Shares"). Complaint ¶ 34. The Stipulation also provided that Arie would transfer his 51% interest in TPR to Dalia. Id. In the event that any of the transfers contemplated by the Stipulation were found unenforceable for any reason, the Stipulation contained a reformation provision, stating:

> If any provision of this Agreement, for any reason whatsoever, be declared … unenforceable by any Court of competent jurisdiction … the remainder of this Agreement and the application of such provision to any person or situations, other than those as to which such provision may have been held invalid or unenforceable shall not be affected thereby and shall continue to be enforced to the fullest extent that such severance of the invalid portions is possible without vitiating the original intent and purposes and economic intentions of the parties (the "Original Intent"), as herein set forth …. **In the event a provision is superseded under this Article XVI, either party may seek reformation of the affected provision in any court of competent jurisdiction, which shall be empowered to revise the provision to reflect the parties' Original Intent to the greatest extent possible, consistent with New York law.** It is the intention of the parties hereto that the provisions may be enforced in equity in addition to, and not to the exclusion of any other remedies which may be available to the parties.

---

[2] "Complaint" means the New York TRI Action's Third Amended and Supplemental Complaint dated September 20, 2011. For the Court's convenience, a copy of the Complaint, without exhibits, is attached as Exhibit R to the Leinbach Decl.

Stipulation, pp. 47-48 (emphasis added) (Complaint ¶ 38 and attached Ex. A).

Moreover, to effectuate the Genger family's wishes concerning ownership of the

Genger's families TRI shares, defendant Sagi Genger, as CEO of defendant TPR Investment

Associates, Inc., and David Parnes, as trustee of the Orly and Sagi Trusts, entered into an

October 29, 2004 agreement (the "October 2004 Agreement"), stating:

> In case, at any time hereafter, any further action is necessary or
> desirable to carry out the purpose of this Letter Agreement, **each of
> the parties hereto shall take or cause to be taken all necessary
> action**, including, without limitation, the execution and delivery of
> such further instruments and documents **as may be reasonably
> requested by any party for such purpose or otherwise to
> complete or perfect the transactions contemplated hereby.**

October 2004 Agreement (emphases added) (Complaint ¶ 50 and attached Ex. B).[3]

**The Delaware DJ Action**

On October 4, 2011, Dalia commenced a declaratory judgment action in Delaware

Chancery Court entitled *Dalia Genger as Trustee of the Orly Genger 1993 Trust v. TR Investors

LLC et al.* (Orly Aff. ¶ 5 and Ex. A (Delaware DJ Action Complaint)).[4]  Like the New York TRI

Action, the Delaware DJ Action seeks a judicial determination regarding beneficial ownership of

the Orly Trust TRI Shares. Id.  However, unlike the New York TRI Action, Dalia's Chancery

Court proceeding fails to include either Arie or the Sagi Trust as parties or take into account the

reformation provision in the Stipulation.  Orly Aff. ¶¶ 5-8; Leinbach Decl. ¶ 4.

---

[3] In addition, Arie was granted an irrevocable proxy and a backup proxy agreement to vote the
two trust's TRI shares during his lifetime, thus maintaining the Genger family's majority voting
control over TRI.  Complaint ¶¶ 50-55 and attached Exs. B-E.

[4] Dalia's Delaware counsel is Jeremy Anderson, a former associate to Trump Group lawyer
Allingham II.  See Leinbach Decl. ¶ 6.

4

**The Delaware Proceedings Before Chancellor Strine**

In filing the Delaware DJ Action, Dalia deliberately seeks to have her case placed before a Court and Judge (Chancellor Strine) who already has determined the Orly Trust does <u>not</u> own the TRI Shares (a determination reversed by the Delaware Supreme Court on jurisdictional grounds). Orly Aff. ¶¶ 9-13 and Exs. D and E.

Chancellor Strine ruled on the issue as part of a limited action under 8 Del. C. § 225 between various members of the "Trump Group" and Arie Genger (Orly's father) to determine which stockholder group possessed majority voting interest and was entitled to elect the TRI board of directors. As part of that proceeding, in an August 29, 2010 Opinion (the "Side Letter Opinion"), the Chancery Court attempted to opine regarding who owned the TRI Shares.[5] (Orly Aff. ¶ 10 and Ex. D). In that Side Letter Opinion, the Chancellor expressly acknowledged the Orly Trust "was not formally before the Court" in any capacity. Side Letter Opinion at 1 (Orly Aff., Ex. D). The Chancellor nevertheless went on to determine that the Orly Trust did not beneficially own the TRI Shares. Rather, the Chancellor held that the TRI Shares are owned by TPR (and pursuant to the Side Letter Agreement between TPR and the Trump Group could be purchased by the Trump Group). Side Letter Opinion at 3; <u>see also</u> Final Judgment Order at ¶ 8 (Orly Aff., Ex. E) ("TPR is the record and beneficial owner of all [TRI] shares not presently owned by the Trump Group").

On July 18, 2011, the Delaware Supreme Court affirmed in part and reversed in part the decision of the Delaware Chancery Court. <u>See</u> Delaware Supreme Court Opinion (Orly Aff., Ex. C). Specifically, the Delaware Supreme Court held that, because the Delaware Court of

---

[5] The August 29 Opinion is referred to as the "Side Letter Opinion" because it purports to apply a "side letter" where TPR's CEO, Sagi Genger, contracted to sell TRI Shares to the Trump Group. Notably, TPR claims the right to sell the Orly Trust's TRI Shares because Dalia -- in derogation of her fiduciary duties as Trustee -- purported to give Sagi (for no apparent consideration) the unfettered right the sell, transfer, and otherwise dispose of, the TRI Shares. <u>See</u> Orly Aff. ¶ 10 n. 1; <u>see also</u> Meeting Agreement ¶¶ 3, 11 (Siegel-Baum Decl. Ex. I).

Chancery was deciding a Section 225 *in rem* proceeding (as opposed to a plenary proceeding), it

exceeded its jurisdiction in deciding the Trump Group's right to buy, and TPR's right to sell, the

Orly Trust TRI Shares. Del. Sup. Ct. Op. at 35-44. The Delaware Supreme Court concluded:

> To summarize, the trial court lacked personal jurisdiction over
> either the Orly Trust or TPR, which was required for a binding
> adjudication of the beneficial ownership of their respective stock
> ownership interests. Without personal jurisdiction over these
> entities, the Court of Chancery lacked the power to augment TPR's
> beneficial ownership interest, or diminish the Orly Trust's
> beneficial ownership interest, in Trans-Resources by adjudicating
> that TPR beneficially owned the Genger Shares and Orly Trust
> Shares. Therefore, the beneficial ownership determinations that
> flow from the Court of Chancery's August 9, 2010 Side Letter
> Opinion and its August 18, 2010 Final Judgment Order must be
> reversed.

Id. at 44. Notably, the Delaware Supreme Court also suggested that the adjudication of beneficial

ownership take place in the New York Courts. Id. at 44, n.98.

Rather than follow the Delaware Supreme Court's advice and bring an action in

New York, or conserve its resources by litigating the matter in the existing New York TRI

Action, Dalia deliberately chose the worst possible option – to bring a plenary action in

Delaware Chancery Court where the matter already has been decided adverse to the Orly Trust.

Orly Aff. ¶ 12. By bringing her Delaware DJ Action, Dalia is attempting to cure the

jurisdictional defect that protected the Orly Trust, plainly intending to obtain from Chancellor

Strine the same erroneous findings adverse to the Orly Trust he had made previously (even

though Orly, the Orly Trust, and TPR were not parties to that prior proceeding). Id. Little

wonder then that, at a recent hearing before this Court, Mr. Allingham II, the Trump Group's

attorney, welcomed Dalia's filing of her new Delaware DJ Action. See October 11, 2011

Hearing Transcript at 28:3-8 (Leinbach Decl., Ex. V).

Dalia's use of the Delaware DJ Action to harm Orly and the Orly Trust is of a

piece with her many other efforts to financially damage Orly and the Orly Trust, in collusion with her son, Sagi. See Siegel-Baum Decl. ¶¶ 4-14 and Exs. G-M; Orly Aff. ¶¶ 2-4. For this reason, Orly has brought a proceeding in Surrogate Court to remove Dalia as Trustee of the Orly Trust. See *In the Matter of the Application of Orly Genger, as a person interested, for the removal of Dalia Genger as Trustee of the Orly Genger 1993 Trust pursuant to SPCA § 711(11)*, Index 0017/2008. The Surrogate action is still pending before the Surrogate Court. Siegel-Baum Decl. ¶ 19.

On July 1, 2009, the Surrogate Court imposed certain protective restraints upon Dalia to preserve the status quo (the "Restraints"):

> ORDERED that, during the pendency of his proceeding, Respondent and/or her counsel are required to give notice by overnight mail to Petitioner's counsel of any (1) offer to purchase the Orly Trust's 19.3% interest in TRI within 10 days of receiving such offer and (2) act by Respondent, her agents and all other persons acting on her behalf to assign, mortgage, pledge, redeem, encumber, sell or otherwise alter the Orly Trust's interest in TRI at least 10 days prior to such act.

July 1, 2009 Order at 2 (emphases added) (Siegel-Baum Decl. Ex. N); accord September 8, 2010 Stipulation (Siegel-Baum Decl. Ex. O) (stipulating to same restraints). Dalia did not provide Orly or her counsel with any notice before filing the Delaware DJ Action. (Siegel-Baum Decl. ¶ 18).

**Additional Reasons Why Ownership of the TRI Shares should be Decided in New York**

Any determination regarding the Orly Trust should be made in New York, not Delaware. Orly, the sole beneficiary of the Orly Trust, is a resident of New York and has chosen this Court as her forum of choice. (Orly Aff. ¶ 6). Dalia, the present Trustee of the Orly Trust, is a resident of New York. Id. The Trust Agreement creating the Orly Trust specifically states that "This Trust Agreement and the trusts hereby created shall be governed by the Law of the State of New York." See Trust Agreement, Article Sixth (Governing Law) (Orly Aff., Ex. B).

More generally, every party necessary to determination of who owns the TRI Shares are parties to, and have appeared in, the New York TRI Action. (Orly Aff. ¶ 7). Further, the New York Court has jurisdiction to decide all necessary issues, including issues touching upon the dissolution of Arie and Dalia Genger's marriage and reformation of the Stipulation of Settlement arising therefrom. Id. Thus, it is not surprising that the Delaware Supreme Court recognized in its opinion that ownership of the TRI Shares should be decided in New York. See Del. Sup. Ct. Op. at 44, n.98 (Orly Aff., Ex. C).

Finally, this Court is already familiar with many of the issues in this case, having presided over extensive motion practice in the New York TRI Action, and in the related action before this Court, titled *Orly Genger v. Dalia Genger et al.,* Index No. 109749/09 (the "New York TPR Action"). Orly Aff. ¶ 8; Leinbach Decl. ¶ 3. For example, this Court already has recognized that both the TPR and TRI Shares are "unique" and should "be protected from transfer, sale or assignment until this litigation is ultimately decided." See July 28, 2010 Amended Decision and Order in New York TPR Action (Leinbach Decl., Ex. T); February 17, 2011 Decision and Order in New York TRI Action (Leinbach Decl., Ex. V).

## ARGUMENT

## I.    THE COURT SHOULD ENJOIN DALIA FROM CONTINUING HER DUPLICATIVE DELAWARE LITIGATION

This Court has broad powers to prevent a defendant like Dalia from prosecuting foreign legal proceedings that duplicate litigation currently pending before it. For example, in Jay Franco and Sons Inc. v. G Studios, LLC, Index No. 602236/05, 2006 WL 5110770 (Sup. Ct. N.Y. Cty. June 14, 2006), plaintiff filed an action in New York seeking the return of a $70,000 deposit paid to defendant, after the parties failed to complete and enter a trademark licensing agreement. Ten months later, defendant commenced a fraud action in California, contending the

licensing agreement had failed due to plaintiff's fraud and the deposit did not have to be returned. Id. Although defendant contended the actions were not duplicative,[6] the New York Supreme Court disagreed and enjoined the California action. Id. (citing Matter of the Adoption of Baby Girl S., 181 Misc. 2d 117, 130 (Surr. Ct. Westchester Cty. 1999) ("the court has the authority to grant injunctive relief in order to protect the integrity of its jurisdiction and to prevent the parties from engaging in duplicative litigation")).

The First Department affirmed, holding that, although the legal claims differed, the operative facts and "underlying issue in both cases is the [same]," and the injunction was proper:

> In the interest of preventing duplicative litigation that might lead to conflicting results, and to prevent the waste of judicial resources and unnecessary legal expenses, the court did not improvidently exercise its discretion by invoking its equity power to enjoin defendant from prosecuting [an action the defendant filed in California].

Jay Franco and Sons Inc. v. G Studios, LLC, 34 A.D.3d 297, 825 N.Y.S.2d 20, 21 (1st Dept. 2006); see also Bryan v. Bryan, 275 A.D.2d 688, 713 N.Y.S.2d 348 (1st Dept. 2000) (affirming decision enjoining defendant from prosecuting duplicative action filed in Texas); Lafferty v. Lafferty, 243 A.D.2d 541, 663 N.Y.S.2d 108, 109 (2d Dept. 1997) (affirming decision enjoining defendant from prosecuting duplicative action filed in Connecticut.[7] The same result, enjoining

---

[6] Indeed, defendant's California attorneys submitted a certification in California stating that the California action was "not related to another action or proceeding pending in any state." Jay Franco and Sons, Inc., 2006 WL 5110770, at *1.

[7] See also Garvin v. Garvin, 302 N.Y. 96, 103, 96 N.E.2d 721 (1951) (affirming lower court's decision to enjoin defendant from prosecuting a subsequent action in the Virgin Islands); Pereia v. Pereria, 272 A.D. 281, 70 N.Y.S.2d 763 (1st Dept. 1947) (reversing lower court's decision and enjoining defendant from prosecuting a subsequent action in Nevada); Palmer v. Palmer, 268 A.D. 1010, 52 N.Y.S.2d 383 (3d Dept. 1944) (affirming lower court's decision to enjoin defendant from prosecuting a subsequent action in Nevada); Browne v. Browne, 53 A.D.2d 134, 385 N.Y.S.2d 983, 987 (4th Dept. 1976) (affirming Supreme Court's decision to enjoin defendant from prosecuting action in Texas); Hon v. Hon, 164 Misc.2d 806, 624 N.Y.S.2d 553,

Dalia from prosecuting the Delaware DJ Action, is called for here.

The Delaware DJ Action was commenced over <u>fifteen months</u> after the New York

TRI Action, and seeks the same relief: a judgment affirming the Orly Trust's beneficial

ownership to the Orly Trust TRI Shares.  <u>Compare</u> First Cause of Action in New York TRI

Complaint, at ¶¶ 174-189 (Leinbach Decl., Ex. R) <u>with</u> Count One of Delaware DJ Action

Complaint, at ¶¶ 37-43 (Orly Aff., Ex. A).  This Court has spent countess hours over the past

year and a half familiarizing itself with the facts of the case and making substantive ruling

regarding the property at issue in this case.  Indeed, there are already over 100 entries on the

Court's docket for this case.  <u>See</u> E-filing docket (Leinbach Decl. ¶ 3 and Ex. S).

Allowing Dalia to prosecute the Delaware Action would only duplicate this

Court's efforts in a state with no connection to the New York Stipulation that gave rise to the

Genger family's division of wealth, and no connection to Dalia, Orly, or the Orly Trust.  Indeed,

while this Court has already addressed the issue of reformation of the Stipulation pursuant to the

Genger family's original intent, the Delaware Chancery Court never addressed such issues in the

prior special 225 proceeding before it, which was an <i>in rem</i> proceeding narrowly focused on the

parties' relative rights to appoint board members to TRI's board of directors.  Orly was not a

party to these prior Delaware proceedings and had no opportunity to raise the New York

Stipulation or related issues with the Delaware Court.  <u>See</u> Del. Sup. Ct. Op. at 44; <u>see also</u> Orly

Aff. ¶¶ 6-8, 14-16.  For this reason alone, the Court should enjoin or stay the Delaware DJ

Action.  <u>See, e.g.</u>, <u>Interested Underwriters at Lloyd's v. H.D.I. III Associates</u>, 213 A.D.2d 246,

---

554 (Sup. Ct. Queens Cty. 1995) (enjoining plaintiff from prosecuting subsequent proceeding in
Connecticut after commencing an action in New York); <u>Pavlo v. Pavlo</u>, 137 Misc.2d 418, 520
N.Y.S.2d 991, 994 (Sup. Ct. Kings Cty. 1987) (enjoining defendant from prosecuting subsequent
action in New Jersey); <u>Fernandez v. Fernandez</u>, 39 Misc.2d 471, 240 N.Y.S.2d 926, 927 (Sup.
Ct. Bronx Cty. 1963) (enjoining defendant from prosecuting subsequent action in Mexico);
<u>Martin v. Martin</u>, 62 Misc.2d 703, 309 N.Y.S.2d 477, 480 (Sup. Ct. Nassau Cty. 1970)

247, 623 N.Y.S.2d 871, 873 (1st Dept. 1995) (affirming order staying Colorado action where "New York action was properly placed, ... a contrary decision in Colorado would interfere with the New York court's ability to resolve the issues before it, ... the facts indicate that the defendant may have engaged in forum-shopping ... [and] significant New York contacts existed") (internal citations omitted); Bryan v. Bryan, 275 A.D.2d 688, 689, 713 N.Y.S.2d 348, 349 (1st Dept. 2000) (enjoining action where "New York has the greater interest in and contacts with the ... litigation" because "most, if not all, of the marital property is located in New York; the antenuptial agreement was entered into in New York; the parties lived together in New York as husband and wife ... and the wife continues to reside in New York").

Both the Delaware and New York courts recognize a party's right to move to dismiss a complaint due to the plaintiff's failure to name all necessary parties. NY CPLR 3211(a)(10); Court of Chancery Rule 12(b)(7), 19(a). The New York TRI Action includes all necessary parties for an adjudication of the Orly Trust's beneficial ownership to the Orly Trust TRI Shares: Orly, Arie, the Orly Trust,[8] Dalia, Sagi, TPR, the Sagi Trust, and the Trump Group. In contrast, Dalia's newly minted Delaware DJ Action only names TPR and the Trump Group as defendants. See Delaware DJ Action Complaint at 1.

In this regard, Dalia's decision to exclude Orly as a party is telling. As a non-party, Orly cannot move the Delaware Court to dismiss the Delaware DJ Action, despite the fact that Dalia's prosecution of the Delaware DJ Action would rob Orly of her right to prosecute her

---

(enjoining defendant from commencing subsequent proceeding in Nevada).

[8] Dalia's contention that the Orly Trust is not a party to this action (see Dalia Brief in support of Motion to Dismiss) is meritless. Orly is prosecuting this action on behalf of the Orly Trust, a trust formed in and under the laws of New York, precisely because Dalia is acting against the interests of Orly and the Orly Trust, despite Orly's requests that Dalia fulfill her fiduciary duties to Orly and the Orly Trust. See Statement of Facts; Orly Aff. ¶¶ 2-13; Siegel-Baum Decl. ¶¶ 2-19.

case in her chosen forum before contrary rulings in Delaware make relief in this Court meaningless. Only this Court can provide Orly with the relief she seeks and deserves. Orly Aff. ¶ 16. For this additional reason, the Court should immediate enjoin Dalia from continuing her Delaware DJ Action.

Finally, Dalia should not be able to prosecute the Delaware DJ Action because Dalia should not be permitted to act against beneficiary Orly's interest while an action for Dalia's removal is pending. See Surrogate Court Petition (Siegel-Baum Decl., Ex. M). Indeed, to restrain Dalia during the pendency of the Surrogate Court proceeding, the Surrogate Court issued restraints preventing Dalia from taking any action to "affect the Orly Trust's interest in" the Orly Trust TRI Shares without giving Orly at least ten (10) days advanced notice of any such action. See Siegel-Baum Decl. Ex. N (signed Order to Show Cause), Ex. O (signed stipulation). Not only did Dalia fail to give Orly any notice of her plans to commence the Delaware Action, but Dalia continues to ignore Orly's express instruction to Dalia protect the Orly Trust's interest in the Orly Trust TRI Shares. See Siegel-Baum Decl. ¶¶ 5-11 and Ex. J (January 10, 2009 Letter). Allowing Dalia to prosecute the Delaware Action only further undermines the very Orders and Restraints meant to protect Orly from such misfeasance by Dalia. For this reason too, Dalia should be enjoined from prosecuting the Delaware Action.

## II.   THIS COURT SHOULD STOP DALIA FROM COLLATERALLY ATTACKING THIS COURT'S AUTHORITY AND IRREPARABLY HARMING ORLY THROUGH DUPLICATIVE LITIGATION

New York courts have the power to enjoin a defendant from prosecuting a foreign proceeding to protect the authority and dignity of the New York Courts:

> The plaintiff evidently expects to engage the defendant in an unseemly race to judgment in the two courts. What is being challenged here, therefore, is not the dignity and authority of the Connecticut Court, but of this Court."

Hon, 624 N.Y.S.2d at 554 (emphasis added). This power to enjoin also exists as a matter of equity to protect the rights of its litigants where a subsequently filed action would damage a plaintiff's rights in the earlier filed action:

> In our opinion there is a sufficient and immediate necessity for equitable intervention by our courts to protect the marital status of the wife domiciled in New York. The failure of equity to act at the earliest opportunity when called upon to do so might result in irreparable harm to the domiciliary party who invokes its protection. Certainly there is every reason for a wife in plaintiff's position to fear the result of a foreign divorce proceeding prosecuted by the husband. It is difficult for her to determine whether she should go to Nevada, if possessed of means to do so, and there contest the *bona fides* of her husband's claim of domicile. Such procedure would entail the risk of acquiescing in the jurisdiction of the Nevada courts. The alternative risk in staying quiescent at home involves the possible inability to procure later the proof she now has to establish the husband's lack of bona fide domicile in the foreign jurisdiction.

Pereia, 70 N.Y.S.2d at 768 (emphasis added); see also Browne, 385 N.Y.S.2d at 986 (preventing defendant from prosecuting action in Texas where a Texas judgment would prejudice plaintiff's rights in New York proceeding); Lafferty, 663 N.Y.S.2d at 109 (preventing defendant from seeking a sister state ruling that would make New York decision ineffectual); Palmer, 52 N.Y.S.2d at 383 (same). Indeed, the Delaware Chancery Court did not hesitate to impose an anti-litigation injunction against Orly, to prevent any duplication of effort and challenge to its authority in the New York Courts. See Orly Aff. ¶¶ 14-16. This Court should adopt the same precaution, and stop Dalia's transparent attempt to forum-shop these matters from New York.

By filing the Delaware DJ Action, Dalia improperly seeks to "engage [Orly] in an unseemly race to judgment in the two courts" (Hon, 624 N.Y.S.2d at 554) and irreparably and prejudice her rights in this proceeding (Pereia, 70 N.Y.S.2d at 768). Dalia's Delaware DJ Action seeks to preempt this Court's determination of who owns the TRI Shares, and prevent this Court's reformation of the Stipulation of Settlement or consideration of TPR's prior agreement