to do all that is necessary to effectuate the transfer of the TRI Shares to the Orly Trust, the Sagi

Trust, and Arie. See October 2004 Agreement (New York TRI Action Complaint ¶ 50 and

attached Ex. B). As a matter of equity, the Court need not wait until Orly is actually foreclosed,

in whole or in part, from prosecuting her action in this Court, but may (and should) act now and

enjoin Dalia's Delaware DJ Action.

## III.  THE COURT SHOULD ENJOIN DALIA FROM COMMENCING ANY FURTHER DUPLICATIVE ACTIONS

Not only does the Court have the power to enjoin Dalia from prosecuting the

Delaware DJ Action, it also has the power to prevent Dalia from commencing new actions:

> Granting the preliminary injunction requested by the wife would do no more than maintain the status quo of the parties until the bona fides of the husband's alleged foreign domicile are determined in the main action. To permit the husband to institute divorce proceedings in Nevada would place his wife in an unfair position of imminent peril….she would then be placed on the horns of a dilemma, have the option of either sitting idly by while her marriage is purportedly dissolved in Nevada, keeping for herself what may be an illusory right to attack the decree at a later time, or of appearing in Nevada, at great expense, and placing all her marital rights at the mercy of a court ostensibly foreign to every aspect of their marital domicile and relationship.

> Under the circumstances, a preliminary injunction is proper and plaintiff may maintain her action for a permanent injunction. This is true, despite the fact that there is no matrimonial action pending presently between the parties.

Martin, 309 N.Y.S.2d at 479-80 (internal citations omitted). Pending a final determination by

this Court in the New York TRI Action, Dalia should be enjoined from commencing any new

actions as Trustee of the Orly Trust addressing the same subject-matter.

## CONCLUSION

For each and every one of the foregoing reasons, this Court should grant Orly's motion for an Order: (i) enjoining Dalia from prosecuting the Delaware Action; and (ii) enjoining Dalia from commencing any new actions as Trustee of the Orly Trust concerning the subject-matter of the operative Complaint in this action.  Plaintiff Orly Genger also respectfully requests that the Court grant her such further and different relief as the Court deems just and proper.

Dated:   New York, New York           Respectfully submitted,
         October 25, 2011

                                      ZEICHNER ELLMAN & KRAUSE LLP


                                      By: _____
                                          Yoav M. Griver
                                          Bryan D. Leinbach
                                          Attorneys for plaintiff Orly Genger
                                          575 Lexington Avenue
                                          New York, New York 10022
                                          (212) 223-0400


Of Counsel
William B. Wachtel
Wachtel & Masyr LLP
One Dag Hammarskjold Plaza
885 Second Avenue
New York, New York 10017
(212)909-9595

15

NYSCEF DOC. NO. 112    20-01187-jlg   Doc 1-47   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 49   RECEIVED NYSCEF: 09/20/2011

Pg 3 of 150

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| ARIE GENGER and ORLY GENGER, in her individual capacity and on behalf of the ORLY GENGER 1993 Trust,<br><br>     Plaintiffs,<br><br>  -against-<br><br>SAGI GENGER, TPR INVESTMENT ASSOCIATES, INC., DALIA GENGER, THE SAGI GENGER 1993 TRUST, ROCHELLE FANG, Individually and as Trustee of THE SAGI GENGER 1993 TRUST, GLENCLOVA INVESTMENT COMPANY, TR INVESTORS, LLC, NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, JULES TRUMP, EDDIE TRUMP, MARK HIRSCH, and TRANS-RESOURCES, INC.<br><br>     Defendants. | INDEX NO.   651089/2010<br><br>**THIRD AMENDED AND SUPPLEMENTAL COMPLAINT** |

   Plaintiffs Arie Genger and Orly Genger, in her individual capacity and on behalf of the Orly Genger 1993 Trust, by their respective attorneys, for their Third Amended and Supplemental Complaint against the defendants in this action allege, on information and belief, as follows:

## I.  THE PARTIES

   1.  Plaintiff Arie Genger ("Arie") is a resident of the State of Florida, and the father of the Plaintiff Orly Genger ("Orly") and the defendant Sagi Genger ("Sagi").

   2.  Plaintiff Orly Genger is the adult daughter of Arie Genger and Dalia Genger, and the beneficiary of the Orly Trust, and a resident of the State of New York and is the beneficiary of the Orly Genger 1993 Trust (the "Orly Trust"). She brings this action on behalf of the Orly Trust as the beneficiary of the Orly Trust to protect her interests thereunder.

3.     Defendant Sagi Genger ("Sagi") is the estranged adult son of plaintiff Arie Genger and Defendant Dalia Genger, and is a resident of the City, County, and State of New York, and maintains an office at 1211 Park Avenue, New York, NY 10128.

4.     Defendant TPR Investment Associates, Inc. ("TPR") is a Delaware Corporation with a principal office located at 1211 Park Avenue, New York, NY 10128.

5.     At all relevant times to this Complaint Sagi is the President of defendant TPR and continues to be a controlling member of TPR's Board of Directors.

6.     Defendant Dalia Genger ("Dalia") is the mother of Sagi Genger and Orly Genger and the former wife of the Plaintiff Arie Genger, and is a resident of the City, County and State of New York. Dalia is the putative trustee of the Orly Trust and at relevant times to this Complaint is believed to have been a director of TPR.

7.     Defendant The Sagi Genger 1993 Trust ("Sagi Trust") is a trust entity, and the beneficiary of the Sagi Trust is Sagi.

8.     Defendant Rochelle Fang ("Fang") is the mother-in-law of the Defendant Sagi Genger and was the Trustee of the Sagi Trust during relevant periods in 2008, and is a resident of the City, County and State of New York.

9.     Defendant Glenclova Investment Company ("Glenclova") is a Cayman Islands company with a business address in the Bahamas, and an owner of common stock of Trans-Resources, Inc. ("TRI"). On information and belief Glenclova is in turn owned by other off-shore companies directly or indirectly controlled by the Trump Parties as defined below.

10.     Defendant TR Investors, LLC ("TR Investors") is a New Jersey Limited Liability Company and an owner of common stock of TRI. On information and belief TR Investors is in

2

turn owned by other off-shore companies directly or indirectly controlled by the Trump Parties as defined below.

11.    Together Glenclova and TR Investors are controlled by the Trump Group of South Africa and are collectively referred to herein as the "Trump Group".

12.    Defendant New TR Equity I, LLC ("New TR I") is a Delaware Limited Liability Company, controlled by Jules Trump and/or Eddie Trump.

13.    Defendant New TR Equity II, LLC ("New TR II") is a Delaware Limited Liability Company, controlled by Jules Trump and/or Eddie Trump.

14.    Defendant Jules Trump is a resident of Florida, and an officer and director of Glenclova.

15.    Defendant Eddie Trump is a resident of Florida, and an officer and director of Glenclova.

16.    Defendant Mark Hirsch is a resident of New York, and an officer and director of Glenclova.

17.    The Trump Group, New TR I , New TR II, Jules Trump, Eddie Trump and Mark Hirsch are referred to herein as the "Trump Parties."

18.    Defendant Trans-Resources, Inc. ("TRI") is a Delaware Corporation which is doing business in the City, County and State of New York, with its principal place of business located in the City, County and State of New York.

19.    The claims set forth in this Complaint arise from the conduct of each of the defendants, or their respective agents and co-conspirators, who committed one or more (i) tortious acts within the state, (ii) tortious acts without New York State causing injury to the

3

Plaintiffs or their property within New York State, and (iii) breaches of contract or fiduciary duty arising from contractual obligations, transactions and fiduciary obligations performed or to be performed in New York State.

## II.    NATURE OF THE CASE

20.    In this case, Plaintiffs Arie and Orly, in her individual capacity and on behalf of the Orly Trust, are seeking declaratory, injunctive, and other equitable relief, as well as additional compensatory damages in an amount yet to be determined arising from, inter alia, the loss of Arie's voting control of TRI and the tortious conduct of the defendants as set forth herein, in connection with the Trump Parties' campaign to take over and dilute the value of plaintiffs' interests in TRI, a company founded by Arie nearly three decades ago, including the defendants' wrongful, concerted efforts to strip Arie of his ownership and control of 52.85% of the shares of TRI's common stock, including the Orly Trust's interest in a portion of this TRI stock, and to oust Arie from his management control of TRI—all in an audacious series of breaches of contractual, fiduciary and legal obligations giving rise to each of the causes of action alleged in this Complaint.

## III.    FACTS RELEVANT TO ALL CLAIMS

### A.    Background

21.    The Plaintiff Arie is the founder and former Chairman of TRI, a private corporation which, through its subsidiaries, is a leading distributor and manufacturer of agricultural fertilizer worldwide.

22.    Arie founded TRI in 1985. Until 2001, TRI was wholly-owned by TPR Investment Associates, Inc. ("TPR"), a Genger family corporation established by Arie.

23.     Prior to October 30, 2004, TPR was controlled by Plaintiff Arie who owned 51% of TPR stock.

24.     Prior to October 30, 2004, Arie maintained majority control of TRI through his 51% majority ownership and control of TPR.

25.     The minority 49% interest in TPR, prior to October 30, 2004, was owned by D&K, Ltd. Partnership ("D&K"), also a Genger family company, which was in turn owned by Arie's wife, Dalia, (4%), the Sagi Trust and the Orly Trust (48% each).

26.     The Sagi and Orly Trusts were established in 1993 by Arie as part of a family estate plan.

27.     In 2001, defendants Glenclova and TR Investors became minority shareholders of TRI, acquiring approximately 47.15% of TRI common stock.

28.     As a result of the Trump Group acquiring 47.15% of TRI common stock, TPR became the owner of 52.85% of TRI stock with Arie maintaining a 51% controlling interest in TPR. Through his 51% ownership of TPR, Arie maintained control of a majority 52.85% interest in TRI, the company he founded.

29.     When the Trump Group became a minority shareholder of TRI, the Trump Group and TPR entered into the 2001 TRI Stockholders Agreement, dated March 30, 2001 (the "2001 TRI Stockholders Agreement") which, among other things, was intended to ensure that Arie (through his controlling interest in TPR) would continue to control the majority voting rights of TRI shares for the duration of his life.

5

30.    The 2001 TRI Stockholders Agreement specifically recognized that Arie was the

51% owner of TPR and that Dalia and the Orly Trust and the Sagi Trust through the D&K

Limited Partnership together owned 49% of TPR.

31.    The 2001 TRI Stockholders Agreement contains certain provisions restricting

the transfer of TPR's majority interest in TRI to someone other than Arie during his lifetime,

except under certain enumerated conditions intended to ensure that Arie, as the majority

shareholder of TPR, would maintain control over 52.85% of TRI shares during his life. The

2001 Stockholders Agreement specifically provides that exclusive jurisdiction over disputes

relating to this 2001 TRI Stockholders Agreement shall be in Federal courts or New York State

courts sitting in the City, State, and County of New York. The full terms and conditions of the

2001 TRI Stockholders Agreement are incorporated herein by reference.

**B.    The Genger Divorce and Court-Ordered Stipulation of Settlement**

32.    In 2002, Dalia and Arie became embroiled in a bitter divorce action venued in the

Supreme Court, New York County, entitled *Dalia Genger v. Arie Genger*, Index No. 302436-

2002 ("Genger Divorce Action").

33.    In October of 2004, Dalia and Arie agreed to a Stipulation of Settlement, which

was incorporated into a Judgment of Divorce in the Genger Divorce Action on January 7, 2005

("Stipulation of Settlement"), attached hereto as Exhibit A.  This Court-Ordered Stipulation of

Settlement, among other things equitably distributed between Arie and Dalia various marital

assets, including the ownership interests in the family holding company TPR which then held

52.85% of TRI common stock which was controlled by Arie through his control of TPR.

Pursuant to the terms of the Judgment of Divorce, the New York State Supreme Court retained

6

jurisdiction over the parties with respect to the enforcement of the terms of the Stipulation of

Settlement.

34.    Pursuant to the terms of the Stipulation of Settlement and certain 2004 TPR

Transaction Documents (described below) implementing the Stipulation of Settlement, it was

agreed by and among Arie, Dalia, Sagi, Orly, the Orly Trust, and the Sagi Trust that as part of

the settlement of the Genger Divorce Action, that Arie would transfer his 51% interest in the

TPR marital asset to Dalia, in consideration of TPR concurrently divesting itself of its 52.85%

majority interest in TRI on the following terms and conditions, which were all part of a single

integrated transaction:

i.      The defendant Sagi would become the President of TPR;

ii.     TPR, by Sagi as President of TPR, would transfer to the plaintiff Arie
        direct ownership of 794.40 shares of TRI common stock representing
        13.99468% of the common stock of TRI;

iii.    TPR, by Sagi as President of TPR, would transfer to each of the Sagi Trust
        and Orly Trust, record ownership of 1,102.80 shares (or 19.42766 % each)
        of TRI stock, subject to and on the further conditions that:

        (a) the Sagi Trust and the Orly Trust would each execute and deliver a
        2004 Voting Trust Agreement to Arie which provides further that:

                (i) the Sagi Trust and the Orly Trust would immediately execute
                and deliver to Arie an irrevocable voting proxy ("Putative
                Irrevocable Proxies") intended to ensure that Arie would maintain
                voting control over the Sagi Trust TRI shares and the Orly Trust
                TRI Shares for the duration of Arie's life, and

                (ii) in the event that the Putative Irrevocable Proxies granted by the
                Sagi Trust and the Orly Trust to Arie were ever held to be invalid
                then:

                        (1) a Back-up Voting Trust Agreement would be entered
                        into promptly between each of the Sagi and Orly Trusts and Arie
                        which:

7

(a) **grants Arie the right to vote the Orly Trust and Sagi Trust TRI shares for the duration of Arie's life,**

(b) provides that Arie is entitled to keep possession of the Sagi Trust and Orly Trust TRI Shares pursuant to a Voting Trust Agreement in a form attached to the 2004 Voting Trust Agreement, and

(c) provides that the Orly and Sagi Trust TRI shares would not be sold without a prior Court order,

and the 2004 Voting Trust Agreement further provides that:

(2) **pending the execution of the Back–up Voting Trust Agreement, the Orly and Sagi Trusts would be obligated to vote the Orly Trust and Sagi Trust Shares as directed by Arie during his lifetime.**

**Id.(emphasis added)**

35.    The Court-Ordered Stipulation of Settlement in the Genger Divorce Action is attached as Exhibit A hereto.

36.    Article II of the Stipulation of Settlement in the Divorce Action, entitled "Distribution of Assets," specifically provides, in pertinent part, as follows:

[2. (a)] "(ii) [Dalia] shall receive . . . sole ownership of the husband's [Arie's] two hundred and fifty (250) shares of common stock of TPR Investment Associates, Inc. ("TPR"), . . . which represents fifty-one percent (51%) of the issued and outstanding shares of common stock of TPR (exclusive of the 1.96% ownership of TPR, which the wife [Dalia] owns indirectly through her general partnership interests in D&K [partnership].

\*    \*    \*

"9. (a) TPR owns 3,000 shares of stock in Trans-Resources, Inc. ("TRI Stock") . . . . Concurrently with the execution of this agreement, the TRI Stock shall be distributed as follows:

"(i) **The husband [Arie], shall receive 794.40 shares of the TRI Stock, representing 13.99468% of the common stock of TRI;**

8

> **(ii) Each of Sagi Genger and Orly Genger, will receive
> in trust 1,102.80 shares of TRI Stock representing 19.42766%
> of the common stock of TRI for each of Sagi and Orly, and
> such trusts will simultaneously therewith execute and deliver
> irrevocable proxies to the husband for all of the TRI Stock
> owned by the trusts; and**

> **"(c)   <u>Concurrently with the execution of this Agreement,</u>
> each of the Husband and Wife will execute and deliver or cause
> TPR to execute and deliver (i) all documents reasonably
> necessary to effect the transfers required by subparagraph (a)
> of this Section 9, and (ii) duly executed stock powers to transfer
> the shares as required by subparagraph (a) of this Section 9.**

* * *

> "(e) Following the foregoing transfers of the TRI Stock, the wife
> [Dalia] will have no ownership interest in TRI."

(Stipulation of Settlement,  Exhibit A hereto, Article II, paragraph 2(a) (ii), p.5, and paragraph 9
(a), (c) & (e) at pp. 13, 14) (emphasis added).

37.     The Stipulation of Settlement also provides that this TPR/TRI transaction was a

fundamental part of the Stipulation of Settlement, and specifically states in pertinent part, in

bold and capital letter type:

> **"A FUNDAMENTAL PART OF THIS AGREEMENT IS THE
> HUSBAND'S RELINQUISHMENT OF HIS OWNERSHIP
> OF SHARES OF COMMON STOCK IN TPR, AND THE
> TRANSFER OF SUCH OWNERSHIP TO THE WIFE."**

Stipulation of Settlement,  Exhibit A hereto, Article 3, para. 1.

38.     The Stipulation of Settlement also included an express reformation clause which

provides that in the event that any term of the Stipulation of Settlement were to be voided by a

court of competent jurisdiction for any reason, then either Dalia or Arie would be entitled to seek

court-ordered reformation of the Stipulation of Settlement in a New York Court to give effect to

9

the intent of the parties to the fullest extent permitted by the laws of the State of New York. This

reformation clause of the Stipulation of Settlement provides:

## "ARTICLE XVI

## POSSIBLE INVALIDITY

"If any provision of this [Stipulation of Settlement], for any reason
whatsoever, be declared . . . unenforceable by any Court of
competent jurisdiction . . . the remainder of this Agreement and
the application of such provision to any person or situations, other
than those as to which such provision may have been invalid or
unenforceable shall not be affected thereby and shall continue to be
enforced to the fullest extent that such severance of the invalid
portions is possible without vitiating the original intent and
purposes and economic intentions of the parties (the "Original
Intent"), as herein set forth.... **In the event a provision is
superseded under this [Stipulation of Settlement], either party
may seek reformation of the affected provision in any court of
competent jurisdiction which shall be empowered to revise the
provision to reflect the parties' Original Intent to the greatest
extent possible, consistent with New York law.** It is the
intention of the parties hereto that this provision may be enforced
in equity in addition to, and not to the exclusion of, any other
remedies which may be available to the parties."

(Stipulation of Settlement, ARTICLE XVI, Exhibit A at pages 47-48) (emphasis added)).

39.    Dalia was represented by separate, independent legal counsel in connection with

the negotiation and her execution of the Stipulation of Settlement.

40.    Dalia, through her counsel, received a complete copy of the 2001 TRI

Stockholders Agreement prior to the execution of the Stipulation of Settlement.

41.    Sagi had full knowledge of the terms of the Stipulation of Settlement prior to, and

at the time that it was negotiated and executed, and was named as a fiduciary with regard to

certain marital property distributed or to be distributed under the Stipulation of Settlement.

42.     Sagi and his own counsel were provided with a full and complete copy of the 2001 TRI Stockholders Agreement prior to the execution of the Stipulation of Settlement.

43.     Edward Klimmerman, a partner at Sonnenschein, Nath & Rosenthal, LLP (now known as SNR Denton), represented Arie in the Genger Divorce Action, had full knowledge of the negotiation and terms of the Stipulation of Settlement at the time the Stipulation of Settlement was executed.  Mr. Klimmerman signed the Stipulation of Settlement as a witness. Mr. Klimmerman was also legal counsel for TRI and TPR at the time the Stipulation of Settlement was executed.

44.     As counsel for TRI and TPR, Mr. Klimmerman participated in the actual drafting of the 2001 TRI Stockholders Agreement.  As Arie's counsel in the Genger Divorce Action, he did not advise Arie that anything in the Stipulation of Settlement violated any term of the 2001 TRI Stockholders Agreement between TPR and the Trump Group.

45.     Arie reasonably believed that the transfers set forth in the 2004 Transfer Documents and Court-Ordered Stipulation of Settlement were valid and enforceable.

46.     Dalia and her legal representatives reasonably believed that the 2004 Transfers provided for in the Stipulation of Settlement were valid and enforceable at the time Dalia entered into the Stipulation of Settlement.

47.     Defendant Jules Trump, a representative of the Trump Group was aware of the Genger Divorce Action, and prior to the execution of the Stipulation of Settlement testified as a witness in the Genger Divorce Action in connection with the ownership of TRI shares.

C.   **The 2004 TPR Transfer of TRI Shares Pursuant to the Stipulation of Settlement**

48.   To implement the TPR and TRI share transfer provisions in the Stipulation of Settlement, Arie, the Sagi Trust, the Orly Trust and TPR, concurrently with the execution of the Stipulation of Settlement, entered into the following "2004 TPR Transaction Documents" in accordance with the express terms and intent set forth in the Stipulation of Settlement:

(i) a 2004 TPR Agreement to Transfer TRI Shares, dated October 29, 2004 (the "2004 TPR Transfer Agreement", attached hereto as Exhibit B); and

(ii) a 2004 Voting Trust Agreement, dated October 29, 2004 (the "2004 Voting Trust Agreement", attached hereto as Exhibit C), which attached:

(a) Executed Documents referred to as Putative Irrevocable Proxies, dated October 29, 2004, executed by the Sagi Trust and the Orly Trust ("Putative Irrevocable Proxies", attached hereto as Exhibit D) which by their specific terms purported to grant to the Plaintiff Arie the right to control and vote the Sagi Trust TRI shares and the Orly Trust TRI shares for the duration of his life, and

(b) a form Back-up Voting Trust Agreements ("Back up Voting Trust Agreements", attached here to Exhibit E), which were to be executed promptly by the Sagi Trust and the Orly Trust in the event that the Putative Irrevocable Proxies granted by the Sagi Trust and the Orly Trust to Arie were ever held to be invalid, and provided that:

(i) the Sagi Trust and the Orly Trust were required to vote the TRI shares in accordance with Arie's directions pending the execution of the Back-up Voting Trust Agreements in accordance with the express intent in the Stipulation of Settlement that Arie was to maintain voting control of the Sagi Trust and Orly Trust TRI shares for the duration of his life;

(ii) Arie would be entitled to keep possession of the Sagi Trust and Orly Trust TRI Shares pursuant to a Voting Trust Agreement in the form attached to the 2004 Voting Trust Agreement; and

12

(iii) the Orly and Sagi Trust TRI shares would not
be sold without a prior Court Order.

49.    Each of the 2004 Transaction Documents confirm the stated intention of the

parties to the Stipulation of Settlement and 2004 Transaction Documents that Arie, for the

duration of his life, would continue to have voting control over 52.85% of the outstanding shares

of TRI that were previously owned by TPR and controlled in turn by Arie through his 51%

ownership of TPR.

**D.    The 2004 TPR Transfer Agreement-Exhibit B**

50.    The 2004 Transfer Agreement executed by Sagi himself on behalf of TPR,

provides :

> "This letter will set forth our agreement pursuant to which you will
> purchase the 3,000 shares of common stock ("the Shares") of
> Trans-Resources, Inc. ("TRI") owned by TPR Investment
> Associates, Inc. ("TPR"). TPR hereby sells, transfers and conveys
> the Shares to you as follows:
>
>     (i)     794.40 shares to Arie Genger;
>
>     (ii)    1,102.80 Shares to the Sagi Genger 1993 Trust, and
>
>     (iii)   1,102.80 Shares to the Orly Genger 1993 Trust.
>
>                         *   *   *
>
> "The Shares represent 52.85% of the issued and outstanding shares
> of TRI. The Shares are being transferred hereunder free and clear
> of any liens, claims or encumbrances and **such transfer does not
> violate the Certificate of Incorporation of TPR or any
> agreement to which TPR is subject.**
>
> **"The trustees of the Sagi Genger 1993 Trust and of the Orly
> Genger 1993 Trust ("Trusts") have agreed to execute on behalf
> of the Trusts (i) an Irrevocable Proxy to appoint Arie Genger
> to vote the Shares owned by the Trusts and (ii) a voting trust
> letter agreement, copies of which are annexed hereto."**

13

> "**In case, at any time hereinafter, any further action is
> necessary or desirable to carry out the purposes of this Letter
> Agreement, each of the parties hereto shall take or cause to be
> taken all necessary action**, including, without limitation, the
> execution and delivery of such further instruments and documents
> which may be reasonably requested by any party for such purpose
> or otherwise **to complete or perfect the transactions
> contemplated hereby**."

> This Letter Agreement shall be governed by the laws of the State
> of New York without regard to conflicts of law principles.

(2004 TPR Transfer Agreement, Exhibit B) (emphasis added)

### E.   The 2004 Voting Trust Agreements (Exhibit C hereto)

51.    In accordance with the terms of the Stipulation of Settlement (Exhibit A) and the

2004 TPR Transfer Agreement (Exhibit B), Arie and the Sagi and Orly Trusts, respectively,

entered into identical 2004 Voting Trust Letter Agreements in favor of Arie (Exhibit C) which

provide as follows:

> "In connection with the transfer to the [Sagi and Orly Trusts] of
> 1,102.80 shares [each] of common stock (the "Shares") of Trans-
> Resources, Inc. (TRI) **pursuant to the terms and conditions of
> the Stipulation of Settlement of even date herewith**, the [Sagi
> and Orly] trust is [each] granting to Arie Genger an irrevocable
> proxy ("the Proxy") for the shares, a copy of which is annexed
> hereto.

(Exhibit C)(emphasis added).

### F.   The 2004 Putative Irrevocable Proxies Executed By The Sagi and Orly Trusts (Exhibit D, hereto)

52.    In accordance with the 2004 TPR Transfer Agreement, the Stipulation of

Settlement, and the 2004 Voting Trust Agreement, the Sagi and Orly Trusts executed two

identical Putative Irrevocable Proxies, each of which states, in relevant part, that:

> "[The Sagi Trust and Orly Trust, each respectively], ("the Trust")
> being the current record and beneficial owner of 1,102.80 shares of
> common stock of [TRI] **does hereby constitute and appoint Arie**

14

> **Genger, Chairman of the Board, Chief Executive Officer, and
> owner of approximately fourteen percent (14%) of the shares
> of common stock of TRI to vote as its proxy, all shares of
> common stock of TRI** which are now or hereafter owned by
> **the Trust**, at any and all meetings of the stockholders of TRI,
> regular or special, or by consent in lieu of meeting or any
> adjournments thereof in the same manner and to the same extent
> that the Trust might were the Trust present at said meeting (or
> executing such consent), upon any issue or proposal which may be
> brought before  such meeting or by such consent.
>
> **"This Irrevocable Proxy shall he deemed coupled with an
> interest and be irrevocable from the date hereof, and shall
> continue for the duration of Arie Genger's life."**

(Exhibit D)(emphasis added).

53.    The 2004 Voting Trust Agreement further provides that **in the event that the
Putative Irrevocable Proxies were ever declared invalid**, the Orly and Sagi Trusts would be
obligated to enter into a Back-up Voting Trust Agreement (Exhibit E) to assure that Arie would
maintain voting control over a majority of TRI shares for the duration of his life.  This part of the
2004 Voting Trust Agreement, executed by the Sagi Trust and the Orly Trust, provides:

> **"In the event that for any reason the Proxy is declared invalid
> and is no longer in effect, the Trust agrees, as promptly as
> practicahle, to enter into a Voting Trust Agreement (the
> "Voting Agreement") with Arie Genger as the voting trustee,
> which shall be substantially in the form annexed hereto.
> During the time the Proxy is not in effect and prior to the time
> the Voting Agreement is entered into, the Sagi Trust agrees to
> vote the shares as directed in writing by Arie Genger."**

(2004 Voting Trust Agreement, Exhibit C ) (emphasis added).

**G.    Back-Up Voting Trust Agreement –(Exhibit E hereto)**

54.    The Backup Voting Trust Agreement, which springs into effect upon the Putative
Irrevocahle Proxies being voided, provides:

15

> "The Trust Securities [the Sagi and Orly TRI Shares subject to
> the Voting Trust] shall be held by the Trustee [Arie Genger]
> for the purposes of and in accordance with this Agreement <u>and</u>
> <u>none of the Trust Securities shall be sold or otherwise disposed</u>
> <u>of by the Trustee except as herein expressly provided or in</u>
> <u>accordance with a final order of any Court or administrative</u>
> <u>agency with jurisdiction thereover.</u>"

* * *

> "This Agreement shall continue in effect for the duration of
> Arie Genger's Life"

Exhibit E. (emphasis added)

55.    In order to ensure that he maintained absolute control of the TRI shares for the

duration of his life, Arie never delivered physical copies of TPR's TRI shares to the Orly or Sagi

Trusts.

### H.    The Intent of the Parties

56.    The written 2004 Transaction Documents and the Stipulation of Settlement reflect

the stated intention of all the parties to these collective documents, <u>to wit</u>, that in order to resolve

the contested Genger Divorce Action, Arie agreed as part of the distribution of marital assets to

transfer his 51% interest in the family holding company, TPR, to Dalia, in exchange for Dalia

agreeing that TPR would concurrently divest itself of its 52.85% interest in the common stock of

TRI by distributing TPR's 52.85% majority interest in TRI to Arie (14%), the Sagi Trust

(19.425%), and the Orly Trust (19.425%) each, **on the express further condition that Arie**

**maintain voting rights for the Sagi Trust and Orly Trust TRI shares for the duration of his**

**life.**

57.    Arie, Dalia, Sagi and Orly each reasonably believed that the 2004 Transfers

provided for in the Stipulation of Settlement were valid and enforceable.

16

58.    Arie, Dalia, Sagi and Orly each reasonably believed that the Putative Irrevocable Proxies and Voting Trust Agreements were valid and assured that Arie would be able to maintain 58.85% voting control for the duration of his life.

59.    Accordingly, the concurrently executed integrated 2004 Transfer Documents were intended to implement the terms of the Stipulation of Settlement which provided expressly that Arie was to retain his 52.85% voting control over TRI and concomitantly continue to control the management and Board of TRI during his lifetime.

60.    It was also the parties' stated intention, and all parties reasonably believed, that the terms of the court-ordered Stipulation of Settlement with Dalia would not violate the terms or intent of the 2001 TRI Stockholders Agreement because Arie would still control what had been TPR's voting majority of TRI shares.

61.    The Genger Divorce Action was not concealed from TRI, the Trump Group, or the Trump Parties at any time.

62.    The 2004 transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust were reflected in the books and records of TRI.

63.    Prior to 2008, Jules Trump, and Mark Hirsch, each individually and on behalf of the Trump Group between 2004 and 2008 had access to the books and records of TRI.

64.    Between 2004 and 2008, as a Director of TRI, Jules Trump and Mark Hirsch, each had a fiduciary duty and legal duty of reasonable care to the record and beneficial owners, including TPR and TRI, to know the identity of all TRI shareholders of record as set forth in the books and records of TRI- a close corporation.

17

65.   As a Directors of TRI, Jules Trump, and Mark Hirsch, each individually and on behalf of TRI, had a fiduciary and legal duty of reasonable care to TPR and Arie to read all corporate Board minutes and other documents presented to the Directors and/or shareholders of TRI, in their entirety, prior to signing such documents.

66.   Prior to 2008, the books and records of TRI show that:

(i) Arie was record owner of 794.40 shares of TRI, representing 13.9946% of the common stock of TRI;

(ii) the Sagi Trust was the record owner of 1102.80 TRI shares, representing 19.42766% of the common stock of TRI; and

(iii) the Orly Trust was the record owner of 1102.80 TRI shares, representing 19.42766% of the common stock of TRI.

67.   Prior to 2008, the 2004 Transfers and the record ownership of TRI shares was known by:

(i) the officers and directors of TRI, in addition to Arie

(ii) TRI's legal counsel; and

(iii) TRI's Certified Public Accountant.

68.   Jules Trump, and Mark Hirsch, each individually and on behalf of the Trump Group executed corporate TRI documents as Director and/or on behalf of a shareholder of TRI which indicated that Arie, the Orly Trust and the Sagi Trust were the record owners of TRI shares.

18

69.    The terms of the Stipulation of Settlement relating to the distribution of TPR and TRI shares as marital assets in connection with the Genger Divorce Action were not in any way or at any time concealed from TRI, the Trump Group, or the Trump Parties.

70.    Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, and otherwise knew, and was aware that the Genger Divorce Action could involve in some way the equitable distribution of TPR shares owned by Arie as part of the divorce action.

71.    Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, knew, and was aware that the Genger Divorce Action involved in some way the value of TPR's ownership of TRI shares.

72.    Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, knew, and was aware that the Genger Divorce Action involved in some way Arie's management and control over TRI, the company that he had founded and managed since 1985.

73.    Prior to 2008, Jules Trump knew that ownership of TPR, as a marital asset which owned 52.85% of TRI shares, was a major asset and was the subject of a claim by Dalia for equitable distribution in the Genger Divorce Action.

74.    Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, knew, and was aware that the Genger Divorce Action would involve in some way the equitable distribution of TPR assets, including Arie's 51% majority ownership of TPR.

75.    Prior to 2008, the Trump Group, through Jules Trump who testified in the Genger Divorce Action, and otherwise knew, and was aware that the Genger Divorce Action could

19

involve D&K Limited Partnership, which was identified in the 2001 TRI Stockholders

Agreement as an owner of 49% of TPR (the majority Shareholder of TRI) and further disclosed

that in turn this 49% minority ownership of TPR by D&K was owned by Arie's wife Dalia (4%)

the Sagi Trust (48%) and the Orly Trust (48%), and that these Trust interests could be effected

by the equitable distribution of TPR assets as part of the Genger Divorce Action.

76.     The Trump Group knew that the 2001 TRI Stockholders Agreement did not

contain an express provision setting forth the rights and obligations of TPR, Arie or the Trump

Group in the event of a contested divorce involving Arie's ownership of TPR shares as marital

property, including TPR's ownership of TRI shares under New York's equitable distribution

laws or otherwise.

77.     Prior to 2008, Arie had reason to believe that The Trump Group, through Jules

Trump, and otherwise, had notice of the 2004 Transfers.

78.     Prior to 2008, Arie had reason to believe that The Trump Group had notice of the

2004 Transfers which were reflected in TRI corporate documents.

79.     Prior to 2008, the Trump Group and Jules Trump, in particular, had knowledge of

facts in 2002-2004 including, but not limited, to the fact that Arie was involved in a bitter

contested divorce, and that the issue of Arie's ownership interests in TRI, through TPR or

otherwise, was an issue raised in the Genger Divorce Action.

80.     Between 2004 and 2008, Directors of TRI, its legal counsel, Secretary, as well as

its Controller, knew of the 2004 transfers.

20

81.    Between 2004 and 2008, TRI, under Arie's management, reported the new company ownership resulting from the 2004 transfers to its lead bank, the IRS, and TRI's insurance company.

82.    Between October 2004 and August of 2008 nothing prevented the Trump Group, Jules Trump, TRI or its officers or directors, or any of them, from making any inquiry whatsoever of Arie, Orly, TPR, TRI, TRI's general counsel, Dalia, Sagi, the Sagi Trust, the Orly Trust, or D&K, concerning the effect, if any, that the Genger Divorce Action, or any judgment or resolution of the Genger Divorce Action had, would or could have, on (i) the ownership of TPR, (ii) Arie's ownership of a majority interest of TPR, (iii) TPR's ownership of TRI, (iv) Dalia's interest in D&K minority ownership of TRI, or the rights of the Sagi Trust or the Orly Trust as limited partners of D&K which owned approximately 49% each of TPR -- which ownership was acknowledged by the Trump Group in the 2001 TRI Stockholders Agreement.

83.    Between October 2004 and August of 2008 nothing prevented the Trump Group, Jules Trump, TRI or its officers or directors, or any of them, from making any inquiry whatsoever of Arie, Orly, TPR, TRI, TRI's general counsel, Dalia, Sagi, the Sagi Trust, the Orly Trust, or D&K as to the identity of the record owners of TRI.

84.    Jules Trump, Eddie Trump and Mark Hirsch (an attorney) at all times relevant to this complaint were sophisticated business individuals, with special expertise in corporate governance and ownership.

85.    At all times relevant to this action the Trump Parties had access to independent legal counsel.

21

86.    Prior to 2008, the Trump Group, by Jules Trump, and otherwise, acted with willful blindness and indifference to facts which put The Trump Group on notice of (i) the 2004 Transfers, and (ii) that Arie, the Sagi Trust and the Orly Trust were record owners of their respective TRI shares.

87.    The Trump Group, by Jules Trump, and otherwise, waived any objection to the 2004 Transfers.

88.    Between 2004 and 2008, under Arie's management, TRI's business performance improved consistently without any complaint or objection by TRI's Board of Directors including but not limited to representatives of the Trump Group.

I.    **The Trump Parties' 2008 Scheme and Conspiracy to Seize Majority Control of TRI, Squeeze Out Arie as an Officer, Director and Shareholder of TRI and Dilute the Value of Arie's, Orly's and the Orly Trust's Interests in the Affected TRI Shares**

89.    There was no hint of any substantial disagreement between Arie and the Trump Group relating to the Genger Divorce Action, or otherwise, until June of 2008, when TRI's value increased substantially as a result of improved performance.

90.    In the early Spring of 2008, TRI was facing a threat of foreclosure of one of its major operating units by Bank Hapoalim, a long-time lender of TRI.

91.    To address this foreclosure threat, Arie and the Trump Group explored the possibility of a sale of assets and restructuring plan involving the spin-off of all of TRI's North American assets to a separate entity and a capital loan by the Trump Group into a residual TRI to retire the Bank Hapoalim debt in exchange for increasing the equity position of the Trump Group in the restructured TRI so that the Trump Group would obtain a majority position (the "Funding Plan").

22

92.     Had the Funding Plan been implemented, in return for providing funding Jules and Eddie Trump through TR-I and TR-II would, for the first time, have been permitted to obtain a direct ownership interest in TRI, and the Trump Parties, under the Funding Plan, would have obtained majority control over TRI, the company that Arie had founded and worked so hard to make succeed.

93.     TRI's legal counsel advised that it would be necessary for a special committee of the Board to be constituted in order for the Board to approve the Funding Plan without the vote of Jules Trump who was an interested Director with a conflict of interest.

94.     Despite requests from Arie to constitute such a committee, the Trump Group Directors failed to agree to the appointment of such committee.

95.     The Board of TRI never constituted a special committee in order for the Board to approve the Funding Plan.

96.     The implementation of the Funding Plan was also subject to other conditions relating to the value of the transaction which conditions were never met.

97.     While the proposed Funding Plan was being worked on, the financial condition of TRI began to improve substantially. By late June 2004, TRI was generating positive cash flow of $15-20 million per month. This represented a dramatic improvement in TRI's earnings within a matter of months in 2008, and rendered the Funding Plan unnecessary.

98.     As a result, there was no longer a need for TRI or Arie to move forward with the Trump Group Funding Plan that would have given the Trump Parties' majority control of TRI.

23

99.     To proceed with the Funding Agreement would have diluted the shares of existing

shareholders and cause TRI to pay the Trump Group unreasonable fees for a loan that was not

needed.

100.    Based on the advice of TRI's Delaware corporate counsel concerning the

establishment of an independent committee of the Board to approve the Funding Plan, which the

Trump Group refused to empanel, and the fact such a Funding Plan was no longer necessary

because of improved performance of TRI which permitted the satisfaction of the Bank Hapoalim

loan, the Funding Plan was rejected and the Bank Hapoalim loan satisfied with TRI's own

substantially improved earnings without the need for funding from the Trump Parties or any

other third-party.

101.    On information and belief, the Bank Haopolim's threat of foreclosure and the

Funding Plan takeover proposed by the Trump Group were also engineered by Jules Trump,

individually, and on behalf of the Trump Group with the aid, assistance and further illegal

conduct of the Trump Group and a principal officer of Bank Haopolim with whom the Trump

Group had other business entanglements.

102.    Thwarted in their effort to take over the controlling interest in TRI through the

rejected Funding Plan, the Trump Group, Mark Hirsch, Eddie Trump, and Jules Trump

formulated a further illegal scheme and plan to take over the then very profitable TRI, and oust

Arie as its CEO, and steal the Genger family TRI shares at a fraction of their value.

103.    In furtherance of this plan, the Trump Group leveled an extortionate threat at Arie

demanding that unless Arie agreed to turn over majority control of TRI to the Trump Group

pursuant to the Funding Plan (which was no longer necessary ), the Trump Group would declare

24

that the 2004 TPR transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust under the

Stipulation of Settlement were void under the 2001 TRI Stockholders Agreement even though

Arie as a permitted Transferee held 14% of TRI outright, and had received a Voting Trust

Agreement and Putative Irrevocable Proxies from the Sagi Trust and the Orly Trust which, on

their face, gave Arie the right during his lifetime to control the management of TRI, and vote the

same 52.85% shares of TRI stock that had been controlled by Arie through his 51% ownership of

TPR prior to the Stipulation of Settlement and the execution of the 2004 Transfer Documents.

Thus, there was virtually no effective difference in Arie's control of TRI Shares as between his

majority control of TPR prior to the execution of the Stipulation of Settlement, and the intended

control that Arie would exercise after the Stipulation of Settlement and 2004 Transfer

Documents were executed.

104.    At the time they made this threat in 2008, the Trump Parties, among other things,

knew that:

(i) the intent of the parties pursuant to the 2001 TRI Stockholders Agreement in

restricting certain transfers to Genger family members was to ensure that (a) Arie, personally,

would continue to have management and majority shareholder voting control over TPR's TRI

shares for the duration of his life, and (b) prevent any other Genger family member from having

any management or voting control over TRI during Arie's lifetime;

(ii) pursuant to the terms of the Stipulation of Settlement and the 2004 TPR-TRI

Transfer Documents Arie, Dalia, Orly and Sagi, specifically intended to preserve Arie's

management and voting control of TRI, in the context of resolving the equitable distribution of

marital property issues concerning TPR raised in the Genger Divorce Action;

25

(iii) that as a condition for Arie transferring his 51% interest in TPR to Dalia in the Genger Divorce Action, it was intended that pursuant to the Stipulation of Settlement and 2004 Transaction Documents Arie would receive valid Putative Irrevocable Proxies and Back-up Voting Trust Agreements from the Sagi Trust and the Orly Trust designed to ensure that Arie would retain voting control over a majority of TRI shares for the duration of his life even if the Putative Irrevocable Proxies were held to be invalid; and

(iv) that if the 2004 TPR transfer of TRI shares were voided, as threatened by the Trump Group, then:

(a)    52.85% of TRI shares would revert to TPR, which would be unjustly enriched because TPR, under the Stipulation of Settlement and implementing 2004 Transaction Documents, had already divested itself of those TRI shares in consideration of Arie relinquishing his 51% ownership of TPR to Dalia;

(b) that Arie would be the beneficial owners of such 3000 TRI Shares, and Arie would have the right to vote the 52.85% of TRI shares that were returned to TPR, subject to the Orly and Sagi Trust rights to receive certain of these shares upon Arie's death;

(c)    Sagi was not authorized to act on behalf of TPR to sell any of the TRI shares without the consent of Arie as the beneficial owner of the Arie TRI Shares, and the beneficial holder of the voting rights to TPR's TRI Shares;

(d)    Arie would be entitled to reform the Stipulation of Settlement, pursuant to the express terms of the Stipulation of Settlement, so that Arie would regain control of 51% of TPR's ownership and control of 52.85% of TRI's shares;

(e) that the New York Supreme Court under the Judgment of Divorce, had retained jurisdiction over Arie and Dalia in connection with enforcing the terms of the Stipulation of Settlement, including Arie's reformation claims; and

(f)    TPR, under Sagi's control, was not authorized to sell TRI shares to the Trump Group without the consent of Arie, as beneficial owner of TPR's record ownership of the TRI shares, in the event the 2004 Transfers were held to be invalid;

(v) that if the Putative Irrevocable Proxies (Exhibit D) were held to be invalid, that the Sagi and Orly Trust shares would be subject to the Back-Up Voting Trust Agreement Exhibit E) which was referred to in the 2004 Voting Trust Agreement (Exhibit C).

105.    Nevertheless, on August 8, 2008, the Trump Group, in furtherance of their plan to pressure Arie and take over a majority control of TRI, sent a letter to TPR asserting that it had the right under Section 3.2 of the 2001 TRI Stockholders Agreement to purchase all of the TRI shares that were the subject of the Stipulation of Settlement transfers in 2004, **at 2004 prices** – a small fraction of what is believed to have been a TRI value in excess of $1 billion in 2008, which had net after-tax income in excess of $150 million in that year. The Trump Group provided no such letter or notice to Orly or the Orly Trust or the Sagi Trust.

106.    Three days later, on August 11, 2008, the Trump Parties, through Glenclova, commenced an action in the Federal District Court of the Southern District of New York against TPR (the "Federal Action") claiming that the transfer of the TRI shares by TPR to Arie Genger, the Orly Trust and the Sagi Trust pursuant to the express terms of the Stipulation of Settlement and 2004 Transaction Documents, was void.

27

107.    Notwithstanding the Trump Parties' respective specific knowledge in 2008 of the existence and terms of the Court-ordered Stipulation of Settlement and the 2004 TPR Transfer Documents, the Trump Group did not name Arie, Dalia, the Sagi Trust or the Orly Trust as parties in the Federal Action.

108.    The Trump Parties knew at the time they commenced the Federal Action that Arie was a known third party beneficiary under the 2001 TRI Stockholders Agreement and that the 2004 Transfers were approved in a Court-Ordered Stipulation of Settlement in the Genger Divorce Action, but nevertheless opposed Arie's motion to intervene in the Federal Action.

109.    The Trump Parties also knew that Sagi, as a result of the Stipulation of Settlement and 2004 TPR Transfer Documents, became the president of TPR, but that he had since become estranged from his father, and that Sagi had installed his mother-in-law Rochelle Fang as the nominal trustee of the Sagi Trust and that he exercised total dominion and control over her.

110.    The Trump Parties also knew that if the 2004 TPR transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust pursuant to the "So-Ordered" Stipulation of Settlement and 2004 Transfer Documents were voided, that Arie's transfer of his 51% ownership in TPR to Dalia would also have to be voided, and that as a consequence Dalia, or Sagi as her successor-in-interest, as a matter of New York law, would have to hold this 51% TPR interest in a constructive trust for the benefit of Arie with respect to TPR's ownership of the TRI Shares.

111.    The Trump Parties knew that neither TPR, nor Sagi as its President, would be authorized to sell any of TPR's shares of TRI to the Trump Group in the event that the 2004 TPR Transfers of TRI Shares to Arie, the Sagi Trust or the Orly Trust were voided because in that

28

event those TRI shares would be returned to TPR subject to a constructive trust for the benefit of Arie.

112.    Prior to August 22, 2008, the Trump Group also knew that in the event that the 2004 transfers by TPR of TRI Shares to Arie, the Sagi Trust or the Orly Trust were voided, Sagi, as the President of TPR, also owed a separate fiduciary duty to Arie and the Orly Trust with respect to the 3000 TRI shares that would revert to TPR.

113.    TPR and Sagi each had a fiduciary and contractual duty to Arie to hold any TRI shares that reverted to TPR in a constructive trust for their respective benefits as the beneficial owner of such shares, and also owed a fiduciary duty to Orly and the Orly Trust with respect to her interest in a portion of these shares.

114.    Nevertheless, in August, 2008, the Trump Group met, conspired and schemed with Sagi and/or his representatives to contrive a plan to offer Sagi approximately $26.7 million to induce Sagi to cause the Sagi Trust, through his mother-in-law Fang, to transfer to the Trump Parties the Sagi Trust's 19.425% of TRI shares that the Sagi Trust received pursuant to the Stipulation of Settlement and 2004 TPR Transaction Documents. This $26.7 million payment was a fraction of the value of those shares at that time given the performance of TRI which, in 2008 had after tax earnings of $150,000,000 of sales of approximately $1 billion.

115.    As part of this conspiracy and scheme, the purchase of the Sagi Trust Shares was to be conditioned on Sagi, purportedly as the President of TPR, further agreeing that if the Court in the Federal Action, or any other court, held that the 2004 TPR Transactions were void, then TPR would be "deemed" the Seller of the Sagi Shares, even though the Sagi Trust could keep the $26.7 million, and even though TPR had no right or authority to sell the Arie, the Sagi Trust and

29

Orly Trust Shares without the consent of Arie as beneficial owners of these respective shares,

subject to Orly's interest to receive the Orly Trust TRI Shares upon Arie's death, and Arie's

beneficial interest in the voting rights for the Sagi Trust, Orly Trust and Arie TRI Shares.

116.    The Trump Group defendants knew that if the $26.7 million purported purchase

price of the Sagi Trust Shares was paid to the Sagi Trust that the money would need to be

returned to TPR.

117.    The Trump Group defendants knew that Sagi, on behalf of TPR was not

authorized to sell the Sagi Trust Shares, in the event the 2004 Transfers were declared invalid.

118.    The Trump Group defendants never sought or received a representation by TPR

or Sagi that Sagi, on behalf of TPR was authorized to sell any TRI Shares to the Trump Group.

119.    The Trump Group defendants knew that Sagi on behalf of TPR was not

authorized to sell any of TPR's TRI shares to the Trump Group in the event that the 2004 Shares

reverted to TPR that Sagi and TPR had a fiduciary and contractual duty to protect Arie's control

over the 52.85% of TRI Shares for the duration of his life.

120.    The Trump Group did not obtain a representation from Sagi or TPR as to whether

any sale by the Sagi Trust or TPR would be subject to Arie's right to vote those Shares for the

duration of his life in accordance with the terms of the Court-ordered Stipulation of Settlement

and the 2004 Transaction Documents.

121.    As part of this conspiracy and scheme the Trump Parties also required that in

order for Sagi to get the $26.7 million put in his Trust, Sagi purportedly as the President of TPR

would have to further agree in a "side letter" that if the Court in the Federal Action, or any other

court, held that the 2004 TPR Transactions were void, then TPR would also agree to sell the 14%

30

Arie TRI shares and the 19.425% Orly Trust Shares, which TPR had already sold to Arie and the

Orly Trust pursuant to the Stipulation of Settlement and the 2004 Transaction Documents, to the

Trump Parties at a price that was 60% less than the price per share to be paid to the Sagi Trust.

Again, Sagi had no authority to make this sale on behalf of TPR.

122.    As part of the same conspiracy and scheme, the Trump Parties also insisted that

neither the Sagi Trust nor TPR take any action to protect the voting rights of Arie that were

granted to Arie by the Sagi Trust and the Orly Trust under the 2004 Voting Trust Agreements in

accordance with the 2004 TPR Transfer Agreement.

123.    To induce Sagi to sell the Sagi Trust Shares to the Trump Parties, the Trump

Group proposed a scheme and conspiracy that the Trump Parties knew would require Sagi to use

his position as President of TPR to obtain a personal benefit by having $26.7 million paid to his

Sagi Trust, while selling out Arie's and the Orly Trust's TRI shares for a fraction of their real

value in an obvious breach of Sagi's fiduciary and contractual duties to Arie and the Orly Trust,

which breaches of duty arose from, among other things, (i) Sagi's self-dealing transactions as an

officer of TPR to get $26.7 million from the Trump Group for his Sagi Trust shares while at the

same time and at the expense of Arie and the Orly Trust agreeing to sell their TRI shares at a

price per share that was 60% lower than the deal Sagi was making for himself through the sale of

the Sagi Trust shares to the Trump Parties, (ii) ignoring Arie's and the Orly Trust's beneficial

interest in the value of TPR's ownership of specific TRI stock that TPR had already transferred

to Arie and the Orly Trust for valuable consideration pursuant to the Stipulation of Settlement

and the 2004 TPR Transaction documents; (iii) inducing Fang as the Trustee of the Sagi Trust to

violate the 2004 Voting Trust Agreement with Arie; (iv) inducing the trustees of the Orly Trust

31

to violate their fiduciary obligations to the Orly Trust and Orly; (v) failing to protect Arie's

voting rights to 52.85% of TRI shares in accordance with the express intent and provisions of the

Stipulation of Settlement and the 2004 Transaction Documents; (vi) disposing of and

substantially devaluing the asset value of TPR's ownership of TRI shares, with knowledge that

such shares would be subject to Arie's claims for imposing a constructive trust on such shares,

reformation and/or rescission under the terms of the Stipulation of Settlement with respect to

restoring Arie's rights to a 51 % ownership of TPR insofar as TPR's ownership of TRI shares

was concerned; (vii) failing to disclose to Arie, Orly, or the Orly Trust the terms of the Trump

Parties' proposed scheme and plan to purchase the same TRI shares that TPR previously sold to

Arie and the Orly Trust under the Stipulation of Settlement and 2004 TPR Transfer Agreement,

(viii) failing to take all actions necessary to comply with the stated intentions of the parties to the

Stipulation of Settlement and 2004 Transaction Documents, and (ix) entering a self-interested,

unauthorized, ultra-vires agreement, ostensibly on behalf of TPR but in reality using his position

as President of TPR for his own personal gain to the detriment of Arie's and the Orly Trust's

legal and equitable interests in TPR's ownership of the TRI shares that were transferred to each

of them by TPR four years earlier, pursuant to the Stipulation of Settlement and 2004

Transaction Documents.

124.    In furtherance of this scheme and conspiracy, the Trump Parties, the Sagi Trust,

by Rochelle Fang, and Sagi, purportedly on behalf of TPR, executed a 2008 Stock Purchase

Agreement with the Sagi Trust without the knowledge or consent of Arie or the Orly Trust, to

sell the 1102.80 Sagi Trust Shares of TRI common stock representing 19.425% of the shares of

stock to the Trump Group and two new entities – TR I and TR II – for $26,715,416.00. ("2008
Stock Purchase Agreement", attached hereto as Exhibit F).

125.   When combined with the Trump Parties' minority share of 47.15 %, this Sagi
Trust sale would give the Trump Parties a 66.575% majority and controlling voting interest in
TRI, in direct derogation of the intent of the Court–Ordered Stipulation of Settlement and the
Putative Irrevocable Proxies and 2004 Voting Trust Letter Agreement.

126.   The Trump Parties acknowledged the existence of the Putative Irrevocable
Proxies and 2004 Voting Trust Letter Agreement in the 2008 Stock Purchase Agreement,
representing and warranting that:

> "Such Purchaser hereby acknowledges receipt of copies of the
> irrevocable proxy dated as of October 29, 2004, issued by Seller
> ["Sagi Trust"] in favor of Arie Genger with respect to the shares
> (the "Proxy"), a backup form of voting trust agreement and voting
> trust certificate delivered in connection with the Proxy and the
> Letter Agreement dated October 29, 2004 [2004 Voting Trust
> Letter Agreement] with respect to the transfer of shares from TPR
> to Seller"

127.   The 2008 Stock Purchase Agreement also states that if the 2004 transfer of TRI
shares by TPR to the Sagi Trust were determined to be void and the shares returned to TPR then
**TPR** would be deemed the seller of the Sagi Trust Shares to the Trump Parties for $26.7 million,
even though this $26.7 million would have already been paid to the Sagi Trust controlled by Sagi
through his mother-in-law Fang. There was no provision with respect to the reallocation of the
sales proceeds to TPR.

128.   The 2008 Stock Purchase Agreement violated the terms of the  2001 Stockholders
Agreement, including, but not limited to, Section 3.2 of that Agreement.

33

129.    By entering into the 2008 Stock Purchase Agreement, the Trump Group voluntarily and intentionally waived any right to purchase the Sagi Trust Shares under the 2001 Stockholders Agreement.

130.    Also through its intentional conduct, including its violation of the 2001 Stockholders Agreement, the Trump Group is estopped from utilizing any purported right to purchase under the 2001 Stockholders Agreement.

131.    In addition, Sagi, ostensibly acting for TPR, but without authority and in violation of his contractual, legal and fiduciary duties owed to Arie and Orly, signed a side letter on the very same day as the 2008 Stock Purchase Agreement that provides that if the 2004 transfer by TPR of TRI Shares to Arie and the Orly Trust under the Stipulation of Settlement and 2004 Transaction Documents were declared void, then Sagi, purportedly on behalf of TPR, would transfer the Arie Shares and Orly Trust Shares to the Trump Parties at a price per share 60% per share lower than the Sagi Trust was to receive under the 2008 Stock Purchase Agreement, which would then be deemed a sale by TPR ("2008 Stock Purchase Side Letter Agreement", attached hereto as Exhibit G).

132.    The terms of both the 2008 Stock Purchase Agreement and the Side Letter violated the 2001 Stockholders Agreement, including, but not limited to Section 3.2 of the 2001 Stockholders Agreement.

133.    The Trump Group defendants waived, and are estopped from asserting, any right under the 2001 Stockholders Agreement to purchase the Arie and Orly Trust TRI Shares from TPR.

34

134.    Neither Arie on behalf of TRI or the Board of Directors of TRI approved the transaction set forth in the 2008 Stock Purchase Agreement and Side Letter.

135.    This Side Letter was not only an insidious requirement mandated by the Trump Parties to get a majority interest in TRI for the first time, but was tantamount to a $26.7 million bribe offered by the Trump Parties to Sagi, the estranged son of Arie, to betray his father and rob his sister of the true value of their respective legal and equitable interests in the TRI stock previously owned by TPR in order for the Trump Group to completely squeeze out Arie and the Orly Trust at unconscionably low prices.

136.    At the time the Trump Parties, TR-I and TR II, the Sagi Trust and Sagi purportedly on behalf of TPR, executed the 2008 Stock Purchase Agreement, the Trump Parties also knew that if the 2004 transactions were voided, TPR, Sagi, the Sagi Trust and the Trump Parties would all be unjustly enriched by the 2008 Stock Purchase Agreement and Side Letter.

137.    The Trump Parties also knew that if the 2004 TPR Transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust were voided, that these TRI shares recovered by TPR would be the subject of a constructive trust established for the benefit of Arie, the Orly Trust and the Sagi Trust.

138.    The Trump Parties, Sagi, and the Sagi Trust knew that Sagi, as an officer and director of TPR, owed a fiduciary duty to Arie, the Orly Trust, and the Sagi Trust, not to devalue or alienate Arie's and the Orly Trust's beneficial ownership of TPR insofar as TPR's ownership of the TRI shares was concerned, and not to strip Arie of his voting rights with respect to these TRI Shares.

35

139.    The Trump Parties, Sagi and the Sagi Trust knew at the time they executed the
2008 Stock Purchase Agreement that pursuant to the Court –Ordered Stipulation of Settlement,
Arie had a contractual right to seek to reform the terms of the Stipulation of Settlement in order
to give full effect to the intent of the parties with respect to his relinquishment of control in TPR
in exchange for Arie's continuing control of 52.85% of TRI shares and outright ownership of
14% of TRI's stock, as a permitted transferee.

140.    The Trump Parties, Sagi, and the Sagi Trust knew at the time they executed the
2008 Stock Purchase Agreement and Side Letter that Arie was entitled to rescission for failure of
consideration of that part of the Stipulation of Settlement that transferred his 51% of TPR to
Dalia, in exchange for Dalia's agreement to have TPR concurrently transfer 14% of TRI's shares
to Arie outright, and  that Arie would maintain voting control, or 52.85% of TRI for the duration
of his life.

141.    In connection with the 2008 Stock Purchase Agreement and in furtherance of the
plan and scheme to wrest control of TRI from Arie's control, the Trump Parties aided and
abetted the preparation of a sworn affidavit swearing that the Sagi Trust shares had been lost,
when the Trump Parties knew that was not a true statement.

J.    **The Trump Parties Declare Themselves The Majority Owners Of TRI, and
Commence An Action In The Delaware Chancery Court To Determine The
Composition of TRI's Board of Directors**

142.    On August 25, 2008, only three days after the 2008 Stock Purchase Agreement
and 2008 Stock Purchase Side Letter Agreement were executed, the Trump Group asserted that it
was in control of TRI through the acquisition of 1102.80 shares that were purportedly transferred
to them by the Sagi Trust.

36

143.    On August 25, 2008, the Trump Parties commenced a Chancery Court in rem summary proceeding in the State of Delaware pursuant to 8 Del.C § 225(a) to determine the composition of the Board of Directors of TRI ("The Delaware Action") and to declare, inter alia that:

    i.    the Trump Parties are the majority shareholders of TRI and have the right to vote all of its shares including the shares which were allegedly purchased pursuant to the Stock Purchase Agreement;

    ii.    the 2004 transfers to Arie Genger, the Sagi Trust and the Orly Trust are void and continue to belong to TPR; and

    iii.    that the Putative Irrevocable Proxies do not apply to the shares transferred pursuant to the Stock Purchase Agreement.

144.    Neither TPR, the Sagi Trust, nor the Orly Trust were a party to the Delaware Action, although TPR was given an opportunity to participate in that action, and refused to do so.

145.    The Trump Group as interested Directors in control of TRI had a fiduciary and legal duty to authorize the appointment of separate, independent counsel for TRI in connection with the Delaware proceeding and otherwise with respect to determining the beneficial and record ownership of the Arie, Orly Trust and Sagi Trust TRI shares.

**K.**    **The July 23, 2010 Opinion of the Delaware Chancery Court**

146.    On July 23, 2010 the Delaware Chancery Court issued a lengthy written decision which held that the transfers of TPR's TRI shares to Arie, the Sagi Trust and the Orly Trust pursuant to the Stipulation of Settlement and 2004 Transaction Documents were void and ownership reverted to TPR and that TPR's sale of the Sagi Trust TRI Shares to the Trump Group pursuant to the 2008 Stockholders Agreement was valid.

37

147. The Chancery Court also held that the Sagi Trust Irrevocable Proxy was not valid under New York or Delaware law. The Chancery Court in this § 225 proceeding held that the Trump Group was entitled to elect a majority of TRI Board members.

148. While voiding the 2004 Transfers, however, the Chancery Court in this July 23 decision also held that because Arie was a "permitted transferee" under the 2001 TRI Stockholders Agreement, the transfer of the TRI shares to him did not warrant a forfeiture of Arie's TRI Shares.

149. Because Arie was a permitted transferee of the TRI shares owned by TPR (a Genger family holding company that Arie had created) the Trump Group would have no right to stop the transfer of these TPR TRI shares to Arie once it received contractual notice and Arie agreed to be personally bound by the TRI Stockholders Agreement.

150. Under the Delaware Chancery Court's July 23 decision, Arie would retain his TRI shares once he gave formal notice of TPR's 2004 transfer and agreed to be bound by the 2001 TRI Stockholders Agreement, which Arie promptly agreed to do shortly thereafter.

151. In its July 23, 2010 decision, the Court of Chancery also held that because neither Orly nor the Orly Trust were parties to the Delaware Chancery Court action, the Delaware Court declined to issue any ruling with respect to the Orly Trust TRI Shares.

**L.    The July 26, 2010 TRO in this New York Action**

152. Based on the July 23, 2010 Chancery Court decision, Arie and Orly sought and obtained a temporary restraining order from this Court, restraining Sagi and TPR from selling or encumbering the Arie and Orly Trust TRI shares. This temporary restraining order was granted on July 26, 2010 and extended by this Court on July 28, 2010.

38

**M.**    **The August Opinion of the Delaware Chancery Court**

153.    After being advised by the Trump Group of plaintiff being granted a TRO in this New York Action, the Delaware Chancery Court indicated that it would reexamine its rulings with regard to the Arie and Orly Trust TRI shares, and expressed concern about whether the New York TRO was designed to undermine its ruling in the Delaware Court, which it was not.

154.    On August 3, 2010, to allay the Court of Chancery's concerns, Arie's counsel in this case wrote to this Court advising that because defendants Sagi and TPR had agreed to abide by a *status quo order* entered by the Delaware Chancery Court, which provided that Arie would be given notice in the event TPR or Sagi intended to sell the Arie and Orly TRI Shares to the Trump Group, it was agreed among counsel for TPR, Sagi, Dalia and the plaintiffs, that the temporary restraining order would be vacated and plaintiffs in this action would accordingly withdraw their application for a preliminary injunction, without prejudice.

155.    On August 9, 2010, the Chancery Court made an abrupt "about face" regarding its determination earlier relating to the Arie and Orly Trust TRI Shares. In this second opinion, the Delaware Chancery reversed itself regarding the ownership of the Arie and Orly Trust Shares, and held that the Trump Group had the right to purchase the Arie and Orly Trust TRI shares from TPR under the 2008 Side Letter Agreement, even though the Court had held only two weeks earlier that Arie was a permitted transferee under the Stockholders Agreement and should be permitted to keep his shares, and that the Orly Trust was never a party to the § 225 proceeding. The Chancery Court also held that Arie and the Orly Trust had no beneficial interest in the Arie and Orly Trust TRI shares—even though TPR, Sagi, the Sagi Trust and the Orly Trust were never parties to the Delaware § 225 proceeding.

39

**N.    The Delaware Chancery Court's Final Judgment Order of August 18, 2010**

156.    On August 18, 2010, the Delaware Chancery Court entered a Final Judgment

Order which found (i) that TPR's 2004 transfers of the Arie TRI Shares, and the Orly Trust TRI

shares were void under the 2001 TRI Stockholders Agreement, (ii) that title to the Sagi Trust

TRI Shares, the Orly Trust TRI Shares and the Arie TRI Shares, all reverted to TPR; (iii) that the

Irrevocable Proxy for the Sagi Trust was not valid; (iv) that the sale of the Sagi Trust TRI shares

by Sagi on behalf of TPR was valid; (v) that the Side Letter was a valid agreement; and (vi) that

Arie and the Orly Trust had no beneficial or legal ownership interest in the Arie and Orly Trust

TRI shares.

157.    There was no discussion or finding in the Chancery Court Decision as to whether

Sagi was authorized to sell the Arie, Orly and Sagi Trust TRI Shares out of TPR.

158.    In addition to these holdings, the Chancery Court entered an anti-lawsuit

injunction, which prohibited Arie from "commenc[ing] or prosecut[ing] any legal proceeding . .

. in any [state] court [including the action in this Court which had already been commenced]

constituting a collateral attack on, attempt to prevent implementation of, or relitigation of any of

the [Chancery] Court's holdings set out in paragraphs 2 through 16 inclusive (summarized

above), of this final judgment order" pending a determination of an appeal to the Delaware

Supreme Court, with certain limited exceptions, but even the Chancery Court specifically

recognized Arie's right to apply to this Court to seek to escrow the proceeds from TPR's

impending sale of the Arie TRI Shares to the Trump Group, as follows:

> "Arie Genger shall have the right to seek an order from a court of
> competent jurisdiction requiring TPR Investment Associates, Inc.
> and its officers and directors to place in escrow the proceeds of
> sale of the shares of TRI referenced in paragraph 14 of this Order.
> [the "Arie TRI Shares"]."

**O.    Arie Appeals From the Chancery Court's Final Judgment Order**

159.    Arie timely appealed from the Chancery Court's rulings, arguing, inter alia, that
(i) the Trumps ratified the 2004 transfers, as a matter of law; (ii) the Irrevocable Proxy was valid
under New York law; and (iii) the Delaware Chancery Court had no jurisdiction to determine the
ownership of the Arie and Orly TRI shares or the validity of the Side Letter.

160.    Under threat of contempt, Arie agreed to stay this case pending a final
determination by the Delaware Supreme Court.

**P.    The Purported Sale by TPR of the Arie and Orly Trust TRI Shares**

161.    While Arie's appeal was pending, Arie was informed that TPR, without Arie's
consent or approval, intended to sell the Arie TRI shares to the Trump Group for $7,424,994.

162.    While the Trump Group and TPR agreed to hold $5,924,944 of these sale
proceeds in escrow pending a determination by the Delaware Supreme Court relative to the
ownership of the Arie and Orly Trust TRI shares, Sagi, as the CEO of TPR, insisted that TPR
was entitled to keep and spend the $1.5 million of the proceeds from the sale of the Arie TRI
shares, notwithstanding the pending appeal challenging the Chancery Court's rulings relating to
the ownership of the Arie and Orly Trust TRI Shares.

163.    While the appeal to the Delaware Supreme Court was pending, TPR, without the
consent or approval of Arie or Orly, also entered into an agreement to sell the Orly Trust TRI
Shares to the Trump Group for $10,314,005, with the proceed to be held in escrow by counsel
for Dalia as the nominal trustee of the Orly Trust.

164.    The Trump Group as interested Directors in control of TRI had a fiduciary and
legal duty to authorize the appointment of separate, independent counsel for TRI in connection
with the Delaware proceeding and otherwise with respect to determining the beneficial and

41

record ownership of the Arie, Orly Trust and Sagi Trust TRI shares prior to TRI recording the

transfer of the Arie and Orly Trust Shares to the Trump Group in 2010.

165.    Neither Sagi nor TPR had any authority to sell the Arie or Orly Trust Shares to

the Trump Group.

**Q.    This Court Enjoins TPR and Sagi From Taking or Using the $1.5 million
Sale Proceeds From the Purported TPR Sale of the Arie Shares to the Trump
Group**

166.    Arie moved by Order to Show Cause to restrain and enjoin Sagi and TPR from

using or disposing of the $1.5 million sale proceeds that were about to be released to TPR, and

requested that these specifically identified funds be placed in an acceptable escrow account or

paid into Court. This Court by its February 17, 2011 Decision and Order decreed as follows:

> "ORDERED that the defendants Sagi Genger and TPR
> Investment Associates, Inc., and their agents, servants, employees
> and all other persons acting under the jurisdiction, supervision
> and/or direction of the defendants, are enjoined and restrained,
> during the pendency of this action, from doing or suffering to be
> done, directly or through any attorney, agent, servant, or employee
> or other person under the supervision or control of the defendants,
> from taking, using, or spending or converting to their own use
> otherwise, the $1.5 million proceeds from the sale of certain
> common stock in Trans-Resources, Inc. in which plaintiff claims
> an interest"

**R.    The Decision of the Delaware Supreme Court**

167.    On July 18, 2011, the Delaware Supreme Court reversed that part of the Delaware

Chancery Court's Judgment that held that Arie and the Orly Trust were not the beneficial owners

of the Arie and Orly Trust TRI Shares.

168.    On Arie's appeal the Delaware Supreme Court described the limited nature of the

§225 proceeding as follows:

> A Section 225 proceeding is not an *in personam* action.
> Rather, it is "in the nature of an *in rem* proceeding," where the

42

"defendants" are before the court, not individually, but rather, as
respondents being invited to litigate their claims to the *res* (here,
the disputed corporate office) or forever barred from doing so.

\* \* \*

[For example] in a Section 225 proceeding the court "cannot go
further and actually rescind a transaction procured through such
unlawful behavior or award money damages to those harmed by
that behavior." That type of ultimate relief can only be obtained in
a plenary action in a court that has *in personam* jurisdiction over
any necessary or indispensable parties.

169.    Further explaining the limited holding of the Delaware Chancery Court, the

Delaware Supreme Court held:

Given the jurisdictional limitations that inhere in a Section 225
action, we affirm the judgment of the Court of Chancery insofar as
it determines the *record* [emphasis in original] ownership of the
disputed Trans-Resources shares in the Side Letter Opinion and the
Final Judgment Order.

\* \* \*

An adjudication of who has the right to vote disputed corporate
shares for Section 225 purposes cannot constitute a binding
adjudication of who beneficially owns those shares, because a
Section 225 action is by its nature an *in rem*, not a plenary,
proceeding. **Only in a plenary proceeding before a court that
has *in personam* jurisdiction over the litigants may the court
adjudicate the litigants' property interest in disputed
corporate shares**.

(Emphasis added)

170.    The Delaware Supreme Court also held that the issue of ultimate beneficial

ownership of the Arie TRI Shares and the Orly Trust TRI Shares was beyond the equity

jurisdiction of the Chancery Court in the summary § 225 *in rem* proceeding, and that the issue of

the beneficial ownership of those shares needed to be adjudicated in a plenary action in a

jurisdiction where the Court has *in personam* jurisdiction over all indispensable parties. These

43

necessary parties -- Arie, TPR, Sagi, Orly, the Orly Trust and the Trump Group -- are all parties to this New York action , and have been served and have appeared in this case.

171.    The Delaware Chancery Court's holdings were limited to an in rem proceeding to determine who held the record ownership of the shares at a point in time in order to determine voting rights to elect members of the TRI Board based on the record owners of those shares at the time of the election.

172.    The Delaware Chancery Court was without jurisdiction to determine the ultimate ownership of the Arie and Orly Trust TRI shares or any of the tort claims asserted by Plaintiffs in this action. Nor did the Delaware Chancery Court have jurisdiction to determine Arie's claims for rescission, unjust enrichment, constructive trust or reformation arising from and in connection with the Court-ordered Stipulation of Settlement, the 2004 Transaction Documents, or the authority of Sagi to act on behalf of TPR.

173.    The Delaware Supreme Court affirmed that portion of the Chancery Court ruling that held that TPR's 2004 transfers of TRI shares pursuant to the Stipulation of Settlement in the Genger divorce and implementing 2004 TPR Transaction Documents violated the 2001 TRI Stockholders Agreement and were void ab initio, for the purpose of the Delaware § 225 proceeding to determine composition of the TRI Board.

## FIRST CAUSE OF ACTION ON BEHALF OF PLAINTIFF ARIE GENGER

### (For a Declaratory Judgment Under CPLR 3001 that the Stipulation of Settlement Entitles Plaintiff Arie to a Court-Ordered Reformation of the Terms of the Stipulation of Settlement as Against All Defendants)

174.    Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 173.

44

175.    Article XVI of the Stipulation of Settlement provides that the parties to the Stipulation of Settlement have a right to seek court-ordered reformation in a New York court in order to reflect the parties' original intent in the event a portion of the "So-Ordered" Stipulation of Settlement is held to be invalid for any reason.

176.    The concurrent transfer of Arie's ownership of his 51% interest in TPR in consideration of receiving a 14% interest in TRI and the right to control the voting rights of 52.85% of TRI Shares for the duration of Arie's life was an essential, fundamental condition of the transfers of TPR and TRI shares set forth in the Court-Ordered Stipulation of Settlement.

177.    The Delaware Chancery Court, as affirmed by the Delaware Supreme Court, held that TPR's 2004 transfers of 52.85% of the shares of TRI Stock under the Stipulation of Settlement and 2004 TPR Transfer Documents were invalid and void *ab initio*, and that the Putative Irrevocable Proxies were invalid.

178.    The provisions of the Court-Ordered Stipulation of Settlement relating to the transfer of ownership of TPR in consideration of the 2004 Transfers were based upon the mutual mistake of Dalia and Arie that the 2004 Transfers and Irrevocable Proxies were valid.

179.    The Court-Ordered Stipulation of Settlement specifically provides that the parties agree that if any of the terms of the Stipulation of Settlement is declared invalid by any court of competent jurisdiction for any reason, Arie is entitled to seek an Order from this Court to reform the Stipulation of Settlement, or obtain such other equitable or legal relief as is necessary to give full meaning and expression to the original intent of the parties to the Court–Ordered Stipulation of Settlement.

45

180.    Arie is entitled to an Order of the New York Supreme Court to reform the terms of the Court-Ordered Stipulation of Settlement to reflect the parties' original intent to the greatest extent possible.

181.    Accordingly, Arie seeks an Order and declaratory judgment to reform the Court-Ordered Stipulation of Settlement to provide as follows:

(i)    That the transfer by Arie of his 51% interest in TPR to Dalia and the concurrent transfer of the 3000 shares of TRI stock to Arie, the Orly Trust and the Sagi Trust, respectively, as originally set forth in the Stipulation of Settlement is voided *ab initio* as a result of the Delaware Court finding that the 2004 Transfers are invalid;

(ii)    that all the assets of TPR, other than the 3000 Arie, Orly Trust and Sagi Trust TRI shares, remain the property of TPR or any successor in interest to those assets;

(iii)    that pursuant to a further order of this Court the Court-Ordered Stipulation of Settlement is modified *ab initio* to provide that the 3000 shares of TRI common stock that were returned to TPR as a result of the Delaware Court Action voiding the original 2004 Transfers be placed in a newly formed single purpose entity controlled by Arie ("TPR2");

(iv)    that Arie be declared the 51% owner of TPR2, which in turn shall be declared, *ab initio* the record and beneficial owner of all of such 3000 TRI shares, as though no 2004 Transfers were consummated under the original terms of the Stipulation of Settlement;

(v)    that the Orly Trust and Sagi Trust each be declared the owner of 24.5% of TPR2 so that together they own the remaining 49% of TPR2;

(vi)    that TPR2 shall not sell or transfer the 3000 TRI shares prior to Arie's death, unless such sale would be otherwise permitted and would not violate the terms of the 2001 Stockholders Agreement including, but not limited to, Article 2 of such agreement;

(vii) upon Arie's death, 1102.8 of TRI shares, plus any stock dividends relating thereto ("the Sagi Trust TRI Shares") will be transferred by TPR2 outright to the Sagi Trust, and 1102.8 of TRI shares plus any stock dividends relating thereto ("the Orly Trust TRI Shares") will be transferred outright to the Orly Trust;

(viii)   All cash dividends relating to the Sagi Trust and the Orly Trust TRI Shares received by TPR2 during Arie's lifetime will be distributed, after payment of taxes and expenses to the Shareholders of TPR2, as if (a) Arie owned 794.40 shares, representing 13.99468% of the common stock of TRI, and (b) the Sagi Trust and the Orly Trust each owned 1102.8 shares, representing 19.42766% of TRI common stock;

(ix)    Arie through his 51% control of TPR2 will retain all voting rights to the 3000 TRI shares and any additional TRI shares issued to TPR or TPR2 as stock dividends or otherwise for the duration of his life.

(x)    The Trump Group shall deliver to TPR2 the 1102.8 shares of TRI common stock purportedly purchased under the 2008 Stock Purchase Agreement.

182.    The $26,715,416.00 paid by the Trump Group to the Sagi Trust under the 2008 Stock Purchase Agreement will be returned to the Trump Group by TPR and the Sagi Trust.

183.    The Trump Group shall deliver to TPR2 the 794.40 Arie and the 1102.8 Orly Trust TRI shares purportedly sold to TPR under the Side Letter Agreement and 2010 Transaction.

47

184.    The purported sales by TPR of the Arie and Orly Trust TRI shares to The Trump Group, while the Delaware Supreme Court appeal was pending, will be declared null and void, and the proceeds from these purported sales now held in escrow will be released to The Trump Group.

185.    TRI shall record on its books that TPR2 is the record owner of 3000 shares of TRI Common Stock, representing 52.85% of the issued common stock of TRI.

186.    TPR2 will consent to the terms of the 2001 Stockholders Agreement.

187.    Arie, Orly, Dalia, Sagi, TPR and TRI shall be directed to take all other necessary action and to execute all documents necessary to give full meaning to the intention of the parties to the Court Ordered Stipulation of Settlement in light of the ruling of the Delaware court that the 2004 Transfers were invalid.

188.    There is a justiciable controversy.

189.    There is no adequate remedy at law.

## SECOND CAUSE OF ACTION ON BEHALF OF ARIE AND ORLY

**(For the Imposition of a Constructive Trust against Sagi, TPR, Dalia, the Sagi Trust, Fang, and the Trump Parties)**

190.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 189, and incorporate the allegations contained in paragraphs 209-219.

191.    Upon the Delaware Court voiding TPR's 2004 transfer of 52.85% of TRI shares to Arie, the Sagi Trust and the Orly Trust, legal title to such TRI shares reverted to TPR subject to Arie's rights as a constructive beneficial owner of 51% of the shares of TPR with respect to TPR's ownership of 52.85% of TRI shares.

192.    TPR is not entitled, in equity or good conscience, to retain any direct or indirect benefit resulting from the record ownership of the 3000 shares of TRI stock reverting to TPR as a result of the ruling of the Delaware courts .

193.    TPR would be unjustly enriched at the expense of Arie if it were permitted to retain any direct or indirect ownership or benefit from the sale of the 3000 shares of TRI stock because record ownership of such TRI shares reverted to TPR as a result of the Delaware court rulings.

194.    Upon TPR becoming the record owner of Arie's 794.4 shares of TRI stock as a result of the Delaware Court rulings, such shares were immediately held in a constructive trust by TPR for the benefit of Arie as the beneficial owner of those shares.

195.    Upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Orly Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Orly Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Orly Trust's right to receive the Orly Trust TRI Shares upon Arie's death.

196.    Upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Sagi Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Sagi Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Sagi Trust's right to receive the Sagi Trust TRI Shares upon Arie's death.

49

197.    Upon TPR becoming the record owner of all 3000 shares of TRI stock comprising the Orly Trust Shares, the Sagi Trust Shares and the Arie Shares, TPR held the voting rights to such 3000 shares in a constructive trust for the benefit of Arie.

198.    Arie's beneficial ownership and voting rights with respect to the 3000 TRI shares, which were held by TPR in a constructive trust for his benefit, were protected from further transfer to The Trump Group from the moment record title reverted to TPR.

199.    TPR was not authorized to transfer any of the 3000 TRI shares as to which it became the record owner, without the consent of Arie as the beneficial owner of such TRI Shares.

200.    TPR is not authorized to vote any of the 3000 TRI shares that reverted to TPR as record owner as a result of the Delaware Court rulings, except at the direction of Arie.

201.    The Trump Group are not bona fide purchasers of any of the 3000 TRI shares that reverted to TPR.

202.    The Trump Group was on notice of Arie's ownership and voting right claims with respect to the 3000 TRI shares that reverted to TPR, as record owners.

203.    The Trump Group knew and were on notice that TPR was not authorized to sell TPR's TRI shares without the prior consent of Arie.

204.    The Trump Group knew and was on notice that Arie objected to the sale to The Trump Group of any of the 3000 TRI shares that reverted to TPR, as record owner under the 2008 Stock Purchase Agreement, the Side Letter Agreement or the 2010 purported sale of the Arie and Orly Trust TRI shares.

50

205.    The Constructive Trust in favor of Arie imposed upon the Arie, the Orly Trust and the Sagi Trust TRI shares existed at the moment record ownership reverted to TPR, and attaches to any purported sale of these shares to The Trump Group, who were not bona fide purchasers.

206.    The Trump Group, in addition to TPR, would be unjustly enriched if they were permitted to keep the benefit of the purported sale by TPR of the 3000 TRI shares to The Trump Group, which sale Sagi was not authorized to enter into on behalf of TPR without the prior consent of Arie because, inter alia,

(i) the Trump Group would become the owner of the Arie, Sagi Trust and Orly Trust Shares, over the objection of Arie and without Arie's required prior permission and consent;

(ii)    the Trump Group would obtain Arie's right to vote these shares for the duration of his lifetime, without Arie's required prior permission and consent; and

(iii)    these shares would be acquired substantially below their true value without Arie's required prior permission and consent;

(iv)    the purported transaction by TPR was in derogation of Arie's beneficial ownership and voting rights appurtenant to such shares; and

(v)    the Trump Group are not bona fide purchasers of such shares.

207.    Plaintiffs have no adequate remedy at law.

51

## THIRD CAUSE OF ACTION
## ON BEHALF OF ARIE AND ORLY

**(Claim for Breach of Fiduciary Duty, Aiding and Abetting Breach of Fiduciary Duty and
Conspiracy to Breach Fiduciary Duty Against Sagi, TPR, the Sagi Trust, Fang, the Trump
Parties and TRI)**

208.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 207.

209.     Sagi, individually and as an officer of TPR, owed a fiduciary duty of trust,
confidence and loyalty to Arie and the Orly Trust because, among other things, (i) he was
entrusted to manage TPR's ownership of the TRI shares for the benefit of Arie and the Orly
Trust upon the Chancery Court voiding the 2004 TPR transfers of TRI shares to Arie, the Sagi
Trust and the Orly Trust, and the resulting ownership of such 52.85 % of TRI shares by TPR; (ii)
he was entrusted to manage TPR's record ownership of the TRI shares for the benefit of Arie and
the Orly Trust upon the Delaware Chancery Court voiding the 2004 TPR transfer of TRI shares
to Arie, the Sagi Trust and the Orly Trust; (iii) pursuant to the 2004 TPR Transfer Agreement,
Sagi was entrusted to take all actions necessary to ensure that Arie would maintain voting control
of 52.85% of the stock of TRI in accordance with the express intent of all parties to the
Stipulation of Settlement and 2004 TPR Transaction Documents; (iv) through Fang and the Sagi
Trust, as his co-agents and alter egos, Sagi owed a duty of trust and confidence to Arie under the
2004 Voting Trust Agreement; and (v) as the successor to the rights and liabilities of Dalia under
the Stipulation of Settlement and the manager of TPR, as a family holding company, Sagi owed a
fiduciary duty to protect the assets of the Orly Trust for the benefit of his sister Orly and his
father, Arie, in connection with the ownership of TPR, TPR's ownership of the TRI shares and
D&K's minority ownership of TPR.

52

210.    As a fiduciary Sagi, individually, and as an officer of TPR, owed a duty of fidelity and undivided loyalty to Arie, Orly, and the Orly Trust regarding the TRI shares.

211.    Fang, individually and as the trustee of the Sagi Trust, owed a fiduciary duty to Arie under the 2004 Voting Trust Agreement and Side Letter.

212.    The Trump Group, on becoming the majority shareholder of record in TRI, owed a fiduciary duty of fidelity and loyalty to Arie as the known beneficial owner of record of the Arie TRI shares.

213.    Jules Trump and Mark Hirsch, each individually and on behalf of the Trump Group, and as Directors of TRI owed a fiduciary duty to TPR, and Arie as the beneficial owner of TRI shares to read TRI corporate documents presented to him in their entirety and have knowledge of the shareholders of record of TRI, a close corporation.

214.    Sagi, TPR, the Sagi Trust, Fang, the Trump Parties each breached their respective fiduciary duties as a result of the conduct set forth in the allegations of this complaint, including, but not limited to their respective conduct in connection with the negotiation, execution and implementation of the 2008 Stock Purchase Agreement and the Side Letters and the subsequent transfer of the Arie and Orly Trust TRI Shares.

215.    Sagi, TPR, the Sagi Trust, Fang, and the Trump Parties also knowingly aided, abetted, induced, participated in, enabled and substantially assisted each other to breach each of the other's respective fiduciary duties to Arie, Orly and the Orly Trust by the conduct alleged herein, including but not limited to misrepresenting to the Delaware Chancery Court that the share certificates for the Sagi Trust TRI shares were lost despite having actual knowledge that

such share certificates were held by Arie, and had not been delivered to the Sagi Trust, Sagi or Fang.

216.    TRI also knowingly aided, abetted, induced, participated in, enabled and substantially assisted the respective breaches of fiduciary duties owed to Arie, Orly and the Orly Trust by Sagi, TPR, the Sagi Trust, Fang and the Trump Parties.

217.    Sagi, TPR, the Sagi Trust, Fang, and the Trump Parties, each acting in conspiracy with, and as the co-agent of one another, entered into an illegal scheme, agreement, plan, and artifice to breach each other's respective fiduciary duties owed to Arie, Orly, and the Orly Trust by the conduct alleged herein in furtherance of this conspiracy.

218.    As a result of such breaches of fiduciary duty, aiding and abetting of breaches of fiduciary duties and conspiracies to breach fiduciary duty, by Sagi, TPR, the Sagi Trust, Fang, the Trump Parties and TRI, and each of them, Arie suffered compensatory damages in an amount to be determined.

219.    As a result of such breaches of fiduciary duty, aiding and abetting of breaches of fiduciary duty and conspiracies to breach fiduciary duty, by Sagi, TPR, the Sagi Trust, Fang, the Trump Parties and TRI, and each of them, Orly, individually and as the beneficiary of the Orly Trust, suffered compensatory damages in an amount to be determined.

## FOURTH CAUSE OF ACTION
## ON BEHALF OF ARIE AND ORLY

**(Claim for Unjust Enrichment and Rescission Against Sagi, TPR, Dalia, the Sagi Trust, Fang, and the Trump Parties)**

220.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 219.

221.    As a result of the Delaware Chancery Court holding, Dalia, TPR, Sagi, the Sagi Trust and the Trump Parties would each be unjustly enriched at the expense of Arie and the Orly

Trust if each or any of them were allowed to retain any direct or indirect benefit or consideration received by each of them from TPR's ownership of TRI Shares, which none of them are entitled, in equity or good conscience, to retain.

222.    Plaintiff Arie is entitled to rescind the transfer of his 51% interest in TPR to Dalia pursuant to the Stipulation of Settlement and 2004 Transaction Documents based on failure of consideration because, as a result of the holding by the Delaware Chancery Court, Arie did not receive any of the consideration that was due to him pursuant to such Agreements, including and not limited to (a) his 14% interest in the Arie TRI Shares, and his right to vote 52.85% of the TRI Shares that he controlled prior to the Delaware Court voiding the 2004 Transfers.

223.    Plaintiff the Orly Trust, is entitled to rescind the 2004 Transaction Documents based on failure of consideration because as a result of the holding by the Delaware Court the Orly Trust did not receive any of the consideration due to the Orly Trust pursuant to the 2004 Transfers.

224.    Arie and the Orly Trust are each also entitled to rescission because of failure of consideration based on mutual mistake as to the enforceability of the 2004 TPR Transfers of TRI stock to Arie, the Sagi Trust and the Orly Trust pursuant to the Stipulation of Settlement and the 2004 Transaction Documents.

225.    Arie and the Orly Trust are each entitled to an accounting.

226.    Arie and the Orly Trust have no adequate remedy at law.

### FIFTH CAUSE OF ACTION

**(Claim for Permanent Injunction Against Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties)**

227.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 226.

55

228.   Plaintiffs are entitled to the issuance of a permanent injunction enjoining and restraining Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties, and each of them, from directly or indirectly transferring, selling, acquiring, pledging, assigning, diluting, voting, valuing, replacing, conveying, using, removing from the jurisdiction, or otherwise disposing of, or encumbering the 3000 shares of TRI stock that reverted to TPR's control as a result of the Delaware Court rulings.

229.   The failure to grant such permanent injunction will result in irreparable injury to the Plaintiffs.

230.   There is no adequate remedy at law.

231.   The balance of equities favor the Plaintiffs.

## SIXTH CAUSE OF ACTION

### (Claim for Breach of Contract against TPR on Behalf of Arie and Orly)

232.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 231.

233.   TPR entered into the 2004 TPR Transfer Agreement with Arie.

234.   TPR entered into the 2004 TPR Transfer Agreement with the Orly Trust.

235.   TPR breached its express and implied covenants and representations thereunder in connection with the transfer of TRI shares to Arie.

236.   TPR breached its express and implied covenants and representations thereunder by purporting to agree to transfer the Arie, Sagi Trust and Orly Trust TRI Shares to the Trump Parties.

237.   Arie and the Orly Trust performed their respective obligations under the 2004 TPR Transfer Agreement.

56

238.    As a result of such breach of contract, Arie lost the benefit of his bargain and suffered damages in an amount yet to be determined.

239.    TPR breached its express and implied covenants and representations under the 2004 Transaction Documents in connection with the transfer of TRI shares to the Orly Trust.

240.    The Orly Trust performed its obligations under the 2004 TPR Transfer Agreement.

241.    As a result of such breach of contract, the Orly Trust lost the benefit of its bargain and suffered damages in an amount yet to be determined, but believed to be in an amount to be determined.

### SEVENTH CAUSE OF ACTION
### ON BEHALF OF ARIE

**(Claim for Breach of Contract against the Sagi Trust)**

242.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 241.

243.    The Sagi Trust entered into the 2004 Voting Trust Agreement with Arie.

244.    The Sagi Trust breached its express and implied covenants and representations thereunder in connection with Arie's voting rights and control of TRI shares.

245.    Arie performed his obligations under the 2004 Voting Trust Agreement.

246.    As a result of such breach of contract, Arie lost the benefit of his bargain and suffered damages in an amount yet to be determined.

### EIGHTH CAUSE OF ACTION
### ON BEHALF OF ARIE AND ORLY

**(Claim for Tortious Interference with Contract Against the Trump Parties)**

247.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 246.

57

248.   The Trump Parties, and each of them, tortiously interfered with, among other things, (i) the Stipulation of Settlement between Arie and Dalia, (ii) the 2004 TPR Transfer Documents between Arie and the Orly Trust and TPR, (iii) the 2004 Voting Trust Agreement between Arie and the Sagi Trust, and (iv) the 2004 Voting Trust Agreement between Arie and the Orly Trust.

249.   The Trump Parties, and each of them, intentionally caused such breaches of contract without justification, as a result of the conduct set forth herein.

250.   As a result of the Trump Parties' tortious interference with contract, Arie suffered damages in an amount yet to be determined.

251.   As a result of the Trump Parties' tortious interference with contract, Orly and the Orly Trust suffered damages in an amount yet to be determined.

## NINTH CAUSE OF ACTION ON BEHALF OF ARIE AND ORLY

### (Claim for Aiding and Abetting Tortious Interference with Contract Against Sagi, Fang, and the Sagi Trust)

252.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 251.

253.   Sagi, Fang, and the Sagi Trust each had knowledge of the Trump Parties' tortious interference with the 2004 TPR Transaction Agreement and the Stipulation of Settlement, and each such defendant caused, encouraged and substantially assisted the Trump Parties in the commission of the foregoing acts of tortious interference with 2004 TPR Transaction Agreement and the Stipulation of Settlement.

254.   Sagi, Fang, and  TPR each had knowledge of the Trump Parties' tortious interference with the 2004 Voting Trust Agreement, and the Stipulation of Settlement, and each such defendant caused, encouraged and substantially assisted the Trump Parties in the

58

commission of the foregoing acts of tortious interference with the 2004 Voting Trust

Agreements.

255.    By reason of the foregoing, Arie has been damaged in an amount to be

determined.

256.    By reason of the foregoing, Orly, individually and as the beneficiary of the Orly

Trust has been damaged in an amount to be determined.

## TENTH CAUSE OF ACTION ON BEHALF OF ARIE AND ORLY

### (Claim for Preliminary Injunction Against the Trump Parties, Sagi Genger TPR and the Sagi Trust Under CPLR 7109)

257.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 256.

258.    The Arie and Orly Trust TRI shares are unique chattel.

259.    By virtue of the facts set forth above, Arie is the beneficial owner of the Arie TRI

shares.

260.    Sagi is not authorized to take any action on behalf of TPR to sell, transfer, pledge,

dilute, or take any action on behalf of TPR relating to or concerning the 3000 TRI shares that

reverted to TPR, without the prior written consent of Arie and Sagi is not authorized to exercise

any and all rights, including TPR's voting rights with respect to such 3000 TRI shares, except as

so directed by Arie as the beneficial owner of such shares and the voting rights appurtenant

thereto.

261.    Sagi is not authorized to take any action on behalf of TPR to sell, transfer, pledge,

dilute, or take any action on behalf of TPR relating to or concerning the Orly Trust TRI shares.

262.    By virtue of the facts set forth above, the Orly Trust is entitled to the benefits

provided to it under the Stipulation of Settlement.

263.    The Arie TRI shares, the Orly Trust TRI shares, and the Sagi Trust shares are wrongfully being held by the Trump Parties.

264.    Plaintiffs are entitled to a preliminary injunction, under CPLR 7109, that the Arie TRI shares, the Orly Trust TRI shares, and the Sagi Trust TRI shares shall be restrained and enjoined from transferring, selling, diluting, pledging, assigning or otherwise disposing of or removing such shares from the State until the further order of the Court.

**WHEREFORE**, Plaintiffs demand Judgment in favor of Plaintiffs against the Defendants as follows:

(a) on the **First Cause of Action against all Defendants**: that this Court find and declare that Arie is entitled to an Order from this Court to reform the terms of the Court-Ordered Stipulation of Settlement to provide as follows:

(i)    that the transfer by Arie of his 51% interest in TPR to Dalia and the concurrent transfer of the 3000 shares of TRI stock to Arie, the Orly Trust and the Sagi Trust, respectively, as originally set forth in the Stipulation of Settlement is voided *ab initio* as a result of the Delaware Court finding that the 2004 Transfers are invalid;

(ii)    that all the assets of TPR, other than the 3000 Arie, Orly Trust and Sagi Trust TRI shares, remain the property of TPR or any successor in interest to those assets;

(iii) that pursuant to a further order of this Court the Court-Ordered Stipulation of Settlement is modified *ab initio* to provide that the 3000 shares of TRI common stock that were returned to TPR as a result of the Delaware Court Action voiding the original 2004 Transfers be placed in a newly formed single purpose entity controlled by Arie (hereinafter, "TPR2");

60

(iv) that Arie be declared the 51% owner of TPR2 which in turn shall be declared, ab initio, the record and beneficial owner of all such 3000 TRI shares, as though no 2004 Transfers were consummated under the original terms of the Stipulation of Settlement;

(v) that the Orly Trust and Sagi Trust each be declared the owner of 24.5% of TPR2 so that together they own the remaining 49% of TPR2;

(vi) that TPR2 shall not sell or transfer the 3000 TRI shares prior to Arie's death, unless such sale would otherwise be permitted and would not violate the terms of the 2001 Stockholders Agreement, including, but not limited to, Article 2 of such Agreement;

(vii) upon Arie's death, 1102.8 of TRI shares, plus any stock dividends relating thereto ("the Sagi Trust TRI shares") will be transferred by TPR2 outright to the Sagi Trust, and 1102.8 of TRI shares, plus any stock dividends relating thereto ("the Orly Trust TRI Shares") will be transferred outright to the Orly Trust;

(viii) all cash dividends relating to the Sagi Trust and the Orly Trust TRI Shares received by TPR2 during Arie's lifetime will be distributed, after payment of taxes and expenses to the Shareholders of TPR2, as if (a) Arie owned 794.40 shares, representing 13.99468% of the common stock of TRI, and (b) the Sagi Trust and the Orly Trust each owned 1102.8 shares, representing 19.42766% of TRI common stock;

(ix) Arie through his 51% control of TPR2 will retain all voting rights to the 3000 TRI shares and any additional TRI shares issued to TPR or TPR2 as stock dividends or otherwise for the duration of his life.

(x) The Trump Group shall deliver to TPR2 the 1102.8 shares of TRI common stock purportedly purchased under the 2008 Stock Purchase Agreement.

61

(xi) The $26,715,416.00 paid by the Trump Group to the Sagi Trust under the 2008 Stock Purchase Agreement will be returned to the Trump Group by TPR and the Sagi Trust.

(xii) The Trump Group shall deliver to TPR2 the 794.40 Arie and the 1102.8 Orly Trust TRI shares purportedly sold to TPR under the Side Letter Agreement and 2010 Transaction.

(xiii) The purported sales by TPR of the Arie and Orly Trust TRI Shares to the Trump Group, while the Delaware Supreme Court appeal was pending, will be declared null and void and the proceeds from these purported sales now held in escrow will be released to the Trump Group.

(xiv) TRI shall record on its books that TPR2 is the record owner of 3000 shares of TRI Common Stock, representing 52.85% of the issued common stock of TRI.

(xv)   TPR2 will consent to the terms of the 2001 Stockholders Agreement.

(xvi) Arie, Orly, Dalia, Sagi, TPR and TRI shall be directed to take all other necessary action and to execute all documents necessary to give full meaning to the intention of the parties to the Court-Ordered Stipulation of Settlement in light of the rulings of the Delaware Court that the 2004 Transfers were invalid.

(xvii) Any other declaration as the Court may deem fair and reasonable to give effect to the Original Intent of the parties to the Stipulation of Settlement.

(b) on the **Second Cause of Action against Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties**, that the Court find and declare that:

62

(i) upon the Delaware Court voiding TPR's 2004 transfer of 52.85% of TRI shares to Arie, the Sagi Trust and the Orly Trust, legal title to such TRI shares reverted to TPR subject to Arie's rights as a constructive beneficial owner of 51% of the shares of TPR with respect to TPR's ownership of 52.85% of TRI shares;

(ii) upon TPR becoming the record owner of Arie's 794.4 shares of TRI stock as a result of the Delaware Court rulings, such shares were immediately held in a constructive trust by TPR for the benefit of Arie as the beneficial owner of those shares;

(iii) upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Orly Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Orly Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Orly Trust's right to receive the Orly Trust TRI Shares upon Arie's death;

(iv) upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Sagi Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Sagi Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Sagi Trust's right to receive the Sagi Trust TRI Shares upon Arie's death;

(v) upon TPR becoming the record owner of all 3000 shares of TRI stock comprising the Orly Trust Shares, the Sagi Shares and the Arie Shares, TPR held the voting rights to such 3000 shares in a constructive trust for the benefit of Arie;

63

(vi) TPR was not authorized to transfer any of the 3000 TRI shares as to which it became the record owner, without the consent of Arie as the beneficial owner of such TRI Shares;

(vii) TPR is not authorized to vote any of the 3000 TRI shares that reverted to TPR as record owner as a result of the Delaware Court rulings, except at the direction of Arie;

(viii) The Constructive Trust in favor of Arie imposed upon Arie, the Orly Trust and the Sagi Trust TRI shares existed at the moment record ownership reverted to TPR, and attaches to any purported sale of these shares to the Trump Group, who were not and are not bona fide purchasers of any of the 3000 TRI shares that reverted to TPR.

(c) on the **Third Cause of Action against Defendants Sagi, TPR, the Sagi Trust, Fang, the Trump Parties and TRI, jointly and severally,** as follows:·

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys fees and costs incurred in connection with this action;

(ii) awarding compensatory damages to the Plaintiff Orly Genger individually and as the beneficiary of the Orly Trust in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys fees and costs incurred in connection with this action;

(d) on the **Fourth Cause of Action against Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang, and the Trump Parties:**

(i) rescinding Plaintiff Arie's transfer of his 51% interest in TPR to Dalia pursuant to the Stipulation of Settlement and 2004 Transaction Documents;

64

(ii) rescinding the 2004 Transaction Documents;

(iii) Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties must account to Arie and Orly, individually and as the beneficiary of the Orly Trust, for 3000 TRI Shares and/or their respective value that are now or ever have been in their respective possession, custody or control; and

(iv) such other equitable relief as the Court may deem fair and reasonable;

(e) on the **Fifth Cause of Action against Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties**, permanently enjoining and restraining these Defendants, and each of them, from directly or indirectly transferring, selling, acquiring, pledging, assigning, diluting, voting, valuing, replacing, conveying, using, removing from the jurisdiction, or otherwise disposing of, or encumbering the 3000 shares of TRI common stock that reverted to TPR as a result of the Delaware court rulings.

(f) on the **Sixth Cause of Action against Defendant TPR**:

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action; and

(ii) awarding compensatory damages to the Plaintiff Orly individually and as the beneficiary of the Orly Trust in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action.

(g) on the **Seventh Cause of Action against Defendant Sagi Trust**, a money judgment awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus Plainitiff's attorneys' fees and costs incurred in connection with this action;

65

(h) on the **Eighth Cause of Action Against the Defendant Trump Parties, jointly and severally**:

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(ii) awarding compensatory damages to the Plaintiff Orly individually and as the beneficiary of the Orly Trust in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(i) on the **Ninth Cause of Action Against Sagi, Fang, and the Sagi Trust**:

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(ii) awarding compensatory damages to the Plaintiff Orly, individually and as the beneficiary of the Orly Trust, in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(j) on the **Tenth Cause of Action for a Preliminary Injunction Against the Trump Parties, Sagi Genger, TPR and the Sagi Trust Under CPLR 7109**, and each of them for an injunction or temporary restraining order under CPLR 7109, restraining and enjoining each of them from transferring, selling, diluting, pledging, assigning or otherwise disposing of or

66

removing the Arie TRI Shares, the Orly Trust TRI shares, and the Sagi Trust TRI shares from the State until the further Order of the Court.

(k)     **On all causes of action set forth in this Complaint,** such other relief as this court may deem just, together with the costs and disbursements incurred by plaintiffs in this action, including the recovery of plaintiffs' reasonable attorneys' fees.

DATED: New York, New York  
      September 20, 2011

MITCHELL SILBERBERG & KNUPP LLP

By: _____

Paul D. Montclare (PM 4454)  
Lauren J. Wachtler (LW 4205)  
12 E. 49th Street, 30th Floor  
New York, New York 10017  
(212) 509-3900

Attorneys for Plaintiff ARIE GENGER

ZEICHNER ELLMAN & KRAUSE LLP

By: _____  
Yoav M. Griver  
Bryan D. Leinbach  
575 Lexington Avenue  
New York, New York 10022  
Telephone: (212) 223-0400  
Facsimile: (212) 753-0396

Attorneys for Plaintiff ORLY GENGER, in  
her individual capacity and on behalf of the  
ORLY GENGER 1993 Trust

68

SUPREME COURT: NEW YORK COUNTY

| | |
|---|---|
| ARIE GENGER and ORLY GENGER, in her individual capacity and on behalf of the ORLY GENGER 1993 Trust,<br><br>       Plaintiffs,<br><br>    -against-<br><br>SAGI GENGER, TPR INVESTMENT ASSOCIATES, INC., DALIA GENGER, THE SAGI GENGER 1993 TRUST, ROCHELLE FANG, Individually and as Trustee of THE SAGI GENGER 1993 TRUST, GLENCLOVA INVESTMENT COMPANY, TR INVESTORS, LLC, NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, JULES TRUMP, EDDIE TRUMP and MARK HIRSCH,<br><br>       Defendants. | Index No. 651089/10<br><br>(Justice Paul G. Feinman) |

# PLAINTIFF ORLY GENGER'S SECOND REPLY MEMORANDUM IN FURTHER SUPPORT OF HER MOTION TO ENJOIN DEFENDANTS DALIA GENGER, THE TRUMP GROUP AND TPR INVESTMENT ASSOCIATES, INC. FROM PROSECUTING DUPLICATIVE LITIGATION IN DELAWARE CHANCERY COURT

ZEICHNER ELLMAN & KRAUSE LLP
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 223-0400

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

PRELIMINARY STATEMENT ....................................................................... 1

ARGUMENT ................................................................................................... 5

    I.    THE COURT SHOULD EXERCISE ITS BROAD AUTHORITY
        AND STAY THE DELAWARE DJ ACTION TO PREVENT
        UNNECESSARY PROSECUTION OF DUPLICATIVE
        LITIGATION.............................................................................. 5

    II.   ORLY HAS DEMONSTRATED HER RIGHT TO PRELIMINARY
        RELIEF..................................................................................... 10

    III.  A PURELY NOMINAL UNDERTAKING IS APPROPRIATE
        HERE........................................................................................ 12

CONCLUSION.............................................................................................. 14

## TABLE OF AUTHORITIES

Page(s)

**NEW YORK CASES**

Ackerman v. Ackerman,
  631 N.Y.S.2d 657 (1st Dept. 1995) ................................................................6, 7

Arie Genger v. Sagi Genger et al.,
  Index No. 651089/2010 (N. Y. Sup. Ct. Feb. 17, 2011) ........................................10, 11

Arpels v. Arpels,
  8 N.Y.2d 339 (1960) ........................................................................................6

Browne v. Browne,
  53 A.D.2d 134, 385 N.Y.S.2d 983 (4th Dept. 1976) ...............................................7

Bryan v. Bryan,
  275 A.D.2d 688, 713 N.Y.S.2d 348 (1st Dept. 2000)..............................................5

Chayes v. Chayes,
  180 A.D.2d 566, 580 N.Y.S.2d 269 (1st Dept. 1992)............................................6, 7

Cooperstown Capital, LLC v. Patton,
  60 A.D.3d 1251, 876 N.Y.S.2d 186 (3d Dept. 2009) ..............................................13

E.B. Latham & Co. v. Mayflower Industries,
  278 A.D. 90, 103 N.Y.S.2d 279 (1st Dept. 1951)................................................6, 7

Fernandez v. Fernandez,
  39 Misc.2d 471, 240 N.Y.S.2d 926 (Sup. Ct. Bronx Cty. 1963) ...............................7

Four Seasons Solar Products Corp. v. Solarium Products of Florida, Inc.,
  102 A.D.2d 757, 477 N.Y.S.2d 291 (1st Dept. 1984)..............................................6

Four Times Square Associates, LLC v. Cigna Investments, Inc.,
  306 A.D.2d 4 (1st Dept. 2003)...........................................................................11

George Hyman Constr. Co. v. Precision Walls, Inc.,
  517 N.Y.S.2d 263 (2d Dept. 1987) .....................................................................6

Hon v. Hon,
  164 Misc.2d 806, 624 N.Y.S.2d 553 (Sup. Ct. Queens Cty. 1995) ..........................12

Indosuez Int'l Fin. v. National Reserve Bank,
  263 A.D.2d 384, 693 N.Y.S.2d 33 (1st Dept. 1999)................................................6

Interested Underwriters at Lloyd's v. H.D.I. III Associates,
  213 A.D.2d 246, 623 N.Y.S.2d 871 (1st Dept. 1995)............................................5, 7

IRB-Brasil Resseguros S.A. v. Portobello Int'l Ltd.,
  59 A.D.3d 366, 874 N.Y.S.2d 79 (1st Dept. 2009)........................................................8

Jay Franco and Sons Inc. v. G Studios, LLC,
  34 A.D.3d 297, 825 N.Y.S.2d 20 (1st Dept. 2006)........................................................5

Jay Franco and Sons Inc. v. G Studios, LLC,
  Index No. 602236/05, 2006 WL 5110770 (Sup. Ct. N.Y. Cty. June 14, 2006).........................5

Jones v. Park Front Apartments, LLC,
  73 A.D.3d 612 (1st Dept. 2010).......................................................................10

Lafferty v. Lafferty,
  243 A.D.2d 541, 663 N.Y.S.2d 108 (2d Dept. 1997) .............................................6, 7

Martin v. Martin,
  62 Misc.2d 703, 309 N.Y.S.2d 477 (Sup. Ct. Nassau Cty. 1970) ...................................12

Miller v. Wincott,
  2005 WL 1388847 (Sup. Ct. June 7, 2005) ........................................................6

Orly Genger v. Dalia Genger et al.,
  Index No. 109749/2009 (N.Y. Sup. Ct. July 28, 2010) ....................................4, 10, 11

Pereia v. Pereria,
  272 A.D. 281, 70 N.Y.S.2d 763 (1st Dept. 1947)..................................................12

R&R Capital v. Merritt,
  63 A.D.3d 565, 881 N.Y.S.2d 96 (1st Dept. 2009)..................................................6

Roman v. Sunshine Ranchettes, Inc.,
  98 A.D.2d 744, 469 N.Y.S.2d 449 (2d Dept. 1983) .................................................6

Sarepa S.A. v. Pepsico, Inc.,
  225 A.D.2d 604, 639 N.Y.S.2d 128, (2d Dept. 1996) ..............................................6

Velez v. Feinstein,
  87 A.D.2d 309 (1st Dept 1982).....................................................................11

Wright v. Lewis,
  21 Misc. 3d 1120(A), 873 N.Y.S.2d 516 (Sup. Ct. Kings Co. 2008) ...............................13

NEW YORK STATUTES

CPLR 6301........................................................................................6, 8

CPLR 6312........................................................................................4, 12

## PRELIMINARY STATEMENT

The question before this Court is a narrow one: should the Court continue enjoining the duplicative declaratory judgment action recently begun by Dalia[1] in Delaware Chancery Court? The answer is yes, for all the reasons that led the Court to enjoin the Delaware DJ Action in the first place. This Court remains the only Court with jurisdiction over all the parties and issues, and the only Court Orly has chosen to hear her claims and to protect her interests in the Orly Trust (interests that are being actively dissipated by Dalia, in dereliction of her duties as Trustee of the Orly Trust).

The few contentions offered by Dalia and the Trump Group defendants[2] in opposition to preliminary injunction are unpersuasive. *First,* the July 20, 2010 New York TRI Action, Dalia's October 4, 2011 Delaware DJ Action, and the Trump Group's October 26, 2011 Counterclaim in the Delaware DJ Action, all seek the same determination – who beneficially owns the Orly Trust Shares. See, e.g., Trump Group Opp. at 5 (conceding that "Orly Genger, purporting to act in this case on behalf of the Orly Trust, seeks a declaration that the Orly Trust is the beneficial owner of the [Orly Trust Shares] – precisely the same relief in respect to the [Orly Trust Shares] as the relief sought by the Trustee in the [Delaware DJ Action]"). Thus, while the New York TRI Action also raises other important and significant issues not present in Delaware – for example, the New York TRI Action includes all parties (e.g., Eddie Trump and Mark Hirsch and Rochelle Fang) and all claims (e.g., defendants' fraudulent conduct), and protects Orly's ability to wield the Orly Trust shares as part of a control block with Arie Genger,

---

[1] Capitalized terms not defined herein were defined in the prior motion papers submitted by Orly in support of injunctive relief. Those papers and annexed exhibits are fully incorporated herein by reference. Also incorporated herein by reference is the accompanying Attorney's Statement of Bryan D. Leinbach.

[2] The opposition papers submitted by defendant TPR and third-party Sagi Trust are essentially limited to irrelevant *ad hominem* attacks upon Orly and her counsel. The Court likely wasted enough of its valuable time just wading through all that pointless hyperbole, and non-substantive material requires no substantive response here.

thereby increasing its monetary value) – the Delaware DJ Action is still entirely subsumed within it.

The Court has every right and authority to stay such duplicative litigation, without a showing of anything more, such as "fraud or gross wrong." Duplicative litigation leads to conflicting results, waste of judicial resources, and unnecessary legal expenses. Conversely, enjoining duplicative litigation protects the dignity and authority of this Court, prevents forum-shopping, and avoids unseemly races to judgment. This is why the cases cited by defendants where injunctions were denied involve failed attempts to enjoin <u>first-filed cases</u> where there were good and sufficient reasons for bringing a case outside of New York. Here, of course, the Delaware DJ Action is a second-filed case brought by in Delaware, a forum with no connection of any kind to either Dalia or the Orly Trust. It remains uncontroverted that (i) Dalia resides in New York; (ii) Orly resides in New York; (iii) the Orly Trust is governed by New York law; (iv) the question raised by the Delaware DJ Action is already before this Court; (v) this is the only action where all the parties are present; and (vi) this is the only Court that can and should decide whether Sagi/TPR had the authority to sell the Orly Trust Shares under the Stipulation and Agreement of Settlement that memorialized the end of Arie and Dalia's New York marriage and the distribution of their marital property. That is why these issues should be decided here, not in Delaware.

Importantly, given every opportunity to explain, and even while submitting an affidavit in opposition, defendant Dalia remains conspicuously silent about why she has spent time and Orly Trust assets retaining Delaware counsel and bringing a duplicative Delaware DJ Action, instead of filing a simple cross-claim in this action (if a cross-claim is even needed). Nor does she respond in any way to the fact that, in bringing the Delaware DJ Action, Dalia ignored

2

Orly's express wishes and an Order from the Surrogate Court requiring her to provide Orly with ten days notice before doing anything to affect the Orly Trust's interest in its TRI shares. Dalia's silence on these matters underscores what is already apparent on its face – the Delaware DJ Action is nothing more than Dalia and the other defendants' transparent attempt to rob Orly of her chosen forum, so they may complete fraudulently dissipating the Orly Trust's assets.

Under these circumstances, even if a showing of some deliberate "wrong" is required (it is not), Orly would still be entitled to an injunction. New York Courts have recognized that forum-shopping, such as defendants' blatant attempts to wrest this case from Orly's chosen forum of this New York Court, is enough to justify an injunction. Equally supportive of an injunction is Dalia's remarkable decision to bring an action in Delaware, before a court that has already found against the Orly Trust (even if said findings were later vacated on appeal) and in a jurisdiction that otherwise has no personal jurisdiction over the Orly Trust (and still has no jurisdiction over Orly). Little wonder, that the Trump Group – purported defendants adverse to Dalia in the Delaware DJ Action – so desperately support Dalia in her choice of forum. Finally, Orly's verified complaint (and her verified complaint in the other Orly Trust matter before Your Honor) describes how Dalia, Sagi, and the other defendants have worked together to fraudulently divest the Orly Trust of its assets. The Delaware DJ Action is plainly an effort in service to that fraudulent end.

*Second*, Orly easily meets the standard for a preliminary injunction. Orly has reasonably demonstrated a likelihood of success on the merits of her motion by showing that the Delaware DJ Action is an unnecessary and duplicative drain on party and judicial resources. Further, this Court already has found Orly demonstrated a sufficiently reasonable likelihood of success on her underlying claims when it granting a previous injunction to protect the Orly

3

Trust's interest in its TRI shares.[3]  The current injunction merely prevents defendants from circumventing that injunction (and this Court's authority) by seeking another forum.

The irreparable harm to Orly is also readily apparent.  By its very nature, the Delaware DJ Action, if not enjoined, irreparably impugns this Court's authority, generates unnecessary legal expenses, and risks conflicting results that will irreparably harm Orly's ability to prosecute and prove her claims in her chosen forum.  The irreparable harm is particularly acute here, as Orly is not a party to the Delaware action and cannot defend her interests in that action.  In this regard, Dalia has already taken multiple positions adverse to Orly, and manifestly cannot be trusted to defend Orly and her interests in any jurisdiction.

As to the equities, the balance clearly favors enjoining the Dalia DJ Action.  Any argument the defendants might have made in Delaware can be made here.  Conversely, allowing the Delaware DJ Action to continue would completely foreclose Orly from her day in court, as Orly is not a party to the Delaware DJ Action.

*Third*, there is no basis for anything other than a nominal undertaking in this case. NY CPLR 6312 limits any undertaking to the "damages or costs which may be sustained" by defendants from the requested injunction.  Here, defendants face no possible harm.  The Delaware DJ Action seeks only a declaration as to the ownership of the Orly Trust TRI Shares, not damages.  If the action is enjoined, the defendants are free to make the same arguments and seek the same declaration in this action.  Indeed, if anything, the injunction saves defendants from the cost of prosecuting an unnecessary litigation in Delaware.  Accordingly, any undertaking in this case should be for a nominal amount.

---

[3] Likewise, in denying defendants summary judgment in the other Orly Trust action before the Court involving the sham UCC sale, the Court recognized the substantive merit of Orly's claim that Dalia, Sagi, TPR and others have been attempting to fraudulently strip the Orly Trust of its assets, to Orly's detriment.  See Orly Genger v. Dalia Genger et al., Index No. 109749/2009, *10-11 (N.Y. Sup. Ct. July 28, 2010).

Over fifteen months ago, Orly chose this Court as her desired forum for deciding who beneficially owns the TRI Shares, and it is this Court that should decide that issue. To achieve that end, and prevent defendants from cynically stripping that choice from Orly, TPR and the Trump Group Defendants should continue to be enjoined from continuing to litigate that issue in Delaware through the conclusion of the New York TRI Action.

## ARGUMENT

I.   **THE COURT SHOULD EXERCISE ITS BROAD AUTHORITY AND STAY THE DELAWARE DJ ACTION TO PREVENT UNNECESSARY PROSECUTION OF DUPLICATIVE LITIGATION**

"The court has the authority to grant injunctive relief in order to protect the integrity of its jurisdiction and to prevent the parties from engaging in duplicative litigation." Jay Franco and Sons Inc. v. G Studios, LLC, Index No. 602236/05, 2006 WL 5110770 (Sup. Ct. N.Y. Cty. June 14, 2006); Jay Franco and Sons Inc. v. G Studios, LLC, 34 A.D.3d 297, 298, 825 N.Y.S.2d 20 (1st Dept. 2006) (trial court may invoke its "equity power" and enjoin duplicative litigation in another state in "the interest of preventing duplicative litigation that might lead to conflicting results, and to prevent the waste of judicial resources and unnecessary legal expenses"; affirming stay of duplicative, second-filed California action); Interested Underwriters at Lloyd's v. H.D.I. III Associates, 213 A.D.2d 246, 247, 623 N.Y.S.2d 871, 873 (1st Dept. 1995) (affirming order staying duplicative, second-filed Colorado action where "New York action was properly placed, ... a contrary decision in Colorado would interfere with the New York court's ability to resolve the issues before it, ... the facts indicate that the defendant may have engaged in forum-shopping ... [and] significant New York contacts existed") (internal citations omitted); Bryan v. Bryan, 275 A.D.2d 688, 689, 713 N.Y.S.2d 348, 349 (1st Dept. 2000) (enjoining duplicative, second-filed Texas action where "New York has the greater interest in and contacts with the ... litigation" because "most, if not all, of the marital property is

5

located in New York; the antenuptial agreement was entered into in New York; the parties lived together in New York as husband and wife ... and the wife continues to reside in New York"); Lafferty v. Lafferty, 243 A.D.2d 541, 541, 663 N.Y.S.2d 108, 109 (2d Dept. 1997) (affirming decision enjoining defendant from prosecuting duplicative, second-filed action in Connecticut; Connecticut action would "violate the plaintiff's rights 'respecting the subject of the action' (CPLR 6301) and tend to render her New York judgment ineffectual"); see generally Orly Moving Br. at 3-6 (and cases cited); Orly Reply Br. at 3-6 (and cases cited).

As the cases cited above affirm, the Trump Group and Dalia are wrong when they claim the Court's equitable power to enjoin duplicative litigation is narrowly limited to instances involving fraud or similar wrongdoing. Indeed, not one of the cases cited in either defendant's opposition (Trump Opp. at 6-12; Dalia Opp. at 2-5) decline to enjoin a second-filed action on that basis. The cases cited by defendants generally involve attempts to enjoin first-filed actions in other states with a clear nexus to the action, where the traditions of comity and deference to a plaintiff's choice of forum strongly apply. See, e.g., Ackerman v. Ackerman, 631 N.Y.S.2d 657 (1st Dept. 1995) (Trump Group Opp. at 9) (refusing to enjoin Connecticut action where Connecticut action was first-filed action and husband-plaintiff was Connecticut resident).[4]  Here,

---

[4] The other cases cited by the Trump Group, Dalia, or both, are readily distinguishable. See, e.g., Arpels v. Arpels, 8 N.Y.2d 339, 342 (1960) (declining to enjoin French divorce action entitled to no full faith and credit in New York, but noting that Arpels would have received her injunction if the duplicative action had been brought in another state); Four Seasons Solar Products Corp. v. Solarium Products of Florida, Inc., 102 A.D.2d 757, 477 N.Y.S.2d 291 (1st Dept. 1984) (refusing to enjoin first-filed action in favor of second-filed action); George Hyman Constr. Co. v. Precision Walls, Inc., 517 N.Y.S.2d 263 (2d Dept. 1987) (same); Indosuez Int'l Fin. v. National Reserve Bank, 263 A.D.2d 384, 693 N.Y.S.2d 33 (1st Dept. 1999) (refusing to enjoin first-filed action in Russia); Roman v. Sunshine Ranchettes, Inc., 98 A.D.2d 744, 469 N.Y.S.2d 449 (2d Dept. 1983) (no indication two actions were duplicative); Chayes v. Chayes, 180 A.D.2d 566, 580 N.Y.S.2d 269 (1st Dept. 1992) (refusing to enjoin Massachusetts proceeding where New York action had resulted in divorce decree and was no longer ongoing); Sarepa S.A. v. Pepsico, Inc., 225 A.D.2d 604, 639 N.Y.S.2d 128 (2d Dept. 1996) (no indication New York action was first-filed action); Miller v. Wincott, 2005 WL 1388847 (Sup. Ct. June 7, 2005) (table) (case did not involve enjoining a duplicative, second-filed action); E.B. Latham & Co. v. Mayflower Industries, 278 A.D. 90, 103 N.Y.S.2d 279 (1st Dept. 1951) (same); R&R Capital v. Merritt, 63 A.D.3d 565, 881 N.Y.S.2d 96 (1st Dept. 2009) (refusing to enjoin other state actions which did not seek same relief or issues as New York action).

6

of course, those same traditions support a stay of the Delaware DJ Action in favor of Orly's first-filed New York TRI Action.

Even assuming, *arguendo*, something more is required, not much more is required. Reasons for enjoining foreign proceedings include not just fraud, but bad-faith, intent to harass, or if the purpose of the foreign state proceeding was "an attempt to evade the law or public policy of this state." E. B. Latham & Co. v. Mayflower Indus., 278 A.D. 90, 103 N.Y.S.2d 279 (1st Dept. 1951); Ackerman v. Ackerman, 219 A.D.2d 515, 631 N.Y.S.2d 657 (1st Dept. 1995) (same); Chayes v Chayes, 180 A.D.2d 566, 580 N.Y.S.2d 269 (1st Dept. 1992) (same). In other words, the forum shopping engaged in by Dalia, and the risk of inconsistent rulings engendered thereby, provides sufficient reason to issue the requested injunction. See Interested Underwriters, 213 A.D.2d at 246-47, 623 N.Y.S.2d at 872-73 (trial court properly enjoined second-filed, duplicative Colorado action to prevent forum shopping; the "New York action was properly placed, the defendant caused the numerous delays herein, [and] a contrary decision in Colorado would interfere with the New York Court's ability to resolve the issues before it."); Fernandez v. Fernandez, 39 Misc.2d 471, 240 N.Y.S.2d 926, 927 (Sup. Ct. Bronx Cty. 1963) (enjoining defendant from prosecuting subsequent action in Mexico because "defendant, if not enjoined, may get a divorce decree in Mexico, and then among other action, may move to amend his answer to plead the divorce as a defense. The action pending here should not be complicated in this fashion"); Browne v. Browne, 53 A.D.2d 134, 385 N.Y.S.2d 983, 986 (4th Dept. 1976) (preventing defendant from prosecuting action in Texas where a Texas judgment would prejudice plaintiff's rights in New York proceeding); Lafferty, 243 A.D.2d at 541 (injunction proper given defendant's "motivation" for commencing action in other state and fact that judgment of other state would "violate the plaintiff's rights 'respecting the subject of the

7

action' (CPLR 6301) and tend to render her New York judgment ineffectual").

In <u>IRB-Brasil Resseguros S.A. v. Portobello Int'l Ltd.</u>, a case cited by Dalia at

page 9 of her opposition brief, the First Department held that the trial court properly enjoined

prosecution of an action in Brasil for reasons equally applicable here:

> The court properly invoked its equity power to enjoin defendants
> from prosecuting the action they commenced in Brazil in about
> April 2008, in order to prevent the waste of judicial resources,
> unnecessary legal expenses, and duplicative litigation that might
> lead to conflicting results (*Jay Franco & Sons Inc. v. G Studios,
> LLC,* 34 A.D.3d 297, 825 N.Y.S.2d 20 [2006] ). An injunction may
> be issued "where it can be shown that the suit sought to be
> restrained is not brought in good faith, or that it was brought **\*367**
> for the purpose of vexing, annoying and harassing the party
> seeking the injunction" (*Paramount Pictures v. Blumenthal,* 256
> App.Div. 756, 759, 11 N.Y.S.2d 768 [1939], *appeal dismissed* 281
> N.Y. 682, 23 N.E.2d 15 [1939]). The instant action to collect on
> unpaid notes was properly placed in New York because the Global
> Note and related documents at issue explicitly provide that they are
> governed by New York law, and the parties agreed to submit to the
> jurisdiction of the courts of this state. This action was commenced
> in 2006, and defendants delayed commencement of their Brazilian
> action until about a year and a half later, which is evidence of their
> bad faith. Their motivation in that action was to avoid the
> application of New York law, which is yet another indication of
> bad faith. Since "a contrary decision in [the foreign court] would
> interfere with the New York court's ability to resolve the issues
> before it," it is entirely appropriate for the New York court to
> exercise its discretion to enjoin the action in the foreign court
> (*Interested Underwriters at Lloyd's v. H.D.I. III Assoc.,* 213
> A.D.2d 246, 623 N.Y.S.2d 871 [1995]). Comity does not require
> our courts to defer to the foreign jurisdiction under such
> circumstances (*Certain Underwriters at Lloyds, London v.
> Millennium Holdings LLC,* 52 A.D.3d 295, 861 N.Y.S.2d 3
> [2008]).

59 A.D.3d 366, 366-67, 874 N.Y.S.2d 79, 80 (1st Dept. 2009).

Indeed, even if fraud is required (it is not), an injunction is still appropriate here.

By her verified complaint, Orly alleges that Dalia, Sagi, TPR and the Trump Group are working

together to defraud Orly of her beneficial interest in the Orly Trust TRI Shares. See Third

Amended Complaint ¶¶ 89-141. The Delaware DJ Action is simply another affirmative action in

furtherance of that conspiracy. In this regard, Dalia's assertion that her Delaware DJ Action will

protect the Orly Trust (or that such is her aim and intent) cannot withstand the slightest scrutiny.

Entirely missing from Dalia's affidavit or briefing is any discussion of her prior

acts as Trustee – fraudulent and self-serving acts which render the limited declaratory relief

purportedly sought by Dalia in her Delaware DJ Action entirely illusory. Specifically, on or

around January 31, 2009, Dalia executed a document entitled "Meeting of Partners of D&K LP –

Jan. 31, 2009 & Agreement" (the "Meeting Agreement"). The Meeting Agreement purported to

grant D&K GP (i.e., Sagi Genger) unfettered authority to encumber the Orly Trust's TRI Shares:

> The partners wish to clarify that the authority vested in the General
> Partner to make limited partners' assets subject to a pledge shall be
> done in substantially the same manner in which TPR Investment
> Associates, Inc. shares were pledged in conjunction with the
> aforementioned note. However, the General Partner shall be
> authorized to sign for the partnership and/or each individual
> partner.

Meeting Agreement ¶ 3 (copy attached as **Exhibit I** to the Attorney's Statement of Judith Seigel-

Baum, previously submitted). The Meeting Agreement also purports to:

> Indemnify and provide a general release from any claim or right at
> equity, law, or contract or otherwise the current and former general
> partner, its officers, the partnership's holdings (including TPR
> Investment Associates, Inc.) and the officers of its holdings to
> fullest extent permitted in connection with any claim by the
> partnership and/or its partners. Irrespective of the above, nothing
> herein shall serve to release or indemnify Arie Genger, William
> Dowd, Lawrence Small or Edward Klimerman.

Id. ¶ 1.[5] In other words, the Meeting Agreement grants Sagi the unfettered authority to dispose

---

[5] Tellingly, Dalia entered the Meeting Agreement only weeks after making sworn statements to the Surrogate Court
that she would protect the Orly Trust and its assets and would "take no action" that might affect the value or
ownership of the TRI Shares. Seigel-Baum Stmt. ¶¶ 6-7. Similarly, the Meeting Agreement was negotiated and
executed without ever informing the Orly Trust's beneficiary, Orly (again in contradiction to Dalia's sworn
statements to the Surrogate Court that she was making sure Orly was being kept "aware of what was going on"). Id.
¶ 9.

of the TRI shares in any way he desires (and indemnifies him whatever he does) – rendering any

"declaration" pursuant to the carefully circumscribed metes and bounds of the Delaware DJ

Action an immediate nullity.[6]  Only this New York Court, which has before it all the issues and

all the parties, can the propriety and enforceability of the Meeting Agreement and the other

fraudulent actions of Dalia, Sagi, TPR, and Trump Group, be properly considered, and Orly's

rights truly protected.[7]

## II.    ORLY HAS DEMONSTRATED HER RIGHT TO PRELIMINARY RELIEF

A court may grant a preliminary injunction where the movant shows: "(1) a

likelihood of success on the merits of the parties underlying claims; (2) an irreparable harm to

the party if the relief requested is withheld; and (3) a balance of the equities tips in favor of the

party." Arie Genger v. Sagi Genger et al., Index No. 651089/2010, at *6 (N. Y. Sup. Ct. Feb. 17,

2011) (citing Jones v. Park Front Apartments, LLC, 73 A.D.3d 612, 612 (1st Dept. 2010)).  Here

Orly readily meets all three elements.

*First*, Orly demonstrates a likelihood of success on the merits.  In this regard,

certainty is not required; just a reasonable likelihood of success.  Arie Genger, supra, at *7-8

---

[6] Perhaps unintentionally, Dalia's sudden belated efforts on behalf of the Orly Trust call into question the Meeting Agreement she signed; Sagi's authority to try to sell the Orly Trust Shares to the Trump Group pursuant to the Side-Letter Agreement; and her current arguments against reformation of the Stipulation and Agreement of Settlement that memorialized the end of Arie and Dalia's New York marriage and the distribution of their marital property.

[7] The Meeting Agreement and similar acts by Dalia render her assertion that the Delaware DJ Action is somehow superior (Dalia Opp. at 2-3), or an example of Dalia protecting the Orly Trust (id. at 10-11), entirely perverse.  By her Third Amended Complaint, Orly seeks a reformation of the Stipulation of Settlement, which would result in the Orly Trust continuing to have the same beneficial interest in its TRI shares that it was intended to have as a result of Arie and Dalia's divorce.  Arie would have a life-tenancy over some of the rights attendant to those shares, but the Orly Trust would remain the beneficiary of its value – a value enhanced by being part of a voting block with Arie. See Third Amended Complaint, Prayer for Relief.  By contrast, Dalia has already given away the store.  She has supported, and continues by her Delaware DJ Action to support, Sagi's efforts to sell the Orly Trust Shares at a fire-sale price millions of dollars less than Sagi received for the Sagi Trust Shares.  These actions are of a piece with Dalia's past efforts to help Sagi loot the Orly Trust of its D&K shares (see Orly Genger v. Dalia Genger et al., Index No. 109749/2009, *10-11 (N.Y. Sup. Ct. July 28, 2010)), and conclusively demonstrate Dalia's bad faith and the fact that Dalia has not, is not, and will not look after Orly's interests or protect the Orly Trust's assets from dissipation.

(citing Four Times Square Associates, LLC v. Cigna Investments, Inc., 306 A.D.2d 4, 5 (1st

Dept. 2003) ("a likelihood of success on the merits may be sufficiently established even where

the facts are in dispute and the evidence inconclusive")).   Here, Orly has reasonably

demonstrated a likelihood of success on the merits of her motion by showing that the Delaware

DJ Action is an unnecessary and duplicative drain on party and judicial resources.  Further, this

Court already has found Orly demonstrated a sufficiently reasonable likelihood of success on her

underlying claims when it granting a previous injunction to protect the Orly Trust's interest in its

TRI shares.  Arie Genger, supra, at *7-8.  Nothing has changed since then that should alter the

Court's determination (indeed, if anything, the Delaware Supreme Court's decision overturning

much of the Chancery Court's finding enhances Orly's likelihood of success on her claims).[8]

       *Second*, Orly has demonstrated irreparable injury.  As Orly is neither a party to the

Delaware DJ Action nor subject to personal jurisdiction in Delaware, Orly would be foreclosed

from protecting her rights or the rights of the Orly Trust in that proceeding, and her right to

prosecute this action in her chosen forum could be prejudiced (in whole or in part) by contrary

rulings in Delaware:

> The failure of equity to act at the earliest opportunity when called
> upon to do so might result in irreparable harm to the domiciliary
> party who invokes its protection.  Certainly there is every reason
> for a wife in plaintiff's position to fear the result of a foreign
> divorce proceeding prosecuted by the husband.  It is difficult for
> her to determine whether she should go to Nevada, if possessed of
> means to do so and there contest the *bona fides* of her husband's
> claim of domicile.  Such procedure would entail the risk of

---

[8] Dalia's claim that Orly lacks standing to sue (Dalia Opp. Br. at 10-11) has already been considered and rejected by this Court.  Orly Genger v. Dalia Genger et al., Index No. 109749/2009, *4 (N.Y. Sup. Ct. July 28, 2010) (citing Velez v. Feinstein, 87 A.D.2d 309, 315 (1st Dept 1982) ("Where a claim exists in favor of the trust...against third persons and the trustees are under a duty to enforce that claim and have improperly and unjustifiably failed to do so, the beneficiaries may bring a suit on behalf of the trust...").  Here, Orly is suing Dalia for fraud, a claim Dalia cannot pursue on Orly or the Orly Trust's behalf.  Dalia's contention that Arie cannot seek reformation of the So-Ordered Stipulation of Settlement (Dalia Opp. Br. at 12-13) was addressed in Arie's opposition to defendants' motion to dismiss this action.  Orly incorporates those arguments into the instant brief as if fully set forth herein.

> acquiescing in the jurisdiction of the Nevada courts. The
> alternative risk in staying quiescent at home involves the possible
> inability to procure later the proof she now has to establish the
> husband's lack of bona fide domicile in the foreign jurisdiction.

Pereia v. Pereria, 272 A.D. 281, 70 N.Y.S.2d 763, 768 (1st Dept. 1947) (emphasis added); see

also Martin v. Martin, 62 Misc.2d 703, 309 N.Y.S.2d 477, 479-480 (Sup. Ct. Nassau Cty. 1970)

(allowing husband to institute divorce proceedings in Nevada would "place his wife in an unfair

position of imminent peril. ... she would then be placed on the horns of a dilemma ... of either

sitting idly by [and] keeping for herself what may be an illusory right to attack the decree at a

later time, or of appearing in" the foreign jurisdiction she did not choose).

By filing the claim and counterclaim and seeking to litigate in Delaware, the

defendants improperly seek to "engage [Orly] in an unseemly race to judgment in the two

courts" (Hon v. Hon, 164 Misc.2d 806, 624 N.Y.S.2d 553, 554 (Sup. Ct. Queens Cty. 1995)) and

irreparably prejudice her rights in this proceeding (Pereia, 70 N.Y.S.2d at 768). As prior events

conclusively demonstrate, irreparable risk to Orly exists so long as the defendants are not

enjoined from further adjudicating Orly's rights to the Orly Trust Shares in Delaware Chancery

Court.

*Third*, a balancing of the equities clearly favors Orly. If Dalia, TPR, and the

Trump Group are enjoined from prosecuting the Delaware DJ Action, they can still bring all their

arguments and claims before this Court. However, if defendants are permitted to prosecute the

Delaware DJ Action, Orly would be foreclosed from defending her rights in that action and could

be prejudiced in prosecuting her case before this Court. See Martin, supra; Pereia, supra.

## III.   A PURELY NOMINAL UNDERTAKING IS APPROPRIATE HERE

An undertaking in connection with a preliminary injunction is limited to the

"damages or costs which may be sustained" by Dalia, TPR, and the Trump Group from the

requested injunction. NY CPLR 6312(b). Here, of course, none of the defendants identify any such damages or costs to them from the requested temporary restraining order (see Dalia Opp. at 15-16; Trump Opp. at 13); nor could they if they tried.

Neither Dalia nor the Trump Group seeks damages in the Delaware DJ Action; the only relief sought by them is a judicial determination of who owns the Orly Trust TRI Shares. Such a determination, however, is already at issue, and will be decided, in this Court. Given the lack of damage to defendants, no undertaking beyond a truly nominal amount (e.g., $500) should be required here. See, e.g., Cooperstown Capital, LLC v. Patton, 60 A.D.3d 1251, 1253, 876 N.Y.S.2d 186, 189 (3d Dept. 2009) (amount of the undertaking should "be rationally related to the potential damages' that defendants could recover if an injunction is ultimately deemed unwarranted"); Wright v. Lewis, 21 Misc. 3d 1120(A), 873 N.Y.S.2d 516 (Sup. Ct. Kings Co. 2008) ("Courts, in exercising their discretion, have set nominal undertakings in cases in which the defendant's potential damages, if the defendant prevails, are minimal . . .").

If anything, the injunction prevents defendants from wasting money prosecuting duplicative claims in two jurisdictions. Certainly, enjoining the Delaware DJ Action does not damage defendants. Indeed, defendants essentially admit this, given the Trump Group's purported pledge to voluntarily "take no action in either of the Genger-related actions in Delaware" (Trump Opp. at 2) and Dalia's newly-minted motion to have the Southern District Court stay her own Delaware action. See accompanying Attorney's Statement of Bryan Leinbach at Exhibit J. (Of course, Dalia's effort to stay her own action conclusively demonstrates she corruptly commenced her Delaware action purely to divest Orly of her chosen forum.)

## CONCLUSION

For each and every one of the foregoing reasons and the reasons set forth in her prior papers, this Court should grant Orly's motion for an Order: (i) enjoining Dalia, TPR, and the Trump Group from prosecuting the Delaware Action; and (ii) enjoining them from commencing any new actions concerning the subject-matter of the operative Complaint in this action. Plaintiff Orly Genger also respectfully requests the Court grant her such further and different relief as the Court deems just and proper.

Dated:   New York, New York
         December 9, 2011

Respectfully submitted,

ZEICHNER ELLMAN & KRAUSE LLP

By: _____
     Yoav M. Griver
     Bryan D. Leinbach
     Attorneys for plaintiff Orly Genger
     575 Lexington Avenue
     New York, New York 10022
     (212) 223-0400

Of Counsel
William B. Wachtel
Wachtel & Masyr LLP
One Dag Hammarskjold Plaza
885 Second Avenue
New York, New York 10017
(212)909-9595

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

ARIE GENGER and ORLY GENGER, in her individual
capacity and on behalf of the ORLY GENGER 1993
Trust,

                    Plaintiffs,

       v.

SAGI GENGER, TPR INVESTMENT ASSOCIATES,
INC., DALIA GENGER, THE SAGI GENGER 1993
TRUST, ROCHELLE FANG, Individually and as Trustee
of THE SAGI GENGER 1993 TRUST, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC,
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC,
JULES TRUMP, EDDIE TRUMP, MARK HIRSCH, and
TRANS-RESOURCES, INC.,

                    Defendants.

Index No. 651089/2010

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF ORLY GENGER'S MOTION FOR A PRELIMINARY INJUNCTION

**PEDOWITZ & MEISTER, LLP**
**1501 Broadway, Suite 800**
**New York, NY 10036**
**Tel: (212) 403-7330**
**Fax: (212) 354-6614**
**robert.meister@pedowitzmeister.com**
**Attorneys for Defendant**

# Table of Contents

Page

Preliminary Statement...................................................................................1

I.    An Equitable Stay Is Only Warranted When There Is Clear Evidence that a
      Duplicative Action Was Not Brought in Good Faith, or Was Brought for the Purposes
      of Vexing, Annoying and Harassing the Party Seeking the Injunction..................2

      A.  The Delaware Action Does Not Duplicate this Action...............................2

      B.  New York Courts Do Not Lightly Enjoin Prosecution of Other Actions............5

      C.  Orly Genger Has Failed to Demonstrate a Clear Right to Preliminary
          Injunction..................................................................8

              a.  Orly Has Failed To Demonstrate a Likelihood of Success on the
                  Merits..............................................................9

              b.  Orly Has Failed To Demonstrate Irreparable Injury.................13

              c.  Orly Has Failed to Prove that the Balance of Equities Weighs in
                  Her Favor..........................................................14

II.   Orly Must Post a Substantial Undertaking for any Preliminary Injunction...........15

III.  The Federal Court May Enjoin the Delaware Action in Favor of the Interpleader
      Action Pending Before Judge Keenan................................................16

Conclusion...............................................................................18

## Table of Authorities

**Cases**

*1234 Broadway LLC v. W. Side SRO Law Project*, 86 A.D.3d 18 (1st Dep't 2011)........... 9, 13, 15

*Aetna Ins. Co. v. Capasso*, 75 N.Y.2d 860, 862 (1990)................................................ 8, 13

*Amend v. Hurley*, 293 N.Y. 587, 595 (1944) ............................................................... 12

*Arie Genger & Orly Genger v. Sagi Genger et al.,* Index No. 651089/2010 (N. Y. Sup. Ct., N.Y. Co.)........................................................................................................................... 2, 17

*Arie Genger et al. v. Sagi Genger et al.*, Index No. 651089/2010 Decision and Order (Feb. 17, 2011) ........................................................................................................................ 2, 12

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 10 CIV. 8630 RWS, 2011 WL 3847376 (S.D.N.Y. Aug. 30, 2011) ............................................................................... 6, 10, 14

Chayes v. Chayes, 180 A.D.2d 566 (1st Dep't 1992)...................................................... 5

*Dalia Genger, as Trustee of the Orly Genger 1993 Trust v. TR Investors, LLC et al.* (Del. Ch. 6906-CS. filed Oct. 4, 2011)........................................................................... 4, 11, 17

*Doe v. Axelrod*, 73 N.Y.2d 748 (1988) ........................................................................ 9

*E. Air Lines, Inc. v. Trans Caribbean Airways, Inc.*, 29 A.D.2d 379 (1st Dep't. 1968) .............. 12

*E.B. Latham & Co. v. Mayflower Indus.*, 278 A.D. 90 (1st Dep't. 1951) ............................. 5, 6, 7

*Genger v. TR Investors, LLC*, 592, 2010, 26 A.3d 180 (Del. July 18, 2011) ........................ 10, 13

*Glenclova Investment Co. v. Trans-Resources, Inc.*, 08 civ 7140 (JFK) (S.D.N.Y.) .................. 17

*Greater New York Mut. Ins. Co. v. United States Underwriters Ins. Co.*, 36 A.D.3d 441 (1st Dep't. 2007)................................................................................................. 13

*Grant Co. v. Srogi*, 52 N.Y.2d 496, 517 (1981)...........................................................8

*Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*, 263 A.D.2d 384 (1st Dep't 1999)...................8

*IRB-Brasil Resseguros S.A. v. Portobello Int'l Ltd.*, 59 A.D.3d 366 (1st Dep't. 2009)............8

*Jay Franco & Sons, Inc. v. G Studios, LLC*, Index No. 602236/05, 2006 WL 5110770 (N.Y. Ct. Sup. Ct. June 14, 2006).......................................................................................... 7

*Koultukis v. Phillips*, 285 A.D.2d 433 (1st Dep't. 2001).................................................. 8

*Leif B. Pederson, Inc. v. Weber*, 128 A.D.2d 453 (1st Dep't 1987) ................................. 14, 15

*Margolies v. Encounter, Inc.*, 42 N.Y.2d 475 (1977) .............................................................. 15, 16

*Matter of the Trust Established on December 13, 1993 by ARIE GENGER for the benefit of ORLY GENGER*, file no. 0017/2008, (Surrg. Ct., N. Y. Co. Dec. 31, 2008). ............................ 6

*McLaughlin, Piven, Vogel, Inc. v. W.J. Nolan & Co., Inc.*, 114 A.D.2d 165 (2d Dep't. 1986) ... 14

*Merrell Benco Agency, Inc. v. Safrin*, 231 A.D.2d 614 (1st Dep't 1996)......................................... 9

*Miller v. Wincott*, 8 Misc. 3d 1002(A) (Sup. Ct., Nassau Co. 2005)............................................... 6

*Orly Genger v. Dalia Genger et al.*, Index No. 109749/09 (N.Y. Co. Sup. Ct. filed August 11, 2010) ....................................................................................................................................... 4, 16

*Paramount Pictures v. Blumenthal*, 256 App.Div. 756 (1st Dept.1939)...................................... 7, 8

*Pedowitz & Meister v. TPR Inv. Assoc., Inc. et al*, 11 civ. 1502 (JFK) (S.D.N.Y. filed Nov. 1, 2011) ..................................................................................................................................... 11, 16

*Price Paper & Twine Co. v. Miller*, 182 A.D.2d 748 (2d Dep't 1992) ........................................... 9

*R & R Capital LLC v. Merritt*, 63 A.D.3d 565 (1st Dep't. 2009)...................................................... 5

*Reynolds Metals Co. v. Colonial Realty Corp.*, 41 Del. Ch. 183, 190 A.2d 752, 756 (Del. Sup. Ct. 1963) ............................................................................................................................................... 4

*Rosenthal v. Burry Biscuit Corp.*, 30 Del. Ch. 299, 60 A.2d 106 (Del. Ch. Ct. 1948)................... 4

*Sarepa, S.A. v. Pepsico, Inc.*, 225 A.D.2d 604 (2d Dep't. 1996) *denied* 91 N.Y.2d 801 (1996).... 6

*TR Investors, LLC v. Genger*, CIV.A. 3994-VCS, 2010 WL 3279385 (Del. Ch. Aug. 9, 2010).................................................................................................................. 12

*Uniformed Firefighters Ass'n of Greater New York v. City of New York*, 79 N.Y.2d 236 (1992) ................................................................................................................ 15

*Velez v. Feinstein*, 87 A.D.2d 309 (1st Dep't. 1982).......................................................... 6, 10, 14

*Village of Honeoye Falls v. Elmer*, 69 A.D.2d 1010 (4th Dep't. 1979 ) ...................................... 13

## Statutes

8 Del. C. § 220…………………………………………………………………………..4

8 Del. C. § 262 ................................................................................................................................... 4

8 Del. C. § 327 ................................................................................................................................... 4

CPLR § 6301 ...................................................................................................................................... 8

CPLR § 6312 .................................................................................................................................... 15

N.Y. BCL § 626(a) ............................................................................................................................. 4

## Treatises

6 N.Y. Jur., Reformation of Instruments, s 49 ............................................................................. 12

Defendant Dalia Genger, sued here solely in her individual capacity, respectfully submits this memorandum in opposition to the motion of Co-Plaintiff Orly Genger for a preliminary injunction restraining Dalia Genger from prosecuting the Delaware court action she commenced as Trustee of the Orly Genger 1993 Trust (Orly Trust) to declare that the Orly Trust is the beneficial owner of the 1,102.8 shares of common stock of Trans-Resources, Inc. (TRI) that TPR Investment Associates, Inc. (TPR) sold to the Orly Trust in 2004 ("the Delaware litigation").

## Preliminary Statement

Orly Genger is not entitled to a preliminary injunction.

As a preliminary matter, the Delaware litigation is not "duplicative" of Orly's action in this court. *Nowhere* in Orly's 68-page Third Amended Complaint does she seek a declaration that the Orly Trust is the beneficial owner of the 1,102.8 shares of TRI stock. In fact, Orly's complaint seeks to have Arie Genger declared the beneficial owner of the Orly Trust's TRI shares. Thus this action in this Court is an entirely different action—an action which would strip the Orly Trust of substantial legal and monetary rights. Therefore, to protect the Orly Trust's rights, the court should *not* enjoin the Delaware action.

Second, even if it were duplicative, in order to join the Delaware ligation Orly would have to prove by clear evidence that the Delaware ligation was not brought in good faith, or was brought for the purposes of vexing, annoying and harassing Orly, who is not a party in that suit. No such evidence exists and none has been submitted in support of this motion.

Finally, Orly has not demonstrated that she is entitled to the drastic remedy of a preliminary injunction as she has not shown any of the three elements that must be proved by clear evidence 1) a likelihood of success on the merits, 2) danger of irreparable injury, and 3) a

1

balance of equities in her favor.   Orly's motion is premised on the first count in the Third

Amended Complaint — a reformation claim brought by *Arie* and not Orly — that <u>this Court has</u>

<u>already recognized is unlikely to succeed on the merits</u>.   In granting a preliminary injunction

against TPR, the Court stated:

> Clearly, if the Delaware Supreme Court affirms the ruling of the Chancery Court,
> the TRI shares purchased by the Trump Group will no longer be owned by TRP
> [*sic.*, TPR], and Arie's request to rescind or reform the 2004 transfers such that he
> can be reinstated retroactively as the indirect owner of the TRI shares (through
> TPR) will be rendered impossible. . . .

*Arie Genger et al. v. Sagi Genger et al.*, Index No. 651089/2010 Decision and Order (Feb. 17,

2011); Meister Ex. A. Accordingly, for all of these reasons, the Court must deny the issuance of

a preliminary injunction.

**I.   An Equitable Stay Is Only Warranted When There Is Clear Evidence that a
Duplicative Action Was Not Brought in Good Faith, or Was Brought for the
Purposes of Vexing, Annoying and Harassing the Party Seeking the Injunction**

**A.   The Delaware Action Does Not Duplicate this Action**

*Nowhere* in its 68 pages does the Third Amended Complaint seek a declaration that the

Orly Trust is the beneficial owner of the 1,102.8 shares of TRI Stock or other relief based on that

premise.   At the October 26, 2011 hearing at the presentation of the Order to Show Cause for this

motion, Orly's counsel misspoke when he told the Court that "[i]f you compare the first count of

the third amended complaint before your Honor and the first count of Dalia's case in Delaware,

they're the same.   They both make claims as to who owns the beneficial ownership of the exact

same shares." *Arie Genger et al. v. Sagi Genger*, Index No. 651089/2010, TRO Hr'g Tr. at 3:21-

25 (Oct. 26, 2011) (hereinafter "TRO Hr'g") Meister Ex. B.   First, the first count of the Third

2

Amended Complaint was brought only by Arie Genger and *not by Orly*,[1] and it does *not* seek a

declaration that the Orly Trust is the beneficial owner of the TRI shares. In fact, the complaint

expressly requests that <u>Arie and not Orly or the Orly Trust</u> should be declared the beneficial

owners of the 1,102.8 shares that TPR sold to the Orly Trust. The Third Amended Complaint

specifically pleads:

> 181. Accordingly, <u>Arie</u> seeks an Order and declaratory judgment to reform the Court-
> Ordered Stipulation of Settlement to provide as follows:
>
>                 . . .
>
> (iv) that **Arie** be declared the 51% owner of TPR2, which in turn shall **be
> declared, *ab initio* the record and beneficial owner of all of such 3000
> TRI shares**,[2] as though no 2004 Transfers were consummated under the
> original terms of the Stipulation of Settlement.

Thus the Third Amended Complaint seeks to put all of the 3,000 TRI shares that TPR sold in the

2004 transfers (including those sold to the Orly Trust) into a new entity that it refers to as

"TPR2," which would be 51% owned by Arie Genger and 24.5 percent owned by the Orly Trust

until Arie's death.[3] At the October 26th hearing, Orly's counsel explained that:

> The reformation that they're[4] seeking will protect the Orly Trust because the TRI
> shares will be put back into TPR and then the Orly Trust . . . will be given the
> equivalent shares of TPR so that they will own the same amount of TRI shares.
> In a different way, they are asking that the Orly Trust be given the TRI shares
> back. So it is the exact same lawsuit . . . .

TRO Hr'g Tr. 21:26-22:4; Meister Ex. B. Thus if Arie Genger's cause of action were successful,

the Orly Trust would *not* be declared the beneficial stock owner of the 1,102.8 TRI shares and

thus the Trust would forfeit *substantial* rights. The Orly Trust would not be able to alienate this

---

[1] Orly should not be able to obtain a preliminary injunction based on the claims that she has not brought!
[2] This includes all 1,102.8 TRI shares sold to the Orly Trust.
[3] The motion contains no evidence that TPR2 exists, other than in Arie Genger's fantasies.
[4] Counsel misspoke since this claim is only brought on behalf of Arie Genger.

beneficial interest which could be extremely valuable.[5]  It would not be until Arie Genger's death

that the Orly Trust would obtain beneficial ownership of the TRI shares.[6]

On the other hand, the Delaware action Dalia brought on behalf of the Orly Trust

explicitly demand Judgment:

a)  Declaring that the Orly Trust is a protected purchaser and beneficial owner of
    the 1,102.80 shares of common stock of TRI sold to it by TPR;

b)  Declaring that the Orly Trust is entitled to all dividends declared or paid
    attributable to such shares since October 29, 2004;[7]

Therefore, if the Delaware action is successful the Orly Trust would be declared the

beneficial owner of the 1,102.8 shares of TRI stock now and would not have to wait until Arie

Genger's death.  This would give the Orly Trust an *immediate* right to any dividends, stock

splits, and to attempt to capitalize on any appreciation in the value of the stock.  As beneficial

owner now, the Orly Trust will also have other valuable rights, including the ability to exercise

appraisal rights on any merger,[8] the right to inspect the corporate records,[9] and to bring a

derivative action on behalf of the corporation.[10]  Additionally, if the Orly Trust is declared the

beneficial owner of the TRI shares now, that ownership interest would be alienable, allowing the

---

[5] In her Second Amended Complaint (¶ 114) in her companion action, *Orly Genger v. Dalia Genger, et al.*, Sup. Ct., N. Y. Co., Index No. 109749/09, Orly Genger contends that the Orly Trust TRI shares are worth hundreds of millions of dollars.

[6] Third Amended Compl. ¶ 181(vii) upon Arie's death, 1102.8 of TRI shares, plus any stock dividends relating thereto. . . will be transferred by TPR2 . . . outright to the Orly Trust." During Arie's lifetime, it is requested that the Orly Trust receive "[a]ll cash dividends relating to the . . .the Orly Trust TRI Shares". Compl. At ¶ 181(viii).

[7] *Dalia Genger v. TR Inv., LLC et al.* p. 8 (Del. Ch. 6906-CS. filed Oct. 4, 2011). Meister Aff. Ex. C.

[8] 8 Del. C. § 262; *See also* Reynolds Metals Co. v. Colonial Realty Corp., 41 Del. Ch. 183, 190, 190 A.2d 752, 756 (Del. Sup. Ct. 1963)(Permitting a beneficial owner to seek appraisal rights as "[t]his is the recognition of the realities of modern stock practices and the necessity to afford such protection to stock beneficially owned as is not inconsistent with protection of the corporation's rights.") The beneficial owner may have additional rights pursuant to TRI's bylaws.

[9] 8 Del. C. § 220.

[10] 8 Del. C. § 327. *See* Rosenthal v. Burry Biscuit Corp., 30 Del. Ch. 299, 313, 60 A.2d 106, 113 (Del. Ch. Ct. 1948) ("[A]n equitable owner of stock can maintain a stockholder's derivative action.") *See also* N.Y. BCL § 626(a) "An action may be brought in the right of a domestic or foreign corporation to procure a judgment in its favor, by a holder of . . .a beneficial interest in such shares or certificates."

Orly Trust to sell this interest for valuable consideration, and thereby put money into the Trust, which then could be invested to create income for the beneficiaries and diversified prudently.

### B. New York Courts Do Not Lightly Enjoin Prosecution of Other Actions

"The general rule is that the courts of this State will decline to interfere by injunction to restrain its citizens from proceeding in an action commenced in the courts of a sister State." *E.B. Latham & Co. v. Mayflower Indus.*, 278 A.D. 90, 94 (1st Dep't. 1951). Therefore, even if the Delaware action were found to duplicate this action, "[t]he rule of comity forbids our courts from enjoining an action in a sister State 'unless it is clearly shown that the suit sought to be enjoined was brought in bad faith, motivated by fraud or an intent to harass the party seeking an injunction. . . .'" *Chayes v. Chayes,* 180 A.D.2d 566, 566 (1st Dep't 1992) (internal citation omitted). *See also, R & R Capital LLC v. Merritt*, 63 A.D.3d 565 (1st Dep't. 2009) (reversing an order enjoining actions in Delaware and Pennsylvania courts as this "improperly intrudes on the jurisdiction of [these] courts, in violation of established principles of comity. . ." and there was "no basis for the court's finding that the Delaware and Pennsylvania actions were brought in bad faith or with an intent to harass defendant."); *E.B. Latham & Co.*, 278 A.D. at 94 ("It is only in extreme and extraordinary cases that the court will break the rule of comity which forbids the granting of an injunction to stay proceedings which have been commenced in a foreign court of competent jurisdiction.").

There has been no evidence that the Delaware litigation was brought in bad faith. As discussed above, the actions commenced by Dalia Genger, as Trustee, seek to maximize the Orly Trust's recovery of the TRI shares. Dalia is litigating on behalf of the Orly Trust to see to it that the Orly Genger Trust has assets—assets that it can actually use and enjoy *immediately.* "'Where a claim exists in favor of the trust . . . the trustees are under a duty to enforce that claim'" *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 10 CIV. 8630 RWS, 2011 WL 3847376

at *8 (S.D.N.Y. Aug. 30, 2011) *quoting Velez v. Feinstein*, 87 A.D.2d 309 (1st Dep't. 1982).
Dalia is doing just that.

By requesting that this Court issue a preliminary injunction to prevent Dalia from acting

on behalf of the trust, Orly is seeking to undermine the Trust by controlling its assets without

permission of the Surrogate's Court, which has rejected Orly Genger's petition to replace Dalia

from her position as Trustee.[11]   Orly's moving papers are riddled with conclusory statements

regarding Dalia's intentions—none of which have been proven or accepted by this Court or any

other Court.    These statements are not sufficient to clearly show that the Delaware litigation

was brought in bad faith.  *See E.B. Lathem*, 278 A.D. at 94, (reversing the lower court's

injunction for failing to since there was "no allegation . . .[that the] action was instituted in bad

faith" since "[t]he mere averment" of a conspiracy among the parties "does not suggest any

wrongful purpose.");  *See e.g., Sarepa, S.A. v. Pepsico, Inc.*, 225 A.D.2d 604 (2d Dep't. 1996) *lv.

denied* 91 N.Y.2d 801 (1996) (reversing the Supreme Court's issuance of an injunction since

there had been "been no such clear showing" that the foreign suit sought to be enjoined was

brought in "bad faith, or motivated by fraud or an intent to harass the party seeking the

injunction.") *Miller v. Wincott*, 8 Misc. 3d 1002(A) (Sup. Ct., Nassau Co. 2005) (denying the

issuance of a preliminary injunction as where the party failed to establish that "the suit was

brought to harass the party seeking the injunction" or that "the foreign suit was motivated by

fraud."). Rather than "pauperizing" Orly, the evidence shows that Dalia is litigating on behalf of

the Orly Trust to enable the Trust to receive the benefits her mother intended to provide for Orly

in the Divorce Stipulation Agreement.

---

[11] *Matter of the Trust Established on December 13, 1993 by ARIE GENGER for the benefit of ORLY GENGER*,
Surrg. Ct., N. Y. Co. file no. 0017/2008, December 31, 2008.

Contrary to the assertion of Orly's counsel on October 26, 2011, there mere existence of duplicative litigation is not sufficient to enjoin another proceeding in a sister state. In oral arguments and in her brief, Orly relies heavily on *Jay Franco & Sons, Inc. v. G Studios, LLC*, Index No. 602236/05, 2006 WL 5110770 (N.Y. Ct. Sup. Ct. June 14, 2006) *aff'd* 34 A.D.3d 297, 298 (1st Dep't. 2006).[12] But in recounting the facts of that case, orally and in her brief, Orly's Counsel omitted to note that in *Franco*, the court concluded that the defendant had "'not brought [the other action] in good faith." *Id.* In that case, the defendant had filed an action in California 10 weeks after the New York Court denied the defendant's application for a stay. In the California action, the defendant submitted a certification required by California law disclosing the pendency of the New York action, but stating that its "claims in the instant case are not at issue in the New York action." The New York Supreme Court found that this representation was "clearly false as the facts alleged in the complaint [in California] were raised in support of its motion for a stay [in New York]. . ." *Id.* (emphasis added). The New York Supreme Court concluded that because "the defendant has clearly misrepresented to the California court that the two actions were not related," an injunction was appropriate as the California action was "'not brought in good faith, or [ ] was brought for the purposes of vexing, annoying and harassing the party seeking the injunction.'" *Id. quoting Paramount Pictures, Inc. v. Blumenthal*, 256 App. Div. 756, 759 (1st Dep't. 1939). Accordingly, the New York court granted an injunction as, *inter alia*, it was "clearly established" that this course of action was "'necess[ary] [ ] equitable inference [used] to prevent a failure of justice.'" *Id., quoting E.B. Latham & Co.*, 278 App. Div. 90, 94 (1st Dep't. 1951).

---

[12] *Arie Genger et al., v. Sagi Genger et al.*, Index No. 651089/10, TRO Hr'g, Statements of attorney for Orly Genger, Yoav Griver, Esq., Tr. at 28:21 – 29:7 (Meister Aff. Ex. B).

Therefore, the *Franco* case exemplified that duplicative litigation in another jurisdiction may only be enjoined "where it can be shown that the suit sought to be restrained is not brought in good faith, or that it was brought for the purpose of vexing, annoying and harassing the party seeking the injunction." *IRB-Brasil Resseguros S.A. v. Portobello Int'l Ltd.*, 59 A.D.3d 366, 366-67 (1st Dep't. 2009) *quoting Paramount Pictures v. Blumenthal*, 256 App.Div. 756, 759 (1st Dept.1939), *appeal dismissed* 281 N.Y. 682 (1939). *See also Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*, 263 A.D.2d 384, 384 (1st Dep't 1999) (affirming the denial of a preliminary injunction "since the doctrine of comity militates against staying proceedings previously commenced in a foreign court of competent jurisdiction. . . and the additional expense and trouble of litigating in a foreign court is insufficient to warrant an injunction."). There has been no such showing in this case and therefore, the preliminary injunction must be denied.

## C. Orly Genger Has Failed to Demonstrate a Clear Right to Preliminary Injunction

"Preliminary injunctive relief is a drastic remedy and will only be granted if the movant establishes a clear right to it under the law and the undisputed facts found in the moving papers." *Koultukis v. Phillips*, 285 A.D.2d 433, 435 (1st Dep't. 2001) (citation omitted)(emphasis added). As the Court of Appeals explained, "in order to be entitled to a preliminary injunction, plaintiffs ha[ve] to show [1] a probability of success, [2] danger of irreparable injury in the absence of an injunction, and [3] a balance of the equities in their favor." *Aetna Ins. Co. v. Capasso*, 75 N.Y.2d 860, 862 (1990) *citing Grant Co. v. Srogi*, 52 N.Y.2d 496, 517 (1981). *See also* CPLR § 6301. *Nowhere* in Orly Genger's brief does she address these criteria. And nowhere in her motion papers is there evidence that meets those standards.

8

### a. **Orly Has Failed To Demonstrate a Likelihood of Success on the Merits**

"[T]he threshold inquiry is whether the proponent has tendered sufficient evidence demonstrating ultimate success in the underlying action." *1234 Broadway LLC v. W. Side SRO Law Project*, 86 A.D.3d 18, 23-24 (1st Dep't. 2011) *citing Doe v. Axelrod*, 73 N.Y.2d 748 (1988). "[A] party seeking the drastic remedy of a preliminary injunction must [nevertheless] establish a clear right to that relief under the law and the undisputed facts upon the moving papers." *Id.*

In this action, Orly brings three claims against Dalia:

1. an action for the imposition of a constructive trust on the 1,102.80 shares of TRI stock that TPR sold to the Orly Trust *in favor of Arie* (the Second Cause of Action)[13],

2. a claim for Unjust Enrichment and Rescission (the Fourth Cause of Action), and

3. a Preliminary Injunction (the Fifth Cause of Action).

In this case, "the plaintiff[ ] offered nothing more than conclusory allegations concerning [her] claim[s] . . . . When 'there are key facts in dispute, the motion for a preliminary injunction [should be] denied.'" *Merrell Benco Agency, Inc. v. Safrin*, 231 A.D.2d 614 (1st Dep't 1996) *quoting Price Paper & Twine Co. v. Miller*, 182 A.D.2d 748 (2d Dep't 1992). The legal deficiencies in Orly's claims were fully briefed in Dalia Genger's Motion to Dismiss, which is pending before this court.[14] We incorporate the arguments raised in our motion to dismiss herein

---

[13] *Arie Genger et al., v. Sagi Genger et al.*, Index No. 651089/10, Third Amended Compl. (filed Sept. 20, 2011):

> 195.  Upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Orly Trust TRI shares, **a constructive trust was immediately created in favor of Arie** with respect to the Orly Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Orly Trust's right to receive the Orly Trust TRI Shares upon Arie's death.

*Emphasis added.*

[14] Motions to Dismiss setting forth similar arguments were also raised by the other defendants in this action: The Trump Group, TPR, and Sagi Genger. Since this is *Orly's* motion for a preliminary injunction we will address the claims that *Orly* has brought since Arie's claims should not be a basis for the issuance of a preliminary injunction on Orly's behalf.

9

to demonstrate that this action is unlikely to succeed on the merits.

Further, Orly's claims are unlikely to succeed in this action as she lacks standing. Orly

purportedly brings these claims on behalf of the Orly Genger Trust, however, Orly, as

beneficiary, is not authorized to bring such an action. The First Department has held that:

> In an action brought by a beneficiary on behalf of the trust, the
> beneficiary must show why he has the right to exercise the power,
> which the law and the trust agreement in the first instance confide
> in the trustees, to bring a suit on behalf of the trust. This will
> normally require either a showing of a demand on the trustees to
> bring the suit, and of a refusal so unjustifiable as to constitute an
> abuse of the trustee's discretion, or a showing that suit should be
> brought and that because of the trustees' conflict of interest, or
> some other reason, it is futile to make such a demand.

*Velez v. Feinstein*, 87 A.D.2d 309, 315 (1st Dep't 1982). In addition, the Delaware Supreme

Court acknowledged that Orly is not an "authorized representative of the Orly Trust." *See*

*Genger v. TR Investors, LLC*, 592, 2010, 26 A.3d 180, 202-03 (Del. July 18, 2011) ("A separate

consent, by an authorized representative of the Orly Trust, was required to accomplish [*in*

*personam* jurisdiction over the Trust], and there is no evidence or claim that such consent was

ever obtained.").

Dalia is the Trustee of the Orly Genger Trust. "'Where a claim exists in favor of the trust

. . . the trustees are under a duty to enforce that claim and [when they] have improperly and

unjustifiably failed to do so, the beneficiaries may bring a suit on behalf of the trust. . . .'" *BNP*

*Paribas Mortg. Corp. v. Bank of Am., N.A.*, 10 CIV. 8630 RWS, 2011 WL 3847376 at *8

(S.D.N.Y. Aug. 30, 2011) *quoting Velez*, 87 A.D.2d at 314. There is no evidence and thus can be

no finding that Dalia, as Trustee of the Orly Trust, has failed to act on the Orly Trust's behalf.

Indeed, Dalia, as Trustee of the Orly Trust, has commenced an action to declare that the Orly

Trust is the beneficial owner of the TRI shares transferred by TPR. *Dalia Genger v. TR*

*Investors, LLC et al.* (Del. Ch. 6906-CS. filed Oct. 4, 2011) Meister Aff. Ex. C. Similarly, in the

interpleader action commenced by Escrow Agent Pedowitz & Meister pending before Judge

Keenan in the Southern District of New York, Dalia has vigorously defended the Orly Trust's

rights by bringing a crossclaim against all defendants seeking to have the Orly Trust declared the

beneficial owner of the 1,102.8 shares of TRI. *See* Answer & Crossclaim of Dalia Genger,

*Pedowitz & Meister v. TPR Inv. Assoc., Inc. et al.,* 11 civ. 1502 (JFK) (S.D.N.Y. filed Nov. 1,

2011); Meister Aff. Ex. D. And Dalia Genger also commenced a separate action against Arie

Genger to get damages for the Orly Trust for Arie Genger's breach of his divorce settlement

agreement if it is ultimately held that he did not successfully cause TPR to transfer the TRI

shares to the Orly Trust. Dalia Genger Aff., ¶5.

Although Orly is purportedly suing on behalf of the Orly Trust in this action, her

complaint tells a much different story: that of a daughter in thrall to her father and <u>his</u> interests.[15]

The complaint seeks to *divest* the Orly Trust of substantial rights and give these rights to her

father, Arie. The complaint seeks a declaration that Arie, through his ownership of what they

call TPR2, is the beneficial owner of the Orly Trust's TRI stock and seeks a constructive trust of

these shares *against* the Orly Trust in Arie Genger's favor.[16]

During the proceedings before the Delaware Chancery Court, it was noted that Orly

Genger was "clearly working in concert with [her father, Arie Genger] on a joint legal strategy."

---

[15] Significantly, at the October 26, 2011 hearing before the Court, Orly Genger's Counsel, Yoav Griver, Esq., referred to the time consumed by this case by stating "My wife asked how my marriage to *Arie Genger* was going."

[16] Significantly, Orly takes a completely different position with respect to the $10.3 million placed in escrow on the Trump Group purported purchase of these same TRI shares. Her counsel notified the Escrow Agent of Orly's position that "Orly Genger maintains that the [Orly] Trust (and Orly Genger, as beneficiary) has a beneficial interest in" those funds, see Meister Aff. Ex. E, which could interest only arise if the Trump Group had validly purchased the TRI shares. (That notice led to the federal interpleader action that will determine who is entitled to the $10.3 million based on who has the beneficial interest in the shares.

*TR Investors, LLC v. Genger*, CIV.A. 3994-VCS, 2010 WL 3279385 (Del. Ch. Aug. 9, 2010)

*rev'd,* 592, 2010, 26 A.3d 180 (Del. July 18, 2011). Here it is no different.

Additionally, although the first count of the Third Amended Complaint, the reformation

claim, was brought solely by <u>Arie</u> and not Orly, Orly's Counsel told this Court that this action

was same as the suit Dalia commenced on behalf of the trust in the Delaware. But the Arie's

first count, seeking reformation of the Divorce Stipulation Agreement, is unlikely to succeed on

the merits. This Court has expressly stated that Arie's reformation claims are unlikely to succeed

on the merits. In your Honor's decision granting a preliminary injunction against TPR, he stated:

> Clearly, if the Delaware Supreme Court affirms the ruling of the Chancery Court,
> the TRI shares purchased by the Trump Group will no longer be owned by TRP
> [*sic.*], and Arie's request to rescind or reform the 2004 transfers such that he can
> be reinstated retroactively as the indirect owner of the TRI shares (through TPR]
> will be rendered impossible. . . .

*Arie Genger et al. v. Sagi Genger et al.*, Index No. 651089/2010 Decision and Order (Feb. 17,

2011); Meister Ex. A. As we now know, the Delaware Supreme Court affirmed the Chancery

Court's ruling. Thus, Arie's reformation claim is "impossible."

Although additional reasons why Arie's reformation claim is unlikely to succeed were

articulated in our motion to dismiss pending before this Court, to which we respectfully refer, it

is important to note that

> Before [a party] 'can be granted reformation, (it) must establish (its) right to such
> relief by clear, positive and convincing evidence. Reformation may not be granted
> upon a probability nor even upon a mere preponderance of evidence, but only
> upon a certainty of error' *Amend v. Hurley*, 293 N.Y. 587, 595, 59 N.E.2d 416,
> 419; 6 N.Y. Jur., Reformation of Instruments, s 49, p. 598).

*E. Air Lines, Inc. v. Trans Caribbean Airways, Inc.*, 29 A.D.2d 379, 382 (1st Dep't. 1968) *aff'd*

23 N.Y.2d 709 (1968). Further, it is unlikely that Arie can prove "by clear, positive, and

convincing evidence" that there was a mutual mistake of fact as to the transfers of TRI stock in

the Divorce Stipulation Agreement. See Dalia Genger Aff. ¶2.

The Delaware Supreme Court found "[w]hen [Arie] effectuated the 2004 Transfers, [he] knew that neither Trust was a 'Permitted Transferee' of the [TRI] shares under the Stockholders Agreement." *Genger v. TR Investors, LLC,* 592, 2010, 26 A.3d 180, 202-03 (Del. July 18, 2011). Therefore when Arie warranted in the Divorce Stipulation Agreement that no consents were needed, "[t]hat representation was false." *Id.*

"The burden upon a party seeking reformation is a heavy one since it is presumed that a deliberately prepared and executed written instrument accurately reflects the true intention of the parties: '[T]he proponent of reformation must show in no uncertain terms not only that mistake or fraud exists, but exactly what was really agreed upon between the parties.'" *Greater New York Mut. Ins. Co. v. United States Underwriters Ins. Co.,* 36 A.D.3d 441 (1st Dep't. 2007) (citation omitted). As shown in our motion to dismiss it and in Dalia Genger's Aff., ¶2, it is highly unlikely that Arie will succeed on this claim. Since this claim is the basis of Orly's Counsel's argument that the Delaware ligation is duplicative, the court should not grant the preliminary injunction as it is first, not bought by Orly and second, unlikely to succeed.

### b.  **Orly Has Failed To Demonstrate Irreparable Injury**

Orly, as the party seeking the preliminary injunction, has the burden of proving irreparable injury. *See e.g. Aetna Ins. Co. v. Capasso,* 75 N.Y.2d 860, 862 (1990) ("*plaintiffs* had to show a. . . danger of irreparable injury") (emphasis added). "Conclusory statements lacking factual evidentiary detail warrant denial of a motion seeking a preliminary injunction." *1234 Broadway LLC v. W. Side SRO Law Project,* 86 A.D.3d 18, 23-24 (1st Dep't. 2011) *citing Village of Honeoye Falls v. Elmer,* 69 A.D.2d 1010 (4th Dep't. 1979 ).

"Where the threatened harm is a competing legal proceeding, a preliminary injunction may be denied if the same legal claims or defenses can be asserted in that proceeding." 13

13

Weinstein, Korn, & Miller ¶ 6301.15 *See also Leif B. Pederson, Inc. v. Weber*, 128 A.D.2d 453,

454-55 (1ˢᵗ Dep't. 1987) (reversing the issuance of a preliminary injunction as "CPLR 6301

allows a preliminary injunction only when defendant might violate plaintiff's rights regarding the

subject of the action, or when plaintiff might do something to interfere with or render a judgment

ineffectual. . . . absent sound reasons, a court generally should not deprive a plaintiff of the right

to sue in a forum of her choice").   Here, the claims asserted by Dalia, in her capacity as Trustee

of the Orly Genger Trust are the only claims that are seeking to declare the Trust the beneficial

owner of the TRI shares.  Bearing this in mind, there is no threat of irreparable injury that

warrants issuing this injunction.  The only potentially serious injury posed to the Orly Trust is

permitting the Trust's beneficiary, Orly Genger, to forfeit the Trust's substantial rights in favor

of her father.

### c. **Orly Has Failed to Prove that the Balance of Equities Weighs in Her Favor**

Orly has not met her burden in demonstrating that the balance of equities weigh in her

favor.  It "must be shown that the irreparable injury to be sustained . . . is more burdensome [to

the plaintiff] than the harm caused to defendant through imposition of an injunction."

*McLaughlin, Piven, Vogel, Inc. v. W.J. Nolan & Co., Inc.*, 114 A.D.2d 165, 174 (2d Dep't.

1986).  Orly, in this action, is not seeking a declaration that the Orly Trust is the beneficial owner

of the TRI shares.  "'Where a claim exists in favor of the trust . . . the trustees are under a duty to

enforce that claim. . . .'" *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 10 CIV. 8630 RWS,

2011 WL 3847376 at *8 (S.D.N.Y. Aug. 30, 2011) *quoting Velez*, 87 A.D.2d at 314.  By

commencing the Delaware litigation, Dalia is fulfilling her duties as trustee.

Public Policy weighs against the granting of this injunction.  "A preliminary injunction

substantially limits a defendant's rights and is thus an extraordinary provisional remedy requiring

14

a special showing." *1234 Broadway LLC v. W. Side SRO Law Project*, 86 A.D.3d 18, 23 (1[st]

Dep't 2011) *quoting Margolies v. Encounter, Inc.*, 42 N.Y.2d 475, 479 (1977). "[A] court

generally should not deprive a plaintiff of the right to sue in a forum of her choice." *Leif B.

Pederson, Inc. v. Weber*, 128 A.D.2d 453, 454-55 (1st Dep't 1987).

Moreover, if the Court does not issue a preliminary injunction enjoining the Trump

Group from prosecuting their counterclaims in the Delaware action that would withstand an

immediate appeal, the Orly Trust would be enjoined from responding to those counterclaims

which could allow the matter to be decided on default or other motion, to the great detriment of

the Orly Trust.

## II.    Orly Must Post a Substantial Undertaking for any Preliminary Injunction.

A preliminary injunction is "a drastic remedy because it requires a party either to refrain

from certain conduct or to perform certain acts before the party's obligations have been

definitively adjudicated. Thus, a preliminary injunction "should be issued cautiously and in

accordance with appropriate procedural safeguards." *Uniformed Firefighters Ass'n of Greater

New York v. City of New York*, 79 N.Y.2d 236, 241 (1992). "To afford reasonable protection to

the defendant against an erroneous or improper grant of this special provisional remedy, the

plaintiff as beneficiary thereof is *required* to post an undertaking in an amount fixed by the

court." *Margolies v. Encounter, Inc.*, 42 N.Y.2d 475, 479 (1977)(emphasis added).

Accordingly, CPLR § 6312(b) requires that:

> prior to the granting of a preliminary injunction, the plaintiff shall give an
> undertaking in an amount to be fixed by the court, that the plaintiff, if it is finally
> determined that he or she was not entitled to an injunction, will pay to the
> defendant all damages and costs which may be sustained by reason of the
> injunction

Therefore, "[i]f it is later finally determined that the preliminary injunction was improperly granted there will then be a ready source from which the defendant may recover for damages which he may have sustained." *Margolies*, 42 N.Y.2d at 479.

The undertaking in this case should be at least equal to the value of the TRI shares at issue[17] plus an amount sufficient to reimburse the Orly Trust in the event the order is determined to have been improvidently issued.

III.    **The Federal Court May Enjoin the Delaware Action in Favor of the Interpleader Action Pending Before Judge Keenan.**

In addition to the Delaware action, there is a federal statutory interpleader to determine who is entitled to the $10.3 million that the Trump Group paid in escrow for the TRI shares that TPR sold to the Orly Trust, which moneys have been paid into the federal court. *Pedowitz & Meister v. TPR Inv. Assoc., Inc. et al,* 11 civ. 1502 (JFK) (S.D.N.Y. filed Nov. 1, 2011); Meister Aff. Ex. F.

In that action, Dalia, as Trustee of the Orly Trust, has asserted a crossclaim seeking a judgment:

A.    Declaring that the Orly Trust is a protected purchaser and beneficial owner of the 1,102.80 shares of common stock of TRI sold to it by TPR;

B.    Declaring that the Orly Trust is entitled to all dividends declared or paid attributable to such shares since October 29, 2004; and

C.    Alternatively, awarding the Orly Trust the interpleaded funds, all interest thereon and any dividends paid to TPR attributable to such shares since October 29, 2004, if the Court declares that the Orly Trust is not the beneficial owner of such shares.[18]

---

[17] In her Second Amended Complaint, Orly Genger contends that the Orly Trust TRI shares are worth hundreds of millions of dollars. *See* Orly Genger v. Dalia Genger et al., Index No. 109749/09 Comp. ¶ 114 (N.Y. Co. Sup. Ct. filed August 11, 2010). At a bare minimum, the undertaking should be equal to the amount the Trump Group agreed to pay TPR for the Orly Trust's TRI shares, $10,314,005.

[18] Answer & Crossclaim of Dalia Genger p. 5, *Pedowitz & Meister v. TPR Inv. Assoc., Inc. et al,* 11 civ. 1502 (JFK) (S.D.N.Y. filed Nov. 1, 2011); Meister Aff. Ex. D.

If the Orly Trust's crossclaim in the interpleader action are successful, the Orly Trust will be declared the beneficial owner of the TRI shares; if they are *unsuccessful*, the Orly Trust will be entitled to the 10.3 million dollar escrowed fund, because TPR admitted that "TPR has relinquished in favor of the Orly Trust any economic interest in the TRI Shares, which includes any right to the interpleaded funds that might otherwise belong to TPR", "except for any rights that may exist by virtue of TPR being a creditor of the Orly Trust". Answer and Crossclaim of Dalia Genger, as Trustee, ¶4 and Reply thereto of TPR, ¶4.[19] Therefore, under <u>any</u> of the scenarios in the interpleader, the Orly Trust would obtain substantial rights immediately. This is significantly more than whatever speculative benefit the Orly Trust sought in this action.

On Friday, November 18th, we served a motion in the interpleader action asking that court to enjoin the defendants in that action, who included Orly Genger, from

A        from prosecuting the following actions: *Glenclova Investment Co. v. Trans-Resources, Inc.,* 08 civ. 7140 (JFK)(S.D.N.Y.); *Arie Genger & Orly Genger v. Sagi Genger et al.,* Index No. 651089/2010 (N. Y. Sup. Ct., N.Y. Co.); and *Dalia Genger, as Trustee of the Orly Genger 1993 Trust v. TR Investors LLC et al.,* Del Ch. Ct., C.A. 6906 – CS (Del. Ch. Ct.) until further order of this Court, except those parties may participate in any oral arguments in those actions of pending motions to dismiss such actions; and

B        from commencing any new action affecting the property, instrument or obligation involved in the statutory interpleader action.

Meister Aff. Ex. H.

---

[19]        Meister Aff. Ex. G.

## **Conclusion**

For the foregoing reasons, this Court should deny the motion for a preliminary injunction enjoining Dalia Genger.

Dated: November 21, 2011

Respectfully submitted,

PEDOWITZ & MEISTER, LLP

By: _____
Robert A. Meister
Marisa Warren
1501 Broadway, Suite 800
New York, NY 10036
212.403 .7330
Robert.meister@pedowitzmeister.com
Marisa.warren@pedowitzmeister.com
Attorneys for Dalia Genger

1

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK : TRIAL TERM:  PART 12
- - - - - - - - - - - - - - - - - - - - - - - X
ARIE GENGER and ORLY GENGER, in her
individual capacity and on behalf of
THE ORLY GENGER 1993 TRUST,

                              Plaintiffs,

                           - against -

SAGI GENGER, TPR INVESTMENT ASSOCIATES,
INC., DALIA GENGER, THE SAGI GENGER 1993
TRUST, ROCHELLE FANG, individually and
as trustee of THE SAGI GENGER 1993
TRUST, GLENCLOVA INVESTMENT COMPANY,
TR INVESTORS, LLC, NEW TR EQUITY I, LLC,
NEW TR EQUITY II, LLC, JULES TRUMP,
EDDIE TRUMP and MARK HIRSCH,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - X

Index No. 651089/2010

                         October 26, 2011
                         60 Centre Street
                         New York, New York 10007

B E F O R E:   HON.  PAUL G. FEINMAN, Justice


A P P E A R A N C E S:


MITCHELL SILBERBERG & KNUPP, LLP
Attorneys for Arie Genger
12 East 49th Street
New York, New York 10017
BY:  LAUREN J. WACHTLER, ESQ.
     PAUL D. MONTCLARE, ESQ.

ZEICHNER ELLMAN & KRAUSE, LLP
Attorneys for Orly Genger
575 Lexington Avenue
New York, New York 10022
BY:  YOAV M. GRIVER, ESQ.

                Debra Salzman, Official Court Reporter

```
 2    A P P E A R A N C E S:   (Cont'd)

 3

 4

 5    PEDOWITZ & MEISTER, LLP
      Attorneys for Dalia Genger
 6    1501 Broadway
      New York, New York 10036
 7    BY:   ROBERT A. MEISTER, ESQ.
            MARISA H. WARREN, ESQ.
 8

 9

10

11                                    Debra Salzman, RMR
                                       Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26
```

| | |
|---|---|
| 1 | Proceedings |
| 2 | A F T E R N O O N   S E S S I O N |
| 3 | THE COURT:  Back so soon. |
| 4 | MS. WACHTLER:  Apologize for that. |
| 5 | THE COURT:  So what's happening? |
| 6 | Dalia has gone to court. |
| 7 | MR. GRIVER:  Dalia has gone to court, but not |
| 8 | here; she's gone to court in Delaware.  And we are asking |
| 9 | the Court to put in a temporary restraining order and to |
| 10 | enjoin Dalia from continuing to prosecute her duplicative |
| 11 | action. |
| 12 | In my papers I cite cases and it's is clear that |
| 13 | the Court has the equitable power to enjoin Dalia in order |
| 14 | to protect Orly, protect the court and preserve this |
| 15 | court's jurisdiction.  And so I think I'm going to spend a |
| 16 | little time talking to you about why the Court should |
| 17 | impose a TRO. |
| 18 | First, there's no question that the case that |
| 19 | Dalia started is duplicative.  It has the exact same legal |
| 20 | issue as what's before the Court in the 2010 matter, the |
| 21 | beneficial ownership of the TRI shares.  That's it.  If you |
| 22 | compare the first count of the third amended complaint |
| 23 | before your Honor and the first count of Dalia's case in |
| 24 | Delaware, they're the same.  They both make claims as to |
| 25 | who owns the beneficial ownership of the exact same shares. |
| 26 | More importantly, there's no reason that the case |

4

```
 1                          Proceedings

 2     should be in Delaware.  Everything is in New York and this

 3     is where this issue should be decided.  Dalia isn't a

 4     resident of Delaware.  She lives in New York.  Orly lives

 5     in New York.  The Orly Trust is a New York trust.

 6                THE COURT:  There aren't too many places in

 7     Delaware -- I shouldn't say this on the record -- there are

 8     a couple of beautiful places in Delaware along the shore,

 9     Bethany, I think, is the name of the town, and Rehoboth,

10     Delaware and some of the towns up along that coastline are

11     beautiful.  And other than the credit cards, you like to be

12     in Wilmington, there's not too many places to --

13                MS. WACHTLER:  You're not convincing me.

14                THE COURT:  The shoreline is beautiful.  But any

15     way, you're right, they don't live in Delaware.

16                MR. GRIVER:  They don't.  The Orly Trust, it

17     calls for the application of New York law.  TPR is located

18     in New York.  All the contracts at issue are located in New

19     York.  The stipulation and divorce decree is New York.  The

20     divorce is a New York divorce.  The marriage was a New York

21     marriage.  All the parties necessary for determination of

22     this issue are before this Court.

23                THE COURT:  If they had gone to a bet din in

24     Israel then maybe we wouldn't have had all these problems.

25                MR. GRIVER:  Maybe.  But Orly chose to be here.

26     All kidding aside, Orly chose to be here and she chose to
```

| | |
|---|---|
| 1 | Proceedings |
| 2 | be here 15 months ago.  She asked this court to decide |
| 3 | this.  Dalia is in this court.  The Orly Genger Trust is in |
| 4 | this court.  There are parties that should be part of this |
| 5 | decision, a part of this adjudication that are not in |
| 6 | Delaware.  Orly, for example, is not part of that suit. |
| 7 | Arie is not part of that suit. |
| 8 | You know, I made a list of all of the reasons |
| 9 | that this case should be in New York and then I made a list |
| 10 | of why this case is now in Delaware and I came up with one, |
| 11 | and that's Chancellor Strine.  Delaware should be the last |
| 12 | place that the Orly Trust would want to be because |
| 13 | Chancellor Strine, as you know from the papers, or perhaps |
| 14 | you don't, already ruled on this issue and ruled against |
| 15 | the Orly Trust. |
| 16 | The Orly Trust actually has that as part of her |
| 17 | complaint in the action that she's brought.  She actually |
| 18 | talks about the fact that the court that she chooses to be |
| 19 | in front of has already ruled against her.  That's |
| 20 | paragraph 34 of her complaint.  And she's absolutely right, |
| 21 | because this court ruled in paragraph 8 of its final |
| 22 | judgment that TPR owned the trust, not -- that TPR owned |
| 23 | the TRI shares, not the Orly Trust.  And what this case is |
| 24 | designed to do, your Honor, is get this case in front of a |
| 25 | judge that has already decided this issue against the |
| 26 | trust. |

1                              Proceedings

2              Now, granted, it should not have made that

3      decision.  It made that decision as part of an in rem

4      proceeding.  It had no right to make that decision.  The

5      Delaware Supreme Court reversed it and they reversed it

6      saying, look, you don't have, among other things,

7      jurisdiction over the Orly Trust.

8              So Dalia did that.  And just last night, your

9      Honor, the Trump Group filed an answer to a motion to

10     dismiss.  And on page 31 of their brief --

11             THE COURT:  Motion to dismiss in Delaware.

12             MR. GRIVER:  Yes, the motion to dismiss the

13     Delaware action.  They tried to bring a plenary proceeding

14     and that's being opposed because --

15             MR. MEISTER:  Excuse me.  That's not the Orly

16     action.

17             MR. GRIVER:  This is another case in Delaware.

18             THE COURT:  Okay.

19             MR. GRIVER:  That involves the Trump Group and

20     the attempt to sue TPR and Arie Genger over the Arie Genger

21     portion of the TI shares.

22             THE COURT:  Okay. Arie Genger.

23             MR. GRIVER:  Yes.  And Arie Genger has moved to

24     dismiss saying, among other things, "You don't have

25     jurisdiction over me.  You don't have personal jurisdiction

26     over me."

Debra Salzman, Official Court Reporter

```
 1                          Proceedings
 2              But the Trump Group filed papers there and they
 3      said -- and this is on page 31.  I'll give a copy to you
 4      and your Honor, if you'd like -- they say the Orly Trust is
 5      now before this court.  And they drop a footnote and they
 6      say, "On October 4, 2011, Dalia Genger, as trustee, filed
 7      an action in this court on the Orly Trust behalf seeking a
 8      determination as to beneficial ownership and, accordingly,
 9      this court now has the power to make these decisions."
10              This could not have been an accident.  This has
11      to have been the intent.  And, your Honor, the cases are
12      clear that in a situation like this, the first filed
13      authority, that is you, protects its authority and the
14      desire --
15              THE COURT:  It's about time I won something,
16      right?
17              MR. GRIVER:  And the desire of Orly Genger.
18              And, finally, you have to ask yourself, why is
19      Dalia doing this?  And more importantly, is Dalia really
20      going to protect the Orly Trust?
21              THE COURT:  Better going into it having the judge
22      on your side, right?  She knows that.
23              MR. GRIVER:  I think the Court has to ask itself
24      who is more likely to protect the assets of the Orly Genger
25      Trust; is it Orly Genger, the beneficiary, or is it Dalia
26      Genger as trustee?
```

```
 1                         Proceedings
 2              And the Court knows because we've put it out
 3    before you --
 4              THE COURT:  Well, let me ask you.  I haven't
 5    asked this before.  But if you are so convinced that Dalia
 6    is set about ruining her daughter financially or helping
 7    the brother ruin the daughter financially, why not go back
 8    to the Surrogate's Court and renew your application to
 9    remove her?
10              MR. GRIVER:  You know, we thought about that, but
11    there's differences between the two actions.  There's a
12    reason why there are two actions.  We are seeking to remove
13    Dalia.  What Dalia has done is going to be placed on top of
14    everything else she has done as a reason that she needs to
15    be removed.  But the issue of the beneficial ownership of
16    the shares is before this Court and the issue of the
17    beneficial ownership of the shares Dalia is now trying to
18    place in front of the Delaware court.
19              THE COURT:  I understand the issue.  I was just
20    wondering.
21              MR. GRIVER:  We will make this known to the
22    Surrogate Court.  The Surrogate Court is in the midst of
23    its application.  It is moving at its own speed.  What we
24    need is we need a TRO to protect --
25              MS. WACHTLER:  December.
26              MR. GRIVER:  -- there's been a motion to dismiss
```

| | |
|---|---|
| 1 | Proceedings |
| 2 | pending since, I believe, December 12th of 2010, with all |
| 3 | deliberate speed. |
| 4 | THE COURT: The 60-day rule doesn't apply there. |
| 5 | MS. WACHTLER: I don't think any rules apply in |
| 6 | the Surrogate's Court. |
| 7 | MR. GRIVER: Mr. Meister practices there more |
| 8 | than I do. |
| 9 | THE COURT: 120 is on the outside. |
| 10 | MR. MONTCLARE: That court is very overworked, |
| 11 | Judge, really, truthfully. |
| 12 | MR. GRIVER: There are only two surrogates. |
| 13 | THE COURT: They have a staff that I tell you is |
| 14 | unrivaled. It is what it is. Okay. |
| 15 | MR. GRIVER: It is what it is. |
| 16 | THE COURT: The bottom line is you have the |
| 17 | application pending. I didn't remember that or maybe I |
| 18 | didn't know that and that's why I didn't remember that. |
| 19 | MR. GRIVER: Right. We do have an application |
| 20 | pending and we actually put in an affidavit from Judith |
| 21 | Seigel-Baum, who is Orly's lawyer in the surrogate |
| 22 | proceeding, to explain the difference between the two |
| 23 | actions and why this is the only court who can protect Orly |
| 24 | in this case. She can't go to Delaware without placing |
| 25 | herself under the jurisdiction of that court, which she |
| 26 | does not want to do. |

```
 1                              Proceedings
 2              THE COURT:  She doesn't want to do it for the
 3     same reason they want to do it.  I understand that.
 4              MR. GRIVER:  But she's faced with a Hobson's
 5     choice.
 6              THE COURT:  Who was it who said, you know, the
 7     goal here is to get everything in one court with
 8     jurisdiction.  Was that the Southern District who dropped
 9     that footnote?
10              MR. GRIVER:  That was the Delaware Supreme Court
11     suggested New York.
12              THE COURT:  Right.
13              MR. GRIVER:  Justice Solomon a few weeks ago --
14              THE COURT:  I think they actually suggested the
15     Southern District.
16              MR. MONTCLARE:  Like a court in New York like the
17     Southern District.  And the reason for that, Judge, just so
18     you know, is that in the briefing that was brought up by
19     the other side that there's already a case in the Southern
20     District.
21              MR. GRIVER:  Right.  But all of the cases that I
22     cite stand for the proposition that a court has equitable
23     power to do this and must do this because it should not
24     permit another court proceeding to interfere with its
25     determination of issues that are already before it.
26              THE COURT:  The question is, whether it would
```

| | |
|---|---|
| 1 | Proceedings |
| 2 | render any order that I might issue ineffectual. |
| 3 | So what say you? |
| 4 | MR. MEISTER: Let me answer in similar aspects. |
| 5 | First, just to apprise the Court, this morning, |
| 6 | in the Delaware action, the Trump Group and TRI filed an |
| 7 | answer and counterclaim seeking a determination from that |
| 8 | court. The Orly Trust does not beneficially own the |
| 9 | shares. So issue is joined, addressed to the question of |
| 10 | the stay, which would prohibit Dalia from prosecuting the |
| 11 | Delaware action. If that stay were granted, presumably she |
| 12 | wouldn't respond to the counterclaim. |
| 13 | So I think starting with a balance of harms -- |
| 14 | THE COURT: Well, wait a minute. |
| 15 | There's a stay in effect. It's not like she's |
| 16 | going to lose her right to reply if and when such stay is |
| 17 | vacated. I mean I'm not expert on Delaware civil |
| 18 | procedure, but I can't imagine a code that would -- |
| 19 | Delaware is a great court of equity, the chancellor's |
| 20 | court, that's going to say you lose your right to reply to |
| 21 | a counterclaim because you were stayed. |
| 22 | MR. MEISTER: I don't know, your Honor. We just |
| 23 | found out about it literally this morning. |
| 24 | THE COURT: That may not be your strongest |
| 25 | argument, that she's going to lose her right to respond to |
| 26 | the counterclaim because I find that hard to believe. |

| | |
|---|---|
| 1 | Proceedings |
| 2 | MR. MEISTER:  Let me then answer on the |
| 3 | question -- |
| 4 | THE COURT:  If necessary, you could always |
| 5 | fashion a stay such that "but for her right to file her |
| 6 | reply to a counterclaim," you know. |
| 7 | MR. MEISTER:  Let me answer then on, if you will, |
| 8 | the points under the heading of probability of success of |
| 9 | this motion. |
| 10 | First, my colleague says that this action before |
| 11 | your Honor seeks the determination of the beneficial |
| 12 | ownership and cites the first count in the complaint.  The |
| 13 | first count -- I have it in front of me -- Orly is not a |
| 14 | party to.  It's a claim by Arie that seeks, in effect, to |
| 15 | undo the whole kit and caboodle from the divorce. |
| 16 | Arie and Orly are parties on the second count. |
| 17 | The second count, even more tellingly, doesn't seek to |
| 18 | recover the TRI shares for the Orly Trust any more than the |
| 19 | first does.  The second count seeks to recover the TRI |
| 20 | shares, if you will, for Arie.  They seek a constructive |
| 21 | trust against the Orly Trust in favor of Arie. |
| 22 | And what that seeks in those two counts is that |
| 23 | the TRI shares go back to TPR and that TPR shares go back |
| 24 | to Arie for his life.  In other words, this is an attempt |
| 25 | to renegotiate the seven-year-old divorce settlement |
| 26 | agreement. |

Debra Salzman, Official Court Reporter

| | |
|---|---|
| 1 | Proceedings |
| 2 | But what it isn't is, it isn't a claim seeking to |
| 3 | recover for the Orly Trust the TRI shares, as Orly in her |
| 4 | affidavit in support of the motion here says.  Those |
| 5 | issues, with much respect, are not before your Honor.  They |
| 6 | haven't been brought before your Honor.  In fact, the Orly |
| 7 | Trust is not before your Honor. |
| 8 | Dalia Genger is a defendant in the action in her |
| 9 | capacity as, if you will, former wife and party to the |
| 10 | separation stipulation and the attempt to undo seven years |
| 11 | of whatever, due to Arie's concealing the fact that there |
| 12 | was a consent needed from the Trumps. |
| 13 | I would add as further evidence of this that TRI, |
| 14 | the issuer of the shares in question, was not even added to |
| 15 | this action as a party until the supplemental summons was |
| 16 | filed on September 20th of this year. |
| 17 | Now, as to Orly Trust not being a party, I |
| 18 | emphasize that Dalia is a party in her individual capacity |
| 19 | and, respectfully, Orly, although she is a beneficiary, she |
| 20 | is not the sole beneficiary, as one of the affidavits says, |
| 21 | I think it's Ms. Seigel-Baum, who should know better |
| 22 | because my first motion to dismiss her complaint -- |
| 23 | petitioner, I should say -- in the Surrogate Court, was the |
| 24 | failure to join the other beneficiary, which is a |
| 25 | contingent beneficiary coming into existence if she doesn't |
| 26 | have children during her life. |

Debra Salzman, Official Court Reporter

| 1 | Proceedings |

2        But it's a basic question of trust law.  The

3    trustee has discretion to do things with the corpus of the

4    trust of which the attempts to get these shares declared

5    beneficially owned by the trust is quintessentially a right

6    of the trustee.  It's not the beneficiary.

7        The fact that the trust agreement says it's

8    governed by New York law is interesting but irrelevant.  It

9    doesn't affect who owns the shares.  The fact that the

10   beneficiary happens to live here and in fact the trustee

11   happens to live here is also irrelevant.

12       In essence -- oh, the last thing I should say is

13   to the degree that there are claims asserted in this action

14   before your Honor, all of the defendants have moved to

15   dismiss those claims.  And at the request of counsel for

16   Arie, the briefing on that was extended so that those

17   motions won't be fully briefed until December 9th.

18       Respectfully, I can't speak for the other ones.

19   We feel pretty confident about our motion to dismiss the

20   motion to, in effect, undo the divorce, which is what Dalia

21   is being sued for in this action.

22       Some of the moving affidavits, particularly

23   Ms. Seigel-Baum's, talks about the other action --

24            THE COURT:  Why the rush in Delaware?

25            MR. MEISTER:  Why the rush?

26            THE COURT:  Yes.

| | |
|---|---|
| 1 | Proceedings |
| 2 | MR. MEISTER:  I don't know -- |
| 3 | THE COURT:  Why not let this work its way through |
| 4 | and why, at the end of the day, if Delaware needs to rule, |
| 5 | let them. |
| 6 | MR. MEISTER:  Well, the end of what day, your |
| 7 | Honor?  The issues aren't before your Honor. |
| 8 | THE COURT:  The end of the case -- well, so say |
| 9 | you, not so say them. |
| 10 | MR. MEISTER:  Well, that's true.  They don't say |
| 11 | that but their pleading does.  Your Honor, respectfully, is |
| 12 | bound by the pleading, not by what my colleague across the |
| 13 | way suddenly says is before your Honor and is not before |
| 14 | your Honor.  It is before Judge Keenan in the Southern |
| 15 | District of New York where they have made an application |
| 16 | for permission to make a motion to dismiss or stay.  That |
| 17 | will be discussed with Judge Keenan November 3rd. |
| 18 | MR. MONTCLARE:  That's a motion to stay based on |
| 19 | abstention. |
| 20 | MR. MEISTER:  Among other grounds -- that's |
| 21 | solely?  Okay.  I haven't seen your motion yet. |
| 22 | MR. GRIVER:  It's abstention based on the fact |
| 23 | that this is a New York divorce proceeding and federal |
| 24 | courts generally give deference to a New York court. |
| 25 | MR. MONTCLARE:  And even under Colorado River |
| 26 | abstention, Judge, which is basically there's two exact set |

```
 1                        Proceedings

 2     of motions filed in both courts on the same day with the

 3     same return dates, you're going to have two courts -- and

 4     they're very complicated motions -- it's just senseless to

 5     proceed in two courts.

 6             THE COURT:  What if the other judge is smarter

 7     than I am, should I let him do it or her?

 8             MR. MEISTER:  He's probably wondering the same

 9     question in the obverse.

10             MR. MONTCLARE:  We're sitting with Judge Keenan

11     on, I think, next Thursday.

12             MS. WACHTLER:  On November 3rd.

13             MR. MONTCLARE:  And he's going to address our

14     abstention motion and a briefing schedule generally on the

15     motions to dismiss.

16             MR. MEISTER:  So returning to the question you

17     put to me.  Frankly, the reason to get this decided is to

18     get it decided, you know, this has been hanging around now

19     since 2008 when the Trumps first filed their first action.

20     I think the federal case has been pending since 2008.

21             If we can defeat the Trumps' argument that the

22     Orly Trust is precluded by collateral estoppel or

23     res judicata from contending that the shares belong to the

24     trust, and we hope we can, it puts us in a position to

25     negotiate with them because, when all is said and done,

26     there are two ways this can wind up.
```

Debra Salzman, Official Court Reporter

1           Proceedings

2           The shares can wind up --

3           THE COURT:  Now Dalia is going to stand up to the

4     Trumps on behalf of Orly's beneficial interest?

5           MR. MEISTER:  Yes.

6           THE COURT:  Okay.

7           MR. MEISTER:  I mean the action down there is not

8     to find out who owns the shares as they characterize it.

9     It seeks a declaration that the Dalia -- that the Orly

10    Trust is the beneficial owner of the shares.

11          Now, that may be a tough argument, even apart

12    from the collateral estoppel issues, which we feel a little

13    bit better about, and it may be a tough argument, but we're

14    entitled to try to make it.

15          If we make it, then the Trumps Group beneficially

16    own the shares and the trust does, which I think would

17    strengthen any hand in negotiation.  If for some reason it

18    loses, then we have an action, an interpleader action, as

19    your Honor knows, dealing with the $10.3 million which was

20    paid by the Trump Group, assuming they had the right to

21    purchase the shares.  And that would put at least

22    $10.3 million to the benefit of the trust, which at the

23    moment is sitting, you know, with a corpus solely of this

24    possible right, which we hope it is a right, to the TRI

25    shares.

26          If it gets the TRI shares, they will be sitting

```
 1                        Proceedings

 2       with shares which don't pay a significant dividend.  Any

 3       dividends that have been paid have been held in escrow, I'm

 4       told, shares that can't be sold to anyone, shares that are

 5       pieces of paper, if in fact they're pieces of paper now as

 6       opposed to bookkeeping, which would only have value to the

 7       organization, the trust, if someone buys them and as a

 8       practical matter, there ain't nobody going to buy these

 9       things but the Trumps.

10               So the name of the game seems to be either to

11       increase our leverage with the Trumps, on the one hand, or

12       to get the shares and sit there and hold them in the hopes

13       that the Trumps, in fact, do what counsel have represented

14       in court is their hidden intention, not the Trumps' counsel

15       mind you, of taking the company public for a billion

16       dollars $2 billion.  I've heard various figures thrown out.

17               But sitting around here and litigating in -- I

18       can't think of how many courts -- one, two, three, four,

19       five courts is not in anyone's interest and the Delaware

20       court seems able to move the case quickly and hopefully

21       with a favorable result.  Either way the trust will

22       benefit.

23               MR. MONTCLARE:  Just on behalf of Arie, and it's

24       very important that just --

25               MR. MEISTER:  Can I just object here because

26       Arie, with much respect, shouldn't be a party to this
```

| | |
|---|---|
| 1 | Proceedings |
| 2 | argument.  Arie is trying to take the shares away from -- |
| 3 | MR. MONTCLARE:  We have an interest in these |
| 4 | shares as well.  We have a voting interest in these shares |
| 5 | and I do have an interest and I have to correct absolute |
| 6 | mistakes you've just made. |
| 7 | The caption in this case is Orly individually in |
| 8 | her capacity as a beneficiary of the Orly Trust.  She's a |
| 9 | plaintiff in this case.  She's not a defendant in this case |
| 10 | and Dalia is in this case for the reasons that Mr. Meister |
| 11 | mentioned, but the main target here is the Trumps.  And the |
| 12 | idea is that in this constructive trust we believe that |
| 13 | Arie has a beneficial interest in the voting rights to |
| 14 | these shares.  He has a beneficial interest in his own |
| 15 | shares obviously. |
| 16 | In terms of the matrimonial case, again it's |
| 17 | skewed.  If you take a look at the relief we're requesting |
| 18 | in the first claim, in the reformation cases, we want to |
| 19 | put everything back to status quo ante, with the trust |
| 20 | having its percentages that it had indirectly before |
| 21 | through D & K, which the Court is aware, and that there be |
| 22 | distributions during the lifetime of Mr. Genger equal to |
| 23 | the exact percentage of the Orly Trust shares as they exist |
| 24 | now 19 percent and that only on death it's going to go to |
| 25 | Orly, and TPR is going to go back to being unowned by a |
| 26 | majority by Mr. Genger without any other assets in it but |

```
 1                           Proceedings

 2     TRI.

 3              It's a little complicated, Judge, but the reality

 4     is, is that the issue of beneficial ownership is going to

 5     be determined here.  The constructive trust issues are

 6     going to be determined here.  To suggest that it's a smart

 7     move because it's quicker to go to Delaware and that

 8     they're going to defeat a collateral estoppel decision by

 9     the judge who is reversed by the Delaware Supreme Court is

10     unlikely.

11              And what concerns me is -- and we can't prove

12     this here and I'm not blaming Mr. Meister -- but we think

13     that Sagi is behind all this with his little puppeteer

14     strings saying, "Okay, I'll fix all these problems.  We'll

15     get back to Delaware by, one, having TPR, who I control,

16     bringing a separate action in Delaware."  The Trump say,

17     "Oh yeah, and we'll sue Arie in Delaware."  And now

18     Mr. Meister's client Dalia, all of a sudden, says the trust

19     is going to go into Delaware.

20              And now all of a sudden they push everything back

21     to Delaware in a court which is an equity court.  It's not

22     dealing with issues relating to reformation.  It's not

23     dealing with the constructive issues that we're bringing

24     up.  And now we have this pleading where they're claiming

25     on the other side collateral estoppel.  And you know what

26     it sounds like to me, Judge.  It sounds like to me that
```

|   |   |
|---|---|
| 1 | Proceedings |
| 2 | there is no adversary proceeding here. |
| 3 | And you know -- and then what -- and the question |
| 4 | arises to me -- I'll be quiet -- is to why anybody |
| 5 | representing the Orly Trust interest or Orly's interests as |
| 6 | a beneficiary would intentionally select the court, the |
| 7 | only court in the world that has already formed an opinion |
| 8 | that she was not truthful in some way or another in her |
| 9 | testimony, which he rejected in the case there down in |
| 10 | Delaware, and who's made specific rulings adverse to her, |
| 11 | which have been reversed by the Delaware Supreme Court. |
| 12 | It's just very confusing to me. |
| 13 | MR. MEISTER:  Your Honor, may I just respond to |
| 14 | that? |
| 15 | THE COURT:  In a moment.  Let me hear Mr. Griver. |
| 16 | MR. GRIVER:  Let me just address some of the |
| 17 | things that Mr. Meister said so that Mr. Meister can |
| 18 | respond to both of us at once. |
| 19 | The reason I pointed out the first cause of |
| 20 | action in the third amended complaint before your Honor, |
| 21 | there's a second cause of action where Orly is asking for a |
| 22 | constructive trust on behalf of her trust, but if you look |
| 23 | at paragraph 181(5), it asks that Orly Trust and Sagi Trust |
| 24 | each be declared the owner of 24.5 percent of TPR, so |
| 25 | together they own the remaining 49 percent of TPR. |
| 26 | The reformation that they're seeking will protect |

1                        Proceedings

2      the Orly Trust because the TRI shares will be put back into

3      TPR and then the Orly Trust and the Sagi Trust will be

4      given the equivalent shares of TPR so that they will own

5      the same amount of TRI shares.

6               In a different way, they are asking that the Orly

7      Trust be given the TRI shares back.  So it is the exact

8      same lawsuit except we have more people and we have more

9      issues and we actually have context in New York.

10              As for the Orly Trust not being here because

11     Dalia is the trustee, this court already decided in the

12     2009 action before your Honor that Orly has the right to

13     bring an action on behalf of her trust as the sole actual

14     non-contingent beneficiary.

15              And Mr. Meister says that this is a situation of

16     trust law.  I would say it's simpler than that.  It's a

17     question of who do you trust.  And is Dalia really going to

18     be in Delaware fighting tooth and nail the way Orly is

19     fighting here to protect the Orly Trust?  I would suggest

20     to you that based on past is prologue, the answer is

21     absolutely not, not just in her choice to go to the worst

22     jurisdiction and get this case before the worst possible

23     judge in the United States of America, but if you think

24     about it look about what happened --

25              THE COURT:  Be careful what you say.  These

26     transcripts are put up on the Web.

                Debra Salzman, Official Court Reporter

| 1 | Proceedings |

2    MR. GRIVER:  They're going up on the Web and

3    they're being sent directly to Judge Strine.

4    MR. MONTCLARE:  They've already been sent to

5    Judge Strine.

6    MS. WACHTLER:  Everything we say in this court on

7    the record is put before Judge Strine too.

8    THE COURT:  Well, let him know that I actually

9    have vacationed many times in Delaware and think it's a

10   beautiful state on the coastline.

11   MS. WACHTLER:  Thank you for that help.

12   MR. GRIVER:  Mr. Meister said that the trust

13   doesn't really have anything except these potential

14   interests.  That's true.  But when Dalia became the trustee

15   of the trust, the trust had a corpus, it had assets.  Those

16   have been given away.  And the lawsuits about that where

17   the court has held that there are issues of fact as to

18   whether Dalia is acting with fraudulent intent in the

19   things that she do, you denied motions for summary judgment

20   brought by the defendants in the 2009 case.  Dalia has

21   acted to dissipate those assets and povertize Orly.

22   With regard to the TPI shares, she allowed Sagi

23   to enforce a D & K note that she had successfully argued to

24   another judge was never to be enforced.  With the TRI

25   shares she signed a piece of paper.  And what fiduciary

26   does this?  She signs a piece of paper that says the

| | |
|---|---|
| 1 | Proceedings |
| 2 | following:  You, Sagi -- who, by this time, is already in |
| 3 | litigation with Orly -- you, Sagi, may sell the TRI shares |
| 4 | to whomever you want, whenever you want, for whatever price |
| 5 | you want.  You don't have to tell me about it.  And I also |
| 6 | hereby absolve you of all liability.  I give you a full and |
| 7 | complete release for whatever you may do with this power, |
| 8 | with this unfettered power.  And I'm doing this as a |
| 9 | trustee of the trust. |
| 10 | If Dalia is successful in Delaware and the shares |
| 11 | go back into the trust, she signed a piece of paper that |
| 12 | says sell it, sell it for a penny to the beggar outside in |
| 13 | the street and it won't matter to me and I absolve you. |
| 14 | This is not the type of person that you want to |
| 15 | have deciding and fighting and clawing about this issue. |
| 16 | You want Orly here with Orly's counsel, the way Orly |
| 17 | intended 15 months ago when you were placed in charge of |
| 18 | this legal issue and you should not as a matter of equity, |
| 19 | as a matter of fairness, allow Dalia to do this and then go |
| 20 | into the Delaware court and be done with it. |
| 21 | There is no legitimate reason why Delaware is |
| 22 | chosen except to allow the Trump Group to win.  That is the |
| 23 | only possible answer for why they did this.  And because of |
| 24 | that, your Honor, because just as a general matter someone |
| 25 | should not be allowed to remove the jurisdiction of this |
| 26 | court in this way. |

| | |
|---|---|
| 1 | Proceedings |
| 2 | The general principle that says there should be |
| 3 | no duplicative litigation, because what the heck is the |
| 4 | Orly Trust doing spending money for another set of lawyers, |
| 5 | spending money on another litigation?  Why are they not |
| 6 | here with Mr. Meister, who is a capable and fantastic |
| 7 | attorney, fighting for the Orly Trust along with Orly? |
| 8 | That's the way it should be, that's the way it must be and |
| 9 | that's why this Court must grant the TRO. |
| 10 | And I hope Chancellor Strine reads that. |
| 11 | MR. MEISTER:  Okay. |
| 12 | THE COURT:  Careful what you wish for. |
| 13 | MR. MEISTER:  Two points I'd like to make. |
| 14 | First, let me quote, because my friend |
| 15 | Mr. Genger -- |
| 16 | MR. GRIVER:  Griver. |
| 17 | Are you talking about me? |
| 18 | MR. MEISTER:  To you. |
| 19 | MR. GRIVER:  Okay.  Griver. |
| 20 | THE COURT:  Genger is his client. |
| 21 | MR. MEISTER:  I'm sorry. |
| 22 | He says in the second count in this complaint |
| 23 | before your Honor seeks a constructive trust for the Orly |
| 24 | Trust.  Let me read you from page 63, the claim for relief, |
| 25 | subparagraph 3:  "Upon TPR becoming the record owner of the |
| 26 | 11,002 shares of TRI stock comprising the Orly Trust TRI |

| | |
|---|---|
| 1 | Proceedings |
| 2 | shares, a constructive trust was immediately created in |
| 3 | favor of Arie with respect to the Orly Trust shares." |
| 4 | MR. MONTCLARE:  Subject to the rights.  You have |
| 5 | to read the whole sentence.  It's unfair not to read the |
| 6 | whole sentence. |
| 7 | MR. MEISTER:  "Including but not limited to the |
| 8 | voting rights appertinent to such shares, all of which were |
| 9 | held by TPR for the benefit of Arie subject to the Orly |
| 10 | Trust's right to receive the Orly Trust TRI shares upon |
| 11 | Arie's death." |
| 12 | So it's not merely my paraphrasing.  Those are |
| 13 | the words and it seeks not a constructive trust in favor of |
| 14 | the Orly Trust.  It seeks a constructive trust imposed on |
| 15 | the Orly Trust in favor of Arie who is going to keep these |
| 16 | shares for life.  So as long as we're going to be factual. |
| 17 | Secondly, the question of being in a court which |
| 18 | found Orly to be untruthful, I would say two things about |
| 19 | that.  It's not my fault that she made up testimony which |
| 20 | was contradicted by her father when she testified that she |
| 21 | was at a meeting which her father said she wasn't at and |
| 22 | that her father told the Trumps things that were |
| 23 | contradicted. |
| 24 | But more importantly, her testimony is totally |
| 25 | irrelevant and wouldn't be admissible on the issue here of |
| 26 | the beneficial ownership of these shares.  This is a |

Proceedings

question of interpretation of a contract which is an issue
of law.  It's a question, if you will, of whether notices
were given, and a question of the arguments which the Trump
Group made in their motion to dismiss this claim against
them, this question of collateral estoppel and res
judicata, and now we find ourselves on what I assume is
Orly's side of this because we don't think collateral
estoppel applies.

I don't know if that was quite what Mr. Montclare
was saying, but we don't think we're collaterally estopped
and we researched to show and to argue that we're not
collaterally estopped to argue that these shares belonged
to the Orly Trust beneficially.

As to the voting, that's already been decided by
the Supreme Court of Delaware.  So I don't know what all
this stuff is, but that's not my issue.

MS. WACHTLER:  Your Honor, just one thing.  I
think we're running far afield and I'm not exactly sure
where Mr. Meister is going with this.  But this is for a
TRO to prevent extraordinary litigation which this trust
has started for no apparent reason.  No one has ever said
why this action was brought in Delaware other than what
Mr. Griver has shown is the real reason, because
Mr. Meister never says it, and to say that things can be
adjudicated more quickly in Delaware is just not the case.

| 1 | Proceedings |

2       And the fact of the matter is we have been trying

3  to get the issue of beneficial ownership determined by this

4  court in the jurisdiction which the trust has chosen, which

5  Orly has chosen, which Arie has chosen, and every time we

6  take a step forward, we're drawn back to somehow them

7  trying to get this court back to Delaware to deprive this

8  court of its jurisdiction and that simply should not be.

9  And that's what this TRO is all about and what this

10 injunctive relief is about, so that we can proceed here

11 where we were told to proceed by the Delaware Supreme Court

12 and where the plaintiffs in this case want to proceed.

13       And to say that he's protecting the interests or

14 Dalia is somehow protecting the interests of the trust by

15 wasting these assets, by starting an interpleader action

16 when the money was safe in an escrow account, by bringing

17 an action in Delaware, by trying to dismiss to our case

18 here for no reason and then taking a contrary position in

19 Delaware, it just seems to me that this really needs to be

20 stopped.

21       MR. GRIVER:  Let me just read your Honor a case

22 by the First Department in 2006.  It was a unanimous

23 decision and I nothing that Mr. Meister has said takes this

24 case away from this Franco case.

25       It said:  "In the interests of preventing

26 duplicative litigation that might lead to conflicting

| 1 | Proceedings |

2    I were to grant the TRO that it is meant to impugn the

3    integrity of the Delaware Chancery Court, the fix is in.

4    So, again, I just urge you to be careful with your

5    language.

6             MR. GRIVER:   Not with the judge, your Honor, not

7    with the judge.   I'm talking about --

8             THE COURT:   You're talking about the cooperation.

9             MR. GRIVER:   I'm talking about the cooperation.

10    I'm talking about the interests of the parties.

11             MR. MEISTER:   May I speak to that, because I did

12    receive this afternoon, or maybe it was late morning, a

13    call from Skadden Arps, who found somewhere in these papers

14    a reference impugning the integrity of the lawyer in

15    Delaware who's representing the Orly Trust, saying that he

16    used to be associated with Skadden, which is true.   But he

17    and his firm were on Arie's side in two peripheral matters

18    against the Trumps in the main litigation.

19             MR. MONTCLARE:   Maybe they should be

20    disqualified.   I didn't know that.

21             MR. MEISTER:   Well, you probably should.   He

22    represented a witness and they apparently filed some

23    affidavit saying Arie was in such pure heart that he

24    couldn't possibly have spoliated the documents which he was

25    found to have spoliated.

26             So they're going to be bringing that to the

| | |
|---|---|
| 1 | Proceedings |
| 2 | Court's attention.  Frankly, there's no fix in. |
| 3 | THE COURT:  All right.  What type of schedule are |
| 4 | you looking for? |
| 5 | MR. GRIVER:  Well, the opposition papers would |
| 6 | have to be filed by when? |
| 7 | MR. MEISTER:  Where are we?  We're in end of |
| 8 | October. |
| 9 | MR. GRIVER:  Yes. |
| 10 | MR. MEISTER:  November 18th, your Honor. |
| 11 | THE COURT:  Okay.  And reply. |
| 12 | MR. GRIVER:  We hit Thanksgiving, don't we? |
| 13 | THE COURT:  We certainly do. |
| 14 | MR. MEISTER:  We do. |
| 15 | THE COURT:  I'm not here the Wednesday before |
| 16 | Thanksgiving.  It basically looks to me like you're looking |
| 17 | for an early December. |
| 18 | MR. GRIVER:  Either Friday the -- |
| 19 | THE COURT:  Maybe the surrogate will rule at the |
| 20 | one-year mark. |
| 21 | MR. GRIVER:  How about December 7th?  That's |
| 22 | always a historical date. |
| 23 | THE COURT:  Let me get the calendar. |
| 24 | (A discussion was held off the record.) |
| 25 | THE COURT:  That was going to be for the |
| 26 | argument.  I was going to give you 11/18 and start with the |

| | |
|---|---|
| 1 | Proceedings |
| 2 | date to come in for the argument and work backwards. |
| 3 | Change the date to the 14th for the hearing and the papers |
| 4 | in on the 7th.  Hearing date December 14, 2:15. |
| 5 | MR. GRIVER:  The 14th.  Papers then due on the |
| 6 | 5th. |
| 7 | THE COURT:  I will give you to the 21st. |
| 8 | MR. MEISTER:  November 21st? |
| 9 | THE COURT:  Yes. |
| 10 | MR. MEISTER:  Thank you. |
| 11 | THE COURT:  And reply December -- file them by |
| 12 | the 9th.  Can you do that? |
| 13 | MR. GRIVER:  Yes.  Thank you. |
| 14 | THE COURT:  I granted the TRO and we will see you |
| 15 | at 2:15. |
| 16 | MR. MEISTER:  As written? |
| 17 | THE COURT:  I was about to bring myself to that |
| 18 | point. |
| 19 | So I'm signing the proposed order to show cause |
| 20 | and we've worked out a schedule for briefing papers of |
| 21 | opposition by the 21st of November.  Reply papers by the |
| 22 | 9th of December and oral argument at 2:15 on the 14th of |
| 23 | December. |
| 24 | I'm inclined to grant the temporary restraining |
| 25 | order.  It doesn't necessarily mean that it will get |
| 26 | continued in the form of a preliminary injunction and |

```
 1                         Proceedings

 2    obviously one issue that you need to address is whether it

 3    would be appropriate to require any sort of undertaking or

 4    a bond pursuant to Article 63, should I actually grant the

 5    injunction, Article 63 or 62, anyway, whichever.

 6            MR. MONTCLARE:  It's 63.

 7            THE COURT:  It's been a lot of, how shall I put

 8    it, concern expressed out in the bar about courts

 9    overlooking the mandatory undertaking.  So I'm not

10    overlooking it, but I leave it to you to address.

11    Sometimes it gets overlooked because nobody raises it.  So

12    that's one issue I just want to put out there.

13            Now, to the extent of the wording, the way it's

14    currently worded, it says:  "That until further order of

15    this court, Dalia, along with Dalia's agents, assigns,

16    attorneys and/or anyone acting on Dalia's behalf shall be

17    prohibited from prosecuting the Delaware action," which, I

18    guess, is previously defined in the order as "Genger as

19    Trustee of the Orly Genger 1993 Trust v. TR Investors LLC,

20    et al."

21            You don't actually have an index number there

22    from Delaware.

23            MR. GRIVER:  I didn't have an index number.

24            THE COURT:  All right.

25            "Or commencing any new actions as trustee of the

26    Orly Trust concerning the matter of the operative complaint
```

| 1 | Proceedings |
| 2 | in this action." |
| 3 | Now, I know what my concerns are about that |
| 4 | language, but I'm curious about what your concerns are, |
| 5 | because I'll tell you what I'm trying to do.  I have no |
| 6 | intention of stopping Judge Keenan from doing as much as |
| 7 | he'd like in this case and having them resolve these issues |
| 8 | here in New York.  But I am concerned that that Delaware |
| 9 | action just sort of be put on hold until I can have a |
| 10 | reasoned reconsideration of the points.  I don't need any |
| 11 | second, third, fourth actions there. |
| 12 | MR. MEISTER:  I don't envision any second, third, |
| 13 | fourth actions.  But my question would be, your Honor |
| 14 | talked about carving out an ability to respond to the |
| 15 | counterclaim that the Trumps filed.  The other party TPR |
| 16 | filed an answer before which does not have a counterclaim, |
| 17 | a cross-claim, so we don't have to worry about them, in |
| 18 | Delaware. |
| 19 | MS. WACHTLER:  Well, wouldn't your remedy be in |
| 20 | Delaware then to say that you're stayed and that you need |
| 21 | to have some sort of -- |
| 22 | MR. MEISTER:  I don't know Delaware procedure, |
| 23 | your Honor.  I never practiced in their courts.  I would |
| 24 | think that if your Honor allows the Delaware counsel to |
| 25 | answer -- |
| 26 | THE COURT:  It seems to me that if you become |

1                          Proceedings

2      aware after consulting with your Delaware counsel that

3      there's an issue of being precluded, that you come back and

4      ask me for the carve out at that point.

5                I mean at this point --

6                MR. MEISTER:  How are they harmed?

7                THE COURT:  I don't know that they are, I don't

8      know that you are.  That's the whole point.  I mean we're

9      all sort of imagining a harm.

10                MR. MEISTER:  The harm I imagine is if it were

11     here, I don't know what would happen if counterclaim were

12     unanswered.  I would think there's the possibility of a

13     default.  I would think there's the possibility that the

14     Trumps can move either for a default judgment or possibly

15     for summary judgment.

16                I would think that if we filed a reply, I guess

17     it's called, to the counterclaim denying their request for

18     relief, et cetera, then everyone's interests would be

19     protected and I would assume once the pleading was over,

20     the next step -- this I know because I've been following

21     peripherally the other action down there -- the next step

22     in Delaware is one goes to the court and askings for a

23     scheduling order, and at that time I presume Mr. Anderson,

24     the Delaware counsel, could apprise the court that the

25     action is stayed.

26                MS. WACHTLER:  Wouldn't the Trumps -- wouldn't

                    Debra Salzman, Official Court Reporter

1          Proceedings

2     you ask the Trumps' consent?

3          THE COURT:  My gut reaction is that this is in

4     effect a stay of that action and so that you have the

5     benefit of a stay until such time that it's vacated.

6          MR. GRIVER:  When this happened in this case,

7     what the parties did was they got together, they informed

8     this Court about it and put together a stipulation staying

9     the case until procedures in Delaware were completed.

10         I don't see any reason why, although I've never

11    done this in Delaware, I've done this in other

12    jurisdictions and other court systems, there's no reason

13    why the --

14         THE COURT:  You don't go to Delaware.

15         MR. GRIVER:  I would be happy to provide advice

16    on the issue.

17         MR. MEISTER:  Your Honor, I feel confident that

18    if Skadden would agree to a stay, I can't imagine that the

19    court there is eager to hear the case, but I don't know if

20    Skadden is going to agree to a stay.  I don't know.

21    They're adversaries.  If they have us at a disadvantage,

22    which you've now put us, they may take advantage of it.

23         MS. WACHTLER:  Then you have to come back here.

24         MR. MONTCLARE:  They have to come back here in

25    with the Trumps.

26         THE COURT:  Why don't you talk to them and tell

```
1                          Proceedings

2       them what I've done.  And if you need to, we'll give you

3       the carve out.

4                    (Proceedings concluded.)

5                     *      *      *

6                    C E R T I F I C A T E

7            I, Debra Lynn Salzman, an Official Court

8   Reporter of the State of New York, do hereby certify

9   that the foregoing is a true and accurate transcript

10  of my stenographic notes.

11

12  _____

13  Debra Lynn Salzman, RMR

14  Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

26
```

20-01187-jlg    Doc 1-47    Filed 06/20/20    Entered 06/20/20 20:19:48    No R part 49    651089/2010

MS # 12
P 1

At IAS Part 12 of the Supreme Court of the State of
New York, held in and for the County of New York at
the Courthouse at 60 Centre Street, New York, New
York on the 26 day of October, 2011

PRESENT:

Honorable Paul G. Feinman,

Justice

---

ARIE GENGER and ORLY GENGER, in her
individual capacity and on behalf of the ORLY
GENGER 1993 Trust,

                    Plaintiffs,

    -against-

SAGI GENGER, TPR INVESTMENT
ASSOCIATES, INC., DALIA GENGER, THE
SAGI GENGER 1993 TRUST, ROCHELLE
FANG, Individually and as Trustee of THE SAGI
GENGER 1993 TRUST, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS,
LLC, NEW TR EQUITY I, LLC, NEW TR
EQUITY II, LLC, JULES TRUMP, EDDIE
TRUMP and MARK HIRSCH,

                    Defendants.

Index No.: 651089/10

E-FILE

ORDER TO SHOW CAUSE
AND TEMPORARY
RESTRAINING ORDER

---

After hearing counsel for Orly Genger, Arie Genger, and Dalia Genger,
on the record (Court Reporter Debra Salzman), and

Upon the reading and filing the Affidavit of Orly Genger, sworn to on October 24,

2011 and the exhibits thereto; the Attorney's Statement of Judith E. Siegel-Baum, dated October 25,

2011 and the exhibits thereto; the Attorney's Statement of Bryan D. Leinbach, dated October 25,

2011, and the exhibits thereto; the accompanying memorandum of law, dated October 25, 2011; and

on all other proceedings had herein;

LET defendant Dalia Genger ("Dalia") or her attorneys show cause before this Court, to be held at the Courthouse, 60 Centre Street, at IAS Part 12, Room 212, New York, New York, on the 14th day of December 2011, at 2:15 p.m., or as soon thereafter as counsel can be heard, why an Order, enjoining Dalia, along with Dalia's agents, assigns, attorneys, and/or anyone acting on Dalia's behalf from (i) prosecuting the action commenced in Delaware Chancery Court entitled *Dalia Genger as Trustee of the Orly Genger 1993 Trust v. TR Investors LLC et al* (the "Delaware Action"); and (ii) commencing any new actions as Trustee of the Orly Genger 1993 Trust (the "Orly Trust") concerning the subject matter of the operative Complaint in this action; and it is hereby

ORDERED that, until further order of this Court, Dalia, along with Dalia's agents, assigns, attorneys, and/or anyone acting on Dalia's behalf shall be prohibited from prosecuting the Delaware Action or commencing any new actions as Trustee of the Orly Trust concerning the subject matter of the operative Complaint in this action; and it is further

ORDERED, that a copy of this Order to Show Cause, together with copies of the papers upon which it was made, shall be served upon counsel for all parties who have appeared in this action by e-mail and electronic filing and that such service shall be deemed good and sufficient notice of this application. All opposition papers shall be e-filed on or before Nov 21, 2011. All reply papers shall be e-filed on or before Dec. 9, 2011.

ENTER:

_____
J.S.C.

**HON. PAUL G. FEINMAN**

At IAS Part 12 of the Supreme Court of the State of
New York, held in and for the County of New York at
the Courthouse at 60 Centre Street, New York, New
York on the __9__ day of ~~October~~, 2011
*NOVEMBER*

PRESENT:

Honorable Paul G. Feinman,

Justice

M.S. Ø13

ARIE GENGER and ORLY GENGER, in her
individual capacity and on behalf of the ORLY
GENGER 1993 Trust,

                              Plaintiffs,

          -against-

SAGI GENGER, TPR INVESTMENT
ASSOCIATES, INC., DALIA GENGER, THE
SAGI GENGER 1993 TRUST, ROCHELLE
FANG, Individually and as Trustee of THE SAGI
GENGER 1993 TRUST, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS,
LLC, NEW TR EQUITY I, LLC, NEW TR
EQUITY II, LLC, JULES TRUMP, EDDIE
TRUMP and MARK HIRSCH,

                              Defendants.

Index No.: 651089/10

**ORDER TO SHOW CAUSE**   **E-FILE**
**AND TEMPORARY**
**RESTRAINING ORDER**

After hearing from counsel for
plaintiff & counsel for defendants
TPR, the "Trump Group", Dalia
Genger, on the record on 11/1/2011
(Ct. reporter Debra Salzman), and
again on 11/9/2011 (Ct. reporter
Nina Koss)

Upon the reading and filing the Attorney's Statement of Yoav M. Griver, dated

October 31, 2011, and the exhibits thereto; and on all other proceedings had herein;

LET defendants TPR Investment Associates, Inc. ("TPR") and TR Investors,

LLLC, Glenclova Investment Company, New TR Equity I, LLC, New TR Equity II, LLC

(collectively without TPR, the "Trump Group Defendants"), or their attorneys *appear and* show cause before

this Court, to be held at the Courthouse, 60 Centre Street, at IAS Part 12, Room 212, New York, New