CONCLUSION

As a derivative plaintiff, Orly owed fiduciary duties to the Orly Trust. She breached

those fiduciary duties when she directed the Settlement Proceeds away from the Orly Trust.

Dalia's claims for breach of fiduciary duty, accounting and turnover of the Settlement Proceeds

must stand.

And if Dalia is eventually removed as trustee, although she should not be, Orly cannot be

allowed to choose a successor trustee since she has stated, in writing, that she expects that trustee

to act contrary to the interests of the Orly Trust.

Dated:  September 25, 2017
       New City, New York

                                    Judith Bachman, Esq.
                                    Counsel for Dalia Genger,
                                    Cross-Petitioner
                                    254 S. Main Street, Suite 306
                                    New City, New York 10956
                                    8456393210

STATE OF NEW YORK
SURROGATE'S COURT:  COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - x
In the Matter of the Application of
ORLY GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA §711(11)

AFFIRAMATION OF SERVICE
File No. 0017/2008

- - - - - - - - - - - - - - - - - - - - - - - x

Judith Bachman, under the penalties of perjury, affirms as follows:

1.  I am an attorney at law duly licensed to practice in the state of New York.

2.  I am counsel of record for Cross-Petitioner, Dalia Genger ("Dalia").

3.  On September 25, 2017, I caused to be deposited a copy of the Affirmation and
    Memorandum of Law in Opposition to the Motion to Dismiss Cross-Peition of
    Respondent, Dalia Genger, herein, in an overnight mail service County of Rockland,
    State of New York, addressed to:


        SAGI GENGER 1993 TRUST
        C/O John Dellaportas
        Kelley Drye & Warren
        101 Park Avenue
        New York, New York

        Kasowitz, Benson, Torres & Freidman LLP
        1633 Broadway
        New York, NY 10019


Dated: New City, New York
       September 25, 2017

                                            Judith Bachman, Esq.

STATE OF NEW YORK
SURROGATE'S COURT:  COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In the Matter of the Application of<br>ORLY GENGER, as a person interested, for the<br>removal of DALIA GENGER as Trustee of the<br>Orly Genger 1993 Trust pursuant to SCPA §711(11) | AFFIRMATION OF<br>JUDITH BACHMAN<br>IN OPPOSITION TO<br>MOTION TO DIMSISS<br>CROSS-PETTION<br>File No. 0017/2008 |

- - - - - - - - - - - - - - - - - - - - - - - - x

Judith Bachman, under the penalties of perjury, affirms as follows:

1. I am an attorney at law duly licensed to practice in the state of New York.

2. I am counsel of record for Cross-Petitioner, Dalia Genger ("Dalia").

3. I make this affirmation in opposition to Orly Genger's motion to dismiss Dalia's
   Cross-Petition for breach of fiduciary duties, turnover and accounting.

4. Attached hereto as Exhibit 1 is a true and correct copy of Trust Agreement for the
   Orly Genger 1993 Trust.

5. Attached hereto as Exhibit 2 is a true and correct copy of Orly Genger's Complaint in
   Genger v. Gener, Index No. 651089/2010.

6. Attached hereto as Exhibit 3 is a true and correct copy of the Decision of Justice Jaffe
   of the New York Supreme Court, New York County, dated January 2, 2103.

7. Attached hereto as Exhibit 4 is a true and correct copy of the Decision of Justice
   Feinman of New York Supreme Court, New York County, dated June 28, 2010.

8. Attached hereto as Exhibit 5 is a true and correct copy of Decision of Justice Jaffe of
   the New York Supreme Court, New York County, dated April 9, 2012.

9. Attached hereto as Exhibit 6 is a true and correct copy of the Letter from the Trump
   Group Counsel, dated June 28, 2013.

10. Attached hereto as Exhibit 7 is a true and correct copy of the Orly's Settlement Agreement.

11. Attached hereto as Exhibit 8 is a true and correct copy of the Decision of Judge Forrest of the United States District Court, Southern District of New York, dated January 5, 2015.

12. Attached hereto as Exhibit 9 is a true and correct copy of the Reply Memorandum of the Trump Group, dated April 17, 2014.

13. Attached hereto as Exhibit 10 is a true and correct copy of transcript of a hearing before Justice Jaffee, dated March 25, 2015.

14. Attached hereto as Exhibit 11 is a true and correct copy of testimony of Orly Genger, dated August 8, 2016.

15. Attached hereto as Exhibit 12 is a true and correct copy of the Decision of Justice Jaffe of the New York Supreme Court, New York County, dated May 7, 2015.

Dated: September 24, 2017
      New City, New York

Judith Bachman, Esq.
Counsel for Cross-Petitioner
Dalia Genger
254 S. Main Street, Suite 306
New City, New York 10956
845-639-3210

STATE OF NEW YORK
SURROGATE'S COURT: COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - x
In the Matter of the Application of
ORLY GENGER, as a person interested, for the
removal of DALIA GENGER as Trustee of the
Orly Genger 1993 Trust pursuant to SCPA §711(11)          AFFIRAMATION OF SERVICE
                                                         File No. 0017/2008
- - - - - - - - - - - - - - - - - - - - - - - x

Judith Bachman, under the penalties of perjury, affirms as follows:

1.  I am an attorney at law duly licensed to practice in the state of New York.

2.  I am counsel of record for Cross-Petitioner, Dalia Genger ("Dalia").

3.  On September 25, 2017, I caused to be deposited a copy of the Affirmation and
    Memorandum of Law in Opposition to the Motion to Dismiss Cross-Peition of
    Respondent, Dalia Genger, herein, in an overnight mail service County of Rockland,
    State of New York, addressed to:


          SAGI GENGER 1993 TRUST
          C/O John Dellaportas
          Kelley Drye & Warren
          101 Park Avenue
          New York, New York

          Kasowitz, Benson, Torres & Freidman LLP
          1633 Broadway
          New York, NY 10019


Dated: New City, New York
       September 25, 2017

                                              Judith Bachman, Esq.



TRUST AGREEMENT

BETWEEN



ARIE GENGER

AS GRANTOR

AND

LAWRENCE M. SMALL AND SASH A. SPENCER

AS TRUSTEES

CREATING

THE ORLY GENGER 1993 TRUST

Dated: December /3 , 1993

Copy 2 of 4

RUBIN BAUM LEVIN CONSTANT & FRIEDMAN

30 ROCKEFELLER PLAZA · NEW YORK, N.Y. 10112

Index to the Orly Genger 1993 Trust Agreement

| Article | Contents | Page |
|---|---|---|
| FIRST: | Disposition of Principal and Income During the Life of the Grantor's Daughter, ORLY GENGER | 1 |
| SECOND: | Continuing Trust for Descendants of the Grantor's Daughter, ORLY GENGER | 5 |
| THIRD: | Disposition of Property if No Descendant of the Grantor is Living | 9 |
| FOURTH: | Additions to the Trusts | 13 |
| FIFTH: | Irrevocability | 13 |
| SIXTH: | Governing Law | 13 |
| SEVENTH: | Trustees | 13 |
| EIGHTH: | Compensation of Trustees | 18 |
| NINTH: | Settlement of Trustees' Accounts; Exoneration of Trustees | 18 |
| TENTH: | Definitions | 21 |
| ELEVENTH: | Administrative Powers | 22 |
| TWELFTH: | Provisions Relating to the GST | 32 |
| THIRTEENTH: | Release of Powers | 37 |
| FOURTEENTH: | Provision with Respect to Closely Held Businesses | 38 |
| FIFTEENTH: | Headings | 39 |
| SIXTEENTH: | Severability | 39 |

TRUST AGREEMENT dated December /3 , 1993, between
ARIE GENGER (now residing at 1067 Fifth Avenue, New York, New
York), as Grantor, and LAWRENCE M. SMALL (now residing at 2804
Woodland Drive, Washington, D.C. 20008) and SASH A. SPENCER (now
residing at 251 Crandon Boulevard, Townhouse 164, Key Biscayne,
Florida 33149), as Trustees.

The Grantor hereby transfers to the Trustees, and the
Trustees hereby acknowledge receipt of, the sum of Six Hundred
Thousand Dollars ($600,000.00), to be held, administered and
disposed of in accordance with the provisions of Article FIRST
hereof.  Said sum and any other property that may be received by
the Trustees pursuant to the provisions of Article FOURTH
hereof, and all investments and reinvestments thereof, and all
proceeds thereof which constitute principal, are hereinafter
collectively called "principal."

This Trust Agreement shall be known as the "Orly
Genger 1993 Trust Agreement" and the trust created by Article
FIRST hereof shall be known as the "Orly Genger 1993 Trust."

> FIRST:    Disposition of Principal and Income
>           During the Life of the Grantor's Daughter,
>           ORLY GENGER.

A.    The Trustees shall hold, manage, invest and rein-
vest the principal of the trust created by this Article, IN
TRUST, and, so long as the Grantor's daughter, ORLY GENGER,
shall live, the Trustees are authorized and empowered to pay
such part, parts or all, if any, of the net income of the trust

created by this Article (hereinafter referred to in this Article
as "Orly's Trust") to, or apply such part, parts or all, if any,
of such net income for the use or benefit of, such one or more
of the following individuals living from time to time in such
equal or unequal amounts or proportions, and at such time or
times, as the Trustees, in their discretion, shall determine:

     1.   The Grantor's daughter, ORLY GENGER.

     2.   Each descendant of ORLY GENGER.

The Trustees shall accumulate all income of Orly's Trust not so
paid to or applied and, at least annually, add such net income
to the principal of Orly's Trust.

     In making such distributions, the Trustees are
requested (but they are not directed) to limit the total amount
of the distributions made to any descendant of ORLY GENGER with
respect to any calendar year to the amount necessary to increase
such descendant's taxable income for United States income tax
purposes for such year to the greatest amount that shall still
result in such descendant not being subject to United States
income taxes at the highest marginal rate in effect for such
year, after taking into account all of such descendant's other
income and deductions for such year.

     B.   The Trustees are authorized and empowered to pay
to, or apply for the use or benefit of, the Grantor's said
daughter such part, parts or all, if any, of the principal of
Orly's Trust, and at such time or times, as said Trustees, in

-2-

their discretion, shall determine, without regard to the inter-
est in the trust of any other person and without regard to the
fact that any such payment or application may result in the
termination of Orly's Trust.

        C.    Upon the death of the Grantor's said daughter,
the Trustees shall pay the then principal of Orly's Trust,
together with all net income thereof then accrued but not yet
collected, and collected but not yet disposed of, as follows:

        1.    The Trustees shall pay one-half (1/2) of
such income and principal, in such equal or unequal amounts or
proportions, to or for the use or benefit of such one or more of
the descendants of the Grantor's said daughter, and upon such
terms, conditions and trusts, if any, as the Grantor's said
daughter, by a provision in her Will expressly referring to this
Article of this Trust Agreement, shall validly direct and
appoint. If, or to the extent that, the Grantor's said daughter
shall fail so validly to direct and appoint such principal and
income, the Trustees, at the death of the Grantor's said daugh-
ter, shall pay the same, per stirpes, to such of the descendants
of the Grantor's said daughter as shall survive her, subject,
however, to the provisions of Article SECOND hereof, or, if no
descendant of the Grantor's said daughter shall survive her, per
stirpes, to such of the Grantor's descendants as shall so sur-
vive, or, if no descendant of the Grantor shall so survive, in
accordance with the provisions of Article THIRD hereof.

-3-

2. The Trustees shall pay one-half (1/2) of such income and principal, per stirpes, to such of the descendants of the Grantor's said daughter as shall survive her, subject, however, to the provisions of Article SECOND hereof, or, if no descendant of the Grantor's said daughter shall survive her, per stirpes, to such of the Grantor's descendants as shall so survive, or, if no descendant of the Grantor shall so survive, in accordance with the provisions of Article THIRD hereof

3. If, pursuant to the provisions of paragraph 1 or paragraph 2 of this Section C, the Trustees are directed to pay a per stirpital share of such income and principal to a descendant of the Grantor, and if at the time the Trustees are so directed there shall be in existence a trust for such descendant under a trust agreement between Arie Genger, as grantor, and Lawrence M. Small and Sash A. Spencer, as trustees, executed on the date hereof and known as the "Sagi Genger 1993 Trust Agreement," the Trustees shall not pay such per stirpital share to such descendant but shall instead pay such per stirpital *share to the trustees then acting under said trust agreement, to* be disposed of by them pursuant to the provisions of the trust for such descendant under said trust agreement.

D. Notwithstanding anything herein to the contrary, if any Trustee hereunder shall be one of the potential income *beneficiaries of Orly's Trust, such Trustee shall not, in his or* her capacity as such a Trustee, have any voice or vote or other-

-4-

wise participate in any decision pertaining to the payment or
application of the income or principal of Orly's Trust to or for
the use or benefit of him or her in his or her capacity as a
beneficiary of such trust or to or for the use or benefit of any
person whom he or she has an obligation to support, and, in each
such event, the other Trustee or Trustees shall make all deci-
sions relating to such trust that pertain to such matters.

SECOND:   Continuing Trusts for
          Descendants of the Grantor's Daughter,
          ORLY GENGER.

A.   If, under any provision of this Trust Agreement,
any property is directed to be paid to a descendant of the
Grantor's daughter, ORLY GENGER, subject to the provisions of
this Article, such property shall not be distributed or paid to
such descendant.  Instead, the Trustees shall continue to hold
such property, IN TRUST (in a separate trust for each such
descendant which is referred to in this Article as "such descen-
dant's trust"; provided, however, that if there shall be prop-
erty so directed to be paid on more than one occasion to any
such descendant, all such property shall be held in a single
trust for such descendant), and, so long as such descendant
shall live before attaining the age of twenty-one (21) years,
the Trustees, other than such descendant if he or she shall be
a Trustee hereunder, are authorized and empowered to pay to, or
apply for the use or benefit of, such descendant, such part,
parts or all, if any, of the net income of such descendant's

-5-

trust, and at such time or times, as said Trustees, in their discretion, shall determine, and the Trustees shall accumulate the balance of such net income, if any, and, at least annually, add it to the principal of such descendant's trust, and, so long as such descendant shall live after attaining the age of twenty-one (21) years, the Trustees shall pay to such descendant all of the net income of such descendant's trust in at least quarterly installments.

B.   The Trustees, other than such descendant if he or she shall be a Trustee hereunder, are authorized and empowered to pay to, or apply for the use or benefit of, such descendant, such part, parts or all, if any, of the principal of such descendant's trust, and at such time or times, as said Trustees, in their discretion, shall determine, without regard to the interest in the trust of any other person and without regard to the fact that any such payment or application may result in the termination of the trust.

C.   Upon the death of such descendant (hereinafter referred to in this Article as "such deceased descendant"), the Trustees shall pay the then principal of such deceased descendant's trust, together with all net income thereof accrued but *not yet collected, and collected but not yet disposed of, as* follows:

-6-

1.   The Trustees shall pay one-half (1/2) of such income and principal, in such equal or unequal amounts or proportions, to or for the use or benefit of such one or more of the descendants of such deceased descendant, and upon such terms, conditions and trusts, if any, as such deceased descendant, by a provision in his or her Will expressly referring to this Article of this Trust Agreement, shall validly direct and appoint.  If, or to the extent that, such deceased descendant shall fail so expressly and so validly to direct and appoint such principal and income, the Trustees shall, at the death of such deceased descendant, pay the same, per stirpes, to such of the descendants of such deceased descendant as shall survive such deceased descendant, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, per stirpes, to such of the descendants as shall so survive of the ancestor of such deceased descendant closest in degree of relationship to such deceased descendant who (i) shall have descendants who shall so survive and (ii) shall have been a descendant of the Grantor or shall have been the Grantor, subject, however, to the provisions of this Article, or, if no such descendant shall so survive, in accordance with the provisions of Article THIRD hereof.

2.   The Trustees shall pay one-half (1/2) of such income and principal, per stirpes, to such of the descendants of such deceased descendant as shall survive such deceased

-7-

~~descendant, subject, however, to the provisions of this Article,~~
or, if no such descendant shall so survive, per stirpes, to such
of the descendants as shall so survive of the ancestor of such
deceased descendant closest in degree of relationship to such
deceased descendant who (i) shall have descendants who shall so
survive and (ii) shall have been a descendant of the Grantor or
shall have been the Grantor, subject, however, to the provisions
of this Article, or, if no such descendant shall so survive, in
accordance with the provisions of Article THIRD hereof.

3.   If, pursuant to the provisions of paragraph
1 or paragraph 2 of this Section C, the Trustees are directed to
pay a per stirpital share of such income and principal to a
descendant of the Grantor subject to the provisions of this
Article, and if at the time the Trustees are so directed there
shall be in existence a trust for such descendant under a trust
agreement between Arie Genger, as grantor, and Lawrence M. Small
and Sash A. Spencer, as trustees, executed on the date hereof
and known as the "Sagi Genger 1993 Trust Agreement," the
Trustees shall not pay such per stirpital share to such descen-
dant subject to the provisions of this Article but shall instead
pay such per stirpital share to the trustees then acting under
said trust agreement, to be disposed of by them pursuant to the
provisions of the trust for such descendant under said trust
agreement.

-8-

D.    Notwithstanding anything herein to the contrary, each trust created by the terms of this Article shall terminate, if not sooner terminated, upon the expiration of twenty-one (21) years after the death of the last surviving descendant of the Grantor's parents, SHARGA GENGER and DORA GENGER, who shall have been in being on the date hereof; and the Trustees shall thereupon pay the then principal of any trust terminated in accordance with the provisions of this Section, together with all net income thereof accrued but not yet collected and collected but not yet disposed of, to the descendant of the Grantor with respect to whom such trust is being held.

THIRD:    Disposition of Property if No Descendant of the Grantor is Living.

A.    As used in this Article:

1.    The words "such time" shall mean the time as of which any property is directed to be paid in accordance with the provisions of this Article.

2.    The term "Qualified Charitable Organization" shall mean an organization that shall be qualified as an organization to which contributions and bequests are deductible for both United States income tax, gift tax and estate tax purposes under the provisions of Section 170, Section 2522 and Section 2055 of the Internal Revenue Code.

B.   If, under any provision of this Trust Agreement, any property is directed to be paid in accordance with the provisions of this Article, the Trustees shall pay such property as follows:

1.   If the Grantor, the Grantor's spouse and/or any one or more descendants of the Grantor shall have caused there to be created a foundation known as The Genger Foundation, and if at such time said Foundation shall be in existence and shall be a Qualified Charitable Organization, then, in such event, the Trustees shall pay such property to said Foundation.

2.   If at such time either The Genger Foundation created as aforesaid shall not be in existence or said Foundation shall be in existence but shall not be a Qualified Charitable Organization, and if at such time the Trustees are authorized under applicable law to cause to be organized a corporation under and in accordance with the laws of any state of the United States which the Trustees, in their discretion, shall select, which corporation (i) shall be known by the name of The Genger Foundation (or by such other name as the Trustees, in their discretion, shall select if the name of The Genger Foundation shall not be available to be utilized as the name of said corporation), (ii) shall have as its purposes the encouragement, promotion, support and enhancement of non-orthodox study and education for children in the State of Israel pertaining to the customs, practices and ancient and modern history of the Jewish

-10-

people and shall maintain all of the property held by it, and
use all of the net income thereof received from time to time,
for the encouragement, promotion, support and enhancement of
such study and education for children, (iii) shall be required
to maintain all of the property held by it, and use all of the
net income thereof received from time to time, for such pur-
poses, with such property and income to be expended for such
purposes in such amounts, at such time or times and to or for
the use or benefit of such recipient or recipients as the direc-
tors, trustees and/or the officers of such corporation shall, in
their discretion, determine from time to time, subject, however,
to the other provisions of this paragraph 2, (iv) shall have as
its initial directors or trustees the Trustees hereunder, the
Grantor's cousin, JEREMIAH WOHLBERG (now residing at 2325
Lindenmere Drive, Merrick, New York), if he shall not then be a
Trustee hereunder, and also such other individual or individ-
uals, if any, as may be designated by the Trustees, and there-
after to have as directors or trustees such individuals as shall
from time to time be determined as provided for in the certi-
ficate of incorporation and/or by-laws of said corporation, and
(v) shall be organized and maintained in such manner as to be
and continue to be a Qualified Charitable Organization, then, in
such event, the Trustees shall organize such a corporation, and
the Trustees shall pay such property to such corporation.

-11-

3.   If at such time (i) either The Genger Foundation created as aforesaid shall not be in existence or said Foundation shall be in existence but shall not be a Qualified Charitable Organization, and (ii) the Trustees are not authorized under applicable law to cause to be organized a corporation of the nature referred to in paragraph 2 of this Section B, then, in such event, the Trustees shall pay such property to the JEWISH COMMUNAL FUND OF NEW YORK, New York, New York, to be held, administered and disposed of pursuant to the rules and regulations thereof as an Undesignated Philanthropic Fund to be known as the Genger Philanthropic Fund and with the privilege of making advisory recommendations with respect thereto to be held in the first instance by the Trustees, said JEREMIAH WOHLBERG, if he shall not then be a Trustee hereunder, and also by such other individual or individuals, if any, as the Trustees may designate, and thereafter by such other individual or individuals as such designees and their successors acting in such capacity may from time to time designate, and it is requested (but not directed) that the principal and income of such Fund shall be utilized to encourage, promote, support and enhance non-orthodox study and education for children in the State of Israel *pertaining to the customs, practices and ancient and modern* history of the Jewish people.

-12-

FOURTH:   <u>Additions to the Trusts.</u>

Any person, including the Grantor, by a transfer to take effect during the life of such person or upon the death of such person, may, at any time or times, add to the principal of any trust hereunder any property of any kind or nature accept- able to the Trustees, and any such additional property so received by the Trustees pursuant to the provisions of this Article shall thereafter be deemed to be part of the principal of such trust subject to all of the terms, provisions and condi- tions of this Trust Agreement.

FIFTH:   <u>Irrevocability.</u>

This Trust Agreement and the trusts hereby created are irrevocable and not subject to amendment or change.

SIXTH:   <u>Governing Law.</u>

This Trust Agreement and the trusts hereby created shall be governed by the laws of the State of New York.

*SEVENTH:*   <u>*Trustees*</u>.

A.   The initial Trustees acting hereunder shall be LAWRENCE M. SMALL and SASH A. SPENCER.

B.   Each individual acting as a Trustee hereunder (whether such Trustee is initially a party to this Trust Agree- ment or a successor Trustee named in Section C of this Article

-13-

or appointed pursuant to the provisions of this Section B) is authorized and empowered to appoint another individual (other than the Grantor) to act in his or her place and stead as a Trustee hereunder. Each appointment of a successor Trustee hereunder shall be made by the execution of an instrument of appointment signed and acknowledged by the individual who shall have made such appointment and by delivering such instrument in accordance with the provisions of Section G of this Article; and any such appointment may be revoked in the same manner by the individual Trustee who shall have made it at any time before the occurrence of the event or events as of which such appointment shall, by its provisions, become effective. Any appointment made in accordance with the provisions of this Section B shall be valid only if the individual so appointed shall, within thirty (30) days after the later of (i) the date on which a copy of such instrument of appointment is so delivered to him or her, and (ii) the occurrence of the event or events as of which such appointment shall, by its provisions, become effective, qualify as a successor Trustee under this Trust Agreement in accordance with the provisions of Section D of this Article. Each successor Trustee named in Section C of this Article or appointed in accordance with the provisions of this Section B shall be vested with the same powers and authority as the initial Trustees who are parties to this Trust Agreement; provided, however, that no such Trustee shall be permitted to exercise any authority or

-14-

power which such Trustee shall be prohibited from exercising by
an express provision of this Trust Agreement.

      C.  1.  If either LAWRENCE M. SMALL or SASH A.
SPENCER shall cease to act as a Trustee hereunder, and no suc-
cessor Trustee appointed by him pursuant to the provisions of
Section B of this Article shall quality and act as a Trustee
hereunder, MARTIN A. COLEMAN (now residing at 51 Cambridge Road,
Great Neck, New York 11023) shall act as Trustee hereunder.

      2.  If MARTIN A. COLEMAN shall fail or cease
cease to act as a Trustee hereunder, and no successor Trustee
appointed by him pursuant to the provisions of Section B of this
Article shall quality and act as a Trustee hereunder, THOMAS G.
HARDY (now residing at 935 Park Avenue, New York, New York
10028) shall act as a Trustee hereunder.

      D.  Each successor Trustee hereunder shall qualify as
such by accepting the trusteeship by the execution of a signed
and acknowledged instrument of acceptance and by delivering such
instrument in accordance with the provisions of Section G of
this Article.

      E.  Any individual Trustee hereunder may resign as
such a Trustee by the execution of a signed and acknowledged
instrument of resignation and by delivering such instrument in
accordance with the provisions of Section G of this Article.

-15-

Any such resignation shall become effective upon the receipt of
such instrument of resignation by each individual to whom it is
delivered or mailed as aforesaid or at such later date as may be
specified therein.

   F. If any individual while acting as a Trustee here-
under shall become incapable of discharging his or her responsi-
bilities and duties as such a Trustee by reason of a physical,
emotional or intellectual incapacity and such incapacity shall
be confirmed by each of two medical doctors in written state-
ments, copies of which shall be delivered or mailed as hereinaf-
ter provided, the individual who is so incapacitated shall be
deemed for the purposes of construing and applying all of the
provisions of this Trust Agreement to have effectively resigned
as such Trustee in compliance with the provisions of Section E
of this Article, such resignation to be deemed to be effective
upon the delivery or mailing of the aforesaid statements as
hereinafter provided.  Each of the aforesaid statements shall be
signed and acknowledged by the medical doctor making the same
and copies of the same shall be delivered or mailed by regis-
tered or certified mail to the individual, if any, who will
become the successor Trustee hereunder in the place and stead of
the incapacitated Trustee to whom such statement pertains, to
each Trustee, if any, then acting hereunder (other than the
incapacitated Trustee to whom such statement pertains), and also
to either (i) the Grantor (or, if the Grantor shall not then be

-16-

living, to the executors, administrators or personal representa
tives of the Grantor's estate), or (ii) any one or more of the
adult individuals to whom or for whose use or benefit the income
of any trust hereunder may then be paid or applied.

G.   Each instrument directed to be delivered in
accordance with the provisions of this Section G shall be deliv-
ered in person or by mailing a copy of the same by registered or
certified mail to each Trustee, if any, then acting hereunder
(other than the Trustee, if any, who shall have executed such
instrument), and to either (i) the Grantor (or, if the Grantor
is not then living, to the executors, personal representatives
or administrators of the Grantor's estate), or (ii) any one or
more of the adult individuals to whom or for whose use or bene-
fit the income of any trust hereunder may then be paid or
applied.

H.   No bond or other security shall be given by or
required in any jurisdiction (whether in the State of New York
or elsewhere) of any Trustee at any time acting hereunder
(whether such Trustee is named herein or appointed pursuant to
the provisions hereof) for the faithful performance of such
Trustee's fiduciary duties in any capacity hereunder regardless
of whether such Trustee is or may become a non-resident of the
State of New York or elsewhere.

-17-

account shall be a proper administration expense of the trust to
which such account relates.

      B.  If any Trustee shall resign as a Trustee here-
under, the continuing Trustee, if any, or, if there is no con-
tinuing Trustee, any successor Trustee who shall have qualified
to act in accordance with the provisions of Section D of Article
SEVENTH hereof, may deliver to the Trustee so resigning an
instrument whereby such resigning Trustee shall be released and
discharged, to the extent stated therein, of and from any and
all accountability, liability and responsibility for acts or
omissions as Trustee. Any such release and discharge shall be
binding upon all persons, whether or not then in being, then or
thereafter interested in either the income or the principal of
any trust hereunder and shall have the force and effect of a
final decree, judgment or order of a court of competent juris-
diction rendered in an appropriate action or proceeding for the
judicial settlement of the account of such Trustee in which
jurisdiction was obtained of all necessary and proper parties.
The foregoing provision, however, shall not preclude any Trustee
so resigning from having his or her account judicially settled,
and in any such proceeding it shall not be necessary to serve
any person who is under a disability if there is another party
to the proceeding who is not under any disability and who has
the same interest as the person who is under a disability, and,
in such event, it shall not be necessary to appoint a guardian

-19-

ad litem for any such party who is under a disability.   The
expenses of any judicial account rendered by a Trustee who shall
resign shall be a proper administration expense of the trust to
which such account relates.

C.   In addition to the foregoing, the Trustees are
hereby authorized, at any time and from time to time, with re-
spect to any trust hereunder, to settle the account of the
Trustees by agreement between the Trustees and the then adult
individual or individuals to whom or for whose use or benefit
the income of such trust may then be paid or applied and the
adult or adults who would be entitled to the principal in case
such trust were to terminate at the time of such agreement,
excluding any such individual who is under a disability if there
is a party to the agreement who is not under any disability and
who has the same interest as the individual who is under a dis-
ability, which agreement shall bind all persons, whether or not
then in being, then or thereafter interested in either the
income or the principal of such trust.   Any such settlement
shall have the same force and effect as a final decree, judgment
or order of a court of competent jurisdiction rendered in an
appropriate action or proceeding for the judicial settlement of
such account in which jurisdiction was obtained of all necessary
and proper parties.   The expenses of any such account shall be
a proper administration expense of such trust.

-20-

D.   To the extent permitted by law, no Trustee shall be accountable, liable or responsible for any act, default, negligence, or omission of any other Trustee.

TENTH:   Definitions.

Wherever used in this Trust Agreement:

1.   The word "Trustees" and all references to the Trustees shall mean and refer to the Trustees and successor Trustees hereinabove named, any successor Trustee appointed pursuant to the provisions hereof, any substitute Trustee appointed by a court of competent jurisdiction, the survivors or survivor of them, and their and each of their successors or successor, as may be acting hereunder from time to time.

2.   The words "IN TRUST" shall mean "in trust, nevertheless, to hold, manage, invest and reinvest, and, until payment thereof as hereinafter directed, to receive the income thereof."

3.   The word "pay" shall, where applicable, mean "convey, transfer and pay" and the word "payment" shall, where applicable, mean "conveyance, transfer and payment."

4.   The words "descendant" and "descendants," when used with respect to any person, shall be deemed to include (i) every individual who is born to such person, (ii) every individual who is lawfully adopted by such person, and (iii)

-21-

every individual who is otherwise descended from such person,
whether by birth, or by lawful adoption, or by a combination
thereof.

5.   The words "Internal Revenue Code" shall mean
and refer to "the United States Internal Revenue Code of 1986
(as amended from time to time)," and any reference to a specific
section, chapter or other provision of the Internal Revenue Code
shall mean and refer to said section, chapter or other provision
and any successor statute thereto pertaining to the same subject
matter as said section, chapter or other provision.

ELEVENTH: Administrative Powers.

A.   In addition to and in amplification of the powers
given by law to trustees, the Trustees, but solely in their
fiduciary capacities, are hereby authorized and empowered, in
their discretion:

1.   To sell, exchange, make contracts with
respect to, grant options on or otherwise dispose of, at public
or private sale, at such prices, on such terms (including sales
on credit with or without security) and at such time or times as
the Trustees shall determine, any property, real or personal,
which may at any time form part of any trust hereunder.

2.   To lease, for such periods (whether or not
any such period shall extend beyond the period prescribed by law

-22-

or the probable term of any trust hereunder), on such terms and conditions and at such time or times as the Trustees shall determine, the whole or any portion or portions of any property, real or personal, which may at any time form part of any trust hereunder, whether the same be held in severalty or as tenant-in-common with others or in a partnership, syndicate or joint venture or otherwise, and release and convey any undivided interest in any such property for the purpose of effecting partition of the whole or any part thereof; and make, place, extend or renew mortgages, pledges, building loan agreements or building loan mortgages upon or affecting any and all such property; and make, execute and deliver such mortgages, pledges and agreements, together with proper bonds, notes or other instruments of indebtedness to accompany the same, and such extension or renewal agreements, as to the Trustees shall seem necessary, advisable or proper; and also to repair, alter, reconstruct, build upon or improve any such property and on such terms and at such time or times as the Trustees shall determine, give and grant to others the right so to do, or agree in, or so modify any lease affecting any such property that the lessee may alter, repair, reconstruct, build upon, improve, mortgage and pledge any such property; and generally to make, alter and modify all agreements, leases, mortgages, pledges, building loans, sales, exchanges, transfers and conveyances of or affecting any such property which the Trustees shall determine to be necessary, advisable or proper for the preservation, improvement, enhance-

-23-

accurate

ment in value of, or betterment of or addition to, such prop-
erty.

3.    To hold any part or all of the assets of any
trust hereunder invested in the same form of property in which
the same shall be invested when received by the Trustees, and
invest and reinvest the assets of any such trust, or any portion
thereof, in any form of investment which the Trustees may deter-
mine (including, without limitation, mutual funds, common trust
funds, investment trusts, general partnerships and limited part-
nerships), whether or not such investment is of the nature pre-
scribed by law as a legal investment for fiduciaries or is spec-
ulative in nature, and without regard to the percentage of the
assets of such trust which such investment or similar invest-
ments may constitute.

4.    To vote in person or by proxy all stocks and
other securities held by any trust hereunder; grant, exercise,
sell or otherwise turn to account rights to subscribe for stock
and securities and options of any nature; amortize or refrain
from amortizing premiums on bonds or other securities which the
Trustees may purchase or receive; participate in reorganiza-
tions, mergers, liquidations or dissolutions, and contribute to
the expenses of, and deposit securities with, protective commit-
tees in connection therewith; participate in voting trusts; and
generally exercise, in respect of said stock and securities, all

-24-

rights, powers or privileges which may be lawfully exercised by any person owning similar property in his or her own right.

5.    To employ any investment counsel, corporate custodians, agents, accountants, brokers and attorneys which the Trustees may select and pay the charges thereof (including charges for preparation of trust tax returns, the Trustees' accounts and any other necessary trust records); and the Trustees, or a partnership, corporation or other entity in which any Trustee shall be interested, or by which any Trustee may be employed, may be retained in any such capacity, and, in such event, the charges which shall be payable to such Trustee, or to any such partnership, corporation or other entity, shall be in addition to compensation otherwise allowable to such Trustee and may be paid without prior judicial approval.

6.    In any case in which the Trustees are authorized or required to pay or distribute any share of any trust hereunder, to make such payment or distribution in kind, or partly in kind and partly in money and, in connection therewith, to allocate equal or unequal interests in, or amounts of, specific property in satisfaction of such payment or distribution; provided, however, that any property distributed in kind shall be valued, for purposes of such distribution, at its fair market value on the date of distribution.

-25-

7.   To settle, adjust, compromise or submit to arbitration any dispute, claim or controversy in which any trust hereunder may be in any way interested.

8.   To borrow money from any person, partnership, corporation or other entity, who may be any Trustee or a partnership, corporation or other entity in which any Trustee may be interested, or by which any Trustee may be employed, for the purpose of meeting any and all charges against any trust hereunder or for any other purpose connected with the administration, preservation, improvement or enhancement in value of any such trust, and, in connection with any such borrowing, to pledge, hypothecate or mortgage any part or all of the assets of any such trust.

9.   To keep any or all of the securities at any time forming a part of any trust hereunder in the name of one or more nominees.

10.   In any case where doubt or uncertainty exists under applicable law or this Trust Agreement, to credit receipts and charge expenses to principal or income, or partly to each.

11.   By instrument or instruments signed by all of the Trustees qualified and acting as such at any time with respect to any trust hereunder, to delegate, in whole or in part, to any person or persons (including any one or more of the

-26-

Trustees) the authority and power to (i) sign checks, drafts or orders for the payment or withdrawal of funds from any bank account or other depository in which funds of such trust shall be held, (ii) endorse for sale, transfer or delivery, or sell, transfer or deliver, or purchase or otherwise acquire, any and all stocks, stock warrants, stock rights, bonds or other securities whatsoever with respect to such trust, and (iii) gain access to any safe deposit box which may be in the names of the Trustees and remove part or all of the contents of any such safe deposit box and release and surrender the same.

12.   To pay or deliver to either parent or to the guardian of the property of any minor or to an adult with whom such minor resides, and, with respect to any person for whom it is permissible to do so under applicable law, to a custodian for such person under a Uniform Gifts to Minors Act or Uniform Transfers to Minors Act of any state until the age of eighteen (18) years (or until such age in excess of eighteen (18) years as shall be permissible under applicable law and which the Trustees, in their discretion, shall select) any sum or property, including income, which such minor or such person shall either be entitled to receive or to have applied for his or her use or benefit under any of the provisions hereof, without requiring that such parent, adult or custodian obtain letters of guardianship or that such parent, guardian, adult or custodian give any bond or other security for any such payment or delivery

-27-

so made; and the receipt of such parent, guardian, adult or
custodian for the amount of such payment, or for the property so
delivered, shall be an absolute protection to the Trustees and
a complete release and discharge from all further accountability
in respect of any such payment or delivery.

13.  If any beneficiary of any trust hereunder
shall, in the opinion of the Trustees, be or become incapaci-
tated (whether by reason of illness, age or other causes) the
Trustees may, in their discretion, wholly or partly in lieu of.
paying net income or principal of such trust to such beneficiary
as authorized or directed by this Trust Agreement, dispose of
the same in one or more of the following ways:

(a)  by making payment of such net income
or principal to a legally appointed guardian or
other fiduciary of such beneficiary;

(b)  by making payment of such net income
or principal, on behalf of such beneficiary, to
any person with whom such beneficiary resides or
who has charge of his or her care; and/or

(c)  by applying such net income or princi-
pal directly for the use or benefit of such ben-
eficiary.

-28-

14.  To remove the assets of, hold and administer
any such assets in, and/or move the situs of the administration
of any trust hereunder to, such location or locations (which may
be in a state or other jurisdiction other than the State of New
York) as the Trustees, in their discretion, shall select.  If
the Trustees, in their discretion, shall determine it advisable
to move the situs of the administration of any trust hereunder
to a location where the judicial administration of trusts is
required or permitted, the Trustees are authorized to select and
request a court in such location having jurisdiction over the
administration of trusts to accept jurisdiction over the admin-
istration of such trust, and it is requested that such court
accept, and that it be permitted to accept, jurisdiction over
the administration of such trust; and it is directed that the
administration of such trust shall be governed from time to time
by the laws of the jurisdiction in which the administration of
such trust is then located.

15.  To make, or refrain from making, elections
or allocations permitted under any applicable tax law without
regard to the effect of any such election or allocation on the
interest of any beneficiary of any trust hereunder and, if any
such election or allocation shall be made, to apportion, or
refrain from apportioning, any benefits thereof among the
respective interests of the beneficiaries of such trust, all in
such manner as the Trustees shall deem appropriate.

-29-

16.   To retain or invest in solido the property held in any trust hereunder with the property held in one or more of the other trusts hereunder or with the property held in any other trust created by the Grantor or by any other person for purposes of convenience or for the better investment thereof.

17.   To exercise all authority, powers, privileges and discretion conferred in this Article after the termination of any trust created hereunder and until all of the assets of such trust are fully distributed.

B.   No person or party dealing with the Trustees shall be bound to see to the application of any money or other consideration paid by him or her to the Trustees.

C.   Neither the principal nor the income of any trust hereunder, or any part thereof, shall or may at any time be liable or subject in any manner whatsoever to the debts or liabilities of any beneficiary entitled to receive any principal or income therefrom; nor shall the principal or income of any trust hereunder be liable to attachment by garnishment proceedings or other legal process issued by any creditor of any beneficiary of such trust for debts heretofore or hereafter contracted by such beneficiary; nor shall any assignment, conveyance, charge, encumbrance or order, either of principal or income, given by any such beneficiary be valid.

-30-

D.   Whereever in this Trust Agreement it is provided
that an instrument is to be "acknowledged," such instrument
shall be acknowledged in such manner as would be required if the
same were a conveyance of real property entitled to be recorded
in the State of New York.

E.   1.   To the fullest extent permitted by law, no
transaction or decision involving any trust hereunder shall be
deemed invalidated in any way by reason of any personal, benefi-
cial or other interest which any Trustee may have with respect
to such transaction or decision, including, without limitation,
any transaction or decision with respect to any corporation,
company, partnership, association, estate, trust or other entity
in which any Trustee may have an interest in a capacity other
than as a Trustee hereunder, regardless of any conflict of
interest as to any such transaction or decision, and any such
transaction or decision shall be lawful and proper and shall not
be questioned unless such Trustee is guilty of fraud with
respect thereto.   Without limiting the foregoing, no Trustee
shall be disqualified or barred from acting as such or have any
liability hereunder in exercising any power, authority or dis-
cretion conferred upon the Trustees by reason of the fact that
such Trustee may be a stockholder, officer, director, partner,
executor, administrator, personal representative, trustee, bene-
ficiary, or in any other way interested in the corporation, com-
pany, partnership, association, estate, trust or other entity

-31-

whose securities or property are the subject matter of the exercise of such power, authority or discretion.

2.    The Trustees hereunder shall be entitled to compensation as officers, directors, fiduciaries or other participants in any such entity notwithstanding the fact that they are Trustees hereunder and are also entitled to receive reimbursement for their out-of-pocket expenses as such Trustees.

F.    The Trustees shall be under no duty or obligation and shall not be liable to any trust hereunder or to any person or persons interested in any trust hereunder or be surcharged for failure to buy, sell or engage in any transaction directly or indirectly involving securities issued or to be issued by any corporation or other business organization concerning which any of the Trustees, in a capacity other than as a Trustee hereunder, may have acquired any information which has not been disclosed to the public.

TWELFTH:  Provisions Relating to the GST.

A.    As used in this Article:

1.    "GST" shall mean and refer to "the United States generation-skipping transfer tax imposed by Chapter 13 of the Internal Revenue Code."

-32-

2.   The words "inclusion ratio" shall have the same meaning as those words are given in Section 2642 of the Internal Revenue Code.

3.   The words "Net Death Taxes" shall mean and refer to "the aggregate death taxes (including, without limitation, United States, state, local and other estate taxes and inheritance taxes but not including any interest and penalties thereon), after taking into account all applicable credits, payable with respect to the estate of such beneficiary."

B.   1.   Notwithstanding any other provision in this Trust Agreement to the contrary, and in addition to any other power of appointment hereinabove given by the previous provisions of this Trust Agreement to any individual at whose death the inclusion ratio with respect to any trust under this Trust Agreement would, but for the provisions of this Section B, be more than zero (such individual being referred to in this Article as "such beneficiary"), the Trustees of such trust are authorized and empowered, by an acknowledged instrument in writing (with such instrument to be filed with the court, if any, then having jurisdiction over such trust, if such court shall accept such instrument for filing), (i) to create in such beneficiary a power (hereinafter referred to in this Section B as "such power"), to be exercised by a provision in his or her Will expressly referring to this Article of this Trust Agreement, to appoint to the creditors of his or her estate any portion of the

-33-

property held in such trust at the death of such beneficiary, and (ii) to limit such power, by formula or otherwise, to less than all of the property held in such trust at the death of such beneficiary; provided, however, that with respect to each such trust, the maximum amount of property over which such power may be created shall not, after taking into account the property, if any, over which any other such power is created in such beneficiary, exceed the amount, if any, above which any further addition to the amount subject to such power would increase the Net Death Taxes determined with respect to such beneficiary's estate by an amount equal to or greater than the net decrease in the aggregate of (x) the GST and (y) any state and/or local tax on generation-skipping transfers imposed as a result of the death of such beneficiary that would result from such further addition. Unless such beneficiary's Will otherwise provides by express reference to this Trust Agreement and such power, the increase in the Net Death Taxes on such beneficiary's estate resulting from such power shall be paid from that part of the principal of such trust over which such power is exercisable. If, or to the extent that, such beneficiary shall fail so expressly and so validly to exercise any power created in such beneficiary by the Trustees pursuant to the provisions of this paragraph, the unappointed portion (or, as the case may be, all) of the property subject to such power shall pass pursuant to the provisions of this Trust Agreement otherwise applicable to such property.

-34-

2.   The Trustees are further authorized and empowered, by an acknowledged instrument in writing (with such instrument to be filed with the court, if any, then having jurisdiction over the trust to which such power relates, if such court shall accept such instrument for filing), to revoke any power created by the Trustees pursuant to the provisions of paragraph 1 of this Section B at any time prior to the death of the beneficiary in whom such power was created, and to release, in the manner set forth in Article THIRTEENTH hereof, the right to create such a power.   The Trustees shall not be liable for any exercise, release or failure to exercise the authority and power granted to them by the provisions of said paragraph 1 or for the revocation of any power created by them pursuant to the provisions of said paragraph 1, provided they utilize good faith in considering whether or not to exercise or release such power or to cause such revocation, whether such consideration be at their own instance or at the request of an individual who is a beneficiary of a trust hereunder, the guardian or other fiduciary of such an individual, or a member of his or her family.

C.   1.   Notwithstanding any other provision in this Trust Agreement to the contrary, if at any time any property is to be placed in a trust under the provisions of any Article of this Trust Agreement, the Trustees shall, if need be, and if it is possible to do so, divide such property and place the same in separate trusts to the end that one such trust shall have an

-35-

2007-01-16 17:08        Sagi A. Genger        121275066620 >>        P 37/43

inclusion ratio of zero, and if any property which is directed
to be added to a trust hereunder shall have an inclusion ratio
which is different than the inclusion ratio of such trust, the
Trustees shall not make such addition but shall instead admin-
ister such property in a separate trust under this Trust Agree-
ment; and, in each such instance, the property to be placed or
held in such a separate trust shall be held, administered and
disposed of by the Trustees pursuant to provisions identical to
the provisions of the trust to which, but for the provisions of
this paragraph 1, such property would have been placed or added.

     2.  If, pursuant to the provisions of paragraph
1 of this Section C, any property that would otherwise be held
in a single trust hereunder is instead held in separate trusts
hereunder, the Trustees of such trusts may, at any time or from
time to time, (i) make different tax elections and allocations
with respect to each such trust, (ii) expend principal and
income and exercise any discretionary power differently with
respect to each such trust, (iii) invest each such trust differ-
ently, and/or (iv) take all other actions consistent with such
trusts being separate entities.  Furthermore, the donee of any
power of appointment with respect to such trusts may exercise
such power differently with respect to each such trust.

     D.  Notwithstanding the provisions of the foregoing
Sections of this Article to the contrary, if any Trustee here-
under is a current beneficiary of the income of any trust here-

-36-

**425**

under, or may, in the discretion of the Trustees, be a current
income beneficiary of any such trust, then, in such event, such
Trustee shall not, in his or her capacity as a Trustee of such
trust, have any voice or vote or otherwise participate in any
decision pertaining to the matters relating to such trust that
are addressed in the foregoing Sections of this Article, and, in
each such event, the other Trustee or Trustees of such trust
shall make all decisions relating to such trust that pertain to
such matters.

        THIRTEENTH:    Release of Powers.

        Any beneficiary and any Trustee hereunder may at any
time or times release any discretionary power of appointment or
discretionary power to distribute principal or income or any
other discretionary power hereby given to such beneficiary or
Trustee, either with or without consideration, with respect to
the whole or any part of the property subject to such power and
also in such manner as to reduce or limit the persons or objects
or classes of persons or objects in whose favor such power would
otherwise be exercisable, by an instrument signed and acknowl-
edged by the beneficiary or Trustee releasing such power and
delivered to (i) each Trustee then acting hereunder (other than
the Trustee, if any, who shall have executed such instrument),
(ii) the Grantor (or, if the Grantor is not then living, to the
executors, administrators or personal representatives of the

                        -37-

Grantor's estate), or (iii) any one or more of the adult indi
viduals to whom or for whose use or benefit the income of any
trust hereunder may then be paid or applied.  In the event of
the release of any such power by any Trustee, the remaining
Trustee or Trustees hereunder, if any, may thereafter exercise
such power, other than any discretionary power which was not
initially vested in such remaining Trustee or Trustees.  The
release of any power by any Trustee hereunder pursuant to the
provisions of this Article shall not be binding upon any Trustee
who may thereafter act as a Trustee hereunder unless such power
shall have been released by all of the Trustees then in office
who are vested with such power by their execution of a signed
and acknowledged instrument specifically providing that such
release is to be binding upon all successor Trustees hereunder.

FOURTEENTH:   Provision With Respect To
Closely Held Businesses.

Without limiting the powers and authority conferred
upon the Trustees by Article ELEVENTH hereof but in extension
thereof, the Trustees are specifically authorized and empowered,
in their discretion, to retain for as long as they, in their
discretion, shall deem advisable, any or all shares of stock in
any closely held corporation, or any indebtedness owing by any
such corporation, or any or all interests in any proprietorship,
unincorporated business, partnership, joint venture, realty or

-38-

any other asset, whether owned individually, as tenant-in-common, partner or otherwise, regardless of whether such asset or assets shall be producing profits or losses through ownership or operation thereof, and regardless of the percentage of the trusts hereunder which such assets or similar assets may constitute; and their decision to retain and hold any such asset or liability shall be binding and conclusive upon and shall not be subject to question by any person interested, or who may become interested, in any of the trusts hereunder, and the Trustees shall not incur any liability by reason thereof.

FIFTEENTH:   <u>Headings</u>.

The Article headings contained herein are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope hereof or the intent of any provision hereof.

SIXTEENTH:   <u>Severability</u>.

Should any part, clause, provision or condition hereof be held to be void or invalid, then such invalidity shall not affect any other part, clause, provision or condition hereof, but the remainder hereof shall be effective as though such void

-39-

part, clause, provision or condition had not been contained
herein.

WITNESS the due execution hereof by the Grantor and
Trustees on the day and year first above written.

ARIE GENGER,
as Grantor

LAWRENCE M. SMALL,
as Trustee

SASH A. SPENCER,
as Trustee

-40-

STATE OF NEW YORK  }
                   }  ss.:
COUNTY OF NEW YORK }

On this _13_ day of December, 1993, before me person-
ally appeared ARIE GENGER, to me known and known to me to be a
person described in and who executed the foregoing instrument,
and he duly acknowledged to me that he executed the same.

_____
Notary Public

BRIT GEIGER
Notary Public, State of New York
No. 24-4502316 Qual. in Kings Co.
Certificate Filed in New York County
Commission Expires June 30, 19__

_District of Columbia_
~~STATE OF~~               }
                          }  ss.:
~~COUNTY OF~~              }

On this _15th_ day of December, 1993, before me person-
ally appeared LAWRENCE M. SMALL, to me known and known to me to
be a person described in and who executed the foregoing instru-
ment, and he duly acknowledged to me that he executed the same.

_Jeanne M. Meister_
Notary Public

My Commission Expires July 31, 1997

STATE OF _New York_ }
                    }  ss.:
COUNTY OF _New York_ }

On this _16th_ day of December, 1993, before me person-
ally appeared SASH A. SPENCER, to me known and known to me to be
a person described in and who executed the foregoing instrument,
and he duly acknowledged to me that he executed the same.

_Stella M. Orso_
Notary Public

STELLA M. ORSO
Notary Public, State of New York
No. 24-4924037
Qualified in Kings County
Certificate Filed in New York County
Commission Expires March 30, 19__

-41-

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| ARIE GENGER and ORLY GENGER, in her individual capacity and on behalf of the ORLY GENGER 1993 Trust, | INDEX NO.  651089/2010 |
| Plaintiffs, | **THIRD AMENDED AND SUPPLEMENTAL COMPLAINT** |
| -against- | |
| SAGI GENGER, TPR INVESTMENT ASSOCIATES, INC., DALIA GENGER, THE SAGI GENGER 1993 TRUST, ROCHELLE FANG, Individually and as Trustee of THE SAGI GENGER 1993 TRUST, GLENCLOVA INVESTMENT COMPANY, TR INVESTORS, LLC, NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, JULES TRUMP, EDDIE TRUMP, MARK HIRSCH, and TRANS-RESOURCES, INC. | |
| Defendants. | |

Plaintiffs Arie Genger and Orly Genger, in her individual capacity and on behalf of the

Orly Genger 1993 Trust, by their respective attorneys, for their Third Amended and

Supplemental Complaint against the defendants in this action allege, on information and belief,

as follows:

**I.    THE PARTIES**

1.    Plaintiff Arie Genger ("Arie") is a resident of the State of Florida, and the father

of the Plaintiff Orly Genger ("Orly") and the defendant Sagi Genger ("Sagi").

2.    Plaintiff Orly Genger is the adult daughter of Arie Genger and Dalia Genger, and

the beneficiary of the Orly Trust, and a resident of the State of New York and is the beneficiary

of the Orly Genger 1993 Trust (the "Orly Trust"). She brings this action on behalf of the Orly

Trust as the beneficiary of the Orly Trust to protect her interests thereunder.

3.     Defendant Sagi Genger ("Sagi") is the estranged adult son of plaintiff Arie Genger and Defendant Dalia Genger, and is a resident of the City, County, and State of New York, and maintains an office at 1211 Park Avenue, New York, NY 10128.

4.     Defendant TPR Investment Associates, Inc. ("TPR") is a Delaware Corporation with a principal office located at 1211 Park Avenue, New York, NY 10128.

5.     At all relevant times to this Complaint Sagi is the President of defendant TPR and continues to be a controlling member of TPR's Board of Directors.

6.     Defendant Dalia Genger ("Dalia") is the mother of Sagi Genger and Orly Genger and the former wife of the Plaintiff Arie Genger, and is a resident of the City, County and State of New York. Dalia is the putative trustee of the Orly Trust and at relevant times to this Complaint is believed to have been a director of TPR.

7.     Defendant The Sagi Genger 1993 Trust ("Sagi Trust") is a trust entity, and the beneficiary of the Sagi Trust is Sagi.

8.     Defendant Rochelle Fang ("Fang") is the mother-in-law of the Defendant Sagi Genger and was the Trustee of the Sagi Trust during relevant periods in 2008, and is a resident of the City, County and State of New York.

9.     Defendant Glenclova Investment Company ("Glenclova") is a Cayman Islands company with a business address in the Bahamas, and an owner of common stock of Trans-Resources, Inc. ("TRI"). On information and belief Glenclova is in turn owned by other off-shore companies directly or indirectly controlled by the Trump Parties as defined below.

10.     Defendant TR Investors, LLC ("TR Investors") is a New Jersey Limited Liability Company and an owner of common stock of TRI. On information and belief TR Investors is in

2

turn owned by other off-shore companies directly or indirectly controlled by the Trump Parties as defined below.

11.      Together Glenclova and TR Investors are controlled by the Trump Group of South Africa and are collectively referred to herein as the "Trump Group".

12.      Defendant New TR Equity I, LLC ("New TR I") is a Delaware Limited Liability Company, controlled by Jules Trump and/or Eddie Trump.

13.      Defendant New TR Equity II, LLC ("New TR II") is a Delaware Limited Liability Company, controlled by Jules Trump and/or Eddie Trump.

14.      Defendant Jules Trump is a resident of Florida, and an officer and director of Glenclova.

15.      Defendant Eddie Trump is a resident of Florida, and an officer and director of Glenclova.

16.      Defendant Mark Hirsch is a resident of New York, and an officer and director of Glenclova.

17.      The Trump Group, New TR I , New TR II, Jules Trump, Eddie Trump and Mark Hirsch are referred to herein as the "Trump Parties."

18.      Defendant Trans-Resources, Inc. ("TRI") is a Delaware Corporation which is doing business in the City, County and State of New York, with its principal place of business located in the City, County and State of New York.

19.      The claims set forth in this Complaint arise from the conduct of each of the defendants, or their respective agents and co-conspirators, who committed one or more (i) tortious acts within the state, (ii) tortious acts without New York State causing injury to the

3

Plaintiffs or their property within New York State, and (iii) breaches of contract or fiduciary duty arising from contractual obligations, transactions and fiduciary obligations performed or to be performed in New York State.

## II.    NATURE OF THE CASE

20.    In this case, Plaintiffs Arie and Orly, in her individual capacity and on behalf of the Orly Trust, are seeking declaratory, injunctive, and other equitable relief, as well as additional compensatory damages in an amount yet to be determined arising from, inter alia, the loss of Arie's voting control of TRI and the tortious conduct of the defendants as set forth herein, in connection with the Trump Parties' campaign to take over and dilute the value of plaintiffs' interests in TRI, a company founded by Arie nearly three decades ago, including the defendants' wrongful, concerted efforts to strip Arie of his ownership and control of 52.85% of the shares of TRI's common stock, including the Orly Trust's interest in a portion of this TRI stock, and to oust Arie from his management control of TRI—all in an audacious series of breaches of contractual, fiduciary and legal obligations giving rise to each of the causes of action alleged in this Complaint.

## III.    FACTS RELEVANT TO ALL CLAIMS

### A.    Background

21.    The Plaintiff Arie is the founder and former Chairman of TRI, a private corporation which, through its subsidiaries, is a leading distributor and manufacturer of agricultural fertilizer worldwide.

22.    Arie founded TRI in 1985. Until 2001, TRI was wholly-owned by TPR Investment Associates, Inc. ("TPR"), a Genger family corporation established by Arie.

4

23.     Prior to October 30, 2004, TPR was controlled by Plaintiff Arie who owned 51% of TPR stock.

24.     Prior to October 30, 2004, Arie maintained majority control of TRI through his 51% majority ownership and control of TPR.

25.     The minority 49% interest in TPR, prior to October 30, 2004, was owned by D&K, Ltd. Partnership ("D&K"), also a Genger family company, which was in turn owned by Arie's wife, Dalia, (4%), the Sagi Trust and the Orly Trust (48% each).

26.     The Sagi and Orly Trusts were established in 1993 by Arie as part of a family estate plan.

27.     In 2001, defendants Glenclova and TR Investors became minority shareholders of TRI, acquiring approximately 47.15% of TRI common stock.

28.     As a result of the Trump Group acquiring 47.15% of TRI common stock, TPR became the owner of 52.85% of TRI stock with Arie maintaining a 51% controlling interest in TPR. Through his 51% ownership of TPR, Arie maintained control of a majority 52.85% interest in TRI, the company he founded.

29.     When the Trump Group became a minority shareholder of TRI, the Trump Group and TPR entered into the 2001 TRI Stockholders Agreement, dated March 30, 2001 (the "2001 TRI Stockholders Agreement") which, among other things, was intended to ensure that Arie (through his controlling interest in TPR) would continue to control the majority voting rights of TRI shares for the duration of his life.

5

30.     The 2001 TRI Stockholders Agreement specifically recognized that Arie was the

51% owner of TPR and that Dalia and the Orly Trust and the Sagi Trust through the D&K

Limited Partnership together owned 49% of TPR.

31.     The 2001 TRI Stockholders Agreement contains certain provisions restricting

the transfer of TPR's majority interest in TRI to someone other than Arie during his lifetime,

except under certain enumerated conditions intended to ensure that Arie, as the majority

shareholder of TPR, would maintain control over 52.85% of TRI shares during his life. The

2001 Stockholders Agreement specifically provides that exclusive jurisdiction over disputes

relating to this 2001 TRI Stockholders Agreement shall be in Federal courts or New York State

courts sitting in the City, State, and County of New York. The full terms and conditions of the

2001 TRI Stockholders Agreement are incorporated herein by reference.

**B.     The Genger Divorce and Court-Ordered Stipulation of Settlement**

32.     In 2002, Dalia and Arie became embroiled in a bitter divorce action venued in the

Supreme Court, New York County, entitled *Dalia Genger v. Arie Genger*, Index No. 302436-

2002 ("Genger Divorce Action").

33.     In October of 2004, Dalia and Arie agreed to a Stipulation of Settlement, which

was incorporated into a Judgment of Divorce in the Genger Divorce Action on January 7, 2005

("Stipulation of Settlement"), attached hereto as Exhibit A. This Court-Ordered Stipulation of

Settlement, among other things equitably distributed between Arie and Dalia various marital

assets, including the ownership interests in the family holding company TPR which then held

52.85% of TRI common stock which was controlled by Arie through his control of TPR.

Pursuant to the terms of the Judgment of Divorce, the New York State Supreme Court retained

6

jurisdiction over the parties with respect to the enforcement of the terms of the Stipulation of

Settlement.

34.    Pursuant to the terms of the Stipulation of Settlement and certain 2004 TPR

Transaction Documents (described below) implementing the Stipulation of Settlement, it was

agreed by and among Arie, Dalia, Sagi, Orly, the Orly Trust, and the Sagi Trust that as part of

the settlement of the Genger Divorce Action, that Arie would transfer his 51% interest in the

TPR marital asset to Dalia, in consideration of TPR concurrently divesting itself of its 52.85%

majority interest in TRI on the following terms and conditions, which were all part of a single

integrated transaction:

        i.      The defendant Sagi would become the President of TPR;

        ii.     TPR, by Sagi as President of TPR, would transfer to the plaintiff Arie
                 direct ownership of 794.40 shares of TRI common stock representing
                 13.99468% of the common stock of TRI;

        iii.    TPR, by Sagi as President of TPR, would transfer to each of the Sagi Trust
                 and Orly Trust, record ownership of 1,102.80 shares (or 19.42766 % each)
                 of TRI stock, subject to and on the further conditions that:

             (a) the Sagi Trust and the Orly Trust would each execute and deliver a
             2004 Voting Trust Agreement to Arie which provides further that:

                   (i) the Sagi Trust and the Orly Trust would immediately execute
                   and deliver to Arie an irrevocable voting proxy ("Putative
                   Irrevocable Proxies") intended to ensure that Arie would maintain
                   voting control over the Sagi Trust TRI shares and the Orly Trust
                   TRI Shares for the duration of Arie's life, and

                   (ii) in the event that the Putative Irrevocable Proxies granted by the
                   Sagi Trust and the Orly Trust to Arie were ever held to be invalid
                   then:

                       (1) a Back-up Voting Trust Agreement would be entered
                   into promptly between each of the Sagi and Orly Trusts and Arie
                   which:

> **(a) grants Arie the right to vote the Orly Trust and Sagi Trust TRI shares for the duration of Arie's life,**
>
> (b) provides that Arie is entitled to keep possession of the Sagi Trust and Orly Trust TRI Shares pursuant to a Voting Trust Agreement in a form attached to the 2004 Voting Trust Agreement, and
>
> (c) provides that the Orly and Sagi Trust TRI shares would not be sold without a prior Court order,

and the 2004 Voting Trust Agreement further provides that:

> **(2) pending the execution of the Back–up Voting Trust Agreement, the Orly and Sagi Trusts would be obligated to vote the Orly Trust and Sagi Trust Shares as directed by Arie during his lifetime.**

**Id.(emphasis added)**

35.    The Court-Ordered Stipulation of Settlement in the Genger Divorce Action is attached as Exhibit A hereto.

36.    Article II of the Stipulation of Settlement in the Divorce Action, entitled "Distribution of Assets," specifically provides, in pertinent part, as follows:

> [2. (a)] "(ii) [Dalia] shall receive . . . sole ownership of the husband's [Arie's] two hundred and fifty (250) shares of common stock of TPR Investment Associates, Inc. ("TPR"), . . . which represents fifty-one percent (51%) of the issued and outstanding shares of common stock of TPR (exclusive of the 1.96% ownership of TPR, which the wife [Dalia] owns indirectly through her general partnership interests in D&K [partnership].
>
> &ast;   &ast;   &ast;
>
> "9. (a) TPR owns 3,000 shares of stock in Trans-Resources, Inc. ("TRI Stock") . . . . Concurrently with the execution of this agreement, the TRI Stock shall be distributed as follows:
>
> **"(i) The husband [Arie], shall receive 794.40 shares of the TRI Stock, representing 13.99468% of the common stock of TRI;**

8

> **(ii) Each of Sagi Genger and Orly Genger, will receive
> in trust 1,102.80 shares of TRI Stock representing 19.42766%
> of the common stock of TRI for each of Sagi and Orly, and
> such trusts will simultaneously therewith execute and deliver
> irrevocable proxies to the husband for all of the TRI Stock
> owned by the trusts; and**
>
> **"(c)    Concurrently with the execution of this Agreement,
> each of the Husband and Wife will execute and deliver or cause
> TPR to execute and deliver (i) all documents reasonably
> necessary to effect the transfers required by subparagraph (a)
> of this Section 9, and (ii) duly executed stock powers to transfer
> the shares as required by subparagraph (a) of this Section 9.**

                                *    *    *

> "(e) Following the foregoing transfers of the TRI Stock, the wife
> [Dalia] will have no ownership interest in TRI."

(Stipulation of Settlement, Exhibit A hereto, Article II, paragraph 2(a) (ii), p.5, and paragraph 9
(a), (c) & (e) at pp. 13, 14) (emphasis added).

37.    The Stipulation of Settlement also provides that this TPR/TRI transaction was a

fundamental part of the Stipulation of Settlement, and specifically states in pertinent part, in

bold and capital letter type:

> **"A FUNDAMENTAL PART OF THIS AGREEMENT IS THE
> HUSBAND'S RELINQUISHMENT OF HIS OWNERSHIP
> OF SHARES OF COMMON STOCK IN TPR, AND THE
> TRANSFER OF SUCH OWNERSHIP TO THE WIFE."**

Stipulation of Settlement, Exhibit A hereto, Article 3, para. 1.

38.    The Stipulation of Settlement also included an express reformation clause which

provides that in the event that any term of the Stipulation of Settlement were to be voided by a

court of competent jurisdiction for any reason, then either Dalia or Arie would be entitled to seek

court-ordered reformation of the Stipulation of Settlement in a New York Court to give effect to

                                    9

the intent of the parties to the fullest extent permitted by the laws of the State of New York. This

reformation clause of the Stipulation of Settlement provides:

### "ARTICLE XVI

### POSSIBLE INVALIDITY

> "If any provision of this [Stipulation of Settlement], for any reason
> whatsoever, be declared . . . unenforceable by any Court of
> competent jurisdiction . . . the remainder of this Agreement and
> the application of such provision to any person or situations, other
> than those as to which such provision may have been invalid or
> unenforceable shall not be affected thereby and shall continue to be
> enforced to the fullest extent that such severance of the invalid
> portions is possible without vitiating the original intent and
> purposes and economic intentions of the parties (the "Original
> Intent"), as herein set forth.... **In the event a provision is
> superseded under this [Stipulation of Settlement], either party
> may seek reformation of the affected provision in any court of
> competent jurisdiction which shall be empowered to revise the
> provision to reflect the parties' Original Intent to the greatest
> extent possible, consistent with New York law.** It is the
> intention of the parties hereto that this provision may be enforced
> in equity in addition to, and not to the exclusion of, any other
> remedies which may be available to the parties."

(Stipulation of Settlement, ARTICLE XVI, Exhibit A at pages 47-48) (emphasis added)).

39.    Dalia was represented by separate, independent legal counsel in connection with

the negotiation and her execution of the Stipulation of Settlement.

40.    Dalia, through her counsel, received a complete copy of the 2001 TRI

Stockholders Agreement prior to the execution of the Stipulation of Settlement.

41.    Sagi had full knowledge of the terms of the Stipulation of Settlement prior to, and

at the time that it was negotiated and executed, and was named as a fiduciary with regard to

certain marital property distributed or to be distributed under the Stipulation of Settlement.

10

42.    Sagi and his own counsel were provided with a full and complete copy of the 2001 TRI Stockholders Agreement prior to the execution of the Stipulation of Settlement.

43.    Edward Klimmerman, a partner at Sonnenschein, Nath & Rosenthal, LLP (now known as SNR Denton), represented Arie in the Genger Divorce Action, had full knowledge of the negotiation and terms of the Stipulation of Settlement at the time the Stipulation of Settlement was executed. Mr. Klimmerman signed the Stipulation of Settlement as a witness. Mr. Klimmerman was also legal counsel for TRI and TPR at the time the Stipulation of Settlement was executed.

44.    As counsel for TRI and TPR, Mr. Klimmerman participated in the actual drafting of the 2001 TRI Stockholders Agreement. As Arie's counsel in the Genger Divorce Action, he did not advise Arie that anything in the Stipulation of Settlement violated any term of the 2001 TRI Stockholders Agreement between TPR and the Trump Group.

45.    Arie reasonably believed that the transfers set forth in the 2004 Transfer Documents and Court-Ordered Stipulation of Settlement were valid and enforceable.

46.    Dalia and her legal representatives reasonably believed that the 2004 Transfers provided for in the Stipulation of Settlement were valid and enforceable at the time Dalia entered into the Stipulation of Settlement.

47.    Defendant Jules Trump, a representative of the Trump Group was aware of the Genger Divorce Action, and prior to the execution of the Stipulation of Settlement testified as a witness in the Genger Divorce Action in connection with the ownership of TRI shares.

11

C.    **The 2004 TPR Transfer of TRI Shares Pursuant to the Stipulation of Settlement**

48.    To implement the TPR and TRI share transfer provisions in the Stipulation of

Settlement, Arie, the Sagi Trust, the Orly Trust and TPR, concurrently with the execution of the

Stipulation of Settlement, entered into the following "2004 TPR Transaction Documents" in

accordance with the express terms and intent set forth in the Stipulation of Settlement:

>        (i) a 2004 TPR Agreement to Transfer TRI Shares, dated
> October 29, 2004 (the "2004 TPR Transfer Agreement", attached
> hereto as Exhibit B); and

>        (ii) a 2004 Voting Trust Agreement, dated October 29,
> 2004 (the "2004 Voting Trust Agreement", attached hereto as
> Exhibit C), which attached:

>        (a) Executed Documents referred to as Putative Irrevocable
> Proxies, dated October 29, 2004, executed by the Sagi Trust and
> the Orly Trust ("Putative Irrevocable Proxies", attached hereto as
> Exhibit D) which by their specific terms purported to grant to the
> Plaintiff Arie the right to control and vote the Sagi Trust TRI
> shares and the Orly Trust TRI shares for the duration of his life,
> and

>        (b) a form Back-up Voting Trust Agreements ("Back up
> Voting Trust Agreements", attached here to Exhibit E), which
> were to be executed promptly by the Sagi Trust and the Orly Trust
> in the event that the Putative Irrevocable Proxies granted by the
> Sagi Trust and the Orly Trust to Arie were ever held to be invalid,
> and provided that:

>        (i) the Sagi Trust and the Orly Trust were required
> to vote the TRI shares in accordance with Arie's directions
> pending the execution of the Back-up Voting Trust Agreements in
> accordance with the express intent in the Stipulation of Settlement
> that Arie was to maintain voting control of the Sagi Trust and Orly
> Trust TRI shares for the duration of his life;

>        (ii) Arie would be entitled to keep possession of the
> Sagi Trust and Orly Trust TRI Shares pursuant to a Voting Trust
> Agreement in the form attached to the 2004 Voting Trust
> Agreement; and

(iii) the Orly and Sagi Trust TRI shares would not
be sold without a prior Court Order.

49.    Each of the 2004 Transaction Documents confirm the stated intention of the

parties to the Stipulation of Settlement and 2004 Transaction Documents that Arie, for the

duration of his life, would continue to have voting control over 52.85% of the outstanding shares

of TRI that were previously owned by TPR and controlled in turn by Arie through his 51%

ownership of TPR.

**D.    The 2004 TPR Transfer Agreement-Exhibit B**

50.    The 2004 Transfer Agreement executed by Sagi himself on behalf of TPR,

provides :

> "This letter will set forth our agreement pursuant to which you will
> purchase the 3,000 shares of common stock ("the Shares") of
> Trans-Resources, Inc. ("TRI") owned by TPR Investment
> Associates, Inc. ("TPR"). TPR hereby sells, transfers and conveys
> the Shares to you as follows:
>
> > (i)     794.40 shares to Arie Genger;
> >
> > (ii)    1,102.80 Shares to the Sagi Genger 1993 Trust, and
> >
> > (iii)   1,102.80 Shares to the Orly Genger 1993 Trust.
>
> * * *
>
> "The Shares represent 52.85% of the issued and outstanding shares
> of TRI. The Shares are being transferred hereunder free and clear
> of any liens, claims or encumbrances and **such transfer does not
> violate the Certificate of Incorporation of TPR or any
> agreement to which TPR is subject.**
>
> **"The trustees of the Sagi Genger 1993 Trust and of the Orly
> Genger 1993 Trust ("Trusts") have agreed to execute on behalf
> of the Trusts (i) an Irrevocable Proxy to appoint Arie Genger
> to vote the Shares owned by the Trusts and (ii) a voting trust
> letter agreement, copies of which are annexed hereto."**

13

DATED: New York, New York          MITCHELL SILBERBERG & KNUPP LLP
September 20, 2011

By: _____

Paul D. Montclare (PM 4454)
Lauren J. Wachtler (LW 4205)
12 E. 49th Street, 30th Floor
New York, New York 10017
(212) 509-3900

Attorneys for Plaintiff ARIE GENGER

ZEICHNER ELLMAN & KRAUSE LLP

By: _____

Yoav M. Griver
Bryan D. Leinbach
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 223-0400
Facsimile: (212) 753-0396

Attorneys for Plaintiff ORLY GENGER, in
her individual capacity and on behalf of the
ORLY GENGER 1993 Trust

68

> "**In case, at any time hereinafter, any further action is
> necessary or desirable to carry out the purposes of this Letter
> Agreement, each of the parties hereto shall take or cause to be
> taken all necessary action,** including, without limitation, the
> execution and delivery of such further instruments and documents
> which may be reasonably requested by any party for such purpose
> or otherwise **to complete or perfect the transactions
> contemplated hereby.**"

> This Letter Agreement shall be governed by the laws of the State
> of New York without regard to conflicts of law principles.

(2004 TPR Transfer Agreement, Exhibit B) (emphasis added)

### E.      The 2004 Voting Trust Agreements (Exhibit C hereto)

51.      In accordance with the terms of the Stipulation of Settlement (Exhibit A) and the

2004 TPR Transfer Agreement (Exhibit B), Arie and the Sagi and Orly Trusts, respectively,

entered into identical 2004 Voting Trust Letter Agreements in favor of Arie (Exhibit C) which

provide as follows:

> "In connection with the transfer to the [Sagi and Orly Trusts] of
> 1,102.80 shares [each] of common stock (the "Shares") of Trans-
> Resources, Inc. (TRI) **pursuant to the terms and conditions of
> the Stipulation of Settlement of even date herewith,** the [Sagi
> and Orly] trust is [each] granting to Arie Genger an irrevocable
> proxy ("the Proxy") for the shares, a copy of which is annexed
> hereto.

(Exhibit C)(emphasis added).

### F.      The 2004 Putative Irrevocable Proxies Executed By The Sagi and Orly
### Trusts (Exhibit D, hereto)

52.      In accordance with the 2004 TPR Transfer Agreement, the Stipulation of

Settlement, and the 2004 Voting Trust Agreement, the Sagi and Orly Trusts executed two

identical Putative Irrevocable Proxies, each of which states, in relevant part, that:

> "[The Sagi Trust and Orly Trust, each respectively], ("the Trust")
> being the current record and beneficial owner of 1,102.80 shares of
> common stock of [TRI] **does hereby constitute and appoint Arie**

14

> **Genger, Chairman of the Board, Chief Executive Officer, and
> owner of approximately fourteen percent (14%) of the shares
> of common stock of TRI to vote as its proxy, all shares of
> common stock of TRI which are now or hereafter owned by
> the Trust**, at any and all meetings of the stockholders of TRI,
> regular or special, or by consent in lieu of meeting or any
> adjournments thereof in the same manner and to the same extent
> that the Trust might were the Trust present at said meeting (or
> executing such consent), upon any issue or proposal which may be
> brought before such meeting or by such consent.
>
> **"This Irrevocable Proxy shall be deemed coupled with an
> interest and be irrevocable from the date hereof, and shall
> continue for the duration of Arie Genger's life."**

(Exhibit D)(emphasis added).

53.    The 2004 Voting Trust Agreement further provides that **in the event that the
Putative Irrevocable Proxies were ever declared invalid**, the Orly and Sagi Trusts would be
obligated to enter into a Back-up Voting Trust Agreement (Exhibit E) to assure that Arie would
maintain voting control over a majority of TRI shares for the duration of his life. This part of the
2004 Voting Trust Agreement, executed by the Sagi Trust and the Orly Trust, provides:

> **"In the event that for any reason the Proxy is declared invalid
> and is no longer in effect, the Trust agrees, as promptly as
> practicable, to enter into a Voting Trust Agreement (the
> "Voting Agreement") with Arie Genger as the voting trustee,
> which shall be substantially in the form annexed hereto.
> During the time the Proxy is not in effect and prior to the time
> the Voting Agreement is entered into, the Sagi Trust agrees to
> vote the shares as directed in writing by Arie Genger."**

(2004 Voting Trust Agreement, Exhibit C ) (emphasis added).

### G.    Back-Up Voting Trust Agreement –(Exhibit E hereto)

54.    The Backup Voting Trust Agreement, which springs into effect upon the Putative
Irrevocable Proxies being voided, provides:

15

> "The Trust Securities [the Sagi and Orly TRI Shares subject to
> the Voting Trust] shall be held by the Trustee [Arie Genger]
> for the purposes of and in accordance with this Agreement <u>and
> none of the Trust Securities shall be sold or otherwise disposed
> of by the Trustee except as herein expressly provided or in
> accordance with a final order of any Court or administrative
> agency with jurisdiction thereover.</u>"

* * *

> "This Agreement shall continue in effect for the duration of
> Arie Genger's Life"

Exhibit E. (emphasis added)

55.     In order to ensure that he maintained absolute control of the TRI shares for the

duration of his life, Arie never delivered physical copies of TPR's TRI shares to the Orly or Sagi

Trusts.

### H.     The Intent of the Parties

56.     The written 2004 Transaction Documents and the Stipulation of Settlement reflect

the stated intention of all the parties to these collective documents, <u>to wit</u>, that in order to resolve

the contested Genger Divorce Action, Arie agreed as part of the distribution of marital assets to

transfer his 51% interest in the family holding company, TPR, to Dalia, in exchange for Dalia

agreeing that TPR would concurrently divest itself of its 52.85% interest in the common stock of

TRI by distributing TPR's 52.85% majority interest in TRI to Arie (14%), the Sagi Trust

(19.425%), and the Orly Trust (19.425%) each, **on the express further condition that Arie

maintain voting rights for the Sagi Trust and Orly Trust TRI shares for the duration of his

life.**

57.     Arie, Dalia, Sagi and Orly each reasonably believed that the 2004 Transfers

provided for in the Stipulation of Settlement were valid and enforceable.

16

58.    Arie, Dalia, Sagi and Orly each reasonably believed that the Putative Irrevocable Proxies and Voting Trust Agreements were valid and assured that Arie would be able to maintain 58.85% voting control for the duration of his life.

59.    Accordingly, the concurrently executed integrated 2004 Transfer Documents were intended to implement the terms of the Stipulation of Settlement which provided expressly that Arie was to retain his 52.85% voting control over TRI and concomitantly continue to control the management and Board of TRI during his lifetime.

60.    It was also the parties' stated intention, and all parties reasonably believed, that the terms of the court-ordered Stipulation of Settlement with Dalia would not violate the terms or intent of the 2001 TRI Stockholders Agreement because Arie would still control what had been TPR's voting majority of TRI shares.

61.    The Genger Divorce Action was not concealed from TRI, the Trump Group, or the Trump Parties at any time.

62.    The 2004 transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust were reflected in the books and records of TRI.

63.    Prior to 2008, Jules Trump, and Mark Hirsch, each individually and on behalf of the Trump Group between 2004 and 2008 had access to the books and records of TRI.

64.    Between 2004 and 2008, as a Director of TRI, Jules Trump and Mark Hirsch, each had a fiduciary duty and legal duty of reasonable care to the record and beneficial owners, including TPR and TRI, to know the identity of all TRI shareholders of record as set forth in the books and records of TRI- a close corporation.

17

65.    As a Directors of TRI, Jules Trump, and Mark Hirsch, each individually and on behalf of TRI, had a fiduciary and legal duty of reasonable care to TPR and Arie to read all corporate Board minutes and other documents presented to the Directors and/or shareholders of TRI, in their entirety, prior to signing such documents.

66.    Prior to 2008, the books and records of TRI show that:

(i) Arie was record owner of 794.40 shares of TRI, representing 13.9946% of the common stock of TRI;

(ii) the Sagi Trust was the record owner of 1102.80 TRI shares, representing 19.42766% of the common stock of TRI; and

(iii) the Orly Trust was the record owner of 1102.80 TRI shares, representing 19.42766% of the common stock of TRI.

67.    Prior to 2008, the 2004 Transfers and the record ownership of TRI shares was known by:

(i) the officers and directors of TRI, in addition to Arie

(ii) TRI's legal counsel; and

(iii) TRI's Certified Public Accountant.

68.    Jules Trump, and Mark Hirsch, each individually and on behalf of the Trump Group executed corporate TRI documents as Director and/or on behalf of a shareholder of TRI which indicated that Arie, the Orly Trust and the Sagi Trust were the record owners of TRI shares.

18

69.    The terms of the Stipulation of Settlement relating to the distribution of TPR and TRI shares as marital assets in connection with the Genger Divorce Action were not in any way or at any time concealed from TRI, the Trump Group, or the Trump Parties.

70.    Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, and otherwise knew, and was aware that the Genger Divorce Action could involve in some way the equitable distribution of TPR shares owned by Arie as part of the divorce action.

71.    Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, knew, and was aware that the Genger Divorce Action involved in some way the value of TPR's ownership of TRI shares.

72.    Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, knew, and was aware that the Genger Divorce Action involved in some way Arie's management and control over TRI, the company that he had founded and managed since 1985.

73.    Prior to 2008, Jules Trump knew that ownership of TPR, as a marital asset which owned 52.85% of TRI shares, was a major asset and was the subject of a claim by Dalia for equitable distribution in the Genger Divorce Action.

74.    Prior to 2008, the Trump Group, through Jules Trump, who testified in the Genger Divorce Action, knew, and was aware that the Genger Divorce Action would involve in some way the equitable distribution of TPR assets, including Arie's 51% majority ownership of TPR.

75.    Prior to 2008, the Trump Group, through Jules Trump who testified in the Genger Divorce Action, and otherwise knew, and was aware that the Genger Divorce Action could

19

involve D&K Limited Partnership, which was identified in the 2001 TRI Stockholders

Agreement as an owner of 49% of TPR (the majority Shareholder of TRI) and further disclosed

that in turn this 49% minority ownership of TPR by D&K was owned by Arie's wife Dalia (4%)

the Sagi Trust (48%) and the Orly Trust (48%), and that these Trust interests could be effected

by the equitable distribution of TPR assets as part of the Genger Divorce Action.

76.     The Trump Group knew that the 2001 TRI Stockholders Agreement did not

contain an express provision setting forth the rights and obligations of TPR, Arie or the Trump

Group in the event of a contested divorce involving Arie's ownership of TPR shares as marital

property, including TPR's ownership of TRI shares under New York's equitable distribution

laws or otherwise.

77.     Prior to 2008, Arie had reason to believe that The Trump Group, through Jules

Trump, and otherwise, had notice of the 2004 Transfers.

78.     Prior to 2008, Arie had reason to believe that The Trump Group had notice of the

2004 Transfers which were reflected in TRI corporate documents.

79.     Prior to 2008, the Trump Group and Jules Trump, in particular, had knowledge of

facts in 2002-2004 including, but not limited, to the fact that Arie was involved in a bitter

contested divorce, and that the issue of Arie's ownership interests in TRI, through TPR or

otherwise, was an issue raised in the Genger Divorce Action.

80.     Between 2004 and 2008, Directors of TRI, its legal counsel, Secretary, as well as

its Controller, knew of the 2004 transfers.

20

81.     Between 2004 and 2008, TRI, under Arie's management, reported the new
company ownership resulting from the 2004 transfers to its lead bank, the IRS, and TRI's
insurance company.

82.     Between October 2004 and August of 2008 nothing prevented the Trump Group,
Jules Trump, TRI or its officers or directors, or any of them, from making any inquiry
whatsoever of Arie, Orly, TPR, TRI, TRI's general counsel, Dalia, Sagi, the Sagi Trust, the Orly
Trust, or D&K, concerning the effect, if any, that the Genger Divorce Action, or any judgment or
resolution of the Genger Divorce Action had, would or could have, on (i) the ownership of TPR,
(ii) Arie's ownership of a majority interest of TPR, (iii) TPR's ownership of TRI, (iv) Dalia's
interest in D&K minority ownership of TRI, or the rights of the Sagi Trust or the Orly Trust as
limited partners of D&K which owned approximately 49% each of TPR -- which ownership was
acknowledged by the Trump Group in the 2001 TRI Stockholders Agreement.

83.     Between October 2004 and August of 2008 nothing prevented the Trump Group,
Jules Trump, TRI or its officers or directors, or any of them, from making any inquiry
whatsoever of Arie, Orly, TPR, TRI, TRI's general counsel, Dalia, Sagi, the Sagi Trust, the Orly
Trust, or D&K as to the identity of the record owners of TRI.

84.     Jules Trump, Eddie Trump and Mark Hirsch (an attorney) at all times relevant to
this complaint were sophisticated business individuals, with special expertise in corporate
governance and ownership.

85.     At all times relevant to this action the Trump Parties had access to independent
legal counsel.

21

86.    Prior to 2008, the Trump Group, by Jules Trump, and otherwise, acted with

willful blindness and indifference to facts which put The Trump Group on notice of (i) the 2004

Transfers, and (ii) that Arie, the Sagi Trust and the Orly Trust were record owners of their

respective TRI shares.

87.    The Trump Group, by Jules Trump, and otherwise, waived any objection to the

2004 Transfers.

88.    Between 2004 and 2008, under Arie's management, TRI's business performance

improved consistently without any complaint or objection by TRI's Board of Directors

including but not limited to representatives of the Trump Group.

I.    **The Trump Parties' 2008 Scheme and Conspiracy to Seize Majority Control
of TRI, Squeeze Out Arie as an Officer, Director and Shareholder of TRI
and Dilute the Value of Arie's, Orly's and the Orly Trust's Interests in the
Affected TRI Shares**

89.    There was no hint of any substantial disagreement between Arie and the Trump

Group relating to the Genger Divorce Action, or otherwise, until June of 2008, when TRI's value

increased substantially as a result of improved performance.

90.    In the early Spring of 2008, TRI was facing a threat of foreclosure of one of its

major operating units by Bank Hapoalim, a long-time lender of TRI.

91.    To address this foreclosure threat, Arie and the Trump Group explored the

possibility of a sale of assets and restructuring plan involving the spin-off of all of TRI's North

American assets to a separate entity and a capital loan by the Trump Group into a residual TRI to

retire the Bank Hapoalim debt in exchange for increasing the equity position of the Trump Group

in the restructured TRI so that the Trump Group would obtain a majority position (the "Funding

Plan").

22

92.     Had the Funding Plan been implemented, in return for providing funding Jules and Eddie Trump through TR-I and TR-II would, for the first time, have been permitted to obtain a direct ownership interest in TRI, and the Trump Parties, under the Funding Plan, would have obtained majority control over TRI, the company that Arie had founded and worked so hard to make succeed.

93.     TRI's legal counsel advised that it would be necessary for a special committee of the Board to be constituted in order for the Board to approve the Funding Plan without the vote of Jules Trump who was an interested Director with a conflict of interest. .

94.     Despite requests from Arie to constitute such a committee, the Trump Group Directors failed to agree to the appointment of such committee.

95.     The Board of TRI never constituted a special committee in order for the Board to approve the Funding Plan.

96.     The implementation of the Funding Plan was also subject to other conditions relating to the value of the transaction which conditions were never met.

97.     While the proposed Funding Plan was being worked on, the financial condition of TRI began to improve substantially. By late June 2004, TRI was generating positive cash flow of $15-20 million per month. This represented a dramatic improvement in TRI's earnings within a matter of months in 2008, and rendered the Funding Plan unnecessary.

98.     As a result, there was no longer a need for TRI or Arie to move forward with the Trump Group Funding Plan that would have given the Trump Parties' majority control of TRI.

23

99.     To proceed with the Funding Agreement would have diluted the shares of existing

shareholders and cause TRI to pay the Trump Group unreasonable fees for a loan that was not

needed.

100.     Based on the advice of TRI's Delaware corporate counsel concerning the

establishment of an independent committee of the Board to approve the Funding Plan, which the

Trump Group refused to empanel, and the fact such a Funding Plan was no longer necessary

because of improved performance of TRI which permitted the satisfaction of the Bank Hapoalim

loan, the Funding Plan was rejected and the Bank Hapoalim loan satisfied with TRI's own

substantially improved earnings without the need for funding from the Trump Parties or any

other third-party.

101.     On information and belief, the Bank Haopolim's threat of foreclosure and the

Funding Plan takeover proposed by the Trump Group were also engineered by Jules Trump,

individually, and on behalf of the Trump Group with the aid, assistance and further illegal

conduct of the Trump Group and a principal officer of Bank Haopolim with whom the Trump

Group had other business entanglements.

102.     Thwarted in their effort to take over the controlling interest in TRI through the

rejected Funding Plan, the Trump Group, Mark Hirsch, Eddie Trump, and Jules Trump

formulated a further illegal scheme and plan to take over the then very profitable TRI, and oust

Arie as its CEO, and steal the Genger family TRI shares at a fraction of their value.

103.     In furtherance of this plan, the Trump Group leveled an extortionate threat at Arie

demanding that unless Arie agreed to turn over majority control of TRI to the Trump Group

pursuant to the Funding Plan (which was no longer necessary ), the Trump Group would declare

24

that the 2004 TPR transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust under the

Stipulation of Settlement were void under the 2001 TRI Stockholders Agreement even though

Arie as a permitted Transferee held 14% of TRI outright, and had received a Voting Trust

Agreement and Putative Irrevocable Proxies from the Sagi Trust and the Orly Trust which, on

their face, gave Arie the right during his lifetime to control the management of TRI, and vote the

same 52.85% shares of TRI stock that had been controlled by Arie through his 51% ownership of

TPR prior to the Stipulation of Settlement and the execution of the 2004 Transfer Documents.

Thus, there was virtually no effective difference in Arie's control of TRI Shares as between his

majority control of TPR prior to the execution of the Stipulation of Settlement, and the intended

control that Arie would exercise after the Stipulation of Settlement and 2004 Transfer

Documents were executed.

104.    At the time they made this threat in 2008, the Trump Parties, among other things,

knew that:

(i) the intent of the parties pursuant to the 2001 TRI Stockholders Agreement in

restricting certain transfers to Genger family members was to ensure that (a) Arie, personally,

would continue to have management and majority shareholder voting control over TPR's TRI

shares for the duration of his life, and (b) prevent any other Genger family member from having

any management or voting control over TRI during Arie's lifetime;

(ii) pursuant to the terms of the Stipulation of Settlement and the 2004 TPR-TRI

Transfer Documents Arie, Dalia, Orly and Sagi, specifically intended to preserve Arie's

management and voting control of TRI, in the context of resolving the equitable distribution of

marital property issues concerning TPR raised in the Genger Divorce Action;

25

(iii) that as a condition for Arie transferring his 51% interest in TPR to Dalia in the Genger Divorce Action, it was intended that pursuant to the Stipulation of Settlement and 2004 Transaction Documents Arie would receive valid Putative Irrevocable Proxies and Back-up Voting Trust Agreements from the Sagi Trust and the Orly Trust designed to ensure that Arie would retain voting control over a majority of TRI shares for the duration of his life even if the Putative Irrevocable Proxies were held to be invalid; and

(iv) that if the 2004 TPR transfer of TRI shares were voided, as threatened by the Trump Group, then:

(a)     52.85% of TRI shares would revert to TPR, which would be unjustly enriched because TPR, under the Stipulation of Settlement and implementing 2004 Transaction Documents, had already divested itself of those TRI shares in consideration of Arie relinquishing his 51% ownership of TPR to Dalia;

(b) that Arie would be the beneficial owners of such 3000 TRI Shares, and Arie would have the right to vote the 52.85% of TRI shares that were returned to TPR, subject to the Orly and Sagi Trust rights to receive certain of these shares upon Arie's death;

(c)     Sagi was not authorized to act on behalf of TPR to sell any of the TRI shares without the consent of Arie as the beneficial owner of the Arie TRI Shares, and the beneficial holder of the voting rights to TPR's TRI Shares;

(d)     Arie would be entitled to reform the Stipulation of Settlement, pursuant to the express terms of the Stipulation of Settlement, so that Arie would regain control of 51% of TPR's ownership and control of 52.85% of TRI's shares;

26

(e) that the New York Supreme Court under the Judgment of Divorce, had retained jurisdiction over Arie and Dalia in connection with enforcing the terms of the Stipulation of Settlement, including Arie's reformation claims; and

(f)    TPR, under Sagi's control, was not authorized to sell TRI shares to the Trump Group without the consent of Arie, as beneficial owner of TPR's record ownership of the TRI shares, in the event the 2004 Transfers were held to be invalid;

(v) that if the Putative Irrevocable Proxies (Exhibit D) were held to be invalid, that the Sagi and Orly Trust shares would be subject to the Back-Up Voting Trust Agreement Exhibit E) which was referred to in the 2004 Voting Trust Agreement (Exhibit C).

105.    Nevertheless, on August 8, 2008, the Trump Group, in furtherance of their plan to pressure Arie and take over a majority control of TRI, sent a letter to TPR asserting that it had the right under Section 3.2 of the 2001 TRI Stockholders Agreement to purchase all of the TRI shares that were the subject of the Stipulation of Settlement transfers in 2004, **at 2004 prices** – a small fraction of what is believed to have been a TRI value in excess of $1 billion in 2008, which had net after-tax income in excess of $150 million in that year.  The Trump Group provided no such letter or notice to Orly or the Orly Trust or the Sagi Trust.

106.    Three days later, on August 11, 2008, the Trump Parties, through Glenclova, commenced an action in the Federal District Court of the Southern District of New York against TPR (the "Federal Action") claiming that the transfer of the TRI shares by TPR to Arie Genger, the Orly Trust and the Sagi Trust pursuant to the express terms of the Stipulation of Settlement and 2004 Transaction Documents, was void.

107.   Notwithstanding the Trump Parties' respective specific knowledge in 2008 of the existence and terms of the Court-ordered Stipulation of Settlement and the 2004 TPR Transfer Documents, the Trump Group did not name Arie, Dalia, the Sagi Trust or the Orly Trust as parties in the Federal Action.

108.   The Trump Parties knew at the time they commenced the Federal Action that Arie was a known third party beneficiary under the 2001 TRI Stockholders Agreement and that the 2004 Transfers were approved in a Court-Ordered Stipulation of Settlement in the Genger Divorce Action, but nevertheless opposed Arie's motion to intervene in the Federal Action.

109.   The Trump Parties also knew that Sagi, as a result of the Stipulation of Settlement and 2004 TPR Transfer Documents, became the president of TPR, but that he had since become estranged from his father, and that Sagi had installed his mother-in-law Rochelle Fang as the nominal trustee of the Sagi Trust and that he exercised total dominion and control over her.

110.   The Trump Parties also knew that if the 2004 TPR transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust pursuant to the "So-Ordered" Stipulation of Settlement and 2004 Transfer Documents were voided, that Arie's transfer of his 51% ownership in TPR to Dalia would also have to be voided, and that as a consequence Dalia, or Sagi as her successor-in-interest, as a matter of New York law, would have to hold this 51% TPR interest in a constructive trust for the benefit of Arie with respect to TPR's ownership of the TRI Shares.

111.   The Trump Parties knew that neither TPR, nor Sagi as its President, would be authorized to sell any of TPR's shares of TRI to the Trump Group in the event that the 2004 TPR Transfers of TRI Shares to Arie, the Sagi Trust or the Orly Trust were voided because in that

28

event those TRI shares would be returned to TPR subject to a constructive trust for the benefit of
Arie.

112.    Prior to August 22, 2008, the Trump Group also knew that in the event that the
2004 transfers by TPR of TRI Shares to Arie, the Sagi Trust or the Orly Trust were voided, Sagi,
as the President of TPR, also owed a separate fiduciary duty to Arie and the Orly Trust with
respect to the 3000 TRI shares that would revert to TPR.

113.    TPR and Sagi each had a fiduciary and contractual duty to Arie to hold any TRI
shares that reverted to TPR in a constructive trust for their respective benefits as the beneficial
owner of such shares, and also owed a fiduciary duty to Orly and the Orly Trust with respect to
her interest in a portion of these shares.

114.    Nevertheless, in August, 2008, the Trump Group met, conspired and schemed
with Sagi and/or his representatives to contrive a plan to offer Sagi approximately $26.7 million
to induce Sagi to cause the Sagi Trust, through his mother-in-law Fang, to transfer to the Trump
Parties the Sagi Trust's 19.425% of TRI shares that the Sagi Trust received pursuant to the
Stipulation of Settlement and 2004 TPR Transaction Documents. This $26.7 million payment
was a fraction of the value of those shares at that time given the performance of TRI which, in
2008 had after tax earnings of $150,000,000 of sales of approximately $1 billion.

115.    As part of this conspiracy and scheme, the purchase of the Sagi Trust Shares was
to be conditioned on Sagi, purportedly as the President of TPR, further agreeing that if the Court
in the Federal Action, or any other court, held that the 2004 TPR Transactions were void, then
TPR would be "deemed" the Seller of the Sagi Shares, even though the Sagi Trust could keep the
$26.7 million, and even though TPR had no right or authority to sell the Arie, the Sagi Trust and

29

Orly Trust Shares without the consent of Arie as beneficial owners of these respective shares, subject to Orly's interest to receive the Orly Trust TRI Shares upon Arie's death, and Arie's beneficial interest in the voting rights for the Sagi Trust, Orly Trust and Arie TRI Shares.

116.    The Trump Group defendants knew that if the $26.7 million purported purchase price of the Sagi Trust Shares was paid to the Sagi Trust that the money would need to be returned to TPR.

117.    The Trump Group defendants knew that Sagi, on behalf of TPR was not authorized to sell the Sagi Trust Shares, in the event the 2004 Transfers were declared invalid.

118.    The Trump Group defendants never sought or received a representation by TPR or Sagi that Sagi, on behalf of TPR was authorized to sell any TRI Shares to the Trump Group.

119.    The Trump Group defendants knew that Sagi on behalf of TPR was not authorized to sell any of TPR's TRI shares to the Trump Group in the event that the 2004 Shares reverted to TPR that Sagi and TPR had a fiduciary and contractual duty to protect Arie's control over the 52.85% of TRI Shares for the duration of his life.

120.    The Trump Group did not obtain a representation from Sagi or TPR as to whether any sale by the Sagi Trust or TPR would be subject to Arie's right to vote those Shares for the duration of his life in accordance with the terms of the Court-ordered Stipulation of Settlement and the 2004 Transaction Documents.

121.    As part of this conspiracy and scheme the Trump Parties also required that in order for Sagi to get the $26.7 million put in his Trust, Sagi purportedly as the President of TPR would have to further agree in a "side letter" that if the Court in the Federal Action, or any other court, held that the 2004 TPR Transactions were void, then TPR would also agree to sell the 14%

30

Arie TRI shares and the 19.425% Orly Trust Shares, which TPR had already sold to Arie and the

Orly Trust pursuant to the Stipulation of Settlement and the 2004 Transaction Documents, to the

Trump Parties at a price that was 60% less than the price per share to be paid to the Sagi Trust.

Again, Sagi had no authority to make this sale on behalf of TPR.

122.    As part of the same conspiracy and scheme, the Trump Parties also insisted that

neither the Sagi Trust nor TPR take any action to protect the voting rights of Arie that were

granted to Arie by the Sagi Trust and the Orly Trust under the 2004 Voting Trust Agreements in

accordance with the 2004 TPR Transfer Agreement.

123.    To induce Sagi to sell the Sagi Trust Shares to the Trump Parties, the Trump

Group proposed a scheme and conspiracy that the Trump Parties knew would require Sagi to use

his position as President of TPR to obtain a personal benefit by having $26.7 million paid to his

Sagi Trust, while selling out Arie's and the Orly Trust's TRI shares for a fraction of their real

value in an obvious breach of Sagi's fiduciary and contractual duties to Arie and the Orly Trust,

which breaches of duty arose from, among other things, (i) Sagi's self-dealing transactions as an

officer of TPR to get $26.7 million from the Trump Group for his Sagi Trust shares while at the

same time and at the expense of Arie and the Orly Trust agreeing to sell their TRI shares at a

price per share that was 60% lower than the deal Sagi was making for himself through the sale of

the Sagi Trust shares to the Trump Parties, (ii) ignoring Arie's and the Orly Trust's beneficial

interest in the value of TPR's ownership of specific TRI stock that TPR had already transferred

to Arie and the Orly Trust for valuable consideration pursuant to the Stipulation of Settlement

and the 2004 TPR Transaction documents; (iii) inducing Fang as the Trustee of the Sagi Trust to

violate the 2004 Voting Trust Agreement with Arie; (iv) inducing the trustees of the Orly Trust

31

to violate their fiduciary obligations to the Orly Trust and Orly; (v) failing to protect Arie's

voting rights to 52.85% of TRI shares in accordance with the express intent and provisions of the

Stipulation of Settlement and the 2004 Transaction Documents; (vi) disposing of and

substantially devaluing the asset value of TPR's ownership of TRI shares, with knowledge that

such shares would be subject to Arie's claims for imposing a constructive trust on such shares,

reformation and/or rescission under the terms of the Stipulation of Settlement with respect to

restoring Arie's rights to a 51 % ownership of TPR insofar as TPR's ownership of TRI shares

was concerned; (vii) failing to disclose to Arie, Orly, or the Orly Trust the terms of the Trump

Parties' proposed scheme and plan to purchase the same TRI shares that TPR previously sold to

Arie and the Orly Trust under the Stipulation of Settlement and 2004 TPR Transfer Agreement,

(viii) failing to take all actions necessary to comply with the stated intentions of the parties to the

Stipulation of Settlement and 2004 Transaction Documents, and (ix) entering a self-interested,

unauthorized, ultra-vires agreement, ostensibly on behalf of TPR but in reality using his position

as President of TPR for his own personal gain to the detriment of Arie's and the Orly Trust's

legal and equitable interests in TPR's ownership of the TRI shares that were transferred to each

of them by TPR four years earlier, pursuant to the Stipulation of Settlement and 2004

Transaction Documents.

124. In furtherance of this scheme and conspiracy, the Trump Parties, the Sagi Trust,

by Rochelle Fang, and Sagi, purportedly on behalf of TPR, executed a 2008 Stock Purchase

Agreement with the Sagi Trust without the knowledge or consent of Arie or the Orly Trust, to

sell the 1102.80 Sagi Trust Shares of TRI common stock representing 19.425% of the shares of

32

stock to the Trump Group and two new entities – TR I and TR II – for $26,715,416.00. ("2008

Stock Purchase Agreement", attached hereto as Exhibit F).

125.    When combined with the Trump Parties' minority share of 47.15 %, this Sagi

Trust sale would give the Trump Parties a 66.575% majority and controlling voting interest in

TRI, in direct derogation of the intent of the Court–Ordered Stipulation of Settlement and the

Putative Irrevocable Proxies and 2004 Voting Trust Letter Agreement.

126.    The Trump Parties acknowledged the existence of the Putative Irrevocable

Proxies and 2004 Voting Trust Letter Agreement in the 2008 Stock Purchase Agreement,

representing and warranting that:

> "Such Purchaser hereby acknowledges receipt of copies of the
> irrevocable proxy dated as of October 29, 2004, issued by Seller
> ["Sagi Trust"] in favor of Arie Genger with respect to the shares
> (the "Proxy"), a backup form of voting trust agreement and voting
> trust certificate delivered in connection with the Proxy and the
> Letter Agreement dated October 29, 2004 [2004 Voting Trust
> Letter Agreement] with respect to the transfer of shares from TPR
> to Seller"

127.    The 2008 Stock Purchase Agreement also states that if the 2004 transfer of TRI

shares by TPR to the Sagi Trust were determined to be void and the shares returned to TPR then

**TPR** would be deemed the seller of the Sagi Trust Shares to the Trump Parties for $26.7 million,

even though this $26.7 million would have already been paid to the Sagi Trust controlled by Sagi

through his mother-in-law Fang.  There was no provision with respect to the reallocation of the

sales proceeds to TPR.

128.    The 2008 Stock Purchase Agreement violated the terms of the  2001 Stockholders

Agreement, including, but not limited to, Section 3.2 of that Agreement.

129.    By entering into the 2008 Stock Purchase Agreement, the Trump Group voluntarily and intentionally waived any right to purchase the Sagi Trust Shares under the 2001 Stockholders Agreement.

130.    Also through its intentional conduct, including its violation of the 2001 Stockholders Agreement, the Trump Group is estopped from utilizing any purported right to purchase under the 2001 Stockholders Agreement.

131.    In addition, Sagi, ostensibly acting for TPR, but without authority and in violation of his contractual, legal and fiduciary duties owed to Arie and Orly, signed a side letter on the very same day as the 2008 Stock Purchase Agreement that provides that if the 2004 transfer by TPR of TRI Shares to Arie and the Orly Trust under the Stipulation of Settlement and 2004 Transaction Documents were declared void, then Sagi, purportedly on behalf of TPR, would transfer the Arie Shares and Orly Trust Shares to the Trump Parties at a price per share 60% per share lower than the Sagi Trust was to receive under the 2008 Stock Purchase Agreement, which would then be deemed a sale by TPR ("2008 Stock Purchase Side Letter Agreement", attached hereto as Exhibit G).

132.    The terms of both the 2008 Stock Purchase Agreement and the Side Letter violated the 2001 Stockholders Agreement, including, but not limited to Section 3.2 of the 2001 Stockholders Agreement.

133.    The Trump Group defendants waived, and are estopped from asserting, any right under the 2001 Stockholders Agreement to purchase the Arie and Orly Trust TRI Shares from TPR.

34

134.    Neither Arie on behalf of TRI or the Board of Directors of TRI approved the
transaction set forth in the 2008 Stock Purchase Agreement and Side Letter.

135.    This Side Letter was not only an insidious requirement mandated by the Trump
Parties to get a majority interest in TRI for the first time, but was tantamount to a $26.7 million
bribe offered by the Trump Parties to Sagi, the estranged son of Arie, to betray his father and rob
his sister of the true value of their respective legal and equitable interests in the TRI stock
previously owned by TPR in order for the Trump Group to completely squeeze out Arie and the
Orly Trust at unconscionably low prices.

136.    At the time the Trump Parties, TR-I and TR II, the Sagi Trust and Sagi
purportedly on behalf of TPR, executed the 2008 Stock Purchase Agreement, the Trump Parties
also knew that if the 2004 transactions were voided, TPR, Sagi, the Sagi Trust and the Trump
Parties would all be unjustly enriched by the 2008 Stock Purchase Agreement and Side Letter.

137.    The Trump Parties also knew that if the 2004 TPR Transfers of TRI shares to
Arie, the Sagi Trust and the Orly Trust were voided, that these TRI shares recovered by TPR
would be the subject of a constructive trust established for the benefit of Arie, the Orly Trust and
the Sagi Trust.

138.    The Trump Parties, Sagi, and the Sagi Trust knew that Sagi, as an officer and
director of TPR, owed a fiduciary duty to Arie, the Orly Trust, and the Sagi Trust, not to devalue
or alienate Arie's and the Orly Trust's beneficial ownership of TPR insofar as TPR's ownership
of the TRI shares was concerned, and not to strip Arie of his voting rights with respect to these
TRI Shares.

35

139.    The Trump Parties, Sagi and the Sagi Trust knew at the time they executed the
2008 Stock Purchase Agreement that pursuant to the Court –Ordered Stipulation of Settlement,
Arie had a contractual right to seek to reform the terms of the Stipulation of Settlement in order
to give full effect to the intent of the parties with respect to his relinquishment of control in TPR
in exchange for Arie's continuing control of 52.85% of TRI shares and outright ownership of
14% of TRI's stock, as a permitted transferee.

140.    The Trump Parties, Sagi, and the Sagi Trust knew at the time they executed the
2008 Stock Purchase Agreement and Side Letter that Arie was entitled to rescission for failure of
consideration of that part of the Stipulation of Settlement that transferred his 51% of TPR to
Dalia, in exchange for Dalia's agreement to have TPR concurrently transfer 14% of TRI's shares
to Arie outright, and  that Arie would maintain voting control, or 52.85% of TRI for the duration
of his life.

141.    In connection with the 2008 Stock Purchase Agreement and in furtherance of the
plan and scheme to wrest control of TRI from Arie's control, the Trump Parties aided and
abetted the preparation of a sworn affidavit swearing that the Sagi Trust shares had been lost,
when the Trump Parties knew that was not a true statement.

**J.      The Trump Parties Declare Themselves The Majority Owners Of TRI, and
Commence An Action In The Delaware Chancery Court To Determine The
Composition of TRI's Board of Directors**

142.    On August 25, 2008, only three days after the 2008 Stock Purchase Agreement
and 2008 Stock Purchase Side Letter Agreement were executed, the Trump Group asserted that it
was in control of TRI through the acquisition of 1102.80 shares that were purportedly transferred
to them by the Sagi Trust.

36

143.    On August 25, 2008, the Trump Parties commenced a Chancery Court in rem

summary proceeding in the State of Delaware pursuant to 8 Del.C § 225(a) to determine the

composition of the Board of Directors of TRI ("The Delaware Action") and to declare, inter alia

that:

    i.      the Trump Parties are the majority shareholders of TRI and have the right to vote
              all of its shares including the shares which were allegedly purchased pursuant to
              the Stock Purchase Agreement;

    ii.     the 2004 transfers to Arie Genger, the Sagi Trust and the Orly Trust are void and
              continue to belong to TPR; and

    iii.    that the Putative Irrevocable Proxies do not apply to the shares transferred
              pursuant to the Stock Purchase Agreement.

144.    Neither TPR, the Sagi Trust, nor the Orly Trust were a party to the Delaware

Action, although TPR was given an opportunity to participate in that action, and refused to do so.

145.    The Trump Group as interested Directors in control of TRI had a fiduciary and

legal duty to authorize the appointment of separate, independent counsel for TRI in connection

with the Delaware proceeding and otherwise with respect to determining the beneficial and

record ownership of the Arie, Orly Trust and Sagi Trust TRI shares.

**K.    The July 23, 2010 Opinion of the Delaware Chancery Court**

146.    On July 23, 2010 the Delaware Chancery Court issued a lengthy written decision

which held that the transfers of TPR's TRI shares to Arie, the Sagi Trust and the Orly Trust

pursuant to the Stipulation of Settlement and 2004 Transaction Documents were void and

ownership reverted to TPR and that TPR's sale of the Sagi Trust TRI Shares to the Trump Group

pursuant to the 2008 Stockholders Agreement was valid.

147.    The Chancery Court also held that the Sagi Trust Irrevocable Proxy was not valid under New York or Delaware law. The Chancery Court in this § 225 proceeding held that the Trump Group was entitled to elect a majority of TRI Board members.

148.    While voiding the 2004 Transfers, however, the Chancery Court in this July 23 decision also held that because Arie was a "permitted transferee" under the 2001 TRI Stockholders Agreement, the transfer of the TRI shares to him did not warrant a forfeiture of Arie's TRI Shares.

149.    Because Arie was a permitted transferee of the TRI shares owned by TPR (a Genger family holding company that Arie had created) the Trump Group would have no right to stop the transfer of these TPR TRI shares to Arie once it received contractual notice and Arie agreed to be personally bound by the TRI Stockholders Agreement.

150.    Under the Delaware Chancery Court's July 23 decision, Arie would retain his TRI shares once he gave formal notice of TPR's 2004 transfer and agreed to be bound by the 2001 TRI Stockholders Agreement, which Arie promptly agreed to do shortly thereafter.

151.    In its July 23, 2010 decision, the Court of Chancery also held that because neither Orly nor the Orly Trust were parties to the Delaware Chancery Court action, the Delaware Court declined to issue any ruling with respect to the Orly Trust TRI Shares.

**L.    The July 26, 2010 TRO in this New York Action**

152.    Based on the July 23, 2010 Chancery Court decision, Arie and Orly sought and obtained a temporary restraining order from this Court, restraining Sagi and TPR from selling or encumbering the Arie and Orly Trust TRI shares. This temporary restraining order was granted on July 26, 2010 and extended by this Court on July 28, 2010.

38

**M.     The August Opinion of the Delaware Chancery Court**

153.     After being advised by the Trump Group of plaintiff being granted a TRO in this

New York Action, the Delaware Chancery Court indicated that it would reexamine its rulings

with regard to the Arie and Orly Trust TRI shares, and expressed concern about whether the New

York TRO was designed to undermine its ruling in the Delaware Court, which it was not.

154.     On August 3, 2010, to allay the Court of Chancery's concerns, Arie's counsel in

this case wrote to this Court advising that because defendants Sagi and TPR had agreed to abide

by a *status quo order* entered by the Delaware Chancery Court, which provided that Arie would

be given notice in the event TPR or Sagi intended to sell the Arie and Orly TRI Shares to the

Trump Group, it was agreed among counsel for TPR, Sagi, Dalia and the plaintiffs, that the

temporary restraining order would be vacated and plaintiffs in this action would accordingly

withdraw their application for a preliminary injunction, without prejudice.

155.     On August 9, 2010, the Chancery Court made an abrupt "about face" regarding its

determination earlier relating to the Arie and Orly Trust TRI Shares. In this second opinion, the

Delaware Chancery reversed itself regarding the ownership of the Arie and Orly Trust Shares,

and held that the Trump Group had the right to purchase the Arie and Orly Trust TRI shares from

TPR under the 2008 Side Letter Agreement, even though the Court had held only two weeks

earlier that Arie was a permitted transferee under the Stockholders Agreement and should be

permitted to keep his shares, and that the Orly Trust was never a party to the § 225 proceeding.

The Chancery Court also held that Arie and the Orly Trust had no beneficial interest in the Arie

and Orly Trust TRI shares—even though TPR, Sagi, the Sagi Trust and the Orly Trust were

never parties to the Delaware § 225 proceeding.

39

**N.    The Delaware Chancery Court's Final Judgment Order of August 18, 2010**

156.    On August 18, 2010, the Delaware Chancery Court entered a Final Judgment

Order which found (i) that TPR's 2004 transfers of the Arie TRI Shares, and the Orly Trust TRI

shares were void under the 2001 TRI Stockholders Agreement, (ii) that title to the Sagi Trust

TRI Shares, the Orly Trust TRI Shares and the Arie TRI Shares, all reverted to TPR; (iii) that the

Irrevocable Proxy for the Sagi Trust was not valid; (iv) that the sale of the Sagi Trust TRI shares

by Sagi on behalf of TPR was valid; (v) that the Side Letter was a valid agreement; and (vi) that

Arie and the Orly Trust had no beneficial or legal ownership interest in the Arie and Orly Trust

TRI shares.

157.    There was no discussion or finding in the Chancery Court Decision as to whether

Sagi was authorized to sell the Arie, Orly and Sagi Trust TRI Shares out of TPR.

158.    In addition to these holdings, the Chancery Court entered an anti-lawsuit

injunction, which prohibited Arie from "commenc[ing] or prosecut[ing] any legal proceeding . .

. in any [state] court [including the action in this Court which had already been commenced]

constituting a collateral attack on, attempt to prevent implementation of, or relitigation of any of

the [Chancery] Court's holdings set out in paragraphs 2 through 16 inclusive (summarized

above), of this final judgment order" pending a determination of an appeal to the Delaware

Supreme Court, with certain limited exceptions, but even the Chancery Court <u>specifically</u>

recognized Arie's right to apply to this Court to seek to escrow the proceeds from TPR's

impending sale of the Arie TRI Shares to the Trump Group, as follows:

> "Arie Genger shall have the right to seek an order from a court of
> competent jurisdiction requiring TPR Investment Associates, Inc.
> and its officers and directors to place in escrow the proceeds of
> sale of the shares of TRI referenced in paragraph 14 of this Order.
> [the "Arie TRI Shares"]."

40

**O.    Arie Appeals From the Chancery Court's Final Judgment Order**

159.    Arie timely appealed from the Chancery Court's rulings, arguing, inter alia, that

(i) the Trumps ratified the 2004 transfers, as a matter of law; (ii) the Irrevocable Proxy was valid

under New York law; and (iii) the Delaware Chancery Court had no jurisdiction to determine the

ownership of the Arie and Orly TRI shares or the validity of the Side Letter.

160.    Under threat of contempt, Arie agreed to stay this case pending a final

determination by the Delaware Supreme Court.

**P.    The Purported Sale by TPR of the Arie and Orly Trust TRI Shares**

161.    While Arie's appeal was pending, Arie was informed that TPR, without Arie's

consent or approval, intended to sell the Arie TRI shares to the Trump Group for $7,424,994.

162.    While the Trump Group and TPR agreed to hold $5,924,944 of these sale

proceeds in escrow pending a determination by the Delaware Supreme Court relative to the

ownership of the Arie and Orly Trust TRI shares, Sagi, as the CEO of TPR, insisted that TPR

was entitled to keep and spend the $1.5 million of the proceeds from the sale of the Arie TRI

shares, notwithstanding the pending appeal challenging the Chancery Court's rulings relating to

the ownership of the Arie and Orly Trust TRI Shares.

163.    While the appeal to the Delaware Supreme Court was pending, TPR, without the

consent or approval of Arie or Orly, also entered into an agreement to sell the Orly Trust TRI

Shares to the Trump Group for $10,314,005, with the proceed to be held in escrow by counsel

for Dalia as the nominal trustee of the Orly Trust.

164.    The Trump Group as interested Directors in control of TRI had a fiduciary and

legal duty to authorize the appointment of separate, independent counsel for TRI in connection

with the Delaware proceeding and otherwise with respect to determining the beneficial and

41

record ownership of the Arie, Orly Trust and Sagi Trust TRI shares prior to TRI recording the

transfer of the Arie and Orly Trust Shares to the Trump Group in 2010.

165.    Neither Sagi nor TPR had any authority to sell the Arie or Orly Trust Shares to

the Trump Group.

**Q.    This Court Enjoins TPR and Sagi From Taking or Using the $1.5 million
Sale Proceeds From the Purported TPR Sale of the Arie Shares to the Trump
Group**

166.    Arie moved by Order to Show Cause to restrain and enjoin Sagi and TPR from

using or disposing of the $1.5 million sale proceeds that were about to be released to TPR, and

requested that these specifically identified funds be placed in an acceptable escrow account or

paid into Court. This Court by its February 17, 2011 Decision and Order decreed as follows:

> "ORDERED that the defendants Sagi Genger and TPR
> Investment Associates, Inc., and their agents, servants, employees
> and all other persons acting under the jurisdiction, supervision
> and/or direction of the defendants, are enjoined and restrained,
> during the pendency of this action, from doing or suffering to be
> done, directly or through any attorney, agent, servant, or employee
> or other person under the supervision or control of the defendants,
> from taking, using, or spending or converting to their own use
> otherwise, the $1.5 million proceeds from the sale of certain
> common stock in Trans-Resources, Inc. in which plaintiff claims
> an interest"

**R.    The Decision of the Delaware Supreme Court**

167.    On July 18, 2011, the Delaware Supreme Court reversed that part of the Delaware

Chancery Court's Judgment that held that Arie and the Orly Trust were not the beneficial owners

of the Arie and Orly Trust TRI Shares.

168.    On Arie's appeal the Delaware Supreme Court described the limited nature of the

§225 proceeding as follows:

> A Section 225 proceeding is not an *in personam* action.
> Rather, it is "in the nature of an *in rem* proceeding," where the

"defendants" are before the court, not individually, but rather, as respondents being invited to litigate their claims to the *res* (here, the disputed corporate office) or forever barred from doing so.

\* \* \*

[For example] in a Section 225 proceeding the court "cannot go further and actually rescind a transaction procured through such unlawful behavior or award money damages to those harmed by that behavior." That type of ultimate relief can only be obtained in a plenary action in a court that has *in personam* jurisdiction over any necessary or indispensable parties.

169.   Further explaining the limited holding of the Delaware Chancery Court, the

Delaware Supreme Court held:

Given the jurisdictional limitations that inhere in a Section 225 action, we affirm the judgment of the Court of Chancery insofar as it determines the *record* [emphasis in original] ownership of the disputed Trans-Resources shares in the Side Letter Opinion and the Final Judgment Order.

\* \* \*

An adjudication of who has the right to vote disputed corporate shares for Section 225 purposes cannot constitute a binding adjudication of who beneficially owns those shares, because a Section 225 action is by its nature an *in rem*, not a plenary, proceeding. **Only in a plenary proceeding before a court that has *in personam* jurisdiction over the litigants may the court adjudicate the litigants' property interest in disputed corporate shares.**

(Emphasis added)

170.   The Delaware Supreme Court also held that the issue of ultimate beneficial

ownership of the Arie TRI Shares and the Orly Trust TRI Shares was beyond the equity

jurisdiction of the Chancery Court in the summary § 225 *in rem* proceeding, and that the issue of

the beneficial ownership of those shares needed to be adjudicated in a plenary action in a

jurisdiction where the Court has *in personam* jurisdiction over all indispensible parties.  These

necessary parties -- Arie, TPR, Sagi, Orly, the Orly Trust and the Trump Group -- are all parties
to this New York action , and have been served and have appeared in this case.

171.    The Delaware Chancery Court's holdings were limited to an in rem proceeding to
determine who held the record ownership of the shares at a point in time in order to determine
voting rights to elect members of the TRI Board based on the record owners of those shares at
the time of the election.

172.    The Delaware Chancery Court was without jurisdiction to determine the ultimate
ownership of the Arie and Orly Trust TRI shares or any of the tort claims asserted by Plaintiffs
in this action. Nor did the Delaware Chancery Court have jurisdiction to determine Arie's claims
for rescission, unjust enrichment, constructive trust or reformation arising from and in
connection with the Court-ordered Stipulation of Settlement, the 2004 Transaction Documents,
or the authority of Sagi to act on behalf of TPR.

173.    The Delaware Supreme Court affirmed that portion of the Chancery Court ruling
that held that TPR's 2004 transfers of TRI shares pursuant to the Stipulation of Settlement in the
Genger divorce and implementing 2004 TPR Transaction Documents violated the 2001 TRI
Stockholders Agreement and were void ab initio, for the purpose of the Delaware § 225
proceeding to determine composition of the TRI Board.

### FIRST CAUSE OF ACTION ON BEHALF OF PLAINTIFF ARIE GENGER

**(For a Declaratory Judgment Under CPLR 3001 that the
Stipulation of Settlement Entitles Plaintiff Arie to a
Court-Ordered Reformation of the Terms of the Stipulation
of Settlement as Against All Defendants)**

174.    Plaintiff repeats and re-alleges the allegations in paragraphs 1 through 173.

44

175.    Article XVI of the Stipulation of Settlement provides that the parties to the
Stipulation of Settlement have a right to seek court-ordered reformation in a New York court in
order to reflect the parties' original intent in the event a portion of the "So-Ordered" Stipulation
of Settlement is held to be invalid for any reason.

176.    The concurrent transfer of Arie's ownership of his 51% interest in TPR in
consideration of receiving a 14% interest in TRI and the right to control the voting rights of
52.85% of TRI Shares for the duration of Arie's life was an essential, fundamental condition of
the transfers of TPR and TRI shares set forth in the  Court-Ordered Stipulation of Settlement.

177.    The Delaware Chancery Court, as affirmed by the Delaware Supreme Court, held
that TPR's 2004 transfers of 52.85% of the shares of TRI Stock under the Stipulation of
Settlement and 2004 TPR Transfer Documents were invalid and void *ab initio*, and that the
Putative Irrevocable Proxies were invalid.

178.    The provisions of the Court-Ordered Stipulation of Settlement relating to the
transfer of ownership of TPR in consideration of the 2004 Transfers were based upon the mutual
mistake of Dalia and Arie that the 2004 Transfers and Irrevocable Proxies were valid.

179.    The Court-Ordered Stipulation of Settlement specifically provides that the parties
agree that if any of the terms of the Stipulation of Settlement is declared invalid by any court of
competent jurisdiction for any reason, Arie is entitled to seek an Order from this Court to reform
the Stipulation of Settlement, or obtain such other equitable or legal relief as is necessary to give
full meaning and expression to the original intent of the parties to the Court–Ordered Stipulation
of Settlement.

45

180.    Arie is entitled to an Order of the New York Supreme Court to reform the terms
of the Court-Ordered Stipulation of Settlement to reflect the parties' original intent to the
greatest extent possible.

181.    Accordingly, Arie seeks an Order and declaratory judgment to reform the Court-
Ordered Stipulation of Settlement to provide as follows:

(i)     That the transfer by Arie of his 51% interest in TPR to Dalia and the
concurrent transfer of the 3000 shares of TRI stock to Arie, the Orly Trust and the Sagi Trust,
respectively, as originally set forth in the Stipulation of Settlement is voided *ab initio* as a result
of the Delaware Court finding that the 2004 Transfers are invalid;

(ii)    that all the assets of TPR, other than the 3000 Arie, Orly Trust and Sagi
Trust TRI shares, remain the property of TPR or any successor in interest to those assets;

(iii)   that pursuant to a further order of this Court the Court-Ordered Stipulation
of Settlement is modified *ab initio* to provide that the 3000 shares of TRI common stock that
were returned to TPR as a result of the Delaware Court Action voiding the original 2004
Transfers be placed in a newly formed single purpose entity controlled by Arie ("TPR2");

(iv)    that Arie be declared the 51% owner of TPR2, which in turn shall be
declared, *ab initio* the record and beneficial owner of all of such 3000 TRI shares, as though no
2004 Transfers were consummated under the original terms of the Stipulation of Settlement;

(v)     that the Orly Trust and Sagi Trust each be declared the owner of 24.5% of
TPR2 so that together they own the remaining 49% of TPR2;

46

(vi)    that TPR2 shall not sell or transfer the 3000 TRI shares prior to Arie's

death, unless such sale would be otherwise permitted and would not violate the terms of the 2001

Stockholders Agreement including, but not limited to, Article 2 of such agreement;

(vii) upon Arie's death, 1102.8 of TRI shares, plus any stock dividends relating

thereto ("the Sagi Trust TRI Shares") will be transferred by TPR2 outright to the Sagi Trust, and

1102.8 of TRI shares plus any stock dividends relating thereto ("the Orly Trust TRI Shares") will

be transferred outright to the Orly Trust;

(viii)   All cash dividends relating to the Sagi Trust and the Orly Trust TRI

Shares received by TPR2 during Arie's lifetime will be distributed, after payment of

taxes and expenses to the Shareholders of TPR2, as if (a) Arie owned 794.40 shares,

representing 13.99468% of the common stock of TRI, and (b) the Sagi Trust and the Orly

Trust each owned 1102.8 shares, representing 19.42766% of TRI common stock;

(ix)    Arie through his 51% control of TPR2 will retain all voting rights to the

3000 TRI shares and any additional TRI shares issued to TPR or TPR2 as stock dividends or

otherwise for the duration of his life.

(x)    The Trump Group shall deliver to TPR2 the 1102.8 shares of TRI

common stock purportedly purchased under the 2008 Stock Purchase Agreement.

182.    The $26,715,416.00 paid by the Trump Group to the Sagi Trust under the 2008

Stock Purchase Agreement will be returned to the Trump Group by TPR and the Sagi Trust.

183.    The Trump Group shall deliver to TPR2 the 794.40 Arie and the 1102.8 Orly

Trust TRI shares purportedly sold to TPR under the Side Letter Agreement and 2010

Transaction.

47

184. The purported sales by TPR of the Arie and Orly Trust TRI shares to The Trump Group, while the Delaware Supreme Court appeal was pending, will be declared null and void, and the proceeds from these purported sales now held in escrow will be released to The Trump Group.

185. TRI shall record on its books that TPR2 is the record owner of 3000 shares of TRI Common Stock, representing 52.85% of the issued common stock of TRI.

186. TPR2 will consent to the terms of the 2001 Stockholders Agreement.

187. Arie, Orly, Dalia, Sagi, TPR and TRI shall be directed to take all other necessary action and to execute all documents necessary to give full meaning to the intention of the parties to the Court Ordered Stipulation of Settlement in light of the ruling of the Delaware court that the 2004 Transfers were invalid.

188. There is a justiciable controversy.

189. There is no adequate remedy at law.

## SECOND CAUSE OF ACTION ON BEHALF OF ARIE AND ORLY

### (For the Imposition of a Constructive Trust against Sagi, TPR, Dalia, the Sagi Trust, Fang, and the Trump Parties)

190. Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 189, and incorporate the allegations contained in paragraphs 209-219.

191. Upon the Delaware Court voiding TPR's 2004 transfer of 52.85% of TRI shares to Arie, the Sagi Trust and the Orly Trust, legal title to such TRI shares reverted to TPR subject to Arie's rights as a constructive beneficial owner of 51% of the shares of TPR with respect to TPR's ownership of 52.85% of TRI shares.

48

192.    TPR is not entitled, in equity or good conscience, to retain any direct or indirect benefit resulting from the record ownership of the 3000 shares of TRI stock reverting to TPR as a result of the ruling of the Delaware courts .

193.    TPR would be unjustly enriched at the expense of Arie if it were permitted to retain any direct or indirect ownership or benefit from the sale of the 3000 shares of TRI stock because record ownership of such TRI shares reverted to TPR as a result of the Delaware court rulings.

194.    Upon TPR becoming the record owner of Arie's 794.4 shares of TRI stock as a result of the Delaware Court rulings, such shares were immediately held in a constructive trust by TPR for the benefit of Arie as the beneficial owner of those shares.

195.    Upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Orly Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Orly Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Orly Trust's right to receive the Orly Trust TRI Shares upon Arie's death.

196.    Upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Sagi Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Sagi Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Sagi Trust's right to receive the Sagi Trust TRI Shares upon Arie's death.

49

197.    Upon TPR becoming the record owner of all 3000 shares of TRI stock comprising the Orly Trust Shares, the Sagi Trust Shares and the Arie Shares, TPR held the voting rights to such 3000 shares in a constructive trust for the benefit of Arie.

198.    Arie's beneficial ownership and voting rights with respect to the 3000 TRI shares, which were held by TPR in a constructive trust for his benefit, were protected from further transfer to The Trump Group from the moment record title reverted to TPR.

199.    TPR was not authorized to transfer any of the 3000 TRI shares as to which it became the record owner, without the consent of Arie as the beneficial owner of such TRI Shares.

200.    TPR is not authorized to vote any of the 3000 TRI shares that reverted to TPR as record owner as a result of the Delaware Court rulings, except at the direction of Arie.

201.    The Trump Group are not bona fide purchasers of any of the 3000 TRI shares that reverted to TPR.

202.    The Trump Group was on notice of Arie's ownership and voting right claims with respect to the 3000 TRI shares that reverted to TPR, as record owners.

203.    The Trump Group knew and were on notice that TPR was not authorized to sell TPR's TRI shares without the prior consent of Arie.

204.    The Trump Group knew and was on notice that Arie objected to the sale to The Trump Group of any of the 3000 TRI shares that reverted to TPR, as record owner under the 2008 Stock Purchase Agreement, the Side Letter Agreement or the 2010 purported sale of the Arie and Orly Trust TRI shares.

205.    The Constructive Trust in favor of Arie imposed upon the Arie, the Orly Trust and the Sagi Trust TRI shares existed at the moment record ownership reverted to TPR, and attaches to any purported sale of these shares to The Trump Group, who were not bona fide purchasers.

206.    The Trump Group, in addition to TPR, would be unjustly enriched if they were permitted to keep the benefit of the purported sale by TPR of the 3000 TRI shares to The Trump Group, which sale Sagi was not authorized to enter into on behalf of TPR without the prior consent of Arie because, inter alia,

(i) the Trump Group would become the owner of the Arie, Sagi Trust and Orly Trust Shares, over the objection of Arie and without Arie's required prior permission and consent;

(ii)    the Trump Group would obtain Arie's right to vote these shares for the duration of his lifetime, without Arie's required prior permission and consent; and

(iii)    these shares would be acquired substantially below their true value without Arie's required prior permission and consent;

(iv)    the purported transaction by TPR was in derogation of Arie's beneficial ownership and voting rights appurtenant to such shares; and

(v)    the Trump Group are not bona fide purchasers of such shares.

207.    Plaintiffs have no adequate remedy at law.

51

### THIRD CAUSE OF ACTION
### ON BEHALF OF ARIE AND ORLY

**(Claim for Breach of Fiduciary Duty, Aiding and Abetting Breach of Fiduciary Duty and Conspiracy to Breach Fiduciary Duty Against Sagi, TPR, the Sagi Trust, Fang, the Trump Parties and TRI)**

208.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 207.

209.    Sagi, individually and as an officer of TPR, owed a fiduciary duty of trust, confidence and loyalty to Arie and the Orly Trust because, among other things, (i) he was entrusted to manage TPR's ownership of the TRI shares for the benefit of Arie and the Orly Trust upon the Chancery Court voiding the 2004 TPR transfers of TRI shares to Arie, the Sagi Trust and the Orly Trust, and the resulting ownership of such 52.85 % of TRI shares by TPR; (ii) he was entrusted to manage TPR's record ownership of the TRI shares for the benefit of Arie and the Orly Trust upon the Delaware Chancery Court voiding the 2004 TPR transfer of TRI shares to Arie, the Sagi Trust and the Orly Trust; (iii) pursuant to the 2004 TPR Transfer Agreement, Sagi was entrusted to take all actions necessary to ensure that Arie would maintain voting control of 52.85% of the stock of TRI in accordance with the express intent of all parties to the Stipulation of Settlement and 2004 TPR Transaction Documents; (iv) through Fang and the Sagi Trust, as his co-agents and alter egos, Sagi owed a duty of trust and confidence to Arie under the 2004 Voting Trust Agreement; and (v) as the successor to the rights and liabilities of Dalia under the Stipulation of Settlement and the manager of TPR, as a family holding company, Sagi owed a fiduciary duty to protect the assets of the Orly Trust for the benefit of his sister Orly and his father, Arie, in connection with the ownership of TPR, TPR's ownership of the TRI shares and D&K's minority ownership of TPR.

52

210.    As a fiduciary Sagi, individually, and as an officer of TPR, owed a duty of fidelity
and undivided loyalty to Arie, Orly, and the Orly Trust regarding the TRI shares.

211.    Fang, individually and as the trustee of the Sagi Trust, owed a fiduciary duty to
Arie under the 2004 Voting Trust Agreement and Side Letter.

212.    The Trump Group, on becoming the majority shareholder of record in TRI, owed
a fiduciary duty of fidelity and loyalty to Arie as the known beneficial owner of record of the
Arie TRI shares.

213.    Jules Trump and Mark Hirsch, each individually and on behalf of the Trump
Group, and as Directors of TRI owed a fiduciary duty to TPR, and Arie as the beneficial owner
of TRI shares to read TRI corporate documents presented to him in their entirety and have
knowledge of the shareholders of record of TRI, a close corporation.

214.    Sagi, TPR, the Sagi Trust, Fang, the Trump Parties each breached their respective
fiduciary duties as a result of the conduct set forth in the allegations of this complaint, including,
but not limited to their respective conduct in connection with the negotiation, execution and
implementation of the 2008 Stock Purchase Agreement and the Side Letters and the subsequent
transfer of the Arie and Orly Trust TRI Shares.

215.    Sagi, TPR, the Sagi Trust, Fang, and the Trump Parties also knowingly aided,
abetted, induced, participated in, enabled and substantially assisted each other to breach each of
the other's respective fiduciary duties to Arie, Orly and the Orly Trust by the conduct alleged
herein, including but not limited to misrepresenting to the Delaware Chancery Court that the
share certificates for the Sagi Trust TRI shares were lost despite having actual knowledge that

such share certificates were held by Arie, and had not been delivered to the Sagi Trust, Sagi or
Fang.

216.    TRI also knowingly aided, abetted, induced, participated in, enabled and
substantially assisted the respective breaches of fiduciary duties owed to Arie, Orly and the Orly
Trust by Sagi, TPR, the Sagi Trust, Fang and the Trump Parties.

217.    Sagi, TPR, the Sagi Trust, Fang, and the Trump Parties, each acting in conspiracy
with, and as the co-agent of one another, entered into an illegal scheme, agreement, plan, and
artifice to breach each other's respective fiduciary duties owed to Arie, Orly, and the Orly Trust
by the conduct alleged herein in furtherance of this conspiracy.

218.    As a result of such breaches of fiduciary duty, aiding and abetting of breaches of
fiduciary duties and conspiracies to breach fiduciary duty, by Sagi, TPR, the Sagi Trust, Fang,
the Trump Parties and TRI, and each of them, Arie suffered compensatory damages in an amount
to be determined.

219.    As a result of such breaches of fiduciary duty, aiding and abetting of breaches of
fiduciary duty and conspiracies to breach fiduciary duty, by Sagi, TPR, the Sagi Trust, Fang, the
Trump Parties and TRI, and each of them, Orly, individually and as the beneficiary of the Orly
Trust, suffered compensatory damages in an amount to be determined.

## FOURTH CAUSE OF ACTION
## ON BEHALF OF ARIE AND ORLY

### (Claim for Unjust Enrichment and Rescission Against Sagi, TPR, Dalia, the Sagi Trust, Fang, and the Trump Parties)

220.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 219.

221.    As a result of the Delaware Chancery Court holding, Dalia, TPR, Sagi, the Sagi
Trust and the Trump Parties would each be unjustly enriched at the expense of Arie and the Orly

Trust if each or any of them were allowed to retain any direct or indirect benefit or consideration received by each of them from TPR's ownership of TRI Shares, which none of them are entitled, in equity or good conscience, to retain.

222.    Plaintiff Arie is entitled to rescind the transfer of his 51% interest in TPR to Dalia pursuant to the Stipulation of Settlement and 2004 Transaction Documents based on failure of consideration because, as a result of the holding by the Delaware Chancery Court, Arie did not receive any of the consideration that was due to him pursuant to such Agreements, including and not limited to (a) his 14% interest in the Arie TRI Shares, and his right to vote 52.85% of the TRI Shares that he controlled prior to the Delaware Court voiding the 2004 Transfers.

223.    Plaintiff the Orly Trust, is entitled to rescind the 2004 Transaction Documents based on failure of consideration because as a result of the holding by the Delaware Court the Orly Trust did not receive any of the consideration due to the Orly Trust pursuant to the 2004 Transfers.

224.    Arie and the Orly Trust are each also entitled to rescission because of failure of consideration based on mutual mistake as to the enforceability of the 2004 TPR Transfers of TRI stock to Arie, the Sagi Trust and the Orly Trust pursuant to the Stipulation of Settlement and the 2004 Transaction Documents.

225.    Arie and the Orly Trust are each entitled to an accounting.

226.    Arie and the Orly Trust have no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### (Claim for Permanent Injunction Against Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties)

227.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 226.

228.    Plaintiffs are entitled to the issuance of a permanent injunction enjoining and

restraining Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties, and each of them, from

directly or indirectly transferring, selling, acquiring, pledging, assigning, diluting, voting,

valuing, replacing, conveying, using, removing from the jurisdiction, or otherwise disposing of,

or encumbering the 3000 shares of TRI stock that reverted to TPR's control as a result of the

Delaware Court rulings.

229.    The failure to grant such permanent injunction will result in irreparable injury to

the Plaintiffs.

230.    There is no adequate remedy at law.

231.    The balance of equities favor the Plaintiffs.

### SIXTH CAUSE OF ACTION

**(Claim for Breach of Contract against TPR on Behalf of Arie and Orly)**

232.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 231.

233.    TPR entered into the 2004 TPR Transfer Agreement with Arie.

234.    TPR entered into the 2004 TPR Transfer Agreement with the Orly Trust.

235.    TPR breached its express and implied covenants and representations thereunder in

connection with the transfer of TRI shares to Arie.

236.    TPR breached its express and implied covenants and representations thereunder

by purporting to agree to transfer the Arie, Sagi Trust and Orly Trust TRI Shares to the Trump

Parties.

237.    Arie and the Orly Trust performed their respective obligations under the 2004

TPR Transfer Agreement.

56

238.    As a result of such breach of contract, Arie lost the benefit of his bargain and suffered damages in an amount yet to be determined.

239.    TPR breached its express and implied covenants and representations under the 2004 Transaction Documents in connection with the transfer of TRI shares to the Orly Trust.

240.    The Orly Trust performed its obligations under the 2004 TPR Transfer Agreement.

241.    As a result of such breach of contract, the Orly Trust lost the benefit of its bargain and suffered damages in an amount yet to be determined, but believed to be in an amount to be determined.

### SEVENTH CAUSE OF ACTION
### ON BEHALF OF ARIE

**(Claim for Breach of Contract against the Sagi Trust)**

242.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 241.

243.    The Sagi Trust entered into the 2004 Voting Trust Agreement with Arie.

244.    The Sagi Trust breached its express and implied covenants and representations thereunder in connection with Arie's voting rights and control of TRI shares.

245.    Arie performed his obligations under the 2004 Voting Trust Agreement.

246.    As a result of such breach of contract, Arie lost the benefit of his bargain and suffered damages in an amount yet to be determined.

### EIGHTH CAUSE OF ACTION
### ON BEHALF OF ARIE AND ORLY

**(Claim for Tortious Interference with Contract Against the Trump Parties)**

247.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 246.

57

248.    The Trump Parties, and each of them, tortiously interfered with, among other things, (i) the Stipulation of Settlement between Arie and Dalia, (ii) the 2004 TPR Transfer Documents between Arie and the Orly Trust and TPR, (iii) the 2004 Voting Trust Agreement between Arie and the Sagi Trust, and (iv) the 2004 Voting Trust Agreement between Arie and the Orly Trust.

249.    The Trump Parties, and each of them, intentionally caused such breaches of contract without justification, as a result of the conduct set forth herein.

250.    As a result of the Trump Parties' tortious interference with contract, Arie suffered damages in an amount yet to be determined.

251.    As a result of the Trump Parties' tortious interference with contract, Orly and the Orly Trust suffered damages in an amount yet to be determined.

### NINTH CAUSE OF ACTION ON BEHALF OF ARIE AND ORLY

**(Claim for Aiding and Abetting Tortious Interference with Contract Against Sagi, Fang, and the Sagi Trust)**

252.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 251.

253.    Sagi, Fang, and the Sagi Trust each had knowledge of the Trump Parties' tortious interference with the 2004 TPR Transaction Agreement and the Stipulation of Settlement, and each such defendant caused, encouraged and substantially assisted the Trump Parties in the commission of the foregoing acts of tortious interference with 2004 TPR Transaction Agreement and the Stipulation of Settlement.

254.    Sagi, Fang, and TPR each had knowledge of the Trump Parties' tortious interference with the 2004 Voting Trust Agreement, and the Stipulation of Settlement, and each such defendant caused, encouraged and substantially assisted the Trump Parties in the

58

commission of the foregoing acts of tortious interference with the 2004 Voting Trust

Agreements.

255.    By reason of the foregoing, Arie has been damaged in an amount to be

determined.

256.    By reason of the foregoing, Orly, individually and as the beneficiary of the Orly

Trust has been damaged in an amount to be determined.

## TENTH CAUSE OF ACTION ON BEHALF OF ARIE AND ORLY

### (Claim for Preliminary Injunction Against the Trump Parties, Sagi Genger TPR and the Sagi Trust Under CPLR 7109)

257.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 256.

258.    The Arie and Orly Trust TRI shares are unique chattel.

259.    By virtue of the facts set forth above, Arie is the beneficial owner of the Arie TRI

shares.

260.    Sagi is not authorized to take any action on behalf of TPR to sell, transfer, pledge,

dilute, or take any action on behalf of TPR relating to or concerning the 3000 TRI shares that

reverted to TPR, without the prior written consent of Arie and Sagi is not authorized to exercise

any and all rights, including TPR's voting rights with respect to such 3000 TRI shares, except as

so directed by Arie as the beneficial owner of such shares and the voting rights appurtenant

thereto.

261.    Sagi is not authorized to take any action on behalf of TPR to sell, transfer, pledge,

dilute, or take any action on behalf of TPR relating to or concerning the Orly Trust TRI shares.

262.    By virtue of the facts set forth above, the Orly Trust is entitled to the benefits

provided to it under the Stipulation of Settlement.

59

263.    The Arie TRI shares, the Orly Trust TRI shares, and the Sagi Trust shares are
wrongfully being held by the Trump Parties.

264.    Plaintiffs are entitled to a preliminary injunction, under CPLR 7109, that the Arie
TRI shares, the Orly Trust TRI shares, and the Sagi Trust TRI shares shall be restrained and
enjoined from transferring, selling, diluting, pledging, assigning or otherwise disposing of or
removing such shares from the State until the further order of the Court.

**WHEREFORE**, Plaintiffs demand Judgment in favor of Plaintiffs against the
Defendants as follows:

(a) on the **First Cause of Action against all Defendants**: that this Court find and
declare that Arie is entitled to an Order from this Court to reform the terms of the Court-Ordered
Stipulation of Settlement to provide as follows:

(i) that the transfer by Arie of his 51% interest in TPR to Dalia and the
concurrent transfer of the 3000 shares of TRI stock to Arie, the Orly Trust and the Sagi Trust,
respectively, as originally set forth in the Stipulation of Settlement is voided *ab initio* as a result
of the Delaware Court finding that the 2004 Transfers are invalid;

(ii) that all the assets of TPR, other than the 3000 Arie, Orly Trust and Sagi Trust
TRI shares, remain the property of TPR or any successor in interest to those assets;

(iii) that pursuant to a further order of this Court the Court-Ordered Stipulation of
Settlement is modified *ab initio* to provide that the 3000 shares of TRI common stock that were
returned to TPR as a result of the Delaware Court Action voiding the original 2004 Transfers be
placed in a newly formed single purpose entity controlled by Arie (hereinafter, "TPR2");

60

(iv) that Arie be declared the 51% owner of TPR2 which in turn shall be declared, ab initio, the record and beneficial owner of all such 3000 TRI shares, as though no 2004 Transfers were consummated under the original terms of the Stipulation of Settlement;

(v) that the Orly Trust and Sagi Trust each be declared the owner of 24.5% of TPR2 so that together they own the remaining 49% of TPR2;

(vi) that TPR2 shall not sell or transfer the 3000 TRI shares prior to Arie's death, unless such sale would otherwise be permitted and would not violate the terms of the 2001 Stockholders Agreement, including, but not limited to, Article 2 of such Agreement;

(vii) upon Arie's death, 1102.8 of TRI shares, plus any stock dividends relating thereto ("the Sagi Trust TRI shares") will be transferred by TPR2 outright to the Sagi Trust, and 1102.8 of TRI shares, plus any stock dividends relating thereto ("the Orly Trust TRI Shares") will be transferred outright to the Orly Trust;

(viii) all cash dividends relating to the Sagi Trust and the Orly Trust TRI Shares received by TPR2 during Arie's lifetime will be distributed, after payment of taxes and expenses to the Shareholders of TPR2, as if (a) Arie owned 794.40 shares, representing 13.99468% of the common stock of TRI, and (b) the Sagi Trust and the Orly Trust each owned 1102.8 shares, representing 19.42766% of TRI common stock;

(ix) Arie through his 51% control of TPR2 will retain all voting rights to the 3000 TRI shares and any additional TRI shares issued to TPR or TPR2 as stock dividends or otherwise for the duration of his life.

(x) The Trump Group shall deliver to TPR2 the 1102.8 shares of TRI common stock purportedly purchased under the 2008 Stock Purchase Agreement.

61

(xi) The $26,715,416.00 paid by the Trump Group to the Sagi Trust under the 2008 Stock Purchase Agreement will be returned to the Trump Group by TPR and the Sagi Trust.

(xii) The Trump Group shall deliver to TPR2 the 794.40 Arie and the 1102.8 Orly Trust TRI shares purportedly sold to TPR under the Side Letter Agreement and 2010 Transaction.

(xiii) The purported sales by TPR of the Arie and Orly Trust TRI Shares to the Trump Group, while the Delaware Supreme Court appeal was pending, will be declared null and void and the proceeds from these purported sales now held in escrow will be released to the Trump Group.

(xiv) TRI shall record on its books that TPR2 is the record owner of 3000 shares of TRI Common Stock, representing 52.85% of the issued common stock of TRI.

(xv)    TPR2 will consent to the terms of the 2001 Stockholders Agreement.

(xvi) Arie, Orly, Dalia, Sagi, TPR and TRI shall be directed to take all other necessary action and to execute all documents necessary to give full meaning to the intention of the parties to the Court-Ordered Stipulation of Settlement in light of the rulings of the Delaware Court that the 2004 Transfers were invalid.

(xvii) Any other declaration as the Court may deem fair and reasonable to give effect to the Original Intent of the parties to the Stipulation of Settlement.

(b) on the **Second Cause of Action against Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties**, that the Court find and declare that:

62

(i) upon the Delaware Court voiding TPR's 2004 transfer of 52.85% of TRI shares to Arie, the Sagi Trust and the Orly Trust, legal title to such TRI shares reverted to TPR subject to Arie's rights as a constructive beneficial owner of 51% of the shares of TPR with respect to TPR's ownership of 52.85% of TRI shares;

(ii) upon TPR becoming the record owner of Arie's 794.4 shares of TRI stock as a result of the Delaware Court rulings, such shares were immediately held in a constructive trust by TPR for the benefit of Arie as the beneficial owner of those shares;

(iii) upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Orly Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Orly Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Orly Trust's right to receive the Orly Trust TRI Shares upon Arie's death;

(iv) upon TPR becoming the record owner of the 1102.8 shares of TRI stock comprising the Sagi Trust TRI shares, a constructive trust was immediately created in favor of Arie with respect to the Sagi Trust TRI Shares, including, but not limited to, the voting rights appurtenant to such shares, all of which were held by TPR for the benefit of Arie, subject to the Sagi Trust's right to receive the Sagi Trust TRI Shares upon Arie's death;

(v) upon TPR becoming the record owner of all 3000 shares of TRI stock comprising the Orly Trust Shares, the Sagi Shares and the Arie Shares, TPR held the voting rights to such 3000 shares in a constructive trust for the benefit of Arie;

63

(vi) TPR was not authorized to transfer any of the 3000 TRI shares as to which it became the record owner, without the consent of Arie as the beneficial owner of such TRI Shares;

(vii) TPR is not authorized to vote any of the 3000 TRI shares that reverted to TPR as record owner as a result of the Delaware Court rulings, except at the direction of Arie;

(viii) The Constructive Trust in favor of Arie imposed upon Arie, the Orly Trust and the Sagi Trust TRI shares existed at the moment record ownership reverted to TPR, and attaches to any purported sale of these shares to the Trump Group, who were not and are not bona fide purchasers of any of the 3000 TRI shares that reverted to TPR.

(c) on the **Third Cause of Action against Defendants Sagi, TPR, the Sagi Trust, Fang, the Trump Parties and TRI, jointly and severally,** as follows:

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys fees and costs incurred in connection with this action;

(ii) awarding compensatory damages to the Plaintiff Orly Genger individually and as the beneficiary of the Orly Trust in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys fees and costs incurred in connection with this action;

(d) on the **Fourth Cause of Action against Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang, and the Trump Parties:**

(i) rescinding Plaintiff Arie's transfer of his 51% interest in TPR to Dalia pursuant to the Stipulation of Settlement and 2004 Transaction Documents;

64

(ii) rescinding the 2004 Transaction Documents;

(iii) Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties must account to Arie and Orly, individually and as the beneficiary of the Orly Trust, for 3000 TRI Shares and/or their respective value that are now or ever have been in their respective possession, custody or control; and

(iv) such other equitable relief as the Court may deem fair and reasonable;

(e) on the **Fifth Cause of Action against Defendants Sagi, TPR, Dalia, the Sagi Trust, Fang and the Trump Parties**, permanently enjoining and restraining these Defendants, and each of them, from directly or indirectly transferring, selling, acquiring, pledging, assigning, diluting, voting, valuing, replacing, conveying, using, removing from the jurisdiction, or otherwise disposing of, or encumbering the 3000 shares of TRI common stock that reverted to TPR as a result of the Delaware court rulings.

(f) on the **Sixth Cause of Action against Defendant TPR**:

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action; and

(ii) awarding compensatory damages to the Plaintiff Orly individually and as the beneficiary of the Orly Trust in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action.

(g) on the **Seventh Cause of Action against Defendant Sagi Trust**, a money judgment awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus Plainitiff's attorneys' fees and costs incurred in connection with this action;

(h) on the **Eighth Cause of Action Against the Defendant Trump Parties, jointly and severally**:

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(ii) awarding compensatory damages to the Plaintiff Orly individually and as the beneficiary of the Orly Trust in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(i) on the **Ninth Cause of Action Against Sagi, Fang, and the Sagi Trust**:

(i) awarding compensatory damages to the Plaintiff Arie in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(ii) awarding compensatory damages to the Plaintiff Orly, individually and as the beneficiary of the Orly Trust, in an amount to be determined, plus an additional award of punitive damages in an amount to be determined, plus Plaintiff's attorneys' fees and costs incurred in connection with this action;

(j) on the **Tenth Cause of Action for a Preliminary Injunction Against the Trump Parties, Sagi Genger, TPR and the Sagi Trust Under CPLR 7109**, and each of them for an injunction or temporary restraining order under CPLR 7109, restraining and enjoining each of them from transferring, selling, diluting, pledging, assigning or otherwise disposing of or

removing the Arie TRI Shares, the Orly Trust TRI shares, and the Sagi Trust TRI shares from the State until the further Order of the Court.

      (k)      **On all causes of action set forth in this Complaint,** such other relief as this court may deem just, together with the costs and disbursements incurred by plaintiffs in this action, including the recovery of plaintiffs' reasonable attorneys' fees.

67

DATED: New York, New York
September 20, 2011

MITCHELL SILBERBERG & KNUPP LLP

By: _____

Paul D. Montclare (PM 4454)
Lauren J. Wachtler (LW 4205)
12 E. 49th Street, 30th Floor
New York, New York 10017
(212) 509-3900

Attorneys for Plaintiff ARIE GENGER

ZEICHNER ELLMAN & KRAUSE LLP

By: _____

Yoav M. Griver
Bryan D. Leinbach
575 Lexington Avenue
New York, New York  10022
Telephone: (212) 223-0400
Facsimile: (212) 753-0396

Attorneys for Plaintiff ORLY GENGER, in
her individual capacity and on behalf of the
ORLY GENGER 1993 Trust

68

NYSCEF DOC. NO. 285

# SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: _____ JAFFE _____

*Amended Decision*

_____ PART 12
                        Justice

Genger

- v -

Genger

INDEX NO. 651089/2010

MOTION DATE _____

MOTION SEQ. NO. 006

MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | 1, 2, 3, |
| Answering Affidavits — Exhibits _____ | 4, 5 |
| Replying Affidavits _____ | 6 |

**Cross-Motion:** ☐ Yes ☐ No

Upon the foregoing papers, it is ordered that this motion *is resolved by the annexed Decision and order*

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):

Dated: 1/2/13 _____          _____ J.S.C.

**Check one:** ☐ FINAL DISPOSITION   ☑ NON-FINAL DISPOSITION

**Check if appropriate:** ☐ DO NOT POST   ☐ REFERENCE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : PART 12
------------------------------------------------------------------------x
ARIE GENGER and ORLY GENGER, in her individual
capacity and on behalf of THE ORLY GENGER 1993
TRUST,

                                Plaintiffs,

                -against-

SAGI GENGER, TPR INVESTMENT ASSOCIATES,
INC., DALIA GENGER, THE SAGI GENGER 1993
TRUST, ROCHELLE FANG, individually and as trustee
of THE SAGI GENGER 1993 TRUST, GLENCLOVA
INVESTMENT COMPANY, TR INVESTORS, LLC,
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC,
JULES TRUMP, EDDIE TRUMP and MARK HIRSCH,

                        Defendants.
------------------------------------------------------------------------x
BARBARA JAFFE, JSC:

Index No. 651089/2010

Argued:        3/13/12
Mot. seq. nos.:   006-007,
              009-011, 015

**AMENDED DECISION
AND ORDER**

       By notices of motion dated October 14, 2011, defendants move pursuant to CPLR 3211

for an order dismissing various causes of action asserted in the third amended and supplemental

complaint of Arie Genger and his daughter Orly Genger, in her individual capacity and on behalf

of the Orly Genger 1993 Trust (complaint). By order to show cause dated September 13, 2012,

defendants Glenclova Investment Company, TR Investors, LLC, New TR Equity I, LLC, New

TR Equity II, LLC, Jules Trump, Eddie Trump, and Mark Hirsch (Trump Group) move pursuant

to CPLR 2214(c) for an order permitting them to supplement the record of its motion (sequence

15) with a recent decision of the Delaware Chancery Court. On or about October 17, 2012, I was

assigned to Part 12 where this action pends.

       In his complaint, Arie advances 10 causes of action including, as pertinent here, a

declaratory judgment authorizing him to reform the divorce settlement stipulation between him

and his ex-wife, Dalia Genger, the mother of Orly and Sagi Genger and trustee of the Orly Trust;

constructive trust; breach of fiduciary duty, conspiracy and aiding and abetting breach of

fiduciary duty; unjust enrichment and rescission; breach of contract; tortious interference with

contract, and aiding and abetting tortious interference of contract; and preliminary and permanent

injunctions.

## I. BACKGROUND

The history of this action is set out in opinions rendered by the justice previously

assigned, the Surrogate's Court, the Delaware Chancery Court, the Delaware Supreme Court, and

the United States District Court for the Southern District of New York (Southern District).

Therefore, the only background provided here is for the purpose of addressing the instant

motions.

In 1993, as part of a family estate plan for the benefit of his children Sagi and Orly, Arie

established the Sagi Trust and the Orly Trust (the Trusts). In 2001, TPR Investment Associates

(TPR), a Genger family-controlled corporation, entered into a stockholders agreement with

Trump Group, whereby Trump Group obtained the right to purchase all of TPR's 3,000 shares in

Trans-Resources, Inc. (TRI), another Genger family-controlled corporation. The agreement also

provided that consent was required for any share transfers, except those to a "permitted

transferee." (Stockholders Agreement, § 3.1).

### A. The divorce stipulation

In 2004, Arie and Dalia settled their bitterly contested divorce by entering into a so-

ordered stipulation distributing their marital assets, including their interests in TPR and TRI. At

the time, Arie held 51 percent of TPR's stock with the remaining 49 percent held by D&K

2

Limited Partnership (D&K). Dalia held four percent of D&K; the Sagi Trust, and the Orly Trust

held 48 percent each. TPR held 52.85 percent of TRI's common stock, and the remaining 47.15

percent was held by Trump Group.

Pursuant to the divorce stipulation and related documentation, Arie agreed to transfer his

51 percent interest in TPR to Dalia, with the proviso that TPR divest its 3,000 shares of TRI

common stock on the following terms: (1) Sagi would become TPR's president and chief

executive officer; (2) TPR would transfer to Arie 794.4 shares of TRI common stock (the Arie

Shares), representing a 13.4 percent interest in TRI; (3) TPR would transfer to each of the Trusts

1,102.8 shares of TRI common stock (the Sagi Trust Shares and the Orly Trust Shares, each

representing a 19.43 percent interest in TRI); and (4) each of the Trusts would execute

agreements providing for, *inter alia*, Arie's irrevocable right to vote the Sagi Trust Shares and

the Orly Trust Shares in TRI for the duration of his life. (2004 Transfers). The divorce

stipulation includes a clause which provides, in effect, that in the event any of the terms therein

are voided by a court of competent jurisdiction, the parties thereto may seek a court-ordered

reformation of the affected terms to give effect to the parties' original intent. (Divorce

Stipulation, Art. XVI, at 47-48).

In 2007, Dalia commenced an arbitration proceeding against Arie, contesting the

distribution of marital assets under the divorce stipulation. In 2008, an arbitration award in the

proximate amount of $3.85 million was entered in Dalia's favor.

### B.  Trump Group's acquisition of TRI shares

In early 2008, when TRI faced financial difficulties, Arie, now in control of TRI by

virtue of the 2004 Transfers, explored the possibility of obtaining capital funding for it from

3

Trump Group, in exchange for increasing Trump Group's equity position to become TRI's

majority stockholder. While a funding plan was being negotiated and drafted, TRI's financial

condition significantly improved. Arie then reneged on the funding agreement and threatened to

sue Trump Group if it challenged the 2004 Transfers.

Subsequently, Trump Group asserted its right under the TRI stockholders agreement to

purchase all of TPR's 3,000 TRI shares, and maintained that the 2004 Transfers under the

divorce settlement and underlying transaction documents were invalid because Arie never sought

its consent, as is required by the TRI stockholders agreement. Thus, on August 11, 2008, Trump

Group filed an action in the Southern District against TPR and TRI, asserting that the 2004

Transfers were invalid as violative of the stockholders agreement. Arie intervened, and TPR

interposed a third-party complaint against him, seeking a declaratory judgment that TPR is the

true owner of all TRI shares, and that Arie had tortiously interfered with TPR's contractual and

property rights in executing the divorce stipulation. In response, Arie asserted in his third-party

answer various counterclaims substantially similar to those asserted in the instant action.

On or about August 22, 2008, Trump Group and TPR entered into a stock purchase

agreement, whereby TPR agreed to sell the Sagi Trust's 1102.8 shares of TRI common stock to

Trump Group for $26.7 million, which would result in Trump Group becoming TRI's majority

stockholder. On the same day, the parties entered into a side letter agreement, whereby TPR

agreed that, in the event that the 2004 Transfers of the TRI shares by TPR to the Orly Trust and

Arie were determined to be invalid, Trump Group would be entitled to purchase directly from

TPR the Orly Trust Shares and the Arie Shares at less than 60 percent of the per share price paid

by Trump Group for the Sagi Trust Shares.

4

On August 25, 2008, after purchasing the Sagi Trust Shares from TPR, Trump Group

commenced in the Delaware Chancery Court a "Section 225 proceeding" under Title 8 of the

Delaware Code, asserting that it was in control of TRI via its purchase of the Sagi Trust Shares

pursuant to the stock purchase agreement, and sought a judicial determination of the composition

of TRI's board of directors. In an opinion dated July 23, 2010, the Chancery Court ruled, *inter*

*alia*, that because the 2004 Transfers violated the TRI stockholders agreement, and because

Trump Group never ratified the 2004 Transfers despite Arie's contrary allegation, by virtue of the

stock purchase agreement, Trump Group owned the Sagi Trust Shares, giving it the majority

voting control of TRI. (*TR Investors, LLC, v Genger*, 2010 WL 2901704 [Del. Ch. Ct. 2010]).

The court concluded as follows:

> [T]he Trump Group controls the Trans-Resources board for the following reasons: (1) the
> Trump Group never received notice of the 2004 Transfers, which were made in violation
> of the Stockholders Agreement, until June 2008; and (2) the Trump Group did not ratify
> those Transfers when it bought the transferred shares from Sagi Genger and TPR.
> Because it never ratified the wrongful transaction, the Trump Group was free to deal with
> the relevant transferor, TPR, and its transferee, the Sagi Trust, and settle the matter by
> acquiring the wrongly transferred shares in an agreed upon negotiation. In doing so, the
> Trump Group clearly reserved its position that TPR made a void transfer, has proven that
> its position was correct, and is entitled, as a result, to be deemed to have taken the shares
> from TPR as a settlement of the improper Transfers. In the alternative, even if the Trump
> Group ratified the 2004 Transfers-which it did not-I find that the Trump Group did not
> purchase the shares from Sagi Genger subject to the proxy in favor of Arie Genger.
> Therefore, the Trump Group holds a majority equity and voting stake in Trans-Resources,
> and its ability to vote its shares is unaffected by the proxy.

(*TR Investors, LLC*, 2010 WL 2901704, *2).

Thereafter, in an opinion dated August 9, 2010, the Chancery Court expanded its ruling,

holding that the Arie and Orly Trust Shares transferred in 2004 were also invalid, thereby

entitling Trump Group to buy those shares from TPR pursuant to the side letter agreement if it

5

chose to do so. (*TR Investors, LLC v Genger*, 2010 WL 3279385 [Del. Ch. Ct. 2010]). Plaintiffs

commenced the instant action promptly after the Chancery Court issued its July 2010 opinion.

      While Arie was seeking relief in this court, he appealed the Chancery Court rulings. In an

opinion dated July 19, 2011, the Delaware Supreme Court affirmed that part of the Chancery

Court's findings and rulings that Trump Group had legally purchased the Sagi Trust Shares from

TPR, giving it majority control of TRI, but it reversed the Chancery Court's August opinion as to

the beneficial ownership of the Arie Shares and Orly Trust Shares absent personal jurisdiction

over TPR and the Orly Trust which were not parties to the section 225 proceeding. (*Genger v TR*

*Investors, LLC*, 26 A3d 180 [Del. Sup. Ct. 2011]). Promptly thereafter, Trump Group and Arie,

which were parties to the Delaware court proceedings, negotiated a form of the Revised Final

Judgment Order (Final Order) that reflected and implemented the various findings and rulings of

the Delaware Chancery Court and the Delaware Supreme Court. It expressly provides that

members of Trump Group are the "owners of . . . 67.7477 percent of the authorized and issued

stock" of TRI, that TPR is the "record owner of all [TRI] shares not presently owned" by Trump

Group, and that Arie and the Orly Trust "are not and have not been since at least the date of

execution of the Stockholders Agreement the record owners of any [TRI] shares." (Final Order,

¶¶ 2-8). The Final Order was adopted and signed by the Chancery Court, and entered in the

docket on or about August 19, 2011.

      C.  Additional lawsuits arising from Trump Group's acquisition of TRI shares

      On about July 22, 2011, in response to the Delaware Supreme Court's ruling, Trump

Group commenced an action against Arie and TPR in the Delaware Chancery Court, seeking a

declaration that it is both the record and beneficial owner of the Arie Shares. On October 4,

2011, Dalia, as trustee of the Orly Trust, also filed an action in the Delaware Chancery Court

against Trump Group and TPR, seeking a declaration that the Orly Trust is the beneficial owner

of the Orly Trust Shares. Pursuant to two separate temporary restraining orders, dated October

26, 2011 and November 9, 2011, and issued by the previously assigned justice, Dalia, TPR and

Trump Group were prohibited from proceeding with the Delaware declaratory judgment actions.

In addition to the foregoing court actions, counsels for TPR and Trump Group, in their capacity

as escrow agents with respect to the sales of the Orly Trust Shares and the Arie Shares to Trump

Group, filed separate interpleader actions in the Southern District and deposited escrowed funds

of approximately $10.3 million and $7.4 million, respectively, with the Southern District clerk.

As a result, there were no less than six separate actions pending in three different jurisdictions

relating to the issue of the beneficial ownership of the Arie Shares and the Orly Trust Shares.

### D. Instant motions

On March 13, 2012, oral argument on defendants' motions was heard by the previously

assigned justice pending the Southern District's determination as to its jurisdiction to hear and

adjudicate the primary issue of whether Arie and the Orly Trust each, respectively, has a

beneficial interest in the Arie Shares and the Orly Trust Shares, which is at the heart of the

parties' dispute. In an opinion dated June 14, 2012, the Southern District observed that the

parties had created "a headache-inducing jurisdictional conflict" in requesting that it "clean up

the mess they made by determining which of the federal or state courts should decide the issue

underpinning all their claims - that is, the beneficial ownership of the Arie Shares and Orly Trust

Shares." (*Glenclova Investments Co. v Trans-Resources, Inc., et al.,* __ F Supp 2d __, 2012 WL

2196670, at *5 [SDNY 2012]). While that court took "no position on the question of forum," in

7

light of the temporary restraining orders staying litigation in Delaware as to the issue of

beneficial ownership of the Orly Trust Shares and "the difficulty the Delaware Chancery Court

may have in obtaining personal jurisdiction over Arie and Orly," the Southern District concluded

that the foregoing "strongly suggests that the parties agree to litigate their claims in the New

York Supreme Court." (*Id.* at 19).

## II. ANALYSIS

In considering a motion to dismiss pursuant to CPLR 3211(a)(7), the court must

determine whether the pleadings state a cause of action. The motion must be denied if, from the

four corners of the pleadings, factual allegations are discerned which, taken together, manifest

any cause of action cognizable at law. (*Richbell Info. Servs. v Jupiter Partners*, 309 AD2d 288,

289 [1st Dept 2003], *quoting 511 W. 232nd Owners Corp. v Jennifer Realty Corp.*, 98 NY2d 144,

151-152 [2002]). The pleadings are afforded a liberal construction, and the court is to accord

plaintiffs the benefit of every possible favorable inference. (*Simkin v Blank,* 19 NY3d 46, 52

[2012]). However, while factual allegations in a complaint should be accorded every favorable

inference, bare legal conclusions and inherently incredible facts are insufficient. (*Matter of Sud v

Sud*, 211 AD2d 423, 424 [1st Dept 1995]).

Moreover, "[w]hen the moving party offers evidentiary material, the court is required to

determine whether the proponent of the [complaint] has a cause of action, not whether [he or] she

has stated one." (*Asgahar v Tringali Realty, Inc.*, 18 AD3d 408, 409 [2d Dept 2005]). And, a

cause of action may not be maintained if it is barred by, *inter alia*, collateral estoppel, res judicata

or issue preclusion. (CPLR 3211[a][5]).

8

### A. Trump Group's motion to dismiss (motion sequence number 011)

The complaint contains the following causes of action against Trump Group: declaratory judgment to reform the divorce stipulation (first cause of action); constructive trust, unjust enrichment, rescission, breach of fiduciary duty, aiding and abetting or conspiracy to commit a breach (second, third, fourth, and fifth causes of action); tortious interference with contract (ninth cause of action); and preliminary and permanent injunction (fifth and tenth causes of action). The gist of the complaint is that, because the 2004 Transfers effected by the divorce stipulation were held void and unenforceable by the Delaware courts, the divorce stipulation must be reformed in such a manner that Arie will resume beneficial ownership of the 3,000 shares of TRI stock that TPR owned before the 2004 Transfers. According to plaintiffs, any act of defendants that is inconsistent with Arie's beneficial ownership in such shares of stock is actionable and warrants the payment of damages.

### 1. Collateral estoppel

Seeking dismissal of the complaint, Trump Group argues that plaintiffs' claims are collaterally estopped by the Delaware courts' determination of factual and legal issues and even if plaintiffs are entitled to relitigate the issues underlying their claims, the complaint nonetheless does not state a cause of action. It identifies the following issues of fact and law that were decided by the Delaware courts: the invalidity of the 2004 Transfers that Arie caused TPR to make to himself and to the Orly and Sagi Trusts in violation of the TRI stockholders agreement, thereby entitling Trump Group to purchase all of TPR's 3,000 shares of stock in TRI; Trump Group's entitlement to control TRI as of 2004 when Arie caused TPR to breach the stockholders agreement; Arie's failure to provide notice of the 2004 Transfers and to obtain Trump Group's

9

consent to the Transfers, which violated the stockholders agreement; and Trump Group's

ownership of 67.7 percent of TRI shares upon its purchase of the Sagi Trust Shares from TPR

pursuant to the 2008 purchase agreement with TPR, which is now controlled by Sagi, as its

current president and chief executive officer.

Arie argues in opposition that because: (1) the issues listed by Trump Group were

decided in a statutorily limited section 225 *in rem* summary proceeding and not in a plenary

action; and (2) the Delaware Supreme Court held that an adjudication of the right to vote

corporate shares is not binding with respect to the beneficial ownership of such shares, the

section 225 proceeding in the Chancery Court did not result in a determination of the beneficial

ownership of all 3,000 TRI shares. He also contends that the Delaware courts' findings do not

bind him because they neither conflict with the causes of action he advances in his complaint, nor

are they essential to the Delaware courts' determinations, and because the court imposed on him

a higher burden of proof. (Arie's Opposition Brief, at 11-13; Hearing Transcript, March 13,

2012, at 63). He does not contend that he did not have a full and fair opportunity to litigate in the

Delaware courts. Rather, he contends that "essential parties were missing." (Arie's opposition

brief, at 14).

Orly joins Arie's arguments and adds that, contrary to the position taken by TPR and

Sagi, as well as Trump Group, she has legal standing to represent the Orly Trust, per the holding

of the previously assigned justice. (*Genger v Genger*, NY County, June 28, 2010, Feinman, J.,

index no. 109749/2009). Thus, both she and Dalia assert that they may act on behalf of the Orly

Trust unless and until the Surrogate's Court rules otherwise in an appropriate action there. Orly

also denies that she is collaterally estopped by the Delaware decisions as she was not a party to

10

those proceedings and had no opportunity to litigate the issues there.

While a non-party may not be estopped from arguing a position previously litigated, many of the issues listed by Trump Group are closely related to the Delaware courts' invalidation of the 2004 Transfers and constitute the primary bases for the instant action, and Orly does not allege that her participation as a litigant or party in the Delaware proceedings would have altered the Delaware courts' findings and rulings that relate to the invalidation. In any event, the Delaware Supreme Court recognized that Delaware has no jurisdiction over the Orly Trust and TPR, and thus specifically left open the issue of the beneficial ownership of the Orly Trust Shares. Thus, that Orly did not litigate the 2004 Transfers issues in Delaware does not appear to have prejudiced her rights, and she does not argue otherwise. And, as Arie is estopped from arguing some of the issues (*infra*, at 12-16), and as Orly does not distinguish her arguments and issues from Arie's, instead fully adopting them, to the extent that the Delaware findings and rulings on the issues relating to such arguments apply to both Arie and Orly, and to which this court gives full faith and credit (US Const, art IV, § 1; *Ho v McCarthy,* 90 AD3d 710, 711 [2d Dept 2011]), they also bind Orly here. In this regard, I need not decide whether there is any merit to Trump Group's argument that, although Orly and the Orly Trust were not parties in the Delaware proceedings, their interest was fully represented by Arie, who acted as a fiduciary, was in privity with Orly, and actively litigated the issues raised in the Delaware proceedings on behalf of Orly and the Orly Trust.

Accordingly, where applicable, or unless otherwise specified or the context otherwise requires, all references hereinafter to "Arie" include "Orly" and the "Orly Trust." However, to avoid any possibility of risk or confusion, the decretal paragraphs set forth at the conclusion of

11

this decision and order will, where applicable, reflect the separate rulings with respect to Arie
and Orly and/or the Orly Trust.

In claiming that he retains a beneficial interest in all 3,000 TRI shares including the Sagi

Trust Shares purchased by Trump Group from TPR, Arie overlooks the Final Order which he

himself negotiated and which gives neither Arie nor the Orly Trust record ownership of any TRI

shares. And he identifies no clause or provision in the Delaware courts' opinions suggesting that

he has a beneficial ownership interest in the Sagi Trust Shares. Therefore, any allegation or

claim by Arie in opposition to Trump Group's motion that TPR's record ownership of all 3,000

TRI shares "remained subject to his beneficial ownership claims" has no factual or legal basis.

(Arie's Opposition Brief, at 15-17). Indeed, Arie acknowledges that "[t]he Chancery Court also

held that the Trumps owned the Sagi [Trust] shares under the 2008 Agreement and that the Sagi

Trust Irrevocable Proxy [held by Arie] was not valid under New York or Delaware law." (*Id.* at

9).

Many of Arie's claims against Trump Group in this action are integrally related to the

Delaware courts' invalidation of the 2004 Transfers, and the Delaware Supreme Court noted that

Arie had "voluntarily asked the trial court to determine that he beneficially owned 13.99 percent"

of TRI shares, and that Arie and Trump Group "were legally free to consent to the jurisdiction of

the Court of Chancery exercising plenary *in personam* jurisdiction over themselves personally."

(*Genger v TR Investors, LLC*, 26 A3d 180, 202 [Del. Sup. Ct. 2011]).

That a section 225 proceeding was *in rem* has no bearing on the preclusive effect of a

decision on a subsequent action. (*Johnston v Arbitrium [Cayman Islands] Handels AG*, 198 F3d

342, 348 [2d Cir 1999] ["Under applicable Delaware law . . . the determination of an issue

12

actually litigated and decided against a defendant in an in rem case may have collateral estoppel

effect in a subsequent in personam proceeding"]). In *Johnston*, the Second Circuit expressly

rejected the argument that issues decided in a section 225 proceeding concerning disputed

ownership and control of corporate shares could not collaterally estop claims raised in a

subsequent *in personam* action involving findings and determinations made in the prior *in rem*

action. And TPR and the Orly Trust's absence from Delaware was the basis for the Delaware

Supreme Court's reversal of the Chancery Court's ruling with respect to the issue of beneficial

ownership of the Arie Shares and the Orly Trust Shares, but not as to other findings and rulings

of the Chancery Court.

The higher burden of proof imposed on Arie in the Chancery Court to prove the factual

issues by clear and convincing evidence is immaterial. The Second Circuit in *Kosakow v New*

*Rochelle Radiology Assoc.,* analyzed applicable New York law, as set forth by the Court of

Appeals in *Schwartz* and followed in *Parker, supra,* and stated, in relevant part:

> The *Schwartz* opinion counsels that a functional approach should
> be taken in analyzing collateral estoppel in New York, and that it
> should not be applied rigidly . . . Notably, under this functional
> test, the court did not mention the burden of proof, let alone
> describe it as a dispositive factor. While there is a certain logical
> appeal to the decision in *Nesbitt* [that collateral estoppel may not
> apply if there is a difference in the burden of proof], *the value of*
> *collateral estoppel in fostering judicial economy and avoiding*
> *inconsistent results would be severely compromised if every shift in*
> *the burden of proof would make collateral estoppel unavailable.*
> . . . It follows that the New York Court of Appeals would similarly
> reject the proposition that collateral estoppel can never be applied
> where there is a difference in the burden of proof. *Schwartz's*
> practical approach to the issue dictates that parties not be permitted
> to relitigate the same issues, despite differing burdens of proof,
> where it is evident that burden of proof played little or no role in
> the prior factual determination.

13

*(Kosakow,* 274 F3d 706, 731-732 [2d Cir 2001][emphasis added]).  Absent any New York authority to the contrary offered by Arie, *Kosakow* is persuasive.  Moreover, the Chancery Court imposed on Arie a higher burden of proof as a sanction for spoliating evidence and contempt of court.  To permit him to relitigate his claims here would render the sanction nugatory.

And, following *Kosakow,* the Second Circuit recently held that where a plaintiff had a full and fair opportunity to litigate her claims in an earlier Article 78 proceeding under New York law, she was collaterally estopped from advancing those claims in the federal action notwithstanding the difference in the applicable burdens of proof between the proceeding and a subsequent action in the federal court. *(Constantine v Teachers Coll.,* 448 Fed Appx 92, 94-95, 2011 WL 4509542 [2d Cir 2011]).

Most importantly, the underlying facts and record clearly reflect that Arie had a full and fair opportunity in the Delaware courts to litigate the issues regarding invalidation of the 2004 Transfers. *(Schwartz v Public Adm'r of County of Bronx,* 24 NY2d 65, 73 [1969] [while burden of proving identity of issues rests on proponent of collateral estoppel, opponent bears burden of proving that he or she did not have full and fair opportunity to litigate issues in earlier action]); *accord Parker v Blauvelt Volunteer Fire Co.,* 93 NY2d 343, 349 [1999]).  Accordingly, to the extent that the allegations in support of the causes of action asserted in the complaint are contradicted by the findings and rulings of the Delaware courts, Arie is collaterally estopped from relitigating them. (CPLR 3211[a][5]).

### 2. Declaratory judgment to reform the divorce stipulation (first cause of action)

Arie seeks a declaratory judgment against Trump Group and other defendants to reform the divorce stipulation based on: (1) the provision giving the parties the right to seek a

14

—

court-ordered reformation to reflect their original intent in the event that any portion of the

stipulation is held to be invalid; (2) the Delaware courts' invalidation of the 2004 Transfers and

the irrevocable proxies held by Arie to vote the Orly Trust Shares and the Sagi Trust Shares; and

(3) his and Dalia's mutual mistake in believing that the 2004 Transfers and the irrevocable

proxies were valid.  In seeking reformation, Arie wants, *inter alia*, the 3,000 TRI shares held by

TPR prior to the 2004 Transfers placed in a new entity to be controlled by him, and for him to

retain all voting rights to such shares. (Complaint, ¶¶ 175-189).  This is the only cause of action

where Orly and the Orly Trust are not co-plaintiffs with Arie.

      The Southern District observed not only that the instant action is "little more than a

collateral attack on the Delaware Supreme Court ruling," but that authorizing Arie to reform the

corporate ownership structure in TPR and TRI, including allowing him to retain his voting rights

in all 3,000 shares of TRI stock, constitutes a collateral attack on the Delaware courts'

determinations, whereby they unequivocally ruled, *inter alia*, that he has no right to vote any of

the shares because the irrevocable voting proxies held by him pursuant to the 2004 Transfers are

invalid. (*Glenclova Investments Co. v Trans-Resources, Inc., et al.,* __ F Supp 2d __, 2012 WL

2196670, at *5).  It also noted that Arie's federal counterclaims, which are substantially similar

to those advanced here, including the reformation claim, are directed against 13 counterclaiming

defendants including Dalia, even though 12 of them were not parties to the divorce stipulation,

and "the majority of the counterclaims do not name Dalia at all." (*Id.* at 17).  Moreover, the

Southern District observed that:

                even though Arie is the party who made false representations in the
                [Divorce] Stipulation of Settlement, his reformation claim does not
                seek to right that wrong.  Instead, he wants to change the terms of

> the [Stipulation] in a manner designed to undo the Delaware
> Chancery Court's finding of liability against him, thereby allowing
> him to avoid the consequences of his own breach of the 2001 [TRI]
> Stockholders Agreement - Trump Group's right to purchase those
> invalidly transferred shares.

(*Id.* at 17).   Consequently, Arie is collaterally estopped from seeking a declaratory judgment to

reform the divorce stipulation, at least as asserted against Trump Group, as it is "little more than

a collateral attack on the Delaware Supreme Court ruling," and as Trump Group is not a party to

the divorce stipulation.   Although Arie maintains that Trump Group is a necessary party because

it holds the 3,000 TRI shares needed to implement the reformation, the remedy of reformation or

rescission is unavailable against a nonparty to a contract. (*Baranek v Baranek*, 54 AD3d 789, 790

[2d Dept 2008]).

　　　And, as Trump Group was not a party to the divorce stipulation, Arie's and Dalie's

alleged "mutual mistake" in effecting the 2004 Transfers is immaterial and may not be used as a

defense in Arie's dispute with Trump Group.   Moreover, Arie seeks to undo the Delaware courts'

adverse findings against him and Trump Group's right to buy the "invalidly transferred shares,"

notwithstanding that they were transferred as a result of his misrepresentation in the divorce

stipulation that no consent, other than TPR's, was required for the 2004 Transfers.   In any event,

any equitable or contractual right in favor of Arie to reform the divorce stipulation does not

override the pre-existing contractual right of Trump Group to purchase the invalidly transferred

shares, when it was Arie then in control of TPR who caused TPR to breach the TRI stockholders

agreement.

　　　3.　Constructive trust, unjust enrichment and rescission (second and fourth causes of action)

　　　The elements of a cause of action for a constructive trust are: "(1) a confidential or

fiduciary relation; (2) a promise, express or implied; (3) a transfer made in reliance on that

promise; and (4) unjust enrichment." (*Wachovia Sec., LLC v Joseph*, 56 AD3d 269, 271 [1st Dept

2008]).  Arie asserts that New York courts frequently impose constructive trusts with "sufficient

flexibility" to prevent enrichment and that the "constructive trust doctrine is not rigidly limited."

(Arie's Opposition Brief, at 20).

Arie alleges that Trump Group is not a bona fide purchaser, and that a constructive trust

should be imposed in his favor with respect to all 3,000 shares of TRI stock that reverted to TPR

because Trump Group, as well as Sagi, TPR's current president, owe fiduciary and contractual

duties to Arie and the Orly Trust. (*Id.* at 23).  According to Trump Group, however, it had neither

a confidential nor fiduciary relationship with Arie and/or the Orly Trust.

Courts have held that "a person wrongfully acquiring property can be treated as a

constructive trustee notwithstanding the lack of a fiduciary relationship." (*See eg In re Koreag,

Controle et Revision S.A. v Refco F/X Assoc.*, 961 F2d 341, 353 [2d Cir 1992]), *citing Simonds v

Simonds*, 45 NY2d 233, 242 [1978]).  Whether Trump Group was a bona fide purchaser or

whether it owed a confidential or fiduciary relationship need not be decided for purposes of

addressing Arie's claim for a constructive trust.

In an earlier decision in this action entered on January 3, 2012 (motion sequence numbers

004 and 005), the previously assigned justice denied plaintiffs' request for an order enjoining

defendants from taking certain actions, including any act to sell or transfer the Arie and Orly

Trust Shares pending a final adjudication of beneficial interest, finding that an injunction would

interfere with TRI's management in which Trump Group holds majority control, that plaintiffs

have alternative remedies even if they obtain a final judicial determination of beneficial interest,

17

and that requiring Trump Group and TPR to comply with the court's order in giving 10 business days' notice to plaintiffs of a proposed future transaction, except with respect to share dilution, is sufficient to maintain the status quo. (*Genger v Genger*, Dec. 28, 2011 [Sup Ct, NY County]).

The same considerations render unnecessary Arie's claim for a constructive trust as, *inter alia*, the notice requirement affords plaintiffs a sufficient opportunity to seek judicial relief in the event that defendants propose to enter into a transaction that may adversely affect plaintiffs' asserted interest in the Arie Shares and the Orly Trust Shares.

In order to plead a cause of action for unjust enrichment adequately, a plaintiff must allege "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." (*Georgia Malone, Inc. v Rieder*, 19 NY3d 511, 515 [2012], *citing Mandarin Trading Ltd. v Wildenstein*, 16 NY3d 173, 182 [2011]).

In his complaint, Arie alleges, *inter alia*, that: (1) TPR/Sagi had no authority to sell the 3,000 TRI shares to Trump Group when the Delaware courts had determined that the 2004 Transfers were void *ab initio* as the shares then reverted to TPR subject to Arie's interest by virtue of the divorce stipulation; (2) the purchase price paid by Trump Group for the 3,000 TRI shares under the purchase agreement for the Sagi Trust Shares and the side letter agreement for the Arie Shares and Orly Trust Shares was a fraction of the value of such shares; and (3) Trump Group was not a bona fide purchaser and would be unjustly enriched if allowed to benefit from TPR's sale of the TRI shares.

Trump Group does not specifically deny that the per share price paid for the Arie and the Orly Trust Shares was significantly lower than that for the Sagi Trust Shares, and its assertion

18

that the Delaware courts have held that it was "entitled to buy TPR's TRI shares at 2004 values,

which were far less than the $26 million Trump Group paid TPR just for the Sagi Trust Shares"

does not defeat a claim of unjust enrichment because that portion of the Chancery Court's

opinion does not address the purchase price for the Arie Shares and Orly Trust Shares or the side

letter agreement, nor does it compare the per share price difference. Moreover, Trump Group's

contention that the claim for unjust enrichment requires a fiduciary or confidential relationship,

and must be pleaded with specificity, is not supported by the opinions it cites in its moving

papers. Rather, a fiduciary or confidential relation is an element of a constructive trust claim.

(*Supra*, at 16-17). Consequently, Arie has sufficiently alleged, for the purpose of CPLR

3211(a)(7), a claim for unjust enrichment.

Rescission is a part of the fourth cause of action. As Trump Group was not a party to the

divorce stipulation, and for the reasons fully discussed above in connection with the dismissal of

the reformation claim (*supra*, at 16-18), rescission does not lie against Trump Group.

4.  Permanent injunction (fifth cause of action) and preliminary injunction (tenth cause of action)

Plaintiffs seek to preliminarily and permanently enjoin Trump Group from transferring,

selling, pledging, assigning, diluting, voting or otherwise disposing of all 3,000 shares of TRI

stock that reverted to TPR as a result of the Delaware court rulings. The reasons set forth above

for dismissing the constructive trust claim (*supra*, at 16-18) apply equally here. In addition, the

Delaware courts held that Arie and the Orly Trust are not the record owners of any TRI shares,

and that no TRI shares owned by Trump Group or owned of record by TPR are subject to any

proxy of any kind in favor of Arie. (Final Order, ¶¶ 7-10). Thus, granting the requested

injunctive relief in plaintiffs' favor to enjoin Trump Group and TPR from exercising their

19

respective voting rights in the TRI shares would constitute a collateral attack on the court rulings.

### 5. Breach of fiduciary duty, conspiracy, and aiding and abetting breach of fiduciary duty (third cause of action)

The elements of a cause of action for a breach of fiduciary duty are: "the existence of a fiduciary relationship . . . misconduct by the defendant, and . . . damages . . . caused by the defendant's misconduct." (*Rut v Young Adult Inst., Inc.*, 74 AD3d 776, 777 [2d Dept 2010]). Arie alleges, *inter alia*, that: (1) upon becoming the majority shareholder of TRI in 2008 after purchasing the Sagi Trust Shares from TPR, Trump Group owed a fiduciary duty to him and the Orly Trust as the "known beneficial owners" of the Arie Shares and Orly Trust Shares in TRI; and (2) as a majority shareholder, Trump Group breached its fiduciary duty by purchasing the Arie Shares and the Orly Trust Shares at a significant discount, thereby advancing its scheme to squeeze Arie out of TRI. (Complaint, ¶¶ 209-214).

Although Trump Group does not deny that it became a majority shareholder of TRI after it purchased the Sagi Trust Shares in 2008 and that as a majority shareholder, it owed a fiduciary duty to TRI minority shareholders (*Richbell Info. Servs.*, 309 AD2d at 300 ["(a) majority shareholder in a close corporation is in a fiduciary relationship with the minority"]), it denies knowing that plaintiffs were beneficial owners of any TRI shares, and thus could owe them no fiduciary duty.

Even assuming that Trump Group was unaware that plaintiffs were beneficial owners in 2008 when it entered into the side letter agreement to buy the Arie Shares and the Orly Trust Shares, it became aware of it by 2011 when it exercised its option to buy Arie's and the Orly Trust's shares, as since at least 2008, they asserted beneficial ownership in the shares, even if it

20

had not yet been judicially determined.

Trump Group also denies owing any duty because when it executed the side letter agreement it was not a majority shareholder, and that, even assuming it owed a fiduciary duty, the sole duty was to refrain from using its majority power to oppress the minority, and Arie does not allege that TPR, the minority shareholder, was oppressed.

Here, the fiduciary duty arose in 2008 after the Sagi Trust Shares were purchased, and the allegation is that the duty was breached in 2011 when Trump Group bought the Arie Shares and the Orly Trust Shares at a deep discount with the intent of removing plaintiffs, who have claimed, at least indirectly, to be putative minority shareholders of TRI through their interest in TPR, after the Delaware courts ruled that the 2004 Transfers were void and the transferred Arie Shares and Orly Trust Shares reverted to TPR. In any event, "whether such [fiduciary] obligation exists is necessarily fact-specific to the particular case," and it would be premature to dismiss the claim before discovery is undertaken to ascertain the facts. (*Weiner v Lazard Freres & Co.*, 241 AD2d 114, 122 [1st Dept 1998]). Consequently, for all of these reasons and for purposes of CPLR 3211(a)(7), the complaint adequately states a claim for breach of fiduciary duty against Trump Group.

It is also alleged, in addition to the direct breach of fiduciary duty, that Trump Group conspired with other defendants, and aided and abetted them in the breach of their fiduciary duty. To state a claim of aiding and abetting a breach of fiduciary duty, the complaint must contain facts to support "a fiduciary duty owed to plaintiff . . . a breach of that duty, and [the] defendant's substantial assistance in effecting the breach,'" which resulted in damages. (*Monaghan v Ford Motor Co.*, 71 AD3d 848, 850 [2d Dept 2010]). While an entity such as TPR owes no fiduciary

21

duty to its shareholders under New York and Delaware laws, as argued by Trump Group, the complaint is replete with allegations that Sagi, as TPR's president, breached fiduciary duties he owed to Arie, as well as other allegations that the 2008 purchase agreement and the side letter agreement constituted a $26.7 million bribe offered by Trump Group to Sagi, to betray and rob his father and sister of their interests in the relevant TRI shares, and to squeeze them out of TRI at unconscionably low prices. (Complaint, ¶¶ 123, 135).

The complaint thus contains sufficient factual allegations supporting a claim that Sagi breached his fiduciary duty to Arie (*infra*, at 27-28), as does the claim that Trump Group aided and abetted Sagi in breaching it. Moreover, "actual knowledge" of the alleged wrongdoing "need only be pleaded generally . . . particularly at the pre-discovery stage." (*Oster v Kirschner*, 77 AD3d 51, 55 [1st Dept 2010]).

However, the complaint is not only bereft of an explicit and independent allegation of conspiracy, but such a cause of action does not exist, as it is well settled that "a mere conspiracy to commit a [tort] is never of itself a cause of action," even though allegations of a conspiracy are permitted to connect defendants with an otherwise actionable tort. (*See Alexander & Alexander v Fritzen*, 68 NY2d 968, 969 [1986]).

### 6. Tortious interference with contract (eighth cause of action)

The elements of a cause of action for tortious interference of contract are: "(1) the existence of a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of that contract, (3) the defendant's intentional procurement of the third party's breach of that contract, and (4) damages." (*Chung v Wang*, 79 AD3d 693, 694 [2d Dept 2010]).

The complaint contains allegations that Trump Group interfered with several contracts,

22

including the divorce stipulation, the 2004 Transfer documents between Arie and TPR, and the

2004 voting trust agreements between Arie and the Orly and Sagi Trusts. However, absent any

allegation in the complaint that Dalia breached the divorce stipulation and the related

documentation, there can be no finding that Trump Group tortiously interfered with the divorce

stipulation and the related documentation.

Although the Delaware courts held that the 2004 Transfers are void, Arie argues that the

Delaware Chancery Court held that the 2004 Transfers are unenforceable, whereas the 2004

Transfer documents and the 2004 voting trust agreements are void. (Arie's Opposition Brief, at

32). He also maintains, however, that "[on] July 23, 2010, the Delaware Chancery Court issued a

lengthy written decision which held that the 2004 transfers of TPR's TRI shares to Arie, the Sagi

Trust and the Orly Trust pursuant to the Divorce Decree were void . . . ." (*Id.* at 9). Arie then

asks that instead of considering the illegal contract void in toto, the illegal provision be severed,

thereby permitting the validation of the balance of the agreement. (*Id.* at 33). In his view,

because the 2004 Transfer documents and voting trust agreements contained "valid and binding

provisions" that required Sagi and TPR to take "all necessary actions . . . to complete or perfect

the transactions contemplated hereby," a tortious interference claim may be alleged against

Trump Group for causing the other defendants to breach these contractual provisions. (*Id.*).

Trump Group, however, rightly maintains that "because the 2001 Stockholders

Agreement prohibited any transfers to the Trusts, any purported obligations on the part of TPR

and Sagi to cooperate with such improper transfers cannot be enforced and cannot give rise to an

interference claim [against Trump Group.]" (Trump Group's Reply Brief, at 19). And, as Arie

failed to provide notice to Trump Group with respect to TPR's transfer of the Arie Shares to

23

himself, which notice was required by the stockholders agreement even though he was a

permitted transferee, the transfer of the Arie Shares was also void, as determined by the Delaware

court.

### B. Motion of TPR and Sagi Trust to dismiss (motion sequence number 010), motion of Rochelle Fang, individually and as trustee of Sagi Trust to dismiss (motion sequence number 009), and motion of Sagi to dismiss (motion sequence number 007)

The complaint contains various causes of action against TPR, Sagi Trust, Sagi and

Rochelle Fang (Fang), trustee of the Sagi Trust, including: a declaratory judgment to reform the

divorce stipulation (first cause of action); constructive trust (second cause of action); breach of

fiduciary duty, conspiracy and aiding and abetting in the breach of fiduciary duty (third cause of

action); unjust enrichment and rescission (fourth cause of action); breach of contract (sixth and

seventh causes of action); aiding and abetting tortious interference with contract (ninth cause of

action); as well as preliminary and permanent injunctions (fifth and tenth causes of action).

These defendants seek the dismissal of all of these causes of action as asserted against each of

them. They also contend that this court lacks jurisdiction over the Sagi Trust, but they do not

refute the assertion that the Sagi Trust is a New York trust and that its beneficiary resides in New

York.

### 1. Declaratory judgment for reformation (first cause of action)

It cannot be disputed that TPR, Sagi Trust, Sagi, and Fang are not parties to the divorce

stipulation. Yet, Arie argues in opposition to these defendants' motions to dismiss that, because

reformation of the divorce stipulation requires these defendants' participation, they are

"necessary parties" to the reformation process and that complete relief cannot be obtained in their

absence. (Arie's Opposition Brief, at 9-10). The reasons set forth above, in connection with

24

Trump Group's motion to dismiss the declaratory judgment for reformation against it (*supra*, at 14-16), apply equally to the instant claim against these defendants.

### 2. Constructive trust, unjust enrichment and rescission (second and fourth causes of action)

The cause of action for a constructive trust claim against TPR, Sagi, the Sagi Trust and Fang fails for the same reasons set forth above in connection with dismissal of that cause of action against Trump Group. (*Supra*, at 16-18). More specifically, as TPR and Sagi are required to give 10 days' notice to plaintiffs of a proposed transaction (except share dilution) involving the Arie and Orly Trust Shares (*Genger v Genger*, Dec. 28, 2011 [Sup Ct, NY County]), such notice is sufficient to afford them an opportunity to seek any necessary judicial relief.

Arie argues that allowing TPR to retain any benefit arising from its record ownership of the TRI shares that reverted to it as a result of invalidation of the 2004 Transfers constitutes unjust enrichment because TPR had divested itself of such TRI shares "in consideration for and as a condition of Arie giving up his 51 percent ownership interest in TRI." (Arie's Opposition Brief, at 10-12). However, it was Arie who had control of TPR before the 2004 Transfers and it was he who caused TPR to enter into the 2004 Transfers, which were invalidated by the Delaware courts.

However, to the extent that Arie alleges in the complaint that TPR entered into the 2008 side letter agreement with Trump Group to sell the Arie Shares and the Orly Trust Shares at a discount and that TPR benefited from the transaction at his expense and that of Orly and the Orly Trust, there exists a viable claim of unjust enrichment, which the Chancery Court apparently noticed when it observed that "it may be that [Arie] Genger and Orly Genger have claims against TPR and Sagi Genger over how the price paid by Trump Group for the Arie and Orly Shares was

25

allocated . . . If those transferees [i.e., Arie and the Orly Trust] have any beef with TPR or Sagi

Genger, the transferees are free to file suit against them." (*TR Investors, LLC v Genger*, 2010 WL

3279385, *3 [Del. Ch. Ct. 2010]).

Arie also argues that an inference must be drawn that "Fang benefited at Arie's expense

from her involvement in the conspiracy designed to squeeze [him] out of TRI [and] her central

role and complicity in accepting the $26.7 million bribe paid to the Sagi Trust by Trump Group

for the purported sale of the Sagi Trust TRI shares." (Arie's Opposition Brief, at 12). He fails to

allege, however, with any particularity, that Fang, individually or in her capacity as trustee of the

Sagi Trust, was unjustly enriched, and at oral argument, Arie's counsel stated, in relevant part

that the "claim is for aiding and abetting. For some reason [Fang] was brought back for a very

short period of time . . . to execute the 2008 Stockholders [sic] Agreement, and we have alleged

that they aided and abetted each other . . . and that [Fang] was the alter ego and co-agent of Sagi

in his breaches of fiduciary duty. That is why she's in the case." (Hearing Transcript, March 13,

2012, at 139). Thus, the claim against Fang is based on her aiding and abetting Sagi in his

breach of fiduciary duty, rather than on the allegation that she was unjust enriched, either

individually or as trustee for the Sagi Trust. Moreover, Arie does not explain in either the

complaint or his Opposition Brief how the Sagi Trust itself was unjustly enriched, and Arie failed

in the Delaware court proceedings to mount a successful challenge to Trump Group's purchase of

the Sagi Trust Shares.

Sagi contends that as unjust enrichment constitutes a "quasi-contract claim" and as there

are "written contracts dealing with the same subject matter," the cause of action for unjust

enrichment is not viable. (Sash Affirmation in Support of [Sagi] Motion to Dismiss, ¶ 12).

However, Arie, Orly and/or the Orly Trust were not parties to the 2008 side letter agreement and thus they have no standing to assert a breach of contract claim. Moreover, the side letter agreement was executed by Trump Group and TPR, by Sagi, and he knew or should have known that Arie and Orly have asserted beneficial interest claims in the Arie Shares and Orly Trust Shares since at least 2008, but he nonetheless caused TPR to sell the Shares in 2011 at an allegedly heavily discounted price. Indeed, Arie asserts that TPR is controlled by Sagi, and that Sagi, *inter alia*, breached his fiduciary duties and was unjustly enriched. In light of the foregoing, and given the position of the Delaware Chancery Court on the issue (*supra*, at 25-26), the unjust enrichment claim against Sagi is viable.

As TPR, Sagi, the Sagi Trust and Fang were not parties to the divorce stipulation, however, the cause of action seeking rescission has no factual or legal basis. (*Supra*, at 19).

### 3. Breach of fiduciary duty, conspiracy and aiding and abetting breach (third cause of action)

Arie fails to set forth any statutory or decisional law for the proposition that a corporation, such as TPR, takes on or otherwise assumes the fiduciary duties of its directors and officers such as Sagi, to its purported shareholders, such as Arie and the Orly Trust. Indeed, a corporation owes no fiduciary duties to its shareholders. (*See Gates v Bea Assoc., Inc.*, 1990 WL 180137, *6 [SD NY 1990] [to permit aiding and abetting claim against corporation would "completely undermine and negate the rule that a corporation does not have fiduciary duties to its shareholders."]).

The breach of fiduciary claim against the Sagi Trust and Fang is based, according to Arie, on their obligation, individually and as trustee under the divorce stipulation and the 2004 Transaction documents, to ensure that Arie would maintain voting control over the Sagi Trust

27

Shares for the duration of his life. (Arie's Opposition Brief, at 17). However, the voting trust

agreements and the proxies held by Arie with respect to the Sagi Trust and Orly Trust Shares as

well as the Arie Shares were invalidated by the Delaware courts, due to Arie's breach or

violation of the stockholders agreement.

Arie also alleges that the Sagi Trust and Fang aided and abetted Sagi and Trump Group in

breaching the respective fiduciary duties they owed to him. As the Delaware courts upheld the

sale of the Sagi Trust Shares to Trump Group, and absent any allegation that the Sagi Trust and

Fang owe Arie a fiduciary duty with respect to the Arie Shares and the Orly Trust Shares, the

Sagi Trust and Fang could not have aided and abetted Trump Group or Sagi in breaching their

fiduciary duties in such a transaction. Similarly, the complaint does not set forth facts as to why

Orly can assert a breach of fiduciary duty claim against Fang, inasmuch as Orly does not allege

that she is also a beneficiary of the Sagi Trust which Fang served as the trustee.

Sagi conclusorily denies owing a fiduciary duty to Arie, just as TPR owes no fiduciary

duty to Arie. However, the complaint is replete with allegations of a fiduciary duty owed to Arie

by Sagi, individually and as a TPR officer, which was breached by Sagi in causing TPR to enter

into the stock purchase and side letter agreements, when he used his position as president of TPR

and caused TPR to sell the Arie and Orly Trust Shares to Trump Group at a fraction of their fair

market value. And, Sagi does not dispute that a director or officer of a corporation owes

fiduciary duties to the corporation and its shareholders. Indeed, the Southern District observed

that, even if Arie's reformation counterclaim constitutes a basis for abstaining from exercising

jurisdiction, certain of his other counterclaims do not compel abstention, "particularly the claims

for breach of fiduciary duty against Sagi and others (premised on Sagi's implementation of the

28

2008 side letter agreements on behalf of TPR) . . . ." (*Glenclova Investments Co. v Trans-Resources, Inc., et al.*, __ F Supp 2d __, 2012 WL 2196670, at *17 [SDNY 2012]).  The aiding and abetting breach of fiduciary duty claim against Sagi also survives Sagi's motion to dismiss, as discussed above relating to the survival of the breach of fiduciary duty claim against Trump Group (*supra*, at 20-22), and it is alleged that Sagi assisted or aided and abetted Trump Group in the breach of such duty.

    4.  Breach of contract against TPR and Sagi Trust (sixth and seventh causes of action)

    To state a claim for breach of contract, the complaint must allege the existence of a contract, plaintiff's performance, defendant's nonperformance, and resulting damages. (*Elisa Dreier Reporting Corp. v Global NAPS Networks, Inc.*, 84 AD3d 122, 127 [2d Dept 2011]).

    Arie alleges that "TPR breached the 2004 Transfer Agreement by executing the 2008 Stock Purchase and Side Letter Agreements and purporting to sell the TRI shares to Trump Group in disregard of Arie's beneficial and voting rights, thereby failing to effectuate the express intent of the parties to the 2004 Transaction Documents and the [divorce stipulation.]" (Arie's Opposition Brief, at 22).  As discussed *supra*, at 25, Arie brought about his own loss of voting rights in the TRI shares, in spite of the voting trust agreements and the irrevocable proxies held by him, by causing TPR to enter into the 2004 Transfers without obtaining the required consent, as a result of which the Delaware courts found the proxies unenforceable.  Moreover, Arie was not a party to the 2008 side letter agreements which allegedly sought to deprive Arie and Orly of the asserted claims of beneficial interests in the Arie and Orly Trust Shares when such shares reverted to TRP, albeit such interests have not been judicially determined, and thus has no standing to assert a breach of contract claim as to these agreements.

29

Further, the breach of contract claim in the seventh cause of action against the Sagi Trust

is not viable for the same reason that the breach of fiduciary duty claim against the Sagi Trust is

not, as discussed above. (*Supra*, at 27).

Arie also observes that defendants "conveniently ignore the fact that the Delaware Courts

made no determinations as to the validity of the Back-Up Voting Trust Agreements, the express

intent of which was to ensure that Arie would maintain voting control . . . in the event the

irrevocable proxies were determined to be invalid." (Arie's Opposition Brief, at 23).  Having

failed to raise this claim or issue in Delaware, the argument is precluded, and in any event, does

not apply as to Orly as any voting right under the back-up voting trust agreements was held only

by Arie.  In the Delaware proceedings, voting right was clearly an important issue for Arie.

Thus, his belated attempt to raise it now is untenable and a waste of judicial resources. (*Olawoyin

v 520 W. 43rd St. Partners, LLC*, 34 Misc 3d 130 [A], 2011 NY Slip Op 52328 [U], *1 [App

Term, 1st Dept 2011] [plaintiff's claim "properly dismissed under familiar principles of res

judicata, since the claim could have been litigated in the prior . . . proceeding between the

parties"]; *see also Landau, P.C. v LaRossa, Mitchell & Ross*, 11 NY3d 8, 12-13 [2008] ["once a

claim is brought to a final conclusion, all other claims arising out of the same transaction or

series of transactions are barred, even if based upon different theories or if seeking a different

remedy."]).

### 5.  Aiding and abetting tortious interference with contract (ninth cause of action)

In the complaint, Arie alleges that Sagi, Fang and the Sagi Trust "each had knowledge of

[Trump Group's] tortious interference with the 2004 TPR Transaction Agreement and the

[divorce stipulation]" as well as "the 2004 Voting Trust Agreements," and that each had aided

30

and abetted, and provided substantial assistance to Trump Group in committing tortious acts. (Complaint, ¶¶ 253-256). As the tortious interference of contract claim against Trump Group (eighth cause of action) is legally insufficient (*supra*, at 22-24), so too is the aiding and abetting claim against Sagi, Fang and the Sagi Trust as they cannot have aided and abetted Trump Group in committing a tort that could not have been committed. Moreover, no liability for tortious interference generally attaches when the defendant is a party to the subject contract (*UBS Sec. L.L.C. v Highland Capital Mgt., L.P.*, 86 AD3d 469, 476-477 [1ˢᵗ Dept 2011]), and Arie offers no proposition of law to the contrary.

In addition, Arie contends that the Sagi Trust "aided and abetted Trump Group's tortious interference with the Back-Up Voting Trust Agreement between Arie and the Orly Trusts." (Arie's Opposition Brief, at 24). However, as discussed *supra*, at 30, any claim made by Arie with respect to the back-up voting trust agreement is res judicata, and the allegation that the Sagi Trust aided and abetted Trump Group in violating the agreement has no legal basis as the agreement is longer legally enforceable.

### 6. Preliminary and permanent injunctions (fifth and tenth causes of action)

For the reasons set forth in conjunction with the dismissal of the fifth and tenth causes of action against Trump Group (*supra*, at 19-20), these causes of action against TPR, Sagi, Fang and the Sagi Trust are also not viable.

### C. Motion of Dalia Genger to dismiss (motion sequence number 006)

In his complaint, Arie asserts causes of action against Dalia for a declaratory judgment to reform the divorce stipulation (first cause of action), constructive trust (second cause of action), unjust enrichment and rescission (fourth cause of action), and permanent injunction (fifth cause

31

of action).

### 1. Declaratory judgment for reformation (first cause of action)

According to Arie, the reformation claim is based on: (1) the right set forth in the divorce stipulation entitling him to seek reformation when the 2004 Transfers were voided by the Delaware courts; and (2) mutual mistake in that both he and Dalia reasonably believed that the 2004 Transfers were valid when they signed the divorce stipulation.

Dalia argues that the reformation claim must be dismissed because: (1) the relevant provision in the divorce stipulation was not triggered by the Delaware court which held only that Arie failed to give notice or seek consent of the other shareholders, such as the Trump Group, for the 2004 Transfers and did not hold that the provision was void or unenforceable; (2) Arie is barred from altering the economics of the divorce stipulation because the $3.85 million 2007-2008 arbitration award in favor of Dalia effected a final resolution and conclusion of all disputes thereunder; and (3) there was no mutual mistake because Arie knew that the consent of other shareholders was required for the 2004 Transfers.

Although the Delaware courts' ruling voiding the 2004 Transfers arguably gives rise to a claim for contractual reformation, the scope of the reformation sought is precluded because Arie seeks, *inter alia*, full control of all 3,000 shares of TRI stock and the voting rights related thereto, and the Delaware courts ruled that Trump Group outright owns 67.7 percent of all TRI shares, including the 1,100 Sagi Trust Shares, and that TPR is the record owner and has voting rights as to those TRI shares that are not currently owned by Trump Group. Thus, the requested reformation constitutes an impermissible collateral attack on the Delaware court's decisions, which are entitled to full faith and credit. Moreover, as observed by the Southern District,

32

instead of seeking to right the wrong he had committed with respect to the divorce stipulation,

Arie seeks a declaratory judgment to undo the Delaware rulings and avoid the consequences of

his own breach of the TRI stockholders agreement. (*Supra*, at 15-16). Thus, any right to

reformation Arie might have had pursuant to the divorce stipulation is vitiated by the Delaware

court rulings and by his own acts.

As Arie's claim is brought after the 2004 Transfers were invalidated by the Delaware

courts in 2010, it could not have been raised before or during the conclusion of the arbitration

proceedings in 2008. (*See Indosuez Intl. Fin. v National Reserve Bank*, 304 AD2d 429, 430 [1st

Dept 2003] [res judicata inapplicable if claim arose after conclusion of prior action]). Thus, the

arbitration award has no impact on the instant reformation claim.

In the alternative, Arie contends that the divorce stipulation may be equitably, as opposed

to contractually, reformed due to a "mutual mistake." Although he maintains that both he and

Dalia "reasonably believed" that the 2004 Transfers were valid, he was discredited by the

Delaware courts, and Dalia denies it. Moreover, the Delaware Supreme Court specifically stated

that "[Arie's] misrepresentation was false. In fact, the prior consent of Trump Group signatories

to the Stockholders Agreement . . . was required," and that "when [Arie] effectuated the 2004

Transfers, [he] knew that neither [the Orly or the Sagi] Trust was a 'Permitted Transferee' of the

[TRI] shares under the Stockholders Agreement." (*Genger v TR Investors, LLC*, 26 A3d 180,

184, 185 [Del. Sup. Ct. 2011]). Therefore, crediting Arie's unsubstantiated or conclusory

allegation of a "mutual mistake," would result in an improper end run around the Delaware

courts' determinations.

And, the Court of Appeals recently rebuffed a husband's attempt to reopen a divorce

33