settlement based on alleged post-divorce changes in asset valuation. (*Simkin v Blank*, 19 NY3d 46 [2012]). There, the husband alleged that he and his wife were mutually mistaken about the value of an investment account as it had never actually existed due to Bernard Madoff's Ponzi scheme. First, the Court observed that "a claim predicated on mutual mistake must be pleaded with the requisite particularity necessitated under CPLR 3016 (b) . . . [and] that the mutual mistake must exist at the time the contract is entered into and must be substantial," and that any court-ordered relief of reformation is reserved only for "exceptional situations." (*Id.* at 52). The Court, moreover, analogized the circumstances with a dispute over marital assets that unexpectedly gained or lost value after the dissolution of the marriage. (*Id.* at 55). Here, it is apparent that the value of TRI shares increased subsequent to the execution of the divorce stipulation and that Arie did not expect that the economic scheme he had carefully devised under it would be invalidated by the court.

    2.  Constructive trust, unjust enrichment and rescission (second and fourth causes of action)

        Arie alleges that Dalia has been unjustly enriched because (1) the 2004 Transfers were voided and the transferred shares reverted to TPR, and (2) if Dalia were permitted to retain the 51 percent interest in TPR she received under the divorce stipulation while Arie was divested of his 14 percent interest in TRI and his right to vote 52.25 percent of the TRI shares which he controlled prior to the voiding of those transfers, Dalia would be unjustly enriched at his expense. Thus, Dalia's alleged unjust enrichment stems from the voiding of the 2004 Transfers by the Delaware court. As the voiding of the 2004 Transfers was due to Arie's own acts in causing TPR to violate the shareholders agreement, as found by the Chancery Court, Arie cannot complain that Dalia was unjustly enriched by it. The same holds true for the cause of action for rescission.

34

In addition, as unjust enrichment is an element required for the imposition of a constructive trust, and as Arie has failed to show that Dalia was unjustly enriched, the constructive trust cause of action cannot stand as a matter of law. (*Simonds v Simonds*, 45 NY2d 233, 242 [1978] [purpose of constructive trust is to prevent unjust enrichment]). Alternatively, the constructive trust claim fails because the current facts do not warrant the relief requested, the reasons for which are set forth above (*supra*, at 16-18) in conjunction with Trump Group's motion to dismiss an identical claim against it.

### 3. Permanent injunction (fifth cause of action)

Arie argues in opposition to Dalia's motion to dismiss that Dalia should be permanently enjoined from interfering with his asserted interest in the TRI shares because his claims of reformation/rescission, constructive trust and unjust enrichment will result in an unraveling of the 2004 Transaction documents and the divorce stipulation, and will likely result in Dalia holding interests in the TRI shares. Thus, Arie argues that an injunction will prevent her from interfering with his interests in those shares. (Arie's Opposition Brief, at 20-21). Because all of the above claims against Dalia have no merit, there is no basis for granting injunctive relief.

### D. Motion of Trump Group to supplement the record (motion sequence number 015)

The Trump Group's motion to supplement the record on its motion is denied as, in light of the above findings, the documents it seeks to add are unnecessary.

### III. CONCLUSION

Based on all of the foregoing, it is hereby

ORDERED, that with respect to motion sequence number 006, the motion of defendant Dalia Genger seeking dismissal of all causes of action asserted in the complaint as against her is

35

granted in all respects, and the complaint is severed and dismissed as against said defendant with costs and disbursements as taxed by the Clerk of the Court, and the Clerk is directed to enter judgment accordingly; it is further

ORDERED, that with respect to motion sequence number 007, the motion of defendant Sagi Genger seeking dismissal of all causes of action asserted in the complaint as against him is granted to the extent of dismissing the first, second, fourth (rescission only), fifth, ninth and tenth causes of action, and is otherwise denied; it is further

ORDERED, that with respect to motion sequence number 009, the motion of defendant Rochelle Fang, individually and as trustee of the Sagi Genger 1993 Trust (the Sagi Trust), seeking dismissal of all causes of action asserted in the complaint as against her is granted in all respects, and the complaint is severed and dismissed as against said defendant with costs and disbursements as taxed by the Clerk of the Court, and the Clerk is directed to enter judgment accordingly; it is further

ORDERED, that with respect to motion sequence number 010, the motion of defendant TPR Investment Associates (TPR) seeking dismissal of all causes of action asserted in the complaint as against TPR is granted to the extent of dismissing the first, second, third, fourth (rescission only), fifth, sixth, and tenth causes of action, and is otherwise denied; it is further

ORDERED, that with respect to the motion sequence number 010, the motion of the Sagi Trust seeking dismissal of all causes of action asserted in the complaint as against the Sagi Trust is granted in all respects, and the complaint is severed and dismissed as against said defendant with costs and disbursements as taxed by the Clerk of the Court, and the Clerk is directed to enter judgment accordingly; it is further

36

ORDERED, that with respect to motion sequence number 011, the motion of defendants

Glencova Invesment Company, TR Investors, LLC, New TR Equity I, LLC, New TR Equity II,

LLC, Jules Trump, Eddie Trump and Mark Hirsch (collectively, Trump Group) seeking dismissal

of all causes of action asserted in the complaint against Trump Group is granted to the extent of

dismissing the first, second, third (conspiracy only), fourth (rescission only), fifth, eighth and

tenth causes of action, and is otherwise denied; and it is further

ORDERED, that the conspiracy cause of action asserted against any of the defendants as

part of the aiding and abetting causes of action sounding in tort is dismissed; it is further

ORDERED, that defendants Glenclova Investment Company, TR Investors, LLC, New

TR Equity I, LLC, New TR Equity II, LLC, Jules Trump, Eddie Trump, and Mark Hirsch's

motion for permission to supplement the record is denied.

ENTER:

Barbara Jaffe, JSC

DATED:      January 3, 2013
            New York, New York

37

FILED: NEW YORK COUNTY CLERK 07/02/2010

NYSCEF DOC. NO. 71                                                    RECEIVED NYSCEF: 07/02/2010

## SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:  HON. PAUL G. FEINMAN                                 PART  12

_____
                                        *Justice*

_Senger_

- v -

_Senger_

|  | INDEX NO. | 109749/09 |
| --- | --- | --- |
|  | MOTION DATE |  |
|  | MOTION SEQ. NO. | 001 |
|  | MOTION CAL. NO. |  |

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | **PAPERS NUMBERED** |
| --- | --- |
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | |
| Answering Affidavits — Exhibits _____ | |
| Replying Affidavits _____ | |

**Cross-Motion:**  ☐ **Yes**   ☐ **No**

Upon the foregoing papers, it is ordered that this motion

MOTION ~~AND CROSS MOTIONS ARE~~ DECIDED
IN ACCORDANCE WITH ANNEXED DECISION AND ORDER.

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

Dated: ___6/28/10___  6:05 pm                    _____   J.S.C.

Check one:   _____ **FINAL DISPOSITION**   __✓__ **NON-FINAL DISPOSITION**

Check if appropriate:   _____ **DO NOT POST**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: CIVIL TERM: PART 12
------------------------------------------------------------------X

ORLY GENGER, in her individual capacity and on
behalf of the Orly Genger 1993 Trust (both in its

individual capacity and on behalf of D & K
Limited Partnership),

                                 Plaintiff,

                 against

DALIA GENGER, SAGI GENGER, D & K GP
LLC, and TPR INVESTMENT ASSOCIATES,
INC.,

                                 Defendants.
------------------------------------------------------------------X

|  |  |
|---|---|
| Index No. | 109749/2009 |
| Mot. Seq. Nos. | 001 through 006 |

**DECISION AND ORDER**

**For the Plaintiff:**
Zeichner Ellman & Krause LLP
575 Lexington Avenue
New York, NY 10022
(212) 223-0400

**For Dalia Genger:**
Pedowitz & Meister LLP
1501 Broadway
New York, NY 10036
(212) 403-7330

**For Sagi Genger:**
McLaughlin & Stern, LLP
260 Madison Avenue
New York, NY 10016
(212) 448-1100

**For D&K GP, LLC:**
Finkelstein Newman Ferrara LLP
225 Broadway
New York, NY 10007

**For TPR:**
Lyons McGovern, LLP
The Hennessy House
16 New Broadway
Sleepy Hollow, NY 10591
(914) 631-1336

        E-filed papers considered in review of this motion brought by order to show cause for a preliminary injunction,
motions for summary judgment, and motion to amend:

| | **Papers:** | **E-File Number:** |
|---|---|---|
| Seq. No. 001 | Order to Show Cause & TRO, Exhibits, Memo of Law in Support | 6 , 7, 7-1, 9 |
| | Affidavit & Affirmation in Opposition, Exhibits, Memo of Law | 35, 35-1 - 35-8, 36, 37 |
| | Affidavit & Affirmation in Opposition, Memo of Law, Exhibit | 38, 39, 40, 40-1 |
| Seq. No. 002 | Notice of Motion, Affirmations, Exhibits | 12, 13, 13-1 - 13-6, 18, 18-1 - 18-9 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52 |
| | Reply Memo of Law (Dalia Genger) | 61 |
| | Reply Memo of Law | 65 |
| Seq. No. 003 | Notice of Motion, Affirmation, Exhibits, Memo of Law | 15, 16, 16-1 - 16-9, 19 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 53 |
| | Memo of Law in Reply, Affirmation, Exhibit | 59, 60, 60-1 |
| | Reply Affirmation, Exhibits, Memo of Law | 62, 62-1, 64 |
| Seq. No. 004 | Notice of Motion, Affirmation, Memo of Law, Exhibits | 20, 21, 22, 22-1 - 22-8 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 54 |
| Seq. No. 005 | Notice of Motion, Affirmation, Memo of Law, Exhibits | 27, 28, 29, 29-1 |
| | Pl.'s Omnibus Memo. of Law in Opp. | 52, 55 |
| Seq. No. 006 | Notice of Motion, Affirmation, Exhibits | 45, 46, 46-1 - 46-7 |
| | Affirmation in Opp., Memo of Law, Exhibits | 47, 48, 48-1 - 48-2 |

1

| | |
|---|---|
| Affirmation in Reply & Opp | 49 |
| Affirmation in Opposition | 50 |
| Memo of Law in Reply | 51 |
| Affirmation in Opposition, Memo of Law, Exhibits | 56, 57, 57-1 - 57-2 |
| Memo of Law in Reply | 58 |
| Transcript of Oral Argument | 69 |

**PAUL G. FEINMAN, J.:**

The motions bearing sequence numbers 001 through 006 are consolidated for the purpose of decision.

In motion sequence number 001, plaintiff moves by order to show cause for a preliminary injunction and a temporary order restraining defendants from removing from the State or otherwise disturbing shares of D&K Limited Partnership's 48 percent ownership interest in the common stock of TPR Investment Associates, until there is a judicial determination as to who owns these closely held family shares.[1] At oral argument, the court continued the TRO pending determination of these motions.

In motion sequence numbers 002 through 005, each of the defendants originally moved to dismiss the complaint on various grounds. By interim order dated October 21, 2009, these motions were converted pursuant to CPLR 3211 ( c) to motions for summary judgment (Doc. 41, 42, 43, 44).[2]

In motion sequence number 006, plaintiff moves for leave to amend the complaint and submits a proposed amended verified complaint containing additional allegations and naming an additional defendant.

---

[1] Under the terms of the original TRO signed at the time of the signing of the Order to Show Cause, defendants and their agents are stayed from removing or disposing in any manner the shares at issue. Plaintiff was directed to provide an undertaking in the amount of $150,000.

[2] Documents and exhibits are referred herein by their designated e-filing document number in the New York State Court's E-Filing System.

All the motions are opposed.

For the reasons set forth below, the motion for a preliminary injunction is granted ; the

motions by defendants for summary judgment are each granted in part and otherwise denied, and

the motion to amend the complaint is granted to the extent indicated.

### *Background*

The litigants are members of a nuclear family and certain of their family-owned

corporations and companies.  The central issue concerns the intent behind the signing of a

promissory note and pledge agreement in December 1993, executed as part of estate planning

tools of the parents of plaintiff Orly Genger and her brother, Sagi Genger, one of the defendants.

Plaintiff contends that the note and pledge agreement were part of an entire estate planning

scheme by which plaintiff's father, Arie Genger, and plaintiff's mother Dalia Genger, planned to

provide for their two children, plaintiff and defendant Sagi Genger, with the greatest amount of

funding possible and with minimum tax consequences.  Arie and Dalia Genger were divorced in

2004 and the gravamen of this complaint is that in the years following the divorce, plaintiff's

mother and brother have deliberately not adhered to the intent behind the promissory note and

pledge, and have schemed to seize control of some of the family's closely held companies.

Their schemes have been to the detriment of one of the entities, the D&K Limited Partnership,

an entity partially owned by the Orly Genger 1993 Trust, and for the benefit of Sagi Genger and

for defendant TPR Investment Associates, on which Sagi and Dalia Genger serve as the

directors, and of which Sagi Genger is chief executive officer.  Among the other relief sought by

plaintiff is an injunction restraining further actions that would irreparably harm D&K Ltd.

Partnership's ability to recover its interest in the shares originally held by it, that defendants be

denied any ability to further erode the holdings of the Orly Genger 1993 Trust, and that shares

3

already sold be returned to the ownership of the Ltd. Partnership.

Plaintiff argues, and none of the defendants dispute her, that as beneficiary of the Orly
Genger 1993 Trust, she has a right to assert causes of action on behalf of the trust, citing *Velez v
Feinstein*, 87 AD2d 309 (1st Dept. 1982) (where trustee has failed to enforce a claim on behalf of
the trust, the beneficiary may do so). She further argues that as the Orly Genger 1993 Trust is a
limited partner of D&K Ltd. Partnership, she has the right to assert causes of action on behalf of
the Partnership as against TPR Investment and the other defendants, citing among other cases,
*CCG Assoc. I v Riverside Assoc.*, 157 AD2d 435, 442 (1st Dept. 1990) ("[t]he right of a limited
partner to bring an action on behalf of the partnership to enforce a right belonging to the
partnership is beyond dispute") (Pl Memo of Law [Doc. 9:4] p. 1 n. 1).[3]  Defendants' arguments
in opposition are not persuasive.

According to the verified complaint (Doc. 7-1), plaintiff and her brother Sagi are
individually beneficiaries of irrevocable trusts established in 1993 by their parents.  Each trust
was funded with a $600,000 gift. As established, the Orly Genger Trust and the Sagi Genger
Trust together owned 96 percent in defendant D&K Ltd. Partnership, a family-owned limited
partnership. Dalia Genger held the remaining four percent interest, and acted as the general
manager. Defendant TPR Investment Associates, Inc. is a corporation founded by plaintiff's
father, Arie Genger who originally was the sole shareholder, and serves as a holding company
for the family's interests. Sagi Genger is presently Chief Executive Officer and a member of the
board. Prior to 1993, TPR Investment held a majority interest in non-party Trans-Resources,

---

[3]Unless otherwise noted, all factual allegations are taken from plaintiff's verified complaint
(Doc. 7-1).

Inc., a closely held private corporation.[4]

Around the time the two trusts were funded in1993, D&K Ltd. Partnership purchased 240 shares of common stock, comprising 49 percent of all shares, in TPR Investment for $10,200,000. The Orly and Sagi Trusts each paid $600,000, Dalia Genger paid $50,000, and D&K Ltd. Partnership executed a promissory note dated December 21, 1993 for $8,950,000, in satisfaction of the balance (Ver. Compl. [Doc. 7-1] ¶ 16, citing attached Ex. 1 [eFile Doc. 7-1:49 *et seq.*]). The note was signed by Dalia Genger as General Partner of D&K Ltd. Partnership. The note required that D&K Ltd. Partnership repay principal and accrued interest in annual installments over a ten-year period. Both trusts, and Dalia Genger, assumed proportional liability for repayment. The note was secured with a Pledge Agreement dated December 21, 1993, signed by Dalia Genger, in which D&K Ltd. Partnership pledged its 240 TPR Investment shares as collateral for repayment of the note (Ver. Compl. [Doc. 7-1] ¶ 18) According to the September 6, 2007, testimony of Sagi Genger in the arbitration proceeding concerning his parents' divorce, the purpose of the note was "[e]ssentially an estate planning tool, to transfer wealth," with the intent to minimize taxes owed by the family members (Doc. 46-5:150-152 [S. Genger EBT, pp. 366, 368]). As a result of the purchase by D&K Ltd. Partnership of TPR Investment stock, the Orly and Sagi trusts each acquired 23.52 percent indirect interest in TPR Investment, and Dalia acquired a 1.96 percent indirect interest. Arie Genger retained 51 percent ownership.

As alleged in the complaint, each member of the family understood and agreed, in the

---

[4]Trans-Resources is the parent company of several subsidiaries that provide growers with specialty fertilizer and industrial chemicals, and is one of the two largest produces of potassium nitrate in the world (Ver. Compl. [Doc. 7-1] ¶ 12).

"desire to ensure equal wealth transfer to Sagi and Orly and with the estate-planning purposes

underlying the creation of the Trusts and D&K [Ltd. Partnership]'s purchase of the TPR shares,"

that the note and Pledge Agreement "would never be enforced by any of them" (Ver. Compl.

[Doc. 7-1] ¶ 20).   Sagi in particular was charged with ensuring that the promissory note and

Pledge Agreement would not be enforced and, in the first years, took "specific steps to fulfill

that charge," an example of which follows here (Ver. Compl. [Doc. 7-1] ¶ 20).

D&K Ltd. Partnership made payments on the note until 1999 and then ceased.   In

November 2002, TPR Investment sent a letter to D&K Ltd. Partnership seeking payment of the

past due principal and interest (Doc. 29-1:77-78]).   Sagi Genger, TPR's CEO, explained during

his testimony in the above-mentioned arbitration proceeding that this November 2002 letter was

merely "pro forma," and that there was no intent to collect on the note  (Doc. 46-5:153 [S.

Genger EBT, p. 370]).

In October 2004, Dalia and Arie Genger were divorced, resulting in certain changes to

the ownership of certain family entities, memorialized in the Stipulation and Agreement of

Settlement, dated October 26, 2004 (Ver. Compl. [Doc. 7-1] ¶ 22, citing Ex. 2 [Doc. 7-1:66 *et

seq.*]).   In particular, Dalia received sole ownership of Arie Genger's 250 shares of TPR

Investment, the Trans-Resources shares were redistributed such that Dalia Genger owned no

shares in that company, and Arie Genger was granted a lifetime voting proxy over the family

Trans-Resources shares (Stipulation pp. 5, 8-14 [Doc. 7-1:71, 73-80]). The Stipulation and

Agreement of Settlement gave Sagi Genger "full and complete authority" to sell non-liquid

assets and distribute them as he saw fit, subject to his fiduciary duties to effectuate the intent of

the parties entering the Agreement (Stipulation p. 7 [Doc. 7-1:73]).   However, the net proceeds

were to be distributed so as to minimally fund a "basic escrow account" after which monies were

6

to go to TPR Investment "in satisfaction of the parties' indebtedness" (Stipulation p. 8 [Doc. 7-1:74]).

Despite the changes, both the Orly and Sagi trusts continued to have equal ownership interests in Trans-Resources shares as well as in the TPR Investment shares owned by D&K Ltd. Partnership (Ver. Compl. [Doc. 7-1] ¶ 23).

Also on October 26, 2004, TPR Investment, Arie Genger, and Dalia Genger signed an Assumption Agreement which acknowledged the promissory note's existence and noted that at that juncture, approximately $9,980,000, inclusive of interest, was owed by D&K Ltd. Partnership to TPR Investment (Doc. 22-4).

In addition, also on the same date, Sagi and Dalia Genger formed D&K GP LLC to serve as the general partner for D&K Ltd. Partnership (Pl. Mot. 001, Ex. 5 ¶ 5 [Doc. 7-1:151]). Under the agreement, Dalia Genger transferred her general partnership interest in D&K Ltd. Partnership, in exchange for a 99 percent interest in D&K GP; Sagi Genger was granted power to select the manager. Accordingly, D&K GP LLC now held a four percent interest in D&K Ltd. Partnership.

Plaintiff alleges that in the years subsequent to the divorce, Dalia Genger has sought, in collusion with her son Sagi Genger, to "destroy" her former husband financially, and their actions have threatened to destroy plaintiff financially as well (Ver. Compl.[Doc. 7-1] ¶ 25). Thus, when Dalia in effect ceded her control over D&K Ltd. Partnership to Sagi, the restructuring left only the two trusts liable to TPR Investment for repayment of the promissory note (Ver. Compl.[Doc. 7-1] ¶ 27). In August 2006, Sagi Genger on behalf of TPR Investment,

7

assigned the promissory note to David Parnes,[5] but stated in writing to Parnes that "D&K LP and its partners have a variety of claims against TPR, and deny the enforceability of the Note." (Ver. Compl. [Doc. 7-1] ¶ 47, citing Ex. 8 [Doc. 7-1:179-*et seq.*]). In 2007, Sagi Genger allegedly stripped Dalia Genger of her majority interest in TPR Investment by selling an interest to his mother-in-law, Rochelle Fang (Ver. Compl. [Doc. 7-1] ¶ 32). In late 2007 or early 2008, Dalia Genger divested herself of the balance of her TPR Investment shares, leaving Sagi Genger in direct control of TPR Investment and its interest in the promissory note (Ver. Compl. [Doc. 7-1] ¶ 33).  As a result, Sagi Genger in essence now wore two hats, as CEO of TPR Investment, the creditor of the note, and as manager of D&K Ltd. Partnership, the debtor on the note (Ver. Compl. [Doc. 7-1] ¶ 34).

In November 2007, Sagi Genger and Leah Fang executed an "Amended and Restated Limited Partnership Agreement of D&K Limited Partnership," permitting D&K GP to "mortgage, hypothecate, pledge, create a security interest in or lien upon, or otherwise encumber the L[imited] P[artner] TRI Interests, for the benefit of the Partnership (Doc. 46-5:218).  The document was signed by Sagi Genger, managing member of D&K GP LLC, the General Partner, and Leah Fang, as sole trustee for both the Sagi Genger 1993 Trust and the Orly Genger 1993 Trust, the Limited Partners (Doc. 46-5:223).  Plaintiff only learned of this document's existence in 2009.

In January 2008, Dalia Genger was appointed successor trustee to the Orly Genger 1993 Trust (Ver. Compl. [Doc. 7-1] ¶ 39).  She succeeded several other individuals, including two

---

[5] Parnes is a former trustee of the Orly Genger 1993 Trust, the present trustee of the Sagi Genger 1993 Trust, an officer of TPR Investment and director of Trans-Resources (Ver. Compl. [Doc. 7-1] ¶ 46).  Parnes testified during the arbitration proceeding that the purpose of the transfer of the note to him was to prevent collection by any others (*Id.*).

long-term friends of her son's and her son's sister-in-law. As trustee, Dalia has "complete
control over the assets of the Orly Trust, including its ownership interests in TPR (through
D&K) and TRI" (Ver. Compl. [Doc. 7-1] ¶ 41).

In 2008, TPR Investment, through CEO Sagi Genger, reclaimed the promissory note
from Parnes, and in August 2008, notified D&K Ltd. Partnership's general manager (Sagi
Genger), that it was in default under the note and that if it failed to satisfy the full terms of the
note, its shares would be sold at public auction (Ver. Compl. [Doc. 7-1] ¶ 52, citing Ex. 10 [Doc.
7-1:185-186]). As the payment was not made, D&K Ltd. Partnership was informed by TPR
Investment that the latter would sell the former's 240 shares of common stock in TPR
Investment to the highest qualified bidder on February 27, 2009 (Ver. Compl., Ex. 11 [Doc. 7-
1:187-188]). Notice was not provided to either of the trusts, but was published in THE NEW
YORK POST in October 2008 and again in February 2009 (Ver. Compl. [Doc. 7-1] ¶¶ 52-53,
citing Ex. 12 [Doc. 7-1:189-191]).

On January 31, 2009, the general partner of D&K Ltd. Partnership, that is to say D&K
GP, and the limited partners, the Sagi and Orly trusts, and TPR Investment, memorialized a
document called "Meeting of Partners of D&K LP - Jan. 31, 2009 & Agreement," in which it
was agreed that D&K GP could sign for the Limited Partnership and for each individual partner
when making the limited partners' assets subject to a pledge (Doc. 22-4:17-18).[6] This same
agreement included the promise of TPR Investment that it would "refrain from enforcing the

---

[6]Plaintiff alleges she first learned of this agreement only when the documents were provided as
part of defendants' papers submitted in their motions to dismiss (Am. Ver. Compl.[Doc. 46-4] ¶
94).

note against each limited partner for thirty days." (*Id.* [Doc. 22-4:18] ¶ 8).[7]

The note was foreclosed upon on February 27, 2009, less than the 30 days indicated in the Agreement date, and D&K Ltd. Partnership's 240 shares of TPR Investment were purchased back by TPR, decreasing the obligations of D&K Ltd. Partnership under the promissory note, and leaving a balance of approximately $8.8 million that continues to be guaranteed by the Orly and Sagi trusts (Ver. Compl. [Doc. 7-1] ¶ 57, citing Ex. 13 [Doc. 7-1:192-194]).    Plaintiff and her attorney only learned in early June 2009 that the note had been foreclosed and that the pledged shares had been sold back to the company (Ver. Compl. [Doc. 7-1] ¶ 65).   Plaintiff has made a written demand that TPR Investment return the pledged shares to D&K Ltd. Partnership, but TPR has declined to comply (Ver. Compl. [Doc. 7-1] ¶ 69, citing Ex. 20 [Doc. 7-1:225-227]).

Also in August 2008, Rochelle Fang, as trustee of the Sagi Genger 1993 Trust, and Sagi Genger, sold that trust's interest in Trans-Resources to another group (named "Trump"), which sale divested Arie Genger from control and put the company in the control of the Trump group (Ver. Compl. [Doc. 7-1] ¶ 60, citing Ex.14 [Doc. 7-1:195-207]).   The validity of this sale is under challenge in Delaware Chancery Court, although plaintiff Orly Genger has not joined in that action (Ver. Compl. [Doc. 7-1] ¶ 61).

After this purported sale of the Sagi Genger Trust's shares of Trans-Resources, plaintiff feared her trust's shares would not be protected from sale.  She requested in writing from her mother as trustee in January 2009 and again in June 2009 that the Orly Genger 1993 Trust retain all of its shares of Trans-Resources and that they not be sold, but Dalia Genger has refused to

---

[7]The copy of the document e-filed with the court is not clear enough to discern who signed on behalf of the trusts, although presumably it was Dalia Genger, or on behalf of TPR Investment.

agree, or even to respond (Ver. Compl. [Doc. 7-1] ¶¶ 63, 66, citing Ex. 15, 16 [Doc. 7-1:208-215]). Plaintiff, who had brought a proceeding in Surrogate's Court to remove her mother as trustee at the time of her appointment in January 2008, an application which was denied as being premature (Ver. Compl. [Doc. 7-1] ¶¶ 39-40), brought a second application on June 22, 2009, seeking to enjoin Dalia Genger or her agents from doing anything to affect the Orly Genger 1993 Trust's Trans-Resources shares, to remove Dalia as trustee and appoint another in her stead based on breach of fiduciary duties, and for a surcharge for damages (Ver. Compl.[Doc. 7-1] ¶ 67). At this juncture, the Surrogate's Court has ordered that Dalia Genger provide at least 10 days notice before disposing of any of the trust's Trans-Resources shares (Ver. Compl.[Doc. 7-1] ¶ 68, citing Ex.19 [Doc. 7-1:222- 224]).

Plaintiff contends that Dalia Genger has failed to act in the best interests of the Orly Genger 1993 Trust, that Sagi Genger has acted in a self-dealing manner and together with Dalia Genger has undermined the estate plans that intended for both children to benefit equally from the family's wealth (Ver. Compl. [Doc. 7-1] ¶ 58). Plaintiff fears that through defendants' continued scheming, the Orly Genger 1993 Trust's one remaining asset, its ownership of the Trans-Resources shares, will also be wrongly divested (Ver. Compl. [Doc. 7-1] ¶ 59).

The verified complaint alleged 16 causes of action against the various defendants, including replevin of the shares from TPR Investment back to D&K Ltd. Partnership, and a request for a preliminary injunction.

As stated above, defendants each submitted pre-answer motions to dismiss which, after notice by the Court, have been converted to motions for summary judgment pursuant to CPLR 3211 ( c). Subsequent to the filing by defendants of their motions, plaintiff moved to amend her complaint "to address, among other things," the defendants' "scheme regarding the Orly Trust's

11

TRI Shares," and the involvement in the scheme of Leah Fang, the proposed additional

defendant (Pl. Mot. 006, Ex. D, Part 1, Proposed First Am. Ver. Compl., [Doc. 46-4] ¶ 95).    The

proposed first amended verified complaint contains an additional four causes of action, two

against Leah Fang, and two seeking additional declaratory relief, and amends certain of the

original causes of action to include the new allegations and those against Leah Fang.

### *Legal Analysis*

For convenience, the motion to amend will be addressed first, and then the preliminary

injunction, followed by the motions to dismiss.  Because the motion to amend the complaint is

granted, the remainder of this decision addresses the claims as alleged in the amended complaint.

A.    Motion to Amend the Verified Complaint (Sequence Number 006)

Leave to amend pleadings is to be freely given upon terms that may be just (CPLR 3025

[b]).  In addition, CPLR 3025 (a) permits any party to amend a pleading once, without court

permission provided it is done under one of the following circumstances: within 20 days of the

service of the original pleading; at any time before the period for responding to it has expired, or

within 20 days after the service of a responsive pleading.  Plaintiff proffers a proposed amended

complaint to add a new defendant and new causes of action (Doc 46-4).

Contrary to defendants' arguments, case law holds that where a defendant has not

answered the complaint but instead interposed a motion to dismiss, as was done here, the

plaintiff may amend her complaint once as of right, because defendants, by making pre-answer

motions, have extended their time to answer (*see, Johnson v Spence*, 286 AD2d 481 [2d Dept.

2001]; *STS Mgt. Dev., Inc. v New York State Dept. of Taxation & Fin.*, 254 AD2d 409 [2d Dept.

2001]; *Miller v General Motors Corp.*, 99 AD2d 454 [1st Dept. 1984], *aff'd* 64 NY2d 1081

[1985]).  Although defendants oppose, plaintiff is entitled to serve and file her amended

12

complaint without review by the court, although the rulings below on defendants' motions shall refine the scope of the proposed amended complaint and require her to file and serve a second amended complaint. Defendants' arguments in opposition, including that there is another action pending, can be pled as affirmative defenses. Plaintiff's motion to amend her complaint is thus granted to the extent indicated.

B.    Motion for Preliminary Injunction (Sequence Number 001)

Among the purposes of a preliminary injunction are maintaining the status quo and preventing irreparable injury to a party (*see, e.g., Ma v Lien*, 198 AD2d 186 [1st Dept. 1993], *lv dismissed* 83 NY2d 847 [1994]). To prevail, the party seeking injunctive relief must demonstrate a likelihood of success on the merits; that it will suffer irreparable injury if the relief is not granted; and that the equities balance in its favor (*Aetna Ins. Co. v Capasso*, 75 NY2d 860, 862 [1990]). A preliminary injunction should generally not be granted where there are issues of fact (*Lincoln Plaza Tenants Corp. v MDS Properties Dev. Corp.*, 169 AD2d 509 [1st Dept. 1991]; *but see Ma v Lien, supra* at 187 ["even where the facts are in dispute, the nisi prius court can find that a plaintiff has a likelihood of success on the merits, from the evidence presented"]). If money damages are an adequate remedy, irreparable harm does not exist and injunctive relief should be denied (*Sterling Fifth Assoc. v Carpentille Corp., Inc.*, 5 AD3d 328, 330 [1st Dept. 2004]).

Plaintiff argues that the shares of Ltd. Partnership are unique chattel as contemplated by CPLR 7109, and that accordingly the court should grant a preliminary injunction restraining defendants from disposing of the shares until order of the court. She argues that the D&K Ltd. Partnership shares are unique because they are shares of a closely held family company which represents an ownership in another closely held family company, TPR Investment, and that their

value is dependent, at least in part, on the outcome of the family litigation currently before the

Delaware Chancery Court concerning Trans-Resources (Pl. Memo of Law, 5-6 [Doc. 9:8-9]).

Under CPLR 7109, where the chattel is unique, the court may grant a preliminary

injunction or temporary restraining order that it may not be transferred, sold, pledged, assigned

or otherwise disposed of until the court orders (CPLR 7109 [a]). Defendants argue that the

shares are in essence fungible, and that if appropriate, money damages would fully compensate

plaintiff (TPR [S. Genger] Aff. in Opp. [Doc. 39] ¶ 6). Sagi Genger avers that the "TPR shares

are currently not for sale and there is no intention to sell them at this time or in the near future."

(S. Genger Aff. in Opp. [Doc. 35] ¶ 5]). He makes no statements concerning the TRI shares.

Plaintiff's argument, however, is that her parents never meant for the promissory note to be

enforced, but rather that the trust funds remain intact for the two children. The recent actions

taken by defendants concerning the promissory note which have negatively impacted the Orly

Genger 1993 Trust, and the sale of the Trans-Resources shares belonging to the Sagi Genger

1993 Trust, possibly foretell defendants' plans to sell her trust's shares of Trans-Resources and

thus she seeks court intervention to prevent further dissipation of the trust.

The granting of a preliminary injunction is a discretionary remedy (*Ross v Schenectady*,

259 App. Div. 774, 774 [3d Dept. 1940]; *Dabrinsky v Seagate Assn.*, 239 NY 321 [1925]). Here,

where the family shares at issue are intertwined among various family entities, defendants have

not offered sufficient evidence to show that the shares of either TPR Investment or Trans-

Resources owned by the Orly Genger 1993 Trust are not "unique" and should not be protected

from transfer, sale, or assignment until this litigation is ultimately decided. In addition, given

that defendant Sagi Genger states there is no immediate plan to sell or otherwise dispose of the

TPR Investment shares, an injunction is not likely to cause much harm to defendants. The

14

balance of equities therefore lies in favor of plaintiff. Accordingly, the motion for a preliminary injunction is granted.

### *Motions for Summary Judgment*

The proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case (*Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [ ]). Evidentiary proof must be submitted in admissible form (*Zuckerman v City of N.Y.*, 49 NY2d 557, 562 [1980]). Parties in opposition must submit "evidentiary facts or materials, by affidavit or otherwise ... demonstrating the existence of a triable issue of ultimate fact." (*Tortorello v Carlin*, 260 AD2d 201, 204 [1st Dept. 1999]). "Issue finding and not issue resolving" is the proper role of the court in deciding such motions (*Winegrad, supra*, at 853). Regardless of the sufficiency of the opposing papers, in the absence of admissible evidence sufficient to preclude any material issue of fact, summary judgment is unavailable (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]).

None of the converted motions for summary judgment contains first-person affidavits, and all rely upon documentary evidence and the pleadings for the bases of their motions. Although plaintiff objects to the lack of first-person affidavits, the converted motions are nonetheless considered by the court and decided on their merits.

Plaintiff argues that all of the motions should be preemptively denied based on the doctrines of issue preclusion and judicial estoppel, pointing to the testimony and evidence presented at the arbitration which resulted in the May 6, 2008, award entitled *Dalia Genger v Arie Genger*, Case No. 13 170 Y 00996 07 (American Arbitration Assn., Commercial Arbitration Tribunal, NYC). (Doc. 46-5:131 *et seq.*]). The doctrine of issue preclusion serves

to bar a party from "relitigating in a subsequent action or proceeding an issue that was raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same" (*Ryan v New York Tel. Co.*, 62 NY2d 494, 500 [1984]; *see also, Parker v Blauvelt Volunteer Fire Co.*, 93 NY2d 343, 349 [1999]). The doctrine of judicial estoppel prohibits a party that has assumed a certain position in a prior legal proceeding and secured a judgment in its favor, from assuming a contrary position in another action simply because the party's interests have changed (*City of N.Y. v College Point Sports Assn., Inc.*, 61 AD3d 33, 44 n. 1 [2d Dept. 2009], citations omitted). Notably, of course, the arbitration concerned issues arising from the divorce of plaintiff's parents, and determined, among other questions, that the promissory note could not be enforced by either parent as against each other. This is not the issue raised by plaintiff in her litigation. Additionally, because the testimony by Sagi Genger, Dalia Genger, and others in that arbitration was offered to answer the questions of whether the note was enforceable, and its value, *as between the former husband and wife*, the witnesses and parties did not address the value or enforceability of the note *as between the children* of Arie and Dalia Genger, *or the family owned companies*. Thus, the testimony adduced in the arbitration may well be admissible in this action, but there is no collateral estoppel effect.

C.    Dalia Genger's Motion for Summary Judgment (Sequence Number. 002)

The first amended verified complaint alleges three causes of action against Dalia Genger: breach of fiduciary duty (1st cause of action), fraud (5th cause of action), and conspiracy to commit fraud (8th cause of action).

As argued by defendant, the claim of breach of fiduciary duty is also at issue in a proceeding currently before the Surrogate's Court entitled *In the Matter of the Application of*

16

*Orly Genger, as a person interested, for the removal of Dalia Genger as Trustee of the Orly Genger 1993 Trust pursuant to SCPA § 711 (1)*, File No. 17/2008 (Surrogate's Court NY County). Plaintiff does not address this argument. Accordingly, in the interest of judicial economy, the branch of defendant's motion seeking summary judgment and dismissal as to the complaint's 1st cause of action, is granted, on the ground that the same claim is pending in another court proceeding (CPLR 3211 [a] [4]).

The 5th Cause of Action sounds in fraud, while the 8th Cause of Action alleges conspiracy to commit fraud among the four defendants. As an initial matter, it is well established that "a mere conspiracy to commit a fraud is never of itself a cause of action," although allegations of conspiracy are permitted to connect the actions of separate defendants with an otherwise actionable tort (*Alexander & Alexander of N.Y. Inc. v Fritzen*, 68 NY2d 968, 969 [1986] [citation omitted]). As explained in *Brackett v Griswold*, "[t]he allegation that there was a conspiracy to commit the fraud does not effect the substantial ground of action," and "[t]he *gravamen* is fraud and damage, and not the conspiracy." (112 NY 454, 466-467 [1889]). "The allegation and proof of a conspiracy in an action of this character is only important to connect a defendant with the transaction and to charge him [*sic*] with the acts and declarations of his [*sic*] co-conspirators, where otherwise he [*sic*] could not have been implicated." (*Id.*). Accordingly, the 8th cause of action is dismissed as against this defendant, and the others.

To state a claim for fraud, plaintiff must allege "a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance . . . and damages" (*Eurycleia Partners, LP v Seward & Kissel, LLP*, 12 NY3d 553, 559 [2009]). In addition, under CPLR 3016 (b), the circumstances constituting the wrong must be stated in detail.

Defendant Dalia Genger argues that plaintiff's claims are unspecific and general in

17

nature. In particular, she argues that there is no allegation of the manner in which plaintiff relied

on any of her statements, or in what manner she, defendant, could have prevented the

enforcement of the promissory note and the foreclosure sale. Although plaintiff argues in

opposition that Dalia Genger made many statements over the years, including sworn statements,

affirming that all interested parties to the note had agreed that TPR Investment would never seek

to enforce the promissory note (Am. Ver. Compl. [Doc. 46-4] ¶¶ 62, 145-147), none of

defendant's statements *explicitly* make this assertion other than in the context of the divorce

proceedings. However, plaintiff also argues that even after she requested that her mother, as

trustee, not encumber the remaining assets of the trust, her mother signed the January 2009

Meeting Agreement which gave power to D&K GP - the company controlled by Dalia and Sagi

Genger - to pledge the Orly Genger 1993 Trust's shares of Trans-Resources as security for the

promissory note, and which indemnified Sagi Genger, among others. There are also the

transactions over the years that apparently have given Sagi Genger, and Dalia Genger, potential

control over family assets in a way that has harmed plaintiff's share.

When claiming that the defendants together acted to commit a fraud, the plaintiff need

not allege and prove that each defendant committed every element of fraud but only facts which

support an inference that the defendants knowingly agreed to cooperate in a fraudulent scheme

(*Snyder v Puente De Brooklyn Realty Corp*, 297 AD2d 432, 435 [3d Dept.2002], *lv denied*, 99

NY2d 506 [2003]; *LeFebre v New York Life Ins. & Ann. Corp.*, 214 AD2d 911, 912 [3d Dept.

1995]). Plaintiff alleges that the various defendants together committed fraud by, for example,

creating the conditions that resulted in the "sham sale" of the TPR Investment assets owed by

D&K Ltd. Partnership, and agreeing in the January 2009 Meeting Agreement to give power to

D&K GP, the company controlled by Dalia and Sagi, to pledge the Orly Trust's shares of Trans-

18

Resources as security for the promissory note (Am. Ver. Compl. [Doc. 46-4] ¶¶ 76-68, 151).
Plaintiff asked repeatedly for information about her trust, but because defendant has not been
forthcoming nor kept her informed, she did not know that there was any need to attempt to
protect the assets of her trust.

The evidence and arguments provided by both parties show that there is a question of fact
as to whether Dalia Genger acted with intent to commit fraud against plaintiff's trust, and to lull
plaintiff into a false sense of security as to the status of her trust. Accordingly, the branch of
defendant's motion to dismiss the 5th cause of action is denied.

D.    Sagi Genger's Motion for Partial Summary Judgment (Sequence Number 003)

Defendant Sagi Genger seeks summary judgment and dismissal of the 6th, 7th, 8th, and 16th
causes of action.[8]

The 6th cause of action sounds in fraud. The elements of fraud are set out above in the
discussion of Dalia Genger's motion. The complaint focuses on the statements made by
defendant in particular during the 2007 - 2008 arbitration proceeding, which helped form the
basis for the arbitrator's decision that the parties never intended for the note to be collected and
that it was not an asset to be valued, statements of which the plaintiff was aware and which
caused her to believe that her trust fund was secure and that no one would enforce the note.

The 7th cause of action alleges aiding and abetting fraud. The elements of aiding and
abetting fraud are that there exists a fraud, the defendant knew of the fraud, and the defendant
provided substantial assistance to advance the fraud's commission (*M&T Bank Corp. v
Gemstone CDO VII, Ltd.*, 23 Misc. 3d 1105A; 881 NYS2d 364, 2009 NY Slip Op 50590(U)

---

[8]He does not seek summary judgment as to the 2nd, 3rd, or 4th causes of action, in which he is also
named.

{Sup. Ct., Erie County 2009], *aff'd in part, mod in part*, 68 AD3d 1747 [4[th] Dept. 2009],

quotation and citation omitted). The complaint contends that defendant and D&K GP knowingly

assisted in the "sham sale" of the D&K Ltd. Partnership shares, failed to notify the Partnership

members of the foreclosure and sale, the sale of which harmed the Orly Trust, and entered into

the Meeting Agreement which now allows defendant and D&K GP to pledge or encumber the

Trans-Resources shares owned by the Orly Genger 1993 Trust.

Defendant argues that summary judgment is appropriate based on the documentary

evidence. He contends that prior to this litigation, plaintiff never claimed that the note or pledge

agreement were invalid. Among the evidence he points to in arguing the note's enforceability, is

testimony of Arie Genger acknowledging that payments were made by D&K Ltd. Partnership on

the promissory note (Doc. 16-4:3-4]) , the Assumption Agreement signed by Dalia, Arie, and

Sagi Genger on October 25, 2004, acknowledging the nearly $10,000,000 due under the note

(Doc. 16-6]), the November 19, 2008 letter from plaintiff's counsel to the Surrogate, stating in

part that "D&K [Ltd. Partnership] is indebted on a multi-million dollar note to TPR, which is

secured by D&K's 49% stock interest, and which has not been serviced for years" (Doc. 16-8]),

and a document signed by plaintiff dated December 27, 2007, in which she states that the trust

"is indebted in the amount of approximately $4.5 million" (Doc. 16-9]).

Defendant also argues that the statute of frauds bars plaintiff's 6th and 7th causes of action

because plaintiff claims that the promissory note has been orally modified. General Obligations

Law § 5-701 requires that agreements which by their terms are not to be performed within one

year, or which are promises to answer for the debt or default of another person, must be in

writing and subscribed by the party to be charged therewith (GOL § 5-7-1 [a] [1]-[2]). The parol

evidence rule of the General Obligations Law provides that where a written agreement contains

20

a provision stating that it cannot be changed orally, then such a document cannot be changed by executory agreement unless it is in writing, signed by the party against whom enforcement of the change is sought (GOL § 15-301 [1]).  Thus, defendant argues that plaintiff cannot claim that the parties legally agreed, orally, that the note would not be enforceable.

Defendant's arguments are unpersuasive.  Courts have also found, specifically in regard to promissory notes, that when parties contest whether a notice is enforceable, there is an issue of fact that survives summary judgment and the statute of frauds will not prevent the court's examination of parol evidence on the issue.  For example, in *Greenleaf v Lachman*, the Court examined a promissory note allegedly executed so as to avoid negative income tax treatment, and found an exception to the parol evidence rule in order to allow admission of parol evidence, not to vary the terms of the writing, but to show that a "writing, although purporting to be a contract, is, in fact, no contract at all." (216 AD2d 65, 66 [1st Dept.1995], *lv denied* 88 NY2d 802 [1996]).  Similarly, in *Dayan v Yurkowski*, the Court denied summary judgment and held that the defendant's parol evidence should be considered to show that the note, while valid on its face, was not intended to take effect (238 AD2d 541 [2d Dep't 1997]; *see also, Paolangeli v Cowles*, 208 AD2d 1174, 1175 [3d Dep't 1994]).

Here, where plaintiff and all the defendants copiously cite to factual support, a material issue of fact exists regarding the intention of the note's enforceability.  While the documents speak for themselves, plaintiff raises material questions of fact concerning the actual intent behind the promissory note.  She argues that the promissory note's purpose was to facilitate the estate planning of Arie Genger and the transfer of funds between the family members with lessened tax consequences.  Indeed, it is curious that interest payments were made by the Partnership for several years and then ceased, and that Sagi Genger testified that TPR

21

Investment's 2002 notice was "pro forma" and not meant as an actual request that payment be made. It could be found that enforcement of the note's terms was only made after Sagi Genger allegedly came into control of both TPR Investment and D&K Ltd. Partnership. Given the testimonial evidence in particular, there is a question of fact as to whether the promissory note was intended to be an enforceable agreement, and it would be premature to apply a Statute of Frauds analysis to the cause of action. In addition, as plaintiff has established that there are questions of fact as to whether defendant acted with intent to defraud plaintiff and D&K Ltd. Partnership and provided substantial assistance to D&K GP in particular to advance the fraud's commission, the branch of the motion seeking summary judgment and dismissal of the 6th and 7th causes of action is denied.

The 8th cause of action alleges conspiracy to commit fraud. For the same reasons set forth above in discussing Dalia Genger's motion, this branch of defendant's motion is granted.

The 16th cause of action alleges promissory estoppel. This is an equitable cause of action and must allege "a clear and unambiguous promise by defendants upon which [the plaintiff] reasonably and foreseeably relied to [plaintiff's] detriment." (*401 Hotel, L.P. v MTI/The Image Group, Inc.*, 251 AD2d 125, 126 [1st Dept. 1998]). Here, plaintiff alleges that it was the promise and intent of Arie Genger and the family as a whole, that the promissory note was not to be enforced, so as to preserve the trust accounts, and that she relied on that promise these many years only to learn that one of the main assets of her trust account had been sold in violation of the promise. Defendant argues not only that the documents state otherwise, but that plaintiff may not assert promissory estoppel in order to avoid the affirmative defense of the statute of frauds, citing *Cohen v Brown, Harris, Stevens, Inc.*, 64 NY2d 728 (1984), and *Lowinger v Lowinger*, 287 AD2d 39, 45 [1st Dept. 2001], *lv denied* 98 NY2d 605 (2002).

22

While the assertion of the statute of frauds is often sufficient to cause a dismissal of a claim of promissory estoppel, exceptions include where "the circumstances are such as to render it unconscionable to deny" the promise upon which the plaintiff has relied (*see, Philo Smith & Co. v. USLIFE Corp.*, 554 F.2d 34, 36 [2d Cir. N.Y. 1977]). Here, where there are questions of fact as to whether defendants intentionally breached the family agreement concerning the entirety of the estate planning and unconscionably caused plaintiff to lose a significant amount of her trust funds to their benefit, with the possibility of losing all of the funds, defendant has not established entitlement to summary judgment and dismissal of the claim of promissory estoppel notwithstanding his defense of the statute of frauds (*see, Swerdloff v Mobil Oil Corp.*, 74 AD2d 258, 261 [2d Dep't 1980], *app denied* 50 NY2d 913 [1980]). Accordingly, defendant's motion for summary judgment and dismissal of the 16th cause of action is denied.

E.    D&K GP's Motion for Partial Summary Judgment (Sequence Number 004)

Defendant D&K GP seeks summary judgment and dismissal of "all" the causes of action of the complaint as against it, but its motion papers specifically addresses only the 4th, 6th, 7th, and 8th causes of action.[9]

As an initial issue, D&K GP argues that plaintiff, "in her capacity as beneficiary under the Orly Trust and in the Orly Trust's capacity as limited partner in D&K LP, agreed not to bring an action against D&K." (Lyons {D&K GP} Aff. [Doc. 21] ¶ 5). Specifically, defendant points to the "Amended and Restated Limited Partnership Agreement of D&K Limited Partnership," in which Leah Fang as trustee for both the Orly and Sagi trusts, agreed that the trusts expressly waived their right to bring an action against D&K GP, the General Partner; Sagi

---

[9]D&K GP did not seek summary judgment as against the 2nd or 3rd causes of action, in which it is also named as a defendant.

Genger signed on behalf of D&K GP (Doc. 22-8). Accordingly, D&K GP argues that summary

judgment and dismissal of the claims against it should be dismissed in their entirety. However,

this agreement provides that its partners, which include the Orly Genger 1993 Trust, may sue for

"fraud, bad faith, or willful misconduct." (Doc. 22-8:5). Plaintiff alleges that there has been bad

faith and fraud by various family entities as concerns the enforcement of the promissory note,

and including various documents signed on behalf of the Genger trusts, as well as D&K Ltd.

Partnership. At the very least, there appear to be irregularities. Summary judgment and

dismissal on this ground is not appropriate.

The 4th cause of action, brought by the Orly Genger 1993 Trust and D&K Ltd.

Partnership against both defendant D&K GP and Sagi Genger, claims defendants prevented the

Ltd. Partnership from honoring its obligations under the note, and that it tortiously interfered

with the contract.

Tortious interference with contractual relations consists of four elements: a contract

between plaintiff and a third party; the defendant's knowledge of the contract; the defendant's

intentional inducement of the third party to breach or otherwise render performance impossible;

and resulting damages to plaintiff (*Kronos, Inc. v AVX Corp.*, 81 NY2d 90, 94 [1993], citation

omitted). Defendant argues that, as the general partner to D&K Ltd. Partnership, it is a party to

the contract at issue, that it, too, has also been injured by the nonpayment and resulting

foreclosure, and that a party to a contract cannot tortiously interfere with the contract (Def.

Memo of Law § IV [Doc. 22:12]). Plaintiff argues that according to Sagi Genger's testimony

during the arbitration proceeding, Dalia Genger had repaid her four percent interest in the

promissory note, and that therefore D&K GP was not a party to the agreement.

Here, the contract is the promissory note between D&K Ltd. Partnership and TPR

24

Investment. Defendant D&K GP knew of the contract, but was also the general partner of the Limited Partnership from 2004 onward, and thus is understood to be a party to the contract. This is because the management of the property and the business of the partnership are vested exclusively in the general partners (*Durant v Abendroth*, 97 NY 132, 144 [1884]). By law, a general partner in a limited partnership is subject to all the restrictions and liabilities of a partner in a partnership without limited partners, although it may not undertake certain actions without the written consent of the limited partners, as defined in the statute (Limited Partnerships § 98). Thus, plaintiff's argument that Dalia Genger had repaid the interest she owed on the promissory note, does not divest defendant of its rights and duties as general partner. Accordingly, as it was the general partner of D&K Ltd. Partnership, no claim of tortious interference with the contract may lie. Summary judgment and dismissal of the 4th cause of action against defendant is granted.

The 6th and 7th causes of action are fraud, and aiding and abetting fraud. The elements of both causes of action have been previously set forth. There are questions of material fact as to whether defendant engaged in fraud and in aiding and abetting fraud, and accordingly the branch of defendant's motion for summary dismissal of these two causes of action is denied.

The branch of the motion to dismiss the 8th cause of action, claiming conspiracy to commit fraud, is granted, for the reasons stated previously as concerns the other defendants.

F.    TPR's Motion for Summary Judgment (motion sequence no. 005)

Defendant TPR moves for summary judgment and dismissal of the 8th, 9th, 10th, 11th, 12th, 13th, 14th, 15th, and 16th causes of action as against it. In sum, it argues that the documentary evidence establishes that there are no material questions of fact that would preclude a grant of summary judgment and dismissal of the complaint as against it.

The branch of the motion to dismiss the 8th cause of action, alleging conspiracy to

25

commit fraud, is granted for the reasons set forth above concerning the other defendants.

The 9th cause of action seeks declaratory relief and damages pursuant to NY UCC §§ 9-627, 610, and 611-614, as concerns the notice of foreclosure and the sale. UCC § 9-610 provides that every aspect of the disposition of collateral after a default must be commercially reasonable. UCC § 9-611 ( c) (2) provides that before the disposition of collateral, the secured party shall send an authenticated notification of disposition to "any secondary obligor." UCC § 9-612 (b) provides that for a non-consumer transaction, 10 days is sufficient notice before the disposition. UCC § 9-613 (a) (4) requires that for the notification of disposition to be sufficient, it must include a statement that the debtor is entitled to an accounting of the unpaid indebtedness and the charge, if any, for an accounting. UCC § 9-613 (a) (5) requires that for the notification of disposition to be sufficient, it must state the time and place of the public disposition or the time after which any other disposition is to be made. UCC § 9-627 provides that simply because a greater amount could have been obtained is not in itself sufficient to preclude the secured party from establishing that the disposition was made in a commercially reasonable manner, and describes what are commercially reasonable dispositions.

The complaint alleges that TPR Investment failed to properly notify the Orly Genger 1993 Trust or Orly Genger of the sale of the shares of TPR owed by D&K Ltd. Partnership, and that the notice of August 31, 2008 failed to state that D&K Ltd. Partnership is entitled to an accounting of its unpaid indebtedness, or to provide the time and place of the disposition of the collateral. In addition, the $2,200,000 sale price was only a "fraction" of the original $10,200,000 purchase price, and failed to take into consideration certain potential monies received from the sale of TRI shares to the Trump group.

Defendant TPR Investment argues that it fully complied with the UCC requirements

26

when noticing the default and conducting the foreclosure sale. In addition, it argues that even if

it could be found that plaintiff never received notice of the default and sale, she has not alleged

that she suffered redressable damages, as she makes only a generalized statement that the shares

sold for a fraction of their original purchase price (Def. Memo of Law [Doc.29] p. 8, citing Ver.

Compl. [Doc. 7-1] ¶ 146]). It also argues that plaintiff does not offer any evidence as to what the

fair market value of the TPR Investment shares might have been and, as stated explicitly in the

statute, an enforcement will not be found commercially unviable simply because a greater

amount could have been obtained (UCC § 9-627 [a]).

An examination of the notice shows that certain of the complaint's allegations have no

merit but that others are meritorious (Def. Memo of Law [Doc. 29] p. 7, citing Ex. K [Doc. 29-

1:136]). The notice is not addressed to either of the limited partners, the Orly or Sagi Genger

trusts, who as guarantors, are secondary obligors, and there is no proof of service provided by

defendant establishing notification. The notice indicates that the date of the sale was February

27, 2009, but does not indicate the date of the notice itself, meaning that defendant has not

established that the 10-day rule was adhered to. Furthermore, given that the January 31, 2009,

Meeting Agreement stated in paragraph 8 that TPR would wait 30 days until selling the shares,

it appears that the sale on February 27, 2009 was premature in any event (see Doc. 22-4:17-18]).

As for the claimed violation of UCC § 9-627, there remain questions of fact as to whether the

sale was itself conducted in a  commercially reasonable manner as set forth in the statute,

whether or not the shares were sold at a value far lesser value than their worth. However, the

notice clearly indicates the date, time, and location of the sale, and also that D&K Ltd.

Partnership is entitled to an accounting and includes the telephone number to call. Accordingly,

the branch of defendant's motion seeking summary judgment and dismissal of the 9th cause of

27

action is granted solely to the extent that the claims seeking declarations of violations of UCC § 9-613 (a) (4) and (a) (5), are dismissed. The remainder of the 9th cause of action remains.

The 10th cause of action alleges conversion and seeks replevin, and the 11th cause of action seeks a judgment declaring that D&K Ltd. Partnership has a superior right to possess chattel under CPLR 7101. Conversion is when a person, without authority, intentionally exercises control over the property of another person and interferes with the other person's right of possession (see, Sporn v MCA Records Inc., 58 NY2d 482, 487 [1983]). Replevin, under Article 71 of the CPLR, is a remedy ancillary to an action to recover a chattel (see Sears Roebuck & Co. v Austin, 60 Misc. 2d 908, 908 [Civ. Ct., NY County 1969]). Defendant argues that plaintiff does not adequately plead the elements of conversion and thus cannot establish that replevin is appropriate, nor does she show that she is entitled in the 11th cause of action to a declaration that she has a superior right to that of defendant's in the TPR Investment shares. It argues that plaintiff does not establish that its assuming ownership rights to the shares was unauthorized, nor does she show that D&K Ltd. Partnership or any other entity had a superior right.

The claim of conversion and replevin, and the declaration as to whose right is superior, go to the heart of plaintiff's complaint. Because, as set forth in the discussion above, there are disputed questions of fact as to the intent of the promissory note and Pledge Agreement and whether enforcement of them was ever contemplated, there can be no summary determination as to who is entitled to the shares and no declaratory relief granted at this time. Accordingly, the branches of defendant's motion for summary dismissal of the 10th and 11th causes of action are denied.

The 12th cause of action seeks a preliminary injunction to enjoin TPR Investment from in

any matter disposing of the TPR shares pending a final determination of the declaratory

judgment branch of the complaint. This cause of action is redundant of the motion separately

brought by plaintiff and opposed by defendants on grounds similar to those articulated by

defendant in its motion for summary judgment. As the plaintiff's motion for a preliminary

injunction has been granted as set forth above, summary judgment and dismissal of this cause of

action is granted. Of course, if what plaintiff is seeking is a permanent injunction, the cause of

action would have to be repleaded.

The 13th cause of action seeks a constructive trust on behalf of D&K Ltd. Partnership. In

equity, a constructive trust may be imposed when the movant establishes that there is a

confidential or fiduciary relationship, a promise, a transfer in reliance thereon, and unjust

enrichment (*Sharp v Kosmalski*, 40 NY2d 119, 121 [1976], citations omitted). Defendant argues

that there is no relationship between it and plaintiff, perhaps overlooking that this claim is

brought on behalf of D&K Ltd. Partnership, a minority shareholder of TPR Investment. It is

disputed as to whether TPR Investment owed a fiduciary duty of care to minority shareholder

D&K Ltd. Partnership (*see Alpert v 28 Williams St. Corp.*, 63 NY2d 557, 568 [1984] [fiduciary

duty of majority to minority shareholders; *Salm v Feldstein*, 20 AD3d 469 [2d Dept. 2005]

[fiduciary duty of managing member of company and co-member to plaintiff]). The parties

dispute, of course, whether defendant was among the entities promising that the promissory note

would never be enforced. Defendant argues that there was no transfer in reliance, however

plaintiff sufficiently argues that D&K Ltd. Partnership pledged its shares of TPR in reliance of

the promise that the note would be not enforced, citing *Lester v Zimmer*, 147 AD2d 340, 341-

342 (3d Dept. 1989), which notes that the elements of a constructive trust are "flexible," and the

"transfer" should be interpreted broadly. Whether defendant was unjustly enriched is a matter to

29

be determined at trial.  Accordingly, as there are questions of fact, summary judgment is denied as to the 13th cause of action.

The 14th and 15th causes of action, brought on behalf of the Orly Genger 1993 Trust, allege constructive and actual fraudulent conveyance under New York Debtor & Creditor Law §§ 273, 276, and 277.  Section 273 of the Debtor and Creditor Law provides that "every conveyance made . . . by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."  Section 276 of the Debtor & Creditor Law provides that a conveyance is actually fraudulent if it was made with actual intent "to hinder, delay, or defraud either present or future creditors."  Section 277 provides that a conveyance of partnership property made either when the partnership is insolvent or will be rendered insolvent by the conveyance, is fraudulent as to partnership creditors if the conveyance is made (a) to a partner even if there is a promise by the partner to pay partnership debts, or (b) to a non-partner without fair consideration to the partnership.

None of these statutes apply to the facts here, and defendant's motion for summary judgment and dismissal of the two causes of action must be granted based on failure to state a cause of action.  In New York, only creditors may maintain actions for fraudulent conveyance (*Geren v Quantum Chemical Corp.*, 99 F3d 401, 1995 WL 737512, **2 [2d Cir. [NY] 1995], citing *Pappa Bros. v Thompson*, 214 NYS2d 13, 15 [Sup. Ct. Nassau County, 1961]).  Although plaintiff argues that the Orly Genger 1993 Trust is a creditor, she is misapplying the statute.  A creditor is defined as an entity "having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent."  (Debtors & Creditors Law § 270).  The complaint alleges that certain of the assets of the trust were wrongly conveyed to defendant by the actions

of Sagi Genger.  However, to establish a constructive fraudulent conveyance, plaintiff must

demonstrate: (1) that there was a conveyance; (2) that the defendant would become insolvent as

a result of the conveyance; and (3) there was no fair consideration for the conveyance (see,

*United States v Sweeney,* 418 F. Supp. 2d 492, 498 [SDNY 2006], citation omitted).  To establish

intentional fraudulent conveyance, plaintiff must show in addition that there was actual intent "to

hinder, delay, or defraud . . . creditors" (*Sweeney,* at 498).   Not only does plaintiff not establish

that she is a creditor who has a claim, but she does not allege that *defendant* became insolvent

because of the conveyance of the TPR shares.  Furthermore, she offers nothing more than the

statement that the shares were bought by TPR Investment for a "fraction" of their original value,

to establish that there was no fair consideration.  Her reliance on Debtor and Creditor Law § 277

is also misplaced, based on the facts alleged in the pleadings.  Accordingly, the 14th and 15th

causes of action are dismissed on summary judgment.

    The 16th cause of action alleges promissory estoppel on behalf of D&K Ltd. Partnership.

Defendant's motion for summary dismissal of this cause of action is granted for the same

reasons set forth in the discussion of the branch of Sagi Genger's motion for summary judgment

and dismissal of this cause of action.

    Therefore,

    As to Motion Sequence Number 001, due deliberation having been had, and it appearing

to this Court that a cause of action exists in favor of the plaintiff and against the defendants and

that the plaintiff is entitled to a preliminary injunction on the ground that the subject of the

action is unique and that the defendants threaten to do an act in violation of the plaintiff's rights

respecting the subject of the action, tending to render the judgment ineffectual, as set forth in the

aforesaid decision, it is

ORDERED that the undertaking is continued in the sum of $ 150,000.00 , conditioned that the plaintiff, if it is finally determined that she was not entitled to an injunction, will pay to the defendants all damages and costs which may be sustained by reason of this injunction; and it is further

ORDERED that defendants, their agents, servants, employees and all other persons acting under the jurisdiction, supervision and/or direction of defendants, are enjoined and restrained, during the pendency of this action, from doing or suffering to be done, directly or through any attorney, agent, servant, employee or other person under the supervision or control of defendant or otherwise, any of the following acts: removing the Shares from the state, or otherwise transferring, selling, pledging, assigning, or otherwise disposing of the Shares; and it is further

ORDERED that as to Motion Sequence Number 002, the motion for summary judgment by Dalia Genger is granted only to the extent of dismissing the 1st and 8th causes of action as against her in the first amended verified complaint, and is otherwise denied; and it is further

ORDERED that as to Motion Sequence Number 003, the motion for partial summary judgment by Sagi Genger is granted only to the extent of dismissing the 8th and 16th causes of action as against him in the first amended verified complaint, and is otherwise denied; and it is further

ORDERED that as to Motion Sequence Number 004, the motion for partial summary judgment by D&K GP is granted only to the extent of dismissing the 4th and 8th causes of action against it in the first amended verified complaint, and is otherwise denied, and it is further

ORDERED that as to Motion Sequence Number 005, the motion for summary judgment by TPR Investment Associates, Inc., is granted only to the extent of dismissing the 8th, 12th, 14th,

15th, and 16th causes of action in their entirety as against this defendant, and as to the 9th cause of action, dismissing the claims alleging violations of UCC § 9-613 (a) (4) and (a) (5); and the motion is otherwise denied; and it is further

ORDERED that as to Motion Sequence Number 006, the motion to amend the complaint is granted to the extent set forth above; plaintiff shall e-file and serve a second amended complaint incorporating the limitations set forth herein, and serve it on all parties who shall then serve their answers in accordance with the CPLR; and it is further

ORDERED that the parties shall appear for a preliminary conference in Supreme Court, 60 Centre Street, room 212, on September 15, 2010, at 2:15 p.m.

This constitutes the decision and order of the court.

Dated: June 28, 2010
New York, New York

_____
J.S.C.

FILED: NEW YORK COUNTY CLERK 04/10/2012

INDEX NO. 651089/2010

NYSCEF DOC. NO. 229

RECEIVED NYSCEF: 04/10/2012

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 12

------------------------------------------------x

ARIE GENGER and ORLY GENGER, in her
individual capacity and on behalf of
THE ORLY GENGER 1993 TRUST,

                              Plaintiffs,

                                                    Index No. 651089-10

              -against-

SAGI GENGER, TPR INVESTMENT ASSOCIATES,          ORDER
INC., DALIA GENGER, THE SAGI GENGER 1993         Motion Sequence
TRUST, ROCHELLE FANG, individually and as        Numbers 012 and 013
trustee of THE SAGI GENGER 1993 TRUST,
GLENCLOVA INVESTMENT COMPANY, TR INVESTORS,
LLC, NEW TR EQUITY I, LLC, NEW TR EQUITY II,
LLC, JULES TRUMP, EDDIE TRUMP AND MARK HIRSCH,

                              Defendants.

------------------------------------------------x

**PAUL G. FEINMAN, J:**

    The instant motions, brought on by orders to show cause

assigned motion sequence numbers 012 and 013, respectively, are

filed by plaintiff Orly Genger, in her individual capacity and on

behalf of the Orly Genger 1993 Trust, seek temporary restraining

orders and preliminary injunctions against the defendants named

in the above-captioned action, from proceeding with that certain

action commenced in the Delaware Chancery Court entitled *Dalia*

*Genger as Trustee of the Orly Genger 1993 Trust v. TR Investors*

*LLC et al* (the Delaware Action), in which Dalia Genger sought a

declaratory judgment with respect to the beneficial ownership of

the Orly Trust shares.  On October 26, 2011 and November 9, 2011,

after hearing from counsel for the plaintiff and the defendants,

this Court issued temporary restraining orders (the TROs) enjoining the defendants from proceeding with, or otherwise making any motion in or concerning, the Delaware Action until further order of this Court.  The TROs were issued to maintain the status quo in this matter, pending a decision of the United States District Court for the Southern District of New York (the Federal Court), which is anticipated to, inter alia, determine the proper forum or jurisdiction for hearing and adjudicating the beneficial interest in the disputed shares (the Federal Court Decision).  Inasmuch as the Federal Court Decision has not yet been issued, the instant motions are held in abeyance, pending the Federal Court's resolution of the jurisdictional issue.

Accordingly, it is

ORDERED that the temporary restraining orders dated October 26, 2011 and November 9, 2011 shall continue pending further order of this Court; and it is further

ORDERED that the parties are directed to notify the court when the Federal Court Decision has issued in order that this court may finally resolve the motions hereby held in abeyance.

Dated: April 9, 2012

_____
J.S.C.

2

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

ONE RODNEY SQUARE
P.O. BOX 636
WILMINGTON, DELAWARE 19899-0636
———
TEL: (302) 651-3000
FAX: (302) 651-3001
www.skadden.com

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WASHINGTON, D.C.
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

DIRECT DIAL
(302) 651-3070
DIRECT FAX
(302) 434-3070
EMAIL ADDRESS
THOMAS.ALLINGHMAN@SKADDEN.COM

June 28, 2013

**BY EFILING AND ELECTRONIC MAIL**

The Honorable Barbara Jaffe
Supreme Court of the State of New York
County of New York
60 Centre Street
New York, New York 10007

RE:  *Genger, et al. v. Genger, et al.*,
Index No. 651089/2010

Dear Justice Jaffe:

I write on behalf of the parties to the settlement agreement that was submitted in camera to Your Honor yesterday, including Arie and Orly Genger and my clients, the Trump Group. A material term of the agreement among the settling parties was the dismissal of *all* claims presently pending against one another, in whatever capacity they were brought. Certain of Orly Genger's claims against the Trump Group in this action have been held by Justice Feinman to be derivative in nature, brought by Orly on behalf of the Orly Genger 1993 Trust. (As I said on the call with the Court yesterday, the Trump Group argued that Orly lacked standing to bring such claims on behalf of the Orly Genger 1993 Trust, but Justice Feinman rejected our arguments.) The language that was drafted during yesterday's conference call as a potential "fix" for the issues raised by Mr. Dellaportas – that "nothing contained [in the Order] shall in any way affect any derivative claims presently before the Court" -
- would have the effect of *not* dismissing Orly Genger's derivative claims against the Trump Group, contrary to the agreement of the settling parties. Excluding such claims from the claims that are to be dismissed is not what the Trump Group bargained and paid for in the settlement, and as a consequence we cannot stipulate to the entry of an order that includes such carve-out language. (I apologize to the Court for not having affirmatively objected to this language during yesterday's call; though

The Honorable Barbara Jaffe
June 28, 2013
Page 2

I did express concern about drafting language by committee on the telephone, I
needed to compare the terms of our settlement agreement to the proposed language
before the conflict between the two became apparent to me.)

The Second Amended Stipulation and Order of Discontinuance with
Prejudice (Docket No. 471) (the "Stipulation and Order") that Ms. Wachtler
previously submitted was intended to reflect the agreement of the settling parties
regarding dismissal of *all* claims they have against one another and was agreed to by
all of the parties to that stipulation and order. The Trump Group cannot support or
stipulate to an order that does not effect a dismissal of all claims that the members of
the AG Group, including Orly Genger, have pending against my clients, and none of
the parties ever intended for the Trump Group to do that. For these reasons, we (and
all the settling parties) respectfully request that the Court enter the Stipulation and
Order previously submitted to the Court. Of course, nothing in the Stipulation and
Order precludes the Orly Trust from commencing a lawsuit for claims it may have
against any dismissed party or from pursuing claims in the action titled *Dalia
Genger, as trustee of the Orly Genger 1993 Trust, v. TR Investors, LLC, et al., C.A.*
No. 6906-CS (Del. Ch.).

I am, of course, available at the Court's call should the Court have any
questions concerning this matter.

Respectfully,

*/s/ Thomas J. Allingham II*

Thomas J. Allingham II

cc:   All Counsel of Record (by eFiling and Electronic Mail)

## SETTLEMENT AGREEMENT AND RELEASE

This settlement agreement and release (this "Agreement") is entered into as of June 16, 2013, by and between Arie Genger and Orly Genger (in her individual capacity and in her capacity as beneficiary of the Orly Genger 1993 Trust), Arnold Broser, David Broser, (in their individual capacity and on behalf of all entities managed, owned or controlled in any way by Arnold Broser or David Broser and which are in any way related to the subject matter hereof ("Broser Entities" and collectively with Arie Genger and Orly Genger in all capacities referenced above, the "AG Group"), and TR Investors, LLC ("TR Investors"), Glenclova Investment Co. ("Glenclova"), New TR Equity I, LLC ("New TR I"), New TR Equity II, LLC ("New TR II" and, together with TR Investors, Glenclova and New TR I, the "Trump Entities"), Trans-Resources, LLC (the successor to Trans-Resources, Inc. and together with its predecessor entities referred to herein as, "Trans-Resources"), Jules Trump, Eddie Trump and Mark Hirsch (collectively, with the Trump Entities and Trans-Resources, the "Trump Group"). The members of the AG Group and the Trump Group are each referred to herein individually as a "Party" and together as the "Parties".

WHEREAS, in March 2001, TR Investors, Glenclova, Trans-Resources and TPR Investment Associates, Inc. ("TPR") entered into a stockholders agreement with respect the common stock of Trans-Resources (the "Stockholders Agreement");

1

**WHEREAS**, since August 2008, Arie Genger, Orly Genger, the Trump Group and others have been engaged in various litigations (described below) concerning the ownership and control of Trans-Resources; and

**WHEREAS**, the Parties wish to resolve all issues, disputes and disagreements between them, including but not limited to the issue of ownership of all Trans-Resources shares;

**NOW, THEREFORE**, in consideration of the promises and representations contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.     **Recitals.**     The above recitals are incorporated into and made a part of this Agreement and are binding on all Parties hereto.

2.     **Initial Consideration from the Trump Group.**     Upon dismissal with prejudice of the claims, counterclaims, cross-claims, third-party claims, issues and matters as provided in Paragraph 4 below, the Trump Group shall promptly:

(a)     release all claims they may have to the (i) $7,428,994.00 plus interest held by Skadden, Arps, Slate, Meagher & Flom LLP as escrow agent (the "Skadden Escrow") and (ii) $10,314,005.00 plus interest held by with Pedowitz & Meister as escrow agent (the "P&M Escrow");

(b)     pay to Wachtel, Masyr & Missry, LLP as attorneys for the AG Group ("Wachtel") an amount in cash equal to $35,000,000.00 minus (i) the amount held in the Skadden Escrow, and (ii) the amount held in the P&M Escrow.

2

3.     **Further Consideration from the Trump Group.**  Trans-Resources on behalf of the Trump Group shall pay: (i) $7,500,000 to Wachtel on the third anniversary of the Effective Date (defined below), and (ii) $7,500,000 to Wachtel 364 days following the third anniversary of the Effective Date The payments provided under this paragraph shall be (a) subject to the terms and conditions herein and (b) evidenced by two (2) promissory notes that are substantially in the form attached as Exhibit A hereto (the "Notes").  Notwithstanding anything else herein, the maturity of the two $7,500,000 Notes shall be delayed beyond their due date until the earlier (the "Extended Maturity Date") of (A) such time as all pending claims, cross-claims and counter-claims brought by any of TPR, Sagi Genger, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than the Orly Trust Action (as defined below)), D&K Limited Partnership, D&K GP LLC, Rochelle Fang, and/or David Parnes (collectively, the "Sagi Group") against any member of the Trump Group have been dismissed with prejudice and the statute of limitations shall have run with respect to any other potential claims of the Sagi Group that might be the subject of the Indemnification provided for by Paragraph 5 below or (B) such time as each member of the Sagi Group shall have provided the Trump Group with a release of the Trump Group Released Parties (as defined below) and covenant not to sue in form and substance that is the same as the AG release and covenant not to sue contained in Paragraph 6(a) below (the "Sagi Group Release").

Subject to the foregoing, the Notes shall become immediately due and payable upon the occurrence of any transaction or series of transactions which shall result in the Trump Group owning or controlling neither (i) a majority of the voting stock of Trans-Resources or its successors or each of its two principal subsidiaries, Haifa Chemicals, Ltd. and Na-Churs Plant

3

Food Company or their successors, nor (ii) directly or indirectly, a majority of the assets

currently owned by Trans-Resources and its subsidiaries; provided, however, that in such event,

at the request of the Trump Group, the amounts then payable on the Notes shall be placed in

escrow for the duration of their original term or until the Extended Maturity Date (if applicable)

under the provisions of an escrow agreement on reasonable terms to be negotiated at such time in

good faith between Trans-Resources, the payee and an escrow agent selected by their mutual

consent, which shall provide for their release to the Trump Group in payment of Indemnification

Amounts, AG Group Release Amounts and Discovery Costs (as such terms are defined below),

if any, and payment to the payee of such amounts after reduction for Indemnification Amounts,

AG Group Release Amounts and Discovery Costs, if any, upon their original maturity date or the

Extended Maturity Date (if applicable).  If Trans-Resources is unable to pay the Notes as and

when they mature, the Trump Group will be obligated to make payment thereon in an amount

equal to the lesser of (x) the outstanding amounts not paid by the obligor thereunder and (y) any

amount by which cash payments received by members of the Trump Group (other than Trans-

Resources) from Trans-Resources and its subsidiaries since the Effective Date (whether in the

form of dividends, distributions, compensation or otherwise) exceeds reasonable compensation

for services rendered plus payments for goods, services and assets provided by such persons in

amounts that would have been paid for such goods, services and assets in arms' length

transactions with unaffiliated third parties; provided, however, that in neither case shall the

Trump Group be obligated to pay any amount that exceeds the outstanding amounts not paid by

Trans-Resources on the Notes (subject to any Indemnification Amounts, AG Group Release

Amounts or Discovery Costs).

4

4.    **Dismissal of Claims with Prejudice**. Within two (2) business days of the
Effective Date (defined below), the AG Group and the Trump Group shall take all actions
necessary or desirable to:  (i) effect the dismissal with prejudice of all claims, counterclaims,
cross-claims, third-party claims, issues and matters between them, and to vacate all court orders
which restrain, enjoin or in any way limit actions by any members of the Trump Group, in each
pending action in which members of the AG Group and the Trump Group are parties (whether or
not service of process with respect thereto has been effected), including, without limitation, each
of the following pending actions (collectively, the "Litigation"): *Genger v. TR Investors, LLC*,
No. 168, 2013 (Del.); *TR Investors, LLC v. Genger*, C.A. No. 6697-CS (Del. Ch.); *Trans-
Resources, Inc. v. Genger*, C.A. No. 4391-CS (Del. Ch.) (with respect to Arie Genger only); *TR
Investors, LLC, et al. v. Genger*, C.A. No. 3994-CS (Del. Ch.); *Glenclova Investment Co. v.
Trans-Resources, Inc., at al.*, No. 08 Civ. 7140 (JFK) (S.D.N.Y.); *Arie Genger and Orly Genger
v. Sagi Genger, et al.*, Index No. 651089/2010 (N.Y. Supr.); and (ii) have the New York State
Supreme Court enter a definitive non-appealable order declaring that members of the Trump
Group own all right, title and interest (beneficially, of record and otherwise) to the shares of
Trans-Resources purportedly transferred by TPR in October 2004 to Arie Genger (the ("Arie
Shares") and to the Orly Genger 1993 Trust (the "Orly Trust Shares"),  with the understanding
and agreement that should the request for the entry of such an order with respect to the "Orly
Trust Shares" be denied or not entered in a reasonably timely fashion,  then the AG Group and
the Trump Group shall take all action necessary or desirable to have the New York State
Supreme Court vacate all court orders which restrain, enjoin or in any way limit actions by the

5

parties to the pending action captioned *Dalia Genger, as Trustee of the Orly Genger 1993 Trust*

*v. TR Investors, LLC, et al.,* C.A. No. 6906-CS (Del. Ch.) (the "Orly Trust Action"), to prosecute,

defend, compromise, settle and otherwise deal with all claims, counterclaims, cross-claims, third-

party claims, issues and matters asserted therein; provided, however, that nothing in this

Agreement is intended to require or permit the dismissal of any claims, counterclaims, cross-

claims, third-party claims, issues and matters, (i) in *Trans-Resources, Inc. v. Genger*, C.A. No.

4391-CS (Del. Ch.) (the "Breach of Fiduciary Duty Case"), as between the Trump Group and

Avi Pelossof and/or William Dowd (subject to the exchange of general releases between the

members of the Trump Group and William Dowd as contemplated below) and (b) against TPR,

the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust, D&K Limited Partnership, D&K GP

LLC, Sagi Genger or Dalia Genger.  Any member of the AG Group  including, without

limitation, Orly Genger, who is called to testify in the Litigation or the Orly Trust Action, agrees

to testify that he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993 Trust,~~ and as

beneficiary of the Orly Genger 1993 Trust) or it has waived all claims he, she (in her individual

capacity, ~~on behalf of the Orly Genger 1993 Trust~~ and as beneficiary of the Orly Genger 1993

Trust) or it had or may have to ownership (record, beneficial or otherwise) of any shares of

Trans-Resources and that he, she (in her individual capacity, ~~on behalf of the Orly Genger 1993~~

~~Trust,~~ and as beneficiary of the Orly Genger 1993 Trust) or it is opposed to the Orly Genger

1993 Trust seeking any remedy of any kind against any member of the Trump Group.

Notwithstanding the foregoing, upon receipt by the Trump Group of a general release in form

and substance reasonably satisfactory to it, the Trump Group shall provide the same general

6

release to William Dowd and cause the dismissal of the Breach of Fiduciary Duty Case as

between the Trump Group and him.

>   5.      **Indemnification.**

>        (a)      Upon closing of this Agreement, each of the members of the AG

Group with the exception of Arnold Broser and David Broser and the Broser Entities, jointly

and severally, agrees to indemnify and hold harmless (i) each of the members of the Trump

Group, and their respective past and present affiliates and direct and indirect subsidiaries, and (ii)

each of the past and present agents, representatives, officers, directors, advisors, employees,

general partners, limited partners, shareholders, members, predecessors, successors, heirs,

executors, administrators and assigns of each person and entity referenced in clause (i), from all

reasonable costs, expenses, attorneys' fees of counsel selected by the Trump Group (it being

agreed that the Trump Group will cooperate with the AG Group in all reasonable respects to

cause the amount of such costs, expenses and its attorneys' fees to be minimized), settlements

and/or judgments (whether direct or related to joint and several liability) (the "Indemnification

Amounts") incurred as a result of, in connection with, or relating in any way to any (x) claims,

counterclaims, cross-claims or third-party claims raised or that could have been raised in the

Litigation, and (y) claims that are pending, have been brought, or that may in the future be

brought by or on behalf of any of TPR, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust

(other than those claims currently pending in the Orly Trust Action), D&K Limited Partnership,

D&K GP LLC, Sagi Genger, David Parnes or Dalia Genger, regardless of whether they were or

could have been raised in the Litigation or the Orly Trust Action, relating in any way, whether

directly or indirectly, to (A) the Shareholders Agreement entered into by Trans-Resources

7

shareholders and Trans-Resources on March 30, 2001, (B) the transfer of interests in TPR or the

purported transfer of shares of Trans-Resources by TPR in October 2004, (C) any activities or

developments relating to or conducted by Trans-Resources or any of its direct or indirect

subsidiaries that occurred prior to September 26, 2008, (D) the acquisition by the Trump Group

of all interests (record, beneficial or otherwise) of the so called "Arie Shares", "Orly Trust

Shares" and the shares of Trans-Resources purportedly transferred by TPR in October 2004 to

the Sagi Genger 1993 Trust (the "Sagi Trust Shares") (including, without limitation, the

negotiations for the ownership or acquisition of such shares), (E) the control of Trans-Resources

or any of its direct or indirect subsidiaries by the Trump Group through its acquisition of the

aforementioned shares, (F) records and documents (including but not limited to electronic files)

in the possession, custody or control of Trans-Resources or any of its direct or indirect

subsidiaries, (G) misrepresentations made or improper acts conducted prior to September 26,

2008 by any officer or director of Trans-Resources, (H) this Agreement, (I) the business or

operations of Trans-Resources or any of its direct or indirect subsidiaries conducted prior to

September 26, 2008 arising from or in any way related to the conduct of any member of the AG

Group, Avi Pelossof or William Dowd, or (J) the conduct of any other individual to the extent

Arie Genger is aware, or should have been aware, thereof. Notwithstanding the foregoing, the

indemnity provided for above shall not apply to any claims which may be brought subsequent to

the Effective Date (and which are entirely unrelated to any claim brought prior to such date) by

any of Sagi Genger, the Sagi Genger 1993 Trust or TPR and which arise solely out of actions

taken or not taken by members of the Trump Group which actions or inactions no member of the

AG Group was aware of or should have been aware of; provided, however, that such claim was

8

not encouraged or solicited by any member of the AG Group and no member thereof cooperates in asserting, instituting or prosecuting such claim. Notwithstanding anything herein to the contrary, the undertaking of William Wachtel hereunder shall not exceed under any circumstance an amount greater than $5,000,000.

(b)   The Trump Group may request payment or reimbursement of the Indemnification Amounts at any time by providing a written statement or copy of an underlying invoice or expense documentation to any member of the AG Group at the addresses set forth in Paragraph 16 below, and the AG Group shall pay such indemnified expenses in full and in cash within five (5) business days of the date such request is made. The supporting documentation submitted with any payment or reimbursement request hereunder may be redacted as necessary to preserve attorney-client privilege, attorney work product, or confidential information the Trump Group may, in its reasonable determination, need to protect. The Trump Group will provide the AG Group with reasonable notice prior to making any motion or taking any appeal with respect to, or in, any past, present or future action or claim for which the Trump Group is seeking indemnification, and such notice will be accompanied by a non-binding estimate of the legal fees and costs associated with such motion or appeal. The Trump Group authorizes the AG Group and their respective counsel to discuss directly with the Trump Group's appointed counsel the amount and scope of any invoice for which the Trump Group is seeking indemnification. The AG Group in its sole discretion may settle any indemnified claim so long as there is no monetary contribution to be paid by the Trump Group, and the Trump Group is released, in form and substance reasonably satisfactory to it, from any liability relating to any such indemnified

9

claim. The Trump Group shall not enter into any settlement of any indemnified claim, or

discussions with respect thereto, without the express written consent of the AG Group.


(c)      With respect to each Indemnification Amount, until such time as it

has been paid over to the Trump Group, the members of the AG Group shall remain jointly and

severally liable for such Indemnification Amount and, the Trump Group may at its option pursue

all legal remedies available to it and/or withhold an amount equal to such unreimbursed

Indemnification Amount from any payments by Trans-Resources to be made pursuant to the

Notes.

      6.      **Releases.**

      (a)      **The AG Group Release.**  Effective on the Effective Date, each of

the members of the AG Group, for itself, himself or herself, and in all capacities, and on behalf

of its (and its respective affiliates' and direct and indirect subsidiaries'), his or her respective

agents, representatives, officers, directors, advisors, employees, general partners, limited partners,

shareholders, members, subsidiaries and affiliates, and each of their respective predecessors,

successors, heirs, executors, administrators and assigns, and any other persons or entities acting

in concert with any of them including, without limitation, any member of the Sagi Group which

he, she or it shall at any time directly or indirectly control or be deemed authorized to act on

behalf of (individually, an "AG Group Releasing Party" and collectively, the "AG Group

Releasing Parties"):  (i) fully, finally, irrevocably and unconditionally waives, releases and

discharges each of the members of the Trump Group and its (and its respective past and present

affiliates' and direct and indirect subsidiaries'), his or her respective past and present agents

10

(including Skadden, Arps, Slate, Meagher & Flom LLP in any capacity, including as Escrow

Agent for the Skadden Escrow or for any escrow in which it held, holds, or may hold, any

dividends or distributions from Trans-Resources), representatives, officers, directors, advisors,

employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates,

and each of their respective predecessors, successors, heirs, executors, administrators and assigns

(collectively, the "Trump Group Released Parties"), from any and all claims, counterclaims,

demands, proceedings, actions, causes of action, orders, obligations, damages, debts, costs,

expenses and other liabilities whatsoever and however arising, whether known or unknown, past,

present or future, suspected or unsuspected, contingent or actual, both at law and in equity,

including without limitation, claims for fraud or fraud in the inducement (collectively, "Claims"),

which such AG Group Releasing Party now has, has ever had or may hereafter claim to have

against any Trump Group Released Party or its, his or her assets, liabilities or operations from

the beginning of the world through the Effective Date (individually, an "AG Group Released

Claim" and collectively, the "AG Group Released Claims"); and (ii) agrees not to assert, institute

or prosecute, or encourage, solicit or cooperate with any other person or entity in asserting,

instituting or prosecuting, any proceeding against any of the Trump Group Released Parties in

any jurisdiction (domestic or foreign, including, without limitation, the State of Israel) with

respect to any AG Group Released Claim or any other Claim relating in any way, directly or

indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or

acquisition of Trans-Resources shares (including any dividends or distributions relating thereto

or any escrow in which such dividends or distributions may currently be or in the past have been

held), the Litigation, the Orly Trust Action, control of Trans-Resources or any of its direct or

11

indirect subsidiaries, the business or operations of Trans-Resources or any of its direct or indirect subsidiaries, or arising out of this Agreement including, without limitation, the negotiation and execution of this Agreement or the AG Group Releases provided hereunder; provided, however, that this AG Group Release shall not apply to any Claims (x) seeking equitable relief to enforce the terms of this Agreement or claims seeking payment of the Notes or any indemnification payments required to be paid hereunder, (y) relating solely to events that transpired in their entirety subsequent to the Effective Date and that could not, under any circumstances, have possibly been pursued prior to the Effective Date whether or not then known, and (z) between any of the AG Group Releasing Parties and TPR, and/or any other member of the Sagi Group.

If an AG Releasing Party brings an AG Group Released Claim or other Claim in violation of the immediately preceding paragraph, the AG Group, jointly and severally, agrees to indemnify the Trump Group for any and all settlements, judgments, costs and fees, including legal fees and disbursements of counsel chosen by the Trump Group, incurred in working on, preparing for or defending such claim ("AG Group Release Amounts"). With respect to each AG Group Release Amount, until such time as such AG Group Release Amount has been paid over to the Trump Group, the members of the AG Group shall remain jointly and severally liable for such AG Group Release Amount, and the Trump Group may at its option pursue all legal remedies available to it and/or withhold an amount equal to such unreimbursed AG Group Release Amount from any payments to be made by Trans-Resources pursuant to the Notes. For purposes of the removal of all doubt, it is the parties' intention that no claims shall be brought or pursued by any member of the AG Group against any member of the Trump Group for any

12

reason whatsoever (other than claims permitted under clause (x), (y) and (z) of the immediately preceding paragraph).

(b)    **The Trump Group Release.** Effective on the Effective Date, each of the members of the Trump Group, for itself or himself, and in all capacities, and on behalf of its (and its respective affiliates' and direct and indirect subsidiaries'), or his respective agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns, and any other persons or entities acting in concert with any of them (individually, a "Trump Group Releasing Party" and collectively, the "Trump Group Releasing Parties"):  (i) fully, finally, irrevocably and unconditionally waives, releases and discharges each of the members of the AG Group and its (and its respective past and present affiliates' and direct and indirect subsidiaries'), his or her respective past and present agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns (collectively, the "AG Group Released Parties"), from any and all claims, counterclaims, demands, proceedings, actions, causes of action, orders, obligations, damages, debts, costs, expenses and other liabilities whatsoever and however arising, whether known or unknown, past, present or future, suspected or unsuspected, contingent or actual, both at law and in equity including, without limitation, claims for fraud or fraud in inducement, ("Claims"), which such Trump Group Releasing Party now has, has ever had or may hereafter claim to have against any AG Group Released Party or its, his or her assets, liabilities or operations from the beginning of the world through the Effective Date (individually,

13

a "Trump Group Released Claim" and collectively, the "Trump Group Released Claims"); and (ii)

agrees not to assert, institute or prosecute, or encourage, solicit or cooperate with any other

person or entity in asserting, instituting or prosecuting, any proceeding against any member of

the AG Group Released Parties with respect to any Trump Group Released Claim or any other

Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or

indirect subsidiaries, the ownership or acquisition of Trans-Resources shares, control of Trans-

Resources or any of its direct or indirect subsidiaries, the business or operations of Trans-

Resources or any of its direct or indirect subsidiaries, or the negotiation and execution of this

Agreement or the Trump Group Releases provided hereunder; provided, however, that this

Trump Group Release shall not apply to any Claims (x) seeking equitable relief to enforce  the

terms of this Agreement or claims seeking payment of any indemnification payments required to

be paid hereunder, (y) relating solely to events that transpired in their entirety subsequent to the

Effective Date and that could not, under any circumstances, have possibly been pursued prior to

the Effective Date whether or not then known, and (z) between any of the Trump Group

Releasing Parties and Avi Pelossof, William Dowd (unless and until the exchange of mutual

general releases between the Trump Group and William Dowd referred to above) and/or TPR.

If a Trump Group Releasing Party brings a Trump Group Released Claim or other Claim

in violation of the immediately preceding paragraph, the Trump Group, jointly and severally,

agrees to indemnify the AG Group for any and all settlements, judgments, costs and fees,

including legal fees and disbursements of counsel chosen by the AG Group, incurred in working

on, preparing for or defending such claim ("Trump Group Release Amounts").  With respect to

each Trump Group Release Amount, until such time as such Trump Group Release Amount has

14

been paid over to the AG Group, the members of the Trump Group shall remain jointly and severally liable for such Trump Group Release Amount, and the AG Group may at its option pursue all legal remedies available to it. For purposes of the removal of all doubt, it is the parties intention that no claims shall be brought or pursued by any member of the Trump Group against any member of the AG Group for any reason whatsoever (other than claims permitted under clause (x), (y) and (z) of the immediately preceding paragraph).

7.    **Discovery Obligations.**    Effective on the Effective Date (defined below), to the extent that a member of the AG Group or the Orly Genger 1993 Trust seeks discovery or testimony from any member of the Trump Group, or if any member of the Trump Group is subpoenaed by any party to an action in which any member of the AG Group or the Orly Genger 1993 Trust is a party, each of the members of the AG Group, jointly and severally, agrees that to the extent indemnities of the Trump Group provided for elsewhere in this Agreement do not apply, they shall indemnify the Trump Group for any and all costs and fees, including reasonable legal fees and disbursements of counsel to be chosen by the Trump Group (it being understood that for the purposes of this Discovery Obligation indemnity only, the indemnification for legal fees shall be limited to $750 per hour of legal services), incurred in working on, preparing for or defending such claim, it being agreed that the Trump Group will cooperate with the AG Group in all reasonable respects to cause the amount of such costs and fees, including its attorneys' fees and disbursements to be minimized ("Discovery Costs"). With respect to each Discovery Cost, until such time as such Discovery Cost has been paid over to the Trump Group, the members of the AG Group shall remain jointly and severally liable for such Discovery Cost, and the Trump Group may at its option pursue all legal remedies available to it

15

and/or withhold an amount equal to such unreimbursed Discovery Cost from any payments to be made by Trans-Resources pursuant to the Notes.

### 8. Cooperation.

(a)    Each member of the AG Group shall take all actions necessary or desirable, as promptly as practicable and as may be requested by the Trump Group from time to time including, without limitation, testifying in the Orly Trust Action, to (i) effectuate the release of the AG Group Released Claims and to prevent or preclude any other person or entity from asserting, instituting or prosecuting, or encouraging, soliciting or cooperating with any other person or entity in asserting, instituting or prosecuting, any proceeding or claims against any of the Trump Group Released Parties with respect to any AG Group Released Claim or any other Claim relating in any way, directly or indirectly, to Trans-Resources or any of its direct or indirect subsidiaries, the ownership or acquisition of Trans-Resources shares, the control of Trans-Resources or any of its direct or indirect subsidiaries, records and documents (including but not limited to electronic files) in the possession, custody or control of Trans-Resources or any of its direct or indirect subsidiaries or the business or operations of Trans-Resources or any of its direct or indirect subsidiaries brought by any party without regard to whether such party is a signatory hereto and (ii) cause the Orly Genger 1993 Trust to release any and all claims against the Trump Group Released Parties, including, without limitation, any claims pending in the Orly Trust Action.

(b)    As a condition to any settlement that any member of the AG Group shall enter into with any member of the Sagi Group, the AG Group parties to such settlement shall cause each Sagi Group party to such settlement to (i) dismiss with prejudice all pending claims, cross-claims and counter claims against any of the Trump Group Released Parties (as defined below)

16

and to provide the Sagi Group Release, and (ii) if the Orly Genger 1993 Trust is a party to such

settlement, cause it to agree in writing to become an AG Group member for purposes of

providing the indemnity contained in Paragraph 5. Likewise, as a condition to any agreement by

the AG Group to a replacement trustee for the Orly Genger 1993 Trust, the AG Group shall use

its best efforts to cause such trustee to agree in writing on behalf of the Orly Genger 1993 Trust

that it shall be a member of the AG Group for purposes of providing the indemnity contained in

Paragraph 5.

      (c)     Each member of the AG Group covenants that for so long as the indemnity

contained in Paragraph 5 remains in effect, he, she or it shall not contribute or deposit any

amounts, or permit to be contributed or deposited any amounts (including, without limitation,

any payments made under Paragraphs 2 and 3), to or with the Orly Genger 1993 Trust or to any

other trust or entity that any of them directly or indirectly controls or is or was established at

their direction, or that is or was established or exists for any of their direct or indirect benefit,

unless such trust or entity has agreed in writing to being a member of the AG Group for purposes

of providing the indemnity contained in Paragraph 5. The foregoing shall not restrict members

of the AG Group from investing in or with such entities provided that that such investment may

be liquidated, without restriction, by such member of the AG Group from time to time as may be

necessary to comply with the terms of the indemnity contained in Paragraph 5.

      (d)     The AG Group covenants that, subject to any confidentiality orders of any court

or other restrictions imposed by law (i) with respect to any court filing made or received by it

concerning the Orly Genger 1993 Trust, it shall contemporaneously provide a copy thereof to the

Trump Group, and (ii) contemporaneously with its becoming aware of any changes or

17

contemplated material changes to the Orly Genger 1993 Trust including, without limitation, the resignation of its trustee and/or the appointment of a replacement trustee, it shall provide written notice thereof to the Trump Group.

9. **Confidentiality.** The Parties and their counsel shall not disclose the terms of this Agreement, except if, upon written advice of counsel, it is required to do so by law. Notwithstanding the foregoing, disclosure may be made by the Parties: (i) to their respective accountants, financial advisors or attorneys (collectively, "Advisors") as required to obtain tax or legal advice, it being agreed that each Party shall apprise its Advisors of the obligation to maintain such confidentiality and that each Party shall be accountable for any breach of this provision by its respective Advisors, and (ii) notwithstanding anything to the contrary in this Agreement, the Parties may disclose the terms of this Agreement if necessary in any action to enforce this Agreement or as may be required to respond to a valid subpoena, court order or other legal process. Each Party agrees that he, she or it will promptly give notice of any attempt to compel disclosure of the terms of this Agreement to each of the other Parties, at least five (5) days before compliance is required.

10.    **Third Party Beneficiaries.** This Agreement shall have no third party beneficiaries except for those persons and entities that are not Parties hereto but are covered by the releases set forth in Paragraph 6 above, who may enforce those releases.

11.    **Binding Effect**

This Agreement shall be binding upon and inure to the benefit of each of the Parties hereto and (where applicable) their respective current and former agents, representatives, officers, directors, advisors, employees, general partners, limited partners, shareholders, members, subsidiaries and

18

affiliates, and each of their respective predecessors, successors, heirs, executors, administrators and assigns.

12.   **Representations and Warranties.**

(a)   Each Party represents that it, he or she is authorized to enter into this Agreement and to grant the rights granted by it, him or her in this Agreement. Each Party further represents that, to the extent any non-party consents are required for the performance of any of its, his or her obligations under this Agreement (including, without limitation, with any entity controlled by any Party, including any of its partners or equity holders), it, he or she has obtained such consents.

(b)   Each Party has the benefit of the advice of counsel chosen and employed by it, him or her concerning this Agreement.

(c)   Each Party is the sole owner and holder of the Claims it is releasing under this Agreement, and represents that none of the Claims released herein have been assigned, pledged, encumbered, or otherwise transferred in whole or in part, to any other person or entity.

(d)   Each member of the AG Group represents that he, she or it is knowledgeable, sophisticated and experienced in business, financial and other matters relevant to his, her or its entry into this Agreement and the transactions contemplated hereby, and has engaged advisors, experienced in the matters contemplated by this Agreement. Each member of the AG Group has undertaken such investigation and has been provided with and has evaluated such documents and information as he, she or it has deemed necessary to enable him, her or it to make an informed decision with respect to the execution, delivery and performance of this Agreement and the transactions contemplated hereby. Each member of the AG Group is

19

consummating the transactions contemplated hereby without reliance upon any express or

implied representations or warranties of any nature, whether in writing, orally or otherwise, made

by or on behalf of or imputed to any of the Trump Group Released Parties, except as expressly

set forth in this Agreement, and no member of the AG Group shall make any Claim with respect

thereto. Each member of the AG Group acknowledges that he, she or it is taking full

responsibility for making his, her or its own evaluation of the adequacy and accuracy of all

documents or information that may have been furnished to him, her or it, and that no member of

the AG Group shall have any Claim against any of the Trump Group Released Parties with

respect thereto, including for Claims relating to the accuracy or completeness of the information

that may have been furnished to him her or it. Each member of the AG Group acknowledges and

understands that each member of the Trump Group Released Parties expressly disclaims any and

all liability that may be based on any of the documents and information that may have been

furnished to any member of the AG Group and all liability based on such documents or

information or errors therein or omissions therefrom. Accordingly, each member of the AG

Group acknowledges that none of the Trump Group Released Parties has made any

representation or warranty with respect to (i) any historical information, financial or otherwise,

including without limitation results of operations (or any component thereof), cash flows, or

financial condition (or any component thereof), of Trans-Resources and/or any of its subsidiaries,

(ii) any valuations or projections or estimates of future revenues, future results of operations (or

any component thereof), future cash flows or future financial condition (or any component

thereof) of Trans-Resources and/or any of its subsidiaries or the future business and operations of

Trans-Resources and/or any of its subsidiaries, (iii) any Claims any member of the AG Group

20

may have against any of the Trump Group Released Parties or (iv) any other information or

documents that may have been made available to any member of the AG Group or their

respective counsel, accountants or advisors with respect to any of the Trump Group Released

Parties any of their respective businesses, assets, liabilities or operations, except as expressly set

forth in this Agreement. In addition to the foregoing, each member of the AG Group

acknowledges that his, her or its entry into this Agreement and the transactions contemplated

hereby is based solely on his, her or its respective assessment and valuation of all Claims that he,

she or it may have against any of the Trump Group Released Parties and the likelihood of

success of such Claims in a court of competent jurisdiction. Each member of the AG Group

acknowledges that the consideration to be received by the AG Group pursuant to this Agreement

constitutes full and fair consideration for the release of all Claims contemplated hereunder.

(e)      Each member of the Trump Group represents that he, she or it is knowledgeable,

sophisticated and experienced in business, financial and other matters relevant to his, her or its

entry into this Agreement and the transactions contemplated hereby, and has engaged advisors,

experienced in the matters contemplated by this Agreement. Each member of the Trump Group

has undertaken such investigation and has been provided with and has evaluated such documents

and information as he, she or it has deemed necessary to enable him, her or it to make an

informed decision with respect to the execution, delivery and performance of this Agreement and

the transactions contemplated hereby. Each member of the Trump Group is consummating the

transactions contemplated hereby without reliance upon any express or implied representations

or warranties of any nature, whether in writing, orally or otherwise, made by or on behalf of or

imputed to any of the AG Group Released Parties, except as expressly set forth in this

21

Agreement, and no member of the Trump Group shall make any Claim with respect

thereto. Each member of the Trump Group acknowledges that he, she or it is taking full

responsibility for making his, her or its own evaluation of the adequacy and accuracy of all

information that may have been furnished to him, her or it, and that no member of the Trump

Group shall have any Claim against any of the AG Group Released Parties with respect thereto,

including for Claims relating to the accuracy or completeness of the information that may have

been furnished to him her or it. Each member of the Trump Group acknowledges and

understands that each member of the AG Group Released Parties expressly disclaims any and all

liability that may be based on any of the documents and information that may have been

furnished to any member of the Trump Group and all liability based on such documents or

information or errors therein or omissions therefrom. Accordingly, each member of the Trump

Group acknowledges that none of the AG Group Released Parties has made any representation or

warranty with respect to (i) any historical information, financial or otherwise, including without

limitation results of operations (or any component thereof), cash flows, or financial condition (or

any component thereof), of Trans-Resources and/or any of its subsidiaries, (ii) any valuations or

projections or estimates of future revenues, future results of operations (or any component

thereof), future cash flows or future financial condition (or any component thereof) of Trans-

Resources and/or any of its subsidiaries or the future business and operations of Trans-Resources

and/or any of its subsidiaries, (iii) any claims any member of the Trump Group may have against

any of the AG Group Released Parties or (iv) any other information or documents that may have

been made available to any member of the Trump Group or their respective counsel, accountants

or advisors with respect to any of the AG Group Released Parties any of their respective

22

businesses, assets, liabilities or operations, except as expressly set forth in this Agreement. In addition to the foregoing, each member of the Trump Group acknowledges that his, her or its entry into this Agreement and the transactions contemplated hereby is based solely on his, her or its respective assessment and valuation of all Claims that he, she or it may have against any of the AG Group Released Parties and the likelihood of success of such Claims in a court of competent jurisdiction. Each member of the Trump Group acknowledges that the consideration to be received by the Trump Group pursuant to this Agreement constitutes full and fair consideration for the release of all claims contemplated hereunder.

13.     **Attorneys' Fees.** The Parties agree to be responsible for their own attorneys' fees and costs incurred in connection with this Agreement and negotiations related to and preparation of this Agreement and not to seek from each other reimbursement of any such costs, expenses or attorneys' fees.

14.     **Governing Law.**

This Agreement, and all disputes arising under this Agreement or related thereto, shall be governed by, construed and interpreted in accordance with the laws of the State of Delaware, applicable to instruments made, delivered and performed entirely in such state, without regard to the choice of law provisions thereof.

15.     **Arbitration.** UNLESS THIS AGREEMENT SPECIFICALLY PROVIDES FOR ANOTHER TYPE OF DISPUTE RESOLUTION WITH RESPECT TO A PARTICULAR KIND OF DISPUTE, ANY AND ALL CONTROVERSIES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR VALIDITY THEREOF, SHALL BE EXCLUSIVELY SETTLED BY FINAL AND BINDING

23

ARBITRATION IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THIS
SECTION.

(a)     The arbitration shall be conducted in accordance with the Commercial
Arbitration Rules of the American Arbitration Association ("AAA") then in effect (the "Rules"),
except as set forth herein.  Any member of the Trump Group on behalf of the Trump Group, on
the one hand, and any member of the AG Group on behalf of the AG Group, on the other hand,
may demand arbitration by giving the other written notice to such effect in accordance with the
Rules.

(b)     The arbitration will be held before one neutral arbitrator.  Within thirty (30)
days after the other Party's receipt of the demand for arbitration, the Party seeking arbitration
will invite the other Party to join it in approaching the following list of individuals about serving
as arbitrator and will approach such individuals with such other Party (if its invitation is accepted)
or without such other Party (if its invitation is rejected or not responded to within five (5)
business days): The Honorable William B. Chandler III, David A. Jenkins, Esq., Stephen E.
Jenkins, Esq., Robert J. Katzenstein, Esq., and Andre G. Bouchard, Esq.  If only one such
individual is available and willing, he shall serve as the arbitrator.  If more than one such
individual is available and willing, the Parties will mutually determine which of those so
available and willing will serve as the arbitrator.  If the Parties are unable to agree, the arbitrator
will be selected by the AAA from the foregoing list in accordance with the listing, striking and
ranking procedure in the Rules, with each Party being given a limited number of strikes, except
for cause.  If none of the foregoing individuals is available, the arbitrator will be selected by the
AAA in accordance with the listing, striking and ranking procedure in the Rules, with each Party

24

being given a limited number of strikes, except for cause. Any arbitrator appointed by the AAA shall be a retired judge that presided over a state or federal court located in Delaware or a practicing attorney licensed in Delaware with no less than fifteen years of experience with large commercial cases. Any such arbitration proceedings shall be and remain confidential. The place of arbitration shall be in Manhattan, New York or elsewhere if otherwise agreed to.

(c)    Discovery will be limited to the request for and production of documents, directly related to the issues in dispute, limited depositions of limited duration, and interrogatories. Interrogatories will be allowed only as follows: a Party may request the other Party to identify by name, last known address and telephone number (i) all persons having knowledge of facts relevant to the dispute and a brief description of that person's knowledge, and (ii) any experts who may be called as an expert witness, the subject matter about which the expert is expected to testify, the mental impressions and opinions held by the expert and the facts known by the expert. All issues concerning discovery upon which the parties cannot agree will be submitted to the arbitrator for determination.

(d)    Each of the Parties agrees that it will use commercially reasonable efforts to join (and will allow the other party to join) any third party that the Parties have agreed is indispensable to the arbitration. If any such third party does not agree to be joined, the arbitration will proceed nonetheless.

(e)    The arbitrators are not empowered to award damages not permitted by the terms of this Agreement and if so permitted, then not in excess of compensatory damages, except with respect to indemnification obligations for punitive damages as provided hereunder, and

25

each Party irrevocably waives the right to recover punitive, exemplary or multiple damages with respect to any dispute other than with respect to indemnification obligations for such punitive damages as provided hereunder. The decision of, and award rendered by, the arbitrator will be final and binding on the Parties, will be in writing and will include the findings of fact and conclusions of law upon which it is based, if any.

(f)      The Parties specifically acknowledge that this Agreement evidences a transaction involving, affecting, affected by, and a part of, interstate commerce and that this agreement to arbitrate is governed by and enforceable under the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq.

(g)      Except to the extent that any of the indemnification provisions contained herein shall be applicable (i) the Parties shall each be responsible for their own costs and expenses (including legal fees and disbursements) incurred in any arbitration, and (ii) the AG Group on the one hand and the Trump Group on the other shall each be responsible for 50% of the fees and disbursements of the arbitrator and of any costs and expenses payable to the AAA.

(h)      With respect to the enforcement, modification or vacating of any arbitration award (it being reconfirmed hereby that the arbitration award shall itself be final and binding on the Parties), the Parties submit to the exclusive jurisdiction of one or the other of (i) the United Stated District Court of the Southern District of New York sitting in the Borough of Manhattan in the City of New York and (ii) the Commercial Division of the New York State Supreme Court sitting in the Borough of Manhattan in the City of New York.

16.      **Notice.** If any Party is required to give notice to any other Party under this Agreement, such notice shall be in writing and shall be deemed to have been duly given upon receipt of hand delivery, one business day following its being sent to the recipient via Federal Express or another

26

nationally recognized over-night courier, or by e-mail with confirmation of receipt to the

following individuals or to such other address or person as such Parties may from time to time

specify by written notice given in the manner provided above:

**If to the Trump Group:**

        Mark S. Hirsch, Esq.

        The Trump Group

        41 Madison Avenue, Suite 4101

        New York, NY 10010

        Phone: (212) 838-1000

        E-mail: mhirsch@trumpgroup.com

**With Copy to:**

        Thomas J. Allingham II, Esq.

        Anthony W. Clark, Esq.

        Douglas D. Herrmann, Esq.

        Skadden, Arps, Slate, Meagher & Flom LLP

        One Rodney Square

        P.O. Box 636

        Wilmington, DE 19899

        Phone: (302) 651-3000

        E-mail: thomas.allingham@skadden.com

27

E-mail:  anthony.clark@skadden.com

E-mail:  douglas.herrmann@skadden.com

**If to Arie Genger:**

Arie Genger

104 West 40th Street, 19th Floor

New York, NY 10018

E-mail:  wachtel@wmllp.com

**With Copy to:**

Stephen P. Lamb, Esq.

Paul Weiss

500 Delaware Avenue, Suite 200

Wilmington, DE 19889

**If to Orly Genger:**

Orly Genger

104 West 40th Street, 19th Floor

New York, NY 10018


E-mail: wachtel@wmllp.com

**With Copy to:**

28

William Wachtel

Wachtel Masyr & Missry LLP

885 second ave.

New York, NY 10017

[]

**If to Arnold Broser or David Broser:**

David Broser

104 West 40th, 19th FloorNew York, NY 10018

E-mail: wachtel@wmll.com

**With Copy to:**

William Wachtel

Wachtel Masyr & Missry LLP

885 second ave.
New York, NY 10017

29

17.     **Entire Agreement.** This Agreement contains the entire agreement between the Parties

concerning the subject matter hereof. Neither this Agreement nor any of its terms or provisions

shall be binding on any Party until all the Parties hereto have signed. The Parties agree that all

drafts of this Agreement are strictly confidential and shall supplement and complement any

protection, which may attach to the exchange of confidential information in settlement

discussions, whether by common law or statute including, but not limited to, Federal Rule of

Evidence 408 and comparable state laws. Any and all prior discussions and agreements between

the Parties concerning the subject matter of this Agreement are merged into this Agreement

when signed. This Agreement may not be modified or amended, nor any of its provisions

waived, except by an instrument in writing signed by all Parties. No Party has made any

warranty or representation to the other Parties that is not set forth expressly herein. In entering

into this Agreement, no Party has relied on any statement or representation made by or on behalf

of any other Party, by or on behalf of any affiliate of such other Party, or by counsel for such

other Party that is not set forth expressly in this Agreement.

18.     **No Drafting Presumption.** This Agreement shall be interpreted or construed without

any presumption that the provisions hereof should be strictly construed against the drafter, it

being agreed that the Parties and their respective counsel and other agents have fully and equally

participated in the preparation, negotiation, review and approval of all provisions of this

Agreement.

19.     **No Admissions.** The Parties have executed this Agreement for the sole purpose of

settling and disposing of all Claims between them, and it is expressly understood and agreed that

no Party hereto admits any wrongdoing on its, his or her part by executing this Agreement.

30

20.     **Binding Effect.**  It is the intention of the parties to extinguish all AG Group Released Claims and all Trump Group Released Claims and, consistent with such intention, each of the Parties hereby waives any and all rights, to the extent permitted by law, to assert that the Release provided by it in Paragraph 6 hereunder is unenforceable as to any claim whatsoever and for any reason including, without limitation, any and all rights under section 1542 of the California Civil Code, if applicable, or any other applicable similar law or principle of common law, which may have the effect of limiting the Releases herein.  Section 1542 of the California Civil Code provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

21.     **Headings.**  The section headings contained in this Agreement are for reference purposes only and shall not in any way effect or control the meaning or interpretation of this Agreement.

22.     **Execution in Counterparts and by PDF e-mail.**  This Agreement may be executed in multiple counterparts and by fax or PDF e-mail, each of which, when so executed and delivered, shall be an original, but such counterparts shall together constitute one and the same instrument and agreement.

23.     **Effective Date.**  This Agreement shall be effective immediately upon execution and delivery by all Parties hereto (the "Effective Date").

31

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed as follows:

**TR Investors, LLC**                                **Arie Genger**

By: _____

Print: _____          Date: _____6/15/13_____

Title: _____

Date: _____


**Glenclova Investment Co.**                  **Orly Genger (in her individual capacity and**

                                              **in her capacity as beneficiary of the**

By: _____          **Orly Genger 1993 Trust)**

Print: _____

Title: _____          Date: _____6/15/13_____

Date: _____

32

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed as follows:

TR Investors, LLC                          Arie Genger

By: _Mark S Hirsch_____              _____

Print: _MARK J. HIRICH_____              Date: _____

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_____


Glenclova Investment Co.                  Orly Genger (in her individual capacity and

                                          in her capacity as beneficiary of the

By: _Mark S Hirsch_____               Orly Genger 1993 Trust)

Print: _MARK S. HIRICH_____

Title: _Executive VP/General Counsel_     _____

Date: _June 16, 2013_____               Date: _____

32

**New TR Equity I, LLC**

By: _____

Print: _____

Title: _____

Date: _____

**Arnold Broser**

Date: _____ 6/11/13 _____

**New TR Equity II, LLC**

By: _____

Print: _____

Title: _____

Date: _____

**David Broser**

Date: _____ 6/16/13 _____

33

**New TR Equity I, LLC**                    **Arnold Broser**

By: _Mark S Hirsch_                         _____

Print: _MARK S. Hirsch_                     Date: _____

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_


**New TR Equity II, LLC**                   **David Broser**

By: _Mark S Hirsch_                         _____

Print: _MARK S. HIRSCH_                     Date: _____

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_

33

**Trans-Resources, LLC**

By: _Mark S Hirsch_

Print: _MARK S. HIRSCH_

Title: _Executive VP/General Counsel_

Date: _June 16, 2013_

34

**Jules Trump**

Date: 6/16/2013

**Eddie Trump**

Date: _____

**Mark Hirsch**

Date: _____

35

**Jules Trump**

_____

Date: _____

**Eddie Trump**

_____

Date: June 16, 2013

**Mark Hirsch**

_____

Date: _____

35

**Jules Trump**

_____

Date: _____

**Eddie Trump**

_____

Date: _____

**Mark Hirsch**

_____

Date: _June 16, 2013_____

35

EXHIBIT A

*6/16/13*
*Draft - Confidential*

# [FORM OF SUBORDINATED NOTE]

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH THE REGISTRATION OR QUALIFICATION PROVISIONS OF APPLICABLE FEDERAL AND STATE SECURITIES LAWS OR APPLICABLE EXEMPTIONS THEREFROM.**

## TRANS-RESOURCES

## <u>SUBORDINATED NOTE</u>

$7,500,000.00                                                    June __, 2013

     **FOR VALUE RECEIVED**, Trans-Resources, LLC a Delaware entity (the successor to Trans-Resources, Inc. and referred to herein as the "<u>Maker</u>"), hereby promises to pay to the order of [_____] (the "<u>Payee</u>"), the principal sum of Seven Million, Five-Hundred Thousand Dollars ($7,500,000.00) pursuant to the terms and conditions of and at the times provided in the Settlement Agreement (as defined below).

    1.    <u>Notes</u>. This Subordinated Note (this "<u>Note</u>") is issued pursuant to, and is subject to the terms and conditions of, the Settlement Agreement and Release, dated as of June __, 2013 by and among the AG Group and the Trump Group, as amended, restated, supplemented or otherwise modified from time to time (the "<u>Settlement Agreement</u>"). Terms used herein and not otherwise defined herein shall have the respective meanings ascribed thereto in the Settlement Agreement.

    2.    <u>No Interest</u>. This Note will not accrue interest, pursuant to the terms of the Settlement Agreement.

    3.    <u>Maturity</u>. Subject to the terms and conditions of the Settlement Agreement and this Paragraph 3, this Note shall mature and be redeemed or satisfied in full by the Maker in one installment, which shall be paid by the Maker no later than the ___ anniversary of the Effective Date (the "<u>Maturity Date</u>"). Notwithstanding the foregoing, the Maturity Date shall automatically be extended until the earlier (the "<u>Extended Maturity Date</u>") of (i) such time as all pending claims, cross-claims and counter-claims brought by any of TPR, Sagi Genger, the Sagi Genger 1993 Trust, the Orly Genger 1993 Trust (other than the Orly Trust Action), D&K Limited Partnership, D&K GP LLC, Rochelle Fang, and/or David Parnes (collectively, the "<u>Sagi Group</u>") against any member of the Trump Group have been dismissed with prejudice and the statute of limitations shall have run with respect to any other potential claims of the Sagi Group that might be the subject of the indemnification obligations provided for by Paragraph 5 of the Settlement Agreement and (ii) such time as each member of the Sagi Group shall have provided the Trump Group with a release of the Trump Group Released Parties and covenant not to sue in form and substance that is the same as the AG Group Release and covenant not to sue contained in Paragraph 6(a) of the Settlement Agreement. Subject to the foregoing, this Note shall become immediately due and payable upon the occurrence of any transaction or series of transactions which shall result in the Trump Group owning or controlling neither (i) a majority of the voting stock of Trans-Resources or its successors or each of its two principal subsidiaries, Haifa

Chemicals, Ltd. and Na-Churs Plant Food Company or their successors, nor (ii) directly or indirectly, a majority of the assets currently owned by Trans-Resources and its subsidiaries; provided, however, that in such event, at the request of the Trump Group, the amounts then payable on this Note shall be placed in escrow until the Maturity Date or until the Extended Maturity Date (if applicable) under the provisions of an escrow agreement on reasonable terms to be negotiated at such time in good faith between the Maker, the Payee and an escrow agent selected by mutual consent of the Maker and the Payee (such consent, not to be unreasonably withheld, conditioned or delayed), which shall provide for the release of funds from such escrow to the Maker in satisfaction of any and all Indemnification Amounts, AG Group Release Amounts and Discovery Costs owing to Maker, if any, and payment to the Payee of any amounts remaining in escrow after payment to Maker of all Indemnification Amounts, AG Group Release Amounts and Discovery Costs, if any, upon the Maturity Date hereunder or the Extended Maturity Date (if applicable).

4.     Optional Prepayments. The Maker may voluntarily prepay this Note prior to the Maturity Date, in whole or in part, at any time, without premium or penalty.

5.     Adjustment. In accordance with the terms of the Settlement Agreement, in the event that at any time Indemnification Amounts, Discovery Costs, AG Group Release Amounts, or other amounts due and payable by the AG Group to the Trump Group pursuant to the Settlement Agreement (the "Costs") have not been paid to the Trump Group in accordance with the terms of the Settlement Agreement, the Maker may, upon written notice to the Payee, set off and apply as a credit against the amount due under this Note any and all due, unpaid and outstanding Costs. The rights and remedies described herein are in addition to any other rights and remedies the Parties may have under the Settlement Agreement or other applicable law.

6.     Subordination. Pursuant to the terms of the Settlement Agreement, this Note is unsecured and shall be fully subordinated to any obligation of Trans-Resources, including, but not limited to, outstanding credit facilities, bonds, loans, tax obligations and payables.

7.     Enforcement. The Maker hereby agrees to pay on demand all reasonable costs and expenses, including without limitation attorneys' fees and costs of collection, incurred or paid by the Payee in enforcing this Note in accordance with the Settlement Agreement.

8.     Amendments. No failure or delay on the part of the Maker or the Payee in exercising any right, power, privilege or remedy shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power, privilege or remedy preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy. This Note may not be amended and the provisions hereof may not be waived, except in accordance with the terms of the Settlement Agreement.

9.     Lost Notes, etc. If this Note is mutilated, destroyed, lost or stolen, upon receipt of evidence satisfactory to the Maker of such loss, theft, destruction or mutilation of this Note and, if requested in the case of any such loss, theft or destruction, upon delivery of an indemnity agreement reasonably satisfactory to the Maker, or, in the case of any such mutilation, upon surrender and cancellation of this Note, the Maker shall issue a new Note of like tenor and amount, in lieu of this Note.

- 2 -

Error! Unknown document property name.

10.   <u>ASSIGNMENT</u>. THIS NOTE, INCLUDING THE RESPECTIVE RIGHTS AND OBLIGATIONS OF THE MAKER AND THE PAYEE PURSUANT THIS NOTE, MAY NOT BE ASSIGNED, TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF BY EITHER THE MAKER OR THE PAYEE WITHOUT THE PRIOR WRITTEN CONSENT OF THE OTHER WHICH CONSENT MAY BE WITHHELD IN SUCH PARTY'S SOLE DISCRETION.

11.   <u>Binding Effect</u>. The provisions of this Note shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns permitted hereby.

*[signature page follows]*

- 3 -

**Error! Unknown document property name.**

**IN WITNESS WHEREOF,** the Maker has caused this Subordinated Note to be duly executed under seal on the date set forth above by a duly authorized representative of the Maker.

TRANS-RESOURCES, LLC

By:_____
    Name:
    Title:

4

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 15, 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
TPR INVESTMENT ASSOCIATES, INC.,    :
                                    :
                Plaintiff,          :
                                    :
            -against-               :
                                    :
PEDOWITZ & MEISTER LLP, as escrow   :
agent, DALIA GENGER, as trustee of  :
the Orly Genger 1993 Trust, and     :
ORLY GENGER, as beneficiary of the  :
Orly Genger 1993 Trust,             :
                                    :
                Defendants.         :
----------------------------------X

No. 13 Civ. 8243 (JFK)
**OPINION & ORDER**

Appearances

For TPR Investment Associates, Inc.
    MORGAN, LEWIS & BOCKIUS, LLP
    By:  John Dellaportas
         Mary C. Pennisi

For Orly Genger
    ZEICHNER, ELLMAN & KRAUSE, LLP
    By:  Yoav M. Griver
         Bryan Leinbach

For Pedowitz & Meister, LLP
    PEDOWITZ & MEISTER, LLP
    By:  Robert A. Meister

For Dalia Genger
    Judith Bachman

**JOHN F. KEENAN, United States District Judge:**

We proceed once more unto the breach within the Genger

family.  In this latest action, TPR Investment Associates, Inc.

("TPR"), which is controlled by Sagi Genger, seeks a judgment

directing the release of about $10.3 million in escrowed

proceeds (the "Proceeds") arising out of TPR's sale of certain
shares of Trans-Resources Inc. to a group of parties known as
the "Trump Group." Defendant Orly Genger, Sagi's estranged
sister, has filed a motion to dismiss this action. TPR not only
opposes Orly's motion but has also cross-moved for summary
judgment. Most recently, Orly filed a motion to dismiss the
crossclaims against her by Pedowitz & Meister LLP and Dalia
Genger.

For the reasons that follow, Orly's motion to dismiss the
complaint is denied, and TPR's motion for summary judgment is
granted. Orly's motion to dismiss the interpleader crossclaim
by Pedowitz & Meister LLP is granted, and her motion to dismiss
Dalia's crossclaim against her is denied as moot.

## I. Background

The Court assumes familiarity with the extensive history of
the Genger family imbroglio. See generally Glenclova Inv. Co. v.
Trans-Resources, Inc., 874 F. Supp. 2d 292, 295-300 (S.D.N.Y.
2012) (hereinafter, the "Omnibus Opinion" or Glenclova); TR
Investors, LLC v. Genger, No. 6697-CS, 2013 WL 603164, at *3-13
(Del. Ch. Feb. 18, 2013). The following section contains only
the background that is necessary to understand the instant
action and decision.

2

20-01187-jlg   Doc 1-52   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 54
Case 1:13-cv-08243-JFK   Document 44-0   Filed 05/15/14   Page 3 of 21
Pg. 88 of 150

## A.   Relevant History

The Genger combatants include Arie Genger and his adult
daughter Orly in one camp; Arie's former wife Dalia, who is the
trustee of a trust benefitting her estranged daughter Orly in a
second camp; and former Trans-Resources majority owner TPR and
its president, Sagi, who is Arie and Dalia's adult son.   Also
relevant is the collection of entities referred to as the "Trump
Group."   These include Glenclova Investment Co.; TR Investors,
LLC; New TR Equity I, LLC; New TR Equity II, LLC; Eddie Trump;
Jules Trump; and Mark Hirsch.

Not including the instant action, most of the litigation
between these disputants has been a battle over shares of Trans-
Resources stock.   Some of the shares in dispute have been
referred to as the "Orly Trust Shares."   These 1,102.8 shares
had been transferred by TPR, which was then controlled by Arie,
to the Orly Genger 1993 Trust (the "Orly Trust") as part of Arie
and Dalia's 2004 divorce settlement.   Once the Trump Group
learned of this and other transfers in 2008, it objected on the
grounds that the transfers were prohibited by the March 31, 2001
Stockholders Agreement between Trans-Resources, TPR, and members
of the Trump Group.   Ultimately, Glenclova filed the Glenclova
action to enforce the 2001 Stockholders Agreement. See generally
Glenclova, 874 F. Supp. 2d at 295-96.

3

To cover its bases, the Trump Group separately entered into
an agreement with TPR (by then under Sagi's control), which gave
the Trump Group an option to purchase the Orly Trust Shares
should a court determine that the 2004 transfers were void.   If
the transfers were ruled to be valid, then the Orly Trust would
keep the Orly Trust Shares.   But if the transfers were deemed
void, the shares would go back to TPR, which would then sell
them to the Trump Group.

The Delaware Chancery Court determined that Arie's transfer
of the Orly Trust Shares to the Orly Trust was void, such that
TPR (and not Arie or the Orly Trust) retained legal and
beneficial ownership of the disputed shares. TR Investors, LLC
v. Genger, C.A. No. 3994-VCS, 2010 WL 3279385, at *3 (Del. Ch.
Aug. 9, 2010).   While this ruling was being appealed, the Trump
Group exercised its option to purchase the Orly Trust Shares
from TPR for about $10.3 million.   All of the parties agreed
that this amount, the Proceeds, should be held in escrow while
the Delaware appeal continued.   Accordingly, the Proceeds were
held in escrow by Pedowitz & Meister LLP ("P&M" or the "Escrow
Agent"), pursuant to an agreement between Orly, Dalia, TPR, and
the Trump Group (the "Escrow Agreement").

That Escrow Agreement is central to the instant litigation,
and will be discussed at greater length below.   To summarize, it
stated that the Trump Group would proceed with its plan to

4

purchase the Orly Trust Shares from TPR, but that the purchase
amount would be held by the Escrow Agent pending a final ruling
on beneficial ownership by the Delaware Supreme Court.
Ultimately, the Delaware Supreme Court reversed the Chancery
Court's determination of beneficial ownership because it ruled
that the Chancery Court lacked in personam jurisdiction over TPR
and the Orly Trust. Genger v. TR Investors, LLC, 26 A.3d 180,
201-03 (Del. 2011).

       After the Delaware Supreme Court's ruling reopened the
question of beneficial ownership of the Orly Trust Shares, the
Escrow Agent filed an interpleader action before this Court. See
Pedowitz & Meister LLP v. TPR Inv. Assocs., Inc., No. 11 Civ.
5602 (S.D.N.Y.). I dismissed the interpleader action for lack
of subject matter jurisdiction, reasoning that the parties'
competing claims were for beneficial ownership of the Orly Trust
Shares, rather than for the Proceeds from the sale of those
shares. See Glenclova, 874 F. Supp. 2d at 300-04. Thereafter,
the Southern District Cashier's Office returned the $10.3
million to the Escrow Agent's escrow account, where it has
remained. Since that time, the parties have litigated
principally in New York Supreme Court. See Genger v. Genger, No.
651089/2010 (N.Y. Sup. Ct.). As part of a stipulation
dismissing the action in Delaware Chancery Court, the parties to
that action — TPR/Sagi, the Trump Group, and Dalia, but not Arie

                                    5

or Orly — agreed that the Trump Group is the rightful owner of the Orly Trust Shares. (Dellaportas Dec. Ex. B ¶ 2.) Additionally, Orly and the Trump Group have settled their claims against each other. Pursuant to that settlement, Orly acknowledged that the Trump Group is the record and beneficial owner of the Orly Trust Shares. (Id. Ex. J at 2.) At long last, the dispute regarding ownership of the Orly Trust Shares is over.

Finally, it bears mentioning that in October 2011, TPR and Dalia signed a settlement agreement, which stated in part that TPR relinquished its right to the Proceeds in favor of the Orly Trust (still controlled by Dalia). When Orly later found out about this agreement, she denounced it in New York Supreme Court as a "sham defendants-only" agreement which violated that court's order enjoining Sagi/TPR and Dalia from spending or demanding the Proceeds before a court could determine beneficial ownership of the Orly Trust Shares. The Supreme Court agreed with Orly and declared the settlement agreement void, see Genger, 2013 WL 2396219, and the First Department recently affirmed that ruling, see Genger v. Genger, 982 N.Y.S.2d 11, 13 (1st Dep't 2014). Dalia has moved for reconsideration or leave to appeal to the New York Court of Appeals.

6

20-01187-jlg   Doc 1-52   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 54
Case 1:13-cv-08243-JFK   Document 44   Filed 05/15/14   Page 7 of 21
Pg 92 of 150

### B. This Case, Orly's Motions to Dismiss, and TPR's Motion for Summary Judgment

The instant case differs from the previous Glenclova action in that here, the parties are fighting over the Proceeds from the sale of the Orly Trust Shares — not the shares themselves. As noted, Orly has relinquished her claim to the shares as part of her settlement with the Trump Group. TPR's complaint seeks a permanent injunction directing the Escrow Agent to release the $10.3 million in Proceeds to TPR.

Both P&M and Dalia filed answers and crossclaims "against the other Defendants." P&M seeks to invoke "defensive" interpleader under Rule 22 of the Federal Rules of Civil Procedure. (Oral Arg. Tr. at 27-29; P&M Ans. ¶ 28.) See Fed. R. Civ. P. 22(a)(2). This is a request to "do-over" the statutory interpleader action I dismissed, with the purported difference being that now there actually are adverse claimants to the Proceeds themselves. See generally Pedowitz & Meister, No. 11 Civ. 5602. Orly moves to dismiss P&M's crossclaim for interpleader, contending that it violates both the Escrow Agreement and my prior rulings dismissing the statutory interpleader actions.

Meanwhile, Dalia's crossclaim sought the release of the Proceeds to the Orly Trust, on the grounds that the voided settlement agreement between the Orly Trust and TPR "is valid

7

and enforceable, and that the Appellate Division will so find."
(Dalia Crossclaim ¶¶ 19-20.).  Since Dalia filed her crossclaim,
the First Department ruled the opposite.  In light of this
development, Dalia's counsel advised at oral argument that she
no longer objects to TPR's requested relief. (Oral Arg. Tr. at
25-26.)  Dalia has thereby abandoned her crossclaim, mooting
Orly's motion to dismiss it.

We now turn to the principal matter of Orly's motion to
dismiss TPR's complaint.  Orly urges that the complaint fails to
state a claim because none of the conditions to releasing the
Proceeds set forth in Section 2 of the Escrow Agreement have
been satisfied.  She also strongly contests TPR's representation
in the complaint that "all of the issues as to ownership of the
[Orly Trust] Shares and the accompanying . . . Proceeds are now
resolved." (Compl. ¶ 15.)  Not so, says Orly:  although she has
stopped pursuing beneficial ownership of the shares themselves,
the propriety of the 2004 transfer of the shares to the Orly
Trust remains an issue before the New York Supreme Court and the
First Department.  More generally, Orly accuses TPR of trying to
forum shop with this latest litigation.  As an alternative to
dismissal, she seeks a stay of this action while the litigation
in New York state remains ongoing.

20-01187-jlg   Doc 1-52   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 54
Case 1:13-cv-08243-JFK   Document 44   Filed 05/15/14   Page 9 of 21
Pg 94 of 150

In a single brief, TPR opposes Orly's motion to dismiss and
moves for summary judgment.  Its position is largely predicated
on my Omnibus Opinion, which stated that "if the 2004 transfer
of shares to Arie and the Orly Trust is found to be invalid,
then TPR had the right to sell the shares to the Trump Group,
and TPR would be entitled to the interpleaded funds." Glenclova,
874 F. Supp. 2d at 303.  Arguing from this language, TPR asserts
that the recent resolution of the beneficial ownership issue
compels a ruling that the interpleaded $10.3 million must be
released to TPR.  TPR further contends that the doctrines of
collateral estoppel, res judicata, and judicial estoppel bar
Orly from relitigating the rulings in the Omnibus Opinion.
Second, TPR contends that the longstanding New York Supreme
Court case, which the parties continue to litigate, does not
include a claim by Orly for the Proceeds.  Instead, according to
TPR, Orly filed a new action in New York Supreme Court on
December 23, 2013 seeking to compel the Escrow Agent to release
the money to her.  Third, TPR notes that Orly is pursuing a
claim for unjust enrichment in state court, and argues that for
TPR to be unjustly enriched it must first be enriched — that is,
it must first possess the funds at issue.  Fourth, TPR urges
that a stay of this action would be inappropriate, essentially
because it would cause further delay.

9

20-01187-jlg   Doc 1-52   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 54
Pg 95 of 150
Case 1:13-cv-08243-JFK   Document 44   Filed 05/15/14   Page 10 of 21

## II.   Discussion

### A.   Relevant Legal Standards

The standards governing the instant motions are well
settled.   In reviewing Orly's motions to dismiss under Rule
12(b)(6), the Court accepts TPR's allegations of fact as true,
and draws all reasonable inferences in its favor. See Ganino v.
Citizens Util. Co., 228 F.3d 154, 161 (2d Cir. 2000); Lee v.
Bankers Trust Co., 166 F.3d 540, 543 (2d Cir. 1999).   Review of
a motion for failure to state a claim "is limited to the facts
as asserted within the four corners of the complaint, the
documents attached to the complaint as exhibits, and any
documents incorporated in the complaint by reference." McCarthy
v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007)
(citing Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 776 (2d Cir.
2002)).   To survive a 12(b)(6) motion, the complaint "must
contain sufficient factual matter, accepted as true, to 'state a
claim to relief that is plausible on its face.'" Ashcroft v.
Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v.
Twombly, 550 U.S. 544, 570 (2007)).

TPR, which moves for summary judgment, will prevail if the
evidence, viewed in the light most favorable to Orly, shows that
there is no genuine issue as to any material fact and that it is
therefore entitled to a judgment as a matter of law. Fed. R.
Civ. P. 56(a); Vacold LLC v. Cerami, 545 F.3d 114, 121 (2d Cir.

20-01187-jlg    Doc 1-52    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 54
Pg 96 of 150
Case 1:13-cv-08243-JFK    Document 44    Filed 05/15/14    Page 11 of 21

2010).  As the movant, TPR bears the initial burden of
demonstrating "the absence of a genuine issue of material fact."
Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If TPR
meets that burden, then Orly must come forward with specific
evidence demonstrating the existence of a genuine dispute of
material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
249 (1986).  "The mere existence of a scintilla of evidence in
support of the non-movant's position will be insufficient; there
must be evidence on which the jury could reasonably find for the
non-movant." Hayut v. State Univ. of N.Y., 352 F.3d 733, 743 (2d
Cir. 2003) (alterations omitted).  "Only disputes over facts
that might affect the outcome of the suit under the governing
law will properly preclude the entry of summary judgment."
Anderson, 477 U.S. at 248.

### B.    Analysis

Although the motions by TPR and Orly stand on different
procedural ground, they raise the same question in substance:
Should this Court direct the Escrow Agent to release the
Proceeds to TPR?  To answer this question, I must determine
whether TPR is correct that judgment in its favor would be
consistent with my prior rulings and with the goals of the
Escrow Agreement, or instead whether Orly is correct that the
Escrow Agreement compels dismissal of the complaint.

## 1.   The Relevant Portion of the Omnibus Opinion Is Not Dicta

TPR argues that my Omnibus Opinion, plus the recent
resolution of beneficial ownership, together compel release of
the Proceeds.   It relies on specific passages in the Omnibus
Opinion, in particular a passage in the discussion of this
Court's jurisdiction over the interpleader actions then before
me.   I concluded that the Court lacked subject matter
jurisdiction, because the parties' real dispute was over
beneficial ownership of the shares rather than the Proceeds from
their sale.   The Opinion states:

> The point is subtle but important.   All potential
> claimants acknowledge that if Arie and the Orly Trust
> are deemed to be the beneficial owners of the Arie
> Shares and Orly Trust Shares, then the Trump Group's
> purchase of shares from TPR would be rescinded and the
> interpleaded funds would go back to the Trump Group.
> But, if the 2004 transfer of shares to Arie and the
> Orly Trust is found to be invalid, then TPR had the
> right to sell the shares to the Trump Group, and TPR
> would be entitled to the interpleaded funds.
>
> [. . .]
>
> The condition precedent to disbursement of funds under
> either   of   the   escrow   agreements   is   judicial
> determination of the beneficial ownership of the Arie
> Shares and Orly Trust Shares, an issue left unresolved
> by the Delaware Supreme Court.   Nevertheless, once a
> court enters judgment on this issue, the escrow agents
> can disburse the escrowed funds to the prevailing
> claimant in accordance with guidance set forth in the
> escrow agreements.   In effect, the stakeholders have
> contracted around any possibility of "double liability
> or vexatious, conflicting claims" with respect to the
> interpleaded funds.
>
> [. . .]

12

> [T]he stakeholder plaintiffs did not need to commence
> the interpleader actions in order to get judicial
> guidance as to who beneficially owns the Arie Shares
> and Orly Trust Shares, and, as a result, who is
> entitled to the escrowed funds. . . . [Once] the New
> York Supreme Court reaches the merits of beneficial
> ownership of the Arie Shares, Orly Trust Shares, or
> both, that judgment will have preclusive effect in any
> other court where the parties have raised the matter—
> be it through res judicata or collateral estoppel. In
> other words, only one court can determine the
> beneficial ownership of the Arie Shares and/or the
> Orly Trust Shares, and, once that has occurred, the
> respective stakeholder plaintiffs will know which
> claimant is entitled to the interpleaded funds. There
> is no risk of one claimant to the Arie Shares
> prevailing in Delaware while another claimant to those
> shares prevails in New York, and therefore, no risk
> that the stakeholders will have to fend off adverse
> claims to the interpleaded funds. As the stakeholders
> have not demonstrated that the interpleaded funds are
> subject to actual or even potential adverse claims,
> the Pedowitz and Skadden interpleader actions do not
> meet the statutory requirements for subject matter
> jurisdiction under § 1335.

Glenclova, 874 F. Supp. 2d at 303-04. The Opinion also notes as

to Arie, who is in a substantively similar position as Orly on

this issue: "Moreover, while Arie asserts a beneficial

ownership in the underlying Trans-Resources shares, in no case

does he have a claim against the interpleaded funds themselves.

Instead, Arie's numerous counterclaims seek money damages for

breach of fiduciary duties that are ancillary to, and beyond the

scope of," the interpleader. Id. at 303 n.2.

The beneficial ownership issue is now dead; Orly has

settled with the Trump Group. Therefore, TPR argues, it is now

entitled to the Proceeds it received from the Trump Group in

13

20-01187-jlg    Doc 1-52    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 54
Case 1:13-cv-08243-JFK    Document 44    Filed 05/15/14    Page 14 of 21
Pg 99 of 150

consideration for those shares.  TPR continues, "That is not to say Orly loses her day in Court . . . .  Orly remains free to pursue her money damages, such as they are, in the New York Supreme Court." (TPR Br. at 3; see also id. at 4 ("TPR should receive the proceeds which unquestionably belong to it, while Orly can seek to litigate the equities of that in state court.").)

Orly strenuously objects to TPR's characterization of the Omnibus Opinion, and insists that the portion quoted by TPR is mere dicta.  This is so, Orly urges, because I did not purport to reach a legal conclusion in that passage, but only to explain the background of the parties' positions.  Accordingly, Orly argues, that language does not control the outcome here and cannot override the Escrow Agreement among the parties.  TPR replies that the quoted portion is not and cannot be dicta, because "it was the express basis upon which this Court found a lack of 'adverse claimants,' and thus dismissed on subject matter jurisdiction grounds." (TPR Reply Br. at 5.)  In other words, TPR contends that the Court could not have dismissed the interpleader action without the disputed passage, because that passage explains the Court's legal conclusion that the real dispute between the parties was not the Proceeds but rather beneficial ownership.

TPR is correct.  In dismissing the action for want of subject matter jurisdiction, I found that there was no genuine danger "of multiple liability when all potential claimants agree that only one of them is entitled to the res." Glenclova, 874 F. Supp. 2d at 303.  Simply put, I concluded that beneficial ownership and the Proceeds go hand-in-hand as issues.  Because the Trump Group is now the undisputed owner of the Orly Trust Shares, TPR is entitled to the Proceeds paid by the Trump Group for those shares. See id. at 303-04.  It follows that TPR's reliance on the Omnibus Opinion is not misplaced.

It must be emphasized, however, that neither my 2012 Omnibus Opinion nor today's decision announce any kind of equitable or normative conclusion as to who among the Genger siblings ultimately deserves recompense.  That is a different question, one that was left to the state courts to sort out. See Glenclova Inv. Co. v. Trans-Resources, Inc., No. 08 Civ. 7140, 2013 WL 6003512, at *3 (S.D.N.Y. Nov. 12, 2013).  Thus, nothing in this Opinion should be construed as resolving any question other than whether TPR is the next (but not necessarily last) beneficiary of the sale of the Orly Trust Shares.

### 2.   The Significance of the Escrow Agreement

Orly's main argument for dismissal is that none of the preconditions to releasing the escrowed Proceeds, which are set forth in Section 2 of the Escrow Agreement, have been satisfied.

15

Her interpretation of that section is correct. The Escrow
Agreement was signed by the parties at a very specific point in
the litigation. Chancellor Strine in Delaware had ruled that
Arie's transfer of the relevant shares to the Orly Trust was
invalid, returning them to TPR/Sagi, who wanted to sell them to
the Trump Group. Arie planned to appeal that ruling, and the
Escrow Agreement was designed to dictate what would happen once
the Delaware Supreme Court decided his appeal. Under the
Agreement's provisions, the Trump Group received the shares in
exchange for payment to the Escrow Agent, who would hold onto
the Proceeds until one of five contingencies occurred:   (1)
mutual consent of the parties; (2) a request from TPR plus an
affirmance by the Delaware Supreme Court of the Chancery Court's
ruling; (3) a request from the Trump Group plus an order from
the Delaware Supreme Court vacating the Chancery Court's ruling;
(4) a request from the Trump Group plus the expiration of Arie
and Orly's time to appeal the Chancery Court's determination; or
(5) a request by one of the parties plus silent acquiescence by
the other parties. (Escrow Agreement § 2(b).)

    As Orly correctly points out, what transpired thereafter
does not fit neatly into any one of these boxes. Obviously, the
parties continue to be in active conflict, eliminating the first
and fifth contingencies above (mutual consent or silent
acquiescence). Arie did appeal, eliminating the fourth

                                16

contingency.  The Delaware Supreme Court reversed Chancellor

Strine's ruling on beneficial ownership, eliminating option 2.

But the Trump Group did not ask for its money back, as

contemplated in option 3 (the last remaining possibility),

likely because the reversal was on jurisdictional grounds and

not the merits.

The problem with Orly's proposed reading of the Escrow

Agreement is that the Agreement completely omits any mention of

the Genger v. Genger action in the New York state court.  That

case was filed by Orly and her father after the Delaware

Chancery Court ruled against them the first time.  The parties

have actively litigated the New York case in recent years, and

it has become the "epicenter for the Genger family litigation."

Glenclova Inv. Co., 2013 WL 6003512, at *2.

Orly now urges that this Court may not order the Escrow

Agent to release the Proceeds except in strict accordance with

the letter of the Escrow Agreement.  But because the Agreement's

terms do not allow for enforcement of any New York state

judgment, to accept Orly's argument would be akin to ruling that

the New York Supreme Court has no power to adjudicate disputes

relating to this money.  That result would be plainly

inconsistent with Orly's position that the 2010 New York Supreme

Court action (which she filed) is the appropriate place for

litigation of these issues.  See Orly Moving Br. at 17-18; Orly

17

20-01187-jlg   Doc 1-52   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 54
Case 1:13-cv-08243-JFK   Document 44-5 Filed 05/15/14   Page 18 of 21
Pg 103 of 150

Reply Br. at 9.)   It is also inconsistent with the position she took in the prior interpleader action. See Pedowitz & Meister LLP, No. 11 Civ. 5602, ECF No. 11 at 6-8.   Having convinced me to stay or dismiss the other Southern District actions in favor of the state proceeding, Orly may not now insist on a reading of the Escrow Agreement that would render the state court impotent.

Orly's position that I cannot rule for TPR without "rewriting" the Escrow Agreement is also at odds with the Omnibus Opinion, which she has never challenged.   First, in that ruling I recommended New York Supreme Court as the optimal venue for adjudicating beneficial ownership and the related issues. See Glenclova, 874 F. Supp. 2d at 304, 307, 309, 314.   I also observe that by the time I issued the Omnibus Opinion, the three main scenarios enumerated in Section 2(b) of the Escrow Agreement whereby the Escrow Agent could release the funds were already impossible.   Nor did I intend to give Orly a unilateral veto over release of the Proceeds, as would be required under the two remaining routes to release of the funds under Section 2(b).   For these reasons, I reject Orly's position on this issue.[1]

---

[1] Orly also argues that she is the only party to make a valid written request for the Proceeds under the Escrow Agreement, and that the question of who-requested-what-first presents a material factual dispute barring the entry of summary judgment.   She is incorrect.   As an initial matter, TPR's letter requesting the Proceeds appears to comply with Section 2b(v) of the Escrow Agreement. See Dellaportas

18

I conclude that the Escrow Agreement does not prevent me
from giving effect to the plain import of my prior rulings.  The
Omnibus Opinion states that once "the New York Supreme Court
reaches the merits of beneficial ownership" of the Orly Trust
Shares, everyone involved would "know which claimant is entitled
to the interpleaded funds." Glenclova, 874 F. Supp. 2d at 303.
The question of beneficial ownership has now been resolved, and
all parties agree that the Trump Group owns the shares.  It
follows that TPR is entitled to the Proceeds, with Orly's
remaining claims for money damages against TPR and Sagi to be
resolved in New York Supreme Court.

### 3.    There Is No Need for an Interpleader

As previously noted, P&M seeks to interplead the Proceeds
under Rule 22.  For defensive interpleader to be proper, P&M
must reasonably fear double liability or vexatious claims. See
6247 Atlas Corp. v. Marine Ins. Co., 155 F.R.D. 454, 462
(S.D.N.Y. 1994); see also Washington Elec. Coop., Inc. v.
Paterson, Walke & Pratt, P.C., 985 F.2d 677, 679 (2d Cir. 1993).

---

Dec. Ex. C.  Regardless, today's decision in TPR's favor is not based
upon the mechanics of the Escrow Agreement, but upon this Court's
prior rulings.  Thus, the question whether it was TPR or Orly who
first validly requested the Proceeds is of no moment. See Anderson,
477 U.S. at 248 ("Only disputes over facts that might affect the
outcome of the suit under the governing law will properly preclude the
entry of summary judgment.").

At oral argument, counsel indicated that P&M prefers
interpleader to protect itself from liability for damages, as
opposed to mere overlapping claims to the Proceeds. (Oral Arg.
Tr. at 28-29.)

Interpleader is not necessary in the circumstances of this
case.  Because summary judgment will be entered in favor of TPR,
P&M as Escrow Agent is required by the force of this judgment to
release the Proceeds to TPR.  The mere act of complying with
this Opinion and Order will not cause P&M to incur liability for
damages to Orly or anyone else.  Accordingly, Orly's motion to
dismiss P&M's interpleader crossclaim is granted, albeit for a
different reason than those offered by Orly.  There is no record
before me regarding whether P&M may be liable on any other
basis, and I expressly decline to consider the issue.

20

20-01187-jlg   Doc 1-52   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 54
Case 1:13-cv-08243-JFK   Document 44   Filed 05/15/14   Page 21 of 21
Pg 106 of 150

### III. Conclusion

For the foregoing reasons, Orly's motion to dismiss the complaint is denied, and TPR's motion for summary judgment is granted.   P&M is directed to release the Proceeds, together with any interest accrued thereon, to TPR.   Orly's motion to dismiss the interpleader crossclaim by P&M is granted.   Orly's motion to dismiss Dalia's crossclaim against her is denied as moot.   The Clerk of Court is respectfully directed to close this case.

**SO ORDERED.**

Dated:   New York, New York
         May 15, 2014

*John F. Keenan*
———————————————————
          John F. Keenan
   United States District Judge

20-01187-jlg   Doc 1-52   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 54
Pg 107 of 150
Case 1:14-cv-05683-KBF   Document 94   Filed 01/05/15   Page 1 of 25

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JAN 0 5 2015
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X
                                             :
SAGI GENGER,                                 :
                                             :
                         Plaintiff,          :
                                             :
           -v-                               :          14-cv-5683 (KBF)
                                             :
ORLY GENGER,                                 :          OPINION & ORDER
                                             :
                         Defendant.          :
                                             :
-------------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

   As Tolstoy famously wrote, "Happy families are all alike; every unhappy

family is unhappy in its own way." Leo Tolstoy, Anna Karenina 1 (Constance

Garnett trans., 1978).  In the case of the wealthy Genger family, that unhappiness

has taken the form of a seemingly never-ending series of lawsuits stemming from

the divorce of Arie Genger and Dalia Genger, the family patriarch and matriarch,

respectively.  Together, Arie, Dalia, their son Sagi, and their daughter Orly[1] have

employed a small army of lawyers to fight over the pieces of the family pie and, it

seems, to make each other's lives as miserable as possible.

   This latest installment in the Genger family's litigation saga concerns a

straightforward contract dispute between Sagi and Orly.  Sagi alleges that he and

Orly entered into a tri-party agreement with Dalia, under which Sagi and Orly

would receive shares of stock in exchange for providing Dalia with financial support

---

[1] For the sake of clarity, in this Opinion the Court will refer to the members of the Genger family by
their given names.

20-01187-jlg   Doc 1-52   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 54
Pg 108 of 150
Case 1:14-cv-05683-KBF   Document 94   Filed 01/05/15   Page 2 of 25

derived from the economic value obtained from that stock. Sagi contends that Orly
has breached the agreement, and now seeks damages from her. Orly, for her part,
denies the agreement's validity and enforceability, primarily because she claims she
never actually received the promised shares of stock, which means that the
agreement is not supported by consideration. But, as it turns out, Orly has
effectively monetized an interest in the very shares she claims not to have received
to the tune of $32.3 million.

Orly contends that this case is "an attempt to push the camel's nose under
the tent flaps," and that Sagi and Dalia "hope to create a pipeline allowing them to
siphon money from Orly for the rest of her life." (ECF No. 92 at 1.) The Court sees
things differently: this case is a simple breach of contract action. Nothing more,
nothing less.

Because there is no triable issue as to whether there was a valid and
enforceable agreement supported by consideration, and for the reasons that follow,
the Court GRANTS Sagi's motion for summary judgment, DENIES Orly's motion
for summary judgment, and DENIES AS MOOT Orly's motion to disqualify and all
pending motions in limine.

2

20-01187-jlg    Doc 1-52    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 54
Pg 109 of 150
Case 1:14-cv-05683-KBF    Document 94    Filed 01/05/15    Page 3 of 25

I.    BACKGROUND

A.    Factual Background[2]

The Genger family consists of father Arie, mother Dalia, son Sagi, and

daughter Orly. (DSOF ¶ 5.) Sagi is currently the President and CEO of TPR

Investment Associates, Inc. ("TPR"). (DSOF ¶ 4.) In 2004, Arie and Dalia

divorced.[3] (DSOF ¶ 5; PRSOF ¶ 5.) As part of the divorce, Dalia agreed to convey

her marital rights to 794.40 shares of TRI to trusts benefiting Sagi and Orly (the

"Sagi Trust" and the "Orly Trust,"[4] respectively) in exchange for a commitment by

Sagi and Orly to financially support her. This arrangement was effectuated via

three documents.

First, Dalia and Arie signed a stipulation of settlement finalizing the terms of

their divorce settlement (the "2004 Divorce Stipulation"), which was fully executed

---

[2] The following facts are taken from the Local Rule 56.1 statements submitted by the parties in connection with this motion for summary judgment and their supporting materials (ECF No. 34 ("PSOF"), 37 ("DSOF"), 51 ("DRSOF"), 52 ("DCMUF"), 55 ("PRSOF")), the factual materials submitted with the parties' letters dated November 25, 2014 (ECF Nos. 84-85), and public records of the parties' prior judicial proceedings. The Court cites to the parties' factual submissions only when they support a factual proposition, cite relevant material, and are not contradicted in pertinent part by a counter-statement supported by citation to evidence that would be admissible. See Local Civil Rule 56.1(d); Chimarev v. TD Waterhouse Investor Servs., Inc., 280 F. Supp. 2d 208, 223 (S.D.N.Y. 2003) (material facts set forth in a Rule 56.1 statement "are uncontested and may be accepted as true" where a Rule 56.1 counter-statement was "deficient" because it consisted solely of "blanket denials" and was "not supported by citation to any evidence"), aff'd, 99 Fed. App'x 259 (2d Cir. 2004). The Court recites only those facts relevant to the claims and defenses currently at issue, but also includes some factual allegations that are not material to the claims asserted but that are important to understanding the context for this case. Some of defendant's responses fail to directly address straightforward factual allegations, and these failures are considered admissions as a matter of law. See Local Civil Rule 56.1(c); Gubitosi v. Kapica, 154 F.3d 30, 31 n.1 (2d Cir. 1998); NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd., 262 F.Supp.2d 134, 139 (S.D.N.Y. 2003).

[3] The divorce was finalized by a 2005 judgment. (PRSOF ¶ 5.)

[4] The trusts are officially named the "Sagi Genger 1993 Trust" and the "Orly Genger 1993 Trust." (DSOF ¶ 26.)

3

on October 30, 2004.[5] (PSOF ¶ 1; DSOF ¶ 7.) In the 2004 Divorce Stipulation,

Dalia promised to convey equal interests in a total of 794.40 shares of TRI to the

Orly Trust and the Sagi Trust. (PSOF ¶ 1; DSOF ¶ 27.) The 2004 Divorce

Stipulation contains an "entire understanding" clause, which is subject to a carve-

out for other agreements expressly incorporated by reference and those "entered

into concurrently herewith." (DSOF ¶ 24.)

The second was a letter signed by Sagi and Dalia dated October 30, 2004 (the

"2004 Promise"). (PSOF ¶ 3; DRSOF ¶ 51.) In the 2004 Promise, Sagi agreed to

pay Dalia up to an amount equal to all dividends, distributions, proceeds or other

payments attributable to the TRI shares, upon Dalia's demand. (PSOF ¶ 3.) The

2004 Promise also states that the agreement is made "in consideration of" the

following: "Orly and [Sagi] are benefiting by the receipt of a total of 794.40 shares of

[TRI], or beneficial[6] interests in those shares, by trusts for [their] benefit." (DSOF

¶ 52.) The parties dispute whether the 2004 Promise was intended to be integrated

with the 2004 Divorce Stipulation. (See DRSOF ¶ 3.)

At the time the 2004 Promise was signed, Orly was vacationing in Fiji, and

thus could not contemporaneously sign the 2004 Promise. (PSOF ¶ 4.) However,

---

[5] The 2004 Divorce Stipulation states that it is "made as of October 26, 2004." (DSOF ¶ 7.)

[6] Beneficial ownership is "[a] corporate shareholder's power to buy or sell the shares, though the shareholder is not registered on the corporation's books as the owner." Ownership, Black's Law Dictionary (9th ed. 2009); see also Cartica Mgmt. v. CorpBanca, S.A., No. 14–CV–2258 PKC, 2014 WL 4804491, at *15 (S.D.N.Y. Sept. 25, 2014) (explaining the definition of beneficial ownership under federal securities law). Record ownership is determined based on who is "listed in the issuer's books as the owner of stock on the record date." Stockholder of Record, Black's Law Dictionary (9th ed. 2009).

4

20-01187-jlg    Doc 1-52    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 54
Case 1:14-cv-05683-KBF    Document 94    Filed 01/05/15    Page 5 of 25
Pg 111 of 150

before Sagi signed the 2004 Promise, Orly verbally agreed to indemnify Sagi for

50% of the payments he would have to make under the 2004 Promise.[7]  (PSOF ¶ 4.)

The third agreement was a letter signed by Sagi and Orly dated November

10, 2004 (the "2004 Indemnity").[8]  (PSOF ¶ 5.)  In the 2004 Indemnity, Orly agreed

to indemnify Sagi "for and against one-half (1/2) of any and all payments, liabilities,

damages, claims, actions, losses, settlements, penalties, judgments or obligations

. . . , including [Sagi's] reasonable counsel and other professional fees, expenses and

costs, which arise from [Sagi's] undertakings in the [2004 Promise]."  (PSOF ¶ 5.)

On August 22, 2008, Sagi-controlled TPR entered an agreement with the

Trump Group to sell the Sagi Trust's shares of TRI to the Trump Group for $26.7

million.  (DSOF ¶ 34.)  Sagi also sold the Orly Trust's TRI shares to the Trump

Group for approximately $10.3 million, subject to the condition that TPR was

determined to be an owner of the shares.[9]  (DSOF ¶ 35.)

---

[7] In response to this factual allegation by Sagi, Orly counters that she does not remember a phone
call with Sagi on the day of the divorce, and makes several non-responsive statements concerning
the drafting and execution 2004 Promise and the 2004 Divorce Stipulation.  (See DRSOF ¶ 4.)  But
she does not actually deny making this oral promise.

[8] At the initial case conference in the prior action, Orly's counsel stated that they believed the 2004
Indemnity was a forgery, and they would investigate this theory by, inter alia, using the services of
an ink expert.  (DRSOF ¶ 11.)  The ink expert's examination of the 2004 Indemnity was also
discussed at the October 31, 2014 status conference in the instant action; the Court ordered the
parties to meet and confer regarding any outstanding issues with respect to expert discovery (ECF
No. 48), and no such issues were subsequently raised with the Court.

Despite the considerable amount of discovery in this case, and her retention of an ink expert, Orly is
unable to point to any admissible evidence suggesting that the 2004 Indemnity is a forgery.  Further,
in her briefing on this motion, Orly did not advance the argument that the 2004 Indemnity is a
forgery or is otherwise inauthentic.  Most importantly, in her Rule 56.1 responses, Orly does not
affirmatively deny the existence of the 2004 Indemnity, or that she signed it.  (See DRSOF ¶¶ 5, 11.)
A party cannot create a genuine issue of material disputed fact through mere say-so and the hiring of
an expert.  There is accordingly no genuine issue of material disputed fact as to the authenticity of
the 2004 Indemnity or as to whether Orly signed it.

[9] The parties dispute exactly what ownership interest was required by the condition.  (See PRSOF
¶ 35.)

20-01187-jlg   Doc 1-52   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 54
Pg 112 of 150
Case 1:14-cv-05683-KBF   Document 94   Filed 01/05/15   Page 6 of 25

In 2011, the Supreme Court of Delaware affirmed a judgment invalidating the 2004 transfer of the TRI shares to the Orly Trust as to record ownership. Genger v. TR Investors, LLC, 26 A.3d 180, 198-200 (Del. 2011). As a result of this invalidation, record ownership of the TRI shares reverted to Sagi-controlled TPR. In that same decision, the Supreme Court of Delaware held that because the trial court lacked personal jurisdiction over the Orly Trust and TPR, it lacked the power to declare who beneficially owned the TRI shares, and therefore reversed the beneficial ownership determinations flowing from the trial court's orders. Id. at 203.

On June 16, 2013, Orly entered into a settlement agreement (the "2013 Settlement Agreement") with the Trump Group and others regarding her claims to ownership of the TRI shares. (ECF No. 84 ex. A ("2013 S.A.").) The agreement provides that Orly, Arie, and their litigation funders[10] will receive $32.3 million[11] in exchange for a declaration that the Trump Group owns "all right, title and interest (beneficially, of record, and otherwise)" to the TRI shares, and that Orly waives all of her claims to the TRI shares, both as a trust beneficiary[12] and individually. (2013 S.A. ¶¶ 2-4.) The 2013 Settlement Agreement does not waive any of the Orly Trust's claims. (See 2013 S.A. ¶ 4.) However, in the agreement Orly agreed to cause the Orly Trust to do the same. (2013 S.A. ¶ 8(a)(ii).)

---

[10] The 2013 Settlement Agreement refers to these parties collectively as the "AG Group." (2013 S.A. at 1.)

[11] The $32.3 million consists of $17.3 million in cash upfront, plus two additional $7.5 million payments to be made over four years. (2013 S.A. ¶¶ 2-3.)

[12] Specifically, as a beneficiary of the Orly Trust. (2013 S.A. ¶ 4.)

20-01187-jlg   Doc 1-52   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 54
Case 1:14-cv-05683-KBF   Document 94   Filed 01/05/15   Page 7 of 25
Pg 113 of 150

Then, on August 30, 2013, the Orly Trust (by Dalia), TPR, and the Trump Group agreed that "the Trump Group owns, for all purposes, all right, title and interest (beneficially, of record and otherwise) to all authorized and issued shares of [TRI]." (ECF No. 85 ex. 5 ¶ 2.) This stipulated agreement was so-ordered by the Delaware Court of Chancery. (ECF No. 85 ex. 5 at 7.) Subsequently, a court in this District and New York's First Department both concluded that this so-ordered stipulation determined the Trump Group to be the beneficial owner of the TRI shares. TPR Inv. Assocs., Inc. v. Pedowitz & Meister LLP, No. 13 Civ. 8243 (JFK), 2014 U.S. Dist. LEXIS 67116, *5-6 (S.D.N.Y. May 15, 2014); Genger v. Genger, 121 A.D.3d 270, 280 (N.Y. App. Div. 2014).

On or about January 22, 2014, Dalia demanded $200,000 from Sagi under the 2004 Promise, which Sagi paid. (PSOF ¶¶ 6, 9.) On January 23, 2014, Sagi informed Orly of Dalia's demand.[13] (PSOF ¶ 7.) On February 17, 2014, Sagi demanded $100,000 from Orly under the 2004 Indemnity. (PSOF ¶ 10.) Orly refused to pay. (PSOF ¶ 11.) This lawsuit for breach of contract followed.

B.   Procedural Background[14]

1.   General procedural background.

Sagi initially filed a breach of contract action against Orly in this Court on February 18, 2014. (No. 14-cv-1006, ECF Nos. 1-2.) Orly filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) on May 2, 2014. (No. 14-cv-1006,

---

[13] Sagi first provided Orly's counsel with a written copy of Dalia's demand on January 29, 2014. (DSOF ¶ 60.)

[14] The Court recounts only the procedural history immediately relevant to the disposition of this motion.

7

20-01187-jlg    Doc 1-52    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 54
Pg 114 of 150
Case 1:14-cv-05683-KBF    Document 94    Filed 01/05/15    Page 8 of 25

ECF No. 9.) Orly then filed a motion to dismiss for lack of subject-matter

jurisdiction under Rules 12(b)(1) and 12(h)(3) on May 29, 2014. (No. 14-cv-1006,

ECF No. 24.) That same day, Sagi filed a motion for summary judgment. (No. 14-

cv-1006, ECF No. 18.)

On July 22, 2014, the Court granted Orly's Rule 12(b)(1) motion[15] and

dismissed the action without prejudice, after finding that diversity jurisdiction was

inappropriate because both Sagi and Orly were domiciled in New York on the date

the action was filed. (No. 14-cv-1006, ECF No. 52.) Two days later, on July 24,

2014, Sagi commenced the instant proceeding, which was initially assigned to Judge

Caproni. (ECF No. 1.) On August 5, 2014, the case was reassigned to this Court,

which set an accelerated schedule for discovery, briefing, and trial owing to the

material similarity between this action and the previous one. (ECF No. 9.)

Orly filed a motion to dismiss under Rule 12 on August 27, 2014. (ECF No.

10.) The motion became fully briefed on September 18, 2014. (ECF No. 19.) The

Court denied the motion on September 19, 2014, finding that (1) subject-matter

jurisdiction over this action was appropriate; (2) Sagi had sufficiently alleged the

elements of the causes of action; and (3) the parties' briefing revealed a host of

factual issues outside the four corners of the complaint. (ECF No. 20.)

Both Sagi and Orly moved for summary judgment on October 20, 2014. (ECF

Nos. 32, 35.) Sagi filed motions in limine on November 17, 2014. (ECF No. 59.)

The following day, Orly filed motions in limine, (ECF No. 68), as well as a motion to

---

[15] The Court also denied as moot Orly's Rule 12(b)(6) motion to dismiss and Sagi's motion for summary judgment.

8

20-01187-jlg    Doc 1-52    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 54
Pg 115 of 150
Case 1:14-cv-05683-KBF    Document 94    Filed 01/05/15    Page 9 of 25

disqualify Sagi's counsel John Dellaportas from acting as counsel at trial on November 18, 2014, (ECF No. 65). Sagi and Orly submitted their oppositions to each others' motions in limine on November 24, 2014. (ECF Nos. 79, 81.)

Sagi then submitted his opposition to Orly's motion to disqualify on November 26, 2014. (ECF No. 89.) That same day, the Court issued an order stating its intention to decide the case on summary judgment, and adjourning the trial date and all other dates. (ECF No. 90.) The parties submitted reply briefs on December 5 and 6, 2014. (ECF Nos. 91, 92.)

      2.    Motion to compel production of the 2013 Settlement Agreement.

On September 30, 2014,[16] Sagi filed a letter-motion to compel production of the 2013 Settlement Agreement. (ECF Nos. 22-23.) Orly filed her opposition to the letter-motion on October 3, 2014, (ECF No. 25), the same day she filed her Answer, (ECF No. 24). On October 7, 2014, the Court denied Sagi's letter-motion, based on its mistaken belief that the 2013 Settlement Agreement was irrelevant to the claims at issue. (ECF No. 26.)

Upon reviewing the parties' summary judgment briefing, the Court realized its mistake, and on November 18, 2014 the Court vacated the October 7, 2014 order and granted Sagi's letter-motion to compel.[17] (ECF No. 64.) In the November 18, 2014 order, the Court ordered the parties to submit three-page letters regarding the potential impact of the 2010 Settlement Agreement on the claims and defenses at

---

[16] Sagi filed the same letter twice; once on September 30, 2014, and again on October 1, 2014. (ECF Nos. 22-23.) An additional exhibit is attached to the October 1, 2014 version.

[17] This order refers to the 2013 Settlement Agreement as the "2010 Settlement Agreement."

9

20-01187-jlg   Doc 1-52   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 54
Pg 116 of 150
Case 1:14-cv-05683-KBF   Document 94   Filed 01/05/15   Page 10 of 25

issue not later than November 25, 2014. (ECF No. 64.) The parties submitted their

letters on November 25, 2014. (ECF Nos. 84-85.)

II.   SUMMARY JUDGMENT STANDARD

Summary judgment may not be granted unless the movant shows, based on

admissible evidence in the record placed before the court, "that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating

"the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986). When the moving party does not bear the ultimate burden on a

particular claim or issue, it need only make a showing that the non-moving party

lacks evidence from which a reasonable jury could find in the non-moving party's

favor at trial. Id. at 322-23. In making a determination on summary judgment, the

court must "construe all evidence in the light most favorable to the nonmoving

party, drawing all inferences and resolving all ambiguities in its favor." Dickerson

v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's

claims cannot be sustained, the opposing party must set out specific facts showing a

genuine issue of material fact for trial. Price v. Cushman & Wakefield, Inc., 808 F.

Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d

Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true

nature of the facts to overcome a motion for summary judgment," as "[m]ere

conclusory allegations or denials . . . cannot by themselves create a genuine issue of

material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159,

20-01187-jlg   Doc 1-52   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 54
Pg 117 of 150
Case 1:14-cv-05683-KBF   Document 94   Filed 01/05/15   Page 11 of 25

166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In

seeking to show that there is a genuine issue of material fact for trial, the non-

moving party cannot rely on mere allegations, denials, conjectures or conclusory

statements, but must present affirmative and specific evidence showing that there

is a genuine issue for trial.").

Only disputes relating to material facts—"facts that might affect the outcome

of the suit under the governing law"—will properly preclude the entry of summary

judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)

(the non-moving party "must do more than simply show that there is some

metaphysical doubt as to the material facts").

III.    DISCUSSION

Under New York law, to recover for breach of contract, a plaintiff must prove

"(1) the existence of a contract between [plaintiff] and that defendant; (2)

performance of the plaintiff's obligations under the contract; (3) breach of the

contract by that defendant; and (4) damages to the plaintiff caused by that

defendant's breach." Diesel Props. S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d

42, 52 (2d Cir. 2011) (citation omitted); see also Flomenbaum v. N.Y. Univ., 71

A.D.3d 80, 91 (N.Y. App. Div. 2009); Clearmont Prop., LLC v. Eisner, 58 A.D.3d

1052, 1055 (N.Y. App. Div. 2009). There is no triable issue as to whether all four

elements are satisfied in this case. Accordingly, the Court grants Sagi summary

judgment as to his breach of contract claim. There is also no triable issue as to

11

20-01187-jlg    Doc 1-52    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 54
Pg 118 of 150
Case 1:14-cv-05683-KBF    Document 94    Filed 01/05/15    Page 12 of 25

Sagi's promissory estoppel cause action, and so the Court grants him summary judgment on that alternative basis.

A.    Enforceability

1.    Integrated agreement.

Under New York law, "all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties." This Is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998); accord Madeleine, L.L.C. v. Casden, 950 F. Supp. 2d 685, 695-96 (S.D.N.Y. 2013). Contracts that are executed at different times "should be interpreted together if 'the parties assented to all the promises as a whole so that there would have been no bargain whatever if any promise or set of promises had been stricken.'" Commander Oil Corp. v. Advance Food Serv. Equip., 991 F.2d 49, 53 (2d Cir. 1993) (quoting 6 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts, § 863:275 (3d ed. 1970)). Whether multiple documents should be read as constituting a single agreement depends on the intent of the parties. TVT Records v. Island Def Jam Music Grp., 412 F.3d 82, 89 (2d Cir. 2005); accord Commander Oil, 991 F.2d at 52-53; Madeleine, 950 F. Supp. 2d at 696. The intent of the parties is "typically a question of fact for the jury, . . . [b]ut if the documents in question reflect no ambiguity as to whether they should be read as a single contract, the question is a matter of law for the court." TVT Records, 412 F.3d at 89 (citation omitted).

12

20-01187-jlg    Doc 1-52    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 54
Pg 119 of 150
Case 1:14-cv-05683-KBF    Document 94    Filed 01/05/15    Page 13 of 25

In TVT Records, the Second Circuit determined two agreements to be integrated based, inter alia, on the fact that the documents were intended to effectuate the same result. Id. As the parties under the later agreement were obligated to honor all of the terms and conditions of the earlier agreement, the later agreement was "meaningless" without the first. Id. The fact that the documents were "negotiated and signed at different times, memorialized in different documents and involved different parties" did not dictate a contrary result, because these facts did not address "the legally operative question: whether the contracts were part of a single transaction intended to effectuate the same purpose." Id. at 90 (citations omitted).

Similarly, in This Is Me, the Second Circuit held that a jury was justified in reading two contracts together where they were executed "more or less" (but not exactly) concurrently, and where one of the two contracts stated that the two contracts were intended to be executed together, but the other contract did not. 157 F.3d at 145. The Court also noted that counsel for a defendant conceded in a letter that the two contracts were intended to be read together. Id.

The 2004 Promise and the 2004 Indemnity are sufficiently unambiguous such that there is no triable issue as to whether they form an integrated agreement, even though they were executed on different dates and were not all between the same parties, and in this sense no different than the agreements at issue in TVT Records. Indeed, neither agreement makes any sense without the promises expressed in the other. Without the 2004 Indemnity, Sagi could be obligated under the 2004 Promise

13

20-01187-jlg    Doc 1-52    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 54
Pg 120 of 150
Case 1:14-cv-05683-KBF    Document 94    Filed 01/05/15    Page 14 of 25

to pay Dalia double the economic benefit he received from his shares of TRI, and

Orly would effectively have received the shares as a gift. Further, the 2004

Indemnity explicitly attaches and cross-references the 2004 Promise, which makes

the situation here directly analogous to that in TVT Records, where the later

agreement was "meaningless" without the earlier one. Id. at 89.

There is accordingly no triable issue as to whether the documents were

"designed to effectuate the same purpose" and to "be read together." This Is Me,

157 F.3d at 143. For this reason, the Court will refer to the integrated agreement in

the rest of this Opinion as the "2004 Integrated Agreement.[18]

### 2.    Consideration.

Under New York law, to be valid, a contract must be supported by

consideration. Murray v. Northrop Grumman Info. Tech., Inc., 444 F.3d 169, 178

(2d Cir. 2006). Consideration to support an agreement exists where there is "either

a benefit to the promisor or a detriment to the promisee." Hollander v. Lipman, 65

A.D.3d 1086, 1087 (N.Y. App. Div. 2009) (quoting Weiner v. McGraw-Hill, Inc., 443

N.E.2 441, 445 (N.Y. 1982)).

As a general matter, "[a] promise to perform a pre-existing legal obligation

does not amount to consideration." Murray, 444 F.3d at 178 (citing Goncalves v.

Regent Int'l Hotels, Ltd., 447 N.E.2d 693, 700 (N.Y. 1983)). However, § 5-1105 of

New York's General Obligations Law provides:

---

[18] Orly vigorously disputes whether the 2004 Divorce Stipulation is integrated with the 2004
Promise and the 2004 Indemnity. However, Sagi does not contend that the 2004 Divorce Stipulation
is integrated with the 2004 Promise and the 2004 Indemnity (ECF No. 57 at 10), and so the Court
need not reach this issue.

20-01187-jlg   Doc 1-52   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 54
Pg 121 of 150
Case 1:14-cv-05683-KBF   Document 94   Filed 01/05/15   Page 15 of 25

> A promise in writing and signed by the promisor or by his
> agent shall not be denied effect as a valid contractual
> obligation on the ground that consideration for the
> promise is past or executed, if the consideration is
> expressed in the writing and is proved to have been given
> or performed and would be a valid consideration but for
> the time when it was given or performed.

N.Y. Gen. Oblig. Law § 5-1105.

To meet § 5-1105's requirement that the consideration be "expressed" in the writing, the recitation of consideration must not be vague or imprecise.[19] See United Res. Recovery Corp. v. Ramo Venture Mgmt., Inc., 584 F. Supp. 2d 645, 656 (S.D.N.Y. 2008); Movado Grp., Inc. v. Presberg, 259 A.D.2d 371, 371 (N.Y. App. Div. 1999); Umscheid v. Simnacher, 482 N.Y.S.2d 295, 297 (N.Y. App. Div. 1984). For example, courts have held that the statements "past work on the Company's behalf" and "services rendered on the respondent's behalf" are too vague and imprecise to meet the expression requirement. United Res. Recovery, 584 F. Supp. 2d at 656;

---

[19] In several cases, courts have stated that in order to recover under § 5-1105, "the writing must contain an unequivocal promise to pay a sum certain, at a date certain, and must express consideration for the promise." E.g., United Res. Recovery Corp. v. Ramo Venture Mgmt., Inc., 584 F. Supp. 2d 645, 656 (S.D.N.Y. 2008) (quoting Umscheid v. Simnacher, 482 N.Y.S.2d 295, 297 (N.Y. App. Div. 1984)); In re Maxwell Commc'n Corp., 198 B.R. 63, 69 (S.D.N.Y. 1996) (same); Kreuter v. Tsucalas, 734 N.Y.S.2d 185, 188 (N.Y. App. Div. 2001) (same). The citation provided for this statement of law is typically the Second Department's decision Umscheid v. Simnacher, 482 N.Y.S.2d 295 (N.Y. App. Div. 1984), which in turn cited as support Sarama v. John Mee, Inc., 102 Misc. 2d 132 (N.Y. Civ. Ct. 1979), and Citibank National Ass'n v. London, 526 F. Supp. 793 (S.D. Tex. 1981), the latter of which cited only Sarama as support for this proposition.

However, Sarama in fact states that "[i]n order for plaintiff to recover for breach of contract, defendant's letter must contain an unequivocal promise to pay a sum certain, at a date certain, and, further, it must conform with General Obligations Law [§] 5-1105, by expressing in the letter the consideration for the promise." Sarama, 102 Misc. 2d at 133 (emphasis added). Sarama thus states that the requirement of "an unequivocal promise to pay a sum certain, at a date certain" is a general requirement for recovery for breach of contract under the facts of that case, not a requirement for recovery under § 5-1105. The Court further notes that the "sum certain" and "date certain" requirements are found nowhere in the text of § 5-1105, nor can they be implied from that text, and that New York's Court of Appeals has never embraced an interpretation of § 5-1105 encompassing those requirements.

20-01187-jlg    Doc 1-52    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 54
Pg 122 of 150
Case 1:14-cv-05683-KBF    Document 94    Filed 01/05/15    Page 16 of 25

Umscheid, 482 N.Y.S.2d at 297. By contrast, in <u>Movado Group, Inc. v. Presberg</u>, the Appellate Division of New York's First Judicial Department held that a commitment to pay all of a company's debts to a party on an "absolute, unconditional, and continuing" basis was sufficient to establish past consideration under § 5-1105, despite its being "a broad commitment, certainly not limited to one opening transaction." 259 A.D.2d at 371.

The 2004 Integrated Agreement clearly purports to provide each party with a benefit in exchange for a legal obligation: Dalia receives financial support in exchange for the transfer of the TRI shares to the Sagi Trust and the Orly Trust; Sagi receives an ownership interest in the TRI shares[20] in exchange for a commitment to financially support Dalia; and Orly receives an ownership interest in TRI shares in exchange for a commitment to indemnify Sagi.

Orly contends that the 2004 Integrated Agreement is not supported by consideration for two reasons. First, Orly contends that the 2004 Integrated is not supported by consideration because the Orly Trust never received the TRI shares. But the 2004 Promise states that Orly and Sagi are benefiting from receipt of <u>either</u> the TRI shares <u>or</u> "beneficial interests in those shares," by their respective trusts. (ECF No. 1 ex. A.) Thus, the question becomes whether Orly has benefited from the

---

[20] Sagi contends that the contract is supported by two forms of consideration: (1) the Orly Trust's receipt of the TRI shares as part of the divorce stipulation; (2) love, affection, and the end to parental strife. (Compl. ¶ 8.) The Court rejects Sagi's argument that the 2004 Integrated Agreement is supported by consideration because Orly received an emotional and psychological benefit in helping to bring about an end to her parents' bitter divorce. Affection, love, and feelings cannot constitute consideration under New York law. <u>See, e.g.</u>, <u>McRay v. Citrin</u>, 706 N.Y.S. 2d 27, 28 (N.Y. App. Div. 2000); <u>Rose v. Elias</u>, 576 N.Y.S.2d 257, 258 (N.Y. App. Div. 1991); <u>see also</u> 22 N.Y. Jur. 2d Contracts §§ 116-17.

Orly Trust's receipt of beneficial interests in the TRI shares. There is no genuine dispute as to whether she has so benefited: Orly's claims to beneficial ownership of the TRI shares individually and as a trust beneficiary enabled her to obtain $32.3 million from the Trump Group under the 2013 Settlement Agreement. Further, no court has issued a binding final judgment that the Orly Trust did not receive a beneficial interest in the TRI shares.[21]

Second, Orly contends that the TRI shares cannot serve as valid consideration because they had already been transferred when the 2004 Indemnity was signed, and they were transferred pursuant to the 2004 Divorce Stipulation, which is a separate agreement. This argument fails because the 2004 Integrated Agreement satisfies § 5-1105 of New York's General Obligations Law. The past consideration is precisely and unambiguously stated in the 2004 Promise, which states that "Orly and [Sagi] are benefiting by the receipt of a total of 794.40 shares of Trans-Resources, Inc. ("TRI"), or beneficial interests in those shares, by trusts for [their] benefit." (ECF No. 1 ex. A.) This statement is sufficiently precise and unambiguous so as to satisfy § 1105's expression requirement—indeed, this statement is considerably more exact than a promise to pay all of a company's debts on an ongoing basis, which was found to be sufficient in Movado Group. And as established above, there is no triable issue as to whether Orly was for all intents and purposes given a beneficial interest in the TRI shares.

---

[21] The Delaware Court of Chancery's beneficial ownership determinations were reversed by the Supreme Court of Delaware's July 18, 2011 decision. Genger v. TR Investors, LLC, 26 A.3d 180, 203 (Del. 2011).

17

20-01187-jlg   Doc 1-52   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 54
Case 1:14-cv-05683-KBF   Document 94   Filed 01/05/15   Page 18 of 25
Pg 124 of 150

Accordingly, there is no triable issue as to whether the 2004 Integrated Agreement was supported by valid consideration.[22]

B.   Defenses

There is no triable issue as to whether Orly has a viable defense to the 2004 Integrated Agreement.

1.   Judicial estoppel.

The doctrine of judicial estoppel "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001) (citation and internal quotation marks omitted). The decision whether judicial estoppel should bar a litigant from making a particular argument is highly fact-specific. See id. at 751. Several considerations counsel in favor of applying the doctrine in a particular case: (1) the party's later position is clearly inconsistent with its earlier position; (2) the party has succeeded in persuading a court to accept its earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; (3) the party asserting the inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. Adelphia Recovery Trust v. Goldman Sachs & Co., 748 F.3d 110, 116 (2d Cir. 2014) (citing New Hampshire, 532 U.S. at 750-51). However, "[b]ecause the doctrine is

---

[22] Orly makes much of the fact that the 2013 Settlement Agreement did not release the Orly Trust's claims to the TRI shares. But this fact does nothing to disprove that Orly benefited from her claim to beneficial ownership of the TRI shares, and to the extent that it is relevant, it just provides further evidence that the Orly Trust had a legitimate claim to beneficial ownership of the TRI shares.

18

20-01187-jlg    Doc 1-52    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 54
Case 1:14-cv-05683-KBF    Document 94    Filed 01/05/15    Page 19 of 25
Pg 125 of 150

primarily concerned with protecting the judicial process, relief is granted only when the risk of inconsistent results with its impact on judicial integrity is certain." Id. (alteration in original) (quoting Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 397 (2d Cir. 2011)).

Orly argues that Sagi should be judicially estopped from arguing that the Orly Trust received a beneficial interest in the TRI shares. However, in this case embracing Sagi's position runs no risk of endangering judicial integrity, as no court has issued a binding final judgment that the Orly Trust did not receive a beneficial interest in the TRI shares. Further, there is no reason to believe that permitting Sagi to argue that the Orly Trust received the beneficial interest in the TRI shares would give Sagi an unfair advantage or impose an unfair detriment on Orly— indeed, embracing Orly's argument here would effectively allow her to avoid paying hundreds of thousands of dollars due under an otherwise valid agreement for a technical and formalistic reason unrelated to the equities of the situation. Accordingly, even assuming that Sagi has taken an inconsistent litigation position,[23] judicial estoppel does not bar Sagi from arguing that the Orly Trust received beneficial ownership of the TRI shares.

2.    Mutual mistake.

"A contract is voidable under the equitable remedy of rescission if both parties entered into the contract under a mutual mistake of fact." Schultz v. Hourihan, 656 N.Y.S.2d 526, 528 (N.Y. App. Div. 1997). In order to obtain

---

[23] Given the strong rationale for not applying the doctrine of judicial estoppel here, the Court need not delve into the specific arguments advanced by Sagi or TPR in the course of their numerous years of prior litigation involving Orly and/or the TRI shares.

20-01187-jlg    Doc 1-52    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 54
Pg 126 of 150
Case 1:14-cv-05683-KBF    Document 94    Filed 01/05/15    Page 20 of 25

rescission of a contract due to mutual mistake, "it must be shown that the mistake in question is mutual, substantial, material and exists at the time the contract is entered." Rodriguez v. Mower, 56 A.D.3d 857, 858 (3d Dep't 2008) (citation omitted). In New York, a mutual mistake must be established by "clear and convincing" evidence. E.g., Carney v. Carozza, 792 N.Y.S.2d 642, 644 (N.Y. App. Div. 2005); Silver v. Gilbert, 776 N.Y.S.2d 867, 867 (N.Y. App. Div. 2004).

Orly first argues that if the 2004 Integrated Agreement is valid, it should nevertheless be rescinded because there was a mutual mistake as to whether Sagi and Orly were being treated equally in their parents' divorce. This argument fails because there was no mistake of fact here—the 2004 Divorce Stipulation and the 2004 Integrated Agreement explicitly provide for equal treatment of Orly and Sagi.

Orly further argues that the parties were mutually mistaken with regard to whether the interests in the TRI shares could be validly transferred to their trusts, such that they would receive equal interests in the TRI shares. This argument too fails, because as established above, the parties were in fact only mistaken as to their ability to receive and/or monetize record ownership in the TRI shares, and this mistake was not substantial or material because the money was clearly in the beneficial interest—Orly monetized her beneficial interest in the Orly Trust shares for $32.3 million, while Sagi sold his interests in the TRI shares for $37.0 million.

In any event, rescission due to mutual mistake is an equitable remedy, and it would not serve the interests of equity to rescind the 2004 Integrated Agreement here, as doing so would enable Orly to obtain her benefit from the agreement (the

20

20-01187-jlg   Doc 1-52   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 54
Pg 127 of 150
Case 1:14-cv-05683-KBF   Document 94   Filed 01/05/15   Page 21 of 25

$32.3 million she received for the beneficial interest in the TRI shares) while

escaping her obligations under it (her commitment to financially support her

mother). Accordingly, the Court declines to rescind the contract under the doctrine

of mutual mistake.

3.      Lack of opportunity to defend.

Orly argues that as an indemnitor she has no contractual duty to indemnify

Sagi without first receiving notice and a chance to defend. Under New York law, an

indemnitee cannot seek reimbursement from an indemnitor unless the indemnitee

first notifies the indemnitor of a potentially covered claim and gives them an

opportunity to defend against it. See Chase Manhattan Bank v. 264 Water St.

Assocs., 634 N.Y.S.2d 687, 689 (N.Y. App. Div. 1995). However, notice to the

indemnitor is not required if an indemnitee can "establish that [it] would have been

liable and that there was no good defense to that liability." Deutsche Bank Trust

Co. of Ams. v. Tri-Links Inv. Trust, 900 N.Y.S.2d 246, 253 (N.Y. App. Div. 2010).

Although the parties do not dispute that Sagi twice informed Orly and her

counsel of Dalia's demand prior to paying Dalia, they do dispute whether Sagi

informed Orly of his intention actually to honor Dalia's demand. (See DRSOF ¶ 7;

PRSOF ¶ 61.) Ultimately, however, even if Sagi did fail to properly notify Orly,

notice was not required as a matter of law because Sagi had no good defense against

Dalia's demand—the 2004 Integrated Agreement expressly gives Dalia the right to

make such a demand and clearly obligates Sagi to pay it, and as established above

there is no valid argument against the agreement's enforceability or validity.

Accordingly, the parties' dispute over whether Sagi properly provided Orly with

20-01187-jlg    Doc 1-52    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 54
Pg 128 of 150
Case 1:14-cv-05683-KBF    Document 94    Filed 01/05/15    Page 22 of 25

notice does not preclude this Court from granting Sagi summary judgment as to the validity of the indemnification obligation as a matter of law.

C.    Performance, Breach, and Damages

The parties do not dispute that Sagi performed his obligations under the 2004 Integrated Agreement, as it is undisputed that Sagi paid Dalia $200,000. There is also no dispute as to whether Orly breached the 2004 Indemnity by refusing to pay Sagi, and nor is there a dispute that Sagi suffered damages of at least $100,000 as a result. Accordingly, because the 2004 Integrated Agreement is valid and enforceable, there is no triable issue as to whether all of the elements of Sagi's breach of contract claim are satisfied, and summary judgment is thus granted in Sagi's favor as to his breach of contract claim.

D.    Promissory Estoppel

Even if the 2004 Integrated Agreement were not valid and enforceable, Sagi is also entitled to equitable relief under the doctrine of promissory estoppel. "A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance."[24] Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000) (citing Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 301 (2d Cir. 1996)).

---

[24] "New York courts limit promissory estoppel claims to instances of unconscionable injury only where promissory estoppel is invoked as a defense to the Statute of Frauds. . . . But New York courts generally do not require a showing of unconscionability where promissory estoppel is invoked to prevent injustice stemming from reliance on a gratuitous promise." Pearce v. Manhattan Ensemble Theatre, Inc., 528 F. Supp. 2d 175, 181 (S.D.N.Y. 2007) (collecting cases).

20-01187-jlg   Doc 1-52   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 54
Pg 129 of 150
Case 1:14-cv-05683-KBF   Document 94   Filed 01/05/15   Page 23 of 25

In the 2004 Indemnity, Orly made a clear and unambiguous promise to

indemnify Sagi for "one-half (1/2) of any and all payments, liabilities, damages,

claims, actions, losses, settlements, penalties, judgments or obligations . . . ,

including [Sagi's] reasonable counsel and other professional fees, expenses and

costs, which arise from [Sagi's] undertakings in the [2004 Promise]." (PSOF ¶ 5.)

There is no material dispute as to whether Sagi relied on this promise in paying

Dalia, or that he sustained injury as a result of this reliance.

However, Orly argues that Sagi's reliance was not reasonable or foreseeable,

because when he paid Dalia he was already aware that Orly disputed the validity

and enforceability of the 2004 Integrated Agreement. This argument is

unpersuasive. First, the time from which foreseeability is determined is when the

promise is made, not the time of performance, and there is no genuine dispute as to

whether it was foreseeable that Sagi would rely on the promise when it was made.

Second, there is no genuine dispute as to whether Sagi's reliance was reasonable,

because as explained above, Orly's position that the 2004 Integrated Agreement was

invalid and unenforceable objectively lacked merit.

Orly argues that Sagi should be barred from recovering under a theory of

promissory estoppel due to unclean hands. "The doctrine of unclean hands applies

when the complaining party shows that the offending party is guilty of immoral,

unconscionable conduct and even then only when the conduct relied on is directly

related to the subject matter in litigation and the party seeking to invoke the

doctrine was injured by such conduct." Kopsidas v. Krokos, 742 N.Y.S.2d 342, 344

23

20-01187-jlg    Doc 1-52    Filed 06/20/20    Entered 06/20/20 20:19:48    NoR part 54
Pg 130 of 150
Case 1:14-cv-05683-KBF    Document 94    Filed 01/05/15    Page 24 of 25

(N.Y. App. Div. 2002) (quoting Nat'l Distillers & Chem. Corp. v. Seyopp Corp., 17 N.Y.2d 12, 15-16 (N.Y. 1966)) (internal quotation marks omitted). Orly argues that Sagi's hands are unclean because under his Presidency, TPR was obligated to effectuate the transfer of the TRI shares to her, and failed to do so. However, on July 24, 2014, the Appellate Division of New York's First Judicial Department held that as an officer of TPR, Sagi's fiduciary duty was to the corporation and its stockholders, and that Sagi had not breached any duty to Orly in failing to honor the agreement to transfer the TRI shares to her trust. Genger v. Genger, 121 A.D.3d 270, 278-79 (N.Y. App. Div. 2014). Sagi's behavior here is consistent with his duty to TPR and its shareholders, and does not rise to the immoral or unconscionable level required to bar him from relief under the doctrine of unclean hands.

Accordingly, there is no triable issue as to Sagi's promissory estoppel claim, and Sagi is granted summary judgment on that cause of action in addition to his breach of contract cause of action.

IV.    CONCLUSION

For the above reasons, the Court GRANTS Sagi's motion for summary judgment, DENIES Orly's motion for summary judgment, and DENIES AS MOOT Orly's motion to disqualify and all pending motions in limine.

20-01187-jlg   Doc 1-52   Filed 06/20/20   Entered 06/20/20 20:19:48   NoR part 54
Pg 131 of 150
Case 1:14-cv-05683-KBF   Document 94   Filed 01/05/15   Page 25 of 25

The Clerk of Court is directed to close the motions at ECF Nos. 32, 35, 59, 65,

and 68 and to terminate this action.

SO ORDERED.

Dated:      New York, New York
            January 5, 2015

                                    _____
                                        KATHERINE B. FORREST
                                       United States District Judge

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

ARIE GENGER and ORLY GENGER, in her individual
capacity and on behalf of THE ORLY GENGER 1993 TRUST,

        Plaintiffs,

        - against -

SAGI GENGER, TPR INVESTMENT ASSOCIATES, INC.,
DALIA GENGER, THE SAGI GENGER 1993 TRUST,
ROCHELLE FANG, Individually and as Trustee of THE
SAGI GENGER 1993 TRUST, GLENCLOVA INVESTMENT
CO., TR INVESTORS, LLC, NEW TR EQUITY I, LLC,
NEW TR EQUITY II, LLC, JULES TRUMP, EDDIE TRUMP,
MARK HIRSCH, and TRANS-RESOURCES, INC.,

        Defendants.

---

SAGI GENGER, individually and as assignee of THE SAGI
GENGER 1993 TRUST, and TPR INVESTMENT
ASSOCIATES, INC.,

        Cross-Claimants, Counterclaimants, and
        Third Party Claimants,

        - against -

ARIE GENGER, ORLY GENGER, GLENCLOVA
INVESTMENT CO., TR INVESTORS, LLC, NEW TR
EQUITY I, LLC, NEW TR EQUITY II, LLC, JULES TRUMP,
EDDIE TRUMP, MARK HIRSCH, TRANS-RESOURCES,
INC., AND WILLIAM DOWD,

        Cross-Claim, Counterclaim, and/or
        Third Party Defendants.

---

INDEX NO. 651089/2010E

Hon. Barbara Jaffe

Part 12

Motion Sequence 32

**ORAL ARGUMENT**
**REQUESTED**

GLENCLOVA INVESTMENT CO., TR INVESTORS, LLC,
NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC,
JULES TRUMP, EDDIE TRUMP, MARK HIRSCH, and
TRANS-RESOURCES, INC.,

        Counterclaimants, Cross-Claimants, and
        Third Party Plaintiffs,

        - against -

ARIE GENGER, ORLY GENGER, SAGI GENGER, TPR
INVESTMENT ASSOCIATES, INC., THE SAGI GENGER
1993 TRUST, WILLIAM DOWD, ARNOLD BROSER,
DAVID BROSER, and ONE OR MORE ENTITIES
DIRECTED, OWNED OR CONTROLLED BY ARNOLD
BROSER AND/OR DAVID BROSER,

        Counterclaim, Cross-Claim, and/or
        Third Party Defendants.

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
TRANS-RESOURCES' AND THE TRUMP GROUP'S MOTION TO DISMISS FIRST
AMENDED ANSWER, COUNTERCLAIMS, CROSS-CLAIMS, AND THIRD PARTY
COMPLAINT OF SAGI GENGER, INDIVIDUALLY AND AS ASSIGNEE OF THE
SAGI GENGER 1993 TRUST, AND TPR INVESTMENT ASSOCIATES, INC.**

        SKADDEN, ARPS, SLATE,
        MEAGHER & FLOM LLP

Of Counsel:        William P. Frank
Thomas J. Allingham II        John Boyle
Anthony W. Clark        Four Times Square
Douglas D. Herrmann        New York, New York  10036
Christopher M. Foulds        (212) 735-3000
One Rodney Square        (212) 735-2000 (facsimile)
P.O. Box 636
Wilmington, Delaware  19899-0636        *Attorneys for Glenclova Investment Co.,*
(302) 651-3000        *TR Investors, LLC, New TR Equity I, LLC,*
(302) 651-3001 (facsimile)        *New TR Equity II, LLC, Jules Trump,*
        *Eddie Trump, Mark Hirsch and*
        *Trans-Resources*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT.............................................................................................................5

I.    THE TPR GROUP'S CLAIMS FOR FRAUD AND AIDING AND ABETTING
      FRAUD AGAINST TRANS-RESOURCES SHOULD BE DISMISSED. ...................5

      A.    The Alleged Representations Concerning The Free Transferability Of
            Shares Do Not Support A Claim For Fraud.............................................5

      B.    The Alleged Omissions Concerning The Funding Agreement Do Not State
            A Claim. ...........................................................................................9

      C.    The TPR Group Cannot Profit From Their Own Misconduct. ..............12

II.   THE COMPLAINT FAILS TO STATE ANY CLAIM FOR BREACH OF
      FIDUCIARY DUTY OR AIDING AND ABETTING SUCH A BREACH. ...................14

III.  THE COMPLAINT FAILS TO STATE CLAIMS FOR BREACH OF THE
      STOCKHOLDERS AGREEMENT. ...............................................................17

IV.   THE COMPLAINT FAILS TO STATE A CLAIM AGAINST TRANS-
      RESOURCES FOR TORTIOUS INTERFERENCE WITH THE TRANSFER
      AGREEMENT.........................................................................................19

V.    THE COMPLAINT FAILS TO STATE A CLAIM AGAINST TRANS-
      RESOURCES FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE
      BUSINESS RELATIONS. .........................................................................20

VI.   THE COMPLAINT FAILS TO STATE A CLAIM FOR CONTRIBUTION .................22

VII.  THE COMPLAINT FAILS TO STATE A CLAIM FOR INDEMNIFICATION. ...........23

VIII. THE TPR GROUP'S CLAIMS ARE TIME-BARRED. ....................................26

      A.    Both Tortious Interference Claims Are Barred By The Statute Of
            Limitations .....................................................................................26

      B.    The Fraud Claims And The Breach Of Contract Claims Are Barred By
            The Statute Of Limitations:...............................................................27

IX.   THE TPR GROUP SHOULD NOT BE GRANTED LEAVE TO REPLEAD.................29

CONCLUSION..........................................................................................................30

i

## TABLE OF CASES AND AUTHORITIES

**CASES**          **PAGE(S)**

*420 East Associates v. Kerner,*
    438 N.Y.S.2d 316 (1st Dep't 1981)...............................................................19

*Aldrich v. Marsh & McLennan Companies, Inc.,*
    861 N.Y.S.2d 30 (1st Dep't 2008) ...............................................................28

*Arnold v. Society for Savings Bancorp., Inc.,*
    678 A.2d 533 (Del. 1996) ...........................................................................15

*Barrett v. Freifeld,*
    908 N.Y.S.2d 736 (2d Dep't 2010) ..............................................................15

*Basic, Inc. v. Levinson,*
    485 U.S. 224 (1988)..............................................................................11, 12

*Beverly v. Acme Scaffold Co.,*
    160 N.Y.S.2d 907 (N.Y. Sup. Ct. 1957).......................................................12

*Brooklyn Union Gas Co. v. Interboro Surface Co., Inc.,*
    449 N.Y.S.2d 274 (2d Dep't 1982) ..............................................................29

*Buller v. Giorno,*
    868 N.Y.S.2d 639 (1st Dep't 2008)...............................................................26

*Cerra v. Scher Fabrics, Inc.,*
    748 N.Y.S.2d 483 (1st Dep't 2002) ..............................................................30

*Davis v. Breadstreet Holdings Corp.,*
    No. 117455/06, 2012 WL 1241000 (N.Y. Sup. Ct. Mar. 30, 2012) (ORDER) ..................7

*DePetris & Bachrach, LLP v. Srour,*
    898 N.Y.S.2d 4 (1st Dep't 2010) ..................................................................19

*Eastman Kodak Co. v. Roopak Enterprises, Ltd.,*
    608 N.Y.S.2d 445 (1st Dep't 1994) ................................................................6

*Freeman v. City of New York,*
    975 N.Y.S.2d 141 (2d Dep't 2013)................................................................29

*Genger v. Genger,*
    966 N.Y.S.2d 346, 2013 WL 221485
    (N.Y. Sup. Ct. Jan. 3, 2013) (TABLE) ...................................................23, 24

*Hetchkop v. Woodlawn at Grassmere, Inc.*,
    116 F.3d 28 (2d Cir. 1997)............................................................................................10

*Hicinbothem v. Natural Golf Corp.*,
    697 N.Y.S.2d 760 (3d Dep't 1999).................................................................................17

*Jaffe v. Gordon*,
    658 N.Y.S.2d 612 (1st Dep't 1997)................................................................................19

*Lama Holding Co. v. Smith Barney Inc.*,
    88 N.Y.2d 413 (N.Y. 1996) ............................................................................................19

*Laub v. Faessel*,
    745 N.Y.S.2d 534 (1st Dep't 2002) ..................................................................................9

*Mashreqbank PSC v. Ahmad Hamad Algosaibi & Brothers Co.*,
    975 N.Y.S.2d 710, 2013 WL 3782228 (N.Y. Sup. Ct. July 18, 2013) (TABLE)..............12

*Mayer v. Sanders*,
    695 N.Y.S.2d 593 (2d Dep't 1999).................................................................................23

*McArthur v. J.M. Main Street, Inc.*,
    847 N.Y.S.2d 233 (2d Dep't 2007).................................................................................16

*MediaXposure Ltd. (Cayman) v. Omnireliant Holdings, Inc.*,
    918 N.Y.S.2d 398, 2010 WL 4225939 (N.Y. Sup. Ct. Oct. 25, 2010) (TABLE) .............17

*Nixon Peabody LLP v. de Senihles, Valsamdidis, Amsallem, Jonath, Flaicher Associates*,
    873 N.Y.S.2d 235, 2008 WL 4256476 (N.Y. Sup. Ct. 2008) (TABLE) ...............................19

*Oneida Indian Nation v. Hunt Construction Group, Inc.*,
    970 N.Y.S.2d 156 (4th Dep't 2013)................................................................................29

*Oneida of Thames Band v. State of New York*,
    757 F.2d 19 (2d Cir. 1985).............................................................................................13

*Orlando v. Kukielka*,
    836 N.Y.S.2d 252 (2d Dep't 2007)...................................................................................8

*PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*,
    857 A.2d 998 (Del. Ch. 2004).........................................................................................13

*Patmos Fifth Real Estate Inc. v. Mazl Building LLC*,
    975 N.Y.S.2d 711, 2013 WL 3942115 (N.Y. Sup. Ct. July 29, 2013) (TABLE)................8

*Procapui-Productores de Camaroes de Icapui Ltda. v. Leyani*,
    No. 07-CV-6627 (BSJ), 2010 WL 2720584 (S.D.N.Y. June 22, 2010) ............................21

*Reis v. Hazelett Strip-Casting Corp.*,
    28 A.3d 442 (Del. Ch. 2011) ......................................................................15

*Rojas v. Paine*,
    956 N.Y.S.2d 81 (2d Dep't 2012) ...............................................................9

*Rosado v. Proctor & Schwartz, Inc.*,
    483 N.Y.S.2d 271 (1st Dep't 1984), *aff'd*, 66 N.Y.2d 21(N.Y. 1985) .............25

*Rotanelli v. Madden*,
    569 N.Y.S.2d 187 (2d Dep't 1991) ...............................................................6

*Savannah Bank v. Savings Bank of Fingerlakes*,
    691 N.Y.S.2d 227 (4th Dep't 1999).........................................................19, 20

*St. George Hotel Associates v. Shurkin*,
    786 N.Y.S.2d 56 (2d Dep't 2004).............................................................29

*Susman v. Commerzbank Capital Markets Corp.*,
    945 N.Y.S.2d 5 (1st Dep't 2012) ...............................................................26

*The Laurel Hill Advisory Grp., LLC v. American Stock Transfer & Trust Co.*,
    No. 6518322011, 2012 WL 10008211 (N.Y. Sup. Ct. Aug. 27, 2012) ...............6

*In re T.J. Ronan Paint Corp.*,
    469 N.Y.S.2d 931 (1st Dep't 1983) ...............................................................26

*TR Investors, LLC v. Genger*,
    C.A. No. 6697-CS, 2013 WL 603164 (Del. Ch. Feb. 18, 2013)..........3, 8, 13, 18

*TR Investors, LLC v. Genger*,
    C.A. No. 3994-CS, 2010 WL 2901704 (Del. Ch. July 23, 2010) ............1, 3, 15

*TR Investors, LLC v. Genger*,
    C.A. No. 3994-CS (Del. Ch. Sept. 18, 2009) (TRANSCRIPT)........................16

*Viacom Outdoor Inc. v. Wixon Jewelers, Inc.*,
    919 N.Y.S.2d 151 (1st Dep't 2011) .........................................................12, 13

*Village On Canon v. Bankers Trust Co.*,
    920 F. Supp. 520 (S.D.N.Y. 1996) ...............................................................6

*Watts v. Exxon Corp.*,
    594 N.Y.S.2d 443 (3d Dep't 1993).............................................................28

*Worcester Creameries Corp. v. City of New York*,
    861 N.Y.S.2d 198 (3d Dep't 2008).............................................................18

## STATUTES AND RULES

CPLR 213................................................................................................................27, 28

8 *Del. C.* § 342 ...............................................................................................…..15

## OTHER AUTHORITIES

Black's Law Dictionary (7th ed. 1999).........................................................…..10

McKinney's Consolidated Laws of New York Annotated
    General Obligations Law Section 15-108(b) ...............................................22, 23

The Trump Group[1] and Trans-Resources submit this reply memorandum in response to the TPR Group's Memorandum of Law in Opposition to (A) Trans-Resources' Motion to Dismiss the First Through Fourth Cross-Claims, and (B) Trans-Resources' and the Trump Group's Motion to Dismiss the Fifth Cross-Claim for Contribution and Indemnification (the "Opposition Brief" and cited herein as "Opp'n Br. at ___").

## PRELIMINARY STATEMENT

The Opposition Brief illustrates exactly why the Trump Group and Trans-Resources bargained with TPR for a Stockholders Agreement that prevented any transfer of TPR's Trans-Resources stock to Sagi Genger or any of Sagi's affiliates. Because TPR nevertheless sought to transfer Trans-Resources stock to the Sagi Trust, in direct violation of the Stockholders Agreement (which Sagi negotiated and TPR signed), the Trump Group and Trans-Resources have been mired in six years of sordid Genger family litigations, including this one. This is the exact result that the Stockholders Agreement's transfer prohibition was designed to prevent. In language that squarely applies here, then-Vice Chancellor (now Chief Justice) Strine held that "if [the] violation of the Stockholders Agreement has deepened the Genger Family's internecine feud, that is unfortunate. But it is not the Trump Group's problem, nor is it a basis for an appeal to this court's sense of equity." *TR Investors, LLC v. Genger*, C.A. No. 3994-VCS, 2010 WL 2901704, at *18 (Del. Ch. July 23, 2010). The Complaint and the TPR Group's improper attempt to supplement their allegations in the Complaint with new allegations and the incorporation of over 20 new exhibits in the Opposition Brief amplify the now-Chief Justice's holding that TPR's violation enhanced the Genger family's desire to litigate with one another until the end of time and that none of their problems actually include Trans-Resources or the Trump Group.

---

[1]    Unless otherwise noted, all capitalized terms have the same meanings as in the Trump Group's Memorandum of Law in Support of Trans-Resources' and the Trump Group's Motion to Dismiss (the "Trump Brief" and cited herein as "Trump Br. at ___").

The overarching issue infecting all of the TPR Group's claims and many arguments is their failure to acknowledge the actual cause of any injury to them. To borrow the TPR Group's analogy, an arsonist should not complain when he burns down his own house. (*See* Opp'n Br. at 3). Yet that is exactly what Sagi and the TPR Group are doing – as explained in the Opening Brief, the Complaint contains facially defective claims against Trans-Resources and the Trump Group *to recover alleged damages that the TPR Group inflicted upon themselves*. For all of their claims, the TPR Group insist that the Trump Group's contractual right under the Stockholders Agreement to purchase the so-called Sagi Trust Trans-Resources shares as the result of TPR's breach "is the injury." (Opp'n Br. at 26 (underlining in original)). Said differently, according to the TPR Group, the alleged injury is that the so-called Sagi Trust Trans-Resources shares were "encumbered" by the Trump Group's purchase rights. (Opp'n Br. at 11-12 (underlining in original)). It was *TPR's breach* that ignited those purchase rights.

For this claimed injury, the TPR Group seek damages equal to the difference between (i) the $26 million the Trump Group agreed to pay for the shares after the breach came to light (which at the time the TPR Group gladly accepted as "fair, reasonable and acceptable" and without qualification as to an "encumbrance" or otherwise), and (ii) a hypothetical value that the TPR Group now believe those shares would have been worth *if the TPR Group had not breached the Stockholders Agreement*. But the law does not permit the collection of damages resulting from one's own breach. For this reason alone, all of the TPR Group's claims should (and respectfully must) be dismissed.

In various places, the Opposition Brief insinuates that there is an open question as to whether TPR breached the Stockholders Agreement, or even whether the Sagi Trust was a permitted transferee. (*See, e.g.*, Opp'n Br. at 23 ("[The Trump Group] claims the Sagi Trust was not a permitted transferee, but any such judicial finding was [not] made in a case to which the Sagi Trust was a party."); *id.* at 11 n.4 ("suggest[ing] a possible defense to the Purchase

2

Rights")).  But there can be no dispute that TPR breached the Stockholders Agreement when it
purported to transfer shares to the Sagi Trust.

For starters, the TPR Group concede that "the Sagi Trust was not a 'Permitted Transfer-
ee' under the Stockholders Agreement. . . ." (Opp'n Br. at 6-7).  And, TPR has previously ar-
gued to the Delaware Court of Chancery that "[Arie] caused *TPR to violate the Stockholders
Agreement* by transferring, without any notice . . . 1102.8 shares to a trust for Sagi." (Ex. 1 at 6
(emphasis added)).[2]  The Delaware courts agreed.  *See TR Investors, LLC v. Genger*, C.A. No.
6697-CS, 2013 WL 603164, at *1 (Del. Ch. Feb. 18, 2013)  ("[T]he transfer of the Trans-
Resources stock out of TPR *violated the terms of the Stockholders Agreement that TPR had
signed* with the Trump Group.") (emphasis added).

In the TPR Group's own words, that breach by TPR meant that "under the Stockholders
Agreement, the Trump Group had the right to purchase the transferred [Trans-Resources] Shares
at their 2004 values." (Opp'n Br. at 10 (underlining in original)).  When the Trump Group began
to exercise these rights in the summer of 2008, the Trump Group agreed to compromise such
rights to purchase the so-called Sagi Trust shares at 2004 values.  As the Delaware courts found,
"the Trump Group was giving up its right to purchase the shares from TPR at 2004 prices, which
likely would have allowed the Trump Group to obtain the Shares for *much less* than the approx-
imately $26 million it paid to purchase the Sagi Shares." *TR Investors, LLC v. Genger*, 2010 WL
2901704, at *17 (emphasis added).  The TPR Group also admit that the Trump Group were enti-

---

[2]     A copy of the pleading is attached as Exhibit 1 to the Affirmation of John Boyle in Support of The Reply
Memorandum of Law in Further Support of Trans-Resources' and The Trump Group's Motion to Dismiss First
Amended Answer, Counterclaims, Cross-Claims, and Third Party Complaint of Sagi Genger, Individually and as
Assignee of The Sagi Genger 1993 Trust, and TPR Investment Associates, Inc.(the "Boyle Affirmation") submitted
herewith. Copies of other documents relied upon in the Complaint and other documents that the Court may consider
are similarly attached as exhibits to the Boyle Affirmation. The exhibits to the Boyle Affirmation are cited herein as
"Ex. __".

tled "to purchase the TRI shares at 2004 market value" and "could have claimed a lower market value" than what it ultimately paid. (Compl. ¶ 28).

Given these admissions, it is unsurprising that the TPR Group confirmed in 2008 (without qualification or carve-outs) that $26 million was "fair, reasonable and acceptable to each [of] the [Sagi Trust], TPR and Sagi Genger." (Trump Br. at 2 (emphasis omitted)). Indeed, the TPR Group states in their brief that they "settle[d] with the Trump Group for the *maximum* that it could hope to recover in litigation. . . ." (Opp'n Br. at 11 (emphasis added)). These voluntary concessions conclusively rebut the TPR Group's current reckless allegation that the Trump Group stole the so-called Sagi Trust Trans-Resources shares, or somehow wrongfully bought them for "pennies on the dollar." These accusations are particularly indefensible given that (i) the Sagi Trust claims to have owned the shares solely as the result of what Sagi must have known (having participated in the negotiation of the Stockholders Agreement) was a void transfer, and (ii) the Sagi Trust either received the shares as a gift or paid *at most* $1.00 for the shares that TPR then sold to the Trump Entities for $26 million. (Trump Br., Ex. G). Sagi (the TPR executive who both executed the violative transfer, and participated in negotiating the Stockholders Agreement that such purported transfers violated) and TPR (the party that breached the Stockholders Agreement) are suing to recover damages for an injury that they caused.

All of the TPR Group's many arguments (which are addressed in turn below) depend on ignoring the consequences of their own actions. For this reason and for all the reasons explained below and in the Trump Brief, the Trump Group respectfully urge this Court to dismiss the Complaint.

4

## ARGUMENT

### I.    THE TPR GROUP'S CLAIMS FOR FRAUD AND AIDING AND ABETTING FRAUD AGAINST TRANS-RESOURCES SHOULD BE DISMISSED.

In their opening brief, the Trump Group show that the Complaint fails to state a claim for fraud and aiding and abetting fraud against Trans-Resources. (*See* Trump Br. at 13). Under New York law, a cause of action for fraud requires a plaintiff to plead with specificity that a defendant made a material representation of existing fact that was false and known by the defendant to be false when made, for the purpose of inducing plaintiff's reliance, which the plaintiff justifiably relied upon, and by which, as a proximate cause of such justifiable reliance, the plaintiff was damaged. (*Id.*) The Complaint's allegations fall well short of this burden.

#### A.    The Alleged Representations Concerning The Free Transferability Of Shares Do Not Support A Claim For Fraud.

The Trump Brief correctly argued that the TPR Group could not state a claim for fraud against Trans-Resources based on statements Arie made in his personal capacity. (Trump Br. at 12-16). The TPR Group concede this point. (Opp'n Br. at 18 ("Arie's lies in his divorce settlement . . . is [sic] an aspect of TPR's and Sagi's Counterclaim against Arie but not the Cross-Claims against [Trans-Resources].")). Accordingly, the TPR Group have abandoned any claim of reliance on Arie's misrepresentations in the MSA as against Trans-Resources. (*Compare* Trump Br. at 5 *with* Opp'n Br. at 18).

Recognizing that Arie's personal representations are not actionable, the TPR Group nevertheless argue that they were hoodwinked based upon their reliance on a boilerplate legend stamped on a stock certificate. (Opp'n Br. at 17). To support this argument, the TPR Group first claim that the stock certificate issued to the Sagi Trust stated the shares were "freely transferable." (Opp'n Br. at 17; *see also* Opp'n Br. at 5). That is factually incorrect; the word "freely" appears nowhere on the stock certificate the TPR Group attached to the Opposition Brief (but not to the Complaint). Instead, the stock certificate simply includes a boilerplate legend about trans-

ferring stock on the Trans-Resources stock ledger. But, even if the stock certificate had said that
the shares were freely transferable, the TPR Group could not, as matter of law, have justifiably
relied on a generic stock certificate legend to override the express terms of the Stockholders
Agreement. (*See* Trump Br. at 14-15).

The TPR Group next argues that they "did not know" the Stockholders Agreement had
been violated. (Opp'n Br. at 17). But the TPR Group do not (and cannot) allege that their mem-
bers were unfamiliar with the transfer restrictions in the Stockholders Agreement. (*See* Opp'n Br.
at 17). TPR signed, and was a party to, the Stockholders Agreement, and Sagi (the individual
who consummated the improper transfers on behalf of TPR) helped to negotiate it. (*See* Trump
Br. at 6). Accordingly, the TPR Group's fraud and aiding and abetting claims fail as a matter of
law, since the TPR Group may not rely on the stock certificate's legend when they know such
terms contradict the Stockholders Agreement. *See Vill. on Canon v. Bankers Trust Co.*, 920 F.
Supp. 520, 530-31 (S.D.N.Y. 1996) (holding that a party to a contract is presumed to have read it,
and rejecting argument that such party relied on representations that contradicted the terms of
that contract); *Rotanelli v. Madden*, 569 N.Y.S.2d 187, 188 (2d Dep't 1991) (same). Tellingly,
the TPR Group do not plead when (if ever) any of their members first saw the stock certificate or
who, if anyone, actually read the legend and relied on it.[3] *See Eastman Kodak Co. v. Roopak
Enters., Ltd.*, 608 N.Y.S.2d 445, 446 (1st Dep't 1994) (dismissing fraud claim because, among
other things, party failed to allege with sufficient particularity the timing of purported misrepre-
sentations); *The Laurel Hill Advisory Grp., LLC v. Am. Stock Transfer & Trust Co.*, No.
6518322011, 2012 WL 10008211, at *6 (N.Y. Sup. Ct. Aug. 27, 2012) ("Despite a thirty-page

---

[3]    Notably, no member of the TPR Group, including Sagi, was able to produce the stock certificate at the clos-
ing on the Stock Purchase Agreement on August 22, 2008. The Trump Entities, therefore, insisted on escrowing
most of the sale proceeds until the stock certificate could be produced.

complaint, Mr. Siemann does not give even an approximate date, time, or location of the alleged misrepresentation. . . . This is fatal to his claim.").

The TPR Group also insist in the Opposition Brief (but again do not allege in their Complaint) that Arie's knowledge must be imputed to Trans-Resources, and that Trans-Resources is thus chargeable with knowing that the statement on the share certificate was false. (Opp'n Br. at 18-19). Even if this were alleged in the Complaint (it was not), then by the same logic Arie's knowledge must also be imputed to TPR (as Arie was an officer and director of TPR at the time TPR purportedly transferred its Trans-Resources' shares).

The TPR Group's argument is not saved by their allegation that Arie used his control over TPR to pass "a Board Resolution authorizing TPR to transfer" the shares. (Compl. ¶ 16.) It is telling that the TPR Group now state that TPR "unwittingly" violated the Stockholders Agreement when overlapping management at Trans-Resources and TPR "had contemporaneous knowledge," but "did not cause the company [TPR] to provide the requisite notice to the Trump Group." (Opp'n Br. at 6). This cavalier approach to pleading one thing, but arguing another should not be condoned. The TPR Group's attempt to impute Arie's knowledge to an entity of which he is an officer only when convenient (as it is with Trans-Resources), but not when such imputation is harmful to their position (as it is with TPR) should be rejected. Thus, even if the Court finds that Arie's knowledge somehow could be imputed to Trans-Resources, then, respectfully, it should equally find that his knowledge is imputed to TPR. In any event, TPR must have acted with its eyes wide open, and could not therefore have been defrauded.

Moreover, the TPR Group cannot credibly suggest that they were unaware of the Stockholders Agreement's prohibition on transfers without notice, or that Sagi, as President of TPR, lacked the obligation or ability to confirm (or discover) whether TPR had provided the contractually required notice, since (i) TPR was a party to the Stockholders Agreement, and (ii) Sagi, as its President, signed the Transfer Agreement on TPR's behalf and participated in negotiating the

7

Stockholders Agreement. (*See* Trump Br. at 6). The TPR Group does not dispute these points, and therefore concedes them. *See also Davis v. Breadstreet Holdings Corp.*, No. 117455/06, 2012 WL 1241000 (N.Y. Sup. Ct. Mar. 30, 2012) (ORDER) ("[P]laintiffs' 'failure to address this issue in its responding brief indicates an intention to abandon [these] [bases] of liability. . . .'") (alteration in original) (quoting *Gary v. Flair Beverage Corp.*, 875 N.Y.S.2d 4, 6 (1st Dep't 2009)); *Patmos Fifth Real Estate Inc. v. Mazl Bldg. LLC*, 975 N.Y.S.2d 711, 2013 WL 3942115, at *9 (N.Y. Sup. Ct. July 29, 2013) (TABLE) (finding plaintiffs failed to state a claim because "a claim is deemed abandoned if the party asserting it fails to oppose the branch of a motion to dismiss it. . . .") (citations omitted).

It is even more revealing that the TPR Group now maintain that the Sagi Trust "did not realize [the lack of required notice], since Arie had 'represent[ed] falsely in the divorce settlement that the 2004 Transfers were not made in violation of any agreement.'" (Opp'n Br. at 6). But, the TPR Group explicitly disclaimed relying on Arie's statements in the MSA for its claims against the Trump Group so as not to have those statements attributed to Arie as an officer of TPR. (*See* Opp'n Br. at 18 ("Arie's lies in his divorce settlement . . . is [sic] an aspect of TPR's and Sagi's Counterclaim against Arie but not the Cross-Claims against TRI.")). In this respect, the TPR Group's failure to meet their burden concerning their reliance can (and respectfully should) be decided as a matter of law. *See Orlando v. Kukielka*, 836 N.Y.S.2d 252, 255 (2d Dep't 2007) (finding reliance "unreasonable as a matter of law" where plaintiff had the means to determine the truth).

Lastly, the TPR Group have not pleaded any proximate causation connecting the alleged misrepresentations to their claimed injury. The TPR Group's claimed injury is that the Sagi Trust had to sell its Trans-Resources shares at a discount because the shares were "encumbered" by the Trump Group's contractual right to purchase the shares. (Opp'n Br. at 11-12 (underlining in original)). However, the Delaware courts explicitly held that the Sagi Trust did not sell the

8

shares; TPR did. *See, e.g., TR Investors, LLC v. Genger*, 2013 WL 603164, at *10 ("[T]he Su-

preme Court explicitly and implicitly affirmed the three essential grounds on which my decisions

had rested: (1) that Genger had transferred the Trans-Resources stock out of TPR in violation of

the Stockholders Agreement, (2) that this stock reverted to TPR, and (3) that the Trump Group

had the right to buy this stock *from TPR*.") (emphasis added).  In addition, the cause of the "<u>en-

cumbrance</u>" was not the legend on the stock certificate; rather, the "encumbrance" was caused by

TPR's own breach of the Stockholders Agreement, which triggered the Trump Group's contrac-

tual purchase rights.  The TPR Group cannot hold the Trump Group liable for TPR's self-

inflicted harm. *See Laub v. Faessel*, 745 N.Y.S.2d 534, 537 (1st Dep't 2002) (dismissing fraud

claim where plaintiff failed to allege that the defendant's purported misrepresentations, rather

than another factor, caused the plaintiff's losses; and denying leave to replead, because amend-

ments to the complaint would not change such fundamental deficiency in the plaintiff's claims).

### B.    The Alleged Omissions Concerning The Funding Agreement Do Not State A Claim.

The TPR Group also incorrectly argue that Trans-Resources committed a fraud when, af-

ter execution of the Stockholders Agreement, "[Trans-Resources'] management actively con-

cealed from [the TPR Group] a series of events in 2008 that were highly material to the Sagi

Trust Shares, including [Trans-Resources'] scheme to strip the Sagi Trust of its shares, its reneg-

ing on the Funding Agreement, and the Trump Group's decision to invoke their Purchase Rights

in retaliation." (Opp'n Br. at 17-18).

*First*, for the reasons detailed in the Trump Brief (Trump Br. at 15-16), the TPR Group's

fraud claim should be dismissed because Trans-Resources did not owe any duty of disclosure to

Sagi or the Sagi Trust, because neither was ever a valid stockholder of Trans-Resources. *See,

e.g., Rojas v. Paine*, 956 N.Y.S.2d 81 (2d Dep't 2012) (dismissing fraudulent concealment claim

for lack of duty).  In response, the TPR Group insist that Trans-Resources owed a duty of disclo-

sure to the Sagi Trust because "[t]he Sagi Trust was the beneficial owner of the Sagi Trust

Shares until the Courts invalidated those transfers *in 2011, at which point* the shares reverted to

TPR." (Opp'n Br. at 20 (emphasis added)).  That statement is inaccurate.

     The TPR Group is incredibly mistaken in claiming "the Chancery Court and this Court

have held on multiple occasions that the Sagi Trust was the beneficial owner." (Opp'n Br. at 25

(citing Dellaportas Aff.[4] Ex. H, Stipulation and Proposed Order of Dismissal, *Genger v. TR In-*

*vestors, LLC*, C.A. No. 6906-CS (Del. Ch.) ¶ 1; Dellaportas Aff. Ex. I, Final Judgment Order, *TR*

*Investors LLC v. TPR Inv. Assoc., Inc.*, C.A. No. 6697-CS (Del. Ch.) ¶ 4).  Neither of the exhib-

its cited by the TPR Group in the Opposition Brief (but not referred to in, or attached to, the

Complaint) states that an impermissible transferee (including the Sagi Trust, Arie or the Orly

Trust) was a "beneficial owner" at any time.  Rather, the TPR Group's exhibits state that the

transfers were "void" and that the Trans-Resources stock at all times belonged to TPR.

(Dellaportas Aff. Ex. H, ¶ 2; Dellaportas Aff. Ex. I, ¶ 4)  As consequence, the transfers never

happened, the Sagi Trust's stock certificate would be voided, and Trans-Resources' books should

be corrected to reflect that the transfers were void.

     Even if the Sagi Trust really was a "beneficial owner" as a result of the invalid transfer

(which it could not have been), the Stockholders Agreement is "binding upon . . . transferees."

(Opp'n Br. at 23).  The Stockholders Agreement states that violative transfers are "void," which

means as a legal matter they never happened.  *See Hetchkop v. Woodlawn at Grassmere, Inc.*,

116 F.3d 28, 32 (2d Cir. 1997) (a void contract is a "nullity"); Black's Law Dictionary (7th ed.

1999) (defining void as "of no legal effect").  Indeed, as the TPR Group admit on the face of the

Complaint, "the Stockholders Agreement restricted the transfer of TRI shares. . . .  A transfer

that failed to comply with [the Stockholders Agreement's transfer] restrictions and the prior no-

---

[4]    "Dellaportas Aff." means the Affirmation of John Dellaportas dated March 28, 2014 (D.I. 845).

tice requirement would ***automatically*** be deemed ***invalid and void. . . .*" (Compl. ¶ 13 (emphasis added)). Because the TPR Group concede that any impermissible transfer is "automatically" void, the transfers were void at the time they were made in 2004 (as was found by the Delaware courts). Any other result would allow the breaching party to obtain the benefits of its own breach, and the TPR Group cite no authority that would support such a result.

*Second*, the Trump Brief established that the Complaint fails to state a claim against Trans-Resources for failing to disclose to the TPR Group that the Funding Agreement was being discussed, or that it thereafter had been tabled. (Trump Br. at 12-13). The TPR Group concede that the Funding Agreement was never an enforceable agreement because it was never finalized. (Opp'n Br. at 20-21). But even if the Funding Agreement had been finalized (which it was not) and there was a duty of disclosure owed to the TPR Group (which there was not), the TPR Group's claim would still fail – because any disclosure would have had no impact on the Trump Group's contractual purchase rights under the Stockholders Agreement. As explained in the Trump Brief, the draft Funding Agreement does not so much as mention the so-called Sagi Trust Shares, or the Trump Entities' "Purchase Rights" emanating from TPR's breach of the Stockholders Agreement.[5] (*See* Trump Br. at 16). And, even if the Funding Agreement had been finalized, the Trump Group retained the independent right under the Stockholders Agreement to void the transfer of the so-called Sagi Trust Shares and to purchase those shares at their 2004 value.

*Finally*, Trans-Resources neither issued affirmatively false statements to the TPR Group concerning the Funding Agreement, nor made incomplete statements that could have triggered a duty to disclose more. The TPR Group's only cited authority, *Basic, Inc. v. Levinson*, 485 U.S.

---

[5]    At the only Trans-Resources board meeting where the Funding Agreement was discussed, the minutes recite that Arie noted the 2004 Transfers were made in violation of the Stockholders Agreement without suggestion that such violation would be waived in connection with the unfinished Funding Agreement. Indeed, it was expressly noted that the Stockholders Agreement violation would need to be addressed at a later date.

11

224, 236 (1988), proves the point. (Opp'n Br. at 20-21). There, a corporation affirmatively is-sued a "public denial of merger activity and the suspension of trading in Basic stock just prior to the merger announcement." 485 U.S. at 224. By contrast, the most the TPR Group allege is that Trans-Resources never disclosed anything about the Funding Agreement. Accordingly, the TPR Group fail to state a claim for fraud based on disclosure of the negotiations surrounding the po-tential Funding Agreement.

### C.    The TPR Group Cannot Profit From Their Own Misconduct.

As the Trump Group previously explained (Trump Br. at 14), the *in pari delicto* doctrine is an appropriate grounds for dismissal where a wrongdoer asserts a tort claim against another who is alleged to have participated in the wrong. *See Mashreqbank PSC v. Ahmad Hamad Algo-saibi & Bros.*, 975 N.Y.S.2d 710, 2013 WL 3782228, at *4-5 (N.Y. Sup. Ct. July 18, 2013) (TABLE) (explaining "[t]he doctrine of *in pari delicto* mandates that a wrongdoer cannot assert a tort claim against another who participated in the wrong," and dismissing fraud counterclaim for failure to state a claim); *see also Beverly v. Acme Scaffold Co.*, 160 N.Y.S.2d 907, 909 (N.Y. Sup. Ct. 1957) (granting motion to dismiss third party complaint under *in pari delicto* doctrine). In response, the TPR Group argue that "TRI does not specify . . . any immoral or unconscionable conduct by TPR." (Opp'n Br. at 18-19). But the TPR Group's own Complaint concedes that TPR agreed to the impermissible transfers, in direct contravention of a binding agreement (here the Stockholders Agreement). (Compl. ¶ 16). Indeed, TPR was a knowing, direct participant in the impermissible transfers, whereas Trans-Resources could only have any knowledge imputed to it through the knowledge of its Chairman (Arie), who was acting in his own personal capacity without disclosing the transfers to the Trans-Resources' board of directors. Moreover, it was TPR that failed to disclose the impermissible transfers and kept them secret for years.

This highlights the Trump Group's fundamental argument that the TPR Group cannot claim entitlements under a contract that they intentionally breached. *See Viacom Outdoor Inc. v.*